**No. 25-07930**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

IN RE APPLE IPHONE ANTITRUST LITIGATION

On Appeal from the United States District Court
for the Northern District of California
Case No. 4:11-cv-6714-YGR, Hon. Yvonne Gonzalez Rogers

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS

Betsy C. Manifold
Rachele R. Byrd
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
750 B Street, Suite 1820
San Diego, CA 92101
Tel.: (619) 239-4599

Mark C. Rifkin
Matthew M. Guiney
Thomas H. Burt
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
Tel.: (212) 545-4600

David C. Frederick
Aaron M. Panner
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel.: (202) 326-7900

*Counsel for Plaintiffs-Appellants*

May 13, 2026

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..........................................................................iv

INTRODUCTION ......................................................................................1

JURISDICTIONAL STATEMENT ................................................................4

STATEMENT OF THE ISSUES...................................................................4

FEDERAL RULES INVOLVED ...................................................................5

BACKGROUND .......................................................................................5

I. Plaintiffs Sued Apple To Recover App Store Overcharges That Consumers Have Paid To Apple Since July 2008............................................5

II. Plaintiffs Developed An Econometric Model That Calculates Consumer-Borne Overcharges On Every App Store Transaction ..................9

III. The District Court Provisionally Denied Plaintiffs' First Class-Certification Motion ................................................................................13

    A. Apple Argued That Its Data Is Insufficient To Allow Plaintiffs To Link Apple IDs To Potential Class Members.............................................................................................13

    B. The District Court Expressed Concern That Plaintiffs Will Not Precisely Identify Each Putative Class Member's Damages Before Trial........................................................16

IV. The District Court Granted Plaintiffs' Renewed Class-Certification Motion .....................................................................................17

V. Plaintiffs Attempted To Match Apple IDs To Individual Class Members But Were Stymied By Apple's Data Production.........................20

    A. Apple Frustrated Plaintiffs' Discovery Efforts Necessary To Complete The District Court-Mandated Matching Exercise ...........................................................................................21

B.     Plaintiffs Retained Darryl Thompson To Perform The District Court-Mandated Matching Of Apple IDs To People ..................................................................................22

C.     Before Trial, Plaintiffs Showed That Less Than 6% Of Potential Class Members Had No Measurable Damages...................24

VI.    The District Court Decertified The Class Because Plaintiffs' Experts Did Not Precisely Identify Class Members' Individual Damages...........................................................................................26

SUMMARY OF ARGUMENT ........................................................................28

STANDARD OF REVIEW .............................................................................30

ARGUMENT .................................................................................................30

I.     The District Court's Initial Certification Order Was Correct.......................30

A.     Plaintiffs' Antitrust Claims Are Ideally Suited For Class Adjudication ...............................................................................30

B.     Under *Olean*, Plaintiffs Established Predominance With Evidence "Capable Of Establishing Antitrust Impact On A Class-Wide Basis" .................................................................33

II.    The District Court's Decertification Order – Based Solely On The Perceived Difficulty Of Precisely Matching Apple IDs To Class Members Before Trial – Was An Abuse Of Discretion ......................37

A.     The District Court Erred In Decertifying On Predominance Grounds After Accepting Evidence That Establishes Class-Wide Antitrust Impact Susceptible To Common Proof ...............................................................................38

B.     The District Court Also Erred In Requiring That Plaintiffs Provide A Mechanism – Prior To Trial And Claims Administration – Of Assessing The Extent Of Individual Class Members' Damages .................................................43

C.     The District Court Erred In Applying A Certification-Stage Administrability Requirement, In Violation Of *Briseno*...................................................................................47

ii

D.     Article III Standing Principles Do Not Compel A
       Different Result ..................................................................................52

CONCLUSION ..................................................................................................55

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

Page

**CASES**

*Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952 (9th Cir. 2013) ..........................30

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)...............................................31

*Apple Inc. v. Pepper*, 587 U.S. 273 (2019)........................................................5, 6, 9

*Behar v. Northrup Grumman Corp.*, 2024 WL 5275027
(C.D. Cal. Dec. 3, 2024) ........................................................................49

*Bowerman v. Field Asset Servs. Inc.*, 60 F.4th 459 (9th Cir. 2023) .........................44

*Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017) .........3, 4, 5, 15, 28,
29, 32, 38, 47,
48, 49, 50, 51, 52

*Brown v. DirecTV, LLC*, 562 F. Supp. 3d 590 (C.D. Cal. 2021)..............................49

*Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013) ...............................45

*Carey v. Piphus*, 435 U.S. 247 (1978) .....................................................................53

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................54

*Chamberlan v. Ford Motor Co.*, 402 F.3d 952 (9th Cir. 2005)...............................31

*Cherry v. Dometic Corp.*, 986 F.3d 1296 (11th Cir. 2021) .....................................51

*Dairy, LLC v. Milk Moovement, Inc.*, 2023 WL 3437426
(E.D. Cal. May 12, 2023) ........................................................................53

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) .......................4, 19, 43

*Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817 (8th Cir. 2016)......................48

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023) .............................8, 9

*FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020) ............................................30

*Google Inc. St. View Elec. Commc'ns Litig., In re*, 21 F.4th 1102
(9th Cir. 2021) ..........................................................................................48

*Google Play Store Antitrust Litig.*, *In re*, 147 F.4th 917 (9th Cir. 2025), *cert. dismissed*, 146 S. Ct. 1051 (2026) ................................................9

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) ........................46

*Hamilton v. Wal-Mart Stores, Inc.*, 39 F.4th 575 (9th Cir. 2022) ....................48, 49

*Healy v. Milliman, Inc.*, 164 F.4th 701 (9th Cir. 2026) ..............................52, 54, 55

*Hoever v. Marks*, 993 F.3d 1353 (11th Cir. 2021) ....................................................53

*Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161 (9th Cir. 2014)....................................44

*JUUL Labs, Inc., Mktg. Sales Pracs. & Prods. Liab. Litig.*, *In re*, 609 F. Supp. 3d 942 (N.D. Cal. 2022)............................................................49

*Kang v. Credit Bureau Connection, Inc.*, 2022 WL 16748698 (E.D. Cal. Nov. 6, 2022)...................................................................49

*Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004)..............................................45

*Leyva v. Medline Indus., Inc.*, 716 F.3d 510 (9th Cir. 2013)..............................2, 44

*Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1308 (2025)...............................................................44

*Moser v. Benefytt, Inc.*, 8 F.4th 872 (9th Cir. 2021)....................................................4

*Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir. 2015) ................................51

*NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*, 926 F.3d 528 (9th Cir. 2019) ...........................................................30

*Nexium Antitrust Litig.*, *In re*, 777 F.3d 9 (1st Cir. 2015) ................................ 44-45

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) ......................................1, 5, 19, 27, 28, 31, 32, 33, 35, 36, 37, 38, 43, 44, 45, 46

*Petrobras Sec.*, *In re*, 862 F.3d 250 (2d Cir. 2017) ..................................................51

*Rail Freight Fuel Surcharge Antitrust Litig.*, *In re*, 934 F.3d 619 (D.C. Cir. 2019)....................................................................45

*Rikos v. Procter & Gamble Co.*, 799 F.3d 497 (6th Cir. 2015)...............................51

*Roach v. T.L. Cannon Corp.*, 778 F.3d 401 (2d Cir. 2015) ....................................45

*Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125 (9th Cir. 2016)......1, 33, 51, 52

*Ryan Racing, LLC v. Gentilozzi*, 231 F. Supp. 3d 269 (W.D. Mich. 2017) .........................................................................................................34

*Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996 (9th Cir. 2018)...............................30

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992 (8th Cir. 2016) .................................................................................................51

*Sullivan v. DB Invs., Inc.*, 613 F.3d 134 (3d Cir. 2010) .........................................45

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) .........................................37

*Urethane Antitrust Litig., In re*, 768 F.3d 1245 (10th Cir. 2014)...........................44

*Victorino v. FCA US LLC*, 2020 WL 2306609 (S.D. Cal. May 8, 2020) ........................................................................................................50

*Weiner v. Ocwen Fin. Corp.*, 343 F.R.D. 628 (E.D. Cal. 2023).............................49

*Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig., In re*, 722 F.3d 838 (6th Cir. 2013) .........................................................................44

*Williams v. Apple, Inc.*, 338 F.R.D. 629 (N.D. Cal. 2021) .................................4, 50

*Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168 (9th Cir. 2010) .................................................................................................30

*Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087 (9th Cir. 2010) .............................................................................................30, 44

**CONSTITUTION, STATUTES, AND RULES**

U.S. Const. art. III .............................................................................................28, 52

Sherman Act, 15 U.S.C. § 1 *et seq.* ......................................................................8, 9

§ 2, 15 U.S.C. § 2...................................................................................8

28 U.S.C. § 1292(e)......................................................................................4

Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ......................8, 9

Fed. R. Civ. P.:

    Rule 23 ...........................................................................3, 16, 17, 32, 48

        advisory committee's note to 1966 amendment ............................3, 31

    Rule 23(b)(3) ................................................... 4, 5, 13, 17, 28, 29, 31, 35, 36

    Rule 23(f) .......................................................................................4, 20, 41

Fed. R. Evid. 702 .........................................................................................4, 5, 19

## OTHER MATERIALS

3G Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*
    (Sept. 2025 update)................................................................................ 53-54

Press Release, Apple Inc., *Apple Reinvents the Phone with iPhone*,
    https://www.apple.com/newsroom/2007/01/09Apple-
    Reinvents-the-Phone-with-iPhone/ (last accessed May 11,
    2026)................................................................................................... 5

## INTRODUCTION

Plaintiffs represent a class of nearly 200 million purchasers of apps and in-app content from Apple's App Store who incurred billions of dollars in overcharges because Apple unlawfully monopolized those sales. After this case made previous trips to this Court and the Supreme Court, in 2024 the district court certified the class and this Court denied Apple's petition for interlocutory review. But just three months before trial, the district court granted Apple's motion to decertify the class. Its sole reason was that Plaintiffs had failed, *before trial*, to precisely match App Store transactions with the persons who paid for them. That ruling was erroneous under this Court's precedents.

*First*, the district court's order violates the rule that a plaintiff class satisfies the predominance requirement upon showing that it can "establish[] antitrust impact on a class-wide basis." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 682 (9th Cir. 2022) (*en banc*). Here, every potential class member who purchased apps and in-app content on the App Store was "exposed to" Apple's illegal monopoly conduct. *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136 (9th Cir. 2016). Through their Nobel Prize-winning economist, Professor Daniel L. McFadden, Plaintiffs proffered a model based on every individual transaction in the App Store's history that calculated the overcharge that consumers paid. During class certification, Plaintiffs showed that the McFadden model is *capable* of establishing the precise overcharges paid by every class

member. Aggregating those transactions by account (Apple ID) showed that nearly all class members suffered measurable damages. Indeed, the court originally certified the class based on that showing.

