**No. 25-7930**

### UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

IN RE APPLE IPHONE ANTITRUST LITIGATION

On Appeal from the United States District Court
for the Northern District of California
Case No. 4:11-cv-6714-YGR, Hon. Yvonne Gonzalez Rogers

### EXCERPTS OF RECORD OF PLAINTIFFS-APPELLANTS VOLUME 2 of 13 (2-ER-29–275)

Betsy C. Manifold
Rachele R. Byrd
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
750 B Street, Suite 1820
San Diego, CA 92101
Tel.: (619) 239-4599

Mark C. Rifkin
Matthew M. Guiney
Thomas H. Burt
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
Tel.: (212) 545-4600

David C. Frederick
Aaron M. Panner
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite
400 Washington, D.C. 20036
Tel.: (202) 326-7900

*Counsel for Plaintiffs-Appellants*

May 13, 2026

BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
STEPHANIE AVILES (350289)
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
saviles@whafh.com

MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
THOMAS H. BURT (*pro hac vice*)
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

*Interim Class Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR |
| | **DECLARATION OF RACHELE R. BYRD IN SUPPORT OF PLAINTIFFS' ADMINISTATIVE MOTION FOR LEAVE TO SUBMIT INDIVIDUAL PLAINTIFFS' DAMAGES INFORMATION IN RESPONSE TO COURT'S QUESTION AT OCTOBER 14, 2025 HEARING** |
| | CTROOM:    1, 4th Floor<br>JUDGE:      Hon. Yvonne Gonzalez Rogers |

DECL. OF RACHELE R. BYRD IN SUPPORT OF PLAINTIFFS' ADMIN. MOT. FOR LEAVE
Case No. 4:11-cv-06714-YGR

**ER-30**

I, Rachele R. Byrd, declare as follows:

1.    I am an attorney duly licensed to practice before all courts of the State of California. I am a partner of the law firm Wolf Haldenstein Adler Freeman & Herz LLP, Class Counsel for Plaintiffs. I submit this declaration in support of Plaintiffs' Administrative Motion to Submit Individual Plaintiffs' Damages Information in Reponses to Court's Question at October 14, 2025 Hearing ("Motion"). I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.    **Exhibit 1** is a true and correct copy of the Supplemental Declaration of Minjae Song, Ph.D. dated October 16, 2025 ("Supplemental Song Declaration").

3.    On October 15, 2025, my partner, Betsy C. Manifold, provided Defendant with a draft copy of the Supplemental Song Declaration and inquired whether Defendant was willing to stipulate to its filing.

4.    On October 16, 2025, Defendant responded that it would not stipulate, contending the Supplemental Song Declaration is untimely, and that it intends to oppose the Motion.

5.    I therefore was unable to obtain a stipulation from Defendant to the relief requested in the Motion.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct. Executed October 16, 2025 at Poway, California.

<em>/s/ Rachele R. Byrd</em><br>
RACHELE R. BYRD

# EXHIBIT 1

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT**

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| **IN RE APPLE IPHONE ANTITRUST LITIGATION** | **No. 4:11-cv-06714-YGR**<br><br><br>**Hon. Yvonne Gonzalez Rogers** |

SUPPLEMENTAL DECLARATION OF

# MINJAE SONG, PH.D.

**OCTOBER 16, 2025**

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

I, Minjae Song, hereby declare and state as follows:

1. I submit this Supplemental Declaration in further support of Plaintiffs' Opposition to Apple's Motion for Summary Judgment (the "Opposition"). If called as a witness to testify, I could and would testify competently thereto.

2. I understand that the Court asked during the October 14, 2025 hearing on Apple's motions whether Plaintiffs' experts had calculated the individual damages of the Named Plaintiffs— Robert Pepper, Stephen Schwartz, Edward Hayter, and Edward Lawrence.

3. At my direction, my team previously calculated the individual damages for all four Named Plaintiffs using the results of our computation of class-wide damages based on the complete App Store database produced by Apple. These individual damages calculations were performed both with Apple's price tiers removed (*i.e.*, flexible pricing) and with the price tiers in place.

4. The Named Plaintiffs' individual damages, calculated both with and without Apple's price tiers, are set forth below:

| Named Plaintiff | Total App and In-App Purchases | Individual Damages With Flexible Pricing | Individual Damages With Price Tiers |
| --- | --- | --- | --- |
| Robert Pepper | $1,877.83 | $224.84 | $212.39 |
| Stephen Schwartz | $710.20 | $18.05 | $19.02 |
| Edward Hayter | $28.94 | -$0.72 | $0.30 |
| Edward Lawrence | $494.35 | $25.03 | $20.62 |

5. I hereby declare, subject to the penalty of perjury under the laws of the United States, that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Executed this 16th day of October, 2025, at Washington, DC.

_____
Minjae Song, Ph.D.

Declaration of Minjae Song, Ph.D.                    No. 4:11-cv-06714-YGR | Page 1 of 1

**ER-34**

BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
STEPHANIE AVILES (350289)
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: 619 239-4599
Facsimile: 619 234-4599
manifold@whafh.com
byrd@whafh.com
saviles@whafh.com

MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
THOMAS H. BURT (*pro hac vice*)
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

*Class Counsel for Plaintiffs*
 Additional counsel on signature page

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| In re Apple iPhone Antitrust Litigation | No. 4:11-cv-06714-YGR<br><br>**RESPONSIVE SEPARATE STATEMENT WITH ADDITIONAL MATERIAL FACTS**<br><br>The Honorable Yvonne Gonzalez Rogers<br><br>Date:      October 14, 2025<br>Time:      2:00 p.m.<br>Courtroom:  1, 4th Floor |

[REDACTED VERSION]

RESPONSIVE SEPARATE STATEMENT WITH ADDITIONAL MATERIAL FACTS
Case No. 11-cv-06714-YGR

**ER-35**

### APPLE'S TABLE OF ABBREVIATIONS

| Abbreviation | Referenced Document |
|---|---|
| Ex.__ | Exhibits to the Declaration of Cynthia E. Richman in Support of Apple Inc.'s Motion for Summary Judgment, Motion to Decertify the Class, and *Daubert* Motion to Exclude the Opinions of Mr. Darryl Thompson & Prof. Alan MacCormack. |
| [Date] [Name] Dep. | Deposition transcript of named witness, each attached as an Exhibit to the Declaration of Cynthia E. Richman in Support of Apple Inc.'s Motion for Summary Judgment, Motion to Decertify the Class, and *Daubert* Motion to Exclude the Opinions of Mr. Darryl Thompson & Prof. Alan MacCormack. |
| Abrantes-Metz Rep. | Expert Report of Rosa M. Abrantes-Metz, Ph.D., dated March 7, 2025. |
| Abrantes-Metz Reb. Rep. | Reply Report of Rosa M. Abrantes-Metz, Ph.D., dated June 13, 2025. |
| *Epic* Trial Tr. | Transcript from the trial held in *Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640, from May 3, 2021 to May 24, 2021. |
| Halderman Rep. | Opening Expert Report and Declaration of J. Alex Halderman, Ph.D., dated March 7, 2025. |
| Halderman Reb. Rep. | Rebuttal Expert Report and Declaration of J. Alex Halderman, Ph.D., dated June 13, 2025. |
| Hitt Rep. | Opening Expert Report and Declaration of Lorin M. Hitt, Ph.D., dated March 7, 2025. |
| Jin Rep. | Opening Expert Report and Declaration of Ginger Jin, Ph.D., dated March 7, 2025. |
| McFadden Rep. | Expert Report of Daniel L. McFadden, Ph.D., dated March 7, 2025. |
| Prince Reb. Rep. | Rebuttal Expert Report and Declaration of Jeffrey T. Prince, Ph.D., dated June 13, 2025. |
| Simonson Rep. | Opening Expert Report and Declaration of Itamar Simonson, Ph.D., dated March 7, 2025. |
| Sundararajan Rep. | Opening Expert Report and Declaration of Arun Sundararajan, Ph.D., dated March 7, 2025. |
| Sundararajan Reb. Rep. | Rebuttal Expert Report and Declaration of Arun Sundararajan, Ph.D., dated June 13, 2025. |
| Song Rep. | Expert Report of Minjae Song, Ph.D., dated March 7, 2025. |
| Stiglitz Rep. | Expert Report of Joseph E. Stiglitz, Ph.D., dated March 7, 2025. |
| Schiller Decl. | Declaration of Philip W. Schiller ISO Apple's Opposition to Plaintiff's Motion for a Preliminary Injunction, Dkt. 74, *Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640, filed on September 15, 2020. |
| Kosmynka Decl. | Declaration of Trystan Kosmynka, Dkt. 821-10, *Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640, filed on October 8, 2021. |

RESPONSIVE SEPARATE STATEMENT WITH ADDITIONAL MATERIAL FACTS
Case No. 11-cv-06714-YGR

-i-

**ER-36**

Pursuant to the Court's Standing Order in Civil Cases, Defendant Apple Inc. ("Apple") hereby submits the following Supporting Separate Statement of Undisputed Material Facts in support of its Motion for Summary Judgment.

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| Issue 1 (Market Definition) Issue 3 (iOS Design) | **Fact 1:** Apple released iPhone in 2007. Initially, iPhone could run only applications that were preinstalled by Apple. In October 2007, Apple announced that it would allow third-party developers to create native iOS apps. Ex. 5 (Feb. 12, 2021 Cook Dep.) 135:18–22, 136:5–17, 138:19–24, 146:1–19, 248:5–11; Ex. 4 (Feb. 11, 2021 Schiller Dep.) 22:4–6; Ex. 61 (Apple Inc., *Third Party Applications on the iPhone*, Apple Hot News, Oct. 17, 2007) (archived). | Disputed. Initially, iPhone could run only **native** applications that were preinstalled by Apple and Steve Jobs advised developers to create web-based applications that would work through the Safari browser. *See* Ex. 41 (Stiglitz Rep.) ¶ 38.[2] Apple changed course after " ███████████████ ███████████████ " Ex. 10 (Forstall Dep.) at 84:1-85:9. |
| Issue 1 (Market Definition) Issue 2 (Refusal to Deal) Issue 3 (iOS Design) | **Fact 2:** Apple launched the App Store in 2008 as the sole means of distributing native iOS apps to iPhone users. At launch, the App Store included 538 third-party applications. By 2023, the U.S. App Store had over 1.6 million apps. Ex. 5 (Feb. 12, 2021 Cook Dep.) 146:1–19; Ex. 4 (Feb. 11, 2021 Schiller Dep.) 224:5–18; Ex. 19 (Hitt Rep.) ¶ 46(a); Ex. 80 (Schiller Decl.) ¶ 3. | Disputed. At least one competitor, Cydia, launched a third-party app store in 2008 that was available to iOS device users even before Apple introduced its App Store. *See* Ex. 41 (Stiglitz Rep.) ¶ 73; Ex. 33 (Abrantes-Metz Rep.) ¶¶ 89, 107; Ex. 3 (Shoemaker Dep.) at 316:22-24; Ex. 6 (Federighi Dep.) at 296:5-11; Ex. 12 (Elhauge Dep.) at 160:6-23; Ex. 30 (July 11, 2025 Abrantes-Metz Dep.) at 201:16-202:4. Apple prevented iOS users from purchasing native apps and in-app digital content from Cydia and other potential competitors through technological and contractual restrictions that made the App Store the exclusive source for iOS apps and in-app digital content. *See* Ex. 21 (May 30, 2025 Stiglitz Dep.) at 116:14-119:22; Ex. 41 (Stiglitz Rep.) ¶¶ 64, 67-79; Ex. 33 (Abrantes-Metz Rep.) ¶ 89; Ex. 38 (McFadden Rep.) ¶ 14; Ex. 87 (APL- |

---

[1] Issue numbers correspond with the issues listed in the Statement of Issues to be Decided in Apple's concurrently filed Motion for Summary Judgment. *See* Mot. for Summary Judgment at ii.

[2] All exhibits referenced in Plaintiffs' responses or affirmative material facts are attached to the contemporaneously filed Byrd Declaration.

RESPONSIVE SEPARATE STATEMENT WITH ADDITIONAL MATERIAL FACTS
Case No. 11-cv-06714-YGR
-1-

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | | EG_01895633) at -635 (Apple "███████████████████████████ ████████████████████"); Ex. 60 (APL-APPSTORE_09869802) at -803 (Facebook); Ex. 66 (APL-APPSTORE_06587460) at -460 (Facebook); Ex. 7 (Patel (NVIDIA) Dep.) at 150:22-152:1. |
| Issue 1 (Market Definition) | **Fact 3:** The App Store facilitates simultaneous transactions between consumers, on the one hand, and developers, on the other.<br><br>Ex. 104 (Dec. 15, 2022 Abrantes-Metz Dep.) 107:2–11, 108:8–109:1; Ex. 22 (Sundararajan Rep.) ¶¶ 153–164; Ex. 105 (Apple Inc., *Apple Developer Program, Apple Developer*) ("Join the Apple Developer Program to reach customers around the world on the App Store for all Apple platforms."). | Disputed. The App Store sells apps and in-app digital content directly to consumers. Separately, and at a different time, the App Store sells app and in-app digital content distribution services to developers while retaining sole discretion to make apps and in-app digital content available to consumers. The App Store does not connect consumers to developers to transact with each other. *See* Ex. 46 (Stiglitz Rebuttal Rep.) ¶ 64; Ex. 13 (Aug. 3, 2021 McFadden Dep.) at 30:19-31:9, 57:17-19; Ex. 22 (June 4, 2025 Song Dep.) at 76:17-19; Ex. 71 (APL-APPSTORE_10137264) at -296 (Apple Developer Program License Agreement stating app "███████████████████ ████████████████████████ ████████████████████████ ██████████."). |
| Issue 1 (Market Definition) | **Fact 4:** In addition to the App Store, developers can distribute their apps and digital content through web apps, their own websites, and other app transaction platforms.<br><br>Ex. 4 (Feb. 15, 2021 Schiller Dep.) 426:2–13; Ex. 1 (Dec. 16, 2020 Okamoto Dep.) 76:6–9, 98:2–11; Ex. 19 (Hitt Rep.) ¶¶ 84, 94, 122. | Disputed. Apple substantially limits the distribution of iOS apps and in-app digital content. Developers are prohibited from distributing iOS apps through any other platform, and Apple imposes restrictions, including anti-steering rules, that severely limit developers from distributing in-app content outside of the iOS platform. Likewise, iOS users cannot obtain developer content through any app store or in-app purchasing system other than Apple's App Store and its "IAP" system. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 22-23, 27, 67-95, 100-04; Ex. 16 (Dec. 15, 2022 Abrantes-Metz Dep.) at 28:24-29:9; Ex. 15 (Dec. 5, 2022 McFadden Dep.) at 187:3-17; Ex. 3 (Shoemaker Dep.) at |

RESPONSIVE SEPARATE STATEMENT WITH ADDITIONAL MATERIAL FACTS
Case No. 11-cv-06714-YGR

-2-

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | | 277:12-23; Ex. 2 (Fischer Dep.) at 292:5-12; Ex. 28 (Jin Dep.) at 137:16-138:3; Ex. 11 (Rubinfeld Dep.) at 64:12-23; Ex. 63 (APL-APPSTORE_00318230) at -260, -263. |
| Issue 1 (Market Definition) | **Fact 5:** Apple allows users of apps that operate across multiple platforms to access content, subscriptions, or features they have acquired in the app on other platforms or the developer's website, including consumable items in multi-platform games, provided the content, subscriptions, and features are also available as in-app purchases within the app (unless the app qualifies as a "reader" app, in which case users can access previously purchased content or subscriptions that are not available to purchase within the app).<br><br>*See* Ex. 49 (App Review Guidelines, June 9, 2025) at § 3.1.3 (a)–(b) at 26 ("'Reader' Apps" and "Multiplatform Services"); Ex. 19 (Hitt Rep.) ¶¶ 122–133, 136, 140, 141; *see, e.g.,* Ex. 53 (Roblox Corp., *Roblox*, Apple App Store) (explaining that Roblox on iOS "features full cross-platform support, meaning you can join your friends and millions of other people on their computers, mobile devices, Xbox One, or VR headsets.") *and* Ex. 72 (Nia, *Is Roblox Cross-Platform Enabled? Everything to Know*, PlaySwap, Dec. 24, 2024) (similar). | Disputed as incomplete. Under the App Store Review Guidelines, Apple prohibited app developers from directing or informing iOS users of availability of apps and in-app purchases on other platforms. *See* Ex. 63 (APL-APPSTORE_00318230) at -260, -263; Ex. 41 (Stiglitz Rep.) ¶ 87-95; *see also* Ex. 4 (Haun Dep.) at 87:17-89:4; Ex. 3 (Shoemaker Dep.) at 117:20-22; Ex. 5 (Kosmynka Dep. & Errata) at 52:17-24.<br><br>For example, throughout the Class Period, ███████████████████████ *See, e.g.,* Ex. 41 (Stiglitz Rep.) ¶ 89-95; Ex. 5 (Kosmynka Dep.) at 98:6-100:9; Ex. 4 (Haun Dep.) at 172:16-173:19; Ex. 1 (Okamoto Dep.) at 371:1-373:14. |
| Issue 2 (Refusal to Deal)<br><br>Issue 3 (iOS Design) | **Fact 6:** At the App Store's launch, Steve Jobs stated that Apple was "trying to do two diametrically opposed things at once—provide an advanced and open platform to developers while at the same time protect iPhone users from viruses, malware, privacy attacks, etc."<br><br>Ex. 61 (Apple Inc., *Third Party Applications on the iPhone*, Apple Hot News, Oct. 17, 2007) (archived). | Disputed. ████████████████ *See* Richman Decl. Ex. 61 (Dkt. 1003-62). Further, Jobs gives the example of Nokia, which "██████████████ *Id.* at 2. ████████████. *See* Ex. |

RESPONSIVE SEPARATE STATEMENT WITH ADDITIONAL MATERIAL FACTS
Case No. 11-cv-06714-YGR
-3-

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | | 79 (APL-APPSTORE_10888329) at -349. |
| Issue 2 (Refusal to Deal)<br><br>Issue 3 (iOS Design) | **Fact 7:** From the App Store's inception, Apple adopted a closed and secure platform model for distributing native iOS apps, which enables developers to build those apps using Apple's proprietary software and tools such that developers could offer iOS apps (paid or free) through the App Store alone.<br><br>Ex. 1 (Dec. 16, 2020 Okamoto Dep.) 73:10–74:8; Ex. 43 (APL-APPSTORE_00000055) at 081; *see* Ex. 4 (Feb. 11, 2021 Schiller Dep.) 69:1–9, 217:18–25, 292:2–17, 306:8–307:13; Ex. 20 (Halderman Rep.) ¶ 84; Ex. 80 (Schiller Decl.) ¶¶ 3, 4, 10–14, 24, 25. | Disputed. Apple's App Review process suffers from several known weaknesses and has been unable to prevent apps that may compromise device security or user data from being distributed on the App Store.<br><br>*See* Ex. 43 (Kohno Rep.) ¶¶ 148-70; Ex. 47 (Kohno Rebuttal Rep.) ¶¶ 136-78; Ex. 65 (APL-EG_04107164) at -164 ("███████████ ████████████ ████████████ ████████████ ████████████ ██████████"). |
| Issue 1 (Market Definition)<br><br>Issue 2 (Refusal to Deal) | **Fact 8:** Developers can join the Apple Developer Program to obtain a license to use and gain access to Apple's proprietary software development tools and technology in order to develop iOS apps for distribution through the App Store. These tools include over 250,000 Application Programming Interfaces ("APIs") and multiple Software Development Kits ("SDKs").<br><br>Ex. 50 (Apple Developer Program License Agreement, June 9, 2025 ("DPLA")) at 1 ("Apple is willing to grant You a limited license to use the Apple Software and Services provided to You under this Program to develop and test Your Applications on the terms and conditions set forth in this Agreement."); Ex. 5 (Feb. 12, 2021 Cook Dep.) 251:5–10; Ex. 68 (Jessica Burley, *The Apple Ecosystem in the US*, May 2025) at 11 ("Apple has released over 250,000 APIs[.]"); Ex. 80 (Schiller Decl.) ¶¶ 4, 10–14. | Disputed. Incomplete and misleading. The DPLA says "███████ ████████████ ████████████ ████████████ ████████████ ██████████ Richman Decl. Ex. 50 (Dkt. 1003-51) at 1. But all this means is that Apple charges and collects from developers a $99 annual fee and imposes a set of terms and conditions on developers for access to its APIs and SDKs. *See* Fact 9. |
| Issue 1 (Market Definition) | **Fact 9:** Since its launch in 2008, developers who want to distribute apps on the App Store to iPhone users must (i) sign the Developer Program License | Undisputed. |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| Issue 2 (Refusal to Deal) <br><br> Issue 5 (Untimely Claims) | Agreement, which sets out Apple's terms and conditions, (ii) abide by the App Review Guidelines, and (iii) pay a $99 annual fee. <br><br> Ex. 80 (Schiller Decl.) ¶¶ 4, 10–14; Ex. 82 (*Epic* Trial Tr.) 2742:6–2743:10 (Schiller); *see* Ex. 50 (DPLA) at 1 ("Apple is willing to grant You a limited license to use the Apple Software and Services provided to You under this Program to develop and test Your Applications on the terms and conditions set forth in this Agreement."). | |
| Issue 1 (Market Definition) | **Fact 10:** Apple applies a headline commission rate of 30% to digital good purchases made in the App Store. Apple has never increased this headline commission rate. On the contrary, Apple has lowered the commission in multiple instances, including: (1) in 2016, Apple reduced its commission rate to 15% for all subscription renewals after the first year; (2) in 2021, Apple introduced the Small Business Program which offers a reduced rate of 15% to small business developers, who comprise more than 90% of all developers on the App Store; (3) in 2016 and 2021, respectively, Apple also introduced the Video Partner Program and News Partner Program, which reduced the commission rate to 15% for participating developers. <br><br> Ex. 82 (*Epic* Trial Tr.) 2740:3–15, 2804:18–2805:11 (Schiller); Ex. 1 (Dec. 16, 2020 Okamoto Dep.) 86:10–87:2; Ex. 5 (Feb. 12, 2021 Cook Dep.) 24:12–21; Ex. 64 (Apple Inc., *Small developers on the App Store grew revenue by 71 percent over the past two years*, Apple Newsroom, May 11, 2023); Ex. 84 (Apple Inc., *Apple introduces the News Partner Program*, Apple Newsroom, Aug. 26, 2021); Ex. 85 (Apple Inc., *Apple Video Partner Program*, Apple Developer); Ex. | Disputed. Misleading and incomplete. Apple did not introduce the Small Business Program in response to competition; rather, Apple CEO Tim Cook characterized the initially temporary program as motivated by a concern for small businesses, especially in the context of the COVID-19 pandemic. *See* Ex. 41 (Stiglitz Rep.) ¶ 44 & n.63; *see also* Ex. 94 (May 21, 2021 Trial Testimony of Tim Cook, *Epic Games, Inc. v. Apple, Inc.*, No. C-20-5640 YGR) at 3992:4-17. Apple only continued the Small Business Program because it was ███████████ ██████████████████ ███████████████ ██████████ ███████" Ex. 84 (APL-APPSTORE_10871989) at -995. Moreover, Apple viewed its Video Partner Program, News Partner Program, and subscription programs as a ███████████████ ██████████ " *Id.* <br><br> The Video Partner Program is a self-promotional tool that only provides eligibility to developers that agree to integrate with Apple TV and other Apple features, *see* Ex. 46 (Stiglitz Rebuttal Rep.) ¶¶ 37-38, and "██████████ |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | 80 (Schiller Decl.) ¶ 7. | ██████." Ex. 54 (APL-APPSTORE_ 09980457) at -457; *see* Ex. 41 (Stiglitz Rep.) ¶ 44. The News Partner Program likewise is a self-promotional tool that requires that news apps provide their content to Apple News while allowing "████████ ████████████" Ex. 86 (APL-APPSTORE_11289619) at -619; *see* Ex. 41 (Stiglitz Rep.) ¶ 44. |
| Issue 1 (Market Definition) | **Fact 11:** As of 2023, 95% of the apps on the U.S. Storefront were free to download and incurred no commission on the download, and 82.4% were both free to download and did not offer in-app purchases of digital goods and services.<br><br>Ex. 19 (Hitt Rep.) ¶¶ 46 (c), 47 (Exhibit 1), 259 n.420. | Undisputed. |
| Issue 2 (Refusal to Deal) | **Fact 12:** Apple reviews each app and app update that is submitted to the App Store in a process known as App Review, which uses a combination of automated tools and human reviewers to evaluate apps against the App Review Guidelines, and rejects those apps and app updates that fail review.<br><br>Ex. 81 (Kosmynka Decl.) ¶ 2; Ex. 80 (Schiller Decl.) ¶¶ 19, 26; Ex. 2 (Feb. 2–3, 2021 Kosmynka Dep.) 112:1–12, 238:14–239:2, 243:9–20; *see* Ex. 49 (App Review Guidelines, June 9, 2025) at 1 ("[E]very app is reviewed by experts . . . We also scan each app for malware and other software that may impact user safety, security, and privacy."). | Disputed. Apple purports to do this. All apps and app updates go through App Review, but both the human and automated processes have significant flaws, and apps that should fail get through. *See* Ex. 43 (Kohno Rep.) ¶ 115 ("████████████████████ ████████████████████ ████████████████████ ████████████████████."); *id.* ¶ 189 ("██████ ████████████████████ ████████████████████ ████████████████"); Ex. 47 (Kohono Rebuttal Rep.) ¶¶ 136-78; Ex. 67 (APL-APPSTORE_02921977) at -977 ("██ ████████████████████ ████████████████████ ████████████"); Ex. 58 (APL-APPSTORE_09166610) at -610 ("████ |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮"). |
| Issue 2 (Refusal to Deal)  Issue 5 (Untimely Claims) | **Fact 13:** Apple has applied some kind of app-review criteria since the App Store's launch, and in 2010, it formalized this process in the App Review Guidelines. Apple has never permitted third-party app marketplaces on iOS for app distribution in the United States.  Ex. 43 (APL-APPSTORE_00000055) at 080; *see* Ex. 2 (Feb. 2, 2021 Kosmynka Dep.) 197:6–14; *see* Ex. 106 (APL-APPSTORE_03238239) (App Store Review Guidelines, 2010) at 248; Ex. 49 (App Review Guidelines, June 9, 2025) §§ 2.5.2, 4.7 at 16–17, 37. | Disputed. The App Review Guidelines did not formalize the App Review process. The App Review Guidelines are guidance for the developer that neither fully explain the review process, nor are applied mechanically or consistently. *See* Ex. 47 (Kohno Rebuttal Rep.) ¶¶ 111-32 (outlining the inconsistencies in how Apple treats different categories of apps during App Review). |
| Issue 2 (Refusal to Deal)  Issue 5 (Untimely Claims) | **Fact 14:** In 2010, Apple launched iPad, a tablet. iPad ran on iOS until 2019, when Apple launched iPadOS. iPad has an App Store where users can purchase and download apps. As with iPhone, Apple requires native iPad apps to be submitted through App Review and distributed through the App Store.  Ex. 63 (Apple Inc., *Apple Launches iPad*, Apple Newsroom, Jan. 27, 2010); Ex. 88 (Apple Inc., *The new iPadOS powers unique experiences designed for iPad*, Apple Newsroom, June 3, 2019). | Undisputed. |
| Issue 1 (Market Definition) | **Fact 15:** Developers set prices for their app downloads and in-app digital content and they can currently choose among over 800 price tiers.  Ex. 50 (DPLA), Schedule 2, §3.1 ("All of the Licensed Applications shall be marketed by Apple, on Your behalf, to End-Users at prices identified in a price tier and designated by You, in Your sole discretion, from the pricing schedule set forth in the App Store Connect tool[.]"); Ex. 58 (Apple Inc., *App Store Connect Help: Manage app pricing - Set a price,* | Disputed. Incomplete and misleading. Apple's price tiers constrain developers in their pricing choices, for example, by limiting options for bundling and contingent pricing. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 121-37; Ex. 72 (APL-APPSTORE_10342115) at -159. |

RESPONSIVE SEPARATE STATEMENT WITH ADDITIONAL MATERIAL FACTS
Case No. 11-cv-06714-YGR

-7-

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | Apple Developer) ("You'll need to set pricing for your app before you submit it for review. Choose from up to 800 price points by default, and request to access an additional 100 higher price points (up to $10,000)."); *see* Ex. 54 (Apple Inc., *App Store Connect Help: Reference - Pricing and Availability*, Apple Developer) ("The price you choose for the in-app purchases . . . determines both the customer price and your proceeds."); *see also* Ex. 43 (APL-APPSTORE_00000055) at 075 ("we talk about the 70/30 revenue split but the developer gets to pick the price . . .") | |
| Issue 1 (Market Definition) | **Fact 16:** The App Store provides developers with guidance on how to create app descriptions, how to choose app names, and how to select the best app genre.<br><br>*See* Ex. 59 (Apple Inc., *App Store: Creating your product page,* Apple Developer); *see also* Ex. 22 (Sundararajan Rep.) ¶ 155. | Undisputed. |
| Issue 2 (Refusal to Deal)<br><br>Issue 3 (iOS Design) | **Fact 17:** Apple has never permitted sideloading on iOS for app distribution in the United States.<br><br>Ex. 52 (Apple Inc., *Apple Platform Security*, Dec. 2024) at 133 ("Unlike other mobile platforms, iOS, iPadOS, and visionOS don't allow users to install potentially malicious unsigned apps from websites or to run untrusted apps. Instead . . . all apps must be downloaded from the App Store."); Ex. 82 (*Epic* Trial Tr.) 2738:12–14 (Schiller); Ex. 43 (APL-APPSTORE_00000055) at 075. | Undisputed. |
| Issue 3 (iOS Design) | **Fact 18:** "Sideloading" refers to the ability to install apps to devices via third-party app marketplaces or direct downloads. For iOS, this refers to the installation of native apps from outside the App Store. | Disputed. There is no widely accepted definition of "sideloading." Professor Stiglitz defines it as " ████████ ███████████████ ████████████████ ████████ " Ex. 41 (Stiglitz Rep.) ¶ 74. |

RESPONSIVE SEPARATE STATEMENT WITH ADDITIONAL MATERIAL FACTS
Case No. 11-cv-06714-YGR
-8-

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | Ex. 3 (Feb. 10, 2021 Federighi Dep.) 303:12–17; *see* Ex. 20 (Halderman Rep.) ¶ 112. | |
| Issue 3 (iOS Design) | **Fact 19:** "Jailbreaking" refers to a process of effectively removing the security protections of a device to modify the device's behavior. For iOS, this is a process that deliberately bypasses various security features of iOS.<br><br>Ex. 3 (Feb. 10, 2021 Federighi Dep.) 288:6–13; Ex. 20 (Halderman Rep.) ¶¶ 15(j), 105. | Disputed. Apple's definition is overbroad. "Jailbreaking" refers to the process by which iOS devices users can access and unlock the iOS operating system to " ███████████ ████████ " Ex. 64 (APL-EG_ 02273420) at -465; Ex. 41 (Stiglitz Rep.) ¶ 72. |
| Issue 3 (iOS Design) | **Fact 20:** Apple's technical safeguards include system-level software protections that prevent "sideloading" (outside of limited app-testing contexts) and guard against threats arising from removing security measures from devices, including through "jailbreaking." These protections serve as "another line of defense against harmful software." Technical restrictions of this sort were integrated into iOS beginning with the release of iPhone in 2007.<br><br>Ex. 20 (Halderman Rep.) ¶ 92, *see id.* ¶¶ 93, 96, 105, 112; Ex. 3 (Feb. 10, 2021 Federighi Dep.) 224:19–225:15, 227:21–228:21, 289:9–21; Ex. 43 (APL-APPSTORE_00000055) at 080; Ex. 6 (March 8, 2021 Forstall Dep.) 71:9–72:15. | Disputed. Vague and misleading. Apple's iOS software, which was implemented on the iPhone in 2007, prevents use of apps not downloaded through the App Store by requiring a "digital signature" or "certificate" that can only be obtained through the App Store. *See* Ex. 41 (Stiglitz Rep.) ¶ 74 (" ██████ ███████ "); Ex. 6 (Federighi Dep.) at 224:19-225:15, 227:21-228:21, 288:6-13, 289:10-21. Code signing is part of the App Store process in DMA jurisdictions where Apple cannot maintain its App Store monopoly and developers can distribute their apps through alternative distribution methods. *See* Ex. 43 (Kohno Rep.) ¶¶ 264-77. |
| Issue 3 (iOS Design) | **Fact 21:** Providing on-device protections, including sandboxing, code signing, and entitlements are "an essential part of iOS's approach to security."<br><br>Ex. 20 (Halderman Rep.) ¶¶ 14; *see id.* ¶¶ 15(i), 93, 97, 106–108, 110, 143–49; *see also* Ex. 3 (Feb. 10, 12, 2021 Federighi Dep.) 78:15–20, 201:13–204:10, 356:19–22, 360:19–24, 363:12–18; 364:12–20. | Undisputed. |
| Issue 3 (iOS Design) | **Fact 22:** Mandatory code signing is a process where devices verify that any third-party code has been electronically signed by a specific entity. On iOS, | Disputed as misleading. Code signing is part of the App Store process in DMA jurisdictions where Apple cannot maintain its App Store monopoly and developers |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | Apple requires that a developer who is a member of the Apple Developer Program sign their code for their app before submitting it for distribution via the App Store. iOS will not run unsigned apps.<br><br>Ex. 52 (Apple Inc., *Apple Platform Security*, Dec. 2024) at 131 ("To help ensure that all apps come from a known and approved source and haven't been tampered with, these operating systems require that all executable code be signed using an Apple-issued certificate."); *see* Ex. 20 (Halderman Rep.) ¶ 93. | can distribute their apps through alternative distribution methods. *See* Ex. 43 (Kohno Rep.) ¶¶ 264-77; *id.* ¶ 276 (" ▮▮▮▮ "). |
| Issue 3 (iOS Design) | **Fact 23:** Apple built entitlements—controls on which operating system resources may be accessed by certain apps or other software—into iOS. Entitlements are designed to prevent unauthorized access to device features and data, including access by malicious code.<br><br>*See* Ex. 57 (Apple Inc., *Documentation: Bundle Resources - Entitlements*) ("An *entitlement* is a right or privilege that grants particular capabilities to an executable."); Ex. 20 (Halderman Rep.) ¶ 97; *see also* Ex. 90 (*Epic* Trial Tr.) 1102:9–17 (Kosmynka) ("[A]n entitlement gives an app a particular permission to a set of resources of APIs on the . . . user's device."); Ex. 91 (*Epic* Trial Tr.) 3386:20–3387:4 (Federighi). | Undisputed. |
| Issue 3 (iOS Design) | **Fact 24:** Jailbroken phones are more susceptible to "malware" and privacy threats like "spyware" and exposure of sensitive user data as the process relies on vulnerabilities that have not been resolved. Entitlements are critical to mitigate vulnerabilities. | Disputed. Misleading and vague. Phones that are jailbroken in the sense defined by Prof. Stiglitz – *see* Fact 19 – in theory have more vulnerabilities because jailbreaking bypasses iOS's sandboxing requirement. ▮▮▮▮ |

RESPONSIVE SEPARATE STATEMENT WITH ADDITIONAL MATERIAL FACTS
Case No. 11-cv-06714-YGR
-10-

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | *See* Ex. 20 (Halderman Rep.) ¶¶ 106, 107, 110; Ex. 3 (Feb. 10 2021 Federighi Dep.) 291:4–8. | ███████████████. *See* Ex. 5 (Kosmynka Dep.) at 30:18-31:5; Ex. 10 (Forstall Dep.) at 290:22-25; Ex. 8 (Schiller Dep.) at 168:21-169:7. ███████████████████████ ███████████████████████ ███████████████████████. *See* Ex. 10 (Forstall Dep.) at 268:14-269:6; Ex. 90 (APL-EG_00875856) at -858.  None of Apple's cited evidence explains how entitlements, specifically, are critical to preventing jailbreaking or mitigating the dangers, if any, posed by apps downloaded via an app store accessed on a jailbroken phone. ████████████ ████████████████████.  *See* Ex. 6 (Federighi Dep.) at 291:1-293:6. |
| Issue 3 (iOS Design) | **Fact 25:** Apple's warranty "does not apply" to claims for warranty services made with respect to "an Apple Product that has been modified to alter functionality or capability without the written permission of Apple[.]"  There is no evidence in the record that Apple's warranty policies are anticompetitive.<br><br>Ex. 97 (iPhone hardware warranty, current) at 2; *see* Ex. 45 (APL_APPSTORE_06928901) (pre-2011 iPhone hardware warranty) at 902; *see* Ex. 11 (May 14, 2025 McFadden Dep.) 98:20–24 ("Q. Do you have any understanding or opinion as to whether Apple voids the warranties of iOS device consumers who buy competing apps?  A. Actually, I don't know whether it actually does."); *see* Ex. 28 (Halderman Reb. Rep.) ¶¶ 237–38, 242–43; *see* Ex. 14 (May 30, 2025 Stiglitz Dep.) 147:15–21. | Disputed.  Apple's warranty policies are anticompetitive because those policies (in conjunction with other end-user agreements), the contractual restrictions placed on developers, and the technical "walled garden" make the App Store "███ ████████████████████ ████████████████████ ██."  Ex. 41 (Stiglitz Rep.) ¶ 42; Ex. 1 (Okamoto Dep.) at 278:10-12 ("█ ████████████████████ ████████████████████ █████").  Richman Decl. Ex. 45 (Dkt. 1003-46) (warranty); Ex. 68 (APL-EG_07832391) at -392 ("█ ████████████████████ ████████████████████ ████████").  Ex. 76 (APL-EG_09483903) at -903 ███████████████████████ ███████████████████████ ███████████████████████). |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| Issue 3 (iOS Design) | **Fact 26:** Survey data has shown that consumers have ranked "malware protection" and "privacy" as the most important features in Apple's App Store. An Apple survey in 2023 found that 81% of iPhone buyers in the U.S. were satisfied with their devices. An Apple-conducted survey in 2020 found 93% of iPad owners in the U.S. were satisfied with their device. Another Apple-conducted survey concluded that consumers distinguish iOS from Google's Android system by Apple's security and privacy features.<br><br>*See* Ex. 23 (Simonson Rep.) ¶¶ 57–58 ("[P]rivacy, malware protection, and app description details were identified as 'must-have' by the greatest number of respondents[.]"), ¶¶ 92, 103; Ex. 107 (APL-APPSTORE_11425222) (iPhone Buyer FY 23-Q4 Full Report) at 304 (iPhone consumer satisfaction rate); Ex. 92 (APL-APPSTORE_11029055) (iPad Buyer FY20-Q2 Full Report) at 086 (iPad consumer satisfaction rate); Ex. 65 (APL-APPSTORE_11425412) (Q2 2021 Privacy & Security) at 430, 435, 460–61 (showing consumers value privacy and associate Apple with better security and privacy features compared with Android). | Disputed as incomplete and misleading.<br><br>*See* Ex. 39 (Simonson Rep.) ¶¶ 79-82.<br><br>*See* Ex. 49 (Hoyer Rebuttal Rep.) ¶¶ 35-38 ( ▮ ).<br><br>Neither of Apple's ▮ And APL-APPSTORE 11425412 ▮. ▮ *See* Ex. 36 (Hoyer Rep.) ¶ 73. |
| Issue 1 (Market Definition)<br><br>Issue 4 (Scope of Pleading and Standing)<br><br>Issue 5 (Untimely Claims) | **Fact 27:** Apple introduced In-App Purchase ("IAP") in 2009, which is a commerce functionality integrated within iOS. IAP is not bought or sold directly to or by consumers. IAP processes payments, deducts Apple's commission, and remits the remainder to the developer.<br><br>Ex. 48 (APL-APPSTORE_00000004) at 006–007 ("I'm happy to say that we are supporting all of these additional purchasing models in iPhone 3.0 and we are doing it with what we call 'in-app purchase.'"); *see* Ex. 50 (DPLA) § 1.2 at 8 (IAP API definition), Attachment 2 | Disputed. IAP is "Apple's in-app payment processor." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 967 (9th Cir. 2023); Ex. 41 (Stiglitz Rep.) ¶ 43 ( ▮ It was introduced in 2009. *See* Ex. 91 (APL-APPSTORE_ 00207407) at -407 (" ▮ "). It is little, if anything, more than an interface with a consumer's underlying payment source, such as a credit or debit card. With IAP " ▮ |

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| | ("Additional Terms for Use of the In-App Purchase API") at 88–93; *see also* Ex. 80 (Schiller Decl.) ¶¶ 32–34, 38, 40. | ███████████████ " Ex. 41 (Stiglitz Rep.) ¶ 43. "███████ ███████████ " *Id.* But all iOS app developers may only use IAP as their payment processor. *See* Ex. 89 (APL-APPSTORE_10745991) at -6000 ("███ ███████ "); Ex. 41 (Stiglitz Rep.) ¶ 43. |
| Issue 2 (Refusal to Deal)  Issue 4 (Scope of Pleading and Standing)  Issue 5 (Untimely Claims) | **Fact 28:** Since launching its IAP system, Apple's policies have required developers in the United States to use IAP as the payment processor for in-app sales of digital products. Apple has never allowed apps in the App Store that are selling digital goods or services to use third-party payment processors on iOS in the United States (other than as part of the Video Partner Program, which requires integration with a number of Apple technologies).  *See* Ex. 49 (App Review Guidelines, June 9, 2025) § 3.1.1 at 20 ("If you want to unlock features or functionality within your app . . . you must use in-app purchase. Apps may not use their own mechanisms to unlock content or functionality, such as license keys, augmented reality markers, QR codes, cryptocurrencies and cryptocurrency wallets, etc."); Ex. 81 (Kosmynka Decl.) ¶ 15; Ex. 4 (Feb. 11, 2021 Schiller Dep.) 37:18–38:4, 121:21–122:2; Ex. 85 (Apple Inc., *Apple Video Partner Program,* Apple Developer). | Undisputed. |
| Issue 2 (Refusal to Deal)  Issue 4 (Scope of Pleading and Standing) | **Fact 29:** Until October 2021, Apple's App Review Guidelines prohibited developers from using information obtained within the app to target individual users outside of the app to use purchasing methods other than in-app purchase. Apple applied these written policies uniformly to U.S. developers. | Disputed as misleading. Apple changed this guideline only because of the settlement in *Cameron et al v. Apple. See* Ex. 56 (Aug. 26, 2021 news article); Ex. 83 (APL-APPSTORE_11453959) at -962 ("████████████████ ████████████████ "). |

RESPONSIVE SEPARATE STATEMENT WITH ADDITIONAL MATERIAL FACTS
Case No. 11-cv-06714-YGR
-13-

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| Issue 5 (Untimely Claims) | *See* Ex. 94 (APL-APPSTORE_10859338) (App Review Guidelines, June 7, 2021) § 3.1.3 at 350; Ex. 95 (App Review Guidelines, Oct. 22, 2021) § 3.1.3 at 12; Ex. 87 (Apple Inc., *News: App Store Review Guideline updates now available*, Apple Developer, Oct. 22, 2021); Ex. 4 (Feb. 11, 2021 Schiller Dep.) 156:2–8, 162:6–8. | |
| Issue 2 (Refusal to Deal)

Issue 4 (Scope of Pleading and Standing)

Issue 5 (Untimely Claims) | **Fact 30:** The App Review Guidelines previously barred developers from including links, buttons, or using other methods to direct users to external payment mechanisms. These provisions were modified in January 2024 and April 2025.

Ex. 94 (APL-APPSTORE_10859338) (App Review Guidelines, June 7, 2021) §§ 3.1.1, 3.1.3 at 348, 350; Ex. 89 (App Review Guidelines, Jan. 16, 2024) § 3.1.1(a) at 11; Ex. 103 (App Review Guidelines, Apr. 30, 2025) § 3.1.1(a) at 22; Ex. 108 (Apple Inc., *News: Updated guidelines now available*, Apple Developer, May 1, 2025). | Disputed as incomplete. The *Epic* injunction required Apple to change its anti-steering policies. *See* Permanent Injunction, *Epic Games, Inc. v. Apple Inc.*, 4:20-cv-05640-YGR (N.D. Cal. Sept. 10, 2021) Dkt. 813. Apple's efforts to "thwart[] the Injunction's goals" throughout the Class Period resulted in a contempt order. Order at 2, *Epic Games*, (N.D. Cal. Apr. 30, 2025) Dkt. 1508. |
| Issue 6 (Proof of Damages and Injury) | **Fact 31:** Plaintiffs' own damages model calculates that named plaintiff Hayter benefited monetarily from the challenged conduct.

Ex. 98 (Prince Reb. Rep.) ¶ 38. | Disputed. Mr. Hayter has damages under Plaintiffs "Price Tier" model. Song Decl. ¶ 5. Apple's conduct also harmed Mr. Hayter and other Plaintiffs by reducing app output, diminishing quality, and stifling innovation within the iOS ecosystem. *See* Ex. 38 (McFadden Rep.) ¶¶ 17, 19; Ex. 18 (May 14, 2025 McFadden Dep.) at 13:22-15:25, 74:2-12; Ex. 14 (Nov. 5, 2021 McFadden Dep.) at 38:8-39:11; Ex. 41 (Stiglitz Rep.) ¶¶ 21-22, 99-104, 109-120. |
| Issue 6 (Proof of Damages | **Fact 32:** The McFadden-Song model is the sole proof that Plaintiffs suffered monetary injury and quantified damages.[3] | Disputed. Misleading as to injury. In addition to supracompetitive prices, all consumers are injured by having only one |

[3] Points relating to the flaws and assumptions of the McFadden-Song model, which pertain to issue number 6 regarding failure to prove injury and damages, are not included in this Statement because they are not questions of fact. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 36 n.5 (2013) ("[W]hile

*(Cont'd on next page)*

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Resp. & Supporting Evid. |
|---|---|---|
| and Injury) | Ex. 98 (Prince Reb. Rep.) ¶¶ 9–12. | iOS app distribution and in-app purchase option. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 100-04. Decreased output, quality, and innovation on the App Store are also anticompetitive harms. *See id.* at ¶¶ 109-120. |
| Issue 5 (Untimely Claims) | **Fact 33:** Plaintiffs' original Complaint (filed in Dec. 2011), Consolidated Complaint (filed in March 2021), Amended Complaint (filed in September 2012), and Second Amended Consolidated Complaint (filed in September 2013) did not mention in-app purchases.<br><br>Dkt. 1, 26, 81, 111. | Disputed. As early as the first complaint, Plaintiffs alleged Apple's anticompetitive conduct forced iOS device users to pay supracompetitive prices "for *products* sold in the iPhone Applications Aftermarket," which include in-app purchases. Dkt. 1 ¶¶ 87, 93 (emphasis added); Ex. 41 (Stiglitz Rep.) ¶ 40 (recounting evolution of app store products, including in-app purchases). |
| Issue 5 (Untimely Claims) | **Fact 34:** Plaintiffs' Third Amended Consolidated Complaint ("TAC") was filed on September 17, 2020, over 8 years from the filing of their original Complaint.<br><br>Dkt. 1, 229. | Undisputed. |
| Issue 5 (Untimely Claims) | **Fact 35:** Plaintiffs did not include in-app purchases as part of the alleged iOS market until they filed their TAC on September 17, 2020.<br><br>*Compare* Dkt. 229 *with* Dkt. 1, 81, 111. | Disputed. As early as the first complaint, Plaintiffs alleged Apple's anticompetitive conduct forced iOS device users to pay supracompetitive prices "for *products* sold in the iPhone Applications Aftermarket," which include in-app purchases. Dkt. 1 ¶¶ 87, 93 (emphasis added); Ex. 41 (Stiglitz Rep.) ¶ 40 (recounting evolution of app store products, including in-app purchases). |

the data contained within an econometric model may well be 'questions of fact' in the relevant sense, what those data prove is no more a question of fact than what our opinions hold.").

**OPPOSING PARTY'S ADDITIONAL MATERIAL FACTS**

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| Issue 1 (Market Def) | **Additional Fact 36:** A market having two sides is not always a two-sided *transaction* platform. *See* Ex. 46 (Stiglitz Rebuttal Rep.) ¶ 64; Ex. 25 (June 25, 2025 Sundararajan Dep.) at 101:11-16, 121:10-14; Ex. 22 (June 4, 2025 Song Dep.) at 92:4-19; Ex. 37 (Jin Rep.) ¶ 59; Ex. 28 (Jin Dep.) at 87:21-88:9, 101:12-102:4, 103:3-15. | |
| Issue 1 (Market Def) | **Additional Fact 37:** Two-sided markets that do not facilitate simultaneous transactions or sell the same product to both sides can be analyzed as one-sided if their indirect network effects are weak, because such analyses still capture all anticompetitive effects. *See* Ex. 26 (June 25, 2025 Stiglitz Dep.) at 290:2-7; Ex. 41 (Stiglitz Rep.) ¶ 373-74; Ex. 46 (Stiglitz Rebuttal Rep.) ¶ 57. | |
| Issue 1 (Market Def) | **Additional Fact 38:** Apple's experts do not quantify the strength of App Store indirect network effects. *See* Ex. 25 (June 25, 2025 Sundararajan Dep.) at 174:19-25; Ex. 28 (Jin Dep.) at 99:11-21; Ex. 46 (Stiglitz Rebuttal Rep.) ¶¶ 54 n.100, 57-60, 65. | |
| Issue 1 (Market Def) | **Additional Fact 39:** There is no evidence the App Store exhibits significant indirect network effects. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 372-76; Ex. 46 (Stiglitz Rebuttal Rep.) ¶¶ 57-60; Ex. 45 (Abrantes-Metz Rebuttal Rep.) ¶¶ 61-68; Ex. 22 (June 4, 2025 Song Dep.) at 93:6-22; Ex. 21 (May 30, 2025 Stiglitz Dep.) at 182:14-25; Ex. 26 (June 25, 2025 Stiglitz Dep & Errata) at 288:18-289:6. | |
| Issue 1 (Market Def) | **Additional Fact 40:** Apple's experts do not point to any study showing the App Store is a two-sided *transaction* platform or facilitates *simultaneous* transactions. *See* Ex. 48 (Sundararajan Rebuttal Rep.) App. Ex. C.1; Ex. 25 (June 25, 2025 Sundararajan Dep.) at 146:20-25; Ex. 37 (Jin Rep.) ¶ 60 n.110. | |
| Issue 1 (Market Def) | **Additional Fact 41:** The App Store does not connect parties on both sides to transact directly. Rather, it sells distribution services to app developers while retaining discretion to make their apps available to device users separately and at a different time. *See* Ex. 46 (Stiglitz Rebuttal Rep.) ¶ 64; Ex. 13 (Aug. 3, 2021 McFadden Dep.) at 30:21-31:9, 57:17-19; Ex. 22 (June 4, 2025 Song Dep.) at 76:17-19; Ex. 71 (APL-APPSTORE_10137264) at -296; Ex. 25 (June 25, 2025 Sundararajan Dep.) at 121:10-14. | |
| Issue 1 (Market Def) | **Additional Fact 42:** Like a customer at a traditional retailer, iOS users purchase apps directly from Apple through its App Store and IAP system. *See* Ex. 46 (Stiglitz Rebuttal Rep.) ¶ 64; Ex. 9 (Feb. 12, 2021 Cook Dep.) at 227:10-25; Ex. 22 (June 4, 2025 Song Dep.) at 114:21-115:3; Ex. 16 (Dec. 15, 2022 Abrantes-Metz Dep.) at 110:18-21; Ex. 13 (Aug. 3, 2021 McFadden Dep.) at 29:18-22. Apple prevents iOS users from buying apps directly from developers and significantly constrains their other options for | |

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| | buying in-app digital content. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 87-95; Ex. 38 (McFadden Rep.) ¶¶ 17, 19; Ex. 59 (APL-APPSTORE_ 11045202) at -204; Ex. 61 (APL-APPSTORE_06713744) at -744; Ex. 77 (APL-APPSTORE_10890472) at -478. | |
| Issue 1 (Market Def) | **Additional Fact 43:** Plaintiffs' market definition accounts for how Apple's conduct affects both consumers *and* developers. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 372-378; Ex. 46 (Stiglitz Rebuttal Rep.) ¶¶ 54-65; Ex 21 (May 30, 2025 Stiglitz Dep.) at 183:6-7; Ex. 26 (June 25, 2025 Stiglitz Dep.) at 286:8-14, 290:17-291:16; Ex. 38 (McFadden Rep.) ¶ 30 & fig. 2; Ex. 13 (Aug. 3, 2021 McFadden Dep.) at 30:13-18. | |
| Issue 1 (Market Def) | **Additional Fact 44:** Plaintiffs' damages model accounts for both sides of the App Store. *See* Ex. 38 (McFadden Rep.) ¶ 30 & fig. 2 (" ██████████████████ ██████ "); Ex. 18 (May 14, 2025 McFadden Dep.) at 55:3-11; Ex. 14 (Nov. 5, 2021 McFadden Dep.) at 233:7-10; Ex. 40 (Song Rep.) ¶ 8; Ex. 22 (June 4, 2021 Song Dep.) at 56:22-57:6; Ex. 41 (Stiglitz Rep.) ¶ 378. | |
| Issue 1 (Market Def) | **Additional Fact 45:** Plaintiffs' but-for commission rate accounts for both iOS users and developers, and the method works whether or not the App Store is a two-sided platform. *See* Ex. 16 (Dec. 15, 2022 Abrantes-Metz Dep.) at 104:7-12, 112:2-5; Ex. 20 (May 23, 2025 Abrantes-Metz Dep. & Errata ) at 26:3-13. | |
| Issue 1 (Market Def) | **Additional Fact 46:** Apple has monopolized both sides of the App Store. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 28, 377. | |
| Issue 2 (refusal to deal)[4] | **Additional Fact 47:** The DPLA "conditions" developer access to iOS developer tools on agreement to only distribute apps through the App Store. *See* Ex. 70 (APL-APPSTORE_10429513) at -513, -547, -549; Ex. 41 (Stiglitz Rep.) ¶¶ 43, 68-71, 75. | |
| Issue 2 (refusal to deal) | **Additional Fact 48:** The DPLA "conditions" developer access to the App Store on their agreement to use Apple's IAP for all App Store in-app purchases. *See* Ex. 100 (APL-APPSTORE_ 10859338) at -348 (§3.1.1); Ex. 41 (Stiglitz Rep.) ¶¶ 43, 80-86. | |
| Issue 2 (refusal to deal) | **Additional Fact 49:** Apple has rejected requests from app developers to offer alternative payment solutions to customers. *See* Ex. 88 (APL-APPSTORE_10991276) at -276 (Spotify); Ex. 81 (APL-APPSTORE_10871795) (Amazon) (" ██████████ ██████ "); Ex. 41 (Stiglitz Rep.) ¶ 81 (Epic). | |

[4] All Issue 2 citations are relevant to Issue 3 given Apple's argument that its design-choice argument "falls within the ambit of the refusal-to-deal doctrine." Mot. for Summary Judgment at 13.

RESPONSIVE SEPARATE STATEMENT WITH ADDITIONAL MATERIAL FACTS
Case No. 11-cv-06714-YGR
-17-

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| Issue 2 (refusal to deal) | **Additional Fact 50:** Developers may not mention the 30% commission paid to Apple. *See* Ex. 3 (Shoemaker Dep.) at 144:10-23 (" ██████████████ "). | |
| Issue 2 (refusal to deal) | **Additional Fact 51:** Developers may not create apps "similar to the App Store." *See* Ex. 100 (APL-APPSTORE_10859338) at -353; Ex. 66 (APL-APPSTORE_06587460) at -460-61 ( █████████ ); Ex. 41 (Stiglitz Rep.) ¶¶ 69-70. | |
| Issue 2 (refusal to deal) | **Additional Fact 52:** Under Schedule 2 of the DPLA, Developers must agree to set their prices in designated price tiers and pay Apple its 30% commission (or other applicable rate). *See* Ex. 80 (APL-APPSTORE_11288950) at -952 (§ 3.1 - tiers) & -953 (§ 3.4 -commission). Developers must also cede control of their apps to Apple, which exercises sole discretion to provide certain services, including "hosting services." *See id.* at -950 (§§ 1.1-1.2) | |
| Issue 2 (refusal to deal) | **Additional Fact 53:** Apple's warranty policy " ████████████████████ ." *See* Ex. 73 (APL-APPSTORE_06928875) at -876 (warranty); Ex. 1 (Okamoto Dep.) at 278:7-12. | |
| Issue 2 (refusal to deal) | **Additional Fact 54:** Apple's end-user agreements prohibit circumventing Apple's technological "walled garden." *See* Ex. 62 (Software License Agreement for iOS) at 13 (prohibiting "jailbreaking"); Ex. 55 (Apple Media Services Terms and Conditions) at 3-4 ("You may not tamper with or circumvent any security technology included with the Services or Content"); Ex. 41 (Stiglitz Rep.) ¶ 42 and nn.50-51. | |
| Issue 2 (refusal to deal) | **Additional Fact 55:** Apple's technical design reinforces its contractual restrictions in making the App Store the only source for apps and in-app purchases. *See* Ex. 41 (Stiglitz Rep.) ¶ 74 (DPLA and Apple's certificate/code-signing technology work together to make sideloading of iOS apps impossible); *id.* at ¶ 73 (Apple has used its tech to make jailbreaking virtually impossible); Ex. 6 (Federighi Dep.) at 294:17-22. | |
| Issue 2 (refusal to deal) | **Additional Fact 56:** Apple has market power in the markets for smartphones and tablets. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 245-305. | |
| Issue 2 (refusal to deal) | **Additional Fact 57:** ████████████████████████████████. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 273, 274 (Figs. 7,8), 280, 301 (Fig. 9), 302. | |

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| Issue 2 (refusal to deal) | **Additional Fact 58:** There are significant barriers to entry into both the smartphone and tablets markets. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 277-81, 303-05. | |
| Issue 2 (refusal to deal) | **Additional Fact 59:** There are high rates of co-ownership of iPhones and iPads and purchase of one device often leads to purchase of the other. *See* Ex. 98 (APL-EG_06218185) at -185; Ex. 99 (APL-APPSTORE_11109932) at -976; Ex. 57 (APL-EG_09278862) at -905; Ex. 41 (Stiglitz Rep.) ¶¶ 35, 170, 182; Ex. 97 (APL-APPSTORE_10339734) at -953. | |
| Issue 2 (refusal to deal) | **Additional Fact 60:** ███████████████████████ . *See* Ex. 41 (Stiglitz Rep.) ¶¶ 245-50; Ex. 34 (Barnes Rep.) ¶¶ 55-63 & Exs. 5-12; Ex. 21 (May 30, 2025 Stiglitz Dep.) at 89:18-90:2. | |
| Issue 2 (refusal to deal) | **Additional Fact 61:** The App Store has "extraordinarily high operating margins." *Epic Games v. Apple, Inc.*, 67 F.4th 946, 984 (9th Cir. 2023); *see also* Ex. 34 (Barnes Rep.) ¶¶ 5-6, 23-54. | |
| Issue 2 (refusal to deal) | **Additional Fact 62:** Apple's commission rate is supra-competitive. *See* Ex. 33 (Abrantes-Metz Rep.) ¶ 21 (modeling competitive rate at 13.6%); Ex. 41 (Stiglitz Rep.) ¶¶ 145-47. | |
| Issue 2 (refusal to deal) | **Additional Fact 63:** "███████████████████████ ." Ex. 41 (Stiglitz Rep.) ¶¶ 363-71. | |
| Issue 2 (refusal to deal) | **Additional Fact 64:** There is considerable consumer demand for alternative app stores and alternative in-app purchase solutions. *See* Ex. 49 (Hoyer Rebuttal Rep.) ¶ 36. | |
| Issue 2 (refusal to deal) | **Additional Fact 65:** Consumers have no way of knowing how much of their App Store spending is due to Apple's commission. *See* Ex. 36 (Hoyer Rep.) ¶ 84, fig. 15 (███████████████████████); *id.* at ¶¶ 80-84 (majority of iOS mobile device users do not have any knowledge of Apple's requirements on app developers); Ex. 35 (Chen Rep.) ¶¶ 51-67. | |
| Issue 2 (refusal to deal) | **Additional Fact 66:** Consumers often purchase iPhones and iPads without considering their app purchasing options or their app store spending over time. *See* Ex. 36 (Hoyer Rep.) ¶¶ 70-73, 78, 87; Ex. 35 (Chen Rep.) ¶¶ 32-35. | |
| Issue 2 (refusal to deal) | **Additional Fact 67:** Significant switching costs include losing device familiarity, Ex. 35 (Chen Rep.) ¶¶ 166-69; 214-29, and interoperability, *id.* at ¶¶ 181-200, the expense of transferring or losing device content, *id.* at ¶¶ 201-213, and the cost of a new device. Ex. 41 (Stiglitz Rep.) ¶¶ 170, 172, 174-77. | |
| Issue 2 (refusal to deal) | **Additional Fact 68:** Data shows switching away from iOS is limited. *See* Ex. 41 (Stiglitz Rep.) ¶¶ 197-200 ("███████████████████████ "); Ex. 39 (Simonson Rep.) ¶ 166 (███████████████████████). | |

RESPONSIVE SEPARATE STATEMENT WITH ADDITIONAL MATERIAL FACTS
Case No. 11-cv-06714-YGR
-19-

| Issue No. | Opposing Party's Additional Material Facts & Supporting Evid. | Moving Party's Resp. & Supporting Evid. |
|---|---|---|
| Issue 3 (iOS design) | **Additional Fact 69:** ██████████████████████████ ██████ . *See* Ex. 43 (Kohno Rep.) ¶¶ 70-94, 242-49. | |
| Issue 3 (iOS design) | **Additional Fact 70:** ██████████████ ████████ . *See* Ex. 43 (Kohno Rep.) ¶¶ 242-45, 264-90. | |
| Issue 3 (iOS design) | **Additional Fact 71:** ██████████████████████████████████████████████████ . *See* Ex. 43 (Kohno Rep.) ¶ 264-80; Ex. 79 (APL-APPSTORE_10888329) at -348. | |
| Issue 3 (iOS design) | **Additional Fact 72:** ██████████████████████████████████████████████ *See* Ex. 43 (Kohno Rep.) ¶ 280; Ex. 85 (APL-APPSTORE_11433454) at -457. | |
| Issue 3 (iOS design) | **Additional Fact 73:** ████████████████████████ *See* Ex. 85 (APL-APPSTORE_11433454) at -457 ("█████████ ██████████"); Ex. 43 (Kohno Rep.) ¶ 265. | |
| Issue 3 (iOS design) | **Additional Fact 74:** ████████████████████████████ . *See* Ex. 43 (Kohno Rep.) ¶ 277. | |
| Issue 6 (Damages /Injury) | **Additional Fact 75:** Apple's conduct has reduced app output, quality, and innovation for iOS developers, while insulating Apple from competitive pressure to enhance its services or develop new apps. Ex. 41 (Stiglitz Rep.) ¶¶ 21-22, 99-104, 109-120; Ex. 38 (McFadden Rep.) ¶¶ 17, 19; Ex. 14 (Nov. 5, 2021 McFadden Dep.) at 38:8-39:11. ████████████████████ ████████ . Ex. 78 (APL-APPSTORE_10908929) at -935; Ex. 74 (APL-APPSTORE_10767225) at -227; Ex. 75 (APL-APPSTORE_10929194) at -245. | |
| Issue 6 (Damages /Injury) | **Additional Fact 76:** McFadden's damages model does not depend on Thompson's work linking transactions to payors because the model measures monetary harm at the transaction level. *See* Ex. 40 (Song Rep.) ¶¶ 61, 65-67; Ex. 29 (July 3, 2025 Song Dep.) at 13:15-22; Ex. 38 (McFadden Rep.) ¶¶ 49, 56. | |
| Issue 6 (Damages /Injury) | **Additional Fact 77:** Dr. Abrantes-Metz's model assumes, as a conservative modeling choice, that there would be another app store; the results do not depend on Plaintiffs prevailing on each alleged theory of anticompetitive conduct. Ex. 33 (Abrantes-Metz Rep.) ¶¶ 19, 23; Ex. 45 (Abrantes-Metz Rebuttal Rep.) ¶¶ 57-59. | |

**ATTESTATION**

I attest that the evidence cited herein fairly and accurately supports the facts as asserted.

DATED: September 2, 2025

By: _David C. Frederick_
DAVID C. FREDERICK

DAVID C. FREDERICK (*pro hac vice*)
MARK C. HANSEN (*pro hac vice*)
JAMES M. WEBSTER, III (*pro hac vice*)
AARON M. PANNER (*pro hac vice*)
LILLIAN V. SMITH (*pro hac vice*)
ALEX A. PARKINSON (*pro hac vice*)
ALEX TREIGER (*pro hac vice*)
CAROLINE SCHECHINGER (*pro hac vice*)
KYLE M. WOOD (*pro hac vice*)
ASHLE J. HOLMAN (*pro hac vice*)
KELLEY C. SCHIFFMAN (*pro hac vice*)
ANNA K. LINK (*pro hac vice*)
ANTHONY GUTMAN (*pro hac vice*)

**KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C**
1615 M Street, NW Suite 400
Washington, D.C. 20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999
dfrederick@kellogghansen.com
mhansen@kellogghansen.com
jwebster@kellogghansen.com
apanner@kellogghansen.com
lsmith@kellogghansen.com
aparkinson@kellogghansen.com
atreiger@kellogghansen.com
cschechinger@kellogghansen.com
kwood@kellogghansen.com
aholman@kellogghansen.com
kschiffman@kellogghansen.com
alink@kellogghansen.com
aguttman@kellogghansen.com

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
RACHELE R. BYRD (190634)
BETSY C. MANIFOLD (182450)
STEPHANIE AVILES (350289)
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

**WOLF HALDENSTEIN ADLER**

RESPONSIVE SEPARATE STATEMENT WITH ADDITIONAL MATERIAL FACTS
Case No. 11-cv-06714-YGR
-21-

**FREEMAN & HERZ LLP**
MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
THOMAS H. BURT (*pro hac vice*)
270 Madison Ave
New York, NY 10016
Telephone: 212/545-4600
Facsimile: 212/686-0114

*Class Counsel for Plaintiffs*

RESPONSIVE SEPARATE STATEMENT WITH ADDITIONAL MATERIAL FACTS
Case No. 11-cv-06714-YGR
-22-

**ER-58**

BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: 619/239-4599
Facsimile: 619/234-4599
manifold@whafh.com
byrd@whafh.com

MARK C. RIFKIN (pro hac vice)
MATTHEW M. GUINEY (pro hac vice)
THOMAS H. BURT (pro hac vice)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

*Class Counsel for Plaintiffs*

[Additional counsel appear on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR |
|---|---|
| | ~~STIPULATION AND [PROPOSED]~~ ORDER MODIFYING SCHEDULE with Qualification |
| | The Honorable Yvonne Gonzalez Rogers |

STIPULATION AND ~~[PROPOSED]~~ ORDER MODIFYING SCHEDULE
Case No. 11-cv-06714-YGR

**ER-59**

Pursuant to Federal Rule of Civil Procedure 16(b) and Civil Local Rules 6-2 and 7-12, Plaintiffs Robert Pepper, Stephen H. Schwartz, Edward W. Hayter, and Edward Lawrence, and Defendant Apple Inc. ("Defendant") (collectively, the "Parties"), by and through their respective counsel, hereby agree as follows:

WHEREAS, on July 11, 2024, this Court entered a Case Management and Pretrial Order, ECF No. 891;

WHEREAS, before this Court entered this Case Management and Pretrial Order, the Parties had reached impasse on several discovery issues, including Plaintiffs' entitlement to discovery from Defendant of all data, as opposed to a sample, to identify potential Class members—identification of whom is necessary for Plaintiffs' damages expert, Professor Daniel L. McFadden, to calculate individualized damages on a Class member by Class member basis—as the Court has directed Plaintiffs to do (*see* ECF No. 789 at 24 n.17, 27-28);

WHEREAS, pursuant to this Case Management and Pretrial Order, among other events and deadlines, the Parties' disclosure and exchange of opening expert reports are due on October 10, 2024; Plaintiffs' "pricing model" must be "run on all App Store transactional data" by October 10, 2024; the Parties must disclose and exchange rebuttal expert reports by February 7, 2025; and expert discovery closes on March 24, 2025 (ECF No. 891 at 1);

WHEREAS, on August 9, 2024, the Honorable Thomas S. Hixson granted two discovery motions in Plaintiffs' favor, compelling Defendant to:  (1) produce documents reflecting Defendant's efforts to comply with new laws in the European Union and South Korea that have opened the App Store to competition; (2) update its custodial productions from nine custodians (Phil Schiller, Trystan Kosmynka, Erik Neuenschwander, Eddy Cue, Matthew Fischer, Carson Oliver, Kevan Parekh, Craig Federighi, and Tim Cook) generated between October 1, 2019, and February 2, 2024; and (3) produce all data necessary for Plaintiffs and their claims administrator to identify potential Class members (*see* ECF No. 919 at 1-6);

WHEREAS, on September 12, 2024, Defendant completed its production of the data that will be used to identify potential Class members;

WHEREAS, after an initial analysis, Plaintiffs' claims administrator has estimated that it will take approximately three months (i.e., until mid-December 2024) for it to complete its analysis of

STIPULATION AND [PROPOSED] ORDER MODIFYING SCHEDULE
Case No. 11-cv-06714-YGR
-1-

**ER-60**

Defendant's records of App Store payors for the entire Class Period to create a list of potential Class members;

WHEREAS, once Plaintiffs have ascertained the identities of all potential Class members, Defendant needs approximately one month to create and produce to Plaintiffs a document that matches transactions to all "payor IDs" associated with a given potential Class member, which Professor McFadden can then use to complete his individualized damages calculations;

WHEREAS, as explained in greater detail in the accompanying Declaration of Rachele. R. Byrd, all of the foregoing must be completed before Professor McFadden can perform the last stage of his expert analysis and finalize an expert report that reflects his damages calculations for all potential Class members on "all App Store transactional data" (ECF No. 891 at 1);

WHEREAS, as further explained in the accompanying Declaration of Rachele. R. Byrd, Plaintiffs assert that their other expert analyses, including that of Dr. Rosa Abrantes-Metz, cannot be finalized without (1) an opportunity to review Defendant's updated document productions, which Defendant has committed to substantially completing by November 15, 2024, and (2) an opportunity to depose Mr. Kevan Parekh and Mr. Erik Neuenschwander, two Apple employees who were named for the first time in Defendant's First Amended Initial Disclosures, served on May 13, 2024 following Plaintiffs' most recent requests for production;

WHEREAS, the Parties thus believe that good cause exists to amend the Case Management and Pretrial Order to extend the deadlines for exchanging opening and rebuttal expert reports and the close of expert discovery by approximately four months, and to extend the briefing schedule for dispositive, *Daubert*, and decertification motions (should either Party obtain permission to so file), without altering the Compliance Deadline, Pretrial Conference Statement submission date, the Pretrial Conference dates, or the Trial Date;

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED among the Parties, through their respective counsel and subject to approval of the Court, to the entry of an Order providing that the schedule shall be modified as follows:

/ / /

/ / /

/ / /

STIPULATION AND [PROPOSED] ORDER MODIFYING SCHEDULE
Case No. 11-cv-06714-YGR
-2-

Case 4:11-cv-06714-YGR    Document 933    Filed 10/11/24    Page 4 of 7

**PRETRIAL SCHEDULE**

| EVENT | PRESENT DEADLINE | ~~PROPOSED~~ DEADLINE |
|---|---|---|
| Substantial Completion of Apple's Outstanding Document Productions | n/a | November 15, 2024 |
| Deadline for Plaintiffs' Claims Administrator to Provide Defendant with a List of Potential Class Members | n/a | December 12, 2024 |
| Deadline for Apple to Provide to Plaintiffs a List Matching Transaction IDs to the Payor IDs Associated with All Potential Class Members | n/a | January 17, 2025 |
| Disclosure of Expert Reports and Plaintiffs' Expert's Pricing Model Run on All App Store Transaction Data<br><br>All Experts, Retained and Non-Retained, Must Provide Written Reports Compliant with FRCP 26(a)(2)(B) | Opening: October 10, 2024<br><br>Rebuttal: February 7, 2025 | Opening: February 21, 2025<br><br>Rebuttal: June 6, 2025 |
| Expert Discovery Cutoff | March 24, 2025 | July 7, 2025 |
| Submission of Dispositive Motions/ *Daubert* Motions/Motions to Decertify[1] | n/a | August 4, 2025 |
| Oppositions to Dispositive Motions/ *Daubert* Motions/Motions to Decertify | n/a | September 4, 2025 |
| Replies in Support of Dispositive Motions/ *Daubert* Motions/Motions to Decertify | n/a | September 25, 2025 |
| Hearing on Dispositive Motions/*Daubert* Motions/Motions to Decertify | May 8, 2025, at 2:00 p.m.[2] | On or after October 7, 2025, at the Court's convenience |

[1] *See* Standing Order regarding Pre-filing Conference Requirements for motions for summary judgment. These requirements also apply to any contemplated *Daubert* Motions or Motions to Decertify. *See* ECF No. 791 at 4:4-25, 5:9-16.

[2] The Parties disagree whether the May 8, 2025 deadline in the operative Case Management and Pretrial Order is a hearing date or the deadline for submitting dispositive motions. The Parties agree that this date should be modified, however.

STIPULATION AND ~~[PROPOSED]~~ ORDER MODIFYING SCHEDULE
Case No. 11-cv-06714-YGR

-3-

| EVENT | PRESENT DEADLINE | ~~PROPOSED~~ DEADLINE |
|---|---|---|
| Compliance Deadline | November 28, 2025, at 9:01 a.m. | Same |
| Joint Pretrial Conference Statement | December 5, 2025 | Same |
| First Pretrial Conference | December 17, 2025 | Same |
| Second Pretrial Conference | January 9, 2026 | Same |
| Trial Date | February 2, 2026 | Same |

Pursuant to the Court's Pretrial Instructions in Civil Cases at Section 2, trial counsel shall meet and confer at least twenty-one (21) days in advance of the Pretrial Conference. The compliance deadline on Friday, November 28, 2025, at 9:01 a.m. is intended to confirm that counsel have reviewed the Court's Pretrial Setting Instructions and are in compliance therewith. Five (5) business days prior to the date of the compliance deadline, the Parties shall file a one-page JOINT STATEMENT confirming they have complied with this requirement or explaining their failure to comply. All compliance deadlines are decided on the papers and personal appearances are not necessary. If compliance is complete, the compliance deadline will be vacated. Failure to timely comply with the compliance deadline may result in sanctions or an additional conference being set.

The Parties must comply with both the Court's Standing Order in Civil Cases and Standing Order for Pretrial Instructions in Civil Cases for additional deadlines and procedures. All Standing Orders are available on the Court's website at http://www.cand.uscourts.gov/ygrorders.

**IT IS SO STIPULATED.**

DATED: October 3, 2024

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By:     */s/ Rachele R. Byrd*

RACHELE R. BYRD (190634)
BETSY C. MANIFOLD (182450)
750 B Street, Suite 1820

STIPULATION AND [PROPOSED] ORDER MODIFYING SCHEDULE
Case No. 11-cv-06714-YGR

-4-

**ER-63**

San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY(*pro hac vice*)
THOMAS H. BURT (*pro hac vice*)
270 Madison Avenue
New York, New York 10016
Telephone: 212/545-4600
Facsimile: 212/545-4677

DAVID C. FREDERICK (*pro hac vice*)
AARON M. PANNER (*pro hac vice*)
JOSH HAFENBRACK (*pro hac vice*)
KYLE M. WOOD (*pro hac vice*)
ASHLE J. HOLMAN (*pro hac vice*)
KELLEY C. SCHIFFMAN (*pro hac vice*)
ANNA K. LINK (*pro hac vice*)
**KELLOGG, HANSEN, TODD, FIGEL &
  FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
dfrederick@kellogghansen.com
apanner@kellogghansen.com
jhafenbrack@kellogghansen.com
kwood@kellogghansen.com
aholman@kellogghansen.com
kschiffman@kellogghansen.com
alink@kellogghansen.com

*Class Counsel for Plaintiffs*

DATED: October 3, 2024                    **GIBSON, DUNN & CRUTCHER LLP**

                              By:    */s/ Caeli A. Higney*

                                     THEODORE J. BOUTROUS JR. (SBN 132099)
                                     tboutrous@gibsondunn.com
                                     DANIEL G. SWANSON (SBN 116556)
                                     dswanson@gibsondunn.com
                                     333 South Grand Avenue
                                     Los Angeles, CA 90071
                                     Telephone: 213.229.7000
                                     Facsimile: 213.229.7520

                                     CAELI A. HIGNEY (SBN 268644)

STIPULATION AND [PROPOSED] ORDER MODIFYING SCHEDULE
Case No. 11-cv-06714-YGR
-5-

**ER-64**

chigney@gibsondunn.com
JULIAN W. KLEINBRODT (SBN 302085)
jkleinbrodt@gibsondunn.com
DANA L. CRAIG (SBN 251865)
dcraig@gibsondunn.com
ELI M. LAZARUS (SBN 284082)
  elazarus@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone:  415.393.8200
Facsimile:  415.393.8306

*Attorneys for Defendant Apple Inc.*

### E-FILING ATTESTATION

I, Rachele R. Byrd, am the ECF User whose ID and password are being used to file this document.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that the other signatory identified above has concurred in this filing.

*/s/ Rachele R. Byrd*
RACHELE R. BYRD

**PURSUANT TO STIPULATION, IT IS SO ORDERED with a qualification. The parties have conveniently agreed to extend their own schedule and yet maintain a trial date which shifts the burden to the Court. The Court will maintain that date but the parties will be required to prepare for trial with or without a ruling on the filed motions.**

DATED: October 11, 2024

THE HONORABLE YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE

STIPULATION AND [PROPOSED] ORDER MODIFYING SCHEDULE
Case No. 11-cv-06714-YGR
-6-

**ER-65**

FILED

Jun 14 2024

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| In re Apple iPhone Antitrust Litigation | Case No. 4:11-cv-06714-YGR <br><br> **STIPULATED ~~[PROPOSED]~~ SUPPLEMENTAL PROTECTIVE ORDER GOVERNING PAYOR DATA** <br><br> Hon. Yvonne Gonzalez Rogers |

- 1 -

STIPULATED ~~[PROPOSED]~~ SUPPLEMENTAL PROTECTIVE ORDER GOVERNING PAYOR DATA
Case No. 4:11-cv-06714-YGR

**ER-66**

WHEREAS the parties to *In re Apple iPhone Antitrust Litigation* (the "Parties") agreed to a Stipulated Protective Order on January 6, 2020 (ECF No. 195);

WHEREAS the Court entered the Stipulated Protective Order on January 9, 2020 (ECF No. 199);

WHEREAS the Court subsequently entered a Stipulated Amended Protective Order on January 21, 2021 (ECF No. 381) (the "Protective Order");

WHEREAS the Parties anticipate that Defendant Apple Inc. ("Apple") will produce to Plaintiffs Robert Pepper, Stephen H. Schwartz, Edward W. Hayter and Edward Lawrence ("Plaintiffs") certain data relating to members and potential members of the class, about which Apple has expressed significant concerns relating to protection of consumer privacy;

WHEREFORE, IT IS HEREBY ORDERED:

Pursuant to Federal Rule of Civil Procedure 26(c), the Court finds good cause for the following Stipulated Supplemental Protective Order Governing Payor Data ("Order" or "Supplemental Protective Order").

1.    **GENERAL PROVISIONS**

(a)    The definitions, terms, and provisions contained in the Protective Order shall be incorporated herein by reference as though fully set forth herein; provided, however, that in the event of a conflict between any definition, term, or provision of this Supplemental Protective Order and any definition, term, or provision of the Protective Order, this Supplemental Protective Order will control with respect to such conflict.

(b)    The Parties acknowledge that this Supplemental Protective Order does not confer blanket protections on all disclosures during discovery. Designations under this Order shall be made with care and shall not be made absent a good faith belief that the designated material

- 2 -

satisfies the criteria set forth below. If it comes to the attention of a Producing Party that designated material does not qualify for protection at all, or does not qualify for the level of protection initially asserted, the Producing Party must promptly notify all other Parties that it is withdrawing or changing the designation.

2.    **ADDITIONAL DEFINITIONS**

(a)    Applicable Data Law: Any applicable security, privacy, data protection, or breach notification laws, rules, regulations, or directives.

(b)    Data Breach: Unauthorized access, use, or disclosure of "HIGHLY CONFIDENTIAL – PAYOR DATA" material in electronic form or of devices containing "HIGHLY CONFIDENTIAL – PAYOR DATA" material in electronic form.

(c)    "HIGHLY CONFIDENTIAL – PAYOR DATA" Information or Items: sensitive, personal information concerning the identities of and/or other information about individuals involved in App Store transactions.

3.    **SCOPE**

(a)    The protections conferred by this Order cover not only Discovery Material governed by this Order as addressed herein, but also any information copied or extracted therefrom, as well as all copies, excerpts, summaries, or compilations thereof, plus testimony, conversations, or presentations by Parties or their counsel in court or in other settings that might reveal Protected Material.

(b)    Nothing in this Supplemental Protective Order shall prevent or restrict a Producing Party's own disclosure or use of its own Protected Material for any purpose.

- 3 -
STIPULATED [PROPOSED] SUPPLEMENTAL PROTECTIVE ORDER GOVERNING PAYOR DATA
Case No. 4:11-cv-06714-YGR

(c)     Nothing in this Order shall be construed to prejudice any Party's right to use any Protected Material in court or in any court filing with the consent of the Producing Party or by order of the Court.

(d)     This Order is without prejudice to the right of any Party to seek further or additional protection of any Discovery Material or to modify this Order in any way, including, without limitation, an order that certain matter not be produced at all.

4.     **DURATION**

Even after the termination of this case, the confidentiality obligations imposed by this Order shall remain in effect until a Producing Party agrees otherwise in writing or a court order otherwise directs.

5.     **ACCESS TO AND USE OF PROTECTED MATERIAL**

(a)     Basic Principles. A Receiving Party may use Information or Items designated as "HIGHLY CONFIDENTIAL – PAYOR DATA" that are disclosed or produced by another Party in connection with this case only for prosecuting, defending, attempting to settle this litigation, or (with consent of the Producing Party) effectuating a settlement of this litigation. Such Information or Items may be disclosed only to the categories of persons and under the conditions described in this Order. When the litigation has been terminated, a Receiving Party must comply with the provisions of section 14 (FINAL DISPOSITION) of the Protective Order with respect to "HIGHLY CONFIDENTIAL – PAYOR DATA" Information or Items, including to wipe all data from any computer or backup drive that has held such Information or Items, especially given the risk that local indices and other artefacts of such Information or Items might otherwise remain.

(b)     Protected Material designated as "HIGHLY CONFIDENTIAL – PAYOR DATA" shall be subject to all of the protections and restrictions afforded to "HIGHLY

- 4 -

STIPULATED [PROPOSED] SUPPLEMENTAL PROTECTIVE ORDER GOVERNING PAYOR DATA
Case No. 4:11-cv-06714-YGR

**ER-69**

CONFIDENTIAL – ATTORNEYS' EYES ONLY" information as well as the additional protections and restrictions described herein. For the avoidance of doubt, the Protective Order's Section 9 (PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION), Section 12 (INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL), Section 13 (MISCELLANEOUS), and Section 14 (FINAL DISPOSITION) apply to "HIGHLY CONFIDENTIAL – PAYOR DATA." To the extent there are differences between the protections and restrictions provided by the Protective Order for "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information and the protections and restrictions provided herein, the more restrictive protection shall apply.

(c)    Secure Storage, No Export or Copying. "HIGHLY CONFIDENTIAL – PAYOR DATA" Information or Items may be stored and maintained by Receiving Party only on a secure computer. Once that computer contains "HIGHLY CONFIDENTIAL – PAYOR DATA" Information or Items, all access ports on the computer must be disabled for accessing storage and can only be used for accessories (e.g., a keyboard and mouse), and the secure computer must have no operable internet access or network access to other computers. The secure computer must be stored in a secure room without internet access or network access to other computers. Receiving Party shall not copy, remove, or otherwise transfer any portion of the "HIGHLY CONFIDENTIAL – PAYOR DATA" Information or Items onto any recordable media or recordable device, except solely for the purpose of creating a backup of the work product that exists on the secure computer in the unlikely event the secure computer experiences a hardware or system failure. Any such storage drive containing a backup of the Receiving Party's work product shall be a new device (i.e., not previously used to store any different data), secured in accordance with Section 7 below and

- 5 -
STIPULATED [PROPOSED] SUPPLEMENTAL PROTECTIVE ORDER GOVERNING PAYOR DATA
Case No. 4:11-cv-06714-YGR

shall remain in the secure room at all times without any internet or network access (or connection to any other device with internet or network access).

(i)    Representatives of the Producing Party, which may include, at the Producing Party's option, a technical consultant and an attorney, may deliver by hand "HIGHLY CONFIDENTIAL – PAYOR DATA" Information or Items to the secure location where Receiving Party intends them to be housed. Those representatives of the Producing Party may observe the loading of "HIGHLY CONFIDENTIAL – PAYOR DATA" Information in electronic form onto the secure computer on which Receiving Party intends to store it, and may inspect that computer and any drive to be used to contain a backup of the Receiving Party's work product to confirm that they comply with the requirements of this Order.

(ii)    Prior to loading of "HIGHLY CONFIDENTIAL – PAYOR DATA" Information or Items onto the secure computer, Receiving Party may install onto the secure computer commercially available software tools for viewing, searching, and analyzing the "HIGHLY CONFIDENTIAL – PAYOR DATA" Information or Items, but not for any unauthorized copying or transmitting of those Information or Items. Producing Party shall have the opportunity to inspect such tools installed on the secure computer prior to the loading of "HIGHLY CONFIDENTIAL – PAYOR DATA" Information or Items onto the secure computer.

(iii)    Receiving Party may take notes relating to "HIGHLY CONFIDENTIAL – PAYOR DATA" Information or Items onto the secure computer but may not copy or include any portions or sections of the data into the notes.

(iv)    Except with consent of the Producing Party, no recordable media or recordable devices, including without limitation sound recorders, computers, cellular telephones, peripheral equipment, cameras, CDs, DVDs, or drives of any kind, shall be permitted into the secure

- 6 -

**ER-71**

room housing a secure computer that contains "HIGHLY CONFIDENTIAL – PAYOR DATA" Information or Items.

(v)     An access port configured to access storage on the secure computer may be activated solely for the purpose of (i) transferring information to the Producing Party, but may be activated only under the observation and monitoring of representatives of the Producing Party, which may include, at the Producing Party's option, a technical consultant and an attorney; or (ii) creating a backup of the Receiving Party's work product. Representatives of Producing Party shall also have the opportunity to observe and monitor the transfer of information for the purpose of sharing with the Producing Party.

(d)     Restricted Access. Unless otherwise ordered by the Court or permitted in writing by the Producing Party, a Receiving Party may allow access to any information or item designated "HIGHLY CONFIDENTIAL – PAYOR DATA," any secure computer containing such information or item, and any secure room housing such secure computer, only to individuals who have been identified to Producing Party and approved by Producing Party for purposes of such access and who have signed Exhibit A to this Supplemental Protective Order, entitled "Acknowledgment and Agreement To Be Bound by Supplemental Protective Order."

(e)     The Receiving Party shall maintain a record of any individual who has inspected any portion of the "HIGHLY CONFIDENTIAL – PAYOR DATA" Information.

(f)     Legal Advice Based on Protected Material. Nothing in this Supplemental Order shall be construed to prevent counsel from advising their clients with respect to this case based in whole or in part upon "HIGHLY CONFIDENTIAL – PAYOR DATA" Information or Items, provided counsel does not disclose the "HIGHLY CONFIDENTIAL – PAYOR DATA" Information or Items except as provided in this Order.

- 7 -

Case 4:11-cv-06714-YGR    Document 882    Filed 06/14/24    Page 8 of 15

(g)    Limitations. Nothing in this Order shall restrict in any way a Producing Party's use or disclosure of its own Protected Material. Nothing in this Order shall restrict in any way the use or disclosure of Discovery Material by a Receiving Party: (i) that is or has become publicly known through no fault of the Receiving Party; (ii) that is lawfully acquired by or known to the Receiving Party independent of the Producing Party; (iii) previously produced, disclosed and/or provided by the Producing Party to the Receiving Party or a non-party without an obligation of confidentiality and not by inadvertence or mistake; (iv) with the consent of the Producing Party; or (v) pursuant to order of the Court.

6.    **DESIGNATING PROTECTED MATERIAL**

(a)    Available Designation. Any Producing Party may designate Discovery Material as "HIGHLY CONFIDENTIAL – PAYOR DATA," provided that the Discovery Material constitutes information concerning the identities of or other information about individuals involved in App Store transactions, disclosure of which to another Party or Non-Party the Producing Party believes would create a substantial risk of serious harm to consumer privacy.

(b)    Written Discovery and Documents and Tangible Things. Written discovery, documents (which include "electronically stored information," as that phrase is used in California Code of Civil Procedure 2031.010 *et seq*., and tangible things that meet the requirements for confidentiality may be so designated by placing the appropriate designation on every page of the written material prior to production. For digital files being produced, the Producing Party may mark each viewable page or image with the appropriate designation, and mark the medium, container, and/or communication in which the digital files were contained.

(c)    Native Files. Where electronic files and documents are produced in native electronic format, such electronic files and documents shall be designated for protection under this

- 8 -

STIPULATED [~~PROPOSED~~] SUPPLEMENTAL PROTECTIVE ORDER GOVERNING PAYOR DATA
Case No. 4:11-cv-06714-YGR

**ER-73**

Order by appending to the file names or designators information indicating whether the file contains "HIGHLY CONFIDENTIAL – PAYOR DATA" material, shall produce together with the native files a "read me" text file explaining the designation, or shall use any other reasonable method for so designating Protected Materials produced in electronic format.

(d)    Depositions and Testimony. To the extent "HIGHLY CONFIDENTIAL – PAYOR DATA" Information is the subject of deposition or other testimony, such testimony shall be deemed to be "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" under the Protective Order.

7.    **DATA SECURITY**

(a)    Receiving Party shall implement an information security management system ("ISMS") to safeguard "HIGHLY CONFIDENTIAL – PAYOR DATA" material in electronic form, including reasonable and appropriate administrative, physical, and technical safeguards, and encryption technologies governed by written policies and procedures, which shall comply with at least one of the then-current versions of the following standards: (a) the International Organization for Standardization's 27001 standard; (b) the National Institute of Standards and Technology's (NIST) 800-53 standard; (c) the Center for Internet Security's Critical Security Controls; or (d) the most recently published version of another widely recognized industry or government cybersecurity framework. The Parties shall implement multi-factor authentication[1] for any access to "HIGHLY CONFIDENTIAL – PAYOR DATA" material in electronic form and implement encryption of all "HIGHLY CONFIDENTIAL – PAYOR DATA" material in electronic form when at rest (i.e.,

---

[1] Multi-factor authentication is "[a]uthentication using two or more factors to achieve authentication. Factors are (i) something you know (e.g., password/personal identification number); (ii) something you have (e.g., cryptographic identification device, token); and (iii) something you are (e.g., biometric)." National Institute of Standards and Technology (NIST), Special Publication SP 1800-12, Appendix B at 63, available at https://nvlpubs.nist.gov/nistpubs/SpecialPublications/ NIST.SP.1800-12.pdf; *see also* NIST, Special Publication 800-53, at 132, available at https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-53r5.pdf.

- 9 -

**ER-74**

electronically stored but not in process).

(b)    If Receiving Party becomes aware of any Data Breach, Receiving Party shall, in the most expedient time possible and without unreasonable delay, consistent with the legitimate needs of law enforcement and any measures necessary to determine the scope of the Data Breach and restore the reasonable integrity of affected data system(s), notify Producing Party in writing and then fully cooperate with Producing Party as may be reasonably necessary to (a) determine the source, extent, or methodology of such Data Breach, (b) to recover or to protect "HIGHLY CONFIDENTIAL – PAYOR DATA" material, and/or (c) to satisfy Producing Party's legal, contractual, or other obligations. For the avoidance of doubt, notification obligations under this Section arise when the Receiving Party both (a) learns of a Data Breach, and (b) learns that any of the Producing Party's "HIGHLY CONFIDENTIAL – PAYOR DATA" material are potentially subject to the Data Breach. The notification obligations set forth in this Section do not run from the time the Data Breach itself.

(c)    Receiving Party shall promptly comply with Producing Party's reasonable request(s) that Receiving Party investigate, remediate, and mitigate the effects of a Data Breach and any potential recurrence and take all reasonable steps to terminate and prevent unauthorized access. Receiving Party shall promptly provide any information that is reasonably requested by Producing Party and that relates to any such Data Breach, including but not limited to, the "HIGHLY CONFIDENTIAL – PAYOR DATA" material that was potentially impacted, underlying vulnerabilities or flaws that led to the Data Breach, start or end date of the Data Breach, date of discovery, and specific actions taken to contain, mitigate, or remediate the Data Breach. For the avoidance of doubt, nothing in this Section is intended to create a waiver of any applicable privileges, including privileges applicable to a Party's investigation and remediation of a Data Breach.

(d)    If Receiving Party is aware of a Data Breach, the Parties shall meet and confer in good faith regarding any adjustments that should be made to the discovery process and discovery

- 10 -

STIPULATED [PROPOSED] SUPPLEMENTAL PROTECTIVE ORDER GOVERNING PAYOR DATA
Case No. 4:11-cv-06714-YGR

**ER-75**

schedule in this action, potentially including but not limited to (1) additional security measures to protect Discovery Material; (2) a stay or extension of discovery pending investigation of a Data Breach and/or implementation of additional security measures; and (3) a sworn assurance that Discovery Materials will be handled in the future only by entities not impacted by the Data Breach. Further, the Receiving Party shall submit to reasonable discovery concerning the Data Breach.

(e)    In the event of a Data Breach affecting Protected Material of Designating Party, at Designating Party's request, Receiving Party within 10 business days shall provide a copy of its most recent ISMS policies and procedures that relate to the safeguarding of "HIGHLY CONFIDENTIAL – PAYOR DATA" material in electronic form and that preceded the Data Breach.

(f)    Receiving Party shall comply with this Section and Applicable Data Law. If Receiving Party is uncertain whether a particular practice would conform with the requirements of this Section, it may meet and confer with the Producing Party; if any Party believes that the proposed practice would violate this Supplemental Protective Order, it may, within 10 business days, bring the dispute to the Court. The Party challenging the proposed practice would bear the burden of demonstrating a violation.

8.    **INADVERTENT FAILURE TO DESIGNATE PROPERLY**

(a)    If timely corrected, an inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

9.    **INADVERTENT DISCLOSURE NOT AUTHORIZED BY ORDER**

(a)    In the event of a disclosure (other than a Data Breach) of any "HIGHLY CONFIDENTIAL – PAYOR DATA" material pursuant to this Order to any person or persons not authorized to receive such disclosure under the Supplemental Order, the Party responsible for having

- 11 -

STIPULATED [PROPOSED] SUPPLEMENTAL PROTECTIVE ORDER GOVERNING PAYOR DATA
Case No. 4:11-cv-06714-YGR

made such disclosure, and each Party with knowledge thereof, shall immediately notify counsel for the Producing Party whose Discovery Material has been disclosed and provide to such counsel all known relevant information concerning the nature and circumstances of the disclosure. The responsible disclosing Party shall also promptly take all reasonable measures to retrieve the improperly disclosed Discovery Material and to ensure that no further or greater unauthorized disclosure and/or use thereof is made.

(b)    Unauthorized or inadvertent disclosure does not change the status of Discovery Material or waive the right to hold the disclosed document or information as Protected.

**IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.**

Dated:  June 13, 2024          By:    */s/ Caeli A. Higney*
**GIBSON, DUNN & CRUTCHER LLP**
CAELI A. HIGNEY (268644)
JULIAN W. KLEINBRODT (302085)
DANA LYNN CRAIG (251865)
ELI M. LAZARUS (284082)
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: 415.393.8200

THEODORE J. BOUTROUS JR. (132099)
DANIEL G. SWANSON (116556)
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000

CYNTHIA E. RICHMAN (D.C. Bar No. 492089; pro hac vice)
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500

*Counsel for Defendant Apple Inc.*

- 12 -
STIPULATED [~~PROPOSED~~] SUPPLEMENTAL PROTECTIVE ORDER GOVERNING PAYOR DATA
Case No. 4:11-cv-06714-YGR

Dated:  June 13, 2024          By:      */s/ Rachele R. Byrd*
                                        **WOLF HALDENSTEIN ADLER**
                                        **FREEMAN & HERZ LLP**
                                        RACHELE R. BYRD (190634)
                                        750 B Street, Suite 1820
                                        San Diego, CA 92101
                                        Telephone:  619/239-4599
                                        Facsimile:  619/234-4599

                                        **WOLF HALDENSTEIN ADLER**
                                        **FREEMAN & HERZ LLP**
                                        MARK C. RIFKIN (*pro hac vice*)
                                        MATTHEW M. GUINEY (*pro hac vice*)
                                        THOMAS H. BURT (*pro hac vice*)
                                        270 Madison Avenue
                                        New York, New York 10016
                                        Telephone:  212/545-4600
                                        Facsimile:  212/545-4677

                                        *Consumer Plaintiffs' Class Counsel*

**PURSUANT TO STIPULATION, IT IS SO ORDERED.**

DATED:  June 14, 2024

HON. THOMAS S. HIXSON
United States Magistrate Judge

- 13 -
STIPULATED [~~PROPOSED~~] SUPPLEMENTAL PROTECTIVE ORDER GOVERNING PAYOR DATA
Case No. 4:11-cv-06714-YGR

**ER-78**

## DECLARATION REGARDING CONCURRENCE

I, Caeli A. Higney, am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the signatories identified above has concurred in this filing.


Dated:  June 13, 2024                    _/s/ Caeli A. Higney_

                                          Caeli A. Higney

14

STIPULATED [PROPOSED] SUPPLEMENTAL PROTECTIVE ORDER GOVERNING PAYOR DATA
Case No. 4:11-cv-06714-YGR

**ER-79**

## EXHIBIT A –

### Acknowledgment and Agreement To Be Bound by Supplemental Protective Order

I, _____, acknowledge and declare that I have received a copy of the Stipulated Amended Protective Order dated January 21, 2021, and the Supplemental Protective Order Governing Payor Data (the "Orders") in *In re Apple iPhone Antitrust Litigation* in United States District Court for the Northern District of California, Case No. 4:11-cv-06714-YGR. Having read and understood the terms of both of those Orders, I agree to be bound by their terms and consent to the jurisdiction of said Court for the purpose of any proceeding to enforce those terms.

Name of individual: _____

Present occupation/job description: _____

_____

_____

Name of Company or Firm: _____

Address:_____

Dated: _____

I hereby appoint _____ [print or type full name] of _____ [print or type firm name and full address and phone number] as my California agent for service of process in connection with this action or any proceedings related to enforcement of the Orders.

_____

[Signature]

15

**ER-80**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR |

**JOINT DISCOVERY LETTER BRIEF REGARDING PLAINTIFFS' REQUEST FOR PRODUCTION NO. 55 TO DEFENDANT APPLE, INC.**

The Honorable Thomas Hixson
United States District Court for the Northern District of California
Courtroom E – 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Dear Judge Hixson,

Plaintiffs and Defendant Apple, Inc. ("Apple" and together with Plaintiffs, the "Parties") respectfully submit this joint statement regarding Request For Production No. 55, served on Apple on April 12, 2022.

Counsel for the Parties have met and conferred and exchanged correspondence in a good faith effort to resolve disputes concerning Apple's production of the data necessary to identify members of the class, including uninjured members. The Parties have made meaningful progress to resolve potential disputes without the need for the Court's intervention. However, because the Parties have been unable to resolve all disputes before the April 12, 2024, deadline for filing discovery motions, Plaintiffs seek the relief specified herein. *See* ECF 801 at 4:4-10 (accepting the fact discovery deadlines from the Parties' joint statement); ECF 791 at 6 (the Parties' joint proposal for a discovery motions deadline of April 12, 2024).

Respectfully submitted,

| WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP | GIBSON, DUNN & CRUTCHER LLP |
|---|---|
| By:  *Rachele R. Byrd* | By:  *Caeli Higney* |
| Rachele R. Byrd | Caeli Higney |
| *Plaintiffs' Class Counsel* | *Counsel for Defendant Apple, Inc.* |

**ER-81**

<u>**Plaintiffs' Position**</u>

**<u>Introduction and relief requested:</u>**  Plaintiffs request that the Court compel Apple to produce documents responsive to Request for Production No. 55 ("RFP 55") in Plaintiffs' Third Set of Requests for Production, attached hereto as **Ex. A**.  The Court should compel Apple to produce all data sufficient for Plaintiffs to link the individuals who paid for transactions on the App Store to their specific transactions so that Plaintiffs may both identify their Class membership status and their total damages (if any).

**<u>Background:</u>**  On April 12, 2022, Plaintiffs served Apple with RFP 55, which sought information needed for Plaintiffs to identify the consumers associated with the transactions in the otherwise anonymized App Store transaction dataset to determine if each consumer (1) meets the $10 lifetime spending threshold for Class membership, and if so, (2) their damages.  This matching will fulfill the Court's instruction that Professor McFadden show that his model "can successfully ascertain the number of uninjured class members and limit them."  ECF 789 at 27-28; *see also id.* at 1.

Apple served Plaintiffs its Responses and Objections to Plaintiffs' Third Set of Requests for Production ("R&Os"), attached hereto as **Ex. B**.  Apple served a host of objections to RFP 55, ultimately indicating that while it would "continue to meet and confer with Plaintiffs regarding this Request" it was "not prepared to produce the data" at that time.  Plaintiffs later made clear that Apple could produce the data directly to Plaintiffs' claims administration service, and that neither Plaintiffs nor their expert needed direct access to it.

Initially, after the Court granted class certification, Apple indicated that it would produce data sufficient for the purposes Plaintiffs required, but the Parties disagreed over the manner in which Apple would produce it.  After two meet and confers in March and April 2024, Plaintiffs have made significant compromises, agreeing to atypical production restrictions that are rarely employed in class action litigation.  Specifically, the Parties have agreed in principle that:

- Apple will produce data sufficient for Plaintiffs' claims administrator to identify which individuals are potentially entitled to notice.
- Apple will produce that data directly to the claims administrator.  It will be housed on an "air-gapped" computer in a segregated office within the administrator's facility.
- The Parties have agreed to certain additional limitations on access to, and the copying of, the data that Apple will produce, and plan to submit those agreements in writing in a stipulated supplemental protective order.

The sole dispute concerns whether and how Apple will produce certain data linking individuals to transactions.  During the meet and confer on April 11, 2024, Apple belatedly proposed to insinuate itself into the process necessary to meet the identification burden the Court has imposed on Plaintiffs and their experts.  Specifically, Apple has refused to produce information sufficient for Plaintiffs themselves to identify the specific transactions that each payor is associated with.  Instead, Apple proposes that the claims administrator produce *to Apple* a list of individuals that are potentially entitled to notice.  From there, *Apple* will analyze the data linking named payors to transactions and (on a yet-unspecified timeline) provide to Plaintiffs a document indicating exactly which transactions those payors are associated with.  To date, Apple has not specified what data elements the augmented list would contain.

**ER-82**

Because Apple did not reveal this portion of its production proposal until the meet and confer held on April 11, 2024, Plaintiffs have not had sufficient time to confer with the necessary parties to determine whether this proposal is acceptable. However, Plaintiffs do have two significant concerns with the process Apple has proposed.

*First*, Apple's proposal gives Plaintiffs no assurance that they, their claims administrator, and their expert group will have the ability to adequately and timely: (1) identify the Class members requiring notice; (2) match those individuals to the transactions presently grouped by account in the transactional data Apple previously produced; and (3) calculate each individual's damages (if any), before the deadline for exchanging expert reports on October 10, 2024. *See* ECF 789 at 27-28; *see also id.* at 1. The only way Plaintiffs' expert can link a transaction to a person in the App Store transaction data that Apple has produced is with an anonymized Apple ID. There are no unique payor or transaction identifiers in the data set. Now, literally at the last hour, Apple proposes to give Plaintiffs only a list of payors and their associated transactions while withholding the "key" that links payor identities to the transactional data. Without more information, including the linking information Apple has refused to turn over to Plaintiffs' claims administrator, Plaintiffs' expert simply will not be able to calculate individualized damages as the Court expects.

*Second*, Apple's proposal—in which Apple takes part in the matching process that is Plaintiffs' burden—gives Plaintiffs no means to review, monitor, evaluate, or test the results that *Apple* will provide to match transactions to individual payors. To date, Apple has not guaranteed that Plaintiffs will have any visibility into the "matching" work that Apple proposes it will do for Plaintiffs, or any ability to verify that Apple's analysis is accurate. Without such an agreement, Apple's position is untenable—no defendant has the right to unilaterally control the analysis of key evidence without oversight from its counterparty or the Court.

Because of these points that remain unresolved at the final hour, Plaintiffs must submit this dispute to the Court. That said, Plaintiffs will continue working with Apple in good faith in the hopes of settling on a production mechanism that both satisfies Apple's security concerns and ensures Plaintiffs are not prejudiced in their ability to identify Class members and calculate their damages.

**Analysis:** Plaintiffs seek from Apple the consumer data that is essential to their expert's model; RFP 55 seeks only the information necessary to link consumers to the transactions they made on the App Store. *See* Fed. R. Civ. P. 26(b)(1). As Apple now recognizes, it must produce this data, but Apple continues to erect barriers to access that could threaten Plaintiffs' expert's ability to timely produce a report identifying harmed and unharmed Class members. Apple must therefore show that "good cause" exists to justify its refusal to produce the necessary data in the manner Plaintiffs propose. Fed. R. Civ. P. 26(c)(1); *see La. Pac. Corp. v. Money Mkt. 1 Inst. Inv. Dealer*, 285 F.R.D. 481, 485 (N.D. Cal. 2012) (party opposing discovery "has the burden of clarifying, explaining and supporting its objections with competent evidence").

To date, Apple has only cited generalized privacy and data security risks as justifying its refusal to disclose all necessary data to Plaintiffs. *See, e.g.*, Ex. B at 3. But Apple still has not specified what additional "risk" disclosure of this data to the claims administrator under the restrictions to which the Parties have already agreed will present to the Class members or to Apple. Nor can it. During the Parties' March 8 meet and confer, Plaintiffs' claims administrator informed Apple's counsel that Apple has already vetted and approved it to host similar Apple customer data in two

- 2 -

matters: *Lerman v. Apple Inc.*, No. 1:15-cv-07381 (E.D.N.Y.) (class action brought by iPhone 4S owners claiming that an iOS update rendered their devices "buggy" and slow) and *In re MacBook Keyboard Litig.*, No. 5:18-cv-02813 (N.D. Cal.) (class action brought by MacBook consumers over allegedly defective keyboards). Before Apple approved the administrator for hosting the data, it required the administrator to complete an extensive questionnaire; provide Apple all requested information; and allow Apple to conduct an on-site inspection. The administrator also noted that it has or is currently hosting highly sensitive data for the SEC, FTC, Equifax, and Blue Cross Blue Shield (the latter involving highly sensitive patient medical records), among others. Apple has not yet identified how those prior practices, or the practices the claims administrator has explained for this particular case, are in any way deficient.

Accordingly, Apple's general invocations of data security and privacy concerns—without identifying any specific security or privacy risks that are unmet by the procedures agreed to by the parties[1]—do not justify Apple's refusal to produce directly to Plaintiffs the crucial data necessary to link those individuals to the subject transactions. *See Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992) ("Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." (citation omitted)). And at present, Plaintiffs cannot say whether Apple's last-minute proposals for producing the key data linking people to transactions will allow Plaintiffs to satisfy the Court's instructions to identify harmed and unharmed Class members before the expert report deadline this coming October. Additionally, while Apple now expresses some willingness to produce the data necessary for Plaintiffs to complete the matching process, Apple provided no substantive response to Plaintiffs inquiries between their April 11 meet and confer and the filing of this letter.

Therefore, Plaintiffs respectfully request that the Court order Apple to produce—under the restrictions to which the Parties have already agreed—***all*** data sufficient for Plaintiffs to link the individuals who paid for transactions on the App Store to their specific transactions so that Plaintiffs may both identify their Class membership status and their total damages (if any).

**Apple's Position:**

**Introduction.**  The data at issue here—which "would identify who downloaded each and every app"—is "the most sensitive conceivable data that Apple maintains" and lies at the core of Apple's "guardianship of consumer privacy," as Apple has explained to Plaintiffs even before they first issued their RFP No. 55. *See* CMC Tr. 12:17–24 (Apr. 11, 2022). Apple protects this data with multiple layers of cyber security in its normal course of business. Plaintiffs now want to take this data out of Apple's custody—and outside of those protections—creating substantial new security risks to App Store users' privacy. *See id.* at 14:19–20 (Court noting "security issues" with Plaintiffs' request). Apple and Plaintiffs are continuing to discuss how Apple can provide

---

[1] The data which Apple has now agreed to produce is no more sensitive than the medical data produced to Plaintiffs' claims administrator in litigation against Blue Cross and Blue Shield, which was produced without requiring the extraordinary safety protocols to which the Parties already have agreed here.

- 3 -

**ER-84**

Plaintiffs with the information they need without creating these new security risks, and Apple remains optimistic that the parties can reach a negotiated resolution of this issue. But facing the discovery motion deadline, Plaintiffs sought to move forward with this motion in the meantime.

Plaintiffs' motion to compel should be denied for two reasons. *First*, Apple has already agreed to produce what is required by RFP No. 55 and is not obligated to do more. As Plaintiffs admit, Apple has agreed to produce personal identifying information ("PII") relating to payors for all U.S. transactions on the App Store. This is all the data that RFP No. 55 requested—"All DOCUMENTS CONCERNING the identity of each and every member of the CLASS or that identify which APPLE IDs belong to which members of the CLASS, including but not limited to the first and last name, email address, birthdate, telephone number, billing address, and method of payment of the user associated with each APPLE ID for which YOU have produced or will produce transactional data." While Plaintiffs appear to take issue with the fact that Apple will produce payor-level identifying information as opposed to account-level information, their class is defined as "those persons who *paid* more than $10.00 in total to Apple during the Class Period for iOS application and in-app purchases from any one Apple ID account." *See* Renewed Mot. for Class Certification, at 1 (emphasis added). Indeed, the only person who could be potentially "harmed" from an overcharge on an app download or in-app purchase or suffer damages is the person who actually paid for that app or in-app purchase. Apple therefore stands by its proposal to produce identifying information about App Store *payors*.

Apple has never agreed to produce—and Plaintiffs did not request in their RFP—the "key" that links payor identities to the transactional data. Apple objected to the RFP on May 12, 2022, stating that "the Request does not actually seek—and therefore Apple will not produce—data connecting the requested information about Apple's customers with their transactional records." **Ex. B** at 4. Plaintiffs have had nearly two years to cure that deficiency and have elected not to do so. Apple should not be compelled to produce what Plaintiffs have decided not to request.

*Second*, the "key" that Plaintiffs now request gives rise to the grave privacy concerns that Apple's production plan will avoid. Plaintiffs seek non-anonymized information about users' identities, where they live, their phone numbers, specific financial account information and—if that data is linked to the transactional data—everything they have downloaded and spent on the App Store. That pairing puts at risk potential insights about U.S. App Store users' political views, health concerns, sexual orientations, and all sorts of personal secrets and intimate activities. A data breach of that information would be catastrophic. Indeed, Apple—which has staked its corporate identity and brand on the protection of customer data—takes the protection of these two data sets so seriously that it strictly enforces a separation of them between different systems within the company.

Apple instead plans to produce to Plaintiffs all the payor PII they need to conduct their "matching" analysis. Though not requested in Plaintiffs' RFP, Apple will assist Plaintiffs in identifying which transactions are, per Plaintiffs' matching, tied together by common payors so that Plaintiffs can calculate alleged harm associated with individuals. This process will meet Plaintiffs' needs without adding unnecessary risk to many millions of users' privacy.

**Analysis.** Apple should not be compelled to produce data that Plaintiffs do not need and did not request and that would endanger important consumer interests. Rule 26 bars discovery that is not "proportional to the needs of the case," including by reference to "the importance of the discovery

- 4 -

**ER-85**

in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). And courts recognize that privacy objections to discovery require a "careful balancing of the need for the particular information against the claimed privacy right." *Shaw v. Experian Info. Sols., Inc.*, 306 F.R.D. 293, 301 (S.D. Cal. 2015) (citing *Artis v. Deere & Co.*, 276 F.R.D. 348, 352–53 (N.D. Cal. 2011)).

Here, Plaintiffs have no need for the data "key," so their interest in it is vastly outweighed by the burden of risk to Apple's users. The key connecting payors' identities to their transactions implicates the "revelation of personal secrets, intimate activities, [and] similar private information" that is not at issue with the ordinary production of class member contact information. *Shaw*, 306 F.R.D. at 301 (citing *Khalilpour v. CELLCO P'ship*, 2010 WL 1267749, at *3 (N.D. Cal. Apr. 1, 2010)). Plaintiffs' demand that the Court compel production the data-linking key is deficient on its face because it makes no attempt to strike any balance—much less a proper balance—between protecting the privacy of class members' information with Plaintiffs' needs.

At this stage of the litigation, Plaintiffs seek to demonstrate which App Store transactions are tied together by a common payor so that they can net out which payors have alleged damages and which do not. As Plaintiffs recognize, some accounts may have different payors over time, and a single payor might have multiple accounts. Plaintiffs therefore face the task of sifting through the payors' identifying information to attempt to determine whether one John Smith is actually the same person as a J.T. Smith and a Johnny Smith found in the data. Apple has agreed to produce data sufficient for Plaintiffs to attempt that analysis. Once they have done so, Apple will, within its security perimeter, map the "linked" payors (as identified by Plaintiffs) on to the previously produced transactional data. That mapping process requires no analysis and allows no discretion on Apple's part. Apple will then produce to Plaintiffs information sufficient for them to aggregate transactions by individual payors. That is all that Plaintiffs need, and more than their RFP requested. They have no need to possess the key that ties payor PII together with users' transactions.

Plaintiffs' only ground for demanding production of the data-linking key is an unfounded skepticism that Apple may do something nefarious or wrong with the mapping. Such baseless speculation is no cause to trample on serious and well-founded concerns for the security of extremely sensitive consumer data. Sharing the "key," even if Plaintiffs' counsel try in good faith to protect it, creates another vector of risk that is out of any party's control. Apple is willing to engage in discussion to alleviate whatever concerns Plaintiffs have, but compelling needless production of a data key that puts consumer privacy at serious risk is simply not proportional to the needs of the case.

- 5 -

**ER-86**

Dated: April 12, 2024

WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP

By:     */s/ Rachele R. Byrd*

Rachele R. Byrd
Mark C. Rifkin
Matthew M. Guiney
Thomas H. Burt
Betsy C. Manifold
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: 619.239.4599

*Plaintiffs' Class Counsel*

Dated: April 12, 2024

GIBSON, DUNN & CRUTCHER LLP

By:     */s/ Caeli Higney*

Caeli Higney
One Embarcadero Center, Suite 2600
San Francisco, CA 94111

*Attorney for Defendant Apple, Inc.*

## E-FILING ATTESTATION

I, Rachele R. Byrd, am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that the other signatory identified above has concurred in this filing.

*/s/ Rachele R. Byrd*
Rachele R. Byrd

- 6 -

**ER-87**

# Exhibit A

BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile:  619/234-4599
manifold@whafh.com
byrd@whafh.com

MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
THOMAS H. BURT (*pro hac vice forthcoming*)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
Telephone: 212/545-4600
Facsimile:  212/545-4677
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

*Interim Class Counsel for Plaintiffs*
[Additional Counsel Appear on Signature Page]

### UNITED STATES DISTRICT COURT

### FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE iPHONE ANTITRUST LITIGATION | ) Case No. 4:11-cv-06714-YGR<br>)<br>) **PLAINTIFFS' REQUESTS FOR**<br>) **PRODUCTION OF DOCUMENTS TO**<br>) **DEFENDANT APPLE INC. – SET NO. 3**<br>)<br>)<br>) JUDGE:      Hon. Yvonne Gonzalez Rogers<br>) CTRM:      1 – 4th Floor<br>)<br>) |

PROPOUNDING PARTY:   PLAINTIFFS ROBERT PEPPER, STEPHEN H. SCHWARTZ, EDWARD W. HAYTER AND EDWARD LAWRENCE

RESPONDING PARTY:   DEFENDANT APPLE INC.

SET NO.:       THREE

PLS' REQUEST FOR PRODUCTION OF DOCUMENTS – SET NO. 3
CASE NO. 4:11-CV-06714-YGR

**ER-89**

PLEASE TAKE NOTICE that pursuant to rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiffs Robert Pepper, Stephen H. Schwartz, Edward W. Hayter and Edward Lawrence ("Plaintiffs") by and through their undersigned counsel, hereby request that Defendant Apple Inc. ("Apple" or "Defendant") produce the documents hereinafter described.

Defendant shall serve a written response hereto and produce the following described documents for inspection and copying within thirty (30) days of service hereof at the law offices of Wolf Haldenstein Adler Freeman & Herz LLP, Symphony Towers, 750 B Street, Suite 1820, San Diego, California 92101, or at such other place upon which the parties may agree.

## INSTRUCTIONS

1.    In producing documents and other materials in response to this document request, you are requested to furnish all documents in your possession, custody, or control, regardless of whether such documents are possessed directly by you or your partners, agents, employees, representatives, subsidiaries, affiliates or investigators, or by your attorneys or their agents, employees or investigators.

2.    Defendant shall produce the original of each document described below or, if the original is not available, then a copy thereof; and in any event also all non-identical copies which differ from the original or from the other copies produced for any reason, including the making of notes thereon (on either the front or back of the document), and drafts.  A document also shall be considered non-identical and must be produced if it was kept in a different file from another copy of the same document (which otherwise was identical).  For example, and including without limitation, if the same document was kept in the usual course of business in the files of two different corporate directors then both copies must be produced even if they were otherwise identical.

3.    All documents produced shall be bound or stapled in the same manner as the original.

4.    All documents shall be produced as they are kept in the usual course of business, or the documents shall be organized and labeled to correspond to the categories in the requests.

**ER-90**

5.    Documents shall be produced in their original folders, binders, covers or containers, or facsimile thereof.

6.    Production shall include the title or the like however denominated of the file, folder, binder, cover or container (or the like however denominated) in which the documents were kept in the ordinary course of business.

7.    In your response to each request, identify by Bates number, including prefix, or otherwise the identity of the person, department, branch, division or office from whose files the document(s) are being produced.

8.    All documents that originated in electronic form shall be produced in their native electronic form, with metadata.  These documents shall be produced with an accompanying index, to the extent one exists, that lists:

- Beg doc # - Document first Bates number;
- End doc # - Document last Bates number;
- Secondary begin doc # - First Bates number of unit;
- Secondary end doc # - End Bates number of unit (last page of last attachment to doc);
- Owner – Name of person whose files the document comes from;
- Doc date – date of file;
- File size – number of bytes in the file;
- File name – name of the file;
- Document type – document type;
- Doc title – re: line of document;
- Author – Author;
- Recipient – recipients;
- cc- carbon copies; and
- bcc – blind copies.

9.    All other documents shall be produced in searchable PDF format to the extent they are available, or can be made available, in that format.

10.    All electronic mail shall be provided in native e-mail format (e.g., .pst, .nsf, .xls, and .doc), with metadata, with the following fields combined in an accompanying index:

- Owner – Name of person whose e-mail file or other e-files are being provided;
- File Name – Name of file;
- File Date – Date of file; and
- File Size – Size of file

PLS' REQUEST FOR PRODUCTION OF DOCUMENTS – SET NO. 3
CASE NO. 4:11-CV-06714-YGR
- 2 -

**ER-91**

11.     For those paper documents which have been created digitally but executed with a hand-written signature or physical seal, then both the digital version and the signed paper copy should be produced.

12.     You are instructed to produce each document in response to this document request in its entirety, without deletion or excision, regardless of whether you consider the entire document to be relevant or responsive.  If any requested document cannot be produced in full, produce it to the extent possible, indicating which document, or portion of that document, is being withheld, and the reason that document or portion is being withheld.

13.     If you object to any request in this document request on the ground that it is overly broad, you are instructed to produce documents in response to the request as narrowed to conform to your objection within the period allowed for a response and to state in your responses:  (1) how you narrowed the request, and (2) the reason why you claim the request is overly broad.  Plaintiffs do not waive the right to compel the production as originally sought from Apple.

14.     If you assert any claim of privilege, whether attorney-client, work-product or otherwise, in objecting to any of the document requests herein, and withhold any responsive document pursuant to that objection, identify each document by providing the following:  (a) the title and description of the document, the number of pages, and the Bates-number range; (b) the subject matter or general nature of the document (without disclosing its contents); (c) the identity and position of its author; (d) the date it was communicated (or prepared, if that is the more relevant date); (e) the identity and position of all addressees and recipients of the communication; (f) the document's present location; (g) the specific basis for the assertion that the document is privileged or protected (including a brief summary of any supporting facts); and (h) the steps taken to ensure the confidentiality of the communication, including an affirmation that no unauthorized persons received the communication.

15.     If a document responsive to a document request has been destroyed or discarded, identify the document in the same manner in which the privileged documents are to be identified as stated above.

16.    If no documents responsive to a particular document request exist or are within your possession, custody, or control, you must so state in your response to the request.

17.    This request is continuing so as to require supplemental production pursuant to rule 26(a) of the Federal Rules of Civil Procedure.  If you discover, obtain possession of, or create, varying or additional documents responsive to the request between the time of the original response and the time set for trial, notice of such supplemental documents and copies thereof shall be served on Plaintiffs' counsel no later than ten (10) days after the discovery of any such documents, but in no event later than one week before the first day of trial.

## DEFINITIONS

1.    "APPLE," "YOU" or "YOUR" means Apple Inc., including any agents or persons acting on its behalf or under its control, and its branches, divisions, subsidiaries, affiliates, representatives, employees, attorneys and investigators.

2.    "CLASS" shall include all persons in the United States, exclusive of APPLE and its employees, agents and affiliates, and the Court and its employees, who purchased one or more iOS applications or application licenses from Defendant APPLE, or who paid APPLE for one or more in-app purchases, including, but not limited to, any subscription purchase, for use on an iOS device at any time since July 10, 2008.

3.    "COMMUNICATION" shall include, without limitation, any transmission or transfer of information of any kind, whether orally, electronically, in writing, or in any other manner, at any time or place, and under any circumstances whatsoever.

4.    "CONCERNING" a given subject shall mean: directly or indirectly comprising, concerning, constituting, containing, discussing, embodying, evidencing, exhibiting, identifying, mentioning, negating, pertaining to, recording, regarding, reflecting, relating to, showing, or supporting a given subject matter.

5.    "DOCUMENT" and "DOCUMENTS" shall have the full meaning ascribed to those terms under Rule 34 of the Federal Rules of Civil Procedure and shall include, without limitation, any and all drafts; COMMUNICATIONS; memoranda; records; reports; books; records, reports, and/or summaries of personal conversations or interviews; diaries; presentations;

slide decks; graphs; charts; spreadsheets; diagrams; tables; photographs; recordings; tapes; microfilms; minutes; records, reports, and/or summaries of meetings or conferences; press releases; blog posts; stenographic handwritten or any other notes; work papers; checks, front and back; check vouchers, check stubs or receipts; tape data sheets or data processing cards or discs or any other written, recorded, transcribed, punched, taped, filmed or graphic matter, however produced or reproduced; and any paper or writing of whatever description, including information contained in any computer although not yet printed out. Any production of electronically stored information shall include the information needed to understand such information. The term "DOCUMENT" or "DOCUMENTS" further includes all copies where the copy is not identical to the original.

6.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope.

7.      "All" and "each" shall be construed as "all and each."

8.     The use of the singular form of any word includes the plural and vice versa.

**RELEVANT TIME PERIOD**

Unless otherwise indicated, the relevant time period for these document requests is from January 1, 2006 through the present date.

**DOCUMENT REQUESTS**

**REQUEST FOR PRODUCTION NO. 55:**

All DOCUMENTS CONCERNING the identity of each and every member of the CLASS or that identify which APPLE IDs belong to which members of the CLASS, including but not limited to the first and last name, email address, birthdate, telephone number, billing address, and method of payment of the user associated with each APPLE ID for which YOU have produced or will produce transactional data.

DATED:  April 12, 2022

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By: */s/ Rachele R. Byrd*

BETSY C. MANIFOLD
RACHELE R. BYRD
750 B Street, Suite 1820
San Diego, CA 92101
Telephone:  619/239-4599
Facsimile:   619/234-4599
manifold@whafh.com
byrd@whafh.com

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
MARK C. RIFKIN
MATTHEW M. GUINEY
THOMAS H. BURT
270 Madison Avenue
New York, NY 10016
Telephone:  212/545-4600
Facsimile:   212/545-4677
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

*Interim Class Counsel for Plaintiffs*

DAVID C. FREDERICK (*pro hac vice*)
AARON M. PANNER (*pro hac vice*)
**KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C**
1615 M Street, NW Suite 400
Washington, D.C. 20036
Telephone:  202/326-7900
Facsimile:  202/326-7999
dfrederick@kellogghansen.com
apanner@kellogghansen.com

*Counsel for Plaintiffs*

APPLE2:28289

PLS' REQUEST FOR PRODUCTION OF DOCUMENTS – SET NO. 3
CASE NO. 4:11-CV-06714-YGR
- 6 -

**ER-95**

**CERTIFICATE OF SERVICE**

I, Amanda Salas, hereby certify that I am a citizen of the United States, over the age of eighteen, and not a party to the within action.  I hereby certify that on April 12, 2022, I delivered the foregoing **PLAINTIFFS' REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT APPLE INC**. **– SET NO. 3**, via electronic mail to the counsel listed on the attached service list.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 12th day of April 2022 at San Diego, California.

AMANDA SALAS

IN RE APPLE iPHONE ANTITRUST LITIGATION
Case Nos.: 4:11-cv-06714-YGR-TSH; 4:19-cv-03074-YGR-TSH
Service List – April 12, 2022
Page 1

COUNSEL FOR CONSUMER PLAINTIFFS

Betsy C. Manifold
Rachele R. Byrd
WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP
750 B Street, Suite 1820
San Diego, CA 92101
 619/239-4599
 619/234-4599 (fax)
manifold@whafh.com
byrd@whafh.com

Mark C. Rifkin
Matthew M. Guiney
Thomas H. Burt
WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP
270 Madison Ave.
New York, NY  10016
 212/545-4600
 212/545-4677 (fax)
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

David C. Frederick
Aaron M. Panner
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street, NW Suite 400
Washington, D.C. 20036
202/326-7900
202/326-7999 (fax)
dfrederick@kellogghansen.com
apanner@kellogghansen.com

*Plaintiffs' Interim Class Counsel and Proposed
Co-Class Counsel*

Michael Liskow
CALCATERRA POLLACK LLP
mliskow@calcaterrapollack.com
1140 Avenue of the Americas, 9th Floor
New York, NY 10036-5803
Telephone: (212) 899-1761
Facsimile: (332) 206-2073

*Counsel for Plaintiff Robert Pepper*

COUNSEL FOR DEFENDANT APPLE INC.

Theodore J. Boutrous Jr.
Richard J. Doren
Daniel G. Swanson
Jay P. Srinivasan
Dana Lynn Craig
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
 213/229-7000
 213/229-7520 (fax)
tboutrous@gibsondunn.com
rdoren@gibsondunn.com
dswanson@gibsondunn.com
jsrinivasan@gibsondunn.com
dcraig@gibsondunn.com

Cynthia E. Richman
Harry R. S. Phillips
Mark A. Perry
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
 202/955-8234
 202/530-9691 (fax)
crichman@gibsondunn.com
hphillips2@gibsondunn.com
mperry@gibsondunn.com

Veronica S. Lewis
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
 214/698-3100
 214/571-2900 (fax)
vlewis@gibsondunn.com

Ethan Dettmer
Eli M. Lazarus
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
 415/393-8200
 415/393-8306 (fax)
edettmer@gibsondunn.com
elazarus@gibsondunn.com
AppleAppStoreDiscovery@gibsondunn.com

IN RE APPLE iPHONE ANTITRUST LITIGATION
Service List – April 12, 2022
Page 2

David R. Eberhart
Anna T. Pletcher
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
    415/984-8700
    415/984-8701 (fax)
deberhart@omm.com
apletcher@omm.com

Katrina Robson
Elena Zarabozo
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, DC 20006
    202/383-5300
    202/383-5414 (fax)
krobson@omm.com
ezarabozo@omm.com

Scott Schaeffer
O'MELVENY & MYERS LLP
Plaza 66, Tower 1, 37th Floor
1266 Nanjing Road West
Shanghai 200040, China
    86-21-2307-7000
    86-21-2307-7300 (fax)
sschaeffer@omm.com

Michelle Lowery
McDERMOTT WILL & EMERY LLP
2049 Century Park East, Suite 3200
Los Angeles, CA 90067-3206
    310/277-4110
    310/277-4730 (fax)
mslowery@mwe.com

Elizabeth Rodd
Sandra Meyer
McDERMOTT WILL & EMERY LLP
200 Clarendon Street, Floor 58
Boston, MA 02116-5021
    617-835-4040
    617-321-4577 (fax)
erodd@mwe.com
smeyer@mwe.com

Nicole Castle
Michael Huttenlocher
McDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, NY 10017-3852
    212-547-5400
    212-547-5444 (fax)
ncastle@mwe.com
mhuttenlocher@mwe.com

Hannah L. Cannom
Bethany M. Stevens
WALKER STEVENS CANNOM LLP
500 Molina Street #118
Los Angeles, CA 90013
    213/337-9972
    213/403-4906
hcannom@wscllp.com
bstevens@wscllp.com

27640

**ER-98**

# Exhibit B

THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
RICHARD J. DOREN, SBN 124666
  rdoren@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
JAY P. SRINIVASAN, SBN 181471
  jsrinivasan@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA   90071-3197
Telephone:    213.229.7000
Facsimile:    213.229.7520

VERONICA S. MOYÉ (Texas Bar No. 24000092;
appearance *pro hac vice*)
  vlewis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
Telephone:    214.698.3100
Facsimile:    214.571.2900

CYNTHIA E. RICHMAN (D.C. Bar No.
492089; *pro hac vice*)
  crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile:  202.467.0539

ETHAN D. DETTMER, SBN 196046
  edettmer@gibsondunn.com
RACHEL S. BRASS, SBN 219301
  rbrass@gibsondunn.com
CAELI A. HIGNEY, SBN 268644
  chigney@gibsondunn.com
ELI M. LAZARUS, SBN 284082
  elazarus@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105-0921
Telephone:    415.393.8200
Facsimile:  415.393.8306

Attorneys for Defendant, APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

IN RE APPLE IPHONE ANTITRUST
LITIGATION,

CASE NO. 4:11-cv-06714-YGR

**DEFENDANT APPLE INC.'S RESPONSES
AND OBJECTIONS TO CONSUMER
PLAINTIFFS' THIRD SET OF REQUESTS
FOR PRODUCTION OF DOCUMENTS**

Hon. Yvonne Gonzalez Rogers

**PROPOUNDING PARTY:**      Consumer Plaintiffs

**RESPONDING PARTY:**      Defendant Apple Inc.

**SET NO.:**      Three

Gibson, Dunn &
Crutcher LLP

APPLE INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' THIRD SET OF REQUESTS FOR
PRODUCTION OF DOCUMENTS (NO. 55) – CASE NO. 4:11-CV-06714-YGR – CONFIDENTIAL

**ER-100**

Pursuant to Federal Rules of Civil Procedure 26 and 34, Defendant Apple Inc., by and through the undersigned counsel, hereby objects and responds to the Consumer Plaintiffs' Third Set of Requests for Production, including without limitation document request No. 55 (the "Request"), Definitions, and Instructions contained therein.

### PRELIMINARY STATEMENT

1.     Consumer Plaintiffs' third set of requests for production purport to seek highly sensitive data relating to the identities and complete transaction histories of Apple's customers.    On its face, Plaintiffs' Request calls for the names, email addresses, phone numbers, physical addresses, and credit card numbers associated with more than 400 million consumer accounts.    In addition, even though this appears nowhere in their Request, Plaintiffs have explained that they also intended to request information that would allow them to link each of these consumer accounts with transacation data.    The Request raises profound security and privacy risks, and the production of such data would present extraordinary risks to the privacy and security of Apple's customers, contrary to Apple's fundamental values and priorities.    *See* CMC Tr. 14:19-20 (Apr. 11, 2022) (the Court recognizing "security issues" with Plaintiffs' request).

2.     Apple's responses to the Request are made to the best of its current knowledge, information, and belief.    Apple reserves the right to supplement or amend any of its responses should future investigation indicate that such supplementation or amendment is necessary.

3.     Apple's response to the Request is confidential and made solely for the purposes of and in relation to this action.    The response is given subject to all appropriate objections (including, but not limited to, objections concerning competency, relevancy, materiality, propriety, and admissibility).    All objections are reserved and may be interposed at any time.

4.     Apple's response is based on its understanding that Plaintiffs seek only information that is within Apple's possession, custody, and control.

5.     Nothing contained in these Responses and Objections or provided in response to the Request consists of, or should be construed as, an admission relating to the accuracy, relevance,

Gibson, Dunn &
Crutcher LLP

APPLE INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' THIRD SET OF REQUESTS FOR
PRODUCTION OF DOCUMENTS (NO. 55) – CASE NO. 4:11-CV-06714-YGR – CONFIDENTIAL

**ER-101**

existence, or nonexistence of any alleged facts or information referenced or implied in any request.

## RESPONSES AND OBJECTIONS

**REQUEST FOR PRODUCTION NO. 55:**

All DOCUMENTS CONCERNING the identity of each and every member of the CLASS or that identify which APPLE IDs belong to which members of the CLASS, including but not limited to the first and last name, email address, birthdate, telephone number, billing address, and method of payment of the user associated with each APPLE ID for which YOU have produced or will produce transactional data.

**OBJECTIONS TO REQUEST FOR PRODUCTION NO. 55:**

Apple objects to the production of the highly sensitive information sought by this Request regarding an enormous number of third parties who have entrusted Apple to safeguard that information.   The Request constitutes a grave invasion of privacy, disproportionate to Plaintiffs' purported need.   Plaintiffs' Request is staggering: credit card and consumer-identifying information for every U.S. App Store account—*400 million* accounts—which Plaintiffs indicate they intend to link with the detail of *64 billion* transactions.   This Request is deficient on its face because it makes no attempt to strike any balance—much less a proper balance—between protecting the privacy of putative class members' information with Plaintiffs' needs.   *Murphy v. Target Corp.*, No. 09CV1436-AJB WMC, 2011 WL 2413439, at *1 (S.D. Cal. June 14, 2011) ("In the class action context, Courts balance the following factors when assessing the potential intrusion of pre-certification discovery on the putative class members' right of privacy . . . :   (1) if the party has a legally protected privacy interest; (2) whether the party has a reasonable expectation of privacy; and (3) whether production of the information constitutes a serious invasion of privacy.").   Here, the existence of profound privacy interests and the threat of a serious invasion of them are self-evident. Plaintiffs' Request seeks non-anonymized information about users' identities, where they live, specific financial information (including full credit card numbers) and—if that information is linked to the transactional data—everything they have downloaded and spent on the App Store.   That

Gibson, Dunn &
Crutcher LLP

3

**ER-102**

combination of information would uncover a trove of highly sensitive information—including users' political views, health concerns, sexual orientations, and all sorts of personal secrets and intimate activities. For example, the mere fact that someone has downloaded an app could reveal closely held secrets that have serious, life-changing consequences. *See*, *e.g.*, Liam Stack, *Catholic Officials on Edge After Reports of Priests Using Grindr*, The New York Times (Oct. 14, 2021) https://www.nytimes.com/2021/08/20/nyregion/pillar-grindr-catholic-church.html. App Store users have entrusted such information to Apple, not to Plaintiffs or their consultants, and Apple takes that trust so seriously that Apple itself does not combine that information or keep it in a single database. Apple is not satisfied that Plaintiffs or their consultants can or will sufficiently safeguard that information.

Apple further objects to the Request on the grounds that it is overly burdensome and wholly disproportionate to the needs of the case given the privacy risks identified above. Plaintiffs apparently issued this Request in order to "deanonymize" the transactional data they have already received. But the Request does not actually seek—and therefore Apple will not produce—data connecting the requested information about Apple's customers with their transactional records. Regardless, Plaintiffs have made no effort to explore safer and less intrusive alternatives for addressing the class certification issues underlying the Request that do not require exposing Apple's customers to a privacy breach.

Apple further objects on the grounds and to the extent that the Request seeks documents and information that are unrelated and irrelevant to the claims in, or defenses to, this litigation or that are not proportional to the needs of the case, considering the burden and expense of the proposed discovery.

Apple further objects that Plaintiffs have unduly delayed in propounding this Request. Plaintiffs filed their lawsuit in 2011 and propounded their first requests for production in October 2019. Plaintiffs' first set of requests for production did not request transactional or consumer-identifying data. Apple and Plaintiffs, along with the plaintiffs in the related case, *Cameron v. Apple*, Case No. 4:19-cv-3074-YGR (N.D. Cal.), negotiated for many months throughout 2020

Gibson, Dunn & Crutcher LLP

4

APPLE INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' THIRD SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS (NO. 55) – CASE NO. 4:11-CV-06714-YGR – CONFIDENTIAL

regarding a transactional data production in response to a request from the *Cameron* plaintiffs. Many months into these negotiations, in September 2020, Plaintiffs finally propounded their request for transactional data.   After further negotiations, Apple produced transaction data in January 2021. Following subsequent negotiations with Plaintiffs, Apple then produced additional transaction data in June 2021.   At no time during those negotiations did Plaintiffs seek the personal identifying information sought by this Request, outside of a request for information on consumers' age, in response to which Apple produced data on birth years reported by consumers in establishing their account IDs.   Instead, Plaintiffs waited until March 2022—18 months after their first transaction data request and two-and-a-half years into discovery—to request this data.   There is no reason that Plaintiffs could not have propounded this Request in conjunction with their previous request for transactional data in 2020.   It is unreasonable and unduly burdensome for Apple to now have to collect new, extensive data in response to this belated Request.

Apple further objects to the Request on the grounds that it is overbroad as written and unduly burdensome to the extent it seeks "ALL DOCUMENTS CONCERNING the identity of each and every member of the CLASS . . . including but not limited to the first and last name, email address, birthdate, telephone number, billing address, and method of payment of the user associated with each APPLE ID."

Apple objects to the Request, including the associated Definitions and Instructions, to the extent that they are not limited to the relevant time period, thus making the Request overly broad, unduly burdensome, and not relevant to the claims or defenses in this action, especially to the extent the Request seeks documents pertaining to facts outside the applicable statutes of limitations.   The Plaintiffs' stated Relevant Time Period begins on January 1, 2006—years before any App Store transactional data, related consumer-identifying data, or the App Store itself ever existed.

Apple further objects to the extent that the Request is duplicative of Plaintiffs' Request No. 48, which sought, in part, each App Store "consumer's age," in response to which Apple produced data on birth years reported by consumers in establishing their account IDs.

Apple objects to the Request on the grounds and to the extent that it calls for the production of

Gibson, Dunn &
Crutcher LLP

5

APPLE INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' THIRD SET OF REQUESTS FOR
PRODUCTION OF DOCUMENTS (NO. 55) – CASE NO. 4:11-CV-06714-YGR – CONFIDENTIAL

**ER-104**

any information or documents protected by the attorney-client privilege, the attorney work-product doctrine, Federal Rule of Evidence 502, any other legally cognizable privilege or immunity, or the laws, regulations, or policies of other countries, and Apple and its counsel hereby assert such privileges and immunities.   Inadvertent production of any information or documents that are privileged or otherwise immune from discovery shall not constitute a waiver of any privilege or of any other ground for objecting to the discovery with respect to such information or documents or the subject matter thereof, or the right of Apple to object to the use of any such information or documents or the subject matter thereof during these or any other proceedings.   The production of a privileged or work-product-protected document, whether inadvertent or otherwise, is not a waiver of privilege or protection from discovery in this case or in any other federal or state proceeding to the fullest extent of Federal Rule of Evidence sections 502(d) and (e).   For example, the production of privileged or work-product-protected documents in this case as part of a mass production is not itself a waiver in this case or in any other federal or state proceeding.

Apple objects to the Request (including the Definitions and Instructions), on the grounds and to the extent that it purports to impose obligations beyond those imposed or authorized by the Federal Rules of Civil Procedure, the Federal Rules of Evidence, the Local Rules of the Northern District of California, any other applicable federal or state law, and any agreements between the parties.   Apple will construe and respond to the Request in accordance with the requirements of the Federal Rules of Civil Procedure and other applicable rules or laws.

Apple objects to the Request to the extent it does not identify the documents sought with reasonable particularity as required by Rule 34(b) of the Federal Rules of Civil Procedure.

Apple objects to the Request to the extent that any regulatory body, governmental agency, or governmental entity, domestic or foreign, objects to the production of the requested documents.

Apple objects to the Request to the extent that it seeks information that is proprietary or otherwise confidential to Apple.

Apple objects to the Request to the extent that it seeks information that is subject to the limitations set forth in the Expert Stipulation Order.   ECF No. 201.

Gibson, Dunn & Crutcher LLP

6

APPLE INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' THIRD SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS (NO. 55) – CASE NO. 4:11-CV-06714-YGR – CONFIDENTIAL

**ER-105**

Apple objects to the Request to the extent that it requires Apple to collect and produce data in a manner and form that such data is not maintained in the ordinary course of business.   Indeed, to mitigate the serious privacy concerns described above, Apple does not maintain the requested data in the same internal databases, nor in the form requested by Plaintiffs.

Apple objects to production of documents in response to the Request on the grounds and to the extent that production of such documents demanded therein would violate the rights of privacy of third parties under California law or other applicable laws of any relevant jurisdiction, or that such production otherwise is prohibited by law, or is subject to legal requirements for notification of third parties.

Apple objects to the Request on the grounds and to the extent that the Request purport to require Apple to collect, review and produce an enormous volume of data within 30 days, as specified in the Request.

Apple objects to the Request to the extent it seeks to impose an obligation on Apple to conduct anything beyond a diligent search and reasonable inquiry of readily accessible files, including electronic files, where responsive documents would reasonably be expected to be found.

Apple objects to the Request to the extent that it uses words and phrases that are not defined in an understandable manner.   Apple will interpret the terms and phrases used in the Request as those terms and phrases are understood to Apple.

By stating in these responses that Apple will meet and confer regarding the Request, Apple does not intend to represent that any responsive documents or all requested documents actually exist, but rather that Apple will continue, as it has been doing, to meet and confer with Plaintiffs in good faith to identify a solution that addresses both parties' interests and the interests of third parties.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 55:**

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Apple responds as follows:   Apple will continue to meet and confer with Plaintiffs regarding this Request but is not prepared to produce the data that Plaintiffs claim is

Gibson, Dunn &
Crutcher LLP

7

APPLE INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' THIRD SET OF REQUESTS FOR
PRODUCTION OF DOCUMENTS (NO. 55) – CASE NO. 4:11-CV-06714-YGR – CONFIDENTIAL

**ER-106**

requested in RFP 55, particularly given that Plaintiffs have not contemplated less invasive and more secure mechanisms for addressing the class certification issues underlying RFP 55.

DATED:   May 12, 2022                    GIBSON, DUNN & CRUTCHER LLP


                                         By:   _____*/s/ Cynthia E. Richman*_____
                                                    Cynthia E. Richman

                                         *Attorneys for Defendant Apple Inc.*

Gibson, Dunn & Crutcher LLP

8

APPLE INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' THIRD SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS (NO. 55) – CASE NO. 4:11-CV-06714-YGR – CONFIDENTIAL

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| **IN RE APPLE IPHONE ANTITRUST LITIGATION** | Case No. 4:11-cv-6714-YGR<br><br>**ORDER**<br>**DENYING APPLE'S *DAUBERT* MOTION TO EXCLUDE THE TESTIMONY OF PROFESSOR DANIEL L. MCFADDEN AND DR. ROSA ABRANTES-METZ; AND**<br><br>**GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Re: Dkt. Nos. 683, 690, and 786 |

Pending before this Court is the Renewed Motion for Class Certification filed by plaintiffs Robert Pepper, Stephen H. Schwartz, Edward W. Hayter, and Edward Lawrence ("consumer plaintiffs"), a *Daubert*[1] motion to exclude the testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz filed by defendant Apple, Inc., and an Omnibus Motion to Seal which will be addressed by separate order. Though the Court previously denied in part plaintiffs' motion for class certification, it noted that it expected that plaintiffs could fix the identified problems with their expert's econometric model. At this juncture, plaintiffs have resolved those deficiencies. The Court, therefore, **GRANTS** the renewed motion for class certification and **DENIES** Apple's *Daubert* motion.

Given the procedural posture of this motion, the Court accepts plaintiffs' representation that Professor McFadden can: (i) match the Apple identification numbers he has with *actual consumers* to ascertain class members, and (ii) limit the percentage of unharmed class members swept in by the narrowed class definition. Should Professor McFadden's model fail to do both, the Court will consider whether modification or decertification is appropriate for all or part of the class. *See City of Los Angeles, Harbor Division v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) (holding that a district court is free to "reconsider, *rescind*, or modify an

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–90 (1993).

United States District Court
Northern District of California

**ER-108**

interlocutory order" such as certification of a class "for cause by it seen to be sufficient" (emphasis supplied)).

## I.   BACKGROUND

### A.   FACTUAL BACKGROUND

The facts of this case are well known to the parties. The background relevant to the instant motion is summarized as follows:

Consumer plaintiffs bring this class action pursuant to Section 2 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 2, on behalf of the following class:

> All persons in the United States, exclusive of Apple and its employees, agents and affiliates, and the Court and its employees, who purchased one or more iOS applications or application licenses from Defendant Apple Inc. ("Apple"), or who paid Apple for one or more in-app purchases, including, but not limited to, any subscription purchase, for use on an iOS Device at any time since July 10, 2008 (the "Class Period"). The Class is limited to those persons who paid more than $10.00 in total to Apple during the Class Period for iOS application and in-app purchases from any one Apple ID account.

(Dkt. No. 666-1, Renewed Motion for Class Certification, "Mot." at 1.) Consumer plaintiffs theorize that Apple charges developers on the App Store supracompetitive commissions, which the developers then pass to consumers in the form of increased prices for app downloads or subscriptions. (Dkt. No. 228, Third Amended Complaint, ¶ 47.) Consumer plaintiffs allege that this conduct allows Apple to unlawfully monopolize the retail market for the sale of apps, including in-app purchases ("IAP").

Consumer plaintiffs bring two causes of action against Apple based on this alleged conduct: (1) unlawful monopolization of the applications aftermarket in violation of Section 2 of the Sherman Act and (2) attempted monopolization of the applications aftermarket.  (*Id*. ¶¶ 78–88.)

### B.   PROCEDURAL BACKGROUND

#### 1.   PREVIOUS *DAUBERT* MOTION

In its previous order, the Court granted in part and denied in part Apple's *Daubert* motion to exclude Professor McFadden's expert opinion and denied without prejudice consumer plaintiffs' motion for class certification. (Dkt. No. 630, "Previous Order.") With respect to the

2

**ER-109**

*Daubert* motion, Apple challenged several aspects of Professor McFadden's econometric model. The Court examined these challenges systematically.

First, it denied Apple's motion as to Professor McFadden's overarching model. Apple argued that Professor McFadden's econometric model was meant not to test whether Apple's allegedly anticompetitive conduct had a common impact on class members but to prove it. (*Id.* at 3.) The Court disagreed, finding that Professor McFadden relied on sound scientific and economic principles to determine that Apple's commission rate on developers acts as a tax for both developers and their consumers. (*Id*. at 4.)

Next, the Court denied Apple's motion as to Professor McFadden's market definition. (*Id.* at 5.) Professor McFadden opined that there was a single relevant aftermarket for selling iOS apps and in-app content to consumers.  Apple argued that he had ignored the two-sidedness of the App Store. (*Id.*) The Court found that, under *Daubert*, the bases of Professor McFadden's market definition were sound. It declined to address the merits question of whether Professor McFadden's market definition was correct because, traditionally, market definitions are highly factual, and frequently the focus of any trial.

Finally, the Court ruled on Apple's challenges to Professor McFadden's three-step approach to quantifying the impact and damages of Apple's allegedly anticompetitive conduct. In step one, Professor McFadden identified the but-for commission rate—the commission rate that would exist but for Apple's monopolistic practices. The Court rejected Professor McFadden's but-for commission rate as arbitrary, finding that Professor McFadden was not an expert in the relevant fields nor was his conclusion the product of legitimate economic inquiry.

In the second step, Professor McFadden estimated the app and in-app prices that consumers would have paid in the but-for world. Apple challenged Professor McFadden's pricing model on five grounds:

1.    The model initially forecasted that about 5.8% of Apple accounts were uninjured. In other words, the model forecast that plaintiffs' proposed class included many accounts who were not harmed by Apple's allegedly anticompetitive conduct. Largely due to errors identified by Apple's experts, Professor McFadden later

United States District Court
Northern District of California

3

conceded that the model actually included 14.6% uninjured accounts.

2. Professor McFadden also conceded that, at the time of decision, he had not fixed one of these errors—the use of fixed-dollar rather than percentage pricing, which at times created negative but-for prices. Given this concession, and the fact that the parties did not dispute that fixing the model to reflect percentage pricing would fix the problem, the Court rejected Apple's argument that Professor McFadden's model otherwise generated negative but-for prices.

3. The Court did find that Professor McFadden's opinion that Apple's focal-point pricing and pricing tiers would not exist in the but-for world lacked foundation and ignored overwhelming evidence to the contrary.

4. Apple argued that Professor McFadden's model was not sufficiently robust for three reasons—the sample size was too small; the model easily allowed for accounts to switch from harmed to unharmed; and it estimated a wide variation of unharmed accounts depending on the sample size. The Court found that Professor McFadden had sufficiently supported his use of a 0.1% sample size. Given that the model required adjustment, the Court granted Apple's motion as to the robustness of Professor McFadden's model without ruling on its other arguments. The Court did, however, order plaintiffs to address the confidence level of the model in the next round of briefing.

5. Apple contended that Professor McFadden's decision to exclude free apps from his model ignored market realities. Because free apps were excluded from Professor McFadden's impact calculations and the proposed class definition, the Court rejected Apple's argument.

In the third and final step, Professor McFadden proposed a method for separating harmed from unharmed class members. Though the Court found that the method of identifying the class members—matching Apple IDs to actual customers through Apple's internal records—was sufficiently objective, plaintiffs' approach with respect to timing was unacceptable. The Court advised plaintiffs that it could not wait until *after trial* to ascertain which class members were

4

United States District Court
Northern District of California

uninjured.  While perhaps acceptable in a settlement context, plaintiffs had no legal basis for addressing a core merits issue after trial.

Ultimately, the Court granted plaintiffs leave to amend their expert's report and noted that it expected that many of the identified issues could be fixed.

### 2. PREVIOUS CLASS CERTIFICATION MOTION

The Court also analyzed plaintiffs' class certification motion and found that plaintiffs met all the Rule 23(a) requirements.

Four common questions capable of class-wide resolution existed. First, the relevant market. Plaintiffs proffered Professor McFadden's definition of the market: a single aftermarket of the sale of iOS apps and in-app content. Apple criticized this definition, arguing that the relevant market was a two-sided transaction platform. The Court found that, for purposes of class certification, Professor McFadden's opinion on the market definition constituted common proof, though it declined to rule on its merits. The Court also found that Professor McFadden put forth common proof that could resolve the question of Apple's power in the market, its willfulness in acquiring and maintaining a monopoly, and whether it had violated Section 2 of the Sherman Act by monopolizing the market for iOS apps and in-app content.

Without Professor McFadden's methodology, many of the same issues addressed in the *Daubert* context led the Court to find that plaintiffs could not meet the predominance requirement of Rule 23(b)(3). Plaintiffs had not shown that the impact or damages of Apple's allegedly anticompetitive conduct could be proven on a classwide basis. With respect to antitrust impact, because Professor McFadden's methodology could not then reliably ascertain how many class members were unharmed by Apple's allegedly anticompetitive conduct, individual questions would predominate. With respect to antitrust damages, the Court rejected plaintiffs' proffer that they would run Professor McFadden's model after trial to determine classwide damages as too speculative.

* * *

Since the Previous Order, plaintiffs have filed a revised supplemental expert report by Professor McFadden. They also filed a new expert report by Dr. Rosa Abrantes-Metz, an expert in

5

**ER-112**

econometrics, statistics, transaction pricing, and payment processing, to calculate anew Apple's but-for commission rate. Based on those expert reports, plaintiffs renewed their motion for class certification. Apple then moved to exclude the new testimony of both of plaintiffs' experts and opposed the renewed motion for class certification.

## II.    *DAUBERT* MOTION

Because the Court's *Daubert* analysis informs the rest of its decision, the Court begins there. It then proceeds to analyze plaintiffs' renewed motion for class certification.[2]

### A.    LEGAL FRAMEWORK

Federal Rule of Evidence 702[3] provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

At the class certification stage, "the relevant inquiry is a tailored *Daubert* analysis which

---

[2] The Court references various reports from plaintiffs as follow: Professor McFadden's Opening Report from June 1, 2021 (Dkt. No. 443-14, "McFadden's Opening Report"); Professor McFadden's Reply Report from October 19, 2021 (Dkt. No. 554-5, "McFadden's Reply Report"); Professor McFadden's Second Revised Supplemental Report (Dkt. No. 679-1, "McFadden's 2nd Supplemental Report"); Professor McFadden's Second Reply Report from April 28, 2023 (Dkt. No. 708-2, "McFadden's Second Reply Report"); and Professor McFadden's Declaration (Dkt. No. 702-2, "McFadden's Decl.").

For Dr. Abrantes-Metz there are: Dr. Abrantes-Metz's Opening Report from September 26, 2022 (Dkt. No. 666-2, "Dr. Abrantes-Metz's Opening Report"); Dr. Abrantes-Metz's Reply Report from April 28, 2023 (Dkt. No. 708-3, "Dr. Abrantes-Metz's Reply Report"); and Dr. Abrantes-Metz's Declaration (Dkt. No. 702-3, "Dr. Abrantes-Metz's Decl.").

For Apple's experts, there are: Professor Jeffrey T. Prince's Report from March 10, 2023 (Dkt. No. 668-5, "Prince Report"); Professor Lorin M. Hitt's Report from March 10, 2023 (Dkt. No. 688-3, "Hitt Report"); Professor Mark Watson's Report from March 10, 2023 (Dkt. No. 688-6, "Watson Report"); and Professor Richard Schmalensee's Report from March 10, 2023 (Dkt. No. 688-4, "Schmalensee Report").

[3] The Supreme Court updated the rule effective December 1, 2023. The changes are underlined. *See* https://www.supremecourt.gov/orders/courtorders/frev235468.pdf.  The new language does not change the intent of the rule, rather it provides further clarity.

6

**ER-113**

United States District Court
Northern District of California

United States District Court
Northern District of California

scrutinizes the reliability of the expert testimony in light of the criteria for class certification and the current state of the evidence." *Rai v. Santa Clara Valley Transportation Auth.*, 308 F.R.D. 245, 264 (N.D. Cal. 2015); *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 985–86 (9th Cir. 2020). "Ultimately, the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of [their] methodology." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (quotation marks and citation omitted).

### B. PROFESSOR MCFADDEN'S CHALLENGED OPINIONS

Apple submits that Professor McFadden has failed to fix the deficiencies in his model identified by the Court in its Previous Order. Plaintiffs disagree. The Court analyzes each argument.

#### 1. METHODOLOGY

Apple challenges Professor McFadden's methodology on: (a) marginal costs; (b) in-app purchase prices; (c) price tiers and focal prices; and (d) developer competition.

##### a. MARGINAL COSTS

First, Apple argues Professor McFadden's model overestimates marginal costs. Even though, according to Apple, it is "textbook economics that digital goods have low or zero marginal costs," Apple believes the model is engineered to find positive marginal costs for every app and in-app purchase which leads to overestimation of marginal costs. Apple supports this position by pointing to the "natural experiments" its experts ran on the model.

The Court disagrees. Apple misconstrues Professor McFadden's model; in it, marginal cost is calculated based on app developers' "*variable* costs." (McFadden's Opening Report ¶ 185 (emphasis in original).) Professor McFadden defines a "variable cost" as an expense that "varies in proportion to production output." (*Id.* ¶ 185; *see also* McFadden's Decl. ¶ 5.) In other words, when Professor McFadden posits that app developers have marginal costs, he is looking at how costs change not when producing one additional unit of a digital good but when operating at scale. (McFadden's Reply Report ¶¶ 73–74.) So, for example, when Professor McFadden states that Fortnite incurs marginal costs, he is not talking about the marginal cost of creating one more unit of its digital currency, "V-bucks," but "all of the different variable costs that come along with [its]

7

**ER-114**

United States District Court
Northern District of California

iOS app monetization business." (*Id.* ¶ 74.)

Moreover, Professor McFadden provides examples of positive variable costs. (McFadden's Opening Report ¶¶197–208.) User acquisition costs, for example, tend to rise with revenue, suggesting that they are variable, rather than fixed, costs. (*Id.* ¶ 198.) Streaming costs are another. (*Id.* ¶ 201.) When a user streams a song on Spotify, for example, Spotify pays a royalty fee. (*Id.* ¶ 206.) Apple does not address either example of positive variable cost but at least one of Apple's experts, Professor Hitt, conceded when presented with such examples that marginal costs could be "meaningful." (McFadden's Reply Report ¶ 73 n.138.)

Lastly, Apple argues that its experts' "natural experiments" undermine how Professor McFadden computed marginal costs. Apple has lowered its commission rate three times. (Hitt Report ¶ 41.) Each time it did, prices mostly stayed the same. Apple extrapolates that such a result shows that in a digital marketplace "products have zero or negligible marginal cost."[4] By way of illustration, Professor Hitt proffers Apple's Small Business Program ("SBP"), introduced in December 2020. (*Id.* ¶ 55.) The SBP reduced Apple's commission rate to 15% for paid transactions for app developers who earned less than or equal to $1 million in net proceeds. (*Id.*) The program was voluntary. Professor Hitt then analyzed whether app developers who participated in the program lowered their prices in response by comparing what their prices were six months before the program and six months after. (*Id.* ¶ 56.) Professor Hitt concluded that most participants did not reduce their prices.

At most, Professor Hitt's conclusions on the natural experiments go to weight, not admissibility. The "test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert,* 43 F.3d at 1318. Apple's analysis of Professor Hitt's natural experiments say nothing about Professor McFadden's methodology; instead, they articular a different perspective on what would have happened in the but-for world. That perspective does

---

[4] Apple also states that, in a deposition, Professor McFadden admits that he did not test his model against these natural experiments. That is not what Professor McFadden said. In response to the question of whether he thought that "it is likely that marginal costs, as you estimate them, would change at the exact same time as a change in the commission rate," Professor McFadden responded he had not "examined" that particular issue. (McFadden 3d Deposition at 160:15–23.)

8

**ER-115**

United States District Court
Northern District of California

not discredit Professor McFadden's testimony about how all app developers across the App Store would have priced their apps and in-app content had Apple's commission rate always been 13.63% rather than 30%. "The question of what would have happened but for [defendant's] monopoly overcharge is a hypothetical, and a hypothetical question generally cannot be answered by historical data about what actually happened but must often be answered by general principles about what generally tends to happen." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 605 (N.D. Cal. 2010) (internal citation and quotations omitted); *see also In re Lithium Ion Batteries Antitrust Litig.*, 2017 WL 1391491, at *11 (N.D. Cal. Apr. 12, 2017) ("Determination of the difference between prices paid and prices that would have been paid 'but-for' the unlawful conduct is necessarily hypothetical.")

Professor McFadden has demonstrated that calculating marginal costs at the app, rather than individual item, level is reliable.[5] For that reason, the motion on this ground is **DENIED**.

### b.    IN-APP PURCHASE PRICES

Apple next argues that Professor McFadden's model cannot predict what individual in-app purchase prices would be but for Apple's allegedly anticompetitive conduct and therefore cannot reliably calculate damages. (*See* McFadden's 2nd Supplemental Report ¶ 42.)

As explained in its Previous Order, the Court understands that Professor McFadden calculates prices at the "app level" rather than the "individual app purchase level." (Previous Order at 10.) He does so because he opines that app developers consider costs at the app level when setting prices. (*Id.*) Thus, when he built his model, Professor McFadden averaged the prices of all in app content in an app, per month. (*Id.*) He then calculated the but-for prices at the *app* level to estimate damages. (McFadden's 2nd Reply Report ¶ 108.) The Court declined in the previous round of briefing to exclude Professor McFadden's model because he calculates but-for prices at the app, rather than individual, level and it will not revisit that decision here.

Apple next challenges Professor McFadden's use of the "percentage method" to estimate

_____

[5] As Professor Prince acknowledged, "economists think about short run and long run." (Dkt. No. 702-5, 2023 Prince Dep. 70:15.) The perspective of the analysis, therefore, is "going to impact how [economists] think about [costs] being variable or marginal." (*Id.*)

9

**ER-116**

United States District Court
Northern District of California

damages. In its Previous Order, the Court excluded Professor McFadden's model because it generated negative but-for prices. The parties then agreed the issue could be fixed if Professor McFadden applied the percentage rather than fixed-dollar method. (Previous Order at 11.) Professor McFadden now uses the percentage method to estimate damages. (McFadden's 2nd Supplemental Report ¶ 40.)

Apple now argues that even though Professor McFadden applies the percentage method, he changes the price of every as-is in-app item by the same percentage to calculate the but-for price, a method that is scientifically unsound. The Court disagrees with Apple's characterization. As Professor McFadden states, he uses "the percentage method to estimate damages for each transaction, not to *predict* item level prices." (McFadden's 2nd Supplemental Report ¶ 37.) Instead, he calculates how much Apple overcharged consumers as a percentage of its total revenues. (*Id.* ¶ 40.) Professor McFadden then calculates individual damages by taking this percentage and multiplying it against each individual's spending on a particular app, in a particular month. (*Id.* ¶ 41.) To illuminate, Professor McFadden gives the example of two users, one who spends $0.99 on an app, the other $9.99. (*Id.* ¶ 41.) Using Dr. Abrantes-Metz's but-for commission rate of 13.63%, Professor McFadden concluded that Apple's overcharge for that particular app was 35.5% in January 2018. (*Id.*) At the as-is commission rate of 30%, Apple's revenue from the first user was $0.297, for the second user $2.997. The users were therefore overcharged by $0.105 (35.5% of $0.297) and $1.064 (35.5% of $2.997), respectively.

As now applied, the Court finds the percentage method sufficiently reliable. For that reason, the motion on this ground is **DENIED.**

### c. PRICE TIERS AND FOCAL-POINT PRICING

The Court previously excluded Professor McFadden's model because it ignored Apple's price tiers and focal-point pricing. (Previous Order at 11–12.) Apple argues that Professor McFadden's model still ignores the issue.

In their renewed motion for class certification, plaintiffs maintain their challenge to Apple's price tiers. For that reason, Professor McFadden explains, he has created two models, one without price tiers and one which incorporates tier and focal pricing. (McFadden's 2nd

10

**ER-117**

United States District Court
Northern District of California

Supplemental Report ¶ 85.) Professor McFadden conducts a simulation with Apple's current price tiers, using the same 0.1% sample he uses generally to calculate damages. (*Id.* ¶ 87.) At the app-level, Professor McFadden assumes that developers choose their app and average in-app content prices consistent with the increments set out in Apple's tier schedules. (*Id.*) Within these restrictions, Professor McFadden models that app developers set the prices that will result in maximized profits. (*Id.*) In the same way, Professor McFadden's model demonstrates that it can accommodate focal-point pricing. (*Id.* ¶ 88.) Professor McFadden acknowledges that, with the current tier and focal pricing, the percentage of unharmed accounts is higher. (*Id.* ¶ 90.)

Professor McFadden then conducted a simulation using a more granular, 750-point pricing structure. (*Id.* ¶ 93.) He did so because, as part of its settlement with app developers, Apple announced that it would introduce such a pricing schedule. (*Id.* ¶ 94.) Using this more granular pricing structure, Professor McFadden calculates that the percentage of unharmed accounts would be similar to a but-for world with no pricing tiers. (*Id.* ¶ 95.)

The Court finds that Professor McFadden's tier and focal pricing simulation is sufficiently reliable. Whether proof exists that pricing tiers or a pricing schedule is, in fact, anticompetitive is a merits question not before the Court and likely reasonably in dispute in any event. That Professor McFadden's does not predict in-app prices ending at 99 cents is no surprise. As explained, Professor McFadden averages all in-app content prices, ending in 99 cents, at the app-level. He then restricts the movement of these averaged prices to change in increments consistent with Apple's pricing schedule. This approach, Professor McFadden explains, is consistent with how one of Apple's experts, Professor Prince, originally calculated the effect of price tiers. (McFadden 2nd Reply Report ¶ 51.)

Further, as Professor McFadden explains, his model does reflect the impact of focal-point pricing through Apple's current pricing structure and the 750-point structure that Apple has stated it will implement. Professor Prince disputes this, arguing that Professor McFadden's model does not reflect "voluntary focal-point pricing." (Prince Report ¶ 148.) In so arguing, Professor Prince ignores that the analysis of price tiers and focal point pricing is "interchangeable." (McFadden's 2nd Reply Report ¶ 55.) In other words, whether the impact of a price restriction is analyzed as a

11

United States District Court
Northern District of California

price tier—Apple requiring that all app prices end in $0.99—or as focal-point pricing—app developers would freely choose to price at 99-cent points—the effect is the same. Apple does not give the Court any reason to think otherwise.[6]

Finally, Apple's argument that Professor McFadden's model does not reflect the as-is world because he assumes that app developers set prices to maximize profits exactly rather than along one of Apple's price tiers does not persuade. Professor McFadden states that he simulates the but-for world by assuming that developers choose the prices that yield them the highest profits based on Apple's pricing schedule. (McFadden's 2nd Supplemental Report ¶ 87.) Moreover, Professor McFadden's model incorporates actual transaction data from the App Store, which already reflects Apple's pricing restrictions. Nothing further is required.

On that ground, Apple's motion is **DENIED.**

### d.    APP COMPETITION

Lastly, Apple attacks Professor McFadden's methodology on the basis that it does not consider competition between app developers, instead treating them like monopolists to calculate the prices they would set in the but-for world. Put another way, Apple's expert Professor Prince argues that Professor McFadden assumes that app developers' prices are not sensitive to consumer demand. (McFadden's Reply Report ¶ 21.) Plaintiffs oppose, noting that Professor McFadden's model incorporates the reality of each app developer's competitive environment.

Apple again mischaracterizes Professor McFadden's methodology. Professor Prince contends that Professor McFadden's model:

> does not account for competition between apps, even within the same genre . . . . Instead, his model continues to assume that developers have no incentive to respond to changes in the price of other apps, even if they are in the same genre or offer a substitutable product.

(Prince Report ¶ 191.) This is incorrect. Professor McFadden's model does consider competition "through the price sensitivity of demand." (McFadden's Reply Report ¶ 120.) Modeling competition through demand captures "how readily consumers switch to other apps should an app

---

[6] In fact, in its *Daubert* motion, Apple noted that its price tiers and focal-point pricing had essentially the same impact. (Dkt. No. 476-11 at 22.)

12

United States District Court
Northern District of California

increase its price." (*Id.*) It is true, Professor McFadden notes, that his model does not include the "strategic interactions between apps in the But-For world," but this decision, he argues is "conservative."[7] (*Id.* at ¶ 122.)

Because Professor McFadden does model competition between apps by considering the price sensitivity of demand in this section, the motion on this point is **DENIED.**[8]

### 2. SUFFICIENCY OF DATA

Apple challenges the sufficiency of Professor McFadden's data. It argues that Professor McFadden uses a two-step process to estimate consumer price sensitivity. In the first step, Apple states, Professor McFadden runs a regression on a 0.1% sample of transactions from the App Store to get a coefficient. In the next step, Apple continues, Professor McFadden constrains that coefficient by using profit margin bounds derived from a "tiny and unrepresentative" sample of six app developers. Apple concludes that the Court should reject Professor McFadden's model for imposing arbitrary and unrepresentative constraints.

To start, Apple again mischaracterizes the model. Professor McFadden does not proceed in two steps—he calculates consumer price sensitivity with the requisite constraints in one step. Apple has nothing to say against the reliability of this approach, which Professor McFadden presents as a "standard computation tool." (McFadden's Decl. ¶ 80.)

Instead, Apple expends much ink arguing that Professor McFadden's margin bounds were both arbitrarily chosen and imposed. The Court is not persuaded. First, plaintiffs note that, when the model was initially run, Professor McFadden only had access to six developers' data. By trial, plaintiffs state that they will receive profit data from significantly more developers and Professor McFadden will correspondingly update his estimated coefficients. That is sufficient at this stage. (*See* Previous Order at 10 n.8.) Moreover, Professor McFadden has produced unrebutted evidence

---

[7] Apple also argues that Professor McFadden's methodology is flawed because it does not consider that "many apps are not subject to Apple's commission, so a change in commission rate may not translate to a decrease in the competitive price for competing apps." The Court previously rejected Apple's argument that Professor McFadden should have considered free apps in his demand equation and does so for the same reasons now. (Previous Order at 13–14.)

[8] In fact, in the very next section, Apple acknowledges that a "pivotal step" in Professor McFadden's model is "estimating price sensitivity."

13

**ER-120**

United States District Court
Northern District of California

that economists often infer costs, rather than inputting actual cost data, to estimate demand because firms do not typically disclose their costs. (McFadden's Reply ¶ 148.) That Professor McFadden can input actual app developer's costs here, even if minimal, increases the model's reliability.

Second, Apple contends that Professor McFadden has no "objective methodology" for translating his cost data into margin bounds and "instead appears to rely loosely on his review" of the available app developer data. As an example, Apple notes that Professor McFadden calculates the profit constraints for the Games Genre in the 60% to 90% range. This is so, Apple states, despite the fact that the lowest actual profit margin he observed was 64% and the highest was 92.2%. This is a minor quibble—Professor McFadden notes from the beginning that he is using these six developers' data to *estimate*, not precisely quantify, the average profit margin for the sake of class certification. (McFadden's Reply Report ¶ 151.)

Third, Apple's contention that if Professor McFadden removed or changed the margin constraints, the results would change, is a point in favor of the model's reliability, not against. If the inputs change, then the results *should* change as well.

On this ground, the motion is **DENIED**.

### 3.    RELIABILITY

Apple next argues that Professor McFadden's model remains insufficiently robust by (i) failing to consistently determine the percentage of unharmed accounts depending on the sample used and (ii) producing different results even when using the same sample. Moreover, even though Professor McFadden has now clarified the confidence level of the model, Apple contends that this only masks how even slight changes to its margin constraints can cause millions of accounts to switch from harmed to unharmed.

In the Court's Previous Order, it noted that Professor McFadden's model had a "switcher" problem: the same account could switch from harmed to unharmed depending on which 0.1% sample he used to calculate damages. The Court asked plaintiffs to address the issue. Plaintiffs have now done so.

In his revised report, Professor McFadden first points out that switching is a natural

14

**ER-121**

consequence of using different samples which have different apps, transactions, and customers and therefore different margin constraints. (McFadden's 2nd Supplemental Report ¶ 50.) To account for and minimize this sampling error, Professor McFadden has now drawn seventy-five 0.1% samples, estimated consumer demand based on these samples, taken the average of the seventy-five coefficients obtained, and used the averaged coefficients to estimate damages across all transactions from the App Store at a 95% confidence level. (*Id.* ¶ 54.)

Apple now pivots to a different argument. It contends that Professor McFadden has a switcher problem because accounts change from harmed to unharmed depending on the margin constraint used. McFadden explains that this is a feature not a bug. Logically, if Apple changes the margin constraints of the model—by, for example, arbitrarily imposing a 70%-90% profit range to make its point rather than the 60%-90% estimated by Professor McFadden—many accounts will switch from harmed to unharmed.[9]

When actually using the same samples and constraints as Professor McFadden, Apple's own expert arrived at consistent results. Instead of using seventy-five 0.1% samples and then averaging them, Apple's expert Professor Watson used a 7.5% sample that contained the same accounts. (McFadden's Decl. ⁋ 91.) Professor Watson's slightly different method produced slightly different results: a lower price sensitivity that resulted in 2.2% fewer harmed accounts. (*Id.* at ⁋ 92.) Apple notes that this equals 3.9 million accounts switched but ignores that 170 million stayed the same. (*Id.*) This does not shake Professor McFadden's 95% confidence interval but instead serves to confirm it. That the pool of putative class members is so high does not change the result.

Again, Apple's arguments here go to weight, not admissibility. They are fodder for cross-examination, not reason to exclude Professor McFadden's testimony. For the reasons set forth above, Apple's *Daubert* motion on this ground is **DENIED.**

---

[9] The same goes for Apple's first argument—that when Professor McFadden fixed an issue where certain apps were in the incorrect genre, a small percentage of accounts switched from harmed to unharmed. Because different genres have different constraints in Professor McFadden's model, this type of change demonstrates that the model reacts to different inputs as a reliable model should.

United States District Court
Northern District of California

United States District Court
Northern District of California

### C.     DR. ABRANTES-METZ'S CHALLENGED OPINIONS[10]

Dr. Abrantes-Metz opines that, in a but-for world, Apple would have charged a 13.63% commission rate in its App Store. Apple moves to exclude Dr. Abrantes-Metz's expert opinion on four grounds: (1) Dr. Abrantes-Metz has not applied her previous economics expertise to present her current expert opinion, producing an "accounting identity" rather than an economic model; (2) her but-for commission rate rests on untenable assumptions; (3) her inputs are unreliable; and (4) her benchmark analysis is arbitrary.[11] The Court evaluates each.

### 1.     RELIABLE APPLICATION OF EXPERTISE

First, Apple seeks to exclude the opinion on the grounds it is a product of an "accounting identity," rather than an economic model. Because this accounting identity lacks "any economic content or predictive power," Apple argues, Dr. Abrantes-Metz's analysis is not a reliable application of her expertise. This is most noticeable, Apple concludes, in her disregard of indirect network effects.

Dr. Abrantes-Metz is a Ph.D. economist specializing in industrial organization,

---

[10] Apple also argues that the Court must exclude Professor McFadden's entire model because, even though he relies on Dr. Abrantes-Metz's but-for commission rate, he never read the underlying report that justifies it.

Fed. R. of Evid. 703 permits an expert to base his opinion on "facts or data in the case that the expert has been made aware of." This includes data presented to the expert "outside of court and other than by his own perception." Fed. R. of Evid. 703, Notes of Advisory Committee. In that way, Rule 703 reflects the reality that it is now "common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert." *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002). That is what Professor McFadden has done here—based his opinion in part on Dr. Abrantes-Metz's expertise in industrial organization and multi-sided platforms, expertise the Court previously noted he lacked. Whether the but-for commission rate is suspect, therefore, is properly addressed through Apple's challenge of Dr. Abrantes-Metz's opinion, not Professor McFadden's. Apple's *Daubert* motion on this ground borders on disingenuous and is therefore **DENIED.**  Counsel is cautioned not to engage in such specious arguments.

[11] In its supplemental brief on Judge Donato's recent order excluding the opinion of consumer plaintiffs' expert in *In re Google Play Store Antitrust Litig.*, No. 21-md-2981-JD (N.D. Cal. Aug. 28, 2023), Apple also argues that Judge Donato's order there supports excluding Professor McFadden and Dr. Abrantes-Metz's opinions here. The Court disagrees. Other than noting that Judge Donato's order excluded the proffered expert opinion for its unsupported assumptions, an argument Apple already makes in its *Daubert* motion, Apple does not explain how Judge Donato's order is relevant here.

16

**ER-123**

econometrics, and finance. (Dr. Abrantes-Metz's Opening Report ¶ 1.) She is currently the Principal at the Brattle Group and Co-chair of its Global Antitrust and Competition Practice. (*Id.*) Formerly, she was an adjunct professor at the Leonard N. Stern School of Business at New York University, where she taught industrial organization and competitive analyses. (*Id.*) Before that, she was an economist at the Federal Trade Commission. (*Id.* ¶ 2.) Plaintiffs present Dr. Abrantes-Metz as a qualified expert on benchmark analyses that would have prevailed but-for allegedly anticompetitive conduct. (*Id.* ¶ 3.) Apple does not challenge her expertise.

Dr. Abrantes-Metz asserts that she used her expertise to create an "economic model" to calculate her but-for commission rate "based on the fundamental principles that an app store's operating profit margin is equal to the difference between the revenue it earns and the costs it incurs, and its revenue depends on its market share and the price (commission rate) it charges." (*Id.* ¶ 21.) To apply that equation, Dr. Abrantes-Metz estimated that Apple would have a 76.9% market share, while the hypothetical rival app store acquired the other 23.1%, using surveys developed by one of Apple's experts. (*Id.* ¶ 35.) She then assumed that the rival app store's profit margin would be 23%. (*Id.* ¶ 43.) Dr. Abrantes-Metz drew this figure from data about the Microsoft Store, which in 2019 reported a profit margin of 23%. (*Id.*) The Microsoft Store is an appropriate benchmark, Dr. Abrantes-Metz posited, because it is an established rival to Steam in the sale of Windows PC game apps. (*Id.* ¶ 47.) This is analogous to the but-for world on which she modeled her commission rate. (*Id.*) Finally, Dr. Abrantes-Metz assumes that a rival app store's variable and fixed costs are the same as Apple's App Store (3.8% of total billings and $786 million, respectively). (*Id.* ¶ 55.) She then plugs these figures into her economic model to calculate the but-for commission rate.

Apple's criticism is, essentially, that Dr. Abrantes-Metz erred in using an equation rather than an economic model. This is pedantic; economic models generally consist of mathematic equations that describe a theory of economic behavior. That Dr. Abrantes-Metz's economic model consists of one mathematical equation does not mean that she has "no theory of economic behavior underpinning her analysis," as Apple charges. Dr. Abrantes-Metz explains, step by step, how she calculates the "fundamental principles" underpinning her equation. (*Id.* ¶ 21.) And though

17

**ER-124**

Apple may disagree with her inputs (as analyzed below), it has nothing to say about why those fundamental principles are not a reliable application of her expertise.

Nor does Apple's argument that Dr. Abrantes-Metz fails to reliably apply her economic expertise by ignoring indirect network effects persuade. Dr. Abrantes-Metz relied on Professor McFadden's market definition—a single aftermarket for the sale of iOS apps and in-app content to consumers—in constructing her model. (*Id.* ¶ 20.) The Court previously found that Professor McFadden's market definition was sufficiently reliable for purposes of class certification. (Previous Order at 4.) In doing so, the Court rejected Apple's argument that Professor McFadden ignored the two-sidedness of Apple's App Store and its indirect network effects. (Dkt. No. 476-3.) As the Court already warned Apple, it will not reconsider that ruling.[12]

On that ground, Apple's motion is **DENIED**.

### 2. ASSUMPTIONS

Apple next argues that Dr. Abrantes-Metz's model relies on untenable assumptions about the but-for world: (1) that Apple would only have one other competing app store; (2) both app stores would charge identical commission rates; and (3) the hypothetical app store would provide identical terms and services to the App Store.

First, Dr. Abrantes-Metz has sufficiently defended her assumption that, in the but-for world, the App Store would face one, smaller competitor. She conservatively chose to model a duopoly, rather than a market with multiple rivals, because of the unremarkable and well-supported proposition in economics that more competition equals lower prices. (Dr. Abrantes-Metz's Opening Report ¶ 36; Dr. Abrantes-Metz's Decl. ¶ 43.) Apple does not dispute this basic tenet but instead argues that, under Dr. Abrantes-Metz's model, having more than one rival app store would actually increase Apple's but-for commission rate. Professor Hitt, Apple's expert, arrives at this counterintuitive conclusion by changing the respective market shares in Dr. Abrantes-Metz's existing model while maintaining the same profit margins. (Hitt Report ¶ 296.)

---

[12] Apple also makes the argument that Dr. Abrantes-Metz erred by only considering some of the factors she has considered in other works. This argument relates to the strength of the opinion, not the reliability of the principles upon which it is based. (*See* Dr. Abrantes-Metz's Reply Report ¶ 40.)

18

**ER-125**

United States District Court
Northern District of California

As Dr. Abrantes-Metz states, it makes no economic sense to presume that "more competition increases prices but does not reduce profitability." (Dr. Abrantes-Metz's Decl. ¶ 44.)

Second, Dr. Abrantes-Metz sufficiently explains her reason for postulating that, in the but-for world, Apple and its competitor would charge identical commission rates. In Dr. Abrantes-Metz's but-for world, Apple and the rival app store would have started at the same time and provided the same services. It follows, Dr. Abrantes-Metz argues, that they would have charged the same price, or commission rate, to their consumers. (Dr. Abrantes-Metz's Report ¶ 28; Dr. Abrantes-Metz's Decl. ¶¶ 68–69.) This is not true of just the but-for world; in the as-is world, competitors like Microsoft and Steam charged the same commission rate for years until a new competitor, Epic Games, forced Microsoft to *lower* its commission rate. (Dr. Abrantes-Metz's Decl. ¶ 73.) If anything, these benchmarks demonstrate that assuming an identical commission rate among the two competitors Dr. Abrantes-Metz posits would exist in the but-for world is conservative.

Moreover, Dr. Abrantes-Metz explained why her model predicts that, in the but-for world, Apple would charge a single rate, rather than tiered rates. While tiered rates in the but-for world are possible, Dr. Abrantes-Metz explains, she does not think they are likely because commission rates would be much closer to costs. (Dr. Abrantes-Metz's Reply Report ¶ 60 n.114.) If she had modeled a tiered commission rate system, Dr. Abrantes-Metz notes, her predicted 13.63% but-for rate would be at the higher tier, not the lower. (*Id.* ¶ 63.) This is because she modeled her but-for commission rate on Microsoft's profits from game sales in 2019, when Microsoft charged a 30% commission rate on games and a 15% commission rate on non-game apps. (*Id.*)

Third, Dr. Abrantes-Metz's assumption that Apple and its hypothetical rival would provide identical services in the but-for world is well explained. Dr. Abrantes-Metz's cites to economic literature for the proposition that two competitors in a duopoly would provide the same services. (Dr. Abrantes-Metz's Opening Report ¶ 28 n.14.) Apple's experts do not contest that economists use symmetric competitors to design economic models—one of Apple's experts, Professor Hitt, stated in his deposition that it is not an "unusual assumption"—but instead speculate that in the but-for world Apple might try to differentiate itself by, for example, offering a consumer rewards

19

**ER-126**

program. (Schmalensee Report ¶ 92.) Such speculation in the face of widely accepted principles goes to weight, not admissibility.

For those reasons, Apple's motion in this regard is **DENIED.**

### 3. INPUTS

Apple next argues that, even if Dr. Abrantes-Metz's model is sound, her inputs are not. Apple first takes issue with the fact that Dr. Abrantes-Metz assumes that the relevant market in the but-for world was at all times the same as it was in 2019. Dr. Abrantes-Metz's model, in fact, does not assume a constant market size; instead, she assumes that *billings* in the as-is and but-for world are the same. In other words, she assumes that billings would not increase as a result of lower commission rates. (Dr. Abrantes-Metz's Opening Report ¶ 56; Dr. Abrantes-Metz's Decl. ¶¶ 79–81.) This, she explains, is a conservative assumption because modeling that billings would *increase* in the but-for world would result in a *lower* but-for commission rate. Dr. Abrantes-Metz did take into account other market sizes when she, for example, input Apple's app billings from 2018 (not 2019) to check her model. (Dr. Abrantes-Metz's Reply Report ¶ 106.)

As another example, Apple attacks Dr. Abrantes-Metz's use of only one platform—Microsoft—to determine the rival app store's profit margin in the but-for world. Dr. Abrantes-Metz, however, sufficiently explained her process for choosing Microsoft as an input. (Dr. Abrantes-Metz's Opening Report ¶ 43.) To model a duopoly, she looked for an app store that had a high enough profit margin to support its entry and continued operation in the market but not so high it would attract other rivals. (Dr. Abrantes-Metz's Decl. ¶ 115.) She researched various choices and explained why she rejected them—noting that the Google Play store is accused of charging anticompetitive prices while Epic Games is known to charge a below-competitive one. (Dr. Abrantes-Metz's Opening Report ¶¶ 66, 90.) She then explained that she ultimately settled on Microsoft because it had a similar functionality to the Apple app store; was an established, profitable rival to a larger competitor, Steam; and using its 2019 profile allows Dr. Abrantes-Metz to calculate what Microsoft's profit margin was after a new competitor, Epic Games, entered the market but before Microsoft cut its commission rates in response. (Dr. Abrantes-Metz's Decl.

United States District Court
Northern District of California

20

**ER-127**

¶ 125.)[13]

Finally, Apple argues that Dr. Abrantes-Metz's input for the hypothetical rival store's market share is unfounded. Dr. Abrantes-Metz used the survey results from Apple's own expert, Dr. Simonson, to conclude that Apple and its hypothetical rival would have a 76.9/23.1% split of the market. As Dr. Abrantes-Metz explained, this is a conservative input in Apple's favor—in that but-for world, Apple's share of the market would still be highly concentrated. (Dr. Abrantes-Metz's Opening Report ¶ 113.) In fact, another of Apple's experts noted that it would have been reasonable for Dr. Abrantes-Metz to model a 50/50% split with a lower but-for commission rate. (Dr. Abrantes-Metz's Reply Report ¶ 114.) Yet Apple argues that, if Dr. Abrantes-Metz is using the Microsoft Store's profit margin from 2019, she should input its 2019 market share of 7.7% as well into her model. Dr. Abrantes-Metz explains why she rejects the resulting 92.3/7.7% split—it is far too concentrated to be a model of a truly competitive duopoly where both competitors entered the market on the same footing. (Dr. Abrantes-Metz's Opening Report ¶ 110.) Dr. Abrantes-Metz has sufficiently justified the opinion. Apple's objection may be reraised on cross-examination.

Apple's motion on this point is **DENIED.**

### 4. BENCHMARK ANALYSIS

Finally, Apple argues that Dr. Abrantes-Metz's benchmark comparison is cherry-picked. To check her conclusion that, in the but-for world, Apple's commission rate would be 13.63%, Dr. Abrantes-Metz did a benchmark marketplace analysis. A good benchmark must "share key features of the relevant marketplace in question, while at the same time being as free as possible of anti-competitive conduct." (Dr. Abrantes-Metz's Reply Report ¶ 168.) She first considered various candidates: the Windows PC Game apps, Android apps, MacOS apps, and Steam games. Dr.

---

[13] In its Reply, Apples argues for the first time that Dr. Abrantes-Metz's but-for commission rate should be excluded because while Microsoft's profit margin (on which Dr. Abrantes-Metz relied) was 23% in 2019, in 2020 it was 55% while in 2021 it was 43%. Arguments presented for the first time on reply are disfavored and can be disregarded. In any case, Dr. Abrantes-Metz already explained why she thought Microsoft's *2019* profit margin was particularly well-suited, as explained above. Moreover, even with a 13.63% but-for commission rate, Dr. Abrantes-Metz still calculates that Apple would earn a 57.2% profit. (Dr. Abrantes-Metz's Opening Report ¶ 23.) That is sufficient.

21

**ER-128**

Abrantes-Metz explained why she rejected those benchmarks. For example, she states, Google purportedly raised barriers to entry by requiring Android device manufacturers to prominently display the Google Play store on their devices while Epic Games lowered its commission rate to break into the marketplace at the cost of negative operating profits. (Dr. Abrantes-Metz's Opening Report ¶ 49.) In the end, she concluded that the Windows Store was the most appropriate benchmark for two reasons: the Windows Store and Apple App store are similar in the services they provide, and, unlike Apple, Microsoft does not impose significant barriers to entry. (Dr. Abrantes-Metz's Opening Report ¶ 64.)

Apple does not dispute that Windows Store is a suitable benchmark.[14] Instead, it argues that Dr. Abrantes-Metz excluded other benchmarks with 30% commission rates, like the Google Play Store and Steam, while including the 12% commission rates of Microsoft and Epic Games in her analysis. As stated above, Dr. Abrantes-Metz excluded the Google Play Store because of its allegedly anticompetitive conduct.[15] Given that an important part of conducting her check was finding a benchmark as free as possible of anticompetitive conduct (a qualification Apple does not contest), Dr. Abrantes-Metz sufficiently explained why she excluded the Google Play Store.[16] Dr. Abrantes-Metz did *not*, however, exclude Steam from her analysis. (Dr. Abrantes-Metz's Opening Report ¶ 119; Dr. Abrantes-Metz's Reply Report ¶ 170.) Though Dr. Abrantes-Metz argued that Steam *should* be excluded because of its anticompetitive conduct, she ran her benchmark analysis *with* Steam and found that the but-for commission rate would range from 13.91%-14.18%, which

---

[14] Apple does argue that Dr. Abrantes-Metz was inconsistent in considering Google's anticompetitive conduct but ignoring the fact that the Federal Trade Commission recently sued Microsoft over its significant power in the video game market. But, as Dr. Abrantes-Metz states, FTC's complaint was over Microsoft's proposed merger with Activision, which had not taken place and so could not have influenced its then-existing commission rate. (Dr. Abrantes-Metz's Reply Report ¶ 165.)

[15] A jury recently convicted Google for the anticompetitive policies of its Play Store. *In re Google Play Antitrust litigation*, No. 21-md-2981-JD.

[16] Dr. Abrantes-Metz also explained why the Amazon and Samsung Stores were not suitable benchmarks for the deployment of Android apps: given Google's allegedly anticompetitive conduct, which has kept the Samsung Galaxy Store and Amazon Appstore from becoming true rivals in this space, neither was a good example on which to model a truly competitive duopoly. (Dr. Abrantes-Metz's Reply Report ¶ 143.)

22

**ER-129**

United States District Court
Northern District of California

United States District Court
Northern District of California

was consistent with her final rate of 13.63%. (Dr. Abrantes-Metz's Reply Report ¶ 170.)

Moreover, Dr. Abrantes-Metz adequately defended her decision to include Microsoft and Epic Games' 12% commission rate. Though Microsoft charged a 30% commission rate in its PC games store and stated it would not lower its commission rate on its platform, once Epic Games entered the market, Microsoft eventually did lower its commission rate to 12% in response. (Dr. Abrantes-Metz's Opening Report ¶¶ 111–113.) Dr. Abrantes-Metz concluded that including the way Microsoft changed its commission rate when faced with "stiff competition" in her analysis was a useful predictor of what the range of commission rates would look like for Apple in the more competitive, but-for world. (*Id.* ¶ 115.)

Finally, Apple argues that Professor Abrantes-Metz's analysis was skewed by including direct-to-consumer platforms, or platforms that distribute their own apps. As Dr. Abrantes-Metz explains, however, including direct-to-consumer platforms, which do compete in the same market, is the more holistic approach. Moreover, Apple's argument that direct-to-consumer platforms should be excluded because they do not face the same costs ignores that self-distribution is not "free"; direct-to-consumer platforms have to choose between the costs of building and marketing a new platform or paying the commission rates of established ones like the Apple App Store. In either situation, there are distribution costs involved.

Apple's *Daubert* motion is **DENIED.**

## III.    CLASS CERTIFICATION

Plaintiffs once again move for class certification under Rule 23(b)(3) based on Apple's allegedly anticompetitive conduct. In its Previous Order, the Court found that plaintiffs met the requirements of Rule 23(a) which are summarized above. Here, therefore, it analyzes only whether plaintiffs can now satisfy the predominance requirement of Rule 23(b)(3).

### A.    LEGAL FRAMEWORK

Under Rule 23(b)(3), a court must find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." "An individual question is one where 'members of a proposed class will need to

23

**ER-130**

United States District Court
Northern District of California

present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted). The "predominance inquiry asks whether the common, aggregation-enabling issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (quoting 2 W. Rubenstein, 2 Newberg on Class Actions § 4:49 (5th ed.)).

"In carrying the burden of proving facts necessary for certifying a class under Rule 23(b)(3), plaintiffs may use any admissible evidence," including expert evidence. *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022). Just because the proffered expert evidence is admissible, however, does not mean that a court can certify a class. A court must decide if the expert's methodology is "capable of showing class-wide antitrust impact" in light of "factors that may undercut the model's reliability (such as unsupported assumptions, erroneous inputs, or nonsensical outputs)."

### B. PREDOMINANCE

In its Previous Order, the Court excluded plaintiffs' expert testimony and thus found they could not satisfy the predominance requirement.[17] Now that the Court has found otherwise, the only dispute left is whether plaintiffs can prove antitrust injury on a classwide basis.[18]

Core to the predominance analysis is whether plaintiffs' class definition sweeps in a statistically significant number of uninjured class members. In the last round of briefing, plaintiffs conceded that their class definition included an estimated 14.6% of uninjured class members. (Previous Order at 23.) The Court then noted that the Ninth Circuit had not "squarely addressed

[17] The Court previously expressed its concern with plaintiffs' proposed plan of proving classwide damages by running Professor McFadden's model after trial. (Previous Order at 25–27.) Plaintiffs have now affirmed to the Court that Professor McFadden will calculate both aggregate and individual damages *before trial* with the full transactions data of the entire App Store. Given that, the Court now finds that plaintiffs have satisfied the predominance requirement as to damages.

[18] In its opposition to plaintiffs' motion for class certification, Apple raises many of the same arguments made in its *Daubert* motion. The Court incorporates its analysis above but does not regurgitate the reasons for rejecting the arguments.

24

United States District Court
Northern District of California

the issue of whether a particular percentage of uninjured class members defeats predominance," but, given the errors in Professor McFadden's methodology, the Court found that individual issues would predominate regardless because plaintiffs could not reliably identify which class members, and how many, were injured. (Previous Order at 25.)

Plaintiffs now seek to narrow the class. Plaintiffs currently estimate that 17.8% of Apple accounts have not suffered an overcharge due to Apple's allegedly anticompetitive conduct. (McFadden's 2nd Supplement Report ¶ 16.) Because there are many more accounts than iPhone users, plaintiffs surmise that the actual number of class members that are uninjured is significantly lower. In any case, in response to the Court's overbreadth concerns, plaintiffs have now narrowed their class definition to only include Apple account holders who have spent $10 or more on app or in-app content. Under this narrowed definition, Professor McFadden estimates that the class includes only 7.9% uninjured members. (*Id.*)

Notably, since the Court's Previous Order, an *en banc* panel of the Ninth Circuit rejected the argument that "Rule 23 does not permit the certification of a class that potentially includes more than a de minimis number of uninjured class members." *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 (9th Cir. 2022). Nevertheless, the Ninth Circuit stated, a district court "must consider whether the possible presence of uninjured class members means that the class definition is fatally overbroad." *Id.* at 669 n.14. The problem with a class definition that includes uninjured class members is "the obverse of a different problem with class definition: the problem of the 'fail-safe' class: one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim." *Messner v. Northshore University HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012). "Defining a class so as to avoid, on one hand, being over-inclusive and, on the other hand, the fail-safe problem is more of an art than a science." *Id.* Both, however, "can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis." *Olean*, 31 F.4th at 669 n.14 (quoting *Messner*, 669 F.3d at 825).

In *Olean*, defendants argued on appeal that the district court abused its discretion in certifying a class that potentially included 28% uninjured class members. 31 F.4th at 680. The

25

United States District Court
Northern District of California

Ninth Circuit rejected this argument, holding that all that is necessary at the class certification stage is a finding that an expert's model was "*capable* of showing" that all class members suffered antitrust impact on a classwide basis, even those with "limited transactions." 31 F.4th at 681.

The same is true here. Professor McFadden's model can show the impact of Apple's allegedly anticompetitive conduct across all class members. He has now run his revised model on all the App Store transactions across the Games, Music, and Entertainment genres and can compute which Apple accounts suffered damages and which did not. Plaintiffs have represented to the Court that, once Apple produces the rest of its app transactional data, Professor McFadden will be able to calculate the exact extent of injury suffered by each class member. Acknowledging that an estimated 17.8% of accounts in Professor McFadden's model are uninjured, plaintiffs have revised their class definition to limit the number of uninjured class members.

While the Court remains concerned that the $10.00 cutoff results in an estimated 7.9% or 10,283,035 million uninjured accounts, it expects, given plaintiffs' representations, that once the model is fully run, that number will be reduced[19] or the cutoff could be changed to reduce the impact of including unharmed accounts. Accordingly, under *Olean*, the predominance requirement is met.

Apple's arguments otherwise do not persuade. According to Apple, *Olean* is distinguishable because all or virtually all class members in that case were harmed.[20] This is not the case—in *Olean*, up to 28% of the class was uninjured, significantly more than the 7.9% posited by plaintiffs here. It is true that in this case, the number of uninjured accounts numbers in

[19] *See* Dkt. No. 786-1, Declaration of Minjae Song, Ph.D. in Response to Order for Supplemental Information in Further Support of Renewed Motion for Class Certification. The attendant motion to seal is **GRANTED**.

[20] Apple argues also that the First Circuit's opinion in *In re New Motor Vehicle Canadian Export Antitrust Litig.*, 522 F.3d 6 (1st Cir. 2008), supports its position here. To start, the Ninth Circuit in *Olean* noted that *In re New Motor* was distinguishable because the First Circuit found that the case could not proceed on jurisdictional grounds and so the rest of its analysis on class certification was dictum. *Olean*, 31 F.4th at 678 n.26. In any case, Apple's arguments about why *In re New Motor* supports its position go to the admissibility of Professor McFadden's model, rather than whether it provides common evidence in support of class certification. The Court rejects these arguments for the same reason it denies Apple's *Daubert* motion.

26

**ER-133**

United States District Court
Northern District of California

the millions. The Ninth Circuit in *Olean*, however, rejected the argument that Rule 23 has an uninjured class member cutoff beyond which class certification is impermissible. That position is "inconsistent with Rule 23(b)(3), which requires only that the district court determine after rigorous analysis whether the common question predominates over any individual questions." *Id.* at 669. The model, once run, will answer the common question of whether Apple's conduct caused class members to suffer an antitrust injury. At this juncture, the Court cannot "flatly reject" class certification because the pre-run model shows an estimated 7.9% of the class is uninjured. *See id.,* n.14.

For those reasons, plaintiffs' motion for class certification is **GRANTED.**

**C.     APPOINTING CLASS REPRESENTATIVES AND CLASS COUNSEL**

In its Previous Order, the Court noted that the proposed Class Representatives—plaintiffs Stephen H. Schwartz, Edward W. Hayter, Robert Pepper, and Edward Lawrence—were each both typical and adequate. (Previous Order at 20). Consumer plaintiffs now move to appoint them as class representatives. Apple does not oppose. The motion to do so is **GRANTED.**

The Court also noted, in its Previous Order, that it had "no concerns" regarding the adequacy of Wolf Haldenstein Adler Freeman & Herz LLP and Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C. to serve as co-class counsel. (Previous Order at 20 n.11.) Consumer plaintiffs move to appoint Wolf Haldenstein and Kellogg Hansen as co-class counsel. Apple, again, does not oppose this request. The motion in this respect is also **GRANTED.**

**IV.     CONCLUSION**

For the foregoing reasons, Apple's *Daubert* motion is **DENIED** and plaintiffs' motion for class certification is **GRANTED.**

The Court sets a Case Management Conference for February 26, 2024, at 2:00 p.m. on the Zoom platform. Parties shall meet and confer on a schedule for the balance of the action. By no later than February 16, 2024, the parties shall file a joint statement with the proposed schedule including (i) the *earliest* date by which they will be in a position to file all remaining motions, including trial-related motions, (ii) any trial conflicts within six (6) months thereafter; and (iii) the timeframe within which Professor McFadden will run his model on the rest of the App Store

27

transactional data and whether the model can successfully ascertain the number of uninjured class members and limit them.

This Order terminates Docket Nos. 683, 690 and 786.

**IT IS SO ORDERED.**

Dated: February 2, 2024

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

United States District Court
Northern District of California

28

**ER-135**

**Pages 1 - 102**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

|  |  |
|---|---|
| In Re Apple iPhone Antitrust Litigation | ) ) ) ) ) ) ) ) ) ) |

**NO. CV 11-06714-YGR**

Oakland, California
Friday, June 23, 2023

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
BY: **MARK RIFKIN, ESQUIRE**

WOLF HALDENSTEIN ADLER FREEMAN & HERZ, LLP
Symphony Towers
750 B Street, Suite 1820
San Diego, CA  92101
BY: **RACHELE R. BRYD, ESQUIRE**
**BETSY MANIFOLD, ESQUIRE**

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C.  20036
BY: **DAVID C. FREDERICK, ESQUIRE**
**KYLE M. WOOD, ESQUIRE**

Reported By:    Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                Official Reporter

**ER-136**

**APPEARANCES CONTINUED:**


For Defendants:

GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
BY:  **CYNTHIA RICHMAN, ESQUIRE**

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
BY:  **DANIEL SWANSON, ESQUIRE**

GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA  94105
BY:  **JULIAN KLEINBRODT, ESQUIRE**
**CAELI A. HIGNEY, ESQUIRE**

**Friday - June 23, 2023**                                    **8:51 a.m.**

# P R O C E E D I N G S

## ---oOo---

THE CLERK:  Your Honor, calling CV 11-6714-YGR, In re Apple iPhone Antitrust Litigation.

Parties, please state your appearances for the record.

MR. RIFKIN:  Good morning, Your Honor.  Mark Rifkin for --

THE COURT:  Mr. Rifkin, at a microphone.

MR. RIFKIN:  Oh, I'm sorry.

THE COURT:  People have forgotten how to be in federal court.

MR. RIFKIN:  Well, so many of us are used to doing this by Zoom, but I do apologize, Your Honor.

Good morning.  Mark Rifkin from Wolf Haldenstein on behalf of the plaintiffs.

THE COURT:  Good morning.

MR. RIFKIN:  And with me are my partners Betsy Manifold and Rachele Byrd.

THE COURT:  Okay.  Hold on just a minute.

MS. MANIFOLD:  Betsy Manifold.  Good morning, Your Honor.

THE COURT:  Good morning.

And then Ms. Byrd.

MS. BYRD:  Good morning, Your Honor.  Rachele Byrd.

THE COURT: Okay. And I have who else?

MR. FREDERICK: David Frederick from Kellogg Hansen and my colleague, Kyle Wood.

THE COURT: Okay.

MR. WOOD: Good morning, Your Honor. Kyle Wood.

THE COURT: Good morning.

Now for the Defense.

MS. RICHMAN: Good morning, Your Honor. Cynthia Richman for Apple.

THE COURT: Good morning.

MS. RICHMAN: One thing, we are joined by Jen Brown, who I think you've met before. She is the director of commercial litigation at Apple.

THE COURT: Okay. Good morning.

MR. SWANSON: Good morning, Your Honor. Dan Swanson for Apple.

THE COURT: Mr. Swanson, good morning.

MS. HIGNEY: Good morning, Your Honor. Caeli Higney for Apple.

THE COURT: Higney. Okay. Good morning.

MR. KLEINBRODT: Good morning, Your Honor. Julian Kleinbrodt, also for Apple.

THE COURT: Okay. Good morning. Got it.

Okay. And who is arguing and which issues? If you've divided them, I would like to know in advance.

MR. RIFKIN:  Good morning again, Your Honor.  Mark Rifkin.  I will be arguing for the plaintiffs.

THE COURT:  All issues?

MR. RIFKIN:  Yes, Your Honor.

THE COURT:  Okay.

MS. RICHMAN:  Your Honor, I will be arguing for Apple on the class certification.  I understand you took the *Daubert* off the calendar for today, but if we were to address issues related to that, Mr. Swanson will tackle those.

THE COURT:  All right.  Well, I probably will.

All right.  Let's go.  At the mics on the class certification.

Let me ask, Mr. Rifkin, are you prepared -- well, I will have -- I will hear argument on the *Daubert*.  I'm assuming that you're prepared to do that?

MR. RIFKIN:  We are prepared to address those issues, yes, Your Honor.

THE COURT:  Let's start with the *Daubert* then.  And I'm assuming that -- no.  Stay at the mic -- I'm assuming that because the class certification issues dovetail with the *Daubert*.

It's your motion, Mr. Swanson.  Go ahead.

MR. SWANSON:  Your Honor, thank you.

One thing we would ask is that we get the opportunity to file our reply brief.

THE COURT:  Your request is noted.  I'll decide later.

MR. SWANSON:  All right.  I just wanted to note that my remarks today will be a poor substitute for a written response.

So it's -- it's a very broad-ranging motion that touches on a lot of different points.  It's a very complicated model.  What I would like to do is focus on what I think of as the kind of the top five points that distill a great deal of what is wrong and unreliable with the plaintiffs' expert evidence.

Four of the points relate to Professor McFadden's model.  The fifth point represents to Dr.Abrantes-Metz's calculation of the but-for commission rate.

So what are the four points?  First Pams, the McFadden model still lacks foundation because it's not calibrated to account for 99-cent pricing, whether price tiers or focal point prices.  And those prices, those 99-cent prices, are an incredibly important constraint that prevents injury in this case, and failing to account for them results in a vast inflation of damages and overestimate of the incidence of injury.  So that's point one.

Second point is there is an actual direct and I think scientifically proper way to test a model as complicated as this, and that is to look to see whether it generates correct predictions about the real world.  And Apple has, on numerous occasions, dropped the commission rate from 30 percent to 15

percent.  I know you're well aware of that, Your Honor.  It happened first back with the Renewing Subscription Program. It's happened with the Small Business Program.  It's happened with another program that perhaps has been discussed less, the Video Partner Program.  All of those are programs where the commission was cut in half.  And we can actually see what happened to prices for consumers in the wake of those commission cuts.

And the question is what does Professor McFadden's model predict about those exact apps in those exact circumstances, and, in fact, those predictions are shown to be false.  His model predicts lower prices.  The real world does not show that prices get lowered in those circumstances.  So that's the second critique.

The third is -- and these are all interrelated -- the third is another reason in addition to price tiers why Professor McFadden's model actually delivers those false positives, and that is because of the way he treats costs in the model.

Costs are critically important because his model, through its plumbing, infers marginal cost, and the way it works, the higher the marginal cost, the higher the damages.  The higher the -- the lower the price will be in the but-for world, the higher the damages.

He sets his model up mathematically rigidly without any

empirical evidentiary basis to essentially force marginal costs that have a certain pattern, and that pattern has very important implications for the way his model estimates damages. It essentially skews the marginal cost upward and therefore inflates damages.

He also uses, under the rubric of "cost," the so-called margin constraints, and this is another way in which he puts a thumb on the scale and forces a marginal cost to be higher than they otherwise would, and he bases that on data from just six developers.

The fourth issue is the switcher problem. There was a switcher problem before. The model continues to have a switcher problem. The model generates results that make uninjured accounts ping-pong upon or injured accounts ping-pong back and forth to lack of injury by the millions every time you make a small change in the sample or in the model itself. So those are all flaws of Professor McFadden's model.

Then there is the but-for commission rate that gets input into the model that has now been outsourced to Dr. Abrantes-Metz.

THE COURT: Let me stop you. Let's remain focused for right now on McFadden. Do have you more to say on each of these or were you just outlining?

MR. SWANSON: I was just outlining, I'm afraid.

THE COURT: That's all right. Let's go ahead and

focus on the first issue, the lack of -- or at least what I heard you say, the lack of analysis on focal point.  I will hear what you have to say and then I'll hear from Mr. Rifkin.

**MR. SWANSON:**  Okay.  So the prices in the but-for world are what drive damages.  That's the case -- that's true of any overcharge case.  And we focus particularly on the in-app purchase prices.  Those in-app purchases -- those transactions generate 99 percent of the damages that Professor McFadden calculates.  And all of those transactions take place at prices that are on tier; that means, they're basically, roughly speaking, all or mostly all at 99 cents.

In the but-for world, they would be at 99 cents as well.  They would be at 99 cents if there were no price tiers.  I think in the last go-around, the evidence was effectively undisputed that developers would choose 99-cent focal prices in the absence of any mandate to conform to price tiers.

We have, in this round, submitted a report by Professor Berger, who is a true subject matter expert in this area, and he expands the evidentiary range to show that this remains true across virtually all digital platforms, and it's not limited to the digital world certainly, but I think the evidence is overwhelming that in the absence of price tiers, 99-cent pricing would still be the way that developers price in the but-for world.

Now, the plaintiffs, we submit, have no admissible expert

evidence to claim that price tiers would even be absent from the but-for world.  Professor McFadden's opinion in the last round to that effect was excluded as lacking any foundation. They haven't tried to resurrect that opinion.  He hasn't tried to -- they haven't submitted a subject matter expert.  And the opinions of all of Apple's experts are uniform -- Professor Berger, Professor Hitt, Professor Schmalensee, Professor Prince -- that prices tiers are not only not anticompetitive, they have a very important pro-competitive effect, and that is the effect that Justice Gorsuch had noted in this case when it was before the Supreme Court where he observed, in something of a warning shot across the bow for the plaintiffs at this stage, that 99-cent prices, quote, create a strong disincentive for developers to raise their prices.

Now, Professor Prince, Professor Hitt, you know, they've all addressed how vitally important it is to take account of that constraint in analyzing the extent to which there is injury and damage.  Professor Hitt, Professor Prince, they've shown that there is a vast inflation of damages and injury.

By the way, Professor McFadden deals with the but-for pricing issue in neglecting to truly take account of price tiers and focal point pricing.

Why does he not take account of 99-cent pricing?  His model before is the same as his model now.  He hasn't changed it.  It's still -- the model itself only looks at an aggregated

but-for -- or it looks at an aggregated price for in-app purchases.

So as I know you know well, an app may have a multitude of in-app purchases.  I think Fortnite from our prior experience had four levels of in-app currency possibilities at different tranches ranging from somewhere around 7.99 to like 79.99.  Fortnite also has battle passes.  Other apps offer subscriptions that range from a week to a month to six months to a year.

All of these things have prices that vary potentially by a factor of 10.  Sometimes the subscription in-app purchases vary by a factor of 40 or 50, depending if you're looking at a weekly or a yearly subscription.  They're just all kinds of different in-app purchase options that are in the same app.  And Professor McFadden adds them all up.  He aggregates them, and that's the level at which his model deals.

But price tiers don't operate at the aggregate level.  In order for his model to be reliable, he needs to -- in order for it to calibrate two price tiers to 99-cent pricing, it needs some way to translate from that aggregate level to the individual item level, and the model just doesn't do that.

You will recall the last time we were here, we were fighting about whether or not his model used the fixed-dollar method, and the fixed-dollar method actually does predict individual item prices, but it had the problem of predicting

some absurd stuff as well, like negative prices.  And that was
the thing where Professor McFadden kept flip-flopping.  He said
that was not his method.  It turns out his staff had actually
implemented the fixed-dollar method.  But at any rate,
ultimately he said the right thing to do is the percentage
method.  So that is where we were in the last round.

The percentage method we thought was his way of
translating the aggregate down to the individual in-app
purchase items, but in deposing him, he said no, that's not the
case.  He said something that I think is fairly pivotal for
purposes of this part of the motion, and that is he said that
his model is completely silent about the in-app purchase items.
He said that's true even when the app has only one in-app
purchase item.

His model actually makes a prediction of that very price
if there's only one because he doesn't have anything else to
aggregate with it.  But what he said, which is kind of
stunning, is, quote -- when he is asked, you know, "What about
those apps with only one in-app purchase?  You know, does your
model predict reliably what that price will be in the but-for
world," he says, quote, I do not know what would happen,
unquote.  He says, "The model is silent.  Even if the developer
has a single IAP item in the as-is world, I do not model, nor
am I predicting, what their menu would be -- would look like in
the but-for world."

So if his model can't predict, is silent about what individual item prices are, then there is no way he can tell us what the price tier price would be because price tiers are only about item prices.  They have nothing to do with his aggregates.

And I asked him in his deposition, "How can you implement price tiers in your model if your model can't predict individual in-app purchase item prices?"  And he had no answer. The only thing he says is, "Well, Professor Prince uses a method," and that's the method of taking the aggregate price and moving it in 99-cent intervals so you get an aggregate price that has nothing to do with price tier prices and you move it a dollar one way or the other and figure out which one, according to Professor McFadden's model, is optimal.

Professor Prince addresses that in paragraph 134 in Appendix E of his latest report.  Professor Prince points out "That's not my method."  Professor Prince used that to test Professor McFadden's original model, the one that had the fixed-dollar method.

The fixed-dollar method actually does pretty much conform to 99-cent pricing because that method actually predicted item prices.  But it, again, had the vice of predicting negative prices, too, which is why Professor McFadden walked away from it.

So Professor Prince is not the one who substantiates what

Professor McFadden is doing now in his simulations.  His simulations are just moving a number around that has, according to Professor McFadden, no information about what those item prices that are key should be.  It does not take account of the constraining effect of price tiers which operate at the item level.

So what's the upshot of that?  Professor Hitt and Professor Prince show that if you actually apply Professor McFadden's model at the item level, the number of uninjured basically doubles.  Aggregate damages move by billions of dollars.  So it's an enormously important consideration.

Now, the plaintiffs say, Oh, you can't apply it at the item level, but how else are we to do what we're supposed to do in testing supposedly scientific models other than seeing how they operate under different assumptions.  And, at any rate, his model is silent on the prices that are critical for purposes of calibrating to 99-cent pricing.

One final point and then I'll turn it over to Mr. Rifkin, and that is there's another critically important flaw in the way that he treats or does not account for 99-cent pricing, and that is this.  His model rests on the assumption, this critical assumption, that every price in the real world is a profit-maximizing price for the developer, profit maximizing in the sense of his model, in the sense of marginal costs being

equated with the appropriate mathematical figure.  And that's a model that doesn't account for what Professor Berger explains is the behavioral aspects of 99-cent prices, how they affect demand.

So Professor McFadden says, My model, which doesn't account for this stuff, is going to assume that every price in the real world is profit maximizing.  The problem with that is all those are 99-cent prices, and it gets plaintiffs twisted up in knots to some degree because on the one hand they say, Well, we allege that these price tiers are anticompetitive. Developers wouldn't price at these tiers unless they were forced to.  At the same time, you've got Professor McFadden saying, My model only operates if I assume all of these prices in the real world are prices that developers would set because they're profit maximizing.

You can't reconcile those two things.  Abraham Lincoln said you shouldn't be in favor of and against something at the same time, and that is where I think they end up.

So thanks for hearing me out, Your Honor.  Those are my points on price tiers.

THE COURT:  Mr. Rifkin.

MR. RIFKIN:  Thank you, Your Honor.

To accommodate the Court's concern that was expressed in the order denying the motion without prejudice, Professor McFadden has now modeled developer pricing under the

assumption that developers would choose but-for app download and IAP prices first in accordance with Apple's original rigid price tier schedule which, by and large, was in dollar increments for most prices.  It was a little bit smaller in some instances and a little bit bigger in other instances.

He then also modeled prices under a focal pricing structure that resembles almost exactly the pricing structure that Apple has now implemented following the settlement in the developer case.

Both of those changes yield damages estimates that were different than his original damages estimate but less than one percent different than the results that were achieved without either accommodation.

THE COURT:  All right.  So could you tell me what paragraphs of the report you're referring to?

MR. RIFKIN:  So I am, in particular, referring to --

THE COURT:  And I'm looking at -- unfortunately I don't have ECF numbers in the courtesy copy that was sent.  So I have -- I'm assuming we're talking -- well, you tell me --

MR. RIFKIN:  Sure.

THE COURT:  -- which particular of these reports I'm supposed to be looking at.

MR. RIFKIN:  So if you look at Professor McFadden's original report, I'm referring now in particular to paragraphs 45 and 46 --

THE COURT:  Give me the date so I make sure I'm looking at the right one because we've got many, many reports in this case.

MR. RIFKIN:  The date is January 19th, Your Honor.

THE COURT:  What year?

MR. RIFKIN:  2022.

MS. BYRD:  '23.

MR. RIFKIN:  I'm sorry, 2023.  Forgive me.

THE COURT:  Hold on.  I had his September 26th.

So January 23rd, 2023.  Okay.  I have in my binder that was given -- I've got the September 26th, the April 28th -- well, September 26th, '22; April 28th, 2023 -- hold on because I'm not seeing --

MR. RIFKIN:  Sure.

THE COURT:  I have to pull it up.  I don't have a full copy.  It was not provided to me as a courtesy.  All right.  Docket number, please.

MR. RIFKIN:  I'm sorry?

THE COURT:  The docket number where I can find it.

MR. RIFKIN:  I'm told it's Docket No. 679, Your Honor.  Yes.  And I'm told that's the version that's under seal.

THE COURT:  Okay.  I now -- I now have it, and if someone on the plaintiffs' side would please send me a courtesy copy.

The reason that I ask for courtesy copies is that it takes

**ER-152**

our printers here, when we've got color, a long time to print these things, so I'd appreciate a courtesy copy.

**MR. RIFKIN:**  A hard copy, Your Honor, yes.

**THE COURT:**  Yes.  A hard copy.

I am still -- I try to go electronic but still a little old school having to mark things up.

**MR. RIFKIN:**  Not a problem, Your Honor.

**THE COURT:**  So what paragraphs am I supposed to be looking at?

**MR. RIFKIN:**  So I believe that the paragraphs that I'm referring to are paragraphs 44 and 45 of that document, and then he continues on to address Professor Prince's analysis in paragraphs 46 and 47.

The debate that Apple was referring to here is largely one of whether the methodology Professor McFadden used adequately incorporates focal pricing or price tiers.

If you recall from the original class certification motion, Apple objected to Professor McFadden's modeling of but-for prices at the app level and insisted instead that but-for prices had to be modeled at the individual item level. The Court rejected that argument in the first go-around, and this new debate relates directly to the issue that the Court addressed, which is that Professor McFadden has imposed price tiers and focal pricing by changing the increments with which the average prices can move to simulate the effect of either

the price tiers or the focal prices.

So, in other words, the results that Professor McFadden generates do not necessarily fall either in a 99-cent price or on a price ending in 9 simply because they reflect the averages of many different prices.  They may be 99-cent prices if, in fact, there is only one app or one IAP item, and in that case, the average will be the same as the individual item.

But if there are two items that are priced at 99-cent prices, the average is going to be a 48-cent average, and that -- obviously that doesn't fit either the price tier constraint, the rigid price tier constraint, or the more flexible focal pricing constraints that Apple has since imposed.

But if the averages are confined, as he has done, and they move in lockstep with either the 99-cent prices, so they'll move in one-dollar increments, or if he applies the more flexible pricing schedule, the focal pricing schedule that Apple has now implemented in the real world, then they'll move at smaller increments, but if the averages are moving in those increments, Professor McFadden says that mirrors the effect of the price constraints that the Court has directed him to address.

The issue here is essentially no different than the issue the Court decided in the *Lithium Ion Batteries* case in the first opinion on class certification in 2017 where Your Honor

again noted that "The use of averages in econometric modeling is common if not unavoidable," and it does not hide the effects of, for example, in that case, individual price negotiations, nor did it mask the fact that some individual class members in that case suffered no overcharge.

The same thing is true here.  The use of averages does not mask, hide, or in any way hinder Professor McFadden's ability to incorporate price tiers or focal pricing in his analysis.

In the *Lithium Ion Batteries* case, Your Honor said, "The use of averages goes to the weight of the expert opinion not its admissibility."  And the exact same thing is true here.

There is no dispute that Professor McFadden did impose price constraints to reflect both the price tiers that Apple originally imposed and then the more flexible price points that Apple has since implemented.

The question is whether --

THE COURT:  I don't think in Batteries, right -- in Batteries we didn't have the same kind of error rate that we have here.

MR. RIFKIN:  I'm not sure what you mean when you refer to "error rate."

THE COURT:  We didn't have the same number or percentage of unharmed accounts in Batteries as exists here.

MR. RIFKIN:  That is certainly true.

THE COURT:  And so an economic analysis must -- is

specific to the facts, so less of a concern in Batteries where you don't have a problem of identifying unharmed accounts. Here I have that problem, so how does averages address that issue?

MR. RIFKIN:  Well, the averages -- as you said in *Lithium Ion Batteries*, "The use of averages does not" --

THE COURT:  I'm not suggesting that in some instances it's not appropriate, as it was there.  My question is more specific to this case.  The Ninth Circuit instructs me that I have to look at each case on a case-by-case basis.

So you all cite to me, as you well know -- and you're good lawyers -- quotes from lots of different -- from lots of different antitrust opinions; right?  I get them on both sides. It's like patent cases.  I could have a construction on the use of the word "protocol" that are entirely different based upon two different opinions.  That's not the issue.

So I understand the basics that any opinion is going to cite.  My question is specific to this case, which I have an obligation to address.

MR. RIFKIN:  Yes, Your Honor.  And to be more specific in the answer, once Professor McFadden imposes the price constraints, be they the price tiers or the focal price constraints -- doesn't matter -- there will be a computation of the individual impact on each individual account in the Apple universe, and we've talked about this before.  Your Honor has

already decided this issue.

Professor McFadden also proposes a methodology for aggregating those accounts to unique Apple customers. Your Honor is aware that there are three or four times as many individual unique Apple IDs as there are customers, and Your Honor already decided that the methodology for matching accounts to users is readily available and a reliable method for doing so.

I want to make clear that Professor McFadden's model will predict impact and damages on the account level. The granularity of Professor McFadden's calculation is the account level. It is based upon an averaging methodology, which the Court has already approved. It is based upon prices that are analyzed at the app level rather than the item level, which the Court has already approved.

To simulate the effect of either price tiers or focal pricing, Professor McFadden constrains the movement of those averages, which he has said is the same thing as imposing price tiers on an item level in terms of addressing -- in terms of addressing the effective price tiers or focal pricing on his modeling. But once the model is run, it yields results at the app -- I'm sorry -- at the Apple ID level for each and every one of the 400 million accounts that are in the class. There is no debate about that.

**THE COURT:** All right. Okay. Keep going. Sorry.

MR. RIFKIN: Okay. And so what we have here is a dispute between two renowned experts on whether one methodology is appropriate or a different methodology is appropriate.

Professor McFadden's methodology is based upon the same methodology that he employed originally. Obviously he's had to correct the various issues the Court had with the detailed implementation of his overall model, but the Court previously accepted that Professor McFadden could model price effects at the app level and could do so using averages.

He has done that, and because he has not changed that methodology, the way he imposed price tiers is by moving the averages -- by confining the averages to move in accordance with those -- with those intervals, whether they're the original price tiers or the subsequent 750 price points. But he has addressed the Court's concerns consistent with the Court's direction and consistent with the Court's prior ruling on class certification.

Professor -- excuse -- I'm sorry. Excuse me. Apple's experts now change slightly, and so what they argue is that if one were to take the methodology that Professor McFadden has used priced at the app level and using those averages and instead impose that methodology on individual items that are purchased, whether they be individual apps or, more particularly, individual items of in-app purchases, that distorts the results. But Professor Prince needs to change the

methodology in order to do that, and so he takes Professor McFadden's methodology and performs a price tier simulation at the app level, which is not the way the model was constructed, in order to conclude that Professor McFadden's analysis was not correct.

Regardless, we have two recognized experts who disagree about the proper way for price tiers or price -- focal pricing constraints to be imposed on the model.  This is -- as the Court said in the *Lithium Ion Batteries* case, this is a quintessential dispute between experts that goes to the weight of the evidence, not its admissibility.

**THE COURT:**  Between when I wrote that decision and now, what happened in between at the Ninth Circuit?  You tell me.

**MR. RIFKIN:**  Well, *Olean* on was decided.

**THE COURT:**  Exactly.  Exactly.

**MR. RIFKIN:**  But *Olean* doesn't --

**THE COURT:**  So I just want you -- look, it doesn't -- reciting *Lithium* back to me repeatedly doesn't necessarily help you.  That's my point.  Argue your case, not *Lithium*.

**MR. RIFKIN:**  I'm not arguing *Lithium Ion* at all, but *Olean* doesn't change that.  *Olean* is completely consistent with the idea that a dispute over a battle of experts, as it were, is a question that goes to the weight of the evidence, not its admissibility.

THE COURT: In that case, there was an evidentiary hearing; right?

MR. RIFKIN: Correct.

THE COURT: There was an evidentiary hearing, and the court had to -- and the court was affirmed, which is great. I always like it when the Ninth Circuit affirms me and my colleagues.

We have to get into the nitty-gritty. That's my point.

MR. RIFKIN: And I have tried to do just that by explaining what Professor McFadden did, how Professor McFadden did it, what Professor Prince did to criticize it, that is, to distort it --

THE COURT: Well, he changed it. He changed the methodology to create or to suggest a distortion.

MR. RIFKIN: Correct. Okay. He applied the methodology in a way it was never intend to be applied by running the simulation at a different level than it was constructed to suggest that Professor McFadden's methodology is inadequate.

THE COURT: Okay. Any response? And then we can move to the second.

MR. SWANSON: Yes, Your Honor. My response really focuses on your question, which I think gets to the heart of it, which is, is it okay to use that aggregated average in a case like this one, and I think the answer is absolutely not,

for at least two reasons.

One, it's not your average average.  This isn't like asking what the average price of a half gallon of milk is in a particular region because that's asking the average of a given product.

What Professor McFadden does is take in-app purchase items --

**THE COURT:**  What McFadden's model does is take it to a level that is logical and that has a baseline price.  Taking it down to the app level creates all sorts of unintended complications.

**MR. SWANSON:**  Well, I would say taking it up -- he says he does it at the app level; right?  Not at the -- the item level would be the individual prices which are --

**THE COURT:**  I would consider the item level to be a higher level of detail than the app level.

**MR. SWANSON:**  Yes.  Absolutely.

**THE COURT:**  And so trying to do this from the item level seems to me to impose a significantly higher level of complication that may not be necessary for purposes of trying to figure out aggregate damages.

**MR. SWANSON:**  And that's the question.  Absolutely agree that's the question.  And the question is, is it necessary, and the answer is that's where 99-cent pricing operates.

If you don't have an average that tells you something about those item prices, you're not going to be able to tell whether price tiers actually keep developers from moving those granular item prices. That's exactly where it operates.

And so that's why -- he's got an average that is not your typical average. It's a wide variety of things that have a vast array of differing prices. It's not the average of a price of, you know, half gallon of milk that might vary by 25 cents.

THE COURT: But I hear the plaintiff saying -- and, again, I will get into the nitty-gritty of this, but what I hear the plaintiff saying is that McFadden has created a construct that puts constraints on the movement, and if you're putting constraints on the movement, then that addresses some of the concerns, at least from their perspective.

MR. SWANSON: But if you're -- that average has to say something about the item prices, you know. The cases where averages have been used, the experts have said the average is a good representative for what will happen in the individual transaction.

THE COURT: Do you have any -- I don't think *Lithium* is the best -- is the best analogy here. In fact, I don't know that there is a good analogy.

MR. SWANSON: I don't know that there is.

THE COURT: Do you have an analogy?

**ER-162**

**MR. SWANSON:** No. I think this is a platform case. I think you once said we are in the Wild West. It's a platform case. One of the more complicated cases. Brand new Supreme Court opinions. We're all studying the opinion in the *Epic* case.

No. I mean, this is --

**THE COURT:** I would have thought you would have studied that already.

**MR. SWANSON:** Oh, I have been studying it every day.

**MR. RIFKIN:** Yeah.

**MR. SWANSON:** And I would like to comment on it in our reply brief, too.

But --

**THE COURT:** All right. Let's --

**MR. SWANSON:** -- the point is this last -- if I could say the last thing.

Professor McFadden is the one who doesn't say what the expert normally says. The expert normally says the average tells you something about the individual transactions. Professor McFadden says it says zero about the individual transactions. He says it's silent. He says, "I have no idea" --

**THE COURT:** But in some ways doesn't that -- logically speaking, it would seem to me the damages would be greater if we got down to the item level.

MR. SWANSON:  Maybe in a case that doesn't have price tiers.

THE COURT:  I don't know about that.  I don't know about that.  All I know is that we would have more consumers, right -- the gateway is the app level.  That's the gateway. And so all they're doing is talking about damages at the gateway.

If we go down one level, then what we are talking about is a significantly more -- is significantly more money being spent by consumers who are potentially being harmed.  So all it does -- I mean, it's a nice theoretical argument, and I get it, but all it does, it seems to me, is, if you get past the gateway, is increase damages.  So in a sense -- and I'll -- I'll go again and look, but in a sense, it seems to me to be a conservative approach.

MR. SWANSON:  I mean, I don't think so, again, because if the tears, which operate only at the item level, do constrain developers either from raising or lowering a price, they keep prices stable, then that is going to be a factor that actually reduces damage.

And my next point is really a way to get the real-world test on that, which is --

THE COURT:  Well, let's move to point 2.

MR. SWANSON:  Yes.  So if his model -- not just a question of price tiers because there are other issues that I

get to, but if his model really does incorporate price tiers, if it's an effective -- and his model doesn't.  It's the simulations that purport to.

But in any event, if that's right, then his model should make accurate predictions when we actually see the commission decreased, the commission decreased by a very substantial amount, by 50 percent, from 30 down to 15 percent in --

THE COURT:  Where is that?

MR. SWANSON:  That is in Professor Hitt's report in Section 6 and Section 7.

So there is the Auto-Renewing Subscription Program that went into effect, I think, in 2016 where developers were given a lower commission rate when their subscriptions renewed, from 30 down to 15 percent.

There is the Small Business Program where developers who had less than a million dollars in billings got a 15-percent commission.

There is also the Video Partner Program where participating video developers got 30 percent down to 15 percent for their subscriptions.

Those three programs collectively account for about a third of all spending since the App Store opened.  So there is a lot of data out there from which one can test --

THE COURT:  And you produced it all to them?

MR. SWANSON:  Yes.  Absolutely.

**ER-165**

THE COURT:  All right.  Keep going.

MR. SWANSON:  They've had it all.

Once we did the updated production of data, they had more data, we all had more data about the Small Business Program also.

So what we submitted reflects many years of data.  And as I say, it applies to an enormous amount of spending on the App Store.

So what --

THE COURT:  Was this data -- did McFadden ask for this data and was it provided?

MR. SWANSON:  Yes.  Well, he -- we gave it to him. This is just all the transactional data.  Every single transaction --

THE COURT:  I'm assuming you gave it to the lawyers. That does not always mean that it makes its way down to an expert.  That's the question I'm asking.

MR. SWANSON:  Yeah.  I mean, he had all those data -- to run his model, he had to have all those data.  But did he ever test his predictions against what happened in the real world?  No.  Not a word in his reports about that.

So what Professor Hitt did -- he did two things.  In Section 6 of his latest report, he said, I'll take all those apps that are subject to these programs, and I'll look at the price before and I'll look at the price after, and he did

different bands of time, I think going up to six months, maybe a little longer -- a little shorter.

And then he did a second set of tests that's in Section 7 of his report. He said, Professor McFadden makes a prediction for these apps that are subject to these programs, so I'm going to take Professor McFadden's model, and I'm going to look at it. He did it -- he did it including this aggregated average. He looked at it that way, too, as well as by looking at individual IAP predictions, so he did it the way Professor McFadden likes as well as the way he doesn't like, but he looked at the same apps at the same time plugging in the same 15 percent new commission rate and plugging in all the factors that Professor McFadden plugs into his model.

So both of those tests came back showing that developers by and large don't drop their prices -- they didn't drop their prices when the commission level dropped substantially. Professor McFadden's model makes an enormous number of false predictions, false positives. His model, to take an example, says -- looking at subscription apps, his model says -- predicts that close to a hundred percent of them should lower their price as a result of these policies that reduce the commission.

In reality, the real number was closer to zero than it was to a hundred. I'm not using the specific numbers because I think we've got protective order issues, but they're in

Section -- this is in Section 7 of Professor Hitt's report.

The model --

THE COURT:  Do I have a rebuttal report from McFadden? And what is --

MR. RIFKIN:  I'm sorry?

THE COURT:  Do I have a rebuttal report from McFadden on Hitt?

MR. RIFKIN:  Yes.

THE COURT:  And where is this addressed in the rebuttal report from McFadden?  I also, again, because I have so many reports from him, I would need a -- I want to make sure I have the right -- and, again, I don't have dates on anything.

MR. RIFKIN:  Your Honor, if I may, let me see if I can help.  The ECF number is --

THE COURT:  Which one are you giving me?

MR. RIFKIN:  So this is the rebuttal report.

THE COURT:  Okay.

MR. RIFKIN:  In which he -- in which he addresses Professor Hitt's natural experiments, and it's No. 708-2, is the ECF number.

THE COURT:  Okay.

MR. RIFKIN:  And his response to Professor Hitt's natural experiments begin at paragraph 82.  There's a heading there.  It says "B, Hitt's Natural Experiments."

THE COURT:  Okay.  And Hitt's report -- again, I have

your reports.  I don't have ECF numbers on anything.  So what is the ECF number so I make sure I'm looking -- because my notes -- well, I guess I only have one Hitt report.

MR. SWANSON:  Right.

THE COURT:  I've got nine expert reports.  I think I only have one Hitt report; is that right?

MR. SWANSON:  It's 688.

THE COURT:  Okay.  Section 6 and 7.

All right.  So what does McFadden say at 708 on this topic?

MR. RIFKIN:  So Professor McFadden's observations about Professor Hitt's report and his natural experiments are essentially twofold.

One is to point out that this is essentially a disagreement between two experts as to whether Professor McFadden's conclusions are right or wrong.

THE COURT:  Did he do -- did he do -- does he say whether or not the math behind Hitt's analysis is accurate or not accurate?

MR. RIFKIN:  He can't opine on the accuracy of it because Professor Hitt -- and I was going to address this -- never provided one critical piece of data and that is any validation of the second natural experiment.

Professor Hitt conducted two natural experiments.  One of them is what's called a simple before-and-after test.  And in

it, he claimed to look at prices that developers charged before Apple implemented the two price reductions, the Small Developer Program and the Auto-Renewal Program, and then prices that those same developers charged after the implementation of those programs.

Professor Watson, one of Apple's other experts, says exactly what we say, which is that the so-called before-and-after test is simply too simplistic to yield useful results.  Apple's own expert, Professor Watson, does our job for us.  He says, You cannot rely on a simple before-and-after comparison because it doesn't account for a myriad of factors that might influence a developer's pricing decisions.

So Professor McFadden's agrees completely with Professor Watson and believes that the simple before-and-after test that's done is completely useless.

Now, we had some technical debates with Professor Hitt about the particular dates he used for his before-and-after studies, but it doesn't really matter because the bottom line is that the -- that natural experiment is too simplistic to serve any useful purpose here.

The second natural experiment that Professor Hitt performed is a so-called difference in differences test where he has to perform a regression analysis to compare differences in the way the two groups -- supposedly control group and then a tested group -- respond to prices in relation to Apple's

announcements of the Small Developer Program and the -- and the Auto-Renewal Program.

In order for those results, for the difference in differences analysis to be valid, Professor Hitt was required by accepted science to perform some validating test on the results. And one of those issues that arises that needs to be validated is whether there is some extraneous impact on either the control group or the tested group that is skewing results.

And there are any one of a number of tests that can be performed, one of which Professor Hitt said in his deposition he relied on or at least he said he used.

Now, the results of that test, which he calls "the parallel trends test" -- and the purpose of that test is to make sure that the two groups which are tested so that you can accurately measure the difference in differences in the responses between the two groups -- whether they are valid and have otherwise parallel trends in them or there is something about the groups that's skewing your result.

And Professor Hitt said in his deposition that he did that test, but he admitted that he has never discussed that test in his report, he never addressed it, he never disclosed that he did it, and he never produced a single piece of data on the only verification test he claims to have run.

THE COURT: Why is that? Is he accurate, that, one, Hitt said that and --

MR. SWANSON:  Hitt ran --

THE COURT:  Go ahead.

MR. SWANSON:  Hitt ran 50-plus regressions to show that he had control groups for his before-and-after tests. We're just talking about the before-and-after tests.  I can't wait until we hear about the false positives, which Professor McFadden doesn't address.

But Professor Hitt did run over 50 regressions.  He used multiple control groups.

THE COURT:  Okay.  So I want to make sure that we're talking about the same thing.

MR. SWANSON:  Yeah.  The only thing --

THE COURT:  That there is the two natural experiments, which is the way Mr. Rifkin described them.

MR. SWANSON:  There are -- there are two experiments, two tests.  One is before-and-after --

THE COURT:  Right.

MR. SWANSON:  -- which was --

THE COURT:  So now we're talking -- let's --

MR. SWANSON:  Before-and-after is -- but what he calls two things are both about the before-and-after, and then there is the comparing McFadden's own predictions against what happened to the exact same apps.

THE COURT:  So I want to make sure that we're all talking -- I was going to apples and apples, but let's -- the

so-called difference and differences test.

**MR. RIFKIN:**  "Difference in," I-N.  Difference in differences where the analysis compares the difference between the price reactions of two different groups.

**THE COURT:**  So we are going to call that Experiment No. 2.

**MR. RIFKIN:**  Right.

**THE COURT:**  And in Experiment No. 2, I am being told by Mr. Rifkin that Professor Hitt said he relied on a validation test, but in his deposition, he admitted that he never produced it, he never discussed it in his report, none of that happened.

First of all, is that an accurate representation of what Professor Hitt said?

**MR. SWANSON:**  No.  What -- what -- again, these two things that he's calling "two things" are all about the same thing, they're about the before-and-after.  So to make sure -- and Professor Watson didn't say what Mr. Rifkin said.  You can look at the deposition.

But, yes to look at a before-and-after test, you need to make sure that you've got the right control group.  That's why Professor Hitt ran 50 regressions of these difference in differences to make sure that that before-and-after wasn't the result of some confounding factor.  And so he turned all of those over.

Now, what they're saying is, Oh, there's another test called "parallel trends" that can be run as well.  And Hitt said, Yeah, I ran that, too, in the deposition.  I wasn't relying on it.  And so we're happy -- we'll turn it over.  If they want it, we'll do it in the reply brief.  They can look at it to their heart's content.

Professor McFadden could run it.  He didn't say anything about what the results were in his declaration because the parallel trends are there.  It's reflected in the 50-plus difference in difference regressions.  So that's all about the before-and-after.

But what about the false positives with Professor McFadden's own model?

**MR. RIFKIN:**  Your Honor, would you like me to respond now and address some of the Court's questions and then try to respond to Mr. Swanson's challenge?

**THE COURT:**  Well, I will probably need -- to make sure that I am following you all, I may need to have kind of a clear articulation from the plaintiff in terms of the identification of the experts, the notion that in deposition, you know -- deposition transcript -- unless you already have it for me in all of this paper where you say that he doesn't do something.

So I just don't have cites for what it is that you're saying to me.

**MR. RIFKIN:**  I'm happy to provide them right now.

THE COURT:  Go ahead.

MR. RIFKIN:  Okay.  So first with respect to Professor Watson's testimony, it is -- what's the -- what's the document number?

It's ECF No. 701-9.  And regarding his statement that the before-and-after test, what he says is an economist couldn't just look at before and after because some other uncontrolled factor might cause changes, and the specific example was minimum wage employment increase.  But he goes on to discuss the fact that before-and-after tests are statistically invalid.

And then he raises the difference in differences analysis as one way to address the question of the inadequacy of the before-and-after test.

And so now I can give you the cite to Professor Hitt's deposition testimony, and that is ECF No. 701-6, and this is -- this is where Professor Hitt told us about the tests he performed.

He claims to have done a number of validation tests.  He admits that he doesn't provide any results in his report, and he admits that he didn't provide any of these results in his work papers.  And that begins on page 114 of 701-6.

And in particular with regard to the only result he claims to have relied on, the parallel trends analysis, he says, "Yes."  And now I'm reading from page 7 -- 116 of Exhibit 701-6.  "Yes.  In the process of preparing this, we did

look at parallel trends."

And then he refers to something called "time-fixed effects," and then he says, "So a lot of that would wash out." This is his testimony.

And I asked him, "Do you present the results of any parallel trends analysis in your report," and he says, "No, I don't think we put those in the report, but it was something we did along the way." And I say to him, "Is it in your work papers?" And he says, "I don't believe so. I don't believe that we put it anywhere here because I don't think a reference -- I don't think I referenced that in the report, but, yeah, that's a normal thing" -- and unfortunately the transcript has a typographical error. He says, "That's a normal thing to do along the way, and we did that."

THE COURT: Did McFadden test his model against real data in any way, shape, or form?

MR. RIFKIN: McFadden did not because he doesn't believe it's either necessary or appropriate to do so. And the simple reason for that is Professor Hitt conducts his natural experiments in the real world, and Professor McFadden is modeling results in the but-for world. And Professor Hitt admitted that in the real world, he did nothing to eliminate the confounding effects of Apple's rigid price trends -- price tiers -- I'm sorry -- price tiers on the ability of developers to respond to a change in the commission from 30 percent to 15

percent.

THE COURT:  Is there any case law that either of you are aware of which suggests that when we have new, kind of, cutting edge economic theories, that experts should be or are required to test but-for models with real world data?

MR. SWANSON:  There is a case before the Ninth Circuit right now.  That's Judge Donato's certification of a class in the Google Play class action, and these very issues -- the same evidence is in the Google Play case.

THE COURT:  But he certified the class.

MR. SWANSON:  He did certify it.  The Ninth Circuit took it on a 23(f).  It's being briefed right now.

Focal point pricing and the fact that -- same thing happened with Google Play.  When they also reduced commissions, prices didn't drop.  And they had -- and that's a focal point pricing, not -- that's a focal point pricing issue, which would be in the but-for world.  So Ninth Circuit is going to confront that.

THE COURT:  Okay.  Any other one that you're aware of?  No?

MR. RIFKIN:  (Mr. Rifkin shakes head.)

MR. SWANSON:  No.

MR. RIFKIN:  Not that I'm aware of.

THE COURT:  I just wanted to make sure, Mr. Rifkin, that your "no" was on the record since --

**MR. RIFKIN:**  No.  Not that we're aware of, Your Honor.

**THE COURT:**  She won't take down the nod of your head.

Let's go on.  Then I think the third issue that was raised are price tiers.

**MR. SWANSON:**  Well, could I just make one last point on the prior one because I think it's important because all this statistical mumbo jumbo -- I will confess, I didn't do great in econometrics, but it can be --

**THE COURT:**  Well, but have you been doing this for a long time so that's no excuse at this point.

**MR. SWANSON:**  I know a lot of econometricians.  And Professor McFadden is -- I know.  But it can be boiled down to a very simple logical proposition, and that goes to the false positives.

If there is some confounding factor that could explain why prices didn't drop when the commission dropped, it should be in Professor McFadden's model.  If it's not in his model, it's not reliable.  If it is in his model, then his model shouldn't be generating false positives.

And, in any event, he should be testing that, and he never did.  And there's a good reason for that because it fails the test.  It fails one of the most critical tests for a *Daubert*, which is can the model be falsified.  Yes, it can, and this one was.

So thank you for letting me --

44

THE COURT:  So let's deal with that, false positives.

MR. RIFKIN:  Yes.  Well, false positives is the ultimate conclusion of the rightness or wrongness of Professor McFadden's conclusions, and we've already discussed why we think Professor Hitt's natural experiments are unreliable to demonstrate false positives at all, period, plain and simple.

But the most important defect is the one that Mr. Swanson just mentioned, and that's --

THE COURT:  The most important defect of --

MR. RIFKIN:  In Professor Hitt's --

THE COURT:  No.  I want to focus first on McFadden's because you have the burden.

MR. RIFKIN:  Yes.

THE COURT:  All right.  So what about the false positives that are being generated by his model?

MR. RIFKIN:  Well, Professor McFadden doesn't agree that there are any false positives generated by the model.  You asked us in the --

THE COURT:  I thought we were still looking at some percentage because at some point, we're going to get to *de minimis*, whether or not it's *de minimis*.

MR. RIFKIN:  Your Honor, if I can step back for just a moment.

In the original class certification decision, you asked us

**ER-179**

to set out the confidence interval for the Court.  We did.  Professor McFadden says in his report -- and I believe it's paragraph 60 -- that he's expressing his opinion to a 95-percent degree of certainty.  He does not believe that there are any false positives generated by his report at all and by his econometric modeling.

He rejects the notion that Professor Hitt's natural experiments demonstrate false positives because he believes that Professor Hitt has not explained what confounding factors have influenced his natural experiments, nor has Professor Hitt or any of Apple's seven other experts identified any confounding factors which they believe are skewing Professor McFadden's conclusion.

I've identified one important one that's obviously skewing Professor Hitt's natural experiment, and that is the -- the rigid price tiers that Apple imposes that constrain the ability of developers to respond to certain price -- certain commission changes.  But Professor McFadden does not believe his model demonstrates any false positives.

We are going to talk about --

THE COURT:  I think I had asked you to run it against the named plaintiffs.  Was that done?

MR. RIFKIN:  I don't believe Your Honor did ask that.

Am I correct?

Your Honor, I don't believe --

THE COURT:  Did you run it against the named plaintiffs?

MR. RIFKIN:  It has been run against the individual accounts of all the class members, the named plaintiffs included.

THE COURT:  And was it successful in 95 percent of the -- 95 percent of the time?

MR. RIFKIN:  It's successful to a 95-percent certainty.

THE COURT:  I want to know with respect to real people --

MR. RIFKIN:  Yes.

THE COURT:  -- and real accounts --

MR. RIFKIN:  Yes.

THE COURT:  -- was the model run against the accounts of the named plaintiffs --

MR. RIFKIN:  Yes.

THE COURT:  -- and did it accurately predict with respect to their accounts?

MR. RIFKIN:  Well, it predicts effects that take place in a world that doesn't exist, so there is no way to know for certainty whether it's accurate or not.  We don't -- we don't have the ability to say, Well, now Apple has reduced its commission to what Professor -- to what Dr. Abrantes-Metz says it should do because Apple never has, and we don't know what

the effect of that would be in a competitive world where there is a competitor of Apple offering a similar service at a different price.  We just don't know that because it's the but-for world.

These are all -- by their nature, they are hypothetical simulations of what is likely to happen.  And Professor McFadden has expressed his opinion to a 95-percent confidence level.  That's all he can do because he doesn't have the ability to change the real world and make it into the but-for world.

Professor Hitt's natural experiments took place in the as-is world, and Professor Hitt is saying that that is what the but-for world would look like but doesn't give us any reason why we should believe Professor Hitt any more than we believe Professor McFadden.

THE COURT:  All right.  Let's move on.

MR. SWANSON:  All right.  Well, we've offered one -- already one factor that would explain why the commission reductions which actually happened in the real world -- that's the only place you can test things -- didn't result in lower prices --

THE COURT:  That's why there is so many economists' jokes out there about solving problems in the but-for world; right?  The three people on the island just believe there's a boat.

**ER-182**

MR. SWANSON:  Just assume.  Just assume.

MR. RIFKIN:  Assume there's a boat.

MR. SWANSON:  That's the usual punch line.

But here we're going to assume that the model can't be falsified, which is not about *Daubert*.  It has to be falsifiable or it's not a scientific model.

So what is it that's creating these false positives? Well, I have already talked about one thing.  His model doesn't take account of the constraining effect of price tiers or focal pricing.

Another thing is the way his model treats costs, which is driven by a set of assumptions which are not substantiated, not tested, and a set of constraints which are based on almost no data at all, certainly not representative data.  And that will take us ultimately to this confidence level issue, but that's my fourth point.

So there is violent agreement -- maybe the only thing in this case that we can agree on -- it's a matter of economics that if marginal costs are zero, then the commission won't affect the price.  There will be no injury.  There will be no damage.  If the marginal cost of an app transaction is zero, then there will be no damage.  Professor McFadden agrees with that.  Plaintiffs don't take issue with it.

And if there is any academic consensus about the particular part of the world we're talking about, which is the

digital world, it is that in the digital world where products are made out of electrons, marginal costs are negligible or zero. That is not something that Professor Prince or Professor Hitt made up. That is a proposition that has wide acceptance. It had wide acceptance in the Microsoft case decades ago. The D.C. Circuit said, and I quote, "The cost of producing software are almost exclusively in its design, and therefore marginal production costs are virtually zero."

Virtual currencies are a great example of that. Tim Sweeney testified in this courtroom that the marginal costs of V-Bucks is zero. Dr. Evans agreed. Every economist for the developer plaintiffs in their class action now settled said that marginal costs are basically zero. Those are the developers. They know.

But in Professor McFadden's model, virtual currencies --

**THE COURT:** Let me, before you go there -- as an academic proposition, do all your experts agree, as Mr. Swanson's arguing, that if marginal cost is zero, damage is zero? Do they agree? As an academic matter, if I put them on the stand, would they say, Well, yes, of course?

**MR. RIFKIN:** Yes, with one caveat, and I'll address this more fully when I get a chance to speak, but it has -- it has to do with where those marginal costs are calculated. It's the difference between calculating them at the app level, which you know we've had quite a bit of extensive discussion about

where Professor McFadden believes it's appropriate to calculate them, or at the item level, which is where the defendant and its experts insist on calculating them.

THE COURT:  All right.  And so -- and that kind of distinction I understand, but the basic --

MR. RIFKIN:  Yes.

THE COURT:  -- but the basic premise people agree on.

MR. RIFKIN:  Yes.

THE COURT:  All right.

Keep going, Mr. Swanson.

MR. SWANSON:  Okay.  So I've said that his assumptions drive a lot of the results, so one of my -- what am I saying there?

What Professor McFadden does in setting up is model, to set up his model he needs to set like a mathematical equation that then he fits the data to.  So that equation is rigid.  It says, The data have to behave like I say they behave.  And what he does is very important from this marginal cost perspective. He says that, "There is only one price point where marginal costs can be zero."  So I'll just pick out an example.  It may be close to one of the illustrations, but say a dollar sixty-four.  If an app at the app level is priced at a dollar sixty-four, that's the only time marginal cost is going to be zero.  Anything above that will have a positive marginal cost. It will keep getting higher, the higher up you go on that line.

Interestingly, he said below that point, marginal costs will be negative, which is absurd, but he does have lots of negative marginal costs in his model.

But he has zero.  Once he runs the model, nothing ever hits that price point.  He's got zero instances of marginal costs at zero.  He has got very, very few instances where it's small, and a whole lot of instances where it is big.

What's the point of that?  Big marginal costs are what drive damages in this model.  And he has created that by an assumption, not by an actual evaluation of what developers' marginal costs are.

In his aggregation, you know, what Mr. Rifkin calls the averaging, adding all of these different individual items in-app together, that also pushes the price up which by dint of his assumptions pushes the marginal cost up which pushes damages up.  These are all assumptions.  And it bears emphasis that Professor McFadden didn't test them against real-world data.

When I asked him in his deposition if he had done any analysis, any testing to confirm whether the marginal cost that is his model generates are actually correct and accurate, Professor McFadden's answer was, quote, The answer is no.

THE COURT:  Well, again, did that -- do you know of experts in these kinds of circumstance -- are they required to do it?  Back to the *Google* case, which I have not looked at my

colleague's decision nor any of the expert reports. Was it done there?

MR. SWANSON: The issue was raised. Judge Donato's reaction -- I mean, part of this is just reading the transcript. Judge Donato's reaction was, Well, nothing is zero. That's he was said. And, you know, we're not saying every app has to be zero. Certainly not saying that at all.

We're saying that there is no reason why you can reject the proposition that a lot of them will be at zero --

THE COURT: My question is a little bit different, which is, again, given the kinds of issues that we are dealing with in this particular case -- and Google is probably the closest analogy where class certification was granted -- did the experts on the plaintiffs' side -- did they test these kinds of assumptions for marginal cost against real-world circumstances?

MR. SWANSON: I mean, I -- I think it has been done before. I mean --

THE COURT: Was it done there where class cert was granted?

MR. SWANSON: I'm thinking of predatory pricing cases where marginal cost is the critical issue, and there have been a lot of those. I've been through a number of trial of those.

Yes, the experts look at the costs. We've had more than a hundred subpoenas of developers in this case to get their cost

data.  Professor McFadden looked at the six that we'll talk about because I'll talk next about the margin constraints. Last time I deposed him, asked him have you looked at any of the other developer cost data.  He said no.  He doesn't look at data.  He doesn't compare his assumptions to the real world. That's what -- that is what *Daubert* is supposed to be about.

And so I think, yes, he -- he should -- if he's going to make an assumption that has such momentous consequences -- I mean, for example, he should look, you know, if item prices move together.  That -- you know, he's got this percentage method.  Shouldn't item prices move together if this aggregation makes any sense?  They don't.  Professor Hitt looked at it, they don't move together.  They move often in opposite directions.

So the empirical testing is important, and that's what Professor Hitt has done, that's what Professor Prince has done. That was not a *Daubert* issue, but in *Olean*, you know, I mean, there was a whole back and forth.  The expert -- the defense expert said, Here is the problem.  Plaintiffs expert said, Yeah, okay, I looked at that.  Here's my response.  Here's how I tested that.

THE COURT:  And in *Olean*, was the -- were the plaintiffs' experts testing only in the but-for world or did they also test in the real world?

MR. SWANSON:  I mean, I don't even understand that.

Every case -- every damage case is about the but-for world, so we now have an immunity from testing --

THE COURT:  That's why I'm asking the question, Mr. Swanson.  That's why I'm asking the question.

MR. SWANSON:  Yeah.  I don't -- what -- I don't understand it because all you can do is look at the real world. If you have --

THE COURT:  So did it happen in *Olean*, was my question?

MR. SWANSON:  Oh, I mean, I think no one even -- no one raised that argument because it was all about what the data in the real world showed.

THE COURT:  That was a real world case.

MR. SWANSON:  Yes.  So is this.

THE COURT:  Well, I -- I --

MR. SWANSON:  I mean, there are --

THE COURT:  Look, the reason that I'm asking these questions is because the rules in these kinds of cases are not set.

MR. SWANSON:  Right.  I understand.

THE COURT:  And I'm trying to understand the extent to which the industry is in fact engaging on these issues in a way that's either consistent with the plaintiffs or whether everyone else is doing both, that is, having the but-for analysis and doing the -- the natural world -- you know, you

**ER-189**

could say that -- a lodestar check or something, you know, real-world check against what it is they're trying to do.

That's the question that I'm asking.  I'm trying to understand what is going on in the antitrust cases generally.

MR. SWANSON:  Absolutely.  I mean, so-called natural experiments.  And experiments where you can falsify an econometric model are the gold, you know -- the gold standard if you can do it, if you have the data.

And so, yes, I mean, I think that by -- I don't doubt that was done in *Olean*.  You know, the regression was run in different ways, the plaintiffs' regression.

He is talking about the but-for world as though it's the nether region that we can't reach.  We have a --

THE COURT:  I mean, the damages here are estimated to be $10 billion; right?

MR. SWANSON:  Right.

THE COURT:  $10 billion is a lot of money.  It would seem to me that we could have some, you know, analysis, if we're talking about that kind of thing, to understand how these kinds of cases where that much money is at stake should be litigated.  And I don't understand, given that we are talking about $10 billion, why Professor McFadden would not look at real data as a check on his theory.

MR. RIFKIN:  Are you asking that rhetorically or do you want --

THE COURT: I am.

MR. RIFKIN: All right. So Professor McFadden constructed his model from real-world data. It's an argument that Apple has made, but it's not true. He constructs his model from real-world data.

The answer to the question why he didn't perform this so-called natural experiments validation test is that it's simply not required nor is it routinely done. Apple has not suggested that it is --

THE COURT: Okay. So here's the thing, again.

So you're saying that it's not required, and that -- and by that I mean that no circuit court has ever required it so okay, and you don't disagree with that.

MR. SWANSON: I mean, I haven't looked at it. I'm sure. *Daubert* is all about falsifying tests, so I think there are a thousand cases that involve falsification of a model's predictions in the real world.

THE COURT: Okay. So --

MR. SWANSON: The *Daubert* factor.

THE COURT: -- not routinely done. So what is --

MR. RIFKIN: Your Honor, if I can answer the questions that you asked of Mr. Swanson which he didn't answer, I would like to tell you now that it was not done in *Olean* and was not done in *Google*. It couldn't be done in *Google* because Professor Fisher in that case constructs his damages model at

**ER-191**

the market level, macroeconomically, and so there was no basis on which you could do that testing.

But the simple answer is no, it wasn't --

THE COURT:  What was the class?  How is the class defined in *Google*?

MR. RIFKIN:  In the *Google* case, it was all those people who purchased apps or made IAP on the Google Play Store. It's a similar construct to what we have here.

THE COURT:  All right.  Go ahead.

MR. RIFKIN:  But the model -- and if we want to talk about *Google*, I'm happy to explain it in a little bit more detail, but essentially the difference is that Professor Fisher in the *Google* case constructed his model at the -- at the level of the Google Play Store as a simple unified economic entity. And Professor McFadden constructs his model with far more granularity at the app level, which is why Professor McFadden's model is able to identify individual damages for each and every account.

One of the issues that's being litigated in the Ninth Circuit right now is that Professor Fisher's model does not allow that because it's constructed at the app level, and they say in their --

THE COURT:  Are they only asking for injunctive relief?

MR. RIFKIN:  No.  There are -- there are monetary

damages claims and injunctive relief claims, but what Google says in its appeal is one of the weaknesses of Professor Fisher's model -- I express no opinion on it, but I'm repeating Google's argument.

Google says that one of the weaknesses in Professor Fisher's argument, unlike Professor McFadden's model in the *Apple* case, is that you cannot use Professor Fisher's model to identify which accounts have been harmed and which accounts have not been harmed. That's an issue that I thought Your Honor was asking a question about a few moments ago when you were talking to me about the number of unharmed accounts.

Professor McFadden's model is going to identify all of them. For the data he has run, he has already identified all of the unharmed accounts and all of the harmed accounts. Professor Fisher's model, because it's constructed macroeconomically, not microeconomically, cannot do that, and for that reason could not do the kind of testing that we're talking about now.

In *Olean*, although the model was constructed more like Professor McFadden's model than Professor Fisher's model, the answer to Your Honor's question was the test was not done and there was no issue made about it. And the test was not done because not only is there no case that says it must be, but more importantly for the experts, there is no academic literature that says it must be.

None of Apple's expert has identified a single authoritative text that says you must validate your results from your regression analysis by running a simulation against as-is data.  It simply is not in the academic literature.

THE COURT:  Okay.

MR. RIFKIN:  Okay.

And that's -- the same thing is true of any computation that takes place at the -- at the individual account basis, including this question of marginal costs, which I don't want to interfere with Mr. Swanson's discussion, but I'll explain shortly why marginal costs were not an issue in the *Google* case either.

THE COURT:  Go ahead.

MR. RIFKIN:  Okay.  So the whole business about marginal costs is, to a great extent, a dispute again, an ongoing dispute about whether apps should be modeled at the app level or at the individual item level.

When Apple and its experts say that some apps have zero marginal cost or some IAP has zero marginal cost, what they mean is that some items of IAP have zero marginal cost, and the -- and the example they give almost all the time is the cost of minting virtual currency.  And by that, what they're talking about is the cost of issuing an item of virtual currency, whether it's V-Bucks or something else, it's an item of virtual currency.

We have already explained -- and I think Your Honor understands it so I won't belabor the point -- why Professor McFadden strongly believes pricing items at the item -- pricing -- modeling price reactions at the item level is the wrong level to do this at.

And so when we talk about zero marginal costs, what Apple's experts mean is that some IAP has zero marginal cost at the item level, but they don't debate and they don't dispute and they don't deny that at the -- at the app level, there are marginal costs.

So, for example, if we were to look at an app that sells V-Bucks, for example, they don't dispute that if -- if more products are generated that provide for V-Bucks or that V-Bucks are bought by more consumers and more users, that there is a scale issue, and they don't dispute that at the app level where Professor McFadden constructs his model, those scale issues translate into marginal costs. There is no way they can dispute it because in fact it happens.

So instead, they turn the tables and say, We need to look at the individual item level.

I'm not going to say anything more about it.

**THE COURT:** We don't need to.

**MR. RIFKIN:** Okay.

Now, in addition to that, it is a fallacy that Apple repeats constantly that Professor McFadden did not have

real-world data on which to model marginal costs.  The irony is that the experts agree that most times when an econometric analysis like this is done, the economists do not have any real-world marginal cost data.

Here, when Professor McFadden submitted his most recent report, he had real-world marginal cost data from a small number of developers.  And Your Honor addressed this in the original class certification decision where Your Honor said you understood that for purposes of class certification, he relied only on marginal cost data from six developers.  And Your Honor said in a footnote in the opinion that you thought that that was not a class certification issue but would expect that before trial, more fulsome data would be used.  And I'm looking for the footnote.  I believe it is Footnote 10 --

THE COURT:  When I say things like that, I'm just making work for myself because then it ensures that I get a motion for decertification.  But go ahead.  I hear what you're saying.

MR. RIFKIN:  It is Footnote 8, Your Honor, on page 10. "The Court notes that the data is not fulsome.  While it appears that Professor McFadden analyzed the financial records of six developers, the Court would expect a more fulsome analysis or reliance on an industry expert for purposes of trial."

This is a rehash of the same argument we heard before

dressed in slightly different clothes.  Okay?

**THE COURT:**  I understand.

**MR. RIFKIN:**  And since -- since the time -- just to complete the picture -- since the time that Professor McFadden prepared his most recent report, as Your Honor is aware, we have been, and I think Mr. Swanson referred to it -- we have been subpoenaing cost data from more and more and more developers.  And we collect more and more data.  And Professor McFadden will incorporate that data into the final analysis that he runs before trial begins.  But we can only run the model on the data we have, which admittedly is more robust than the data that economists usually have in most cases.

And so when Professor McFadden constructed his econometric model, he used the real-world data he had for the three genres that he studied -- Games, Music and Entertainment -- and he imposed what are called "margin bounds" on the diffuse data. It's a recognized technique.  Nobody says it runs afoul of any accepted authoritative literature.  They disagree about how it was implemented, but mostly they disagree about when it was implemented.

Apple's experts say, or at least some of them do -- Apple's experts say that Professor McFadden used the data he had to construct the model, and then when he was unhappy with the results he obtained, he re-ran the model imposing margin bounds on -- on the -- on the marginal cost data that he had.

But that's not what happened, and two of Apple's experts admitted as much. And so what actually happened, according to Professor Hitt and, I believe, Professor Watson, is that Professor McFadden imposed the margin bounds first before he ran the econometric modeling. And they quibble about whether the margin bounds were appropriately set or not, but whether they were supposed to be set at 60 to 90 percent or 64 to 92 percent or some other level, these are matters that are mere differences of opinion between experts that go to the weight of the expert's opinion, not its admissibility. And whether Professor McFadden ultimately uses the same margin bounds in his final analysis once we've received all the data from Apple and all the data from the additional developers, whom we continue to receive data from -- once he does that before trial, it may be that the margin bounds are the same that he's already constructed. It may be that they're different margin bounds, but they will be tethered to the data that is collected in the real world; not what Apple says, but data that Professor McFadden has available to him from the real world.

THE COURT: All right. Last topic, and then we'll take a short break.

MR. RIFKIN: Okay.

THE COURT: Your last topic is the switcher problem.

MR. SWANSON: And that requires some discussion of this margin-bounds issue. And if I could say one thing about

64

marginal cost?

THE COURT:  Quickly.  And by "quickly," I don't mean speak faster.

MR. SWANSON:  I'm sorry?

THE COURT:  Be efficient, Mr. Swanson.

MR. SWANSON:  Yeah.  Okay.

Marginal costs -- we don't agree with the things he said. We agree with marginal costs has the same definition it had in the *Microsoft* case.  It has the same definition Professor McFadden gave it.  It's the cost of one more unit of output.  That's hitting the "buy" button.  If the individual items have zero marginal cost, when you add them up --

THE COURT:  We've had this discussion before.  Move on.

MS. HIGNEY:  I'm done with that.

Margin constraints, these are the things that he imposes based on the six developers.  That's not a sample.  That's not a scientific sample.  Yes, they've had a lot more data. Professor Hitt looked at it.  He discussed it in his report. He said it's not going to rescue these margin bounds.

Professor McFadden, when I deposed him, years after he first chose these six developers, he said, "I haven't looked at anything more."  So we have no idea what, again, more data will show.

We know Professor Watson has looked at what was done here.

**ER-199**

What Professor McFadden said was, "Well, you know, I used billions of data points to estimate my model, and then I make it even more accurate by adding these margin constraints." So it makes it sound like the margin constraints aren't that important; they just make it more accurate.

What Professor Watson did was say, "Well, what happens to the model if you don't have the margin constraints?" And the model spits out nonsense results. Those billions of data points -- they run 75 samples, they average them together. Those billions of data points, when you run it through the 75 samples, say crazy things like "demand curve slope upward," "the model predicts that" -- or "the regressions predict that consumers would like higher prices, not lower prices." That is crazy. That's nonsense.

Those samples vary from each other sometimes by a factor of a trillion with a "T." So the results of the underlying regressions are not good. And Professor Watson explains statistically what the problems are that make them very unreliable.

So the margin constraints are critical because the margin constraints actually substitute for the data. Instead of getting results that are dictated by billions of data points, you end up getting results that are dictated by six unrepresented developers out of hundreds of thousands, and that's not a proper sample. That's taking his work from where

he claims he uses an enormous sample of accounts to basically basing his results on what he interprets, and even there, it's unclear how he comes from those numbers to his margin bounds from what he interprets from just six unrepresentative developers.  By the way, Epic is one of them.

And so what are these margin constraints?  They control -- once again, they control what marginal cost can be in his model.  The margin constraints for Games say that on average, marginal cost has to be 10 to 40 percent of price.  That's his constraint.  So that's not near zero.  That's not small.  That's not negligible.  That's not what all the academics say about marginal cost in the digital world.  He constrains the average to be from 10 to 40 percent.

Professor Watson shows if you move those constraints around just by a little bit, the whole model goes crazy.  The damages change.  They shift by billions of dollars.  The number of uninjured move up substantially.  And that goes to the reliability of the model.  He still has a switcher problem.  He has a switcher problem because he's got an unrepresentative sample from which he draws the margin constraints which control the results which will change massively, will flip millions, tens of millions of accounts from one status to the other depending on how the margin constraints change.

And we have no idea, yes, that's right.  But we're supposedly supposed to wait for trial to see if this is a

reliable model.  Now is the time.  They have the burden.  And Professor McFadden hasn't bothered to look at anything more than data from six developers.

There are --

**THE COURT:**  Okay.  Response.

**MR. RIFKIN:**  Yes, Your Honor.  A couple of responses.

First on the question of switchers, which is what I thought we were addressing, Apple's original argument, if you will recall, had been that if you -- if you drew 25 random .1 percent samples from the full database, that some accounts would appear in more than one of those samples.  And that because those samples all generated ever so slightly different coefficients from the regression, because the populations were not identical, some accounts that appeared in more than one sample would switch from being ever so slightly harmed under one regression to ever so slightly unharmed in another regression.

Everybody agrees that the effect of switching from harm to unharmed accounts is simply the manifestation of where within the confidence interval those particular results fall.  Nobody has suggested that they fall outside the 95-percent confidence interval.  And, in fact, Apple's experts all conceded that the accounts that switched were accounts where there was varying little commerce conducted on the App Store.

To correct that problem, as the Court asked

Professor McFadden to do, Professor McFadden, instead of drawing a single .1 percent sample -- which, by the way, the Court said in the original class certification decision was appropriate, the appropriate sample size -- Professor McFadden ran 75 separate regressions using 75 independent 0.1 percent samples, returning the samples, you know, the accounts to the pool of accounts in each instance so that there was no elimination of any accounts in any of the samples, and he had 75 regression results.

He then averaged the 75 regression coefficients to derive a single model with average coefficients that were produced from 75 samples.  So there now is only one model.  And with only one model, there can't be any switching.

Apple's experts at one point said that it would have been better to run a single regression using a sample of 7.5 percent instead of 75 regressions of 0.1 percent.  So that's a bit of a challenge to the Court's decision already, but, nonetheless, no expert from Apple has said that if you ran the sample that way, a 7.5 percent sample against the entire regression versus the average of 75 0.1 percent samples, that you get any materially different results.

This was a distinction with no difference at all.  And so the whole point about switching simply disappeared.  But instead of conceding that, Apple changes the definition of "switchers."  And what it now says and what Mr. Swanson just

**ER-203**

argued is that if you change the parameters of the model ever so slightly -- and he's referring then to the margin bounds that Professor McFadden imposed -- if you change the data inputs from which the margin -- from which the model is derived, you get vastly different results.

That's a tautology with which no economist and no statistician would disagree.  It's also a tautology that has absolutely no meaning because no one says that a model is supposed to be so reliable that it will withstand changes in data inputs and yield the exact same results.

If it did, if a model produced the same results from of different datasets, it's because the model itself is flawed and doesn't respond to the data.

The only thing that Apple's experts demonstrated is that Professor McFadden's model responds to the data that it is built on.  And if they had asked us that, we would have stipulated to it.  We could have saved a lot of time and a lot of money.  But it doesn't invalidate the model.  It doesn't invalidate the results, and it never should have been done.

**THE COURT:**  Okay.  We are going to take a break. Let's do 10 minutes.

(Recess taken at 10:33 a.m.)

(Proceedings resumed at 10:44 a.m.)

**THE COURT:**  We're back on the record.  The record will reflect the parties are present.

Okay.  Do you want -- I think you have one more argument.

MR. SWANSON:  Can I --

THE COURT:  And then we'll move over to the class cert.

MR. SWANSON:  -- make an efficient response to the last?

THE COURT:  Go ahead.

MR. SWANSON:  My efficient response would be Professor Watson -- Section 5 of his report addresses the claim that the model is 95 percent -- in the 95-percent confidence interval. He says that the margin constraints drawn from a sample of six developers makes that -- makes a mockery of that claim.  It isn't true.

Professor Watson in Section 6.2 of his report talks about the test that Mr. Rifkin was alluding to.  This is the switchers that result from changing the -- not the sample of developers for the margin costs but the sample of accounts for running the model.  And what Professor Watson found, when he took the 75 samples and he added them all together, so you had exactly the same accounts, and he ran the model on that, the exact same model, four million -- four million accounts switched from harmed to unharmed.  That's a switcher problem, and that's in Section 6.2 of Professor Watson's report.

The last point I was going to make was about Dr. Abrantes-Metz's but-for commission rate.  She was engaged

as a replacement for Professor McFadden's efforts in that area, and -- but she feeds a single number into Professor McFadden's model.

Professor McFadden, by the way, hasn't read her report, interestingly, but he rigorously applies her number in his model.  His model doesn't work unless you got a single number to plug into it.

THE COURT:  Right.

MR. SWANSON:  And she, who takes an approach using an accounting identity, not an economic model, comes up again with a single number, even though --

THE COURT:  My memory of the arguments here is that she used the same method as was used in the related case; is that right?

MR. SWANSON:  You're talking about Professor Economides?

THE COURT:  I don't.  There is so many professors --

MR. SWANSON:  I understand.  I think it was Professor Economides who did something similar, but even Professor Economides said Apple has a two-part -- two-tiered commission structure so he came up with two tiers, so I think she didn't do the same thing that he did.  He used different data.  But, yes, there was a similarity in approach.

One thing, again, that -- ask one more time if we can file a reply brief because we've got new evidence.  One of the data

points she uses -- this is new evidence that came in from Microsoft that belatedly produced something that's very critical.  One of her data points, critical data points in her calculation of the but-for commission is taken from a Microsoft document.  It's a Microsoft ordinary course of business report that reports a profit figure for their store.  I'm not going to say what it is --

THE COURT:  This came in after she did her analysis?

MR. SWANSON:  Well, what happened after she did her analysis was we got from Microsoft the next years' -- the two years after that, and those numbers are very different.

THE COURT:  Okay.  But they came in after her report?

MR. SWANSON:  Yes, yes, yes.  She knows -- I mean, plaintiffs know that.  Plaintiffs got the same production that we got.  She hasn't revised her opinions, but if you plug the new numbers in or if you average them together, you get a significantly higher but-for commission rate and, of course, everything that goes with that:  Enormously higher amount of uninjured accounts shifts from harmed to unharmed; lower damages; the whole nine yards.

So we'd like to submit that to you, Your Honor, in conjunction with our reply so that you can actually see, once again, testing these assumptions by real-world data.  Is she using a number that is reliable?  Is it a number that stays the same over time?  Because that's what she's doing, she is

modeling what would happen from the beginning of the App Store to today, I mean, well over a decade.  So her numbers need to be robust, and they can't be cherry-picked so that they just happen to generate a number which, you know, isn't so high that it's over 15 percent and isn't so low that they're not going to be able to get their $10 million in damages.

THE COURT:  Response?

MR. RIFKIN:  Yes, Your Honor.

First, on this question of 7.5 percent versus 75 times 0.1 percent, the four million accounts that Mr. Swanson just referred to are those accounts that fall within the -- the 5-percent interval that is the result of the 95-percent confidence level.  It's not a challenge to the 95-percent confidence level.  It's just where within that 95-percent confidence level any one individual account might fall.

And the aggregate number, which is the number to which Professor McFadden will testify at trial, is materially the same whether you do a 7.5 percent sample or 75 -- or the average of 75 0.1 percent samples.

But if the Court accepts Professor McFadden's model as accurate and reliable, because it hasn't been demonstrated otherwise, then when he runs his damages model before trial -- now, he already has run his damages model for the Music, Games and Entertainment genres -- 70 percent of the commerce on the App Store using all transactional data, billions of

transactions through August of 2022 -- when he runs the damages model against the entire database of all the transactions for all of the app genres that Apple will have to produce before trial, when it supplements his -- his -- when Apple supplements its document production and he runs his model against that database, which he will do before trial, we will have a final list of all those accounts that are harmed, all those accounts that are unharmed, and then as the Court has already said, Professor McFadden has proposed -- and that's using a common method of identifying harmed and unharmed accounts that's applicable to all the accounts in the database.  And then as the Court has already recognized, Professor McFadden has proposed a reliable methodology for tracing those individual accounts and aggregating them to specific class members so that we will automatically be able to identify class member by class member not only which class members have been harmed in the aggregate but also by how much.

THE COURT:  Okay.

MR. RIFKIN:  So if I can now --

THE COURT:  So let me --

MR. RIFKIN:  I'm sorry.  Did you have a question, Your Honor?

THE COURT:  No.  I wanted to move on.

MR. RIFKIN:  Yes.  I was about now to move on to the question of Dr. Abrantes-Metz.

And so the Court said in its original decision that Professor McFadden lacked the requisite expertise in transaction pricing and in platform economics to be able to render a reliable opinion on the but-for commission rate, and so we've substituted Dr. Abrantes-Metz, whom no one debates has the exact expertise in transaction platforms -- transaction pricing and platform economics.

She has used an economic equation to construct the but-for commission rate that every one of Apple's experts has agreed is useful as a tool for economists, applies fully to the App Store, and applies fully to the but-for world.  They disagree about its reliability for predicting what the but-for commission rate would be, but no expert has identified any authoritative text that says it can't be used.

So this is a quintessential difference of opinion between sets of experts as to whether the economic modeling Dr. Abrantes-Metz has done is or is not -- does or does not yield results that are reliable.

The issue about the Microsoft margin costs is one that I was glad to address, and I'm thankful that Mr. Swanson raised it.

Dr. Metz had available to her an internal Microsoft document that was produced during the litigation before she rendered her opinion.  And in it, it reported a number of marginal cost data.

One was the marginal cost data for the Microsoft Store, and then there were marginal cost numbers that were included in the Microsoft internal document for dozens of other companies, including Epic and Apple.

And Dr. Metz had that real-world data available to her, and she constructed her model from the marginal costs that the Microsoft Store reported for itself. And when she was asked to explain why she used that, she gave a number of cogent reasons, one of which was she believed it was a close competitor in the sense that it resembled what she believed a real-world competitive environment would look like for the Apple App Store. And she also explained that she trusted Microsoft to know and accurately report its own marginal cost data.

Now, you may recall from before we took the break, I made the point that in most cases, economists don't have real-world marginal cost data. They have to estimate it. Here, we actually had at least some data, and the data that we had that Dr. Metz believed was most reliable was the Microsoft data.

She chose not to use any marginal cost data that was included in the Microsoft internal report for companies other than Microsoft for the very cogent reason that she believed that Microsoft did not have sufficient knowledge to know the marginal costs of other app stores reliably, and, in fact, she even pointed to some as examples. One was Epic.

The marginal cost reported by Microsoft for Epic in its

report was something on the order of 20 or 30 percent, but we knew from the Epic trial and from Your Honor's 200-page decision in that case that Epic had a negative marginal cost. And so she knew that that was not reliable.

The Microsoft document also included margin information for the App Store, and I believe -- and I don't have the number directly in front of me -- but I believe that they used approximately 47 percent, something like that for the margin in the App Store.  But we know from the Epic trial that Apple's real margin on the App Store was much greater than that.

And so Dr. Metz prudently said, "I can rely on this as data we don't usually have.  I'm glad to have it, but I can't rely on more than the Microsoft data because the rest of it is knowingly unreliable.  I know it to be incorrect."

Mr. Swanson said -- and, by the way, Your Honor, yes, Professor Metz -- Dr. Metz -- I keep making the same mistake -- Dr. Metz used essentially the same methodology to calculate the but-for commission rate in the App Store that Professor Economides used to calculate the commission rates in the developer case.  There is -- I don't think there is any debate about that.

Professor Economides had a slightly different task in front of him than professor -- than Dr. Metz.  Mr. Swanson said that Professor Economides modeled two tiers of commission rates because Apple has two tiers in its App Store.  I think he made

a misstatement.  I don't believe he intended to, but that's not what Professor Economides did.

He modeled different rates for apps and for IAP because he believed they would be priced differently, not because Apple charges different commission rates for apps than it charges for IAP.  It really is -- again, it's a point that's hardly worth mentioning, but I wanted to make sure the Court understood that Professor Economides was not modeling two tiers of prices because Apple charges two tiers of commissions.  It's simply because he believed that there would be two different prices, one for apps and one for IAP.

THE COURT:  Okay.

MR. RIFKIN:  That's all I have to says unless Your Honor has any more questions on Dr. Abrantes-Metz.

THE COURT:  No.  We are going to move to the class certain.

MR. RIFKIN:  Okay.

THE COURT:  Ms. Richman.

MR. RIFKIN:  Your Honor, did you want to hear the other side first?  Or did you -- well, I guess I'm staying so it doesn't matter.

THE COURT:  You're staying so it doesn't matter. Ms. Richman is arguing the class cert.

MR. SWANSON:  Can I just make one clarification -- no. Okay.

THE COURT:  Ms. Richman, come on forward.

MS. RICHMAN:  Thank you, Your Honor.

THE COURT:  So, look, I've already done one round of this.  I have zero interest in hearing argument on things that I've already addressed.

I started with the *Dauberts* because these kinds of cases, as we all know, are expert-heavy and the objections to the revised expert opinions are the focus, it seems to me, of any class certification.

So what else, then -- and I'm not -- I'm not going to spend a ton of time.  I have a patent trial conference after you all, so I want to make sure to give you some time to argue, but what is the -- you know, if you had to make three points, what is it that you want to make in terms of opposing the motion, given that I've already -- you know, each of the components -- many of these things aren't really disputable.

MS. RICHMAN:  Yes, Your Honor.  Thank you.

I think, as you noted, Mr. Swanson did a lot of the heavy lifting today.  I would just say, though, that even if Professor McFadden's model is determined to be admissible as *Olean* said, not all admissible expert evidence is capable of resolving classwide issues in one stroke, which is the law in the Ninth Circuit.  And *Olean* noted that courts have frequently found that expert evidence, while otherwise admissible under *Daubert*, was inadequate to satisfy the prerequisites of Rule 23

for, among other reasons, where the evidence contained unsupported assumptions or where the evidence --

THE COURT: That all goes to the *Daubert*, it seems to me.

MS. RICHMAN: Your Honor, my point is just that even if it's admissible, you can still consider these arguments in connection with Rule 23. That's Footnote 9 of *Olean*.

But I think --

THE COURT: Okay. That's a stretch today in this case, but go ahead.

MS. RICHMAN: Well, Your Honor, I think the elephant in the room here, the thing that hasn't been discussed that you mentioned from -- at the outset is the fact that the putative class contains a great number of uninjured class members, and, therefore, individual issues will predominate.

This is an --

THE COURT: So what is -- so let's make sure we're talking about the same thing.

The defendant -- or the plaintiffs say what, Mr. Rifkin? I thought you said that this approach, you have 95 percent confidence. That would suggest 5 percent non-confidence.

MR. RIFKIN: Well, what -- what the 95 percent --

THE COURT: So a 5 percent error rate.

MR. RIFKIN: The 95-percent confidence level is the gold standard of statistical analysis --

THE COURT:  5 percent error rate.  No?

MR. RIFKIN:  Well --

THE COURT:  95 is not 100.

MR. RIFKIN:  It doesn't actually -- technically that's whatnot the 95-percent confidence level means.  It doesn't talk about error rates.

MS. RICHMAN:  Your Honor --

MR. RIFKIN:  It talks about -- okay.  I'll -- I'll stop there.  It's --

THE COURT:  He's not a hundred percent confident.  He cannot come in here and tell me that he is 100-percent confident that when he runs the entire model with all the data that you just said he going to do before trial, that 100 percent of those accounts are going to be -- are going to have damages.

MR. RIFKIN:  Correct.

THE COURT:  Okay.  So that's all I'm saying, Mr. Rifkin.

MR. RIFKIN:  I'm sorry.  I misunderstood your question.

    Yes.  That's correct.

MS. RICHMAN:  But I think, Your Honor, we're actually talking about two different things because Professor McFadden, under his confidence intervals, he predicts that between 17 to 20 percent of Apple ID accounts are uninjured.

**ER-216**

THE COURT: Okay. So let's --

MS. RICHMAN: So this is a different issue.

THE COURT: Let's talk about that. 17 -- and I wanted to make sure I had the correct number, which is what I thought I was asking but perhaps not. 17 to 20 percent, you agree that's what his prediction is.

MR. RIFKIN: No.

THE COURT: No?

MR. RIFKIN: No.

THE COURT: How can this not be something that is knowable? Give me a paragraph number of the report where he says 17 to 20 percent.

MS. RICHMAN: McFadden says in his supplemental declaration in Figures 6 and 7 that over 30 million accounts, between 17 to 20 percent --

THE COURT: I want to get this, Ms. Richman. I mean, we cannot be -- this can't be a disputable fact. We may not agree --

MS. RICHMAN: Your Honor --

THE COURT: I'm looking at 679-1. Is that what I'm supposed to look at, his revised supplemental report dated January 19th?

MS. RICHMAN: Yes, Your Honor, at Figure 6 and 7.

THE COURT: What page, ECF page?

And can you tell me the green that's on here, Mr. Rifkin,

**ER-217**

what does the green highlight represent?  Changes to the report?

MR. RIFKIN:  Yes, Your Honor, that's correct.

MS. RICHMAN:  Is that changes, Mr. Rifkin, or is that the confidential information?

THE COURT:  Is the blue confidential?

MR. RIFKIN:  Just a moment, Your Honor.  We'll confirm that.

THE COURT:  All right.  And what ECF page am I looking for?

MS. RICHMAN:  Your Honor, I think page 32.

THE COURT:  Page 32.

MS. RICHMAN:  Figure 6.

THE COURT:  Page 32 of 80?

MS. RICHMAN:  Of 73 on my version, which is the one that was originally filed with his report.

THE COURT:  Okay.  Are you looking at an ECF number or a page number of the report?

MS. RICHMAN:  I'm looking at a page number.

THE COURT:  All right.  Hold on.

MR. RIFKIN:  Your Honor, it's just -- I think you're referring to the ECF number.  It's page 39 of 80.

THE COURT:  Correct.  I have it now.

MR. RIFKIN:  There is a table at the top.

THE COURT:  All right.  So he says -- and this is from

**ER-218**

him?

**MR. RIFKIN:**  Correct.

**THE COURT:**  That without the $10 spending cutoff, unharmed IDs are 17.8 percent.  You're not disputing that.

**MR. RIFKIN:**  No.  That's what he says.

**THE COURT:**  But with the $10 spending cutoff, we cut that down to 7.9 percent.

**MR. RIFKIN:**  And that's what I meant when I said "no."

**THE COURT:**  Okay.

**MR. RIFKIN:**  Because that's the proposed class, is --

**THE COURT:**  Is the 7.9.  So that's the focus.

**MR. RIFKIN:**  Correct.

**THE COURT:**  Let's focus on 7.9.

Go ahead, Ms. Richman.

**MS. RICHMAN:**  Well, Your Honor, I think there is a question as to whether the $10 cutoff is being applied.  The plaintiffs do persist in arguing that even as originally defined --

**THE COURT:**  I don't understand that the class that they are asking me to -- I understood the class that they are asking me to certify are those that do not include that anybody with -- who are under the $10 spending cutoff.  That was my understanding.

So lines 4, 5, and 6 of Figure 6, that's what I'm looking at.  So I don't know why I would talk about the 17.8 at all.

**ER-219**

It's not an issue.

MS. RICHMAN:  Well, Your Honor, that wasn't entirely clear test, I would say, because they also say --

THE COURT:  Ms. Richman, stop.

Yes, am I right or am I wrong?

MR. RIFKIN:  Yes, you are right.

THE COURT:  All right.

MS. RICHMAN:  Okay.

THE COURT:  All of that is no longer an issue, and it's what I understood.  Okay.

7.9 percent.  You can proceed with that as the common understanding of what the unharmed accounts are.

And, again, as I understand it, by the time we go to trial, there will be -- that 7.9 percent will be eliminated once all of the -- once everything is run.  Again, that's my understanding.  Am I wrong?

MR. RIFKIN:  No, Your Honor, you are correct.

THE COURT:  Okay.

MS. RICHMAN:  That is a perplexing statement to me, Your Honor, because, first of all, we don't know how many uninjured will be when the model is run across the entire class.  There are 23 genres that we don't even know the margin.

THE COURT:  That's why I am sure I will see another motion, Ms. Richman, but right now what I have sitting in front of me today is an analysis which indicates that under this

model, unharmed accounts are 7.9 percent.

MS. RICHMAN: Yes, Your Honor. And that equates to over 10 million accounts.

THE COURT: But there is nothing in -- predominance doesn't look at -- well, go ahead. Make the argument.

MS. RICHMAN: Thank you, Your Honor.

I think what you were going to say is predominance doesn't necessarily turn on the number of uninjured accounts. There is no *de minimis* threshold. The Ninth Circuit rejected that in *Olean*. And so what the analysis is, though, under *Olean* is whether the individual issues are going to predominate.

THE COURT: Right. And they're going to predominate, at least under this, for 91 percent. 91 percent. That's not a bad percentage in terms of predominance, with the understanding that it's going to get even more certain before trial.

MS. RICHMAN: Well, Your Honor, I don't think that's true at all.

THE COURT: Well, then I guess --

MS. RICHMAN: I think what they are saying is they want to expunge the uninjured from the class, expunge the uninjured accounts, which is basically creating a failsafe class. It's not possible --

THE COURT: That could be a problem --

MS. RICHMAN: -- under *Olean*.

THE COURT: That could be a problem, too.

MS. RICHMAN:  I think no matter how you slice it, 10 million accounts, 7.9 percent uninjured is astonishingly high. I'm not aware of any case where the plaintiffs have conceded injury of at least 7.9 -- non-injury of at least 7.9 percent and a class has been certified.

There are certainly cases where there has been dispute between the parties, like in *Olean*, like in *Google* where the dispute is that plaintiffs come forward and they say a hundred percent is injured --

THE COURT:  How is it -- I mean, in some ways what you're arguing is that, you know -- is that Apple's too big to be held accountable, and that I don't buy as a perspective. It's only that big because you're big, because you're so many customers.

MS. RICHMAN:  Yes, Your Honor.  And I don't think that's the argument that we're making.

This is kind of the same issue that's on appeal in the *Google Play* case where there are, you know, tens of millions of potentially uninjured there.

The question that the Court needs to focus on is, you know, what is the trial going to be like.  Are individual issues going to predominate.  And what we've heard during the last hearing and today is that there is no intention to identify injured and uninjured individuals before the -- before trial.  That's something that is going to be shunted to a

post-liability phase.

THE COURT:  I -- we have -- okay.  Let's be -- let's walk through this because I thought I made very clear that that would not be tolerated, and I thought that Mr. Rifkin tried to address that topic and has told me that the model is being run in advance.  So let me ask this question.

Assuming, for purposes of argument, that a class is certified, you all have talked about that you're getting additional discovery.  When are you finished?  How much more time do you need?  This case is on my very old records report.

MS. RICHMAN:  I think, Your Honor -- I don't recall the exact window, but I think it's sometime 60 days to 90 days after you issue your class certification.

THE COURT:  I looked.  I don't have an order in this case.

MR. RIFKIN:  We believe that Ms. Richman is correct.  We understand that fact discovery is cut off 60 days after --

THE COURT:  Give me an order number or a case number.

MR. RIFKIN:  It's Document No. 640.

THE COURT:  640.

MR. RIFKIN:  And --

THE COURT:  Hold on.  Let me get it.

MR. RIFKIN:  Yeah.  Of course.

THE COURT:  Okay.  So final reports 60 days after the decision --

**MR. RIFKIN:** I'm talking about -- it's line 23 on the numbered lines.

**THE COURT:** But final reports -- two lines down. So you have 60 days to complete fact discovery after class cert. But also you have to have your final reports done 60 days after a decision on class cert.

**MR. RIFKIN:** That's correct, Your Honor.

**THE COURT:** And then -- so I am assuming -- let's say, for purposes of argument, I issued this decision on July 1st, which, by the way, that will not happen, but just letting -- just for purposes of argument. That means that -- and, again, assuming 30 days approximately, that between that day and September 1st, this entire model is going to be run and a new report is going to issue and you are going to tell me exactly who is in the class and who's not in the class.

In this expert report, I would expect an updated report. I would expect that all of these developers from whom you're getting information, all of that is going to be incorporated into all of these reports. All of these things are going to happen in 60 days.

Then you get -- 45 days after that rebuttals, 30 days to take your depositions, and then I get the final round of dispositive and *Daubert* motions. And if it doesn't -- if it did not satisfy, I'm assuming that I would also get a motion to decertify.

MR. RIFKIN: Right. And, Your Honor, yes that's what the order says, but I -- I have -- my paper copy has this big blue sticky on it, and it very pleadingly says "please get more time." And I would like to explain the reason for that, if I may.

We have learned since Your Honor set this schedule and since we began the process of doing all the revised calculations to generate these updated reports that the computer processing time for the database we already have is something on the order of several weeks, not several days and certainly not several hours. It literally takes the computer two or three weeks to run the regression on the database because the database is so massive.

Apple needs to update the data that it has provided to us to account for the year that has transpired since it last produced data.

Once we get that data, we will conduct the analysis for the entire class, and we will do so before trial, but it cannot be done --

THE COURT: Well, you have to do so, not before trial, but for purposes of these reports because if it is not in the report, you do not get to put it on at trial.

MR. RIFKIN: We agree and we recognize that and we -- and we will abide by it, except I'm asking the Court to give us some extra time between when fact discovery ends and when

these -- when these final reports are due because this -- this provided that they would be due at the same time.  That's unworkable.

And what we would like is we would like a 90-day interval between when fact discovery is over and when the expert reports have to be delivered.  That's purely -- it's purely a function of the computer processing time that's necessary --

**THE COURT:**  How long does it take?

**MR. RIFKIN:**  Literally two or three weeks to run the data.  And that's on the dataset as it exists now.

The dataset that will be the final dataset based upon the supplemental data that Apple will have to produce to us before the discovery cutoff will be even larger and so it will take even longer.

And then there is a process of quality control that we have to undertake, and unfortunately that, too, takes computer time.  It's not even human time.  It's machine time to process billions and billions and billions of calculations.

And so what we would ask for is to have discovery -- fact discovery cutoff 60 days after the decision on class certification and then to have our expert report due 90 days after the close of fact discovery.

We believe that is a workable timeline, and we believe that although it's 90 days later than what this order contemplates, given the reality of the analysis that needs to

be done, it's certainly a reasonable amount of time.

THE COURT:  Ms. Richman.

MS. RICHMAN:  Your Honor, I'd like to return to the issue at hand, which is whether the class should be certified. And one thing that Mr.--

THE COURT:  The question we were having -- you were making some assertions about what I would know and what I --

MS. RICHMAN:  Well, I'm going to read to you from their -- their class certification motion.  "Now that" --

THE COURT:  Hold on.  Let me get it.  Give me a page and line number.

MS. RICHMAN:  Page 18, line 1.

THE COURT:  Hold on.  All right.

Do you have that in front of you, Mr. Rifkin?

MR. RIFKIN:  No, I do not.

THE COURT:  Lines 1 through 4.

MR. RIFKIN:  I have it now.

THE COURT:  Read lines 1 through 4.

MR. RIFKIN:  Correct.  Correct.  I've read them.

THE COURT:  Okay.  So what do you mean when you say that these -- "matching will take place after trial"?

MR. RIFKIN:  So the regression model calculates damages on the individual Apple ID basis account by account, apple ID by Apple ID by Apple ID.  Those accounts need to be matched to individual class members, people, so the IDs need to

be matched to people, and we know that there are three or four times as many accounts as there are people, so about 130 or so million people and there are about 400 or 427 or so million Apple IDs.  So we need to match those accounts to people and net out the -- the accounts that have damages and the accounts that don't have damages per person.

And we addressed this at the original round of class certification, and we explained to the Court that that's how we would do it, and we understood that the Court was satisfied with that.  If the Court wants us to do that matching before trial, we'll do that matching before trial.  That is a -- that is a simple mechanical process that will aggregate the accounts and match them to individual class members.

All we need from Apple is the data that first they said didn't exist but Your Honor found that it did, and then we need them to produce it because they refused to produce it.

So those two things have to happen before we can do that mechanical process.  First they have to produce the data they said doesn't exist and then we have to run the mechanical matching to do.

It.  We're happy to do that whenever the Court wants it done.  If Your Honor wants it done before trial, we will do it before trial because we will have done the damages calculation account by account by account before trial.  And that's the basis on which the matching will be done.

If the Court wants that done before trial, then we will need a little bit more time to produce the expert report. Your Honor, if you want it in the expert report, then as I said, we need two things:  We need the data from Apple and a little bit more time to do that matching.  But all that is is mechanical computations.

THE COURT:  Ms. Richman.

MS. RICHMAN:  Your Honor, it's not mechanical computations.  This is an issue that has been briefed in the current round.

What we understood Your Honor to have held in your order is that the process for linking accounts -- you refused to exclude that on *Daubert* grounds but that you were reserving on the question of trial.

I don't understand how we can certify a class when we actually have no idea at this point how many individuals are injured and how many are not.

THE COURT:  This is a new world and I have one more round to go.

MS. RICHMAN:  Yes, Your Honor.

THE COURT:  So listen to me, Ms. Richman.  It is a new world.  And I do try these cases.  And it seems to me the logical way to proceed is that if everything else is appropriate and I can certify a class, then I intend to do so, and then they are going to have to spend the money and you are

going to have to give them that additional data, and they are going to -- and they are going to have to run all these things. And then I'm going to have to look at it again and decide whether it's sufficient or not.  And if it's not, the class will be decertified.

MS. RICHMAN:  Your Honor, who is the class notice being sent to in this case?  We don't know individuals who are in the class.  We know that there are --

THE COURT:  They are going to be individuals -- we never send notices in these kinds of cases to Ms. Richman, Mr. Swanson, Mr. Rifkin.  We never do that.  What are we going to do?  We're going to have notices that go out in banners, in platforms, in all sorts of appropriate ways to let people know that they are potentially a member of a class.  We're going to do it the way we always do it, every single class.  We are going to do it that way.

MS. RICHMAN:  Your Honor, we'll have to do that in connection with the accounts, and some of those accounts, 20 percent --

THE COURT:  Do it globally.  We will do it globally.

MS. RICHMAN:  So for accounts that have zero or negative damages --

THE COURT:  We always say "you may" or "you may not."

So I can tell you, I am not going to be a member of this class even though I have an iPhone.  Why?  Because I don't

spend a dollar, not a single dollar.  So I'm going to be underneath that $10 limit.

MS. RICHMAN:  I understand, Your Honor.

You know, it doesn't solve the question, I think, of whether common issues predominate here --

THE COURT:  But predominate is an issue and a function under *Olean* of -- right now the question to me is I am looking at a model -- and, again, I still have to go back, I have to consider everything that Mr. Swanson argued.  But assuming for purposes of argument as we stand here, I'm looking at a model that says 7.9 percent, and I am being told that by the time I get to trial, that number is going to be closer to zero --

MS. RICHMAN:  Your Honor, there is no evidence of that.  We have no idea.  If anything, it's going to grow between now and trial.

THE COURT:  Then I guess that's the point of the next round, isn't it?

MS. RICHMAN:  No.  No, Your Honor.  It's the point of this round.  It's the district court's obligation to resolve disputed -- disputed expert evidence and conduct --

THE COURT:  Right.  And 7.9 -- 91 percent, 91 percent of -- I would say at 91 percent, you know, there's a pretty good argument that predominance is satisfied.

MS. RICHMAN:  That would be unprecedented, Your Honor, to certify --

THE COURT:  You have no cases given this context that -- give me cases.

MS. RICHMAN:  Well, we'll find out soon enough when the Ninth Circuit evaluates the *Google* decision.  But the Ninth Circuit in the *Van* case just five weeks ago decertified a class where there was evidence that 18 of 13,680 discounts --

THE COURT:  What's the percentage?

MS. RICHMAN:  0.13 percent.

THE COURT:  Okay.  Give me that case.

MS. RICHMAN:  It's *Van vs. LLR* -- we submitted a letter --

THE COURT:  This will be better.  This is what I want from you all.

I want a brief that has zero argument.  Zero.  Do you understand me?  Zero argument.  I want case names and parentheticals identifying either the percentage where class is not certified or where class is certified; right?  I'm trying to figure out what does *de minimis* mean.  So you can give me in a parenthetical percentage numbers or you can give me, you know, fixed numbers, right, actual numbers.

MS. RICHMAN:  Yes, Your Honor.  We'd be happy to do that.  And I do have the Westlaw cite for the *Van* case if you would like that now.

THE COURT:  No.  I want it in a brief.

So what did I say?  How many pages do you get?  No more

**ER-232**

than five pages.

MS. RICHMAN:  That sounds fine, Your Honor.

THE COURT:  So I want you to do my research for me because you have many more lawyers than I have.

MS. RICHMAN:  That's our job.

THE COURT:  So all I'm looking for are percentages on either side of the -- of the analysis in terms of certification versus non-certification.

Ninth Circuit cases, I can tell you right now, have the most weight or Supreme Court.  Circuit courts and district courts -- other circuit courts and district courts can be identified but are not, obviously, binding.

All class certification motions.

MS. RICHMAN:  Thank you for that opportunity, Your Honor.

THE COURT:  But, in my view, that's, you know -- the only way I know to be fair to the process is to let the process work, and there is a lot of money on the line and a lot of money that the plaintiffs' lawyers, you know, will have to spend to get to a point before it ever gets to -- before it ever gets to trial.  But there's no point in them spending that money if I'm going to throw it out; right?  There's no point in them spending that money if I'm not going to certify in the first instance.

So it is a half step, as far as I'm concerned, because

**ER-233**

there's one more step to go, but I don't know that I can just ignore the -- and I don't think I can.  I have to let this play out; at least, that's where my head is.

So other things you want to argue?

MR. RIFKIN:  Your Honor, I just very briefly wanted to point you to another page in the Professor McFadden's report.  And I'm trying to look for the exhibit number.

I'm sorry.  The number -- it's Figure 7?  What's the ECF number?  I think it's 706-1.  679.

Your Honor, in Exhibit 679, Figure 7, also presents the percentages of uninjured with the imposition of price tiers and focal pricing.  I wanted to make sure Your Honor had that in front of you so that you know the full dataset.  I didn't get a chance to mention it earlier.  I wanted to do that.

We will -- we believe we have and we believe we can adhere to the Ninth Circuit -- to the Ninth Circuit's standard which requires a reliable method to identify who the -- who the uninjured class members are.  I've already explained how and why.  I've asked the Court if the Court wants it all done, not just the uninjured accounts but also the uninjured class members, I've also explained that we need a little bit more time to do that.  And I will briefly mention two cases that will be on our list.  One is *Olean*, where 5.2 percent --

THE COURT:  Well, I've already read *Olean*.

MR. RIFKIN:  Okay.  So Your Honor knows that 5.2

percent of the class members were uninjured in that case, but that did not -- certainly did not stop the court from certifying.

THE COURT:  But we also didn't have millions of potential -- right?  This is a different case, Mr. Rifkin, and you need to remember that.  This is a different kind of case.

MR. RIFKIN:  Your Honor, it was the purchasers of tuna fish.  There were hundreds of millions of purchasers of tuna fish in the *Olean* case.

And, in any event, we will comply with Your Honor's direction to provide the authority that you've asked for.  That's certainly one of them.

MS. RICHMAN:  Your Honor, at the risk of trying your patience, which I fear is already tried, in *Olean* the plaintiffs' experts offered a model that showed injury to a hundred percent of all the classes.  There were robustness checks conducted that showed some diminishment in those numbers, but the plaintiffs were proffering the opinion that all or nearly all of the members of the class were injured.

This is a very different case where off the bat, we're talking a minimum of 7.9 percent, and that's before we even get to adjustments related to the -- all the failures with Professor McFadden's model that Mr. Swanson identified.

THE COURT:  Well, I don't know that I agree with all of Mr. Swanson's arguments.  I know that that upsets him.  As

you said, maybe he'll want to cry.

MS. RICHMAN:  I know.  I know.  I think I'm going to owe him a drink after today.

But, Your Honor, just to follow up on one of the requests that Mr. Swanson made -- and perhaps you need some time to think about this -- but does Apple have leave to file its reply, its *Daubert* reply brief?

THE COURT:  All right.  You may.

MS. RICHMAN:  Thank you, Your Honor.

MR. RIFKIN:  Your Honor, to the extent that Apple intends to raise new arguments or new evidence, we would certainly like the opportunity to ask for permission to file a short surreply.

THE COURT:  You can ask.

MR. RIFKIN:  Yes.  I understand you haven't granted that permission yet.  Thank you.

THE COURT:  Does Apple want to be heard on the timing issues that Mr. Rifkin has raised in terms of my last scheduling order?

MS. RICHMAN:  Your Honor, I think it may make sense for the parties to confer separately on a schedule for moving forward.

THE COURT:  I'd like you to confer now.

MS. RICHMAN:  Okay.

THE COURT:  So I'll give you a week.

MS. RICHMAN: Oh, I'm sorry. I thought you meant for the duration of the case.

THE COURT: I am talking about the duration of the case. And I'd like you to -- just like this order, you know, had deadlines that were teed off a decision, this controls unless I have something else. So they have asked for more time. You can assume, for purposes of argument, if a class is certified, I'm going to want everything done, including the identified -- the identification of those individuals.

MR. RIFKIN: Yes, Your Honor. Thank you for the guidance.

THE COURT: All right.

MS. RICHMAN: A week is fine, Your Honor.

And did you set a deadline -- I'm sorry if I missed it -- for the supplemental class certification summary of the cases?

THE COURT: I think a week as well.

MS. RICHMAN: That's fine. Thank you.

THE COURT: You probably already have it written. I could say Monday; right? Let's not.

MS. RICHMAN: Thank you.

THE COURT: All right. We're adjourned. Thank you.

(Proceedings adjourned at 11:34 a.m.)

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Monday, June 26, 2023

*Pamela Batalo Hebel*
_____
Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
U.S. Court Reporter

# ATTACHMENT A

ER-239

BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
BRITTANY N. DEJONG (258766)
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
dejong@whafh.com

MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com

*Interim Class Counsel and Proposed Co-Class Counsel*

[Additional Counsel Appear on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR |
|---|---|
| | **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES** |
| | DATE:      Nov. 16, 2021<br>TIME:       10:00 a.m.<br>CTROOM:  1, 4th Floor<br>JUDGE:     Hon. Yvonne Gonzalez Rogers |

PLTFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEM. OF Ps & As
Case No. 11-cv-06714-YGR

**ER-240**

**NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION**

PLEASE TAKE NOTICE that on November 16, 2021, at 10:00 a.m. in Courtroom 1, 4th Floor of the above-entitled Court, located at 131 Clay Street, Oakland, California, Plaintiffs Robert Pepper, Stephen H. Schwartz, Edward W. Hayter and Edward Lawrence ("Plaintiffs") will, and hereby do respectfully move this Court for an order:

1. certifying the following Class:

All persons in the United States, exclusive of Apple and its employees, agents and affiliates, and the Court and its employees, who purchased one or more iOS applications or application licenses from Defendant Apple Inc. ("Apple"), or who paid Apple for one or more in-app purchases, including, but not limited to, any subscription purchase, for use on an iOS Device at any time since July 10, 2008 (the "Class Period");

2. appointing Plaintiffs as Class Representatives; and

3. appointing Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein") and Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C. ("Kellogg Hansen") as Co-Class Counsel.

All the prerequisites and requirements for class certification are met and therefore certification is warranted. Plaintiffs base their Motion for Class Certification on: the Memorandum of Points and Authorities filed in support of this Motion; the Declaration of Rachele R. Byrd and its exhibits; the Declarations of Robert Pepper, Stephen H. Schwartz, Edward W. Hayter and Edward Lawrence; the Expert Report of Daniel L. McFadden; all other records and papers on file in this action; any oral argument and evidence that may be presented at the hearing on this Motion; and all other matters properly before the Court.

DATED: June 1, 2021

**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**

By: _/s/ Rachele R. Byrd_
RACHELE R. BYRD

BETSY C. MANIFOLD
RACHELE R. BYRD
BRITTANY N. DEJONG
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599

-1-

**ER-241**

manifold@whafh.com
byrd@whafh.com
dejong@whafh.com

MARK C. RIFKIN
MATTHEW M. GUINEY
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com

*Interim Class Counsel and Proposed
Co-Class Counsel*

DAVID C. FREDERICK (*pro hac vice*)
AARON M. PANNER
MINSUK HAN
**KELLOGG, HANSEN, TODD, FIGEL &
  FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C.  20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
dfrederick@kellogghansen.com
apanner@kellogghansen.com
mhan@kellogghansen.com

*Counsel for Plaintiffs and Proposed
Co-Class Counsel*

-2-
PLTFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEM. OF Ps & As
Case No. 11-cv-06714-YGR

**ER-242**

**TABLE OF CONTENTS**

PAGE

I.      STATEMENT OF ISSUES TO BE DECIDED ................................................1

II.     INTRODUCTION ................................................................................1

III.    STATEMENT OF FACTS ......................................................................2

        A.      Relevant Background.................................................................... 2

        B.      Sales of iOS Apps and IAP Constitute a Relevant Antitrust Market...................... 4

        C.      Apple's Market Power is Largely Derived from Significant Switching Costs and Imperfect Information.................................................. 6

        D.      Apple's Market Power in the Relevant Market Is Evidenced by Its 100% Share of the Market and Its Substantial Profit Margins ...................... 7

        E.      Apple's Purported Business Justification Is Pretextual ......................... 8

        F.      Class Members Have Been Uniformly Impacted and Suffered Damages............ 10

IV.     ARGUMENT....................................................................................11

        A.      Standards for Class Certification ........................................... 11

        B.      The Four Prerequisites of Rule 23(a) Are Satisfied............................. 12

                1.      The Class Is Undoubtedly Numerous ....................................... 12

                2.      Class Members Share Common Questions of Law and Fact..................... 12

                3.      Plaintiffs Are Typical............................................... 13

                4.      Plaintiffs Are Adequate............................................. 14

        C.      The Requirements of Rule 23(b)(3) Are Satisfied.............................. 15

                1.      Common Questions of Law and Fact Predominate ................................ 16

                        a.      Common Evidence Will Prove the Relevant Market and Apple's Power in That Market........................................ 17

                        b.      Common Evidence Will Prove Apple's Willful Acquisition and Maintenance of Monopoly Power........................................ 18

PLTFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEM. OF Ps & As
Case No. 11-cv-06714-YGR

c.    Common Evidence Will Prove Apple's Anticompetitive Conduct ........................................................................................ 19

d.    Common Evidence Will Prove Causal Antitrust Impact .............. 19

e.    The Damages Will Be Estimated Using a Common Method ....... 21

2.    Superiority ................................................................................................... 24

D.    Appointment of Class Counsel .............................................................. 25

V.    CONCLUSION ...........................................................................................25

## TABLE OF AUTHORITIES

PAGE(S)

### Cases

*Amchem Products, Inc. v. Windsor,*
  521 U.S. 591 (1997)............................................................................................ 12, 15, 16, 24

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
  568 U.S. 455 (2013)............................................................................................ 11, 12

*Apple Inc. v. Pepper,*
  139 S. Ct. 1514 (2019)......................................................................................... *passim*

*Apple iPod iTunes Antitrust Litig.,*
  2008 U.S. Dist. LEXIS 107127
  (N.D. Cal. Dec. 22, 2008) .................................................................................. 12, 13, 15, 24

*Bafus v. Aspen Realty, Inc.,*
  236 F.R.D. 652 (D. Idaho 2008) ........................................................................ 20

*Blackie v. Barrack,*
  524 F.2d 891 (9th Cir. 1975) .............................................................................. 12, 14

*Blue Shield of Va. v. McCready,*
  457 U.S. 465 (1982)............................................................................................ 20

*Bogosian v. Gulf Oil Corp.,*
  561 F.2d 434 (3rd Cir. 1977) .............................................................................. 20

*Coal. For ICANN Transparency, Inc. v. VeriSign, Inc.,*
  611 F.3d 495 (9th Cir. 2010) .............................................................................. 16

*Comcast Corp. v. Behrend,*
  569 U.S. 27 (2013).............................................................................................. 23

*Cummings v. Connell,*
  316 F.3d 886 (9th Cir. 2003) .............................................................................. 14

*Dilts v. Penske Logistics, LLC,*
  2013 U.S. Dist. LEXIS 192323
  (S.D. Cal. Jan. 17, 2013)..................................................................................... 11

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
  504 U.S. 451 (1992)............................................................................................ 17

*Ellis v. Costco Wholesale Corp.,*
  657 F.3d 970 (9th Cir. 2011) .............................................................................. 16

-iii-

**ER-245**

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ............................................................................................... 16

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ................................................................................ 16

*Giuliano v. Sandisk Corp.*,
  2015 U.S. Dist. LEXIS 193817
  (N.D. Cal. May 14, 2015) ................................................................................ 18, 19

*Glictronix Corp. v. Am. Tel. & Tel. Co.*,
  603 F. Supp. 552 (D.N.J. 1984) ........................................................................... 20

*Gonzales v. Free Speech Coal.*,
  408 F.3d 613 (9th Cir. 2005) ............................................................................... 13

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ................................................................... 13, 14, 15

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ............................................................................... 14

*Hawaii v. Standard Oil Co. of Cal.*,
  405 U.S. 251 (1972) ............................................................................................. 11

*Hunt v. Check Recovery Sys., Inc.*,
  241 F.R.D. 505 (N.D. Cal. 2007) ......................................................................... 15

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) .............................................................................. 17

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  1994 U.S. Dist. LEXIS 12652
  (N.D. Cal. Aug. 31 1994) ..................................................................................... 24

*In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*,
  276 F.R.D. 364 (C.D. Cal. 2011) ......................................................................... 23

*In re Apple & AT&TM Antitrust Litig.*,
  569 F. Supp. 2d 1288 (N.D. Cal. 2008) ............................................................... 17

*In re Blood Reagents Antitrust Litig.*,
  2015 U.S. Dist. LEXIS 141909
  (E.D. Pa. Oct. 19, 2015) ....................................................................................... 23

*In re Capacitors Antitrust Litig. (No. III)*,
  2018 U.S. Dist. LEXIS 195310
  (N.D. Cal. Nov. 14, 2018) ..................................................................................... 23

-iv-

**ER-246**

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
308 F.R.D. 606 (N.D. Cal. 2015) ........................................................................ 11

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
2006 U.S. Dist. LEXIS 39841
(N.D. Cal. June 5, 2006) ........................................................................... *passim*

*In re Glumetza Antitrust Litig.*,
336 F.R.D. 468 (N.D. Cal. 2020) ........................................................................ 16

*In re High-Tech Emp. Antitrust Litig.*,
289 F.R.D. 555 (N.D. Cal. 2013) ........................................................................ 20

*In re High-Tech Emp. Antitrust Litig.*,
985 F. Supp. 2d 1167 (N.D. Cal. 2013) ........................................................ 13, 23, 24

*In re Korean Ramen Antitrust Litig.*,
2017 U.S. Dist. LEXIS 7756
(N.D. Cal. Jan. 19, 2017) ..................................................................................... 23

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
522 F.3d 6 (1st Cir. 2008) ..................................................................................... 20

*In re Qualcomm Antitrust Litig.*,
328 F.R.D. 280 (N.D. Cal. 2018) ........................................................................ 13

*In re Rubber Chemicals Antitrust Litig.*,
232 F.R.D. 346 (N.D. Cal. 2005) ............................................................ 11, 21, 25

*In re Static Random Access (SRAM) Antitrust Litig.*,
2008 U.S. Dist. LEXIS 107523
(N.D. Cal. Sept. 29, 2008) ................................................................................... 12

*In re Static Random Access Memory Antitrust Litig.*,
264 F.R.D. 603 (N.D. Cal. 2009) ........................................................................ 23

*In re Tableware Antitrust Litig.*,
241 F.R.D. 644 (N.D. Cal. 2007) ....................................................... 12, 15, 16, 23, 24

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
267 F.R.D. 291 (N.D. Cal. 2010) ................................................................... 16, 20

*In re TFT-LCD Antitrust Litig.*,
267 F.R.D. 583 (N.D. Cal. 2010) ........................................................................ 23

*In re Vitamins Antitrust Litig.*,
209 F.R.D. 251 (D.D.C. 2002) ............................................................................ 16

-v-

**ER-247**

*Johnson v. Ariz. Hosp. & Healthcare Ass'n*,
  2009 U.S. Dist. LEXIS 122807
  (D. Ariz. July 14, 2009) ........................................................................................ 23

*Kanawi v. Bechtel Corp.*,
  254 F.R.D. 102 (N.D. Cal. 2008) .......................................................................... 19

*Leyva v. Medline Indus., Inc.*,
  716 F.3d 510 (9th Cir. 2013) ................................................................................. 21

*Little Caesar Enters. Inc. v. Smith*,
  172 F.R.D. 236 (E.D. Mich. 1996) ........................................................................ 22

*Moore v. Jas. H. Matthews & Co.*,
  682 F.2d 830 (9th Cir. 1982) ................................................................................. 21

*Newcal Indus., Inc. v. Ikon Office Solution*,
  513 F.3d 1038 (9th Cir. 2008) ......................................................................... 13, 17

*Nitsch v. Dreamworks Animation SKG Inc.*,
  315 F.R.D. 270 (9th Cir. 2016) .............................................................................. 14

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) ..................................................................................... 17, 18

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
  2019 U.S. Dist. LEXIS 169446
  (N.D. Cal. Sep. 20, 2019) ...................................................................................... 23

*Pecover v. Elec. Arts, Inc*.,
  2010 U.S. Dist. LEXIS 140632
  (N.D. Cal. Dec. 21, 2010) ...................................................................................... 14

*Reiter v. Sonotone Corp.*,
  442 U.S. 330 (1979) ............................................................................................... 11

*Ruiz v. XPO Last Mile, Inc.*,
  2016 U.S. Dist. LEXIS 152095
  (S.D. Cal. Feb. 1, 2016) ......................................................................................... 11

*Shaffer v. Cont'l Cas. Co.*,
  2007 U.S. Dist. LEXIS 96189
  (C.D. Cal. Jan. 26, 2007) ....................................................................................... 19

*Stockwell v. City and County of San Francisco*,
  749 F.3d 1107 (9th Cir. 2014) ..................................................................... 11, 12, 16

-vi-

PLTFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEM. OF Ps & As
Case No. 11-cv-06714-YGR

*Sullivan v. Nat'l Football League,*
  34 F.3d 1091 (1st Cir. 1994) ........................................................................................... 20

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.,*
  209 F.R.D. 159 (C.D. Cal. 2002) ..................................................................................... 14

*Thompson v. Clear Channel Commc'ns, Inc.* (*In re Live Concert Antitrust Litig.*),
  247 F.R.D. 98 (C.D. Cal. 2007) ................................................................................. *passim*

*Valentino v. Carter-Wallace, Inc.,*
  97 F.3d 1227 (9th Cir. 1996) ........................................................................................... 24

*Wal-Mart Stores, Inc. v. Dukes,*
  564 U.S. 338 (2011) ......................................................................................... 11, 12, 13

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
  395 U.S. 100 (1969) ......................................................................................................... 20

**Statutes**

15 U.S.C. § 2 ................................................................................................................... 1, 13

**Other Authorities**

6 A. Conte & H. Newberg, NEWBERG ON CLASS ACTIONS (4th ed. 2002) ........... 11, 12, 14, 17, 22

**Rules**

Federal Rules of Civil Procedure ("FRCP") 23 ................................................................... *passim*

PLTFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEM. OF Ps & As
Case No. 11-cv-06714-YGR

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    STATEMENT OF ISSUES TO BE DECIDED

a)    Whether the Court should certify the Class pursuant to the Federal Rules of Civil Procedure ("FRCP") 23(a) & (b);

b)    Whether the Court should appoint Plaintiffs Class Representatives; and

c)    Whether the Court should appoint Wolf Haldenstein and Kellogg Hansen as Co-Class Counsel.

### II.    INTRODUCTION

Plaintiffs bring this class action pursuant to Section 2 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 2 (the "Sherman Act"), on their own behalf and on behalf of persons who bought software applications ("apps") or licenses for apps from Apple or paid Apple for in-app purchases,[1] including subscription purchases, on the "App Store," which is entirely owned and operated by Apple, for use on one or more iPhones, iPads, or iPod Touches ("iOS Devices"), at any time since the App Store opened on July 10, 2008. TAC ¶ 1.[2]  Plaintiffs allege that Apple unlawfully monopolizes the retail market for the sale of apps, including IAP, and uses its monopoly power to charge consumers supra-competitive prices for apps and IAP. *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1518 (2019). This "is a classic antitrust claim." *Id*. at 1519.

Plaintiffs challenge Apple's decision to *require* its customers to buy apps and pay for IAP for their iOS Devices *only* from Apple, which monopolizes the aftermarket for iOS apps and IAP. Eddy Cue, a senior Apple executive admitted that Apple tries "to get people *hooked to the [iOS] ecosystem*." Byrd Decl., Ex. B (emphasis added). Apple's CEO, Tim Cook, recently admitted that Apple tries to avoid competition from developers and other app stores: if other app stores were allowed to compete with its App Store, Apple would "have to differentiate [its App Store] in some

---

[1] "In-app purchases" ("IAPs") are purchases made within applications, such as payment for additional application features, full versions of games, and subscriptions for access to content and membership. Third Amended Complaint ("TAC"), ¶ 4.

[2] "iPads" include all iPad Pro, iPad Mini and iPad Air models as well as standard iPads. TAC, ¶ 1, n.1. iPads use the "iPadOS" operating system. Declaration of Rachele R. Byrd in Support of Plaintiffs' Motion for Class Certification ("Byrd Decl."), Ex. A, 315:21-316:18. Both iPadOS and the operating system used on iPhones and iPod Touch will be referred to as "iOS" because there are no relevant differences between iOS and iPadOS.

-1-

**ER-250**

way." *Id.*, Ex. C, 3934:23-3935:1.

Plaintiffs now seek certification under FRCP 23(a) and (b)(3) on behalf of the following Class of consumers:

> All persons in the United States, exclusive of Apple and its employees, agents, and affiliates, and the Court and its employees, who purchased one or more iOS apps or app licenses from Apple, or who paid Apple for one or more in-app purchases, including, but not limited to, any subscription purchase, for use on an iOS Device at any time since July 10, 2008.

The case easily meets all the requirements for class certification. The Class consists of millions of Apple customers; Plaintiffs' claims are typical for all other Class members; Plaintiffs are adequate class representatives; and Class members share many common questions of law and fact. The overwhelming predominant common questions in this case include: (1) whether the aftermarket for iOS apps and IAP is a relevant market and whether Apple has power in that market; (2) whether Apple willfully acquired or maintained monopoly power in that market; (3) whether Apple has engaged in anticompetitive conduct; (4) whether Apple's monopoly has caused antitrust injury to Plaintiffs and all other members of the Class; and (5) if so, what measure of damages is proper.

## III.    STATEMENT OF FACTS

### A.    Relevant Background

Apple launched the iPhone in June 2007. It designed and built the iPhone's operating system, known as "iOS," to enable iPhone users to send and receive calls; download, install, and run computer-like software programs (called "applications" or "apps") to browse the Internet; transform music into cell phone ringtones; take photos; play games; and engage in other functions typically performed on desktop or laptop computers. TAC, ¶ 2. On September 14, 2007, Apple introduced the iPod Touch, a device similar to the iPhone without telephony, which also operates on iOS and runs apps that also run on the iPhone. *Id.*, ¶ 3. On April 3, 2010, Apple introduced the iPad, a tablet computer with a touch screen interface, utilizing the same iOS as the iPhone and iPod Touch and able to run apps that function on those devices as well. *Id.*

Apple designed iOS to be a "closed" system. *Id.*, ¶ 36. Unlike traditional desktop or laptop computers, whose operating systems allow consumers to buy software applications from

-2-

**ER-251**

competing software distributors, the iOS prevents iOS Device customers from buying software applications from anyone other than Apple. *Id*., ¶ 6. Apple's operating system for desktop and laptop computer operating system, called "macOS," from which Apple derived the iOS, allows consumers to buy software from non-Apple vendors and to pay such vendors directly without having to pay an additional fee to Apple. *Id*., ¶ 7. An iOS Device customer does not agree to buy apps or pay for IAP only on the App Store. *Id.*, ¶ 18. Apple forces that upon them to keep them "hooked" into its iOS "ecosystem," Byrd Decl., Ex. B, and to avoid having to compete with developers or other app stores to sell apps or IAP.

Apple has owned and operated 100% of the App Store since its launch on July 10, 2008. Apple employees staff the App Store, and Apple controls all its revenue and business operations. TAC, ¶ 45. Apple collects all money customers spend on the App Store for apps and IAP (which it calls "billings"), keeps its cut (which it calls "revenue"), and then remits the remainder to developers. Byrd Decl., Ex. D, 278:1-279:17.

Apple *uniformly* charges a 30% commission on the amount its customers pay for virtually all paid apps and IAP through the App Store—which has not changed since the launch of the App Store. The *same* commissions have been charged on billions of transactions for paid apps and IAP. Apple now charges a reduced commission of 15% in limited circumstances, which has little effect on its overall business. In 2016, Apple reduced its commission from 30% to 15% for *all* subscription renewals after the first year of a subscription. TAC, ¶ 10. Additionally, in late 2020, in response to the adverse publicity and pressure from regulators and litigants (including this and related litigation) about Apple's App Store monopoly and supra-competitive commissions, Apple announced the App Store Small Business Program, beginning in January 2021, in which existing developers that earned less than $1 million in total proceeds (net of Apple's commission and some taxes and adjustments) in the prior calendar year pay a reduced commission of 15%. *See* https://developer.apple.com/app-store/small-business-program/ (last visited May 31, 2021).

At either 30% or 15%, Apple's commission is the *same* for all the affected apps and IAP, and Apple's customers all pay the *same* prices for apps and IAP in the App Store. Byrd Decl., Ex.

-3-

PLTFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEM. OF Ps & As
Case No. 11-cv-06714-YGR

**ER-252**

Case 4:11-cv-06714-YGR    Document 643-1    Filed 04/27/22    Page 15 of 37

E, 86:10-87:3. Apple permits no individually negotiated commissions or prices for paid apps or for IAP.

Apple also controls the prices developers can charge for their apps. Developers may only charge a price that ends in $.49 or $.99 (e.g., $0.49, $.99, $1.49, $1.99, or $2.99) for each app and all IAP. TAC, ¶ 50; Byrd Decl., Ex. D, 265:6-11, 266:12-15, 268:2-270:11. Apple eliminates more than 99% of the price points that developers may charge to Apple's customers for all paid apps and IAP.[3]

Just prior to the launch of the App Store, Steve Jobs falsely claimed that Apple did not "intend to make money off the App Store," and if Apple's 30% commission "pays for running the store, well that will be great." *Id*., Ex. G at '81. The App Store has been enormously profitable since 2009. *See id*., Ex. H ("[w]e are definitely making money"); Ex. I, 89:13-90:7, 90:9-91:13. The App Store has "obviously done, far, far better than" just covering costs. *Id*., Ex. J, 175:11-25. Apple gets its enormous profit because it ensures that its App Store is the *only* store in the world where the tens of millions of U.S.-based iOS Device owners (and many millions more worldwide) can buy an iOS app or pay for IAP. TAC, ¶ 5.

**B.    Sales of iOS Apps and IAP Constitute a Relevant Antitrust Market**

Sales of iOS apps and IAP is a type of relevant antitrust market known as an "aftermarket." *See* Byrd Decl., Ex. K, ¶ 43. In the primary market, consumers choose a mobile device with OS pre-installed, such as iOS or Android. *Id*., ¶ 44. All iOS Devices come pre-loaded with the iOS and cannot be used without it, and the iOS cannot be used on non-Apple devices. *Id*. iOS apps (so-called "native" apps) (and IAP) may only be downloaded and installed from Apple's App Store. *Id*., Ex. E, 98:2-11; Ex. A, 224:6-13. Because customers pay the App Store directly, Apple collects its commission on all paid apps and IAP without depending on the developers or any third party to remit Apple's share. *Id*., Ex. D, 278:1-8; Ex. C, 3863:18-3864:2 ("If not for IAP, we would have

---

[3] For prices greater than $29.99, developers may only charge prices in $1.00 increments (e.g., $30.99, $31.99, $32.99); for apps and IAP where the price is greater than $124.99, developers may only charge prices in $5.00 increments (*e.g*., $129.99, $134.99, $139.99); and for apps and IAP where the price is greater than $299.99, developers may only charge in $10.00 increments (*e.g*., $309.99, $319.99, $219.99). *Id*., at 270:2-25; Ex. F.

-4-

PLTFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEM. OF Ps & As
Case No. 11-cv-06714-YGR

to come up with another system to invoice developers").

Most important, apps compatible with non-iOS mobile devices are not reasonable substitutes for iOS apps. Non-iOS apps cannot be installed or operated on iOS devices, and *vice versa*. In addition, consumers face various types of costs if they attempt to switch to alternative mobile platforms—for example, from iOS to Android—called "switching costs." Byrd Decl., Ex. K, ¶ 66. Therefore, the prices of apps on non-iOS platforms, including on Android, websites, or consoles, do not affect or constrain the commission that Apple charges on the sale of apps and IAP through its App Store.

Apple further protects its App Store from competition from other platforms by enforcing the "anti-steering" policy – prohibiting app developers from informing iOS users, inside the app or in the App Store, of the availability of their app and in-app purchases on other platforms. *See* Byrd Decl., Ex. L, § 2.3.10 ("[D]on't include names, icons, or imagery of other mobile platforms in your app or metadata, unless there is a specific, approved interactive functionality"); *id*. at § 3.1.1 ("Apps and their metadata may not include buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than in-app purchase."); Ex. M, 117:20-22 ("apps [were] generally prohibited from pointing to their availability on other platforms.")

Web-based applications accessible through a web browser on an iOS Device, called "web apps," are likewise not reasonable substitutes for installing native apps and making in-app purchases through the App Store. *Id*., Ex. K, ¶¶ 48-58; Ex. I, 47:20-22. *First*, there are "voluminous" technological benefits of native apps over web apps. *Id.*, Ex. J, 81:2-84:6; Ex. N. *Second*, web apps have limited functionality compared to native apps. Native apps are "faster," "use less memory," and "take advantage of the native graphics libraries in a way that is either not available or would have to be shoehorned in a web app." *Id*., Ex. J, 81:17-24, 83:8-17; Ex. M, 249:13-18; Ex. O, 254:1-15, 258:18-259:19. *Third*, while native apps can use large portions of an iPhone's gigabytes of memory, web apps are limited to just 50 MB of cache memory, which severely limits the size of web apps and requires information to be overwritten frequently. *Id*., Ex. K, ¶ 51; Ex. P, 145:1-7, 146:1-11; Ex. I, 175:12-21. *Fourth*, web apps use different and more limited Application Programming Interfaces ("APIs") to enable certain functionalities than native

-5-

**ER-254**

apps use. *Id*., Ex. P, 141:3-15.

### C.    Apple's Market Power is Largely Derived from Significant Switching Costs and Imperfect Information

Apple enjoys market power in the iOS aftermarket thanks to their locked-in consumers, who have relatively inelastic demand and face high switching costs, which helps Apple set and maintain the supra-competitive App Store commission. Byrd Decl., Ex. K, ¶ 98-101. Switching costs include: (1) the equipment costs of switching which typically requires switching multiple devices (*e.g*., iPhones, iPads, Macs, AppleTV, watches); (2) the cost of re-purchasing apps because apps purchased on iOS are not compatible with non-iOS devices; (3) the loss of data stored on iOS apps not easily transferable to outside iOS, including various user account information and auto-generated random passwords; and (4) the loss of "ecosystem integration" with other Apple devices including iPhones, iPads, Apple TV, Apple Watch, and Macs. *Id*., ¶¶ 70-75. Because of the switching costs, the incidence of consumers switching between iOS and Android is relatively low. *Id*., Ex. Q, 152:2-11.

Apple purposefully exploits the high switching costs. As Eddy Cue, a senior Apple executive, explained: "The more people use our stores the more likely they are to buy additional Apple products and upgrade to the latest versions. Who's going to buy a Samsung phone if they have apps, movies, etc already purchased? They now need to spend *hundreds more to get to where they are today*. . . . Who leaves Apple products once they've bought apps, music, movies, etc!" *Id*., Ex. B (emphasis added); Ex. I, 67:13-19, 68:1-13, 69:1-5. In an agenda for a 2010 executive team meeting, Steve Jobs wrote that he wanted to "tie all of our products together, so we further *lock customers into our ecosystem*." *Id*., Ex. R (emphasis added); Ex. J, 248:25-249:1, 249:18-23.

Apple leverages the high switching costs by withholding information in the primary and secondary markets about future market conditions or alternatives, substantially enhancing its market power in the iOS apps and IAP aftermarket. Byrd Decl., Ex. K, ¶ 98. Competition in the primary market for iOS Devices does not constrain Apple in the aftermarket because consumers lack sufficient information about the features and costs of the aftermarket when they make their

-6-

**ER-255**

choice in the primary market.[4] When buying an iOS Device, consumers lack sufficient information to accurately predict how they will use their iOS Device, what apps and in-app content will be available, and how much they will spend on apps, in-app content, and other complementary products. *Id.*, ¶ 103.[5] Further, after consumers make their foremarket purchases, Apple's so-called "anti-steering" provision prohibits developers from telling them about less costly IAP options thereafter. *Id.*, Ex. C, 3864:21-23; Ex. L §§ 2.3.10, 3.1.1; Ex. M, 117:1-2. These factors all contribute to Apple's near-complete monopoly power in the aftermarket for paid iOS apps and IAP.

**D.    Apple's Market Power in the Relevant Market Is Evidenced by Its 100% Share of the Market and Its Substantial Profit Margins**

The App Store is the only place where Apple's iOS Device customers can buy apps and pay for IAP. Apple has cornered virtually 100% of the worldwide multi-billion-dollar market for iOS apps and IAP by eliminating all competition. Byrd Decl., Ex. K, ¶ 108; TAC, ¶ 51. With few immaterial exceptions, the App Store is the only means by which iOS users can install native iOS apps. Byrd Decl., Ex. U, 133:20-135:17; Ex. E, 72:8-12; Ex. D, 143:5-13; Ex. C, 3932:11-13. Furthermore, Apple requires all app developers to distribute their iOS apps solely through the App Store and prohibits them from distributing apps directly through third-party app stores. *Id.*, Ex. V at '99, § 7.3.

The App Store's extremely high gross and net margins are further evidence of Apple's market power. *Id.*, Ex. K, ¶ 116. Presentations to Apple executives with decision-making authority for the App Store regularly include a detailed analysis of the App Store's financial performance.

---

[4] From its own analysis, Apple understood that demand for apps is "highly inelastic" as consumers lack comparative information concerning the app content prices across platforms. *Id.*, Ex. S; Ex. T, 308:13-20.

[5] Apple does not estimate—nor inform consumers regarding—the amount of money a consumer spends on apps over the lifecycle of an iPhone. *Id.*, Ex. D, 133:2-11, 136:9-17; Ex. I, 188:2-189:5, 189:18-22. Apple prevents developers from referencing to customers its commission structure. *Id.*, Ex. M, 144:10-23 (Apple "did not like to see [information on Apple's commission] in [a developer's] marketing text" for the app). It never disclosed the 30% commission on paid apps and IAP before the Supreme Court's 2019 ruling in Plaintiffs' favor. *Pepper*, 139 S. Ct. 1514. Consumers thus lacked the information they needed to assess lifecycle costs of apps. Byrd Decl., Ex. D, 132:20-24, 134:6-21.

-7-

*Id.*, Ex. W; Ex. X; Ex. Y, 56:6-8, 97:3-7, 234:12-21. Those presentations disclosed that Apple's share of the App Store revenue for FY2019 (net of remittance to developers) was $13.5 billion and that it earned a gross margin of 92.7% on these sales, and its net margin, after deducting all operating expenses (or "OPEX"), was 82.8%. *Id.*, Ex. X at '6318; Ex. K, ¶ 117. Apple predicted that its FY2020 App Store gross margin would increase to 93.5% and its net margin would increase to 83.1%. *Id.*, Ex. X at '6318; Ex. K, ¶ 118. The exceptionally high profit margins of the App Store year after year confirm that Apple extracts supra-competitive rents from its customers.

Nor did Apple ever base the 30% commission on its cost to create or run the App Store or provide services to developers. *Id.*, Ex. I, 137:13-138:3, 138:9-14, 140:10-141:10. When the App Store launched in 2008, Apple set the commission rate *ad hoc*: Mr. Cue and Mr. Jobs simply picked a rate without ***any*** consideration of App Store costs or the costs of providing developers with software development tools. *Id.*, 135:8-136:14, 137:13-138:3, 138:9-14.

In June 2011, Phil Schiller, the Apple senior executive in charge of marketing the iPhone, said he did not think "that 70/30 will last . . . forever" because "someday we will see enough challenge from another platform or web based solutions to want to adjust our model." *Id.*, Ex. Z; Ex. I, 143:25-144:6, 145:6-13. The size of the App Store profits—then over $1 billion annually— caused Schiller to ask: "is that enough to then think about a model where we ratchet down from 70/30 to 75/25 or even 80/20" if Apple could maintain a "$1B a year run rate." *Id.*, Ex. Z; Ex. I, 143:25-144:6; 145:6-13.

Despite Mr. Schiller's prediction, Apple's commission on paid apps and IAP largely have remained 30% because it forecloses the competition that he expected, and its App Store net profits have swelled to well over $10 billion per year. *Id.*, Ex. X at '318. Apple still does not consider costs in setting its commission to this day. *Id.*, Ex. I, 140:10-141:10. As a monopolist, Apple is able to set prices arbitrarily and without considering costs.

### E.    Apple's Purported Business Justification Is Pretextual

Apple's purported business justification for forbidding sales of iOS apps outside the App Store—alleged security and privacy concerns—is pretextual. Apple's choice for the App Store to be the only market for iOS apps and IAP payments was a business decision; it was not necessary

-8-

**ER-257**

to ensure the iOS ecosystem's security.[6]

The iOS operating system and the hardware on which it runs—*not* the App Store sales platform—are the ***primary sources of iOS device security***. Byrd Decl., Ex. KK, at '311, Ex. BB, 322:10-19, 323:25-324:13; Ex. CC, 2556:9-22. Apple easily could implement features to support app purchases and payment for IAP without forcing iOS Device customers to shop and pay on the App Store, just as it does with macOS.[7] Apple allows developers to sell apps to Mac users outside of Apple's Mac app store. But iOS offers even more robust ***operating system-based*** security features than macOS. *See id.*, Ex. A, 207:24-208:1; Ex. BB, 321:3-19. Apple has no genuine security reason for restricting iOS app distribution to the App Store because the App Store itself provides little if any extra security beyond what is provided by iOS.

Apple's reasonable security concerns[8] could be met even if app sales were opened—like what Apple does on macOS or through third party actions. *Id.*, Ex. CC, 2569:12-20; 2571:17; Ex. J, 127:9-22, 129:5-18. And, of course, requiring IAP payment processing on the App Store does not advance security—that payment structure merely empowers Apple to take its cut from consumers before remitting developer proceeds. *Id.*, Ex. C, 3863:18-3864:2.

---

[6] In 2007, Apple prepared two white papers to assess the risks of distributing third-party apps on the iOS platform. Byrd Decl., Ex. AA; Ex. J, 108:22-24, 109:18-110:4. These "technical document[s] from a technical team . . . building the [iOS] security infrastructure," explicitly contemplated the possibility of distribution outside the App Store and assumed that "the technical infrastructure . . . [would] allow for *other distribution mechanisms*" beyond the App Store. *Id.*, 129:19-130:19 (emphasis added).

[7] For example, iOS requires "sandboxing," which "restrict[s] [apps] from accessing files stored by other apps or from making changes to the device," is a security feature provided by the operating system, not the App Store. *Id.*, Ex. DD, at '383. *See also id.* Ex. A, 207:24-208:1.

[8] The perfunctory app review process does little to keep iOS devices secure. *Id.*, Ex. EE; Ex. BB, 140:15-141:12. Apple does not monitor apps to see if they have changed after they have been published in the App Store. *Id.*, Ex. E, 200:4-11. And Apple has only a limited ability to detect malicious apps during the review process (*id.*, Ex. FF, 94:9-23), as evidenced by a number of malicious apps that Apple failed to detect. *Id.*, Ex. M, 214:23-215:23. Apple acknowledged that the App Store has had "all kinds of security and privacy issues," including "apps in the store that have defrauded customers . . . [or] potentially taken their data." *Id.*, Ex. I, 169:1-9. Some fraudulent apps evade Apple's screening even after multiple rounds of app review. *Id.*, Ex. FF, 121:19-23.

-9-

PLTFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEM. OF Ps & As
Case No. 11-cv-06714-YGR

**F.      Class Members Have Been Uniformly Impacted and Suffered Damages**

Apple's unlawful and anticompetitive exclusivity scheme has generated enormous supra-competitive profits for Apple. Since 2008, Apple has collected more than $59.8 billion in App Store revenue, and more than $50 billion in App Store revenue just in the last four years. *Id.*, Ex. K, ¶ 25; Ex. X, at '317. Apple charges the same commissions (whether 30% or 15%) on all apps and all IAP. *Id.*, Ex. E, 86:10-87:3. And Apple's customers pay *uniform prices* for each app and for IAP. For any given app or IAP, all iOS Device customers pay the exact *same* prices. *Id.*, Ex. D, 265:6-11, 266:12-15, 268:2-270:25. Customers do not separately negotiate prices.

Apple's conduct increases the prices of apps and IAP paid by consumers. *Id.*, Ex. K, ¶ 131. Consumers bear a large portion of Apple's 30% commission. Specifically, anyone who buys apps or pays for IAP is impacted by Apple's supra-competitive App Store commissions because they lead directly to increased prices for apps and IAPs in the App Store. *Id.*[9] Developers charge consumers higher prices on the App Store than they charge through other distribution channels unencumbered by Apple's 30% commission, "to help offset" Apple's 30% commission. *Id.*, Ex. T, 177:19-178:2; Ex. D, 94:6-11; *see also id.*, Ex. II ("Due to the 70/30 revenue split, [Pandora] will be charging $12.99 on iOS at launch and the service will be available for $9.99 on web."). This price differential exists even between iOS and other Apple platforms. For example, CBS All Access charges $6.99 on iOS, where Apple's fee is 30%, but only $5.99 on Apple TV, where Apple's fee is 15%. *Id.*, Ex. JJ, at '680; Ex. T, 177:2-17, 178:10-21, 179:5-9. Apple has overcharged Class members by *billions* of dollars for paid apps and IAP during the Class Period as a result of its anti-competitive conduct. *Id.*, Ex. K, ¶¶ 236, 239.[10]

[9] Apple's conduct also harms innovation by preventing new and innovative app stores on iOS and app development that could benefit consumers. *See id.*, Ex. K, ¶ 243; Ex. HH (Apple said reduced commissions of Small Business Program would enhance innovation).

[10] But for Apple's conduct, competing app stores would have entered the iOS apps and IAP aftermarket, alongside the option of direct distribution of apps and IAP payment, offering competitive alternatives to the App Store. *See, e.g., id.*, Ex. A, 72:5-12, 74:6-9 (in macOS, multiple third-party app stores sell apps alongside direct sales by multiple developers, including Microsoft).

-10-

**ER-259**

## IV.   ARGUMENT

### A.   Standards for Class Certification

Antitrust class actions play an integral role in the private enforcement of antitrust laws. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979); *Hawaii v. Standard Oil Co. of Cal.,* 405 U.S. 251, 266 (1972); *see generally* 6 A. Conte & H. Newberg, NEWBERG ON CLASS ACTIONS, § 18:1, at 3-6 (4th ed. 2002) ("NEWBERG"). Courts should "'resolve doubts in these actions in favor of certifying the class.'" *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 612 (N.D. Cal. 2015) (quoting *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005)); *Dilts v. Penske Logistics, LLC*, 2013 U.S. Dist. LEXIS 192323, at *5 (S.D. Cal. Jan. 17, 2013) ("doubts regarding the propriety of class certification should be resolved in favor of certification").

Rule 23 permits class certification where: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interest of the class." *Ruiz v. XPO Last Mile, Inc.*, 2016 U.S. Dist. LEXIS 152095, at *14 (S.D. Cal. Feb. 1, 2016). Further, the party seeking class certification only needs to satisfy the requirements of one of the subsections of Rule 23(b). *Id.* at *13. Class actions for money damages proceed under Rule 23(b)(3), which additionally requires that "the questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FRCP 23(b)(3). The Court may certify a class action if, after "rigorous analysis," it determines that Plaintiffs have met their burden. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011).

While the class certification analysis must be rigorous, a motion for class certification does not require "free-ranging merits inquiries." *Stockwell v. City and County of San Francisco*, 749 F.3d 1107, 1111-12 (9th Cir. 2014) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013)). "Rule 23(b)(3) requires a showing that ***questions*** common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen*

-11-

**ER-260**

*Inc.*, 568 U.S. at 459. *See also Stockwell*, 749 F.3d at 1112 ("demonstrating commonality does not require proof that the putative class will prevail on whatever common questions it identifies"). The Court may consider the merits only to the extent the class determination involves considerations enmeshed in the factual and legal issues comprising Plaintiffs' causes of action. *See Dukes*, 564 U.S. at 351. Moreover, the Court is "bound to take the substantive allegations of the complaint as true." *In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 648 (N.D. Cal. 2007) ("*Tableware*") (quoting *Blackie v. Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975)).

Antitrust actions are well-suited for class-wide resolution. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Like other antitrust claims, Plaintiffs' claims against Apple rest on evidence and economic analysis common to all iOS Device customers. Plaintiffs will prove that sales of iOS apps and IAP is a properly defined relevant antitrust market; Apple has monopoly power in that market; Apple willfully acquired or maintained that power; and its conduct caused antitrust injury and damages to the Class. In addition, as set forth in the Expert Report of Daniel L. McFadden, established and reliable econometric models are available to quantify the antitrust impact and damages caused by Apple's alleged anticompetitive conduct on a class-wide basis.

**B.    The Four Prerequisites of Rule 23(a) Are Satisfied**

**1.    The Class Is Undoubtedly Numerous**

Rule 23(a)(1) provides that a class should be certified if "the class is so numerous that joinder of all members is impracticable." Because millions of Apple customers bought iOS apps or paid for IAP throughout the U.S., numerosity is easily satisfied. *See Apple iPod iTunes Antitrust Litig.*, 2008 U.S. Dist. LEXIS 107127, at *8-9 (N.D. Cal. Dec. 22, 2008) ("*iTunes*"), *amended by* 2009 U.S. Dist. LEXIS 10755 (N.D. Cal. Jan. 15, 2009); *In re Static Random Access (SRAM) Antitrust Litig.*, 2008 U.S. Dist. LEXIS 107523, at *37 (N.D. Cal. Sept. 29, 2008) (Where the precise size of the class is unknown, but "'general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied.'") (quoting NEWBERG, § 3:3).

**2.    Class Members Share Common Questions of Law and Fact**

Rule 23(a)(2) requires "questions of law or fact common to the class." The commonality requirement is satisfied if a classwide proceeding has the "capacity . . . to generate common

-12-

answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (citations and quotations omitted). "Antitrust liability alone constitutes a common question." *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013) ("*High-Tech II*"). *See also In re Qualcomm Antitrust Litig.*, 328 F.R.D. 280, 294 (N.D. Cal. 2018) (commonality satisfied where plaintiff questions whether defendant's business practices are anticompetitive and whether each class member suffered the same injury as a result of defendant's anticompetitive conduct).

To begin, Plaintiffs must prove both that a "'relevant market' exists and that the defendant has power within that market." *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044 (9th Cir. 2008). Additionally, questions surrounding "the willfulness of Apple's behavior" and "questions of antitrust injury" will be integral to Plaintiffs' success on their monopolization and attempted monopolization claims and are common to the Class. *iTunes*, 2008 U.S. Dist. LEXIS 107127, at *14-15. Those quintessential common questions are shared by each Class member. Even if each Class member were forced to proceed individually on their antitrust claims, each would have to prove market and market power as foundational elements of their own cases. The "questions of market definition, market share, and market power are common to all members of the proposed class." *Id.*, at *12.

In addition to common factual issues, Class members also share the legal issue of whether Apple violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by monopolizing the aftermarket for iOS apps and IAP. Whether Apple violated the antitrust laws is a common legal issue. *See Gonzales v. Free Speech Coal.*, 408 F.3d 613, 618 (9th Cir. 2005); *Thompson v. Clear Channel Commc'ns, Inc.* (*In re Live Concert Antitrust Litig.*), 247 F.R.D. 98, 113 (C.D. Cal. 2007) ("*Live Concert*").

### 3.    Plaintiffs Are Typical

Rule 23(a)(3) requires that "the claims . . . of the representative parties are typical of the claims . . . of the class." FRCP 23(a) (3). "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct

-13-

**ER-262**

which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quotations and citation omitted). In antitrust cases like this, typicality "will be established by plaintiffs and all class members alleging the same antitrust violations." *Pecover v. Elec. Arts, Inc.*, 2010 U.S. Dist. LEXIS 140632, at *32 (N.D. Cal. Dec. 21, 2010) (quotations and citation omitted). Moreover, the typicality requirement is "liberally construed." *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 164 (C.D. Cal. 2002).

Plaintiffs allege the same antitrust claims as all other members of the Class. Each Plaintiff (and Class member) purchased an iOS Device and then bought an app from Apple or paid for IAP through the App Store during the Class Period, and each was injured by paying the supra-competitive prices for the apps and IAP. *See* Byrd Decl., Exs. LL-OO; *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 284 (9th Cir. 2016) ("all class members were injured by the same alleged antitrust conspiracy and incurred the same alleged injury – suppressed compensation caused by Defendants' single antitrust conspiracy.") These common facts give rise to common claims by Plaintiffs and all other Class members for the same antitrust violations by Apple – monopolization and attempted monopolization of the aftermarket for apps and IAP.

### 4.    Plaintiffs Are Adequate

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." FRCP 23(a) (4).    Adequacy under Rule 23(a)(4) turns on two basic questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020.

To disqualify either class representatives or class counsel, perceived conflicts of interest must "relat[e] to the subject matter of the suit" (NEWBERG, §18:14, at 40-41; *see also Blackie*, 524 F.2d at 909) and must be actual, not hypothetical. Mere potential conflicts are not sufficient to defeat class certification. *See Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003) ("this circuit does not favor denial of class certification on the basis of speculative conflicts"). Here, the interests of Plaintiffs and the rest of the Class are entirely aligned. As direct consumers of iOS apps and in-

-14-

**ER-263**

app content during the Class Period, they all share the same interest in determining: (1) whether Apple monopolized the iOS apps aftermarket; and (2) whether they paid supra-competitive prices for apps and in-app content as a result. *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 U.S. Dist. LEXIS 39841, at *36 (N.D. Cal. June 5, 2006) ("*DRAM*") (adequacy of representation met because "the named plaintiffs allege that all members of the proposed class paid artificially inflated prices as a result of defendants' [antitrust violation] during the relevant class period, that all suffered similar injury as a consequence of the conspiracy, and that all seek the same relief"). Under these circumstances, no conflicts preclude class certification. *See Tableware*, 241 F.R.D. at 649.

Plaintiffs are motivated advocates for the Class. They have retained legal counsel with considerable experience in the prosecution of major class and antitrust litigation.   Plaintiffs have produced documents, provided declarations and/or sat for depositions. *See* Byrd Decl., Exs. LL-OO. Plaintiffs are committed to the prosecution of this action on behalf of the Class. *Id*. They easily meet the adequacy requirement, and the Court should appoint them Class Representatives.

### C.    The Requirements of Rule 23(b)(3) Are Satisfied

Rule 23(b)(3) is satisfied when "questions of law or fact common to the class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(3). When "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022; *iTunes*, 2008 U.S. Dist. LEXIS 107127, at *22.

To determine whether a class action is superior to individual actions, "courts consider the interests of the individual members in controlling their own litigation, the desirability of concentrating the litigation in the particular forum, and the manageability of the class action." *iTunes*, 2008 U.S. Dist. LEXIS 107127 at *22 (citing *Amchem*, 521 U.S. at 615, and *Hunt v. Check Recovery Sys., Inc.*, 241 F.R.D. 505, 514 (N.D. Cal. 2007)).

The "predominance" and "superiority" factors are closely related: when common issues predominate, class actions achieve economy and efficiency by minimizing costs and avoiding the confusion that would result from inconsistent outcomes. *See Tableware*, 241 F.R.D. at 651.

### 1.    Common Questions of Law and Fact Predominate

Predominance is satisfied where the elements of class claims are subject to generalized, as opposed to individualized, proof. *DRAM*, 2006 U.S. Dist. LEXIS 39841, at \*38; *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 266 (D.D.C. 2002); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 310 (N.D. Cal. 2010). "Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws." *Amchem*, 521 U.S. at 625. "Considering whether questions of law or fact common to class members predominate begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). Plaintiffs will use generalized proof for each element of their claims.

To prove their Sherman Act section 2 monopolization claim, Plaintiffs will need to prove: "(a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020). For Plaintiffs to prove their claim for attempted monopolization, they will need to prove: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Coal. For ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 506 (9th Cir. 2010) (internal quotation marks omitted). These standard "common questions" will predominate here. "[T]he state of the market and [Apple's] use and maintenance of monopoly power, as opposed to individual plaintiff's conduct, drives the claim." *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 475 (N.D. Cal. 2020).

Moreover, under Rule 23 (b)(3) courts should not evaluate merits issues, but should "focus[] on whether the questions presented, whether meritorious or not, were common to the members of the putative class." *Stockwell*, 749 F.3d at 1113-14; *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 & n.8 (9th Cir. 2011) (district court resolves "factual disputes necessary to determine whether there was a common pattern and practice that could affect the class *as a*

-16-

*whol*e" but "not to determine whether class members could actually prevail on the merits of their claims") (emphasis in original).

As Prof. McFadden confirmed, each element of Plaintiffs' monopolization and attempted monopolization claims can and will be proved with evidence common to all Class members. *See Live Concert*, 247 F.R.D. at 149; NEWBERG, § 18.25 at 84 ("common liability issues such as conspiracy or monopolization have, almost invariably, been held to predominate over individual issues").

### a. Common Evidence Will Prove the Relevant Market and Apple's Power in That Market

The two predominant issues here will be the definition of the relevant market (*i.e.*, the aftermarket for iOS apps and IAP) and whether Apple possesses monopoly power in that market. *See Live Concert*, 247 F.R.D. at 147 (regardless of the merits of parties' positions, market definition and market power were predominant common issues supporting class certification). To state a valid claim under the Sherman Act, a plaintiff "must allege that the defendant has market power within a 'relevant market.'" *Newcal*, 513 F.3d at 1044 (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc*., 504 U.S. 451, 481 (1992)). "The relevant market is the field in which meaningful competition is said to exist." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997).

In *In re Apple & AT&TM Antitrust Litig*., the plaintiffs alleged a substantially identical "aftermarket for iPhone applications that 'would not exist without' the primary market for iPhones, and is thus 'wholly derivative from and depend[e]nt on the primary market.'" *Id.,* 596 F. Supp. 2d 1288, 1304 (N.D. Cal. 2008) (quoting *Newcal*, 513 F.3d at 1049). This Court held that "[t]he allegations in the Complaint recite[d] facts, which, if presumed to be true, would support the existence of an aftermarket for iPhone applications, under the standard articulated by the Ninth Circuit in *Newcal*." *Id*. Here, Plaintiffs allege a nearly identical aftermarket: for iOS applications and IAP that would not exist without the primary market for iOS Devices.

The market in this case is different from the two-sided transaction platform at issue in *Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ("*Am. Ex.*"). There, the Supreme Court described a two-sided transaction platform as one "supplying only *one* product – *transactions* – which is

-17-

jointly consumed" by the parties on both sides of the platform. *Id*. at 2286 n.8 (emphasis added). In contrast, the Supreme Court explained in this case that Apple's App Store is an "electronic store where iPhone owners can ***purchase iPhone applications from Apple***." *Pepper*, 139 S. Ct. at 1518 (emphasis added). Apple does ***not*** sell apps or IAP to developers.[11] The Supreme Court did not identify the App Store as a two-sided transaction platform because it does not sell only one product jointly consumed by parties on both sides of the transaction the way ancillary credit card transactions were sold to both parties in *Am. Ex*.[12]

Moreover, Plaintiffs will use common evidence to demonstrate that Apple has power in that aftermarket. Plaintiffs have offered the economic analysis of Prof. McFadden regarding market power. Prof. McFadden's expert report opines that evidence common to every member of the Class — such as evidence of Apple's near 100% share of the market, evidence of Apple's substantial profit margins, and evidence that Apple prevents distribution of iOS apps outside the App Store – demonstrates Apple's market power in the relevant market. Byrd Decl., Ex. K, ¶¶ 108-122. *See Giuliano v. Sandisk Corp*., 2015 U.S. Dist. LEXIS 193817, at *53 (N.D. Cal. May 14, 2015) ("economic analysis . . . offered a plausible class-wide methodology to establish market power.")

**b.    Common Evidence Will Prove Apple's Willful Acquisition and Maintenance of Monopoly Power**

Plaintiffs also will use common evidence to demonstrate that Apple willfully acquired and maintained its monopoly power in the iOS apps and IAP aftermarket. *First*, Apple designed iOS to be a "closed" system to prevent iOS Device consumers from installing and running apps that

[11] *AmEx* is also distinguishable because American Express's anti-steering provisions sought to level the playing field with its competitors, other credit card companies, whereas Apple's anti-steering provisions empty the playing field of competition and allow Apple to maintain its near-100% monopoly over the relevant market. *Am. Ex.*, 138 S. Ct. at 2280.

[12] The App Store does not become a two-sided transaction platform merely because Apple's customers and app developers have each asserted antitrust claims against Apple. "Multiple suits are not atypical when the intermediary in a distribution chain is a bottleneck monopolist or monopsonist (or both) between the manufacturer on the one end and the consumer on the other end. A retailer who is both a monopolist and a monopsonist may be liable to different classes of plaintiffs—both to downstream consumers and to upstream suppliers—when the retailer's unlawful conduct affects both the downstream and upstream markets." *Pepper*, 139 S. Ct. at 1525. Of course, whether the App Store is or is not a two-sided market is ***itself*** a common question.

-18-

**ER-267**

they did not obtain from Apple. TAC, ¶ 36. The only way to install an iOS app on an iOS Device, short of jailbreaking the device, is to download it from the App Store. Byrd Decl., Ex. U, 133:20-135:17, Ex. E, 72:8-12; Ex. D, 143:5-13; 247:15-22; Ex. C, 3932:11-13. *Second*, Apple isolates its App Store from competition from other platforms by prohibiting app developers from informing iOS users, in the iOS app or on the App Store, of the availability of their apps or IAP on other platforms. *See id.*, Ex. L, §§ 2.3.10, 3.1.1; Ex. M, 117:20-22. This evidence of willful acquisition and maintenance of monopoly power is common to all Class members and will predominate over any individualized issues. "The question of whether there has been an antitrust violation is a common issue rather than an individual one. In no event will the individual circumstances of particular class members be relevant to the inquiry of whether such a violation has occurred." *Giuliano*, 2015 U.S. Dist. LEXIS 193817, at *52.

<b>c.    Common Evidence Will Prove Apple's Anticompetitive Conduct</b>

Apple's anticompetitive conduct is common to all Class members and is not in any way individualized. Apple locked all iOS Devices to prevent all Class members from downloading native apps from, or paying for IAP through, anywhere but the App Store. Plaintiffs will therefore use class-wide proof of Apple's anticompetitive conduct in proving their monopolization and attempted monopolization claims. *See Id.* at *53 ("Plaintiffs will rely on common evidence to establish an antitrust violation, *i.e.*, to show that the Disputed Patents were fraudulently procured and used by SanDisk to acquire and maintain monopoly power in the final flash product market.")

Apple's pretextual business justifications are affirmative defenses that are insufficient to defeat a motion for class certification. *See Kanawi v. Bechtel Corp.*, 254 F.R.D. 102, 109 (N.D. Cal. 2008) (affirmative defense "must be proven, and is not an appropriate basis to deny class certification."); *Shaffer v. Cont'l Cas. Co.*, 2007 U.S. Dist. LEXIS 96189, at *15 (C.D. Cal. Jan. 26, 2007) ("Court is not convinced that issues of damages or affirmative defenses preclude class certification").  In any event, evidence tending to prove or disprove Apple's purported business justifications likewise will be common to all Class members.

<b>d.    Common Evidence Will Prove Causal Antitrust Impact</b>

"Antitrust 'impact'—also referred to as antitrust injury—is the 'fact of damage' that results

-19-

<b>ER-268</b>

from a violation of the antitrust laws." *DRAM*, 2006 U.S. Dist. LEXIS 39841, at *40. "It is the causal link between the antitrust violation and the damages sought by plaintiffs." *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 19 n.18 (1st Cir. 2008) (citing *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1103 (1st Cir. 1994)). Thus, Plaintiffs here "must be able to establish, predominantly with generalized evidence, that all (or nearly all) members of the class suffered damage as a result of [Apple's] alleged anti-competitive conduct." *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 567 (N.D. Cal. 2013) ("*High-Tech I*") (quoting *In re TFT-LCD*, 267 F.R.D. at 311).

To demonstrate antitrust injury at trial, Plaintiffs need only show some damage suffered because of the alleged anticompetitive behavior. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969) ("burden of proving the fact of damage . . . is satisfied by . . . proof of *some* damage flowing from the unlawful [conduct]; inquiry beyond this minimum point goes only to the amount and not the fact of damage"). At the class certification stage, Plaintiffs "need only advance a plausible methodology to demonstrate that antitrust injury can be proven on a class-wide basis." *DRAM*, 2006 U.S. Dist. LEXIS 39841, at *45. Antitrust injury "flows from that which makes defendants' acts unlawful." *Blue Shield of Va. v. McCready*, 457 U.S. 465, 484 (1982). Proof of such antitrust impact can be "made on a common basis so long as the common proof adequately demonstrates some damage to each individual." *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 454 (3rd Cir. 1977). Antitrust "[i]mpact is a distinct element of liability, independent of proof of a violation and independent of the matter of individual damages." *Glictronix Corp. v. Am. Tel. & Tel. Co.*, 603 F. Supp. 552, 588 (D.N.J. 1984).

Plaintiffs typically establish antitrust injury or impact for class certification through expert testimony that generally accepted economic methodologies are available to demonstrate such impact and to reasonably calculate damages on a class-wide basis. *See e.g.*, *Live Concert*, 247 F.R.D. at 144; *DRAM*, 2006 U.S. Dist. LEXIS 39841, at *44-45; *Bafus v. Aspen Realty, Inc.*, 236 F.R.D. 652, 658 (D. Idaho 2008) (expert declaration described what appeared to the court to be a viable method for determining economic effect on a class basis). Plaintiffs have submitted the

Expert Report of Dr. Daniel L. McFadden in support of their motion for class certification.[13] *See* Byrd Decl., Ex. K. Prof. McFadden has conducted a sophisticated, two-step analysis, first estimating Apple's but-for commission structure and then estimating the effect of Apple's but-for commission on the prices for apps and IAP in the BFW. To conduct that analysis, Prof. McFadden used a combination of multivariable regression model (estimating consumer demand) and a structural model (using profit maximization conditions to estimate developer costs and but-for prices). The two-step analysis and the econometric methodology as applied by Prof. McFadden are widely accepted by economists to determine and measure the effects of anticompetitive conduct on market prices. Prof. McFadden's work on the data he has received to date establishes that the analysis and methodology satisfactorily determine and measure by common means the effect of Apple's anticompetitive conduct on app and IAP prices.

Whether consumers paid to subscribe to music streaming services or purchased 100 virtual tokens in a game app, their transactions were subject to higher prices because of Apple's App Store supra-competitive commissions, as a result of which app developers inflated the price of apps and IAPs above a competitive level. *Id*., ¶ 131. App Store commissions increased app developers' effective operating costs, and app developers set higher prices to offset some of the increased cost. Prof. McFadden's methodologies and conclusions are fully consistent with Plaintiffs' aftermarket antitrust theory and with the Supreme Court's decision in *Pepper*. This evidence of antitrust impact will be common to all members of the Class and will predominate over any individualized issues.

### e.    The Damages Will Be Estimated Using a Common Method

Once antitrust injury is established, the overall burden of proving damages is eased significantly under Section 2 of the Sherman Act. *See Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 836 (9th Cir. 1982); *DRAM*, 2006 U.S. Dist. LEXIS 39841, at *48. Individual damages issues are thus generally no bar to certification of antitrust claims. *See Live Concert*, 247 F.R.D. at 133-34; *Rubber Chems.*, 232 F.R.D. at 354; *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir.

---

[13]Among his many qualifications, Prof. McFadden is the E. Morris Cox Professor Emeritus of Economics at the University of California at Berkeley and Nobel Laureate in Economics for his work on discrete choice modeling. *See* Byrd Decl., Ex. K, ¶ 1, 2.

-21-

**ER-270**

2013) (plaintiffs need only propose a valid method for calculating class-wide damages, not an actual calculation of damages); *see generally* NEWBERG, §18:27.

Here again, the quantification of damages reinforces predominance because Plaintiffs will calculate damages on a class-wide basis, based upon one or more well-established and reliable damages methodologies. *See, e.g., Little Caesar Enters. Inc. v. Smith*, 172 F.R.D. 236, 267 (E.D. Mich. 1996); *DRAM*, 2006 U.S. Dist. LEXIS 39841, at *48-50. In this case, Plaintiffs will establish damages for all iOS apps customers pursuant to a common methodology, which Prof. McFadden has formulated.

*First*, Prof. McFadden investigated what app store commission rates Apple would have charged in a competitive but-for world ("BFW"). But for Apple's anticompetitive conduct, there would have been non-Apple iOS app stores, against which Apple's App Store would have had to compete to sell apps and IAP to iOS device consumers; as a result, Apple would have charged lower, competitive commission rates. Prof. McFadden has determined that the BFW commission rate would have ranged from 10% to 12%. Prof. McFadden based this range on various benchmark analyses he performed as well as his analysis of Apple's App Store profit margin. Byrd Decl., Ex. K, ¶ 136.

*Second*, based upon Apple's transactional data (through September 30, 2019), data produced by App Annie, an app market analytics firm, and app developers' cost data produced in discovery to date, Prof. McFadden estimated a model of consumer demand and app developer costs to calibrate app and in-app content prices in the competitive BFW. This model consists of (1) consumer demand for apps and IAP, (2) app developers' cost of supplying apps and in-app content, *i.e.*, app developers' supply function, and (3) app developers' pricing decisions. Prof. McFadden estimated this model of demand and supply, given Apple's real world app store commissions, and then used the estimate to calibrate the app and in-app content prices that iOS device consumers would have paid if Apple had charged competitive commissions. *Id.*, ¶¶ 137, 138.

Courts repeatedly have acknowledged similar methodologies as accepted means of calculating class-wide damages in antitrust cases. Multiple regression analysis of the kind Prof.

McFadden used here is commonly used at class certification. *See* Federal Judicial Center, *Reference Manual on Scientific Evidence*, at 260 (3rd ed. 2011), available at https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf; *see also, e.g., In re TFT-LCD Antitrust Litig.*, 267 F.R.D. 583, 606 (N.D. Cal. 2010) ("courts have accepted multiple regression analyses as means of proving antitrust injury and damages on a class-wide basis"); *High-Tech II*, 985 F. Supp. 2d at 1212; *In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 371-73 (C.D. Cal. 2011); *In re Capacitors Antitrust Litig. (No. III)*, 2018 U.S. Dist. LEXIS 195310, *56 (N.D. Cal. Nov. 14, 2018); *In re Korean Ramen Antitrust Litig.*, 2017 U.S. Dist. LEXIS 7756, *33-37 (N.D. Cal. Jan. 19, 2017). Moreover, use of a structural model, as Prof. McFadden has done, is also an accepted methodology. *See*, *e.g.*, *In re Static Random Access Memory Antitrust Litig.*, 264 F.R.D. 603, 615 (N.D. Cal. 2009) (structural model was a "plausible methodolog[y] … to demonstrate class-wide injury"); *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 2019 U.S. Dist. LEXIS 169446, at *13-15 (N.D. Cal. Sep. 20, 2019). Finally, use of a benchmark is "a generally accepted methodology for proving antitrust impact and damages." *In re Blood Reagents Antitrust Litig.*, 2015 U.S. Dist. LEXIS 141909, at *29 n.9 (E.D. Pa. Oct. 19, 2015); *see also Johnson v. Ariz. Hosp. & Healthcare Ass'n*, 2009 U.S. Dist. LEXIS 122807, at *38 (D. Ariz. July 14, 2009).

Apple may challenge Prof. McFadden's application of these accepted methodologies for calculating class-wide damages, but this is not the time or place to resolve any battle of experts. "It is not necessary that plaintiffs show that their expert's methods will work with certainty at this time. Rather, plaintiffs' burden is to present the court with a likely method for determining class damages." *Tableware*, 241 F.R.D. at 652; *Live Concert*, 247 F.R.D. at 110 ("district court is not permitted to discount the testimony of a plaintiff expert merely because the defendant has challenged some aspect of the expert's opinion"). Prof. McFadden's damages model is consistent with Plaintiffs' theory — and the Supreme Court's view – of the case. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("'plaintiff's damages case must be consistent with its liability case'") (citation omitted); *Pepper*, 139 S. Ct. at 1518.

-23-

### 2.    Superiority

Superiority under Rule 23(b)(3) is demonstrated where "classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Apple cannot seriously question the superiority of the class mechanism in resolving the antitrust claims asserted against it here. Litigating the monopolization and attempted monopolization claims of each iOS Device customer on an individual basis, even if it were practically feasible, is plainly not the preferable alternative. *See*, *e.g.*, *High-Tech II*, 985 F. Supp. 2d at 1228 (class action superior where "Plaintiffs case rises and falls with their common evidence"); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 1994 U.S. Dist. LEXIS 12652, at *9-10 (N.D. Cal. Aug. 31 1994) (finding class action superior method because, "[d]espite the complexity of determining individual damages, other methods of adjudicating this controversy would appear to be even more complex and less efficient."); *Live Concert*, 247 F.R.D. at 148 (class mechanism clearly superior way to resolve antitrust claims, even if individualized damages analysis assumed to be required); *DRAM*, 2006 U.S. Dist. LEXIS 39841, at *51 ("unnecessarily duplicative, and judicially inefficient, for the court to mandate individual trials as to each class member").

Indeed, class certification is nothing less than essential if the private antitrust enforcement mechanism is to function at all. As the court held in *Tableware*: "The modest amount at stake for individual plaintiffs . . . renders individual prosecution impractical; class treatment not only promotes judicial economy, it represents plaintiffs['] only chance for adjudication." *Id.*, 241 F.R.D. at 652 (citing *Amchem*, 521 U.S. at 616). A class action is the superior means of resolving cases such as this, where individual claims are too small to be litigated individually but which involve large damages in the aggregate. *See Id.,* at 617. In *iTunes*, this Court certified an antitrust class action that "involves potentially millions of class members," where individual recoveries "would likely be no more than several hundred dollars," finding that "there would be little incentive for an individual iPod purchaser to take on a factually complex antitrust case such as this one." *Id.*, 2008 U.S. Dist. LEXIS 107127, at *23. The Court's analysis applies with identical force to this case as well.

-24-

**ER-273**

**D.    Appointment of Class Counsel**

The Court should appoint Wolf Haldenstein and Kellogg Hansen as Co-Class Counsel. Rule 23 requires the Court to appoint counsel to represent the interests of the Class. *See* FRCP 23(g)(1); *Rubber Chems.*, 232 F.R.D. at 355. For the reasons stated above in connection with the adequacy requirements of Rule 23(a) (4), and Wolf Haldenstein has demonstrated thus far in its role as Interim Class Counsel in this litigation, Wolf Haldenstein has served as lead counsel throughout this litigation and undoubtedly is "well equipped" to vigorously represent the proposed Class. *See* Byrd Decl., Ex PP.  Moreover, Kellogg Hansen is a preeminent law firm representing both plaintiffs and defendants in complex trial and appellate matters.  With more than 90 attorneys, Kellogg Hansen boasts an extensive record of success before the Supreme Court and in Courts of Appeals and District Courts throughout the United States. *See* Byrd Decl., Ex. QQ. Kellogg Hansen successfully briefed and argued the appeal before the Supreme Court in *Pepper*.  The Court should accordingly appoint Wolf Haldenstein and Kellogg Hansen as Co-Class Counsel.

**V.    CONCLUSION**

Accordingly, this case easily meets all the requirements of Rules 23(a) and 23(b)(3) for class certification. Plaintiffs therefore request that the Court grant their motion to certify the class action, to appoint Plaintiffs as Class Representatives, and to appoint Wolf Haldenstein and Kellogg Hansen as Co-Class Counsel.

DATED: June 1, 2021

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By:    */s/ Rachele R. Byrd*
       RACHELE R. BYRD

BETSY C. MANIFOLD
RACHELE R. BYRD
BRITTANY N. DEJONG
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
dejong@whafh.com

MARK C. RIFKIN

-25-

**ER-274**

MATTHEW M. GUINEY
**WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com

*Interim Class Counsel and Proposed Co-Class
Counsel*

DAVID C. FREDERICK (*pro hac vice*)
AARON M. PANNER
MINSUK HAN
**KELLOGG, HANSEN, TODD, FIGEL &
 FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C.  20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
dfrederick@kellogghansen.com
apanner@kellogghansen.com
mhan@kellogghansen.com

*Counsel for Plaintiffs and Proposed
Co-Class Counsel*

272950v13

-26-
PLTFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEM. OF Ps & As
Case No. 11-cv-06714-YGR

**ER-275**