**No. 25-7930**

## UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

IN RE APPLE IPHONE ANTITRUST LITIGATION

On Appeal from the United States District Court
for the Northern District of California
Case No. 4:11-cv-6714-YGR, Hon. Yvonne Gonzalez Rogers

### EXCERPTS OF RECORD OF PLAINTIFFS-APPELLANTS VOLUME 4 of 13 (4-ER-452–702)

Betsy C. Manifold
Rachele R. Byrd
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
750 B Street, Suite 1820
San Diego, CA 92101
Tel.: (619) 239-4599

Mark C. Rifkin
Matthew M. Guiney
Thomas H. Burt
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
Tel.: (212) 545-4600

David C. Frederick
Aaron M. Panner
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite
400 Washington, D.C. 20036
Tel.: (202) 326-7900

*Counsel for Plaintiffs-Appellants*

May 13, 2026

# ATTACHMENT JJ

ER-453

UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA
# OAKLAND DIVISION

| | |
|---|---|
| **IN RE APPLE IPHONE ANTITRUST LITIGATION** | **No. 4:11-cv-06714-YGR**<br><br><br><br>**Hon. Yvonne Gonzalez Rogers** |

REPLY REPORT OF
## DANIEL L. MCFADDEN

IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**OCTOBER 19, 2021**

Non-Party Highly Confidential—Outside Counsel Eyes Only

**ER-454**

## CONTENTS

**I.  Introduction**......................................................................................................**1**
  A.  Assignment ....................................................................................................1
  B.  Summary of Opinions ....................................................................................2

**II.  Methodology for Assessing Common Economic Proof of Impact** ......................**4**
  A.  Identifying Harmed Class Members ...............................................................4
  B.  Proving Common Impact.................................................................................7
     1.  Apple's Experts' Criticisms of My Two-Step Methodology .....................7
     2.  Individualized Inquiry is Unnecessary to Demonstrate Consumer Harm...............10
  C.  But-For Commission Rates.............................................................................16
  D.  Apple's Monetization Strategies in the But-For World ...................................24
  E.  App Developers' Costs....................................................................................31
     1.  App Developers' Variable Costs of Production and Distribution.............31
     2.  Negative Variable Costs .........................................................................36

**III.  Apple's Experts' Criticisms on Model Specifications**......................................**40**
  A.  Free Apps.......................................................................................................40
  B.  Price Tiers.....................................................................................................46
  C.  App Competition...........................................................................................48
     1.  Modeling App Competition .....................................................................48
     2.  The Functional Form of Price Elasticity .................................................51
  D.  Aggregation of IAP Items..............................................................................55

**IV.  Apple's Experts' Criticisms on the Applications of the Methodology** ...........**58**
  A.  Estimation Procedure ....................................................................................58
     1.  The Criticism Regarding Margin Bounds ...............................................59
     2.  Professor Prince's Placebo Analysis.......................................................66
  B.  Sampling Method ..........................................................................................68
     1.  The Criticism Regarding the Sample Size................................................69
     2.  The Criticism Regarding Selecting Three App Categories .....................78
     3.  The Criticism Regarding Selecting Top 70 percent Revenue Apps .......81
  C.  Scaling Up Calculations of Common Impact .................................................82

**V.  Market Definition**.............................................................................................**87**
  A.  The Relevant Market Is a Market where iOS Device Consumers Purchase iOS Apps and In-App Content ................................................................................................87
  B.  The Aftermarket Framework and Switching Costs..........................................89
  C.  Cluster Markets and "Competitive Conditions" .............................................95

Non-Party Highly Confidential—Outside Counsel Eyes Only

D.   Professor Hitt's Proposed Relevant Markets..................................................99
    1.   Professor Hitt's Proposed Digital Game Transaction Market ...............................99
    2.   Professor Hitt's Proposed TV and Video Streaming App Transaction Market.....101
    3.   The Possibility of Multiple App Transactions Markets Does Not Necessitate Individual Inquiry.........................................................................106
E.   Two-sided Market Issues...............................................................108

**VI. Market Power**.................................................................................**111**
A.   Apple's Experts' Criticisms on Market Share and Barriers to Entry..........................112
B.   Apple's Experts' Criticisms on App Store Profit Margin .........................................114

**VII. Anticompetitive Conduct** ...................................................................**118**
A.   The Monopolization of the (After)Market for iOS Apps and In-app Content .............118
B.   The Tier Pricing Policy ...................................................................120

**Appendix A Curriculum Vitae of Daniel McFadden**.................................................**123**

**Appendix B Materials Relied Upon**.................................................................**143**

Figure 1: Professor Prince's Item-Level But-For Price Simulation Implies Illogical Marginal Costs For Robux (Roblox IAP) ...................................................................57

Figure 2: Games Damages for Professor Prince's Profit Margin Bounds ...................................63

Figure 3: Music and Entertainment Damages for Professor Prince's Profit Margin Bounds .......64

Figure 4: Music and Entertainment Estimation Results...............................................75

Figure 5: Damages Calculation Features for Games, Music, and Entertainment........................86

Figure 6: Percentage of Consumer Accounts in Each App Genre Who Made Purchases in Other Genres...................................................................108

Non-Party Highly Confidential—Outside Counsel Eyes Only

## I.    INTRODUCTION

### A.    ASSIGNMENT

1.  I submitted an expert report in support of Consumer Plaintiffs' motion for class certification in this matter on June 1, 2021 (the "McFadden Opening Report" or my "Opening Report").[1] In response to my Opening Report, Apple's experts submitted seven rebuttal reports on August 10, 2021. Counsel for Consumer Plaintiffs asked me to prepare this reply report in response to points and critiques raised by Apple's experts, including the expert reports of Professor Prince, Professor Schmalensee, Professor Hitt, Professor Willig (as adopted by other Apple experts), Professor Simonson, Professor Rubin, and Mr. Malackowski.[2]

2.  I have not undertaken to address each and every aspect of Apple's expert reports. This should not be construed as my being in agreement with Apple's experts on these aspects to which I do not respond directly. If new information becomes available to me after this reply report is submitted that alters my opinions, I reserve the right to update my opinions and/or file a supplemental expert report.

3.  My Opening Report disclosed my qualifications, compensation, and documents I relied on. 0 includes my most up-to-date CV and Appendix B lists the documents that I relied on in preparing this reply report.

---

[1]    Expert Report of Daniel L. McFadden, *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR, June 1, 2021. Unless otherwise indicated, all defined terms in this reply report have the same meaning as in my Opening Report.

[2]    Expert Report and Declaration of Jeffrey T. Prince, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR, August 10, 2021 ("Prince Report"); Expert Report and Declaration of Richard Schmalensee, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR, August 10, 2021 ("Schmalensee Report"); Expert Report and Declaration of Lorin M. Hitt, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR, August 10, 2021 ("Hitt Report"); Expert Report and Declaration of Robert D. Willig, *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR, August 10, 2021 ("Willig Report"); Expert Report and Declaration of Itamar Simonson, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR, August 10, 2021 ("Simonson Report"); Expert Report and Declaration of Aviel D. Rubin, Ph.D., *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR, August 10, 2021 ("Rubin Report"); and Expert Report and Declaration of James E. Malackowski, *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR, August 10, 2021 ("Malackowski Report"). As portions of the Willig Report have been adopted by other Apple experts, when citing to the Willig Report I note which Apple expert has adopted the particular section(s) or paragraph(s).

---

Written Evidence of Daniel L. McFadden                    No. 4:11-cv-06714-YGR | Page 1 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

**ER-457**

B.    SUMMARY OF OPINIONS

4.  Having reviewed Apple's experts' reports, I reaffirm the opinions offered in my Opening Report.

5.  Apple's experts devote significant portions of their reports to criticizing my But-For commission rates and proposing creative ways in which Apple would maintain its grip on control over the sales of iOS apps and in-app content to protect its monopoly rent in the But-For world.[3] In doing so, they either misrepresent the effects of competition, ignoring a fundamental principle regarding how damages resulting from anticompetitive conduct are calculated, or propose alternative But-For worlds that are void of evidence or economic principles. I provide detailed responses to these arguments in Section II of this report.

6.  One of Apple's experts, Professor Prince, presents various empirical analyses that purport to show that my econometric model is not reliable and fails to quantify the common impact to the Consumer Class. Despite his multi-pronged attacks and aggressive rhetoric, his analyses do not support his claims. Instead, he demonstrates that my methodology can be used to quantify damages and identify unharmed Class members for a variety of theories of harm and But-For commission rates.

7.  Furthermore, Professor Prince does not hesitate to mischaracterize my methodology and its underlying econometric principles, sometimes failing to meet the standards of scientific inquiry. Some of the highlights of his failure include the following:

- he fails to report the results of analyses he claims to have done;[4]

- he presents a different analysis from what he claims to have done, which as best as I can discern was due to a simple yet crucial error in his computer code;[5]

- he uses an incorrect mathematical equation in his analysis of free apps;[6]

---

[3]  As in my Opening Report, I will use the terms "As-Is" or "As-Is world" to refer to the economic conditions consumers actually faced during the alleged Class period and the terms "But-For" or "But-For world" to refer to the economic conditions that consumers would have faced absent the conduct by Apple that Consumer Plaintiffs' complaint in this case alleges to be anti-competitive. *See* McFadden Opening Report, ¶ 11.

[4]  *See* Section IV.A.2, ¶ 164. *See also* Section IV.B.2, ¶ 195.

[5]  *See* Section IV.B.2, ¶¶ 192-194.

[6]  *See* Section III.A, ¶¶ 108-109 .

Non-Party Highly Confidential—Outside Counsel Eyes Only

- he provides computer code that fails to replicate the backup materials provided for his 25-sample analysis, which purports to show my "entire approach is unreliable";[7]

- when I use his provided computer code to re-run that analysis, I obtain meaningfully different results;[8]

- regardless of its replicability, his analysis fails entirely to support his claim because the variance from sample to sample is minimal and easily explained by small variations in estimation that do not signal a problem;[9]

- he improperly makes sweeping claims relating to negative coefficients that are statistically not different from zero;[10] and

- he ignores those same negative coefficients when he obtains them in his own analysis.[11]

8. I address Professor Prince's criticisms and claims in Sections III and IV of this report.

9. Apple's experts also put considerable effort into criticizing my market definition and market power analyses. However, in doing so, they mischaracterize my analyses and propose alternative relevant markets based on claims that are unconnected to economic evidence. Importantly, their critiques do not alter my opinion concluding that "[t]he economic evidence as to the core aspects of liability—market definition, market power, entry barriers, and misconduct—is common to all Consumer Class members."[12] I provide detailed responses to Apple's experts' liability arguments in Sections V to VII of this report.

---

[7]    *See* Section IV.B.1, ¶¶ 168-169; Prince Report ¶ 110.
[8]    *See* Section IV.B.1, ¶¶ 183-186.
[9]    *See* Section IV.B.1.
[10]   *See* Section IV.B.1, ¶¶ 174-176.
[11]   *See* Section IV.A.2, ¶ 163.
[12]   McFadden Opening Report, ¶ 12.

Written Evidence of Daniel L. McFadden                    No. 4:11-cv-06714-YGR | Page 3 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

## II.    METHODOLOGY FOR ASSESSING COMMON ECONOMIC PROOF OF IMPACT

### A.    IDENTIFYING HARMED CLASS MEMBERS

10. Defendant (Apple) and Apple's experts claim that there is no "common way" to establish which Apple IDs belong to which individuals.[13] For example, Professor Prince asserts that I "cannot determine which consumers are unharmed because [I] cannot identify all the purchases made by the consumer" because I only observe Apple IDs rather than consumer identities.[14] He concludes that "there is no common way for Professor McFadden, myself, Apple, or any other party to establish which Apple IDs belong to which individuals."[15] This claim is nonsensical.

11. A practical process for compensating consumers is to ask iOS device users if they have purchased an app or made "in-app purchases" ("IAP") through the Apple App Store, and ask them to submit all the Apple IDs under which they made purchases. Using the Apple App Store transactions data, and the billing information Apple has for Apple ID accounts, damages specific to each claimant can be calculated and awarded. Individuals can be completely identified and all relevant Apple IDs can be linked. The process can handle any commission schedule the Court determines would have resulted in the But-For world.[16]

12. If a judgement is entered against Apple, here is a practical process for identifying and compensating harmed Class members:

    a.  Require Apple to send email notices to each Apple ID account holder that they may be entitled to a refund as a result of this judgement if they have purchased apps or made IAP

---

[13]  I identify Apple IDs using the "person_id" field in Apple's App Store transactions data. *See* McFadden Opening Report, footnote 10 and Appendix C.

[14]  Prince Report, ¶ 38.

[15]  Prince Report, ¶ 26. *See also* Declaration of Mark Rollins in Support of Apple Inc.'s *Daubert* Motions & Briefs in Opposition to Class Certification, *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR, August 10, 2021 ("Declaration of Mark Rollins"), ¶ 5.

[16]  Professor Prince agrees that there are no technical impediments to allocating damages in this way once I obtain a set of Apple IDs. Deposition of Jeffrey T. Prince, *In Re Apple iPhone Antitrust Litigation,* Case No. 4:11-cv-06714-YGR, October 4, 2021, ("Prince Deposition"), 34:3-35:4. (Q. Is it correct to say that given all the Apple IDs used by a particular class member, there is no technical impediment to netting the results of the various – the various IDs produced in Dr. McFadden's model against each other?…Q. In other words, I'm not asking you – I'm not asking you if there is an impediment to accessing the information. I'm asking you if you had the information. Is there any reason you can't simply do that? A. Nothing stands out to me sitting here, no.).

Written Evidence of Daniel L. McFadden                    No. 4:11-cv-06714-YGR | Page 4 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

during the designated damage period, and offer them an on-line claim form to submit. As Exhibit 1 of the Declaration of Mark Rollins demonstrates, an Apple ID is an email address, and if the account is currently active, Apple has billing information (name, address, and credit card or other account information that it bills for purchases). Apple may choose to link Apple IDs that have the same billing information to minimize redundant emails.

b.  Public notice of the judgement, followed by the claimant process, can find Class members who no longer have active Apple ID accounts.

c.  Ask claimants in the on-line claim form to provide name, address, and a list of all the Apple IDs they have used. Ask them to designate an active Apple ID account to which a refund or credit is to be issued if they are entitled to this as a result of their purchases during the Class period, and give them the option to receive a check if they do not currently have an active Apple ID account.

d.  Cross check claims forms against App Store transactions records to eliminate duplicate claims, merge transactions records across Apple IDs with the same owner, and for an owner/claimant, edit the claimed list of Apple IDs to delete incorrect ones or add omitted ones.[17]

e.  For each verified claimant and all transactions records for the corrected list of Apple IDs for this claimant, calculate the net overcharge explained in Section IV.C of this report for each paid transaction.[18] Then, sum these overcharges over all the claimant's paid transactions. If this sum is positive, issue a refund or credit to this claimant equal to this sum, or an appropriate proportion if the aggregate of these awards exceeds the aggregate damage amount established by the Court.

---

[17]  I understand that the App Store transactions data Apple produced for this matter are part of much larger transactions data that include additional information including the email address, phone number, and billing address associated with the Apple ID. *See* Declaration of Mark Rollins, ¶ 7 and Exhibit 1. In addition, I understand there is a "one-to-one" mapping between the "Apple generated random universally unique identifiers (UUIDs)" and "consumer identification values used internally at Apple." *See* McFadden Opening Report, Appendix C; and Defendant Apple Inc.'s Responses and Objections to Consumer Plaintiffs' Second Set of Interrogatories, *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR, April 26, 2021, p. 6. Therefore, the UUIDs can be linked back to individual consumers once the Apple IDs are provided.

[18]  *See also* McFadden Opening Report, Sections VI and VII.

Non-Party Highly Confidential—Outside Counsel Eyes Only

13. Through this process, individual Class member claimants who are harmed by an overcharge are completely identified, and their individual harm from overcharges is quantified.

14. Claimants who are unharmed or benefit from Apple's misconduct will not be compensated through this process. The Consumer Class should include all purchasers of Apple App Store apps and IAP in the relevant Class period, as they all are potentially harmed individuals, and the process above ensures that only the harmed Class members in terms of overcharges are compensated. Then, the presence of Class members who are unharmed in terms of overcharges has no effect on the determination and distribution of damages.

15. The process can handle any But-For commission schedule the Court finds on the merits. This could be either a uniform commission as proposed by Plaintiffs, or a commission structure resembling benchmark commission structures, as suggested by Apple.[19]

16. Until this process is completed, no Apple IDs should be excluded from the Consumer Class because uninjured Apple IDs may be determined to belong to injured Class members. For example, suppose one Apple ID is determined to be harmed by $50 and another Apple ID benefited from Apple's misconduct by $30. These two Apple IDs could belong to the same Class member, in which case this member would be harmed by $50-$30=$20. The damages must be netted out not only for a given Apple ID, but also across Apple IDs for the same Class member. Therefore, no Apple IDs should be excluded from the Consumer Class before the claims process described above is complete.

17. As I highlighted in Section IV.B of this report, sampling of transactions and limiting the analysis to high-revenue apps, as I do in my Opening Report, is a statistically valid method to estimate the demand price sensitivity parameter for each genre of apps.[20] In my Opening Report, I measure the reliability of my estimates using bootstrap methods, and in my opinion based on these statistics, these estimates can be defended on their merits as reliably determined. This is the only element in the determination and distribution of damages that involves sampling, as all

---

[19]   *See e.g.* Prince Report, ¶ 44.

[20]   McFadden Opening Report, footnote 297.

Written Evidence of Daniel L. McFadden                    No. 4:11-cv-06714-YGR | Page 6 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

other elements of the process above can be conducted for the full populations of Class members and apps, with no sampling.

## B.    PROVING COMMON IMPACT

### 1.    Apple's Experts' Criticisms of My Two-Step Methodology

18.  In my Opening Report, I describe a two-step methodology for measuring the common impact of Apple's misconduct on the Consumer Class.[21] The first step estimates the competitive But-For commission rates using a benchmark approach. The second step estimates the magnitude of impact on the Consumer Class resulting from Apple's supra-competitive commission rates. I demonstrate how this methodology works by applying it to the three largest app categories by revenue, namely Games, Music, and Entertainment, using a sample consisting of transactions associated with a randomly drawn sample of 0.1 percent of Apple IDs.

19.  In my demonstration of my damages calculation, I calculate damages inflicted on app developers to illustrate how my calculation does not double-count damages inflicted on consumers and app developers.[22]

20.  "Common" does not mean an identical magnitude of impact. Class members' damages vary according to a number of parameters I estimated in my demonstration. I estimate different marginal costs for different apps, which affects the extent to which developers change their prices in response to Apple's commission rate. In my methodology, estimates of price elasticity differ depending on (1) an app's category, (2) whether an app developer monetizes its app through paid downloads or IAP, and (3) the price of an app download or IAP. As a result, the estimated amount and percentage of the excessive commission Class members bear differ depending on which apps and IAP they purchased during the Class period.

---

[21]  *See* McFadden Opening Report, ¶¶ 136-137.

[22]  Professor Schmalensee argues that harm calculations must "apportion the incidence of net harm to each side of the platform to avoid double-counting, accounting for any pass-through by developers." Schmalensee Report, ¶ 129. Please see Section V.E for my responses to Professor Schmalensee's criticism regarding the two-sidedness of the App Store. In fact, Professor Schmalensee acknowledged in his deposition that my analysis does attempt to apportion damages between consumers and developers and does not double count damages. Deposition of Richard Schmalensee, *In Re Apple iPhone Antitrust Litigation,* Case No. 4:11-cv-06714-YGR, October 7, 2021, ("Schmalensee Deposition"), 92:23-93:4 and 93:21-93:25.

Non-Party Highly Confidential—Outside Counsel Eyes Only

21. Apple's experts appear to believe that I ought to have used an econometric model to "test" if there exists common impact of Apple's misconduct. For example, Professor Prince states that "instead of providing a method to determine whether iOS apps will respond to changes in Apple's commission rate in a common manner, Professor McFadden simply assumes his conclusion by ignoring competition among apps altogether, and then assuming that all apps in a genre face the same price sensitivity."[23] This is a mischaracterization of my econometric model. As I explained in Section VI.A of my Opening Report, my methodology is based on the economic principle of tax incidence: "[t]he App Store commission works the same way as sales or ad valorem tax … When firms pay a certain percentage of their revenue to a retailer or distributor, they offset an increase in this component of marginal costs by raising prices. How much they increase prices depends on the impact of the commission on their marginal costs and on the price elasticity of their consumers, but the common economic impact is that consumers pay higher prices as a result of an increased commission."[24]

22. Two facts are critical in establishing common impact in addition to this fundamental economic principle. First, "all app developers selling apps and in-app content through the App Store were bound by Apple's alleged anticompetitive iOS aftermarket restrictions during the Class Period."[25] Second, "[e]ach purchaser of a given app or in-app content paid the same price in a given period, and was overcharged by the same amount of Apple's excessive commission that was not 'absorbed' by app developers."[26] That is because app developers "do not and cannot price discriminate based on the consumer preferences."[27]

23. As I explain in Section VI.B of my Opening Report, Apple's internal documents show that Apple is well aware of such effects of the App Store commission on the (retail) price of apps and

---

[23]  Prince Report, ¶ 69. I will address his criticism that I ignore competition among apps and assume all apps in a genre face the same price sensitivity in Sections III.C.1 and III.C.2 of this report.

[24]  McFadden Opening Report, ¶ 132.

[25]  McFadden Opening Report, ¶ 133.

[26]  McFadden Opening Report, ¶ 134.

[27]  McFadden Opening Report, ¶ 134.

in-app content.[28] Furthermore, "the European Commission concluded that the App Store commission fee resulted in higher prices for consumers of music streaming services."[29]

24. Most of Apple's experts' critiques are not about the applicability of the two-step methodology described above, but instead about the particulars of my implementation, for instance, how I estimate the model or simulate the But-For world. On the first step of my methodology in which I establish the But-For commission rate, multiple experts criticize the level or structure of my But-For commission rates and suggest their own alternative But-For commission rates. I address these critiques in Section II.C below.

25. Professor Prince is the only expert who substantively criticizes my econometric model (the second step of my methodology), but his critiques are mostly about either the number of unharmed Apple IDs, or his own views on how the model ought to be set up or estimated. Professor Prince's critiques do not primarily relate to the ability of my econometric model to calculate damages on a class-wide or individual basis. In Exhibits 1 and 2 of his report, for example, Professor Prince uses my methodology and demonstrates it can be used to identify unharmed Apple IDs for a variety of alternative But-For commission rates, market definitions, or estimation strategies, regardless of the reasonableness of any of these alternatives. Furthermore, the possibly unharmed Apple IDs he identifies at a 12 percent But-For commission rate account for no more than 1 percent of total spend by all Consumer Class members in the As-Is world.[30] While I still address his criticisms in this report and explain why they are unfounded, I do not see his criticisms as a challenge to my methodology itself. I note that some of his criticisms appear to stem from his lack of understanding in statistics and econometrics. I will identify throughout this report what they are and explain why they are misleading to avoid any confusion among people who are not trained in econometrics.

26. Importantly, none of Apple's experts dispute the principle of tax incidence, a fundamental economic principle underlying my methodology. They do not object to the economic principle that app developers facing a downward demand curve and incurring positive variable costs

---

28    McFadden Opening Report, ¶ 151.

29    McFadden Opening Report, ¶ 152.

30    *See* Figure 5.

Non-Party Highly Confidential—Outside Counsel Eyes Only

would charge lower "retail" prices at lower commission rates.[31] Some of Apple's experts argue that some app developers may incur no variable costs, or disagree with how I estimate the demand curve, but none of them disagree that tax incidence provides an appropriate framework to estimate the effect of Apple's commission rate on consumer prices.

### 2. Individualized Inquiry is Unnecessary to Demonstrate Consumer Harm

27. Some of Apple's experts, most notably Professors Hitt and Willig, make several arguments they claim demonstrate that individualized inquiry is necessary to determine consumer harm. For example, Professor Hitt opines that "individual inquiry is required to identify for which transactions a developer would pass-through a lower commission rate to consumers such that it can be determined whether, and by how much, any individual proposed developer or consumer class member was impacted by Apple's challenged conduct."[32]

28. Apple's experts' arguments supporting this position can be summarized as the following three points: (1) consumers' share of the excessive commission ("pass-though") is dependent on developers' marginal costs, which vary across developers;[33] (2) developers vary as to whether they currently charge higher prices in the App Store because of the supra-competitive commission rate, indicating that some do not pass through the commission to consumers;[34] and

---

[31] Professor Hitt appears to be the only expert who does not support this principle. He claims that "[w]hich developers would, in fact, charge a lower price in the but-for world (assuming they paid a lower commission rates in the but-for world) is a matter of individual inquiry." Hitt Report, ¶ 365. However, in another place of his report, he argues developers' marginal cost is directly related to the effects of the App Store commission on the retail price. *See e.g.* Hitt Report, ¶ 358. These are mutually exclusive assertions.

[32] Hitt Report, ¶ 348. Professor Willig makes a similar argument by asserting that "[d]etermining which apps falls into these two categories [(1) apps where the developer does not incur a fixed-dollar cost with each purchase and (2) subscription apps with advertising and no fixed-dollar incremental cost,] would require individualized inquiry at the app level. Determining which consumers are uninjured due to their exclusively purchasing one or both of these two types of apps would require individualized inquiry at the consumer level coupled with the individualized inquiries at the app level." Willig Report, ¶¶ 215, 217 (adopted by Schmalensee).

[33] Professor Hitt states, "[i]n short, individual inquiry will be required to determine whether a developer has low marginal costs and thus whether it would pass-through any lower commission rate in the but-for world." Hitt Report, ¶ 358. Professor Willig opines that distinguishing between zero- and positive-marginal cost apps "would require individualized inquiries at the app level." Willig Report, ¶ 225 (adopted by Schmalensee).

[34] Hitt Report, ¶ 365, "Pandora, YouTube, and Tidal all charge a higher price for certain in-app purchases through an iOS app compared to purchases directly from their web site, indicative that they pass-through Apple's commission rate to consumers. Other developers, however, do not charge different prices on the App Store for in-app purchases compared to what those developers charge outside of the App Store, for which they do not pay

---

Non-Party Highly Confidential—Outside Counsel Eyes Only

(3) focal point pricing and minimum-pricing rules would prevent developers from lowering prices.[35]

29. Apple's experts, Professors Hitt and Schmalensee in particular, also claim that even in the presence of competition, the App Store would continue to charge the same commission rate, and, due to differentiation across app stores, many consumers would continue to choose to transact through the App Store.[36] Professor Hitt uses this conclusion to argue that "[t]hese consumers would not be harmed by Apple's challenged conduct, and determining which proposed consumer class members would transact through the App Store versus other potential iOS transaction platforms or directly with developers would require individualized inquiry."[37] I will address this claim in the next section where I address Apple's experts' criticisms on my But-For commission rate analysis.

30. First, regarding marginal costs, individualized inquiry is unnecessary, as I demonstrate in my Opening Report that well-established econometric techniques can be used to infer developers' marginal (or variable) costs from empirical estimation using market data.[38] Apple's experts, especially Professors Hitt and Willig, ignore a rich academic literature in the field of industrial

---

a commission, such as Hulu or certain LinkedIn subscriptions. These developers may therefore be unlikely to pass through a lower commission rate (if any) that was charged by an iOS app transaction platform in the but-for world… Which developers would, in fact, charge a lower price in the but-for world (assuming they paid a lower commission rates in the but-for world) is a matter of individual inquiry." [Footnotes omitted]. In this report, unless a footnote within a quotation is included, it has been intentionally omitted.

[35] Hitt Report, ¶¶ 366-370. *See also* Hitt Report, ¶ 366, "[D]etermining whether such pricing policies would prevent developers from passing-through any lower commission rates would require individualized inquiry."

[36] *See* Hitt Report, Section 8.1 and Schmalensee Report, ¶ 139.

[37] Hitt Report, ¶ 320.

[38] McFadden Opening Report, ¶ 140. *See also* Daniel Ackerberg, C. Lanier Benkard, Steven Berry, and Ariel Pakes, "Econometric Tools for Analyzing Market Outcomes," Chapter 63 in *Handbook of Econometrics*, vol. 6A, eds. James J. Heckman and Edward E. Leamer (North-Holland, 2007): 4172-4276, at pp. 4174-5, "The static analysis of the change usually assumes a mode of competition (almost always either Nash in prices or in quantities) and either has cost data, or more frequently estimates costs from the first order conditions for a Nash equilibrium."

Non-Party Highly Confidential—Outside Counsel Eyes Only

organization upon which I base my model.[39] Professor Prince himself cites a paper that is an exemplar of this framework.[40]

31. Second, that some developers currently do not charge different prices across the App Store and other channels is not determinative of whether prices would be lower in the But-For world. Professor Hitt claims that because some app developers "do not charge different prices on the App Store for in-app purchases compared to what those developers charge outside of the App Store, for which they do not pay a commission," they "may therefore be unlikely to pass through a lower commission rate (if any) that was charged by an iOS app transaction platform in the but-for world."[41]

32. However, Professor Hitt's "empirical evidence" appears to be nothing more than a cursory price comparisons across channels. He provides just three examples of developers that he claims charge the same price whether sold on the iOS App Store or sold directly with no commission. However, two of his three examples do not support his assertion. For example, he claims that LinkedIn is an example of an app developer that does not charge different prices on the App Store and outside of the App Store.[42] He did not provide any sources or backup for his analysis of LinkedIn when he submitted his report, although his deposition testimony indicated that he believed that there was backup for this analysis.[43] Then, on October 14, 2021, he submitted

---

[39]  Professor Hitt confirmed in his deposition that he is not only familiar with this literature, but he in fact teaches one of the seminal papers which I rely on. Deposition of Lorin M. Hitt, *In Re Apple iPhone Antitrust Litigation,* Case No. 4:11-cv-06714-YGR, October 11, 2021, ("Hitt Deposition"), 20:1-18. ([A.]… [T]here do exist models -- in particular, structural models that I use and teach -- that, among other things, generate cost parameters as a byproduct of the estimation. Q. There is a 1995 paper that is sometimes shorthanded BLP. Are you familiar -- are you familiar with that? A. Yes. Berry, Levinshon & Pakes… I teach that paper in my classes. Q. Okay. And in that paper, do they estimate the auto makers' cost based on pricing and sales data for autos? A. Yeah. I believe there is -- there is an estimation of a marginal cost in there that comes as part of the -- as part of the estimations.).

[40]  Prince Report, footnote 104, *citing* Aviv Nevo, "Measuring Market Power in the Ready-to-Eat Cereal Industry," *Econometrica* 69(2) (2001): 307-342.

[41]  Hitt Report, ¶ 365.

[42]  Hitt Report, ¶ 365.

[43]  Hitt Deposition, 97:20-98:7. ("Q. Is there anywhere in this section of your report that you give more information about LinkedIn? A. No. I would have to look at the backup. Q. Okay. And when -- when you say look at the backup, where -- is there a particular workpaper I should look to for information about LinkedIn? A. I would have to see where that appears. Let me just check something. Yeah. I don't -- I don't see it here. I would have to go back and look at the full backup to see what we were using as a backup for that. I can do that, but I can't -- can't do it realtime.).

Non-Party Highly Confidential—Outside Counsel Eyes Only

**ER-468**

errata to his report with a new workpaper. In the errata, he replaced "LinkedIn" with "certain LinkedIn subscriptions" and referenced the new workpaper in a footnote.[44] His workpaper (WP_591) is a 12-page pdf file with screenshots of linkedin.com, apparently from someone's mobile phone. These screenshots show monthly and annual subscription prices of four LinkedIn products (Business, Career, Recruiter Lite, and Sales Navigator Professional) but do not show the date of access or, more importantly, the prices of these products on the App Store.[45] Absent this information, I could not confirm his corrected statement or replicate his "empirical analysis."

33.  My own analysis shows that LinkedIn offers discounts for annual subscriptions on its web channel. For example, LinkedIn charges the same price for monthly subscriptions of Sales Navigator Professional ($79.99) on iOS and web but offers discounts for annual subscriptions on web ($779.88/year on web vs. $799.99/year on iOS).[46] According to Apple's App Store Preview, LinkedIn does not offer annual subscription options for its Business and Career products while they are available at discounted rates on its website.[47]

34.  Another example Professor Hitt relies on but does not support his claim is Hulu. He claims that Hulu with ads is sold at $5.99/month and Hulu without ads is sold at $11.99/month both on the App Store and Hulu's website.[48] What he does not mention is Hulu offers two bundle products,

---

[44]  Errata to Expert Report of Lorin Hitt, Ph.D., *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, October 14, 2021.

[45]  Prince Report, Workpaper 591.

[46]  For the web price, see Devon Delfino, "'How Much is LinkedIn Premium?': A cost breakdown of all 4 of LinkedIn's paid membership tiers," September 4, 2019, *Business Insider*, available at, https://www.businessinsider.com/how-much-is-linkedin-premium, last accessed October 18, 2021. For the iOS price, see Apple App Store Preview, "LinkedIn Sales Navigator," available at, https://apps.apple.com/us/app/linkedin-sales-navigator/id910768078, last accessed October 18, 2021.

[47]  Apple App Store Preview, "LinkedIn: Network & Job Finder," available at, https://apps.apple.com/us/app/linkedin-network-job-finder/id288429040, last accessed October 18, 2021. Professor Hitt's workpaper also shows LinkedIn offers discounts for annual subscriptions through its website. *See* Prince Report, Workpaper 591.

[48]  Hitt Report, footnote 589. The price of these two products is $6.99/month and $12.99/month respectively. For the iOS price, see App Store Preview, "Hulu: Watch TV series & movies," available at, https://apps.apple.com/us/app/hulu-stream-movies-tv-shows/id376510438, last accessed October 18, 2021. For the web price, see Hulu Help Center, "What are the costs and commitments for Hulu?," October 8, 2021, available at, https://help.hulu.com/s/article/how-much-does-hulu-cost, last accessed October 18, 2021. These are the same sites cited in Hitt Report, footnote 589.

---

Written Evidence of Daniel L. McFadden                    No. 4:11-cv-06714-YGR | Page 13 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

Hulu+Live TV and Hulu(No Ads)+Live TV, which are not available on the App Store. It has been well documented that firms use bundling to offer price discounts.[49]

35.  More generally, the observation that an app developer sells the same products and services across different channels does not establish that its pricing is not affected by the App Store commission or changes in costs. App developers, or any firms, set prices based on demand and competitive conditions facing them. Without investigating how these conditions differ by channel, one cannot attribute an observed price difference or uniformity to the App Store commission *alone*.[50] Professor Hitt testified in his deposition that he did not investigate one such key condition, price elasticity, across channels, while also acknowledging how it could differ across channels.[51]

36.  In my Opening Report, I discuss two examples that provide compelling evidence for the App Store commission resulting in higher prices for consumers.[52] First, I examine the example of CBS All-Access, which priced its subscription $1 higher on iOS vs. Apple TV, where it received a flat 15 percent commission from the outset of the subscription. In that example, the documentary evidence directly attributes the higher price to the difference in commission rate,

---

[49]  *See e.g.* Paul Belleflamme and Martin Peitz, *Industrial Organization: Markets and Strategies*, 2nd Edition, (Cambridge University Press, 2015), p. 272-4.

[50]  It is possible that differences in demand conditions offset differences in competitive conditions such that firms charge the same price across channels. Also, the academic literature documents that firms sometimes use uniform pricing across geographic markets that have different demand and cost conditions because they care about brand image or try to soften competition. *See e.g.* Stefano DellaVigna and Matthew Gentzkow, "Uniform Pricing in U.S. Retail Chains," *The Quarterly Journal of Economics* (2020): 2011-2084; Brian Adams and Kevin R. Williams, "Zone Pricing in Retail Oligopoly," *American Economic Journal: Microeconomics*, 11(1) (2019): 124-156.

[51]  Hitt Deposition, 93:18-94:25. (Q. Dr. Hitt, have you investigated whether the price elasticity of subscribing video streaming services is the same across different devices? A. So I -- I haven't done any calculations of price elasticity, but… [the] subscriptions are identical… You would expect them to be similar in some way, but I haven't done the calculations of that. Q. Okay. Well, you said you would expect them to be similar in some way. If they are different, would that mean that each channel is a different market? A. Not necessarily… [M]y understanding is -- is when defining the boundaries of markets, you take into account, you know, all of the economic circumstances that apply to those markets. But certainly if… you have radically different [elasticities], that could drive you toward a different market definition… Q. Okay. So if the content itself is identical, what else could explain a difference in price? A. There could be channel-specific considerations, such as, you know, the willingness or propensity of consumers to transact in these different -- different environments.).

[52]  McFadden Opening Report, ¶¶ 151-152.

---

Written Evidence of Daniel L. McFadden          No. 4:11-cv-06714-YGR | Page 14 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

**ER-470**

providing a firm basis for causally attributing higher prices to the commission rate.[53] Second, I discuss the European Commission's preliminary conclusions from its investigation into the App Store's impact on music streaming services. The European Commission found that the App Store commission "was passed on to end users by raising prices, typically from 9.99 to 12.99 Euros."[54] Here again, the finding of one of the world's leading competition authorities is a much more reliable basis for attributing higher prices to the App Store commission than simply looking at a handful of prices. To further bolster confidence in my findings, I explain in my Opening Report that my estimates of the consumer burden of the App Store's excessive commissions, which I find to be approximately 82 percent in both of my demonstrative calculations, are very similar to the burden implied by the CBS All-Access and European Commission examples (83 percent and 77 percent, respectively).[55]

37.  As I explain in my Opening Report, "I model app developers as firms that set prices to maximize profits, given demand conditions and costs."[56] Because app developers, as profit maximizing firms, set prices given demand and supply conditions, I estimate consumer demand for apps and in-app content and app developers' costs. As a result, "the degree of the common economic impact, and thus the amount of damages, differs depending on which apps and in-app content the Consumer Class members spent money on."[57] Professor Hitt asserts that "at one extreme" it is possible that an app developer does not change consumer prices in response to a decrease in cost.[58] Extreme cases are possible, but highly unlikely by definition. Individual inquiry would

---

[53]  McFadden Opening Report, ¶ 151, *citing* APL-APPSTORE_09924671 and Deposition of Eric Gray, *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06715-YGR, February 12, 2021, 174:15-178:2. Specifically, in an internal Apple email a member of the App Store management team writes "CBS All Access gets 85/15 on [Apple TV] and 70/30 on iOS. As a result, they price a dollar higher on iOS to help offset the delta." APL-APPSTORE_09924671 at 680.

[54]  McFadden Opening Report, ¶ 152, *quoting* European Commission – Speech, "Statement by Executive Vice-President Margrethe Vestager on the Statement of Objections sent to Apple on App Store rules for music streaming providers," (Brussels, April 30, 2021) SPEECH/21/2093, available at, https://ec.europa.eu/commission/presscorner/detail/en/speech_21_2093, last accessed October 18, 2021.

[55]  McFadden Opening Report, ¶¶ 235-238, footnote 302.

[56]  McFadden Opening Report, ¶ 165.

[57]  McFadden Opening Report, ¶ 135.

[58]  "At one extreme, if an app developer does not change consumer prices at all in response to a decrease in cost, then the consumers that transacted with that developer would not pay a higher price in the actual world compared to the but-for world, and therefore could not be harmed." Hitt Report, ¶ 364.

---

Written Evidence of Daniel L. McFadden                     No. 4:11-cv-06714-YGR | Page 15 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

not be necessary because of the possibility of having such rare cases. My methodology provides reasonable and accurate estimates of But-For prices, obviating the need for individual inquiry.

38. Finally, the presence of pricing minimums and focal point pricing do not require individualized inquiry. As I argue in my Opening Report, Apple's pricing-tier policy is anticompetitive.[59] Nevertheless, I demonstrate in Section III.B of this report that my model can accommodate calculating damages under the pricing tiers. Thus, focal point pricing and minimum-pricing rules would not necessitate individualized inquiry.

39. In the remainder of this section and Sections III and IV, I address Apple's experts' criticisms of my methodologies and how I applied these methodologies in my Opening Report.

### C.    BUT-FOR COMMISSION RATES

40. In this section I address Apple's experts' criticisms about the level and structure of the But-For commission rates estimated in my Opening Report. I can summarize their criticisms in four categories. First, they criticize that I did not model or make predictions about how the But-For world would come about. Second, they criticize that I cherry pick the competitive benchmark rates by ignoring other "platforms" that charge 30 percent commissions. Third, they criticize that a proper But-For commission rate should reflect a historical trend of the benchmark commission rate. Fourth, they argue that competing app stores in the But-For world would be differentiated, charging different commission rates, while the App Store's But-For commission rate would likely be 30 percent, so I should not assume a single But-For commission rate. I will now address these criticisms in turn.

41. First, Professor Prince criticizes that I "[did] not actually model how Apple would set [the But-For commission rate]" nor make predictions about what "salient features of the but-for world would look like, including how many rival iOS app stores would enter, whether any would enter, or what the App Store's market share would be."[60] In Section VI.C of my Opening Report, I offer economic reasoning for why my But-For commission rates are reasonable. In addition,

---

[59]    McFadden Opening Report, ¶¶ 129-130.
[60]    Prince Report, ¶ 41.

Non-Party Highly Confidential—Outside Counsel Eyes Only

these critiques ignore the well-established principles I rely on to establish the But-For commission rates I consider. As explained by antitrust economist Daniel Rubinfeld, in such an approach, "damages are measured by obtaining a 'but-for price' from a market (the 'comparable market') that closely approximates the market in which the violation occurred. The 'but-for price' is a measure of what the price of the product would be if the wrongful behavior had not occurred," noting that the approach was first cited by the Supreme Court in 1946.[61] The entry event of the Epic Games Store and subsequent pricing reactions of competitors provides a clear illustration of the effect of competition on commission rates in a very similar market, and reasonable examples of the likely competitive prices in the But-For world. By straightforward economic intuition, the prices charged by entrants and other smaller firms in the benchmark market (here, the 10 to 12 percent rates charged by Epic, Microsoft, and Discord) are more likely to be representative of the competitive price absent Apple's conduct than the immediate reaction of the largest incumbent firm (here, Steam's tiered rates).[62]

42. As I testified in my deposition, competition can take different forms in the But-For world. There could be entry of third-party app stores, putting competitive pressure on the App Store.[63] Alternatively, Apple could charge a competitive commission rate to prevent potential rivals from entering the market, in which case the App Store would be the only iOS app store.[64] The key

---

[61] I note for the sake of clarity that Professor Rubinfeld refers to what I call a benchmark approach as the "yardstick approach"; irrespective of the differences between literal "yardsticks" and "benchmarks," what he describes is the approach I use in my Opening Report. Daniel L. Rubinfeld, "Antitrust Damages," *Research Handbook on the Economics of Antitrust Law*, ed. E. Elhauge, (Elgar, 2012): 378-393, at p. 380, "Under the yardstick approach, damages are measured by obtaining a 'but-for price' from a market (the 'comparable market') that closely approximates the market in which the violation occurred. [Footnote 13: The yardstick approach was first cited by the Supreme Court in *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, rehearing denied, 327 U.S. 817 (1946).] The 'but-for price' is a measure of what the price of the product would be if the wrongful behavior had not occurred. A yardstick can come from a different but related product market in the same or similar geographic market."

[62] Hitt Report, ¶ 176, "[T]he Epic Games Store and the Microsoft Store are much smaller than Steam: collectively these two platforms were only 33.6 percent as large as Steam in 2019 based on Professor Economides' analysis." *See also* McFadden Opening Report, ¶ 157.

[63] Deposition of Daniel L. McFadden, *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR, August 3, 2021, ("McFadden Deposition"), 130:17-132:5.

[64] McFadden Deposition, 130:17-132:5. (Q. If you believe that that could be achieved through limit pricing, does that mean that your but-for world is consistent with no actual entry? … THE DEPONENT. Yes, my but-for world is consistent with a – a situation in which Apple rules allowed entry, but it sets its commissions in such a way that potential entrants found it unprofitable to come in. That – that's what limit pricing does, and that's certainly a possible outcome.) McFadden Deposition, 131:7-18.

Non-Party Highly Confidential—Outside Counsel Eyes Only

element of my benchmark analysis is that "the competitive forces would force Apple to a competitive benchmark,"[65] whatever form the competitive pressures may take.

43. Second, Apple's experts contend that I cherry-pick the competitive benchmark rates I use in my analysis, which I select by examining recent competition in the PC gaming market.[66] Professor Hitt claims that I do not present any analysis to support my benchmark selection.[67] In particular, Professors Hitt and Schmalensee argue that the 30 percent rate charged, for instance, by Android app stores and in the console gaming industry is a competitive benchmark rate.[68]

44. I testified in my deposition that console gaming participants do not provide a proper benchmark because their business model is significantly different from Apple's business model.[69] Major console makers like Sony are widely reported to lose money on console hardware sales, later making up for this loss on software and other ancillary sales.[70] This view is consistent with the Court's decision in *Epic Games, Inc. v. Apple Inc.* ("*Epic*") where it concluded that "the evidence is substantial that the economic factor driving [the commission rate charged in the

---

[65]    McFadden Deposition, 133:4-13.

[66]    *See e.g.* Hitt Report, ¶ 172, "Professor McFadden's but-for commission rate is not based on economics or any analysis in general. Instead, he simply cherry-picks commission rates from certain PC app transaction platforms, leading him to assume but-for commission rates that are much lower than those charged by most app transaction platforms."; Schmalensee Report, ¶ 202, "[T]he 12% threshold that Professor McFadden cherry-picked as the upper bound of the but-for commission rate is the lowest commission rate of two out of the other three remaining platforms that he chose as a comparison to predict the but-for world commission rate."

[67]    Hitt Report, ¶ 173.

[68]    For example, Professor Schmalensee points out that "stores handling apps for Windows, Android and MacOS had 30% headline rates for much of the relevant periods." Schmalensee Report, ¶ 135.

Hitt Report, ¶ 119, "[C]urrent headline commission rates on these 'more competitive' other app transaction platforms were, and generally continue to be, 30 percent."

*See also* Hitt Report, ¶ 194, "Plaintiffs' experts' assumptions that Apple would charge a lower commission rate in the but-for world are inconsistent with market realities. While some app transaction platforms charge lower headline commission rates or have recently reduced their commission rates for certain apps, the predominant headline commission rate charged by app transaction platforms during the class period is 30 percent."

[69]    McFadden Deposition, 136:7-9.(I asked [my team] to exclude game – game devices because I -- I believe that's a different business model.).

[70]    *See e.g.* Owen S. Good, "Sony is selling the PS5 at a loss, investors told," *Polygon,* February 3, 2021, available at, https://www.polygon.com/2021/2/3/22264242/playstation-5-sales-loss-manufacturing-costs-msrp-sony, last accessed October 18, 2021, "Sony shipped more than 4.5 million PlayStation 5s from the console's Nov. 12 launch to the end of the year, but it took a loss on those sales because the PS5's "strategic price point" is lower than what it cost to manufacture it… Sony's PlayStation revenue from game sales (both PS4 and PS5, add-on content included) plus larger profit margins on the outgoing PlayStation 4 more than made up any shortfall, the company said."

---

Written Evidence of Daniel L. McFadden                    No. 4:11-cv-06714-YGR | Page 18 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

gaming industry] do not apply equally to Apple" and "[o]ther gaming industry participants operate under a distinctly different economic model."[71] I also testified in my deposition that I do not consider Android app stores as an appropriate benchmark as there have been well-reported claims of anticompetitive conduct in that market.[72]

45. Third, Apple's experts also argue that "in the context of retrospective harm cases… it is important to construct a but-for world that is true to the historical competitive conditions faced by consumers and developers."[73] Professor Hitt takes this argument literally and estimates that "[u]nder a number of alternative commission policies… the *minimum* number of unharmed class members, [is] as high as 99.5 percent of developers and 31.2 percent of consumers."[74]

46. Specifically, Professor Hitt offers two detailed examples of alternative commission rate schemes. First, he applies the headline commission rate from PC app platforms (specifically, the Microsoft Store) exactly as they occurred in time.[75] He claims that, because the Microsoft Store did not lower its commission rate below 30 percent before October 2017, all consumer accounts who did not have a transaction after that date, amounting to 31.2 percent of the proposed class accounts, could not have been harmed.[76]

47. Next, Professor Hitt considers Steam's commission structure, under which apps pay a 30 percent commission on their first $10 million in lifetime worldwide revenue, 25 percent on the next $40 million, and 20 percent on all revenue above $50 million.[77] He concludes that 21.5 percent of

---

[71] Rule 52 Order After Trial on the Merits, *Epic Games, Inc. v. Apple Inc.*, Case No. 4:20-cv-05640-YGR, September 10, 2021, ("*Epic v. Apple* Order"), p. 36.

[72] McFadden Deposition, 135:1-136:9. *See also* James Clayton, "Google and Apple attacked on app store 'monopoly'," *BBC News,* April 22, 2021, available at, https://www.bbc.com/news/technology-56840379, last accessed October 18, 2021. The anti-competitive claims against Google and its Play Store undermine the reliability of other Android app stores as appropriate benchmarks, due to Google's close relationship to the Android operating system. For instance, Google owns the "Android" trademark, and only devices that meet Google's criteria for being an "Android-compatible device" can use the "Android" trademark. *See* Android Developers, "Brand guidelines," available at, https://developer.android.com/distribute/marketing-tools/brand-guidelines, last accessed October 18, 2021.

[73] Schmalensee Report, ¶ 130.

[74] Hitt Report, ¶ 32 [Emphasis original].

[75] Hitt Report, ¶¶ 211-216.

[76] Hitt Report, ¶ 216.

[77] Hitt Report, ¶¶ 217-222.

---

Written Evidence of Daniel L. McFadden                    No. 4:11-cv-06714-YGR | Page 19 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

**ER-475**

proposed Consumer Class accounts did not make any purchases from apps with more than $10 million in lifetime U.S. App Store revenues, and so could not have been harmed.[78] He admits in a footnote that this is an overstatement as the Steam tiers are based on worldwide revenues, and adjusts his estimate to 12.5 percent of Consumer Class accounts.[79]

48. Professor Prince also supports this argument and identifies uninjured Apple IDs under alternative But-For commission rates.[80] In doing so, he uses my methodology to demonstrate that my model can be used to identify uninjured Apple IDs for various But-For world scenarios.

49. Professor Hitt's analysis demonstrates a misunderstanding of the use of benchmark analysis. Such a literal application of the commission rates from the market chosen for the benchmark analysis is a nonsensical proposition. Benchmark analysis looks for real-world examples from analogous markets that have exhibited more rigorous competition for evidence of what equilibrium competitive pricing may be.

50. Professor Economides, one of Developer Plaintiffs' experts, estimates But-For commission rates that are not significantly different from mine. He also finds benchmark app stores in the "Windows PC App Distribution Market," but considers more stores than I do, including Steam, Blizzard.net, Origin, and WeGame.[81] Then he uses a sales-weighted average of their commission rates to estimate one of his But-For commission rates. His approach is not identical to mine, but he also finds a real-world example for more rigorous competition in the same market and arrives at a similar But-For commission rate.

51. Fourth, Professor Hitt claims that even in the presence of competition, the App Store would continue to charge the same commission rate, and, due to differentiation across app stores, many consumers would continue to choose to transact through the App Store.[82] Professor Schmalensee

---

[78]  Hitt Report, ¶ 222.

[79]  Hitt Report, footnote 401.

[80]  Prince Report, ¶¶ 43-44.

[81]  Expert Class Certification Report of Professor Nicholas Economides, *Cameron et al. v. Apple Inc.*, Case No. 4:19-cv-03074-YGR, June 1, 2021, ("Economides Report"), Section II.C.1.

[82]  *See* Hitt Report, Section 8.1; and Hitt Report, ¶ 320, "Taken together, the survey evidence from Professor Simonson consistently shows that many proposed consumer class members have preferences for the features provided by the App Store and would continue to transact through the App Store in the but-for world, even if

---

Non-Party Highly Confidential—Outside Counsel Eyes Only

likewise asserts that "the App Store would have incentives to keep the headline commission rate to be 30% and, continue to differentiate by offering better privacy and malware protection, and continue to work to attract free apps."[83]

52. Professor Hitt uses this conclusion to argue that "[t]hese consumers would not be harmed by Apple's challenged conduct, and determining which proposed consumer class members would transact through the App Store versus other potential iOS transaction platforms or directly with developers would require individualized inquiry."[84]

53. At a fundamental level, Professor Hitt's and Professor Schmalensee's assertions misrepresent the effects of competition, leading to an absurd conclusion regarding how damages resulting from anticompetitive conduct are calculated. Determining what platform consumers would have chosen in the But-For world is absolutely unnecessary. Damages accrue for what consumers chose in the As-Is world. Consumers are entitled to the presumption that their welfare was reduced by the difference between the competitive (But-For) price and what they actually paid.[85]

54. Professor Hitt's only supporting evidence comes from Professor Simonson's survey results. In reference to Professor Simonson's first survey, Profess Hitt opines that "consumers value many aspects of the App Store that *may not be available* on other iOS app transactions platforms…[t]hus, in the but-for world, many proposed consumer class members are likely to

---

the App Store offered higher commission rates than other iOS app transaction platforms." Professor Schmalensee makes a similar point by asserting that "[s]mall developers may find that the App Store continues to be the best channel for them. Large developers may be able to obtain special deals with other stores in exchange for exclusive distribution, or they may be able to use established reputations, plus advertising, to drive sufficient traffic to their websites to make direct distribution the most attractive." Schmalensee Report, ¶ 139.

[83] Schmalensee Report, ¶ 137.

[84] Hitt Report, ¶ 320.

[85] Professor Hitt does not deny competition results in lower prices, improved quality and more choices for consumers. Hitt Deposition, 29:21-25, (Q. Is it fair to say that competition generally results in some mix of lower prices, better quality, and improved choices? A. Ah, it can. It depends on exactly the nature of the competition. That is a possibility.). The welfare-improving qualities of competition are a fundamental premise of competition and antitrust policy. *See e.g.* U.S. Department of Justice and the Federal Trade Commission, "Horizontal Merger Guidelines," August 19, 2010, p. 2, available at, https://www.justice.gov/atr/horizontal-merger-guidelines-08192010, last accessed October 18, 2021, "The unifying theme of these Guidelines is that mergers should not be permitted to create, enhance, or entrench market power or to facilitate its exercise. For simplicity of exposition, these Guidelines generally refer to all of these effects as enhancing market power. A merger enhances market power if it is likely to encourage one or more firms to raise price, reduce output, diminish innovation, or otherwise harm customers as a result of diminished competitive constraints or incentives."

Non-Party Highly Confidential—Outside Counsel Eyes Only

continue to transact through the App Store due to its strong privacy and malware protections."[86] Due to differences in consumer preferences, "determining which proposed consumer class members would do so would require individualized inquiry."[87] Similarly, Professor Hitt opines that Professor Simonson's survey two shows "respondents indicated they would make most or all of their transactions through the App Store."[88] He uses these results to again argue for individualized inquiry by claiming "respondents vary in whether they would transact through Store B and, if so, [to what degree.]"[89]

55. Professor Schmalensee also relies on Professor Simonson's surveys to support his claims. He explains that, "Professor Simonson finds an overwhelmingly 83 percent of respondents would prefer the App Store with superior privacy and malware protection, as well as more free apps, over an alternative store with lower prices."[90]

56. These surveys are predicated on Professor Simonson's assumption that alternative app stores would have "lower" or "unknown" features while the Apple App store receives "high" marks across all features. These features include privacy, malware protection, and app variety. Professor Simonson claims he constructs these surveys "[b]uilding on a likely scenario in which consumers would have less information about the features of an alternative store."[91] However, he presents no empirical evidence to that effect. He instead only offers citations explaining how uncertainty affects consumers' choices and their tendency to "avoid risk and choose the most trusted brand."[92]

57. Contrary to Professor Hitt's and Professor Schmalensee's representations, Professor Simonson's survey results merely establish the grounds for competition with the App Store. They show that iOS consumers have preferences for security, privacy, and app quality control. As with any

---

[86]  Hitt Report, ¶ 316 [Emphasis added]. *See also* Hitt Report, ¶ 317, where Professor Hitt again relies on Professor Simonson's first survey to support this opinion.

[87]  Hitt Report, ¶ 316.

[88]  Hitt Report, ¶ 318.

[89]  Hitt Report, ¶ 318.

[90]  Schmalensee Report, ¶ 137.

[91]  Simonson Report, ¶ 19.

[92]  Simonson Report, footnote 11. The academic articles he cited do not even mention the terms "privacy," "malware," or "app variety."

---

Written Evidence of Daniel L. McFadden    No. 4:11-cv-06714-YGR | Page 22 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

profit-maximizing firm, economists would expect effective competing app stores to account for these preferences in determining their competitive strategy, as Professor Hitt acknowledges in his deposition testimony.[93] Evidence does not support the proposition that the App Store can only maintain its current level of quality at a 30 percent commission rate, nor do Professor Hitt or Professor Schmalensee provide evidence that a competitor could not meet or exceed the quality provided by the App Store.

58.   The evidence also does not show that the current level of quality provided by the App Store is particularly high. Problems with fraudulent apps continue to persist. An internal review was prompted in 2017 by a blog post entitled "How to Make $80,000 Per Month on the Apple App Store," which detailed a wholly defective app called "Mobile protection :Clean & Security VPN" that duped users into $99.99 per week subscription charges.[94] Despite that, a *Washington Post* investigation from June 2021 found that "[n]early 2 percent of Apple's top-grossing apps on one day were scams – and they have cost people $48 million."[95] The Court in *Epic* also affirms Apple's lack of responsiveness to developer concerns: "Notably, Apple conducted developer surveys in 2010 and 2017. Comparing the two indicates that Apple is not moving quickly to address developer concerns or dedicating sufficient resources to their issues. Innovators do not rest on laurels."[96] The key economic insight here is not to confuse the fact that consumers and developers choose to transact through the App Store with the conclusion that the App Store's current level of quality is efficient.[97] We need only to look to the Microsoft Store in my

---

[93]   Hitt Deposition, 30:2-8. (Q. Do firms consider consumer preferences when deciding how to compete with rivals? A. Again, as a general matter, I think that is one consideration of many to the extent that consumer preferences affect demand, knowing demand is an input to your competitive strategy, along with many, many other things.).

[94]   APL-APPSTORE_09567760. [All spacing and errors in original].

[95]   Reed Albergotti and Chris Alcantara, "Apple's tightly controlled App Store is teeming with scams," *The Washington Post*, June 6, 2021, available at, https://www.washingtonpost.com/technology/2021/06/06/apple-app-store-scams-fraud/, last accessed October 18, 2021.

[96]   *Epic v. Apple* Order, p. 101.

[97]   Michael R. Baye and Jeffrey T. Prince, "The Economics of Digital Platforms: A Guide for Regulators," *The Global Antitrust Institute Report on the Digital Economy* 34 (January 2020): 1250-1297, p. 1264, Discussing an example of a consumer's decision to use Google Maps: "The fact that this consumer is willing to make the transaction does not mean that the level of privacy or security protection offered by Google is efficient."

Non-Party Highly Confidential—Outside Counsel Eyes Only

benchmark analysis for an example of an app store that both reduced its commission and resolved to improve quality in response to new competitive pressure.[98]

59.  If we are to put weight in Professor Simonson's surveys, they do not conclusively support Apple's experts' claims, conversely suggesting that a sizeable number of consumers are not currently offered options suiting their preferences. Professor Simonson's second survey suggests that a sizeable number of consumers have a preference for app store variety. In particular, Professor Simonson finds that 24.4 percent of consumers would use an unknown app store with equal price, less app variety, and unknown other features at least half the time.[99] Professor Simonson conceded in his deposition that he cannot rule out that such preferences exist.[100] Professor Rubin further corroborates this fact in his report. He explains that there are some consumers, including among named class members, who "take a different view with respect to security" and instead "believe that the benefits of being able to go to and download apps from third-party stores outweigh the benefits of safety, privacy, ease of use, and reliability."[101]

### D.    APPLE'S MONETIZATION STRATEGIES IN THE BUT-FOR WORLD

60.  Apple's experts criticize my and other Plaintiffs' experts' consideration of Apple's IP in the But-For world. In particular, Mr. Malackowski and Professors Willig, Schmalensee, and Hitt each opine that in a properly constructed But-For world, Apple would change its monetization strategy with respect to its intellectual property, and would not allow "IP free riding."[102]

---

[98]  McFadden Opening Report, ¶ 158 and footnote 227, *citing* Tom Warren, "Microsoft shakes up PC gaming by reducing Windows store cut to just 12 percent," *The Verge,* April 29, 2021, available at, https://www.theverge.com/2021/4/29/22409285/microsoft-store-cut-windows-pc-games-12-percent/, last accessed October 18, 2021, "The 12 percent cut might tempt more developers into listing their games in Microsoft's store, particularly if the company can improve the poor experience for end users. Booty [Matt Booty, head of Xbox Game Studios at Microsoft] is promising just that, with "improved install reliability and faster download speeds over the next few months." Microsoft is also reportedly working on an overhaul to its Windows store that could pave the way for developers to be able to submit any Windows application to the store — including browsers like Chrome or Firefox. These store improvements may even allow third-party commerce platforms in apps, which would be a big shift alongside this 12 percent cut."

[99]  Simonson Report, Exhibit 22.

[100]  Simonson Deposition, 194:5-196:1.

[101]  Rubin Report, ¶ 136.

[102]  Malackowski Report, ¶ 190.

Non-Party Highly Confidential—Outside Counsel Eyes Only

61. Mr. Malackowski argues that "Plaintiffs' experts' But-For world proposals do not address how Apple would be compensated for the extensive IT assets and services it provides" and that "Plaintiffs' experts take all of the IP assets and services for granted in the but-for world."[103]

62. Similarly, Professor Willig explains, "[i]mplicit within Plaintiffs' experts' reports… is the assumption that, in the but-for world, developers would continue to have access to the same Apple IP they currently do today under the DPLA for the current $99 annual fee."[104] Professor Willig posits that if Apple and its App Store were no longer the exclusive means of selling and distributing apps and in-app content on iOS, "developers could choose to circumvent to varying degrees transacting on the App Store and thus circumvent paying Apple a commission for the use of its IP (beyond the $99 Apple Developer Program fee)."[105] He goes on to explain that "[i]n response to such a loss of revenue in the but-for world, Apple would have a strong economic incentive to choose among multiple feasible mechanisms to monetize its IP."[106]

63. Apple's experts each offer some possibilities as to how Apple could change its monetization strategy in the But-For world, but they do not offer analysis of Apple's incentives that would determine the likelihood of any particular monetization strategy. In other words, Apple's experts do not model a But-For world; they simply provide speculative alternative monetization strategies that Apple does not employ today but Apple's experts think may be possible for Apple to implement today or in a But-For world.

64. Mr. Malackowski lists a number of alternative monetization options, including Apple (i) charging a percentage-based royalty on *all* iOS-related revenues, (ii) charging for use of specific software or a menu of tools, (iii) raising the developer license fee above $99, (iv) implementing a tiered pricing structure of developer licences, or (v) varying fees based on developer

---

[103]  Malackowski Report, ¶¶ 189-190.

[104]  Willig Report, ¶ 193 (adopted by Malackowski).

[105]  Willig Report, ¶ 196 (adopted by Malackowski).

[106]  Willig Report, ¶ 197 (adopted by Malackowski). Professor Schmalensee makes a similar argument, noting that I "simply assume that the App Store would reduce its headline commission rate and not re-optimize all other components of its monetization strategy." Schmalensee Report, ¶ 132. He argues that limiting the class members to participants who made paid transactions is "inconsistent with the fact that all transactions, regardless of whether a commission is involved or not, are subject to the App Store's evolving monetization model — of which the commission is just one element." Schmalensee Report, ¶ 37.

Non-Party Highly Confidential—Outside Counsel Eyes Only

characteristics.[107] Professor Willig, citing Mr. Malackowski, focuses on an ad valorem royalty based on a percentage of *all* app revenue: effectively, expanding a fee like the App Store commission to some or all app revenues currently exempt from the commission, such as in-app advertising and the sale of "real-world" goods and services facilitated by apps (e.g., food purchased through Uber Eats and DoorDash).[108] He also singles out the possibility of Apple expanding its annual Developer Program fee to a tiered fixed-fee system.[109] Professor Schmalensee also speculates on Apple implementing an *ad valorem* or tiered fixed fee licensing scheme, among other possible changes selected from variations in monetization observed on other platforms.[110] Professor Hitt echoes other Apple experts, relying in part on Mr. Malackowski's proffered alternatives.[111] All of the aforementioned experts claim that the result of any possible changes would have differential impacts on consumer, developers, or both.[112]

---

[107]   Malackowski Report, ¶¶ 201-206.

[108]   Willig Report, ¶¶ 198-200 (adopted by Malackowski), "One way in which Apple could monetize its IP in the but-for world is to—alternatively or additionally—choose to implement an ad valorem royalty (i.e., a royalty based on a percentage of revenue) on certain classes of developers and/or apps… With this type of ad valorem monetization model, Apple could decide that the scope of value creation covered by its royalty would be both broader in some respects and narrower in some respects than the current scope of the commission requirement. For example, Apple could choose to monetize in-app advertising, which is not currently covered by Apple's commission. Apple might also have incentives to monetize other types of transactions currently exempted from the commission requirement, such as requiring a royalty on transactions facilitated by the app but where the product or service was delivered outside of the app."

[109]   Willig Report, ¶¶ 204-206 (adopted by Malackowski).

[110]   Schmalensee Report, ¶ 148. Professor Schmalensee also points out the possibility that Apple could keep its current general approach, but complicate it by adding more pricing tiers, changing the subscription renewal discount rate, or by offering discounts to some developers. Schmalensee Report, ¶¶ 154-160.

[111]   Hitt Report, ¶¶ 335-343.

[112]   *See e.g.* Malackowski Report, ¶ 219, "Alternative IP and developer tool compensation structures would uniquely affect App Store consumers as well, on a consumer-by-consumer basis… It is important to note, however, that the particular ramifications felt by consumers would vary significantly and could be positive or negative depending on an individual consumer's application preferences and habits."; Hitt Report, ¶ 343, "Determining whether a proposed consumer class member has been impacted by Apple's challenged conduct after accounting for potential licensing fees for Apple's intellectual property, such as Metal, in the but-for world would also require individualized inquiry."; Schmalensee Report, ¶ 147, "Regardless of how developers would choose to react to these sorts of changes, and their choices would likely differ, some consumers would be harmed because some apps would become more expensive and/or more intrusive, some would not be available on the App Store, and some would simply not be developed."; and Willig Report, ¶ 214 (adopted by Malackowski), "Thus, determining which developers would be better off in this but-for world, which might be worse off, and the degree to which that is the case, would require individual inquiry into the monetization economics of each developer and the motivated changes of Apple's monetization of its IP in the but-for world."

Written Evidence of Daniel L. McFadden                    No. 4:11-cv-06714-YGR | Page 26 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

65. Mr. Malackowski's alternative monetization strategies for the But-For world are speculative and unconnected to evidence or economic principles, and none of Apple's other experts provide any economic justification to repair these flaws in his analysis. Mr. Malackowski assumes a change in Apple's incentives to invest in and monetize its IP in the But-For world without first establishing any causal link between those changes and the removal of the challenged conduct. In his deposition, Mr. Malackowski repeatedly acknowledges that he provides no evidence or analysis relating to the probability that Apple would implement any of his purported alternative monetization strategies[113] – let alone that Apple would be likely to implement these strategies. He also acknowledges that no alternative monetization strategy that he proposes is more likely than any other.[114] He simply states that Apple would need to make up for its lost commission revenue elsewhere in its business.[115] Professor Schmalensee similarly acknowledges in his deposition that he has not performed any analysis to model Apple's alternative monetization strategies, nor has he attempted to predict what monetization strategy Apple would pursue.[116] While many outcomes are *possible* in a But-For world, juxtaposing them does not prove any of them is a likely outcome. Mr. Malackowski offers no analysis of Apple's incentives to implement any of his posited alternative monetization strategies, nor does he examine the market conditions that inform those incentives.

---

[113] Deposition of James E. Malackowski, *In Re Apple iPhone Antitrust Litigation,* Case No. 4:11-cv-06714-YGR, October 5, 2021 ("Malackowski Deposition"), 106:12-108:18.

[114] Malackowski Deposition, 110:13-19. (Q. Okay. And did you express anywhere in either of your reports whether any of these monetization strategies would be more likely for Apple to follow than any other of these alternative monetization strategies? A. No. I did not.).

[115] Malackowski Deposition, 97:13-23. (Q. So in the -- in the context of this case, did you mean by that sentence in Paragraph 200 that in the but-for world Apple needs to earn the same overall profit margin that it currently earns? A. The words of the report speak for themselves, but in response to your question, I do believe in a but-for world it would be rational for Apple to seek to -- seek to earn a like amount to its current earnings because the contribution that it would be making would also be similar to what it is making in the existing condition.).

[116] Schmalensee Deposition, 36:2-8. (Q. And -- and, in fact, you -- you don't – you don't do any analysis to identify any of those alternative strategies or to model them; correct? A. I discuss them, but I don't model them, and I don't attempt to predict what Apple would do in part because I don't attempt to predict what other players would do in that but-for world.). He also makes similar admissions in the deposition regarding his lack of analysis to determine whether Apple would have incentive to implement each of the specific hypothetical monetization strategies he discusses at length in his report, including raising the Apple Developer Program annual fee, charging for its software development kit, and charging for use of its Metal API engine. Schmalensee Deposition, 41:8-43:4 and 47:4-48:12.

Non-Party Highly Confidential—Outside Counsel Eyes Only

66. Mr. Malackowski presents no evidence or analysis that Apple considers compensation for its IP in setting its App Store commission rate, aside from Tim Cook's testimony in the *Epic* trial.[117] This Court found in *Epic* that "the record is devoid of evidence that Apple set its 30% commission rate as a calculation related to the value of its intellectual property rights," and Mr. Malackowski has presented no new evidence to rectify that.[118] Rather, in his deposition, Mr. Malackowski testified that "Apple does not categorize the 30 percent as a royalty on intellectual property" so he does not view it as such.[119] Mr. Malackowski therefore concedes that he cannot establish any link between Apple's 30 percent commission rate and Apple's compensation for its IP, a foundational premise of his position.

67. Relatedly, Mr. Malackowski fails to address why Apple does not employ these alternative monetization strategies today. He offers no economic analysis of Apple's incentives that explain why it is currently constrained from doing so, nor why these constraints would differ in the But-For world. In his deposition, he acknowledges that Apple could have employed these alternative monetization strategies today if it were beneficial for it to do so.[120] However, he ultimately offers the opinion that these alternative monetization strategies would have negative effects on Apple in both the As-Is world and But-For world.[121]

---

[117] Malackowski Report, ¶ 198, "Tim Cook's testimony made clear that the entire current compensation structure, including the commissions, is how Apple generates a return on its ecosystem of R&D and IP rights."

[118] *Epic v. Apple* Order, p. 114.

[119] Malackowski Deposition, 77:16-21. (Q. Is it your view that the 30 percent commission that Apple charges is a - - is a royalty on intellectual property? A. I -- I don't provide that opinion. Apple does not categorize the 30 percent as a royalty on intellectual property; so no. I don't present that.).

[120] Malackowski Deposition, 101:3-18. (Q. Okay. Would -- would you agree with me that if -- if in the but-for world Apple would lose revenue from The App Store, it could make up for that revenue in some other business segment? It could do so -- not would, but could do so? … THE WITNESS: I have no basis to say they could. To the extent that they could generate more revenue or optimize revenue in another segment, I know of no reason why they wouldn't be doing that today; so it would not make sense to me that they are leaving that money in the table and would turn to it in the event of the relief being sought; rather, they would focus on how to recover that revenue related to the business that -- the business that was impacted.). *See also* Malackowski Deposition, 118:7-25.

[121] Malackowski Deposition, 114:3-115:7. (Q. All right. So did you do anything to measure the difference in incentives or constraints for this alternative monetization strategy in the as-is world versus the but-for world? … THE WITNESS: I did not do anything to specifically measure the inefficiencies associated with any of the listed alternatives. I do refer in Paragraph 207 to the fact that the structures would increase friction and transaction costs and, therefore, be less efficient… Q. "And consistent result of many of the alternative structures is an increase in friction and transaction costs." Is that -- is that where you are referring me? A. Yes. Q. Is -- is that true in the but-for world? A. Yes. Q. Is it true in the as-is world? A. Yes. Which is why these

68. Because Mr. Malackowski and Apple's other experts provide no analysis to support their But-For world alternatives, I do not comment on each of them. However, as an example of Mr. Malackowski's failure to address Apple's current incentives, consider Mr. Malackowski's suggestion that Apple could implement a revenue-based royalty on all revenues generated through the iOS ecosystem: "App Store developers generated upwards of $640 billion in iOS ecosystem-related revenues globally in 2020… $550 billion (85%+) of these revenues were not subject to the current App Store commission structure, but could be subject to an alternative gross revenue-based royalty structure."[122] In FY2019, the last full year of data available, Apple's global App Store revenue was $13.75 billion. [123] Using the numbers Mr. Malackowski cites, Apple would collect this same amount with a 2.5 percent royalty charge on the $550 billion in "untaxed" iOS-related revenue. Put differently, Apple could double its App Store revenue by implementing a 2.5 percent royalty on currently "untaxed" revenues. According to Mr. Malackowski, it is within Apple's right to implement this royalty, and Apple could do so in the But-For world, but it nonetheless currently refrains from doing so in the As-Is world.

69. Further, Mr. Malackowski ignores the fact that in the But-For world I described in my Opening Report, Apple would still earn a profit on the App Store even while charging a lower commission rate.[124] I do not argue that Apple should not be compensated for its IP. Rather, I calculate a breakeven commission rate for the App Store of ▮ percent[125] – at a higher competitive commission rate, Apple would continue to earn a positive return on the App Store. Mr. Malackowski does not explain why Apple, if faced with a decline (but not elimination) of the profitability of the App Store, would depart from its current monetization strategies and pursue one or more of Mr. Malackowski's speculative alternatives. In fact, in his deposition, he repeatedly explains why Apple would not be incentivized to pursue any of these monetization

---

alternatives are generally not employed.) *See also* Malackowski Deposition, 113:5-10; 115:22-116:7; 120:10-121:1; 131:10-18; and 134:20-135:6.

[122] Malackowski Report, ¶ 204, *citing* "A Global Perspective on the Apple App Store Ecosystem," Analysis Group, June 2021, p. 2.

[123] APL-APPSTORE_08856864.

[124] McFadden Opening Report, ¶ 161.

[125] McFadden Opening Report, ¶ 161.

Non-Party Highly Confidential—Outside Counsel Eyes Only

**ER-485**

strategies.[126] He seems to suggest that Apple would be forced to pursue one of these strategies in the But-For world despite their negative effects to Apple.[127]

70. Stemming from his arguments about alternative monetization strategies that Apple could adopt in the But-For world, Mr. Malackowski argues that developers and consumers would be affected differently in the But-For world, "resulting in groups of 'winners,' 'losers,' and relatively unaffected parties."[128] These differential effects on developers and consumers are additional speculation without any evidentiary basis on top of his existing speculation regarding Apple's potential alternative monetization strategies.

71. In hypothesizing about differential consumer impacts, Mr. Malackowski shows a clear misunderstanding of basic economics. In attempting to explain how consumer prices might increase in the But-For world, he states: "developers facing higher upfront costs of development, such as higher annual fees and/or upfront license fees for certain tools/APIs, may respond by increasing application prices or by requiring users to purchase applications that otherwise would have been free."[129] Mr. Malackowski's misunderstands the basic economic principle that fixed costs do not affect a firm's profit-maximizing price.

72. Professor Schmalensee makes a broader assertion regarding consumer harm from Apple's hypothetical alternative monetization strategies. He states "[r]egardless of how developers would choose to react to these sorts of changes, and their choices would likely differ, some consumers would be harmed because some apps would become more expensive and/or more intrusive, some would not be available on the App Store, and some would simply not be developed." [130] However, in his deposition, he acknowledges that he has not performed any detailed modelling to justify this claim.[131] In short, Apple's experts have demonstrated neither that Apple would

---

[126]  *See* footnote 121.

[127]  Malackowski Deposition, 132:2-4. (THE WITNESS: I don't believe, based upon what I have seen, that any of these strategies would lead to a net positive for Apple.).

[128]  Malackowski Report, ¶ 208, Section 10.2, and Section 10.3.

[129]  Malackowski Report, ¶ 220.

[130]  Schmalensee Report, ¶ 147.

[131]  Schmalensee Deposition, 46:13-46:25. (THE WITNESS: I say most plausible policy changes by Apple would affect developers differently. Some might become more expensive. Some might become more intrusive in the sense of do more collection of information. Some might choose to rely more on advertising. Some would be

Non-Party Highly Confidential—Outside Counsel Eyes Only

have incentive to implement these hypothetical strategies, nor that that these strategies would cause any harm to negate the benefits to consumers from lower commission rates in the But-For world.

### E.    APP DEVELOPERS' COSTS

#### 1.    App Developers' Variable Costs of Production and Distribution

73. Professors Hitt, Willig, Schmalensee, and Prince all offer critiques involving the claim that some app developers have zero marginal costs. Professor Willig asserts, without citation, that "[m]any apps have zero incremental costs to the developer."[132] He opines that "[c]onsumers that purchase only apps with no incremental costs to the developer are uninjured because the developers of these apps would have no economic incentive to lower the prices of these apps in the but-for world."[133] Professor Prince claims that "[t]he academic literature, plus evidence in this matter and *Epic v. Apple*, show that many software and online services in general—and iOS apps in particular—are likely to have zero or close to zero marginal costs"[134] and that I estimate "marginal costs that are too high to be consistent with this evidence."[135] Professor Hitt likewise claims that "contrary to Professor McFadden's assumption, many app developers have zero or de minimis marginal costs," citing Professor Prince.[136] However, he simultaneously acknowledges that "some app developers may face meaningful marginal costs," noting my example of music streaming apps.[137] Professor Hitt confirmed in his deposition testimony that "certainly

---

unprofitable -- unprofitable. And all of those outcomes would affect consumers adversely. BY MR. RIFKIN: Q. Have -- have you done any modeling of any of those effects you just described? A. I have not attempted a detailed model of any of those effects.).

[132]    Willig Report, ¶ 223 (adopted by Schmalensee).

[133]    Willig Report, ¶ 224 (adopted by Schmalensee).

[134]    Prince Report, ¶ 83.

[135]    Prince Report, ¶ 84. In Prince Report, ¶ 85, Professor Prince also claims that marginal costs for specific apps are too high without justification, except for the case of Fortnite where Professor Prince quotes Epic CEO Tim Sweeney that Fortnite's V-Bucks has no marginal cost (Trial Testimony of Timothy Sweeney, *Epic Games, Inc. v. Apple, Inc.*, Case No. 4:20-cv-05640-YGR, May 3, 2021, at 190:12–16).

[136]    Hitt Report, ¶ 357.

[137]    Hitt Report, ¶ 356.

---

Written Evidence of Daniel L. McFadden                    No. 4:11-cv-06714-YGR | Page 31 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

developers could have operational costs that they may need to incur that do scale with the number of users and quantity and use."[138]

74. While Apple's experts do not provide much evidence for zero variable cost, I present evidence of positive variable costs in my Opening Report.[139] For example, Professor Prince criticizes that I estimate a marginal cost of $20.05 for Fortnite in 2018 which he claims is inconsistent with Epic CEO Tim Sweeney's testimony that V-Bucks "has no marginal cost."[140] Apple's experts' criticisms along these lines show their lack of understanding of my model and the economic principles it is based on. Marginal costs in my model do not merely represent the "production and distribution,"[141] "replication,"[142] or cost of in-game currency[143]: in my model marginal costs represent all of the different variable costs that come along with app developers' iOS app monetization business. As I make clear in Section VI.D.3 of my Opening Report, usage and user acquisition costs are such examples. This is because the relevant margin for app developers' pricing decisions should encompass all relevant costs and benefits associated with selling their digital goods, and I show in my Opening Report that this at the very least includes usage and user acquisition costs. Therefore, the fact that I estimate positive marginal costs for 90.6 percent of Games apps and 95.6 percent of Music and Entertainment apps is not inconsistent with the

---

[138]  Hitt Deposition, 20:19-21:14: (Q. Do you believe that some apps have meaningful marginal costs? A. Yes. … Q. What constitutes meaningful marginal costs? A. So a meaningful marginal cost could be nonzero. … [F]or example, media apps -- have significant licensing fees, which could be… a substantial fraction of revenue. Q. … And other than royalties and licensing fees… do you have any marginal costs of developers in mind? A. Oh, well, so this wasn't something that was the focus of my report, but -- but certainly developers could have operational costs that they may need -- need to incur that do scale with the number of users and quantity and use.)

[139]  *See* McFadden Opening Report, Section VI.D.3.

[140]  Prince Report, ¶ 85; Trial Testimony of Timothy Sweeney, *Epic Games, Inc. v. Apple, Inc*., Case No. 4:20-cv-05640-YGR, May 3, 2021, 190:12–16. ("Q. What does it cost to Epic to generate a V-Buck, minting a V-Buck? A. There is no cost to a V-Buck. There's cost in developing the software, but the V-Bucks themselves don't have a marginal cost.").

[141]  Anja Lambrecht, Avi Goldfarb, Alessandro Bonatti, Anindya Ghose, Daniel G. Goldstein, Randall Lewis, Anita Rao, Navdeep Sahni, and Song Yao,"How Do Firms Make Money Selling Digital Goods Online?," *Marketing Letters*, 25(3) (2014): 331–341, p. 332–3.

[142]  Avi Goldfarb and Catherine Tucker, "Digital Economics," *Journal of Economic Literature*, 57(1) (2019): 3–43, p. 3.

[143]  Trial Testimony of Timothy Sweeney, *Epic Games, Inc. v. Apple, Inc.*, Case No. 4:20-cv-05640-YGR, May 3, 2021, 190:12–16.

Written Evidence of Daniel L. McFadden                    No. 4:11-cv-06714-YGR | Page 32 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

**ER-488**

evidence Professor Prince presents in his report,[144] nor the claims made by Professor Hitt and Willig. They are simply comparing apples to oranges.

75.   Professor Schmalensee claims that "[m]aking an in-app purchase often amounts to paying to unlock features already present in the previously downloaded app. The only potentially positive component of marginal cost is then customer acquisition cost, which may have been incurred long before an already-acquired customer makes an in-app purchase and is thus at best loosely related to that purchase."[145] Professor Schmalensee's claim is unfounded. First, he ignores usage costs and royalty payments, which as I explain in my Opening Report are potentially important sources of marginal costs for apps.[146] These costs could still be incurred for users that "unlock features already present in the previously downloaded app."[147] Second, as I also explain in my Opening Report, user acquisition costs can "be incurred when ads are used to direct lapsed users back to an app."[148]

76.   Professor Prince criticizes my characterization of app developers' variable costs. He claims that I underestimate my "benchmark" app developers' profit margins "by first assuming that marginal costs are equal to average variable costs, and then incorrectly assuming that all user acquisition costs for some of his benchmark firms are variable costs."[149] Professor Prince claims that "[i]t is not true that an app developer incurs additional user acquisition costs every time a consumer chooses to download their app. Rather, the causation could run the other way around; when an app developer incurs additional user acquisition costs, more consumers will choose to download their app."[150] In addition, Professor Prince claims that a ██████████████████ ████████████████████████████████ is evidence that "the specific values Professor McFadden uses for his constraints are unsupported and incorrect."[151]

---

144   Prince Report, ¶¶ 83-84.
145   Schmalensee Report, ¶ 210.
146   McFadden Opening Report, VI.D.3.
147   Schmalensee Report, ¶ 210.
148   McFadden Report, ¶ 197.
149   Prince Report, ¶ 100.
150   Prince Report, ¶ 100.
151   Prince Report, ¶ 102.

Non-Party Highly Confidential—Outside Counsel Eyes Only

77. First, it is not true that I first assume "that marginal costs are equal to variable costs, and then incorrectly assum[e] that all user acquisition costs for some of [my] benchmark firms are variable costs."[152] I do not claim that all UA costs reported by developers are strictly variable, nor do I claim that I have identified all other variable costs that would be related to the economic margin of app developers. I analyze some app developers' costs data to establish a broad range of the average gross margin across all app developers. In constraining the bounds of the average margin of apps, I explicitly account for potential imprecision and uncertainty in developers' cost data. However, Professor Prince misrepresents my approach as claiming much more than I actually do in my Opening Report.

78. Second, as I discuss in my Opening Report, advertising payment mechanisms like pay-per-install explicitly support the conclusion that there is a causal link by which downloads result in an increase in UA costs, at least for some UA costs.[153]

79. ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████  ████████████████████████████████
████████████████████

80. Professor Prince also criticizes the marginal cost estimates obtained from my econometric model. First, he claims that my marginal cost estimates are "unrealistically uniform."[156] He asserts, "Professor McFadden finds, for instance, that every single one of the 62 game apps in his Paid Download sample that had a download price of $1.99 faced marginal costs between ████ and ████ – a one-cent range."[157] Second, he opines that my cost estimates imply "the most

---

[152] Prince Report, ¶ 100.
[153] McFadden Opening Report, VI.D.3.
[154] McFadden Opening Report, ¶ 198.
[155] McFadden Opening Report, VI.D.3.
[156] Prince Report, ¶ 87.
[157] Prince Report, ¶ 87.

Non-Party Highly Confidential—Outside Counsel Eyes Only
**ER-490**

expensive apps within each genre and business model tend to have the lowest profit margins" and that I offered "no evidence that such outcomes are consistent with market realities."[158]

81. Professor Prince's first criticism is unfounded. The feature that estimated costs are similar between apps with the same price is economically sensible. One would expect apps with similar marginal costs to be sold at similar prices and apps with very different marginal costs to have very different profit-maximizing prices. As explained in my Opening Report, my econometric model is based on a consumer utility maximization model widely used in the academic literature.[159] Thus, some of the mathematical properties of my model, including the relationship between price and marginal cost, stem from that model.

82. Professor Prince's second criticism, that it is "implausible" to have the most expensive apps have the lowest profit margins, is misleading. First, it is not clear what he means by being implausible. He compares Minecraft, which has an estimated margin of 51 percent, with Eden World Builder, which has an estimated margin of 148 percent because its marginal cost is estimated to be negative.[160] According to Professor Prince, Minecraft is sold at an average download price of $6.88, while Eden World Builder is sold at an average download price of $0.94. Although he claims they are similar games, there is no reason to believe their profit margin should be similar given the price difference. Second, it is not implausible to have the percentage margin be negatively correlated with price. Consumers may be much more price-sensitive for expensive apps than for 99 cent apps that practically have no effect on their budget. App developers or firms dealing with price sensitive consumers are expected to have lower percentage margins. Third, not surprisingly, demand models taught in microeconomic classes and those widely used in the academic literature have the same property. For example, the linear demand curve taught

---

[158]  Prince Report, ¶ 88.

[159]  McFadden Opening Report, ¶ 180 and Appendix D. Logit models have a long history of use in antitrust settings and are also widely used in academia. *See* Gregory J. Werden, Luke M. Froeb, and Timothy J. Tardiff, "The Use of the Logit Model in Applied Industrial Organization," *International Journal of the Economics of Business* 3(1) (1996): 83-105, at p. 84; and Kenneth Train, *Discrete Choice Methods with Simulation*, (Cambridge University Press, 2009), at p. 34.

[160]  Prince Report, footnote 102.

Non-Party Highly Confidential—Outside Counsel Eyes Only

in introductory economics classes has the feature that the price elasticity increases with price.[161] This implies that profit margins decrease as price increases.[162]

## 2.    Negative Variable Costs

83. In my Opening Report I account for the possibility that some app developers have other revenue sources such as advertising. In such a case, app developers' variable costs I estimate may capture part of these additional revenues as a negative component.[163] I explain that "the As-Is price [these app developers] charge is 'too low' for the estimated price elasticities, meaning that they could have made more money by charging higher prices but they did not. This could happen if they have other revenue sources such as advertising. In such cases, their variable cost estimates would be negative as they include the omitted revenues. These instances are easily identifiable from the cost estimates."[164]

84. Consider an app developer who charges $0.99 for a Paid Download app. Given potential consumers' price elasticity, this app developer may make more money by charging $1.99, because he may not lose many sales by raising price from $0.99 to $1.99, but he still does not raise the price. One way to explain this phenomenon is that there may be other types of revenues generated from selling this app, in addition to getting paid for the sale of the app, that this app developer prefers selling more apps at $0.99 than raising the price to $1.99.

85. In demonstrating how my methodologies could be applied to the produced App Store transactions data, I use all transaction records associated with a randomly drawn 0.1 percent of the Apple IDs and estimate app and IAP demand and app developers' variable costs for the

---

[161]   For example, *See* R. Glenn Hubbard, and Anthony Patrick O'Brien, *Microeconomics*, 4th Edition, (Pearson, 2013), p. 183.

[162]   My model implies that demand elasticity increases proportionally with price, leading to lower price-cost margins for more expensive products. This relationship is consistent with a logit demand model where consumer's disutility from price is linear and each product's market share is small. Even in a more flexible random coefficients logit demand model, demand elasticity is increasing in price holding all else equal. *See* Aviv Nevo, "A Practitioner's Guide to Estimation of Random Coefficients Logit Models of Demand," *Journal of Economics and Management Strategy* 9(4) (2000): 513-548, at pp. 522-526. Professor Prince cites a paper using the latter class of model in footnote 104 of his report. *See* Aviv Nevo, "Measuring Market Power in the Ready-to-Eat Cereal Industry," *Econometrica,* 69(2) (2001): 307–342.

[163]   McFadden Opening Report, footnote 245.

[164]   McFadden Opening Report, ¶ 240.

Non-Party Highly Confidential—Outside Counsel Eyes Only

Games, Music, and Entertainment categories. In that analysis, I demonstrate that my model could be used to identify apps for which app developers may incur negative variable costs and that these app developers may increase the download or IAP price at a lower commission rate. I also show that those apps are mostly low price apps and IAP, the number of Apple IDs that are not harmed as a result of spending money on those apps is not significant, and the damages amount associated with these Apple IDs is negligible. For the reasons specified in Section II.A of this report, none of these Apple IDs should be excluded from the Class.

86. Nevertheless, it would be worth addressing two specific points Apple's experts made regarding negative marginal cost. First, Professor Schmalensee criticizes that in my model "developers cannot choose to rely on advertising revenues and must earn a profit through paid apps or in-app purchases."[165] He claims that this feature is problematic because my model "cannot capture developers' complex choice among several monetization strategies."[166] Second, Professor Willig claims that consumers of subscription apps with advertising such as newspaper apps benefited from Apple's alleged misconduct, and "[i]dentifying all such apps would require an app-by-app inquiry."[167]

87. I disagree with Professor Schmalensee's assertion that my model should capture developer's complex choice among several monetization strategies. He focuses on advertising revenues, but there are other aspects of consumer welfare I do not model in my Opening Report, which would amplify consumer harms if modeled and estimated.[168] For example, I do not analyze how Apple's alleged misconduct has hindered output expansion and quality improvement. I also do not analyze how search frictions, as a result of the Apple App Store being the only iOS store, had harmed iOS device consumers. I also do not analyze how the Apple App Store's excessively

---

[165] Schmalensee Report, ¶ 208.

[166] Schmalensee Report, ¶ 208.

[167] Willig Report, ¶ 227 (adopted by Schmalensee). Professor Schmalensee relies on Professor Willig to make the same argument: "As Professor Willig demonstrates, for apps that rely heavily on advertising, so that their marginal costs are effectively negative, the profit-maximizing response to lower commissions is to raise the price of the app. Customers of such apps would be worse off in plaintiffs' but-for world." Schmalensee Report, ¶ 209.

[168] McFadden Opening Report, ¶¶ 243-244.

Non-Party Highly Confidential—Outside Counsel Eyes Only

high commission discouraged entry of new apps and how this decreased consumer welfare.[169] I limit my analysis to the harm resulting from the App Store commission elevating app and IAP prices above the competitive level because that is the most obvious way in which the Class members were commonly harmed. Because I do not model other aspects of harm to consumer welfare, my methodology would provide conservative estimates of damages inflicted on the Consumer Class.

88. Regarding advertising revenues in particular, my model accounts for the effects of advertising revenues on app developers' app and IAP pricing strategies, as I explain in my Opening Report.[170] Furthermore, even if I account for app developers' adverting decisions in my model, it would likely show larger damages. I explain below why that is when I address Professor Willig's argument regarding newspaper apps.

89. Professor Willig's assertion that consumers of subscription apps with advertising benefited from Apple's alleged misconduct is misguided. Simply speaking, he uses the negative marginal cost logic to muddy the water. His argument has two primary flaws, which I describe below.

90. First, he presents some data points to purportedly support his argument, but his "empirical" analysis cannot be used to test his argument. Professor Willig states that he has "identified several iOS newspaper/magazine apps that charge a subscription fee and display ads in the app to their subscribers" and lists five examples including the New York Times, the Wall Street Journal, The Economist, The New Yorker, and Wired.[171] He then presents digital-only subscription and advertising revenue figures for the New York Times and Dow Jones (the

---

[169] *See* Schmalensee Report, ¶ 24 for Professor Schmalensee's criticism that I do not incorporate competition between apps. Professor Schmalensee criticized my Opening Report model for not incorporating app entry in the But-For World. However, were I to do so, it would increase the damage to consumers predicted by my model. First, a decrease in the App Store commission would spur entry of new apps which would benefit consumers in terms of increased product variety. *See e.g.* Paul Belleflamme and Martin Peitz, Industrial Organization: Markets and Strategies, 2nd Edition, (Cambridge University Press, 2015), p. 82.

Second, the entry of new apps would put additional competitive pressure on existing apps which would lead to further price cuts, in addition to the price cuts that my model would predict if it incorporated strategic interaction between existing apps. *See* Section III.C for more details on why my model is conservative for not incorporating strategic interaction between apps.

[170] *See e.g.* McFadden Opening Report, footnote 245 and ¶ 240.

[171] Willig Report, ¶ 227 (adopted by Schmalensee).

---

Non-Party Highly Confidential—Outside Counsel Eyes Only

publisher of the Wall Street Journal). According to his research, the New York Times' digital advertising revenues were $229 million while its digital-only newspaper subscription revenues were $544 million in 2020, and Dow Jones' digital advertising revenues were $165 million while its digital-only subscription revenues were $429 million in the same year.[172]

91. However, showing that a newspaper's digital advertising revenues are about 40 percent of its digital-only subscription revenues is not helpful to determine whether the marginal cost is negative. In other words, while arguing that "[i]dentifying all such apps would require an app-by-app inquiry," Professor Willig does not explain or suggest how comparing digital advertising revenues with digital-only subscription revenues is useful in that inquiry or why his way of comparing the two data points is superior to my methodology to identify apps with negative marginal cost.

92. The second flaw of Professor Willig's argument is that he ignores the market reality, and the economic principle of two-sided markets, that these newspapers are likely to lower their ad price (i.e., the price they charge advertisers) if they increase the digital subscription price.[173] The academic literature has documented that advertisers' demand for advertising on media platforms depends on, among other things, the number of users (subscribers).[174] Thus, when a newspaper increases its subscription price, it has profit-maximizing motives to lower ad price to compensate advertisers for the loss of subscribers.[175]

93. Professor Willig's argument is based on the mathematical model presented in the technical appendix of his report.[176] In his mathematical model, he assumes the marginal revenue of advertising is not affected by a change in the subscription price, which is equivalent to assuming

---

[172] Willig Report, ¶ 228 (adopted by Schmalensee).

[173] *See* Marc Rysman, "The Economics of Two-Sided Markets," *Journal of Economic Perspectives* 23(3) (2009): 125-143, at 130.

[174] *See* Claude Crampes, Carole Haritchabalet, and Bruno Jullien, "Advertising, Competition and Entry in Media Industries," *The Journal of Industrial Economics* 57(1) (2009): 7-31.

[175] In his deposition, Professor Schmalensee agreed that proper analysis of a newspaper platform requires analysis of both subscription and advertising prices. Schmalensee Deposition, 64:3-64:8. (Q. Okay. The bottom line is you - you can't look at just one side of the - of the equation. You can't just look at subscription prices. You need to look at advertising prices too to understand the way that two-sided market works. A. Right.).

[176] Willig Report, Technical Appendix XII.C (adopted by Schmalensee).

Non-Party Highly Confidential—Outside Counsel Eyes Only

**ER-495**

that the newspaper he models does not balance its two-sided prices. This assumption is faulty. In his deposition, Professor Schmalensee defended this faulty assumption, arguing that Professor Willig's model (which Professor Schmalensee adopted) "[views] the [advertising] market as competitive so the price is given." [177] This assertion is inconsistent with the academic literature on newspapers as two-sided markets, which finds that newspapers typically have market power in their relationship with advertisers.[178] A sound two-sided market model should account for a newspaper's incentives associated with ad revenues. Once this incentive is incorporated in his model, one expects that the newspaper would likely lower its digital subscription price at a lower commission rate, whether or not the marginal cost is negative.

94. As I explain in my Opening Report, whether or not an app developer's marginal cost is negative or not is an empirical question, and my model identifies such cases, which renders an app-by-app inquiry unnecessary.[179]

## III.  APPLE'S EXPERTS' CRITICISMS ON MODEL SPECIFICATIONS

95. Apple's experts, mostly Professor Prince, make a number of criticisms regarding the particulars of my econometric model used in the second step of my methodology. These criticisms are laid out in Section 6 of the Prince Report and are related to (1) free apps, (2) Apple's price tiers, (3) competition among apps, and (4) aggregation of IAP. I address these criticisms in turn below.

### A.  FREE APPS

96. Apple's experts claim that "free apps" should be part of the relevant market and I should include them in my damages calculations. Professor Schmalensee, for example, criticizes that I am wrong to argue that "free apps are not reasonably interchangeable with paid apps" and asserts

---

[177]  Schmalensee Deposition, 120:24-121:13. ([Q.] You are aware that Professor Willig only modeled the changes in subscription price for newspapers; correct? A. Yes…. He treats advertising rather than per subscriber as a given. He does that -- Q. As a constant; correct? A. Yeah. Viewing that market as competitive so that price is given. Q. Okay. And by given, you mean constant; correct? A. Constant, yes. Beyond the newspaper's control.).

[178]  *See* Mark Armstrong, "Competition in Two-Sided Markets," *The RAND Journal of Economics* 37(3) (2006): 668–691.

[179]  *See* McFadden Opening Report, ¶¶ 225, 240.

Non-Party Highly Confidential—Outside Counsel Eyes Only

that "[f]rom a consumers' [sic] perspective, free and paid transactions of the same type of app are substitutable."[180] Professor Schmalensee points out that "some apps such as Spotify have both a paid and free version, and the free version offers many of the same features as the paid version."[181]

97. Before I discuss my responses to Apple's experts' arguments regarding free apps, I reiterate my earlier point that the question of whether free apps are part of the relevant market is common to all Consumer Class members.

98. As this Court explained in the *Epic* decision, it is important to note that there are two types of free apps. The first type is apps "for which a consumer does not pay to download, and which does not sell any digital goods or subscriptions."[182] Such apps typically sell non-digital goods (like shopping apps) or provide auxiliary services for app developers' businesses (like banking apps). The second type is apps for which the initial download is free but app developers can make money from selling in-app content or charging for upgrades. Such apps are called "freemium" apps in the *Epic* decision. I call them Free Download IAP apps in my Opening Report.[183] As the Court noted, Apple distinguishes these two types of apps in the Developer Product Licensing Agreement and applies different rules to them.[184]

99. Professor Schmalensee is not clear about which types of free apps he has in mind when he claims that free apps are reasonably interchangeable with paid apps. However, his Spotify example above suggests that he misunderstands what free apps are.[185] As Professor Schmalensee notes,

---

[180]  Schmalensee Report, ¶ 52.

[181]  Schmalensee Report, ¶ 52.

[182]  *Epic v. Apple* Order, p. 32.

[183]  McFadden Opening Report, ¶ 28.

[184]  *See Epic v. Apple* Order, p. 32, "In terms of payment, Apple knew from the outset that developers would either distribute their apps for "free" or by selling them. The [Developer Product Licensing Agreement] contained Schedules 1 and 2 to address each category, respectively. [After describing "free" apps] On the other hand, the "freemium model" (used by *Fortnite*) is one where the initial download is "free", but revenue comes from in-app purchases or payments for upgrades. Apps which do charge for downloads or digital goods bought within an app fall under the purview of Schedule 2."

[185]  Professor Simonson similarly conflates "freemium" apps for which consumers have not yet purchased in-app content with apps that are free to download and offer no digital content for purchase in his survey four questions. My model captures the fact that consumers of freemium apps may choose to purchase more in-app content in the But-For world. Simonson Deposition, 122:13-20.

Spotify has both a free and paid version, but Apple's App Store data records the sales of Spotify's paid version as IAP, which makes Spotify a Free Download IAP app.[186] For such apps, iOS device consumers first download a free version and then purchase paid services without re-downloading the app. As a result, I include the download of the free version in estimating app download demand and include the purchase of the paid version in estimating IAP demand. This approach is consistent with the sequence of actions that iOS device consumers typically go through in "consuming" Free Download IAP apps.[187]

100. Professor Schmalensee's confusion regarding the definition of free apps is also evident in Exhibits 2 and 3 of his report. In Exhibit 2, Professor Schmalensee lists baby name apps that are free, but many of them are Free Download IAP apps.[188] For example, each of the first three "free" baby name apps on his list offers IAP for ad removal or premium accounts.[189] Similarly, each of the first three "free" basketball training apps on his list offers IAP for subscriptions or

---

[186] In his deposition, Professor Schmalensee indicates that he believes I did not include the completely free version of the Spotify app in my analysis. He misunderstands my methodology. I include the free to use version of Spotify in my download demand estimation from 2011 to 2019. I also include it in my But-For simulation from 2014 to 2019, as the download component of a Free Download with IAP app. From 2011 to 2013, Spotify did not complete any paid App Store transactions, so the But-For simulation is inapplicable to Spotify in those years. *See* Schmalensee Deposition, 106:11-18. Note that Spotify stopped selling new subscriptions through App Store IAP in 2016. Rob Pegoraro, "Spotify just turned up the volume on its latest fight with Apple," *Yahoo!*, July 1, 2016, available at, https://sports.yahoo.com/news/spotify-apple-app-fight-163600384 html, last accessed October 18, 2021. However, Spotify continued to process subscription renewals as IAP, so paid Spotify IAP transactions continue to appear in the App Store transaction data through the end of my sample in 2019. As such, I classify Spotify as a Free Download with IAP app from 2014 to 2019.

[187] Professor Schmalensee's discussion of Spotify during his deposition reveals additional gaps in his understanding of the analysis in my Opening Report. He mischaracterizes my sampling method, claiming that he "did a sample of – of apps and a sample of transactions… I don't know if he has Spotify." Schmalensee Deposition, 105:25-106:10. As described in Appendix C of my Opening report, I selected a random sample of Apple IDs from the App Store Transactions data. I then limited my estimation sample to transactions for relatively high revenue apps, including Spotify.

[188] In his deposition, Professor Schmalensee admits that he does not know which of the baby name apps he identifies as "free" in Exhibit 2 are completely free, and which sell IAP. *See* Schmalensee Deposition, 100:18-25.

[189] Schmalensee Report, Exhibit 2. *See also* Apple App Store Preview, "Babies Name," available at, https://apps.apple.com/us/app/babies-name/id1434911336, last accessed October 18, 2021; Apple App Store Preview, "Baby Affinity," available at, https://apps.apple.com/us/app/baby-affinity/id1547913226, last accessed October 18, 2021; and Apple App Store Preview, "Baby Boy & Girl Names Meaning," available at, https://apps.apple.com/us/app/baby-boy-girl-names-meaning/id1488731209, last accessed October 18, 2021.

---

Written Evidence of Daniel L. McFadden                    No. 4:11-cv-06714-YGR | Page 42 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

access to specific content.[190] Professor Prince adopts Professor Schmalensee's definition of free apps in claiming that I excluded free apps from my analysis altogether.[191]

101. Regarding the first type of free apps (which a consumer does not pay to download, and which do not sell any digital goods or subscriptions), Professor Prince argues that I exclude from my analysis, and predict no But-For price for, "all free-to-download apps that do not offer in-app purchases ('free apps')."[192] He then asserts that my model and logic "predict that free apps would raise their prices in the but-for world had [I] included them in [my] analysis."[193]

102. As I explained in my Opening Report, "I model app developers as firms that set prices to maximize profits, given demand conditions and cost. … Depending on what types of apps they sell, app developers decide how much to charge for initial downloads, subscriptions, or non-subscription in-app content."[194] Then I explain with mathematical equations how I model price decisions for Paid Download IAP apps, Paid Download apps, and Free Download IAP apps.

103. The apps I model are those that app developers monetize through the App Store by charging for downloads or selling in-app content. Free apps have different monetization strategies, as I explained in my Opening Report.[195] Professor Prince argues that app developers of free apps, such as Lyft, DoorDash, and Bank of America, decide how much to charge for downloading their apps by comparing the revenues from selling their apps with the cost of offering apps, and that they decide to offer free apps because the As-Is 30 percent commission is too high, but they would have charged for downloading in the But-For world.

104. Consider first apps that enable the sale of non-digital goods and services like Lyft or DoorDash. Because their revenues come from selling non-digital goods and services, they would want to

---

[190]  Schmalensee Report, Exhibit 3. *See also* Apple App Store Preview, "1x1 Basketball Training – Video Guide," available at, https://apps.apple.com/us/app/1x1-basketball-training-video-guide/id981617290, last accessed October 18, 2021; Apple App Store Preview, "Academy by In The Lab," available at, https://apps.apple.com/us/app/academy-by-in-the-lab/id1508624570, last accessed October 18, 2021; and Apple App Store Preview, "All-Around," available at, https://apps.apple.com/us/app/all-around/id1218143119, last accessed October 18, 2021.

[191]  Prince Report, ¶ 63.

[192]  Prince Report, ¶ 51.

[193]  Prince Report, ¶ 52.

[194]  McFadden Opening Report, ¶ 165.

[195]  McFadden Opening Report, ¶ 26.

Written Evidence of Daniel L. McFadden                    No. 4:11-cv-06714-YGR | Page 43 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

give away their apps for free so that more people can use them to buy their goods and services. The real economic cost of charging for app downloads would come from the loss of sales of their non-digital goods and services, and that cost would be enormous. Professor Prince argues that these app developers would have charged for app downloads in the But-For world because their share of $0.99 or $1.99 would be larger.

105. In this sense, Professor Schmalensee's discussion of what would happen to free apps such as Uber and Lyft in the But-For world is equally unrealistic and inconsistent with market realities. He states that "Uber and Lyft have paid $99 annually to join the Apple Developer Program, for instance, even though they have not paid commissions. If that annual fee were higher in the But-For world, as it might well be, they would be worse off. Such a higher annual fee would likely reduce the supply of free apps, making consumers who only downloaded free apps in the actual world worse off."[196] Professor Schmalensee appears to use this example to argue that apps that are not subject to the App Store commission should be included in Developer Class's damages model and that the way that such apps would affect consumers in the But-For world is *not* through a higher commission but through reduced outputs resulting from a higher annual fee. Again, the $99 annual fee is typically a tiny portion of these companies' non-digital businesses, so the annual fee must increase by an enormous amount for them to forfeit their business with iOS device consumers.

106. The same principle can be applied to free apps providing auxiliary services for app providers' main business such as banking apps. These companies offer free apps to iOS device consumers to provide mobile services related to their main businesses, not to make money by selling apps. Another type of free apps are those that rely solely on advertising for revenue such as Google Maps, Firefox, and Pinterest. These app providers' entire businesses are driven by advertising, and they use apps to make money from advertisers who value iOS device consumers' attention.

107. Given the benefits that these free apps bring to the whole business, these app providers may well want to pay iOS device consumers to download their apps. Professor Prince recognizes such incentives in his report when he says, "Developers may set the price at zero when the true, profit-

---

[196]  Schmalensee Report, ¶ 38.

Non-Party Highly Confidential—Outside Counsel Eyes Only

maximizing price would be negative–i.e., they would prefer to pay users to install the app."[197] For these app developers, it would not make sense to sacrifice their "real" business in order to earn (relatively) miniscule revenues from selling apps. Put differently, to the free app providers, charging for downloads is not worth the enormous opportunity cost. Hence, it is not appropriate to use my model, which is set up to describe the price strategies of app developers whose main business pertains to selling apps and in-app content, to "predict" the But-For price of free apps.

108. Though Professor Prince recognizes that optimal prices might be positive, negative, or zero, he mechanically applies the formula in my model that I use for positive prices, to free apps. In so doing, he purports to show "free apps will raise their prices in the but-for world similar to paid download apps with low prices and negative marginal costs."[198] He claims that it is because my model assigns free apps a negative marginal cost. He is right that my model assigns free apps a negative marginal cost *when it is mechanically applied to them*, but he makes a mathematical error in his mechanical application: free apps do not pay the commission.[199] Taking into account free, or negative-price, apps would require a different commission variable, or even a different equation. Indeed, when the commission variable is mechanically set equal to zero in my model, it produces different results from what Professor Prince asserts as I show below.

109. When tweaking my model to allow zero to be an optimal price, Professor Prince is implicitly assuming that the App Store commission stays the same regardless of whether the price is positive or negative. But Professor Prince repeatedly admitted that he did not consider what the App Store commission would be for negative prices.[200] Therefore, his implicit assumption that the App Store's commission is the same for positive and negative prices, say 30 percent, would produce a strange result at negative prices. For example, if an app developer paid each downloader a dollar (which Professor Prince admits is possible and possibly optimal),[201] then Apple would pay the developer 30 cents. In arithmetic terms, a negative price multiplied by a

---

[197] Prince Report, footnote 50.

[198] Prince Report, Appendix F.1, ¶ 23.

[199] In his deposition, Professor Prince agreed that the commission rate should be 0 for free apps. Prince Depo, 107:2-5. (Q. … And at zero payment, tau implies zero? [sic] A. In that instance, zero dollars would go to Apple, yes.).

[200] Prince Deposition, 102:17-111:21.

[201] Prince Deposition, 102:17-24.

Non-Party Highly Confidential—Outside Counsel Eyes Only

positive commission variable produces a negative commission payment. Neither Professor Prince nor I think this result reflects the real world.[202]

110.  This example shows that a positive commission variable only works for positive prices. A negative payment would require either a negative commission variable (if Apple took some of the reverse payment) or zero (if it did not). Instead, Professor Prince used the positive commission for free apps. If he had not made this mistake, he would have reached the conclusion that the price of free apps would be lower (i.e., negative) in the But-For world.[203]

111.  In my view, whether free apps are part of the relevant market is not a relevant question for the purpose of the class certification and should not be used to identify the Class members or to calculate damages.

### B.   PRICE TIERS

112.  Apple's experts make two arguments regarding Apple's tier pricing policy. First, they argue that Apple's tier pricing policy is not anticompetitive. Second, they argue that the omission of the App Store price tiers leads to overestimating the number of harmed consumers. I will address the first argument in Section VII.B of this report, and in this section I address the second argument.

113.  Professor Hitt observes that "█ percent of proposed consumer class accounts only made paid transactions on the App Store at the minimum price" (i.e., $0.99) and argues that "these consumers would all be unharmed by Apple's challenged conduct if Apple maintained its tier-based pricing … in the but-for world."[204] Professor Prince asserts that I am "overestimating the number of consumers that are harmed" by "[a]ssuming that price tiers would disappear."[205]

---

[202]  Prince Deposition, 108:17-109:1.

[203]  Professor Prince shows that the marginal cost of free apps is $c_{jt}^d = (1 - \tau^{RW}) \frac{1}{\alpha^d}$, and $c_{jt}^d$ is negative because $\alpha^d < 0$ and $1 > \tau > 0$. (Prince Report, Appendix F.1, ¶23.) This is wrong because $\tau^{RW} = 0$ for free apps. The right formula for free apps is $c_{jt}^d = \frac{1}{\alpha^d}$ with $\tau^{RW} = 0$. With $c_{jt}^d = \frac{1}{\alpha^d}$, my model predicts that the price of free apps becomes negative in the But-For world because $p_{jt}^{d\ BF} = \frac{1}{\alpha^d}\left(\frac{\tau}{1-\tau}\right) < 0$.

[204]  Hitt Report, ¶ 370.

[205]  Prince Report, ¶ 59.

114. Professor Prince attempts to quantify the effect of the But-For world price tier assumption by comparing the profitability of paid-download only apps at price tiers adjacent to the As-Is price, and finds that "[o]nly 927 observations (31.2 percent) of [my] sample find it optimal to adjust their price downward by an entire price tier in the but-for world."[206]

115. Whether I overestimate damages and the number of harmed consumers will depend on how the Court decides on this issue based on its merits. For the purpose of the class certification, what matters is my model is able to identify unharmed consumers and calculate damages for a But-For world where price tiers do not disappear, as Professor Prince both demonstrated in his report and testified in his deposition.[207]

116. I note, however, that Professor Prince's price tier analysis does not calculate the optimal profit-maximizing price on the pricing tier for an app; instead, it checks whether a price one-tier lower, or one-tier higher, would be more profitable. For example, an app that priced at $5.99 in the As-Is world, Professor Prince only checked whether $4.99 or $6.99 would be more profitable in the But-For world than $5.99. He did not check whether any price below $4.99 was even more profitable. Therefore, Professor Prince did not actually find the profit-maximizing price on the pricing tier.[208]

117. The correct way to find the optimal But-For price with pricing tiers is to compare profits from all price points and pick the one that maximizes profits. Applying this method to Professor Prince's analysis, I find that the overall damages are slightly larger with tier prices than the damages in my Opening Report.[209] This result occurs because none of the apps in his analysis would raise

---

[206]  Prince Report, ¶ 61.

[207]  Prince Report, Exhibit 6; Prince Deposition, 100:5-22. (Q. Let me ask it a different way. Are you able to get a prediction for what a but-for world would look like in terms of app prices using Professor McFadden's model, even if there are price tiers? Mr. Swanson: Object to the form…A. So [Exhibit 6] – I mean, this is an example where I'm – I'm describing a method to determine what the price change would be if there were price tiers in place. I'm presenting a method that – that would do that based on Professor McFadden's model.).

[208]  Prince Deposition, 101:20-102:16. (Q. Okay. Let's suppose that an app was optimally priced in Dr. McFadden's estimation at $2.30. Would the developer in the presence of price tiers at integrals a dollar apart ending in 99 – so 1.99, 2.99 – choose the price at 1.99 or 2.99?... in your methodology for this analysis, did you check all possible price tiers or only the immediate above and below? A. Yesterday for sure I didn't check any beyond these two… But I can't say that we never considered, you know, potentially going beyond that.).

[209]  See McFadden Opening Report, ¶¶ 236, 239.

Non-Party Highly Confidential—Outside Counsel Eyes Only

their prices in this But-For world, and because many apps would reduce their prices by more than they would in the absence of price tiers. In addition, the percentage of unharmed Apple IDs increases from 7.7 percent to 11.4 percent with price tiers, a relatively small change given that "[o]nly 927 observations (31.2 percent) of [my] sample find it optimal to adjust their price downward by an entire price tier in the but-for world."[210]

### C.     APP COMPETITION

#### 1.     Modeling App Competition

118.  Professor Prince criticizes that I do not model "any competition between apps—even within the same genre" but assume that "apps price in a manner that completely ignores pricing decisions by other apps, no matter how similar."[211] His interpretation of this model feature is that I assume "each app sets its price as a monopolist."[212] Although he acknowledges that I do not "explicitly assume or state that each app is a monopolist,"[213] he still asserts that because I do not explicitly model competition between apps, "[my] predictions about prices of apps in the but-for world are unreliable."[214] Professor Schmalensee makes a similar argument by claiming that "the actual extent of pass-through will depend on the ease of entry, the nature and intensity of competition and, generally, on the shapes of demand and cost functions."[215] He claims that "most, if not all, iOS apps have competition from apps offered by other developers."[216] Despite their criticisms, Professors Prince and Schmalensee do not explain how accounting for app competition would affect my estimation of the But-For prices for apps and in-app content.

119.  As Professor Prince acknowledges, I have never claimed that each app is a monopolist. In my deposition, I instead clarified that "if you produce a differentiated product, you have at least

---

[210]   Prince Report, ¶ 61.

[211]   Prince Report, ¶ 62. Professor Hitt makes a similar criticism using Spotify and Pandora as an example. Hitt Report, ¶ 280.

[212]   Prince Report, ¶ 62.

[213]   Prince Report, footnote 68.

[214]   Prince Report, ¶ 64.

[215]   Schmalensee Report, ¶ 128.

[216]   Schmalensee Report, ¶ 163.

Written Evidence of Daniel L. McFadden                              No. 4:11-cv-06714-YGR | Page 48 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

some local ability or market power to control the price you charge for that product."[217] When asked in my deposition what would be an example of an elasticity consistent with high levels of competition, I answered "in my judgment, three is pretty competitive."[218] Professor Prince uses this statement to assert that "[I estimate] that 59 percent of the apps [I] stud[y] had, in at least one year, an elasticity of at least three and, therefore, [I] would judge them to be in a 'pretty competitive' environment."[219]

120. While it is true that I do not explicitly model competition between apps in their pricing decisions, I estimate the degree of competitiveness through the price sensitivity of demand. This price sensitivity captures how readily consumers switch to other apps should an app increase its price. As Professor Prince explains in his report, "the demand for an app that faces intense competition would have a higher elasticity of demand than another app in the same genre that does not face as much competition."[220]

121. In Appendix D of my Opening Report, I explain how the app download and IAP demand equations approximate consumer demand based on consumer utility maximization. The utility function specified in Appendix D.1 of my Opening Report is widely used to model oligopolistic competition in the academic literature.[221] For such a utility function, my approximation is especially reasonable when consumers choose among a large number of choices as iOS device consumers typically do.

122. What my model *does not* do is capture the strategic interactions between apps in the But-For world. But this is a conservative approach. That is, incorporating strategic interactions between apps would have resulted in larger damages.

123. Professor Schmalensee suggests that competition between apps would lead consumers rather than developers to capture additional gains from reduced App Store commissions. He states, "In

---

[217]    McFadden Deposition, 83:12-24.

[218]    McFadden Deposition, 128:10-129:3.

[219]    Prince Report, footnote 70.

[220]    Prince Report, ¶ 66.

[221]    I won the Nobel Prize in Economics in 2000 for my research that laid the foundation of the consumer choice model widely used in the academic literature.

Non-Party Highly Confidential—Outside Counsel Eyes Only

case of intense competition among developers and low barriers to entry into the iOS developer business, lowering the commission rate uniformly across developers would have no effect on their profits; developers would compete the gains away."[222]

124.    In a model that accounts for competition between apps, some developers would compete away their gains from lower commissions and pass them on to consumers leading to a larger damages estimate. As an illustrative example, suppose the App Store commission in the But-For world decreases, and Spotify and Pandora compete with each other for music streaming services. There are two effects that push Spotify and Pandora prices downward. First, given the lower commission, Spotify and Pandora will both lower prices to increase demand for their products while maintaining adequate profit margins. Second, given that Spotify and Pandora compete with each other for music streamers, both apps have an incentive to undercut each other's prices to retain their consumers. Pandora's price cut will incentivize Spotify to decrease its own price so that Pandora does not steal many of its consumers. What this means is that the direct impact of a lower App Store commission on decreasing prices in the But-For world is further reinforced by an indirect or "strategic" effect of competitors enacting further price decreases in order to not lose market share. Indeed, this is a well-established principle in the economic literature called "strategic complementarities," and it is well-known that accounting for strategic responses amplifies firms' responses to cost shocks.[223]

---

[222]    Schmalensee Report, ¶ 163. In his deposition, he clarified that he expects that developers would compete away the gains from lower commissions in the But-For world, at least in some submarkets. Schmalensee Deposition, 109:18-24. He continues to concede that developers could compete the gains away by lowering the prices of apps and IAP, or by improving product quality. Schmalensee Deposition, 114:17-23. He also acknowledges that consumers would capture those gains. Schmalensee Deposition, 115:5-12.

[223]    The concepts of "strategic complements" and "strategic substitutes" were introduced by Jeremy Bulow, John Geanakoplos, and Paul Klemperer. When firms' choices (e.g., prices or quantities) are strategic complements, a firm responds to more aggressive behavior by its competitors with more aggressive actions. Jeremy I. Bulow, John D. Geanakoplos, and Paul D. Klemperer, "Multimarket Oligopoly: Strategic Substitutes and Complements," *Journal of Political Economy*, 93(3) (June 1985): 488-511, at p. 494. Accounting for strategic interaction in the presence of strategic complementarity amplifies firms' responses to shocks such as cost changes. Paul Belleflamme and Martin Peitz, *Industrial Organization: Markets and Strategies*, 2nd Edition, (Cambridge University Press, 2015), p. 70, "If the firms' choices are strategic complements... and if an increase in some parameter of the market environment raises marginal profits [with respect to the firm's choice], then an increase in this parameter leads firms to increase their strategic choice at equilibrium... Strategic interaction amplifies the effect of the policy change on $x$ [the strategic choice]." Note that an increase in cost increases a firm's marginal profit with respect to price when demand is downward sloping.

Non-Party Highly Confidential—Outside Counsel Eyes Only

125. In addition, Professor Prince makes a misleading claim that my decision to not explicitly model competition between apps is "based on the assumption that any individual's probability of buying a particular app does not depend on any observable characteristics of that individual."[224] As evidence, he cites Appendix D of my Opening Report.[225] Professor Prince appears particularly concerned with the probability of an individual consumer downloading a particular app not being a function of individual characteristics.

126. As I explain in my Opening Report, accounting for the consumer characteristics that led the Consumer Class members to purchase different apps and in-app content is not necessary in quantifying common impact of Apple's alleged misconduct.[226] Because all app developers selling apps and in-app content through the App Store are subject to Apple's excessive commission, and app developers do not price discriminate based on consumer characteristics, all purchasers of a given app or in-app content paid the same price in a given period and were overcharged by the same amount as a result of Apple's alleged misconduct. My model and methodology estimates that overcharge amount.[227]

### 2.    The Functional Form of Price Elasticity

127. Professor Prince criticizes that my model "assumes all apps within the same genre will have the same sensitivity to price."[228] He further claims that "a given app's price elasticity, which is

---

[224] Prince Report, ¶ 65. Indeed, Professor Prince seems to confuse modeling strategic interactions with incorporating consumer heterogeneity in a demand model. These are related but distinct issues. One does not need to explicitly incorporate consumer heterogeneity to model firms' strategic interactions. A logit model based on the consumer utility function described in Appendix D of my Opening Report is often used to model firms' strategic interactions. *See e.g.* Gregory J. Werden, Luke M. Froeb, and Timothy J. Tardiff, "The Use of the Logit Model in Applied Industrial Organization," *International Journal of the Economics of Business* 3(1) (1996): 83-105, at pp. 84, 96-99.

[225] Prince Report, footnote 73. *See also* McFadden Opening Report, Appendix D, ¶ 7.

[226] McFadden Opening Report, Section VI.A.

[227] Even if I used a mathematically fancier model to make an individual's purchase probability as a function of consumer characteristics, I would need to average out individual-level purchase probabilities to model app developers' pricing decisions. This is because app developers, such as a racing game app developer in Professor Princes' example, do not price discriminate based on consumers' characteristics such as age. Prince Report, ¶ 65.

[228] Prince Report, ¶ 67. This criticism is related to his criticism that my variable cost estimates are "unrealistically uniform" since the price sensitivity is one of the key elements I use to estimate app developers' variable costs. *See* Prince Report, ¶ 87.

---

meant to capture the level of competition an app faces, is completely unaffected by changes in the presence and prices of similar apps."[229]

128. As I explained above, I estimated the level of competition an app faces through the price sensitivity parameters; I do not model the strategic interactions between apps in the But-For world, but this is a conservative approach. Nevertheless, it is important to understand that I allow the price sensitivity to differ not only by genre, but also by whether a transaction is for an app purchase or an IAP. As a result of this choice of a functional form, the price elasticity of demand differs by genre, whether a transaction is for an app purchase or an IAP, and the price level.

129. Because my demand model is based on the consumer utility function widely used to model oligopolistic competition in the academic literature and antitrust agencies' merger analysis, the functional form of the price elasticity of my model is not much different from that of the demand models widely used in the academic literature.[230] For example, the price elasticity of those demand models also depends on the price sensitivity, measured as consumers' marginal disutility of paying a higher price, and the price level, among other things.[231]

130. Professor Prince appears to believe that my model should allow the price sensitivity parameter to be different for different apps within the same genre. As evidence to support his argument that different apps within the same genre face different price sensitivities, he "divide[s] apps within a genre into high revenue and low revenue apps" and estimates my model "while keeping all other assumptions made by [me] intact."[232]

---

[229] Prince Report, ¶ 67.

[230] *See* Steven Berry, James Levinsohn, and Ariel Pakes, "Automobiles Prices in Market Equilibrium," *Econometrica* 63(4) (July 1995): 841-890. *See also* Aviv Nevo, "A Practitioner's Guide to Estimation of Random Coefficients Logit Models of Demand," *Journal of Economics and Management Strategy* 9(4) (2000): 513-548, at p. 521-526.

[231] Depending on the type of problems to analyze, researchers allow the price sensitivity to depend on consumer characteristics such as income, but they average out consumer heterogeneity when analyzing non-discriminatory pricing.

[232] Prince Report, ¶ 70. Professor Prince determines high revenue and low revenue apps based on whether the app's lifetime revenues were above or below the median app lifetime revenues. Prince Report, footnote 78.

Non-Party Highly Confidential—Outside Counsel Eyes Only

131. Professor Prince finds that the price sensitivity for high-revenue games is "more than eight times"[233] that for low-revenue games. Similarly, the price sensitivity for low-revenue Music & Entertainment apps is "more than four times"[234] that for high-revenue Music & Entertainment apps. Professor Prince claims that "[t]his difference, which is masked in [my] analysis, likely impacts [my] conclusions regarding which, and how, many consumers are harmed."[235]

132. Dividing apps by historical, lifetime revenue and estimating the price sensitivity for each revenue group is not a correct way to make my model more "flexible." Revenues are highly correlated with the model outcome. They result from consumers choosing an app because it has features they want at a price they are willing to pay. Estimating demand for each revenue group separately is no different from trying to explain an outcome (app downloads) using a variable that is highly correlated with the outcome (revenues).[236]

133. Professor Prince's method of grouping apps by revenue also creates practical issues. For example, how do you categorize a new app? If it is highly desirable, it is more like the high revenue group, but there is no way to know that until it has a sales history. If it is a "flop," it is more like the low revenue group, but again, this cannot be known until it has a track record in the marketplace. To assign a new app into the low-revenue category just because it has not had a chance to earn revenues seems arbitrary, to assign it to the high revenue group in case it succeeds is speculation.

134. Then can apps within the same genre (category) be grouped based on some exogenous variables and each group's price sensitivity be estimated separately? Based on the information available to me, I have not found reasonable further groupings of apps within the same genre. However, apps within the same genre could be grouped based on some predetermined characteristics and the

---

[233] Prince Report, ¶ 71.

[234] Prince Report, ¶ 71.

[235] Prince Report, ¶ 72.

[236] Professor Prince testified in his deposition that an app's revenue is the result of paid downloads and IAP. Prince Deposition, 53:23-54:7. (Q. Let me ask that a different way. What determines the lifetime revenue of an app? A. It is the total amount of receipts that it takes in. Q: And the receipts that it takes in are – is – is a results of the – depending on its business model, the combined total of the paid downloads and the IAP it sells to its users; is that right? A. Yes. I believe that is correct.).

price sensitivity for each group can be separately estimated. What Professor Prince is confused about is even if that is the case, it does not mean there is no common impact.

135. Professor Prince asserts that because "[d]ifferent apps face different levels of competition, even within a single genre,"[237] "the overall level of competition an app faces is an individualized issue."[238] Professor Prince concludes that "[my] methods therefore cannot show whether any individual consumer, let alone the whole class, is harmed"[239] since I have allegedly not provided "a method to determine whether iOS apps will respond to changes in Apple's commission rate in a common manner."[240]

136. As I explain in my Opening Report and in Section II.B (and elsewhere) of this report, common impact does not mean the same magnitude of impact: "When firms pay a certain percentage of their revenue to a retailer or distributor, they offset an increase in this component of marginal costs by raising prices. How much they increase prices depends on the impact of the commission on their marginal costs and on the price elasticity of their consumers, but the common economic impact is that consumers pay higher prices as result of an increased commission."[241] Even if dividing apps based on revenues is a valid way to group apps (which is not), and it turns out the price sensitivity differs between these groups, it does not necessitate individual inquiry. All it changes is the magnitude of impact.

137. Lastly, in the high-revenue vs. low-revenue analysis, Professor Prince reports, "when I attempt to use Professor McFadden's model to determine but-for prices for these apps, his model fails to predict any but-for prices."[242] His explanation is that he obtained a negative coefficient for the relationship between app downloads and IAP transactions for low-revenue Games and high-revenue Music & Entertainment apps.[243] This is his recurring criticism on the performance of my model throughout his report, and I will fully address it in Section IV.B of this report. In short, his

---

237   Prince Report, ¶ 68.
238   Prince Report, ¶ 69.
239   Prince Report, ¶ 69.
240   Prince Report, ¶ 69.
241   McFadden Opening Report, ¶ 132.
242   Prince Report, ¶ 72.
243   Prince Report, footnote 79.

criticism is that my model predicts that additional app downloads will decrease IAP transactions, when applied to high-revenue and low-revenue apps separately. This statement is inconclusive without calculating standard errors. In my Opening Report, I find the relationship between app downloads and IAP transactions is not statistically significant for Music & Entertainment apps, and Professor Prince does not dispute this fact.[244] This relationship captures the effects of app downloads in a given month on the number of IAP transactions in the same month (after controlling for historical patterns of app downloads through the time fixed effects).[245] We would expect that over time, downloads have stronger effects on IAP transactions. But this coefficient simply implies that many consumers do not make IAP in the same month in which they download apps.[246] Despite not calculating standard errors, he relies on a negative estimate of this coefficient as a basis of the "model failure."

### D.    AGGREGATION OF IAP ITEMS

138. Another criticism that Professor Prince makes regarding the "mathematical assumptions" of the econometric model used in the second step of my methodology is that those properties have the implication that "developers change the price of all in-app purchase items by the same dollar amount in the but-for world."[247] He asserts that "an in-app purchase item of 99 cents would experience the same dollar amount price increase as one priced at $29.99" in my model and that "[c]hanging this assumption changes [my] conclusions regarding which, and how many, consumers are harmed."[248]

---

[244] McFadden Opening Report, ¶ 232. Prince Deposition, 74:20-75:2. (Q. And you did not report a different standard error; is that right? A. From conducting the same analysis as he did? Q. Right. That is what I'm asking. A. Yes. I did not dispute the standard error from his analysis.).

[245] Professor Prince evidently agrees with this interpretation despite his outsized focus on this coefficient. Prince Deposition, 74:4-7. (Q. And the equation that we are talking about, the coefficient beta Q is for downloads and IAP purchases in the same month; is that right? A. That is my recollection.).

[246] Professor Prince agrees that my model can be used to investigate this very relationship. Prince Deposition, 77:22-78:7. (Q. Did – okay. So you – you may have – you may have predicted my next question. Did you do anything to investigate the possibility that there are purchasing patterns that would indicate a weak relationship between downloads and IAP purchases within the same month? A. And I guess – I guess I would say not beyond what has been presented here. I would say this analysis is exactly looking at that. The – the regressions are looking at the relationship between downloads and in-app purchases in the same month.).

[247] Prince Report, ¶ 73.

[248] Prince Report, ¶ 73.

Non-Party Highly Confidential—Outside Counsel Eyes Only

139.  As evidence to support this criticism, Professor Prince modifies my model to estimate But-For prices for individual IAP items. Rather than estimating the average But-For price of an app's in-app content, he applies the But-For price formula from my model to each IAP item independently to estimate its But-For price.[249] Using the example of the game Roblox, which sells 13 IAP items, he reports that Roblox would increase price for the 3 lowest priced IAP items in the But-For world, while it would decrease price for the other 10 IAP items.[250]

140.  Professor Prince's Roblox analysis demonstrates why my modeling approach is reasonable and consistent with market realities while his alternative approach is improper. Figure 1 recreates Professor Prince's Exhibit 8 with information about marginal costs added in. In his analysis, Professor Prince estimated the variable cost of a pack of 80 Robux (Roblox's virtual currency) to be ▮▮▮ and the variable cost of a pack of 800 Robux to be ▮▮▮ This implies that if a customer purchased ten 80 Robux packs, for a total of 800 Robux, the developer would incur a variable cost of ▮▮▮ . However, if the consumer instead purchased a single pack of 800 Robux, the developer would incur a positive marginal cost of ▮▮▮ How can the same quantity of in-app currency have both a ▮▮▮ and ▮▮▮ marginal cost? This implication is nonsensical.

---

[249]  *See* McFadden Opening Report, Appendix E, ¶ 42. *See also* Prince Report, ¶ 76 and Exhibit 8.
[250]  Prince Report, ¶¶ 75-79.

Non-Party Highly Confidential—Outside Counsel Eyes Only

**FIGURE 1: PROFESSOR PRINCE'S ITEM-LEVEL BUT-FOR PRICE SIMULATION IMPLIES ILLOGICAL MARGINAL COSTS FOR ROBUX (ROBLOX IAP)**

| Item | As-Is Price | But-For Price | But-For Price Change | Implied Marginal Cost | Equivalent Number of 80-Robux Purchases | Implied Marginal Cost of Equivalent Number of 80-Robux Purchases |
|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] | |

Sources and Notes:

[1]-[4]: Brattle's replication of Professor Prince's item-level But-For simulation for Roblox (Exhibit 8).

[5]: Equivalent purchase in terms of 80-Robux purchases.

[6]: -$1.70 x [5].

141. Professor Prince asserts that "looking at only an average price across many in-app purchase items assumes away all such differences," because it "mechanically obscures an area where differences in impact are likely to arise: consumers who buy different in-app purchase items for the same app may suffer different amounts of harm—and some may experience no harm at all."[251] He was able to squeeze out more uninjured Apple IDs by blindly applying my But-For price calculation method to individual IAP items, but his Roblox example clearly demonstrates that he did not critically think about what his alternative modeling approach implies.

142. In my Opening Report, I estimate app developers' variable costs at the app level, not at the IAP-item level, because I find the app level is the most reasonable level at which app developers' variable costs can be estimated.[252] Professor Prince's Roblox analysis confirms that my approach is more reasonable, as my analysis leads to the more palatable conclusion that the average marginal cost of Roblox's in-app content is ████.

---

[251] Prince Report, ¶ 74.

[252] For details on estimation procedure, see McFadden Opening Report, Appendix E.2.

Non-Party Highly Confidential—Outside Counsel Eyes Only

143. Professor Prince's Roblox analysis also sheds light into the nature of variable costs my model is set up to estimate. The variable cost my model estimates is not the developer's variable cost of selling 80 Robux, or the variable cost of selling "V-Bucks for Epic's Fortnite game" which Professor Schmalensee argues is likely zero,[253] but the variable cost of running and monetizing their app. As I explained in the Opening Report and Section II.E.1 of this report, when app developers set the price of their IAP, they will take into account the costs that scale up as more users engage with and spend money on their apps.[254]

144. Given the nature of the variable cost, my model describes how app developers set the unit price of app downloads or the average price of IAP items to maximize their profits given demand and supply conditions. In my view, building a model at this level of details is reasonable and sufficient to estimate common impact of Apple's alleged misconduct. Professor Prince, and other Apple experts, misinterpreted this modeling approach and twisted my model to reach nonsensical conclusions regarding its implications for IAP item prices in the But-For world.

## IV. APPLE'S EXPERTS' CRITICISMS ON THE APPLICATIONS OF THE METHODOLOGY

145. In this section I address Professor Prince's criticisms regarding my estimation procedure[255] and sampling method.[256] I also demonstrate how the estimates obtained from a random sample can be used to calculate damages for transactions not included in that sample to address Professor Prince's criticisms regarding the representativeness of my damages calculation.

### A. ESTIMATION PROCEDURE

146. Professor Prince criticizes how I estimate the econometric model described in Section VI of my Opening Report. He claims that "estimates of each app's demand and marginal cost are driven

---

[253] Schmalensee Report, ¶ 210.
[254] *See* McFadden Opening Report, Section VI.D.1.
[255] *See* Prince Report, Section 7.
[256] *See* Prince Report, Section 8.

Non-Party Highly Confidential—Outside Counsel Eyes Only

not by consumer data … but by arbitrary and incorrectly calculated margin constraints."[257] He has two specific criticisms regarding the model estimation. He claims that the estimates of the price sensitivity presented in my Opening Report are (1) driven by "the ad hoc constraints" I impose and (2) not driven by "the observed relationship in the data between quantities and prices."[258]

147. Professor Prince performs two analyses to purportedly prove his points. Regarding the first criticism, he estimates my econometric model with different margin bounds and reports that results "change substantially."[259] Based on this result, he criticizes that I am "assuming the conclusion within [my] demand model."[260] Regarding the second criticism, he replaces actual quantities with "random 'placebo' quantities" and reports that he obtains "precisely the same values for three of the four price sensitivity estimates."[261] He concludes that "[i]t is therefore apparent how divorced [my] estimates are from the transaction data on which they should be primarily based."[262]

### 1.    The Criticism Regarding Margin Bounds

148.  As I explain in my Opening Report, in economics, especially in the field of industrial organization, economists frequently estimate variable costs using firms' profit maximization conditions and demand estimates.[263] None of Apple's experts, including Professor Prince, challenge this approach. This is not surprising given that it is a widely used methodology in

---

[257]  Prince Report, ¶ 18. Despite claiming that my estimates "are driven not by consumer data" in his report, he agreed in the deposition that my model results do in fact depend on the data used in estimation. Prince Deposition, 50:13-17. (Q. I said is it fair to say that with different data and the same margin bounds the model will produce different results? Mr. Swanson: Same objection. THE WITNESS: I believe that is possible.).

[258]  Prince Report, ¶ 93.

[259]  Prince Report, ¶ 95.

[260]  Prince Report, ¶ 96.

[261]  Prince Report, ¶ 94.

[262]  Prince Report, ¶ 94.

[263]  McFadden Opening Report, ¶¶ 140-142.

Non-Party Highly Confidential—Outside Counsel Eyes Only

academic papers, including at least one co-authored by Professor Prince.[264] This approach is popular among academics because cost data are often difficult to obtain.

149. When reliable cost data are available, however, economists do not hesitate to use them to help estimate demand models. As I explain in my Opening Report, "information on firms' costs and variable margin is helpful in estimating demand and costs. By reversing the mechanism of imputing firms' variable margins, firms' cost data can be used to estimate consumer demand more accurately."[265]

150. Professor Prince argues that the way in which I use supplemental cost data to refine and sharpen estimates is "inconsistent with well-established literature."[266] He goes on to estimate my model without margin constraints to purportedly demonstrate that "[my] model fails to precisely estimate the demand for in-app purchases" without the supplemental cost data.[267] This is a mischaracterization of my estimation procedure and inconsistent with the economic literature. Contrary to Professor Prince's claim, economists do use marginal cost data in empirical analyses.[268] It is the scarcity of such data that forces economists to use firms' pricing equations to infer marginal costs. As noted above, if cost data are available, as in the current case, using them in estimation is widely accepted. This has been done in articles published in the premier economic journal, the American Economic Review. For example, in an article on the economic impact of introducing an online version of a newspaper, Matthew Gentzkow was unable to estimate price sensitivity with only price and quantity data because of insufficient variation in prices. However, using industry revenue and cost data, together with one of the firm's pricing

---

[264] *See e.g.* Claudio Lucarelli, Jeffrey Prince, and Kosali Simon, "The Welfare Impact of Reducing Choice in Medicare Part D: A Comparison of Two Regulation Strategies," *International Economic Review* 53(4) (November 2012): 1155-1177, at p. 1156.

[265] McFadden Opening Report, ¶ 141.

[266] Prince Report, footnote 104.

[267] Prince Report, ¶ 104.

[268] *See e.g.* Daniel Ackerberg, C. Lanier Benkard, Steven Berry, and Ariel Pakes, "Econometric Tools for Analyzing Market Outcomes," Chapter 63 in *Handbook of Econometrics* 6A, eds. James J. Heckman and Edward E. Leamer (North-Holland, 2007): 4172-4276, at pp. 4174-5, "The static analysis of the change usually assumes a mode of competition (almost always either Nash in prices or in quantities) and either has cost data, or more frequently estimates costs from the first order conditions for a Nash equilibrium.".

Non-Party Highly Confidential—Outside Counsel Eyes Only

equations, the author was able to estimate a measure of price sensitivity.[269] Matthew Gentzkow, Jesse Shapiro, and Michael Sinkinson extend this approach in an article studying how competition affected ideological diversity in U.S. newspapers.[270] In particular, the authors use, in part, data on marginal costs, advertising revenue, and average prices to estimate their econometric model. These examples from articles published in top economic journals by respected economists demonstrate that supplementing estimation with marginal cost data is a well-established practice that allows economists to obtain estimates (or more precise estimates) of the coefficients of interest.

151.

---

[269] Matthew Gentzkow, "Valuing New Goods in a Model with Complementarity: Online Newspapers," *American Economic Review* 97(3) (June 2007): 713-744, p.730.

[270] Matthew Gentzkow, Jesse M. Shapiro, and Michael Sinkinson, "Competition and Ideological Diversity: Historical Evidence from US Newspapers," *American Economic Review* 104(10) (October 2014): 3073-3114.

[271] Prince Report, ¶ 93.

[272] McFadden Opening Report, ¶ 189.

[273] McFadden Opening Report, ¶ 190.

[274] McFadden Opening Report, ¶ 191.

[275] McFadden Opening Report, ¶ 213.

Non-Party Highly Confidential—Outside Counsel Eyes Only

152.

153.

276  Prince Report, Appendix Exhibit 6.

277  Prince Report, Appendix Exhibit 6.

278  McFadden Deposition, 184:1-10.

Written Evidence of Daniel L. McFadden          No. 4:11-cv-06714-YGR | Page 62 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

**FIGURE 2: GAMES DAMAGES FOR PROFESSOR PRINCE'S PROFIT MARGIN BOUNDS**

| Imposed profit margin bounds | App download | | In-app purchases | | Damages ($ Billions) |
| | Implied download-price sensitivity bounds | Estimated download-price sensitivity | Implied in-app purchase price sensitivity bounds | Estimated in-app purchase price sensitivity | |
| --- | --- | --- | --- | --- | --- |

Source: Brattle analysis of Apple App Store transaction data.

Notes: Calculations based on 0.1 percent random sample. Imposed profit margin bounds and implied coefficient bounds are taken from Appendix Exhibit 6 of Professor Prince's report.

154. Professor Prince conducts a similar analysis for the Music and Entertainment categories, but again his alternative margin bounds are not based on any evidence or analysis, whereas the [0.20, 0.60] bounds I impose in my Opening Report are based on the analysis of cost data of Spotify (between 22.1 percent and 26.6 percent), Pandora (between 31.5 percent and 38.6 percent), and Netflix (between 46.1 percent and 47.3 percent) and include these margin estimates.[279]

155. Figure 3 replicates Appendix Exhibit 7 of the Prince Report and adds the last column to show damages estimates for each of his alternative margin bounds. Among the alternative margin bounds Professor Prince uses in his report, the [0.20, 0.50] bounds are as good as the [0.20, 0.60] bounds in terms of the underlying cost data, and the damages estimates based on the [0.20, 0.50] bounds are larger than my damages estimates, which shows that my damages estimates are conservative. In fact, as Figure 3 shows, damages estimates are larger than my estimates in four out of Professor Prince's five alternative bounds, while they are slightly smaller in the remaining case.

---

[279] McFadden Opening Report, ¶¶ 193-195, 213.

Written Evidence of Daniel L. McFadden                    No. 4:11-cv-06714-YGR | Page 63 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

**FIGURE 3: MUSIC AND ENTERTAINMENT DAMAGES FOR PROFESSOR PRINCE'S PROFIT MARGIN BOUNDS**

| | App download | | In-app purchases | | |
| Imposed profit margin bounds | Implied download-price sensitivity bounds | Estimated download-price sensitivity | Implied in-app purchase price sensitivity bounds | Estimated in-app purchase price sensitivity | Damages ($ Billions) |
| --- | --- | --- | --- | --- | --- |



Source: Brattle analysis of Apple App Store transaction data.

Notes: Calculations based on 0.1 percent random sample. Imposed profit margin bounds and implied coefficient bounds are taken from Appendix Exhibit 7 of Professor Prince's report.

156. ███████████████████████████████████████████████████

157. In addition, Professor Prince misleads when he claims that Spotify and Netflix "do not even monetize on the App Store *currently*, instead taking advantage of the reader rule."[282] Professor

---

[280] Prince Report, ¶ 98. This criticism is at odds with his criticism that my margin constraints are ad hoc since he acknowledges that they are based on the analysis of several app developers' cost data.

[281] Prince Report, ¶ 98.

[282] Prince Report, footnote 115 [Emphasis added].

Non-Party Highly Confidential—Outside Counsel Eyes Only

Prince understands that both have in fact monetized on the App Store in the past, as he testified in his deposition. In particular, he testified that this statement above would be incorrect if he deleted the word "currently."[283] However, both Spotify and Netflix continue to earn revenue via the App Store and pay commissions to Apple through continuing renewed subscriptions made on iOS prior to IAP removal, a fact Professor Prince also admitted in his deposition.[284] In fact, according to Professor Hitt's analysis, Netflix was the number two app in Entertainment by App Store revenue in 2020, more than a year after it removed the ability to subscribe in-app.[285]

158. Professor Prince's statement also illustrates his limited understanding of the App Store's relationship with Netflix and Spotify. While Netflix and Spotify do qualify under the reader rule and are thus able to allow users to access content subscribed to outside the App Store, Spotify openly flaunted the App Store's rules by including calls to action in their apps directing users to subscribe via the web when they removed IAP.[286] Apple blocked an update to Spotify's app shortly after it removed IAP in 2016 for that reason, as I explain in my Opening Report.[287] Netflix is not much different. When users open the Netflix iOS app, they are greeted with the following message that stops just short of directing them to subscribe via the Netflix website: "Trying to join Netflix? You can't sign up for Netflix in the app. We know it's a hassle. After you're a member, you can start watching in the app."[288]

---

[283] Prince Deposition, 71:6-14. (Q. Well, in your paragraph – in your Footnote 115, you said two of his benchmark firms, Spotify and Netflix, do not even monetize on The App Store currently, comma, and then it continues; right? But if you deleted the word currently, then that would be an incorrect statement. Is that fair? A. I think that is fair.).

[284] Prince Deposition, 71:15-17. (Q. Okay. [Spotify and Netflix] both have revenue on The App Store right now; right? A. That is my understanding.).

[285] Hitt Report, Appendix D, Figure 15.

[286] *See* APL-APPSTORE_00045455. In an email to Spotify, Apple says, "But our rules are clear, both in spirit and in letter, that developers may not attempt to divert in-app purchase sales to other payment mechanisms simply to avoid Apple's commission, such as by linking out to a website. Spotify's recent actions clearly violate these rules: it is using the free player app to solicit and sign up new App Store customers and direct them—during and immediately after a free trial period—to sign up for a Spotify subscription on the web." APL-APPSTORE_00045455 at 455.

[287] McFadden Opening Report, ¶ 94, *citing* APL-APPSTORE_00045455.

[288] Bill Murphy Jr., "Netflix Made a Big, Risky Change in 2018. Now We Know How It All Turned Out," *Inc.*, July 6, 2020, available at, https://www.inc.com/bill-murphy-jr/netflix-made-a-big-risky-change-in-2018-now-we-know-how-it-all-turned-out.html, last accessed October 18, 2021.

---

159. As I explain in my Opening Report and testified at my deposition, more cost data from app developers, although not necessary, would be useful.[289] Additional cost data may indicate that my current margin bounds need some adjustments. For example, if additional cost data indicate the average margin of app developers in the Music and Entertainment categories does not exceed 50 percent, I would need to adjust my margin bounds from [0.20, 0.60] to [0.20, 0.50]. However, I do not expect to make significant adjustments given how wide the current bounds are set. Moreover, as Professor Prince's analysis demonstrates, damages estimates are similar or larger when *reasonable* alternative bounds are used.

160. Professor Prince also criticizes that my margin constraints are implemented at the app-level whereas my margin data is at the developer-level.[290] This criticism is also misguided. I do not directly compare the (model-predicted) variable margin of apps to the variable margin of app developers from the cost data. As noted above, I use the app developers' cost data to construct bounds for the (model-predicted) *average* variable margin.

### 2.    Professor Prince's Placebo Analysis

161. As another way to purportedly show that my estimates of consumers' price sensitivity are not driven by "the observed relationship in the data between quantities and prices,"[291] Professor Prince uses "hypothetical data that substitutes random 'placebo' quantities for actual quantities" and reports that he obtains "precisely the same values for three of the four price sensitivity estimates."[292] He asserts that his analysis shows that my estimates are divorced from "the transaction data on which they should be primarily based."[293]

---

[289]  McFadden Opening Report, ¶¶ 140-141; McFadden Deposition, 185:25-186:12. (Q. You state there that you "do not need every app developer's cost to assess common economic impact because I use consumer demand and app developer's profit maximization conditions estimate to app developer's costs." The question is: Do you need any app developer's costs to assess common economic impact? A. The - the answer is that you - you do not, but the accuracy of the calculations can - can be improved because app developer's cost data allow you to determine the demand parameters more precisely, and that's - that's useful for the conclusion).

[290]  Prince Report, ¶ 99.

[291]  Prince Report, ¶ 93.

[292]  Prince Report, ¶ 94.

[293]  Prince Report, ¶ 94.

Non-Party Highly Confidential—Outside Counsel Eyes Only

162. Professor Prince's so-called placebo analysis and conclusions drawn from it are misleading in multiple ways. First, Professor Prince's other analyses show that my model produces different results with the same margin bounds when different data are used. For example, as discussed above, he obtains different estimation results with the same margin bounds depending on whether data are limited to "high-revenue" or "low-revenue" apps.[294] Professor Prince testified to this in his deposition.[295]

163. Second, Professor Prince is completely silent about the sign of the coefficient that captures the relationship between app downloads and IAP transactions. As explained in Section III.C.2 of this report, in his high-revenue vs low-revenue analysis (and other analyses), he declares that my model "fails … even to predict any but-for prices" because he obtains a negative estimate for this coefficient.[296] In another analysis he performs, he concludes that my model is "fundamentally flawed and unreliable" because he obtains a negative estimate for this coefficient.[297] In the placebo analysis, however, he obtains a negative estimate for the same coefficient in both the Games and the Music and Entertainment categories but raises no concern.

164. Third, Professor Prince's claim that he obtains "precisely the same values for three of the four price sensitivity estimates" is not true, because he fails to report that one of his three coefficients is no longer significant.[298] In the deposition, he testified that "if the code is in workpaper nineteen, which I suspect it is, then one would go to workpaper nineteen, run the code, and it

---

[294] Prince Report, Exhibit 7. Another example is Professor Prince's improper estimation of the Entertainment genre in isolation, which I discuss in detail in Section IV.B.2. Professor Prince mistakenly applied the Games margin bounds and instrumental variables to estimate my demand model using just Entertainment apps. He obtains different coefficient estimates than when these same bounds and instrumental variables are applied to Games apps. *See* Prince Report, Workpaper 31. *See also* Prince Deposition, 20:2-16. *See also* McFadden Opening Report, ¶ 231 and Figure 15.

[295] Prince Deposition, 49:19-50:1. (Q. Okay. So preserving his margin bounds, you've got a result for the high revenue apps; right? A. Yes. Q. And preserving his margin bounds, you got a result for the low revenue apps; right? A. Yes. Q. Were they the same? A. I believe they were different.).

[296] Prince Report, ¶ 72. *See also* my discussion of Professor Prince's high-revenue vs low-revenue analysis in Section III.C.2 of this report.

[297] Prince Report, ¶ 114. *See* my discussion of this analysis in Section IV.B.1 of this report.

[298] Prince Report, ¶ 94.

would produce the standard errors."[299] However, as of the date of this report, he has not produced any backup production containing standard errors or the computer code calculating standard errors.[300] From my investigation of his analysis, I find that the price sensitivity estimate for IAP demand for Games takes a different value from that reported in my Opening Report ███ ███████████[301] and is statistically significant at a 1 percent significance level, and the price sensitivity estimate for IAP demand for Music and Entertainment takes a similar value ████ but its standard error is twice the value of the estimate █████, rendering it statistically not different from ████.[302] In other words, although Professor Prince claims that his placebo analysis proves that the coefficients do not change when placebo data is used, he cannot replicate IAP demand estimation for both the Games and the Music and Entertainment categories and conceals these results by failing to calculate or report standard errors.

## B.   SAMPLING METHOD

165. In my Opening Report, in demonstrating how my methodology can be used to quantify common impact, I do the following: use the App Store transactions data, which ends at the end of September 2019; focus on the three largest app categories, namely, Games, Entertainment, and Music; use the 0.1 percent random sample; and select the apps that ever comprised 70 percent of revenue in a given category and year.[303] Given the size of the App Store transactions data, which includes over 64 billion transactions, it is not practical to use the whole data in estimation, and random sampling is often used in such situations.[304] As long as sampling is random, estimating a

---

[299]   Prince Deposition, 59:20-60:1. (Q. Where in your report would I look for the standard errors for the coefficients you discuss in paragraph ninety-four? A. I would say to – if the code is in workpaper nineteen, which I suspect it is, then one would go to workpaper nineteen, run the code, and it would produce the standard errors.).

[300]   Professor Prince also testified that he does not believe he, as an econometrician, should always examine standard errors when determining if two estimates are the same. Prince Deposition, 59:6-59:11. (Q. I asked it a little different. As an econometrician, should you examine the standard error for a coefficient before you conclude that that coefficient means something? Isn't that an always? A. Oh, I don't think I'm willing to say that.).

[301]   Prince Report, Workpaper 19.

[302]   McFadden Opening Report, Figure 15.

[303]   McFadden Opening Report, ¶¶ 228-9, footnote 297.

[304]   McFadden Opening Report, ¶ 218.

Non-Party Highly Confidential—Outside Counsel Eyes Only

model with a sample is a statistically valid approach, and numerous empirical studies and reports rely on this approach, as I explain below.

166. Econometricians, or anyone who performs econometric analysis, report standard errors when reporting estimates of model parameters to determine the statistical reliability of the estimates. In my Opening Report, I calculate standard errors using bootstrap methods.[305] Once the model parameters are estimated and their statistical reliability is determined, damages can be calculated for the full population of Class members and apps, with no sampling. In Section IV.C of this report, I demonstrate how the estimated model can be used to calculate damages for transactions not included in estimation.[306] Before doing that, I will first address Apple's experts' criticisms regarding my sampling method in this section. Contrary to Apple's experts' claims, (1) the 0.1 percent random sample is large enough to be representative, (2) my model can be readily extended beyond the three app categories I estimate in my Opening Report, and (3) the top 70 percent revenue apps in my estimation cover the vast majority of revenue and are adequate to estimate the impact of Apple's commissions.

### 1.    The Criticism Regarding the Sample Size

167. Professor Prince criticizes that I study "only a small fraction" of the App Store transactions data that "has transactions for more than 450 million accounts and over 4.5 million apps (out of which almost 1.2 million have paid transactions)."[307] He asserts that "[a] sound methodology applied to a properly drawn and large enough random sample should yield similar results with different random samples" but my "approach does not pass this test."[308] He then claims that if my "sampling approach and overall methodology were sound, and [my] sample size were large enough,… a different random sample, or using the entire data, would not change [my] conclusions."[309] As a way of purportedly proving this point, he has "tested" my model on "25

---

[305]    McFadden Opening Report, Appendix E, ¶ 28.

[306]    *See also* Section VI.F of my Opening Report where I outline how damages calculations could be "scaled up."

[307]    Prince Report, ¶ 108.

[308]    Prince Report, ¶ 110.

[309]    Prince Report, ¶ 112. Professor Prince also criticizes that the 0.1 percent sample leads to errors in calculating average prices. Prince Report, ¶ 111.

Non-Party Highly Confidential—Outside Counsel Eyes Only

alternative, randomly drawn 0.1 percent samples of Apple IDs," and concludes that "[d]ifferent randomly drawn samples do lead to a wide range of different end results that vary, sometimes dramatically, from [my] reported results."[310] He asserts, "These results illustrate that either [my] entire approach is unreliable, or [I] [use] that approach on woefully insufficient data to generate reliable results, or both."[311]

168.  I first note that I could not use Professor Prince's computer code to draw the same 25 0.1 percent samples of Apple IDs used in his analysis. My understanding is that Professor Prince's code is intended to allow my team or anyone to replicate his selections of Apple IDs included in the 25 random samples, regardless of which "database engine" is used.[312] However, when his code is run on the Apple Transactions data, it fails to produce the Apple IDs included in his backup production. Moreover, the results obtained from the 25 samples drawn by running his code as it is are different from what he describes in his report.

169.  I find that Professor Prince's computer code contains errors that prevent people who do not have direct access to his supporting team's database engine – not the data itself, which I have, but the actual database server on which it is housed for Professor Prince and his team – from drawing the same Apple IDs included in his backup production.[313] I had to fix these errors so that Professor Prince, or anyone who has access to the produced App Store transactions data, can draw the same Apple IDs, regardless of which database engine is used. After fixing these errors, I re-ran his code to draw 25 samples to replicate his analysis,[314] but again the results obtained

---

[310]  Prince Report, ¶ 113.

[311]  Prince Report, ¶ 110.

[312]  Reply in Support of Defendant Apple Inc.'s Notice of *Daubert* Motion to Exclude Testimony of Professor Daniel L. McFadden, *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR, September 1, 2021, p. 5.

[313]  Different SQL configurations may store the same dataset in a different order. The rows of loaded data must be sorted, in this case by person ID, to replicate Professor Prince's random person ID draws. However, Professor Prince's code neglects to save his sorted data despite acknowledging this requirement. Prince Deposition, 29:22-30:10. (Q. Sure. If I had a script that drew the first, third, and fifth person ID transaction record and the entire database was ordered by person ID, then anywhere I ran that script, any database that was ordered by person ID would draw the same first, third, and fifth record. Is that fair to say? A. I think that is fair to say. Q. If there is no sort order, you can't be sure that would be correct. Fair? A. So the – the logic we used for the sort ordering would not necessarily apply in that case.).

[314]  These corrections entail dropping Apple IDs that are blank and subsequently saving the sorted, which Professor Prince neglects to do. Professor Prince's algorithm for drawing 25 0.1 percent samples is otherwise unaltered.

Non-Party Highly Confidential—Outside Counsel Eyes Only

from these 25 samples are different from what he describes in his report, although they are similar to the results obtained from the 25 samples based on his un-amended computer code.

170. Since Professor Prince included tables containing 25 sets of approximately 400,000 Apple IDs in his backup production, I first assess his analysis using those 25 samples.[315] Then I show how his results change when I use his computer code, as it is (un-amended) and fixed (amended), to draw 25 0.1 percent samples. In short, I cannot confirm that the computer code he used actually generated the samples he analyzes because of his coding error, but I find that the results he presents in his report exaggerate his point compared to those obtained by running his code on my server.

171. At a high level, Professor Prince's criticism, whether exaggerated or not, is not only unfounded, but in my opinion, an effort to confuse people who are not trained in statistics and econometrics. He argues that 0.1 percent of Apple IDs is too small to be representative of the full App Store transactions data, but the 0.1 percent is no smaller than the sample size of survey studies on consumer expenditures that the US government regularly conducts.[316] For example, the Consumer Expenditure Surveys conducted yearly by the US Department of Labor surveys approximately "7,000 sample households," which represented about 0.005 percent of the US households in 2019, or roughly 20 times smaller than my sample of the Apple transactions data.[317] Similarly, the Survey of Income and Program Participation administered by the US Census Bureau has a sample size ranging from "14,000 to 52,000 interviewed households."[318]

---

[315] Of the roughly 400,000 Apple IDs that initially appear in any one 0.1 percent sample, approximately 100,000 on average enter the damages calculations due to the data cleaning process described in my opening report. *See* McFadden Opening Report, Appendix E.1.

[316] The 0.1 percent sample used in estimating common impact in my Opening Report is based on over 3,900,000 paid transactions associated with about 99,000 (randomly drawn) Apple IDs.

[317] *See* U.S. Bureau of Labor Statistics, "Consumer Expenditure Surveys," August 30, 2016, available at, https://www.bls.gov/cex/csxovr.htm, last accessed October 18, 2021. *See also* U.S. Census Bureau, "HH-1. Households by Type: 1940 to Present," December 2020, available at, https://www2.census.gov/programs-surveys/demo/tables/families/time-series/households/hh1.xls, last accessed October 18, 2021. Professor Prince understands this to be a "large" sample. Prince Deposition, 71:23-72:8. (Q. Okay. Are you familiar with the consumer expenditure survey? A. Yes. Q. Can you tell me what that is. A. Oh, I don't – I don't know a lot of the details off the top of my head…but my vague understanding is that it is a rather large survey that gathers information about expenditures by consumers, as – as the title implies.).

[318] U.S. Census Bureau, "SIPP Introduction & History," July 13, 2021, available at, https://www.census.gov/programs-surveys/sipp/about/sipp-introduction-history.html, last accessed October 18, 2021.

Non-Party Highly Confidential—Outside Counsel Eyes Only

The Census describes this sample as "large" and specifies that "Government policy makers also depend heavily on SIPP for information on the distribution of income and the success of government assistance programs."[319] The random sample is also widely accepted and used in the academic literature. In my recent paper published at the American Economic Review, one of the top economics journals, I use about a 0.16 percent random sample of seniors enrolled in Medicare Part D to study inertia in the choice of health insurance plans.[320] Because utilizing the whole data, also known as the *population* in statistics, is often logistically and computationally impractical, economists and statisticians rely on *random sampling* methods, which allow them to use a subset of the population to analyze various aspects of the population.

172.  The 0.1 percent sample used in my Opening Report is such a random sample representing the full App Store transactions data. In Figures 20 – 26 of my Opening Report, I demonstrate that this sample is representative of the full transactions data.[321] In addition, as explained in my Opening Report, I also extract transactions for randomly selected 0.39 percent and 6.25 percent of Apple IDs and confirm that the 0.1 percent sample represents the full data as well as these 0.39 percent or 6.25 percent samples.[322]

173.  Apple's own experts rely on random sampling in rebutting my Opening Report as well as in their academic research. For example, Professor Simonson relies on Dynata to send invitations to "a random sample of their members and invite them to participate in the survey."[323] Across his six surveys, Professor Simonson relies on approximately 3,600 invited participants[324]—far smaller than the sample size I use in my Opening Report.[325] Professor Simonson testified that his sample

---

[319]  U.S. Census Bureau, "About this Survey," August 10, 2021, available at, https://www.census.gov/programs-surveys/sipp/about.html, last accessed October 18, 2021.

[320]  Florian Heiss, Daniel McFadden, Joachim Winter, Amelie Wuppermann, and Bo Zhou, "Inattention and Switching Costs as Sources of Inertia in Medicare Part D," *American Economic Review* 111(9) (2021): 2737-2781, at p. 2745-6.

[321]  Professor Prince presents a similar comparison between the sample data from Forrest Research used in his analysis and the census data representing the entire population. *See e.g.* Jeffrey T. Prince and Shane Greenstein, "Measuring Consumer Preferences for Video Content Provision via Cord-Cutting Behavior", *Journal of Economics and Management Strategy* 26(2) (2017): 293-317, at p. 298.

[322]  McFadden Opening Report, Appendix C, ¶ 6.

[323]  Simonson Deposition, 88:9-89:2.

[324]  Simonson Deposition, 90:18-22.

[325]  *See* McFadden Opening Report, Figure 19.

Non-Party Highly Confidential—Outside Counsel Eyes Only

size "[a]bsolutely" obtained reliable results.[326] Professor Prince has similarly relied on random samples in his peer-reviewed academic work, albeit of smaller size than my 0.1 percent sample.[327]

174.   Then what is it that Professor Prince is complaining about? His criticism is directly related to the statistical significance of estimates. When he claims that "[my] model fails altogether on nine of these 25 samples (or 36 percent),"[328] what he is reporting is that he estimates the relationship between app downloads and IAP transactions in the same month ($\beta^Q$) to be negative in nine out of the 25 samples. Eight of these nine cases happen with the Music and Entertainment categories. In my Opening Report, I estimate this relationship to be positive for both the Games and the Music and Entertainment categories, implying that more app downloads in a given month likely lead to more IAP transactions in that month, but it is "not statistically significant at a 10 percent significance level" for the Music and Entertainment categories. That is, its standard error is too large to make its value statistically different from zero.[329]

175.   One would not necessarily expect this relationship to be strong: downloads in one month can lead to IAP in later months, but the relationship within a given month may be weak, which is what I find for the Music and Entertainment categories. Professor Prince simply finds that the estimate of this parameter for the Music and Entertainment categories varies relatively widely

---

[326]   Simonson Deposition, 92:24-93:2.

[327]   For example, Professor Prince uses survey data from Forrest Research which involves samples of the US population comprising thousands of respondents (approximately 30-50k) to represent the U.S. population, a sample size of approximately .01 percent. *See e.g.* Jeffrey T. Prince and Shane Greenstein, "Measuring Consumer Preferences for Video Content Provision via Cord-Cutting Behavior," *Journal of Economics and Management Strategy* 26(2) (2017): 293-317. In some of his papers, Professor Prince uses a sub-sample of the Forrest Research data representing an even smaller percentage sample size of the U.S. population. *See e.g.* and Jeffrey T. Prince, "Relating Inertia and Experience in Technology Markets: an Analysis of Households' Personal Computer Choices," *Applied Economics* 43(29) (2011): 4501-4514. *See also* Jeffrey T. Prince, and Avi Goldfarb, "Internet Adoption and Usage Patterns are Different: Implications for the Digital Divide," *Information Economics and Policy* 20(1) (2008): 2-15. In one case, Professor Prince also uses survey data from the data company Research Now SSI, which was renamed Dynata in 2019, to execute two consumer surveys administered to a total sample of roughly 1,400 households across both surveys. *See* Jeffrey T. Prince, Yu-Hsin Liu and Scott Wallsten, "Distinguishing Bandwidth and Latency in Households' Willingness-to-Pay for Broadband Internet Speed," *Information Economics and Policy* 45 (2018): 1-15*;* Dynata, "Announcing New Name and Brand: Research Now SSI is Now Dynata," January 15, 2019, available at, , last accessed October 18, 2021.

[328]   Prince Report, ¶ 114.

[329]   McFadden Opening Report, ¶ 232.

Non-Party Highly Confidential—Outside Counsel Eyes Only

across the 25 samples with some of them falling in the negative domain because of its statistical *insignificance*. In other words, Professor Prince's analysis confirms the conclusions drawn from my bootstrapped standard errors with his own "bootstrapping" method.[330]

176. Professor Prince emphasizes statistical insignificance elsewhere in his report where it suits his purposes. In another analysis where he estimates my model *without* the margin bounds,[331] he reports my model "fails to precisely estimate the demand for in-app purchases," citing "a very wide confidence interval."[332] He even quotes a textbook to explain the concept of confidence intervals and statistical significance.[333] But in his 25 sample analysis, he discards his statistical knowledge.

177. Given the magnitude of the estimated relationship between app downloads and IAP ($\beta^Q$) is small, I keep it in the damages calculations in my Opening Report. Alternatively, I can drop the associated variable that estimates this relationship because its coefficient is not statistically different from zero, and re-estimate damages. When it is done for the Music and Entertainment categories, damages estimates and the number of unharmed Apple IDs do not meaningfully change. Figure 4 compares the estimation results in my Opening Report with those obtained without the variable capturing the within-month relationship between app downloads and IAP transactions (Log Downloads) for Music and Entertainment (see "No Log Downloads" column). The IAP Price coefficient goes from ▮ in the Opening Report to ▮, and the standard error increases from ▮ but remains small enough to make the estimate statistically significant at a 1 percent significant level. This specification change also leads to very minor changes in damage results. For example, the Consumer Class's overcharge as a percentage of the App Store commission revenues changes from approximately ▮ percent to ▮ percent for a 12 percent But-For commission rate, and the number of unharmed Apple IDs as a percentage of

---

[330]   Professor Prince testified that he does not take issue with my standard error calculation. Therefore, the results he presents should come as no surprise to him, or anyone else. Prince Deposition, 80:14-81:2. (Q. Did [Professor McFadden] report his standard errors for beta Q for music and entertainment? A. Yes…Q. Okay. You are not – just to be clear, you are not saying the standard errors should be reflected differently from what he calculated? A. Right. Because I don't believe the – I believe, though, those are correct from the model that he ran.).

[331]   *See* Section IV.A for my responses to this analysis.

[332]   Prince Report, ¶ 104.

[333]   Prince Report, ¶ 104, footnote 120.

Non-Party Highly Confidential—Outside Counsel Eyes Only

the total number of the Consumer Class using the definition from the Opening Report goes from ▮ percent to ▮ percent.[334]

**FIGURE 4: MUSIC AND ENTERTAINMENT ESTIMATION RESULTS**

| | Opening Report | | No Log Downloads | |
|---|---|---|---|---|
| | Downloads | IAP | Downloads | IAP |
| Download Price | | | | |
| IAP Price | | | | |
| Log Downloads | | | | |
| Year-Month FEs | | | | |
| App FEs | | | | |
| IAP FEs | | | | |

Sources: Brattle analysis of the App Store transactions data.

Notes: Calculations based on 0.1 percent random sample. Bootstrapping standard errors are reported in parentheses. The app fixed effects and the year-month fixed effects are included as explanatory variables in the app download demand. The IAP-item fixed effects and the year-month fixed effects are included as explanatory variables in the IAP demand. In addition, the average number of downloads in other genres for users who downloaded the app is included as an explanatory variable in the downloads regression, and the average number of IAP transactions in other genres for users who made an IAP transaction is included in as an explanatory variable in the IAP regression. The first two columns are estimates from the Opening Report, and the last two columns are estimates with Log Downloads dropped.

178. Professor Prince also asserts that a number of accounts switch from injured to uninjured (or vice versa) across different random samples. However, his discussion obscures the small magnitude of this effect and conceals the explanations for it. Professor Prince calculates the harm incurred by each Apple ID for "the other 16 of these samples" (that is, his 16 samples that do not yield a negative estimate of $\beta^Q$) and finds that "the same account may be harmed in [my] analysis but

---

[334] Uses the Opening Report Games genre estimates for calculating share uninjured. For Consumer Class's overcharge as a percentage of the App Store commission, see McFadden Opening Report, ¶ 239. For the unharmed percentage, see McFadden Opening Report, ¶ 241.

Written Evidence of Daniel L. McFadden                    No. 4:11-cv-06714-YGR | Page 75 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

unharmed when using a different sample, or vice-versa."[335] Using Professor Prince's definition of "net harm,"[336] across all 16 of Professor Prince's samples with each of them containing approximately 100,000 Apple IDs used in his net harm calculations, there are 61 such Apple IDs that are harmed in my Opening Report but unharmed when using a different sample (or vice versa). Put another way, these Apple IDs represent just 0.06 percent of the Apple IDs used in estimating damages. Moreover, Professor Prince finds these 61 Apple IDs by comparing Apple IDs in my sample to *all* of the 16 random samples he uses. Thus, if my sample is compared with any single one of his 16 samples, fewer than 4 Apple IDs switch the harmed/unharmed status on average.

179. Before I explain why these 61 Apple IDs switch the harmed/unharmed status across Professor Prince's 25 random samples, I should point out that his analysis is a wrong way to assess the statistical reliability of my (or any statistical) model. Consider, for example, the first of Professor Prince's 25 samples. 87 Apple IDs appear both in his 0.1 percent sample and my own, meaning that the other 98,757 Apple IDs that are included in my sample do not appear in his sample. Does that mean that my model is silent about damages inflicted on these 98,757 Apple IDs? Absolutely not.

180. The 0.1 percent random sample is used to *estimate* the model. In my Opening Report, I demonstrate how the estimated model can be used to quantify damages on the class-wide basis.[337] I also calculate the size of the unharmed Apple IDs in terms of the percentage, not in terms of the number of Apple IDs, because I use the 0.1 percent sample. The role of the 0.1 percent sample ends there. For the individual basis damages calculation, I take the estimated coefficients of the model and calculate damages for each of the Class members. I outline how this is to be done in the claiming process in Section II.A above.

181. Among the 61 Apple IDs that switch the harmed/unharmed status between my sample and Professor Prince's 25 samples, 51 Apple IDs switch the harmed/unharmed status because of

---

[335]   Prince Report, ¶ 115.

[336]   Section IV.C of this report discusses Professor Prince's net harm calculations.

[337]   *See* McFadden Opening Report, Section VII.

Non-Party Highly Confidential—Outside Counsel Eyes Only

small differences in the estimated coefficients.[338] When a different random sample is used to estimate the model, the value of the estimated coefficients changes slightly. This is expected from any econometric analysis. These changes affect the harmed/unharmed status of about 3.2 Apple IDs on average, which account for less than 0.005 percent of the Apple IDs included in my 0.1 percent sample. Further, the harmed/unharmed status of these 51 Apple IDs will not change once the values of the estimated coefficients are fixed.[339]

182. The other 10 Apple IDs switch the harmed/unharmed status mainly because each sample contains slightly different sets of apps and slightly different transactions. Even for the same set of apps, different samples can contain different transactions. Suppose two random samples include the same 100 apps. Because these two samples include transactions associated with different Apple IDs, both the average price paid for these 100 apps and which are included in my estimation procedure after my data cleaning process can be slightly different.[340] In my Opening Report, I estimate the class-wide damages at the app-year level,[341] and these differences across samples can make a small number of Apple IDs harmed in one sample but unharmed in another sample.[342] Again, when damages are calculated using the entire transactions data, this issue does not exist because calculation does not depend on sampling. I demonstrate how the estimates

---

[338] Professor Prince testified he understands there will be differences in estimated coefficients across different 0.1 percent samples. Prince Deposition, 90:11-17. (Q. Each of those [0.1 percent] samples run in the model will produce its own price sensitivity coefficients; right? A. Yes. Q. And they will not be identical to each other; right? A. In expectation, no.).

[339] Professor Prince testified in his deposition that, while he has not himself presented any analysis to this effect, he believes harm status will not change if the estimated coefficients are fixed. Prince Deposition, 87:4-21. (Q. Well, let me see if I can come at it a slightly more straightforward way. If you – if you, as you said, take Dr. McFadden's estimations of accounts that were injured as – as a given and you draw any other one random sample of the same size, how would you calculate the expected number of switchers, if I can use that term, in the second sample? … THE WITNESS: I guess this is why I – I think this problem needs to be better defined because if we take Professor McFadden's model as given, his – the estimates from his model, if I draw two different samples and the same account shows up in both, I'm going to get the same result for them; right? Because I'm using the same numbers; so I – that is why I'm saying I don't feel like this problem is defined properly enough.).

[340] Professor Prince evidently understands that different 0.1 percent samples will generate a different set of transactions for any particular app. Prince Deposition, 89:9-16. (Q. And in between there is distribution range where we get a number of Netflix users that is not going to be exactly the same from one [0.1 percent sample] to the other but will describe some kind of a distribution curve. Fair? A. If we drew a bunch of different samples, there would be a distribution in the number of Netflix users I would anticipate, yes.).

[341] *See* McFadden Opening Report, Section VII.

[342] For the 10 Apple IDs that switch the harmed/unharmed status, the change in net harm between my Opening Report and Professor Prince's analysis is no more than ▮ in total and ▮ on average.

---

Non-Party Highly Confidential—Outside Counsel Eyes Only

**ER-533**

obtained from a random sample can be used to calculate damages for transactions not included in that sample in Section IV.C below.

183.   My examination thus far of Professor Prince's analysis involving the 25 random samples is based on the 25 samples included in his backup production. When I use his computer code to generate 25 random samples myself, I get different Apple IDs in those samples and, more importantly, obtain qualitatively different results.

184.   First, while he reports that the estimate of $\beta^Q$ is negative in 9 out of the 25 samples (or 36 percent), the estimate of $\beta^Q$ is negative in 5 out of the 25 Samples (or 20 percent) when using his un-amended computer code.[343]

185.   Second, while he reports that 4.1 percent of overlapped Apple IDs (or 61 out of 1,481 instances) switch the harmed/unharmed status across his produced 25 samples, 3.1 percent of overlapped Apple IDs (or 58 out of 1,869 instances) switch the harmed/unharmed status across the 25 samples when using his un-amended computer code.[344]

186.   Finally, the average number of switchers I obtain using his produced 25 samples (3.81) is more than 20 percent higher than the average number of switchers when using his computer code, either un-amended or amended.

### 2.   The Criticism Regarding Selecting Three App Categories

187.   My Opening Report is explicit that I estimate damages for the three largest app categories to illustrate how my methodology can be applied.[345] My description of the estimation procedure, as well as the computer code included in the backup production, are complete and detailed enough for any well-trained economist to apply to other app categories. Professor Prince claims that my

---

[343]   The estimate of $\beta^Q$ is negative 6 out of the 25 samples (or 24 percent) when using his amended computer code.

[344]   3.1 percent (or 58 out of 1,848 instances) switch the harmed/unharmed status across the 25 samples when using his amended computer code.

[345]   McFadden Opening Report, ¶ 229.

model "cannot even be readily extended to offer an assessment of harm for many apps [I exclude]."[346]

188. Professor Prince offers two analyses to support his claim. First, he "[applies my] approach to the Sports genre" and finds "an upward sloping demand curve for in-app purchases."[347] Second, he "[applies my] method to the Music and Entertainment genres separately rather than combined."[348] He reports estimating a negative within-month relationship between IAP and app downloads for the Entertainment genre. He uses his results as evidence that "[e]xtending [my] model in a straightforward way to another genre, or separating the two combined genres, causes the model to fail."[349] For the Music genre, he does not report any results in his report and, as of the date of this report, has not produced any backup for his separate analysis of this genre.[350]

189. As I explain in my Opening Report and elsewhere in this report, I applied my methodology to the three largest app categories to illustrate, by way of example, how it can be used to quantify damages inflicted on the Consumer Class.[351] Professor Prince's criticism is not different from arguing that a multivariable regression analysis is not reliable because researchers use different sets of explanatory variables or instrumental variables, or different estimation strategies, for different datasets.

190. In explaining how he "applied [my] approach to the Sports genre," Professor Prince states that he "had to remove" the average margin constraints because I "did not offer a common method for determining which bounds to impose for other genres."[352] In other words, because I did not show which bounds to impose for the Sports genre in my Opening Report, he decided to remove them.

---

[346]  Prince Report, ¶ 120.
[347]  Prince Report, ¶ 120.
[348]  Prince Report, ¶ 122.
[349]  Prince Report, ¶ 123.
[350]  *See* Prince Report, ¶ 122. *See also* Prince Workpaper 31.
[351]  McFadden Opening Report, ¶ 229.
[352]  Prince Report, ¶ 120, footnote 148.

Non-Party Highly Confidential—Outside Counsel Eyes Only

He refuses to acknowledge that "[t]hese variable margin constraints are based on the analysis of the app developer cost information available at the time of drafting" my Opening Report.[353]

191. If Professor Prince was truly interested in estimating the app download and IAP demand for the Sports genre with minimal efforts, he could have investigated whether the Sports apps have similar cost structures as the Games apps or the Music and Entertainment apps. For example, he could have investigated whether the Sports apps typically pay licensing royalties to content providers as the Music and Entertainment apps do.

192. Professor Prince's second analysis includes two serious flaws. One is a coding error much like the simple yet crucial coding error in his 25 sample analysis. The other is a failure to report his results, much like his failure to report the full results of his placebo analysis.

193. Professor Prince states that he was "not forced to drop [my] profit margin constraints, but rather applied them as is, to each genre separately."[354] Examination of his "workpapers" produced in his backup materials, however, reveals that Professor Prince did not in fact do what he says he did.[355] For the Entertainment category, he replaced the margin constraints used for the Music and Entertainment categories with the margin constraints used for the Games category. He further replaced the instruments used for the Music and Entertainment categories with those used for the Games category.[356]

194. While Professor Prince acknowledged that he did not write his own code in the statistical analysis program R, he testified that he is able to code R script and asserted that he had inspected the code his team wrote for his report.[357] However, the produced computer code estimates the Entertainment category using the margin constraints and instrumental variables used for the

---

[353] McFadden Opening Report, ¶ 214. In addition to removing the average margin bounds, Professor Prince estimated the app download and IAP demand for the Sports genre using the same instrumental variables used for the Games genre. Prince Report, ¶ 120, footnote 148.

[354] Prince Report, footnote 151.

[355] Prince Deposition, 20:11-16. (Q. Okay. Looking at this script, is that what you, in fact, did? A. This suggests possibly not, but, again, I – I would want to go back and – and have a chance to really review this. But I – I see that these numbers look like games.)

[356] Prince Workpaper 31.

[357] Prince Deposition, 25:15-18. (Q. Did you – did you review the R code that was used to generate your results for your analysis reflected in your report? A. I – I reviewed everything that they did.)

Non-Party Highly Confidential—Outside Counsel Eyes Only

Games category, not the Music and Entertainment category, and he reports that results are "erroneous and contrary to economic theory and common sense."[358] But these results are of no use.

195. The second flaw in Professor Prince's separate analysis of Music and Entertainment apps, is that although he testified to have examined each of Music and Entertainment separately, he has not reported any work or results of any kind for Music apps as of the date of this report.[359]

### 3.  The Criticism Regarding Selecting Top 70 percent Revenue Apps

196. Professor Prince criticises my use of the highest-revenue apps that account for 70 percent of revenue in estimating the model.[360] For the results presented in my Opening Report, "I limit the data to the apps that were ever in the list of apps sorted by revenue that comprise 70 percent of revenue in a given category and year. So if an app was part of the top 70 percent revenue apps in one year, I include this app in all years. The 0.1 percent sample includes 78,509 apps in the Games, Entertainment, and Music categories that the Consumer Class in the 0.1 percent sample ever spent money on. Out of those apps, 1,926 are included in the estimation sample by satisfying this criteria."[361]

197. Using the top 70 percent revenue apps in estimating demand for app downloads and IAP is a reasonable econometric approach. The 1,926 apps included in the sample provide sufficient information for estimating the price sensitivity and other parameters consistently, which are then used to estimate damages on a class-wide or individual basis. Out of these 1,926 apps, I observe over ▮▮▮▮ app-months and over ▮▮▮▮ IAP-months. The number of observations derived

---

[358] Prince Report, ¶ 122.

[359] Prince Deposition, 14:17-15:3. (Q. Did you apply his models to the music and entertainment genres separately or did you only apply his model to the entertainment genre separately? A. Oh, I – I believe that I applied it to the music genre separately as well. Q. So where would I look for the results of that analysis? A. As I said, I'm not -- I don't believe they are presented here; so I -- I -- as I'm reading now, I don't believe I discussed those results. I think I simply stated that I did conduct that analysis separately.) *See also* Prince Deposition, 15:19-15:23. ([Q.] Are you certain that you turned them over to our side at all? Speaking specifically about the music genre. A. No. I am not certain.). *See also* Prince Report, Workpaper 31.

[360] Prince Report, ¶ 108.c.

[361] McFadden Opening Report, footnote 297.

from these apps is sufficiently high for me, or any econometrician, to rely on estimated parameters to predict price changes for transactions that are not included in the sample.

198. The apps that are not included in the sample, i.e., the bottom 30 percent revenue apps, are apps that were never part of the top 70 percent revenue group in any single year during the entire time period. These apps typically do not have consistent sales over time. Thus, once their characteristics and the time effects are accounted for, there is not much useful information provided by these apps for identifying the key parameters of the model. For example, the 1,926 apps included in the sample recorded download transactions of ▆ per month on average and IAP transactions of ▆ per month per IAP item on average.[362] The 76,583 apps not included in the sample, however, recorded download transactions of ▆ per month on average and IAP transactions of ▆ per month per IAP item on average.[363] Including such outliers would not add much useful information for identifying the key parameters of the model.

199. Again, the second step of my methodology is to estimate demand as well as variable costs imputed from demand estimates and the profit maximization conditions, and use the estimated demand and variable costs to measure the degree to which app developers change price in response to a change in the App Store commission. This step does not require using all Apple IDs or all apps to be statistically robust and reliable. The estimates obtained from the second step can be used to estimate damages associated with Apple IDs or apps that are not included in the sample. I demonstrate how to scale up damages calculation in the next section.

## C.    SCALING UP CALCULATIONS OF COMMON IMPACT

200. Before I demonstrate how to scale up the damages calculation, two issues need to be addressed. The first issue is related to how to calculate "net harm." In my Opening Report, I identify unharmed Apple IDs as those that are not harmed for any single transaction.[364] However, when I

---

[362] The median number of download transactions per month is ▆ and the median number of IAP transactions is ▆ per month per IAP item.

[363] The median number of download transactions per month is ▆ and the median number of IAP transactions is ▆ per month per IAP item.

[364] See McFadden Opening Report, ¶ 241.

Non-Party Highly Confidential—Outside Counsel Eyes Only

calculate the class-wide damages, I net out harmed and unharmed transactions. Therefore, my class-wide damage calculation is a net harm calculation. I agree with Professor Prince that "if the total cost using but-for prices is higher than (or equal to) the total cost using actual prices, this account is unharmed."[365] Suppose an Apple ID spent money on two apps. The But-For price of one of them is estimated to be lower than its As-Is price, while the But-For price of the other app is estimated to be higher than its As-Is price. A way to determine whether this Apple ID is unharmed on net is to compare the total spending using the But-For prices with the total spending using the As-Is prices. If the former is higher than or equal to the latter, this account is unharmed. Using this method, the percentage of (net) unharmed Apple IDs is 7.7 percent as opposed to 5.8 percent of unharmed IDs reported in my Opening Report.[366]

201. The second issue regards the "basic data processing error" Professor Prince claims I made.[367] He claims that I made this error by excluding "apps in years where they do not have the same price in all months of the year."[368] In particular, he states that I made an error by excluding an app that "shows a price of $0.99000000 in one month and a price of $0.99000001 in another month of the same year."[369]

202. Let me first explain what the "basic data processing error" Professor Prince labels is truly about. In demonstrating how my methodologies can be used to quantify damages for the Class members, I present damages calculations at the app-year level. This choice was made because calculating damages at the app-year level was sufficient to demonstrate the soundness and applicability of my methodologies.[370] When the data was prepared for the app-year-level damages calculation, I had to deal with apps whose price had changed over a calendar year. If I had kept them in the data and used their average price as their price, I would have had app prices that were very different from the actual prices the iOS device consumers paid when purchasing those apps. So I only kept apps

---

[365] Prince Report, ¶ 31.

[366] Prince Report, ¶¶ 30-31.

[367] Prince Report, ¶ 32.

[368] Prince Report, ¶ 32.

[369] Prince Report, ¶ 32.

[370] If the Consumer Class is certified, my methodologies can be and will be used to calculate damages for the entire transaction data.

Non-Party Highly Confidential—Outside Counsel Eyes Only

whose price did not change over a calendar year. In doing so, I let the computer compare the minimum and the maximum of the monthly average prices for a given app, and drop the app if these average prices are not the same. Because the computer is very precise about whether two numbers are the same, it dropped apps whose minimum monthly average price was not *precisely* the same as its maximum monthly average price over a given year. Professor Prince calls it a basic data processing error and shows that if I had not used the same precision that the computer uses, a portion of unharmed Apple IDs would increase.[371]

203. In demonstrating how to scale up the damages calculation below, I calculate the net harm and do not use the machine precision to determine price changes. Professor Prince makes numerous criticisms about the scalability of my methodology. For example, he asserts that I offer "no prediction of but-for prices for more than 99 percent of apps" that are not included in the estimation presented in my Opening Report.[372] Furthermore, he criticizes that I offer "no assessment of harm for many accounts," claiming, "[a]lmost 10 percent of the accounts in his sample make (paid) transactions only for apps that Professor McFadden excludes from his analysis."[373]

204. The first criticism regards apps that are not included in damages calculation in my Opening Report. The second criticism is about Apple IDs in the 0.1 percent sample that are dropped from damages calculation because I drop apps with low revenue and calculate damages at the app-year level. Professor Prince uses Mr. Hayter, one of the named plaintiffs, as an example of such cases in his report.[374]

205. As a way to demonstrate how the estimates obtained from the sample can be used to scale up damages calculations, I calculate damages for all Games, Music, and Entertainment apps included in the 0.1 percent sample, instead of limiting apps to the top 70 percent revenue apps. This adds

---

[371] Professor Prince instead calculates the difference between the minimum and maximum monthly average price over a year and checks whether they differ by a very small fraction. I adopt his approach in comparing the maximum and minimum average prices. Prince Report, ¶ 32. In my Opening Report, I estimate that 5.8 percent of Apple IDs are uninjured. Professor Prince shows that the share of uninjured Apple IDs increases to 7.7 percent when using a net measure of harm, to 10.5 percent when addressing the machine precision point, and to 14.6 percent when making both adjustments. Prince Report, ¶ 30-32.

[372] Prince Report, ¶ 116. Professor Prince also criticizes that I only estimate "a price change for less than 1 percent of all non-free apps and less than 56 percent of all paid transactions in [my] 0.1 percent sample." Prince Report, ¶ 118.

[373] Prince Report, ¶ 119.

[374] Prince Report, ¶ 119. *See also* Prince Report, Workpaper 28.

Non-Party Highly Confidential—Outside Counsel Eyes Only

back 76,583 apps to the But-For simulation. In this demonstration, I show how to include the bottom 30 percent revenue apps in calculating damages, but this method can be applied to apps not included in the 0.1 percent sample.

206. Also, instead of aggregating data at the app-year level, I calculate damages at the app-month level so that I do not drop many apps because of price changes during a calendar year. The app-month aggregation level strikes an ideal balance between the need to be more granular for the damage calculation, with the need to have a reasonably long-enough time period so that price changes reflect changes in app developers' costs. Consequently, Mr. Hayter's purchases are now included in the damages calculation since he purchased an app in the Games genre for which I now predict But-For prices.

207. Finally, for apps for which there is a change in the download price within a month, I treat these price changes as temporary price reductions or price fluctuations that are not explained by fluctuations in demand or marginal costs. And for transactions for which there are such temporary price changes within an app-month, I assume that their prices in the But-For world would be the same as those in the As-Is world. Thus, there would be no harm associated with those transactions.

208. Figure 5 compares damages results between this scaled up calculation (shown in column "All Apps & App-Monthly"), which I call the All Apps approach hereafter, and the calculation based on the approach used in my Opening Report (shown in column "Top 70% Revenue Apps & App-Yearly"), which I call the Top 70% approach hereafter. Both analyses account for the machine precision issue discussed above and calculate the net harm described above. Figure 5 also compares the portion of Apple IDs, apps, and paid transactions included in the Top 70% approach and the All Apps approach.

Non-Party Highly Confidential—Outside Counsel Eyes Only

**FIGURE 5: DAMAGES CALCULATION FEATURES FOR GAMES, MUSIC, AND ENTERTAINMENT**

|  | Top 70% Revenue Apps & App-Yearly | All Apps & App-Monthly |
|---|---|---|
| % App Store Commission Overcharged to Consumers |  |  |
|    Games | 54.1% | 52.3% |
|    Music and Entertainment | 42.2% | 45.0% |
| % Uninjured | 14.6% | 15.3% |
| % Actual World Revenue of Uninjured | 0.4% | 0.7% |
| % Paid Apps Included | ■ | 100.0% |
| % Paid Transactions Included | ■ | 100.0% |
| % Apple IDs with at Least One Paid Transaction Included | ■ | 100.0% |

Sources: Brattle Analysis of the App Store transactions data.

Notes: Calculations based on the 0.1 percent sample for Games, Entertainment and Music genres. For the Top 70% Revenue Apps & App-Yearly, the ■ percent of included paid apps account for approximately ■ percent of app store revenue in the Games, Music, and Entertainment genres. The All Apps & App-Monthly results included all apps with paid transactions in the Games, Music, and Entertainment genres.

209. As shown in Figure 5, the damages results are very similar whether I limit the But-For simulation to the top 70 percent revenue apps as in my Opening Report or I add 76,583 apps in Games, Music, and Entertainment to the But-For simulation. This is because what really matters for damages are the highest-revenue apps. While the percent of App Store commission overcharged to consumers in Games is 54.1 percent in the Top 70% approach, it is now 52.3 percent in the All Apps approach. For Music and Entertainment, the corresponding numbers are 42.2 percent in the Top 70% approach and 45.0 percent in the All Apps approach. The share uninjured is also very similar, with the Top 70% approach yielding 14.6 percent and the All Apps approach yielding 15.3 percent. In neither simulation do the uninjured Apple IDs account for more than 1 percent of total spend by all Consumer Class members in the As-Is world.

210. This result should not be surprising, as the calculation in the Top 70% approach includes ■ percent of Apple IDs with at least one paid transaction in Games, Music, and Entertainment, while the All Apps approach includes 100 percent of Apple IDs with all of their paid transactions

Non-Party Highly Confidential—Outside Counsel Eyes Only

in those genres. Professor Prince's criticisms about how my Opening Report But-For simulation is done over too small a sample is unwarranted. He simply ignores the explanation in my Opening Report of how I would scale up the damages calculation.[375] Moreover, the results in Figure 5 demonstrate that the class-wide damages calculation does not change significantly whether the calculation is based on a sample of transactions or more complete transaction data.

## V.     MARKET DEFINITION

### A.     THE RELEVANT MARKET IS A MARKET WHERE IOS DEVICE CONSUMERS PURCHASE IOS APPS AND IN-APP CONTENT

211. In my Opening Report, I describe the relevant market as follows:[376]

> Common economic evidence supports the conclusion that there
> exists a relevant antitrust market for selling consumers iOS apps
> and in-app content, which are relevant products in this market.
> Consumers who have iOS mobile devices ("iOS device
> consumers" hereafter) are consumers of this market, Apple is a
> retailer that sells iOS apps and in-app content, and app developers
> are suppliers that "manufacture" apps and in-app content and
> supply them through Apple. Apple, as the retailer, sets the App
> Store commission, which when paid by developers leads to the
> determination of the retail prices paid by consumers and the
> wholesale prices received by developers.

212. I proceed to explain that this market can be characterized as an aftermarket, where the primary market is the market for mobile iOS-installed devices.[377] Then I explain that common evidence

---

[375]  McFadden Opening Report, Section VI.F.
[376]  McFadden Opening Report, ¶ 42.
[377]  McFadden Opening Report, ¶¶ 43-44.

Non-Party Highly Confidential—Outside Counsel Eyes Only

supports the conclusions that iOS device consumers (1) do not have reasonable substitutes for iOS apps,[378] (2) do not have viable alternatives to the App Store for installing iOS apps and purchasing in-app content,[379] (3) face significant switching costs if they attempt to switch to an alternative mobile OS device,[380] and (4) do not find personal computers or gaming consoles are reasonable substitutes to their iOS devices.[381]

213. The aftermarket framework provides a useful analytical tool, but it is not essential to use this framework to define and analyze the relevant market. The core economic principle, common to the Consumer Class, is that there exists a relevant antitrust market for selling consumers iOS apps and in-app content, and Apple, as a retailer in this market, exercises its market power, charging supra-competitive App Store commissions.

214. The US consumers' mobile device choice is limited to iOS and Android devices, and iOS devices have significant user shares with the iPhone's share surpassing 50 percent among smartphone users and iPad's share exceeding 60 percent among tablet users.[382] While consumers use iOS devices, the App Store is the only app store through which they can install iOS apps and purchase in-app content. Moreover, Apple's anti-steering policies render purchasing in-app content directly from app developers not a viable alternative to Apple's IAP. In other words, common evidence supports the conclusion that the App Store is the only retail store the US consumers can use to purchase and install various iOS apps and in-app content while using iOS mobile devices.

215. Apple's experts criticize my market definition analysis on multiple fronts. They (1) dispute my characterization of the relevant market as an aftermarket, (2) disagree that iOS device consumers face high switching costs, (3) argue that I used the cluster market framework but failed to show the relevant market is a cluster market, and (4) criticize that I ignored the two-sided aspects of the App Store. In addition, Professor Hitt proposes two alternative relevant markets, namely a

---

[378]  McFadden Opening Report, Sections III.B and III.D.
[379]  McFadden Opening Report, Sections III.C and III.F.
[380]  McFadden Opening Report, Section III.E.1.
[381]  McFadden Opening Report, Section III.E.2.
[382]  McFadden Opening Report, ¶¶ 18-19.

Non-Party Highly Confidential—Outside Counsel Eyes Only

"digital game transactions" market and a "TV and video streaming app transactions" market. In the remainder of this section, I address these criticisms.

## B.    THE AFTERMARKET FRAMEWORK AND SWITCHING COSTS

216. Apple's experts dispute my characterization of the relevant market as an aftermarket. Professor Willig states, "because consumers and developers can substitute across transaction platforms without requiring substitution in the foremarket, the aftermarket framework does not apply."[383] The basis of this proposition is that "many iOS users multihome on other devices on which they can transact for apps and in-app content that they want to enjoy."[384] As evidence for this claim, he relies on Professor Hitt's analysis of consumer multi-homing. Professor Schmalensee makes a similar argument. He asserts that, in order to establish the existence of an aftermarket due to switching costs, "both sides must be considered," and consideration of consumers must "account ownership of multiple devices on which apps can be used."[385] He claims, without citation or supporting analysis, that "many consumers have access to multiple devices and could acquire games and game-related digital content on other platforms—and, in many cases, enjoy the content purchased on these other platforms even on their iOS devices."[386]

217. Apple's experts' arguments about iOS device consumers multi-homing are misleading. I make it clear in my Opening Report that software applications developed for personal computers or gaming consoles are not reasonable substitutes to iOS apps and that evidence supporting this conclusion is common to all Class members.[387] The Court also recognizes in the *Epic* decision that, in the context of gaming, mobile gaming is distinct from gaming on other platforms, citing, among other evidence, industry and expert evidence indicating that popular mobile games are only available on mobile, mobile gaming's growth has not come at the expense of PC and

---

[383]  Willig Report, ¶ 173 (adopted by Schmalensee).

[384]  Willig Report, ¶ 170 (adopted by Schmalensee).

[385]  Schmalensee Report, ¶¶ 104-105. I address Professor Schmalensee's arguments regarding the App Store being a two-sided transaction platform in Section V.E.

[386]  Schmalensee Report, ¶ 105.

[387]  McFadden Opening Report, Section III.E.2.

Non-Party Highly Confidential—Outside Counsel Eyes Only

console gaming, and that console gaming may be complementary to mobile gaming.[388] The Court also "agrees that in the smartphone context, consumers typically 'single home.'"[389] At a fundamental level, the fact that some (or many) consumers have access to multiple devices and *could* acquire the same apps on these devices does not prove that such alternatives are close enough substitutes to constrain Apple from exercising its market power for selling iOS apps and in-app content.

218. In their arguments against the applicability of the aftermarket framework, Apple's experts also ignore Apple's policies and actions that "prohibit developers from informing consumers about the existence of" purchase channels outside the App Store.[390] The Court in *Epic* found that Apple "acts anticompetitively by blocking developers from using [effective marketing activities such as push notifications and email outreach] to Apple's own unrestrained gain."[391] The Court in the *Epic* decision recognizes that "information costs may create 'lock-in' for platforms as users lack information about the lifetime costs of an ecosystem. Users may also lack the ability to attribute costs to the platform versus the developer, which further prevents them from making informed choices."[392]

219. Economists and antitrust scholars recognize that a platform may deliberately increase switching costs and hinder access to information of outside options to lock-in users and hinder competition with other platforms. The Stigler Committee on Digital Platforms, a panel of eminent economic and legal scholars and other experts in related fields, explain in their Final Report: "Platforms may seek to reduce interoperability and awareness of outside options. For example, platforms may exclude certain services or increase friction in accessing third parties' services. High search and switching costs are used to 'lock-in' users and reduce the ability of competitors to access

---

[388] *Epic v. Apple* Order, p. 125-126.

[389] *Epic v. Apple* Order, p. 52.

[390] McFadden Opening Report, Section III.F.

[391] *Epic v. Apple* Order, p. 163.

[392] *Epic v. Apple* Order, p. 164. The Court goes on to state, "While Epic Games did not meet its burden to show actual lock-in on this record, the Supreme Court has recognized that such information costs may create the potential for anticompetitive exploitation of consumers. *Eastman Kodak*, 504 U.S. at 473-75." *Epic v. Apple* Order, p. 164.

those users. Platforms may adopt strategies to reduce multi-homing to obtain more market power over their users."[393]

220. Apple's experts also dispute the extent of consumer switching costs for mobile devices. Professor Schmalensee claims that "it is easy to wrongly infer that switching costs are high just because relatively little switching has recently occurred," noting the example of iOS and Android overtaking Nokia and RIM as the top-selling smartphones.[394] He also cites the Simonson surveys as evidence that consumers "are not affected by the switching costs that Plaintiffs' experts have claimed,"[395] and that "there is meaningful switching from iOS devices to Android phones," such that "competition among iOS and non-iOS devices is robust."[396]

221. Professor Willig opines that "inasmuch as Apple's incentives with regard to its conduct towards the App Store are significantly intertwined with the impacts on its sales of iOS devices, it follows that there is no validity to the claim of a separate relevant market confined to the iOS App Store."[397] His argument is essentially a presupposition of the conclusion that competition in the foremarket disciplines Apple's behavior in the aftermarket. He claims that "Apple's existing and potential customers have many non-Apple choices from which to pick a smartphone, including numerous models from manufacturers such as Samsung, LG, Motorola, and

---

[393] Stigler Committee on Digital Platforms, "Final Report", *Stigler Center for the Study of the Economy and the State, University of Chicago Booth School of Business*, 2019, pp. 62-63, available at, https://www.chicagobooth.edu/-/media/research/stigler/pdfs/digital-platforms---committee-report---stigler-center.pdf, last accessed October 18, 2021.

[394] Schmalensee Report, ¶ 106. Professor Schmalensee also claims that I "assert the existence of a foremarket for OS-installed mobile devices without performing a rigorous market definition analysis," and that "Apple faces numerous large competitors for the sale of such devices, competitors that get their operating systems essentially for free." Schmalensee Report, ¶ 46.

[395] Schmalensee Report, ¶ 108.

[396] Schmalensee Report, ¶ 110.

[397] Willig Report, ¶ 174 (adopted by Schmalensee).

Non-Party Highly Confidential—Outside Counsel Eyes Only

Google."[398] He concludes that the fact that Apple has not "hugely increased its commission rate" is "plain evidence" that the switching cost-based argument of an aftermarket is not correct.[399]

222. As discussed above, in my Opening Report I present a range of evidence supporting the existence of switching costs, in addition to evidence of the low rates of switching.[400] As shown in my Opening Report, Android and iOS have maintained a stable duopoly over OS-installed mobile devices for years, evidence consistent with the conclusion that iOS and Android are significantly differentiated.[401] The academic literature predicts that undifferentiated two-sided platforms often "tip" to favor a single firm because of indirect network effects.[402]

223. Citing the Stigler Report referenced above, one of Apple's own experts, Professor Prince, explains in one of his public policy articles, "[A] variety of different switching costs might prevent some iPhone users from switching to Android devices. Such costs might include transferring contacts and photos, learning new user interfaces, the need to purchase/download new apps, and so on. The presence of large switching costs may exacerbate lock-in and therefore contribute to market power and/or dominance."[403]

224. Professor Schmalensee's example of iPhone and Android displacing Nokia and RIM as the leaders in the market for smartphones is misleading. He presents this takeover as evidence of low

---

[398] Willig Report, ¶ 177 (adopted by Schmalensee). Professor Willig then claims that "[t]here is intense rivalry among smartphone manufacturers," a claim presented without citation or supporting analysis, and without noting that all of the alternatives he lists use the Android operating system. Willig Report, ¶ 177 (adopted by Schmalensee). He continues to claim more broadly, "[i]n theory, adverse changes to conduct over later-purchased products or services that exploits an installed base of consumers typically would make sense only when the manufacturer has essentially given up on its reputation and its primary-market product because the product is at a technological dead end or the demand for its capabilities is sufficiently declining." Willig Report, ¶ 179 (adopted by Schmalensee). Again, this claim is presented without citation or supporting analysis.

[399] Willig Report, ¶ 182 (adopted by Schmalensee).

[400] *See* McFadden Opening Report, Section III.E.1, where I provide common evidence supporting high switching costs and lock-in, including data from Apple documents, accounts from popular media, and third-party estimates of potential sources of switching costs.

[401] *See* McFadden Opening Report, Section II.A.

[402] *See e.g.* Bernard Caillaud and Bruno Jullien, "Chicken & egg: competition among intermediary service providers," *RAND Journal of Economics* 34(2) Summer 2003: 309-328, at p. 320, "When matchmakers provide undifferentiated exclusive intermediation services, competition yields an equilibrium with an efficient market structure that involves monopolization."

[403] Michael R. Baye and Jeffrey T. Prince, "The Economics of Digital Platforms: A Guide for Regulators," *The Global Antitrust Institute Report on the Digital Economy* 34 (January 2020): 1250-1297, at p. 1273.

---

Written Evidence of Daniel L. McFadden                    No. 4:11-cv-06714-YGR | Page 92 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

switching costs for smartphones. However, global smartphone sales grew by nearly 700 percent between 2007 and 2013,[404] the period in which Professor Schmalensee notes that iPhone and Android reached a combined 94 percent global market share.[405] It follows that the vast majority of iPhone and Android adopters were new to the smartphone market, not switchers from incumbent smartphones. Also, even if switching costs were relatively low for Nokia and RIM users, it does not mean that switching costs are also low for iPhone users. As I discuss in my Opening Report, Apple employs a number of strategies to keep switching costs high, beyond merely the cost of a new device.[406]

225. Professor Schmalensee insists that "[e]ven if some iOS developers and consumers have non-trivial switching costs, it does not follow that an aftermarket exists that gives the App Store durable market power."[407] He cites the need for Apple to "innovate to remain competitive" and suggests that "[f]ailure to meet the evolving needs of developers" may lead to some developers leaving the platform.[408]

226. Professor Schmalensee's assertion of the demands of the innovative mobile industry preventing durable market power are at odds with actual observed outcomes. Professor Schmalensee himself hints at the acrimonious relationship between Apple and developers when he notes that "[s]ome iOS developers, for example, have threatened to leave the App Store when they request services from the App Store."[409] Despite these threats, developers remain dissatisfied with the App Store and Apple has shown little responsiveness to their complaints, as the Court in *Epic* recognizes.[410]

---

[404] S. O'Dea, "Global smartphone sales to end users 2007-2021," Chart, *Statista*, September 13, 2021, available at, https://www.statista.com/statistics/263437/global-smartphone-sales-to-end-users-since-2007/, last accessed October 18, 2021.

[405] Schmalensee Report, ¶ 106.

[406] McFadden Opening Report, Section III.E.1.

[407] Schmalensee Report, ¶ 111.

[408] Schmalensee Report, ¶ 111.

[409] Schmalensee Report, ¶ 111.

[410] *Epic v. Apple* Order, p. 101: "Notably, Apple conducted developer surveys in 2010 and 2017. Comparing the two indicates that Apple is not moving quickly to address developer concerns or dedicating sufficient resources to their issues. Innovators do not rest on laurels." *See also* at p. 40: "Epic Games raises legitimate concerns regarding some of the consequences of Apple's App Guidelines and its refusal to share control of data absent customer agreement. First, Apple does a poor job of mediating disputes between a developer and its customer. […] [D]evelopers lack the ability to provide refunds and have worse customer service as the result. […] [Apple] has created overly simplistic rules to issue refunds which can also increase fraud." *See also* at p. 41:

Non-Party Highly Confidential—Outside Counsel Eyes Only

227. Finally, Professor Willig opines that the applicability of the aftermarket framework is "not remotely common across either putative class because the specific substitution opportunities for individual consumers and individual developers are markedly different."[411] This claim is unfounded and misguided for at least three reasons. First, individual iOS device consumers do not have markedly different substitution opportunities from one another. As I argue in my Opening Report and as the Court recognizes in *Epic*, multi-homing is not a significant factor with respect to iOS device consumers.[412]

228. Second, a relevant question for the market definition analysis is not what specific substitution opportunities individual consumers have available to them, but whether there exist reasonably close substitutes for enough iOS device consumers such that a small but significant and non-transitory increase in price ("SSNIP") for all iOS apps and in-app content would lead to sufficient customer switching to render the SSNIP unprofitable.[413] This distinction is meaningful and important. Suppose, for a moment, that 1 percent of iOS device consumers would readily switch to Android devices in the presence of a SSNIP. This group of customers that would substitute in response to a given price change is often referred to as the "marginal customers."[414] Whether Mr. Lawrence or Mr. Hayter, two of the named plaintiffs, belongs to that 1 percent group of marginal customers is not a relevant question for defining a relevant market. Even if both Mr. Lawrence and Mr. Hayter are marginal customers, whether they would choose Samsung or Motorola Android phones is not a relevant question either. Absent price discrimination, the marginal customers in a properly-defined relevant market "protect" the less price sensitive consumers – often called "infra-marginal customers" – by being sufficiently numerous and willing to switch that they make a SSNIP unprofitable for the hypothetical

---

"[Explaining reasons why developers may benefit from a closer connection to consumers and their information] Other examples, however, seem more legitimate such as Match Group's desire to obtain the information to run registered sex offender checks and age verification."

[411]  Willig Report, ¶ 173 (adopted by Schmalensee).

[412]  *See* McFadden Opening Report, Section III.A and *Epic v. Apple* Order, p. 52.

[413]  McFadden Opening Report, ¶ 66.

[414]  *See e.g.* Daniel Gore, Stephen Lewis, Andrea Lofaro, and Frances Dethmers, *The Economic Assessment of Mergers under European Competition Law*, (Cambridge University Press, 2013), p. 35. *See also* Lynn Pepall, Dan Richards, and George Norman, *Industrial Organization: Contemporary Theory and Empirical Applications*, 5th Edition, (Wiley, 2014), p. 158.

Non-Party Highly Confidential—Outside Counsel Eyes Only

monopolist in question. For this reason, the focus of the market definition inquiry should be on the discipline that marginal customers impose on the hypothetical monopolist.[415]

229. Third, the Court in the *Epic* decision identified the evidentiary deficiencies regarding consumer lock-in in its aftermarket analysis,[416] and the question of whether those deficiencies can be rectified is inherently common to the Consumer Class. The Court's analysis is focused on whether switching costs act as a barrier to prevent competition in the foremarket for devices from constraining Apple's pricing in the market for apps and in-app content. All Class members would require a determination of the extent of that constraint.

## C.    CLUSTER MARKETS AND "COMPETITIVE CONDITIONS"

230. Professor Schmalensee claims that "the single relevant market defined by [the experts of the Consumer Class and Developer Class] can only be characterized as a cluster market. When multiple products that are bought and sold independently face similar competitive conditions, such as common competitive suppliers and comparable degrees of ease of entry, these products may be combined to form a cluster market for analytical convenience."[417] He then argues that I used the cluster market framework in my Opening Report but failed to show the relevant market is a cluster market because "competitive conditions [for different types of transactions] are not sufficiently similar."[418] Professor Willig similarly states that "iOS app transactions cannot be clustered into a single market because different app transactions face substantially different competitive conditions."[419] Professor Willig uses the Staples/Office Depot case as an example

---

[415]    *See e.g.* Daniel Gore, Stephen Lewis, Andrea Lofaro, and Frances Dethmers , *The Economic Assessment of Mergers under European Competition Law*, (Cambridge University Press, 2013), p. 36, "The preferences over alternatives of [infra-marginal] customers are not relevant for determining the boundaries of the relevant market. Infra-marginal customers are nonetheless relevant to the market definition exercise since the greater the proportion of infra-marginal customers in a candidate market, the more likely a hypothetical monopolist of that candidate market will find it profitable to increase price above the competitive level. It should be noted that, while they would not respond to a small but significant price increase for the products in question, infra-marginal customers nonetheless benefit from the behavior of marginal customers, as the threat of marginal customers switching to alternatives provides the competitive constraint on suppliers' pricing that determines the price paid by all customers, both marginal and infra-marginal.".

[416]    *Epic v. Apple* Order, pp. 130-132.

[417]    Schmalensee Report, ¶ 53.

[418]    Schmalensee Report, ¶ 60.

[419]    Willig Report, ¶ 86 (adopted by Hitt and Schmalensee).

Non-Party Highly Confidential—Outside Counsel Eyes Only

where "the court excluded ink and toner because of the different competitive conditions defining sales of those products."[420] Professor Hitt claims "it is inappropriate to cluster together transactions for all types of apps into a single market as Plaintiffs' experts have done. This is because the available substitutes, as well as competitive conditions, are different across different app transactions."[421]

231. Apple's experts mischaracterize my market definition analysis. First and foremost, whether the relevant market defined in my Opening Report is called a cluster market or not (I do not use this term in my Opening Report), the underlying economic principles related to the market definition analysis remain the same. I analyze in my Opening Report why a number of alternatives are not reasonable substitutes for transacting through the App Store to sell iOS device consumers apps and in-app content.[422] For these alternatives, I consider personal computers (PCs) and gaming consoles,[423] non-iOS mobile devices,[424] and direct purchases from app developers,[425] and opine that common evidence supports the conclusion that these alternatives are not reasonable substitutes. In other words, in my Opening Report I consider various alternatives for different types of iOS apps and in-app content transactions and arrive at the same conclusion for all types.

232. Professor Willig's Staples/Office Depot example provides a useful analogy. According to Professor Willig, ink and toner were excluded from the cluster market because "the court found that large business customers purchased ink and toner from not only office supply stores like Staples and Office Depot, but also from printer and copier manufacturers pursuant to certain contractual arrangements in which customers purchased printers and copiers together with maintenance services and ink and toner."[426] This situation is similar to enterprise apps, which are installed on some companies' iOS devices for their employees and not available for iOS device

---

[420] Willig Report, ¶ 83 (adopted by Hitt). Professor Willig also relies on Prof. Hitt's analyses to support his claims that the "competitive conditions" vary across certain categories of apps. Willig Report, ¶¶ 113-151 (adopted by Hitt). I address Prof. Hitt's analysis in more detail in the next section.

[421] Hitt Report, ¶ 228.

[422] McFadden Opening Report, Section III.

[423] McFadden Opening Report, Section III.E.2.

[424] McFadden Opening Report, Section III.E.1.

[425] McFadden Opening Report, Section III.F.

[426] Willig Report, ¶ 83 (adopted by Hitt).

Non-Party Highly Confidential—Outside Counsel Eyes Only

consumers in general.[427] I exclude the enterprise apps from the relevant market because the enterprise app transactions face different "competitive conditions" from other iOS app transactions. For all other iOS apps, the App Store is like a monopoly office supply store selling all types of office supplies.

233. Second, Apple's experts do not distinguish "competitive conditions" relevant for the market definition analysis from mere substitution possibilities, and as a result, they do not reconcile their claims of different app transactions facing substantially different competitive conditions with Apple's plainly unconstrained and largely uniform pricing. Apple has charged largely the same commission rate to all apps throughout the 13 years since the App Store's launch. As the Court states in *Epic*, "unlike those in the computer gaming market, nothing other than legal action seems to motivate Apple to reconsider pricing and reduce rates."[428] This fact is compelling evidence that selling iOS apps and in-app content through the App Store constitutes a distinct relevant market, regardless of types of apps, and Apple faces different competitive conditions from other transactions markets outside the App Store.

234. Professor Hitt provides the primary analysis of the "competitive conditions that drive Apple's experts' conclusions on the appropriate approach to market definition. Throughout his report, Professor Hitt extensively explains many ways in which apps, developers, and consumers can be different from other apps, developers and consumers. He repeatedly asserts that these many differences, including monetization strategies, available substitutes, consumer preferences, price sensitivity, and "economic conditions," result in different "competitive conditions" across a variety of apps.[429] However, he makes no effort nor presents any analysis connecting any of these differences to constraints on Apple's ability to set prices.

---

[427] McFadden Opening Report, ¶ 63.

[428] *Epic v. Apple* Order, p. 36.

[429] "[D]ifferences in optimal monetization strategies imply, in turn, differences in competitive conditions." These differences in monetization strategy further "indicat[e] differences in competitive conditions […] even among apps that developers self-assign to the same broad App Store app genre." Hitt Report, ¶ 235.

"Plaintiffs have not analyzed whether the available substitutes for transactions for different apps are the same. They also have not analyzed whether the set of developers and consumers for different types of apps are the same, and they have not considered other factors that could influence the ability or propensity of developers or consumers to substitute to other transaction platforms, such as how the characteristics of consumer preferences, like price sensitivity, vary across apps, even for apps within a particular app genre. In fact, Professor McFadden

Non-Party Highly Confidential—Outside Counsel Eyes Only

235. As Professor Willig states, "[p]roperly defined relevant markets facilitate the analyses of products, services, suppliers, and platforms that place significant competitive *constraints* on the challenged behavior of a firm."[430] Professor Hitt articulates the same principle at the outset of his critique of Plaintiffs' experts' market definition in his report: "Here, it is of critical importance to determine what options developers and consumers have for transacting with each other beyond downloading an iOS app and transacting through an iOS app on an iOS device, as this will determine what substitute competitive options are available for developers and consumers and *what competitive pressures constrain Apple's pricing.*"[431] [Emphasis added.] Apple's experts' analyses of competitive conditions do not meet their own criteria.

236. Third, the fact that I estimate different price sensitivity across app categories does not imply that apps in different categories do not belong to the same market for iOS app and IAP transactions. Professor Hitt claims, "Professor McFadden conducts his analysis separately for two groups of apps (game apps, and a combined group of apps from the media and entertainment genres), and he finds different economic conditions prevail for these two groups of apps as well as between initial download transactions and in-app purchase transactions, which is inconsistent with his claim that there is a single market for the distribution of all iOS apps that includes both initial downloads and in-app purchase."[432] Professor Hitt is confused. The price sensitivity captures different competitive conditions app developers in each category face, which are not the same competitive conditions that Apple faces in selling apps and in-app content through the App Store. Using the monopoly office supply store analogy again, the fact that consumers' price sensitivity for pencils is different from that for paper clips does not mean that the monopoly office supply store faces different competitive conditions for selling these two products.

---

conducts his analysis separately for two groups of apps (game apps, and a combined group of apps from the media and entertainment genres), and he finds different economic conditions prevail for these two groups of apps as well as between initial download transactions and in-app purchase transactions, which is inconsistent with his claim that there is a single market for the distribution of all iOS apps that includes both initial downloads and in-app purchase." Hitt Report, ¶ 234.

[430]  Willig Report, ¶ 51 (adopted by Schmalensee) [Emphasis added].

[431]  Hitt Report, ¶ 227.

[432]  Hitt Report, ¶ 234.

Non-Party Highly Confidential—Outside Counsel Eyes Only

D.   PROFESSOR HITT'S PROPOSED RELEVANT MARKETS

237. Professor Hitt extends his analysis of competitive conditions to propose two relevant markets, i.e., "the market for digital game transactions" and "the TV and video streaming app transaction market," as examples of "potentially multiple markets in which the App Store provides transactions to proposed developer and consumer class members."[433]

### 1.   Professor Hitt's Proposed Digital Game Transaction Market

238. Professor Hitt's analysis of the digital game transaction market includes summaries of Minecraft, Roblox, and Fortnite data by platform, illustrating that these games are multi-platform.[434] He also discusses how some developers provide users with the ability to create a centralized account with the developer, allowing them to carry over content and progress from one device to another, specifically citing Epic, Roblox, and King, the developer of *Candy Crush* and several other apps.[435] In addition, he cites several sources (including Prof. Hanssens' thoroughly discredited survey from the *Epic* matter) surveying iOS device users that find they own, in varying proportions, other devices.[436] He also compares the game app spending growth rate of individuals who downloaded a console or PC "companion" app to those who did not, and presents the slower growth rate of "companion" app downloaders as evidence of substitution between iOS and PCs or game consoles.[437] Professor Hitt includes as "companion" apps the official companion apps for Playstation, Xbox, Nintendo Switch, and Steam, as well as the parental control app for the Nintendo Switch.[438]

239. Professor Hitt claims that "these analyses indicate that game developers and game consumers have choices on where to perform game transactions. Developers and consumers treat these options as substitutes, which indicates that different transaction platforms compete with the App

---

[433]   Hitt Report, ¶ 251.
[434]   Hitt Report, Appendix D, Figures 3, 4, and 5.
[435]   Hitt Report, Appendix D, ¶¶ 21-26.
[436]   Hitt Report, Appendix D, ¶¶ 29-30.
[437]   Hitt Report, Appendix D, ¶¶ 47-50.
[438]   Hitt Report, Appendix D, note to Figure 11.

Written Evidence of Daniel L. McFadden                    No. 4:11-cv-06714-YGR | Page 99 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

Store for game transactions" and concludes that "there is a well-defined games transaction market and … Apple already faces competition for games transactions with other platforms."[439]

240. Professor Hitt's market definition analysis is flawed in at least two aspects. First, as I explained in Section V.B and elsewhere in this report, the fact that some (or many) consumers have access to multiple devices and *could* play the same games on these devices does not prove that such alternatives are close enough substitutes to constrain Apple from exercising its market power for selling iOS game apps and in-app content. Professor Hitt concludes that "Apple already faces competition for games transactions with other platforms,"[440] but does not show that these multi-platform games or other game app transaction platforms put competitive pressure on game app transactions on the App Store.[441]

241. The Court in *Epic* did not arrive at the conclusion that mobile gaming is distinct from gaming on other platforms by counting the number of multi-platform games or the number of ways in which consumers could purchase digital game apps. The Court examined the extent to which *popular* mobile games are available on non-mobile platforms, as well as the extent to which mobile gaming's growth cannibalized the growth of PC and console gaming, and concluded playing games on PCs and gaming consoles were not close substitutes to playing mobile games.[442]

242. Second, the multi-platform game examples Professor Hitt highlights to support including non-mobile devices in the market are special cases that are not broadly representative, both when considered across apps and across time. As the Court noted in the *Epic* decision, *Fortnite* was a

---

[439] Hitt Report, ¶ 259.

[440] Hitt Report, ¶ 259.

[441] Professor Hitt's "companion" app analysis, while he does not label it as such, is effectively a "difference-in-differences" (DID) analysis. However, as such, it is ill-designed and does not serve to answer the question he poses. In such an analysis, the econometrician compares the change in the outcome of interest in a "treatment" group to the change in the outcome of a control group, which did not receive the "treatment," whatever that may be. In his setting, the treatment is downloading a companion app. However, he does not control for variables that may explain why some consumers downloaded the companion app and others did not in the first place, effectively treating the action of downloading the companion app as a "natural experiment." Without such controls, simply comparing the difference in growth rates, as Professor Hitt does, may capture the difference in spending on iOS games due to some intrinsic differences between these two groups that led one group (the treatment group) to download the companion app more likely than the other (the control group), instead of capturing the effect of downloading the companion app on spending on iOS games.

[442] The Court even agreed that console gaming might be complementary to mobile gaming. *Epic v. Apple* Order, pp. 125-126.

Non-Party Highly Confidential—Outside Counsel Eyes Only

pioneer in cross-platform functionality.[443] Yet this pioneering multiplatform game only arrived on iOS in 2018.[444] *Minecraft* launched on iOS in 2011, yet cross-platform functionality with iOS devices came much later, announced in 2016.[445] King's games and *Roblox* have similarly evolved considerably in their multi-platform availability and integration.[446] Consistent with these facts, the Court found in *Epic* that the Switch or game streaming services are not reasonable substitutes to mobile game app transactions due to, among other things, the relative recent introduction of these products.[447]

### 2. Professor Hitt's Proposed TV and Video Streaming App Transaction Market

243. Professor Hitt's analysis establishing a "TV and video streaming app transaction market" follows a similar approach to his digital game transaction market analysis. He lists "video streaming app transaction platforms" other than the App Store through which "developers and their customers can and do make TV and video streaming app transactions," and concludes that "there is a well-defined video streaming app transaction market that includes other transaction platforms beyond the App Store."[448] In addition, he presents data from Netflix, showing that its overall user growth

---

[443] *Epic v. Apple* Order, p. 9, "In fact, Epic Games pioneered cross-platform play for the gaming industry."

[444] Nick Statt, "Fortnite is now open to everyone on iOS," *The Verge,* April 2, 2018, available at, https://www.theverge.com/2018/4/2/17189048/fortnite-battle-royale-ios-mobile-epic-games-available-now-download, last accessed October 18, 2021.

[445] Scott Nichols, "'Minecraft' coming to iOS on Thursday," *Digital Spy,* November 16, 2011, available at, https://www.digitalspy.com/videogames/minecraft/a351307/minecraft-coming-to-ios-on-thursday/, last accessed October 18, 2021; Allegra Frank, "Minecraft gets cross-platform play later this year," *Polygon,* June 13, 2016, available at, https://www.polygon.com/e3/2016/6/13/11922908/minecraft-cross-platform-e3-2016, last accessed October 18, 2021.

[446] Roblox initially launched on PC in 2006, followed by iOS in 2012, Android in 2014, and most recently Xbox One in 2015. Hritwik Raj, "When was Roblox Released on PC, Android, iOS and Xbox One," *Touch, Tap, Play*, February 28, 2021, available at, https://www.touchtapplay.com/when-was-roblox-released/, last accessed October 18, 2021. A May 2020 article reported that "[t]here is currently no word on whether it will be headed to other platforms like PS4 and Nintendo Switch." Joseph Yaden, "What is Roblox?," *DigitalTrends*, May 3, 2020, available at, https://www.digitaltrends.com/gaming/what-is-roblox/, last accessed October 18, 2021.

Game developer King rose to prominence through games played on Facebook before transitioning to focus on mobile. *See* Stuart Dredge, "King.com hails mainstream potential of mobile gaming," *The Guardian,* September 24, 2012, available at, https://www.theguardian.com/technology/appsblog/2012/sep/24/king-com-mainstream-mobile-games, last accessed October 18, 2021.

[447] *Epic v. Apple* Order, p. 126.

[448] Hitt Report, ¶ 260 and Appendix D, ¶¶ 71-77. These platforms include mobile devices, personal computers, some game consoles, media player devices (e.g., Roku), smart TVs, and streaming from developers' websites.

---

Non-Party Highly Confidential—Outside Counsel Eyes Only

and downloads of its iOS app appear to have been unchanged by its decision to remove IAP in 2018, claiming "[t]his demonstrates that subscription transactions outside of the App Store are substitutes for subscription transactions through the App Store for developers and consumers of video streaming apps."[449] He also discusses the Video Partner Program, a program under which certain video app providers are conditionally able to access a 15 percent commission rate on all transactions.[450]

244. Again, Professor Hitt relies on mere substitution possibilities as evidence for a distinct market for the TV and video streaming app transactions. Counting the number of ways in which consumers could make TV and video streaming app transactions does not establish that they are reasonable substitutes to the App Store or to each other. For instance, in his deposition, Professor Hitt acknowledged that "[t]here could be channel-specific considerations" that could drive differences in price elasticity across channels.[451] He similarly acknowledged that if channel-specific elasticities were "radically different […] that could drive you toward a different market definition." [452] Despite these acknowledgements, he confirmed that he did not investigate channel-specific price elasticities in his analysis.[453]

245. In the analysis of Netflix's subscriber data, Professor Hitt shows evidence that "the decision to stop allowing new iOS accounts to pay for their subscriptions in the iOS app … did not lead to

---

Hitt Report, ¶ 262. Professor Hitt claims that "consumers typically own multiple devices that support video streaming app transactions." Hitt Report, ¶ 262.

[449] Hitt Report, Appendix D, ¶ 89.

[450] Hitt Report, Appendix D, ¶¶ 90-91.

[451] Hitt Deposition, 93:18-94:25. (Q. Dr. Hitt, have you investigated whether the price elasticity of subscribing video streaming services is the same across different devices? A. So I -- I haven't done any calculations of price elasticity, but… [the] subscriptions are identical… You would expect them to be similar in some way, but I haven't done the calculations of that. Q. Okay. Well, you said you would expect them to be similar in some way. If they are different, would that mean that each channel is a different market? A. Not necessarily… [M]y understanding is -- is when defining the boundaries of markets, you take into account, you know, all of the economic circumstances that apply to those markets. But certainly if… you have radically different [elasticities], that could drive you toward a different market definition… Q. Okay. So if the content itself is identical, what else could explain a difference in price sensitivity? A. There could be channel-specific considerations, such as, you know, the willingness or propensity of consumers to transact in these different -- different environments.).

[452] Hitt Deposition, 93:18-94:25.

[453] Hitt Deposition, 93:18-94:25.

---

any discernible change in the monthly number of *new* downloads of the Netflix iOS app."[454] In other words, when iOS device consumers could not pay for the Netflix subscriptions through the App Store, they went to other channels (e.g., Netflix's website) to purchase the Netflix subscriptions. This is far from evidence of substitution as a result of a small but significant price increase. Removing in-app purchasing functionality from iOS apps is equivalent to raising the price of transactions to infinity. Furthermore, Netflix's removal of IAP was not a representative example of the effect of removing IAP. After removing IAP, Netflix added a message in its iOS app that stops just short of directing iOS consumers to subscribe via their website: "Trying to join Netflix? You can't sign up for Netflix in the app. We know it's a hassle. After you're a member, you can start watching in the app."[455] Additionally, as Professor Hitt acknowledged in his deposition, Netflix's decision to remove IAP was widely publicized, receiving coverage from both mainstream and tech-focused media outlets.[456] This press coverage doubly benefitted Netflix, both by freely informing consumers that they must now subscribe through a web browser and by offering context for its decision, possibly mitigating any negative effects of the inconvenience on consumers' perception of Netflix.[457] Thus, what Professor Hitt finds is when

---

[454]  Hitt Report, Appendix D, ¶ 88 [Emphasis original].

[455]  Bill Murphy Jr., "Netflix Made a Big, Risky Change in in 2018. Now We Know How It All Turned Out," *Inc.*, July 6, 2020, available at, https://www.inc.com/bill-murphy-jr/netflix-made-a-big-risky-change-in-2018-now-we-know-how-it-all-turned-out.html, last accessed October 18, 2021.

[456]  Hitt Deposition, 95:23-96:2. ([THE WITNESS:] [Y]ou cannot subscribe to Netflix through iOS as of the time they made the change… and that was pretty well publicized.). For press coverage at the time, see Brian Fung, "The app-store war between Netflix and Apple is heating up," *The Washington Post,* January 4, 2019, available at, https://www.washingtonpost.com/technology/2019/01/04/app-store-war-between-netflix-apple-is-heating-up/, last accessed October 18, 2021; Manish Singh, "Netflix permanently pulls iTunes billing for new users," *VentureBeat,* December 28, 2018, available at, https://venturebeat.com/2018/12/28/netflix-permanently-pulls-itunes-billing-for-new-users/, last accessed October 18, 2021; Sarah Perez, "Netflix stops paying the 'Apple tax' on its $853M in annual iOS revenue," *TechCrunch*, December 31, 2018, available at, https://techcrunch.com/2018/12/31/netflix-stops-paying-the-apple-tax-on-its-853m-in-annual-ios-revenue/, last accessed October 18, 2021; and Chris Welch, "Netflix stops offering in-app subscriptions for new and returning customers on iOS," *The Verge*, December 28, 2018, available at, https://www.theverge.com/2018/12/28/18159373/netflix-in-app-subscriptions-iphone-ipad-ios-apple, last accessed October 18, 2021.

[457]  A Washington Post article from January 2019 begins: "A growing number of software companies are looking to bypass the dominant app store gatekeepers at Apple and Google… The revolt is being led by companies such as Netflix, which became the latest firm to cut off a lucrative relationship for Apple when it confirmed that new customers will no longer be able to pay their monthly subscription fees through iTunes. Instead, subscribers are being redirected to make payments on Netflix's own website." Brian Fung, "The app-store war between Netflix and Apple is heating up," *The Washington Post,* January 4, 2019, available at, https://www.washingtonpost.com/technology/2019/01/04/app-store-war-between-netflix-apple-is-heating-up/, last accessed October 18, 2021.

---

Written Evidence of Daniel L. McFadden                    No. 4:11-cv-06714-YGR | Page 103 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

iOS consumers who downloaded the Netflix iOS app could not buy its subscription services at *any* price, most of them used other channels, with the help of Netflix's message and, possibly, the surrounding publicity.[458]

246. In contrast, Down Dog and Match Group testified in Court that "they have been unable to entice users to other platforms with lower prices."[459] The Court explains, "Match Group has employed marketing campaigns and promotions for web purchases, but the app sales have continued to 'dominate.' Down Dog has had better success at offering cheaper subscriptions on the web, but Apple's anti-steering provision has prevented it from directing users to the cheaper price."[460] More generally, as the Court recognized in the *Epic* decision, "[c]ontractually, Apple imposes the DPLA, which prohibits developers from distributing app outside the App Store. These contractual terms are standardized and nonnegotiable—a contract of adhesion."[461]

247. Professor Hitt relies on the fact that video streaming apps are "subject to different App Store rules and policies, such as the reader rule and the Video Partner Program" as additional evidence for the existence of a distinct market for the TV and video streaming app transactions.[462] However, evidence suggests that the Video Partner Program is more than merely a way to discount the App Store commission for certain app developers. I understand that this program, which has existed since 2016 but remained secret until 2020, offers certain premium streaming video app developers a 15 percent commission rate from the outset, rather than only on renewals beyond one year, and on IAP, like movie rentals.[463] In exchange, app developers agree to

---

[458] Relevant to the discussion is also the European Commission's finding that, in the context of music streaming services, the loss of an IAP option is a separate source of consumer harm. *See* McFadden Opening Report, ¶ 127.

[459] *Epic v. Apple* Order, p. 93.

[460] *Epic v. Apple* Order, p. 93.

[461] *Epic v. Apple* Order, p. 93. *See also* McFadden Opening Report, Section III.F.

[462] Hitt Report, ¶ 268.

[463] The first press reporting indicating the program existed arose in April 2020, when Amazon's Prime Video began allowing IAP. Apple at the time did not clarify any details relating to the commission rate. *See* Nick Statt, "Amazon Prime Video now allows in-app rentals and purchases on the iPhone, iPad, and Apple TV," *The Verge,* April 1, 2020, available at, https://www.theverge.com/2020/4/1/21203294/amazon-prime-video-ios-in-app-purchases-iphone-ipad-apple-tv-change, last accessed October 18, 2021. Apple did not publish guidelines for the Video Partner Program until September 2020. *See* Mike Wuerthele, "Apple clarifies details on Video Partner Program for developers," *AppleInsider*, September 24, 2020, available at, https://appleinsider.com/articles/20/09/24/apple-clarifies-details-on-video-partner-program-for-developers, last

integrate their service with a number of other features within the iOS ecosystem, including "Universal Search, Siri, AirPlay, and single sign-on or zero sign-on," and being available via Apple's AppleTV.[464] Evidence shows that the integration requirements make it such that this cannot be simply interpreted as a price reduction. Apple's Phil Schiller testified in this Court that the reduced rate was intended as an offset for the engineering and development necessary to implement the required integrations.[465]

248. Furthermore, Professor Hitt presents no compelling evidence supporting the conclusion that the reduced rate for the Video Partner Program and subscription renewals is a result of Apple responding to competitive pressure in the TV and video streaming app transaction segment. For example, when Apple lowered the rate on subscription renewals past one year to 15 percent in 2016, it expanded the option to offer subscriptions to all categories of apps.[466] If I follow Professor Hitt's argument regarding different App Store rules and polices being evidence of a distinct relevant market, Apple's 2016 policy change should be interpreted as evidence supporting the conclusion that the relevant market is broader than a subset of app categories.

249. Professor Hitt himself appears to think that the reduced rate for both the Video Partner Program and subscription renewals is fully within Apple's discretion, equivalent to the reduction for small developers that per Apple CEO Tim Cook was expressly not driven by competition.[467] While criticising Professor Elhauge's two-tier But-For commission structure, Professor Hitt argues,

---

accessed October 18, 2021; and Apple Developer, "Apple Video Partner Program," available at, https://developer.apple.com/programs/video-partner/, last accessed October 18, 2021.

[464]  Apple Developer, "Apple Video Partner Program," available at, https://developer.apple.com/programs/video-partner/, last accessed October 18, 2021.

[465]  Trial Testimony of Phillip Schiller, *Epic Games, Inc. v. Apple, Inc.*, Case No. 4:20-cv-05640-YGR, May 17, 2021, 2806:6-21. (A. … The Apple TV Team was working on a new generation of an app on Apple TV where new digital TV services were cropping up as separate services, separate applications, and we wanted to bring them all together into one experience for users. And so the Apple TV Team started meeting with TV content providers and described the work they were going to do to integrate into this new experience… [I]n talking with those developers, the Apple TV Team asked if we could lower the commission on 85/15, not in the second year, but in the first year to help them cover the costs of all this engineering work. And so in doing that, we created a Video Partner Program for any developer who wants to be in that service and do that work to get that benefit.).

[466]  Roger Fingas, "Apple announces it will offer App Store subscriptions to all apps, take smaller 15% cut," *AppleInsider*, June 8, 2016, available at, https://appleinsider.com/articles/16/06/08/apple-announces-it-will-offer-app-store-subscriptions-take-smaller-15-cut, last accessed October 18, 2021.

[467]  Trial Testimony of Tim Cook, *Epic Games, Inc. v. Apple, Inc.*, Case No. 4:20-cv-05640-YGR, May 21, 2021, 3992:4-3993:1.

---

Written Evidence of Daniel L. McFadden                    No. 4:11-cv-06714-YGR | Page 105 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

"Apple has introduced changes to its commission rate schedule over time, such as introducing a 15 percent commission rate for subscription renewals, then for transactions that qualify under the Video Partner Program, and then for transactions under the Small Business Program. … *As it has done so in the past, Apple could choose to change what types of transactions qualify for the lower 15 percent commission tier*" in the But-For world.[468] Also, in claiming that a correct But-For commission rate is 30 percent and explaining why app developers paying 15 percent in the As-Is world would pay 30 percent in his But-For world, he states, "Apple's business situation could differ in the but-for world and it could choose to maintain just one commission rate, it could choose to introduce additional rates, or *it could choose to set entirely different rates for its programs (like the Small Business Program and the Video Partner Program) altogether.*"[469]

### 3.    The Possibility of Multiple App Transactions Markets Does Not Necessitate Individual Inquiry

250.  Professor Willig, after summarizing Professor Hitt's analysis purporting to show distinct markets for game and video streaming app transactions, opines that "because there are multiple relevant app transaction markets, (a) the relevant market(s) in which any given consumer participated would be different than the relevant market(s) in which some other consumers participated and (b) the relevant market(s) in which any given developer participated would be different than the relevant market(s) in which some other developers participated. Thus, antitrust issues that depend on market definition are not common to all class members."[470] Professor Hitt opines that his analysis shows that "different developers and consumers participate in [the relevant] markets to different extents, meaning that determining the appropriate relevant market requires individual analysis."[471]

251.  Apple's experts are once again confused, as they were in their aftermarket disputes, about what individual inquiry means in the context of market definition analysis. If multiple relevant app transaction markets are considered, a market definition analysis would be conducted for each candidate market. For a given candidate market, economists would investigate if there exist

---

468   Hitt Report, ¶ 188 [Emphasis added].
469   Hitt Report, Footnote 395 [Emphasis added].
470   Willig Report, ¶ 152 (adopted by Hitt).
471   Hitt Report, ¶ 34.

reasonably close substitutes outside that market such that a SSNIP would lead to sufficient customer switching to render the SSNIP unprofitable. Such an investigation does not require individual inquiry. Put differently, if there were 100 separate individual litigations regarding Apple's monopolization of iOS app and in-app content sales, the same market definition analysis would be performed for each individual case.

252. Professor Hitt does not engage in individual inquiry when he investigates whether there exists a distinct market for the digital game transactions or a distinct market for the TV and video streaming app transactions. Although his methodology is flawed and his conclusions are unfounded, he shows that determining the appropriate relevant market does not require individual analysis.

253. The fact that I allow, for instance, the price sensitivity to differ across the app categories does not mean that the categories are separate markets. My decision to estimate my damages model separately for two different sets of app categories is to reflect different demand and competitive conditions in each category in estimating the price effects resulting from a lower competitive commission rate, and thus damages. However, if it is somehow determined that there are multiple markets around the app categories and separate litigations are required for each of these markets, my model can be used in each of these litigations without significant modifications.

254. Furthermore, in such circumstances, any individual class member is highly likely to have an interest in the outcome across these litigations. To use app genre as an example, I calculate the proportion of Consumer Class accounts in each genre that also spent in other genres, similar to the calculation in Professor Hitt's Figure 31.[472] As Figure 6 shows, ███████████ of proposed Class accounts in any genre also made purchases in other genres: in the lowest case, ██████ of accounts with spend in the Games category also spent in at least one other genre; for all other genres, more than ██████ of Class accounts with spend in that genre also spent in at least one other genre. This spending pattern implies that the multiple app transactions markets Apple's experts propose likely include the same Class accounts across those markets. As a result, each

---

[472] Hitt Report, Figure 31: Percent of proposed consumer accounts with exclusive spend by genre through the App Store (July 10, 2008 – April 25, 2021).

Non-Party Highly Confidential—Outside Counsel Eyes Only

litigation would repeatedly use the same econometric model to measure the impact of the same alleged misconduct by Apple for the same Class members.

**FIGURE 6: PERCENTAGE OF CONSUMER ACCOUNTS IN EACH APP GENRE WHO MADE PURCHASES IN OTHER GENRES**



Source: Full App Store Transactions Data.

### E.    TWO-SIDED MARKET ISSUES

255. Apple's experts claim that the Apple App Store is a two-sided transaction platform rather than a retail store.[473] Professor Schmalensee claims that "[My] relevant market for 'selling consumers iOS apps and in-app content' fails to acknowledge that the App Store's output is transactions, provided simultaneously to developers and consumers. Focusing only on the services provided to consumers is precisely the economic error committed by plaintiffs in *Amex* when they focused

---

[473]    Schmalensee Report, ¶¶ 31-32; Willig Report ¶ 68.

Written Evidence of Daniel L. McFadden          No. 4:11-cv-06714-YGR | Page 108 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

only on the merchant side of payments card platforms."[474] He argues that I should have modelled app developers "as another distinct group of customers, as is appropriate when analyzing a two-sided transaction platform."[475] Professor Willig echoes this opinion, claiming that my model "does not appear to take into account the interdependence of the two groups of customers—consumers and developers—served by the App Store."[476]

256. Relatedly, Apple's experts claim that because the Apple App Store is a two-sided transaction platform, I should account for indirect network externalities in my market definition analysis.[477] Professor Willig states that "the relevant market must include the sources of the competitive constraints on the challenged behavior of a firm," which include the "demand substitution opportunities" of both app consumers and app developers.[478]

257. Apple's experts criticisms are flawed for several reasons, and ultimately their criticisms are a matter of terminology and not of substance.

258. First, because the Apple App Store is the only app store available for iOS device consumers and app developers that wish to "interact with" iOS device consumers, there is no reasonable substitute to the Apple App Store for either consumer or developers.

259. Second, the decision that both consumers and app developers make regarding platform choices takes place in the (primary) market for devices, and in my Opening Report I provide common evidence supporting the conclusion that iOS device consumers have high costs of switching to an alternative mobile OS device (platform).[479] I also provide common evidence supporting the conclusion that apps developed for non-mobile platforms such as personal computers or gaming

---

[474] Schmalensee Report, ¶ 45.

[475] Schmalensee Report, ¶ 35.

[476] Willig Report, ¶ 68 (adopted by Schmalensee).

[477] Schmalensee Report, ¶ 61; Willig Report, ¶ 71 (adopted by Schmalensee).

[478] Willig Report, ¶ 72 (adopted by Schmalensee).

[479] McFadden Opening Report, Section III.E.1. Some analyses consider network effects as a source of consumer lock-in, which bolster my conclusion here. *See* Michael R. Baye and Jeffrey T. Prince, "The Economics of Digital Platforms: A Guide for Regulators," *The Global Antitrust Institute Report on the Digital Economy* 34 (January 2020): 1250-1297, at p. 1274, "[E]ntry by a superior platform may be hindered by lock-in, even if the cost to an individual user of switching is negligible. Intuitively, the benefit to an individual switching to the superior platform may be dwarfed by the lost network effects if other users do not also switch."

consoles are not part of the relevant market.[480] My market definition analysis is consistent with the market definition analysis of other economic experts in this and related cases who view the Apple App Store as a two-sided transaction platform, in that we agree that selling iOS apps and in-app content is a distinct relevant market.[481]

260.  Third, the market definition analysis in my Opening Report is consistent with the Supreme Court's analysis of the Apple App Store in *Apple Inc. v. Pepper*, in which the Supreme Court held that to consumers Apple acts as a retailer.[482] I consider the viability of non-iOS devices and means of transacting outside the App Store as substitutes for accessing iOS apps and in-app content through the App Store.[483]

261.  Fourth, my methodologies account for the effects of Apple's misconduct on both iOS device consumers and app developers. My model explicitly accounts for developers' profit incentives and the transactions they make selling iOS apps and in-app content to consumers through Apple as an intermediary.[484] My methodology determines the price effects of a lower commission rate (the price charged by the platform, Apple) by modeling the decision of developers (one side of the platform), who observe and react to the commission based on consumer demand parameters (the other side of the platform). I use a benchmark competitive commission rate based on recent competition among PC game app stores, which are subject to two-sided platform dynamics.[485]

262.  Fifth, the economic evidence needed to determine the relevant market boundaries is common to the Consumer Class, regardless of whether we use the terminology that Apple is a retailer or a two-sided platform. As I explain above, consumers in the App Store spend on a diversity of apps. A two-sided market analysis would not obviate that overlap in interest in the outcome of any market definition analysis. If anything, it would enhance the importance of a joint analysis, as,

---

[480]  McFadden Opening Report, Section III.E.2.

[481]  *See e.g.* Expert Report of Dr. David S. Evans, *Epic Games, Inc. v. Apple Inc.*, Case No. 4:20-CV-05640-YGR-TSH, February 16, 2021, Section V.D and Expert Class Certification Report of Professor Einer Elhauge, *Cameron et al. v. Apple Inc.,* Case No. 4:19-cv-03074-YGR, June 1, 2021, Section I.B.6.

[482]  *See* Plaintiff's Opposition to Defendant Apple Inc.'s *Daubert* Motion to Exclude Testimony of Professor Daniel L. McFadden, *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR, August 25, 2021, p. 24.

[483]  McFadden Opening Report, Sections III.E and III.F.

[484]  McFadden Opening Report, Section VI.D.1.

[485]  McFadden Opening Report, Section VI.C.

Written Evidence of Daniel L. McFadden                                    No. 4:11-cv-06714-YGR | Page 110 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

**ER-566**

for instance, consumers' preferences for a "one stop shop" may alter the determination of the relevance of an alternative transaction platform that appears to be a reasonable substitute for developers of a certain subset of apps.

263. Lastly, in the light of the two-sided market framework, my methodologies for quantifying the common impact of Apple's misconduct would provide conservative estimates of damages. For example, lower commissions could attract firm entry, both as a direct effect of lower commissions and as an indirect network effect when more customers join the platform. I have not modeled this firm entry, which Professor Schmalensee notes would "reduce the profits of incumbent app developers."[486] This drop in profit would occur, in part, due to lower prices, which would increase consumer damages.

264. As a final note, Apple's experts' arguments might lead one to conclude that indirect network externalities make the App Store a "natural monopoly," and that forcing competition may reduce the welfare generated by concentrating consumers and developers into a single platform. If so, how does Apple's supra-competitive App Store commission help deliver the benefits of indirect network externalities? It does not. Rather, the supra-competitive App Store commission discourages entry by developers, which in turn makes consumers worse off, amplifying the anticompetitive effects of Apple's misconduct.

## VI.    MARKET POWER

265. In my Opening Report, I explained that Apple's high market share and prohibitive entry barriers in the relevant (after)market for the sale of iOS apps and in-app content, along with Apple's high App Store profit margins, are common evidence of Apple's market power in the relevant market.[487] In this section I explain why the criticisms of these opinions from Professor Schmalensee, Professor Willig (as adopted by Professor Schmalensee), and Mr. Malackowski are unfounded.

---

[486]  Schmalensee Report, ¶ 24.
[487]  McFadden Opening Report, Section IV.B.

Non-Party Highly Confidential—Outside Counsel Eyes Only

A.    APPLE'S EXPERTS' CRITICISMS ON MARKET SHARE AND BARRIERS TO ENTRY

266.    Professor Schmalensee argues that "in platform businesses, market share may be a very unreliable indicator of durable market power," because "[b]arriers to entry and expansion in the platform business is [sic] low, and… success and failure can come quickly." [488] He claims that "when users on one side of a platform defect, the platform becomes less attractive to the other group of users, and a rapid downward spiral can ensue." He cites Nintendo Wii as an example.[489] Professor Willig illustrates the same concept, using a hypothetical example involving Discover credit cards.[490] He argues that the threat of such a spiral in a two-sided market is a substantial "disincentive to a platform from raising price."[491]

267.    Professor Schmalensee's arguments regarding the durability of market power are flawed because they do not account for Apple's alleged misconduct. In claiming that barriers to entry for platforms are low, Professor Schmalensee ignores that Apple has enacted a complete prohibition on the entry of competing app stores for iOS. Apple's anti-steering restrictions also prevent direct distribution from developers from being a reasonable substitute for the App Store. He provides no explanation or evidence for why the App Store is at the threat of a downward spiral from user defection, especially given the current lack of alternative means of iOS app distribution. In the But-For world without Apple's restrictive practices, however, the threat of alternative distribution to the App Store would likely be more credible. He acknowledges this reality in his deposition.[492]

268.    Professor Schmalensee also acknowledges in his deposition that in order to determine whether a firm possesses market power, "one of the things you need to look at is market share. That is a

---

[488]    Schmalensee Report, ¶ 101.

[489]    Schmalensee Report, ¶ 101.

[490]    Willig Report, ¶¶ 74-78 (adopted by Schmalensee).

[491]    Willig Report, ¶ 79 (adopted by Schmalensee).

[492]    Schmalensee Deposition, 75:4-17. (Q. Okay. So did you mean to say that the potential for competition in the two-sided transaction platform market for iOS apps and IAP is high? A. Well, at present there are barriers, as we have discussed in a but-for world in which there wouldn't be barriers it would be possible for other stores to enter. And if conditions are right, expand… So it can come quickly. Q. And -- and in the but-for world the barriers to entry and expansion would be low; correct? A. All else equal, yes.).

Non-Party Highly Confidential—Outside Counsel Eyes Only

good index."[493] He also acknowledges that if the court accepts that the relevant market is the market for iOS apps and IAP, Apple has had approximately 100 percent share of that market since 2007,[494] and that "100 percent market share would probably be indicative of at least short-run market power."[495]

269. Further, the examples that Professor Schmalensee and Professor Willig provide in support of the threat of downward spiral in two-sided markets are uninformative to an evaluation of market power of Apple's App Store. Game consoles (such as Nintendo's Wii) and credit cards (such as Discover) operate under different market conditions than Apple's App Store, particularly in the presence of the restrictive practice, and the threat of substitution away from those platforms is more substantial. Wii is a gaming console and not a digital market itself. Use of the digital market that Nintendo operated on the Wii, the Wii Shop Channel, declined following the release of Nintendo's own subsequent console generations, for which Nintendo introduced a new digital market, the Nintendo eShop. The Nintendo eShop remains in operation for the Nintendo Switch.[496]

270. Professor Willig's Discover example is entirely hypothetical and speculative. This example does, however, serve to highlight that Apple would have to reduce its commission if it were faced with a competitive environment. Because Apple currently restricts competition for iOS app

---

[493] Schmalensee Deposition, 125:8-14. (Q. What other factors do you believe you need to consider, in addition to durable supracompetitive profits for extended periods of time, in order to assess market power in a relevant market? A. Well, they are a range, but one of the things you need to look at is market share. That is a good index.).

[494] Schmalensee Deposition, 24:21- 25:9. (Q. Okay. If -- if the Court accepts that the relevant market here is the market for iOS apps and IAP, do you agree that Apple has approximately 100 percent market share of that market? A. As I said in the Epic case, that would be true as a tautology, yes. Q. Okay. And that has been the case since 2008 or '9, when The App Store first appeared; correct?… Well, you can argue it is the truth since 2007 since there were no apps on the phone that weren't either Apple apps or apps that went through The App Store --).

[495] Schmalensee Deposition, 23:21- 24:10. (Q. Okay. And so my -- my question is -- is this. Did you mean by that sentence that 100 percent market share does not indicate market power? A. The focus there is on durability. And that paragraph describes the ability to expand and -- various entry into expansion. It might, if the market -- 100 percent market share would probably be indicative of at least short-run market power...).

[496] Schmalensee Report, Exhibit 1. *See also* Nintendo, "Wii Shop Channel Discontinuation," available at, https://en-americas-support.nintendo.com/app/answers/detail/a_id/27560/~/wii-shop-channel-discontinuation, last accessed October 18, 2021, "Now that customers have shifted to Nintendo eShop on Nintendo Switch and Nintendo 3DS family systems, we plan to focus our efforts in those areas. As such, the Wii Shop Channel closed in early 2019 after over twelve years of operation."

---

Non-Party Highly Confidential—Outside Counsel Eyes Only

distribution, Apple need not worry about a downward spiral triggered by developers and consumers migrating to a competing iOS app store. If the environment became more competitive, the threat of such a spiral would lead Apple to reduce its prices to prevent consumers and developers from leaving the App Store platform.[497]

271. Professor Schmalensee also argues that "the evidence regarding Apple's market power is not common across all app transactions and requires individualized inquiry."[498] He argues that due to "heterogeneity on multiple dimensions among different types of apps," one cannot assess market power in a market for all apps, but instead must conduct "detailed analysis of any smaller proposed relevant market."[499]

272. Professor Schmalensee's opinion that evidence of Apple's market power requires individual inquiry is predicated on his assertion that market definition requires individual inquiry. As I explain above, market definition is primarily a common question to be addressed with common evidence. The same is true for an assessment of market power.[500]

### B.    APPLE'S EXPERTS' CRITICISMS ON APP STORE PROFIT MARGIN

273. In my Opening Report, I opine that "common economic evidence supports that the Apple App Store enjoys a substantially high level of both gross and net margins."[501] As primary evidence for this opinion, I refer to several internal Apple documents that contain internal P&L statements for the App Store over the period from fiscal year 2013 to fiscal year 2019 (and projections for fiscal year 2020).[502] As I identified, these internal P&Ls report consistently substantial gross margins from fiscal years 2013 to 2019 on the order of ███ percent.[503] As outlined below, Mr.

---

[497]  In his deposition, Professor Schmalensee acknowledged that the credit card platforms can co-exist without succumbing to a downward spiral. Schmalensee Deposition, 57:21- 58:1. (Q. Okay. When -- when Visa showed up on the scene or MasterCard showed up on the scene, American Express didn't fold its tent and go home; right? A. I would have to go through the sequence of entry, but it did [sic]. Neither did Diners Club.).

[498]  Schmalensee Report, ¶ 103.

[499]  Schmalensee Report, ¶ 103.

[500]  *See* McFadden Opening Report, Section IV.A.

[501]  McFadden Opening Report, ¶ 116.

[502]  McFadden Opening Report, ¶¶ 117-122.

[503]  McFadden Opening Report, ¶ 121-122, Figure 9, and Figure 10.

---

Non-Party Highly Confidential—Outside Counsel Eyes Only

Malackowski and Professor Schmalensee make unfounded criticisms of my opinion regarding the App Store's profit margin and its implications for market power.

274. Mr. Malackowski criticizes my reliance – and that of other Plaintiff experts' – on internal Apple documents for App Store profitability and margin information. The primary basis of his criticisms are that Apple's internal estimates of App Store margin and profitability are "for management consumption"[504] and are not meaningful estimates because "Apple operates a cross-functional, interrelated ecosystem of Products & Services" and "does not estimate financial data for its reporting segments or components on a standalone basis."[505] He argues that "[t]he costs of developing and maintaining the ecosystem are joint, inseparable costs that cannot be allocated in an economically meaningful way."[506] Mr. Malackowski also argues that Apple's internal estimates of App Store margin and profitability are unreliable because "GAAP accounting standards do not apply to these analyses."[507] Finally, Mr. Malackowski states that, "[t]he fact that multiple methods for the allocation of operating expenses exist simply confirms that while the calculated operating margins for the App Store included in the Tregillis/Elhauge/McFadden Apple Documents are useful for management planning, they cannot be relied upon as a representation of the fully-allocated / burdened standalone financials of the App Store."[508]

275. Mr. Malackowski's criticism is unfounded for several reasons. First, I rely on the same internal Apple estimates of its App Store profit margin as Epic's accounting expert in the recent *Epic* litigation, Mr. Barnes, whose opinion on the App Store's profit margins was viewed favorably by the Court in its decision. The Court acknowledged that "the consistency between Mr. Barnes' analysis and Apple's own internal documents suggest that Mr. Barnes' analysis is a reasonable assessment of the App Store's operating margin."[509] The Court also noted: "[t]hat [the App Store] commission has enabled Apple to collect extraordinary profits as Mr. Barnes credibly

---

[504]  Malackowski Report, ¶ 254.
[505]  Malackowski Report, ¶ 261.
[506]  Malackowski Report, ¶ 252.
[507]  Malackowski Report, ¶ 255.
[508]  Malackowski Report, ¶ 270.
[509]  *Epic v. Apple* Order, p. 42.

shows that the operating margins have exceeded 75% for years."[510] Mr. Malackowski fails to explain why my use of the same internal Apple documents that Mr. Barnes relies on is inappropriate when Mr. Barnes' analysis was accepted by the Court as a "reasonable assessment of the App Store's operating margin."[511]

276. Second, even if I set aside the Court's view of Apple's internal estimates and Mr. Barnes' analysis, Mr. Malackowski provides no explanation or evidence for why Apple's internal profit margin estimates are not "economically meaningful"[512] – e.g., for my analysis of market power – despite the fact that he acknowledges the estimates were prepared by Apple for "management consumption"[513] and are useful for "management planning."[514] In his deposition, he similarly acknowledges that Apple's internal analysis is meaningful "for the reason it was done."[515]

277. Relatedly, Mr. Malackowski notes that "high-level calculations may offer some insight into periodic trends…"[516] He acknowledges the same in his deposition.[517] While it is not clear what periodic trends he refers to in this instance, he also provides no explanation for why Apple's internal margin estimates would provide insight into these trends, but would not be useful for a market power analysis. As I showed in my Opening Report and described above, Apple's internal margin estimates show that App Store margins have been consistently high over time,

---

[510] *Epic v. Apple* Order, p. 144.

[511] *Epic v. Apple* Order, p. 42. In his deposition, Mr. Malackowski acknowledges that Apple's "managerial reports presented profit calculations that are consistent with what the Judge ruled in the Epic case." Malackowski Deposition, 75:24-76:2.

[512] Malackowski Report, ¶ 252.

[513] Malackowski Report, ¶ 254.

[514] Malackowski Report, ¶ 270.

[515] Malackowski Deposition, 37:9-20. (Q. Do you -- do you believe that Apple's attempt to allocate costs to The App Store for purposes of determining the profitability of The App Store was a meaningless exercise? MS. BRASS: Form. THE WITNESS: So it is a general question. We need to break it down. The documents that allocate certain costs to The App Store to come up with a measure of profitability was, in my view, meaningful for the reason it was done, such as trend analysis, but it is not a meaningful reflection of the economic overall profit of The App Store.). *See also* Malackowski Deposition, 60:4-10.

[516] Malackowski Report, ¶ 262.

[517] Malackowski Deposition, 72:17-73-4. (Q. … You admit that high-level calculations of profit and loss, they offer some useful insight into periodic trends; correct? A. Yes. I think that is fair. Q. Okay. And to some extent the insight that they offer is a reliable insight; correct? A. For the purpose of which they are prepared, I think that is fair.).

---

indicating persistent market power.[518] Further, it is unclear why Mr. Malackowski believes that financials must be GAAP compliant in order to be useful for my market power analysis, but could nonetheless be useful for management consumption or an analysis of periodic trends.

278. Third, Mr. Malackowski uses the fact that multiple cost allocation methodologies exist to suggest that there is no reliable representation of the App Store's profit margin. In my experience as an economist, however, the existence of multiple potential allocation methodologies that provide consistent results often serves to provide credence to the reliability of the estimates, not hinder them as Mr. Malackowski suggests. It appears that Apple also saw value in implementing multiple allocation methods in preparing its internal App Store financials for management planning.

279. Professor Schmalensee also criticizes my opinion regarding the App Store's profit margin and its implications for market power. He argues that Apple's high accounting profitability in the App Store "does not establish the existence of market power,"[519] that "a business's profitability cannot be assessed without at least an estimate of the capital invested in it, and that operating margins do not embody any information on invested capital."[520] He further argues, similar to Mr. Malackowski, that "it makes no sense to try to measure the App Store's profitability in isolation" because "Apple uses its intellectual property to compete in multiple markets at the same time," such that there are considerable "joint costs" across Apple's lines of business.[521]

280. Professor Schmalensee cites the common economic definition of market power as the ability to profitably price above marginal cost.[522] As described above, in the *Epic* decision, the Court endorsed Epic's accounting expert's analysis of the App Store financials.[523] In doing so, the

---

[518] McFadden Opening Report, ¶¶ 121-122.

[519] Schmalensee Report, ¶ 94.

[520] Schmalensee Report, ¶ 95.

[521] Schmalensee Report, ¶ 97.

[522] Schmalensee Report, ¶ 84.

[523] In his deposition, Professor Schmalensee stated that the Court's contradiction of his opinion that the App Store's profit margins are not supracompetitive did not induce him perform any additional analyses to reassess his position. Schmalensee Deposition, 52:25- 53:11. (Q. Okay. And now to break it out for the second half. After you read the Court's opinion, did you -- did you go back and do any initial -- any additional analysis to confirm your opinion that -- that Apple's returns have -- on The App Store have not been supracompetitive? A. Same answer. I read -- I read what she had to say and did not find that there were arguments I had missed or

Court determined that there exist reasonable methods to distribute join costs across products,[524] and that Apple's profit margins "strongly show market power."[525]

## VII. ANTICOMPETITIVE CONDUCT

281. In the McFadden Opening Report, I briefly describe Apple's anticompetitive conduct.[526] I explain that: (i) "[c]ommon economic evidence supports the conclusion that Apple allegedly maintained its monopoly by restricting ways in which iOS device consumers download and install apps and make in-app purchases";[527] and (ii) "common economic evidence supports the allegation that Apple has been controlling what prices developers can charge…by setting a pricing tier for apps and in-app content."[528] In this section, I address the opinion of Professor Rubin on the issue of Apple's restrictive practices for iOS app distribution and Professor Schmalensee on the issue of tiered pricing. The opinions of Professors Hitt and Prince on tiered pricing are addressed above in Section III.B.

### A. THE MONOPOLIZATION OF THE (AFTER)MARKET FOR IOS APPS AND IN-APP CONTENT

282. Professor Rubin opines, "Apple recognizes its unique role in protecting the security of the iOS platform and its role in providing a safe and trustworthy app distribution mechanism. Permitting alternative distribution channels, such as third-party app stores, on iOS devices would jeopardize the security, safety, and trustworthiness of the iOS platform and erode Apple's ability to curate apps on the iOS platform to best maintain a safe and trustworthy experience for its users."[529]

283. I understand that the Court in *Epic* found that "Apple's security rationale is a valid business justification for the app distribution restrictions," although "the specific commission rate is

---

evidence that I had missed that would lead me to change my opinion; so I didn't feel additional analysis was necessary.).

[524] *Epic v. Apple* Order, p. 42.

[525] *Epic v. Apple* Order, p. 94.

[526] McFadden Opening Report, Section V.

[527] McFadden Opening Report, ¶ 125.

[528] McFadden Opening Report, ¶ 128.

[529] Rubin Report, ¶ 20(j).

Non-Party Highly Confidential—Outside Counsel Eyes Only

pretextual" as for the intellectual property justification.[530] I also understand that the plaintiff in the *Epic* matter (Epic Games) proposed two, less restrictive, alternative distribution models, arguing that "these models could be implemented on iOS with minimal technical difficulty."[531] However, the Court concluded that "Epic Games has not met its burden to show that its proposed alternatives are 'virtually as effective' as the current distribution model and can be implemented 'without significantly increased cost.'"[532]

284. Consumer Plaintiffs allege that "Apple did not close the iOS system for the purpose of protecting its proprietary right to own, sell or license iOS. Apple closed the iOS system for the specific purpose, and with the specific intent, of foreclosing competition from other potential iPhone software manufacturers and distributors so that Apple could monopolize and derive monopoly profits from the iOS apps aftermarket."[533] Consumer Plaintiffs also allege that "[t]he iOS operation system and the hardware on which it runs—*not* the App Store sales platform—are the *primary sources of iOS device security*."[534]

285. It is beyond the scope of this report to rebut the merits of Apple's security rationale or propose other less restrictive distribution models.[535] Whether Apple's security rationale is a pretext or valid business justification is a common question to all Consumer Class members. Likewise, whether there are other less restrictive distribution models that meet the legal standards is also a common question to all Class members. These questions will be addressed with common evidence on the merit stage.

---

[530]  *Epic v. Apple* Order, p. 146.

[531]  *Epic v. Apple* Order, p. 148.

[532]  *Epic v. Apple* Order, p. 149.

[533]  Stipulation and [Proposed] Order for Leave to File Third Amended Consolidated Class Action Complaint, *In re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR, September 11, 2020, ¶ 37.

[534]  Plaintiff's Notice of Motion and Motion for Class Certification; Memorandum of Points and Authorities, *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR, June 1, 2021, p. 9 [Emphasis Original], *citing* Exhibit KK, APL-APPSTORE_04650308, at 311, Exhibit BB, Deposition of C.K. Haun, Volume 1, *In Re Apple iPhone Antitrust Litigation*, January 13, 2021, 322:9-19 and 323:25-324:21; Exhibit CC, Trial Transcript, *Epic Games, Inc. v. Apple, Inc.*, Case No. C-20-5640-YGR, May 14, 2021, 2556:4-22.

[535]  The Court in the *Epic* decision states that Epic Games has not sufficiently developed its proposed alternative models. *Epic v. Apple* Order, p. 149.

---

Non-Party Highly Confidential—Outside Counsel Eyes Only

## B.    THE TIER PRICING POLICY

286. Apple's experts try to paint Apple's tier pricing as common focal pricing found in other marketplaces. Professor Schmalensee argues that "in the actual world, 99 is a common focal price ending in many industries, and research indicates that it is the most common price ending."[536] He also argues that the 99 cent price tier "may act as a ceiling rather than as a floor, depending on particular circumstances," and criticizes that I did not perform any empirical analysis to evaluate the effect of the tiered pricing on prices and output.[537]

287. Professor Schmalensee mischaracterizes Apple's tier pricing and its effect. Apple's restrictions require developers to choose a price point from Apple's price tiers rather than the precise optimal price they would choose to charge independent of Apple's restrictions.[538] This limits price competition by keeping prices inflated at a particular tier when competition would otherwise drive prices down below the tier but not so low as to reach the next lower tier.[539] As I explained in my opening report, "An app developer of a $1.99 app cannot offer a 20 percent or 30 percent temporary price discount to boost its app sales. Its only choice is to give a 50 percent price discount. An app developer of a $0.99 app is even more constrained. It cannot offer any price discount."[540]

288. This constraint on discounting is not only prevalent at low app prices, because Apple's price tiers have increasingly wide increments as the price of apps increase. As I explained in my Opening Report, "Apple App Store's pricing tier for apps ranges from $0.99 to $999.99 with dollar increments up to $49.99, five-dollar increments from $54.99 to $99.99, ten-dollar increments from $109.99 to $249.99, fifty-dollar increments from $299.99 to $499.99, and hundred-dollar

---

[536] Schmalensee Report, ¶ 211.

[537] Schmalensee Report, ¶ 212. Professor Prince, largely relying on Professor Schmalensee, asserts that "even if Apple were to remove price tiers in the but-for world, evidence suggests that many developers would still price their apps at focal points ending in 99 cents." Prince Report, ¶ 58.

[538] McFadden Opening Report, ¶ 128.

[539] McFadden Opening Report, ¶ 129.

[540] McFadden Opening Report, ¶ 130.

Written Evidence of Daniel L. McFadden                     No. 4:11-cv-06714-YGR | Page 120 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

increments from \$599.99 to \$999.99."[541] This means that app developers are constrained from discounting (i.e., can only offer relatively large price decreases) at all pricing levels.

289. Apple's experts agree that Apple's price tiers prevent app developers from cutting their prices. For example, Professor Hitt explains that "if Apple's price tiers were to remain in place in the but-for world, developers that would like to cut prices by less than \$1 would not be able to."[542] Further, Professor Prince's analysis shows that price tiers prevent some apps from having lower prices in the But-For world. He reports that 51.9 percent of app-years for which my model predicts lower But-For prices would instead maintain their As-Is price when restricted by discrete pricing tiers.[543] Moreover, when asked whether "the only thing keeping the price from being lower [for those apps] is the existence of a price tier structure," Professor Prince answered "I – I believe the way I have presented it, that is right."[544] This is evidence from Apple's own experts of price tiers preventing consumers from reaping the full benefits from competition in the But-For world.

290. Apple's internal documents also highlight the shortcomings of its tier pricing policy. For example, an internal Apple presentation from July 2020 titled, "App Store Pricing Vision & Approach," notes the "[i]nability to use desired prices / conventions" as an impact of its pricing requirements for both developers and its own Apple services.[545] Apple also notes impacts on developers' ability, and its own ability, to offer bundles/discounts.[546] As a proposed solution to these and a number of other drawbacks of tiered pricing identified in its presentation,[547] Apple's recommended option was free-form pricing, described as follows: "Developer can override prices freely between minimum and maximum prices, on a territory by territory basis." [548]

---

[541]   McFadden Opening Report, ¶ 128.

[542]   Hitt Report, ¶¶ 346 and 349.

[543]   Prince Report, Exhibit 6.

[544]   Prince Deposition, 101:10-101:18. (Q. Okay. So taking Professor McFadden's model as a given and then imposing price tiers on it, as you did, those – for those 1,539 apps, the only thing keeping the price from being lower is the existence of a price tier structure. Is that true? Mr. Swanson: Object to form. THE WITNESS: I – I believe the way I have presented it, that is right.).

[545]   APL-APPSTORE_10342115, at 159.

[546]   APL-APPSTORE_10342115, at 159.

[547]   *See e.g.* APL-APPSTORE_10342115, at 137.

[548]   APL-APPSTORE_10342115, at 160.

Non-Party Highly Confidential—Outside Counsel Eyes Only

October 19, 2021

I declare under penalty of perjury that the foregoing is true and correct

*Daniel McFadde*

Daniel McFadden

Non-Party Highly Confidential—Outside Counsel Eyes Only

**ER-578**

## APPENDIX A CURRICULUM VITAE OF DANIEL MCFADDEN

**Professor Daniel McFadden** is a Principal with The Brattle Group, which provides consulting services and expert testimony on economic, finance, regulatory and strategic issues to corporations, law firms and public agencies worldwide.

Professor Daniel McFadden, recipient of the 2000 Nobel Prize in Economics, is the E. Morris Cox Professor Emeritus of Economics at the University of California at Berkeley and the founding director of its Econometrics Laboratory. He is also the Presidential Professor of Health Economics at the University of Southern California, where he has joint appointments at the USC Sol Price School of Public Policy and the Department of Economics at USC Dornsife College. Previously, he was the James R. Killian Professor of Economics at MIT, the Irving Fisher Research Professor at Yale University, and the Fairchild Distinguished Scholar at the California Institute of Technology. He was awarded the Nobel Prize for his numerous contributions to quantitative economic science and, in particular, his pioneering theoretical, methodological, and empirical work in the analyses of discrete choices. Dr. McFadden has received numerous other awards including the John Bates Clark Medal given every two years to the American economist under the age of forty who has made the most outstanding contribution to the field of economic science. Dr. McFadden received his Ph.D. in Economics from the University of Minnesota in 1962. There he also earned his B.S. in Physics, with high distinction, in 1957.

Dr. McFadden has also held the following academic appointments:

| | |
|---|---|
| 2014- | Presidential Professor of Health Economics, University of Southern California |
| 1996- | Director, Econometrics Laboratory, University of California, Berkeley |
| 1995-1996 | Chair, Department of Economics, University of California, Berkeley |
| 1991-1995 | Director, Econometrics Laboratory, University of California, Berkeley |
| 1990- | E. Morris Cox Chair, University of California, Berkeley |
| 1990- | Professor of Economics, University of California, Berkeley |
| 1990 | Sherman Fairchild Distinguished Scholar, California Institute of Technology |
| 1986-1991 | Director, Statistics Center, Massachusetts Institute of Technology |
| 1984-1991 | James R. Killian Chair, Massachusetts Institute of Technology |
| 1978-1991 | Professor of Economics, Massachusetts Institute of Technology |
| 1977-1978 | Irving Fisher Research Professor, Yale University |
| 1968-1979 | Professor of Economics, University of California, Berkeley |

Written Evidence of Daniel L. McFadden                No. 4:11-cv-06714-YGR | Page 123 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

1966-1967    Visiting Associate Professor, University of Chicago
1966-1968    Associate Professor of Economics, University of California, Berkeley
1963-1966    Assistant Professor of Economics, University of California, Berkeley
1962-1963    Assistant Professor of Economics, University of Pittsburgh
1961-1962    Instructor, Economics, University of Minnesota
1959-1960    Research Assistant, Social Psychology, University of Minnesota
1957-1958    Instructor, Physics, University of Minnesota

## Experience

Dr. McFadden has had a varied background in professional and public service. Among his achievements are:

President, American Economic Association (AEA) (2005)

Chair, National Academy of Science (NAS) Section 54 Economic Sciences (2003- )

Chair, NAS Committee on Methods of Forecasting Demand and Supply of Doctoral Scientists and Engineers (1997-2000)

Advisory Committee, Journal of Applied Economics (1996- )

NAS Commission on Science, Engineering, and Public Policy (1995- )

Chair, AEA Committee on Electronic Publication (1994- )

Vice President, American Economics Association (1994)

NAS Committee on Behavioral and Social Sciences and Education (1989-1994)

Panel Study of Income Dynamics, Advisory Board (1988-1991)

Executive Committee, American Economics Association (1985-1987)

President, Econometric Society (1985)

Executive Committee, Econometric Society (1983-1986)

Council of the Econometric Society (1983-1986)

Vice President, Econometric Society (1983-1984)

NAS Committee on Energy Demand Modeling (1983-1984)

NAS Committee, Basic Research in the Social Sciences (1982-1987)

Chair, AEA Awards Committee (1981-1984)

Board of Directors, National Bureau of Economic Research (1980-1983)

Editor, Econometric Society Monographs (1980-1983)

Review Committee, California Energy Commission (1979)

Sloan Foundation Book Committee (1977-1979)

Executive Committee, Econometric Society (1978-1980)

Board of Editors, Transportation Research (1978-1980)

Associate Editor, Journal of Econometrics (1977-1978)

Written Evidence of Daniel L. McFadden       No. 4:11-cv-06714-YGR | Page 124 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

Board of Directors, National Bureau of Economic Research (1976-1977)

Executive Committee, Transportation Research Board (1975-1978)

City of Berkeley, Coordinated Transit Project (1975-1976)

Advisory Committee on Transportation Models, Metropolitan Transportation Commission (1975)

Council of the Econometric Society (1974-1980)

Elected Member, Universities National Bureau (1974-1977)

Board of Editors, Journal of Mathematical Economics (1973-1977)

Board of Editors, American Economic Review (1971-1974)

Chair, NSF-NBER Conference, Economics of Uncertainty (1970- )

Economics Advisory Panel, National Science Foundation (1969-1971)

Editor, Journal of Statistical Physics (1968-1970)

**MIT - Related**

Committee on Curricula, 1990-91

Killian Award Committee, 1984

Center for Energy Policy Research, Program Board, 1983-84

Engineering Dean Search Committee, 1980-81

Provost's Committee on Statistics, 1979-80

CTS Advisory Board, 1978-79

**Berkeley – Related**

Director of Graduate Studies, 1994-95

IBER Advisory Committee, 1993-95 (Chair, 1994-95)

## Professional Affiliations

American Economics Association

The Econometric Society

American Statistical Association

Mathematical Association of America

Transportation Research Board

## Fellowships, Scholarships, Honors, and Awards

Non-Party Highly Confidential—Outside Counsel Eyes Only

Honorary Degree, University of Montreal (2004)

Honorary Degree, University College London (2003)

Richard Stone Prize in Applied Econometrics (2000-2001)

Nobel Prize in Economics (Joint Recipient) (2000)

Nemmers Prize in Economics, Northwestern University (2000)

American Agricultural Economics Association, Best Paper Prize (1994)

University of Chicago, LLD (1992)

Frisch Medal, Econometric Society (1986)

Elected to National Academy of Science (1981)

Outstanding Teacher Award, MIT (1981)

Fisher-Schultz Lecture, Econometrics Society (1979)

Elected to American Academy of Arts and Sciences (1977)

John Bates Clark Medal, American Economics Association (1975)

Elected Fellow, Econometrics Society (1969)

Ford Faculty Research Fellow (1966-1967)

Mellon Post-Doctoral Fellow (1962-1963)

Earhart Fellow (1960-1961)

Ford Foundation Behavioral Science Fellow (1958-1962)

## Publications

### Books and Monographs

Essays on Economic Behavior Under Uncertainty, with M. Balch and S. Wu (eds.), North Holland: Amsterdam, 1974.

Urban Travel Demand: A Behavioral Analysis, with T. Domencich, North Holland: Amsterdam, 1975. Reprinted by The Blackstone Company: Mount Pleasant, MI, 1996.

Production Economics: A Dual Approach to Theory and Applications, with M. Fuss (eds.), North Holland: Amsterdam, 1978.

Structural Analysis of Discrete Data with Econometric Applications, with C.F. Manski (eds.), MIT Press: Cambridge, MA, 1981.

Microeconomic Modeling and Policy Analysis: Studies in Residential Energy Demand, with T. Cowing, Academic Press: New York, 1984.

Non-Party Highly Confidential—Outside Counsel Eyes Only

Preferences, Uncertainty, and Optimality: Essays in Honor of Leonid Hurwicz, with J. Chipman and M.K. Richter (eds.), Westview Press: Boulder, CO, 1990.

Handbook of Econometrics Vol IV, with R. Engle (eds.), North Holland: Amsterdam, 1994.

Statistical Tools, manuscript in preparation.

Rationality and equilibrium, a symposium in honor of Marcel K. Richter, series: Studies in Economic Theory, vol. 26, with C.D Aliprantis, R.L. Matzkin, J.C. Moore, N.C. Yannelis, (Eds.), Springer-Verlag: Berlin Heidelberg 2006.

"Contingent Valuation of Environmental Goods," with Kenneth Train, Elgar, 2017.

"Foundations of Stated Preference Elicitation," with M. Ben-Akiva and K. Train, NOW Press, April 2019.

## Articles

### Production Theory

"Constant Elasticity of Substitution Production Functions," Review of Economic Studies, 1963.

"A Review of 'Manufacturing Production Functions in the U.S., 1957: An Interindustry and Interstate Comparison of Productivity'," Journal of the American Statistical Association, March 1967.

"Cost, Revenue, and Profit Functions," in M. Fuss and D. McFadden (eds.), Production Economics: a Dual Approach to Theory and Applications, North Holland: Amsterdam, 1978.

" A Survey of Functional Forms in the Economic Analysis of Production," with M. Fuss and Y. Mundlak, in M. Fuss and D. McFadden (eds.), Production Economics: a Dual Approach to Theory and Applications, Vol. I, 219-268, North Holland: Amsterdam, 1978.

"The General Linear Profit Function," in M. Fuss and D. McFadden (eds.), Production Economics: a Dual Approach to Theory and Applications, North Holland: Amsterdam, 1978.

"Flexibility Versus Efficiency in Ex Ante Plant Design," with M. Fuss, in M. Fuss and D. McFadden (eds.), Production Economics: a Dual Approach to Theory and Applications, North Holland: Amsterdam, 1978.

"Estimation Techniques for the Elasticity of Substitution and Other Production Parameters," in M. Fuss and D. McFadden (eds.), Production Economics: A Dual Approach to Theory and Applications, North Holland: Amsterdam, 1978.

Non-Party Highly Confidential—Outside Counsel Eyes Only

**ER-583**

"Measurement of the Elasticity of Factor Substitution and Bias of Technical Change," with P. Diamond and M. Rodriguez, in M. Fuss and D. McFadden (eds.), Production Economics: A Dual Approach to Theory and Applications, North Holland: Amsterdam, 1978.

"Joint Estimation of Freight Transportation Decisions Under Nonrandom Sampling," with C. Winston and A. Boersch-Supan, in A. Daugherty (ed.), Analytical Studies in Transport Economics, 137-157, Cambridge University Press: Cambridge, 1985.

**Econometrics**

"Conditional Logit Analysis of Qualitative Choice Behavior," in P. Zarembka (ed.), Frontiers in Econometrics, 105-142, Academic Press: New York, 1973.

"Comments on 'Estimation of a Stochastic Model of Reproduction: An Econometric Approach'," in N. Terleckyj (ed.), Household Production and Consumption, 139-145, National Bureau of Economic Research: New York, 1975.

"The Revealed Preferences of a Government Bureaucracy: Theory," The Bell Journal of Economics and Management Science, Autumn 1975.

"The Revealed Preferences of a Government Bureaucracy: Empirical Evidence," The Bell Journal of Economics and Management Science, No. 1, 55-72, Spring 1976.

"A Comment on Discriminant Analysis 'Versus 'Logit Analysis," Annals of Economic and Social Measurement, 1976.

"Quantal Choice Analysis: A Survey," Annals of Economic and Social Measurement, 1976.
" Econometric Models for Probabilistic Choice Among Products," The Journal of Business, 1980.

"Econometric Models of Probabilistic Choice," in C.F. Manski and D. McFadden (eds.), Structural Analysis of Discrete Data with Econometric Applications, 198-272, MIT Press: Cambridge, MA, 1981.

"Alternative Estimators and Sample Designs for Discrete Choice Analysis," with C.F. Manski, in C.F. Manski and D. McFadden (eds.), Structural Analysis of Discrete Data with Econometric Applications. 2-50, MIT Press: Cambridge, MA, 1981.

"Qualitative Response Models," in W. Hildenbrand (ed.), Advances in Econometrics: Invited Papers for the Fourth World Congress of the Econometric Society, Econometric Society Monograph, 1-37, Cambridge University Press: Cambridge, 1982.

"Specification Tests for the Multinomial Logit Model," with J. Hausman, Econometrica, September 1984.

"Econometric Analysis of Qualitative Response Models," in Z. Griliches and M. Intrilligator (eds.), Handbook of Econometrics, Elsevier: Amsterdam, 1984.

"Comment on Technical Problems in Social Experimentation: Cost versus Ease of Analysis," in J.A. Hausman and D.A. Wise (eds.), Social Experimentation, 214-219, National Bureau of Economic Research: Chicago, 1985.

"The Choice Theory Approach to Market Research," Marketing Science, Fall 1986.

"The Demand for Local Telephone Service: A Fully Discrete Model of Residential Calling Patterns and Service Choices," with K. Train and M. Ben-Akiva, The Rand Journal of Economics, Spring 1987.

"Regression-Based Specification Tests for the Multinomial Logit Model," Journal of Econometrics, 1987.

"What do Microeconometricians Really Do?" Proceedings of the American Statistical Association, 402-405, Business Statistics Section, 1987.

"Comment on Joel Horowitz and George Neumann, Semiparametric Estimation of Employment Duration Models," with A. Han, Econometric Reviews, 1987/1988.

"Econometric Modeling of Locational Behavior," Annals of Operations Research: Facility Location Analysis: Theory and Applications, 1989.

"A Method of Simulated Moments for Estimation of Discrete Response Models Without Numerical Integration," Econometrica, September 1989.

"Testing for Stochastic Dominance," in T. Formby and T.K. Seo (eds.), Studies in the Economics of Uncertainty, 113-134, Springer: New York, 1989.

"Micro-simulation of Local Residential Telephone Demand Under Alternative Service Options and Rate Structures," with T. Atherton, M. Ben-Akiva, and K. Train, in A. de Fontenay, M. Shugard, and D. Sibley (eds.), Telecommunications Demand Modelling, 137-163, Elsevier: Amsterdam, 1990.

"Advances in Computation, Statistical Methods, and Testing of Discrete Choice Models," Marketing Letters, 1991.

"Efficient Estimation by Multinomial Approximation and Sequential Simulation," with W. Beckert and A. Eymann, Working Paper, July 1994.

"Large Sample Estimation and Hypothesis Testing," with W. Newey, in R. Engle and D. McFadden, (eds.) Handbook of Econometrics, North Holland: Amsterdam, 1994.

"Estimation by Simulation," with P. Ruud, The Review of Economics and Statistics, November 1994.

"Simulation of Multivariate Normal Rectangle Probabilities and Their Derivatives: Theoretical and Computational Results," with V. Hajivassiliou and P. Ruud, Journal of Econometrics, May-June 1996.

"Lectures on Simulation-Assisted Statistical Inference," presented at the EC-squared Conference, Florence, Italy, December 12, 1996.

"Estimation of Some Partially Specified Nonlinear Models," with C. Ai, Journal of Econometrics, January-February 1997.

"Modeling Methods for Discrete Choice Analysis," with M. Ben-Akiva, et al., Marketing Letters, July 1997.

"The Method of Simulated Scores with Application to Models of External Debt Crises," with V. Hajivassiliou, Econometrica, July 1998.

Non-Party Highly Confidential—Outside Counsel Eyes Only

"Estimating Features of a Distribution from Binomial Data," with A. Lewbel, Working Paper, May 1997.

"Mixed MNL Models for Discrete Response," with K. Train, Working Paper, December 1996, revised November 1998.

"On Selecting Regression Variables to Maximize Their Significance," Working Paper, July 1998.

"Economic Choices," Nobel Lecture, December 2000. American Economic Review, June 2001.

"Observational Studies: Choice-based sampling," forthcoming in International Encyclopedia of Social and Behavior Sciences, Vol. 2.1, Article 92, Elsevier Science: Amsterdam, 2001.

"Discrete Choice Models Incorporating Revealed Preferences and Psychometric Data," with T. Morikawa and M. Ben-Akiva, Econometric Models In Marketing, Vol. 16, 27-53, Elsevier Science: Oxford, 2002.

"Characteristics of Generalized Extreme Value Distributions," with M. Bielaire and D. Bolduc, Working Paper, April, 2003.

"Structural Simulation of Facility Sharing: Unbundling Policies and Investment Strategy in Local Exchange Markets," by Nauman Ilias, Paul C. Liu, Daniel L. McFadden, Lisa Wood, Glenn A. Woroch & William P. Zarakas, 2005.

"Statistical Analysis of Choice Experiments and Surveys" with A. Bemmaor, F. Caro, J. Dominitz, B. Jun, A. Lewbel, R. Matzkin, F. Molinari, N. Schwarz, R. Willis and J. Winter, Marketing Letters, 16:3/4, 183-196, December 2005.

"Free Markets and Fettered Consumers". American Economic Research, 96:1, March 2006.

"The estimation of generalized extreme value models from choice-based samples", Transportation Research Part B: Methodological, Vol. 42, 4, 381-394, May 2008.

"Risk, Uncertainty and Discrete Choice Models", with A. de Palma, M. Ben-Akiva, D. Brownstone, C. Holt, T. Magnac, P. Moffatt, N. Picard, K. Train, P. Wakker, J. Walker, Marketing Letters, 19:3/4, 269-285, July 2008.

"Semiparametric Analysis", Quantile, no. 5, pp. 29-40, September 2008.

"Conditional Logit Analysis of Qualitative Choice Behavior", Elgar Reference Collection. Pioneering Papers of the Nobel Memorial Laureates in Economics, Vol. 3, pp. 337-374, 2009.

"Maximal Uniform Convergence Rates in Parametric Estimation Problems", with Walter Beckert, Econometric Theory, Vol. 26, Issue 2, 469-500, April 2010.

"Choice probability generating functions", with M. Fosgerau and M. Bierlaire, Working Paper, August 2010.

"Estimating Features of a Distribution from Binomial Data" with Lewbel, A., Linton, O., Journal of Econometrics, Vol. 162, No. 2, pp. 170-88, June 2, 2011.

"Economic Juries and Public Project Provision," Journal of Econometrics, Vol. 166, No. 1, pp. 116-126, January 2012.

**Transportation**

Non-Party Highly Confidential—Outside Counsel Eyes Only

**ER-586**

"The Measurement of Urban Travel Demand," Journal of Public Economics, 303-328, 1974.

"Aggregate Travel Demand Forecasting from Disaggregated Behavioral Models," with F. Reid, Transportation Research Record: Travel Behavior and Values, No. 534, 24-37, 1975.

"The Mathematical Theory of Demand Models," in P. Stopher and A. Meyburg (eds.), Behavioral Travel-demand Models, 305-314, D.C. Heath and Co.: Lexington, MA, 1976.

"Demand Model Estimation and Validation," with A.P. Talvitie and Associates, Urban Travel Demand Forecasting Project, Final Report, Volume V, Institute of Transportation Studies, University of California, Berkeley, June 1977.

"Demographic Data and Policy Analysis," with S. Cosslett, G. Duguay, and W. Jung, Urban Travel Demand Forecasting Project, Final Report, Institute of Transportation Studies, University of California, Berkeley, June 1977.

"Quantitative Methods for Analyzing Travel Behaviour of Individuals: Some Recent Developments," in D. Hensher and P. Stopher (eds.), Behavioural Travel Modelling, 279-318, Croom Helm London: London, 1978.

"An Application of Diagnostic Tests for the Independence from Irrelevant Alternatives Property of the Multinomial Logit Model," with W. Tye and K. Train, Transportation Research Record: Forecasting Passenger and Freight Travel, No. 637, 39-46, Transportation Research Board, 1978.

"Modelling the Choice of Residential Location," in A. Karlqvist, L. Lundqvist, F. Snickars, and J. Weibull (eds.), Spatial Interaction Theory and Planning Models, 75-96, North Holland: Amsterdam, 1978. Reprinted in J. Quigley (ed.), The Economics of Housing, Edward Elgar: London, 1997.

"The Goods/Leisure Tradeoff and Disaggregate Work Trip Mode Choice Models," with K. Train, Transportation Research, February 1978.

"The Theory and Practice of Disaggregate Demand Forecasting for Various Modes of Urban Transportation," in Emerging Transportation Planning Methods, U.S. Department of Transportation DOT-RSPA-DPB-50-78-2, August 1978. Reprinted in T.H. Oum, et al. (eds.), Transport Economics: Selected Readings, 51-80, Seoul Press: Seoul, 1995.

"Overview and Summary: Urban Travel Demand Forecasting Project," with F. Reid, A. Talvitie, M. Johnson, and Associates, The Urban Travel Demand Forecasting Project, Final Report, Volume I, Institute of Transportation Studies, University of California, Berkeley, June 1979.

"Measuring Willingness-to-Pay for Transportation Improvements" in T. Gärling, T. Laitila, and K. Westin (eds.) Theoretical Foundations of Travel Choice Modeling, 339-364, Elsevier Science: Amsterdam, 1998.

"Disaggregate Behavioral Travel Demand's RUM Side: A 30-Year Retrospective," forthcoming in The Leading Edge of Travel Behavior Research, Davide Heshner and J. King (eds.) Pergamon Press: Oxford, 2002.

"Interstate Wine Shipments and E-Commerce," Journal of Wine Economics, Vol. 1, No. 1, May 2006, pp. 3-6.

"Aggregate Travel Demand Forecasting from Disaggregated Behavioral Models," with F. Reid, Elgar Reference Collection. Classics in Planning Series, Vol. 2, pp. 191-204, 2006.

"The behavioral science of transportation", Transport Policy Volume 14, Issue 4, 269274, July 2007.

"The Measurement of Urban Travel", Classics in Planning, Vol. 7, pp. 69-94, 2007.

"Modelling the Choice of Residential Location", Elgar Reference Collection. Pioneering Papers of the Nobel Memorial Laureates in Economics, Vol. 3, pp. 409-430, 2009.

"Is Vehicle Depreciation a Component of Marginal Travel Cost?" with D. Hang and K. Train, Journal of Transportation Economics and Policy, April 2016.

**Economic Growth and Development**

"Comment on 'An Optimum Fiscal Policy in an Aggregate Model of Economic Growth'," in I. Adelman and E. Thorbecke (eds.), The Theory and Design of Economic Development, 140-146, Johns Hopkins Press: Baltimore, MD, 1966.

"The Evaluation of Development Programmes," The Review of Economic Studies, 1967.

"On the Existence of Optimal Development Plans," in H. Kuhn (ed.) Proceedings of the Sixth Princeton Symposium on Mathematical Programming, 403-427, Princeton University Press: Princeton, NJ, 1970.

"Criteria for Public Investment: Comment," The Journal of Political Economy, November/December 1972.

"On the Existence of Optimal Development Programmes in Infinite-Horizon Economies," in J. Mirrlees and N.H. Stern (eds.), Models of Economic Growth, 260-282, Macmillan: Great Britain, 1973.

"Is There Life After Debt? An Econometric Analysis of the Creditworthiness of Developing Countries," with R. Eckaus, G. Feder, V. Hajivassiliou, and S. O'Connell, in J. Cuddington and G. Smith, International Debt and the Developing Countries, 179-209, International Bank for Reconstruction and Development/The World Bank: Washington, D.C., 1985.

"Hot Money and Cold Comfort: Global Capital Movement and Financial Crises in Emerging Economies", Lecture, Latin American and Caribbean Economics Association ANEC Conference on Globalization and Development, 2004.

"Free Markets and Fettered Consumers", American Economic Review, Vol. 96, pp. 5-29, March 2006.

"100 Years of the American Economic Review: The Top 20 Articles", with K. Arrow, B. Bernheim, M. Feldstein, J. Poterba, R. Solow, American Economic Review, Vol. 101, pp. 1-8, February 2011.


**Economic Theory and Mathematical Economics**

"On Hicksian Stability," in J.N. Wolfe (ed.), Value, Capital, and Growth, 329-351, University Press: Edinburgh, 1969.

"On the Controllability of Decentralized Macroeconomic Systems: The Assignment Problem," in H.E. Kuhn and P. Szego (eds.), Mathematical Systems Theory and Economics 1, 221-239, Springer-Verlag: New York, 1969.

"A Simple Remark on the Second Best Pareto Optimality of Market Equilibria" Journal of Economic Theory, June 1969.

"A Technical Note on Classical Gains from Trade," with J.M. Grandmont, Journal of International Economics, 1972.

"On Some Facets of Betting: Comments," in M.S. Balch, D. McFadden, and S.Y. Wu (eds.), Essays on Economic Behavior Under Uncertainty, 126-137, North-Holland: Amsterdam, 1974.

"Some Uses of the Expenditure Function in Public Finance," with P.A. Diamond, Journal of Public Economics, 1974. Reprinted in J. Creedy (ed.), Measuring Welfare Changes and Tax Burdens, Edward Elgar: London, September 1998.

"A Characterization of Community Excess Demand Functions," with R. Mantel, A. Mas-Colell, and M.K. Richter, Journal of Economic Theory, 1974.

"An Example of the Non-Existence of Malinvaud Prices in a Tight Economy," Journal of Mathematical Economics, 1975.

"Tchebyscheff Bounds for the Space of Agent Characteristics," Journal of Mathematical Economics, 1975.

"On Efficiency and Pareto Optimality of Competitive Programs in Closed Multisector Models," with M. Majumdar and T. Mitra, Journal of Economic Theory, August 1976.

"Definite Quadratic Forms Subject to Constraint," in M. Fuss and D. McFadden (eds.), Production Economics: A Dual Approach to Theory and Applications, North-Holland: Amsterdam, 1978.

"Necessary and Sufficient Conditions for the Classical Programming Problem," in M. Fuss and D. McFadden (eds.), Production Economics: A Dual Approach to Theory and Applications, North Holland: Amsterdam, 1978.

"Convex Analysis," in M. Fuss and D. McFadden (eds.), Production Economics: A Dual Approach to Theory and Applications, North Holland: Amsterdam, 1978.

"A Note on the Computability of Tests of the Strong Axiom of Revealed Preference," Journal of Mathematical Economics, 1979.

"Pareto Optimality and Competitive Equilibrium in Infinite Horizon Economies," with M. Majumdar and T. Mitra, Journal of Mathematical Economics, 1980.

"Welfare Analysis of Incomplete Adjustment to Climatic Change," in V.K. Smith and A. White (eds.), Advances in Applied Micro-economics, JAI Press: Greenwich, CT, 1984.

"Stochastic Rationality and Revealed Stochastic Preference," with M.K. Richter, in J. Chipman, D. McFadden, and M.K. Richter (eds.), Preferences, Uncertainty, and Optimality, Essays in Honor of Leo Hurwicz, 161-186, Westview Press: Boulder, CO, 1990.

"Consumers 'Evaluation of New Products: Learning from Self and Others," with K. Train, Journal of Political Economy, 1996.

"Economic Choice Behavior: Psychological Foundations and the Contributions of Amos Tversky," Working Paper, August 1996.

"Rationality for Economists," Working Paper presented at the NSF Symposium on Eliciting Preferences, July 1997. Forthcoming in Journal of Risk and Uncertainty, December 1999.

"Extended Framework for Modeling Choice Behavior," with M. Ben-Akiva, et al. Marketing Letters, Vol. 10, Issue 3, Kluwer, 187-203, August 1999.

Non-Party Highly Confidential—Outside Counsel Eyes Only

**ER-590**

"Pricing in a Competitive Market with a Common Network Resource," Working Paper, April 2003.

"Hybrid Choice Models: Progress and Challenges," with M. Ben-Akiva et. Al., Marketing Letters, Vol. 13, Issue 3, 163-175, August 2002.

"Epilogue," Marketing Letters, Vol. 13, Issue 3, 163-175, August 2002.

"Revealed Stochastic Preference: A Synthesis," Economic Theory, Springer, vol. 26(2), pages 245264, August 2005.

"Welfare Economics at the Extensive Margin Giving Gorman Polar Consumers Some Latitude," Working Paper, June 2004.

"The Misuse of Econometrics in Litigation," by Susan J. Guthrie, Paul C. Liu, Daniel L. McFadden and Kenneth T. Wise, ABA Monograph on Econometrics, Forthcoming, 2005.

"The Misuse of Econometrics in Estimating Damages," with Kenneth T. Wise, et. al. ABA monograph on Econometrics, 2005.

"The Browser War - Econometric Analysis of Markov Perfect Equilibrium in Markets with Network Effects," with Mark Jenkins et. al. Presented at the American Economic Association Annual Meeting.  7-9 January 2005. Philadelphia, PA.

"The Science of Pleasure: The Measurement of Consumer Welfare," Frisch Memorial Lecture, Plenary Session at the Econometric Society World Congress, upcoming, 19-24 August 2005, University College London.

"Rationality and Equilibrium: A Symposium in Honor of Marcel K. Richter", with C. Aliprantis, R. Matzkin, J. Moore, N. Yannelis, Studies in Economic Theory, No. 26, pp. viii, 252, April 2006

"Revealed Stochastic Preference: A Synthesis", Studies in Economic Theory, No. 26, pp. 1-20, 2006.

Foreward to '"Rationality and Equilibrium – 'A Symposium in Honor of Marcel K. Richter", with C. Aliprantis, R. Matzin, J. Moore, N. Yannelis, Studies in Economic Theory, No. 26, pp. v-vi, 2006.

"Human Capital Accumulation and Depreciation", Review of Agricultural Economics, vol. 30, no. 3, 379-85, Fall 2008.

"The Revealed Preferences of a Government Bureaucracy: Theory", Elgar Reference Collection. Pioneering Papers of the Nobel Memorial Laureates in Economics, Vol. 3, pp. 375-390, 2009.

"The Revealed Preferences of a Government Bureaucracy: Empirical Evidence", Elgar Reference Collection. Pioneering Papers of the Nobel Memorial Laureates in Economics, Vol. 3, pp. 391-408, 2009.

"100 Years of the American Economic Review: The Top 20 Articles," Arrow, K.J., Bernheim, B.D., Feldstein, M.S., Poterba, J. M., Solow, R.M., American Economic Review, Vol. 101, No. 1, pp. 1-8, February 2011.

"Choice Probability Generating Functions", Bierlaire, M., Fogerau, M., NBER Working Paper Series, No. 17970, 2012.

**Energy**

"Forecasting the Impacts of Alternative Electricity Rate Structures: A Feasibility Study," Final Report, California Energy Commission, 1976.

"Determinants of the Long-Run Demand for Electricity," with C. Puig and D. Kirshner, Proceedings of the American Statistical Association, 1978.

"A Two-Level Electricity Demand Model," with J. Hausman and M. Kinnucan, Journal of Econometrics, 1979.

"Residential Energy Demand Modeling and the NIECS Data Base: An Evaluation," with T. Cowing and J. Dubin, Report No. MIT-EL-82-009, MIT Energy Laboratory, January 1982.

"An Analysis of the Distributional Impacts of Energy Policies Affecting Residential Energy Demand: The ORNL Model," with J. Berkovec, T. Cowing, and J. Rust, Discussion Paper No. MIT-EL-82-032WP, MIT Energy Laboratory, April 1982.

"An Analysis of the Distributional Impacts of Energy Policies Affecting Residential Energy Demand: The REEPS Model," with T. Cowing, Discussion Paper No. MIT-EL 82-057WP, MIT Energy Laboratory, April 1982.

"An Evaluation of the ORNL Residential Energy Use Model," EPRI Report EA-2442, Electronic Research Institute: Palo Alto, June 1982.

"The NIECS Data Base and Its Use in Residential Energy Demand Modeling," with T. Cowing and J. Dubin, Discussion Paper No. MIT-EL-82-041WP, MIT Energy Laboratory, June 1982.

"A Thermal Model for Single-Family Owner-Occupied Detached Dwellings in NIECS," with J. Dubin, Discussion Paper No. MIT-EL-040WP, MIT Energy Laboratory, June 1982.

"A Comparative Evaluation of the ORNL and REEPS Models of Residential Energy Demand for Forecasting Residential Energy Policy Impacts," with J. Berkovec, T. Cowing, and J. Rust, Discussion Paper No. MIT-EL-82-061WP, MIT Energy Laboratory, July 1982.

"Residential End-Use Energy Planning System (REEPS)," with A. Goett, EPRI Report EA-2512, Electronic Power Research Institute: Palo Alto, July 1982.

"An Econometric Analysis of Residential Electric Appliance Holdings and Consumption," with J. Dubin, Econometrica, March 1984.

"The Residential End-Use Energy Planning System: Simulation Model Structure and Empirical Analysis," with A. Goett, in J. Moroney (ed.), Advances in the Economics of Energy and Resources, JAI Press: Greenwich, CT, 1984.

"Consumer Attitudes and Voluntary Rate Schedules for Public Utilities," with K. Train and A. Goett, the Review of Economics and Statistics, August 1987.

"Estimating Household Value of Electric Service Reliability with Market Research Data," with A. Goett and C-K. Woo, Energy Journal: Special Electricity Reliability Issue, 1988.

"A theory of the perturbed consumer with general budgets", with M. Fogeraru, NBER Working Paper Series, No. 17953, 2012.


**Health Economics**

"Estimation of Response Probabilities from Augmented Retrospective Observations," with D. Hsieh and C. Manski, Journal of the American Statistical Association, No. 391, 651-662, September 1985.

"The Dynamics of Housing Demand by the Elderly: Wealth, Cash Flow, and Demographic Effects," with J. Feinstein, in D. Wise (ed), The Economics of Aging, 55-91, University of Chicago Press: Chicago, 1989.

"The Dynamics of Housing Demand by the Elderly: User Cost Effects," with C. Ai, J. Feinstein, and H. Pollakowski, in D. Wise (ed.), Issues in the Economics of Aging, 33-87, University of Chicago Press: Chicago, 1990.

"Problems of Housing the Elderly in the United States and Japan," in Y. Noguchi and D. Wise (eds.), Aging in the United States and Japan, 109-137, University of Chicago Press: Chicago, 1994.

"Demographics, the Housing Market, and the Welfare of the Elderly," in D. Wise (ed.), Studies in the Economics of Aging, 225-285, University of Chicago Press: Chicago, 1994.

"Living Arrangements: Health and Wealth Effects," with A. Boersh-Supan and R. Schnabel, in D. Wise (ed.), Advances in the Economics of Aging, 193-216, University of Chicago Press: Chicago, 1996.

"Comment on 'Elderly Health, Housing, and Mobility'," in D. Wise (ed.), Advances in the Economics of Aging, 317-320, University of Chicago Press: Chicago, 1996.

"The Impact of Demographics on Housing and Nonhousing Wealth in the United States," with H. Hoynes, in M. Hurd and N. Yashiro (Eds.), The Economic Effects of Aging in the United States and Japan, 153-194, University of Chicago Press: Chicago, 1997.

"Subjective Survival Curves and Life Cycle Behavior," with M. Hurd and L. Gan, in D. Wise (ed.), Inquiries in the Economics of Aging, 259-305, University of Chicago Press: Chicago, 1998.

"Consumption and Savings Balances of the Elderly: Experimental Evidence on Survey Response Bias," with M. Hurd, et al., in D. Wise (ed.), Frontiers in the Economics of Aging, 353-387, University of Chicago Press: Chicago, 1998.

"Healthy, Wealthy, and Wise? Socioeconomic Status, Morbidity, and Mortality among the Elderly," with M. Hurd and A. Merrill, Working Paper, April 1998.

"Predictors of Mortality Among the Elderly," with M. Hurd and A. Merill, working paper, December 1999. Forthcoming in D. Wise (ed.) Themes in the Economics of Aging, University of Chicago Press: Chicago, 2001.

"Comment on Incentive Effects of Social Security Under an Uncertain Disability Option," in D. Wise (ed.) Themes in the Economics of Aging, University of Chicago Press: Chicago, 2001.

"Response Behavior in Surveys of the Elderly: Experimental Evidence from Internet Surveys" with Joachim Winter, Conference Draft, March 2001.

"Healthy, Wealthy, and Wise? Tests for Direct Causal Paths between Health and Socioeconomic Status", with P. Adams, M. Hurd, A. Merrill, and T. Ribeiro, Journal of Econometrics, Vol 112, Issue 1, 3-56, 2003.

"Response," with P. Adams, M. Hurd, A. Merrill, and T. Ribeiro, Journal Of Econometrics, Vol 112, Issue 1, 129-133, 2003.

"Individual Subjective Survival Curves", with L. Gan and M. Hurd, NBER Working Paper No. 9480, January 2003.

"Subjective Mortality Risk and Bequests", with L. Gan, G. Gong and M. Hurd, NBER Working Paper No. 10789, September 2004.

"Broken Down by Work and Sex: How Our Health Declines: Comment, Analyses in the Economics of Aging, pp. 205-12, 2005.

"Medicare prescription drug coverage: Consumer information and preferences", with J. Winter, R. Balza, F. Caro, F. Heiss, B. Jun and R. Matzkin, Proceedings of the National Academy of Sciences, May 2006.

"Who Failed to Enroll in Medicare Part D, and Why? Early Results", with J. Winter and F. Heiss. Health Affairs, doi: 10.1377/hlthaff.25.w344, August 2006.

"Mind the Gap! Consumer Perceptions and Choices of Medicare Part D Prescription Drug Plans", with J. Winter and F. Heiss, Working Paper, November, 2007.

"ConsumerDirected Health Care: Can Consumers Look After Themselves?", with J. Winter and F. Heiss, Swiss Journal of Economics and Statistics, 144(3), 285307 July, 2008.

"Human Capital Accumulation and Depreciation", Review of Agricultural Economics, Vol. 30, Issue 3, pp. 379-385, October 2008.

"Want to Monitor Medicare's New Drug Benefit Program? Start by Sending a Check for $120,000", Economists 'Voices, vol. 5, no. 4, 2008.

"The Human Side of Mechanism Design, A Tribute to Leo Hurwicz and JeanJacque Laffont," Review of Economic Design, 13, (1), 77-100 & 377, 2009.

"Regulation of private health insurance markets: Lessons from enrollment, plan type choice, and adverse selection in Medicare Part D", with J. Winter and F. Heiss, NBER Working Paper 15392, October 2009.

"The Impact of Employer Matching on Savings Plan Participation under Automatic Enrollment: Comment, Research Findings" in The Economics of Aging, pp. 327-35, 2010.

"Mind the Gap! Consumer Perceptions and Choices of Medicare Part D Prescription Drug Plans", with F. Heiss, J. Winter, Research Findings in the Economics on Aging, pp. 413-481, 2010.

"Healthy, Wealthy and Wise?" Revisited: An Analysis of the Causal Pathways from Socio-economic Status to Health," with Stowasser, T., Heiss, F., Winter, J., National Bureau of Economic Research, Inc, NBER Working Papers: 17273, 2011.

"Remedies for Sick Insurance", with C. Noton, P. Olivella, Vol. 6, Iss. 3, (August 2015): 247-278.

"Plan Selection in Medicare Part D: Evidence from Administrative Data", with F. Heiss, A, Leive, J. Winter, NBER Working Paper Series, No. 18166, 2012.

"The New Science of Pleasure", NBER Working Paper Series, No. 18687, 2013.

**Environmental Economics**

"Assessing Use Value Losses Caused by Natural Resource Injury," with J.A. Hausman and G. Leonard, in J. Hausman (ed.), Contingent Valuation: a Critical Assessment, 341-363, North Holland: Amsterdam, 1993.

"Issues in the Contingent Valuation of Environmental Goods: Methodologies for Data Collection and Analysis," with G. Leonard, in J. Hausman (ed.), Contingent Valuation: a Critical Assessment, 165-208, North Holland: Amsterdam, 1993.

"Contingent Valuation and Social Choice," American Journal of Agricultural Economics, November 1994.

"A Utility-consistent, Combined Discrete Choice and Count Data Model Assessing Recreational Use Losses Due to Natural Resource Damage," with J. Hausman and G. Leonard, Journal of Political Economics, 1995.

"Estimating Natural Resource Damages with and without Contingent Valuation, " by Susan J. Guthrie, Daniel L. McFadden and Kenneth T. Wise, at the 88th Annual Meeting of the Air and Waste Management Association, 1995.

"Why is Natural Resource Damage Assessment So Hard?," Hibbard Lecture, Agricultural and Resource Economics, University of Wisconsin, Madison, May, 1996.

"Measuring Environmental Injury in the Presence of Confounding Risks," Working Paper, May 1996.

"On the Analysis of Endogenously Recruited Panels," Working Paper, February 1997.

"Can Meta-analyses of CV Studies Determine Their Reliability?" Working Paper, October 1997.

"Referendum Contingent Valuation, Anchoring, and Willingness to Pay for Public Goods," with D. Green, K. Jacowitz, and D. Kahneman, Resource and Energy Economics, 1998.

"Computing Willingness-to-Pay in Random Utility Models," in J. Moore, R. Riezman, and J. Melvin (eds.), Trade, Theory and Econometrics: Essays in Honour of John S. Chipman, Routledge, forthcoming January 1999.

"Comment on Discussion of Morey and Waldman's 'Measurement Error in Recreation Demand Models,'" with K. Train and R. Johnson, Journal of Environmental Economics and Management, Vol. 40, pp. 76-81 (2000).

## Expert Testimony and Consulting (2017-Present)

I submitted an expert report (August 14, 2017), and a supplemental report (September 22, 2017) on behalf of plaintiffs in the matter of United States v. Novartis Pharmaceuticals Corp., United States District Court, Southern District of New York, No. 11 Civ. 0071 (PGG).

I was deposed (March 1, 2018) on behalf of plaintiffs in the matter of United States v. Novartis Pharmaceuticals Corp., United States District Court, Southern District of New York, No. 11 Civ. 0071 (PGG).

I was deposed (April 10, 2018) on behalf of General Motors, Inc., In Re: General Motors LLC, Ignition Switch Litigation, United States District Court for the Southern District of New York, Case No. 14-MD-2543 (JMF).

I was retained for a class of insurance subscribers who allege an antitrust injury by a consortium of insurers who maintain horizontal agreements that allocate markets and limit competition.

I submitted expert reports on behalf of defendant Polaris Industries Inc. in the matter of Riley Johanssohn et al. v. Polaris Industries No. 0:16-cv-03348-PJS-LIB on January 31, 2019, April 25, 2019 and August 1, 2019.

I was deposed (February 25, 2019 and May 22, 2019) on behalf of Polaris.

I submitted an expert reports on behalf of the Consumer Financial Protection Bureau in the matter of Consumer Financial Protection Bureau v. Ocwen Financial Corporation et al. No. 9:17-CV-80495-MARRA-MATTHEWMAN on August 15, 2019, and November 14, 2019.

I was deposed on behalf of Consumer Financial Protection Bureau v. Ocwen Financial Corporation et al. No. 9:17-CV-80495-MARRA-MATTHEWMAN on February 4, 2020.

I submitted an expert report and testified on behalf of a class of European air freight shippers in an anti-trust matter involving overcharges by airlines serving European markets, June 2020.

I submitted an expert report on behalf of Mondelez and was deposed in a matter involving deceptive labeling, in the case of McMorrow v. Mondelez, July 2020.

I submitted an expert report on behalf of Ford in a matter involving an allegedly defective vehicle component in the case of Eric Stevens et.al. v. Ford Motor Company on May 17, 2021, was deposed in this matter on June 3, 2021, and submitted an affidavit on July 13, 2021.

I submitted an expert report on behalf of the Consumer Plaintiffs in the Apple iPhone antitrust litigation on June 1, 2021, and was deposed in this matter on August 3, 2021.

I submitted an expert report on behalf of Mondelez in a matter involving deceptive labeling, in the case of McMorrow v. Mondelez, July 2, 2021.

---

Written Evidence of Daniel L. McFadden          No. 4:11-cv-06714-YGR | Page 142 of 154

Non-Party Highly Confidential—Outside Counsel Eyes Only

## APPENDIX B MATERIALS RELIED UPON

### CASE MATERIALS

**Filings**

Stipulation and [Proposed] Order for Leave to File Third Amended Consolidated Class Action Complaint. *In Re Apple iPhone Antitrust Litigation.* Case No. 4:11-cv-06714-YGR. September 11, 2020.

Defendant Apple Inc.'s Responses and Objections to Consumer Plaintiffs' Second Set of Interrogatories. *In Re Apple iPhone Antitrust Litigation.* Case No. 4:11-cv-06714-YGR. April 26, 2021.

Plaintiff's Notice of Motion and Motion for Class Certification; Memorandum of Points and Authorities. *In Re Apple iPhone Antitrust Litigation.* Case No. 4:11-cv-06714-YGR. June 1, 2021.

Plaintiff's Opposition to Defendant Apple Inc.'s *Daubert* Motion to Exclude Testimony of Professor Daniel L. McFadden. *In Re Apple iPhone Antitrust Litigation.* Case No. 4:11-cv-06714-YGR. August 25, 2021.

Reply in Support of Defendant Apple Inc.'s Notice of *Daubert* Motion to Exclude Testimony of Professor Daniel L. McFadden. *In Re Apple iPhone Antitrust Litigation.* Case No. 4:11-cv-06714-YGR. September 1, 2021.

**Expert Reports**

Expert Class Certification Report of Professor Einer Elhauge., *Cameron et al. v. Apple Inc.,* Case No. 4:19-cv-03074-YGR., June 1, 2021.

Expert Class Certification Report of Professor Nicholas Economides. *Cameron et al. v. Apple Inc*. Case No. 4:19-cv-03074-YGR., June 1, 2021.

Expert Report and Declaration of Aviel D. Rubin, Ph.D. *In Re Apple iPhone Antitrust Litigation.* Case No. 4:11-cv-06714-YGR. August 10, 2021.

Non-Party Highly Confidential—Outside Counsel Eyes Only
**ER-599**

Expert Report and Declaration of Itamar Simonson, Ph.D. *In Re Apple iPhone Antitrust Litigation*. Case No. 4:11-cv-06714-YGR. August 10, 2021.

Expert Report and Declaration of James E. Malackowski. *In Re Apple iPhone Antitrust Litigation*. Case No. 4:11-cv-06714-YGR. August 10, 2021.

Expert Report and Declaration of Jeffrey T. Prince, Ph.D. *In Re Apple iPhone Antitrust Litigation*. Case No. 4:11-cv-06714-YGR. August 10, 2021.

Expert Report and Declaration of Lorin M. Hitt, Ph.D. *In Re Apple iPhone Antitrust Litigation*. Case No. 4:11-cv-06714-YGR. August 10, 2021.

Expert Report and Declaration of Richard Schmalensee, Ph.D. *In Re Apple iPhone Antitrust Litigation*. Case No. 4:11-cv-06714-YGR. August 10, 2021.

Expert Report and Declaration of Robert D. Willig. *In Re Apple iPhone Antitrust Litigation*. Case No. 4:11-cv-06714-YGR. August 10, 2021.

Expert Report of Daniel L. McFadden. *In Re Apple iPhone Antitrust Litigation*. Case No. 4:11-cv-06714-YGR. June 1, 2021.

**Expert Report Workpapers and Errata**

Errata to Expert Report of Lorin Hitt, Ph.D. *In Re Apple iPhone Antitrust Litigation*. Case No. 4:11-cv-06714-YGR. October 14, 2021.

Prince Report. Workpaper 28.

Prince Report. Workpaper 31.

Prince Report. Workpaper 591.

**Depositions and Declarations**

Declaration of Mark Rollins in Support of Apple Inc.'s *Daubert* Motions & Briefs in Opposition to Class Certification. *In Re Apple iPhone Antitrust Litigation*. Case No. 4:11-cv-06714-YGR. August 10, 2021.

Non-Party Highly Confidential—Outside Counsel Eyes Only
**ER-600**

Deposition of Daniel L. McFadden. *In Re Apple iPhone Antitrust Litigation*. Case No. 4:11-cv-06714-YGR. August 3, 2021.

Deposition of James E. Malackowski. *In Re Apple iPhone Antitrust Litigation*. Case No. 4:11-cv-06714-YGR. October 5, 2021.

Deposition of Jeffrey T. Prince. *In Re Apple iPhone Antitrust Litigation*. Case No. 4:11-cv-06714-YGR. October 4, 2021.

Deposition of Lorin M. Hitt. *In Re Apple iPhone Antitrust Litigation*. Case No. 4:11-cv-06714-YGR. October 11, 2021.

Deposition of Richard Schmalensee. *In Re Apple iPhone Antitrust Litigation*. Case No. 4:11-cv-06714-YGR. October 7, 2021.

Deposition of Eric Gray. *In Re Apple iPhone Antitrust Litigation*. Case No. 4:11-cv-06714-YGR. February 12, 2021.

**Exhibits**

Exhibit BB. Deposition of C.K. Haun. Volume 1. *In Re Apple iPhone Antitrust Litigation*. January 13, 2021.

Exhibit. CC. Trial Transcript. *Epic Games, Inc. v. Apple, Inc*. Case No. C-20-5640-YGR. May 14, 2021.

Exhibit KK. APL-APPSTORE_04650308.

---

**RELATED CASE MATERIALS**

Expert Report of Dr. David S. Evans., *Epic Games, Inc. v. Apple Inc.*, Case No. 4:20-CV-05640-YGR-TSH., February 16, 2021.

Rule 52 Order After Trial on the Merits. *Epic Games, Inc. v. Apple, Inc*. Case No. 4:20-cv-05640-YGR. September 10, 2021.

Non-Party Highly Confidential—Outside Counsel Eyes Only

**ER-601**

Trial Testimony of Phillip Schiller. *Epic Games, Inc. v. Apple, Inc.* Case No. 4:20-cv-05640-YGR. May 17, 2021.

Trial Testimony of Tim Cook. *Epic Games, Inc. v. Apple, Inc.* Case No. 4:20-cv-05640-YGR. May 21, 2021.

Trial Testimony of Timothy Sweeney. *Epic Games, Inc. v. Apple, Inc.* Case No. 4:20-cv-05640-YGR. May 3, 2021.

---

## PRODUCED DOCUMENTS

APL-APPSTORE_00045455
APL-APPSTORE_08856864
APL-APPSTORE_09567760
APL-APPSTORE_09924671
APL-APPSTORE_10334265
APL-APPSTORE_10342115

---

## PUBLICLY AVAILABLE

### Available Online

Albergotti, Reed and Chris Alcantara. "Apple's tightly controlled App Store is teeming with scams." *The Washington Post*. June 6, 2021. Accessed October 18, 2021. https://www.washingtonpost.com/technology/2021/06/06/apple-app-store-scams-fraud/.

Android Developers. "Brand guidelines." Accessed October 18, 2021. https://developer.android.com/distribute/marketing-tools/brand-guidelines.

Apple App Store Preview. "1x1 Basketball Training – Video Guide." Accessed October 18, 2021. https://apps.apple.com/us/app/1x1-basketball-training-video-guide/id981617290.

Apple App Store Preview. "Academy by In The Lab." Accessed October 18, 2021. https://apps.apple.com/us/app/academy-by-in-the-lab/id1508624570.

Apple App Store Preview. "All-Around." Accessed October 18, 2021. https://apps.apple.com/us/app/all-around/id1218143119.

Apple App Store Preview. "Babies Name." Accessed October 18, 2021. https://apps.apple.com/us/app/babies-name/id1434911336.

Apple App Store Preview. "Baby Affinity." Accessed October 18, 2021. https://apps.apple.com/us/app/baby-affinity/id1547913226.

Apple App Store Preview. "Baby Boy & Girl Names Meaning." Accessed October 18, 2021. https://apps.apple.com/us/app/baby-boy-girl-names-meaning/id1488731209.

Apple App Store Preview. "Hulu: Watch TV series & movies." Accessed October 18, 2021. https://apps.apple.com/us/app/hulu-stream-movies-tv-shows/id376510438.

Apple App Store Preview. "LinkedIn Sales Navigator." Accessed October 18, 2021. https://apps.apple.com/us/app/linkedin-sales-navigator/id910768078.

Apple App Store Preview. "LinkedIn: Network & Job Finder." Accessed October 18, 2021. https://apps.apple.com/us/app/linkedin-network-job-finder/id288429040.

Apple Developer. "Apple Video Partner Program." Accessed October 18, 2021. https://developer.apple.com/programs/video-partner/.

Clayton, James. "Google and Apple attacked on app store 'monopoly'." *BBC News*. April 22, 2021. Accessed October 18, 2021. https://www.bbc.com/news/technology-56840379.

Delfino, Devon. "'How Much is LinkedIn Premium?': A cost breakdown of all 4 of LinkedIn's paid membership tiers." *Business Insider*. September 4, 2019. Accessed October 18, 2021. https://www.businessinsider.com/how-much-is-linkedin-premium.

Dredge, Stuart. "King.com hails mainstream potential of mobile gaming." *The Guardian*. September 24, 2012. Accessed October 18, 2021. https://www.theguardian.com/technology/appsblog/2012/sep/24/king-com-mainstream-mobile-games.

Non-Party Highly Confidential—Outside Counsel Eyes Only

Dynata. "Announcing New Name and Brand: Research Now SSI is Now Dynata." January 15, 2019. Accessed October 18, 2021. https://www.dynata.com/press/announcing-new-name-and-brand-research-now-ssi-is-now-dynata/.

European Commission – Speech. "Statement by Executive Vice-President Margrethe Vestager on the Statement of Objections sent to Apple on App Store rules for music streaming providers." (Brussels, April 30, 2021). SPEECH/21/2093. Accessed October 18, 2021. https://ec.europa.eu/commission/presscorner/detail/en/speech_21_2093.

Fingas, Roger. "Apple announces it will offer App Store subscriptions to all apps, take smaller 15% cut." *AppleInsider*. June 8, 2016. Accessed October 18, 2021. https://appleinsider.com/articles/16/06/08/apple-announces-it-will-offer-app-store-subscriptions-take-smaller-15-cut.

Frank, Allegra. "Minecraft gets cross-platform play later this year." *Polygon*. June 13, 2016. Accessed October 18, 2021. https://www.polygon.com/e3/2016/6/13/11922908/minecraft-cross-platform-e3-2016.

Fung, Brian. "The app-store war between Netflix and Apple is heating up." *The Washington Post*. January 4, 2019. Accessed October 18, 2021. https://www.washingtonpost.com/technology/2019/01/04/app-store-war-between-netflix-apple-is-heating-up/.

Good, Owen S. "Sony is selling the PS5 at a loss, investors told." *Polygon*. February 3, 2021. Accessed October 18, 2021. https://www.polygon.com/2021/2/3/22264242/playstation-5-sales-loss-manufacturing-costs-msrp-sony.

Hulu Help Center. "What are the costs and commitments for Hulu?." October 8, 2021. Accessed October 18, 2021. https://help.hulu.com/s/article/how-much-does-hulu-cost.

Murphy, Bill Jr. "Netflix Made a Big, Risky Change in 2018. Now We Know How It All Turned Out." *Inc.*, July 6, 2020. Accessed October 18, 2021. https://www.inc.com/bill-murphy-jr/netflix-made-a-big-risky-change-in-2018-now-we-know-how-it-all-turned-out.html.

Nichols, Scott. "'Minecraft' coming to iOS on Thursday." *Digital Spy.* November 16, 2011. Accessed October 18, 2021. https://www.digitalspy.com/videogames/minecraft/a351307/minecraft-coming-to-ios-on-thursday/.

Nintendo. "Wii Shop Channel Discontinuation." Accessed October 18, 2021. https://en-americas-support.nintendo.com/app/answers/detail/a_id/27560/~/wii-shop-channel-discontinuation.

O'Dea, S. "Global smartphone sales to end users 2007-2021." Chart, *Statista*, September 13, 2021. Accessed October 18, 2021. https://www.statista.com/statistics/263437/global-smartphone-sales-to-end-users-since-2007/.

Pegoraro, Rob. "Spotify just turned up the volume on its latest fight with Apple." *Yahoo!.* July 1, 2016. Accessed October 18, 2021. https://sports.yahoo.com/news/spotify-apple-app-fight-163600384.html.

Perez, Sarah. "Netflix stops paying the 'Apple tax' on its $853M in annual iOS revenue." *TechCrunch*. December 31, 2018. Accessed October 18, 2021. https://techcrunch.com/2018/12/31/netflix-stops-paying-the-apple-tax-on-its-853m-in-annual-ios-revenue/.

Raj, Hritwik. "When was Roblox Released on PC, Android, iOS and Xbox One." *Touch, Tap, Play*. February 28, 2021. Accessed October 18, 2021. https://www.touchtapplay.com/when-was-roblox-released/.

Singh, Manish. "Netflix permanently pulls iTunes billing for new users." *VentureBeat.* December 28, 2018. Accessed October 18, 2021. https://venturebeat.com/2018/12/28/netflix-permanently-pulls-itunes-billing-for-new-users/.

Statt, Nick. "Amazon Prime Video now allows in-app rentals and purchases on the iPhone, iPad, and Apple TV." *The Verge.* April 1, 2020. Accessed October 18, 2021. https://www.theverge.com/2020/4/1/21203294/amazon-prime-video-ios-in-app-purchases-iphone-ipad-apple-tv-change.

Non-Party Highly Confidential—Outside Counsel Eyes Only

**ER-605**

Statt, Nick. "Fortnite is now open to everyone on iOS." *The Verge.* April 2, 2018. Accessed October 18, 2021. https://www.theverge.com/2018/4/2/17189048/fortnite-battle-royale-ios-mobile-epic-games-available-now-download.

Stigler Committee on Digital Platforms. "Final Report." *Stigler Center for the Study of the Economy and the State, University of Chicago Booth School of Business.* 2019. Accessed October 18, 2021. https://www.chicagobooth.edu/-/media/research/stigler/pdfs/digital-platforms---committee-report---stigler-center.pdf.

U.S. Bureau of Labor Statistics. "Consumer Expenditure Surveys." August 30, 2016. Accessed October 18, 2021. https://www.bls.gov/cex/csxovr.htm.

U.S. Census Bureau. "About this Survey." August 10, 2021. Accessed October 18, 2021. https://www.census.gov/programs-surveys/sipp/about.html.

U.S. Census Bureau. "HH-1.  Households by Type: 1940 to Present." December 2020. Accessed October 18, 2021. https://www2.census.gov/programs-surveys/demo/tables/families/time-series/households/hh1.xls.

U.S. Census Bureau. "SIPP Introduction & History." July 13, 2021. Accessed October 18, 2021. https://www.census.gov/programs-surveys/sipp/about/sipp-introduction-history.html.

U.S. Department of Justice and the Federal Trade Commission. "Horizontal Merger Guidelines." August 19, 2010. Accessed October 18, 2021. https://www.justice.gov/atr/horizontal-merger-guidelines-08192010.

Warren, Tom. "Microsoft shakes up PC gaming by reducing Windows store cut to just 12 percent." *The Verge*. April 29, 2021. Accessed October 18, 2021. https://www.theverge.com/2021/4/29/22409285/microsoft-store-cut-windows-pc-games-12-percent/.

Welch, Chris. "Netflix stops offering in-app subscriptions for new and returning customers on iOS." *The Verge*. December 28, 2018. Accessed October 18, 2021. https://www.theverge.com/2018/12/28/18159373/netflix-in-app-subscriptions-iphone-ipad-ios-apple.

Non-Party Highly Confidential—Outside Counsel Eyes Only

Wuerthele, Mike. "Apple clarifies details on Video Partner Program for developers." *AppleInsider.* September 24, 2020. Accessed October 18, 2021. https://appleinsider.com/articles/20/09/24/apple-clarifies-details-on-video-partner-program-for-developers.

Yaden, Joseph. "What is Roblox?." *DigitalTrends*. May 3, 2020. Accessed October 18, 2021. https://www.digitaltrends.com/gaming/what-is-roblox/.

**Journal Articles**

Adams, Brian and Kevin R. Williams. "Zone Pricing in Retail Oligopoly." *American Economic Journal: Microeconomics* 11(1) (2019): 124-156.

Armstrong, Mark. "Competition in Two-Sided Markets." *The RAND Journal of Economics* 37(3) (2006): 668–691.

Baye, Michael R. and Jeffrey T. Prince. "The Economics of Digital Platforms: A Guide for Regulators." *The Global Antitrust Institute Report on the Digital Economy* 34 (January 2020): 1250-1297.

Berry, Steven, James Levinsohn, and Ariel Pakes. "Automobiles Prices in Market Equilibrium." *Econometrica* 63(4) (July 1995): 841-890.

Bulow, Jeremy I., John D. Geanakoplos, and Paul D. Klemperer. "Multimarket Oligopoly: Strategic Substitutes and Complements." *Journal of Political Economy* 93(3) (June 1985): 488-511.

Caillaud, Bernard and Bruno Jullien. "Chicken & egg: competition among intermediary service providers." *RAND Journal of Economics* 34(2) (Summer 2003): 309-328.

Crampes, Claude, Carole Haritchabalet, and Bruno Jullien. "Advertising, Competition and Entry in Media Industries." *The Journal of Industrial Economics* 57(1) (2009): 7-31.

DellaVigna, Stefano and Matthew Gentzkow. "Uniform Pricing in U.S. Retail Chains." *The Quarterly Journal of Economics* (2020): 2011-2084.

Non-Party Highly Confidential—Outside Counsel Eyes Only

Gentzkow, Matthew, Jesse M. Shapiro, and Michael Sinkinson. "Competition and Ideological Diversity: Historical Evidence from US Newspapers." *American Economic Review* 104(10) (October 2014): 3073-3114.

Gentzkow, Matthew. "Valuing New Goods in a Model with Complementarity: Online Newspapers." *American Economic Review* 97(3) (June 2007): 713-744.

Goldfarb, Avi and Catherine Tucker. "Digital Economics." *Journal of Economic Literature* 57(1) (2019): 3–43.

Heiss, Florian, Daniel McFadden, Joachim Winter, Amelie Wuppermann, and Bo Zhou. "Inattention and Switching Costs as Sources of Inertia in Medicare Part D." *American Economic Review* 111(9) (2021): 2737-2781.

Lambrecht, Anja, Avi Goldfarb, Alessandro Bonatti, Anindya Ghose, Daniel G. Goldstein, Randall Lewis, Anita Rao, Navdeep Sahni, and Song Yao. "How Do Firms Make Money Selling Digital Goods Online?." *Marketing Letters* 25(3) (2014): 331–341.

Lucarelli, Claudio, Jeffrey Prince, and Kosali Simon. "The Welfare Impact of Reducing Choice in Medicare Part D: A Comparison of Two Regulation Strategies." *International Economic Review* 53(4) (November 2012): 1155-1177.

Nevo, Aviv. "A Practitioner's Guide to Estimation of Random Coefficients Logit Models of Demand." *Journal of Economics and Management Strategy* 9(4) (2000): 513-548.

Nevo, Aviv. "Measuring Market Power in the Ready-to-Eat Cereal Industry." *Econometrica* 69(2) (2001): 307-342.

Prince, Jeffrey T. "Relating inertia and experience in technology markets: an analysis of households' personal computer choices." *Applied Economics* 43(29) (2011): 4501-4514.

Prince, Jeffrey T. and Avi Goldfarb. "Internet Adoption and Usage Patterns are Different: Implications for the Digital Divide." *Information Economics and Policy* 20(1) (2008): 2-15.

Non-Party Highly Confidential—Outside Counsel Eyes Only

**ER-608**

Prince, Jeffrey T. and Shane Greenstein. "Measuring Consumer Preferences for Video Content Provision via Cord-Cutting Behavior." *Journal of Economics and Management Strategy* 26(2) (2017): 293-317.

Prince, Jeffrey T., Yu-Hsin Liu, and Scott Wallsten. "Distinguishing Bandwidth and Latency in Households' Willingness-to-Pay for Broadband Internet Speed." *Information Economics and Policy* 45 (2018): 1-15.

Rysman, Marc. "The Economics of Two-Sided Markets." *Journal of Economic Perspectives* 23(3) (2009): 125-143.

Werden, Gregory J., Luke M. Froeb, and Timothy J. Tardiff. "The Use of the Logit Model in Applied Industrial Organization." *International Journal of the Economics of Business* 3(1) (1996): 83-105.

**Textbooks**

Ackerberg, Daniel, C., Lanier Benkard, Steven Berry, and Ariel Pakes. "Econometric Tools for Analyzing Market Outcomes." Chapter 63 in *Handbook of Econometrics.* Vol.6A. eds. James J. Heckman, and Edward E. Leamer. (North-Holland, 2007): 4172-4276.

Belleflamme, Paul, and Martin Peitz. *Industrial Organization: Markets and Strategies*. 2nd Edition. (Cambridge University Press, 2015).

Gore, Daniel, Stephen Lewis, Andrea Lofaro, and Frances Dethmers. *The Economic Assessment of Mergers under European Competition Law.* (Cambridge University Press, 2013).

Hubbard, Glenn, R., and Anthony Patrick O'Brien. *Microeconomics*. 4th Edition. (Pearson, 2013).

Pepall, Lynn, Dan Richards, and George Norman. *Industrial Organization: Contemporary Theory and Empirical Applications.* 5th Edition. (Wiley, 2014).

Rubinfeld, Daniel L. "Antitrust Damages." *Research Handbook on the Economics of Antitrust Law.* ed. E. Elhauge. (Elgar, 2012): 378-393.

Non-Party Highly Confidential—Outside Counsel Eyes Only
**ER-609**

Train, Kenneth. *Discrete Choice Methods with Simulation*. (Cambridge University Press, 2009).

Non-Party Highly Confidential—Outside Counsel Eyes Only

# ATTACHMENT PP

BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com

MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com

*Interim Class Counsel and Proposed Co-Class Counsel*

[Additional Counsel Appear on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S *DAUBERT* MOTION TO EXCLUDE REPLY TESTIMONY OF PROFESSOR DANIEL L. MCFADDEN**<br><br><br>DATE:      December 14, 2021<br>TIME:      10:00 a.m.<br>CTROOM:  1, 4th Floor<br>JUDGE:    Hon. Yvonne Gonzalez Rogers |

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF THE RELEVANT PROCEDURAL HISTORY ...................... 2

III.  ARGUMENT ..................................................................................................... 3

    A.   Professor McFadden's Model Will Accurately Identify Injured Class Member Accounts and Calculate Damages at Trial ............................................................. 3

        1.   Accounts Switching Between Prof. Prince's Samples Merely Demonstrate the Standard Error in Any Statistical Analysis .......................................... 3

        2.   Plaintiffs Are Not Required to Calculate Hundreds of Thousands of Individual Class Member Losses Now or at Trial .................................. 6

        3.   Apple IDs Can and Will Be Linked to Class Members ............................. 9

    B.   Professor McFadden's Econometric Model is Scientifically Sound .................... 14

    C.   Professor McFadden's Model is Reliable .............................................................. 15

        1.   Negative Log-Download Coefficients Are Not Illogical .......................... 15

        2.   Prof. Prince's Sports Genre Analysis Is Incomplete ................................ 16

    D.   Plaintiffs are Not Required to Prove Aggregate Damages at This Stage ............. 17

    E.   Professor McFadden's Benchmark Analysis is Reliable ...................................... 18

    F.   Professor McFadden Accounts for Indirect Network Effects .............................. 25

IV.   CONCLUSION ................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
    247 F.R.D. 156 (C.D. Cal. 2007) ........................................................................... 7

*Apple Inc. v. Pepper*,
    139 S. Ct. 1514 (2019) ................................................................................. 15, 25

*Bigelow v. RKO Radio Pictures, Inc.*,
    327 U.S. 251 (1946) ....................................................................................... 7, 20

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
    152 F.3d 588 (7th Cir. 1998) ............................................................................ 25

*Blue Cross & Blue Shield v. AstraZeneca Pharm. LP*
    *(In re Pharm. Indus. Average Wholesale Price Litig.)*,
    582 F.3d 156 (1st Cir. 2009) .............................................................................. 6

*Briseno v. ConAgra Foods, Inc.*,
    844 F.3d 1121 (9th Cir. 2017) ............................................................................ 6

*Brunswick v. Pueblo Bowl-O-Mat*,
    429 U.S. 477 (1977) .......................................................................................... 11

*Buxton v. Lil' Drug Store Prod., Inc.*,
    2007 U.S. Dist. LEXIS 56263 (S.D. Miss. Aug. 1, 2007) .......................................... 6

*Carroll v. SGS Auto. Svc.*,
    2020 US Dist. LEXIS 223676 (M.D. La. Nov. 30, 2020) .......................................... 12

*CollegeNET, Inc. v. The Common Application, Inc.*,
    711 Fed. Appx. 405 (9th Cir. 2017) ................................................................... 12

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013) ..................................................................................... 11

*Concord Boat Corp. v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) .......................................................................... 24

*DSU Med. Corp. v. JMS Co.*,
    296 F. Supp. 2d 1140 (N.D. Cal. 2003) ............................................................. 25

*Epic Games, Inc. v. Apple Inc.*,
    2021 U.S. Dist. LEXIS 172303 (N.D. Cal. Sep. 10, 2021) ........................... 18, 24, 25

-ii-

**ER-614**

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*,
  352 F.3d 367 (9th Cir. 2003) .............................................................................................. 12

*Haller v. Astrazeneca Pharms. LP*,
  598 F. Supp. 2d 1271 (M.D. Fla. 2009) ................................................................................ 6

*Hyland v. HomeServices of Am., Inc.*,
  2012 U.S. Dist. LEXIS 207531 (W.D. Ky. July 3, 2012)...................................................... 24

*In re Air Cargo Shipping Servs. Antitrust Litigation*,
  2014 U.S. Dist. LEXIS 180914 (E.D.N.Y. Oct. 15, 2014)....................................................... 8

*In re Aluminum Phosphide Antitrust Litig.*,
  893 F. Supp. 1497 (D. Kans. 1995) .................................................................................... 25

*In re C.R. Bard, Inc.*,
  948 F. Supp. 2d 589 (S.D.W. Va. 2013)................................................................................ 5

*In re Capacitors Antitrust Litig. (No. III)*,
  2018 U.S. Dist. LEXIS 195310 (N.D. Cal. Nov. 14, 2018)...................................................... 8

*In re Cardizem CD Antitrust Litigation,*
  200 F.R.D. 297 (E.D. Mich. 2001) ...................................................................................... 7

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig. v. Countrywide Fin. Corp.*,
  984 F. Supp. 2d 1021 (C.D. Cal. 2013) ................................................................................ 4

*In re Graphics Processing Units Antitrust Litig.*,
  253 F.R.D. 478 (N.D. Cal. 2008)........................................................................................ 17

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  299 F. Supp. 3d 430 (S.D.N.Y. 2018)................................................................................. 16

*In re Lidoderm Antitrust Litigation,*
  2017 U.S. Dist. LEXIS 24097 (N.D. Cal. Feb. 21, 2017) ........................................................ 8

*In re Linerboard Antitrust Litig.*,
  305 F.3d 145 (3d Cir. 2002)............................................................................................... 18

*In re Live Concert Antitrust Litig.*,
  2011 U.S. Dist. LEXIS 161362 (C.D. Cal. Jan. 4, 2011) ........................................................ 7

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
  169 F.R.D. 493 (S.D.N.Y. 1996) ........................................................................................ 7

-iii-

PLAINTIFFS' OPPOSITION TO APPLE'S *DAUBERT* MOTION TO EXCLUDE
REPLY TESTIMONY OF PROF. MCFADDEN
Case No. 11-cv-06714-YGR

*In re Nexium (Esomeprazole) Antitrust Litig.*,
    777 F.3d 9 (1st Cir. 2016) ........................................................................ 12, 13

*In re Online DVD Rental Antitrust Litig.*,
    2010 U.S. Dist. LEXIS 138558 (N.D. Cal. Dec. 23, 2010) ............................ 24

*In re Optical Disk Drive Antitrust Litig.*,
    2017 WL 11513318 (N.D. Cal. Dec. 18, 2017) ...................................... 20, 24

*In re Scrap Metal Antitrust Litig.*,
    527 F.3d 517 (6th Cir. 2008) .......................................................................... 7

*In re TFT-LCD Antitrust Litig.*,
    2012 U.S. Dist. LEXIS 9449 (N.D. Cal. Jan. 26, 2012) .................................. 6

*Kim v. Crocs, Inc.*,
    2019 U.S. Dist. LEXIS 29131 (D. Haw. Feb. 25, 2019) ............................. 5, 6

*Leyva v. Medline Indus.*,
    716 F.3d 510 (9th Cir. 2013) ........................................................................ 11

*Lithium Ion Batteries Antitrust Litig.*,
    2018 U.S. Dist. LEXIS 35744 (N.D. Cal. March 5, 2018) ............................ 15

*Patt v. Antech Diagnostics*,
    2020 U.S. Dist. LEXIS 160220 (C.D. Cal. May 18, 2020) ............................ 12

*Price v. City of Seattle*,
    2006 U.S. Dist. LEXIS 71041 (W.D. Wash. Sep. 19, 2006) ........................... 6

*Reed Const. Data Inc. v. McGraw-Hill Co.*,
    49 F. Supp. 3d 385 (S.D.N.Y. 2014) .............................................................. 16

*Ruiz Torres v. Mercer Canyons Inc.*,
    835 F.3d 1125 (9th Cir. 2016) ......................................................................... 5

*Snyder v. Bank of Am., N.A.*,
    2020 U.S. Dist. LEXIS 206437 (N.D. Cal. Nov. 3, 2020) ........................ 21, 22

*Syufy Enterprises v. American Multicinema, Inc.*,
    793 F.2d 990 (9th Cir. 1986) ......................................................................... 19

*Takeguma v. Freedom of Expression LLC*,
    2021 U.S. Dist. LEXIS 25834 (D. Ariz. Feb. 10, 2021) ............................... 21

-iv-

**ER-616**

*Trotter Overhead Door, Inc. v. Trotter Doors, LLC*,
  2013 U.S. Dist. LEXIS 120815 (W.D. Okla. Aug. 26, 2013) ................................... 17

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016).............................................................................................. 11

*United Food & Commer. Workers Unions & Emplrs. Midwest Health Bens. Fund v.*
  *Warner Chilcott Lted. (In re Asacol Antitrust Litig.)*,
  907 F.3d 42 (1st Cir. 2018)................................................................................ 12, 13

*United States v. Adams*,
  444 F. Supp. 3d 1248 (D. Or. 2020) ....................................................................... 22

*Vaquero v. Ashley Furniture Indus.*,
  824 F.3d 1150 (9th Cir. 2016) ................................................................................. 11

*Ward v. Apple Inc.*,
  2018 U.S. Dist. LEXIS 26040 (N.D. Cal. Feb. 16, 2018) ........................................ 17

**Other Authorities**

Chetty, Raj, et al., *How Does Your Kindergarten Classroom Affect Your Earnings?*
  *Evidence from Project STAR* (March 2011)  ............................................................. 9

Daniel L. Rubinfeld, "Antitrust Damages,"
  *Research Handbook on the Economics of Antitrust Law*,
  ed. E. Elhague, (Elgar, 2012)................................................................................... 20

Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* (4th ed. 2002)
  § 10:5  ..........................................................................................................................
  § 10:7 .......................................................................................................................... 8

**Rules**

Civil Local Rule 7-4(a)(3) ............................................................................................ 1

Federal Rules of Civil Procedure, rule 702.................................................................. 22

-v-

**ER-617**

**TABLE OF ABBREVIATIONS**

| Abbreviation | Referenced Document |
|---|---|
| *Daubert* Opp. | Plaintiffs' Opposition to Defendant Apple Inc.'s *Daubert* Motion to Exclude Testimony of Daniel L. McFadden, filed on August 25, 2021 at ECF No. 497-4. |
| Epic Tr. | Trial transcript in *Epic Games, Inc. v. Apple Inc.*, No. 20-cv-5640 YGR. |
| Ex. | Exhibit to the Declaration of Rachele R. Byrd in Support of Plaintiffs' Opposition to Defendant Apple Inc.'s *Daubert* Motion to Exclude Reply Testimony of Professor Daniel L. McFadden, filed concurrently. |
| McFadden Reply | Reply Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, dated October 19, 2021 and filed as Exhibit 1 to the Declaration of Rachele R. Byrd in Further Support of Plaintiffs' Motion for Class Certification at ECF No. 554-5. |
| McFadden Report | Expert Class Certification Report of Plaintiffs' Expert Daniel L. McFadden, dated and filed June 1, 2021 at ECF No. 442-11. |
| McFadden Tr. | Transcript of the Deposition of Professor Daniel L. McFadden taken on November 5, 2021. |
| Motion or Mot. | Defendant Apple Inc.'s *Daubert* Motion to Exclude Reply Testimony of Professor Daniel L. McFadden, filed November 9, 2021 at ECF No. 581-4. |
| Prince Decl. | Declaration of Jeffrey T. Prince, Ph.D. in Support of Apple's Motion to Exclude Reply Opinions of Daniel L. McFadden, dated and filed November 9, 2021 at ECF No. 581-5. |
| Prince Report | Expert Report and Declaration of Jeffrey T. Prince, Ph. D., dated and filed on August 10, 2021 at ECF No. 476-6. |
| Prince Tr. | Transcript of the Deposition of Professor Jeffrey Thomas Prince taken on October 4, 2021. |
| Reply | Plaintiffs' Reply Memorandum in Further Support of Motion for Class Certification, filed October 19, 2021 at ECF No. 554-4. |
| Rollins Decl. | Declaration of Mark Rollins in Support of Apple Inc.'s *Daubert* Motions & Briefs in Opposition to Class Certification, dated August 10, 2021 and filed August 11, 2021 at ECF No. 476-12. |

PLAINTIFFS' OPPOSITION TO APPLE'S *DAUBERT* MOTION TO EXCLUDE
REPLY TESTIMONY OF PROF. MCFADDEN
Case No. 11-cv-06714-YGR

**ER-618**

**Statement of the Issues to be Decided:**[1] Whether Apple's Motion should be denied on its merits because: (1) Defendant's challenges go to the weight, not the admissibility, of Prof. McFadden's opinions; and (2) Prof. McFadden's opinions are relevant and reliable and therefore admissible.

## I.   INTRODUCTION

Using a well-established regression methodology, Prof. McFadden has created a reliable statistical model that demonstrates impact and injury on a classwide basis using common evidence. His model calculates *aggregate* Class damages, it permits *individual* damages calculations, and it *identifies* any potentially uninjured Class members by Apple ID. In its second *Daubert* motion attacking Plaintiffs' expert, Apple once again criticizes the correctness of Prof. McFadden's conclusions rather than the soundness of his methodology. But challenges that one methodology is better than another go to *weight* of the evidence, not its admissibility. Apple's attacks are more appropriately left for cross-examination at trial, where the jury will determine the correctness of Prof. McFadden's conclusions.

Apple's argument that Prof. McFadden's model cannot reliably determine which Apple ID accounts are injured is based upon its unreasonable insistence on a 100% confidence level that is inconsistent with sound economic and econometric principles. Furthermore, Apple argues that Prof. McFadden's model does not calculate individual Class member damages, but Plaintiffs are not required to calculate individual Class member losses at class certification—or even at trial. Plaintiffs are only required to present—at the merits phase—an *aggregate* damages calculation. Thereafter, Apple IDs can and will be linked to Class members using Apple's own records. Apple cannot withhold Class member identifiers from its data before production and then fault Plaintiffs for not linking anonymized IDs to Class members.

Apple's argument concerning supposed negative IAP prices in the But-For World mischaracterizes Prof. McFadden's model, which calculates prices for IAP at the app level instead of the unit level because IAP prices are *set at the app level* and they are never negative. The so-

---

[1] Apple's Motion once again violates Civil Local Rule 7-4(a)(3) because it does not include a statement of the issues to be decided.

PLAINTIFFS' OPPOSITION TO APPLE'S *DAUBERT* MOTION TO EXCLUDE
REPLY TESTIMONY OF PROF. MCFADDEN
Case No. 11-cv-06714-YGR

called absurd results Prof. Prince points to are a product of his mistaken extrapolation of pricing from the app level to individual items purchased. Furthermore, Apple's new argument regarding focal point pricing is simply an assertion that developers would impose their own, voluntary price tiers. However, whether compelled by Apple or voluntarily chosen by developers, focal pricing causes aggregate damages to *increase*, and therefore Prof. McFadden's model is conservative.

Apple also makes an unfounded assertion that Prof. McFadden's model produces illogical results because of the relationship between IAP and downloads. Since the log-download relationship is not statistically significant, it is *the same as zero*, and substituting zero for the statistically insignificant result is sound econometrics and produces sensible and reliable results. Prof. Prince also purports to analyze the Sports genre of apps, but he failed to construct margin bounds, so it is not surprising that he has produced irrational results.

Apple's criticism of the comparators Prof. McFadden used in his benchmark analysis is not a basis for exclusion. It, too, goes to the weight of his opinions, not its admissibility. In setting the 10-12% benchmark for Apple's commission in the But-For World, Prof. McFadden had a sound basis for selecting the comparators he used. He used the commission rates those companies charge in their more competitive app stores, and he tested those commission rates against the upper and lower bounds he set for Apple's own commission rate in the But-For World to satisfy himself that the benchmark rate was reasonable and reliable.

Finally, Prof. McFadden did not fail to consider both sides of the App Store as Apple contends because his methodologies *do* account for the effects of Apple's misconduct on both iOS device consumers and app developers.

## II.   STATEMENT OF THE RELEVANT PROCEDURAL HISTORY

Plaintiffs filed their Motion for Class Certification on June 1, 2021, and submitted the expert report of Professor Daniel L. McFadden, Ph. D., winner of the Nobel Prize in Economics and the John Bates Clark Medal. Apple took Prof. McFadden's deposition on August 3, 2021, and on August 10, 2021, Apple filed its opposition to Plaintiffs' motion along with seven rebuttal expert reports and a *Daubert* motion to exclude Professor McFadden's opinions (ECF No. 474).

-2-

PLAINTIFFS' OPPOSITION TO APPLE'S *DAUBERT* MOTION TO EXCLUDE
REPLY TESTIMONY OF PROF. MCFADDEN
Case No. 11-cv-06714-YGR

Plaintiffs filed an administrative motion to strike Apple's *Daubert* motion on August 16, 2021 (ECF No. 486),[2] and an opposition to the *Daubert* motion on August 25, 2021 (ECF No. 498). Plaintiffs filed a reply in further support of class certification on October 19, 2921 (ECF No. 555), including the Reply Report of Daniel L. McFadden (ECF No. 554-5). Apple took Prof. McFadden's deposition a second time on November 5, 2021, filed a second *Daubert* motion on November 9, 2021 (ECF No. 581-4), and filed the Prince Declaration (ECF No. 581-5), which the Court should strike as an improper sur-rebuttal report.

## III.    ARGUMENT[3]

### A.    Professor McFadden's Model Will Accurately Identify Injured Class Member Accounts and Calculate Damages at Trial

Apple's argument that Prof. McFadden's model cannot reliably determine the number of injured Apple ID accounts or whether any given Class member was injured is based upon its unreasonable expectations that are inconsistent with sound economic and econometric principles. The argument also assumes an incorrect legal standard that would require Plaintiffs to calculate hundreds of thousands of individual Class member losses, which they need not do at class certification to demonstrate that impact and injury may be proven on a classwide basis with common evidence, or even at trial.

### 1.    Accounts Switching Between Prof. Prince's Samples Merely Demonstrate the Standard Error in Any Statistical Analysis

*First*, Apple touts Prof. Prince's technique of running 25 samples as though the reasonable expectation is that no one account appearing in multiple samples should have a different result in each. In fact, econometrically, this is an unreasonable expectation. Prof. Prince came close to admitting this in his deposition. As a matter of fundamental statistical principles, no two (randomly dranw) samples will yield identical coefficient estimates for each genre's price sensitivity:

- The population of users of common apps will vary just slightly from sample to sample. If

[2]    Plaintiffs have not withdrawn the administrative motion to strike and do not waive any of the arguments contained therein.

[3]    Plaintiffs included the legal standards applicable to a *Daubert* motion in their opposition to Apple's first *Daubert* motion and will not unduly burden the Court, which is familiar with the applicable legal standards, by repeating them again here.  *See Daubert* Opp. at 7-8.

-3-

40% of all users have the most popular video streaming app, that share may be 39.5% in one random sample and 40.5% in another. That will affect, *in trivial amounts*, the coefficients yielded for each sample. Prof. Prince admitted this was true. Ex. A [Prince Tr.] 88:3-20, 90:11-23.

- For less popular apps, there is a "tail," meaning a list of apps downloaded by a few or one account in the sample. Apps that one or two users may have in one sample are likely to be absent in a different sample, and apps that are absent in the first sample may be present in very small numbers in another sample. Those trivial differences also will have a *very small effect* on the coefficients. Prof. Prince also admitted this was true. *Id*. 89:22-90:23.

All this really expresses is standard error present in any statistical analysis.[4] As Prof. McFadden explains, Prof. Prince's 25 sample analysis is an un-conventional way of calculating standard errors.[5] McFadden Reply, ¶ 175. Prof. Prince admitted during his deposition that if he were to run Prof. McFadden's model over the entirety of the transaction data, and then also over a 0.1% sample, the estimation of the accounts could differ between the two. *Id*. 91:17-92:20. Prof. Prince's argument is a classic straw man. His observation of tiny changes would only be absent if Prof. McFadden's regression analysis had a 100% confidence level. But a 100% confidence level does not exist in statistics, even if one measures an entire population (because of rounding error at extreme decimal points), and certainly not when a regression is performed from a sample of less than the entire population. *See In re Countrywide*, 984 F. Supp. 2d at 1034-35 ("a 95 percent confidence level with a ±10 percentage point maximum margin of error comports with scientific standards.").

Moreover, the number of accounts overlapping between any 0.1% sample will be small.

---

[4] The standard error determines the margin of error. *See* https://www.statology.org/margin-of-error-vs-standard-error-whats-the-difference/ (last visited Nov. 23, 2021). "In statistics, the margin of error is used to express the amount of error that results from using a sample smaller than the whole population to draw conclusions about the whole." *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig. v. Countrywide Fin. Corp*., 984 F. Supp. 2d 1021, 1033 (C.D. Cal. 2013).

[5] Prof. McFadden calculates standard errors using "bootstrapped" samples. He estimates his econometric model with each of the bootstrapped samples and calculates standard errors using the coefficients obtained from these samples. McFadden Report, Appendix E.2.

-4-

PLAINTIFFS' OPPOSITION TO APPLE'S *DAUBERT* MOTION TO EXCLUDE
REPLY TESTIMONY OF PROF. MCFADDEN
Case No. 11-cv-06714-YGR

Case 4:11-cv-06714-YGR     Document 643-42     Filed 04/27/22     Page 13 of 34

The average number of IDs present in Prof. McFadden's sample that are also present in any one of Prof. Prince's 25 samples is approximately 90 of approximately 100,000. McFadden Reply, ¶ 179. Of those, Prof. Prince discarded nine of his own samples because they exhibited a negative log-download, as discussed above. *Id.*, ¶ 178. For his 16 remaining samples that did not produce a negative coefficient for log-download, there were a total of 1,481 instances of overlapping accounts between Prof. McFadden's sample and one of Prince's remaining 16 samples. *Id.*, ¶ 185. Of those 1,481 overlapping accounts, there were only 61 accounts harmed in Prof. McFadden's sample that were unharmed in any one of Prof. Prince's or vice versa. *Id.*, ¶¶ 178-79. What it actually shows is that for any particular account, the *a priori* chance that it will appear in two samples, and injured in one but not in the other, is well under 5%, meaning a confidence well above the 95% threshold. When Prof. McFadden's statistical model identifies an account as injured, the confidence level of that determination is quite high. Apple is arguing for a requirement that switchers be entirely absent, which is an unwarranted – and unprecedented – bar.[6]

Moreover, as Plaintiffs demonstrated in their class certification reply, Apple's argument that the number of uninjured Class members is too high for common issues to predominate fails to distinguish between cases where a large number of ***both uninjured and unidentifiable*** class members defeated predominance and this case, where the small number of ***potentially*** uninjured Class members can be ***identified and excluded***. *See* Reply at 16-17 (citing *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136-38 (9th Cir. 2016)). As the Ninth Circuit held in *Torres*, 835 F.3d at 1137, "fortuitous non-injury to a subset of class members does not necessarily defeat certification." More importantly, McFadden showed that whatever their number, such uninjured class members can be identified and excluded.[7]

---

[6]    In fact, because most of the so-called "switching" between injured and uninjured occurs when a class member has damages that are close to zero, it is not surprising that those Class members "switch" based on small changes in the coefficients. Such margins of error are completely consistent with reliable statistical methods.

[7]    Apple's cases are distinguishable. The opinion of one of the plaintiffs' experts in *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 606 (S.D.W. Va. 2013), was excluded because it had "no basis in any reliable methodology," which clearly is not applicable to Prof. McFadden's opinions here, which are based upon sound and reliable econometric principles. Further, in *Kim v. Crocs, Inc.*,

-5-

PLAINTIFFS' OPPOSITION TO APPLE'S *DAUBERT* MOTION TO EXCLUDE
REPLY TESTIMONY OF PROF. MCFADDEN
Case No. 11-cv-06714-YGR

### 2.    Plaintiffs Are Not Required to Calculate Hundreds of Thousands of Individual Class Member Losses Now or at Trial

Apple's argument that Prof. McFadden cannot compute injury without linking Apple ID accounts to actual customers is a make-believe issue that invites the Court to misapply relevant law. At trial, Plaintiffs will ***not*** be required to calculate individual Class member losses; instead, they will need to prove the Class's ***aggregate*** losses. *See*, *e.g.*, *Price v. City of Seattle*, 2006 U.S. Dist. LEXIS 71041, at *9 (W.D. Wash. Sep. 19, 2006) ("After the jury determines an aggregate amount of damages for redemption fees, individual class members may be required to submit proof of claim forms through a claims administration process."); *In re TFT-LCD Antitrust Litig.*, 2012 U.S. Dist. LEXIS 9449, at *48 (N.D. Cal. Jan. 26, 2012) ("[T]he use of aggregate damages in antitrust cases has been approved numerous times.").[8]

At trial, Plaintiffs' damages expert will testify as to the ***aggregate*** damages suffered by all Class members, netting out the so-called "negative damages" for a small number of Class members (or Apple IDs) against the overwhelming percentage of Class members (or Apple IDs) that have suffered "positive damages." The use of "aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself." *Blue Cross & Blue Shield v. AstraZeneca Pharm. LP (In re Pharm. Indus. Average Wholesale Price Litig.)*, 582 F.3d 156, 197 (1st Cir. 2009) (citing 3 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 10:5, at 483-86 (4th ed. 2002) ("Aggregate computation of class monetary relief is lawful

---

2019 U.S. Dist. LEXIS 29131, at *25 (D. Haw. Feb. 25, 2019), the expert's opinion was based upon data that indisputably "rife with errors," which is clearly not applicable here. *Haller v. Astrazeneca Pharms. LP*, 598 F. Supp. 2d 1271, 1295-96 (M.D. Fla. 2009) is similarly inapplicable as it concerned an expert who merely "skimmed" the plaintiff's medical records to conclude that the subject drug had caused his weight gain and lead to his diabetes, ignoring other common sense factors that could have caused the weight gain. And *Buxton v. Lil' Drug Store Prod., Inc.*, 2007 U.S. Dist. LEXIS 56263, at *44 (S.D. Miss. Aug. 1, 2007), is inapposite because plaintiff's expert opined that the plaintiff had suffered a stroke without citing any supporting facts in the record.

[8]    "Defendants will have … opportunities to individually challenge the claims of absent class members if and when they file claims for damages. At the claims administration stage, parties have long relied on 'claim administrators . . . and other techniques tailored by the parties and the court' to validate claims." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1131 (9th Cir. 2017) (citation omitted).

-6-

PLAINTIFFS' OPPOSITION TO APPLE'S *DAUBERT* MOTION TO EXCLUDE
REPLY TESTIMONY OF PROF. MCFADDEN
Case No. 11-cv-06714-YGR

and proper."); *see also In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 534 (6th Cir. 2008) ("Damages in an antitrust class action may be determined on a classwide, or aggregate, basis. …") (quoting *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 526 (S.D.N.Y. 1996)).

In *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156 (C.D. Cal. 2007), the Central District explained:

> It has become routine for courts in antitrust class actions to rely on class-wide, aggregate techniques to calculate individual damage awards. *See*, *e.g.*, *In re Cardizem CD Antitrust Litigation,* 200 F.R.D. 297, 324 (E.D. Mich. 2001) (finding that the use of an aggregate approach to measure class-wide damages is appropriate). Where, as here, an antitrust action is brought on behalf of consumers alleging that a challenged activity artificially maintained prices above competitive levels, the plaintiffs may prove class-wide damages in the same manner as class-wide impact; by comparing prices during the period of challenged activity to prices as they would have been without the unlawful conduct, and arriving at a total damages figure for the class . . . .

*Id*. at 175 & n.26 (citations omitted).

Again in *In re Live Concert Antitrust Litig.*, 2011 U.S. Dist. LEXIS 161362 (C.D. Cal. Jan. 4, 2011), the Central District noted it "'has become routine for courts in antitrust class actions to rely on class-wide, aggregate techniques to calculate individual damages.'" *Id*. at *11 (quoting *Allied Orthopedic*, 247 F.R.D. at 166, 175).[9]

In *NASDAQ*, the Southern District of New York held that aggregate damages may be awarded in an antitrust class action on a classwide basis "where the computerized records of the particular industry, supplemented by claims forms, provide a means to distribute damages to injured class members in the amount of their respective damages." *Id*., 169 F.R.D. at 526. In that regard, it is important to note that Apple's comprehensive App Store records will provide a means to distribute damages to injured members of the Class in the amount of their respective damages by matching Apple IDs to each Class member and then netting out the "negative damages" from the "positive damages" for each Class member.[10]

---

[9]    In *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946), the Supreme Court held that in antitrust cases, a reasonable estimate of damages is sufficient.

[10]    The aggregate amount of damages suffered by the Class is the exact same whether "negative damages" are netted against "positive damages" for all Apple IDs or are first netted for

-7-

A leading treatise on class actions, *Newberg on Class Actions*, similarly notes that "damages in antitrust class actions may be determined on a class-wide, or aggregate basis . . . where the computerized records of the particular industry, supplemented by claims forms, provide a means to distribute damages to injured class members in the amount of their respective damages." 3 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 10:7 (4th ed.) ("Newberg"). The treatise also notes, "Antitrust class actions are particularly well suited to proof of total class damages, because damages in an antitrust suit need not be proved with common law precision . . . [and] . . . antitrust violations typically involve relatively small injuries to an extremely large number of people"). *Newberg*, § 18:53.

In *In re Capacitors Antitrust Litig. (No. III)*, 2018 U.S. Dist. LEXIS 195310 (N.D. Cal. Nov. 14, 2018), the Court recently noted that "a variety of tools can be used to address damages," including "the appointment of a magistrate judge or special master to preside over individual damages proceedings [or] altering or amending the class definition in response to developments at trial." *Id.* at *65 (citing *In re Air Cargo Shipping Servs. Antitrust Litigation*, 2014 U.S. Dist. LEXIS 180914, at *279 (E.D.N.Y. Oct. 15, 2014)). The Court also noted that it could "call for a trial plan . . . that addresses how the aggregate damages estimated from [the plaintiffs'] expert's report can then be apportioned among the class members." *Id.* (citing *In re Lidoderm Antitrust Litigation*, 2017 U.S. Dist. LEXIS 24097, at *63 (N.D. Cal. Feb. 21, 2017)). Significantly, the Court held that issues regarding how to apportion aggregate damages among class members "do not warrant a denial of class certification." *Id.*

Therefore, it is irrelevant now—*and will also be irrelevant at trial*—whether Prof. McFadden's model is capable of calculating *individual* Class member damages as opposed to Apple ID damages. The discovery cut-off has not yet passed, and Plaintiffs do not yet know when it will be. *See* ECF No. 209 at 4 (discovery cut-off will be 60 days after the Court issues its decision on class certification). Similarly, the parties have not yet exchanged expert merits reports, as they

each individual Apple ID and then the net damages for all the Apple IDs are summed together. This is due to the commutative property of addition, which means that when two or more numbers (whether positive or negative) are added in any order, the sum always remains the same.

-8-

**ER-626**

are not due until 60 days after the Court's decision on class certification. *Id*. at 5. At that time, Plaintiffs will provide Apple with its class damages calculation. But that information is not necessary for the Court to certify the class. *See* ECF No. 330 at 2 ("Given that a full merit analysis is not required at class certification, the Court has granted such motions when plaintiffs can demonstrate how the elements are satisfied even though more work remains to be done.").

Furthermore, Plaintiffs have demonstrated that Professor McFadden's impact and damages model can and does calculate damages for each of the approximately 400 million Apple IDs and also aggregate Class damages by netting out the negative and positive losses of each Apple ID account. McFadden Report, ¶¶ 135, 137, 150, 221, 239, 241 & n.309. Indeed, the *same* total damages number can be arrived at by netting out either the negative and positive losses of each Apple ID account *or* by netting out the negative and positive losses of each Class member because of the commutative property of addition. Once the Court has entered a judgment against Apple for an aggregate damages number, either the Court can order Apple to produce the non-anonymized data in its possession so that Prof. McFadden can identify *individual Class member losses*, or it can order Apple to do the calculation.[11] But, in neither event will Plaintiffs need to prove individualized Class member losses at trial.

### 3.    Apple IDs Can and Will Be Linked to Class Members

Apple argues that there is no basis to suggest Apple might use its own records to link accounts. However, Apple has all the information it needs to link IDs with people. This information includes their names, physical addresses, email addresses (or Apple ID), purchase dates, items purchased, Order IDs, amounts of purchases, types of purchases, sellers, payment types, and last four digits of the payment cards used. *See* Rollins Decl., Ex. 1. Any Class member, using her Apple ID, can retrieve from Apple's website a detailed record of *every* app she ever purchased, every IAP she ever made, and all of her subscriptions.

---

[11]    Economists often merge different data sets based on the string value of only a few variables. *See*, *e.g.*, Chetty, Raj, et al., *How Does Your Kindergarten Classroom Affect Your Earnings? Evidence from Project STAR*, at 6 & App'x A (March 2011), available at: http://www.rajchetty.com/chettyfiles/STAR.pdf (last visited Nov. 22, 2021).

-9-

Plaintiffs cannot currently calculate individual Class member damages because Apple insisted upon anonymizing the data before producing it to Plaintiffs in discovery to protect consumers' privacy. Apple omitted the fields containing identifying information such as name, address, and phone number, and it anonymized the Apple IDs (which are email addresses) using an algorithm before it produced part of its transactional database to Plaintiffs. *See* Ex. B [9/10/20 email from E. Lazarus at 2] ("[F]or privacy purposes, Apple has anonymized the Consumer ID data that you see in the sample production by assigning each unique Consumer ID a unique hash value. Accordingly, each consumer account can still be tracked by a unique number, it will simply be a different number than the one that Apple uses internally and in dealings with the given customer. Accordingly, this hashing will have no effect on the ability of plaintiffs, Apple, and their consultants to analyze the data."). Apple cannot blame Plaintiffs or Prof. McFadden for failing to calculate damages for individual Class members as opposed to individual Apple IDs. But Apple clearly has the information necessary to do so. The Court should not countenance Apple's use of a shield of its own creation. It would be a perverse result for any class action defendant to withhold information needed to identify individual class members and then oppose class certification on the basis that the plaintiff failed to identify individual class members.

Plaintiffs proposed yet another method of matching Apple IDs to consumers: by obtaining a list of Apple IDs from each Class member. Because this is a simple, objective fact within each Class member's knowledge, it presents no bar to certification. The carefully worded Rollins Declaration (notably, dated after his deposition was taken on February 11, 2021), does not compel a different conclusion. Rollins's language was circumspect. He admits that each Apple ID is linked to a specific "first and last name, email address, birthdate, and telephone number" that Apple maintains. Rollins Decl., ¶ 2. Rollins concedes that "payment methods for purchases from the App Store can include but are not limited to credit cards and gift cards, which can be 'linked' to a person's or entity's Apple ID(s)." *Id*., ¶ 4. Rollins asserts that Apple does not verify birthdates or home addresses (*id*., ¶ 2), and that different accounts held by the same person may be linked to different payment cards (*id*., ¶ 4). But he gives no indication of how frequently the latter occurs;

-10-

PLAINTIFFS' OPPOSITION TO APPLE'S *DAUBERT* MOTION TO EXCLUDE
REPLY TESTIMONY OF PROF. MCFADDEN
Case No. 11-cv-06714-YGR

**ER-628**

for all the Rollins Declaration tells us, it may apply to fewer than 1% of all Apple IDs because the Declaration is silent on this matter. Rollins's conclusion is that "Apple does not have the ability to establish or verify each or every Apple ID for a particular person or entity based on email, birthdate, phone number, payment method, or other information a person or entity provides for an Apple ID." *Id*., ¶ 5. But given his admission of what Apple does maintain, and the absence of any quantification of particular matching methods, the words "verify" and "each or every" in this sentence appear to bear tremendous weight. Matching email addresses using names and home addresses is the simplest and most obvious tool, and while it may not "verify each and every" set of IDs belonging to the same consumer, Rollins's declaration provides no reason to reject it as a screening tool. It might well match with ninety or ninety-five percent confidence all the accounts opened by a particular consumer. Layering the use of payment method on top of this will certainly improve the matching process, and while Rollins's declares that this method cannot "verify each and every" account, he provides no insight into how successful such a technique would be when combined with other tools. Plaintiffs could quantify these matching methods, if Apple had not refused to turn over the necessary data for them to do so.

Finally, even if everything Apple argues about the inability to calculate individual Class member damages were true (it is not), this would not be a basis upon which to deny class certification. In the Ninth Circuit, "the rule is clear: the need for individual damages calculations does not, alone, defeat class certification." *Vaquero v. Ashley Furniture Indus*., 824 F.3d 1150, 1155 (9th Cir. 2016) (citing *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1046 (2016)). *See also Leyva v. Medline Indus*., 716 F.3d 510, 513-14 (9th Cir. 2013) (reaffirming, after *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), that need for individualized damages determinations after liability has been adjudicated does not preclude class certification).

Apple cites cases, principally *Brunswick v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 489 (1977), for the proposition that injury is an element of a Sherman Act claim. This is not in dispute.[12] But

---

[12]    *Brunswick* rejected a competitor's claim that increased competition was antitrust injury, not a purchaser claim for output restriction or reduced choice. *Id.* at 488-89.

-11-

Apple fails to effectively rebut Plaintiffs' showing that every Class member was injured by the loss of choice due to Apple's requirement that they find apps and make IAP only on its App Store. *See Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640-YGR (N.D. Cal. Nov. 9, 2021), ECF No. 830 at 4. Every class member suffered reduced choices, and while such injury cannot be quantified, it is a classwide injury within the meaning of both Article III injury and antitrust injury. *See CollegeNET, Inc. v. The Common Application, Inc*., 711 Fed. Appx. 405 (9th Cir. 2017) (reversing District Court's dismissal of antitrust claim for reduced choice and reduced innovation, holding that consumers' theory was viable where challenged conduct left "one dominant provider offering inferior products and services."). Where one provider stifles rival channels and reduces the availability of innovation and alternative apps, as Prof. McFadden opines Apple does, this is cognizable antitrust injury. *See, e.g., Patt v. Antech Diagnostics*, 2020 U.S. Dist. LEXIS 160220, at *18 (C.D. Cal. May 18, 2020) (one form "of antitrust injury is '[c]oercive activity that prevents its victims from making free choices between market alternatives.'") (quoting *Glen Holly Entm't, Inc. v. Tektronix, Inc*., 352 F.3d 367, 374 (9th Cir. 2003)).

Apple also cites *Carroll v. SGS Auto. Svc*., 2020 US Dist. LEXIS 223676 (M.D. La. Nov. 30, 2020), as an example of a flawed methodology for matching numbers to accounts. In that case the proposal was simply to start with a list of numbers, and then find the names to attach them to in a dataset. This raised issues with either related or unrelated people with the same name, and the expert did not provide any way to solve that problem. *Id*. at *17-*20. The proposed method here is nearly precisely the reverse: each Class member will submit Apple IDs, and each Apple ID can be verified in the database. The model's calculation of damages for each Apple ID can then be netted based on the Class members' own assertion of ownership of that account.

Moreover, Apple misapprehends the importance of *United Food & Commer. Workers Unions & Emplrs. Midwest Health Bens. Fund v. Warner Chilcott Lted. (In re Asacol Antitrust Litig.)*, 907 F.3d 42 (1st Cir. 2018), a First Circuit case on which it significantly relies. In fact, read together with another First Circuit decision, *In re Nexium (Esomeprazole) Antitrust Litig*., 777 F.3d 9 (1st Cir. 2016), the two cases demonstrate why Prof. McFadden's proposed method is

-12-

**ER-630**

entirely workable. In *Nexium*, the defendant argued that the presence of uninjured plaintiffs who would not have switched to a generic drug even if it had become available defeated class. The First Circuit held that this did ***not*** defeat certification as long as the court was satisfied that "prior to judgment, it will be possible to establish a mechanism for distinguishing the injured from the uninjured class members." *Id*. at 19. The requirement for this method was that it be "administratively feasible." *Id*. In *Nexium*, the District Court accepted that class member testimony "in the form of an affidavit or declaration would be sufficient in a class action." *Id*. at 20.

The First Circuit distinguished *Asacol* from *Nexium* on the ground that the defendants in *Asacol* "expressly stated their intention to challenge any affidavits that might be gathered. Nor do plaintiffs point to any basis in the record for deeming all such challenges to be so implausible as to warrant a finding that we can consider the issue to be uncontested." *Id*. at 52-53. Accordingly, the First Circuit held in *Asacol* that it would be necessary to take the testimony of each class member to determine whether he or she would have switched to a generic were it available, a class member-by-class member inquiry that was inconsistent with predominance.

The need to ask every class member their subjective intentions made class treatment inappropriate in *Asacol*. Here, the ***objective and verifiable facts*** that each Class member must provide are both more peripheral and less contestable than the expressions of subjective intent in *Asacol*. A Class member's past Apple IDs, which are simply past email addresses each Class member used to sign in to Apple, is an objective fact. It is not an intention, it is not subject to cross-examination, it is not ripe for misrepresentation, and most importantly, it can be verified. If a Class member asserts on a form that she has used the address (to use a simple example) jane.q.public.23@gmail.com in the past, that email either shows up as an Apple ID (with all transaction records) in the database or it does not. Making one up will not help a Class member, and no Class member would deliberately omit an Apple ID to increase his or her recovery. Class members need only supply a list of their past emails that are, or even might be, past Apple IDs.

The question of intention to switch to a generic was dispositive of the class member's claim in both *Nexium* and *Asacol*, but here the fact at issue is only of second order importance. To have

-13-

measurable damages, a Class member must first have an Apple ID with measurable damages. The sole importance of the match between an Apple ID and the consumer attached to the account is to net out the damages calculations across multiple accounts held by the same consumer, such that a consumer whose measured damages in one account is small may be reduced to zero combining the transactions across all that user's accounts. In that sense, netting is just a culling mechanism to weed out consumers with no measurable damages from among those with measurable damages. While Apple maintains that it cannot mechanically, reliably match Apple IDs to consumers, it has never claimed that upon receiving that information it is unable to verify it. In fact, Apple assuredly can do so, as it did with the Plaintiffs' own records.

**B.     Professor McFadden's Econometric Model is Scientifically Sound**

Apple's argument (Motion at 10-11) concerning supposed negative prices mischaracterizes Prof. McFadden's model. Professor McFadden calculates prices for IAP at the app level instead of the unit level because IAP prices are set *at the app level*. Ex. C [McFadden Tr.] 93:1-23, 94:1-10, 122:8-18; McFadden Decl., ¶ 2. The alternative assumption, that a manager would price, for example, 800 Robux and 400 Robux differently, is the unrealistic assumption. Ex. C [McFadden Tr.] 101:13-23.

Because IAP prices are made at the app level, they are never negative. McFadden Decl., ¶ 5. This is the calculation that determines the aggregate damages (*id.*, ¶ 4), and Apple does not challenge it. The so-called "absurd results" Prof. Prince points to are a product of his mistaken extrapolation of pricing from the app level to individual items purchased. *See* McFadden Reply, ¶ 209; Prince Decl., ¶ 48. Prof. McFadden has never advocated for interpreting the per-unit IAP calculations as resulting in negative prices; in fact, he expressly disclaimed this interpretation. McFadden Decl., ¶ 10; Ex. C [McFadden Tr.] 84:11-85:15. Prof. McFadden adopted the percentage method in his Reply Report. McFadden Reply, ¶ 209; *see also* McFadden Decl., ¶ 10; Ex. C [McFadden Tr.] 123:8-13.

Apple also argues that Prof. McFadden's model is fatally defective because it does not include the effect of focal point pricing, or pricing that concentrates at numbers that end in 9. This

-14-

**ER-632**

is an extension of the unsubstantiated argument Apple raised in opposing class certification that leaving price tiers intact would reduce or eliminate the effect of a commission rate reduction on consumer prices. To the contrary, as Prof. McFadden demonstrated in his Reply Report, including price tiers in the model actually *increases* aggregate consumer damages. McFadden Reply, ¶ 117.

Apple's new argument, focal point pricing, is simply an assertion that developers would impose their own, voluntary price tiers. Prof. McFadden explained at his deposition that his model predicts rational, profit-maximizing prices, but some developers may disregard those prices to match focal points. Ex. C [McFadden Tr.] 153:21-154:4. However, the directional effect of any such pricing behavior is known: distorting the profit-maximizing price to match price tiers causes aggregate damages to rise. While fewer developers pricing to existing price tiers or more granular focal points might reduce the *magnitude* of the downward effect on consumer prices, the *direction* of the effect has been established, and Apple has not shown otherwise.[13]

### C.     Professor McFadden's Model is Reliable

#### 1.     Negative Log-Download Coefficients Are Not Illogical

Apple's assertion that Prof. McFadden's model produces illogical results because of the relationship between IAP and downloads is simply wrong. This is the cornerstone of Prof. Prince's argument that the model "fails." Prince Report at ¶ 114; Ex. A [Prince Tr.] 67:4-21. In fact, that relationship simply is *not* strong. That relationship (called, variously, "log-download," or "beta-q," the beta of quantity) is weak and often statistically insignificant for the Music and Entertainment genres, something readily apparent from Prof. McFadden's standard errors, reported in his Original Report. *See* McFadden Report at 102, Fig. 15 (Log Download standard error, shown in parentheses, is ▮▮▮).

---

[13]     This case is not like *Lithium Ion Batteries Antitrust Litig*., 2018 U.S. Dist. LEXIS 35744 (N.D. Cal. March 5, 2018), where the indirect purchasers needed to trace the overcharge on a component through the chain of commerce into finished products, and the expert's purported method of doing so depended on the proposition that quality adjustments accounted for the pass-through of component cost overcharges. *Id*. at *39-*42. Here, as the Supreme Court held in *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1511 (2019), consumers are *direct* purchasers, and Prof. McFadden's model does not depend on adjustments to quality to explain price.

-15-

This is not a mere matter of technical measurement. Fundamentally, while people must download an app to then buy its IAP, there are apps where many people use the free version; there are apps where many people use a free trial for one or two months; there are apps where people buy the game, play for a while, and then download paid content. The pattern is strongest for Entertainment and Music apps, where negative log-download coefficients account for eight of nine negative coefficients in Prof. Prince's analysis. This reflects that there is a life cycle to app use where the relationship of downloads to IAP is neither immediate nor constant. Prof. McFadden has explained, in plain English and in common sense, that these negative coefficients are neither surprising nor illuminating. *See* McFadden Reply, ¶¶ 174-75. Prof. Prince did not profess any understanding of these purchasing patterns and did not take issue with the standard errors Prof. McFadden has measured. Ex. A [Prince Tr.] 79:1-80:22. Since the log-download relationship is ***not statistically significant***, it is the same as zero. Substituting with zero is something Apple rebukes as unacceptably rigging the model, but in fact it is widely accepted econometric practice, and does not change the damages in any meaningful way. McFadden Reply, ¶ 177 and Fig.4.[14]

Prof. Prince feels no need to be intellectually evenhanded about this: when he claimed to find a negative log-download coefficient in Prof. McFadden's work, Prof. Prince declared that it was an irrational result and reflected "model failure." Prince Report, ¶ 114. But when Prof. Prince's own work showed a negative coefficient, as it did in some of his manipulations of Prof. McFadden's model, he did not say his own model had "failed." Ex. A [Prince Tr.] 67:23-68:12.[15]

### 2.    Prof. Prince's Sports Genre Analysis Is Incomplete

---

[14]    The logical explanation for log-download relationships that are not statistically significant (and therefore sometimes appear as negative coefficients) differentiates this case from *Reed Const. Data Inc. v. McGraw-Hill Co.*, 49 F. Supp. 3d 385 (S.D.N.Y. 2014), where the irrational result defied explanation: there, the model showed a price effect without a corresponding quantity effect, which means a perfectly inelastic good, which only exists in certain well-known economic thought experiments. *Id*. at 402.

[15]    *In re LIBOR-Based Fin. Instruments Antitrust Litig*., 299 F. Supp. 3d 430, 501 (S.D.N.Y. 2018) is inapposite. In that case, the expert was tasked with finding the days on which the LIBOR interest rate was manipulated, but the resulting model found far more supposedly manipulative submissions in the period before the conspiracy than in the conspiracy period. *Id*.

-16-

PLAINTIFFS' OPPOSITION TO APPLE'S *DAUBERT* MOTION TO EXCLUDE
REPLY TESTIMONY OF PROF. MCFADDEN
Case No. 11-cv-06714-YGR

**ER-634**

Prof. Prince asserts (Prince Decl. at ¶ 21) that he analyzed the Sports genre of apps. However, by his own admission, he did not construct margin bounds. Ex. A [Prince Tr.] 11:18-13:12. Since the margin bounds applied to a genre are constructed from real-world data to ground the analysis in the realities of the market (McFadden Reply, ¶¶ 149-53), it is not surprising that by dispensing with this important step in model expression, Prof. Prince has produced irrational results. Prof. Prince replicated the Music genre and produced results that he declined to report and said he did not recall (Ex. A [Prince Tr.] 14:17-16:2), and when he attempted to replicate the Entertainment genre, he accidentally applied the wrong margin bounds, taken from the Games genre (*id*. 18:11-20:16). *See* McFadden Reply, ¶ 194. Only in the Sports genre, where he omitted the step of applying margin bounds at all, did he produce a result that he was able to call irrational. That result merely indicates the incompleteness of Prof. Prince's own procedure.

### D.     Plaintiffs are Not Required to Prove Aggregate Damages at This Stage

At class certification, Plaintiffs are not required to present a final and complete damages model that calculates aggregate damages; Plaintiffs are only required to "'provide a ***viable method*** for demonstrating class-wide antitrust injury based on common proof.'" *In re Graphics Processing Units Antitrust Litig*., 253 F.R.D. 478, 497 (N.D. Cal. 2008) (emphasis added). As discussed, *supra*, Plaintiffs will present Prof. McFadden's merits damages report on a date yet to be set by the Court and for use at trial on the merits. Therefore, Apple's criticisms of Prof. McFadden, that his model doesn't "measure total damages" let alone "quantif[y] the precision of his damages estimate," are entirely misplaced, as is its citation to *Ward v. Apple Inc.*, 2018 U.S. Dist. LEXIS 26040 (N.D. Cal. Feb. 16, 2018). In *Ward*, this court found that the plaintiffs had not presented any functioning, data-driven model. *Id*. at *8-*9. That is clearly not the case here. Nor is this case like *Trotter Overhead Door, Inc. v. Trotter Doors, LLC*, 2013 U.S. Dist. LEXIS 120815, at *7-8 (W.D. Okla. Aug. 26, 2013), where the expert failed to "provide any meaningful guidance as to how he reached [his] particular conclusions."

Moreover, Apple's argument that Prof. McFadden doesn't know whether his model works for the entire data set, which includes the other 24 app genres, ignores his testimony. As Prof.

-17-

McFadden explained in his Opening Report, he is able to scale up the estimation results for the whole data "without much difficulty" by "estimate[ing]" demand for apps and in-app content that were not included in the 0.1 percent sample. McFadden Report, ¶ 221. Since the sample provides estimates that are statistically representative of estimates that would be obtained from the full data, it is reasonable to assume the omitted apps have the same percentage overcharge as the average for the included apps. *Id*. Alternatively, he can use the estimated coefficients of the demand equation and conduct the same simulation exercise for the 0.1 percent subsample to find the profit-maximizing But-For app and IAP prices for a given But-For commission rate. *Id.*, ¶¶ 222-23. For either method, he would apply them to Apple IDs based upon the apps and IAP content purchased during the Class Period. *Id.*, ¶ 224. *See also* McFadden Reply, ¶ 210 (Prof. Prince "simply ignores the explanation in my Opening Report of how I would scale up the damages calculation.").

#### E.    Professor McFadden's Benchmark Analysis is Reliable

It is beyond dispute that Apple's 30% headline rate is supracompetitive and has generated huge supracompetitive profits for it since the App Store was launched in 2008. *See Epic Games, Inc. v. Apple Inc.*, 2021 U.S. Dist. LEXIS 172303, at \*158 (N.D. Cal. Sep. 10, 2021) ("Apple's initial rate of 30%, although set by historic gamble, has apparently allowed it to reap supracompetitive operating margins."). Benchmarking "uses competitive prices for other comparable products to estimate the pattern of prices but-for the alleged misconduct." *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 154 (3d Cir. 2002). Apple does not dispute that benchmarking is a generally accepted and widely used methodology for determining the competitive commission a seller would charge in the But-For World.[16] As discussed below, Prof. McFadden used sound economic analysis to identify as comparators the commission rates charged

---

[16]    Benchmarking is the process of comparing business metrics and practices within a business or against competitors, peers, or industry standards "to understand how and where the organization needs to change in order to improve performance." *Source*: https://www.apqc.org/blog/what-are-four-types-benchmarking (last visited November 23, 2021). There are four main types of benchmarking: performance (gathering and comparing quantitative date), practice (gathering and comparing qualitative data), internal (comparing metrics between areas within a single organization), and external (comparing metrics with one or more other organizations). *Id*.

-18-

by relevant and comparable companies in a more competitive market – the market for PC game app stores – that was most similar to how the market for iOS apps and IAP would have looked with competition.[17] Also as discussed below, Prof. McFadden then confirmed the reliability of the benchmark with an appropriate mathematical analysis of Apple's profit margins.

Nonetheless, Apple argues that Prof. McFadden's benchmark analysis is flawed because he supposedly cherry-picked a commission rate out of thin air and not based upon any quantitative analysis. Apple's argument is both legally and factually flawed and should be rejected.

*First*, as a matter of law, there is no hard and fast rule that an expert's choice of an appropriate benchmark must be based on a mathematical formula. Plaintiffs are unaware of any 9th Circuit jurisprudence that **requires** a mathematical formula or any specific methodology to select an appropriate benchmark. The Ninth Circuit has held that "[c]omparability is a question of fact." *Syufy Enterprises v. American Multicinema, Inc*., 793 F.2d 990, 1003 (9th Cir. 1986). The caselaw shows that an expert's choice of a benchmark need only pass a threshold of reasonable reliability for the analysis to be accepted. If the choice of a benchmark meets that threshold of reasonable reliability, then an attack that the benchmark is flawed goes to weight, rather than the admissibility, of the analysis.

Apple does not challenge benchmarking *per se*, but instead uses the supposed absence of any computational support for Prof. McFadden's determination of the 10-12% benchmark for Apple's commission in the But-For World, claiming the supposed absence of a quantitative "methodology" as a shibboleth in its *Daubert* motion. As discussed in detail below, Prof. McFadden had a sound basis for selecting the comparators he used, he used the commission rates those companies charge in their app stores, and he tested those commission rates against upper and

---

[17]   *See* McFadden Report, ¶ 154 ("In the But-For world where the Apple App Store competes with non-Apple app stores or app developers selling iOS apps and in-app content on the iOS devices, the force of competition would bring down the commission rate. If Apple engaged in no anti-competitive acts, then the commission rate should be either the rate established in competition between rival app stores, or a 'limit price' set by Apple that is low enough to deter entry."). Therefore, Apple's argument that Prof. McFadden "makes no predictions about the competitive environment that would have ensued in the but-for-world" is baseless. Motion at 18.

-19-

lower bounds he set for Apple's own commission rate in the But-For World to satisfy himself that the benchmark rate was reasonable and reliable.[18]

In *In re Optical Disk Drive Antitrust Litig.*, 2017 WL 11513318, at *3 (N.D. Cal. Dec. 18, 2017), an antitrust case much like this one, the Court permitted the defendant's expert to testify using "target prices as benchmarks," without using any particular formula to generate the benchmarks, because the plaintiff had not shown that the benchmarks were "economically improper or unreliable." Here, Apple contests Prof. McFadden's use of 10-12% as a benchmark because he supposedly did no mathematical analysis to determine the commission rate, but it offers no evidence whatsoever that 10-12% is "economically improper or unreliable."[19] Indeed, Google, which is defending its own app store against antitrust claims, recently cut its commission rate in half.[20] Together with Prof. McFadden's three other comparators, Google's rate cut strongly suggests that Prof. McFadden's benchmark is economically proper and reliable.[21]

---

[18] Apple's argument that there is no basis to assume a uniform commission rate ignores Supreme Court authority and well-established principles Prof. McFadden relies upon. "'[D]amages are measured by obtaining a 'but-for-price' from a market (the "comparable market") that closely approximates he market in which the violation occurred.  The "but-for-price" is a measure of what the price of the product would be if the wrongful behavior had not occurred,' noting that the approach was first cited by the Supreme Court in 1946."  McFadden Reply, ¶ 41 (quoting Daniel L. Rubinfeld, "Antitrust Damages," *Research Handbook on the Economics of Antitrust Law*, ed. E. Elhague, (Elgar, 2012): 378-93 at 380 and citing *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, *rehearing denied*, 327 U.S. 817 (1946)).

[19] This But-For commission rate is quite similar to the But-For commission rates Prof. Economides, one of the Developer Plaintiffs' experts, estimated using a sales-weighted average of Windows PC stores commission rates.  *See* McFadden Reply, ¶ 50 (citing Expert Class Certification Report of Professor Nicholas Economides, *Cameron et al. v. Apple Inc.*, Case No. 4:19-cv-03074-YGR, June 1, 2021, § II.C.1.)

[20] Following an announcement by Google in March 2021 of an interim commission reduction, the company announced on October 21, 2021, that it is cutting its commission on all Google Play app subscriptions from 30% to 15%. *Source*: https://www.bloomberg.com/news/articles/2021-10-21/google-to-slash-the-fee-it-takes-from-subscriptions-on-app-store (last visited Nov. 23, 2021).

[21] Apple criticizes Prof. McFadden for purportedly "ignoring" Android stores.  Motion at 19. However, as Prof. McFadden explained in his Reply Report, "The anti-competitive claims against Google and its Play Store undermine the reliability of other Android app stores as appropriate benchmarks, due to Google's close relationship to the Android operating system. For instance, Google owns the 'Android' trademark, and only devices that meet Google's criteria for being an 'Android-compatible device' can use the 'Android' trademark."  McFadden Reply, ¶ 44 & n.72.

-20-

**ER-638**

As Professor McFadden explained in his Reply Report, console gaming participants do not provide a proper benchmark because their business model is significantly different from Apple's business model. McFadden Reply, ¶ 44; *see also* Ex. C [McFadden Tr.] 179: 8-10. Moreover, it is no objection to Prof. McFadden's use of Epic's 12% commission as one of his comparators to argue that Epic is unprofitable at that commission rate. To the contrary, Epic's CEO, Tim Sweeney, testified that Epic in fact earns a profit at that commission rate (*i.e.*, its revenues exceed associated costs) but, as a nascent entrant in the mobile game distribution market, it must offer exclusivity incentives that then make it unprofitable in the short-term. Ex. D [Epic Tr.] 126:1-127:6. *See also* Ex. C [McFadden Tr.] 180:18 – 181:3. It is unlikely that Apple, as the behemoth incumbent in a market it created, would need to offer any incentives to retain business in the But-For World if it lowers its headline commission from a supracompetitive rate to a competitive one. As discussed below, given Apple's market share and profit margins, Prof. McFadden has calculated Apple's "break-even" commission to be just ▮▮▮, so the 12% commission rate is neither economically improper nor unreliable.

Likewise, in *Takeguma v. Freedom of Expression LLC*, 2021 U.S. Dist. LEXIS 25834, at *18-24 (D. Ariz. Feb. 10, 2021), the District of Arizona recently rejected a similar challenge to a benchmark analysis where the plaintiff's expert picked a benchmark after reviewing modeling contracts from similar cases and performing an internet search of corresponding rates paid for the use of images and likenesses. There was no evidence that the plaintiff's expert used any type of mathematical formula to determine the benchmark.

Prof. McFadden identified comparators from the market for PC game app stores, a more competitive market, to estimate how the market for iOS apps and IAP would have looked if Apple faced competition. He confirmed the reliability of the benchmark with an appropriate mathematical analysis of Apple's profit margins. Those cases in which an expert's benchmark analysis were excluded are bereft of any such analysis. They are helpful to understand why Prof. McFadden's benchmark analysis easily satisfies the *Daubert* threshold.

For example, in *Snyder v. Bank of Am., N.A.*, 2020 U.S. Dist. LEXIS 206437, at *20 (N.D.

-21-

Cal. Nov. 3, 2020), the Court excluded a benchmark analysis where the plaintiff's expert provided "no explanation" for why he chose the benchmark he did, other an interview with plaintiff himself. Thus, the Court had no way to determine that it was not merely an arbitrary number. *Id*. Here, by contrast, Prof. McFadden explains that his choice of the benchmark commission rate of 10-12% is based upon his consideration of commission rates charged by three comparators doing business in a more competitive market.

In *United States v. Adams*, 444 F. Supp. 3d 1248, 1260-61 (D. Or. 2020), the District of Oregon refused to permit an expert witness to use a benchmark to compare the markings on a shell to a firearm because the "benchmark" he used was merely a number "in his head." The district court found that the expert failed to "express ***any objective benchmark*** at any point during his testimony," which would prohibit any replication of his work. *Id*. at 1261 (emphasis added). The case law underscores that while an expert must offer a reasoned explanation for his benchmark, Rule 702 and *Daubert* do not require any specific methodology for selecting a benchmark. Here, Prof. McFadden expressed an objective benchmark (10-12%) as well as the basis for his determination of the benchmark (by comparison to the commissions charged by Microsoft, Epic, and Discord on their app stores) – not simply a number he had in mind – such that any other expert could replicate his work or dispute the similarity and appropriateness of the comparators he used to determine the benchmark commission rate.

*Second*, Prof. McFadden did perform quantitative analysis to support the appropriateness of his selected benchmark. Specifically, he computed Apple's "break-even" commission rate at ██% and explained that a ██% commission would be sufficient to allow Apple to earn a healthy ██% net profit margin. McFadden Report, ¶ 161. That mathematical analysis confirms that Prof. McFadden's But-For commissions of 10-12% were economically reasonable and reliable.

Prof. McFadden describes the reasons why he considers the commission rates charged by Microsoft, Epic, and Discord on their app stores to be reasonable comparators for Apple in the But-For World in his external benchmark analysis.[22] He addresses not only the competitive

---

[22]    An external benchmark analysis compares the metrics or practices of one organization

-22-

environment, but also factors such as the history of their commissions. For example, Prof. McFadden notes that Epic announced its 12% commission when it entered the market in December 2018, and that Steam cut its commission rate twice – from 30% to 25% and then to 20% – in response to competition from Epic's entry in the market. McFadden Report, ¶¶ 156-57. Prof. McFadden notes that Discord likewise dropped its commission from 30% to 10% in anticipation of Epic's entry into the mobile game distribution market. *Id.*, ¶ 160. And Prof. McFadden notes that when Microsoft announced that it would reduce its commission from 30% to 12%, it was reported that it did so to compete on price with Steam. *Id.* at ¶ 158.

Prof. McFadden did not end his analysis there. After collecting comparative data from those three companies for the external bechmark analysis – which indicated a range of 10-12% for Apple's commission in the But-For World – Prof. McFadden considered the effect of competition on Apple's commission, noting that competition "drives down price." McFadden Report, ¶ 161, n.235. This well-documented phenomenon – that competition would force Apple to cut its commission in the But-For World – supports a finding that Prof. McFadden's benchmark range of 10-12% is both reasonable and reliable.[23]

And Prof. McFadden did not stop his analysis there. Once he was satisfied that the external benchmarks were sensible indicators of Apple's response in the competitive But-For World, Prof. McFadden determined both upper and lower bounds for the predicted commission. For the upper bound, Prof. McFadden considered Apple's own recent history of cutting commissions to 15% in a kind of internal benchmarking.[24] McFadden Reply, ¶ 161. Importantly, Prof. McFadden noted

---

(here, Apple) to those of one or more other companies (here, Microsoft, Epic, and Discord). *Source*: https://www.apqc.org/blog/what-are-four-types-benchmarking.

[23]    It would not be reasonable or reliable to use a benchmark that was ***above*** Apple's 30% headline rate – which the Court has already found to be supracompetitive. Nor would it be reasonable and reliable to assume that Apple's 30% commission rate ***would not change*** in the face of competition in the But-For World, as Apple stubbornly – and illogically insists would be the case. *See* Reply at 10-12.

[24]    In internal benchmarking, a compares its own metrics or practices across units, product lines, departments, programs, or otherwise. *Source*: https://www.apqc.org/blog/what-are-four-types-benchmarking.

-23-

**ER-641**

Case 4:11-cv-06714-YGR   Document 643-42   Filed 04/27/22   Page 32 of 34

that 15% was not a rate that Apple offered in response to competition. *Id*. (citing Tim Cook's testimony in *Epic v. Apple*). From that, Prof. McFadden concluded that 15% was an appropriate upper bound for Apple's commission rate in a competitive market environment. *Id*.

For the lower bound, Prof. McFadden computed ██% as the commission rate that would make Apple's net margin close to zero – in other words, the break-even commission rate above which the App Store would be profitable and below which it would be unprofitable. McFadden Report, ¶ 161. He did so by analyzing Apple's internal documents showing its net margins, P&L, COGS, and OPEX. *Id*. Prof. McFadden noted that ████████████████████ was higher than Apple's break-even commission rate (██%), which likewise supports the reasonableness and reliability of his benchmark analysis. *Id*.

A margin analysis is entirely appropriate to demonstrate the reliability of the benchmark. For example, in *Optical Disk*, the Court noted that the defendant's expert performed a similar operating margin analysis to confirm the reasonableness of his benchmark rate. 2017 WL 11513318 at *3 (citing *In re Online DVD Rental Antitrust Litig.*, 2010 U.S. Dist. LEXIS 138558, at *60 (N.D. Cal. Dec. 23, 2010) (noting that "cost-margin analysis" approach is "well-established" and "find[s] support in the economic literature")).

Thus, Prof. McFadden's benchmark analysis easily meets the threshold of reasonable reliability for admissibility under *Daubert*. Benchmarking is a widely accepted methodology for estimating Apple's commission rate in the But-For World. Prof. McFadden derives and describes an objectively determined benchmark – not simply a number he had in his head – which easily permits replication of his work. His benchmark commission is neither economically improper nor unreliable. Any attack on Prof. McFadden's benchmark analysis goes to its weight, not its admissibility.[25]

---

[25] Apple's cases are distinguishable. The expert's opinions in *Hyland v. HomeServices of Am., Inc.*, 2012 U.S. Dist. LEXIS 207531 (W.D. Ky. July 3, 2012) were excluded because he "failed to identify a sufficiently comparable market against which he can measure Plaintiffs' damages." Here, in contrast, Prof. McFadden's benchmark analysis identified the PC games stores market as comparable. *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000) is similarly inapposite because the expert failed to incorporate all relevant circumstances

-24-

PLAINTIFFS' OPPOSITION TO APPLE'S *DAUBERT* MOTION TO EXCLUDE
REPLY TESTIMONY OF PROF. MCFADDEN
Case No. 11-cv-06714-YGR

### F.   Professor McFadden Accounts for Indirect Network Effects

Apple once again challenges Prof. McFadden's market definition analysis because it purportedly fails to consider "both sides of the App Store" even though it is consistent with the Supreme Court's analysis in *Pepper*, 139 S. Ct. at 1519-21, which held that **to consumers** Apple acts as a retailer. As Prof. McFadden explains, Apple's criticisms are flawed for multiple reasons and are ultimately a matter of terminology and not of substance. *See* McFadden Reply, ¶¶ 257-64.

Importantly, Apple ignores that Prof. McFadden's methodologies *do* account for the effects of Apple's misconduct on both iOS device consumers and app developers. His model explicitly determines the price effects of a lower commission rate (the price charged by the platform, Apple) by modeling the decision of developers (one side of the platform), who observe and react to the commission based on consumer demand parameters (the other side of the platform). *Id.*, ¶ 261. In *Epic Games*, 2021 U.S. Dist. LEXIS 172303 this court found that Dr. Evans's SSNIP test was lacking because he did not "perform any actual SSNIP calculations testing both sides of the market simultaneously." *Id.* at *101. Prof. McFadden, however, does account for both sides of the market.

## IV.   CONCLUSION

For all these reasons, Plaintiffs request that the Court deny Apple's Motion.

DATED: November 23, 2021              By:   */s/ Rachele R. Byrd*
                                                        RACHELE R. BYRD

---

into his "method of analysis related to antitrust liability" and failed to "account for market events that both sides agreed were not related to any anticompetitive conduct." There are no similar contentions here. *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) did not examine a benchmark analysis or apply *Daubert* as the standard for reviewing the expert testimony, and rejected a statistical study which failed to adjust for any other factor that could have affected the independent variable, price in clinical services, except for one, thus effectively attributing the "entire difference [in price] . . . to the [anticompetitive conduct]." No such failure occurred here. Further, in *DSU Med. Corp. v. JMS Co.*, 296 F. Supp. 2d 1140, 1157-59 (N.D. Cal. 2003), a patent infringement case, the court excluded opinion of a reconstructed market that failed to include multiple market substitutes and provided no explanation for use of terms in a hypothetical contract that the party had rejected in negotiations and were out of line with prior agreements. And the expert in *In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. 1497, 1506 (D. Kans. 1995) was not called upon to "supply specialized knowledge, but to plug evidentiary holes in plaintiffs' case, to speculate, and to surmise." That is clearly not the case here.

-25-

PLAINTIFFS' OPPOSITION TO APPLE'S *DAUBERT* MOTION TO EXCLUDE
REPLY TESTIMONY OF PROF. MCFADDEN
Case No. 11-cv-06714-YGR

**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
BETSY C. MANIFOLD
RACHELE R. BYRD
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com

MARK C. RIFKIN
MATTHEW M. GUINEY
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com

*Interim Class Counsel and
Proposed Co-Class Counsel*

DAVID C. FREDERICK (*pro hac vice*)
AARON M. PANNER
**KELLOGG, HANSEN, TODD, FIGEL &
  FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
dfrederick@kellogghansen.com
apanner@kellogghansen.com

*Counsel for Plaintiffs and Proposed
Co-Class Counsel*

**CALCATERRA POLLACK LLP**
MICHAEL LISKOW
mliskow@calcaterrapollack.com
1140 Avenue of the Americas, 9th Floor
New York, NY 10036-5803
Telephone: (212) 899-1761
Facsimile: (332) 206-2073

*Counsel for Plaintiff Robert Pepper*

27848v4

-26-

PLAINTIFFS' OPPOSITION TO APPLE'S *DAUBERT* MOTION TO EXCLUDE
REPLY TESTIMONY OF PROF. MCFADDEN
Case No. 11-cv-06714-YGR

**ER-644**

# Exhibit 20

THEODORE J. BOUTROUS JR., SBN 132099
   tboutrous@gibsondunn.com
RICHARD J. DOREN, SBN 124666
   rdoren@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
   dswanson@gibsondunn.com
JAY P. SRINIVASAN, SBN 181471
   jsrinivasan@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

VERONICA S. MOYÉ (Texas Bar No.
24000092; *pro hac vice*)
   vmoye@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900

MARK A. PERRY, SBN 212532
   mperry@gibsondunn.com
CYNTHIA E. RICHMAN (D.C. Bar No.
492089; *pro hac vice*)
   crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

ETHAN DETTMER, SBN 196046
   edettmer@gibsondunn.com
RACHEL BRASS, SBN 219301
   rbrass@gibsondunn.com
CAELI A. HIGNEY, SBN 268644
   chigney@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105
Telephone: 415.393.8200
Facsimile: 415.393.8306

*Attorneys for Defendant Apple Inc.*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re Apple iPhone Antitrust Litigation | CASE NO.  4:11-cv-06714-YGR<br><br>**SUPPLEMENTAL DECLARATION OF MARK ROLLINS IN SUPPORT OF APPLE INC.'S *DAUBERT* MOTION TO EXCLUDE REPLY TESTIMONY OF PROFESSOR DANIEL L. MCFADDEN**<br><br>The Honorable Yvonne Gonzalez Rogers<br><br>Date:        Dec. 14, 2021<br>Time:        10:00 a.m.<br>Courtroom:  1, 4th Floor |

Pursuant to Civil Local Rule 7-5, I, Mark Rollins, declare as follows:

1.     I am employed as a Finance Manager at Apple Inc. ("Apple") and, among other duties, work with the teams of engineers responsible for all of Apple's identity and access management.

2.     I submitted a declaration dated August 10, 2021 in support of Defendant Apple Inc.'s *Daubert* Motions and Oppositions to Class Certification, and I submit this supplemental declaration in support of Apple's *Daubert* Motion to Exclude Reply Testimony of Professor Daniel L. McFadden. I have personal knowledge of the facts stated below and, if called as a witness, I could and would testify competently thereto.

3.     As I explained in my prior declaration, people or entities use and make purchases on the App Store through "Apple IDs," which are unique, password-protected accounts. People or entities can obtain multiple Apple IDs to use the App Store—for example, using different email addresses.

4.     Apple can locate the purchase history for a single Apple ID, like the report I included as **Exhibit 1** to my prior declaration, but only by running a manual search for that Apple ID in a specific software tool. Such purchase history information may include a name, billing address, email address, payment types, and last four digits of a credit card for a given Apple ID.

5.     Apple can only pull the purchase history reports described in Paragraph 4 one-at-a-time. That is, an individual employee at Apple must manually type an Apple ID into the software tool Apple uses to search for payment information associated with that Apple ID, and then the tool displays a purchase history report for that single Apple ID; the tool cannot be used to pull information for several Apple ID queries at once.

6.     I understand Plaintiffs' expert in this litigation has proposed that Apple could use the type of information contained in the purchase history report attached as **Exhibit 1** to my previous declaration to confirm whether certain information (i.e., email addresses, billing addresses, names) match across different Apple IDs in order to link multiple Apple IDs to a single individual. But the only way to identify instances of overlap in such data between different Apple IDs is for an employee to run manual searches (i.e., for a certain name, Apple ID, email address, physical address, payment method, and/or telephone number) in certain software tools—including the tool I describe in Paragraph 4—and then attempt to try to compare or match the information that is returned. Due to the way in

Gibson Dunn &
Crutcher LLP

SUPPL. DEC. ISO APPLE'S DAUBERT OF MCFADDEN

CASE NO. 4:11-cv-06714-YGR

- 1 -

**ER-647**

which data are stored at Apple, there is no automated process at Apple that could be used to filter, link, or otherwise identify potentially related accounts using this type of information aside from individual, manual searches.

7.   Further, if a search for a particular piece of information—like a search for the name "Daniel McFadden"—turned up 20 "hits" when queried in Apple's systems, an individual Apple employee would likely have to spend considerable time comparing addresses or other potentially correlating information to ascertain whether those 20 Apple IDs may belong to the same person—not to mention attempting to ascertain whether, for example, "Dan McFadden" and "Daniel McFadden" were the same user.

8.   I understand, for example, that an Apple employee ran a manual search for the name of one of the named Plaintiffs, "Edward Hayter," in one of Apple's software tools in connection with this litigation in or around July 2019.  That search returned 12 "hits" in the United States, which included entries for ▆▆ "Edward Hayter"s with address information in ▆▆▆▆▆▆▆▆ with an address in ▆▆▆▆▆▆▆▆ with an address in ▆▆▆▆▆▆ with an address in ▆▆▆▆▆▆▆▆▆▆▆▆▆), and ▆▆ with ▆▆▆▆▆▆▆▆▆▆▆ ) The search results also included, for example, a ▆▆ ▆▆▆▆▆▆▆ and, separately, a ▆▆▆▆▆▆▆▆▆ Apple ID.

9.   Further, as I have previously explained, even if Apple identifies potential overlapping information associated with more than one Apple ID, Apple otherwise does not and cannot independently and accurately identify or validate names, email addresses, billing addresses, payment methods, or phone numbers across Apple IDs to establish that certain Apple IDs do or do not belong to the same person or entity.  That is, for example, even if a manual search located multiple Apple IDs associated with the same billing information or name, Apple has no way to accurately verify or confirm that those Apple IDs actually belong to the same individual as opposed to different individuals using the same credit card or with the same name—for example, a father and son who share both a first and last name and potentially a credit card.  This is true for *every single* Apple ID account, which is what I meant when I said "each or every" in my prior declaration.

10.   I understand, for example, that the named Plaintiff Edward Lawrence identified in a deposition in this case ▆▆ different Apple IDs he uses or has used in the past:

Gibson Dunn & Crutcher LLP

11.    In connection with this litigation, in or around April 2020, Apple manually ran a purchase history queries for the Apple IDs Mr. Lawrence identified as belonging to him. As reflected on those reports, for the Apple ID ███████████ the name associated with the purchase history was ███████ the billing address the user submitted, as reflected on that report, was ███████████████████████████ the credit card number ended in █████ and was a ████ card, and the phone number was entered as ██████████. *See* **Exhibit 2**.    For ████████████████ the billing address was ████████████████████████████ the credit card ended in █████ and was a █████ card, and the phone number was ████████████. *See* **Exhibit 3**.    And for ████████████████ the billing address was ████████████████████████████████ the credit card number ended in █████ and was a █████ and two phone numbers were listed as █████ ███████ and ██████████    *See* **Exhibit 4**.

12.    As reflected in the purchase history data for Mr. Lawrence, there is variation in the information across his accounts—while the ██████████ and ██████████ Apple IDs share the same credit card number/type, they do not share the same phone number; while the ██████████ Apple ID shares one phone number each with ███████ and ██████████ it does not share a credit card number with either.    And ██████████ and ██████████—while they share a billing address—could be housemates, parent/child, or the same person.

13.    Consistent with the process I explain in Paragraphs 4 and 5 above, in order to pull the information in the purchase histories for Mr. Lawrence, Apple had to run individual searches for each individual Apple ID in a specific software tool.    And in order to try to verify that all of these accounts actually belong to the same individual—particularly given the differing account information—only Mr. Lawrence himself could confirm his Apple IDs, as I understand he testified to during his deposition.

14.    Because Apple does not have an automated, non-manual way to identify potential overlap across all Apple IDs, Apple also cannot provide a reasonable estimate of the number of Apple IDs that contain overlapping information (such that they may belong to the same individual), or the

number of IDs in similar situations to Mr. Lawrence's—that is, where some data matches between two (or more) Apple IDs, but other data does not.

15.    While I understand that Plaintiffs assert that matching email addresses using names and physical addresses "might well match with ninety or ninety-five percent confidence on all the accounts opened by a particular consumer," I have no reason to believe this could be the case.  In fact, the examples I reviewed in Paragraphs 8 and 10-12 above for two of the named Plaintiffs, Edward Lawrence and Edward Hayter, indicate that such matching is highly unlikely to identify associated accounts with such precision:  I understand that there are five named Plaintiffs in this case, meaning that at least 2/5—or 40%—may not be matched using Apple's information with confidence.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 30, 2021 at Cupertino, California.

By:    _____
       Mark Rollins

Gibson Dunn &
Crutcher LLP

SUPPL. DEC. ISO APPLE'S DAUBERT OF MCFADDEN                    CASE NO. 4:11-cv-06714-YGR
                                        - 4 -

**ER-650**

Pages 1 - 24

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE

| | | |
|---|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION, | ) ) ) | No. 11-cv-6714-YGR Oakland, California |

Monday, April 11, 2022

**TRANSCRIPT OF PROCEEDINGS**

**FROM THE OFFICIAL ELECTRONIC SOUND RECORDING**

**2:03 P.M to 2:39 P.M.**

**APPEARANCES**:   (By Zoom Webinar)

For Plaintiffs:

        WOLF HALDENSTEIN ADLER
          FREEMAN & HERZ LLP
        750 B Street
        Suite 1820
        San Diego, California  92101
     **BY:  MARK C. RIFKIN, ESQ.**

For Defendant:

        GIBSON, DUNN & CRUTCHER
        333 South Grand Avenue
        Los Angeles, California  90071
     **BY:  DANIEL G. SWANSON, ESQ.**

Transcribed By:  **BELLE BALL, CSR 8785, CRR, RDR**
        Official Reporter, U.S. District Court

**ER-651**

Monday - April 11, 2022                              2:03 p.m.

                      P R O C E E D I N G S

        THE COURTROOM DEPUTY:  Now calling Civil Case

11-6714-YGR In re Apple iPhone Antitrust Litigation.

    Counsel, starting with the plaintiff, please state your

appearances for the record.

        MR. RIFKIN:  Good afternoon, Your Honor.  Mark Rifkin

from Wolf Haldenstein, on behalf of the plaintiffs.

        THE COURT:  Good afternoon, Mr. Rifkin.

        MR. SWANSON:  And good afternoon again, Your Honor.

Dan Swanson for Apple.

        THE COURT:  Okay.  Good afternoon.  All right.

    So, there are a few disagreements.  Where would you like

to start, Mr. Rifkin?

        MR. RIFKIN:  Your Honor, I would like to start on the

first area of disagreement, which is the -- the date for the

plaintiffs to submit their revised motion for class

certification.  And in particular, the revised expert report.

    The parties are two months apart in their proposal in

litigation that is now longer than ten years old.  And the

extra time that we asked for is driven not by our need to

address the issues in brief, but by our expert's need to

address the issues that Your Honor identified in the order.

    And I'd like to go through some those issues and explain

in particular why we think the extra couple of months is

warranted, and why we think the time we asked for is a reasonable period of time. And I'll touch on them in the order in which they appear, but not necessarily in the order in which they are most important.

The first one is the benchmark analysis that Your Honor commented upon in your class certification decision. We intend to have Professor McFadden or another expert from Brattle perform a different kind of quantitative benchmark analysis along the lines that you referred to on Page 7 of your opinion when you mentioned the analysis that Professor Economides had done.

We expect to have both the -- the quantitative benchmark analysis that was done already, but add to it a quantitative benchmark analysis so that Your Honor's concern about the need for a quantitative assessment is fully addressed. That will take some time, but it is by no means the most time-consuming part of the process.

The next area of work that I would like to address has to do with three adjustments that are going to be made to the computational part of this. The first is the 99-cent pricing issue. The second is the use of a percentage calculation rather than a fixed dollar amount. And the third is the question of focal point pricing.

As Your Honor is aware, all three of those adjustments will require that some additional econometric modeling be done.

The experts from Brattle assure us that they are able to make those adjustments and do that renewed econometric modeling.

In the focal point pricing analysis in particular, Your Honor referred to the question of the need for another subject matter expert regarding pricing tiers.

We would like -- again, we would like to include an analysis that addresses both focal point pricing and also a model that eliminates the focal point pricing, because the plaintiffs claim the focal point pricing is anti-competitive.

And we want to have the option to be able to have Professor McFadden run an econometric model that eliminates focal point pricing if the plaintiffs prevail on their claim that focal point pricing is anti-competitive, but that also addresses focal point pricing because we want to make sure we address the Court's concern that that may be a natural clustering of prices in the but-for world.

And so to do that, we think we need to have some additional time for an additional expert, as the Court suggests in the opinion, and for that modeling to be done.

The next set of issues that I would like to discuss are somewhat related to the question of either uninjured or -- uninjured class members or flippers.

And Your Honor has made several points about them in the -- in the opinion, all of which we think will be addressed to one degree or another when we net out the accounts that are

attributable to class members.  And Your Honor addressed that in the opinion, as well.

You may recall that Apple had insisted that it did not have sufficient information to allow the plaintiffs or the Court or anyone else to identify which accounts belong to which class members.

And Your Honor, on Page 14 of the opinion, referred to Mark Rollins's testimony that, in fact, Apple does maintain that information.

We've asked did Apple for it.  We've explained that we believe that identifying accounts to specific class members will let us address the question of netting harm, it will allow us to address the question of flippers, and it will also allow us to address the question of uninjured class members.

And the reason that I say that is this.  The -- the folks from Brattle who have been through the data in excruciating detail tell us that a very, very large number of the so-called uninjured class members -- or accounts, I should say.  I'm sorry.  Let me back up and be clear about that.

A very large number of the so-called uninjured accounts, as well as a very large number of the so-called flipper accounts -- because that's all we have been able to deal with right now, is accounts, not class members -- they will fall out once we net the accounts to particular class members.

And the reason for that is simply this.  Many of the

multiple accounts are those that the experts believe will have one account that's a primary account, and then two or three or four secondary accounts where there's very little activity that takes place.

The experts tell us that most of the so-called flipping between injured and uninjured and most of the accounts that appear to be uninjured are those where there's very little activity in an account.

Let's take a simple example.  If I have two accounts, one of which has 90 percent of my purchases, and I buy hundreds and hundreds and hundreds of dollars of apps or IAP in it, and a second account that has only one or two transactions, that's two accounts.  And if all we have are account-specific information, they are looked at equally.

And so if one -- if the small account with very little activity is an uninjured account or a flipper account, that looks the same, right now, as my other account where I've got 99 percent of my economic activity.

When those two accounts are identified to me and netted out, then the likelihood that I'm either a flipper or uninjured will be greatly reduced.

We think that the ability to do that is something that the Court's opinion addresses in a number of different ways, including the Court's concern about the timing for when we would do this.

And I do want to clarify for the Court now what either I misstated or the Court misunderstood during class certification. We're not asking the Court to reconsider the class certification decision.

I want to be absolutely clear on the record about that. We are not asking the Court to reconsider the decision at all.

But I want to make sure the Court understands something. And that's the timing of when we intend for Professor McFadden to run his model.

And if I didn't say it before, and if we didn't say it clearly enough in the submission, I want to say it clearly now, on the record. We intend that the model, once it is accepted and approved, will be run against all of the data from Apple.

Now, Apple has produced transactional data through April of 2021. Before trial, Apple's going to have to produce data between April of 2021 and whenever we have the trial. But at that point, before our expert submits his final report, which is, by definition, before the trial, the expert is going to run the full damages model against the full set of Apple transactional data. That will yield 400 million results for 400 million Apple IDs.

Now, we've talked at length before, and I'm not going to burden the Court with it again. The aggregate amount of damages is the result of adding up all of those 400 million individual ID-specific sums of damages. Some of them will be

positive damages.  Some of them will be so-called negative damages, which, again, Your Honor has addressed in your class certification opinion.

I won't ask the Court to reconsider it.  I agree that we need to net out the positive and negative damages.  But we will have the tool to do that, because we will have 400 million individual computations as a result of the experts' modeling that will be run against the full set of data that Apple produces.

If the Court understood the plaintiffs to say before that we did not intend to run the data -- to run the model against all the data, and did not intend to have 400 million results until after the trial, I take responsibility for that misunderstanding, and I want to clarify it now.  We are not going to do this after the trial.  It will be done before the expert's final report.

What I intended to say was that we would not present the jury with 400 million numbers.  It would take a lifetime for us to offer that evidence in the record.  But I did not mean to say that we would not have those 400 million calculations until after the trial.  That is why we described to you our intention to proceed on an aggregate basis at trial.  But that aggregate basis is the aggregate of 400 million separate calculations that will be done long before trial.

And the process of collecting those aggregate calculations

and then assigning the 400 million accounts to roughly 150 million account owners will be done in -- number one, will be done, we believe appropriately, as early as possible now if we can get the data from Apple, but certainly, during the process of allocating the aggregate damages to the individual class members.

Your Honor, in your opinion, has suggested that the need to do that runs the risk of predominating over common issues. The need to allocate the aggregate damages to individual class members runs the risk of predominating over the common issues that the Court identified in Your Honor's opinion.

We want to be able to do that now, to demonstrate that it will not predominate. That it will, in fact, be a ministerial function, and it will not predominate any more than it predominates because Professor McFadden has to make 400 million calculations when he runs his model against the universe of transactional data.

We've asked Apple for the identifying information so that we can demonstrate to the Court that this is a ministerial function, that it will not predominate over any common issues. And Apple is refusing.

That process is going to take some time, because in the first instance, we have to work out with Apple whether they will agree or not.

If they don't, we have to bring on a motion. If the Court

grants that motion, we then have to go back and get the data from Apple.

Once we get the data from Apple, we then have to run it against the 400 million individual calculations that Professor McFadden's regression modeling will yield. And (Inaudible) them to 150 million or so class members.

We believe that the time necessary to do that is subsumed within the two months that we asked for in addition to the time that Apple thinks is necessary to do this work. But as Your Honor can see, it's a relatively small amount of time, compared to the enormous amount of time the parties have invested in this case, the lawyers have invested in this case, the Court has invested in this case.

And so in order to be able to do the job adequately, to address all of the issues the Court has identified in the class certification decision, including this question of netting harm, including the question of flippers, and including the question of potentially uninjured class members, to satisfy the Court as to, number one, the true number of uninjured class members that may be out there, and number two, to satisfy the Court that identifying those uninjured class members will not be a predominating individual issue, we believe the time to do that is now so that the Court can make a fully-informed final class certification decision, particularly now that we have guidance from the Ninth Circuit in the *Olean* case, which as

Your Honor knows, came out only a few days ago.

So for all those reasons, we believe that the prudent thing to do is to give the experts the time that they tell us they need to be able to accomplish this work, get it done, answer the Court's questions, satisfy the Court's concerns, present the class-certification motion in a way that fully informs the Court, and allows the Court to make a decision reflecting the corrections that Your Honor took the time to identify for the parties and for counsel.

THE COURT:  Mr. Swanson?

MR. SWANSON:  Your Honor, there are a number of things that Mr. Rifkin said that I would take issue with, but I think we're really focusing on the scheduling right now, so I'm not going to go through the merits of all of the points he's raised, at least until the point comes up that Your Honor wants to hear about them.  All of them, or some of them.

I think the fundamental issue from our standpoint is this is not supposed to be a rerun of class certification.  We went through a lengthy period to do that.  The plaintiff made a strategic decision to advance their case based on a single expert and his model.  Your Honor has heard out the issues; we raised the issues.  They've been aware of them since August, and could have been working to deal with them since then.

I think the basic reason why we think five months is not required is five months isn't required to address the issues

Your Honor has identified with respect to Professor McFadden's model. I don't think we think they will be remedied. But if they can be, they can be dealt with in the next 90 days.

Adding multiple new experts, raising issues that have already been dealt with in Your Honor's order -- for example, focal point pricing -- we understood that we can't reraise things that we didn't prevail on. We assume that that is symmetric, that we're not going to be having the plaintiffs revisit things that they lost.

And so, Your Honor, I think 90 days is perfectly reasonable. It's the time that we're allowed to respond under either schedule. That's what's been proposed. They haven't proposed to add any extra time now to deal with three or four experts, new experts, added on top of Professor McFadden.

On the data issues, we, I think, agree to disagree with Mr. Rifkin. No -- no request has been propounded. Mr. Rifkin is talking about the most sensitive conceivable data that Apple maintains. The data that links individuals to their app download and app transactions, that is at the core of Apple's guardianship of consumer privacy. What Mr. Rifkin seems to be asking for -- although I'm not sure because we have yet to meet and confer about what they think they really need -- but, seems to be asking for data that would identify who downloaded each and every app. You recall from the *Epic* trial how much sensitivity there was, alone, about the dating apps.

What Mr. Rifkin is asking about as to have data that would be taken out of Apple's custody, out of Apple's cyber security protection, multiple layers of protections that would indicate who is engaged in every one of those transactions.  Who's downloaded those apps, and much, much more.  That's just an example.  So that is going to have to be dealt with, if that is something that the plaintiffs pursue at the class certification stage.  But we don't think that actually is a pertinent issue at this stage for class certification.

We were the ones who raised the issue of linkage.  Our argument was that the plaintiffs did not have a reliable method to link Apple ideas.  We didn't prevail on that for class certification purposes, Your Honor.  So again, I don't think this is a situation where plaintiffs should be allowed to revisit these issues when we have our hands tied behind our back on that.

I think the facts would show that it is not going to be reliable -- it won't be a reliable method match these up.  But that no longer seems to be an issue for class certification, so it's not an excuse to take five months instead of getting this done in the next 90 days.

So that's it in a nutshell, Your Honor.  Five months, we're going to have a redo with multiple experts, new experts. Three months, they'll be focused on what they really need to do.

THE COURT:  So let me ask this, Mr. Rifkin.

MR. RIFKIN:  Yes, Your Honor.

THE COURT:  Why is it that you should be allowed a do-over?  As you said, this case has been going on ten years.

Why -- why should I -- why should I not hold you to a standard of having done your best, and, you know, for whatever reason, you made a decision not to do your best?

MR. RIFKIN:  Well, Your Honor, I disagree with that characterization.

But the answer is implied by Your Honor's decision, which begins on Page 1 by indicating that the decision is being denied in certain respects without prejudice.  And, and you say that the Court anticipates that the deficiencies that are identified in the order can be addressed.  And, and that's what we're trying to do.  We're not doing anything improper.

THE COURT:  I also said that perhaps this is a case where you should only be focused on liability before you get into damages.  And why shouldn't -- And why shouldn't I hold you to that as well?  Because you, you failed.  There are security issues.

And, why shouldn't I hold you to that standard?

MR. RIFKIN:  Well, Your Honor, I do want to comment on that.  And again, I -- perhaps I should be taking the responsibility for this misunderstanding on the Court's part.  And I want to make it clear --

**THE COURT:** There was no misunderstanding. You may want to revise the record, now. But I looked at the transcript.

**MR. RIFKIN:** Your Honor --

**THE COURT:** And --

**MR. RIFKIN:** -- you said --

**THE COURT:** You said specifically, you know, this was to be done after trial.

**MR. RIFKIN:** Your Honor, I -- I respectfully --

**THE COURT:** (Inaudible)

**MR. RIFKIN:** I respectfully disagree. But if I did, I'm taking the responsibility for having misstated that. I'm not suggesting that the Court didn't understand what I was saying. If I misspoke, the time to correct that is now. And I'm doing that.

But the point that I just tried to answer had to do with Your Honor's point about a liability-only trial. And Your Honor made that comment after, after noting that we had given a damages range of between 7 and $10 billion, and then running the model afterward to determine the distribution amounts. Which, which you said was too great a range, and at least in your mind, led to the view that the current model produced results which were too speculative.

Now, again, Your Honor asked me at the last hearing whether the experts had run the model and computed damages.

And I answered yes.  And Your Honor asked at the last hearing, well, what's the result?  What are the damages?  And I said a range of 7 to $10 billion.

Let me explain the reason for that.  If you look at the expert's report, there are two separate damages numbers that appear in the report.  The first one appears in Paragraph 236. And it's the number of $6.6 billion, which the expert says represents the consumer class damages attributable to the games category.  It's a single number.  $6.6 billion, attributable to the games category.

The expert then says in Paragraph 239 of his report (As read):

"I estimate that the consumer class damages
attributable to the entertainment and music categories
is $0.6 billion."

So he gives two very specific numbers, one for games and one for entertainment and music.

I added them up.  And the total is $7.2 billion.  That was the lower range of the estimate that I gave to you of 7 to 10 billion.

The reason that I gave a range is not because the experts were uncertain, but it's because the three genres of apps that the experts addressed in the report -- games, entertainment and music -- represent only 79 percent of the commerce on the App Store.

**ER-666**

The remaining 30 percent -- I'm sorry -- 21 percent of commerce on the App Store is what accounts for the range. When one unpacks the $7.2 billion number to represent the entire App Store -- which the experts haven't done yet, so I didn't want to say they gave that number -- that's $10 billion. That's not $7.2 billion. That's $10 billion.

If I led the Court to understand that the experts couldn't calculate anything more than a range, which Your Honor said in the class certification opinion was all we intended to prove at trial, then I take responsibility for not being clear enough at the hearing so that Your Honor could make an informed decision.

We want to be as precise as we can be. We want to answer exactly the concerns the Court has, and the concerns the Court expressed, and the concerns the Court says can be addressed. We agree. These concerns can be addressed. And all we're trying to do is address them. But addressing them requires that we go back and do some additional work.

Now, Mr. Swanson wants to call that a redo. But that's in the nature of a denial of a motion without prejudice. It is exactly what we're trying to do. We are trying to correct the deficiencies the Court said it anticipates we will address in the next round.

I can't imagine that anyone thought that we wouldn't fix the problems that led to the Court excluding the expert report, in the first place. But to do that, it's going to require not

three months of work, but five months of work.  And that's not doing this case over.

THE COURT:  Well, it kind of is.  But I think I'm going to let you do it.  And I --

MR. RIFKIN:  Well, thank you.

THE COURT:  -- sometimes do, and I sometimes don't.  But it is a redo.

Let me be clear.  I don't know why it is that you took the approach that you did.  But I'm not going to have this case go up to the Ninth Circuit only to come back in three years, and have to give you an opportunity to do it again.

All right.  So plaintiffs' schedule -- we'll go with plaintiff's schedule.  Motion to be filed August 26th.

Opposition -- I think it's a little harsh to have Mr. Swanson file the day after Thanksgiving.  So I'm not going to do that, Mr. Rifkin.

MR. RIFKIN:  We're perfectly happy to have him take all the time he needs.  We didn't mean to impose that on Mr. Swanson at all.

THE COURT:  Mr. Swanson.

MR. SWANSON:  Um, can we do it a week after that, then?

THE COURT:  Okay.  That would be December 2nd?

MR. SWANSON:  Yeah.  I don't know if this will mess up other days, though.  But in the abstract, that would be better.

THE COURT:  Okay.  And then the reply.  Right now you have January 13th.  Do you want the extra week, Mr. Rifkin? January 20th?

MR. RIFKIN:  If we could have it, if we could have it, yes.  Please.

THE COURT:  All right.  January 20th.

March 1st is a Wednesday, not a Tuesday.  But let's go ahead and set it for March 1st, specially set, which is a Wednesday, 2:00 p.m.  That'll be in person.

It looks like you -- the deadline to complete fact discovery, you both want 60 days after the decision on class cert?

MR. SWANSON:  Yes, Your Honor.

MR. RIFKIN:  Correct.

THE COURT:  So, that's fine.  Last day to file discovery motions, 30 days -- effectively, 30 days after the decision of class cert, so that's fine.  You disagree on these -- I take it that the next set of expert reports are final reports?

MR. SWANSON:  Right.

MR. RIFKIN:  Correct, Your Honor.  These would be the expert -- the merits reports.

And the reason for the difference in time is simply because in the intervening months, we will expect to receive literally billions of transactions.  Data from literally

billions of additional transactions.

As -- as the --

**THE COURT:** All of that -- why isn't all of that being disclosed in advance? I mean, when I do the MDLs, all of the data upon which the -- upon which the expert reports are being used for purposes of class certification have to be disclosed at the time that the motion is filed. That's what we did in the batteries case. And I don't see any reason not to do that here.

In the batteries case, we had tons of expert reports, and everything was done in advance, so that you were looking at 30 days later, or at most, 60 days later, so that -- these were just to -- these were just to tweak things. Because it should all be done. We shouldn't be doing more, once we get past that.

**MR. SWANSON:** And Your Honor, if the plaintiffs run the whole model, for purposes of class certification, it would make it very easy to do a short re-up at that point. I don't understand why Mr. Rifkin wants to defer that. He's only run it on three genres.

We're going to get 27 genres, like, two months later? Why not see this at class cert?

**MR. RIFKIN:** No. Because -- that's not -- that's not what I'm addressing. And again, what I'm talking about is this.

We have data, we have transactional data from Apple through April of 2021.  We're a year later now.  There's billions of transactions that have taken place in the intervening year.  We don't have that transactional data yet from Apple.  Apple hasn't produced it.

MR. SWANSON:  We haven't --

MR. RIFKIN:  If it produces it, we'll run a model on it.

MR. SWANSON:  Sorry.

MR. RIFKIN:  Okay?  But at some point in time Apple is going to have to produce updated transactional data, which the -- which the experts will have to run their model against.

All they're doing is developing a model.  Once they have the model, they will run it.

THE COURT:  Right.  You said it's mechanical.  So you don't need four months.  I'll give you 60 days.  That's it.  Then 45 days for rebuttal --

MR. RIFKIN:  Fine, Your Honor.

THE COURT:  -- and 30 days after that.  Again, I -- I don't -- I don't under- -- I don't think that you all need this much time.  But you've agreed, so I'll give it to you.

Dispositive motions and *Daubert*s, 45 days after that is fine.

Then oppositions, 45 days; replies, 30 days.  Both of those are fine.

I haven't calculated out -- certainly we aren't in 2022 at this point; we're in 2023.  So -- and I -- I have to tell you, I've got a 55-defendant Nuestra Familia prison case, that I'm going to have to try, a number of them.  They will take priority.

So when we get to your next class cert motion, maybe I will have a better sense of how much I will be in criminal trial, as opposed to -- and when I will free up for a civil trial.  So I'll give that to you -- um, I'll give that to you later.

MR. RIFKIN:  Very well.

THE COURT:  But I think that's as far as we are going to get today.

Mr. Rifkin, you -- I didn't see you at the antitrust conference.  I was on the dais with Ms. Sweeney and Mr. Swanson.  And I will say to you what I said to them:  Be very careful with your *Daubert* motions.  We generally think, on both sides, that they are over-used.

So if I have a Nobel laureate, as long as he's opining on something upon which he is a laureate, I would expect Mr. Swanson not to see a *Daubert*.  Okay?

All right.

MR. SWANSON:  All right, Your Honor.

THE COURT:  I will see you all --

MR. RIFKIN:  Thank you, Your Honor.

THE COURT:  -- in a few months.

We're adjourned on your case.

Can someone please send me an editable version of that document so we can get your scheduling order out?

MR. SWANSON:  Your Honor, I'm sorry; is the date okay for dealing with the sealing issues?  I know my colleague --

THE COURT:  That's fine.

MR. RIFKIN:  The 27th?

MR. SWANSON:  Yeah.

THE COURT:  Yes.  That -- March 29th is what you've put here?

MR. SWANSON:  I think it was April, maybe April --

THE COURT:  April --

MR. SWANSON:  April 27th.

THE COURT:  April 27th is fine.  That works.

MR. SWANSON:  Thank you.

MR. RIFKIN:  Your Honor, we'll submit a Word version of the case management scheduling conference statement to your chambers.

THE COURT:  Okay.

MR. RIFKIN:  Is that how you'd like it done?

THE COURT:  Just the proposed-order mailbox.

MR. RIFKIN:  Yes.  We will do so.

THE COURT:  Okay.  All right.

MR. RIFKIN:  Okay.

**THE COURT:**  All right.  Thank you all.

**MR. RIFKIN:**  Thank Your Honor.

**MR. SWANSON:**  Thank you, Your Honor.

**MR. RIFKIN:**  Bye-bye.

(Proceedings concluded)

CERTIFICATE OF TRANSCRIBER

I, BELLE BALL, CSR 8785, CRR, RDR, hereby certify that the foregoing is a correct transcript, transcribed to the best of my ability from the official electronic sound recording of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

*Belle Ball*

_____ /s/ Belle Ball _____

Belle Ball, CSR 8785, CRR, RDR

Wednesday, April 13, 2022

**ER-675**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

IN RE APPLE IPHONE ANTITRUST LITIGATION

CASE NO. 11-cv-6714-YGR

**ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION WITHOUT PREJUDICE; GRANTING IN PART AND DENYING IN PART APPLE'S *DAUBERT* MOTIONS TO EXCLUDE TESTIMONY OF PROFESSOR DANIEL L. MCFADDEN**

Re: Dkt. Nos. 441, 479, 486, 578, and 604

Pending before this Court is a motion for class certification filed by plaintiffs Robert Pepper, Stephen H. Schwartz, Edward W. Hayter, and Edward Lawrence ("Consumer Plaintiffs"), two *Daubert*[1] motions filed by Apple, Inc., an administrative motion to strike one of Apple's *Daubert* motions filed by Consumer Plaintiffs,[2] an administrative motion to strike the reply testimony of Professor Daniel L. McFadden filed by Apple, and numerous motions to seal which will be addressed by separate order.

As set forth below, while Consumer Plaintiffs satisfy most of the requirements for class certification under Rule 23, the motion must be denied, without prejudice, so that they can address the deficiencies identified herein. As described in the *Daubert* portion of this order, Professor McFadden and his team made unjustifiable assumptions regarding the commission rate upon which much of their analysis rests, and several other aspects of the proffered model are flawed. That said, many of Apple's arguments are not well-taken. The Court anticipates that the

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–90, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) (*Daubert I*).

[2] Consumer Plaintiffs move to strike one of Apple's *Daubert* motions, arguing that Apple was required to seek leave before filing it. (Dkt. No. 486). Plaintiffs also argue that Apple's *Daubert* motion improperly circumvents the page limits set for opposing class certification. Neither argument persuades. The Court finds Apple's *Daubert* motions procedurally proper given the practice in this District. Thus, plaintiffs' motion to strike is **DENIED**.

deficiencies can be addressed, but where an argument has been analyzed and rejected, Apple shall not re-argue the issue on the anticipated next round of briefing.

## I.    RELEVANT BACKGROUND

The facts of the case are well known to the parties and counsel of record. The background relevant to the instant motion is summarized as follows: Consumer Plaintiffs bring this class action pursuant to Section 2 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 2, on behalf of the following class:

> All persons in the United States, exclusive of Apple and its employees, agents and affiliates, and the Court and its employees, who purchased an iOS application or application license from Apple, or who made an in-app purchase, including, but not limited to, a subscription purchase, through such an application, for use on an iOS Device at any time from December 29, 2007 through the present.

(Dkt. No. 228, Third Amended Complaint, "TAC", ¶ 62.) Consumer Plaintiffs' theory of the case is that Apple charges developers on the App Store supracompetitive commissions, which the developers then pass to consumers in the form of increased prices for app downloads or subscriptions.  (*Id*. at ¶ 47.) Consumer Plaintiffs allege that this conduct allows Apple to unlawfully monopolize the retail market for the sale of apps, including in-app purchases ("IAP").

Consumer Plaintiffs bring two causes of action against Apple based on this alleged conduct: (1) unlawful monopolization of the applications aftermarket in violation of Section 2 of the Sherman Act and (2) attempted monopolization of the applications aftermarket.  (*Id*. at ¶¶ 78–88.)

## II.    *DAUBERT* MOTIONS

The Court's analysis begins with the *Daubert* motions as they inform the balance of this Order.

### A.    Legal Framework

The legal standard is not in dispute. In short, Federal Rule of Evidence 702 permits opinion testimony by an expert as long as the witness is qualified and, based upon that qualification, the witness's opinion is relevant and reliable.  An expert witness may be qualified by "knowledge, skill, experience, training, or education" as to the subject matter of the opinion.  Fed. R. Evid. 702. The proponent of expert testimony has the burden of proving admissibility in accordance with

2

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

Rule 702.  Fed. R. Evid. 702, Advisory Committee Notes (2000 amendments). At the class certification stage, "the relevant inquiry is a tailored *Daubert* analysis which scrutinizes the reliability of the expert testimony in light of the criteria for class certification and the current state of the evidence." *Rai v. Santa Clara Valley Transportation Auth.*, 308 F.R.D. 245, 264 (N.D. Cal. 2015); *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 985–86 (9th Cir. 2020).  For scientific opinions, they must be based on scientifically valid principles.  *Daubert*, 509 U.S. at 589. Experts assist the fact finder in their own evaluation of the evidence by providing the fact finder with opinions based upon verifiable, scientific, or other objective analysis. *Id.* at 589–90.

### B.    Challenged Opinions

Consumer Plaintiffs rely primarily on the econometric opinions and method of Professor McFadden in support of their motion for class certification. Apple challenges several aspects of McFadden's opinions and model.  The Court examines the challenges systematically.

### 1.    Overall Model – Motion Denied

Apple challenges the overarching model which Professor McFadden used.  More specifically, Apple claims that McFadden "designed his model not to test whether Apple's conduct had common impact on putative class members, but to prove it."[3] In this regard, Apple argues that the opinions are not "based on principles of hypothesis generation, scrupulous study design, meticulous data collection, and objective interpretation of experimental results," but on achieving a desired, preconceived outcome.  Federal Judicial Center, Reference Manual on Scientific Evidence xiii (3d ed. 2011).

Professor McFadden opines that the commission charged to the developers serves effectively as a "tax."  He asserts that both consumers and developers share the burden of the commission or tax which evidences common impact.  From there, McFadden built a model to assess and quantify common impact within the App Store.  McFadden's opinion that the

---

[3] *See* Dkt. No. 479, (Motion to Exclude Testimony, "*Daubert* Motion I"), at 7; Dkt. No. 477-17, (Deposition of McFadden, "McFadden's Nov. Depo.")*,* at 181:5–6 (purpose of model was "to find a common effect"); *id.* at 26:4–6 (task was "establishing that there was common evidence"); *id.* at 26:9–13 (instructed to "pay attention to the commonality of the effects on the class"); and *id.* at 232:20–23 ("[Y]ou want the model to do the best job you can of reflecting the common effect").

3

United States District Court
Northern District of California

commission serves as a "tax" is grounded in economic principles and literature. The effect of a sales tax on consumer prices is well-documented and explained in McFadden's report. McFadden's report shows that he relied on numerous scientific articles and economic texts describing the effects of taxes on consumers and suppliers in assessing whether common impact exists amongst the proposed class members. (*See* Dkt. No. 443-14, McFadden's Opening Report, ¶¶ 143–147.) Thus, his theory is scientifically sound. While Apple's experts disagree with McFadden's assessment and quantification of common impact, none dispute the fundamentals of his tax methodology.

Accordingly, the motion on this ground is **DENIED**.

### 2.   Market Definition – Motion Denied

Apple also challenges Professor McFadden's opinion on market definition. McFadden opines that a single relevant aftermarket for the sale of iOS apps and in-app content to consumers exists. (McFadden's Opening Report, ¶¶ 42–43.) The foremarket consists of "OS installed mobile devices such as iOS mobile devices or Android devices." (*Id.* at ¶ 44.) Apple challenges Professor McFadden's definition of the relevant market, arguing that he ignores the two-sidedness of the App Store.

In opining on the relevant market definition, Professor McFadden considered potential substitutes for downloading and installing iOS apps and making in app purchases through the App Store, including the use of Web apps, jailbreaking, enterprise software installed on iOS devices, apps compatible with non-iOS devices, and purchasing in-app content outside the App Store. Without deciding the merits of Professor McFadden's market definition, the Court finds such considerations sound in rendering an expert opinion on the market definition.

Beyond this initial assessment, the Court is not inclined to address the market definition at this juncture. Ultimately, the issue is a merits decision not required at the class certification stage.

### 3.   Professor McFadden's Three – Step Impact and Damages Model

The Court now reviews each of the individual steps Professor McFadden conducted in his econometric model; each of which Apple also challenges. With respect to step one, the Court examines McFadden's "benchmark analysis" where he identifies the but-for commission rate.

4

**ER-679**

United States District Court
Northern District of California

Next, the Court examines step two of the model which uses the but-for commission rate from step one to generate "but-for pricing." The but-for pricing is then used to calculate the overage charge in step two. Finally, the Court examines step three which is meant to link accounts to class members and identify harmed members from unharmed members. Step three is also intended to calculate individual damages.

**a.      Step One: "Benchmark Analysis" – Motion Granted**

In his model, Professor McFadden first identifies a but-for commission rate. Here, Professor McFadden, "with the help of his staff," claimed to use a "benchmark analysis" to find a "but-for" commission rate of 10-12% for the period of 2008 to the present. However, as shown below, no analysis was actually conducted. Rather, the rate was cherry-picked from a few data points, many of which McFadden conveniently dismissed. The Court excludes this opinion as it is arbitrary and not based on any legitimate scientific, economic, or mathematic principle.

In his report, Professor McFadden states simply: "I use 10-12 percent as the But-For commission rates." (McFadden's Opening Report, ¶ 166.) There is no mathematical equation or analysis to justify these findings. How Professor McFadden arrives at this conclusion remains a mystery. He is not an expert in app development, app pricing, IAP transactions, or payment processing, nor does he rely on any expert in these fields. That he is a Nobel laureate is laudable but not relevant to these industries. Again, without any relevant expertise, specifically as to this issue, the basis of his opinion eludes. At best, the report merely provides some descriptive clues, but none are sufficient.

The following examples illustrate the cherry picking:

Professor McFadden says he relies on the 12% rate set by the Epic Games Store but ignores the rates set by Apple and Google. (*Id.* at ¶¶ 156–161). Without more, any use of rates from Epic Games must at least consider the context of their litigation strategy. Uncontroverted evidence shows that because of this litigation decision, the Epic Games Store will and is operating at a loss for the foreseeable future. (*See Epic Games, Inc. v. Apple Inc.*, 4:20-cv-5640-YGR, Dkt.

5

**ER-680**

United States District Court
Northern District of California

No. 812, Rule 52 Order After Trial on the Merits, "Rule 52 Order," at §§ I.B.3.a-b.)[4] Professor McFadden ignores this commercial reality and remains silent as to how he evaluated this consideration or why this known unprofitable rate should be at the *top* of his range. As noted, he is not an expert in the relevant industry.

Similarly, McFadden references Steam's commission rates which decreased in November 2018 from a standard rate of 30% to 20% on sales above $50 million and 25% on game sales above $10 million. (McFadden's Opening Report, ¶ 157). Steam is not litigation-driven and is the "largest PC games store." (*Id*.) Professor McFadden never explains why his rate should be a fraction of these commercial rates.

In 2021, Microsoft did announce a 12% rate which was to become effective on August 1, 2021. The market realities of this rate remain unknown, but Professor McFadden never explains why his range uses 12% as a ceiling, rather than a floor.

Remarkably, Professor McFadden relies on a failed platform, Discord, which in March 2019 decided to reduce their rates from 30% to 10%. (McFadden's Opening Report, ¶ 160.) Yet, he fails to disclose, consider, or explain the use of this metric given that Discord closed its doors less than a year later.

Next, rather than use 15% as a data point, which is the subscription rate that Apple implemented in 2016, Professor McFadden states that he uses the rate as an "upper bound" for "sensitivity checks" along with the 15% used for the Small Business Program. (*Id*. at ¶ 161.) Again, Professor McFadden conveniently omits any analysis regarding the subscription rates by claiming that this "discounted rate [was] not the result of competition," citing to Tim Cook's trial testimony in *Epic Games, Inc. v. Apple, Inc*. While the Court found that the decreased rate associated with the Small Business Program was not the result of competition, it did not make the

---

[4] The Consumer Plaintiffs' motion for class certification and Apple's first *Daubert* motion were filed before the Court issued its 184-page Rule 52 Order. While the content of the order has been referenced in numerous arguments and subsequent filings, the parties are reminded that the Court's factual judicial findings in the Rule 52 Order are not admissible evidence should this case proceed to trial. The factual issues here shall be determined by a jury. The references to the order made here are merely to the underlying evidence exchanged in this parallel action.

6

**ER-681**

same conclusion with respect to subscriptions, nor did Mr. Cook suggest otherwise. In fact, it is quite possible that the 15% was the result of competition and negotiation.

The lack of foundation and analysis demonstrate that the opinion is outcome determinative.[5] Why not 12-15% as a range? Why not a baseline of 13% or 14%? At most, the 10% is cherry picked from a failed company. It is not logical that a but-for world would generate market rates which do not anticipate any profit in the foreseeable future. If they did, it would require an explanation. Further, it is not as if a logical analysis is impossible. Professor Economides provided an analysis using multiple data points and math to reach his estimate for the Developer Class. (*See Cameron et al. v. Apple, Inc.*, 4:19-cv-3074-YGR, Dkt. No. 331-5, Expert Class Certification Report of Professor Nicholas Economides at ¶¶ 25-62.)

Thus, the motion on this ground is **GRANTED**. Accordingly, the Court excludes Professor McFadden's opinion on the but-for commission rate as lacking foundation.

### b.    Step Two: Pricing Model – Motion Granted in Part, Denied in Part

The second step of Professor McFadden's model requires estimation of the app and in-app prices that consumers would have paid in the but-for world. This allows for the calculation of the overage, which determines whether there is antitrust injury. To do so, Professor McFadden created an econometric model that estimates iOS aftermarket consumer demand and developer costs and calibrates the but-for pricing based on the but-for commission rate (as noted above 10-12%). The Court finds several problems with McFadden's pricing model, each discussed in detail below.

### i.    Calculation Data and Model Errors – Motion Granted

The Court notes, and Professor McFadden concedes, that the original proffered pricing

---

[5] Further, he states that "markets that have similar characteristics but are more competitive can provide useful benchmarks" (*id.* at ¶ 155) and, when convenient, references all the benchmarks from the gaming industry, (*id.* at ¶¶ 156–160), but then does not consider all the evidence from the gaming industry (*see* Rule 52 Order at §§ II). He alludes to a study that "IAP transactions [are] not different from payment processing" and payment processors "rarely charge higher than 5 percent," (McFadden's Opening Report, ¶ 155), yet has no expertise in this area, does not rely on someone who is an expert, and does nothing to analyze this key data point or show how it applies in this particular circumstance.

7

United States District Court
Northern District of California

United States District Court
Northern District of California

model included several errors which undermined the precision of the proffered conclusions. The opening report stated that the model forecasted that approximately 5.8% of the accounts were uninjured.[6] (McFadden's Opening Report, ¶ 241.)  However, over the course of class certification briefing, Professor McFadden's estimation of "unharmed accounts" continued to increase, largely in part due to correcting errors identified by Apple's experts.  Professor McFadden now agrees that with the corrections, the model forecasts that 14.6 % of accounts are uninjured.

The Court recounts the primary set of retractions and errors:

First, Professor McFadden originally defined a member as uninjured "only if all they had purchased are those [apps] for which the But-for price is higher than the As-is price." *Id.* In his reply report, Professor McFadden revised the opinion to define "uninjured accounts" as those with no "net harm." That is, the revised opinion provided that to determine harm is to consider the total cost of all the purchases an account makes in both the actual world and the but-for world, thus finding the *net harm* of the account.  In accounting for net harm, Professor McFadden's uninjured estimate increased from 5.8% to 7.7%. (*See* McFadden's Reply Report, ¶ 200.)

Next, the calculations contained data errors.  Professor McFadden acknowledges that his original estimate included a computational error which dropped apps whose minimum monthly average price was not precisely the same as its maximum monthly average price over a given year. (*See id.* at ¶ 202.) Once corrected, McFadden admits that the number of uninjured accounts increases to 14.6%.  (*id.* at n.371; McFadden's Nov. Depo., 138:21–139:18.)

---

[6]  Steps one and two of Professor McFadden's model focuses not on people or consumers but on their *accounts*.  Step three would address the actual consumers.

Professor McFadden used the phrase "class members" in his opening report when discussing his estimation of noninjury. *See* McFadden's Opening Report, ¶ 241 ("I estimate that approximately 5.8 percent of the Consumer Class members spent money on only those apps and in-app content items whose But-for prices are higher at the 12 percent But-for commission rate."). However, in his reply report, he refers to the 5.8 percent as referring to the number of uninjured accounts. *See* McFadden's Reply Report, ¶ 200 ("Using this method, the percentage of (net) unharmed Apple IDs is 7.7 percent as opposed to 5.8 percent of unharmed IDs reported in my Opening Report."). In his second deposition, McFadden clarifies that his estimation relates to accounts and not members. *See* McFadden's Nov. Depo.*,* at 136:23–137:9 (explaining that uninjured percentage refers to accounts and that the percentage of uninjured class members will be determined at the claims process).

8

**ER-683**

Third, Professor McFadden again concedes that in calculating individual damages, the model should have used a percentage calculation rather than a fixed dollar calculation method to determine net harm. The fixed dollar method assumes that developers adjust all in-app purchases in a single app by the same dollar amount.  Apparently unaware that his team created a model which relied on the fixed dollar method, Professor McFadden essentially rejected this method in his deposition. He testified that "the percentage method [was his] proposal for the best way to do individual damage calculations" because it is a better depiction of "what developers would do in the but-for world than the [] fixed dollar method." (McFadden's Nov. Depo., 123:9–13.) Professor McFadden also testified that the "percentage adjustment is more economically sensible and the proper scientific protocol would be that [he] adopt the more sensible method." (*Id.* at 106:11–19.)  Professor McFadden confirmed that his model continues to rely on the fixed dollar method and has not yet implemented the percentage method.  (*See id.* at 123:1–8.)[7]

Apple presents evidence that Professor McFadden's fixed dollar method leads to absurd results, including accounts having larger damages than their actual spend in the but-for world and negative pricing. While McFadden disputes the extent of the impact on his results, he acknowledges that application of the method "makes some difference" in the percentage of unharmed consumers (*id.* at 105:1-6) and that the percentage method was a more "sensible method" for determining individual damages. Professor McFadden did not elaborate on the extent of impact.  Thus, the extent and impact of these issues is unclear to the Court. Without revised analysis and clarity, the Court does not find Professor McFadden's pricing model to be reliable as a means for determining antitrust injury or damages.

---

[7] However, in a subsequent declaration submitted by Professor McFadden, he stated that his model used the percentage method rather than the fixed dollar method.  (*See* Dkt. No. 602, Declaration of Daniel L. McFadden in Support of Opposition to Motion to Strike).  Apple moved to strike this supplemental declaration on several grounds, one being that it contained information that contradicted McFadden's previous testimony on the same subject. (*See* Dkt. No. 604, Administrative Motion to Strike or Exclude Reply Testimony of Professor Daniel L. McFadden.) The Court Grants Apple's motion to strike McFadden's supplemental declaration on the grounds that it contradicts McFadden's prior deposition testimony. *See Jones v. City of McMinnville*, 244 F. App'x 755, 759 (9th Cir. 2007) (unpublished) (finding that district court did not abuse its discretion in striking affidavit that was inconsistent with prior deposition testimony).

United States District Court
Northern District of California

9

**ER-684**

Accordingly, the motion on this ground is **GRANTED**.

### ii.    Negative But-For Pricing Issue – Motion Denied

Apple next challenges the reliability of step two on the grounds that it generated what Apple calls "negative but-for pricing" when estimating but-for pricing for in-app purchases. Consumer Plaintiffs counter that this is a red herring, as it is merely a product of Professor Jeffrey Prince's attempt to price items from the app level to individual items.  The Court agrees.

Professor McFadden structured his model to price at the "app level" rather than the "individual in app purchase level."  Professor McFadden used this structure because he opined that estimating developers' costs was best done at the app level.   (McFadden's Reply Report, ¶ 142.) Professor McFadden also opined that developers consider costs at the app level when setting prices.  (*Id.* at ¶¶ 142–144.)[8]  More specifically, in setting his estimates at the app level, Professor McFadden aggregated all in app purchases for a particular app, per month, per Apple ID.  He then calculated an average to determine the as-is price for that app and used that as-is price in calculating the but-for pricing. In explaining how but-for prices are calculated, McFadden explained that the but-for equation is written as a function of price, reduced by Apple's commission, minus costs, multiplied by the quantity. In Appendix E.4. of McFadden's Opening Report, he explained that calculating the but-for pricing requires plugging the demand parameter and variable cost estimates into the developer's profit-maximizing equation. The profit-maximizing equations requires replacing the as-is commission rate with the but-for commission before solving for the but-for pricing. (McFadden's Opening Report, Appendix E.4., ¶¶ 39–45.)

Apple disagrees with pricing at the app level. Professor Prince opines that pricing at the app level "obscures an area where differences in impact are likely." (Dkt. No. 476-6, Prince's

---

[8] At oral argument the parties discussed Professor McFadden's opinions with respect to developer costs. During argument, it became apparent that the parties were relying on unfiled "workpapers." The Court ordered the parties to submit a joint set of "workpapers" so the Court could get a better sense of the data upon which Professor McFadden relied. They complied. (Dkt. No. 624, Joint Administrative Motion to File Under Seal Expert Workpapers). After reviewing the workpapers, the Court notes that the data is not fulsome. While it appears that Professor McFadden analyzed the financial records of six developers, the Court would expect a more fulsome analysis or reliance on an industry expert for purposes of trial.

10

**ER-685**

Opening Report, ¶ 74.) Professor Prince ultimately thinks that but-for pricing should be determined for each individual in-app purchase item, rather than an aggregate, because "whether a given individual is harmed [depends] on the but-for prices of that individual's purchases—specific in-app purchases, not an abstract conglomerate of all in-app purchases available for a given app." (Dkt. No. 581-5, Prince's Reply Report, ¶ 49.)

In Professor Prince's reply report, he attempts to calculate the but-for pricing of each individual in-app purchase. In doing so, he takes what Professor McFadden calculates as the overage/change, which was calculated at the app level, and then subtracts that number from the individual item's as-is price. (*Id*. at ¶¶ 47–49.) Professor Prince then calls that number the but-for price.[9]

Ultimately the issue here is negative damages, not but-for pricing. The parties do not dispute that Professor McFadden's model generates negative damages for some transactions. Nor do they dispute that applying the percentage method instead of the fixed-dollar method to the calculation of individual damages eliminates the negative damages issue.

Thus, the Court **DENIES** the motion to the extent Apple argues that the model generates negative but-for pricing.

### iii.    Focal Pricing and Pricing Tiers – Motion Granted

Professor McFadden's pricing model ignores Apple's focal-point pricing and pricing tiers in calibrating but-for pricing. Under Consumer Plaintiffs' theory of the case, such pricing tiers policies are anticompetitive in a world of increased competition and would not exist. (McFadden's Opening Report, ¶ 162.) However, Professor McFadden's opinion lacks foundation and ignores overwhelming evidence to the contrary.

First, with respect to focal-point pricing, overwhelming evidence suggests that developers would choose to price their apps at focal points ending in 99 cents. (Prince's Opening Report, ¶

---

[9] Professor Prince calls the calculated number the but-for price but calculates the number using Professor McFadden's change/overage number, which already includes McFadden's calculated but-for price.

United States District Court
Northern District of California

United States District Court
Northern District of California

58.)  Apple cites to evidence amongst app stores, including many of the same stores included in Professor McFadden's benchmark analysis, in support of his opinions. (Dkt. No. 476-8, Richard Schmalensee's Opening Report, ¶ 211.)  For instance, though Google Play does not impose 99 cent pricing for its store, of its top 100 paid apps, 83 have prices ending in 99 cents. (*Id.*)  Likewise, for Steam, Amazon App Store, and the Microsoft Store, at least the top 75 apps for those stores have prices ending in .99, even though none of these stores impose the .99-tiered pricing. (*Id.*)

In fact, during his second deposition, Professor McFadden testified that "focal point pricing is common" and that he would expect to see it in a but-for world. (McFadden's Nov. Depo., 152:1–13.) Yet, again, the proffered model fails to incorporate such pricing.  Having failed to use or address the issue, the model does not provide a reliable method for determining but-for pricing in the presence of focal pricing.  *See In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2018 WL 1156797, at *3–5 (N.D. Cal. Mar. 5, 2018).

Second, with respect to pricing tiers, the issue is similar.  Professor McFadden cites to no evidence, or any other subject matter expert, to justify his opinion that pricing tiers would not exist absent anticompetitive conduct.  Without foundation, the opinion cannot stand.

Thus, the motion is **GRANTED** on this ground.

### iv.     Sample Size and Robustness – Granted in Part, Denied in Part

Apple next challenges the "robustness" of the model on several grounds:  One, the sample size is too small. Two, the model allows for accounts to easily flip from harmed to unharmed. Three, it estimates a wide variation of the percentage of unharmed accounts depending on the sample size used.  The Court addresses each argument.

Apple argues vociferously that Professor McFadden's use of a 0.1% sample size is insufficient.  Professor McFadden provides evidence that such sample size is widely accepted in economics, as well as surveys conducted by the government.  (*See* McFadden Reply Report, ¶ 171; s*ee also* U.S. Bureau of Labor Statistics, "Consumer Expenditure Surveys," August 30, 2016, available at, https://www.bls.gov/cex/csxovr.htm, last accessed March 8, 2022) (explaining that

12

survey covered 7,000 sample households which was approximately 0.005 percent of the households in the United States).  Further, Apple's expert, Itamar Simonson, appears to rely on a smaller sample size of consumers when conducting the consumer surveys included with his report. (*See* Dkt. No. 476-9, Simonson's Opening Report, ¶¶ 16, 30) (explaining that he relied on 3,600 participants from a nationwide group of individuals 16 and over). Given Professor McFadden has identified sufficient foundation for his opinion, the issue is one of weight not admissibility. Apple's argument in this regard fails.

As to Apple's other arguments, Professor McFadden does not dispute that his model allows for Apple IDs to switch between harmed and unharmed and can increase the percentage of unharmed accounts depending on the sample used. (McFadden's Nov. Depo., 205:24–206:8) ("the identity or the number of unharmed is determined at a [margin]" and are not "necessarily tightly determined" under the sample size his model used).  Professor McFadden attributes these changes to differences in samples, noting that they are changes you would expect to see in any statistical model that does not have a 100% confidence level. [10] Given that the model requires adjustment, the motion is **GRANTED** on this ground without prejudice to the Consumer Plaintiffs to address the topic in the next round.

**v.    Free Apps – Motion Denied**

Apple challenges Professor McFadden's assumption to exclude free apps that have no IAPs in his demand estimates as ignoring market realities.  Specifically, Apple argues that had Professor McFadden considered the effect of Apple's policies on free apps with no IAP in the but-for world, he would have discovered that some free app developers would have increased their prices in the but-for world due to the decrease in commission rates.  Professor McFadden explains that he did not include those apps because they are not subject to the App Store commission rate. (*See* McFadden's Opening Report, ¶ 184.)  Consumers who only downloaded such apps are not part of Professor McFadden's quantification of common impact.  Nor are they included in the proposed class definition. (*See* Dkt. No. 441, Motion for Class Certification, "Mot.", at 2).  Thus,

[10] The parties disagree about the model's confidence level. This should be clarified on the next round. McFadden's Nov. Depo., 202:10–207:14.

13

United States District Court
Northern District of California

**ER-688**

Professor McFadden's exclusion of free apps with no IAP is consistent with Consumer Plaintiffs' theory of the case.

Accordingly, the motion is **DENIED** on this ground.

### c. Step Three: Identification of Unharmed Class Members

Professor McFadden proposes a third step to his model which is meant to identify harmed class members from unharmed class members. Professor McFadden suggests that harmed class members can be identified through a claims administration process, using claim submission forms, Apple IDs, and Apple's internal records. (McFadden's Reply Report, ¶¶ 10–12.) Apple challenges the overall process, arguing that the process is outside of Professor McFadden's expertise and based on insufficient data.

The Court finds Professor McFadden's proposed method for identifying unharmed class members reasonably objective. It is not uncommon for class members to be identified using such means in class actions. With respect to Apple's argument that insufficient data exists to make this proposed step reliable, the Court is not convinced. In Mark Rollins' declaration, he admits that each Apple ID is linked to a specific "first and last name, email address, birthdate, and telephone number" that Apple maintains. (Dkt. No. 476-12, Declaration of Mark Rollins, ¶ 2.)

Thus, the motion is **DENIED** on this ground. That said, issues remain with respect to the timing of step three as discussed below. (*See infra* Section III.C.1.)

In summary, the Court finds that Professor McFadden's current model is unreliable for determining class wide impact or damages. Until these errors are resolved, and the new opinions established, the Court is not willing to merely rubberstamp some future set of opinions.

Accordingly, the current version of the model is excluded under the *Daubert* standard.

### III. CLASS CERTIFICATION

Consumer Plaintiffs move for class certification under Rules 23(a) and 23(b)(3) based on Apple's alleged anticompetitive conduct with respect to Apple's operation of the App Store. The exclusion of Professor McFadden's model is fatal to Consumer Plaintiffs' current motion for class certification. As discussed in more detail below, without the methodology, Consumer Plaintiffs are unable to meet the requirements of Rule 23(b)(3).

14

**ER-689**

### A.    Legal Standard

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) "Before certifying a class, the trial court must conduct a rigorous analysis to determine whether the party seeking certification has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks omitted).  The rigorous analysis that a court must conduct requires "judging the persuasiveness of the evidence presented" for and against certification and "resolv[ing] any factual disputes necessary to determine whether" the requirements of Rule 23 have been satisfied.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982–83 (9th Cir. 2011).  A "district court must consider the merits if they overlap with the Rule 23(a) requirements." *Id.* (citations omitted).

The party moving for certification first must show that the four requirements of Rule 23(a) are met.  Specifically, Rule 23(a) requires a showing that: (1) the class is so numerous that joinder of all members is impracticable; (2) common questions of law or fact as to the class exist; (3) the claims or defenses of the representative parties are typical of those of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).  The moving party must then show that the class can be certified based on at least one of the grounds in Rule 23(b).  *See* Fed. R. Civ. P. 23(b).  Relevant here, certification under Rule (b)(3) is appropriate only if "the questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### B.    Rule 23(a)

#### 1.    Numerosity

The numerosity element requires that the class be so numerous that joinder of all members individually would be impracticable.  Fed. R. Civ. P. 23(a)(1). Consumer Plaintiffs aver that this requirement is easily satisfied because millions of Apple customers bought iOS apps or paid for IAP throughout the United States.  Apple does not dispute this estimate.  Accordingly, the Court

15

concludes that Consumer Plaintiffs have satisfied the numerosity requirement.

### 2. Commonality

Commonality requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy this requirement, the common question must be of "such nature that it is capable of class-wide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011) "[F]or purposes of Rule 23(a)(2)[,] even a single common question will do." *Id.* at 359 (internal quotations and brackets omitted). The requirements of Rule 23(a)(2) have "been construed permissively," and '[a]ll questions of fact and law need not be common to satisfy the rule." *Ellis*, 657 F.3d at 981 (quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 350). A district court must analyze the persuasiveness of the evidence submitted to establish the commonality requirement and may not simply conclude that the commonality requirement is met on the basis that the plaintiff's evidence in support of that requirement is admissible. *See Grodzitsky*, 957 F.3d at 986 (holding that "[a] district court errs when it 'limit[s] its analysis of whether there was commonality to a determination of whether Plaintiffs' evidence on that point was admissible" and that a "district court must engage in a 'rigorous analysis' of commonality, rather than 'merely conclud[ing] that, because . . . evidence was admissible, a finding of commonality was appropriate' ") (quoting *Ellis*, 657 F.3d at 984).

Here, Consumer Plaintiffs argue that the commonality requirement is met because at least five common questions can be resolved with common proof, namely: (1) whether a relevant market exists; (2) Apple's power within that market; (3) questions regarding the willfulness of Apple's behavior; (4) questions about antitrust injury; and (5) whether Apple has violated Section 2 the Sherman Act, 15 U.S.C. § 2, by monopolizing the aftermarket for iOS apps and IAP. (*See* Mot. at 13.) Consumer Plaintiffs submit that the following constitutes common evidence capable of answering the common questions identified above:

First, with respect to the question of whether a relevant market exists, Consumer Plaintiffs proffer Professor McFadden's opinion on that issue. Professor McFadden opines that the relevant

16

**ER-691**

United States District Court
Northern District of California

market here is the single aftermarket of the sale of iOS apps and in-app content. (McFadden's Opening Report, ¶¶ 43–45.) The foremarket consists of "OS installed mobile devices such as iOS mobile devices or Android devices. (*Id.* at ¶ 44.) Professor McFadden further opines that consumers choose apps based on their needs and not on whether the app supports in app purchases. Professor McFadden points to the way in which Apple chooses to categorize its apps on the App Store, including the bundling of both paid download apps and free download IAP apps in the same category, to support his opinion of a single aftermarket. Professor McFadden also examines potential aftermarket substitutes, including web apps, jail broken apps, enterprise apps, and whether apps that are compatible with non-iOS devices are suitable substitutes. (*See* McFadden's Opening Report, Section III.) He opines that such alternatives are not reasonable substitutes.

While Apple heavily criticizes Professor McFadden's definition of the relevant market, given the various other common questions and common proof that Consumer Plaintiffs proffer, the Court need not decide the merits of the proffered market definition to determine whether the requirements of Rule 23 are met. *See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466, 133 S. Ct. 1184, 185 L. Ed. 2d 308 (2013). For purposes of class certification, the Court finds that Professor McFadden's opinion on market definition constitutes common proof that could resolve whether a relevant market exists.

Next, with respect to Apple's power in the relevant market, Consumer Plaintiffs proffer Professor McFadden's opinion that Apple's share in the relevant market is nearly 100 percent and therefore monopoly power exists. (McFadden's Opening Report, ¶ 108.) He opines that common evidence exists as to Apple's power. Even though he is not an expert in the field, nor does he rely on an industry expert, Professor McFadden points to evidence of high switching costs as common evidence to show the source of Apple's power. (*Id*. at ¶¶ 99–107.) He also points to Apple's iPhone Developer Program License Agreement and profit margin as evidence of Apple's power in the market. Admissible evidence on these topics is sufficient common proof that could resolve the question of Apple's power within the relevant market.

17

United States District Court
Northern District of California

Third, with respect to whether Apple willfully acquired and maintained its monopoly power in the distribution of iOS apps and IAP aftermarket, Consumer Plaintiffs aver that common evidence exists to show that Apple intended to design a closed platform that prevented consumers from installing and running apps that were not downloaded from the App Store. Consumer Plaintiffs point to evidence that Apple prohibits developers from informing consumers of alternative ways to download their apps outside of the App Store.  This is sufficient common proof that can resolve the question of Apple's willfulness.

Fourth, with respect to the issue of common impact, Consumer Plaintiffs proffer Professor McFadden's three-step methodology. Given the Court's exclusion of the methodology as unreliable in the Court's *Daubert* analysis, *see supra* Section II.B.3, the Court finds the evidence insufficient, at this juncture, as common proof of antitrust injury.

Finally, with respect to questions regarding the anticompetitiveness of Apple's conduct, Consumer Plaintiffs offer Professor McFadden's opinions about behaviors that would be absent in a competitive world as compared to Apple's alleged conduct.  He acknowledges that much of the common proof of anticompetitive conduct will be factual and opines that Apple's practice of restricting how iOS consumers download and install apps and make in-app purchases are anticompetitive.  He points to Apple's Developer Agreement, the recent *Epic v. Apple* trial, the European Commission's 2020 investigation into Apple's App Store rules, and the UK's Competition and Markets Authority's 2021 investigation into Apple's alleged anticompetitive conduct as common proof of Apple's anticompetitive conduct.   (*Id*. at *¶¶* 123–127.) Professor McFadden also points to Apple's pricing tiers as anticompetitive conduct.  (*Id.* at *¶* 128.) The Court finds that admissible evidence of these topics would be sufficient common proof that can resolve the question of whether Apple's conduct violates antitrust laws.

In light of the above, the Court finds that four out of the proffered five common questions exist in this action as to satisfy the commonality requirement.

### 3.    Typicality and Adequacy

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*,

18

**ER-693**

617 F.3d 1168, 1175 (9th Cir. 2010).  "The typicality requirement looks to whether the claims of the class representatives [are] typical of those of the class, and [is] satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (citation omitted).  "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal citation and quotation marks omitted).  Typicality may be lacking "if 'there is a danger that absent class members will suffer [because] their representative is preoccupied with defenses unique to it.'"  *Id.* (citation omitted).

The requirement of adequate representation requires a showing that the representative parties "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This requires inquiry into whether the plaintiff and its counsel have any conflicts of interest with other class members, and whether the plaintiff and its counsel will prosecute the action vigorously on behalf of the class.  *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

Consumer Plaintiffs argue that this requirement is satisfied because:

> Plaintiffs allege the same antitrust claims as all other members of the Class. Each plaintiff (and Class member) purchased an iOS Device and then bought an app from Apple or paid for IAP through the App Store during the Class Period, and each was injured by paying the supra-competitive prices for the apps and IAP.

(Mot. at 14.)  Apple disagrees, asserting that the claims and experiences of Consumer Plaintiffs are not typical of the class because they have differing views on security and privacy.  Consumer Plaintiffs argue that their differing views do not make it such that typicality and adequacy is destroyed.  The Court agrees.

While plaintiff Stephen Schwartz prefers the ability to download third party apps from other sources without Apple's intervention, and 73.8% of surveyed consumers consider malware protection a must-have feature, the difference in preferences is not enough to defeat typicality. (*See* Dkt. No. 477–14, Excerpts from Stephen Schwartz's Deposition, 141:3–18; Simonson's Opening Report, ¶ 57.) Nor is plaintiff Edward Lawrence's belief that nothing is truly private, while 87.2% of consumers consider privacy features a must-have. (Dkt. No. 477-16, Excerpts

19

**ER-694**

from Edward Lawrence's Deposition, 183:17–184:4.)

While there are some differences, similarities amongst Consumer Plaintiffs and the class members do exist. Indeed, plaintiffs Robert Pepper and Edward Hayter share, and value privacy, as do the consumers cited in the surveys. (*See* Dkt. No. 477-15, Excerpts from Robert Pepper's Deposition, 146:16–20, 146:21–147:12; Dkt. No. 477-13, Excerpts from Edward Hayter's Deposition, 159:7–10.) Nothing about the Consumer Plaintiffs' expressed preferences and views concerns the Court as it relates to their typicality and adequacy.

Moreover, the Court finds that Consumer Plaintiffs' claims and defenses are typical of the class members. Consumer Plaintiffs allege that their experience is substantially similar to the members of this proposed class, as they have all purchased an iOS Device and used it to buy either an app directly from the App Store or paid for IAP through the App Store. (TAC ¶¶ 21–24.) In doing so, Consumer Plaintiffs suffered harm similar to the class members.

Accordingly, the Court finds that Consumer Plaintiffs satisfy the adequacy and typicality requirements.[11]

In sum, plaintiffs satisfy all of the requirements under Rule 23(a). The Court next addresses the Rule 23(b)(3) requirements.

### C.    Rule 23(b)(3)

Next, the Court examines whether Rule 23(b)(3) is satisfied. Under Rule 23(b)(3), a plaintiff must show that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

#### 1.    Predominance

Rule 23(b)(3) requires the Court to determine whether "questions of law or fact common to

---

[11] Apple does not dispute the adequacy of Wolf Haldenstein and Kellogg Hansen to serve as co-class counsel for the proposed class. Because the Court has no concerns regarding the adequacy of counsel, it finds the adequacy-of-representation requirement satisfied with respect to them.

20

United States District Court
Northern District of California

United States District Court
Northern District of California

class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453, 136 S. Ct. 1036, 194 L. Ed. 2d 124 (2016) (citation omitted). The "predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (quoting 2 W. Rubenstein, 2 Newberg on Class Actions § 4:49 (5th ed.)). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.' " *Id.* (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778 (3d ed.)).

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 131 S. Ct. 2179, 2184, 180 L. Ed. 2d 24 (2011) (citation omitted). Here, Consumer Plaintiffs bring two claims under the Sherman Act against Apple: Section 2 monopolization and attempted monopolization of an aftermarket. To prevail on the monopolization claim at trial, Consumer Plaintiffs will have to prove the following elements: (1) the possession of monopoly power in the relevant market; (2) the willful acquisition or maintenance of that power; (3) antitrust injury; and (4) anticompetitive conduct. *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020). As for their attempted monopolization claim, they will need to prove: (1) that Apple has engaged in predatory or anticompetitive conduct; (2) with a specific intent to monopolize; and (3) a dangerous probability of achieving monopoly power. *Coal. For ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 506 (9th Cir. 2010). However, at the class certification stage, Consumer Plaintiffs' burden is different. They must only show that the elements of their claims are capable of proof at trial

21

through evidence that is common to the class rather than to its individual members. *Tyson Foods, Inc.*, 577 U.S. at 453.

Here, Consumer Plaintiffs argue that the predominance requirement is satisfied with respect to both of their claims, specifically with respect to: (a) the relevant market; (b) Apple's market power in the relevant market; (c) Apple's willful acquisition and maintenance of monopoly of power; (d) Apple's anticompetitive conduct; (e) class wide antitrust injury; and (f) estimation of damages.

Apple asserts that Consumer Plaintiffs have failed to show that antitrust injury can be proven on a class wide basis and therefore failed to satisfy the predominance requirement. While not expressly discussed in Apple's opposition to class certification briefing, the Court also addresses Consumer Plaintiffs' argument that damages can be proved by a common method.

### a.     Class Wide Impact

In order to prove class wide impact, Consumer Plaintiffs must "establish, predominantly with generalized evidence, that all (or nearly all) members of the class suffered damage as a result of defendants' alleged anti-competitive conduct." *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 567 (N.D. Cal. 2013) (internal quotation marks omitted) (modifications in original). Proof of such antitrust impact can be "made on a common basis so long as the common proof adequately demonstrates some damage to each individual." *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 454 (3d Cir. 1977). Some courts have stated that a court's inquiry on class certification should be limited to whether plaintiffs merely "intend" to present "generalized" evidence of antitrust impact. *See, e.g, In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486 PJH, 2006 WL 1530166, at *9 (N.D. Cal. June 5, 2006). However, in *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008), the court explained that even under a plausible methodology standard, "certification [should not be] automatic every time counsel dazzle the courtroom with graphs and tables." *Id.* at 491. "[C]onducting a thorough review of Plaintiffs' theory and methodology is consistent with the requirement that the Court conduct a 'rigorous analysis' to ensure that the predominance requirement is met." *In re High-Tech Employee Antitrust Litigation*, 289 F.R.D. at 567 (citing *Comcast Corp.*, 133 S. Ct. at 1431).

22

**ER-697**

No one disputes that in the antitrust class action context, to satisfy the predominance requirement, proof of "antitrust impact and damages . . . on a class wide basis" must exist. *See In re Lithium, Ion Batteries Antitrust Litigation*, Case No. 13-MD-2420-YGR, 2018 WL 1156797, at *3. Class certification is precluded where plaintiffs have not shown that the antitrust injury element can be proven for all class members with common evidence. *See Ward v. Apple Inc.*, No. 12-CV-05404-YGR, 2018 WL 934544, at *3 (N.D. Cal. Feb. 16, 2018), *aff'd,* 784 F. App'x 539 (9th Cir. 2019). If injury cannot be proven on a class wide basis, an individualized analysis is required, and such analysis will defeat predominance. *Mazza*, 666 F.3d at 595–96; *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 20 (1st Cir. 2008).

Consumer Plaintiffs proffer, and Apple challenges, McFadden's three-step methodology as a viable method for demonstrating class wide injury based on common proof. As explained in the *Daubert* section of this order, the first step of Professor McFadden's method requires determining the but-for commission rate using a benchmark analysis. (McFadden's Opening Report, ¶ 136.) Once the but-for commission rate is determined, the next step is quantifying impact, comparing app prices in the as-is and but-for worlds. This is where the calculation of overcharges happens. (*Id.* at ¶ 137.) Once the overage is calculated, the last step includes determining which class members are harmed or unharmed. (McFadden's Reply Report, ¶ 11.)

The Court incorporates herein, but does not repeat, its analysis from the *Daubert* motions. Rather, it focuses on issues specific to the predominance element. When considering if predominance has been met, a key factual determination courts must make is whether the plaintiffs' statistical evidence sweeps in uninjured class members. If a substantial number of class members "in fact suffered no injury," the need to identify those individuals will predominate. *See Mazza*, 666 F.3d at 595–96.

As demonstrated above, Professor McFadden ultimately conceded that his model includes an estimated 14.6% of uninjured accounts. (McFadden's Reply Report, ¶¶ 202, 208, n. 371, Fig.8.) In the context of this case, 14.6 percent is approximately 30 million accounts. (*See* Prince's Report, ¶ 8.)

Consumer Plaintiffs rely on *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136 (9th

23

**ER-698**

United States District Court
Northern District of California

Cir. 2016) to argue that the number of anticipated uninjured class members does not defeat predominance. In *Torres*, a class of workers sued their employer for violation of state and federal law because of a common policy of "failing to inform domestic farm workers of the availability of H-2A work that paid $12 per hour." *Id.* at 1130. The *Torres* plaintiffs moved to certify a Rule 23(b)(3) class of workers who were not informed of the H-2A work. *Id.* at 1131–32. In opposition to the motion, defendant argued that the proposed class included uninjured workers, thus destroying predominance.  Defendant argued that although none of the workers received the required notice as required by law, the presence of some workers who were not looking for jobs at the time, and thus would not have benefitted had they received notice, were uninjured.  Defendant argued that predominance did not exist because of the uninjured workers. Notably, the class at issue only contained approximately 600 people. *Id.* at 1132.

The Ninth Circuit rejected the defendant's argument, noting that the "fortuitous non-injury to a subset of class members does not necessarily defeat certification of the entire class, particularly as the district court is well situated to winnow out those non-injured members at the damages phase of the litigation, or to refine the class definition." *Id.* at 1137.

Apple relies on a handful of cases for the opposite proposition. (*See* Dkt. No. 480-3, Apple's Opposition to Motion for Class Certification, at 19-20.) Specifically, Apple cites to three circuit decisions:  the D.C. Circuit's decision in *In re Rail Freight Fuel Surcharge Antitrust Litig. - MDL No. 1869*, 934 F.3d 619, 625 (D.C. Cir. 2019) (holding 5-6 percent was the outer limit of non-injured class members); the First Circuit's decision in *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53–54 (1st Cir. 2018) (finding 10% of non-injured class members defeated predominance); and the Eighth Circuit's decision in *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 616 (8th Cir. 2011) (explaining the general proposition that a class action cannot contain class members who have not suffered injury).  The Ninth Circuit has not squarely addressed the issue of whether a particular percentage of uninjured class members defeats predominance.

On the one hand, like the plaintiffs in *Torres*, and given Consumer Plaintiffs' theory of the case, all unharmed class members were exposed to Apple's alleged anticompetitive policies and conduct by way of using the App Store. While some class members may not have been harmed by

24

United States District Court
Northern District of California

the increase in app or in-app content prices, "because [Apple] had exposed every class member to unlawful conduct," (*id.* at 1136), one might consider the lack of injury as to some, "fortuitous." On the other hand, whether *Torres* was intended to be stretched from its impact on a few hundred people to 30 million accounts is far from certain. Moreover, three circuits have taken a position on the topic, and none have sanctioned a proposed class which included 14.6 percent, much less of unharmed "accounts." Rather, the other circuits all require a smaller showing of non-injury and speak in terms of actual people.

Nonetheless, given the Court's ruling on the *Daubert* motions, Consumer Plaintiffs cannot meet their predominance burden because they rely on an unsound methodology, which cannot reliably demonstrate which members, and how many, were injured, as common proof of class wide impact. *See Grodzitsky*, 957 F.3d at 986 (no class certification because plaintiffs offered inadmissible expert opinion of alleged class wide defect).

Accordingly, the Court finds that at this juncture individual issues will predominate with respect to injury.

### b.    Class Wide Damages

In addition to class wide injury, Consumer Plaintiffs must also prove that damages are measurable. *Comcast Corp.*, 569 U.S. at 35. At the class certification stage, plaintiffs may rely on aggregate damage estimates, but must also establish that "there is a method, common across the class, for arriving at individual damages" to survive the predominance inquiry. *See* William R. Rubenstein, Newberg on Class Actions, Antitrust Class Actions, Section 20:62 (Damages at class certification). In relying on aggregate damages, antitrust plaintiffs may not need to establish the amount of damages with the degree of certainty required in other areas of the law but aggregate damages cannot be speculative. *See, e.g.*, *New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 88–89 (2d Cir. 2000) (noting that the plaintiff's "burden of proving antitrust damages is not as rigorous as in other types of cases"); *See* William R. Rubenstein, Newberg on Class Actions, Antitrust Class Actions, Section 20:60 (Damages in antitrust cases); *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370 (7th Cir. 1986) (explaining that speculation has its place in estimating damages but rejected damages model that was based on pure speculation and which

25

ignore economic reality).

Here, Consumer Plaintiffs proffer Professor McFadden's methodology as common proof of calculating individual damages. In addition to the issues addressed in the *Daubert* section of this order, there are several issues with the damages model. First, while step three of McFadden's methodology offers a process for identifying and excluding uninjured class members, it does not attempt to do so until *after judgment* is rendered. More specifically, Consumer Plaintiffs have indicated that they did not intend to actually *run* the model until *after* trial. Instead, their plan is to argue to the jury, that damages range between $7 billion and $10 billion, then run the model afterwards to determine the distribution amounts. (Hearing Transcript (November 16, 2021) 74:2–22). Given the three-billion-dollar range and the concession that the model includes 14.6% of accounts with no harm, the current model produces results which are too speculative.

Second, assuming the model's deficiencies are resolved, the notion that Consumer Plaintiffs could proceed to trial without running the model in advance of trial is, at best, novel. Consumer Plaintiffs do not adequately explain their rationale. The proffered model appears rational where the class has entered into a settlement and a mechanism is needed to distribute an agreed-upon amount based on the net damage to each individual customer, but Consumer Plaintiffs are not representing a settlement class. The Court agrees that the model need not be run for class certification purposes, but trial evidence is evaluated differently.

Accordingly, the Court finds that Consumer Plaintiffs have failed to establish that Professor McFadden's current damages model is a reliable means of assessing class-wide damages. Thus, without a common approach to measuring damages, individual damages calculations would predominate.

The Court notes that given the complexities and nuances of the damages issue in this case, class certification as to liability only under Fed. R. Civ. P. 23(c)(4) may be warranted. *See Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("[e]ven if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular

26

issues."); William R. Rubenstein, Newberg on Class Actions, Section 12:4.  Thus, if liability is established, it is possible that damages could be resolved expeditiously.

## IV.    CONCLUSION

For the foregoing reasons, plaintiffs' motion for class certification is **DENIED WITHOUT PREJUDICE**. The Court sets a case management conference for April 11, 2022 at 2:00 p.m.  Parties shall meet and confer on a schedule for the balance of the action and file a statement with respect to scheduling no later than April 4, 2022.  If sufficient, the Court will issue a scheduling order without a conference unless requested.

This Order terminates Docket Nos. 441, 479, 486, 578, and 604.

**IT IS SO ORDERED.**

Dated: March 29, 2022

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

United States District Court
Northern District of California

27

**ER-702**