**No. 25-7930**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

IN RE APPLE IPHONE ANTITRUST LITIGATION

On Appeal from the United States District Court
for the Northern District of California
Case No. 4:11-cv-6714-YGR, Hon. Yvonne Gonzalez Rogers

## EXCERPTS OF RECORD OF PLAINTIFFS-APPELLANTS
## VOLUME 6 of 13 (6-ER-996–1132)

Betsy C. Manifold
Rachele R. Byrd
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
750 B Street, Suite 1820
San Diego, CA 92101
Tel.: (619) 239-4599

Mark C. Rifkin
Matthew M. Guiney
Thomas H. Burt
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
Tel.: (212) 545-4600

David C. Frederick
Aaron M. Panner
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite
400 Washington, D.C. 20036
Tel.: (202) 326-7900

*Counsel for Plaintiffs-Appellants*

May 13, 2026

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**



DEC 18 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

In Re: APPLE IPHONE ANTITRUST
LITIGATION.

_____

ROBERT PEPPER; et al.,

      Plaintiffs – Petitioners,

  v.

APPLE INC.,

      Defendant - Respondent.

No. 25-7122

D.C. No.
4:11-cv-6714
Northern District of California,
San Francisco

ORDER

Before: HURWITZ and BRESS, Circuit Judges.

The motion (Docket Entry No. 15) for leave to file a reply in support of the petition is granted.

The petition for permission to appeal is granted. *See* Fed. R. Civ. P. 23(f); *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959-60 (9th Cir. 2005) (describing factors this court considers in analyzing a Rule 23(f) petition). Within 14 days, petitioners must comply with Federal Rule of Appellate Procedure 5(d)(1).

The unopposed motion (Docket Entry No. 4) to file under seal Addendum Volume II is granted. The clerk will file publicly the motion to seal (Docket Entry No. 4.1). The clerk will maintain Addendum Volume II under seal at Docket Entry No. 1.2.

**ER-997**

No. 25-7122

———————————

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

———————————

## IN RE APPLE IPHONE ANTITRUST LITIGATION

———————————

On Petition for Permission to Appeal from the
U.S. District Court for the Northern District of California
Case No. 4:11-cv-6714 | Hon. Yvonne Gonzalez Rogers

———————————

## APPLE INC.'S ANSWER TO PETITION FOR PERMISSION TO APPEAL UNDER RULE 23(f)

———————————

Cynthia E. Richman
Harry R. S. Phillips
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
(202) 955-8500

Caeli A. Higney
Julian W. Kleinbrodt
Eli M. Lazarus
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center
Suite 2600
San Francisco, CA 94111
(415) 393-8200

Theodore J. Boutrous Jr.
Daniel G. Swanson
Blaine H. Evanson
Bradley J. Hamburger
Matt Aidan Getz
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

*Counsel for Respondent Apple Inc.*

**ER-998**

# CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1, defendant-respondent Apple Inc., a publicly traded company (NYSE: AAPL), states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Dated:  November 21, 2025          Respectfully submitted,

<u>/s/ Theodore J. Boutrous Jr.</u>
   Theodore J. Boutrous Jr.

*Counsel for Respondent*
*Apple Inc.*

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................... 1

BACKGROUND ............................................................................. 4

STANDARD OF REVIEW .............................................................. 17

REASONS FOR DENYING REVIEW ............................................. 17

    I.    The District Court's Diligent Analysis Under *Olean* Does Not Warrant Rule 23(f) Review. .......................... 18

    II.   The District Court Did Not Impose Any Ascertainability Requirement. ...................................... 25

    III.  Plaintiffs Have Not Demonstrated Any Genuine Death-Knell Situation. ................................................ 29

CONCLUSION ............................................................................. 31

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Acadia Healthcare Co., Inc.*,
   2023 WL 3620955 (6th Cir. May 23, 2023)................................. 30

*Apple Inc. v. Pepper*,
   587 U.S. 273 (2019).....................................................................5, 6

*Blair v. Equifax Check Servs., Inc.*,
   181 F.3d 832 (7th Cir. 1999)....................................................30, 31

*Briseno v. ConAgra Foods, Inc.*,
   844 F.3d 1121 (9th Cir. 2017)....................................3, 25, 26, 27

*Chamberlan v. Ford Motor Co.*,
   402 F.3d 952 (9th Cir. 2005)..............................17, 18, 29, 30, 31

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)............................................2, 3, 7, 13, 17, 31

*In re Delta Air Lines*,
   310 F.3d 953 (6th Cir. 2002)....................................................30, 31

*Epic Games, Inc. v. Apple Inc.*,
   67 F.4th 946 (9th Cir. 2023) ....................................................4, 5

*In re Lamictal Direct Purchaser Antitrust Litig.*,
   957 F.3d 184 (3d Cir. 2020) ...................................................... 23

*Marlo v. UPS, Inc.*,
   639 F.3d 942 (9th Cir. 2011)...................................................... 19

*Momox-Caselis v. Donohue*,
   987 F.3d 835 (9th Cir. 2021)...................................................... 20

*Olean Wholesale Grocery Coop., Inc. v.*
   *Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) .................. 1, 2, 3, 5, 9, 15, 18, 19, 22
   ......................................................................23, 24, 26, 27, 29

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999)..................................................................... 27

# TABLE OF AUTHORITIES
*(Continued)*

Page(s)

*Prado-Steiman ex rel. Prado v. Bush*,
  221 F.3d 1266 (11th Cir. 2000)................................................29, 30

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  934 F.3d 619 (D.C. Cir. 2019) ...................................................... 23

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021).................................................................... 18

*Van v. LLR, Inc.*,
  61 F.4th 1053 (9th Cir. 2023) ...................................................... 24

*Walker v. Life Ins. Co. of the Southwest*,
  953 F.3d 624 (9th Cir. 2020)........................................................ 26

**Constitutional Provisions**

U.S. Const. art. III......................................................................15, 18

U.S. Const. amend. VII.................................................................. 27

**Rules**

Fed. R. Civ. P. 23(b)(3) .........................................................3, 5, 27

Fed. R. Civ. P. 23(f)................................ 1, 2, 3, 10, 17, 18, 20, 24, 29

ER-1002

## INTRODUCTION

Plaintiffs' Rule 23(f) petition presents no unresolved question of class-action law. The decertification order instead rests on the district court's case-specific application of the framework established in *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (en banc). The court gave Plaintiffs every chance to satisfy their burden to "establish that" the "'essential elements of the [antitrust] cause of action,'" including antitrust injury, "are capable of being established through a common body of evidence, applicable to the whole class." *Id.* at 666. But Plaintiffs were consistently unable to do so, and after the court excluded the unreliable expert testimony on which their latest efforts rested, there was no more glue to bind together Plaintiffs' class. Nothing about the court's discretionary, fact-intensive analysis supports interlocutory review—particularly now, on the eve of a trial.

Plaintiffs retained Mr. Darryl Thompson to address a fundamental liability issue: parsing the class to separate injured class members from the millions of uninjured. Plaintiffs repeatedly conceded that if Thompson's testimony were excluded, the class would

1
ER-1003

have to be decertified. And that is what happened. Given his lack of relevant credentials, his unscientific approach, and the staggering flaws in his work, the court excluded Thompson's testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and decertified the class as a result. Yet now, in seeking Rule 23(f) review, Plaintiffs say nothing about their repeated concessions (and resulting waiver) and scarcely challenge the district court's discretionary evidentiary ruling.

Plaintiffs' silence is telling. When this case last came to this Court, Plaintiffs argued that "the district court's fact-intensive application of the legal framework" established in *Olean* presented a "narrow, case-specific" issue not "'worthy of immediate appeal.'" Answer at 12-13, No. 24-875, ECF 12.1 (Mar. 5, 2024). What Plaintiffs said then is certainly true of their petition now. A court's application of established precedent to specific facts does not warrant Rule 23(f) review—especially where, as here, the decision largely turns on narrow questions of admissibility under *Daubert*.

2

Instead of focusing on the *Daubert* analysis that drove the result below, Plaintiffs conjure three reasons for review that grasp at Rule 23(f)'s standards. None is convincing.

First, Plaintiffs fail to demonstrate any error, much less manifest error, in the district court's analysis under *Olean*. That's because the court here did *precisely* what *Olean* requires: it rigorously analyzed whether Plaintiffs' expert testimony was sufficiently reliable to prove antitrust injury on a classwide basis and, when it became clear that it was not, decertified the class.

Second, Plaintiffs are simply wrong in contending that the district court applied a freestanding ascertainability requirement in violation of *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017). The court affirmatively disclaimed any ascertainability rule and instead focused, as this Court's precedent instructs, on Rule 23(b)(3)'s predominance requirement. That analysis is uncontroversial—and miles away from justifying this Court's intervention.

Third, Plaintiffs fail to show any "death knell." They no doubt would prefer a class trial. But they do not seriously contend that they will be unable to proceed to final judgment. Nor could they:

3

unlike class-certification denials early in a case that leave individual plaintiffs facing a long, steep climb, here Plaintiffs are steps away from the end. Plus, even a death knell alone wouldn't be enough; this Court requires a substantial showing of error in addition, and Plaintiffs have not made any. This Court should deny the petition.

## BACKGROUND

**1.** Apple's App Store connects app developers with Apple device users. To maintain a secure and reliable user experience, Apple requires native apps for iPhone and iPad to be downloaded through the App Store. *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 989-90 (9th Cir. 2023). Most apps are free, but for others, developers set a download price or charge for in-app purchases. From the App Store's inception in 2008, Apple has charged developers a 30% commission, reduced to 15% in certain circumstances, on paid app downloads and in-app purchases of digital goods and services. *Id.* at 967-68.

Plaintiffs are iPhone and iPad users who claim that Apple engaged in unlawful monopolization by requiring app distribution through the App Store. Dkt. 229 ¶ 79. Plaintiffs claim these restraints allowed Apple to charge above-competitive commissions to

<div align="center">4</div>

<div align="center">**ER-1006**</div>

developers, who in turn passed those costs on to consumers through higher app and in-app purchase prices. *Id.* ¶ 47.

Plaintiffs' complaint was dismissed in 2013 but reinstated in 2019. *Apple Inc. v. Pepper*, 587 U.S. 273, 289 (2019). In 2021, the district court tried a case challenging the same conduct on behalf of an app developer and found for Apple on all antitrust claims. *Epic*, 67 F.4th at 969-72. This Court affirmed the district court's findings that Apple's App Store conduct is procompetitive because it helps "improve device security and user privacy," protects Apple's investment in intellectual property, and "increases . . . competition" between Apple and Android. *Id.* at 986-90, 998-99.

**2.** Plaintiffs initially sought certification of a Rule 23(b)(3) class covering "all persons" in the United States who paid for an app or in-app purchase of a digital good or service since the App Store launched. Dkt. 441 at 1. Plaintiffs sought only damages, and no classwide injunctive relief. Apple opposed certification, and the main dispute was over whether Plaintiffs could show the "essential element" of antitrust injury with classwide evidence. *Olean*, 31 F.4th at 666.

5

ER-1007

To do so, Plaintiffs relied on a model designed by economist Professor Daniel McFadden. Using data containing app and in-app purchase transactions by Apple ID accounts, McFadden's model attempted to predict the app and in-app purchase prices developers would have set had Apple charged a lower commission rate. McFadden used these "but-for" prices to estimate whether and by how much each Apple ID account had overpaid.

McFadden also outlined a process for "identification of unharmed class members" that would involve matching transactions associated with Apple ID accounts to the real people who made them. Dkt. 630 at 14; *see* Dkt. 643-36 ¶¶ 10-12. That step is critical. McFadden's model finds that many developers would have set the same or even *higher* app and in-app prices in the but-for world. Dkt. 1003-35 ¶ 79. That means, according to McFadden, some consumers have paid the same or even *less* for their apps and in-app content because of the App Store conduct that Plaintiffs challenge. Because those consumers are monetarily unharmed (or better off), they lack antitrust injury and cannot recover. *See Pepper*, 587 U.S. at 284.

6

This is no isolated phenomenon. Plaintiffs suggest now that "almost all" purchases would be cheaper in the but-for world. Pet. 5. But McFadden's model predicts that more than one-third of in-app purchase prices would *increase* but for Apple's conduct. Dkt. 1052-10 ¶ 200. This reality causes many millions of users to be uninjured. Dkt. 1031-4 at 26. So assessing whether any *particular class member* was injured requires analyzing every transaction that person paid for and netting out the cumulative effect of all that person's transactions to see if she came out better or worse than she would have in the but-for world. Dkt. 554-5 ¶¶ 10-11, 16; *see* Dkt. 1003-35 ¶ 79.

In 2022, the district court denied class certification without prejudice. For multiple reasons, the court found that McFadden's model was inadmissible under *Daubert*. Dkt. 630 at 5, 14. The court then observed that a "key factual" issue driving certification is whether evidence needed to separate injured from uninjured class members would predominate over common questions. Dkt. 630 at 23. Without McFadden's model, Plaintiffs could not show "which [class] members, and how many, were injured" and thus lacked

7

**ER-1009**

"common proof of classwide impact." *Id.* at 25. The court also expressed concern that McFadden estimated that 14.6% of class accounts (up to 30 million) were uninjured and had no way to link those accounts to "actual people." *Id.* It further ruled that Plaintiffs needed to "identify[] and exclud[e] uninjured class members" *before trial* by calculating "the net damage to each individual customer" across all transactions (Dkt. 630 at 26), rejecting Plaintiffs' proposal to address this "merits issue" in a post-trial claims-administration process (Dkt. 789 at 4-5).

**3.** Plaintiffs took their second bite at certification in 2022, claiming that tweaks to McFadden's model had addressed the court's concerns. Dkt. 666-1. Trying to reduce the apparent problem of uninjured class members, Plaintiffs truncated their class definition to exclude consumers who spent less than $10 from any account. *Id.* at 1, 15. But even after jettisoning millions of accounts, Plaintiffs' model still left about 10 million (7.9%) unharmed. Dkt. 786-1 ¶¶ 10-11. And Plaintiffs did not offer a methodology to identify real "persons" rather than merely "accounts." Dkt. 688-2 at 15, 24-25.

8

Plaintiffs insisted, however, that "matching Apple IDs to class members" would be a "mechanical step." Dkt. 708-1 at 6-7. They promised a "reliable methodology" that could match accounts to "specific class members" and "automatically" determine "not only which class members have been harmed in the aggregate but also by how much." Dkt. 736 at 74:13-17. Plaintiffs did not dispute that this step was required to maintain a class action. In fact, they said they were "happy" to do that matching "before trial." *Id.* at 93:10-25. And they represented that such matching would "eliminat[e]" the uninjured class members. *Id.* at 85:9-17.

The district court certified the class. The court noted that under this Court's decision in *Olean*, antitrust plaintiffs need evidence "at the class certification stage . . . 'capable of showing' that all class members suffered antitrust impact." Dkt. 789 at 26 (quoting *Olean*, 31 F.4th at 681). While expressing "concern[]" that so many accounts still showed as uninjured, the court accepted Plaintiffs' "representations" that they could later "match" transactions to "actual consumers" and "limit the percentage of unharmed class members."

9

ER-1011

*Id.* at 1, 26. But the court cautioned: if Plaintiffs "fail[ed] to do both," it would consider "decertification." *Id.* at 1.

This Court denied Apple's petition to appeal the class certification order under Rule 23(f). Order, No. 24-875, ECF 17 (May 24, 2024).

**4.** The parties then spent 17 months completing discovery and exchanging final expert reports.

Seeking to perform the matching they had promised, Plaintiffs obtained App Store "payor records." Dkt. 815 at 1. Every app transaction by an iPhone or iPad user is associated with such a record. Dkt. 1003-30 ¶ 11. The records contain personal information (e.g., name, address, phone number) and payment information (e.g., credit card number). *Id.* ¶ 30.

Apple has over one billion payor records relevant to this case. Dkt. 1003-30 ¶ 11. But different transactions by one person can be associated with different records, for example if the person's identifying information or payment method changes. Order 4; *see* Dkt. 1003-29 ¶ 21. This happens regularly. Plaintiffs' exercise therefore involved deduplicating payor records—i.e., determining

10

ER-1012

which are associated with the same person. Order 4-5. Plaintiffs agreed that Apple would then perform the purely "ministerial" task of assigning transactions to those deduplicated payors. Dkt. 1006-1 at 6.[1]

Deduplicating records, particularly at scale, is a recognized discipline within statistics and data science. Dkt. 1003-30 ¶ 104. A successful methodology should recognize that two records with the first names "Jane" and "J@ne" but the same address and last names are likely the same person; that "Jane" and "Bob" with the same last name and address are likely *not* the same person; and that two "Ann Lees" with the same credit card number but different addresses *are* likely the same person. *Id.* And it must solve these and similar puzzles one billion times over.

But Plaintiffs chose to assign this vital task not to a statistician or data scientist, but to Darryl Thompson, who works for a class-

---

[1] Plaintiffs protest that Apple produced only "identifying information" and "refused" to produce data connecting those records to specific transactions. Pet. 8, 22-23. But Plaintiffs "accepted" that limitation given the serious privacy risk of linking named individuals to their "sensitive" app and in-app purchase histories. Dkt. 1003-79 at 4:14-23, 5:23-6:5.

11

action claims administrator.  Dkt. 1003-36 ¶¶ 1, 8-9.  Thompson conceded that he was not familiar with academic literature about deduplication or data matching.  Order 9.  Still, Thompson reviewed Apple's data and declared it "could be reliably deduplicated" using methods from the "claims administration field."  Dkt. 1003-36 ¶¶ 9-10.

Apple's data-science expert, Victoria Stodden, however, found that she could not replicate Thompson's work and that it contained "several alarming errors."  Order 6.  Thompson did not recognize, for instance, that named plaintiff "Rob Pepper" and "Robert Pepper" were the same person even though both lived at the same address and used the same credit card.  *Id.*  Thompson also reported that over 40,000 records featuring different last names and addresses belonged to the same person because they shared the first name "Kim." *Id.*  And he identified 1.9 million "unique payors" in King Salmon, Alaska—a fishing village with 375 residents.  *Id.*  Stodden also noted that Thompson calculated no error rate, which is standard practice in statistics and data science.  Dkt. 1003-30 ¶¶ 93-94; *see* Dkt. 1003-17 at 99:16-22.

<div align="center">12</div>

Plaintiffs nevertheless used McFadden's model to calculate damages incurred by each "payor" Thompson had identified. Dkt. 1003-35 ¶¶ 70-73. So whatever errors infected Thompson's analysis carried over to identifying whether *any* class member was injured. Dkt. 1003-99 ¶¶ 48-50. These flaws left millions of injury questions unanswered: Thompson's matching of transactions to payors was Plaintiffs' only way to answer whether there were 11 million unin-jured payors (as Plaintiffs' experts claim) or many millions more. *See* Dkt. 1003-35 ¶¶ 82-84 & fig. 13.

**5.** Apple moved to exclude Thompson's testimony under *Daub-ert* and to decertify the class. The district court granted both motions. It devoted most of its opinion to *Daubert*, finding Thompson's testimony to be "error-ridden" in four respects.

*First*, Thompson was "not qualified to offer an expert opinion on data cleaning and matching." Order 8. Although "[t]he topics of data cleaning and deduplication have long been active areas of research in statistics and data science," *id.* at 9, "Thompson is not a statistician and does not have a degree or training in statistics," *id.*

13

**ER-1015**

at 8. "Nor was Thompson familiar with rudimentary statistical concepts." *Id.* at 9.

*Second*, Thompson's methodology was unreliable. It could not "be tested or replicated." Order 12. Some of it was "outsourced" to a third party with "black box" methods. *Id.* at 13. Thompson's methods also were "not peer reviewed," and indeed "went against scientific consensus." *Id.* at 14. And Thompson "fail[ed] to provide an error rate, confidence interval, or otherwise meaningfully validate his work." *Id.* at 15.

*Third*, Thompson's results were "replete with errors." Order 16. The court was "left without a consistent or cohesive explanation" of how errors like the "Rob," "Kim" and King Salmon examples occurred. *Id.* at 17-20. Nor could the court have "any assurance that Apple's exemplars defined the universe of Thompson's errors." *Id.* at 20. And Thompson's efforts to clean the data introduced many more errors. For example, when reconciling addresses, he did not "consistently clean or format the apartment number field—'#2' became '2' and 'Apt. 2' became 'Apt2,' but '2' would not match with 'Apt2.'" *Id.* at 17. All these errors, the court determined, were

14

Thompson's fault: Plaintiffs could not "blame [them] on Apple[]." *Id.* at 25 n.20.

*Fourth*, Thompson's methodology aimed at the wrong target and thus was "not relevant." Order 22. Each person Thompson identified as the "payor" was not necessarily the person who paid. For example, Thompson would identify children who paid for apps using their parent's credit card as class members, even though the children did not pay for anything and "likely would not have Article III or antitrust standing." *Id.* at 21.

The district court concluded that once Thompson's methodology was excluded, there was nothing left to sustain class certification. Order 1, 23-27. As the Court explained (and all parties agree), McFadden's model finds "some consumers may be injured while others may be better off, depending on what apps, or combination of apps, those consumers purchased." *Id.* at 24-25. But without a way to "accurately and reliably" deduplicate the payor records, Plaintiffs could not establish antitrust injury with "a common body of evidence." *Id.* at 25 (quoting *Olean*, 31 F.4th at 666).

15

The district court stressed that its decision did not rest on any "ascertainability" requirement or Plaintiffs' failure to "identify every class member." Order 26. The problem, rather, was that Plaintiffs lacked a "common and reliable methodology" to establish the injury and damages elements of their claims. *Id.*

In opposing decertification, Plaintiffs did not dispute that their theory of classwide injury and damages required successful matching of account transactions to real people. Nor did Plaintiffs argue that they should not have to do so before trial. In fact, Plaintiffs conceded that if Thompson's opinions were excluded, "there is no class" and "the class has to be decertified." Dkt. 1062 at 31:16-32:15 ("We don't dispute that."). Consistent with that concession, after excluding Thompson's opinions, the district court decertified the class. Order 1, 27.[2]

---

[2] Apple presented other arguments for decertification that the district court had no need to address: e.g., that the class contained an unprecedently high number of uninjured class members; that Plaintiffs had shown themselves to be inadequate class representatives; and that their damages model was unreliable for additional reasons beyond Thompson's failings (including another still-pending *Daubert* motion whose disposition could independently require decertification).

16

ER-1018

## STANDARD OF REVIEW

Review under Rule 23(f) generally is appropriate only when the decision is "manifestly erroneous," when it presents an "unsettled and fundamental issue of law relating to class actions" that is likely to evade review, or in a "death-knell situation" that effectively ends the litigation. *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959 (9th Cir. 2005) (per curiam).

## REASONS FOR DENYING REVIEW

Plaintiffs' petition is a fact-intensive *Daubert* dispute searching in vain for a Rule 23(f) disguise. For years, Plaintiffs recognized that their bid for class certification depended on reliable expert analysis that could match account transactions to real people. They obtained certification only by promising that analysis. And they were warned—and even conceded—that decertification would result if the testimony they offered came up short.

Now faced with an unassailable *Daubert* decision, Plaintiffs forget what the case is about. They say little about the court's detailed analysis and raise no arguments under *Daubert* at all. Instead, they contend that interlocutory review is warranted on the

17

grounds that the court manifestly erred in applying *Olean*; that the court imposed an ascertainability requirement inconsistent with *Briseno*; and that the decertification order is a "death knell" that will end the case. None of those arguments is well made.

## I. The District Court's Diligent Analysis Under *Olean* Does Not Warrant Rule 23(f) Review.

Plaintiffs first claim the district court manifestly erred by "misappl[ying] *Olean*'s predominance analysis." Pet. 14. But Rule 23(f) is not designed for assertedly "incorrect application of law to facts." *Chamberlan*, 402 F.3d at 959. Regardless, there is nothing manifestly erroneous in the district court's analysis. The court conducted exactly what *Olean* commands: a "rigorous analysis" to "determine whether individualized questions, including those regarding class members' injury, 'will overwhelm common ones and render class certification inappropriate.'" 31 F.4th at 669.

Injury is an "essential element[]" of any antitrust claim (*Olean*, 31 F.4th at 666), and "[e]very class member must have Article III standing in order to recover individual damages" (*TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). *Olean* thus instructs that

18

ER-1020

antitrust plaintiffs cannot "prove there is a common question of law or fact that relates to a central issue" under Rule 23 unless they show that antitrust injury is "capable of being established through a common body of evidence, applicable to the whole class." 31 F.4th at 666.

Since antitrust cases "frequently" require expert evidence to prove injury, class certification often turns on whether an expert's methodology is "capable of showing class-wide antitrust impact." *Olean*, 34 F.4th at 665, 683. Plaintiffs must use "admissible evidence" to satisfy their Rule 23 burden, and defendants "may challenge the reliability of an expert's evidence under *Daubert*." *Id.* at 665 & n.7.

Plaintiffs previously recognized that *Olean* requires courts assessing class certification to "scrutinize any economic model used to establish common antitrust impact for factors that may undercut its reliability." Answer, *supra*, at 1 (cleaned up). The burden of proving that class certification complies with Rule 23 rests with Plaintiffs for purposes of later decertification as much as for initial certification. *Marlo v. UPS, Inc.*, 639 F.3d 942, 947 (9th Cir. 2011). And Plaintiffs

19

knew that the court's certification order rested on their promises of a viable method for matching transactions to people. Dkt. 789 at 1.

Plaintiffs now protest that they were required to perform this indispensable matching before trial. But earlier, they volunteered that they would be "happy" to do so. Dkt. 736 at 93:7-25. And when they opposed Apple's Rule 23(f) petition, they represented that "any uninjured class members will be precisely identified before trial." Answer, *supra*, at 18 n.3. Plaintiffs have therefore waived the main basis for their petition, which can be denied for that reason alone. *Momox-Caselis v. Donohue*, 987 F.3d 835, 842 (9th Cir. 2021) (arguments "inconsistent with . . . prior concession[s] in [the] district court" are "waived").

Plaintiffs also make little effort to challenge the district court's exercise of its discretionary gatekeeping authority. That is because the court's conclusion is unassailable—and certainly yields no manifest error requiring urgent intervention.

Successfully matching account transactions to real people is, as the court concluded, of paramount importance here. Plaintiffs have long conceded that because McFadden's model predicts that

20

many prices would stay the same or even rise in the but-for world, whether any class member was injured "depends on which apps and in-app content they spent money on." Dkt. 1003-35 ¶ 79. Consider former plaintiff Edward Hayter, one of just four named plaintiffs.[3] When Apple manually applied McFadden's model to Hayter's transaction records, the model showed that Hayter *benefited* from the alleged unlawful conduct. Dkt. 1004 at 23. Recognizing that Hayter had no plausible claim of injury in any scenario, Plaintiffs voluntarily dismissed him to forestall summary judgment as to his claim. Dkt. 1066.

