No. 25-7930

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

IN RE APPLE IPHONE ANTITRUST LITIGATION

---

ROBERT PEPPER; EDWARD LAWRENCE; STEPHEN H. SCHWARTZ,

*Plaintiffs-Appellants*,

v.

APPLE INC.,

*Defendant-Appellee*.

---

On Appeal from the U.S. District Court
for the Northern District of California
Case No. 4:11-cv-6714 | Hon. Yvonne Gonzalez Rogers

---

## ANSWERING BRIEF

---

<div style="display:flex">

Cynthia E. Richman
Harry R. S. Phillips
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
(202) 955-8500

Caeli A. Higney
Julian W. Kleinbrodt
Eli M. Lazarus
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Ctr., Ste. 2600
San Francisco, CA 94111
(415) 393-8200

Theodore J. Boutrous Jr.
Daniel G. Swanson
Blaine H. Evanson
Bradley J. Hamburger
Matt Aidan Getz
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

</div>

*Counsel for Appellee Apple Inc.*

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1, appellee Apple Inc. declares that it is publicly traded (NASDAQ: AAPL), that it has no parent corporation, and that no publicly held corporation owns 10% or more of its stock.

Dated:  August 12, 2026                Respectfully submitted,

/s/ *Theodore J. Boutrous Jr.*
    Theodore J. Boutrous Jr.

*Counsel for Appellee*
*Apple Inc.*

i

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................... 1

ISSUES PRESENTED ..................................................................... 5

STATEMENT OF THE CASE .......................................................... 5

    A.    The App Store connects consumers with app developers ..................................................................... 5

    B.    Plaintiffs sue Apple, claiming supracompetitive prices for apps and in-app purchases ........................... 7

    C.    Plaintiffs develop a model attempting to demonstrate classwide injury ......................................... 9

    D.    The district court initially denies certification ............. 14

    E.    The district court later certifies a class on the premise that Plaintiffs would successfully match transactions to real people before trial ........................ 17

    F.    Apple produces payor data and the parties proceed toward trial ..................................................... 20

    G.    The district court decertifies the class after excluding Thompson's analysis .................................... 24

SUMMARY OF ARGUMENT .......................................................... 28

STANDARD OF REVIEW ............................................................... 33

ARGUMENT ................................................................................. 34

I.    The district court correctly required a reliable classwide method to prove antitrust injury ........................................... 34

A.      Private antitrust class actions seeking damages may not be certified without a common method of proving injury ............................................................. 35

B.      To answer the injury question classwide, Plaintiffs needed to match consumers to their transactions ........ 38

C.      Because Plaintiffs provided no reliable classwide way to prove injury, the district court did not abuse its discretion in decertifying the class ............................... 46

II.     The district court's reasoning was fully consistent with this Court's precedent .......................................................... 56

A.      *Olean* confirms decertification was appropriate ........... 56

B.      The district court did not require ascertainability ....... 62

C.      The district court correctly rejected Plaintiffs' invitation to shunt questions of injury to posttrial claims administration ..................................... 65

D.      Mere "exposure" is not antitrust injury ........................ 71

E.      Decertification, rather than millions of individually targeted summary-judgment motions, was the appropriate result ......................................................... 74

CONCLUSION.............................................................................. 76

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
190 F.3d 1051 (9th Cir. 1999) .................................................... 37

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013) ................................................................... 35

*Ambrosio v. Progressive Preferred Ins. Co.*,
154 F.4th 1107 (9th Cir. 2025) ............................................. 59, 66

*Apple Inc. v. Pepper*,
587 U.S. 273 (2019) ...................................................... 8, 9, 11, 15,
................................................................................ 39, 44, 57, 72

*In re Asacol Antitrust Litig.*,
907 F.3d 42 (1st Cir. 2018) ...................................... 32, 54, 61, 67

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990) .............................................................. 39, 72

*Avila v. L.A. Police Dep't*,
758 F.3d 1096 (9th Cir. 2014) ................................................... 41

*Blades v. Monsanto Co.*,
400 F.3d 562 (8th Cir. 2005) ..................................................... 68

*Bowerman v. Field Asset Servs., Inc.*,
60 F.4th 459 (9th Cir. 2023) ................................................. 68, 69

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012) ................................................... 72

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) ........................31, 62, 63, 64, 65, 73

*Cargill, Inc. v. Monfort of Colo., Inc.*,
479 U.S. 104 (1986) ................................................................... 37

iv

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ...................................................... 28, 35

*Epic Games, Inc. v. Apple Inc.*,
67 F.4th 946 (9th Cir. 2023) ........................................... 5, 6, 7, 74

*Est. of Saunders v. Comm'r*,
745 F.3d 953 (9th Cir. 2014)............................................ 49

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020)........................................... 37

*Gerlinger v. Amazon.com Inc.*,
526 F.3d 1253 (9th Cir. 2008)......................................... 39, 55

*Healy v. Milliman, Inc.*,
164 F.4th 701 (9th Cir. 2026) ................................... 32, 68, 73, 75

*Helfand v. Gerson*,
105 F.3d 530 (9th Cir. 1997)........................................... 48

*Hunter v. U.S. Dep't of Educ.*,
115 F.4th 955 (9th Cir. 2024) ......................................... 46

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008) ........................................... 37, 54

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977) .................................................... 8

*Klay v. Humana, Inc.*,
382 F.3d 1241 (11th Cir. 2004)........................................ 68

*Koehler v. Infosys Techs. Ltd.*,
181 F.4th 769 (7th Cir. 2026) ......................................... 51

*L.A. Mem'l Coliseum Comm'n v. NFL*,
791 F.2d 1356 (9th Cir. 1986).......................................... 39, 40

*Lab'y Corp. of Am. Holdings v. Davis*,
605 U.S. 327 (2025) ................................................... 62

*In re Lamictal Direct Purchaser Antitrust Litig.*,
  957 F.3d 184 (3d Cir. 2020) ....................................................... 66

*Lucas Auto. Eng'g, Inc. v.
  Bridgestone/Firestone, Inc.*,
  140 F.3d 1228 (9th Cir. 1998)................................................... 55

*Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*,
  89 F.3d 594 (9th Cir. 1996)....................................................... 34

*Marlo v. UPS, Inc.*,
  639 F.3d 942 (9th Cir. 2011)............................... 33, 34, 52, 70, 75

*Matsushita Elec. Indus. Co., Ltd. v.
  Zenith Radio Corp.*,
  475 U.S. 574 (1986)................................................................... 37

*Mendiola-Martinez v. Arpaio*,
  836 F.3d 1239 (9th Cir. 2016).................................................... 41

*Mendoza v. Block*,
  27 F.3d 1357 (9th Cir. 1994)................................................ 46, 49

*Mr. Dee's Inc. v. Inmar, Inc.*,
  127 F.4th 925 (4th Cir. 2025) ............................................. 61, 73

*In re Nexium Antitrust Litig.*,
  777 F.3d 9 (1st Cir. 2015) ................................................... 41, 68

*Noohi v. Johnson & Johnson Consumer Inc.*,
  146 F.4th 854 (9th Cir. 2025) ................................................... 52

*Off. of Gen. Treasurer ex rel.
  Emps. Ret. Sys. v. Boeing Co.*,
  — F.4th —, 2026 WL 2083048
  (4th Cir. July 20, 2026)............................................................ 28

*Olean Wholesale Grocery Coop., Inc. v.*
  *Bumble Bee Foods LLC,*
  31 F.4th 651 (9th Cir. 2022) ..................4, 9, 27, 29, 30, 31, 32, 33,
  ...........................................................34, 36, 37, 38, 41, 44, 52,
  ...........................................................54, 55, 56, 57, 58, 59, 60,
  ...........................................................61, 62, 63, 66, 68, 70, 74

*In re Online DVD-Rental Antitrust Litig.,*
  779 F.3d 914 (9th Cir. 2015)...................................................... 40

*Orr v. Plumb,*
  884 F.3d 923 (9th Cir. 2018)................................................ 47, 50

*Ortiz v. Fibreboard Corp.,*
  527 U.S. 815 (1999) ................................................................. 66

*Pizzuto v. Tewalt,*
  136 F.4th 855 (9th Cir. 2025) .................................................. 50

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*
  934 F.3d 619 (D.C. Cir. 2019) .................................. 41, 60, 61, 66

*Reiter v. Sonotone Corp.,*
  442 U.S. 330 (1979) ............................................................ 33, 72

*Rodriguez v. W. Publ'g Corp.,*
  563 F.3d 948 (9th Cir. 2009)...................................................... 33

*Ruiz Torres v. Mercer Canyons Inc.,*
  835 F.3d 1125 (9th Cir. 2016).................................. 32, 71, 72, 73

*Shady Grove Orthopedic Assocs. v.*
  *Allstate Ins. Co.,*
  559 U.S. 393 (2010) ................................................................. 36

*Small v. Allianz Life Ins. Co. of N. Am.,*
  122 F.4th 1182 (9th Cir. 2024) ................................................. 36

*Somers v. Apple Inc.,*
  729 F.3d 953 (9th Cir. 2013)......................................... 37, 40, 72

vii

*Thole v. U.S. Bank N.A.*,
    590 U.S. 538 (2020) ............................................................... 55

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ....................................................... 38, 55, 73

*True Health Chiropractic, Inc. v. McKesson Corp.*,
    896 F.3d 923 (9th Cir. 2018) ................................................. 63, 64

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ................................................................ 44

*United States v. Microsoft Corp.*,
    56 F.3d 1448 (D.C. Cir. 1995) .................................................. 10

*Van v. LLR, Inc.*,
    61 F.4th 1053 (9th Cir. 2023) ................................................. 59

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ................................................... 35, 36, 54, 67

*Walker v. Life Ins. Co. of the Sw.*,
    953 F.3d 624 (9th Cir. 2020) ............................................ 31, 64, 65

*Weisgram v. Marley Co.*,
    528 U.S. 440 (2000) ................................................................ 49

*Williams v. Apple Inc.*,
    338 F.R.D. 629 (N.D. Cal. 2021) ............................................. 72

*Yonay v. Paramount Pictures Corp.*,
    163 F.4th 685 (9th Cir. 2026) ................................................. 51

## Constitutional Provisions

U.S. Const. art. III ............................................................... 38, 55, 68

U.S. Const. amend. VII ................................................... 32, 54, 66, 67

## Statutes

15 U.S.C. § 2 .......................................................................... 7, 28

15 U.S.C. § 15 ......................................................................... 33, 37

viii

28 U.S.C. § 2072(b) .............................................................. 15, 36, 67

**Rules**

Fed. R. Civ. P. 23 ......................................... 4, 28, 30, 33, 34, 35, 36,
.........................................................38, 52, 53, 55, 63, 65, 70, 75

Fed. R. Civ. P. 23(b)(3).........................................16, 29, 31, 36, 37, 75

Fed. R. Civ. P. 23(f) .............................................19, 24, 26, 29, 40, 45

Fed. R. Evid. 702......................................................... 3, 4, 16, 18, 30,
.............................................................................. 34, 35, 46, 56, 58

## INTRODUCTION

Plaintiffs challenge a decertification order but never confront the ruling that produced it. The district court certified a class based on Plaintiffs' promise that, before trial, they would offer an expert who could reliably match consumers to their App Store transactions in order to differentiate which class members suffered an injury and which did not. Plaintiffs repeated that promise before this Court in resisting review of the class-certification order. And back before the district court, they conceded that the class should be decertified if the expert's testimony was excluded. Ultimately, the expert Plaintiffs offered was unqualified and his results unreliable. So the district court excluded his testimony and decertified the class.

