No. 25-7930

_____

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

_____

IN RE APPLE IPHONE ANTITRUST LITIGATION

_____

ROBERT PEPPER; EDWARD LAWRENCE; STEPHEN H. SCHWARTZ,

*Plaintiffs-Appellants*,

v.

APPLE INC.,

*Defendant-Appellee*.

_____

On Appeal from the U.S. District Court
for the Northern District of California
Case No. 4:11-cv-6714 | Hon. Yvonne Gonzalez Rogers

_____

## SUPPLEMENTAL EXCERPTS OF RECORD

## VOLUME 1 OF 12 (SER-1–SER-197)

_____

Cynthia E. Richman
Harry R. S. Phillips
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
(202) 955-8500

Caeli A. Higney
Julian W. Kleinbrodt
Eli M. Lazarus
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Ctr., Ste. 2600
San Francisco, CA 94111
(415) 393-8200

Theodore J. Boutrous Jr.
Daniel G. Swanson
Blaine H. Evanson
Bradley J. Hamburger
Matt Aidan Getz
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

*Counsel for Appellee Apple Inc.*

# EXHIBIT 6

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

_____

IN RE APPLE IPHONE           ) Case No.

ANTITRUST LITIGATION,         ) 4:11-cv-06714 YGR

_____

**HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY**

VIDEO-RECORDED DEPOSITION UPON ORAL EXAMINATION OF

DARRYL THOMPSON

9:05 A.M.

JUNE 5, 2025

1200 SIXTH AVENUE, SUITE 610

SEATTLE, WASHINGTON

REPORTED BY:

CARLA R. WALLAT, CRR, RPR

WA CCR 2578, OR CSR 16-0443, CA CSR 14423

JOB No. 7376385

PAGES 1 - 218

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

APPEARANCES

FOR THE CERTIFIED CLASS:
THOMAS H. BURT
Wolf Haldenstein Adler Freeman & Herz LLP
270 Madison Avenue
New York, New York 10016
212.545.4600
burt@whafh.com

KYLE M. WOOD
ANNA K. LINK - via Zoom
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
1615 M Street NW, Suite 400
Washington, DC 20036
202.326.7900
kwood@kelloghansen.com
alink@kelloghansen.com

FOR THE DEFENDANT:
ELI M. LAZARUS
CAELI A. HIGNEY - via Zoom
Gibson, Dunn & Crutcher LLP
One Embarcadero Center, Suite 2600
San Francisco, California 94111
415.393.8200
elazarus@gibsondunn.com
chigney@gibsondunn.com

RAMONA LIN
HARRY R. S. PHILLIPS - via Zoom
Gibson, Dunn & Crutcher LLP
1700 M Street, N.W.
Washington, D.C. 20036
202.955.8500
rlin@gibsondunn.com
hphillips@gibsondunn.com

ALSO PRESENT:
LORI TALBOTT, Videographer
JEREMIAH RONDEAU, Cornerstone Research
CHRIS BRUEGGE, Cornerstone Research - via Zoom

Page 2

---

INDEX

EXAMINATION BY:                          PAGE(S)
MR. LAZARUS                                 9
MR. BURT                                  209

EXHIBITS FOR IDENTIFICATION                 PAGE
Exhibit DX 112   Supplemental Expert Report of     14
        Darryl Thompson, April 16,
        2025
Exhibit DX 113   README file                       18
Exhibit DX 114   Exhibit 1, In Re:  Blue Cross      33
        Blue Shield Antitrust
        Litigation, Declaration of
        Jennifer M. Keough
Exhibit DX 115   Exhibit A, In Re Blue Cross        47
        Blue Shield Antitrust
        Litigation, Declaration of
        Megan E. Jones
Exhibit DX 116   Declaration of Darryl Thompson     72
Exhibit DX 117   7/10/2024 email from Ramona        80
        Lin to Rachele Byrd and Kyle
        Wood

Page 3

---

EXHIBITS FOR IDENTIFICATION                 PAGE
Exhibit DX 118   7/10/2024 letter to Rachele        84
        Byrd and Kyle Wood from Eli
        Lazarus
Exhibit DX 119   Kim B                             148
        Excerpts from Apple Payor Data
        Produced as
        APL-APPSTORE_10767813,
        APL-APPSTORE_10809581,
        APL-APPSTORE_10857484, and
        APL-APPSTORE_10864885
Exhibit DX 120   Kim J                             149
        Excerpts from Apple Payor Data
        Produced as
        APL-APPSTORE_10767813,
        APL-APPSTORE_10809581,
        APL-APPSTORE_10857484, and
        APL-APPSTORE_10864885
Exhibit DX 121   Kim H                             150
        Excerpts from Apple Payor Data
        Produced as
        APL-APPSTORE_10767813,
        APL-APPSTORE_10809581,
        APL-APPSTORE_10857484, and
        APL-APPSTORE_10864885

Page 4

---

EXHIBITS FOR IDENTIFICATION                 PAGE
Exhibit DX 122   Debra                             153
        Excerpts from Apple Payor Data
        Produced as
        APL-APPSTORE_10767813,
        APL-APPSTORE_10809581,
        APL-APPSTORE_10857484, and
        APL-APPSTORE_10864885
Exhibit DX 123   Deb                               154
        Excerpts from Apple Payor Data
        Produced as
        APL-APPSTORE_10767813,
        APL-APPSTORE_10809581,
        APL-APPSTORE_10857484, and
        APL-APPSTORE_10864885
Exhibit DX 124   Cindy - Jason                     156
        Excerpts from Apple Payor Data
        Produced as
        APL-APPSTORE_10767813,
        APL-APPSTORE_10809581,
        APL-APPSTORE_10857484, and
        APL-APPSTORE_10864885

Page 5

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

EXHIBITS FOR IDENTIFICATION                      PAGE

Exhibit DX 125   Cindy                             156
            Excerpts from Apple Payor Data
            Produced as
            APL-APPSTORE_10767813,
            APL-APPSTORE_10809581,
            APL-APPSTORE_10857484, and
            APL-APPSTORE_10864885
Exhibit DX 126   Cindy - Ellie                     158
            Excerpts from Apple Payor Data
            Produced as
            APL-APPSTORE_10767813,
            APL-APPSTORE_10809581,
            APL-APPSTORE_10857484, and
            APL-APPSTORE_10864885
Exhibit DX 127   1/15/2025 letter to Eli           196
            Lazarus from Kyle Wood
Exhibit DX 128   Declaration of Darryl             199
            Thompson, March 7, 2025

REPORTER'S NOTE:  All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily indicate an exact quote from the document.

Page 6

---

please state them at the time of your appearance.

Counsel and all present, including remotely, will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. LAZARUS:  I'm Eli Lazarus of Gibson, Dunn & Crutcher for Apple, Inc., the defendant.  I'm joined here by Ramona Lin, who is a colleague at Gibson Dunn, and Jeremiah Rondeau from Cornerstone Research.  And joining on the Zoom line we have Caeli Higney from Gibson Dunn and Chris Bruegge from Cornerstone Research.

MR. BURT:  I am Thomas Burt from Wolf, Haldenstein, Adler, Freeman & Herz LLP for the certified class.

BY MR. WOOD:  Kyle Wood from Kellogg, Hansen, Todd, Figel & Frederick, also for the certified class.

THE VIDEOGRAPHER:  Thank you.

Would the court reporter please swear in the witness.

DARRYL THOMPSON, sworn as a witness by the Certified Court Reporter, testified as follows:

Page 8

---

SEATTLE, WASHINGTON; JUNE 5, 2025
9:05 A.M.
--oOo--

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 9:05 a.m. on June 5th, 2025.

Please note that the microphones are sensitive and may pick up whispering and private conversations.  Please mute your phones at this time.  Audio and video recording will continue to take place unless both parties agree to go off the record.

This is Media Unit 1 in the video-recorded deposition of Darryl Thompson taken by counsel for defendant in regards to Apple iPhone Antitrust Litigation filed in the United States District Court, Northern District of California, Oakland Division.  Case number 4:11-cv-06714-YGR.  The location of the deposition is 1200 Sixth Avenue, Suite 610, Seattle, Washington.

My name is Lori Talbott representing Veritext and I am the videographer.  The court reporter is Carla Wallat from the firm Veritext.

I'm not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding,

Page 7

---

EXAMINATION

BY MR. LAZARUS:

Q.  Please state your full name for the record.

A.  Darryl Wayne Thompson.

Q.  All right.  We have met a few times, Mr. Thompson.  And I think you know from our prior meetings that I am not a data expert or computer scientist, so I think I'm going to have to ask you to explain a lot of things to me today.  So thank you for your patience with that.

But first I have a few preliminary questions.

Have you been deposed before?

A.  Yes.

Q.  Okay.  How many times?

A.  Once.

Q.  Okay.  And what case was that?

A.  I actually don't recall the case.

Q.  Okay.  When was that?

A.  Approximately seven -- six to seven years ago.

Q.  Okay.  What was the general topic of your testimony?

A.  I was providing information with regards to a class action administration my company was administering.

Q.  Did it -- did your testimony deal with

Page 9

3 (Pages 6 - 9)

deduplication of data?

A. It did not.

Q. Have you ever testified in a trial?

A. I have not.

Q. Okay. Have you ever been retained as a testifying expert in another case?

A. I have not.

Q. And has a court -- has a court ever expressed disagreement with any of your opinions in a case?

A. Not that I am aware of.

Q. Have you ever submitted a declaration in a court case prior to this case?

A. Yes, I have.

Q. Okay. What cases?

A. I could not name any of them I -- but I have.

Q. Okay. About how many?

A. Maybe a dozen.

Q. Okay. Did those declarations deal with deduplication of data?

MR. BURT: Objection. Form.

A. The declaration -- some -- some of the declarations I believe contained information regarding the total population received and the ultimate size of the class after going through deduplication without specifically referencing deduplication.

Page 10

Q. (BY MR. LAZARUS) And when you say the population received, that's the population receiving notice in the case?

A. The population received is the -- in that -- what I was referencing is the population we received from third party, usually the defendant, and then we would perform analysis and deduplication and then the final outcome. So those numbers may have been included in -- in one or more of my declarations.

Q. Thank you.

Just some more preliminaries.

If I ask a question and you don't understand it, please tell me that. If you answer a question, I will assume that you understood the question and have answered it to the fullest extent of your recollection; is that fair?

A. Yes.

Q. Okay. And you may request breaks during the deposition. I just ask that if when you request a break if I have asked a question, I ask that you answer the question before we take a break.

Does that make sense?

A. Yes.

Q. And do you understand that you are under oath today?

Page 11

A. I do.

Q. Is there any reason that you would be unable to give your honest and best testimony today?

A. Not -- no.

Q. We are being helped today by a court reporter. And for her sake, and the sake of the transcript, I'd ask that you wait until I have finished asking a question before you answer. It can be difficult to take down what we're saying if we're talking over each other.

MR. LAZARUS: And finally for the preliminaries, given the topics we will discuss today, I will designate the transcript as "highly confidential - attorneys' only" for Apple.

Q. (BY MR. LAZARUS) All right. What did you do to prepare for today's -- sorry?

MR. BURT: I note that you said, "for Apple." I just want to join in the "highly confidential" designation because we expect to be discussing matters that have source code protection.

Q. (BY MR. LAZARUS) All right. What did you do to prepare for today's deposition?

A. I met with counsel. I did some high-level review of deduplication code that I wrote. I read some sections of my declaration and my expert documentation.

Page 12

Q. Okay. When you -- when did you meet with counsel?

A. I met last Friday, last Monday, last Tuesday, which I guess would have been the day before yesterday.

Q. All right.

A. And yesterday. Additionally, we had met three weeks ago in preparation for when my declaration was previously scheduled.

Q. Your deposition was previously scheduled?

A. Or my deposition, apologies.

Q. And how long were those meetings with counsel?

A. They varied from two hours to four hours.

Q. And you mentioned some code and documents that you looked at.

Did you look at any documents other than the ones that you just named in preparation for this deposition?

A. There was a letter that I also scanned that pertained to -- or at least had a section that pertained to NCOA data.

Q. Who was that letter from?

A. I believe it was from Mark Rifkin.

Q. Okay. Counsel for the plaintiffs?

A. Yes.

Q. Okay. Any other documents?

Page 13

4 (Pages 10 - 13)

A. None that jump out at me right at the moment.

Q. Okay.

MR. LAZARUS: And can we now mark document -- the supplemental expert report, Tab 1, as DX 112.

(Deposition Exhibit DX 112 was marked.)

Q. (BY MR. LAZARUS) And I think that will come up on the screen here.

MR. LAZARUS: And can we also get the paper copies, please.

Q. (BY MR. LAZARUS) All right. This document is labeled "Supplemental Expert Report of Darryl Thompson," correct?

A. That is correct.

Q. Is this a copy of your final report in this case?

A. It appears to be, yes.

Q. Okay. On page 7 of this report, is that your electronic signature?

A. It is.

Q. Okay. And is it okay if I call this document "your report" so that when I say "your report," you'll understand I'm referring to this document and not any prior declaration or other document?

A. I'm fine with that.

Page 14

Q. Okay. Did you write this report yourself?

A. I -- I wrote the significant components of it. Portions of it came out of my original declaration and were provided to me by counsel in a template. And so they filled in certain sections that came out of my declaration and then I -- they provided sections that said, all right, this is sections that you need to provide what you did.

Q. Understood.

What portions did counsel write?

MR. BURT: Objection to characterization.

Q. (BY MR. LAZARUS) You can answer.

A. I'm not sure I can point to any section that I know counsel wrote. As I said, the -- from my recollection, the -- the expert -- the report came over with sections filled out from my declaration, so I don't believe that qualifies that they wrote it. They copied it from my declaration and then they identified sections that I need to fill in.

Q. Okay. But you adopted all of the language in this document as your final report?

A. I did.

Q. Okay. Let's see. Okay.

When did you start drafting this document?

Page 15

A. Oh, I could not give you a date. I've --

Q. Roughly?

A. I want to say March of this year, but I -- again, I can't -- I could not give you with high confidence when I started writing this.

Q. Understood.

Were any portions of this report or the declaration -- well, scratch that.

Were any portions of this report taken from prior declarations that you had given in any other matter?

MR. BURT: Object to form.

A. Possibly bio information would have been brought forward, but -- but nothing with regards to work on this -- on this matter. But possibly bio information.

Q. (BY MR. LAZARUS) Okay. Bio information meaning your own biography --

A. That is correct.

Q. -- background information?

Okay. Have you been asked to prepare any reports to be submitted in this case after this document?

MR. BURT: Objection. I -- I don't think I need to let him answer that.

Page 16

MR. LAZARUS: Your -- what -- what's the basis for the objection?

MR. BURT: You're asking whether he's going to file a report in the future. I don't -- I think that's objectionable.

MR. LAZARUS: And you're --

MR. BURT: Because it goes to attorney work product.

MR. LAZARUS: And you're instructing him not to answer?

MR. BURT: I'm instructing him not to answer.

MR. LAZARUS: All right. I'll withdraw that question for now.

I hear there's a request on the Zoom for all of us to speak up, so --

MR. BURT: I'm a quiet objector so as not to interfere with your examination.

MR. LAZARUS: Much appreciated.

MR. BURT: I'll move my mic up.

MR. LAZARUS: That probably does it.

Q. (BY MR. LAZARUS) Okay. Do you intend to offer any opinions in rebuttal to any of Apple's experts in this case?

MR. BURT: I think that's still attorney

Page 17

5 (Pages 14 - 17)

work product.

MR. LAZARUS: Okay. I'll withdraw that question for the moment also.

Q. (BY MR. LAZARUS) All right. Are all of the opinions that you are offering in this case contained in your report?

A. Yes.

Q. Okay. And are all of the bases for those opinions described in your report?

A. I believe so.

Q. Okay. You also provided a README file on May 28, 2025; is that correct?

A. I provided a README file. I don't know the exact date, but I will accept that it's that date.

Q. Okay.

MR. LAZARUS: Can we go ahead and mark -- it's Tab 17 -- as an exhibit?

MR. BURT: Is this 113?

MR. LAZARUS: I'm sorry?

MR. BURT: Is this 113?

MR. LAZARUS: It should be 113, right.

(Deposition Exhibit DX 113 was marked.)

Q. (BY MR. LAZARUS) Okay. Is this the README file that you produced?

A. Yes.

Page 18

Q. All right. And your report and this README file both describe the methods you used to form your opinions in this case, correct?

MR. BURT: Objection to form.

A. The README file simply lists a -- a -- a set of steps to executing code that I believe represents the -- a -- substantially all of the code I ran in order to achieve the outcome.

Q. (BY MR. LAZARUS) Okay. And just the -- so the question I asked is, your report and the README file both describe the methods you used to form your opinions in this case; is that -- is that correct?

MR. BURT: Same objection.

A. The README file gives a list of -- of code to execute and -- and some additional instruction. I don't know that it -- it actually direct -- provides detail on, you know, the actual activity. Simply the code being run.

Q. (BY MR. LAZARUS) Okay. But to understand the methods that you used in this case in your analysis, we should look at the report and this README file?

MR. BURT: Objection. Asked and answered.

A. Yes. The -- the README file did provide information on how -- which scripts I ran, yes.

Page 19

Q. (BY MR. LAZARUS) Okay. And we'll come back to talk more about your background, but your current employer is JND Legal Administration; is that correct?

A. That is correct.

Q. All right. And you maintain that parts of the methods and the code described in your report and the README file are proprietary to JND, correct?

A. That is correct.

Q. Do you have knowledge of anyone outside of JND using those methods?

MR. BURT: Objection to form.

A. Not -- not that I'm aware of.

Q. (BY MR. LAZARUS) In forming your opinions in this case, did you review any peer-reviewed publications related to the methods you relied upon?

A. I did not.

Q. Are there any analyses that you relied upon for the opinions in your report that are not included in the -- well, scratch that. Let me back up.

In addition to the report and this README file, you also provided backup materials of computer files that you relied on in your analysis in this case; is that right?

MR. BURT: Objection to form.

A. Yes. I provided the code, yes.

Page 20

Q. (BY MR. LAZARUS) Okay. Are there any analyses that you relied upon for the opinions in your report that are not included in the computer files that you provided to Apple?

A. I'm not sure I understand the -- the question.

Q. Okay. So you provided computer files to Apple, more specifically, to Apple's consultants at Cornerstone Research, correct?

A. That is correct.

Q. Are there any -- scratch that.

Did you conduct any analysis that you rely upon in your report other than those that are reflected in the computer files that you produced?

A. I do not believe I relied on any -- anything other than what's -- what was provided in -- in -- I did not rely on anything -- or I do not believe I relied on anything other than what I provided in the outcome and what I -- what I determined in the report.

Q. Okay. So tell me if I have this right.

You do not believe that you relied upon any -- you do not believe you relied upon anything other than what is in your report, what is in your README file and what is in the computer files and code that you produced to Cornerstone Research.

Is that right?

Page 21

6 (Pages 18 - 21)

A. If I understand the question, I believe that is correct.

Q. Okay. Are there any questions that you have that -- to help clarify the question?

A. I'm trying to -- I'm trying to determine if there was something that -- that it's -- that is -- would qualify as -- as meeting the -- the criteria you speak of. I -- and I can't think of anything.

Q. Okay. Understood.

Have you identified any errors or omissions in your report since you submitted it?

A. Not to my -- no, not to my knowledge.

Q. Okay. You hold yourself out as a data specialist, correct?

A. I -- I have extensive experience in utilizing and working with data.

Q. Okay. If you look at page 1 of the report, there's a line that says, "I have worked as a data -- data specialist for over 25 years."

Is that right?

A. Line 1, Section 3?

Q. Correct. In paragraph 3.

A. That is correct.

Q. Okay. And that's -- you stand by that assertion?

Page 22

A. I do.

Q. Okay.

A. I've worked as a data specialist for over 25 years.

Q. All right. And you graduated from Washington State University in 1996 with a bachelor of arts in management information systems; is that correct?

A. That's correct.

Q. Have you resided outside of the state of Washington since you graduated in 1996?

A. No.

Q. Okay. Do you have any formal education beyond the bachelor's degree in management information systems that we just referred to?

A. No.

Q. Okay. You don't have any advanced degrees like a master's or a Ph.D., right?

A. I do not.

Q. And you don't have any degree in statistics, correct?

A. I do not.

Q. You're not a professor of management information systems, statistics or any other subject, correct?

A. I am not.

Page 23

Q. You have not authored any peer-reviewed published research on subjects relating to statistical methodology, correct?

A. I have not.

Q. You do not have any professional certifications or accreditations in management information systems, statistics or any other fields, correct?

A. That is correct.

Q. All right. So we mentioned that your current employer is JND Legal Administration. Okay if we refer to the company as JND?

A. Certainly.

Q. All right. And what is JND?

A. JND is a legal administration firm. We provide legal administration -- or for -- administration services for class action lawsuits, securities cases. We also have a e-discovery division.

Q. All right. And what is your job title?

A. I am chief information officer and chief operating officer.

Q. And what are your main responsibilities?

A. I -- I oversee the entire IT organization. I oversee the operations organization. So the -- the IT organization includes the infrastructure,

Page 24

networking, data administration. Operations includes the -- the teams that do project management and administration of our -- administration of our projects.

Q. Understood.

And what are your responsibilities on the legal cases that JND handles claims administration for?

A. What are my responsibilities?

Q. Yes.

A. It can -- it varies widely, from performing oversight of actual and managing the delivery of a project, from -- from noticing to distribution. I also, for our most complex cases, I am involved in the data management and processing and prep and deduplication of data.

Q. Okay. And when you say "noticing," and "distribution," what do those terms refer to?

A. Noticing is sending either mail or email or some other information to class members about the administration.

Distribution refers to once the administration has completed the -- it's -- it's process and determined who received payment, distribution is sending some sort of payment.

Q. Understood.

Page 25

7 (Pages 22 - 25)

**SER-9**

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

And you say at paragraph 6 of your report, which is on page 2, that there is an Exhibit B -- excuse me, Appendix B to the report, correct?

A. Paragraph -- yes.

Q. And in that paragraph 6, you state that Appendix B is a non-exhaustive list of class action settlement administrations for which I reviewed or oversaw the review of data in the last four years, correct?

A. Yes.

Q. And Appendix B contains 11 page -- an 11-page list of cases, correct?

A. Yes.

Q. And did you personally conduct deduplication of individual persons based on personally identifiable information in all of these cases?

A. No.

MR. BURT: Objection to form.

Q. (BY MR. LAZARUS) For what percentage of those cases would you estimate that you did personally conduct deduplication work?

A. I -- I don't believe I could give a -- a realistic answer to that. I -- I do not know.

Q. Is it fair to say it is neither zero percent nor 100 percent?

Page 26

A. It is absolutely not zero and it is not 100. That is correct.

Q. Would you say it's closer to 25 or 75 percent?

A. I believe it'd be closer to 25 percent that I actually did the hands on deduplication.

Q. Okay. And in the cases where you did do hands-on deduplication, what types of data did you deduplicate?

MR. BURT: Objection to form.

A. In general? In general, it would have been contact data for individual -- or for individuals, name, address, situationally phone, situationally email, situationally some sort of other identifier.

Q. (BY MR. LAZARUS) Okay. In all of those cases, was it always personal information that you were deduplicating as opposed to some other kind of data? Does that make sense?

MR. BURT: Objection to form.

A. I would need an example of "some other kind of data." That's too broad for me, I think, to answer.

Q. (BY MR. LAZARUS) Was it always contact information for people that you were deduplicating?

A. No.

Q. Okay. What was an example of when it was not that?

Page 27

A. Business data.

Q. Okay. What do you mean by "business data"?

A. Names of businesses, addresses of businesses.

Q. Understood.

Okay. So other than contact information for persons and business information, is there other data that you can think of that you have deduplicated in any of those cases in Exhibit -- in Appendix B?

A. Yes.

Q. Okay. What other kinds of information?

A. Vehicle data could be involved, but an association with people or businesses.

Q. Okay. Understood.

Okay. And then from September 1998 to July 2010 you were employed by a company called Adaptis, correct?

A. That is correct.

Q. And what is Adaptis?

A. Adaptis was a health care claims administration company.

Q. Okay. And you say "was."

Does the company no longer exist?

A. The company no longer exists.

Q. Okay. Were your responsibilities at Adaptis similar to your current responsibilities at JND?

Page 28

MR. BURT: Objection to form.

Q. (BY MR. LAZARUS) You can answer.

A. I -- I had overlapping responsibilities at Adaptis as what I do at JND, yes.

Q. Okay. What's different between your responsibilities at Adaptis and your responsibilities at JND?

A. Currently, I'm -- oversee operations. I did not do that at Adaptis. Currently, I'm CIO in the IT arena and at Adaptis I held various roles as I became more and more senior, from data analyst to managing director of IT.

Q. Understood.

Did you do what you describe as hands-on data deduplication work at Adaptis?

A. I did hands-on data analysis work at Adaptis. I did hands-on data matching work at Adaptis, which is matching to, you know, to contact records to determine they're the same. The purpose and outcome was in deduplication, but roll up in that situation. But the function was the same and similar.

Q. What's the difference between matching and deduplication?

A. For -- so deduplication is to identify a -- a primary record and all of its related records.

Page 29

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

Matching is to take records and merge details about them to determine a final.

Q. Okay. That sounds very similar to me.

A. It is very similar.

Q. Okay. All right. Let's go to -- from October 2010 to June 2016 you were employed by Garden City Group, correct?

A. That is correct.

Q. And what is Garden City Group?

A. Garden City Group was a legal claims administration company.

Q. And it no longer exists?

A. It no longer exists.

Q. And was it -- how did it cease to exist?

A. It was acquired by a competitor.

Q. Okay. What competitor was that?

A. Epiq.

Q. Okay. Spelled E-P-I-Q; is that correct?

A. No clue.

Q. Okay. Were your responsibilities at Garden City Group similar to your responsibilities at JND?

A. Yes.

Q. Are there differences?

A. Yes.

Q. And what are those?

Page 30

A. At Garden City Group, again, I was not the -- I was not COO or head of operations. So I was not responsible for the operations organization.

Other than that, as my role grew, I -- I filled the similar role as a CIO for Garden City Group.

Q. All right. Did you do data deduplication or data matching at Garden City Group?

A. I did.

Q. Okay. Did you do both of those, matching and deduplication?

A. At Garden City Group primarily it was deduplication, similar to JND.

Q. Okay. Were the methods that you used at Garden City Group similar to the methods that you use at JND for deduplication?

MR. BURT: Objection. Form.

A. I believe so.

Q. (BY MR. LAZARUS) Can you think of any differences between them?

A. Only that as I have gained more and more and more and more experience over the years, I've evolved and improved my methods. And so I believe they've gotten better.

Q. Can you give examples of how they've gotten better?

Page 31

[redacted]

Q. Okay. Can you define "claims administration"?

A. Claims administration in general?

Q. Claims administration as the field that you work in?

A. So legal claims administration?

Q. Yes.

A. It is a -- the service of taking a -- well, a class action administration as an example, and providing a life cycle of steps. And it is very dependent on the case which of those pieces of the life cycle actually are required in order to frequently effectuate notice, effectuate, you know, claims receipt, processing claims, claims determination and

Page 32

ultimately some sort of benefit distribution to harmed parties.

Q. All right.

MR. LAZARUS: Could we pull up the document Tab 18C, please?

MR. BURT: And is this going to be a source code protected document?

MR. LAZARUS: No. This is a public filing. Okay.

(Deposition Exhibit DX 114 was marked.)

MR. LAZARUS: And is this Exhibit 114?

Q. (BY MR. LAZARUS) All right. This is a public filing dated September 3, 2001.

Do you recognize this as a declaration of a Jennifer Keough -- and I don't know if I'm pronouncing that --

A. Keough.

Q. Keough.

So do you recognize this as a declaration of a Jennifer Keough submitted in In Re: Blue Cross Blue Shield Antitrust Litigation concerning a class settlement in that litigation?

A. I have no reason to believe that's not what this is.

Q. Okay. And you referred to this litigation in

Page 33

9 (Pages 30 - 33)

your report, correct?

A. I did.

Q. All right. And do you see that in paragraph 99, which is on the last page of that declaration of Ms. Keough, it refers to due process and Rule 23 requirements?

A. I do.

Q. Based on your work in claims administration, are you aware that for a damages class action Rule 23 requires the best notice that is practicable under the circumstances including individual notice to all members who can be identified through reasonable effort?

MR. BURT: Objection to the extent it calls for a legal conclusion.

But you can answer to the extent you understand.

A. Okay.

Can you repeat the question?

Q. (BY MR. LAZARUS) Sure.

Based on your work in claims administration, are you aware that for a damages class Rule 23 requires, quote, "The best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable

Page 34

effort"?

A. I am aware of Rule 23. I've not read it.

Q. Okay.

A. But I am aware of it and its purpose.

Q. All right. When deduplicating records within the claims administration process, the goal is to get the best notice practicable under the circumstances to members of the class identified through reasonable efforts, correct?

A. It is -- it is a goal. It's -- as I've mentioned, it is situational, what -- what is required for -- for any particular administration. Notice may not be one of the deliverables. But where administration -- or where noticing is and we have class data, then I believe that is a reasonable statement.

Q. And what are other -- you mentioned -- you said that the deduplication with the goal of getting the best notice practicable under the circumstances to members of the class identified through reasonable effort, you said that is one goal -- or that is a goal.

What are other goals?

MR. BURT: Objection to form.

A. We have situations -- administrations that we've administered where there is no noticing. We were

Page 35

just doing distribution.

Q. (BY MR. LAZARUS) Okay. And so what -- okay.

If you look at paragraph 24 of Ms. Keough's declaration, it states, quote, "Based on JND's experience in handling class action mailings, JND was trusted by the parties to institute deduplication measures based on and in accord with industry best practices to combine records so that we could reduce duplicate mailings," correct?

Do you see that?

A. This is paragraph 25?

Q. 24.

A. 24. I don't believe that is paragraph 24.

Q. Is it not?

A. Oh, hold on. Second part of paragraph 24. Got it.

Q. Yes.

Do you see that language?

A. Yes.

Q. Okay. Do you understand the practice that Ms. Keough is describing in that paragraph?

MR. BURT: Objection to form.

A. I -- I believe I know what she is referring to.

Q. (BY MR. LAZARUS) Okay. Why does the claims

Page 36

administration process require or benefit from deduplicating records as -- as Ms. Keough is describing it?

MR. BURT: Objection. Form.

A. Why does the claim administration industry benefit?

Q. (BY MR. LAZARUS) Yes, from deduplication of data?

A. I don't know that the -- that the claims administrator benefits from deduplication.

Q. Why does the claims administrator do deduplication?

A. The -- the intent would be to -- I -- I believe it would be several fold. The -- the intent would be to combine records that represent the same entity, so that whatever future action needs to be taken, that can be done for a -- an individual once. People are not a big fan of receiving 78 postcards of -- about a notice. And also, 78 postcards are -- carry a cost.

So I think they're -- they're a benefit to the -- the class and -- but I don't believe it is -- there's a benefit to the administrator.

Q. Understood. Fair enough.

How do you know how effective the

Page 37

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

deduplication process was in achieving intended goals in class administration?

A. I missed a word. Can you repeat that one more time for me?

Q. Let me rephrase it.

When you are involved in deduplication for class administration, how do you know that the deduplication process is achieving the intended goals?

A. So we -- I mean, we spend extensive time, both performing deduplication and reviewing and -- and kind of quality reviewing the outcome to -- to ensure accuracy.

And then we do -- you know, for most administrations, we have paths for class members to contact us. And if there are issues, they have the ability to contact us and let us know that there was an issue with whatever they received, and that can provide feedback.

Q. And when you refer to quality reviewing of the outcome, what does that involve?

A. It involves a -- additional resources with extensive experience in doing deduplication, experience utilizing JND methods and methodologies for deduplication to review how -- how deduplication was performed and evaluating both code and the data outcome

Page 38

to see if there's anything identifiable that would suggest an issue.

Q. And when you say "additional resources," are you referring to people?

A. I'm referring to people.

Q. So the -- the quality review process at JND involves additional people, human resources with extensive experience in doing deduplication reviewing the process that has been undertaken in a given case; is that right?

A. I think I missed -- again, I missed a word. Can you please repeat that question?

Q. So I'm saying the -- I'm trying to recap what you have said.

The quality review process for deduplication at JND involves additional people, human resources with extensive experience in deduplication reviewing the process that has been undertaken in a particular case?

MR. BURT: Objection to form.

Q. (BY MR. LAZARUS) Is that right?

A. Yes.

Q. Okay. JND was or has been the claims administrator in two cases involving Apple, Inc., Lerman versus Apple and the MacBook Keyboard Litigation.

Page 39

Is that right?

A. Yes, I believe that's correct.

Q. And you refer to those cases in paragraph 5 of your report, correct?

A. Yes, that is correct.

Q. All right. Let's start with the Lerman versus Apple case.

Were you personally involved in that case?

A. Can -- can you give me a little -- well, what scope is personally involved mean?

Q. What does it mean to you?

A. I had -- I -- communications with the people running the case about the case. I had knowledge about the case. I had -- so if that is personally involved, then, yes, I was personally involved in that case.

Q. Did you do what you have described as hands-on deduplication of data in that case?

A. I don't recall. I don't believe so.

Q. Okay. Do you know what data, if any, JND used to deduplicate in that case?

A. I don't in that particular case. I don't recall.

Q. Okay.

A. I do know at one point I looked at the data.

Q. Okay. Do you know what -- do you recall what

Page 40

kind of data that was?

A. I do not.

Q. Was it personally identifying -- personally identifiable information about customers?

A. I apologize, I do not recall.

Q. Okay. How large was the class in Lerman versus Apple?

A. I do not recall.

Q. Would -- does it sound right to you that it was 1.5 million customers?

A. I -- I can't either confirm or deny.

Q. Understood.

Okay. And then for the MacBook Keyboard Litigation, were you personally involved in that case?

A. Yes, I was.

Q. Okay. What were your responsibilities with respect to that case?

A. I both worked closely with the VP of operations on the administration, as well as I did extensive data analysis on the case.

Q. Okay. Did you do hands-on deduplication of data in that case?

A. I -- it -- it appears I did. I don't recall doing it, but, yes, I did.

Q. Okay. Understood.

Page 41

11 (Pages 38 - 41)

What data did JND use to deduplicate in that case?

A. It was a number of years ago. I don't recall the exact data.

Q. Okay. But would it have been personally identifiable information for customers?

A. I do know there were -- was information about customers in the data.

Q. Okay. Do you recall that Apple did not -- well, do you recall that data used for deduplication in that case came from Apple?

A. Yes.

Q. Is it correct that Apple did not provide credit card information in that case?

A. I do not recall.

Q. Okay. Do you recall how large the class was in that litigation?

A. I -- I don't remember a count.

Q. Okay. Does 15 million sound right to you?

A. I -- I do not remember a count.

Q. Okay. And you write in paragraph 5 of your report that in the MacBook Keyboard Settlement, JND analyzed data, quote, "using an agreed upon data hierarchy," correct?

A. Yes, I did write that.

Page 42

Q. What does "data hierarchy" mean there?

A. As I recall, the data contained information with regards to MacBook ownership and dates and time -- of when they were owned, and we had to apply a hierarchical ownership of when somebody may have been the owner to determine whether they were the valid -- a valid class member to receive payment. I believe that's the case.

Q. Okay. And I guess just backing up for me because, again, I am not an expert in these areas.

But -- so data hierarchy, what does that mean, generally?

A. I -- I think that could vary massively depending on the -- the situation. But in -- in the most generic terms I think it would be a way to apply, for lack of a better term, priority to -- to data amongst itself.

Q. Okay. And why was there an agreed hierarchy in the MacBook Keyboard Settlement?

A. I -- I don't recall the -- where the hierarchical definition came from.

Q. In that case, in that data, were there multiple possible hierarchies?

A. I'm not sure I understand the question.

Q. So there was an agreed upon hierarchy, right?

Page 43

Does that imply that there were alternative hierarchies that could have been used?

MR. BURT: Objection. Form.

A. I -- I don't know that I can answer that question. I...

Q. (BY MR. LAZARUS) Does the choice of a data hierarchy affect the results of the deduplication process?

MR. BURT: Objection. Form. Incomplete hypothetical.

A. I -- I suppose it could.

Q. (BY MR. LAZARUS) So looking at the MacBook Keyboard Settlement, there was an agreed hierarchy, as you write in your report.

If a different hierarchy had been used, would you agree it is possible that a different deduplication result would have obtained?

MR. BURT: Same objection.

A. I do not believe -- if I recall correctly, I do not believe the hierarchy relevant to MacBook was deduplication based. I believe it was ownership based, which would not be relevant to deduplication.

Q. (BY MR. LAZARUS) Understood. Okay.

You personally have never been an employee of Apple; is that right?

Page 44

A. I have not.



Page 45

12 (Pages 42 - 45)

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127



Q. Okay. But do you agree that when an individual enrolls in an employer-sponsored health plan, the employer may provide some information like name and address for the employee?

MR. BURT: Objection. Form.

A. Yes.

Q. (BY MR. LAZARUS) Okay. Did that data also -- I'll scratch that.

The ▮▮▮▮▮▮▮▮▮▮▮▮ does not appear in your Appendix B of your report.

Why is that?

A. I believe because it was referenced in my -- in the content of the report.

Q. Okay.

MR. LAZARUS: Can we mark Tab 2 as the next exhibit, which will be -- this should be 115; is that right?

Page 46

(Deposition Exhibit DX 115 was marked.)

Q. (BY MR. LAZARUS) All right. This is a public filing dated March 6, 2024, although the signature at the bottom is dated March 5.

Do you recognize this as a declaration of a Megan Jones submitted in In Re: Blue Cross Blue Shield Antitrust Litigation?

A. I -- yes, I -- that's what it looks to be.

Q. Okay. And do you know Megan Jones?

A. I believe I have been on a conference call that Megan Jones attended at some point.

Q. Okay. And Megan Jones appears to be affiliated with the Hausfeld LLP firm; is that correct?

A. I assume so.

Q. Okay▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮▮▮

Q. Okay. But you have no reason to doubt it?

A. I have no reason to doubt it.

Q. If you look at paragraph 6 of this declaration, do you see that the middle sentence refers to JND's fees and expenses as more than $76.5 million?

A. I do.

Q. And is that correct, that those were JND's

Page 47

fees and expenses for administering claims in that case at that point?

A. I -- I could not confirm or deny a -- a total of JND's fees for Blue Cross Blue Shield.

Q. Okay. But do you have any reason to doubt that number in this declaration?

A. No.

Q. Okay. Why would -- that seems like a large number to me.

Why would JND's fees and expenses be so high for administering claims in that litigation?

MR. BURT: Objection. Form.

A. The -- the scope of services requested and provided.

Q. (BY MR. LAZARUS) Was this -- is that a large number -- compared to other cases that JND is involved in, is that amount of fees and expenses typical of cases or would that be on the high side?

A. That -- that is a -- a significant -- that's not -- JND received significant revenue from Blue Cross Blue Shield.

Q. Okay. If I'm understanding correctly that the revenue received from this case is larger than other cases, why would that be? Why is that?

MR. BURT: Objection. Form. "This

Page 48

case."

A. Again, scope -- scope of services provided, size of -- of case, size of class, size of notice, volume of claims, volume of, you know, activity with the class, the contact -- our contact center. You know, it is a -- a very, very large complex administration.

Q. (BY MR. LAZARUS) And there was an objection on -- that my question referred to "this case."

You understood I was referring to the Blue Cross Blue Shield litigation in that question; is that right?

A. I did.

Q. Okay. So looking at your answer to that question, are you saying that -- or would you agree that, as a general matter, the -- the more class members there are, the more -- the higher the fees and expenses would be to administer claims; is that fair to say?

MR. BURT: Objection. Form.

A. I would say there is a relationship, but, again, it also is heavily dependent on services provided.

Q. (BY MR. LAZARUS) Right.

A. And requested.

Page 49

13 (Pages 46 - 49)

Q. Understood.

But, I guess, holding those services provided constant, there is a positive correlation between the number of class members and the fees that will be required for class administration?

MR. BURT: Objection. Form. Foundation.

A. If you're doing the same type of work for more people, yes, that would cost more.

Q. (BY MR. LAZARUS) Okay. When you say, "if you're doing the same type of work for more people," does that mean if you're doing the same type of work in class administration for a class with more members, that would cost more?

A. It could cost more.

Q. As a general -- as a general rule, you would expect it to cost more, right?

MR. BURT: Objection. Form.

A. As a general rule. I've seen exceptions where very small classes are very, very costly to administer because of the nature of the class, the nature of the individuals involved.

Q. (BY MR. LAZARUS) But that would be the exception to the rule; is that right?

A. I believe so.

Page 50

Q. Generally, a larger class will mean larger class administration fees; is that right?

A. It would mean more work to administer the class, so that would result in higher fees.

Q. All right. Why did you write about JND's experience in the ▮▮▮▮▮▮▮▮▮▮ in your report in the case that we are talking about today -- the Apple case that we're talking about today?

A. The work I performed in the ▮▮▮▮▮▮▮ ▮▮▮▮▮ settlement with regards to data deduplication was on a large dataset and it, to me, represented a -- a logical example of my experience working with large datasets doing complex deduplication.

MR. BURT: Objection. Form.

Page 51

A. There was different data to -- to utilize. There was different quality issues to address. ▮▮

Q. Okay. When you say, "different data quality issues to address," if I heard that right, can you give us example -- an example of data -- a data quality issue that applied to one of those cases but not the other, the Blue Cross Blue Shield litigation versus the Apple case that we are talking about today?

A. I don't recall not -- a -- a smiley face emoji in the Blue Cross Blue Shield data, and there was a -- a small portion of the Apple data that had some -- some -- some things like that.

Q. Okay. Are you saying that you do recall a

Page 52

smiley face emoji in Blue Cross Blue Shield or --

A. I -- I -- I was saying that I didn't recall seeing that in the Blue Cross Blue Shield data, but I do recall, you know, emoji type data in the Apple data in some -- some instances.

Q. Understood. Okay.

A. As an example.

Q. All right. And for the Equifax data breach, you write in your report, again, at paragraph 4, that you also personally worked on the data analysis and deduplication, correct?

A. That is correct.

Q. And am I correct that that Equifax litigation was about a class of consumers whose personal information was held by Equifax and may have been impacted by a data breach of the Equifax computer systems?

A. That is correct.

Q. So in the deduplication in the Equifax case, am I correct that you were deduplicating records representing individual consumers?

A. Can -- can you restate that question?

Q. Sure.

So in the deduplication work in the Equifax case, am I correct that you were deduplicating records

Page 53

14 (Pages 50 - 53)

representing individual consumers?

A. The -- yeah, the data that we had was -- or were provided was for individuals. I don't know how to respond to the statement "consumers" other than it's individuals.

Q. Understood.

And those records that you were deduplicating contained personally identifiable information like name and address; is that right?

A. That is correct.

Q. Were addresses in that case cross-checked against any external datasets?

A. Yes.

Q. What external datasets?



Q. Okay. The National Change of Address database, is that administered by the US Postal Service?

A. Yes. As far as I'm aware.

Q. And do you use a third-party vendor in order to access that dataset?

A. Yes, I do.

Q. Okay. And who is that vendor?

A. The current vendor is Melissa Data.

Q. Was Melissa Data used as a vendor in the Equifax data breach litigation for your deduplication work?

A. I don't know if that was the vendor we were using at the time. We've been using Melissa Data for a number of years, but I don't remember exactly.

Q. Okay. And the information that you were deduplicating, was that information that had been provided by individuals to banks or credit card companies in applying for loans or credit, do you know?

A. I have no visibility into how Equi- -- yeah, Equifax collects their data.

Q. Okay. But you would agree that when individuals submit documents -- let me retract that.

You would agree that when individuals apply for loans or credit, they might submit documents such as pay stubs or other documentation to verify the information they are providing?

MR. BURT: Objection. Form. Foundation.

Q. (BY MR. LAZARUS) Would you agree with that?

A. I think that is a reasonable statement.

Q. Okay. And is it possible that banks would validate that sort of information before issuing a loan or providing credit to an individual?

MR. BURT: Objection. Form. Foundation.

A. I -- I assume a competent bank would, yes.

Q. (BY MR. LAZARUS) Okay. And why -- why -- again, why did you write about the Equifax work in your report in this case that we're talking about today?

A. Similarly, it represented a large, complex deduplication effort that I personally performed.

Q. Okay. And you say in paragraph 4 of your report that the deduplication work for the Equifax case took months.

Do you recall how many months that was?

A. That was -- I -- I do not know exactly. That also was several years ago, though, pre-COVID years.

Q. Understood. Time has lost meaning since then.

A. It really has.

Q. Is -- do you recall whether you spent more time on the deduplication work in the Equifax case than the Apple payor data in this case?

A. I don't recall.

Q. Okay. Did you use the same methods for data evaluation, cleaning, deduplicating and validating in

the Equifax case as you used in the Apple case we are talking about today?

Q. All right. For purposes of this case, the Apple case we're talking about today, in what field do you purport to be an expert?

A. Data deduplication.

Q. Okay. Any other fields or is that --

A. That I am purporting to be an expert today?

Q. Right.

A. No.

Q. Okay. Do you purport to have expertise in data analysis?

A. I purport to have decades of experience in data analysis.

Q. Okay. Is there a difference in your mind between decades of experience and having expertise in data analysis?

MR. BURT: Objection. Form. Calls for

15 (Pages 54 - 57)

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**SER-17**

a legal conclusion.

A. Decades of experience is a -- is a quantifiable effort. Expertise, you know, requires me to make a determination compared to others that I don't know.

Q. (BY MR. LAZARUS) All right. Do you purport to have expertise in natural language processing?

A. I do not.

Q. Do you purport to have expertise in statistical modeling?

A. I do not.

Q. Do you purport to have expertise in statistics?

A. I do not.

Q. And we have discussed that you produced to Apple or Apple's consultants code that you used in your analysis in this case, correct?

A. We did discuss that, yes.

Q. And when you perform deduplication work, do you normally produce your proprietary methodology to an opposing party?

A. We do not.

MR. BURT: Eli, we've been going about an hour and a half.

MR. LAZARUS: Yes.

Page 58

MR. BURT: And if the witness doesn't need a break and if you don't need a break, eventually I'm going to, so if you got a stopping point.

MR. LAZARUS: Understand.

Would you like a break at this point? We can take one.

THE WITNESS: I -- I'm fine until someone else needs a break.

MR. LAZARUS: Okay.

MR. BURT: We can keep going.

MR. LAZARUS: Okay.

Q. (BY MR. LAZARUS) Have you ever produced your proprietary methodology for deduplication to an opposing party?

A. I have not.

Q. And let me see. Okay. I'm going backwards a little bit here, but if we could go back to Ms. Keough's declaration, which was Exhibit 114.

I did not ask, who is Ms. Keough?

A. Jennifer Keough is the CEO of JND Legal Administration and the J in JND.

Q. It stands for Jennifer. Understood.

Paragraph 26 of Ms. Keough's declaration starting on the second line of that paragraph states, quote, "JND again analyzed the data to determine the

Page 59

most effective rules in order to achieve the highest quantity of deduplication while not deduplicating individuals that were not conclusively the same person."

Do you see that language?

A. I do.

Q. Okay. Do you understand what practice Ms. Keough is describing there?

A. I do.

Q. Can you explain in your own words what the practice is with respect to achieving the highest quality of deduplication while not deduplicating -- I'm sorry, the highest quantity of deduplication while not deduplicating individuals that were not conclusively the same person?

MR. BURT: Objection to form.

A. My understanding of what she was communicating there was a validated review deduping process where we utilized the data points available to identify the same individuals and where we would have high confidence that those matches would, in fact, be the same individual.

Q. (BY MR. LAZARUS) And the part about not deduplicating individuals that were not conclusively the same person, what does that refer to?

Page 60

A. That refers to not including logic within a deduplication process that we did not have high confidence that those -- the data points utilized would result in a -- a positive match.

Q. And why is that an appropriate practice, if it is?

MR. BURT: Objection. Form.

Q. (BY MR. LAZARUS) Let me withdraw that question.

Is that an appropriate practice in deduplication for claims administration?

A. I believe it to be, yes.

Q. Okay. And why is that appropriate?

A. If you are able to deduplicate with high confidence but don't deduplicate the records that you do not have confidence in the deduplication, you may slightly overnotice, but you are still notifying the class in the most efficient way possible.

Q. Okay. Has any employee or executive of JND served as a testifying expert witness in another case, to your knowledge?

A. In -- I believe so, but I couldn't -- I couldn't point to a specific situation.

Q. Okay. Okay. And I guess in the -- the language we were just talking about from Ms. Keough's

Page 61

16 (Pages 58 - 61)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

declaration where she says that JND analyzed the data to determine the most effective rules in order to achieve the highest quantity of deduplication while not deduplicating individuals that were not conclusively the same person, is that something that you did in this case that we're talking about today?

A. My -- my goal was to deduplicate where I had high confidence in the match and not deduplicate where the -- I did not believe the -- it was reasonable to believe that the records were -- represented the same entity or individual.

███ ████████████████

███████████████████████

███████████████████████████

████████████

MR. BURT: Objection. Form.

███ █████████████████████

███████████████████████████

███████████████████.

Q. (BY MR. LAZARUS) All right. And we will get more obviously into your assignment in this case.

On -- on the question about other JND employees or executives serving as testifying expert witnesses in other cases, did that happen in any of the

Page 62

cases listed in Appendix B in your report?

A. Actually, can you restate that question?

Q. Sure.

So initially I asked or intended to ask, has any employee or executive of JND served as a testifying expert witness in another case other than the case we're talking about here today?

A. And I don't know off the top of my head.

Q. Okay. And you don't know off the top of your head if that is true of any case listed in Appendix B of your report, right?

A. I do not know that off the top of my head, no.

Q. Okay. When was JND first retained in this case?

A. Actually, I don't -- I don't know a specific date when -- when counsel reached out to my senior management.

Q. How did you first hear about JND's retention?

A. I spoke to one of the founders and discussed what -- the assignment.

Q. And one of the founders of JND?

A. Yes.

Q. Do you remember which one?

A. It was either Jennifer Keough or Neil Zola.

Q. And do you remember ballpark when that was?

Page 63

A. I would say, approximately, a year ago.

Q. Okay. So, approximately, June of 2024?

A. I'd probably say, approximately, May of 2024.

Q. Okay. Why was JND first retained in this case?

MR. BURT: Objection. Form.

A. I -- all I can tell you is what I was requested to do.

Q. (BY MR. LAZARUS) Okay. Okay. We will move on to that.

But, I guess, first, do you understand that you may need to testify in front of a jury in this case?

A. I do.

Q. When did you learn that?

A. Earlier this year.

MR. LAZARUS: This might be a good time for a break if that's --

THE WITNESS: I'm fine with that.

MR. LAZARUS: -- good for you all.

Okay. Why don't we go off the record.

THE VIDEOGRAPHER: We are going off the record at 10:42.

(Break from 10:42 a.m. to 10:58 a.m.)

THE VIDEOGRAPHER: We are back on the

Page 64

record. The time is 10:58. Please proceed.

MR. WOOD: Noting for the record that Anna Link of Kellogg Hansen has also joined, also counsel of record for the certified class.

Q. (BY MR. LAZARUS) All right. We'll jump back into the questions.

███████████████████████

█████████████

███████████████

████████████████████████

██████████████████████████

████████████

███████████████████████

██████████████████████████████

████████████████████████

███████████████

MR. BURT: Objection to form.

A. No, not that I'm aware of.

Q. (BY MR. LAZARUS) Okay. Are you -- so you're not aware that JND's compensation would change at all if the plaintiffs' class is decertified or remains certified?

A. Not that I'm aware of, no.

Q. Okay. And you're not aware that JND's compensation would change at all if the plaintiffs

Page 65

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

prevail at trial or do not prevail at trial?

A. That is correct.

Q. Is JND being paid any compensation other than for your services in this case?

MR. BURT: Objection to form.

Q. (BY MR. LAZARUS) I should -- let me rephrase that.

Is JND being paid any other compensation in this case other than for your services?

A. I -- I do not know if, for example, the -- Jennifer or Neil may be billing time. It would be time in relation to this effort.

Q. Okay. So to your knowledge, JND is not being paid for anything in this case other than your deduplication work or other people's work in connection with your deduplication work; is that right?

MR. BURT: Objection to form.

If I -- if I understand the question, you can answer only to the extent that you know.

A. From what I know, that is correct, we are only being compensated for -- for work related to deduplication and our retention for that -- for that service.

Q. (BY MR. LAZARUS) Okay. Do you know if JND has had any discussions with plaintiffs' counsel about

Page 66

the possibility that JND would have a role in claims administration for this case?

A. Repeat the question. I think I --

Q. Are you aware of whether JND has had any discussions with plaintiffs' counsel about the possibility that JND would have a role in claims administration for this case?

A. I believe conversations have occurred. I'm not privy to any details.

Q. Okay. Do you know whether JND expects to have a role in claims administration in this case?

MR. BURT: Objection. Asked and answered.

A. I -- I don't know that I can say expects. I -- I believe I can say interested in.

Q. (BY MR. LAZARUS) Okay. Interested in meaning, if you can perform a role in claims administration in this case, JND would like to do so? Let me rephrase that.

If JND can play a role in claims administration, JND would like to do that; is that right?

A. That is correct. We provide claims administration, and if there is claims administration here, we would be interested in providing the service.

Page 67

Q. Okay. Do you know -- do you know when discussions on that topic have taken place between plaintiffs' counsel and JND?

A. I -- I do not.

Q. Okay. Even ballpark?

A. I -- I don't know. Again, I was not privy to -- to -- I was not involved in the conversation, nor privy to any details about a conversation.

Q. Okay. And how are you personally being compensated for your work in this case?

A. I get a salary from JND for all of the work I do. The work I'm doing on this has no impact except increasing my work.

Q. Okay. About how many hours have you spent on this case to date?

A. I would estimate several hundred.

Q. Okay. And am I correct that, in broad strokes, what you did in this case was to evaluate data produced by Apple, cleanse the data and deduplicate the data by matching records that appear to you to represent the same person. Is that --

MR. BURT: Objection to form.

Q. (BY MR. LAZARUS) Is that a fair characterization of what you have done?

A. I think that is a reasonable summary.

Page 68

Q. Okay. Did you personally perform all of the data evaluation, cleaning and matching for this project?

A. Yes.

Q. Has anyone assisted you in this matter?

A. Yes.

Q. Okay. Who -- who was that?

A. Cameron Karlin.

Q. Can you spell that, please?

A. I don't think I can.

Q. Okay.

A. C-A-M-E-R-O-N, K-A-R-L-I-N.

Q. Who is that?

A. Cameron is a manager of data analysis at JND.

Q. Okay. And what did Cameron do in connection with this work that we are talking about today?

A. Cameron performed quality review of my efforts to -- yeah, he performed quality review.

Q. Did anyone else assist you on your work in this matter?

A. No.

Q. Okay. How much time did Cameron spend on this assignment?

A. I -- I don't have a number. I would -- I could provide an estimate.

Page 69

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

Q. Okay. What estimate would you provide?

A. A hundred hours or less.

Q. Okay. And in your Summary of Results at paragraph 10 in your report, you state that, "JND determined that Apple payor data could be reliably deduplicated."

Do you see that, paragraph 10?

MR. BURT: Page 3.

A. "JND determined that Apple payor data could be reliably deduplicated to remove the vast majority of duplicate entities"?

Q. (BY MR. LAZARUS) Yes.

A. Yes.

Q. Okay. Who does "JND" refer to in that paragraph?

MR. BURT: Objection. Form.

A. That refers to my company, JND Legal Administration.

Q. (BY MR. LAZARUS) So who at JND determined that Apple payor data could be reliably deduplicated, etcetera, as stated in that paragraph?

A. I did.

Q. And if you look at paragraphs 16 and 17 of your report, you'll see that it uses the word "we." So, "We first needed to review the data submission," in

Page 70

paragraph 16, and then, "We commenced our process of deduplicating the data," in paragraph 17.

Do you see that?

A. I do.

Q. Okay. Who does "we" refer to there?

MR. BURT: Objection. Form.

Q. (BY MR. LAZARUS) In those paragraphs?

A. That refers to me.

Q. Does it refer to you and Cameron Karlin or should it be just you?

MR. BURT: Objection. Form.

A. This refers to me.

Q. (BY MR. LAZARUS) Okay. Have you had any communications about Apple with any governmental agency or regulator, whether foreign or domestic?

A. Not -- not that I recall.

Q. The same question for, have you had any communications about the app store or any app marketplace with any governmental agency or regulator, whether foreign or domestic?

A. Also not that I recall, no.

Q. Okay. In your work on this case, did you review plaintiffs' Third Amended Complaint in this case?

A. Do you have a copy of that?

Page 71

Q. I don't know that we actually do. So -- but if you recall, do you -- did you review --

A. I don't recall.

Q. -- plaintiffs' Third Amended Complaint? Okay.

A. Apologies for not letting you complete your sentence.

Q. Right. No problem. No worries.

So you --

MS. LIN: I can upload it, too. I just need a second.

MR. LAZARUS: May as well do that and we'll just come back to those.

But in the meantime, can we go -- can we do Tab 10B first?

(Deposition Exhibit DX 116 was marked.)

Q. (BY MR. LAZARUS) All right. Mr. Thompson, do you -- well, first of all, this document is being marked as Exhibit 116.

MR. LAZARUS: Thank you.

Q. (BY MR. LAZARUS) Do you recognize this document as a declaration dated August 1, 2024, that you signed in connection with this litigation?

A. I do.

Q. All right. I'll ask you to look at paragraph 4, please. You state in that paragraph,

Page 72

quote, "In this case, JND was requested to evaluate a sample dataset of Apple payor data in order to design an algorithm to deduplicate/roll-up payor records."

Do you see that?

A. I do see that.

Q. And a little later in that paragraph it says, "In order to accurately determine a total transaction value for a payor, all instances of the payor need to be linked as they represent the same individual/entity."

Did I read that correctly?

A. You did.

Q. Okay. Does that paragraph accurately describe what plaintiffs' counsel asked you to do in this case?

MR. BURT: Objection. Form.

A. The -- all but the last sentence accurately defines what the -- what plaintiffs' counsel requested us to do on the sample data. And I believe the last sentence represents why.

Q. (BY MR. LAZARUS) You say, "All but the last sentence accurately defines what plaintiffs' counsel requested us to do on the sample data"?

A. That is correct.

Q. Okay. And then what are you saying about the last sentence?

Page 73

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

A. And -- the last sentence is -- represents the why. They didn't ask us to -- there's no action with regards to us and actually the transaction value.

Q. Understood. Okay. Thank you.

Okay. Now, let's turn back to Exhibit 112, which is your report.

If you look at paragraphs 8 and 9 of your report, do those paragraphs state the questions you were asked to investigate as your assignment in this case?

A. I believe that represents a fair summary of the assignment.

Q. Okay. And did plaintiffs' counsel ask you those questions at the start of your engagement on this matter?

MR. BURT: I'm going to object to the extent that you're calling for the substance of communication that's attorney work product.

MR. LAZARUS: I think it's -- I think the question is fair because it is asking -- and I'll preface it this way to say, I'm only asking for information from plaintiffs' counsel that you relied on in drafting your report.

MR. BURT: I just want to make sure I understand. You're saying you're asking for the

Page 74

instruction about the assignment upon which he relied in reaching his conclusions?

MR. LAZARUS: Correct.

MR. BURT: Yeah, I have no problem with him answering what he understood his assignment to be.

Q. (BY MR. LAZARUS) And I think my question here is the timing of when did you receive these questions that are what you said was a fair summary of your assignment in this case.

MR. BURT: To the extent that you're asking him about communications with counsel, those are work product, but I have no problem with him answering when he understood his assignment.

MR. LAZARUS: Okay. Let's go with that.

A. I -- the best I can do is a ballpark of, approximately, a year ago I understood the overall assignment. Maybe several months later, when we received the full dataset, clarity on the work product and desired outcome of the -- or desired output of the -- of my work.

Q. (BY MR. LAZARUS) Okay. Did the assignment change after you first started working on the case?

MR. BURT: Objection. Objection to form. I can explain it if you need me to.

A. Please repeat the question.

Page 75

Q. (BY MR. LAZARUS) Did your assignment change after you first started working on this case?

MR. BURT: Objection. Form.

MR. LAZARUS: Okay.

Q. (BY MR. LAZARUS) Excuse me. Let me -- let me rephrase it slightly this way.

Did your assignment in this case change after you first started working on this case?

MR. BURT: Objection to form. I -- I can help you out by explaining why I'm objecting.

MR. LAZARUS: Okay. Please.

MR. BURT: He's -- what he's described is that he started working, and the declaration shows, he started working during the period when we had an active disagreement with Apple about the data, for example, the contemplation of a sample process that's described in the declaration.

I -- I don't want to say more words, but that's the basis of the objection.

MR. LAZARUS: Okay. Understood. Thank you.

Q. (BY MR. LAZARUS) Okay. Well, I will still ask the question.

Did your assignment change after you had started work in this case?

Page 76

MR. BURT: Same objection.

To the extent you understand it, go ahead and answer.

A. Okay.

So from -- from -- my question, from -- from the moment I started working to some later point, did the -- did the assignment change?

Q. (BY MR. LAZARUS) Yes.

A. The initial assignment involved a sample dataset and a determination of whether deduplication could be applied based on the sample set. When a full dataset was provided, the addition of producing a deduplicated set was added.

Q. Okay. And I guess I want to ask about the August 1 declaration that we were looking at as Exhibit 116.

So the description there appears to request -- the description there appears to describe a request to design an algorithm to deduplicate/roll-up payor records, which is different from what's described in paragraph 8 of the final report of determining whether a reliable means exists for deduplicating.

Is that -- is that indeed a difference?

A. Can you specify in the expert report exactly where -- what you're referencing?

Page 77

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

Q. Paragraph 8 of the expert report. I'm sorry, paragraph 9.

So my question is, in paragraph 9 of your expert report, you state, "Counsel requested that I determine whether there exists a reliable means by which to consolidate duplicative payor records that all relate to the same person and associate those names to a unique person."

And the "determine whether there exists a reliable means," language does not appear in paragraph 4 of the August 1 declaration.

Is there a reason for that?

A. No, not that I'm aware of, there's no reason that the -- the words are slightly different.

Q. Okay. But they are describing the same assignment that you received?

A. I -- I believe, yes, that -- that I had overlapping assignments in -- in concept and direction for -- for both a sample set of determining whether a deduplication can occur and for the full dataset of performing a deduplication providing an outcome.

Q. And in -- so now the final report, in paragraph 8, you state that, quote, "JND was requested to evaluate a large dataset produced by Apple containing information that it collects from 'payors' -

Page 78

individuals that purchase apps and in-app content on Apple iPhones and iPads," correct?

A. Correct.

Q. All right. You use the term "unique payor" in paragraph 9. And then in paragraph 18 you use the term "unique individual."

Do those mean the same thing in this context?

A. Where's the reference on the second one, please?

Q. Paragraph 18.

A. Yeah, I think if -- the entire sentence read in context would suggest, that, yeah, individuals represents Apple payor.

Q. Okay. And Apple did, in fact, produce a dataset to your office in Seattle in a few installments, correct?

A. Yeah, Apple payor data was delivered to -- to our Seattle office.

Q. And in your report you refer to that dataset as the Apple payor data, correct?

A. That is correct.

MR. LAZARUS: Can we please mark Tab 3 as the next exhibit which will be 117?

And this is a three-page document that is not stapled at this moment.

Page 79

(Deposition Exhibit DX 117 was marked.)

Q. (BY MR. LAZARUS) This is a copy of an email from my colleague, Ramona Lin, to plaintiffs' counsel dated July 10, 2024.

Do you recognize this document?

A. Yes. It looks familiar to me.

Q. Okay. So this document was previously shared with you; is that right?

A. The contents are familiar to me.

Q. Okay.

A. I don't remember if it came to me originated from Ramona Lin, but the contents look familiar to me.

Q. Okay. This email was sent just after production to your office of the sample dataset, the sample of the Apple payor data, correct?

A. Oh, I don't know the -- the dates. I have no reason to believe that's incorrect.

Q. Okay. And this email lists 17 fields, including first_name, last_name, city, state, postal code, etcetera.

Do you recognize those as the fields included in the Apple payor data?

A. Yes.

Q. And for the sake of the transcript, I'll try to list out the field names -- list out field names

Page 80

when they come up, including the underscores, just the first time. And then after that, we can just refer to them with -- without the underscore, like "first name," "last name," if that's okay with you?

A. That's fine with me.

Q. Okay. So one of the fields listed in this Exhibit 117 is billing_info_id_hashed.

Did you understand that that variable refers to unique -- unique identifiers for each payor record?

A. For each payor record in the dataset provided?

Q. Yes.

A. So it was the -- essentially, the unique ID for each of the 1.69 billion records?

Q. Right.

A. I understood that as the intent.

Q. Okay. You understood that as the intent, but is that different from what you saw in the data?

A. There was some small -- very small portion of those -- those hashed values that were not unique in the data.

Q. Okay. And another --

A. As I recall.

Q. Okay. Did you do anything to try to correct the -- sorry.

And so you said that you saw some small

Page 81

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

portion of the hashed values that were not unique in the data.

Is that a problem in the data?

A. Not for the purpose of deduplication.

Q. Okay. So you did not do anything to try to correct that non-uniqueness of those particular hashed values?

A. I -- I evaluated them to determine if there was a -- a issue with how the data was produced to me. But it appeared for -- for all records that I recall, that they -- the billing_info_id when duplicated also represented duplicate information about the individual and, therefore, didn't impact the deduplication.

I also, when I produced the ultimate outcome to -- back to Apple, I provided a -- an ID indicator so that they understood that I was not providing duplicate records. They provided duplicate records to me and I was just providing an outcome for what they gave me.

Q. And another field in this Exhibit 117 is person_id_hashed.

Do you understand that variable to indicate the account associated with the payor record?

A. Yes, I understood person_id_hashed was intended to represent a -- a payor entity in -- in the Apple data.

Page 82

Q. Okay. And do you understand that an account with Apple is sometimes referred to as an Apple ID or an Apple ID account? This is just for ease of talking about it.

A. Can you please repeat the question?

Q. Do you understand that an account with Apple -- I'll say, do you understand that a customer account with Apple is sometimes referred to as an Apple ID or an Apple ID account?

A. And this would be for a Apple accountholder as opposed to a payor? You're distinguishing those two things?

Q. Correct.

A. Okay. Unrelated to person_id_hashed?

Q. I'm asking about in everyday parlance when people talk about having an account -- a customer account with Apple, they might use the term "Apple ID" or "Apple ID account."

And I'm just asking if you're aware of that terminology.

A. I'm aware of and understand that terminology, yes.

Q. Okay. And the fields that are listed in this email were the fields in the sample dataset and also the full Apple payor dataset; is that correct?

Page 83

MR. BURT: Objection to foundation.

Q. (BY MR. LAZARUS) You can answer the question.

A. Okay.

These look to be the fields. I would have to do an actual compare to the actual to say with 100 percent certainty, yes, these represent every field and there's no extras we're missing.

Q. Okay. And this email states that, quote, "This sample production," -- I'm looking at -- okay.

So bottom of the first page as you're looking at it, "This sample production includes user-generated data that is received by Apple during its ordinary course of business but is not verified by Apple."

Do you see that?

A. I do.

MR. LAZARUS: All right. Can we please mark Tab 4 as the next exhibit?

This will be a copy of a letter from me to plaintiffs' counsel. This is a two-page letter printed two sided.

(Deposition Exhibit DX 118 was marked.)

Q. (BY MR. LAZARUS) Do you recognize this letter?

A. I'm not sure I've ever seen this letter.

Q. Okay. If you look at in your report

Page 84

footnote 2, I believe you are referencing this letter; is that right?

A. Okay.

Q. Does that indicate that you -- does that refresh your recollection that you have seen this letter?

A. Yeah, it -- it is vaguely familiar.

Q. Okay.

A. Pieces of it are vaguely familiar.

Q. On page 2 of this letter, beginning on the third line, it says, "Apple further provides notice that this sample production includes user-generated data that is received by Apple during its ordinary course of business but is not verified by Apple. For example, Apple device users supply data concerning their street addresses, phone numbers and similar information, or users may on occasion omit such data in submissions to Apple, or submit fictitious values. As a result, not all data fields are populated for all payor data records and those that are populated may contain data that is not reliable."

Do you see that?

A. I do.

Q. So did you understand when you began your assignment in this case that these limitations

Page 85

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

described in my letter applied to the sample Apple payor data?

A. I did.

Q. And did you understand that these limitations applied to the full Apple payor dataset when you began to analyze it?

A. I did.

Q. And you understood that these limitations applied to the full Apple payor dataset when you finalized your opinions about the data, correct?

A. I'm sorry, please repeat that.

Q. You understood that these limitations described in my letter applied to the full Apple payor dataset when you finalized your opinions about the data?

A. I did.

Q. And you mentioned before that you saw, for example, smiley face emojis in the Apple payor data, correct?

A. I did.

Q. And did you see entries in the Apple payor data that appeared to not be legitimate names and addresses?

A. I did.

Q. Did you see names or addresses that included

Page 86

profanity?

A. Yes.

Q. For example, addresses that contained the letters F-U-C and K?

A. I don't remember specifically, but profanity in -- existed, yeah.

Q. Okay. How did you handle entries in the data like that, data that included profanity or otherwise appeared to be not legitimate names and addresses?

A. In situations where I could identify data that -- such as profanity, emojis, I would cleanse or remove the data and then use other available data points to attempt to match and deduplicate the records.

Q. When you say "cleanse the records," does that mean cleanse them to remove the emojis and the profanity?

A. It means, yeah, removing profanity if I could identify it and removing emojis, or in nonstandard ASCII characters, potentially translating them if possible.

Q. Did you -- with respect to profanity, did you conduct that cleansing by way of code or manually cleansing the values?

A. By "manually" you mean actually by hand one by one records? What does "manual" mean?

Page 87

Q. So -- well, let me ask what it means to you in the question.

So would you draw a distinction between cleansing by way of code versus manually cleansing? Would you use those terms in talking about this concept?

A. I don't think I would use the term "manually" per se. I -- I would say that I would write a -- write a piece of code that would perform an update to -- to records to remove particular data --

Q. Okay.

A. -- if I were able to identify them.

Q. And with respect to profanity, did you write a piece of code to cleanse data of profanity?

A. I -- I believe I -- there was some -- some code that removed some -- some amount of profanity at some point.

Q. Okay. Can you -- if we look at your README file, which we have marked as Exhibit --

MR. BURT: 113.

MR. LAZARUS: 113. Thank you.

Q. (BY MR. LAZARUS) Do you have your README file --

A. I do.

Q. -- in front of you?

Page 88

Does the README file name any file or code that was used for cleaning profanity?

A. I do not know off the top of my head.

Q. Okay. Why don't we -- we'll put a pin in that and maybe come back to it.

Did you see addresses that were illegitimate like in the street1 field values like "your mom" or other things like that?

A. I'm -- I -- I don't recall. I know there was data -- data -- data issues that -- but in some portion, but I don't recall "your mom."

Q. But when you say, "data issues," are you referring to other values that did not appear to represent legitimate addresses?

A. I believe that is -- is reasonable in some -- some small portion, yeah.

Q. Okay. Did you see instances of famous addresses like The White House in the data?

A. I don't recall off the top of my head.

Q. Okay. Or another example, Apple's headquarters at 1 Infinite Loop, did you see that address entered into the payor -- Apple payor data here?

A. I do recall a small portion of Apple's address as the address, yeah.

Page 89

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

Q. And how did you deal with addresses like those that were -- well, let me ask the initial question.

Do you believe in your expert opinion that those are legitimate addresses representing the addresses of Apple payors?

MR. BURT: Objection to form.

A. No. In my opinion, that -- Apple's address as an Apple payor address is not a valid address.

Q. (BY MR. LAZARUS) And what did you do in your deduplication work with respect to addresses like Apple's headquarters that do not, in your opinion, represent valid addresses for Apple payors?

A. Part of the cleansing analysis I identified that. I believe I would attempt to remove it and not utilize it as a matching criteria --

Q. Okay.

A. -- at some point.

Q. And looking again at your README file, Exhibit 113, can you point to a file listed there that does the work you just described of removing invalid address entries so that they would not be utilized as matching criteria?

A. Not off the top of my head, no.

Q. Okay. Would it help if we looked at the individual files?

*Page 90*

A. It -- yeah, possibly. If we want to go through all of them and review them, I could -- I could search.

Q. Is there one file, looking at your README file, that you think is more likely to contain the cleaning code that you are thinking of?

A. Not one particular, no. I -- not at the moment.

Q. Okay. We talked before about the Blue Cross Blue Shield data and Equifax data.

Would I be correct that there appear to be more illegitimate addresses in the Apple payor data [REDACTED]

MR. BURT: Objection to form.

[REDACTED]

*Page 91*

[REDACTED]

Q. So returning to your report at paragraph 8, I want to focus on your reference to payors as, "individuals that purchased apps and in-app content on Apple iPhones and iPads."

Do you see that language in paragraph 8?

A. I do.

Q. Okay. What was the basis for your understanding that payors are individuals making purchases on iPhones and iPads and not other devices?

A. I believe that was communicated to me, but I couldn't -- I couldn't confirm who communicated that to me, that defined the class.

Q. Okay. Are you aware that the payor dataset produced by Apple included information collected from payors who made purchases on iPod Touch devices?

A. Did not.

*Page 92*

Q. Do you know whether the Apple payor data included entries for consumers who only downloaded free apps and never paid for apps or in-app content?

A. That is not information I would have had.

Q. So you do not know that sitting here today?

A. (Shaking head.)

Q. And for the court reporter --

A. No.

Q. -- say an audible. Yeah, thank you.

Do you know whether the Apple payor data included entries for consumers who paid for transactions using gift cards?

A. I do not.

Q. Okay. Do you know whether the Apple payor data included entries for consumers who paid for transactions using credit card points?

A. I do not.

Q. Do you know whether the Apple payor data included entries for consumers who only made purchases that were refunded, charged back or reversed?

A. I do not.

Q. In paragraph 9 of your report, you stated that, quote, "Counsel requested that I determine whether there exists a reliable means by which to consolidate duplicative payor records that all relate

*Page 93*

24 (Pages 90 - 93)

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**SER-26**

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

to the same person and associate those names to a unique person," correct?

A. That is paragraph 9 of the expert -- supplemental expert report?

Q. Yes.

A. Okay.

Q. Okay. And let's see.

And then the next part of paragraph 9 states, "If such a means exists, counsel further requested that I proceed with deduplicating those records and create an anonymized identifier for each unique payor, and then match those payor identifiers to create a primary person ID," correct?

A. That is correct.

Q. Okay. In that first question in paragraph 9, were plaintiffs' counsel asking you -- I'll rephrase.

In that first question in paragraph 9 of your report, is that part of your assignment asking you whether there was a means to fully consolidate duplicative payor records or partially consolidate them?

MR. BURT: Objection. Form.

A. I -- I don't believe I understand the -- the difference between those statements.

Q. (BY MR. LAZARUS) So in -- in paragraph 9,

Page 94

"Counsel requested that I determine whether there exists a reliable means by which to consolidate duplicative payor records that all relate to the same person."

My question is, in this assignment, were you asked to consolidate all records that relate to the same person or, as we were discussing before, those about which you had high confidence or any different metric?

MR. BURT: Objection. Form.

A. I -- I do not believe there was any conversation about a -- a partial versus complete. It was a deduplication to the best of my ability based on my experience doing deduplication, which would go back to my applying the methodologies I've used and have confidence in the outcome of.

Q. (BY MR. LAZARUS) But you did not conclude that there was a means to fully deduplicate all records in the payor data, did you?

MR. BURT: Objection. Form.

Q. (BY MR. LAZARUS) And let me -- well, I'll refer you to paragraph 15 of your report that states that you, quote, "determined and communicated to plaintiffs' counsel that JND could reliably reduce duplication in the Apple data," correct?

Page 95

A. Yes, that is what it says.

Q. And that is reduce but not eliminate, correct?

A. I don't -- I don't believe it references a -- a -- to degree reduced to zero would be eliminate. So I don't believe it's referenced there.

Q. Okay. And as you understood your assignment, was that assignment asking you to reduce duplication to zero or reduce duplication to some other level?

A. As I understood my assignment, it was to reduce duplication to the best of my ability where I had confidence that I had matched records that were of the same entity. I -- I cannot point to -- well, that's -- that's it.

Q. And your report states at paragraph 10 that, quote, "JND determined that the Apple payor data could be reliably deduplicated to remove the vast majority of duplicate entities," correct?

A. That is correct.

Q. Okay. And that's -- you're stating there that you could deduplicate to remove the vast majority of duplicate entities but not all duplicate entities, correct?

A. I cannot rule out the possibility that additional -- that records as this that are of the same entity that did not have adequate information for me to

Page 96

reliably determine they're the same.

Q. How do you know you -- or do you know that you did not fully deduplicate the data?

A. Can you restate that? I think that's a double negative.

Q. Yes, there's -- yeah, a lot of "not's" in there.

My question is, you refer to having identified that there -- you communicated to plaintiffs' counsel that JND could reliably reduce duplication in the Apple data. And then you state that, "JND determined that the Apple payor data could be reliably deduplicated to remove the vast majority of duplicate entities."

And my question is whether you are certain that you removed the vast majority of duplicate entities but not all?

A. I have high confidence that I -- that a vast majority of duplicates were removed. When you achieve over 80 percent reduction, my experience is that is an exceptional deduplication effort.

I -- I cannot rule out the possibility that additional -- or that records exist that are the same entity still in the data.

THE VIDEOGRAPHER: Counsel, I'm so sorry to interrupt, but we lost the remote people. Do you

Page 97

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

want to go off the record or not?

THE WITNESS: And it's noon.

MR. LAZARUS: It is noon. Sure, why don't we go off the record. Thank you.

THE VIDEOGRAPHER: We are going off the record at 12:01.

(Deposition recessed at 12:01 p.m. to be reconvened at 12:45 p.m.)

Page 98

AFTERNOON SESSION

12:49 P.M.

--oOo--

THE VIDEOGRAPHER: We are back on the record. The time is 12:49. Please proceed.

EXAMINATION RESUMED

BY MR. LAZARUS:

Q. All right. Before we went off the record, I was inarticulately trying to ask a question with a bunch of double negatives. So I will try that again.

In your analysis of the Apple payor data, is it possible that you eliminated 100 percent of the duplication?

A. I can't rule it out.

Q. Okay. How likely do you think it is that you eliminated 100 percent of the duplication?

A. I -- I don't know how to quantify -- quantify that. I -- I -- yeah, I don't know how to quantify that.

Q. Okay. Have you tried to quantify it at all?

A. I have not.

Q. And why -- if you didn't deduplicate 100 percent, why not?

MR. BURT: Objection. Form. Incomplete

Page 99

hypothetical.

Q. (BY MR. LAZARUS) If -- if in your analysis in this case you did not eliminate 100 percent of the duplication in the Apple payor data, why is that?

A. Records would not be matched and deduplicated if they did not have the data points available to match records together to a level that I had confidence that they could be considered the same record.

Q. To a level that you would have confidence?

A. That is correct.

Q. Okay. And how did you determine whether you had sufficient confidence or not?

MR. BURT: Objection. Form.

Q. (BY MR. LAZARUS) I'll rephrase again.

How did you determine whether you had sufficient confidence in deduplicating particular records or not?

MR. BURT: Objection. Form.

A. So I -- in evaluating the data and determining what data was available, I -- I build -- built a set of deduplication scripts that I -- that align with deduplication methodologies I've used for -- for years, if not decades.

And in applying those and utilizing them over this time, in my experience, I have assembled an

Page 100

understanding of the outcomes and -- and based on adequate matching points, have built a experience -- confidence in various data matches.

Q. (BY MR. LAZARUS) And I'll point to paragraph 17F of your report where you refer to an iterative process that you repeat until, in your words, "the marginal returns are outweighed by the time and effort required to continue."

In that language, when you say, "marginal returns," does that refer to additional duplicates that could be potentially identified with additional iterations of your process?

A. I think you're going to have to re- -- restate that, please.

Q. Yeah.

So you refer in paragraph 17F to marginal returns.

And I'll just ask, what do marginal returns -- what does "marginal returns" mean there?

A. Okay. I understand the question.

So if -- in -- in analyzing records that still are identified as unique or primary, and I'm not able to find ways to code and generate a match based on the data available, that then I -- then that is a time where I -- I determine that I have -- I have

Page 101

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

effectively matched as -- as many as I can identify with -- with the information available.

Q. But the 17F language refers to the marginal returns being outweighed by the time and effort required to continue.

Does that mean that if you took the time and effort to run additional iterations of your method, you might identify additional matches, but so few that it would be outweighed by spending any additional time and effort; is that right?

A. I -- I can't rule out that, you know, additional -- you know, unlimited time and unlimited money could -- could result in some additional matching.

Q. But that's what marginal returns refers to, right?

A. Yeah.

Q. The returns is additional matches, right?

A. The -- the -- yeah, marginal returns would be, in this context, additional matches.

Q. Okay. And the point you refer to when the marginal costs are outweighed by the time and effort required to continue, that means the point when you determined that the additional duplicates you might be able to find would not be worth the time and effort

required to identify them, correct?

A. Actually, can you -- can you re- -- restate that question because I think you missed -- misused a word.

Q. Okay.

A. I believe you said "marginal cost."

Q. I'm sorry. Well, and I have it -- I have it written down as marginal cost, too. But thank you for catching that.

The point you refer to when the marginal returns are outweighed by the time and effort required to continue, that means the point when you determine that the additional duplicates you might be able to find would not be worth the time and effort required to identify them; is that correct?

A. That is correct.

Q. And how did you estimate the marginal returns?

MR. BURT: Objection. Form.

A. I was -- I don't believe there's an estimation of marginal returns. I believe it is more accurate to say I was not finding additional matches that I could effectuate in a -- in a both coded and confident manner, which is the -- the point we try to determine my returns here for the effort I'm putting in, I'm not -- I'm not finding additional things that I could

match.

Q. And did you -- are you saying that you did -- you got the marginal returns down to zero?

A. I -- I'm saying that I -- I did not see things I could match but decided not to. I -- it required additional work for me to find add- -- additional possible matches.

Q. Okay. And that's based on your -- your experience that you've described in your work in legal administration, claims administration?

A. Correct. And my -- and my years of experience performing data match and data duplication -- deduplication, that's correct.

Q. So since we're talking about marginal returns that could be generated if additional time and effort was spent, am I right, to take this to the extreme, it would be possible to identify additional matches by examining every single possible match, but you would say the benefit of doing that would be outweighed by the amount of time and effort it would require to do that; is that right?

MR. BURT: Objection to form.

A. I'm sorry, please restate because I think a piece of that is -- I have -- I have a question about how you framed it. So please restate.

Q. (BY MR. LAZARUS) Okay. So I guess to take a step back.

You referred to marginal returns being outweighed by time and effort required to identify any additional matches?

A. That is correct.

Q. Excuse me.

And I'm trying to understand -- I think what I have heard you say is that it would -- in order to find additional matches, it would require -- and to back up.

In order to identify additional potential matches, it would require the expenditure of more time and more effort than you thought in your judgment worthwhile in the analysis; is that correct?

A. I -- I was -- yeah, I was no longer seeing a benefit and additional matches from the work continuing, so I stopped.

Q. But would you agree that -- that you did not examine every possible match, you personally sitting down and examining every possible match?

A. If you're asking if I looked at all 1.7 billion records individually and tried to match them individually, I did not do that.

Q. And why not?

A. It would have been ineffective and time

27 (Pages 102 - 105)

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**SER-29**

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

consuming beyond measure.

Q. But if the time were available to examine every single possible match, do you agree that an individualized analysis of every possible match could yield additional matches?

A. I can't rule it out.

Q. Okay. All right. Let's go back to your report at paragraph 10. You know what? Well, hold on, let me see. Let's see.

So you ran your iterative process for deduplication, right?

A. That is correct.

Q. And at some point you determined that the marginal returns in matches from continuing to iterate were so low that they were outweighed by the additional time and effort required to continue iterating?

MR. BURT: Objection to form. Asked and answered.

A. I did.

Q. (BY MR. LAZARUS) And I understand you say that your experience has informed your decision on when to stop iterating that process.

Can you describe the criteria that you used to make that decision?

A. To make the decision that the marginal return

was no longer justifying the -- the means, so to speak -- or --

Q. Right.

A. Okay.

So as I -- as I recall, I reached a point of deduplication and analysis where I could no longer apply either cleansing or additional deduplication rules which would either produce a match result in one of the rules that I had already built or, with a new rule, that I would have high confidence that the records that matched were, in fact, the same entity.

Q. Okay. And if I'm understanding right, that -- does that mean that at the end -- the last round of iteration that you did run, you got zero matches?

MR. BURT: Objection. Form. Foundation.

Q. (BY MR. LAZARUS) And I'll say my question is, that sounds different from marginal returns being outweighed, you know, marginal returns being low enough that outweighed by the additional time and effort, versus marginal returns got down to zero, the last iteration produced zero matches and, therefore, you stopped.

Do you understand the difference that I'm asking about?

A. I do.

Q. And which one accurately describes your approach, your method on -- on determining when to stop iterating on your method?

A. I do not believe they're mutually exclusive.

Q. Okay. Can you explain more?

A. So the last iteration run produced a result. Additional analysis to determine if additional iterations would benefit I didn't identify, I'll say, meaningful results to justify continuing.

Q. How do you determine whether the next round iteration would yield results before you've run it, if that makes sense?

A. The analysis of the data is the determination of whether there is something there to -- to either cleanse or apply new rules to that -- so that's -- that's how you determine whether there's something there to -- to actually iterate on.

Q. So the -- the last iteration produced some level of matching --

A. Uh-huh.

Q. -- some number of matches?

A. Uh-huh.

Q. And you did analysis and determined that the next round of iteration, which you did not run, likely

would -- would not produce matches or would produce very few; is that right?

MR. BURT: Objection. Form.

A. Give me a second.

Q. (BY MR. LAZARUS) No problem.

A. I -- I -- as I recall, I do -- reached a point where I was not identifying any matches that I could apply a -- a process to deduplicate further.

Q. Okay. Are you aware of any literature or studies that support the decision-making process that you've just described?

A. I am not.

Q. And your algorithm for deduplication groups records if they match exactly on some combination of the cleaned variables in the payor data; is that correct?

A. That is correct.

Q. Why did you use that approach?

A. Why did I use the approach of matching on the data available to determine if somebody's the same person?

Q. Let's start there.

A. That is -- the information in the data is what I had available to define what each individual, you know, data points were, their contact information. And

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

so in -- as far as data based contact information goes, those are the data points that define an individual.

Q. And in many -- you describe tiers of your matching process, correct?

A. Could you point out to where I did?

Q. I believe in your report you refer to tiers of matching.

But you agree, sitting here today, that you used different tiers of matching in your process; is that right?

A. I did use different tiers in my deduplication matching process, yes.

Q. Okay. And in many tiers, you include address as part of the match, correct?

A. I do.

Q. Are you aware of literature, studies or publications that suggest that using -- that suggest using exact address matching?

A. Can -- can you restate it?

Q. Sure.

So are you aware of literature, studies or publications that suggest or recommend using exact address matching for deduplication purposes?

A. No.

Q. Are you aware of other methods commonly used

Page 110

to deduplicate and/or determine association between records that include address?

A. To -- to clarify, you said, "other methods." Address by itself is not a method of matching individuals to -- so I want to make sure that that's not what you're suggesting when you say "other methods."

Q. What I'm suggesting is, your -- your method uses, as we just discussed, as one part of your method, you use exact matching between the cleaned addresses of different entries.

A. Addresses utilized as a -- as a one piece in a collection of data points and matching, yes, I agree with that.

Q. And so as opposed to using exact matching of cleaned address values, are you aware of other methods commonly used in deduplication that involves address matching?

A. I was with you until your last word.

Q. Okay.

A. Because you ended with "in address matching," and I don't believe that's what your intent was. Because you're saying what -- what I believe your question was, what else other than address do you use in address matching?

Page 111

Q. So I think I'm trying to focus in on exact matching --

A. Okay.

Q. -- of cleaned address.

A. Okay.

Q. Are there other -- are you aware of other ways to, as part of a deduplication process, use address data other than exact matching of --

A. Yes.

Q. -- a cleaned address? Okay.

What -- what other methods are you familiar with?

A. I am familiar with processes of using, as an example, a -- an address combined with city and state and not using postal code because postal code sometimes can -- can be inaccurate, or using address along with postal code and not city and state. And to -- because sometimes the postal code is more accurate than the -- than the city.

Q. Are you aware of any publication criticizing as outdated or unreliable processes of deduplication that rely on coding by hand depending on the results of the previous step -- previous step?

MR. BURT: Objection. Form.

A. Coding by hand?

Page 112

Q. (BY MR. LAZARUS) Coding by hand.

A. Versus?

Q. Any alternatives you can think of.

MR. BURT: Objection. Form.

A. I am not aware of any publications like that.

Q. (BY MR. LAZARUS) Okay. Are you aware of the concept of geocoding in address matching?

A. I am aware of the concept.

Q. Okay. And what is that?

A. It is -- from -- from my memory, I believe geocoding is a method of assigning essentially a coordinate to a location.

Q. Okay. And you did not use that concept in your analysis in this case, correct?

A. No, I did not.

Q. Okay. Why not?

A. It -- it is not a method or practice that I have commonly used. I have used geocoding infrequently and didn't find it to be overly valuable.

Q. Okay. When -- when have you used geocoding? Do you remember particular instances when you did?

A. Not specifics. I have used geocoding on a number, and I cannot give you a specific number, a number of administrations in order to apply geocoding to -- to addresses.

Page 113

29 (Pages 110 - 113)

**SER-31**

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

Q. Okay. Do you remember when the last time you used it was?

A. I do not.

Q. Ballpark?

A. I -- no, I do not.

Q. Okay. Are you aware of using distance metrics such as the Levenshtein or Hamming distance to determine whether names or addresses match?

A. No.

Q. Are you aware of the concept of thresholding to determine matches by using distance metrics in address matching?

A. No.

Q. Are you aware of the concept of a longest common subsequence in address matching?

A. No.

Q. Are you aware of the concept of an N-gram in address matching?

A. No.

Q. Are you aware of the concept of user defined parameters in address matching?

A. Can you provide clarity on what you mean by "user defined parameters"?

Q. I think let's -- let's move on.

Oh, are you aware of the concept of SOUNDEX

Page 114

properties in addressing matching -- in address matching?

A. What is that? Repeat that.

Q. SOUNDEX properties?

A. In address matching? No, not in address matching.

Q. Are you familiar with SOUNDEX properties in other contexts?

A. Aware of them, yes.

Q. What's your understanding of what SOUNDEX properties are?

A. My understanding would be a -- I believe I've experienced it with regards to more in the -- I'm trying to think of a situation where it's actually -- I've actually been involved in it. I don't know that I can --

Q. Well --

A. Yeah, I don't --

MR. BURT: Let the witness finish.

THE WITNESS: Huh?

MR. BURT: Let the witness finish.

A. I can't think of a context or a situation where I've been involved with it.

Q. (BY MR. LAZARUS) Whether or not you've been involved with it, do you have a -- an understanding of

Page 115

what SOUNDEX properties are?

A. I believe it's a -- a -- essentially, phonetic matching.

Q. Are you aware of the concept of predictive modeling such as logistic regression in address matching?

A. No.

Q. I did want to -- so on paragraph 9 of your report, it states that if a reliable means for deduplication exists, I'm paraphrasing there, quote, "Counsel further requested that I proceed with deduplicating those records and create an anonymized identifier for each unique payor, and then match those payor identities to create a primary person ID."

I'd like to suggest one thing that might be a typographical error there.

Page 116

Q. Okay. Okay. Your report states that in formulating your opinions in this case, you relied on well-accepted methods of consolidating contact data in the claims administration field including proprietary

Page 117

30 (Pages 114 - 117)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

methods that JND has developed over the past nine years, correct?

A. What section?

Q. Let's see.

Paragraph 10. Thank you.

A. Okay.

Q. You see the language that I'm referring to in paragraph 10?

A. I do.

Q. All right. And the methods that you are describing in paragraph 10, they attempt to clean, deduplicate and match records, correct?

A. Cleanse and deduplication, yes.

Q. Outside of claims administration, are you aware of any other fields that have developed methods to clean and deduplicate records in a dataset?

A. I am not -- I've personally not worked in other fields that -- other than health care claims administration where we did clean and match data. So I -- I can't speak to fields I've not -- not worked in or with.

Q. And you're not aware of other fields that do -- that have developed methods to clean and deduplicate data?

MR. BURT: Objection. Asked and

Page 118

answered.

A. No.

Q. (BY MR. LAZARUS) Would you be surprised to learn that other disciplines use data cleaning?

A. It -- I -- I'm not sure if you're asking my emotional response -- response to the statement. But I -- I -- I would expect other industries to utilize these process -- or similar processes and methodologies based on how much data exists in the world today.

Q. And is that true for both cleansing data and deduplicating data?

A. Cleansing data, yes. Matching data, yes. Deduplication may be a -- a function of the various industries.

Q. Okay. Maybe related to that point that you were just making, is identifying unique individuals distinct from deduplicating records?

A. Can -- can you repeat that question? I thought there was something --

Q. Sure.

A. -- something didn't make sense to me.

Q. Is identifying unique individuals distinct from deduplicating records?

A. I'm trying to determine what the outcome of -- of -- of both efforts are in my head. I believe the

Page 119

outcome is essentially the same.

Q. Okay. And in the process that you undertook in this case, were there any different steps that you took to identify unique individuals different from the deduplicating records or are those essentially the same effort?

A. The effort of deduplication's goal essentially is to produce a list of unique individuals.

Q. In addition to the Apple payor data in this case, you used a National Change of Address search in your analysis in this case, correct?

A. I ran a subset of the data through the National Change of Address, a process in order to get updated current addresses for a portion of the population, correct.

Q. And that was through Melissa Data, if I -- is that the right name of the vendor?

A. That is correct.

Q. Okay. And other than your -- other than the Apple payor data itself, the data or results that you received from Melissa Data and your own JND methods, did you rely on anything else in reaching your opinions in this case?

A. Other than my experience and the data available?

Page 120

Q. That's correct.

A. No, that's what I relied on.

Q. Okay.

A. And I believe that's complete.

Q. There was no other external data source that was used other than the Melissa Data data?

A. No, due to the limitations of the protection orders of very limited what could be done with the data.

Q. Would additional data have been helpful in conducting this analysis?

MR. BURT: Objection. Form.

Q. (BY MR. LAZARUS) Would additional data have been helpful in your deduplication effort in this case?

MR. BURT: Objection. Form.

A. It is possible.

Q. (BY MR. LAZARUS) Is there any particular data that you think of that would have been helpful?

A. It is possible that running a subset of the data through a -- one of the big three credit bureaus for advanced address search could have produced additional updated addresses that would have benefitted the matching.

Q. Did you request the ability to do that additional running of data through one of the big

Page 121

31 (Pages 118 - 121)

credit bureau's data?

A. It was -- I believe there was discussion, but due to the aggressive nature of the protective order surrounding the Apple data, it was -- I don't believe that running this -- that there was much appetite for -- for sending the data out to a second vendor for that additional search.

Q. Okay. Did plaintiffs' counsel provide any assumptions that you relied on in forming your opinions?

A. Did plaintiffs' counsel -- I'm going to repeat your question to make sure I understand.

Did plaintiffs' counsel provide any assumptions that I used to form my conclusion, was that your question?

Q. Yes.

A. Not that I can think of.

Q. Other than asking you the questions that formed your assignment, did counsel give you instructions on how you should conduct your analysis?

MR. BURT: Objection. Form.

A. Not -- not that I can think of. Counsel are not versed in data deduplication.

Q. (BY MR. LAZARUS) Did plaintiffs' counsel advise you to be aggressive or conservative in

Page 122

assigning matches?

A. They were -- they provided neither direction on either of those things.

Q. Okay. Did they identify a target number for your end result of identified unique payors?

A. They did not.

Q. Did they identify a range of numbers to target for the end result?

A. They did not.

Q. Okay.

MR. BURT: I should object to the form of those questions to the extent that they go beyond what he relied on. But I let him answer.

Q. (BY MR. LAZARUS) Before submitting your report, did you know whether any of plaintiffs' other experts intended to rely on your opinions?

A. No. I'm -- was, and for the most part, still unaware of any other experts that exist.

Q. Okay. Experts that exist in this case, is that --

A. That's correct.

Q. Other than staff at JND and plaintiffs' counsel, did you discuss the opinions in your report with anyone else?

A. Not that I can think of. I don't know if it

Page 123

came up over dinner.

Q. Okay. And if it came up over dinner -- well, I'll withdraw that.

You don't have a memory of it coming up over dinner?

A. I do not.

Q. Okay. And you're not remembering any other conversations at dinner or otherwise about your work in this case?

A. Outside of counsel or JND staff?

Q. Outside of counsel or JND staff.

A. I -- not that I can think of.

Q. Okay. Are you familiar with someone named Minjae Song?

A. I -- I am.

Q. Okay. Who is that?

A. I believe that he works for Brattle.

Q. And have you discussed with him your work in this case?

A. I was on a conference call with Minjae prior to work starting. So I don't believe I've ever -- I don't recall talking to him since this work commenced.

Q. Okay.

A. So I don't think I could talk to him about the work occurring, at least that I recall.

Page 124

Q. Okay. Did -- did Dr. Song say anything in that conversation that you relied upon in doing the work on your assignment in this case?

A. Not that I recall.

Q. Okay. Am I correct that in your work on this case you performed some cleansing and then some deduplication and then some cleansing again and went back and forth between cleansing and deduplication a number of times; is that accurate?

A. That is accurate.

Q. Okay. How many times did you cleanse and deduplicate?

A. I -- many.

Q. Okay. But you don't know an exact number?

A. I do not know an exact number.

Q. Is an exact number recorded in your materials that you've produced to Apple's consultants?

A. No.

MR. BURT: Objection. Form.

Q. (BY MR. LAZARUS) All right. Looking back at the -- at Tab 10B -- sorry. That's -- let's -- what's our exhibit number? 116. Thank you. Exhibit 116.

This is your August 1st, 2024, declaration.

A. Yep.

Q. Do you see at paragraph 7D, you state, "I do

Page 125

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

not know how to mechanically duplicate the skill of
recognizing how successful each iteration has been at
resolving issues with incomplete personally identifying
data. JND has developed unique expertise to do so over
the course of many years and many engagements."
        Do you see that?
    A. I do.
    Q. How many people outside of JND have the skill
and expertise that you refer to in that paragraph 7D,
to the extent you know?
    A. I -- I can't imagine a way I would know that.
    Q. Okay. All right. Will you get -- so the next
one I want to refer to is your README file, which has
already been marked as Exhibit 113.
        The purpose of that README file was to explain
the order in which code files should be run to produce
the final output from your analysis with sufficient
information to allow Apple's expert to replicate JND's
analysis with no changes to the code other than updates
to file paths; is that right?
    A. I'm unclear where that -- you determined that
was the -- what I -- my marching order for producing
this.
    Q. Okay. I -- I can represent to you that that
is the request that our team made for the README file.

Page 126

---

    A. Okay.
    Q. Is that consistent with your goal in creating
the README file?
    A. My goal in producing the README file was, to
the best of my ability and limited time, provide the --
the approximate order of running the -- the files that
I used to produce results in order for a third party to
try to replicate the effort and come up with similar
outcomes, recognizing that the code I provided was not
a deliverable of this effort and, therefore, is not a
situation where you would not have to change any code
in order to achieve the goal.
    Q. The README file lists dot SQL scripts,
correct?
    A. That is correct.
    Q. Besides SQL, which I'm -- I understand would
be spelled S-Q-L?
    A. Of course.
    Q. Did you use any other software or computer
programs for your work in this case?
    A. The NCOA process.

Page 127

---

[REDACTED]

    Q. Okay. Can you confirm -- actually, let me
take that back.
        MR. LAZARUS: Okay. It's been another
hour. I think it might be good to take a break. So
why don't we go off the record.
        THE VIDEOGRAPHER: We are going off the
record at 1:48.
        (Break from 1:48 p.m. to 2:06 p.m.)
        THE VIDEOGRAPHER: We are back on the
record. The time is 2:06. Please proceed.
        MR. LAZARUS: Thank you.
    Q. (BY MR. LAZARUS) Okay. Now I want to ask a
series of questions looking at paragraph 17 of your
report. And also looking at the README file which
is --
        MR. BURT: 113.
        MR. LAZARUS: 113. Thank you.
    Q. (BY MR. LAZARUS) So let me know when you have
paragraph 17.

Page 128

---

[REDACTED]

    A. Yes, I do.

[REDACTED]

Page 129

---

33 (Pages 126 - 129)



Q. Okay. And your report refers to tiers and rounds.

Can you say what you mean by "tiers" and "rounds"?

A. Can you point out to me where I refer to

Page 130

"tiers" and I refer to "rounds"?

Q. I will in just a moment.

Do you -- 17E.

A. Okay. I see "tiers" in E. I don't see "rounds." Where do I refer to "rounds"?

Q. In F, 17F.

A. Okay. All right.

Q. What do you mean by "tiers" and "rounds"?

A. In this context, I referred to tiers as the -- the tiers of the deduplication matching logic within the various deduplication algorithms that, based on the hierarchy of the -- of the tier within the overall file, I apply to have a -- a confidence level in the matching based on the data points utilized for each tier.

With regards to round, I -- that is the iterative process of applying and then making changes and applying and making changes as necessary to improve and enhance and evolve the -- the matching.

Q. Okay. So within a round, am I correct that you would apply various tiers of your process; is that right?

A. That is a fair characterization, yes.

Q. Okay. And can you identify what is described in paragraph 17E of your report as the first round of

Page 131

your deduplication algorithm, can you identify the scripts listed in your README file that correspond to that round?

MR. BURT: I'm sorry. Did you mean F?

MR. LAZARUS: I believe I mean E. Yeah, I mean -- I mean in paragraph 17E where there is a description of the top tier and then in 17F, yes, it refers to the first round. So thank you.

Q. (BY MR. LAZARUS) Paragraph 17E and F.

In your README file, can you point to the files that correspond to the first round of deduplication?

Q. Okay. All right. In paragraph 17A of your report, you state that you, quote, "evaluated the entire dataset to determine what data quality issues exist."

Do you see that?

A. I do.

Q. What data quality issues did you identify?

MR. BURT: Object to form.

Page 132

A. I don't remember a list off the top of my head. In -- I -- I can give you some examples. There were records that had missing fields, missing address or a missing name or states that weren't a US state as a value.

But overall, as I recall, this was a -- a small subset of the overall data.

Q. (BY MR. LAZARUS) Okay. And did you analyze the frequency of missing values for each variable?

A. At the time I did.

Q. Okay. And did you review the most common values for each variable to determine whether they were plausible?

A. I did.

Q. And what did you -- how many of the most common values did you review, like, the top ten or -- in terms of the most common values, which ones did you review?

A. For each data point how many did I review?

Q. Right. For each variable.

A. Okay.

Page 133

34 (Pages 130 - 133)



Q. And did you determine that action was required based on common values in the data?

A. There were -- there were some scenarios where action was required.

Q. What action did you take?



Q. Okay. And is that exclusion of a value for matching purposes recorded in code?

A. So the -- it's not a -- well, yes.

Q. Where is that recorded?

A. So if a field is blank, it would be excluded

Page 136

I have no way to know based on a hashed value that it wasn't already there.

Q. Okay. Did you ask that question of anyone?

A. I did not.

Q. And if you look back at the email from my colleague Ramona, which is Exhibit 117.

A. Yep.

Q. There is a list of 16 phone numbers hashed that are included in that email, correct?

A. It looks like about 16, yeah.

Q. And am I correct that you replaced those phone numbers with missing values?

A. I replaced these hashed values with blanks in the sample data for these particular values.

Q. Okay. Did you also do so in the full dataset?

A. With a different set of hashed values because these weren't -- were not consistently carried over to the full dataset. But, yes, I followed a similar process.

Q. Did you investigate whether there were any other values for phone_number_hashed that appeared very frequently and, therefore, could be not legitimate phone numbers?

A. I did.

Q. Okay. And what did you find in that

from matching.



Q. Okay. When you matched on a phone number and the field is phone_number_hashed, did you include the area code in that matching?

A. I did not. But I -- I do not know that I had clarity whether the area code was included in the hashed value and also provided separately, therefore,

Page 135

investigation?

A. I don't recall specifically. I believe there were some -- some additional phone numbers that the -- the volumes seemed unduly high. But because I had no visibility into the actual phone number since I had a hashed value, it was difficult to make a determination.

Q. So you did not then replace those phone numbers that you identified with blank values?

A. I don't recall if I -- I added to the list of approximately 16 off the top of my head.

Q. Okay. And do you think it is plausible that a single phone number, including area code, would be associated with over 1,000 unique payors?

MR. BURT: Objection. Form. Foundation.

Q. (BY MR. LAZARUS) You can answer.

A. Okay. Please -- please repeat, then.

Q. Do you think it is plausible that a single phone number, including area code, would be associated with over 1,000 unique payors?

A. It seems unlikely. I certainly couldn't rule it out.

Q. Okay. What if it was more than 100,000 unique payors?

A. It seems unlikely. Again, I cannot rule it

Page 137

35 (Pages 134 - 137)

Veritext Legal Solutions

Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

out.

Q. Okay. The hash_hashed field represents payment -- payment method information, correct?

A. My understanding of the hash_hashed was a hashed of the last four digits of the payor's credit card number for that -- for that record is what I understood it to be.

Q. Did you investigate whether there were any -- well, let me scratch that.

Okay. Let's look at paragraph 10 of your report.

In paragraph 10 you write about, quote, "well-accepted methods of consolidating contact data in the claims administration field, including proprietary methods that JND has developed over the past nine years," correct?

A. That is correct.

Q. All right. When you describe your methods as "well accepted," who specifically are you claiming to have accepted these methods?

A. Well, these are methods that have evolved over the last 14 years of me working in the legal claims administration industry across two of the largest legal claims administration organizations that have existed, and utilized against thousands of, you know,

Page 138

administration services and datasets without, you know, having situations where these were not found to produce valid and useful results.

So I would say, myself, for extensive experience doing this and working with, you know, individuals in the industry that -- that work at companies I work with, or work at.

Q. Have any of those well-accepted methods that you describe been published in any publications, periodicals, journals, to your knowledge?

A. No. As stated, we've -- we feel that the -- the methods that we utilize are -- are proprietary and a competitive advantage for our organization. And I can't see a situation where we would -- would publish those.

Q. And you write also in paragraph 10 of your report that you applied your deduplication methods to, quote, "a random sample of approximately 13 million payor records."

Do you see that?

A. I do.

Q. Did you make any changes to your methods after you applied them to this sample and before you applied them to the full payor dataset?

MR. BURT: Objection. Form.

Page 139

A. Let me reread the sentence, please.

Got it. Yes.

Q. (BY MR. LAZARUS) What changes did you make?

A. I added multiple tiers to the deduplication logic. I added additional data cleansing because the full dataset represented additional, you know, opportunities for both cleansing and deduplication based on shear volume.

Q. Okay. In paragraph 17E, you write that, "Each tier of the deduplication algorithm utilizes different available data points in combination, or alone, to produce a match, and each match requires a different level of review and validation based on the data points used in the match," correct?

A. Correct.

Q. And in the statement that, "each match requires a different level of review and validation," do you mean to say that you or someone at JND reviewed and validated some matches or all matches for each tier of the algorithm?

MR. BURT: Objection. Form and foundation.

A. Some matches. It would be -- I don't see a situation where, again, one point -- a total of 1.44 billion records that were -- were identified as

Page 140

duplicates could realistically be reviewed.

Q. (BY MR. LAZARUS) How was the review carried out? You mentioned Cameron assisted with that.

What review was done by you and Cameron?

Or -- and additionally, we would do the same analysis, see if there's matches that didn't occur that if, with additional either cleansing or deduplication we could apply to, you know, create the match.

MR. BURT: Objection. Form.

Page 141

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY



Q. Okay. The code that was used in review and validation, was that code produced to Apple?

A. I -- I don't know off the top of my head. It was certainly coded on the air-gapped machine.

Q. In paragraph 17F, you say that you, "ran the deduplication algorithm against the data and reviewed the outcome, evaluated records that are potential matches that did not match in version 1."

What is version 1 there?

Page 142

A. So in any particular round, I'm -- I may run a -- a code set, evaluate whether the outcome -- if there's additional matching opportunities or cleansing and matching opportunities that occur, make a -- a modification to the -- that -- the code for that round and then rerun it as that round before I determine that I've -- I've completed the -- the efforts of that round and move on to the next one for -- for additional, you know, types of matching.

Q. Okay. What assumptions did you make, if any, in conducting your deduplication work?

A. Let's see. I assumed that the person_id_hashed provided by Apple was as they defined it that represented, for the most part, a payor individual and that it could reliably be treated as such.

Q. Can I ask where you saw a representation from Apple that person_id_hashed represented, for the most part, a payor individual?

A. I believe I read that in the data dictionary provided, but I do not -- I cannot be certain that that is where I received that information.

Q. Okay. Any other assumptions that you made in conducting your deduplication work?

A. That's the -- that's the most -- that's the

Page 143

one I can think of off the top of my head.

Q. Okay. For each tier of the deduplication method that you used, you required values of the relevant variables to match exactly and without using, quote-unquote, "fuzzy matching"; is that right?

MR. BURT: Objection. Form. Foundation.

Q. (BY MR. LAZARUS) Okay. I can -- I'll break it up.

For each tier of the deduplication method that you used, you required values of the relevant variables to match exactly across records, correct?

A. Can you -- you're going to have to restate that or give an example or -- or something of that nature.

Q. Sure.

So to -- my basic question is, you used exact matching rather than fuzzy matching; is that correct?

A. Fuzzy matching isn't a real thing.

Q. Okay. I'm interested to hear about that.

A. But I believe your question is, for example, did I only match a record when using the name if the full name matched completely to the other full name? The answer to that is no.

Q. What did you do instead?

Page 144

A. As an example, along with additional data points, if a partial address matched, say, the first ten digits of the address line 1, along with the full name, along with the person ID, along with the city and state, that would be considered a match in one of the tiers of the -- of the deduplication, which in -- in some realms would -- I think people might use the phrase "fuzzy matching" on that. I would refer to it as logical partial data points.

Q. Did you do any analysis that matched, for example, first name that would match -- let me restart.

So did you do any analysis that would match in the first name field for the values of William and Bill?

A. No.

Q. And why not?

A. There -- there -- there are tools, you know, available that would allow for, you know, the variable names representations to be matched, but I don't believe it's something that I could easily access from an air-gapped computer.

Q. Did you request the ability to access tools to do that?

A. I did not.

Q. Do you agree that requiring exact matching for

Page 145

37 (Pages 142 - 145)

a variable for two records to be a match could result in some records not being matched due to slight differences in the values entered by a single payor?

A. As -- as -- I mean, I don't know how to answer that because it -- it feels like you're asking me to agree to that when, in fact, that is not the situation -- I did not in every situation require a full match of the data.

So I will say, with the caveat that I -- I coded to deal with not full matches of every field necessarily, that, yes, requiring full matches could potentially repress matching.

Q. Okay. Do you agree that there could be different people with the same first name and same last name at the same address?

A. I can't rule that out.

Q. For example, Bob Smith, Senior and Bob Smith, Junior, those could both show up as Bob Smith in the data, but they could actually be different people, right?

A. I -- I cannot rule out that Junior and Senior still living at home don't use their Junior and Senior, even though they know if they don't, they're going to get each other's mail.

Q. And your algorithm would not differentiate

Page 146

between those two payors with the same first name and last name based on their name if they didn't use some other indicator like a suffix Junior and Senior; is that right?

A. If -- if they lived in the same household and had the same name and did not use their Junior and Senior, I would not distinguish them.

Q. Okay. Do you agree that there could be records that have the same last name but different first names that could still correspond to the same payor?

A. I certainly can't rule that out.

Q. Okay. And your algorithm would not be able to match those records based on the name, correct?

A. Because the names are different.

Q. Right.

A. That is correct.

Q. You did not use some variables in your matching algorithm, correct?

A. Can you be more specific with variables?

Q. Variables available in the Apple payor data.

A. So data fields?

Q. Okay.

A. There were some data fields, as mentioned previously. I did not use county. I did not use area

Page 147

code. I did not -- so, yes, those -- those as examples I did not use.

Q. Why -- why was county not used?

A. I -- I'm -- I do not see a situation that county benefits in an address match where a street address and a city/state or a street address and a postal code would not create the match. I do not see what data point I would replace county with to give me confidence in a match.

Q. Okay. Let's look at an example.

MR. LAZARUS: 19A, please.

(Deposition Exhibit DX 119 was marked.)

MR. LAZARUS: And I will represent that this is a record from the Apple payor data.

Q. (BY MR. LAZARUS) Do you see the field names listed at the left here?

A. I do.

Q. And those match the fields in the raw Apple payor data that you received?

A. They appear to be, yes.

Q. And in this record, the last name listed is ███ correct?

A. That is correct.

Q. And the first name listed is ███ correct?

A. Correct.

Page 148

Q. So this is a ███████ living at -- or let me take that back.

This is -- this record lists ███████ together with the address -- an address in ██████ ██████, correct?

A. That is correct.

MR. LAZARUS: Okay. If we could get 19B and then C after that.

(Deposition Exhibit DX 120 was marked.)

MR. LAZARUS: And I'm sorry, what was the exhibit number on that last one?

MS. LIN: 119.

MR. LAZARUS: 119. Okay. So this one will be 120.

Q. (BY MR. LAZARUS) All right. This is Exhibit 120, which I will represent is another record from the Apple payor data.

And if you see the first name here is ███ and the last name is ██, correct?

A. Correct.

Q. And the address listed is in ███████████ ██████, correct?

A. Correct.

Q. Okay. And then I will show you another Exhibit.

Page 149

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

MR. LAZARUS: So this should be Exhibit 121.

(Deposition Exhibit DX 121 was marked.)

MR. LAZARUS: I should be saying DX 121.

Q. (BY MR. LAZARUS) In DX 121, the name -- the first name listed is ███ correct?

A. Correct.

Q. And the last name listed is ███████ correct?

A. Correct.

Q. And the address listed is Apple's headquarters at 1 Infinite Loop in Cupertino, California, correct?

A. Correct.

Q. All right. Do you agree that all three of these exhibits at DX 119, DX 120 and DX 121 have different person_id_hashed values?

A. Looks to, yes.

Q. And they all have different last names, correct?

A. They do.

Q. And they have a different payment credential in the hash_hashed column, correct?

A. Okay. Correct.

Q. And they have different phone numbers in the phone number field, correct?

A. Appears to, yes.

Page 150

Q. And they have different city, state, postal code and street 1 values, correct?

A. Correct.

Q. Would you agree, then, that the only identifying information shared by all three of these records is the first name '███████'

MR. BURT: Objection.

Withdrawn.

A. In -- in the data provided as it exists, yes, I -- the only -- the only common data point I see is '███████' correct.

Q. (BY MR. LAZARUS) And sitting here today, is it your opinion that these three records correspond to three unique individuals or one payor or two -- let me rephrase that.

Sitting here today, is it your opinion that these three records correspond to one, two or three unique individuals?

MR. BURT: Objection. Form.

A. I -- I don't -- I do not know that I have enough information to actually render an opinion on that. If you are -- in its static state where -- without any -- any additional information or evolution of the data, I -- I currently don't see them as a -- as a -- as a match, but...

Page 151

Q. (BY MR. LAZARUS) And you would agree that it is not -- it would not be appropriate to group these three records together as a unique individual based solely on the first name, correct?

A. As a -- as a general statement, I agree that matching on first name alone is not a -- a valid match criteria.

Q. And that is, again -- that is the -- well, withdrawn.

Did you review matches to see if records like these that only share one data point in the first name field were matched together?

A. I -- I reviewed matches based on a broad spectrum of criteria and in looking for situations where matches occurred where not all fields matched to determine if there -- there was a -- a concern or issue with the match.

And so, in general, I can't say that I specifically analyzed that as you described it. But, yes, on -- at the field by field level I did look for and review matches and where data points did and didn't match.

Q. Would you be surprised to learn that your method did group these three records together?

A. Again, if you're looking for me to gauge my

Page 152

emotional opinion to it, I have no comment. To -- is it possible that these three records matched for a variety of reasons? It is possible, but I can't speak to it in isolation.

Q. Understood.

So I will represent to you that I understand that these three records were grouped together in a collection of 42,555 records from 17,683 accounts as identified by person ID.

Do you consider it plausible that all 42,555 records in that grouping represent a single unique payor?

A. Again, I would need to examine in detail the data, the criteria, the match, how it occurred before I could render an opinion. Is it -- and determine whether a -- a viable valid match could exist and why.

MR. LAZARUS: Can I have 19G, please? And I'll do H after that.

(Deposition Exhibit DX 122 was marked.)

MR. LAZARUS: So this will be DX 122.

Q. (BY MR. LAZARUS) I will again represent that this exhibit is a record from the Apple payor data.

And this record lists first name ███████ correct?

A. Correct.

Page 153

39 (Pages 150 - 153)

Q. Last name listed is ▮▮▮▮ correct?

A. Correct.

Q. And the address listed is ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮, correct?

A. Correct.

Q. Okay.

MR. LAZARUS: I'll now mark DX 123.

(Deposition Exhibit DX 123 was marked.)

Q. (BY MR. LAZARUS) DX 123 is another record from the Apple payor data.

And do you see that the first name listed here is ▮▮▮▮

A. Yes.

Q. And the last name listed here is ▮▮▮▮ correct?

A. Correct.

Q. And the address listed is ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮, correct?

A. Correct.

Q. So these two records have the same last name, the same -- the same last name, correct?

A. Correct.

Q. On the address -- the street address, the two values are the same except for a period at the end of the address in one of them, correct?

Page 154

A. Correct.

Q. But the records have different values for person_id_hashed, correct?

A. Correct.

Q. And they have different values for phone number, correct?

A. Correct.

Q. Based on the information that you can see in these two records, do you believe, in your opinion, that these are two distinct individuals, ▮▮▮▮▮▮▮, at the same address or a single individual?

A. Seems to be, with the information in front of me, plausible that they're the same individual.

Q. I will represent that in the output data that we received from your production, that these two records were not matched.

Why would that be, or why is that, I should say?

A. So the -- the al- -- matching algorithm does do a partial first name along with last name and address. But I believe because partial first name does, you know, present a -- a increased risk of overmatching, I believe the algorithm includes a -- the phone_number_hashed as a -- as a validator to compensate for the increased risk of a partial name.

Page 155

Q. I see.

MR. LAZARUS: I will mark another document. This one will be DX 124.

(Deposition Exhibit DX 124 was marked.)

Q. (BY MR. LAZARUS) Looking at DX 124, the first name listed is ▮▮▮▮ correct?

A. Correct.

Q. The last name listed is ▮▮▮▮ correct?

A. Correct.

Q. And the address listed is ▮▮▮▮▮▮ -- excuse me -- ▮▮▮▮▮▮▮▮▮▮▮▮ written out completely, correct?

A. Correct.

Q. And that address is in ▮▮▮▮▮▮▮▮, as identified here, correct?

A. Correct.

MR. LAZARUS: We'll mark the next document as DX 125, correct?

(Deposition Exhibit DX 125 was marked.)

Q. (BY MR. LAZARUS) This document identifies the -- this document is another record from the Apple payor data.

The first name listed is ▮▮▮▮ correct?

A. Not on mine.

Q. Oh, what do you have?

Page 156

A. I have another ▮▮▮▮

Q. Well, let's -- I do have an extra ▮▮▮▮ here.

MR. LAZARUS: This -- yes, this one with ▮▮▮▮ should be DX 125. Is that correct on the Exhibit Share?

Q. (BY MR. LAZARUS) Okay. So in DX 125, the first name listed is ▮▮▮▮ correct?

A. Correct.

Q. And the last name listed is ▮▮▮▮ correct?

A. Correct.

Q. And the address listed is ▮▮▮▮▮▮▮ ▮▮▮▮ period, correct?

A. Correct.

Q. And that address is listed as being in ▮▮▮▮▮▮▮▮ correct?

A. Correct.

Q. And so looking at DX 124 and DX 125, these list, would you agree, the same address?

A. It does, yes.

Q. And DX 124 and DX 125 identify the same payment method in the hash_hashed field, correct?

A. Looks to, yes.

Q. So looking at these two records, do ▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮, in your

Page 157

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY



Q. opinion, to be different payors?

A. In -- in isolation, they do not.

Q. They do not look to be different payors?

A. They -- they do not -- they -- they look to be different payors.

Q. Okay. Thank you.

And do you agree that it would be plausible that ███████ and ████████████ are a married couple that share a credit card and live at the same address?

A. Do I agree it's plausible? I agree it's plausible.

Q. Okay.

MR. LAZARUS: We'll mark this as DX 126.

(Deposition Exhibit DX 126 was marked.)

Q. (BY MR. LAZARUS) DX 126 I will represent is another record from the Apple payor data.

The first name listed in this record is ███████ correct?

A. Correct.

Q. And the last name listed is ██████ correct?

A. Correct.

Q. And the address listed is ██████ ████████████ fully spelled out, correct?

A. Correct.

Page 158

Q. And that address is listed as being in ████████████ , correct?

A. Correct.

Q. Looking at these three exhibits, DX 124, DX 125 and DX 126, do you see that they all three have the same address except that ██████ is fully spelled out in two of them and abbreviated in one of them?

A. I do.

Q. And do you see that all three of them use the same payment method in the hash_hashed field?

A. I do.

Q. Would it be -- well, in your opinion sitting here today, do you believe that these are one, two or three unique payors?

A. With the data available in front of me, in isolation, it looks to be three different people.

MR. BURT: I'm going to object that Apple's counsel is marking as exhibits paper copies of data removed from the system which, of course, since it's Apple's data, they have the right to do, but that the expert on plaintiffs' side could not similarly remove for the purpose of examination preparation.

MR. LAZARUS: Understood. The objection is noted.

Q. (BY MR. LAZARUS) Would it be consistent with

Page 159

the information you see in these three records that ██████ and ███████ are a married couple and have a daughter named ██████

A. There is nothing in the information I have in front of me that I -- I can draw that conclusion definitively. I can't rule it out.

Q. Okay. If we assume that that is the case, then would you agree that it is also plausible that the daughter, ████ was using her parents' credit card?

A. I certainly couldn't rule it out.

Q. But in that case, ████ would not be a unique payor, would she?

MR. BURT: Objection. Form.

A. What -- what's your definition of "payor," then?

Q. (BY MR. LAZARUS) This is an important question.

What is your definition of "payor"?

A. A -- a individual that paid for something. And I'm not aware of anything that suggests that it has to be their own credit card, just that they have to make a payment. And, therefore, they have a transact -- a record in the transaction data with their personal information on it.

Q. But would you agree that in a hypothetical in

Page 160

which a parent has a credit card and pays the credit card bills from the parents' bank account and let's a child use that credit card, but pays, again, for the bill on that credit card out of the parents' bank account, would you agree that in that situation the parent is the payor?

MR. BURT: Objection. Form and scope.

Q. (BY MR. LAZARUS) I will -- if you followed that hypothetical that I described, then you can answer. If not, I can break it down into the individual pieces.

A. I -- I followed it. I -- and I -- it is -- I think my -- the hypothetical, sure, the hypothetical is possible. It is unclear to me while -- within the data how any of those hypotheticals could be definitively determined.

Q. So your last statement was: It was unclear to me within the data how any of those hypotheticals could definitely be determined.

Why not?

A. So, based on the data available, it's equally as possible that ████ and ████ are a married couple and ██████ is the live-in nanny that uses their credit card.

Q. Did you seek to -- well, I'm trying to decide

Page 161

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

the order of the questions here.

But did you attempt to resolve uncertainties like that?

MR. BURT: Objection. Form.

A. And, again, I -- I think this goes back to the definition of "payor." And I am unaware of any document or documentation that suggests that a -- assuming your hypothetical is correct, there's -- I am unaware of any definition of -- of a class member that suggests that it's the -- the cardholder as opposed to the information available, which is an individual associated to a record that has transactions and made payments.

Q. (BY MR. LAZARUS) Do you not agree that the -- the payor is the person who -- whose money was used to pay for a transaction?

MR. BURT: Objection. Form. Foundation.

A. Again, you are -- that -- that's a class definition that I'm certain I am not the person to define.

Q. (BY MR. LAZARUS) And in -- on the question of, did you attempt to resolve any uncertainties like the ones we're discussing right now, did you ask for any additional data in order to resolve these sorts of

Page 162

uncertainties?

MR. BURT: Objection. Form.

A. You're -- you're -- I didn't have an uncertainty about this so, therefore, there would be no reason for me to request data to resolve something I did not see as an uncertainty.

Q. (BY MR. LAZARUS) Okay. And I apologize if I've missed it, but can you explain why you don't see an uncertainty as to -- let's stick with the ███ ███████ situation in DX 124, DX 125 and DX 126.

Am I correctly understanding that you are saying you do not see uncertainty in who the unique payors were among those three?

A. I do not.

Q. Okay. And can you explain why you don't see uncertainty there?

A. My understanding of the Apple payor data is that each line represents a -- a billing event associated with transactions that I did not have and -- but represented billing events or purchases.

And the -- each -- each individual that made a purchase represented a potential class member if they fulfilled all additional requirements for being -- being part of the class.

It -- I am unaware if it exists, but I am not

Page 163

privy to it, but I am unaware of anything within the class definition that suggests that a payor had to use their own credit card or -- and I don't -- I am unaware of how, on an individual basis, one could determine that regardless of the data. Because ███ could have used her -- whoever's credit card and gave him 20 bucks for it, and so she did actually pay.

So the -- I don't see how the hypotheticals in this situation could ever be resolved.

Q. Did you make an attempt to determine if two -- You know what? I'll withdraw that.

All right. Let's see.

This relates to a topic that we discussed earlier, but I have some slightly different questions.

Did you estimate a false positive rate, by which I mean the rate at which you identified two records as being the same payor even though they are not in reality?

A. Did I estimate a false positive rate?

Q. Yes.

A. I did not.

Q. Okay. And similar question, did you estimate a false negative rate?

A. Can you expound by -- provide the full definition, please?

Page 164

Q. I will.

So did you estimate a false negative rate, by which I mean the rate at which you identified two records as being different payors even though in reality they are the same payor?

A. I did not.

Q. If there are mistakes in your matching, what do you believe would be the -- what do you believe are the sources of those mistakes?

MR. BURT: Objection to form. Compound.

Q. (BY MR. LAZARUS) I'll stick with the question if you understand it.

A. I do. Repeat it for me, but I -- I believe I understand your question.

Q. If there are mistakes in your matching, what are the sources of those mistakes? And I will revise it to say, if there are mistakes in the matching that you conducted in this case, what do you believe are likely to be the sources of those mistakes?

A. I don't know how to answer that because I -- I looked for mistakes. I tried to identify mistakes and then fix mistakes. So if I had a -- a area where I thought, oh, there's mistakes, I would have attempted to identify and resolve.

It's not to say there are no mistakes as much

Page 165

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

as I can't give you an example because I attempted to identify and resolve them.

Q. So, for example, if there were mistakes in cleaning the data versus cleaning -- excuse me. Let me ask it this way.

Is it possible that there were mistakes in cleaning the data?

A. I certainly can't rule it out.

Q. Is it possible that there were mistakes in matching the data?

A. Also certainly cannot rule that out.

Q. In the review that you conducted in looking for mistakes to correct, did you see mistakes in cleaning?

A. I -- I cannot say -- I could not give examples, but it is certainly likely that I identified areas where cleansing was -- was inaccurate and I fixed or resolved the -- the issue that I identified. I have confidence that that occurred.

Q. And to make sure we're using -- we're understanding each other, is cleaning the same as cleansing? Are those two synonyms?

A. I -- I would use those -- those terms interchangeably in this situation.

Q. Okay. And in the review searching for

Page 166

mistakes, did you identify mistakes in matching as opposed to cleaning?

A. I -- I'm confident I identified issues where there -- I needed to add additional matching logic. I don't recall off the top of my head identifying situations where a match occurred where it shouldn't have, but I can't categorically say that that didn't happen also.

Q. Did you take steps to determine whether any mistakes had been made in coding the analysis?

A. I -- as previously mentioned, I had a additional person review both code and results attempting to identify errors.

Q. Does the code used in this case to clean the data contain any software tests?

A. Such as?

Q. I'll turn the question back to you.

What does "software tests" mean to you?

A. And that's why I'm asking. It's -- they're -- software tests can -- can, in theory, mean a -- a wide ranging set of things. So I'm -- I'm -- as stated, I'm not sure how to answer.

Q. Okay. I -- my understanding is that, for example, when a coder is submitting code to an open source software project, that code would typically

Page 167

contain tests to show that the code does what the author says it does.

Is that a familiar concept to you?

A. It is.

Q. Okay. Does the code that you used to clean data in this case contain software tests of that kind?

A. It does not. I've never seen those sort of tests applied in this application.

Q. Are you familiar with the concept of a gold standard validation set?

A. Theoretically, but I would love to hear the definition in this context.

Q. I don't know that I have a -- a definition.

But what's -- what's your understanding of the concept?

A. Well, a -- a gold standard from -- from what I could -- and, again, without looking at a definition, I believe that is a -- a -- sort of a perfect sample. But -- and, again, I don't know how that applies in this -- is applicable in this situation. But that's how I would understand the term here.

Q. And do you mean that you don't see how that concept is applicable in this situation because there is no gold standard validation set available?

A. Well, and I -- again, what -- what is the

Page 168

validation? Part of this is, gold standard, okay. But validation set, what does that mean? I don't -- I don't understand the -- what the -- is being referenced. That I cannot give you an example of because I do not know what it's attempting to reference.

Q. Okay.

MR. BURT: We've been going about 90 minutes, Eli.

MR. LAZARUS: Okay. Shall we take a break?

THE VIDEOGRAPHER: We are going off the record at 3:31.

(Break from 3:31 p.m. to 3:51 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 3:51. Please proceed.

MR. LAZARUS: Thank you.

Q. (BY MR. LAZARUS) I'd like to go back to your README file, which is Exhibit DX 113. And that file -- at the point that you're describing the nonstandard ASCII files, there's a statement, "I would comment and uncomment sections as needed."

Do you see that?

A. I do.

Q. Do you remember that?

Page 169

43 (Pages 166 - 169)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

Can you explain to me, and this is where not being a computer person, what "comment" and "uncomment" means?

A. Certainly.

So the -- the -- those particular files are a -- a set of executables. And I would -- and commenting is simply flagging particular sections as, don't run -- when this file is executed, don't run these -- this section. So that would be commenting it out. Or uncommenting it would be, make this particular section of code available for execution.

Q. I see.

Okay. So it's more or less turning on and off different parts of the code.

Is that a fair description?

A. I think that's a -- a fair laymen's determination of it, yes. Absolutely.

Q. Okay. And why -- why did you do that in this case in -- in those files?

A. Certainly.



And other sections I would continue to run until I cleansed to the best of my ability the -- the nonstandard ASCII and either, again, remove it or -- or translate it to something that is more logical in order to do matching on.

Q. Okay. In the situation that you just described, it sounds like commenting or uncommenting that portion of the code might affect the time that's required to -- to run code but would not affect the results of -- of running the code; is that right?

A. That is correct.

Q. Okay. Is that always the case in all of the

Page 170

Page 171

times that you commented and uncommented portions of the code in those files that you're talking about at this point in your README file?

A. For these -- these two particular files?

Q. Right.

A. Yeah, the primary driver was I wasn't getting any additional results, meaningful results. And so I commented out so that it would -- yeah, it'd speed up.

Q. Okay. Are there -- were there instances in those particular files when you commented a portion of code in a way that did affect the output?

A. I don't believe so.

Q. Okay. Do you remember which lines of code you commented or uncommented in running those files?

A. I'm sure the -- I'm sure the file is hundreds of lines long, and I certainly do not recall which or when.

Q. And the commenting and uncommenting is not recorded in a file that you produced to Apple, correct?

A. It is not.

Q. Okay. And at the bottom of the README file there's a statement, "There may be additional places that require code to be commented for a script to fully execute."

Do you remember which lines of code are

Page 172

referenced there that need to be commented or uncommented -- uncommented to make all of the scripts fully execute?

A. I -- I do not remember which -- which scripts or which line in scripts. It should be relatively obvious to an individual experienced in -- in SQL code.

Just wanted to make it clear that some analysis and -- and evaluation was required in order for certain scripts to run without -- all it really would do is, generally speaking, without kicking off the SQL statement that ran a query.

Q. Is it recorded somewhere what portions would need to be commented or uncommented in order to make all of the scripts fully execute?

A. It is not.

Q. And would -- am I correct that commenting or uncommenting some portions of the code would affect the output of the code?

A. Oh, certainly commenting out certain portions of code would change the outcome.

Q. And so as produced, without commenting or uncommenting certain portions of the code, the scripts that you provided to Apple's consultants will not replicate your final output again --

MR. BURT: Objection. Form.

Page 173

44 (Pages 170 - 173)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

Foundation.

Q. (BY MR. LAZARUS) Let me repeat that.

Am I correct that without commenting or uncommenting certain portions of code, the scripts that you provided to Apple's consultants as produced will not replicate your final output?

MR. BURT: Objection. Form. Foundation.

A. I believe that the -- that the code that I produced is substantially in the form that I ran it with, and -- and if run as is, should substantially produce the -- should produce similar outcomes.

It would -- I think the majority of things that would be commented are not items that produce a change to the data outcome as much as queries that would be used to analyze a step.

So I believe that the -- run as is, they would -- should produce similar -- very similar results.

Q. (BY MR. LAZARUS) Okay. Similar but not exactly the same?

A. I -- I certainly can't say exactly. I can't -- I can't rule out that -- that there would be some -- some level of a discrepancy.

Q. Okay. Excuse me.

Page 174

We talked earlier about paragraph 15 of your report -- excuse me -- which states that, "JND communicated to plaintiffs' counsel that it could reliably reduce duplication in the Apple data."

How do you define "reliably" in that sentence? "Reliably" or "reliability," how do you define those terms?

A. Okay. I'm sorry, I was reading the section. Can you repeat the question?

Q. I want to ask how you define "reliably" as used in that sentence or to define the noun form of it, "reliability"?

A. Okay.

So I would define that as being able to apply a set of methods that I have used extensively and have confidence in a -- a outcome based on both the methods used and the data available to apply it against.

Q. And is that the same definition of "reliably" or "reliability" that you have used in other deduplication work in the past?

A. I -- I don't know that I can say I've used the term "reliably" or "reliability" in reference to a previous deduplication. I can say that applying methods and based on the data available is the process by which I determine a confidence level in an outcome.

Page 175

Q. Okay. And that again -- that understanding of reliability is based on your years of experience in the field?

A. That is correct.

Q. All right. Sticking with your report, the paragraph 17E states that, "the top tier of the matching algorithm is the most stringent and matched on Person_ID_Hashed, first name, last name, full address, city, state and postal code."

Do you see where I'm reading that from?

A. I do.

Q. And when you say, "top tier," does that mean that this tier was run first before other matching tiers?

A. I -- yes, I believe that is correct.

Q. Okay. And why were these variables chosen for matching in this top tier?

A. I -- I tier the -- the deduplication based on a confidence level that the amount -- the data being matched is most likely to represent the -- the same individual.

And so in this situation, if exact first name, exact last name, exact full address, exact cities, exact state, exact postal code, along with the person ID that bundles people in -- within the Apple data all

Page 176

match, I have an extremely high confidence level that that should be the same person.

Q. And what is that understanding based on?

A. Experience.

Q. And, now, in this example, you did not match based on payment information. Let me -- well, let me -- let me ask about phone number.

You did not match based on phone number in this example -- in this top tier, correct?

A. I didn't.

Q. Why not?

A. I -- I can't tell you specifically my thought process at the time, other than I -- I assess matching and it -- I can only assume that I made a determination that phone number did not meaningfully change the outcomes and, therefore, I was confident as this is the top tier.

Q. And paragraph 17E also states that this tier "required minimal validation as it matched on virtually every available and relevant personal identifying data point."

What validation did you perform for this top tier?

A. Similar to all tiers. I did queries. I looked for, you know, matches that -- for, you know,

Page 177

45 (Pages 174 - 177)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

any reason I could identify, any analysis seemed anomalous, to see if I needed to adjust any -- any sort of matching logic.

But as -- as stated, when -- when you have the same full name, you have the same full address and you have the same person_id_hashed, there -- there's limited data to -- that -- that could definitively say that this is not a match. You know, things like phone number or, you know, a -- the last four digits of his credit card, people have multiple credit cards, people have multiple phone numbers. It's not a -- not a definitive that it -- it could change the outcome of that.

Q. Did you identify matches that you thought may not be true matches in that first tier?

A. I -- I don't recall specifically as -- as I analyzed. I'm sure I did analyze and evaluate.

Q. Okay. How was the validation for that first tier different from validation for other tiers?

A. Primarily, it would have been based on the types of queries run, the -- the what -- what matching or no matching to compare in -- in the records that were rolled up, and quantity of time spent performing the analysis. The -- the fewer the data points, the greater the analysis performed to try to determine

Page 178

erroneous matches.

Q. And was the validation performed by both you and the Cameron person that you mentioned before?

A. Yes.

Q. Is the validation work documented in your materials that you produced to Apple?

A. There could be validation code in -- in the scripts provided.

Q. All right. In your second example in paragraph 17E, you state that you ███████████ ██████████████████████████████████████ ████████████

Did I read that correctly?

A. That is correct.

Q. Okay. Why was the variable last name no longer included -- or why was the variable last name not included in this second -- in this second example?

A. So, in my experience, there is a -- a meaningful population of individuals where they have changed their last name, the most common being somebody getting married, that this produces a significant positive match for.

So we -- we look at these and -- and attempt to match. But -- and, again, combining that not just with address, but person ID, which is purported to be

Page 179

a -- a somewhat bundling of -- of a record, it gave me confidence that that was a logical match.

THE COURT REPORTER: Logical?

THE WITNESS: Logical match. Apologies.

MR. LAZARUS: I was just going to check the transcript and tell you, but that -- that wouldn't work.

Q. (BY MR. LAZARUS) On address, you agree that there are 50 and more than 51 different values for state in the data?

A. I haven't looked at in a long time, but that sounds right.

Q. There are -- my understanding is that there are over 200 different values.

Am I correct that you did not make adjustments to values for state that do not correspond to an actual state abbreviation?

A. I don't recall off the top of my head what I did with state.

Q. Okay. Am I correct that fractions sometimes appear in street addresses?

A. I -- I'm not disputing it. I -- I don't know the answer to that.

Q. Okay. In the Apple payor data, you don't recall whether there were fractions in street

Page 180

addresses?

A. I don't.

Q. Okay. And you don't recall how you coded or matched based on those?

A. I do not.

Q. Okay. The example that I'm thinking of is ████████████████████████, Pennsylvania.

You would agree that that could be written in various ways, in unicode with ██ ███████████ ████████

A. I don't dispute that.

Q. Okay. And it could be written other ways, like ████████.

Do you agree with that?

A. I do. It could be, I suppose.

Q. All right. Okay. Do you agree that the same street numbers and street names can appear in different cities?

A. Yes. Street -- street numbers and street names do appear in different cities.

Q. Okay. And do you agree that a ZIP Code can cover multiple cities?

A. I don't know that I -- I can't -- I can't -- I can neither confirm or deny that.

Q. Okay.

Page 181

46 (Pages 178 - 181)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

A. That would be somewhat unusual, I think. But I suppose it's possible.

Q. Okay. All right. For the address 123 West Main Street, you can imagine a number of different permutations of the spelling with West abbreviated as W and Street abbreviated as ST, right?

A. Yes.

Q. Would all combinations of those be treated as a match in your process?

A. The -- if they are -- if they are spelled out differently, and so they're West and W, may -- they would not match. However, various other processes throughout the matching or cleansing could ultimately produce a match, such as running them through the NCOA standardized as the address for an ultimate match.

Q. And is it also true that an address -- well, let me scratch that.

If you had a tier that matched on every available and relevant personal identifying data point, in other words, if records were exact duplicates on every available relevant piece of personal identifying information in the data, would any validation be required to evaluate resulting matches?

A. Every single data point available? Well, that I think in some situations did exist because

Page 182

billing ID was duplicate, in which case I was looking -- I was trying to figure out why billing ID was there multiple times.

But other than that, if every single data point for -- was the same, then I -- I'm unaware of how to dispute that those -- those two records are the same.

Q. And so that's -- am I understanding correctly that that's true if you included every data field including billing_info_id and also true if you excluded billing_info_id and ran the match -- ran -- excuse me, the tier based on all personal identifiable data points not including billing_info_id_hashed?

MR. BURT: Objection to form.

MR. LAZARUS: Yeah, that was a long question.

Q. (BY MR. LAZARUS) Let me break that down into two parts.

The first one is, do I understand correctly that if there were records that matched on every single data field including billing_info_id_hashed, you would not view any validation as required in that situation?

A. It's a hypothetical as I did not do that match. If I did, I -- I would have -- I would have -- pure -- process I would still probably run queries to

Page 183

validate that there was nothing anomalous. It's just that there's -- I'm not sure what would be identifiable to determine that something isn't since all data points are -- are the same. There's nothing that can be identified that would cause them to not be the same entity.

So out of -- out of process, I would. But, yes, it would -- it wouldn't -- it would bear no fruit.

Q. And if you had matched on every available personal identifying data point, excluding billing_info_id because it's the record identifier and not personally identifiable information, in that case, would you view any validation as necessary?

A. Same answer. I would -- I would perform validation, but I -- it would -- I do not see how it would bear fruit. But out of process I would follow my process.

Q. Next I want to ask some questions about the NCOA check that is described in paragraph 17G of your report.

You write that you, quote, "cross-checked the address information against publicly available data obtained through an NCOA (National Change of Address) search from the United States Postal Service."

Do you see where I'm reading that?

Page 184

A. I do.

Q. And we discussed earlier that this search was run through a third-party vendor, Melissa Data Solutions, correct?

A. That is correct.

Q. And you mentioned at one point earlier that you may have used a different vendor at another time.

Is that -- is that true, that you have used other -- another vendor or multiple other vendors for NCOA searches?

MR. BURT: Objection to characterization of prior testimony.

A. Over -- over -- over the many years I've done this, I, myself and my organization, have used more than one vendor to provide NCOA services.

Q. (BY MR. LAZARUS) Why change vendors for NCOA search services?

A. Melissa Data provided a better solution at a competitive price.

Q. What was the name of the Melissa Data Solutions product that you used in this case?

A. I don't know that I -- I know it is Melissa Data.

Q. Are you aware that they have different -- Melissa Data Solutions has different product offerings?

Page 185

47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

A. I do know they have multiple offerings. I believe we just use their NCOA product or their -- their solution.

Q. Does that solution that you used only run the data through the NCOA database or does it do additional work on the data?

A. The process does do -- perform some level of standardization of addresses as -- as an output.

Q. Okay. And what's your understanding of that standardization? What does it do?

A. It attempts to take the address input and standardize it to the -- basically, the postal -- the USPS form of an address, from -- from my understanding.

Q. Does it do anything else, to your understanding?

A. Standardization and looking for a change of address is -- is my understanding of its -- its function.

Q. And does -- my understanding is that you uploaded a portion of the Apple payor data to Melissa Data Solutions; is that correct?

A. That is correct.

Q. And then does Melissa Data -- did Melissa Data Solutions automatically conduct all of the standardization and NCOA checks on all of those

Page 186

uploaded records or did you need to request steps to be taken on particular records or portions of the uploaded data?

A. The process as I understand it on the Melissa Data side, as they've communicated, is we upload the -- I upload the file. Their system automatically picks it up. There is no request. There is no person interaction.

Q. Do you know whether Melissa Data Solutions offers a product that does NCOA lookup only and not the additional standardization steps that you described?

A. I -- I don't know.

Q. Okay. Did you perform any validation to confirm that the address cleaning steps being outsourced to Melissa Data Solutions were done correctly?

A. No. I'm -- I'm unclear on how that would be done, so, no.

Q. Do you know how Melissa Data Solutions matches addresses?

MR. BURT: Objection to form. Foundation.

Q. (BY MR. LAZARUS) Well, let me back up. Does Melissa Data Solutions match addresses?

A. I'm -- I am unaware of Melissa Data's internal

Page 187

processes for -- for how they connect a uploaded record to a record so they could produce a -- a NCOA output. Everything I -- everything I would say with regard to that would be speculation of a third party's internal workings.

Q. So am I correct that you're not aware whether they use exact matching or what we were referring to earlier as fuzzy matching?

A. I'm -- yeah, I am not aware of their -- their internal processes.

Q. Okay. How many name and address combinations did you cross-check against the NCOA data through Melissa Data Solutions?

A. 290 million. I'm -- I'm trying to pull from my memory, but I -- I couldn't -- couldn't swear to an exact number.

Q. Okay. Why does 290 million come to mind?

A. Other than that's what comes to mind. I -- it's somewhere -- I think it's somewhere in the ballpark, but -- but I don't know exactly the number. Somewhere between -- yeah, I -- I don't know exact number. But it's -- it's about that. Somewhere in the neighborhood.

Q. And is that 290 million, is that all of the name and address combinations in the Apple payor data?

Page 188

A. That represented the subset of the total population that at that point had -- was still identified as a primary record based on all of the deduplication and cleansing that occurred up until that point.

The -- the intent of sending that small subpopulation instead of sending the entire 1.69 billion records was in complying with the protective order and protecting the data to best of our ability.

Q. For how many records did you verify a change in address using the NCOA data search?

A. I don't have that number in -- on top of my head.

Q. Okay. Is that number available in the materials that you've made available to Apple?

A. It is available in the data I made available.

Q. Okay. And once you got any change of address associated with a name, did you then add the new address information back to your computer at JND and merge it onto the Apple payor data?

A. You're going to have to say that one more time for me.

Q. Let me -- I'll break it up into two. Once you got any change of address associated

Page 189

48 (Pages 186 - 189)

with a name, did you then add the new address information back to your computer at JND?

A. Got it.

We -- I -- I took the results of the NCOA process and I uploaded back to the air-gapped PC, that is correct.

Q. And you merged it onto the Apple payor dataset that you had on that computer?

A. That is correct.

Q. Did you record anywhere the full list of names checked against the NCOA data?

A. There is -- are -- there is a table within the data provided made available to Apple that contains a list of records that I uploaded to -- or that I -- yeah, that I downloaded and then uploaded for the NCOA process.

Q. Okay. And do I understand correctly that that table shows the results from the NCOA data search for each name checked?

A. I do not recall if the results are in a table. They are, however, in text files that were provided and made available to Apple's consultants. So the -- all of the data is there in some form. It may -- they may not be in tables simply because they take up a lot of space in the database.

Page 190

Q. Okay. And when you say that the NCOA search results data are in the materials provided to Apple in some form, does that include if there was no change to the address?

A. It would have in the -- in the data it would have the information -- I'm speaking from memory, but I'm pretty certain that the result file had the data uploaded for processing, as well as the output of the process.

Q. In your opinion, did checking against the NCOA data resolve most of the address changes in the data?

MR. BURT: Objection to form.

A. Did it resolve -- I'm -- I don't believe I understand the question with regards to "Did it resolve most of the changes to the address -- addresses." Can you -- can you clarify what you mean by that?

Q. (BY MR. LAZARUS) I will try.

So the NCOA data is intended to identify individuals who have changed their address; is that correct?

A. That is correct.

Q. And so within the Apple payor data there are records representing some number of individuals who have changed addresses, correct?

Page 191

A. Almost certainly, yes.

Q. And is it your opinion that most of those people represented in the Apple payor data who had changed their address were identified through the NCOA search?

A. I -- I can't -- I don't believe I could classify it as "most." I can say the -- the NCOA look-back period is four years. So if an individual moved within the last four years, then the process is likely to have been successful in identifying and updating that address.

Q. All right. What is the file Apple_final_deduplication_ouput? And in the file name the last part is spelled O-U-P-U-T, but I imagine, is that a typo that it should have an extra T so it should be "output"?

A. Seems reasonable, yes.

Q. So to read it that way, what is the file named Apple_final_deduplication_output?

A. I think that that is the piece of code that spools out the -- essentially, the -- the three columns mentioned earlier. Again, I'm working from memory and I don't have the code in front of me. But I believe that is the code that spools out a -- the billing_info_id, the primary_billing_info_id, and the

Page 192

JND sequence number.

THE COURT REPORTER: Was it JD?

A. JND sequence number.

MR. LAZARUS: And is that a file that we have a printout of?

Q. (BY MR. LAZARUS) Your report references that you reduced duplication down to approximately 246 million payors, correct?

A. That is correct.

Q. The number that we see in Apple_final_deduplication_output is 243,646,638.

Do you know why that is different from approximately 246 million?

A. Not off the top of my head.

Q. Okay. Don't hold me to it, but I think we're winding down.

All right. Apple's consultants visited your office at JND in Seattle on May 5 to 6, 2025, correct?

A. I'll take your word for it. I won't dispute that.

Q. And they were given access to inspect files on an air-gapped computer at JND, correct?

A. That sounds correct.

Q. And let's see.

After that, you brought a hard drive

Page 193

49 (Pages 190 - 193)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

containing computer files to the office of Apple's consultants in San Francisco, correct?

A. That is correct.

Q. And is it okay if I refer to those files on the hard drive that you brought to San Francisco as your backup files?

A. I -- I have no issue with you referring to them that way.

Q. Okay. And you -- you delivered that hard drive with your backup files to San Francisco initially on May 21st, 2025, correct?

A. I'll take your word for it. I don't --

Q. Okay.

A. -- I don't have a phone or a calendar in front of me, but, sure.

Q. Right.

Did you make any modifications to your backup files after Apple's consultants were given access to JND's computer on May 5 to 6, 2025 and before you transported your backup files to the office of Apple's consultants on May 21, 2025?

A. Not that I recall, no.

Q. In the final Apple -- the file Apple_final_deduplication_output, you referenced there were three fields generated by that code; is that -- is

Page 194

that correct?

A. If it does what I recall it doing, I think the better way -- it -- it spools them out to -- to flat files.

Q. Okay.

A. I think.

Q. Thank you.

So in the final output, those three fields that you produced were billing_info_id_hashed, second field primary_billing_info_id_hashed and JND_assigned_ID, correct?

A. That is correct.

Q. And can you explain what that additional field JND_assigned_id was?

A. Certainly.

So I added a numeric sequence to every record I received from Apple as a external or internal identifier, however you want to phrase it, but a JND specific identifier that had no -- contained no meaning other than it's a numeric.

And the purpose of providing it back to Apple -- or to -- in that file was, as I mentioned previously, billing_info_id was not unique in the file I received. And, therefore, the only way to provide clarity that I wasn't providing duplicate billing info

Page 195

records back, I needed to show they existed multiple times in the data I received.

Q. All right.

MR. LAZARUS: I'll ask that we mark for identification a letter here and this will be Exhibit DX 127.

(Deposition Exhibit DX 127 was marked.)

Q. (BY MR. LAZARUS) And the letter is dated January 15, 2025, and it is from plaintiffs' counsel to myself.

I apologize, I may be looking at the wrong document.

MR. LAZARUS: Could we go off the record for a moment?

THE WITNESS: I'd love the use the restroom if we take five.

THE VIDEOGRAPHER: We are going off the record at 4:48.

(Break from 4:48 p.m. to 4:52 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 4:52. Please proceed.

MR. LAZARUS: Thank you.

Q. (BY MR. LAZARUS) As I was just saying, the document that we have marked as Exhibit 127 is, in fact, the document that I intended to mark as Exhibit

Page 196

DX 127. So I'll proceed to ask a couple of questions about it.

On the first page here, at the bottom of the paragraph that starts with the word "First," the last sentence refers to a solution that plaintiffs and their claims administrator have created.

And I'll give you a moment to look at the paragraph, but claims administrator there refers to JND, correct?

A. Well, I -- I did not author the letter. I think -- I assume claims administrator means JND.

Q. Understood.

A. But, yeah, I need a minute to read the whole paragraph, please.

Q. Okay. Go ahead.

A. Okay.

Q. All right. And understanding that you did not write the letter, do you understand the reference to claims administrator here to be a reference to JND?

A. That's what I would understand it to be.

Q. Okay. And on the second page in the paragraph beginning "Second," do you see -- I'll read -- this is in the middle of the paragraph, there's a sentence that says, "Specifically, with a double-hashed billing info id field, plaintiffs would have to provide their

Page 197

50 (Pages 194 - 197)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

damages calculations back to Apple to remove a layer of hashing from the double-hashed billing info ID field before JND could begin administering damages to class members."

Do you see that?

A. Okay.

Q. Before -- earlier in the deposition we discussed the possibility that JND would serve a role in claims administration in this case.

Does this -- reading this sentence change your recollection at all about whether JND is expected to have a role in claims administration in this case?

MR. BURT: Objection to form.

A. I don't know that it changes my -- my position on that. It -- I -- as sort of discussed previously, JND's not been hired to be the claims administrator for this, as there's nothing to be the administrator of at this time.

Q. (BY MR. LAZARUS) Okay. Was one of the purposes of the JND_assigned_id field to assist with claims administration in the event that JND was assisting with claims administration?

A. That is not why I assigned it. I assigned it so that it was clear that I was returning a record for every record provided to me.

Page 198

MR. LAZARUS: Let's see. Can we get Tab 9, please? This will be marked as DX 128.

(Deposition Exhibit DX 128 was marked.)

Q. (BY MR. LAZARUS) And this is a document titled "Declaration of Darryl Thompson" dated March 7, 2025.

This is a declaration from you; is that correct?

A. It looks to be, yes.

Q. Okay. And this is your electronic signature on page 8, correct?

A. It is.

Q. Okay. Did you author this declaration?

MR. BURT: Objection to form.

MR. LAZARUS: Withdrawn.

Q. (BY MR. LAZARUS) Did you write this declaration?

A. I -- I wrote the majority of it. Some of it was taken from previous declarations, but I was the primary author.

Q. Okay. When you say "previous declarations," what declarations are you referring to?

A. I couldn't point to -- I don't recall. But things like my bio information as an example would have -- would have come from -- likely come from

Page 199

previous -- a previous declaration. No reason to rewrite it.

Q. And the previous declarations from which material was drawn for this declaration, were those previous declarations all declarations from you or from other people?

A. Certainly that piece would have been from a declaration where I was the signatory.

Q. Right. Any other -- any -- any declarations from other people that you drew from in writing this declaration?

A. It is -- I think it's likely that I -- there may be some information out of the Blue Cross Blue Shield declaration Exhibit 114 that may have contributed to some information in here with regards to Blue Cross Blue Shield. But other than that, I can't think of where -- any others.

Q. Understood.

And did -- did counsel write any portions of this declaration?

A. I -- counsel reviewed and provided markups that I would review and determine if they were accurate and accept or reject, depending on accuracy.

Q. Okay. And you decided what language was ultimately included in the declaration?

Page 200

A. I did.

Q. Okay. Does this declaration reflect the same analysis as the report that we've been discussing today?

A. I believe so, yes.

Q. Why did you decide to title this a declaration instead of an expert report?

A. I believe at the time of its -- that it was delivered, it was not being delivered as an expert report, but a -- a declaration.

Q. And the footers on pages 1 and 3 through 8 do refer to "Expert Report of Darryl Thompson."

Why didn't you change them to say "declaration"?

MR. BURT: Objection. Form.

A. I do not -- I don't know why it is stated that way. An error.

Q. (BY MR. LAZARUS) Are you aware that plaintiffs' counsel were obligated to disclose their expert witnesses to Apple on March 7, 2025?

MR. BURT: Objection. Calls for a legal conclusion.

A. Restate -- can you repeat?

Q. (BY MR. LAZARUS) Just if you're aware.

Are you aware that plaintiffs' counsel was

Page 201

51 (Pages 198 - 201)

**SER**-53

obligated to disclose their expert witnesses to Apple on March 7, 2025?

A. I was not.

Q. Okay. Are you aware that Apple requested access to inspect your code at JND's office in Seattle on May 1 and 2, 2025?

A. I -- I don't know if I'm -- if I was included in -- in that information, but I may have.

Q. Okay. Do you -- do you know where you were on May 1 and 2, 2025?

A. No.

Q. All right. Do you think it is likely that some number of payors in the Apple payor data have provided fictitious contact information in order to protect their own privacy?

MR. BURT: Objection. Form.

A. I -- I don't know how I would be able to speculate on that with any accuracy at all.

Q. (BY MR. LAZARUS) Do you think it's likely that some number of payors in the Apple payor data have engaged in fraud?

MR. BURT: Same objection.

A. I'm -- I also would have no way to speculate with any accuracy on that question.

Q. (BY MR. LAZARUS) Okay. And I'll ask a

Page 202

follow-up question to that.

Do you think it is likely that some number of payors represented in the Apple payor data have entered fictitious contact information as part of committing fraud?

MR. BURT: Objection to form. Foundation.

A. And, again, I don't -- I don't know how -- how I could possibly accurately speculate on -- on that situation.

Q. (BY MR. LAZARUS) Okay. Do you think it is likely that some number of payor records in the Apple payor data were set up by bots and not directly by human operators?

MR. BURT: Objection. Form. Foundation.

A. Similarly, I -- it is -- without deeper access to Apple's systems I would have no way to assess that accurately.

Q. (BY MR. LAZARUS) And when I say, "bots," do you understand I mean computer programs designed to perform automated tasks?

A. I -- I take bots as a term of art in my -- in my industry.

Q. And am I correct that you did not request any

Page 203

additional data in order to identify payor records that might have been created by bots?

MR. BURT: Objection. Form. Foundation.

A. I -- sorry, but -- but based on what it took to get the data I got, I don't see how that was a conceivable thing.

Q. (BY MR. LAZARUS) And not a conceivable thing --

A. To receive additional data from Apple.

Q. And so you did not request any --

A. I requested --

MR. BURT: Object to form. Foundation.

A. I requested no additional data from Apple.

Q. (BY MR. LAZARUS) Do you agree that fraudulent activity, whether by a human operator or by a bot, is more likely to be found where the payor spends money through multiple accounts rather than just one?

MR. BURT: Objection. Form. Foundation.

A. Please -- please restate your question.

Q. (BY MR. LAZARUS) Do you agree that fraudulent activity, whether by a human operator or by a bot, is more likely to be found where the payor spends money through multiple accounts rather than just one account?

Page 204

A. Not my -- not my field of expertise. So I -- I can't speak to fraudulent purchasing.

Q. Okay. Just to ask one follow-up there.

Do you suspect that it is true that fraudsters would tend to set up one account and run all of their frauds out of that one account or set up many accounts?

MR. BURT: Objection. Form. Foundation.

A. Again, I -- other than speculation, I have no -- I have no experience with fraud -- fraudulent purchasing accounts. So I have no -- I have no way to give you a -- a answer that I can have confidence in.

MR. LAZARUS: Okay. So -- okay. Well, I think -- why don't we go off the record and take a break and then come back and we'll see if we have anything else.

THE VIDEOGRAPHER: We are going off the record at 5:11.

(Break from 5:11 p.m. to 5:24 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 5:24. Please proceed.

MR. LAZARUS: Thank you.

Q. (BY MR. LAZARUS) Mr. Thompson, you mentioned that in your review and validation of the data that both you and the person, Cameron, who I apologize, the

Page 205

52 (Pages 202 - 205)

**SER-54**



last name is --

A. Karlin.

Q. Karlin.

You mentioned that both you and Karlin -- I'm sorry, I'll start over.

You mentioned that both you and Cameron Karlin conducted review and validation of your deduplication results; is that right?

A. That is correct.

Q. And did you and Cameron have any disagreements over any particular finding in that review?

MR. BURT: I'm going to object. And I think that's a discussion within an expert shop and I --

MR. LAZARUS: You're right. You're right. Withdrawn.

Q. (BY MR. LAZARUS) All right. Let me ask this.

Page 206

MR. BURT: Object to form.

Go ahead.

Page 207

MR. BURT: Objection. Form. Foundation.

Page 208

Q. (BY MR. LAZARUS) All right. And then one other point. So I asked earlier where you were on May 1 and 2, and you said you don't have a calendar in front of you.

Do you have your phone with you that -- would you be able to look at your calendar and refresh your memory as to where you --

A. My phone is not on me right this second, no.

Q. All right. We will let that go.

MR. LAZARUS: Okay. Those are all the questions I have. Thank you.

MR. BURT: I think I don't need to take a break to ask what I need to ask. And this will not take very long. Thank you for your patience, Mr. Thompson.

EXAMINATION

BY MR. BURT:

Q. You know who I am, but just so the record's clear, Thomas Burt from Wolf Haldenstein. You know me.

Is this the first engagement you've worked on deduplication for where there were user-generated data

Page 209

53 (Pages 206 - 209)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

fields that were some measure of populated with inaccurate, noninformative or nonstandard entries?

MR. LAZARUS: Object to form.

A. This is not the first engagement that I've had to deal with similar data, no.

Q. (BY MR. BURT) In the past, has that happened once or more than once?

A. It has happened more than once.

Q. So early this morning, Mr. Lazarus asked you about your hands-on involvement in the list of engagements that is attached as Appendix B to your report.

Do you generally remember discussing that subject?

A. I do.

Q. And taking not just -- withdrawn. Let me ask you first.

What period's covered by that list?

A. I believe the list is the last four years.

Q. Okay. Taking not just that period, but your entire experience at Garden City and at JND together, can you quantify for me how often you've been the supervisor of the folks doing hand -- hands on deduplication work?

A. Over the entire period, probably well over

Page 210

50 percent of the time. Possibly 60 to 70 percent of the time.

Q. Have you ever taught other people how to do deduplication?

A. I have.

Q. Are the people that you've taught how to do deduplication people who worked on assignments that you've supervised?

A. They were.

Q. And have you ever taught anyone to teach other people the skill set of deduplicating?

A. People that I have taught have become managers that then taught others, yes.

Q. Okay. Are there any of the engagements that are listed in your Exhibit B to your report engagements where the people doing the hands-on deduplication were taught to do it by the people that you taught how to teach it?

A. Most certainly, yes.

MR. BURT: Unless Mr. Lazarus has more questions, I do not.

MR. LAZARUS: I do not either.

MR. BURT: We're off the record.

THE VIDEOGRAPHER: Before we conclude, can we please get orders on the record?

Page 211

MR. LAZARUS: What does that mean?

THE VIDEOGRAPHER: Transcript order -- transcript orders and video orders.

MR. LAZARUS: So we would like the rough transcript as soon as it can be delivered today. And the -- an expedited transcript tomorrow, if that's -- and then in terms of video --

THE VIDEOGRAPHER: Copy or sync?

MR. LAZARUS: I think we want a copy. Is that what we have done for other depositions?

THE VIDEOGRAPHER: Yeah, I don't know what your standing order is -- or if there is a standing order, what it is.

MR. LAZARUS: Do you know, Ramona?

MS. LIN: No idea. It's a standing order.

THE VIDEOGRAPHER: Okay. I will have them check. All right.

MR. LAZARUS: Okay. Thank you.

MR. BURT: Rough and regular on the transcript. Video, we'll circle back.

THE VIDEOGRAPHER: Okay. All right. Thank you, everyone.

This concludes today's testimony of Darryl Thompson. The total number of media units used

Page 212

was five and will be retained by Veritext. We're going off the record at 5:35.

(Deposition concluded at 5:35 p.m.)

(Signature was reserved.)

Page 213

54 (Pages 210 - 213)

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**SER-56**

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

REPORTER'S CERTIFICATE

I, CARLA R. WALLAT, CCR, CSR, RPR, CRR, the undersigned Certified Court Reporter, authorized to administer oaths and affirmations in and for the states of Washington (2578), Oregon (16-0443), and California (14423) do hereby certify:

That the sworn testimony and/or proceedings, a transcript of which is attached, was given before me at the time and place stated therein; that any and/or all witness(es) were duly sworn to testify to the truth; that the sworn testimony and/or proceedings were by me stenographically recorded and transcribed under my supervision. That the foregoing transcript contains a full, true, and accurate record of all the sworn testimony and/or proceedings given and occurring at the time and place stated in the transcript; that a review of which was requested; that I am in no way related to any party to the matter, nor to any counsel, nor do I have any financial interest in the event of the cause.

WITNESS MY HAND AND DIGITAL SIGNATURE this 6th day of June, 2025.

*Carla R. Wallat*

CARLA R. WALLAT, RPR, CRR

Washington CCR #2578, Expires 1/5/2026

Oregon CSR #16-0443, Expires 9/30/2027

California CSR #14423, Expires 1/31/2026

Page 214

---

THOMAS H. BURT

burt@whafh.com

June 6, 2025

RE: In Re Apple Iphone Antitrust Litigation

6/5/2025, Darryl Thompson, (#7376385).

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure. Contact Veritext when the sealed original is required.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the time of the deposition.

Page 215

---

xx Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 216

---

I declare under penalty of perjury under the laws that the foregoing is true and correct.

Executed on _____ , 20___,

at _____, _____.

_____

Darryl Thompson

Page 217

55 (Pages 214 - 217)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

In Re Apple Iphone Antitrust Litigation

Darryl Thompson (#7376385)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

(Darryl Thompson)          Date

Page 218

56 (Page 218)

SER-58

# EXHIBIT 88

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

IN RE APPLE IPHONE

ANTITUST LITIGATION,          Case No. 4:11-cv-06714

                                          YGR

_____

VIDEO DEPOSITION OF DANIEL L. McFADDEN, Ph.D.

San Francisco, California

Wednesday, May 14, 2025

STENOGRAPHICALLY REPORTED BY:

REBECCA L. ROMANO, RPR, CSR, CCR

California CSR No. 12546

Nevada CCR No. 827

Oregon CSR No. 20-0466

Washington CCR No. 3491

JOB NO. 7370734

PAGES 1 - 256

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

IN RE APPLE IPHONE

ANTITUST LITIGATION,    Case No. 4:11-cv-06714
YGR

_____

DEPOSITION OF DANIEL L. McFADDEN, Ph.D., taken on behalf of the Defendant, at Gibson Dunn & Crutcher, LLP, One Embarcadero Center, Suite 2600, San Francisco, California, commencing at 9:06 a.m., Wednesday, May 14, 2025, before REBECCA L. ROMANO, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Court Reporter.

Page 2

APPEARANCES OF COUNSEL

For the Consumer Plaintiffs:

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

BY:  MARK C. RIFKIN

Attorney at Law

270 Madison Avenue

New York, New York 10016

(212) 545-4600

rifkin@whafh.com

For the Defendant:

GIBSON, DUNN & CRUTCHER LLP

BY:  DANIEL G. SWANSON

Attorney at Law

333 South Grand Avenue

Los Angeles, California 90071-3197

(213) 229-7430

dswanson@gibsondunn.com

/////

Page 3

APPEARANCES OF COUNSEL(cont'd)

For the Defendant:

GIBSON, DUNN & CRUTCHER LLP

BY:  HARRY R. S. PHILLIPS

Attorney at Law

1050 Connecticut Avenue, N.W.

Washington, DC 20036-5306

(202) 887-3706

hphillips2@gibsondunn.com

ALSO PRESENT:

Conor Foley, Cornerstone Research(via Web conference)

David Grothouse, Senior Litigation Counsel at Apple

Shawna Hynes, Videographer

Miguel Matamoros, Brattle Group

E. Charlie Nusbaum, Brattle Group

/////

Page 4

I N D E X

DEPONENT                         EXAMINATION

DANIEL L. MCFADDEN, PH.D.                    PAGE

BY MR. SWANSON                           10

BY MR. RIFKIN                        248

E X H I B I T S

NUMBER                          PAGE
         DESCRIPTION

Exhibit DX61   Expert Report of Daniel L.      10
         McFadden, Ph.D. dated March 7,
         2025;

Exhibit DX62   Stipulation and Proposed Order   96
         for Leave to File Third Amended
         Consolidated Class Action
         Complaint;

Exhibit DX63   Paper - Choice  What Can Go     120
         Wrong?;

/////

Page 5

2 (Pages 2 - 5)

EXHIBITS(cont'd)

NUMBER                    PAGE
DESCRIPTION
Exhibit DX64   Draft Paper - The Economic      177
Impact of a Market
Intermediary's Sales
Commission;

Exhibit DX65   Amicus Brief dated April 7,      232
2025;

PREVIOUSLY MARKED EXHIBITS
NUMBER                    PAGE
Exhibit DX37                    36

COURT REPORTER'S NOTE:  All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily indicate an exact quote from the document.

/////

Page 6

---

San Francisco, California;
Wednesday, May 14, 2025
9:06 a.m.
---o0o---

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 9:06 a.m. on May 14th, 2025.

Please note the microphones are sensitive and may pick up whispering and private conversations.  Please mute your phones at this time.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit 1 of the video-recorded deposition of Professor Daniel McFadden taken by counsel for defendant in the matter of In Re: Apple iPhone Antitrust Litigation, filed in the United States District Court, Northern District of California Oakland Division, Case No. 411-CV-06714YGR.

The location of this deposition is One Embarcadero Center, Suite 2600, San Francisco, California 94111.

My name is Shawna Hynes, representing Veritext Legal Solutions, and I am the

Page 7

---

videographer.  I am not related to any party in this action nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present, including remotely, will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. SWANSON:  Dan Swanson for Apple Inc.

MR. RIFKIN:  Mark Rifkin for the plaintiffs.

MR. PHILLIPS:  Harry Phillips for Apple.

MR. GROTHOUSE:  David Grothouse for Apple.

MR. NUSBAUM:  Charlie Nusbaum with Brattle Group.

Mr. MATAMOROS:  Miguel Matamoros with Brattle Group.

THE VIDEOGRAPHER:  Thank you.

Will the court reporter please introduce yourself and administer the oath to the witness, and then counsel may proceed.

THE COURT REPORTER:  My name is Rebecca

Page 8

---

Romano.  I'm a California certified court reporter, license 12546.  I will be producing a transcript that is automatically admissible in court.

If you could raise your right hand for me, please.

THE DEPONENT:  (Complies.)

THE COURT REPORTER:  You do solemnly state, under penalty of perjury, that the testimony you are about to give in this deposition shall be the truth, the whole truth and nothing but the truth?

THE DEPONENT:  I do.

/////

Page 9

3 (Pages 6 - 9)

DANIEL MCFADDEN, 09:08:04 having been administered an oath, was examined and testified as follows:

EXAMINATION

BY MR. SWANSON: 09:08:04

Q. Good morning, Professor McFadden.

A. Good morning.

Q. For the record, would you state your full name?

A. Daniel McFadden. 09:08:34

Q. Okay. Now, we have premarked our first exhibit today --

(Exhibit DX 61 was marked for identification by the Court Reporter and is attached hereto.) 09:08:41

Q. (By Mr. Swanson) -- which bears the number DX61. I think there's a copy that is within arm's length there.

That is, as I understand it, your most recent expert report. 09:08:57

Could you confirm that for us?

A. Yes.

Q. And did you draft that report yourself?

A. I -- I prepared this in the same way that I have previous reports, which is I drafted it, but 09:09:12

*Page 10*

I have supporting staff as well. 09:09:16

Q. And you therefore had assistance from some of the folks who worked at Brattle; is that correct?

A. That's correct. 09:09:30

Q. And who at Brattle would that be?

A. That would be the two gentlemen at the table here, Mr. Nusbaum and Mr. Matamoros.

Q. Would that include Dr. Song?

A. No. I think at the point I was asked to 09:09:51 write this, there was a separation, which he went his way and I went mine.

Q. Do you know if Dr. Song saw a draft of your report?

A. I don't know directly, but my 09:10:09 understanding is that it would have been shared by the -- the staff.

Q. Are there any opinions that you intend to offer at trial that are not disclosed in your March 7 report? 09:10:26

A. As of now, my understanding is that this is what I would be asked opinion about in court.

Q. Could you turn to page 4 of your report. I wanted to ask you a question about paragraph 11 at the top. 09:10:45

*Page 11*

You state there, unless otherwise noted, 09:10:55 you reaffirm your opinions from your 2023 supplemental report and your other reports during the class certification stage.

Do you see that? 09:11:04

A. Yes.

Q. When you're referring to your other reports during the class certification stage, is that all -- all of them?

A. I would say yes. I view -- in order 09:11:18 for -- to answer that in -- in -- with precision, I would need to know the specific opinion and whether there was clarifications and along the line. But the answer is generically yes.

Q. Okay. Are there any specific past 09:11:37 opinions that you can recall that you're not reaffirming?

A. No, I don't recall -- I don't -- I don't have any opinions now which were different from what I had then. 09:11:59

Q. Are you reaffirming your opinion on relevant market definition as set forth in your opening report?

MR. RIFKIN: Objection to form.

THE DEPONENT: I would say that -- one 09:12:15

*Page 12*

question is -- is whether I am now offering 09:12:18 opinions on some of the issues that I addressed before, and that was one area where -- where I am not offering an opinion in this report.

Q. (By Mr. Swanson) When you say it's an 09:12:36 area when you are not offering an opinion, are you indicating that you don't expect to be offering the opinion you previously rendered?

A. My understanding is that that subject is 09:12:52 now the responsibility of Professor Stiglitz, and I defer to him on those issues.

Q. All right. We'll come back to that.

Is it still your opinion that absent the alleged misconduct, all or nearly all consumers of iOS apps or in-app content would have paid lower 09:13:12 prices for their purchases?

A. As you stated. I -- I believe that was a general opinion in my previous work and I -- I stand by those opinions.

Q. Could you turn to paragraph 20 of your 09:13:43 report, please.

At the very bottom, I think it's the -- the last sentence that carries over from page 6 to page 7, you say there that you also testified why the tax incidence framework shows that 09:14:01

*Page 13*

4 (Pages 10 - 13)

super-competitive commissions charged by Apple impacts all members of the class.

Do you see that?

A. Yes, I see that.

Q. By "all," do you mean 100 percent?

A. Yes, I -- I believe 100 percent of the people are impacted that are not necessarily encountered overcharge arm, but they -- they are impacted.

Q. How is a consumer impacted by Apple's super-competitive commission if she would have paid more in the but-for world, according to your model?

A. Well, as I opined in my original report in 2021, and I think Professor Stiglitz has also opined, there can be harm to the consumers separate from the issue of whether they incurred monetary damages from an overcharge, so...

Q. Well, monetary damage is all about the impact of the super-competitive commission, right?

MR. RIFKIN: Objection to form.

THE DEPONENT: Please repeat the question.

Q. (By Mr. Swanson) Monetary damage is all about the impact of the alleged super-competitive commission, right?

Page 14

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, this -- this -- this sentence I don't think is restricted to monetary damage. Impact could be both monetary damages and nonmonetary arm.

Q. (By Mr. Swanson) I understand you have an opinion or Professor Stiglitz has an opinion that there may be other nonmonetary injuries, but this sentence is about the super-competitive commission, and that's a monetary issue, is it not?

A. Not necessarily, no. The super-competitive commission have impacts beyond the -- the direct monetary effect on the -- on the -- on the charge paid on current purchases.

Q. And what would those nonmonetary effects be of the commission -- be from the commission allegedly being excessive?

A. Well, as I -- as I cited in my original report, there could be a suppressing effect on -- on entry into the developer marker so that fewer apps were available. The -- the -- they could have a negative impact on innovation by developers.

These things are also enumerated by Dr. Stiglitz, and this is an area that I -- that I defer to him on in terms of the current litigation.

Page 15

(Discussion off the stenographic record.)

Q. (By Mr. Swanson) If a consumer would have paid more in the but-for world, according to your model, is that consumer benefited monetarily by the conduct in the super-competitive commission?

A. Please start over. I didn't get the whole sentence.

Q. If a consumer would have paid more in the but-for world, according to your model, is that consumer monetarily benefited by the super-competitive commission?

MR. RIFKIN: Object to form.

THE DEPONENT: In terms of the overcharge, the answer is that -- that person is now -- has a negative overcharge. That's correct.

Q. (By Mr. Swanson) And a negative overcharge is good to consumers, is it not?

MR. RIFKIN: Object to form.

THE DEPONENT: This gets to the question of what's good for consumers. If you say have -- have they benefited monetarily in terms of the overcharge, the answer is yes.

Have they benefited overall? That's a broader question, and I'm not offering an opinion on that. And as I say, Professor Stiglitz has

Page 16

opined on it, and I defer to his opinions on that.

Q. (By Mr. Swanson) When you speak of the class in your March 7 report, which class definition are you using?

A. In my original work, the class was defined as all consumers who bought iOS apps in the aftermarket. That was subsequently not changed, but an alternative was offered of a $10 cutoff, which was defined in terms of Apple ID expenditures.

So in my original class certification stage reports, both of those cases were -- were considered, and that was the class considered at that time.

The -- the damage model and -- and design is flexible with respect to the definition of the class because that simply determines what -- what accounts payors are considered and what transactions by them are considered, and that's adjustable in the implementation of the model.

Q. Are statements about the original class definition in your prior reports still valid when applied to the current class definition?

MR. RIFKIN: Objection to form.

THE DEPONENT: My understanding is that

Page 17

5 (Pages 14 - 17)

there are at least proposed modifications to the 09:20:38 class definition, and that's not something that I have considered.

Q. (By Mr. Swanson) I did want to ask you that, but my question was a little bit different. 09:20:54 It is: When you in your prior reports made a statement or offered an opinion about the class as it was defined then, do those statements and opinions still apply in your current reports?

MR. RIFKIN: Objection to form. 09:21:12

THE DEPONENT: I would say they do apply in my current report because my current report is essentially a description of the damage analysis and framework that I had established through 19 -- 1923 [sic]. 09:21:31

Q. (By Mr. Swanson) Professor, how many hours have you spent on the case since your last deposition, which was in February of 2023?

A. I haven't added up current hours, but it's in the ballpark of one month. 09:21:48

Q. And do you have a sense of how many hours you've spent working on the case since you retired from Brattle in December of 2023?

A. That one month is -- is basically the -- the time spent on this report, and -- and I had 09:22:05

Page 18

no -- no work between my retirement and the 09:22:11 preparation of this report.

Q. What was your assignment in connection with your March 7 report?

A. It's probably -- the best way to describe 09:22:44 is tell you what I was asked to do. Go to paragraph -- no, I'm sorry.

Q. Paragraph 3? Does that help?

A. Yes, paragraph 3. So I was asked to explain for the merits litigation the -- the 09:23:15 architecture of the damage analysis and -- and how it is designed and how it was designed to work.

Q. That description in paragraph 3, is that the full extent of your assignment for your trial testimony? 09:23:38

A. Yeah, for -- for -- for potential future trial testimony in the merits case? Is that what you're referring to?

Q. Well, as -- as you sit there expecting to deliver opinions that are in your report at trial, 09:23:52 does that paragraph 3 essentially describe the full scope of -- of your testimony?

A. I -- I would say that's certainly what I was asked to do. I -- I -- I have no -- no instructions at this point to mutually explain 09:24:13

Page 19

that. 09:24:15

Q. If you move to paragraph 4 on that same page, you state that you were invited to work on this project by David Sunding, Ph.D., formerly president of The Brattle Group and now 09:24:32 vice chairman of Berkeley Research Group, LLC.

Do you see that?

A. Yes.

Q. Are you still in contact with Dr. Sunding in connection with this case? 09:24:42

A. No.

Q. Do you have affiliation with the Berkeley Research Group?

A. No.

Q. What was Dr. Sunding's role in your work 09:24:51 in this case aside from -- from being invited, as you described here?

A. He was a participant in the group discussions with me and -- and staff as to how to approach damage calculations in this litigation, 09:25:11 and -- and I'm understanding from staff he was kept informed, although he did not remain in active day-to-day participation in the work.

Q. Did you -- you say in your report that you kept him informed of the theoretical work that 09:25:38

Page 20

you performed. 09:25:42

Did you keep him involved and informed with respect to the empirical work as well?

A. I did not personally, no.

Q. Did you rely on any feedback from 09:25:55 Dr. Sunding about your work?

A. I don't know if you'd call it feedback, but there certainly was a work discussion among -- among Ph.D. economists about the nature of the economic model, what the market was here in -- and 09:26:13 how to go about modeling prices, price changes.

Q. These were oral discussions with Dr. Sunding?

A. Yes.

Q. In paragraph 4 of your report, you also 09:26:34 indicate that, during the class certification stage, you directed and worked closely with Minjae Song, Ph.D., another principal of The Brattle Group, in the creation, testing and implementation of your damages model. 09:26:50

Which of you was primarily responsible for the creation of the model?

A. I would say that if you describe building this damage analysis like you're building a house, I was the architect for the plan and he was the 09:27:11

Page 21

6 (Pages 18 - 21)

contractor who actually -- actually put the 09:27:14 structure in place.

Q. Who was the inspector who did the testing?

A. Well, I would say -- say that -- that the 09:27:24 judge was the planning department.

MR. SWANSON: I don't know what our role was.

Q. (By Mr. Swanson) And -- and then Dr. Song, as the contractor, would have been the 09:27:40 implementer?

A. Well, I would say that that work was done under my direct supervision, so I was involved on a regular basis with -- with the implementation.

Q. You were a hands-on architect? 09:27:57

A. Well, I would say I was certainly a supervising architect, and so I was conferring regularly and being consulted regularly on how to proceed.

Q. Were there any errors in the 09:28:13 implementation of the model in the class certification phase?

MR. RIFKIN: Objection to form.

THE DEPONENT: There -- there were -- there were certainly some errors, which were 09:28:27

Page 22

pointed out by your defense experts and -- and 09:28:31 point -- requested -- the court required us to correct, yes.

Q. (By Mr. Swanson) And who was primarily responsible for those errors? 09:28:45

MR. RIFKIN: Objection to form.

THE DEPONENT: I would think we'd have to look at specific issues, but certainly some of the errors were computational, and I think those would have been -- coding -- coding issues raised by the 09:29:02 coders -- caused by the coders.

Q. (By Mr. Swanson) And the coders are people who work at Brattle?

A. As far as I know, that coding was all done internally, yes. 09:29:25

Q. And who was supervising the coders?

A. I would say Dr. Song.

Q. There was an implementation issue when your team created a model which relied on a fixed dollar method for calculating individual damages 09:29:44 that you essentially rejected in favor of a percentage method.

Do you recall that?

MR. RIFKIN: Object to the form.

THE DEPONENT: I do recall that. That 09:29:55

Page 23

was a -- a misunderstanding on my part because I -- 09:29:56 I failed to make the distinction between work that was done to respond to -- to your expert, Dr. Prince, and work that would be done as part of the affirmative damage analysis. 09:30:16

I was confused on that issue in your -- in my deposition, as I'm sure you recall.

Q. (By Mr. Swanson) Did Dr. Song supervise the implementation of the fixed dollar method in that episode? 09:30:34

A. I would say that -- that -- that work done for the preparation of -- of the reply was -- Dr. Prince -- was done under my supervision and I -- I was aware of it. Dr. Song was -- as I said, was the contractor. I was aware of it. I simply 09:31:01 confused -- got myself confused in response to your questions.

Q. At one point there was a computational error which dropped apps whose minimum monthly average price was not precisely the same as its 09:31:19 maximum monthly average price over a given year.

Do you recall that?

A. Yes. I recall an issue where -- where round-off cents could make a difference in the -- that was -- should have been caught in the coding. 09:31:37

Page 24

Q. And who was supervising the process? 09:31:42

A. I -- I actually don't know exactly. I mean, I -- Dr. Song and I were responsible for it, but I'm not sure. That's pretty far down the -- the chain in terms of -- of the work. I'm not sure 09:31:59 who the direct supervisor of that coder was.

Q. You state in your current report that effective December 31, 2023, you retired as a principal of The Brattle Group.

Why did you retire? 09:32:22

A. Well, my hearing is not as good as it used to be, and I've been trying to get a little bit of research done and -- give my wife a little bit of benefit of retirement.

Q. Did your experience with Brattle in this 09:32:39 case lead you to be dissatisfied with the support that they provided?

A. No.

Q. Have you formed any affiliation with a different consulting firm since then? 09:32:52

A. No.

Q. You indicate in paragraph 4 of your report that since the time that you retired, "Dr. Song has directly overseen the implementation of my methodology using the App Store transactions 09:33:08

Page 25

7 (Pages 22 - 25)

data for all genres in his expert report, including 09:33:12 preparing the underlying data for the modeling."

What do you mean in that sentence by "directly overseen"?

A. He is -- I'm no longer the -- the 09:33:30 operating architect, the supervising architect for that work. I have retired from that, so he's taken on that role.

Q. Have the blueprints changed at all since you retired? 09:33:44

A. I would say they have not. It's exactly the same blueprint. There are -- just as in building a house there may be construction issues in what materials are available and so forth, and I think some of those are present in Dr. Song's 09:33:58 current work, but I'm not involved in that.

Q. Have you had a role in directing any of Dr. Song's work from 2024 forward?

MR. RIFKIN: Objection to form.

THE DEPONENT: I would say that I have 09:34:24 been kept apprised of that work, and occasionally I've been asked my opinion on -- implementation issues that have arisen, but I have not had any supervisory role.

Q. (By Mr. Swanson) You state that you and 09:34:42

Page 26

Dr. Song have conferred regularly as he has 09:34:45 implemented your methodology.

How regularly?

A. I would say quite regularly in 2025 and infrequently before 2025. 09:34:58

Q. Have these been oral or written communications or both?

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, we have Zoom meetings, so oral and visual. 09:35:16

Q. (By Mr. Swanson) Any written communications?

A. Well, I've been shown documents and tables and such on Zoom, but I don't have copies.

Q. Do you know if Dr. Song has relied on 09:35:33 your feedback in these various conferences that you've had with him?

MR. RIFKIN: Objection to form.

THE DEPONENT: I would have to look at -- at the specific issues, but I think by and large 09:35:56 the -- the -- the way this has gone is that various issues have come up and he's suggested how they would like to handle it and asked if that was -- what I thought was the best thing to do, and I can't think of any exceptions where I did not think 09:36:19

Page 27

it was the best thing to do. 09:36:22

Q. (By Mr. Swanson) Can you think of an example of one of those issues?

MR. RIFKIN: I'm going to object here. I think the protocol prohibits your inquiry into 09:36:32 communications between the experts, and I think this probably encroaches on that.

MR. SWANSON: I mean, I agree that there is an exclusion for communications among experts and their staff. The only question I have is 09:36:50 whether that has been waived by what's in the report.

MR. RIFKIN: I don't think so at all.

MR. SWANSON: Are you going to instruct him not to answer? 09:37:01

MR. RIFKIN: I think it's inconsistent with -- with the order. So if it requires an instruction, then yes.

MR. SWANSON: I mean, I think you have to tell us if this is -- you're taking the position 09:37:13 that this doesn't waive that because there is an exception for reliance.

MR. RIFKIN: I think if you want to ask Dr. Song if he relied upon any of those communications, you may want to do that to 09:37:28

Page 28

establish it as a threshold. But I don't know that 09:37:30 Professor McFadden can tell you what Dr. Song relied upon or didn't. I don't think you've established that.

MR. SWANSON: Yeah, I'm really talking 09:37:40 now about what Professor McFadden is relying on.

MR. RIFKIN: I'm sorry. Then maybe I misunderstood the question. Are you asking whether Professor McFadden relied upon any communications from Dr. Song in preparing his report? I thought 09:37:54 you were asking if -- if Dr. Song relied upon any of those communications in preparing Dr. Song's report. I could have misunderstood the question.

MR. SWANSON: Yeah. I mean, there's an extent to which it probably goes to both, but I 09:38:09 think it was more intended to be the former rather than the latter --

MR. RIFKIN: Okay.

MR. SWANSON: -- at this stage.

MR. RIFKIN: Well, then, why don't you 09:38:16 clarify the question, and then let's see if Professor McFadden can answer the predicate question first.

MR. SWANSON: Okay.

Q. (By Mr. Swanson) When you indicate here, 09:38:24

Page 29

8 (Pages 26 - 29)

Professor McFadden, that you and Dr. Song have 09:38:35 conferred regularly as he has implemented your methodology, are you relying on those discussions in connection with offering up the opinions that are in this March 7 report? 09:38:52

A. No, I am not.

Q. And do those discussions have any bearing on your opinions in this case?

MR. RIFKIN: Objection to form.

THE DEPONENT: I suppose they do, because 09:39:25 I -- my opinion is that -- to the extent that I have been apprised of what Dr. Song has done, he is implementing his work in conformity with the original architecture for the damage analysis.

Q. (By Mr. Swanson) Okay. And in reaching 09:39:46 an opinion as to whether he has properly implemented your blueprints, have you relied upon your discussions with him about issues that have come up about how to implement the methodology?

MR. RIFKIN: Objection to form. 09:40:12

THE DEPONENT: I would say in the -- in the end, it's -- it's Dr. Song's responsibility to explain to you whether or not and -- and how he is -- he has done his implementation. But at -- at the high level in which he and I had had 09:40:28

Page 30

discussions, my -- my understanding is that it -- 09:40:32 he's following the original design.

Q. (By Mr. Swanson) Is the selection of instrumental variables for the genres that you did not address in your prior reports a topic that you 09:40:49 considered to be one of implementation of your methodology?

A. Yes, I think that's an implementation issue which the -- the operating econometrician has the responsibility to sort out. 09:41:10

Q. And that would be Dr. Song?

A. That would be Dr. Song for his current work, yes.

Q. And do you have an opinion about whether or not his selection of instrumental variables for 09:41:20 those new genres was a reliable selection?

A. Actually I have not even reviewed that work in detail. I just have a broad overview that he's carried on in a similar way to what was done earlier. So at this point, I don't have a basis 09:41:42 for -- for offering any opinion.

Q. In Appendix B to your March 7 report, you list the materials that you relied upon in preparing that report?

A. Yes. 09:42:11

Page 31

Q. And I think that list is at pages 44 to 09:42:12 45 in this -- again, look at that.

Is this a list that supplements the lists of relied-upon materials from your prior reports?

A. I think the answer is yes in the sense 09:42:45 that there were materials that went into my original opinions, and those -- to the extent that I'm holding those opinions indirectly, then I'm also relying on the support for that.

Q. So between all of those lists attached to 09:43:00 all of your prior reports along with this list, have you identified all documents and information that you've relied on in connection with forming your opinions that you intend to provide at trial?

A. Yes. 09:43:25

Q. On page 44, you have a section of this appendix that is entitled "Expert Reports."

Do you see that?

A. Yes.

Q. One of the expert reports you list is the 09:43:37 March 7, 2025, report of Dr. Minjae Song.

Do you see that?

A. Yes.

Q. Have you reviewed the entirety of Dr. Song's report? 09:43:48

Page 32

A. I have a copy of it and I have skimmed it 09:43:51 at least, and in particular I -- I read more carefully the -- the section which was relevant which is mentioned in my report, which is the -- the introduction of data on payors, I suppose, to 09:44:10 accounts.

Q. That report is, I believe, over 100 pages.

How many pages would you say you read carefully? 09:44:23

A. I -- I don't have a -- a count in my mind, so I don't think I can accurately answer that. But I would say that -- the -- the section that dealt with -- with payors is the section that I read carefully. 09:44:44

I also discussed with staff at various points the -- the general nature of -- of Dr. Song's findings.

Q. When you say you skimmed his report, was that a one-time skimming or did you skim it over 09:45:07 several occasions?

A. I would say there were two -- two phases. One is before -- before the preparation of my report. I was primarily getting staff reports on his work, and that included details -- some details 09:45:29

Page 33

9 (Pages 30 - 33)

on payors, the new payor data as opposed to account ID data.

But beyond that, I -- I think I actually started to read the report only after my report was filed. I received a copy of it after his report was filed.

Q. So after March 7th?

A. Yes.

Q. Are you vouching for the accuracy of Dr. Song's estimates and opinions in his report?

A. I would say that what I -- what I -- my understanding from what I -- what I have been told about and have read about in his report that it follows the -- the design that I originally set out, the blueprint, and to -- and my -- my -- I guess you could say I could vouch for that.

For the implementation issues, that's mostly work done -- I think work done after -- after I retired. I'm not in a direct supervisory role for that, so I -- he -- he would be the person to ask about that work.

Q. To the best of your knowledge, are there any errors or inaccuracies in Dr. Song's report?

MR. RIFKIN: Objection to form.

THE DEPONENT: Not -- not to my

*Page 34*

knowledge.

Q. (By Mr. Swanson) Can you flip to page 1 of your report, please. I'm going to ask you a question keyed off of paragraph 1, where you describe the definition of the certified class. I think that's the second sentence in paragraph 1.

A. I have it in front of me.

Q. Okay. You understand that the class was certified to include all purchases for use on iPod Touch devices?

A. This -- this description is itself taken from, I think, court documents, and I think at the time those documents were written, the terminology was "all iOS devices," and I understand that that -- that that included the -- the iPod Touch.

Q. In your prior reports, you included iPod Touch transactions, didn't you?

A. That -- there were specific instructions of -- of what -- what Apple ID accounts were used, and that's detailed in -- in the previous work.

And as I sit here now, I believe that did include iPod Touch, but that's not something that I was paying attention to at the time, and the -- the instructions were -- at the time were look at all iOS device aftermarket purchases.

*Page 35*

Q. In a prior deposition, we had marked your June 1st, 2021, report as Exhibit DX37.

MR. SWANSON: I don't think we need to mark it again.

MR. RIFKIN: No.

MR. SWANSON: But we will give you a copy.

MR. RIFKIN: If you want us to look at it, sure.

Q. (By Mr. Swanson) Could you turn to page 6 of that -- it's a hefty document there -- to page 6, paragraph 16.

THE DEPONENT: 16, did you say?

MR. SWANSON: Paragraph 16.

MR. RIFKIN: Paragraph 16?

MR. SWANSON: On page 6.

THE DEPONENT: Yes.

Q. (By Mr. Swanson) And you state there that Apple mobile devices relevant for this matter are the iPhone, iPad and iPod Touch.

Do you see that?

A. Yes.

Q. And you defined the term "iOS mobile devices" as used in that report to include the iPod Touch, correct?

*Page 36*

A. That was my understanding at the time, yes.

Q. Okay. And then in paragraph 17 -- let's see. You state toward the bottom of that page:

"The iPod Touch's relative share of App Store transactions among the iOS mobile devices peaked in 2009, accounting for 36 percent of the App Store revenues at the time, and then decreased rapidly afterward."

Do you see that?

A. I do.

Q. And is that still your understanding?

A. Yes.

Q. Do you understand that Apple launched the App Store on July 10, 2008?

A. I don't recall the specific dates, but I believe that's right.

Q. If you look at paragraph 21 of that report, I think that will refresh your recollection.

A. Yes.

Q. And that indicates -- your report indicates that Apple launched the App Store on July 10, 2008, right?

A. Yes.

*Page 37*

10 (Pages 34 - 37)

Q. Okay. Could you turn to page 149 of this 09:52:04 2021 report and take a look at figure 23.

A. I have that in front of me now.

Q. All right. Thank you.

So figure 23 shows there were almost 09:52:52 7 billion iPod Touch transactions in the full transactional data that you had at that time, right?

A. Gee, I'm sorry. It's been some years now since I have looked at any of this, and I don't 09:53:12 recall the -- the context or this table, so I don't know what these -- what this refers to.

Is it -- is it -- is this table reporting the -- the numbers of transactions up to 2019? Is that correct? 09:53:32

Q. Well, if you need to refresh yourself in looking at the report, I mean, I'm certainly happy to let you do so.

The figure 23 reports figures from above sample and the full data, right? 09:54:04

A. Yes. And again, I -- I simply don't recall this table now. And I have go back and know what that refers to, although the work in that report initially used a single 0.1 of 1 percent sample in the full transaction. 09:54:26

Page 38

Q. And that would be the sample referred to 09:54:29 in figure 23, correct?

A. Presumably.

Q. Well, the notes say "calculations based on a 0.1 percent random sample," right? 09:54:37

A. Is that -- what was the question?

Q. I said the notes to figure 23 at the bottom there --

A. Yes.

Q. -- of that figure say "calculations based 09:54:49 on 0.1 percent random sample," right?

A. Yes, that's what it says.

Q. And that's how you were doing estimation back at that time with a single 0.1 percent --

A. Yeah. 09:55:06

Q. -- random sample, right?

A. In the original report, yes.

Q. And you -- reporting in figure 23 the number of transactions for these various devices that were in the sample, right? 09:55:20

So, for example, for iPod, there were 6.6 million, roughly, transactions in the sample that you were using, right?

A. That's -- that sounds right.

Q. And on the right-hand side, the 09:55:44

Page 39

indication was that that's -- those iPod 09:55:47 transactions were 10.4 percent of the sample, right?

A. That's -- that's what the table indicates. 09:55:59

Q. Okay. And then you have columns for full data where you indicate that there are 6.7 billion, roughly, iPod transactions accounting for 10.4 percent of the full transactional data that you had up to that point in time; is that not 09:56:16 correct?

A. Yes.

Q. Now, you included those 6-plus billion iPod Touch transactions in the relevant aftermarket that you defined; is that not correct? 09:56:37

A. That's -- that's correct.

Q. And you included iPod Touch devices in the primary market that you defined?

A. I -- I would say that in the damage analysis, I was concerned with the aftermarket, 09:56:58 and -- and so these tables have to deal with the aftermarket. I would say at that point I certainly -- my understanding was that iPod Touch was an iOS device that operated in that aftermarket. I don't recall ever offering any 09:57:17

Page 40

opinion on the -- the primary market, though, the 09:57:21 device market.

Q. You don't recall in your report -- prior reports identifying the devices that constituted the primary market, sometimes called the fore 09:57:34 market, F-O-R-E?

A. Yes. Well, I suppose I must have done. I would have go back and review, reread the report to -- to recall what -- what I said.

Q. You included iPod Touch transactions in 09:57:54 your estimation of consumer demand in all of your prior reports, correct?

A. Yes, I would -- I do not recall that it was -- it was identified as any separate class of -- of transactions. 09:58:15

Q. You included iPod Touch transactions in calculating damages in all of your prior reports, correct?

A. As far as I can recall, yes.

Q. You can put the older report to one side 09:58:33 now, and we can switch back to your March 7 report.

If you could turn to page 1 of your March 7 report, and in particular, footnote 2.

In footnote 2, you state that "For purposes of this report, I have been instructed by 09:59:12

Page 41

11 (Pages 38 - 41)

counsel to treat iPhones and iPads but not the iPod 09:59:15 Touch as iOS mobile devices."

Do you see that?

A. Yes.

Q. Who gave you that instruction? 09:59:24

A. That -- reported to me by staff as coming from the plaintiffs' counsel.

Q. And were you given to understand why iPod Touch devices were not to be treated as iOS mobile devices? 09:59:44

MR. RIFKIN: Objection. Again, I think we're getting to the point where your questions encroach on areas that are excluded from discovery by the -- by the order protocol.

Q. (By Mr. Swanson) Well, setting aside 10:00:05 what staff may have told you about counsel's direction, do you have any understanding as you sit here as to why iPod Touch devices are not treated as iOS mobile devices in your report?

MR. RIFKIN: Well, that -- that doesn't 10:00:24 quite cover the -- the exemptions because it's not just staff. Is also includes communications with other experts as well as communications with counsel.

So I think that the question still 10:00:36

Page 42

encroaches on areas that are exempt from discovery. 10:00:39

Q. (By Mr. Swanson) Are you relying on instruction from counsel in your report?

A. Yes. My -- my understanding is that counsel has asked the court to exclude iPod Touch, 10:00:52 and I'm -- I'm not -- I don't have an opinion on why they are asking for that.

But the instructions here were to prepare this report basically on the assumption the court would accept their -- their modification of the 10:01:10 class definition.

Q. As an economist, do you have an opinion as to whether or not it's appropriate to exclude iPod Touch transactions from the estimation of your model? 10:01:26

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, as an econometrician, I would have the opinion that it would have -- make virtually no difference to the estimation of the damages, because while -- while 10:01:39 they accounted as quite a quite large number of transactions, they account for a tiny fraction of the total value of transactions.

Q. (By Mr. Swanson) Do you have an understanding of what the consequences are of 10:01:57

Page 43

excluding iPod Touch transactions from the class 10:01:59 numerically?

A. No, I have not studied the issue.

MR. RIFKIN: Dan, we're getting close to an hour. I don't know if you were getting ready to 10:02:11 switch topics, but --

MR. SWANSON: Yeah.

MR. RIFKIN: -- is this a good time for a break?

MR. SWANSON: You want to take a break 10:02:17 now?

MR. RIFKIN: That would be great. Thank you.

THE VIDEOGRAPHER: This marks the end of Media No. 1. Off the record at 10:02. 10:02:24

(Recess taken.)

THE VIDEOGRAPHER: This marks the beginning of Media No. 2 in the deposition of Professor Daniel McFadden. We are back on the record. The time is 10:18 a.m. 10:17:56

Q. (By Mr. Swanson) Professor, could you please turn to paragraph 5 of your March 7 report.

In the paragraph, at least the first part of it, you state that you are "aware that counsel for consumer plaintiffs has also asked 10:18:20

Page 44

Professor Stiglitz and Dr. Abrantes-Metz to submit 10:18:23 expert reports describing their opinions. I rely on several of their conclusions in forming some of my own opinions."

Do you see that? 10:18:36

A. Yes.

Q. And then in footnote 6 there at the bottom of the page, you list the March 7 report of Professor Stiglitz and the March 7 report of Dr. Abrantes-Metz, correct? 10:18:45

A. Correct.

Q. And you list them in your appendix on relied-upon materials, right?

A. I believe so, yes.

Q. Okay. Have you read the entirety of 10:18:53 Professor Stiglitz' March 7 report?

A. I have -- at -- not -- not in great detail with -- with extended consideration, but yes, I have read it front to back.

Q. And that report is close to 200 pages, 10:19:26 right?

A. It's a long report, yes.

Q. Do you remember how long you spent in reviewing it?

A. Well, I'm a fast reader, so I would say 10:19:42

Page 45

12 (Pages 42 - 45)

probably four -- four hours. 10:19:46

Q. And was that in one sitting?

A. Oh, I think the sequence is that I was receiving summaries from staff prior to -- as I prepared my report on what Professor Stiglitz' 10:20:04 opinions were going to be and so that -- and so you -- and my reading of my report was primarily done after I submitted my report.

Q. Have you read Professor Stiglitz' March 7 report in more than one sitting? 10:20:30

A. Certainly sections of it, yes.

Q. And turning to Dr. Abrantes-Metz' March 7 report, have you read the entirety of that?

A. I did read that, again, primarily after I submitted my report. 10:20:59

Q. You are aware that she had submitted a prior report in the class certification phase, right?

A. Yes.

Q. And at least as of the time I asked you 10:21:11 in the prior deposition, you said you had not read that report.

Have you read it since then?

A. I've read one -- one -- I believe the current report, I read -- I forget if it was the 10:21:25

Page 46

March 7 report or -- the March 7 report. 10:21:29

Q. Okay.

A. But in this case I was instructed by counsel to use her estimate of the but-for commissions, so that was essentially a wall -- 10:21:44 given that number, I -- I read it out of interest, not because I wanted to form any opinions on it.

Q. We'll come back to that.

When you say in paragraph 5 that you "rely on several of their conclusions in forming 10:22:06 some of your own opinions," are you indicating that your March 7 report sets forth opinions of yours that are newly formed?

A. No, it -- in fact, the -- the bullet points that -- in paragraphs that follow this which 10:22:24 are drawn from their -- their opinions are essentially what I use.

Q. When you formed the opinions set forth in your prior reports, you were not relying on any conclusions of Professor Stiglitz, correct? 10:22:47

A. Correct.

Q. And the same question for Dr. Abrantes-Metz, setting aside the but-for number?

A. I was given the -- the 13.63 number and 10:23:01

Page 47

used in my supplemental report in 2023. 10:23:06

Q. But there were no other conclusions of Dr. Abrantes-Metz that you were relying on in that or any other prior report, right?

A. That's correct. 10:23:21

Q. Have you changed any of your prior opinions in reliance on conclusions of Professor Stiglitz?

A. It's a simple question, but could you repeat it? 10:23:40

Q. Sure.

Have you changed any of your prior opinions in reliance on conclusions of Professor Stiglitz?

A. I would -- I would say no. I don't 10:23:51 recall any opinion that he offered that called into question my -- my earlier conclusions.

Q. Have you changed any of your opinions from your prior reports in reliance on conclusions of Dr. Abrantes-Metz? 10:24:12

MR. RIFKIN: Objection to form.

THE DEPONENT: No, there -- the only -- the only conclusion from her report that plays a role is the but-for commission rate, and that's unchanged. 10:24:31

Page 48

Q. (By Mr. Swanson) Okay. And that's the 10:24:32 specific conclusion of Dr. Abrantes-Metz that you're relying on that you referred to here in paragraph 5?

A. Correct. 10:24:42

Q. Are -- well, in paragraph 5 you state that you've been instructed by counsel for consumer plaintiffs to assume that Apple would charge a 13.63 percent commission in the but-for world.

Do you see that? That's in the second 10:25:13 bullet.

A. I do.

Q. I think -- I'm sorry. The first bullet under paragraph 5.

A. Yes, I see it. 10:25:23

Q. So on the one hand you say you rely on Dr. Abrantes-Metz for the 13.63 percent number, but you also say counsel instructed you to assume that.

What is the role of Dr. Abrantes-Metz' conclusion given that instruction from counsel? 10:25:49

A. Well, I think Abrantes-Metz would need to testify for the basis for -- for the 13.63 number, and so I'm -- I'm -- relying on counsel's instruction that that's going to be supported by her expert testimony. 10:26:15

Page 49

13 (Pages 46 - 49)

Q. Are you in any way vouching for the reliability of that number based on your review of her report?

A. No, I'm offering no opinion.

Q. How was the instruction provided by counsel?

A. This came back in 1922 or 1923 [sic], so I simply don't recall the -- the -- the mechanics of it.

Q. 2022, 2023?

A. It would have been late '22 or early '23 when I was asked to use this number instead of the range that appeared in my original report.

Q. Could you turn to paragraph 38 of your report.

You indicate there that in both your 2023 supplemental report and the present report, counsel provided you with the but-for commission rate which you understand is consistent with the opinions of Dr. Abrantes-Metz.

Are you saying anything here different from what you said in that first bullet of paragraph 5 that we just talked about?

A. No, I think that's the same statement.

Q. You also state in paragraph 38, "Hence, I do not discuss its estimation in this report."

Were you prepared to discuss the estimation of but-for commissions in your report had you not been instructed to assume the 13.63 percent figure?

MR. RIFKIN: Objection to form.

THE DEPONENT: No. I did not do the investigation.

Q. (By Mr. Swanson) Can your own methodology be used to estimate Apple's but-for commission?

MR. RIFKIN: Objection to form.

THE DEPONENT: No. I think that's -- there is a separate calculation that's required to do that. One has to look at comparable markets in which there is competition and one perhaps has to look at the Apple Store's own accounts and return on investment to make those judgments. That was -- that's not part of the damages analysis that I designed.

Q. (By Mr. Swanson) Well, couldn't you estimate the demand for App Store transactions and then infer the marginal cost for Apple by assuming profit maximization?

MR. RIFKIN: Objection to form.

Page 50

Page 51

THE DEPONENT: I haven't thought about it, and I would -- I would have to think about it in order to answer the question.

Q. (By Mr. Swanson) In your opinion, is Apple's marginal cost of an App Store transaction close to zero?

A. I -- I do not have an -- I do not have an opinion on that. I haven't studied it.

Q. Could you turn back to paragraph 5, please. I want to focus on the second bullet there. It goes from page 2 to page 3.

You state that you understand that "Professor Stiglitz has offered opinions related to the liability issues in this matter, including the relative antitrust markets in which the App Store operates and whether and how Apple's alleged misconduct has harmed consumers."

Do you see that?

A. Yes.

Q. Are these opinions of Professor Stiglitz that you're relying on?

A. I would say that what -- what I'm relying on is the -- the definition of the aftermarket that -- in which damages from overcharges have to be calculated, and so the -- the -- the damage --

architecture of the damage model is that it is -- is flexible and could be adapted to whatever the definition of that market is.

And so the extent to which I'm relying on Professor Stiglitz is essentially his -- his description of what that aftermarket is, and I think the -- the damage model is -- is -- has been implemented in terms of what was at that time the opinion on what the aftermarket was. And as far as my -- I have an understanding of the current work that it is also consistent with the definition -- his definition of the aftermarket.

Q. What do you understand Professor Stiglitz' opinion to be about the definition of the relevant market?

MR. RIFKIN: Objection to form.

THE DEPONENT: I -- I would basically have to rely on the -- the description that's in my report, which is an attempt to summarize that and -- and I don't have an opinion on it beyond what's -- what appears in the report. That's in -- that's in paragraphs 12 through -- through 19 -- 12 through 18. 12 through -- yes, 12 through 18 or 19.

Q. (By Mr. Swanson) Do you have an

Page 52

Page 53

14 (Pages 50 - 53)

understanding as to whether Professor Stiglitz 10:33:09 concludes that the relevant market is single-sided or two-sided?

A. Please repeat the question.

Q. Yeah. 10:33:26

Do you have an understanding as to whether Professor Stiglitz concludes that the relevant market is single-sided or two-sided?

MR. RIFKIN: Objection to form.

THE DEPONENT: My -- my reading of his 10:33:40 report is that he concludes that it is two-sided, as do I, but that it does not exhibit strong platform externalities, which raise additional issues in the operation of two-sided markets.

But I'm not offering an opinion on these 10:34:02 issues, so I haven't studied it in further detail.

Q. (By Mr. Swanson) But it is your statement that the relevant market is two-sided at this point?

MR. RIFKIN: Objection to form. 10:34:20

THE DEPONENT: I'm not sure what the legal -- exact legal definition of "two-sided" is, but my view is that we have accounted for the fact that this is a market in which there are developers who have interests and are -- can be harmed by 10:34:35

Page 54

anticompetitive conduct and consumers that have 10:34:39 interests and also can be harmed by competitive -- anticompetitive conduct and the -- the tax incidence framework for the damage analysis is a position of allocation of the impact of the alleged 10:34:55 anticompetitive acts on both the consumers and developers.

Of course, the plaintiffs in this case are consumers, and I concentrate on the incidence of the -- of the commission of alleged 10:35:10 super-competitive commission rates on them.

Q. (By Mr. Swanson) Do you agree that the App Store is a two-sided transaction platform?

MR. RIFKIN: Objection to form.

THE DEPONENT: I -- I -- I'm not going to 10:35:27 agree to that because I think the -- the definition of "platform" has a specific legal meaning in terms of -- of -- of case law and so forth and -- and may not coincide with my understanding of the economic use of the term "platform." 10:35:44

So I don't know how to answer that question.

Q. (By Mr. Swanson) Well, you can answer the question as you used the term "platform" in your writings, and we'll come to that later. 10:35:53

Page 55

But in your economic understanding of the 10:35:57 term "platform" and "two-sided platform," is the -- I'm sorry.

Let's start with -- is the App Store a two-sided platform? 10:36:08

MR. RIFKIN: Objection to form.

I think this exceeds the scope of Professor McFadden's opinion.

MR. SWANSON: We're not doing those objections today, Mark. 10:36:17

MR. RIFKIN: Well, I'm just --

MR. SWANSON: That's a relevance objection.

MR. RIFKIN: Well, I think it's an objection to form because it's an improper 10:36:22 question.

MR. SWANSON: You made your objection.

MR. RIFKIN: Be that as it may, I've made my objection.

MR. SWANSON: Yeah. 10:36:30

THE DEPONENT: I think every market in which there are multiple sellers and multiple buyers that -- with transactions that go through some intermediary have -- have a two-sided aspect to them. 10:36:44

Page 56

I would use the term "platform" to -- 10:36:45 to -- economically to apply any of those such markets.

But there is also a -- a specific concentration focused in economics on externalities 10:36:56 that may arise from the -- interchangeability or ubiquity or something like that in the operation of an intermediary, and I'm quite aware of that literature. I even participated in it.

But Professor Stiglitz' opinion that I've 10:37:19 read is that his view is that -- these external effects that can occur for a market intermediary are not an issue in this case.

Q. (By Mr. Swanson) And these are so-called indirect network effects? 10:37:37

A. I'm sorry?

Q. You're referring to so-called indirect network effects?

A. I -- I don't -- I, myself, don't use that term. I'm not sure what the distinction between 10:37:50 direct and indirect network effects would be.

Q. Do you understand Professor Stiglitz to be quantifying any harm to class members?

A. I don't recall from my reading of his report that he has numbers. 10:38:22

Page 57

15 (Pages 54 - 57)

Q. You're the one quantifying harm, correct? 10:38:25
A. I'm the one who's quantifying the -- the overcharge harm to consumers, yes.
Q. At the top of page 3 of your report -- it's one of the bullets under paragraph 5 -- you 10:38:52 say --
I'll wait till you're there.
You say, "The methodology described in this report is consistent with these opinions" -- and you're referring there to the opinions of 10:39:07 Professor Stiglitz.
Do you see that?
A. Yes.
Q. Are there specific opinions of Professor Stiglitz' that you're referring to in 10:39:17 this paragraph that your model is consistent with?
A. I would say that the -- the opinion -- his opinions on what the -- the aftermarket is, is consistent with the damage model in the sense that it is flexible enough to deal with the original 10:39:39 definition of that market and any modifications that he's suggesting for.
Q. Are you also referring to his opinions about the identification of the anticompetitive conduct? 10:40:02

Page 58

A. I would say that I am not because the 10:40:11 damage model essentially starts from an instruction on what the but-for commission rate would have been absent anticompetitive conduct.
It does not depend on what the source of 10:40:25 that -- of that conduct was that would have made the difference between that claimed but-for rate and the actual rate.
Q. Well, when you refer to Professor Stiglitz offering opinions related to 10:40:45 liability issues, including whether and how Apple's alleged misconduct has harmed consumers, what are you referring to there?
A. I'm referring to the -- the overall opinion that he has that Apple did engage in 10:41:14 misconduct, specifically misconduct which allowed it to charge super-competitive commission in the iOS aftermarket.
Q. You have worked with Professor Stiglitz in litigation matters before, right? 10:41:44
A. I have.
Q. The Sabre case was one such instance?
A. Yes.
Q. Have there been others?
A. That's the one I recall, yes. 10:41:57

Page 59

Q. Are you familiar with Professor Stiglitz' 10:42:04 academic work in the area of antitrust economics?
A. I'm sure I'm not familiar with all of it. He's a prolific publisher. But I'm -- I'm aware of some of it. 10:42:23
Q. Would you say that Professor Stiglitz' work has shaped the field of antitrust law?
MR. RIFKIN: Objection to form.
THE DEPONENT: The answer is that's -- that's a question I've never asked myself, and -- 10:42:41 and I don't even know how you'd go about answering it. I would do citation counts, so how would you -- how do you determine what the criterion is?
Q. (By Mr. Swanson) Are you aware of any specific work of Professor Stiglitz that has shaped 10:43:01 the field of antitrust law?
MR. RIFKIN: Objection to form.
THE DEPONENT: Well, you're pressing me to remember articles that I may have read in the distant past. But I know that he's been one of 10:43:15 the -- of the major players in the issue of platform -- platform industry economics.
Q. (By Mr. Swanson) What makes you think that?
A. Well, somewhat from personal discussions 10:43:35

Page 60

with him. I mean, over the years we've talked a 10:43:38 number of times about these things.
Q. Excluding any work he's done in litigation, is it your understanding that he's written extensively on platform economics in an 10:43:56 economic context?
MR. RIFKIN: Objection to form.
THE DEPONENT: I think my -- my previous statement here was that -- is that I -- I think he's had an influence on that subject. I -- I 10:44:13 can't do it in terms of counts of articles and things like that. I don't know.
Q. (By Mr. Swanson) Are you familiar with any of the economics textbooks that Professor Stiglitz has authored? 10:44:30
A. Actually, I'm not -- the answer is no.
Q. Have you read any of his popular books?
MR. RIFKIN: Objection to form.
THE DEPONENT: Again, I'm not aware of -- I'm not aware of his popular books. 10:44:56
Q. (By Mr. Swanson) In your opinion, is Professor Stiglitz an expert on econometrics?
MR. RIFKIN: Objection to form.
THE DEPONENT: Well, I think Professor Stiglitz is an expert on the entire -- 10:45:10

Page 61

16 (Pages 58 - 61)

entire field of economics. He's the -- he's probably the world's most respected economist, so -- but -- certainly in my special field, he's -- that's not an area he publishes in.

Q. (By Mr. Swanson) Are you aware of any contributions Professor Stiglitz has made to the field of econometrics?

A. No, I -- I would say that I'm not.

Q. In your opinion, who has greater expertise in econometrics, Professor Stiglitz or Dr. Song?

MR. RIFKIN: Objection to form.

THE DEPONENT: Please --

Q. (By Mr. Swanson) In your opinion?

A. -- repeat.

Q. In your opinion, who has greater expertise in econometrics, Professor Stiglitz or Dr. Song?

A. Well, I would say that -- as -- as I mentioned, I think Professor Stiglitz is qualified to testify as an expert on almost everything. But in terms of detailed econometrics, Dr. Song is himself a very skilled expert in econometrics.

Q. In the Weber case, you relied on Professor Stiglitz' opinions in calculating

Page 62

damages, correct?

MR. RIFKIN: Objection to form.

THE DEPONENT: I would say generically, yes, but you're asking me to remember a -- a case that -- from many years ago, so I -- I -- I would have to go back to the case to remember any detail about it.

Q. (By Mr. Swanson) Even if you don't recall the exact details, do you still believe that Professor Stiglitz' opinions were correct in that case, the ones that you relied on?

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, I would say that Professor Stiglitz and I agreed on the nature of the platform in that case, and I'm aware that on -- on appeal, that case went against the -- the principals who we were working for. So the court -- the court made a different ruling on platforms than I think was -- was my opinion and I think also his opinion at the time of the case.

Q. (By Mr. Swanson) Did you read that opinion?

A. I don't recall reading -- reading the opinion. I should say in -- in context here, I went back and forth on platform questions because I

Page 63

worked on -- on a number of platform issues having to do with credit cards way -- way, way back, decades back, and it's always been an area that's a difficult one in economics and I think -- I think a difficult one for the courts to get the economics right.

Q. Do you have an opinion as to whether the Supreme Court has gotten the economics right on platform economics?

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, my opinion is that if -- if they say it's this way, that's the way you -- you work for, that starting point.

Q. (By Mr. Swanson) Do you know if Professor Stiglitz has expressed disagreement with the way the Supreme Court has addressed platform economics issues?

MR. RIFKIN: Objection to form.

THE DEPONENT: He has not to me expressed anything about that.

Q. (By Mr. Swanson) Appendix A of your March 7 report is your CV, correct?

A. Yes.

Q. And pages 42 and 43 contain a list of your expert testimony and consulting from 2017 to

Page 64

the present; is that right?

A. Yes.

Q. Is it a complete list?

And I ask because, for example, it does not -- this list does not include any reports submitted or testimony given in this matter in 2022 or 2023.

A. Well, it's -- it's complete, but it does not include this case. You are correct.

Q. So there's no other expert testimony or consulting work for other cases --

A. That is correct.

Q. -- that hasn't been listed already?

A. That is correct. I retired from this business except for legacy litigation.

Q. So since you've retired from Brattle, you haven't engaged in any consulting or testimonial work other than this case?

A. That's correct.

Q. Would you please turn to paragraph 12 of your report.

In paragraph 12, you indicate that you understand "consumer plaintiffs allege that Apple lock consumers into buying apps only from Apple and paying Apple a 30 percent fee without their consent

Page 65

17 (Pages 62 - 65)

and lock consumers' iOS devices to prohibit them from using any app that was not approved or sold by Apple."

Do you see that?

A. Yes.

Q. In footnote 7, you cite the plaintiffs' third amended consolidated complaint.

Do you see that?

A. Yes.

Q. You understand that's the current complaint?

A. Actually, I don't know.

Q. Well, if you'll turn to your relied-upon materials.

Page 44, under "Case Materials," the second item there that you rely upon is "Stipulation and proposed order for leave to file third amended consolidated class action complaint."

Do you see that?

A. Yes.

Q. Okay.

A. I see it as a reference.

Q. You're relying on that.

Can you tell me what -- what that is, then?

Page 66

A. I'm -- I'm citing -- I'm citing from the third amended complaint. Is this -- I don't actually know whether that's identical to what's listed here as -- as case materials.

Q. Okay. I'll represent to you -- Mr. Rifkin can jump in if he disagrees -- but that's the stipulation that contains the third amended complaint, which is the operative complaint in this case at this time.

A. Okay.

Q. And that's what you're relying on?

A. That's -- that's -- that's what I'm relying on in the sense -- in the sense that this paragraph is drafted from the statements in that document.

Q. Okay. And you reviewed that third amended complaint, correct?

A. I looked at these complaints. I -- I had help drafting this paragraph.

Q. Do you recall the last time you looked at the -- the third amended complaint?

A. No, I don't recall.

Q. But you have looked at it?

A. I have looked at it, yes.

Q. Does the conduct that you describe in

Page 67

paragraph 12 of your report, namely locking consumers into buying apps only from Apple and prohibiting them from using apps not approved or sold by Apple -- does that conduct reflect the conduct you understand plaintiffs to challenge in their complaint?

A. I'm sorry. Please repeat the question. I -- I didn't understand particularly the last sentence.

Q. Okay. I'll shorten it.

Does the conduct you describe in paragraph 12 of your report reflect the conduct you understand plaintiffs to challenge in their third amended complaint?

A. The sentence I heard that plaintiffs could challenge in their amended third complaint --

Q. I'll try it again.

A. Is that --

Q. You describe certain conduct by Apple here in paragraph 12 of your report, right?

A. Yes. My understanding is that these are listed as complaints in -- listed as terms in this third amended complaint.

Q. Okay. That -- that covers my question.

Do you understand plaintiffs to be

Page 68

challenging any conduct other than what you're listing here in your paragraph 12?

A. I have no understanding of that -- I don't -- its -- its relevance to the damage model is indirect in the sense that the damage model is designed to -- to -- to calculate the -- the overcharge to consumers from a commission rate that's super-competitive relative to some -- some benchmark, and it does not depend on the specifics of the -- the alleged anticompetitive conduct which led -- led to that difference between the -- the -- the competitive benchmark rate and -- and the actual rate.

So that I -- effect -- it's -- it is not relevant to -- to the architecture of the damage model, and so I do have an understanding. I didn't need to have an understanding of these details.

Q. Okay. We'll come back to that.

For now, could you turn to your paragraph 17, which is on page 5.

In that first sentence there, you indicate "Apple's conduct has allowed it to acquire monopoly power, the exercise of which has harmed consumers."

Do you see that?

Page 69

18 (Pages 66 - 69)

A. Yes. 10:57:09

Q. Are you offering an opinion that Apple's conduct has allowed it to acquire monopoly power?

A. I am citing Professor Stiglitz.

Q. So are you relying on Professor Stiglitz 10:57:21 for that?

A. I would say the damage model is based on the difference between the actual commission charge and an analysis of what a competitive benchmark would have been, and it does not rely specifically 10:57:43 on the reason that those differ.

Q. Are you offering any opinion on when Apple acquired monopoly power?

A. I'm -- I'm relying on the -- Abrantes-Metz' estimation of the -- of the 10:58:27 competitive or but-for commission rate, and I have -- I have -- the damage model could accommodate a different benchmark reached through time, but he doesn't have to do that.

But that was not the instruction I was 10:59:01 given by counsel, and I have not investigated on my own.

Q. Do you apply the but-for commission rate provided by Dr. Abrantes-Metz to transactions in 2008 in your model? 10:59:23

Page 70

A. In -- in the current implementation, that 10:59:26 rate is used throughout the alleged damage period.

Q. Okay. Are you assuming or opining that Apple had acquired monopoly power in 2008?

MR. RIFKIN: Objection to form. 10:59:44

THE DEPONENT: I'm using Dr. Abrantes-Metz' number and -- and if her number is the -- is different in 2008 from Apple's number, if Apple's number was -- commission rate was higher than 13.63, then it would be up to her to provide 11:00:03 you with justification for that.

Q. (By Mr. Swanson) I'm asking a specific question, though, about whether you are offering an opinion as to when Apple acquired monopoly power?

A. The answer is -- is no, I'm not myself 11:00:24 offering an opinion on that. I'm -- I have been instructed to use this particular commission rate, and that's -- implicit in that is an assumption that that rate would have -- would have applied throughout the entire damage period. 11:00:41

Q. And to the extent that that is implicit in the conclusions of Dr. Abrantes-Metz, have you read anything in her expert report that talks about why she thinks there was monopoly power in 2008?

A. I -- I don't recall reading anything 11:01:05

Page 71

about that. 11:01:07

Q. Do you recall reading anything about that in -- in Professor Stiglitz' report?

A. I don't -- I might find something if I went back and read these reports more carefully. 11:01:24 In terms of what the -- I actually read, I don't recall either one opining on it -- the matter.

Q. Do you think it's credible to assume or conclude that Apple possessed monopoly power in the relevant market in 2008? 11:01:41

MR. RIFKIN: Objection to form.

THE DEPONENT: I haven't studied the -- studied the issue, but my understanding is that from the -- from the very beginning, Apple had very tight control over the installation of apps on -- 11:01:56 on the iOS devices. And in the intermediary years, only its own apps were allowed, and so that -- and -- and from the point that it began to allow third-party apps, it required them to go through the Apple Store. 11:02:20

So I -- so I'm -- I have not opined on that in my report, but my impression is that they controlled that market from the very beginning.

Q. (By Mr. Swanson) In paragraph 12 of your report, back on page 4, you state that consumers -- 11:02:44

Page 72

"Consumer plaintiffs allege that Apple 11:02:54 has monopolized or attempted to monopolize the market for the sale of iOS apps and in-app content."

Do you see that? 11:03:03

A. Yes.

Q. Have you drawn any distinction in your modeling between those two legal theories in estimating harm?

MR. RIFKIN: Objection to form. 11:03:15

THE DEPONENT: The two terms being "monopolized" versus "attempted to monopolize"?

Q. (By Mr. Swanson) Yes.

A. No. I -- I don't even know what the distinction is legally. 11:03:31

Q. Are you offering an opinion that Apple charges a super-competitive App Store commission?

A. I would say that I -- I am not. I think that my -- my use of -- of Abrantes-Metz' but-for commission rate implicitly assumes that the Apple 11:04:05 commission is super-competitive, so I'm -- I'm taking her -- her estimation as the basis for the damage calculations.

Q. Turn, please, to paragraph 17 of your report, which is on the next page, page 5, and I'm 11:04:40

Page 73

19 (Pages 70 - 73)

focusing on that last sentence in paragraph 17. 11:04:53
Are you offering any opinion that Apple's conduct has suppressed output in the variety and quality of available iOS apps and in-app content?

A. Well, I have repeatedly in my original 11:05:10 report and -- and subsequent reports pointed out that monetary harm from overcharges is one measurable harm to -- to consumers but that the alleged anticompetitive conduct could suppress entry by developers, suppress developer innovation 11:05:42 by reducing the return on investment and innovation.

Q. Have you conducted any independent study of the effect of Apple's conduct on output?

A. What output? 11:06:05

Q. Well, the output that is referred to in the last sentence of paragraph 17.

A. Well, the answer is -- is in -- in studying the effect of price on demand for apps and in-app content, yes, the damage model is doing a 11:06:28 quantitative calculation of the impact of -- of prices on these quantities.

Q. Well, the output is the same in the -- your but-for world as in the actual world, is it not? 11:06:49

Page 74

A. No, it's not. But the damage -- 11:06:49 overcharge damage calculation is based on the difference in price as-is and but-for at -- at the quantities sold.

Q. But are the but-for quantities higher 11:07:04 than the as-is quantities or lower?

A. Well, the downward-sloping demand curve, the but-for quantities will be larger if the but-for price is lower.

Q. So do you calculate damages based on 11:07:29 those larger assumed but-for quantities?

A. Well, I -- I have not done that. And the answer is could -- could one do that as a matter of -- an economic calculation? Yes, one -- one could calculate the loss of consumer surplus. 11:07:52

But I have not done that, and I -- the reason is that the -- the accepted legal standard as I -- is -- seems to be that overcharges on existing purchases are -- are -- is a -- is a harm that is -- is -- is recognized as compensatable. 11:08:11

Q. Have you conducted any quantitative study of the effect of Apple's conduct on product quality?

A. I have not.

Q. Have you conducted any quantitative study 11:08:28

Page 75

of the effect of Apple's conduct on app variety? 11:08:31

A. No, I have not done anything currently on that issue.

Q. What econometric modeling approach would be appropriate to assess whether Apple's conduct 11:08:45 has affected the variety and quality of available iOS apps and in-app content?

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, that's a broad question and I think an interesting one. 11:09:02

But I have not systematically gone about outlining how to do that. It's -- certainly, it's not part of my opinions in this case.

Q. (By Mr. Swanson) Turning to paragraph 18 of your report. 11:09:19

MR. RIFKIN: Dan, are you going to switch topics?

MR. SWANSON: Not really.

MR. RIFKIN: Okay.

MR. SWANSON: But you want to take a 11:09:26 break?

MR. RIFKIN: Well, if you wanted to ask a couple more questions on the same topic, go ahead, and then we'll take a break.

MR. SWANSON: Yeah, go a little bit 11:09:33

Page 76

further and then take a break. 11:09:35

MR. RIFKIN: Sure.

Is that okay with you, Professor McFadden?

MR. SWANSON: Why don't you just 11:09:40 intervene whenever --

MR. RIFKIN: Yeah, I just thought you were changing topics. That's fine.

MR. SWANSON: Yeah. I mean, probably not for a while, but I don't mind taking a break. 11:09:46

MR. RIFKIN: Well, why don't we take a break, then.

MR. SWANSON: Yeah, let's do it.

THE VIDEOGRAPHER: This marks the end of Media No. 2. Off the record. The time is 11:10. 11:09:54

(Recess taken.)

THE VIDEOGRAPHER: This marks the beginning of Media No. 3 in the deposition of Professor Daniel McFadden. We're back on the record. The time is 11:28. 11:28:43

Q. (By Mr. Swanson) Professor, can you turn to paragraph 18 of your report, please.

A. I have it.

Q. Okay. There you state that "as established by Professor Stiglitz, the relevant 11:28:56

Page 77

20 (Pages 74 - 77)

antitrust market in which Apple's App Store 11:28:58 operates is the market for the sale of iOS apps and in-app content in the United States."

Do you agree with that conclusion of Professor Stiglitz? 11:29:12

A. I -- I do. The subtext here is that the -- iPod Touch devices have come up, and I'm not sure what the relevant -- exactly how this sentence relates to how they are treated.

Q. That -- that was -- you're reading my 11:29:38 mind, because I wanted to ask that.

Based on your understanding, are paid app downloads and in-app transactions made by the iPod Touch in or outside the relevant market?

MR. RIFKIN: Objection to form. 11:30:00

THE DEPONENT: And my view is that the damage model can handle either case. My view as a person who's looking at the data is that it's going to make very little difference to -- in any -- any of the calculations. But it's not going to make 11:30:13 zero difference. So I think -- the calculations will have to be run whatever is decided on that issue.

Q. (By Mr. Swanson) The definition of the class doesn't affect the economic delineation of 11:30:31

Page 78

the relevant market, does it? 11:30:36

A. I think, as an overall statement, the answer is no, it should not.

Q. I wanted to ask you about paragraph 14 through 16 of your report. 11:31:14

Do you want to -- if you want to flip and take a quick look at those, although I'll take them one by one.

This is the part of your report where you summarize Professor Stiglitz' opinions about three 11:31:29 categories of Apple's conduct?

A. Yes.

Q. And you find these conclusions of Professor Stiglitz to be consistent with the opinions you have previously expressed; is that 11:31:46 right?

A. Yes.

Q. I'm going to start with paragraph 14.

You refer here to Professor Stiglitz' opinion that "Apple's policies prohibit developers 11:32:01 from distributing storelike apps, that is, apps that distribute other apps through the App Store."

Do you see that?

A. Yes.

Q. What is a storelike app? 11:32:15

Page 79

A. My understanding is that it would be -- 11:32:25 and -- an app which would allow you to acquire other apps or app content through some device other than through the Apple Store. That is, it would direct you to some -- some alternative. Or even 11:32:44 within this app, you would buy another app and pay for it outside the App Store. The Apple app.

Q. Would storelike apps compete with Apple's App Store?

A. Well, I think that the -- the 11:33:04 redirection -- the point redirection would be to outside the -- the rules of the Apple App Store.

Q. Would that make the developers of storelike apps competitors of Apple?

A. The answer is that I -- I have not 11:33:34 thought about this significantly. This is basically just my summary of what I understand is -- is Professor Stiglitz' opinion.

But I believe the answer is yes. That is to say, if -- and -- and within -- within an app 11:33:51 you could set up an account and buy in-app content through that app without ever having it go through the Apple payment system and subject to Apple commissions, yes, it could be a direct competitor.

Q. Also in paragraph 14, you summarize 11:34:17

Page 80

Professor Stiglitz' opining that "Apple imposes 11:34:23 contractual and technological restrictions that effectively prevent developers from selling apps to iOS device users throughout any channel other than the App Store." 11:34:35

Do you see that?

A. Yes.

Q. Do you understand that these restrictions that he's referring to effectively prevent developers from selling storelike apps to iOS 11:34:45 device users through channels other than the App Store?

A. Again, this is a -- a reference to Professor Stiglitz, so I have not investigated this personally myself. But my -- my understanding is 11:35:03 that a channel other than the App Store would be some -- some mechanism by which you could go to something on the Internet, say on your iPhone, and from that engage in a download which would end up with an app being installed on your iPhone and that 11:35:26 you would pay for through, say, perhaps putting in a credit card number directly to that site, and that would -- circumvent the -- the Apple sales commission.

Q. Have you heard the term "side loading" 11:35:47

Page 81

21 (Pages 78 - 81)

been used in reference to such an approach? 11:35:49

A. I'm -- I'm -- I encountered that term first in reading Professor Stiglitz' report.

Q. And do you understand him to be using the term "side loading" in the context that you just described? 11:36:03

A. I think that's right. I have not engaged in any separate independent investigation of that.

Q. Is your understanding that the restrictions that you're summarizing here from Professor Stiglitz' report apply equally to storelike apps and non-storelike apps? 11:36:22

A. Well, if -- I'm not sure even what the distinction is here. I think storelike apps are when you sell nondigital content, and if that's -- if that's the -- what that means, then I'm aware that Apple has a different system for -- for handling those than it does for digital content. 11:36:44

Q. Yeah. Fair enough. I think Professor Stiglitz is just referring to apps with digital content or sales, right? 11:37:06

A. Well, certainly the -- the -- the issue here in this market are the apps which provide digital content. 11:37:21

Page 82

Q. Are there apps other than storelike digital -- storelike apps that would be in competition with Apple's App Store if stores were allowed on the App Store or if side loading was allowed? 11:37:28 11:37:53

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, I think that Amazon would very much like to be able to provide apps for the iOS system.

Q. (By Mr. Swanson) That would be a storelike app, right? 11:38:07

A. Well, again, the distinctions here are digital -- how it would be treated by Apple as digital content or nondigital content and whether they would impose on the Amazon store a commission for digital content. 11:38:21

And having said that, I would say we're getting into language and business operations here which I don't -- have not studied and I don't have any detailed opinions on. 11:38:45

Q. In your summary of Professor Stiglitz' opinions which you say are consistent with your own, he speaks and you summarize his opinion about "contractual and technological restrictions," right? 11:39:08

Page 83

A. Which paragraph is this in again? 11:39:09

Q. I believe we're still in 14.

A. Still in 14.

Q. At the bottom of page 4 where you say -- although you're summarizing his opinions, you say, "Additionally, Apple imposes contractual and technological restrictions that effectively prevent developers from selling apps for the iOS device users to any channel other than the App Store." 11:39:23

Do you see that? 11:39:40

A. Yes.

Q. Do you have any understanding of the difference between the contractual and technological restrictions referred to here?

A. Well, the technological restrictions I think primarily refer -- refer to jailbreaking, in which an app would be installed in violation of the -- of the Apple warranty on the devices. 11:39:50

And the contractual ones -- well, might -- might -- an example might be subscriptions and -- and the ability of -- of streaming services, for example, to bill their subscribers outside the Apple Store. 11:40:19

Q. What technological restriction are you referring to when you talk about jailbreaking? 11:40:43

Page 84

A. Well, I don't know much about jailbreaking, but I understand that basically a hacker can or at least used to be able to break into the operating system and override its -- some of its restrictions so that external apps could be installed. And I think I've just told you everything I know about jailbreaking. 11:40:48 11:41:05

Q. Is it your understanding that Professor Stiglitz opines that jail -- that prevention of jailbreaking is an anticompetitive act of Apple's? 11:41:23

A. I don't have any understanding of that. I don't recall anything in what I read in which he says has an opinion on that.

Q. Do you have an opinion on that? 11:41:42

A. No. That's -- that's a more complicated issue. I think that gets into the issue of the integrity of the operating -- the operating system.

Q. So you -- you don't have an opinion, right? 11:42:02

A. I do not have an opinion.

Q. Do you know if there are any other technological restrictions that are being referred to here in paragraph 14?

A. I don't have -- I made no independent 11:42:15

Page 85

22 (Pages 82 - 85)

study of this subject.    11:42:18

Q. Have you ever heard of "code signing restrictions"?

A. I -- I've heard the term, but I don't know what it means.    11:42:35

Q. Okay. Is it fair to say you therefore do not hold an opinion that code signing restrictions are anticompetitive conduct of Apple's?

A. Yes, I have no opinion on that.

Q. Turning to paragraph 15 of your report,    11:43:01 the second category of conduct on which Professor Stiglitz opines, as you indicate here, is "Apple's requirement that developers distributing their apps through the App Store use Apple's own payment processing system, iAP, when selling their    11:43:18 digital in-app content."

Do you see that?

A. Yes.

Q. Do you understand that to be a contractual or technological restriction?    11:43:26

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, I would say it -- I'm not sure what the distinction is. I -- it seems like it would be mostly -- mostly a contractual prohibition, but it would be    11:43:52

Page 86

accompanied by, you know, basically whether the --    11:43:56 the -- did the Apple -- I don't know the word for it. You know, the windows into the operating system would -- would allow an app developer to request payment through a separately set up account    11:44:15 or not.

Q. (By Mr. Swanson) The references in Professor Stiglitz' report, the contractual restrictions, do you know who those contracts are with? Are they with consumers or developers or    11:44:37 both?

MR. RIFKIN: Objection to form.

THE DEPONENT: I don't know.

Q. (By Mr. Swanson) Looking at paragraph 16, this third category of conduct on    11:44:47 which Professor Stiglitz opines, the reference here is to anti-steering restrictions.

Do you see that?

A. Yes.

Q. We have, I think, spoken about these    11:45:08 before in a prior deposition. Your damage methodology takes account of the anti-steering restrictions; is that still correct?

A. I would say that the damage methodology or architecture of the damage analysis works off    11:45:40

Page 87

the difference between the actual commission, sales    11:45:44 commission rate and the but-for sales commission rate, which has been put forward as publicly available in a competitive market.

And it -- it doesn't directly depend on    11:46:03 what the nature of the offending conduct is, but certainly if -- if there were no anti-steering restrictions and consumers could readily pay for things through -- set up their own accounts with other people, that would certainly reduce Apple's    11:46:30 ability of monopolize -- monopolize through the control of the payment system.

Q. And that specific restriction, if it were assumed a way, would also logically reduce the but-for commission rate; is that right?    11:46:52

MR. RIFKIN: Objection to form.

THE DEPONENT: I don't know. I haven't thought about that, and I don't see a direct connection.

Q. (By Mr. Swanson) You submitted a    11:47:09 declaration at some point years ago addressing what was plaintiffs' then attempt to add a state law claim that was directed at Apple's anti-steering provisions.

Do you remember that?    11:47:25

Page 88

A. I don't remember.    11:47:27

Q. Okay. If you look at paragraph 17, there you say at the beginning, "Together, Apple's conduct has allowed it to acquire monopoly power, the exercise of which has harmed consumers."    11:47:44

When you say "together," you're referring to the three categories of conduct that -- that are summarized in the three paragraphs above?

A. Yes.

Q. Do you have any opinion as to whether    11:48:03 the -- any subset of those three categories of conduct inflict the same amount of harm on consumers?

A. I have not studied the issue. I have no opinion.    11:48:22

Q. Paragraph 18 of your report, you say, "My damages model estimates the effect of Apple's conduct on the prices paid by consumers for iOS apps and any content."

Which conduct of Apple are you referring    11:48:48 to? Is it all three of those categories from Professor Stiglitz' report?

A. It's -- it's the summary of all conduct which would lead the Apple Store commission to be higher then a competitor rate.    11:49:06

Page 89

23 (Pages 86 - 89)

**SER-82**

Q. Does any element of conduct suffice to result in the but-for commission dropping to 13.6 percent?

A. That's a question for Professor -- for Dr. Abrantes-Metz.

Q. Is that a question for Professor Stiglitz as well?

A. I suppose, yes, it would be a fair question for him.

Q. There's nothing in your model other than level of the but-for commission that could account for different combinations of conduct being found to be unlawful short of the entire set of conduct, is there?

A. The answer is that the model works on the basis of a competitive rate, and so the -- it distinguishes only what the as-is actual rate established by Apple and what is projected to be -- is estimated to be the rate that would have prevailed absent the -- the alleged conduct.

And if some of that conduct were -- were questioned, then the issue would be what -- whether that would change the competitive.

I think the answer is that the competitive rate is based on comparables which

Page 90

are -- which have the -- the features of competition, so that should be relatively immune to the -- the question of what -- exactly how -- how Apple accomplished the rates it was able to charge.

Q. Could your model estimate the effect of the technological restrictions alone?

A. I think my -- my previous answer applies here, which would be the question -- the question is if you have only technological restrictions, would that change Dr. Abrantes-Metz' view on what the competitive market would have looked like, and I think -- I think the answer is probably no, that she would say that her basis for the competitive market is what goes on -- for her benchmark is what goes on in comparable markets.

Q. And that's your supposition? Is it -- is it your opinion -- do you have any opinion on that yourself?

A. I think that's basically the -- the -- the -- the economic substance of the matter.

Q. So if the jury were to find that the so-called anti-steering restrictions were not unlawful, that the iAP requirement was not unlawful, that the technological restrictions were not unlawful, your sense of the nub of the

Page 91

economics is the but-for commission rate would still be 13.6 percent?

MR. RIFKIN: Objection to form.

THE DEPONENT: The answer is I -- I haven't thought about that and -- and I don't know. But if -- if Apple is engaged in no -- no anticompetitive conduct, then -- then it presumably has a case that its rate is the competitive rate, and then there's an issue that Dr. Abrantes-Metz is -- I don't think I would agree with that.

Q. (By Mr. Swanson) I guess I'm getting at a situation where some but not all of the conduct is found to be unlawful, and I'm just trying to understand whether you've indicated that you think that isn't likely to matter to Dr. Abrantes-Metz' conclusion about the but-for commission rate.

A. Well, I would say that -- that -- that the question for her, then, would be if there's -- there's certain kinds of acts that are unlawful, then she needs to -- that are not found unlawful, then what would happen in comparable markets where those practices are present and what kinds of rates would prevail there.

Q. If some conduct is found to be lawful and some to be found unlawful, nothing in your model

Page 92

needs to be adjusted if anything other than the but-for commission rate; is that right?

A. That's right.

Q. Are you aware of Dr. Abrantes-Metz currently in her report offering any opinion about what the but-for commission rate would be if some of the challenged conduct was found to be lawful?

MR. RIFKIN: Objection to form.

THE DEPONENT: I didn't look for anything on that subject when I was reading the report. I don't recall reading anything about it.

Q. (By Mr. Swanson) Does your model offer any estimate of what download prices consumers would pay for storelike apps in the but-for world?

A. The model currently deals only with apps that have either paid download or iAP in the -- in the as-is world, so that to the extent that an App Store is selling nondigital content and is not subject to Apple commissions, it's -- it's outside my analysis.

Q. Well, if the but-for world reflects the removal of the alleged anticompetitive conduct, and one aspect of the anticompetitive conduct that's alleged is the refusal to allow storelike apps to sell digital content, don't you need to predict

Page 93

24 (Pages 90 - 93)

what the price of the storelike apps would be in the but-for world?

A. I think the question -- the answer to the question is that one has to think about what -- a competitive alternative to the as-is world would be with either rival app stores being available to consumers or Apple engaging in limit pricing so that they don't enter. And I believe that's the nature of -- of Dr. Abrantes-Metz' analysis.

Q. Well, Dr. Abrantes-Metz assumes at least one rival competitor enters the market, doesn't she?

A. That's my recollection, yes.

Q. All right. Do you have any understanding as to whether that rival is distributed through Apple's App Store or outside of Apple's App Store by side loading?

MR. RIFKIN: Objection to form.

THE DEPONENT: I actually haven't asked the question. I would -- I would assume that it would operate -- I'm not sure what the distinction between side loading and -- and independent operation would be, in fact.

Q. (By Mr. Swanson) Well, you understand that one of the complaints plaintiffs raise is that

Page 94

Apple won't allow apps that sell digital content to be distributed in the Apple App Store, right?

A. I understand that part.

Q. Right.

In a but-for world, it's at least possible that there would be such applike -- storelike apps, correct?

A. Yes, there could be. And the issue is would those apps charge for downloading? I don't know.

Q. But doesn't your model need to predict what those prices would be in the but-for world?

A. The model operates off the -- Apple's but-for commission, and so the -- your question is you need to have a great deal more detail on the nature of -- of the but-for world to support that but-for commission, and -- and the answer is that's a question for -- for Dr. Abrantes-Metz.

Q. Okay. Is it a question for Professor Stiglitz too?

A. Perhaps.

MR. SWANSON: Let's mark as what would be DX62.

(Exhibit DX 62 was marked for identification by the Court Reporter and is

Page 95

attached hereto.)

MR. SWANSON: Let's mark as DX62 the stipulation that contains the operative complaint in this case.

Q. (By Mr. Swanson) Go ahead and flip through that and see if it refreshes your recollection on having seen it before.

A. Very dimly. I don't --

Q. Okay.

A. I think I have seen it before, but I don't remember when.

Q. Can you please turn to paragraph 51 of the complaint. It's on page 12.

Let me know when you've had a chance to look at that.

A. I'm reading it now. I read the paragraph.

Q. Okay. Do you understand this to set forth the conduct that plaintiffs allege has enabled Apple to acquire and maintain a monopoly in the iOS app aftermarket?

A. And I -- I have seen this before, but I don't remember this -- this paragraph, and reading it now, I'm not -- I'm not really prepared to make comments on it.

Page 96

Q. Is there any conduct you understand plaintiffs to be challenging that is not discussed in this paragraph 51?

A. Paragraph 51 seems to refer specifically to -- to the locking provisions on -- on the devices, and as Professor Stiglitz has -- has claimed in his report, there are other contractual nonsteering provisions and -- and contractual requirements to use the -- the Apple store payment system and so forth, which he uses also be legs -- legs of the anticomparative score.

Q. Yet when you reviewed this, did you see anything at all that challenges the anti-steering provisions or the iAP provisions?

MR. RIFKIN: Objection to form.

THE DEPONENT: You're referring to paragraph 51?

Q. (By Mr. Swanson) Well, or this entire complaint.

A. Oh, well, I don't -- unfortunately it's been so long that this is dim in my memory. I don't recall this document content anymore.

Q. And you don't recall plaintiffs at one point attempting to amend their complaint -- unsuccessfully attempting to amend their complaint

Page 97

25 (Pages 94 - 97)

to add a challenge to Apple's anti-steering 12:05:05 provisions?

MR. RIFKIN: Objection to form.

THE DEPONENT: The answer is no, I don't remember. 12:05:13

Q. (By Mr. Swanson) And you don't remember submitting a declaration in support of that effort?

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, as I sit here, I don't remember. I don't remember the declaration. 12:05:23

Q. (By Mr. Swanson) Paragraph 51 of the complaint discusses conduct that involves voiding the warranties of iOS device consumers who bought competing apps.

Do you see that? 12:05:47

A. Yes.

Q. Is that conduct that you understand is alleged to be anticompetitive in this case?

A. I don't recall, but I believe so, yes.

Q. Do you have any understanding or opinion 12:06:28 as to whether Apple voids the warranties of iOS device consumers who buy competing apps?

A. Actually, I don't know whether it actually does. I understand that -- it does announce -- have the ability to do that. 12:06:52

Page 98

Q. And what do you base that understanding 12:06:59 on?

A. Really, this goes back in history to the discussions prior to my filing my original report four -- four years ago, and I think staff at that 12:07:18 point told -- told me that Apple was very opposed to jailbreaking and had engaged in -- a series of soft -- developed an operating system which made jailbreaking more difficult.

Q. Does your model estimate damages based on 12:07:47 that conduct?

A. My model operates off the but-for commission rate estimated by Dr. Abrantes-Metz and does not go behind that to -- to Apple's conduct except that whatever Apple did, it was able to 12:08:17 establish commissions in excess of what comparable markets with competitive rivals charge or are calculated to be able to charge.

Q. All right. You can put that aside for the moment. Thanks. 12:08:40

And we can turn back to your report. Paragraph 19 of your report, please, if you can turn to that.

You state in the first sentence there of paragraph 19 the model that you developed "is 12:09:07

Page 99

intended to estimate and quantify the monetary harm 12:09:09 incurred by consumers as a result of overcharges for their app and in-app purchases relative to what they would have paid for these purchases absent Apple's alleged misconduct." 12:09:24

Do you see that?

A. Yes.

Q. By "monetary harm," you are referring to quantifying an overcharge on the commission and the impact of that on consumer prices, correct? 12:09:37

MR. RIFKIN: Objection to form.

THE DEPONENT: Yes, for -- for as-is purchases.

Q. (By Mr. Swanson) When you say that your model does not capture other forms of harm that 12:09:53 consumers may have incurred as a result of Apple's alleged misconduct, are you referring to any other forms of monetary harm?

A. The -- the answer is -- let me step back, perhaps tell you about why this paragraph is here. 12:10:19

In my original report and supplementary report, I used "harm" as a synonym for an overcharge.

Professor Stiglitz talks about harm in -- in a broader sense, I think which involves 12:10:37

Page 100

consumer -- consumer satisfaction. 12:10:41

And so I want to draw a distinction between my use of the word "harm" and my earlier reports in the use -- his use of the word "harm," and -- and I -- the point is that there can be 12:10:55 forms of impacts on consumers' satisfaction separate from the issue of its impact on their -- on their payment, their monetary payment.

And I am not offering opinions on -- on that or trying to quantify that. 12:11:15

Q. And my question was: Are those other forms of harm considered by you to be monetary harm?

A. Well, that's -- that's -- you ask a deep economic question, which is can changes in consumer 12:11:32 satisfaction be monetized, and I think the -- the answer is they -- they can be, but not necessarily in conformity with legal precedents and standards.

Q. So those other forms of harm, to your mind as an economist, are also monetary harm, but 12:12:03 they may not be legally recoverable monetary harm?

MR. RIFKIN: Objection to form.

MR. SWANSON: I'm trying to understand.

THE DEPONENT: Yeah, that's -- I think that's -- that's a -- a fair characterization, in 12:12:13

Page 101

26 (Pages 98 - 101)

fact, to that -- and economists can do consumer 12:12:16
surplus measurements in the -- in the traditional
economic use of that term, but monetary
standards -- I'm sorry.

The legal standards for -- for the 12:12:31
recovery are often based in terms of actual lost
income rather than the deeper question of -- of
trying to balance or -- or monetize consumer
satisfaction.

Q. (By Mr. Swanson) With reference to the 12:12:53
harms that Professor Stiglitz speaks of, the
broader harms, those include loss in output or
reduction in app variety; is that correct?

A. Yes.

Q. To your knowledge, has any expert in this 12:13:18
matter proposed a model to calculate damages to
class members from lost output or reduced app
variety?

A. In the case? I'm not aware of this being
done in the case, no. 12:13:31

Q. Do you know how Professor Stiglitz
defines "output" in this context?

A. I -- I suppose he's using the common
economic understanding of that term, but no, beyond
that, I don't know his definition. 12:13:49

Page 102

Q. And the economic understanding of that 12:13:50
term would be transactions or something else?

A. It would -- it -- we need to talk about
what we're transacting for, yes, and for a measured
product incoming units it would be the quantity of 12:14:06
units, yes.

Q. You contend that the extent of harm that
your model estimates is conservative, right?

A. I would say that it is -- it is in the
sense that loss of variety, loss -- loss of quality 12:14:29
are -- are things which are detrimental to consumer
satisfaction.

Q. By describing your model as conservative
in that sense, do you mean to opine that class
members are owed more damages then your model 12:14:53
calculates?

A. No. I think what they're owed can -- has
to be -- conform to legal standards for recovery,
and I -- and in this case, my damage model is based
on what I understand to be a legal standard that -- 12:15:14
that over -- overcharges our category that can be
recovered.

I don't have an opinion on -- on the
other matters or...

Q. Your model estimates that some class 12:15:33

Page 103

members paid lower prices as a result of Apple's 12:15:35
conduct, correct?

MR. RIFKIN: Objection to form.

THE DEPONENT: The model damage
calculation has a small percentage of consumers -- 12:15:48
or a small percentage of app purchases where the
model implications are that they would have paid --
paid more in the but-for world. That's correct.

Q. (By Mr. Swanson) What makes you say that
there are a small number of transactions? 12:16:09

A. A small percentage.

Q. What makes you say there's a small
percentage of transactions that would have been
priced higher in the but-for world?

A. Oh, that's -- that's -- that's -- comes 12:16:24
from the results of the model estimation as
described in my supplemental report, for example.

Q. To the extent prices would be higher in
the but-for world on account of Apple's conduct,
the consumers who paid those particular prices 12:16:49
obtained a monetary benefit, did they not?

A. They did, yes.

Q. Do you have any opinion as to whether
some class members obtain nonmonetary benefits from
Apple's conduct? 12:17:04

Page 104

A. I -- I have an opinion as an economist 12:17:12
that -- that there was harm incurred by consumers
and potential consumers as a result of conduct that
would restrict innovation or entry of alternative
products. 12:17:34

Q. Is the protection of consumer privacy a
nonmonetary benefit to a consumer?

A. I would think so, yes.

Q. Is the protection of a consumer's
security a nonmonetary benefit? 12:17:53

A. It -- it should be, yes.

Q. Does your model attempt to assess any of
those benefits to the extent they arise from
Apple's conduct in this case?

A. Well, they are issues in what the -- 12:18:12
whether -- whether a competitive market could
provide or would provide those same services. But
the model -- my damage model itself does not
attempt to monetize those.

Q. If your model does not account for 12:18:33
nonmonetary effects of Apple's conduct, how do you
know if any class member was harmed?

MR. RIFKIN: Objection to form.

THE DEPONENT: I think as a matter --
matter of economics in -- and consumer -- theory of 12:18:55

Page 105

27 (Pages 102 - 105)

consumers, innovations which lead to new -- new or higher-quality products or increased variety in the availability of products is something that increases consumer satisfaction.

So that -- they -- they would -- they would -- they have been harmed by not having access to those better products and more products.

Q. (By Mr. Swanson) So are you assuming that there are no benefits to Apple's conduct to consumers?

A. I think the issue is what -- what is -- what is the comparison of what Apple provides and what would be provided in a competitive market. I mean, if -- if the answer is that comparable products with comparable services are available in competitive markets, then the issue is simply what the price is for those.

Q. Well, your model shows that some prices are higher in the but-for world, right?

A. For some apps or in-app content, yes, they can be in the model.

Q. And is it possible in the but-for world that some consumers receive the benefit of -- in a nonmonetary sense from Apple's conduct?

MR. RIFKIN: Objection to form.

Page 106

THE DEPONENT: I think there's -- I cannot answer that question because I have not tried to quantify our -- consumer satisfaction and analyze it.

Q. (By Mr. Swanson) Okay. And you haven't tried to assess the potential nonmonetary benefits accruing in the form of increased consumer privacy protection and security as a result of Apple's conduct?

MR. RIFKIN: Objection to form.

THE DEPONENT: Please repeat the question.

Q. (By Mr. Swanson) You have not attempted to quantify any nonmonetary benefits flowing in to consumers from enhanced security or privacy on account of Apple's challenged conduct?

MR. RIFKIN: Same objection.

THE DEPONENT: The answer is I have not attempted to quantify that, nor if a competitive market provided comparable products, including comparable features like security and privacy, would -- would it be an issue.

Q. (By Mr. Swanson) Well, a comparable market would provide comparable prices, and yet you still find that there are prices in the but-for

Page 107

world that would be higher than they were in the real world, right?

MR. RIFKIN: Objection to form.

THE DEPONENT: I understood -- I may have misunderstood your question. I thought you were asking about privacy and security, and -- and my answer was that if you have a competitive market in which consumers can obtain products, the same apps at -- at lower prices with the same security and privacy provisions, then -- then there is no difference in -- in those dimensions --

Q. (By Mr. Swanson) That's what I'm trying to --

(Simultaneously speaking.)

THE DEPONENT: -- with that respect.

Q. (By Mr. Swanson) Sorry. Are you finished?

Yeah, that's what I'm trying to understand, because your model says there is a competitive market in the but-for world, and yet some consumers pay higher prices.

And my question is: Is it also possible in a competitive but-for world that some consumers will receive fewer privacy and security benefits?

MR. RIFKIN: Objection to form.

Page 108

THE DEPONENT: I think the answer to that is that -- that -- that's a legitimate question about the nature of the -- of the competition, and I would turn to Abrantes-Metz and ask in -- in comparable markets, what -- what, in fact, is the nature of these additional dimensions of product quality and are they, in fact, comparable markets in that respect. That -- that, I think -- is again the issue at hand.

Q. (By Mr. Swanson) Could you turn to paragraph 20 of your report, please.

Focusing for the moment on the beginning of that paragraph where you state that "The App Store commission functions like a sale tax whose impact could be apportioned between consumers and developers using a tax incidence framework."

Do you see that?

A. Yes.

Q. A tax incidence framework, generally speaking, seeks to estimate how a tax on a product affects the prices that consumers ultimately pay for that product; is that fair?

A. Yes, both -- both sellers and buyers.

Q. Could you move forward to paragraph 22.

You state there that "Apple's App Store commission

Page 109

28 (Pages 106 - 109)

**SER-87**

has the same economic effects as a sales or 12:25:16 ad valorem tax, a tax assessed as a fixed percentage of a sales price."

Do you see that? At the end of the paragraph? 12:25:31

A. Well, let -- let me just read -- read the paragraph.

Yes. What's the question?

Q. Okay. You're not claiming the commission is an actual tax, correct? 12:25:57

A. No. The claim is -- in terms of -- in terms of economics, transactions between principals, the effect of an intermediary has a similar -- similar instance on -- on the -- on the principals whether it's a -- an Apple or Amazon or 12:26:27 the U.S. government or -- or a state sales revenue tax.

Q. The relevant aspect of the commission is that it is charged as a fixed percentage of the sales price, right? 12:26:50

A. Yes. Well, that's -- whether the tax is charged as a fixed percentage, whether it's charged as an excess tax, or whether it's -- it's paid by a bill to the buyer or bill to the seller, it is economically secondary because with the adjustments 12:27:16

Page 110

of supply and demand, there's -- there's some final 12:27:21 incidence in which the buyers pay some portion and the sellers pay some portion.

Q. The tax incidence framework would apply to any fee that is charged as a fixed percentage of 12:27:33 the sale price of an app or of in-app content; is that right?

A. I'm not sure where this question is going, but -- but -- but the answer is that there's -- there's a question of -- of how buyers 12:28:01 of multiple products or sellers of multiple products might respond to -- to a tax, but the -- the -- the -- overall, the answer is yes.

Q. So, for example, a percentage royalty charged to a developer on the price of an app or an 12:28:23 in-app purchase would be analyzed using the tax incidence framework, correct?

MR. RIFKIN: Objection to form.

THE DEPONENT: Please repeat the question. 12:28:36

Q. (By Mr. Swanson) A percentage royalty, for example, charged to a developer on the price of an app or an in-app purchase would be analyzed using the tax incidence framework, correct?

A. Could you give me an -- an example? 12:28:49

Page 111

Q. Developer has to pay someone 10 percent 12:28:53 of the purchase price of the app as a royalty.

A. So, for example, a -- a music provider to charge a -- a royalty fee which is a percentage of the -- of the price of -- of a Spotify 12:29:09 subscription? Is that --

Q. For example. Or a provider of intellectual property might charge 5 percent of the price of an app.

You're aware that's a common phenomenon, 12:29:25 aren't you?

A. Actually, I don't know -- I don't know that much about how -- how things like music are -- entertainment royalties are charged or exactly what the basis of the -- of the -- how the royalty fee 12:29:43 is established.

Q. Okay. Well, then, we don't need to have specifics.

But my question to you is general. If a royalty is charged to a developer as a percentage 12:29:55 of the price of the app or the in-app purchase, that particular royalty could be analyzed using the tax incidence framework; is that not correct?

A. I think yes, in principle. Yes, there would be some incidence of the royalty on -- on 12:30:16

Page 112

the -- on the consumer and some on the supplier. 12:30:18

Q. Do you agree that in the but-for world, Apple would charge a commission for its services?

MR. RIFKIN: Objection to form.

THE DEPONENT: I -- I'm -- I'm aware that 12:30:38 in general that intermediaries have costs, and they would -- at -- at -- certainly cover their costs on -- on a return on their investments, yes.

Q. (By Mr. Swanson) And what services do Apple's get -- I'm sorry. Strike that. 12:30:59

What services do developers get from Apple in exchange for paying the commission, in your opinion as an economist?

A. Well, I -- I would say that they get the -- the services comparable to what any whole -- 12:31:15 wholesaler or -- wholesaler or manufacturer gets from being able to distribute through a retailer to the customers.

Q. So distribution services?

A. Distribution services, information 12:31:33 services.

Q. Payment processing?

A. Perhaps -- perhaps -- perhaps other features. You mentioned privacy and security. That would be services, yes. 12:31:43

Page 113

29 (Pages 110 - 113)

Q. How about access to Apple's intellectual property?  12:31:45

A. I'm not so sure about that. I haven't thought about it. But I'm not sure exactly what -- what Apple's intellectual property claims would be  12:32:05 here in -- in a competitive environment, for example.

MR. SWANSON: Should we talk about lunch?

MR. RIFKIN: Sure. Why don't we go off the record.  12:32:29

MR. SWANSON: Let's go off the record.

THE VIDEOGRAPHER: Off the record. This marks the end of Media No. 3. The time is 12:32.

(Recess taken.)

THE VIDEOGRAPHER: This marks the  12:32:49 beginning of Media No. 4 in the deposition of Professor Daniel McFadden. We are back on the record. The time is 1:46.

Q. (By Mr. Swanson) Professor, is it your opinion that Apple is a retailer that sells iOS  01:46:55 apps in an app content?

A. I think that -- that would be appropriate in a description. I think of it more as a consignment store, which -- which essentially implies a project -- a venue where sellers can come  01:47:19

Page 114

together and process things through to buyers.  01:47:23

Q. Is it your opinion that app developers are suppliers that manufacture apps in an app content and supply them through Apple?

MR. RIFKIN: Objection to form.  01:47:40

THE DEPONENT: My understanding -- of developers is that -- is that they are producing digital products and -- and digital content. Then they sell those through Apple for use on iOS devices and perhaps two other channels for -- often  01:47:59 for use on other types of devices.

Q. (By Mr. Swanson) Is it your opinion that Apple pays developers a wholesale price for their apps and in-app items?

A. I think that can be one way to label  01:48:17 the -- the payments to developers. The arrangement is that developers are charged on a commission on the price they set for their products.

Q. Is it your opinion in the but-for world, Apple would pay developers a higher wholesale  01:48:37 price?

MR. RIFKIN: Objection to form.

THE DEPONENT: I think the results for any particular developer would depend on their particular product and the -- and the prices that  01:48:56

Page 115

they -- they would set forth in their marginal  01:49:00 costs, but -- but with -- with a -- a lower commission rate in many cases the result would be a -- a lower -- a lower price to -- to the buyer and a higher price to the -- the developer.  01:49:23

Q. (By Mr. Swanson) Is it your opinion that the wholesale price that Apple pays to developers in the but-for world would be higher if there were no iAP requirement?

A. What -- what do you mean by an iAP  01:49:48 requirement?

Q. Well, the -- the one that you summarized from Professor Stiglitz' report that you said was consistent with your own opinions that Apple requires developers to use its payment solution,  01:50:02 iAP?

A. Okay. Thank you for that clarification, but could you the start the question over again, then, please?

Q. Okay. So in the but-for world, would  01:50:17 developers be paying Apple for payment solution services?

MR. RIFKIN: Objection to form.

THE DEPONENT: I think that -- in -- in a competitive market for app devices, there -- there  01:50:39

Page 116

would be potentially rivals to an Apple App Store  01:50:44 and there would be some competitive commission rate established in that market, and that would -- that would include -- that was -- there would be a positive commission. I think that's what  01:51:03 Dr. Abrantes-Metz had given as evidence, that in the competitive -- in the comparable competitives that she's analyzed that that would be the case.

Q. (By Mr. Swanson) Professor Stiglitz opines, and you say it's consistent with your  01:51:29 opinion, that Apple's iAP requirement has foreclosed alternative to Apple's iAP system that likely would have existed but for Apple's conduct.

Do you recall that?

A. I -- I recall statements like that. I --  01:51:50 I don't recall specifically the restriction to iAP.

Q. Take a look at paragraph 15 of your report.

Go ahead and look at that. We don't need to read it out loud.  01:52:13

A. Yes. Oh, yes.

Q. You are refreshed?

A. My memory is refreshed, yes.

Q. So that implies, does it not, that in the but-for world, some developers would likely have  01:52:39

Page 117

30 (Pages 114 - 117)

used alternative iOS in-app payment processing 01:52:41 solutions?

A. I'm not sure that -- about the adjective "likely," but they would have that option, yes.

Q. Well, you say "Apple's iAP requirement 01:52:58 has foreclosed alternatives to Apple's iAP system would likely would have existed but for Apple's conduct."

Do you not think that's likely anymore?

MR. RIFKIN: Objection to form. 01:53:17

THE DEPONENT: Oh, no, I think that -- there's two statements, and I would make the distinction. Are there some -- some developers who would like to use alternative payment systems? I think demonstrably, yes. Some have tried to answer 01:53:31 to that.

Do I think that all developers or many developers would choose alternative systems? And the answer is I don't know. I haven't studied the issue. 01:53:48

Q. (By Mr. Swanson) Does your methodology take account of the likelihood that some developers would not be purchasing payment solutions from Apple?

A. My interpretation of -- of the 01:54:06

Page 118

Abrantes-Metz but-for commission rate is that 01:54:10 it's -- is a commission rate which would prevail either if there were an active rival in the market or if Apple effectively adopted that rate so that rivals would be deferred from entering the market; 01:54:28 that is to say they would engage in limit pricing.

I -- I have no opinion on what would actually occur, but that's my interpretation of the meaning of the but-for commission rate.

Q. Well, you do say in paragraph 15 that 01:54:47 "alternatives likely would have existed," so that suggests that someone would not be foreclosed in the but-for world, does it not?

A. I think -- this is nitpicking, but I think the potential -- the potential rivals and 01:55:18 actual rivals is -- really -- really a question to be determined as to whether injury would actually occur, and that would -- that would depend on Apple's but-for conduct and exactly what form it would take. It could -- it could, I think, 01:55:36 legitimately discourage entry of rivals by pricing it in such a way that it's not profitable for them to come in.

(Exhibit DX63 was marked for identification by the Court Reporter and is 01:55:46

Page 119

attached hereto.) 01:55:46

MR. SWANSON: I'd like to mark as DX63 the document entitled "Choice: What can go wrong."

THE DEPONENT: I have it.

Q. (By Mr. Swanson) You have it now. 01:56:28

Is this a paper that you wrote, Professor McFadden?

A. It is.

Q. Can you turn to page 14, please. And I'd like to ask you about, I guess, what is the second 01:56:47 paragraph where you say, "A common form of economic organization of a market for branded products are consignment stores that facilitate search among products by posting prices set by suppliers and/or processing transactions and charge suppliers 01:57:02 commissions for their services."

Do you see that?

A. Yes.

Q. And you mentioned earlier that you think of the App Store more of a consignment store now; 01:57:13 is that --

MR. RIFKIN: Objection.

I'm sorry. Objection to form.

I didn't mean to interrupt.

THE DEPONENT: Well, the term 01:57:22

Page 120

"consignment store," I use -- I don't think this is 01:57:23 idiosyncratic to me, but I use "consignment store" as -- as my description of -- a source of anywhere from department stores and supermarkets to auction houses and -- and Amazon as stores that provide 01:57:40 a -- a forum in which suppliers can bring their goods to sell and -- and put -- have them displayed in a way in which buyers can find that they can fulfill the transactions and accomplish what they need to accomplish. 01:58:03

Q. (By Mr. Swanson) So does this description of consignment store apply to the App Store?

A. I think it does.

Q. In the paper here, you give the example 01:58:22 and you just gave the example in your testimony of the Amazon store.

Is the Amazon marketplace store a two-sided platform?

A. I earlier made the point that my use of 01:58:43 the term "platform" is maybe different from the -- from the legal one.

But yes, consignment -- consignment store involves -- involves two-sided market, yes. I would call it a platform in economic terminology. 01:59:03

Page 121

31 (Pages 118 - 121)

Whether it would be called a platform in legal     01:59:06
terminology where there's an -- added issues of
network externalities is -- is -- I'm -- I'm
unclear on -- what the final meaning in the legal
parlance is of that.     01:59:26
   Q.  Okay.  Well, I'm just asking you as an
economist, so I don't think you need to worry too
much about the legal terminology.
   A.  I would say in -- in the way -- the way I
use the word "platform" in economic settings, yes,     01:59:41
it's a two-sided platform.
   Q.  Do you have an understanding as to
whether or not the Amazon store, as you referred to
it here, benefits from any type of network effects?
     MR. RIFKIN:  Objection to form.     01:59:59
     THE DEPONENT:  I haven't studied that
specifically.  I think there is a -- a -- some
distinction between platforms like credit cards and
platforms like a -- like basically a supermarket
or -- or a farmer's market.  I think the networks     02:00:29
or externalities for credit cards are qualitatively
different than what -- whatever net -- kind of
network effects there might be for -- for a -- a
department store -- or -- or a farmer's market.
   Q.  (By Mr. Swanson)  Well, the Amazon store     02:00:49

Page 122

you're referring to is the one where the suppliers     02:00:51
set the prices, not Amazon, right?
   A.  Yes.  In that sense, it's -- when I use
the term "consignment store," I'm thinking of
stores in which the seller is a posting a price.     02:01:07
   Q.  Like a supermarket, typically the
supermarket sets the prices, not the suppliers of
milk and cheese and peanut butter, right?
   A.  I think as -- as economists, we recognize
that if these principles are rational, they respond     02:01:25
to the price they actually pay, and it's -- really
quite immaterial as to who actually names the price
and whether you get the -- the wholesale or the
retail version of that price.  In the end, it
worked out as the final prices paid by consumers     02:01:49
and received by suppliers.
   Q.  So your opinion as an economist is it
doesn't matter how the transaction is structured
vertically?
     MR. RIFKIN:  Objection to form.     02:02:14
     THE DEPONENT:  I think that's -- that
seems like a very broad statement.  I suppose there
might be situations in which -- how a structure
would matter, and particularly if -- if either
buyers or sellers are perhaps un- -- unaware or     02:02:27

Page 123

not -- not fully informed that it could matter.     02:02:32
     But I think that -- certainly the
economic fundamentals are that a rational economic
agent is concerned with what they actually pay or
to buy when they sell or a buy or sell.     02:02:55
   Q.  (By Mr. Swanson)  Could you -- you can
put that aside for a moment.  We'll come back to
it, that Exhibit 63.
     But if you could pull your report from
the pile again, I would like to ask you to turn to     02:03:09
paragraph 38.
   A.  I have it in front of me.
   Q.  You say there in paragraph 38 that your
"tax incidence model requires three components as
an input."     02:03:36
     Do you see that?
   A.  Yes.
   Q.  Your model depends on assumptions as well
as these three inputs, correct?
   A.  Well, it's a framework that depends on a     02:04:00
long-term economic understanding of how
intermediaries in a market affect the principals
on -- on both sides.  And of course, it reflects my
judgments on how to carry out the design and doing
the analysis, given the kinds of data that are     02:04:34

Page 124

available.     02:04:37
   Q.  And that judgment is reflected in the
making of certain assumptions, is it not?
   A.  I would say yes, that's true.
   Q.  And there is a difference between an     02:04:47
input and an assumption, isn't there?
   A.  I'm not sure that I understand what --
what you're getting at there.  For -- let's take,
for example, the but-for rate.  That's an input to
the model.  It's also -- I have been asked to make     02:05:11
that as an assumption that that would be the --
but-for rate.
   Q.  Okay.  Are either of the other two inputs
assumptions?
   A.  Well, I would say estimation of consumer     02:05:41
demand and the developers' costs which were
inferred from the available data both involved
inputs of data and -- and economic theory.  I
suppose all economic theory could be characterized
by -- as an assumption, but it's an assumption     02:06:11
informed by historical successes and failures.
   Q.  Could you turn to paragraph 30 of your
report.
     MR. RIFKIN:  3-0?
     MR. SWANSON:  3-0.     02:06:25

Page 125

32 (Pages 122 - 125)

MR. RIFKIN: Yeah.

THE DEPONENT: I have that in front.

Q. (By Mr. Swanson) Okay. Second sentence of that paragraph says, "App developers set prices to maximize profits given their costs and the consumer demand they face rather than taking the market price as given."

Is that an assumption?

A. I would say that is a -- yes, that is a standard economic assumption in economics that firms -- app developers or firms seek to maximize profits.

Q. Is it a standard assumption in economics that all firms do not take the market prices given?

A. I'm sorry?

Q. Let me put it differently.

If you were assuming that developers set prices in a competitive market, wouldn't you assume that they would take market price as given?

A. I think the proposition -- the general economic proposition is that firms will -- firms seek to maximize prices in a -- in a perfectly competitive market, they will find that they have no ability to alter their price from the competitive low.

Page 126

Q. And that means they will take the market price as given --

A. That -- that their profit maximization choice will turn out to be the market price, yes.

Q. So you're not assuming a competitive market that developers are operating in here?

A. No, I am definitely not assuming, nor do I think there is evidence that it's a competitive market.

Q. In paragraph -- well, turn to paragraph 40, please.

A. 42, did you say?

Q. 40. 4-0.

A. I have that in front of me.

Q. Okay. The next to last sentence of paragraph 40 says, "In economic terms, the profit-maximizing firm sets price at a level where the marginal revenue equals the marginal cost."

Do you see that?

A. Yes.

Q. Would you agree that in economic theory, marginal revenue is equal to price in a competitive market?

A. No. Typically marginal revenue is not equal to price because --

Page 127

Q. In a competitive market?

A. I'm sorry. In a competitive market?

Q. In a competitive market.

A. Oh, sorry. I -- I misheard.

Yes, in a competitive market, any firm that tried to do this calculation would find that marginal revenue would equal price, yes.

Q. And in a competitive market, an economist would say that price is equal to marginal cost, correct?

A. I'm sorry. I'm losing track. Please repeat.

Q. Yeah. Sorry.

In a competitive market, an economist would assume that price and marginal cost are equal; isn't that true?

A. I wouldn't call that an assumption. That's a -- a consequence of a competitive market.

Q. You would agree that apps are not homogenous products, wouldn't you?

A. I think it's clear that they are branded products.

Q. They are branded and differentiated in other ways as well, right?

A. In many cases, yes.

Page 128

Q. You're assuming in your model that developers have some market power, correct?

A. Yes. It goes with the proposition that you have some ability to change your price that -- that gives you some limited local market power at -- at the least.

Q. You're assuming that developers have the power to set price above marginal cost, correct?

A. I don't know that I -- I wouldn't say that that's an assumption. That is -- that is a property of -- of a firm's operating in a market where there's branded -- differentiated products and -- and consumers place some value on the branding or heterogenous features in those products.

Q. Are you making any assumptions about the degree of market power held by developers?

A. I don't -- I don't believe so. I don't -- assuming that they have the ability to list different -- different prices in -- for their branded products, then they would see some -- variation and demand depending on the prices they set, and they would do the economical calculation to find the best price for them.

Q. Have you analyzed whether developers have

Page 129

33 (Pages 126 - 129)

increased their market power since the App Store opened in 2008?   02:12:26

A. No, I have not examined that question. I'm -- I think that I can understand how one might do that by looking at the number of apps that are available and so forth.   02:12:47

Q. Have you seen any evidence that developers on average have raised the price of their apps or in-app content since 2008?

A. I haven't -- I haven't looked for it, so I don't know.   02:13:13

Q. Would it surprise you if the average cost of an app on the App Store has increased significantly since 2008?

A. Well, I don't think we have direct observation on those costs. We have direct observation on the prices.   02:13:24

Q. Yeah. I'm sorry.

A. And of course you'd have to adjust those to real -- to real terms to make this a fair comparison. And the answer is I have not done that.   02:13:35

Q. And I'm sorry. I said cost. I meant to say the price of the apps.

Have you seen any evidence that the   02:13:48

Page 130

average price of apps on the App Store have increased significantly since 2008?   02:13:50

A. The answer is I have not looked.

Q. You would agree that Apple has not raised the commission at any time since the inception of the App Store, wouldn't you?   02:14:04

A. That's my understanding, yes.

Q. What economic factors would cause the developers to raise their prices after 2008?

A. First of all, I -- I don't know that they would. I could imagine that as the overall size of the market for -- aftermarket for iOS apps has -- has grown that there is -- has been entry, and -- and some of that entry would be probably for more -- for higher-cost apps would -- would enter and -- and so prices would be on average affected by that kind of entry.   02:14:31   02:14:55

Q. Could increasing developer market power be a factor that could cause developers to raise their prices subsequent to 2008?   02:15:17

A. Well, I would agree that the -- the ability of a developer to raise its prices would be a measure of its market power. Would historical developments in the market provide opportunities for additional market power to developers? The   02:15:45

Page 131

answer is I haven't studied it. I -- I don't know.   02:15:48

Q. If you turn back to paragraph 38, please. A few questions. A few more questions on that.

You indicate that your three inputs allow you to determine how developer pricing changes in response to commission rate changes.   02:16:12

Do you see that?

A. Please refer me to a sentence.

Q. This is on paragraph 38.

A. And -- and please ask the question again.   02:16:32

Q. It's at the end of the paragraph where you say that your "inputs together allow you to determine how developer pricing changes in response to commission rate changes."

A. Yes.   02:16:51

Q. Does your third input, the marginal cost estimate, depend on your second input, the estimate of consumer demand?

A. It does.

Q. Do you agree that marginal cost is the incremental or addition to cost that results from producing one more unit of output?   02:17:16

A. I -- I do, although your -- your statement leaves out a lot of qualifying conditions about short run and -- and long run and so forth.   02:17:34

Page 132

Q. Okay. Well, could you look at footnote 37 on page 12.   02:17:38

You say there are variable costs that are often used for proxies for the marginal cost of a firm, which is the "increment or addition to cost that results from producing one more unit of output."   02:18:05

Do you see that?

A. Yes.

Q. Do you stand by that?   02:18:14

A. I do.

Q. Okay. You refer there, higher up in that footnote, to "variable costs as firm expenses that change in proportion to production output."

Do you see that?   02:18:39

A. Yes.

Q. How do you measure production output?

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, generically, the economic theory of -- of firm behavior is -- is based on simple firms that are producing one product in some physical units, and that's -- that's the case that's -- where this is rather simple to -- to define. A production output is simply the number of units they produce and sell.   02:18:51   02:19:16

Page 133

34 (Pages 130 - 133)

Q. (By Mr. Swanson) In the context of this 02:19:21 case, does production output refer to something that is produced by the developer?

A. I guess the -- the question I have in -- in responding to your question is this is kind 02:19:43 of -- this is a generic statement about -- about firms, and the question is what production output would mean in the context of an -- of an app developer.

And what I -- what I would assume in the 02:20:03 context of an app developer, it's -- it's the number of -- number of apps you -- you supply and the number -- the -- the amount of content through iAP that you supply.

Q. So would app downloads be production 02:20:22 output for a developer?

A. I think they would, although the -- the context for this is that the -- this -- this firm is engaging in some -- some account of activity which makes the -- the delivery of this particular 02:20:49 digital product and everything that goes with it possible, and -- and including that it may include its own selling costs, for example. It may include some downstream maintenance of the product that's been delivered and so forth. 02:21:16

Page 134

Q. Yeah, I wasn't asking about cost. I was 02:21:18 asking about production output.

Is app download production output for a developer. That's all I asked.

A. Yes. It's -- it's -- it's the -- it's 02:21:31 the delivery of the -- of the app and the delivery of all the things that go with delivering the app.

Q. So our in-app transaction is production output for the developer?

A. The content that's provided through iAP, 02:21:46 yes, I think it is.

Q. Is there any production output for a developer other than app downloads and in-app transactions?

A. Well, those are obviously the -- the 02:22:06 headline production outputs of -- of an app developer. But there is -- there are -- there are dimensions to delivering these products, which -- which have to be considered as part of the correction process. For example, if you produce an 02:22:23 app that requires you to host the -- the buyer, then you -- then that's part of -- part of the production process.

If you -- and that's an example of the -- of the kinds of auxiliary dimensions to this 02:22:39

Page 135

production. 02:22:44

Q. Well, does your model anywhere take account of that type of production output?

A. I think it -- I think it does in the sense that it's looking at what developers actually 02:22:57 price their goods at, and, under the assumption of product monetization, that can be used to infer what their marginal cost is.

Q. What is the unit of output in your model?

A. Well, in -- in the damage analysis that 02:23:30 I -- I designed, the output is either a download or it's a -- a unit of iAP content, which I treat iAP as a composite commodity at the app level.

Q. Does your model treat app users as a unit of output anywhere? 02:23:56

A. Please repeat the question.

Q. Does your model treat app users as a unit of output anywhere?

A. I'm not -- I don't think I understand the question. The model certainly is -- is a model 02:24:18 which specifies a demand equation for iAP content as -- as -- and, again, that's implicitly but not explicitly a composite.

Q. Do costs in your model vary depending on the user? 02:24:48

Page 136

A. Do costs depend on the user? Well, the 02:24:53 answer is -- as a question of in reality, I suppose they can, yes.

Q. In your model, if two users make the same in-app purchase at the same time, will your model 02:25:14 treat the cost of those transactions as the same?

A. No, it definitely does not. The -- the -- those consumers pay -- pay the same price, and the marginal cost that's inferred from that price is -- is -- the app developers perceived a 02:25:36 cost of providing that service to its -- to its spectrum of buyers.

Q. Let me make sure we're on the same wavelength.

If two users make the same in-app 02:25:53 purchase at the same price at the same time, does your model treat the cost of each of those transactions as the same?

A. Yes, it is the same. It is -- it's the perceived marginal cost by the app developer of 02:26:12 delivering that product to the -- all the consumers that have the ability to buy it.

Q. The primary data set your model uses to estimate consumer demand and marginal cost is the App Store transaction data, right? 02:26:38

Page 137

35 (Pages 134 - 137)

A. I -- I have two data sources. The 02:26:44 primary one is the App Store transaction data. I also draw on data from the developers. I should say in my previous reports, I had some direct evidence on that, and I believe an analysis has 02:27:01 taken place subsequent to my reports. There -- there's another expert that's providing such data.

Q. Yeah, and I'll come to that in a moment.

Would you describe the App Store transaction data as real-world data? 02:27:18

A. Yes.

Q. The developer cost data that I think you alluded to a moment ago from your prior reports is another -- another source of real-world data for estimating your model; is that fair to say? 02:27:47

A. You're referring to information on -- on the margins --

Q. Yes.

A. -- gross margins, variable margins of developers? That's also real-world -- real-world 02:27:56 data, yes. Well, at least in -- in my previous reports where I -- I -- some direct involvement in -- in analyzing those data, it was definitely real-world data.

I -- I can't speak to the current data 02:28:17

Page 138

that's being used. I'm not -- I'm not familiar 02:28:22 with it in any detail.

Q. Okay. Your model's third input, the estimate of the but-for commission rate, is the only part of your model that reflects hypothetical 02:28:35 conditions, correct?

A. Well, I think I -- I would disagree that -- that's a hypothetical. I believe that that's substantially based on real-world data on comparable markets. 02:29:01

Q. You assume, don't you, in your methodology, that consumer demand is the same in the but-for world as the real world?

A. I -- I assume that the demand models that I fit are -- will -- will extrapolate from the 02:29:30 but-for prices -- I'm sorry -- from the as-is prices to the but-for prices that we determined.

Q. And you're assuming that marginal cost is the same in the but-for world as the real world?

A. Yes, I am, over -- again, over the range 02:29:59 of the -- of the analysis.

Q. The impact of the but-for world in your model occurs through the but-for commission estimate, right?

A. Please repeat the question. 02:30:18

Page 139

Q. The impact of the but-for world in your 02:30:18 model occurs through the but-for commission estimate; is that not right?

A. Yes.

Q. So based on your assumptions and 02:30:32 methodology, you built your model without knowing anything about the nature of competition in the but-for world; is that correct?

MR. RIFKIN: Objection to form.

THE DEPONENT: The damage model as it's 02:30:52 designed works off another expert's estimate of the rate that would prevail in a -- in a competitive but-for circumstance, and it does not depend on the nature -- the exact nature of the but-for market and that would -- that would lead to that rate. 02:31:18

Q. (By Mr. Swanson) Do you agree as a general matter that real-world evidence is informative for assessing any impact of Apple's commission rate on app and in-app purchase prices?

A. Again, please repeat the question. 02:31:33

Q. Yes.

Do you agree as a general matter that real-world evidence is informative for assessing the impact of Apple's commission rate on app and in-app purchase prices? 02:31:43

Page 140

A. Yes, provided it's properly and carefully 02:31:48 analyzed.

Q. Could you take a look at footnote 36 in your report. It's on page 11.

You state there that you understand 02:32:09 "Professor Stiglitz has analyzed real-world evidence that is consistent with the implications of the tax incidence framework."

Do you see that?

A. Yes. 02:32:20

Q. Do you recall what you were referring to there?

A. I would have to go back to his report to pull out the specific examples, but I believe that they had to do with the prices charged by various 02:32:31 apps through the Apple store when they, in fact, have the option of -- of a charging mechanism outside the Apple store.

Q. Can you turn to paragraph 56 of your report, please, at least the part on page 20. 02:32:57

In the second sentence there, you state that "a class member who exclusively spent money on apps for which my model predicts price increases in the but-for world would incur no monetary damages."

Do you see that? 02:33:22

Page 141

36 (Pages 138 - 141)

A. Yes. 02:33:23

Q. What kinds of apps does your model predict would have higher prices in the but-for world?

A. They typically would be low-price 02:33:31 downloads or in-app content typically often charged at Apple's minimum price of 99 cents.

Q. Are these apps ones that earn revenues from advertising?

A. I have not collected direct evidence on 02:34:13 that, but that's -- that's my inference. That is the -- let me say -- restate that.

That -- that's -- that's the inference from the model, that if they're profit-maximizing, then there must be -- that they have some other 02:34:30 source of revenue which is justifying their behavior.

Q. But your model only generally predicts that prices will be higher in the but-for world for low-priced apps, right? 02:34:46

MR. RIFKIN: Objection to form.

THE DEPONENT: It's -- it's in the nature of the -- of the profit-maximizing calculation that higher-priced apps will be -- will infer a higher positive marginal cost, yes. 02:35:16

Page 142

Q. (By Mr. Swanson) Is it your view that 02:35:19 apps with higher prices do not earn revenue through advertising?

A. No. It's simply a question of the -- I have no direct evidence on -- on advertising. I 02:35:35 haven't collected it.

The -- the logic of it is that if your price in the Apple store is sufficiently low, you -- the inference would be if you're profit-maximizing, you must have some other source 02:35:56 of revenue. There's no implication the other way that if you have -- a high -- a cost -- high-priced app that it could not also have other sources of revenue.

Q. Would you agree that your model predicts 02:36:13 prices for over a million apps?

A. Yes.

Q. Okay. Do you have an estimate of the proportion of those apps that your model predicts would have higher prices in the but-for world at 02:36:37 some point in time?

A. I had in my original report some number which would be relevant to that.

Q. Would you be surprised --

A. So yes, but I haven't done any 02:37:07

Page 143

calculations of that sort since that time. 02:37:09

Q. Would you be surprised if your model predicts that almost 1 million apps will have higher prices in the but-for world at some point in time? 02:37:20

A. The number that I had in my original report was -- that something like 5 or 6 percent of -- of apps had higher prices in the but-for world. That's the only number that I recall.

Q. 5 or 6 percent of apps or 5 or 6 percent 02:37:43 of accounts?

A. No, my original calculation was a calculation of the percent of apps with a property that if that was the only app purchased, the consumer would see a price increase rather than a 02:38:05 price decrease in the but-for world.

Q. Let me ask you to turn to paragraph 42 of your report. I just wanted to ask about the second sentence there in paragraph 42 which continues onto page 16. 02:38:46

You say, "If the commission rate is lower, app developers will lower their app and in-app content prices because the extra sales they make by cutting prices are more profitable than before." 02:38:59

Page 144

Do you see that? 02:38:59

A. Yes.

Q. Is that a prediction of your model?

A. I think I've tried throughout this report to qualify that the -- a lower commission rate will 02:39:08 lead to behavior only if marginal costs -- major or marginal cost is positive. I don't see that qualification here, so in that case this is a statement that would not apply to those particular sales. 02:39:33

Q. Your model can make predictions about but-for pricing for a commission rate of 15 percent in the but-for world, correct?

MR. RIFKIN: Objection to form.

THE DEPONENT: Please repeat the 02:39:51 question.

Q. (By Mr. Swanson) Your model can make predictions of but-for pricing for a commission rate in the but-for world of 15 percent, correct?

A. Are you asking me could it or -- or did 02:40:05 it? I mean, I -- I do -- the calculations I have done in my supplemental report were for the 13.62 percent. If you're asking me could it be done for different rates --

Q. Yeah -- 02:40:22

Page 145

37 (Pages 142 - 145)

A. -- yes, it could be.

Q. -- could be 15 percent instead of 13 --

A. Yes.

Q. -- .6?

A. Yes. Yes, that would be straightforward.

Q. And that would be the best prediction of your model if the but-for commission rate was 15 percent?

A. Yes.

MR. RIFKIN: Objection to form.

Q. (By Mr. Swanson) Have you tested your model to see if its predictions match reality when Apple dropped the commission for some developers to 15 percent?

MR. RIFKIN: Objection to form.

THE DEPONENT: I have not done that, and I would have to actually think about how you -- how would you even do it.

Q. (By Mr. Swanson) Do you think it's important for you to provide real-world evidence to corroborate the predictions of your economic model?

A. As a general economic proposition, I think it is valuable and scientifically appropriate to test the predictions of your model against reality.

Page 146

I'm not sure how that would work in the hypothetical you just suggested. I mean, I think, for example, I would view looking at comparable markets for digital services that are competitive as the kind of real -- real-world evidence you would look at.

Q. Well, you're aware that many developers pay 15 percent in the real world, right?

A. Well, what I'm aware of is that -- after a certain date, sequential renewals went to 16 percent, and there was a small developer program that provided that -- that incentive -- incentive. That's what I know about.

Q. Okay. That's real-world activity, right?

A. Well -- well, the answer is yes, that's -- that's the real world. And, of course, the -- the question then would be can you do a careful analysis of those data and take care of the possible confounding effects, so like you've isolated the -- the evidence that would bear on the question.

Q. Well, does your model take account of all confounding effects when it makes its predictions?

MR. RIFKIN: Objection to form.

THE DEPONENT: The -- the damage model

Page 147

assumes that in the presence of a but-for commission rate, developers would price by maximizing profits and that consumers would respond in their demand to those decreased prices. That's -- those are the assumptions of the -- of the -- the damage analysis model.

Q. (By Mr. Swanson) Your model incorporates to the best of your ability all of the economic factors that you think affect pricing either in the actual or but-for world, correct?

MR. RIFKIN: Objection to form.

THE DEPONENT: I -- I agree broadly. I mean, any -- any model is, of course, a simplification of -- of reality, so I -- so I have made judgments on what -- what was key in terms of what could happen in the but-for world and what one could do with the available information.

Q. (By Mr. Swanson) Have you conducted any analysis at any point to test how your models' predictions compare to real-world evidence?

MR. RIFKIN: Objection to form.

THE DEPONENT: I myself have not done that, and I -- in terms of the kind of -- data you would need to do that, I -- I -- at the point at least up to my supplemental report, I did not have

Page 148

those -- any data like that.

Q. (By Mr. Swanson) Can you think of any way to test your model's predictions against real-world evidence?

A. Well, I think the primary real-world evidence would come from examination of comparable -- comparable digital markets that are -- are competitive.

I would -- I would say if Apple has -- essentially done experiments in which have changed the commission rates, then -- then in principle that would provide evidence that could be analyzed, and if you can do it in such a way that you control for confounding effects, yes, that should be useful.

Q. And you previously discussed Professor Stiglitz attempt to analyze such natural experiments, haven't you?

A. I have.

Q. Are those opinions that you continue to hold and reaffirm?

A. I have not in this report considered those. I -- they're -- they're not part of this report. I'm not expecting to offer opinions on them.

Page 149

38 (Pages 146 - 149)

Q. Have you identified any natural 02:46:41 experiments that could shed light on the reliability of your model?

A. No. I think that there are some examples such as those given by Professor Stiglitz which are 02:47:05 germane to this, but I'm -- I have not done it myself.

Q. Okay. And are you satisfied that Professor Stiglitz' examples account for confounding effects? 02:47:22

A. I'm aware that he has those examples, but I -- but I'm not prepared to offer any opinion myself on them.

MR. RIFKIN: Dan, good time for a break?

MR. SWANSON: Yeah. 02:47:37

MR. RIFKIN: Okay. Let's go off the record.

THE VIDEOGRAPHER: This marks the end of Media No. 4. Off the record. The time is 2:47 p.m. 02:47:43

(Recess taken.)

THE VIDEOGRAPHER: This marks the beginning of Media No. 5 in the deposition of Professor Daniel McFadden. We are back on the record. The time is 3:04. 03:04:47

Page 150

Q. (By Mr. Swanson) Professor McFadden, do 03:04:53 the App Store transaction data alone provide sufficient information to estimate consumer demand?

A. Yes.

Q. Would it be consistent with the 03:05:08 econometric methods widely used in the economic literature to use the App Store transactions data alone to estimate consumer demand for apps in an app content?

A. I think that the -- the good econometric 03:05:22 practice would be to use all the available data that -- that allows you to -- to sharpen those estimates, but it's certainly legitimate to have a starting point to use only the transactions data.

Q. And have you ever tried to use the 03:05:46 App Store transaction data alone as a starting point for your estimates?

A. I -- I don't recall the full history of the work from four years ago, but the -- that -- that started -- started from the idea that 03:06:08 developer gross margin data would be relevant and valuable for estimation, and so that was built into the architecture of the analysis.

I recall that there was some issue from your expert reports as to whether it could be done 03:06:36

Page 151

without the margin balance, and I just don't recall 03:06:38 now what we did in response to that.

Q. Okay. But it's perfectly possible to do it without margin bounds, is it not?

A. With -- certainly with less precision, 03:06:53 but if you're just asking me as an econometrician would that -- would that be a source, I think -- I think it would be a sufficient source to get estimates of at least some quality, but not necessarily good quality. 03:07:11

Q. Could you take a look at paragraph 43 of your report.

You say that there that "The key element of consumer demand needed for the purpose of quantifying the common economic impact of Apple's 03:07:26 anticompetitive conduct is consumers' sensitivity to price changes."

Do you see that?

A. Yes.

Q. Does your estimate of consumer demand 03:07:34 apply to both price increases as well as price decreases?

A. As -- as the demand models that we use are written down, they at least over the range in which they -- they are fitted and presumably 03:07:58

Page 152

reflect the reality, they -- they would handle -- 03:08:07 they should handle both price increases and decreases.

Q. Does your estimation of consumer demand rely on assumptions about the functional form of 03:08:17 the demand curve?

A. It does.

Q. You assume that price elasticity is equal to price multiplied by your estimated price sensitivity, correct? 03:08:35

A. Correct.

Q. And your model implies that demand elasticity increases proportionally with price, correct?

A. Yes. 03:08:47

Q. That's an assumption that you make about demand, correct?

A. Well, I would say that -- yes, that specification is an assumption. It's based on considerable experience in working with consumer 03:09:01 demand data, and I think it has some -- some theoretical merits.

But I would say that in -- in general, an econometrician confirming this would have some flexibility in trying out alternative forms to see 03:09:22

Page 153

39 (Pages 150 - 153)

SER-98

which one fits the data best.

Q. Based on that assumption, the higher price for an app or in-app content, the higher the price elasticity, right?

A. That's a property of this, yes.

Q. And the higher the price elasticity, the higher the marginal cost that you infer, correct?

A. That's true.

Q. Do your modeling assumptions rule out low price elasticities for high-priced apps or in-app content?

A. Please repeat the question.

Q. Do you your modeling assumptions rule out low price elasticities for high-priced apps or in-app content?

A. I wouldn't say they rule it out. I mean, I think these price sensitivity parameters in the demand model vary by genre. They vary between downloads and iAP. So -- some -- some of the -- some of the variations in price differ across those categories, and that's -- that's not built into the -- the specification.

Q. For a given price sensitivity, though, your assumption does build into the modeling that higher-priced apps or in-app content will have

Page 154

higher rather than low price elasticities, correct?

A. Correct.

Q. Do you agree that your econometric model is based on the logit model?

A. What -- the statement is that it is consistent with the logit model when -- the share of purchases among all consumers is a relatively small percentage of the total population. In that sense, it's consistent with the logit model. But -- but it's a widely used model for demand quite independently of that property.

Q. Your model is consistent with the logit model when each product's market price is small; is that what you're trying to say?

A. It's -- it's approximately -- yes, it's approximately consistent when there's a large number of products and the total market for the products -- the total number of consumers purchasing, say, in -- in a month is a small share of the total number of consumers who are potential purchasers.

Q. And is it also consistent if consumers' disutility from price is linear?

A. I'm sorry? Say again.

Q. Is it also necessary for your model to be

Page 155

consistent with the logit model that a consumer's disutility from price is linear?

A. No, I would say neither the logit model nor this model requires that kind of response. That -- that pattern response is typically for products that are either purchased or not purchased, and their price is a small share of -- of people's incomes. So that's -- that's just a general economic proposition.

But I would say that the -- the use of this model is -- is not hinged on that property.

Q. Do you agree that the relationship between price and marginal cost in your model stems from the logit demand model?

A. No. I think that -- the log linear model is a widely used model for demand quite independently of -- of the logit model, and...

Q. So you --

A. The fact that the logit model -- that it can be derived from the logit model under limited conditions is -- is not the reason it's used primarily.

Q. So if you've previously said that mathematical properties of my model, including the relationship between price and marginal costs, stem

Page 156

from that model, the logit model, you were in error?

A. No. That -- that is a property of the logit model -- of the logit model under these specific conditions previously mentioned.

But this -- the log linear model is a freestanding demand model widely used without that -- that backstory.

Q. Are you familiar with more flexible random coefficients logit demand models?

A. Yes.

Q. You have estimated damages based on such an econometric model?

A. I have.

Q. In this case?

A. Oh, in this case? No. Well, I think the -- the -- again, as -- as a limiting property of -- of the -- what's called a mixed logit model. A limiting property of the mixed logit model is that you get the -- the log linear model with variables in there that -- that are expectations of that mixing so that it doesn't actually change the -- the nature of the model, at least in particular, I'm -- I'm speaking of mixing with respect to features that the consumers care about,

Page 157

40 (Pages 154 - 157)

not -- not the price.                                03:16:02

Q. Can you turn -- well, take a look at paragraph 44. It's on the same page.

You state that you "designed your model to estimate demand for app downloads and demand for 03:16:17 in-app content separately while accounting for their interrelations."

Do you see that?

A. Yes.

Q. For apps in the same genre, are downloads 03:16:28 and in-app content economic substitutes, in your opinion?

A. Please repeat the question.

Q. Sure.

For apps in the same genre, are downloads 03:16:39 and in-app content economic substitutes, in your opinion?

MR. RIFKIN: Objection to form.

THE DEPONENT: No. I would say they're -- they're not. You know, the acquisition 03:16:51 of one is a precondition for the acquisition of the -- of the second.

Q. (By Mr. Swanson) Do you consider them to be in the same relevant market?

A. I think I have to answer by going back to 03:17:18

Page 158

what the -- the demand specification actually is, 03:17:20 and it's -- it's -- it's one in which there is a -- an equation for downloads which does not include a -- a variable for IP, and there's an equation for IP demand which does depend on down -- downloads. 03:17:39 It's the presence of the downloads in the iAP equation which is -- is the interrelationship which I think is being referred to here.

Q. And my question is: Do you consider downloads and in-app purchases within the same 03:18:01 genre to be in the same relevant market?

A. I would say they are all -- they are in the app -- iAP -- I'm sorry -- in the iOS aftermarket, yes.

Q. And do products, to be in the same 03:18:19 relevant market, have to be economic substitutes?

A. No, I don't think so necessarily. You could have comparable -- what economists call complements also in the same market.

Q. Like hot dogs and buns?            03:18:38

A. Or left shoes and right shoes, yeah.

Q. And is this an example, you believe, of left shoes and right shoes?

A. Well, I think it's not quite the left shoe and the right shoe, but it's -- it would be 03:18:56

Page 159

unuseful, if not impossible, to do an iAP download 03:18:58 unless you have already acquired the app.

Q. As a general matter, if demand for two products exhibits the same price sensitivity, are the two products likely economic substitutes? 03:19:19

A. Please repeat the question.

Q. As a general matter, if demand for two products exhibits the same price sensitivity, are the two products likely economic substitutes?

A. I don't -- I don't think there's -- 03:19:41 there's a general law one way or the other. I -- that the -- the preconditions for that question are sufficiently ambiguous so that I think to actually answer it, you would need to know a lot more.

Q. How can you tell if two products are 03:19:59 economic substitutes?

A. Well, in general, if the price -- just as a matter of general economics, if the price of product A goes up and the -- the demand for product B goes up, that's an indication they are 03:20:18 substitutes.

Q. Is it your opinion that price sensitivity for in-app content and for app downloads is different for the game genre?

MR. RIFKIN: Objection to form.       03:20:45

Page 160

THE DEPONENT: Between one and the other, 03:20:48 you mean?

MR. SWANSON: Yes. Yup. Yup.

THE DEPONENT: Well, I think it's an empirical question, and I -- I think the -- the 03:20:53 answer is, from my estimates in the supplementary report, is they are different.

Q. (By Mr. Swanson) By modeling demand for app downloads and demand for in-app content separately, are you allowing for marginal cost to 03:21:10 vary as between app download transactions and in-app content transactions?

A. Yes.

Q. And is it an empirical -- strike that.

As an empirical matter, is it your 03:21:31 conclusion that marginal cost varies as between app download transactions and in-app content transactions for the same genre?

A. I haven't sat down to look at the data to answer that question exactly, but I believe that 03:21:52 the answer is they would be different -- they could easily be different.

Q. Take a look at paragraph 45, also on the same page. You say there, "Rather than letting all apps and in-app purchases have the same demand 03:22:15

Page 161

41 (Pages 158 - 161)

coefficients, my model allows apps that belong to different app categories, hereafter referred to as 'genres,' to have different coefficients."

Do you see that?

A. Yes.

Q. Does your model permit you to assess whether apps that belong to the same category are economic substitutes?

A. I think the answer is that the -- the model specification does not say anything about -- about patterns of substitution and complementarity. It's essentially -- it's -- it's essentially a property of competition among many products that own -- own price comes to dominate the decisions of an individual producer.

Q. Continuing on in paragraph 45, you say in the last two sentences there, "The App Store transactions data provides information on which genre each app belongs to. This allows the estimated model to reflect the demand and supply conditions that are specific to each app genre."

Do you see that?

A. Yes.

Q. First, what do you mean by "demand conditions"?

Page 162

A. Well, demand has both a price -- a price and other factors in it which influence demand, and essentially this is allowing for the possibility that price sensitivities differ across genres and also that other contributions to quantity at given prices can also vary across genres.

Q. Do demand conditions include the intensity of competition in app phases?

A. Well, they do in the sense that the price sensitivity itself reflects the -- the degree to which consumers have the ability to switch away from a commodity or switch into not buying any commodities in the market.

Q. That is an assessment made at the genre level, right, not at the app level?

A. I'm sorry. I -- I -- I'm missing the context for the question.

Q. Sure.

The demand conditions for an app within a genre is the focus of what I was asking about.

Do those demand conditions include how intensive the competition is for a particular app within a given genre?

A. Oh. Well, then my previous answer was -- was what I intended to say, which is that the --

Page 163

the price sensitivity reflects whatever the opportunities consumers see for buying substitutes for this particular app or not buying in this genre at all. And it -- I think it's not an unreasonable specification that -- at least within -- within a genre that that's -- that's -- that's a particular estimate of -- of price sensitivity.

Q. Your model assumes, does it not, that all apps and in-app purchases in the same genre face the same demand conditions?

MR. RIFKIN: Objection to form.

THE DEPONENT: I -- I take it you mean face the same price sensitivity parameter? Is that what you mean by that?

Q. (By Mr. Swanson) Well, are there demand conditions other than price sensitivity of consumers?

A. The model, if you will recall from when we've looked at this before, on the right-hand side of the demand equation contains not only price, but also a series of other variables, and so it depends on those other variables as well.

Q. And those are fixed effects?

A. For example, those are -- are fixed effects.

Page 164

Q. Okay, and what are those?

A. Well, there's an app fixed effects and there's a -- a time fixed effect in the model.

Q. And in lay terms, how would you describe what those variables are?

A. That for a particular app, we -- we are not trying to explain the overall popularity of that app. We're simply looking at variation in popularity of that app with -- with -- with measured changes in -- in its feature such as its price.

Q. Do you -- does your model assume that supply conditions differ as between app downloads and in-app purchases?

A. It allows -- it allows the -- a marginal cost that we impute to vary between the two, yes.

Q. And why would marginal cost differ as between the two?

A. I would -- I'm not the right expert to ask to enumerate all the things that go into marginal cost, but there are clearly costs that go into finding a customer and selling and getting them to download an app than there are to persuading them to buy iAP for -- for an app that's already been downloaded. Like -- perhaps user

Page 165

42 (Pages 162 - 165)

**SER-101**

acquisition costs would be higher for -- for getting people to download it to begin with than it would be to persuade them to -- that you have content that they should buy.

Q. Should there be distinct margin constraints for app downloads as opposed to in-app purchases as a result?

A. I think yes. It's reasonable that there are.

Q. How would you estimate damages if supply conditions are the same for apps in a given genre but demand conditions differ among those apps?

A. Please repeat the question.

Q. How would you estimate damages if supply conditions are the same for apps in a given genre but demand conditions differ as between apps in that genre?

A. Well, I think the practical answer is that one -- one can measure demand conditions at -- at some level of granularity and, you know, it's my judgment in terms of the way this model was designed that we picked a granularity that balances the ability to get reliable statistical results and which allows some of the variation across apps to be captured.

*Page 166*

So I think the -- the answer is that -- to the extent that there is variation in demand, we've tried to deal with it.

Q. Have you tested whether demand conditions differ for apps in a given genre?

A. I -- I personally have not done so. I'm -- I -- I'll leave it to Dr. Song as -- as to whether in the current round, he's done some of that. I'm -- I may remember having told that he has, but now I don't remember specifically.

Q. Is it important to the reliability of your model to test whether demand conditions differ for apps in a given genre?

A. Is it important to test? I would say that there -- there is a balance between how detailed or granular a model can be and how accurately it can be estimated, and -- and there's -- there's a balance for -- point for that, and my -- in my judgment, that's the balance point we've picked.

If you do testing for, you know, uniformity or lack of heterogeneity, that's informative for whether you got that point right or not. So yes, I would -- I would say it's useful to have information like that.

*Page 167*

Q. Moving to paragraph 47. You indicate there that -- this is at the bottom of paragraph 47 on page 17.

You state that your model "can incorporate information about developers' variable margins as the constraints that the demand estimates should satisfy."

Do you see that?

A. Yes.

Q. Does your model require accurate information about developers' margins?

A. In the way that I use it, the answer is no. In principle, if one had accurate information about individual developers' margins and you accept that they are profit maximizers, one -- one would be able to precisely determine their price sensitivity or the demand for that app.

But that's not the way I use these. I use these as bounds based on observations about -- about developers.

And now I should say -- I should qualify this by saying that in my supplemental report, I had relatively few developers' data on which to base this analysis, and it was more a demonstration that you could use these data than it was a final

*Page 168*

result. My understanding is that there is now a -- more -- quite a bit more data on developers available that's been used by Dr. Song.

Q. At least insofar as you used margin data from the developers and derived margin bounds, are those margin bounds associated with statistical error?

A. They -- they are not treated as -- as statistical in my estimation. I recall -- I would have to go back and read the details, but I recall doing some sensitivity tests of how things would change if the margin balance were changed, and so that's -- that's related to answering that question.

Q. Well, if, for example, the upper margin bound for a genre is too low compared to reality, would that inject statistical error into your damage estimates?

A. I have to speak from recollection here because I haven't gone back and reviewed my work from a few years back, but my -- my -- my memory of it is that the margin bounds are treated as fixed numbers in the estimation.

Q. Does that mean they're being treated as being measured without error?

*Page 169*

43 (Pages 166 - 169)

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**SER-102**

A. Yes. 03:36:48

Q. And so does your model take no account of measurement error with respect to margin bounds?

A. I think my recollection is that there is a separate calculation of the sensitivity of the 03:37:02 model outputs to the margin bounds, and that's the evidence that we have on their effect.

Q. Now, you indicated that in your prior reports you had used some developer information to derive margin bounds to show that your model could 03:37:33 accommodate such information, right?

A. Correct.

Q. Do you know whether the average margins implied by your unconstrained model are anywhere close to the average margins implied by your 03:37:56 constrained model?

MR. RIFKIN: Objection to form.

THE DEPONENT: I would have to go back and look at the earlier reports. I don't at this point even recall whether we looked at that. 03:38:17

Q. (By Mr. Swanson) When you added margin constraints to your model, did it increase the amount of damages calculated?

A. I don't recall that damages were calculated with estimates without -- without the 03:38:32

Page 170

use of the margin bounds. We -- in the design of 03:38:38 the model, margin bounds were -- were sort of built into the strategy for doing demand estimation.

Q. Do you have an opinion as to whether the incorporation of margin bounds increased damages 03:38:50 compared to not including margin bounds?

A. I -- I do not know at this point which -- how it would go.

Q. Given the imposition of margin constraints, does your model necessarily estimate 03:39:09 positive aggregate damages?

A. No. I don't think that's a necessary consequence.

Q. Your list of relied-upon expert reports does not include the March 7 expert report of 03:39:36 Professor Allen McCormick, correct?

A. Correct.

Q. Are you aware of his report?

A. I've been told about it.

Q. Have you read it? 03:39:48

A. No, I have not.

Q. Do you plan to read it?

A. I received -- I think I received a copy of it. No, I may not even have received a copy of it. 03:39:59

Page 171

Q. Okay. You saw references to it in 03:39:59 Dr. Song's report, right?

A. I was told about it by staff. I -- I don't -- I don't recall reading Dr. Song's report to -- to -- paragraphs that involved that. 03:40:14

Q. So the paragraphs that you remember reading from Dr. Song's report were not paragraphs that said anything about Professor McCormick?

A. No. Parts of Dr. Song's report that I was concentrating on were the ones that involved 03:40:29 the new payor data that was available.

Q. Do you know Professor McCormick professionally?

A. No, I do not.

Q. Are you aware of what field or fields 03:40:44 he's an expert in?

A. My understanding is that he is an expert in -- that he's a business school professor that has expertise in digital production.

Q. If you were to provide guidance to such 03:41:05 an expert about how to estimate an accurate range of developer margins for use in your model, what instructions would you give him or her?

MR. RIFKIN: Object to the form.

THE DEPONENT: I think I would have to -- 03:41:22

Page 172

the Court didn't like my analysis, or at least 03:41:23 didn't feel it was sufficient, and I -- I understand that. And I think the -- the fact that there's an another expert here is -- is justified. He's -- I am not an expert on the details of -- of 03:41:39 digital production.

Q. (By Mr. Swanson) But you're an expert on how the margin bounds fit in your model, right?

A. Well, yes.

Q. And conceptually, at least, you're an 03:41:54 expert on what should be measured in order to properly fit into your model, right?

A. Well, if -- if the question is do I understand what should go into a -- a margin bound so that it's commensurate with and on the same 03:42:16 scale as marginal costs, yes, I understand those elements.

Q. Would you guide a subject matter expert to calculate developer margins at the app level or the item level? 03:42:32

MR. RIFKIN: Object to the form.

THE DEPONENT: Oh, I think at the -- at the app month level, because I do -- I do not think that -- we understand that -- that we understand or there's really a possibility of understanding the 03:42:55

Page 173

44 (Pages 170 - 173)

detailed cost and the behavior of a developer at 03:42:57 the level of how -- how they handle iAP content.

Q. (By Mr. Swanson) What guidance would you give a subject matter expert in this area about how to choose the lower end of the margin range? 03:43:19

A. I believe that from -- from an economic perspective, what's -- what's relevant here are what the developers themselves view as their imputed marginal costs of providing product -- product, and that should be what drives their 03:43:49 pricing.

What they're doing is they're -- they're pricing -- if they're profit-maximizing in -- relative to what -- what their view of what their costs are. 03:44:06

And I would -- and I would myself turn to an industry expert and ask what -- what do these guys think they're doing. I don't know that -- that a general economist has great insight into that. 03:44:22

Q. Well, your model needs a range, so what does the lower and upper end of that range reflect from a statistical standpoint?

A. From a statistical standpoint, I would say the margin bounds are effectively bounds on the 03:44:50

Page 174

price sensitivity coefficients, and they -- they 03:44:54 are -- they then are based on the -- in the end on the judgment and evidence brought forward by industry experts on what -- what margin bounds prevail in -- in a particular class of developers 03:45:17 in a particular genre.

Q. But what is the guidance about where to locate those points? Are those two points intended to contain the cost experience of 60 percent of developers? Something else? 03:45:38

MR. RIFKIN: Objection to the form.

THE DEPONENT: The answer is I -- I don't know what the instructions of counsel were to -- or the requests from Dr. Song were to Dr. -- to Professor McCormick. 03:45:52

Q. (By Mr. Swanson) But you designed the model and you assigned a role for margin bounds, so what is the margin bounds supposed to measure?

What's supposed to be within those bounds, the average cost, the average cost for 03:46:06 40 percent of developers, 80 percent, 10 percent?

MR. RIFKIN: Objection to the form.

THE DEPONENT: It's not a -- that's not a question that I ever answered for myself, and I deferred originally to other people for examples of 03:46:30

Page 175

developers' financial records. 03:46:38

And whatever Professor McCormick has done, I'm not -- was not involved in designing that, nor would I feel that I am competent to design that. 03:46:52

Certainly when we were working with the financial records for a few firms, the idea was to look at -- look at the upper and lower limits of the -- of what we saw in reality.

Q. (By Mr. Swanson) That's what you were 03:47:05 doing when you --

A. Yes, when we were doing it.

Q. Would you guide a subject matter expert in this area to calculate developer margins for a particular year or set of years for purposes of 03:47:18 reliability of your model?

A. I don't think I would have -- have any foreknowledge on which would be better.

MR. SWANSON: I'm getting that look from you. Yet on timing -- 03:47:44

MR. RIFKIN: No. You want to take a break?

MR. SWANSON: I'm about to change.

MR. RIFKIN: Sure. Let's take a break.

THE VIDEOGRAPHER: This marks the end of 03:47:50

Page 176

Media No. 5. Off the record. The time is 3:48. 03:47:54

(Recess taken.)

(Exhibit DX64 was marked for identification by the Court Reporter and is attached hereto.) 03:48:34

THE VIDEOGRAPHER: This marks the beginning of Media No. 6 in the deposition of Professor Daniel McFadden. We are back on the record. The time is 4:04 p.m.

Q. (By Mr. Swanson) Professor, we've had 04:04:38 during a break an exhibit marked. This will be DX64. It's a paper that appears to be entitled "The economic impact of a market intermediary sales commission."

I think that -- 04:04:53

A. Yes.

Q. -- should be in front of you now.

A. Yes.

Q. Is that a paper that you have written?

A. Yes, that's a recent working paper in 04:05:02 progress.

Q. Okay. And is there any particular purpose for which you wrote this?

A. Yes. For some years I have been working on a treatise on the welfare economics of product 04:05:21

Page 177

45 (Pages 174 - 177)

liability, and I -- I made myself notes to add to that, and this is one of those notes. It got onto my CV by mistake because it was intended for sort of further treatise, not for this case.

But in any case, it's -- it -- it certainly deals with the issue of how to -- how to analyze the effects of intermediary sales.

Q. If you look at the bottom paragraph on the first page -- well, first of all, we talked about intermediaries earlier. Are you using the term here in the same sense that we discussed that term earlier?

A. Yes, I -- I -- I -- in the first paragraph, I describe some of the universe of intermediaries that can have various forms, but various kinds of agent -- agencies and consignment stores are examples that I have in mind.

Q. Is there some reason why you didn't include app stores in that set of examples?

A. Well, yes. I -- this was for my -- my -- my later treatise. I didn't deliver -- I didn't want to mention any active case, and so I have...

Q. So now back to the bottom paragraph on page 1.

Second sentence, you say, "For example,

Page 178

an intermediary like Amazon provides a virtual platform where principals can arrange transactions and provide checks on product safety and labeling and often provides transaction fulfillment services such as payment processing and provision for returns."

I just wanted to focus on the virtual platform language. What are you referring to by the term "virtual platform"?

A. Essentially a -- as an example of a two-sided -- a two-sided market, and the intermediary is facilitating the connection between sellers and buyers. So a -- a real estate agent is an intermediary that's helping buyers find houses and sellers of houses find buyers.

And I think the same thing is true for a consignment store.

Q. And you're using the term "platform" here in the economic sense, right, not in a legal sense?

A. In -- in the -- in the economic sense, very definitely.

Q. A little further in that bottom paragraph, you say, "Actual or potential competition for the provision of intermediary services establishes a benchmark limit on the

Page 179

commission that an intermediary can charge when coexisting with or forestalling rivals."

Do you see that?

A. Yes.

Q. First of all, what did you mean by "forestalling rivals"?

A. About -- about pricing in such a way that injury -- injury is discouraged. So in the -- in the antitrust analysis, I believe, and in damages from improper conduct, if -- if a firm basically is a monopolist but is pricing in such a way that no -- no potential rivals have an incentive to enter, then they're not causing any damage.

Q. Would allowing storelike apps in the App Store provide actual or potential competition for the provision of intermediary services?

A. I think I -- you'd have to look at the specifics of how that's structured, but I -- I think it's possible. I really don't have an opinion. It would -- that's a question of the specifics of the structuring.

Q. And when I say "storelike apps," I'm referring not to stores like Amazon that sell physical goods; I'm talking about digital in-app content.

Page 180

A. Yes, I understand it was in the Apple Store content.

Q. And would allowing side loading of such storelike apps on iOS devices provide actual or potential competition for the provision of intermediary services?

A. Again, I think that it's a question of the specifics of -- of -- of how it's set up and what the contractual arrangements are. I don't have an opinion ahead of time that it would or wouldn't forestall competition in a way that's consistent with the antitrust regulations.

Q. Well, my question was just if you had side loading of storelike apps, do you view that as providing actual or potential competition for the provision of intermediary services?

A. The answer is I don't know enough about what side loading involves to -- to answer the question and -- but I can imagine that potential rivalries could exist in a variety of forms and limit pricing that -- that discourages entry could also appear in a variety of forms. I...

Q. Still on the first page but a little higher up in that second paragraph, the one that starts -- well, the sentence that starts "For

Page 181

46 (Pages 178 - 181)

**SER-105**

example." 04:11:15

You say, "If Amazon decreases its sales commission on books, this may result in a reduction in price of a particular book, a new edition with more durable binding, better editing, improved 04:11:26 content, or reduction in advertising inserts and increase the variety of authors and books sold through Amazon."

Do you see that?

A. Yes. 04:11:39

Q. If Apple were to decrease the App Store commission, could that result in apps that have improved content?

A. As -- I think in -- generically, yes.

Q. Could it result in apps with less 04:11:56 advertising?

A. I believe so.

Q. Okay. Have you analyzed whether any of this has occurred on the occasions when Apple reduced the App Store commission rate? 04:12:06

A. No, I have not myself investigated these issues per Apple.

Let me just remark -- this work was not -- it was done -- obviously memorializes my -- my experience which the Apple litigation is 04:12:28

Page 182

informing, but this is my own personal research 04:12:31 work. It has nothing to do with this case. I don't -- I wasn't paid for or authorized to do this.

Q. Understood. Thank you for clarifying 04:12:43 that.

On the second page, the first full paragraph, you indicate that "An economic analysis of sales commissions may want to consider welfare effects on the other economic agents, such as 04:13:03 consumers who are not buyers or producers who are not sellers in the as-is market but might be active principals in a but-for market."

Do you see that?

A. Yes. 04:13:16

Q. Have you considered such effects in your damage model?

A. No, I have not, and deliberately, because my understanding is that the -- the legal standards here are that -- I can look at for overcharges as 04:13:31 monetary damages, but that other forms of harm have a -- have a different legal standing and not necessarily immediately accepted by the courts.

Q. Well, in this particular sentence, are you assuming that there would be harm? 04:13:52

Page 183

A. Well, no. I'm just saying there may be 04:13:59 welfare effects. So if you're doing this as an economist for the purposes of, say, public policy, perhaps for the design of litigation or for regulation, that these may be factors you would 04:14:13 want to consider.

I think there are factors that could come in at that level which would not be appropriate to bring into a legal case.

Q. You are referring, though, on page 2 to 04:14:25 welfare effects that could be positive or could be negative, right?

A. In general, yes.

Q. Okay. And in this case, you haven't looked at the effects of Apple's conduct on 04:14:37 consumers who download apps but have never downloaded a paid app or made an in-app purchase, correct?

A. That's correct.

Q. And you're aware that there are tens of 04:14:49 millions of those consumers, right?

A. Yes, I am.

Q. Do you think it's appropriate to ignore the effects of Apple's conduct on those consumers?

A. I think for an economist, it would be a 04:15:03

Page 184

concern if you're trying to do welfare economics 04:15:07 for the entire economy, but I think that -- in a legal setting, you follow the rules set by the consumers.

Q. Are those consumers who downloads apps 04:15:21 but don't make in-app purchases part of the relevant market in this case, as plaintiffs defined it?

MR. RIFKIN: Objection to form.

THE DEPONENT: I think the answer -- that 04:15:35 question has a -- has a compound answer, which is that from a legal point of view, the -- the parties in -- the relevant parties in this case are the people who actually purchased products in -- in this market. 04:15:52

But from the standpoint of a general economic welfare analysis, you would -- you would also consider what's -- what's that mean to other agents in the economy.

Q. (By Mr. Swanson) I mean, economists 04:16:07 certainly, and especially in the digital context, analyze markets where products are priced at zero, don't they?

A. Well, I think that -- the -- the answer to your question is I haven't done a literature 04:16:27

Page 185

47 (Pages 182 - 185)

search on zero-priced products, but it's certainly 04:16:29 the case that economists worry -- worry about provision of public goods and other goods that do not have market prices, do not have markets.

I'm not sure how you would classify 04:16:49 zero-priced digital goods in that I presume -- I presume the supplier offers a zero-priced digital good if they expect somehow to be able to monetize that downstream.

Q. Sometimes the developer monetizes through 04:17:07 advertising, right?

A. Through advertising or by getting -- giving a download to someone who will buy iAP, yes.

Q. And Apple would monetize it because the more users, if there are network effects, the more 04:17:22 developers will want to use the platform; is that logical?

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, I think what's true is that it -- if Apple is aware that there are 04:17:37 major network effects, it -- it should be seeking to get as many developers on this platform as possible, and presumably by charging as little price as they could, while -- while working even on it. 04:17:57

Page 186

Or so -- I'm -- I'm not sure. I think 04:17:57 Apple has incentives here, right? I'm not sure they work in the direction that you would like to claim.

Q. (By Mr. Swanson) Is it your opinion that 04:18:08 any time there are network effects with respect to a two-sided platform that the operator of the platform always has an incentive to charge a lower price to one side?

A. Oh, I think that -- at this point, I'm -- 04:18:23 I'm definitely not prepared to discuss platform -- platform economics. I'm -- it's a complicated area of economics. Tensions between what are so natural returns to scale and the negative effects of -- of concentration. 04:18:47

Q. Okay. Could you turn to page 4 of this article.

Here you're considering the case of a single product and seller but many potential buyers? 04:19:04

A. Yes.

Q. That's what you call a "monopolized market"?

A. Yes. The monopoly here refers to the seller side of the market. 04:19:12

Page 187

Q. You go on to say, "Suppose the product's 04:19:14 unique properties and/or branding give the seller the ability to set the retail price of the product and elicit positive demand over a range of prices."

Do you see that? 04:19:26

A. Yes.

Q. Does that description apply to developers in your model?

A. Developers in the Apple case?

Q. In your model. 04:19:32

A. In the demand model, yes, it does.

Q. Okay. And you also say here that "The market will clear when marginal revenue equals commission-adjusted marginal cost."

Do you see that? 04:19:45

A. Yes.

Q. Is that how you assume developers will set price in your model here in this case?

A. Yes, it is.

Q. Okay. And you also say here, "Assume 04:19:55 that in the relevant range, marginal cost is constant."

Do you see that?

A. Yes.

Q. That's what you assume in your model in 04:20:05

Page 188

this case, right? 04:20:06

A. Yes.

Q. Okay. And then if you'll to turn page 6.

In the first full paragraph, you say, "The assumption that marginal cost is constant over 04:20:22 the relevant range of quantities as in figure 2 corresponds to a seller whose technology is scalable, i.e., quantity can be doubled simply by doubling the rental of capital equipment and the workforce." 04:20:42

Do you see that?

A. Yes.

Q. Do you assume that to be true in your model in this case?

A. I haven't thought about it -- about it in 04:20:52 terms of the details of a developer's production technology, so I -- I'm not sure I can make that correspondence. But that's -- that's certainly the spirit of the assumption that -- that the digital production is scalable. 04:21:12

Q. On page 6 at heading 4, the upper half of the page, you refer here to a "monopolistically competitive market."

Do you see that?

A. Yes. 04:21:31

Page 189

48 (Pages 186 - 189)

Q. Would you characterize the competition between developers in a given genre as monopolistically competitive?

A. I think that's -- an old but -- but correct economist description of this market. I --

Q. And --

A. -- I imagine that the participants in the market would say we're not monopolists, we're -- we're workable competitors. But this is economist terminology for economists.

Q. The -- how do you distinguish, then, between the monopolized market and the monopolistically competitive market? What's the differing assumption or premise that distinguishes between those two?

A. Well, in the monopolistically competitive market -- well, as -- if you read through this section, you'll find this is where I make an argument that if choices are -- are discrete and these conditions that I've described for the market and the number of the buyers is small relative to the total of number of potential buyers that -- that you -- you get the result.

First of all, that -- that discrete choice demand will tend to take this log linear

Page 190

form approximately, and secondly, that Nash equilibrium with active price competition will tend -- tend to go in the limit to the more or less classic Chamberlinian monopolistic competition model.

Ef- -- effectively it's the -- it's the size of the active buyers compared with the size of the -- of the population of potential buyers that -- that determines whether the -- the Chamberlinian model is -- is an appropriate model. I believe it is -- I believe it is in this case.

Q. Do the potential buyers in that -- in that telling include those who never make a purchase?

A. It would, yes.

Q. All right. You can put that to one side and then find your expert report again.

And please turn to paragraph 32. Let's see.

A. I have.

Q. I'm sorry. I'm trying to find my place here.

The second sentence is where I wanted to start where you say, "At the time of writing my

Page 191

2023 supplemental report, that data set" -- referring to the App Store transactions data -- "recorded all transactions made through the App Store from July 2008 through April 2022."

Do you see that?

A. Yes.

Q. Would using additional transactional data after April 2022 result in more accurate estimates?

A. I would say that using more data which would reflect -- should lead to estimates which are more reflective of the behavior of this market through the entire damage period. I wouldn't say one way or the other as to whether they would be accurate.

Generally -- as a general statistical matter, you have more data drawn from the same population, you can get more accurate estimates. But here we have several things going on. One, it's a larger population, but also you have whatever has happened between '22 and '24.

Q. Well, if you assume that price sensitivity is uniform across the damage period, wouldn't you be drawing from the same population with more recent App Store transactional data?

A. Well, again, I think there are two things

Page 192

going on, which is that one is -- the answer is yes. To the extent that that price sensitivity parameter is, in fact, constant over time, is having more -- more data would allow you to estimate -- estimate it with more precision.

To the extent that there's any drift in it over time, this will allow you to more closely estimate the -- the -- the -- effectively the mean -- the mean value.

Q. Drift over time would mean that at some point the structural relationship is changing?

A. Oh, the structural relationship is -- words are rather vague. But the response is yes, if the -- if the market environment itself is changing over time, then the -- the price sensitivity parameter we measure is a measure of the sort of -- of the -- the average sensitivity over the -- the period being analyzed.

Q. Do you have any view as to whether or not the price sensitivity parameter that you're measuring was stable over the entire damage period to date?

A. I -- I don't -- if we examine that in the past, I don't recall the results. I simply don't remember. I don't remember asking the question.

Page 193

49 (Pages 190 - 193)

I'm not saying we didn't, but I don't remember it.

Q. Well, Dr. Song is now implementing your methodology with almost two years of additional App Store transactional data, correct?

A. Yes.

Q. Would you expect him at least for the music and entertainment and games genres, which you yourself estimated, to come up with estimates that are very similar to the ones that you previously reported?

A. I would expect him to be similar, but, again, to the extent that there is any drift over time, that would -- that would generate differences, and I think the updated sensitivity estimates would be more representative of the -- the overall behavior of consumers in the damage period.

Q. If Dr. Song, using more data, estimated a parameter that you had estimated and his estimate was significantly different than yours, what would you conclude from that?

MR. RIFKIN: Objection to form.

THE DEPONENT: I would say that there could be multiple reasons for that. One would be that one is working with -- a different set of data

Page 194

and it involves somewhat different market conditions and -- and the parameters reflect the -- something about the average behavior over the period. That's the most likely source of -- of differences that are substantial.

Q. (By Mr. Swanson) Would there be any boundary point in terms of differences between your estimates and his where you would be led to question whether there was something wrong with the model itself?

MR. RIFKIN: Objection to form.

THE DEPONENT: I think the answer is that -- that an analysis based on the entire damage period would be the gold standard, and -- and if there's a question -- there's a question about what was missing in the earlier model. For example, there's -- there's different developer data available, I understand, in Dr. Song's work than there was in -- in my work. When I say developer data, I mean the margin data.

He's -- he analyzed different -- a more complete set of genres than my initial example of genres. So those things would all contribute to differences.

Q. (By Mr. Swanson) Would the gold standard

Page 195

analysis including -- let me start over.

Would the gold standard be satisfied if Dr. Song included all of the iPod Touch transactions over the damage period?

MR. RIFKIN: Objection to form.

THE DEPONENT: My -- my view is that this was a -- a market -- aftermarket for iOS devices, and I -- I'd be -- I'd surprised if the -- the presence or absence of the iPod Touch would -- would have much difference primarily because it was a -- an early and relatively small factor in the overall development of this market in terms of revenues and -- and numbers of transactions.

Q. (By Mr. Swanson) Well, we established earlier from your own report that at -- at an earlier point iPod Touch transactions accounted for 10 percent of the entire universe over the class period up to that point.

Do you recall that?

A. I -- that was a table from my original report, but since then, you have many more years of transactions, and you have inclusion of the under $10 people by -- as part of the class definition. And so I don't know -- I almost doubt that that 10 percent number has remained in place.

Page 196

Q. What does -- what does the class definition have to do with what data you should use to estimate demand in your model?

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, I think there's a question of implementation as to whether you -- you include payors or accounts in the -- in the demand estimation that are -- don't fit the -- fit the class definition.

Q. (By Mr. Swanson) Well, isn't everyone who makes a purchase part of the demand in the market regardless of whether they spend more than $10 or not?

A. Well, I think -- I think that's right, and I think it's legitimate to -- use -- use them all. But I think from an econometric view, you could also -- it's a legitimate argument that you should concentrate on the sensitivity of the people who matter for the -- for the case. So I don't think there was a clear econometric reason that one -- one is to be excluded.

Q. Could you -- well, I'm going to ask you this question -- a little bit different topic.

But in your model, if a consumer makes one in-app purchase and the model calculates

Page 197

50 (Pages 194 - 197)

damages associated with that purchase, and then we compare that scenario with another one where the same consumer at the same time, same item, but instead of purchasing only one, the consumer purchases ten, would your model calculate ten times the damage in that second scenario?

MR. RIFKIN: Objection to form.

THE DEPONENT: I'm sorry. I have to stop and think -- think about it because I have to think about the steps in the -- in the damage calculation.

I -- I think the answer depends on whether those ten are bought as ten replications of the same item purchase or whether they're bought as -- as a package of ten. My model does not predict demand at the item level. You -- you narrowed it by saying they -- by only the one item, so that -- that helps.

But my model is not -- is not -- does not actually say that the way this would be sold in the but-for world would be one item -- the same item that you can buy ten times. I'm -- I think the model cannot -- cannot determine that.

Q. (By Mr. Swanson) Let me ask you to look at paragraph 51 in your report.

Page 198

A. I have that in front of me.

Q. Okay. In that paragraph you're talking about focal pricing?

A. Yes.

Q. The last sentence of that paragraph, you say, "I offer no opinions in this report regarding whether developers would display such pricing behavior in the absences of Apple's price tier restrictions."

Do you see that?

A. Yes.

Q. Now, in prior reports, you have offered some opinions on that topic, have you not?

A. I've offered the opinion that if focal prices are contained within Apple's price tiers, which in the case of -- of a 99-cent ending for a price, that's true, then an analysis of the impact of the tiers also tells you something about the -- about the impact of focal pricing.

Q. In this last sentence where you say you offer no opinions, are you withdrawing any prior opinions that you offered?

A. No. My opinion is -- is the same, which is that the framework, the architecture for this demand model can be applied with tier restrictions

Page 199

in place, and to the extent that focal pricing is on the -- on the tier grid with focal prices in place and that the -- that the demand -- damage model can accommodate that. That opinion is unchanged.

Q. Are you offering any opinion that Apple's price tiers are anticompetitive?

A. I am not. I've not been asked to do that. I'm not -- I understand that I will not be offering that opinion.

Q. Could you find Exhibit 63, the choice article.

A. Yes.

Q. And if you could turn to page 9 of that exhibit, please, I'd appreciate it.

Do you see the paragraph that says, "7. Focal pricing"?

A. Yes.

Q. You indicate there that there's an observation in marketing that consumer demands serve -- excuse me. "Consumer demands surge at specific monetary price trigger points, termed focal prices, with the implication that products should be designed to be sold at these prices."

Do you see that?

Page 200

A. Yes.

Q. First, what did you mean by "design"?

A. I'll give an example. If a maker of cereal or -- or a carbonated beverage finds that demand surges at 99 -- 99 cents, beyond 99 cents, and then they'll pick a size for their bottle or their box of cereal so that that's an attractive product at that price.

Q. Is it -- do you have an opinion as to whether app developers design their products in that way in connection with Apple's price tiers?

A. It -- I have no personal information on what designers consider, but I think as a general economic phenomenon, if -- if there -- there is a jump at 99 cents, yes, developers would -- would take that into account even if they were free to set any price they wish.

Q. And is it your -- well, is it your opinion that the products that are designed in that way to respect Apple's price tiers, so to speak, in the actual world will be designed the same way in the but-for world?

MR. RIFKIN: Objection to form.

THE DEPONENT: I don't know the answer to that. I -- certainly there's nothing in the damage

Page 201

51 (Pages 198 - 201)

modeling which is -- is intended to make any -- any  04:42:30
suggestions as to what that would be. I think I
deliberately said I -- I do not think I can explain
developer behavior at the granularity that would be
required to predict decisions -- for example, the  04:42:55
size of cereal boxes or -- or the number of digital
coins that go into an item, you know, in the iAP.

Q. (By Mr. Swanson) Are you assuming for
purposes of your model that in the real world, the
price tier points that the developers choose are  04:43:17
exactly profit-maximizing?

MR. RIFKIN: Objection to form.

THE DEPONENT: The calculation in the
but-for situation assumes that developers choose
among the available tier points and they choose the  04:43:44
maximum profit among the tier points and not -- not
other points off -- off the tiers even if they were
higher profit.

Q. (By Mr. Swanson) If developers are
designing their products to correlate with the  04:43:59
price tier point that they choose, does that mean
that that price tier point is the most
profit-maximizing point?

MR. RIFKIN: Objection to form.

THE DEPONENT: That's -- that's -- that's  04:44:21

Page 202

a difficult question to answer, and I believe it --  04:44:22
it depends on the -- the structure of production
for developers and how -- what the -- what the
nature of -- of quality changes are.

Q. (By Mr. Swanson) Have you studied that  04:44:44
empirically?

A. I have not studied it empirically. I've
thought about it, and I think it's -- it's an
under-explored area in economics.

Q. You know if Dr. Song has explored that  04:44:59
empirically?

A. As far as I know, he has not.

Q. Could you turn to page 13, please. And I
wanted to focus on figure 3.

This figure in your article presents a  04:45:24
demand curve in red. I believe in the text you
referred to it as "a partial attention demand
curve."

Is that a fair --

A. Yes.  04:45:36

Q. -- statement?

Is it fair to say that this figure and
that particular curve seeks to depict consumer
demand in a world where prices ending in 99 are
focal prices?  04:45:47

Page 203

A. Yes. This is a -- this is a constructed  04:45:53
example. It's not a -- not a general economic
theory, but for this constructed example, this
would be the nature of demand.

Q. Does your model of consumer demand in  04:46:08
this case rely on a partial attention demand curve
like the one depicted in figure 3?

A. In this case, no. The assumption in this
case is that consumers respond in a classic way to
prices and products, that they are not inattentive.  04:46:28

Q. So does that mean that you're assuming
that developers do not set prices to take account
of what you call here "dollar-focused consumers"?

A. In the damage model for Apple, yes.
The -- I have not made any special assumption on  04:46:50
the presence of -- of focal prices. I do not
think, given the immaturity of the -- of that
field, that it would be appropriate or -- or
legally wise to introduce it.

Q. Please turn to page 14.  04:47:16

In your discussion of a consignment store
that engages in anticompetitive conduct, you refer
to "a tendency for suppliers to set prices at focal
points being capable of influencing the
distribution of the harm it causes consumers."  04:47:45

Page 204

Do you see that discussion?  04:47:49

A. Sorry. Refer to me to a line if you can.

Q. It is -- it's in the bottom paragraph,
and you talked about -- when you start saying,
"Suppose the conduct of a consignment store crosses  04:48:11
a traditional antitrust red line, say by refusing
to deal with suppliers who attempt to sell through
rival stores."

Do you see -- do you see that?

A. Yes.  04:48:25

Q. Then you say, "In the terminology of
class action litigation, consignment store conduct
is a common effect, but a tendency for suppliers to
set prices at focal points can influence the
distribution of the harm it causes consumers, as in  04:48:36
the figure 4 example."

Do you see that?

A. Yes.

Q. What are you referring to there?

A. Well, figure 4 was -- was an example  04:48:45
where I considered in -- in a -- a particular
little constructed exercise, a small number of
consumers that have a left inattention in the sense
that they ignore the sense part of -- of a price.

And what -- what I find there is that a  04:49:14

Page 205

52 (Pages 202 - 205)

relatively small number of these kinds of consumers 04:49:21 can -- can, in fact, cause a fairly significant market effect.

Q. Can the tendency toward focal pricing mean in such a scenario that some consumers are not 04:49:33 harmed by the anticompetitive conduct?

A. What it means is that in terms of the price changes, yes, different -- different consumers would be affected differently. That is to say -- this would be -- this could have a 04:50:00 disruptive effect on the -- on the pattern of effects.

Q. Do you agree that the impacts of focal pricing effects on the distribution of harm may in some circumstances require individualized inquiry 04:50:20 on the pricing behavior of each supplier?

A. Well, I think that one of the issues in -- in class actions is that individualized inquiry is generally so costly as to essentially suppress that as -- as a remedy for misconduct, so 04:50:44 the question is if -- if, in fact, this phenomena is -- is important -- and one example doesn't establish that -- then it's -- then it's an issue that the -- the law in economics community should be thinking about. 04:51:06

Page 206

Q. Could you please turn to paragraph 54 of 04:51:10 your report.

In that paragraph, you state that you "modeled developer pricing decisions and therefore estimate but-for prices at the app level using the 04:51:32 average of item level prices in a given month as the app level in-app content price."

Do you see that?

A. Yes.

Q. And this is what you were earlier 04:51:45 referring to as "composite price"?

A. Yes.

Q. When you refer here to the average of item level prices, are you referring to a simple average or a weighted average? 04:51:59

A. It's a simple average in the calculations that I did to -- up to my supplementary report.

Q. Does it make a difference to your model whether you use a simple or a weighted average?

A. That's certainly an implementation issue. 04:52:16 I -- it doesn't change the architecture of the model. It -- it could have an impact on -- on the results, yes.

Q. Would your model yield unreliable results if you used weighted averages instead of simple 04:52:30

Page 207

averages? 04:52:34

A. I think that it's -- it's an econometrician's decision as to which of these price indices for a composite commodity is appropriate, and I don't think you can say either 04:52:50 one or the other is more or less reliable or more or less appropriate in any generic basis.

It's really a question of in the particular application whether a -- a level aggregation is the best one to use. 04:53:10

Q. Did you have a reason for using a simple average instead of a weighted average?

A. I don't have a strong reason. There is -- there is one reason, which is a simple average is -- avoids any -- any possible 04:53:25 econometric contamination from -- that would be introduced by changing the weights.

This is a problem which is not specific here. It arises every time you talk about price indices in the macro economy and otherwise. 04:53:43

Q. In your opinion, did developers decide what price they will charge for in-app purchases based on the average price of all in-app items rather than the price of those items individually?

A. My judgment is that -- app -- app 04:54:13

Page 208

developers have a marginal cost for -- for app 04:54:16 content, which is a relatively -- determined by production of that content and -- primarily and not by how it's packaged. And so that -- I think it's appropriate to do the analysis at the composite 04:54:39 content level, and I don't think that we have sufficient information on app developers' behavior to go at a finer granularity than that.

Q. Are you aware of any other businesses where sellers maximize profits based on the simple 04:55:01 average of all the prices they charge?

A. I think I have to answer by saying first of all, I don't follow and have information on most manufacturers' behavior at all, and in particular, I don't have any detailed information on how they 04:55:33 price multiple products.

I think that there are obviously issues on both the consumer demand side and the production side on how you manufacture and price products that are packaged in a variety of packages and formats. 04:55:54

Q. Does the approach of using a composite product as you described it result in your model calculating higher damages?

MR. RIFKIN: Objection to form.

THE DEPONENT: The answer is I don't 04:56:22

Page 209

53 (Pages 206 - 209)

**SER-112**

know. I don't -- that's -- that's certainly not an intended part of the design. The design was motivated by what seemed reasonable in terms of the -- the data that was available and what we knew about developer behavior.

Q. (By Mr. Swanson) Well, composite pricing will tend to have higher prices than the -- than the sum of the individual in-app items for a given developer, correct?

A. Well, it is an average, so it will be roughly higher -- higher for half and lower for half. Of course, an average is not the same as the mode, but -- I'm sorry -- the median, but yes.

Q. Take a case where a developer has two in-app items and maximizes its profits at an average -- simple average price of $2.99.

Do you have that in mind?

A. Two items --

Q. Two items --

A. -- whose average price is 2.99?

Q. Yeah. Now, that would be consistent with the developer charging 99 cents for one of the items and $4.99 for the other item.

Do you agree?

A. Oh, you test me. It's simple arithmetic,

Page 210

but it's too late in the day for me to do it in my head.

Q. Well, I will represent to you that if you take the average of 99 cents and $4.99, you get 2.99.

MR. RIFKIN: Objection.

THE DEPONENT: Yes, I accept that.

Q. (By Mr. Swanson) Okay. So would the developer be equally profitable in the approach you take if it instead charges $1.99 for one of the items and $3.99 for the other item?

A. The answer is that that's -- that's not knowable without knowing something about the -- the quantities that are being transacted here, what -- what the demand response is and what the -- what the actual costs are of packaging in -- in the various sizes.

And it's -- that's a pretty complex problem, and certainly, I think -- a problem I think at a granularity where the outside econometrician has very little hope of answering it.

Q. Well, in your model, if you see one developer that has two items priced at 99 cents and 4.99 and another developer with two items priced at

Page 211

1.99 and 3.99, your model will treat both of those as having the same composite price of $2.99; isn't that the case?

A. That sounds right.

Q. Okay. And your assumptions you use in your methodology will imply that both of those developers are maximizing their profits at a price -- average price of $2.99, correct?

A. That also sounds right.

Q. So when you say that developers set prices at the app level rather than the item level, do you mean that developers care only about the simple average price of all of the in-app items?

A. No. What I mean is that there are issues of how consumer demand responds to -- at the item level, and there are issues about -- about the -- the marginal costs at packaging at -- at the item level which -- are beyond the ability of -- the econo- -- outside econometrician to learn about from the kinds of data we have, and so we -- I've designed an analysis which does not try to speculate or infer what that level of -- of packaging and pricing behavior would be.

Q. When estimating demand for in-app purchases, does your model estimate demand for

Page 212

in-app purchases at the composite price or the individual item price?

A. Please ask the question again.

Q. When estimating demand for in-app purchases, does your model estimate that demand at the composite price or the individual item price?

MR. RIFKIN: Objection to form.

THE DEPONENT: The -- the -- a -- a record -- a record in that estimation is an item.

Q. (By Mr. Swanson) Which means that it's true that you estimate consumer demand for in-app purchases using the item prices, right?

A. Using the individual market demand and price by item, correct.

Q. And estimating consumer demand using the composite price would make no sense, would it? Consumer -- consumers don't purchase composites that are fictional, do they?

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, I think -- I think it would -- one could do that, and that's very commonly done in economics where demand is -- is studied at -- at -- at a granularity or composite of commodities with an appropriate commodity -- composite price, and so I think it would -- it

Page 213

54 (Pages 210 - 213)

would certainly be possible to do that and appropriate to do that.

Q. (By Mr. Swanson) Why didn't you do that, then?

A. Well, I -- I think -- I -- as I recall, this goes back to -- four years, and I don't recall the details. But I think that was -- simply a judgment that -- at the time that -- those were -- those were the -- the data that were available for -- for estimation.

Q. Do you have any estimate of consumer price sensitivity at the so-called app or composite level?

MR. RIFKIN: Objection to form.

THE DEPONENT: Yeah. The answer I -- I have not seen results at that level, no.

Q. (By Mr. Swanson) Is it correct to say that in your model, the individual price of an in-app item is used for estimating demand, while the composite price is used for estimating damages?

A. That's correct.

Q. Is your model's assumption that developers set prices at the app level an empirical assumption?

A. I'm not sure what you mean by

Page 214

"empirical." I guess -- what do you mean by "empirical"? Perhaps you could explain.

Q. Have you surveyed any developers to ask whether they set prices at the app or the item level?

A. No, I -- I -- I think that -- that assumption is an assumption based on the -- the economic -- the econometrics of this at -- at a finer level of granularity, there's enough complexity so that -- the proper -- marginal cost is not easily measured. Prices are -- involve more complexities than simply a relationship to marginal cost at the item level. There's -- there's demand interactions and production interactions which make that a much more complicated relationship.

Q. You feel very comfortable estimating demand at the item level, right?

A. I'm -- I'm -- I'm aware that what that involves is that the distinction between the item level and the app month level go into the -- they basically end up in the residual, and so that the question as to whether you're getting a correct estimate of the app month level price coefficient is a question of whether the instruments are appropriately orthogonal to the -- to the residual

Page 215

in that -- to the disturbance in that case.

Q. You're referring to the instrumental variables?

A. Yes, the instrumental variables.

Q. And is it your -- do you have any evidence that the instruments are orthogonal?

A. The answer is I don't have over-identifying instruments, so I have not been able to make a test of that.

Q. Okay.

MR. RIFKIN: Good time for a break?

MR. SWANSON: Yeah.

MR. RIFKIN: Okay.

THE VIDEOGRAPHER: This marks the end of Media No. 6. Off the record. The time is 5:06.

(Recess taken.)

THE VIDEOGRAPHER: This marks the beginning of Media No. 7 in the deposition of Professor Daniel McFadden. We're back on the record. The time is 5:24.

Q. (By Mr. Swanson) Professor, take the example of a developer who sets a price for a paid download. Your model looks at that price and together with the assumption that that price is exactly profit-maximizing for the developer, you

Page 216

are able to infer a marginal cost; is that correct?

A. That's correct.

Q. Okay. And the accuracy of that marginal cost inference hinges on the assumption that the price the developer chooses is exactly profit-maximizing, correct?

A. Correct.

Q. Now, every app that has ever been sold at an App Store is set a price tier price point, correct?

A. Yes.

Q. So your model's accuracy in terms of inferring marginal cost hinges on assuming that all of those price tier price points are exactly profit-maximizing, correct?

A. Correct.

Q. And if they're not profit-maximizing exactly, then your inference of marginal cost is not accurate, is it?

A. If they're not exact, then the -- the marginal costs have the possibility of ranging within some bounds, and one could set out to do an analysis on that basis.

Q. One could calculate those bounds, correct?

Page 217

55 (Pages 214 - 217)

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**SER-114**

A. Yes.

Q. And Professor Prince has actually done that in the past, has he not?

A. Yes. I -- I don't think he used them inappropriately, but yes. Once -- once you have them, you could do something appropriate.

Q. Well, you didn't have any issues with the mathematics of his calculation of those bounds, did you?

A. I'm sorry. You're testing me on something that I haven't read for -- for -- for four years, so I simply can't -- answer the question because I -- I haven't refreshed my knowledge of that.

Q. Okay. Fair enough.

When a consumer makes an in-app purchase in a free-to-download app, the free download of the app itself generates no cost to the developer in your model, correct?

A. No, I don't -- I don't agree with that. It -- it -- it's -- I think the model is silent on -- on how -- how the developer would -- covers his fixed cost in that case.

Q. Well, your model, by being silent, treats the cost as zero, right?

Page 218

A. Well, in terms of the pricing decision for iAP, that's based on the marginal cost of providing that composite iAP. And the -- the cost of delivering the app is not part of that calculation.

So presumably, somewhere in the background, they -- the app developer is making some business decision that's -- that that's the business model he wants to exercise, one with free downloads.

Q. Well, if free app downloads and associated in-app purchases are like left and right shoes, don't you need to look at the composite marginal cost of those two transactions?

A. I'm sorry. Just for my hearing, repeat that.

Q. Sure.

You had earlier said you viewed downloads as complements of in-app purchases in the apps which have been downloaded.

Did I get that right?

MR. RIFKIN: Objection to form.

THE DEPONENT: I -- I'm not sure I understand the phrasing of the question, but I -- I think the answer would be that if I'm a developer.

Page 219

I -- I am making a business decision on whether I want to charge for the download of my app or not.

Q. (By Mr. Swanson) Well, if downloads and in-app purchases are complements instead of substitutes, wouldn't the developer want to optimize with respect to the cost of the download as well as with respect to the cost of the in-app purchase?

A. Well, the answer is -- is that if you -- went back further and asked for what -- what is the business decision of the developer as to what business model to adopt and whether to offer the download freely or not, presumably at that level, there -- if I'm a developer, I'm making some projection as to how much I can -- how much rev- -- profit I can gain from selling -- selling the app and selling advertising, and that would go into my decision as to whether to be in this business at all or whether to deliver the app freely or not. I agree with that.

Q. Well, do your -- the equations that define your model have any role for the cost of that free-to-download transaction?

A. The answer is -- is no. I -- I -- the -- the model effectively says that when -- when I

Page 220

price iAP, I'm -- I'm simply responding to -- to the market as exists with the people that have freely downloaded my app. That's just distinct from the business model in which they are making a joint decision as to how to price the app and how to price the iAP.

Q. If a user downloads an app for free and uses it but does not make any in-app transactions, is there any cost to the developer reflected in your model?

A. No. Those apps -- transactions do not appear in the analysis.

Q. Can I ask you to turn to paragraph 55 of your report.

You state in paragraph 55 that "There could be cases in which an app developer's cost structure or market conditions are such that your model estimates some consumer class members incurred no monetary harm as a result of Apple's alleged anticompetitive conduct."

Do you see that?

A. Yes.

Q. You write that there could be such cases.

Do you know whether there are such cases, in fact, where your model estimates class members

Page 221

56 (Pages 218 - 221)

incurred no monetary harm because of Apple's 05:33:05
alleged anticompetitive conduct?

A. Well, there certainly are such cases predicted by my analysis in the supplementary report in 2023. 05:33:23

Q. And as Dr. Song has implemented your model and reported about that in his March 7 expert report, does he find that there are more such class members who are not monetarily injured?

MR. RIFKIN: Objection to form. 05:33:52

THE DEPONENT: I don't -- I don't remember his exact results, but because he's working with payors rather than individual accounts and because he's working with more -- more time, I think there is a -- probably more of a chance that 05:34:08 any particular consumer would buy something which -- in which they would have benefited from the but-for case than -- than before.

Q. (By Mr. Swanson) Do you know how many class members Dr. Song finds incurred no monetary 05:34:27 harm because of Apple's alleged anticompetitive conduct?

A. I don't recall the number.

Q. You're aware that number is available in his report? 05:34:41

Page 222

A. Yes. I -- I -- I remember seeing in a 05:34:43 Zoom call the numbers, but I don't remember what the numbers were.

Q. Do you recall if it's more than 10 million class members? 05:34:53

A. Oh, no. What I remember are percentages. I don't remember numbers. I don't even remember the percentages, but I certainly -- I don't remember seeing numbers.

Q. Okay. Let me ask you to flip to 05:35:06 paragraph 58 of your report.

You write there that you understand that "Apple has now produced a supplemental data set that maps individual payor IDs which represent consumers who are billed for a transaction to the 05:35:46 transactions contained within the App Store transactional data."

Do you see that?

A. Yes.

Q. And do you base this understanding on the 05:35:55 part of the Song report that you reviewed?

A. Yes.

Q. Do you have any understanding about how individual payor IDs were mapped to transactions?

A. If it has been described to me, yes. 05:36:13

Page 223

Q. And do you know who did that mapping? 05:36:15

MR. RIFKIN: Objection to form.

THE DEPONENT: Ask the question again, please.

Q. (By Mr. Swanson) Let me start -- let me 05:36:27 start over again.

Let me ask you: Do you know who Darryl Thompson is?

A. No. I -- I've been told, but I can't repeat to you now the name of the outside firm, the 05:36:41 claims administrator firm that actually did this analysis, but I understand they played a major role in doing it.

Q. Does the JND Legal strike a chord?

A. I believe that's what I was told, yes. 05:36:58

Q. Okay. And do you understand that Mr. Thompson is with JND Legal and submitted a declaration about that activity?

A. I have no information on that. I have not heard the name before, and I haven't seen any 05:37:16 of their product myself.

Q. Did you -- when you read that part of Dr. Song's report, did you note that he, Dr. Song, referred to a declaration that was attached to his report? 05:37:31

Page 224

A. I'm sorry. I missed that. I didn't pick 05:37:32 up on it.

Q. Okay. Are you aware that JND Legal purports to have matched approximately 1.69 billion Apple IDs to approximately 246 million unique 05:37:48 individuals?

A. I was -- I was told, given ballpark estimates of those numbers, yes.

Q. Are you aware that Apple's data set matching transactions to payors relies on 05:38:05 JND Legal's list of unique individuals?

A. That's my understanding.

Q. And do you understand that JND Legal's list relies on a methodology for identifying and removing duplicate payor records? 05:38:21

A. I -- I have no direct and detailed knowledge of how -- how they work. I simply have a description that they -- they have done this analysis and that that's what they do, but I don't -- I don't know anything about the details of 05:38:45 it.

Q. You're not offering any opinion that JND Legal's methodology for matching Apple IDs to individuals is reliable?

A. Yes, I have no involvement in that work 05:38:58

Page 225

57 (Pages 222 - 225)

and I have no opinion.

Q. Your model, as a matter of logic, will only accurately identify which class members were harmed and unharmed to the extent that JND Legal has reliably identified the unique class members?

Would you agree with that?

A. I do not agree with -- with that in full, no. I mean, I think there are obvious things that one could do. If you knew more about what that company had done and had specific questions about the way particular subclasses were processed, one could go through and track what implication that -- that had for the -- for the percent of harm.

Q. Your understanding is Dr. Song has implemented your methodology at the individual class member level based on JND Legal's work; is that fair?

MR. RIFKIN: Objection to form.

THE DEPONENT: My -- my understanding is that he has used the identification of payors and the transactions associated with those payors that Apple has -- has delivered. That's my understanding.

Q. (By Mr. Swanson) Okay. And how important is it to an accurate individualized

Page 226

assessment of damages under your model that JND Legal's work is reliably accurate?

A. Well, my -- my view is that payor data is better than account ID level data for allocating damages and for determining in the claims administration process what -- what's a damage account and what's not or what is a damage payor and what's not, but I -- actually, I think that doing it on an account basis would already have been an acceptable claims process from my -- from my point of view. I think it would meet the standards that class action requires, as I understand them.

I would hope that the payor data is more accurate in identifying actual class members than just sending money out to accounts, for example. But beyond that, I don't have an opinion on the matter.

Q. Well, data at the account level doesn't tell you anything about individual -- any given individual class member, does it?

A. Well, I would say there are -- there are certainly interactions between Apple ID accounts which are omitted if you simply do things on an account-by-account basis, and if you have good

Page 227

payor data, that takes care of that issue.

Q. If you have good payor data and you're able to accurately figure out who the unique payors are from that data, then that takes care of that issue, in your opinion?

A. Yes.

Q. So it is important that the methodology used to assess unique payors is a reliable methodology, correct?

A. Well, the question is essentially is it -- is the error rate from using payors identified in this way more -- more or less than the error rate from assigning damage -- allocating damages by Apple ID and missing the interactions between Apple IDs.

My -- my own opinion, without detailed study, is that either of these methods is -- would be better than most of the class action cases where I have worked in the past in terms of getting the damages remediation to the people who actually incurred the damages.

Q. You understand that in this case, the presiding judge has required that there be a matching process at this expert report time?

A. Actually, I -- I don't -- I -- I know

Page 228

that from my original time on my original report, the -- it makes sense to do it on a payor basis, and the data was unavailable at the payor basis. I am not so aware that was a part of a -- the judge's order.

Q. Let me ask you to turn to paragraph -- well, 59, which is a sentence of your report.

You say there that "The process described above can handle any but-for commission rate the jury determines would prevail in the but-for world."

Do you see that?

A. Yes.

Q. Your model assumes that iOS App Stores in the but-for world charge a single uniform commission rate, correct?

A. Correct.

Q. If the jury determines that absent Apple's alleged anticompetitive conduct, multiple stores would charge different commission rates, can your model calculate damages?

A. I would say there's -- there's nothing intrinsic in the architecture of the model that would prevent that. The architecture of the model is designed in such a way that it would be

Page 229

58 (Pages 226 - 229)

relatively -- relatively straightforward to 05:45:38 introduce commission rates that varied over time or, say, varied between iAP and various genres.

But if it actually varied between rivals, my model does -- does not at this point work -- 05:46:01 work from a description of what the actual topography in the but-for competition would be. It works simply from the Abrantes-Metz but -- but-for rate.

So in summary, my statement is that if I 05:46:24 was -- if -- if she -- or if I was given rates from her that varied by time or varied by genre or varied by the nature of the product being delivered, the -- the model could accommodate that. But if the -- and she said that these rates would 05:46:44 differ by rival, then I don't have a model of operation of rival stores.

Q. If the jury determines that developers maximized profits and set their prices not at the app level but at the item level, how would the jury 05:47:07 reliably calculate damages based on the evidence from your model?

MR. RIFKIN: Objection to form.

THE DEPONENT: The answer is I don't -- I don't think I can do it and I don't think they can 05:47:19

Page 230

do it reliably. 05:47:22

Q. (By Mr. Swanson) If the jury determines that marginal costs are zero for in-app virtual currency transactions, how would the jury reliably calculate damages using your model? 05:47:34

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, this is -- this is going to have to be a pretty smart jury if they can do those calculations, but I think the answer is if they -- if they can work at that level, then I 05:47:53 don't know. I don't know -- I don't know how they would proceed.

Q. (By Mr. Swanson) If the jury determines that the margin constraints generally should be set at higher ranges, in other words, shifted up, how 05:48:09 would the jury reliably calculate damages using your model?

A. The answer is that the model could be -- demand reestimated and damages recalculated with -- with different margin constraints. That -- that is 05:48:38 an exercise that -- that takes quite a while and it would be -- I think beyond -- clearly beyond the capacity of a jury to do or ask for.

Q. (By Mr. Swanson) This is 65.

/////

Page 231

(Exhibit DX65 was marked for 05:49:14 identification by the Court Reporter and is attached hereto.)

MR. SWANSON: Mark this as 65.

Q. (By Mr. Swanson) Professor McFadden, do 05:49:51 you recognize Exhibit 65?

A. I do.

Q. Is this an amicus brief that was submitted to the U.S. Supreme Court on behalf of you and Professor Stiglitz? 05:50:00

A. Correct.

Q. And this was filed last month?

A. I believe so.

Q. Did you draft any part of this brief?

A. No. 05:50:19

Q. Did you review it?

A. I did. I reviewed it and made some suggestions.

Q. Now, this was submitted in a case called Laboratory Corporation of America versus Davis. 05:50:32

Do you have an understanding about what the issue is before the Supreme Court on which you decided to serve as a friend of the court?

A. I have limited understanding as to what the petitioner's proposal was, but beyond that, I 05:50:53

Page 232

don't know anything about the case. 05:50:59

Q. Do you understand that the Supreme Court granted review in that case to determine whether a class may be certified that contains unharmed class members? 05:51:11

A. I understand that that's -- that's the issue as to what the petitioner's proposal is, a particular proposal for making decisions on the basis of that.

Q. And you understand that the class as 05:51:27 defined in this matter contains members that your model shows are monetarily unharmed, correct?

A. You're now referring to our Apple litigation?

Q. Yeah. 05:51:41

A. Yes, the model does show that.

Q. And do you understand that the question the Supreme Court is set to decide is quite relevant for whether this matter may continue as a class action? 05:51:54

MR. RIFKIN: Objection to form.

THE DEPONENT: Actually, I don't -- I -- I know very little about the circumstances here and how they relate to -- to this case. I suppose -- I suppose that these issues I thought were resolved 05:52:15

Page 233

59 (Pages 230 - 233)

at the class cert phase and -- and perhaps they will come up again on appeal, but I thought that was a -- a settled issue at this point.

Q. (By Mr. Swanson) Well, if the issue could come up again on appeal, it would be quite relevant if the Supreme Court decided an intervening case on that topic, would it not, as a matter of logic?

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, I imagine so, yes.

Q. (By Mr. Swanson) Now, on the front page of Exhibit 65, your counsel are listed -- your and Professor Stiglitz' counsel for purposes of the submission of this brief, right?

A. Actually, please -- please ask the question again.

Q. Sure.

This brief on the first page lists who your lawyers were who filed this brief on your behalf and on Professor Stiglitz' behalf, correct?

A. Yes, I believe that's the case.

Q. And that would be the Kellogg Hansen law firm?

A. Apparently.

Q. Yeah. And these -- and that firm is

Page 234

serving as your personal lawyers for purposes of filing this brief with the Supreme Court, correct?

A. Oh, I don't know what -- what the legalities of all this are. I mean, I -- I -- you're asking me about something that -- that I don't have any direct knowledge of.

Q. Well, are -- would -- do you understand that Kellogg Hansen was acting as your lawyer -- your lawyers for purposes of filing this brief with the Supreme Court?

A. Actually, I don't think I have -- I have an understanding of that. I have -- I -- I was asked if I agreed with the main points of this, and I -- I said that I did, and so they proceeded to -- to produce a draft in essentially this form.

I did not -- I did not instigate it, so I didn't have any personal involvement in deciding who was the lawyers representing this -- this opinion.

Q. You understand that Kellogg Hansen are also counsel to the plaintiff class in this litigation against Apple, don't you?

A. Actually, I -- I -- I don't know the specifics of that, no.

Q. You see David Frederick is listed as one

Page 235

of your lawyers here from Kellogg Hansen. Are you aware that he, along with Mr. Rifkin, is a lead counsel in this case?

A. Well, the answer is that -- yes, I must know that from the past. I've certainly talked to the lead counsels at times in the past, but I haven't remembered the name.

Q. And do you understand that this case can no longer proceed as a class action as a result of any decision by the Supreme Court in Laboratory Corporation that Mr. Frederick and his firm will likely lose a very large amount of attorneys' fees?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I -- I think I've tried to describe my involvement in this, which was that I was -- I was asked if I agreed with -- agreed with the point of view raised in this draft, and I -- and I said that I did, and so I was -- I was recorded as having approved its submission.

Beyond that, I -- I know nothing about the -- what you raise as kind of the legal side story here. I'm not involved in that.

Q. (By Mr. Swanson) Well, you agreed to submit this brief to the Supreme Court, and you're

Page 236

telling me you did not know that the law firm that represented it was -- your lawyer before the Supreme Court never informed you that they were also the lawyers in this case against Apple?

MR. RIFKIN: Objection to form.

THE DEPONENT: I -- I didn't ask because I simply concentrated on the contents of the amicus brief. The issue here for me was whether the brief itself was -- was sound.

Q. (By Mr. Swanson) If you would please turn to page 1 of this brief and look at the second paragraph on that page, starting with the second sentence.

"To certify an antitrust class, Federal Rule of Civil Procedure 23 requires a reliable method to measure harm on a classwide basis and to later assign zero damages to any fortuitously uninjured class members."

Do you see that?

A. Yes.

Q. What do you understand to be meant by "fortuitously uninjured"?

A. Well, in point of fact, I did not try to interpret the -- the legal part of this document. I concentrated on its -- its economics, and so I --

Page 237

60 (Pages 234 - 237)

I -- I don't have an opinion at this point on what that means.

Q. Do you have any opinion about whether the class members that your model finds to be monetarily unharmed in this case are "fortuitously uninjured"?

MR. RIFKIN: Objection to form.

THE DEPONENT: I -- I would assume that "fortuitously uninjured" means that -- that in the happy circumstance that they were not harmed, but otherwise I -- I -- I have not -- it's not a term that I've used, and I -- and I assume that it means simply that.

Q. (By Mr. Swanson) Can you turn to page 4, please. And I wanted to ask you about -- I think it's the fourth sentence in the first paragraph, the one that reads:

"Reliable models therefore may estimate zero damages for some consumers not because those individuals suffered no adverse effects, but because of noisy data, anomalous transactions, or the inherent limits of statistical modeling."

Do you see that?

A. Yes.

Q. As it's been implemented, does your model

Page 238

find over 10 million class members to be monetarily unharmed because of noisy data?

MR. RIFKIN: Objection to form.

THE DEPONENT: First of all, I'll refer back to the models that I'm familiar with from my supplementary report. I can't comment on -- on Dr. Song's work.

But there -- they do estimate zero damages for some consumers. That's a percentage, and, you know, the rules of arithmetic is that a small percentage of a very large number may still be a large number.

Beyond that, I don't recognize the -- the -- the 10 million figure. I know it is a percentage.

In my model, those people are there because the -- the model finds with some degree of precision that they are buying products for apps that -- that predictably would not have decreased prices in the -- in the but-for case.

Q. (By Mr. Swanson) And that's not because of noisy data or anomalous transactions or the limits of the statistical model, right?

MR. RIFKIN: Objection to form.

THE DEPONENT: There's two -- two

Page 239

different things possibly going on. One is that a -- a perfectly precise model and completely true model may identify unharmed or benefits -- beneficiary members of a -- of a class.

And the second is that in any econometric forecast of a but-for world, using statistical methods is never totally precise, so there will be some people who are probably misclassified. Either they were unharmed and then they -- uncorrectly classified as harmed or vice versa.

Those are two different phenomena.

Q. (By Mr. Swanson) Understood.

And the extent to which your model or your prior models as implemented in your prior reports have found uninjured Apple ID accounts, that has been because of the assumptions you've made that lead to the conclusion that negative marginal costs estimated and inferred by your model are associated with negative damage, right?

MR. RIFKIN: Objection to form.

THE DEPONENT: I would agree with that. I -- I -- I -- I would prefer instead of using the word "assumptions" to use "economic standard practices," "econometric practices," the data and -- and -- and what I think are appropriate

Page 240

assumptions. That would be the substitution I would make.

Q. (By Mr. Swanson) Let me ask you to turn to page 10 of your amicus brief.

THE VIDEOGRAPHER: Counsel, may we go off the record for a second for an audio adjustment?

MR. SWANSON: Sure.

THE VIDEOGRAPHER: Off the record. The time is 6:04.

(Recess taken.)

THE VIDEOGRAPHER: Back on the record. The time is 6:09.

Q. (By Mr. Swanson) We were at page 10 of your amicus brief. Professor McFadden, could you look at the bottom paragraph.

I just wanted to ask about that or at least part of that paragraph on page 10.

You say, "Some variation and individual impact is inevitable. Even the most reliable models will assign zero damages to some class members whether because of data limitations or genuine differences in consumer behavior. Some consumers may have paid unusually low prices due to coupons, bundling or timing. Still others may fall within the model's margin of error where the harm,

Page 241

61 (Pages 238 - 241)

though real, is too small or idiosyncratic to be 06:09:47 isolated with confidence."

Do you see that?

A. Yes.

Q. Are any of those explanations or reasons 06:09:54 for why your model, as you implemented it in your prior reports, finds that millions of Apple ID accounts are uninjured?

A. Well, I think the answer is that my model is, I believe, reliably identifying unharmed in -- 06:10:19 in the supplemental report accounts, perhaps later unharmed payors, and I think that's -- that's a genuine difference or at least given -- given the assumptions that set up the -- the architecture of -- of the demand model, which is to not try to 06:10:49 deal with almost unanswerable questions about quality change.

Q. Could you turn back to page 6. I forget if we were already there. But anyway, turn to page 6. I wanted to ask you about the top 06:11:10 paragraph.

You say there, "Price fixing is not the only way anticompetitive conduct undermines market integrity. Consider Apple's monopolization of the iPhone app marketplace. By prohibiting competing 06:11:28

Page 242

app stores, Apple has been able to force developers 06:11:32 to pay a 30 percent commission on most paid apps and in-app purchases, generating years of super-competitive profits."

Do you see that? 06:11:43

A. Yes.

Q. Did you write that?

A. No.

Q. Has any court found Apple to be a monopolist of the iPhone app marketplace? 06:11:51

A. I can't answer that question. I don't know.

Q. Are you aware that the only court to address this issue in the Epic games case found that Apple was not a monopolist? 06:12:09

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: The answer is I -- I did not suggest any edits to this paragraph because it seems to be a statement of -- of fact, and I -- I 06:12:31 have no personal knowledge to -- to have an opinion on that. I treated it as a statement of fact.

Q. (By Mr. Swanson) And at the time you saw this and treated it as a statement of fact, you were not aware or had not recalled that the author 06:12:55

Page 243

of this statement was the lawyer for the class in 06:12:58 this case suing Apple?

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, I -- I was aware that -- that it was your inquiry via Brattle staff 06:13:13 as to whether I would support such a brief, and so that was a connection I was aware of.

Q. (By Mr. Swanson) Did -- did you pay any lawyer for preparing this brief?

A. No. 06:13:34

Q. Do you know if anyone paid the lawyers who prepared this brief for you?

A. No, I have no knowledge of that.

Q. Now, you, in this top paragraph on page 6, cite the Supreme Court decision in 06:13:53 Apple v. Pepper, this case, for your statement that "Apple has monopolized the iPhone app marketplace by prohibiting competing app stores."

Do you see that?

MR. RIFKIN: Objection to form. 06:14:06

THE DEPONENT: First of all, the term is "monopolization." I don't -- rather than "monopoly." I don't know if that matters.

Q. (By Mr. Swanson) Okay.

A. But the -- what exactly is your question 06:14:24

Page 244

for me? 06:14:28

Q. I was focusing on the citation here, Apple Inc. v. Pepper, citing this U.S. Supreme Court Reporter, 2019.

Do you see that? 06:14:38

A. Yes.

Q. That's a decision you've read before, right? You've relied on it in prior reports?

A. I relied -- I've relied on its implications. I don't recall reading it. 06:14:52

Q. Okay. Do you think the sentence right above that citation accurately describes the Pepper case?

A. The answer is I don't -- I don't know. I didn't -- I don't know the details of the -- of the 06:15:20 legal claims here and citations, and I did not -- when reviewing this -- this draft of this amicus brief have any comments on this. I viewed that as something for the lawyers.

Q. This top paragraph on page 6 continues: 06:15:47 "Professor McFadden's econometric analysis showed that this distortion led to systematically inflated prices, imposing a functional tax on all participants in the marketplace." 06:16:02

Page 245

62 (Pages 242 - 245)

Q. Do you see that? 06:16:04

A. Yes.

Q. Did you edit that?

A. No.

Q. Is it correct that your model and 06:16:10 methodology show that all participants in the market paid inflated price -- prices?

MR. RIFKIN: Objection to form.

THE DEPONENT: I don't -- I don't have an independent analysis of the grammar in this 06:16:37 sentence. If one is talking about systematically inflated prices, then I think conclusion -- conclusion would be correct, but I think that my model shows that there are cases showing where prices are not inflated. That's -- those are the 06:16:57 exceptions when negative marginal cost is measured by my model.

Q. (By Mr. Swanson) Did you consider editing this brief to disclose to the United States Supreme Court that your model and methodology 06:17:13 indicate that there are millions of uninjured Apple ID accounts?

A. No. My edits were entirely concerned with the question of the economic effect on the harm to people of rules which would either certify 06:17:36

Page 246

or not class actions, and there -- there -- that 06:17:45 was the point -- that was the area where I suggested edits, and it's based on my opinion that as an economist, there's a benefit-cost analysis that needs to be done on the large number of people 06:18:07 that potentially are harmed, the small number of people that are potentially unharmed, the cost to society and the court system of the -- of this kind of -- kind of litigation.

I mean, I'm -- I'm not even a -- a law 06:18:25 and economics professor, but I certainly see that, you know, there are issues that perhaps at the Supreme Court level there should be some discussion of this and not -- I don't think the petitioner's proposed rule is a good solution for this -- I 06:18:44 think a rather complex problem.

Q. Have you submitted or signed on to amicus briefs before the Supreme Court in the past?

A. On one occasion I did, and I've submitted briefs to other -- other court levels on a couple 06:19:03 of occasions.

MR. SWANSON: Can we take a break? Because I think we're close.

MR. RIFKIN: Let's go off the record.

THE VIDEOGRAPHER: Off the record. The 06:19:16

Page 247

time is 6:19. 06:19:17

(Recess taken.)

THE VIDEOGRAPHER: We're back on the record. The time is 6:30.

Q. (By Mr. Swanson) Professor McFadden, do 06:30:11 you hold any opinions which you intend to express at trial that were not set forth in your reports or discussed in this deposition?

A. As of this point, I do not anticipate that. 06:30:24

Q. Do you have any plans at present to submitted a rebuttal report?

A. Actually I -- I have no plans, and I have not been asked to anticipate that.

Q. Have you seen any economic evidence that 06:30:39 contradicts any of your opinions?

A. That's -- that's a broad question. But the -- the answer is not that come to mind.

MR. SWANSON: All right. No further questions. 06:30:56

MR. RIFKIN: I have just two questions to clarify some prior testimony, so if you'll just indulge me for a moment.

EXAMINATION

/////

Page 248

BY MR. RIFKIN: 06:31:08

Q. Professor McFadden, do you recall being asked earlier in the deposition some questions about unharmed Apple IDs or apps?

Do you recall that? 06:31:21

A. Yes, I do.

Q. Okay. Do you have exhibit DX37 handy? This is your June 1, 2021 --

A. It is available here, yes.

Q. Okay. I'd like you, if you would, 06:31:36 please, to turn to paragraph 241 of Exhibit DX37.

Let me know when you have that in front of you.

MR. SWANSON: I'm sorry. Which --

MR. RIFKIN: 241 on page 106. 06:31:56

Q. (By Mr. Rifkin) Do you have that in front of you?

A. Yes, I do.

Q. And I'd like to direct your attention to the sentence that includes "I estimate that 06:32:06 approximately 5.8 percent of the consumer class members spent money on only those apps and in-app content whose but-for prices are higher at the 12 percent but-for commission rate."

Do you see that? 06:32:24

Page 249

63 (Pages 246 - 249)

A. Yes.  06:32:24

Q. Is that 5.8 percent number that appears in paragraph 241 of Exhibit DX37 -- is that the -- the number that you were recalling from before?

A. Yes, that is the number I was recalling.  06:32:39

Q. And is that the percentage of unharmed Apple IDs that you calculated when you prepared your reports based on the -- the data through 2019?

A. It's -- it's, in fact, a percentage of -- of Apple IDs that were unharmed and which did not,  06:33:02 in fact, make any purchases which would offset that.

And -- and it's not -- it's not a percent of -- of apps or app items that would by -- by tomorrow's calculation have caused a price decrease  06:33:30 rather than a price increase.

Q. Okay. Thank you.

And then switching now to a different area.

Do you -- do you recall some testimony  06:33:45 about margin bounds being applied at a particular level of transaction?

Do you recall that earlier in the deposition today?

A. If you could remind me a little more. I  06:34:07

Page 250

don't --  06:34:09

Q. Let me ask you this: In the demand estimations that you included in your supplemental reports, did you apply margin bounds at the app year level?  06:34:20

A. Yes, those bounds all apply at the app year level.

MR. RIFKIN: Thank you. I don't have any further questions.

MR. SWANSON: We're done.  06:34:29

MR. RIFKIN: Thank you.

MR. SWANSON: Thank you.

THE VIDEOGRAPHER: We are off the record at 6:34 p.m., and this concludes today's testimony given by Professor Daniel McFadden. The total  06:34:38 number of media was seven and will be retained by Veritext Legal Solutions.

(TIME NOTED: 6:34 P.M.)

06:38:28

---o0o---

06:38:28

Page 251

I, DANIEL L. McFADDEN, Ph.D., do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear notes; that my testimony as contained herein, as corrected, is true and correct.

Executed this _____ day of _____, 2025, at _____,_____.

_____
DANIEL L. McFadden, Ph.D.

Page 252

I, Rebecca L. Romano, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Court Reporter, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any deponents in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made stenographically by me and which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [X] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: May 16th, 2025

Rebecca L. Romano, RPR,
CSR. No 12546

Page 253

64 (Pages 250 - 253)

| | |
|---|---|
| DANIEL G. SWANSON | In Re Apple Iphone Antitrust Litigation v. |
| dswanson@gibsondunn.com | Daniel McFadden (#7370734) |
| May 15, 2025 | E R R A T A  S H E E T |
| RE: In Re Apple Iphone Antitrust Litigation v. | PAGE_____ LINE_____ CHANGE_____ |
| 5/14/2025, Daniel McFadden, (#7370734). | _____ |
| The above-referenced transcript has been | REASON_____ |
| completed by Veritext Legal Solutions and | PAGE_____ LINE_____ CHANGE_____ |
| review of the transcript is being handled as follows: | _____ |
| __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext | REASON_____ |
| to schedule a time to review the original transcript at | PAGE_____ LINE_____ CHANGE_____ |
| a Veritext office. | _____ |
| __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF | REASON_____ |
| Transcript - The witness should review the transcript and | PAGE_____ LINE_____ CHANGE_____ |
| make any necessary corrections on the errata pages included | _____ |
| below, notating the page and line number of the corrections. | REASON_____ |
| The witness should then sign and date the errata and penalty | PAGE_____ LINE_____ CHANGE_____ |
| of perjury pages and return the completed pages to all | _____ |
| appearing counsel within the period of time determined at | REASON_____ |
| the deposition or provided by the Code of Civil Procedure. | PAGE_____ LINE_____ CHANGE_____ |
| Contact Veritext when the sealed original is required. | _____ |
| __ Waiving the CA Code of Civil Procedure per Stipulation of | REASON_____ |
| Counsel - Original transcript to be released for signature | |
| as determined at the deposition. | _____ _____ |
| __ Signature Waived – Reading & Signature was waived at the | (Daniel McFadden)                Date |
| time of the deposition. | |
| Page 254 | Page 256 |

__ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
Transcript - The witness should review the transcript and
make any necessary corrections on the errata pages included
below, notating the page and line number of the corrections.
The witness should then sign and date the errata and penalty
of perjury pages and return the completed pages to all
appearing counsel within the period of time determined at
the deposition or provided by the Federal Rules.
_X_ Federal R&S Not Requested - Reading & Signature was not
requested before the completion of the deposition.

Page 255

65 (Pages 254 - 256)

Case: 25-7080, 06/12/2026, DktEntry: 34.2 (125 of 197)

# EXHIBIT 11

BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
STEPHANIE AVILES (350289)
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
saviles@whafh.com

MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
THOMAS H. BURT (*pro hac vice*)
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

*Class Counsel for Plaintiffs*

[Additional Counsel Appear on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR<br><br>**PLAINTIFFS' ADMINISTRATIVE MOTION FOR RENEWED REQUEST FOR EVIDENTIARY HEARING RE: APPLE'S FRE 702 AND *DAUBERT* OBJECTIONS TO DARRYL THOMPSON'S OPINIONS**<br><br>Hon. Yvonne Gonzalez Rogers |

[FILED UNDER SEAL]

PLAINTIFFS' ADMINISTRATIVE MOTION FOR RENEWED REQUEST FOR EVIDENTIARY
HEARING RE: APPLE'S FRE 702 AND *DAUBERT* OBJECTIONS TO
DARRYL THOMPSON'S OPINIONS
Case No. 4:11-cv-06714-YGR

**SER-126**

Pursuant to Local Rule 7-11, Plaintiffs Robert Pepper, Stephen H. Schwartz, and Edward Lawrence ("Named Plaintiffs") hereby join and renew Apple's request "to hold an evidentiary hearing to determine whether Apple's Daubert and Rule 702 objections to Mr. Thompson['s] . . . opinions should be sustained." Dkt. No. 1001 at 2. Plaintiffs submit that the Court's assessment of Mr. Thompson's deduplication methodology would benefit from live testimony. Mr. Thompson can explain his matching process and rationales for it in person better than can be conveyed in writing, especially because, as the Court noted, Apple's motion requires resolving highly technical and complex questions. A hearing would also afford the Court and the parties an opportunity to explore the importance of Apple's recent confirmation that it chose not to disclose the full scope of data provided to Mr. Thompson. *See* Dkt. No. 1060 at 2.

In its *Daubert* motion, Apple argues Mr. Thompson's methodologies are unreliable and his opinions should be excluded. Dkt. No. 1002-1 at 8-24. Apple's motion to decertify also, incorrectly, casts its qualms with Mr. Thompson and his methods as relevant to the Court's Rule 23(b)(3) analysis. Dkt. No. 1006-1 at 11-15; *but see* Dkt. No. 1031-4 at 11-13 (detailing how under *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017), and later cases applying it, "[t]he impact of Mr. Thompson's work on absent Class members' claims . . . is ***null***") (emphasis added). Questions from the Court during the October 14th hearing on both motions suggest further clarification of Mr. Thompson's deduplication experience and his work in this case would assist the Court. *See, e.g.*, Dkt. No. 1062 at 46:17-20 (acknowledging complexity of so-called "Kim" problem). This case is particularly appropriate for an evidentiary hearing because of the large volume and complexity of expert materials submitted. An evidentiary hearing would afford the Court the opportunity not only to engage with Mr. Thompson directly, but also to gauge his credibility and expertise, and assess what analyses he could conduct with the knowledge that the data include full hashed credit card numbers.

For example, Mr. Thompson can explain why he could not readily determine that, contrary to Apple's repeated representations, Apple had produced hashed complete payment card numbers (not just the last four digits). *See* Dkt. No. 1060 at 1; Dkt. No. 1031-6 ¶ 7(g). A hearing will let Mr. Thompson explain for the first time why, had he known he had complete payment card numbers, he could have avoided the "Kim" problem, as well as similar first name problems. Although such issues

PLAINTIFFS' ADMINISTRATIVE MOTION FOR RENEWED REQUEST FOR EVIDENTIARY HEARING RE: APPLE'S FRE 702 AND *DAUBERT* OBJECTIONS TO DARRYL THOMPSON'S OPINIONS
Case No. 4:11-cv-06714-YGR
-1-

**SER-127**

affect a very small fraction of all payor records, he can incorporate full payment card numbers into his deduplication analysis and provide updated results in approximately six weeks. *See also* Dkt. No. 1031-5 at 26-27; Dkt. No. 1031-6 ¶ 37. (Further post-trial de-duplication work during claims administration can even more accurately allocate damages to individual payors. *See* Dkt. No. 1031-6 ¶ 34 ("The only way to know if two records both contain accurate data and accurately reflect the same unique customer is to do what we would do during class action claim administration: send correspondence both directly to the noted address and indirectly (*e.g.*, a notice posted online), and give the customer the opportunity to verify or correct their information.").)

In addition, an evidentiary hearing will give the Court a fuller opportunity to determine the reliability of his deduplication methodology. For example, Mr. Thompson can further explain why, in his decades of real-world experience, the "Robert/Rob" issue Apple has identified[1] is best resolved by conservatively treating "Robert" and "Rob" as two people for liability purposes rather than the same person. *See* Dkt. No. 1031-5 at 25-26; Dkt. No. 1032-23 at 155:14-25, 207:6-20. Likewise, Mr. Thompson can further explain why identifying far more people who used King Salmon, Alaska as their address than actually live in that small town is not a deduplication error or failure of his methodology, as Apple and Prof. Stodden argue, but rather the result produced by data that Apple's customers provided to Apple. *See* Dkt. No. 1031-5 at 26; Dkt. No. 1031-6 ¶ 36. He can also explain the reasons that leaving those payors – whom no one disputes are real people who made real App Store purchases during the Class Period – in the Class (which is all that has happened because of Mr. Thompson's efforts) is preferable to excluding them. At most, that overestimates the number of uninjured class members by undermatching payors. *See* Dkt. No. 1031-6 ¶ 36. Lastly, Mr. Thompson can explain exactly why a meaningful error rate cannot reliably be calculated based on Apple's reliance on consumer-generated information, *see* Dkt. No. 1031-6 ¶¶ 33-34, a point neither Apple nor its expert

---

[1] Prof. Stodden was unable to identify any way for statisticians to resolve nickname issues with certainty. Declaration of Rachele R. Byrd in Support of Plaintiffs' Admin. Mot. for Renewed Request for Evidentiary Hearing, Exhibit 1 (Stodden Depo. Tr.) at 67:18-70:8. At best, she said they can use those unidentified methods to surmise that someone named "Robert" and someone named "Rob" who both live at the same address, use the same Apple ID, and use the same payment card may be the same person. However, Prof. Stodden admitted that she did not investigate *any* of those methodologies. *Id*. at 71:3-6 ("I did not investigate these approaches as part of my assignment.").

PLAINTIFFS' ADMINISTRATIVE MOTION FOR RENEWED REQUEST FOR EVIDENTIARY
HEARING RE: APPLE'S FRE 702 AND *DAUBERT* OBJECTIONS TO
DARRYL THOMPSON'S OPINIONS
Case No. 4:11-cv-06714-YGR
-2-

SER-128

dispute, *see* Dkt. No. 1033-1 at 105:2-25, 116:16-117:2, 117:14-118:5 (Prof. Stodden's failure to explain how any meaningful error rate could be calculated for the deduplication of user-generated data like Apple's payor data); Dkt. No. 922-2 at 11:5-10 ("[I]t's Apple position [sic] that this whole exercise cannot be done reliably. . . . [W]e have taken that position from the beginning.").[2]

However, at this late stage of the proceedings, if the Court views this issue as important to trial procedures (as opposed to post-trial claims administration), a *Daubert* hearing could assist the Court.[3] Evidentiary hearings are routinely used in antitrust class actions to evaluate expert opinions in the class certification context. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 36–38 (2013) (citing expert testimony at evidentiary hearing). The Ninth Circuit has also recognized that evidentiary hearings are helpful to resolve class certification motions. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (three-day evidentiary hearing); *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co.*, No. 23-55742, 2025 WL 1683472, at *2 (9th Cir. June 16, 2025) (approving "rigorous analysis" undertaken in *Olean* which included expert testimony at evidentiary hearing and reports).

This Court has previously held a *Daubert* hearing when determining whether to exclude an expert before trial. *See United States v. Baras,* No. CR 11-00523 YGR, 2013 WL 6502846, at *14 (N.D. Cal. Dec. 11, 2013) (scheduling evidentiary hearing "to determine whether either of these experts can adequately articulate a causal connection for their opinions."). And other courts in this

---

[2] In fact, during post-certification discovery, Apple urged Judge Hixson to compel Mr. Thompson to provide his proprietary code to Apple so that Apple could do the payor deduplication itself and provide the results of the work to Plaintiffs for use in their damages model. *See, e.g.*, Dkt. No. 920-2 at 13:9-17 (Plaintiffs should "come up with a methodology and have Apple implement" it); Dkt. No. 922-2 at 9:15-14:16 (same).

[3] Plaintiffs regret that they were unable to identify class members from the payor identification data that Apple collected with 100% certainty. But it would be legal error to decertify the class. *See Briseno*, 844 F.3d at 1131 (post-trial claims administration proceedings are the forum in which a class action defendant may "individually challenge the claims of absent class members if and when they file claims for damages"); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513–14 (9th Cir. 2013) (holding a district court abused its discretion by denying class certification on the belief that individual damages questions predominated over common ones; the panel pointed out the record contained evidence that "would enable the court to accurately calculate damages and related penalties for each [individual class member's] claim . . . once the common liability questions are adjudicated"); FED. R. CIV. P. 23(b)(3) advisory committee's note to 1966 amendment (contemplating the certification of class actions "despite the need, if liability is found, for separate determinations of the damages suffered by individuals within the class").

PLAINTIFFS' ADMINISTRATIVE MOTION FOR RENEWED REQUEST FOR EVIDENTIARY HEARING RE: APPLE'S FRE 702 AND *DAUBERT* OBJECTIONS TO DARRYL THOMPSON'S OPINIONS
Case No. 4:11-cv-06714-YGR
-3-

SER-129

District have held evidentiary hearings when the court believed that a *Daubert* motion could affect the outcome of a class certification motion. *See, e.g.*, *Simon and Simon, PC v. Align Tech. Inc.,* No. 20-CV-03754-VC*, 2023 WL 8261297, at \*3 (N.D. Cal. Sept. 29, 2023) (two-day evidentiary hearing); *In re Capacitors Antitrust Litig.*, No. 14-CV-03264-JD, 2020 WL 870927, at \*2 (N.D. Cal. Feb. 21, 2020). Indeed, the Ninth Circuit has "encourage[d]" district courts "to hold a hearing . . . to provide plaintiffs with an opportunity to respond to defendants' [*Daubert*] challenges." *In re Hanford Nuclear Rsrv. Litig.*, 292 F.3d 1124, 1139 (9th Cir. 2002).

For these reasons, Plaintiffs join Apple's unopposed request for a four-hour evidentiary hearing allowing live testimony from Mr. Thompson to explain his deduplication methodologies and results and from Prof. Stodden to examine and cross-examine her on Apple's *Daubert* challenges as to Mr. Thompson. In the alternative, if the Court is not inclined to hold a hearing, Plaintiffs respectfully request that the Court permit Mr. Thompson to file a supplemental report within six (6) weeks to update his analysis to account for the payment card data that Apple failed to disclose it had produced.

DATED: October 20, 2025

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By: /s/ Rachele R. Byrd
RACHELE R. BYRD (190634)
BETSY C. MANIFOLD (182450)
STEPHANIE AVILES (350289)
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599
byrd@whafh.com
manifold@whafh.com
saviles@whafh.com

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
THOMAS H. BURT (*pro hac vice*)
270 Madison Ave
New York, NY 10016
Telephone: 212/545-4600
Facsimile: 212/686-0114
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

PLAINTIFFS' ADMINISTRATIVE MOTION FOR RENEWED REQUEST FOR EVIDENTIARY HEARING RE: APPLE'S FRE 702 AND *DAUBERT* OBJECTIONS TO DARRYL THOMPSON'S OPINIONS
Case No. 4:11-cv-06714-YGR
-4-

SER-130

DAVID C. FREDERICK (*pro hac vice*)
MARK C. HANSEN (*pro hac vice*)
AARON M. PANNER (*pro hac vice*)
JAMES WEBSTER (*pro hac vice*)
LILLIAN V. SMITH (*pro hac vice*)
ALEX A. PARKINSON (*pro hac vice*)
ALEX TREIGER (*pro hac vice*)
CAROLINE SCHECHINGER (*pro hac vice*)
KYLE M. WOOD (*pro hac vice*)
ASHLE J. HOLMAN (*pro hac vice*)
KELLEY C. SCHIFFMAN (*pro hac vice*)
ANNA K. LINK (*pro hac vice*)
ANTHONY R. GUTTMAN (*pro hac vice*)
**KELLOGG, HANSEN, TODD, FIGEL &**
  **FREDERICK, P.L.L.C**
1615 M Street, NW Suite 400
Washington, D.C. 20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999
dfrederick@kellogghansen.com
mhansen@kellogghansen.com
jwebster@kellogghansen.com
apanner@kellogghansen.com
lsmith@kellogghansen.com
aparkinson@kellogghansen.com
atreiger@kellogghansen.com
cschechinger@kellogghansen.com
kwood@kellogghansen.com
aholman@kellogghansen.com
kschiffman@kellogghansen.com
alink@kellogghansen.com
aguttman@kellogghansen.com

*Class Counsel for Plaintiffs*

**SER-131**

Case 25-7930, 08/12/2026, DktEntry: 34.2, (1305/2697)

# EXHIBIT 53

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION**

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | Civil Action No. 4:11-cv-06714-YGR |

**REBUTTAL EXPERT REPORT AND DECLARATION OF MARK WATSON, PH.D.**

June 13, 2025

**SER-133**

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

**Table of contents**

I.   INTRODUCTION .................................................................................................. 3

  *A.  Qualifications* ........................................................................................... 3

  *B.  Assignment* ............................................................................................... 4

II.  SUMMARY OF OPINIONS ............................................................................... 5

III. OVERVIEW OF THE MCFADDEN-SONG APPROACH FOR CALCULATING DAMAGES ............................................................................................................... 8

IV.  MARGIN CONSTRAINTS IN THE MCFADDEN-SONG MODEL DETERMINE DAMAGES ............................................................................................................... 24

  *A.  The McFadden-Song Margin Constraints Guarantee Billions of Dollars of Harm and Exclude the Possibility of Zero Damages* ........................................... 28

  *B.  Dr. Song's Results Do Not Change Even When Randomly Generated Transaction Data Are Used* 31

  *C.  Dr. Song's Price Sensitivity Parameters and Thus Damages Estimates Are Almost Always Determined by the Upper or Lower Bounds of his Margin Constraints, Not the App Store Transaction Data* ............................................................................ 34

  *D.  The McFadden-Song Model Yields Unreliable Results Without the Margin Constraints, and Is Therefore Not Suitable for Determining Damages* ............ 37

V.   DR. SONG INAPPROPRIATELY APPLIES PROFESSOR MACCORMACK'S USER MARGIN CALCULATIONS TO A MODEL OF APP TRANSACTIONS .......... 45

VI.  THE MCFADDEN-SONG MODEL ASSUMES A SPECIFIC RELATIONSHIP BETWEEN PRICES AND MARGINAL COSTS THAT DRIVES BUT-FOR PRICING BEHAVIOR AND DAMAGES IN THE MODEL ................................................................................. 49

VII. MODIFYING DR. SONG'S ASSUMPTION REGARDING LOG DOWNLOADS RESULTS IN ECONOMICALLY INCOHERENT RESULTS, IMPLYING HIS MODEL IS UNRELIABLE .......... 55

VIII. THE MCFADDEN-SONG MODEL CANNOT RELIABLY DETERMINE HARM, THE PERCENTAGE OF UNHARMED PAYORS, NOR WHICH ACCOUNTS ARE HARMED ...................... 58

  *A.  Dr. Song Ignores the Most Important Source of Uncertainty—Uncertainty Regarding the Assumed Margin Constraints* ............................................................... 59

  *B.  Uncertainty Regarding Profit Margin Ranges Yields Uncertainty Regarding Damages, the Percentage of Unharmed Accounts, and the Identities of Harmed Payors* ................ 61

IX.  ADDITIONAL PROBLEMS WITH THE MCFADDEN-SONG MODEL .......... 63

  *A.  The McFadden-Song "Percentage Method" for Computing Damages Leads to Nonsensical But-for Predictions* ..................................................................................... 64

1 of 113

**SER-134**

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

*1.    The McFadden-Song "Percentage Method" Does Not Predict But-for Prices for a Majority of Transactions* ................................................................................................... 64

*2.    The McFadden-Song "Percentage Method" Is an Assumption That Lacks Empirical Support.* 67

**B.    The McFadden-Song Model Does Not Predict Prices that Align with Apple's Price Tiers** .......... 69

**C.    Assumptions about Competition and Consumer Demand Underlying the McFadden-Song Model** ................................................................................................................... 72

*1.    Monopoly Pricing Assumption* ........................................................................... 72

*2.    Uniform Price Sensitivity Assumption* ............................................................... 75

**APPENDIX A.    CV AND PRIOR TESTIMONY** ........................................................ 79

**APPENDIX B.    DOCUMENTS RELIED UPON LIST** ............................................... 93

**APPENDIX C.    GENERALIZED METHODS OF MOMENTS AS USED BY THE MCFADDEN-SONG MODEL IS EQUIVALENT TO THE STEPS I OUTLINE IN SECTION III** ................... 98

*C.1. The McFadden-Song Demand Equations and Constraints* ................................. 98

*C.2. GMM Estimation with and without the constraints* .......................................... 100

*C.3. Returning the McFadden-Song Estimates* ....................................................... 102

**APPENDIX D.    WITHOUT THE MARGIN CONSTRAINTS, THE MCFADDEN-SONG MODEL CAN RESULT IN ESTIMATES OF EXTREMELY LARGE PUTATIVE BENEFITS** ............... 103

**APPENDIX E.    PROFESSOR MCFADDEN'S TRANSACTION DATA-BASED ESTIMATES FOR IN-APP PURCHASES ARE IMPRECISE IN PART DUE TO WEAK INSTRUMENTS** ............... 107

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

10.     I have been asked by counsel for Apple to analyze and comment on topics in the McFadden, Song, and MacCormack Reports. Specifically, I have been asked to evaluate whether the damages methodology proposed by Professor McFadden and implemented by Dr. Song is reliable from an economics and econometrics perspective. I have also been asked to evaluate claims made by Dr. Song regarding the "genre groupings" and "genre-group level variable profit margin ranges" in Professor MacCormack's report.[7]

11.     I am being compensated for my work on this matter at my standard billing rate of $1,175 per hour. My compensation is not in any way based on the content of my opinion or contingent on the outcome of this matter. I have been assisted in this matter by staff at Cornerstone Research, who worked under my direction. I reserve the right to update or supplement my opinions as additional information becomes available to me.

## II.     Summary of Opinions

12.     In Professor McFadden's model, implemented by Dr. Song (hereafter the "McFadden-Song model"),[8] app developers set prices to maximize profits given demand and supply conditions and commission rates. Therefore, estimation of consumer demand is a critical building block in Dr. Song's determination of but-for prices and harm. I find that the McFadden-Song model is fundamentally unreliable for the calculation of damages and the determination of harmed and unharmed class members.

13.     To estimate consumer demand, the McFadden-Song model relies on two data sources. One is the App Store transaction data, and the second is genre gross margin bounds based on Professor MacCormack's subjective analysis of a small set of developers' accounting information. In Dr. Song's implementation of the McFadden-Song model, he uses these genre gross margin bounds, along with other assumptions, to constrain the demand estimates—and

---

[7] Song Report, ¶¶ 51–52.

[8] I use the term "McFadden-Song model" given that Professor McFadden and Dr. Song have claimed to work closely together in this matter. See Song Report, ¶¶ 4 ("I have worked on that engagement with Daniel L. McFadden, Ph.D., since 2020. I have overseen the econometric analyses performed by Brattle at the direction and in support of Prof. McFadden in this matter since that time."), 8 ("I supported Prof. McFadden and acted under his direction during the creation, testing, and implementation of his model"), 9 ("I have been responsible for this implementation effort since February 2, 2024. I have kept Prof. McFadden apprised of my work."). See also McFadden Report, ¶ 4 ("I directed and worked closely with Minjae Song, Ph.D. …in the creation, testing, and implementation of my damages model…Since [December 31, 2023], Dr. Song has directly overseen the implementation of my methodology using the App Store transactions data…Dr. Song and I have conferred regularly as he has implemented my methodology.").

SER-136

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

therefore damages—predicted by his model. I call these constraints on the demand estimates his "margin constraints."

14.     Dr. Song's assumptions and constraints mask the unreliability of the model, replace estimates based on billions of actual transactions, and guarantee a finding of substantial aggregate harm. In particular, the margin constraints are *not* an example of incorporating more data. The opposite is true. In fact, because the McFadden-Song model's estimates based on real-world transaction data so frequently fall outside the bounds of the margin constraints, the role of the margin constraints in the analysis is mostly to *replace* the estimates based on the billions of App Store transactions. In other words, the margin constraints override the predictive power of billions of real-world transactions in favor of a subjective analysis of a small number of developers' accounting data carried out by Professor MacCormack. My analysis of the McFadden-Song model, summarized in Exhibit 1 below, finds that the model's margin constraints determine its harm estimates—i.e., the model's results are based on the margin constraints themselves, and not on the estimates generated from billions of App Store transactions. In particular, my analysis shows that the margin constraints guarantee a finding of *at least* $16.1 billion in damages. That is, the structure of Dr. Song's analysis guarantees estimated damages of at least $16.1 billion regardless of the real-world relationship between price and quantity that underlies consumer demand for products in the App Store.

---

*EXHIBIT 1*
*Minimum and Maximum Damages Allowed Under Song's Margin Constraints ($ millions)*

| Damages from the McFadden-Song Model | | Allowed Damages Range from the McFadden-Song Model with Margin Constraints | |
|---|---|---|---|
| **All Business Models** | **Excluding Paid Downloads with Paid In-App Purchases** | **Lowest Possible** | **Highest Possible** |
| $20,382 | $20,289 | $16,116 | $22,260 |

Source: McFadden-Song Data Production; Song Report, Figure 19

Note: For each genre and business model, I utilize the maximum upper bound and minimum lower bound for the price sensitivity parameters reported by Dr. Song across the 75 samples. The bounds on the price sensitivity parameters are calculated and reported in the McFadden-Song Data Production as part of the implemention of the margin constraints. Given these price sensitivity parameters, I apply the McFadden-Song damages methodology for each genre and business model to calculate the lowest and highest possible damages—i.e., the damages implied by the maximum and minimum price sensitivity parameters, respectively (see Appendix D). Lowest and highest total damages are then calculated by summing the lowest and highest damages, respectively, from each genre and business model. Lowest and highest damages are calculated using the assumed 13.63 percent but-for commission rate. Putative damages for the Paid Download Apps with Paid In-App Purchases business model, as identified by Dr. Song, are excluded from the Allowed Damages Range calculation.

**SER**-137

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

15. Removing the McFadden-Song model's assumptions and constraints reveals the unreliability of the model and shows it does not predict harm with any certainty. Absent the margin constraints, Dr. Song's estimates of consumers' price sensitivity vary such that almost any amount of damages—zero, tens of billions, or *negative* tens of billions of dollars—is possible. The vast range of uncertainty in the McFadden-Song model—a problem with the model that is masked by the margin constraints—renders the model's predictions unreliable for the determination of aggregate damages or harm for any individual class member. Because the margin constraints determine Dr. Song's estimates, they *replace* the App Store transaction data Dr. Song uses to estimate the model rather than *supplement* those data. The margin constraints are so determinative of Dr. Song's findings that when I replace the App Store transaction data with random numbers from the New York Powerball Lottery, the estimation results in very similar estimates of aggregate harm.

16. Even supposing the model's use of margin constraints were appropriate, Professor MacCormack's genre gross margins are incompatible with the margins in the McFadden-Song model. Whereas the McFadden-Song model is a model of transactions, Professor MacCormack purports to calculate user-based costs that are fundamentally distinct from transaction data-based costs. By relying on user-based costs to constrain transaction costs, Dr. Song makes fundamental theoretical errors which yield unreliable estimates. To the extent that there is uncertainty in these margin constraints, it would result in further uncertainty in the McFadden-Song model's predictions.

17. Beyond its other issues, the McFadden-Song model has a number of features that are economically unlikely to be consistent with the real world. The McFadden-Song model assumes that as the price of a given app or in-app purchase increases, its cost must increase as well. The model also assumes that when choosing prices, developers do not consider the price of other, similar apps. These inconsistencies between the model and the real world undercut the reliability of the model's predictions of harm.

18. The above issues all persist whether the model is estimated using one sample or 75 samples as Dr. Song does; more samples merely add to the substantial computational burden of the model. To the extent that a jury would dispute certain assumptions or factors of the McFadden-Song model, it would be impossible to adjust the model and determine the resulting

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

impact in a short time frame, and speculative as to whether the model could accommodate alternative assumptions at all.[9]

### III.    Overview of the McFadden-Song Approach for Calculating Damages

19.    In this section, I outline the assumptions underlying the McFadden-Song model, discuss the economic implications, and—where my expertise is appropriate—discuss the shortcomings of these assumptions. In particular, I outline how Dr. Song's reliance on Professor MacCormack's variable profit margin bounds effectively throws out information from billions of App Store transactions, and instead replaces those data with estimates based on a tiny number of developers.[10, 11] I further show how the McFadden-Song model assumes a relationship between as-is prices and marginal cost (and therefore harm) that plays a critical role in the calculation of but-for prices, damages, and which consumers are harmed.

20.    To use his model to predict but-for prices and estimate harm, Professor McFadden needs to estimate certain parameters—i.e., the numbers that characterize consumer demand in his model. Professor McFadden describes the McFadden-Song model as based on a model of "tax incidence," where the commission charged by Apple "has the same economic effects as a sales or *ad valorem* tax, a tax assessed as a fixed percentage of a sales price."[12] In this model, developers decide what prices to charge in part based on the commission rate. If the commission rate were different, developers may charge different prices. As a result, consumers could be better off, worse off, or equally well off in the but-for world.[13] The amount of harm—if any—

---

[9] Deposition of Daniel L. McFadden, Ph.D., May 14, 2025 ("McFadden 2025 Deposition"), pp. 229:18–231:23 ("Q. If the jury determines that… multiple stores would charge different commission rates, can your model calculate damages?... [A. I]f the -- and she [Dr. Abrantes-Metz] said that these rates would vary by rival, then I don't have a model of operation of rival stores. Q. If the jury determines that developers maximized profits and set their prices not at the app level but at the item level, how would the jury reliably calculate damages based on the evidence from your model?... [A.] The answer is I don't – I don't think I can do it and I don't think they can do it reliably. Q… If the jury determines that marginal costs are zero for in-app virtual currency transactions, how would the jury reliably calculate damages using your model?... [A.] I don't know -- I don't know how they would proceed. Q… If the jury determines that the margin constraints generally should be set at higher ranges, in other words shifted up, how would the jury reliably calculate damages using your model? A… it would be -- I think beyond -- clearly beyond the capacity of a jury to do or ask for.").

[10] Expert Report of Alan D. MacCormack, March 6, 2025 ("MacCormack Report"), Table 5. For example, Professor MacCormack bases his analysis of UAR costs (i.e. User Acquisition and Retention costs) on six developers for games, four for Music + Entertainment, and five for Social Networking + Lifestyle. Taken together, these three genres are responsible for 83.5 percent of the damages estimated by Dr. Song. See Workpaper 1.

[11] In the App Store transaction data, there are approximately ███████ transactions between July 2008 and February 2024 after performing Dr. Song's data filters and restricting to iPhone and iPad transactions. See Workpaper 2.

[12] McFadden Report, ¶ 22.

[13] McFadden Report, ¶ 55 ("There could be cases in which an app developers' cost structure or market conditions are such that my model estimates some Consumer Class members incurred no monetary harm as a result of Apple's alleged anticompetitive conduct.").

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

borne by consumers in the McFadden-Song model is the amount they were overcharged by developers, relative to what prices would have been under a lower commission rate.[14]

21.     To calculate the price developers *would have charged* had the commission rate been lower, the McFadden-Song model "requires an estimate of consumer demand…[and] developers' costs, which, together with estimates for consumer demand and developers' profit maximization conditions, allow [determination of] how developer pricing changes in response to commission rate changes."[15] With estimates of demand and developers' costs, the McFadden-Song model estimates what prices app developers would have charged in the but-for world, and thus, how much consumers were theoretically overcharged.[16]

22.     The "key element of consumer demand needed [in the McFadden-Song model] …is consumers' sensitivity to price changes" because developers' "pricing decision[s] will depend on how price sensitive the iOS device consumers are."[17] Without understanding how sensitive consumers are to changes in price, it is impossible to understand how a change in the commission rate would affect the prices developers charge.[18] As I describe in more detail below, the McFadden-Song model seeks to estimate this sensitivity to price by examining the relationship between the prices that app developers charge and the quantities that consumers download or purchase.[19]

23.     Estimating the relationship between price and quantity is difficult because there are both supply factors (e.g., costs) and demand factors (e.g., consumers' willingness to pay) that jointly determine the observed prices and quantities in the data. As an example, imagine a new technology or tool that makes it cheaper to develop apps, leading to increased entry of new apps. Incumbent developers might notice that sales of their apps are falling due to the increased competition and lower prices to win back customers. Despite reducing prices, these incumbent developers may end up making the same number of sales as the year before.[20] If an

---

[14] Song Report, ¶ 65.

[15] McFadden Report, ¶ 38.

[16] McFadden Report, ¶ 42 ("If the commission rate is lower, app developers will lower their app and in-app content prices because the extra sales they make by cutting prices are more profitable than before. But app developers will stop lowering the prices at some point because they have to sell *every* unit at lower prices, and it is not worth selling more units when the prices are below some threshold. The pricing model estimates the level at which app developers stop lowering their app and in-app content prices for a given But-For commission rate.").

[17] McFadden Report, ¶ 43.

[18] McFadden Report, ¶ 42.

[19] Song Report, Appendix D, ¶ 137, Equations (1), (2).

[20] I present a similar example of the effects of supply shifts masking the true relationship between price and quantity in my textbook. See James H. Stock and Mark W. Watson, *Introduction to Econometrics*, Second Edition, (Harlow, England: Pearson, 2006) ("Stock and Watson (2006)"), p. 426 ("Philip Wright had data on total annual butter consumption and its

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

econometrician were to naively estimate the relationship between price and quantity without accounting for the increase in competition, they might find no relationship between prices and quantities sold.[21] When facing this econometric issue, economists use an econometric technique known as "instrumental variables" to overcome this challenge.[22]

24.      In the context of the McFadden-Song model, Dr. Song estimates three parameters for each of the app "genre groupings" defined by Professor MacCormack using this instrumental variables technique.[23] These three parameters control three distinct parts of how the McFadden-Song model describes consumer behavior:

   a.   The first parameter measures consumers' sensitivity to the price of a paid download. I refer to this as the "coefficient on paid download price" or the "paid download price sensitivity parameter."[24]

   b.   The second parameter measures consumers' sensitivity to the price of an in-app purchase. I refer to this as the "coefficient on in-app purchase price" or the "in-app purchases price sensitivity parameter."[25]

---

average annual price in the United States for 1912 to 1922. It would have been easy to use these data to estimate the demand elasticity by applying OLS … but he had a key insight: Because of the interactions between supply and demand the regressor [] was likely to be correlated with the error term. To see this. look at Figure 12.1a, which shows the market demand and supply curves for butter for three different years. The demand and supply curves for the first period are denoted D1 and S1 and the first period's equilibrium price and quantity are determined by their intersection. In year 2, demand increases from D1 to D2 (say, because of an increase in income) and supply decreases from S1 to S2 (because of an increase in the cost of producing butter); the equilibrium price and quantity are determined by the intersection of the new supply and demand curves. ln year 3, the factors affecting demand and supply change again; demand increases again to D3, supply increases to S3 and a new equilibrium quantity and price are determined. Figure 12.1b shows the equilibrium quantity and price pairs for these three periods and for eight subsequent years, where in each year the supply and demand curves are subject to shifts associated with factors other than price that affect market supply and demand. This scatterplot is like the one that Wright would have seen when he plotted his data. As he reasoned, fitting a line to these points by OLS will estimate neither a demand curve nor a supply curve, because the points have been determined by changes in both demand and supply.").

[21] See, e.g., Stock and Watson (2006), Figure 12.1a.

[22] In Appendix E, I outline how the McFadden-Song model fails a necessary test when using this technique, and how this shortcoming makes the McFadden-Song model unreliable.

[23] Song Report, ¶ 51 ("I rely on the genre groupings Professor MacCormack describes in his report for the purposes of estimating consumer demand.").

[24] McFadden Report, ¶¶ 61–63; Song Report, ¶¶ 137–139.

[25] McFadden Report, ¶¶ 61–63; Song Report, ¶¶ 137–139.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

c. The third parameter measures how strongly consumers' purchases of in-app items increase when the app is downloaded more frequently. I refer to this as the "coefficient on log downloads" or the "log downloads parameter."[26]

25. In the McFadden-Song model, the price sensitivity parameters Dr. Song estimates (i.e., a and b in the above list) determine the elasticity of demand at a given price—in other words, the percentage change in quantity demanded associated with a percentage change in price. Specifically, the price sensitivities estimated by Dr. Song multiplied by the price of an app is the estimated elasticity of demand at that price for that app.[27]

26. As a numerical example, suppose the paid download price sensitivity estimated by Dr. Song is -0.10. This means that for an app that costs $1.00 to download, Dr. Song estimates that consumers would download this app by 0.1 percent less (or -0.10 times $1.00) if the price were to increase by one cent (or 1 percent of $1.00).[28] For a $50.00 app, the same estimate indicates that consumers would download the app 5 percent less (or -0.10 times $50.00) if the price were to increase by 50 cents (or 1 percent of $50.00).[29]

27. Price sensitivity values are generally expected to be negative. This is because of what economists call the "law of demand"—as the price of a good increases, fewer consumers will want to purchase it.[30] If a price sensitivity value were greater than zero, it would imply that as a good became more expensive, consumers would be more likely to purchase it. A model which generates results with positive estimated price sensitivities may mean the economist has not appropriately controlled for important relevant economic factors.[31]

---

[26] McFadden Report, ¶¶ 61–63; Song Report, ¶¶ 137–139.

[27] Stock and Watson (2006), pp. 267–271 ("In the economic analysis of consumer demand, it is often assumed that a 1% increase in price leads to a certain *percentage* decrease in the quantity demanded. The percentage decrease in demand resulting from a 1% increase in price is called the price **elasticity**."), ("In the log-linear model, a one-unit change in $X$ ($\Delta X=1$) is associated with a 100 x $\beta_1$% change in Y."). The elasticity of demand in the McFadden-Song model follows from his equations for consumer demand for paid downloads and in-app purchases. See Song Report, ¶¶ 137–139.

[28] This effect is symmetrical. In this example, if the price were to decrease by one cent, consumers would download this app by 0.1 percent more.

[29] Note that these numerical examples use an approximation that is only valid when the implied change in quantity is small. For larger values of price coefficients this approximation can be less accurate. See Stock and Watson (2006), p. 269 ("$\ln(x + \Delta x) - \ln(x) \cong \frac{\Delta x}{x}$ (when $\frac{\Delta x}{x}$ is small)."). This effect is symmetrical. In this example, if the price were to decrease by 50 cents, consumers would download this app by 5 percent more.

[30] David Besanko and Ronald R. Braeutigam, *Microeconomics*, Fourth Edition, (Hoboken, NJ: John Wiley & Sons, 2011) ("Besanko and Braeutigam (2011)"), p. 775 ("Law of Demand[:] The inverse relationship between the price of a good and the quantity demanded, when all other factors that influence demand are held fixed.").

[31] This may be due to omitted variable bias, invalid instruments, and/or model misspecification. See Stock and Watson (2006), Chapters 6, 12.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

28.     As explained in greater detail later in this report, Dr. Song's estimates of consumer demand are a foundational element of his estimates of damages, both in the aggregate and for specific class members. In the McFadden-Song model, estimates of price sensitivity are used to infer app developers' marginal costs.[32] One key assumption of the McFadden-Song model is that there is a close relationship between prices, marginal costs, and consequently, damages. By assumption, apps with higher prices have higher costs and, in turn, higher damages.[33, 34] This relationship holds regardless of the method used to estimate consumers' price sensitivity, and it does not allow for any characteristics or circumstances—besides the genre and business model groupings—that might make apps with similar prices behave differently.[35] This is inconsistent with known economic behavior. For example, in Section VI below I discuss women's luxury handbags, which greatly differ in price despite having similar marginal costs.

29.     In addition to the assumptions that create this relationship between prices, costs, and damages, the McFadden-Song model requires an estimate of the consumer price sensitivity. The McFadden-Song model assumes that, for Paid Download Only Apps and Free Download Apps

---

[32] McFadden Report, ¶ 38 ("The tax incidence framework…requires three components as an input. First, it requires an estimate of the App Store commission rate that would prevail absent its alleged conduct…Second, the tax incidence framework requires an estimate of consumer demand…Third, I must estimate developers' costs, which, together with estimates for consumer demand and developers' profit maximization conditions, allow me to determine how developer pricing changes in response to commission rate changes.").

[33] Damages for an individual transaction of Paid Download Only Apps and Free Download Apps with Paid In-App Purchases can be written as a function of as-is app composite prices, transaction prices, the price elasticity, and as-is and but-for commission rates. See Appendix D.

[34] The statement that damages are higher for more expensive items within a genre grouping and business model is true both in dollar terms and in percentage terms.

[35] Professor McFadden's testimony is consistent with this statement. See McFadden 2025 Deposition, pp. 153:8–155:2 ("Q. You assume that price elasticity is equal to price multiplied by your estimated price sensitivity, correct? A. Correct. Q. And your model implies that demand elasticity increases proportionally with price, correct? A. Yes. Q. That's an assumption that you make about demand, correct? A. Well, I would say that -- yes, that specification is an assumption… Q. Based on that assumption, the higher price for an app or in-app content, the higher the price elasticity, right? A. That's a property of this, yes. Q. And the higher the price elasticity, the higher the marginal cost that you infer, correct? A. That's true… Q. For a given price sensitivity, though, your assumption does build into the modeling that higher-priced apps or in-app content will have higher rather than low price elasticities, correct? A. Correct."). Dr. Song's testimony seemed to suggest that this relationship is dependent on specific features of apps and may be mitigated by the fixed effects used in estimating the price sensitivity term—an interpretation that is inconsistent both with Professor McFadden's testimony and the equations in Dr. Song's own report (see Song Report, ¶¶ 163–168). See Deposition of Minjae Song, Ph.D., June 4, 2025 ("Song Deposition"), pp. 223:16–227:12 ("Q. Do -- well, I'm asking you a mathematical question. Is it not true that for a given price sensitivity, Professor McFadden's model mathematically imposes the requirement that higher priced apps will have higher marginal costs?... [A.] … I think mathematically that's correct… Q. It's not possible in Professor McFadden's model for a high priced app to have a zero or low marginal cost, is it?... [A.] If you have two identical apps -- and when I say identical, that means same function, same quality in all dimensions they are the same -- and one app is more expensive than the other app, Professor McFadden's model… predicts higher cost than for the low price app because they are the same app… Q. Professor McFadden's model, though, doesn't require that based on the apps being identical, does it? A. His model and my implementation of it controls for other non-price aspects of apps and in-app content. Q. Well, if you have any two apps in the same genre and the as-is price of one is higher than the other, your model, as implemented, will say that the higher priced model has a higher marginal cost than the lower price app, correct? A. Controlling for all other things, yes… Q. Okay. But the other things your model controls for that are relevant to that -- that aspect of the model are price sensitivity and business model? A. And fixed effects.").

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

with Paid In-App Purchases, if consumers are more price sensitive, then estimated damages will be higher, all else equal.[36] The assumptions of the McFadden-Song model also imply that as app prices increase, purchasers of those apps tend to be harmed more.[37] Thus, Dr. Song's estimates of the price sensitivity parameters—and more importantly his assumptions about the *potential range that those parameters can take*, as I discuss below—can and do substantially affect his assessment of the amount of aggregate harm, as well as which and how many payors are harmed.

30.     By relying on Professor MacCormack's genre groupings, and by applying the McFadden-Song model, Dr. Song assumes that consumers are equally sensitive to price for all apps or in-app purchases within a genre. For example, given this assumption, the change in consumers' willingness to download a $1.99 app that changed prices to $2.99 would be equal regardless of whether that app is extremely popular or extremely niche. This feature of the McFadden-Song model holds true regardless of the method for estimating the price sensitivity parameter.

31.     The McFadden-Song model's methodology for estimating consumer demand and calculating damages is mostly unchanged from the one that Professor McFadden described in his Initial Report and which I discussed in my previous expert report.[38] Professor McFadden testified he was "the architect" of the model, while Dr. Song was "the contractor who actually put the structure in place."[39] However, Dr. Song adds additional genres than were in Professor McFadden's previous reports. Professor McFadden testified that he did not fully oversee every step of that process; for example, he did not review Dr. Song's choice of instrumental variables for these additional genres.[40] Dr. Song also adds novel restrictions on the model relative to the ones included by Professor McFadden, namely, relying on work outlined in Professor

---

[36] See Appendix D, Equation (4). As consumers become more price sensitive ($\alpha$ becomes more negative, e.g. if $\alpha$ goes from -1 to -2) damages will increase.

[37] For Paid Download Apps with Paid In-App Purchases, this relationship is more complicated. Paid Download Apps with Paid In-App Purchases represent only "▮ percent of all-time App Store spending." Song Report, fn. 43.

[38] Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, June 1, 2021 ("McFadden 2021 Opening Report"). See also Song Report, ¶¶ 49, 55.

[39] McFadden 2025 Deposition, pp. 21:21–22:2 ("Q. Which of you was primarily responsible for the creation of the model? A. I would say that if you describe building this damage analysis like you're building a house, I was the architect for the plan and he was the contractor who actually … put the structure in place.").

[40] McFadden 2025 Deposition, p. 31:3–20 ("Q. (By Mr. Swanson) Is the selection of instrumental variables for the genres that you did not address in your prior reports a topic that you considered to be one of implementation of your methodology? A. Yes, I think that's an implementation issue which the – the operating econometrician has the responsibility to sort out. Q. And that would be Dr. Song? A. That would be Dr. Song for his current work, yes. Q. And do you have an opinion about whether or not his selection of instrumental variables for those new genres was a reliable selection? A. Actually I have not even reviewed that work in detail. I just have a broad overview that he's carried on in a similar way to what was done earlier."). I discuss instrumental variables further in Section IV.D and Appendix E.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

MacCormack's report. Dr. Song's estimation methodology proceeds in eight steps, as I explain below:[41]

32.     Step 0: Determine the margin constraints. Prior to any analytical steps in Dr. Song's methodology, Professor MacCormack claims to calculate "genre gross margins" based on his analysis of the costs for a small fraction of app developers.[42] Dr. Song relies on "the genre groupings Prof. MacCormack describes in his report"[43] and "the genre-group level variable profit margin ranges estimated by Prof. MacCormack to form the variable profit margin bounds."[44] Dr. Song adjusts Professor MacCormack's genre gross margins,[45] and uses these as his margin constraints, listed in Exhibit 2.[46]

---

[41] My earlier report contained a similar description of Dr. Song's method for imposing the margin constraints, in particular the implementation of Steps 2 and 3, and there was some confusion on the part of the plaintiffs about whether this description was accurate. See Reply Report of Daniel L. McFadden, Ph.D. in Support of Plaintiffs' Renewed Motion for Class Certification, April 28, 2023 ("McFadden 2023 Reply Report"), ¶¶ 145–147 ("For example, Prof. Watson claims that my demand coefficients are 'largely determined by [my] profit margin constraints,' which he claims are 'ad hoc.' … This claim is simply not true. The 'two separate approaches' that Prof. Watson describes do not exist in my estimation process. I use a standard computation tool that finds solutions with constraints in one estimation step."). Dr. Song's estimates, as with Professor McFadden's estimates in his earlier reports, are generated using a constrained Generalized Method of Moments (GMM) procedure. My discussion is about the relevance of the underlying transaction data in such a procedure, which hold regardless of implementation details. To eliminate the plaintiffs' confusion on this matter, I have included a detailed description of the constrained GMM procedure in Appendix C to clarify my discussion of Dr. Song's margin constraints. Dr. Song's computer program carries out Steps 2 and 3 using the Matlab function 'fmincon.' As I show in Appendix C, the fmincon function numerically implements steps 2 and 3 and returns the resulting estimates.

[42] MacCormack Report, ¶¶ 99–100 ("I treat each of the 114 developer submissions as a distinct unit of analysis. Out of the 114 submissions, 43 were excluded from the analysis due to incomplete or otherwise unusable information. I therefore consider the remaining 71 submissions in my analysis, and I refer to the resulting dataset as "Developer Cost Data" throughout the report. Primarily using the information in the Developer Cost Data, I calculate genre-level cost shares for each of the variable cost categories."). As I discuss further in Section V, these ranges appear to be based on a methodology that I understand conflates various types of costs.

[43] Song Report, ¶ 51.

[44] Song Report, ¶ 52.

[45] Song Report, ¶ 53. See Song Report, ¶¶ 152–158 for greater detail.

[46] Professor MacCormack's margin constraints are based on his estimates from Royalties, UAR, infrastructure, and maintenance. See MacCormack Report, Appendix B. Exhibit 2 only includes developers Professor MacCormack used for Royalties and UAR as Professor MacCormack does not report which developers are used to estimate infrastructure and maintenance costs in his Appendix B. According to Professor MacCormack's estimates, infrastructure and maintenance costs represent a minority of overall costs. Instead, Royalties and UAR are 70–83 percent of Professor MacCormack's estimates of total variable costs. The variable cost range of Royalties and UAR Professor MacCormack reports is 20–35 percent, and the total variable cost range is 24–50 percent, This means that at the lower bound Royalties and UAR make up a little over 83 percent of total variable costs (20 percent ÷ 24 percent = 83.3 percent), while at the upper bound Royalties and UAR make up 70 percent of total variable costs (35 percent ÷ 50 percent = 70 percent). See MacCormack Report, Table 13. Additionally, Professor MacCormack does not always use his reported developers' data. For example, when discussing Roblox, Professor MacCormack states that "Roblox has a unique business model, wherein it shares its revenue with users that create Roblox's in-game content. This makes the 28–36% range likely in excess of the royalties incurred by the average developer in the genre. As a result, I treat it as an outlier and exclude it from my calculations." MacCormack Report, ¶ 208. Nonetheless, Professor MacCormack still reports Roblox in Table 11 in his Appendix B. Excluding Roblox, Professor MacCormack is estimating Royalties for Games entirely based on data from a single developer, Glu Games.

*EXHIBIT 2*

*Profit Margins of Developers According to Plaintiffs' Experts*

| Song Genre Group | MacCormack Margin Ranges | | Song Margin Bounds | | Number of Developers' Cost Data Used |
|---|---|---|---|---|---|
| | Lower Bound | Upper Bound | Lower Bound | Upper Bound | Royalties & UAR |
| Games | 50% | 76% | 52% | 78% | 6 |
| Music + Entertainment | 21% | 45% | 30% | 65% | 5 |
| Social Networking + Lifestyle | 57% | 94% | 59% | 97% | 5 |
| Imaging | 39% | 80% | 40% | 82% | 8 |
| Health & Fitness + Medical | 41% | 66% | 42% | 68% | 7 |
| Reading | 41% | 72% | 42% | 74% | 9 |
| Business + Finance | 49% | 92% | 51% | 94% | 3 |
| Education | 28% | 57% | 29% | 59% | 3 |
| Workflow Tools | 45% | 82% | 46% | 84% | 8 |
| Navigation + Travel | 47% | 89% | 49% | 91% | 3 |
| Sports | 36% | 80% | 37% | 82% | 2 |
| Weather | 56% | 92% | 58% | 94% | 4 |
| Food & Drink | 43% | 77% | 44% | 79% | 3 |
| Shopping | 43% | 77% | 44% | 79% | 3 |
| Stickers | 43% | 77% | 44% | 79% | 3 |
| Catalogs | 43% | 77% | 44% | 79% | 3 |

Source: Song Report, Figure 19; MacCormack Report, Figures 1 and 2, Appendix B, fn. 4

Note: UAR refers to User Acquisition and Retention costs. Counts represent the number of developers in each genre grouping that Professor MacCormack analyzes data for in either the UAR or Royalties cost categories, as reported in Appendix B of his report, although Professor MacCormack may have used fewer developers to estimate Royalties or UAR costs. See MacCormack Report, fn. 4 ("[Figures 1 and 2] only include genres and genre groups for which I have usable cost data.").

33.  Step 1: Draw the data. Dr. Song draws a 0.1 percent sample of accounts in the App Store transaction data and uses data for all of their paid transactions, including prices and commissions.[47] He then filters the data to only include transactions which occurred on an iPad or iPhone,[48] and excludes returns among other filters.[49] Across the 75 samples, this results in 946,463 paid apps.[50] Lastly, he filters this sample to include only transactions associated with the 35,410 apps with high revenues—specifically the apps "that, at any point, ranked among the top

---

[47] Song Report, ¶ 112.

[48] Dr. Song offers no opinion on whether iPod touch transactions should be included and states that he applied this filter at the request of counsel. See Song Report, fn. 3 ("I have been instructed by Counsel to treat iPhones and iPads, but not the iPod Touch, as iOS mobile devices.").

[49] Song Report, ¶ 113 ("I remove four other types of transactions from these samples: refunds, refunded transactions, non-initial downloads, and pre-download in-app purchase transactions."). Dr. Song also excludes transactions from Apple-developed apps. See Song Report, fn. 168.

[50] Workpaper 3. These apps represent 0.6 percent of total unique apps in the App Store transaction data.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

70 percent in revenue for any genre and year."[51] These apps make up approximately 2.4 percent of unique paid apps in the App Store transaction data.[52] Importantly, these data do not contain any information on developers' profits or the profit margin earned for a given transaction.[53]

34.     Step 2: Estimate the model. The McFadden-Song model estimates parameters that characterize consumers' demand for apps.[54] These estimates are necessary for the determination of but-for prices and harm in the McFadden-Song model. The McFadden-Song methodology obtains preliminary estimates for these parameters using variation in prices and quantities observed in the transaction data for the selected accounts through a methodology called "Generalized Method of Moments." [55] I provide a more detailed discussion of his methodology and its application in Appendix C. These estimates can be thought of as his "transaction data-based estimates." According to Professor McFadden, the McFadden-Song model does not require app developers' cost data.[56] He further reaffirmed in deposition that such an approach would be "legitimate."[57] Estimates of consumer demand paired with the model of app developers' profit maximization would allow him to directly estimate app developers' costs without further assumptions.[58] I explain in Section IV.D how the margin constraints mask the underlying unreliability of the McFadden-Song model.

35.     Step 3: "Improve" the estimation through constraints. Even though Professor McFadden claims to be able to estimate developers' costs and profits from the transaction data-based

---

[51] Song Report, ¶ 118; Workpaper 3. These apps are determined based on revenues within the sample, that is the top apps may vary somewhat from sample to sample.

[52] See Workpaper 3.

[53] See Workpaper 3.

[54] In particular, the McFadden-Song model assumes a certain specification of developer profits and assumes developers set prices to maximize profits. The determination of profit-maximizing prices necessitates an estimate of how consumers' quantity of transactions changes with respect to transaction prices. As stated by Professor McFadden, this estimation process requires a substantial amount of time. See Deposition of Daniel McFadden, Ph.D., August 3, 2021 ("McFadden 2021 August Deposition"), pp. 218:25–219:12 ("Q. Can your model estimate but-for prices for every app and in-app purchase during the class period? A. I think the answer is: Yes, in principle; that is, the – the restriction to the 1/10th-of-1-percent sample and the restriction to the 70-percent-highest-revenue-generator apps were choices made to – to make the analysis feasible and practical within the time frame in which I was working.").

[55] Song Report, ¶ 136. In the context of Dr. Song's calculations, this method is also called "instrumental variables" or "two-stage least squares."

[56] McFadden Report, ¶ 33 ("In situations where firms' cost data are not available, but there is sufficient information to estimate consumer demand, economists can…impute firms' variable margins.").

[57] McFadden 2025 Deposition, p. 151:10–14 ("I think that the -- the good econometric practice would be to use all the available data that -- that allows you to -- to sharpen those estimates, but it's certainly legitimate to have a starting point to use only the transactions data.").

[58] McFadden Report, ¶ 34 ("it is important to emphasize that my model does not require information for every app developer's cost. I can use consumer demand and app developers' profit maximization conditions to estimate app developers' costs without cost data from each of these app developers.").

estimates and the model alone,[59] his model assumes average developer profit margins estimated by his model must be within a specific range.[60] As an example, for the Games genre, Dr. Song requires that consumers' estimated price sensitivity must be consistent with developers setting app prices in such a way that they earn, on average, a profit margin between 52 and 78 percent.[61, 62] In general, the McFadden-Song model excludes the possibility of any parameters that would yield average profit margins outside the ranges calculated in Step 0.

36.     In practice, this restriction on the average profit margins for developers implies that the range of price sensitivity parameters he estimates is similarly restricted. For example, for the first 0.1 percent sample Dr. Song draws, the price sensitivity of Games paid downloads *must* lie within the range of -1.471 to -0.722, and the price sensitivity of Games in-app purchases *must* lie within the range of -0.317 to -0.147 in order to have the average profit margin for Games developers lie between 52 and 78 percent.[63]

37.     Dr. Song also assumes that there must be a specific relationship between downloads of an app and its in-app purchases, which I refer to as his "log downloads assumption."[64]

38.     If Dr. Song finds, using the transaction data, that a parameter estimate falls outside the range permitted by his margin constraints, he discards that estimate and instead uses the closest

---

[59] McFadden Report, ¶ 33 ("In situations where firms' cost data are not available, but there is sufficient information to estimate consumer demand, economists can…impute firms' variable margins.").

[60] Song Report, ¶ 150 ("The GMM estimation procedure solves the following optimization problem: For each genre group and sample, minimize the GMM criterion function subject to the average developer margin bounds…").

[61] Song Report, Figure 11.

[62] Dr. Song calculates the margin constraints using an estimated composite price for each app and year. Specifically, he takes the simple average of prices for all in-app purchase items associated with an app across a given year. For example, suppose an app has three in-app purchase items: a basic, standard, and deluxe version with prices of $0.99, $1.99, and $9.99, respectively. Dr. Song would treat this app as if it has a single in-app purchase composite with a price of $4.32. (($0.99 + $1.99 + $9.99) ÷ 3 ≈ $4.32). I discuss the composite price more in Section IX.A.

[63] These price sensitivity ranges will vary across samples due to a draw of different accounts and those accounts' transactions. In practice, the upper and lower bound do not vary much across samples. The range of allowed price sensitivities for Games paid downloads across all 75 samples is -1.536 to -0.653, and the analogous range of allowed price sensitivities for Games in-app purchases is -0.358 to -0.145. Workpaper 4.

[64] Song Report, ¶ 150 ("The GMM estimation procedure solves the following optimization problem: For each genre group and sample, minimize the GMM criterion function subject to the average developer margin bounds and constraint on the app downloads coefficient, $\beta^Q$. … $0 < \beta^Q < 1$."). Dr. Song's assumption requires that the coefficient on log downloads be between zero and one. The coefficient being greater than or equal to zero implies that the more people download an app, the more in-app purchases there will be. The coefficient being less than or equal to one requires that increases in app downloads do not disproportionally increase in-app purchases. There are situations where this assumption may also be violated, e.g., if there are positive network effects such that the more users an app has, the more desirable in-app purchases become (e.g., because the app provides a more enjoyable experience when shared with more people). Additionally, without this assumption, the McFadden-Song model will be unable to estimate damages. I discuss this assumption and its implications in greater detail in Section VII.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

point on the range allowed by the margin constraints.[65] These bounds effectively take information from the small number of developers analyzed by Professor MacCormack, and, instead of "improv[ing]" demand estimation,[66] use those developers' information (as interpreted by Professor MacCormack) to override information stemming from billions of App Store transactions. Neither Dr. Song nor Dr. McFadden have explained how *overriding* estimates based on billions of actual App Store transactions in favor of information from a small number of developers is supposed to improve the estimates.

39. <u>Step 4: Rerun the model across 75 samples.</u> Dr. Song performs Steps 1-3 for each of 75 separate samples of accounts, assuming (without evidence) that price sensitivity is the same for all apps within each genre, and then takes the average of the resulting 75 estimates to arrive at his final estimate of the price sensitivity parameter for each genre.[67] He also uses a process called "bootstrapping" to generate estimates of the statistical error of his estimates.[68] This approach theoretically generates a possible range of price sensitivity parameters, and consequently a possible range of damages. However, because each of these "bootstrapped" estimates is calculated subject to the margin constraints, Dr. Song will always find a price sensitivity parameter, and thus an estimate of damages, subject to the margin constraints. Dr. Song does not investigate any possible error in the estimates of the margin constraints, nor does he provide assurances against other potential shortcomings in the McFadden-Song model that could be masked by the margin constraints.

40. <u>Step 5: If the "log downloads" parameter is "insignificant," remove it.</u> If, based on his bootstrapped estimates of standard error from Step 4, he finds that the coefficient on "log downloads" is statistically insignificant for a given genre, he re-estimates his model for those

---

[65] My earlier report contained a similar description of the model's method for imposing the margin constraints, and there was some confusion on the part of the plaintiffs about whether this description was accurate. See McFadden 2023 Reply Report, ¶¶ 145–147 ("For example, Professor Watson claims that my demand coefficients are 'largely determined by [my] profit margin constraints,' which he claims are 'ad hoc.' … This claim is simply not true. The 'two separate approaches' that Professor Watson describes do not exist in my estimation process. I use a standard computation tool that finds solutions with constraints in one estimation step."). Dr. Song's estimates, as with Professor McFadden's estimates in his earlier reports, are generated using a constrained Generalized Method of Moments (GMM) procedure. My discussion is about the relevance of the underlying transaction data in such a procedure, which hold regardless of implementation details. To eliminate the plaintiff's confusion on this matter, I have included a detailed description of the constrained GMM procedure in Appendix C to clarify my discussion of the McFadden-Song model's margin constraints.

[66] McFadden Report, ¶ 47.

[67] Song Report, ¶¶ 54 ("…I draw 75 0.1 percent random samples of App Store transactions data, estimate demand for each genre group with each sample, and take the average of the 75 sets of estimated coefficients to obtain the average estimate for each of the demand parameters. I use these average coefficient estimates when simulating But-For prices in my damages calculations."), 76 ("Figure 12… shows the mean estimated demand coefficients… for each genre grouping.").

[68] Joshua D. Angrist and Jorn-Steffen Pishke, *Mostly Harmless Econometrics: An Empiricist's Companion*, (Princeton, NJ: Princeton University Press, 2008), pp. 226–227.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

genres using Steps 1-4 without the "log downloads" parameter.[69] By the end of Step 5, he has the demand estimates listed in Figure 12 in his report.

41.    Step 6: Compute marginal costs. In order to calculate but-for prices in the McFadden-Song model, Dr. Song must first calculate app-level marginal costs. He calculates these costs using: (a) app-level monthly prices; (b) app-level commission rates; and (c) the estimated consumer demand parameters from Step 5. As discussed in more detail in Section IX.A, for apps with in-app purchases, the app-level monthly price is a "composite" based on an average of each of the app's unique item prices.[70] The McFadden-Song model derives these unobserved marginal costs through an assumption that observed prices reflect profit maximizing monopolistic behavior by developers.[71] That is, for a given estimate of consumer demand, only one value for marginal cost can justify the observed app price and commission rate.[72] Marginal costs in this context refer to the incremental costs (or, according to Professor McFadden, ancillary revenues

---

[69] In practice, Dr. Song uses estimates based on his method without the log downloads coefficient for two genre groupings: Health & Fitness + Medical; and Imaging. See Song Report, ¶ 170 ("[T]he log downloads variable is omitted for the Health & Fitness + Medical genre grouping and the Imaging (Photo & Video + Graphics & Design) genre grouping because it is statistically insignificant when included.").

[70] As I explain in Section IX.A, Professor McFadden has testified that this app-level aggregation is necessary to his model, and that a jury would be unable to reliably calculate damages if they were to determine that developers maximized profits at the item level rather than the app level. McFadden 2025 Deposition, pp. 230:18–231:12 (Q. If the jury determines that developers maximized profits and set their prices not at the app level but at the item level, how would the jury reliably calculate damages based on the evidence from your model? … A. The answer is I don't -- I don't think I can do it and I don't think they can do it reliably. Q. (By Mr. Swanson) If the jury determines that marginal costs are zero for in-app virtual currency transactions, how would the jury reliably calculate damages using your model? … A. … if they can work at that level, then I don't know. I don't know -- I don't know how they would proceed.").

[71] As discussed further in Section IX.C.1, the McFadden-Song model assumes that each developer is a monopolist and does not consider substitution to other apps for the purposes of setting its own prices. As a result, marginal costs are not equal to prices set by app developers, which would be the case in a perfectly competitive industry. In addition, Professor McFadden has testified that focal point pricing could affect which consumers are harmed and whether individualized inquiry might be required. Deposition of Daniel L. McFadden, December 5, 2022 ("McFadden 2022 Deposition"), pp. 147:18–148:24 ("Q. Do any of your models or simulations take account of the fact that the App Store transaction data reflected the pricing choices of developers who are already constrained by Apple's price tiers in the real as-is world? A. The answer is my -- my assumption as described in Appendix E is that developers are profit maximizers in the as-is world and that they have produced products and menus of products that are appropriate to those prices. Q. Well, your model assumes that if an app is priced at the $1.99 tier in the real world, that $1.99 is the true profit-maximizing price for that developer and that app at that time, correct? A. That -- that is correct. Q. Isn't it a fact that when you observe that in the real world the developer selected a tier price of $1.99, all you know is that that price was more profitable than the 99-cent or the 2.99 price tier? A. You certainly know that, and you also know or at least as an economist assume that developers are profit maximizers, so that -- they are missing products which maximize their products. Q. But with price tiers in the real world, isn't it a fact that you can't know exactly what the developer's marginal cost is? A. The answer is -- is yes, you can -- you can determine that within -- within limits. Q. And the limits are implicitly defined by the tiers, correct? A. Yes."). While Professor McFadden testified regarding this problem with estimating marginal costs, neither he nor Dr. Song has adjusted the model to address this issue. Both the flexible price and price-tier but-for simulations continue to rely on marginal costs calculated while ignoring how the presence of price tiers in the as-is world limits the model's ability to estimate marginal cost.

[72] Song Report, ¶ 140 ("As in Prof. McFadden's prior reports, I model app developers as firms setting app-level download and in-app purchase prices to maximize their profits."). As explained in more detail in Sections IV and VII, Dr. Song's margin constraint and log downloads assumptions ensure that his parameter estimates yield a profit function that satisfies the conditions for such maximization to be feasible.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

such as ad sales) associated with one additional app download or in-app purchase transaction.[73,] [74] As discussed in more detail below, the McFadden-Song model assumes a specific relationship between prices and inferred marginal costs within each genre group and business model. Marginal costs, and their relationship with price in the McFadden-Song model, are important for the determination of putative damages; Professor McFadden has testified that if the jury were to find that marginal costs were different than in his model—for example, if certain virtual currencies had zero marginal costs—then they could not reliably calculate damages using the McFadden-Song model.[75]

42.    Step 7: Compute but-for prices. The McFadden-Song model then calculates app-level but-for prices by reversing the developer pricing equations used to calculate marginal costs in Step 6. This calculation uses the marginal costs from Step 6, the estimated demand parameters obtained from Step 5, and an assumed 13.63 percent but-for commission rate computed by another expert, Dr. Rosa Abrantes-Metz.[76] Dr. Song converts but-for prices into an overcharge percentage, defined as the difference between as-is and but-for prices divided by average commissions charged on purchases.[77] As Dr. Song and Professor McFadden note, when inferred

---

[73] Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, Fourth Edition, (Harlow, England: Pearson, 2015) ("Carlton and Perloff (2015)"), p. 54 ("Associated with the concepts of total cost and variable cost is marginal cost (MC), which is the *increment*, or addition, to cost that results from producing one more unit of output… It is important to distinguish between the concept of marginal cost and the various concepts of average cost. There are three common types of average cost: *average total cost* (sometimes simply called *average cost*), *average variable cost*, and *average fixed cost*…"). See also McFadden Report, fn. 37 ("Variable costs are firm expenses that change in proportion to production output… Variable costs are often used as proxies for the marginal cost of a firm, which is the '*increment*, or addition, to cost that results from producing one more unit of output.'").

[74] McFadden 2025 Deposition, p. 132:20–25 ("Q. Do you agree that marginal cost is the incremental or addition to cost that results from producing one more unit of output? A. I -- I do, although your -- your statement leaves out a lot of qualifying conditions about short run and -- and long run and so forth.").

[75] McFadden 2025 Deposition, pp. 230:18–231:12 (Q. If the jury determines that developers maximized profits and set their prices not at the app level but at the item level, how would the jury reliably calculate damages based on the evidence from your model? … A. The answer is I don't -- I don't think I can do it and I don't think they can do it reliably. Q. (By Mr. Swanson) If the jury determines that marginal costs are zero for in-app virtual currency transactions, how would the jury reliably calculate damages using your model? … A. … if they can work at that level, then I don't know. I don't know -- I don't know how they would proceed.").

[76] Song Report, ¶ 12 ("I have been instructed by Counsel for Consumer Plaintiffs to assume that Apple would charge a 13.63 percent commission rate on top app downloads and in-app purchases made through the App Store absent Apple's alleged anticompetitive conduct. I understand that this commission rate is consistent with the opinions offered by Dr. Abrantes-Metz."). The equations of the McFadden-Song model allow for estimation of but-for prices for any choice of the but-for commission rate. See Song Report, ¶ 164.

[77] Song Report, ¶ 167. For Paid Download Only Apps and Free Download Apps with Paid In-App Purchases the overcharge percentage is equivalent to the percent change in price at the app-month level divided by the average commission rate charged for that app-month. For Paid Download Apps with Paid In-App Purchases, the overcharge percentage reflects the percent change in the quantity-weighted average of the price for the app's paid download and single composite in-app purchase item, also divided by the app-month average commission rate.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

marginal costs are negative in the model, the associated overcharge will also be negative.[78] Because the McFadden-Song model only estimates but-for prices at the app-month level, they will not necessarily lie on Apple's price tiers.[79] In fact, Professor McFadden has testified it is not possible to use his model to estimate the but-for prices of specific in-app purchase items.[80]

43.     Step 8: Translate but-for prices into damages. Finally, Dr. Song purports to translate the application of his model from app-level estimates in Steps 6 and 7 into damages for individual transactions. This change in consumer content prices—the extent to which consumer prices would change due to a change in the commission rate—is referred to as the "incidence rate" and is the core damages mechanism of Professor McFadden's "tax incidence framework."[81] Dr. Song uses Professor McFadden's "percentage method" for this process, multiplying the as-is commissions charged on a given transaction by the overcharge ratio calculated in Step 7 to estimate damages for an individual transaction.[82] Using these estimates of damages for each individual transaction, Dr. Song aggregates over transactions to calculate harm for each class member and total harm across all class members' App Store transactions.

44.     The academic literature cited in Professor McFadden's and Dr. Song's reports do not support their method for estimating demand outlined in Steps 1-5. Each of the articles that Professor McFadden has previously cited either (a) does not include constraints that limit the range of variables (other than, perhaps, to exclude economically unreasonable values such as a positive value for price sensitivity); (b) features constraints that are based on estimates constructed from a large, representative sample; or (c) includes detailed robustness analysis for

---

[78] Song Report, ¶ 79 ("[T]hese calculations net out any 'negative' damages, which arise when the model predicts an app-month would raise its price in the But-For world… these app-months are those that the damages model estimates to have negative marginal costs.").

[79] See Exhibit 14.

[80] McFadden 2022 Deposition, pp. 116:19–117:4 ("Q. (By Mr. Swanson) But -- but you are not assuming that the developer maintains its business model in terms of the number of in-app purchase items it offers in the but-for world; is that correct? A. It is correct, but at the level of granularity of -- of -- in-app menus, my model is silent on how -- how those are organized by the developer. I deal only with profit maximization at the granularity -- granularity of average IAP price and total IAP transactions.").

[81] McFadden Report, ¶ 20. In Professor McFadden's original report, he referred to the incidence rate as the "percent of the burden" borne by consumer class members. See McFadden 2021 Opening Report, ¶ 144.

[82] McFadden Report, ¶¶ 49–54; Song Report, ¶¶ 65–66. As noted above, the overcharge percentage is equivalent to a percent change in price divided by the average commission rate. Thus, the percentage method calculates damages as the product of three terms: (1) the as-is price for each transaction; (2) the McFadden-Song estimate of the app-month percent change in price; and (3) the ratio of the as-is commission for a given transaction to the average commission for the corresponding app-month. Professor McFadden asserts that this method does not constitute a but-for price for any individual transaction. See McFadden Report, ¶ 54 ("Because I use spending (or commissions) as a basis for damages, I do not need to estimate in-app item-level But-For prices when implementing the 'percentage method.'"). I describe the "percentage method" in greater detail in Section IX.A.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

potential mismeasurement of costs and model misspecification.[83] In contrast, Dr. Song's margin constraints rely on margins estimates from Professor MacCormack's analysis, which are based on data from only 68 developers[84] out of the more than 373,235 developers on the App Store.[85] In fact, because Professor MacCormack calculates these margins separately for each genre, the number of developers used to calculate each margin constraint is much lower, only in the single digits of developers for each genre.[86]

---

[83] The few articles (Manski, 1990; Ciliberto and Tamer, 2009; Su and Judd, 2012) Professor McFadden cites in his opening report include constraints based on economic theory, which are different from the McFadden-Song model's approach of constraints based on a small selection of apps. See McFadden 2021 Opening Report, fn. 291; Charles F. Manski, "Nonparametric Bounds on Treatment Effect," *American Economic Review*, 80(2) (1990), pp. 319–323; Federico Ciliberto and Elie Tamer, "Market Structure and Multiple Equilibria in Airline Markets," *Econometrica*, 77(6) (2009), pp. 1791–1828; Che-Lin Su and Kenneth L. Judd, "Constrained Optimization Approaches to Estimation of Structural Models," *Econometrica*, 80(5) (2012), pp. 2213–2230. Petrin uses auxiliary data in his estimation. His method requires the model-implied average family size of SUV buyers to match actual average family sizes. However, Petrin estimates these averages from the Consumer Expenditure Survey, a large representative survey conducted by the U.S. Bureau of Labor Statistics that measures expenditures, income and demographic characteristics of U.S. consumers. Moreover, Petrin optimally weights the various sources of data used in his analysis; in contrast, the McFadden-Song model discards the transaction data if it is not consistent with the profit margin constraints. Amil Petrin, "Quantifying the Benefits of New Products: The Case of the Minivan," *Journal of Political Economy*, 110(4), pp. 705–729. In articles Professor McFadden has cited which include smaller samples of cost data, the authors examine whether their findings are sensitive to modeling assumptions and whether model outputs match underlying data. Gentzkow (2007) notes that "[t]his strategy depends on strong assumptions about the form of the firm's profit function, as well as the accuracy of the observed cost data" and examines whether the results are "robust to varying the supply parameters and the form of the utility function." Matthew Gentzkow, "Valuing New Goods in a Model with Complementarity: Online Newspapers," *The American Economic Review*, 97(3), 2007, pp. 713–744, pp. 715, 742. In Gentzkow et al. (2014), the authors examine whether the model outputs match the underlying cost data. Matthew Gentzkow et al., "Competition and Ideological Diversity: Historical Evidence from US Newspapers," *The American Economic Review*, 104(10), 2014, pp. 3073–3114, p. 3094 ("In Section VII we report evidence that our estimates of the fixed costs of newspapers of different size are a good match to the data.").

[84] MacCormack Report, Table 10 states that there are 71 developer productions. However, in MacCormack Report, ¶ 193, Professor MacCormack states that "out of the 114 developer productions provided, I identified and retained usable data from 71 submissions pertaining to 68 unique developers."

[85] Workpaper 5. The count of developers is obtained after applying Dr. Song's data filters. Some apps may have multiple developer IDs associated with them.

[86] I present the number of developers used in each genre in Exhibit 2. The number of developers used to estimate Royalties and UAR is between 2 and 9 depending on genre. Professor MacCormack's margin constraints are based on his estimates from Royalties, UAR, infrastructure, and maintenance. See MacCormack Report, Appendix B. Exhibit 2 only includes developers Professor MacCormack used for Royalties and UAR as Professor MacCormack does not report which developers are used to estimate infrastructure and maintenance costs in his Appendix B. According to Professor MacCormack's estimates, infrastructure and maintenance costs represent a minority of overall costs. Instead, Royalties and UAR are 70–83 percent of Professor MacCormack's estimates of total variable costs. The variable cost range of Royalties and UAR Professor MacCormack reports is 20–35 percent, and the total variable cost range is 24–50 percent, This means that at the lower bound Royalties and UAR make up a little over 83 percent of total variable costs (20 percent ÷ 24 percent = 83.3 percent), while at the upper bound Royalties and UAR make up 70 percent of total variable costs (35 percent ÷ 50 percent = 70 percent). See MacCormack Report, Table 13. Additionally, Professor MacCormack does not always use his reported developers' data. For example, when discussing Roblox, Professor MacCormack states that "Roblox has a unique business model, wherein it shares its revenue with users that create Roblox's in-game content. This makes the 28–36 percent range likely in excess of the royalties incurred by the average developer in the genre. As a result, I treat it as an outlier and exclude it from my calculations." MacCormack Report, ¶ 208. Nonetheless, Professor MacCormack still reports Roblox in Table 11 in his Appendix B. Excluding Roblox, Professor MacCormack is estimating Royalties for Games entirely based on data from a single developer, Glu Games.

**SER-153**

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

45.      As mentioned above, Dr. Song's core method for estimating consumer demand is mostly unchanged from the one Professor McFadden described in his initial report. Specifically, the novel elements of Dr. Song's implementation of the McFadden-Song model are: (a) his reliance on Professor MacCormack's genre gross margins to inform his margin constraints (Step 0 above); (b) his assumption that the coefficient on log downloads must be between zero and one (in Step 3); (c) his re-estimation of the model if his log downloads parameter is not statistically significant (Step 5);[87] and (d) the estimation of demand and calculation of but-for prices for additional genre groupings.

46.      Further, the McFadden-Song model assumes a specific relationship between as-is prices and marginal costs within a genre group and business model. The only way the model can explain why two apps in the same genre with the same commission rates are priced differently is by assuming those apps have different marginal costs. This occurs because the model has no way to capture how differences in apps' features (e.g., customer bases, quality, or pricing strategies) affect prices, except insofar as they affect marginal cost.[88] In particular, Dr. Song assumes that two apps with the same price must have the same marginal cost, and when one app is priced higher than another, it must be the case that it also has a higher marginal cost.[89] I discuss why this is an inappropriate assumption and inconsistent with well-understood economic behavior (using the example of luxury handbags, which often have approximately the same production costs but vastly different sale prices) in Section VI.

47.      This artificially constructed relationship between as-is prices and marginal costs also causes Dr. Song to assume a direct relationship between as-is prices and damages. Within a given genre group, the higher the as-is price is, the higher the damages Dr. Song estimates from his "percentage method" are.[90] Further, the McFadden-Song model implies that, for each genre group and business model, there is a single cut-off level of prices where apps priced below the cut-off level have a negative marginal cost (and thus negative damages) and apps priced above

---

[87] Professor McFadden previously removed his log downloads parameter for his estimation of demand for Music + Entertainment. See, for example, Revised Supplemental Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, January 19, 2023 ("McFadden 2023 Supplemental Report"), ¶ 61. Dr. Song has codified this decision for the estimation of all genre groupings.

[88] Dr. Song's estimation methodology includes app fixed effects which allow the level of demand to vary across products within a genre (i.e., the quantity purchased for that app on average). See Song Report, ¶ 78. However, the inclusion of these fixed effects has no effect on the relationship between prices and marginal costs in his model. While these fixed effects will control for a given app's overall price level or number of downloads, they do not address how the model interprets the relationship between price and marginal cost—any changes in price in the McFadden-Song model are assumed to be due to changes in the cost of providing an app.

[89] This statement assumes the two apps have the same commission rate. The McFadden-Song model could also explain differences between app prices in the same genre if they have different commission rates.

[90] To be clear, this assumes that two apps have the same as-is commission rate. Dr. Song uses a single uniform but-for commission rate for all apps.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

the cut-off level have positive marginal costs (and thus positive damages). This result is shown for the Games genre in Exhibits 9 and 10 below, where all transactions below a certain price yield negative damages in the McFadden-Song model.[91]

48.     Finally, the McFadden-Song model uses its relationship between prices, costs, and the commission rate to estimate harm for individual class members. Whether any individual class member is harmed depends on their individual purchases (and the but-for prices implied by the McFadden-Song model), and aggregate harm is calculated as the sum of net harm across all class members.[92] One can adjust inputs such as the but-for commission rate or the margin constraints to estimate different levels of putative harm to individuals which, in aggregate, determine total harm. By contrast, one cannot go "the opposite way" and pick an estimate of total harm and use the McFadden-Song model to determine the harm of individual class members. For example, suppose the jury determined that the aggregate damages were $5 billion (which is not a figure calculated by Dr. Song). One cannot start with that aggregate damages number and use the model to apportion damages across class members because the model is not designed to do that. One would need to speculate on changes to individual inputs to generate such a total harm estimate, or one would need to alter the McFadden-Song model in some way.

## IV.     Margin Constraints in the McFadden-Song Model Determine Damages

49.     As I described in Section III, demand estimation in the McFadden-Song model theoretically relies on two sources of information. The first source is Professor MacCormack's gross margin bounds for the genre groups he has defined.[93] Professor MacCormack bases these bounds on the cost data for a limited set of developers.[94] The second source is App Store transaction data. Subject to the margin constraints, Dr. Song estimates demand and costs using historical data on individual transactions on the App Store.

50.     On the surface, it may appear that introducing the margin constraints as an input into the McFadden-Song model is a case of bringing more data to bear on the analysis, potentially

---

[91] Specifically, for Free Download Apps with Paid In-App Purchases and Paid Download Only Apps, the marginal cost will be positive if $p > (-1/\alpha)$ where, the $\alpha$ parameter is constrained to be negative in the McFadden-Song estimation process. This cut-off price is the same for all apps in a genre group and business model regardless of the commission rate. See Song Report, ¶¶ 142, 144.

[92] Song Report, ¶¶ 167–168.

[93] Song Report, ¶ 52 ("I rely on the genre-group level variable profit margin ranges estimated by Prof. MacCormack to form the variable profit margin bounds for my demand estimation.").

[94] Professor MacCormack evaluates costs for six individual Games developers, four Music + Entertainment developers, and five Social Networking + Lifestyle developers. MacCormack Report, Table 5.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

leading to better, more reliable results. However, this is not the case. Instead, it is the margin constraints themselves that are driving the results that lead to Dr. Song's putative damages. The margin constraints play an outsized role in determining estimation results (and consequently the calculations of putative harm). Further, these constraints mask the McFadden-Song model's inability to capture the behavior of real-world app developers in its estimates. In sum, the McFadden-Song model is unreliable.

51.    The estimation methodology in the McFadden-Song model and its interplay with the margin constraints may seem complex, so I use an analogy throughout this report to help crystallize the core issue. In my view, the use of the margin constraints in the McFadden-Song model is like bowling with the bumpers on.[95] In an unconstrained setting—bowling on lanes without bumpers—all outcomes are possible, including gutter balls. Good bowlers tend to get good scores, and bad bowlers tend to get bad scores. However, with bumpers keeping the bowling ball in the lane, gutter balls would be ruled out. Good bowlers would still tend to get good scores, but bad bowlers' scores would improve. As I explain, Dr. Song's "bumpers"—the margin constraints—serve this same purpose. Like bumpers, the McFadden-Song model's margin constraints ensure that his estimates stay within a well-defined range and thus ensure a certain range of damages. They mask the fact that the McFadden-Song model is the econometric equivalent of a "bad bowler."

52.    Exhibit 3 visually depicts the intuition behind the margin constraints.[96] If the unconstrained estimation procedure were to find price sensitivities that would generate average profit margins outside the margin constraints—the ball going "in the gutter"—then the margin constraints would act as bumpers to prevent that value from being used to compute damages.

---

[95] In bowling, "bumpers" are rails on the edge of the bowling lane that prevent balls from falling into the gutter.

[96] This exhibit is a simplification. The new imposition of Dr. Song's log downloads assumption means that, in practice, the restriction on the parameter estimates is multidimensional. However, I find that the margin constraints tend to bind more often than the log downloads assumption, and so present a one-dimensional representation. See Appendix D.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

*EXHIBIT 3*
 *Intuition Behind the McFadden-Song Model's Margin Constraints*



Source: Adapted from a4gpa, "Bumper Bowling," *Flickr*, licensed under CC BY-SA 2.0, available at
https://www.flickr.com/photos/a4gpa/2311679637/in/album-72157604047845850.

53.     As I show below, despite the availability of the entire App Store transaction history for each account and each app, and despite Professor McFadden's claim that the model can "impute firms' variable margins" using only estimates based on the App Store transaction data,[97] Dr. Song instead chooses to bowl with bumpers by applying the margin constraints. With that in mind, there are two possibilities: The first possibility is that the margin constraints do not matter—the model's estimated parameters never or rarely hit the bumpers. This would be the case if the range of the margin constraints corresponded to, or was wider than, the range of margins imputed by the model from the App Store transaction data. The second possibility is that the margin constraints do matter—the model's estimated parameters often or always hit the bumpers. This would be the case if Dr. Song's chosen margin constraints were frequently inconsistent with the margins that the McFadden-Song model imputes from the App Store transaction data. Further, the frequency with which these estimates hit the margin constraints would be proportional to the degree to which Dr. Song's results, and by extension his estimates of harm, are *determined* by the margin constraints.

54.     As I explain, Dr. Song's estimates are almost always determined entirely by the margin constraints and seldom based on the App Store transaction data. That is, even though the ball

---

[97] McFadden Report, ¶ 33 ("In situations where firms' cost data are not available, but there is sufficient information to estimate consumer demand, economists can use this principle and observed market equilibrium prices to impute firms' variable margins.").

**SER**-157

almost always should have gone in the gutter, the McFadden-Song model appears to hit pins because the bumpers are on. Importantly, the use of the margin constraints: (a) rules out zero harm and guarantees that Dr. Song will always find that a large number of class members are harmed; and (b) masks whether Dr. Song is able to reliably infer developers' but-for world pricing behavior. Additionally, even if it *were* appropriate to use the margin constraints that Dr. Song uses, the precision of those estimates is critical, because they determine the existence and extent of harm.

55.     I understand that Professor Hitt presents evidence that the margins calculated by Professor MacCormack, and adopted by Dr. Song, include a wide variety of operating costs which do not correspond to the marginal costs represented by the McFadden-Song model or are otherwise computed incorrectly.[98] If there were to be a mismatch between the costs calculated by Professor MacCormack and the costs relevant to the McFadden-Song model, then that would make the margin constraints doubly inappropriate; they would not only obscure information provided by the transaction data, but would do so based on constraints that would not be expected to hold even if the McFadden-Song model were correct and margins were estimated accurately.

56.     The rest of this section demonstrates how the margin constraints play an outsize role in determining putative harm and mask flaws in the McFadden-Song model:

a.  First, I show that the McFadden-Song margin constraints guarantee damages of at least $16.1 billion and guarantee harm to at least 89.2 percent of class members. (Section IV.A)

b.  Second, I show that Dr. Song's results are consistent with a poorly designed model, incorrectly chosen margin constraints, or both. I do this by replacing the number of apps sold in the App Store by outcomes of New York's Powerball Lottery. In this case, the parameter estimates should be zero since lottery outcomes are random and not explained by App Store prices. I then re-run the McFadden-Song model and compute parameter estimates and damages. As I show, the imposition of margin constraints means that the parameter estimates (and damages) based on these lottery numbers are not zero,[99] and are in fact

---

[98] Rebuttal Expert Report and Declaration of Lorin M. Hitt, Ph.D., June 13, 2025 ("Hitt Report"), Sections 9–10.

[99] As mentioned above, parameter estimates should be zero given the fact that price and quantities are randomized and therefore unrelated to actual transaction prices. If the parameter estimate were truly zero, then damages would be undefined in the McFadden-Song model. See Appendix D.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

similar to those obtained by Dr. Song using the actual App Store transaction data. (Section IV.B)

c.  Third, I show that Dr. Song's estimates are almost always based on the margin constraints themselves—i.e., he almost always hits the bumpers—and not on the billions of transactions contained in the App Store transaction data. (Section IV.C)

d.  Finally, I show that the margin constraints mask the underlying unreliability of the McFadden-Song model. Specifically, I re-estimate the McFadden-Song model with the margin constraints removed—i.e., without bumpers—which yields estimates that are so imprecise as to be meaningless and frequently result in values that do not make sense economically. (Section IV.D)

### A.  The McFadden-Song Margin Constraints Guarantee Billions of Dollars of Harm and Exclude the Possibility of Zero Damages

57.  In this section, I explain that Dr. Song's selection of his margin constraints guarantees large estimated damages and a large number of harmed class members. This demonstrates the importance—over and above all of the other flaws in his damages calculations—of his selection of these margin constraints.

58.  Dr. Song's damages calculations depend upon his estimates of consumer price sensitivity from the McFadden-Song model. The McFadden-Song model's estimates of consumer price sensitivity, in turn, depend on two separate approaches. First, Dr. Song performs an econometric analysis of billions of real-world transactions in the App Store transaction data—i.e., he throws the bowling ball down the lane. In this analysis, the transaction data—subject to the reliability of the analytical framework—determine estimates of the price sensitivity parameters. If Dr. Song finds that the price sensitivity parameters are inside the range of his chosen margin constraints—i.e., inside the bumpers—he keeps them. Second, if a parameter estimate is outside the narrow range implied by his margin constraints—i.e., if his bowling ball would go into the gutter—he lets the bumpers do the work and effectively discards the estimate based on the App Store transaction data, substituting it for the closest end point on the margin constraint.[100] Essentially,

---

[100] As discussed above, for in-app purchases, Dr. Song constrains both the price sensitivity coefficient and the coefficient on log-downloads. When one or both of the unconstrained coefficient estimates do not satisfy the constraints, Dr. Song's procedure replaces these estimates with constrained estimates that are as "close" as possible to the unconstrained estimate. As described in Appendix C, "close" is determined by the GMM procedure, which typically (but not always) results in a value of the price sensitivity parameter that is the largest or smallest value consistent with the constraint.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

in instances where the ball hits the bumpers, Dr. Song intervenes, rejects what the App Store transaction data would estimate based on billions of real-world transactions, and instead relies directly on his margin constraint to select the supposedly appropriate parameter estimate.

59.     In short, the McFadden-Song model requires that its price sensitivity parameters be estimated within the boundaries of these margin constraints. The margin constraints therefore limit the range of damages, yielding a lower bound on estimated damages that, as it turns out, exceeds $16.1 billion.[101]

60.     Because Dr. Song's price sensitivity parameters are an input to his calculation of total harm, I first undertake an analysis of what the margin constraints will allow in terms of damages. That is, I recalculate Dr. Song's damages assuming the McFadden-Song price sensitivity parameters take the minimum or maximum values allowed by the margin constraints.[102] I then input those parameters into his calculation of claimed damages. This analysis answers the question, "For Paid Download apps and for Free Download Apps with Paid In-App Purchases, what are the minimum and maximum damages that are possible in the McFadden-Song model, and do they include zero?" I show the results below in Exhibit 4.

---

[101] This figure assumes a but-for commission rate of 13.63 percent. If the but-for commission rate were higher, there would still be a minimum amount of damages for Paid Download Only Apps and Free Download Apps with Paid In-App Purchases. Whether that minimum amount of damages would be above zero depends on the relevant price sensitivity parameters and the assumed but-for commission rate. For more detail on this relationship, see Appendix D.

[102] I focus this analysis on Paid Download Only Apps and Free Download Apps with Paid In-App Purchases. I do this for two reasons. First, these business models amount to 94.3 percent of App Store revenue of all-time, See Song Report, fn. 43. Second, for these apps there is a straightforward relationship between the estimated price sensitivity parameter and damages. See, for example, McFadden Report, ¶ 74 ("The But-For download price [for Paid Download Apps with Paid In-App Purchases] does not have an explicit solution formula in this case, so it must be solved numerically and hence there is no explicit formulas for the estimated net monetary loss to a buyer per As-Is app download transaction."). Because the but-for prices for Paid Download Apps with Paid In-App Purchases are determined numerically, it is possible that numerical optimization estimation process may find local minima or be unable to converge when removing the log downloads constraints or the margin constraints. To avoid any impact stemming from the numerical optimization process, I present results excluding these apps.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

**EXHIBIT 4**

*Minimum and Maximum Damages Allowed Under Dr. Song's Margin Constraints ($ millions)*

| App Genre | Damages from the McFadden-Song Model | | | | Allowed Damages Range from the McFadden-Song Model with Margin Constraints | |
|---|---|---|---|---|---|---|
| | All Business Models | Excluding Paid Downloads with Paid In-App Purchases | Lowest Average Margin Allowed | Highest Average Margin Allowed | Lowest Possible | Highest Possible |
| Games | $13,982 | $13,917 | 52% | 78% | $10,538 | $14,439 |
| Music + Entertainment | $1,315 | $1,308 | 30% | 65% | $1,205 | $1,519 |
| Social Networking + Lifestyle | $1,714 | $1,709 | 59% | 97% | $1,358 | $1,961 |
| Imaging | $848 | $849 | 40% | 82% | $818 | $1,123 |
| Health & Fitness + Medical | $626 | $623 | 42% | 68% | $597 | $777 |
| Reading | $383 | $381 | 42% | 74% | $331 | $512 |
| Business + Finance | $269 | $269 | 51% | 94% | $251 | $368 |
| Education | $508 | $505 | 29% | 59% | $492 | $631 |
| Workflow Tools | $513 | $510 | 46% | 84% | $396 | $566 |
| Navigation + Travel | $66 | $62 | 49% | 91% | $51 | $91 |
| Sports | $91 | $90 | 37% | 82% | $44 | $173 |
| Weather | $32 | $31 | 58% | 94% | $13 | $52 |
| Food & Drink | $9 | $8 | 44% | 79% | $2 | $15 |
| Shopping | $26 | $26 | 44% | 79% | $19 | $32 |
| Stickers | $1 | $1 | 44% | 79% | $1 | $1 |
| Catalogs | $0 | $0 | 44% | 79% | $0 | $0 |
| **Total** | **$20,382** | **$20,289** | | | **$16,116** | **$22,260** |

Source: McFadden-Song Data Production; Song Report, Figure 19

Note: Damages for genres may not add up to totals due to rounding. For each genre and business model, I utilize the maximum upper bound and minimum lower bound for the price sensitivity parameters reported by Dr. Song across the 75 samples. The bounds on the price sensitivity parameter are calculated and reported in the McFadden-Song Data Production as part of the implementation of the margin constraints. Given these price sensitivity parameters, I apply the McFadden-Song damages methodology for each genre and business model to calculate the lowest and highest possible damages—i.e., the damages implied by the maximum and minimum price sensitivity parameters, respectively (see Appendix D). Lowest and highest total damages are then calculated by summing the lowest and highest damages, respectively, from each genre and business model. Damages are calculated using the assumed 13.63 percent but-for commission rate. Putative damages for the Paid Download Apps with Paid In-App Purchases business model, as identified by Dr. Song, are excluded from the Allowed Damages Range calculation.

61.     As the exhibit shows, based on damages estimated using the margin constraints and the assumed but-for commission rate of 13.63 percent, the McFadden-Song model will yield, *at minimum*, $16.1 billion of harm.[103] In other words, Dr. Song has positioned his bumpers such that he is always going to hit some pins—gutter balls are not possible—and these bumpers yield damages of at least $16.1 billion.[104]

62.     The same analysis can be applied to illustrate the minimum and maximum number of harmed class members. I find that the McFadden-Song model will yield, *at minimum*, 165.4 million harmed class members, implying at most 10.8 percent of class members can be

---

[103] This number is conservative. Including Paid Download Apps with Paid In-App Purchases would tend to increase this minimum number.

[104] This result is conditional on Dr. Song's assumption of a but-for commission rate of 13.63 percent. If for instance, Dr. Song assumed a different but-for commission rate, the minimum number of damages would change.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

unharmed.[105] As above, because of where Dr. Song has positioned his bumpers, gutter balls are not possible. It is always the case that a large share of the Class is categorized as harmed when damages are calculated using the margin constraints imposed by Dr. Song.

### B. Dr. Song's Results Do Not Change Even When Randomly Generated Transaction Data Are Used

63.     Contrary to Professor McFadden's assertion that the margin constraints "improve" the estimation of the price sensitivity term,[106] the margin constraints actually replace the results that would be found based on the App Store transaction data. To show that this is the case, I demonstrate that by using the margin constraints, Dr. Song's results can be closely approximated using randomized data instead of the App Store transaction data. In other words, either the McFadden-Song model generates estimates that are only as good as estimates based on randomized data (i.e., the model fails to capture consumer and app developer behavior), the margin constraints are inappropriate with respect to actual app developer behavior, or both.

64.     To demonstrate this, I replace App Store transaction data with lottery data from the New York State Powerball. That is, instead of estimating McFadden-Song with actual download quantities and quantities of in-app purchases from the App Store, I choose a random number from the lottery results and replace the outcome variable—either downloads or in-app purchases—with that random number.[107]

65.     Using data from the Powerball achieves two goals. First, it breaks any potential real-world relationship between price and quantity that Dr. Song could estimate as an input to his calculation of total harm. Instead of having data that may exhibit a negative relationship between price and quantity (i.e., data that are reflective of the "law of demand" described above), there is absolutely *zero* relationship between the price of apps or in-app transactions and the random New York State Powerball numbers. With these randomized data, the price sensitivity one would expect to find *without* the constraints should be close to zero.[108]

---

[105] Workpaper 6. For simplicity, I am estimating this number assuming no change in harm due to Paid Download App with Paid In-App Purchases transactions.

[106] McFadden Report, ¶ 47 ("…[I]f information on the variable margin is available, it can help improve demand estimation.").

[107] More specifically, I select a random row from the New York State Powerball data, select two two-digit numbers at random, and concatenate those to create a random four-digit number. I then take the logarithm of this randomly generated number (just as Dr. Song takes the logarithm of downloads and in-app purchases) and use that as the outcome variable.

[108] While the true relationship between price and randomized data should be zero, because of statistical error the results from an estimation procedure may not be zero for any given sample.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

66.     This exercise is analogous to throwing the bowling ball down the lane without looking. Imagine two bowlers are using bumpers. One bowler is attempting to bowl with accuracy and get the highest score possible, while the other is throwing the ball at random, indifferent to their score. Now imagine that, across 75 rounds, these two bowlers keep getting scores close to each other. If this were the case over so many rounds, then the fact that the two bowlers keep getting close to the same score would suggest that the bumpers, rather than the accuracy with which they throw the ball, are responsible for the outcomes.

67.     Using random Powerball numbers as my outcome variable, I rerun the McFadden-Song model *with* the margin constraints and estimate damages. Exhibit 5 presents the results for the Games genre, looking at the comparison between Song's damages estimates and the estimates for damages when using the Powerball numbers. As the exhibit shows, when running the McFadden-Song model using random data, I find $12.4 billion in harm, compared to Dr. Song's estimate of $13.9 billion for this genre.[109] The fact that I can get a damages number so similar even with randomized transaction data is direct evidence of the tightness of the margin constraints.

---

[109] I find that my estimates of the price sensitivity for paid downloads when using lottery data almost exactly match Dr. Song's. This is because Dr. Song's estimates of paid downloads are almost always at the top of the margin constraints. For the price sensitivity of in-app purchases, I match 71 of the 75 samples. This is because, as shown in Exhibit 6, Dr. Song's estimates are more likely to be at the lower bound of the margin constraints, whereas (by construction) the lottery data is more likely to be at the upper bound. When the estimates do match, it is due to chance. Regardless of whether one is using the App Store transaction data or lottery data, the McFadden-Song model estimates on price sensitivity of in-app purchases bounces between the upper and lower bounds determined by the margin constraints. The fact that damages are so similar regardless of the data used to estimate the model illustrates that the margin constraints are determining the results.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

**EXHIBIT 5**

*Damages Range Estimates for Games: Lottery Data Estimates vs. Song Estimates ($ millions)*

| Business Model | McFadden-Song Damages | Damages Calculated Using Lottery Data Estimates |
|---|---|---|
| Paid Download Only Apps | $52 | $52 |
| Free Download Apps with Paid In-App Purchases | $13,866 | $12,364 |
| **Total** | **$13,917** | **$12,416** |

Source: McFadden-Song Data Production; Data.gov, "Lottery Powerball Winning Numbers: Beginning 2010," available at https://catalog.data.gov/dataset/lottery-powerball-winning-numbers-beginning-2010, accessed on May 15, 2025

Note: Lottery Data estimates are generated using randomly sampled game download or in-app purchase counts taken from winning Powerball lottery numbers. For each app-month or app-item-month, two random powerball numbers were drawn from the six winning numbers on a randomly chosen date between September 26, 2020 and May 14, 2025. These two numbers were concatenated to make a single four-digit number, and the logarithm of the concatenated number was treated as the outcome variable (i.e., log quantity or log of total in-app purchases) in the McFadden-Song model. Explanatory variables, including prices for apps and in-app purchases, were left unchanged.

68.     Professor McFadden claims that the margin constraints are used to "improve demand estimation."[110] These results are inconsistent with that claim. Using the McFadden-Song model, I have shown that Dr. Song's results can be closely replicated using randomized transaction data for which quantities have no relationship to prices. Thus, either the model is failing to capture real-world app developer behavior, the margin constraints are inappropriate, or both. Additionally, as shown in Exhibit 4, doing this same exercise for all genres will always result in at least $16.1 billion of aggregate harm.[111] In fact, because the estimation of the model is so restricted by the constraints and the constraints do not change using lottery data, estimating the model using lottery data is bound to return results similar to the McFadden-Song model for other genres as well. Fundamentally, it is a simple fact of the model that the margin constraints *do not allow* parameter values which would result in damages estimates below $16.1 billion, regardless of which data are used to estimate demand. This further illustrates that the margin constraints are determining damages—even when using random numbers instead of billions of App Store transactions, it is impossible to find damages below $16.1 billion.

---

[110] McFadden Report, ¶ 47.

[111] Specifically, I would find at least $16.1 billion of harm if I conducted this analysis across all genre groupings and for both Paid Download Apps and Free Download Apps with Paid In-App Purchases. In the analysis presented above, I only conduct this analysis for the Games genre.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

*C. Dr. Song's Price Sensitivity Parameters and Thus Damages Estimates Are Almost Always Determined by the Upper or Lower Bounds of his Margin Constraints, Not the App Store Transaction Data*

69.      In this section, I demonstrate that Dr. Song's margin constraints have outsized importance in determining alleged harm. As noted above, the McFadden-Song model's margin constraints determine the possible range of damages. Whether harm is determined by the App Store transaction data or the margin constraints depends on how often an estimate would be different absent those constraints. If the estimates consistently hit the constraints, then it is the constraints, not the data, that determine the results—and thus the estimates of total harm. In practice, Dr. Song's price sensitivity parameter estimates are almost always determined by the margin constraints, not the transaction data.

70.      In the previous section, I described how replacing the actual transaction data with random numbers had almost no effect on the estimate of harm because the margin constraints forced the estimates to lie in a well-defined range—i.e., the bumpers prevent rolling a gutter ball even when randomized data would lead to the gutter. I now outline the outsized importance of the margin constraints through an analysis of how often the McFadden-Song model's estimates hit the boundaries of the margin constraints—i.e., with the actual transaction data how often Dr. Song's estimates hit the bumpers. This analysis demonstrates that Dr. Song's imposed margin constraints impact his estimation results for most of his samples. As a result, any claim that using 75 samples rehabilitates the McFadden-Song model's reliance on margin constraints is incorrect; the margin constraints' impact is pervasive, and they determine Dr. Song's damages estimates.

71.       Reliable models tend to make predictions that are consistent both with economic theory and with real-world data.[112] As stated by Professor McFadden, "as a general economic proposition…it is valuable and scientifically appropriate to test the predictions of [models]

---

[112] See, for example, Ali Hortaçsu and Joonhwi Joo, "Introduction: Structural Econometric Modeling," in *Structural Econometric Modeling in Industrial Organization and Quantitative Marketing: Theory and Applications*, (Princeton, NJ: Princeton University Press, 2023), pp. 1–10, pp. 1–2 ("One of the major strengths of utilizing a model in science comes from its logic of establishing the relations among distinct variables: build a model and test the predictions from that model using real-world data. … If the real-world data do not support the predictions from a model, the model is rejected. Models that are rejected less often are considered more reliable, and more reliable models are considered to provide more reliable predictions."); Jean Tirole, *The Theory of Industrial Organization*, (Cambridge, MA: The MIT Press, 1988), pp. 3–4 ("At first sight, even a theorist should regret the very high ratio of theory to evidence in a field in which theoretical models are often lacking in generality and in which practical implications are so crucial…the theoretical contributions should soon feed back to empirical analysis. They suggest what evidence to look for, separate the endogenous from the exogenous variables, and highlight the hypothesis to be tested"); Ulrich Doraszelski and Ariel Pakes, "Chapter 30: A Framework for Applied Dynamic Analysis in IO," in *Handbook of Industrial Organization Volume 3*, ed. Mark Armstrong and Robert Porter (Amsterdam, NL: Elsevier/North Holland, 2007), fn. 6 ("Of course if the test rejects we are left with the problem of distinguishing whether the rejection is due to a misspecification of the state variables or the inappropriateness of the equilibrium assumptions.").

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

against reality." [113] If the McFadden-Song model accurately represents app developers' behavior, it should accurately recover developers' average margins. As Professor McFadden explains, "the variable margin can be estimated using only demand estimates if the variable margin is unknown."[114] As such, one test of the reliability of the McFadden-Song model is how often it yields estimates based on the real-world transaction data that are consistent with the assumed margin constraints.

72.     Dr. Song and Professor McFadden's 75-sample methodology provides an opportunity to demonstrate whether their results tend to rely on the transaction data versus the margin constraints. In Exhibit 6, I show how often the McFadden-Song analysis relies on the margin constraints rather than the billions of real-world transactions in the App Store transaction data. Exhibit 6 shows that at least one of Dr. Song's parameter estimates are determined by the margin constraints more than 99.1 percent of the time. [115] Put another way, when Dr. Song throws his bowling ball down the lane, it almost always hits one of the bumpers.

---

[113] McFadden 2025 Deposition, p. 146:19–25 ("Q. Do you think it's important for you to provide real-world evidence to corroborate the predictions of your economic model? A. As a general economic proposition, I think it is valuable and scientifically appropriate to test the predictions of your model against reality.").

[114] McFadden Report, ¶ 47.

[115] Neither constraint binds for 2 out of 225 samples across Games, Music + Entertainment, and Social Networking + Lifestyle. (225-2) ÷ 225 = 99.1%.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

**EXHIBIT 6**

*How Often Dr. Song's Estimates Hit Boundary Constraints*

| Price Sensitivity Estimate | Games | Music + Entertainment | Social Networking + Lifestyle |
|---|---|---|---|
| *Panel A: Download Price Sensitivity* | | | |
| Estimate at Upper Bound | 73 | 75 | 75 |
| Estimate in Interior | 2 | 0 | 0 |
| Estimate at Lower Bound | 0 | 0 | 0 |
| *Panel B: In-App Purchase Price Sensitivity* | | | |
| Estimate at Upper Bound | 12 | 48 | 41 |
| Estimate in Interior | 4 | 26 | 11 |
| Estimate at Lower Bound | 59 | 1 | 23 |
| **Samples where Neither Constraint Binds** | **2** | **0** | **0** |
| **Percent of Parameters Constrained** | **96%** | **83%** | **93%** |

Source: App Store Transaction Data; McFadden-Song Data Production

Note: Panel A shows the number of samples for which the price sensitivity parameter for app downloads is equal to the Upper Bound, Lower Bound, or neither (in the "Interior"), across each genre with a tolerance of 0.001. Panel B shows the number of samples for which the price sensitivity parameter for in-app purchases (IAPs) is equal to the Upper Bound, Lower Bound, or neither (in the "Interior"), across each genre with a tolerance of 0.001. A tolerance value is used for determing when a value is "equal to" the upper or lower bound to account for the imprecision inherent in the numerical methods used for estimation by Dr. Song. Samples where neither constraint binds reports the number of samples, by genre, where both the download and in-app purchase price sensitivity parameters are "interior" estimates. Percent of parameters constrained is calculated as the sum of the number of parameters equal to either the upper or lower bound across the two panels divided by 150 for the the total number of price sensitivity parameter estimates for each genre.

73.     Importantly, because these parameter estimates are an input to Dr. Song's calculations of alleged harm, this means that 99.1 percent of these inputs into his calculations are no more than the substitution of his imposed margin constraints in place of estimates based on actual transaction data. This outsized role for the margin constraints in determining estimates in the McFadden-Song model is not consistent with Professor McFadden's characterization of the app developers' cost information as "improv[ing] demand estimation."[116] Rather, the assumptions in the McFadden-Song model, particularly the assumed margin constraints, are largely *determining* the estimated price sensitivity parameters and damages. Because the margin constraints largely override the results of the regression model (i.e., the results obtained in Step 2 of the McFadden-Song model, detailed in Section III), this also means any factors that differ across apps or over time, which may or may not be accounted for in the regression estimation based on the actual

---

[116] McFadden Report, ¶ 47.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

transaction data, are only controlled for to the extent they are accounted for in the margin constraints themselves.[117]

74.     While the use of these margin constraints may give the appearance of adding more data to the analysis, as used by the McFadden-Song model these data come at the cost of ignoring the information provided by billions of App Store transactions. In practice, the margin constraints restrict the model's reliance on the transaction data to estimate the parameters of interest. As with my analysis using lottery draws to generate randomized transaction data in Section IV.B above, this restriction implies that: (a) the McFadden-Song model does not capture developers' behavior well; and/or (b) the margin constraints are inappropriate (either too narrow or otherwise covering the incorrect range).

75.     In the next section, I show that the McFadden-Song transaction data-based estimates fail to capture real-world app developer behavior. This means that, regardless of whether the margin constraints are appropriate, in practice, the margin constraints serve to mask what would otherwise be a wide range of estimates that includes economically insensible results.

### D.   The McFadden-Song Model Yields Unreliable Results Without the Margin Constraints, and Is Therefore Not Suitable for Determining Damages

76.     As I have shown in the preceding subsections, it is the McFadden-Song model's margin constraints, and not the billions of real-world transactions from the App Store transaction data, that determine Dr. Song's putative damages. I have further demonstrated that the margin constraints are so tight that even "bowling a ball at random" yields substantial estimated damages, and Dr. Song is almost always hitting his bumpers. In this section, I illustrate that the margin constraints are a crude fix for an unreliable model—they ensure that Dr. Song finds at least $16.1 billion of harm despite the failure of the McFadden-Song model to accurately predict how consumers respond to changes in prices.[118] I show this by describing the results of the model absent the constraints. As I explain, when I remove the bumpers, the results show that the McFadden-Song model does not bowl accurately.

---

[117] As I explain in fn. 88, the fixed effect terms in the transaction data-based regression do not account for features of apps that change over time. However, even if they were effective in controlling for relevant factors, the margin constraints (which in practice replace most of Dr. Song's estimates) are applied to the transaction data without any fixed effects or other controls or adjustments being applied. Dr. Song's testimony incorrectly suggests that including fixed effects in his regression means that he controls for features of apps that change over time. See Song Deposition, pp. 142:3–143:14.

[118] For example, as I show, the unconstrained McFadden-Song model sometimes estimates positive price sensitivity parameters, which would be inconsistent with consumers' demand behavior or firms' pricing behavior in the real world.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

77.     As Professor McFadden states, the margin constraints are not necessary to estimate the model.[119] Indeed, as I show throughout this section, the results of the unconstrained McFadden-Song model are so unreliable that using constraints does nothing more than mask the underlying unreliability of the model. Estimates based solely on the *data* rather than the *constraints* are inconsistent and, in some of the 75 samples, contrary to economic theory and common sense, thus revealing the unreliability of the McFadden-Song model as a representation of real-world app developer behavior.

78.     As I explain below, absent the margin constraints:

    a.  The price sensitivity estimates are extremely imprecise—they show significant variation from sample to sample, illustrating the unreliability of Dr. Song's estimates.

    b.  Dr. Song's methodology often produces numbers that are contrary to economic theory—that is, they imply that consumers or developers are behaving irrationally, such as demand increasing when prices increase.[120]

    c.  These issues mean that Dr. Song's estimates (either constrained or unconstrained)[121] cannot be used to reliably calculate damages or the share of injured class members after removing the margin constraints.[122]

79.     To show that Dr. Song's estimates are imprecise, I re-estimate the McFadden-Song model on the 75 samples removing the margin constraints but retaining the log downloads

---

[119] McFadden Report, ¶ 47 ("A basic economic principle shows that a profit-maximizing firm's variable margin is the inverse of the price elasticity of demand it faces. This relationship means that the variable margin can be estimated using only demand estimates if the variable margin is unknown.").

[120] As Dr. Song explains, negative price sensitivity parameters are necessary for his model to rationalize observed developer behavior as the result of profit maximization. See Song Report, ¶¶ 146–148. If the price sensitivity parameter is positive, this would imply, counter-intuitively, that consumers increase purchases of a product when prices increase. If that were the case, the McFadden-Song model would predict that developers are not behaving rationally because they either have positive margins in which case they could always do better by charging higher prices and thereby sell more units and raise profits higher, or they have negative margins in which case they would do better by exiting the app store.

[121] As discussed throughout this section, Dr. Song's constrained estimates are unreliable because the margin constraints (based on a limited number of developers) play an outsized role in determining estimation results and mask the McFadden-Song model's inability to capture the behavior of real-world app developers. However, predicting but-for prices using the simple average of the unconstrained price sensitivity estimates would also be unreliable. Averaging a set of unreliable, highly variable estimates based on 75 samples does not make the average suitable for the estimation of harm.

[122] This issue may arise due to the structure of the McFadden-Song model and the unreliability of its estimation procedure. It is not primarily driven by small sample size. Adding more samples will not fix the problem because the variability is driven by improper modeling assumptions.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

assumption. Exhibit 7 shows the results for Games in-app purchases.[123] I focus on this genre and business model because Games in-app purchases represent approximately $13.9 billion, or 68.0 percent of damages in the McFadden-Song model.[124] Here, I graph (1) in black bars, the upper and lower bound of the price sensitivity parameter implied by the margin constraint (the "bumpers"), (2) in red circles, the McFadden-Song model's estimate of the price sensitivity parameter, and (3) in blue triangles, the transaction data-based estimate for a given sample (i.e., what the McFadden-Song model would find without the bumpers). For some samples, the transaction data-based estimates take on values that are too extremely positive or negative to fit on the graph, and these estimates are noted by blue arrows. Continuing with the bowling analogy, absent the "bumpers," the McFadden-Song model frequently does not stop at the gutter—it throws the ball several lanes over.

---

[123] The results are similar for the Music + Entertainment and Social Networking + Lifestyle genres. See Workpaper 7.

[124] See Workpaper 8. This number is conservative, because it does not include damages from Paid Download Apps with Paid In-App Purchases.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

*EXHIBIT 7*
*Price Sensitivity Estimates for 75 Samples, Games: In-App Purchases*



Source: McFadden-Song Data Production

Note: Transaction data-based estimates are obtained by carrying out the McFadden-Song estimation method without the bounds on the price sensitivity parameters implied by the margin constraints. I maintain the constraint requiring the coefficient on log downloads in the in-app purchases equation to be between zero and one. Price sensitivity estimates outside the range -8 to 8 are indicated using arrows. The six samples where the estimate without margin constraints are less than negative eight are represented with left facing arrows and the six samples where the estimate without margin constraints are greater than eight are represented with right facing arrows. The average value reports the average of coefficient estimates calculated across the values for the 75 samples shown in the exhibit. For all parameter estimates, the numerical solver program fmincon (used by Dr. Song) terminated after finding a valid solution (as indicated by a positive value for exitflag).

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

80.     As the exhibit shows, from the distribution of blue triangles, the estimates when removing the bumpers from the McFadden-Song model are so imprecise as to be meaningless. The range of estimates is from -36.2 to 49.4.[125] In fact, 12 out of 75 of Dr. Song's samples report an estimate of the wrong sign, meaning that the estimate implies consumers prefer *higher* prices to lower contrary to the "law of demand."[126] The fact that the model is so imprecise without the constraints suggests that there are underlying theoretical and econometric issues with the model. These issues are not something that can be fixed with additional samples or observations—they are a result of incorrect underlying assumptions of the model and flawed econometric choices.

81.     In Exhibit 8, I calculate the range of damages implied by the McFadden-Song model using the unconstrained parameter estimates for the three largest genre groupings (Games, Music + Entertainment, Social Networking + Lifestyle).[127] Here, as in Exhibit 4, I restrict the analysis to include Paid Download Only Apps and Free Download Apps with Paid In-App Purchases.[128] Without the margin constraints, different samples in the McFadden-Song model imply damages that range between 20.1 billion of harm to almost $67.1 billion in *benefit* to consumers. This wide range illustrates that absent the margin constraints, averaging across 75 samples masks the significant variation in results between -$67.1 billion and $20.1 billion. The fact that this variability exists is not something that can be fixed with additional samples. The unreliability lies in the model, not the sampling methodology. The margin constraints mask the flaws of an inherently unreliable model and, as shown in Exhibit 4, effectively assumes a minimum of $16.1 billion of harm.[129]

---

[125] Workpaper 9. I do not report a confidence interval for these estimates, because the individual estimates are too imprecise to provide meaningful confidence intervals.

[126] Workpaper 9; Besanko and Braeutigam (2011), p. 31 ("[L]aw of demand[:] The inverse relationship between the price of a good and the quantity demanded, when all other factors that influence demand are held fixed.").

[127] As shown in Appendix D, the McFadden-Song model can return a range of damages that includes very large values of *benefit* to consumers, depending on the values of the price sensitivity parameters. The margin constraints restrict the values of the price sensitivity parameters, such that the McFadden-Song model will always return large positive damages.

[128] I restrict to these business models for the same reasons I described in fn. 72.

[129] This $16.1 billion of harm includes all genre groupings. If I restrict to only Games (as I do in Exhibit 8), I find a minimum of at least $10.5 billion for Paid Download Only Apps and Free Download Apps with Paid In-App Purchases.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

*EXHIBIT 8*
*Damages Range Estimates for Games, Music + Entertainment, Social Networking + Lifestyle: Transaction Data-Based Estimates ($ millions)*

| App Genre | McFadden-Song Damages with Margin Constraints | Damages Calculated Using Transaction Data-Based Price Sensitivity Estimates | |
| --- | --- | --- | --- |
| | | Lowest Damages | Highest Damages |
| *Paid Download Only* | | | |
| Games | $52 | -$407 | -$160 |
| Music + Entertainment | $16 | -$52,708 | -$279 |
| Social Networking + Lifestyle | -$1 | -$293 | -$84 |
| *Free Download with In-App Purchases* | | | |
| Games | $13,866 | $12,727 | $16,955 |
| Music + Entertainment | $1,292 | -$22,589 | $1,478 |
| Social Networking + Lifestyle | $1,710 | -$3,854 | $2,214 |
| **Total** | **$16,934** | **-$67,125** | **$20,125** |

Source: McFadden-Song Data Production

Note: Damages for genres may not add up to totals due to rounding. McFadden-Song Damages are calculated using the average value of the parameters from Dr. Song's estimation with margin constraints applied, as reported in Song Report Figure 12. Transaction data-based price sensitivity estimates for each of Dr. Song's 75 samples are calculated by applying the McFadden-Song model without the margin constraints limiting the allowed range for the price sensitivity parameter (see notes to Exhibit 7). For each genre and business model, the lowest damages and highest damages for the transaction data-based estimates are calculated using the largest negative (i.e., negative value closest to zero) price sensitivity parameter and the smallest price sensitivity parameter estimates, respectively. Positive values for price sensitivity parameter are not used to calculate damages. Damages are calculated using the assumed 13.63 percent but-for commission rate. For all three genres analyzed here, the transaction data-based price sensitivity parameter estimate for in-app purchase items is positive in at least one of the 75 samples. Thus, for the in-app purchases business model, in addition to the lowest damages reported above, the range of damages consistent with the range of parameter estimates includes large negative damages for each genre. See Appendix D.

82.    The imprecision in the McFadden-Song model likely results—in part—from Dr. Song's use of weak instrumental variables. For in-app purchases, Dr. Song uses the same instruments as those previously used by Professor McFadden.[130] Despite Dr. Song's explanation that he adopted

---

[130] Dr. Song explains that his model uses instrumental variables. See Song Report, fn. 227 ("I use the following instrumental variables ('IVs') in my GMM estimation…"). In a prior report, I discuss the weak instruments problem in more detail and demonstrate that Dr. McFadden's use of instrumental variables suffered from a weak instruments problem. See Watson Class Certification Report, ¶¶ 86–91 ("Another issue is that Professor McFadden's analysis yields unreliable estimates of the parameters that characterize consumer demand for in-app purchases because his analysis suffers from what economist call '*weak instruments*'… his transactions-data-based analysis cannot estimate the in-app purchase demand parameters (and thus harm) with any precision, a fact which is masked by his use of margin constraints."), Appendix G ("In any application of instrumental variables, the selection of the instrumental variables is a foundational step in establishing the reliability of results… Although Professor McFadden asserted in his deposition that his instruments were 'obvious ones,' I do not agree… I present results from formal tests indicating that Professor McFadden's

**SER-173**

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

Professor McFadden's instruments because Professor McFadden "used the margin bounds, [and] he didn't think the weak instrument issue [was] relevant in his model,"[131] it is nonetheless important to consider the strength of instruments when evaluating the overall reliability of the underlying model, as a weak instruments problem can lead to very imprecise estimates and substantial variation across sub-samples.[132]

83.     When using instruments, economists have a set of standard tests they perform to confirm whether the instruments are weak.[133] I undertook these tests in Appendix G in my previous report, where I showed that the McFadden-Song model suffered from a "weak instruments problem" because the selected instruments for prices and downloads did not correlate with prices or downloads sufficiently. Dr. Song has added additional app genres in his implementation of the McFadden-Song model. Thus, in Appendix E of this report, I again test for weak instruments. As I explain in Appendix E, I find that for the majority of genres the McFadden-Song model fails the tests for weak instruments for nearly every single sample, including for Games, Music + Entertainment, and Social Networking + Lifestyle.[134] This indicates that, despite the inclusion of additional app genres, the McFadden-Song model continues to suffer from a "weak instruments problem." The imprecision of the McFadden-Song model's results is consistent with this conclusion, and because Dr. Song's transaction data-based estimates are so imprecise without the margin constraints, they cannot be relied upon to determine harm. Adding more samples cannot fix this problem.

84.     The unreliability of Dr. Song's estimates is also made clear from examining the estimated price sensitivity parameter for Paid Downloads. The unconstrained estimates of price sensitivity for Paid Downloads are larger than the value implied by the margin constraint in each of the 75 samples for the Games, Music + Entertainment, and Social Networking + Lifestyle genres. Indeed, the difference between the constrained and unconstrained estimates are highly

---

econometric analysis for in-app purchases suffers from weak instrument problems… I present results from formal tests indicating that Professor McFadden's econometric analysis for in-app purchases suffers from weak instrument problems… I then demonstrate that Professor McFadden's model yields imprecise estimates by computing confidence intervals for the transactions-data-based estimates, which I find are often infinitely wide[.]").

[131] Song Deposition, pp. 217:20–218:7 ("Q. Okay. So did you test the strength of your instruments for any of those other genres? A. As Professor McFadden explained in the class certification stage, given that he use it -- he used the margin bounds, he didn't think the -- the weak IV-- weak instrument issue is not relevant in his model and I followed Professor McFadden's footsteps.").

[132] See Appendix E and Watson Class Certification Report, Appendix G.

[133] Stock and Watson (2006), Section 12.3.

[134] The test statistic indicates weak instruments for all 75 samples in 10 out of 15 genres (including Games and Social Networking + Lifestyle). For another genre (Music + Entertainment), the test statistic indicates weak instruments for 74 out of 75 samples. For the remaining genres, the test indicates weak instruments for between 4 percent (Sports) and 85 percent (Health & Fitness + Medical) of the 75 samples. See Appendix E.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

statistically significant in each of the 75 samples for each of these three genres.[135] These results indicate that the assumed margin constraints imposed by Dr. Song are grossly inconsistent with the transaction data for Paid Downloads. And, as shown from the damage values shown in Exhibit 8, eliminating the margin constraints leads to very different estimates of damages.

85.     This wide range of damages estimates resulting from the unconstrained model (including estimates that are often economically unrealistic) also raises the question of whether the model suffers from omitted variable bias or other forms of model misspecification. The transaction data-based regression—the results obtained in Step 2 of the McFadden-Song model to which the margin constraints are applied in Step 3 (as detailed in Section III)—incorporates controls known as app (or in-app purchase item) fixed effects and time fixed effects. However, these fixed effects will not control for changes over time in competitive conditions and consumer demand that are different across apps.[136, 137] If any of these uncontrolled-for factors are correlated with the instruments, they will be a source of omitted variable bias in the price sensitivity estimate.[138] For example, consider a scenario in which a Paid Download Only App developer announces quality-improving updates across all their apps and raises prices for the improved products. Without a control for this change in competitive conditions, the regression will still pick up the higher demand resulting from the quality improvements but produce estimates that are (incorrectly) biased in the direction of consumers appearing to prefer the higher prices that come with them.[139]

---

[135] Workpaper 10.

[136] App fixed effects control for characteristics of apps and consumer demand for individual apps that are constant for that app over time. Stock and Watson (2006), Section 10.3, p. 356 ("Fixed effects regression is a method for controlling for omitted variables in panel data when the omitted variables vary across entities… but do not change over time."). An app fixed effect will control for a permanent difference in the level of popularity of one app versus another. However, changes over time that affect some (but not all) apps, such as unmeasured and unaccounted-for quality changes, are not controlled for using fixed effects. For example, if an app issues an update or releases a new feature that does not lead to a new app ID being issued (e.g. the discovery and patching of a security bug), that would not be accounted for by an app fixed effect. Time fixed effects control for characteristics of the market that lead to a uniform increase in demand for all apps within a given month. Stock and Watson (2006), Section 10.4, p. 361 ("Just as fixed effects for each entity can control for variables that are constant over time but differ across entities, so can time fixed effects control for variables that are constant across entities but evolve over time."). For example, an increase in popularity for Tetris-style games, but not other games apps, would not be controlled for by a time fixed effect.

[137] Dr. Song's testimony incorrectly suggests that including fixed effects means that his estimation accounts for app-specific time-varying factors like changes in quality. See Song Deposition, p. 142:3–14 ("[Q.] What part of Professor McFadden's model takes account of quality improvement? A. Well, Professor McFadden's model take data as given and estimate demand and includes app fixed effects and in-app content fixed effects to account for app quality or non-price quality and in-app content fixed effects to account for app quality or non-price quality in in-app item or content qualities. So in -- in that aspect, Professor McFadden's model account for qualities or quality changes over time.").

[138] Stock and Watson (2006), Chapter 12.

[139] In principle, including additional appropriate control variables or using a valid instrumental variable could address these problems. However, as discussed in Appendix E, the instruments used by Dr. Song for in-app purchases are not valid

**SER-175**

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

86.     Put more simply, when one removes the bumpers, Dr. Song's bowling ball alternates between getting a strike, hitting no pins, and ending up in another lane entirely. In sum, the margin constraints guarantee damages, dictate Dr. Song's results, and mask the underlying unreliability of the McFadden-Song model. The McFadden-Song model is demonstrably unreliable for the estimation of consumer harm.

## V.     Dr. Song Inappropriately Applies Professor MacCormack's User Margin Calculations to a Model of App Transactions

87.     In this section, I explain how—even if it were appropriate to constrain developers' average profit margins in the model—the McFadden-Song model's reliance on Professor MacCormack's analysis of margins for its margin constraints appears to be inappropriate for applying to the McFadden-Song model, leading to unreliable predictions of putative damages. Professor MacCormack provides no evidence that his margin bounds are relevant for the McFadden-Song model: he testified that "the model's not really something [he] would have a strong understanding of" and that he did not review the model before conducting his analysis.[140] As I explain, Professor MacCormack and Dr. Song treat app costs differently. Professor MacCormack bases his analysis on revenues (which he assumes are proportional to users),[141] whereas the McFadden-Song model is estimated based on transactions.[142] Further, as I explained in Section IV above, and as Dr. Song has explained, lower margins will tend to generate higher estimates of putative damages.[143] Thus, to the extent that Professor MacCormack includes costs that would be inappropriate to include at the level of a transaction (thereby leading to lower

---

because his model suffers from a weak instruments problem, and it is likely that his instruments for Paid Download Only Apps are not exogenous.

[140] Deposition of Alan D. MacCormack, DBA, May 23, 2025 ("MacCormack Deposition"), p. 144:16–20 ("Q. We talked earlier about how you did look at, for example, the 2021 report of Professor McFadden. Did you review his specification of his model? A. I did not. I'm not an economist, so the model's not really something I would necessarily have a strong understanding of.").

[141] Professor MacCormack claims to perform all his calculations "on a revenue basis" under the assumption that "revenue… is proportional to users." See MacCormack Deposition, pp. 152:20–153:7 ("Q. If the proper economic unit is users, why not calculate variable cost per user? A. The assumption here is that the revenue, of course, is proportional to users. I don't necessarily have the data that was provided. It was actually done in terms of revenues, so I don't have user data. Q. Have you made any calculations of variable costs or gross margins on a per-user basis? A. No. All of these are done on a revenue basis.").

[142] McFadden 2021 August Deposition, p. 184:15–23 ("Q. Would you expect that most of your price-sensitivity parameters would depend on the observed transaction data? A. I believe you are asking me a question about the estimation and what drives the estimation. Essentially, in – in terms of – of the data and what drives the estimation in terms of the data are the – are the price variations that we do see for specific transactions.").

[143] Song Report, ¶ 53.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

margins for transactions), the McFadden-Song model will tend to overestimate putative damages. As I explain below, these costs are inappropriate for the McFadden-Song model.

88.     Plaintiffs' experts were asked about the relationship between Professor MacCormack's margin estimates and the McFadden-Song model in deposition. Professor MacCormack testified that he does not "have a specific grasp" on how his estimates are used in the McFadden-Song model,[144] and that he has not spoken to Professor McFadden.[145] Dr. Song testified that he did not give any instruction to Professor MacCormack or communicate with Professor MacCormack regarding the analyses in the report,[146] and that he has only "skimmed" Professor MacCormack's report.[147] Dr. Song also testified that he has not made an independent analysis of the reliability of Professor MacCormack's margin bounds or whether Professor MacCormack measures economic costs,[148] and that Professor MacCormack's margin calculations are "at a different level" from download and in app purchase transactions.[149] Based on this understanding, Dr. Song relies on

---

[144] MacCormack Deposition, pp. 149:16–150:3 ("Q…Do you have a specific grasp of how this range of variable costs is used in his model? A. I do not. Q. Are your ranges intended to be inputs into his model? A. That's my assumption. Q. Okay. Do you have any understanding of the impact of your genre gross margin ranges on the damage estimates that come from the model? A. I don't.").

[145] MacCormack Deposition, pp. 36:21–37:1 ("Q. Sure. Have you had any communications with Professor McFadden or his staff working under his direction about this matter? A. I've certainly not talked to Professor McFadden.").

[146] Song Deposition, p. 183:7–14 ("Q. Did you give Professor MacCormack any instructions about how to go about calculating the bounds? A. No. Q. Have you spoken to him? A. Not about his analysis or report. I believe I met him once in the beginning of his engagement. I think that that's all.").

[147] Song Deposition, pp. 40:12–41:12 ("Q. Have you read Professor MacCormack's report in this case? A. I have reviewed it. I -- I skim -- skimmed through it…. Q. Have you reviewed Professor MacCormack's deposition transcript? A. Not carefully. But, again, I reviewed -- reviewed it quickly with some attention to -- to some parts.").

[148] Song Deposition, pp. 183:2–186:11 ("Q. Have you made any independent assessment of the accuracy or reliability of Professor MacCormack's margin bounds? A. I -- I did not conduct independent analysis… Q. Do you have an independent opinion as to whether the costs Professor MacCormack deemed to be variable are actually variable costs in an economic sense? … A. So my understanding is economists use similar data that we have or we collected or counsel collected from app developers to learn about the -- the variable cost of various businesses. And my understanding is Professor MacCormack has expertise in analyzing those data, cost data. So I didn't do any independent analysis, but I rely on him for that analysis… Q. Professor McFadden's model assumes that marginal cost are constant, correct? A. Yes. Q. Okay, that means that marginal cost and average variable cost must be the same if the model -- model's assumption is correct, true? A. Yeah, that is the part -- feature of the -- of his model. Q. Okay. Did Professor MacCormack confirm that? A. Again the -- the -- the-- the part of Professor MacCormack's analysis I relied on was the -- the range of variable profit margins. That's all I relied on.").

[149] Song Deposition, pp. 189:22–192:8 ("Q. Okay. Did Professor MacCormack calculate separate margin bounds for downloads and for IAP transactions? A. The -- the inputs or data Professor MacCormack provided to me is at different level from those cjt… Professor McFadden's model and methodology estimates those cs for all apps on the App Store… Professor MacCormack's margin bounds is at different level and also is based on a different set of app developers and also, you know based on his expertise, experience and other information. Q. Professor MacCormack's margin bounds are on a different level because no one told him that the model assumed and actually estimated different costs for in-app purchases and for downloads, correct? A. I don't know who talked to him about what. I have no idea on what he -- he -- his communication with counsel. Q. Well, counsel are not econometricians, right? A. But I understand he read Professor McFadden's reports, did he not? Q. And -- A. I don't know… Q. Don't you think it would be pretty important for Professor MacCormack to know how the model works so that he could aim his estimates to match up with the equations of the model? A. Well, his input, the -- the margin bounds, he gave me matches the margin bounds that Professor McFadden's model has.").

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

Professor MacCormack's cost measurements as the basis for the McFadden-Song model's margin constraints.[150]

89.    Dr. Song estimates the McFadden-Song model using app *transactions*. When determining how sensitive consumers are to changes in prices, he uses monthly-level data on transactions for specific app purchases (e.g., the price and quantity of transactions for Minecraft) and specific in-app item purchases (e.g., the price and quantity of transactions for a package of extra lives in Candy Crush Saga).[151] Using the estimated price sensitivity and log downloads parameters, Dr. Song uses the assumptions of the McFadden-Song model to generate but-for prices for each app-month, and he calculates total harm "associated with each transaction."[152] As Professor McFadden has testified, the costs in his model are constant marginal costs associated with transactions.[153]

90.    By contrast, Professor MacCormack's genre gross margins are not based on app transactions. Instead, they are premised on capturing "all the other costs leading up to the revenue generated from the sale of the goods,"[154] such as user acquisition and retention costs and maintenance costs,[155] which are important when estimating app developers' overall variable costs.[156] That is, he asserts that "users, rather than digital goods and services, are the appropriate unit of analysis for evaluating the economics of app developers."[157] Indeed, Professor MacCormack explicitly rejects calculating transaction marginal costs, describing it as "a different method of evaluation," and claims that "this approach may accurately measure unit

---

[150] Song Report, ¶ 17 ("When estimating consumer demand, I rely on Prof. MacCormack's analysis to group App Store genres and to determine the margin bounds for each genre grouping."); Song Deposition, pp. 182:5–183:1 ("Q. Now, you use Professor MacCormack's margin ranges with some adjustment, correct? A. Correct. Q. And you did so because you were instructed to do so by counsel; is that right? A. Which part? Q. To use Professor MacCormack's margin bounds. A. My understanding is Professor MacCormack was retained as an industry expert who has experience and expertise in understanding and analyzing software businesses. And he reviewed and analyzed a lot of data and provided the margin bounds that I could use in my implementation of Professor McFadden's model.").

[151] Song Report, ¶ 137 (demand functions), ¶ 149 (estimating equations).

[152] Song Report, ¶ 168.

[153] McFadden 2022 Deposition, pp. 157:17–158:12.

[154] MacCormack Report, ¶ 37.

[155] MacCormack Report, Section 7.

[156] Professor MacCormack claims to estimate variable costs, and I take this claim as given in the above discussion. MacCormack Report, ¶ 5 ("I have been asked by Counsel for Consumer Plaintiffs ('Counsel') to …[e]stimate the range of variable costs incurred by a typical developer in each genre of apps available on the App Store."). However, I understand that Professor Hitt opines that Professor MacCormack's estimates include some costs that are not variable. Hitt Report, Sections 10.2.1–10.2.3. To the extent that Professor MacCormack includes non-variable costs, his estimates would be doubly inappropriate to use in the McFadden-Song model, which only considers marginal costs (and assumes that marginal costs are constant so that average variable cost is equal to marginal cost). McFadden Report, ¶ 31 ("I used real-world data to estimate consumer demand ($D$) and the app developer marginal costs, assuming that developers set their prices to maximize profits."). See also McFadden 2022 Deposition, pp. 157:17–158:12.

[157] MacCormack Report, ¶ 8.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

profitability *per product or digital good*."[158] Therefore, Professor MacCormack's costs and the costs in the McFadden-Song model are not equivalent, and using Professor MacCormack's costs based on business activity is inappropriate for the McFadden-Song model of transactions.

91.     The problem with using two different cost metrics is that they may not yield the same result in the McFadden-Song model. As an analogy, if a cook uses three tablespoons of salt instead of three teaspoons, which the recipe recommends, the dish may be ruined. The McFadden-Song model requires that developers set their prices according to a specific concept of costs: the marginal transaction cost. If Professor MacCormack's margin constraints measure different costs—if they're in tablespoons where the recipe calls for teaspoons—then those constraints may be inappropriate and yield unreliable results. In fact, Professor MacCormack testified that his gross genre margin bounds seek to measure a different form of costs—such costs would be inconsistent with the price-setting behavior in the McFadden-Song model.[159]

92.     Indeed, I understand from Professor Hitt's report that Professor MacCormack's approach to estimating variable costs is inaccurate and incorrectly classifies many costs as variable costs. First, I understand that Professor MacCormack classifies variable costs not based on accounting practices or academic sources, but instead on his subjective judgment.[160] Second, I understand that these costs are allocated solely onto paid users (rather than across all users).[161] As a result, I understand that Professor MacCormack's estimated costs are too high (implying margins that are too low).[162] Further, I understand that Professor Hitt opines that the marginal costs associated

---

[158] MacCormack Report, ¶ 37 ("A different method of evaluation would be to consider the revenue and costs per digital good or service sold, such as a token in a game. In such cases, the cost of creating another unit (i.e., the marginal cost), is often extremely low, sometimes approaching zero. While this approach may accurately measure unit profitability *per product or digital good*, it does not fully capture the business of developing and operating a mobile application.").

[159] MacCormack Deposition, pp. 108:17–109:10 ("Q. In what way is the marginal cost of a digital good relevant to setting the price of a -- of that digital good?... A. In setting the price of the good, I would want to understand all of the variable costs that are going to be involved in order to think about that user's journey. This is at least how we teach it. And so I need to acquire the customer. I need to engage them. I need to support them with infrastructure, maintenance, and support. So all of these costs are typically variable costs. And so that is how we would tell our students, like, [y]ou need to understand all of these things in order to set the appropriate pricing for the value you're creating for someone.").

[160] Hitt Report, Section 10.2.

[161] Hitt Report, Section 10.2.4.1.

[162] Hitt Report, Section 10.2.4.1. To the extent that Professor MacCormack's subjective evaluation of his genre gross margins has any error associated with it, that uncertainty will impact the certainty regarding both the aggregate harm and harm associated with any individual class member in the McFadden-Song model. See Section VIII.A. Consistent with this, Professor Stiglitz has opined in other matters that marginal costs for software developers are approximately zero. See Declaration of Joseph E. Stiglitz and Jason Furman, *United States of America v. Microsoft Corporation*, January 28, 2002, p. 7 ("Producing a software program has high fixed costs in the form of investments in research and development but, once this investment has been made, virtually no marginal cost from producing additional units."); Joseph E. Stiglitz, *The Road to Freedom: Economics and the Good Society*, First Edition, (New York, NY: W.W. Norton & Company, 2024), p. 129 ("With the rise of the digital economy, where the marginal cost of production (the extra cost of producing an extra unit) is low, the 'overhead' (fixed) costs have assumed an increasingly large role.").

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

with digital transactions is approximately zero, which would be consistent with Professor MacCormack's claim that "the marginal cost of producing an individual digital good may approach zero."[163]

93. To the extent that Professor MacCormack's genre gross margins are too low, they will tend to inflate damages in the McFadden-Song model. As Dr. Song explains, "higher variable profit margins lead to smaller damages estimates all else equal."[164] Therefore, if Dr. Song includes a broader set of costs to inform the margin constraints of his model (i.e., *lower* profit margins), it will bias the model toward finding higher damages.

## VI. The McFadden-Song Model Assumes a Specific Relationship Between Prices and Marginal Costs That Drives But-for Pricing Behavior and Damages in the Model

94. The reliability of the McFadden-Song model's damages estimates hinges on its marginal cost calculations, as these marginal costs directly determine whether an overcharge exists. As Dr. Song and Professor McFadden explain, apps associated with "negative" damages "are those that the damages model estimates to have negative marginal costs."[165] Specifically, the McFadden-Song model yields harm based on the following marginal cost values: apps with positive marginal costs would be cheaper in the but-for world, apps with negative marginal costs would be more expensive, and apps with zero marginal costs would maintain identical prices.[166]

95. As I explain in this section, the McFadden-Song model assumes a specific relationship between prices and marginal costs and this relationship is critical for Dr. Song's estimates of damages. The model's assumptions imply that prices are directly tied to marginal costs, so that marginal costs can be computed from as-is prices and the resulting marginal costs can then be used to compute but-for prices and damages. This section explains this relationship in the

---

[163] MacCormack Report, ¶ 39. Professor MacCormack acknowledges that "[i]n his expert reports, Professor Hitt refers to various academic sources to support this view." MacCormack Report, fn. 15. Hitt Report, Section 9.5.2.

[164] Song Report, ¶ 53.

[165] Song Report, ¶ 79; McFadden Report, ¶ 55.

[166] This relationship follows directly from the McFadden-Song model. The price difference between the as-is and but-for world for a Paid Download Only App can be expressed as $p_{jt}^{d\,AS} - p_{jt}^{d\,BF} = \frac{c_{jt}^d}{1-\tau^{AS}} - \frac{c_{jt}^d}{1-\tau^{BF}}$. When $\tau^{BF} < \tau^{AS}$ (commission rate is assumed to be lower in the but-for world), this price difference will be positive (higher prices in the as-is world) if $c_{jt}^d > 0$, negative (lower prices in the real world) if $c_{jt}^d < 0$, and zero (no price change) if $c_{jt}^d = 0$. See Song Report, Appendix D.1.d.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

McFadden-Song model and highlights two examples of circumstances in which the resulting marginal costs (and therefore damages) are mismeasured.

96.     In the McFadden-Song model, the price charged for most items (either a paid download for an app without in-app purchases or an in-app purchase for a free download app) only depends on three things: (a) the marginal cost for providing the item; (b) the price sensitivity parameter(s) of consumer demand; and (c) the commission rate.[167] Given the three values for (a)-(c), but-for prices can be calculated using a formula provided by Dr. Song.[168] In the McFadden-Song model, items in the same genre have the same price sensitivity parameter, so that prices of items in the same genre with the same commission rate only depend on marginal cost. Moreover, this one-to-one relationship between price and marginal cost can be reversed so that, given an item's price, its marginal cost can be calculated. This direct relationship between price and marginal cost can be seen in Exhibits 9 and 10, which provide examples of this relationship for Paid Download Only Apps and Free Download Apps with Paid In-App Purchases in the Games genre assuming a commission rate of 30 percent, for apps on Apple's price tiers.[169] As shown in these exhibits, for every $1 increase in price, the estimate of marginal cost increases by 70 cents. This direct relationship also extends to but-for prices—for each $1 increase in as-is price, but-for price increases by 81 cents.[170] This also means that when an app goes on sale, the McFadden-Song model assumes that this can only be explained by changes in its marginal cost. As an example, the game "Dragon Quest VIII" is normally priced at $19.99, which the model interprets as the app having a marginal cost of $12.99. If it were discounted to $9.99, the McFadden-Song model would assume that its marginal cost had declined to $5.99.[171]

---

[167] For Paid Download Apps with Paid In-App Purchases, the price depends on both price sensitivities as well as the coefficient on log downloads. I focus on Paid Download Only Apps and Free Download Apps with Paid In-App Purchases as they account for 94.3 percent of App Store revenue of all-time. See Song Report, fn. 43.

[168] Song Report, ¶ 164.

[169] As discussed in Section IX, the McFadden-Song model calculates in-app prices based on a "composite" price, which may not fall on a given price tier.

[170] Workpaper 11.

[171] This assumes no other changes in its commission rate. PSprices, "Dragon Quest VIII," available at https://psprices.com/region-us/game/3770750/dragon-quest-viii. See Song Report, ¶ 163, Equation 7.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

**EXHIBIT 9**

*The McFadden-Song Model Assumes that as Prices Increase, so do Costs and Consumer Harm: Paid Download Only Apps in Games Genre*

| Assumed As-is Download Price | Marginal Cost | But-for Price | Overcharge Ratio |
|---|---|---|---|
| $0.99 | -$0.31 | $1.07 | -8.4% |
| $1.99 | $0.39 | $1.88 | 5.3% |
| $2.99 | $1.09 | $2.69 | 9.9% |
| $3.99 | $1.79 | $3.50 | 12.2% |
| $4.99 | $2.49 | $4.32 | 13.5% |
| $9.99 | $5.99 | $8.37 | 16.2% |
| $19.99 | $12.99 | $16.47 | 17.6% |
| $29.99 | $19.99 | $24.58 | 18.0% |
| $39.99 | $26.99 | $32.68 | 18.3% |
| $49.99 | $33.99 | $40.79 | 18.4% |

Source: McFadden-Song Data Production; Equinux, "A Better App Store Pricing Matrix," available at https://www.equinux.com/us/appdevelopers/pricematrix.html

Note: Assumed as-is prices are a subset of price points from Apple's price tier schedule. Marginal costs and but-for prices for a given as-is price are calculated using the McFadden-Song model using the mean estimate of the price sensitivity parameter for Games Downloads as reported in Song Report, Figure 12. The as-is commission rate is assumed to be 30 percent, and for this example I follow Dr. Song in assuming the but-for commission rate is 13.63 percent. The overchange ratio reported here is calculated as 1 – (but-for price / as-is price). In the McFadden-Song model, "overcharge ratio" is also used to refer to the value reported here divided by the as-is commission rate. See Appendix D.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

*EXHIBIT 10*

**The McFadden-Song Model Assumes that as Prices Increase, so do Costs and Consumer Harm: Free Download Apps with Paid In-App Purchases in the Games Genre**

| Assumed As-is Composite Price | Marginal Cost | But-for Price | Overcharge Ratio |
|---|---|---|---|
| $0.49 | -$1.98 | $1.03 | -109.3% |
| $0.99 | -$1.63 | $1.43 | -44.5% |
| $1.49 | -$1.28 | $1.84 | -23.2% |
| $1.99 | -$0.93 | $2.24 | -12.6% |
| $2.49 | -$0.58 | $2.65 | -6.3% |
| $2.99 | -$0.23 | $3.05 | -2.1% |
| $3.49 | $0.12 | $3.46 | 1.0% |
| $3.99 | $0.47 | $3.86 | 3.2% |
| $4.49 | $0.82 | $4.27 | 5.0% |
| $4.99 | $1.17 | $4.67 | 6.4% |
| $9.99 | $4.67 | $8.72 | 12.7% |
| $19.99 | $11.67 | $16.83 | 15.8% |
| $29.99 | $18.67 | $24.93 | 16.9% |
| $39.99 | $25.67 | $33.04 | 17.4% |
| $49.99 | $32.67 | $41.14 | 17.7% |

Source: McFadden-Song Data Production; Equinux, "A Better App Store Pricing Matrix," available at https://www.equinux.com/us/appdevelopers/pricematrix.html

Note: Assumed as-is prices are a subset of price points from Apple's price tier schedule. As-is prices analyzed in the McFadden-Song model may not match price tiers due to the construction of prices of composite in-app purchase items as model inputs. Marginal costs and but-for prices for a given as-is price are calculated using the McFadden-Song model using the mean estimate of the price sensitivity parameter for Games Downloads as reported in Song Report, Figure 12. The as-is commission rate is assumed to be 30 percent, and for this example I follow Dr. Song in assuming the but-for commission rate is 13.63 percent. The overchange ratio reported here is calculated as 1 – (but-for price / as-is price). In the McFadden-Song model, "overcharge ratio" is also used to refer to the value reported here divided by the as-is commission rate. See Appendix D.

97.     It follows that if Dr. Song measures marginal cost inaccurately, he will inaccurately estimate but-for prices and therefore damages, even if all other features of his model and analysis are correct. For example, if marginal costs were overestimated by $10, then, using the McFadden-Song model, but-for prices (and damages) would be overestimated by approximately $11.58.[172] As I discussed in Section V, Dr. Song may be substantially overestimating transactional marginal costs and therefore damages.

98.     In their model, consumers are equally price sensitive for every app in the same genre, and all developers maximize profits by setting a markup price that depends only on the genre-specific estimated price sensitivity and an app-specific commission rate.[173] In this way, each app developer acts like a monopolist for the sake of setting their app's price because they do not consider the potential impact their app price has on the consumption of other apps (or, likewise,

---

[172] Song Report, ¶ 164. Assuming a but-for commission rate of 13.63 percent, increasing cost by $1, will increase but-for prices by $1.16, i.e., $1 ÷ (1 – 0.1363) = $1.1578.

[173] Marginal costs for an app can also vary across time, for example, if that app's commission rate, price, or business type changes. I omit this distinction for simplicity in the text.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

the impact of price competition from other app developers). Therefore, Dr. Song derives marginal costs from price using only the estimated genre-specific price sensitivities and observed app transaction prices and commission rates. That is, costs for two different games apps can only be different due to differences in their prices and commission rates (and, likewise, the only reason that apps have different prices are due to their costs and commission rates). However, in the real world, prices differ based on quality and the strength of a developer's offering. For example, the difference between a $500 bottle of wine and a $5 bottle of wine is based on the interplay between demand and supply—not merely the costs of production. Because marginal costs determine harm in the McFadden-Song model, unreliable marginal cost estimation implies unreliable damages estimation.

99.     As an illustration of the shortcomings of the McFadden-Song model, consider the pricing of women's handbags. If the economic logic of the McFadden-Song model was applied in that context, it would suggest that the price difference between a luxury handbag and a budget handbag is solely due to differences in their production costs. However, factors such as brand prestige, design, and variation in consumers' preference contribute to differences in price but may not contribute to differences in cost. For instance, there is evidence that luxury and budget handbags have approximately the same production costs despite vastly different sale prices.[174]

100.    Similarly, an economist might expect prices for digital goods to vary based on the perceived value and quality of the product, as with other types of goods.[175] Premium products may charge higher prices due to superior quality, features, user experience, brand reputation, and/or network effects.[176] The McFadden-Song model rules out these kinds of price variation. Additionally, contrary to testimony given by Dr. Song, his inclusion of fixed effects in the model

---

[174] Leslie Kaufman, "The $4,800 Handbag Under the Tree; Another Jolly Season for Luxury Goods," *The New York Times*, November 23, 2000, available at https://www.nytimes.com/2000/11/23/business/the-4800-handbag-under-the-tree-another-jolly-season-for-luxury-goods.html ("For example, one high-placed executive at a brand-name luxury house explained the rough cost of producing a high-quality leather handbag. The finest leather from an Italian (only!) tannery, depending on the exchange rate, costs $50 to $60, or about 30 percent of the bag's manufacturing cost. The labor of a master craftsman to cut individual pieces (sometimes as many as seven) and stitch the bag is about 40 percent of its cost, roughly $72. The specially manufactured metal hardware, like the logo and locks, might account for another 25 percent of the cost, or $45. Add another 5 percent for miscellaneous costs, and all in all there is $180 worth of bag. And that stays the same, this executive says, whether you are paying $460 for Escada's new handbag in turquoise leather or $4,800 for that forest green Hermes Kelly handbag that is so frequently out of stock.").

[175] I am not aware of (nor has Dr. Song has provided) any evidence that prices for apps and in-app purchases depend only on marginal costs (for a given genre, business model, and commission rate) conditional on commission rate and price sensitivity. While Dr. Song does include fixed effects in his estimation, which would account for the app or item-level demand in aggregate, these do not account for changes in demand over time. In the model, changes in price can only be driven by changes in commission rate, and changes in cost. See Song Report, ¶¶ 163–164.

[176] Avi Goldfarb and Catherine Tucker, "Digital Economics," *Journal of Economic Literature*, 57(1), 2019, pp. 3–43, p. 7 ("Different retailers offer different quality, shopping experiences, and shipping policies. Firms with higher quality may develop stronger brands, and therefore command higher prices."); Hal R. Varian, *Intermediate Microeconomics: A Modern Approach*, (New York, NY: W. W. Norton & Company, 2005), p. 96 ("Normal and Inferior Goods.").

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

for estimating the price sensitivity parameter does not address this issue of how the McFadden-Song model deals with differences in marginal cost across apps.[177]

101.    Returning to Exhibit 9, for the cheapest product (paid download of $0.99), Dr. Song finds a negative marginal cost of -$0.31, which predicts a but-for price of $1.07 and implies that consumers would have paid 8.4 percent more in the but-for world. For all other Paid Download Only Apps in the Games genre, Dr. Song finds positive marginal costs, which imply that consumers would have paid less in the but-for world. This overcharge increases with the as-is price—Dr. Song predicts that a purchaser of a $1.99 Paid Downloads Only Apps in the Games genre paid 5.3 percent more than in the but-for world, whereas the purchaser of a $49.99 app paid 18.4 percent more. In Exhibit 10, I show a similar pattern holds for Free Download Apps with Paid In-App Purchases.[178] As shown in Professor Hitt's report, the McFadden-Song model's composite prices result in at least 64.3 percent of transactions with an estimated marginal cost above $5, meaning they yield harm.[179]

102.    For higher-priced apps in particular, the McFadden-Song model predicts marginal costs far in excess of Professor Hitt's and Professor MacCormack's opinions regarding the near-zero

---

[177] Professor McFadden's testimony is consistent with my description here. See McFadden 2025 Deposition, pp. 153:8–155:2 ("Q. You assume that price elasticity is equal to price multiplied by your estimated price sensitivity, correct? A. Correct. Q. And your model implies that demand elasticity increases proportionally with price, correct? A. Yes. Q. That's an assumption that you make about demand, correct? A. Well, I would say that -- yes, that specification is an assumption… Q. Based on that assumption, the higher price for an app or in-app content, the higher the price elasticity, right? A. That's a property of this, yes. Q. And the higher the price elasticity, the higher the marginal cost that you infer, correct? A. That's true… Q. For a given price sensitivity, though, your assumption does build into the modeling that higher-price apps or in-app content will have higher rather than low price elasticities, correct? A. Correct."). Dr. Song's testimony suggested that this relationship is dependent on specific features of items and may be mitigated by the fixed effects used in estimating the price sensitivity term—an interpretation that is inconsistent both with Professor McFadden's testimony and the equations in Dr. Song's own report (see Song Report, ¶¶ 163–168). See Song Deposition, pp. 223:16–227:12 ("Q. Do -- well, I'm asking you a mathematical question. Is it not true that for a given price sensitivity, Professor McFadden's model mathematically imposes the requirement that higher priced apps will have higher marginal costs?... [A.] I think mathematically that's correct… Q. It's not possible in Professor McFadden's model for a high priced app to have a zero or low marginal cost, is it?... [A.] If you have two identical apps -- and when I say identical, that means same function, same quality, in all dimensions they are the same -- and one app is more expensive than the other app, Professor McFadden's model… predicts higher cost than for the low price app because they are the same app… Q. Professor McFadden's model, though, doesn't require that based on the apps being identical, does it? A. His model and my implementation of it controls for other non-price aspects of apps and in-app content. Q. Well, if you have any two apps in the same genre and the as-is price of one is higher than the other, your model, as implemented, will say that the higher priced model has a higher marginal cost than the lower price app, correct? A. Controlling for all other things, yes… Q. Okay. But the other things your model controls for that are relevant to that -- that aspect of the model are price sensitivity and business model? A. And fixed effects.").

[178] As I discuss in Section IX.B, because of the way the McFadden-Song model aggregates in-app purchases, many apps do not have in-app purchase prices that match Apple's price tiers. The same pricing patterns hold for composite app prices between the tiered prices I provide in this exhibit.

[179] Hitt Report, Section 9.5.2.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

marginal costs of digital goods.[180] For example, Dr. Song estimates that all Paid Download Only Apps in the Games genre priced at $2.99 or higher (e.g., side scrolling platformer Geometry Dash)[181] have a marginal cost of at least a dollar, and he estimates that Paid Download Only Apps in the Games genre priced at $19.99 or higher (e.g., social simulation game Animal Crossing: Pocket Camp C)[182] have a marginal cost of $10 dollars or more. To the extent that these marginal costs are inflated, Dr. Song will tend to overstate harm.[183]

## VII. Modifying Dr. Song's Assumption Regarding Log Downloads Results in Economically Incoherent Results, Implying His Model is Unreliable

103.    As discussed in Section III, Dr. Song has introduced a new assumption regarding his log downloads parameter relative to Professor McFadden's original model. In this section, I first explain the assumption he makes. Second, I show that this assumption matters: Dr. Song's estimates are determined by this assumption in almost half of the samples he uses. This finding mirrors my finding regarding the McFadden-Song margin constraints, i.e., that the McFadden-Song model is fundamentally unreliable and does not accurately reflect the real world, and inappropriate assumptions and constraints paper over its unreliability.

104.    Dr. Song models and estimates whether the number of app downloads impacts the number of in-app purchases for that app (the "log downloads parameter").[184] For example, if Dr. Song estimates that parameter to be positive, it would imply that more new downloads of the Candy Crush Saga app, all else equal, would be associated with more purchases of in-app content for Candy Crush Saga.

---

[180] MacCormack Report, ¶ 37 ("A different method of evaluation would be to consider the revenue and costs per digital good or service sold, such as a token in a game. In such cases, the cost of creating another unit (i.e., the marginal cost), is often extremely low, sometimes approaching zero"); Opening Expert Report and Declaration of Lorin M. Hitt, Ph.D., March 7, 2025 ("Hitt Merits Opening Report"), ¶ 34 ("Many app developers face zero marginal costs for an app transaction, thus they would not be expected to set lower prices due to a lower commission rate.").

[181] Apple App Store, "Geometry Dash," available at https://apps.apple.com/us/app/geometry-dash/id625334537.

[182] Apple App Store, "Animal Crossing: Pocket Camp C," available at https://apps.apple.com/us/app/animal-crossing-pocket-camp-c/id6547834967.

[183] Song Report, fn. 84 ("Prof. McFadden has previously demonstrated that higher margin bounds can result in lower price sensitivity estimates, which in turn lead to lower damages.").

[184] Specifically, the log downloads parameter controls whether, and how much, more downloads of an app in a given month are associated with increased (when the parameter is positive) or decreased (when the parameter is negative) sales of that app's associated IAP items in that same month. The log downloads parameter is denoted as $\beta^Q$ in Dr. Song's and Dr. McFadden's notation. See, for example, Song Report, ¶¶ 137–139.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

standard errors reported in Dr. Song's report give a misleading impression about the accuracy of his individual and aggregate damages estimates.

114.    The McFadden-Song model ignores the primary source of uncertainty in its estimates: uncertainty regarding the margin constraints. In Section IV, I showed that the margin constraints determine much of McFadden-Song model's estimates and thus damages. In fact, the margin constraints guarantee that the McFadden-Song model will always find aggregate harm of at least $16.1 billion.[199] Yet the McFadden-Song model assumes that the margin constraints are known with certainty—and that "they're being treated as being measured without error"[200]—despite Professor MacCormack's reliance on a small number of developers' data for each genre grouping. For example, for the Games genre, the upper bound of the McFadden-Song margin constraint is 78 percent.[201] This number is based off Professor MacCormack's analysis of produced data from only six developers.[202] As I highlighted in Section III, this means that the accounting data from only six developers—rather than billions of app transactions—can determine Dr. Song's estimates for the Game genre.

115.    To be clear, Dr. Song does quantify *some* uncertainty in his estimates. However, those quantifications of uncertainty, at times, reflect no more than the slight variation across different samples of how the ranges of profit margins are translated into ranges of allowable consumer price sensitivities.[203] That is, based on the variation between samples, the bumpers in the McFadden-Song estimation procedure can move around slightly. But Dr. Song assumes that the range of profit margins itself—e.g., 52 percent to 78 percent for Games[204]—is known with certainty. Because these ranges play an outsized role in determining his final estimates, the final estimates in Dr. Song's report appear to be precisely estimated *because* he has assumed the profit margin ranges are known with certainty. In other words, the precision he reports stems from the fact that his margin constraints are the driving force of the estimates he obtains across all

---

[199] See Exhibit 4.

[200] McFadden 2025 Deposition, pp. 169:24–170:1 ("Q. Does that mean they're being treated as being measured without error? A. Yes.").

[201] Song Report, Figure 11.

[202] MacCormack Report, ¶ 194 ("For example, while I have usable information from 6 developers in the Games genre, I only have data from 2 developers in the Sports genre, and no data for the Stickers or Catalog genres."). I understand that Professor MacCormack incorporates additional data on "Sales & Marketing expenses incurred by several additional publicly traded game developers." MacCormack Report, ¶ 216.

[203] For example, if an estimate of the price sensitivity is against the upper bound of the margin constraints in two different samples, the variation in apps captured in each sample may mean the estimate of the price sensitivity varies slightly. However, in both instances, the variation in the transaction data-based estimate is muted by the margin constraints.

[204] Song Report, Figure 11.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

samples. Because the margin constraints, by design, do not vary across samples, Dr. Song's results appear more precise than they are.

116.     I understand that Professor Hitt finds Professor MacCormack's determination of "genre gross margins" to be non-statistical, but instead based on Professor MacCormack's subjective *judgment*, where his judgment is informed by an examination of a small number of developers' produced data.[205] In fact, Professor MacCormack testified that "there [is] not the availability of a clear natural statistical metric to summarize" the reliability of his genre gross margins, and that "there was an amalgamation of sources plus judgement to determine the range."[206] Because Professor MacCormack and Dr. Song have provided no statistical formula—nor scientific basis—to evaluate the accuracy of Professor MacCormack's judgment or Dr. Song's downstream analysis of that judgment, the results of that analysis are inherently uncertain and unreliable.

117.     As a statistical matter, the uncertainty of Professor MacCormack's judgment may be compounded by his summation of several factors that are each uncertain. I understand that Professor MacCormack's determination of "genre gross margins" relies upon the addition of four categories of variable costs—royalties, user acquisition and retention, infrastructure, and maintenance and support.[207] To the extent that each of these is measured with some error, the total statistical unreliability may further increase.[208] For example, if a new acquaintance says they will arrive after running a 15-minute errand, you might expect them to arrive in anywhere between 10 to 20 minutes; if they are running four 15-minute errands, it may take them anywhere between 40 to 80 minutes—the range of your expectation increases.

### B.     Uncertainty Regarding Profit Margin Ranges Yields Uncertainty Regarding Damages, the Percentage of Unharmed Accounts, and the Identities of Harmed Payors

118.     Absent a statistical methodology for quantifying uncertainty, I discuss how changing the margin constraints changes the demand estimates, total harm, and the identities of those harmed.

---

[205] MacCormack Report, Table 10 (detailing reliance on 71 developer productions). I understand that Professor MacCormack uses these data for 27 app genres that he combines into 16 groups. MacCormack Report, ¶ 112 ("I combine the 27 genres into 16 groups, assigning a label to some for easy reference."). Emphasis removed.

[206] MacCormack Deposition, pp. 155:19–156:9 ("Q. Is that because you were unable to construct statistical measures of reliability for those? … A. In the data that I had access to, especially as it pertains to particular genres, there's in some case a relatively low number of observations, in which cases I would supplement those observations with public information, where available. So there was an amalgamation of sources plus judgment to determine the range, and there was not the availability of a clear natural statistical metric to summarize the interval.").

[207] MacCormack Report, ¶¶ 94–95.

[208] The total variance would depend on the variance of the individual components as well as the covariance between the measurement of the different variables. See, for example, Stock and Watson (2006), p. 38 ("$var(X + Y) = var(X) + var(Y) + 2cov(X, Y)$.").

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

Any uncertainty or error regarding the margin bounds translates into uncertainty or margin of error for the demand estimates and, subsequently, total harm. Dr. Song has not quantified this uncertainty—and because the margin constraints determine the degree of harm as well as which class members are injured—one cannot use the McFadden-Song model to reliably establish harm.

119.    As I discuss, this also highlights that higher assumed margins (i.e., where marginal costs are smaller as a percentage of the price) lead to lower putative damages. In other words, if Dr. Song's margin constraints force app developers' profit margins to be low—i.e., by setting a lower value for the upper bound of the margin constraint—he will tend to overstate his resulting alleged harm. As a result, even if the McFadden-Song model could reliably estimate demand (and I show in Sections IV, VII, and VIII.A that it cannot), if Dr. Song is incorrect about app developers' profit margins, he will be incorrect about estimates of harm.

120.    Dr. Song's margin constraints are between 52 and 78 percent for Games apps and 30 and 65 percent for Music + Entertainment genre.[209] These constraints are, in turn, based on six Games developers and four Music + Entertainment developers.[210] Dr. Song's claimed harms will be sensitive to changes to the margin constraints. In fact, as discussed in my previous report, any increase in the upper or lower bound of the margin constraints will result in a decrease in total harm. Total harm declines because an increase in the lower bound or upper bound of the margin constraints corresponds to a decrease in estimated marginal cost under the McFadden-Song model, as I showed in Appendix F of my previous report.[211]

121.    The consequences of uncertainty regarding Dr. Song's profit margin ranges are not limited to total damages. This source of uncertainty or margin of error also leads directly to uncertainty or margin of error regarding which accounts are harmed, also known as "switching." Upward shifts of Dr. Song's margin constraints will decrease the number of harmed class members because rising margins will change the threshold for which apps generate negative harm in the but-for world in the McFadden-Song model.[212] Consequently, uncertainty regarding

---

[209] Song Report, Figure 11.

[210] MacCormack Report, Table 5.

[211] Watson Class Certification Report, Appendix F, ¶ 17 ("For in-app purchases…[w]hen the lower or upper end point of the margin constraint increases, the estimates of marginal cost fall."). Generally, an increase in the upper bound will have an impact on paid downloads, while both bounds will have an impact on in-app purchases. This is because, as shown in Exhibit 6, within the Games genre, the lower bound binds more often for in-app purchases, while the upper bound almost always binds for paid downloads.

[212] McFadden Report, ¶ 74. Higher margin bounds imply a price sensitivity parameter closer to zero under the margin constraints. This will result in a higher threshold of prices for which the difference between as-is and but-for prices are negative, based on the inverse of the price sensitivity parameter. See, e.g., Exhibits 9 and 10.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

"the placement and width of the bumpers" leads to many payors switching from harmed to unharmed.

122. The fact that Dr. Song's estimates of harm and harmed class members (as well as their identities) will decrease when increasing the margin constraints is consistent with the fact that it is not his econometric analysis of the billions of real-world transactions in the App Store transaction data that is determining estimates, but rather the margin constraints themselves. It also shows that the margin constraints determine the estimates of harm and harmed class members, separate and apart from any other flaws in the McFadden-Song model.

123. As I showed in Section IV, the McFadden-Song model cannot reliably estimate demand parameters—one cannot simply "choose the right margin bounds" and get a correct estimate of harm, as the constraints merely mask the underlying unreliability of the model. Moreover, the McFadden-Song model's margin constraints rely on *average* profit. As a result, even if the margin constraints were set to 100 percent, the McFadden-Song model would still generate marginal costs well in excess of zero for many apps and in-app purchases and thus would generate substantial estimates of harm.[213] To the extent that those marginal costs are unreliable, so too will be the damages estimates.[214]

## IX.    Additional Problems with the McFadden-Song Model

124. This section highlights two additional problems with the McFadden-Song model. The first set of problems concern the "percentage method" that Dr. Song uses to compute transaction-level damages from app-level but-for prices. I find that the "percentage method" can lead to nonsensical transaction-level damages and is, by design, incapable of predicting prices that align with Apple's price tiers. The second set of problems concern two important assumptions underlying the McFadden-Song model that I have already discussed above: (a) app developers are monopolists; and (b) consumers have homogeneous price sensitivity for all items within the genre classifications proposed by Professor MacCormack. I find that both assumptions are unsupported by Professor McFadden and Dr. Song, unrealistic, and overly simplistic.

---

[213] See Section III.

[214] As shown in Appendix D, conditional on the other assumptions of the McFadden-Song model, constraining the margins to forbid a price sensitivity parameter above approximately -0.0553 will effectively assume positive harm for Free Download Apps with Paid In-App Purchases in the Games genre.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

SER-191

_____
Mark Watson

# EXHIBIT 47

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

IN RE APPLE IPHONE ANTITRUST ) Case No.
LITIGATION ) 4:11-CV-06714-YGR
)
)
)
)
)
_____)

** HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY **

REMOTE PROCEEDINGS OF

VIDEOTAPED DEPOSITION OF

VICTORIA C. STODDEN, Ph.D.

San Francisco, California

Thursday, July 17, 2025

Reported Stenographically by:

REAGAN EVANS

CA CSR NO. 8176

TX CSR No. 3308

RPR, RMR, RDR, CRR, CCRR, CLR, CRC

JOB No. NY 7481706

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 78

Q Well, the real point is that you can't tell who the dependent minor is; right?

There are several hypothesis under which these people are two adults and a dependent minor, but that's an assumption. And even holding that assumption, you can't tell from the data who the dependent minor is; right?

MR. LAZARUS: Object to the form.

THE WITNESS: So please correct me if I am wrong. Are you suggesting that same-sex couple would not have a daughter and it would be --

BY MR. BURT:

Q No. Exactly the opposite.

A Okay.

Q We know there are three people in the household. We -- we may think that one of them is a dependent minor, but we don't know which is the dependent minor and we don't know which are the couple; right?

A So the information about one of these records being a daughter that was from counsel, it wasn't from the Apple data. Yeah.

Q Okay.

And these could equally be three -- based only on the Apple data, these could equally be three

Page 79

adults who are related in some unrevealed way with only one having a different last name and who share a credit card; right? You can't reject that hypothesis based on only the Apple payor data.

MR. LAZARUS: Object to the form.

THE WITNESS: So in your hypothetical, these three records would be correctly identified each as a unique payor, if I'm understanding you correctly.

BY MR. BURT:

Q I haven't gotten that far yet. You're jumping to the next question.

A Okay. I'm sorry.

Can you repeat the question then?

Q Certainly.

So it is -- you cannot reject based only on the Apple data the hypothesis that these are three adults who share a home address and a credit card, even though only two of them share the same surname; right?

MR. LAZARUS: Same objection.

THE WITNESS: So understanding -- so understanding that in this case that we have a married couple and we have a daughter using the married couple's credit card, if I'm understanding

Page 80

you correctly, that's not information that I could have gotten from -- that was from counsel, that additional information.

BY MR. BURT:

Q Right. But I asked something different.

There are multiple other possible hypotheses for the structure of this household, many of which you cannot reject based on only the information in the Apple data set; right?

A I would agree that there could be other -- other arrangements in the household that we don't know about from the Apple data.

Q So you -- as we've discussed, they're sharing the same credit card, and that you don't have from the data; right? That you don't have from counsel; right? That you have from the data?

A I'm looking at Exhibit 5. And it looks to me like the record representing credit card is the same for the three individuals, the three records that we have, yes.

Q And which credit card information is available to you there?

A So in Exhibit 5, the credit card hash is the one you can see about four lines down. It starts with 596, it's the hash representation.

Page 81

Q And is that a hashed full credit card or something else?

MR. LAZARUS: Object to the form.

THE WITNESS: So my information on -- that this variable refers to credit card information or debit card information, that's my understanding of this -- of this variable.

BY MR. BURT:

Q Let me try again. Let me try again.

Is this a hashed full credit card or something less than that?

A Can you -- I don't mean to be pedantic. Can you define what you mean by "full credit card"?

Q The entire number.

Is it a hashed value of the entire credit card number, or is it a hashed value of some set of digits from the entire credit card number less than the entire credit card number?

Was that a clear question?

A When I investigated the fields in the Apple payor data set, I saw a large number of unique hashes in the credit card and debit card field, meaning, I think, if I recall correctly, something like 600,000 or something like this.

That, to me, seems -- based on that, I

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 82

would believe this was the full credit card set of digits; although, the reason I asked you the question is whether you're including expiration date or CVV, or, sort of, other information like that in there.

Q Okay. Let me just ask it in the broad way.

What is your understanding of what the credit card field in the Apple payor data set included?

MR. LAZARUS: Object to the form.

THE WITNESS: So, first of all, my understanding is this field that you're referring to also included debit card information.

So it could be credit or debit card information.

That's my understanding of what that field represents. And we have a hashed value for it.

Upon investigation of the field itself, my own investigation of the data, as I mentioned, there are a very large number of unique hashes in this field indicating to me probably there's a representation of the full credit card number; however, that's based on my investigation of the data.

Largely, like I said, some -- my memory is

Page 83

something like 600,000 something unique values, but that's just off the top of my head.

BY MR. BURT:

Q Okay.

In your example in Footnote 64, you say that you can't tell if ▮▮▮▮▮▮▮ -- I'm sorry -- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ are one or two payors.

In your mind, what information would you need to make that determination?

A I'm just -- I'm going to take a moment to read the sentence that the footnote pertains to.

Okay.

So you're asking me to resolve the ambiguity that I'm describing in Footnote 64, what additional information would I need; is that right?

Q Yes. Yes.

A Okay.

So I would want to know who is responsible for paying that credit card, in other words, who pays Apple?

Q In your mind, who is responsible for paying

Page 84

the credit card and who pays Apple are --

A I'm sorry. I didn't -- yes. I was trying to rephrase my own answer. So let me try again.

I would -- I would need to know who pays -- who actually paid Apple. In other words, who's responsible for that credit card payment?

Q Okay.

Does this data set include anything that would allow you to understand whether a payment card account -- I know you've pointed out a few times that it includes debit cards, whether a payment card account is joint?

MR. LAZARUS: Object to the form.

THE WITNESS: So determining whether it's the sort of credit-debit card field, hash refers to a joint credit card, definitively, if that's what you're asking, I think definitively this is a difficult -- this is difficult to disambiguate based on the information in the data.

However, if you look at other fields, you could become informed probabilistically, like, is it the same last name? Is it the same address and so on? And things that might indicate if the couple is -- presumably couple -- is sharing a credit card number, there may be further information that might

Page 85

be indicative.

But I believe your question is, can we resolve this definitively? And I can't resolve it definitively from the data.

BY MR. BURT:

Q Okay.

So I heard what you said. Let me follow up on that.

If one were to apply the assumption that any two people in the same household using the same payment method are the same payor, would you call that a reliable assumption?

MR. LAZARUS: Object to the form.

THE WITNESS: So this -- what you're describing, to me, sounds like the application of a rule. Right.

When you see these matches, I think what you said was last name and address, I think, with the same pay -- like, the same credit or debit card information, would that be considered reliable for identifying unique payors in the Apple data set?

I don't think that would be reliable on its own as a successful way to reliably identify payors in the --

///

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 90

Can you point me to any software or practice that has employed for the purpose of the specific case of common use of payment method any of the papers that you have cited?

MR. LAZARUS: Object to the form.

THE WITNESS: So the papers I've cited, they give reference to the tools for matching that can be applied, in my opinion, in this situation, that are widely vetted and have been used across many different applications.

It would be unusual, and I think very unlikely, if there was one tool or one method for the specific example that you're talking about. It would be general -- more general methods that are applied. And this is exactly what we're seeing. And this is how the field has been moving forward.

BY MR. BURT:

Q Can you cite me to anywhere in the real world that I can go check that is an example of the deployment for the purpose of resolving problems arising from common use of a payment method that applies any of the methods that you cite?

MR. LAZARUS: Object to the form.

THE WITNESS: So I can -- if you'll indulge me, I can speculate because the --

Page 91

BY MR. BURT:

Q I did not ask -- respectfully, Professor, I'm not asking you to speculate. I'm not asking you if it's possible. I'm not asking you about theory.

I'm asking you to provide a concrete example, if you can.

A To the best of my knowledge, some delivery services that have payment information associated would use disambiguation methods, as referenced in my report.

Q Which ones?

A I would need to take a look to remember which ones.

Q I understand your answer.

You said -- withdrawn.

THE REPORTER: I'm sorry, Mr. Lazarus, what are you saying?

MR. LAZARUS: Sorry. I was saying we're coming up on another hour.

MR. BURT: Sure.

Let's take ten.

MR. LAZARUS: Okay.

THE REPORTER: Fabian, do you want to go off the record?

THE VIDEOGRAPHER: Yeah.

Page 92

The time now is 11:21 a.m.

We are off the record.

Thank you.

(Recess was taken at 11:21 a.m. until 11:33 a.m.)

THE VIDEOGRAPHER: The time is now 11:33 a.m.

We are on the record.

Thank you.

BY MR. BURT:

Q Dr. Stodden, I understand from your counsel that you want to make a correction to your testimony.

A Yes.

Thank you, Mr. Burt.

So in two answers to your questions in the last session, I mentioned that there were 600,000 unique hashed values in the credit-debit card field. That's an error. I meant to say ▇▇▇▇▇, not 600,000. So I just wanted to make that correction.

Q That's very helpful.

And did you discuss that with your -- with Apple's counsel while you were off the record?

MR. LAZARUS: Objection. That -- we're --

Page 93

that gets into privileged territory.

MR. BURT: It's during the testimony; you're going to lose that one.

MR. LAZARUS: But, no. That's, I think, during breaks, counsel is allowed to speak with the witness in a privileged setting.

MR. BURT: I want the colloquy between myself and Mr. Lazarus marked Plaintiffs' Marked 1.

Let's continue, shall we?

Do we have that additional document which was previously marked Plaintiff PX 117?

CONCIERGE TECH: It's DX 117. And I am having to remark it as DX 117. I'm just going to -- it's -- so just give me one second. Sorry. It's being a little tricky.

MR. BURT: Thank you for reminding me. DX, it was used by Apple. Okay.

CONCIERGE TECH: Let's see if it lets me do this. Confirm.

All right.

In theory, that worked.

MR. LAZARUS: This is Exhibit DX 117 now.

MR. BURT: "D" as in Defendant, X 117, which has been previously marked in this litigation.

(Exhibit DX 117 was previously

24 (Pages 90 - 93)

## HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 262

REPORTER'S CERTIFICATE

I, Reagan Evans, RPR, RMR, RDR, CRR, CCRR, CLR, CRC, CSR No. 8176, in and for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said remote deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and the same is a true, correct, and complete transcript of said proceedings;

That if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript { } was { } was not required.

I further certify that I am not interested in the event of the action.

Witness my hand this 18th day of July, 2025.

Certified Shorthand Reporter
for the State of California

Page 263

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Apple Iphone Antitrust Litigation  v.
DATE OF DEPOSITION: 7/17/2025
WITNESSES' NAME: Victoria C. Stodden , PhD

PAGE  LINE (S)    CHANGE       REASON

Victoria C. Stodden , PhD
SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____ DAY OF _____, 20__.

_____                    _____
(NOTARY PUBLIC)        MY COMMISSION EXPIRES:

67 (Pages 262 - 263)