No. 25-7930

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

IN RE APPLE IPHONE ANTITRUST LITIGATION

---

ROBERT PEPPER; EDWARD LAWRENCE; STEPHEN H. SCHWARTZ,

*Plaintiffs-Appellants*,

v.

APPLE INC.,

*Defendant-Appellee*.

---

On Appeal from the U.S. District Court
for the Northern District of California
Case No. 4:11-cv-6714 | Hon. Yvonne Gonzalez Rogers

---

**SUPPLEMENTAL EXCERPTS OF RECORD**

**VOLUME 2 OF 12 (SER-198–SER-496)**

---

Cynthia E. Richman
Harry R. S. Phillips
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
(202) 955-8500

Caeli A. Higney
Julian W. Kleinbrodt
Eli M. Lazarus
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Ctr., Ste. 2600
San Francisco, CA 94111
(415) 393-8200

Theodore J. Boutrous Jr.
Daniel G. Swanson
Blaine H. Evanson
Bradley J. Hamburger
Matt Aidan Getz
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

*Counsel for Appellee Apple Inc.*

# EXHIBIT 46

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | Civil Action No. 4:11-cv-06714-YGR |

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**Rebuttal Expert Report and Declaration of Victoria C. Stodden, Ph.D.**

June 27, 2025

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

# Table of Contents

I.     Qualifications ................................................................................................ 1

II.    Background ................................................................................................... 2

III.   Assignment .................................................................................................. 5

IV.   Summary of Opinions ................................................................................. 7

V.    Overview of the Data, the Challenge of Identifying Unique Payors, and Mr. Thompson's Method ........................................................................ 11

     A.    Overview of the Apple Payor Data .......................................... 11

     B.    Overview of the Challenge of Identifying Unique Payors ................. 13

     C.    Summary of Mr. Thompson's Proposed Method to Identify Unique Payors ....... 17

VI.   Mr. Thompson Used the Wrong Definition of Payor and As a Result His Method Cannot Reliably Identify Unique Payors ........................................ 26

VII.  Mr. Thompson's Methods Are Unreliable for the Purpose of Identifying Unique Payors 30

     A.    Mr. Thompson's Data Cleaning Is Ineffective for the Purpose of Identifying Unique Payors .......................................................... 30

     B.    Mr. Thompson's Deduplication Is Unreliable for the Purpose of Identifying Unique Payors ............................................................ 34

     C.    Mr. Thompson's Deduplication Is Inappropriately Sensitive to Small Changes .. 38

VIII. Mr. Thompson's Deduplication Method Was Designed For Providing Class Notice and Claims Administration, and Such an Approach Is Not Appropriate for a Reliable Identification of Unique Payors ........................ 41

IX.   Mr. Thompson's Conclusion that His "Deduplication" Approach Reliably Identifies Unique Individuals is Unsupported By Any Evidence ................. 44

X.    Mr. Thompson Provided No Evidence that His Method Can Be Relied Upon in a Process to Assign Transactions to Payors ........................................... 49

XI.   Mr. Thompson Provided No Assessment of the Error Rate of His Method and No Validation to Review Potential Sources of Error, Thus Omitting Key Components of Reliability Assessment .......................................................... 52

     A.    Mr. Thompson Provided No Assessment of the Error Rate of His Method, a Key Component of Reliability Assessment ................. 53

     B.    Mr. Thompson Did Not Appropriately Validate the Inputs or Outputs to Identify Sources of Error ....................................... 56

XII.  Mr. Thompson Did Not Use or Even Acknowledge Applicable Widely-Accepted and Scientific Methods that Have Been Peer-Reviewed and Published ................. 59

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

                    i

**SER-201**

| | A. | Mr. Thompson's Methods Are Based Entirely on His Subjective Opinions and Beliefs ........................................................................................... 61 |
|---|---|---|
| | B. | Mr. Thompson Does Not Use or Even Consider the Vast Number of Widely-Accepted and Reliable Data Cleaning Methods from the Published Literature ... 63 |
| | C. | Mr. Thompson Did Not Use or Even Consider the Vast Number of Widely-Accepted and Reliable Deduplication Methods from the Published Literature ... 70 |
| | D. | Mr. Thompson's Methods Have Not Been Directly Evaluated by Any Third Party, Including Other Claims Administration Firms, or Any Opposing Party or Court in Previous Litigation............................................................................. 75 |
| XIII. | | Mr. Thompson's Own Computer Code Does Not Produce His Results, Rendering His Method Untestable and Unreliable ....................................................... 77 |
| XIV. | | Mr. Thompson's Implemented Method Differs Materially from the Method Described in His Reports and Deposition ........................................................... 81 |
| XV. | | Conclusion .......................................................................................... 86 |

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

## I.    Qualifications

1.     I am an Associate Professor in the Department of Industrial and Systems Engineering at the University of Southern California. I graduated magna cum laude with a Bachelor's of Social Science in Economics from the University of Ottawa and hold a Master's degree in Economics from the University of British Columbia. I received a Ph.D. in Statistics from Stanford University and a Master's degree in Legal Studies from Stanford Law School.

2.     I held the Kauffman Fellowship in Law and Innovation at Yale Law School 2009–2010 and was a Berkman Klein fellow at Harvard Law School 2008–2009. Additionally, I did postdoctoral research at MIT in 2009 and held a faculty position at Columbia University 2010–2014 and a faculty position at the University of Illinois at Urbana Champaign 2014–2021 where I was awarded tenure in 2017. I have been a tenured faculty member at the University of Southern California since 2021.

3.     My research focuses on the reproducibility and reliability of scientific results, which has become a topic of great interest in the scientific community in part because of the challenges researchers face in transparently communicating methods that leverage increasingly large and complex computational code and data. I am internationally recognized as a leader in improving the reliability of scientific results in the face of increasingly sophisticated computational approaches to research—including, specifically, understanding when and how inferences from data are valid and reproducible; what it means to have replicated a result; the effect of "big data" and computation on reliable and reproducible scientific inference; the design and implementation of scientific validation systems; standards of openness and transparency for data and code sharing; and resolving legal and policy barriers to disseminating reproducible and reliable research. I also have experience in academic research with deduplication of individuals in large, complex datasets, such as Medicare claims. I have taught undergraduate and graduate courses in machine learning, replicating computational results, data science, data mining, statistical computing, quantitative methods, and other topics. My teaching has covered data deduplication.

4.     I have published more than 50 papers in scientific journals and conference proceedings, and have co-edited two professional books, both published in 2014—*Privacy, Big Data, and the*

*Public Good: Frameworks for Engagement*, published by Cambridge University Press, and *Implementing Reproducible Research*, published by Taylor & Francis.

5.  In 2024, I was selected to receive a prestigious Humboldt Research Award in recognition of my entire research agenda. Also in 2024, I won the International Excellence Fellowship of the Karlsruhe Institute of Technology in Germany, which is awarded to an internationally renowned scientist in recognition of her or his scientific achievements and whose research has a lasting impact on their discipline beyond their own field of work while addressing global challenges facing society in the 21st century as well as topics of relevance to the future.

6.  In 2009, I won the Access to Knowledge Kaltura prize for my publication on legal issues in reproducible research and scientific innovation. I have also served on the following National Academies of Science, Engineering, and Medicine committees: "Reproducibility and Replication in Science" and "Fostering Research Integrity." I co-chaired the National Science Foundation ("NSF") Advisory Committee for Cyberinfrastructure and was a member of the NSF Directorate for Computer and Information Science and Engineering Advisory Committee. In 2022, I served on the Committee of Visitors for the NSF's Office of Advanced Cyberinfrastructure (compute systems at scale), providing external review of both the quality and integrity of the program operations, as well as program-level technical and managerial aspects of research proposal decisions.[1]

7.  I testified on scientific reproducibility before the U.S. House of Representatives Committee on Science, Space and Technology for the March 5, 2013 hearing on Scientific Integrity & Transparency.

8.  A copy of my curriculum vitae, setting forth my professional experience and qualifications, is attached as **Appendix A**, and a list of my prior testimony in the last four years is attached as **Appendix B**.

## II.  Background

9.  I understand that the Court has certified a class of "[a]ll persons in the United States, exclusive of Apple and its employees, agents and affiliates, and the Court and its employees,

---

[1] *See* U.S. National Science Foundation, "Committees of Visitors," available at https://www.nsf.gov/about/performance/cov, accessed on June 16, 2025.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

who purchased one or more iOS applications or application licenses from Defendant Apple Inc. ("Apple"), or who paid Apple for one or more in-app purchases, including, but not limited to, any subscription purchase, for use on an iOS Device at any time since July 10, 2008 (the "Class Period"). The Class is limited to those persons who paid more than $10.00 in total to Apple during the Class Period for iOS application and in-app purchases from any one Apple account."[2] I also understand from Counsel that members of the certified class are referred to as "payors"[3]— in reference to "persons… who purchased… applications… or who paid Apple for… in-app purchases"[4]—and that Plaintiffs previously used Apple accounts as a proxy for payors. I further understand from Counsel that Plaintiffs retained Mr. Thompson to disambiguate "unique payors" in instances in which a "unique payor" may use multiple Apple accounts, or in which multiple "unique payors" may have used the same Apple accounts.[5]

10.     I understand that others of Plaintiffs' experts have proposed a methodology that purports to determine the price for each App Store transaction but for Apple's challenged conduct. I further understand that Plaintiffs' experts applied this methodology to data containing all U.S. App Store downloads and digital in-app purchases for all iOS apps (the "App Store Transaction Data") from the launch of the App Store to February 2024.[6] I understand that while these data

---

[2] Order Denying Apple's *Daubert* Motion to Exclude the Testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz; and Granting Plaintiffs' Motion for Class Certification, *In re Apple iPhone Antitrust Litigation*, February 2, 2024, p. 2. I also understand that claims arising from iPod transactions have been dismissed with prejudice. *See* Order Granting in Part Motion to Modify Class, *In re Apple iPhone Antitrust Litigation*, June 11, 2025. *See* also Order Granting Stipulation for Leave to File Third Amended Consolidated Class Action Complaint, *In re Apple iPhone Antitrust Litigation*, September 17, 2020.

[3] Some payors may not meet all the conditions to be part of the class. Thus I understand that the class consists of payors, but not all payors are necessarily in the class.

[4] Order Denying Apple's *Daubert* Motion to Exclude the Testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz; and Granting Plaintiffs' Motion for Class Certification, *In re Apple iPhone Antitrust Litigation*, February 2, 2024, p. 2.

[5] *See* Section V; Supplemental Expert Report of Darryl Thompson, April 16, 2025 ("Thompson Supplemental Report"), ¶¶ 8–9.

[6] I have not reviewed nor been asked to review the App Store Transaction Data.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

contain a field that identifies the Apple account (i.e., an anonymized ID corresponding to an Apple ID) through which the transaction was made, these data do not contain any information about the payor for the transaction.[7]

11.    I understand that Apple and Plaintiffs both acknowledge that class members are payors rather than accounts. Apple therefore produced data containing payment information for paid transactions from the launch of the App Store to February 2, 2024.[8] Apple initially produced two files with a sample of approximately 1 million and 12 million records from the Apple Payor Data on or about July 10, 2024 (collectively the "Apple Payor Data Sample"), and Apple later produced the full dataset of approximately 1.69 billion records on or about September 12, 2024 ("Apple Payor Data").[9] The Apple Payor Data production was updated on or about October 25, 2024 and November 7, 2024. I understand that Apple communicated to counsel for Plaintiffs that each payor record consists of user-generated information purporting to represent the payor's name, their address, and their phone number (anonymized, i.e., "hashed," except for the area code). These data also include an anonymized Apple account and hashed payment information (related to the PayPal account or payment card used) associated with the payor record.[10]

12.    An individual may pay for transactions associated with different account identifiers if, for example, an individual has multiple Apple accounts concurrently or over time. In addition, the transactions made in association with a single account identifier may correspond to multiple

---

[7] *See* Apple Support, "Apple ID (or Apple Account)," available at https://support.apple.com/guide/itunes/aside/glos1009407f/windows, accessed on June 16, 2025 ("An Apple ID (also called an Apple Account) consists of an email address and a password.").

[8] *See* Letter from Eli M. Lazarus to Rachele R. Byrd and Kyle M. Wood, "Re: *In re iPhone Antitrust Litig.*, No. 4:11-cv-06714-YGR (N.D. Cal.), Apple's Sample Payor Data Production Letter," July 10, 2024.

[9] I understand that the full dataset consisted of multiple files, including supplemental files to correct missing information in the original production.

[10] I understand that this anonymized account identifier in the Apple Payor Data also corresponds to an Apple ID. However, to protect the privacy of App Store consumers, the anonymized account identifier in the Apple Payor Data has been re-hashed so that it is different from the anonymized account identifier in the App Store Transaction Data, and only Apple possesses the key to map the account identifiers in the two data sets.

payors if, for example, some transactions for the account are paid for by one person, such as a parent, while other transactions are paid for by another person, such as a child. To determine the full set of transactions paid for by a person, it would therefore be necessary to identify all the unique payor records in the Apple Payor Data that correspond to the unique individual that actually made the payments.

13. I understand that Apple does not attempt to identify unique individuals associated with different payor records or associated with transactions in the ordinary course of business. I also understand that Plaintiffs retained JND Legal Administration ("JND") to attempt to identify unique payors based on the available fields in the Apple Payor Data.[11]

### III. Assignment

14. I have been asked by counsel for Defendant Apple to review and evaluate work done by Plaintiffs' expert Darryl Thompson of JND ("Mr. Thompson"), who purports to determine that there exists a reliable means to identify payor records that are associated with a unique person and to then identify payor records associated with unique persons using that method. I understand that Mr. Thompson's work is described in the August 1, 2024 Declaration of Darryl Thompson ("Thompson Declaration"), the March 7, 2025 Declaration of Darryl Thompson (which I will refer to as the "Thompson Report," as I understand it has been characterized by counsel for Plaintiffs as an expert report), the April 16, 2025 Supplemental Expert Report of Darryl Thompson ("Thompson Supplemental Report"), the computer code and related materials that Mr. Thompson produced to Apple's consultants at Cornerstone Research on May 21, 2025 and May 23, 2025 ("Computer Code"), a ReadMe file that Mr. Thompson produced on May 28, 2025, which Counsel for Apple requested Mr. Thompson produce to explain how to run his code

---

[11] I understand that after JND performed this matching process, Apple merged the anonymized payor identifiers on-to the App Store Transaction Data, which allows both sides' experts to identify and analyze the transactions corresponding to each unique payor as identified by JND.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

to produce his final output ("ReadMe"),[12] and the June 5, 2025 Deposition of Darryl Thompson ("Thompson Deposition"). Specifically, Counsel for Apple asked that I evaluate whether the methods implemented in the Computer Code are reliable methods for identifying unique payors for App Store transactions. Counsel also asked me to confirm whether or not the Computer Code performs the data cleaning and deduplication described in the Thompson Declaration, the Thompson Report, the Thompson Supplemental Report, and the Thompson Deposition.

15.     In forming my opinions, I relied upon my expertise in statistics and data analysis, the Thompson Declaration, the Thompson Report, the Thompson Supplemental Report, the materials referenced in those three submissions, the Computer Code and all other code and data produced by JND, Plaintiffs' complaint and other legal filings, the written transcript of the Thompson Deposition, academic literature, and publicly available information.[13] A list of the materials I relied upon is attached as **Appendix C**. I reserve the right to amend or supplement my opinions should new information become available to me.

16.     I am being compensated at my standard billing rate of $1,000 per hour. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction. I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based upon the content of my opinion or the outcome of this or any other matter.

---

[12] Counsel for Apple requested that Mr. Thompson produce "a ReadMe file that explains the order in which code files should be run to produce the final output. This should include sufficient information to allow Apple's expert to replicate JND's analysis with no changes to the code other than updates to filepaths. If there are any manual steps that are not performed by code (e.g., manually copying files from one folder to another folder), please include a detailed description of any such steps in the ReadMe file." *See* Email chain from Kyle Wood to Eli Lazarus, "RE: [EXTERNAL] RE: 4:11-cv-06714-YGR In re Apple iPhone Antitrust Litigation -- D. Thompson backup materials," June 4, 2025.

[13] I reviewed and analyzed the Apple Payor Data and Computer Code on an air-gapped desktop computer in a secured room at Cornerstone Research's San Francisco office.

Highly Confidential—Attorneys' Eyes Only                    Page 6
Subject to Protective Order

## IV.     Summary of Opinions

17.     Mr. Thompson failed to meet the burden of his assignment. He did not establish a "reliable means by which" to identify unique payors in the Apple Payor Data,[14] and I find that his methods are *not reliable* for the purpose of identifying unique payors. I arrive at this conclusion for the following reasons:

   a. Mr. Thompson used the wrong definition of payor, and therefore his method cannot reliably identify unique payors. In particular, I understand that a payor is an individual whose money was used to pay for a transaction. But Mr. Thompson testified in his deposition that he "was not aware of anything that suggests that [a payor has to use] their own credit card," as opposed to someone else's credit card, "just that they have to make a payment" and have "a record in the transaction data with their personal information on it."[15] Mr. Thompson's definition of "payor" is untethered from the key question of who actually paid the money for a transaction.[16] The determination of who actually paid could require an individualized inquiry that would not be possible with the available Apple Payor Data. Furthermore, such inquiry is not isolated to a few examples. For the purported payors identified by Mr. Thompson who use credit and debit cards, 22.3 percent appear to use a card attributed to another "unique payor." Because he used the wrong definition of payor, Mr. Thompson's methods are not appropriate for identifying unique payors (Section VI).

---

[14] *See* Thompson Supplemental Report, ¶ 9 ("Counsel requested that I determine whether there exists a reliable means by which to consolidate duplicative payor records that all relate to the same person and associate those names to a unique person.").

[15] Thompson Deposition, p. 160:16–24.

[16] In the case of a credit card (or other payment method) facilitated by intermediary institutions, I understand that the credit card holder (or holder of the payment method) should be considered the payor.

b. Setting aside the fundamental flaw that Mr. Thompson did not use the correct notion of a "payor" in his attempts to identify "unique payors," his method is still flawed and unreliable for the purpose of deduplicating records.

i. Mr. Thompson's data cleaning is ineffective because, for example, his principal data cleaning operations simply replaced one invalid entry, such as a payor address like "The moon,"[17] with another invalid entry, such as a differently punctuated representation of the same invalid payor address, or with an entry that is actually less likely to match correctly (Section VII.A);

ii. Mr. Thompson's deduplication approach is also unreliable for the purpose of identifying unique payors, in some instances erroneously assigning records for a single individual to multiple purported payors, and in other instances erroneously assigning records corresponding to multiple individuals to a single purported payor. As but one example, for the named plaintiff Pepper, Mr. Thompson's method concludes that "Rob Pepper" and "Robert Pepper" are two distinct payors, even though these records share the same address, phone number, and credit card (or other payment method). The true number of "unique payors" may be higher or lower than what Mr. Thompson finds, and the correct set of payor records associated with any given "unique payor" may be different than the set of records that Mr. Thompson associated with that "unique payor" (Section VII.B);

iii. Mr. Thompson's deduplication is inappropriately sensitive to small changes that are inherently unrelated to matching accuracy. As one of many examples of his arbitrary judgments that lead to inappropriate sensitivity, if I change the sort order of records in the raw Apple Payor Data (the sort order of which I understand to be arbitrary), this change

---

[17] I discuss this example in more detail in Section V.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

Page 8

would significantly alter the number of purported "unique payors" (Section VII.C).

c.  Mr. Thompson admitted his deduplication method was designed for providing class notice and claims administration, and such an approach is demonstrably too narrow for a reliable identification of unique payors in this matter (Section VIII).

d.  Mr. Thompson's conclusion that his "deduplication" approach reliably identifies unique individuals is unsupported by evidence. Whether the Apple Payor Data has the quality and characteristics that would allow deduplication to identify unique individuals is a fact-specific empirical question and Mr. Thompson's claim that the methods described in the Thompson Supplemental Report produce a "reliable determination of unique individuals" in this case lacks any supporting analysis or factual basis and is without merit (Section IX).

e.  Mr. Thompson provided no evidence that his method can be relied upon to reliably assign transactions to payors. Whatever error exists with regard to Mr. Thompson's list of unique payors likely significantly understates his total error in assigning each of the 1.69 billion payor records to the correct payor. Mr. Thompson's method appears to have difficulty disambiguating transactions in instances in which a "unique payor" may use multiple Apple accounts, or in which multiple "unique payors" may have paid for transactions through the same Apple account, with such ambiguous cases being assigned in a manner that is inconsistent or incorrect (Section X).

f.  Mr. Thompson provided no assessment of the error rate of his method and no validation to review potential sources of error:

    i.  Mr. Thompson made no attempt to quantify either the error rate of his method or the uncertainty or confidence associated with his output estimate. Such quantification is a critical standard practice in the scientific community, and without this information readers do not know whether

Mr. Thompson's estimate of the number of unique payors is expected to be close to or potentially far from the true number, given his methods (Section XI.A);

ii. Mr. Thompson did not appropriately validate the input or output from his deduplication to identify sources of error. This is clear because, while he purported to review both his input and his output, I identified numerous important mistakes upon a brief inspection (Section XI.B);

g. Mr. Thompson did not use or even acknowledge widely-accepted and scientific methods for data cleaning, deduplication, and address matching that have been peer-reviewed and published, nor have his methods been validated by any third party, including other claims administration firms, or any opposing party or Court in previous litigation.

i. Rather than relying on widely-accepted practices from relevant scientific fields, Mr. Thompson instead repeatedly turned to his own subjective judgment and experience as the basis for his opinions (Section XII.A);

ii. Despite the extensive academic literature on the importance of identifying and eliminating data errors, Mr. Thompson did not use or even consider widely-accepted and reliable data cleaning methods from the published literature (Section XII.B);

iii. Similarly, he did not use or even consider widely-accepted and reliable deduplication methods from the published literature, even though such methods have been studied and relied upon in many disciplines for nearly 80 years. While there is no single approach from the published literature that works in all cases, there are certain best practices from the literature, such as allowing matches for records where it is sufficiently clear that those records represent the same information, even when those records are

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

not verbatim matches. Mr. Thompson did not follow such best practices (Section XII.C);

    iv.   Finally, Mr. Thompson's methods have not been directly evaluated by any third party, including other claims administration firms, or any opposing party or Court in previous litigation. (Section XII.D).

h.   Furthermore, several fundamental flaws with Mr. Thompson's backup production make his work untestable. First, the Computer Code did not run at all without making significant modifications. Second, after making these modifications, the Computer Code produced results that were different from the output data provided by Mr. Thompson (Section XIII).

i.   In addition, Mr. Thompson's implemented method differs significantly from the method described in his reports and his deposition. For example, Mr. Thompson's actual data cleaning effort only removes a narrow set of invalid characters from names and addresses, and updates addresses based on the NCOA, even though he purported to apply "layers of proprietary data cleansing code" to address a range of data quality issues such as invalid addresses, profanity, and outliers (Section XIV). [18]

18.   As a result of this large number of important deficiencies, I conclude that not only does the Computer Code not perform the methods that Mr. Thompson said it did, but also that Mr. Thompson's methods are unreliable for the purpose of identifying "unique payors."

## V.   Overview of the Data, the Challenge of Identifying Unique Payors, and Mr. Thompson's Method

### A.  Overview of the Apple Payor Data

19.   I understand that the Apple Payor Data consists of payor records for all individuals who made at least one paid app download or digital in-app purchase on an iOS device (including

---

[18] Thompson Supplemental Report, ¶ 17.c.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

iPhones, iPads, and iPod Touch devices) since the launch of the App Store on July 10, 2008 to February 2, 2024.

20.     The data contain 18 fields that can be grouped into six general categories, each category containing one or more fields. Five of those categories contain personally identifying information: Apple account identifier (one field), name (three fields), address (seven fields), payment method (two fields), and phone number (three fields). A sixth category contains record identifiers that were generated by Apple and contain no personally identifying information (two fields). The full list of fields from the data and a description of each field is shown in Exhibit 1.

---

*Exhibit 1*
*Names and Descriptions of Fields in the Apple Payor Data*

| Category | Field | Note |
| --- | --- | --- |
| 1.  Apple account identifier | person_id_hashed | hashed Apple account identifier |
| 2.  Name | name_prefix | |
| | first_name | |
| | last_name | |
| 3.  Phone number | country_dial_code | |
| | area_code | area code for hashed phone number |
| | phone_number_hashed | hashed phone number |
| 4.  Address | county | |
| | city | |
| | state | |
| | postal_code | |
| | street1 | |
| | street2 | |
| | street3 | |
| 5.  Payment method | ppal_payer_number_hashed | hashed PayPal account information |
| | hash_hashed | hashed payment card information |
| 6.  Record identifier | billing_info_id_hashed | hashed record identifier |
| | billing_info_id_created | date the record was created |

Source: Apple Payor Data
Note: The field names are directly from the Apple Payor Data and the notes are based on my own analysis, as well as my understanding from Counsel for Apple.

21. I understand that a unique payor may have multiple records or rows in the Apple Payor Data, and that those records may contain information that differs in any of the five categories. For example, two different records corresponding to a single distinct payor might share the same Apple account identifier, name, address, and phone number, but have different payment methods. I also observe some records that are identical across all five categories of personally identifying information and differ only in the record identifier assigned by Apple. In total, the data include approximately ▮ billion records, ▮ million of which are distinct based on all available fields in the five categories of personally identifying information described above.[19]

### B. Overview of the Challenge of Identifying Unique Payors

22. I understand from Counsel that Plaintiffs seek to identify unique payors who are potential members of the certified class and that previously Plaintiffs used the Apple account identifier as a proxy for class members.[20] However, I understand that there are circumstances in which a payor may pay for the transactions through multiple Apple accounts, or in which multiple payors may have paid for transactions through the same Apple account. My understanding from Counsel is that Plaintiffs have thus retained Mr. Thompson to help disambiguate "unique payors" in instances in which a "unique payor" may use multiple Apple accounts, or in which multiple "unique payors" may have paid for transactions through the same Apple account.[21] While I have not reviewed Plaintiffs' damages model, I understand that failing to identify unique payors accurately may have substantial consequences when estimating damages for each potential class

---

[19] The difference between the 1.69 billion records in the full data and the 965 million records that are distinct based on all personally identifying information is important for evaluating Mr. Thompson's opinions. There are far fewer than 1.69 billion candidate "unique payors" that Mr. Thompson would need to disambiguate (at most 965 million), and furthermore, many of the potential payors in the Apple Payor Data do not exhibit the challenges associated with multiple accounts for the same payor, or multiple payors using the same account. Thus Mr. Thompson's method would only affect Plaintiffs' identification of a much smaller set of potential payors. *See* Workpaper 1.

[20] *See* Order Denying Plaintiffs' Motion for Class Certification Without Prejudice; Granting in Part and Denying in Part Apple's *Daubert* Motions to Exclude Testimony of Professor Daniel L. McFadden, *In re Apple iPhone Antitrust Litigation*, March 29, 2022.

[21] *See* Section V; Thompson Supplemental Report, ¶¶ 8–9.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

member. For example, because of the $10 spending threshold, I understand that incorrectly assigning transactions to class members may result in payors being improperly included or excluded from the class entirely. Additionally, I understand that failing to identify payors accurately may have a significant impact on identifying the share of Class Members who are unharmed.

23.     To illustrate the challenge of matching payment records to identify unique payors, I present fictitious data in Exhibit 2 with the same structure and format as and exhibiting some of the same types of data issues I have observed in the Apple Payor Data. For readability, I show just a subset of the fields in the five categories containing personally identifying information in the data in Exhibit 2: *person_id_hashed*, *first_name*, *last_name*, *hash_hashed*, *phone_number_hashed*, *city*, *state*, *postal_code*, and *street1*.[22]

***Exhibit 2***
***Fictitious Examples of Apple Payor Data***

| | person_id hashed | first_ name | last_ name | hash_hashed | phone_number hashed | city | state | postal code | street1 |
|---|---|---|---|---|---|---|---|---|---|
| 1. | 9q4ei2e3… | Jane | Brown | 1p855w9... | 124dfe52... | Dallas | TX | 75201 | 456 Tenth St |
| 2. | 9q4ei2e3… | J@ne | Brown1 | 1p855w9... | 124dfe52... | Dallas | TX | 75201 | 456 Tenth St |
| 3. | 1e5ee5e5... | Bob | Brown | 4a8596a7... | 124dfe52... | Dallas | TX | 75201 | 456 Tenth St |
| 4. | 83cf8b60... | Bob | Brown | 377adeb4... | 124dfe52... | Dallas | TX | 75201 | The moon |
| 5. | 5344c411... | Ann | Lee | a7f0b84d... | 08efb597... | San Francisco | CA | 94102 | 11 Fifth St |
| 6. | 234666d7... | Ann | Lee | 9ae2bdd7... | fb824fc4... | San Fransico | CA | 94102 | 11 Fifth St |
| 7. | fd0f7e53... | Frank | Nguyen | ee377871... | ede1c491... | NYC | NY | 10010 | 12 W 50th St |
| 8. | 98f1f17f... | Frank | Nguyen | d59eced1... | 9e0b260d... | New York City | NY | 10010 | 12 W 50th Street |
| 9. | d359f8b5... | Bill | Smith | 14063697... | 7fcbba91... | NYC | NY | 10008 | 321 Main St |
| 10. | 30e4c022... | William | Smith | 768b84ef... | 7fcbba91... | NYC | NY | 10008 | 321 Main St |
| 11. | 30e4c022... | W | S | | 7fcbba91... | | | | |

Source: Fictitious data resembling the Apple Payor Data
Note: See text.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

**SER-216**

24. Exhibit 2 shows eleven rows of fictitious data, where each row is a distinct combination of data across all fields. I understand that each of the fields in the raw data was user-generated data and that Apple anonymized the *person_id_hashed*, *hash_hashed*, and *phone_number_hashed* fields before production in this case, i.e., Apple assigned each value of these fields to a distinct alphanumeric sequence in a way that maintains distinctness.

25. The examples presented in Exhibit 2 highlight some of the data issues in the Apple Payor Data, such as typos and invalid entries.[23] For example, rows 1 and 2 match on many of the fields, but in row 2 the *first_name* contains the special character "@" instead of the letter "a," and the *last_name* contains a numeric digit "1."[24] Rows 3 and 4 also match on many fields, but the *street1* field in row 4 indicates "The moon," which is not a valid street name in Dallas. Rows 1–3 also seem to have the same address and phone number but have two distinct names and account identifiers.

26. There are additional typos and invalid entries in the user-generated addresses in Exhibit 2. For instance, rows 5 and 6 match on most fields, but the city field in row 6 misspells "San Francisco," instead writing "San Fransisco." In Rows 7 and 8, the records are similar except the *city* field in row 7 lists "NYC" while row 8 lists "New York City," and the *street1* field in row 7 lists "12 W 50th St" while in row 8 the *street1* field indicates "12 W 50th Street."

27. Names can also take different forms. For example, rows 9 and 10 are identical except for the *person_id_hashed* and the *first_name* field: *first_name* in row 9 is "Bill" and *first_name* in row 10 is "William."

---

[23] These examples, though fictitious, are comparable to the data quality issues that Mr. Thompson mentioned. *See* Thompson Declaration, ¶ 5 ("A large portion of the records had missing data, values of '[Missing in DS]', 'NA' and 'X'. Nearly 10% of records provided have these data issue. Records also contained non-standard ASCII values ranging from foreign language characters to emojis. Fields contained unexpected data. For example, the state field contained over 1600 unique values. This is because sometimes a state, like California, for instance would be represented as 'CA' or 'California.' In addition, some data was in the wrong fields – for example, some of the 1600 states were cities. Also, some portion of the data seemed to have values shifted to the wrong fields (name in the phone field as an example).").

[24] I include sentence punctuation for my report inside of quotation marks. Such punctuation does not appear in the data unless specifically noted.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

28.     The fictitious data in Exhibit 2 present a small set of illustrative examples of the challenges associated with deduplicating records and identifying "unique payors."[25] Records must be cleaned, and judgments must be made about when it is appropriate to group records. Many of these judgments are not obvious without an individualized inquiry—for example, it is difficult to determine simply from comparing "William" and "Bill" Smith at the same address and phone number whether this is two unique individuals, such as a father and son, or whether this is a single individual who reported a nickname "Bill" in one instance and a legal name "William" in another.

29.     The topics of data cleaning and deduplication have long been active areas of research in statistics and data science. Scientists frequently develop methods to clean (including data verification and validation) and deduplicate user entered addresses and other identifying information in application areas such as optimization of package delivery routes, mail redirection, or grouping addresses for demographic purposes such as community identification.[26] Statistical methods, which I discuss in more detail in Section XII, are routinely used today in address matching, and many such models have been in frequent continuous use for many years.[27]

---

[25] Thompson Supplemental Report, ¶ 9 ("If such a means exists, Counsel further requested that I proceed with deduplicating those records and create an anonymized identifier for each unique payor.").

[26] *See* Keshav Ramani and Daniel Borrajo, "Methods for Matching English Language Addresses," *Transactions in GIS*, 27(2), 2023, pp. 347–363 ("Ramani and Borrajo (2023)") at p. 348 ("Some potential applications of address matching are in the field of mail routing, clustering of addresses, and matching a given list of addresses of interest to a larger database."); Dengyue Li et al., "Approximate Address Matching," *Proceedings of the International Conference on P2P, Parallel, Grid, Cloud and Internet Computing*, 2010, pp. 264–269 ("Li et al. (2010)") at p. 264 ("Address matching and correction are widely used in daily life and business applications, in situations ranging from finding a friend who has moved to responding to a critical 911 call."). *See also* Sam Comber and Daniel Arribas-Bel, "Machine Learning Innovations in Address Matching: A Practical Comparison of Word2vec and CRFs," *Transactions in GIS*, 23(2), 2019, pp. 334–348 ("Comber and Arribas-Bel (2019)") at p. 335 ("In the absence of unique identifiers that enable direct linking of data in relational database management environments, practitioners have traditionally relied on mathematical linkage techniques broadly divided by deterministic or probabilistic principles.").

[27] Alvaro E. Monge, "Matching Algorithms Within a Duplicate Detection System," *IEEE Data Engineering Bulletin*, 23(4), 2000, pp. 14–20 ("Monge (2000)") at p. 15 ("The record matching problem has been recognized as

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

Statistical methods are also important to assess the reliability of data cleaning and deduplication, including through quantification of the error rates associated with data cleaning, deduplication, and estimation of unique payors.

### C. Summary of Mr. Thompson's Proposed Method to Identify Unique Payors

30.     Mr. Thompson purports to identify "unique payors" in the Apple Payor Data using a methodology that can be divided into three parts:[28] (1) data cleaning, (2) deduplication, and (3) validation. Mr. Thompson claims to have applied these steps in "an iterative process."[29]

31.     **Mr. Thompson's Described Data Cleaning.** As illustrated in Exhibit 2, records in the Apple Payor data can contain nonsensical, apparently fake or otherwise erroneous, or even missing values, as well as records that convey the same information in different ways (e.g., "NYC" and "New York City"). Mr. Thompson made similar observations in his Declaration, stating that "[d]uring the initial review of the Payor data [sample], significant data issues were identified."[30] In addition to finding missing or placeholder values, Mr. Thompson reported finding "non-standard ASCII values ranging from foreign language characters to emojis,"

---

important for at least 50 years."); Comber and Arribas-Bel (2019), p. 335 ("Traditionally, address matching has focused on the probabilistic linkage approaches developed by the US Census Bureau in the 1970s."). *See also* Halbert L. Dunn, "Record Linkage," *American Journal of Public Health*, 36(12), 1946, pp. 1412–1416; H.B. Newcombe et al., "Automatic Linkage of Vital Records," *Science*, 130(3381), 1959, pp. 954–959 ("Newcombe et al. (1959)"). For a historical discussion, *see, e.g.*, Jana Lynn Asher et al., "An Introduction to Probabilistic Record Linkage with a Focus on Linkage Processing for WTC Registries," *International Journal of Environmental Research and Public Health*, 17(18), Article 6937, 2020, pp. 1–16 ("Asher et al. (2020)"); Wen Xia et al., "A Comprehensive Study of the Past, Present, and Future of Data Deduplication," *Proceedings of the IEEE*, 104(9), 2016, pp. 1681–1710 ("Xia et al. (2016)").

[28] Mr. Thompson's code also includes code to load raw data for processing and export final output. These steps do not involve substantive analysis and therefore are not a focus of my report.

[29] Thompson Supplemental Report, ¶ 17.

[30] Thompson Declaration, ¶ 5.

"unexpected data" in fields ("over 1600 unique values" in the "state" field), and "data… in the wrong fields," such as cities in the "state" field or "name in the phone field as an example."[31]

32.     In his Supplemental Report, Mr. Thompson confirmed that he had "developed a data cleansing algorithm to address any data issues in an attempt to leave usable data for future matching."[32] He stated that this cleaning code contains "layers of proprietary data cleansing code to address the remaining data quality issues," and additional layers would be added and run until "marginal returns were very low."[33] I describe Mr. Thompson's data cleaning in more detail in Section XII.B.

33.     **Mr. Thompson's Described Deduplication**. The second part of Mr. Thompson's methodology is "deduplication." Mr. Thompson uses this terminology to refer to the process of attempting to match distinct records that correspond to a single "unique individual."[34] To deduplicate payor records, Mr. Thompson stated that he wrote "new code for this project" to identify records that match exactly on certain cleaned and combined fields.[35] Mr. Thompson's stated method consists of ██ "Rounds" of deduplication using his cleaned fields, and each Round includes several combinations of these cleaned fields that are used to match records. Mr.

---

[31] Thompson Declaration, ¶ 5.

[32] Thompson Supplemental Report, ¶ 17.b. Mr. Thompson refers to cleaning the data as "data cleansing" while I refer to it in this report as "data cleaning." Data cleaning is the standard terminology used by the scientific community.

[33] Thompson Supplemental Report, ¶ 17.c.

[34] Deduplication is defined as "[t]he process of determination and elimination of duplicates." *See* Otmane Azeroual et al., "A Record Linkage-Based Data Deduplication Framework with DataCleaner Extension," *Multimodal Technologies and Interaction*, 6(4), Article 27, 2022, pp. 1–18 at p. 1. I use the term deduplication and matching of records interchangeably in this report. *See* Thompson Deposition, pp. 119:22–120:1 ("Q. Is identifying unique individuals distinct from deduplicating records? A. I'm trying to determine what the outcome of -- of -- of both efforts are in my head. I believe the outcome is essentially the same.").

[35] Thompson Supplemental Report, ¶ 17.d. The one exception to exact matching is that one step of his algorithm allows records to match on the first three characters of the first name, along with exact matching on additional fields. This is described below in Exhibit 3.

Thompson referred to each set of fields used to match records in subsequent steps as a "Tier."[36] Exhibit 3 shows the fields that are used in each Tier and Round in Mr. Thompson's deduplication method.

34. In ▮▮▮▮▮▮ his deduplication process, Mr. Thompson used thirteen combinations of fields, or Tiers.[37] The thirteen Tiers match records based on the fields listed in Exhibit 3.[38]

---

***Exhibit 3***



---

[36] Thompson Supplemental Report, ¶ 17.e.

[37] Thompson testified that the choice and number of fields chosen for matching was done based only on his experience. Thompson Deposition, pp. 176:5–177:4 ("Q. … Sticking with your report, the paragraph 17E states that, 'the top tier of the matching algorithm is the most stringent and matched on Person_ID_Hashed, first name, last name, full address, city, state and postal code.' Do you see where I'm reading that from? A. I do. Q. And when you say, 'top tier,' does that mean that this tier was run first before other matching tiers? A. I -- yes, I believe that is correct. Q. Okay. And why were these variables chosen for matching in this top tier? A. I -- I tier the -- the deduplication based on a confidence level that the amount -- the data being matched is most likely to represent the -- the same individual. And so in this situation, if exact first name, exact last name, exact full address, exact cities, exact state, exact postal code, along with the person ID that bundles people in -- within the Apple data all match, I have an extremely high confidence level that that should be the same person. Q. And what is that understanding based on? A. Experience."). *See also* Section XII.A.

[38] I observed in the Computer Code that Mr. Thompson created the following fields to use as the basis for deduplicating records: *compressed_full_name* catenates *first_name* and *last_name*; *compressed_full_address* catenates *street1*, *street2*, *street3*, *city*, *state*, and *postal_code*; *compressed_partial_address_w_postal* catenates *street1*, *street2*, *street3*, and *postal_code*; *compressed_partial_address_w_city_state* catenates *street1*, *street2*, *street3*, *city*, and *state*. I use the term "catenate" to refer to Mr. Thompson's removal of white space " " and addition of the "^" character delimiter. For example, *compressed_full_name* is *first_name* and *last_name* with no white space and a "^" delimiter between.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

**SER-222**

35.     In each of the Tiers listed in Exhibit 3, Thompson considered records "duplicates" if they have exactly the same values for each of the fields in that Tier.[39] For example, in Tier 1, Mr. Thompson began by searching for exact matches based on the account identifier

[REDACTED]

[REDACTED] [40] For each group of records that matches exactly at this step (and each "group" consisting of a single unmatched record), Mr. Thompson assigned a primary record that will then be considered for matching in subsequent Tiers. Importantly, the primary record Mr. Thompson chose was simply the record that happened to appear first in the data for each group. This determination is completely arbitrary and entirely dependent on the order in which records initially appeared in the Apple Payor Data. In subsequent rounds of matching, Mr. Thompson disregarded all information not contained in the primary records, except in Round 5 where Mr. Thompson attempted to match records with a missing name.[41] I return to this point in Section VII.C.

36.     In [REDACTED] of his deduplication algorithm, Mr. Thompson then looked for primary records that match [REDACTED]

[REDACTED]

[REDACTED]

---

[39] In his deposition, Mr. Thompson testified that he allowed a partial match on the first three letters of *first_name*. Thompson Deposition, p. 155:19–25 ("A. So the -- the al- -- matching algorithm does do a partial first name along with last name and address. But I believe because partial first name does, you know, present a -- a increased risk of overmatching, I believe the algorithm includes a -- the phone_number_hashed as a -- as a validator to compensate for the increased risk of a partial name."). In his produced Computer Code, Mr. Thompson appears to only apply this partial match on the first three letters of the *first_name* field in [REDACTED].

[40] *See* footnote 38 for a description of the purportedly cleaned fields Mr. Thompson uses to match records.

[41] In Tiers [REDACTED] Mr. Thompson allows records with a missing name to match to any of the 1.69 billion records in the full Apple Payor Data.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order                                    Page 20

37.    **Example**. This process is depicted in Exhibit 4 for selected records that appear to be associated with named Plaintiff Robert Pepper. [42] In this example, ████████████ are exact matches based on the account identifier, full name, and full address, so these are matched ███

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████ there are three potential "unique payors" still under consideration.

38.    In Tier 2, ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████

---

[42] I understand from Mr. Pepper's deposition that his home address in 2021 was ████████████████
████. *See* Deposition of Robert Pepper, June 14, 2021 ("Pepper Deposition"), p. 16:3–9.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order                    Page 21

*Exhibit 4*



39. Duri[...] the Apple Payor Data (corresponding t[...] million distinct records) at the same time. Instead, according to the Computer Code, h[...]

40. [...] Mr. Thompson's deduplication process, he created a

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

41. During ███████ of Mr. Thompson's deduplication process, ████████████



42. After ███████ Mr. Thompson sent every primary record that remained at this point of his deduplication process (approximately 270 million records) to Melissa Data, a third party service that uses the National Change of Address ("NCOA") data from the United States Postal Service ("USPS") to "update the addresses of customers that have moved."[43] However, due to the arbitrary sort order, the primary record does not always correspond to the most recent address available for a purported matched group of records, since the selection of the primary record was arbitrary for a matched group. Furthermore, the NCOA only maintains a four-year change of address history.[44]

---

[43] *See* Melissa Direct, "NCOALink® National Change of Address (NCOA) Service," available at https://www.melissa.com/direct/direct-mail/ncoa-link, accessed on June 25, 2025. NCOA is a centralized system that stores approximately 160 million change-of-address records consisting of names and addresses of individuals, families, and businesses who have submitted a change-of-address with the U.S. Postal Service. *See* "NCOALink®," *USPS*, available at http://postalpro.usps.com/mailing-and-shipping-services/NCOALink, accessed on June 23, 2025. I understand that Melissa Data is a full service provider of NCOA data licensed by U.S. Postal Service. "NCOALink® Full Service Provider Licensees," *USPS*, April 25, 2025, available at https://postalpro.usps.com/ncoalink/Full_Service_Provider_Licensees, accessed on June 23, 2025.

[44] *See* Workpaper 2. Among the 270 million records Mr. Thompson sent to Melissa Data, 58 percent of the records were created before year 2020.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

43. Using the addresses that he received back from Melissa Data, Mr. Thompson performed a



████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████ :[45]

    a. Tier 17: *compressed_full_name*, *NCOA_compressed_full address*[46]

44. Finally, Mr. Thompson performed a ███████████████████████████

██████████████████████████████████████████████████████████████

████████████████████ [47]

45. ██████████████████████████████████

    ██████████████████████████████████████

    ██████████████████████████████████████

    ████████████████████████████████

    ████████████████████████████

    ████████████████████

---

[45] I note that the code Mr. Thompson used to perform matching in ██████ has many additional Tiers that were "commented" out of Mr. Thompson's code. According to Mr. Thompson, commenting code means "flagging particular sections as don't run," and he agreed that in layman's terms, uncommenting and commenting mean "turning on and off different parts of code," respectively. *See* Thompson Deposition, p. 170:1–17 ("[C]ommenting is simply flagging particular sections as, don't run -- when this file is executed, don't run these -- this section. So that would be commenting it out. Or uncommenting it would be, make this particular section of code available for execution."). It is not clear if Mr. Thompson ever ran those additional Tiers that were commented in his code.

[46] ████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
██████████████████████████

[47] Before ████████ Mr. Thompson replaced or removed non-ASCII characters from fields ██████████
███████████████████████████████████████████████████

[48] I note that Mr. Thompson ran ██████████████████████████████████████████████
███████████████████████████████████████████████████████████████

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

46.     In Tiers ████ Mr. Thompson ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

47.     At the end of this process, Mr. Thompson purported to identify ████ million "unique individuals."[50]

48.     **Mr. Thompson's Described Validation**. As noted, Mr. Thompson stated that the data cleaning and deduplication parts of his method were "intertwined with data validation."[51] Based on my review of the materials Mr. Thompson produced, as well as Mr. Thompson's deposition testimony, I understand that his data "validation" was only used in an ad hoc way to help try to determine what data cleaning steps were necessary and to identify anomalies that required adjustment to his matching algorithm.[52]



---

[49] For each group of records that matched on each Tier, ████████████████ ███████████ ██████████████████████████████████████. It is possible that there are multiple primary records in a matched group, however, Mr. Thompson's code ████████████ ████████████████████████████████████████

[50] Mr. Thompson also asserted that there are ████ million unique payors in the Apple Payor Data. *See* Thompson Supplemental Report, ¶ 18. However, Mr. Thompson's backup materials show ████████ unique payors instead. *See* Workpaper 3. No explanation of this discrepancy is provided, nor any information on which value is correct.

[51] Thompson Supplemental Report, ¶ 17.e.

[52] Thompson Deposition, pp. 141:2–142:14 ("Q. (BY MR. LAZARUS) How was the review carried out? You mentioned Cameron assisted with that. What review was done by you and Cameron? A. For -- for each tier, we would -- ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

Page 25

**SER-227**

**VI.    Mr. Thompson Used the Wrong Definition of Payor and As a Result His Method Cannot Reliably Identify Unique Payors**

49.    I understand from Counsel that a payor is an individual whose money was used to pay for a transaction.[53] As discussed in Section II, I understand from Counsel that the Class consists of individual "payors,"[54] not, for example, individual Apple accounts, and that Plaintiffs retained Mr. Thompson to disambiguate "unique payors" in instances in which a "unique payor" may use multiple Apple accounts, or in which multiple "unique payors" may have used the same Apple accounts.[55] As I will discuss in this section, Mr. Thompson stated that his assignment was to "determine whether there exists a reliable means by which to consolidate duplicative payor records that all relate to the same person [… and if] such a means exists, [… to ] proceed with deduplicating those records [… to identify] each unique payor."[56] Mr. Thompson also claimed that "each unique payor could be a potential Class member, depending on whether they meet the requirements for Class membership."[57] I conducted analyses that show Mr. Thompson's definition of "payor" in his deposition responses, and as implemented in his Computer Code, is untethered from the key question of who actually paid for a transaction, and as a result, his methods are not appropriate for identifying unique payors as required by his stated assignment.

50.    Mr. Thompson identified "payors" without regard for who actually paid for an app or in-app content. The Thompson Supplemental Report uses the terms "unique person," "unique

---

[53] As I described in footnote 16, in the case of a credit card (or other payment method) facilitated by intermediary institutions, I understand that the credit card holder (or holder of the payment method) should be considered the payor. For example, I understand from counsel that a child who uses a parent's credit card to perform transactions on the App Store would not be a distinct payor from the parent if the parent were the individual responsible for paying the credit card bill.

[54] Some payors may not meet all the conditions to be part of the class. Thus I understand that the class consists of payors, but not all payors are in the class.

[55] *See* Section V; Thompson Supplemental Report, ¶¶ 8–9.

[56] Thompson Supplemental Report, ¶ 9.

[57] Thompson Supplemental Report, ¶ 9.

individual," "unique payor," and "potential class member" interchangeably.[58] Mr. Thompson further testified in his deposition that a payor is "an individual that paid for something" and has "a record in the transaction data with [the individual's] personal information on [that record]."[59] Consistent with this language, Mr. Thompson largely did not use payment information in his deduplication method and does not consider who paid for transactions when assigning records to a "payor." As I discuss in Section IX, as Mr. Thompson's method was actually designed for identifying records that are "duplicates,"[60] and not "unique payors," Mr. Thompson effectively treated the observation that two records use the same payment information in the same manner as the observation that two records have the same name or the same address.

51.     To illustrate the impact of Mr. Thompson's definition of "payor," consider the following three records in Exhibit 5 from the Apple Payor Data that were presented to Mr. Thompson during his deposition. These three records list different names, but the records share the same

---

[58] Thompson Supplemental Report, ¶¶ 9 ("Specifically, Counsel requested that I determine whether there exists a reliable means by which to consolidate duplicative payor records that all relate to the same person and associate those names to a unique person. If such a means exists, Counsel further requested that I proceed with deduplicating those records and create an anonymized identifier for each unique payor … I understand that each unique payor could be a potential Class member…"), 18 ("…JND deduplicated the Apple Payor Data to reduce the number of potential Class members from approximately ▇ billion to approximately ▇ million unique individuals…"). *See also* Thompson Deposition, p. 79:4–13 ("Q. All right. You use the term 'unique payor' in paragraph 9. And then in paragraph 18 you use the term 'unique individual.' Do those mean the same thing in this context? ... A. Yeah, I think if -- the entire sentence read in context would suggest, that, yeah, individuals represents Apple payor.").

[59] Thompson Deposition, p. 160:16–24 (describing that Mr. Thompson views a payor as "a[n] individual that paid for something," and that he was "not aware of anything that suggests that it has to be their own credit card, just that they have to make a payment. And, therefore, they have a transact -- a record in the transaction data with their personal information on it.").

[60] Thompson Deposition, pp. 68:17–25 ("Q. Okay. And am I correct that, in broad strokes, what you did in this case was to evaluate data produced by Apple, cleanse the data and deduplicate data by matching records that appear to you to represent the same person… Is that a fair characterization of what you have done? A. I think that is a reasonable summary."), 82:14–18 ("I also, when I produced the ultimate outcome to – back to Apple, I provided a – an ID indicator so that they understood that I was not providing duplicate records. They provided duplicate records to me and I was just providing an outcome for what they gave me."), 96:6–12 ("Q. Okay. And as you understood your assignment, was that assignment asking you to reduce duplication to zero or reduce duplication to some other level? A. As I understood my assignment, it was to reduce duplication to the best of my ability where I had confidence that I had matched records that were of the same entity.").

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

address and credit card payment information.[61] Mr. Thompson's method identified these records as three separate "unique payors."

***Exhibit 5***



52.     Mr. Thompson confirmed at deposition that he believed categorizing these records as three unique payors was correct, and that this was consistent with his definition of "unique payor."[62] However, I understand that these three records represent a mother, a father, and a

---

[61] Thompson Deposition, p. 159:4–11 (where Mr. Thompson agreed that the three records have the same address and payment information, "[D]o you see that they all three have the same address except that Avenue is fully spelled out in two of them and abbreviated in one of them? A. I do. Q. And do you see that all three of them use the same payment method…? A. I do.").

[62] Thompson Deposition, pp. 159:12–16 ("Q. Would it be -- well, in your opinion sitting here today, do you believe that these are one, two or three unique payors? A. With the data available in front of me, in isolation, it looks to be three different people."), 163:11–14 (testifying that he did "not see uncertainty in who the unique payors were" in that example), 163:17–164:9 (testifying that his "understanding of the Apple payor data is that each line represents a … billing event associated with transactions that I did not have and -- but represented billing events or purchases. And … each individual that made a purchase represented a potential class member if they fulfilled all additional requirements for … being part of the class. It -- I am unaware if it exists, but I am not privy to it, but I am unaware of anything within the class definition that suggests that a payor had to use their own credit card or -- and I don't -- I am unaware of how, on an individual basis, one could determine that regardless of the data. Because [daughter] could have used her -- whoever's credit card and gave him 20 bucks for it, and so she did actually pay. So the -- I don't see how the hypotheticals in this situation could ever be resolved.").

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

daughter.[63] I further understand that the daughter used the parents' credit card to make purchases on the App Store, but that the parents are the card holders and bear the responsibility to pay the credit card bills associated with the card in question—specifically, the *hash_hashed* field in Exhibit 5, which I understand to be the hashed payment card information, is identical across the three records. Consequently, based on my understanding from Counsel of the definition of "payor," these three records would correspond to at most two distinct payors—the father and the mother. In other words, the daughter should not be considered a distinct payor even though Mr. Thompson has designated her as one in both his deposition and in his Computer Code.[64] Identifying unique payors in such instances requires an individualized inquiry to determine who actually paid. Such inquiry would not be possible with the available Apple Payor Data.

53.     This is not an isolated example. For the purported payors identified by Mr. Thompson who use credit and debit cards, 22.3 percent appear to use a card attributed to another "unique payor."[65] Similarly, my analysis shows that 9 percent of alleged "unique payors" identified by Mr. Thompson use the same PayPal account as another "unique payor."[66] The pervasiveness of such examples shows that Mr. Thompson's fundamental misapplication of the notion of "payor" renders his method for identifying purportedly "unique payors" highly ineffective and unreliable in the disambiguation of unique payors it sought to accomplish.

54.     **Conclusion**. Mr. Thompson used a materially incorrect definition of payor, and therefore his method cannot reliably identify unique payors.

---

[63] I understand that one of these records corresponds to ███████████, who is a partner at Gibson, Dunn & Crutcher representing Apple in this matter. My understanding is that ██████████ is therefore excluded from the class. *See* Order Denying Apple's *Daubert* Motion to Exclude the Testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz; and Granting Plaintiffs' Motion for Class Certification, *In re Apple iPhone Antitrust Litigation*, February 2, 2024, p. 2. ██████████'s class membership is not material, however, for purposes of assessing the reliability of Mr. Thompson's method at identifying "unique payors."

[64] From the data, I am unable to distinguish whether there should be one or two distinct unique payors in this example.

[65] *See* Workpaper 4.

[66] *See* Workpaper 5.

**VII. Mr. Thompson's Methods Are Unreliable for the Purpose of Identifying Unique Payors**

55. Setting aside the fundamental flaw that Mr. Thompson did not use the correct notion of a payor in his attempts to identify unique payors, his method is further flawed and unreliable for the purpose of deduplicating records. Mr. Thompson's data cleaning is ineffective, with no discernable methodology, and his deduplication is based on arbitrary and ad hoc judgments that are very sensitive to arbitrary changes, such as the order in which the raw data are sorted. These flaws render Mr. Thompson's method unreliable for the purpose of identifying "unique payors."

### A. Mr. Thompson's Data Cleaning Is Ineffective for the Purpose of Identifying Unique Payors

56. While Mr. Thompson described "layers of proprietary data cleansing code,"[67] his code falls far short of resolving data quality issues that might improve the results of Mr. Thompson's deduplication efforts.

57. First, Mr. Thompson's principal data cleaning operations simply replace one invalid entry with another invalid entry.[68] Exhibit 6 shows the five most common values cleaned by Mr. Thompson in the *street1* field in the raw data and compares the values from the raw data to the values in the cleaned data that Mr. Thompson subsequently used in his matching. Rows 1 and 3, from the raw data, correspond to the address of Apple's Headquarters, and Mr. Thompson's code removed the period from the "Inc." string in the address. Mr. Thompson also admitted in his deposition that Apple's Headquarters is not a valid address for a payor, and yet it still appears in his output dataset of purported unique payors even after his cleaning effort. This is because his removal of punctuation or other special characters does not fix addresses that are invalid to begin

---

[67] Thompson Supplemental Report, ¶ 17.c.

[68] Mr. Thompson also has data cleaning operations that replace values with "missing." Those operations are not the focus of this discussion as replacing a value with missing does not retain information that can be used for matching.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

with.[69] Rows 2 and 4 are cleaned to remove the hyphen, even though we do not know whether there is ambiguity between values like "182-21" and "18-221." This cleaning step would be invalid when the placement of the special character has meaning.[70]

58.     The addresses in Rows 2 or 4 may be actual addresses, but neither appears to be a valid address because each is associated with tens of thousands of payor records. Each is associated with tens of thousands of payor records and, yet again these addresses appear in Mr. Thompson's output dataset of purported unique payors. In Row 5, his Computer Code replaced "N/A" with "NA," but Mr. Thompson still used the value "NA" to attempt to match even though this again is not a valid payor street address.

**Exhibit 6**
**Most Common Values that Mr. Thompson Purportedly "Cleaned" in the street1 Field**

| | *street1* in Raw Apple Payor Data | *street1_cleaned* in Mr. Thompson's Backup Materials[1] | Count |
|---|---|---|---|
| 1. | Apple Computer Inc. 1 Infinite Loop | AppleComputerInc1InfiniteLoop | 177,041 |
| 2. | ███████████████████████████ | ███████████████████████████ | 147,376 |
| 3. | Apple Computer Inc. | AppleComputerInc | 101,070 |
| 4. | ███████████████████████████ | ███████████████████████████ | 86,475 |
| 5. | N/A | NA | 55,512 |

Source: Apple Payor Data; Thompson Backup Materials
Note: As I describe in Section VII.A, Mr. Thompson replaces the value "NA" with a missing value during his data cleaning. However, he does this *before* he removes the forward slash character "/". Consequently, he replaces "NA" with missing, but "N/A" becomes "NA" and is not subsequently updated to also be a missing value.
[1] This shows the purportedly "cleaned" values used in the first three rounds of Mr. Thompson's deduplication, prior to the NCOA standardization. I understand that the NCOA product used by Mr. Thompson through Melissa Data may perform additional standardization that may be applied to primary records before the last round of matching. However, I understand that such standardization would not include removal of invalid addresses like Apple's Headquarters in Rows 1 or 3.

---

[69] Thompson Deposition, pp. 89:20–90:8 ("Q: Okay. Or another example, Apple's headquarters at 1 Infinite Loop, did you see that address entered into the payor -- Apple payor data here? A. I do recall a small portion of Apple's address as the address, yeah… In my opinion, that -- Apple's address as an Apple payor address is not a valid address."). I discuss below in Section XIV that Mr. Thompson does not clean this value, even though he testifies in his deposition that he believed he did so.

[70] A similar example that does not appear in the top 5 is ██████████████████████

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

59. An analysis of the specific special characters removed by Mr. Thompson also demonstrates that his data cleaning did not resolve other fundamental problems with invalid entries. For example, Mr. Thompson removed the special character "@" from the *street1* field even though over 80 percent of the records that contain the "@" symbol in the *street1* field also contain ".com," ".net," ".edu," or ".org," and therefore appear to be email addresses, not valid street addresses to use for matching, an observation apparently missed by Mr. Thompson.[71] Similarly, Mr. Thompson removed the special character "#" from the *street1* field even though the top five most common occurrences of this special character in the *street1* field appear to use it to denote an apartment number, *i.e.,* "#1," "#2," "#3," "#4," and "#5."[72] He also removed the "/" special character where again, in each of the five most common instances of this character in the *street1* field ("1/2," "1/4," "c/o," "3/4," and "N/A"), this character appears to have a meaning important for matching.[73] Mr. Thompson then used these invalid street addresses for his street address matching in Tiers 1–16.

60. Similar patterns hold for the other fields that Mr. Thompson cleaned. For example, Exhibit 7 shows the five most common values cleaned by Mr. Thompson in the *street2* field. As was the case for the *street1* field, Mr. Thompson's most common data cleaning modifications for *street2* do not improve the quality of the data that can be used for matching. The values "#2" and "Apt. 2" in the *street2* field in Rows 1 and 3 respectively may be synonymous in many instances, but Mr. Thompson's own cleaning does not standardize these values in a way that would permit a match during subsequent deduplication steps, for example his use of exact matching does not match "2" and "Apt2."

---

[71] *See* Workpaper 6.

[72] *See* Workpaper 7. The value "#2" is the most common, followed by "#1," "#3," "#4," and "#5."

[73] *See* Workpaper 8. Mr. Thompson's final output actually includes the "/" special character in the *street1* field because he conducts non-ASCII cleaning after this step. Specifically, Mr. Thompson replaced "½" with "1/2," and he does this after removing symbols "/."

61. Mr. Thompson testified that Melissa Data's NCOA service may perform address standardization, but he was unable to describe the standardization process in his deposition and asserted that it would not be possible for him to validate the NCOA data processing done by Melissa Data.[74] In other words, Mr. Thompson admitted that he is unaware of the "internal processes" of this significant part of his data cleaning, leaving this potentially important step of his process a black box.[75] Additionally, as I described in Section V.C, Mr. Thompson only sent a subset of records to the NCOA, and that subset was arbitrarily chosen such that it may not always correspond to the most recent address available for a potential payor. Also, as I describe in Section XIII, I did not have sufficient access to the Melissa Data application to validate the additional standardization done by the Melissa Data operation myself.

**Exhibit 7**
***Most Common Values that Mr. Thompson Purportedly "Cleaned" in the street2 Field***

|  | *street1* in Raw Apple Payor Data | *street1_cleaned* in Mr. Thompson's Backup Materials[1] | Count |
|---|---|---|---|
| 1. | #2 | 2 | 529,730 |
| 2. | #1 | 1 | 393,997 |
| 3. | Apt. 2 | Apt2 | 391,553 |
| 4. | #3 | 3 | 388,081 |
| 5. | Apt. 1 | Apt1 | 377,465 |

Source: Apple Payor Data; Thompson Backup Materials
Note:
[1] This shows the purportedly "cleaned" values used in the ▉▉▉▉ rounds of Mr. Thompson's deduplication, prior to the NCOA standardization. I understand that the NCOA product used by Mr. Thompson through Melissa Data may perform additional standardization that may be applied to primary records before the last round of matching. However, Mr. Thompson was unable to describe the standardization performed by Melissa Data. *See* footnote 74.

---

[74] Thompson Deposition, pp. 186:11–188:10 ("[Melissa Data's NCOA] attempts to take the address input and standardize it to the -- basically, the postal -- the USPS form of an address, from -- from my understanding… Q. Okay. Did you perform any validation to confirm that the address cleaning steps being outsourced to Melissa Data Solutions were done correctly? A. No… Q. … [Y]ou're not aware whether they use exact matching or… fuzzy matching? A. I'm -- yeah I am not aware of their -- internal processes.").

[75] *See* footnote 74.

62.     These flaws also apply beyond the address fields. The five most common first names with numeric characters are "1" (which Mr. Thompson set to a missing value), "xp2n" (which becomes "xpn"), "M7md" (which becomes "Mmd"), "Applecard911" (which becomes "Applecard"), and "11" (which Mr. Thompson set to a missing value).[76] To the extent that some of these may be online usernames or another phrase unique payors identify with, removing numeric characters would decrease the quality of matching by removing information that could have helped to distinguish between distinct payors.

63.     These examples show that for the purpose of deduplicating records, Mr. Thompson's data cleaning is seriously deficient and ineffective, if not outright detrimental, and facilitates matching of records that should not be matched and does not allow matching of records that should be matched.

### B. Mr. Thompson's Deduplication Is Unreliable for the Purpose of Identifying Unique Payors

64.     Mr. Thompson's deduplication approach is also unreliable, in some obvious instances erroneously assigning records corresponding to a single individual to multiple purported payors, and in other instances assigning records corresponding to multiple individuals to a single purported payor. Each type of error will be discussed in turn. Consider named Plaintiff Robert Pepper, for whom I list two records in Exhibit 8. Mr. Pepper has at least two different account identifiers, and the payor records associated with one account identifier use the first name "Rob," while the payor records associated with the other use the first name "Robert." However, Mr. Pepper's records share the same address, phone number, and credit card data.[77] Mr. Thompson's method incorrectly concludes that named Plaintiff Pepper is two "unique payors" ("Rob" and

---

[76] *See* Workpaper 9.

[77] I note that the address matches the one Mr. Pepper provided in his deposition. *See* Pepper Deposition, p. 16:3–9 (noting that Mr. Pepper's home address in 2021 was ███████████████████████).

"Robert") because Mr. Pepper has records for which the first names and the Apple account identifiers do not match exactly.[78]

*Exhibit 8*
*Mr. Thompson's Matched Results for Named Plaintiff Pepper*

| | Purported Payor 1 | Purported Payor 2 |
|---|---|---|
| **person_id_hashed** | | |
| **compressed_full_name** | | |
| **hash_hashed** | | |
| **phone_number_hashed_cleaned** | | |
| **compressed_full_address** | | |
| **seq (JND_ID)** | | |
| **primary_seq (JND_Primary_ID)** | | |

Source: Thompson Backup Materials
Note: Mr. Thompson incorrectly assigned the records associated with named Plaintiff Pepper to two purported unique payors. As I described in Section V.C, Mr. Thompson catenated cleaned fields into new fields (e.g., *compressed_full_name*, *compressed_full_address*) which he then used for his matching exercise.

65. While Mr. Thompson appears to incorrectly identify records associated with named Plaintiff Pepper,[79] the personally identifying information in these two sets of records could correspond to Mr. Pepper and another individual at the same address with a similar name (e.g., ▮ ▮). Again, this would require individualized inquiry requiring more information than available in the Apple Payor Data, which is consistent with Mr. Thompson's deposition testimony that he

---

[78] In ▮ Mr. Thompson matched on ▮ ▮ *See* Exhibit 3 above. It's also worth noting that Mr. Thompson's method would never match two records for an individual that used a *first_name* like "Bill" in some records and another *first_name* like "William" in other records. Since these two *first_name* values do not have the first three letters in common, Mr. Thompson's method will *never* attribute them to a single "unique payor" even if all other variables in the data match. As I discussed in Section II, I understand that disambiguating unique payors such as named Plaintiff Pepper who might have more than one Apple account, as well as disambiguating multiple payors who share a single Apple account, is the very reason that Plaintiffs have retained Mr. Thompson. That his method fails to disambiguate Mr. Pepper's records because Mr. Pepper used a different first name for these two records associated with different Apple account identifiers is evidence of the inability of Mr. Thompson's method to reliably perform the intended disambiguation.

[79] For example, I understand from Mr. Pepper's deposition that Mr. Pepper has a son ▮ , but I see no indication that there is another individual living with Mr. Pepper who shares the name "Rob" or "Robert." *See* Pepper Deposition pp. 108:10–13 (describing that Mr. Pepper purchased an iPad for his "oldest son, ▮ ▮

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

could not distinguish cases based on the data alone.[80] However, even in this instance, it would still be appropriate to assign these records to a single "unique payor" if in fact only one person actually paid. Mr. Pepper used this notion of payor—i.e., the one who actually paid—in his deposition, describing that "it's me buying it" even if the app was for a family member's use.[81] There are many similar examples, such as records with different names and addresses but the same phone number, which might correspond to a single individual who changed their name and moved because of a marriage or divorce, or which could represent two individuals who had the same phone number at different points in time; records with different first names, but the same last name, address, and phone number, which could be due to the use of a nickname; and others. As I discuss in Section XI, Mr. Thompson made no attempt to quantify the portion of records he could not disambiguate, and even seemed to be unaware of the need to do so to assess the reliability of his method.

66.     Mr. Thompson's method is also unreliable because it produces a second type of error by erroneously assigning records for multiple people to the same purported "unique payor." As an example, consider the following records listed in Exhibit 9. These records share the first name "Kim," but they have no other information in common. When questioned in deposition, Mr. Thompson testified that "without any... additional information or evolution the data, [he]

---

[80] Thompson Deposition, pp. 146:13–147:7 (describing that Mr. Thompson "would not differentiate between those two payors … if they lived in the same household and had the same name."), 147:13–16 (discussing that Mr. Thompson could not rule out that records with the same last name but different first name might correspond to the same payor, "Q. … Do you agree that there could be records that have the same last name but different first names that could still correspond to the same payor? A. I certainly can't rule that out.").

[81] Pepper Deposition, p. 111:3–10 ("Q. And same for the iPad that was used by your son. Do you have any recollection of buying any apps on that iPad that your son was using? A. Yeah, I'm sure. So -- so it depends how you want to look at it. Would he ask me to buy an app for him, and I would say 'yes'? That happened. Do you classify that as him buying it or me? Like, I guess it's me buying it but it's for him.").

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

currently [didn't] see [these three records] as a...match."[82] However, Mr. Thompson's algorithm grouped these three records, and assigned them to a single purportedly "unique payor." This same purportedly "unique payor" was associated with over 40,000 records, some of which have little or no information in common other than the first name "Kim."[83] I reviewed Mr. Thompson's backup materials to determine why these records matched, and I was unable to replicate his result. When I ran Mr. Thompson's code, instead of one purportedly unique payor, I found 2,908 purportedly unique payors instead.[84] I return to this in Section XIII where I discuss that Mr. Thompson's methods are untestable because his backup materials do not produce his output. Notwithstanding the irreproducibility of Mr. Thompson's results, what is clear is that Mr. Thompson's final output associates these dissimilar records with the same purported "unique payor."

---

[82] Thompson Deposition, p. 151:20–25. Mr. Thompson also agreed that a large number, e.g. 1,000, of identical phone number records would be unlikely to be associated with a unique payor. *See* Thompson Deposition, pp. 137:18–138:1 ("Q. Do you think it is plausible that a single phone number, including area code, would be associated with over 1,000 unique payors? A. It seems unlikely. I certainly couldn't rule it out. Q. Okay. What if it was more than 100,000 unique payors? A. It seems unlikely. Again, I cannot rule it out.").

[83] *See* Workpaper 10.

[84] *See* Workpaper 11.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

*Exhibit 9*



67.     These examples show that Mr. Thompson's method has serious errors that cause his method to both overestimate and underestimate the number of distinct payors. The true number of "unique payors" may be higher or lower than what Mr. Thompson found, and I find that the correct set of records associated with any given "unique payor" may be different than the set of records that Mr. Thompson associated with that "unique payor." I understand that these sensitivities could affect the estimation of the number of uninjured class members. Mr. Thompson put no method forward for how to resolve these challenges, nor does he even attempt to assess the magnitude of the impact of these challenges on his deduplication methods and permit an assessment of the reliability of his methods.

### C. Mr. Thompson's Deduplication Is Inappropriately Sensitive to Small Changes

68.     Compounding the cleaning and deduplication problems described in the preceding subsections, Mr. Thompson's deduplication algorithm is inappropriately sensitive to small changes, in particular to changes in parts of his method that have nothing to do with matching. The goal of sensitivity analysis is "to ascertain how a given model (numerical or otherwise)

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

depends on its input factors."[85] In fact, "it is generally agreed in existing guidelines that uncertainty and sensitivity analyses are both crucial for the validation or verification of a model."[86] "Sensitivity analysis provides information on the relative importance of model input parameters and assumptions. It is distinct from uncertainty analysis, which addresses the question 'How uncertain is the prediction?' Uncertainty analysis needs to map what a model does when selected input assumptions and parameters are left free to vary over their range of existence, and this is equally true of a sensitivity analysis."[87] Not only did Mr. Thompson provide no estimate of his output uncertainty (a topic discussed in Section XI.A), but also it is clear that a deduplication algorithm's effectiveness should not depend on unrelated information such as the sort order of the records. As I discuss in Section XII.A, Mr. Thompson provided no justification for the judgments used in his algorithm, such as the fields chosen for matching in the Tiers or the order of Tiers, other than his own experience and sometimes no justification at all is offered. I show that these judgments chosen by Mr. Thompson have unexplained and unjustified important effects on the outcome of the deduplication algorithm, rendering his results unreliable.[88]

69.     As one of many examples of his arbitrary judgments that lead to inappropriate sensitivity, Mr. Thompson assigned the ███████████████████████████████

---

[85] Andrea Saltelli et al., "A Quantitative, Model Independent Method for Global Sensitivity Analysis of Model Output," *Technometrics*, 41(1), 1999, pp. 39–56 at p. 39.

[86] Andrea Saltelli et al., "Sensitivity Analysis," *SSRN*, 2021, pp. 1–10, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3977108, at p. 1.

[87] Andrea Saltelli, "Why So Many Published Sensitivity Analyses are False: A Systematic Review of Sensitivity Analysis Practices," *Environmental Modelling & Software*, 114, 2019, pp. 29–39 at p. 29.

[88] It is important to note that because of numerous flaws in the contents and documentation of Mr. Thompson's backup, his methods were untestable. I discuss this in detail in Section XIII. However, I was able to operationalize parts of Mr. Thompson's method, including his matching Tiers that do not rely on NCOA address. I was thus able to test the sensitivity of small changes to *specific parts of the method*.



████ .[89] He provided no justification for this decision.[90] However, as I discussed in Section V.C, ████████████████████████████████████████████

████████████████████████████████ .[91]

70. To demonstrate how Mr. Thompson's arbitrary choice of primary record affect the results of his matching, consider the example presented in Exhibit 9, which list records for a purported "unique payor" with the first name "Kim." As I described in Section VII.B, there are over 40,000 records in the Apple Payor Data that Mr. Thompson assigned to this purported payor. As the records assigned to this purported payor vary significantly in terms of the identifying information, the primary record selected at any given Tier of the matching process will have an important effect on the set of matches in the next Tier. To demonstrate this impact, I attempted to run Mr. Thompson's data cleaning and deduplication on all of the more than 40,000 records associated with this purported payor, except without the NCOA address cleaning step and ████ of the deduplication.[92] I also had to make some edits to Mr. Thompson's Computer Code, because as I discuss in Section XIII, that code did not run as produced.[93] Apart from these changes, I attempted to run Mr. Thompson's data cleaning and deduplication in exactly the same

---

[89] I discussed the arbitrary designation of a primary record in Section V.C. Another example of an arbitrary decision is the order of the matching tiers. While Mr. Thompson attempts to justify ████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████ *See* Thompson Supplemental Report, ¶ 17.e.

[90] Another decision rule, for example, would have been to assign the most recently updated record to be the primary record. As I also noted in Section V.C, this may have been a more principled way of choosing which record to send to Melissa Data for NCOA and other address cleanup.

[91] Except during ████████ Mr. Thompson's matching, which attempts to deduplicate records with a missing name.

[92] I did not have access to NCOA data.

[93] ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████ .

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

order specified in his ReadMe file, and with no changes to the substantive data cleaning or deduplication steps as specified in his code. This produced 2,908 purported "unique payors."[94]

71.     I then re-sorted the raw Apple Payor Data, and proceeded to rerun *exactly* the same set of cleaning and deduplication steps just discussed. With this new sort order for the raw Apple Payor Data, Mr. Thompson's code produced 2,429 purported "unique payors," a 16.5 percent change.[95] This sensitivity to an arbitrary change that should not affect the results shows that Mr. Thompson's deduplication method is unreliable.

72.     **Conclusion**. Mr. Thompson's method is flawed and unreliable, with no discernable methodology, for the purpose of deduplicating records because it relies on ineffective or even detrimental data cleaning operations, the deduplication is inconsistent—in some instances erroneously assigning records for a single individual to multiple purported payors, and in other instances erroneously assigning records corresponding to multiple individuals to a single purported payor—and is based on judgments that are unsupported, arbitrary, ad hoc, and inappropriately sensitive to small changes, rendering the output unreliable.

## VIII.   Mr. Thompson's Deduplication Method Was Designed For Providing Class Notice and Claims Administration, and Such an Approach Is Not Appropriate for a Reliable Identification of Unique Payors

73.     I understand that Mr. Thompson's methods were designed for the different purpose of providing class notice and claims administration, which rely on the substantially narrower task of deduplicating records in a dataset.[96] Mr. Thompson explained in his deposition testimony that in

---

[94] *See* Workpaper 11. This is far more than the single unique payor that Mr. Thompson identifies for these records, however it is not clear why Mr. Thompson's Computer Code did not produce the result in his final output.

[95] *See* Workpaper 12.

[96] Thompson Deposition, pp. 117:22–118:13 ("Q. … Your report states that in formulating your opinions in this case, you relied on well-accepted methods of consolidating contact data in the claims administration field including proprietary methods that JND has developed over the past nine years, correct? A. What section? Q. Let's see. Paragraph 10. Thank you. A. Okay. You see the language that I'm referring to in paragraph 10? A. I do. Q. All right. And the methods that you are describing in paragraph 10, they attempt to clean, deduplicate and match records, correct? A. Cleanse and deduplication, yes.").

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

every case that was included in Appendix B of his Supplemental Report (listing his work in the past four years), he reviewed or oversaw the review of data for the purpose of "class action settlement administrations."[97] Mr. Thompson also confirmed in his deposition testimony that when providing notice to class members in the claims administration field, "the goal is to get the best notice practicable under the circumstances to members of the class identified through reasonable efforts."[98] He stated that "the intent [of deduplication] would be to combine [i.e., deduplicate] records that represent the same entity, so that whatever future action needs to be taken can be done for … an individual once. People are not a big fan of receiving 78 postcards … And also, 78 postcards … carry a cost."[99] Although deduplicating records is the goal in providing class notice, Mr. Thompson testified that it is permissible to under-aggregate records in a way that might result in "overnoticing" a certified class, as long as the class was notified "in the most efficient way possible."[100]

---

[97] Thompson Deposition pp. 24:14–18 ("Q. … And what is JND? A. JND is a legal administration firm. We provide legal administration -- or for -- administration services for class action lawsuits, securities cases. We also have a e-discovery division."), 26:5–10 ("Q. And in that paragraph 6, you state that Appendix B is a non-exhaustive list of class action settlement administrations for which I reviewed or oversaw the review of data in the last four years, correct? A. Yes.").

[98] Thompson Deposition, pp. 35:5–36:1 ("Q. All right. When deduplicating records within the claims administration process, the goal is to get the best notice practicable under the circumstances to members of the class identified through reasonable efforts, correct? A. It is -- it is a goal. It's -- as I've mentioned, it is situational, what -- what is required for -- for any particular administration. Notice may not be one of the deliverables. But where administration -- or where noticing is and we have class data, then I believe that is a reasonable statement. Q. And what are other -- you mentioned -- you said that the deduplication with the goal of getting the best notice practicable under the circumstances to members of the class identified through reasonable effort, you said that is one goal -- or that is a goal. What are other goals? MR. BURT: Objection to form. A. We have situations -- administrations that we've administered where there is no noticing. We were just doing distribution.").

[99] Thompson Deposition, p. 37:13–20.

[100] Thompson Deposition, pp. 60:23–61:18 ("Q. (BY MR. LAZARUS) And the part about not deduplicating individuals that were not conclusively the same person, what does that refer to? A. That refers to not including logic within a deduplication process that we did not have high confidence that those -- the data points utilized would result in a -- a positive match ... Q. Is that an appropriate practice in deduplication for claims administration? A. I believe it to be, yes. Q. Okay. And why is that appropriate? A. If you are able to deduplicate with high confidence but don't deduplicate the records that you do not have confidence in the deduplication, you may slightly overnotice, but you are still notifying the class in the most efficient way possible"). *See also* Thompson Deposition, pp. 61:1–13

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

74. Mr. Thompson took the same approach in this matter as he had taken in his prior claims administration work. He stated that as he "understood [his] assignment [for the present matter], it was to reduce duplication to the best of [his] ability where [he] had confidence that [he] had matched records that were of the same entity."[101] To do so, Mr. Thompson stated that he applied "well-accepted methods of consolidating contact data in the claims administration field."[102] He compared his process for deduplicating Apple Payor Data to the deduplication he conducted for a ████████████████████████████████████████████████████████████████████ ████████████████████████████████ before sending class notice.[103] The declaration submitted by JND—the firm at which Mr. Thompson works—to the court for that matter noted that "JND was trusted by the Parties to institute deduplication measures based on and in accord with [claims administration] industry best practices to combine records so that we could reduce duplicate mailings."[104]

75. In this case, Mr. Thompson's assignment was different and required more than deduplication of contact information. As noted in Section VI, Mr. Thompson stated his assignment was to "determine whether there exists a reliable means by which to consolidate duplicative payor records *that all relate to the same person* [… and] if such a means exists, [… to ] proceed with deduplicating those records [… to *identify*] *each unique payor*" (emphasis

---

(discussing Mr. Thompson's approach that involved "not including logic within a deduplication process that we did not have high confidence that … the data points utilized would result in a … positive match"), 62:7–11 (discussing that Mr. Thompson's goal "was to deduplicate where I had high confidence in the match and not deduplicate where … I did not believe … it was reasonable to believe that the records were -- represented the same entity or individual.").

[101] Thompson Deposition, p. 96:6–13 ("Q. Okay. And as you understood your assignment, was that assignment asking you to reduce duplication to zero or reduce duplication to some other level? A. As I understood my assignment, it was to reduce duplication to the best of my ability where I had confidence that I had matched records that were of the same entity. I -- I cannot point to -- well, that's -- that's it.").

[102] Thompson Supplemental Report, ¶ 12.

[103] Thompson Declaration, ¶ 3; Thompson Supplemental Report, ¶ 4.

[104] Thompson Deposition, p. 36:2–19.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

added).[105] As I discuss next in Section IX, the ability of a well-executed deduplication method to identify unique payors depends on the nature of the records being deduplicated, and in this case fails.

76. **Conclusion**. Mr. Thompson's deduplication method was designed for providing class notice and claims administration, where it is permissible to under-aggregate records as long as the class was notified most efficiently, and the goal of such an approach is inappropriate for the reliable identification of unique payors in the Apple Payor Data.

## IX. Mr. Thompson's Conclusion that His "Deduplication" Approach Reliably Identifies Unique Individuals is Unsupported By Any Evidence

77. Mr. Thompson described the first part of his assignment as "determin[ing] whether there exists a reliable means by which to consolidate duplicative payor records that all relate to the same person and associate those names to a unique person."[106] Despite the vast majority of the Thompson Report being devoted to the second part of Mr. Thompson's assignment (implementing a deduplication method intended to identify unique payors),[107] the first part— determining whether consolidating duplicative records can reliably identify unique payors—is just as necessary to support Mr. Thompson's assignment.[108] Assuming *arguendo* that Mr. Thompson's implemented algorithm flawlessly removed the "vast majority" of duplicate records (as he claims)[109], if it does not satisfy the first part of his assignment, Mr. Thompson's output can

---

[105] Thompson Supplemental Report, ¶ 9.

[106] Thompson Report, ¶ 7. I note that there are no files in Mr. Thompson's backup materials that appear to correspond to his purported analysis of a sample of Apple Payor Data that he claims to have used to form his opinion that "records could be deduplicated reliably." *See* Thompson Supplemental Report, ¶¶ 10, 13–14.

[107] Thompson Report, ¶ 7.

[108] Thompson Report, ¶ 7.

[109] Thompson Supplemental Report, ¶ 10.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

only be interpreted as a version of the input data with duplicates removed.[110] That alone does not indicate the alleged "payors" identified by Mr. Thompson's method reliably represent unique individuals.

78.     Mr. Thompson's conclusion regarding the first part of his assignment is that "[i]t is [his] opinion, based on [his] considerable experience and the methods [he] applied here, that the final number of approximately 246 million records in the Final Payor Database is a reliable determination of unique individuals."[111] However, this conclusion is entirely unsupported by evidence, regardless of whether clear duplicates are removed correctly (which they are not, see Section VII). Despite Mr. Thompson's vague allusion to "methods [he] applied here," no method described in the Thompson Supplemental Report nor any code found in Mr. Thompson's Computer Code provides support for his conclusion.[112]

79.     When deduplication methods are used with the goal of reducing duplicative records (for example, to save money on postage), a competent deduplication method may be implemented to some benefit on virtually any data that contains duplicates.[113] However, for a deduplication-based approach to reliably identify unique individuals, as in this case, the method would need to be implemented proficiently *and* the dataset at issue would need to conform to certain assumptions. This fact is entirely missed by Mr. Thompson and consequently not addressed. Logically, for the task of reliably identifying unique individuals to be possible with a deduplication-based approach, all records attributable to the same individual must be sufficiently similar and all records attributable to different individuals must be sufficiently different. In other words,

---

[110] Thompson Deposition, p. 68:17–25 ("Q. Okay. And am I correct that, in broad 18 strokes, what you did in this case was to evaluate data produced by Apple, cleanse the data and deduplicate the data by matching records that appear to you to represent the same person. Is that -- MR. BURT: Objection to form. Q. (BY MR. LAZARUS) Is that a fair characterization of what you have done? A. I think that is a reasonable summary.").

[111] Thompson Supplemental Report, ¶ 19.

[112] Thompson Supplemental Report, ¶ 19.

[113] I defined deduplication in footnote 34.

disambiguation must be possible. Mr. Thompson stated this limitation during his deposition, noting that "[r]ecords would not be matched and deduplicated if they did not have the data points available to match records together to a level that I had confidence that they could be considered the same record."[114]

80.    **Example**. A deduplication-based method, when implemented correctly, can identify unique individuals in certain datasets. For example, unused portions of the ███████████ ████████████████████████████████████████████████████████████████████ ███████████████████████ A deduplication-based method likely could reliably identify the number of individuals in an employer-maintained dataset containing names and Social Security numbers verified to be accurate for example, as all records attributable to a single individual would be sufficiently similar (same SSNs), while all records attributable to different individuals would be sufficiently different (different SSNs). However, for many datasets, this assumption does not hold. For example, if instead of verified SSNs, a dataset contained only birth month and year, it would likely not be possible to reliably produce a list of unique individuals, since a single combination of fields could correspond to multiple real individuals. It could similarly be impossible to identify unique individuals in a dataset that contained user-provided SSNs that contained typos and errors. Thus, the ability to reliably identify unique individuals depends on the fields available in the data and the quality of the data.

81.    For these reasons, whether the Apple Payor Data has the quality and characteristics that would allow deduplication to identify unique individuals is a fact-specific empirical question. Despite Mr. Thompson's conclusory language, Mr. Thompson left this question unanswered. As such, Mr. Thompson's claim—based only on his "considerable experience" from past engagements—that the methods described by the Thompson Supplemental Report produce a

---

[114] Thompson Deposition, p. 100:5–8.

"reliable determination of unique individuals" in this case lacks merit.[115] Whether Mr. Thompson's deduplication method could reliably identify unique individuals in some past dataset (which has not been demonstrated in this litigation) has no relevance to whether his method can reliably identify records for unique individuals in the Apple Payor Data.

82.     In addition to Mr. Thompson apparently not directly analyzing whether the fields and quality of the Apple Payor Data allow for deduplication to reliably identify unique individuals, the evidence that Mr. Thompson does present regarding data quality points to the contrary position. Mr. Thompson's analyses appear to corroborate Apple's assessment that the Apple Payor data has significant issues that cannot be fully resolved.

83.     When producing these data, Apple warned that its data contain "user-generated data" that are "not verified by Apple," and specifically that "not all data fields are populated for all payor data records, and those that are populated may contain data that is not reliable."[116] Mr. Thompson verified that Apple's representations regarding data quality were correct, confirming that "significant data issues were identified with the quality" during his analysis of the sample.[117] Mr. Thompson also noted that "[a] large portion of the records had missing data," and confirmed the existence of apparently fake or unexpected values across many other fields.[118] While my analysis validated the conclusions of both Apple and Mr. Thompson on this issue, even a brief review would have been sufficient since just the first handful of records I reviewed contained missing, anomalous, and apparently erroneous values.

84.     Mr. Thompson further declared that these issues were so pervasive that they could not be fully resolved by his cleaning method, noting that for a dataset with "this many issues with data

---

[115] Thompson Supplemental Report, ¶ 19.

[116] *See* Letter from Eli M. Lazarus to Rachele R. Byrd and Kyle M. Wood, "Re: *In re iPhone Antitrust Litig.*, No. 4:11-cv-06714-YGR (N.D. Cal.), Apple's Sample Payor Data Production Letter," July 10, 2024.

[117] Thompson Declaration, ¶ 5.

[118] Thompson Declaration, ¶ 5.

quality" there would be "no way to reach a perfectly cleansed set," which is also a conclusion that my analysis of Mr. Thompson's method supports (see Section VII.A).[119] Given that a deduplication-based method can only identify unique payors reliably if the input data is of sufficient quality, and Mr. Thompson's description of the quality of the Apple Payor Data appears to be consistent with Apple's understanding, it is unclear how Mr. Thompson then concludes that the Apple Payor Data is of sufficient quality such that removing similar rows can produce a "reliable determination of unique individuals."[120] The Thompson Supplemental Report is silent on this question.

85.     When describing his results, Mr. Thompson similarly provided no evidence that his method of deduplication reliably identifies individuals, instead focusing on how many records were combined. The sole statistic Mr. Thompson offered in apparent support of his method in the Thompson Supplemental Report is the claim that he reduced the number of primary records in the Apple Payor Data from "███ billion to approximately ███ million unique individuals."[121] Mr. Thompson made a similar claim when asked about the quality of his results during his deposition, stating that "[w]hen you achieve over 80 percent reduction, my experience is that is an exceptional deduplication effort."[122] But these claims only evaluate the difference between Mr. Thompson's output and the input data he used, rather than the difference between Mr. Thompson's output and actual unique payors. Therefore, even if Mr. Thompson's deduplication method was adequate for eliminating duplicative records to save on mailing costs, or efficiently notice a class, there is no basis for his opinion that "███ million records…is a reliable determination of unique individuals."[123] Therefore, even if all of the analyses performed by Mr.

---

[119] Thompson Declaration, ¶ 7.e.

[120] Thompson Supplemental Report, ¶ 19.

[121] Thompson Supplemental Report, ¶ 18.

[122] Thompson Deposition, p. 97:18–20.

[123] Thompson Supplemental Report, ¶ 19.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

Thompson are accepted at face value, and every methodological and conceptual error ignored, his analyses could only support an opinion regarding the large proportion of duplicate records in the Apple Payor Data, rather than how close his output is to the true class, which he never purports to evaluate. I discuss this further in Section XI.B.

**X.      Mr. Thompson Provided No Evidence that His Method Can Be Relied Upon in a Process to Assign Transactions to Payors**

86.      According to the Thompson Supplemental Report, Mr. Thompson was charged with identifying "payor records that all relate to the same person."[124] I understand from Counsel that for the purposes of calculating damages, Mr. Thompson's output was relied upon to assign individual transactions to payors, by mapping from transaction to payor record to a supposed class member identified by Mr. Thompson. For Mr. Thompson's output to be suitable for this purpose, merely identifying a list of unique potential class members (which I do not believe Mr. Thompson has done reliably) would be insufficient—the ▮ billion individual payor records must be assigned to the correct class member. However, when describing his conclusions, Mr. Thompson speaks only of the total number of potential class members, stating that "JND deduplicated the Apple Payor Data to reduce the number of potential Class members from approximately ▮ billion to approximately ▮ million unique individuals" and that "the final number of approximately ▮ million records… is a reliable determination of unique individuals."[125] It is unclear whether the Thompson Supplemental Report is intended to state that individual payor records are assigned reliably by his method, but his report and Computer Code provide no basis for that claim.

87.      Creating a class list that includes unique payors is a different and considerably simpler task compared to accurately assigning all ▮ billion payor records to class members, as it does not require correctly disambiguating individual records.  For example, consider a case where 15

---

[124] Thompson Supplemental Report, ¶ 7.

[125] Thompson Supplemental Report, ¶¶ 18–19.

payor records must be assigned correctly to 3 different potential class members. A given method might discern that there are 3 potential class members while assigning nearly all payor records and transactions to the wrong payors. While this output could be used for providing notice, and would qualify as a list of unique payors, any damages calculations that relied on it would be entirely incorrect.

88.     Whatever errors exist with regards to Mr. Thompson's purported list of unique payors, it is likely that those errors significantly understate his total error in assigning each of the ▮ billion payor records to the particular grouping of records meant to represent unique payors.  As discussed previously (Section VII.B), Mr. Thompson's method appears to have difficulty disambiguating transactions in instances in which a "unique payor" may use multiple Apple accounts, or in which multiple "unique payors" may have paid for transactions through the same Apple account, with such cases being assigned in a manner that is inconsistent or incorrect.  In that section, I provided an example of the difficulty of disambiguating children who paid using a parent's credit card from parents paying with the same card, which is just one example where Mr. Thompson's method is unable to correctly assign transactions, regardless of whether it is able to identify the correct number of unique payors (which appears to vary case to case).

89.     The questionable nature of Mr. Thompson's matching of individual payor records to class members is highlighted by the number of conflicts between Mr. Thompson's method of assigning payors and the method it supposedly improves upon, which is a comparison Mr. Thompson never makes. The Thompson Supplemental Report claims the existence of ▮ billion "potential Class members" prior to his deduplication (referencing the total number of records in the Apple Payor Data), and compares his ▮ million alleged class members exclusively to this number. However, I understand from Counsel that the number of alleged potential class members prior to Mr. Thompson's analyses was ▮ million, which is the number of potential class members if every account is assumed to belong to a unique payor. Mr. Thompson never engages with a comparison, and both methods would produce conflicting

results, he does not show why his method is an improvement on the previous flawed method Plaintiffs employed.[126]

90.     For *56 percent* of account-payor combinations in Mr. Thompson's output, the account corresponds to at least one other payor or the payor corresponds to at least one other account.[127] This shows the prevalence of potential disambiguation issues would need to be examined for a correct assignment of transaction to unique payors, but that Mr. Thompson did not examine. This need for disambiguation is true despite both methods producing a similar number of purported class members. Furthermore, Mr. Thompson's output implies the existence of payors associated with many accounts. For example, 4 payors are associated with over 100,000 accounts.[128] For the alleged payor associated with the most accounts, these accounts are also associated with approximately 65,000 others payors.[129] It is unclear why Mr. Thompson's method produces these results as no analyses supporting his unintuitive assignments of individual payor records to unique payors was described or provided. Therefore, even if Mr. Thompson's estimate that the Apple Payor Data contain "approximately ▮ million unique individuals" were correct (and I do not believe that it is), there is no evidence supporting Mr. Thompson's conclusion that his output can be used to reliably match between individual transactions and class members.

91.     **Conclusion**. Mr. Thompson provides no evidence that his method reliably assigns individual records in the Apple Payor Data to the correct unique payor, and an examination of his method shows important examples where his method did not.

---

[126] *See* Thompson Supplemental Report, ¶ 18. *See* Workpaper 12.

[127] *See* Workpaper 13.

[128] Upon review, none of these payors appeared to be legitimate (i.e., none appear to belong to a large organization or government with over 100,000 accounts).

[129] *See* Workpaper 14.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

**XI.     Mr. Thompson Provided No Assessment of the Error Rate of His Method and No Validation to Review Potential Sources of Error, Thus Omitting Key Components of Reliability Assessment**

92.     While Mr. Thompson purported to have performed "validation" of his work, my review of Mr. Thompson's Computer Code and his output shows that his purported validation was woefully inadequate and ineffective. He performed no estimation of the error rate, or confidence, associated with his method, including no appropriate validation of the data inputs he attempted to use to deduplicate, and no appropriate validation of the output of his method to confirm that he had reliably identified unique payors.

93.     In data analytics and statistics, validation is an essential step to ensure that a method is reliable.[130] In the context of Mr. Thompson's data cleaning, validation should be applied to the data, to ensure data cleaning actually brings the cleaned values closer to the correct values, and to the output itself, to ensure the statistical estimates are close to what they should be. As it relates to his deduplication effort, validation would allow the estimation of the magnitude of errors in his method that could either lead to incorrectly grouping records that should not have been grouped, and therefore underestimating the number of unique payors, or fail to group records that should be grouped, resulting in overestimation of the number of unique payors. Error estimation is crucial for assessing the reliability of Mr. Thompson's methods, and Mr. Thompson acknowledged that his method could simultaneously make underestimation and overestimation

---

[130] National Research Council, "Chapter 5: Model Validation and Prediction," in *Assessing the Reliability of Complex Models: Mathematical and Statistical Foundations of Verification, Validation, and Uncertainty Quantification*, (Washington, DC: The National Academies Press, 2012) pp. 52–85 ("NRC (2012)"). *See also* Soumia Belouafa et al., "Statistical Tools and Approaches to Validate Analytical Methods: Methodology and Practical Examples," *International Journal of Metrology and Quality Engineering* 8, 2017, pp. 1–10 ("Belouafa et al. (2017)") at p. 1 ("The principle of validation of quantitative analytical procedures is widely spread today in all domains of activities where measures are made. The objective of validation of an analytical method is to demonstrate that the method is suitable for the intended use... The intent of method validation is to provide scientific evidence that the analytical method is reliable and consistent before it can be used in routine analysis of product.").

Highly Confidential—Attorneys' Eyes Only                                    Page 52
Subject to Protective Order

errors. However, in defiance of standard practice and his assignment, Mr. Thompson made no attempt to assess or quantify the scope of those errors.[131]

### A. Mr. Thompson Provided No Assessment of the Error Rate of His Method, a Key Component of Reliability Assessment

94. Mr. Thompson acknowledged in his deposition that his method may not deduplicate perfectly, and that he could not rule out the possibility of error.[132] Similarly, in the Thompson Declaration, he described that "[t]here is no way to reach a perfectly cleansed data set on a volume of records this large with this many issues with data quality."[133] Although estimating the error rate of his method and the uncertainty or confidence associated with his output of his method is a requirement for methods reliability assessment, Mr. Thompson made no such

---

[131] Thompson Deposition, pp. 166:3–11 ("Q…Is it possible that there were mistakes in cleaning the data? A. I certainly can't rule it out. Q. Is it possible that there were mistakes in matching the data? A. Also certainly cannot rule that out."), 164:15–165:6 ("Did you estimate a false positive rate, by which I mean the rate at which you identified two records as being the same payor even though they are not in reality? A. Did I estimate a false positive rate? Q. Yes. A. I did not. Q. Okay. And similar question, did you estimate a false negative rate? A. Can you expound by -- provide the full definition, please? Q. I will. So did you estimate a false negative rate, by which I mean the rate at which you identified two records as being different payors even though in reality they are the same payor? A. I did not.").

[132] Thompson Deposition, p. 166:3–11 ("Q. … Is it possible that there were mistakes in cleaning the data? A. I certainly can't rule it out. Q. Is it possible that there were mistakes in matching the data? A. Also certainly cannot rule that out."). *See also* Thompson Deposition, p. 99:9–22 ("Q. … In your analysis of the Apple payor data, is it possible that you eliminated 100 percent of the deduplication? A. I can't rule it out. Q. Okay. How likely do you think it is that you eliminated 100 percent of the duplication? A. I -- I don't know how to quantify -- quantify that. I -- I -- yeah, I don't know how to that. Q. Okay. Have you tried to quantify that at all? A. I have not.").

[133] Thompson Declaration, ¶ 7.e.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

attempt.[134] Such quantification is a critical standard practice in the scientific community.[135]

Indeed, in his deposition, Mr. Thompson testified that he didn't know how to quantify the

amount of deduplication he had achieved through his method, i.e., the extent to which his

method had grouped all records that should have been grouped.[136]

95.     In scientific work, typically a *confidence interval* is calculated, which allows a scientist to

quantify the expected accuracy of the estimated output.[137] Thus, I would expect Mr. Thompson's

estimate of unique payors to be accompanied by a measure of error such as a confidence interval,

---

[134] To understand how to assess and quantify an error rate associated with a statistical method, it is instructive to understand the types of errors that may occur. Deduplication can create two types of errors: the process can incorrectly match records that should not be matched, commonly referred to in statistics as a false positive, or the process can fail to match records that should have been matched, referred to as a false negative. *See* Comber and Arribas-Bel (2019), p. 343 (When evaluating the success of their address matching method, "In Figure 4, the top left quadrant shows true negatives, top right shows false positives, bottom left shows false negatives, and bottom right shows true positives. Briefly, true positives are address pairs labeled as matches that are true matches; false positives are address pairs mislabeled as matches; true negatives are records classified as non-matches which are true non-matches; and false negatives are addresses classified as non-matches but are actually true matches."). There is a tradeoff between these two types of error. To see this tradeoff, consider first a method that assigned every record in the data to a single "unique payor." In this case there would be no false negatives *i.e.*, by construction, no records are not matched that should have been matched. However, there would likely be significant false positives, i.e., many records that should not have been grouped together because they correspond to distinct payors would be incorrectly grouped together under this method. Conversely, now consider a method that assigned every record in the data to a distinct payor . In this case there would be no false positives, *i.e.*, there would be no records for two distinct payors that would be incorrectly grouped since by construction the approach would not group any records. However, there would likely be a significant number of false negatives, *i.e.*, the method would fail to group records that should have been grouped as a single payor.

[135] Robert V. Hogg et al., *Probability and Statistical Inference*, Ninth Edition, (Upper Saddle River, NJ: Pearson Education Inc., 2015), pp. vii ("Statisticians recognize that there are often small errors in their inferences, and they attempt to quantify the probabilities of those mistakes and make them as small as possible. That these uncertainties even exist is due to the fact that there is variation in the data... In light of this uncertainty, the statistician tries to determine the pattern in the best possible way, always explaining the error structures of the statistical estimates"), p. 2 ("[S]tatisticians know that mistakes will be made in data analysis, and they try to minimize those errors as much as possible and then give bounds on the possible errors. By considering these bounds, decision makers can decide how much confidence they want to place in the data and in their analysis of them.").

[136] Thompson Deposition, p. 99:16–22 ("Q. Okay. How likely do you think it is that you eliminated 100 percent of the duplication? A. I -- I don't know how to quantify -- quantify that. I -- I -- yeah, I don't know how to quantify that. Q. Okay. Have you tried to quantify it at all? A. I have not.").

[137] *See, e.g.*, Geoff Cumming et al., "Error Bars in Experimental Biology," *Journal of Cell Biology*, 177(1), 2007, pp. 7–11 at p. 7 (" Journals that publish science—knowledge gained through repeated observation or experiment—don't just present new conclusions, they also present evidence so readers can verify that the authors' reasoning is correct. Figures with error bars can, if used properly (1–6), give information describing the data (descriptive statistics), or information about what conclusions, or inferences, are justified (inferential statistics)."). *See also* Belouafa et al. (2017), p. 3 ("Confidence intervals are used to indicate the reliability of an estimate. Confidence intervals provide limits around the sample mean to predict the range of the true population of the mean.").

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order                                                                Page 54

so a reader can assess the accuracy of his estimate of the true number of unique payors. Without this information, readers do not know whether Mr. Thompson's estimate of the number of unique payors is expected to be close or potentially far from the true number, given his methods.[138] Providing these confidence estimates is standard practice in data inference.[139]

96.     To assess and measure a method's error rate, it is common to employ statistical approaches. For example, one might evaluate an address matching algorithm against comparable external dataset or a "gold standard" benchmark dataset for a sample of correctly matched records.[140] The results of running the matching algorithm on the gold standard dataset could give an estimate of the accuracy of the matching algorithm under consideration.[141]

97.     While I have not attempted to perform a rigorous quantification of the error rate in Mr. Thompson's method, I anticipate that, if I did, I would find a high error rate given the numerous

---

[138] For example, take two different scenarios: one in which Mr. Thompson gave an estimate of the number of unique payors that with 95 percent confidence does not deviate by more than ▮ million payors from the true number of unique payors, and a second in which Mr. Thompson instead gave an estimate of the number of unique payors that with 95 percent confidence does not deviate by more than ▮▮ million payors from the true number of unique payors. The informativeness of Mr. Thompson's estimate of ▮ million unique payors would be very different in these two scenarios. Because Mr. Thompson did not apply standard confidence intervals to his work, he provides no basis on which to determine which of these situations is closer to reality. In the second case, our confidence in his methods would be much lower. While these two scenarios are hypothetical, they illustrate how important such estimates of precisions are for assessing the reliability of Mr. Thompson's method.

[139] *See, e.g.*, Dennis Gilliland and Vince Melfi, "A Note on Confidence Interval Estimation and Margin of Error," *Journal of Statistics Education*, 18(1), 2010, pp. 1–8 at p. 1 ("Confidence interval estimation is a widely used method of inference and margin of error is a commonly used term, and these occupy a large part of introductory courses and textbooks in Statistics…" (emphasis removed). As another example, the prestigious journal *Science* requires authors to report a measure of uncertainty of point estimates. *See* Science, "*Science* Journals: Editorial Policies," available at https://www.science.org/content/page/science-journals-editorial-policies#TOP-guidelines, accessed on June 16, 2025 ("Point estimates of population parameters (e.g., mean, correlation coefficient, slope) or comparative measures (e.g., mean difference, odds ratio, hazard ratio) should be accompanied by a measure of uncertainty, such as a standard error or a confidence interval.").

[140] Mr. Thompson testified in his deposition that, although he understood the concept of a gold standard test data set, he didn't know how the concept would apply in this matter. *See* Thompson Deposition, p. 168:9–24 ("A. Well, a -- a gold standard [data set is]… a perfect sample. But -- and, again, I don't know how that applies in this -- is applicable in this situation.").

[141] Other common metrics to assess error in address matching including precision (the ratio of true matches over the sum of true positives and false negatives), recall (the ratio of true positives over the sum of true positives and false negatives), accuracy (sum of precision and recall), and the f-measure (a summary metric computing an average of precision and recall). *See* David Hand and Peter Christen, "A Note on Using the F-Measure for Evaluating Record Linkage Algorithms," *Statistics and Computing*, 28, 2018, pp. 539–547.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

problems I have identified and discussed in this report, including errors found even in the deduplication of named Plaintiff Robert Pepper's records. Mr. Thompson failed to perform any standard validation to confirm that his algorithm is producing reliably correct matches and deduplication, and further failed to provide any information of when his method is expected to work well, and when it isn't.

### B. Mr. Thompson Did Not Appropriately Validate the Inputs or Outputs to Identify Sources of Error

98. In order to assess the error rate associated with a method, one must validate the input and output data to determine sources of error and the potential magnitude or prevalence of those errors.[142] While Mr. Thompson claims to have "evaluated the entire data set" for "data quality issues,"[143] he apparently reported no systematic evaluation of the prevalence of data quality issues, nor did he systematically correct or account for those issues or attempt to assess the success of his data cleaning efforts. He purports to have "looked for mistakes" in his deduplication output and he testified that he could not give "an example [of a mistake] because [he] attempted to identify and resolve them." However, I identified numerous important mistakes in his output upon a short initial review.[144]

99. For example, as part of his data cleaning, Mr. Thompson purportedly removed 16 phone numbers "that appeared very frequently [in the full Apple Payor Data] and, therefore, could be

---

[142] *See, e.g.*, NRC (2012), p. 53 ("Identifying and representing uncertainties typically involves sensitivity analysis to determine which features or inputs of the model affect key model outputs.").

[143] Thompson Supplemental Report, ¶ 17.a.

[144] Thompson Deposition, pp. 165:15–166:2 ("Q. If there are mistakes in your matching, what are the sources of those mistakes? And I will revise it to say, if there are mistakes in the matching that you conducted in this case, what do you believe are likely to be the sources of those mistakes? A. I don't know how to answer that because I -- I looked for mistakes. I tried to identify mistakes and then fix mistakes. So if I had a -- a area where I thought, oh, there's mistakes, I would have attempted to identify and resolve. It's not to say there are no mistakes as much as I can't give you an example because I attempted to identify and resolve them.").

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

not legitimate phone numbers."[145] It is unclear how Mr. Thompson arrived at or validated his list of removed phone numbers. Specifically, while Apple provided Mr. Thompson with a list of 16 apparently fake phone numbers based on the Apple Payor Data Sample (*e.g.*, Apple provided the hashed values corresponding to 16 apparently fake numbers like 1234567 and 4567890 that each appeared in tens of thousands of sample records), Mr. Thompson does not appear to remove these 16 numbers. Inexplicably, two of the 16 phone numbers he removed are associated with only a single Apple account and a single record.[146] Therefore, it appears that the phone numbers he removed are not the same as the anomalous phone numbers provided by Apple. No validation is evident in the Computer Code or documentation to support Mr. Thompson's decision to remove values from the *phone_number_hashed* field that appear "too frequently," nor whether this was carried out successfully.

100. Also, as I discussed in Section VII.A, Mr. Thompson claimed to have identified invalid characters to remove through "validation."[147] However I observe that the result of many of these data cleaning steps was simply to replace one invalid entry with another, suggesting that no true validation actually took place. As an additional example, Mr. Thompson removed the special character "/" from the *city* field. For some records, the *city* field contained values like "Bronx/Manhattan" or "Beverly Hills/Los Angeles." Thus, the result of removing the special character "/" was to change the *city* field for these records to "BronxManhattan" and "Beverly HillsLosAngeles," respectively. Had Mr. Thompson validated this cleaning, he would have seen the need to standardize these cities so they could potentially be matched with some version of

---

[145] Thompson Deposition, p. 136:20–24 ("Q. Did you investigate whether there were any other values for phone_number_hashed that appeared very frequently and, therefore, could be not legitimate phone numbers? A. I did.").

[146] *See* Workpaper 15. Additionally, another two phone numbers that Mr. Thompson removed are only associated with 7 records and 16 records, respectively.

[147] Thompson Supplemental Report, ¶ 17.e. *See also* Thompson Deposition, p. 87:14–20 ("Q. When you say 'cleanse the records,' does that mean cleanse them to remove the emojis and the profanity? A. It means, yeah, removing profanity if I could identify it and removing emojis, or in nonstandard ASCII characters, potentially translating them if possible.").

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

"New York City" and "Los Angeles," respectively. If Mr. Thompson had done appropriate validation, he presumably would have seen that his data cleaning resulted in values that would not match correctly.[148]

101.    Additionally, Mr. Thompson's purported validation of his output was not systematic. While he testified in his deposition that he performed "validation" on his matching,[149] it is clear from his final deduplicated results that his validation—if he in fact performed any—failed to identify (or perhaps identified but failed to correct for[150]) clearly erroneous matches that should have been corrected. There are purportedly unique payors in Mr. Thompson's matched results that are associated with hundreds or thousands of records, such as the example of purported payor "Kim" in Exhibit 9 above. In addition, certain locations are associated with an implausible number of payors. As one example, Mr. Thompson's results show that he purportedly identified 1.9 million "unique payors" with an address in the town of King Salmon, Alaska (zip code 99613), even though that town only has a total population of 375 residents according to the U.S.

---

[148] Mr. Thompson also described other anomalies that he observed in the data. Thompson Declaration, ¶ 5 ("Fields contained unexpected data. For example, the state field contained over 1600 unique values. That is because sometimes a state, like California, for instance would be represented as 'CA' or 'California.' In addition, some data was in the wrong fields — for example, some of the 1600 states were cities. Also, some portion of the data seemed to have values shifted to the wrong fields (name in the phone field as an example)."). I saw no indication in Mr. Thompson's code that he had attempted to clean such anomalies.

[149] Thompson Deposition, p. 142:2–17 ("Q. Well, describe to me, please, how review and validation was carried out… A. It -- it used code to -- to query the data and produce results… And then there would be -- we would additionally do manual review of the matches that occurred in any one tier to determine our -- you know, whether there was any issues or -- that we needed to address with regards to the matches that occurred. Q. Okay. The code that was used in review and validation, was that code produced to Apple? A. I -- I don't know off the top of my head.").

[150] Thompson Deposition, pp. 133:11–135:8 ("Q. Okay. And did you review the most common values for each variable to determine whether they were plausible?… A.



Census.[151] There are many other examples where Mr. Thompson's results are clearly incorrect.[152] These examples were immediately obvious when I "review[ed] the most common values" for Mr. Thompson's output data, i.e., his matched records, just as Mr. Thompson purported to have done for common values in the raw data.[153]

102.     Finally, Mr. Thompson's validation, to the extent that he actually performed validation, was not even saved in his Computer Code. Mr. Thompson testified in his deposition that the code that he used to validate his matching "may or may not have been saved,"[154] and I did not identify any code in his backup materials that systematically validates his matching results. I return to this point in Section XIV.

103.     **Conclusion**. Mr. Thompson did not appropriately validate his methods, nor did he provide any evidence of reliability. In particular, he made no attempt to quantify the error rate of his method, he performed no systematic assessment of the prevalence of data issues in the input data that he attempted to deduplicate, and he substituted inadequate subjective heuristics in the place of standard measures of errors such as confidence intervals.

## XII.     Mr. Thompson Did Not Use or Even Acknowledge Applicable Widely-Accepted and Scientific Methods that Have Been Peer-Reviewed and Published

104.     The topics of data cleaning and deduplication have long been substantial and active areas of research in statistics and data science. There are many thousands of peer-reviewed and

---

[151] U.S. Census Bureau, "Explore Census Data," available at https://data.census.gov/, accessed on June 16, 2025. *See* Workpaper 16.

[152] A non-exhaustive list includes purported payors identified by Mr. Thompson's matching algorithm that each have over 100 distinct strings in the *compressed_full_name* field (*i.e.*, according to Mr. Thompson, each of these payors has provided more than 100 different combinations of name information); over 100 distinct strings in the *phone_number_hashed* field; or over 100 distinct addresses. *See* Workpaper 17.

[153] Thompson Deposition, p. 133:11–14 ("[D]id you review the most common values for each variable to determine whether they were plausible? A. I did.").

[154] Thompson Deposition, p. 142:15–20 ("Q. Okay. The code that was used in review and validation, was that code produced to Apple? A. I -- I don't know off the top of my head. It was certainly coded on the air-gapped machine. But those -- those scripts don't produce a -- an outcome and a result, so they may or may not have been saved.").

published research articles on methods for data cleaning, deduplication, and validation across many different disciplines.[155] While there is no one universally accepted way to clean and deduplicate every dataset, and none of the methods developed by the scientific community are expected to eliminate all errors, this vast body of research has identified certain commonly accepted best practices.[156] However, Mr. Thompson did not cite to a single peer-reviewed or published work to support any of his methodology, despite the vast bodies of literature on data cleaning and address matching.[157] In his deposition, Mr. Thompson testified that he is not aware of any literature that would support his selected methods.[158] Instead, he described his method as "proprietary,"[159] saying that "JND has developed unique expertise"[160] and that his unique method requires "subjective judgment."[161] These statements stand in stark contrast to his unfounded assertion that he uses "well-accepted methods."[162] In the following subsections, I explain why

---

[155] On Google Scholar, searching for "data cleaning" yields ~247,000 articles, "deduplication" yields ~55,900 articles, and "validation" yields ~6,210,000 articles. *See* Google Scholar search, "data cleaning," available at https://scholar.google.com/scholar?hl=en&as_sdt=0%2C5&q=%22data+cleaning%22&btnG=, accessed on June 18, 2025; Google Scholar search, "deduplication," available at https://scholar.google.com/scholar?hl=en&as_sdt=0%2C5&q=%22deduplication%22&oq=, accessed on June 18, 2025; Google Scholar search, "validation," available at https://scholar.google.com/scholar?hl=en&as_sdt=0%2C5&q=%22validation%22&btnG=, accessed on June 18, 2025.

[156] *See, e.g.*, Davide Chicco et al., "Eleven Quick Tips For Data Cleaning and Feature Engineering," *PLoS Computational Biology*, 18(12), 2022, pp.1–21.

[157] In Mr. Thompson's deposition, he acknowledges that he does not rely on any academic literature and that the methods he used are entirely based on his experience. *See* Thompson Deposition, pp. 120:19–121:2 (noting that Mr. Thompson did not rely on anything other than his "experience and the data available" in forming his opinions). *See also* Thompson Deposition, p. 109:9–12 ("Q. Okay. Are you aware of any literature or studies that support the decision-making process that you've just described? A. I am not.").

[158] Thompson Deposition, p. 109:9–12 ("Q. Okay. Are you aware of any literature or studies that support the decision-making process that you've just described? A. I am not.").

[159] Thompson Supplemental Report, ¶ 17.b.

[160] Thompson Declaration, ¶ 7.d.

[161] Thompson Declaration, ¶ 7.e.

[162] *See, e.g.*, Thompson Supplemental Report, ¶ 12.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

Mr. Thompson's failure to use established, well-accepted methods from the literature is problematic and undermines his assertion of reliability of his proffered method.

### A. Mr. Thompson's Methods Are Based Entirely on His Subjective Opinions and Beliefs

105.     Rather than relying on widely-accepted practices from the relevant scientific fields that I discuss below, Mr. Thompson repeatedly turned to his own subjective judgment and experience as the basis for his opinions. He testified in his deposition that "other than [his] experience and the data available," he did not rely on anything else in reaching his opinions.[163]

106.     Mr. Thompson testified that he did not match records together if he did not "[have] confidence that they could be considered the ███████ ██ ████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████ █████████████████████████████ ██ ████████████████████████████ █████████████████████████████████████████████ ███████████████████████████████████████

---

[163] Thompson Deposition, pp. 120:19–121:2 (noting that Mr. Thompson did not rely on anything other than his "experience and the data available" in forming his opinions). *See also* Thompson Deposition, pp. 175:1–176:4 ("Q. We talked earlier about paragraph 15 of your report -- excuse me -- which states that, 'JND communicated to plaintiffs' counsel that it could reliably reduce duplication in the Apple data.'… I want to ask how you define 'reliably' as used in that sentence or to define the noun form of it, 'reliability'? A. Okay. So I would define that as being able to apply a set of methods that I have used extensively and have confidence in a -- a outcome based on both the methods used and the data available to apply it against… Q. Okay. And that again -- that understanding of reliability is based on your years of experience in the field? A. That is correct.").

[164] Thompson Deposition, p. 100:7–8.

[165] Thompson Deposition p. 100:21–23.

[166] Thompson Deposition, pp. 100:14–101:3.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order                              Page 61

████████████████████████████ SER-264 █ ██████████████████████

████████████████████████████ in the data simply because he "did not have confidence

that those would add meaningful value in matching."[168] But again, he provided no objective or

widely-accepted basis for his asserted "confidence."

107.    Similarly, Mr. Thompson's decision regarding when to stop trying to find additional

matches was not based on any objective or widely-accepted measures of "marginal returns,"

error rate, algorithm output stability, or any other well-accepted stopping criteria, rather it was

again inappropriately based on his subjective confidence in the results.[169] Mr. Thompson testified

that he did no estimation or quantification of marginal returns; he instead just decided he "was

not finding additional matches…in a both coded and confident manner," so he simply concluded

---

[167] Thompson Deposition, pp. 176:16–177:17 ("Q. Okay. And why were these variables chosen for matching in this top tier? A. I -- I tier the -- the deduplication based on a confidence level that the amount -- the data being matched is most likely to represent the -- the same individual. And so in this situation, if exact first name, exact last name, exact full address, exact cities, exact state, exact postal code, along with the person ID that bundles people in -- within the Apple data all match, I have an extremely high confidence level that that should be the same person. Q. And what is that understanding based on? A. Experience… Q. You did not match based on phone number in this example -- in this top tier, correct? A. I didn't. Q. Why not? A. I -- I can't tell you specifically my thought process at the time, other than I -- I assess matching and it -- I can only assume that I made a determination that phone number did not meaningfully change the outcomes and, therefore, I was confident as this is the top tier.").

[168] Thompson Deposition, p. 135:12–19.

[169] Thompson Deposition, pp. 106:13–107:11 ("Q. And at some point you determined that the marginal returns in matches from continuing to iterate were so low that they were outweighed by the additional time and effort required to continue iterating? MR. BURT: Objection to form. Asked and answered. A. I did. Q. (BY MR. LAZARUS) And I understand you say that your experience has informed your decision on when to stop iterating that process. Can you describe the criteria that you used to make that decision? A. To make the decision that the marginal return was no longer justifying the -- the means so to speak -- or -- Q. Right. A. Okay. So as I -- as I recall, I reached a point of deduplication and analysis where I could no longer apply either cleansing or additional deduplication rules which would either produce a match result in one of the rules that I had already built or, with a new rule, that I would have high confidence that the records that matched were, in fact, the same entity."). *See*, *e.g.*, Joan Heck Wortman and Jerome P. Reiter, "Simultaneous Record Linkage and Causal Inference with Propensity Score Subclassification," *Statistics in Medicine*, 37, 2018, pp. 3533–3546 at p. 3539 ("Clearly, linkage errors can have negative consequences for causal inference. One could restrict causal inference to estimating only with cases known to be true links with complete certainty. However, this may exclude some links that are correct or possibly innocuously in error like those in Section 3.1, ultimately inflating mean squared errors. We thus need a rule for deciding which linked pairs to use … One approach is to attempt to choose the threshold for accepting links to minimize the mean squared error … The … error … should decrease as we add cases … until we start adding many nonlinks, when bias introduced by the invalid links can overwhelm the reductions in variance due to increased samples size.").

the costs outweighed the benefits of continuing.[170] This is problematic because Mr. Thompson's decision to stop was entirely based on his subjective judgment and his own incremental time spent trying to find additional matches. In other words, it would not matter if Mr. Thompson's estimate of "unique payors" was off from the true number by 2 million or 200 million; his method would stop when *he believed* additional changes that he could think of to his method did not produce a significant number of additional matches.

108.    As discussed in Section XI, Mr. Thompson did not provide any empirical measures of validation to allow others to assess or potentially gain a similar confidence in the reliability of his "various data matches."[171]

### B.    Mr. Thompson Does Not Use or Even Consider the Vast Number of Widely-Accepted and Reliable Data Cleaning Methods from the Published Literature

109.    Data cleaning—"the detection and removal of errors and inconsistencies from data with the aim of improving data quality"—is an integral part of working with data.[172] Data errors are a

---

[170] Thompson Deposition, pp. 103:17–104:13 ("Q. And how did you estimate the marginal returns? MR. BURT: Objection. Form. A. I was -- I don't believe there's an estimation of marginal returns. I believe it is more accurate to say I was not finding additional matches that I could effectuate in a -- in a both coded and confident manner, which is the -- the point we try to determine my returns here for the effort I'm putting in, I'm not -- I'm not finding additional things that I could match. Q. And did you -- are you saying that you did -- you got the marginal returns down to zero? A. I -- I'm saying that I -- I did not see things I could match but decided not to. I -- it required additional work for me to find add- -- additional possible matches. Q. Okay. And that's based on your -- your experience that you've described in your work in legal administration, claims administration? A. Correct. And my -- and my years of experience performing data match and data duplication -- deduplication, that's correct.").

[171] Thompson Deposition, pp. 100:24–101:3 ("A. And in applying those and utilizing them over this time, in my experience, I have assembled an understanding of the outcomes and -- and based on adequate matching points, have built a experience -- confidence in various data matches.").

[172] *See, e.g.*, Samson Oni et al., "A Comparative Study of Data Cleaning Tools," *International Journal of Data Warehousing and Mining*, 15(4), 2019, pp. 48–65 ("Oni et al. (2019)") at p. 48 48 ("Hence, data cleaning is essential and often takes more than 80 percent of time and resources of the data analyst."); Hadley Wickham, "Tidy Data," *Journal of Statistical Software*, 59(10), 2014, pp. 1–23 at p. 1 ("It is often said that 80% of data analysis is spent on the process of cleaning and preparing the data."); Oni et al. (2019), p. 48 ("Hence, data cleaning is essential and often takes more than 80 percent of time and resources of the data analyst.").

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

common data quality issue and are expected across all types of data, including in user-generated

data, where humans can make mistakes when entering data.[173]

110.     There is extensive academic literature on the importance of identifying and eliminating

data errors to maximize the accuracy and reliability of results.[174] Through proper data cleaning,

the matching accuracy of records improves.[175] In contrast, failing to adequately and consistently

fix data errors, such as "spelling errors, variation in the recording of street names (i.e. Martin

Luther King Blvd, MLK, and Martin Luther Boulevard), the wrong directional identifiers, wrong

or missing suffix or prefix, inconsistent abbreviations, and out-of-range or impossible address

numbers" can lead to bias and inaccuracies in the deduplication and matching of records.[176] As

described in Section VII.A, Mr. Thompson's data cleaning involved searching across records for

one invalid character at a time and then removing that character (*e.g.*, the first name "J@ne" in

Exhibit 2 would be cleaned by Mr. Thompson's method to "Jne"). Mr. Thompson's approach is

starkly inadequate compared to modern widely-accepted methods, and does not align with best

---

[173] Kimberly A. Barchard and Larry A. Pace, "Preventing Human Error: The Impact of Data Entry Methods on Data Accuracy and Statistical Results," *Computers in Human Behavior*, 27(5), 2011, pp. 1834–1839 ("Barchard and Pace (2011)") at p. 1834 ("When humans do data entry, errors are therefore expected.").

[174] *See* Heiko Müller and Johann-Christoph Freytag, "Problems, Methods, and Challenges in Comprehensive Data Cleansing," *Humboldt University of Berlin*, Working Paper, 2003, available at https://pubs.dbs.uni-leipzig.de/dc/files/Mller2003ProblemsMethodsand.pdf ("Müller and Freytag (2003)") p. 3 ("This has led to the development of a broad range of methods intending to identify and eliminate [the existence of anomalies and impurities] in existing data").

[175] Oni et al. (2019), p. 48 ("Fusing poor quality data from various sources together will cause more issues afterwards. Therefore, adequate cleaning of data from various sources before integration will have significant impact on the outcome of data fusion."); Mong Li Lee et al., "Cleansing Data for Mining and Warehousing," *Database and Expert Systems Applications*, 1677, 1999, pp. 751–760 at p. 751 ("'Dirty' data files are prevalent because of incorrect or missing data values, inconsistent value naming conventions, and incomplete information. Hence, we may have multiple records refer[r]ing to the same real world entity.").

[176] Bias is defined as "a systematic tendency to over- or under-estimate the true population value." *See* David Diez et al., *OpenIntro Statistics*, Fourth Edition, (2019), p. 170; Gisela Bichler and Stefanie Balchak, "Address Matching Bias: Ignorance Is Not Bliss," *Policing: An International Journal of Police Strategies & Management*, 30(1), 2007, pp. 32–60 ("Bichler and Balchak (2007)") at p. 35 ("These factors together introduce potential bias").

Highly Confidential—Attorneys' Eyes Only                    Page 64
Subject to Protective Order

practices used by practitioners across many fields that perform data cleaning of name or address data.[177]

111.    To identify and eliminate data errors, especially in large and complex datasets, such as the Apple Payor Data, where it is impossible to manually review all the observations, researchers typically follow a systematic approach of "auditing data to identify the types of anomalies reducing the data quality, … choosing appropriate methods to automatically detect and remove them, and … applying the methods."[178] Statistical methods are commonly used to parse the data and detect anomalies in string syntaxes,[179] where "string" refers to a field that contains characters, such as a name or address field. Some examples include examining the minimal and maximal length of strings, frequency of values, and searching for string patterns.[180] Mr.

---

[177] For general reviews on data cleaning algorithms, *see* Müller and Freytag (2003), Xu Chu et al., "Data Cleaning: Overview and Emerging Challenges," *Proceedings of the International Conference on Management of Data*, 2016, pp. 2201–2206 ("Chu et al. (2016)"), and Fakhitah Ridzuan and Wan Mohd Nazmee Wan Zainon, "A Review on Data Cleansing Methods for Big Data," *Procedia Computer Science*, 161, 2019, pp. 731–738. An overview of data cleaning methods for string data is in Mark van der Loo and Edwin de Jonge, *Statistical Data Cleaning with Applications in R*, (Hoboken, NJ: John Wiley & Sons, 2018), pp. 77–118 (including sections on character normalization, encoding, transliteration, pattern matching, and text matching). For a review of name matching techniques, *see, e.g.*, Peter Christen, "A Comparison of Personal Name Matching: Techniques and Practical Issues," *Proceedings of the Sixth IEEE International Conference on Data Mining Workshops*, 2006, pp. 290–294 ("Christen (2006)"), pp. 291–293, who discusses phonetic encoding, pattern matching (including distance measures), and combined techniques. For a standard methodology and software used for address cleaning and matching, *see, e.g*., Bichler and Balchak (2007), pp. 35–44.

[178] Müller and Freytag (2003), pp. 10–11.

[179] Müller and Freytag (2003), p. 11 ("The first step in data cleansing is auditing the data to find the types of anomalies contained within it. The data is audited using statistical methods and parsing the data to detect syntactical anomalies.").

[180] Müller and Freytag (2003), p. 11 ("The instance analysis of individual attributes (data profiling) and the whole data collection (data mining) derives information such as minimal and maximal length, value range, frequency of values, variance, uniqueness, occurrence of null values, typical string patterns as well as patterns specific in the complete data collection.").

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

Thompson testified in his deposition that he has no expertise in statistics and that he did not use any statistical method in his review of the data.[181]

112.    Additionally, to detect and eliminate anomalies, researchers typically use existing published and tested approaches, software frameworks, and tools, since such published tools have typically been vetted by the research community and allow researchers to capitalize efficiently on the work required to build and vet these tools.[182] There are many widely used software tools that have been developed to clean names, addresses, and other data in a systematic manner.[183] Some of these tools have been downloaded millions of times for use by a multitude of practitioners across a wide range of disciplines.[184] These tools are reliable because they were

---

[181] Thompson Deposition, pp. 58:12–14 (confirming that Mr. Thompson does not purport to have expertise in statistics, "Q. Do you purport to have expertise in statistics? A. I do not."), 23:19–25 (describing that Mr. Thompson does not have a degree or a teaching position in statistics, "Q. And you don't have any degree in statistics, correct? A. I do not. Q. You're not a professor of management information systems, statistics or any other subject, correct? A. I am not."), 24:1–9 (discussing that Mr. Thompson has not authored any peer-reviewed publication related to statistical methodology, nor does he have any professional certifications or accreditation related to statistics, "Q. You have not authored any peer-reviewed published research on subjects relating to statistical methodology… You do not have any professional certifications or accreditations in management information systems, statistics or any other fields, correct? A. That is correct.").

[182] Müller and Freytag (2003), pp. 15–18 ("In this section we describe existing data cleansing projects.").

[183] Some common and widely-used open source tools that have been developed for data cleaning include: Tableau Prep, which offers "cleaning operations such as filtering, adding, renaming, splitting, grouping, or removing fields [for cleaning and shaping data];" OpenRefine, a Google tool for working with messy data that offers features such as "Clustering [to] [f]ix inconsistencies by merging similar values;" and Tidyverse, packages for "data import, tidying, manipulation, visualisation, and programming." "Welcome to the Tidyverse" is cited 18,164 times in Google Scholar, and the phrase "tidyVerse" produces 55,800 search results in Google Scholar. *See* Tableau, "Tableau Prep Help: Clean and Shape Data," available at https://help.tableau.com/current/prep/en-us/prep_clean htm, accessed on June 18, 2025; OpenRefine, "Homepage," available at https://openrefine.org/, accessed on June 18, 2025; Hadley Wickham et al., "Welcome to the Tidyverse," *Journal of Open Source Software*, 4(43), Article 1686, 2019, pp. 1–6; Google Scholar search, "Welcome to the Tidyverse," available at https://scholar.google.com/scholar?hl=en&as_sdt=0%2C5&q=Welcome+to+the+tidyverse&btnG=, accessed on June 19, 2025; Google Scholar search, "tidyVerse," available at https://scholar.google.com/scholar?hl=en&as_sdt=0%2C5&q=%22tidyVerse%22&btnG=, accessed on June 19, 2025. There are numerous papers that have examined and documented the accuracy and reliability of these or other data cleaning tools. *See, e.g.*, Oni et al. (2019); Müller and Freytag (2003).

[184] *See* OpenRefine, "OpenRefine Usage," available at https://openrefine.org/usage, accessed on June 16, 2025 ("**OpenRefine is downloaded on average 15,500 times per month** and received over 800 academic citations in 2023.") (emphasis in original); "tidyverse," available at https://www.cran-e.com/package/tidyverse, accessed on

developed using high quality control standards (e.g., by using software tests and open source

development methods), and have been vetted by the scientific community, and as a result are

widely accepted in the scientific community.

113.    With the exception of the NCOA data solution from Melissa Data used by Mr. Thompson

on a small subset of observations, and whose data cleaning operation Mr. Thompson was unable

to describe in his deposition,[185] Mr. Thompson did not employ any standard tools for data

cleaning. Instead of using a data cleaning tool that is reliable and well-accepted among

researchers and practitioners, Mr. Thompson chose to clean the data by using code he wrote

himself for this case that applies a small set of operations that he selected without providing any

support as to how he selected them, or checks on whether they were implemented correctly. His

decision not to use standard and widely-available tools developed by others and widely accepted

by practitioners is compounded by his validation processes.[186] Mr. Thompson admitted in his

deposition that while he was familiar with the concept of a "software test" to ensure that software

---

June 18, 2025 ("[The tidyverse] package has been downloaded 1,451,480 times in the last 30 days."); Tableau, "Why choose Tableau," available at https://www.tableau.com/why-tableau, accessed on June 18, 2025 ("The Tableau Community has more than one million members, spanning over 500 user groups worldwide and our active Community Forums and programs"); Kate VanDerAa, "11 Most-Favorite Data Visualizations on Tableau Public," *Tableau*, November 19, 2024, available at https://www.tableau.com/blog/most-favorited-data-visualizations-tableau-public, accessed on June 19, 2025 ("Since Tableau Public launched in 2009, over 5 million people worldwide have joined [Tableau's] free data visualization platform."). OpenRefine, Tidyverse, and Tableau can be used offline. *See* OpenRefine User Manual, "Running OpenRefine," available at https://openrefine.org/docs/manual/running, accessed on June 18, 2025 ("OpenRefine does not require internet access to run its basic functions."); "How to install Tidyverse without internet connection for R 3.5.2," Posit Community, November 7, 2019, available at https://forum.posit.co/t/how-to-install-tidyverse-without-internet-connection-for-r-3-5-2/44201, accessed on June 18, 2025; Tableau Deployment Guide, "Registers and Activate from the User Interface," available at https://help.tableau.com/current/desktopdeploy/en-us/desktop_deploy_activate_license htm, accessed on June 19, 2025 ("To activate Tableau Prep Builder offline, you will need your product key and Tableau Desktop version 2018.1 or later installed on the same computer that is offline.").

[185] Thompson Deposition, pp. 187:23–188:10 ("I'm -- I am unaware of Melissa Data's internal processes for … a NCOA output.").

[186] Mr. Thompson did not follow any best practices for statistical computing and code and software development in the scientific community, such as coding standards or code quality assurance processes. *See, e.g.*, Andrew Dovgal, "Coding Standards and Best Practices: Guide & Implementation Tips," *DevCom*, December 30, 2024, available at https://devcom.com/tech-blog/coding-standards-and-best-practices-guide-implementation-tips/, accessed on June 16, 2025; Ricardo Sanchez et al., "Best Practices in Statistical Computing," *Statistics in Medicine*, 40(27), 2021, pp. 6057–6068; Atieh Khanjani and Riza Sulaiman, "The Process of Quality Assurance Under Open Source Software Development," *Proceedings of the IEEE Symposium on Computers & Informatics*, 2011, pp. 548–552.

performed the desired operations correctly, he had "never seen those sort[s] of tests applied in this application" to determine that his claims administration code was working as intended.[187] As discussed in Section XIV, he further testified to a number of data cleaning steps that he stated in his deposition that he thought he had performed; however, when I reviewed his code, he had not actually performed these steps.[188] Well-accepted tools that have been developed by others and subjected to extensive review and testing are substantially more reliable than Mr. Thompson's code and memory. For example, in my experience, I have never seen a widely used tool that purports to have functionality that is in fact completely missing—as is the case with respect to Mr. Thompson's code.

114.    Mr. Thompson's disregard for the scientific literature is also apparent in his treatment of the common data issue of outliers, which are data points that significantly differ from other observations in a dataset.[189] Hawkins (1980) defines an outlier as "an observation which deviates so much from other observations as to arouse suspicions that it was generated by a different mechanism."[190] Because the presence of outliers can lead to inflated error rates and allow bias to creep into results, peer-reviewed research on outliers suggests that "researchers should

---

[187] Thompson Deposition, pp. 167:23–168:8 ("Q. Okay. I -- my understanding is that, for example, when a coder is submitting code to an open source software project, that code would typically contain tests to show that the code does what the author says it does. Is that a familiar concept to you? A. It is. Q. Okay. Does the code that you used to clean data in this case contain software tests of that kind? A. It does not. I've never seen those sort of tests applied in this application."). *See also* IEEE Computer Society, "The Importance of Software Testing," available at https://www.computer.org/resources/importance-of-software-testing, accessed on June 16, 2025 ("Software testing is a crucial activity in the software development life cycle that aims to evaluate and improve the quality of software products. Thorough testing is essential to ensure software systems function correctly, are secure, meet stakeholders' needs, and ultimately provide value to end users.").

[188] I discuss several discrepancies between Mr. Thompson's stated data cleaning and his actual data cleaning in Section XIV.

[189] Charu C. Aggarwal, "An Introduction to Outlier Analysis," in *Outlier Analysis*, Second Edition, (New York, NY: Springer, 2017), pp. 1–34 ("Aggarwal (2017)") p. 1 ("An outlier is a data point that is significantly different from the remaining data.").

[190] D.M. Hawkins, *Identification of Outliers*, (London, UK: Chapman and Hall, 1980), p. 1.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

ALWAYS check for them" (emphasis in original) and resolve them or take steps to mitigate the bias they may induce.[191]

115.    Outliers are especially prevalent in user-generated data, such as the Apple Payor Data, because they "are often caused by human error, such as errors in data collection, recording, or entry."[192] The academic literature discusses many methods for detecting and handling outliers.[193] Some common methods for identifying outliers in non-numerical data involve computing the length and frequency of different string values in a dataset, identifying unusual groups or clusters of data values, and searching for repeated patterns of anomalous entries or mistakes.[194] For example, a value that appears unusually frequently, such as the address of Apple's Headquarters at "1 Infinite Loop" indicates a possible outlier. Some common methods for handling outliers include removing the outlier ("[e]limination of the data point from the analysis"), studying the outlier in detail ("[c]onducting follow-up work to study the case as a unique phenomenon of interest"), correcting the outlier (e.g., if it is a mistake), and reporting findings with and without outliers ("[r]eporting substantive results with and without the outliers – which also includes providing an explanation for any difference in the results.").[195]

116.    Mr. Thompson did not systematically use or acknowledge any of these published methods of data cleaning that I could verify in his backup files or documentation, and as noted in

---

[191] Jason W. Osborne and Amy Overbay, "The Power of Outliers (and Why Researchers Should Always Check for Them)," *Practical Assessment, Research & Evaluation*, 9, Article 6, 2004, pp. 1–8 ("Osborne and Overbay (2004)").

[192] Osborne and Overbay (2004).

[193] *See, e.g.*, Herman Aguinis et al., "Best-Practice Recommendations for Defining, Identifying, and Handling Outliers," *Organizational Research Methods*, 16(2), 2013, pp. 270–301 ("Aguinis et al. (2013)"); Chu et al. (2016).

[194] David Guthrie et al., "An Unsupervised Approach for the Detection of Outliers in Corpora," *Proceedings of the International Conference on Language Resources and Evaluation*, 2008, pp. 3409–3413 at p. 3410 lists some characteristics that can be used to find outliers ("Average sentence length, [a]verage word length, … [p]ercentage of all characters that are punctuation characters … [t]op 1000 words …"); Aggarwal (2017), p. 21 ("[D]emographic data might contain attributes such as race, gender, or ZIP code… Most of the existing models can be extended to this case… Other common methods for text and categorical data include clustering, proximity-based methods, probabilistic models, and methods based on frequent pattern mining.").

[195] Aguinis et al. (2013), p. 279.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

Section VII.A, his method is so affected by poor data cleaning that it leads to unreliable match results.[196]

### C. Mr. Thompson Did Not Use or Even Consider the Vast Number of Widely-Accepted and Reliable Deduplication Methods from the Published Literature



or grouping addresses for demographic purposes such as community identification or geographically targeted social services or care delivery.[198] While there is no single approach from the published literature that works in all cases, there are certain best practices from the literature, which Mr. Thompson did not utilize, such as allowing matches for

---

[196] Mr. Thompson admitted in his deposition that any computer code steps he may have taken to correct outliers were not included in the backup code, and so that code is unverifiable by me, and what corrections to outliers, if any, were taken are not made clear. Thompson Deposition, pp. 133:22–135:1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Q. Are those ▮▮▮▮ saved in the backup materials that you produced to Apple? A. I do not know if -- if ▮▮▮▮▮▮▮▮▮ -- are saved or not. They're -- some of them certainly may be transient. Q. And did you determine that action was required based on common values in the data? A. There were -- there were some scenarios where action was required. Q. What action did you take? A. As an example, as you previously mentioned, Apple's address was used a -- I couldn't give you a count, but it was used more than one would expect for -- for an address. And in those situations, I – I would remove the value and not utilize an address for that record in attempting to match it. Q. Okay. And is that exclusion of a value for matching purposes recorded in code? A. So the – it's not a -- well, yes. Q. Where is that recorded? A. So if a field is blank, it would be excluded from matching.").

[197] Monge (2000), at p. 15 ("The record matching problem has been recognized as important for at least 50 years."); Comber and Arribas-Bel (2019), p. 335 ("Traditionally, address matching has focused on the probabilistic linkage approaches developed by the US Census Bureau in the 1970s."). *See also* Müller and Freytag (2003); Newcombe et al. (1959). For a historical discussion, *see, e.g.*, Asher et al. (2020); Xia et al. (2016).

[198] *See* Ramani and Borrajo (2023), p. 348 ("Some potential applications of address matching are in the field of mail routing, clustering of addresses, and matching a given list of addresses of interest to a larger database."); Li et al. (2010), p. 264 ("Address matching and correction are widely used in daily life and business applications, in situations ranging from finding a friend who has moved to responding to a critical 911 call."); Comber and Arribas-Bel (2019), p. 335 ("In the absence of unique identifiers that enable direct linking of data in relational database management environments, practitioners have traditionally relied on mathematical linkage techniques broadly divided by deterministic or probabilistic principles.").

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

records for which it is sufficiently clear that they represent the same information and yet are not verbatim matches.[199]

118.    Despite the long line of research across a broad range of scientific disciplines that discusses various methods for matching records, names, and addresses,[200] Mr. Thompson did not consider any academic or industry publication for his matching methodology. Nor did he use any common matching tools. Instead, he chose to write "new code for this project"[201] to identify records that match exactly on certain fields and stated that his method required "a subjective judgment."[202] Mr. Thompson focused myopically on JND's own "proprietary" method that is demonstrated to be fatally flawed and inadequate, and that leads to uncontrolled and unmeasured errors as discussed in this report.

119.    In his deduplication process, Mr. Thompson required exact string matching in order to group records, meaning that he required that values in fields must be identical in order for multiple records to be grouped to the same payor.[203] However, exact string matching is not a commonly used approach for matching string fields such as names and addresses.[204] In fact,

---

[199] Thompson Deposition, p. 20:13–16 ("Q. (BY MR. LAZARUS) In forming your opinions in this case, did you review any peer-reviewed publications related to the methods you relied upon? A. I did not.").

[200] *See, e.g.*, William W. Cohen et al., "A Comparison of String Metrics for Matching Names and Records," *Proceedings of IJCAI-03 Workshop on Information Integration*, 2003, pp. 73–78 at p. 73 ("The task of matching entity names has been explored by a number of communities, including statistics, databases, and artificial intelligence… In statistics, a long line of research has been conducted in *probabilistic record linkage*.") (emphasis in original).

[201] Thompson Supplemental Report, ¶ 17.d.

[202] Thompson Declaration, ¶ 7.e.

[203] Thompson Deposition, p. 109:13–17 ("Q. And your algorithm for deduplication groups records if they match exactly on some combination of the cleaned variables in the payor data; is that correct? A. That is correct.").

[204] *See, e.g.*, Clodoveu A. Davis Jr. and Emerson de Salles, "Approximate String Matching for Geographic Names and Personal Names," *IX Brazilian Symposium on GeoInformatics*, 2007, pp. 49–60 ("Davis Jr. and de Salles (2007)") at p. 52 ("Matching names is a challenging task, mainly because of spelling variations and some widely used practices, such as abbreviation… Such variations usually keep exact matches from being effective."); Christen (2006), p. 290 ("As names are often recorded with different spelling variations, applying exact string matching leads to poor results.").

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order                                    Page 71

many scientific publications have found that exact string matching algorithms are significantly less reliable than alternative statistical methods because they can be too restrictive.[205] As discussed previously, Mr. Thompson failed to match records for named plaintiff Robert Pepper because "Rob" and "Robert" prevented an exact match on name in Mr. Thompson's Tiers 1 – 12.[206] Mr. Thompson also failed to match these records in Tier 13, in which he only required an exact match on the first three letters of the first name. This is because the records were not an exact match for *person_id_hashed* as required by Mr. Thompson's method even though address, phone number, and credit card information were all the same across these records.[207] Mr. Thompson's failure to match these records because of a different *person_id_hashed* value even when so much other information is shared undermines his purported ability to disambiguate payors that might have multiple accounts.

120.    In the academic literature, "two records are [considered] *equivalent* if they are equal semantically,"[208] meaning the two records convey equivalent information. Therefore, two records do not need to be exactly identical to be considered a match.[209] As a result, when matching addresses and names, researchers typically use methods that are designed to identify equivalent records for which it is sufficiently clear that they represent the same information and yet are not verbatim matches. One widely-accepted and widely-used matching approach involves defining

---

[205] *See, e.g.*, Tigran Avoundjian, "Comparing Methods for Record Linkage for Public Health Action: Matching Algorithm Validation Study," *JMIR Public Health Surveillance*, 2020, 6(2), e15917, pp. 1–12 at p. 1 ("In simulations, [the approximate matching algorithms] maintained a high recall at nearly all data quality levels, while being comparable with deterministic algorithms in terms of precision. Deterministic algorithms typically failed to identify matches in scenarios with low data quality.").

[206] *See* Section VII.B.

[207] *See* Exhibit 8.

[208] Monge (2000), p. 16.

[209] Monge (2000), p. 16 ("One important area of research that is relevant to approximate record matching is approximate string matching.").

metrics to measure the closeness, or similarity, of two strings, such as a name or address field.[210] Records that are sufficiently close along one or several fields according to these metrics are then considered to be matches.[211] Examples of such metrics include "edit distance," which refers to "the minimum number of operations on individual characters (e.g.[,] substitutions, insertions, and deletions) needed to transform one string of symbols to another."[212] There are also other approaches that are commonly used in the literature for matching.[213]

121.    Mr. Thompson acknowledged his ignorance of the extensive amount of research on methods to match records.[214] He confirmed that he was unaware of any literature, studies, or publications that suggest or recommend using exact matching for deduplication.[215] As discussed

---

[210] *See, e.g.*, Li et al. (2010), p. 265 ("As an alternative to this lengthy process of address standardization, we use string similarity techniques directly to calculate the string similarity between the customer's address string and the reference address string."); Ioannis Koumarelas et al., "Experience: Enhancing Address Matching with Geocoding and Similarity Measure Selection," *Journal of Data and Information Quality*, 10(2), Article 8, 2018, pp. 1–16 at p. 2 ("A typical method of classifying two records as duplicates is by determining the similarity or distance of their corresponding values.").

[211] Monge (2000), p. 16 ("An application will typically just compare scores to a threshold that depends on the domain and the particular record matching algorithm in use."). *See also* Christen (2006), p. 293 ("For the similarity measures a threshold can be varied between 0.0 and 1.0 that influences the classification performance (name pairs with a similarity value above the threshold are classified matches, and pairs with similarity value below as non-matches).").

[212] Monge (2000), p. 16. *See also* V. I. Levenshtein, "Binary Codes Capable of Correcting Deletions, Insertions, and Reversals," *Soviet Physics Doklady*, 10(8), 1966, pp. 707–710 at p. 707 ("Consider a function … equal to the smallest number of deletions and insertions that transform the word x into y."); Li et al. (2010), p. 265 ("The standard string similarity metrics, such as the edit distance, quantify differences between two strings").

[213] Bichler and Balchak (2007), pp. 39–41 ("Address matching tools allow for both automatic 'batch matches' and interactive or manual matching… ESRI software algorithms involve two steps in the process for developing match candidates: transformation tools (soundex) and a probabilistic scoring process."). *See also* Stacie B. Dusetzina et al., *Linking Data for Health Services Research: A Framework and Instructional Guide*, (Rockville, MD: Agency for Healthcare Research and Quality, 2014) at p. 36 ("Other methods are available for researchers who have more challenging linkage scenarios.").

[214] Thompson Deposition, pp. 109:9–12 ("Q. Okay. Are you aware of any literature or studies that support the decision-making process that you've just described [regarding when to stop iterating Mr. Thompson's method]? A. I am not."), 114:6–19 ("Q. Okay. Are you aware of using distance metrics such as the Levenshtein or Hamming distance to determine whether names or addresses match? A. No. Q. Are you aware of the concept of thresholding to determine matches by using distance metrics in address matching? A. No. Q. Are you aware of the concept of a longest common subsequence in address matching? A. No. Q. Are you aware of the concept of an N-gram in address matching? A. No.").

[215] Thompson Deposition, p. 110:20–24 ("Q. Sure. So are you aware of literature, studies or publications that suggest or recommend using exact address matching for deduplication purposes? A. No.").

in the next subsection, Mr. Thompson testified that he had never produced his proprietary methodology for deduplication to another party, for testing or otherwise,[216] and that he did not have knowledge of anyone outside of JND using the methods he applied in this matter.[217]

122. As noted in Section V.C, Mr. Thompson's matching efforts relied heavily on exact matching of the name and address fields, and as mentioned this is a technique recognized in the scientific community to be a poor choice for address matching.[218] Mr. Thompson however did not provide any support for his decision to use exact matching for example appropriate references to the scientific literature or widely-accepted methods. Best practices have emerged in the research community that indicate using more reliable fields rather than less reliable fields when address matching. Human-entered data like the addresses in the Apple Payor Data is especially prone to data errors because humans often make mistakes when manually entering data.[219] In contrast, credit card numbers generally have low error rates because there are restrictions on what people can enter for their credit card numbers; in particular, the numbers entered must consist of a certain string length, follow a specific pattern, and are validated by the relevant financial institution before a transaction can occur.[220] Similarly, zip codes may be less prone to data errors because they also have a fixed string length and can be verified against other

---

[216] Thompson Deposition, p. 59:12–15 ("Q. (BY MR. LAZARUS) Have you ever produced your proprietary methodology for deduplication to an opposing party? A. I have not.").

[217] Thompson Deposition, p. 20:5–12 ("Q. All right. And you maintain that parts of the methods and the code described in your report and the README file are proprietary to JND, correct? A. That is correct. Q. Do you have knowledge of anyone outside of JND using those methods? … A. Not -- not that I'm aware of.").

[218] *See, e.g.*, Davis Jr. and de Salles (2007), p. 52 ("Matching names is a challenging task, mainly because of spelling variations and some widely used practices, such as abbreviation…. Such variations usually keep exact matches from being effective."); Christen (2006) at p. 290 ("As names are often recorded with different spelling variations, applying exact string matching leads to poor results.").

[219] Barchard and Pace (2011), p. 1834 ("When humans do data entry, errors are therefore expected.").

[220] A common validation algorithm for credit card numbers in the Luhn Algorithm. *See, e.g.*, Khalid Waleed Hussein et al., "Enhance Luhn Algorithm for Validation of Credit Cards Numbers," *International Journal of Computer Science and Mobile Computing*, 2(7), 2013, pp. 262–272 at p. 262 ("The Luhn algorithm is the first line of defense in many e-commerce sites and is used to validate a variety of identification numbers such as credit card numbers.").

fields such as street, city, and state data. Mr. Thompson again provided no references to the scientific literature or to widely-accepted methods to justify his choice to rely heavily on exact matching of error prone fields such as name and street address, instead of relying on less error prone fields such as hashed credit card or zip code.

### D. Mr. Thompson's Methods Have Not Been Directly Evaluated by Any Third Party, Including Other Claims Administration Firms, or Any Opposing Party or Court in Previous Litigation

123. While the Thompson Supplemental Report claims that Mr. Thompson's methods are "well-accepted…in the claims administration field,"[221] it does not appear that Mr. Thompson's methods have previously been directly evaluated, much less accepted, by any third party, including any claims administration firm. In his deposition, Mr. Thompson conceded he was unaware of *any* other firm that utilized his method.[222]

124. Nor does Mr. Thompson's method appear to have been directly evaluated pursuant to any previous litigation by an opposing party or court. While Mr. Thompson listed other cases where JND provided class notice or claims administration, in his deposition Mr. Thompson confirmed that he had never been admitted as an expert in any previous case.[223] Mr. Thompson also stated that, in addition to the fact that his "proprietary" deduplication method has never been published in a journal or used outside of his firm, this method has also *never* been produced to an opposing party during litigation.[224] This implies that Mr. Thompson's methods have never been properly vetted by a third-party, such as by an expert retained by an opposing party in a litigation. A proper vetting would require review of the code and methodology used by Mr. Thompson. It is

---

[221] Thompson Supplemental Report, ¶ 10.

[222] Thompson Deposition, p. 20:9–12 ("Q. Do you have knowledge of anyone outside of JND using those methods? A. Not – not that I'm aware of.").

[223] Thompson Deposition, p. 10:5–7 ("Q. Okay. Have you ever been retained as a testifying expert in another case? A. I have not.").

[224] Thompson Deposition, p. 59:12–15 ("Q. Have you ever produced your proprietary methodology for deduplication to an opposing party? A. I have not.").

not possible for me to meaningfully analyze Mr. Thompson's methods using only the vague descriptions provided in the three-page methodology section of his reports. For example, his reports provided no description of the variables included in ▮▮▮▮▮▮ Tiers of matching, they were silent on whether the method required exact matching (it does), there was no indication of which records were candidates for matching at any given step (e.g., there was no indication of the concept of a ▮▮▮▮▮▮ (see Section V.C), among many other omissions. It would be impossible for any third-party reader of Mr. Thompson's reports to grasp the material details of Mr. Thompson's method.

125.    In light of the foregoing, despite the term "well-accepted methods" appearing four times within Mr. Thompson's six-page report, there does not appear to be *any* relevant community within which Mr. Thompson's methods have been evaluated and are "well-accepted," nor could Mr. Thompson identify one. When Mr. Thompson was asked directly "who specifically are you claiming to have accepted these methods," Mr. Thompson clarified that this claim was referring to *his own* acceptance of his proprietary methods, stating "[s]o I would say, myself, for extensive experience doing this and working with, you know, individuals in the industry that – work at companies I work with, or work at."[225]

126.    **Conclusion**. Rather than relying on widely-accepted practices from the relevant scientific fields discussed in the previous sections, Mr. Thompson repeatedly turned to his own subjective

---

[225] Thompson Deposition, pp. 138:18–139:7 ("Q. All right. When you describe your methods as 'well accepted,' who specifically are you claiming to have accepted these methods? A. Well, these are methods that have evolved over the last 14 years of me working in the legal claims administration industry across two of the largest legal claims administration organizations that have existed, and utilized against thousands of, you know, administration services and datasets without, you know, having situations where these were not found to produce valid and useful results. So I would say, myself, for extensive experience doing this and working with, you know, individuals in the industry that -- that work at companies I work with, or work at."). While Mr. Thompson claims to have taught this method to many others in claims administration, this does not establish that his method is effective or correct. *See* Thompson Deposition, p. 211:3–19 ("Q. Have you ever taught other people how to do deduplication? A. I have. Q. Are the people that you've taught how to do deduplication people who worked on assignments that you've supervised? A. They were. Q. And have you ever taught anyone to teach other people the skill set of deduplicating? A. People that I have taught have become managers that then taught others, yes. Q. Okay. Are there any of the engagements that are listed in your Exhibit B to your report engagements where the people doing the hands-on deduplication were taught to do it by the people that you taught how to teach it? A. Most certainly, yes.").

judgment and experience as the basis for his opinions, not citing to or even considering any of the many widely-accepted and reliable data cleaning, deduplication, or validation methods from the published literature. Mr. Thompson's methods have not been validated by any third party, opposing parties, or other claims administration firms or courts in any previous litigation.

### XIII. Mr. Thompson's Own Computer Code Does Not Produce His Results, Rendering His Method Untestable and Unreliable

127. It is long established in the scientific community that reproducibility—"obtaining consistent computational results using the same input data, computational steps, methods, and code; and conditions of analysis"[226]—is a necessary condition for reliable scientific research.[227] To comply with this principle, researchers routinely share details of their methodology, including the data and code that generated their results, when publishing their research findings. Access to the precise computational methods and their implementation allows others to re-execute the computations and regenerate the findings, permitting review and testing of the correctness of the process that produced the scientific results.[228] Similarly, it is my understanding, based on past

---

[226] National Academies of Sciences, Engineering, and Medicine, *Reproducibility and Replicability in Science*, (Washington, DC: The National Academies Press, 2019) ("NASEM (2019)"), p. 1.

[227] Garret Christensen and Edward Miguel, "Transparency, Reproducibility, and the Credibility of Economic Research," *Journal of Economic Literature*, 56(3), 2018, pp. 920–980 at p. 920 ("Openness and transparency have long been considered key pillars of the scientific ethos (Merton 1973)."); Craig Willis and Victoria Stodden, "Trust but Verify: How to Leverage Policies, Workflows, and Infrastructure to Ensure Computational Reproducibility in Publication," *Harvard Data Science Review*, 2(4), 2020, pp. 1–60 at p. 3 ("We propose and define a novel concept of assessable reproducible research artifacts and point the way to an improved understanding of how changes to author incentives and dissemination requirements impact the quality, rigor, and trustworthiness of published computational research.") (emphasis in original).

[228] For example, the publishing groups behind the most reputable and highest impact scientific journals, *Nature* and *Science*, require authors, as a condition of publication, to deposit all the data and code they used to generate the published results so that others can computationally reproduce and verify the findings. *See* Nature Portfolio, "Reporting Standards and Availability of Data, Materials, Code and Protocols," available at https://www.nature.com/nature-portfolio/editorial-policies/reporting-standards, accessed on June 16, 2025 ("A condition of publication in a Nature Portfolio journal is that **authors are required to make materials, data, code, and associated protocols promptly available to readers without undue qualifications,**" (emphasis in original)); Science, "*Science* Journals: Editorial Policies," available at https://www.science.org/content/page/science-journals-

experience, that expert witnesses are expected to produce all materials they relied upon, including code that can be run to produce their computational results. This allows other experts to verify, understand, test, and assess the methods and results presented in expert reports. In this case, the ability to reproduce Mr. Thompson's results using his Computer Code is crucial for me to understand and assess his methods, including the identification and estimation of the impact of any potential errors or other sources on unreliability.

128.    There are several fundamental flaws with Mr. Thompson's backup data production that make it untestable. First, the Computer Code did not run at all without making significant modifications. Mr. Thompson described in the ReadMe that "[t]here may be additiional [*sic*] places that require code to be commented or uncommented for a script to fully execute," and the ReadMe file indicates that "[n]o code [was] saved to create round 2" and "[n]o code [was] saved to create round 3."[229] In addition to fixing the issues specified by Mr. Thompson, there were many additional changes that were required, such as fixing code that references fields that did not exist in the tables generated by the Computer Code.[230]

129.    After making these modifications, the Computer Code produced results that were different from the output data provided by Mr. Thompson. I identified observations in Mr. Thompson's output that were matched even though they did not meet any conditions in Mr. Thompson's █ Tiers that he included in his code and described in his ReadMe, which indicates that even Mr. Thompson's own code cannot create the final output dataset of 246 million

---

editorial-policies#TOP-guidelines, accessed on June 16, 2025 ("The *Science* journals support the Transparency and Openness Promotion (TOP) guidelines to raise the quality of research published in *Science* and to increase transparency regarding the evidence on which conclusions are based."); *See also* NASEM (2019), p. 7 ("When results are produced by complex computational processes using large volumes of data, the methods section of a scientific paper is insufficient to convey the necessary information for others to reproduce the results. Additional information related to data, code, models, and computational analysis is needed for others to computationally reproduce the results.").

[229] *See* Mr. Thompson's ReadMe file.

[230] For example, in his ███████ Mr. Thompson used ███████████████████████ to match records. However, in his code for creating the intermediate data for ████████, he excluded these ███ fields. In order to run his code, I had to edit the code to add ███████████████████████ to the intermediate data.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

purportedly unique payors, and thus his method is effectively a black box.[231] Mr. Thompson conceded at deposition that his data production will not reproduce his final output dataset of 246 million records.[232]

130.    In the ReadMe, Mr. Thompson stated that users attempting to run his code should "comment and uncomment sections [of certain data cleaning code] as needed." When asked to clarify which lines of code he commented and uncommented at deposition, Mr. Thompson stated "… I'm sure the file is hundreds of lines long, and I certainly do not recall which or when."[233] When asked if this information is recorded anywhere, Mr. Thompson stated "[i]t is not."[234]

131.    I was also unable to perform any analyses regarding the Melissa Data Solutions NCOA product used by Mr. Thompson, except using the data he provided,[235] since my analytical use case did not meet the requirements for access under the Melissa Data Solutions policies.[236]

---

[231] Each of the examples I have discussed in this report exhibit this phenomenon. In Section VII.C, I discussed that Mr. Thompson's code produces nearly 3,000 payors associated with the "Kim" example, but in his final output this is a single payor. Additionally, both ███████████ and ██████████ have records that are not matched by Mr. Thompson's code, but are matched in Mr. Thompson's final output. *See* Workpaper 18.

[232] Thompson Deposition, p. 127:8–12 (Mr. Thompson confirms that his code will not run without modification, stating that "the code I provided was not a deliverable of this effort and, therefore, is not a situation where you would not have to change any code." After modifying his code, Mr. Thompson stated he believes another party could achieve "similar outcomes.").

[233] Thompson Deposition, p. 172:13–17 ("Q. Okay. Do you remember which lines of code you commented or uncommented in running those files? A. I'm sure the – I'm sure the file is hundreds of lines long, and I certainly do not recall which or when.").

[234] Thompson Deposition, p. 172:18–20 ("Q. And the commenting and uncommenting is not recorded in a file that you produced to Apple, correct? A. It is not.").

[235] For example, I was unable to validate how Melissa Data standardized different representations of the same information such as "Street" and "St." While I did observe some standardizations based on the data that Mr. Thompson provided to Melissa Data, and the output data returned by Melissa Data, this only permitted limited visibility into how the black box of Melissa Data's standardization functioned.

[236] According to the Melissa Data Solutions website, usage of the NCOA database for analytical purposes is disallowed. "NCOA^Link® Processing Acknowledgement Form," *Melissa*, available at https://www.melissa.com/pdf/des-paf.pdf, accessed on June 22, 2025. The required PAF states that "… the sole purpose of the NCOA^Link service is to provide a mailing list correction service for lists that will be used for preparation of mailings.") *See also* "Change of Address/NCOA Processing," *Melissa*, available at https://www.melissa.com/ncoalink-processing, accessed on June 22, 2025 ("Melissa is a NCOA^Link® Full Service Provider licensee of the USPS. NCOA^Link® processing requires a processing Acknowledgement Form (PAF).").

132.     Additionally, my review of Mr. Thompson's backup materials was limited by Plaintiffs' delay in providing those materials. His six-page expert report provided only a cursory description of how he purportedly cleaned and deduplicated the Apple Payor Data and how he validated his results, and the actual methodologies were only available in the Computer Code, which, as I described above in this section, was incomplete, disorganized, and not possible to run without modification. Consequently, while I was able to identify numerous deficiencies in Mr. Thompson's work that render his analysis unreliable in my opinion, it appears possible, or even likely, that there are additional problems with his analysis that I was unable to explore.

133.     In addition to the other flaws identified in this report, the insurmountable barriers to the reproducibility of Mr. Thompson's methods and results described above make it impossible to assess his methods as reliable.[237]  Importantly, since it was not possible to execute Mr. Thompson's code to verify his output, I could not test whether his methods are in fact reliable as he claims. As noted previously, Mr. Thompson testified that he had never produced his proprietary methodology for deduplication to another party,[238] and I found that his production in this matter was woefully below the standard necessary for meaningful testability and reliability.

134.     **Conclusion**. Several fundamental flaws with Mr. Thompson's backup production make it untestable and unreliable, including: missing information and files in Mr. Thompson's data production; unexplained additional files; and incorrect code. Mr. Thompson did not provide all the files necessary to test his method nor did he provide clear, complete, and unambiguous reproducibility instructions indicating how to recreate his output from the code his provided.

---

[237] NASEM (2019), p. xvi ("Repeated findings of comparable results tend to confirm the veracity of an original scientific conclusion, and, by the same token, repeated failures to confirm throw the original conclusions into doubt. When a scientific study becomes the basis of policy or has a direct or indirect impact on human well-being, scientific reliability becomes more than an academic question.").

[238] Thompson Deposition, p. 59:12–15 ("Q. (BY MR. LAZARUS) Have you ever produced your proprietary methodology for deduplication to an opposing party? A. I have not.").

### XIV. Mr. Thompson's Implemented Method Differs Materially from the Method Described in His Reports and Deposition

135. Notwithstanding the inadequacy of Mr. Thompson's backup materials, I was able to determine important ways that his actual data cleaning and validation, as implemented in his code, differ materially from the data cleaning and validation that he described in his Declaration, Report, Supplemental Report, and Deposition.[239] Moreover, because of the relationship between data cleaning, validation, and deduplication, the material differences in his actual data cleaning and validation relative to his stated data cleaning and validation have important effects on his actual deduplication results.

136. While he did not provide specific details about his data cleaning in his reports or in his ReadMe,[240] Mr. Thompson described several aspects of his data cleaning during his deposition. Specifically, he testified in his deposition that his data cleaning method involved "removing profanity if [he] could identify it and removing emojis, or in nonstandard ASCII characters, potentially translating them if possible."[241] He also testified that he observed some addresses, like the address for Apple's headquarters, that were not valid payor addresses.[242] With respect to those addresses, Mr. Thompson testified that he "would attempt to remove [such addresses] and

---

[239] In the Thompson Declaration, Mr. Thompson appears to describe the same approach as his expert report and supplemental report. Additionally, when asked what changes were made between them, Mr. Thompson stated in his deposition that he performed more data cleaning and more deduplication steps. Thompson Deposition, p. 140:3–8 ("Q. What changes did you make? A. I added multiple tiers to the deduplication logic. I added additional data cleansing…").

[240] Mr. Thompson described in ¶ 17.g of his report that he used National Change of Address ("NCOA") data to update address for individuals who have moved and reported a change of address to the United States Postal Service. *See* Thompson Supplemental Report, ¶ 17.g.

[241] Thompson Deposition, pp. 87:17–20 ("A. It means, yeah, removing profanity if I could identify it and removing emojis, or in nonstandard ASCII characters, potentially translating them if possible."). *See also* Thompson Deposition, 88:13–17 ("Q. And with respect to profanity, did you write a piece of code to cleanse data of profanity? A. I -- I believe I -- there was some -- some code that removed some -- some amount of profanity at some point.").

[242] Thompson Deposition, p. 90:7–8 ("A. In my opinion, that -- Apple's address as an Apple payor address is not a valid address.").

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

not utilize [them] as a matching criteria."[243] Similarly, Mr. Thompson described in his deposition

that he checked for outliers in all the fields and took actions to fix the outliers if needed.[244]

137.    By contrast, upon review of Mr. Thompson's Computer Code and materials, I determined

that Mr. Thompson did not implement all the data cleaning methods that he presented in his

report and described in more detail in his deposition. Exhibit 10 compares Mr. Thompson's

stated data cleaning methods and his actual methods.

*Exhibit 10*
*Comparison of Mr. Thompson's Stated Method and His Actual Method*

|  | Stated Method | Actual Method |
|---|:---:|:---:|
| 1.  Removed profanity | ✔ | |
| 2.  Removed invalid addresses | ✔ | |
| 3.  Checked and removed outliers | ✔ | |
| 4.  Removed nonstandard ASCII characters | ✔ | ✔ |
| 5.  Removed numeric and special characters from names, cities, and states | ✔ | ✔ |
| 6.  Used data processed by NCOA | ✔ | ✔ |

Source: Computer Code
Note: The stated methods were collected from Mr. Thompson's reports and deposition. Mr. Thompson does have code to remove nonstandard ASCII characters (including emojis), but he does not run that code until the end of his matching process.

138.    Mr. Thompson's *actual data cleaning code* only removed a narrow set of invalid

characters from names and addresses and updated addresses for a small subset of records based

on the NCOA. Mr. Thompson's code implemented the following steps:

---

[243] Thompson Deposition, pp. 90:9–15 ("Q. (BY MR. LAZARUS) And what did you do in your deduplication work with respect to addresses like Apple's headquarters that do not, in your opinion, represent valid addresses for Apple payors? A. Part of the cleansing analysis I identified that. I believe I would attempt to remove it and not utilize it as a matching criteria…"), 134:14–20 ("Q. What action did you take? A. As an example, as you previously mentioned, Apple's address was used a -- I couldn't give you a count, but it was used more than one would expect for -- for an address. And in those situations, I -- I would remove the value and not utilize an address for that record in attempting to match it.").

[244] Thompson Deposition, pp. 133:15–134:9 ("Q. And what did you -- how many of the most common values did you review, like, the top ten or -- in terms of the most common values, which ones did you review? A. For each data point how many did I review? Q. Right. For each variable. A. Okay. I would -- for every -- every field, I would do a -- I would do a query against the data group for a value and -- and along with a count. And I would do that for, I don't know, the top 100,000, probably. And then review to see what the outliers were and if -- if they needed required action.").

a. Mr. Thompson deleted the values "NA," "[MISSING FROM DS]," "X," "G£û" and "✖" from the fields *first_name, last_name, street1, street2, street3, city, state,* and *postal_code*;

b. Mr. Thompson set the fields *first_name* and *last_name* to missing when both fields contained less than two characters;

c. Mr. Thompson removed numeric digits (i.e., 0, 1, 2, 3, … 9) and invalid character symbols from *first_name, last_name, city,* and *state*; Mr. Thompson also removed the same set of invalid character symbols from *street1, street2,* [245] and *postal_code*;

d. Mr. Thompson replaced *postal_code* with the first five digits when *postal_code* contains more than five digits;

e. Mr. Thompson set 16 values that he identified as "bad phone numbers" to missing values; [246]

f. Mr. Thompson replaced non-ASCII characters in the data (e.g., characters like "ĥ") with ASCII counterparts (e.g., "h"), [247] and replaced Chinese, Japanese, Korean, and other non-English and emoji characters with null values; and,

---

[245] Mr. Thompson replaced the values of *street3* with the values from the *street2* field, so *street2* was repeated twice, and *street3* was not used in matching.

[246] I discussed this in Section XI.B.

[247] ASCII (American Standard Code for Information Interchange) is the most common character encoding format for text data in computers and on the internet. *See* Rahul Awati and Peter Loshin, "What is ASCII (American Standard Code for Information Interchange)?" *TechTarget*, January 24, 2025, available at https://www.techtarget.com/whatis/definition/ASCII-American-Standard-Code-for-Information-Interchange, accessed on June 16, 2025; ASCII-Code.com, "ASCII Table: Reference to ASCII Table of Windows-1252," available at https://www.ascii-code.com/, accessed on June 16, 2025.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

g. Mr. Thompson updated a subset of addresses based on the National Change of Address ("NCOA") data from the United States Postal Service, which he accessed through the third party vendor Melissa Data.[248]

139. However, Mr. Thompson's data cleaning code performed no actual adjustments to remove illegitimate or outlier addresses (e.g., Apple's headquarters at 1 Infinite Loop[249]) despite his assertion during his deposition that he had done so;[250] similarly he performed no cleaning to remove profanity, even though he asserted in his deposition that he had performed this step as well.[251] I confirmed these discrepancies both by reviewing the code referenced in Mr. Thompson's ReadMe file and by verifying that many values Mr. Thompson purported to clean nonetheless appear unaltered in his final data and were therefore not in fact cleaned. He also made no adjustments in his code to account for different variations of the same information (e.g., names like "William" and "Bill").

140. Mr. Thompson also testified that "a small subset of data" needed to be taken out of the air-gapped room to check certain names and addresses against the "NCOA (National Change of

---

[248] Mr. Thompson also asserts that he applied "additional layers of proprietary data cleansing code to address remaining data quality issues and repeated the process again until the marginal returns were very low." *See* Thompson Supplemental Report, ¶ 17.c. However, no additional data cleaning beyond the steps above are referenced in the ReadMe file that Mr. Thompson provided on May 28, 2025, listing the code Mr. Thompson purports to have run to produce his output.

[249] There were over a million records in the Apple Payor Data with an *street1* or *street2* resembling "Apple Computer," "Apple Inc," "Infinite Loop," or "1 Infinite." *See* Workpaper 19.

[250] Thompson Deposition, pp. 89:20–90:15 ("Q: Okay. Or another example, Apple's headquarters at 1 Infinite Loop, did you see that address entered into the payor -- Apple payor data here? A. I do recall a small portion of Apple's address as the address, yeah… In my opinion, that -- Apple's address as an Apple payor address is not a valid address. Q. (BY MR. LAZARUS) And what did you do in your deduplication work with respect to addresses like Apple's headquarters that do not, in your opinion, represent valid addresses for Apple payors? A. Part of the cleansing analysis I identified that. I believe I would attempt to remove it and not utilize it as a matching criteria.").

[251] Thompson Deposition, p. 87:10–20 ("A. In situations where I could identify data that – such as profanity, emojis, I would cleanse or remove the data and then use other available data points to attempt to match and deduplicate the records. Q. When you say 'cleanse the records,' does that mean cleanse them to remove the emojis and the profanity? A. It means, yeah, removing profanity if I could identify it and removing emojis, or in nonstandard ASCII characters, potentially translating them if possible.").

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

Address) search from the [United States Postal Service ("USPS")]."[252] According to Mr. Thompson, this step "determine[d] whether any particular name that has multiple addresses is actually the same person."[253] Mr. Thompson clarified in his deposition that the "small subpopulation" of names and addresses submitted to the NCOA data process included one primary record for every potential unique payor in the payor data.[254] He further testified in his deposition that these names and addresses had been uploaded to Melissa Data,[255] and that Melissa Data performed address standardization in addition to running data through the NCOA registry,[256] but that he was "unaware of Melissa Data's internal processes" for cleaning records or producing NCOA output.[257] Mr. Thompson also testified that he was "unclear on how [validation] would be done" on the Melissa Data NCOA output.[258]

---

[252] Thompson Declaration, ¶ 7.m.

[253] Thompson Supplemental Report, ¶ 17.g.

[254] Thompson Deposition, p. 189:1–10 ("[The records uploaded] represented the subset of the total population that at that point had -- was still identified as a primary record… The -- the intent of sending that small subpopulation instead of sending the entire 1.69 billion records was in complying with the protective order and protecting the data to best of our ability."). Mr. Thompson's methodology assigned every purported payor a unique "primary record."

[255] Thompson Deposition, p. 120:12–18 ("A. I ran a subset of the data through the National Change of Address, a process in order to get updated current addresses for a portion of the population, correct. Q. And that was through Melissa Data, if I -- is that the right name of the vendor? A. That is correct.").

[256] Thompson Deposition, p. 186:4–8 ("Q. Does that solution that you used only run the data through the NCOA database or does it do additional work on the data? A. The process does do -- perform some level of standardization of addresses as -- as an output.").

[257] Thompson Deposition, pp. 187:23–188:10 ("Q. (BY MR. LAZARUS) Well, let me back up. Does Melissa Data Solutions match addresses? A. I'm -- I am unaware of Melissa Data's internal processes for -- for how they connect a uploaded record to a record so they could produce a -- a NCOA output. Everything I -- everything I would say with regard to that would be speculation of a third party's internal workings. Q. So am I correct that you're not aware whether they use exact matching or what we were referring to earlier as fuzzy matching? A. I'm -- yeah, I am not aware of their -- their internal processes.").

[258] Thompson Deposition, p. 187:13–18 ("Q. Okay. Did you perform any validation to confirm that the address cleaning steps being outsourced to Melissa Data Solutions were done correctly? A. No. I'm -- I'm unclear on how that would be done, so no.").

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order                                                   Page 85

141. **Conclusion**. The Computer Code Mr. Thompson provided in his backup production is not correct or accurate, and differs materially and substantially from his description in his Declaration, Reports, and his Deposition Testimony.

## XV. Conclusion

142. Mr. Thompson failed to meet the burden of his assignment. Given the lack of any attempt to quantify the types or amount of error his method produced, and the glaring failures I have pointed out throughout my report, I find that Mr. Thompson's method is unreliable for the purpose of identifying unique payors.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on the 27th day of June, 2025 (with correction of a scrivener's error on the 28th day of June, 2025)

_____
Victoria C. Stodden, Ph.D.

Highly Confidential—Attorneys' Eyes Only
Subject to Protective Order

CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Victoria Stodden
Associate Professor
Department of Industrial and Systems Engineering
University of Southern California
victoria@stodden.net
*http://stodden.net*

Victoria Stodden is an internationally recognized statistician and data scientist. Professor Stodden analyzes the reliability of scientific results, particularly in the context of sophisticated computational approaches to research. Her expertise includes statistical data analyses, big data methods, the design and implementation of scientific validation systems, and openness standards for data and code sharing.

## EDUCATION

**Stanford University**, Ph.D., Statistics

**Stanford Law School**, M.L.S.

**Stanford University**, M.S., Statistics

**University of British Columbia**, M.S., Economics

**University of Ottawa**, B.Soc.Sci., Economics, *magna cum laude*

## ACADEMIC APPOINTMENTS

| | |
|---|---|
| **University of Southern California** | |
| Associate Professor, Department of Industrial and Systems Engineering Viterbi School of Engineering | 1/2021–present |
| **Karlsruhe Institute of Technology (KIT)** | |
| Visiting Professor in the KIT Graduate School Computational and Data Science (KCDS), supported by the International Excellence Award of KIT and the MathSEE (Mathematics in Sciences, Engineering, and Economics) Distinguished Fellowship | 1/2025–present |
| **Stanford University** | |
| Faculty Affiliate, Meta-Research Innovation Center (METRICS) | 2015–present |
| **Stanford Law School** | |
| Affiliate Scholar, The Center for Internet and Society | 2014–present |
| **University of Illinois Urbana-Champaign** | |
| Associate Professor, School of Information Sciences, with courtesy appointments in the College of Law and Departments of Statistics and Computer Science | 8/2014–1/2021 |
| **University of California at Berkeley** | |
| Visiting Assistant Professor in the Statistics Department | 1/2014–6/2014 |
| **Columbia University** | |

SUBJECT TO PROTECTIVE ORDER — HIGHLY CONFIDENTIAL — OUTSIDE COUNSEL'S EYES ONLY

**Appendix A**

## Victoria Stodden
University of Southern California

| | |
|---|---|
| Assistant Professor, Department of Statistics, with affiliate appointment in the Institute for Data Sciences and Engineering | 7/2010–7/2014 |
| **Yale Law School** | |
| Kauffman Fellow in Law and Innovation | 8/2009–7/2010 |
| **MIT Sloan School of Management** | |
| Postdoctoral Researcher | 1/2009–7/2009 |
| **Harvard Law School** | |
| Fellow, Berkman Center for Internet & Society | 1/2008–12/2009 |

## HONORS AND RECOGNITIONS

| | |
|---|---|
| Professor Maurice H. Belz Fund Visiting Scholar, University of Melbourne, Australia | 6/25–8/25 |
| Karlsruhe Institute of Technology MathSEE (Mathematics in Sciences, Engineering, and Economics) Distinguished Fellowship | 1/25 |
| Alexander Humboldt Foundation Research Fellowship, Germany (€60,000) | 10/24 |
| International Excellence Award of KIT (Karlsruhe Institute of Technology), Germany | 9/24 |
| Stanford Centennial Teaching Award, Stanford University | 6/03 |
| Statistics Departmental Teaching Award, Stanford University | 6/03 |
| Statistics Departmental Teaching Award, Stanford University | 6/02 |
| Merit Scholarship, Association of Professors of the University of Ottawa | 1993–94 |
| Merit Scholarship, University of Ottawa | 1992–93 |
| Dean's Honor List for Outstanding Academic Performance, University of Ottawa | 1991–94 |

## PROFESSIONAL ACTIVITIES

**Academic Journals/Editorial**

| | |
|---|---|
| Associate Editor for Reproducibility, *Technometrics* | 2024–present |
| Associate Editor, *Harvard Data Science Review* | 2019–present |
| Advisory Board Member, Research Ideas and Outcomes, *The Open Science Journal* | 2016–present |
| Associate Editor for Reproducibility, *IEEE Transactions on Parallel and Distributed Systems* | 2018–2022 |
| Associate Editor for Reproducibility, *Journal of the American Statistical Association, Applications and Case Studies* | 2016–2018 |
| Associate Editor, Institute of Mathematical Statistics, *Annals of Applied Statistics* | 2015–2020 |

**External Advisory Boards and Committees**

| | |
|---|---|
| National Science Foundation, *Committee of Visitors (COV) for the Office of Advanced Cyberinfrastructure (OAC), Directorate for Computer and Information Sciences and Engineering (CISE)* | 7/2022–8/2022 |
| National Academy of Engineering (NAE), *Advisory Group for the Online Resource Center for Ethics Education in Engineering and Science* | 2014–2020 |

2

**SER-291**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Appendix A**

**Victoria Stodden**
University of Southern California

| | |
|---|---|
| Inaugural Chair, *ACM Emerging Interest Group on Reproducibility and Independent Verification* | 2020–2021 |
| Member, National Institute of Statistical Sciences (NISS) Board of Trustees | 2020–2021 |
| Advisory Committee for American Educational Research Association (AERA) & Council of Graduate Schools (CGS), "Examining Impact and Fostering Academic Support for Open Science Products" | 2020–2021 |
| National Information Standards Organization (NISO) Working Group Member: Taxonomy, Definitions, and Recognition Badging Scheme Working Group | 2019–2021 |
| Advisor to the Curating for Reproducibility (CURE) Consortium, Yale University | 2017–present |
| ACM Task Force on Data, Software, and Reproducibility in Publication | 2013–present |
| Social Science Research Council, Digital Culture Advisory Board | 2015–2020 |
| Advisory Board, Project TIER (Teaching Integrity in Empirical Research), Haverford University. Funded by the Alfred P. Sloan Foundation. | 2015–present |
| The International Mathematical Union, Committee on Electronic Information and Communication | 2014–2020 |
| Board of Advisors, American Statistical Association, *Statistical Analysis and Data Mining* | 2013–2016 |
| Transparency and Openness Promotion (TOP) Guidelines Coordinating Committee, Center for Open Science | 2016–2021 |
| IEEE CS Ad Hoc Committee on Open Science and Reproducibility, reporting to the Board of Governors | 2020–2021 |
| ACM Ethics & Plagiarism Committee | 2017–2019 |
| American Statistical Association, Committee on Professional Ethics | 2016–2019 |
| Advisory Group on Reproducibility to the Supercomputing Conference, ACM, and IEEE | 2015–2018 |
| Member, *NSF Advisory Committee for the Computing and Information Science and Engineering (CISE) Directorate* | 2014–2017 |
| American Statistical Association, Committee on Privacy and Confidentiality | 2013–2015 |
| American Statistical Association, Presidential Strategic Initiative, Developing a Prototype Statistics Portal | 2013–2014 |
| Co-chair, Committee on Data Sharing and Reproducibility, American Statistical Association | 2013–2014 |
| *NSF Advisory Committee for Advanced CyberInfrastructure*, Office of Advanced Cyberinfrastructure, Computing and Information Science and Engineering (CISE) Directorate (ACCI) | |
| • Co-Chair | 2013–2014 |
| • Member | 2011–2015 |

## CONGRESSIONAL TESTIMONY

- Hearing on Scientific Integrity & Transparency, House Committee on Science, Space and Technology Subcommittee on Research, Washington, D.C., March 5, 2013.
  http://science.house.gov/hearing/subcommittee-research-scientific-integrity-transparency

3

**SER-292**

Case 4:11-cv-06714-YGR Document 43-1 Filed 01/01/21 Page 95 of 117 — FOR ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Appendix A**

### Victoria Stodden
University of Southern California

## PUBLICATIONS: PEER-REVIEWED ARTICLES

- V. Stodden, "On Emergent Limits to Knowledge—Or, How to Trust the Robot Researchers: A Pocket Guide," *Harvard Data Science Review*, 6(1), 2024. DOI:10.1162/99608f92.dcaa63bc

- M. Parashar, M. A. Heroux and V. Stodden, "Research Reproducibility," *Computer*, Vol. 55, no. 8, Aug. 2022. DOI:10.1109/MC.2022.3176988.

- M. Schweinsberg, et al., "Same Data, Different Conclusions: Radical Dispersion in Empirical Results When Independent Analysts Operationalize and Test the Same Hypothesis," *Organizational Behavior and Human Decision Processes*, Vol. 165, July 2021. DOI:10.1016/j.obhdp.2021.02.003.

- M. Krafczyk, A. Shi, A. Bhaskar, D. Marinov, and V. Stodden, "Three Empirical Principles for Computational Reproducibility and their Implementation: The Reproduction Package," Philosophical Transactions of the Royal Society A: Mathematical, Physical, and Engineering Sciences, Mar. 29, 2021. DOI:10.1098/rsta.2020.0069.

- H. Fineberg, V. Stodden, and X.L. Meng, "Highlights of the US National Academies Report on 'Reproducibility and Replicability in Science'," *Harvard Data Science Review*, Issue 2.4, Fall 2020. DOI:10.1162/99608f92.cb310198.

- C. Willis and V. Stodden, "Trust but Verify: How to Leverage Policies, Workflows, and Infrastructure to Ensure Computational Reproducibility in Publication," *Harvard Data Science Review*, Issue 2.4, Fall 2020. DOI:10.1162/99608f92.25982dcf.

- D. Chapp, V. Stodden and M. Taufer, "Approaching a Vision of Reproducibility in Cyberinfrastructure: Building on Community Efforts," *Supercomputing Frontiers and Innovations*, 7(1), Jan. 2020. DOI:10.14529/js200106.

- V. Stodden, "The Data Science Life Cycle: A Disciplined Approach to Advancing Data Science," Communications of the ACM, 63(7), July 2020. DOI:10.1145/3360646.

- J. Jeschke, K. Börner, V. Stodden, and K. Tockner, "Open Access Journals Need to Become First Choice in Invasion Ecology and Beyond," *NeoBiota*, 52, Nov. 2019. DOI:10.3897/neobiota.52.39542.

- H. Monajemi, R. Murri, E. Jonas, P. Liang, V. Stodden, and D. Donoho, "Ambitious Data Science Can Be Painless," *Harvard Data Science Review*, Issue 1.1, July 2019. DOI:10.1162/99608f92.02ffc552.

- B. Ludäscher, K. Chard, N. Gaffney, M. B. Jones, J. Nabrzyski, V. Stodden, M. Turk, and K. Turner, "Computing Environments for Reproducibility: Capturing the 'Whole Tale'," *Future Generation Computer Systems*, 94(C), May 2019. DOI:10.1016/j.future.2017.12.029.

- F. Berman, S. Davidson, D. Estrin, B. Halipern, M. Franklin, M. Martonosi, P. Raghavan, R. Rutenbar, V. Stodden, and A. Szalay, "Realizing the Potential of Data Science," Communications of the ACM, 61(4), Apr. 2018. DOI:10.1145/3188721.

- V. Stodden, J. Seiler, and Z. Ma, "An Empirical Analysis for Journal Policy for Computational Reproducibility," Proceedings of the National Academy of Sciences, Mar. 2018. DOI:10.1073/pnas.1708290115.

- N. Kafkafi et al. "Reproducibility and Replicability of Rodent Phenotyping in Pre-clinical Studies," *Neuroscience & Biobehavioral Reviews*, Jan. 2018. DOI:10.1016/j.neubiorev.2018.01.003.

- R.C. Jiménez et al. "Four Simple Recommendations to Encourage Best Practices in Research Software," F1000Research 2017, 6(876), June 2017. DOI:10.12688/f1000research.11407.1.

- D. Greenbaum, J. Rozowsky, V. Stodden, and M. Gerstein, "Structuring Supplemental Materials in Support of Reproducibility," *Genome Biology*, 2017. DOI:10.1186/s13059-017-1205-3.

4

**SER-293**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Appendix A**

**Victoria Stodden**
University of Southern California

- V. Stodden, M. McNutt, D. H. Bailey, E. Deelman, Y. Gil, B. Hanson, M. A. Heroux, J. P. A. Ioannidis, and M. Taufer, "The 'Reproducibility Enhancement Principles' for Computational Methods," *Science*, 354(6317), Dec. 2016. DOI:10.1126/science.aah6168.

- B. Alberts, R. J. Cicerone, S. E. Fienberg, A. Kamb, M. McNutt, R. M. Nerem, R. Schekman, R. Shiffrin, V. Stodden, S. Suresh, M. T. Zuber, B. Kline Pope, and K. Hall Jamieson, "Self-correction in Science at Work," *Science*, 348(6242), June 2015, pp. 1420–22. DOI:10.1126/science.aab3847.

- V. Stodden, "Reproducing Statistical Results," *Annual Review of Statistics and Its Application*, Vol. 2, 2015, pp. 1–19. DOI:10.1146/annurev-statistics-010814-020127.

  **Chosen by Annual Reviews for Open Access in support of the 2019 National Academies of Science, Engineering and Medicine report, "Reproducibility and Replicability in Science."**

- V. Stodden, J. Seiler, and S. Miguez, "ResearchCompendia: CyberInfrastructure for Reproducibility and Collaboration in Computational Science," *IEEE Computing in Science and Engineering*, 17(1), Jan./Feb. 2015, pp. 12–19. DOI:10.1109/MCSE.2015.18.

- V. Stodden, "The Reproducible Research Movement in Statistics," *Statistical Journal of the International Association of Official Statistics*, 30(2), 2014, pp. 91–93. DOI:10.3233/SJI-140818.

- V. Stodden and S. Miguez, "Best Practices for Computational Science: Software Infrastructure and Environments for Reproducible and Extensible Research," *Journal of Open Research Software* 2(1), Page/Article e21, 2014, pp. 1–6. DOI:10.5334/jors.ay.

- V. Stodden, P. Guo, and Z. Ma, "Toward Reproducible Computational Research: An Empirical Analysis of Data and Code Policy Adoption by Journals," *PLOS ONE* 8(6), 2013. DOI:10.1371/journal.pone.0067111.

  **Chosen for inclusion in the PLOS Open Data Collection.**

- R. LeVeque, I. Mitchell, and V. Stodden, "Reproducible Research for Scientific Computing: Tools and Strategies for Changing the Culture," *IEEE Computing in Science and Engineering*, Vol. 14, Issue 4, 2012, pp. 13–17. DOI:10.1109/MCSE.2012.38.

- V. Stodden with Yale Roundtable Participants, "Reproducible Research: Addressing the Need for Data and Code Sharing in Computational Science," IEEE Computing in Science and Engineering, vol. 12, no. 5, pp. 8–13, Sep./Oct. 2010.

- V. Stodden, "Open Science: Policy Implications for the Evolving Phenomenon of User-Led Scientific Innovation*," Journal of Science Communication* 9(1), Mar. 2010. DOI:10.22323/2.09010205.

- V. Stodden with the Toronto International Data Release Workshop Authors, "Prepublication Data Sharing," *Nature*, 461(10), Sep.2009, pp. 168–70. DOI:10.1038/461168a.

- V. Stodden, "Enabling Reproducible Research: Open Licensing for Scientific Innovation," *International Journal of Communications, Law and Policy*, Issue 13, Winter 2008–09, pp.1–25.

  **Winner of the Access to Knowledge Kaltura prize.**

- V. Stodden, "The Legal Framework for Reproducible Research in the Sciences: Licensing and Copyright," *IEEE Computing in Science and Engineering*, 11(1), Jan. 2009, pp. 35–40. DOI:10.1109/MCSE.2009.19.

- D. Donoho, A. Maleki, I. Rahman, M. Shahram, and V. Stodden, "Reproducible Research in Computational Harmonic Analysis," *IEEE Computing in Science and Engineering*, 11(1), Jan. 2009, pp. 8–18. DOI:10.1109/MCSE.2009.15.

- E. Hurowitz, I. Drori, V. Stodden, D. Donoho, and P. Brown, "Virtual Northern Analysis of the Human Genome," *PLOS ONE*, May 23, 2(5), 2007. DOI:10.1371/journal.pone.0000460.

- I. Ur Rahman, I. Drori, V. Stodden, D. Donoho, and P. Schroeder, "Multiscale Representations of Manifold-valued Data," SIAM J. Multiscale Modeling and Simulation, 4(4), 2005, p. 1201–1232. DOI:10.1137/050622729.

5

**Victoria Stodden**
University of Southern California

- V. Stodden, *Model Selection When the Number of Variables Exceeds the Number of Observations*, Doctoral thesis, Stanford University Department of Statistics, 2006.

# PUBLICATIONS: EDITED WORKS

- V. Stodden, "Reproducibility and Replicability in Science," Guest Editor's Introduction, *Harvard Data Science Review* 2020. (Five contributed articles). Special Issue for the National Academies "Reproducibility and Replicability in Science" Report.

- D. Allison, R. Shiffrin, and V. Stodden, "Reproducibility of Research: Issues and Proposed Remedies," Guest Editor's Introduction, Proceedings of the National Academy of Sciences, 115(11), pp. 2561–2562, Mar. 2018. DOI: 10.1073/pnas.1802324115. (Twelve contributed articles). Co-organizers' edited volume from the National Academies Arthur M. Sackler Colloquium on Improving the Reproducibility of Scientific Research.

- V. Stodden, "Reproducible Research: Tools and Strategies for Scientific Computing," Guest Editor's Introduction, *IEEE Computing in Science and Engineering*, 4(4), pp. 11–12, 2012. DOI:10.1109/MCSE.2012.82. (Seven contributed articles).

- J. Lane, V. Stodden, S. Bender, and H. Nissenbaum, eds., *Privacy, Big Data, and the Public Good: Frameworks for Engagement*, Cambridge University Press, June 2014.

- V. Stodden, F. Leisch, and R. Peng, eds., *Implementing Reproducible Research (A Volume in the R Series)*, Taylor & Francis, Apr. 2014.

# PUBLICATIONS: BOOK CHAPTERS

- D. Donoho and V. Stodden, "Reproducible Research in Computational Mathematics," invited to *The Princeton Companion to Applied Mathematics*, edited by N. J. Higham; M. R. Dennis, P. Glendinning, P. A. Martin, F. Santosa, and J. Tanner, associate eds., 2015, pp. 916–925.

- D. Bailey, J. Borwein, and V. Stodden, "Facilitating Reproducibility in Scientific Computing: Principles and Practice," in *Reproducibility: Principles, Problems, Practices, Prospects*, H. Atmanspacher and S. Maasen, eds., Wiley, 2015. pp. 205–232.

- V. Stodden, "Enabling Reproducibility in Big Data Research: New Approaches to Intellectual Property and Privacy Law for Scientific Integrity," in *Privacy, Big Data, and the Public Good: Frameworks for Engagement*, J. Lane, V. Stodden, H. Nissenbaum, and S. Bender, eds., Cambridge University Press, 2014. pp. 112–132.

- C. Hurlin, C. Perignon, and V. Stodden, "RunMyCode.org: A Research-Reproducibility Tool for Computational Sciences," in *Implementing Reproducible Research*, V. Stodden, F. Leisch, and R., Peng, eds., Taylor & Francis, 2014. pp. 367–382.

- V. Stodden, "Policy and Intellectual Property Rights in Computational Science," in *Implementing Reproducible Research*, V. Stodden, F. Leisch, and R., Peng, eds., Taylor & Francis, 2014. pp. 325–342.

- V. Stodden, "What Computational Scientists Need to Know About Intellectual Property Law: A Primer," in *Opening Science: The Evolving Guide on How the Web is Changing Research, Collaboration and Scholarly Publishing*, S. Bartling and S. Friesike, eds., Springer, 2013. pp. 225–235.

- V. Stodden, "Innovation and Growth through Open Access to Scientific Research: Three Ideas for High-Impact Rule Changes," in *Rules for Growth: Promoting Innovation and Growth Through Legal Reform*, edited by The Kauffman Task Force on Law, Innovation, and Growth. Feb. 2011. pp. 409–432.

6

Case 4:11-cv-06714-YGR   Document 1058-45   Filed 04/05/24   Page 98 of 117   HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Appendix A**

**Victoria Stodden**
University of Southern California

- V. Carey and V. Stodden, "Reproducible Research Concepts and Tools for Cancer Bioinformatics," *in Biomedical Informatics for Cancer Research*, M. F. Ochs, J. T. Casagrande, and R. V. Davuluri, eds., Springer, 2010. pp. 149–175.

## PUBLICATIONS: REFEREED CONFERENCE ARTICLES

- A. Bhaskar and V. Stodden. "Reproscreener: Leveraging LLMs For Assessing Computational Reproducibility Of Machine Learning Pipelines," ACM REP '24 ACM Conference on Reproducibility and Replicability, June 18–20, 2024. DOI:10.1145/3641525.3663629 (forthcoming)
- Y. Zheng and V. Stodden. "The Idealized Machine Learning Pipeline (IMLP) For Advancing Reproducibility In Machine Learning," ACM REP '24 ACM Conference on Reproducibility and Replicability, June 18–20, 2024. DOI:10.1145/3641525.3663630 (forthcoming)
- P. Zhang, Y. Jiang, A. Wei, V. Stodden, D. Marinov, and A. Shi, "Domain-Specific Fixes for Flaky Tests with Wrong Assumptions on Underdetermined Specifications," IEEE/ACM 43rd International Conference on Software Engineering (ICSE), 2021. DOI:10.1109/ICSE43902.2021.00018.
- V. Stodden, "Beyond Open Data: A Model for Linking Digital Artifacts to Enable Reproducibility of Scientific Claims," Third International Workshop on Practical Reproducible Evaluation of Computer Systems (P-RECS20), June 2020. DOI:10.1145/3391800.3398172.
- W. Lam, S. Winter, A. Astorga, V. Stodden, and D. Marinov, "Understanding Reproducibility and Characteristics of Flaky Tests Through Test Reruns in Java Projects," 2020 IEEE 31st International Symposium on Software Reliability Engineering (ISSRE), 2020. DOI:10.1109/ISSRE5003.2020.00045.
- K. Chard, N. Gaffney, M. B. Jones, K. Kowalik, B. Ludäscher, J. Nabrzyski, V. Stodden, I. Taylor, T. Thelen, M. J. Turk, and C. Willis, "Application of BagIt-Serialized Research Object Bundles for Packaging and Re-execution of Computational Analyses," IEEE 15th International Conference on e-Science (e-Science), San Diego, 2019. DOI:10.1109/eScience.2019.00068.
- V. Stodden, V. Ferrini, M. Gabanyi, K, Lehnert, J. Morton, and H. Berman, "Open Access to Research Artifacts: Implementing the Next Generation Data Management Plan," Association for Information Science and Technology (ASIST19), 2019. DOI:10.1002/pra2.51.
- M. S. Krafczyk, A. Shi, A. Bhaskar, D. Marinov, and V. Stodden, \Scientific Tests and Continuous Integration Strategies," Second International Workshop on Practical Reproducible Evaluation of Computer Systems (P-RECS19), June 2019. DOI:10.1145/3322790.3330595.
- V. Welch, E, Deelman, V. Stodden, and M. Taufer, "Initial Thoughts on Cybersecurity and Reproducibility," Second International Workshop on Practical Reproducible Evaluation of Computer Systems (P-RECS19), June 2019. DOI:10.1145/3322790.3330593.
- K. Chard, N. Gaffney, M. B. Jones, B. Ludäscher, J. Nabrzyski, V. Stodden, M. Turk, and C. Willis, "Implementing Computational Reproducibility in the Whole Tale Environment," Second International Workshop on Practical Reproducible Evaluation of Computer Systems (P-RECS19), June 2019. DOI:.10.1145/3322790.3330594.
- B. Mecum, S. Wyngaard, C. Willis, M. Turk, T. Thelen, I. Taylor, V. Stodden, D. Perez, J. Nabrzyski, B. Ludäscher, S. Kulasekaran, K. Kowalik, M. B. Jones, M. Hategan, N. Gaffney, K. Chard, and A. Brinckman, "Science, Containerized: Integrating Provenance and Compute Environments with the Whole Tale," AGU Fall Meeting Abstracts, 2018.
- V. Stodden, X.Wu, and V. Sochat, "AIM: An Abstraction for Improving Machine Learning Prediction," IEEE Data Science Workshop Proceedings, June 2018. DOI:10.1109/DSW.2018.8439914.

7

**Appendix A**

**Victoria Stodden**

University of Southern California

- V. Stodden, M. S. Krafczyk, and A. Bhaskar, "Enabling the Verification of Computational Results: An Empirical Evaluation of Computational Reproducibility," First International Workshop on Practical Reproducible Evaluation of Computer Systems (P-RECS18), June 2018. DOI:10.1145/3214239.3214242.

- V. Stodden and X. Wu, "Defining the AIM: An Abstraction for Improving Machine Learning Prediction," American Statistical Association Symposium on Data Science and Statistics, May 2018.

- H. Monajemi, D. L. Donoho, and V. Stodden, "Making Massive Computational Experiments Painless," IEEE BigData 2016, Open Science in Big Data (OSBD 2016), Dec. 5, 2016.

- B. Ludäscher, K. Chard, N. Gaffney, M. B. Jones, J. Nabrzyski, V. Stodden, and M. Turk, "Capturing the 'Whole Tale' of Computational Research: Reproducibility in Computing Environments," Science Gateways 2016.

- V. Stodden and S. Miguez, "Provisioning Reproducible Computational Science Information," reproducibility@XSEDE: An XSEDE14 Workshop, 2014.

- V. Stodden and H. Reich, "Software Patents as a Barrier to Scientific Transparency: An Unexpected Consequence of Bayh-Dole," Conference on Legal Empirical Studies, Stanford, CA, Nov. 2012.

- V. Stodden, C. Hurlin, and C. Perignon, "RunMyCode.org: A Novel Dissemination and Collaboration Platform for Executing Published Computational Results," IEEE International Conference on eScience, Workshop on Analyzing and Improving Collaborative eScience with Social Networks, 2012.

- V. Stodden, "Data Sharing in Social Science Repositories: Facilitating Reproducible Computational Research," NIPS workshop: Computational Science and the Wisdom of Crowds, Dec. 2010.

- V. Stodden and P. Meier, "A Global Empirical Evaluation of New Communication Technology Use and Democratic Tendency."
  **Nominated for Best Paper, 3rd IEEE/ACM International Conference on Information and Communication Technologies and Development, Doha, Qatar, Apr. 2009.**

- D. Donoho and V. Stodden, "Breakdown Point of Model Selection When the Number of Variables Exceeds the Number of Observations," IEEE World Congress on Computational Intelligence, 2006.

- E. Hurowitz, I. Drori, and V. Stodden, "Fast l1 Minimization for Genomewide Analysis of mRNA Lengths," IEEE International Workshop on Genomic Signal Processing and Statistics, 2006.

- D. Donoho and V. Stodden, "Breakdown Point of Model Selection When the Number of Variables Exceeds the Number of Observations," Proc. IEEE International Joint Conference on Neural Networks, Vancouver, BC, 2006.

- D. Donoho and V. Stodden, "When Does Non-Negative Matrix Factorization Give a Correct Decomposition Into Parts?" Proceedings NIPS 2003.

## PUBLICATIONS: OTHER SCHOLARLY WORKS

- V. Stodden with Committee Members, "Reproducibility and Replication in Science," National Academies of Sciences, Engineering, and Medicine, Apr. 2019.

- V. Stodden with Committee Members, "Fostering Integrity in Research," National Academies of Sciences, Engineering, and Medicine, Apr. 2017.

- V. Stodden, "How do I know the right level of abstraction at which to explain a phenomenon?", Reply to The Edge Annual Question 2018: What is the Last Question? Jan. 2018.

- V. Stodden, "Epsilon," Reply to The Edge Annual Question 2017: What scientific term ought to be more widely known? Jan. 2017.

8

**Appendix A**

**Victoria Stodden**
University of Southern California

- V. Stodden with Committee Members, "Realizing the Potential of Data Science," Final Report from the National Science Foundation Computer and Information Science and Engineering Advisory Committee Data Science Working Group, Dec. 2016.
- D. James, N. Wilkins-Diehr, V. Stodden, D. Colbry, and C. Rosales, "Standing Together for Reproducibility in Large-Scale Computing: Report on reproducibility@XSEDE, An XSEDE14 Workshop," Dec. 2014.
- V. Stodden, "Reproducibility," Reply to The Edge Annual Question 2014: What scientific idea is ready for retirement? Jan. 2014.
- J. Lane and V. Stodden, "What, Me Worry? What to Do about Privacy, Big Data, and Statistical Research," *Amstat News*, Dec. 2013.
- V. Stodden, "Resolving Irreproducibility in Computational and Empirical Research," invited *IMS Bulletin*, Dec. 2013.
- V. Stodden, D. Bailey, and J. Borwein, "'Setting the Default to Reproducible' in Computational Science Research," *SIAM News*, June 2013.
- D. Bailey, J. Borwein, and V. Stodden, "Set the Default to 'Open'," *Notices of the AMS*, June 2013.
- V. Stodden, D. Bailey, J. Borwein, R. LeVeque, W. Rider, and W. Stein "Setting the Default to Reproducible: Reproducibility in Computational and Experimental Mathematics," ICERM Workshop Report, 2013.
- V. Stodden, "Where did you get that fact?", Reply to The Edge Annual Question 2012: What should we be worried about? Jan. 2013.
- V. Stodden, "Fact, Fiction, and Our Probabilistic World," Reply to The Edge Annual Question 2011: What is your favorite deep, elegant, or beautiful explanation? Jan 2012. Published in *This Explains Everything: Deep, Beautiful, and Elegant Theories of How the World Works*, Harper Perennial, Jan. 22, 2013.
- V. Stodden, "Phase Transitions and 'Scale Transitions:' Conceptualizing Unexpected Changes Due to Scale," Reply to The Edge Annual Question 2010: What Scientific Concept Would Improve Everybody's Cognitive Toolkit? Jan 2011. Published in *This Will Make You Smarter: New Scientific Concepts to Improve Your Thinking*, Harper Perennial, Feb. 14, 2012.
- V. Stodden and S. Arbesman, "Scientists, Share Secrets or Lose Funding," Bloomberg View, Jan. 10, 2012.
- V. Stodden with Participants, "Changing the Conduct of Science: Summary Report of the Workshop," Held on Nov. 12, 2010," at the National Science Foundation Workshop Changing the Conduct of Science in the Information Age, June 2011.
- V. Stodden, "Trust your Science? Open Your Data and Code," *Amstat News*, July 1, 2011.
- V. Stodden, "White Paper for Expert Panel Discussion on Data Policies," for a Workshop of the National Science Board Expert Panel on Data Policies, Mar. 27–29, 2011.
- V. Stodden with Task Force co-authors, "Cyber Science and Engineering: A Report of the NSF Advisory Committee on Cyberinfrastructure," Task Force on Grand Challenges, Nov. 2010.
- V. Stodden, "Remarks," presented before The National Academies of Sciences, Engineering, and Medicine Committee on The Impact of Copyright Policy on Innovation in the Digital Era, Washington, D.C., Oct. 15, 2010.
- V. Stodden, "Cogitamus, Ergo Sum? The 'Difference Between Knowing the Name of Something and Knowing Something,'" Reply to The Edge Annual Question 2009: How Has the Internet Changed the Way You Think? Jan. 2010.

9

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Appendix A**

**Victoria Stodden**
University of Southern California

# PUBLICATIONS: TECHNICAL REPORTS

- M. A. Heroux, L. Barba, M. Parashar, V. Stodden, and M. Taufer, "Toward a Compatible Reproducibility Taxonomy for Computational and Computing Sciences," Sandia National Lab (SNL-NM), Albuquerque, NM, 2018.
- V. Stodden, "The Scientific Method in Practice: Reproducibility in the Computational Sciences," MIT Sloan Research Paper No. 4773-10. 2010. DOI:10.2139/ssrn.1550193.
- D. Donoho, V. Stodden, and Y. Tsaig, "About SparseLab," Stanford Department of Statistics Technical Technical Report, SparseLab 2.0, Mar. 2007.
- D. Donoho, V. Stodden, and Y. Tsaig, "SparseLab Architecture," Stanford Department of Statistics Technical Report, SparseLab 2.0, Mar. 2007.

# SOFTWARE DEVELOPMENT

| | |
|---|---|
| **Reproscreener.org**: The Center for Research and Education in AI and Learning (**REAL@USC**)-funded collaborative project developing an open-source tools to evaluate machine learning pipelines to improve efficiency and reproducibility. | 8/2023–present |
| **WholeTale.org**: NSF-funded collaborative project to develop an open-source platform that supports modern research tools such as the Jupyter notebook, and creates online "research compendia" that make available data and code as a novel standardized re-executable package called a "Tale." | 10/2017–2/2023 |
| **ezdmp.org**: NSF-funded collaborative project to develop an open-source next generation data management plan tool. | 9/2016–8/2018 |
| **ResearchCompendia**: Sloan Foundation-funded project to develop an opensource platform to support online "research compendia" that make available data and code alongside published results and verify findings in the cloud. | 4/2013–10/2014 |
| **RunMyCode.org**: Collaboration to develop open availability of code and data with published computational results. | 3/2012–10/2014 |
| Developed and maintained SparseLab webpage for the collaborative Matlab toolbox distribution from my dissertation (over 7,000 downloads in 2008). | 9/2005–1/2022 |

# SELECTED PRESENTATIONS

| | |
|---|---|
| **Invited Colloquium Presentation**, Heidelberg Institute of Theoretical Studies Colloquium, "*Verifying Correctness in AI-enabled Scientific Research – A New Frontier.*" | 3/2025 |
| **Invited Presentation**, International Excellence Talk and MathSEE Lecture, Karlsruhe Institute of Technology, "*AI and the Future of Research: Stakeholders, Process, and Practices.*" | 1/2025 |
| **Invited Presentation**, US-UK Scientific Forum: Science in the Age of AI. "*On Emergent Limits to Knowledge Or, How to Trust the Robot Researchers: A Pocket Guide.*" | 6/2024 |
| **Keynote**, Learning from Authoritative Security Experiment Results (LASER) Workshop, Annual Computer Security Applications Conference (ACSAC). "*A Decade Later: Reproducibility & Reliability of Research Results.*" | 12/2023 |

10

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Appendix A**

**Victoria Stodden**
University of Southern California

| | |
|---|---|
| Departmental Seminar, Alfred-Weber-Institut Für Wirtschaftswissenschaften, Heidelberg University, Germany. "*Automating Assessment of Machine Learning Research: Revisiting Arrow's Impossibility Theorem*." | 11/2023 |
| **Invited Presentation**, Joint Statistical Meetings, Statistics and the Reproducibility Crisis. "*Automating Assessment of Computational Reproducibility in Machine Learning Research*." | 8/2023 |
| **Invited Presentation**, The Center for Research and Education in AI and Learning (REAL@USC) First Anniversary Conference, "*Automating Machine Learning Model Checking*." | 10/2022 |
| Building a Community Roadmap to Robust Science in High-Throughput Applications, SIAM Conference on Computational Science and Engineering (CSE21). "*Advancing Computational Scientific Discovery by Enabling Reproducibility and Transparency: Policies and Practice*." | 3/2021 |
| **Invited Address**, Scholarship for a Post-Pandemic World: A Conversation; Council of Graduate Schools 60th Annual Meeting. "*Training and Scholarly Impact in a Digital World*." | 12/2020 |
| Epstein Institute Seminar, University of Southern California. "*Two Projects for Advancing Scientific Reliability in Complex Computational and Human Systems.*" | 9/2020 |
| **Keynote**, Applied Human Factors and Ergonomics Conference: The Human-Side of Service Engineering. "*Toward a Computable Scholarly Record: Meta Science and Engineering Reproducibility in the Era of AI*." | 7/2020 |
| **Invited Address**, IEEE CS Ad Hoc Committee on Open Science and Reproducibility. "*Reproducibility and Replicability in Science*." | 6/2020 |

The National Academies of Science, Engineering, and Medicine Committee

| | |
|---|---|
| • "Roundtable on Data Science Post-Secondary Education" | 2016–2019 |
| • "Reproducibility and Replicability in Science" | 2016–2019 |
| • "Responsible Science: Ensuring the Integrity of the Research Process" | 2014–2018 |

| | |
|---|---|
| **Invited Distinguished Speaker**, Northwestern Computer Science **Distinguished Lecture** Series, Northwestern University. "*The Lifecycle of Data Science: A Framework for Advancing Computational and Data-enabled Research*." | 11/2019 |
| **Invited Distinguished Speaker**, Center for Data and Computing **Distinguished Speaker** Series, University of Chicago. "*Reproducibility is Not a Crisis. Now What? Next Steps for Advancing Computational and Data-enabled Science*." | 11/2019 |
| **Keynote**, Parallel Computing 2019: Symposium Tools and Infrastructure for Reproducibility in Data-Intensive Applications, Prague, Czech Republic. "*Advancing Reproducibility and Transparency in Data Inference Applications*." | 9/2019 |
| **Invited Seminar**, Space Telescope Science Institute, Baltimore, MD. "*Reproducibility in Scientific Inference, Data Dissemination, and Computational Environments*." | 7/2019 |
| **Keynote**, Computational Reproducibility at Exascale 2018 (CRE2018), Supercomputing18, Dallas, TX. "*Reproducibility in Computational and Data-enabled Science*." | 11/2018 |
| **Plenary**, Ethics, law, and transparency. "Institute for the Secure Sharing of Online Data" (ISSOD) Workshop, Boston, MA. "*A Future of Research Transparency: Enabling Reproducibility in Repository Design*." | 11/2018 |
| **Keynote**, The 27th International Symposium on High-Performance Parallel and Distributed Computing, Arizona State University. "*Reproducibility in Computational and Data-enabled Science*." | 6/2018 |

11

**SER-300**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

# Appendix A

**Victoria Stodden**
University of Southern California

| | |
|---|---|
| **Keynote**, IEEE Data Science Workshop, EPFL, Switzerland. "*Reproducibility and Generalizability in Data-enabled Discovery.*" | 6/2018 |
| **Keynote**, Northwestern Computational Research Day, Evanston, IL. "*Reproducibility in Computational Research: Code, Data, Statistics, and Implementation.*" | 4/2018 |
| **Invited Presentation**, Sandia National Laboratories, Oak Ridge National Laboratory, Swiss Institute of Technology (SOS) SOS-22 Workshop: HPC and Data Science, Waikoloa, HI. "*Reproducibility at Exascale.*" | 3/2018 |
| **Keynote**, Research Data Management Implementations (RDMI) Workshop, Arlington, VA. "*Research Data Management Implementations: Towards the Reproducibility of Science.*" | 9/2017 |
| **Invited Address**, European Alpbach Forum, Technology Symposium, Austria. "*Knowledge and Understanding in the Age of Data.*" | 8/2017 |
| **The Judith Resnik Year of Women in ECE Invited Seminar**, Carnegie Mellon University, Pittsburgh, PA. "*Reproducibility in Computationally-enabled Research.*" | 3/2017 |
| National Academy of Sciences, Arthur M. Sackler Colloquia, Reproducibility of Research: Issues and Proposed Remedies, Washington, D.C. "*Reproducibility in Computationally-enabled Research.*" | 3/2017 |
| Seance de reflexion of the Swiss National Research Council on "2050: A Science Odyssey," Interlaken, Switzerland. "*Science: Set the Default to Open.*" | 11/2016 |
| **Invited Talk**, SIAM Annual Meeting, Boston MA. "*Implementing Reproducibility in Computational Science.*" | 7/2016 |
| **Keynote**, Marìa de Maeztu Annual Event: Data-driven Knowledge Extraction Workshop, Universitat Pompeu Fabra, Barcelona, Spain. "*Reproducibility in Computational Research.*" | 6/2016 |
| **Keynote**, Coalition for Networked Information Annual Meeting, San Antonio, TX. "*Defining the Scholarly Record for Computational Research.*" | 4/2016 |
| **Keynote**, AAAS Reproducibility Workshop: Modeling and Code, Washington, D.C. "*Software in Science.*" | 2/2016 |
| **Plenary Speaker**, SuperComputing15, Austin, TX. "*Reproducibility in High Performance Computing.*" | 11/2015 |
| **Keynote**, Open Access Week, Virginia Tech, Blacksburg, VA. "*Scholarly Communication in the Era of Big Data and Big Computation.*" | 10/2015 |
| **Invited Talk**, AAAS Annual Meeting, San Jose, CA. "*Integrity, Reproducibility, and the Changing Technological Environment for Research.*" | 2/2015 |
| **Keynote**, Berkeley Initiative for Transparency in the Social Sciences Conference, University of California, Berkeley. "*Framing Transparency in Research: Issues and Opportunities.*" | 12/2014 |
| **Keynote**, OpenCon 2014, American University Washington College of Law, Washington, D.C. "*Open Data and Reproducibility in Research.*" | 11/2014 |
| **Keynote**, Computational and Simulation Sciences and eResearch, Annual Conference, Melbourne, Australia. "*Open Data and Reproducibility in Research.*" | 3/2014 |
| **Plenary Speaker**, Open Repositories 2013, Charlottetown, Prince Edward Island, Canada. "*Re-use and Reproducibility: Opportunities and Challenges.*" | 7/2013 |

12

**SER-301**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Appendix A**

**Victoria Stodden**
University of Southern California

| | |
|---|---|
| **Keynote**, PDE Software Frameworks, Muenster, Germany. "*Reproducible Results: Challenges for Computational Science and the Scientific Method.*" | 6/2012 |
| **Keynote**, 74th EAGE Conference & Exhibition: Open-source E+P Software - Six Years Later, Copenhagen, Denmark. "*The Central Role of Geophysics in the Reproducible Research Movement.*" | 6/2012 |
| **Dean's Lecture**, UC Berkeley School of Information, Berkeley, CA. "*The Credibility Crisis in Computational Science: An Information Issue.*" | 2/2012 |
| **Plenary Keynote**, Cyberinfrastructure Days, University of Michigan. "*The Credibility Crisis in Computational Science: A Call to Action.*" | 12/2011 |
| National Science Foundation, Advisory Committee on Cyberinfrastructure, Washington, D.C. "*Report on Journal Policy and Reproducible Computational Research.*" | 11/2011 |
| **Keynote**, Open Science Summit, Computer History Museum, Mountain View, CA. "*Transparency in Scientific Discovery: Innovation and Knowledge Dissemination.*" | 10/2011 |
| National Science Board Expert Panel Discussion on Data Policy, Washington, D.C. "*Scientific Reproducibility: First Steps and Guiding Questions.*" | 3/2011 |
| **Keynote**, ICML Workshop on Machine Learning Open Source Software, Haifa, Israel. "*Reproducible Research in Computational Science: Problems and Solutions For Data and Code Sharing.*" | 6/2010 |
| **Dean's Lecture**, UC Berkeley School of Information, Berkeley, CA. "*The Digitization of Science and the Degradation of the Scientific Method.*" | 5/2010 |
| The New Biology: Pathways to Convergence in the Life Sciences, MIT/Kauffman Seminar for Senior Congressional and Executive Branch Staff, MIT. "*Innovation and Openness in Science and the Exceptional Role of the Biological Sciences .*" | 4/2010 |
| **Invited Chaired Session** on Reproducibility: New England Statistics Symposium, Harvard University. "*Scientific Integrity and Reproducibility: Data and Code Sharing.*" | 4/2010 |
| **Invited Lecture**, UC Berkeley School of Information, Berkeley, CA. "*Open Licensing and Scientific Reproducibility.*" | 4/2010 |
| **Keynote**, Scientific Software Days, Texas Advanced Computing Center, University of Texas at Austin. "*The Impact of Computational Science on the Scientific Method.*" | 5/2009 |
| **Neyman Invited Seminar**, Department of Statistics, UC Berkeley. "*The Reproducible Research Standard: Legal Barriers to Practicing the Scientific Method in Computational Research.*" | 2/2009 |

# TEACHING

**Courses Developed**

**University of Southern California, Department of Industrial and Systems Engineering**
- PhD Seminar on Modern Machine Learning      8/2024-12/2024
- Predictive Analytics, Graduate      1/2022-5/2024
- Engineering Statistics, Undergraduate      1/2022
- Discrete Systems Simulation, Undergraduate      8/2021

**University of Illinois Urbana-Champaign, School of Information Sciences**

13

**SER-302**

**Appendix A**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

**Victoria Stodden**

University of Southern California

| | |
|---|---|
| • Concepts of Machine Learning, Undergraduate | 8/2019 |
| • Data Management, Curation & Reproducibility, Undergraduate | 8/2019 |
| • Legal Aspects of Information Systems, Undergraduate | 8/2019 |
| • Methods for Data Science, Master's | 8/2018 |
| • Introduction to Data Science, Master's, Departments of Computer Science (CS) and Statistics | 8/2015 |
| • Intellectual Property for Scholarship, Master's | 8/2015 |
| • Data Policy Seminar, Master's | 8/2014 |

**Columbia University, Department of Statistics**

| | |
|---|---|
| • Replicating Computational Results, Ph.D. Level Course, IGERT "From Data to Knowledge" crossover course, jointly offered between Statistics and EECS | 1/2012 |
| • Statistical Computing in SAS, Master's | 8/2010 |
| • Introduction to Data Science, Master's | 8/2010 |

**University of California, Berkeley, Department of Statistics**

| | |
|---|---|
| • Capstone Course in Data Science, Master's | 1/2011 |

**Stanford University, Department of Statistics**

| | |
|---|---|
| • Statistical Computing in SAS, Master's | 6/2003 |

**Courses Taught**

**University of Southern California, Department of Industrial and Systems Engineering**

| | |
|---|---|
| • Seminar on Modern Machine Learning | 8/2024-12/2024 |
| • Predictive Analytics, Master's | 1/2022-5/2024 |
| • Engineering Statistics, Undergraduate | 1/2022 |
| • Discrete Systems Simulation, Undergraduate | 8/2020–2021 |

**University of Illinois Urbana-Champaign**

| | |
|---|---|
| • Introduction to Data Science, Master's, crosslist with CS and Stats | Fall 2019 |
| • Introduction to Data Science, Master's, crosslist with CS and Stats | Spring 2019 |
| • Introduction to Data Science, Master's | Fall 2018 |
| • Introduction to Data Science, Master's, crosslist with CS and Stats | Spring 2018 |
| • Methods for Data Science, Master's | |
| • Journal Club on Data Science and Reproducibility, all levels | |
| • Introduction to Data Science, Master's, crosslist with CS and Stats | Fall 2017 |
| • Data, Statistics, and Information, Master's | |
| • Introduction to Data Science, Master's, crosslist with CS and Stats | Spring 2017 |
| • Data, Statistics, and Information, Master's | |
| • Introduction to Data Science, Master's, crosslist with CS and Stats | Fall 2016 |
| • Data, Statistics, and Information, Master's | |
| • Introduction to Data Science, Master's, crosslist with CS and Stats | Spring 2016 |
| • Data, Statistics, and Information, Master's | |
| • Introduction to Data Science, Master's | Fall 2015 |
| • Data Policy Seminar, Master's | Spring 2015 |
| • Socio-technical Data Analysis, Master's, co-taught | Spring 2015 |

**Columbia University**

| | |
|---|---|
| • Applied Data Mining, Undergraduate | Fall 2014 |
| • Introduction to Data Science, Undergraduate | Summer 2014 |

14

**SER-303**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Appendix A**

**Victoria Stodden**
University of Southern California

| | |
|---|---|
| • Introduction to Probability, Undergraduate | Summer 2014 |
| • Linear Regression Models, Undergraduate | Fall 2013 |
| • Replicating Computational Results, Columbia University IGERT "From Data to Knowledge" crossover course, jointly offered between statistics and EECS | Spring 2012 |
| • Statistical Computing in SAS, Undergraduate | Fall 2012 |
| • Linear Regression Models, Undergraduate | Fall 2012 |
| • Statistical Computing in SAS, Undergraduate | Fall 2011 |
| • Linear Regression Models, Undergraduate | Summer 2011 |

**University of California, Berkeley**

| | |
|---|---|
| • Data Science, Capstone Master's Course | Spring 2014 |
| • Concepts in Computing with Data, Undergraduate | Summer 2013 |

**Stanford Law School**

| | |
|---|---|
| • Quantitative Methods: Statistical Inference | Spring 2007 |
| • Empirical Research Seminar, co-taught | Fall 2006 |

## MENTORING

**Postdoctoral Scholars**

| | |
|---|---|
| • Matthew Krafczyk, National Center for Supercomputing Applications, University of Illinois Urbana-Champaign | 8/2016–8/2019 |
| • Jennifer Seiler, Department of Statistics, Columbia University | 8/2013–8/2015 |

**Ph.D.**

| | |
|---|---|
| • Adhithya Bhaskar, Department of Industrial and Systems Engineering School of Engineering, University of Southern California; PhD Advisor | 8/2021–present |
| • Yantong Zheng, Department of Industrial and Systems Engineering School of Engineering, University of Southern California; PhD Advisor | 8/2021–present |
| • Becky Vandewalle, Geography University of Illinois Urbana-Champaign; Qualifying Exam Committee Member | 10/2020 |
| • Craig Willis, School of Information Sciences University of Illinois Urbana-Champaign; PhD Advisor | Graduated 8/2020 |
| • Rutvik Chaudhury, Department of Computer Science School of Engineering, University of Illinois Urbana-Champaign; PhD Advisor | 8/2019–1/2020 |
| • Kelechi Ikegwu, Informatics Qualifying Exam Committee Member | 5/2019 |
| • Q. Chelsea Song, Psychology, Doctoral Committee Member; now Assistant Professor, Department of Psychology, Purdue University | Graduated 5/2018 |

**Master's**

| | |
|---|---|
| • Vaishnavi Guntupalli, Research Assistant, Department of Industrial and Systems Engineering, University of Southern California | 11/2022–5/23 |
| • Peilun Zhang, Thesis Primary Co-advisor, Department of Computer Science, University of Illinois Urbana-Champaign | 8/2019–7/2020 |
| • Yang Yu, Department of Statistics Summer Intern, University of Illinois Urbana-Champaign | 6/2019–8/2019 |
| • Xiaomian Wu, Department of Statistics, University of Illinois Urbana-Champaign; coauthored "AIM: An Abstraction for Improving Machine Learning | 8/2017–5/2018 |

15

**SER-304**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Appendix A**

**Victoria Stodden**
University of Southern California

Prediction," with V. Stodden and V. Sochat, 2018 IEEE Data Science Workshop, June 2018.

- Jennifer Beamer, Summer Intern, Library Sciences, University of Hawai'i at Manoa — 6/2017–8/2017
- Yantong Zheng, Undergraduate and Master's Department of Statistics, University of Illinois Urbana-Champaign — 1/2017–5/2018
- William Pooler, School of Information Sciences, University of Illinois Urbana-Champaign — 8/2015–5/2016

**Undergraduate**

- Mingzhe Wang, Undergraduate Summer Intern, Department of Computer Science, University of Illinois Urbana-Champaign — 6/2020–8/2020
- Daniel Lee, Department of Statistics, University of Illinois Urbana-Champaign — 1/2017–5/2018
- Kefu Zhu, James Scholar Honors Project Supervision, Department of Statistics, University of Illinois Urbana-Champaign — 8/2016–12/2016
- Saumil Padhya, James Scholar Honors Project Supervision, Department of Statistics, University of Illinois Urbana-Champaign — 8/2016–12/2016
- April Tang, Department of Statistics, University of Illinois Urbana-Champaign — 8/2015–5/2016
- Pakwesi Taylor, Department of Statistics, Columbia University — 6/2014–8/2014
- Christine Byun, Independent Study, Department of Statistics, Columbia University — 8/2013–12/2013
- Zhaokun Ma, Department of Statistics, Columbia University; coauthored "Toward Reproducible Computational Research: An Empirical Analysis of Data and Code Policy Adoption by Journals," PLOS ONE 8(6), 2013; and "Journal Policy for Computational Reproducibility," Proceedings of the National Academy of Sciences, March 2018 — 6/2012–8/2012
- Isabel Reich, Department of Statistics, Columbia University; coauthored "Software Patents as a Barrier to Scientific Transparency: An Unexpected Consequence of Bayh-Dole," Conference on Legal Empirical Studies, Stanford, Nov. 2012 — 6/2012–8/2012
- Peixuan Guo, Department of Statistics, Columbia University; coauthored "Toward Reproducible Computational Research: An Empirical Analysis of Data and Code Policy Adoption by Journals," PLOS ONE 8(6), 2013 — 6/2011–8/2011
- Michael Fusella, Department of Statistics, Columbia University — 6/2011–8/2011
- Matthew Lewis, Department of Statistics, Columbia University — 6/2011–8/2011

# SERVICE

**School and Department Service**

**University of Southern California**

- Chair, Departmental Chair Review Subcommittee, Viterbi School of Engineering, Engineering Faculty Council — 8/2023–8/2024
- Merit Review Subcommittee Member, Viterbi School of Engineering, Engineering Faculty Council — 8/2022–8/2023
- Industrial and Systems Engineering Departmental Representative, Viterbi School of Engineering, Engineering Faculty Council — 8/2022–8/2025
- Inaugural Chair, Department of Industrial and Systems Engineering Diversity Committee — 8/2021–8/2025
- Chair, Department of Industrial and Systems Engineering Hiring Committee — 8/2021–8/2022

16

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Appendix A**

**Victoria Stodden**
University of Southern California

| | |
|---|---|
| • Ph.D. Admissions Committee, Department of Industrial and Systems Engineering | 8/2021–8/2022 |
| • Ph.D. Curriculum Committee, Department of Industrial and Systems Engineering | 8/2020–8/2022 |
| • Chair, Department of Industrial and Systems Engineering Hiring Committee | Summer 2021 |

**University of Illinois Urbana-Champaign**

| | |
|---|---|
| • School of Information Sciences Diversity Committee | 8/2019–8/2020 |
| • School of Information Sciences Master's of Information Management Committee | 8/2019–8/2020 |
| • School of Information Sciences Curriculum Committee | 8/2016–8/2019 |
| • School of Information Doctoral Students Committee | 8/2014–8/2015 |

**University Service**

**University of Southern California**

| | |
|---|---|
| • Member, Affinity Group for Computational Science and Engineering within the School of Advanced Computing, Viterbi School of Engineering, University of Southern California | 8/2023–present |

**University of Illinois Urbana-Champaign**

| | |
|---|---|
| • Budget Committee | 8/2019–8/2022 |
| • Discovery Partners Institute (DPI) Culture & Society (C&S) Inaugural Working Subcommittee | 8/2018–8/2020 |
| • Scientific Advisory Board for the University of Illinois News Bureau | 10/2017–8/2020 |
| • IT Committee | 8/2015–8/2018 |

**Columbia University**

| | |
|---|---|
| • Senate IT Committee | 8/2016–8/2019 |

# RESEARCH GRANTS

| | |
|---|---|
| "ReproScreener: Enabling Robustness in Machine Learning at Scale via Automated Knowledge Verification," PI: Victoria Stodden $50,000. The Center for Research and Education in AI and Learning (REAL@USC). | 8/2022–7/2023 |
| "Collaborative Research: PPoSS: Planning: Performance Scalability, Trust, and Reproducibility: A Community Roadmap to Robust Science in High-throughput Applications," PI: Victoria Stodden $30,000. Part of collaborative award led by UTK (Entire award $150,000). National Science Foundation #2028881. | 10/2020–9/2022 |
| Supplement to "CC*DNI DIBBS: Merging Science and Cyberinfrastructure Pathways: The Whole Tale," PI: Bertram Ludäscher (Illinois-led institution). Co-PIs: Victoria Stodden, Niall Gaffney (University of Texas at Austin), Matthew Turk (University of Illinois), Kyle Chard (University of Chicago). Supplement award: $304,774 with Illinois share $54,774 (sub-awards to University of Chicago ($150,000) and USC ($100,000)). National Science Foundation #1541450. | 3/2016–2/2022 |
| "EAGER: Reproducibility and Cyberinfrastructure for Computational and Data-Enabled Science," PI: Victoria Stodden. Co-PI: Michela Taufer (UTK), $300,000 ($149,997 to UTK). National Science Foundation #1941443. | 9/2019–8/2022 |

17

**Appendix A**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Victoria Stodden**
University of Southern California

| | |
|---|---|
| "EAGER: Preserve/Destroy Decisions for Simulation Data in Computational Physics and Beyond," PI: Victoria Stodden. Co-PI: Darko Marinov (University of Illinois), $300,000. National Science Foundation #1839010. | 8/2018–7/2022 |
| Discovery Partners Institute. PI: Victoria Stodden, $3,000. University of Illinois Economic Development and Innovation (VPEDI) International Travel Grant. | 6/2018–8/2018 |
| "EAGER: Collaborative Proposal: Supporting Public Access to Supplemental Scholarly Products Generated from Grant Funded Research," PI: Victoria Stodden. Collaborative proposal with Illinois share: $59,991. National Science Foundation #1649555. | 9/2016–8/2019 |
| "CC*DNI DIBBS: Merging Science and Cyberinfrastructure Pathways: The Whole Tale," PI: Bertram Ludäscher (UIUC lead institution). Co-PIs: Victoria Stodden, Niall Gaffney (University of Texas at Austin), Matthew Turk (University of Illinois), Kyle Chard (University of Chicago). Cooperative proposal $5,887,240. National Science Foundation #1541450. | 3/2016–2/2021 |
| "CC*DNI DIBBS: Merging Science and Cyberinfrastructure Pathways: The Whole Tale," PI: Bertram Ludäscher (UIUC lead institution). Co-PIs: Victoria Stodden, Niall Gaffney (University of Texas at Austin), Matthew Turk (University of Illinois), Kyle Chard (University of Chicago), Jarek Nabryszki (University of Notre Dame), Matthew B. Jones (University of California, Santa Barbara). Supplement $293,559. National Science Foundation #1541450. | 7/2019–2/2021 |
| "Facilitating Transparency in Scientific Publishing," PI: Victoria Stodden. $420,640. Alfred P. Sloan Foundation. | 7/2012–11/2014 |
| "EAGER: Policy Design for Reproducibility and Data Sharing in Computational Science," PI: Victoria Stodden, $168,800. National Science Foundation #1153384. | 9/2011–12/2013 |
| "Community Forum on Reproducible Research Policies," PI: Victoria Stodden. $3,800. Alfred P. Sloan Foundation. | 7/2011 |

18

Case 4:11-cv-06714-YGR Document 1035-45 Filed 03/05/26 Page 110 of 117

SUBJECT TO PROTECTIVE ORDER

**Victoria Stodden, Ph.D.**                                        September 2024

# Prior Testimony[1]

*Rumble, Inc., v. Google LLC et al.*, United States District Court, Northern District of California, Oakland Division, Case No. 4:21-cv-00229.  Deposed September 27, 2024.

---

[1] The party that retained me is underlined.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**Appendix C**

# Materials Relied Upon

### Academic Articles

- Alvaro E. Monge, "Matching Algorithms Within a Duplicate Detection System," *IEEE Data Engineering Bulletin*, 23(4), 2000, pp. 14–20

- Andrea Saltelli, "Why So Many Published Sensitivity Analyses are False: A Systematic Review of Sensitivity Analysis Practices," *Environmental Modelling & Software*, 114, 2019, pp. 29–39

- Andrea Saltelli et al., "A Quantitative, Model Independent Method for Global Sensitivity Analysis of Model Output," *Technometrics*, 41(1), 1999, pp. 39–56

- Andrea Saltelli et al., "Sensitivity Analysis," *SSRN*, 2021, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3977108, pp. 1–10

- Atieh Khanjani and Riza Sulaiman, "The Process of Quality Assurance Under Open Source Software Development," *Proceedings of the IEEE Symposium on Computers & Informatics*, 2011, pp. 548–552

- Clodoveu A. Davis Jr. and Emerson de Salles, "Approximate String Matching for Geographic Names and Personal Names," *IX Brazilian Symposium on GeoInformatics*, 2007, pp. 49–60

- Craig Willis and Victoria Stodden, "Trust but Verify: How to Leverage Policies, Workflows, and Infrastructure to Ensure Computational Reproducibility in Publication," *Harvard Data Science Review*, 2(4), 2020, pp. 1–60

- Davide Chicco et al., "Eleven Quick Tips For Data Cleaning and Feature Engineering," *PLoS Computational Biology*, 18(12), 2022, pp.1–21

- David Guthrie et al., "An Unsupervised Approach for the Detection of Outliers in Corpora," *Proceedings of the International Conference on Language Resources and Evaluation*, 2008, pp. 3409–3413

- David Hand and Peter Christen, "A Note on Using the F-Measure for Evaluating Record Linkage Algorithms," *Statistics and Computing*, 28, 2018, pp. 539–547

- Dengyue Li et al., "Approximate Address Matching," *Proceedings of the International Conference on P2P, Parallel, Grid, Cloud and Internet Computing*, 2010, pp. 264–269

- Dennis Gilliland and Vince Melfi, "A Note on Confidence Interval Estimation and Margin of Error," *Journal of Statistics Education*, 18(1), 2010, pp. 1–8

**SER-309**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## Appendix C

- Fakhitah Ridzuan and Wan Mohd Nazmee Wan Zainon, "A Review on Data Cleansing Methods for Big Data," *Procedia Computer Science*, 161, 2019, pp. 731–738

- Garret Christensen and Edward Miguel, "Transparency, Reproducibility, and the Credibility of Economic Research," *Journal of Economic Literature*, 56(3), 2018, pp. 920–980

- Geoff Cumming et al., "Error Bars in Experimental Biology," *Journal of Cell Biology*, 177(1), 2007, pp. 7–11

- Gisela Bichler and Stefanie Balchak, "Address Matching Bias: Ignorance Is Not Bliss," *Policing: An International Journal of Police Strategies & Management*, 30(1), 2007, pp. 32–60

- H.B. Newcombe et al., "Automatic Linkage of Vital Records," *Science*, 130(3381), 1959, pp. 954–959

- Hadley Wickham, "Tidy Data," *Journal of Statistical Software*, 59(10), 2014, pp. 1–23

- Hadley Wickham et al., "Welcome to the Tidyverse," *Journal of Open Source Software*, 4(43), Article 1686, 2019, pp. 1–6

- Halbert L. Dunn, "Record Linkage," *American Journal of Public Health*, 36(12), 1946, pp. 1412–1416

- Heiko Müller and Johann-Christoph Freytag, "Problems, Methods, and Challenges in Comprehensive Data Cleansing," *Humboldt University of Berlin*, Working Paper, 2003, available at https://pubs.dbs.uni-leipzig.de/dc/files/Mller2003ProblemsMethodsand.pdf

- Herman Aguinis et al., "Best-Practice Recommendations for Defining, Identifying, and Handling Outliers," *Organizational Research Methods*, 16(2), 2013, pp. 270–301

- Ioannis Koumarelas et al., "Experience: Enhancing Address Matching with Geocoding and Similarity Measure Selection," *Journal of Data and Information Quality*, 10(2), Article 8, 2018, pp. 1–16

- Jana Lynn Asher et al., "An Introduction to Probabilistic Record Linkage with a Focus on Linkage Processing for WTC Registries," *International Journal of Environmental Research and Public Health*, 17(18), Article 6937, 2020, pp. 1–16

- Jason W. Osborne and Amy Overbay, "The Power of Outliers (and Why Researchers Should Always Check for Them)," *Practical Assessment, Research & Evaluation*, 9, Article 6, 2004, pp. 1–8

## Appendix C

- Joan Heck Wortman and Jerome P. Reiter, "Simultaneous Record Linkage and Causal Inference with Propensity Score Subclassification," *Statistics in Medicine*, 37, 2018, pp. 3533–3546

- Keshav Ramani and Daniel Borrajo, "Methods for Matching English Language Addresses," *Transactions in GIS*, 27(2), 2023, pp. 347–363

- Khalid Waleed Hussein et al., "Enhance Luhn Algorithm for Validation of Credit Cards Numbers," *International Journal of Computer Science and Mobile Computing*, 2(7), 2013, pp. 262–272

- Kimberly A. Barchard and Larry A. Pace, "Preventing Human Error: The Impact of Data Entry Methods on Data Accuracy and Statistical Results," *Computers in Human Behavior*, 27(5), 2011, pp. 1834–1839

- Mong Li Lee et al., "Cleansing Data for Mining and Warehousing," *Database and Expert Systems Applications*, 1677, 1999, pp. 751–760

- Otmane Azeroual et al., "A Record Linkage-Based Data Deduplication Framework with DataCleaner Extension," *Multimodal Technologies and Interaction*, 6(4), Article 27, 2022, pp. 1–18

- Peter Christen, "A Comparison of Personal Name Matching: Techniques and Practical Issues," *Proceedings of the Sixth IEEE International Conference on Data Mining Workshops*, 2006, pp. 290–294

- Ricardo Sanchez et al., "Best Practices in Statistical Computing," *Statistics in Medicine*, 40(27), 2021, pp. 6057–6068

- Sam Comber and Daniel Arribas-Bel, "Machine Learning Innovations in Address Matching: A Practical Comparison of Word2vec and CRFs," *Transactions in GIS*, 23(2), 2019, pp. 334–348

- Samson Oni et al., "A Comparative Study of Data Cleaning Tools," *International Journal of Data Warehousing and Mining*, 15(4), 2019, pp. 48–65

- Soumia Belouafa et al., "Statistical Tools and Approaches to Validate Analytical Methods: Methodology and Practical Examples," *International Journal of Metrology and Quality Engineering*, 8, 2017, pp. 1–10

- Tigran Avoundjian, "Comparing Methods for Record Linkage for Public Health Action: Matching Algorithm Validation Study," *JMIR Public Health Surveillance*, 2020, 6(2), e15917, pp. 1–12

- V. I. Levenshtein, "Binary Codes Capable of Correcting Deletions, Insertions, and Reversals," *Soviet Physics Doklady*, 10(8), 1966, pp. 707–710

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## Appendix C

- Wen Xia et al., "A Comprehensive Study of the Past, Present, and Future of Data Deduplication," *Proceedings of the IEEE*, 104(9), 2016, pp. 1681–1710

- William W. Cohen et al., "A Comparison of String Metrics for Matching Names and Records," *Proceedings of IJCAI-03 Workshop on Information Integration*, 2003, pp. 73–78

- Xu Chu et al., "Data Cleaning: Overview and Emerging Challenges," *Proceedings of the International Conference on Management of Data*, 2016, pp. 2201–2206

**Books and Book Chapters**

- Charu C. Aggarwal, "An Introduction to Outlier Analysis," in *Outlier Analysis*, Second Edition, (New York, NY: Springer, 2017), pp. 1–34

- David Diez et al., *OpenIntro Statistics*, Fourth Edition, (2019)

- D.M. Hawkins, *Identification of Outliers*, (London, UK: Chapman and Hall, 1980)

- Mark van der Loo and Edwin de Jonge, *Statistical Data Cleaning with Applications in R*, (Hoboken, NJ: John Wiley & Sons, 2018)

- National Academies of Sciences, Engineering, and Medicine, *Reproducibility and Replicability in Science*, (Washington, DC: The National Academies Press, 2019)

- National Research Council, "Chapter 5: Model Validation and Prediction," in *Assessing the Reliability of Complex Models: Mathematical and Statistical Foundations of Verification, Validation, and Uncertainty Quantification*, (Washington, DC: The National Academies Press, 2012) pp. 52–85

- Robert V. Hogg et al., *Probability and Statistical Inference*, Ninth Edition, (Upper Saddle River, NJ: Pearson Education Inc., 2015)

- Stacie B. Dusetzina et al., *Linking Data for Health Services Research: A Framework and Instructional Guide*, (Rockville, MD: Agency for Healthcare Research and Quality, 2014)

**Data**

- Apple Payor Data

**Depositions**

- Deposition of Darryl Thompson, June 5, 2025

- Deposition of Robert Pepper, June 14, 2021

**SER-312**

Case 4:11-cv-06714-YGR   Document 1105-25   Filed 08/12/2025   Page 115 of 117

Case 4:11-cv-06714-YGR   Document 1105-25 (Document Filed Under Seal) Page 115 of 117
HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## Appendix C

**Expert Reports and Declarations**

- Declaration of Darryl Thompson, August 1, 2024

- Declaration of Darryl Thompson, March 7, 2025

- Supplemental Expert Report of Darryl Thompson, April 16, 2025, with backup materials

**Legal Documents**

- Order Granting Stipulation for Leave to File Third Amended Consolidated Class Action Complaint, *In re Apple iPhone Antitrust Litigation*, September 17, 2020

- Order Denying Plaintiffs' Motion for Class Certification Without Prejudice; Granting in Part and Denying in Part Apple's *Daubert* Motions to Exclude Testimony of Professor Daniel L. McFadden, *In re Apple iPhone Antitrust Litigation*, March 29, 2022

- Order Denying Apple's *Daubert* Motion to Exclude the Testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz; and Granting Plaintiffs' Motion for Class Certification, *In re Apple iPhone Antitrust Litigation*, February 2, 2024

- Letter from Eli M. Lazarus to Rachele R. Byrd and Kyle M. Wood, "Re: *In re iPhone Antitrust Litig.*, No. 4:11-cv-06714-YGR (N.D. Cal.), Apple's Sample Payor Data Production Letter," July 10, 2024

- Email chain from Kyle Wood to Eli Lazarus, "RE: [EXTERNAL] RE: 4:11-cv-06714-YGR In re Apple iPhone Antitrust Litigation -- D. Thompson backup materials," June 4, 2025

- Order Granting in Part Motion to Modify Class, *In re Apple iPhone Antitrust Litigation*, June 11, 2025

**Websites**

- "Change of Address/NCOA Processing," *Melissa*, available at https://www.melissa.com/ncoalink-processing, accessed on June 22, 2025

- "How to install Tidyverse without internet connection for R 3.5.2," Posit Community, November 7, 2019, available at https://forum.posit.co/t/how-to-install-tidyverse-without-internet-connection-for-r-3-5-2/44201, accessed on June 18, 2025

- "NCOALink® Full Service Provider Licensees," *USPS*, April 25, 2025, available at https://postalpro.usps.com/ncoalink/Full_Service_Provider_Licensees, accessed on June 23, 2025

Page 5

**SER-313**

## Appendix C

- "NCOA<sup>Link®</sup> Processing Acknowledgement Form," *Melissa*, available at https://www.melissa.com/pdf/des-paf.pdf, accessed on June 22, 2025

- "NCOALink®," *USPS*, available at http://postalpro.usps.com/mailing-and-shipping-services/NCOALink, accessed on June 23, 2025

- "tidyverse," available at https://www.cran-e.com/package/tidyverse, accessed on June 18, 2025

- Andrew Dovgal, "Coding Standards and Best Practices: Guide & Implementation Tips," *DevCom*, December 30, 2024, available at https://devcom.com/tech-blog/coding-standards-and-best-practices-guide-implementation-tips/, accessed on June 16, 2025

- Apple Support, "Apple ID (or Apple Account)," available at https://support.apple.com/guide/itunes/aside/glos1009407f/windows, accessed on June 16, 2025

- ASCII-Code.com, "ASCII Table: Reference to ASCII Table of Windows-1252," available at https://www.ascii-code.com/, accessed on June 16, 2025

- Google Scholar search, "data cleaning," available at https://scholar.google.com/scholar?hl=en&as_sdt=0%2C5&q=%22data+cleaning%22&btnG=, accessed on June 18, 2025

- Google Scholar search, "deduplication," available at https://scholar.google.com/scholar?hl=en&as_sdt=0%2C5&q=%22deduplication%22&oq=, accessed on June 18, 2025

- Google Scholar search, "tidyVerse," available at https://scholar.google.com/scholar?hl=en&as_sdt=0%2C5&q=%22tidyVerse%22&btnG=, accessed on June 19, 2025

- Google Scholar search, "validation," available at https://scholar.google.com/scholar?hl=en&as_sdt=0%2C5&q=%22validation%22&btnG=, accessed on June 18, 2025

- Google Scholar search, "Welcome to the Tidyverse," available at https://scholar.google.com/scholar?hl=en&as_sdt=0%2C5&q=Welcome+to+the+tidyverse&btnG=, accessed on June 19, 2025

- IEEE Computer Society, "The Importance of Software Testing," available at https://www.computer.org/resources/importance-of-software-testing, accessed on June 16, 2025

- Kate VanDerAa, "11 Most-Favorite Data Visualizations on Tableau Public," *Tableau*, November 19, 2024, available at https://www.tableau.com/blog/most-favorited-data-visualizations-tableau-public, accessed on June 19, 2025

**SER**-314

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## Appendix C

- Melissa Direct, "NCOALink® National Change of Address (NCOA) Service," available at https://www.melissa.com/direct/direct-mail/ncoa-link, accessed on June 25, 2025

- Nature Portfolio, "Reporting Standards and Availability of Data, Materials, Code and Protocols," available at https://www.nature.com/nature-portfolio/editorial-policies/reporting-standards, accessed on June 16, 2025

- OpenRefine, "Homepage," available at https://openrefine.org/, accessed on June 18, 2025

- OpenRefine, "OpenRefine Usage," available at https://openrefine.org/usage, accessed on June 16, 2025

- OpenRefine User Manual, "Running OpenRefine," available at https://openrefine.org/docs/manual/running, accessed on June 18, 2025

- Rahul Awati and Peter Loshin, "What is ASCII (American Standard Code for Information Interchange)?" *TechTarget*, January 24, 2025, available at https://www.techtarget.com/whatis/definition/ASCII-American-Standard-Code-for-Information-Interchange, accessed on June 16, 2025

- Science, "*Science* Journals: Editorial Policies," available at https://www.science.org/content/page/science-journals-editorial-policies#TOP-guidelines, accessed on June 16, 2025

- Tableau Deployment Guide, "Registers and Activate from the User Interface," available at https://help.tableau.com/current/desktopdeploy/en-us/desktop_deploy_activate_license.htm, accessed on June 19, 2025

- Tableau, "Tableau Prep Help: Clean and Shape Data," available at https://help.tableau.com/current/prep/en-us/prep_clean.htm, accessed on June 18, 2025

- U.S. Census Bureau, "Explore Census Data," available at https://data.census.gov/, accessed on June 16, 2025

- U.S. National Science Foundation, "Committees of Visitors," available at https://www.nsf.gov/about/performance/cov, accessed on June 16, 2025

**Note: In addition to the materials on this list, I relied on all materials cited in my report to form my opinions.**

Case: 25-7930, 08/12/2026, DktEntry: 34.3, (119 of 299)

# EXHIBIT 38

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | Civil Action No. 4:11-cv-06714-YGR |

**REBUTTAL EXPERT REPORT AND DECLARATION OF JEFFREY T. PRINCE, PH.D.**

June 13, 2025

**SER-317**

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

**Table of contents**

1. INTRODUCTION ................................................................................................................ 2

   *1.1. Qualifications* ............................................................................................................ *2*

   *1.2. Assignment* .............................................................................................................. *3*

   *1.3. Overview of Plaintiff Experts' Damages Model* ...................................................... *4*

2. SUMMARY OF OPINIONS ............................................................................................... 6

3. THE MCFADDEN-SONG MODEL CANNOT SHOW THAT ALL OR NEARLY ALL CLASS MEMBERS WERE INJURED, NOR RELIABLY IDENTIFY UNHARMED CLASS MEMBERS ......... 7

   *3.1. The McFadden-Song Model Continues to Predict a Large Number of Unharmed Class Members* ............................................................................................................ *9*

     *3.1.1. The Number and Percent of Unharmed Class Members Consistently Rose with Every Implementation of Professor McFadden's Model throughout the Class Certification Stage* ................... *9*

     *3.1.2. Small Changes to Data and Professor McFadden's Model Resulted in a Large Number of Class Members Switching between Harmed and Unharmed in the Class Certification Stage* ............. *12*

     *3.1.3. Dr. Song's Extension of Professor McFadden's Model to All App Store Genres and Calculations at the "Payor" Level Does Not Meaningfully Reduce the Number of Unharmed Class Members* ................................................................................................... *14*

   *3.2. Plaintiffs Lack Common Evidence of Injury for the Millions of Class Members that the McFadden-Song Model Finds to Be Uninjured* ............................................................. *16*

   *3.3. The $10 Spending Cutoff Is Arbitrary and Excludes Millions of Class Members with the Same Theory of Liability* ............................................................................................. *21*

   *3.4. The Reliability of Dr. Song's Results Depends Upon the Reliability of the Methodology to Identify Payors for Linking to Transactions* ................................................................ *24*

   *3.5. The McFadden-Song Model Cannot Measure the Impact on Consumers of Any Specific Challenged Conduct* ...................................................................................................... *26*

4. APPENDIX A— CV ...................................................................................................... 29

5. APPENDIX B—PRIOR TESTIMONY .......................................................................... 53

6. APPENDIX C—DOCUMENTS RELIED UPON LIST ................................................... 55

SER-318

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

# 1. Introduction

## *1.1. Qualifications*

1. My name is Jeffrey T. Prince. I am an economist, tenured professor, and the Chairperson of Business Economics and Public Policy at the Kelley School of Business, Indiana University. I am also the Harold A. Poling Chair in Strategic Management, Advisory Committee Member for the Indiana University Center for Survey Research, and Faculty Affiliate of both the Indiana University Data Science Program and Kelley Institute for Corporate Governance and Ethics. From 2016 to 2022, I served as Co-Director of the Institute for Business Analytics at the Kelley School.

2. From Fall 2019 to Fall 2020, I served as Chief Economist at the Federal Communications Commission ("FCC"), where I advised the Chairman on a wide range of telecommunications policy issues and initiatives and led the internal research program.

3. My primary areas of economic expertise include industrial organization and applied econometrics. A great deal of my research focuses on technology markets, consumer demand, quality competition, and data privacy. Many of my published papers utilize and analyze market data and/or survey data and involve estimates of consumer preferences for product attributes. I have developed and taught Ph.D.-level courses on empirical industrial organization, in which I have instructed students on a wide range of econometric techniques, including those assessed in this report. At the Kelley School, I have developed courses on data analysis and empirical methods that my colleagues and I have taught to senior undergraduates, MBAs, and PhDs. I recently developed and taught a course on digital economics for business at the undergraduate level and will soon teach an advanced version of it in Kelley's executive education program as well. I am also the sole author of a textbook with McGraw-Hill Education on predictive analytics, a co-author of a managerial economics textbook entitled Managerial Economics and Business Strategy, also published by McGraw-Hill Education, and a coauthor of a book about the Metaverse, recently published by the Oxford University Press.

4. I graduated from Miami University with a B.S. in Mathematics and Statistics and a B.A. in Economics in 1998. I then received my Ph.D. in Economics from Northwestern University, specializing in Industrial Organization. Since earning my Ph.D. in 2004, I have published more than 30 research papers utilizing a wide range of econometric techniques, many in top economics and management journals. **Appendix A** provides my current CV.

**SER-319**

Case: 25-7930, 08/12/2026, DktEntry: 34.3, (123 of 299)

5. In addition to my work on this matter, I have extensive experience as a testifying expert in state and federal court. I have also provided expert briefings to state and federal enforcement agencies. This work has involved analysis of class certification issues on behalf of both plaintiffs and defendants. I have also analyzed competitive issues involving antitrust claims in digital markets. **Appendix B** provides a list of matters in which I have given testimony in the last four years.

### *1.2. Assignment*

6. I previously submitted an Expert Report and Declaration in this matter on March 10, 2023, in support of Apple's Opposition to Plaintiffs' Renewed Motion for Class Certification and Apple's Motion to Exclude the Testimony of Professor Daniel McFadden and Dr. Rosa Abrantes-Metz.[1] I also submitted an Expert Report on August 10, 2021,[2] and Declarations on November 9, 2021, November 30, 2021, June 30, 2023, and April 29, 2025.[3]

7. I have been asked by counsel for Apple to analyze the Expert Reports of Professor Daniel L. McFadden and Dr. Minjae Song, dated March 7, 2025, as well as the Declaration of Dr. Minjae Song, dated May 6, 2025, and assess the methods and methodologies proposed therein.[4] Specifically, I was asked to evaluate the reliability, as a matter of economics and econometrics, of Professor McFadden's and Dr. Song's methods, models, and methodology for providing common economic proof of impact and damages attributable to Apple's alleged conduct and for identifying harmed and unharmed class members. I reserve the right to update or supplement my opinions as further information is made available to me.

8. I am being compensated for my work on this matter at my standard billing rate of $1,175 per hour. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction. I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither my compensation in this matter nor

---

[1] Expert Report and Declaration of Jeffrey T. Prince, Ph.D., March 10, 2023 ("2023 Prince Report").

[2] Expert Report and Declaration of Jeffrey T. Prince, Ph.D., August 10, 2021 ("2021 Prince Report").

[3] Declaration of Jeffrey T. Prince, Ph.D., in Support of Apple's Motion to Exclude Reply Opinions of Daniel L. McFadden, November 9, 2021; Supplemental Declaration of Jeffrey T. Prince, Ph.D., in Support of Apple's Motion to Exclude Reply Testimony of Daniel L. McFadden, November 30, 2021; Reply Declaration of Jeffrey T. Prince, Ph.D., in Support of Apple's *Daubert* Motion, June 30, 2023; Declaration of Jeffrey T. Prince, Ph.D., in Support of Apple's Opposition to Plaintiffs' Motion to Modify Class Definition, April 29, 2025.

[4] Expert Report of Daniel L. McFadden, Ph.D., March 7, 2025 ("2025 McFadden Report"); Expert Report of Minjae Song, Ph.D., March 7, 2025, with backup materials ("Song Report"); Declaration of Minjae Song, Ph.D., in Support of Plaintiffs' Motion to Modify Class Definition and Approve Notice to the Class, May 6, 2025.

my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion or the outcome of this or any other matter.

### *1.3. Overview of Plaintiff Experts' Damages Model*

9. Plaintiffs' damages model in this case was initially put forward by Professor McFadden ("Professor McFadden's model") and, more recently, implemented with some adjustments by Dr. Song (the "McFadden-Song model").[5] Each iteration of what is now the McFadden-Song model has found that prices for some apps would be higher with a lower assumed commission rate, meaning some class members, according to the model, would be worse off in a world absent Apple's challenged conduct ("the but-for world").[6] This occurs because for apps with sufficiently low real-world prices, the model estimates negative marginal cost, which leads the model to predict negative damages for class members who purchased those apps. I understand that Professors Lorin Hitt and Mark Watson each discuss the McFadden-Song model in depth and describe some of these aspects at greater length. For the purposes of this report, I note a few additional characteristics of the McFadden-Song model below.

10. While the main features of the McFadden-Song model are largely unchanged from Professor McFadden's model in the class certification phase of this case, Dr. Song's implementation of the model includes some updates. Specifically, in discussing Professor McFadden's model at the class certification phase, the Court indicated a concern about the high number of unharmed class members identified by Professor McFadden's model, and noted its expectation, based on Plaintiffs' representations, that extending the model to additional app genres would mitigate this concern by reducing the fraction and number of unharmed class members.[7] Accordingly, in the latest iteration, Dr. Song has extended the McFadden-Song model to additional genres of apps.

---

[5] Deposition of Daniel L. McFadden, May 14, 2025 ("2025 McFadden Deposition"), pp. 25:7–26:8 ("Q. You state in your current report that effective December 31, 2023, you retired as a principal of The Brattle Group. … You indicate in paragraph 4 of your report that since the time that you retired, 'Dr. Song has directly overseen the implementation of my methodology using the App Store transactions data for all genres in his expert report, including preparing the underlying data for the modeling.' What do you mean in that sentence by 'directly overseen'? A. He is -- I'm no longer the -- the operating architect, the supervising architect for that work. I have retired from that, so he's taken on that role.").

[6] See, e.g., Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, June 1, 2021 ("2021 McFadden Report"), Exhibits 16 and 17; Supplemental Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, September 26, 2022 ("2022 McFadden Supplemental Report"), Figure 1; Revised Supplemental Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, December 30, 2022 ("2022 First Revised McFadden Supplemental Report"), Figure 1; Revised Supplemental Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, January 19, 2023 ("2023 Second Revised McFadden Supplemental Report"), Figure 1; Song Report, Figure 13.

[7] Order Denying Apple's *Daubert* Motion to Exclude the Testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz; and Granting Plaintiffs' Motion for Class Certification, *In Re Apple iPhone Antitrust Litigation*, February 2,

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

11. In addition to extending the model to other app genres, Dr. Song incorporates newer data for more recent transactions on the App Store and adapts the model to changes in the class composition to exclude transactions on iPod touch devices.[8] Dr. Song then runs the McFadden-Song model to calculate damages and the share of unharmed class members, based on individual "payors" who had at least $10 in App Store spending in at least one account. Dr. Song relies on a purported matching of payment profiles, produced by JND Legal Administration, to assign transactions and thus damages.[9] To reduce the number of unharmed class members in the McFadden-Song model, Dr. Song applies a cutoff to exclude payors who paid less than $10. As was the case in Professor McFadden's original model, this cutoff is not determined as the result of an empirical analysis. The McFadden-Song model, like Professor McFadden's model, relies on a but-for commission rate calculated by Dr. Abrantes-Metz for its determination of harm. As was the case in Professor McFadden's model, the McFadden-Song model takes this but-for commission rate as given based on instruction from Plaintiffs' counsel.[10]

12. Professor McFadden and Dr. Song also assert that their analysis of harm and damages is "conservative" because it does not include additional types of harm—due to alleged loss of innovation, reduction of choice, and reduction of app variety, as described by Professor Stiglitz—over and above the putative monetary damages estimated by the McFadden-Song model.[11]

---

2024 ("2024 Class Certification Ruling"), p. 26 ("While the Court remains concerned that the $10.00 cutoff results in an estimated 7.9% or 10,283,035 million uninjured accounts, it expects, given plaintiffs representations, that once the model is fully run, that number will be reduced or the cutoff could be changed to reduce the impact of including unharmed accounts.").

[8] Dr. Song also relies on Professor MacCormack to apply constraints to the McFadden-Song model's margin estimation. I understand Professor Watson and Professor Hitt discusses this in detail in their reports.

[9] See Song Report, ¶ 70 ("I have received a declaration from JND Legal Administration that explains its methodology for identifying and removing duplicate payor records."); Deposition of Minjae Song, Ph.D., June 4, 2025, pp. 252:16–257:6 ("[Q.] This is the paragraph [paragraph 70] where you say you understand Apple matched the transactions data to unique payers after JND Legal Administration deduplicated approximately ▮ billion potential payors. Do you see that? A. I do. Q. You attach a declaration from Darryl Thompson [Chief Information Officer and Chief Operating Officer for JND Legal Administration] to your expert report. A. Correct… Q. Okay. Mr. Thompson is the individual expert who sponsors this deduplication methodology, correct? A. He – he's the – he's – he's the expert who conducted the – the deduplication analysis… Q. Do you – do you have an understanding specifically of what his methodology is? A. I have a – a high-level understanding of what he did, but my understanding is limited because his methodology is proprietary… Q. Well, if Mr. Thompson does not do his work reliably, does that not tell you that your reported harmed and unharmed calculations are not likely to be reliable? A. Again, since I was not part of mapping Mr. Thompson's payor IDs to transactions data, I cannot really speak to that… I cannot really speak to the – the effects of any changes in Mr. Thompson's payor de – deduplication work.").

[10] Song Report, ¶ 12; 2025 McFadden Report, ¶ 5.

[11] Song Report, ¶ 16 ("Prof. McFadden's damages model, which I apply in this report, estimates the monetary harm caused by Apple's allegedly supracompetitive App Store commission. To the extent that Prof. Stiglitz identifies additional forms of consumer harm, my estimates provide a conservative measure."); 2025 McFadden Report, ¶ 19.

## 2. Summary of Opinions

13. The McFadden-Song model is unreliable and incapable of determining which class members are harmed or unharmed due to Apple's conduct on a classwide basis using common evidence, or of calculating damages to individual class members. At all stages of this case, the McFadden-Song model has predicted that a substantial number of class members are unharmed. According to the most recent estimate from the model, approximately 9.7 million class members—or approximately 11.0 million class members when purportedly simulating Apple's price tiers—are unharmed. Moreover, small perturbations to that model—whether due to corrections in the methodology, small changes in the data, or changes to its (many) unreliable assumptions—are highly impactful on the number of unharmed class members and the identity of which class members are harmed or unharmed. None of the changes in Dr. Song's implementation of the McFadden-Song model has meaningfully reduced the number or the percentage of unharmed class members. (Section 3.1)

14. Professor Stiglitz claims that class members are harmed by Apple's alleged misconduct due to alleged loss of innovation, reduction of choice, and reduction of app variety. According to Professor Stiglitz, class members have suffered this harm beyond any putative monetary harm stemming from the McFadden-Song model. Relying on Professor Stiglitz's claims about this additional harm, Professor McFadden and Dr. Song seem to imply that class members predicted to be unharmed by their model are nevertheless harmed by Apple's conduct. However, Plaintiffs' experts have not pointed to any evidence (much less evidence common to class members) nor put forward any model to quantify the alleged additional harm that Professor Stiglitz claims exists, and they have not shown that the alleged additional harm exceeds the monetary benefits to unharmed class members predicted by the McFadden-Song model. Further, whether and to what extent a class member would be harmed by any alleged loss of innovation, reduction of choice, or reduction of app variety needs to account for variation in consumer preferences on these dimensions. Plaintiffs' experts have provided no analysis of this alleged harm, and it is not clear how Plaintiffs' experts would be able to establish the existence of these kinds of alleged harms based on evidence common to the class. (Section 3.2)

15. The $10 spending cutoff aimed at reducing the number of unharmed class members in the McFadden-Song model removes 23 million harmed payors that have (according to the McFadden-Song model) viable damages claims. The arbitrary cutoff is therefore untethered to Plaintiffs' theory of liability. The $10 spending cutoff results in a lower percentage of unharmed class members because it disproportionately removes consumers that primarily

purchase low-priced transactions. Specifically, in the McFadden-Song model, low-priced apps are the ones that have higher but-for prices (thereby generating no "harm"). Therefore, while the removal of payors that made only a few low-priced purchases appears to be aimed at reducing the number of unharmed payors, this is misleading because it is Dr. Song's and Professor McFadden's modeling assumptions—rather than any empirical evidence—that make unharmed payors cluster around low price points. (Section 3.3)

16. Plaintiffs purport to identify class members who are unique individual payors so that they can be linked to all of their relevant transactions. To the extent that payor records and transactions have been assigned to the wrong class members as a result of Plaintiffs' experts' data processing work, Dr. Song would be unable to reliably determine whether individual class members are harmed or to what extent. Further, in aggregate, the impact of such issues would have an ambiguous effect on the total fraction of unharmed class members. (Section 3.4)

17. Finally, the McFadden-Song model—and its associated damages estimate—is not directly connected to Apple's challenged conduct. Dr. Song, like Professor McFadden, relies on a but-for commission rate calculated by Dr. Rosa Abrantes-Metz to predict but-for app and in-app content prices. This but-for commission rate is determined independently from the McFadden-Song model and has not been apportioned across Apple's various kinds of alleged misconduct. According to Professor Lorin Hitt, Dr. Abrantes-Metz has failed to articulate how the but-for commission rate would change based on whether the specific challenged conduct is allowed (or not allowed) in the but-for world, and her conclusion that the but-for commission rate would be 13.63 percent independent of which part of Apple's conduct is found to be unlawful is unreliable. This implies that the McFadden-Song model, which relies entirely on Dr. Abrantes-Metz's testimony for the but-for commission rate, will be unable to reliably apportion the putative damages estimate to specific aspects of Apple's alleged misconduct. (Section 3.5)

**3. The McFadden-Song Model Cannot Show that All or Nearly All Class Members Were Injured, Nor Reliably Identify Unharmed Class Members**

18. I have reviewed Dr. Song's implementation of Professor McFadden's methodology in the Song Report. I find that the McFadden-Song model is not meaningfully different from the

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

model described by Professor McFadden in his 2023 Second Revised Supplemental Report.[12] Dr. Song's implementation—including its additional assumptions and reliance upon Professor MacCormack—does not resolve the various flaws I previously identified that render the model an unreliable methodology for identifying harmed and unharmed class members and calculating classwide damages. Therefore, I reaffirm the opinions presented in my Expert Report and Declaration, dated March 10, 2023 (the "2023 Prince Report").[13] I understand that Professors Hitt and Watson address similar and additional flaws, including the McFadden-Song model's false predictions regarding pass-through and marginal costs,[14] its unreliable predictions regarding the relationship between apps' prices and costs,[15] and its reliance on—and sensitivity to—app developers' profit margins.[16]

19. In this section, I explain how the McFadden-Song model is not a reliable methodology for providing common economic proof of impact and damages attributable to Apple's alleged conduct, nor is it a reliable methodology for identifying harmed and unharmed class members. Specifically, the McFadden-Song model continues to predict millions of unharmed class members, notwithstanding its extension to additional app genres and application to individual payors rather than accounts[17] (Section 3.1). Plaintiffs attempt to salvage this fundamental failing in a variety of ways. First, Plaintiffs make unsubstantiated claims that there are nonmonetary harms that may accrue to class members over and above any lack of putative monetary harm estimated by the McFadden-Song model (Section 3.2). Second, Plaintiffs continue to impose a $10 spending cutoff for class membership, which is arbitrary and excludes millions of putative class members with the same theory of liability (Section 3.3). Further, Plaintiffs' methodology to establish harm to particular class members depends upon the reliability of their methodology to identify unique payors (in order for them to be linked to transactions) (Section 3.4). Finally, the McFadden-Song model cannot measure the impact on class members of any specific challenged conduct. The model potentially measures damages from lawful and procompetitive conduct, and since it cannot be adapted if

---

[12] 2023 Second Revised McFadden Supplemental Report; Song Report, ¶¶ 49 ("I explain how I use the methodology Prof. McFadden demonstrated in the Class certification stage to estimate damages using all of the App Store transactions data which includes 27 genres in total, and how I identify harmed and unharmed Class members."), 55; 2025 McFadden Report, ¶ 4 ("Dr. Song has directly overseen the implementation of my methodology using the App Store transactions data for all genres in his expert report, including preparing the underlying data for the modeling. Dr. Song and I have conferred regularly as he has implemented my methodology.").

[13] 2023 Prince Report.

[14] Opening Expert Report and Declaration of Lorin M. Hitt, Ph.D., March 7, 2025 ("2025 Hitt Report"), Section 9; Rebuttal Expert Report and Declaration of Lorin M. Hitt, Ph.D., June 13, 2025 ("2025 Hitt Rebuttal Report"), Section 9.5.

[15] 2025 Hitt Rebuttal Report, Section 9.3.

[16] Rebuttal Expert Report and Declaration of Mark Watson, Ph.D., June 13, 2025 ("2025 Watson Report"), Section IV.

[17] 2024 Class Certification Ruling, p. 26:12–15 ("While the Court remains concerned that the $10.00 cutoff results in an estimated 7.9% or 10,283,035 million uninjured accounts, it expects, given plaintiffs representations, that once the model is fully run, that number will be reduced or the cutoff could be changed to reduce the impact of including unharmed accounts.").

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

any type of conduct is ruled lawful and/or procompetitive, it cannot reliably establish impact or estimate damages (Section 3.5).

### *3.1. The McFadden-Song Model Continues to Predict a Large Number of Unharmed Class Members*

20. Throughout this matter, Professor McFadden's model has predicted that many class members were unharmed by the alleged conduct. His corrections to various errors have often increased that number, and only by implementing an arbitrary $10 cutoff (unrelated to Plaintiffs' theory of liability) have Professor McFadden and Dr. Song reduced the number of unharmed class members to what is still a very large number—approximately 9.7 million in their most recent reports (or approximately 11.0 million in the context of the McFadden-Song methodology that purportedly simulates Apple's price tiers).[18] In this section, I recap how the number of unharmed class members has historically increased with the implementation of corrections to Professor McFadden's model. I further explain how, since the class certification stage, the implementation of the McFadden-Song model continues to yield a large number of unharmed class members. As such, the McFadden-Song model does not show that all or nearly all class members were injured.

### *3.1.1. The Number and Percent of Unharmed Class Members Consistently Rose with Every Implementation of Professor McFadden's Model throughout the Class Certification Stage*

21. As detailed in the 2023 Prince Report, the percent of unharmed App Store accounts steadily increased across each of Professor McFadden's reports throughout the class certification stage.[19] Exhibit 1 visually depicts the change in the percent of unharmed accounts across Professor McFadden's class certifications reports. Below, I explain how this percent changed over time.

---

[18] Song Report, Figure 13. The unrounded number reported by Dr. Song is 9,693,747. In his price tier simulation, this number if 10,986,763.

[19] 2023 Prince Report, Exhibit 4.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

**EXHIBIT 1**
*The Percent of Unharmed Accounts has Steadily Increased Across Each of Professor McFadden's Reports Throughout the Class Certification Stage*



Source: McFadden Reports
Note: Each bar represents the percentage of unharmed accounts in one of Professor McFadden's reports.

22. Professor McFadden reported approximately 5.8 percent of accounts were unharmed in his 2021 Initial Report.[20] However, in his 2021 Reply Report, Professor McFadden made two adjustments that yielded a finding that 14.6 percent of accounts were unharmed.[21] This increase stemmed from how Professor McFadden identified whether an account was harmed. Whereas he originally identified unharmed accounts as those that were not harmed for any single transaction, his 2021 Reply Report properly identified unharmed accounts as those that were not harmed on net across that account's total set of transactions.[22] Further, I identified a data processing error in Professor McFadden's analysis. Specifically, I explained how a computer rounding error led Professor McFadden to errantly drop observations from his

---

[20] 2021 McFadden Report, ¶ 241.

[21] Reply Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, October 19, 2021 ("2021 McFadden Reply Report"), ¶ 200, footnote 371.

[22] 2021 McFadden Reply Report, ¶ 200.

10 of 57

analysis.[23] When fixing this error and using a measure of net harm, Professor McFadden acknowledged in his 2021 Reply Report that the fraction of unharmed accounts increased to 14.6 percent.[24]

23. Later, in his 2021 Declaration, Professor McFadden found that this number further increased to 15.3 percent.[25] Relative to his earlier reports, this difference stemmed from the set of apps included in his prediction of but-for prices. Whereas his earlier calculations included only but-for price predictions for the top 70 percent revenue apps, his 2021 Declaration included but-for price predictions for all apps in the genres he studied.[26] Following Professor McFadden's 2021 Declaration, the Court denied Plaintiffs' motion for class certification based on, in part, "Calculation Data and Model Errors" in Professor McFadden's model[27] and noted that no courts "have sanctioned a proposed class which included 14.6 percent" uninjured putative class members.[28]

24. In his 2022 Supplemental Report addressing the errors the Court identified in his original model, Professor McFadden found that 17.2 percent of accounts (or around 30.4 million accounts) were unharmed.[29] Relative to his 2021 Declaration, this difference stemmed from: (a) attempting to "address the switcher issue"—that the same account can switch between harmed and unharmed depending on the sample used to calculate damages—by estimating demand using 75 different 0.1 percent samples and using the average estimates to predict but-for prices;[30] and (b) "using the full App Store data rather than a sample of the data to calculate damages."[31]

25. Finally, after more revisions and corrections, Professor McFadden further adjusted his estimates of unharmed accounts upward to 17.6 percent in his 2022 First Revised

---

[23] See, for example, 2021 Prince Report, ¶ 32.

[24] 2021 McFadden Reply Report, footnote 371.

[25] Declaration of Daniel L. McFadden in Support of Plaintiffs' Opposition to Defendant Apple Inc.'s *Daubert* Motion to Exclude Reply Testimony of Professor Daniel L. McFadden, November 23, 2021 ("2021 McFadden Declaration"), ¶ 9.

[26] 2021 McFadden Declaration, ¶ 9. See also 2021 McFadden Reply Report, ¶ 209.

[27] Order Denying Plaintiffs' Motion for Class Certification Without Prejudice; Granting in Part and Denying in Part Apple's *Daubert* Motions to Exclude Testimony of Professor Daniel L. McFadden, *In Re Apple iPhone Antitrust Litigation*, March 29, 2022 ("2022 Class Cert Motion"), p. 7.

[28] 2022 Class Cert Motion, p. 25.

[29] 2022 McFadden Supplemental Report, Figure 1.

[30] 2022 McFadden Supplemental Report, ¶¶ 12, 54–55.

[31] 2022 McFadden Supplemental Report, ¶ 29. After reaching 17.2 percent, Professor McFadden introduced a $10 spending cutoff to reduce the number and fraction of predicted unharmed accounts in his model. 2022 McFadden Supplemental Report, ¶ 77. I address this cutoff in Section 3.3.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

Supplemental Report and 17.8 percent in his 2023 Second Revised Supplemental Report.[32] Relative to his 2022 Supplemental Report, these differences stemmed from errors in how he classified certain apps into certain genres over time, which impacted his estimates of but-for prices.[33] The fraction of unharmed accounts reached as high as 20.0 percent in the price tier analysis of his 2023 Second Revised Supplemental Report.[34]

*3.1.2. Small Changes to Data and Professor McFadden's Model Resulted in a Large Number of Class Members Switching between Harmed and Unharmed in the Class Certification Stage*

26. One of the reasons the McFadden-Song model cannot reliably determine which class members are harmed or unharmed is its instability. Specifically, as was true of Professor McFadden's model, the McFadden-Song model fails to produce similar results in the presence of small variations in the data or in the assumptions upon which the model is built. These small changes can result in millions of class members alternating between harmed and unharmed. This source of unreliability in Professor McFadden's model is something I discussed at length in the 2023 Prince Report.[35] Because Dr. Song has not made substantial changes to Professor McFadden's model in his implementation, this unreliability persists in the McFadden-Song model today.

27. As an example of the model's instability in the presence of small variations in the data, in the 2023 Prince Report, I explained how Professor McFadden mis-categorized the genre of certain apps in the App Store transaction data.[36] Upon correcting his error, 958 apps out of a pool of 545,438 Games and Music + Entertainment apps changed genres.[37] At well under one percent of apps (more precisely, approximately 0.18 percent), this is a numerically minor change. However, this minor change in app genre categorization caused more than a million accounts to change from harmed to unharmed.[38] While one million accounts may represent only a small share of total accounts, these additional unharmed accounts increased the already very large number of unharmed accounts by around 3.3 percent.[39]

---

[32] 2022 First Revised McFadden Supplemental Report, Figure 1; 2023 Second Revised McFadden Supplemental Report, Figure 1.

[33] See, for example, 2023 Prince Report, footnote 104.

[34] 2023 Second Revised McFadden Supplemental Report, Figure 7.

[35] 2023 Prince Report, Section 5.

[36] 2023 Prince Report, ¶¶ 51–54.

[37] 2023 Prince Report, ¶ 52, Exhibit 2.

[38] 2023 Prince Report, Exhibit 3.

[39] $1,000,000 \div (17.2\% \times 176,964,271) \approx 3.3\%$.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

28. This issue of instability in Professor McFadden's model was not mitigated by his use of 75 samples. Professor Watson found that for one of the 75 Music + Entertainment samples in that same report, the genre correction impacted only 7 apps (out of more than 800 apps), and yet this minor difference caused the price sensitivity estimate to change from -1.6 to -62.3 (i.e., consumers would be almost 40 times more sensitive to a change in prices).[40] Even though the other 74 samples saw much smaller changes, the total harm from Music + Entertainment transactions fell by ▮▮▮▮▮▮, or about ▮▮ percent, and this difference led to the above-referenced shift in harm status for more than one million accounts.[41] As this example shows, the use of 75 samples does not correct the fact that Professor McFadden's model lacked the levels of robustness and stability that I would expect to be characteristic of a reliable methodology.

29. As an example of instability in the presence of changes to the assumptions upon which Professor McFadden's model was built, I also showed in the 2023 Prince Report that changing Professor McFadden's unrealistic and unsupported assumptions yielded more unharmed accounts, generating additional "switchers." For example, I showed that alternative assumptions regarding Professor McFadden's "percentage method," his price tier simulation, the $10 spending cutoff, the but-for commission rate, and the margin constraints all yielded large changes to the percentage and identity of unharmed accounts.[42] Further, as Professor McFadden testified, if the jury were to disagree with certain assumptions of the McFadden-Song model, the jury would not be able to adapt the model and identify which class members are harmed and which are not.[43] Therefore, the McFadden-Song model is

---

[40] 2023 Prince Report, ¶ 155. See also Expert Report and Declaration of Mark Watson, Ph.D., March 10, 2023 ("2023 Watson Report"), Appendix H. In the McFadden-Song model, an app's demand elasticity is its price times the price sensitivity parameter. For a $1 app, the difference between a -62.3 and -1.6 price sensitivity is the difference between a -62.3 and -1.6 price elasticity. The price elasticity of demand is the ratio between the percentage change in quantity demanded and the percentage change in price.

[41] 2023 Prince Report, ¶ 155.

[42] For example, I showed that (i) applying Professor McFadden's model to predict but-for prices for individual items instead of using his "percentage method" for calculating item-level but-for prices increases the share of unharmed accounts from 17.8 percent to 35.9 percent; (ii) changing the $10 spending cutoff to be based on spending across all genres instead of only Games and Music + Entertainment increases the share of unharmed accounts from 7.9 percent to 12.4 percent; (iii) changing the but-for commission rate to but-for rates consistent with Dr. Abrantes-Metz's methodology but different than her proposed 13.63 but-for rate increases the share of unharmed accounts from 17.8 percent up to 44.8 percent; and (iv) changing Professor McFadden's proposed margin constraints based on six developers' accounting data to Professor Watson's sensitivity analysis of the margin constraints increases the share of unharmed accounts from 17.8 percent to 29.0 percent. 2023 Prince Report, Exhibit 19.

[43] 2025 McFadden Deposition, pp. 229:18–231:23 ("Q. If the jury determines that… multiple stores would charge different commission rates, can your model calculate damages?... [A. I]f the -- and she [Dr. Abrantes-Metz] said that these rates would vary by rival, then I don't have a model of operation of rival stores. Q. If the jury determines that developers maximized profits and set their prices not at the app level but at the item level, how would the jury reliably calculate damages based on the evidence from your model?... [A.] The answer is I don't – I don't think I can do it and I don't think they can do it reliably. Q… If the jury determines that marginal costs are zero for in-app virtual currency transactions, how would the jury reliably calculate damages using your model?... [A.] I don't know -- I don't know how they would proceed. Q… If the jury determines that the margin constraints generally should be set at higher ranges, in other words shifted up,

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

incapable of showing injury, calculating damages, and identifying harmed versus unharmed class members on a classwide basis in a reliable manner.

30. Given that Dr. Song has not corrected these issues in his implementation of Professor McFadden's model—i.e., in the McFadden-Song model—this fundamental unreliability has carried forward into his own results.

### 3.1.3. Dr. Song's Extension of Professor McFadden's Model to All App Store Genres and Calculations at the "Payor" Level Does Not Meaningfully Reduce the Number of Unharmed Class Members

31. Throughout class certification, Professor McFadden calculated whether an individual *account* was harmed or unharmed. By contrast, Dr. Song analyzes whether an individual "*payor*" is harmed or unharmed. This creates challenges in directly comparing the unharmed metrics in terms of number or percentage that result from one analysis to the other. For example, a single, unique payor may be associated with multiple accounts, and, conversely, an account may be associated with multiple payors. A harmed payor may also be associated with two accounts—one unharmed and the other harmed. Nonetheless, both approaches find a very high number and percentage of unharmed individuals (either measured in terms of accounts or payors). Plaintiffs have acknowledged that payors are the appropriate unit of analysis.[44]

---

how would the jury reliably calculate damages using your model? A… it would be -- I think beyond -- clearly beyond the capacity of a jury to do or ask for.").

[44] Song Report, ¶ 11 ("Apple has since produced a supplementary dataset that contains anonymized billing IDs (hereafter referred to as 'payor IDs'), which represent individual persons, and the transactions IDs associated with the transactions paid for by these persons. I further understand this supplementary dataset can be used together with the new transaction ID variable included in the revised App Store transactions dataset to identify the individual transactions attributable to each payor. Counsel has instructed me to use this supplementary dataset for the purposes of identifying which individuals meet the spending threshold for Class membership and determining whether any individual Class member incurred monetary harm.").

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

32. Professor McFadden reported that, absent the arbitrary $10 spending cutoff, approximately 17.8 percent of 176,964,271 accounts were unharmed, corresponding to approximately 31.5 million unharmed accounts.[45] Dr. Song's implementation of the McFadden-Song model—also without the arbitrary $10 spending cutoff—yields approximately 27.0 million unharmed payors, corresponding to 12.0 percent of all payors.[46] This large number and percentage of unharmed class members persists despite adjustments to Professor McFadden's model that Dr. Song undertook in his implementation of the McFadden-Song model, such as the inclusion of all other genres in the estimation as well as new assumptions regarding the estimation.[47] That is, without relying on the arbitrary $10 spending cutoff, the McFadden-Song model continues to find a large number and percentage of class members that are monetarily *benefited* by Apple's conduct, despite extending the model to additional genres of apps.

33. Even with the application of the $10 spending cutoff, the McFadden-Song model finds that there are approximately 9.7 million unharmed payors.[48] These unharmed *payors* are associated with more than 14.5 million unharmed *accounts* based on the McFadden-Song model.[49] Like the 10.3 million unharmed accounts that Professor McFadden identified in his 2023 Second Revised Supplemental Report,[50] Dr. Song continues to find a very large number of unharmed accounts.

34. The 9.7 million unharmed payors from Dr. Song's analysis excludes iPod touch transactions, whereas Professor McFadden's earlier analyses did not. Plaintiffs sought to

---

[45] 2023 Second Revised McFadden Supplemental Report, Figure 6. 17.8% × 176,964,271 ≈ 31,499,640. Including the arbitrary $10 cutoff, Professor McFadden estimated that 7.9 percent of accounts were unharmed, corresponding to approximately 7.9% × 130,519,401 ≈ 10,311,033 unharmed accounts. The discrepancy between the total number of accounts and payors reported by Professor McFadden and Dr. Song arises from the differing time periods analyzed. Professor McFadden's data span from July 2008 to April 2022, whereas Dr. Song's data span from July 2008 to February 2024.

[46] See Workpaper 1. Including only payors with at least one account with more than $10 in spending, Dr. Song estimated 9,693,747 payors were unharmed, or approximately 5.2 percent. See Workpaper 2.

[47] See, for example, Song Report, ¶¶ 51–52 ("I rely on the genre grouping Prof. MacCormack describes in his report for the purposes of estimating consumer demand. Furthermore, I rely on the genre-group level variable profit margin ranges estimated by Prof. MacCormack to form the variable profit margin bounds for my demand estimation."), 79 ("I calculate Class-wide damages for the Class members as the sum of the damages they incurred for each of their respective App Store transactions"), 150 ("Another constraint is that the coefficient of log downloads on in-app purchase demand… be between 0 and 1.").

[48] Song Report, Figures 24 and 25. Specifically, Dr. Song finds approximately 9.7 million unharmed payors counting payors with at least $10 in spending from one account, 9.8 million unharmed payors counting payors with at least $10 in total spending, 11.0 million unharmed payors counting payors with at least $10 in spending from one account under his price tier simulation, and 11.1 million unharmed payors counting payors with at least $10 in total spending under his price tier simulation.

[49] See Workpaper 3.

[50] 2023 Second Revised McFadden Supplemental Report, Figure 6. 7.9% × 130,519,401 ≈ 10,311,033 unharmed accounts.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

remove iPod touch transactions from the class.[51] The Court has since dismissed claims related to iPod touch transactions with prejudice.[52] As a result, approximately 2.0 million unharmed payors associated with iPod touch transactions were removed, leaving an estimated 9.7 million unharmed payors as identified in the McFadden-Song model.[53] These payors are those who made iPod touch transactions that the McFadden-Song model predicts would become more expensive in the but-for world, thereby making these individuals unharmed. The exclusion of iPod touch transactions also provides another illustration of how the model cannot reliably identify harmed class members. Specifically, the exclusion of iPod touch transactions induces a substantial number of "switchers." By reincluding these transactions, 346,459 class members would switch from harmed to unharmed, while 296,128 would switch from unharmed to harmed.[54]

### 3.2. Plaintiffs Lack Common Evidence of Injury for the Millions of Class Members that the McFadden-Song Model Finds to Be Uninjured

35. Both Professor McFadden and Dr. Song claim that their damages estimates from the McFadden-Song model are "conservative" to the extent that "consumers are harmed in other ways as a result of Apple's alleged misconduct."[55] As support for this claim of *additional* impact of Apple's alleged misconduct (i.e., beyond the putative monetary harm calculated from the McFadden-Song model), Professor McFadden and Dr. Song rely on the opinions of Professor Stiglitz, who claims that Apple's alleged misconduct includes depriving consumers "of alternative channels through which they could purchase iOS apps and in-app content," which Professor Stiglitz alleges has "reduced innovation, decreased the app variety available

---

[51] Plaintiffs' Notice of Motion and Motion to Modify Class Definition and Approve Notice to the Class; Memorandum of Points and Authorities in Support, *In Re Apple iPhone Antitrust Litigation*, April 15, 2025, p. 1.

[52] Order Granting in Part Motion to Modify Class, *In Re Apple iPhone Antitrust Litigation*, June 11, 2025, p. 1.

[53] The exclusion of iPod touch transactions tends to remove unharmed payors even under the $10 cutoff. See Workpaper 4. The most complete approach to calculating the impact of excluding iPod touch transactions would be to include iPod touch transactions, rerun Dr. Song's data processing and analysis in its entirety, and compare the results. Due to the substantial computation resources involved with processing the App Store transaction data and running Dr. Song's analysis, I present approximations by processing the iPod touch transactions separately and reincorporating them rather than reprocessing the full transaction data from scratch. However, iPod touch transactions predominantly appear in the data prior to 2017. Because Dr. Song applies his margin constraints from 2017 onwards—and because, as Professor Watson explains, those margin constraints predominantly determine the estimates of the McFadden-Song model—I would not expect the inclusion of iPod touch transactions to have a substantial impact on the estimation results. Song Report, footnote 228; 2025 Watson Report, Section IV.

[54] See Workpaper 5.

[55] 2025 McFadden Report, ¶ 8 ("I designed my methodology to estimate the monetary harm caused by Apple's allegedly supracompetitive App Store commission rate. The extent of consumer harm my model estimates is conservative if consumers are harmed in other ways as a result of Apple's alleged misconduct."); Song Report, ¶ 47 ("As explained by Prof. McFadden, the damages model I use in this report quantifies the monetary harm resulting from the supracompetitive App Store commission Apple charges. It does not capture the additional sources of consumer harm described by Prof. Stiglitz. The magnitude of consumer harm I obtain in this report are in that sense conservative.").

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

to iOS device users, and restricted output."[56] On this basis, Dr. Song opines that "[c]lass members for whom [his] damages calculation attributes no monetary damages may still be harmed by Apple's conduct during the Class period" because "Prof. Stiglitz has analyzed several other forms of harm, e.g., a loss in app and in-app purchase output."[57]

36. Professor McFadden and Dr. Song therefore seem to imply that the up to 11.0 million class members for whom the McFadden-Song model finds no monetary harm are still in fact harmed. If so, to my understanding, that is a new opinion that neither has offered before in this litigation. Importantly, Plaintiffs' experts have not pointed to sufficient evidence or put forward any model to quantify the alleged *additional* harm that Professor Stiglitz claims exists.[58] Nor have they indicated that this additional harm can be shown based on evidence common to the class. Indeed, Professor Stiglitz, on whom Professor McFadden and Dr. Song rely to assert this *additional* harm, testified that he did not analyze whether all or nearly all class members suffered harm in addition to the putative monetary harm found by the McFadden-Song model.[59] Absent sufficient supporting analysis, the claim of *additional* harm is little more than speculation, as is any claim that such harm is common to all class members. That is, without a method by which to measure this alleged *additional* harm, Plaintiffs' experts are unable to say whether and to what extent a given consumer was

---

[56] Song Report, ¶¶ 46–47.

[57] Song Report, ¶ 81. See also 2025 McFadden Report, ¶ 8 ("Section II summarizes Apple's alleged misconduct, and the resulting consumer harm analyzed by Prof. Stiglitz. I find his opinions consistent with the opinions I offered in my prior reports… The extent of consumer harm my model estimates is conservative if consumers are harmed in other ways as a result of Apple's alleged misconduct.").

[58] See, for example, 2025 McFadden Deposition, p. 102:10–20 ("Q. (By Mr. Swanson) With reference to the harms that Professor Stiglitz speaks of, the broader harms, those include loss in output or reduction in app variety; is that correct? A. Yes. Q. To your knowledge, has any expert in this matter proposed a model to calculate damages to class members from lost output or reduced app variety? A. In the case? I'm not aware of this being done in the case, no."). Professor Stiglitz describes examples of allegedly reduced innovation, asserting that Apple's alleged misconduct has negatively affected innovation for developers of games and super apps. However, these specific examples fall short showing that innovation is systematically restricted by the alleged misconduct. Expert Report of Jospeh E. Stiglitz, Ph.D., March 7, 2025 ("Stiglitz Report"), ¶¶ 117, 120 ("First, Apple's restrictions force game developers to develop multiple versions of their app (i.e., one for the cloud and one for iOS devices) instead of just one version for the cloud. This increases the costs associated with the development or improvement of any apps or in-app content offered, as developers must spend more resources making different versions of the same app; and should they decide to develop an app or in-app content only for iOS devices, it reduces their expected return. Consequently, product development and innovation are stifled…Apple has also imposed restrictions on super apps (single apps that run a number of mini programs and offer access to a wide range of physical and digital products as well as online and offline services), prohibiting digital transactions and stripping away the design and visual presentation of their content, such as recommending and categorizing games, because it has a 'store-like' resemblance. These restrictions can potentially lead to a reduced number of super app users, similarly disincentivizing developers to invest in the development or quality improvements of super apps.").

[59] Deposition of Joseph Stiglitz, May 30, 2025 ("Stiglitz Deposition"), p. 33:1–10 ("Q. Have you quantified the amount of any non-monetary harm, if any, that plaintiff suffered as a results of Apple's alleged misconduct? A. No, I, I didn't do any estimate of the damages themselves. It's much more of a qualitative analysis. Q. Were you asked to analyze whether the evidence shows that all or nearly all members of the plaintiff class suffered non-monetary harm? A. No, I didn't look at that kind of detailed analysis.").

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

injured, e.g., by the loss of innovation that allegedly would have occurred in the but-for world, or by a lack of alternative app stores.

37. In addition to their failure to sufficiently analyze or even indicate what kind of evidence or analysis could show whether and to what extent consumers suffered this *additional* harm, it is not clear how Plaintiffs' experts would be able to balance this alleged *additional* harm against any benefits. There are at least two kinds of benefits to consumers that Plaintiffs' experts would need to consider. First, for some transactions, the McFadden-Song model finds "negative" damages (in other words, putative positive monetary benefits to consumers).[60] Professor McFadden agreed that these "negative" damages should be thought of as monetary benefit to consumers.[61] Second, as Professor McFadden also testified, some consumers received other nonmonetary benefits stemming from the alleged anticompetitive conduct, including consumer privacy and security.[62]

38. For example, the McFadden-Song model predicts that named Plaintiff Mr. Hayter is unharmed.[63] To determine whether he is "harmed in other ways as a result of Apple's alleged misconduct"[64] would require an analysis of these other putative harms, including whether, on net, those harms surmount the monetary benefit Mr. Hayter receives from the change in Apple's but-for commission rate. Among Professor McFadden, Dr. Song, and Professor Stiglitz, none has provided any methodology, let alone any methodology using evidence common to all class members, for quantifying these other harms or even establishing if they

---

[60] See, for example, 2025 McFadden Deposition, p. 16:8–22 ("Q. If a consumer would have paid more in the but-for world, according to your model, is that consumer monetarily benefited by the super-competitive commission? … THE DEPONENT: In terms of the overcharge, the answer is that -- that person is now -- has a negative overcharge. That's correct. Q. (By Mr. Swanson) And a negative overcharge is good to consumers, is it not? … THE DEPONENT: This gets to the question of what's good for consumers. If you say have -- have they benefited monetarily in terms of the overcharge, the answer is yes.").

[61] 2025 McFadden Deposition, p. 104:18–22 ("Q. To the extent prices would be higher in the but-for world on account of Apple's conduct, the consumers who paid those particular prices obtained a monetary benefit, did they not? A. They did, yes.").

[62] 2025 McFadden Deposition, p. 105:6–11 ("Q. Is the protection of consumer privacy a nonmonetary benefit to a consumer? A. I would think so, yes. Q. Is the protection of a consumer's security a nonmonetary benefit? A. It -- it should be, yes.").

[63] See Workpaper 6. The Named Plaintiffs' transactions are identified by mapping the Apple IDs they provided to the anonymized "person_id" variable in the App Store transaction data. See Letter from Daniel G. Swanson (Gibson Dunn) to Rachele R. Byrd (Wolf Haldenstein Alder Freeman & Herz LLP), "Re: *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.)," February 27, 2023. I determine whether a Named Plaintiff is harmed under the McFadden-Song model based on transactions made by accounts for each Named Plaintiff. I understand that an Apple expert will submit a report in response to Plaintiffs' methodology for assigning transactions to individual payors, which may alter the assignments of transactions to the Named Plaintiffs and affect the harm assessment.

[64] 2025 McFadden Report, ¶ 8 ("I designed my methodology to estimate the monetary harm caused by Apple's allegedly supracompetitive App Store commission rate. The extent of consumer harm my model estimates is conservative if consumers are harmed in other ways as a result of Apple's alleged misconduct."); Song Report, ¶ 47 ("As explained by Prof. McFadden, the damages model I use in this report quantifies the monetary harm resulting from the supracompetitive App Store commission Apple charges. It does not capture the additional sources of consumer harm described by Prof. Stiglitz. The magnitude of consumer harm I obtain in this report are in that sense conservative.").

exist for any class members. Hence, there is no basis for claiming that Mr. Hayter would no longer be unharmed if "other ways" of harm were considered. Indeed, there is no method presented, and thus no basis for any claim that any of the class members deemed unharmed by the McFadden-Song model would experience any of these other harms at all. This means that Plaintiffs cannot rule out that all such class members would continue to be unharmed, even taking into account these other potential types of harm.

39. Furthermore, it is not evident that the alleged *additional* impact of Apple's challenged conduct would result in harm to all or nearly all consumers. Economic theory and consumer behavior suggest significant heterogeneity in consumer preferences,[65] and academic research indicates that apps are no exception to this.[66] This heterogeneity implies that the other harms claimed by Professor Stiglitz do not necessarily affect all consumers, rendering an individualized inquiry into consumer preferences necessary to determine which consumers would suffer any additional harm and by how much. For instance:

- *The alleged reduction in competition does not necessarily lead to loss of innovation, and even if there is an impact on innovation it does not necessarily affect all consumers.* As an initial matter, the alleged reduction in competition does not necessarily lead to less innovation. The economic literature has long understood that the relationship between the number of competitors and the level of innovation in an industry is ambiguous.[67] Hence, it is not at all clear that greater competition would necessarily yield more innovation; instead, it could result in less innovation, e.g., if Apple's innovation incentives are reduced with more competition. Even if there is a loss of innovation associated with the challenged conduct, the extent to which consumers would be harmed depends on consumer preferences, which vary.

---

[65] See, e.g., Kenneth E. Train, *Discrete Choice Methods with Simulation*, Second Edition, (Cambridge, England: Cambridge University Press, 2009), pp. 46–47 ("The value or importance that decision makers [consumers] place on each attribute of the alternatives varies, in general, over decision makers. For example, the size of a car is probably more important to households with many members than to smaller households. Low-income households are probably more concerned about the purchase price of a good, relative to its other characteristics, than higher-income households… Two people who have the same income, education, etc., will make different choices, reflecting their individual preferences and concerns.").

[66] See, e.g., Daniel Ershov, "Variety-Based Congestion in Online Markets: Evidence from Mobile Apps," *American Economic Journal: Microeconomics*, 16(2), 2024, pp. 180–203 at pp. 190 ("...consumers have idiosyncratic product preferences, which are difficult for platforms to predict."), 201 ("...personalization technology is unlikely to ever be perfect, as consumers have idiosyncratic product preferences that are difficult to predict."); Thomas W. Quan and Kevin R. William, "Product Variety, Across-Market Demand Heterogeneity, and the Value of Online Retail," *The RAND Journal of Economics*, 49(4), 2018, pp. 877–913 at p. 877 ("Our estimates indicate products face substantial demand heterogeneity across markets."); Federico Etro, "Device-Funded vs Ad-Funded Platforms," *International Journal of Industrial Organization*, 75(5), 2021, pp. 1–18 ("Our benchmark model has heterogenous consumers purchasing a device with an app store and variety of apps priced under monopolistic competition...").

[67] See, for example, Richard Gilbert, "Looking for Mr. Schumpeter: Where Are We in the Competition-Innovation Debate?" *Innovation Policy and the Economy*, 6, 2006, pp. 159–215 at pp. 205–206 ("At the same time, neither theory nor empirical evidence supports a strong conclusion that competition is uniformly a stimulus to innovation.").

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

If the but-for world would have included higher-quality streaming video games, consumers uninterested in such products would presumably not be harmed by their absence.[68]

- *The alleged reduction of choice from alternative app stores does not necessarily affect all consumers.* The unavailability of alternative app stores in the actual world does not necessarily imply harm to consumers, nor would any such harm necessarily apply to all consumers. If some consumers never would have purchased from alternative app transaction platforms that would supposedly exist in the but-for world, the loss of such an option presumably would not cause any harm for those consumers. Professor Simonson's survey found that the majority of respondents were aware that the App Store was the only store from which they would be able to obtain apps on their iPhone and/or iPad and that users were satisfied with their App Store experiences.[69] In addition, Professor Simonson found that when evaluating a potential alternative to the App Store, consumers' preferences for the App Store "tend to be insensitive to the magnitude of the price and other key feature differences between the Apple App Store and a hypothetical alternative store."[70]

- *The alleged lack of app variety and output does not necessarily affect all consumers.* The value of additional app variety or more output is inherently particular to individual consumers. A consumer derives a benefit only if the additional offerings align with her preferences or needs. For example, the existence of additional weather apps may be superfluous to a consumer who already uses a weather app she likes. In such cases, more variety may impose costs—such as greater search costs—without conferring any benefits. Furthermore, under the McFadden-Song model, app transactions can result in "negative" damages.[71] This means that a greater variety or output of apps has the potential to generate additional negative harm for some consumers.

40. Importantly, the *additional* harm claimed by Plaintiffs' experts is not impossible to quantify. Professor McFadden noted during his deposition that, in principle, economists can measure such kinds of harm.[72] Thus, it is not the case that Plaintiffs' experts have asserted

---

[68] Professor Hitt found that 29.1 percent of accounts only spend in a single genre through the App Store. Additionally, Professor Hitt found that, for example, 6.3 percent of accounts with positive billing on apps had more than 90 percent of their spending in the Education genre alone. Such consumers would likely be uninterested in streaming video games products. See 2025 Hitt Report, Exhibits 20 and 21.

[69] Rebuttal Expert Report and Declaration of Itamar Simonson, Ph.D., June 13, 2025, Section III.C.4.

[70] Opening Expert Report and Declaration of Itamar Simonson, Ph.D., March 7, 2025, ¶ 19.

[71] Song Report, ¶ 79.

[72] 2025 McFadden Deposition, pp. 100:14–102:9 ("Q. (By Mr. Swanson) When you say that your model does not capture other forms of harm that consumers may have incurred as a result of Apple's alleged misconduct, are you referring to any

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

additional harm that cannot be measured. Rather, they have asserted theoretically measurable additional harms with no indication as to what kind of evidence or model they would use to substantiate their claim of such harm.

### 3.3. The $10 Spending Cutoff Is Arbitrary and Excludes Millions of Class Members with the Same Theory of Liability

41. As I opined in the 2023 Prince Report, Plaintiffs' $10 spending threshold for class membership is an arbitrary cutoff and is not based on any economic analysis.[73] Imposing this threshold arbitrarily reduces the percentage of purportedly unharmed accounts by excluding some (but not all) low-cost transactions that Professor McFadden estimated would have higher prices in the but-for world (and are therefore unharmed). As I discuss below, this continues to be true for the McFadden-Song model.

42. The application of this cutoff was also at odds with Plaintiffs' experts' own findings of "harm." Although applying this cutoff did achieve Plaintiffs' goal of reducing the number and percentage of purportedly unharmed accounts that Professor McFadden's model found, it also removed a substantial number of accounts that Professor McFadden found had been injured and therefore (according to the model) had viable claims. This issue persists for the McFadden-Song model today. In fact, as shown in Exhibit 2 below, the $10 cutoff, when applied by Dr. Song in the McFadden-Song model, removes a greater number of purportedly

---

other forms of monetary harm? A. The -- the answer is -- let me step back, perhaps tell you about why this paragraph is here. In my original report and supplementary report, I used 'harm' as a synonym for an overcharge. Professor Stiglitz talks about harm in -- in a broader sense, I think which involves consumer -- consumer satisfaction. And so I want to draw a distinction between my use of the word 'harm' and my earlier reports in the use -- his use of the word 'harm,' and -- and I -- the point is that there can be forms of impacts on consumers' satisfaction separate from the issue of its impact on their -- on their payment, their monetary payment. And I am not offering opinions on -- on that or trying to quantify that. Q. And my question was: Are those other forms of harm considered by you to be monetary harm? A. Well, that's – that's -- you ask a deep economic question, which is can changes in consumer satisfaction be monetized, and I think the -- the answer is they -- they can be, but not necessarily in conformity with legal precedents and standards. Q. So those other forms of harm, to your mind as an economist, are also monetary harm, but they may not be legally recoverable monetary harm? … THE DEPONENT: Yeah, that's -- I think that's – that's a -- a fair characterization, in fact, to that -- and economists can do consumer surplus measurements in the -- in the traditional economic use of that term, but monetary standards – I'm sorry. The legal standards for -- for the recovery are often based in terms of actual lost income rather than the deeper question of – of trying to balance or -- or monetize consumer satisfaction."); Deposition of Daniel L. McFadden, November 5, 2021, pp. 194:4–195:8 ("Q. Can your model show the effect of Apple's anti-steering provisions on app and in-app purchase prices independently from the effect of any of the other conduct the plaintiffs challenge? … THE DEPONENT: I would say that my modeling framework and my mechanisms have the capacity to do that, but there are elements involving the extent to which consumers would follow leads or announcements within the -- within their app and actually use alternative mechanisms that could involve additional study of consumer choice. I have not been asked to do that. It -- I think it could be done, but I haven't done it. Q. (By Mr. Swanson) Until you actually are asked to do it and try to do it, can you testify that it can be done? … THE DEPONENT: Oh, I -- I would be prepared to say it can be done. It can be done by -- through -- through consumer experiments, for example. Q. (By Mr. Swanson) And that would involve some type of survey research? … THE DEPONENT: It could involve survey research and it could involve survey research enhanced by actual experimental treatments in which consumers are asked to make meaningful choices in -- in a simulated market.").

[73] 2023 Prince Report, Section 5.4.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

*harmed* payors than it does unharmed ones. If the goal of this $10 cutoff is to segregate unharmed from harmed class members, it does not—and cannot—accomplish that purpose.

43. The fact that the cutoff is arbitrary and lacks a basis in any kind of economic analysis is evidenced in Professor McFadden's own testimony. Professor McFadden, who originally imposed the $10 threshold on an account basis, testified that he had no opinion on whether the class should be truncated by a dollar spend or whether such a cutoff should be at $10 or any other number.[74] He further testified that the reliability of his model is not improved in any way by this cutoff,[75] nor does it make his model any more capable of identifying harmed accounts.[76]

44. Despite this, as I noted above, Dr. Song continues to apply the $10 cutoff in his implementation of the McFadden-Song model. He provides no economic support for that implementation beyond relying on the class definition.[77] As I noted, Dr. Song's adoption of the $10 cutoff raises all the issues I described above in the context of Professor McFadden's prior analysis.

45. Mechanically, the $10 spending cutoff results in a lower percentage of unharmed class members because, unsurprisingly, it disproportionately removes low-priced transactions. However, this result is not because the challenged conduct affects low-priced transactions differently (i.e., less). Rather, it is a mathematical artifact of the McFadden-Song model, where low-priced apps have higher but-for prices (thereby resulting in a finding of no harm)—specifically, because those apps are estimated to have negative marginal costs.[78] As I discussed in the 2023 Prince Report, Professor McFadden's model's finding that lower-

---

[74] Deposition of Daniel L. McFadden, December 5, 2022 ("2022 McFadden Deposition"), pp. 216:21–217:22.

[75] 2022 McFadden Deposition, p. 231:12–23.

[76] 2022 McFadden Deposition, pp. 232:6–233:2 ("Q. … For your model to reliably determine whether a given account is harmed or unharmed, is it necessary for you to remove all accounts with $10 or less in lifetime spending from your model estimation? A. In -- in order to analyze the case with -- with this cutoff? Is that the question? Q. In order to reliably determine whether a given account is harmed or unharmed. … THE DEPONENT: The answer is whatever the definition of the class is and what accounts are in the class, I think the model -- the model procedure, the methodology in terms of the data that's used, how it's estimated and how damages are calculated, is -- is applicable, can be -- can be done, and -- there's no -- I see no particular relationship between that and the reliability of the analysis.").

[77] Song Report, ¶ 71 ("The Class is limited to those persons who paid more than $10 in total to Apple during the Class Period for iOS apps and in-app purchases from any one Apple ID. To identify the payors that satisfy this definition, I first merge the supplementary datasets containing payor IDs with the full App Store transactions data to identify the paid App Store transactions attributable to each payor. For each payor, I then calculate the total amount spent on apps and in-app purchases separately for every Apple ID through which they made paid transactions. I include all of a payor's transactions in my calculations if they spent more than $10 through at least one Apple ID.").

[78] See 2023 Prince Report, Exhibits 7 and 8.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

priced apps are frequently associated with a benefit to consumers rather than harm resulted from an assumption in his model, not from empirical analysis.[79]

46. Professor Watson's analysis of but-for prices predicted by the McFadden-Song model for in-app purchases from Free Download Apps with Paid In-App Purchases in the Games genre summarizes this assumed relationship between price and findings of benefit or harm.[80] He shows that apps priced $2.99 or lower would be cheaper in the but-for world, but those priced $3.49 or higher would be more expensive.[81] By construction, payors that spent less than $10 cannot have purchased many expensive items (e.g., they cannot have purchased any item costing more than $10, or more than one item costing more than $5) but could have purchased multiple cheaper items (e.g., up to twenty $0.49 items). In fact, almost half of the transactions that are removed by applying a $10 cutoff in the McFadden-Song model had a price of $0.99 or less.[82] Therefore, while the removal of payors that made only a few low-priced purchases appears to be aimed at reducing the number of unharmed payors, this is misleading because it is Dr. Song's adoption of Professor McFadden's modeling assumptions—rather than any empirical evidence—that make unharmed payors cluster around low price points in the McFadden-Song model.

47. The majority of payors that the spending cutoff removes are actually the ones that the McFadden-Song model would otherwise find to be injured. This result confirms that this cutoff is unconnected to any theory of liability. Plaintiffs allege that consumers are harmed because Apple allegedly restricts their iOS app and in-app purchases to the App Store. Under Plaintiffs' theory of liability, consumers would therefore be harmed whether they spend $10 on apps, $3 on apps, or nothing on apps at all.[83] Yet a consumer's spending determines

---

[79] 2023 Prince Report, ¶ 23 ("In Professor McFadden's model, harm is closely related to marginal costs. If and only if an app's marginal costs are positive will a lower Apple commission mean a lower price, and a conclusion that consumers are harmed in Professor McFadden's view. Because of the strict relationship between prices and implied marginal costs in Professor McFadden's model, higher-priced apps must have higher marginal costs. As a result, higher-priced apps with positive marginal costs lower their prices in the but-for world and generate harm, while lower-priced apps with zero or negative marginal costs do not. I must emphasize that this is ultimately an assumption of Professor McFadden's, not a finding from any analysis. From this perspective, all that remains for his empirical work to do is determine how high the price of an app needs to be (i.e., what is the threshold price) for a given genre and App Store business model, such that one can assume marginal costs, and therefore purported harm, are positive. Consequently, by not considering differences in the demand faced by apps within a genre, Professor McFadden does not show that accounts are harmed in a common manner; instead, he assumes it.").

[80] 2025 Watson Report, Exhibit 10.

[81] Technically, within the McFadden-Song model, these are not prices for a particular in-app item. Because Dr. Song calculates app-level average prices across all items, they are instead average prices for each app's available in-app items. Therefore, the harm or benefit Dr. Song would estimate would depend not only on the price of the individual in-app item actually purchased, but also on the prices of all other items offered by the same app.

[82] 46.7 percent of the transactions removed by applying a $10 cutoff are associated with transactions with a price of $0.99 or less. See Workpaper 7.

[83] See, for example, Song Report, ¶ 18.

whether that consumer belongs in the class. Exhibit 2 shows the payors excluded by applying a $10 spending threshold and whether they were harmed or unharmed in the context of the McFadden-Song model. The spending cutoff does remove over 17 million purportedly unharmed payors. However, as the exhibit shows, the cutoff removes more (23 million) payors that the McFadden-Song model finds have been harmed and therefore (according to the McFadden-Song model) have viable claims.[84]

**EXHIBIT 2**

**Plaintiffs' $10 Threshold Excludes Both Harmed and Unharmed Class Members in the McFadden-Song Model**

| Total Payors Excluded [A] | Harmed Payors Excluded [B] | Unharmed Payors Excluded [C] | Unharmed % of Total Excluded [D]=[C]/[A] |
|---|---|---|---|
| 40,498,263 | 23,155,881 | 17,342,382 | 42.8% |

Source: App Store Transaction Data; McFadden-Song Data Production
Note: Excluded payors consist of all payors that have a net spending of less than or equal to $10 on iPhone and iPad transactions in each of their accounts since July 10, 2008, and that have at least one covered transaction for which Dr. Song estimates a but-for price. Excluding payors that have a net spending of less than or equal to $10 on iPhone and iPad transactions across all accounts since July 10, 2008, and that have at least one covered transaction for which Dr. Song estimates a but-for price leads to 39,985,119 total payors excluded. Of those excluded payors, 43.0 percent (17,207,866 payors) are unharmed. For both cutoff methods, excluded payors' harmed versus unharmed status are evaluated using Dr. Song's estimates for but-for prices under his flexible pricing scenario. Damages across all excluded payors are calculated by applying Dr. Song's app-month consumer overcharge estimates to Dr. Song's App Store transaction data after the data are filtered to exclude: 1.) non-iPhone and non-iPad transactions; 2) free transactions; 3.) transactions associated with Apple-owned or internal developer accounts; 4.) transactions for which the account or the payor is not identified; and 5.) in-app purchases and subscriptions that are dated before the first instance of the purchasing account downloading the corresponding app or if the purchasing account has no record of downloading the corresponding app. Harmed Payors are those with net positive damages. Unharmed Payors are those with net negative or net zero damages.

### 3.4. The Reliability of Dr. Song's Results Depends Upon the Reliability of the Methodology to Identify Payors for Linking to Transactions

48. As noted above, Professor McFadden calculated damages at the level of an *account*, while Dr. Song calculates damages at the level of the *payor*.[85] Dr. Song defines payors as "the persons who paid for any particular transaction."[86] As I have previously explained, a fundamental issue in Professor McFadden's methodology was the attribution of harm to *accounts* rather than to *consumers*.[87] To address this issue, Dr. Song purports to estimate

---

[84] Despite removing more harmed payors, this nonetheless increases the relative proportion of harmed payors because unharmed payors are less common than harmed payors in the McFadden-Song model. If payors with less than $10 in spending were included in the class, there would be 27.0 million unharmed class members (12.0 percent of all class members). See Workpaper 8.

[85] Song Report, ¶ 68. See Section 3.1.3.

[86] Song Report, ¶ 69.

[87] See, for example, 2023 Prince Report, ¶ 46.

harm for transactions aggregated to the unique payor level rather than the account level.[88] In particular, Dr. Song relies upon a declaration (which I understand Plaintiffs later designated to be an expert report) from Darryl Thompson at JND Legal Administration for the deduplication of alleged payors (i.e., the matching of payor records to a single unique payor) in an effort to match transactions to unique payors (consumers) rather than accounts.[89] Dr. Song states that JND Legal Administration analyzed approximately ▉ billion payor records and deduplicated them to identify ▉ million unique payors.[90] The payor records for these purportedly unique payors are associated with approximately ▉ billion transactions.[91] Dr. Song then conducts additional data analysis and concludes that ▉ million payors, with more than ▉ billion transactions, satisfy the class definition.[92]

49. To the extent that payor records have not been properly aggregated, and thus transactions are not assigned to the correct unique payor, Dr. Song cannot reliably determine whether a class member is harmed or to what extent. For example, suppose JND Legal Administration assigns transactions to "Payor A" and "Payor B" as separate unique payors, where Payor A is harmed by $2 and Payor B is unharmed by $5 (that is, Payor B's transactions would, on net, be $5 *more expensive* in the but-for world). If these transactions are actually associated with a single payor rather than two separate payors, that single payor would be unharmed by $3. In this example, the failure to correctly assign transactions to unique payors transforms a single unharmed payor into two separate payors, one harmed and another unharmed. In aggregate, across millions of payors, such deduplication errors would have an ambiguous effect on the total fraction of unharmed class members.

50. I do not have an opinion on the reliability of JND Legal Administration's methodology for identifying unique payors so that they can be linked to transactions. However, if this methodology is found to be unreliable, then Dr. Song's identification of payors in the data, which relies entirely on JND Legal Administration's methodology, and his payor-level damages methodology would be equally unreliable. Any conclusions Dr. Song reaches about which class members are harmed and by how much would therefore be unreliable.

---

[88] See, for example, Song Report, ¶ 71 ("For each payor, I… calculate the total amount spent on apps and in-app purchases separately for every Apple ID through which they made paid transactions. I include all of a payor's transactions in my calculations if they spent more than $10 through at least one Apple ID.").

[89] Song Report, ¶ 70.

[90] Song Report, ¶ 70.

[91] Song Report, ¶ 70.

[92] Song Report, ¶ 74.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

### 3.5. The McFadden-Song Model Cannot Measure the Impact on Consumers of Any Specific Challenged Conduct

51. Professor Stiglitz claims that Apple's conduct has "enabled it to gain and maintain its monopoly power in the aftermarket."[93] He points to three forms of alleged conduct: (a) "exclusionary restrictions on the sale of iOS apps;"[94] (b) the "mandate that developers must use Apple's own proprietary in-app payment system ('IAP') for the sale of in-app content within the app;"[95] and (c) "anti-steering provisions that prohibit developers from directing users to alternative purchase channels outside of the App Store."[96]

52. Professor McFadden asserts that these three forms of conduct—taken together—lead to supracompetitive commissions and prices.[97] He states that "Apple's conduct has allowed it to acquire monopoly power" and "charge a supracompetitive App Store commission" in addition to the other allegedly harmful conduct discussed in Section 3.2.[98] Notably, Plaintiffs' complaint does not include anti-steering as basis for liability. This omission underscores a key flaw: the McFadden-Song model attributes harm to all three forms of conduct without distinguishing among them. When studying damages, it is important to establish a connection between the legal theory of the harmful event and the economic impact of that event.[99] The failure to do so undercuts the usefulness of the McFadden-Song model for calculating harm should any one form of challenged conduct be found to be lawful and / or to create benefits for consumers.

53. The results of the McFadden-Song model and associated estimates of damages are not directly connected—nor does the model apportion harm—to any particular type of

---

[93] Stiglitz Report, ¶ 63.

[94] Stiglitz Report, ¶ 63 and Section III.A.

[95] Stiglitz Report, ¶ 63 and Section III.B.

[96] Stiglitz Report, ¶ 63 and Section III.C.

[97] 2025 McFadden Report, ¶¶ 13–17 ("I find these opinions consistent with the opinions I offered in my class certification reports. First, Apple through its Developer Program License Agreement and App Review Guidelines sets the requirements developers must meet to distribute their products via the App Store….Second, Apple requires that developers distributing their apps through the App Store use Apple's own payment processing system (IAP) when selling their digital in-app content…Third, Apple has enacted as series of anti-steering provisions that insulate its App Store from competitions, at least until January 2024…Together, Apple's conduct has allowed it to acquire monopoly power, the exercise of which has harmed consumers.").

[98] 2025 McFadden Report, ¶ 17.

[99] See Mark A. Allen, et al., "Reference Guide on Estimation of Economic Damages," in *Reference Manual on Scientific Evidence*, Third Edition, (Washington, D.C.: The National Academies Press, 2011), pp. 425–502 at p. 432 ("The first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event … The characterization of the harmful event begins with a clear statement of what occurred. The characterization also will include a description of the defendant's proper actions in place of its unlawful actions and a statement about the economic situation absent the wrongdoing, with the defendant's proper actions replacing the unlawful ones (the but-for scenario).").

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

challenged conduct. Regardless of which aspects of the conduct are ultimately found unlawful, the McFadden-Song model would still give the same result. Specifically, the McFadden-Song model, like Professor McFadden's model before it, predicts but-for prices assuming a different but-for commission rate, which it takes as given.[100] Professor McFadden testified that he had no opinion on the but-for commission rate.[101] In particular, Plaintiffs' counsel instructed Professor McFadden and Dr. Song to assume a but-for commission rate "consistent with the opinions offered by Dr. Abrantes-Metz."[102] However, according to Professor Lorin Hitt, Dr. Abrantes-Metz has failed to articulate how the but-for commission rate would change based on whether the specific challenged conduct is allowed (or not allowed) in the but-for world, and her conclusion that the but-for commission rate would be 13.63 percent independent of which part of Apple's conduct is found to be unlawful is unreliable.[103] This implies that the McFadden-Song model, which relies entirely on Dr. Abrantes-Metz's testimony for the but-for commission rate, will be unable to reliably apportion the putative damages estimate to specific aspects of Apple's alleged misconduct.

54. In addition, if Dr. Abrantes-Metz's conclusion is found to be unreliable, the McFadden-Song model cannot distinguish between harmful, lawful, or procompetitive behavior. This raises the risk of attributing damages to conduct that is both lawful and benefits consumers. This failing undermines the reliability of the putative damages calculations for different possible outcomes in this case. Moreover, if any of the challenged conduct is also found to be associated with benefits to consumers, as I understand other experts have opined is the

---

[100] 2025 McFadden Report, ¶ 8 ("I designed my methodology to estimate the monetary harm caused by Apple's allegedly supracompetitive App Store commission rate."). See also 2025 McFadden Deposition, pp. 90:1–5 ("Q. Does any element of conduct suffice to result in the but-for commission dropping to 13.6 percent? A. That's a question for Professor -- for Dr. Abrantes-Metz."), 95:11–18 ("Q. But doesn't your model need to predict what those prices would be in the but-for world? A. The model operates off the -- Apple's but-for commission, and so the -- your question is you need to have a great deal more detail on the nature of -- of the but-for world to support that but-for commission, and -- and the answer is that's a question for -- for Dr. Abrantes-Metz."), 108:22–109:9 ("[Q.] And my question is: Is it also possible in a competitive but-for world that some consumers will receive fewer privacy and security benefits? … [A.] think the answer to that is that -- that -- that's a legitimate question about the nature of the -- of the competition, and I would turn to Abrantes-Metz and ask in -- in comparable markets, what -- what, in fact, is the nature of these additional dimensions of product quality and are they, in fact, comparable markets in that respect. That -- that, I think -- is again the issue at hand.").

[101] 2022 McFadden Deposition, p. 195:15–21 ("Q. (By Mr. Swanson) Do you have any opinion as to whether Dr. Abrantes-Metz's 13.63 percent but-for commission rate is a reliable estimate? [A.] The answer is I have not read her report, so I have no opinion."); 2025 McFadden Deposition, pp. 49:16–50:4 ("Q. So on the one hand you say you rely on Dr. Abrantes-Metz for the 13.63 percent number, but you also say counsel instructed you to assume that. What is the role of Dr. Abrantes-Metz' conclusion given that instruction from counsel? A. Well, I think Abrantes-Metz would need to testify for the basis for -- for the 13.63 number, and so I'm -- I'm -- relying on counsel's instruction that that's going to be supported by her expert testimony. Q. Are you in any way vouching for the reliability of that number based on your review of her report? A. No, I'm offering no opinion.").

[102] Song Report, ¶ 46. See also 2025 McFadden Report, ¶ 5 ("I have been instructed by Counsel for Consumer Plaintiffs to assume that Apple would charge a 13.63 percent commission on app downloads and in-app purchases made through the App Store absent Apple's alleged anticompetitive conduct. I understand that this commission is consistent with the opinions offered by Dr. Abrantes-Metz.").

[103] 2025 Hitt Rebuttal Report, Section 8.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

case,[104] this creates a significant disconnect between the various kinds of challenged conduct and putative damages.

55. Further, as Professor Watson and I have shown in previous reports, and as I have discussed above, small changes to the McFadden-Song model reveal its instability, leading to substantial changes in both estimated damages and the number of harmed and unharmed consumers.[105] However, Professor McFadden has testified that changes to his model—such as operating at the item level rather than the app level, or if marginal costs for certain transactions should be zero, or if the margin constraints should be different—would make it impossible for the jury to reliably determine the extent of damages.[106] Therefore, if the jury disagrees with Plaintiffs on any of these points, or if certain aspects of Apple's challenged conduct are found to be lawful, then the jury has no method to decide whether all class members—or even most class members, or any particular class member—are damaged.

56. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 13th day of June, 2025.

Jeffrey T. Prince

---

[104] For example, Professor Sundararajan has described several such benefits to consumers. See Opening Expert Report and Declaration of Arun Sundararajan, Ph.D., March 7, 2025, Section VI.

[105] 2023 Prince Report; 2023 Watson Report. For example, I have previously analyzed flawed aspects of Professor McFadden's marginal cost estimates, his "percentage method," his price tier analysis, aspects of his model's treatment of app competition, and his model's treatment of free apps. Professor Watson has demonstrated the flaws with Professor McFadden's margin constraints and shown how changing those constraints impacts putative damages as well as the fraction and identity of unharmed consumers.

[106] 2025 McFadden Deposition, pp. 229:18–231:23 ("Q. If the jury determines that… multiple stores would charge different commission rates, can your model calculate damages?... [A. I]f the -- and she [Dr. Abrantes-Metz] said that these rates would differ by rival, then I don't have a model of operation of rival stores. Q. If the jury determines that developers maximized profits and set their prices not at the app level but at the item level, how would the jury reliably calculate damages based on the evidence from your model?... [A.] The answer is I don't -- I don't think I can do it and I don't think they can do it reliably. Q… If the jury determines that marginal costs are zero for in-app virtual currency transactions, how would the jury reliably calculate damages using your model?... [A.] I don't know -- I don't know how they would proceed. Q… If the jury determines that the margin constraints generally should be set at higher ranges, in other words shifted up, how would the jury reliably calculate damages using your model? A… it would be -- I think beyond -- clearly beyond the capacity of a jury to do or ask for.").

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

**4. Appendix A— CV**

## VITA

### JEFFREY T. PRINCE

2029 S. Hawksmoore Dr.                                    Office: 812-856-2692
Bloomington, IN 47401                                    ostonFax:812-855-3354

E-mail: jeffrey.t.prince@gmail.com
Web page: https://sites.google.com/view/jeffrey-t-prince/home

**PERSONAL INFORMATION**
> Born: April 29, 1976 at Cincinnati, OH
> Citizenship: USA
> Married to Ann Prince
> Children: Katherine Prince, Elizabeth Prince, Henry Prince

**EDUCATION**
> Ph.D.: Economics, Department of Economics, Northwestern University, 2004.
>> Dissertation Title: The Diffusion of Durable Information Technology Products.
>
> M.A.: Economics, Department of Economics, Northwestern University, 2000.
> B.A.: Economics, Miami University, 1998, *Summa Cum Laude*.
> B.S.: Mathematics/Statistics, Miami University, 1998, *Summa Cum Laude*.

**FIELDS OF SPECIALIZATION**
> Primary:        Industrial Organization
> Secondary:    Applied Econometrics, Strategy, Regulation

**ACADEMIC POSITIONS HELD**
> Professor of Business Economics and Public Policy (with tenure), Kelley School of Business, Indiana University, 2017-present.
>
> Harold A. Poling Chair in Strategic Management, Kelley School of Business, Indiana University, 2015-present.
>
> Faculty Affiliate, Indiana University Institute for Corporate Governance and Ethics, 2025-present.
>
> Faculty Affiliate, Indiana University Data Science Program, 2018-present.
>
> Advisory Committee Member, Indiana University Center for Survey Research, 2018-present.
>
> University Fellow at the Technology Policy Institute, 2021-present.
>
> Chairperson, Department of Business Economics and Public Policy, Kelley School of Business, Indiana University, 2016-2019 & 2020-2025.

**SER-346**

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

Co-Director, Kelley Institute for Business Analytics, 2016-2022.

Associate Professor (with tenure) of Business Economics and Public Policy, Kelley School of Business, Indiana University, 2010-2017.

Visiting Scholar, Strategy Department, Kellogg Graduate School of Management, Northwestern University, Summer and Fall, 2015.

Visiting Scholar, Center of Business and Public Policy, McDonough School of Business, Georgetown University, Fall, 2015.

Cathie and Jerry Anderson Faculty Fellow, Kelley School of Business, Indiana University, 2013-2015.

Assistant Professor, Applied Economics and Management, Cornell University, 2004-2010 (promoted to Associate with tenure, July, 2010).

## NONACADEMIC EXPERIENCE

Chief Economist, Federal Communications Commission, 2019-2020.

National Security Agency, Cryptologic Mathematician in Director's Summer Program, Fort George G. Meade, Maryland, Summer 1998.

UNEXT, Consultant and Co-author for Online Masters Business Course in Vertical Integration, Chicago, Illinois, Summer 2001.

Nationwide Insurance, Actuarial Intern, Columbus, Ohio, Summer 1997.

## EDITORIAL POSITIONS

Co-editor, *Journal of Economics and Management Strategy*, 2015-present.

Editorial Board member, *Information Economics and Policy*, 2008-present.

Co-editor, *Journal of Economics and Management Strategy Special Edition on Digital Transformation and the Business Revolution*, 2024.

## BOOKS

*Conglomerates and Ecosystems in the Digital Era*, co-editor with Justin (Gus) Hurwitz and Geoffrey A. Manne, Cambridge University Press, 2025 (expected).

*Managerial Economics and Business Strategy*, *2025 Release*, with Michael R. Baye, McGraw-Hill Education, 2025.

*The Metaverse: What Everyone Needs to Know*, with Scott J. Shackelford, Michael Mattioli, and Joao Marinotti, Oxford University Press, 2025.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

*Managerial Economics and Business Strategy*, 10th *Edition*, with Michael R. Baye, McGraw-Hill Education, 2022.

*Predictive Analytics for Business Strategy: Reasoning from Data to Actionable Knowledge*, McGraw-Hill Education, 2019.

*Managerial Economics and Business Strategy*, 9th *Edition*, with Michael R. Baye, McGraw-Hill Education, 2017.

*Managerial Economics and Business Strategy*, 8th *Edition*, with Michael R. Baye, McGraw-Hill Education, 2014.

## WORKING PAPERS

"Does Market Power Impact Price Partitioning? Evidence from Cleaning Fees and Rental Rates on AirBnB" with Daniel Simon, 2025, in 2nd round at the *Journal of Industrial Economics*.

"Competitive Effects of Joint Ventures in the U.S. International Airline Market", with Hong Lee, Jaehak Lee, and Daniel Simon, 2025.

"The Time Elasticity of Online Variety", with Hong Lee and Shane Greenstein, 2025.

"Economic Assessment of Vertical Integration, with Antitrust Implications for Vertical Mergers", with Robert Kulick and Elena Ramirez Pierce, 2025.

"Do Shared Marketing and Operations within Joint Ventures Have Differential Impacts on Airline Pricing?" with Daniel Simon, Hong Lee, and Jaehak Lee, 2025.

## REFEREED PUBLICATIONS

"Do People Around the World Care Where Their Data Are Stored?" with Scott Wallsten, forthcoming in *Information Economics and Policy*.

"The Business Revolution: Economy-Wide Impacts of Artificial Intelligence and Digital Platforms", with Hanna Halaburda, D. Daniel Sokol, and Feng Zhu, forthcoming in the *Journal of Economics and Management Strategy,* Special Issue on Digital Transformation and the Business Revolution, 33, 2, pp. 269-275, 2024.

"Optimal Promises: Application of a General Framework to Airline Schedule Times", with Daniel Simon, *Journal of Air Transport Management*, 118, 102618, 2024.

"The Effect of Domestic Travel on the Spread of Covid-19 in the U.S.", with Daniel Simon, *Applied Economics Letters*, 31, 11, pp. 992-995, 2024.

"The Effect of International Travel on the Spread of Covid-19 in the U.S.", with Daniel Simon, *Southern Economic Journal*, 90, 2, pp. 224-241, 2023.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

"How Much is Privacy Worth Around the World and Across Platforms?", with Scott Wallsten, *Journal of Economics and Management Strategy*, 31, pp. 841-861, 2022.

"Mobile Internet Usage and Usage Based Pricing", with Shane Greenstein, *Journal of Economics and Management Strategy*, 30, 4, pp. 760-783, 2021.

"Economics at the FCC: 2019-2020", with Allison Baker, Patrick Brogan, Octavian Carare, Nicholas Copeland, Patrick DeGraba, Steven Kauffman, Paul LaFontaine, Catherine Matraves, Sean Sullivan, Patrick Sun, and Emily Talaga, *Review of Industrial Organization*, 57, pp. 827-858, 2020.

"The Persistence of Broadband User Behavior: Implications for Universal Service and Competition Policy", with Andre Boik and Shane Greenstein, *Telecommunications Policy*, 43, 8, 2019.  Extended working version titled: Empirical Economics of Online Attention.

"A Paradigm for Assessing the Scope and Performance of Predictive Analytics", *Information Economics and Policy*, 47, pp. 7-13, 2019.

"Distinguishing Bandwidth and Latency in Households' Willingness-to-Pay for Broadband Internet Speed," with Yu-Hsin Liu and Scott Wallsten (lead article), *Information Economics and Policy*, 45, pp. 1-15, 2018.

"Does Competition Lead to Agglomeration or Dispersion in EMR Vendor Decisions?", with Seth Freedman and Haizhen Lin, *Review of Industrial Organization*, 53, 1, 57-79, 2018.

"Information Technology and Patient Health: Analyzing Outcomes, Populations, and Mechanisms", with Seth Freedman and Haizhen Lin, *American Journal of Health Economics*, 4, 1, 51-79, 2018.

"Measuring Consumer Preferences for Video Content Provision via Cord-Cutting Behavior", with Shane Greenstein, (lead article) *Journal of Economics and Management Strategy*, 26, 2, 293-317, 2017.

"The Impact of Mergers on Quality Provision: Evidence from the Airline Industry", with Daniel Simon, *Journal of Industrial Economics*, 65, 2, 336-362, 2017.

"The Effect of Competition on Toxic Pollution Releases", with Daniel Simon, *Journal of Environmental Economics and Management*, 79, 40-54, 2016.

"Determinants of Private Long-Term Care Insurance Purchase in Response to the Partnership Program", with Haizhen Lin, *Health Services Research*, 51, 2, 687-703, 2016.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

"Do Incumbents Improve Service Quality in Response to Entry:  Evidence from Airlines' On-Time Performance", with Daniel Simon, *Management Science*, 61, 2, 372-390, 2015.

"Does Service Bundling Reduce Churn?", with Shane Greenstein, *Journal of Economics and Management Strategy*, 23, 4, 839-875, 2014.

"Indirect Network Effects and the Quality Dimension: A Look at the Gaming Industry", with Jin-Hyuk Kim and Calvin Qui, *International Journal of Industrial Organization*, 37, 6, 99-108, 2014.

"Is Dual Agency in Real Estate a Cause for Concern?", with Vrinda Kadiyali and Daniel Simon, *Journal of Real Estate Finance and Economics*, 48, 1, pp. 164-195, 2014.

"The Impact of the Partnership Long-term Care Insurance Program on Private Coverage", with Haizhen Lin, *Journal of Health Economics*, 32, 6, pp. 1205-1213, 2013.

"Racial Bias in Expert Quality Assessment: A Study of Newspaper Movie Reviews", with Lona Fowdur and Vrinda Kadiyali, *Journal of Economic Behavior and Organization*, 84, 1, pp. 292-307, 2012.

"The Welfare Impact of Reducing Choice in Medicare Part D: A Comparison of Two Regulation Strategies", with Claudio Lucarelli and Kosali Simon, *International Economic Review*, 53, 4, pp. 1155-1177, 2012.

"Relating Inertia and Experience in Technology Markets: An Analysis of Households' Personal Computer Choices", *Applied Economics*, 43, 29, pp. 4501-4514, 2011.

"Are Risk Preferences Stable across Contexts?  Evidence from Insurance Data", with Levon Barseghyan and Joshua Teitelbaum, *American Economic Review*, 101, 2, pp. 591-631, 2011.

"Is Time Inconsistency Primarily a Male Problem?", with Dan Shawhan, (lead article) *Applied Economics Letters*, 18, 6, pp. 501-504, 2011.

"Has the Internet Accelerated the Diffusion of New Products?", with Daniel Simon, *Research Policy*, 38, 8, pp. 1269-1277, 2009.

"How Do Households Choose Quality *and* Time to Replacement for a Rapidly Improving Durable Good?", *International Journal of Industrial Organization*, 27, 2, pp. 302-311, 2009.

"Multi-market Contact and On-Time Performance in the US Airline Industry", with Daniel Simon, *Academy of Management Journal*, 52, 2, pp. 336-354, 2009.

"Repeat Purchase amid Rapid Quality Improvement: Structural Estimation of the

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

Demand for Personal Computers", (lead article) *Journal of Economics and Management Strategy*, 17, 1, pp. 1-33, 2008.

"Internet Adoption and Usage Patterns are Different: Implications for the Digital Divide", with Avi Goldfarb, (lead article) *Information Economics and Policy*, 20, 1, pp. 2-15, 2008. (Listed as the #1 most cited article for this journal since 2008: http://www.journals.elsevier.com/information-economics-and-policy/most-cited-articles/)

"The Beginning of Online/Retail Competition and Its Origins: An Application to Personal Computers", *International Journal of Industrial Organization*, 25, 1, pp. 139-156, 2007.

"The Diffusion of the Internet and the Geography of the Digital Divide in the United States", with Shane Greenstein, in (eds) Robin Mansell, Chrisanthi Avgerou, Danny Quah, and Roger Silverstone, <u>The Oxford Handbook of Information and Communication Technologies</u>, Oxford University Press, pp. 168-195, 2007.

## EDITED CHAPTERS AND NON-REFEREED PUBLICATIONS

"Ensuring Antitrust Actually Promotes Competition in the Digital Economy: Evaluating Proposed Remedies in the Google Case", with D. Daniel Sokol and Feng Zhu, Computer & Communications Industry Association, 2025.

"Antitrust Economics of Digital Platforms," with D. Daniel Sokol, <u>Cambridge University Press Handbook on Digital Platforms</u>, eds. Dukes, A., Sokol, D., Sun, T., Zhu, F., 2025.

"Information," with Michael R. Baye, <u>Elgar Encyclopedia on the Economics of Competition, Regulation and Antitrust</u>, ed. Noel, M., 2024.

"Coordinated Effects (Merger)," <u>Global Dictionary of Competition Law</u>, eds. Kovacic, W., Whish, R., Healey, D., 2023.

"Empirical Evidence of the Value of Privacy," with Scott Wallsten, *Journal of European Competition Law and Practice*, 12, 8, pp. 648-654, 2021.

"The Economics of Digital Platforms: A Guide for Regulators", with Michael R. Baye, <u>Global Antitrust Institute Report on the Digital Economy</u>, 2020.

"Does Original Content Help Streaming Services Attract More Subscribers?", *Harvard Business Review*, April, 2018.

"Position Statement on Challenges Facing Online Video Distributors", FCC's Video Landscape Workshop, March, 2016.

"The Dynamic Effects of Triple Play Bundling in Telecommunications", Time Warner

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

Research Program on Digital Communications, Winter, 2012.

"The Geographical Diffusion of the Internet in the United States", with Shane Greenstein, in (eds) Munindar Singh, <u>The Practical Handbook of Internet Computing</u>, CRC Press, pp. 56-1 – 56-17, 2004.

## TEACHING EXPERIENCE

Lecturer, 2026 (scheduled).
 Digital Economics for Business (Executive MBA)

Lecturer, 2025-present.
 Digital Economics for Business (Undergraduate)

Lecturer, 2011-2017, 2024.
 Predictive Analytics for Business Strategy (Undergraduate)
Lecturer, 2019-2021.
 Predictive Analytics for Business Strategy II. (MBA)

Lecturer, 2018-2021.
 Predictive Analytics for Business Strategy I. (MBA)

Lecturer, 2016.
 Econometric Methods in Business II (PhD)

Lecturer, Summer 2012-2014.
 Introduction to Economics (Global Business Institute)

Lecturer, 2011.
 Managerial Economics (Undergraduate)

Lecturer, 2010.
 Business Econometrics (Undergraduate)

At Cornell:
Lecturer, 2006-2010.
 Empirical Analysis of Industrial Organization (PhD)

Lecturer, 2005-2010.
 Introduction to Business Regulation (Undergraduate)

Lecturer, 2007-2010.
 Game Theory for Applied Economists (PhD)

Lecturer, Summer 2007.
 Gaming: In the Casino and Beyond (Cornell Adult University)

Guest Lecturer, 2005-2006.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

Graduate Industrial Organization, Empirical methods (PhD)

At Northwestern:
Teaching Assistant, 2000-2004.
Introductory Econometrics, Transportation, Intermediate Microeconomics, Honors Thesis Seminar, Advanced Econometrics.

Lecturer, 2002-2003.
Introductory Econometrics, Accelerated Probability and Statistics.

## FELLOWSHIPS AND AWARDS

Best Research Poster, Research Conference on Communications, Information and Internet Policy, 2015.

Trustees Teaching Award, Indiana University, 2015.

Trustees Teaching Award Finalist, Indiana University, 2012, '13, '14, '15.

Certificate of Excellence in Reviewing, Information Economics and Policy, 2014.

Sauvain Teaching Award Nominee, 2014.

Innovative Teaching Award, Kelley School of Business, 2012.

Young Faculty Teaching Excellence Award, Cornell University, 2008.

Outstanding Graduate Student Teacher Award, Northwestern University, 2004.

Distinguished Teaching Assistant Award, Northwestern University, 2001,'02,'03,'04.

University Summer Fellowship, Northwestern University, 2003.

University Fellowship, Northwestern University, 1999-2000.

Teaching Assistant Fellow, Northwestern University.

George W. Thatcher Prize for top student in economics, Miami University, 1998.

Alumni Senior Prize for outstanding student in mathematics and statistics, Miami University, 1998.

Actuarial Exam P (equivalent based on passing pre-2000 Part 1 and Part 2 exams), 1998.

## GRANTS AND OTHER FUNDING

Advanced Analytics for IU's Addictions Grand Challenge

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

NET Institute Summer Research Grant

Research Data Grant, Kelley School of Business

Time Warner Research Stipend

Cornell's Institute for the Social Sciences Theme Project Faculty Fellow

Cornell Institute for the Social Sciences Small Grant Award

**INVITED PAPER PRESENTATIONS**
"Do People Around the World Care Where Their Data Are Stored?"
- Plamadiso Talk, Weizenbaum Insitut, November, 2024.
- Ostrom Workshop, Indiana University, October, 2024.
- Cornell University, October, 2023.
- University of Nebraska, November, 2022.

"Optimal Promises: Application of a General Framework to Airline Schedule Times"
- International Industrial Organization Conference, May, 2022.

"How Much is Privacy Worth Around the World and Across Platforms?"
- University of Kent, October, 2021.
- Kelley Faculty Research Series, IU Mexico Gateway, May, 2021.
- Game Theoretic and Behavioral Economic Insights on Social Media, February, 2021.
- Research Conference on Communications, Information and Internet Policy, February, 2021.
- NBER Economics of IT and Digitization Workshop, July, 2020.
- FTC PrivacyCon, July, 2020.

"The Effect of International Travel on the Spread of Covid-19 in the U.S."
- Purdue, November, 2020.

"Mobile Internet Usage and Usage Based Pricing"
- Research Conference on Communications, Information and Internet Policy, February, 2021.
- Federal Communications Commission, October, 2020.
- International Industrial Organization Conference, May, 2020.

"A Paradigm for Assessing the Scope and Performance of Predictive Analytics"
- Technology Policy Institute, February, 2018.

"Distinguishing Bandwidth and Latency in Households' Willingness-to-Pay for Broadband Internet Speed"
- Bureau of Economic Analysis, October, 2017.
- Technology Policy Institute, October, 2017.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

- Research Conference on Communications, Information and Internet Policy, September, 2017.

"The Empirical Economics of Online Attention"
- Pomona College, March, 2019.
- Research Conference on Communications, Information and Internet Policy, September, 2017.
- Searle 8th Annual Conference on Internet Commerce, June, 2017.
- Federal Communications Commission, March, 2017.
- Media Economics Workshop, October, 2016.
- University of Oklahoma, September, 2016.
- International Industrial Organization Conference, April, 2016.
- American Economic Association Annual Meetings, January, 2016.
- Kellogg School of Management, November, 2015.
- Georgetown University, October, 2015.
- Research Conference on Communications, Information and Internet Policy, September, 2015.

"Does Competition Lead to Agglomeration or Dispersion in EMR Vendor Decisions?"
- International Industrial Organization Conference, April, 2017.

"The Effect of Competition on Toxic Pollution Releases"
- International Industrial Organization Conference, April, 2015.
- University of California, Davis, March, 2015.

"The Impact of Mergers on Quality Provision: Evidence from the Airline Industry"
- Strategic Management Society Conference "Strategies in a World of Networks," September, 2014.
- International Industrial Organization Conference, April, 2014.

"Measuring Consumer Preferences for Video Content Provision via Cord-Cutting Behavior"
- Cable Show Academic Workshop, April, 2014.
- Research Conference on Communications, Information and Internet Policy, September, 2013.

"Information Technology and Patient Health: Analyzing Outcomes, Populations, and Mechanisms"
- IUPUI, January, 2018
- Purdue University, November, 2014.
- ASHEcon Conference, June, 2014.
- University of Massachusetts, April, 2014.
- International Industrial Organization Conference, April, 2014.
- NBER Economics of IT and Digitization Workshop, July, 2013.

**SER**-355

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

"Indirect Network Effects and the Quality Dimension: A Look at the Gaming Industry"
- Indiana University Economics Department, November, 2013.
- International Industrial Organization Conference, May, 2013.

"Does Service Bundling Reduce Churn?"
- NBER Economics of IT and Digitization Workshop, July, 2012.
- International Industrial Organization Conference, March, 2012.
- Federal Trade Commission, March, 2012.
- Michigan University, November, 2011.
- Research Conference on Communications, Information and Internet Policy, September, 2011.

"The Impact of the Partnership Long-term Care Insurance Program on Private Coverage"
- University of Cincinnati, October, 2012.

"Do Incumbents Improve Service Quality in Response to Entry:  Evidence from Airlines' On-Time Performance"
- Ohio State University, November, 2012.
- Econometric Society North American Summer Meeting, June, 2011.
- Temple University, November, 2010.
- Miami University, October, 2010.
- International Industrial Organization Conference, May, 2010.

"Has the Internet Accelerated the Diffusion of New Products?"
- Bureau of Economic Analysis, November, 2009.

"Are Risk Preferences Stable across Contexts?  Evidence from Insurance Data"
- Econometric Society North American Summer Meeting, June, 2008.

"Multi-market Contact and On-Time Performance in the US Airline Industry"
- International Industrial Organization Conference, May, 2008.

"The Welfare Impact of Reducing Choice in Medicare Part D: A Comparison of Two Regulation Strategies"
- ASHEcon Conference, June, 2010.
- International Industrial Organization Conference, April, 2009.
- Federal Trade Commission, March, 2008.

"Is Dual Agency in Real Estate a Cause for Concern?"
- International Industrial Organization Conference, May, 2008.
- Midwest Economic Association Annual Meeting, March, 2008.

"Internet Adoption Patterns and Usage are Different: Implications for the Digital Divide"
- University of Maryland, April, 2007.
"How Do Households Choose Quality and Time to Replacement for a Rapidly Improving Durable Good?"

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

- Kelley School of Business, February, 2010.
- Duke University, September, 2007.
- Cornell University, September, 2007.
- Econometric Society North American Summer Meeting, June, 2007.
- International Industrial Organization Conference, April, 2007.

"Relating Inertia and Experience in Technology Markets: An Analysis of Households'
Personal Computer Choices"
- Dartmouth Winter IO Conference, January, 2006.

"The Beginning of Online/Retail Competition and Its Origins: An Application to
Personal Computers"
- International Industrial Organization Conference, April, 2006.
- Cornell University, March, 2006.
- ASSA SGE, January, 2006.

"Repeat Purchase amid Rapid Quality Improvement: Structural Estimation of the
Demand for Personal Computers"
- Penn State University, April, 2007.
- Econometric Society World Conference, August, 2005.
- International Industrial Organization Conference, April, 2005.
- Miami University, March, 2005.
- ASSA SGE, January, 2005.
- Duke University, November, 2004.
- Cornell University, November, 2004.
- NBER Summer Institute, July, 2004.

## EXPERT PANELS AND ENGAGEMENTS

Future of Regulation and Quasi-regulation, USC/Analysis Group Antitrust Conference,
June, 2025.

The Economic Impact of Artificial Intelligence, Technology Policy Institute, Aspen
Forum, August, 2024.

Panel on Unilateral Conduct, NERA Antitrust and Regulation Seminar, July, 2024.

AI Policy and Regulation: Balancing Consumer Protection and Innovation, NABE
Tech Economics Conference, November, 2023.

Panel on the Economics of Privacy, Research Conference on Communications,
Information and Internet Policy, September, 2023.

Panel on Privacy Law, Policy and Consumer Preferences, Technology Policy Institute
Aspen Forum, August, 2023.

Panel on Breaking Developments in Damages Calculations, Litigating Patents and Trade

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

Secret Remedies Summit, January, 2023.

Antitrust: Overview and Recent Developments, University of Nebraska Tech Policy Forum, January, 2023.

Econometrics for Policy Makers, University of Nebraska Tech Policy Forum, January, 2023.

Research Roundtable on Regulating Privacy, George Mason University, December, 2022.

Do People Care Where Their Data Are Stored?  Tech Refactored Podcast, Nebraska Governance and Technology Center, November 2022.

Advertising Markets: Is the Current Ecosystem Stimulating Competition?  Concurrences' Global Antitrust Economics Conference, November, 2021.

Damages from Data Breach and Misuse of Personal Information, Brattle Group, October, 2021.

Broadband Mapping Roundtable, Technology Policy Institute, October, 2021.

Panel on Competition and Innovation, 14th Annual Innovation Economics Conference, August, 2021.

Privacy, Please? American Bar Association Panel on Valuing Privacy, April, 2021.

Two Think Minimum Podcast with Scott Wallsten and Sarah Oh, Technology Policy Institute, February, 2021.

Panel on the Economy of Spectrum Sharing and Business Development, NSF Virtual Workshop on New Paradigms in Intelligent Spectrum Management and Regulations, December, 2020.

Scientific Sense Podcast Interview with Gill Eapen, October, 2020.

Panel on the Attention Economy, Technology Policy Institute Aspen Forum, October, 2020.

Panel on Antitrust Policy and Intellectual Property (moderator), Northwestern/USPTO Conference on Innovation Economics, August, 2020.

Panel on STELAR/Retransmission Consent, Phoenix Center Telecom Symposium, December, 2019.

BU Technology Policy Research Initiative Conference on the Law and Economics of IP, July, 2019.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

FTC Merger Retrospective Hearing, Federal Trade Commission, April, 2019.

Panel on Consumer Protection and Regulation, Maurer School of Law, March, 2018.

Terminator or the Jetsons? The Economics and Policy Implications of Artificial Intelligence, Technology Policy Institute, February, 2018.

All Data is Health Data; The Impact of Data and Data Laws on Clinical Care, Innovation, and Research, Symposium at Hall Center for Law and Health, October, 2017.

Tools of Damages Estimation, IPO's Damages and Injunctions Committee Conference, June, 2017.

The Unlikely Pairing of Payers, Providers and Pharma for Patient Centered Analytics, Kelley Forum on Healthcare Analytics, September, 2016.

Challenges Faced by Online Video Distributors, Federal Communications Commission Video Landscape Workshop, March, 2016.

The Future of Video Policy and Business Models, hosted by the Technology Policy Institute, January, 2014.

**PUBLIC SPEECHES**
"State of the Economy"
- Mechanical Contractor Association of Indiana Annual Meeting, June, 2022.

"IoT and Telecom Policy"
- Nelms Distinguished E-Seminar Series, University of Florida, October, 2020.

"Delivering Econometrics Skills within a Business Analytics Curriculum"
- Robert Morris Teaching Economics Conference, February, 2018

"Critical Assessment of Correlation vs. Causality for Business Decisions"
- 180 Degrees Consulting, Indiana University, February, 2017

"Bringing Repeated Games to Life via Empirical Examples"
- McGraw-Hill Education Fall INXPO Event, October, 2016
- University of Phoenix School of Business Symposium, March, 2016
- McGraw-Hill Education Teaching Workshop for Professional Development, March, 2013

"Critical Assessment of Correlation vs. Causality for Public Policy"
- Vietnam Initiative with Indiana University, October, 2015

"As Graduates of Elder, You are Ready…"

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

- Cincinnati Elder High School Graduation Commencement, May, 2005

## PUBLIC COMMENTARY

"Citizens Around the World Have Similar Data Privacy Preferences, At Least Relatively", with Scott Wallsten, Technology Policy Institute blog, October, 2024

"Privacy Preferences Differ by Gender and Age, But Not by Income", with Scott Wallsten, Technology Policy Institute Blog, November, 2023.

"Conflict of Interest and Platforms," Comment on DOJ and FTC Draft Merger Guidelines, with Avigail Kifer, public submission to antitrust agencies, September, 2023.

"Comment on the January 2022 DOJ and FTC RFI on Merger Enforcement: Issues Related to Digital Markets," with Lesley Chiou, Nathanial Hipsman, and Sachin Sancheti, public submission to antitrust agencies, March, 2022.

"People Lie When Answering Polls. Here's How to Fix It", with Scott Wallsten, *Technology Policy Institute Blog*, January, 2021.

"Travelers Coming from Italy May Have Driven First US Covid-19 Wave More Than Those From China, Study Suggests", with Daniel Simon, *The Conversation*, January, 2021.

"Improved Economic Analysis Should Be Lasting Part of Pai's FCC Legacy", with Babette Boliek and Jerry Ellig, *The Hill*, December, 2020.

"FCC Comments on Vertical Merger Guidelines," with Giulia McHenry, Patrick DeGraba, Eric Ralph, Catherine Matraves, Eugene Kiselev, and Aleksandr Yankelevich, February, 2020.

## MEDIA COVERAGE

Specific Papers/Books/Public Commentary:

"Travelers Coming from Italy May Have Driven First US Covid-19 Wave More Than Those From China, Study Suggests," the *Conversation*, January, 2021.
- Reprint in Associated Press, Yahoo News

"How Much is Privacy Worth Around the World and Across Platforms?"
- "Facebook Would have to pay $3.50 Per Month to U.S. Users for Sharing Contact Info: Study" by Nandita Bose, *Reuters*, February 25, 2020. Reprint in *NY Times*.

"A Paradigm for Assessing the Scope and Performance of Predictive Analytics"

43 of 57

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

- "A Paradigm for Assessing the Scope and Performance of Predictive Analytics – Economic and Policy Implications of AI," by Wallis G. Romzek, Technology Policy Institute, April 17, 2018.

"Does Original Content Help Streaming Services Attract More Subscribers?"
- "Will Netflix Win the Streaming Wars?", Louis Foglia, BEME News, August, 2019.
- "Streaming Video: Original Content is the Hook," by David Marino-Nachison, Barron's Next, April 25, 2018.

Predictive Analytics for Business Strategy
- "Kelley Professor's New Book 'Actively' Advocates the Role of Economics within Today's Analytics Boom," by George Vlahakis, Kelley School official blog, March 27, 2018.

"The Impact of Mergers on Quality Provision: Evidence from the Airline Industry"
- "Flight Delay? Lost Luggage? Don't Blame Airline Mergers, Research Shows," by George Vlahakis, reprinted in *Science Daily*, May 23, 2017.

"The Empirical Economics of Online Attention"
- "We Spend a Fixed Amount of Time Online Each Week (But People with Higher Incomes Spend Less)," by Julia Hann, Forbes, September 14, 2016.
- "Let Them Eat Internet," by Tyler Cohen, *Marginal Revolution*, July 19, 2016.
- "Consumers Have a Troubling Internet Habit That's Threatening Digital Media," by Myles Udland, *Business Insider*, July 19, 2016.
- "Richer People Spend Less Time on the Internet," by Allee Manning, *Vocativ*, July 19, 2016.

"The Impact of the Partnership Long-term Care Insurance Program on Private Coverage"
- "The Boomer Challenge: It's a Numbers Game," by Paul Barr, *Hospitals and Health Networks*, April 8, 2014.

"Do Incumbents Improve Service Quality in Response to Entry: Evidence from Airlines' On-Time Performance"
- "Study Finds That Competition May Lead to More Airline Delays," by Hugo Martin, *LA Times*, December 22, 2013.

"Racial Bias in Expert Quality Assessment: A Study of Newspaper Movie Reviews"
- "Psychology Uncovers Racism at the Movies," by Dr. Raj Persaud and Adrian Furnham, *Psychology Today*, September 5, 2015.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

- "Men in Black the movie – but men in white would be a better film?," by Dr. Raj Persaud and Adrian Furnham, *Huffington Post*, May 22, 2012.

"The Welfare Impact of Reducing Choice in Medicare Part D: A Comparison of Two Regulation Strategies"
- "Medicare As We've Known It Isn't an Option," by Betsy McCaughey, *Wall Street Journal*, April 27, 2011.

"Internet Adoption Patterns and Usage are Different: Implications for the Digital Divide"
- "People below 'digital divide' would use the Internet more, if they had it," by Bill Steele, *Cornell Chronicle*, April 18, 2008.
- Invited guest for "Digital Divide," *Nevada Public Radio*.

Expert Opinion:
"ISP/Website 'Mutuality of Interests' – or Retrans Blackouts – Among Net Neutrality Reversal Possibilities," *Communications Daily*, Vol. 34, No. 17, January, 2014.

## PROFESSIONAL SERVICE

Miami University Economics Advisory Board, 2023-present.

BEPP Faculty Research Awards Committee, 2022-present.

NBER Small Digitization Grants Review Committee, 2022.
Research Conference on Communications, Information and Internet Policy (TPRC) Program Committee, 2017-2021.

International Industrial Organization Conference (IIOC) Local Organizer, 2018.

Midwest Health Economics Conference Local Organizing Committee, 2016.

European Conference on Information Systems (ECIS) Associate Editor of the track "Decision Analytics, Big Data, and Visualization," 2016.

International Conference on Information Systems (ICIS) Associate Editor of the track "Decision Analytics, Big Data, and Visualization," 2014.

International Industrial Organization Conference (IIOC) Program Committee, 2012-2014.

Ad hoc referee for:
*Agricultural and Resource Economics Review, American Economic Journal: Applied Economics, American Economic Review, Applied Economics, Applied Economics Letters, Applied Financial Economics, B.E. Journal of Economic Analysis & Policy,*

**SER-362**

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

*Communications of the Association for Information Systems, Economic Inquiry, Economics of Education Review, Economics of Innovation and New Technology, Economics Letters, European Journal of Law and Economics, Geneva Papers on Risk and Insurance, Growth and Change: A Journal of Urban and Regional Policy, Health Economics, Health Services Research, Information Economics and Policy, Inter-America Development Bank, International Economic Review, International Journal of Industrial Organization, Israel Science Foundation, Journal of Air Transport Management, Journal of Banking and Finance, Journal of Competition Law and Economics, Journal of Economics and Business, Journal of Economics and Management Strategy, Journal of the European Economic Association, Journal of Gerontology, Journal of Health Economics, Journal of Industrial Economics, Journal of Policy Analysis and Management, Journal of Political Economy, Journal of Political Economy Microeconomics, Journal of Public Economics, Journal of Risk and Insurance, Journal of Rural Studies, Journal of Urban Technology, Leverhulme Trust, Management Science, Marketing Science, National Science Foundation, North American Journal of Economics and Finance, Organizational Science, Oxford Bulletin of Economics and Statistics, Quantitative Marketing and Economics, Quarterly Journal of Economics, Quarterly Review of Economics and Finance, RAND Corporation, RAND Journal of Economics, Research Policy, Review of Economics and Statistics, Review of Industrial Organization, Review of Network Economics, Risk Management and Insurance Review, Social Behavior and Personality, Southern Economic Journal, Strategic Management Journal, Telecommunications Policy, Telematics and Informatics, Transportation Research Part E, U.S.-Israel Binational Science Foundation, World Development*

External tenure/promotion/reappointment reviewer for:
> Boston University, City University of Hong Kong, Cornell University, Drexel University, Emory University, Fairfield University, Georgetown University, Imperial College London, Loyola University Maryland, Pomona College, Purdue University, Stanford University, University of Central Florida, University of Colorado, University of Georgia, University of Massachusetts, University of Oklahoma, University of Oregon

External program reviewer for:
> Ball State University Economics

## DISCUSSANT ACTIVITIES

Platform Dynamics Roundtable, November, 2023
- "Self-Preferencing at Amazon: Evidence from Search Rankings," by Chiara Farronato, Andrey Fradkin, and Alexander MacKay

International Industrial Organization Conference, April, 2023
- "Platform Information Design and Competitive Price Targeting," by Ruiqi Wu, Yufeng Huang, and Nan Li

International Industrial Organization Conference, May, 2022

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

- "Conflicts of Interest, Ethical Standards, and Competition in Legal Services," by Jan Bouckaert and Johan Stennek

NBER Economics of Digitization Summer Institute Meeting, July, 2021
- "Browsers Don't Lie? Gender Differences in the Effects of Covid-19 Lockdowns on Digital Activity and Time Use," by Amalia R. Miller, Kamalini Ramdas, and Alp Sungu
- "Does Telemedicine Transcend Disparities or Create a Digital Divide? Evidence from the Covid-19 Pandemic," by Jeffrey McCullough, Kartik K. Ganju, and Chandy Ellimoottil

NBER Economics of Digitization Summer Institute Meeting, July, 2018
- "Steering Incentives and Bundling Practices in the Telecommunications Industry," by Brian McManus, Aviv Nevo, Zachary Nolan, and Jonathan W. Williams

International Industrial Organization Conference, April, 2017
- "Price-Linked Subsidies and Health Insurance Markups," by Sonia Jaffe and Mark Shepard

NBER Economics of Digitization Meeting, March, 2017
- "Using Massive Online Choice Experiments to Measure Changes in Well-being," by Erik Brynjolfsson, Felix Eggers, and Avinash Gannamaneni

International Industrial Organization Conference, April, 2016
- "Using Matching to Study Merger: An Application to the U.S. Airline Industry," by Zexuan Liu, Pallab Ghosh, and Qihong Liu
- "Market Structure with the Entry of Peer-to-Peer Platforms: The Case of Hotels and Airbnb," by Chiara Farronato and Andrey Fradkin

Searle Center Conference on Innovation Economics, June, 2015
- "How Do Open Standards Influence Inventive Activity? Evidence from the IETF," by Wen Wen, Chris Forman, and Sirkka Jarvenpaa

Searle Center Conference on Internet Search and Innovation, June, 2015
- "Match Quality, Search, and the Internet Market for Used Books," by Sara Fisher Ellison
- "E-Book Pricing and Vertical Restraints," by Babur De los Santos and Matthijs Wildenbeest

International Industrial Organization Conference, April, 2015
- "Do Private Medicare Firms Face Lower Costs?," by Keaton Miller
- "The Market for Electric Vehicles: Indirect Network Effects and Policy Impacts," by Yiyi Zhou

Searle Center Research Roundtable on Patents and Technology Standards: The Data Sets, April, 2015

47 of 57

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

American Economic Association Annual Meetings, Pricing and Resource Allocation in Telecommunications, January, 2015
- "Employing Auctions to Allocate Scarce Resources," by John Mayo and David Sappington

American Economic Association Annual Meetings, Digital Media Economics, January, 2015
- "Super Returns? The Effects of Ads on Product Demand," by Seth Stephens-Davidowitz, Hal Varian, and Michael D. Smith

Searle Center Conference on Internet Search and Innovation, June, 2014
- "Auction vs. Posted-Price: Market Mechanism, Lender Behaviors, and Transaction Outcomes in Online Crowdfunding," by Zaiyan Wei and Mingfeng Lin

Research Roundtable on the Law and Economics of Digital Markets, July, 2013
- "Digital Music Consumption on the Internet," by Bertin Martens and Luis Aguiar

Searle Center Conference on Internet Search and Innovation, June, 2013
- "When Does Retargeting Work? Information Specificity in Online Advertising," by Anja Lambrecht and Catherine Tucker
- "Local News Online: Aggregators, Geo-Targeting and the Market for Local News," by Lisa George

International Industrial Organization Conference, May, 2013
- "The Impact of Privacy Policy on the Auction Market for Online Display Advertising," by Garrett Johnson
- "Transactions in Two-Sided Markets," by Alexei Alexandrov and Daniel Spulber

American Economic Association Annual Meetings, Economics of the Internet, January, 2013
- "Supply-Side Responses to Privacy Protection," by Avi Goldfarb and Catherine Tucker

Searle Center Book Preview Roundtable, December, 2012
- *Innovation from the Edges: The Economics of Creating the Commercial Internet,* by Shane Greenstein

Searle Center Conference on Internet Search and Innovation, June, 2012
- "News Aggregators and Competition among Newspapers," by Doh-Shin Jeon and Nikrooz Nasr Esfahani

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

- "Technology Shocks in Multi-Sided Markets: The Impact of Craigslist on Local Newspapers," by Robert Seamans and Feng Zhu

Midwest Health Economics Conference, May, 2012
- "The Anticipatory Effects of Medicare Part D on Drug Utilization," by Abby Alpert

International Industrial Organization Conference, March, 2012
- "Intra-Household Effects on Demand for Telephone Service: Empirical Evidence," by Ching-I Huang
- "Unobserved Risk Type and Sorting: Signaling Game in Online Credit Markets," by Kei Kawai, Ken Onishi, and Kosuke Uetake

NBER Economics of Digitization Meeting, February, 2012
- "The Effect of Localization in News Aggregators on Local News Consumption," by Susan Athey and Markus Mobius

Federal Trade Commission Microeconomics Conference, November, 2011
- "Do Firms Game Quality Ratings? Evidence from Mandatory Disclosure of Airline On-Time Performance," by Silke Forbes, Mara Lederman, and Trevor Tombe

International Industrial Organization Conference, May, 2010
- "Competition in Public School Districts: Student Sorting, School Quality Determination, and School Entry," by Nirav Mehta
- "A Model of Entry and Network Access Competition in Local Telephony," by Gustavo Marcos and Eduardo Saavedra

International Industrial Organization Conference, April, 2009
- "Consumer Search and Online Demand for Durable Goods," by Jun Kim, Bart Bronnenberg, and Paulo Albuquerque
- "Price Controls and Competition in Gasoline Retail Markets," by Juan Esteban Carranza and J.F. Houde

International Industrial Organization Conference, May, 2008
- "A Simple Model of Pricing for Non-storable Goods in Oligopoly: Some Considerations on Airline Pricing Behaviour," by Marco Alderighi

International Industrial Organization Conference, April, 2007
- "Markov Perfect Industry Dynamics with Many Firms," by Gabriel Weintraub

International Industrial Organization Conference, April, 2006
- "Price, Price Dispersion and Number of Sellers at a Low Entry Cost Shopbot," by Michelle Haynes and Steve Thompson

International Industrial Organization Conference, April, 2005

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

- "Asymmetric Advertising Costs as a Barrier to Entry: Evidence from Theatrical Motion Pictures," by Charles Moul

**BOOK REVIEWS**

Tucker, C. and Marthews, A., *You'll Pay for That: Payment Systems, Privacy, and Political Dissent*, MIT Press, 2023.

Bekes, G. and Kezdi, G., *Patterns, Causality and Prediction: Data Analysis for Business, Economics and Policy*, Cambridge University Press, 2017.

Lesser, W., *American Business Regulation: Understand, Survive, and Thrive*, M.E. Sharpe, 2015.

**CONSULTING AND EXPERT WITNESS WORK**

Expert reports, deposition, testimony and consulting for various matters including:
Competition policy and antitrust
Consumer protection
Damages calculations
Intellectual property
Privacy valuation
Survey design and analysis
Telecommunications policy

**MEMBERSHIPS**

American Economic Association.

Industrial Organization Society.

Academy of Management.

Association for Information Systems.

Team member for Cornell's Institute for the Social Sciences Theme Project, Getting Connected: Social Science in the Age of Networks, 2005-2008.

**UNIVERSITY SERVICE**

Member of Subcommittee for Department Research Award, 2023-present.

Member of Indiana Business Research Center Executive Director Search Committee, 2021-2022.

Member of Diversity, Equity & Inclusion Task Force, 2020-2021.

Member of Hiring Committee for Business Economics and Public Policy, 2017-2018, 2015-2016 & 2010-2011.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

Chair of Hiring Committee for Business Economics and Public Policy, 2014-2015 & 2013-2014.

Kelley Direct Policy Committee, 2014-2016.

Judge for Kelley Honors Case Competition, 2016.

Judge for Deloitte Undergraduate Case Competition, 2017, 2015, 2011.

Co-founder and Judge for Economic Consulting Case Competition (EC3), sponsored by the Keystone Group, 2011-2015.

Co-founder and Co-organizer for BEPP "Eat, Meet, & Compete," 2012-2015.

Undergraduate Policy Committee, 2012-2014 & 2010-2011.

Doctoral Advisor for Business Economics and Public Policy, 2011-2012.

Doctoral Policy Committee, 2011-2012.

Judge for Net Impact Sustainable Business Club 2010 Case Competition, 2010.
*At Cornell:*
Applied Economics and Management Petitions Committee, 2007-2010.

Policy Analysis and Management External Hiring Committee, 2006-2007 & 2009-2010.

Mann Café Advisory Board, 2007-2010.

Institute for the Social Sciences Small Grant Program Committee, 2008.

Biz Quiz Faculty Advisor, 2008.

Applied Economics and Management Seminar Committee, 2005-2007.

Judge for Globalize '07, Cornell Hotel School, 2007.

Mann Library Vendor Evaluation Sub-committee, 2006.

**PHD STUDENTS**
*Committee Chair:*
Hong Lee
Aparna Soni
Yu-Hsin Liu
Yejing Ren
Junlin Du (Co-chair)
Fernanda Lopez de Leon

**SER-368**

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

*Committee Member:*
Ningning Guo
Abhishek Ganguly
Catalin Stefanescu
Susan Kayser
Eric Schmidbauer
Shyam Venkatesan
Carlos Castelan
Joo Yeon Sun
Annemie Maertens (Substitute member)
Thanasin Tanompongphandh
Jiahong Zhang
Lona Fowdur
Anirban Mukherjee
Marc Bellemare (Substitute member)
Hyunkyung Choe
Daniel Shawhan

*External Proposal Reviewer:*
Andres Jola Sanchez (chair)
Mohammad Ghuloum
Kyle Bradley

**MASTERS STUDENTS**
*Committee Member:*
Malcolm Wade (Johns Hopkins, Systems Engineering)

**SER**-369

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

**5. Appendix B—Prior Testimony**

## Prior Four Years of Testimony

### JEFFREY T. PRINCE

Alasdair Turner et al. v. Apple, Inc. (Case No. 5:20-cv-07495-EJD), United States District Court of California San Jose Division, March 25, 2025.

Inform Inc. v. Google LLC, Alphabet Inc., and Youtube LLC (Case No. 1:23-cv-01530), United States District Court Southern District of New York, March 14, 2025.

Briefing to the New York Attorney General's Office, on behalf of Lycamobile, Regarding T-Mobile Threats to MVNO Competition, June 4, 2024.

Briefing to the Department of Justice and Monitoring Trustee, on behalf of Lycamobile, Regarding T-Mobile Threats to MVNO Competition, May 24, 2024.

Briefing to Federal Communications Commission, on behalf of Lycamobile, Regarding T-Mobile Threats to MVNO Competition, May 15, 2024.

Langer et al. v. CME Group, Inc. et al. (Case No. 2014-CH-00829), Circuit Court of Cook County, November 14, 2023.

REX v. Zillow, Trulia, NAR (Case No. 2:21-cv-00312-TSZ), United States District Court Western District of Washington at Seattle, May 19, 2023.

Apple iPhone Antitrust Litigation (Case No. 4:11-cv-06714-YGR), United States District Court for the Northern District of California Oakland Division, April 12, 2023

Walter Peters et al. v. Apple, Inc. (Case No. 19STCV21787), Superior Court for the State of California County Los Angeles, September 12, 2022

Hachette Book Group, Inc. et al. v. Internet Archive (Case No. 1:20-cv-04160-JGK-OTW), United States District Court Southern District of New York, June 9, 2022

Dennis McGrath et al. v. Marriott International, Inc. et al. (Case No. 8:19-cv-00368-PWG), United States District Court of Maryland Southern Division, March 21, 2022

Dennis McGrath et al. v. Marriott International, Inc. et al. (Case No. 8:19-cv-00368-PWG), United States District Court of Maryland Southern Division, December 23, 2021

Theta IP, LLC v. Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (Case No. 6:20-cv-00160-ADA), United States District Court for the Western District of Texas Waco Division, October 28, 2021

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

Apple iPhone Antitrust Litigation (Case No. 4:11-cv-06714-YGR), United States District Court for the Northern District of California Oakland Division, October 4, 2021

Dennis McGrath et al. v. Marriott International, Inc. et al. (Case No. 8:19-cv-00368-PWG), United States District Court of Maryland Southern Division, August 13, 2021

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

## 6. Appendix C—Documents Relied Upon List

**Academic Articles**

- Daniel Ershov, "Variety-Based Congestion in Online Markets: Evidence from Mobile Apps," *American Economic Journal: Microeconomics*, 16(2), 2024, pp. 180–203

- Federico Etro, "Device-Funded vs Ad-Funded Platforms," *International Journal of Industrial Organization*, 75(5), 2021, pp. 1–18

- Richard Gilbert, "Looking for Mr. Schumpeter: Where Are We in the Competition-Innovation Debate?" *Innovation Policy and the Economy*, 6, 2006, pp. 159–215

- Thomas W. Quan and Kevin R. William, "Product Variety, Across-Market Demand Heterogeneity, and the Value of Online Retail," *The RAND Journal of Economics*, 49(4), 2018, pp. 877–913

**Books and Book Chapters**

- Kenneth E. Train, *Discrete Choice Methods with Simulation*, Second Edition, (Cambridge, England: Cambridge University Press, 2009)

- Mark A. Allen, et al., "Reference Guide on Estimation of Economic Damages," in *Reference Manual on Scientific Evidence*, Third Edition, (Washington, D.C.: The National Academies Press, 2011), pp. 425–502

**Data Sources**

- App Store Transaction Data

**Declarations**

- Declaration of Jeffrey T. Prince, Ph.D., in Support of Apple's Motion to Exclude Reply Opinions of Daniel L. McFadden, November 9, 2021

- Declaration of Daniel L. McFadden in Support of Plaintiffs' Opposition to Defendant Apple Inc.'s *Daubert* Motion to Exclude Reply Testimony of Professor Daniel L. McFadden, November 23, 2021

- Supplemental Declaration of Jeffrey T. Prince, Ph.D., in Support of Apple's Motion to Exclude Reply Testimony of Daniel L. McFadden, November 30, 2021

- Reply Declaration of Jeffrey T. Prince, Ph.D., in Support of Apple's *Daubert* Motion, June 30, 2023

- Declaration of Jeffrey T. Prince, Ph.D., in Support of Apple's Opposition to Plaintiffs' Motion to Modify Class Definition, April 29, 2025

- Declaration of Minjae Song, Ph.D., in Support of Plaintiffs' Motion to Modify Class Definition and Approve Notice to the Class, May 6, 2025

**Depositions**

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

- Deposition of Daniel L. McFadden, November 5, 2021

- Deposition of Daniel L. McFadden, December 5, 2022

- Deposition of Daniel L. McFadden, May 14, 2025

- Deposition of Joseph Stiglitz, May 30, 2025

- Deposition of Minjae Song, Ph.D., June 4, 2025

**Expert Reports**

- Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, June 1, 2021

- Expert Report and Declaration of Jeffrey T. Prince, Ph.D., August 10, 2021

- Reply Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, October 19, 2021

- Supplemental Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, September 26, 2022

- Revised Supplemental Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, December 30, 2022

- Revised Supplemental Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, January 19, 2023

- Expert Report and Declaration of Jeffrey T. Prince, Ph.D., March 10, 2023

- Expert Report and Declaration of Mark Watson, Ph.D., March 10, 2023

- Expert Report of Daniel L. McFadden, Ph.D., March 7, 2025

- Expert Report of Jospeh E. Stiglitz, Ph.D., March 7, 2025

- Expert Report of Minjae Song, Ph.D., March 7, 2025, with backup materials

- Opening Expert Report and Declaration of Arun Sundararajan, Ph.D., March 7, 2025

- Opening Expert Report and Declaration of Itamar Simonson, Ph.D., March 7, 2025

- Opening Expert Report and Declaration of Lorin M. Hitt, Ph.D., March 7, 2025

- Rebuttal Expert Report and Declaration of Mark Watson, Ph.D., June 13, 2025

- Rebuttal Expert Report and Declaration of Itamar Simonson, Ph.D., June 13, 2025

- Rebuttal Expert Report and Declaration of Lorin M. Hitt, Ph.D., June 13, 2025

**Legal Documents**

- Order Denying Plaintiffs' Motion for Class Certification Without Prejudice; Granting in Part and Denying in Part Apple's *Daubert* Motions to Exclude Testimony of

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

Professor Daniel L. McFadden, *In Re Apple iPhone Antitrust Litigation*, March 29, 2022

- Letter from Daniel G. Swanson (Gibson Dunn) to Rachele R. Byrd (Wolf Haldenstein Alder Freeman & Herz LLP), "Re: *In Re Apple iPhone Antitrust Litigation*, Case No. 4:11-cv-06714-YGR (N.D. Cal.)," February 27, 2023

- Order Denying Apple's *Daubert* Motion to Exclude the Testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz; and Granting Plaintiffs' Motion for Class Certification, *In Re Apple iPhone Antitrust Litigation*, February 2, 2024

- Plaintiffs' Notice of Motion and Motion to Modify Class Definition and Approve Notice to the Class; Memorandum of Points and Authorities in Support, *In Re Apple iPhone Antitrust Litigation*, April 15, 2025

- Order Granting in Part Motion to Modify Class, *In Re Apple iPhone Antitrust Litigation*, June 11, 2025

# EXHIBIT 9

SER-375

THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

CAELI A. HIGNEY, SBN 268644
  chigney@gibsondunn.com
JULIAN W. KLEINBRODT, SBN 302085
  jkleinbrodt@gibsondunn.com
DANA L. CRAIG, SBN 251865
  dcraig@gibsondunn.com
ELI M. LAZARUS, SBN 284082
  elazarus@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: 415.393.8200
Facsimile: 415.393.8306

CYNTHIA E. RICHMAN, D.C. Bar No. 492089*
  crichman@gibsondunn.com
HARRY R. S. PHILLIPS, D.C. Bar No. 1617356*
  hphillips@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Apple Inc.*

*Admitted *pro hac vice*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR<br><br>**DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION TO DECERTIFY THE CLASS**<br><br>The Honorable Yvonne Gonzalez Rogers<br><br>Date: October 14, 2025<br>Time: 2:00 p.m.<br>Courtroom: 1, 4th Floor |

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ................................................................................................ 1

II.    ARGUMENT ...................................................................................................... 2

       A.      Common Issues Do Not Predominate ................................................... 2

               1.     Uninjured Class Members Cannot Be Identified Absent Individual Inquiry ................................................................................. 2

               2.     The Class Still Contains Over 10 Million Uninjured People ........................... 8

               3.     Plaintiffs' Noneconomic Injury Theory Does Not Rescue The Class ............ 11

       B.      The Defined Class Is Not Superior And The Class Representatives Are Not Adequate ...................................................................................... 13

       C.      Plaintiffs Lack A Reliable Damages Model ....................................... 15

III.   CONCLUSION ................................................................................................ 15

Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES

Page

**Cases**

*Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*,
2017 WL 4073792 (N.D. Cal. Sept. 14, 2017) ...................................................................13

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013) ...........................................................................................................2

*In re Asacol Antitrust Litig.*,
907 F.3d 42 (1st Cir. 2018) .............................................................................................5, 12

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990) ...........................................................................................................10

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012) ............................................................................................12

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) ............................................................................................5

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) .....................................................................................................2, 4, 15

*Dairy, LLC v. Milk Moovement, Inc.*,
2023 WL 3437426 (E.D. Cal. May 12, 2023) ....................................................................12

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 .......................................................................................................................4

*Epic Games, Inc. v. Apple Inc.*,
67 F.4th 946 (9th Cir. 2023) ...............................................................................................12

*Glen Holly Ent., Inc. v. Tektronix, Inc.*,
352 F.3d 367 (9th Cir. 2003) ..............................................................................................12

*In re Google Play Store Antitrust Litig.*,
No. 21-md-02981-JD (N.D. Cal. Sept. 13, 2023), Dkt. 604 ...............................................2

*Hinojos v. Kohl's Corp.*,
718 F.3d 1098 (9th Cir. 2013) ............................................................................................6

*Huckaby v. CRST Expedited, Inc.*,
2025 WL 987195 (C.D. Cal. Apr. 1, 2025) ........................................................................14

*Klein v. Facebook, Inc.*,
580 F. Supp. 3d 743 (N.D. Cal. 2022) ................................................................................12

*Lara v. First Nat'l Ins. Co. of Am.*,
25 F.4th 1134 (9th Cir. 2022) .............................................................................................4

*In re Lidoderm Antitrust Litig.*,
2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ......................................................................12

ii

Gibson, Dunn &
Crutcher LLP

|  | **Page** |
|---|---|
| *Marlo v. United Parcel Serv., Inc.*, <br> 639 F.3d 942 (9th Cir. 2011) | 4 |
| *Mays v. Tenn. Valley Auth.*, <br> 274 F.R.D. 614 (E.D. Tenn. 2011) | 14 |
| *Mr. Dee's Inc. v. Inmar, Inc.*, <br> 2023 WL 5436178 (M.D.N.C. Aug. 23, 2023) | 13 |
| *Mr. Dee's Inc. v. Inmar, Inc.*, <br> 127 F.4th 925 (4th Cir. 2025) | 13 |
| *In re Niaspan Antitrust Litig.*, <br> 67 F.4th 118 (3d Cir. 2023) | 3 |
| *Noohi v. Johnson & Johnson Consumer Inc.*, <br> 146 F.4th 854 (9th Cir. 2025) | 5 |
| *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, <br> 31 F.4th 651 (9th Cir. 2022) | 2, 3, 4, 6, 9, 10, 11, 14 |
| *Ortiz v. Fibreboard Corp.*, <br> 527 U.S. 815 (1999) | 5 |
| *In re Rail Freight Fuel Surcharge Antitrust Litig.*, <br> 934 F.3d 619 (D.C. Cir. 2019) | 9, 13, 15 |
| *Reiter v. Sontone Corp.*, <br> 442 U.S. 330 (1979) | 6, 7 |
| *Ruiz Torres v. Mercer Canyons Inc.*, <br> 835 F.3d 1125 (9th Cir. 2016) | 8, 10 |
| *Sherman v. Yahoo! Inc.*, <br> 2015 WL 5604400 (S.D. Cal. Sept. 23, 2015) | 5 |
| *TransUnion LLC v. Ramirez*, <br> 594 U.S. 413 (2021) | 1, 2, 7, 9, 10 |
| *Van v. LLR Inc.*, <br> 61 F.4th 1053 (9th Cir. 2023) | 4 |
| *Victorino v. FCA US LLC*, <br> 2020 WL 2306609 (S.D. Cal. May 8, 2020) | 6 |
| *Walmart Stores, Inc. v. Dukes*, <br> 564 U.S. 338 (2011) | 4, 5, 9, 11, 15 |
| *Weiner v. Ocwen Fin. Corp.*, <br> 343 F.R.D. 628 (E.D. Cal. 2023) | 6 |
| *Williams v. Apple Inc.* <br> 338 F.R.D. 629 (N.D. Cal. 2021) | 10 |
| *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, <br> 2020 WL 4212811 (N.D. Cal. July 22, 2020) | 9 |

DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION TO DECERTIFY THE CLASS
4:11-CV-06714-YGR

**SER-379**

Gibson, Dunn &
Crutcher LLP

**FILED UNDER SEAL**

**Page**

**Statutes**

15 U.S.C. § 15(a) ................................................................................................................6

DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION TO DECERTIFY THE CLASS
4:11-CV-06714-YGR

**SER-380**

Gibson, Dunn &
Crutcher LLP

## I. INTRODUCTION

Plaintiffs' bid to maintain the certification of this unprecedented class—one that Plaintiffs admit still contains over ten million uninjured persons—rests on a logical inconsistency. Plaintiffs contend that their damages class cannot be "overbroad," no matter how "high" the "number or percentage of class members who eventually are proven to lack damages" may be, yet at the same time, they argue that discarding the claims of millions of consumers who allegedly did incur damages was a necessary evil "to reduce the number of economically undamaged class members" and "cure a potential overbreadth problem." Opp. 14, 19–21. Both of these things cannot be true. If, contrary to the Supreme Court's command that "every class member must have Article III standing in order to recover individual damages," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), a damages class really could have an unbounded number of members known to be uninjured, then Plaintiffs' decision to limit the class to consumers who spent more than $10 from any one Apple ID account—whose only stated purpose was to depress the number of uninjured class members—lacks any justification. That would prove the class definition is arbitrary and violates Rule 23's superiority and adequacy requirements. If instead (as is true), a class cannot have a staggering number of uninjured members who lack standing (more uninjured than almost any other class has *members*), then Plaintiffs' class should be decertified.

Plaintiffs have no cogent response to the many other flaws Apple has identified. Plaintiffs concede that the class cannot go to trial unless they have a reliable way to link class members to App Store transactions. Yet Plaintiffs do not deny that their methodology for matching people to transactions has produced glaringly wrong results. Plaintiffs dismiss these serious errors by suggesting, without any evidence, that they are the *only* ones in the entire dataset. That beggars belief. The errors Apple identified—in the course of the spot checks it performed in the limited time afforded by Plaintiffs' late expert report—are likely just the tip of the iceberg. These errors confirm that any *accurate* matching will have to be done on an individualized basis that accounts for nuances in the data—a task that will destroy predominance. Meanwhile, to defend their expert's methodology, Plaintiffs must maintain, contrary to black letter law, that the class includes children who use their parents' credit cards for purchases, rather than the parents who paid for those purchases. There can be no serious dispute that children who did not spend their own money lack both any valid claim for

DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION TO DECERTIFY THE CLASS
4:11-CV-06714-YGR

Gibson, Dunn &
Crutcher LLP

damages and Article III standing. These are among the many reasons why identifying the individuals with claims or standing is not possible absent individualized inquiry.

Plaintiffs promised this Court that further discovery and expert analysis would render their certified class even more suitable for classwide adjudication. The opposite is true: The gerrymandered class still contains at least ten million admittedly uninjured persons and rests on unreliable expert methodologies that will leave a jury adrift. *See In re Google Play Store Antitrust Litig.*, No. 21-md-02981-JD, (N.D. Cal. Sept. 13, 2023), Dkt. 604 (decertifying class based on "new development[]" that expert's opinion proved unreliable). The Court should decertify the class now, before an improper and unmanageable class trial is held.

## II. ARGUMENT

Developments since this Court's February 2024 certification order, including Plaintiffs' merits expert reports, confirm the class still has an unprecedented ten million uninjured members (if not more) who cannot be identified without individualized factfinding; the class arbitrarily excludes millions of consumers with identical claims, many of whom Plaintiffs say *are* injured; and there is no reliable proof showing injury, damages, standing, or class membership on a classwide basis. If Rule 23 truly imposes "stringent requirements for certification that in practice exclude most claims," *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013), this plainly flawed class must be decertified.

**A.      Common Issues Do Not Predominate**

Every member of a Rule 23(b)(3) class "must be able to sufficiently answer the question: 'what's it to you?'" *TransUnion*, 594 U.S. at 423. Indeed, the Court recognized that determining which class members were injured and their damages was a "core merits issue" Plaintiffs would need to address before a class trial. Dkt. 789 at 4–5. They have not.

**1.      Uninjured Class Members Cannot Be Identified Absent Individual Inquiry**

Plaintiffs' predominance argument is based on flawed expert opinions and assumptions that fail the "rigorous analysis" this Court must conduct. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022).

**a. Plaintiffs cannot match transactions to people.** None of the following is in dispute: to

determine whether a class member had a compensable injury (and if so, to calculate the damages), Plaintiffs need to match that *person* with their app and in-app transactions. Mot. 11; Opp. 8–13. This is because Plaintiffs' model attempts to calculate the difference between the prices class members actually paid and those they would have paid but for Apple's conduct. Mot. 11. For many transactions, the model calculates "negative damages"—i.e., that the class member would have paid *more* money but for Apple's conduct. *Id.*; Dkt. 1003-35 (Song Rep.) ¶ 79. Plaintiffs must therefore "net out [the] 'negative' damages" from the payor's transactions against any "positive" damages from other transactions. *Id.* ¶¶ 73, 79. Proper attribution requires proper matching of class members and their transactions, and Plaintiffs do not dispute that their class fails Rule 23's predominance requirement unless this can be done at scale in "one stroke." *Olean*, 31 F.4th at 663–64.

Plaintiffs' expert, Darryl Thompson, attempted to identify unique payment profiles and associate them with real people so that their profiles could be matched with transactions. But his purported matching of profiles to people is riddled with astonishing errors, like failing to deduplicate the payor profiles of even the named plaintiff. Mot. 13. Plaintiffs do not dispute that these errors exist. Their defense is that the errors are "insignificant" because the specific examples cited by Apple "concern[] only .01% of all customer records." Opp. 9. But the errors identified by Apple are only *examples*. Dkt. 1003-30 (Stodden Rebuttal Rep.) ¶¶ 65–66. That Thompson failed to correctly match the profiles of at least one of the named plaintiffs, Mot. 13, suggests the errors are widespread—the tip of a gigantic iceberg. The court made exactly this point in *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 137 (3d Cir. 2023). Plaintiffs there attempted to use "automated data matching to identify class members," but when the defendant "examined [the plaintiffs'] methodology in four of the examples, it discovered that [the methodology] was wrong in half of them." *Id.* at 137. The district court concluded, and the Third Circuit agreed, that these two errors implied that others were abounding among the "millions of transactions" at issue, requiring "individualized fact-finding" to identify and fix. *Id.* at 137, 139 n.13. The examples here show many magnitudes more than two errors. Mot. 13 & n.3; Dkt. 1003-30 (Stodden Rebuttal Rep.) ¶ 94. Thompson did not even provide an error rate for his data—in a deviation from standard practice in the scientific community—let alone one that could be considered low. Mot. 13; Dkt. 1003-30 (Stodden Rebuttal Rep.) ¶¶ 94–97. Nor did Plaintiffs timely provide

DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION TO DECERTIFY THE CLASS
4:11-CV-06714-YGR

Gibson, Dunn & Crutcher LLP

Apple with the backup data necessary for Apple's expert to calculate an error rate herself, much less undertake the individualized process of identifying each error manually. *See* Dkt. 1003-1 ¶¶ 3–8.

Plaintiffs try to shift the burden to Apple to prove that Rule 23's requirements are not satisfied, but that is an inversion of the burden the Supreme Court announced in *Comcast*, 569 U.S. at 33, 35–36, and *Walmart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–54 (2011). Plaintiffs continue to bear this burden on decertification. *See Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 947 (9th Cir. 2011); Mot. 8. If they want to argue that the glaring errors can be safely ignored, they need proof the issues with Thompson's work are not widespread. They have none. This is fatal.

Even if Thompson were allowed to testify, his pervasive errors mean that Apple would have the right to litigate injury status and damages on an individual class-member basis. "Because the Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right,' a class cannot be certified on the premise that [Apple] will not be entitled to litigate its statutory defenses." *Dukes*, 564 U.S. at 367 (citations omitted); *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982–84 (even when plaintiffs have expert evidence, class certification is improper when the evidence cannot be applied on a classwide basis); Mot. 13–14. Now that potentially tens of millions of class members require individualized inquiry, Reply ISO *Daubert* Mot. § 1.D—there is no way of knowing which—Plaintiffs cannot avoid "the spectre of class-member-by-class-member adjudication." *Van v. LLR Inc.*, 61 F.4th 1053, 1069 (9th Cir. 2023); *see also Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1140 (9th Cir. 2022) (affirming denial of class certification where "figuring out whether each plaintiff was injured would be an individualized process"). Such a class is "fatally overbroad" because even as "redefine[d]," it still does not contain "only those members who can rely on the same body of common evidence to establish the common issue." *Olean*, 31 F.4th at 669 n.14. Again, Plaintiffs' only defense is that the errors are *de minimis*—an implausible, unsupported view.

For all the same reasons, it is impossible to determine in one stroke who the class members even are, much less who among them was injured. Plaintiffs do not dispute that, because class membership turns on which transactions a consumer "paid" for, identifying class members also requires a matching exercise. Mot. 14–15; Opp. 8–9. Plaintiffs deride this point as a mere "ascertainability argument." Opp. 11. But identifying class members also implicates predominance and thus the

Gibson, Dunn & Crutcher LLP

"rigorous analysis" required by Rule 23. *Dukes*, 564 U.S. at 350–51; *see Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 n.4 (9th Cir. 2017) (explaining that "definitional deficiencies" in the class should be addressed "through analysis of Rule 23's enumerated requirements"); *Sherman v. Yahoo! Inc.*, 2015 WL 5604400, at \*10 (S.D. Cal. Sept. 23, 2015) (the lack of a "method of identifying class members," "suggests that common questions do not predominate over individual ones"). And identifying class members here will swamp every other question in this case.

Plaintiffs argue that injured class members can be identified later, through a "post-trial claims administration" process run by Thompson. Opp. 12. But this Court has explained that Plaintiffs "could not wait until *after trial*" to perform their matching, which goes to their ability to establish a core element of their Section 2 claim. Dkt. 789 at 4–5. Plaintiffs also concede, as they must under *Noohi v. Johnson & Johnson Consumer Inc.*, 146 F.4th 854, 867 (9th Cir. 2025), that "any failures in the model can be explored at trial." Opp. 23. Apple has the right to a "workable" plan to "press at trial genuine challenges to allegations of injury-in-fact" that "does not cause individual inquiries to overwhelm common issues." *See In re Asacol Antitrust Litig.*, 907 F.3d 42, 58 (1st Cir. 2018). But that is not possible if Thompson's work needs to be "continued" with more "granularity." Opp. 12. Waiting until trial to deliver the "fully executed" version of Thompson's matching, *see Noohi*, 146 F.4th at 867, is just the sort of "adventurous application" of class-action procedure that would abridge Apple's "Seventh Amendment jury trial rights," *see Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845–46 (1999). Plaintiffs' argument that Thompson's failure infects only individual and not aggregate damages, Opp. 12, is also untenable. His matching determines whether and by how much someone's "positive" injuries are netted out by "negative" injuries. If the matching is wrong, aggregate damages (the sum of each class member's net-positive damages) will also be wrong. Dkt. 1003-99 (Prince Rebuttal Rep.) ¶¶ 49–50.

Even if it were permissible for Plaintiffs to establish an element of their claims after trial (and it is most certainly not), they do not explain what Thompson would do differently if he got a post-verdict do-over. Opp. 12–13 (proposing to rely on the same evidence that Thompson already considered, *see* Dkt. 1003-36 (Thompson Supp. Rep.) ¶ 8). In Plaintiffs' cited cases, the court relied on evidence showing that injury or class membership could be identified on a classwide basis. *See*

Gibson, Dunn & Crutcher LLP

*Victorino v. FCA US LLC*, 2020 WL 2306609, at *3–4 (S.D. Cal. May 8, 2020); *Weiner v. Ocwen Fin. Corp.*, 343 F.R.D. 628, 633 (E.D. Cal. 2023). Here Plaintiffs have not shown that this can ever be so.

Plaintiffs vaguely intimate that Apple played a role in Thompson's errors, noting that for reasons of protecting consumer privacy, Thompson worked with a version of the data that omitted the transactions associated with each account, leaving Apple to fill in that information once Thompson was done. Opp. 8–9 & n.5. As Apple explained and Plaintiffs previously acknowledged, that process was "ministerial." Mot. 6. The Opposition does not contest this. Likewise, Plaintiffs' argument that the data Apple gave to Thompson was "poorly maintained" is a red herring. Opp. 12. Thompson reviewed Apple's data at the outset and determined that it was suitable for his task. Mot. 14; Dkt. 1003-36 (Thompson Supp. Rep.) ¶¶ 9–10. And Plaintiffs do not argue that anomalies in Apple's data are responsible for any of the identified errors, nor could they. *See* Dkt. 1003-30 (Stodden Rebuttal Rep.) ¶¶ 66, 119. The problems flow from Thompson's unreliable methodology and demonstrate Plaintiffs' inability to match individuals to transactions in one stroke. *See* Reply ISO *Daubert* Mot. § I.B.

A separate issue also dooms Plaintiffs' class. By their own admission, Plaintiffs' methodology makes no attempt to match transactions to the person who *paid* for that transaction. Mot. 12. Instead, Plaintiffs argue that the person who paid is irrelevant: even if a child used her parent's credit card to pay for an app, or if a girlfriend paid for her boyfriend's in-app transaction, then the child or boyfriend can properly be treated as paying the overcharge and should be the class member. *Id.* That is not how antitrust law—or Article III—works. Plaintiffs sue under Section 4 of the Clayton Act, which authorizes an antitrust action by "any person who shall be injured in his business or property." 15 U.S.C. § 15(a); *see* Third Am. Compl., Dkt. 229 ¶ 26. Consumer antitrust plaintiffs may recover for an overcharge when their property in the form of "money has been diminished by reason of an antitrust violation." *Reiter v. Sontone Corp.*, 442 U.S. 330, 339 (1979) (emphasis added). They then incur "measurable damages" "in the form of higher prices paid." *Olean*, 31 F.4th at 670. Likewise, Article III requires plaintiffs to have suffered an "injury in fact," for example that they "paid more for a product than they otherwise would have." *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1104 n.3 (9th Cir. 2013) (alteration marks omitted). Here, only the individual whose payment method was used has a damages claim or standing. For example, when a child uses her parent's credit card to initiate an app transaction,

only the parent's money (if anyone's) is "diminished." *Reiter*, 442 U.S. at 339.[1] And in the same vein, because the child lost no money, she would not have constitutional standing. *See TransUnion*, 594 U.S. at 417 ("[n]o concrete harm, no standing"); Reply ISO *Daubert* Mot. § I.D.

Plaintiffs suggest that when Apple gave its data to Thompson, it conceded the person who paid was not the proper plaintiff. Opp. 10. This is false. Plaintiffs' citation confirms that Apple produced the requested data without making any representations on this issue. Dkt. 1035-15 at 2. In any event, Apple has consistently maintained that the actual *payors* are the proper class members. *See* Mot. 12.

Reference to the class definition only further undermines Plaintiffs' position. The class is limited to people "who *paid* more than $10.00 in total to Apple during the Class Period for iOS application and in-app purchases from any one Apple ID account." Dkt. 789 at 2 (emphasis added). Plaintiffs newly argue the phrase "from any one Apple ID account" in the class definition necessarily contemplates that the "registrant" on the Apple ID account is the person who did the "paying." Opp. 11. But Plaintiffs know well that Apple ID account holders are not the same as payors, and there can be multiple payor profiles associated with an account. *See* Dkt. 953-8 at 4, 8–10 (Plaintiffs explaining "the person who has the email address associated with an Apple ID may not be the payor for that account"); Dkt. 1003-30 (Stodden Rebuttal Rep.) ¶ 52, Ex. 5; *see also* Dkt. 1002-1 at 5.

Plaintiffs cannot blame Apple for their misguided methodology. Apple produced the data that would have allowed Plaintiffs, had they retained a suitable expert with a scientific methodology (and not committed numerous other unforced errors), to use credit card numbers to deduplicate payors accurately. *See* Reply ISO *Daubert* Mot. § I.D; Dkt. 1003-30 (Stodden Rebuttal Rep.) ¶¶ 52–53, Ex. 5; Ex. 128 (July 17, 2025 Stodden Dep.) 82:6–83:2, 92:11–21. But Plaintiffs inexplicably chose to take a different approach. And even if Apple ID account holders were the right "payors," then Thompson's methods still do not accomplish the task because that is not the matching he performed. Rather than grouping payor records by Apple ID—the correct procedure if the Apple ID registrants really were the right "payors"—Thompson relied on personally identifying information, including

---

[1] Plaintiffs suggest in passing that this case is akin to one where "a child's parent gave them … money," which the child then used to buy candy. Opp. 10. But even assuming that the child's fleeting possession of the money in this hypothetical would yield a different result, here the child never possessed the money for even a moment.

DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION TO DECERTIFY THE CLASS
4:11-CV-06714-YGR

**SER-387**

Gibson, Dunn & Crutcher LLP

name, address, and payment information, in the payor records to match those records to one another, and ultimately to individual persons. Dkt. 1003-17 (Thompson Dep.) 109:13–110:2, 160:16–24. Thus, the unique class member he identified could be—but is not necessarily—the Apple ID account holder. So Plaintiffs' methodology does not conform to even their revisionist reading of the class definition.

In a case like this one, where there is a substantial non-overlap between user accounts and the individuals who paid for transactions on those accounts, the plaintiffs need to determine who *paid* for the relevant transactions. Of the purported unique payors identified by Thompson who used credit or debit cards, at least 22.3% appear to have used a card that is also attributed to another alleged unique payor. Dkt. 1003-30 (Stodden Reb. Rep.) ¶ 53; *see* Dkt. 1002-1 § I.B.2. Plaintiffs' failure to deduplicate the records they requested according to who actually paid defeats predominance.

**b. The damages model remains incapable of reliably identifying the uninjured.** Plaintiffs do not dispute the evidence that their damages model is volatile, with even the slightest tweaks to it causing numerous individuals to flip between injured and uninjured—and often in ways that make no sense. Mot. 15. They argue only that the Court has considered this issue before. Opp. 16. But since class certification, the situation has gotten materially worse, with new evidence highlighting the model's continued instability. When Plaintiffs removed iPod transactions accounting for less than ▮ of billings over the full class period, this caused more than 300,000 payors to switch from injured to uninjured, while somehow also causing the same number to switch from uninjured to injured. Mot. 15; Dkt. 962-2 ¶ 5. The Opposition does not attempt to explain how that makes sense. Opp. 16. It is one thing if a model's output changes somewhat in response to new inputs; it is another for the model to experience wild swings—often in the wrong direction. The newest evidence from the iPod touch transactions is yet another demonstration that the model cannot reliably winnow out uninjured class members. *See Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1137 (9th Cir. 2016).

## 2. The Class Still Contains Over 10 Million Uninjured People

Plaintiffs do not dispute that under the version of their damages model that properly accounts for focal-point pricing, there are approximately 11 million uninjured class members[2]—a number

---

[2] Plaintiffs do not dispute focal-point pricing is the more realistic modeling assumption, given the "overwhelming evidence," that "developers would choose" that. Order, Dkt. 630 at 11.

DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION TO DECERTIFY THE CLASS
4:11-CV-06714-YGR

**SER-388**

Gibson, Dunn &
Crutcher LLP

greater than the previous count of 10.3 million uninjured accounts they promised to reduce. Mot. 16; Dkt. 666-1 at 15; Dkt. 789 at 26. Nor do they dispute that this number is substantially higher than the number of uninjured plaintiffs in any reported federal class action successfully certified. Mot. 17. This case is barreling toward trial with an unprecedented and unacceptably high number of class members who lack standing. *See TransUnion*, 594 U.S. at 417.

Plaintiffs deflect based on technicalities. They argue that they could not have "failed to reduce the number of uninjured class members" because they did not previously "present the number of uninjured *Class members*" to the court, having discussed only accounts. Opp. 8. But Plaintiffs' promise was that the number of uninjured class members would fall significantly below the 10.3 million figure for unharmed accounts. Dkt. 666-1 at 14–15. And it rose to approximately 11 million. Plaintiffs also try to keep the focus on the unharmed *percentage*, which fell from 7.9% to 5.9%. Opp. 8, App'x A. One can question whether a fall by two percentage points—which at 5.9% still lands at the outer edge of "the outer limit" of "5% to 6%" uninjured class members recognized by some courts—counts as a significant decrease. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 625 (D.C. Cir. 2019); *see* Mot. 17. If anything, that still-high percentage confirms that the high raw count is not just a function of Apple's large size. Mot. 17; *contra* Opp. 16. This is not the first federal class to have hundreds of millions of members. *See In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2020 WL 4212811, at *11 (N.D. Cal. July 22, 2020) (discussing classes with 110 million and 194 million members). It is, however, the first to have this many *uninjured* members. Regardless, the raw number of uninjured class members is more important than the percentage under *Olean* and Rule 23. *See Olean*, 31 F.4th at 669 n.14. The raw number is what determines whether the trial will be intractably bogged down with individualized determinations. Mot. 17.

Nothing in the Ninth Circuit's precedent suggests that a class with over 10 million uninjured members should remain certified. Plaintiffs rely on the part of *Olean* which held that a class may be certified if it has *some* number of uninjured members. *Olean*, 31 F.4th at 669; Opp. 8, 13–14. But they disregard *Olean*'s other teaching: that if the class "include[s] a *great number* of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification." *Olean*, 31 F.4th at 669 n.14 (emphasis added). And a class with

Gibson, Dunn & Crutcher LLP

DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION TO DECERTIFY THE CLASS
4:11-CV-06714-YGR

this number of uninjured persons seeking damages is impossible to reconcile with the Supreme Court's holding that "[e]very class member must have Article III standing in order to recover individual damages." *TransUnion*, 594 U.S. at 431.

Plaintiffs' attempt to explain away this portion of *Olean* runs headlong into both their own economic theories and the Ninth Circuit's opinion. Plaintiffs argue that because the uninjured class members *could* "have been harmed" by Apple's conduct (though they were not), their presence in the class does not count against certification. Opp. 14. But Plaintiffs' economic model finds that class members who bought certain products suffered "negative damages." Dkt. 1003-12 (May 14, 2025 McFadden Dep.) 240:12–241:2. Thus, these class members could *not* have been damaged, because they paid *less* than they would have but for Apple's conduct. *See* Mot. 11. Nor is it correct, as a matter of law, that a class member "could not have been harmed" under *Olean* only if she was not "exposed to" the defendant's conduct. Opp. 14. This distinction is contradicted by *Olean*, whose lead example of when uninjured plaintiffs doom a class was where certain class members bought a product after viewing a misleading advertisement but "learned that the advertising was misleading before purchase." *Olean*, 31 F.4th at 669 n.14. Those class members were no less "exposed to" the challenged conduct than the uninjured consumers here who made app purchases but did not pay an inflated price. *Id.*

*Ruiz Torres* says nothing different. *Contra* Opp. 15 n.8. It held that class certification was "not necessarily defeat[ed]" when certain class members, for "fortuitous" reasons, were not harmed but could be "winnow[ed] out." 835 F.3d at 1137. Here, millions of class members went uninjured because of the underpinning economics of Plaintiffs' pass-through theory—not by fortuitous happenstance. *Ruiz Torres* does not say that a class may be certified whenever there is unlawful conduct, no matter how many class members were unquestionably unharmed—a conclusion that would be incompatible with *Olean*.[3]

---

[3] Moreover, in *Ruiz Torres*, the defendant had "accepted for the sake of argument[ ]that every class member was exposed to 'unlawful conduct.'" *Williams v. Apple Inc.* 338 F.R.D. 629 (N.D. Cal. 2021). But in an antitrust case like this one, the Plaintiffs must show actual injury, not mere exposure. *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339–340 & n.8 (1990) (assuming that an antitrust violation "distort[ed]" competition, and explaining that nonetheless, "[t]he antitrust injury requirement cannot be met by broad allegations of harm to the 'market' as an abstract entity").

10

Gibson, Dunn & Crutcher LLP

FILED UNDER SEAL

If Plaintiffs believe that no number of "undamaged class members defeats class certification," Opp. 14, then their prosecution of this case has been inexplicable. Their only stated reason for applying the $10 spending limit was to reduce the number of undamaged class members. Dkt. 666-1 at 15; Mot. 19. On Plaintiffs' present theory, those gymnastics were for nothing. For that matter, it is not clear why Plaintiffs are still touting the percentage of unharmed class members. As they ultimately must concede, their current theory implies that even a high "*percentage* of class members who eventually are proven to lack damages" would not be fatal to certification. Opp. 14 (emphasis added). On their view, a class with 50% uninjured members would be fine. The law does not work this way.

### 3. Plaintiffs' Noneconomic Injury Theory Does Not Rescue The Class

Plaintiffs cannot paper over the above failings by arguing that the 10 million-plus class members who purportedly paid less money thanks to Apple's alleged anticompetitive conduct were nonetheless harmed because they had less choice. Plaintiffs concede that these consumers are not entitled to damages based on this diminished choice; they argue only that the lack of choice establishes antitrust injury. Opp. 17; *accord Olean*, F.4th at 665–66 (injury and damages are distinct elements of an antitrust claim). So even if reduced choice sufficed for antitrust injury, Plaintiffs would still fail to prove *damages* on a classwide basis, which is reason alone why decertification of their 23(b)(3) damages class is necessary. *See* Order, Dkt. 981 at 2 ("Plaintiffs did not move to certify an injunctive class.").

Regardless, Plaintiffs' theory about diminished choice does not establish even injury on a classwide basis, leaving the Court without a "common contention" whose "truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. Not every consumer was injured by less choice, because many consumers prefer the status quo. Even Plaintiffs' own expert found that 40% of users would not buy any apps from outside the App Store when given the option. Dkt. 1003-26 (Hoyer Rebuttal Rep.) ¶¶ 33–36, Fig. 5; *see* Mot. 18. Plaintiffs do not explain how these consumers could have been harmed insofar as Apple's alleged conduct prevented a design feature they would actively *not* choose. Lack of choice is not intrinsically an injury.

FILED UNDER SEAL

*See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1201–02 (9th Cir. 2012).[4]

None of Plaintiffs' other cases says otherwise. *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 370, 368, 374 (9th Cir. 2003), and *Dairy, LLC v. Milk Moovement, Inc.*, 2023 WL 3437426, at *3, *11 (E.D. Cal. May 12, 2023), were lawsuits by individual plaintiffs who unquestionably wished to be free from the defendants' conduct. They do not address the issue here, where a significant portion of the class prefers the status quo. And in *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 803–04 (N.D. Cal. 2022), the plaintiffs plausibly alleged a concrete antitrust injury when they claimed that reduced competition gave the defendant leverage to extract "personal information" from each user. In each of these cases, the plaintiffs coupled reduced choice with a concrete harm—which Plaintiffs have failed to do. Because some consumers value choice and others do not, the factfinder here will need to determine this purported injury on an individual basis. This mirrors the situation in *Asacol*, in which class adjudication was held improper because "the only way to sort out whether class members would have switched to a generic drug was through the testimony of 100% of the class members, and 'a trial in which thousands of class members testify.'" Opp. 15 (quoting *Asacol*, 907 F.3d at 42, 57–58).

Moreover, even if a given class member would have preferred more choice, to determine whether she suffered a non-monetary injury in the form of decreased quality, the factfinder would need to consider all factors that bear on quality, such as how Apple's policies *increased* privacy and security, and balance any decreased quality against any monetary benefit. Mot. 19. Plaintiffs assert that such weighing is improper, but their only authorities are off point. Plaintiffs' quotation from *Epic* is not about antitrust injury at all; it concerns anticompetitive conduct. Opp. 18 (citing *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 985–86 (9th Cir. 2023)). And in *In re Lidoderm Antitrust Litig.*, 2017 WL 679367, at *21 (N.D. Cal. Feb. 21, 2017), the court stated that the defendants' overcharges could not be offset by other benefits. But here, many plaintiffs did not incur monetary damages. And a class member would not have incurred the non-monetary equivalent of an "overcharge" unless quality has been reduced, which cannot be determined without considering both the alleged harms and benefits

---

[4] Plaintiffs attempt to distinguish *Brantley* on the basis that it was a case about the anticompetitive-conduct element of an antitrust claim, not the injury element. Opp. 18. But *Brantley* was about both elements: it held that "an agreement [which] has the effect of reducing consumers' choices … does not sufficiently allege an injury to competition." 675 F.3d at 1202.

DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION TO DECERTIFY THE CLASS
4:11-CV-06714-YGR

Gibson, Dunn & Crutcher LLP

from Apple's conduct. That is an intractable individualized inquiry. *Accord Rail Freight*, 934 F.3d at 623–27 (individualized inquiries for some 2,000 class members infeasible).

**B.      The Defined Class Is Not Superior And The Class Representatives Are Not Adequate**

In their attempts to suppress the number of uninjured class members, Plaintiffs excised millions of consumers whom they believe incurred damages. This arbitrary splitting—in pursuit of an end that Plaintiffs now say was not even necessary—confirms that Plaintiffs' class is not a superior way to resolve this case and that Plaintiffs' interests do not align with those of the class.

**Superiority.** The defined class is not superior because it excludes millions of allegedly injured plaintiffs based on the arbitrary cutoff that class members must spend $10 from one account. Mot. 19–21. The Fourth Circuit's decision in *Mr. Dee's Inc. v. Inmar, Inc.*, 127 F.4th 925 (4th Cir. 2025), explains why such a class definition cannot stand. There, the named plaintiffs tried to slim down their class using thresholds whose sole purpose was to lower the number of uninjured class members. 2023 WL 5436178, at *5–6, 8 (M.D.N.C. Aug. 23, 2023). The Fourth Circuit rejected that move because it "raise[d] a superiority problem." *Mr. Dee's*, 127 F.4th at 932. "[T]he criteria for class membership b[ore] little relationship to the defendants' conduct." *Id.* And by excluding "thousands" of allegedly injured plaintiffs, the class definition "might expose defendants to a continued trickle of individual lawsuits," contrary to class actions' "efficiency goal." *Id.*

Here, too, the resulting class bears no relationship to Apple's conduct. Plaintiffs do not dispute that their $10 threshold is irrelevant to their antitrust theories. *See* Mot. 19. Not only are the excluded "claims against [Apple] substantially similar to those of other class members," but they are identical: The excluded class members bought the same exact products, just fewer of them, or maybe even the same quantity, spread across more accounts. *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*, 2017 WL 4073792, at *2 (N.D. Cal. Sept. 14, 2017). That is "arbitrar[y]." *Id.* Plaintiffs try to distinguish *Abante Rooter* on the ground that "there the plaintiffs' basis for excluding certain potential class members was that they lacked 'readily available data' to identify them." Opp. 21. But that reason for excluding class members is, if anything, more explicable than Plaintiffs' reasoning—to remove *other* class members whom Plaintiffs believe are uninjured, even as they claim the number doesn't matter. Also like in *Mr. Dee's*, Plaintiffs' arbitrary cutoff exposes Apple to more litigation. Plaintiffs attempt

Gibson, Dunn & Crutcher LLP

13

**FILED UNDER SEAL**

to distinguish *Mr. Dee's* by noting that there, unlike here, "nearly 40% of potential [injured] class members [were] excluded." Opp. 19. But, as Apple has already explained, this distinction has no basis in the court's reasoning. *See* Mot. 21. Plaintiffs do not venture to answer this point. Plaintiffs also argue that the excluded class members could not bring a new class action under the statute of limitations. Opp. 19. Apple agrees that any attempted class action would suffer numerous flaws. But that does not mean an enterprising plaintiff will not try, and Apple may still need to expend substantial resources to defeat such a case. And although the Ninth Circuit previously declined to exercise discretion under Rule 23(f) to consider a loosely similar argument, Opp. 19, rejecting Apple's argument today would create a circuit split given *Mr. Dee's*. This development in "procedural law" is "good cause" to consider Apple's argument now. *Huckaby v. CRST Expedited, Inc.*, 2025 WL 987195, at *10 (C.D. Cal. Apr. 1, 2025).

**Adequacy.** Plaintiffs' readiness to discard millions of class members they think were injured shows that they will not adequately protect all class members' interests. Mot. 21–22. They respond that this is old news because they had already tossed aside many purportedly injured class members by the time they sought certification. Opp. 21. But since then, Plaintiffs have discarded millions more potential claimants, permanently extinguishing the claims of 6.2 million class members through their iPod touch maneuver—two-thirds of whom they think were harmed. *See* Mot. 21–22; Dkt. 957-1 at 12. Plaintiffs' willingness to make this move *twice* is a damning pattern which proves they do not have the class's best interests at heart. Plaintiffs invoke *Olean*, which endorsed "*refining* the class definition" to make it less "over-inclusive," but it did not endorse using a hacksaw to throw out more injured class members than uninjured ones. 31 F.4th at 669 n.14 (emphasis added). Plaintiffs also assert they discarded the iPod touch claims because those claims "lacked merit." Opp. 22. But that is not what they maintained at the time, *see* Mot. 22; Dkt. 953-8 at 6, and their unreasoned pivot only highlights their readiness to throw their fellow consumers under the bus.

Plaintiffs' "demonstrated … willingness to abandon claims on behalf of … unnamed class members" shows that they are not adequate class representatives. *Mays v. Tenn. Valley Auth.*, 274 F.R.D. 614, 622–24 (E.D. Tenn. 2011). In *Mays*, as Plaintiffs note, the class representatives were not adequate because they had abandoned fellow plaintiffs' claims, a move which "*potentially* had res

Gibson, Dunn &
Crutcher LLP

judicata effect." Opp. 22 n.10 (emphasis added). This is worse: The new claims Plaintiffs have abandoned are *definitely* doomed because they were dismissed with prejudice. Dkt. 981 at 1.

## C. Plaintiffs Lack A Reliable Damages Model

If Plaintiffs lack a reliable damages model, then they cannot show injury or damages on a classwide basis and the class must be decertified. *Rail Freight*, 934 F.3d at 626 ("No damages model, no predominance, no class certification."). This will be so if the Court rejects even one of the model's critical inputs and design features. Mot. 22–25. With one exception, Plaintiffs do not dispute this. They instead lead with a procedural objection: that Apple's argument is premature because the Court has not yet rejected any of the model's inputs. Opp. 23. But if the Court does so in resolving any of the pending *Daubert* and summary judgment arguments, then the class should be decertified.

Plaintiffs contest only one of Apple's arguments in substance. Their damages model calculates damages compared to a hypothetical world in which Apple undertook none of the challenged conduct. Mot. 23–24. The model assumes that Apple would have charged the same commission regardless of the scope of Apple's conduct in the but-for world. *Id.*; Dkt. 1003-99 (Prince Rebuttal Rep.) ¶¶ 51–54. The model's failure to separate theories of liability means that summary judgment against Plaintiffs on any one of those theories dooms their entire case. *See Comcast*, 569 U.S. at 35–36. Plaintiffs respond by parroting their expert's conclusory opinion that Apple's but-for rates would be the same regardless of which of Apple's conduct had changed. Opp. 23. But as elaborated in the reply to Apple's summary judgment motion, this argument is absurd. *See* Reply ISO MSJ § I.E.

Plaintiffs do not grapple with the implications of their model's brittleness. If the jury disbelieves even one of Plaintiffs' assumptions, it will be unable to calculate damages. Mot. 24. And if the jury returns any damages figure other than Plaintiffs', it will be impossible to fairly apportion those damages because the Court will not know which aspect of Plaintiffs' analysis the jury found lacking. This class must be decertified lest the Court have to engage in the "novel project" of "Trial by Formula" that obscures individualized issues that preclude class treatment. *Dukes*, 564 U.S. at 367.

## III. CONCLUSION

The Court should grant Apple's motion to decertify the class.

Gibson, Dunn & Crutcher LLP

15

DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION TO DECERTIFY THE CLASS
4:11-CV-06714-YGR

DATED: September 23, 2025

**GIBSON, DUNN & CRUTCHER LLP**

By: */s/ Cynthia E. Richman*
    CYNTHIA E. RICHMAN

Cynthia E. Richman (*pro hac vice*)
crichman@gibsondunn.com
Harry R. S. Phillips (*pro hac vice*)
hphillips@gibsondunn.com
1700 M Street, N.W.
Washington, D.C. 20036-4504
Telephone: 202.955.8234
Facsimile: 202.530.9691

Theodore J. Boutrous Jr. (132099)
tboutrous@gibsondunn.com
Daniel G. Swanson (116556)
dswanson@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Caeli A. Higney (268644)
chigney@gibsondunn.com
Julian W. Kleinbrodt (302085)
jkleinbrodt@gibsondunn.com
Dana L. Craig (251865)
dcraig@gibsondunn.com
Eli M. Lazarus (284082)
elazarus@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: 415.393.8200
Facsimile: 415.393.8306

*Attorneys for Defendant Apple Inc.*

DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION TO DECERTIFY THE CLASS
4:11-CV-06714-YGR
**SER-396**

BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
STEPHANIE AVILES (350289)
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone:  619 239-4599
Facsimile:   619 234-4599
manifold@whafh.com
byrd@whafh.com
saviles@whafh.com

MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY(*pro hac vice*)
THOMAS H. BURT (*pro hac vice*)
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
270 Madison Avenue
New York, New York 10016
Telephone:  212 545-4600
Facsimile:   212 545-4677
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

*Class Counsel for Plaintiffs*

[Additional counsel on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR<br><br>**PLAINTIFFS' ADMINISTRATIVE MOTION TO VOLUNTARILY DISMISS PLAINTIFF EDWARD W. HAYTER'S INDIVIDUAL CLAIMS**<br><br>Hon. Yvonne Gonzalez Rogers |

PLAINTIFFS' ADMINISTRATIVE MOTION TO VOLUNTARILY DISMISS PLAINTIFF
EDWARD W. HAYTER'S INDIVIDUAL CLAIMS
Case No. 4:11-cv-06714-YGR

**SER**-397

Pursuant to Federal Rule of Civil Procedure 41(a)(2), Plaintiffs Robert Pepper, Stephen H. Schwartz, Edward W. Hayter, and Edward Lawrence (collectively, "Plaintiffs") ask the Court for an order dismissing only the individual claims of Plaintiff Edward W. Hayter, with prejudice. The remaining Plaintiffs will continue in this lawsuit as Named Plaintiffs and will continue to represent the Class.

On August 4, 2025 Defendant Apple, Inc. moved for summary judgment as to Plaintiff Hayter's individual claims. Plaintiffs opposed summary judgment on all grounds on September 2, 2025. However, because Plaintiff Hayter has incurred economic damages if Apple's price tiers are left in place but not if Apple's price tiers are eliminated, Plaintiff Hayter has consented to dismissal of his individual claims only to avoid any potential confusion at trial. On October 17, 2025, Plaintiffs asked Apple by email to stipulate to the dismissal with prejudice of Plaintiff Hayter's individual claims. On October 20, 2025, Apple refused to stipulate to dismissal unless Plaintiff Hayter consented to testify at trial.

Accordingly, Plaintiffs no longer oppose Defendant's motion for summary judgment as to Plaintiff Hayter's individual claims only, and respectfully request that only Plaintiff Hayter's individual claims be dismissed with prejudice.

DATED:  October 20, 2025

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By:  _/s/ Rachele R. Byrd_
RACHELE R. BYRD

BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
STEPHANIE AVILES (350289)
750 B Street, Suite 1820
San Diego, CA 92101
Telephone:  619 239-4599
Facsimile:   619 234-4599
manifold@whafh.com
byrd@whafh.com
saviles@whafh.com

MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
THOMAS H. BURT (*pro hac vice*)

---

PLAINTIFFS' ADMINISTRATIVE MOTION TO VOLUNTARILY DISMISS PLAINTIFF
EDWARD W. HAYTER'S INDIVIDUAL CLAIMS
Case No. 4:11-cv-06714-YGR
-1-

**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

DAVID C. FREDERICK (*pro hac vice*)
MARK C. HANSEN (*pro hac vice*)
AARON M. PANNER (*pro hac vice*)
JAMES M. WEBSTER, III (*pro hac vice*)
LILLIAN V. SMITH (*pro hac vice*)
ALE   A. PARKINSON (*pro hac vice*)
ALE   P. TREIGER (*pro hac vice*)
CAROLINE A. SCHECHINGER (*pro hac vice*)
KYLE M. WOOD (*pro hac vice*)
ASHLE J. HOLMAN (*pro hac vice*)
KELLEY C. SCHIFFMAN (*pro hac vice*)
ANNA K. LINK (*pro hac vice*)
ANTHONY R. GUTTMAN (*pro hac vice*)
**KELLOGG, HANSEN, TODD, FIGEL &**
  **FREDERICK, P.L.L.C.**
1615 M Street, NW Suite 400
Washington, D.C. 20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999
dfrederick@kellogghansen.com
mhansen@kellogghansen.com
jwebster@kellogghansen.com
apanner@kellogghansen.com
lsmith@kellogghansen.com
aparkinson@kellogghansen.com
atreiger@kellogghansen.com
cschechinger@kellogghansen.com
kwood@kellogghansen.com
aholman@kellogghansen.com
kschiffman@kellogghansen.com
alink@kellogghansen.com
aguttman@kellogghansen.com

*Class Counsel for Plaintiffs*

---

PLAINTIFFS' ADMINISTRATIVE MOTION TO VOLUNTARILY DISMISS PLAINTIFF
EDWARD W. HAYTER'S INDIVIDUAL CLAIMS
Case No. 4:11-cv-06714-YGR
-2-

**SER-399**

THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile:  213.229.7520

CAELI A. HIGNEY, SBN 268644
  chigney@gibsondunn.com
JULIAN W. KLEINBRODT, SBN 302085
  jkleinbrodt@gibsondunn.com
DANA L. CRAIG, SBN 251865
  dcraig@gibsondunn.com
ELI M. LAZARUS, SBN 284082
  elazarus@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: 415.393.8200
Facsimile:  415.393.8306

CYNTHIA E. RICHMAN, D.C. Bar No. 492089*
  crichman@gibsondunn.com
HARRY R. S. PHILLIPS, D.C. Bar No. 1617356*
  hphillips@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile:  202.467.0539

*Attorneys for Defendant Apple Inc.*

*admitted *pro hac vice*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

IN RE APPLE IPHONE ANTITRUST
LITIGATION

No. 4:11-cv-06714-YGR

**DEFENDANT APPLE INC.'S OPPOSITION
TO PLAINTIFFS' ADMINISTRATIVE
MOTION FOR LEAVE TO FILE
SUPPLEMENTAL SONG DECLARATION**

The Honorable Yvonne Gonzalez Rogers

Gibson, Dunn &
Crutcher LLP

Apple hereby submits the following opposition to Plaintiffs' Administrative Motion for Leave to File the Supplemental Declaration of Minjae Song., Ph.D ("Admin Mot."). *See* Dkt. 1059.

. At the October 14, 2025 hearing, the Court—with no opposition from Plaintiffs—struck from the record two untimely and improper submissions from their damages expert, Dr. Song, attempting to backfill analyses he could have done in his expert reports. *See* Declaration of Cynthia E. Richman ("Richman Decl.") Ex. A (Oct. 14, 2025 Hr'g Tr.) at 29:22–30:10. Plaintiffs now seek leave to file another declaration from Dr. Song, which they say is "not an untimely expert disclosure." Admin. Mot. 1. Yet this third declaration furnishes new opinions about the Named Plaintiffs' alleged damages that should have been disclosed in Dr. Song's expert reports due months earlier. It should be rejected for the same reasons as Dr. Song's two prior untimely submissions.

Plaintiffs do not demonstrate cause for their late submission. *See* Fed. R. Civ. P. 26, 37; Dkt. 201 (Order on Expert Stip.) ¶ 4. Plaintiffs claim they were "unable to provide [] information" about the Named Plaintiffs' damages at last week's hearing because Apple had not challenged those damages at summary judgment. *See* Admin. Mot. at 1. But the Named Plaintiffs litigating this case have the burden of showing that they, as individuals, were damaged by Apple's alleged conduct. *See, e.g.*, *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) (named plaintiffs must have standing); *Lierboe v. State Farm Mut. Auto Ins. Co.*, 350 F.3d 1018, 1022–23 (9th Cir. 2003) (same); *see also Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 666 (9th Cir. 2022) (en banc) ("measurable damages" are an element of Plaintiffs' claims). Because the McFadden-Song damages model is Plaintiffs' only method for proving damages, Dr. Song should have run the model for the four Named Plaintiffs in his Opening Report in March 2025. He did not do so. Nor did he do so in his June 2025 Rebuttal Report, after Apple and Prof. Prince pointed out Mr. Hayter's lack of injury in a May 2025 filing. *See* Dkt. 957-17 (Prince Decl.) ¶ 19. Plaintiffs were thus "unable to provide [] information" about the Named Plaintiffs' damages not because Apple hadn't challenged them, Admin. Mot. at 1, but because Plaintiffs declined to timely disclose any expert opinion on a critical issue for which they bear the burden of proof. *See* Ex. A (Oct. 14, 2025 Hr'g Tr.) at 75:4–22. The Court's scrutiny of that failure does not grant Plaintiffs the right to a do-over after briefing and argument have concluded.

Gibson, Dunn &
Crutcher LLP

Plaintiffs' and Dr. Song's claim that his staff, "at [his] direction," had "previously calculated the individual damages for all four Named Plaintiffs," Dkt. 1059-1 (Song Supp. Decl.) ¶ 3, is another attempt by Plaintiffs to rewrite the history of this case, *see* Ex. A (Oct. 14, 2025 Hr'g Tr.) at 13:22–14:22. First, it is contrary to Plaintiffs' in-court representations. *See id.* at 72:13–16 (Song "didn't compute the damages for any one individual"); *id.* at 74:2–7 (Song "does not have" the information needed to "calculate the damages for those [named] plaintiffs"); *id.* 75:6–15 (Song "hasn't taken that step" of calculating damages for the Named Plaintiffs). Even more astounding, it is contrary to Dr. Song's own testimony. When Dr. Song was deposed in June 2025, he testified that he wasn't asked to calculate, and thus "didn't check," whether any Named Plaintiff was injured:

> . Do you have an opinion about whether any of the named plaintiffs in this case were injured by Apple's conduct?
>
> A. Again, for the -- the reason that -- that I explained, I -- I -- I -- I didn't check it.
>
> . You haven't calculated what the named plaintiffs' damages, if any, would be under your model?
>
> MR. RIFKIN: Objection to form.
>
> THE WITNESS: Again, I -- I have not found ways in which I can identify named plaintiffs in the transactions data.
>
> . Well, don't you have their transactions?
>
> A. But, again, having transactions from somebody is not enough to find their transactions in the transactions data.
>
> […]
>
> . Did you review Professor Prince's declaration submitted in connection with the motion to redefine the class?
>
> A. I did read his declarations -- declaration.
>
> . And you responded to it at least in part, correct?
>
> A. Correct.
>
> . Did you investigate his finding regarding Mr. Hayter and whether or not he suffered damages according to your model?
>
> A. I did not investigate that.
>
> . Okay. Do you have any reason to disagree with Professor Prince's opinion that Mr. Hayter was not injured, according to your model?

Gibson, Dunn & Crutcher LLP

MR. RIFKIN: Objection to form.

THE WITNESS: I did not look into that.

BY MR. SWANSON: . Do you plan to do that at any point before trial, look at the damages of the named plaintiffs?

A. If asked and if I have all the information that I need, I can.

Richman Decl. Ex. B (Song June 4, 2025 Dep.) at 262:21–267:15. The eleventh-hour claim that Song directed staff to perform calculations he previously, repeatedly swore were not undertaken contradicts his testimony (and Plaintiffs' counsels' more recent representations) and should not be credited.

Nor is it enough that the McFadden-Song model "calculate[d] damages for each transaction." Admin. Mot. 1. That argument makes a mockery of Rule 26 by implying that Song could offer any opinion whatsoever about the results of his model, whether or not they were previously disclosed in his reports, simply because he turned over the model's output to Apple. *Id.* That is not how expert discovery works. *See* Fed. R. Civ. P. 26(a)(2)(B). These opinions about the Named Plaintiffs' damages have not been tested or rebutted by Apple's experts because they were not timely disclosed. Their disclosure at this late juncture—after summary judgment, *Daubert* motions, and decertification are fully briefed and argued—is neither harmless nor justified. *See* Fed. R. Civ. P. 37(c)(1). The Court should deny Plaintiffs' administrative motion.

. If the Court allows Plaintiffs to file the Supplemental Song Declaration, however, its contents support rather than defeat summary judgment and decertification of the class. The results confirm that Mr. Hayter has negative damages (*i.e.*, is monetarily better off) in the but-for world when all the conduct at issue is assumed unlawful by the model. But even accepting Dr. Song's figures at face value,[1] they show that Mr. Hayter has *higher* damages when *less* than all of the challenged conduct is assumed anticompetitive. *See* Dkt. 1059-1 (Song Suppl. Decl.) ¶ 4. Specifically, his damages are *higher* when the model assumes Apple's price tiers are lawful conduct than when those tiers are

---

[1] Song's declaration only measures harm according to the Named Plaintiffs' (currently identified) accounts, not to them as individual payors. Indeed, Apple understands that Dr. Song's numbers for Mr. Pepper include only those for "Rob Pepper" and not "Robert." Apple's experts also have not yet received backup from Dr. Song necessary to attempt to replicate his results.

APPLE'S OPP. TO ADMIN. MOT. TO FILE SUPPLEMENTAL SONG DECL.
4:11-CV-06714

Gibson, Dunn & Crutcher LLP

**SER-403**

assumed to be unlawful and anticompetitive.[2] *See id.* That absurd result (which is also observed for named plaintiff Schwartz) confirms the model fails under the Supreme Court's decision in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), because it constitutes "a methodology that identifies damages that are not the result of the wrong." *Id*. at 37. This is a liability issue, not just a defect that calls class certification in question. "*Comcast* requires plaintiffs be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Noohi v. Johnson & Johnson Consumer Inc.*, 146 F.4th 854, 865 (9th Cir. 2025) (cleaned up). Here, Mr. Hayter's supposed "damages" are due solely to pricing that is assumed lawful.[3] But "[p]rices whose level above what an expert deems 'competitive' has been caused by factors unrelated to an accepted theory of antitrust harm are not 'anticompetitive' in any sense relevant." *Comcast*, 569 U.S. at 38. Mr. Hayter's (and Mr. Schwartz's) "price tier" damages are caused by just such an unrelated factor because tier prices are assumed (by Dr. Song) to be lawful and thus "are not 'anticompetitive' in any sense relevant." *Id.* Summary judgment is thus wholly appropriate since the McFadden-Song model generates no cognizable damages for Mr. Hayter (or for millions of others like him).

. Lastly, Plaintiffs purport in a footnote to dismiss Mr. Hayter's individual claims "to avoid any potential confusion at trial" given "his lack of damages under one of Plaintiffs' damages models." Admin. Mot. 1 n.1. As already noted, Mr. Hayter lacks cognizable damages. If Plaintiffs concede that Mr. Hayter has no injury, the Court should grant Apple's motion for summary judgment as to his individual claims. *See* Dkt. 1004–33 (MSJ) at 23. Regardless, dismissal of Mr. Hayter will not prevent identical "confusion" (and accompanying individualized inquiry) at trial given that there are almost 3 million payors who, like Mr. Hayter, are uninjured under the McFadden-Song model except when price tiers are assumed to be lawful. Apple reserves the right to call Mr. Hayter (and others like him) to the witness stand to explore these individualized issues at trial.[4]

---

[2] In the "flexible pricing" scenario, all conduct challenged by Plaintiffs—including the price tier mandate—is assumed to be unlawful. In the "price tiers" scenario, the model treats tier pricing as lawful while continuing to treat the remaining conduct as unlawful. That is, the difference between the two damage computations is entirely due to whether tier pricing is lawful or unlawful.

[3] This is so whether tier pricing is lawful when imposed by Apple or when freely chosen by developers.

[4] Because Apple has answered and moved for summary judgment, Plaintiffs cannot dismiss Mr. Hayter's claims voluntarily without a stipulation or court order. Fed. R. Civ. P. 21(a).

4

Gibson, Dunn & Crutcher LLP

* * *

The Court should deny Plaintiffs' administrative motion for leave to file a third supplemental report from Dr. Song.  If the Court grants such leave, however, Apple respectfully requests it be allowed to file a responsive supplemental declaration of no more than 2 pages.

DATED:  October 20, 2025    GIBSON, DUNN & CRUTCHER LLP

        By: */s/ Cynthia E. Richman*

         Theodore J. Boutrous Jr.
         Daniel G. Swanson
         Cynthia E. Richman
         Caeli A. Higney
         Julian W. Kleinbrodt
         Dana L. Craig
         Eli M. Lazarus
         Harry R. S. Phillips

         *Attorneys for Defendant Apple Inc.*

Gibson, Dunn &
Crutcher LLP

THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile:  213.229.7520

CAELI A. HIGNEY, SBN 268644
  chigney@gibsondunn.com
JULIAN W. KLEINBRODT, SBN 302085
  jkleinbrodt@gibsondunn.com
DANA L. CRAIG, SBN 251865
  dcraig@gibsondunn.com
ELI M. LAZARUS, SBN 284082
  elazarus@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: 415.393.8200
Facsimile:  415.393.8306

CYNTHIA E. RICHMAN, D.C. Bar No. 492089*
  crichman@gibsondunn.com
HARRY R. S. PHILLIPS, D.C. Bar No. 1617356*
  hphillips@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile:  202.467.0539

*Attorneys for Defendant Apple Inc.*

*admitted pro hac vice*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR<br><br>**DECLARATION OF CYNTHIA E. RICHMAN IN SUPPORT OF APPLE INC.'S OPPOSITION TO PLAINTIFFS' ADMINISTRATIVE MOTION FOR LEAVE TO FILE SUPPLEMENTAL SONG DECLARATION**<br><br>The Honorable Yvonne Gonzalez Rogers |

Gibson, Dunn &
Crutcher LLP

RICHMAN DECLARATION I.S.O.
APPLE'S OPP. TO ADMIN. MOT. TO FILE SUPPLEMENTAL SONG DECL.
4:11-CV-06714

**SER**-406

I hereby declare as follows:

1.   I am an attorney licensed to practice in Washington, D.C. and admitted *pro hac vice* to practice before this Court. I am a partner at the law firm Gibson, Dunn & Crutcher LLP, counsel of record for Defendant Apple Inc. ("Apple") in this case.  I submit this declaration in support of Apple's Opposition to Plaintiffs' Administrative Motion for Leave to File the Supplemental Declaration of Dr. Minjae Song, Ph.D.

2.   Attached hereto as **Exhibit A** is a true and correct excerpt from the transcript of the October 14, 2025 hearing before this Honorable Court on Apple's motion to decertify the class, motion for summary judgment, and *Daubert* motion to exclude the opinions of Darryl Thompson and Alan MacCormack.

3.   Attached hereto as **Exhibit B** is a true and correct excerpt from the June 4, 2025 deposition of Dr. Minjae Song, Ph.D.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this Declaration was executed on October 20, 2025, in Washington, DC.

By: */s/ Cynthia E. Richman*_____

Cynthia E. Richman

Gibson, Dunn & Crutcher LLP

1

RICHMAN DECLARATION I.S.O.
APPLE'S OPP. TO ADMIN. MOT. TO FILE SUPPLEMENTAL SONG DECL.
4:11-CV-06714

**SER-407**

Case: 25-7080, 06/12/2026, DktEntry: 34.3, p. 1 of 299

# EXHIBIT A

**PAGES 1 - 91**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonee Gonzalez Rogers, Judge

IN RE: APPLE iPHONE ANTITRUST      )      No. 4:11-cv-06714-YGR
LITIGATION,                        )
_____    )

Oakland, California

Tuesday, October 17, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:

        Wolf Haldenstein Adler Freeman & Herz LLP
        270 Madison Avenue
        New York, New York 10016
    BY:  **MARK C. RIFKIN, ATTORNEY AT LAW**
        **THOMAS H. BURT, ATTORNEY AT LAW**

        Wolf Haldenstein Adler Freeman & Herz LLP
        750 B Street, Suite 1820
        San Diego, California 92101
    BY:  **RACHELE R. BYRD, ATTORNEY AT LAW**
        **BETSY C. MANIFOLD, ATTORNEY AT LAW**
        **STEPHANIE AVILES, ATTORNEY AT LAW**

(Appearances continued on the following page)

**REPORTED BY:  April Wood Brott, CSR No. 13782, Official United
States Reporter**

**SER-409**

THE COURT: Stop. Stop. Stop. Could you give me a paragraph number?

MS. RICHMAN: Sure, Your Honor. It's the Song merits report at paragraph 11.

THE COURT: Okay. Go ahead.

MS. RICHMAN: "In Professor McFadden's prior report, it was not possible for him to identify individual class members or the monetary harm attributable to each class member, due to the limitations of the app store transactions data available to him at that time. He was, instead, only able to demonstrate how he could allocate class-wide damages to anonymized Apple IDs."

That is exactly what Dr. Song did in his supplemental report of August 1, which was, I should say, you know, completely procedurally untimely, and should be stricken. We've asked for it to be stricken because it was not disclosed in either his opening or rebuttal reports.

MR. RIFKIN: Your Honor, may I be heard on that?

THE COURT: I'm to you now.

MR. RIFKIN: Okay. Thank you.

When we moved to amend the class definition, we did so on two different fronts. We asked the Court to amend the class definition to clarify that it was limited to iPhones and iPads, and, as Ms. Richman confirmed, the Court did grant that motion and dismissed the iPod touch claims from this case on the

merits.

The second part of the motion was a request that the class definition be amended in only one respect, and that was to have the $10 spending cutoff applied not at the level of the Apple ID but instead to have it apply at the --

THE COURT:  It doesn't say at the Apple ID.  This definition doesn't say that.

MR. RIFKIN:  Your Honor, with respect, we think it does.  It says --

THE COURT:  It doesn't.

MR. RIFKIN:  Your Honor, it says, "The class is limited to those persons who paid more than $10 in total to Apple during the class period for IOS applications and in-app purchases from any one Apple ID account."

THE COURT:  I read that differently.  It means it can be one, or it can be more than one, but it is any.

MR. RIFKIN:  And Your Honor --

THE COURT:  Any, and it has always been any.  So to the extent that you disagree, you're wrong.

MR. RIFKIN:  Well, Your Honor, it says "any one Apple ID account."  I don't want to belabor the point, but when --

THE COURT:  Has -- you -- the problem is, one, it's never been that way; two, nothing that was ever done within the confines of this case schedule suggested that it wasn't that way.  And if the Court of Appeal goes back and rereads all of

the transcripts from all of the hearings that we have had over years, they will see that that is what was intended.

Now, could I have put "any one or more"?  I guess I could have.  But it is not what anybody thought.  Why?  Because we knew -- back at the beginning, we knew that you could have a person who had one account or multiple accounts, and that's why you had to do the matching, because when you received the information of multiple accounts, someone who was harmed could turn into someone who was not harmed.

But that didn't mean that it -- you had to have multiple accounts.  So it could be any.

MR. RIFKIN:  Your Honor, may I try to help explain this --

THE COURT:  You're not going to recreate history the way you'd like to.

MR. RIFKIN:  I --

THE COURT:  Hold on.  I'm going to allow you to make your record --

MR. RIFKIN:  Thank you.

THE COURT:  -- but I think that what you're doing is so disingenuous about what has happened in this case, Mr. Rifkin.  It is absolutely disingenuous.

MR. RIFKIN:  Your Honor, I apologize if we have created that impression, but I assure you that is not the case.  And if I can, I would like to go through step by step so that

**SER-412**

we understand this.

**THE COURT:**  Is there some reason you didn't do that in your briefing?

**MR. RIFKIN:**  We thought we had.  And in fact, when we made the motion in April of 2025 and we asked the Court -- and now I'm reading from Docket Number 951, when we asked the Court to apply the $10 spending cutoff to individual payors rather than Apple IDs, we thought in that motion --

**THE COURT:**  But --

**MR. RIFKIN:**  -- we explained it.

**THE COURT:**  -- what you're talking about --

**MR. RIFKIN:**  Your Honor, if I may try to explain this to you so that at least you understand our position.  You may agree or disagree with it, but we would at least like you to understand our position.

When we moved for class certification, the reason we wrote the proposed class definition the way we did was because at that point in time -- and now I'm talking about 2021 and 2022 and 2023 and 2024.  At that point in time, the only data we had was ID-level data.  We did not have payor-level data.  There was no way for us to apply a cutoff at the payor level.  We could not have.

Let me be clear about that.  We could not have aggregated accounts so that we applied the $10 threshold to groups of accounts that belonged to the same person.  Yes, Your Honor,

that you would be able to once I certified the class, which is what I allowed you to do.  But make no mistake.  I never thought that you would have one consumer with one account.  We never talked about it that way.

And in fact, Song's got analysis.  That's not how it worked.  That's not reality.

**MR. RIFKIN:**  Your Honor, if I said that at any point in time, I didn't mean to say that.

**THE COURT:**  Well, why would I --

**MR. RIFKIN:**  But if Your Honor has understood that, I haven't been clear enough.  We have always known -- always known -- and we have always said to the Court --

**THE COURT:**  Then you should --

**MR. RIFKIN:**  -- there are more accounts --

**THE COURT:**  -- stop raising -- stop.  You need to stop raising some notion that somehow I took you off track by not granting a motion so late in the game, in April of this year, to do something that I always believed was done already.

So I don't know what kinds of games people play, but I'm certainly not -- this case is way too old to be doing things at the last minute anymore.

**MR. RIFKIN:**  Your Honor, before we made that motion -- before we made that motion, we did exactly what we said to the Court we would do, exactly what Your Honor directed us to do. Dr. Song -- once Dr. Song had all of the data from Apple and he

**SER-414**

had the matching that Apple provided, matching transactions to payors -- once he had that data, which he did not have when the class was certified in 2024.  We knew we would get that after class certification.  Once he got that, he did what we said we were going to do.

**THE COURT:**  All right.

**MR. RIFKIN:**  He did what the Court directed us to do. He ran that data using Professor McFadden's model and the matching that Apple gave to him.  He matched transactions to payors.  He applied the $10 cutoff at the payor level, and he computed these numbers, including the total damages number, which is 20.1 billion dollars -- that's a public number -- and both the 5.2 percent with Apple's price tiers removed or 5.9 percent with Apple's price tiers in place.

He did that, and he reported that in his March '25 expert report.  The only way he was able to report it in March of 2025 was because he did it.  And he was only able to do it once we got the data from Apple for Mr. Thompson to do his work and Dr. Song to do his work, which was after class certification had been granted.

We did everything --

**THE COURT:**  There is then absolutely no reason -- right?  If you're saying that, there is absolutely no reason why the supplemental report should come in and the supplemental opinions, because he did what he needed to do back in --

**SER-415**

**MR. RIFKIN:** I agree.

**THE COURT:** -- March. All right.

**MR. RIFKIN:** I agree.

**THE COURT:** So the Daubert or the motion to strike the supplemental report of Song is unopposed because there's no need for it.

**MR. RIFKIN:** Because apparently Your Honor thought that's how it was going to be done all along. We agree. It's unnecessary.

**THE COURT:** All right. That motion is granted.

**MS. RICHMAN:** Thank you, Your Honor.

**THE COURT:** So on the 5.2 to 5.9 --

**MR. RIFKIN:** Yes.

**THE COURT:** The problem, as I understand it, is we don't know if that's a good number because it, by definition, has to rely on Thompson's analysis. Is that Apple's perspective?

**MS. RICHMAN:** That's part of it, yes, Your Honor. It's not just the number of uninjured, even for the individuals who Thompson says are injured because we don't know if he did the matching correctly. And actually, we know he did not do it correctly.

**THE COURT:** Ms. --

**MS. RICHMAN:** You would really have to go --

**THE COURT:** Ms. Richman?

**SER-416**

**MS. RICHMAN:**  Yes, Your Honor.

**THE COURT:**  You and I are going to disagree on the issue of percentages and actual numbers.

**MS. RICHMAN:**  That's fine, Your Honor.

**THE COURT:**  So it's preserved, if it ever needs to be. You and I are going to disagree on that issue.

**MS. RICHMAN:**  Understood.

**THE COURT:**  So I don't want to have argument on that. I understand your perspective.

What concerns me -- what concerns me is the reliability of Thompson's analysis.  That's what I want to focus on next.

**MS. RICHMAN:**  Yes, Your Honor.

**MR. RIFKIN:**  Your Honor, would -- if my --

**THE COURT:**  Hold on.  No.

**MR. RIFKIN:**  Okay.

**THE COURT:**  It is not, in my view, Apple's burden.  It is Plaintiffs' burden.  And it is Plaintiffs' burden because at the time I certified the class, you were missing this piece.  I told you you were missing this piece.  I told you you had to do it, and if you couldn't do it, I would de-certify.  So I want to make sure the record is clear and that you understand, because I saw something in the briefing about the notion that this was somehow Apple's responsibility.  In my view, it is not.  It is your burden under Rule 23.

Again, as I understand it, Apple has shown me a number of

discovery to identify those plaintiffs' data.  That's what we used to calculate the damages.  We didn't go in and search for anything that we didn't have.

THE COURT:  We have four named plaintiffs.

MR. SWANSON:  Right.

THE COURT:  They have to get on the stand and testify. Did you associate their names with the data and give it to the plaintiffs?

MR. SWANSON:  We took the data they gave us.  We asked them, "Please tell us which accounts," because we didn't want to root around in the data, especially, obviously, given that the way that Mr. Thompson has dealt with it, it's generally not possible to do it like with Rob and Robert.  So we just took the data they gave us.  And Professor --

THE COURT:  They identified the accounts --

MR. SWANSON:  Yes -- -

THE COURT:  -- of their clients?

MR. SWANSON:  Yes.

THE COURT:  And you identified the accounts of your clients, and you couldn't run the model as to them?

MR. FREDERICK:  Your Honor --

THE COURT:  Just yes or no before you explain.

MR. FREDERICK:  I don't know the answer to that.

THE COURT:  How can you not know the answer?

MR. FREDERICK:  Because I didn't do that analysis.  I

personally did not do that analysis.

THE COURT:  On the plaintiffs' side, I've got ten lawyers --

MR. FREDERICK:  Your Honor --

THE COURT:  -- over there.

MR. FREDERICK:  -- they didn't move for summary judgment as to those three.  They only moved as to Mr. Hayter.  I think this is --

THE COURT:  You're objecting on the grounds that they didn't give you the data, and yet you had it.

MR. FREDERICK:  Do we have someone who can address this?

MR. RIFKIN:  Yes.  I'm happy to, Your Honor.  The reason for it is this:  Dr. Song computed the damages for the entire database.  He didn't compute the damages for any one individual.

THE COURT:  You have four named -- Mr. Rifkin, how many class action trials have you tried?

MR. RIFKIN:  Four, Your Honor.  Four.

THE COURT:  And did you not have named plaintiffs on the stand who talked about their damages?

MR. RIFKIN:  No, Your Honor.  We had named plaintiffs who talked about their purchases.  None of them talked about their damages.  If you want to ask me if --

THE COURT:  Did they --

**SER-419**

**MR. RIFKIN:** -- the named plaintiffs are going to come in and say, "I had an iPhone.  I had an iPad.  I bought apps.  I bought in-app content."  The answer to all of those questions is yes, yes, yes, and yes.

**THE COURT:**  And damages relative to them?  You're not asking for --

**MR. RIFKIN:**  They will not be asked to testify as to their damages.

**THE COURT:**  That wasn't my question.

**MR. RIFKIN:**  I'm sorry.  I misheard.  I thought you asked if I was going to have the named plaintiffs testify as to their damages.

**THE COURT:**  Someone.  Isn't someone going to testify as to the damages of the actual named plaintiffs?

**MR. RIFKIN:**  No, Your Honor, it's not our intention to do that.

**THE COURT:**  How can you have -- how can you establish injury, which -- Article III injury.  How can you establish that without a reference to damages by the named plaintiffs?

**MR. RIFKIN:**  Your Honor, the named plaintiffs are members of the class, and all of them will have been damaged by the same conduct.  It turns out that all three of them --

**THE COURT:**  That's the point.

**MR. RIFKIN:**  Sorry.  Three of the four of them have been damaged under any scenario, and one of them has been

damaged under one scenario.

If it's necessary -- if Your Honor believes it's necessary to have Dr. Song calculate the damages for those plaintiffs, then Dr. Song needs to know that -- what accounts those plaintiffs had and what transactions are associated with it because he does not have that information now because Apple didn't give it to him.

THE COURT:  Apple -- he has --

MR. RIFKIN:  When Apple --

THE COURT:  -- the accounts?

MR. RIFKIN:  -- delivered them -- of course.

THE COURT:  Right, because it's your client.

MR. RIFKIN:  Of course.

THE COURT:  Your client knows what accounts they have.

MR. RIFKIN:  Of course.

MR. SWANSON:  And Your Honor, can I give you a citation?

THE COURT:  So your clients know what accounts they have, correct?

MR. RIFKIN:  Yes.

THE COURT:  So Apple doesn't have to give you your own clients' information.  You already have that information.  It's your client.

MR. RIFKIN:  We have that information, yes.

THE COURT:  But you just said a moment ago you

couldn't because you're waiting for Apple.

MR. RIFKIN:  No, no, no.

THE COURT:  To foot the bill.

MR. RIFKIN:  And I'm sorry if I confused the Court. Again, I apologize.

Dr. Song calculated aggregate damages.  The plaintiffs will testify as to their membership in the class.  Dr. Song is not going to testify as to any individual class members' damages, but if the Court requires us to testify as to named plaintiffs' damages, he can extract that information the same way Apple did.

It's there.  It's in the records.  He hasn't taken that step because he was asked to compute damages on a class-wide basis.  That's the answer to the question.  Every one of these plaintiffs will identify their transactions.

THE COURT:  The problem --

MR. RIFKIN:  They will identify their accounts.

THE COURT:  The problem is that when you have a model that has to be run in order to determine whether any particular person has been harmed versus not harmed, it is inconceivable to me that you did not know that you had to run that for your own named plaintiff clients.

MR. RIFKIN:  Well, he has done it.  He just doesn't know which -- and the reason for it is this:  He knows that a payor -- by a value.  It's not a real name.  This is Dr. Song.

**SER-422**

Case: 25-7930, 08/12/2026, DktEntry: 34.3, Page 226 of 299

He knows the value.  If we -- if we knew the value that was associated with that name, we could tell him, and he could say, "Here's the damages."

But to have him go back and run the model again just for these -- to extract the damages for those accounts, I suppose he can do it, and if the Court believes it's necessary for him to identify individual damages, he can do it the same way Apple did it.

That's how they know Mr. Hayter has damages one way but not another way, because we gave it to them both ways.  That's how they know that all the other plaintiffs had damages both ways, or surely they would have raised this issue as to the other three plaintiffs.

**MR. FREDERICK:**  They didn't move for summary judgment as to the other three, Your Honor.

**THE COURT:**  I agree.

**MR. FREDERICK:**  They only moved as to Mr. Hayter.  And so I think that, coming to you now, the issue --

**THE COURT:**  There is -- I agree.  There is no motion in front of me, but it is inconceivable to me that you all didn't think that you had to run it as to your own clients.

**MR. FREDERICK:**  I think that, Your Honor, the question is are these representative plaintiffs.

**THE COURT:**  Right, and if --

**MR. FREDERICK:**  If they are --

**SER-423**

Case: 25-7930, 08/12/2026, DktEntry: 34.3 (227 of 299)

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  October 17, 2025

_____

April Wood Brott, CSR No. 13782

Case 25-7080, 06/12/2026, DktEntry: 34.3, Page 228 of 299

# EXHIBIT B

HIGHLY CONFIDENTIAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

_____

In re Apple iPhone Antitrust    CASE NO.

Litigation                      4:11-cv-06714-YGR

_____


HIGHLY CONFIDENTIAL


Videotaped deposition of MINJAE SONG, Ph.D.,

held at the offices of Gibson, Dunn & Crutcher LLP,

1700 M Street, N.W., Washington, D.C., before Misty

Klapper, Registered Merit Reporter, Certified

Shorthand Reporter, Registered Professional

Reporter, Realtime Systems Administrator and Notary

Public, commencing at 9:13 a.m. EDT, June 4, 2025.


JOB No. 7337086

PAGES 1 - 285

Page 1

SER-426

identify my transaction record in the transactions data.

Q.    All right.  Could you turn to page 44 of your expert report.  I want to ask about Figure 13.

Figure 13 presents estimates of class-wide damages and numbers of harmed and unharmed class members using Professor McFadden's model as implemented by you, correct?

A.    Correct.  Correct.

Q.    It has the -- the two scenarios with and without price tiers, correct?

A.    Correct.

Q.    Okay.  With the price tier simulation, about 10.98 million class members are unharmed; is that right?

A.    That's what I see in the table.

Q.    Okay.  And when -- well, do you have an explanation as to why more class members are unharmed when you implement the price tier simulation?

Page 261

A.    I believe Professor McFadden explained that in his earlier reports.  My recollection is that with price tiers, apps or items prices are less likely to change in the presence of commission changes.  So that could be the main reason to see higher -- slightly higher numbers for unharmed payors.

Q.    And you find lower class-wide damages when you apply the price tier simulation, correct?

A.    I have a lower number, a slightly lower number, for net harm under the price tier scenario than flexible but-for pricing scenario.

Q.    Do you have an explanation for why that is?  Is it the same explanation?

MR. RIFKIN:  Objection to form.

THE WITNESS:  I think that is part of the explanations.

BY MR. SWANSON:

Q.    Do you have an opinion about whether any of the named plaintiffs in this

Page 262

case were injured by Apple's conduct?

A.    Again, for the -- the reason that -- that I explained, I -- I -- I -- I didn't check it.

Q.    You haven't calculated what the named plaintiffs' damages, if any, would be under your model?

MR. RIFKIN:  Objection to form.

THE WITNESS:  Again, I -- I have not found ways in which I can identify named plaintiffs in the transactions data.

BY MR. SWANSON:

Q.    Well, don't you have their transactions?

A.    But, again, having transactions from somebody is not enough to find their transactions in the transactions data.

Q.    Well, you don't have to find it. You can use your model, can't you, to see what the prices of those transactions would be in the but-for world?

Page 263

HIGHLY CONFIDENTIAL

A.    The -- oftentimes the -- the names of apps and items that we know of are not necessarily the same as the names of apps and items recorded in the transactions data. Names change.  Also, developers use different descriptions or names for the transactions data, or developers or Apple.

So knowing the name is not enough to know the but-for prices of those apps and items that we know of.

Q.    So if plaintiffs win this case and there's a need to prove up individual recoveries after trial, how are class members going to prove how much of the damages they should get if these problems are so insuperable?

MR. RIFKIN:  Objection to form.

THE WITNESS:  Well, I don't think it's -- it's my assignment to make a judgment.  But I believe Apple has their information, for either E-mail address or credit card

Page 264

**SER-430**

information, which I -- I don't have.

BY MR. SWANSON:

Q.      Yes, but you have the named plaintiffs' transaction information.  You don't need it from Apple.

MR. RIFKIN:  Objection to form, asked and answered.

THE WITNESS:  Again, let me give you an example.

Say -- okay.  Say I spent 9 -- $9.99 on, say, Spoti- -- I'm sorry, let me pick a different one -- some game app.

BY MR. SWANSON:

Q.      Um-hmm.

A.      Okay.

Finding that transaction in the transactions data, even though I know which apps I bought and which items I bought, are not necessarily a straightforward exercise.

BY MR. SWANSON:

Q.      You --

Page 265

HIGHLY CONFIDENTIAL

A.    But I believe Apple has my E-mail address.  So they can check.  They can check how much I spent on what.

Q.    Did you review Professor Prince's declaration submitted in connection with the motion to redefine the class?

A.    I did read his declarations -- declaration.

Q.    And you responded to it at least in part, correct?

A.    Correct.

Q.    Did you investigate his finding regarding Mr. Hayter and whether or not he suffered damages according to your model?

A.    I did not investigate that.

Q.    Okay.  Do you have any reason to disagree with Professor Prince's opinion that Mr. Hayter was not injured, according to your model?

MR. RIFKIN:  Objection to form.

THE WITNESS:  I did not look into that.

Page 266

BY MR. SWANSON:

Q.     Okay.  Did you -- do you think that there is some -- that Professor Prince was unable to identify the apps that Mr. Hayter had purchased?

MR. RIFKIN:  Objection, foundation.

THE WITNESS:  Again, I -- I -- I haven't looked into that.

BY MR. SWANSON:

Q.     Do you plan to do that at any point before trial, look at the damages of the named plaintiffs?

A.     If asked and if I have all the information that I need, I can.

Q.     Okay.  Well, let's assume you have all the information you need.  Do you need to be asked in order to do that?

A.     I -- I have to think about it.

Q.     Okay.  Let's turn to Appendix F.2 of your report, page 109.

In this appendix you present an

Page 267

HIGHLY CONFIDENTIAL

analysis concerning Apple's introduction of new price tiers in March 2023, correct?

A.   Correct.

Q.   Did you assume that developers responded to the change in prices very promptly?

A.   The -- the Figure 31 shows -- or summarizes how -- how they reacted in some ways.

Q.   And you believe that that is reliable information?

A.   Well, Figure 31 and analysis describes in F -- Appendix F.2 is my analysis of Apple's transactions data.

Q.   Do you draw any conclusions in your report from the analyses in Appendix F.2?

A.   I believe I explained what I did and what I found in this appendix section.

Q.   Are -- are those findings important to any of your opinions about damages?

Page 268

**SER-434**

HIGHLY CONFIDENTIAL

CERTIFICATE OF NOTARY

I, MISTY KLAPPER, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in shorthand and thereafter reduced to typewriting by me; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

Misty Klapper, RMR, CSR, RPR, RSA and Notary Public

Page 281

SER-435

BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
STEPHANIE AVILES (350289)
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: 619 239-4599
Facsimile: 619 234-4599
manifold@whafh.com
byrd@whafh.com
saviles@whafh.com

MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
THOMAS H. BURT (*pro hac vice*)
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

*Interim Class Counsel for Plaintiffs*

[Additional Counsel Appear on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR |
| | **PLAINTIFFS' ADMINISTRATIVE MOTION FOR LEAVE TO SU   MIT INDIVIDUAL PLAINTIFFS' DAMAGES INFORMATION IN RESPONSE TO COURT   UESTION AT OCTO   ER    , HEARING** |
| | Hon. Yvonne Gonzalez Rogers |
| | CTROOM:    1, 4th Floor<br>JUDGE:    Hon. Yvonne Gonzalez Rogers |

**SER-436**

Pursuant to Northern District of California Local Rule 7-11, Plaintiffs Robert Pepper, Stephen H. Schwarz, Edward W. Hayter, and Edward Lawrence ("Named Plaintiffs") hereby request leave to file the Supplemental Declaration of Minjae Song, Ph.D., dated October 16, 2025 ("Supplemental Song Declaration"), submitted herewith, regarding their individual damages in response to the Court's inquiry at a hearing held on October 14, 2025. Declaration of Rachele R. Byrd in Support, Exhibit 1; Dkt. No. 1057.  At the October 14th hearing, the Court heard oral argument on Defendant Apple's motion for summary judgment and several other motions. *See* Dkt. Nos. 1004, 1027, 1044, & 1057. Apple's motion for summary judgment challenged Plaintiff Edward Hayter's individual damages but did not challenge the individual damages suffered by the other Named Plaintiffs. Dkt. No. 1004 at 2 & 23.

During the October 14th hearing, Plaintiffs' counsel described how Plaintiff Hayter incurred monetary damages when the damages are calculated leaving Apple's price tiers in place but incurred no monetary damages when they are calculated with flexible pricing (*i.e.*, removing Apple's price tiers). When the Court asked whether individual damages calculations had been performed for the other Named Plaintiffs, Plaintiffs' counsel were unable to provide the information during the October 14th hearing because the question of their damages had not been raised by Apple's summary judgment motion or, indeed, in any of the other motions before the Court.[1]

In fact, Dr. Song and his team had previously calculated individual damages for all four Named Plaintiffs from the results of their class-wide damages calculations. To provide that information, about which the Court asked several questions, Plaintiffs seek leave to file the attached Supplemental Song Declaration. This is not an untimely expert disclosure, as Apple claims, but an effort to address the Court's question.  The backup files for Dr. Song's Opening Report, which were provided directly to Apple's experts in March 2025, contained the calculations for the overcharges attributable to every single transaction in the Apple transactions data.  *See* Dkt. No. 1052-25 (Song Opening Report) ¶ 65 ("I . . . calculate damages for each transaction"). With the information that Apple itself provided Plaintiffs, *see* Dkt. No. 1003-56 (Letter from D. Swanson to R. Byrd (Feb. 27, 2023)), Apple had the

---

[1] Separately, considering his lack of damages under one of Plaintiffs' damages models, to avoid any potential confusion at trial, Plaintiff Hayter has consented to dismiss his individual claims only.

PLAINTIFFS' ADMINISTRATIVE MOTION FOR LEAVE TO SUBMIT INDIVIDUAL PLAINTIFFS' DAMAGES INFORMATION IN RESPONSE TO COURT QUESTION AT OCTOBER 14, 2025 HEARING
Case No. 4:11-cv-06714-YGR
-1-

**SER-437**

same ability as Plaintiffs to identify which transaction overcharges corresponded to each Named Plaintiff.

Accordingly, Plaintiffs respectfully request leave to file the attached Supplemental Song Declaration to fully respond to the Court's question posed at the October 14th Hearing.

DATED:  October 16, 2025

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By:      */s/ Rachele R. Byrd*
          RACHELE R. BYRD

BETSY C. MANIFOLD
RACHELE R. BYRD
STEPHANIE AVILES
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
saviles@whafh.com

MARK C. RIFKIN
MATTHEW M. GUINEY
THOMAS H. BURT
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

DAVID C. FREDERICK (*pro hac vice*)
MARK C. HANSEN (*pro hac vice*)
AARON M. PANNER (*pro hac vice*)
JAMES M. WEBSTER, III (*pro hac vice*)
LILLIAN V. SMITH (*pro hac vice*)
ALE    A. PARKINSON (*pro hac vice*)
ALE    P. TREIGER (*pro hac vice*)
CAROLINE A. SCHECHINGER (*pro hac vice*)
KYLE M. WOOD (*pro hac vice*)
ASHLE J. HOLMAN (*pro hac vice*)
KELLEY C. SCHIFFMAN (*pro hac vice*)
ANNA K. LINK (*pro hac vice*)
ANTHONY R. GUTTMAN (*pro hac vice*)

PLAINTIFFS' ADMINISTRATIVE MOTION FOR LEAVE TO SUBMIT INDIVIDUAL PLAINTIFFS' DAMAGES INFORMATION IN RESPONSE TO COURT   UESTION AT OCTOBER 14, 2025 HEARING
Case No. 4:11-cv-06714-YGR
-2-

**SER-438**

**KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, NW Suite 400
Washington, D.C. 20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999
dfrederick@kellogghansen.com
mhansen@kellogghansen.com
jwebster@kellogghansen.com
apanner@kellogghansen.com
lsmith@kellogghansen.com
aparkinson@kellogghansen.com
atreiger@kellogghansen.com
cschechinger@kellogghansen.com
kwood@kellogghansen.com
aholman@kellogghansen.com
kschiffman@kellogghansen.com
alink@kellogghansen.com
aguttman@kellogghansen.com

*Co Class Counsel*

PLAINTIFFS' ADMINISTRATIVE MOTION FOR LEAVE TO SUBMIT INDIVIDUAL PLAINTIFFS'
DAMAGES INFORMATION IN RESPONSE TO COURT    UESTION AT OCTOBER 14, 2025 HEARING
Case No. 4:11-cv-06714-YGR
-3-

**SER**-439

THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

CAELI A. HIGNEY, SBN 268644
  chigney@gibsondunn.com
JULIAN W. KLEINBRODT, SBN 302085
  jkleinbrodt@gibsondunn.com
DANA L. CRAIG, SBN 251865
  dcraig@gibsondunn.com
ELI M. LAZARUS, SBN 284082
  elazarus@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: 415.393.8200
Facsimile: 415.393.8306

CYNTHIA E. RICHMAN, D.C. Bar No. 492089*
  crichman@gibsondunn.com
HARRY R. S. PHILLIPS, D.C. Bar No. 1617356*
  hphillips@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendant Apple Inc.*

*Admitted *pro hac vice*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR |
| | **DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| | The Honorable Yvonne Gonzalez Rogers |
| | Date: October 14, 2025<br>Time: 2:00 p.m.<br>Courtroom: 1, 4th Floor |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ..................................................................................................1

II.  ARGUMENT.........................................................................................................1

    A.   Plaintiffs' One-Sided Market Definition Fails As A Matter Of Law .........................1

    B.   Plaintiffs Cannot Disclaim Their Direct Challenge To Apple's Refusals To Deal.........................................................................................................................4

    C.   Plaintiffs' Challenge To The Design Of iOS Fails As A Matter of Law ....................9

    D.   The Court Should Reject Plaintiffs' IAP And Anti-Steering Theories......................11

        1.   Plaintiffs cannot sneak unpled IAP and anti-steering theories to the jury ......11

        2.   Plaintiffs lack antitrust standing to challenge the former anti-steering rule ..............................................................................................................12

        3.   Plaintiffs' in-app purchasing theories are time-barred .................................12

    E.   Plaintiffs Cannot Establish Additional Elements Of Their Damages Claims ............13

III. CONCLUSION....................................................................................................15

Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP,*
    592 F.3d 991 (9th Cir. 2010) ................................................................................ 9, 10

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ............................................................................................... 1

*Apple Inc. v. Pepper,*
    587 U.S. 273 (2019) ........................................................................................... 1, 12

*Assoc'd Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
    459 U.S. 519 (1983) .............................................................................................. 12

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
    603 F.2d 263 (2d Cir. 1979) .................................................................................. 10

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,*
    509 U.S. 209 (1993) ............................................................................................... 2

*Cal. Comput. Prods., Inc. v. Int'l Bus. Machs. Corp.,*
    613 F.2d 727 (9th Cir. 1979) ............................................................................ 9, 10

*City of Vernon v. S. Cal. Edison Co.,*
    955 F.2d 1361 (9th Cir. 1992) ........................................................................... 6, 14

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013) ................................................................................................ 15

*Coronavirus Rep. v. Apple Inc.,*
    85 F.4th 948 (9th Cir. 2023) ................................................................................... 3

*CoStar Group, Inc. v. Commercial Real Estate Exch., Inc.,*
    --- F.4th ---, 2025 WL 2573045 (9th Cir. Sept. 5, 2025) ................................... 7, 10

*Eagle v. Star-Kist Foods, Inc.,*
    812 F.2d 538 (9th Cir. 1987) ................................................................................. 12

*Epic Games, Inc. v. Apple Inc.,*
    559 F. Supp. 3d 898 (N.D. Cal. 2021) ......................................................... 3, 4, 5, 9

*Epic Games, Inc. v. Apple Inc.,*
    67 F.4th 946 (9th Cir. 2023) ........................................................................... 3, 4, 12

*Evervictory Elec. (B.V.I.) Co. v. Invision Indus. Inc.,*
    2012 WL 2030177 (C.D. Cal. June 4, 2012) ......................................................... 11

*In Re FirstEnergy Corp. Sec. Litig.,*
    2025 WL 2331754 (6th Cir. Aug. 13, 2025) ......................................................... 15

*Foremost Pro Color, Inc. v. Eastman Kodak Co.,*
    703 F.2d 534 (9th Cir. 1983) ............................................................................ 9, 10

Gibson, Dunn & Crutcher LLP

ii

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020)..................................................................................... 3, 4, 5

*In re Google Play Store Antitrust Litig*,
    147 F.4th 917 (9th Cir. 2025)........................................................................................... 3

*In re Google Play Store Antitrust Litig.*,
    No. 20-cv-5671, Dkt. 491 (N.D. Cal. Oct. 20, 2023) ..................................................... 8

*In re Harley-Davidson Aftermarket Parts Mktg., Sales Pracs. & Antitrust Litig.*,
    --- F.4th ---, 2025 WL 2374859 (7th Cir. Aug. 15, 2025) ............................................ 6

*Hughes v. Gen. Motors Corp.*,
    35 F.3d 571 (9th Cir. 1994).......................................................................................... 14

*Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977) ............................................................. 12

*Image Tech. Servs. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997)...................................................................................... 15

*Intergraph Corp. v. Intel Corp.*,
    195 F. 3d 1346 (Fed. Cir. 1999) .................................................................................... 6

*Jacobson v. Rose*,
    592 F.2d 515 (9th Cir. 1978)........................................................................................ 12

*Key v. Qualcomm Inc.*,
    129 F.4th 1129 (9th Cir. 2025).................................................................................. 5, 14

*Lorain Journal Co. v. United States*,
    342 U.S. 143 (1951)........................................................................................................ 8

*New York v. Facebook, Inc.*,
    549 F. Supp. 3d 6 (D.D.C. 2021)............................................................................... 7, 8

*New York v. Meta Platforms, Inc.*,
    66 F.4th 288 (D.C. Cir. 2023)..................................................................................... 7, 8

*Noohi v. Johnson & Johnson Consumer Inc.*,
    146 F.4th 854 (9th Cir. 2025)...................................................................................... 15

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) .................................................................................. 4, 6

*Oahu Gas Serv., Inc. v. Pac. Res., Inc.*,
    838 F.2d 360 (9th Cir. 1988)......................................................................................... 9

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018)................................................................................................... 2, 3

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022)................................................................................... 13, 14

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 914 (9th Cir. 2015)..................................................................................... 2, 11

Gibson, Dunn &
Crutcher LLP

iii

DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
4:11-CV-06714-YGR

**SER-443**

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009)..............................................................................................9

*Plush Lounge Las Vegas LLC v. Hotspur Resorts Nev. Inc.*,
    371 F. App'x 719 (9th Cir. 2010) ........................................................................3

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ........................................................................ 1, 3, 4

*SaurikIT, LLC v. Apple Inc.*,
    2023 WL 8946200 (9th Cir. Dec. 28, 2023)......................................................13

*SC Innovations, Inc. v. Uber Techs., Inc.*,
    2020 WL 2097611 (N.D. Cal. May 1, 2020) ........................................................3

*Teradata Corp. v. SAP SE*,
    124 F.4th 555 (9th Cir. 2024) ..............................................................................4

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
    875 F.2d 1369 (9th Cir. 1989) ..............................................................................1

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)............................................................................................14

*United States v. Apple Inc.*,
    2025 WL 1829127 (D.N.J. June 30, 2025)............................................................7

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019) ...............................................................................2, 3

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)..........................................................................................5, 8

*Williams v. Boeing Co.*,
    517 F.3d 1120 (9th Cir. 2008) ............................................................................13

**Statutes**

15 U.S.C. § 15b...............................................................................................................13

**Rules**

9th Cir. Rule 36-3(c)......................................................................................................15

Fed. R. Civ. P. 37(c)(1)...................................................................................................14

Gibson, Dunn &
Crutcher LLP

# I. INTRODUCTION

Plaintiffs do not have a case to try. They cannot articulate what market they intend to define at trial and try to talk around whether it will be one or two sided. But they cannot skip this threshold element of their case. Whether or not their experts "analyze[d] both sides" of the App Store, Opp. 6, Plaintiffs' alleged one-sided "retail" market for all "iOS apps," Dkt. 229, Third Am. Compl. ("TAC") ¶¶ 16, 47, is not legally tenable. Yet this is far from the only fatal flaw in their case: Plaintiffs strain against the refusal to deal doctrine but tacitly concede their theory assumes Apple should have been compelled to license its technology to an "alternative iOS app store." Dkt. 1031-1 ("Opp.") 25. Apple's refusal to do so is an archetypal refusal to deal just as Apple's initial security measures are textbook product design decisions. Nor can Plaintiffs salvage their theories with unpled claims about Apple's in-app payment system and anti-steering provisions—particularly with their damages model that cannot disaggregate lawful from allegedly unlawful conduct. The Court should enter summary judgment.

# II. ARGUMENT

## A. Plaintiffs' One-Sided Market Definition Fails As A Matter Of Law

Apple moved for summary judgment because Plaintiffs cannot prove their alleged one-sided "retail market for the sale of [iOS] apps." Dkt. 1004 ("Mot.") 5. That put to Plaintiffs the task of "present[ing] a sufficient disagreement" of fact "to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Plaintiffs' response does anything but. They don't say what market they'll define, wobble between one-sided and two-sided theories, and even toy with skipping market definition altogether. *See* Opp. 4–8. Because Plaintiffs cannot prove their alleged market (to the extent they even intend to stick by it), the Court should enter summary judgment for Apple. *See, e.g.*, *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995) (summary judgment appropriate if a plaintiff "cannot sustain a jury verdict on the issue of market definition"); *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1373–74, 1380 (9th Cir. 1989) (similar).

**1.** Plaintiffs do not dispute that they pleaded a "retail market for the sale of [iOS] apps," a one-sided aftermarket for all iOS apps of every genre. *Apple Inc. v. Pepper*, 587 U.S. 273, 278 (2019). Yet Plaintiffs now equivocate from page to page. They at first appear to stick by this one-sided "retail

model." Opp. 5. But then they assert the App Store—like "most" retail stores—is two sided, *id.* at 5–6, and claim their "experts do not express" an opinion that the "market is one-sided," *id.* at 8. And by the next page, Plaintiffs go back to suggesting a "single-brand market" like theirs cannot be two sided, *id.* at 7, and confirm their "retail" market is not "a two-sided transaction platform in the *Amex* sense," *id.* at 6. At no point do Plaintiffs say what market they will define at trial and whether it is one or two sided. *See* Dkt. 1003-18 (June 25, 2025 Stiglitz Dep.) 288:14–290:7 (equivocating on if the relevant market is one or two sided). Obfuscation is no substitute for evidence—particularly as it is legal error to proceed on a one-sided definition in a case involving a two-sided transaction platform. Opp. 8; *accord US Airways, Inc. v. Sabre Holdings Corp.* ("*Sabre*"), 938 F.3d 43, 58 (2d Cir. 2019).

Nor do Plaintiffs contest the undisputed evidence demonstrating the App Store bears all the hallmarks of a two-sided transaction platform under *Ohio v. Am. Express Co.* ("*Amex*"), 585 U.S. 529, 534–35 (2018). *See* Mot. 6–8; *see also* Dkt. 1003-22 (Jin Rep.) ¶ 60; Dkt. 1003-23 (Sundararajan Rep.) ¶ 144.[1] Their only resistance is Stiglitz's assertion that "an *Amex*-like analysis is unnecessary because no evidence demonstrates any 'substantial indirect network effects.'" Opp. 6. But while "[e]xpert testimony is useful as a guide to interpreting market facts," "it is not a substitute for them"—and cannot alone forestall judgment as a matter of law. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993); *see also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 923 (9th Cir. 2015) ("[T]he mere proffering of unsupported expert testimony does not create a triable issue."). Regardless, Stiglitz is wrong, as he was wrong in *Sabre*, that quantification of strong indirect network effects is a prerequisite for *Amex* to apply. *Sabre*, 938 F.3d at 58–59, 69 (vacating jury verdict). The factual prerequisites recognized by the Supreme Court—namely, that the platform connects two groups through simultaneous transactions, *id.* at 58—*create* indirect network effects, not the other way around. *See* Dkt. 1003-23 (Sundararajan Rep.) ¶¶ 32–33, 35–36.

On this record, Plaintiffs cannot distinguish the many cases holding that the App Store has those predicate features and *is* a two-sided transaction platform. They first assert that "no case hold[s] that

---

[1] Plaintiffs suggest in their separate statement (but not opposition) that App Store transactions are not simultaneous. *See* Dkt. 1031-3 ("Resp. Fact") 41. But even their own expert admits transactions are simultaneous. *See* Dkt. 1003-105 (Dec. 15, 2022 Abrantes-Metz Dep.) 108:8–109:1 (conceding "the purchase and sale of apps" on the App Store "happen[s] simultaneously").

Gibson, Dunn & Crutcher LLP

the App Store is a two-sided transaction platform." Opp. 7. But that is plain wrong: This Court found "the App Store is a two-sided transaction market," *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 994 (N.D. Cal. 2021), which the Ninth Circuit affirmed, *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 1000–01 (9th Cir. 2023), and twice reiterated, *Coronavirus Rep. v. Apple Inc.*, 85 F.4th 948, 955–57 (9th Cir. 2023); *In re Google Play Store Antitrust Litig*, 147 F.4th 917, 931, 945, 950 (9th Cir. 2025) ("app stores . . . compet[e]" in a "two-sided market"). They next argue that, unlike these cases, they dispute the "predicate fact" that the App Store is "a transaction platform." Opp. 8. But mere say-so is not enough when, as explained above, Plaintiffs adduce no evidence and no authority to "avoid the obvious" fact that the App Store is a two-sided transaction platform, *Epic*, 559 F. Supp. 3d at 1016— meaning their alleged one-sided market fails as a matter of law. *See Sabre*, 938 F.3d at 58.

**2.** Plaintiffs' principal argument instead appears to be that they don't need to prove any particular market because *Amex* speaks only to the "impact" a plaintiff must show. Opp. 5–6. This puts the cart before the horse. As *Amex* holds, a court "must first define the relevant market" before assessing competitive effects. 585 U.S. at 542. The Ninth Circuit in *Epic* indeed discussed how to prove anticompetitive effects in cases involving a two-sided market, Opp. 4–5, but only *after* describing "defining the relevant market" as a "threshold step." 67 F.4th at 975. That is consistent with precedent both before and after *Epic*. *See Coronavirus Rep.*, 85 F.4th at 957; *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020). Nor does *SC Innovations, Inc. v. Uber Techs., Inc.* suggest otherwise as it speaks to monopoly power, not market definition. 2020 WL 2097611, at *9 (N.D. Cal. May 1, 2020).

**3.** Plaintiffs also cannot circumvent their burden by saying their experts "analyzed both sides of the App Store." Opp. 6. Ninth Circuit precedent is clear: Failure to prove a relevant market is fatal to a Section 2 claim. *Rebel Oil*, 51 F.3d at 1435; *see also, e.g.*, *Plush Lounge Las Vegas LLC v. Hotspur Resorts Nev. Inc.*, 371 F. App'x 719, 720 (9th Cir. 2010). Plaintiffs' experts did not define a two-sided market that encompasses all iOS app transactions. Dkt. 1033-11 (Stiglitz Rep.) § V.B (outlining SSNIP test for consumer-side substitution only); Dkt. 1003-18 (June 25, 2025 Stiglitz Dep.) 290:17–19 (failing to define a relevant market for the developer side of the platform). And Plaintiffs cannot rescue their claims by pointing to Apple's experts for a fallback definition. To be "relevant to [Plaintiffs] theory of harm at issue," any two-sided market alternative must cover all 26 app genres included in Plaintiffs

DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
4:11-CV-06714-YGR

Gibson, Dunn & Crutcher LLP

case. *Teradata Corp. v. SAP SE*, 124 F.4th 555, 570 (9th Cir. 2024). None of Apple's experts defined such a market. Dkt. 1003-20 (Hitt Rep.) ¶¶ 90, 96–97; Dkt. 1003-22 (Jin Rep.) ¶¶ 91–93; Dkt. 1003-27 (Hitt Reb. Rep.) ¶ 299; Dkt. 1003-28 (Sundararajan Reb. Rep.) ¶ 261. Apple's experts disclaimed a market encompassing all transactions for all genres because, as this Court recognized when defining a two-sided mobile gaming transaction market in *Epic*, the two-sided "competitive conditions for transactions vary significantly across different app genres." Dkt. 1003-20 (Hitt Rep.) ¶¶ 90, 96–97; *see also Epic*, 559 F. Supp. 3d at 1019. Critically, that means only one proposed market—a one-sided aftermarket for all iOS apps of every genre—has been tendered to support Plaintiffs' claims. *Cf. Rebel Oil*, 51 F.3d at 1421; *Epic*, 67 F.4th at 978 & n.9 (relying on *Rebel Oil* to allow the plaintiff's claims to go forward on "a third in-between market"). Because that market fails as a matter of law, Plaintiffs' antitrust claims do too.

**B.      Plaintiffs Cannot Disclaim Their Direct Challenge To Apple's Refusals To Deal**

Plaintiffs now characterize their suit as challenging Apple's "restrictions on both app developers and iOS device consumers" that "interfere with dealing among third parties and rivals." Opp. 9. But Plaintiffs cannot dodge the refusal to deal doctrine by "recast[ing] [Apple's] conduct as an 'affirmative' act of interference." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1078 (10th Cir. 2013). Plaintiffs' allegations, expert testimony, and case law all make clear that Apple's conduct is a refusal to assist or deal with rivals—and is protected under settled law.

**1.** As an initial matter, *Epic* does not "foreclose Apple's refusal-to-deal argument." Opp. 9. Both this Court and the Ninth Circuit rejected Epic's Section 1 claims and therefore declined to analyze the Section 2 claims separately since a "find[ing] that the conduct in question is not anticompetitive under § 1" means "the court need not separately analyze the conduct under § 2." *Epic*, 67 F.4th at 998 (quoting *Qualcomm*, 969 F.3d at 991). Nothing in *Epic* suggests that if the case had been brought as a Section 2 case alone it would not have been analyzed as a refusal to deal. *See* Opp. 9 (citing no part of either decision to support this purported reading). The applicability of refusal to deal doctrine is a gating issue here: Plaintiffs have no Section 1 claim, so there is no rule-of-reason analysis under Section 1 that will precede an analysis under Section 2. *See Novell*, 731 F.3d at 1072 (courts in Section 2 cases apply "considerably more specific rules for common forms of alleged misconduct").

Gibson, Dunn &
Crutcher LLP

Setting aside this material difference, Plaintiffs cannot argue *Epic* controls even if it were true the "Court and the Ninth Circuit rejected Apple's refusal-to-deal arguments." Opp. 9. Here, for example, Plaintiffs seek to compel Apple to code sign rival app marketplaces, *see infra* § II.C—a textbook refusal-to-deal-with-rivals theory that Epic explicitly "disclaim[ed]." *Epic*, 559 F. Supp. 3d at 1034 n.599. Indeed, Plaintiffs would doom themselves to defeat insofar as they claim *Epic* is indistinguishable on the facts and law given that *Epic* upheld the restrictions challenged here under the antitrust laws. *See Key v. Qualcomm Inc.*, 129 F.4th 1129, 1137 (9th Cir. 2025) (requiring "extraordinary differences" for a case "to survive" at odds with a prior precedential opinion).

**2.** Plaintiffs also cannot evade the refusal to deal framework just because they did not label their cause of action "a refusal to deal *claim*." Opp. 14 n.10. Substance matters, not form. The FTC did not cast Qualcomm's licensing practices as a refusal to deal either. *See, e.g.*, Compl., *FTC v. Qualcomm Inc.*, Case 5:17-cv-00220 (N.D. Cal. Jan. 17, 2017), Dkt. 1. But the Ninth Circuit applied duty-to-deal precedents nonetheless. *Qualcomm*, 969 F.3d at 993–95. And while Plaintiffs try to frame their case as one about "restrictions on both app developers and iOS device consumers that block their voluntary dealings with each other," Opp. 9, they elide the actual restrictions at issue.

The restrictions at issue here are refusing to allow any third-party store in the App Store or by sideloading, and "terminat[ing] apps developers who [would] sell apps in competition with" the App Store. Mot. 9. Plaintiffs' own economist confirmed as much. *See* Dkt. 1003-18 (June 25, 2025 Stiglitz Dep.) 226:24–227:11 (opining on Apple's general "policy of not allowing app stores in its own App Store"); Dkt. 1003-15 (May 30, 2025 Stiglitz Dep.) 114:23–115:2 (taking issue with Apple's "refus[al] to deal with developers who sell iOS apps outside the App Store"). These restrictions reflect Apple's "refusal to cooperate with rivals." *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). After all, Plaintiffs' alleged relevant market is one in which Apple, as a "retail store," sells apps and IAPs to consumers. Opp. 7. And Plaintiffs even assert the entire genesis of these restrictions was a world in which "Cydia emerged as an option for downloading iOS apps from the internet" and Facebook provided "store-like" apps. *Id.* at 3. Refusing to allow a competing store on iOS—and terminating developers who would sell apps on iPhone and iPad via another competing store—is a quintessential refusal to deal with rivals in the relevant market. Mot. 12–13. And if Apple's

sideloading restrictions don't bar rivals, then they can't be exclusionary at all. *See Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1356 (Fed. Cir. 1999).

Plaintiffs' own arguments underscore this point. They admit their damages model presumes Apple's restrictions prevented an "alternative iOS App Store" from entering. Opp. 21, 25; *see also* Dkt. 1033-3 (Abrantes-Metz Rep.) ¶ 23. And while Plaintiffs foreswear any claim for injunctive relief, Opp. 14–15, they do not deny that their but-for world remains one in which Apple is compelled to license its proprietary technology to others so that they can offer native iOS apps for download to consumers. *See* Mot. 13. As in *City of Vernon v. Southern California Edison Co.*, Plaintiffs' theory of injury and damages unveils their case as one premised on Apple's refusal "to give all of the access to the facility[y] that [the plaintiff] desire[d]." 955 F.2d 1361, 1366 (9th Cir. 1992). Apple's refusals to deal thus carry a "presumption of legality," Opp. 9 (quoting *Novell*, 731 F.3d at 1073), and Plaintiffs do not even try to satisfy an exception to the rule, *see* Mot. 11–12.

Nor can Plaintiffs stretch Apple's consumer warranty into a grand theory of anticompetitive conduct. Plaintiffs implicitly recognize that Apple's warranty policies, standing alone, cannot be anticompetitive. *See* Resp. Fact 25 (arguing that Apple's warranty policies are anticompetitive only "in conjunction" with other restrictions); *see also In re Harley-Davidson Aftermarket Parts Mktg., Sales Pracs. & Antitrust Litig.*, --- F.4th ---, 2025 WL 2374859, at *9 (7th Cir. Aug. 15, 2025) (rejecting monopolization claim based on warranty that only "foreclose[d] competition for parts that would not be covered by the limited warranty"). And they do not claim that if Apple covered warranty costs for jailbroken phones, it would somehow cause alternative app stores to enter. Regardless, unlike the pleadings decisions Plaintiffs cite (Opp. 10 n.9), Plaintiffs have not identified a single instance of Apple voiding warranties of iOS device owners "who buy competing apps" here. Mot. 16 (citing TAC ¶ 79). At most, Apple may deny service for devices whose security features have been disabled. No case cited by Plaintiffs contends that sort of action reflects anticompetitive conduct. Nor does their liability expert, Stiglitz. *See* Dkt. 1003-15 (May 30, 2025 Stiglitz Dep.) 147:15–21 (conceding it is not "anticompetitive for Apple to make the customer pay for the consequences [of] deciding to jailbreak").

**3.** For these reasons, Plaintiffs find no support in precedent. They first miss the mark in comparing Apple's restrictions on rival stores to the restrictions on commercial real estate listings

Gibson, Dunn &
Crutcher LLP

challenged in *CoStar Group, Inc. v. Commercial Real Estate Exchange, Inc.*, --- F.4th ---, 2025 WL 2573045, at *11 (9th Cir. Sept. 5, 2025). There, CoStar precluded its customers' "ability to use other listing *platforms*" and effectively prevented CoStar's rivals from "access[ing] [customers'] listings in [customers'] *own websites*." *Id.* (emphasis added). Those restrictions directly restrained customers and prevented them from engaging with CoStar's rivals. But Apple does not prevent iPhone owners from using their Amazon Fire Stick to rent movies from Prime Video instead of the Apple TV app. Rather, Apple prohibits competitors from using its own proprietary technology to compete against it—either by offering competing stores within the App Store or through sideloading directly onto iOS. *See New York v. Meta Platforms, Inc.*, 66 F.4th 288, 303, 305 (D.C. Cir. 2023) (rejecting theory that would require a platform to "lend its facilities to its potential competitors"). And CoStar's restrictions—which were not known to CoStar's broker-customers—were "particularly problematic because of their deceptive element." *CoStar*, 2025 WL 2573045, at *12. No similar evidence of duplicity exists here.[2]

In stark contrast, Plaintiffs struggle in vain to distinguish the cases that actually bear on this case. Plaintiffs contend that the *Meta* court analyzed Facebook's policies under "exclusive dealing law, not refusal to deal," Opp. 13, but the D.C. Circuit's reliance on *Trinko* disproves that point. *See Meta*, 66 F.4th at 305–06. And Plaintiffs' own description of *Novell* as involving a challenge which "sought to force Microsoft to share software code" demonstrates its applicability to Plaintiffs' claims here. Opp. 14. Plaintiffs cannot distinguish either case on the ground that those defendants did not "affirmatively interfer[e]" with the dealings of third parties. *Id.*; *see New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 31 (D.D.C. 2021) ("[R]efusals can always be reframed as offers to deal only on the condition that the third party refrains from competing."). After all, Microsoft's refusal to share APIs with independent software vendors restricted Novell from providing features to Word Perfect users, just as Facebook's policies restricted its users from interacting with third-party apps—both situations in which the defendant allegedly "interfered" with its rivals' ability to interact with consumers.

For the same reason that *Meta* recognized, *Lorain Journal Co. v. United States*, 342 U.S. 143

---

[2] So too for Plaintiffs' reliance on *United States v. Apple Inc.*, 2025 WL 1829127, at *11–12 (D.N.J. June 30, 2025). *See* Opp. 11. As Apple explained, the court held that the alleged conduct was not a refusal to deal with smartphone competitors to monopolize an alleged smartphone market. Mot. 10. Here by contrast, Plaintiffs assert that Apple refused to deal with "developers who sell [or would sell] apps in competition with Apple' in the alleged 'iOS applications aftermarket." *Id.*; *see* TAC ¶¶ 79, 84.

Gibson, Dunn & Crutcher LLP

(1951), and its progeny are inapplicable here.  *See* Opp. 13–14.  In such cases, the defendants directly coerced customers from contracting with interbrand competitors.  *See Facebook*, 549 F. Supp. 3d at 32.  But Facebook's policy did not prohibit developers from working with competitors—it "limit[ed] only how [certain] apps on Facebook operate" while "leav[ing] app developers entirely free to develop applications for Facebook's competitors."  *Meta*, 66 F.4th at 304.  So too here.  For *Lorain Journal* to apply, Plaintiffs would need evidence that Apple conditioned developers' access to iOS and the App Store on their agreement not to distribute through Google Play, Steam, or other app marketplaces.  No such evidence exists here.

Nor can Plaintiffs distinguish *Google Play*'s rejection of an indistinguishable store-within-a-store claim as a lawful refusal to deal.  *See* Order at 1, Dkt. 491, *In re Google Play Store Antitrust Litig.*, No. 20-cv-5671 (N.D. Cal. Oct. 20, 2023).  Without disagreeing with the merits of Judge Donato's decision, Plaintiffs cobble together irrelevant observations comparing Google and Apple's developer agreements.  Opp. 14.  None of that drove the result under Section 2 there, and they should not do so here.  Instead, those distinctions were presented in the context of a Section 1 claim, so they have little relevance here.  That Epic agreed Google's "store within a store" restrictions were lawful refusals to deal under Section 2 only highlights the anomalous position that Plaintiffs take in this case.

**4.**  Finally, Plaintiffs seek to analogize Apple's conduct to tying, arguing that Apple conditions access to iOS on consumers' use of Apple's app distribution system.  *See* Opp. 11–13.  But that cannot forestall summary judgment either.  For one, Plaintiffs admit to "not pursuing a Section 1 tying claim."  *Id.* at 13.  And their "analogies" to tying miss the mark: Having conceded the absence of any actual phone-app-store tying agreement, their newest theory, whatever it may be, was never pleaded and should be rejected for reasons discussed below.  *Id.*; *see infra* § II.D.1.  In reality, Plaintiffs are attempting to circumvent refusal to deal precedent by dressing up Apple's platform policies as a hybrid form of conduct between "conditional dealing," "quasi-tying," and "monopoly leveraging."  The Court should reject this effort to manufacture a new theory of liability unsupported by law or fact.  *See Facebook*, 549 F. Supp. 3d at 31; *see also Trinko*, 540 U.S. at 415 n.4 (rejecting such a claim because "leveraging presupposes anticompetitive conduct, which in this case could only be the refusal-to-deal claim we have rejected"); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 455–57 (2009)

(refusing to "alchemize" claims into "a new form of antitrust liability never before recognized").

## C.   Plaintiffs' Challenge To The Design Of iOS Fails As A Matter of Law

Plaintiffs similarly cannot avoid the product design doctrine by distorting their theory of liability.  The operative complaint challenges the technical restrictions that make iOS a "closed" platform.  TAC ¶ 36.  And Plaintiffs continue to attack Apple's requirement that iOS apps possess a "digital signature" or software "certificate" that "can only be obtained through the App Store."  Resp. Fact 20.  Yet they do not dispute that Apple's "on-device protections, including sandboxing, code signing, and entitlements are 'an essential part of iOS's approach to security.'"  Resp. Fact 21.  That means Plaintiffs' challenge fits squarely within—and summary judgment is required under—*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 1000 (9th Cir. 2010).

To be sure, Plaintiffs disagree about the *extent* of "consumer appeal and supposed security risks" addressed by Apple's decision to employ technical safeguards to make iOS a "closed" platform.  Opp. 17.  But summary judgment is appropriate so long as a product's "design provided *some* new benefit to consumers."  *Allied Orthopedic*, 592 F.3d at 1000 (emphasis added).  And Plaintiffs do not dispute that Apple's design choices aim to make its products "more attractive to buyers."  *Cal. Comput. Prods., Inc. v. Int'l Bus. Machs. Corp.* ("*CalComp*"), 613 F.2d 727, 744 (9th Cir. 1979); *see* Dkt. 1004-1 ("SUF") 26; *see also Epic*, 559 F. Supp. 3d at 1038 ("centralized app distribution" helps Apple "provide[] a safe and trusted user experience on iOS").  Plaintiffs therefore ask the Court to defy binding precedent by submitting to a jury the task of "balancing the benefits or worth of a product improvement against its anticompetitive effects."  *Allied Orthopedic*, 592 F.3d at 1000.

Plaintiffs also try to distinguish *Allied Orthopedic* and its predecessors as cases about "*changes* in product design."  Opp. 16.  But *Allied Orthopedic* speaks to "new *and* improved product design." *Allied Orthopedic*, 592 F.3d at 1000 (emphasis added); *see also, e.g.*, *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 545–46 (9th Cir. 1983) (applying doctrine to "new products").  If anything, the reasons for refusing to second-guess innovation is at its apex with the introduction of a novel product: Consumers are worse off when companies forgo development of new products for fear of Section 2 liability.  *See Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 369 (9th Cir. 1988) (courts have "consistently rejected antitrust liability for a monopolist's decision about when or whether

to market new products"). That is why "any firm, even a monopolist, may generally bring its products to market whenever and however it chooses." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 286 (2d Cir. 1979). Regardless, Plaintiffs recognize that Apple catered to "huge" demand by opening iOS to native (and not just web-based) apps. Resp. Fact 1. That change was an "improvement" to iPhone and "does not violate Section 2." *Allied Orthopedic*, 592 F.3d at 999–1000.

Nor can Plaintiffs escape these decisions by casting Apple's "technical restrictions" as "limitations on innovation and new product offerings." Opp. 16–17. The Ninth Circuit has rejected that argument time and time again. *See, e.g.*, *Allied Orthopedic*, 592 F.3d at 1002 (rejecting argument that defendant "force[d] consumers to adopt its new technology" by restricting compatibility with interoperating technologies); *CalComp*, 613 F.2d at 741 (rejecting argument that "IBM made design changes on certain of its CPUs, disk drives and controllers of no technological advantage and solely for the purpose of frustrating competition from plug-compatible manufacturers"). *CoStar* does not dictate a different result. CoStar allegedly "constructed technological barriers that impede[d] [its rival's] ability to access brokers' listing information" without the brokers' knowledge and without any alleged benefit to consumers. 2025 WL 2573045, at *11. No such "deceptive element" exists here, and this Court has ample record evidence (unlike the *CoStar* court) about the benefits of Apple's foundational design decisions. *Id.* at *12; *see* SUF 20–23.

Finally, Plaintiffs claim to challenge Apple's "associated anticompetitive conduct" (Opp. 1, 15) but identify no such conduct aside from the lawful refusals to deal addressed above. *See supra* § II.B. That matters because Plaintiffs must identify exclusionary conduct other than "the product introduction itself." *Foremost*, 703 F.2d at 545–46. In *Allied Orthopedic*, for example, the defendant's new and improved pulse oximetry monitors were incompatible with the old sensor technology that competitors had used, but that incompatibility did not amount to a distinct abuse of market power to force adoption of the new system. 592 F.3d at 1002. Instead, because "the product improvement at issue in th[e] case, not some associated conduct by [the defendant], caused the incompatibility," the plaintiffs had no viable Section 2 claim. *Id.* So too here, where Plaintiffs have not identified anticompetitive conduct beyond Apple's technical restrictions or plain refusals to deal.

**D.    The Court Should Reject Plaintiffs' IAP And Anti-Steering Theories**

**1.    Plaintiffs cannot sneak unpled IAP and anti-steering theories to the jury**

In denying Plaintiffs leave to amend, this Court made clear that the "scope" of the case was locked and could not be "widen[ed]." Dkt. 573 at 7. Plaintiffs were thus bound by the TAC's tripartite theory that Apple acquired or attempted to acquire monopoly power by: (a) "designing the iOS Devices operating system as a closed system and installing security measures and program locks," (b) "establishing the App Store as the exclusive worldwide distributor of iOS apps," and (c) "terminating or threatening to terminate app[] developers who sell apps in competition" and "voiding the warranties of iOS Devices consumers who buy competing apps." TAC ¶¶ 79, 84. It also means anti-steering and IAP restrictions were not part of Plaintiffs' case. They do not deny that the TAC never mentions Apple's former anti-steering rules. *See* Opp. 17–19. While they make much of their passing references to in-app purchases, *id.* at 17, these general allusions do not suffice because restrictions on in-app purchases raise "distinct concepts" compared to Plaintiffs' other challenges. *Evervictory Elec. (B.V.I.) Co. v. Invision Indus. Inc.*, 2012 WL 2030177, at *2 (C.D. Cal. June 4, 2012); *see infra* § II.D.2 (identifying distinctions between purchase of apps and in-app purchases). And broad hints of Apple "threaten[ing] to terminate developers who sell in competition with Apple" say nothing about in-app purchases at all. Opp. 17 (citing TAC ¶¶ 79, 84). None of these scattered references provided Apple with notice that Plaintiffs would launch a direct challenge to the IAP design.

It does not matter that Plaintiffs sketched these theories in discovery or that Apple was compelled to devote some attention to these theories in its own rebuttal expert reports (Opp. 18–19). And it is implausible that plaintiffs only belatedly "discovered" these theories through recent discovery. The operative complaint dictates the boundary of Plaintiffs' claims—not sparse references in discovery or class certification briefing. *See In re Online DVD-Rental*, 779 F.3d 914, 924 n.3 (9th Cir. 2015) ("The district court also did not abuse its discretion in excluding evidence at summary judgment that supported new, unpled liability theories, even though the evidence had been adduced in discovery."). Whether Plaintiffs properly *pleaded* claims related to IAP is a merits issue ripe now, not something relevant to class certification. The Court already rejected Plaintiffs' attempt to add post-*Epic* theories, including those targeting IAP and anti-steering provisions, because such a claim "is not consistent with

their [then] proposed complaint." Dkt. 573 at 6–7. Plaintiffs' efforts to reintroduce those theories now, without leave of court, should be rejected again.[3]

### 2.     Plaintiffs lack antitrust standing to challenge the former anti-steering rule

Plaintiffs lack antitrust standing to challenge Apple's former anti-steering rule because calculating the alleged harm to consumers relies on a series of contingent events that makes apportioning damages complex—with the attendant risk of duplicative recovery between developers and consumers. *See Assoc'd Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 534, 543–44 (1983).[4] Plaintiffs respond by overreading *Pepper*. Opp. 19. There, the Supreme Court held on the pleadings that Plaintiffs could sue Apple as direct purchasers under *Illinois Brick Co. v. Illinois*. *See Pepper*, 587 U.S. at 281. But as *Illinois Brick* itself recognized, remoteness of injury and indirect purchaser standing are "analytically distinct." 431 U.S. 720, 728 n.7 (1977). Nor could the Supreme Court's decision in *Pepper* touch on the former as Plaintiffs had not alleged any challenge to Apple's former anti-steering rules at the time. *See supra* § II.D.1.

Plaintiffs otherwise argue that "Apple's anti-steering directly stopped developers from directing customers to other platforms." Opp. 21. But that only highlights the indirectness. The restraint was imposed on developers, not the class. *See Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 541 (9th Cir. 1987) (restraint must "lead directly" to plaintiffs as "the immediate victims"). Moreover, Plaintiffs do not dispute, as the Ninth Circuit observed in *Epic*, that translating that restraint to an effect on developers at the first step "would require a protracted and speculative inquiry." 67 F.4th at 1003.

### 3.     Plaintiffs' in-app purchasing theories are time-barred

Plaintiffs admit they seek damages for alleged overcharges on in-app purchases even though they waited nearly nine years to even mention such transactions in their pleadings. Opp. 23; *see generally* TAC. In a footnote, Plaintiffs argue that each in-app purchase was a new injury that restarted the limitations window. Opp. 22 n.15. But that is the same argument considered and rejected in

---

[3] Nor can Plaintiffs—as suggested in passing in a footnote—amend the pleadings at trial. Opp. 18 n.12. They concede such a practice is disfavored where there are no "newly-revealed material facts." *Jacobson v. Rose*, 592 F.2d 515, 519 (9th Cir. 1978). No such new facts were uncovered here.

[4] Plaintiffs' argument (Opp. 20) that they have standing to challenge alleged restraints related to in-app purchases is irrelevant because Apple's standing challenge is limited to Plaintiffs' claims concerning Apple's former anti-steering rule. *See* Mot. 19–21.

12

Gibson, Dunn &
Crutcher LLP

*SaurikIT, LLC v. Apple Inc.*, 2023 WL 8946200 (9th Cir. Dec. 28, 2023).  That case involved the same kind of time-barred challenge to foundational decisions about the App Store.  *Id.* at *1.  And there too, Plaintiffs argued that each sale (and each warranty entered into with a customer as a result) was an overt act to restart the limitations period.  *Id.*  But the Ninth Circuit rejected that argument, recognizing the continued sale of Apple's products or services is merely "a reiteration or extension of" an original decision—which does not restart the limitations period.  *Id.*  So too here.  At minimum, damages, if any, must be limited to the four-year period preceding the TAC.  *See* 15 U.S.C. § 15b.

Nor can Plaintiffs avoid the statute of limitations by arguing the TAC "relates back."  Opp. 22–23.  Their new claim that Apple has "foreclose[ed] . . . alternative iOS in-app payment processing solutions," Dkt. 1003-32 (Stiglitz Rep.) ¶ 80, does not "share a common core of operative facts" with Plaintiffs' initial app purchase claim because it rests on "different statistical evidence and witnesses."  *See Williams v. Boeing Co.*, 517 F.3d 1120, 1133 (9th Cir. 2008).  Plaintiffs' own experts admit they concern discrete restrictions in the DPLA and App Review Guidelines and unique competitive conditions related to the purchase of digital content across platforms.  *See* Dkt. 1003-32 (Stiglitz Rep.) ¶¶ 63, 80; Dkt. 1003-35 (Song Rep.) ¶ 45; Dkt. 1003-34 (McFadden Rep.) ¶¶ 15–16.  Apple has objected to this prejudicial change in direction since Plaintiffs filed the TAC because it is not appropriate to introduce a new legal theory nine years into litigation, particularly when, as here, Plaintiffs represented that the prior operative complaint "does not currently concern anything other than iPhone apps purchases."  *See* TAC at 4 (Stipulation and Order for Leave to File TAC).

**E.      Plaintiffs Cannot Establish Additional Elements Of Their Damages Claims**

**1.**  Plaintiffs lack evidence sufficient to prove "antitrust impact on a class-wide basis" given the unreliability of their experts' work.  *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 681 (9th Cir. 2022) (en banc); *see* Mot. 22–25.  Plaintiffs protest that they do not need Mr. Thompson's analysis because "the model measures overcharges for every transaction."  Opp. 24.  But the certified class includes individuals, not transactions.  *See* Dkt. 789 at 2 (certifying class defined as "All persons . . .").  Plaintiffs therefore must show injury to actual people—as they tacitly recognize by arguing that Hayter, as an individual, is damaged.  Opp. 24 n.16; *see also* Dkt. 789 at 1 (certifying the class on "plaintiffs' representation" that they could match transactions to people).  Thompson's

unreliable deduplication efforts are the only evidence Plaintiffs have connecting transactions to individuals.  Because that analysis is inadmissible, Plaintiffs lack proof of classwide injury.  *Olean*, 31 F.4th at 681; *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 431, 436 (2021) (the "concrete harm" requirement must be satisfied by each "individual" class member).[5]

Nor can Plaintiffs (in a footnote, *see* Opp. 24 n.16) create a triable issue for Mr. Hayter alone.  Plaintiffs rely on a new declaration from Dr. Song served on September 2, 2025.  Dkt. 1031-2.  The Court should strike this declaration, as well as the August 1 Supplemental Report (Dkt. 1034-7) on which it relies.  Though expert discovery closed on July 11, Song's submissions include new opinions, including Hayter's damages (Dkt. 1031-2 ¶¶ 4–5), and calculations of individual and classwide damages at the account level (Dkt. 1031-2 ¶¶ 7–8; Dkt. 1034-7 ¶¶ 3–5).  Nothing stopped Song from analyzing Hayter's damages or performing account-based calculations in his prior reports; indeed, he acknowledged in March that his team could "allocate Class-wide damages to anonymized Apple IDs."  Dkt. 1003-35 (Song Rep.) ¶ 11.  Apple's experts have had no opportunity to respond to these new analyses.  *See* Ex. 109 (Aug. 15, 2025 Letter from E. Lazarus to M. Rifkin).  Nor can Plaintiffs claim this is proper "supplementation" under Rule 26(e); Song's supplement and declaration weren't offered to correct his reports but because Plaintiffs "shift[ed] their litigation strategy" at the eleventh hour.  *Key*, 129 F.4th at 1144 (affirming exclusion of supplemental report).  Song's untimely disclosures were not justified or harmless and must be stricken.  Fed. R. Civ. P. 37(c)(1).

**2.**  Plaintiffs also do not dispute that their model aggregates all challenged conduct to estimate damages.  *See* Mot. 23–25.  Nor do Plaintiffs dispute that courts "reject[] a damages model for failure to disaggregate conduct after determining, at class certification or summary judgment, that some alleged conduct was lawful."  Opp. 24.  Thus, binding Ninth Circuit precedent requires summary judgment in full if Apple prevails on any argument above.  *See City of Vernon*, 955 F.2d at 1373.

Plaintiffs suggest a jury can find any conduct anticompetitive and then award any "*amount* of damages" so long as it "is not the product of speculation or guess work."  Opp. 24–25 (quoting *Hughes v. Gen. Motors Corp.*, 35 F.3d 571, at *2 (9th Cir. 1994) (table)).  For one, *Hughes* is a dated

---

[5] Plaintiffs make no claim that they have any standalone challenge to Apple's price tier policies independent of their other claims.  And rightly so, because Plaintiffs have no evidence of classwide injury and damages caused solely by price tiers.  *See* Mot. 24 n.10.

DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
4:11-CV-06714-YGR

Gibson, Dunn & Crutcher LLP

unpublished opinion that may not be cited in this Court. *See* 9th Cir. Rule 36-3(c). For another, Plaintiffs' suggestion that "close enough" is "good enough" ignores the Supreme Court's subsequent decision in *Comcast Corp. v. Behrend*, 569 U.S. 27, 36–37 (2013). Plaintiffs repeat the same error as the *Comcast* plaintiffs by "assum[ing] the validity of all [their] theories of antitrust impact" without "attribut[ing] damages to any one particular theory." *Id.* at 36–37; *see In Re FirstEnergy Corp. Sec. Litig.*, 2025 WL 2331754, at \*22 (6th Cir. Aug. 13, 2025) (requiring "rigorous analysis to determine whether a plaintiff's damages case is consistent with its liability case" (cleaned up)).

Plaintiffs' only other response is to suggest that the failure of some aspect of their liability theory is unproblematic because their damages model is "conservative." Opp. 21, 25. But conservatism is not a substitute for disaggregation. A damages model must be capable of adjusting to the *specific conduct* found unlawful by the jury. *See, e.g.*, *Noohi v. Johnson & Johnson Consumer Inc.*, 146 F.4th 854, 866 (9th Cir. 2025) (damage model must be capable of "separating out those damages from damages tied to the plaintiff's theory"). Indeed, Plaintiffs' argument turns on the assumption that a single "alternative iOS App Store" would enter the market. Opp. 25. But if the Court holds that iOS's technical design (e.g., code signing) independently prevents sideloading, for example, any "alternative iOS App Store" could not be loaded on iOS devices—even if Apple's restriction on third-party marketplaces could be deemed separately unlawful. SUF 18–20; Resp. Add'l Fact 55. Nor can Plaintiffs' model be saved by Abrantes-Metz's assertion that her analysis "accounts for entry of competition, however achieved." Opp. 25. The portion of Abrantes-Metz's testimony cited by Plaintiffs (*id.*) provides no basis for her fanciful claim that removing any restriction alone would place the *exact same* "downward pressure on the commission rate" as removing any other restraint and thus result in the *exact same* commission rate regardless. It thus does not permit a factfinder to "segregate damages attributable to lawful competition from damages attributable to . . . monopolizing conduct." *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1224 (9th Cir. 1997). If the Court grants *any* part of Apple's motion for summary judgment, summary judgment should be entered with respect to Plaintiffs' damages too.

### III. CONCLUSION

The Court should grant Apple's motion for summary judgment.

Gibson, Dunn & Crutcher LLP

DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
4:11-CV-06714-YGR

**SER-459**

DATED: September 23, 2025

**GIBSON, DUNN & CRUTCHER LLP**

By: _/s/ Cynthia E. Richman_
CYNTHIA E. RICHMAN

Cynthia E. Richman (*pro hac vice*)
crichman@gibsondunn.com
Harry R. S. Phillips (*pro hac vice*)
hphillips@gibsondunn.com
1700 M Street, N.W.
Washington, DC 20036-4504
Telephone: 202.955.8234
Facsimile: 202.530.9691

Theodore J. Boutrous Jr. (132099)
tboutrous@gibsondunn.com
Daniel G. Swanson (116556)
dswanson@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Caeli A. Higney (268644)
chigney@gibsondunn.com
Julian W. Kleinbrodt (302085)
jkleinbrodt@gibsondunn.com
Dana L. Craig (251865)
dcraig@gibsondunn.com
Eli M. Lazarus (284082)
elazarus@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: 415.393.8200
Facsimile: 415.393.8306

*Attorneys for Defendant Apple Inc.*

DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
4:11-CV-06714-YGR

**SER-460**

Gibson, Dunn &
Crutcher LLP

THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile:  213.229.7520

CAELI A. HIGNEY, SBN 268644
  chigney@gibsondunn.com
JULIAN W. KLEINBRODT, SBN 302085
  jkleinbrodt@gibsondunn.com
DANA L. CRAIG, SBN 251865
  dcraig@gibsondunn.com
ELI M. LAZARUS, SBN 284082
  elazarus@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: 415.393.8200
Facsimile:  415.393.8306

CYNTHIA E. RICHMAN, D.C. Bar No. 492089*
  crichman@gibsondunn.com
HARRY R. S. PHILLIPS, D.C. Bar No. 1617356*
  hphillips@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
Facsimile:  202.467.0539

*Attorneys for Defendant Apple Inc.*

*admitted *pro hac vice*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| In re Apple iPhone Antitrust Litigation | No. 4:11-cv-06714-YGR <br><br> **DEFENDANT APPLE INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> The Honorable Yvonne Gonzalez Rogers <br><br> Date:      October 14, 2025 <br> Time:      2:00 p.m. <br> Courtroom:  1, 4th Floor |

Gibson, Dunn & Crutcher LLP

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on October 14, 2025 at 2:00 p.m. before the Honorable Yvonne Gonzalez Rogers, in Courtroom 1 of the United States District Court for the Northern District of California, located at 1301 Clay Street, Oakland, CA 94612, Defendant Apple Inc. ("Apple") will and hereby does move this Court to grant Apple's Motion for Summary Judgment, on the ground that Plaintiffs, including the named plaintiffs and class members, cannot establish multiple essential elements of their Sherman Act claims. In moving for summary judgment, Apple does not waive any arguments regarding one-way intervention with respect to Plaintiffs' delay in issuing class notice.

This motion is based on this Notice and Motion, the accompanying Memorandum of Points and Authorities, the concurrently filed Declarations and Exhibits, other documents on file in this or related actions, oral argument of counsel, witness testimony, and any other matters of which the Court may take judicial notice.

Dated: August 4, 2025          GIBSON, DUNN & CRUTCHER LLP

By: */s/ Cynthia E. Richman*

Theodore J. Boutrous Jr.
Daniel G. Swanson
Cynthia E. Richman
Caeli A. Higney
Julian W. Kleinbrodt
Dana L. Craig
Eli M. Lazarus
Harry R. S. Phillips

Gibson, Dunn & Crutcher LLP

## STATEMENT OF ISSUES TO BE DECIDED

Whether Apple is entitled to summary judgment on Plaintiffs' Sherman Act Section 2 claims under Federal Rule of Civil Procedure 56 because:

1. Plaintiffs misdefine the relevant market as a single one-sided market including all genres of iOS apps and in-app items.

2. Plaintiffs' claims based on lawful refusals to deal are foreclosed as a matter of law.

3. Plaintiffs' claims based on Apple's lawful design of iOS software as a closed and secure platform (in and after 2007) are foreclosed as a matter of law.

4. Plaintiffs' challenges to Apple's in-app payment system and former anti-steering rule are absent from the operative complaint, and in any event, are barred by the refusal-to-deal doctrine and/or Plaintiffs' lack of standing.

5. Plaintiffs' purported claims for alleged in-app purchase injuries and damages are barred as untimely in whole or in part.

6. Plaintiffs have failed to prove injury and nonspeculative damages because (A) the flawed opinions of Darryl Thompson and Prof. MacCormack render the McFadden-Song model unreliable; (B) the model is unable to account for lawful conduct in any event; and (C) Edward Hayter lacks any injury or damage according to the model.

Gibson, Dunn & Crutcher LLP

APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:11-CV-06714-YGR

**SER-463**

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................ 1

II.     UNDISPUTED FACTS ............................................................................................. 2

III.    LEGAL STANDARD ................................................................................................ 5

IV.     ARGUMENT .............................................................................................................. 5

    A.    Plaintiffs' One-Sided Consumer Aftermarket Fails As A Matter Of Law .................... 5

    B.    Apple's Restrictions On Rival App Distributors Are Lawful Refusals To Deal. ......... 9

    C.    Apple's Technical Design Of iOS Is Lawful Product Design. ................................... 13

    D.    Plaintiffs' Unpled IAP And Anti-Steering Theories Fail On The Undisputed Record For Multiple Reasons. ........................................................................ 16

        1.    Plaintiffs Cannot Introduce New, Unpled Theories At This Stage. ................ 16

        2.    Apple's IAP And Former Anti-Steering Rule Are Lawful Refusals To Deal. ........................................................................................ 18

        3.    Plaintiffs Lack Antitrust Standing To Challenge The Former Anti-Steering Rule. ................................................................................ 19

    E.    Plaintiffs' In-App Purchasing Theories Are Largely Time-Barred. .......................... 21

    F.    Plaintiffs Cannot Establish Additional Elements Of Their Damages Claims. ............ 22

V.      CONCLUSION ........................................................................................................ 25

Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES

**PAGES**

**CASES**

*In re Adderall XR Antitrust Litig.*,
    754 F.3d 135 (2d Cir. 2014).............................................................................................11

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
    836 F.3d 1171 (9th Cir. 2016)..........................................................................................10

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
    592 F.3d 991 (9th Cir. 2010)......................................................................................14, 16

*Apple Inc. v. Pepper*,
    587 U.S. 273 (2019) ...................................................................................1, 5, 20, 22

*In re Apple iPhone Antitrust Litig.*,
    2013 WL 6253147 (N.D. Cal. Dec. 2, 2013) .......................................................................1

*In re Apple iPhone Antitrust Litig.*,
    2022 WL 1284104 (N.D. Cal. Mar. 29, 2022).................................................................1, 6

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985).....................................................................................................11, 18

*Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*,
    459 U.S. 519 (1983).....................................................................................................19, 21

*Bakay v. Apple Inc.*,
    2024 WL 3381034 (N.D. Cal. July 11, 2024)....................................................................20

*BankAmerica Pension Plan v. McMath*,
    206 F.3d 821 (9th Cir. 2000)............................................................................................15

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
    603 F.2d 263 (2d Cir. 1979).............................................................................................14

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993)...........................................................................................................25

*Cal. Computer Prods., Inc. v. Int'l Bus. Machs. Corp.*,
    613 F.2d 727 (9th Cir. 1979)..................................................................................14, 15, 16

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ............................................................................................................5

*City of Oakland v. Oakland Raiders*,
    20 F.4th 441 (9th Cir. 2021).............................................................................................19

*City of Vernon v. S. Cal. Edison Co.*,
    955 F.2d 1361 (9th Cir. 1992)...........................................................................................23

*Comcast Corp. v. Behend*,
    569 U.S. 27 (2013) ............................................................................................................23

iv

Gibson, Dunn &
Crutcher LLP

**PAGES**

*Coronavirus Rep. v. Apple Inc.*,
   85 F.4th 948 (9th Cir. 2023).................................................................................................5

*Dreamstime.com, LLC v. Google LLC*,
   54 F. 4th 1130 (9th Cir. 2022)..............................................................................................6

*Eagle v. Star-Kist Foods, Inc.*,
   812 F.2d 538 (9th Cir. 1987)...................................................................................19, 20, 21

*Echlin v. PeaceHealth*,
   887 F.3d 967 (9th Cir. 2018)...............................................................................................22

*Epic Games, Inc. v. Apple Inc.*,
   559 F. Supp. 3d 898 (N.D. Cal. 2021) .............................3, 4, 5, 8, 9, 11, 13, 15, 16, 18, 19, 20, 21

*Feitelson v. Google Inc.*,
   80 F. Supp. 3d 1019 (N.D. Cal. 2015) ................................................................................20

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
   703 F.2d 534 (9th Cir. 1983)...............................................................................................13

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020)...................................................................................9, 10, 11, 12

*In re Google Play Store Antitrust Litig.*,
   2025 WL 2167402 (9th Cir. July 31, 2025).......................................1, 6, 8, 9, 12, 13, 14

*Grace v. Apple Inc.*,
   328 F.R.D. 320 (N.D. Cal. 2018) ........................................................................................14

*HDC Med., Inc. v. Minntech Corp.*,
   474 F.3d 543 (8th Cir. 2007)...............................................................................................16

*Hogan v. Amazon.com, Inc.*,
   2024 WL 1091671 (W.D. Wash. Mar. 13, 2024) ................................................................6

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997)..........................................................................................2, 13

*Imperial Irrigation Dist. v. Cal. Indep. Sys. Operator Corp.*,
   146 F. Supp. 3d 1217 (S.D. Cal. 2015)...............................................................................11

*Jacobson v. Rose*,
   592 F.2d 515 (9th Cir. 1978)...............................................................................................18

*Kloth v. Microsoft Corp.*,
   444 F.3d 312 (4th Cir. 2006)...........................................................................................20, 21

*Laydon v. Cooperatieve Rabobank U.A.*,
   55 F.4th 86 (2d Cir. 2022)...................................................................................................21

*Lorenzo v. Qualcomm Inc.*,
   603 F. Supp. 2d 1291 (S.D. Cal. 2009)...............................................................................20

*Magnetar Techs. Corp. v. Intamin, Ltd.*,
   801 F.3d 1150 (9th Cir. 2015).............................................................................................23

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES**

**PAGES**

*Navajo Nation v. U.S. Forest Serv.*,
535 F.3d 1058 (9th Cir. 2008)................................................................................17

*New Mexico Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*,
994 F.3d 1166 (10th Cir. 2021)..............................................................................11

*New York v. Facebook, Inc.*,
549 F. Supp. 3d 6 (D.D.C. 2021) ..............................................................11, 12, 19

*New York v. Meta Platforms, Inc.*,
66 F.4th 288 (D.C. Cir. 2023)...................................................................10, 12, 19

*Noohi v. Johnson & Johnson Consumer Inc.*,
2025 WL 2089582 (9th Cir. July 25, 2025).......................................................23, 24

*Novell, Inc. v. Microsoft Corp.*
731 F.3d 1064 (10th Cir. 2013)...............................................................10, 11, 12

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018).....................................................................................1, 6, 7, 9

*Olean v. Wholesale Grocery Coop.*,
31 F.4th 651 (9th Cir. 2022)....................................................................................22

*Oliver v. Ralphs Grocery Co.*,
654 F.3d 903 (9th Cir. 2011)..............................................................................17, 18

*Oliver v. SD-3C LLC*,
751 F.3d 1081 (9th Cir. 2014).................................................................................21

*In re Online DVD-Rental Antitrust Litig.*,
779 F.3d 914 (9th Cir. 2015)..............................................................................17, 25

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009)............................................................................................9, 10

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
2022 WL 15053250 (E.D.N.Y. Oct. 26, 2022) .........................................................8

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
32 F.4th 824 (9th Cir. 2022)......................................................................................9

*Plush Lounge Las Vegas LLC v. Hotspur Resorts Nevada Inc.*,
371 F. App'x 719 (9th Cir. 2010) ..............................................................................5

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995)..................................................................................5, 6

*Reilly v. Apple Inc.*,
578 F. Supp. 3d 1098 (N.D. Cal. 2022) .....................................................................6

*S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*,
556 F. Supp. 825 (D.D.C. 1982).............................................................................24

APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:11-CV-06714-YGR

**SER-467**

Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES

**PAGES**

*SaurikIT, LLC v. Apple Inc.,*
2023 WL 8946200 (9th Cir. Dec. 28, 2023) ..................................................................21

*SOLIDFX, LLC v. Jeppesen Sanderson, Inc.,*
841 F.3d 827 (10th Cir. 2016) ...........................................................................10, 13

*Stromberg v. Qualcomm Inc.,*
14 F.4th 1059 (9th Cir. 2021) .......................................................................6, 11, 19

*Swierkiewicz v. Sorema N.A.,*
534 U.S. 506 (2002) ......................................................................................17

*Teradata Corp. v. SAP SE,*
124 F.4th 555 (9th Cir. 2024) ...............................................................................8

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.,*
875 F.2d 1369 (9th Cir. 1989) ...........................................................................5, 8

*Tri-Valley Cares v. U.S. Dep't of Energy,*
2010 WL 11530284 (N.D. Cal. Sept. 30, 2010) ..................................................18

*U.S. Airways, Inc. v. Sabre Holdings Corp.,*
938 F.3d 43 (2d Cir. 2019) ...........................................................................1, 6, 7, 8

*United States v. Apple Inc.,*
2025 WL 1829127 (D.N.J. June 30, 2025) .........................................................10

*United States v. Sabre Corp.,*
452 F. Supp. 3d 97 (D. Del. 2020) ......................................................................7

*United States v. Various Slot Machines on Guam,*
658 F.2d 697 (9th Cir. 1981) ............................................................................25

*United Wisconsin Grain Prods. LLC v. Archer Daniels Midland Co.,*
2025 WL 2017271 (7th Cir. July 18, 2025) .........................................................9

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP,*
540 U.S. 398 (2004) ..................................................................................10, 18

*Villa v. San Francisco Forty-Niners, Ltd.,*
104 F. Supp. 3d 1017 (N.D. Cal. 2015) ...............................................................5

*Virginia Panel Corp. v. MAC Panel Co.,*
133 F.3d 860 (Fed. Cir. 1997) ...........................................................................16

*Wasco Prods., Inc. v. Southwall Techs., Inc.,*
435 F.3d 989 (9th Cir. 2006) .............................................................................17

*Williams v. Boeing Co.,*
517 F.3d 1120 (9th Cir. 2008) ..........................................................................22

**STATUTES**

15 U.S.C. § 2 ................................................................................................4

15 U.S.C. § 15b ............................................................................................22

Gibson, Dunn &
Crutcher LLP

Case 4:11-cv-06714-YGR, Document 1004, Entry Filed 08/04/25

## TABLE OF AUTHORITIES

**PAGES**

**OTHER AUTHORITIES**

Herbert Hovenkamp, *FRAND and Antitrust*, 105 Cornell L. Rev. 1683 (2020)................................11

APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:11-CV-06714-YGR

**SER-469**

**TABLE OF ABBREVIATIONS**

| Abbreviation | Referenced Document |
|---|---|
| Ex.__ | Exhibits to the Declaration of Cynthia E. Richman in Support of Defendant Apple Inc.'s Motion for Summary Judgment, Motion to Decertify the Class, and *Daubert* Motion to Exclude the Opinions of Mr. Darryl Thompson and Prof. Alan MacCormack |
| [Name] Dep. | Deposition transcript of named witness, attached as an Exhibit to the Declaration of Cynthia E. Richman in Support of Defendant Apple Inc.'s Motion for Summary Judgment, Motion to Decertify the Class, and *Daubert* Motion to Exclude the Opinions of Mr. Darryl Thompson and Prof. Alan MacCormack |
| Abrantes-Metz Rep. | Expert Report of Rosa M. Abrantes-Metz, Ph.D., dated March 7, 2025 |
| Halderman Rep. | Opening Expert Report and Declaration of J. Alex Halderman, Ph.D., dated March 7, 2025 |
| Hitt Rep. | Opening Expert Report and Declaration of Lorin M. Hitt, Ph.D., dated March 7, 2025 |
| Hitt Reb. Rep. | Rebuttal Expert Report and Declaration of Lorin M. Hitt, Ph.D., dated June 13, 2025 |
| Jin Rep. | Opening Expert Report and Declaration of Ginger Jin, Ph.D., dated March 7, 2025 |
| McFadden Rep. | Expert Report of Daniel L. McFadden, Ph.D., dated March 7, 2025 |
| Prince Reb. Rep. | Rebuttal Expert Report and Declaration of Jeffrey T. Prince, Ph.D., dated June 13, 2025 |
| Sundararajan Rep. | Opening Expert Report and Declaration of Arun Sundararajan, Ph.D., dated March 7, 2025 |
| Sundararajan Reb. Rep. | Rebuttal Expert Report and Declaration of Arun Sundararajan, Ph.D., dated June 13, 2025 |
| Song Rep. | Expert Report of Minjae Song, Ph.D., dated March 7, 2025 |
| Stiglitz Rep. | Expert Report of Joseph E. Stiglitz, Ph.D., dated March 7, 2025 |
| Watson Reb. Rep. | Rebuttal Expert Report and Declaration of Mark Watson, Ph.D., dated June 13, 2025 |

Gibson, Dunn & Crutcher LLP

# I.    INTRODUCTION

This case should not go to trial.  The Third Amended Consolidated Class Action Complaint challenges Apple's policy of refusing to permit competing distribution of native iOS apps and the technical measures encoded into iOS software that maintain a securely closed platform.  These claims, raised solely under Section 2 of the Sherman Act, rest on legal theories that the Supreme Court and Ninth Circuit have rejected.  After nearly fourteen years of litigation, the undisputed record confirms that Apple's policies reflect protected choices about product design and whom to do business with— not anticompetitive conduct.  Moreover, Plaintiffs cannot prove that they paid "a higher-than-competitive price" for apps and in-app purchases, as required for this case to proceed.  *Apple Inc. v. Pepper*, 587 U.S. 273, 284 (2019).

Plaintiffs' claims fail at the threshold because they are premised on a legally untenable one-sided market definition.  The Court has "decline[d] to address" market definition in prior decisions, *In re Apple iPhone Antitrust Litig.*, 2013 WL 6253147, at *6 (N.D. Cal. Dec. 2, 2013), reserving the issue for the "merits," 2022 WL 1284104, at *3 (N.D. Cal. Mar. 29, 2022).  The issue is now ripe, and beyond dispute.  This Court, the Ninth Circuit, and other courts have recognized that the App Store must be analyzed as a two-sided transaction platform that facilitates simultaneous transactions between developers and consumers.  Just last week, the Ninth Circuit reaffirmed that app marketplaces compete in "two-sided markets," where users and developers "rely on the platform as an intermediary for user-developer transactions," and the "platform benefits from significant network effects."  *In re Google Play Store Antitrust Litig.* ("*Google Play*"), 2025 WL 2167402, at *3 (9th Cir. July 31, 2025) (citing *Ohio v. Am. Express Co.* ("*Amex*"), 585 U.S. 529, 535 (2018)).  Plaintiffs' insistence on a one-sided consumer aftermarket disregards the "important" differences between one- and two-sided markets, including the factfinder's obligation to "evaluat[e] both sides" of a two-sided transaction platform "to accurately assess competition."  *Amex*, 585 U.S. at 535, 546.  If indulged, Plaintiffs' legal error will squander the time and resources of the Court, jury, and parties—just as it has in other cases challenging two-sided transaction platforms that have gone to trial on one-sided theories.  *See, e.g.*, *U.S. Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 57–58 (2d Cir. 2019) (vacating jury verdict).

Plaintiffs' liability theories also fail as a matter of law.  Plaintiffs challenge Apple's decision to

Gibson, Dunn &
Crutcher LLP

APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:11-CV-06714-YGR

**SER-471**

distribute apps developed with Apple's own iOS software for its own iOS devices through its own App Store. But under settled precedent, Apple may lawfully refuse to deal with rivals or would-be rivals; Apple need not, as Plaintiffs urge, provide proprietary tools, technologies, and services to developers to allow them to distribute native iOS apps in direct competition with Apple on Apple's own platform.[1] Nor can Plaintiffs challenge Apple's "design[]" of "the iOS Devices operating system as a closed system [with] security measures and program locks," Dkt. 229, Third Am. Compl. ("TAC") ¶¶ 79, 84, a core product-design innovation that benefits consumers and precludes Section 2 liability. And while Plaintiffs have impermissibly sought to reach beyond the operative complaint through unpled expert accusations about Apple's in-app payment system and former anti-steering rule, the conduct is lawful under Section 2, and Plaintiffs' challenge is time-barred.

Finally, Plaintiffs cannot establish injury or measurable damages. Plaintiffs rest on an unreliable model that, even if admitted (despite its many defects), fails if *any* of Apple's challenged conduct is deemed lawful because the model assumes *all* challenged conduct is unlawful and offers no way to disaggregate impact among Apple's alleged acts. This violates the principle that an antitrust plaintiff "must segregate damages attributable to lawful competition from damages attributable to . . . monopolizing conduct." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1224 (9th Cir. 1997). And named plaintiff Hayter has no damages even accepting the model's calculations.

The record leaves no triable issue. Apple did exactly what the antitrust laws permit: It built an innovative platform that consumers and developers value. The Court should grant summary judgment.

## II.    UNDISPUTED FACTS

In 2007, Apple revolutionized the mobile-device industry with the iPhone and its novel iOS operating system. Statement of Undisputed Material Facts ("SUF") 1. Initially, iPhones could run only applications that Apple itself preinstalled. SUF 1. But Apple soon decided to open iOS to third-party developers and help them create iOS apps. SUF 1. To support that shift, Apple launched the App Store in 2008 as the sole means of distributing native iOS apps to consumers. SUF 2.

From the outset, Apple emphasized the tension between openness and security. As Steve Jobs said at the App Store's launch, Apple was "trying to do two diametrically opposed things at once—

---

[1] All mentions in this brief of "iOS apps" refer to native iOS apps.

APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:11-CV-06714-YGR

**SER-472**

Gibson, Dunn &
Crutcher LLP

provide an advanced and open platform to developers while at the same time protect iPhone users from viruses, malware, privacy attacks, etc." SUF 6. To achieve that balance, Apple adopted a closed-system model for distributing iOS apps. SUF 7. This arrangement enabled developers to build native apps using Apple's proprietary software and tools, rather than relying solely on browser-based web apps, while allowing Apple to maintain a secure, curated environment for users. SUF 4, 7.

Under its closed model, Apple has from the beginning required developers who wish to distribute iOS apps to join the Apple Developer Program. SUF 8, 9. To do so, developers enter into the Developer Program License Agreement and abide by the App Review Guidelines. SUF 8, 9. By enrolling in the Apple Developer Program, developers receive access to Apple's proprietary software-development tools, now including over 250,000 Application Programming Interfaces ("APIs") and multiple Software Development Kits, in exchange for a $99 annual fee and a commission on paid apps and digital in-app products. SUF 8, 9. The standard commission rate is 30%, but lower rates apply to small businesses and certain categories of in-app purchases of digital goods. SUF 10. As of 2023, roughly 95% of apps on the App Store were free to download and incurred no commission on the download. SUF 11. Apple designed its platform so that developers could offer, and consumers could download, iOS apps—paid or free—through the App Store alone. SUF 2, 7, 11, 15.[2] With foreign exceptions not relevant here, Apple does not allow alternative app marketplaces. SUF 17.

Apple reviews each app and app update submitted to the App Store through a multilayered process known as App Review. SUF 12. Using a combination of proprietary automated tools and human reviewers, Apple evaluates apps against the App Review Guidelines and rejects those that fail review. SUF 12. Apple has applied app-review criteria since the App Store's launch, and in 2010, it formalized this process in the Guidelines. SUF 13, 16; *see Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 949 (N.D. Cal. 2021), *aff'd in part*, 67 F.4th 946 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681–82 (2024). As this Court found, App Review "helps protect against fraud, privacy intrusion, and objectionable content beyond levels achievable by purely technical measures," and "may also provide some benefit against novel and well-hidden malware attacks." *Epic*, 559 F. Supp. 3d at 1004 n.523,

---

[2] In 2010, Apple launched iPad, a tablet device. SUF 14. iPad ran on iOS until 2019, when Apple launched iPadOS. *Id.* As with iPhone, Apple requires native iPad apps to be submitted to App Review and be distributed through the App Store. *Id.*

1038; *see also* SUF 12, 13.

In addition to App Review, Apple built technical safeguards into iOS to prevent unauthorized app distribution.  SUF 20.  Apple's technical design includes system-level software protections that prevent "sideloading"—the installation of native apps from outside the App Store—and that block removing built-in security features.  SUF 18–20.  Such protections serve as "another line of defense against harmful software."  SUF 20.

The App Store operates in a two-sided marketplace.  Android smartphones—which run a competing mobile operating system—support multiple rival app marketplaces, including the Google Play Store, Samsung Galaxy Store, and Amazon Appstore.  *Epic*, 559 F. Supp. 3d at 968; Ex. 19 (Hitt Rep.) ¶¶ 84, 94, 122.  Developers also can distribute apps and digital content through web apps and websites, including their own websites, and other app-transaction platforms.  SUF 4.  Much of this content is cross-platform: A consumer who plays the video game Roblox, for instance, can download and use the app on a non-iOS platform, purchase in-app currency (Robux) on that alternative platform, and then use Robux on iOS or another platform.  SUF 5.  Alternative platforms have been available since the App Store's launch.  SUF 2, 4.

This case was filed on December 29, 2011.  Dkt. 1.  In the operative complaint, Plaintiffs Robert Pepper, Stephen Schwartz, Edward Hayter, and Edward Lawrence assert two claims under Section 2 of the Sherman Act, 15 U.S.C. § 2, on behalf of a class of consumers: for monopolization and attempted monopolization of an alleged "iOS applications aftermarket."  TAC ¶¶ 78–88.  Their claims rest on theories that Apple acquired or attempted to acquire monopoly power by: "(a) designing the iOS Devices operating system as a closed system and installing security measures and program locks for the specific purpose of preventing Third Party App downloads; (b) establishing the App Store as the exclusive worldwide distributor of iOS apps; and (c) enforcing the App Store's unlawfully acquired market position by terminating or threatening to terminate app[] developers who sell apps in competition with Apple and by voiding the warranties of iOS Devices consumers who buy competing apps."  *Id.* ¶¶ 79, 84.  Plaintiffs sought leave to file a Fourth Amended Consolidated Complaint in light of *Epic*, but the Court rejected their tardy request to add a claim under California's Unfair Competition Law challenging Apple's former anti-steering provisions.  Dkt. 573 at 6–7.  The Court also

subsequently dismissed with prejudice claims arising from App Store transactions on iPod touch.  Dkt. 981 at 1.

## III.    LEGAL STANDARD

"Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV.    ARGUMENT

Summary judgment is warranted.  Plaintiffs' one-sided consumer aftermarket theory falters as a matter of law (§ IV.A).  Their two pleaded theories of exclusionary conduct also fail: Apple's restrictions on rival app distributors are lawful refusals to deal (§ IV.B), and its design of iOS is protected product innovation (§ IV.C).  Plaintiffs' attempt to challenge Apple's in-app purchase ("IAP") mandate and former anti-steering rule—unpled theories advanced in expert reports—fares no better (§§ IV.D & IV.E).  Nor can Plaintiffs prove causal injury or nonspeculative damages (§ IV.F).[3]

### A.  Plaintiffs' One-Sided Consumer Aftermarket Fails As A Matter Of Law.

Proof of a relevant market is essential in Section 2 cases.  *See Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1373–74 (9th Cir. 1989).  Plaintiffs alleged that the relevant market here is "the retail market for the sale of [iOS] apps," which they contend is a one-sided aftermarket for all iOS apps of every genre.  *Apple Inc. v. Pepper*, 587 U.S. 273, 278 (2019).  That may have sufficed as a pleading matter, but when a plaintiff "cannot sustain a jury verdict on the issue of market definition, summary judgment is appropriate."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995); *see, e.g.*, *Plush Lounge Las Vegas LLC v. Hotspur Resorts Nevada Inc.*, 371 F. App'x 719, 720 (9th Cir. 2010) (affirming summary judgment on Section 2 claim due to untenable market).  A one-sided market definition *cannot* sustain a jury verdict here.  Every court to confront the question has found the App Store to be a platform for "app transactions that Apple offers in a two-sided market."  *Epic*, 67 F.4th at 1000–01; *see Coronavirus Rep. v. Apple Inc.*, 85 F.4th 948, 956–57 (9th Cir. 2023)

---

[3] Apple does not waive protections against one-way intervention, *see Villa v. San Francisco Forty-Niners, Ltd.*, 104 F. Supp. 3d 1017, 1021 (N.D. Cal. 2015), and requests that this Court rule on summary judgment only after class notice has gone out and the opt-out period has expired (if the class is not decertified).

Gibson, Dunn & Crutcher LLP

(observing that market must encompass "a category of transactions between developers and consumers on a two-sided platform"); *Hogan v. Amazon.com, Inc.*, 2024 WL 1091671, at *3 (W.D. Wash. Mar. 13, 2024) (recognizing *Epic* "h[eld] that Apple's App Store is a two-sided transaction market"); *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1111 n.3 (N.D. Cal. 2022) (noting App Store's "two-sided nature").

Plaintiffs' one-sided theory is thus wrong as a matter of law. As the Ninth Circuit held in *Google Play*, the two-sided market definition in *Epic v. Apple* was driven by "commercial realities" and "theories of harm"—realities and theories that are the same here. *Google Play*, 2025 WL 2167402, at *7; *see Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1075 (9th Cir. 2021) (requiring an "extraordinary difference" to find claims do not "fail as a matter of law" where they challenge the "same practices" as an earlier lawsuit). And summary judgment is particularly appropriate because Plaintiffs have been on notice of this issue for years, *see In re Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *3, yet "expressly chose to maintain [their] theory of the case" without proposing any alternative two-sided market definition, *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1143 (9th Cir. 2022) (affirming dismissal with prejudice); *see also Rebel Oil*, 51 F.3d at 1437 (plaintiff saved from summary judgment by asserting viable alternative definition).

It is settled precedent that a "two-sided transaction platform[]" is one that "facilitate[s] a single, simultaneous transaction between participants." *Amex*, 585 U.S. at 545. Because such platforms "cannot make a sale unless both sides of the platform simultaneously agree," they are best "understood as supplying only one product—transactions." *Id.* (quotation marks omitted). Two-sided transaction platforms, by their nature, exhibit "more pronounced indirect network effects": "Raising the price on side A risks losing participation on that side, which decreases the value of the platform to side B." *Id.* at 536, 545. Any market analysis that fails to account for how changes on one side of the platform affect the other side therefore "misses the mark." *Id.* at 547.

In the first major case applying *Amex*, the plaintiff (like Plaintiffs here) retained Prof. Stiglitz to advance a theory that the relevant market was one-sided because of a purported lack of indirect network effects. *U.S. Airways*, 938 F.3d at 58. Stiglitz's opinions amounted to advocacy for positions he had unsuccessfully advanced in an amicus brief for the plaintiffs in *Amex*. *See* Ex. 73 (Stiglitz Project Syndicate June 29, 2018 Article) ("As I pointed out in an amicus brief to the Court, AmEx's

arguments in defense of its anti-competitive practices were totally specious"; contending that *Amex* was an "egregious decision" that "betrayed a deep misunderstanding of economics"); *see* Ex. 101 (Amicus Br. for Profs. Connor, McFadden, Stiglitz, et al., in *Amex*).  The Second Circuit held that Stiglitz's opinions injected error into the trial: A jury cannot hear evidence that a market might be one-sided (or evidence predicated on such a theory), the court reasoned, where the relevant transaction platform market was "two-sided as a matter of law." *U.S. Airways*, 938 F.3d at 58.  Because allowing that theory to proceed was "wrong as a matter of law," the court vacated the jury verdict. *Id.* at 58–59; *see also United States v. Sabre Corp.*, 452 F. Supp. 3d 97, 138 (D. Del. 2020) (failure to properly define two-sided transaction platform foreclosed antitrust claim "as a matter of law").

Plaintiffs try to sidestep this overwhelming precedent and argue that Apple sells two distinct products in different one-sided markets—"apps and in-app content to consumers" and "distribution services to developers." Dkt. 991-1 at 1; *see also* Dkt. 626 at 58:7–19 (arguing "there are two different markets here").  But that ignores the App Store's status as a transaction platform and walks back into the precedent that Plaintiffs disregard.  *Amex* "concluded . . . that a business is a transaction platform if it (1) offers different products or services, (2) to different groups of customers, (3) whom the platform connects, (4) in simultaneous transactions." *U.S. Airways*, 938 F.2d at 58 (cleaned up).  That describes the App Store exactly.  Ex. 21 (Jin Rep.) ¶ 60; *see* Ex. 22 (Sundararajan Rep.) ¶ 144.  The App Store offers developers and consumers different services on a platform that connects the two groups and facilitates simultaneous app (and in-app content) transactions.  *See* SUF 3.  Disinterested academic studies corroborate this.  *See* Ex. 27 (Sundararajan Reb. Rep.) App'x Ex. C.1 (listing examples).  Plaintiffs' economists make a weak effort to distract from this reality by suggesting that the App Store offers some services that are not simultaneous.  Ex. 14 (May 30, 2025 Stiglitz Dep.) 179:4–22.  But only the transactions linking the sides need to occur simultaneously.  *Amex*, 585 U.S. at 535 ("The key feature of transaction platforms is that they cannot make a sale to one side of the platform without simultaneously making a sale to the other.").[4]  What matters, and what creates pronounced indirect network effects, is that both platform sides participate in transactions in "direct[] proportion[]" to each

---

[4] For example, credit-card platforms offer services that may occur at different times, such as consumer rewards that are enjoyed after merchants obtain quick, guaranteed payment. *Amex*, 585 U.S. at 534. These "separate but interrelated services" facilitate simultaneous transactions on the platform. *Id.*

Gibson, Dunn &
Crutcher LLP

other.  *Id.* at 545.  That much is undisputed here.  *See* Ex. 104 (Dec. 15, 2022 Abrantes-Metz Dep.) 107:2–11, 108:8–109:1; *see also* Ex. 14 (May 30, 2025 Stiglitz Dep.) 183:1–4.

Plaintiffs cannot proceed under some alternative two-sided theory they have neither pled nor proved.  *See* Dkt. 991-1 at 1.  It is Plaintiffs' burden to define a relevant market, *see Thurman Indus.*, 875 F.2d at 1373–74, but neither they nor their experts define any two-sided market, focusing solely on a consumer-side aftermarket for *all* app genres.  Stiglitz simply ignores the developer half of the equation, Ex. 17 (June 25, 2025 Stiglitz Dep.) 290:17–291:16 (no market defined for developer side of platform), meaning that his market-power analysis also ignores the different market realities for different types of app developers, *see* Ex. 26 (Hitt Reb. Rep.) ¶ 127.  That *Apple's* experts have defined a two-sided game-transaction market and a two-sided video-streaming transaction market illustrates that no *single* two-sided market can be defined here, given that the two-sided "competitive conditions for transactions vary significantly across different app genres."  Ex. 19 (Hitt Rep.) ¶¶ 90, 96–97; *see also* Ex. 21 (Jin Rep.) ¶¶ 91–93 (same); Ex. 26 (Hitt Reb. Rep.) ¶ 299 (same); Ex. 27 (Sundararajan Reb. Rep.) ¶ 261 (same).  In the game and video-streaming transactions markets, for example, developers have several (varying) alternatives to selling iOS in-app content to consumers and regularly make use of them.  Ex. 19 (Hitt Rep.) ¶¶ 124–38, 240; *see also Epic*, 67 F.4th at 973 (affirming two-sided mobile-game transactions market).  Further, Plaintiffs' "market definition must be relevant to the theory of harm at issue," *Teradata Corp. v. SAP SE*, 124 F.4th 555, 570 (9th Cir. 2024) (quotation marks omitted); *accord Google Play*, 2025 WL 2167402, at *7, which would require any two-sided alternative to cover all 26 app genres included in their case.  But no expert or party defines a single two-sided market encompassing all iOS transactions in all genres, leaving no framework to analyze Plaintiffs' case and "no way to measure" alleged harm to competition.  *Amex*, 585 U.S. at 543.

Finally, Plaintiffs cannot rely on Stiglitz's effort to recycle overruled opinions because even dissenting economists must respect precedent, including precedent they view as "specious," (Ex. 73 (Stiglitz Project Syndicate Article)).  Courts have disregarded Stiglitz's opinions as "contrary to controlling law."  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2022 WL 15053250, at *53 (E.D.N.Y. Oct. 26, 2022); *accord U.S. Airways*, 938 F.3d at 59; *see also* Ex. 74 at 30–31 (article published by Plaintiffs' experts Rosa Abrantes-Metz and Minjae Song recognizing that

Gibson, Dunn & Crutcher LLP

the law requires treating transaction platforms as single two-sided markets for transactions). Thus, Stiglitz cannot assert from thin air that his conclusions are impervious here to changes in market definition, another of his rejected *Amex* workarounds. *See* Stiglitz et al., Amicus Br. in *Amex*, at 4 ("assuming Amex is a two-sided platform" is "certainly not a sufficient basis to change established antitrust analysis"). Aside from being facially implausible, this *ipse dixit* opinion rests on ignoring the "more pronounced indirect network effects," *Amex*, 585 U.S. at 545, that are a core feature of two-sided transaction platforms, as the Ninth Circuit underscored in *Google Play*, 2025 WL 2167402, at *19. *See* Ex. 31 (Stiglitz Rep.) ¶¶ 372–78 (insisting the purported "lack of competition" on the App Store "limits the significance of indirect network effects"). Indeed, the damages model on which Stiglitz expressly relies for the assertion that his analysis would be unchanged in a two-sided market, Ex. 31 (Stiglitz Rep.) ¶ 378, also disregards indirect network effects, *see* Ex. 32 (Abrantes-Metz Rep.) ¶¶ 42–44; *see also* Ex. 18 (July 11, 2025 Abrantes-Metz Dep.) 253:11–23 (Abrantes-Metz conceding she did not even consider whether the App Store was a two-sided transaction platform as discussed in *Amex*). While a plaintiff can *allege* anticompetitive effects in alternative one-sided or two-sided markets, *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 839 (9th Cir. 2022), circular reasoning cannot stave off summary judgment. Plaintiffs fail to adduce the necessary proof of a two-sided market in which they can establish the other elements of their case. Summary judgment is thus warranted.

**B. Apple's Restrictions On Rival App Distributors Are Lawful Refusals To Deal.**

Plaintiffs' core liability theory—which alleges that Apple has a policy of operating a "closed" platform and "terminating or threatening to terminate apps developers who sell apps in competition with" Apple's "exclusive" App Store, TAC ¶¶ 79, 84—fails because Apple has "no antitrust duty to deal with its competitors," *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 450 (2009).[5]

There can be no genuine dispute that this is a refusal-to-deal claim. For example, Plaintiffs'

---

[5] Although Apple repeatedly asserted the refusal-to-deal doctrine in *Epic*, the Court did not address that issue or other Section 2–specific conduct arguments because the failure of Epic's Section 1 claims doomed its Section 2 claims without further analysis. *See* 559 F. Supp. 3d at 1044 (citing *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991–92 (9th Cir. 2020)). Here, however, Plaintiffs bring *only* Section 2 claims, making the refusal-to-deal doctrine directly applicable (and dispositive). *See United Wisconsin Grain Prods. LLC v. Archer Daniels Midland Co.*, 2025 WL 2017271, at *6 (7th Cir. July 18, 2025) ("[T]he acts of a single firm are judged by a different standard under § 2.").

Gibson, Dunn &
Crutcher LLP

9

liability expert recognizes the core conduct in the case is Apple's general "policy of not allowing app stores in its own App Store," Ex. 17 (June 25, 2025 Stiglitz Dep.) 226:24–227:11, and its "refus[al] to deal with developers who sell iOS apps outside the App Store," Ex. 14 (May 30, 2025 Stiglitz Dep.) 114:23–115:2. Refusing to enable third parties to function as competing "alternatives for distributing iOS apps to consumers," Ex. 31 (Stiglitz Rep.) ¶ 71, is the epitome of a "refusal to cooperate with rivals," *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004); *see also Qualcomm*, 969 F.3d at 994 (refusal to license rival chip makers). Indeed, courts have consistently applied refusal-to-deal precedent to cases where defendants refuse to enable competition by software developers. *See, e.g.*, *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1080 (10th Cir. 2013) (Gorsuch, J.) (termination of competing developer's advance access to platform APIs); *SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, 841 F.3d 827, 843 (10th Cir. 2016) (iPad app developer refused to provide rival with software toolkit after agreeing to do so); *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 303, 305 (D.C. Cir. 2023) (prohibition of platform access by developers with apps that competed with Facebook or linked to competitors). This case thus falls squarely within the traditional Section 2 rule that a defendant may refuse to deal with rivals. *See Trinko*, 540 U.S. at 407–08; *linkLine*, 555 U.S. at 448; *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016).

Plaintiffs do not deny that Apple's conduct is a refusal to deal with developers. Dkt. 991-1 at 1–2. Rather, they say that developers are not rivals, relying on *United States v. Apple Inc.*, 2025 WL 1829127, at *11–12 (D.N.J. June 30, 2025). But in that case, the court concluded, at the pleading stage, that the alleged conduct vis-à-vis app developers was not a refusal to deal *with smartphone competitors*, who are the rivals in the Government's alleged "smartphone and performance smartphone markets." *Id.* at *8, *12. Here, Plaintiffs expressly assert that Apple has refused to deal with "developers who sell [or would sell] apps in competition with Apple" in the alleged "iOS applications aftermarket." TAC ¶¶ 79, 84. Nor can Plaintiffs evade refusal-to-deal precedent by arguing that Apple imposes "restrictions" or "conditions" on dealing.[6] *Novell*, 731 F.3d at 1079 ("Whether one chooses to call a

---

[6] Plaintiffs cite Stiglitz's effort to reframe the case through a pseudo-tying theory, *see* Dkt. 991-1 at 2, but no tying claim was ever pled or certified in this case. Moreover, Stiglitz applies his so-called "lens of tying" to the consumer side only, Ex. 31 (Stiglitz Rep.) ¶ 362, not to developers, and admits there is no tying agreement between Apple and consumers, Ex. 14 (May 30, 2025 Stiglitz Dep.) 168:1–13.

APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:11-CV-06714-YGR

**SER-480**

Gibson, Dunn & Crutcher LLP

monopolist's refusal to deal with a rival an act or omission, interference or withdrawal of assistance, the substance is the same and it must be analyzed under the [refusal-to-deal] test."); *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 31 (D.D.C. 2021) (rejecting attempt to "reframe [refusals] as offers to deal only on the condition that the third party refrains from competing" because *Trinko* encompasses "refusals conditioned on a firm's status that cannot readily be changed," such as where a firm "agrees to sell to noncompetitors but not competitors" (cleaned up) (citing Herbert Hovenkamp, *FRAND and Antitrust*, 105 Cornell L. Rev. 1683, 1697 (2020))).

The only exception to the refusal-to-deal doctrine is the "narrow-eyed needle," *Novell*, 731 F.3d at 1074, described in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). It requires Plaintiffs to prove that (1) Apple "unilaterally terminate[d] a voluntary and profitable course of dealing," (2) "the only conceivable rationale or purpose [was] to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition," and (3) "the refusal to deal involves products that [Apple] already sells in the existing market to other similarly situated customers." *Qualcomm*, 969 F.3d at 993–94 (cleaned up). Plaintiffs fail at each of these steps.

*First*, Apple has never voluntarily permitted developers to sideload apps or offer third-party app marketplaces in the App Store in the United States. SUF 17. Plaintiffs have no evidence of a prior course of dealing, which is fatal here. *See In re Adderall XR Antitrust Litig.*, 754 F.3d 135, 135 (2d Cir. 2014) (no refusal-to-deal claim where defendant "did not terminate any [profitable] prior course of dealing"); *New Mexico Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 994 F.3d 1166, 1172 (10th Cir. 2021) (similar); *Imperial Irrigation Dist. v. Cal. Indep. Sys. Operator Corp.*, 146 F. Supp. 3d 1217, 1235 (S.D. Cal. 2015) (similar).

*Second*, Apple has a clear, non-pretextual "conceivable rationale" for its policy that does not rely on excluding long-term competition by sacrificing short-term profits. *Qualcomm*, 969 F.3d at 993. This Court credited Apple's privacy, security, and other justifications on a full record in *Epic*, 559 F. Supp. 3d at 1002–10, and the Ninth Circuit affirmed, *Epic*, 67 F.4th at 985–89. Accordingly, no *reasonable* jury could conclude that Apple's longstanding policy is "irrational but for its anticompetitive effect." *Novell*, 731 F.3d at 1075. And at any rate, given that Plaintiffs and their experts concede that Apple's policy served its interest in "greater profits in both the short *and* long

terms," *Qualcomm*, 969 F.3d at 994 (emphasis added); *see* Ex. 31 (Stiglitz Rep.) ¶ 98; TAC ¶ 37, no evidence exists that Apple "sacrificed short-term profits to further an anticompetitive agenda," meaning that Plaintiffs "cannot prevail," *Novell*, 731 F.2d at 1080 n.5.

*Third*, Apple's policy applies uniformly to all prospective rival app marketplaces. SUF 7, 9, 17, 20. This case is not about products that Apple already sells in the existing market to other similarly situated developers. *Qualcomm*, 969 F.3d at 994.

Under this binding precedent, efforts to impose a duty on technology platforms to assist developers in competing with the platform have been roundly rejected. In *New York v. Facebook, Inc.*, for example, the court considered a policy virtually identical to Apple's here—"Facebook's general policy of withholding API access from competitors." 549 F. Supp. 3d at 28. Like Apple's ability to remove third-party app marketplaces for violating Apple's policies, Facebook's terms permitted it to "block[] the API access of Vine, a new app it viewed as a competitor, mere hours after its launch," *Facebook*, 549 F. Supp. 3d at 28. As the D.C. Circuit explained, such a policy restricts rivals from conscripting the incumbent's own platform for competitive gain as even a "dominant firm" need not "lend its facilities to its potential competitors." *Meta*, 66 F.4th at 305. In other words, it was "plainly lawful to the extent it covered rivals with which it had no previous, voluntary course of dealing." *Facebook*, 549 F. Supp. 3d at 28. So too here.

The district court in *Google Play* likewise held that the refusal-to-deal doctrine barred a claim that Google unlawfully prohibited rival app marketplaces on its own Google Play store. *See* Order at 1, Dkt. No. 491, *In re Google Play Store Antitrust Litig.*, No. 20-cv-5671 (N.D. Cal. Oct. 20, 2023). While other theories, including a sideloading theory, went to trial, that reflected different commercial realities and theories of harm: Google has an "'open distribution' approach" (*i.e.*, a prior course of dealing with rival developers) that is "markedly different" from Apple's closed approach, and Epic brought "theories of harm against Google that were not brought against Apple," including Section 1 challenges to agreements Google made with Android phone manufacturers. *Google Play*, 2025 WL 2167402, at *7. Relevant here is the uncontested decision that Google's unilateral restrictions on the "distribution of other app stores through the Google Play Store" were "not unlawful." *Google Play*, 2024 WL 3302068, at *6. No less is true here.

Plaintiffs' theory fails for the additional reason that it would compel Apple to license its intellectual property.[7]  Courts may not "impose[] antitrust liability for a unilateral refusal to sell or license" intellectual property with would-be competitors absent a separate showing of "pretext" or that the intellectual property rights were acquired "in an unlawful manner." *Kodak*, 125 F.3d at 1216, 1219; *accord SOLIDFX*, 841 F.3d at 843.  Plaintiffs have made no such showing.  This Court has already expressed skepticism of a theory that would have required Apple to license its intellectual property on terms preferred by third-party developers, noting that Apple's contrary argument "appears meritorious." *Epic*, 559 F. Supp. 3d at 1050 n.626.  The relevant facts are no different here, SUF 4–7, 17, 20, and the Court should again conclude that Apple is not required to license IP rights that developers would need to compete on Apple's proprietary platform.

### C. Apple's Technical Design Of iOS Is Lawful Product Design.

While Epic wisely "disclaim[ed]" any challenge to Apple's product-design decisions in its suit, *Epic*, 559 F. Supp. 3d at 1034 n.599, Plaintiffs place Apple's "design" of iOS at the center of their case, TAC ¶¶ 36, 40, 51.  They challenge Apple's foundational decision to employ technical safeguards like "security measures" or "program locks" that make iOS a "closed" platform.  TAC ¶¶ 36, 40, 51; *see* SUF 7, 20.  Apple is able to unilaterally design such technical measures into iOS because it "manufactures its own phones." *Google Play*, 2025 WL 2167402, at *7.  This theory falls within the ambit of the refusal-to-deal doctrine discussed above.  But Plaintiffs' theory also independently fails as a matter of law because it challenges lawful product design.

In promoting competition, the antitrust laws protect the right to innovate: "A monopolist, no less than any other competitor, is permitted and indeed encouraged to compete aggressively on the merits, and any success it may achieve through the process of invention and innovation is necessarily tolerated by the antitrust laws." *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 544–45 (9th Cir. 1983).  That includes a company's right to launch products "whenever and however it chooses," *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 286 (2d Cir. 1979), and to design

---

[7] Plaintiffs' liability expert opines that Apple would license a broader scope of its rights to developers in the but-for world, Ex. 14 (May 30, 2025 Stiglitz Dep.) 117:24–118:05, and that consumers would be able to make "unauthorized modifications to iOS," Ex. 31 (Stiglitz Rep.) ¶ 42.

APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:11-CV-06714-YGR

**SER-483**

Gibson, Dunn & Crutcher LLP

or "redesign its products to make them more attractive to buyers," *Cal. Computer Prods., Inc. v. Int'l Bus. Machs. Corp.* ("*CalComp*"), 613 F.2d 727, 744 (9th Cir. 1979). The Ninth Circuit has drawn a clear line: Product-design decisions that "provid[e] a new benefit to consumers" are not actionable under Section 2; such innovations are "necessarily tolerated by the antitrust laws, unless the monopolist abuses or leverages its monopoly power in some other way." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998, 1000 (9th Cir. 2010) (cleaned up).

Plaintiffs challenge pro-consumer technological innovation here—technical features hardcoded into iOS. TAC ¶ 36. "Apple's iOS system . . . is designed to prevent independent modification, creating a 'walled garden.'" *Google Play*, 2025 WL 2167402, at *2. "Apple's on-device protections," including "sandboxing and enforcement of code signing and entitlements," are "an essential part of iOS's approach to security." Ex. 20 (Halderman Rep.) ¶¶ 14, 15(i); *see* SUF 21. Mandatory code signing "ensure[s] that all apps come from a known and approved source." Ex. 20 (Halderman Rep.) ¶ 93; *see* SUF 22. Entitlements are designed to prevent unauthorized access to system components and capabilities, including attacks by malicious code. Ex. 20 (Halderman Rep.) ¶ 97; *see* SUF 23. These technical features also guard against threats arising from removing security measures from devices, including through jailbreaking.[8] *See* Ex. 20 (Halderman Rep.) ¶ 108; SUF 19, 20, 24. Jailbroken phones with security measures removed are far more susceptible to "malware" and privacy threats like "spyware" and exposure of sensitive user data, as jailbreaking modifies iOS's built-in security and integrity protections. SUF 19, 20, 24. These and other technical safeguards have significant security benefits and help create a safer user environment than competing systems like Android. *See* SUF 20, 23, 24, 26; *Google Play*, 2025 WL 2167402, at *7. Consumers value Apple's security approach, ranking "malware protection" and "privacy" as the most important features—"must-have[s]"—of the App Store. SUF 26. This is all consistent with what the Ninth Circuit has recognized: that "device security and user privacy" both "enhance[e] consumer appeal and differentiat[e] iOS devices and the App Store from those products' respective competitors." *Epic*, 67 F.4th at 986.

---

[8] "[T]o 'jailbreak' an iPhone is to remove programmed limitations in order to enlarge the iPhone's functionality, run unauthorized applications, or otherwise change the iPhone's performance." *Grace v. Apple Inc.*, 328 F.R.D. 320, 333 (N.D. Cal. 2018). The concept of jailbreaking—bypassing Apple's security measures—exists *because* of the protections built into iOS, not the other way around.

14

APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:11-CV-06714-YGR

**SER-484**

Gibson, Dunn & Crutcher LLP

Technical safeguards of this sort were integrated into iOS beginning with the release of iPhone in 2007—belying any claim that they were adopted solely to prevent competition with the App Store, which opened in 2008.  SUF 1, 2, 7, 20.  While Plaintiffs' operative complaint alleges that iOS's closed design has violated Section 2 "since June 2007," TAC ¶¶ 16, 31, 51, Plaintiffs have effectively acknowledged the implausibility of such a theory, having "abandon[ed]" all claims arising before July 10, 2008—the class start date.  *BankAmerica Pension Plan v. McMath*, 206 F.3d 821, 826 (9th Cir. 2000).  Summary judgment is warranted on those pre–App Store claims for this reason alone.

Plaintiffs' experts *confirm* that Apple's technical restrictions bestow consumer benefits.  Dr. Kohno concedes that the technical design of the "iOS operating system" promotes "security for iOS devices."  Ex. 83 (Kohno Rep.) ¶ 86.  As to the risks of the process of jailbreaking in particular, he testified that he "personally . . . would not jailbreak [his] own phone" because he would not "have confidence in it being as secure."  Ex. 100 (June 25, 2025 Kohno Dep.) 177:5–15.  Stiglitz admitted that he does not know whether jailbreaking poses security and privacy risks, and acknowledged that "[i]f there were security risks, the security risk would obviously open up privacy risks" that could harm consumers.  Ex. 14 (May 30, 2025 Stiglitz Dep.) 142:25–143:20.  McFadden affirmed that "protection of a consumer's security" and "privacy" are "benefit[s] to a consumer."  Ex. 11 (May 14, 2025 McFadden Dep.) 105:6–11.  MacCormack agreed that adopting a "closed architecture" can be a "valid strategy" for a company.  Ex. 102 (June 16, 2025 MacCormack Dep.) 49:22–50:11.  The challenged technical restrictions thus undisputedly offer consumer benefits and are protected by the antitrust laws.

Plaintiffs' central objection is that Apple's technical restrictions do not permit "sideloading," which would allow third parties to distribute native iOS apps outside the App Store.  TAC ¶¶ 51, 79, 84; *see* SUF 18.  But as the Ninth Circuit has repeatedly recognized, product design that provides benefits to consumers is lawful even if it limits or eliminates interoperability.  In *CalComp*, for instance, the court upheld IBM's redesign of its computers even though the change disrupted compatibility with rivals' components.  *See* 613 F.2d at 743–44.  And *Allied Orthopedic* similarly held that Tyco could lawfully introduce a new, improved sensor system, even though it was incompatible with rivals' sensors.  *See* 592 F.3d at 1000–01.  In the same way, Apple's technical restrictions here have obvious, recognized, and undisputed "benefit[s] to consumers" no matter their effect on rival app distributors.

*Id.* at 1000. Because the analysis admits "no room . . . for balancing the benefits or worth of a product improvement against its anticompetitive effects," and companies have "no duty to help [their] competitors survive or expand," Apple's conduct is lawful under Section 2 unless Plaintiffs can show "some associated anticompetitive conduct." *Id.* at 999–1000, 1002.

Plaintiffs' allegations about Apple's warranty terms, TAC ¶¶ 79, 84, Ex. 31 (Stiglitz Rep.) ¶ 72, are not "associated" anticompetitive conduct. As an initial matter, the record lacks *any* evidence that Apple "void[s] the warranties of iOS Devices consumers who buy competing apps." TAC ¶ 79; *see* SUF 25. Rather, the contention is that "Apple *may* deny customer service—including warranty—for jailbroken devices." Ex. 31 (Stiglitz Rep.) ¶ 72 (emphasis added). But as Stiglitz conceded, it is not "anticompetitive for Apple to make the customer pay for the consequences [of] deciding to jailbreak." Ex. 14 (May 30, 2025 Stiglitz Dep.) 147:15–21. And as already explained, jailbreaking an iOS device and bypassing Apple's closed system opens the device up to myriad security risks that could damage it for reasons beyond Apple's control. Apple's warranty terms simply reflect its "unwillingness to extend free repair or replacement services to usage of its product that it cannot control," "protecting the integrity" of Apple's system—a "legitimate business purpose." *Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 871 (Fed. Cir. 1997); *see HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 549–50 (8th Cir. 2007) (accepting business justification that defendant "could not feasibly warrant the performance of the product" if third-party solutions were used). In sum, because the antitrust laws do not compel a firm to "constrict[] its product development so as to facilitate sales of rival products," *CalComp*, 613 F.2d at 744, Plaintiffs' claims fail as a matter of law.

### D. Plaintiffs' Unpled IAP And Anti-Steering Theories Fail On The Undisputed Record For Multiple Reasons.

Through their expert reports, Plaintiffs attempt to broaden their case beyond the theories pleaded, challenging Apple's IAP mandate and former anti-steering rule. Borrowed from *Epic* and omitted from the TAC's charging counts, these new theories fail procedurally (§ IV.D.1) and have no merit (§ IV.D.2). Plaintiffs also lack antitrust standing to challenge the anti-steering rule (§ IV.D.3).

#### 1. Plaintiffs Cannot Introduce New, Unpled Theories At This Stage.

The Court should reject Plaintiffs' attempt to assert, on the eve of trial, claims they did not

Gibson, Dunn &
Crutcher LLP

allege in the last fourteen years.  The operative complaint alleges that Apple acquired or attempted to acquire monopoly power "[s]pecifically" by **(a)** designing iOS as a closed system with security measures to block third-party app downloads; (b) making the App Store the exclusive global distributor of iOS apps; and (c) threatening developers "who sell apps in competition with Apple" and penalizing consumers who use them.  TAC ¶¶ 79, 84.  Yet Plaintiffs now seek to broaden their case beyond the pleadings, introducing theories from *Epic* through their expert reports that aim at (1) "Apple's mandate that developers must use Apple's own proprietary in-app payment system ('IAP') for the sale of in-app content"; and (2) "Apple's antisteering provisions that prohibit developers from directing users to alternative purchase channels outside of the App Store."  *See* Ex. 31 (Stiglitz Rep.) ¶ 63; Ex. 34 (Song Rep.) ¶ 45; Ex. 33 (McFadden Rep.) ¶¶ 15–16.  This improper gambit should be rejected.

As a matter of law, the operative complaint defines the boundaries of Plaintiffs' claims.  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).  Plaintiffs' attempt to veer away from their pleading thus violates settled Ninth Circuit law.  *See Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 909 (9th Cir. 2011) (plaintiffs cannot rely on unpled theories "identified only in [their] expert report[s]"); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 924 n.3 (9th Cir. 2015) (plaintiffs cannot raise "new, unpled liability theories" at summary judgment or trial).  "Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings." *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006); *accord Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008).  And that is particularly true here because the Court already denied their "belated request to reopen the pleadings": The Court held that their "argument that they intend to pursue the same claim decided in the Epic Games/Apple case is not consistent with their [then] proposed complaint which does not address any of those factual issues at all" and made clear that the "scope" of the case was locked and could not be "widen[ed]."  Dkt. 573 at 6–7.

Plaintiffs cannot escape this settled rule by pointing to scattered passing references in briefs or discovery.  *See* Dkt. 991-1 at 2.  A "plaintiff must identify" the "grounds" for its claims "in the complaint itself"; "a defendant is not deemed to have fair notice of [grounds] identified elsewhere." *Oliver*, 654 F.3d at 909; *see Tri-Valley Cares v. U.S. Dep't of Energy*, 2010 WL 11530284, at *7–8 (N.D. Cal. Sept. 30, 2010) (granting summary judgment where claim was "not alleged" in complaint

and thus was "not properly before the Court"). That Plaintiffs referenced anti-steering in a class-certification brief, *see* Dkt. 643-1 at 5, *after* the Court had already rejected their effort to expand their complaint to add *Epic* theories, cannot somehow amend their pleadings to include those very theories. Nor can Plaintiffs rely on *Apple's* expert testimony to expand their claims. *See* Dkt. 991-1 at 2. Although Apple protected its rights by adducing some rebuttal evidence to counter these unpled theories, that does not revise Plaintiffs' pleadings. *Oliver*, 654 F.3d at 908–09. Moreover, one of the individual plaintiffs has conceded that "open[ing] up" iOS devices to "other stores" would "satisf[y]" him that the conduct he was challenging had been fully "remedied," leaving no room for an IAP or anti-steering challenge. Ex. 7 (May 22, 2020 Hayter Dep.) 164:19–165:25.

It would also be inappropriate (and prejudicial to Apple) for the Court to amend the pleadings at trial, as Plaintiffs have suggested. *See* Dkt. 991-1 at 3. Such amendments are disfavored in this context where there are no "newly-revealed material facts" nor any basis for Plaintiffs' failure to plead these theories years ago when this case began. *Jacobson v. Rose*, 592 F.2d 515, 519 (9th Cir. 1978).

### 2. Apple's IAP And Former Anti-Steering Rule Are Lawful Refusals To Deal.

Plaintiffs' new theories, even if properly raised, fail on the merits. Apple's restrictions on third-party payment processing and its former anti-steering rule are lawful refusals to deal. Start with IAP, which Apple introduced in 2009. SUF 27, 28. IAP is a commerce functionality integrated within iOS that allows developers to sell digital content within their apps. SUF 27, 28. Apple requires developers to use IAP for in-app purchases of digital goods. SUF 28. Apple has always *enforced* its IAP requirements, including the immediate removal of the Fortnite app for permitting "players to choose a direct pay option that would circumvent Apple's IAP system." *Epic*, 559 F. Supp. 3d at 940. Refusing to deal with developers who compete with Apple and capture the same transactions "in replacement of . . . Apple's IAP," Ex. 31 (Stiglitz Rep.) ¶ 85, is a textbook refusal to deal. *See Trinko*, 540 U.S. at 407 (defendant "denied interconnection services to rivals"); *Aspen Skiing*, 472 U.S. at 594 (defendant refused to accept rival's alternative payment product). So too for Apple's former anti-steering guideline. Apple declined to approve apps that used Apple's platform to divert transactions. SUF 29, 30. That steering is a means of routing transactions away from Apple to a developer's competing channel is not reasonably in dispute.

Gibson, Dunn &
Crutcher LLP

Plaintiffs must but cannot satisfy the narrow *Aspen Skiing* exception.  Apple had no prior course of dealing with developers who displaced or circumvented IAP when it adopted the policies in question.  *See Qualcomm*, 969 F.3d at 993–94.  It maintained consistent IAP and anti-steering policies and did not sacrifice short-term profits by doing so.[9]  SUF 27–30.  And the policies applied uniformly.  *Qualcomm*, 969 F.3d at 995–96.  Apple was entitled under the antitrust laws to refuse to allow developers to bypass IAP in their apps or use Apple's platform to steer to rival channels—even if doing so supposedly "cut off" competitors from "access[ing]" Apple's "immensely valuable network."  *Meta*, 66 F.4th at 305.  While this Court enjoined the former steering provisions under state law, it held that they did not violate Section 2.  *See Epic*, 559 F. Supp. 3d at 1055.  For good reason: Antitrust law does not require Apple to host a competitive end-run on its own platform.  *See Facebook*, 549 F. Supp. 3d at 27, 33 (prohibition on "apps . . . providing a link to a different social-networking platform" was lawful withholding of "access to competitors").

### 3. Plaintiffs Lack Antitrust Standing To Challenge The Former Anti-Steering Rule.

In any event, Plaintiffs lack antitrust standing to challenge Apple's former anti-steering rule.  The doctrine of antitrust standing "limit[s]" the "class of persons entitled to obtain [private] damages," even assuming an antitrust violation.  *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 540 (9th Cir. 1987).  In assessing whether a plaintiff has antitrust standing, courts balance several factors, including the existence of an "antitrust injury," "the directness of the injury," "the speculative measure of the harm," "the risk of duplicative recovery," and "the complexity in apportioning damages."  *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 455–56 (9th Cir. 2021).  Even assuming that Plaintiffs could show antitrust injury (*but see infra* IV.F), every other factor cuts decisively against standing here.

*Directness of the injury and speculative measure of harm*.  Antitrust standing requires that the asserted harm be proximate to—the "first step" removed from—the challenged conduct.  *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 534 (1983).  But Apple's refusal to allow developers to steer did not "lead *directly* to" Plaintiffs as "the

---

[9] In a class settlement with developers in 2021, Apple revised its guidelines to "[p]ermit all U.S. developers to communicate with their customers via email and other communication services *outside their app* about purchasing methods other than in-app purchase."  *Cameron v. Apple Inc.*, No. 19-cv-3074 (N.D. Cal.), Dkt. 451 at 13 (emphasis added).

Gibson, Dunn & Crutcher LLP

*immediate* victims." *Eagle*, 812 F.2d at 541 (emphases added). Plaintiffs' theory of harm instead relies on a series of contingent events: As the Ninth Circuit explained in *Epic*, "[c]alculating the damages caused by the anti-steering provision" for developers alone "would require a protracted and speculative inquiry into" the "availability" of substitute platforms, the number and tendencies of multi-homing users, and the "substitution rate" among those users. 67 F.4th at 1003. The next step (in this case) would be to determine what damages were passed on to class members, compounding the speculation. *See id.* at 1003 (damage calculations based on steering theories would be pure speculation); Ex. 24 (Watson Reb. Rep.) ¶¶ 15–16. That is not proximate harm. *See, e.g.*, *Bakay v. Apple Inc.*, 2024 WL 3381034, at *5–6 (N.D. Cal. July 11, 2024) (holding consumer plaintiffs lacked standing as a matter of law because of the attenuated causal chain connecting the challenged App Review Guideline to the alleged overcharge).

Plaintiffs are incorrect that the Supreme Court's earlier decision in this case dictates otherwise. *See* Dkt. 991-1 at 2–3. Looking only to the pleadings, the Court there considered Plaintiffs' claims concerning paid app downloads. *See Pepper*, 587 U.S. at 277. Anti-steering was not a part of this case at that time even arguably. *See supra* IV.D.1. And the Supreme Court held only that consumers could sue Apple as a "retailer" under *Illinois Brick* because they allegedly purchased apps directly from Apple and "pa[id] the alleged overcharge directly to Apple." *Pepper*, 587 U.S. at 281. This does not dictate the result at summary judgment under *AGC*. *See Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1023–28 (N.D. Cal. 2015); *Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1300–01 (S.D. Cal. 2009).

*Risk of duplicative recovery and complexity in apportioning damages.* Antitrust standing also guards against "the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." *AGC*, 459 U.S. at 543–44. These risks are present here. "[I]ndirect and imprecise" theories of liability like Plaintiffs' new anti-steering challenge make "apportionment of any damages" extremely "difficult" and "risk . . . duplicative recovery." *Laydon v. Cooperatieve Rabobank U.A.*, 55 F.4th 86, 100 (2d Cir. 2022). That is especially true given that Apple is currently litigating (and has litigated) overlapping cases by app developers challenging the exact same conduct and has also previously settled similar claims with a broad class of developers. *See Epic*, 559 F. Supp. 3d at 923 (discussing pending lawsuits by developers); *see also, e.g.*, *Korean Publishers*

*Assoc. v. Apple Inc.*, No. 4:25-cv-4438 (N.D. Cal.). A large class of them already litigated an anti-steering case against Apple to settlement. *See Cameron v. Apple Inc.*, No. 4:19-cv-03074 (N.D. Cal., filed June 4, 2019); *see id.* Dkt. 451-1 (Settlement Agreement). Denying standing to indirect consumers is thus "not likely to leave a significant antitrust violation undetected or unremedied." *AGC*, 459 U.S. at 542; *see also Kloth v. Microsoft Corp.*, 444 F.3d 312, 317, 321–22 (4th Cir. 2006) (denying standing to consumer purchasers while recognizing that intermediaries—original equipment manufacturers and retailers—had standing to sue Microsoft). But allowing Plaintiffs to proceed here would invite double counting and confusion, requiring the Court to disentangle overlapping theories, separate developer and consumer harms, and allocate damages across an enormous and diffuse population. *See Eagle*, 812 F.2d at 542–43. Antitrust standing exists to prevent exactly this kind of claim. *See AGC*, 459 U.S. at 538–45.

**E. Plaintiffs' In-App Purchasing Theories Are Largely Time-Barred.**

Plaintiffs may not recover damages for any theories based on in-app purchasing. In-app purchases were introduced in 2009, yet Plaintiffs omitted any mention of them from their original Complaint (filed December 2011), Consolidated Complaint (filed March 2012), Amended Consolidated Complaint (filed September 2012), and Second Amended Consolidated Complaint (filed September 2013). *See* Dkt. 1, 26, 81, 111; *see also* SUF 27, 33. The first mention of in-app purchases came in Plaintiffs' TAC, filed on September 17, 2020. *See* Dkt. 229; *see also* SUF 34, 35. Because Plaintiffs have not alleged any "new and independent" overt act separate from the introduction of IAP itself in 2009 that "inflicts new and accumulating injury," any in-app purchasing claims are time-barred in their entirety. *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014) (cleaned up); *cf. SaurikIT, LLC v. Apple Inc.*, 2023 WL 8946200, at *1 (9th Cir. Dec. 28, 2023) (affirming dismissal of claims "based on conduct that occurred in 2008" and that had not "changed since"). At minimum, Plaintiffs' damages on such theories—if any—must be limited to the four-year period preceding the filing of the TAC, that is, those occurring since September 17, 2016. *See* 15 U.S.C. § 15b.

Plaintiffs cannot get around this time-bar by claiming that in-app purchasing theories "relate back" to any earlier complaint. *See* Dkt. 228 (objecting that any "in-app purchase[]" theories are time-barred). Claims relate back to an earlier complaint (and thus get the benefit of that complaint's

Gibson, Dunn & Crutcher LLP

APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:11-CV-06714-YGR

**SER-491**

limitations period) if they "share a common core of operative facts" with the earlier claims, "such that the plaintiff will rely on the same evidence to prove each claim." *Williams v. Boeing Co.*, 517 F.3d 1120, 1133 (9th Cir. 2008). But the Second Amended Consolidated Complaint does not mention in-app purchases at all, much less Apple's policies concerning them. *See* Dkt. 111. In-app purchases involve discrete technology and rules, implicate distinct competitive concerns and analysis (including because they are typically for digital content accessible across platforms), and have been treated as a separate issue by Plaintiffs' own experts. *See* Ex. 31 (Stiglitz Rep.) ¶¶ 63, 80; Ex. 34 (Song Rep.) ¶ 45; Ex. 33 (McFadden Rep.) ¶¶ 15–16. Because in-app purchasing theories therefore would "not rely on all the same facts and evidence" as the original claims, they do not relate back. *Echlin v. PeaceHealth*, 887 F.3d 967, 978 (9th Cir. 2018).

**F. Plaintiffs Cannot Establish Additional Elements Of Their Damages Claims.**

Apart from their failure to prove a violation of Section 2, Plaintiffs cannot satisfy two independent "essential elements" of their claims: (1) "antitrust injury or impact flowing from that violation" and (2) "measurable damages." *Olean v. Wholesale Grocery Coop.*, 31 F.4th 651, 666 (9th Cir. 2022) (en banc) (quotation marks omitted). Either deficiency is fatal.

First, Plaintiffs have no admissible evidence establishing injury. As explained in Apple's concurrent decertification and *Daubert* motions, Plaintiffs rely exclusively on the McFadden-Song model for the "complex inquiry into how Apple's conduct affected [developers'] pricing decisions," *Pepper*, 587 U.S. at 292 (Gorsuch, J., dissenting), that their commission overcharge theory requires to show individual and classwide injury. That model, in turn, relies on Thompson's unreliable methods for assigning transactions to class members, and on MacCormack's inadmissible and results-driven opinions about developers' average profit margins. *See generally* Mot. to Decertify the Class; *Daubert* Mot. to Exclude the Opinions of Mr. Darryl Thompson & Prof. Alan MacCormack. If either Thompson's or MacCormack's opinions are excluded, Plaintiffs will have no evidence at trial to establish whether any, much less every, class member was injured. That warrants summary judgment on all claims. *See Noohi v. Johnson & Johnson Consumer Inc.*, 2025 WL 2089582, at *7 (9th Cir. July 25, 2025) (failures of injury/damage models fully implemented after class certification may be "explore[d]" at summary judgment).

Gibson, Dunn & Crutcher LLP

For similar reasons, summary judgment should be granted on Hayter's individual claim. Plaintiffs' model calculates that Hayter benefited monetarily from the challenged conduct, SUF 31, and he thus cannot show injury or measurable damages. Given that a substantial percentage of class members are similarly (and concededly) uninjured under Plaintiffs' model, Apple's arguments apply with the same force to those class members' claims. But they cannot be reliably identified due to Mr. Thompson's defective methodology (even taking the McFadden-Song model as admissible). Hayter can be identified as an uninjured class member, however. Plaintiffs' claims to the contrary, *see* Dkt. 991-1 at 3, are incorrect. Plaintiffs produced to Apple records of all of Hayter's App Store transactions, and Apple has identified Hayter's Apple IDs (as they appear in the transactional data) for Plaintiffs, *see* Ex. 55 (Feb. 27, 2023 Letter from D. Swanson). Plaintiffs have everything they need to "confirm or deny" Apple's argument. Dkt. 991-1 at 3.

Second, Plaintiffs' expert evidence cannot serve as "proper proof" of measurable damages if the Court agrees with Apple on any liability issue in this motion. *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1373 (9th Cir. 1992). A valid damages model must "segregate the losses caused by acts which were not antitrust violations from those that were." *Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1159–60 (9th Cir. 2015). If, instead, the "only possibly admissible damage study" simply assumes that *all* challenged conduct is unlawful, there is "no basis in the record for the jury to determine what the effect on damages would be if it found one or more of the challenged acts lawful." *City of Vernon*, 955 F.2d at 1372 (quotation marks omitted). In that context, there is "no proper proof of damages at all" and summary judgment is appropriate. *Id.* at 1372–73; *see also Comcast Corp. v. Behend*, 569 U.S. 27, 36–37 (2013) (rejecting model because it "assumed the validity of all four theories of antitrust impact" and "did not attribute damages to any one particular theory").

For example, if the Court agrees that Apple's policy barring third-party app marketplaces is a lawful refusal to deal, then Plaintiffs' damage model cannot disaggregate that conduct from the *other* restrictions they challenge. The foundation of Plaintiffs' unified model is Abrantes-Metz's calculation of a 13.63% commission rate. Ex. 32 (Abrantes-Metz Rep.) ¶¶ 21, 23. She claims that rate would prevail for all digital content—app sales and in-app purchases—in a but-for world where *none* of the challenged restrictions exists—that is, a world with sideloading, steering, and the displacement of

APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:11-CV-06714-YGR

**SER-493**

Gibson, Dunn &
Crutcher LLP

Apple's IAP, in addition to third-party app marketplaces, cloud streaming games, and "super apps" in the App Store. *See id.;* Ex. 31 (Stiglitz Rep.) ¶ 116. Plaintiffs' other experts, McFadden and Song, do not purport to quantify damages for any specific conduct by Apple; rather, they merely plug the 13.63% rate into their model of developer pass-through to compute damages. Ex. 33 (McFadden Rep.) ¶ 19; *see* Ex. 34 (Song Rep.) ¶ 61 & n.97.[10] Plaintiffs thus aggregate Apple's conduct for damage-estimation purposes. Ex. 11 (May 14, 2025 McFadden Dep.) 92:24–93:3; *see* Ex. 33 (McFadden Rep.) ¶ 19.

As such, the McFadden-Song model does not allow a factfinder to assess "whether each of the particular actions alleged to form an antitrust violation 'materially contributed' to plaintiffs' injury" or "filter[] out" "other causes of plaintiffs' injury." *S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*, 556 F. Supp. 825, 1090 (D.D.C. 1982), *aff'd*, 740 F.2d 980 (D.C. Cir. 1984). That is because the model does not "apportion harm[] to any particular type of challenged conduct" and would "give the same result" regardless of which policies are found unlawful. Ex. 98 (Prince Reb. Rep.) ¶ 53. Plaintiffs' model improperly attributes harm to Apple's conduct collectively with no mechanism to untangle one policy from another. As the Ninth Circuit has underscored: "The concern in *Comcast* was not only that the damages model there proposed to measure damages not associated with the plaintiffs' theory of harm, but also that the model was incapable of separating out those damages from damages tied to the plaintiff's theory." *Noohi*, 2025 WL 2089582, at *6.

The model cannot be salvaged by Abrantes-Metz's conclusory assertions that it does not matter *which* of Apple's challenged conduct was absent (or continued) in the but-for world. *See* Ex. 12 (May 23, 2025 Abrantes-Metz Dep.) 53:3–10 (stating that her commission rate would be the same in "every situation and combination" even if only "some, but not all, of [Apple's] conduct is found to be unlawful"). Abrantes-Metz's 13.63% commission rate is based entirely on her say-so about a scenario in which "a single rival third-party app store competes against the Apple App Store." Ex. 32 (Abrantes-Metz Rep.) ¶ 23. But she has offered no analytical basis for that assertion, and no other expert has supplied it. *See* Ex. 11 (May 14, 2025 McFadden Dep.) 87:24–88:6 (explaining that the but-for

---

[10] They do purport to account for price-tier conduct through a simulated add-on to the damage model that otherwise assumes the absence of all the other challenged conduct, so that the damages in this simulation scenario remain fundamentally based on aggregated conduct. *See* Ex. 34 (Song Rep.) ¶ 84 & Fig. 13. If anything, the price-tier-free simulation shows that Plaintiffs *could have* tried to model other specific conduct but chose not to do so.

APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:11-CV-06714-YGR

**SER-494**

Gibson, Dunn & Crutcher LLP

commission rate "doesn't directly depend on what the nature of the offending conduct is"); Ex. 14 (May 30, 2025 Stiglitz Dep.) 172:10–17 (admitting he "didn't do any independent estimate" of the but-for commission rate "independent of Dr. Abrantes-Metz's conclusion"). In fact, it defies economic logic that the rate Apple would charge in a counterfactual market would remain fixed at precisely 13.63% regardless of what conduct is found unlawful and what type of competition Apple faces in the but-for world. If only the IAP mandate or former anti-steering rule were found anticompetitive, for instance, then it is logically impossible for Abrantes-Metz's but-for commission rate to have obtained in the period from 2008 to 2009 *before* those policies were introduced.

"[A]n expert must back up [her] opinion with specific facts." *United States v. Various Slot Machines on Guam*, 658 F.2d 697, 700 (9th Cir. 1981). Courts have accordingly made clear that *ipse dixit* like Abrantes-Metz's, "not supported by sufficient facts[,] . . . cannot support a jury's verdict" and thus cannot create a genuine dispute of material fact. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993); *see In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 924 ("[T]he mere proffering of unsupported expert testimony does not create a triable issue."). Plaintiffs' entire damages case turns on a single model, tied to a single rate, grounded in a singular assumption that all of Apple's conduct is unlawful. If that assumption fails in any part, the model fails in whole, and summary judgment for Apple is warranted.

### V.    CONCLUSION

Because Plaintiffs' claims fail as a matter of law for multiple reasons, Apple respectfully requests that the Court grant its motion for summary judgment.

DATED: August 4, 2025

**GIBSON, DUNN & CRUTCHER LLP**

By:  */s/ Cynthia E. Richman*
CYNTHIA E. RICHMAN

Cynthia E. Richman (*pro hac vice*)
crichman@gibsondunn.com
Harry R. S. Phillips (*pro hac vice*)
hphillips@gibsondunn.com
1700 M Street, N.W.
Washington, D.C. 20036-4504
Telephone: 202.955.8234
Facsimile: 202.530.9691

Theodore J. Boutrous Jr. (132099)
tboutrous@gibsondunn.com
Daniel G. Swanson (116556)
dswanson@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Caeli A. Higney (268644)
chigney@gibsondunn.com
Julian W. Kleinbrodt (302085)
jkleinbrodt@gibsondunn.com
Dana L. Craig (251865)
dcraig@gibsondunn.com
Eli M. Lazarus (284082)
elazarus@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: 415.393.8200
Facsimile: 415.393.8306

*Attorneys for Defendant Apple Inc.*