The district court also decided, however, to require Plaintiffs (over their objection) to match every transaction to a specific person in the class (as opposed to a specific Apple ID). The court held that Plaintiffs had to calculate every individual class member's damages before trial as a precondition to maintaining the class. That ruling was legally erroneous and therefore an abuse of discretion. The fact that *individual* damages must be assessed during post-trial claims administration is no hurdle to predominance, as this Court repeatedly has recognized. *See*, *e.g.*, *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) ("[T]he presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)."). The court expressed concern that the challenge of matching transactions to purchasers created uncertainty regarding the percentage of class members without measurable damages. But Plaintiffs had shown that the percentage of such class members was very low. Apple permits individuals to establish multiple account numbers ("Apple IDs"), so there is not a one-to-one correspondence between Apple IDs and persons. Nonetheless, Plaintiffs' evidence showed that less than 6% of accounts – comprising less than 1% of the total monetary value of purchases – lacked measurable damages. That

2

evidence satisfied the need to show that the class contained only a small percentage of members without damages. Apple never has claimed that more precise matching of purchases to class members would increase the percentage of class members with no damages – although Apple (unlike Plaintiffs) has all the data necessary to make such an argument if it had any validity.

*Second*, the district court's mandated exercise of linking Apple IDs to people contravenes this Court's ruling in *Briseno v. ConAgra Foods, Inc.* that Rule 23 does *not* require plaintiffs to "demonstrate that there is an 'administratively feasible' means of identifying absent class members" as a precondition to certifying a class. 844 F.3d 1121, 1123 (9th Cir. 2017). Indeed, "Rule 23 specifically contemplates" that *post-trial claims-administration* proceedings will require "individualized claim determinations after a finding of liability." *Id.* at 1131 (citing Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment). The court's decision nevertheless sanctioned a process by which defendant Apple had every incentive to obscure the contents of *its own data* to create an issue for class certification. Unlike other consumer cases in which linking the consumer to a product may be difficult, in this case Apple knows precisely what payment source was used for every single transaction made on the App Store. That's how Apple made billions of dollars in anticompetitive profits. Requiring an exact matching of Apple IDs to individual class members – prior to claims

3

administration – imposed precisely the type of administrative-feasibility requirement other courts within this Circuit have held *Briseno* "forecloses." *E.g.*, *Williams v. Apple, Inc.*, 338 F.R.D. 629, 645 (N.D. Cal. 2021) (Koh, J.).

This Court should reverse the district court's decertification order.

## JURISDICTIONAL STATEMENT

On October 27, 2025, the district court granted Apple's motion to decertify the class that was previously certified on February 2, 2024. 1-ER-2–28; *see* 2-ER-108–135.[1] Plaintiffs timely petitioned this Court for permission to appeal the district court's decertification ruling on November 10, 2025. 6-ER-1036–1122; *see* Fed. R. Civ. P. 23(f). This Court granted Plaintiffs' petition, 6-ER-997, and Plaintiffs perfected the appeal, *see* 6-ER-998–1035.

This Court has jurisdiction under Federal Rule of Civil Procedure 23(f) and 28 U.S.C. § 1292(e) to review the district court's decertification order. *See Moser v. Benefytt, Inc.*, 8 F.4th 872, 875 (9th Cir. 2021).

## STATEMENT OF THE ISSUES

1.      Whether the district court misapplied Rule 23(b)(3) by decertifying a class based on Plaintiffs' failure to match before trial each transaction to a specific claimant, after previously certifying a class based on Plaintiffs' transaction-level

---

[1] The court simultaneously granted Apple's motion to exclude the expert testimony of Mr. Darryl Thompson pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

model capable of proving class-wide antitrust impact through common evidence, as required by *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (*en banc*).

2.  Whether the district court erred by imposing an administrative-feasibility requirement – requiring pre-trial identification of each class member and transaction – contrary to this Court's decision in *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017).

## FEDERAL RULES INVOLVED

Federal Rule of Civil Procedure 23(b)(3) and Federal Rule of Evidence 702 are reprinted in the addendum to this brief.

## BACKGROUND

### I.  Plaintiffs Sued Apple To Recover App Store Overcharges That Consumers Have Paid To Apple Since July 2008

In 2007, Apple introduced the iPhone, a first-of-its-kind mobile device combining the functionality of a mobile phone, computer, music and video player, and camera into one compact handheld device.[2]  The iPhone's software, iOS, allows users to run software applications, or "apps," that give the iPhone its computer-like functionality.  *See Apple Inc. v. Pepper*, 587 U.S. 273, 276 (2019); *see also* 5-ER-821 ¶ 2 (Third Am. Consol. Class Action Compl.).

---

[2] *See* Press Release, Apple Inc., *Apple Reinvents the Phone with iPhone*, https://www.apple.com/newsroom/2007/01/09Apple-Reinvents-the-Phone-with-iPhone/ (last accessed May 11, 2026).

5

Initially, the iPhone enabled only Apple's own native apps preinstalled on the iPhone; third-party developers could make apps accessed only through an internet browser. 2-ER-37 (Fact 1); *see* 3-ER-292 ¶ 21 (McFadden 2021 Opening Rep.). That changed in 2008, when a new platform called "Cydia" allowed iPhone users to download apps onto their iPhones. 10-ER-1735–1736 ¶ 73 (Stiglitz Opening Rep.). Apple followed Cydia's lead later that year, launching its proprietary "App Store." The App Store became the only place for iPhone and, later, iPad users to purchase native apps and in-app content. 2-ER-43 (Fact 14).

Through the App Store, iPhone and iPad users "purchase apps directly from the retailer Apple." *Pepper*, 587 U.S. at 281. Users may also purchase digital content for consumption within those apps, such as in-game virtual currency, subscriptions, and access to premium content. 3-ER-327 ¶ 91 (McFadden 2021 Opening Rep.). When a customer clicks "purchase," Apple collects the full payment amount from the consumer using Apple's own In-App Purchase ("IAP") system, a payment processor that consumers must use to purchase apps on the App Store and that developers must build into their apps so that consumers can purchase in-app content like virtual currency, subscriptions, and other consumable virtual goods. 2-ER-48–49, 2-ER-53 (Facts 27, 47-49). Apple collects payment directly from the consumer using IAP, delivers the digital product to the consumer,

6

and later remits to the developer its share of the purchase price less Apple's own 30% commission. 2-ER-52–54 (Facts 42, 52).

Apple intended for the App Store to be "the sole means of distributing native iOS apps." 2-ER-37 (Fact 2). With the help of myriad contractual and technical restrictions, Apple quickly achieved that goal. Contractually, Apple's license agreement conditions app developers' access to the App Store and the software development kits necessary to make iOS-compatible apps on developers' agreement to deal exclusively with the App Store and to use only Apple's IAP payment mechanism for purchasing in-app content. 2-ER-53–54 (Facts 47-49, 51). Apple's warranties also impose restrictions on consumers, voiding a consumer's warranty on their iPhone or iPad if Apple discovers that the consumer has purchased apps through alternative app distribution channels. 2-ER-54 (Facts 53-54).

Apple also uses its App Review Process to enforce technical restrictions on app distribution. Before Apple lists an app for sale on the App Store, it reviews each app for compliance with its distribution rules, called the App Review Guidelines. 2-ER-42 (Fact 12). Historically, those Guidelines prohibited developers from making apps that sell other apps; directing app users to alternative platforms to purchase in-app content, including an app developer's own website; and informing customers about Apple's 30% commission. 2-ER-39, 2-ER-50,

2-ER-53–54 (Facts 5, 30, 49-51).  If an app fails to comply with these Guidelines, Apple will not digitally "sign" the app; without that signature, it is technically impossible to launch the app on iOS.  2-ER-54 (Fact 55).

These contractual and technical restrictions have enabled Apple to build the App Store into one of the most profitable monopolies in the world.  The App Store is the *only* place where iPhone and iPad users can buy apps and many in-app digital goods.  Since July 2008, Apple – with few exceptions – has used its monopoly and the IAP requirement to collect a supracompetitive 30% commission on every native app purchase and almost every purchase of in-app content.  2-ER-41, 2-ER-55 (Facts 10, 60-61).  Those commissions have fueled "extraordinarily high" App Store profit margins that "have exceeded 75% for years."  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 984-85 (9th Cir. 2023); *see* 7-ER-1290 ¶ 51 & tbl. 10 (Barnes 2025 Opening Rep.).

In 2011, Plaintiffs Robert Pepper and Stephen Schwartz sued Apple seeking damages under Section 2 of the Sherman Act, 15 U.S.C. § 2.  5-ER-848–870.  Together with Plaintiff Edward Lawrence, 5-ER-841–847, they assert monopolization and attempted monopolization claims both individually and on behalf of a nationwide class of iPhone and iPad users.[3]  The parties engaged in

---

[3] Many years later, Epic Games, Inc. sued Apple, pursuing claims under the Sherman Act and California's Unfair Competition Law ("UCL") based on similar conduct.  After a bench trial, the district court rejected Epic's Sherman Act claim,

protracted litigation over Apple's unsuccessful motion to dismiss. *See Pepper*, 587 U.S. at 276-81.

Plaintiffs have shown that Apple has reaped monopoly rents at consumers' expense. Absent Apple's anticompetitive restrictions, competition in the distribution of iOS apps and in-app content would reduce Apple's commission rate by more than half. 2-ER-55 (Fact 62). That supracompetitive commission has directly harmed consumers by increasing the prices developers set for apps and in-app content. 3-ER-348–351 ¶¶ 143-149 (McFadden 2021 Opening Rep.). Plaintiffs' experts calculated that, as a result, consumers (who spend more than $100 billion annually through the App Store) have paid Apple more than $20 billion in overcharges. 9-ER-1600 ¶ 84 & fig. 13 (Song 2025 Opening Rep.).

## II. Plaintiffs Developed An Econometric Model That Calculates Consumer-Borne Overcharges On Every App Store Transaction

During discovery, Apple produced hundreds of terabytes of transaction data recording every purchase of iOS apps and in-app content from the App Store. iPhone and iPad users "make purchases on the App Store through 'Apple IDs,'

---

but it held that certain of Apple's conduct violated the UCL and imposed an injunction. This Court affirmed the liability findings. *See generally Epic Games*, 67 F.4th 946. The district court's Sherman Act rulings were dependent on the factual record that was (hurriedly) developed in that case. Those rulings are not binding in this case. *See also In re Google Play Store Antitrust Litig.*, 147 F.4th 917 (9th Cir. 2025) (affirming judgment that Google monopolized the markets for Android app distribution and Android in-app billing services), *cert. dismissed*, 146 S. Ct. 1051 (2026).

which are unique, password-protected accounts" registered to a primary email address. 13-ER-2478 ¶ 2 (Rollins Decl.). As the data was produced by Apple, each App Store transaction was associated with an Apple-created randomized string of alphanumeric characters, called a "hash value," that represented the purchaser's Apple ID. 9-ER-1564 ¶ 21 (Song 2025 Opening Rep.).