But Hayter, who was counted by Plaintiffs as an "injured" class member excluded from the supposedly maximum 5.9% figure, is just one of millions of similar consumers who have no plausible injury. Dkt. 1063 at 4. This is one—but far from the only—reason that Plaintiffs are wrong to argue (Pet. 18) that no evidence shows that the percentage of uninjured class members exceeds their estimates.

---

[3] Plaintiffs' experts never timely disclosed any damage estimates for the four named plaintiffs in their class or merits expert reports.

21

Modest alterations to McFadden's model change which prices would be higher or lower in the but-for world, thereby causing millions of additional class accounts to switch from injured to uninjured, and profoundly change which class members can prevail at final judgment. *See, e.g.*, Dkt. 1052-10 ¶¶ 348, 359, 618; Dkt. 1052-23 ¶¶ 26-30, 34. Knowing which transactions each class member paid for is thus critical to establishing antitrust injury on a classwide basis.

In analyzing whether Rule 23 remained satisfied, the district court followed *Olean* to a tee. It considered whether "tests were used to confirm the reliability of" Thompson's opinions (31 F.4th at 672), only to discover that his methods "cannot be tested or replicated" at all (Order 12). The court asked whether Thompson used "well-known and well-accepted method[s]" (*Olean*, 31 F.4th at 674), and found that his were neither "peer reviewed" nor "generally accepted in the scientific community" (Order 14). And the court scrutinized "the model's inputs" to decide whether they "rendered the model incapable of demonstrating class-wide impact" (*Olean*, 31 F.4th at 677 n.25), and found a plethora of glaring mistakes Plaintiffs couldn't defend (Order 17-19). Given these issues (plus Thompson's lack of

22

qualifications), the court concluded that he could not reliably perform the vital deduplication—and that without him, Plaintiffs could not establish antitrust injury on a classwide basis. *Id.* at 22, 27. That is the epitome of the "rigorous analysis" *Olean* requires. 31 F.4th at 676.

Plaintiffs contend that the district court should have disregarded the question of what prices class members actually paid as one of "damages." *E.g.*, Pet. 15. That is wrong: these issues are part and parcel of establishing *injury*, which is an element of Plaintiffs' claims and a prerequisite to Article III standing. Without sufficient proof of injury, a consumer cannot "prevail." *Olean*, 31 F.4th at 670. Plaintiffs thus are committing the error of failing to "distinguish[] injury from damages." *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 194-95 (3d Cir. 2020). And unlike questions of damages variation, "winnow[ing] away" uninjured class members must happen at the liability stage—not *after* Plaintiffs receive a merits judgment in their favor. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 624 (D.C. Cir. 2019).

The district court also warned Plaintiffs, correctly, that it was not enough to calculate but-for prices "on a transaction-by-transaction basis." Pet. 15. Transactions are not class members. Because one consumer may make *many* transactions across different Apple IDs, calculating prices on a transaction-by-transaction basis only gets Plaintiffs so far. To determine whether any class member suffered an injury, they needed to match transactions to the actual consumers who made them. Without classwide evidence doing just that, Plaintiffs cannot answer in "one stroke" the "central" question whether each class member suffered antitrust injury at all. *Olean*, 31 F.4th at 670. And without that classwide answer, individualized questions about injury "will overwhelm common ones and render class certification inappropriate." *Id.* at 679.

This Court has rejected certification of classes where, as here, separating uninjured from injured class members cannot be done without "depositions and months of trial." *Van v. LLR, Inc.*, 61 F.4th 1053, 1069 (9th Cir. 2023). The district court's similar analysis here supplies no reason for Rule 23(f) review.

24

## II. The District Court Did Not Impose Any Ascertainability Requirement.

Plaintiffs next argue that the district court violated this Court's decision in *Briseno* by reading an "ascertainability require-ment" into Rule 23. Pet. 18. But the court made clear that it was not requiring ascertainability. And nothing in *Briseno* suggests that individualized issues affecting each class member's ability to win on the merits may be deferred to a post-trial claims-administration pro-cess simply because those issues also relate to class-member identity.

In seeking decertification, Apple never urged any ascertaina-bility requirement, implicit or otherwise. And in decertifying the class, the district court "agree[d]" that Plaintiffs "need not identify every class member" as an independent Rule 23 requirement. Or-der 26. *Briseno* was about identifying who had purchased certain cooking oil to determine who was in the class. 844 F.3d at 1124. Here, however, the problem is one of predominance; regardless of who is in the class, without a common way to match those people to their transactions and net out their harm, "individualized questions

25

ER-1027

relat[ing] to the injury status of class members" would overwhelm common questions. Order 26 (quoting *Olean*, 31 F.4th at 668).

This Court has rejected efforts, like Plaintiffs', to blur the lines between ascertainability and predominance. In *Walker v. Life Insurance Co. of the Southwest*, 953 F.3d 624 (9th Cir. 2020), the Court clarified that "*Briseno* was narrow in focus" and concerned only whether this Circuit would adopt a "freestanding" ascertainability requirement. *Id.* at 633. The Court further specified that *Briseno* does not "excuse a district court from considering" issues relevant to "the predominance rubric." *Id.* The district court's analysis here thus "conforms with *Briseno* and class-certification law more broadly." *Id.*

Plaintiffs' reliance on *Briseno*'s discussion of post-trial claims-administration processes (Pet. 20-21) also misses the mark. As Plaintiffs concede, *Briseno* discussed such processes only in the context of determining "membership in the class." *Id.* at 20 (cleaned up); *see Walker*, 953 F.3d at 633. *Briseno* did not hold that important issues affecting core elements of each class member's claims could be funneled out of court.

26

ER-1028

And for good reason. Reading *Briseno* that way would render Rule 23(b)(3)'s "'rigorous'" requirements a nullity and ignore this Court's instruction that antitrust injury must be shown to be "capable of being established through a common body of evidence." *Olean*, 31 F.4th at 666. It would also eliminate defendants' right to defend themselves against liability to individual claims, violating both the Rules Enabling Act, *see Briseno*, 844 F.3d at 1131, and defendants' Seventh Amendment right to have liability adjudicated by a jury, *see Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845-46 (1999) (warning against "adventurous application[s]" of Rule 23 that infringe Seventh Amendment rights).

Plaintiffs previously defended a jury-trial workaround based on the assertion that their model can calculate *aggregate* damages that can later be divided among the class. That does not solve the constitutional problem with deferring liability issues until after trial. Besides, it is not true. For example, Plaintiffs' class is defined to include only people who paid more than $10 for apps or in-app purchases from any account. Dkt. 789 at 2. If Thompson's model is bunk and erroneously combines payors—e.g., by lumping together

27

different people with the first name "Kim" and assigning to that "Kim" transactions that really belong to people who do not meet the $10 cutoff—that in turn will alter the total amount of spending by the class and inflate Plaintiffs' estimate of *aggregate* damages.[4]

Plaintiffs end their argument with non sequiturs. They insist anew that the matching analysis is relevant only to "damages" (Pet. 20), again ignoring that it goes to whether they can prove antitrust injury and thus establish liability. And however much they'd like to slough off their expert's failings as the product of "Apple's data problems" (*id.* at 21), the district court considered that argument and found that Plaintiffs could *not* "blame [the] errors on Apple[]"

---

[4] Plaintiffs also try to minimize the import of Thompson's errors by noting a "99.9% overlap" in transactions whether injury is assessed by payors or accounts. Pet. 11, 18. That argument improperly relies on an expert report stricken over no objection from Plaintiffs. Dkt. 1062 at 30:4-9. It also says nothing about whether any individual class member was injured, which requires correctly assigning those transactions to actual people. In fact, in half of his results, Thompson assigns multiple payors to one account or multiple accounts to one payor (Dkt. 1003-30 ¶ 90), resulting in different levels of injury or non-injury than the stricken account-based approach.

28

(Order 25 n.20). *Briseno*, like *Olean*, gives Plaintiffs no pathway to Rule 23(f) review.

### III. Plaintiffs Have Not Demonstrated Any Genuine Death-Knell Situation.

Plaintiffs end with a half-hearted death-knell argument, asserting without explanation that their individual "claims are 'too small to justify the expense of litigat[ing]' through trial to a final judgment." Pet. 22 (quoting *Chamberlan*, 402 F.3d at 957-58). Yet Plaintiffs never actually say that they cannot proceed to final judgment on their individual claims; they argue only that there is less incentive now than before the class was decertified.

Rule 23(f) review is not warranted merely because the amount of potential damages decreases. "[E]ven ordinary class certification decisions" will "radically reshape a lawsuit and significantly alter the risk-benefit calculation of the parties." *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1274 (11th Cir. 2000); *see Chamberlan*, 402 F.3d at 958-59 (endorsing *Prado-Steiman*). Instead, to sound a "death knell" and support Rule 23(f) review, a decision must

29

"effectively end[] the litigation." *Chamberlan*, 402 F.3d at 957; *accord Prado-Steiman*, 221 F.3d at 1274.

No doubt Plaintiffs would prefer to pursue a class "of nearly 200 million members" seeking "over $20 billion" in supposed overcharges. Pet. 22. But the death-knell question is whether there is an actual "barrier" preventing Plaintiffs from proceeding to final judgment on their claims. *In re Acadia Healthcare Co., Inc.*, 2023 WL 3620955, at *1 (6th Cir. May 23, 2023). And in addressing that question, the party urging review "must go beyond a general assertion," including by "demonstrat[ing] to the court of appeals why he or she could not pursue the individual claim." *In re Delta Air Lines*, 310 F.3d 953, 960 (6th Cir. 2002); *see Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832, 834 (7th Cir. 1999) (courts "must be wary lest the mind hear a bell that is not tolling"); *see also Chamberlan*, 402 F.3d at 958 (citing *Delta* and *Blair*).

Plaintiffs have not satisfied that burden. And given the status of these proceedings, there is good reason to doubt their assertion. Unlike early class-certification denials, where individual plaintiffs face the long road of ongoing discovery, the decertification order

30

**ER-1032**

came late in the day. Discovery is done. Dispositive motions are briefed. And significant trial preparations were already underway. So Plaintiffs can "carry on in the hope of prevailing" on their individual claims and "then winning class certification . . . on appeal." *Blair*, 181 F.3d at 834.

In any event, the death-knell doctrine does not help Plaintiffs because the decertification order is not "questionable." *Chamberlan*, 402 F.3d at 959; *accord, e.g.*, *Delta*, 310 F.3d at 960 (death-knell arguments require proof of likelihood of "overturning the class certification decision"). Plaintiffs obtained certification by representing that they could—indeed, were "happy to"—identify unharmed class members before trial. They conceded after discovery that if their expert offered for that purpose were excluded, decertification would follow. The district court then excluded that expert in a *Daubert* ruling Plaintiffs do not challenge, and decertified the class as Plaintiffs agreed it must. There is nothing remotely "questionable" about that decision.

## CONCLUSION

The Court should deny review under Rule 23(f).

<p style="text-align:center">31</p>

Dated:  November 21, 2025          Respectfully submitted,

                                   /s/ Theodore J. Boutrous Jr.
                                     Theodore J. Boutrous Jr.

                                   *Counsel for Respondent*
                                   *Apple Inc.*

**CERTIFICATE OF COMPLIANCE**

This answer complies with Circuit Rules 5-2(b) and 32-3(2) because it contains 5,582 words, excluding the portions exempted by Federal Rules 5(b)(1)(E) and 32(f) and Circuit Rule 5-2(b).  The answer also complies with Federal Rules 32(a)(5)(A) and (6) because it has been prepared using Microsoft Word in 14-point, New Century Schoolbook font.

Dated:  November 21, 2025                  Respectfully submitted,

                                                      /s/ Theodore J. Boutrous Jr.
                                                        Theodore J. Boutrous Jr.

                                                      *Counsel for Respondent*
                                                      *Apple Inc.*

**No. _____**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

IN RE APPLE IPHONE ANTITRUST LITIGATION

On Petition for Permission To Appeal from the
United States District Court for the Northern District of California
Case No. 4:11-cv-6714-YGR, Hon. Yvonne Gonzalez Rogers

## PETITION FOR PERMISSION TO APPEAL PURSUANT TO
## FEDERAL RULE OF CIVIL PROCEDURE 23(f)

Betsy C. Manifold
Rachele R. Byrd
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
750 B Street, Suite 1820
San Diego, CA 92101
Tel.: (619) 239-4599

Mark C. Rifkin
Matthew M. Guiney
Thomas H. Burt
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
Tel.: (212) 545-4600

David C. Frederick
Aaron M. Panner
Kyle M. Wood
Kelley C. Schiffman
Alex P. Treiger
Caroline A. Schechinger
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel.: (202) 326-7900

*Counsel for Plaintiffs-Petitioners*

November 10, 2025

**ER-1036**

**TABLE OF CONTENTS**

                                                                              Page

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION .............................................................................1

QUESTION PRESENTED....................................................................2

RELIEF SOUGHT...........................................................................3

BACKGROUND ..............................................................................3

REASONS FOR GRANTING THE PETITION......................................................13

I.      The District Court Misapplied *Olean*'s Predominance Analysis ..................14

II.     The District Court's Ruling Is Inconsistent With *Briseno* ............................18

III.    The District Court Order Is A Death Knell For Plaintiffs'
        Claims ..................................................................................22

CONCLUSION..............................................................................24

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

i

ER-1037

**TABLE OF AUTHORITIES**

Page

**CASES**

*Apple Inc. v. Pepper*, 587 U.S. 273 (2019) ................................................................3

*Arizona Theranos, Inc., Litig.*, *In re*, 2021 WL 6124872
(D. Ariz. Dec. 23, 2021) ...................................................................19

*Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017) .................2, 13, 18,
19, 20, 21

*Brown v. DirecTV, LLC*, 562 F. Supp. 3d 590 (C.D. Cal. 2021) ...............................19

*Chamberlan v. Ford Motor Co.*, 402 F.3d 952 (9th Cir. 2005) .........................14, 22

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023),
*cert. denied*, 144 S. Ct. 681 & 682 (2024) .......................................4

*JUUL Labs, Inc., Mktg. Sales Pracs. & Prods. Liab. Litig.*, *In re*,
609 F. Supp. 3d 942 (N.D. Cal. 2022) ..............................................19

*Leyva v. Medline Indus., Inc.*, 716 F.3d 510 (9th Cir. 2013) ....................................16

*Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011 (9th Cir. 2024),
*cert. denied*, 145 S. Ct. 1308 (2025) ......................................... 16-17

*Norton v. LVNV Funding, LLC*, 2020 WL 5910077 (N.D. Cal.
Oct. 6, 2020) .......................................................................19

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) ............................................1, 7, 12, 13,
14, 15, 17, 18

*Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125 (9th Cir. 2016) ......................13

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) .........................................14

*Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150
(9th Cir. 2016) .......................................................................17

*Victorino v. FCA US LLC*, 2020 WL 2306609 (S.D. Cal. May 8, 2020) ................19

*Williams v. Apple, Inc.*, 338 F.R.D. 629 (N.D. Cal. 2021) ...........................2, 19, 20

ii

**STATUTES AND RULES**

Sherman Act, 15 U.S.C. § 1 *et seq.* ...............................................................4

§ 2, 15 U.S.C. § 2 ..................................................................................4

Fed. R. Civ. P.:

Rule 23 ...............................................................................6, 18

advisory committee's note to 1966 amendment ................................19

Rule 23(b)(3) .......................................................................................2

Rule 23(c)(2)(B) ...............................................................................23

Rule 23(f) ...........................................................1, 2, 3, 7, 13, 22, 24

**OTHER MATERIALS**

Defs.' Notice of Suppl. Authority ISO Defs.' Opp. to Pls.' Mot. for
Class Certification, *Carbone v. Brown Univ.*, No. 1:22-cv-
00125, Dkt. 1197 (N.D. Ill. Oct. 28, 2025) .....................................23

Defs.' Reply ISO Motion To Strike Pls.' Mot. for Class Certification,
*Batton v. NAR*, No. 1:21-cv-00430, Dkt. 255 (N.D. Ill. Nov. 3,
2025) ................................................................................................23

Defs.' Statement of Recent Decision, *In re California Bail Bond
Antitrust Litig.*, No. 4:19-cv-00717-JST (DMR), Dkt. 612
(N.D. Cal. Oct. 29, 2025) ................................................................23

ER-1039

## INTRODUCTION

Plaintiffs represent a class of nearly 200 million purchasers of apps and in-app content from Apple's App Store who overpaid because Apple unlawfully monopolized those sales. After this case made previous trips to this Court and the Supreme Court, in 2024 the district court certified the class and this Court denied Apple's petition for interlocutory review. But just three months before the trial date of February 2, 2026, and days before Plaintiffs were to distribute notice, the court granted Apple's motion to decertify the class for one reason only: that Plaintiffs had, *before trial*, failed to precisely match App Store transactions with the individuals who paid for them.

The district court's decertification order warrants this Court's review under Federal Rule of Civil Procedure 23(f). The order is manifestly erroneous. Its determination that the difficulty of matching transactions to individual class members *before trial* defeats predominance conflicts with this Court's precedents and invites intolerable gamesmanship. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (en banc) (predominance requires showing only common *method* of resolution).

Plaintiffs demonstrated that they could, on a class-wide basis, calculate the overcharge incurred on every App Store transaction, and Apple represented to the court that it would produce to Plaintiffs information sufficient to associate every

transaction with an individual purchaser. Successfully performing that matching – useful for determining the damages due to each class member – is a matter of *post-trial* claims administration that cannot be a basis for denying certification. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017). Another court in this Circuit applied *Briseno* to reject Apple's argument that potential difficulty in determining which individuals in the class incurred damages could defeat predominance. *See Williams v. Apple, Inc.*, 338 F.R.D. 629 (N.D. Cal. 2021) (Koh, J.). The conflict between these decisions adds to the importance of review.

Rule 23(f) is tailor-made for this case. Millions of consumers have been harmed to the tune of $20 billion, and they have been awaiting their day in court for more than a decade. The importance of the district court's ruling goes beyond threatening to end this litigation: defendants across the country have read the court's decision to impose a requirement of pre-trial identification of class members that erects a new and practically insurmountable hurdle to certification. Review should be granted.

### QUESTION PRESENTED

Whether the district court manifestly erred in applying the predominance requirement of Rule 23(b)(3) by requiring Plaintiffs to ascertain individualized damages before trial so as to ensure the class definition primarily encompassed harmed individuals, especially as Plaintiffs showed (without ascertaining

2

**ER-1041**

individualized damages) that the proportion of class members without measurable damages is well under 10%.

## RELIEF SOUGHT

The Court should grant Rule 23(f) review and remand with instructions to re-certify the class.

## BACKGROUND

**1.** Apple launched the App Store in July 2008. The App Store is a monopoly: it is the *only* place where iPhone and iPad users can buy apps and many in-app digital goods, such as subscriptions, in-game currency, or ad-free experiences. Dkt. 1031-3 at 1, 13 (Facts 2, 27-28). Apple enforces its App Store monopoly through a variety of anticompetitive contractual restrictions (including licensing and warranty agreements) and technical restrictions that prevent users from purchasing apps (and much in-app content) anywhere but the App Store. *Id.* at 13-14, 17-18 (Facts 28, 30, 47-55).

"iPhone owners purchase apps directly from the retailer Apple." *Apple Inc. v. Pepper*, 587 U.S. 273, 281 (2019). When a customer clicks "purchase," Apple collects the full payment amount from the consumer; delivers the digital product to the consumer; and later remits to the app developer its share of the purchase price. Dkt. 1031-3 at 16-18 (Facts 42, 52). Since July 2008, Apple – with few exceptions – has collected a 30% commission on every app and in-app purchase, *id.* at 5, 19

3

**ER-1042**

(Facts 10, 60-61), allowing it to reap "extraordinarily high" profit margins that "have exceeded 75% for years." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 984-85 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 & 682 (2024); *see* Dkt. 1052-3 ¶ 51 & tbl. 10. Without Apple's anticompetitive restrictions, competition in the distribution of apps and in-app content would have reduced the commission Apple could charge by more than half. Dkt. 1031-3 at 19 (Fact 62). Apple's supracompetitive commission rate harms iPhone and iPad users because it leads app developers to set higher prices; consequently, consumers have paid Apple more than $20 billion in overcharges for apps and in-app content. Dkt. 1052-25 ¶ 84 & fig. 13.

2.     In 2011, Plaintiffs Robert Pepper and Stephen Schwartz sued Apple under Section 2 of the Sherman Act, 15 U.S.C. § 2, seeking damages. Dkt. 1. Together with Plaintiff Edward Lawrence, Dkt. 183, they assert monopolization and attempted monopolization claims both individually and on behalf of a class.

In discovery, Apple produced a massive amount of transaction data recording every purchase of digital content from the App Store. To establish antitrust injury and damages on a class-wide basis, Plaintiffs developed a method to evaluate the overcharge associated with *each* transaction. Drawing on the expertise of multiple economists, including Nobel-Prize-winning econometrician Daniel McFadden, Plaintiffs developed a model that calculated – for each digital

4

**ER-1043**

purchase – the but-for price, that is, the price that consumers would have paid if Apple had charged a lower commission. (The but-for commission rate was calculated by another economist, Dr. Rosa Abrantes-Metz.) Another expert econometrician, Dr. Minjae Song, has overseen implementing Professor McFadden's model. Transaction by transaction, Professor McFadden's model demonstrates that, for almost all purchases, the price in the "but-for" world would have been lower than the price Apple charged; for a small proportion of transactions, the "but-for" price would have been slightly higher. Apple challenged Plaintiffs' experts under *Daubert*, but those challenges were denied. Dkt. 789 at 6-23.

Plaintiffs also showed that they could, without individualized inquiry, identify class members without measurable damages and confirm that the proportion of such class members was small. iPhone and iPad users "make purchases on the App Store through 'Apple IDs,' which are unique, password-protected accounts" registered to a primary email address. Dkt. 476-12 ¶ 2. As the data was produced by Apple, each App Store transaction was associated with a randomized string of alphanumeric characters, called a "hash value," that substituted for the consumer's Apple ID. Dkt. 1052-25 ¶ 21. The parties and the district court have referred to these hash values as "Apple IDs."

5

**ER-1044**

By aggregating the transactions for a particular Apple ID, Plaintiffs showed they could calculate the damages associated with that Apple ID – which in most cases was a positive damages amount. Dkt. 679-1 ¶¶ 41-43, 90, 95. And by performing these calculations for each Apple ID, Plaintiffs proffered a class-wide damages estimate representing an "exact summation of individual account damages." *Id.* ¶ 43.

Plaintiffs also determined a significant number of Apple IDs existed with a very low volume of associated purchases; such Apple IDs, though numerous, accounted for a very small percentage of purchases. *Id.* ¶ 96 fig. 7. Accordingly, Plaintiffs revised the class definition to exclude purchasers with less than $10 of spending in the App Store through a single Apple ID during the class period. As approved by the district court, the class definition is:

> **All persons in the United States**, exclusive of Apple and its employees, agents and affiliates, and the Court and its employees, **who purchased one or more iOS applications or application licenses from Defendant Apple Inc. ("Apple"), or who paid Apple for one or more in-app purchases**, including, but not limited to, any subscription purchase, for use on an iOS Device at any time since July 10, 2008 (the "Class Period"). **The Class is limited to those persons who paid more than $10.00 in total to Apple during the Class Period for iOS application and in-app purchases from any one Apple ID account**.

Dkt. 789 at 2 (emphases added).

**3.** The district court granted Plaintiffs' motion for class certification in February 2024. To show that Rule 23's requirements were satisfied, Plaintiffs

6

**ER-1045**

relied on a subset of transaction data that included every purchase made in the App Store's Music, Games, and Entertainment genres through April 2022 – comprising "70 percent of the commerce on the App Store." Dkt. 736 at 73:23-74:1; *see* Dkt. 679-1 ¶ 15. Professor McFadden identified precisely which accounts were harmed and estimated class-wide damages for those accounts. Dkt. 679-1 ¶¶ 43, 72-79. The court concluded Plaintiffs could use the model to "show the impact of Apple's allegedly anticompetitive conduct across all class members." Dkt. 789 at 26.

The district court also considered during class certification whether the percentage of uninjured class members meant individual issues concerning antitrust injury would predominate. *Id.* at 24 & n.18. Using the same subset of transaction data, Plaintiffs showed that, after applying the $10 spending threshold, 92.1% of the remaining Apple IDs, accounting for approximately 99% of spending, had measurable damages. Dkt. 786-1 ¶¶ 9-10; Dkt. 679-1 ¶ 78 & fig. 6. The court held that Plaintiffs' showing satisfied *Olean* because that case "rejected the argument that 'Rule 23 does not permit the certification of a class that potentially includes more than a de minimis number of uninjured class members.'" Dkt. 789 at 25 (quoting *Olean*, 31 F.4th at 669); *see id.* at 27 ("*Olean* . . . rejected the argument that Rule 23 has an uninjured class member cutoff"). Apple sought review of the certification order under Rule 23(f), which this Court denied. Order, *Pepper v. Apple Inc.*, No. 24-875, Dkt. 17 (9th Cir. May 24, 2024).

<center>7</center>

<center>**ER-1046**</center>

**4.** In certifying the class, the district court also stated its expectation that Plaintiffs would "calculate both aggregate and individual damages *before trial* with the full transactions data of the entire App Store." Dkt. 789 at 24 n.17. The court further stated it would not suffice to calculate damages for each Apple ID; instead, Plaintiffs would have to "match the Apple [IDs] . . . with *actual consumers*." *Id.* at 1. "Should Professor McFadden's model fail to do [so], the Court will consider whether modification or decertification is appropriate for all or part of the class." *Id.* The court's order offered little explanation for these requirements other than the need to "satisf[y] the predominance requirement." *Id.* at 1, 24 n.17.

To comply with the district court's additional requirements, Plaintiffs asked Apple to provide the data to match Apple IDs with individual class members. Apple admitted it possessed the personal identifying information of App Store customers that would allow Plaintiffs "to demonstrate which App Store transactions are tied together by a common payor so that they can net out which payors have alleged damages and which do not." Dkt. 815 at 5. Yet Apple only agreed to produce records containing the personal identifying information for these "payors"; it refused to produce data linking those payor records to specific transactions. *See id.*

The district court-mandated matching exercise turned out to present several difficulties. To begin with, there is not a one-to-one correspondence between individual App Store customers and Apple IDs: some customers have used more

8

**ER-1047**

than one Apple ID, and more than one individual may have paid for purchases under a single Apple ID. Dkt. 476-12 ¶¶ 2-5. In addition, when Plaintiffs asked Apple to identify which class members were associated with each Apple ID, Apple produced a list of over one billion "payors"; each payor record was associated with an Apple ID. Dkt. 815 at 4-5; Dkt. 1035-14 at 1. But a "payor record" is not the same as an individual class member: "a new record is created each time the [purchaser] creates a new Apple ID account or changes their name, address, or payment method." Order 5. Accordingly, under the court-ordered approach, matching transactions to class members first required grouping together "payor records" that correspond to the same individual.