There is nothing objectionable, much less any abuse of discretion, in those rulings. This Court's decisions make clear, and Plaintiffs have long agreed, that a consumer is not injured by allegedly monopolistic conduct if he would have paid the same or more in the but-for world without the challenged conduct. Plaintiffs' model and real-world evidence alike show that Apple's App Store commission affects different app developers differently. At a lower commission rate, some would

lower their app and in-app purchase prices; others would keep prices steady or even raise them. Plaintiffs concede that many millions of app and in-app purchase prices would stay the same or increase absent the challenged conduct, leaving the consumers who paid those prices potentially uninjured.

To separate the injured wheat from the uninjured chaff, Plaintiffs would have to identify each consumer's full App Store transactions and compare the prices she paid against their but-for counterparts. Indeed, when Apple determined all transactions made by one of the four named plaintiffs and used Plaintiffs' model to assess the but-for prices he would have paid, Apple learned that he was not injured by any of its allegedly unlawful conduct—and Plaintiffs ultimately dismissed his claims as a result. The question then became how Plaintiffs could link millions of real-life consumers to billions of transactions in a manageable class proceeding.

To perform that complex work, Plaintiffs chose to hire not a data scientist or statistician, but an IT manager at a class-action administration firm. The result was a black-box methodology with indefensible results. To name a few: the expert treated over 40,000 payor

records as belonging to one person because they shared the first name "Kim"; found 1.9 million "unique payors" in a remote Alaskan village with 375 residents; and couldn't link the lead plaintiff's transactions together because he gave the first name "Rob" in one profile and "Robert" in another—even though the records had the same address and credit-card information.

Given these flaws, the district court's exclusion order is unimpeachable, and Plaintiffs do not challenge it on appeal. They merely protest, in footnotes, about Apple's data and the district court's refusal to give them another chance to try again. But Apple gave Plaintiffs all the data they asked for and, once Plaintiffs had reviewed a sample of the data, they told the court they had everything they needed. Their expert simply failed at his task, putting the litigation "back to square one." 1-ER-26. Plaintiffs had fifteen years, and three rounds of class-certification briefing, to develop reliable proof of classwide injury; the district court was well within its rights not to offer them a do-over mere months before trial.

Because Plaintiffs cannot challenge the Rule 702 analysis, they insist that this Court's cases forbade the district court to require the

expert evidence in the first place. But the court's decision to decertify the class given the lack of classwide evidence of antitrust injury follows directly from this Court's decision in *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (en banc). Without a classwide way to link consumers to their transactions, proceedings would grind to a halt so the court could conduct millions of individualized inquiries into each class member's injury or lack thereof.

Plaintiffs also accuse the district court of imposing a freestanding "ascertainability" requirement. But the district court disclaimed any such requirement, and this Court has held that issues affecting Rule 23's express requirements may be considered even if they also relate to class-member identity. And while Plaintiffs insist that these issues should have been deferred to posttrial claims administration, they identify no case allowing liability to be proven *after* a class judgment.

This appeal begins and ends with an issue Plaintiffs have forfeited: class certification rested on expert testimony that Plaintiffs told the district court they were "happy to" provide, 2-ER-228, but that didn't pass muster under Rule 702. Once that testimony was excluded, the class was rightly decertified. This Court should affirm.

## ISSUES PRESENTED

**1.** Did the district court abuse its discretion by requiring Plaintiffs to supply a reliable classwide means of proving at trial that each class member was injured by reason of all her App Store transactions?

**2.** Given that Plaintiffs provided no valid classwide means of proving injury, did the district court abuse its discretion in decertifying the class on the eve of trial?

## STATEMENT OF THE CASE

### A. The App Store connects consumers with app developers.

In 2007, Apple launched the revolutionary iPhone and iOS operating system. 2-ER-37; *see Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 966-67 (9th Cir. 2023). Early iPhones featured only pre-installed Apple-developed apps. 2-ER-37; *Epic*, 67 F.4th at 966. But Apple soon announced that it would also allow third-party developers to create iOS apps. In 2008, Apple launched the App Store to distribute those apps to consumers. 2-ER-37. And in 2009, Apple allowed developers to offer in-app sales of digital goods and services. 2-ER-48-49.

Through the App Store, Apple sought to create an attractive platform for developers while protecting iPhone users from "viruses, malware, privacy attacks," and other harmful content. 2-ER-39. Apple thus adopted a secure, centralized distribution model, requiring native iOS apps to be distributed through the App Store following Apple's review. 2-ER-40, 2-ER-42-46. Consumers value Apple's approach, ranking malware protection and privacy among the App Store's most important features. 2-ER-48.

Apple monetizes the App Store by charging developers a commission on paid app downloads and in-app digital purchases. *Epic*, 67 F.4th at 967-68. Most apps incur no commission: as of 2023, 82.4% were free to download and use. 2-ER-42. For others, developers set the prices for downloads and in-app content by choosing among hundreds of price points (or "price tiers") that historically have ended in .99. 2-ER-43. Apple's headline commission rate is 30% commission, but it has cut that rate by half for several categories—including for small businesses, auto-renewing subscriptions after the first year, and certain video-streaming apps—and most developers pay that reduced 15% rate. 2-ER-41, 2-ER-165.

6

This Court confronted the App Store model in a related case, *Epic*, 67 F.4th 946. There, a developer challenged Apple's app-distribution and related restrictions. *Id.* at 969-70. The district court rejected the developer's antitrust claims, ruling that centralized distribution helps Apple "provide[] a safe and trusted user experience" and monetize its intellectual property; this Court affirmed, holding that Apple has pro-competitive justifications for the App Store model's design, including "increas[ing] interbrand competition" with Android. *Id.* at 985-87, 990-94.

### B. Plaintiffs sue Apple, claiming supracompetitive prices for apps and in-app purchases.

Plaintiffs are iPhone and iPad users who sued Apple in 2011, seeking damages under Section 2 of the Sherman Act based on the same App Store distribution restraints upheld in *Epic*. 5-ER-821, 5-ER-825, 5-ER-843. Plaintiffs assert that Apple's model enabled it to charge developers supracompetitive commissions and that developers passed some of those costs through to consumers by setting higher prices for apps or in-app content. OB 8-9.

Although the district court initially dismissed the complaint on antitrust standing grounds, the Supreme Court held in a 5–4 decision

7

that Plaintiffs had alleged they were "direct purchasers" under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), because they paid money for apps to Apple. *Apple Inc. v. Pepper*, 587 U.S. 273, 277, 279-88 (2019).

Both the majority and the dissent recognized that Plaintiffs would face challenges moving forward. As the majority explained, if developers "would always set a higher price such that consumers would pay the same retail price regardless of whether Apple's commission was 10 percent or 30 percent," then those consumers would be uninjured. *Pepper*, 587 U.S. at 284. The dissent agreed: consumers are injured "*only* if the developers are able and choose to pass on the overcharge to them in the form of higher app prices." *Id.* at 292 (Gorsuch, J., dissenting). Determining whether any consumer was injured would therefore require courts to decide "whether and to what extent each individual app developer was able—and then opted—to pass on the 30% commission to its consumers in the form of higher app prices." *Id.* at 293. Sorting that out meant "wrestling with 'complicated theories' about 'how the relevant market variables would have behaved had there been no overcharge'"—"if it can be done at all." *Id.*

8

### C. Plaintiffs develop a model attempting to demonstrate classwide injury.

**1.** Following the Supreme Court's decision, Plaintiffs sought a way to prove the "essential element" of antitrust injury for each member of their massive putative class. *Olean*, 31 F.4th at 666. This effort required Plaintiffs to analyze the relationship between Apple's commission rate and prices consumers pay for apps and in-app purchases. That "complicated" analysis, *Pepper*, 587 U.S. at 286, turns on each developer's product, costs, business model, competition, and customer demand—extrapolated across "tens of thousands of developers" and "over the course of years," *id.* at 292 (Gorsuch, J., dissenting).

To attempt this analysis on a classwide basis, Plaintiffs enlisted economist Daniel McFadden. McFadden's model attempts to predict the App Store prices developers would have set had Apple charged a lower commission rate. Real-world experience speaks to this question: when Apple reduced its commission for multiple categories of apps from 30% to 15%, *supra* at 6, those large decreases had little effect on the prices consumers paid for apps and in-app purchases. Between 85% and 93% of prices stayed the same after the commission dropped,

and more prices went up than down. 9-SER-2123-24, 9-SER-2126, 9-SER-2131.

McFadden declined to build a model consistent with those natural experiments. 1-SER-96-98; *see* 7-SER-1788-806. He instead designed a model whose "purpose" was "to find a common effect" from Apple's conduct. 5-SER-1141-42; *see* 5-SER-987, 5-SER-1192-93. That model predicts but-for prices largely based on three inputs: the hypothetical commission rate Apple would have charged absent the App Store restraints (13.63%, according to another of Plaintiffs' experts); an estimate of consumer sensitivity to App Store prices; and an estimate of developers' marginal costs to produce apps and in-app goods. 8-ER-1504, 8-ER-1516; *see* 1-SER-139-52 (overview of McFadden's model).

McFadden's model depends on various (disputed) assumptions. *See* 1-SER-152-58; 7-SER-1807-18. One is that digital products with higher prices have higher marginal costs, 1-SER-143; 7-SER-1818-20, even though the cost of producing one more digital item is widely agreed to be negligible or nonexistent. 8-ER-1347-49; 9-SER-2139-44; *see United States v. Microsoft Corp.*, 56 F.3d 1448, 1452 (D.C. Cir.

1995). This assumption guarantees that only cheap purchases will generate low or no damages in the model. 7-SER-1807-10.

Another assumption involves how developers set prices. In the real world, apps and in-app items (like many goods) are typically priced at 99-cent price points, so developers are unlikely to reduce prices by a few cents. *See Pepper*, 587 U.S. at 293 (Gorsuch, J., dissenting). McFadden's model sidesteps that constraint, inventing composite prices—e.g., averaging $2.99, $9.99, and $29.99 offerings into a single $14.32 price—to blend away the cheap transactions that are most prevalent in the real world and that otherwise generate no damages in the model. 3-SER-667-69; 7-SER-1816-18.

The result is a counterfactual model that replaces the complicated inquiry into each developer's pricing with a rigid formula: the higher the developer's marginal costs, the lower the but-for price at a lower commission rate, and the greater the overcharge. 1-SER-180-86. Combined with additional constraints on how low developers' costs can fall, the model "guarantees estimated damages of at least $16.1 billion regardless of the real-world" data. 1-SER-136-38.

**2.** Even with these assumptions and constraints, McFadden finds that many prices—over one-third of in-app purchases—would be *higher* if Apple reduced its commission rate.  7-SER-1676, 7-SER-1791.

These but-for price increases result from the nature of Apple's digital platform.  *See* OB 12.  For instance, if developers make money on the platform through both advertising and in-app subscriptions, a lower commission may make it more profitable to raise subscription prices and rely less on advertising (for which no commission is charged).  8-ER-1522; 9-SER-2153-57.  Prices may also hold steady for another reason:  when an additional digital sale costs the developer little or nothing, the profit-maximizing price stays the same no matter the commission rate.  OB 12; 8-ER-1522; 9-SER-2139-40.

These undisputed effects are not uniform.  A lower commission rate affects different developers' pricing behavior differently:  some developers would decrease prices, while others would leave prices unchanged or increase them.  8-ER-1522; 9-SER-2122-39.  Applied across a class of almost everyone who ever bought an app or in-app digital content, this produces many millions of consumers who were not harmed by Apple's conduct.