To establish antitrust injury and damages on a class-wide basis, Plaintiffs developed a method to calculate the overcharge associated with each App Store transaction. Drawing on the expertise of multiple economists, including Nobel Prize-winning econometrician Daniel McFadden, Plaintiffs developed a model that calculated for each app the but-for price a developer would have set to download the app (if the app was not free) and the but-for price for in-app purchases.[4] That calculation starts from the recognition that Apple's commission has the same effect on developers' economic incentives as a value-added-type sales tax, in which the seller sets a retail price that includes the tax. 8-ER-1509–1513 ¶¶ 21-30 (McFadden 2025 Opening Rep.). Using well-established econometric principles, it is possible to calculate the impact of a reduction in the commission rate on retail prices by constructing a pricing model based on a developer's marginal costs and

---

[4] The overcharge for in-app purchases was calculated at the app level, not for individual items. 4-ER-685 (summarizing the calculation). The overall percentage overcharge for in-app purchases offered within a single app in a given month was then applied to individual purchases of in-app content from that app in a given month to calculate the overcharge.

consumer demand: with lower commissions, a developer will generally reduce retail prices to maximize profits. 8-ER-1512–1513 ¶¶ 29-30 & fig. 2.

Professor McFadden constructed such a pricing model. The model utilizes App Store transaction data to calculate a consumer demand function for each category or "genre" of apps (for example, Games or Music) using multiple random samples of app transactions.[5] 8-ER-1514, 8-ER-1518–1519 ¶¶ 32, 43-46; *see* 3-ER-362–364 ¶¶ 177-184 (McFadden 2021 Opening Rep.). He used profit-margin data obtained from app developers to calculate the variable costs associated with app downloads and in-app purchases (again, distinguishing among genres). 8-ER-1519–1520 ¶¶ 47-48 (McFadden 2025 Opening Rep.); *see also* 9-ER-1584–1586 ¶¶ 50-53 (Song 2025 Opening Rep.) (explaining implementation of profit-margin data); 8-ER-1354–1366 ¶¶ 56-89 (MacCormack 2025 Opening Rep.) (offering opinions regarding range of variable costs incurred by typical developer in each genre). That allowed him to calculate genre-specific coefficients to apply to every app, for each month, to calculate the but-for price of downloads (if any) and in-app purchases (again, if any) at the lower commission rate.[6] 8-ER-1520–1522 ¶¶ 49-54

---

[5] The selection criteria for the apps are described in detail in Professor McFadden's reports. 13-ER-2340–2341 ¶¶ 53-54 (McFadden 2023 Rev. Suppl. Rep.); 4-ER-527–529 ¶¶ 171-173 (McFadden 2021 Reply Rep.).

[6] The but-for commission rate was calculated by another economist, Dr. Rosa Abrames-Metz. The model was ultimately implemented by another

(McFadden 2025 Opening Rep.). Using these "app-month" percentage overcharges, Professor McFadden (at the class-certification stage) and later Dr. Song (at the merits stage) calculated the amount of the overcharge associated with each transaction and added up the overcharges to calculate the damages associated with the purchases made using each individual Apple ID. *See* 8-ER-1520–1522 ¶¶ 49-54; 9-ER-1592–1593 ¶¶ 65-67 (Song 2025 Opening Rep.).

For almost all apps and the overwhelming majority of purchases (99% by dollar value), the model demonstrates that a lower commission rate would have resulted in a lower retail price, meaning the user incurred damages on the purchase. 9-ER-1600 ¶ 84 fig. 13 (reporting total overcharges across all App Store spending). But there are exceptions. For one thing, if a developer's variable costs associated with a download or with IAP purchases are zero, a change in the commission rate does not affect the developer's profit-maximizing price and, although the developer receives more of the purchase price at a lower commission rate (and Apple receives less), the user pays the same price. 8-ER-1522 ¶ 55 (McFadden 2025 Opening Rep.). And, in some cases – for example, where a developer obtains significant revenues from advertising – the model predicts a profit-maximizing IAP price that is higher at a lower commission rate. *Id.* As a practical matter,

---

econometrician, Dr. Minjae Song, who had assisted Professor McFadden with the development of the model.

these instances have a de minimis effect on the impact of Apple's conduct: Plaintiffs showed that less than half of 1% of sales involved "negative overcharges," 9-ER-1599–1600 ¶¶ 83-84 & fig. 13 (rows 2 & 5) (Song 2025 Opening Rep.); the total amount of such "negative overcharges" was approximately 0.1% of the positive overcharges, 9-ER-1600 ¶ 84 fig. 13 (rows 3 & 6).

Nevertheless, to determine a class member's net damages precisely, it is necessary to identify all of that class member's purchases (which may be made through multiple Apple IDs) and add up all of the overcharges (nearly all positive, some possibly negative). 9-ER-1598 ¶¶ 79-80. In a tiny number of discrete instances, a particular Apple ID (usually with low dollar-value aggregate purchases) incurred negative overcharges overall. *Id.* That occurrence ended up affecting the district court's evaluation of the class-certification motions out of all proportion to its practical importance.

## III. The District Court Provisionally Denied Plaintiffs' First Class-Certification Motion

### A. Apple Argued That Its Data Is Insufficient To Allow Plaintiffs To Link Apple IDs To Potential Class Members

Plaintiffs first moved for class certification in June 2021, asking the district court to certify, pursuant to Rule 23(b)(3), a nationwide class of consumers who made any purchase from the App Store since July 10, 2008. 2-ER-252 (Pls.' 2021 Class Cert Mot.). They proffered Professor McFadden's model as class-wide proof

13

of antitrust injury and damages.  2-ER-268–272.  At the time, Professor McFadden

had run the model on a sample of transactions from each of the Games, Music, and

Entertainment genres.  3-ER-382 ¶ 229 (McFadden 2021 Opening Rep.).  From

those samples, Plaintiffs showed that almost all Apple IDs – more than 85% – had

positive net overcharges.  4-ER-541–542 ¶¶ 208-209 & fig. 5 (McFadden 2021

Reply Rep.).  Those Apple IDs accounted for an overwhelming majority of

purchases within the samples – more than 99% by dollar value.  *Id.*  Plaintiffs

contended that because overcharges (positive, zero, or negative) could be

calculated for every Apple ID, and because each Apple ID is associated with an

individual class member, the model provided a method to show, on a class-wide

basis, the damages incurred by each purchaser.  4-ER-624–632 (Pls.' 2021 Opp'n

to Apple's *Daubert* Mot. To Strike McFadden 2021 Reply Rep.).

Apple responded, however, that its transaction data did not allow Professor

McFadden to reliably "link[] accounts to actual consumers."  5-ER-790 (Apple's

2021 *Daubert* Mot. To Strike McFadden 2021 Reply Rep.).  Apple argued that,

although each Apple ID is unique and associated with an individual credit [or

debit] card, there is not a one-to-one correspondence between an Apple ID and an

individual purchaser because purchasers may have multiple IDs.[7]  5-ER-791–793.

---

[7] Apple also has argued that multiple individuals may use a particular Apple ID – a parent and child for example – but it does not (and cannot) dispute that

To obtain an Apple ID, an individual provides a first and last name, email address, birthdate, and telephone number. 13-ER-2478 ¶ 2 (Rollins Decl.). Apple does not prevent one person from having more than one Apple ID. *Id.* ¶ 3. Apple argued that Professor McFadden's model could not identify those class members with positive damages because it measured overcharges by Apple ID rather than by class member. 5-ER-790–793 (Apple's 2021 *Daubert* Mot. To Strike McFadden 2021 Reply Rep.).

Plaintiffs disagreed that they needed to "link" Apple IDs to people before trial to establish a reliable method of proving class-wide antitrust injury or damages. 4-ER-460 ¶¶ 10-11 (McFadden 2021 Reply Rep.); 4-ER-624–627 (Pls.' 2021 Opp'n to Apple's *Daubert* Mot. To Strike McFadden 2021 Reply Rep.). Ninth Circuit law does not require a plaintiff class to "calculate individual Class member losses" before trial. 4-ER-624 & n.8 (citing, *inter alia*, *Briseno*, 844 F.3d at 1131). Because each Apple ID is associated with both an individual and a payment method – even if one individual may be associated with multiple Apple IDs – "a practical process for identifying and compensating harmed Class members" after trial would ensure only class members with damages would

---

Apple's records connect every purchase to both an Apple ID and a payment method. Plaintiffs assert that the registered user of the Apple ID is the purchaser. 11-ER-2142–2146; 12-ER-2180–2182.

receive compensation. 4-ER-460–462 ¶¶ 12-14 (McFadden 2021 Reply Rep.).

Plaintiffs could calculate the overcharges associated with each Apple ID, and they

could use the claims-administration process to match Apple IDs to individuals in

calculating damages owed to them. 4-ER-460–461 ¶ 12.

> **B.** **The District Court Expressed Concern That Plaintiffs Will Not Precisely Identify Each Putative Class Member's Damages Before Trial**

Over the course of two hearings, 13-ER-2394–2476; 5-ER-704–777, the

district court did not resolve this dispute. On the one hand, the court agreed that,

at the class-certification stage, Apple IDs were "an objective [damages] measure."

5-ER-710 at 7:18-25 (Dec. 2021 Hr'g Tr.). And it recognized the "significant

amount of law" supporting Plaintiffs' position that a model calculating

"aggregat[ed] damages" is "an appropriate [one]" under Rule 23 "as long as the

model shows class-wide or virtually class-wide impact." 5-ER-710 at 7:18-25,

5-ER-713 at 10:13-18, 5-ER-714 at 11:13-17. The "jury could make a decision

one way or the other whether or not they agree with [Professor McFadden's

model]," and then it would be "purely" a matter of "administration after the fact

to . . . distribute that money to the class members." 5-ER-717 at 14:1-18.

On the other hand, the court expressed concern that Plaintiffs were

proposing to calculate individual class members' damages after trial. 13-ER-2463

at 70:19-20 (Nov. 2021 Hr'g Tr.) ("THE COURT: How is that an acceptable

16

answer to do it after the trial?"); *see also* 5-ER-710 at 7:18-20 ("[O]bviously, right, the law talks about individuals. Doesn't talk about accounts.").

In March 2022, the court found that Plaintiffs satisfied every Rule 23 prerequisite except Rule 23(b)(3)'s predominance requirement. 4-ER-690–695. Although the court identified certain methodological flaws that it believed prevented Professor McFadden's model from serving as common, class-wide proof of antitrust injury and damages, 4-ER-695–702, the court granted Plaintiffs leave to address the issues.