Doing that, however, required certain judgment calls to determine whether two payor records are associated with the same individual – individuals can use nicknames, change addresses or use fictitious addresses, change their last names after marriage, obtain new credit cards, and so forth. Plaintiffs accordingly retained Darryl Thompson – an expert in data deduplication who has conducted or supervised thousands of class administration processes – to determine which Apple payor records should be grouped together as belonging to a single purchaser. Dkt. 1052-32 ¶¶ 3, 8-9. In performing that exercise, Mr. Thompson generally erred on the side of treating two similar payor records as associated with different purchasers, even if there were indications that the two payors were the same person;

9

**ER-1048**

this was conservative, as it tended to reduce the spending attributed to each class member (thus overestimating the number of class members without measurable damages).[1] Of those unique purchasers that Mr. Thompson identified, *see id.* ¶¶ 18-20; Dkt. 1031-6 ¶ 40, Dr. Song determined that upwards of 200 million qualified for class membership, Dkt. 1052-25 ¶ 74.[2] Applying Professor McFadden's damages model, Dr. Song determined that less than 6% of class members (accounting for only 0.5% of all App Store spending) had no measurable damages. *Id.* ¶ 83 & fig. 13. Unlike Plaintiffs' earlier calculation during class certification from a sample of App Store transaction data, these calculations were based on the full transaction dataset and yielded an even lower percentage of class members without damages than the earlier calculation.

Plaintiffs also introduced (although the district court refused to consider) a supplemental report from Dr. Song showing that, when aggregating transaction-

---

[1] An additional challenge was that, when it first produced a sample of the data, Apple produced hash values of only the last four digits of credit card numbers. Dkt. 1035-14 at 1. Although subsequent productions included hashed value for full credit card numbers – which would have been more useful in grouping payor records – Apple never corrected its prior representation that only the last four digits were included. Order 22 & n.19; *see* Dkt. 1061-2.

[2] In decertifying the class, the court opined that what matters in applying the $10 threshold is not whether someone purchased $10 or more "from any one Apple ID account," *see* Dkt. 789 at 2, but rather whether someone purchased $10 or more from "one[] or . . . *more than one* [Apple ID account]." 10/14/25 Hr'g Tr. 13:11-14:11. That distinction goes beyond the class definition but does not affect Plaintiffs' ability to identify class members and allocate damages.

10

ER-1049

level overcharges *by Apple ID* on the complete transaction dataset to estimate class-wide damages, the numbers were virtually the same as with Mr. Thompson's grouping: less than 6% of the Apple IDs surpassing the $10 spending threshold (again accounting for just 0.5% of all App Store spending) suffered no measurable damages. Dkt. 1052-26 ¶ 3 & fig. 1; *see* Dkt. 1062 at 27:9-30:10 (relevant ruling). That consistency is no surprise: a 99.9% overlap in the App Store transactions giving rise to potential damages exists whether transactions were included based on Mr. Thompson's grouping of payors or on Apple IDs. Class-wide damages were also virtually the same: between $20.2 and $20.4 billion using either method. Dkt. 1031-2 ¶ 8; Dkt. 1052-25 ¶ 84 & fig. 13; Dkt. 1052-26 fig. 1.

5. Apple moved to exclude Mr. Thompson's report (Dkt. 1002-1) and to decertify the class (Dkt. 1006); the district court granted both motions.

With respect to the *Daubert* motion, the court first found Mr. Thompson to be unqualified and his approach to grouping payor records were irrelevant because he grouped payor records by name rather than grouping payor records "via payment method." Order 21-22 & n.18. The court did not square this holding with the subsequent acknowledgement that grouping payor records by payment method was not feasible because Apple did not disclose that it had provided Plaintiffs usable payment method data until the October 2025 hearing. *See* Order 22 n.19; Dkt. 1061-2. Plaintiffs subsequently requested a hearing so Mr. Thompson could testify

11

**ER-1050**

how he *could* have used full credit card numbers to improve the accuracy of his grouping, Dkt. 1065-2 at 2, but the court refused to hold one, Order 1 n.2.

The court also focused on two anomalous results produced by Mr. Thompson's method: failure in some instances to group records together where first names do not match exactly (e.g., Rob and Robert); and grouping a set of records together (e.g., associated with the first name "Kim") when each of them had used both the same fictitious addresses and (hashed) phone number. *See* Order 17-20. In his declaration supporting Plaintiffs' *Daubert* opposition, Mr. Thompson explained these errors had a miniscule impact on his overall groupings and were driven by Apple's data-keeping practices and production. Dkt. 1031-6 ¶¶ 37-39.

Proceeding to Apple's decertification motion, the court concluded that exclusion of Mr. Thompson's report "alone requires [class] decertification." Order 25. The court reiterated it had expected Plaintiffs to "match Apple ID accounts with *actual consumers*" before trial to determine the number of class members without measurable damages. Order 1. But "[w]ithout the Thompson report," Plaintiffs (1) have "no methodology to match Apple ID accounts to consumers, and therefore no way to show that antitrust injury is 'capable of being established through a common body of evidence,'" Order 25 (quoting *Olean*, 31 F.4th at 666); and (2) cannot "reliably limit the percentage of uninjured class members, such that the Court may determine whether the class is 'fatally overbroad,'" Order 27 (quoting *Olean*, 31 F.4th at 669 n.14).

12

**ER-1051**

**REASONS FOR GRANTING THE PETITION**

In granting Apple's motion to decertify the class, the district court failed to apply the predominance standards this Court articulated in *Olean*. The presence of class members without measurable damages does not defeat predominance, *see Olean*, 31 F.4th at 669 & n.13, particularly when – as here –the entire class unquestionably was "*exposed* to the challenged conduct," *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136-37 (9th Cir. 2016) ("the possibility that an injurious course of conduct may sometimes fail to cause injury to certain class members . . . fails to reveal a flaw that may defeat predominance"). In deviating from this precedent, the court effectively imposed the very requirement that this Court *disapproved* in *Briseno* – requiring Plaintiffs to identify each and every class member as a condition of certification. The court never should have imposed the requirement that Plaintiffs "calculate . . . individual damages *before trial*" as a condition of maintaining this case as a class action, and its ruling that apparent deficiencies in matching transactions to individual class members warranted decertification was plainly erroneous. Apple has not claimed, and the district court did not conclude, that any defects in Thompson's grouping exercise suggest that the damages issues cannot be addressed on a class-wide basis through Professor McFadden's model, with individual damages appropriately allocated after trial.

Review under Rule 23(f) is "most appropriate" when a class-certification order is "manifestly erroneous," presents "an unsettled and fundamental issue of

13

**ER-1052**

law relating to class actions," or poses "a death-knell situation" and rests on "questionable" grounds. *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959 (9th Cir. 2005) (per curiam). Those standards are met. The upshot of the district court's decision is that upwards of 200 million consumers with collectively $20 billion in damages must sue individually to recover against Apple, a $4 trillion corporation, because of perceived uncertainty in identifying before trial consumers who account for just 0.5% of all App Store spending. That manifest legal error threatens grave injustice. Plaintiffs' petition should be granted.

## I. The District Court Misapplied *Olean*'s Predominance Analysis

In holding that Plaintiffs needed to calculate individual damages for every class member as a condition of class certification, the district court contradicted the predominance standards articulated in *Olean*. " 'The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.' " 31 F.4th at 664 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)). Accordingly, Plaintiffs can show that individualized issues related to injury and damages do not defeat predominance by proffering a damages model "capable of establishing antitrust impact on a class-wide basis." *Id.* at 682; *cf. id.* at 669 n.13 (class cannot be certified when there is no way "short of full-blown, individual trials" to determine whether class members were injured).

14

**ER-1053**

Plaintiffs have advanced a damages model "capable of establishing antitrust impact on a class-wide basis." The district court acknowledged as much in its February 2024 class-certification order, noting that "Professor McFadden's model can show the impact of Apple's allegedly anticompetitive conduct across all class members." Dkt. 789 at 26. That conclusion – which this Court earlier declined to review – was correct. Professor McFadden's model allows Plaintiffs to calculate, on a transaction-by-transaction basis, a "but-for" price for the digital good, that is, the price that the consumer would have paid had Apple charged a lower commission. Dkt. 442-11 ¶¶ 177-208, 233-238. Class-wide damages are simply the sum of those overcharges. Dkt. 1052-25 ¶¶ 61, 67; Dkt. 679-1 ¶¶ 41-43.

Plaintiffs' damages model is likewise "capable of resolving the antitrust impact issue in a single stroke." *Olean*, 31 F.4th at 683. For any individual class member, damages can be calculated by aggregating the damages from each of that class member's purchases using the very same model the district court earlier approved. And Plaintiffs used a variety of methods to show that the proportion of class members *without* measurable damages is quite small. In certifying the class in February 2024, the district court credited Plaintiffs' estimate (based on Apple IDs for a subset of App Store genres) that uninjured class members were limited to less than 8% of all Apple IDs and accounted for about only 1.1% of spending. Using the full App Store data, the proportion of class members without measurable

15

**ER-1054**

damages is even lower. Whether transactions are grouped by class member (using Mr. Thompson's payor-record groupings) or by Apple ID (as was done at the certification stage), Plaintiffs showed that the percentage of class members without measurable damages was less than 6%, accounting for only 0.5% of overall spending.

The district court evidently believed that, because it found Mr. Thompson's payor-record groupings unreliable, Plaintiffs had failed to establish a class-wide method for discerning class members with measurable damages from those without. But any purchaser who has spent more than $10 in the App Store through any one Apple ID during the class period is a class member, and that class member has measurable damages if the sum of overcharges associated with each of their purchases is positive. The trial will not require identifying which specific transactions are associated with which specific class members. Determining which Apple IDs are associated with which class members will affect the ultimate damages allocated to each class member, but that is a matter of claims administration, not an issue for trial. The fact that *individual* damages must be assessed during post-trial claims administration is no hurdle to predominance, as courts have routinely recognized. *See Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) ("[T]he presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)."); *see also Lytle v. Nutramax Lab'ys, Inc.*,

16

**ER-1055**

114 F.4th 1011, 1026-27 (9th Cir. 2024) (similar), *cert. denied*, 145 S. Ct. 1308 (2025); *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016) (similar).

Nor is there any basis to question Plaintiffs' showing that the proportion of uninjured class members is not only identifiable but quite small. *Cf. Olean*, 31 F.4th at 669 n.14 (district court should consider whether "a class is defined so broadly as to include a great number of members who for some reason could not have been harmed"). To be sure, estimating the percentage of class members without measurable damages using either Apple IDs alone or Mr. Thompson's grouping of Apple's imperfect payor records is not *quite* the same as performing that estimate for individual human beings. But the distinction does not make any material difference: Plaintiffs have shown that, when a person has made at least $10 in purchases in the App Store through one Apple ID, the person is very likely to have measurable damages. After all, the data strongly indicates that many of the Apple IDs *do* correspond one-to-one with purchasers. Dkt. 1052-25 ¶ 74 (class members who spent over $10 using at least one Apple ID); Dkt. 1052-26 fig. 1 (Apple IDs with spending over $10). Grouping multiple Apple IDs together simply makes it *more* likely that the associated individual has suffered damages. Dkt. 679-1 ¶ 78 (two-thirds of all Apple IDs without measurable damages spent less than $10). Whether the grouping occurs by class member or Apple ID, the

17

**ER-1056**

same transactions form the basis of the damages estimate and the damages estimate is the same. Dkt. 1031-2 ¶ 8 (99.9% overlap in transactions when grouping by Apple ID and by class member – rendering any difference truly marginal). Apple knows how to run Professor McFadden's model and has easier access to all purchaser data than Plaintiffs. And it has never argued – let alone supplied evidence to show – that the percentage of uninjured class members exceeds Plaintiffs' estimates.

## II.   The District Court's Ruling Is Inconsistent With *Briseno*

The district court's analysis not only ran afoul of *Olean*'s predominance standards, but also contradicts the rationale of *Briseno*, which held that plaintiffs are not required to identify individual class members at the class-certification stage. Indeed, the court's analysis effectively read into the predominance standard an ascertainability requirement, in direct contradiction of *Briseno*.

In *Briseno*, the district court certified a class of purchasers of vegetable oil. The defendant asserted on appeal that the class was unadministrable because it would be practically impossible reliably to identify retail purchasers. This Court affirmed, holding that Rule 23 does *not* require plaintiffs to "demonstrate that there is an 'administratively feasible' means of identifying absent class members" to certify a class. 844 F.3d at 1123. "Rule 23 specifically contemplates" that *post-trial claims administration* proceedings will require "individualized claim

18

**ER-1057**

determinations after a finding of liability." *Id.* at 1131 (citing Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment). And due process does not require that absent class members be identified "with perfect accuracy at the certification stage"; indeed, certification is appropriate even when "it might be *impossible* to identify some class members." *Id.* at 1129, 1132.

District courts in this Circuit have applied *Briseno* to reject arguments, like Apple's here, that each member of a proposed class that suffered damages must be identified before trial to satisfy predominance.[3] In *Williams v. Apple*, plaintiffs moved to certify a class of consumers who purchased subscriptions to Apple's iCloud service. 338 F.R.D. at 645. Apple opposed certification, arguing that individual issues predominated because "some iCloud users are on family plans, which take payment from only one family member at a given time," and it was "infeasible to determine *who* in a family plan 'paid for the subscription' and thus is a member of the Damages Class." *Id.* (cleaned up). The district court found that *Briseno* "forecloses Apple's argument." *Id.* "[A]s in *Briseno*, the administrative feasibility of identifying who paid for the product at issue—and thus could be a

---

[3] *See, e.g.*, *Brown v. DirecTV, LLC*, 562 F. Supp. 3d 590, 602 (C.D. Cal. 2021); *Victorino v. FCA US LLC*, 2020 WL 2306609, at *3 (S.D. Cal. May 8, 2020); *Norton v. LVNV Funding, LLC*, 2020 WL 5910077, at *11 (N.D. Cal. Oct. 6, 2020); *In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prods. Liab. Litig.*, 609 F. Supp. 3d 942, 966 n.11 (N.D. Cal. 2022); *see also In re Arizona Theranos, Inc., Litig.*, 2021 WL 6124872, at *3 (D. Ariz. Dec. 23, 2021).

19

**ER-1058**

member of the Damages Class—is immaterial to class certification" because "a claims administration process would suffice to show membership in [the] class." *Id.* The "asserted difficulty of identifying 'who paid for a subscription to iCloud' is no bar to predominance." *Id.* at 646.

Briseno illustrates why the district court manifestly erred in holding that uncertainty about the identity of the individual paying for a particular transaction could affect the certifiability of the class. *See* Order 20-22, 25-26. First, because each App Store transaction is associated with a payment card, there is no uncertainty. Second, post-trial administration of the claims can allocate damages to individuals. Class members can demonstrate their entitlement to the damages associated with specific purchases; for each set of purchases, damages can be calculated using Professor McFadden's model. *See Briseno*, 844 F.3d at 1131-32 (defendant can "individually challenge the claims of absent class members if and when they file claims for damages" during "the claims administration stage"); *Williams*, 338 F.R.D. at 646.

To try to distinguish this case from *Briseno*, Apple may say that, without certainty as to which transactions should be matched with which class members, there is no way to be certain which class members suffered damages, because not *every* purchase transaction leads to positive damages. But *Briseno* illustrates why this is, if anything, a surmountable problem of post-trial claims administration and

20

**ER-1059**

not an issue affecting predominance. Here, class members are defined according to "objective criteri[a]." *Briseno*, 844 F.3d at 1124. If an Apple consumer spent more than $10 on the App Store from any one Apple ID account, they are in the class. They can be given notice and choose to opt out. If they remain in the class, after trial, they will have the opportunity to assist with the accurate allocation of damages by helping to clarify which transactions are theirs. If their purchases do not exceed $10 by much, they may not recover. The district court's alternative approach – as *Briseno* recognized – shields a wrongdoer from liability by making it practically impossible for most plaintiffs to obtain redress.

The district court's error is compounded by the fact that this case does not have any of the ascertainability problems that gave rise to the issue in *Briseno*. In *Briseno*, the transactions were over-the-counter retail transactions; no clean records existed linking the transaction to a putative class member. *Id.* at 1125. Even there, this Court held that administrative difficulties in identifying class members did not bar certification. *Id.* at 1131-33. But this case is the exact opposite – every transaction is documented to an Apple ID, and every Apple ID is tied to purchaser information. There is no missing information. Apple has the relevant data. The only issue is deploying the data properly. Plaintiffs' first effort to do so met with limitations, but those limitations were traceable to Apple's data problems. Given the presence of that data, the only problem is perfecting the method of mining it

21

**ER-1060**

for damages-allocation purposes at the end of the case – a process that can often take multiple iterations in generating a claims process. Put simply, if there is an ascertainability issue here – which the court mistook for an issue of predominance – it is entirely of Apple's making.

## III. The District Court Order Is A Death Knell For Plaintiffs' Claims

Rule 23(f) review is further warranted because the district court's order creates "a death-knell situation" for Plaintiffs on grounds that are, at a minimum, "questionable." *Chamberlan*, 402 F.3d at 959.

Plaintiffs' "individual claim[s] . . . , without the class, [are] worth far less than the cost of litigation." *Id.* at 957-58. The class consisted of nearly 200 million members who, over the course of nearly 17 years, collectively paid Apple over $20 billion in overcharges for apps and in-app content on their iPhones and iPads. *See* Order 6. On the other hand, the individual claims of the three named Plaintiffs are collectively worth $268. Dkt. 1059-1, Ex. 1 ¶ 4. Courts routinely recognize that such claims are "too small to justify the expense of litigat[ing]" through trial to a final judgment to obtain appellate review. *Chamberlan*, 402 F.3d at 957-58.

Review also is warranted because the district court's order invites gamesmanship. Apple insists class members are defined according to who paid for particular transactions; Apple admits possessing that information but resisted providing it. Instead, grouping "payors" became an exercise in cleansing data the

22

**ER-1061**

accuracy of which Apple itself consistently disclaimed. Apple used its poor data quality as a shield, *see* Dkt. 1035-15 at 2 (disclaiming data reliability), and the district court turned it into a sword, *see* Order 25 n.20 ("Consumer plaintiffs also attempt to blame Thompson's errors on Apple's data keeping practices. They cannot do so[.]").

Ultimately, none of this should have been necessary, and it certainly should not matter for class certification; after all, Plaintiffs were able to show, before trial, that class members responsible for 99.5% of all App Store spending have measurable damages.[4] But in many complex antitrust cases, the calculation of individual damages may present data challenges. Already, defendants in other cases have seized on the district court's order in this case to argue that a failure precisely to identify who paid for a particular good or service should preclude class certification.[5] This Court's decisions, however, reject that approach. Review is required.

_____

[4] Indeed, the parties *jointly* proposed a plan for distributing class notice that involved sending direct email notice to class members identified by Mr. Thompson. Dkt. 1020 at 3. Apple never contended that using Mr. Thompson's analysis would make the notice plan inadequate. *See* Fed. R. Civ. P. 23(c)(2)(B).

[5] *See* Defs.' Statement of Recent Decision, *In re California Bail Bond Antitrust Litig.*, No. 4:19-cv-00717-JST (DMR), Dkt. 612 (N.D. Cal. Oct. 29, 2025); Defs.' Notice of Suppl. Authority ISO Defs.' Opp. to Pls.' Mot. for Class Certification, *Carbone v. Brown Univ.*, No. 1:22-cv-00125, Dkt. 1197 (N.D. Ill. Oct. 28, 2025); Defs.' Reply ISO Motion To Strike Pls.' Mot. for Class Certification at 5 n.6, *Batton v. NAR*, No. 1:21-cv-00430, Dkt. 255 (N.D. Ill. Nov. 3, 2025).

23

ER-1062

## CONCLUSION

This Court should grant Plaintiffs' Rule 23(f) petition.


Date:  November 10, 2025

Respectfully submitted,

*/s/ David C. Frederick*

| | |
|---|---|
| Betsy C. Manifold | David C. Frederick |
| Rachele R. Byrd | Aaron M. Panner |
| WOLF HALDENSTEIN ADLER | Kyle M. Wood |
|   FREEMAN & HERZ LLP | Kelley C. Schiffman |
| 750 B Street, Suite 1820 | Alex P. Treiger |
| San Diego, CA 92101 | Caroline A. Schechinger |
| Tel.: (619) 239-4599 | KELLOGG, HANSEN, TODD, |
| manifold@whafh.com |   FIGEL & FREDERICK, P.L.L.C. |
| byrd@whafh.com | 1615 M Street, N.W., Suite 400 |
| | Washington, D.C. 20036 |
| Mark C. Rifkin | Tel.: (202) 326-7900 |
| Matthew M. Guiney | dfrederick@kellogghansen.com |
| Thomas H. Burt | apanner@kellogghansen.com |
| WOLF HALDENSTEIN ADLER | kwood@kellogghansen.com |
|   FREEMAN & HERZ LLP | kschiffman@kellogghansen.com |
| 270 Madison Avenue | atreiger@kellogghansen.com |
| New York, NY 10016 | cschechinger@kellogghansen.com |
| Tel.: (212) 545-4600 | |
| rifkin@whafh.com | |
| guiney@whafh.com | |
| burt@whafh.com | |

*Counsel for Plaintiffs-Petitioners*

24

**ER-1063**

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing petition complies with the word limit of Ninth Circuit Rules 5-2(b) and 32-3(2) because it contains 5,588 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f) and Ninth Circuit Rule 5-2(b).

I further certify that the foregoing petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point, Times New Roman font.

/s/ *David C. Frederick*
*Counsel for Plaintiffs-Petitioners*

November 10, 2025

**ER-1064**

## CERTIFICATE OF SERVICE

I hereby certify that, on this 10th day of November 2025, I caused the foregoing **Petition for Permission To Appeal Pursuant to Federal Rule of Civil Procedure 23(f)** to be submitted electronically with the Clerk of the Court through the Court's appellate ECF system.

I further certify that, on this date, the foregoing petition was served by electronic mail and overnight mail upon the following:

Cynthia E. Richman
crichman@gibsondunn.com
Harry R. S. Phillips
hphillips2@gibsondunn.com
GIBSON, DUNN & CRUTCHER
  LLP
1700 M Street, N.W.
Washington, D.C. 20036
Tel.: (202) 955-8500

Theodore J. Boutrous Jr.
tboutrous@gibsondunn.com
Daniel G. Swanson
dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER
  LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel.: (213) 229-7000

Caeli A. Higney
chigney@gibsondunn.com
Julian W. Kleinbrodt
jkleinbrodt@gibsondunn.com
Dana L. Craig
dcraig@gibsondunn.com
Eli M. Lazarus
elazarus@gibsondunn.com
GIBSON, DUNN & CRUTCHER
  LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Tel.: (415) 393-8200

*Counsel for Defendant-Respondent Apple Inc.*

 /s/ *David C. Frederick*
*Counsel for Plaintiffs-Petitioners*

**ER-1065**

# ADDENDUM VOL I

Case: 25-7930, 05/13/2026, DktEntry: 24.7, Page 72 of 137

Case: 25-7122, 11/10/2025, DktEntry: 1.1, Page 32 of 87
Case 4:11-cv-06714-YGR    Document 1069    Filed 10/27/25    Page 1 of 27

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | Case No. 4:11-cv-6714-YGR<br><br>ORDER GRANTING APPLE'S *DAUBERT* MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DARRYL THOMPSON AND MOTION TO DECERTIFY THE CLASS<br><br>Re: Dkt. Nos. 1001, 1005, 1059, 1064, 1066 |

Pending before the Court are two motions: Apple, Inc.'s *Daubert*[1] Motion to Exclude the Expert Testimony of Darryl Thompson (Dkt. No. 1001) and Apple's Motion to Decertify the Class. (Dkt. No. 1005.) Almost two years ago, the Court certified a class of consumer plaintiffs over Apple's objection and accepted plaintiffs' representation that their experts could match Apple ID accounts with *actual consumers,* and with this methodology, could in turn determine (within reasonable parameters) whether and to what extent consumer class members were harmed. (Dkt. No. 789 at 1.) In that order, the Court warned that should plaintiffs' expert fail to do so, it would consider decertifying the class. (*Id.*) The expert—on which plaintiffs *chose* to rely—could not do so and instead conducted an error-ridden "matching" attempt. As explained in more detail below, because plaintiffs' process is not sufficiently reliable, the Court **GRANTS** Apple's *Daubert* motion and, as a result, Apple's motion to decertify the class.[2]

## I.    BACKGROUND

### A.    FACTUAL BACKGROUND

The facts of this case are well known to the parties. The Court provides some basic background and facts upon which the decision relies.

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

[2] The Court denies consumer plaintiffs' repeated and belated request to hold an evidentiary hearing on Apple's *Daubert* motion related to Darryl Thompson. (Dkt. No. 1064.) The Court has reviewed Thompson's reports and deposition testimony. No further explanation is needed.

ER-1067

Case: 25-7930, 05/13/2026, DktEntry: 24.7, Page 73 of 137

Case: 25-7122, 11/10/2025, DktEntry: 1.1, Page 33 of 87
Case 4:11-cv-06714-YGR    Document 1069    Filed 10/27/25    Page 2 of 27

Consumer plaintiffs allege that Apple charges iPhone operating system ("iOS") app developers a supracompetitive commission, which developers then pass on to consumers through charging higher prices to download an app or make in-app purchases. (Dkt. No. 228, Third Amended Complaint, ¶¶ 4–6, 9, 47.) Plaintiffs allege that Apple's conduct allowed it to unlawfully monopolize the aftermarket for iOS apps. (*Id.*) They advance two claims against Apple on behalf of a certified class: (1) unlawful monopolization of the applications aftermarket in violation of Section 2 of the Sherman Act and (2) attempted monopolization of the applications aftermarket in violation of Section 2 of the Sherman Act. Class representatives are Stephen Schwartz, Robert Pepper, and Edward Lawrence ("consumer plaintiffs").[3]

Consumer plaintiffs represent the following class:

> All **persons** in the United States, exclusive of Apple and its employees, agents and affiliates, and the Court and its employees, who purchased one or more iOS applications or application licenses from Defendant Apple Inc. ("Apple"), or **who paid Apple for one or more in-app purchases,** including, but not limited to, any subscription purchase, for use on an iOS Device at any time since July 10, 2008 (the "Class Period"). The Class is limited **to those persons who paid more than $10.00 in total** to Apple during the Class Period for iOS application and in-app purchases from any one Apple ID account.