Plaintiffs' estimates of the scale of this problem have fluctuated throughout the case. By the end of discovery, they maintained that nearly 11 million people were unharmed by Apple's challenged conduct. 9-ER-1600. But Apple showed that reasonable adjustments designed to test the robustness of McFadden's model, including varying cost and price assumptions and increasing the 13.63% but-for commission rate, not only decrease overall damages but also move tens of millions more into the uninjured population. 7-SER-1741-42; 8-SER-1885; 11-SER-2508, 11-SER-2515-16.

McFadden's model relies on transactional data organized by Apple ID account. 8-ER-1514. But it is undisputed that consumers can make purchases across multiple accounts—indeed, McFadden himself had two accounts, 12-SER-2716, and named plaintiff Edward Lawrence had five, 11-SER-2594-95. So there is no one-to-one correspondence between accounts and the real-life consumers who are class members. 11-SER-2584 & n.14. And that means McFadden's model, on its own, cannot say whether any individual class member has been injured. 9-ER-1560.

13

Assessing whether a given consumer was injured takes a further step: analyzing every transaction that person made and netting out the cumulative price effect of Apple's conduct to see if she paid more, the same, or less than she would have in the but-for world. OB 13; 9-ER-1598. As McFadden admitted, this requires matching real-life consumers to all their transactions to identify the "harmed class members" and segregate out the uninjured ones. 4-ER-460-61; *see* 4-ER-689; 1-ER-11.

### D. The district court initially denies certification.

**1.** In June 2021, Plaintiffs first sought certification of a nationwide damages class containing "all persons" who purchased an iOS app or paid for any in-app purchase. 4-SER-929.[1] Plaintiffs based their motion on McFadden's model, which they argued could supply classwide proof of antitrust injury and damages. 4-SER-947-48. Running his model on transactions for three app categories, McFadden estimated that 14.6% of class accounts—around 30 million—were uninjured by Apple's conduct. 4-ER-542, 4-ER-683, 4-ER-698.

---

[1] Plaintiffs never moved for, and affirmatively disclaimed, certification of an injunctive-relief class. 3-SER-499, 3-SER-525-26.

McFadden recognized that, to "identify[] harmed class members" rather than accounts, but-for prices must be "netted out" across Apple IDs because a single consumer can make purchases across multiple Apple ID accounts. 4-ER-460-62; 12-SER-2707-10; *see also* 4-ER-538-39; 5-SER-1161-62, 5-SER-1165-66. McFadden therefore proposed a "practical process" to identify injured class members by matching each consumer to his transactions using Apple's records. 4-ER-460-62. In seeking certification, though, Plaintiffs proposed conducting this matching process only *after* "a judgment is entered against Apple." 4-ER-460, 4-ER-627.

Apple opposed class certification. In addition to challenging McFadden's analysis under Rule 702, 5-ER-778-805, Apple argued that McFadden could not establish classwide antitrust injury, including because he could not reliably link transactions to real people, 5-SER-1238-39. Apple also explained that Plaintiffs' proposal to separate out unharmed class members during a posttrial claims-administration process would violate the Rules Enabling Act and Apple's rights because antitrust injury is a liability element that must be proven at trial. 5-ER-791-93.

15

**2.** The district court denied certification without prejudice in early 2022. 4-ER-676-702. The court found McFadden's model inadmissible under Rule 702 because it contained "arbitrary" assumptions, "ignore[d]" .99 pricing, and was ultimately "unreliable for determining class wide impact or damages." 4-ER-677-89.

The court then turned to Rule 23(b)(3)'s predominance requirement. 4-ER-695-701. It observed that "common proof" of antitrust injury requires demonstrating harm "to each individual." 4-ER-697. Therefore, a "key factual" issue for class certification was whether "the need to identify [uninjured class members] will predominate." 4-ER-698. Without McFadden's model, Plaintiffs could not show "which [class] members, and how many, were injured" and thus lacked "common proof of class wide impact." 4-ER-698-700.

The court also expressed concern that McFadden estimated 14.6% of class accounts were uninjured but had no results for "actual people." 4-ER-700. Although the court concluded that Plaintiffs had outlined a "reasonably objective" method for "identifying unharmed class members" using identifying and payment information, the court agreed with

16

Apple that Plaintiffs could not defer that step until "*after judgment* is rendered." 4-ER-689, 4-ER-701.

> **E. The district court later certifies a class on the premise that Plaintiffs would successfully match transactions to real people before trial.**

**1.** Shortly after the district court denied certification, Plaintiffs told the court they "agree[d] that [they] need to net out the positive and negative damages . . . now, to demonstrate that [individual injury issues] will not predominate" and to determine "the true number of uninjured class members." 4-ER-657-60. The district court gave Plaintiffs time to pursue data and conduct that analysis before preparing a second class-certification motion. 4-ER-660, 4-ER-668.

But when Plaintiffs filed that motion in 2022, they continued to focus on "accounts" and offered no common method to trace purchases to real people. 4-SER-906-09. This time, McFadden's model estimated that more than 17% of all class accounts, or 30 million accounts, were unharmed. 13-ER-2352.

To reduce the apparent problem of uninjured class members, Plaintiffs revised their class definition to exclude consumers who did not spend more than $10 from any account. 4-SER-896, 4-SER-909-11.

17

That revision bore no relation to Plaintiffs' liability theory; it threw out more than 25 million accounts the model deemed injured. 11-SER-2510-11 & n.261. Even so, McFadden's model estimated that about 7.9% (over 10 million) of the remaining accounts were unharmed. 13-ER-2352.

At the hearing on class certification, Plaintiffs again did not dispute that showing antitrust injury on a classwide basis required matching transactions to actual class members. 2-ER-234. They conceded that this Court's case law "requires a reliable method to identify who the . . . uninjured class members are." *Id.* And they explained they were "happy" to do that matching "before trial" in order to "eliminate[]" uninjured people from the class. 2-ER-220, 2-ER-228.

**2.** In February 2024, the district court certified a class of "[a]ll persons in the United States . . . who paid more than $10.00 in total to Apple during the Class Period for iOS application and in-app purchases from any one Apple ID account." 2-ER-108-35.

After admitting McFadden's revised model under Rule 702, the court turned to whether Plaintiffs had produced evidence "capable of showing that all class members suffered antitrust impact." 2-ER-130-35 (cleaned up). The court noted concerns that McFadden's model still

18

estimated that millions of accounts were uninjured. 2-ER-133-34. But it accepted Plaintiffs' "representations" that they would later provide a model capable of showing injury to "actual consumers" and thereby "limit the percentage of unharmed class members" and "answer the common question of whether Apple's conduct caused class members to suffer an antitrust injury." 2-ER-108, 2-ER-133-34; *see* 1-ER-4-5.

The court reiterated that Plaintiffs could not "wait until after trial" to separate "harmed from unharmed class members," explaining that they have "no legal basis" to "address[] a core merits issue after trial." 2-ER-111-12. The court ordered the parties to report back on whether Plaintiffs' fully implemented model could "successfully" determine the uninjured class members and "limit them," 2-ER-134-35, and warned that it would consider "decertification" if Plaintiffs "fail[ed] to do both." 2-ER-108; *see* 2-ER-220-21.

In response to Apple's request to appeal the certification order under Rule 23(f), Plaintiffs assured this Court that they would match transactions to class members and "precisely identif[y]" the "uninjured class members . . . *before trial*." No. 24-875, Dkt. 12.1 at 17-18 & n.3 (Mar. 4, 2024) (emphasis added).

19

**F.  Apple produces payor data and the parties proceed toward trial.**

**1.**  Following the class-certification order, Plaintiffs sought to fulfill their promise to match consumers to their transactions and thereby identify harmed class members before trial.

Every app purchase is associated with an Apple "payor record," which contains user-entered fields like name, address, and payment-method information.  6-SER-1374, 6-SER-1381-82.  Because one person can (and often does) generate multiple payor records by using multiple Apple IDs or changing identifying or payment information, the parties agreed that Plaintiffs would first need to determine which payor records belonged to each person.  2-ER-83; 6-SER-1374-75, 6-SER-1383.  After "deduplicating" this data to identify unique payors, Plaintiffs would give Apple the resulting list so it could link the payors to their transactions.  11-ER-2098; 12-ER-2174.  Plaintiffs' experts would then run McFadden's model on each payor's transactions and aggregate each payor's results to assess who was harmed or unharmed. 1-ER-6; 9-ER-1560, 9-ER-1593-95, 9-ER-1598-600.

Apple produced a sample of the payor data for Plaintiffs to review. 11-ER-2095-96. Declaring the data fit for their purposes, Plaintiffs asked the district court to compel Apple to produce the same "fields of payor information produced in the sample" for all potential class members. 10-SER-2250; *see* 3-SER-555-56, 3-SER-558; 10-SER-2273-74. To protect consumers' privacy, Plaintiffs agreed to keep personally identifiable information separate from "the full transaction set." 2-ER-84-86; 3-SER-594; *see* 3-SER-553. The court granted Plaintiffs' request and ordered Apple to produce "the fields of payor information that were in the sample" for "all potential class members." 3-SER-571.

Apple produced the full data—well over a billion payor records—in late 2024. 11-ER-2096; 12-ER-2212-14, 12-ER-2270. As the district court would later remark, "from the outset, Apple cautioned that its payor data was 'user generated' and regularly contained inadvertent or intentional user error." 1-ER-17. Users may omit addresses or phone numbers, enter fictitious values, or otherwise provide incomplete or unreliable information. 11-ER-2118-19.

**2.** Deduplicating records is a recognized discipline within statistics and data science. 6-SER-1386-87, 6-SER-1429-31, 6-SER-1434-35.

A deduplication method must devise a way to recognize, for instance, that two payor records with the first names "Jane" and "J@ne" but the same address and last name are likely the same person; that "Jane" and "Bob" with the same last name and address are likely not the same person; and that two "Ann Lees" with the same credit-card number but different addresses are likely the same person. 6-SER-1383-86. Handling those complexities systematically across an enormous database requires expertise.

Plaintiffs chose to assign this work to Darryl Thompson. 1-ER-6. Thompson is the IT head of a class-action administration firm; he is not a statistician and has no degree or training in data science (or any advanced degree). 1-ER-8-10. But he maintained that Apple's payor data "could be reliably deduplicated" using methods from the "claims administration field." 11-ER-2095.

When Apple's data-science expert tested Thompson's methods, the problems were glaring. His methods were incomplete and could not be replicated—facts Thompson himself acknowledged. 6-SER-1337, 6-SER-1448-49. Thompson provided no error rate or confidence interval to validate his work. 6-SER-1422-26; *see* 6-SER-1330. And he

22

made myriad mistakes. For example, Thompson treated "Rob Pepper" and "Robert Pepper"—the lead named plaintiff—as different people even though the records reflected the same address and credit-card information. 1-ER-7; 6-SER-1404-06. He linked more than 40,000 payor records to one person based on the shared first name "Kim," even though the records otherwise reflected different last names and addresses. 1-ER-7; 6-SER-1406-08. And he used the address value "NA" to match payors as if they shared one address. 6-SER-1400-02.

Thompson nonetheless opined that his count of payors was a "reliable determination of unique individuals" in the class. 11-ER-2098. After Apple assigned those payors their (anonymized) transactions, Plaintiffs' damages expert, Minjae Song, ran McFadden's model on the combined dataset. 9-ER-1593-95. Any errors in Thompson's work thus directly affected Plaintiffs' estimates of injury and damages for each supposed class member. 6-SER-1509-10; 9-ER-1560.