The court's order found the proposal "for identifying unharmed class members" after trial "through a claims administration process, using claims submission forms, Apple IDs, and Apple's internal records," was "reasonably objective"; "[i]t is not uncommon for class members to be identified using such means in class actions." 4-ER-689. However, the court expressed concern that the process "for identifying and excluding uninjured class members" would not occur "until *after judgment* is rendered." 4-ER-701. It stated (without explaining the relevance to class certification) that, while such a mechanism would be appropriate in the case of a class settlement, "trial evidence is evaluated differently." *Id.*

## IV. The District Court Granted Plaintiffs' Renewed Class-Certification Motion

After the court's initial denial of class certification, Professor McFadden refined his model to address the court's methodological concerns, 13-ER-

17

2321–2328 ¶¶ 1-17 (McFadden 2023 Rev. Suppl. Rep.), and re-ran the model on transaction data that included every purchase (rather than samples) made in the App Store's Music, Games, and Entertainment genres through April 2022, comprising "70 percent of the commerce on the App Store." 2-ER-208–209 at 73:23-74:1 (June 2023 Hr'g Tr.); *see* 13-ER-2326 ¶ 15. Professor McFadden identified precisely which Apple IDs incurred overcharges on which transactions, and estimated class-wide damages for those accounts. 13-ER-2337, 13-ER-2349–2351 ¶¶ 43, 72-79.

In provisionally denying class certification, the court also had expressed concern about the fact that the model estimated 14.6% of Apple IDs lacked positive overcharges. 4-ER-698–700. In part to address that concern, Plaintiffs revised the class definition to exclude purchasers with $10 or less of spending in the App Store through a single Apple ID during the class period. That revision excluded approximately two-thirds of all Apple IDs without measurable damages – those that had placed few (or no) transactions on the App Store and accordingly had minimal exposure to it. 12-ER-2309–2310 ¶¶ 9-10 (Song 2024 Decl.); *see* 13-ER-2350 ¶ 76 fig. 5. Of all Apple IDs with more than $10 in lifetime App Store spending, only 7.9% had no positive net overcharges; they accounted for less than 1% of total App Store spending. 13-ER-2351–2352 ¶ 78 & fig. 6. Plaintiffs' revised class definition was:

> *All persons in the United States*, exclusive of Apple and its employees, agents and affiliates, and the Court and its employees, *who purchased one or more iOS applications or application licenses from Defendant Apple Inc. ("Apple"), or who paid Apple for one or more in-app purchases*, including, but not limited to, any subscription purchase, for use on an iOS Device at any time since July 10, 2008 (the "Class Period"). *The Class is limited to those persons who paid more than $10.00 in total to Apple during the Class Period for iOS application and in-app purchases from any one Apple ID account.*

2-ER-109 (emphases added).

Apple simultaneously opposed class certification and moved to exclude Professor McFadden's model pursuant to Federal Rule of Evidence 702 and *Daubert*. The court again thoroughly analyzed Apple's criticisms, found that Professor McFadden's revised model adequately addressed Apple's objections and the court's concerns, and granted class certification. 2-ER-114–121, 2-ER-131–134.

In its order, the court noted that "the only dispute left" was whether the percentage of uninjured class members (7.9%) meant individual issues concerning antitrust injury would predominate. 2-ER-131 & n.18. It held that this Court's *en banc* decision in *Olean* answered that question. Specifically, *Olean* "rejected the argument that 'Rule 23 does not permit the certification of a class that potentially includes more than a de minimis number of uninjured class members.'" 2-ER-132 (quoting *Olean*, 31 F.4th at 669); *see id.* at 27 ("*Olean* . . . rejected the argument that Rule 23 has an uninjured class member cutoff"); *see also* 2-ER-221 at 86:12-

19

15 (June 2023 Hr'g Tr.) ("91 percent . . . That's not a bad percentage in terms of predominance, with the understanding that it's going to get even more certain before trial."). The court found Plaintiffs could use Professor McFadden's model to "show the impact of Apple's allegedly anticompetitive conduct across all class members." 2-ER-133.

Apple petitioned for review of this Order under Rule 23(f), which this Court denied. Order, *Pepper v. Apple Inc.*, No. 24-875, Dkt.17 (9th Cir. May 24, 2024).

## V. Plaintiffs Attempted To Match Apple IDs To Individual Class Members But Were Stymied By Apple's Data Production

In certifying the class, the district court also stated its expectation that Plaintiffs would "calculate both aggregate and individual damages *before trial* with the full transactions data of the entire App Store." 2-ER-131 n.17. Despite its earlier finding that "Professor McFadden's proposed method for identifying unharmed class members" after trial was "reasonably objective," 4-ER-689 (Mar. 2022 Order Provisionally Denying Class Cert.), and Apple's concession that linking accounts to people was no longer "a pertinent issue" "for class certification," 4-ER-663 at 13:8-21 (Apr. 2021 Hr'g Tr.), the court ruled it would not suffice to calculate damages for each Apple ID. Instead, Plaintiffs needed to "match the Apple [IDs] . . . with *actual consumers*" before trial. 2-ER-108. "Should Professor McFadden's model fail to do [so], the Court will consider whether modification or decertification is appropriate for all or part of the class." *Id.* The court's order

20

offered little explanation for these requirements other than the need to "satisf[y] the predominance requirement." 2-ER-108, 2-ER-131 n.17.

### A. Apple Frustrated Plaintiffs' Discovery Efforts Necessary To Complete The District Court-Mandated Matching Exercise

To comply with the court's additional requirements, Plaintiffs asked Apple to provide the data necessary to match Apple IDs with individual class members. Apple admitted it possessed the personal identifying information of App Store customers that would allow Plaintiffs "to demonstrate which App Store transactions are tied together by a common payor so that they can net out which payors have alleged damages and which do not." 2-ER-86 (Apr. 2024 Joint Discovery Letter Br.). Yet Apple only agreed to produce records containing the personal identifying information for these "payors"; it refused to produce data linking those payor records to specific transactions. *Id.*

The court's mandated matching exercise – which Apple could have performed itself with ease – turned out to present several difficulties for a third party hampered by incomplete data. As noted, there is not a one-to-one correspondence between individual App Store customers and Apple IDs. *Supra* p. 14 n.7. When Plaintiffs asked Apple to identify which class members were associated with each Apple ID, it refused; instead, it produced a list of more than one billion "payors"; each payor record was associated with an Apple ID. 2-ER-85–86; 11-ER-2115 (Apple July 2024 Data Dictionary). A "payor record,"

21

however, is not the same as an individual class member: "[A] new record is created each time the [purchaser] creates a new Apple ID account or changes their name, address, or payment method." 1-ER-6 (Oct. 2025 Decertification Order). Accordingly, under the court-ordered approach, matching transactions to class members first required grouping together "payor records" that correspond to the same individual.

Doing that, however, required certain judgment calls to determine whether two payor records are associated with the same individual – individuals can use nicknames, change addresses or use fictitious addresses, change their last names after marriage, obtain new credit cards, and so forth. 5-ER-807–808 ¶¶ 2-5 (Rollins Decl.); 4-ER-648 ¶ 9 (Rollins Suppl. Decl.). Moreover, information needed to create an Apple ID – "street addresses, phone numbers, and similar information" – were missing from, or unreliable in, many records Apple provided. 11-ER-2119 (Apple July 2024 Letter); *see* 12-ER-2212–2214 ¶¶ 7-11 (Thompson Decl.) (cataloguing data issues).

**B.** **Plaintiffs Retained Darryl Thompson To Perform The District Court-Mandated Matching Of Apple IDs To People**

Plaintiffs retained Darryl Thompson (an expert in data deduplication, who has conducted or supervised thousands of class administration processes) to complete the payor record grouping. 11-ER-2093–2095 ¶¶ 3, 8-9 (Thompson 2025 Opening Rep.). In conducting this analysis, Mr. Thompson took the conservative

22

approach of treating two similar payor records as associated with different purchasers, even if there were indications that the two payors were the same person; by reducing the spending attributed to each class member, this had the effect of overestimating the number of class members *without* measurable damages (because class members with higher spending are even more likely to have measurable damages than class members with spending near the $10 cut-off).

Mr. Thompson could not draw on other resources to facilitate the matching exercise because Apple conditioned its agreement to produce the payor records on Plaintiffs' agreement that Mr. Thompson would perform his analysis on an "air-gapped" computer – a computer with no Internet connection and segregated from other internal network devices. 2-ER-70–72 ¶ 5(c) (Suppl. Protective Order); *see* 2-ER-82.[8] That prevented him from accessing external databases to confirm if two similar payor records corresponded to the same person. And even if Mr. Thompson could have resolved that issue by contacting purchasers in cases of uncertainty – he

---

[8] An additional challenge was that, when it first produced a sample of the data, Apple produced hash values of only the last four digits of credit card numbers. 11-ER-2115. Although subsequent productions included hashed values for full credit card numbers (which would have been more useful in grouping payor records), Apple never corrected its prior representation that only the last four digits were included. 1-ER-23 n.19; *see* 7-ER-1259–1264. Plaintiffs explained Mr. Thompson could provide testimony to underscore "the importance" of that missing data and explain "what analyses he could conduct with the knowledge that the data include full hashed credit card numbers," 7-ER-1162–1164, but the court rejected the offer, 1-ER-2 n.2.

23

could not, as the protective order barred him from taking verbatim notes of "any portions or sections of the [payor records]," 2-ER-71 ¶ 5(c)(iii) – he had no time to do so. Apple did not complete its payor record productions until November 7, 2024, *see* 11-ER-2121–2122, leaving Mr. Thompson less than two months to determine which of the more than one billion payor records belonged to the same unique purchaser.[9]

### C. Before Trial, Plaintiffs Showed That Less Than 6% Of Potential Class Members Had No Measurable Damages

Of the unique purchasers that Mr. Thompson ultimately identified, *see* 11-ER-2098 ¶¶ 18-20; 12-ER-2222 ¶ 40, Dr. Song determined that upwards of 200 million qualified for class membership – that is, had more than $10 of purchases using a single Apple ID. 9-ER-1595 ¶ 74.[10] Applying Professor McFadden's

---

[9] The scheduling order required Plaintiffs to provide Mr. Thompson's payor record groupings to Apple on December 12, so that Apple could then identify which transactions were associated with the Apple IDs Mr. Thompson grouped together. 2-ER-63. With that data, Dr. Song could aggregate transaction-level overcharges by "payor" (rather than Apple ID). 9-ER-1593–1594 ¶¶ 69-70. Because of Apple's delayed productions, Apple agreed to accept Mr. Thompson's groupings on January 3, 2025. 11-ER-2098 ¶¶ 19-20.