(Dkt. No. 789, Order Granting Renewed Motion for Class Certification; emphases supplied.) The class was defined, as the Court has previously explained, to consist of "persons," not Apple accounts.

**B.    PROCEDURAL BACKGROUND**

**1.    FIRST CLASS CERTIFICATION ORDER – MARCH 2022**

Consumer plaintiffs first moved for class certification in June 2021. The Court rejected plaintiffs' motion because it did not satisfy Rule 23(b)(3)'s predominance requirement and could not prove antitrust injury on a classwide basis. (Dkt. No. 630 at 25–26.)

The Court's analysis hinged on Professor Daniel L. McFadden's econometric model and accompanying report. The model attempted to estimate how an app developer's pricing would

---

[3] The Court **GRANTS** consumer plaintiffs' request to voluntarily dismiss the individual claims of plaintiff Edward Hayter. (Dkt. No. 1066.)

2

respond to competitive commission rates. The Court determined that Professor McFadden's model[4] was not reliable, and was therefore excluded, for multiple reasons. *First*, the model incorporated a cherry-picked "but-for commission rate" of between 10 to 12% that was not rooted in any legitimate scientific, economic, or mathematic principle. (*Id.* at 5.) Professor McFadden was not qualified to opine specifically on app development, pricing, or payment processing. (*Id.*) *Second*, Apple and its experts identified many confounding errors in the model, including data errors, mixed-up calculation methods, and the failure to account for net harm. (*Id.* at 8–9.) All told, the percentage of uninjured class accounts rose from at least 5.8% to 14.6% after Apple's corrections, which Professor McFadden conceded were appropriate. *Third*, Professor McFadden's model ignored focal-point and tiered pricing in analyzing the but-for pricing. (*Id.* at 11–12.) *Fourth* and finally, Professor McFadden's model was volatile, and consumers might switch between being injured or not depending on the sample size. (*Id.* at 13.) The Court ultimately concluded that consumer plaintiffs did not "meet their predominance burden because they rel[ied] on an unsound methodology, which cannot reliably demonstrate which members, and how many, were injured as common proof of class wide impact" or classwide damages. (*Id.* at 25–26.)

### 2. ORDER ON RENEWED MOTION TO CERTIFY CLASS – FEBRUARY 2024

Consumer plaintiffs renewed their motion for class certification in March 2023. This time, the Court found that plaintiffs had proffered a valid methodology to determine injury and damages on a classwide basis. The Court granted the motion and certified consumer plaintiffs' proposed class, with reservations. (Dkt. No. 789.) To remedy prior errors, consumer plaintiffs submitted a supplemental report from Professor McFadden that ostensibly corrected the prior-identified errors and a new expert report from Dr. Rosa Abrantes-Metz, who the Court found was qualified to, and reliably did, calculate the but-for commission rate of 13.63%.

On round two, when the Court analyzed predominance, it determined that Professor McFadden's model *was* capable of showing antitrust injury on a classwide basis. (*Id.* at 27.)

---

[4] Professor McFadden's model was created by estimating consumer demand in the iOS aftermarket and developer costs. The model then calibrates but-for pricing based on the "but-for" commission rate. (*Id.* at 7.)

3

*United States District Court
Northern District of California*

Case: 25-7930, 05/13/2026, DktEntry: 24.7, Page 75 of 137

Case: 25-7122, 11/10/2025, DktEntry: 1.1, Page 35 of 87
Case 4:11-cv-06714-YGR    Document 1069    Filed 10/27/25    Page 4 of 27

United States District Court
Northern District of California

Professor McFadden had tweaked his model consistent with the Court's prior opinion and had attempted to reduce the number of uninjured accounts. In the background, consumer plaintiffs narrowed the class definition to apply to "[a]ll persons . . . who paid Apple for one or more in app purchases" which were "more than $10 in total to Apple" from any, and all, of their Apple ID accounts. (Dkt. No. 789 at 25.) That decision eliminated a large portion of uninjured accounts. (*Id.*) Moreover, consumer plaintiffs represented to the Court that the number of uninjured class members would decrease after Apple's payor data—upon which the model was based—was deduplicated. (*Id.*) That step was necessary because there are significantly more Apple ID accounts than payors, meaning a single payor, or consumer, likely has multiple accounts or payor records. (*Id.*)

Professor McFadden now estimated that only 7.9% of class accounts were uninjured. (*Id.*) Because consumer plaintiffs had reduced uninjured class accounts and would reduce the number of uninjured class members, the Court agreed that individualized issues of antitrust injury, as proposed, would not predominate, and the "model, once run, will answer the common question of whether Apple's conduct caused class members to suffer an antitrust injury." (*Id.* at 27.)

Although the Court certified the class, the Court was transparent about what it expected from consumer plaintiffs to maintain the class. It cautioned:

> Given the procedural posture of this motion, the Court accepts plaintiffs' representation that Professor McFadden can: **(i) match the Apple identification numbers he has with *actual consumers*** to ascertain class members, and (ii) **limit the percentage of unharmed class members** swept in by the narrowed class definition. Should Professor McFadden's model fail to do both, the Court will consider whether modification or **decertification is appropriate** for all or part of the class.

(*Id.* at 1; emphases supplied.) The Court explained in its predominance analysis that plaintiffs have "now affirmed to the Court that Professor McFadden will calculate both aggregate and individual damages *before* trial with the full transactions data of the entire App Store." (*Id.* at 24, n. 17.) It was not lost on the Court that running the full analysis would be expensive, and it may have been economically unfeasible to do so before the class was certified. The Court thus allowed consumer plaintiffs to proceed, given their assurances.

4

**ER-1070**

In reasoning that Professor McFadden's model was capable of showing anticompetitive impact across all class members, the Court again stated that plaintiffs have "represented to the Court that, once Apple produced the rest of its app transactional data, Professor McFadden will be able to calculate the exact extent of injury suffered by each class member." (*Id.* at 26.) The Court voiced its concern about the number of uninjured class members, and signaled that "it expects, given plaintiffs' representations, that once the model is fully run, that number [of uninjured class members] will be reduced or the cutoff could be changed to reduce the impact of including unharmed accounts." (*Id.*)

### 3.    POST-CERTIFICATION EXPERT DISCOVERY[5]

After the Court certified the class, consumer plaintiffs set out to calculate class damages by payor, not Apple ID. That exercise required consumer plaintiffs to match over a billion payor records (▮ billion) to individual consumers. The number of payor records is several times greater than the number of consumers. (Stodden Rebuttal Report, ("Stodden Reb. Rep."), Ex. 29, Dkt. No. 1003-30, ¶ 12; Thompson Supplemental Report ("Thompson Supp. Rep."), Ex. 35, Dkt. No. 1003-36, ¶ 8.) A single payor may be associated with several payor records because a new record is created each time the payor creates a new Apple ID account or changes their name, address, or payment method. (Stodden Reb. Rep. ¶ 21.)

Consumer plaintiffs engaged Darryl Thompson, the Chief Information Officer of JND Legal Administration, to deduplicate and match Apple's payor records to consumers. That process first required Thompson to "clean" Apple's user-generated payor data, which entails "the detection and removal of errors and inconsistencies from data with the aim of improving data quality." (Stodden Reb. Rep. ¶ 109.) Once the data was cleaned, Thompson was then required to "match" Apple ID accounts to payors (i.e. class members) and validate those results. Thompson used JND Legal's "well-accepted" and "proprietary" methods to deduplicate Apple's payor

---

[5] The Court finds that most of the parties' filed documents were not appropriately sealed and denies those requests by unsealing here. Any forthcoming omnibus motion to seal should be consistent with the content of this Order.

5

ER-1071

records. He reduced the number from ▇ billion records to upwards of 200 million (▇ million[6]) unique payors. (Song Report ("Song Rep."), Ex. 34, Dkt. No. 1003-35, ¶¶ 70, 74.)

Apple then engaged its own expert, Victoria Stodden, Ph.D., an Associate Professor of Industrial and Systems Engineering at the University of Southern California, to examine Thompson's work. Professor Stodden found that she could not replicate Thompson's work and instead identified several alarming errors. For example, Thompson failed to match all payment records belonging to the named plaintiff, Mr. Pepper, and determined that "Rob Pepper" and "Robert Pepper" were different people, despite that the data listed the same home address and credit card information for each. (Stodden Reb. Rep. ¶ 64.) Among other errors, Thompson lumped together all payment records for individuals that shared the first name Kim, despite that those over 40,000 records have nothing else in common, including different last names and addresses. (*Id.* ¶ 66.) He did not omit, or otherwise address, records that inappropriately listed Apple's Headquarters or "N/A" as the payor address. (*Id.* ¶¶ 57–58.) Nor did Thompson's "propriety method" recognize that Bronx/Manhattan (which was cleaned to "BronxManhattan") matched with some iteration of New York City. (*Id.* ¶ 100.) Professor Stodden further suspects that Thompson did not systematically validate his output. By way of example, Professor Stodden points to an instance where Thompson identified 1.9 million "unique payors" in King Salmon, Alaska—a town of 375 residents. (*Id.* ¶ 101.)

Thomspon conceded at his deposition that his work contained several errors. Crucially, he admitted that he did not, and could not, provide an error rate or confidence interval to validate his work. (Deposition Transcript of Darryl Thompson ("Thompson Dep. Tr."), Ex. 16, Dkt. No. 1003-17, 99:16–22.)

Thompson's matching analysis was ultimately incorporated into consumer plaintiffs' damages model, namely that of Professor McFadden and Dr. Minjae Song (the McFadden-Song

---

[6] Thompson's initial declaration included a "typographical" error that stated that the number of unique payors was ▇ million. (Dkt. No. 1029, Oppo. at 1, n. 1.) Thompson repeats that error in his declaration in support of consumer plaintiffs' opposition to the *Daubert* motion. (Dkt. No. 1029-1.)

6

ER-1072

model). The McFadden-Song model relies on Thompson's matched dataset to calculate damages for each individual payor. (Song Rep. ¶¶ 70–74, Ex. 1.)

* * *

Apple, having observed these and other errors in plaintiffs' damages model, moved to strike as unreliable Thompson's expert testimony and to decertify the class, arguing that consumer plaintiffs did not, and could not, fulfill their representation to the Court and obligations under Rule 23.

## II.    *DAUBERT* MOTION

### A.    LEGAL FRAMEWORK

Federal Rule of Evidence 702 permits an expert's opinion testimony if the witness is qualified and based upon that qualification, the witness's opinion is relevant and reliable. Reliability turns on "the soundness of [the expert's] methodology." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1048 (9th Cir. 2025) ("[T]he reliability test may be applied to an expert's reasoning process.") An expert witness may be qualified by "knowledge, skill, experience, training, or education" as to the subject matter of the opinion. Fed. R. Evid. 702. The proponent of expert testimony has the burden of proving admissibility in accordance with Rule 702. *Id.*, Advisory Committee Notes (2000 amendments). At the class certification stage, "the relevant inquiry is a tailored *Daubert* analysis which scrutinizes the reliability of the expert testimony in light of the criteria for class certification and the current state of the evidence." *Rai v. Santa Clara Valley Transportation Auth.*, 308 F.R.D. 245, 264 (N.D. Cal. 2015); *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 985–86 (9th Cir. 2020). For scientific opinions, they must be based on scientifically valid principles. *Daubert*, 509 U.S. at 589. Experts assist the fact finder in their own evaluation of the evidence by providing them with opinions based upon verifiable, scientific, or other objective analysis. *Id.* at 589–90.

### B.    *DAUBERT* CHALLENGE TO DARRYL THOMPSON'S OPINIONS

Apple moves to exclude the opinions of Darryl Thompson in their entirety, arguing that (i) Thompson is not qualified to clean and match Apple's payor data for purposes of the damages model, (ii) his methods and application of those methods are unreliable, and (iii) his analysis is

7

Case: 25-7930, 05/13/2026, DktEntry: 24.7, Page 79 of 137

Case: 25-7122, 11/10/2025, DktEntry: 1.1, Page 39 of 87
Case 4:11-cv-06714-YGR   Document 1069   Filed 10/27/25   Page 8 of 27

irrelevant because it misunderstood the key term "payor" as "account holder." (Dkt. No. 1001.)[7] The Court analyzes each argument in turn.

### 1.    QUALIFICATIONS

Apple first argues that Thompson's opinions should be excluded because he is not qualified to offer an expert opinion on data cleaning and matching as a non-statistician. In this context, the Court agrees.

Rule 702 requires that the Court determine that an expert witness "is qualified by special knowledge as an expert *in the relevant area of expertise*." *AFMS LLC v. United Parcel Serv. Co.*, 2014 WL 12515335, *6 (C.D. Cal. Feb. 5, 2014) (emphasis supplied). An expert's opinion will be excluded if it does not have a "reliable foundation" or if it is not based "in the knowledge and experience of [the relevant] discipline." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 149 (1999) (quoting *Daubert*, 509 U.S. at 592).

As noted above, Thompson is the Chief Information Officer at JND Legal Administration, where he has worked for the last 27 years. (Thompson Supp. Rep., Appendix A.) He holds a Bachelor of Arts in Management Information Systems from Washington State University. (*Id*.) Thompson is not a statistician and does not have a degree or training in statistics. (Thompson Dep. Tr. 23:19–24:9; 58:12–14.) At JND Legal, Thompson "oversees the entire IT organization," which includes "infrastructure, networking, and data administration." (*Id*. at 24:19–25:5.) During claims administration for class action lawsuits, Thompson supervises class notice and distribution, and for "complex cases" is "involved in the data management and processing and prep and deduplication of data." (*Id*. at 25:6–24.) Thompson conceded at his deposition that notice and claims administration is different from matching data to identify injured persons because in the notice process, "[i]f you are able to deduplicate with high confidence but don't deduplicate the records that you do not have high confidence in the deduplication, you may slightly over-notice, but you are still notifying the class in the most efficient way possible." (*Id*. at 61:10–18.)

---

[7] In the same motion, Apple also moves to exclude the expert opinions of Professor Alan MacCormack to the extent that his opinions relate to the average profit margin earned by app developers on the App Store. The Court will not rule on that motion in this Order.

United States District Court
Northern District of California

Case: 25-7930, 05/13/2026, DktEntry: 24.7, Page 80 of 137

Case: 25-7122, 11/10/2025, DktEntry: 1.1, Page 40 of 87
Case 4:11-cv-06714-YGR    Document 1069    Filed 10/27/25    Page 9 of 27

The issue here, Apple argues, is that consumer plaintiffs were not tasked with identifying members to administer a settlement. Consumer plaintiffs were to match Apple ID accounts identified in payor records to *actual consumers* in order to run the damages model. (Dkt. No. 789 at 1.) That is a different inquiry, and for that exercise, Apple argues that Thompson is unqualified. Thompson concedes that he has never served as a testifying expert in a prior case. (Thompson Dep. Tr. 10:5–7.) Moreover, at the October 14, 2025 hearing, counsel for consumer plaintiffs confirmed that Thompson had *never* previously performed this exercise, or a similar matching exercise. (Dkt. No. 1062, Oct. 14, 2025 Tr. 34:6–24.)

Apple argues that a qualified statistician or data scientist should have performed this exercise. According to Apple's expert, Professor Stodden:

> The topics of data cleaning and deduplication have long been active areas of research in statistics and data science. Scientists frequently develop methods to clean (including data verification and validation) and deduplicate user entered addresses and other identifying information in application areas. . . . Statistical methods . . . are routinely used today in address matching, and many such models have been in frequent continuous use for many years. Statistical methods are also important to assess the reliability of data cleaning and deduplication, including through quantification of the error rates associated with data cleaning, deduplication, and estimation of unique payors.

(Stodden Reb. Rep. ¶ 29.) Professor Stodden details the extensive history and literature in this discipline. (*Id*. ¶ 117.) For data matching, while there is "no single approach from the published literature that works in all cases, there are certain best practices from the literature, which Mr. Thompson did not utilize, such as allowing matches for records for which it is sufficiently clear that they represent the same information and yet are not verbatim matches." (*Id.*) As to data cleaning, Professor Stodden explains that "[t]here is extensive academic literature on the importance of identifying and eliminating data errors to maximize the accuracy and reliability of results" through proper data cleaning. (*Id.* ¶ 110.) At his deposition, Thompson conceded that he was not aware of, and his methodology was not rooted in, literature or studies relating to data matching. (Thompson Dep. Tr. 109:9–110:24.)

Nor was Thompson familiar with rudimentary statistical concepts. He admitted that he was

9

<div style="text-align: center; writing-mode: vertical-rl;">United States District Court<br>Northern District of California</div>

unfamiliar with common distance metrics, like Levenshtein or Hamming distance, which are used to help determine whether names or addresses match. (*Id.* at 114:6–19.) He did not know how to measure an error rate or attempt to quantify it at all. (*Id.* at 99:16–22) ("Q: How likely do you think it is that you eliminated 100 percent of the duplication? A: I – I don't know how to quantify – quantify that. I – I yeah, I don't know how to quantify that. Q: Okay. Have you tried to quantify it at all? A: I have not.")

Consumer plaintiffs respond that Thompson's experience as a data specialist at JND Legal qualifies him as in expert in data deduplication. They continue that Thompson has worked on data deduplication and claims administration for several large, high-profile antitrust and data breach settlements, and that he has prior experience deduplicating Apple's data. Consumer plaintiffs posit that experience is worth more than any credential. According to consumer plaintiffs, there are "no meaningful differences between the data deduplication work that Mr. Thompson and an academic statistician perform" because he "carefully limits false positives and false negatives" and perfection is not expected. (Oppo. at 11.)[8]

That argument is fundamentally misguided. Although the Court agrees that perfection is not expected, the parties have not settled the case, and the litigation is not proceeding through a settlement phase where Thompson's experience would be relevant. There, when deduplicating payor records for purposes of providing class notice or administering a settlement, "overnotice" may be appropriate. Here, the inquiry is different.

Consumer plaintiffs were to engage an expert to assist with their damages model. The deduplicated data was intended to serve as an input to an econometric model that would determine whether class members have antitrust standing. An accurate and reliable measure is necessary because antitrust injury is an element of plaintiffs' claims. Not only has Thompson never performed such work, but despite his work experience, he was not familiar with basic statistical

---

[8] Consumer plaintiffs' argument that "the deduplication process was done to fulfill the Court's request for Plaintiffs to identify actual consumers with and without damages, the full implementation of which will only become necessary after trial during Class administration" is not accurate. (*Id.*) As the Court has explained in its prior order, matching records to consumers is necessary to prove antitrust injury—an element of consumer plaintiffs' antitrust claim.

<div style="text-align: center;">10</div>

United States District Court
Northern District of California

methods and could not provide an error rate or some other mechanism to validate his work.

Consumer plaintiffs' cited cases allowing an expert to testify based on the expert's professional experience do not persuade. In those cases, experts were qualified to testify about their workplace experience or industry norms. *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266 (9th Cir. 1994) (longshoreman qualified to testify as an expert about deck conditions); *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998 (9th Cir. 2004) (insurance industry norms); *In re PFA Ins. Mkt'g Litig.*, 2022 WL 3146557, at *2 (N.D. Cal. June 15, 2022) (practices and norms of the life insurance industry). Thompson does not offer that sort of testimony here.

Accordingly, the Court finds that Thompson is not qualified to serve as an expert in identifying payors for purposes of consumer plaintiffs' damages model.

### 2.    RELIABLE METHODOLOGY

For its second ground for exclusion, Apple argues that Thompson's opinions should be excluded because Thompson's methodology is unreliable under *Daubert*. Again, the Court agrees.

Evidentiary reliability is "based upon scientific validity." *Daubert,* 509 U.S. at 590 n. 9. "The question of reliability probes whether the reasoning or methodology underlying the testimony" is valid. *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922 (9th Cir. 2017). The Court is concerned "not [with] the correctness of the expert's conclusions but the soundness of [their] methodology." *Primiano v. Cook,* 598 F.3d 558, 564 (9th Cir.2010). The reliability inquiry is "a flexible one." *Kumho Tire,* 526 U.S. at 150. Here, the Court may analyze "1) whether a theory or technique can be tested; 2) whether it has been subjected to peer review and publication; 3) the known or potential error rate of the theory or technique; and 4) whether the theory or technique enjoys general acceptance within the relevant scientific community." *United States v. Hankey,* 203 F.3d 1160, 1167 (9th Cir. 2000).

#### a.  First Factor: Testability

Apple argues that Thompson's methodology is a "black box" that cannot be tested or replicated, in part because Thompson failed to document many steps in his methodology.

"To demonstrate testability under *Daubert*, an expert must provide sufficient explanation for their methodology such that '[s]omeone else using the same data and methods [would] be able

11

United States District Court
Northern District of California

to replicate the result[s].'" *In re Incretin-Based Therapies Prods. Liab. Litig.*, 2022 WL 898595, at *1 (9th Cir. Mar. 28, 2022) (citing *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1047 (9th Cir. 2014)). "Experts must follow some discernable methodology, [which] may not be 'a black box into which data is fed at one end and from which an answer emerges at the other.'" *GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247, at *4 (N.D. Cal. Apr. 16, 2014).

Thompson's methodology (in which he used code to clean and manipulate data) cannot be tested or replicated. In his supplemental report, Thompson claims that he first cleaned Apple's data using a proprietary "data cleansing algorithm" that he had developed. (Thompson Supp. Rep. ¶ 17.b–c.) Next, Thompson deduplicated the payor data, which required him to write new code. (*Id.* ¶ 17.d–f.) Thompson applied "multiple tiers" of a deduplication algorithm to identify possible matches. (*Id.* ¶ 17.e.) "Each tier of the deduplication algorithm utilizes different available data points in combination, or alone, to produce a match, and each match requires a different level of review and validation based on the data points used in the match." (*Id.*) After Thompson evaluated those results, he "wrote more code to apply additional matching logic" to records that were not properly matched. (*Id.* ¶ 17.f) Thompson stopped the algorithm once he determined that "the marginal returns were outweighed by the time and effort required to continue." (*Id.*) When the deduplication process was complete, Thompson "cross-checked the address information against publicly available data." (*Id.* ¶ 17.g.) Counsel for consumer plaintiffs produced Thompson's code to Apple.

Upon review, Apple and its expert Professor Stodden determined that Thompson's code was "not complete" and would not run without significant modifications. (Stodden Reb. Rep. ¶ 128.) Thompson stated in a ReadMe file to Professor Stodden that he did not "save code" to "create" rounds two and three of deduplication. (*Id.*) At his deposition, Thompson admitted that his code was not in "deliverable" form and could not be run without modifications (i.e. turning on or off undefined portions of the code), which were not recorded. (Thompson Dep. Tr. 127:2–12; 169:18–170:17; 173:12–15.) Nor did Thompson record, or could he otherwise explain, his reasoning for selecting the data fields that he prioritized, each tier of the deduplication algorithm, or the criteria for when Thompson would stop running the algorithm based on "marginal returns."

12

**ER-1078**

*(Id.* at 176:16–177:7; 103:17–104:13.) Further, Thompson outsourced certain of his work to a third party—Melissa Data Solutions—but could not explain or describe what that third party did. (*Id.* at 187:13–188:5.) [9]

Professor Stodden, unsurprisingly, could not replicate Thompson's work. (Stodden Reb. Rep. ¶¶ 128–29.) At his deposition, Thompson testified that counsel produced the code "substantially in the form [he] ran it with" which "should produce similar outcomes," yet Thompson could not rule out "that there would be some – some level of a discrepancy." (Thompson Dep. Tr. 174:2–24.)

Consumer plaintiffs respond that Thompson produced his code, and that running the code, and turning on or off certain portions, "should be relatively obvious to an individual experienced in – in SQL code." (*Id.* 172:18–173:11.) They did not address Apple's argument that certain rounds of code were not documented or saved. Consumer plaintiffs further claim that any "reasoned judgment" Thompson made rests on "decades of data deduplication experience," and they argue that any concerns related to Professor Stodden's different result is "fodder for cross examination." (Oppo. at 20.)

Consumer plaintiffs miss the point. The Court finds that Thompson's work is not testable, and that this factor weighs in favor of exclusion. Thompson failed to record, or explain, his entire methodology such that it could be replicated. That includes the role of Melissa Data Solutions, which remains a "black box" to Apple and this Court. *GPNE Corp.*, 2014 WL 1494247, at *4. Although the Court agrees that an expert may make reasoned judgment calls based on their expertise, that expert must document and record those judgment calls so that they may be tested and analyzed. *Open Text S.A. v. Box, Inc.*, 2015 WL 349197, at *6 (N.D. Cal. Jan. 23, 2015) ("Rather than spelling out the steps she took to go from the data to the royalty rate opinion, Holt cites her 'experience'—an abstraction not visible to the eyes of the Court, the jury, and opposing

---

[9] Melissa Data Solution's policies prevented Professor Stodden from accessing the tool. (Stodden Reb. Rep. ¶ 131) ("I was also unable to perform any analyses regarding the Melissa Data Solutions NCOA product used by Mr. Thompson, except using the data he provided, since my analytical use case did not meet the requirements for access under the Melissa Data Solutions policies.")

13

counsel, or testable in the crucible of cross-examination.") Such documentation is particularly important, where, as here, consumer plaintiffs seek damages exceeding $20 billion. Thompson did not do so.

### b. Second and Fourth Factors: Peer Review & Acceptance in the Scientific Community

Apple argues that Thompson's method was not peer reviewed, nor did he rely on any method that has been peer reviewed, and his method is not generally accepted in the scientific community. Professor Stodden found that Thompson's methodology went against scientific consensus in requiring "exact string matches in order to group records," because "many scientific publications have found that exact string matching algorithms are significantly less reliable than alternative statistical methods because they can be too restrictive." (Stodden Reb. Rep. ¶¶ 119–120.)

Consumer plaintiffs do not dispute Apple's points, notwithstanding Thompson's report indicating that he uses "well accepted" methods (without describing them). Instead, they respond that those factors are irrelevant because plaintiffs offer Thompson as an expert based on his experience as a claims administrator, and Thompson used competitively sensitive methods to deduplicate that cannot be peer reviewed.

Consumer plaintiffs' arguments do not persuade given that the Court has already found that Thompson's experience is not relevant to this inquiry. Both factors also weigh in favor of excluding Thompson's testimony.