Song ran McFadden's model under two scenarios. The "flexible" pricing scenario assumes that all of Apple's alleged restraints (including price tiers) are absent in the but-for world, so developers may set any price in light of the lower commission. 9-ER-1599. The "price tier"

23

scenario differs only by assuming that price tiers are lawful or that developers voluntarily chose prices ending in .99. *Id.* Under the flexible-pricing scenario, Song estimated that about 9.7 million payors suffered no monetary injury; under the price-tier scenario, that number rose to 10.9 million. 9-ER-1600.

Plaintiffs never calculated whether the named plaintiffs were harmed or estimated their damages. 7-ER-1236-39. But Apple's experts showed that Edward Hayter, one of the named plaintiffs, suffered no injury under Plaintiffs' methodology. 2-SER-403-04. Specifically, Hayter was uninjured in the "flexible-pricing" scenario but supposedly injured in the "price-tier" scenario—which meant his "injury" was caused not by allegedly unlawful conduct, but by concededly lawful .99 pricing. 2-SER-403-04; *see* 2-SER-398. Apple sought summary judgment on Hayter's claims. 2-SER-493. After argument, Plaintiffs dismissed Hayter with prejudice. 2-SER-398; *see* 1-ER-3 n.3.

## G.  The district court decertifies the class after excluding Thompson's analysis.

With a February 2026 jury trial fast approaching, Apple moved to exclude Thompson's testimony and decertify the class. 12-ER-2224,

12-ER-2257. In October 2025, the court granted both motions. 1-ER-2-28.

**1.** The court ruled that Thompson's testimony was inadmissible for four independent reasons.

Thompson was "not qualified to offer an expert opinion on data cleaning and matching." 1-ER-9-12. Although "data cleaning and deduplication have long been active areas of research in statistics and data science," 1-ER-10, Thompson "is not a statistician," has no "degree or training in statistics," and was unfamiliar with "rudimentary statistical concepts." 1-ER-9-10.

Thompson's methodology also was unreliable. 1-ER-12-17. It could not "be tested or replicated." 1-ER-13. He "outsourced" work to a third party with "black box" methods. 1-ER-14. Thompson's methods were "not peer reviewed" and "went against scientific consensus." 1-ER-15. And he "fail[ed] to provide an error rate, confidence interval, or otherwise meaningfully validate his work." 1-ER-16.

Further, Thompson "did not reliably apply his methodology." 1-ER-17-21. His results contained "obvious error[s]," 1-ER-21, and he gave no "consistent or cohesive explanation" of how the "Rob," "Kim,"

and other examples occurred. 1-ER-18-21. "Without an error rate," the district court had no "assurance that Apple's exemplars defined the universe of Thompson's errors." 1-ER-21.

And Thompson's methodology was "not relevant" because each person he identified as a "payor" was not necessarily the person who paid—an "error" that "pervades [his] analysis." 1-ER-21-23.

In excluding Thompson's testimony, the court rejected Plaintiffs' "attempt to blame Thompson's errors on Apple's data keeping practices." 1-ER-25-26 & n.20. It noted that Thompson had reviewed a sample of Apple's payor data and that Plaintiffs had chosen to proceed based on that data. 1-ER-20-21 & n.16. The court also denied Plaintiffs' "belated" request to file a supplemental report or put on live evidence about how full credit-card numbers might have improved Thompson's analysis, explaining that Plaintiffs "should have known or identified" that Apple had provided them with full credit-card data. 1-ER-2 n.2, 1-ER-23 & n.19; *see* 1-SER-126, 1-SER-130; 7-ER-1261. And the court rejected Plaintiffs' argument that a supplemental report from Song, served well after expert discovery closed, "validate[d] Thompson's work" by estimating harm to Apple ID accounts rather than

26

payors; the court had struck that report as "untimely and unnecessary" over no objection from Plaintiffs.  1-ER-21 n.17; *see* 7-ER-1195-96.

**2.**  In opposing decertification, Plaintiffs conceded that if Thompson's testimony were excluded, "the class has to be decertified." 7-ER-1198.  The district court agreed, ruling that once Thompson's methodology was excluded, there was nothing left to sustain class certification.  1-ER-2, 1-ER-24-28.

Thompson's analysis "serve[d] as an input" to McFadden's model to determine whether class members suffered antitrust injury, an "element of plaintiffs' claims."  1-ER-11 & n.8.  As the court observed, Plaintiffs and their experts "acknowledge" that developers don't all "respond in the same way to Apple's commission"; some "may choose to pass through some or all of Apple's charged commission to their consumers, while others may not."  1-ER-25.  Thus, "some consumers may be injured while others may be better off, depending on what apps, or combination of apps, those consumers purchased."  1-ER-25-26; *see* 8-ER-1522-23. Without a way to "accurately and reliably" deduplicate payor records, Plaintiffs could not establish antitrust injury for each class member with "a common body of evidence."  1-ER-26 (quoting *Olean*, 31 F.4th

27

at 666). The class therefore "no longer satisf[ied] the predominance inquiry" under Rule 23. *Id.*

The district court stressed that its decision did not rest on any "ascertainability" requirement or Plaintiffs' failure to "identify every class member." 1-ER-27. The problem was "predominance": Plaintiffs lacked a "common and reliable methodology" to establish the injury and damages elements of their claims. *Id.* Plaintiffs thus could not show that Rule 23's requirements were satisfied, and the district court decertified the class.[2]

## SUMMARY OF ARGUMENT

**I.** The district court did not abuse its discretion in excluding Thompson's testimony or decertifying the class that hinged on the testimony.

---

[2] Apple presented other arguments for decertification that the district court had no need to address, including that Plaintiffs' model rested on unreliable and inadmissible inputs unrelated to Thompson and is inconsistent with their liability theories and so violates *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). 12-ER-2252-55; *see Off. of Gen. Treasurer ex rel. Emps. Ret. Sys. v. Boeing Co.*, — F.4th —, 2026 WL 2083048, at *15-18 (4th Cir. July 20, 2026). Apple also moved for summary judgment on Plaintiffs' Section 2 claims. Given those unresolved issues, the proper outcome here even if the Court were to agree with Plaintiffs' arguments would be vacatur and remand.

**A.** Antitrust plaintiffs seeking class treatment must prove that the "essential elements" of their claims, including antitrust injury, "are capable of being established through a common body of evidence, applicable to the whole class." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 666 (9th Cir. 2022) (en banc). Without common proof that each class member was injured, massive antitrust class actions will devolve into individualized proceedings, precluding certification under Rule 23(b)(3). *Id.* at 668.

**B.** To show injury on a classwide basis, Plaintiffs needed a reliable model to prove injury to individual class members based on all the App Store purchases each made. Plaintiffs agree that, if Apple's commissions were lowered, developers would not uniformly reduce their prices; some prices would drop, but many others would stay the same or increase. The only way to determine whether each of millions of consumers in the class was harmed by Apple's challenged conduct is to identify the consumer's transactions and compare the prices paid to the prices that would have been paid in the but-for world. Plaintiffs repeatedly recognized, below and before this Court in successfully resisting Rule 23(f) review, that such analysis would have to be performed

by the time of trial. Thompson, the expert Plaintiffs hired to match consumers to their purchases, simply could not complete the task.

**C.** Plaintiffs present no argument that the decision excluding Thompson's testimony was an abuse of discretion. They at most complain that Apple's data was flawed or incomplete. Yet Apple produced its records in full, and the whole point of an expert was to deduplicate the imperfect, user-generated records. Once Thompson's analysis was excluded, Plaintiffs had no classwide way to determine which class members were injured. Decertification of the class was the necessary result, as Plaintiffs themselves conceded. And after years of Plaintiffs' failing to produce a reliable model of injury, the district court had no reason to give them a fourth chance to satisfy Rule 23.

**II.** Instead of challenging the district court's Rule 702 ruling, Plaintiffs offer five arguments for why the court was wrong to require evidence linking consumers to their transactions. Each is meritless.

**A.** Plaintiffs say the decertification decision is inconsistent with *Olean*. But *Olean* demands a "rigorous assessment" of whether antitrust claims could be resolved "in one stroke," including to ensure that the plaintiffs have offered evidence "capable of showing" "antitrust

30

impact on a class-wide basis." 31 F.4th at 666, 680-81. That's the burden to which the district court held Plaintiffs: after Thompson's exclusion, the only way to answer the injury question for each member of the enormous class would be to conduct individualized proceedings that Rule 23(b)(3) forbids. Moreover, *Olean* recognizes that no class should be certified when it contains a "great number" of uninjured class members, *id.* at 669 n.14, and here the number is great by any measure.

**B.** Plaintiffs are wrong that the district court imposed a freestanding ascertainability requirement of the kind rejected in *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017). The district court disclaimed any such requirement, explaining that it was decertifying the class because Plaintiffs lack common evidence of antitrust injury. Plaintiffs' contention that the district court erred because the predominance issues it considered overlap with questions of class-member identity is one this Court has rejected, both in *Briseno*, *id.* at 1125-28 & nn.4, 6, and in cases since, *e.g.*, *Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 633-34 (9th Cir. 2020).

**C.** Plaintiffs fare no better in arguing that matching consumers to transactions was merely a question of damages that should have

been left until posttrial claims administration. "Damages are measured only after each plaintiff has demonstrated that the defendant's conduct caused the plaintiff to suffer an antitrust injury," *Olean*, 31 F.4th at 666, and "a class cannot be certified based on an expectation that the defendant will have no opportunity to press at trial genuine challenges to allegations of injury-in-fact," *In re Asacol Antitrust Litig.*, 907 F.3d 42, 58 (1st Cir. 2018). Shunting injury issues to posttrial claims administration would violate Apple's Seventh Amendment and due process rights and defy this Court's holding that absent class members' entitlement to relief must be demonstrated before and at trial. *Healy v. Milliman, Inc.*, 164 F.4th 701, 707-08 (9th Cir. 2026).

**D.** Equally misguided is Plaintiffs' insistence that all class members could be deemed injured under *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125 (9th Cir. 2016), on the theory that each was "exposed" to an antitrust violation. *Ruiz Torres* involved a statute under which liability resulted from exposure to misleading information. The antitrust laws here, by contrast, require private plaintiffs to show not just a Sherman Act violation but also a cognizable injury to their

32

"business or property." 15 U.S.C. § 15; *see, e.g.*, *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338-39 (1979).

**E.** Nor are Plaintiffs correct that Apple could have pressed these issues only by seeking summary judgment as to absent class members. If a class has been certified and it becomes clear that Rule 23's dictates are not met, decertification is warranted. *Marlo v. UPS, Inc.*, 639 F.3d 942, 947 (9th Cir. 2011).

## STANDARD OF REVIEW

The party seeking class certification bears the burden of proving that Rule 23's requirements are satisfied. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664-65 (9th Cir. 2022) (en banc). Even after an initial class-certification order, "[a] district court may decertify a class at any time." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009). At decertification, "the burden of demonstrating that the requirements of Rules 23(a) and (b) are met" remains with "the party seeking class certification." *Marlo*, 639 F.3d at 947 (cleaned up).

This Court reviews decertification (like certification) decisions for abuse of discretion. *Marlo*, 639 F.3d at 946. Although a decision

33

"'premised on a legal error'" is "'a per se abuse of discretion,'" *id.*, this Court otherwise reviews deferentially because "[a] district court is in the best position" to determine whether Rule 23's requirements are satisfied, *Olean*, 31 F.4th at 669. The Court thus will "'uphold a district court's determination that falls within a broad range of permissible conclusions.'" *Id.*

A decision to exclude expert testimony likewise is reviewed for abuse of discretion. *Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 596-97 (9th Cir. 1996). The proponent of the testimony bears the burden of proving its admissibility. Fed. R. Evid. 702.