[10] Dr. Song determined whether purchasers qualified for class membership by ascertaining whether they spent more than $10 from a single Apple ID, consistent with the class definition. *See* 9-ER-1594–1595 ¶ 71; 2-ER-109 (defining the class as "limited to those persons who paid more than $10.00 in total to Apple during the Class Period . . . *from any one Apple ID*") (emphasis added). In decertifying the class, the court opined that what matters in applying the $10 threshold is not whether someone purchased more than $10 "from any one Apple ID account," 2-ER-109, but rather whether someone purchased more than $10

damages model, Dr. Song determined that less than 6% of class members (accounting for only 0.5% of all App Store spending) had no positive overcharges. 9-ER-1599–1600 ¶ 83 & fig. 13.

Plaintiffs also introduced a supplemental report from Dr. Song showing that, when aggregating transaction-level overcharges by Apple ID on the complete transaction dataset to estimate class-wide damages, the numbers were virtually the same as with Mr. Thompson's grouping:  less than 6% of the Apple IDs with more than $10 of spending (accounting for just 0.5% of all App Store spending) incurred no positive overcharges.  9-ER-1693–1694 ¶ 3 & fig. 1.  And Dr. Song further showed that 99.9% of the transactions giving rise to potential damages were included in both Mr. Thompson's grouping of Apple IDs and Dr. Song's calculation based on individual Apple IDs.  11-ER-2125 ¶ 8.  Class-wide damages

---

from "one[ ] or . . . *more than one* [Apple ID account]," 7-ER-1179–1180 at 13:11-14:11 (Oct. 2025 Hr'g Tr.) (emphasis added).  The court's statement is contrary to the plain language of the class definition the court itself had approved, and it broadens the class definition to the extent there are class members who spent more than $10 in aggregate across multiple Apple IDs (but not with any single Apple ID).  In any event, that distinction would not affect Plaintiffs' ability to identify class members and allocate damages.  Indeed, Dr. Song determined that, even under the court's understanding of the class definition and using Mr. Thompson's groupings, the proportion of class members without positive overcharges "[is] not materially different."  9-ER-1601 ¶ 85 (Song 2025 Opening Rep.); *see* 9-ER-1660–1661 figs. 24-25 (between 5.3% and 6% of class members who spent more than $10 total across all Apple IDs have no positive overcharges).

also aligned with those two calculation methods:  between $20.2 and $20.4 billion using either method.  *Id.*; 9-ER-1600 ¶ 84 & fig. 13; 9-ER-1694 fig. 1.

**VI.    The District Court Decertified The Class Because Plaintiffs' Experts Did Not Precisely Identify Class Members' Individual Damages**

Apple moved to exclude Mr. Thompson's report (12-ER-2257–2306) and to decertify the class (12-ER-2224–2256); the district court granted both motions.

With respect to the *Daubert* motion, the court found Mr. Thompson unqualified and rejected his grouping approach because it grouped by name rather than "via payment method."  1-ER-22–23 & n.18 (Oct. 2025 Decertification Order).  The court did not square that holding with its subsequent acknowledgement that grouping payor records by payment method was not feasible because Apple did not disclose that it had provided Plaintiffs usable payment method data until the October 2025 hearing.  1-ER-23 n.19.  (Plaintiffs also offered to revise the matching exercise "in approximately six weeks" in light of the later production of full payment card numbers.  7-ER-1162–1163.  The court rejected the offer because, in its view, "[n]o further explanation [wa]s needed."  1-ER-2 n.2.)

The court also focused on two anomalous results produced by Mr. Thompson's method:  its failure, in some instances, to group records together where first names did not match exactly (*e.g.*, Rob and Robert); and its failure to group a set of records together (*e.g.*, those associated with the first name "Kim") when they used both the same fictitious addresses and the same (hashed) phone number.  1-ER-

18–21. In his declaration supporting Plaintiffs' *Daubert* opposition, Mr. Thompson explained these errors had a miniscule impact on his overall groupings and were driven by Apple's data-keeping practices and production. 12-ER-2221–2222 ¶¶ 37-39. Mr. Thompson was further prepared to testify "for the first time why, had he known he had complete payment card numbers, he could have avoided" some of these issues altogether. 7-ER-1162–1163. But the court looked past those considerations, 1-ER-19–21, and refused to consider any additional testimony, 1-ER-2 n.2 ("No further explanation is needed.").

Proceeding to Apple's decertification motion, the court concluded that exclusion of Mr. Thompson's report "alone requires [class] decertification." 1-ER-26. The court reiterated it had expected Plaintiffs to "match Apple ID accounts with *actual consumers*" before trial to determine the number of class members without measurable damages. 1-ER-2. But "[w]ithout the Thompson report," Plaintiffs (1) have "no methodology to match Apple ID accounts to consumers, and therefore no way to show that antitrust injury is 'capable of being established through a common body of evidence,'" 1-ER-26 (quoting *Olean*, 31 F.4th at 666); and (2) cannot "reliably limit the percentage of uninjured class members, such that the Court may determine whether the class is 'fatally overbroad,'" 1-ER-28 (quoting *Olean*, 31 F.4th at 669 n.14).

27

Plaintiffs timely petitioned for and obtained this Court's permission to appeal the district court's decertification order. 6-ER-997. Since then, the district court denied without prejudice both parties' outstanding *Daubert* motions and Apple's pending summary-judgment motion. Dkt.1102 (5-ER-995).

## SUMMARY OF ARGUMENT

The district court's order decertifying the class based on the difficulty of matching purchase records to members of the class conflicts with the predominance standards this Court articulated in *Olean*. It also effectively imposes an administrative-feasibility requirement for certification in conflict with *Briseno*.

*First*, the court's initial determination that Plaintiffs' model could establish class-wide antitrust injury and damages through common proof – as *Olean* requires – was correct. Plaintiffs proffered evidence that, because of Apple's unlawful monopolization, Apple was able to impose inflated commissions on developers, leading developers to set higher prices for apps and in-app digital content. Using an econometric model, Plaintiffs demonstrated both that the class as a whole suffered billions of dollars in overcharges and that virtually all class members (upwards of 94%), accounting for all but a trivial proportion of sales (more than 99%), were subject to such overcharges. That showing was at least as strong as the evidence in *Olean* upheld by this Court to satisfy Rule 23(b)(3)'s predominance requirement.

28

*Second*, the court's demand that Plaintiffs precisely match payment records to individual class members before trial as a condition of maintaining class certification was an abuse of discretion and violated the principle, articulated in *Briseno*, that Rule 23(b)(3) imposes no separate administrability requirement. Any flaws in Plaintiffs' first attempt to match payment records to class members did nothing to undermine the evidence that virtually all class members incurred positive overcharges (*i.e.*, measurable damages). On the contrary, that evidence was stronger than the evidence accepted by the court initially. Moreover, Apple never asserted that the class contained any higher proportion of individuals without positive damages, even though it had all the information it needed to do so. Because the *total* amount of "negative" damages attributable to the class was less than two one-thousandths of the positive damages incurred, no different allocation of those "negative" damages could make any practical difference.

This Court has made clear that the need to employ ordinary claims-administration techniques to allocate damages is not a legally valid justification for denying class certification. And because all class members were exposed to Apple's unlawful monopoly and the vast majority have measurable damages, no concerns about Article III standing (to which the district court did not refer) could justify the district court's decision.

29

## STANDARD OF REVIEW

"A district court's decertification order is reviewed for abuse of discretion." *NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*, 926 F.3d 528, 531 (9th Cir. 2019). "'An error of law is a per se abuse of discretion.'" *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1002 (9th Cir. 2018) (quoting *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 956 (9th Cir. 2013)) (cleaned up). For "issue[s] of law, review is *de novo*." *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1091 (9th Cir. 2010). Should this Court find "no legal error occurred," it will "proceed to review . . . for abuse of discretion" other aspects of the order. *Id.* A district court's decision cannot stand if it "relies upon an improper factor, omits consideration of a factor entitled to substantial weight, or mulls the correct mix of factors but makes a clear error of judgment in assaying them." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1171 (9th Cir. 2010).

## ARGUMENT

## I. The District Court's Initial Certification Order Was Correct

### A. Plaintiffs' Antitrust Claims Are Ideally Suited For Class Adjudication

At trial, Plaintiffs will prove each element of their monopolization claims on a class-wide basis: the definition of the relevant markets; monopoly power in those markets; exclusionary conduct; and class-wide damages. *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020). In other words, "questions of law or fact

common to class members [will] predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "Predominance is a test readily met" in cases involving "violations of the antitrust laws." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (citing Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment). And, here, the elements of Plaintiffs' antitrust claims are subject to "common proof," such that underlying issues "can be determined in one stroke." *Olean*, 31 F.4th at 664, 666.

Indeed, these actions could not possibly be litigated outside the class-action mechanism. The collective damages of the 200 million members of the class amount to $20 billion. But their "individual claim[s], without the class," do not remotely cover "the cost of litigation." *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 957 (9th Cir. 2005) (per curiam). The claims of the three lead Plaintiffs together, for example, sum to just $267. 2-ER-34 ¶ 4.

Apple has never questioned that the foregoing elements of Plaintiffs' monopolization claims can be tried on a class-wide basis. Instead, Apple has focused solely on antitrust injury. Specifically, it has raised challenges associated with matching payment records with individual class members to argue that Plaintiffs cannot establish antitrust injury on a class-wide basis. Such concerns have *zero* impact on how Plaintiffs will try this case. Apple has not identified any way in which any lingering uncertainty about the damages incurred by individual

31

Plaintiffs might affect Plaintiffs' affirmative case or Apple's defense. Yet Apple persuaded the court that tiny discrepancies in Plaintiffs' pre-trial efforts to match payment records with class members – an exercise Plaintiffs showed did not affect class-wide damages or the proportion of uninjured class members – required decertification on the eve of trial.

In reversing its prior certification decision, the court committed legal error and abused its discretion. Under the framework this *en banc* Court established in *Olean*, Plaintiffs provided both (1) a model "*capable* of showing that the [defined] class members suffered antitrust impact on a class-wide basis," 31 F.4th at 680-81; and (2) that the class is not "defined too broadly to permit certification" (because virtually all class members, accounting for the overwhelming share of purchases, had measurable damages), *id.* at 669 n.14.

The court erroneously decertified the class based on concerns about precisely *which* class members were among the tiny percentage without positive overcharges. But that uncertainty resulted from Apple's own refusal to produce useful data and is legally irrelevant under binding law. Moreover, the court's insistence that Plaintiffs match overcharges to class members *before trial* – rather than in administering distribution of any recovery – conflicts with this Court's holding in *Briseno* that Rule 23 imposes no "administrative[ ] feasib[ility]" requirement on class certification. 844 F.3d at 1123.