### c. Third Factor: Error Rate

Apple argues that Thompson's testimony should be excluded because he does not provide, and cannot calculate, an error rate or confidence interval for his deduplication work.

Professor Stodden explains that:

> In data analytics and statistics, validation is an essential step to ensure that a method is reliable. In the context of Mr. Thompson's data cleaning, validation should be applied to the data, to ensure data cleaning actually brings the cleaned values closer to the correct values, and to the output itself, to ensure the statistical estimates are close to what they should be. As it relates to his deduplication effort, validation would allow the estimation of the magnitude of errors in his method that could either lead to incorrectly grouping records that

14

**ER-1080**

> should not have been grouped, and therefore underestimating the number of unique payors, or fail to group records that should be grouped, resulting in overestimation of the number of unique payors. Error estimation is crucial for assessing the reliability of Mr. Thompson's methods.
>
> . . .
>
> In scientific work, typically a confidence interval is calculated, which allows a scientist to quantify the expected accuracy of the estimated output. Thus, I would expect Mr. Thompson's estimate of unique payors to be accompanied by a measure of error such as a confidence interval, so a reader can assess the accuracy of his estimate of the true number of unique payors.

(Stodden Reb. Rep. ¶¶ 93, 95.) Thompson admitted that he did not measure an error rate and did not know how to do so. (Thompson Dep. Tr. 99:16–22; 114:6–19.) When asked about the sources of the mistakes that Thompson was able to identify, Thompson responded "I don't know how to answer that because I – I looked for mistakes. I tried to identify mistakes and then fix mistakes. So if I had a – a area where I thought, oh, there's mistakes, I would have attempted to fix and resolve." (*Id.* at 165:15–166:2.)

Consumer plaintiffs argue that "Mr. Thompson's methods remain reliable notwithstanding the absence of an error rate" because "an overall error rate cannot be determined in a meaningful way." (Oppo. at 22.) Consumer plaintiffs then deflect by attempting to shift the burden to Professor Stodden to calculate Thompson's error rate which she did not do.[10] It is not Apple's burden.

Here, the Court finds that Thompson's failure to provide an error rate, confidence interval, or otherwise meaningfully validate his work weighs in favor of excluding his testimony. Because Thompson's method was not analytical, he could not identify the sources of his mistakes. Although consumer plaintiffs argue that calculating an error rate is not possible, Professor Stodden has offered several ways in which Thompson may have done so. (Stodden Reb. Rep. ¶ 96.) That Thompson chose not to, combined with Thompson other unreliable decisions, further suggests that his testimony should be excluded.

---

[10] Professor Stodden did not attempt to estimate the error rate but anticipated that she would find a "high error rate given the numerous problems" identified. (*Id.* ¶ 97.)

15

**ER-1081**

Based on the four factors analyzed, Thompson's opinions should be excluded.

### 3. RELIABLE APPLICATION OF THE METHODOLOGY

For its third ground for exclusion, Apple argues that Thompson did not reliably apply his methodology. Apple claims that Thompson's deduplication work was replete with errors in terms of both cleaning and deduplicating Apple's payor data. Consumer plaintiffs disagree. The Court considers both.

#### a. Data Cleaning

Data cleaning is "the detection and removal of errors and inconsistencies from data with the aim of improving data quality." (Stodden Reb. Rep. ¶ 109.) In effect, it means to audit or to correct the data. Here, and from the outset, Apple cautioned that its payor data was "user generated" and regularly contained inadvertent or intentional user error.[11]

Apple argues that rather than "clean" the data, Thompson's "cleaning" merely eliminates key characters.[12] For example, many payor records, for unknown reasons, list Apple's former corporate headquarters as the home address. Although Thompson testified that it would be appropriate to remove that address from the dataset, he instead "cleaned" the data by removing the address's spaces. Without explaining his logic, "Apple Computer Inc. 1 Infinite Loop" became "AppleComputerInc1InfiniteLoop." (Stodden Reb. Rep. ¶ 58, Ex. 6.; Thompson Dep. Tr. at 89:20–90:17) ("No. In my opinion, that – Apple's address as an Apple payor address is not a valid address.") Thompson removed backslashes from fractional addresses and abbreviations. Thus,

---

[11] Thompson encountered many data quality issues. (Stodden Reb. Rep. ¶ 25, n. 3) (citing Thompson Decl. ¶ 5 ("A large portion of the records had missing data, values of '[Missing in DS]', 'NA' and 'X'. Nearly 10% of records provided have these data issue. Records also contained non-standard ASCII values ranging from foreign language characters to emojis. Fields contained unexpected data. For example, the state field contained over 1600 unique values. This is because sometimes a state, like California, for instance would be represented as 'CA' or 'California.' In addition, some data was in the wrong fields – for example, some of the 1600 states were cities. Also, some portion of the data seemed to have values shifted to the wrong fields (name in the phone field as an example).")

[12] In large and complex datasets, "where it is impossible to manually review all the observations, researchers typically follow a systematic approach of auditing data to identify the types of anomalies reducing the data quality, . . . choosing appropriate methods to automatically detect and remove them." (Stodden Reb. Rep. ¶ 111.)

ER-1082

United States District Court
Northern District of California

"N/A" became "NA" and "1/2" became "12." (Stodden Reb. Rep. ¶¶ 57–59.) Nor did Thompson consistently clean or format the apartment number field—"#2" became "2" and "Apt. 2" became "Apt2," but 2 would not match with Apt2. (*Id.* ¶ 60.) Where individuals entered their email address rather than their physical address, Thompson omitted the "@" symbol and continued to use the data to match based on that invalid address. (*Id.* ¶ 59.) Those exemplars, according to Professor Stodden, accounted for hundreds of thousands of payor records. (*Id.* ¶ 58, Ex. 6.) Professor Stodden explains that these "outliers" should have been studied, corrected, or removed from the data set. (*Id.* ¶ 115.)

In response, consumer plaintiffs argue that none of the errors that Apple identified would have been match dispositive, meaning that for records to match and "roll up," those records must have also matched based on some other trustworthy piece of data. Those "no harm, no foul" arguments do not persuade. One, they still ignore that the Court must assess the reliability of the approach. Two, they ignore the responsibility to take some legitimate approach with the data, which includes preparing the data such that it is not over or under matched. There may be records that *should* have been matched and were not. Three, consumer plaintiffs do not explain what the other "trustworthy" pieces of data are such that the Court can evaluate the reliability of Thompson's work. Four, in effect, Thompson admits that he kept unreliable, and invalid, information in the dataset by maintaining Apple's address in the data set while acknowledging that it is not a valid payor address. [13]

Based on the factors analyzed, the Court finds that Thompson did not use a reliable method to clean Apple's payor data such that it could reliably be used in the model.

### b. Data Deduplication

In terms of deduplicating the data, Thompson claims that he was able to deduplicate ▮ billion payor records to identify over two hundred "▮ [sic] million unique individuals." (Thompson Supp. Rep. ¶ 18.) Apple challenges his process on at least three grounds.

---

[13] Consumer plaintiffs contend that valid reasons may explain why people entered Apple's corporate address. For instance, consumer plaintiffs hypothesize that some of those individuals may have been Apple employees. That argument does not address the problem.

17

ER-1083

*First*, Apple argues that Thompson's methodology required verbatim matching for certain data fields, like name, and that requirement led to absurd results. (Stodden Reb. Rep. ¶ 119.) For example, Thompson failed to properly match records for *named plaintiff* Robert Pepper because his name(s) included in the records—"Rob Pepper" and "Robert Pepper"—were not an exact match despite that Pepper's address, phone number, and credit card number otherwise matched across records. (*Id.*) Here, according to Professor Stodden, "[i]n the academic literature, two records are considered equivalent if they are equal semantically, meaning the two records convey equivalent information. Therefore, two records do not need to be exactly identical to be considered a match." (*Id.* ¶ 120; cleaned up.) At his deposition, Thompson admitted the underlying error. He conceded that the first names "Deb" and "Debra" are likely the same individual when the address (but for a period) and last name matched. (Thompson Dep. Tr. 154:11–155:13.)

*Second*, Apple argues that Thompson's analysis overmatches in other respects. By way of example, Apple points to the "Kim" error, where Thompson matched over 40,000 individuals that share the first name Kim, "some of which have little or no information in common other than the first name." (Stodden Reb. Rep. ¶ 66.) Exhibit 9 to Professor Stodden's report shows three exemplar "Kims" that were incorrectly matched, each listing different last names, credit card numbers, phone numbers, and addresses. (*Id.*) When Professor Stodden ran her best recreation of Thompson's code in attempt to replicate his work, she identified 2,908 unique payors instead of one unique payor. (*Id.*) At his deposition, Thompson again conceded that "as a general statement, I agree that matching on first name alone is not a – a valid match criteria." (Thompson Dep. Tr. at 152:5–7.) Based on those examples, Professor Stodden concluded that "Mr. Thompson's method has serious errors that cause his method to both overestimate and underestimate the number of distinct payors." (Stodden Reb. Rep. ¶ 67.) Taken together, Apple's exemplars suggest that Thompson's errors are more than an aberration.

*Third*, Apple argues that Thompson does not appear to have validated or cross-checked his results.[14] As an example, Apple points to an instance where Thompson identified 1.9 million

_____

[14] Although not argued in the parties' briefing, Thompson also appears to have failed to remove obviously fake phone numbers from the dataset, including numbers like "1234567"

18

**ER-1084**

United States District Court
Northern District of California

"unique payors" located in King Salmon, Alaska, a town of 375 residents. (*Id.* ¶ 101.) For context, that would mean that King Salmon, Alaska has more than twice the number of residents as San Francisco, California. Apple argues that Thompson's failure to catch that clear error suggests that he did not reliably validate his work product. Professor Stodden explains that this too is not an aberration. There "are purportedly unique payors in Mr. Thompson's matched results that are associated with hundreds or thousands of records" and other locations "with an implausible number of payors." (*Id.*)

In response to those three arguments, consumer plaintiffs explain that Thompson's "code did include logic that allowed matching on 'a partial first name'—the first three initials [sic] of the first name, last name, address, and Apple ID." (Oppo. at 25) (Thompson Dep. Tr. 155:19–25) ("So the – the al – matching algorithm does do partial first name along with last name and address. But I believe because partial first name does, you know, present a – a increased risk of overmatching, I believe the algorithm includes a – the phone number hashed as a – as a validator to compensate for the increased risk of partial name.") That argument raises more questions than answers. If the algorithm supposedly allowed partial matches, why did Thompson's algorithm not match payor records for named plaintiff Pepper? Or with Deb as opposed to Debrah? At the hearing, counsel attempted to argue that Thompson's failure to match Pepper's records was not an "error" because, depending on "cultural context," it may not be obvious that "Rob" is a nickname for "Robert." Maybe so, but Stodden identified routine methods that address those kinds of issues. (Stodden Reb. Rep. ¶¶ 120– 121.)[15]

Consumer plaintiffs' response explains little. They argue that Thompson reliably applied his methodology, but "the data compelled different results" pointing to the King Salmon, Alaksa example and suspected fraud. Or, in response to the "Kim" error, they remarkably blame Apple for

---

despite that Apple provided Thompson with a list of 16 fake numbers, the vast majority of which Thompson did not remove. (Stodden Reb. Rep. ¶ 99.)

[15] Partial name matching that is based on only the first three letters of a full name and nickname would not address many potential scenarios, including a William that goes by Bill, (Stodden Reb. Rep. ¶ 64, n. 78) or an individual that goes by their middle name rather than their first name.

United States District Court
Northern District of California

failing to "clean up bad consumer-entered data"[16] and assert that the users had all entered the same phone number and address. (Thompson Decl. ¶ 37.) That latter explanation, however, is inconsistent with Exhibit 9 of Professor Stodden's report, which details several "Kim" entries associated with different phone numbers and addresses. (Stodden Reb. Rep. ¶ 66, Ex. 9.)

In short, the Court is left without a consistent or cohesive explanation of how the exemplar errors occurred. For the "Kim" error—which plaintiffs concede was an error—consumer plaintiffs suggest that the error is insignificant to the overall analysis. (Thompson Decl. ¶¶ 37–38.) The Court would agree if it had any assurance that Apple's exemplars defined the universe of Thompson's errors. Without an error rate, however, the Court cannot tell, and the burden lies with the consumer plaintiffs. Moreover, in the face of obvious error, Thompson did not correct, systematically analyze, or eliminate the data.[17]

Given those errors, the Court agrees with Apple that Thompson did not reliably apply his methodology.

### 4.   DEFINITION OF PAYOR

Apple's fourth and final ground urges exclusion because Thompson sought to match "names" rather than "payors" and only "payors" are relevant to this action. To be a member of the class in this litigation, a member must have directly purchased an app or in app content from Apple. *Apple Inc. v. Pepper*, 587 U.S. 273, 281 (2019) ("The iPhone owners purchase apps directly from the retailer Apple, who is the alleged antitrust violator. The iPhone owners pay the alleged overcharge directly to Apple. The absence of an intermediary is dispositive.") Expert testimony, of course, must be "relevant to the task at hand." *Daubert*, 509 U.S. at 597.

Here, Thompson equated payors with the names listed in payor records. Apple asserts that

---

[16] Thompson reviewed a sample of Apple's payor data and determined that he could reliably and accurately deduplicate it. (Thompson Supp. Rep. ¶¶ 9–11.)

[17] Consumer plaintiffs also respond that the Court need not be concerned with Apple's exemplars because Dr. Song's supplemental report, based on Apple ID accounts, somehow validates Thompson's work. The Court struck Dr. Song's supplemental report—which consumer plaintiffs did not dispute—as untimely and unnecessary at the October 14, 2025 hearing. (Dkt. No. 1062, Oct. 14 Tr. 28:22–30:10.)

20

**ER-1086**

United States District Court
Northern District of California

payors must be identified through analyzing credit card or other payment information. To illustrate its point, Apple cites a common example: families. Children often use their parent's credit card to purchase apps or make in-app purchases in Apple's App Store through their own Apple ID. Here, although the parent paid Apple for the transaction, and was therefore the direct purchaser, Thompson's analysis viewed the child—who did not directly pay Apple—as a payor. (Thompson Dep. Tr. 160:18–24) (Q: What is your definition of "payor"? A: A – a individual that paid for something. And I'm not aware of anything that suggests that it has to be their own credit card, just that they have to make a payment. And, therefore, they have a transact – a record in the transaction data with their personal information on it.") In other words, Thompson identified two payors rather than matching those records to one payor. That error pervades Thompson's analysis. Professor Stodden identifies that, of Apple users who paid with credit or debit cards, 22.3% used a card that has also been attributed to another payor. (Stodden Reb. Rep. ¶ 53.)

Consumer plaintiffs disagree with that analysis, citing the class definition and Supreme Court precedent. They assert that "[i]f an iPhone owner clicked 'purchase' on an app, they are the direct purchaser" and argue in conclusory fashion that the indirect-purchaser rule is not concerned with "analyzing *whose* money the direct purchaser spent." (Oppo. at 13.)

On this argument, the Court disagrees. As the Supreme Court stated in its prior decision in this case: "If the iPhone owners prevail, they will be entitled to the *full amount* of the unlawful overcharge that *they paid* to Apple." *Apple*, 587 U.S. at 287 (emphasis supplied). To the extent consumer plaintiffs argue that children were "purchasers" because they directed the payment, those children likely would not have Article III or antitrust standing to advance their claim because they do not have a concrete economic injury. *See Y.H. v. Blizzard Ent., Inc.*, 2024 WL 5431490, at *5 (C.D. Cal. Aug. 14, 2024) ("Plaintiff purchased the cards with her father's credit cards on her father's account. . . . Thus, any claimed economic damage resulting from the cards was her father's, not her own.").[18]

---

[18] *See also*, (Dec. 8, 2014 Transcript of *Apple iPod iTunes Anti-Trust Litigation*, No. 05-000037-YGR at 1303) (finding that the named direct-purchaser plaintiff did not have standing because plaintiff did not purchase the iPod with her own money, rather her husband's law firm did).

United States District Court
Northern District of California

On the other hand, the record is mixed with respect to identifying payors via payment method. At the October 14, 2025 hearing, the parties discussed whether Thompson could have, or should have, deduplicated the payor data by payment method, for example by credit card or PayPal account. Consumer plaintiffs requested payment information, including "the full card number," from Apple. (Dkt. No. 1061-2, Ex. B.) In response, Apple provided consumer plaintiffs with hashed, complete payment information, but represented via email and in an accompanying data dictionary that the data field included only the last four digits of the payment method. (Dkt. Nos. 1061-2, Ex. B; 1035-14.) Consumer plaintiffs did not move to compel that information (Dkt. No. 1061-2), nor did they inquire about whether the hashed data field (containing letters and 16 numbers) represented anything other than the last four digits of the payment method. (*Id.*) Thompson incorporated the last four digits of the credit card into his matching analysis but still could not sufficiently identify the payors.[19]

The Court agrees that Thompson's presented analysis is not relevant to this case because it does not identify payors.

\* \* \*

In sum, the Court finds that Thompson's expert testimony should be excluded because he is not qualified, his methods are not reliable, he did not reliably apply his methods, and his testimony is not relevant to this action. The Court has no confidence in Thompson's work. For those reasons, the Court **GRANTS** Apple's *Daubert* motion as it relates to Darryl Thompson.

---

In light of the ultimate resolution, the Court need not opine on the notion of whether, in an individual case, children may have reimbursed their parents thus classifying the parent as the intermediary. Issues between parents and children can be resolved if the model connects the payor with a payment method.

[19] Apple should have accurately transmitted the information and affirmatively corrected consumer plaintiffs' understanding of the data that Apple produced. Consumer plaintiffs should have known or identified that they received complete information regarding payment method and confirmed that understanding with Apple, given how important that data is to this case. In the end, the failures on both sides do not compel a different result.

### III.    MOTION TO DECERTIFY

#### A.    LEGAL FRAMEWORK

"A district court may decertify a class at any time." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009). "Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982). "A motion for class decertification is subject to the same standard as a motion for class certification under Federal Rule of Civil Procedure 23." *Wood v. Marathon Ref. Logistics Servs. LLC*, 2024 WL 4868181, at *1 (N.D. Cal. Oct. 28, 2024) (citing *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942 (9th Cir. 2011)). Like with class certification, "the party seeking certification bears the burden of demonstrating that the requirements of Rule[ ] 23(a) and (b) are met." *Id.* Decertification should "only take place after some change, unforeseen at the time of the class certification, that makes alteration of the initial certification decision necessary." *In re Apple iPod iTunes Antitrust Litig.*, 2014 WL 6783763, at *5 (N.D. Cal. Nov. 25, 2014). Whether to decertify a class is ultimately within the discretion of the court. *See Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013).

#### B.    ANALYSIS

Apple moves to decertify the class under Rule 23(a) and (b)(3). Given the Court's prior orders, the crux of the dispute is whether consumer plaintiffs satisfy Rule 23(b)(3)'s predominance requirement as it relates to injury and damages.

##### 1.    PREDOMINANCE: LEGAL FRAMEWORK

As the Court has explained in its prior rulings, Rule 23(b)(3)'s predominance requirement is demanding. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997). Under Rule 23(b)(3), a court must find that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "[P]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014).

"When individualized questions relate to the injury status of class members, Rule

23

**ER-1089**

23(b)(3) requires that the court determine whether individualized inquiries about such matters would predominate over common questions." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 668 (9th Cir. 2022) (en banc). That is particularly true in antitrust class actions, where plaintiffs must prove as "an essential element of the cause of action," that antitrust injury is "capable of being established through a common body of evidence, applicable to the whole class." *Id.* at 666. Where experts are involved, a court must decide if the expert's methodology is "capable of showing class-wide antitrust impact" in light of "factors that may undercut the model's reliability (such as unsupported assumptions, erroneous inputs, or nonsensical outputs)." *Id.* at 683.

The Ninth Circuit has clarified that a class may contain a "*de minimis* number of uninjured class members," so long as "the district court determine[s] after rigorous analysis whether the common question predominates over any individual questions, including individualized questions about injury or entitlement to damages." *Id.* at 669. Even then, "a court must consider whether the possible presence of uninjured class members means that the class definition is fatally overbroad." *Id.* at 669, n. 14.

### 2.    PREDOMINANCE: ANALYSIS

Apple argues that consumer plaintiffs, through the McFadden-Song model, are not capable of establishing antitrust impact on a classwide basis. Consumer plaintiffs disagree.

The McFadden-Song model attempts to predict "the app and in-app content prices consumers would have paid absent Apple's alleged misconduct" through analyzing "the But-For commission rate, consumer demand, and developer costs." (Report of Daniel L. McFadden ("McFadden Rep."), Dkt. No. 1003-34, Ex. 33, ¶¶ 38–39.) The Court thoroughly examined this model in its prior class certification orders. (Dkt. Nos. 630, 789.) Consumer plaintiffs and their experts acknowledge that not all app developers respond in the same way to Apple's commission rate; some developers may choose to pass through some or all of Apple's charged commission to their consumers, while others may not. (McFadden Rep. ¶¶ 47–48.) One of the ways the McFadden-Song model attempts to address this issue is through constraining the model with "margin bounds" based on app genre. (*Id.*) Under the model, some consumers may be injured

United States District Court
Northern District of California

Case: 25-7930, 05/13/2026, DktEntry: 24.7, Page 96 of 137

Case: 25-7122, 11/10/2025, DktEntry: 1.1, Page 56 of 87
Case 4:11-cv-06714-YGR    Document 1069    Filed 10/27/25    Page 25 of 27

United States District Court
Northern District of California

while others may be better off, depending on what apps, or combination of apps, those consumers purchased. (Song Rep. ¶¶ 79–80.)

Because of that differing injury status, it is crucial that the model accurately and reliably match payor records to actual consumers to determine whether the consumer was injured, and if so, to what extent. (Rebuttal Expert Report of Jeffrey T. Prince ("Prince Reb. Rep."), Dkt. No. 1003-99, Ex. 98, ¶ 49.) For example, as Apple's expert Dr. Jeffrey Prince explains, if "Payor A" was harmed by \$2 and "Payor B" was unharmed by \$5, if those transactions "were actually associated with a single payor, rather than two separate payors, the single payor would be unharmed by \$3." (*Id.*)

Without the Thompson report, which this Court excluded, the litigation is back to square one. Consumer plaintiffs proffer no methodology to match Apple ID accounts to consumers, and therefore no way to show that antitrust injury is "capable of being established through a common body of evidence, applicable to the whole class." *Olean*, 31 F.4th at 666. That alone requires decertification. The Court finds that consumer plaintiffs no longer satisfy the predominance inquiry for three reasons, which overlap with the Court's prior *Daubert* analysis.

***First***, as the Court has already explained, Thompson's matching exercise is unreliable, untested, and contains obvious errors. *See* Section II.B.3.b, incorporated herein.

Consumer plaintiffs' efforts to downplay Thompson's errors or the importance of his work do not persuade. They argue that the errors that Apple identified are overstated and can be measured in the "thousandths of a percent." (Oppo. at 12.) That estimate assumes that Apple's cited errors are *not* exemplars. Without an error rate or confidence interval, the Court is not convinced.[20] Inasmuch as consumer plaintiffs contend that Dr. Song conducted his analysis separate from Thompson's work, his report belies that conclusion. (*Compare* Oppo. at 9 *with* Song Rep. ¶¶ 69–70.)

---

[20] Consumer plaintiffs also attempt to blame Thompson's errors on Apple's data keeping practices. They cannot do so, and Thompson himself claimed that he could deduplicate Apple's payor data after he reviewed a sample of that data. (Thompson Supp. Rep. ¶ 15.)

25

**ER-1091**

Case: 25-7930, 05/13/2026, DktEntry: 24.7, Page 97 of 137

Case: 25-7122, 11/10/2025, DktEntry: 1.1, Page 57 of 87
Case 4:11-cv-06714-YGR    Document 1069    Filed 10/27/25    Page 26 of 27

With respect to consumer plaintiffs' argument that they need not identify every class member, and that Apple raises ascertainability (not predominance) arguments, the Court agrees with the former, but not the latter. The Court previously certified a class expecting a small percentage of unharmed *people* to be included in the final analysis.[21] That is not the issue. The task was to employ a common and reliable methodology that was "capable of establishing antitrust impact on a class-wide basis." *Olean*, 31 F.4th at 678. Here, if "individualized questions relate to the injury status of class members, Rule 23(b)(3) requires that the court determine whether individualized inquiries about such matters would predominate over common questions." *Id.* at 668; *see also Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136–39 (9th Cir. 2016) (addressing claim that class definition was overbroad—and thus arguably contained some members who were not injured—as a Rule 23(b)(3) predominance issue); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 n.4 (9th Cir. 2017). Consumer plaintiffs did not satisfy their burden. The Court's predominance analysis is appropriate.

**Second**, Thompson's work is ultimately not relevant because, rather than focusing on matching payment records to the "person" who "paid" or the "payor," his methodology revolves around names. It does not identify injured class members. *See* Section II.B.4, incorporated herein.

**Third**, as a last-ditch effort, consumer plaintiffs pivot and argue that all class members are "harmed" by a lack of choice, which satisfies the "antitrust injury" requirement. Even if that were true for all class members, which Apple disputes, consumer plaintiffs would still be required to prove damages on a classwide basis. The Court previously rejected consumer plaintiffs' belated request for injunctive relief because plaintiffs did not move for it. (Dkt. No. 981) ("Plaintiffs did not move to certify an injunctive class, and the Court is unprepared to do so via class notice when its prior orders addressing the issue contemplated only a damages class.") Consumer plaintiffs must prove damages.

---

[21] The Court disagrees with Apple's focus on the number of unharmed members rather than the percentage. Given Apple's size, that approach would almost inevitably shield Apple from ever being held accountable for potentially illegal conduct.

26

United States District Court
Northern District of California

Accordingly, the Court finds that the consumer plaintiffs have failed to provide a model capable of reliably showing classwide injury and damages in one stroke. Nor can it reliably limit the percentage of uninjured class members, such that the Court may determine whether the class is "fatally overbroad." *See Olean*, 31 F.4th 669, n. 14. The Court **GRANTS** Apple's motion to decertify the class.

## IV.    IMPACT ON TRIAL

On October 11, 2024, the Court approved the parties' request to modify the pretrial schedule but advised the parties that they would be required to parallel process the pending motions and trial motions to maintain the trial date. (Dkt. No. 933.) With trial deadlines looming, the Court issued this order promptly to conserve the parties' resources. Consumer plaintiffs indicated to the Court at the October 14, 2025 hearing that they (i) would elect not to proceed with trial on the individual claims of Stephen Schwartz, Robert Pepper, and Edward Lawrence on February 2, 2025, but (ii) will seek appeal of this decision under Rule 23(f) within fourteen (14) days of this order. As the parties are required to begin trial preparations soon, the Court advises that it is inclined to stay the action should an appeal be taken.[22] The parties shall file a joint status report within fifteen (15) days of this order. Other pending motions will be addressed in due course.