## ARGUMENT

### I. The district court correctly required a reliable classwide method to prove antitrust injury.

Plaintiffs built an enormous class action on one pillar: their ability to offer viable classwide evidence that each class member would have paid less for app transactions had Apple charged developers a lower commission. If—at the end of the complex chain running from Apple's conduct to its commission to independent developers' pricing decisions— a consumer would have paid the same or more for her transactions in

34

the but-for world, then she suffered no antitrust injury and cannot win at trial. And if Plaintiffs can't answer those consumer-by-consumer injury questions in one fell swoop, then common questions will not predominate and the class must be decertified.

That's what happened. Plaintiffs needed an expert to link well over a billion payor records to the real-life consumers who made the transactions. Thompson was incapable of doing so. So the district court excluded his testimony under Rule 702—a ruling Plaintiffs don't try to challenge—and rightly decertified the class.

## A. Private antitrust class actions seeking damages may not be certified without a common method of proving injury.

**1.** A class action "is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). The party seeking certification bears the burden of "justify[ing] a departure from that rule." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). Rule 23's requirements are "stringent" by design, and "in practice exclude most claims." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013).

35

Because it is merely a "claims-aggregating device," Rule 23 "leaves the parties' legal rights and duties intact" and "does not affect the substance of the claims or plaintiffs' burden of proof." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (en banc) (quoting *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010)); *see also Dukes*, 564 U.S. at 367 (citing 28 U.S.C. § 2072(b)). Plaintiffs who seek certification of a damages class under Rule 23(b)(3) must prove that "common" questions "predominate" over "individual" ones. Fed. R. Civ. P. 23(b)(3). This requires showing by a preponderance of the evidence that "essential elements" of their claims "are capable of being established through a common body of evidence, applicable to the whole class." *Olean*, 31 F.4th at 666. "'Showing predominance is difficult, and it regularly presents the greatest obstacle to class certification.'" *Small v. Allianz Life Ins. Co. of N. Am.*, 122 F.4th 1182, 1198 (9th Cir. 2024).

**2.** Plaintiffs here must provide a classwide method of resolving the "essential elements" of their antitrust claims. *Olean*, 31 F.4th at 666. Yet Plaintiffs cannot bring themselves to accurately recite those elements. They say monopolization claims require "definition of the

36

relevant markets; monopoly power in those markets; exclusionary conduct; and class-wide damages." OB 30 (citing *FTC v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020)). Conspicuously absent: such claims also require "antitrust injury." *Qualcomm*, 969 F.3d at 990; *accord, e.g.*, *Somers v. Apple Inc.*, 729 F.3d 953, 963 (9th Cir. 2013).

This Court has emphasized that antitrust injury is an "essential element" that must be "capable of being established through a common body of evidence." *Olean*, 31 F.4th at 666. That requirement stems from the Clayton Act's dictate that private plaintiffs must be "injured in [their] business or property." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 109 (1986) (quoting 15 U.S.C. § 15). Plaintiffs who benefited or otherwise suffered no loss from alleged anticompetitive conduct cannot have that conduct declared unlawful. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986); *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1056 (9th Cir. 1999).

The antitrust-injury requirement is often the key to satisfying Rule 23(b)(3). *Olean*, 31 F.4th at 666; *accord, e.g.*, *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311-12 (3d Cir. 2008). If "individualized questions" about whether class members are injured cannot be

37

resolved classwide, then an antitrust class will devolve into the sort of person-by-person inquiries Rule 23 forbids. *Olean*, 31 F.4th at 668.

**3.** Similar limitations stem from Article III's requirement that all parties seeking relief in federal court have a sufficiently concrete stake in the controversy. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). As the Supreme Court has held, "[e]very class member must have Article III standing in order to recover individual damages" because federal courts cannot "'order relief to any uninjured plaintiff, class action or not.'" *Id.* at 431. Plaintiffs bear the burden of proof on standing just as on elements of their claims. *Id.* at 430-31. And if individualized questions of each class member's Article III standing will predominate over common questions, no damages class may be certified. *Olean*, 31 F.4th at 668-69.

### B. To answer the injury question classwide, Plaintiffs needed to match consumers to their transactions.

**1.** Plaintiffs claim that Apple charged developers supracompetitive commissions and that Plaintiffs, as consumers, paid more for App Store purchases as a result. But Plaintiffs' model recognizes that when Apple lowers its commissions, developers do not uniformly charge

38

consumers less. Real-world evidence demonstrates that lower prices are the exception, not the rule. 9-SER-2122-39. Even Plaintiffs' flawed model estimates that if Apple had charged lower commissions, more than one-third of in-app purchase items—many billions of transactions—would have cost *more*. 7-SER-1676, 7-SER-1790-92.

As nine Justices agreed, consumers who paid the same or benefited from Apple's allegedly supracompetitive commissions cannot prevail. *Pepper*, 587 U.S. at 284; *id.* at 293 (Gorsuch, J., dissenting). That means a consumer must show he is harmed on net—a point that Plaintiffs did not dispute below and that their expert endorsed. 4-ER-538-39; 5-SER-1162-63; 12-SER-2631-32. A consumer who paid less for some transactions and more for others has not necessarily suffered an "injury attributable to something the antitrust laws were designed to prevent." *L.A. Mem'l Coliseum Comm'n v. NFL*, 791 F.2d 1356, 1368 (9th Cir. 1986). If Apple's commission caused developers to make choices that on balance *benefited* the consumer, then Apple's conduct caused the consumer no injury. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990); *see Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1256 (9th Cir. 2008) (rejecting antitrust claim where

39

plaintiff "has not shown that he paid higher prices . . . than he would have paid otherwise"); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 922-24 (9th Cir. 2015) (same).

Plaintiffs don't dispute these principles in their opening brief. Nor could they, since they (and McFadden) employed this definition of injury below. 4-ER-657-60, 4-ER-683. Indeed, they admit that if a consumer did not pay more on net because of Apple's challenged conduct, that would "affect the merits of [her] claim." OB 53.

In one aside, Plaintiffs suggest that netting does not affect "the existence of antitrust injury"—yet in the same sentence, they admit that netting "affect[s] the merits." OB 53. But netting affects the "merits" *because* it affects whether a consumer suffered an antitrust injury. *NFL*, 791 F.2d at 1367-68; *Somers*, 729 F.3d at 963. Besides, by recognizing that overpayments affect at least the "merits" of Plaintiffs' claims, Plaintiffs end up in the same place: these netting issues must be capable of being resolved with classwide evidence.

Only in their Rule 23(f) reply have Plaintiffs ever squarely argued that a single overcharge is enough to show antitrust injury. No. 25-7122, Dkt. 16.1 at 6 (Nov. 28, 2025). If they try the same maneuver in

40

their reply here, this Court should disregard it.  Plaintiffs forfeited that argument by embracing the opposite position below, *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1251 n.13 (9th Cir. 2016), and by failing to raise it "clearly and distinctly" in their opening brief, *Avila v. L.A. Police Dep't*, 758 F.3d 1096, 1101 (9th Cir. 2014).  Besides, the theory is meritless, as McFadden recognized.  4-ER-538-39.  The case Plaintiffs cited in their 23(f) reply, *In re Nexium Antitrust Litigation*, 777 F.3d 9 (1st Cir. 2015), addressed whether things like rebates offset "undisputed" harm from overpayments for brand-name drugs, *id.* at 26.  It did not involve, as here, monetary benefits created by the challenged conduct itself.

**2.** Plaintiffs must offer evidence that can resolve these injury questions across the class, *Olean*, 31 F.4th at 666, and thereby "winnow[] away" uninjured class members "as part of the liability determination," *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 624 (D.C. Cir. 2019).  Or, as the district court correctly recognized: Plaintiffs must be able, through classwide evidence, to "identif[y] and exclud[e] uninjured class members" as of trial.  4-ER-701; 2-ER-111-

41

12. To perform that winnowing, Plaintiffs needed a viable classwide method to determine what purchases each class member made.

McFadden's model alone is not the answer. It purports to estimate the prices consumers would have paid had Apple's commission been lower on a transaction-by-transaction basis. 8-ER-1522-23. As Plaintiffs have conceded (*e.g.*, OB 12-13, 53), proof that one transaction would cost less in the but-for world isn't proof of injury. A consumer might have paid 10 cents extra for one app, but she wasn't worse off because of Apple's conduct if she also saved 20 cents when buying other apps. *See* 8-ER-1522-23.

That problem is complicated by the fact that people (like McFadden and named plaintiff Lawrence) often have multiple accounts. *See* OB 2; 11-SER-2594-95; 12-SER-2716. Suppose a consumer makes transactions across three accounts:

42

| Hypothetical Consumer's Transactions | | | | | |
|---|---|---|---|---|---|
| Account No. | Address | Price | Units | But-For Price | Overcharge |
| 11111 | Eugene, OR | $1.99 | 4 | $2.99 | –$4 |
| 11111 | Eugene, OR | $2.99 | 1 | $2.99 | $0 |
| 22222 | Eugene, OR | $5.99 | 1 | $4.99 | +$1 |
| 22222 | Orange, CA | $2.99 | 1 | $2.99 | $0 |
| 33333 | Orange, CA | $11.99 | 1 | $9.99 | +$2 |
| 33333 | Irvine, CA | $6.99 | 1 | $5.99 | +$1 |
| | | | *Total Effect:* | | $0 |

If injury were assessed solely based on accounts, 11111 would be deemed uninjured (spending $4 less in the real world than in the but-for world); 22222 would be injured ($1 in overcharges) but not a class member because its total purchases were below $10; and 33333 would be injured ($3 in overcharges) *and* a class member (about $19 total spend). But the real-life person who made all these transactions, though a class member, would not be worse off because of Apple's conduct, meaning he suffered no injury and cannot prevail against Apple.

No consumer could prove her injury in an individual case using McFadden's model alone. It wouldn't tell the jury all the purchases she made, nor what those purchases would have cost in the but-for world.

43

That would leave her unable to "sustain a jury verdict." *Olean*, 31 F.4th at 667-68 (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455-57 (2016)); *see Pepper*, 587 U.S. at 284. Plaintiffs and their expert admitted as much below. 2-ER-227-28; 4-ER-460-62.

To justify class certification, then, Plaintiffs needed a classwide way to identify all purchases each class member made across different accounts and using different payment methods and information. And they needed a way to perform that class-member matching over billions of transactions "in one stroke." *Olean*, 31 F.4th at 666.

**3.** The district court recognized that McFadden's model alone could not winnow out unharmed class members (as opposed to accounts). 2-ER-108, 2-ER-133; 4-ER-700-01. The court certified the class only after Plaintiffs offered assurances that they'd be able to "match" the transactions in McFadden's model to "actual consumers." 2-ER-108. Without that additional "input," 1-ER-11, "the need to identify" millions of uninjured consumers who were swept into the class "will predominate." 4-ER-698.

Plaintiffs recognized this, too. In fact, they invited the court to take this approach. In its initial order denying class certification, the

44

court noted concerns about the number and extent of uninjured class members and Plaintiffs' ability to winnow out uninjured consumers by trial. 4-ER-698-700. In their renewed class-certification motion, Plaintiffs argued that they could defer identifying uninjured class members until after trial. 4-SER-913. But at the hearing on that motion, they agreed that "accounts need[ed] to be matched to individual class members," and they volunteered—unprompted—that they were "happy" to do so "before trial." 2-ER-227-28.