**B.** **Under *Olean*, Plaintiffs Established Predominance With Evidence "*Capable* Of Establishing Antitrust Impact On A Class-Wide Basis"**

**1.** Under *Olean*, plaintiffs establish predominance when they proffer evidence "capable of establishing antitrust impact for the class as a whole." 31 F.4th at 675. Plaintiffs here met that standard. They showed that, because of Apple's monopolization of app distribution and in-app payments, Apple set a supracompetitive commission rate on App Store transactions, leading developers to set higher prices for paid apps and in-app digital content, resulting in class-wide overcharges exceeding $20 billion. *Supra* p. 9. Every class member made more than $10 in purchases from the App Store and therefore was "exposed to" Apple's unlawful monopolization; predominance is not defeated by the class also encompassing some small "subset of people" who "fortuitous[ly]" did not incur positive overcharges. *Ruiz Torres*, 835 F.3d at 1136-37.

In any event, Plaintiffs *did* show they could identify class members who incurred positive overcharges (and those who did not). Plaintiffs' model – which the court admitted over Apple's challenges – calculates an overcharge associated with each App Store transaction. *Supra* pp. 9-13. Each such transaction is associated with a purchaser, and Apple knows who that purchaser is.[11] Based on

---

[11] As noted above, *supra* p. 14 n.7, Apple argues that it does *not* know who the purchaser is because multiple individuals may use an Apple ID. 7-ER-1153–1154. But it knows which payment card is on the hook for the purchase – it verifies the

33

the data Apple produced over the course of discovery, Plaintiffs were able to match every transaction to a specific account – an Apple ID – and therefore were able to calculate the overcharges associated with each of those Apple IDs.

Plaintiffs also showed that the proportion of class members without measurable damages was small. Plaintiffs calculated aggregate damages for all Apple IDs with purchases greater than $10 in Games, Entertainment, and Music genres – accounting for roughly 70% of total class-member purchases. They showed that more than 92% of those Apple IDs had positive net overcharge damages. 12-ER-2309–2310 ¶¶ 9-10; 13-ER-2351–2352 ¶ 78 & fig. 6. And they also showed that Apple IDs evidencing positive overcharges accounted for *99%* of all purchases within the sample. 13-ER-2351–2352 ¶ 78 & fig. 6.

The proof Plaintiffs introduced after the class was initially certified only strengthened the showing of predominance. Dr. Song determined – after applying Professor McFadden's model to Mr. Thompson's work – that less than 6% of class members (accounting for only 0.5% of all App Store spending) had no positive overcharges. 9-ER-1599–1600 ¶ 83 & fig. 13. And Dr. Song's supplemental report confirmed that aggregating transaction-level overcharges by Apple ID

---

card before allowing the transaction to go through – and courts have recognized that this is enough to identify the purchaser. *See*, *e.g.*, *Ryan Racing, LLC v. Gentilozzi*, 231 F. Supp. 3d 269, 279 (W.D. Mich. 2017) ("Improper expenses for airfare can be readily identified according to the names on the plane tickets, which appear on the credit card bills paid[.]").

across the entire data set produced virtually identical figures: less than 6% of class members had no positive overcharges and they accounted for *less than 1%* of all App Store spending. 9-ER-1693–1694 ¶ 5 & fig. 1.

**2.** As the court initially ruled, Plaintiffs' proof satisfied *Olean*'s predominance standard. 2-ER-132–133 (finding Plaintiffs' "model can show the impact . . . across all members" and holding the court could not "'flatly reject' class certification because the pre-run model shows an estimated 7.9% of the class is uninjured," citing *Olean*). In *Olean*, a class of direct purchasers of packaged tuna sought certification under Rule 23(b)(3), relying on expert testimony to demonstrate that an alleged price-fixing conspiracy caused tuna suppliers to systematically overcharge for their products. 31 F.4th at 671-73. Using a regression model, the plaintiffs' expert calculated that direct purchasers "paid 10.28 percent more for tuna during the conspiracy period than they did during the benchmark periods." *Id.* at 671. And he compared the prices predicted by his model to the "actual prices paid" by members of the class and "showed that 94.5 percent of the purchasers had at least one purchase above the predicted but-for price." *Id.* at 672.

The district court granted class certification, a panel of this Court affirmed, and the Court, sitting *en banc*, upheld the decision. To begin, this Court rejected the argument that "Rule 23 does not permit the certification of a class that

potentially includes more than a de minimis number of uninjured class members."
*Id.* at 669. Rather, "Rule 23(b)(3) . . . requires only that the district court determine after rigorous analysis whether the common question predominates over any individual questions, including individualized questions about injury or entitlement to damages." *Id.* The Court held evidence that actual prices paid by class members were inflated over predicted but-for prices for the class as a whole showed that "impact was common to [class members] during the collusion period." *Id.* at 673. And the fact that more than 94% of purchasers had incurred overcharges on one or more purchases "provided further evidence that the conspiracy had a common impact on all or nearly all the members of the . . . class." *Id.* at 672.

Those holdings demonstrate the correctness of the court's initial holding that Plaintiffs' showing here satisfied Rule 23(b)(3). 2-ER-133 (observing that, "in *Olean*, up to 28% of the class was uninjured, significantly more than the 7.9% posited by plaintiffs here" based on the sample genres analyzed).

Indeed, there are striking similarities between the model Plaintiffs put forward in this litigation and the model introduced by the *Olean* plaintiffs' own expert. The *Olean* plaintiffs' model first calculated an "overcharge derived from [a] regression model," then "multipl[ied] the overcharge estimate of [a fixed] percent by the appropriate sales volume for the defendants . . . to estimate damages for each of the class representatives." 31 F.4th at 673 n.19. Here, Plaintiffs'

36

model is – if anything – *more* precise.  It does not depend on sales estimates, but on precise transaction-level data from Apple.  Similarly, although not required at the class-certification stage, the *Olean* plaintiffs' expert demonstrated he was able to "use[ ] the overcharge derived from the regression model to estimate class-wide damages."  *Id.*  Here, as the court recognized, Plaintiffs' model is similarly capable, "once Apple produces the rest of its app transactional data," 2-ER-133.  Because here, as in *Olean*, "the same evidence w[ould] suffice for each member to make a prima facie showing" of individualized injury under that model, the class "is susceptible to generalized, class-wide proof" and certification is proper.  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).

**II.     The District Court's Decertification Order – Based Solely On The Perceived Difficulty Of Precisely Matching Apple IDs To Class Members Before Trial – Was An Abuse Of Discretion**

The district court abused its discretion in holding that alleged difficulties in "match[ing] payor records to actual consumers" could defeat predominance here. 1-ER-26.  The court's chief concern was that, without a "methodology to match Apple ID accounts to consumers" before trial, there was "no way to show that antitrust injury is 'capable of being established through a common body of evidence, applicable to the whole class.'"  *Id.* (quoting *Olean*, 31 F.4th at 666). That unreasoned conclusion is incorrect.  The matching exercise the court rejected did not affect any issue to be determined at trial.  It could not affect the conclusion

37

that all class members suffered exposure to Apple's unlawful monopolization and incurred massive aggregate damages. And it could not call into doubt that the vast majority of class members, accounting for virtually all purchases, incurred positive overcharges. Accordingly, any difficulty in matching purchases with class members (a difficulty entirely of Apple's own making) bore only on the administrative feasibility of identifying the individual damages of class members – a consideration irrelevant to class certification. *See Briseno*, 844 F.3d at 1123.

### A. The District Court Erred In Decertifying On Predominance Grounds After Accepting Evidence That Establishes Class-Wide Antitrust Impact Susceptible To Common Proof

Although the court stated that it was "crucial that the model accurately and reliably match payor records to actual consumers," 1-ER-26, the court did not (and could not) explain how that matching exercise could affect the predominance inquiry. As noted, *Olean* requires evidence "*capable* of establishing antitrust impact for the class as a whole." 31 F.4th at 675 (emphasis added). Professor MacFadden's model satisfies that standard, because it can determine the overcharges associated with each transaction. There is, moreover, no dispute that Apple has information that would allow the effective matching of Apple IDs associated with each transaction with the account holder. Plaintiffs' supposed inability to accomplish that matching exercise perfectly the first time has no impact

38

on whether Professor MacFadden's model is capable of showing antitrust injury on a class-wide basis.

Nor did the matching issue undermine Plaintiffs' showing that the vast majority of class members had measurable damages. Although it is true that, for a small number of apps, the model shows that lower commissions lead to higher (not lower) prices, any issue this creates could affect only a tiny subset of relevant purchases. None of that prevents Plaintiffs from showing antitrust injury on a class-wide basis, or from showing positive measurable damages for the overwhelming majority of class members and virtually all App Store commerce. Apple offered no evidence to the contrary.

1. Plaintiffs established that the matching issue could not undermine predominance by demonstrating that almost all Apple IDs with qualifying purchases experienced positive overcharges. Before the class was certified, Plaintiffs showed that, among the Apple IDs with more than $10 in spending in the Games, Music, and Entertainment genres, only 7.9% had no net positive overcharges; they accounted for just 1.1% of purchases; and the "negative damages" associated with those accounts amounted to just 0.4% of total damages. *Supra* p. 18. Running the same calculation for all Apple IDs with more than $10 in spending (without grouping) after class certification, Plaintiffs showed that between 5.1% and 5.8% of accounts lacked positive overcharges, and they

39

accounted for 0.4% of spending.[12]  Furthermore, the amount of "negative damages" was less than 0.2% of the $20 billion damages amount.  Mr. Thompson's grouping of Apple IDs only confirmed that result:  using it, Plaintiffs showed that between 5.1% and 5.9% of individual class members had no positive net overcharges;[13] they accounted for just 0.4% of total spending; and "negative damages" for these "unharmed payors" amounted to less than 0.2% of damages incurred by the class. *Supra* pp. 12-13.

2.      The court held that Mr. Thompson's matching exercise was flawed, and therefore it could have no confidence that the 5.1-5.9% number was accurate. Although issues with the matching exercise may introduce *some* inaccuracy into the calculation, that inaccuracy makes no material difference.  Because such a small percentage of accounts lack positive overcharges (and because "negative damages" were exceedingly small), it is impossible for *any* matching of Apple IDs to individuals to defeat the conclusion that almost all class members incurred positive overcharges.  For example, when Dr. Song calculated damages at the account level, he found total damages of $20.2 to $20.4 *billion* dollars; the amount

---

[12] The court struck Dr. Song's supplemental report because "there[ was] no need for it."  7-ER-1194–1196 at 28:22-30:10 (Oct. 2025 Hr'g Tr.).  The report is in the record on appeal, and the court's refusal to consider it was itself an abuse of discretion. *Infra* p. 42.