## V.    CONCLUSION

For the foregoing reasons, Apple's motion to exclude the expert testimony of Darryl Thompson and motion to decertify the class are **GRANTED.**

This Order terminates Docket Nos. 1001, 1005, 1059, 1064, 1066.

**IT IS SO ORDERED.**

Dated: October 27, 2025

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

_____

[22] This Order should not be interpreted to take a position on whether the Court should stay the companion case *Lepesant et al. v. Apple, Inc.*, No. 4:21-cv-08819 (N.D. Cal.). The Court will await the parties' position statements on that topic.

27

**ER-1093**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| **IN RE APPLE IPHONE ANTITRUST LITIGATION** | Case No. 4:11-cv-6714-YGR<br><br>**ORDER DENYING APPLE'S *DAUBERT* MOTION TO EXCLUDE THE TESTIMONY OF PROFESSOR DANIEL L. MCFADDEN AND DR. ROSA ABRANTES-METZ; AND**<br><br>**GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Re: Dkt. Nos. 683, 690, and 786 |

Pending before this Court is the Renewed Motion for Class Certification filed by plaintiffs Robert Pepper, Stephen H. Schwartz, Edward W. Hayter, and Edward Lawrence ("consumer plaintiffs"), a *Daubert*[1] motion to exclude the testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz filed by defendant Apple, Inc., and an Omnibus Motion to Seal which will be addressed by separate order. Though the Court previously denied in part plaintiffs' motion for class certification, it noted that it expected that plaintiffs could fix the identified problems with their expert's econometric model. At this juncture, plaintiffs have resolved those deficiencies. The Court, therefore, **GRANTS** the renewed motion for class certification and **DENIES** Apple's *Daubert* motion.

Given the procedural posture of this motion, the Court accepts plaintiffs' representation that Professor McFadden can: (i) match the Apple identification numbers he has with *actual consumers* to ascertain class members, and (ii) limit the percentage of unharmed class members swept in by the narrowed class definition. Should Professor McFadden's model fail to do both, the Court will consider whether modification or decertification is appropriate for all or part of the class. *See City of Los Angeles, Harbor Division v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) (holding that a district court is free to "reconsider, *rescind*, or modify an

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–90 (1993).

interlocutory order" such as certification of a class "for cause by it seen to be sufficient" (emphasis supplied)).

## I.   BACKGROUND

### A.   FACTUAL BACKGROUND

The facts of this case are well known to the parties. The background relevant to the instant motion is summarized as follows:

Consumer plaintiffs bring this class action pursuant to Section 2 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 2, on behalf of the following class:

> All persons in the United States, exclusive of Apple and its employees, agents and affiliates, and the Court and its employees, who purchased one or more iOS applications or application licenses from Defendant Apple Inc. ("Apple"), or who paid Apple for one or more in-app purchases, including, but not limited to, any subscription purchase, for use on an iOS Device at any time since July 10, 2008 (the "Class Period"). The Class is limited to those persons who paid more than $10.00 in total to Apple during the Class Period for iOS application and in-app purchases from any one Apple ID account.

(Dkt. No. 666-1, Renewed Motion for Class Certification, "Mot." at 1.) Consumer plaintiffs theorize that Apple charges developers on the App Store supracompetitive commissions, which the developers then pass to consumers in the form of increased prices for app downloads or subscriptions.  (Dkt. No. 228, Third Amended Complaint, ¶ 47.) Consumer plaintiffs allege that this conduct allows Apple to unlawfully monopolize the retail market for the sale of apps, including in-app purchases ("IAP").

Consumer plaintiffs bring two causes of action against Apple based on this alleged conduct: (1) unlawful monopolization of the applications aftermarket in violation of Section 2 of the Sherman Act and (2) attempted monopolization of the applications aftermarket.  (*Id*. ¶¶ 78–88.)

### B.   PROCEDURAL BACKGROUND

#### 1.   PREVIOUS *DAUBERT* MOTION

In its previous order, the Court granted in part and denied in part Apple's *Daubert* motion to exclude Professor McFadden's expert opinion and denied without prejudice consumer plaintiffs' motion for class certification. (Dkt. No. 630, "Previous Order.") With respect to the

2

United States District Court
Northern District of California

United States District Court
Northern District of California

*Daubert* motion, Apple challenged several aspects of Professor McFadden's econometric model. The Court examined these challenges systematically.

First, it denied Apple's motion as to Professor McFadden's overarching model. Apple argued that Professor McFadden's econometric model was meant not to test whether Apple's allegedly anticompetitive conduct had a common impact on class members but to prove it. (*Id.* at 3.) The Court disagreed, finding that Professor McFadden relied on sound scientific and economic principles to determine that Apple's commission rate on developers acts as a tax for both developers and their consumers. (*Id*. at 4.)

Next, the Court denied Apple's motion as to Professor McFadden's market definition. (*Id.* at 5.) Professor McFadden opined that there was a single relevant aftermarket for selling iOS apps and in-app content to consumers.  Apple argued that he had ignored the two-sidedness of the App Store. (*Id.*) The Court found that, under *Daubert*, the bases of Professor McFadden's market definition were sound. It declined to address the merits question of whether Professor McFadden's market definition was correct because, traditionally, market definitions are highly factual, and frequently the focus of any trial.

Finally, the Court ruled on Apple's challenges to Professor McFadden's three-step approach to quantifying the impact and damages of Apple's allegedly anticompetitive conduct. In step one, Professor McFadden identified the but-for commission rate—the commission rate that would exist but for Apple's monopolistic practices. The Court rejected Professor McFadden's but-for commission rate as arbitrary, finding that Professor McFadden was not an expert in the relevant fields nor was his conclusion the product of legitimate economic inquiry.

In the second step, Professor McFadden estimated the app and in-app prices that consumers would have paid in the but-for world. Apple challenged Professor McFadden's pricing model on five grounds:

1.     The model initially forecasted that about 5.8% of Apple accounts were uninjured. In other words, the model forecast that plaintiffs' proposed class included many accounts who were not harmed by Apple's allegedly anticompetitive conduct. Largely due to errors identified by Apple's experts, Professor McFadden later

3

**ER-1096**

conceded that the model actually included 14.6% uninjured accounts.

2. Professor McFadden also conceded that, at the time of decision, he had not fixed one of these errors—the use of fixed-dollar rather than percentage pricing, which at times created negative but-for prices. Given this concession, and the fact that the parties did not dispute that fixing the model to reflect percentage pricing would fix the problem, the Court rejected Apple's argument that Professor McFadden's model otherwise generated negative but-for prices.

3. The Court did find that Professor McFadden's opinion that Apple's focal-point pricing and pricing tiers would not exist in the but-for world lacked foundation and ignored overwhelming evidence to the contrary.

4. Apple argued that Professor McFadden's model was not sufficiently robust for three reasons—the sample size was too small; the model easily allowed for accounts to switch from harmed to unharmed; and it estimated a wide variation of unharmed accounts depending on the sample size. The Court found that Professor McFadden had sufficiently supported his use of a 0.1% sample size. Given that the model required adjustment, the Court granted Apple's motion as to the robustness of Professor McFadden's model without ruling on its other arguments. The Court did, however, order plaintiffs to address the confidence level of the model in the next round of briefing.

5. Apple contended that Professor McFadden's decision to exclude free apps from his model ignored market realities. Because free apps were excluded from Professor McFadden's impact calculations and the proposed class definition, the Court rejected Apple's argument.

In the third and final step, Professor McFadden proposed a method for separating harmed from unharmed class members. Though the Court found that the method of identifying the class members—matching Apple IDs to actual customers through Apple's internal records—was sufficiently objective, plaintiffs' approach with respect to timing was unacceptable. The Court advised plaintiffs that it could not wait until *after trial* to ascertain which class members were

4

**ER-1097**

United States District Court
Northern District of California

United States District Court
Northern District of California

uninjured. While perhaps acceptable in a settlement context, plaintiffs had no legal basis for addressing a core merits issue after trial.

Ultimately, the Court granted plaintiffs leave to amend their expert's report and noted that it expected that many of the identified issues could be fixed.

## 2. PREVIOUS CLASS CERTIFICATION MOTION

The Court also analyzed plaintiffs' class certification motion and found that plaintiffs met all the Rule 23(a) requirements.

Four common questions capable of class-wide resolution existed. First, the relevant market. Plaintiffs proffered Professor McFadden's definition of the market: a single aftermarket of the sale of iOS apps and in-app content. Apple criticized this definition, arguing that the relevant market was a two-sided transaction platform. The Court found that, for purposes of class certification, Professor McFadden's opinion on the market definition constituted common proof, though it declined to rule on its merits. The Court also found that Professor McFadden put forth common proof that could resolve the question of Apple's power in the market, its willfulness in acquiring and maintaining a monopoly, and whether it had violated Section 2 of the Sherman Act by monopolizing the market for iOS apps and in-app content.

Without Professor McFadden's methodology, many of the same issues addressed in the *Daubert* context led the Court to find that plaintiffs could not meet the predominance requirement of Rule 23(b)(3). Plaintiffs had not shown that the impact or damages of Apple's allegedly anticompetitive conduct could be proven on a classwide basis. With respect to antitrust impact, because Professor McFadden's methodology could not then reliably ascertain how many class members were unharmed by Apple's allegedly anticompetitive conduct, individual questions would predominate. With respect to antitrust damages, the Court rejected plaintiffs' proffer that they would run Professor McFadden's model after trial to determine classwide damages as too speculative.

* * *

Since the Previous Order, plaintiffs have filed a revised supplemental expert report by Professor McFadden. They also filed a new expert report by Dr. Rosa Abrantes-Metz, an expert in

5

**ER-1098**

econometrics, statistics, transaction pricing, and payment processing, to calculate anew Apple's but-for commission rate. Based on those expert reports, plaintiffs renewed their motion for class certification. Apple then moved to exclude the new testimony of both of plaintiffs' experts and opposed the renewed motion for class certification.

## II.   *DAUBERT* MOTION

Because the Court's *Daubert* analysis informs the rest of its decision, the Court begins there. It then proceeds to analyze plaintiffs' renewed motion for class certification.[2]

### A.   LEGAL FRAMEWORK

Federal Rule of Evidence 702[3] provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise <u>if the proponent demonstrates to the court that it is more likely than not that</u>:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the <u>expert's opinion reflects a reliable application of</u> the principles and methods to the facts of the case.

At the class certification stage, "the relevant inquiry is a tailored *Daubert* analysis which

---

[2] The Court references various reports from plaintiffs as follow: Professor McFadden's Opening Report from June 1, 2021 (Dkt. No. 443-14, "McFadden's Opening Report"); Professor McFadden's Reply Report from October 19, 2021 (Dkt. No. 554-5, "McFadden's Reply Report"); Professor McFadden's Second Revised Supplemental Report (Dkt. No. 679-1, "McFadden's 2nd Supplemental Report"); Professor McFadden's Second Reply Report from April 28, 2023 (Dkt. No. 708-2, "McFadden's Second Reply Report"); and Professor McFadden's Declaration (Dkt. No. 702-2, "McFadden's Decl.").

For Dr. Abrantes-Metz there are: Dr. Abrantes-Metz's Opening Report from September 26, 2022 (Dkt. No. 666-2, "Dr. Abrantes-Metz's Opening Report"); Dr. Abrantes-Metz's Reply Report from April 28, 2023 (Dkt. No. 708-3, "Dr. Abrantes-Metz's Reply Report"); and Dr. Abrantes-Metz's Declaration (Dkt. No. 702-3, "Dr. Abrantes-Metz's Decl.").

For Apple's experts, there are: Professor Jeffrey T. Prince's Report from March 10, 2023 (Dkt. No. 668-5, "Prince Report"); Professor Lorin M. Hitt's Report from March 10, 2023 (Dkt. No. 688-3, "Hitt Report"); Professor Mark Watson's Report from March 10, 2023 (Dkt. No. 688-6, "Watson Report"); and Professor Richard Schmalensee's Report from March 10, 2023 (Dkt. No. 688-4, "Schmalensee Report").

[3] The Supreme Court updated the rule effective December 1, 2023. The changes are underlined. *See* https://www.supremecourt.gov/orders/courtorders/frev235468.pdf. The new language does not change the intent of the rule, rather it provides further clarity.

6

**ER-1099**

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

scrutinizes the reliability of the expert testimony in light of the criteria for class certification and the current state of the evidence." *Rai v. Santa Clara Valley Transportation Auth.*, 308 F.R.D. 245, 264 (N.D. Cal. 2015); *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 985–86 (9th Cir. 2020). "Ultimately, the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of [their] methodology." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (quotation marks and citation omitted).

### B. PROFESSOR MCFADDEN'S CHALLENGED OPINIONS

Apple submits that Professor McFadden has failed to fix the deficiencies in his model identified by the Court in its Previous Order. Plaintiffs disagree. The Court analyzes each argument.

### 1. METHODOLOGY

Apple challenges Professor McFadden's methodology on: (a) marginal costs; (b) in-app purchase prices; (c) price tiers and focal prices; and (d) developer competition.

### a. MARGINAL COSTS

First, Apple argues Professor McFadden's model overestimates marginal costs. Even though, according to Apple, it is "textbook economics that digital goods have low or zero marginal costs," Apple believes the model is engineered to find positive marginal costs for every app and in-app purchase which leads to overestimation of marginal costs. Apple supports this position by pointing to the "natural experiments" its experts ran on the model.

The Court disagrees. Apple misconstrues Professor McFadden's model; in it, marginal cost is calculated based on app developers' "*variable* costs." (McFadden's Opening Report ¶ 185 (emphasis in original).) Professor McFadden defines a "variable cost" as an expense that "varies in proportion to production output." (*Id.* ¶ 185; *see also* McFadden's Decl. ¶ 5.) In other words, when Professor McFadden posits that app developers have marginal costs, he is looking at how costs change not when producing one additional unit of a digital good but when operating at scale. (McFadden's Reply Report ¶¶ 73–74.) So, for example, when Professor McFadden states that Fortnite incurs marginal costs, he is not talking about the marginal cost of creating one more unit of its digital currency, "V-bucks," but "all of the different variable costs that come along with [its]

7

**ER-1100**

iOS app monetization business." (*Id.* ¶ 74.)

Moreover, Professor McFadden provides examples of positive variable costs. (McFadden's Opening Report ¶¶197–208.) User acquisition costs, for example, tend to rise with revenue, suggesting that they are variable, rather than fixed, costs. (*Id.* ¶ 198.) Streaming costs are another. (*Id.* ¶ 201.) When a user streams a song on Spotify, for example, Spotify pays a royalty fee. (*Id.* ¶ 206.) Apple does not address either example of positive variable cost but at least one of Apple's experts, Professor Hitt, conceded when presented with such examples that marginal costs could be "meaningful." (McFadden's Reply Report ¶ 73 n.138.)

Lastly, Apple argues that its experts' "natural experiments" undermine how Professor McFadden computed marginal costs. Apple has lowered its commission rate three times. (Hitt Report ¶ 41.) Each time it did, prices mostly stayed the same. Apple extrapolates that such a result shows that in a digital marketplace "products have zero or negligible marginal cost."[4] By way of illustration, Professor Hitt proffers Apple's Small Business Program ("SBP"), introduced in December 2020. (*Id.* ¶ 55.) The SBP reduced Apple's commission rate to 15% for paid transactions for app developers who earned less than or equal to $1 million in net proceeds. (*Id.*) The program was voluntary. Professor Hitt then analyzed whether app developers who participated in the program lowered their prices in response by comparing what their prices were six months before the program and six months after. (*Id.* ¶ 56.) Professor Hitt concluded that most participants did not reduce their prices.

At most, Professor Hitt's conclusions on the natural experiments go to weight, not admissibility. The "test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert,* 43 F.3d at 1318. Apple's analysis of Professor Hitt's natural experiments say nothing about Professor McFadden's methodology; instead, they articular a different perspective on what would have happened in the but-for world. That perspective does

---

[4] Apple also states that, in a deposition, Professor McFadden admits that he did not test his model against these natural experiments. That is not what Professor McFadden said. In response to the question of whether he thought that "it is likely that marginal costs, as you estimate them, would change at the exact same time as a change in the commission rate," Professor McFadden responded he had not "examined" that particular issue. (McFadden 3d Deposition at 160:15–23.)

8

United States District Court
Northern District of California

not discredit Professor McFadden's testimony about how all app developers across the App Store would have priced their apps and in-app content had Apple's commission rate always been 13.63% rather than 30%. "The question of what would have happened but for [defendant's] monopoly overcharge is a hypothetical, and a hypothetical question generally cannot be answered by historical data about what actually happened but must often be answered by general principles about what generally tends to happen." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 605 (N.D. Cal. 2010) (internal citation and quotations omitted); *see also In re Lithium Ion Batteries Antitrust Litig.*, 2017 WL 1391491, at *11 (N.D. Cal. Apr. 12, 2017) ("Determination of the difference between prices paid and prices that would have been paid 'but-for' the unlawful conduct is necessarily hypothetical.")

Professor McFadden has demonstrated that calculating marginal costs at the app, rather than individual item, level is reliable.[5] For that reason, the motion on this ground is **DENIED.**

### b.  IN-APP PURCHASE PRICES

Apple next argues that Professor McFadden's model cannot predict what individual in-app purchase prices would be but for Apple's allegedly anticompetitive conduct and therefore cannot reliably calculate damages. (*See* McFadden's 2nd Supplemental Report ¶ 42.)

As explained in its Previous Order, the Court understands that Professor McFadden calculates prices at the "app level" rather than the "individual app purchase level." (Previous Order at 10.) He does so because he opines that app developers consider costs at the app level when setting prices. (*Id.*) Thus, when he built his model, Professor McFadden averaged the prices of all in app content in an app, per month. (*Id.*) He then calculated the but-for prices at the *app* level to estimate damages. (McFadden's 2nd Reply Report ¶ 108.) The Court declined in the previous round of briefing to exclude Professor McFadden's model because he calculates but-for prices at the app, rather than individual, level and it will not revisit that decision here.

Apple next challenges Professor McFadden's use of the "percentage method" to estimate

---

[5] As Professor Prince acknowledged, "economists think about short run and long run." (Dkt. No. 702-5, 2023 Prince Dep. 70:15.) The perspective of the analysis, therefore, is "going to impact how [economists] think about [costs] being variable or marginal." (*Id.*)

9

<div style="text-align:center">United States District Court<br/>Northern District of California</div>

Case: 25-7930, 05/13/2026, DktEntry: 24.7, Page 108 of 137

Case: 25-7122, 11/10/2025, DktEntry: 1.1, Page 68 of 87
Case 4:11-cv-06714-YGR   Document 789   Filed 02/02/24   Page 10 of 28

United States District Court
Northern District of California

damages. In its Previous Order, the Court excluded Professor McFadden's model because it generated negative but-for prices. The parties then agreed the issue could be fixed if Professor McFadden applied the percentage rather than fixed-dollar method. (Previous Order at 11.) Professor McFadden now uses the percentage method to estimate damages. (McFadden's 2nd Supplemental Report ¶ 40.)

Apple now argues that even though Professor McFadden applies the percentage method, he changes the price of every as-is in-app item by the same percentage to calculate the but-for price, a method that is scientifically unsound. The Court disagrees with Apple's characterization. As Professor McFadden states, he uses "the percentage method to estimate damages for each transaction, not to *predict* item level prices." (McFadden's 2nd Supplemental Report ¶ 37.) Instead, he calculates how much Apple overcharged consumers as a percentage of its total revenues. (*Id.* ¶ 40.) Professor McFadden then calculates individual damages by taking this percentage and multiplying it against each individual's spending on a particular app, in a particular month. (*Id.* ¶ 41.) To illuminate, Professor McFadden gives the example of two users, one who spends $0.99 on an app, the other $9.99. (*Id.* ¶ 41.) Using Dr. Abrantes-Metz's but-for commission rate of 13.63%, Professor McFadden concluded that Apple's overcharge for that particular app was 35.5% in January 2018. (*Id.*) At the as-is commission rate of 30%, Apple's revenue from the first user was $0.297, for the second user $2.997. The users were therefore overcharged by $0.105 (35.5% of $0.297) and $1.064 (35.5% of $2.997), respectively.

As now applied, the Court finds the percentage method sufficiently reliable. For that reason, the motion on this ground is **DENIED.**

### c.   PRICE TIERS AND FOCAL-POINT PRICING

The Court previously excluded Professor McFadden's model because it ignored Apple's price tiers and focal-point pricing. (Previous Order at 11–12.) Apple argues that Professor McFadden's model still ignores the issue.

In their renewed motion for class certification, plaintiffs maintain their challenge to Apple's price tiers. For that reason, Professor McFadden explains, he has created two models, one without price tiers and one which incorporates tier and focal pricing. (McFadden's 2nd

10

**ER-1103**

United States District Court
Northern District of California

Supplemental Report ¶ 85.) Professor McFadden conducts a simulation with Apple's current price tiers, using the same 0.1% sample he uses generally to calculate damages. (*Id.* ¶ 87.) At the app-level, Professor McFadden assumes that developers choose their app and average in-app content prices consistent with the increments set out in Apple's tier schedules. (*Id.*) Within these restrictions, Professor McFadden models that app developers set the prices that will result in maximized profits. (*Id.*) In the same way, Professor McFadden's model demonstrates that it can accommodate focal-point pricing. (*Id.* ¶ 88.) Professor McFadden acknowledges that, with the current tier and focal pricing, the percentage of unharmed accounts is higher. (*Id.* ¶ 90.)

Professor McFadden then conducted a simulation using a more granular, 750-point pricing structure. (*Id.* ¶ 93.) He did so because, as part of its settlement with app developers, Apple announced that it would introduce such a pricing schedule. (*Id.* ¶ 94.) Using this more granular pricing structure, Professor McFadden calculates that the percentage of unharmed accounts would be similar to a but-for world with no pricing tiers. (*Id.* ¶ 95.)

The Court finds that Professor McFadden's tier and focal pricing simulation is sufficiently reliable. Whether proof exists that pricing tiers or a pricing schedule is, in fact, anticompetitive is a merits question not before the Court and likely reasonably in dispute in any event. That Professor McFadden's does not predict in-app prices ending at 99 cents is no surprise. As explained, Professor McFadden averages all in-app content prices, ending in 99 cents, at the app-level. He then restricts the movement of these averaged prices to change in increments consistent with Apple's pricing schedule. This approach, Professor McFadden explains, is consistent with how one of Apple's experts, Professor Prince, originally calculated the effect of price tiers. (McFadden 2nd Reply Report ¶ 51.)

Further, as Professor McFadden explains, his model does reflect the impact of focal-point pricing through Apple's current pricing structure and the 750-point structure that Apple has stated it will implement. Professor Prince disputes this, arguing that Professor McFadden's model does not reflect "voluntary focal-point pricing." (Prince Report ¶ 148.) In so arguing, Professor Prince ignores that the analysis of price tiers and focal point pricing is "interchangeable." (McFadden's 2nd Reply Report ¶ 55.) In other words, whether the impact of a price restriction is analyzed as a

11

**ER-1104**

price tier—Apple requiring that all app prices end in $0.99—or as focal-point pricing—app developers would freely choose to price at 99-cent points—the effect is the same. Apple does not give the Court any reason to think otherwise.[6]

Finally, Apple's argument that Professor McFadden's model does not reflect the as-is world because he assumes that app developers set prices to maximize profits exactly rather than along one of Apple's price tiers does not persuade. Professor McFadden states that he simulates the but-for world by assuming that developers choose the prices that yield them the highest profits based on Apple's pricing schedule. (McFadden's 2nd Supplemental Report ¶ 87.) Moreover, Professor McFadden's model incorporates actual transaction data from the App Store, which already reflects Apple's pricing restrictions. Nothing further is required.

On that ground, Apple's motion is **DENIED.**

### d.   APP COMPETITION

Lastly, Apple attacks Professor McFadden's methodology on the basis that it does not consider competition between app developers, instead treating them like monopolists to calculate the prices they would set in the but-for world. Put another way, Apple's expert Professor Prince argues that Professor McFadden assumes that app developers' prices are not sensitive to consumer demand. (McFadden's Reply Report ¶ 21.) Plaintiffs oppose, noting that Professor McFadden's model incorporates the reality of each app developer's competitive environment.

Apple again mischaracterizes Professor McFadden's methodology. Professor Prince contends that Professor McFadden's model:

> does not account for competition between apps, even within the same genre . . . . Instead, his model continues to assume that developers have no incentive to respond to changes in the price of other apps, even if they are in the same genre or offer a substitutable product.

(Prince Report ¶ 191.) This is incorrect. Professor McFadden's model does consider competition "through the price sensitivity of demand." (McFadden's Reply Report ¶ 120.) Modeling competition through demand captures "how readily consumers switch to other apps should an app

---

[6] In fact, in its *Daubert* motion, Apple noted that its price tiers and focal-point pricing had essentially the same impact. (Dkt. No. 476-11 at 22.)

United States District Court
Northern District of California

Case: 25-7930, 05/13/2026, DktEntry: 24.7, Page 111 of 137

Case: 25-7122, 11/10/2025, DktEntry: 1.1, Page 71 of 87
Case 4:11-cv-06714-YGR   Document 789   Filed 02/02/24   Page 13 of 28

United States District Court
Northern District of California

increase its price." (*Id.*) It is true, Professor McFadden notes, that his model does not include the "strategic interactions between apps in the But-For world," but this decision, he argues is "conservative."[7] (*Id.* at ¶ 122.)

Because Professor McFadden does model competition between apps by considering the price sensitivity of demand in this section, the motion on this point is **DENIED**.[8]

## 2. SUFFICIENCY OF DATA

Apple challenges the sufficiency of Professor McFadden's data. It argues that Professor McFadden uses a two-step process to estimate consumer price sensitivity. In the first step, Apple states, Professor McFadden runs a regression on a 0.1% sample of transactions from the App Store to get a coefficient. In the next step, Apple continues, Professor McFadden constrains that coefficient by using profit margin bounds derived from a "tiny and unrepresentative" sample of six app developers. Apple concludes that the Court should reject Professor McFadden's model for imposing arbitrary and unrepresentative constraints.

To start, Apple again mischaracterizes the model. Professor McFadden does not proceed in two steps—he calculates consumer price sensitivity with the requisite constraints in one step. Apple has nothing to say against the reliability of this approach, which Professor McFadden presents as a "standard computation tool." (McFadden's Decl. ¶ 80.)