From then on, the question of when Plaintiffs would perform the matching was no longer a debate. The district court relied on Plaintiffs' "representation" in certifying the class. 2-ER-108. Plaintiffs even wielded their promise as a sword in opposing Rule 23(f) review, assuring this Court that "any uninjured class members w[ould] be precisely identified *before trial*." No. 24-875, Dkt. 12.1 at 18 n.3 (emphasis added). As late as the hearing on Apple's decertification motion, Plaintiffs continued to agree that "if [Thompson's] analysis doesn't come in," "the class has to be decertified." 7-ER-1198.

Plaintiffs may not change course now. After promising to perform the matching before trial and agreeing that the class should be

decertified if they could not, Plaintiffs "may not complain on review" that the district court held them to their promise. *Hunter v. U.S. Dep't of Educ.*, 115 F.4th 955, 963-64 (9th Cir. 2024) (invited-error doctrine). And because Plaintiffs agreed that matching consumers to transactions would be required before trial, 2-ER-227-28, they also waived any argument to the contrary. *See Mendoza v. Block*, 27 F.3d 1357, 1359-60 (9th Cir. 1994).

## C. Because Plaintiffs provided no reliable classwide way to prove injury, the district court did not abuse its discretion in decertifying the class.

Plaintiffs don't squarely challenge the district court's Rule 702 ruling. They instead offer drive-by protests about Apple's production, its data quality, and the district court's management of the litigation. None of those arguments shows any abuse of discretion in the court's Rule 702 ruling or decertification decision.

**1.** The decision excluding Thompson is unassailable. Thompson was not "familiar with rudimentary statistical concepts" used to deduplicate massive datasets. 1-ER-10. His methods "went against scientific consensus." 1-ER-15. They were not replicable: his code was "not documented or saved," and he had outsourced part of his work to a

46

vendor that did not disclose what it had done. 1-ER-14. Thompson's black-box methods also yielded wild results. 1-ER-19; *supra* at 22-23. Thompson did not even match the lead plaintiff to all his transactions given the difference between "Rob" and "Robert." 1-ER-19. Plaintiffs make no effort to show that the district court abused its discretion in concluding that it could have "no confidence in Thompson's work," 1-ER-23, and so have forfeited any such argument. *Orr v. Plumb*, 884 F.3d 923, 932 (9th Cir. 2018).

**2.** Plaintiffs instead take potshots at the quality and completeness of Apple's data. OB 3, 20-24, 26-27, 41-42, 46. These get Plaintiffs nowhere.

Apple produced the information Plaintiffs sought. *Supra* at 21. If Plaintiffs thought Apple had additional records that would assist Thompson, they could have sought them. But aside from one discovery motion that the district court granted and with which Apple complied, 3-SER-571, Plaintiffs never objected to Apple's productions. That's unsurprising—Thompson "reviewed a sample of Apple's payor data and determined that he could reliably and accurately deduplicate it." 1-ER-21 n.16; *see* 10-SER-2273-74. By not pursuing further data, Plaintiffs

47

forfeited any complaints about Apple's productions. *Helfand v. Gerson*, 105 F.3d 530, 536 (9th Cir. 1997).

Plaintiffs complain that, although Apple produced payors' full credit-card numbers, Apple did not specifically flag this information. OB 23 n.8. As the district court explained, Plaintiffs "should have known or identified that they received complete information." 1-ER-23 n.19; *see* 6-SER-1363-65, 6-SER-1434-36, 6-SER-1439-40. Plus, Plaintiffs could have "inquir[ed]" or "move[d] to compel that information." 1-ER-23. They didn't.

Plaintiffs also suggest Apple's records were unreliable. OB 22. But Apple produced the information its users submitted, and consistently warned Plaintiffs that the user-provided information would have issues. 11-ER-2119, 11-ER-2122. There are well-known ways of handling the challenge of deduplicating user-generated data. 1-ER-10; 6-SER-1429-45. Plaintiffs just chose not to retain an expert capable of doing that work.

Plaintiffs separately complain about the exclusion of Song's supplemental report, through which they attempted to insinuate that account-based results were somehow similar to those based on payors

48

following Thompson's matching. OB 34, 40 n.12. But Song's supplemental report doesn't avoid the issues that drove the decertification ruling: consumers still need matching to all their transactions, *see supra* at 41-44, yet Song's report provided no method of doing so. Regardless, Song's report was untimely. 2-SER-458. And at the decertification hearing, Plaintiffs "agree[d]" there was "no reason" it "should come in," leading the court to grant Apple's motion to strike Song's report as "unopposed." 7-ER-1195-96. Plaintiffs thus have waived any argument on Song. *Mendoza*, 27 F.3d at 1359-60. They also forfeited the point anew by burying it in an undeveloped footnote. *Est. of Saunders v. Comm'r*, 745 F.3d 953, 962 n.8 (9th Cir. 2014).

The district court was well within its discretion to decline Plaintiffs' belated request for an evidentiary hearing or six-week extension so Thompson could file a "supplemental report" based on full credit-card information. 1-SER-130. "It is implausible to suggest, post-*Daubert,* that parties will initially present less than their best expert evidence in the expectation of a second chance should their first try fail." *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000). That principle applies with maximal force here. By the time of decertification, the case was in its

49

fifteenth year, had seen three rounds of briefing over class certification, and was barreling toward a jury trial. Plaintiffs neither sought to postpone the trial nor explained why their long-promised expert evidence was so deficient. Plaintiffs therefore cannot show that the court exceeded its "'wide latitude in controlling discovery,'" *Pizzuto v. Tewalt*, 136 F.4th 855, 867 (9th Cir. 2025), by refusing Thompson more time to try again—especially because they effectively concede that he was not qualified for the task. OB 23 n.8, 26-27.

Plaintiffs also never offered to replace Thompson with a different expert. That is why they seek outright reversal on the ground that no such expert testimony is required. *E.g.*, OB 4. That makes this Court's task straightforward: because the district court was correct that matching real-life consumers to their transactions was required to prove injury classwide, the conceded unreliability of Plaintiffs' expert's testimony means decertification was the natural outcome.

Nor could Plaintiffs change course and suggest a new expert now. They forfeited any such argument by not briefing it. *Orr*, 884 F.3d at 932. Plus, Plaintiffs' "failure to proffer an admissible . . . expert was no one's fault but their own"; the law does not entitle them to

50

"another chance." *Yonay v. Paramount Pictures Corp.*, 163 F.4th 685, 699 (9th Cir. 2026).

The Seventh Circuit recently reached the same conclusion in similar circumstances. In *Koehler v. Infosys Technologies Ltd.*, 181 F.4th 769 (7th Cir. 2026), the plaintiffs rested their class on a proffered expert's "'name-matching' methodology." *Id.* at 775. But that expert was unqualified and his methodology flawed, so the district court excluded his testimony. *Id.* at 775-76. Because the plaintiffs' class-certification motion depended on that testimony, the court denied the motion. *Id.* at 776. In affirming, the Seventh Circuit noted that the plaintiffs "had every opportunity to advance" better evidence before the district court. *Id.* at 778. That they "may regret the choices they made" was no reason for vacatur. *Id.* at 780.

**3.** As for the resulting decision to decertify the class, Plaintiffs offer no meritorious argument—and certainly none that could overcome their concession that decertification should follow.

Plaintiffs first suggest (at 30-32) the court should have been bound by its prior decision to certify the class. That is wrong. The certification decision was expressly conditioned on Plaintiffs' ability to

51

match real-life class members to their transactions, and thereby assess whether each was injured, before or at trial. 2-ER-108. Consistent with this Court's precedent, the district court then "test[ed] the admissibility and reliability" of Plaintiffs' "fully executed" injury model and rejected it. *Noohi v. Johnson & Johnson Consumer Inc.*, 146 F.4th 854, 867 (9th Cir. 2025). Plaintiffs' once-certified, forever-certified view of class actions contradicts case law highlighting a district court's duty to decertify a class once it becomes clear that Rule 23's requirements are not met. *E.g.*, *Marlo v. UPS, Inc.*, 639 F.3d 942, 946-49 (9th Cir. 2011).

Plaintiffs try to minimize the issue by noting (at 36) that 94% of accounts supposedly paid overcharges. That's whistling past the problem: the percentage of *accounts* with supposed overcharges is not the percentage of real-life *class members* who paid more. *See supra* at 42-43. Without a reliable method for matching transactions to real-life people, no one can know "the true number" of uninjured class members, as Plaintiffs admitted below. 4-ER-660. And because determining "the injury status of class members" would demand individualized inquiries that "would predominate over common questions," the district court was right to decertify. *Olean*, 31 F.4th at 668.

Nor can Plaintiffs contend that the importance of matching people to transactions is hypothetical. If Plaintiffs' numbers were reliable, the odds of finding an uninjured class member should be minuscule. But after Apple obtained the full information for named plaintiff Edward Hayter, its expert ran McFadden's model on Hayter's transactions and found that Hayter wasn't injured by Apple's assertedly unlawful conduct. 2-SER-401, 2-SER-404. Plaintiffs then dismissed Hayter's claims with prejudice. 2-SER-398.

There are countless more class members who, like Hayter, would be revealed as uninjured once matched with their transactions. Those consumers are not limited to the nearly 11 million accounts that Plaintiffs (at 39) label a "tiny subset" because Hayter himself was not in that subset. 2-SER-401, 2-SER-404. Plaintiff Robert Pepper provides another example: Thompson failed to match all his payor records, 1-ER-19, illustrating the all-too-real challenges of linking real-life consumers to their transactions. At bottom, ferreting out uninjured people will require millions of individualized inquiries. That is the antithesis of what Rule 23 demands.

Plaintiffs also suggest (at 38) that decertification was improper because they can calculate "aggregate damages" without matching accounts to transactions. That isn't true: for example, aggregate damages here depend on which transactions belong to payors who meet the $10 spending cutoff. 9-ER-1595; *Asacol*, 907 F.3d at 55. More important, each consumer must prove "at least some antitrust impact" at trial from Apple's alleged conduct. *Hydrogen Peroxide*, 552 F.3d at 311. Damages may be measured "only after each plaintiff" makes that showing. *Olean*, 31 F.4th at 666. Otherwise, spurious damages claims, like Hayter's, will inflate the total. Plaintiffs' request to put the aggregate-damages cart before the individual-injury horse "fl[ies] in the face of the core principle that class actions are the aggregation of individual claims, and do not create a class entity." *Asacol*, 907 F.3d at 56. And it would erase Apple's statutory and Seventh Amendment right to litigate each class member's proof of antitrust injury. *Dukes*, 564 U.S. at 366-67; *see infra* at 66-68.

Finally, Plaintiffs appear to argue (at 52-53) that decertification was improper on the ground that all class members have constitutional standing, whether or not they overpaid due to Apple's conduct. That is

54

incorrect: constitutional standing demands "concrete harm," *TransUnion*, 594 U.S. at 417, and if the plaintiff would not receive "a penny more" in the but-for world absent the challenged conduct, then she lacks Article III standing, *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 541 (2020); *see, e.g.*, *Gerlinger*, 526 F.3d at 1255-56 (no Article III standing when antitrust plaintiff did not overpay). In all events, the district court decertified the class because Plaintiffs lacked common evidence to prove *antitrust* injury—a distinct and "more demanding" standard than constitutional standing. *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1232 (9th Cir. 1998). Quite apart from Article III issues, no class may be certified where resolving antitrust injury or any other element would demand individualized inquiries across millions of class members.