[13] The percentage varied depending on whether prices were permitted to vary continuously or were constrained to certain "price tiers." *Supra* p. 24 n.10.

40

of "negative damages" for those accounts with no positive overcharges was between $19 and $32 *million*. *Supra* pp. 24-26. To bring these numbers to a more understandable scale, it is like saying a group of consumers were overcharged a combined $1,000, and some small subset had *total* negative damages of between $1 and $1.60. There is no way to "group" the positive and negative overcharges that could make any meaningful difference.

Again, the court *itself* previously acknowledged that Plaintiffs' model – even without the benefit of Mr. Thompson's matching exercise – sufficed to establish predominance. 2-ER-131–133. No subsequent event has called that prior conclusion into doubt. This Court declined to review the district court's certification order when Apple sought a Rule 23(f) appeal. Order, *Pepper v. Apple Inc.*, No. 24-875, Dkt.17 (9th Cir. May 24, 2024). And the district court declined to revisit any of its previous findings as to Professor McFadden's model in its October 2025 decertification opinion. That is notable, because the court had considered (and rejected) Apple's *Daubert* challenges to Professor McFadden's model. 2-ER-113–130.

Furthermore, Apple's claim that it was important to group Apple IDs accurately pre-trial to determine with precision the proportion of class members without positive damages cannot be credited, particularly because flaws in Apple's

*own* data prevented Mr. Thompson from doing so now.[14] Apple concededly possesses all the information it needs to match Apple IDs to individual payors. 2-ER-86. And it can of course implement Professor McFadden's model (and has done so). Accordingly, Apple can determine, with relative ease, precisely how many class members incurred no positive overcharges. Yet it has never asserted that the proportion of class members without measurable damages is higher than Plaintiffs have claimed – just that Plaintiffs' number is not to be trusted.

The court's choice to decertify here is especially confounding given its decision to strike Dr. Song's supplemental report, which confirmed that Mr. Thompson's matching exercise did not have any practical significance to the predominance inquiry. Specifically, that report showed that aggregating claims at the Apple ID level yielded virtually identical results to the payor-level analysis Mr. Thompson proffered. 9-ER-1693–1694 ¶¶ 3-5 & fig. 1. The court stated there was "no need for" this work. 7-ER-1194–1196 at 28:22-30:10 (Oct. 2025 Hr'g Tr.). But that conclusion cannot be squared with the court's order, which decertified based on the very concerns Dr. Song's supplemental report should have allayed.[15]

---

[14] The court erred in downplaying Apple's data flaws as the reason Mr. Thompson's pre-trial matching exercise had certain limitations. 1-ER-23 n.19.

[15] The court also erroneously held that Mr. Thompson did not qualify as an expert pre-trial to do the matching of Apple IDs to individual purchasers. He is highly qualified to perform the matching exercise at the appropriate time and with the necessary data. However, because Mr. Thompson's testimony was

42

**B.** **The District Court Also Erred In Requiring That Plaintiffs Provide A Mechanism – Prior To Trial And Claims Administration – Of Assessing The *Extent* Of Individual Class Members' Damages**

**1.** The court compounded its error by requiring Plaintiffs to identify class members by name and quantify the precise *amount* of their damages. It insisted that Plaintiffs needed a model that allowed the court, at this juncture, to not only "reliably . . . determine *whether* the consumer was injured," but also, "if so, *to what extent*." 1-ER-26 (emphases added). And it emphasized that "th[e] differing injury status" of the class members justified decertification – even though Plaintiffs already had a precise measure of account-level injury. 1-ER-25–26.

All those concerns are misplaced. *Olean* confirms that the need to calculate whether (and to what degree) individuals suffered damages is a question reserved for the claims-administration stage, not class certification. 31 F.4th at 669 n.13. The defendants there argued (as Apple argues here) that the plaintiffs' expert

---

unnecessary at this time under a correct understanding of applicable class-certification principles – and therefore the court's order to strike his testimony under *Daubert* was unnecessary – this Court need not address the district court's erroneous *Daubert* ruling as to Mr. Thompson. The proper course is for this Court also to vacate the *Daubert* ruling. In the event a matching of Apple IDs to purchasers is necessary after a jury verdict (which would be rendered as to total class-wide damages), Mr. Thompson's methodology could be a component of damages distribution because it could then rely on public information and other verification techniques. Accordingly, this Court's vacatur of the unnecessary pre-trial ruling involving his testimony will ensure that there is no prejudice to a proper process for disseminating any damages awarded by the jury.

43

employed "averaging assumptions," which effectively " 'paper[ed] over' individualized differences among class members" relevant to the antitrust injury they experienced. *Id.* at 677-78. Yet *Olean* "disagree[d]" that this bore on class certification. *Id.* After all, models can show "class-wide impact, 'even when the market involves diversity in products, marketing, and prices.' " *Id.* (quoting *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1254-55 (10th Cir. 2014)).

    **2.**    This Circuit has "emphasized" this holding of *Olean*, *see Bowerman v. Field Asset Servs. Inc.*, 60 F.4th 459, 469 (9th Cir. 2023), and has "repeatedly reaffirmed that class treatment may be appropriate even where damages must be assessed on an individualized basis," *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1027 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1308 (2025); *see Yokoyama*, 594 F.3d at 1094. If a district court decertifies based on a plaintiff's failure to show individualized damages at the certification stage, it has "applied the wrong legal standard, a per se abuse of discretion." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167 (9th Cir. 2014); *see Leyva*, 716 F.3d at 513-15 (similar).

Other circuits similarly follow "the 'black letter rule' " that, "no matter how individualized the issue of damages may be, determination of damages may be reserved for individual treatment" after class certification. *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 853-55, 861 (6th Cir. 2013) (cleaned up); *see*, *e.g.*, *In re Nexium Antitrust Litig.*, 777 F.3d 9, 21-22 (1st

44

Cir. 2015) (similar); *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) (similar); *Sullivan v. DB Invs., Inc.*, 613 F.3d 134, 159 (3d Cir. 2010) (similar). As they must: A contrary rule "would drive a stake through the heart of the class action device." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801-02 (7th Cir. 2013). It is only in "rare[]" and "extreme" cases that "the fact that damages must be calculated on an individual basis" will be any "impediment to class certification." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259-60 (11th Cir. 2004).

**3.** *Olean* elaborates on what those "rare" and "extreme" circumstances look like: cases where the plaintiffs can "propose[] no further way – short of full-blown, individual trials to determine the common question of whether class members were injured" and by how much. *Olean*, 31 F.4th at 669 n.13 (distinguishing *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 625 (D.C. Cir. 2019)) (cleaned up). By contrast, certification is proper where, as here, an expert offers a "proposal for calculating damages [that] is a straightforward process of applying the class-wide overcharge to the [defendants' particular] sales records." *Id.* at 682 n.31.[16] Because such a "proposal does not

---

[16] By contrast, *Rail Freight Fuel Surcharge Antitrust Litigation* involved a circumstance where there was no centralized dataset from which to calculate overcharges; instead, the expert's regression model had to be applied to individual shipper transactions, requiring the kind of individualized, transaction-by-transaction inquiries that would amount to mini-trials for a substantial segment of the class. 934 F.3d at 624-26.

45

give rise to a concern about individualized mini-trials to determine each class member's damage award," individual questions would not predominate even if a defendant may be able to later " 'pick off' " various class members once that approach was applied at the damages phase. *Id.* (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014)).

Here, there is no risk of needing individualized trials. Apple has conceded that it possesses the data necessary to link transactions to individuals – data that would allow Plaintiffs "to demonstrate which App Store transactions are tied together by a common payor so that they can net out which payors have alleged damages and which do not." 2-ER-86. The decertification order does not contest that "Apple should have accurately transmitted" the required information and that Apple failed to do so. 1-ER-23 n.19. Yet it confoundingly suggests that Apple's failure to do so "do[es] not compel a different result." *Id.* But the *existence* of that data confirms that figuring out which specific class members are entitled to compensation (and how much) is not an insurmountable task. *Cf. Olean*, 31 F.4th at 669 n.13. And the court failed to explain why post-trial claims administration – an approach the court itself previously had called "reasonably objective," 4-ER-689 – would not suffice. Moreover, individual class members can come forward (post-trial) to identify which accounts belonged to them.

46

**C.** **The District Court Erred In Applying A Certification-Stage Administrability Requirement, In Violation Of *Briseno***

**1.** The court's view that Plaintiffs had to determine exactly *which* members of the class were among the small number without positive overcharges to obtain class certification – prior to class certification – also conflicts with *Briseno*. That decision rejected the proposition that a plaintiff class is required to "proffer . . . an administratively feasible way to identify putative class members" as a condition of class certification. 844 F.3d at 1133. Instead, this Court held, courts have a "variety of procedural tools" to ensure that absent class members are identified – including mechanisms that can be employed "[a]t the claims administration stage." *Id.* at 1128, 1131; *see id.* at 1131 ("Rule 23 specifically contemplates the need for such individualized claim determinations after a finding of liability."). Here, again, if Plaintiffs prevail at trial, the damages owed in each account will have been calculated based on Apple's data. At most, administration would require members' submissions to identify their Apple IDs. *Supra* p. 17.

Because Apple knows the payor behind each transaction, there could be no difficulty in determining the identities of the individuals who paid overcharges. *Cf.* 1-ER-22 (expressing concerns about multiple family members sharing an Apple ID – an irrelevant consideration, as only the payor suffers pocketbook injury). But any lingering uncertainty easily could be addressed at the claims-administration stage through affidavits and other measures of proof to identify

47

which specific Apple IDs are theirs. *See Briseno*, 844 F.3d at 1132 (discussing this option); *id.* at 1131 n.10 ("District courts also have discretion to allow limited discovery from absent class members if the particular circumstances of a specific case justify it."); *Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817, 831 (8th Cir. 2016) (observing that, "[b]efore a hearing could be held on damages, the district court referred the case to [a] magistrate judge to determine which members should be *included* within the class").

2.      Subsequent Ninth Circuit decisions echo *Briseno*'s caution against making these sorts of administrability concerns an obstacle at the class-certification stage. *In re Google Inc. Street View Electronic Communications Litigation*, for example, featured a class-member objector arguing that, if it was "practically impossible to identify absent class members at the time of certification, then a class action cannot be a superior method of adjudicating the controversy." 21 F.4th 1102, 1116 (9th Cir. 2021) (cleaned up). Rejecting that proposition, this Court emphasized that Rule 23 never "'mentions administrative feasibility'" and that imposing such a requirement "could render other Rule 23 provisions, such as 'the likely difficulties in managing a class action,' . . . superfluous." *Id.* (quoting *Briseno*, 844 F.3d at 1125-26) (cleaned up). And in *Hamilton v. Wal-Mart Stores, Inc.*, this Court echoed those principles, noting that "putative class actions involving monetary damages need not satisfy a freestanding administrability

48

inquiry" and that "Congress 'opted not to make the potential administrative burdens of a class action dispositive and instead directed courts to balance the benefits of class adjudication against its costs.'" 39 F.4th 575, 589 (9th Cir. 2022) (quoting *Briseno*, 844 F.3d at 1128).