Instead, Apple expends much ink arguing that Professor McFadden's margin bounds were both arbitrarily chosen and imposed. The Court is not persuaded. First, plaintiffs note that, when the model was initially run, Professor McFadden only had access to six developers' data. By trial, plaintiffs state that they will receive profit data from significantly more developers and Professor McFadden will correspondingly update his estimated coefficients. That is sufficient at this stage. (*See* Previous Order at 10 n.8.) Moreover, Professor McFadden has produced unrebutted evidence

---

[7] Apple also argues that Professor McFadden's methodology is flawed because it does not consider that "many apps are not subject to Apple's commission, so a change in commission rate may not translate to a decrease in the competitive price for competing apps." The Court previously rejected Apple's argument that Professor McFadden should have considered free apps in his demand equation and does so for the same reasons now. (Previous Order at 13–14.)

[8] In fact, in the very next section, Apple acknowledges that a "pivotal step" in Professor McFadden's model is "estimating price sensitivity."

13

**ER-1106**

United States District Court
Northern District of California

that economists often infer costs, rather than inputting actual cost data, to estimate demand because firms do not typically disclose their costs. (McFadden's Reply ¶ 148.) That Professor McFadden can input actual app developer's costs here, even if minimal, increases the model's reliability.

Second, Apple contends that Professor McFadden has no "objective methodology" for translating his cost data into margin bounds and "instead appears to rely loosely on his review" of the available app developer data. As an example, Apple notes that Professor McFadden calculates the profit constraints for the Games Genre in the 60% to 90% range. This is so, Apple states, despite the fact that the lowest actual profit margin he observed was 64% and the highest was 92.2%. This is a minor quibble—Professor McFadden notes from the beginning that he is using these six developers' data to *estimate*, not precisely quantify, the average profit margin for the sake of class certification. (McFadden's Reply Report ¶ 151.)

Third, Apple's contention that if Professor McFadden removed or changed the margin constraints, the results would change, is a point in favor of the model's reliability, not against. If the inputs change, then the results *should* change as well.

On this ground, the motion is **DENIED**.

### 3. RELIABILITY

Apple next argues that Professor McFadden's model remains insufficiently robust by (i) failing to consistently determine the percentage of unharmed accounts depending on the sample used and (ii) producing different results even when using the same sample. Moreover, even though Professor McFadden has now clarified the confidence level of the model, Apple contends that this only masks how even slight changes to its margin constraints can cause millions of accounts to switch from harmed to unharmed.

In the Court's Previous Order, it noted that Professor McFadden's model had a "switcher" problem: the same account could switch from harmed to unharmed depending on which 0.1% sample he used to calculate damages. The Court asked plaintiffs to address the issue. Plaintiffs have now done so.

In his revised report, Professor McFadden first points out that switching is a natural

14

**ER-1107**

Case: 25-7930, 05/13/2026, DktEntry: 24.7, Page 113 of 137

Case: 25-7122, 11/10/2025, DktEntry: 1.1, Page 73 of 87
Case 4:11-cv-06714-YGR Document 789 Filed 02/02/24 Page 15 of 28

<div style="text-align: center; writing-mode: vertical-rl;">United States District Court<br>Northern District of California</div>

consequence of using different samples which have different apps, transactions, and customers and therefore different margin constraints. (McFadden's 2nd Supplemental Report ¶ 50.) To account for and minimize this sampling error, Professor McFadden has now drawn seventy-five 0.1% samples, estimated consumer demand based on these samples, taken the average of the seventy-five coefficients obtained, and used the averaged coefficients to estimate damages across all transactions from the App Store at a 95% confidence level. (*Id.* ¶ 54.)

Apple now pivots to a different argument. It contends that Professor McFadden has a switcher problem because accounts change from harmed to unharmed depending on the margin constraint used. McFadden explains that this is a feature not a bug. Logically, if Apple changes the margin constraints of the model—by, for example, arbitrarily imposing a 70%-90% profit range to make its point rather than the 60%-90% estimated by Professor McFadden—many accounts will switch from harmed to unharmed.[9]

When actually using the same samples and constraints as Professor McFadden, Apple's own expert arrived at consistent results. Instead of using seventy-five 0.1% samples and then averaging them, Apple's expert Professor Watson used a 7.5% sample that contained the same accounts. (McFadden's Decl. ℙ 91.) Professor Watson's slightly different method produced slightly different results: a lower price sensitivity that resulted in 2.2% fewer harmed accounts. (*Id.* at ℙ 92.) Apple notes that this equals 3.9 million accounts switched but ignores that 170 million stayed the same. (*Id.*) This does not shake Professor McFadden's 95% confidence interval but instead serves to confirm it. That the pool of putative class members is so high does not change the result.

Again, Apple's arguments here go to weight, not admissibility. They are fodder for cross-examination, not reason to exclude Professor McFadden's testimony. For the reasons set forth above, Apple's *Daubert* motion on this ground is **DENIED.**

---

[9] The same goes for Apple's first argument—that when Professor McFadden fixed an issue where certain apps were in the incorrect genre, a small percentage of accounts switched from harmed to unharmed. Because different genres have different constraints in Professor McFadden's model, this type of change demonstrates that the model reacts to different inputs as a reliable model should.

<div style="text-align: center;">15</div>

<div style="text-align: center;">**ER-1108**</div>

Case: 25-7930, 05/13/2026, DktEntry: 24.7, Page 114 of 137

Case: 25-7122, 11/10/2025, DktEntry: 1.1, Page 74 of 87
Case 4:11-cv-06714-YGR   Document 789   Filed 02/02/24   Page 16 of 28

### C.    DR. ABRANTES-METZ'S CHALLENGED OPINIONS[10]

Dr. Abrantes-Metz opines that, in a but-for world, Apple would have charged a 13.63% commission rate in its App Store. Apple moves to exclude Dr. Abrantes-Metz's expert opinion on four grounds: (1) Dr. Abrantes-Metz has not applied her previous economics expertise to present her current expert opinion, producing an "accounting identity" rather than an economic model; (2) her but-for commission rate rests on untenable assumptions; (3) her inputs are unreliable; and (4) her benchmark analysis is arbitrary.[11] The Court evaluates each.

#### 1.    RELIABLE APPLICATION OF EXPERTISE

First, Apple seeks to exclude the opinion on the grounds it is a product of an "accounting identity," rather than an economic model. Because this accounting identity lacks "any economic content or predictive power," Apple argues, Dr. Abrantes-Metz's analysis is not a reliable application of her expertise. This is most noticeable, Apple concludes, in her disregard of indirect network effects.

Dr. Abrantes-Metz is a Ph.D. economist specializing in industrial organization,

---

[10] Apple also argues that the Court must exclude Professor McFadden's entire model because, even though he relies on Dr. Abrantes-Metz's but-for commission rate, he never read the underlying report that justifies it.

Fed. R. of Evid. 703 permits an expert to base his opinion on "facts or data in the case that the expert has been made aware of." This includes data presented to the expert "outside of court and other than by his own perception." Fed. R. of Evid. 703, Notes of Advisory Committee. In that way, Rule 703 reflects the reality that it is now "common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert." *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002). That is what Professor McFadden has done here—based his opinion in part on Dr. Abrantes-Metz's expertise in industrial organization and multi-sided platforms, expertise the Court previously noted he lacked. Whether the but-for commission rate is suspect, therefore, is properly addressed through Apple's challenge of Dr. Abrantes-Metz's opinion, not Professor McFadden's. Apple's *Daubert* motion on this ground borders on disingenuous and is therefore **DENIED.** Counsel is cautioned not to engage in such specious arguments.

[11] In its supplemental brief on Judge Donato's recent order excluding the opinion of consumer plaintiffs' expert in *In re Google Play Store Antitrust Litig.*, No. 21-md-2981-JD (N.D. Cal. Aug. 28, 2023), Apple also argues that Judge Donato's order there supports excluding Professor McFadden and Dr. Abrantes-Metz's opinions here. The Court disagrees. Other than noting that Judge Donato's order excluded the proffered expert opinion for its unsupported assumptions, an argument Apple already makes in its *Daubert* motion, Apple does not explain how Judge Donato's order is relevant here.

16

United States District Court
Northern District of California

Case: 25-7930, 05/13/2026, DktEntry: 24.7, Page 115 of 137

Case: 25-7122, 11/10/2025, DktEntry: 1.1, Page 75 of 87
Case 4:11-cv-06714-YGR   Document 789   Filed 02/02/24   Page 17 of 28

econometrics, and finance. (Dr. Abrantes-Metz's Opening Report ¶ 1.) She is currently the Principal at the Brattle Group and Co-chair of its Global Antitrust and Competition Practice. (*Id.*) Formerly, she was an adjunct professor at the Leonard N. Stern School of Business at New York University, where she taught industrial organization and competitive analyses. (*Id.*) Before that, she was an economist at the Federal Trade Commission. (*Id.* ¶ 2.) Plaintiffs present Dr. Abrantes-Metz as a qualified expert on benchmark analyses that would have prevailed but-for allegedly anticompetitive conduct. (*Id.* ⁋ 3.) Apple does not challenge her expertise.

Dr. Abrantes-Metz asserts that she used her expertise to create an "economic model" to calculate her but-for commission rate "based on the fundamental principles that an app store's operating profit margin is equal to the difference between the revenue it earns and the costs it incurs, and its revenue depends on its market share and the price (commission rate) it charges." (*Id.* ¶ 21.) To apply that equation, Dr. Abrantes-Metz estimated that Apple would have a 76.9% market share, while the hypothetical rival app store acquired the other 23.1%, using surveys developed by one of Apple's experts. (*Id.* ¶ 35.) She then assumed that the rival app store's profit margin would be 23%. (*Id.* ¶ 43.) Dr. Abrantes-Metz drew this figure from data about the Microsoft Store, which in 2019 reported a profit margin of 23%. (*Id.*) The Microsoft Store is an appropriate benchmark, Dr. Abrantes-Metz posited, because it is an established rival to Steam in the sale of Windows PC game apps. (*Id.* ¶ 47.) This is analogous to the but-for world on which she modeled her commission rate. (*Id.*) Finally, Dr. Abrantes-Metz assumes that a rival app store's variable and fixed costs are the same as Apple's App Store (3.8% of total billings and $786 million, respectively). (*Id.* ¶ 55.) She then plugs these figures into her economic model to calculate the but-for commission rate.

Apple's criticism is, essentially, that Dr. Abrantes-Metz erred in using an equation rather than an economic model. This is pedantic; economic models generally consist of mathematic equations that describe a theory of economic behavior. That Dr. Abrantes-Metz's economic model consists of one mathematical equation does not mean that she has "no theory of economic behavior underpinning her analysis," as Apple charges. Dr. Abrantes-Metz explains, step by step, how she calculates the "fundamental principles" underpinning her equation. (*Id.* ¶ 21.) And though

17

United States District Court
Northern District of California

United States District Court
Northern District of California

Apple may disagree with her inputs (as analyzed below), it has nothing to say about why those fundamental principles are not a reliable application of her expertise.

Nor does Apple's argument that Dr. Abrantes-Metz fails to reliably apply her economic expertise by ignoring indirect network effects persuade. Dr. Abrantes-Metz relied on Professor McFadden's market definition—a single aftermarket for the sale of iOS apps and in-app content to consumers—in constructing her model. (*Id.* ¶ 20.) The Court previously found that Professor McFadden's market definition was sufficiently reliable for purposes of class certification. (Previous Order at 4.) In doing so, the Court rejected Apple's argument that Professor McFadden ignored the two-sidedness of Apple's App Store and its indirect network effects. (Dkt. No. 476-3.) As the Court already warned Apple, it will not reconsider that ruling.[12]

On that ground, Apple's motion is **DENIED.**

### 2.   ASSUMPTIONS

Apple next argues that Dr. Abrantes-Metz's model relies on untenable assumptions about the but-for world: (1) that Apple would only have one other competing app store; (2) both app stores would charge identical commission rates; and (3) the hypothetical app store would provide identical terms and services to the App Store.

First, Dr. Abrantes-Metz has sufficiently defended her assumption that, in the but-for world, the App Store would face one, smaller competitor. She conservatively chose to model a duopoly, rather than a market with multiple rivals, because of the unremarkable and well-supported proposition in economics that more competition equals lower prices. (Dr. Abrantes-Metz's Opening Report ¶ 36; Dr. Abrantes-Metz's Decl. ¶ 43.) Apple does not dispute this basic tenet but instead argues that, under Dr. Abrantes-Metz's model, having more than one rival app store would actually increase Apple's but-for commission rate. Professor Hitt, Apple's expert, arrives at this counterintuitive conclusion by changing the respective market shares in Dr. Abrantes-Metz's existing model while maintaining the same profit margins. (Hitt Report ¶ 296.)

---

[12] Apple also makes the argument that Dr. Abrantes-Metz erred by only considering some of the factors she has considered in other works. This argument relates to the strength of the opinion, not the reliability of the principles upon which it is based. (*See* Dr. Abrantes-Metz's Reply Report ¶ 40.)

18

**ER-1111**

Case: 25-7930, 05/13/2026, DktEntry: 24.7, Page 117 of 137

Case: 25-7122, 11/10/2025, DktEntry: 1.1, Page 77 of 87
Case 4:11-cv-06714-YGR   Document 789   Filed 02/02/24   Page 19 of 28

As Dr. Abrantes-Metz states, it makes no economic sense to presume that "more competition increases prices but does not reduce profitability." (Dr. Abrantes-Metz's Decl. ¶ 44.)

Second, Dr. Abrantes-Metz sufficiently explains her reason for postulating that, in the but-for world, Apple and its competitor would charge identical commission rates. In Dr. Abrantes-Metz's but-for world, Apple and the rival app store would have started at the same time and provided the same services. It follows, Dr. Abrantes-Metz argues, that they would have charged the same price, or commission rate, to their consumers. (Dr. Abrantes-Metz's Report ¶ 28; Dr. Abrantes-Metz's Decl. ¶¶ 68–69.) This is not true of just the but-for world; in the as-is world, competitors like Microsoft and Steam charged the same commission rate for years until a new competitor, Epic Games, forced Microsoft to *lower* its commission rate. (Dr. Abrantes-Metz's Decl. ¶ 73.) If anything, these benchmarks demonstrate that assuming an identical commission rate among the two competitors Dr. Abrantes-Metz posits would exist in the but-for world is conservative.

Moreover, Dr. Abrantes-Metz explained why her model predicts that, in the but-for world, Apple would charge a single rate, rather than tiered rates. While tiered rates in the but-for world are possible, Dr. Abrantes-Metz explains, she does not think they are likely because commission rates would be much closer to costs. (Dr. Abrantes-Metz's Reply Report ¶ 60 n.114.) If she had modeled a tiered commission rate system, Dr. Abrantes-Metz notes, her predicted 13.63% but-for rate would be at the higher tier, not the lower. (*Id.* ¶ 63.) This is because she modeled her but-for commission rate on Microsoft's profits from game sales in 2019, when Microsoft charged a 30% commission rate on games and a 15% commission rate on non-game apps. (*Id.*)

Third, Dr. Abrantes-Metz's assumption that Apple and its hypothetical rival would provide identical services in the but-for world is well explained. Dr. Abrantes-Metz's cites to economic literature for the proposition that two competitors in a duopoly would provide the same services. (Dr. Abrantes-Metz's Opening Report ¶ 28 n.14.) Apple's experts do not contest that economists use symmetric competitors to design economic models—one of Apple's experts, Professor Hitt, stated in his deposition that it is not an "unusual assumption"—but instead speculate that in the but-for world Apple might try to differentiate itself by, for example, offering a consumer rewards

19

Case: 25-7930, 05/13/2026, DktEntry: 24.7, Page 118 of 137

Case: 25-7122, 11/10/2025, DktEntry: 1.1, Page 78 of 87
Case 4:11-cv-06714-YGR   Document 789   Filed 02/02/24   Page 20 of 28

program. (Schmalensee Report ¶ 92.) Such speculation in the face of widely accepted principles goes to weight, not admissibility.

For those reasons, Apple's motion in this regard is **DENIED**.

### 3.    INPUTS

Apple next argues that, even if Dr. Abrantes-Metz's model is sound, her inputs are not. Apple first takes issue with the fact that Dr. Abrantes-Metz assumes that the relevant market in the but-for world was at all times the same as it was in 2019. Dr. Abrantes-Metz's model, in fact, does not assume a constant market size; instead, she assumes that *billings* in the as-is and but-for world are the same. In other words, she assumes that billings would not increase as a result of lower commission rates. (Dr. Abrantes-Metz's Opening Report ¶ 56; Dr. Abrantes-Metz's Decl. ¶¶ 79–81.) This, she explains, is a conservative assumption because modeling that billings would *increase* in the but-for world would result in a *lower* but-for commission rate. Dr. Abrantes-Metz did take into account other market sizes when she, for example, input Apple's app billings from 2018 (not 2019) to check her model. (Dr. Abrantes-Metz's Reply Report ¶ 106.)

As another example, Apple attacks Dr. Abrantes-Metz's use of only one platform—Microsoft—to determine the rival app store's profit margin in the but-for world. Dr. Abrantes-Metz, however, sufficiently explained her process for choosing Microsoft as an input. (Dr. Abrantes-Metz's Opening Report ¶ 43.) To model a duopoly, she looked for an app store that had a high enough profit margin to support its entry and continued operation in the market but not so high it would attract other rivals. (Dr. Abrantes-Metz's Decl. ¶ 115.) She researched various choices and explained why she rejected them—noting that the Google Play store is accused of charging anticompetitive prices while Epic Games is known to charge a below-competitive one. (Dr. Abrantes-Metz's Opening Report ¶¶ 66, 90.) She then explained that she ultimately settled on Microsoft because it had a similar functionality to the Apple app store; was an established, profitable rival to a larger competitor, Steam; and using its 2019 profile allows Dr. Abrantes-Metz to calculate what Microsoft's profit margin was after a new competitor, Epic Games, entered the market but before Microsoft cut its commission rates in response. (Dr. Abrantes-Metz's Decl.

20

**ER-1113**

Case: 25-7930, 05/13/2026, DktEntry: 24.7, Page 119 of 137

Case: 25-7122, 11/10/2025, DktEntry: 1.1, Page 79 of 87
Case 4:11-cv-06714-YGR Document 789 Filed 02/02/24 Page 21 of 28

¶ 125.)[13]

Finally, Apple argues that Dr. Abrantes-Metz's input for the hypothetical rival store's market share is unfounded. Dr. Abrantes-Metz used the survey results from Apple's own expert, Dr. Simonson, to conclude that Apple and its hypothetical rival would have a 76.9/23.1% split of the market. As Dr. Abrantes-Metz explained, this is a conservative input in Apple's favor—in that but-for world, Apple's share of the market would still be highly concentrated. (Dr. Abrantes-Metz's Opening Report ¶ 113.) In fact, another of Apple's experts noted that it would have been reasonable for Dr. Abrantes-Metz to model a 50/50% split with a lower but-for commission rate. (Dr. Abrantes-Metz's Reply Report ¶ 114.) Yet Apple argues that, if Dr. Abrantes-Metz is using the Microsoft Store's profit margin from 2019, she should input its 2019 market share of 7.7% as well into her model. Dr. Abrantes-Metz explains why she rejects the resulting 92.3/7.7% split—it is far too concentrated to be a model of a truly competitive duopoly where both competitors entered the market on the same footing. (Dr. Abrantes-Metz's Opening Report ¶ 110.) Dr. Abrantes-Metz has sufficiently justified the opinion. Apple's objection may be reraised on cross-examination.

Apple's motion on this point is **DENIED.**

### 4. BENCHMARK ANALYSIS

Finally, Apple argues that Dr. Abrantes-Metz's benchmark comparison is cherry-picked. To check her conclusion that, in the but-for world, Apple's commission rate would be 13.63%, Dr. Abrantes-Metz did a benchmark marketplace analysis. A good benchmark must "share key features of the relevant marketplace in question, while at the same time being as free as possible of anti-competitive conduct." (Dr. Abrantes-Metz's Reply Report ¶ 168.) She first considered various candidates: the Windows PC Game apps, Android apps, MacOS apps, and Steam games. Dr.

---

[13] In its Reply, Apples argues for the first time that Dr. Abrantes-Metz's but-for commission rate should be excluded because while Microsoft's profit margin (on which Dr. Abrantes-Metz relied) was 23% in 2019, in 2020 it was 55% while in 2021 it was 43%. Arguments presented for the first time on reply are disfavored and can be disregarded. In any case, Dr. Abrantes-Metz already explained why she thought Microsoft's *2019* profit margin was particularly well-suited, as explained above. Moreover, even with a 13.63% but-for commission rate, Dr. Abrantes-Metz still calculates that Apple would earn a 57.2% profit. (Dr. Abrantes-Metz's Opening Report ¶ 23.) That is sufficient.

21

ER-1114

Case: 25-7930, 05/13/2026, DktEntry: 24.7, Page 120 of 137

Case: 25-7122, 11/10/2025, DktEntry: 1.1, Page 80 of 87
Case 4:11-cv-06714-YGR  Document 789  Filed 02/02/24  Page 22 of 28

Abrantes-Metz explained why she rejected those benchmarks. For example, she states, Google purportedly raised barriers to entry by requiring Android device manufacturers to prominently display the Google Play store on their devices while Epic Games lowered its commission rate to break into the marketplace at the cost of negative operating profits. (Dr. Abrantes-Metz's Opening Report ¶ 49.) In the end, she concluded that the Windows Store was the most appropriate benchmark for two reasons: the Windows Store and Apple App store are similar in the services they provide, and, unlike Apple, Microsoft does not impose significant barriers to entry. (Dr. Abrantes-Metz's Opening Report ¶ 64.)

Apple does not dispute that Windows Store is a suitable benchmark.[14] Instead, it argues that Dr. Abrantes-Metz excluded other benchmarks with 30% commission rates, like the Google Play Store and Steam, while including the 12% commission rates of Microsoft and Epic Games in her analysis. As stated above, Dr. Abrantes-Metz excluded the Google Play Store because of its allegedly anticompetitive conduct.[15] Given that an important part of conducting her check was finding a benchmark as free as possible of anticompetitive conduct (a qualification Apple does not contest), Dr. Abrantes-Metz sufficiently explained why she excluded the Google Play Store.[16] Dr. Abrantes-Metz did *not*, however, exclude Steam from her analysis. (Dr. Abrantes-Metz's Opening Report ¶ 119; Dr. Abrantes-Metz's Reply Report ¶ 170.) Though Dr. Abrantes-Metz argued that Steam *should* be excluded because of its anticompetitive conduct, she ran her benchmark analysis *with* Steam and found that the but-for commission rate would range from 13.91%-14.18%, which

_____

[14] Apple does argue that Dr. Abrantes-Metz was inconsistent in considering Google's anticompetitive conduct but ignoring the fact that the Federal Trade Commission recently sued Microsoft over its significant power in the video game market. But, as Dr. Abrantes-Metz states, FTC's complaint was over Microsoft's proposed merger with Activision, which had not taken place and so could not have influenced its then-existing commission rate. (Dr. Abrantes-Metz's Reply Report ¶ 165.)

[15] A jury recently convicted Google for the anticompetitive policies of its Play Store. *In re Google Play Antitrust litigation*, No. 21-md-2981-JD.

[16] Dr. Abrantes-Metz also explained why the Amazon and Samsung Stores were not suitable benchmarks for the deployment of Android apps: given Google's allegedly anticompetitive conduct, which has kept the Samsung Galaxy Store and Amazon Appstore from becoming true rivals in this space, neither was a good example on which to model a truly competitive duopoly. (Dr. Abrantes-Metz's Reply Report ¶ 143.)

22

**ER-1115**

United States District Court
Northern District of California

Case: 25-7930, 05/13/2026, DktEntry: 24.7, Page 121 of 137

Case: 25-7122, 11/10/2025, DktEntry: 1.1, Page 81 of 87
Case 4:11-cv-06714-YGR   Document 789   Filed 02/02/24   Page 23 of 28

United States District Court
Northern District of California

was consistent with her final rate of 13.63%. (Dr. Abrantes-Metz's Reply Report ¶ 170.)

Moreover, Dr. Abrantes-Metz adequately defended her decision to include Microsoft and Epic Games' 12% commission rate. Though Microsoft charged a 30% commission rate in its PC games store and stated it would not lower its commission rate on its platform, once Epic Games entered the market, Microsoft eventually did lower its commission rate to 12% in response. (Dr. Abrantes-Metz's Opening Report ¶¶ 111–113.) Dr. Abrantes-Metz concluded that including the way Microsoft changed its commission rate when faced with "stiff competition" in her analysis was a useful predictor of what the range of commission rates would look like for Apple in the more competitive, but-for world. (*Id.* ¶ 115.)

Finally, Apple argues that Professor Abrantes-Metz's analysis was skewed by including direct-to-consumer platforms, or platforms that distribute their own apps. As Dr. Abrantes-Metz explains, however, including direct-to-consumer platforms, which do compete in the same market, is the more holistic approach. Moreover, Apple's argument that direct-to-consumer platforms should be excluded because they do not face the same costs ignores that self-distribution is not "free"; direct-to-consumer platforms have to choose between the costs of building and marketing a new platform or paying the commission rates of established ones like the Apple App Store. In either situation, there are distribution costs involved.

Apple's *Daubert* motion is **DENIED.**

## III.   CLASS CERTIFICATION

Plaintiffs once again move for class certification under Rule 23(b)(3) based on Apple's allegedly anticompetitive conduct. In its Previous Order, the Court found that plaintiffs met the requirements of Rule 23(a) which are summarized above. Here, therefore, it analyzes only whether plaintiffs can now satisfy the predominance requirement of Rule 23(b)(3).

### A.   LEGAL FRAMEWORK

Under Rule 23(b)(3), a court must find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." "An individual question is one where 'members of a proposed class will need to

23

United States District Court
Northern District of California

present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted). The "predominance inquiry asks whether the common, aggregation-enabling issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (quoting 2 W. Rubenstein, 2 Newberg on Class Actions § 4:49 (5th ed.)).

"In carrying the burden of proving facts necessary for certifying a class under Rule 23(b)(3), plaintiffs may use any admissible evidence," including expert evidence. *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022). Just because the proffered expert evidence is admissible, however, does not mean that a court can certify a class. A court must decide if the expert's methodology is "capable of showing class-wide antitrust impact" in light of "factors that may undercut the model's reliability (such as unsupported assumptions, erroneous inputs, or nonsensical outputs)."