Without Thompson, Plaintiffs cannot "prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied." *Olean*, 31 F.4th at 665. The district court correctly ruled that decertification should follow. 1-ER-26.

## II. The district court's reasoning was fully consistent with this Court's precedent.

Instead of challenging the Rule 702 ruling, Plaintiffs insist the district court was wrong to make them link transactions to consumers in the first place. Plaintiffs' arguments defy precedent.

### A. *Olean* confirms decertification was appropriate.

Plaintiffs cite *Olean* more than any other case but pay scant attention to its facts or reasoning. In two independent ways, *Olean* confirms that decertification was warranted here.

**1.** The district court did precisely what *Olean* requires when it undertook a "rigorous assessment" of whether the elements of Plaintiffs' claims could be resolved "in one stroke." 31 F.4th at 666. The court considered Plaintiffs' proposed method for showing antitrust injury and found that the jury could not resolve that element on a class-wide basis once Plaintiffs' attempt to match consumers to transactions was excluded. 1-ER-24-28. That is *Olean* in a nutshell.

Contrary to Plaintiffs' contention (at 36-37), faithfully applying *Olean*'s test did not require the district court to reach *Olean*'s result because the facts here are so different. The *Olean* plaintiffs asserted

"a simple one-step theory: the [defendants] conspired to raise . . . prices, resulting in higher prices for all buyers." 31 F.4th at 679. Their expert found "that *each* class member was injured by supra-competitive prices," *id.* at 672 n.18 (emphasis added), and this Court concluded that the expert's model could show common injury when combined with additional evidence, including market structure, price correlations, the nature of price-fixing conduct, and admissions of guilt, *id.* at 670. That meant "the [class] would have succeeded in showing antitrust impact on a class-wide basis" if the jury "found that [the] model was reliable." *Id.* at 681. If not, not. But "[i]n neither case would the litigation raise individualized questions regarding which members of the . . . class had suffered an injury." *Id.*

By contrast, Plaintiffs' overcharge theory here is "'complex.'" *Olean*, 31 F.4th at 679. "[M]ultiple speculative steps" stand between Apple's App Store design and consumer prices, *id.*, including the independent pricing decisions of "tens of thousands" of developers, *Pepper*, 587 U.S. at 293 (Gorsuch, J., dissenting). Nor is there any evidence that Apple's conduct "'rais[ed] the baseline prices for all buyers.'" *Olean*, 31 F.4th at 678-79. To the contrary, Plaintiffs' model indicates

that billions of transactions were cheaper, or at least not more expensive, because of how developers react to Apple's conduct. 7-SER-1676, 7-SER-1791. That is true even though that model is biased toward finding injury, *see supra* at 10-11, and lacks the "robustness" of the model in *Olean*. 31 F.4th at 672.[3] Worse, the model cannot determine which class members were injured without still *another* expert to deduplicate well over a billion payor records. *See supra* at 20-24. Given these complexities, it is unremarkable that the district court reached a different result than the one in *Olean*.

Plaintiffs emphasize that *Olean* "rejected the argument that 'Rule 23 does not permit the certification of a class that potentially includes more than a de minimis number of uninjured class members.'" OB 35-36 (quoting 31 F.4th at 669). Yet *Olean* also held that "individualized questions about injury" may predominate over common questions, 31 F.4th at 669, including where plaintiffs cannot "establish the

---

[3] Various Rule 702 objections affecting McFadden's model remain pending, including that it uses a minuscule, non-random sample of developers' cost data to drive its results, thereby guaranteeing massive damages. 1-ER-9 n.7; 12-ER-2289-305.

existence of antitrust [injury] through common proof," *id.* at 666. Whatever the ultimate number of uninjured class members, a class may not be certified if the jury would have to determine person-by-person who falls into that category.

This Court has reiterated that point since *Olean*. In *Van v. LLR, Inc.*, 61 F.4th 1053 (9th Cir. 2023), the Court vacated class certification because the defendant provided "evidence that at least eighteen of the 13,680 [transactions]" were not actionable. *Id.* at 1068. These examples revealed that an individual analysis might likewise be needed for every other transaction, "summoning the spectre of class-member-by-class-member adjudication." *Id.* at 1069; *accord Ambrosio v. Progressive Preferred Ins. Co.*, 154 F.4th 1107, 1111-12 (9th Cir. 2025) (certification inappropriate without classwide way to determine which class members were injured). The same goes here. Without Thompson, Plaintiffs have no classwide way to link class members to their transactions and so determine which were harmed by Apple's conduct. All that remains is the need for person-by-person inquiries stretched across a class of millions.

That remains true even if Plaintiffs are correct (at 12, 14, 28, 34) that uninjured accounts as calculated by McFadden's skewed model made less than 1% of purchases by dollar value. An argument that "class members for whom [Plaintiffs'] damages model shows no injury . . . make up less than one percent of [the defendant's] overall revenue" is "irrelevant" when determining which class members are uninjured would swamp the proceedings. *Rail Freight*, 934 F.3d at 626.

**2.** Further, no class may "'include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct.'" *Olean*, 31 F.4th at 669 n.14. The number of uninjured class members here is "great" by any measure. Even Plaintiffs' lowest estimate is that there are 9.7 to 11 million uninjured payors or accounts. 9-ER-1600.

No matter, say Plaintiffs (at 34-36): this Court should ignore that eye-popping number and focus on the *percentage* of uninjured class members. That too is a high figure, approaching 6% by Plaintiffs' favorable estimate. 9-ER-1600. Regardless, the raw number is what matters. In announcing its "great number" rule, *Olean* endorsed a case where certification was denied because "thousands" of class members

60

were uninjured. *Olean*, 31 F.4th at 669 n.14 (citing *Asacol*, 907 F.3d at 55-58); *accord, e.g.*, *Rail Freight*, 934 F.3d at 625; *Mr. Dee's Inc. v. Inmar, Inc.*, 127 F.4th 925, 933-34 (4th Cir. 2025). If, as here, millions of individual inquiries will be required to identify the injured, those issues will predominate regardless of what percentage of the class is ultimately found uninjured. *Asacol*, 907 F.3d at 51-52.

Plaintiffs are wrong anyway that "only" 6% of the class is uninjured. Recall Hayter, one of four named plaintiffs, whom Plaintiffs jettisoned from the case. *See supra* at 24, 53. Plaintiffs' 6% estimate ignores that not only 25% of the named plaintiffs but also millions more like Hayter are not injured by any assertedly unlawful conduct under their own model. 2-SER-403-04.

That is only the start. Plaintiffs also ignore how simple changes, such as tweaking the 13.63% but-for commission rate or modifying McFadden's biased assumptions, would flip millions more class members to uninjured. 7-SER-1728, 7-SER-1742; 8-SER-1885; 11-SER-2508, 11-SER-2515-16. McFadden says he designed his model to "accommodate any But-For commission rate" the "jury finds on the merits." 8-ER-1505, 8-ER-1523. But every change to that rate scrambles which

61

prices go up or down, leaving no way for a lay jury to know which or how many class members are injured if the jury sides with Apple's experts even in part. 8-SER-1900-02; *see also* 1-SER-117-18.

Reading *Olean* to permit certification of a class with so many uninjured members would deepen an existing split over whether a class may contain uninjured members. *See Lab'y Corp. of Am. Holdings v. Davis*, 605 U.S. 327 (2025). That split should not be extended to permit ongoing certification of a class loaded with millions of uninjured class members even under Plaintiffs' most favorable view.

### B. The district court did not require ascertainability.

Plaintiffs argue (at 3) that, in decertifying the class, the district court "contravene[d] . . . *Briseno v. ConAgra Foods, Inc.*," 844 F.3d 1121 (9th Cir. 2017), by requiring ascertainability. But the district court disclaimed any such requirement. And there is no basis to treat the district court's predominance analysis as ascertainability in disguise.

**1.** The district court cited *Briseno* and "agree[d]" that class certification did not hinge on Plaintiffs' ability to "identify every class member." 1-ER-27. Consistent with Apple's arguments, 12-ER-2239-45; 2-SER-384-85, the court recognized that the issue was whether

62

Plaintiffs had offered "a common and reliable methodology that was 'capable of establishing antitrust impact on a class-wide basis'"—because, if they hadn't, individualized inquiries about "'the injury status of class members'" would "'predominate.'" 1-ER-27 (quoting *Olean*, 31 F.4th at 668, 678).

Plaintiffs are thus incorrect that the district court "adopted a threshold ascertainability prerequisite to certification." OB 51 (cleaned up). The court did not, for instance, decertify the class because Plaintiffs couldn't identify which payors made $10 in purchases to "determine who is in the class." *Briseno*, 844 F.3d at 1124. Absent any indication that the district court subscribed "to the view that a class must be ascertainable, much less that the court applied such a requirement in this case," Plaintiffs cannot complain about a supposed conflict with *Briseno*. *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 929 (9th Cir. 2018).

**2.** Plaintiffs are effectively left to argue that any issue *related* to class-member identity is off-limits when a court considers whether Rule 23 is satisfied. But this Court has consistently rejected that view.

63

As the district court recognized, 1-ER-27, *Briseno* clarified that issues relating to identifying class members may "implicate other class certification criteria" by presenting "predominance problems" or issues of superiority and manageability. 844 F.3d at 1126 n.6. The only analysis *Briseno* rejected was a "*freestanding* administrative feasibility prerequisite." *Id.* at 1124-26 & n.4, 1128 (emphasis added). This Court has since underscored *Briseno*'s narrow rejection of a "freestanding" ascertainability analysis. *E.g.*, *True Health*, 896 F.3d at 929.

The Court has even rejected precisely the argument Plaintiffs advance here. In *Walker v. Life Insurance Co. of the Southwest*, 953 F.3d 624 (9th Cir. 2020), the core issue was whether each class member "was exposed to, and thereby could have relied on," misleading disclosures. *Id.* at 631. That issue was central to each class member's ability to recover, but it also related to the identity of class members, defined as people who "received" the disclosures. *Id.* at 628, 630-32. Like Plaintiffs, the district court in *Walker* read *Briseno* to mean that these exposure-and-injury issues could not be "valid justifications to find a lack of predominance" because they *also* affected class-member identity. *Id.* at 628-29.

64

This Court "d[id] not agree." *Walker*, 953 F.3d at 629. "*Briseno* was narrow in focus," and it "does not expressly excuse a district court from considering [a relevant issue] under the predominance rubric." *Id.* at 633. Even after *Briseno*, the task for district courts remains considering all issues that bear on Rule 23 prerequisites like predominance. *Id.* at 633-34. A court violates *Briseno* only when it imposes "a separate administrability requirement" beyond Rule 23's prerequisites. *Id.* at 633.

The decision below follows this Court's decisions to a tee. In fact, it would have been error for the district court to accept Plaintiffs' invitation to disregard issues of class-member injury just because they also touch on class-member identity. *Walker*, 953 F.3d at 632-33.

**C.    The district court correctly rejected Plaintiffs' invitation to shunt questions of injury to posttrial claims administration.**

Plaintiffs contend (at 53) that the district court should have deferred questions of who was injured to "post-trial claims administration." That would have violated this Court's decisions and the Constitution.

**1.** Plaintiffs rely (at 43-46) on decisions holding that the calculation of individual damages may sometimes be reserved for claims

administration. But as the district court explained, the issue here involves *injury*—a "core merits issue." 2-ER-111-12.