Contrary to the district court here, courts across this Circuit have understood *Briseno* to hold that, "no matter how laborious or imperfect the process of identifying Class Members is, it does not present a predominance issue." *Brown v. DirecTV, LLC*, 562 F. Supp. 3d 590, 602 (C.D. Cal. 2021); *see Behar v. Northrup Grumman Corp.*, 2024 WL 5275027, at *3 (C.D. Cal. Dec. 3, 2024) ("[I]ndividualized inquiries are better suited for *after* a finding of liability and at the claims administration stage[.]"); *Weiner v. Ocwen Fin. Corp.*, 343 F.R.D. 628, 633 (E.D. Cal. 2023) (holding uninjured class members "may be weeded out at the claims phase"); *In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prods. Liab. Litig.*, 609 F. Supp. 3d 942, 966 n.11 (N.D. Cal. 2022) (holding classes can be certified where class members lack "'objective proof' of purchases" because a contrary "argument is a variant on ascertainability that the Ninth Circuit has determined is no stumbling block to certification"); *Kang v. Credit Bureau Connection, Inc.*, 2022 WL 16748698, at *4 (E.D. Cal. Nov. 6, 2022) (citing cases confirming that "the 'most appropriate time' to adjudicate individual issues . . . [about] individual claims for damages is during the trial phase of the proceedings or during the claims

49

administration process"); *Victorino v. FCA US LLC*, 2020 WL 2306609, at *3-4 (S.D. Cal. May 8, 2020) (using bifurcated claims-administration scheme to ensure that certain "claimants purchased the Class Vehicles for personal, family, or household purposes"). Again, the administration here would prove straightforward. Each class member could identify his or her Apple IDs.

Then-District Judge Koh addressed facts materially identical to this case in *Williams v. Apple* and came to the opposite conclusion as the district court here. The *Williams* plaintiffs sought to certify a class of consumers who purchased subscriptions to Apple's iCloud service. 338 F.R.D. at 645. Apple opposed certification, arguing that individual issues predominated because "some iCloud users are on family plans, which take payment from only one family member at a given time," and it was "infeasible to determine *who* in a family plan 'paid for the subscription' and thus is a member of the Damages Class." *Id.* (cleaned up). Judge Koh properly rejected that argument, noting that, "as in *Briseno*, the administrative feasibility of identifying who paid for the product at issue – and thus could be a member of the Damages Class – is immaterial to class certification" because "a claims administration process would suffice to show membership in [the] class." *Id.* "[E]ven if consumers lack 'receipts' of their iCloud purchases, consumers could eventually proffer affidavits describing their purchases to prove class membership." *Id.* at 646 (cleaned up). And "Apple would," of course, "have

the opportunity to challenge the claims of absent class members if and when they file claims for damages." *Id.* (cleaned up). For all those reasons, "the asserted difficulty of identifying 'who paid for a subscription to iCloud' [wa]s no bar" for class certification. *Id.*

Decisions of other circuits similarly recognize "that a freestanding administrative feasibility requirement" for class certification of the type the court functionally imposed here "is neither compelled by precedent nor consistent with Rule 23." *In re Petrobras Sec.*, 862 F.3d 250, 264, 269 (2d Cir. 2017); *see also, e.g.*, *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 525 (6th Cir. 2015) (similar); *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 658, 662 (7th Cir. 2015) (similar); *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 995-96 (8th Cir. 2016) (similar); *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1303 (11th Cir. 2021) (similar).

**3.** The court's order grappled with none of these considerations or authorities. Instead, it cited a *Briseno* footnote that undercuts its core holding. 1-ER-27 (citing *Briseno*, 844 F.3d at 1124 n.4). That footnote confirms that this Court never has adopted "a threshold 'ascertainability' prerequisite to certification." *Briseno*, 844 F.3d at 1124 n.4. The district court then quoted (without attribution) that footnote's characterization of another decision, *Ruiz Torres*, 835 F.3d at 1136-39, as "addressing [the] claim that class definition was

51

overbroad – and thus arguably contained some members who were not injured – as a Rule 23(b)(3) predominance issue," 1-ER-27; *see Briseno*, 844 F.3d at 1124 n.4 (same). But while *Ruiz Torres* does answer the question *whether* the presence of uninjured class members presents a predominance problem, it answered in the negative, concluding that "overbreadth of the class definition" is "a merits dispute about the scope of that liability, and is not appropriate for resolution at the class certification stage." 835 F.3d at 1136-37.

**D.      Article III Standing Principles Do Not Compel A Different Result**

Apple cannot defend the court's decertification order on the basis that uncertainty over which class members may lack measurable damages implicates absent class members' Article III standing. All class members – having made purchases from the monopoly App Store that distorted competition – have standing to sue. Nothing prevents Apple from seeking summary judgment as to any absent class members who (they assert) lack valid claims for any reason, including (supposed) lack of standing. *See Healy v. Milliman, Inc.*, 164 F.4th 701, 708-09 (9th Cir. 2026).

The court's decertification decision was not based on any concern about constitutional standing. That is illustrated by the explanation of how the grouping of Apple IDs could affect a class member's damages: The court noted that, if an individual had two accounts, one with $2 in overcharges and one with $5 in

"negative" damages, the individual "would be unharmed by $3." 1-ER-26 (quoting Apple's expert). Accepting, for the sake of argument, that it is appropriate to offset actual damages in this way, "netting out" account damages for the tiny percentage of class members affected that way – which would occur during the post-trial claims-administration process – does nothing to affect the class member's standing to sue and maintain their claim. Being subjected to an overcharge is an actual, redressable injury. Offsetting that overcharge could affect the merits of the individual class member's claim (and their entitlement to damages) but not their constitutional standing (or the existence of antitrust injury). "[A] compensable injury is not required for Article III standing." *Hoever v. Marks*, 993 F.3d 1353, 1361 (11th Cir. 2021) (*en banc*) (citing *Carey v. Piphus*, 435 U.S. 247, 266 (1978)).

Indeed, *all* class members, by virtue of having made purchases from the monopoly App Store, incurred an injury sufficient to confer standing. Apple's anticompetitive conduct "foreclosed nearly all alternative channels of iOS app sales." 10-ER-1732–1742. "[L]imiting consumer choice, reducing output and innovation, and increasing prices for lower quality and fewer services" all constitute injury-in-fact that all Plaintiffs in the class would have suffered. *Dairy, LLC v. Milk Moovement, Inc.*, 2023 WL 3437426, at *11 (E.D. Cal. May 12, 2023) (citing cases); *see* 3G Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*

53

¶ 391e (Sept. 2025 update) ("Consumers . . . do not get the benefit of the competition that would have accompanied entry.").

This Court's holding in *Healy* that "the logic of *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) requires unnamed members of a certified class for money damages to demonstrate standing at summary judgment," 164 F.4th at 705 (parallel citations omitted), does not place any burden on Plaintiffs to match Apple IDs to individual class members or to prove individual *damages* for absent class members. As *Healy* noted, to the extent a defendant seeks to challenge the standing of absent class members at summary judgment, "the usual summary judgment standards apply." *Id.* at 703. Apple accordingly bore "the initial responsibility" of "identifying those portions" of the record "which it believes demonstrate the *absence* of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (emphasis added). Here, Apple did not argue that any specific unnamed class members were uninjured. Because they all purchased apps and made in-app purchases in the monopolized App Store, all of them were injured by Apple's monopoly.

The court instead focused solely on whether some small number of absent class members lacked measurable *damages* under Professor McFadden's model. The proper vehicle for the court to have done so was summary judgment. *See Healy*, 164 F.4th at 709. (Indeed, Apple previously took that step as to one named

54

plaintiff.) And, even then, "at the summary judgment stage the plaintiffs need not establish that they in fact have standing, but only that there is a genuine question of material fact as to the standing elements." *Id.*

## CONCLUSION

This Court should vacate the district court's decertification order, reinstate the class certification, and remand for further proceedings.

Date: May 13, 2026

Respectfully submitted,

/s/ David C. Frederick

Betsy C. Manifold
Rachele R. Byrd
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
750 B Street, Suite 1820
San Diego, CA 92101
Tel.: (619) 239-4599
manifold@whafh.com
byrd@whafh.com

Mark C. Rifkin
Matthew M. Guiney
Thomas H. Burt
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
Tel.: (212) 545-4600
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

David C. Frederick
Aaron M. Panner
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel.: (202) 326-7900
dfrederick@kellogghansen.com
apanner@kellogghansen.com

*Counsel for Plaintiffs-Appellants*

55

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief complies with the word limit of Ninth Circuit Rule 32-1(a) because it contains 12,762 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f) and Ninth Circuit Rule 32-1(c).

I further certify that the foregoing brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point, Times New Roman font.

/s/ *David C. Frederick*
*Counsel for Plaintiffs-Appellants*

May 13, 2026

## CERTIFICATE OF SERVICE

I hereby certify that, on this 13th day of May 2026, I caused the foregoing

**Opening Brief of Plaintiffs-Appellants** to be submitted electronically with the

Clerk of the Court through the Court's appellate ECF system.

I further certify that, on this date, the foregoing petition was served by

electronic mail and overnight mail upon the following:

Cynthia E. Richman
crichman@gibsondunn.com
Harry R. S. Phillips
hphillips2@gibsondunn.com
GIBSON, DUNN & CRUTCHER
   LLP
1700 M Street, N.W.
Washington, D.C. 20036
Tel.: (202) 955-8500

Theodore J. Boutrous Jr.
tboutrous@gibsondunn.com
Daniel G. Swanson
dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER
   LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel.: (213) 229-7000

Caeli A. Higney
chigney@gibsondunn.com
Julian W. Kleinbrodt
jkleinbrodt@gibsondunn.com
Dana L. Craig
dcraig@gibsondunn.com
Eli M. Lazarus
elazarus@gibsondunn.com
GIBSON, DUNN & CRUTCHER
   LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Tel.: (415) 393-8200

*Counsel for Defendant-Appellee Apple Inc.*

 /s/ *David C. Frederick*
*Counsel for Plaintiffs-Appellants*

# ADDENDUM

## FEDERAL RULES INVOLVED

1.      Federal Rule of Civil Procedure 23(b)(3) provides:

## Rule 23.  Class Actions

* * *

(b) Types of Class Actions.  A class action may be maintained if Rule 23(a) is satisfied and if:

* * *

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

* * *

2.      Federal Rule of Evidence 702 provides:

## Rule 702.  Testimony by Expert Witnesses

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.