## B.    PREDOMINANCE

In its Previous Order, the Court excluded plaintiffs' expert testimony and thus found they could not satisfy the predominance requirement.[17] Now that the Court has found otherwise, the only dispute left is whether plaintiffs can prove antitrust injury on a classwide basis.[18]

Core to the predominance analysis is whether plaintiffs' class definition sweeps in a statistically significant number of uninjured class members. In the last round of briefing, plaintiffs conceded that their class definition included an estimated 14.6% of uninjured class members. (Previous Order at 23.) The Court then noted that the Ninth Circuit had not "squarely addressed

---

[17] The Court previously expressed its concern with plaintiffs' proposed plan of proving classwide damages by running Professor McFadden's model after trial. (Previous Order at 25–27.) Plaintiffs have now affirmed to the Court that Professor McFadden will calculate both aggregate and individual damages *before trial* with the full transactions data of the entire App Store. Given that, the Court now finds that plaintiffs have satisfied the predominance requirement as to damages.

[18] In its opposition to plaintiffs' motion for class certification, Apple raises many of the same arguments made in its *Daubert* motion. The Court incorporates its analysis above but does not regurgitate the reasons for rejecting the arguments.

24

**ER-1117**

Case: 25-7930, 05/13/2026, DktEntry: 24.7, Page 123 of 137

Case: 25-7122, 11/10/2025, DktEntry: 1.1, Page 83 of 87
Case 4:11-cv-06714-YGR Document 789 Filed 02/02/24 Page 25 of 28

the issue of whether a particular percentage of uninjured class members defeats predominance," but, given the errors in Professor McFadden's methodology, the Court found that individual issues would predominate regardless because plaintiffs could not reliably identify which class members, and how many, were injured. (Previous Order at 25.)

Plaintiffs now seek to narrow the class. Plaintiffs currently estimate that 17.8% of Apple accounts have not suffered an overcharge due to Apple's allegedly anticompetitive conduct. (McFadden's 2nd Supplement Report ¶ 16.) Because there are many more accounts than iPhone users, plaintiffs surmise that the actual number of class members that are uninjured is significantly lower. In any case, in response to the Court's overbreadth concerns, plaintiffs have now narrowed their class definition to only include Apple account holders who have spent $10 or more on app or in-app content. Under this narrowed definition, Professor McFadden estimates that the class includes only 7.9% uninjured members. (*Id*.)

Notably, since the Court's Previous Order, an *en banc* panel of the Ninth Circuit rejected the argument that "Rule 23 does not permit the certification of a class that potentially includes more than a de minimis number of uninjured class members." *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 (9th Cir. 2022). Nevertheless, the Ninth Circuit stated, a district court "must consider whether the possible presence of uninjured class members means that the class definition is fatally overbroad." *Id.* at 669 n.14. The problem with a class definition that includes uninjured class members is "the obverse of a different problem with class definition: the problem of the 'fail-safe' class: one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim." *Messner v. Northshore University HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012). "Defining a class so as to avoid, on one hand, being over-inclusive and, on the other hand, the fail-safe problem is more of an art than a science." *Id*. Both, however, "can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis." *Olean*, 31 F.4th at 669 n.14 (quoting *Messner*, 669 F.3d at 825).

In *Olean*, defendants argued on appeal that the district court abused its discretion in certifying a class that potentially included 28% uninjured class members. 31 F.4th at 680. The

25

United States District Court
Northern District of California

Case: 25-7930, 05/13/2026, DktEntry: 24.7, Page 124 of 137

Case: 25-7122, 11/10/2025, DktEntry: 1.1, Page 84 of 87
Case 4:11-cv-06714-YGR   Document 789   Filed 02/02/24   Page 26 of 28

United States District Court
Northern District of California

Ninth Circuit rejected this argument, holding that all that is necessary at the class certification stage is a finding that an expert's model was "*capable* of showing" that all class members suffered antitrust impact on a classwide basis, even those with "limited transactions." 31 F.4th at 681.

The same is true here. Professor McFadden's model can show the impact of Apple's allegedly anticompetitive conduct across all class members. He has now run his revised model on all the App Store transactions across the Games, Music, and Entertainment genres and can compute which Apple accounts suffered damages and which did not. Plaintiffs have represented to the Court that, once Apple produces the rest of its app transactional data, Professor McFadden will be able to calculate the exact extent of injury suffered by each class member. Acknowledging that an estimated 17.8% of accounts in Professor McFadden's model are uninjured, plaintiffs have revised their class definition to limit the number of uninjured class members.

While the Court remains concerned that the $10.00 cutoff results in an estimated 7.9% or 10,283,035 million uninjured accounts, it expects, given plaintiffs' representations, that once the model is fully run, that number will be reduced[19] or the cutoff could be changed to reduce the impact of including unharmed accounts. Accordingly, under *Olean*, the predominance requirement is met.

Apple's arguments otherwise do not persuade. According to Apple, *Olean* is distinguishable because all or virtually all class members in that case were harmed.[20] This is not the case—in *Olean*, up to 28% of the class was uninjured, significantly more than the 7.9% posited by plaintiffs here. It is true that in this case, the number of uninjured accounts numbers in

---

[19] *See* Dkt. No. 786-1, Declaration of Minjae Song, Ph.D. in Response to Order for Supplemental Information in Further Support of Renewed Motion for Class Certification. The attendant motion to seal is **GRANTED**.

[20] Apple argues also that the First Circuit's opinion in *In re New Motor Vehicle Canadian Export Antitrust Litig.*, 522 F.3d 6 (1st Cir. 2008), supports its position here. To start, the Ninth Circuit in *Olean* noted that *In re New Motor* was distinguishable because the First Circuit found that the case could not proceed on jurisdictional grounds and so the rest of its analysis on class certification was dictum. *Olean*, 31 F.4th at 678 n.26. In any case, Apple's arguments about why *In re New Motor* supports its position go to the admissibility of Professor McFadden's model, rather than whether it provides common evidence in support of class certification. The Court rejects these arguments for the same reason it denies Apple's *Daubert* motion.

**ER-1119**

the millions. The Ninth Circuit in *Olean*, however, rejected the argument that Rule 23 has an uninjured class member cutoff beyond which class certification is impermissible. That position is "inconsistent with Rule 23(b)(3), which requires only that the district court determine after rigorous analysis whether the common question predominates over any individual questions." *Id.* at 669. The model, once run, will answer the common question of whether Apple's conduct caused class members to suffer an antitrust injury. At this juncture, the Court cannot "flatly reject" class certification because the pre-run model shows an estimated 7.9% of the class is uninjured. *See id.,* n.14.

For those reasons, plaintiffs' motion for class certification is **GRANTED.**

### C.     APPOINTING CLASS REPRESENTATIVES AND CLASS COUNSEL

In its Previous Order, the Court noted that the proposed Class Representatives—plaintiffs Stephen H. Schwartz, Edward W. Hayter, Robert Pepper, and Edward Lawrence—were each both typical and adequate. (Previous Order at 20). Consumer plaintiffs now move to appoint them as class representatives. Apple does not oppose. The motion to do so is **GRANTED.**

The Court also noted, in its Previous Order, that it had "no concerns" regarding the adequacy of Wolf Haldenstein Adler Freeman & Herz LLP and Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C. to serve as co-class counsel. (Previous Order at 20 n.11.) Consumer plaintiffs move to appoint Wolf Haldenstein and Kellogg Hansen as co-class counsel. Apple, again, does not oppose this request. The motion in this respect is also **GRANTED.**

### IV.     CONCLUSION

For the foregoing reasons, Apple's *Daubert* motion is **DENIED** and plaintiffs' motion for class certification is **GRANTED.**

The Court sets a Case Management Conference for February 26, 2024, at 2:00 p.m. on the Zoom platform. Parties shall meet and confer on a schedule for the balance of the action. By no later than February 16, 2024, the parties shall file a joint statement with the proposed schedule including (i) the *earliest* date by which they will be in a position to file all remaining motions, including trial-related motions, (ii) any trial conflicts within six (6) months thereafter; and (iii) the timeframe within which Professor McFadden will run his model on the rest of the App Store

27

United States District Court
Northern District of California

United States District Court
Northern District of California

transactional data and whether the model can successfully ascertain the number of uninjured class members and limit them.

This Order terminates Docket Nos. 683, 690 and 786.

**IT IS SO ORDERED.**

Dated: February 2, 2024

_____
YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE

28

**ER-1121**

# ADDENDUM VOL II
# FILED UNDER SEAL

**ACMS Docket Report**
**United States Court of Appeals for the Ninth Circuit**

| | |
|---|---|
| **Court of Appeals Docket #:** 25-7122 | **Docketed:** 11/12/2025 |
| Pepper, et al. v. Apple Inc. | **Termed:** 12/18/2025 |
| **Appeal From:** San Francisco, Northern California | |
| **Fee Status:** Not Applicable | |

**Case Type Information:**

  **1)** Original Proceeding

  **2)** 23(f) Petition

  **3)** Private

**Originating Court Information:**

  **District:** Northern District of California : 4:11-cv-6714

  **Trial Judge:** Yvonne Gonzalez Rogers, District Judge

  **Date Filed:** 12/29/2011

    **Date Order/Judgment:**

    10/27/2025

**Prior Cases:**

  None

**Current Cases:**

  None

| | |
|---|---|
| ROBERT PEPPER<br>  Plaintiff - Petitioner | Betsy C. Manifold, Attorney<br>Email: manifold@whafh.com<br>[Retained]<br>Wolf Haldenstein Adler Freeman & Herz LLP<br>750 B Street<br>San Diego, CA 92101<br><br>Rachele R. Byrd, Attorney<br>Email: byrd@whafh.com<br>[Retained]<br>Wolf Haldenstein Adler Freeman & Herz LLP<br>750 B Street<br>San Diego, CA 92101<br><br>Mark C. Rifkin, Attorney<br>Direct: 212-545-4600<br>Email: rifkin@whafh.com<br>[Retained]<br>Wolf Haldenstein Adler Freeman & Herz LLP<br>270 Madison Avenue<br>New York, NY 10016<br><br>Matthew M. Guiney<br>Direct: 212-545-4600<br>Email: guiney@whafh.com<br>[Retained]<br>Wolf Haldenstein Adler Freeman & Herz LLP<br>270 Madison Avenue<br>New York, NY 10016 |

**ER-1123**

Thomas Burt
Direct: 212-545-4600
Email: burt@whafh.com
[Retained]
Wolf Haldenstein Adler Freeman & Herz LLP
270 Madison Avenue
New York, NY 10016

David Charles Frederick, Attorney
Direct: 202-326-7900
Email: dfrederick@kellogghansen.com
[Retained]
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
1615 M Street, NW
Suite 400
Washington, DC 20036

Aaron Martin Panner, Attorney
Email: apanner@kellogghansen.com
[Retained]
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
1615 M Street, NW
Suite 400
Washington, DC 20036

Mr. Kyle Matthew Wood
Direct: 202-367-7806
Email: kwood@kellogghansen.com
[Retained]
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
1615 M Street, NW
Suite 400
Washington, DC 20036

Ms. Anna Link
Direct: 202-326-7954
Email: alink@kellogghansen.com
[Retained]
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
1615 M Street, NW
Suite 400
Washington, DC 20036

Anthony R. Guttman
Direct: 202-367-7814
Email: aguttman@kellogghansen.com
[Retained]
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
1615 M Street, NW
Suite 400
Washington, DC 20036

Alex Treiger, Attorney
**Terminated:** 02/25/2026
Direct: 202-326-7995
Email: atreiger@kellogghansen.com
[Retained]
Kellogg, Hansen, Todd, Figel & Frederick, PLLC

**ER-1124**

<table>
<tr>
<td></td>
<td>
1615 M Street, NW<br>
Suite 400<br>
Washington, DC 20036<br><br>
Caroline Schechinger<br>
<strong>Terminated:</strong> 02/17/2026<br>
Direct: 202-326-7906<br>
Email: cschechinger@kellogghansen.com<br>
[Retained]<br>
Kellogg, Hansen, Todd, Figel & Frederick, PLLC<br>
1615 M Street, NW<br>
Suite 400<br>
Washington, DC 20036
</td>
</tr>
<tr>
<td>
EDWARD LAWRENCE<br>
   Plaintiff - Petitioner
</td>
<td>
Betsy C. Manifold, Attorney<br>
Email: manifold@whafh.com<br>
[Retained]<br>
Wolf Haldenstein Adler Freeman & Herz LLP<br>
750 B Street<br>
San Diego, CA 92101<br><br>
Rachele R. Byrd, Attorney<br>
Email: byrd@whafh.com<br>
[Retained]<br>
Wolf Haldenstein Adler Freeman & Herz LLP<br>
750 B Street<br>
San Diego, CA 92101<br><br>
Mark C. Rifkin, Attorney<br>
Direct: 212-545-4600<br>
Email: rifkin@whafh.com<br>
[Retained]<br>
Wolf Haldenstein Adler Freeman & Herz LLP<br>
270 Madison Avenue<br>
New York, NY 10016<br><br>
Matthew M. Guiney<br>
Direct: 212-545-4600<br>
Email: guiney@whafh.com<br>
[Retained]<br>
Wolf Haldenstein Adler Freeman & Herz LLP<br>
270 Madison Avenue<br>
New York, NY 10016<br><br>
Thomas Burt<br>
Direct: 212-545-4600<br>
Email: burt@whafh.com<br>
[Retained]<br>
Wolf Haldenstein Adler Freeman & Herz LLP<br>
270 Madison Avenue<br>
New York, NY 10016<br><br>
David Charles Frederick, Attorney<br>
Direct: 202-326-7900<br>
Email: dfrederick@kellogghansen.com<br>
[Retained]<br>
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
</td>
</tr>
</table>

**ER-1125**

1615 M Street, NW
Suite 400
Washington, DC 20036

Aaron Martin Panner, Attorney
Email: apanner@kellogghansen.com
[Retained]
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
1615 M Street, NW
Suite 400
Washington, DC 20036

Mr. Kyle Matthew Wood
Direct: 202-367-7806
Email: kwood@kellogghansen.com
[Retained]
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
1615 M Street, NW
Suite 400
Washington, DC 20036

Ms. Anna Link
Direct: 202-326-7954
Email: alink@kellogghansen.com
[Retained]
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
1615 M Street, NW
Suite 400
Washington, DC 20036

Anthony R. Guttman
Direct: 202-367-7814
Email: aguttman@kellogghansen.com
[Retained]
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
1615 M Street, NW
Suite 400
Washington, DC 20036

Alex Treiger, Attorney
**Terminated:** 02/25/2026
Direct: 202-326-7995
Email: atreiger@kellogghansen.com
[Retained]
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
1615 M Street, NW
Suite 400
Washington, DC 20036

Caroline Schechinger
**Terminated:** 02/17/2026
Direct: 202-326-7906
Email: cschechinger@kellogghansen.com
[Retained]
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
1615 M Street, NW
Suite 400
Washington, DC 20036

**ER-1126**

| STEPHEN H. SCHWARTZ<br>  Plaintiff - Petitioner | Betsy C. Manifold, Attorney<br>Email: manifold@whafh.com<br>[Retained]<br>Wolf Haldenstein Adler Freeman & Herz LLP<br>750 B Street<br>San Diego, CA 92101<br><br>Rachele R. Byrd, Attorney<br>Email: byrd@whafh.com<br>[Retained]<br>Wolf Haldenstein Adler Freeman & Herz LLP<br>750 B Street<br>San Diego, CA 92101<br><br>Mark C. Rifkin, Attorney<br>Direct: 212-545-4600<br>Email: rifkin@whafh.com<br>[Retained]<br>Wolf Haldenstein Adler Freeman & Herz LLP<br>270 Madison Avenue<br>New York, NY 10016<br><br>Matthew M. Guiney<br>Direct: 212-545-4600<br>Email: guiney@whafh.com<br>[Retained]<br>Wolf Haldenstein Adler Freeman & Herz LLP<br>270 Madison Avenue<br>New York, NY 10016<br><br>Thomas Burt<br>Direct: 212-545-4600<br>Email: burt@whafh.com<br>[Retained]<br>Wolf Haldenstein Adler Freeman & Herz LLP<br>270 Madison Avenue<br>New York, NY 10016<br><br>David Charles Frederick, Attorney<br>Direct: 202-326-7900<br>Email: dfrederick@kellogghansen.com<br>[Retained]<br>Kellogg, Hansen, Todd, Figel & Frederick, PLLC<br>1615 M Street, NW<br>Suite 400<br>Washington, DC 20036<br><br>Aaron Martin Panner, Attorney<br>Email: apanner@kellogghansen.com<br>[Retained]<br>Kellogg, Hansen, Todd, Figel & Frederick, PLLC<br>1615 M Street, NW<br>Suite 400<br>Washington, DC 20036<br><br>Mr. Kyle Matthew Wood<br>Direct: 202-367-7806<br>Email: kwood@kellogghansen.com |

[Retained]
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
1615 M Street, NW
Suite 400
Washington, DC 20036

Ms. Anna Link
Direct: 202-326-7954
Email: alink@kellogghansen.com
[Retained]
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
1615 M Street, NW
Suite 400
Washington, DC 20036

Anthony R. Guttman
Direct: 202-367-7814
Email: aguttman@kellogghansen.com
[Retained]
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
1615 M Street, NW
Suite 400
Washington, DC 20036

Alex Treiger, Attorney
**Terminated:** 02/25/2026
Direct: 202-326-7995
Email: atreiger@kellogghansen.com
[Retained]
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
1615 M Street, NW
Suite 400
Washington, DC 20036

Caroline Schechinger
**Terminated:** 02/17/2026
Direct: 202-326-7906
Email: cschechinger@kellogghansen.com
[Retained]
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
1615 M Street, NW
Suite 400
Washington, DC 20036

APPLE INC.
  Defendant - Respondent

Cynthia Richman
Direct: 202-955-8234
Email: crichman@gibsondunn.com
[Retained]
Gibson, Dunn & Crutcher, LLP
1700 M Street, NW
Washington, DC 20036-4504

Mr. Harry Phillips, Attorney
Direct: 202-887-3706
Email: hphillips2@gibsondunn.com
[Retained]
Gibson, Dunn & Crutcher, LLP

**ER-1128**

1700 M Street, NW
Washington, DC 20036-4504

Mr. Theodore J. Boutrous, Jr., Attorney
Email: tboutrous@gibsondunn.com
[Retained]
Gibson, Dunn & Crutcher, LLP
333 S Grand Avenue
Suite 5300
Los Angeles, CA 90071-3197

Mr. Daniel Glen Swanson, Attorney
Email: dswanson@gibsondunn.com
[Retained]
Gibson, Dunn & Crutcher, LLP
333 S Grand Avenue
Suite 5300
Los Angeles, CA 90071-3197

Julian Kleinbrodt, Attorney
Direct: 415-393-8382
Email: jkleinbrodt@gibsondunn.com
[Retained]
Gibson, Dunn & Crutcher, LLP
1 Embarcadero Center
Suite 2600
San Francisco, CA 94111-3715

Dana Lynn Craig
Direct: 415-393-8253
Email: DCraig@gibsondunn.com
[Retained]
Gibson, Dunn & Crutcher, LLP
1 Embarcadero Center
Suite 2600
San Francisco, CA 94111-3715

Mr. Matt Aidan Getz
Direct: 213-229-7754
Email: mgetz@gibsondunn.com
[Retained]
Gibson, Dunn & Crutcher, LLP
333 S Grand Avenue
Suite 5300
Los Angeles, CA 90071-3197

**ER-1129**

In Re: APPLE IPHONE ANTITRUST LITIGATION

_____

ROBERT PEPPER; EDWARD LAWRENCE; STEPHEN H. SCHWARTZ,

       Plaintiffs - Petitioners.

 v.

APPLE INC.,

       Defendant - Respondent.

**ER-1130**

| 11/10/2025 | ☑ 1<br>87 pg. 38,203 KB | **PETITION** for Permission to Appeal Pursuant to FRCP 23(f) filed by Petitioner Edward Lawrence, Petitioner Robert Pepper, Petitioner Stephen H. Schwartz.--[COURT UPDATE: Sealed vol of addendum attached as of 11/18/2025 (sealed exhibit originally submitted at DE 4)] [Entered: 11/12/2025 10:13 AM] [Edited: 11/18/2025 09:24 AM] |
|---|---|---|
| 11/12/2025 | 2 | **CASE OPENED.** Your case opening documents have been received in the Clerk's office of the United States Court of Appeals for the Ninth Circuit on **11/10/2025**. The U.S. Court of Appeals docket number **25-7122** has been assigned to this case. All communications with the court must indicate this Court of Appeals docket number. Please carefully review the docket to ensure the name(s) and contact information are correct. It is your responsibility to alert the court if your contact information changes.<br><br>**Resources Available**<br>For more information about case processing and to assist you in preparing your brief, please review the Appellate Practice Guide. Attorneys should consider the court's Appellate Mentoring Program for assistance. [Entered: 11/12/2025 10:15 AM] |
| 11/12/2025 | ☐ 3<br>1 pg. 256 KB | **SCHEDULE NOTICE** for Petition for Permission to Appeal. [Entered: 11/12/2025 10:17 AM] |
| 11/13/2025 | 4 | **MOTION** to File Document Under Seal and Sealed Document Submitted for Filing filed by Petitioner Robert Pepper, Petitioner Edward Lawrence, Petitioner Stephen H. Schwartz. [Entered: 11/13/2025 11:11 AM] |
| 11/13/2025 | 5 | **DEFECTIVE --- MOTION** to Extend Time to File Brief filed by Respondent Apple Inc.. [Wrong filing type used, corrected in DE 8] [Entered: 11/13/2025 07:46 PM] [Edited: 11/14/2025 11:49 AM] |
| 11/13/2025 | 6 | **NOTICE OF APPEARANCE** by Matt Aidan Getz for Respondent Apple Inc.. [Entered: 11/13/2025 09:11 PM] |
| 11/13/2025 | ☐ 8<br>10 pg. 192 KB | **MOTION** to Extend Time to File Answer filed by Respondent Apple Inc.. [Court entered filing to correct DE 5] [Entered: 11/14/2025 11:48 AM] |
| 11/14/2025 | 7 | **ADDED** Counsel for Respondent Matt Aidan Getz [Entered: 11/14/2025 11:35 AM] |
| 11/20/2025 | ☐ 9<br>1 pg. 192 KB | **ORDER FILED.** The unopposed motion (Docket Entry No. 8) for an extension of time to file an answer to the petition for permission to appeal is granted. The answer is due December 1, 2025. [Entered: 11/20/2025 10:06 AM] |
| 11/21/2025 | ☑ 10<br>38 pg. 448 KB | **ANSWER** to Petition for Permission to Appeal Pursuant to FRCP 23(f) (DE 1) filed by Respondent Apple Inc.. [Entered: 11/21/2025 05:24 PM] |
| 11/28/2025 | 11 | **NOTICE OF APPEARANCE** by Anna Link for Petitioner Edward Lawrence, Petitioner Robert Pepper, Petitioner Stephen H. Schwartz. [Entered: 11/28/2025 10:31 AM] |
| 11/28/2025 | 12 | **ADDED** Counsel for Petitioner Anna Link [Entered: 11/28/2025 10:37 AM] |
| 11/28/2025 | 13 | **NOTICE OF APPEARANCE** by Anthony R. Guttman for Petitioner Edward Lawrence, Petitioner Robert Pepper, Petitioner Stephen H. Schwartz. [Entered: 11/28/2025 10:59 AM] |
| 11/28/2025 | 14 | **ADDED** Counsel for Petitioner Anthony R. Guttman [Entered: 11/28/2025 11:07 AM] |
| 11/28/2025 | ☐ 15<br>25 pg. 320 KB | **MOTION** for Leave to File Reply filed by Petitioner Robert Pepper, Petitioner Edward Lawrence, Petitioner Stephen H. Schwartz. [Entered: 11/28/2025 02:51 PM] |
| 11/28/2025 | ☐ 16<br>25 pg. 320 KB | **REPLY** to Answer (DE 10) filed by Petitioner Robert Pepper, Petitioner Edward Lawrence, Petitioner Stephen H. Schwartz. [Court entered filing, PDF from DE 15] [Entered: 11/28/2025 02:57 PM] |
| 12/18/2025 | ☑ 17<br>1 pg. 224 KB | **ORDER FILED.** (Andrew D. HURWITZ, Daniel A. BRESS). The motion (Docket Entry No. 15) for leave to file a reply in support of the petition is granted.<br>The petition for permission to appeal is granted. See Fed. R. Civ. P. 23(f); Chamberlan v. Ford Motor Co., 402 F.3d 952, 959-60 (9th Cir. 2005) (describing factors this court considers in analyzing a Rule 23(f) |

petition). Within 14 days, petitioners must comply with Federal Rule of Appellate Procedure 5(d)(1). The unopposed motion (Docket Entry No. 4) to file under seal Addendum Volume II is granted. The clerk will file publicly the motion to seal (Docket Entry No. 4.1). The clerk will maintain Addendum Volume II under seal at Docket Entry No. 1.2. [Entered: 12/18/2025 11:05 AM]

| Date | No. | Entry |
|---|---|---|
| 2/16/2026 | 18 | **NOTICE** of Withdrawal as Counsel filed by Caroline Schechinger. Counsel withdrawing on behalf of other attorney(s): No [[-]]. Party proceeding without counsel: No. [-]. [Entered: 02/16/2026 09:21 AM] |
| 2/17/2026 | 19 | **TERMINATED** participation of Counsel for Petitioner Caroline Schechinger, representing Petitioner Edward Lawrence, Petitioner Robert Pepper, Petitioner Stephen H. Schwartz. [Entered: 02/17/2026 10:24 AM] |
| 2/25/2026 | 20 | **NOTICE** of Withdrawal as Counsel filed by Alex Treiger. Counsel withdrawing on behalf of other attorney(s): No [[-]]. Party proceeding without counsel: No. [-]. [Entered: 02/25/2026 08:31 AM] |
| 2/25/2026 | 21 | **TERMINATED** participation of Counsel for Petitioner Alex Treiger, representing Petitioner Edward Lawrence, Petitioner Robert Pepper, Petitioner Stephen H. Schwartz. [Entered: 02/25/2026 09:48 AM] |
| 5/1/2026 | 22 | **NOTICE** of Withdrawal as Counsel filed by Kyle Matthew Wood. Counsel withdrawing on behalf of other attorney(s): No [[-]]. Party proceeding without counsel: No. [-]. [Entered: 05/01/2026 09:42 AM] |
| 5/1/2026 | 23 | **TERMINATED** participation of Counsel for Petitioner Kyle Matthew Wood, representing Petitioner Edward Lawrence, Petitioner Robert Pepper, Petitioner Stephen H. Schwartz. [Entered: 05/01/2026 09:49 AM] |