This Court has long rejected efforts to conflate the fact of injury with the amount of damages. "Damages are measured only *after* each plaintiff has demonstrated that the defendant's conduct caused the plaintiff to suffer an antitrust injury." *Olean*, 31 F.4th at 666 (emphasis added); *see also Ambrosio*, 154 F.4th at 1112. Other circuits likewise have explained that "[u]ninjured class members cannot prevail on the merits, so their claims must be winnowed away *as part of the liability determination.*" *Rail Freight*, 934 F.3d at 624 (emphasis added); *accord, e.g.*, *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 194-95 (3d Cir. 2020).

Even if claims administration sometimes may suffice for calculating damages, it is not the time or place to determine whether someone is injured and thus has a viable claim. Injury is a core element of every antitrust claim, *supra* at 36-38, which Apple has a statutory and Seventh Amendment right to contest at trial. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845-46 (1999) (cautioning against "adventurous application[s]" of class-action procedures that abridge "Seventh

66

Amendment jury trial rights"). And a "class cannot be certified on the premise that [the defendant] will not be entitled to litigate its statutory defenses to individual claims." *Dukes*, 564 U.S. at 367 (citing 28 U.S.C. § 2072(b)). Apple has a right to make the same sort of showing it made for Hayter—that, given his purchases, he was not harmed by any conduct claimed to be anticompetitive—for many millions of other class members. Per *Dukes*, that right may not be suppressed to facilitate class litigation.

Multiple circuits have recognized that juries, not claims administrators, must decide core liability questions—including those involving the fact (or not) of injury. The First Circuit held that "in an antitrust action, a class cannot be certified based on an expectation that the defendant will have no opportunity to press at trial genuine challenges to allegations of injury-in-fact." *Asacol*, 907 F.3d at 58. The notion that "uninjured class members could be removed in a proceeding conducted by a claims administrator" is "at odds with . . . Supreme Court precedent" and "would fail to be 'protective of defendants' Seventh Amendment and due process rights.'" *Id.* at 45, 53. Likewise, the Eighth Circuit rejected as "meritless" the notion that the "fact of

67

damage or injury" "could be resolved through a 'claims procedure.'" *Blades v. Monsanto Co.*, 400 F.3d 562, 569-70 (8th Cir. 2005).

Even the cases Plaintiffs cite (at 44-45) reveal the flaw in their argument. Although this Court has suggested that "'the presence of individualized *damages* cannot, by itself, defeat class certification,'" it has never said the same about "individual questions going to injury." *Bowerman v. Field Asset Servs., Inc.*, 60 F.4th 459, 469 (9th Cir. 2023) (emphasis added). And the out-of-circuit decisions Plaintiffs cite consistently distinguish "liability" from "damages." *E.g.*, *Nexium*, 777 F.3d at 21; *Klay v. Humana, Inc.*, 382 F.3d 1241, 1260 (11th Cir. 2004).

This point is especially clear after *Healy v. Milliman, Inc.*, 164 F.4th 701 (9th Cir. 2026), which held that unnamed class members must "demonstrate standing at trial," not "during an individualized claims process." *Id.* at 708. Although *Healy* focused on Article III standing, it made clear that the same analysis applies to all matters on which plaintiffs bear the burden of proof, *id.* at 707-08—which includes the "essential element" of antitrust injury, *Olean*, 31 F.4th at 666.

**2.** Besides, as the district court reasoned, the class here could not be sustained even if only damages were at issue. 1-ER-26. Plaintiffs

68

recognize that the difficulty of calculating damages can be an "impediment to class certification" in "extreme" cases. OB 45; *see Bowerman*, 60 F.4th at 469. This is one. To calculate individual damages, Plaintiffs would need to relate billions of transactions to many millions of people to quantify the impact on each of unique pricing decisions by thousands of developers. Plaintiffs don't dispute that the person they picked to do that work was inadequate. Nor do they explain how that analysis will become any easier, or their expert any less deficient, during claims administration.

Plaintiffs suggest future analysis in claims administration *might* be different because Thompson could not "access[] external databases" or rely on "public information" in his pretrial report. OB 23, 43 n.15. That is false. Thompson "cross-checked the address information against publicly available data" from the Postal Service, 11-ER-2098, and "outsourced certain of his work to a third party," 1-ER-14. It didn't help.

Equally false is Plaintiffs' repeated suggestion that Apple "conceded" having "data that would allow Plaintiffs 'to demonstrate which App Store transactions are tied together by a common payor.'" *E.g.*, OB 46 (quoting 2-ER-86). Here's Apple's statement: "*Plaintiffs seek* to

69

demonstrate which App Store transactions are tied together by a common payor," and "Apple has agreed to produce data sufficient for Plaintiffs *to attempt* that analysis." 2-ER-86 (emphasis added). When Apple did so, it warned Plaintiffs that the matching exercise was no trivial task. *See*, *e.g.*, 11-ER-2119, 11-ER-2122; 3-SER-571. McFadden, too, described matching as "beyond the reach of Apple or the plaintiffs." 9-SER-2217. Apple does not have—no one has—a registry revealing which people stand behind billions of purchases. 5-ER-807-08; 4-ER-647-50. Generating those answers required an expert; Plaintiffs hired a deeply unqualified one.

Plaintiffs then complain that Apple did not solve their predominance problems for them by creating better data, "implement[ing]" their model itself, or "assert[ing]" the precise "proportion" of class members who were unharmed. OB 42. Yet Plaintiffs must "carry the burden of establishing" that Rule 23's prerequisites "are satisfied." *Olean*, 31 F.4th at 665. Apple cannot resolve Plaintiffs' injury questions, but regardless, Rule 23 does not permit shifting the burden to Apple even at decertification. *Marlo*, 639 F.3d at 947-48.

70

### D. Mere "exposure" is not antitrust injury.

Plaintiffs argue (at 33, 38) that *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125 (9th Cir. 2016), means every class member "exposed" to conduct that supposedly violated the antitrust laws can be deemed injured. That attempted workaround is flawed.

**1.** *Ruiz Torres's* exposure-as-injury framework does not apply in antitrust cases like this. *Ruiz Torres* involved a statute that targeted exposure to misleading information. 835 F.3d at 1133-34. The defendant argued that individualized issues might predominate because, although all class members were "exposed" to misleading information, some may not have "ultimately" been harmed by it. *Id.* at 1136. But exposure alone was enough to show "informational injury" under the statute's "liberal" definition. *Id.* at 1135-36. That some class members were "fortuitous[ly]" unaffected beyond the informational injury did not "necessarily" preclude certification. *Id.* at 1137.

There are no "fortuitous[ly]" uninjured class members here. Untold millions are *predictably* uninjured based on uncontested economic principles confirmed by real-world experience. *See supra* at 9-10, 12.

71

Regardless, *Ruiz Torres* is "inapposite" because injury is a "necessary element" that cannot be assumed around. *Williams v. Apple Inc.*, 338 F.R.D. 629, 643-44 (N.D. Cal. 2021) (Koh, J.). Unlike the statute in *Ruiz Torres*, the antitrust laws at issue do not permit private plaintiffs to recover based on abstract "exposure" to anticompetitive conditions; they are concerned with tangible injury to "business or property." *Atl. Richfield*, 495 U.S. at 331 n.1; *see Reiter v. Sonotone Corp.*, 442 U.S. 330, 338-39 (1979). Plaintiffs may not show the tangible injury their claims require—that users "pa[id] Apple higher-than-competitive prices," *Pepper*, 587 U.S. at 278—based on mere "harm to the 'market' as an abstract entity," *Atl. Richfield*, 495 U.S. at 339 n.8, or bare claims of "limitation of consumer choice," *Somers*, 729 F.3d at 966; *see also, e.g.*, *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012) (requiring "reduced choice" *and* "increased prices" to show "harm[] by the challenged injury to competition"). Hence the views of nine Justices that consumers who did not pay "higher app prices" because of Apple's challenged conduct would be uninjured. *Pepper*, 587 U.S. at 284; *id.* at 292-93 (Gorsuch, J., dissenting).

72

Plaintiffs cite no authority suggesting that mere "purchases from [a] monopoly" (OB 53) confer antitrust injury. And their own litigation conduct defeats that theory. Plaintiffs chose to truncate the class by excluding anyone who spent less than $10 on App Store purchases. OB 18. But someone who spent $9 was every bit as "exposed" to the alleged antitrust violations as one who spent $11, so "excising" members like him from the class raises superiority and adequacy problems that themselves would preclude certification. *Mr. Dee's*, 127 F.4th at 932. Equally illogical would be Plaintiffs' decision to dismiss Hayter's claims after the evidence showed that, though "exposed" to the App Store's design, he wasn't injured by it. *Supra* at 24.

**2.** Even if its reasoning applied here, *Ruiz Torres* would not relieve Plaintiffs of their burden to show that injury is susceptible to classwide proof. Any notion that *Ruiz Torres* negates a court's duty to decide whether individualized injury questions defeat predominance was extinguished by *Healy*. As the Court explained there, *Ruiz Torres* "predate[d] *TransUnion*" and was "abrogated to the extent [it] would have permitted unnamed class members to go without demonstrating standing at trial." *Healy*, 164 F.4th at 708; *see id.* (same for *Briseno*).

73

Plus, an exposure theory would present other equally insurmountable predominance problems. Just as some consumers benefited monetarily under McFadden's model, so too any accounting for the non-monetary effects of Apple's conduct would have to assess the benefits, such as increased privacy and malware protection, to each class member. *See Epic*, 67 F.4th at 987 (discussing such benefits). Those assessments would require "individualized questions" that would "overwhelm" the proceedings. *Olean*, 31 F.4th at 668-69.

### E. Decertification, rather than millions of individually targeted summary-judgment motions, was the appropriate result.

Plaintiffs end by suggesting (at 52-55) that only summary judgment could have resulted from concerns about class-member injury. They are mistaken.

Apple sought summary judgment on the ground that, without a reliable way to match transactions to people, Plaintiffs had not met their burden of proving injury. 2-SER-492. If Plaintiffs are suggesting the district court should grant that motion and issue a classwide judgment in Apple's favor, Apple would welcome that result.

74

Plaintiffs presumably instead mean to say that Apple could not have sought decertification and instead had to seek summary judgment against uninjured absent class members one by one. OB 54. Under that view, for Apple to argue a class action is unworkable because of the need for individualized inquiries, it would have to individually litigate summary judgment as to millions of people. Rule 23(b)(3) exists to screen out such unmanageable actions. And when a barrier to compliance with Rule 23 is identified after a class is certified, decertification is the right result. *Marlo*, 639 F.3d at 947.

In fighting that principle, Plaintiffs misread *Healy*. *Healy* held that, because standing is an element plaintiffs must prove at trial, a defendant may challenge the standing of absent class members at summary judgment. 164 F.4th at 710. It did not hold that summary judgment is the *only* way to raise arguments related to injury. Nor did it suggest that a district court must blind itself to issues that prevent the case from proceeding as a class action.

# CONCLUSION

The Court should affirm the decertification order.


Dated:  August 12, 2026                    Respectfully submitted,

                                           /s/ *Theodore J. Boutrous Jr.*
                                              Theodore J. Boutrous Jr.

                                           *Counsel for Appellee*
                                           *Apple Inc.*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 25 7930

I am the attorney or self-represented party.

**This brief contains** | 13,825 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⊙ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   ☐ it is a joint brief submitted by separately represented parties.
   ☐ a party or parties are filing a single brief in response to multiple briefs.
   ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [              ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Theodore J. Boutrous Jr. | **Date** | 8/12/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*