No. 25-7930

———————————

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

———————————

IN RE APPLE IPHONE ANTITRUST LITIGATION

———————————

ROBERT PEPPER; EDWARD LAWRENCE; STEPHEN H. SCHWARTZ,

*Plaintiffs-Appellants*,

v.

APPLE INC.,

*Defendant-Appellee*.

———————————

On Appeal from the U.S. District Court
for the Northern District of California
Case No. 4:11-cv-6714 | Hon. Yvonne Gonzalez Rogers

———————————

### SUPPLEMENTAL EXCERPTS OF RECORD

### VOLUME 3 OF 12 (SER-497–SER-751)

———————————

Cynthia E. Richman
Harry R. S. Phillips
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
(202) 955-8500

Caeli A. Higney
Julian W. Kleinbrodt
Eli M. Lazarus
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Ctr., Ste. 2600
San Francisco, CA 94111
(415) 393-8200

Theodore J. Boutrous Jr.
Daniel G. Swanson
Blaine H. Evanson
Bradley J. Hamburger
Matt Aidan Getz
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

*Counsel for Appellee Apple Inc.*

United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **IN RE APPLE IPHONE ANTITRUST LITIGATION** | **Case No.: 4:11-CV-06714-YGR** |
| | **ORDER GRANTING IN PART MOTION TO MODIFY CLASS** |
| | Re: Dkt. Nos. 951, 974 |

The Court heard argument on plaintiffs' motion to modify the class definition and approve notice to the class. For the reasons stated on the record at argument, the Court rules as follows:

The request to limit the class definition to include only qualifying foremarket purchases of iPhones and iPads only, and to exclude iPod Touch foremarket purchases, is **GRANTED.** Claims stemming from iPod Touch purchases are hereby **DISMISSED WITH PREJUDICE.**

The request to modify the class definition to apply the $10 lifetime spending threshold to Class members rather than Apple IDs is **DENIED WITHOUT PREJUDICE.** The Court noted at argument it expects parties to further brief the issue with forthcoming anticipated motions.

With regard to class notice, one substantive dispute remains, namely the appropriateness of a class notice referencing the possibility of injunctive relief where no injunctive class has been certified. Here, plaintiffs briefly mention injunctive relief in the operative complaint, but did so nowhere in any briefing on class certification.

As a general matter, the burden is on the party moving for class certification to state with specificity the class sought to be certified and the corresponding relief. "Membership in a class should be defined by the nature of the claim asserted and the relief sought." *See* Stevenson, J. and, James Fitzgerald, Fed. Civ. Pro. Before Trial (Rutter Group Prac. Guide) § 10:278. "The burden is

on the party seeking to maintain the action as a class action (normally, plaintiff) to establish a prima facie showing of each of the 23(a) prerequisites *and the appropriate 23(b) ground for a class action.*" *Id*. § 10:571 (emphasis supplied).

Plaintiffs did not move to certify an injunctive class, and the Court is unprepared to do so via class notice when its prior orders addressing the issue contemplated only a damages class. Plaintiffs argue that because a Rule 23(b)(3) class can in theory include claims for injunctive relief as well as damages, their proposed notice is proper. The Court disagrees. Plaintiffs had the opportunity to demonstrate an injunctive class was appropriate and chose not to. Apple subsequently engaged in discovery on the assumption that only a damages class was certified. The Court agrees with Apple that such a large change would be inappropriate at this late hour. The request to include language indicating the possibility of injunctive relief is **DENIED.** As to the remaining details of the notice, the Court indicated at argument that the parties are to rework the class notice and the Court will consider the parties' proposals after further discussion.[1]

This terminates Docket Nos. 951 and 974.

**IT IS SO ORDERED**.

Date: June 11, 2025

_____

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

---

[1] The parties' joint stipulation and proposed order modifying the remaining schedule for expert discovery at Dkt. No. 974 is also **GRANTED.**

**SER-499**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

|  | ) | C-11-06714 YGR |
|---|---|---|
|  | ) |  |
| IN RE APPLE IPHONE ANTITRUST | ) | OAKLAND, CALIFORNIA |
| LITIGATION, | ) |  |
|  | ) | MAY 30, 2025 |
|  | ) |  |
| _____ | ) | PAGES 1-28 |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:

FOR THE PLAINTIFFS:    WOLF HALDENSTEIN ADLER FREEMAN & HERZ
                       BY:  MARK C. RIFKIN
                       270 MADISON AVENUE
                       NEW YORK, NEW YORK  10016

                       BY:  RACHELE R. BYRD
                       750 B STREET, SUITE 1820
                       SAN DIEGO, CALIFORNIA  92101


FOR THE DEFENDANT:    GIBSON, DUNN Y CRUTCHER
                      BY:  CYNTHIA E. RICHMAN
                      1700 M STREET, N.W.
                      WASHINGTON, D.C.  20036

                      BY:  CAELI A. HIGNEY
                          ELI M. LAZARUS
                          KATHERINE WARREN MARTIN
                      ONE EMBARCADERO CENTER, SUITE 2600
                      SAN FRANCISCO, CALIFORNIA  94111


OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                            CERTIFICATE NUMBER 9595
PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

OAKLAND, CALIFORNIA                    MAY 30, 2025

P R O C E E D I N G S

(COURT CONVENED AT 2:02 P.M.)

THE COURT:  GOOD AFTERNOON, EVERYBODY.

MR. RIFKIN:  GOOD AFTERNOON, YOUR HONOR.

MS. RICHMAN:  GOOD AFTERNOON.

THE CLERK:  THANK YOU.  YOU MAY BE SEATED.

GOOD AFTERNOON.  CALLING THE CIVIL MATTER 11-CV-6714-YGR,

IN RE: APPLE IPHONE ANTITRUST LITIGATION.

PARTIES PLEASE STEP FORWARD AND STATE THEIR APPEARANCES

FOR THE RECORD.

MR. RIFKIN:  GOOD AFTERNOON, YOUR HONOR.

MARK RIFKIN, AND WITH MY IS MY PARTNER, RACHELE BYRD, FOR

THE PLAINTIFFS.

THE COURT:  GOOD AFTERNOON.

MS. RICHMAN:  GOOD AFTERNOON, YOUR HONOR.

CINDY RICHMAN.  I'M JOINED BY MY COLLEAGUES, CAELI HIGNEY,

ELI LAZARUS, AND KATHERINE WARREN MARTIN.

THE COURT:  AND WHICH IS WHICH?

MS. RICHMAN:  MS. HIGNEY, MR. LAZARUS,

MS. WARREN MARTIN.

THE COURT:  ALL RIGHT.  GOOD AFTERNOON.

OKAY.  WE ARE HERE ON A MOTION TO MODIFY, AND IT LOOKS

LIKE FUNDAMENTALLY THERE ARE TWO DIFFERENT -- TWO DIFFERENT

ISSUES TO DISCUSS.

Case 4:11-cv-06714-YGR, Document 980, Entry 3404, Filed 06/05/25, Page 3 of 29
Case 25-7030, 08/12/2026, DktEntry 34.6, 6.2555

3

ONE, THE ISSUE OF THE IPOD TOUCH; AND THEN, TWO, THE CUTOFF.

MR. RIFKIN: CORRECT, YOUR HONOR.

THE COURT: SO ON THE IPOD TOUCH, I AM OF THE MIND THAT IT'S FINE IF YOU WANT TO TAKE IT OUT, BUT YOU'VE GOT TO DISMISS THE CLAIMS WITH PREJUDICE.

MR. RIFKIN: YOUR HONOR, WE'VE TRIED TO PRESENT THIS MOTION AS A MOTION TO MODIFY TO AVOID PREJUDICING THE IPOD TOUCH --

THE COURT: WE'VE BEEN AT THIS SINCE 2011. YOU NOTIFIED THESE CLASS MEMBERS THAT THEY HAD A POTENTIAL CLAIM.

YOU HAVE HIRED NOBEL PRIZE WINNING ECONOMISTS WHO SAY THAT THEY CAN'T PROVE A CLAIM, APPARENTLY, BECAUSE YOU AT LEAST ADVISED THE COURT THAT YOU MET AND CONFERRED AND CONSULTED WITH THEM AND YOU HAVE TO EXCLUDE THEM BECAUSE THERE'S NO BASIS FOR THE DAMAGES CLAIM.

WE WEREN'T DOING THIS AGAIN.

MR. RIFKIN: YOUR HONOR, I JUST WANTED TO MAKE SURE THAT WE WERE ALL CLEAR.

FIRST, WE HAVEN'T NOTIFIED ANYBODY YET.

BUT IF THOSE ARE THE COURT'S TERMS, I THINK IN FAIRNESS TO THE IPOD TOUCH CONSUMERS, WE'LL DISMISS THEM WITH PREJUDICE BECAUSE WE DON'T INTEND TO PRESENT ANY EVIDENCE AT TRIAL ON THEIR BEHALF.

THE COURT: OKAY.

RESPONSE?

MS. RICHMAN: YOUR HONOR, THERE'S NO BASIS FOR AMENDING THE CLASS DEFINITION.

THE COURT: CLASS DEFINITIONS ARE AMENDED ALL THE TIME.

MS. RICHMAN: LET ME CONTINUE, YOUR HONOR.

THEY -- PLAINTIFFS HAVE TO SHOW THAT THERE'S A SUFFICIENT BASIS FOR DOING SO.

THE BASIS THAT THEY'VE PROFFERED IN THEIR MOTION IS THAT THEY WERE ADVISED BY PROFESSOR STIGLITZ THAT THE -- AFTER CONSIDERING THE EVIDENCE, HE CONCLUDED THAT, UNLIKE THE FOUR MARKETS FOR SMARTPHONES AND TABLETS, APPLE LACKS MARKET POWER IN THE RELEVANT MARKET FOR PORTABLE MUSIC DEVICES IN WHICH IT SELLS IPOD DEVICES.

THEY SAY BASICALLY THE SAME THING IN THEIR REPLY BRIEF, WHICH IS SUPPORTED BY A DECLARATION OF MR. RIFKIN.

PROFESSOR STIGLITZ WAS DEPOSED THIS MORNING IN SPAIN. MR. SWANSON PUT PLAINTIFFS' MOTION IN FRONT OF HIM AND ASKED HIM IF THE REPRESENTATIONS ARE TRUE.

PROFESSOR STIGLITZ WAS ASKED, DO YOU HAVE AN OPINION AS TO WHETHER APPLE HAS MARKET POWER IN THE RELEVANT MARKET FOR PORTABLE MUSIC DEVICES IN 2008 WHEN APPLE OPENED THE APP STORE?

PROFESSOR STIGLITZ RESPONDED THAT HE HAS NOT STUDIED THAT IN DETAIL TO BE ABLE TO OFFER AN OPINION.

HE WAS THEN ASKED, DO YOU HAVE ANY OPINION AS TO WHETHER

OR NOT APPLE HAS SUFFICIENT MARKET POWER IN THE PORTABLE MUSIC DEVICE FOR A MARKET TO BE ABLE TO IMPOSE THE ALLEGED ANTICOMPETITIVE RESTRICTIONS AT ISSUE?

HE RESPONDED, I HAVE NOT STUDIED THAT IN DETAIL. I WAS ASKED TO FOCUS ON -- TO DO MY DETAILED ANALYSIS ON IPHONE, IPAD, AND THAT'S THE ONLY DETAILED ANALYSIS THAT I DID.

SO THE PROFFERED EVIDENTIARY BASIS --

THE COURT: DID MR. SWANSON ASK HIM WHETHER HE HAD ANY CONVERSATIONS WHATSOEVER WITH MR. RIFKIN OR THE PLAINTIFFS' ATTORNEYS WITH RESPECT TO THAT TOPIC? DID HE ASK HIM THAT QUESTION?

MS. RICHMAN: YES, HE DID, YOUR HONOR.

THE COURT: AND THE RESPONSE?

MS. RICHMAN: HE DID NOT RECALL SUCH CONVERSATIONS.

WE HAVE -- THE TRANSCRIPT IS STILL ROUGH, BUT WE HAVE A COPY OF THE RELEVANT PORTIONS IF YOUR HONOR WOULD LIKE TO SEE THEM.

THE COURT: RESPONSE?

MR. RIFKIN: YOUR HONOR, THAT'S NOT QUITE WHAT HE SAID. WHAT HE SAID WAS HE COULDN'T RECALL THE DETAIL OF THE CONVERSATIONS.

THE COURT: ALL RIGHT. LET ME SEE IT.

AND GO AHEAD -- WHO -- WERE YOU THERE, MR. RIFKIN?

MR. RIFKIN: I'M SORRY, YOUR HONOR? IN SPAIN THIS MORNING?

THE COURT:  HAVE YOU SEEN THIS TRANSCRIPT?

MR. RIFKIN:  I HAVE SEEN THE TRANSCRIPT.  I'M AWARE OF THE TRANSCRIPT.

MS. RICHMAN:  (HANDING.)

MR. RIFKIN:  THANK YOU.

(PAUSE IN PROCEEDINGS.)

THE COURT:  WELL, MR. SWANSON WAS -- SEEMS TO HAVE BEEN QUITE FOCUSSED ON WHETHER OR NOT HE HAD AN OPINION, AS OPPOSED TO WHETHER OR NOT THEY'D HAD A DISCUSSION TO NOT PURSUE THAT LINE.

MS. RICHMAN:  YOUR HONOR, HE SAYS, ON THE BOTTOM OF PAGE 5, I BELIEVE -- I'M NOT SURE WHAT EXACTLY WHAT CONVERSATIONS HE IS REFERRING TO THAT WE MIGHT HAVE HAD.

AND THEN IF YOU CONTINUE FORWARD, HE SAYS AT THE BOTTOM OF THE NEXT PAGE, I THINK, AS I SAY, I CAN'T REMEMBER HAVING TALKED TO HIM ABOUT THIS.

THE COURT:  BUT HE ALSO SAYS -- DO YOU HAVE A COPY FOR MR. RIFKIN?

MS. RICHMAN:  I GAVE HIM ONE.

MR. RIFKIN:  I HAVE A COPY, YOUR HONOR.  THANK YOU.

THE COURT:  WHAT'S THE PREJUDICE TO APPLE?

MS. RICHMAN:  WELL, YOUR HONOR, THE PREJUDICE IS THAT THE PLAINTIFFS ARE MAKING A TRANSPARENT EFFORT TO GERRYMANDER THE CLASS DEFINITION IN ORDER TO REDUCE THE NUMBER OF UNINJURED CLASS MEMBERS, AND SO WE ARE DEEPLY PREJUDICED BY HAVING TO

DEFEND A CLASS ACTION THAT DOES NOT COMPORT WITH THE RULE 23 REQUIREMENTS.

THE DECISION TO DROP THE IPOD TOUCH TRANSACTIONS ONLY UNDERSCORES THAT THE PLAINTIFFS ARE ENGAGED IN YET ANOTHER ARBITRARY ADJUSTMENT TO THE CLASS DEFINITION IN ORDER TO, TO GET THE UNINJURED PLAINTIFFS NUMBER DOWN.

AND SO THERE'S A SIGNIFICANT PREDOMINANCE ARGUMENT THAT WE MADE PREVIOUSLY THAT I THINK IS STILL EXTREMELY IMPORTANT. WHEN YOU CERTIFIED THE CLASS IN THE -- IN FEBRUARY OF 2024, YOU INDICATED THAT YOU EXPECTED THAT AS A RESULT OF THE SUBSEQUENT WORK PLAINTIFFS WOULD DO, THAT BOTH THE PERCENTAGE AND THE RAW NUMBER OF UNINJURED CLASS MEMBERS WOULD DECREASE.

WELL, IT HASN'T, AND THEY ARE PURPORTING TO TRY TO GET THE NUMBER BELOW 6 PERCENT BY THROWING 6 MILLION CLASS MEMBERS OUT OF THE CLASS, 4 MILLION OF WHICH ARE INJURED ACCORDING TO DR. SONG'S IMPLEMENTATION OF PROFESSOR MCFADDEN'S MODEL.

SO NOW THERE ARE EVEN MORE UNINJURED THAN THERE WERE WHEN YOUR HONOR ADDRESSED THIS ISSUE LAST YEAR.

SO THAT IS A MAJOR SOURCE OF PREJUDICE, I WOULD SAY.

THERE'S ALSO THE ISSUE THAT WE BRIEFED AND THAT MR. RIFKIN REFERRED TO ABOUT THE POSSIBILITY OF ADDITIONAL LITIGATION AGAINST APPLE BROUGHT BY THESE IPOD TOUCH --

THE COURT: WELL, THAT ISSUE IS MOOT BECAUSE I'VE RESOLVED THAT ISSUE.

MS. RICHMAN: OH, IF YOU DISMISS IT WITH PREJUDICE,

YOUR HONOR?

THE COURT: YES.

MS. RICHMAN: YES, AND THAT WAS OUR ALTERNATIVE REQUEST FOR RELIEF THAT WE HAD ASKED FOR IN OUR BRIEF.

THE COURT: I THINK THAT'S WHY I OFFERED IT.

MS. RICHMAN: THANK YOU.

THE COURT: AND AS I SIT HERE, THAT'S WHAT MY PERSPECTIVE IS.

IN TERMS OF THE 6 MILLION, WHERE DOES THAT NUMBER COME FROM AGAIN?

MS. RICHMAN: YOUR HONOR, THAT IS IN PROFESSOR PRINCE'S DECLARATION, WHICH IS ATTACHED TO APPLE'S OPPOSITION, AND IT'S IN PARAGRAPH 7, WHICH FALLS OVER PAGES 2 AND 3 OF THE DECLARATION, 6.195 MILLION.

AND THEN IF YOU GO TO PARAGRAPH 10, PROFESSOR PRINCE WRITES, OF THE 6.196 PAYORS WHO ARE EXCLUDED FROM THE CLASS, I FOUND THAT 4,225,126, OR 68 PERCENT, ARE HARMED, AND 1.9, 32 PERCENT, ARE UNHARMED IN THE CONTEXT OF DR. SONG'S MODEL.

THE COURT: ALL RIGHT.

RESPONSE?

MR. RIFKIN: YES, YOUR HONOR, AND I'LL TRY TO BE BRIEF.

WITH RESPECT TO THE INJURED AND UNINJURED CLASS MEMBERS, PROFESSOR PRINCE SAYS THAT IF THE IPOD TOUCH WERE LEFT IN THE CLASS, THEN THE TOTAL NUMBER OF CLASS MEMBERS -- AND HE ONLY

DOES THIS AS AN ESTIMATE BECAUSE HE ACKNOWLEDGES THAT HE DID NOT RERUN THE DAMAGES MODEL IN ORDER TO SUBMIT HIS DECLARATION -- BUT NONETHELESS, HE SAYS THAT THE TOTAL NUMBER OF THE CLASS MEMBERS --

THE COURT:  OKAY.  HOLD ON JUST A MOMENT.

IS THAT ACCURATE?

MS. RICHMAN:  I'M SORRY, YOUR HONOR.  I WAS READING A NOTE.

CAN YOU REPEAT THAT, MR. RIFKIN?

THE COURT:  HE SAID THAT PRINCE ACKNOWLEDGED THAT HE DID NOT RERUN THE DAMAGES MODEL IN ORDER TO SUBMIT HIS DECLARATION.

MS. RICHMAN:  I THINK WE TOOK DR. SONG'S MODEL AS IT WAS, SO WE ACCEPTED IT FOR THE PURPOSES OF THE ANALYSIS.

AND, IN FACT, ON THE 6.2 MILLION PAYORS WHO ARE EXCLUDED FROM THE CLASS BY VIRTUE OF ELIMINATING IPOD TOUCH TRANSACTIONS, PLAINTIFFS CONCEDE IN THEIR REPLY BRIEF THAT THAT IS THE APPROPRIATE CALCULATION.

THE COURT:  GO AHEAD.  I'M SORRY.

MR. RIFKIN:  YOUR HONOR, IF I CAN FINISH?

IT'S -- DR. SONG RAN HIS ANALYSIS ONLY FOR IPHONE AND IPAD PURCHASERS.  HE DID NOT INCLUDE THE IPOD TOUCH PURCHASES IN THE ANALYSIS.

IT WOULD EVER SO SLIGHTLY CHANGE THE NUMBERS.

THE PROBLEM IS, BECAUSE WE'RE DEALING WITH SO MANY

Case 4:11-cv-06714-YGR   Case: 25-7030, 08/12/2026, DktEntry: 3404-1, Document 980   Filed 06/05/25   Page 10 of 29   Page 10 of 29

10

BILLIONS OF TRANSACTIONS, EVERY TIME WE EVER SO SLIGHTLY CHANGE THE NUMBERS, IT HAS A PROFOUND, ABSOLUTE EFFECT.

NONETHELESS, WHAT PROFESSOR PRINCE SAYS IS THAT THE CLASS -- THE TOTAL NUMBER OF PEOPLE IN THE CLASS, IF WE IMPOSED -- AND THIS WAS HIS CHOICE -- IF WE IMPOSED THE $10 SPENDING CUTOFF AT THE APPLE I.D. LEVEL, THE TOTAL NUMBER OF PEOPLE IN THE CLASS GOES FROM 185.4 MILLION TO 191.6 MILLION.

AND THEN HE SAYS THE NUMBER OF HARMED INDIVIDUALS GOES FROM 157.7 MILLION TO 180 MILLION, AND THE NUMBER OF UNHARMED GOES FROM 9.7 MILLION TO 11.6 MILLION.

SO THAT'S A TOTAL CHANGE FROM 5.2 PERCENT UNHARMED TO APPROXIMATELY 6.1 PERCENT UNHARMED, AND WE ACKNOWLEDGE THAT.

BUT HE ALSO PROVIDES A BREAKDOWN OF CHANGES, AND THE NET EFFECT, ACCORDING TO THAT BREAKDOWN, IS A NET INCREASE IN THE NUMBER OF UNHARMED CLASS MEMBERS.  IT CHANGES BY LESS THAN 0.029 PERCENT.  THAT'S LESS THAN .03 PERCENT.

WE ACKNOWLEDGE THAT THERE ARE CHANGES IN BOTH THE NUMBERS AND THE PERCENTAGES.

BUT AS YOUR HONOR IS AWARE, WE HAVE IDENTIFIED EXACTLY WHO THOSE HARMED AND UNHARMED CLASS MEMBERS ARE, PRECISELY AS WE SAID WE WOULD, AND FOR THOSE WHO ARE HARMED, WE HAVE COMPUTED, TO THE PENNY, EXACTLY HOW MUCH DAMAGES THEY HAVE INCURRED.

AND SO NONE OF THIS WILL OCCUPY ANY OF THE COURT'S TIME OR ANY OF THE JURY'S TIME AT TRIAL.  WE KNOW THE ANSWERS TO THIS.

AND HAVING NOW ACCEPTED THE COURT'S PROPOSAL THAT WE AGREE

Case 4:11-cv-06714-YGR    Document 980    Filed 06/05/25    Page 11 of 29
Case: 25-7030, 08/12/2026, DktEntry: 3404.1542 of 255, Page 11 of 29

11

TO DISMISS THOSE IPOD TOUCH CLAIMS WITH PREJUDICE, THERE IS NO PREJUDICE TO APPLE AND WE SHOULD MOVE ON WITH THE MOTION.

THAT HAVING BEEN SAID, I'M HAPPY TO ANSWER ANY QUESTIONS THE COURT MIGHT HAVE.

THE COURT:  OKAY.  ANYTHING ELSE?

MS. RICHMAN:  YES, YOUR HONOR.

I JUST WANT TO UNDERSCORE THAT REGARDLESS OF WHETHER THE IPOD TRANSACTIONS ARE DISMISSED FROM THE CASE WITH PREJUDICE OR NOT, THE FACT REMAINS THAT THERE ARE STILL, ACCORDING TO PLAINTIFFS' OWN CALCULATIONS, BETWEEN OVER 9 TO OVER 11 MILLION UNHARMED CLASS MEMBERS.

AND THE -- I KNOW THAT THE PLAINTIFFS HAVE SAID MULTIPLE TIMES, THEY JUST WON'T PARTAKE IN THE DAMAGES.

BUT THAT IS NOT A SOLUTION.  FIRST, THEY ATTEMPT TO SKIRT THE IMPLICATIONS BY CLAIMING THAT ACTUALLY ALL MEMBERS HAVE BEEN INJURED BY VIRTUE OF REDUCED CHOICE, AGAIN IGNORING WELL SETTLED NINTH CIRCUIT LAW HOLDING THAT REDUCED CONSUMER CHOICE IS INSUFFICIENT TO ESTABLISH INJURY.

THERE ARE DEPOSITIONS OF THE NAMED PLAINTIFFS THAT SHOW THE -- EVEN THE NAMED PLAINTIFFS ARE -- HAVE DIVERGING VIEWS ABOUT WHETHER LESS OR MORE CHOICE IS A RELEVANT CONSIDERATION TO WHERE THEY WOULD MAKE THEIR TRANSACTIONS.

SO, YOU KNOW, THEY CAN'T ESTABLISH CLASS-WIDE INJURY THAT WAY.

IN ADDITION, THE ANTITRUST INJURY REQUIREMENT CAN'T BE MET

Case 4:11-cv-06714-YGR Document 980 Filed 06/05/25 Page 12 of 29
Case 25-7030, 08/12/2026, DktEntry 3404.1, Page 15 of 255

12

BY SUCH BROAD ALLEGATIONS OF INJURY TO THE MARKET.

THE OTHER THING IS THAT ON THE QUESTION OF JUST, YOU KNOW, THE ZEROING OUT DAMAGES FOR THE UNINJURED, THAT IS NOT, NOT AN OPTION HERE. INJURY IS AN ELEMENT OF AN ANTITRUST CLAIM. THIS IS NOT LIKE THE CASES THEY RELY ON, LIKE RUIZ TORRES WHICH HAS NO APPLICATION HERE.

MERE EXPOSURE TO CONDUCT IN THE ALLEGED VIOLATION OF ANTITRUST LAWS DOES NOT CAUSE MARKET PARTICIPANTS TO SUFFER ANTITRUST HARMS. PLAINTIFFS HAVE TO SHOW THAT THEY PAID MORE FOR APPS AND IN-APP CONTENT IN THE REAL WORLD THAN THEY WOULD HAVE IN THE BUT-FOR WORLD THAT THEY ARE PREDICTING, AND THEY CAN'T DO THAT FOR BETWEEN 9 AND 11 MILLION PAYORS.

UNINJURED CLASS MEMBERS CANNOT PREVAIL ON THE MERITS, SO THEIR CLAIMS MUST BE WINNOWED AWAY.

AND IF YOU HAVE TO GO THROUGH 9 TO 11 MILLION CLASS MEMBERS TO DETERMINE WHETHER THEY'RE INJURED OR UNINJURED, THAT COMPLETELY UNDERMINES THE EFFICIENCY OF A CLASS ACTION THAT THE MECHANISM IS INTENDED TO --

THE COURT: DO YOU EXPECT THAT WE'RE GOING TO HAVE INDIVIDUAL CLAIMS OF 185, 186 MILLION PEOPLE?

MS. RICHMAN: WELL, AT A MINIMUM, YOUR HONOR, WE WOULD NEED TO --

THE COURT: THAT'S THE NET EFFECT OF WHAT YOU'RE ARGUING.

MS. RICHMAN: I DON'T THINK SO, YOUR HONOR. I THINK

AT A MINIMUM, IT WOULD BE BETWEEN 9 TO 11 THAT ARE DEEMED UNINJURED BY THE MODEL.

THE COURT: THAT'S NOT WHAT -- THAT'S NOT WHAT I SAID.

MS. RICHMAN: I KNOW WHAT YOU SAID.

I'M SAYING THAT I DON'T THINK YOU WOULD NEED TO DO AN INDIVIDUAL BY INDIVIDUAL BASIS FOR 185 MILLION. I DON'T THINK THAT'S THE IMPORT.

I THINK THE IMPORT IS THAT YOU WOULD NEED TO DO IT FOR AT LEAST 9 TO 11 MILLION.

THE COURT: I'M NOT FOLLOWING YOU.

THE POINT OF A CLASS ACTION IS TO RESOLVE, ON A MORE GLOBAL BASIS, CLAIMS THAT -- WHERE THERE ARE COMMON QUESTIONS AND THAT THOSE COMMON QUESTIONS PREDOMINATE. THEY DO SO FOR 190 OR 186 MILLION PEOPLE.

THE FACT THAT YOUR CLIENT IS SO LARGE THAT THE SMALL PERCENTAGE HERE IMPACTS MILLIONS OF PEOPLE IS A FUNCTION OF THE FACT THAT THEY ARE HUMONGOUS.

BUT THAT DOESN'T UNDERMINE THE FACT THAT THERE ARE COMMON QUESTIONS WHICH PREDOMINATE FOR 186 MILLION PEOPLE, ACCORDING TO HIS MODEL.

MS. RICHMAN: YOUR HONOR, ACCORDING TO HIS MODEL, THERE'S ALSO MASSIVE SHIFTS IN INJURED TO UNINJURED. IF YOU TAKE AWAY THE IPOD, THE IPOD TOUCH TRANSACTIONS, HUNDREDS OF THOUSANDS OF CLASS MEMBERS MOVE FROM UNINJURED TO INJURED.

THAT MAKES NO SENSE. IT UNDERSCORES THAT THE MODEL IS COMPLETELY INCAPABLE OF SHOWING CLASS-WIDE INJURY IN ONE STROKE, AS IT MUST UNDER OLEAN.

AND THIS ISN'T ABOUT THE SIZE OF OUR -- OF MY CLIENT. IT HAS TO DO WITH THE FACT THAT THIS IS AN ANTITRUST CASE, AND IN ANTITRUST CASES, THERE NEEDS TO BE A SHOWING OF ACTUAL INJURY, THAT'S AN ELEMENT OF THE CLAIM, TO ALL OR NEARLY ALL OF THE CLASS MEMBERS, AND THEY CAN'T DO THAT WITH THEIR MODEL.

THE APPROPRIATE REMEDY HERE IS DECERTIFICATION, NOT AMENDMENT.

THE COURT: YOU DIDN'T BRING A MOTION FOR DECERTIFICATION.

MS. RICHMAN: WELL, WE WOULD BE HAPPY TO DO THAT IF THE COURT WOULD ALLOW.

THE COURT: WELL, DIDN'T I SAY, WHEN I ISSUED THE ORDER ORIGINALLY, THAT IF I NEEDED TO ENTERTAIN THAT, I COULD? YOU HAVEN'T BROUGHT THAT MOTION.

MS. RICHMAN: YES, YOUR HONOR.

AND JUST SO YOU HAVE THE FULL CONTEXT, WE'RE STILL IN THE MIDDLE OF EXPERT DISCOVERY. SO WE'RE -- REBUTTAL REPORTS ARE DUE ON JUNE 13TH, AND EXPERT DISCOVERY CLOSES ON JULY 7TH.

I EXPECT SHORTLY THEREAFTER WE WILL BE COMING TO YOU WITH A REQUEST FOR MOTION PRACTICE.

THE COURT: OKAY.

MR. RIFKIN: YOUR HONOR, DO YOU WISH TO HEAR ANYTHING

IN RESPONSE TO THE LAST BIT OF ARGUMENT?

THE COURT:  WELL, THE ARGUMENT IS A MOTION FOR DECERTIFICATION, AND I DON'T HAVE THAT MOTION IN FRONT OF ME.

MR. RIFKIN:  CORRECT, YOUR HONOR.

THE COURT:  SO --

MS. RICHMAN:  YOUR HONOR, IF I MAY?  YOU DON'T HAVE A MOTION FOR DECERTIFICATION IN FRONT OF YOU.  YOU HAVE A MOTION TO AMEND.

BUT THE AMENDMENT MUST SATISFY THE RULE 23 ELEMENTS.

AND SO EVEN THOUGH THAT SPECIFIC MOTION IS NOT IN FRONT OF YOU, THIS IS --

THE COURT:  I DON'T KNOW WHAT YOU MEAN BY THAT.  YOU MEAN THAT THE MOTION TO AMEND, OR THAT THE RESULTING DEFINITION?

MS. RICHMAN:  THE RESULTING DEFINITION, YOUR HONOR.

THE COURT:  AND THAT'S NOT FULLY FLESHED OUT, FRANKLY.

MY FOCUS HERE IS ON THE PROCEDURAL ISSUE OF WHETHER A PLAINTIFF HAS A BASIS FOR MODIFYING THE CLASS BASED UPON WHAT DISCOVERY HAS SHOWN.  THIS IS ROUTINELY DONE IN COURTROOMS ACROSS THE NATION.  WE DO THIS ALL THE TIME SO THAT YOU ALL CAN CONTINUE WHAT YOU ARE DOING.

THAT PARTICULAR MOTION IS GRANTED.  ALL CLAIMS WITH RESPECT TO THE IPOD ARE DISMISSED WITH PREJUDICE.

I WILL RESERVE -- AND THERE IS NOTHING IN THIS RULING THAT

INDICATES THAT I HAVE RULED ON A MOTION TO DECERTIFY, AND I WILL RULE ON THAT MOTION ONCE I RECEIVE IT.

SO WE CAN -- YOU KNOW, AND IN THE INTERIM, PERHAPS WE'LL GET SOME MORE GUIDANCE FROM THE SUPREME COURT WITH RESPECT TO ANY DE MINIMIS HELP.

MS. RICHMAN:  YES, YOUR HONOR.

THE COURT:  OKAY.  THAT WAY YOU CAN KEEP MOVING.

MR. RIFKIN:  THANK YOU, YOUR HONOR.

THE COURT:  ANYTHING ELSE?

MS. RICHMAN:  NOTHING HERE, YOUR HONOR.

MR. RIFKIN:  ON THE $10 THRESHOLD, YOUR HONOR, DO YOU WISH TO HEAR ARGUMENT ON THAT?

THE COURT:  I'VE ALREADY -- I'VE ALREADY CERTIFIED THAT THRESHOLD, AND I THINK IT IS MORE APPROPRIATE TO ADDRESS THAT IN A MOTION TO DECERTIFY.  SO THAT DOESN'T CHANGE.

MR. RIFKIN:  WELL, YOUR HONOR, TOGETHER WITH THIS MOTION, WE'VE ALSO ASKED THE COURT TO APPROVE A PLAN TO SEND NOTICE TO THE CLASS, AND I JUST WANT TO BE HEARD ON THE $10 THRESHOLD ISSUE BECAUSE IT WILL AFFECT HOW WE DESCRIBE THE CLASS IN THE NOTICE.

AND IF I MAY, I DON'T REALLY THINK THERE'S MUCH DISPUTE HERE ON THE FACTS.

YOU MAY RECALL, YOUR HONOR, WHEN YOU CERTIFIED THE CLASS, ALL WE HAD, ALL THE PLAINTIFFS HAD WAS --

THE COURT:  RIGHT, YOU HADN'T RUN THE MODEL YET.  I

UNDERSTAND THAT.

MR. RIFKIN:  NO, WE HAD RUN THE MODEL AGAINST THREE OF THE GENRES.

BUT THE ONLY -- THE ONLY TRANSACTION DETAIL WE HAD WAS AT THE APPLE I.D. LEVEL.

THE COURT:  CORRECT.

MR. RIFKIN:  AND SINCE THEN, APPLE HAS PRODUCED TO THE PLAINTIFFS AND THEIR EXPERTS, APPLE HAS PRODUCED NOW THE TRANSACTION DATA THAT MAP TO THE PAYORS RATHER THAN THE APPLE I.D.S.

THE COURT:  CAN I STOP YOU FOR JUST ONE MOMENT?

MR. RIFKIN:  OF COURSE.

THE COURT:  DID I GIVE YOU A DEADLINE FOR SENDING NOTICE?

MR. RIFKIN:  NO, YOU DID NOT, YOUR HONOR.

THE COURT:  SO IF WE KNOW WE'RE GETTING A MOTION TO DECERTIFY, WHY WOULD YOU SEND NOTICE?

MR. RIFKIN:  THE ONLY REASON FOR DOING SO NOW IS IN THE EVENT THAT ONE OR OTHER PARTY MOVES FOR SUMMARY JUDGMENT, IF WE DON'T SEND NOTICE TO THE CLASS, THERE'S A QUESTION ABOUT WHETHER THE CLASS WILL BE BOUND BY THE COURT'S RULING ON THE MOTION FOR SUMMARY JUDGMENT.

THE COURT:  DO YOU AGREE WITH THAT PROCEDURALLY?

MS. RICHMAN:  YES, YOUR HONOR.  THERE'S A ONE-WAY INTERVENTION ISSUE.

THE COURT: OKAY. HAVE I GIVEN YOU A DEADLINE FOR SUMMARY JUDGMENT?

MR. RIFKIN: YOU HAVE, YOUR HONOR.

THE COURT: WHEN IS THAT?

MS. RICHMAN: IT'S AUGUST 4TH, I BELIEVE, YOUR HONOR.

LET ME JUST CHECK MY SCHEDULE HERE.

AUGUST 4TH IS THE DEADLINE TO SUBMIT DISPOSITIVE MOTIONS, DAUBERT MOTIONS, MOTIONS TO DECERTIFY.

THE COURT: OKAY.

GO AHEAD.

MR. RIFKIN: SO, YOUR HONOR, WE DID NOT HAVE DETAILED INFORMATION FROM WHICH WE COULD APPLY THE $10 SPENDING CUTOFF AT ANYTHING OTHER THAN THE APPLE I.D. LEVEL.

SUBSEQUENT TO YOUR HONOR'S DECISION ON CLASS CERTIFICATION -- AND BY THE WAY, YOUR HONOR SAID, IN GRANTING CLASS CERTIFICATION, THAT ONCE THE MODEL IS FULLY RUN, THE CUTOFF COULD BE CHANGED TO REDUCE THE IMPACT OF INCLUDING UNHARMED ACCOUNTS.

IF YOU RECALL, AT THE TIME, AT THE APPLE I.D. LEVEL -- AGAIN, THIS WAS BASED ON THE MODEL THAT WE HAD RUN AGAINST THREE GENRES AND APPLYING THE $10 CUTOFF AT THE APPLE I.D. LEVEL -- WE ESTIMATED THAT THERE WOULD BE APPROXIMATELY 7.9 PERCENT UNHARMED CLASS MEMBERS. THAT WAS AS A RESULT OF APPLYING THE $10 CUTOFF AT THE APPLE I.D. LEVEL.

ONCE THE MODEL WAS RUN AGAINST ALL TRANSACTIONS ON THE APP

STORE, WE WERE ABLE TO DETERMINE THE EXACT NUMBER OF UNHARMED CLASS MEMBERS, WHETHER THE APPLE I.D. LEVEL IS APPLIED AT THE -- I'M SORRY -- WHETHER THE $10 CUTOFF IS APPLIED AT THE APPLE I.D. LEVEL OR AT THE PAYOR LEVEL, AND WE PROVIDED THOSE COMPARISONS IN THE BRIEFING, BUT LET ME JUST RUN THROUGH THEM QUICKLY HERE.

IF WE APPLY THE $10 THRESHOLD AT THE APPLE I.D. LEVEL, AS WE DID DURING CLASS CERTIFICATION, THE CLASS IS 185.4 MILLION PEOPLE.

IF WE APPLY THE $10 THRESHOLD AT THE PAYOR LEVEL, NOW THAT WE HAVE DONE THAT, AND PROFESSOR -- USING PROFESSOR MCFADDEN'S MODEL, DR. SONG HAS RUN THE MODEL BOTH WAYS, SO THESE ARE NOT HYPOTHETICAL. THESE ARE ACTUAL COMPUTATIONS.

IF WE APPLY THE APPLE I.D. -- THE $10 THRESHOLD AT THE PAYOR LEVEL, THE TOTAL NUMBER OF CLASS MEMBERS INCREASES FROM 185.4 MILLION TO 185.9 MILLION, A CHANGE OF LESS THAN ONE-THIRD OF 1 PERCENT.

IF WE APPLY THE $10 CUTOFF AT THE I.D. LEVEL, THE TOTAL NUMBER OF HARMED INDIVIDUALS IS 175.7 MILLION, AND WHEN THE THRESHOLD IS APPLIED AT THE PAYOR LEVEL, THE THRESHOLD GOES TO 176.1 MILLION, A CHANGE OF LESS THAN ONE QUARTER OF 1 PERCENT.

WE KNOW THE EXACT AMOUNT OF THE DAMAGES FOR ALL 175.7 MILLION OR ALL 176.1 MILLION CLASS MEMBERS. EITHER WAY, THOSE CALCULATIONS HAVE ALREADY BEEN DONE AND HAVE BEEN PROVIDED TO APPLE.

THE NUMBER OF UNHARMED CLASS MEMBERS IS 9.7 MILLION WHEN THE APPLE I.D. -- WHEN THE $10 THRESHOLD IS APPLIED AT THE APPLE I.D. LEVEL.  IT RISES BY ONE-TENTH OF 1 PERCENT TO 9.8 MILLION WHEN IT'S APPLIED AT THE PAYOR LEVEL, A CHANGE FROM 5.2 PERCENT TO 5.3 PERCENT.

AGAIN, WE KNOW EXACTLY WHO THOSE CLASS MEMBERS ARE, EITHER THE 9.7 MILLION OR THE 9.8 MILLION.

WE HAVE DELIVERED ALL OF THAT INFORMATION ALREADY TO APPLE.  APPLE KNOWS THAT INFORMATION NOW EITHER WAY.

WHAT WE ARE SUGGESTING IS THAT APPLYING THE $10 THRESHOLD AT THE PAYOR LEVEL IS MORE CONSISTENT WITH THE WAY PEOPLE THINK.  THEY THINK ABOUT THEIR OWN PURCHASES RATHER THAN WHETHER THEY MADE A PURCHASE IN ONE I.D. OR ANOTHER I.D.

IT HAS VIRTUALLY NO EFFECT AT ALL ON THE NUMBER OF CLASS MEMBERS, ON THE NUMBER OF HARMED CLASS MEMBERS, ON THE NUMBER OF UNHARMED CLASS MEMBERS, ON THE PERCENT OF UNHARMED CLASS MEMBERS, AND MOST IMPORTANTLY AT ALL -- OF ALL, IT HAS ABSOLUTELY NO EFFECT ON OUR ABILITY TO IDENTIFY WHO'S HARMED, TO ASSIGN DAMAGES TO THEM, AND TO IDENTIFY EXACTLY WHO IS UNHARMED.  WE KNOW ALL OF THEM EITHER WAY.

WE'RE SIMPLY SUGGESTING THAT APPLYING THE $10 THRESHOLD MAKES MORE SENSE GIVEN THE WAY PEOPLE TEND TO THINK.

THE COURT:  AND AS I UNDERSTAND IT, THE REQUEST THEN IS TO STRIKE FROM THE CLASS DEFINITION THE LAST PHRASE, QUOTE, "FROM ANY ONE APPLE I.D. ACCOUNT."

MR. RIFKIN:  THAT IS CORRECT, YOUR HONOR.  THAT'S THE ONLY CHANGE.

THE COURT:  DO YOU WISH TO BE HEARD?

MS. RICHMAN:  YOUR HONOR, I UNDERSTOOD THAT YOU HAD ALREADY DECIDED THE ISSUE, SO I'M NOT SURE WHAT THE PURPOSE OF THAT WAS.

BUT ALL I WOULD NOTE IS THAT WE HAVE NOT HAD THE OPPORTUNITY TO TEST THE DEDUPLICATION BY MR. THOMPSON YET BECAUSE THEY ONLY PRODUCED HIS INFORMATION LAST WEEK, 70 DAYS AFTER THE DEADLINE FOR DOING SO.  WE'LL BE SUBMITTING A STIPULATION TO YOU TODAY ASKING FOR SOME RELIEF FROM THE EXPERT DISCOVERY DEADLINES BASED ON THAT FACT.

BUT I DON'T THINK THERE'S TOO MUCH ELSE TO SAY.

THE COURT:  WELL, I'LL SAY THIS:  IF IT DOESN'T EFFECTIVELY MATTER -- AND I AGREE THAT PEOPLE DO THINK ABOUT IT THIS WAY -- THEN WE'LL LEAVE IT THE WAY IT IS.

THIS CAN BE REVISITED IN BRIEFING, AND YOU SHOULD PLAN ON ADDRESSING IT WITH THE NEXT ROUND OF BRIEFING THAT COMES IN.

I THINK IT MAKES SENSE TO HAVE IT FOCUSSED ON PAYORS AS OPPOSED TO I.D.S, BUT WE CAN DO IT EITHER WAY.  IT DOESN'T REALLY MATTER.

AND ALSO, IT IS MY MEMORY, AND MR. RIFKIN CONFIRMED, THAT AT THE TIME WHEN I ISSUED THE ORIGINAL ORDER, THAT'S THE INFORMATION THAT WE HAD, AND IT WASN'T ENTIRELY CLEAR WHETHER THAT COULD BE -- THOSE I.D.S COULD BE MAPPED.  SO NOW WE KNOW.

MS. RICHMAN:  WELL, YOUR HONOR, WE DON'T KNOW BECAUSE WE HAVEN'T SEEN THE BACKUP YET.

THE COURT:  FAIR ENOUGH.  FAIR ENOUGH.

SO LEAVE THAT IN FOR PURPOSES FOR NOW.

MR. RIFKIN:  FINE.

THE COURT:  IT DOESN'T ULTIMATELY MATTER, ESPECIALLY IF WHAT YOU'RE TRYING TO DO IS GIVE NOTICE TO POTENTIAL MEMBERS.

I DO WANT TO SHOW YOU, THOUGH -- WE JUST HAD, IN APRIL AT OUR DISTRICT CONFERENCE, A PRESENTATION ON MORE EFFECTIVE CLASS NOTICES, AND I WANT YOU TO REVAMP YOUR CLASS NOTICE TO BE IN LINE WITH THE FOLLOWING PRESENTATION, WHICH MR. CUENCO IS GOING TO SHOW YOU.  THIS IS FROM A NON-PROFIT, THE IMPACT FUND.

AND THE COURT REPORTER IS RELIEVED OF HER DUTY TO TRANSCRIBE THIS VIDEO.

BUT THERE IT IS.  YOU CAN GET IT FROM -- NOTICEPROJECT.ORG IS THE PAGE.

INTERESTINGLY ENOUGH, THE NOTICES THAT YOU USED WAS MY ATTEMPT, A DECADE OR MORE AGO, TO TRY TO MAKE MORE SIMPLE WHAT WERE THE CLASS ACTION NOTICES THAT WE HAD, AND NOW MY NOTICE IS THE ANTIQUATED NOTICE THAT GETS USED AS THE BAD MODEL IN THIS PARTICULAR THING.

BUT, YOU KNOW, WE KEEP PROGRESSING AND WE KEEP TRYING TO MAKE THESE THINGS BETTER FOR CLASS MEMBERS.

SO LET'S GO AHEAD AND HEAR IT.  IT'S ONLY A MINUTE AND A

HALF.

AND THEN I'D LIKE YOU TO GO BACK AND TRY TO REVAMP IT.

(A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

THE COURT: WE NEED SOUND. LET'S TRY AGAIN.

MS. RICHMAN: ALTHOUGH THE FACES WERE VERY EVOCATIVE. I HAVE A FEELING I KNOW WHAT THEY WERE THINKING.

THE CLERK: LET ME REPEAT IT, YOUR HONOR. SORRY.

THE COURT: YES, THANK YOU.

(A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

THE COURT: OKAY?

MR. RIFKIN: ARE WE BACK ON THE RECORD?

THE COURT: WE ARE BACK ON THE RECORD.

MR. RIFKIN: OKAY. YOUR HONOR, WE'RE GLAD TO DO THAT.

AND WE WERE ABLE TO AGREE WITH APPLE ON LANGUAGE OF THE NOTICE BEFORE, WITH ONE EXCEPTION THAT I'LL ADDRESS IN A MOMENT, SO I DON'T EXPECT THAT WE WILL HAVE ANY DIFFICULTY CONFORMING TO YOUR HONOR'S DIRECTION AND AGREEING ON THE LANGUAGE AND FORM OF THE NOTICE.

THE ONE EXCEPTION, WHICH I'D LIKE TO TURN TO NOW, CONCERNS THE PLAINTIFFS' CLAIM FOR INJUNCTIVE RELIEF.

THE DISPUTE IS A SIMPLE ONE OVER WHETHER THE PLAINTIFFS HAVE OR DON'T HAVE A CLAIM FOR INJUNCTIVE RELIEF, AND APPLE'S ARGUMENT THAT WE DON'T HAVE A CLAIM FOR INJUNCTIVE RELIEF BECAUSE WE DID NOT MOVE TO CERTIFY THE CLASS UNDER 23(B)(2),

BUT INSTEAD MOVED TO CERTIFY THE CLASS UNDER 23(B)(3), IS NOT CONSISTENT WITH THE LAW.

WHILE IT'S GENERALLY TRUE THAT CASES SEEKING INJUNCTIVE RELIEF PRIMARILY ARE CERTIFIED UNDER 23(B)(2), THERE'S NO -- THERE'S NO PROHIBITION AGAINST A CLASS CERTIFIED UNDER 23(B)(3), WHICH PRIMARILY SEEKS MONETARY DAMAGES, AS THIS CASE DOES, FROM ALSO INCLUDING A CLAIM FOR INJUNCTIVE RELIEF EITHER AS A CLASS CLAIM OR AS AN INDIVIDUAL CLAIM.

AND WE CITE THE NORTHWEST AIRLINES CORPORATION CASE FROM THE EASTERN DISTRICT OF MICHIGAN. WE CITE THE MANUAL FOR COMPLEX LITIGATION ON BOTH OF THOSE POINTS.

AND WE ALSO NOTE THAT THE PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF IS NOT DEPENDENT UPON A CLASS CERTIFIED UNDER ANY PROVISION OF RULE 23. AN INDIVIDUAL NAMED PLAINTIFF MAY SEEK AN INJUNCTIVE REMEDY TO ADDRESS A PARTY'S ANTICOMPETITIVE CONDUCT WHICH, BY ITS NATURE, IS MARKET-BASED.

WE POSITED YOUR HONOR'S INJUNCTION IN THE EPIC VERSUS APPLE CASE AS A PRIME EXAMPLE. THERE, OBVIOUSLY THE PLAINTIFF WAS AN INDIVIDUAL PLAINTIFF, ALTHOUGH A CORPORATION, AN INDIVIDUAL PLAINTIFF, NOT A CLASS ACTION.

BUT YOUR HONOR --

THE COURT: THERE WAS NO CLASS ACTION IN THAT CASE.

MR. RIFKIN: CORRECT, NOT -- I SAID NOT A CLASS ACTION.

THE COURT: I KNOW. BUT IT'S NOT A GOOD -- IT'S NOT

SER-523

A GOOD ANALOGY FOR YOU.

THERE WAS A COMPLAINT, THE COMPLAINT SOUGHT INJUNCTIVE RELIEF, AND THERE WAS A SINGLE PLAINTIFF.

MR. RIFKIN:  BUT THE POINT IS, YOUR HONOR, WHETHER WE MOVED TO CERTIFY THIS CASE UNDER 23(B)(2) OR NOT, THAT DOESN'T PREVENT.

THE COURT:  IS IT ANYWHERE IN YOUR COMPLAINT?

MR. RIFKIN:  I BEG YOUR PARDON, YOUR HONOR?

THE COURT:  IS IT IN THE OPERATIVE COMPLAINT?

MR. RIFKIN:  YES, IT IS.  THE CLAIM FOR INJUNCTIVE RELIEF IS IN THE OPERATIVE COMPLAINT.

THE COURT:  DO YOU AGREE?

MS. RICHMAN:  YOUR HONOR, THERE'S A THROWAWAY LINE IN THE THIRD AMENDMENT COMPLAINT ABOUT INJUNCTIVE RELIEF.  THEY DON'T SAY A WORD ABOUT IT IN ANY OF THEIR MANY CLASS CERTIFICATION FILINGS.

THE CASES AND THE MANUAL FOR COMPLEX LITIGATION ARE NOT APPOSITE IN THOSE CASES.  THERE IS, IN THE NORTHWEST AIRLINES CORP., THE PLAINTIFF HAD MOVED FOR RELIEF UNDER 23(B)(2), AND THE COURT JUST DECIDED TO CERTIFY A SINGLE CLASS UNDER 23(B)(3) AND ALLOW THE CLASS TO PURSUE BOTH MONETARY AND INJUNCTIVE RELIEF.

BUT THEY HAD MOVED FOR (B)(2) CERTIFICATION.

AND I THINK THE EPIC CASE IS A GOOD EXAMPLE THAT WE CAN -- THE PLAINTIFFS HAVE MADE THE POINT THAT AN INDIVIDUAL --

INDIVIDUAL CLASS PLAINTIFFS, THE NAMED PLAINTIFFS, COULD SEEK INJUNCTIVE RELIEF.

THE QUESTION IS, WHAT DO WE PUT IN THE NOTICE?

AND THEY ARE -- OUR VIEW IS THAT THEY HAVE NOT DONE ENOUGH TO SUBSTANTIATE CLASS-WIDE NOTICE ASKING FOR INJUNCTIVE RELIEF THAT THEY DID NOT SEEK CLASS-WIDE RELIEF FOR.

THE COURT:  YOU HAVE SOME WORK TO DO ON THE NOTICE. I WILL TAKE A LOOK, A MORE SPECIFIC LOOK AT THIS PARTICULAR ISSUE.

WHY DIDN'T YOU MOVE FOR IT?

MR. RIFKIN:  BECAUSE THE PRIMARY CLAIM HERE IS FOR MONETARY DAMAGES UNDER 23(B)(3), AND WE WERE AWARE THAT IF WE SATISFIED THE MORE STRINGENT REQUIREMENT OF 23(B)(3), WE COULD PURSUE A CLAIM FOR INJUNCTIVE RELIEF.

AND THAT THROWAWAY LINE THAT APPLE'S COUNSEL REFERS TO IS ACTUALLY IN THE PRAYER FOR RELIEF.  IT'S, IT'S ONE OF THE REMEDIES THAT WE ASK FOR --

THE COURT:  SO YOU INTENTIONALLY DID NOT BRING A CLAIM, BRIEFING OR A REQUEST, IN THE MOTION FOR CERTIFICATION?

MR. RIFKIN:  WE DID NOT MOVE FOR CERTIFICATION UNDER 23(B)(2) BECAUSE THE PRIMARY RELIEF SOUGHT HERE IS MONEY DAMAGES.

BUT THAT DOES NOT MEAN THAT A CLASS CERTIFIED UNDER --

THE COURT:  I'M ASKING --

MR. RIFKIN:  CERTIFIED UNDER 23(B)(3) CAN INCLUDE AN

ADJUNCT CLAIM FOR INJUNCTIVE RELIEF.

THE COURT:  I'M ASKING YOU, MR. RIFKIN, WHETHER THIS WAS A MISTAKE OR WHETHER IT WAS INTENTIONAL.

MR. RIFKIN:  NO.  IT WAS DONE INTENTIONALLY.  IT WAS NOT A MISTAKE.

THE COURT:  WHAT'S YOUR BEST NINTH CIRCUIT CASE TO SUPPORT YOUR POSITION ON BOTH SIDES?

MR. RIFKIN:  YOUR HONOR, I DON'T BELIEVE THE NINTH CIRCUIT HAS ADDRESSED THIS ISSUE.

THE COURT:  HAS ANY CIRCUIT?

MR. RIFKIN:  AS I STAND HERE TODAY, I AM UNAWARE OF ANY CIRCUIT AUTHORITY ON THIS.

THE COURT:  MS. RICHMAN?

MS. RICHMAN:  I'M ALSO NOT AWARE OF CIRCUIT AUTHORITY, YOUR HONOR.

I AM AWARE OF A CASE IN THE DISTRICT OF NEW MEXICO WITH FACTS VERY SIMILAR TO OURS WHERE THE DISTRICT COURT STRUCK THE INJUNCTIVE RELIEF LANGUAGE FROM THE CLASS NOTICE --

THE COURT:  OKAY.

MS. RICHMAN:  -- FOR A RULE 23(B)(3) CLASS, AND THAT'S CITED IN OUR PAPERS.

THE COURT:  ALL RIGHT.  I'LL LOOK AT IT BEYOND WHAT I HAVE IN WRITING.

THERE IS THE REQUEST ALREADY DOCKETED TO MODIFY THE DISCOVERY SCHEDULE.  THIS IS AT DOCKET 974.

THAT'S A STIPULATION.  THAT REQUEST IS GRANTED.

MR. RIFKIN:  THANK YOU, YOUR HONOR.

MS. RICHMAN:  THANK YOU, YOUR HONOR.

THE COURT:  AND I WILL TAKE A LOOK AT THE SEALING REQUEST.  I DID NOT LOOK AT THAT BEFORE I GOT UP HERE.

SO IF THEY'RE NARROWLY TAILORED, THEN IT SHOULDN'T BE A PROBLEM.

OKAY.  ANYTHING ELSE?

MR. RIFKIN:  NOTHING FROM THE PLAINTIFFS, YOUR HONOR.

MS. RICHMAN:  NO, YOUR HONOR.

THE COURT:  ALL RIGHT.  WE'RE ADJOURNED.

I'LL SEE YOU IN THE FALL.

MR. RIFKIN:  THANK YOU.

MS. RICHMAN:  HAVE A GOOD WEEKEND.

THE CLERK:  COURT IS ADJOURNED.

(THE PROCEEDINGS WERE CONCLUDED AT 2:48 P.M.)

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

_____
LEE-ANNE SHORTRIDGE, CSR, CRR
CERTIFICATE NUMBER 9595

DATED:  JUNE 5, 2025

**SER-528**

BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
STEPHANIE AVILES (350289)
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599
manifold@whafh.com
byrd@whafh.com

MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
THOMAS H. BURT (*pro hac vice*)
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

*Class Counsel for Plaintiffs*
[Additional counsel on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION TO MODIFY CLASS DEFINITION AND APPROVE NOTICE TO THE CLASS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** <br><br> DATE: May 20, 2025 <br> TIME: 2:00 P.M. <br> COURTROOM: 1, 4th Floor <br><br> The Honorable Yvonne Gonzalez Rogers |

**[REDACTED PUBLIC VERSION]**

---

PLAINTIFFS' MOT. TO MODIFY CLASS DEFINITION AND DIRECT NOTICE
Case No. 11-cv-06714-YGR

**SER-529**

## NOTICE OF MOTION AND MOTION TO MODIFY CLASS DEFINITION AND APPROVE NOTICE TO THE CLASS

PLEASE TAKE NOTICE that on May 20, 2025 at 2:00 p.m. in Courtroom 1, 4th Floor of the above-entitled Court, located at 131 Clay Street, Oakland, California, Plaintiffs Robert Pepper, Stephen H. Schwartz, Edward W. Hayter and Edward Lawrence ("Plaintiffs") will, and hereby do respectfully renew their motion for an Order modifying the Class definition to: 1) exclude the iPod Touch from the definition of "iOS Device," and 2) apply the $10 spending cutoff to individual payors rather than Apple IDs; and approving dissemination of notice to the Class (the "Motion").

Plaintiffs seek to narrow the Class by making two modifications to the Class definition. These modifications have been informed by the benefit of additional fact and expert discovery the parties have conducted since the Court issued its Order certifying the Class. Plaintiffs' proposed modifications will not result in any prejudice to Apple or disturb the Court's previous findings that the Class satisfied the requirements of Rule 23(a) and (b)(3).

Plaintiffs base their Motion on: (1) the Court's Order Denying Apple's Daubert Motion to Exclude the Testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz and Granting Plaintiffs' Motion for Class Certification, (ECF No. 789); (2) the Memorandum of Points and Authorities filed in support of this Motion, appended hereto; (3) the Declaration of Rachele R. Byrd and its exhibits; (4) the Declaration of Cameron Azari; (5) all other records and papers on file in this action; (6) any oral argument and evidence that may be presented at the hearing on this Motion; and (7) all other matters properly before the Court.

DATED: April 15, 2025

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

By:  _/s/ Rachele R. Byrd_
    RACHELE R. BYRD

RACHELE R. BYRD (190634)
BETSY C. MANIFOLD (182450)
STEPHANIE AVILES (350289)
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

---

**SER-530**

**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
THOMAS H. BURT (*pro hac vice*)
270 Madison Ave
New York, NY 10016
Telephone: 212/545-4600
Facsimile: 212/686-0114

DAVID C. FREDERICK (*pro hac vice*)
AARON M. PANNER (*pro hac vice*)
KYLE M. WOOD (*pro hac vice*)
ASHLE J. HOLMAN (*pro hac vice*)
KELLEY C. SCHIFFMAN (*pro hac vice*)
ANNA K. LINK (*pro hac vice*)
**KELLOGG, HANSEN, TODD, FIGEL &
  FREDERICK, P.L.L.C**
1615 M Street, NW Suite 400
Washington, D.C. 20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999
dfrederick@kellogghansen.com
apanner@kellogghansen.com
kwood@kellogghansen.com
aholman@kellogghansen.com
kschiffman@kellogghansen.com
alink@kellogghansen.com

*Class Counsel for Plaintiffs*

# TABLE OF CONTENTS

**Page(s)**

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................1

I.     STATEMENT OF ISSUES TO BE DECIDED ........................................................1

II.    INTRODUCTION .................................................................................................1

III.   BACKGROUND ..................................................................................................1

    A.  The Class Certification Motions ................................................................1

    B.  The Modified Class Definition ..................................................................3

IV.    ARGUMENT.......................................................................................................4

    A.  Plaintiffs' Proposed Modifications to the Class Defintinon Are Based on Evidentiary Developments After Class Certification .................................................................4

       1.   The iPod Touch Should Be Excluded from the Definition of "iOS Device" ..........5

       2.   The $10 Spending Cutoff Should Apply to Individual Payors ...............................8

    B.  The Modified Class Satisfies Rules 23(a) and (b) .........................................................10

    C.  The Court Should Direct Notice to the Class by Email and Media Notice .................11

V.     CONCLUSION.......................................................................................................14

**TABLE OF AUTHORITIES**

<u>**CASES**</u>                                                                                    <u>**Page(s)**</u>

*Abante Rooter and Plumbing, Inc. v. Alarm.com Inc.*,
    No. 15-CV-06314-YGR, 2018 WL 558844 (N.D. Cal. Jan. 25, 2018) .................................4

*Andrews v. Plains All Am. Pipeline, L.P*,
    No. 2:15-CV-0411-PSG (JEMx), 2019 WL 6647928 (C.D. Cal. Nov. 22, 2019) .......6, 8, 10

*Armstrong v. Davis*,
    275 F.3d 849 (9th Cir. 2001) ........................................................................................4

*Bee, Denning, Inc. v. Cap. All. Grp.*,
    310 F.R.D. 614 (S.D. Cal. 2015) .................................................................................6

*Cadena v. Am. Honda Motor Co.*,
    No. CV 18-4007-MWF (MAAX), 2024 WL 5275025 (C.D. Cal. Oct. 24, 2024) ..............14

*General Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)............................................4

*In re Korean Ramen Antitrust Litig.*,
    No. 13-CV-04115-WHO, 2018 WL 1456618 (N.D. Cal. Mar. 23, 2018).............................5

*Maldonado v. Apple, Inc.*,
    No. 3:16-CV-04067-WHO, 2021 WL 134579 (N.D. Cal. Jan. 14, 2021)...........................10

*Minter v. Wells Fargo Bank, N.A.*,
     280 F.R.D. 244 (D. Md. 2012)......................................................................................10

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) ....................................................................................2, 3

*Ruiz Torres v. Mercer Canyons Inc.*,
    835 F.3d 1125 (9th Cir. 2016) ...................................................................................11

*Schneider v. Chipotle Mexican Grill, Inc.*,
    No. 16-CV-02200-HSG, 2019 WL 570751 (N.D. Cal. Feb. 12, 2019)..........................4, 11

*Sihler v. Fulfillment Lab, Inc.*,
    No. 20CV1528-LL-DDL, 2023 WL 7348425 (S.D. Cal. Nov. 7, 2023)........................11, 14

*United States v. Microsoft*,
    253 F.3d 34 (D.C. Cir. 2001) ........................................................................................6

<u>**STATUTES & RULES**</u>                                                                       <u>**Page(s)**</u>

Federal Rules of Civil Procedure
  Rule 23 ..................................................................................................................1, 4, 10, 11

Sherman Antitrust Act of 1890........................................................................................................7

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. STATEMENT OF ISSUES TO BE DECIDED

a) Whether the Court should modify the Class definition to 1) exclude the iPod Touch from the definition of "iOS Device," and 2) apply the $10 spending cutoff to individual payors rather than Apple IDs.

b) Whether the Court should approve notice of the pendency of this action to the Class via email and by media notice.

### II. INTRODUCTION

Plaintiffs bring this motion to modify the Court's February 2, 2024 Order Denying Apple's *Daubert* Motion to Exclude the Testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz and Granting Plaintiffs' Motion for Class Certification (ECF No. 789) ("Class Certification Order"). Plaintiffs seek to narrow the Class by making two modifications to the Class definition. These modifications have been informed by the benefit of additional fact and expert discovery the parties have conducted since the Court issued the Class Certification Order. Plaintiffs' proposed modifications will not result in any prejudice to Apple or disturb the Court's previous findings that the Class satisfied the requirements of Rule 23(a) and (b)(3).

### III. BACKGROUND

#### A. The Class Certification Motions

On June 1, 2021, Plaintiffs filed a Motion for Class Certification, requesting that the Court certify the following Class under the Federal Rules of Civil Procedure 23(a) and (b)(3):

> All persons in the United States, exclusive of Apple and its employees, agents and affiliates, and the Court and its employees, who purchased one or more iOS applications or application licenses from Defendant Apple Inc. ("Apple"), or who paid Apple for one or more in-app purchases, including, but not limited to, any subscription purchase, for use on an iOS Device at any time since July 10, 2008.

Plaintiffs' Notice of Motion and Motion for Class Certification; Memorandum of Points and Authorities (ECF No. 441) at 2. Plaintiffs defined "iOS Devices" as "iPhones, iPads, or iPod Touches," with "iPads" including "all iPad Pro, iPad Mini and iPad Air models as well as standard iPads." *Id.* at 1 & n.2.

On September 26, 2022, Plaintiffs filed a Renewed Motion for Class Certification. ECF No. 666-1. Plaintiffs' experts computed Apple's but-for commission rate and performed econometric modeling to create a damages model that they ran against all transactions in the Games and Music & Entertainment genres from the App Store to demonstrate class-wide impact and calculate damages estimates for all Apple IDs through common proof. *Id*. at 1-2. Prof. McFadden's econometric model satisfied the standard for class certification announced in *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022), because it could determine exactly which Apple ID accounts suffered monetary damages and which did not. Plaintiffs' Renewed Motion for Class Certification (ECF No. 666-1) at 12. Plaintiffs assured the Court that they would run the model on the full set of App Store transactions before trial, that they would match Apple IDs to individual Class members, and that they would identify all Class members who suffered no economic loss before trial. *Id*. at 13.

After running the damages model on all transactions in the Games and Music & Entertainment genres during the class certification stage, Prof. McFadden (a Nobel laureate) estimated that there were approximately 17.8% uninjured Apple ID accounts in the Class. Second Revised Supplemental Report of Daniel L. McFadden (ECF No. 679-1), ¶ 16. Plaintiffs noted that the number of uninjured accounts likely overstated the percentage of unharmed Class members because many App Store customers have multiple Apple IDs. Plaintiffs' Renewed Motion for Class Certification (ECF No. 666-1) at 14-15 & n.14. To reduce the number and percentage of Apple ID accounts without measurable (or with de minimis) damages, Plaintiffs proposed a narrowed Class definition that imposed a $10 lifetime spending cutoff in any one Apple ID account. *Id*. at 15. Applying the lifetime spending cutoff decreased the percentage of unharmed accounts from 17.8% to 7.9%. January 19, 2023, Second Revised Supplemental Report of Daniel L. McFadden (ECF No. 679-1), ¶ 16.

On February 2, 2024, the Court granted Plaintiffs' Renewed Motion for Class Certification and certified the following class:

> All persons in the United States, exclusive of Apple and its employees, agents and affiliates, and the Court and its employees, who purchased one or more iOS applications or application licenses from Defendant Apple Inc. ("Apple"), or who paid Apple for one or more in-app purchases, including, but not limited to, any

subscription purchase, for use on an iOS Device at any time since July 10, 2008 (the "Class Period"). The Class is limited to those persons who paid more than $10.00 in total to Apple during the Class Period for iOS application and in-app purchases from any one Apple ID account.

Class Certification Order (ECF No. 789) at 2. The Court found that Plaintiffs' claims met the *Olean* predominance requirement and that Prof. McFadden's model was capable of showing the impact of Apple's anticompetitive conduct across all Class members. *Id*. at 26. The Court noted that while it remained "concerned that the $10.00 cutoff results in an estimated 7.9% or 10,283,035 million uninjured accounts, it expects, given plaintiffs' representations, that once the model is fully run, that number will be reduced *or the cutoff could be changed* to reduce the impact of including unharmed accounts." *Id*. (emphasis added).

### B. The Modified Class Definition

Since Class certification, the parties have concluded fact discovery, Prof. McFadden has fully run the damages model on all App Store transactions, and Plaintiffs also have retained additional expert witnesses, including a liability expert, Joseph R. Stiglitz, another Nobel laureate, who has opined on the relevant foremarkets in this matter. In addition, Plaintiffs' legal administrator, JND Legal Administration ("JND"), was able to match approximately ███████ Apple IDs to approximately ███████ individuals, despite Apple's protestations that such matching was impossible. *See* Byrd Decl., Ex. C [Song Expert Report], ¶ 21; *id*., Ex. B [Thompson Declaration], ¶ 10; Declaration of Mark Rollins in Support of Apple Inc.'s *Daubert* Motions & Briefs in Opposition to Class Certification (ECF No. 476-12), ¶ 5 ("Apple does not have the ability to establish or verify each or every Apple ID for a particular person or entity based on email, birthdate, phone number, payment method, or other information a person or entity provides for an Apple ID. Apple likewise cannot determine how many Apple IDs any particular person or entity has[.]"); Nov. 16, 2021 Hrg. Tr. (ECF No. 606) 79:23-25 (Ms. Richman) ("The issue is there's no way of linking Apple IDs in any kind of automated way."). Using the results from JND, Apple then matched individual transactions to the ███████ individuals and Plaintiffs' experts then identified ███████ individuals with positive spend, ███████ of whom meet the proposed modified Class definition. Byrd Dec., Ex. C [Song Expert Report], ¶ 74, p. 104, Figure 24.

In light of these evidentiary developments, Plaintiffs move to modify the Class definition in two respects: *first*, to limit qualifying foremarket purchases to iPhones and iPads only (eliminating iPod Touch foremarket purchases); and *second*, to impose the $10 lifetime spending threshold to Class members rather than Apple IDs. The result is the following modified Class definition:

> All persons in the United States, exclusive of Apple and its employees, agents and affiliates, and the Court and its employees, who purchased one or more iOS applications or application licenses from Defendant Apple Inc. ("Apple"), or who paid Apple for one or more in-app purchases, including, but not limited to, any subscription purchase, for use on an iPhone or iPad ("iOS Device") at any time since July 10, 2008 (the "Class Period"). The Class is limited to those persons who paid more than $10.00 in total to Apple during the Class Period for iOS application and in-app purchases from any one Apple ID account.

These modifications will result in a more well-defined Class and ensure that the Class definition comports with the evidence Plaintiffs intend to present at trial.

## IV.    ARGUMENT

### A.    Plaintiffs' Proposed Modifications to the Class Defintinon Are Based on Evidentiary Developments After Class Certification

Rule 23 permits a court to alter or amend an order granting class certification before final judgment. Fed. R. Civ. P. 23(c)(1)(C). The Ninth Circuit has recognized that Rule 23 grants district courts "broad discretion" to revisit certification and "[w]here appropriate, the district court may redefine the class." *Armstrong v. Davis*, 275 F.3d 849, 872 n.28 (9th Cir. 2001). "Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." *Schneider v. Chipotle Mexican Grill, Inc.*, No. 16-CV-02200-HSG, 2019 WL 570751, at *1 (N.D. Cal. Feb. 12, 2019) (citation omitted). This is because "such an order, particularly during the period before any notice is sent to members of the class, 'is inherently tentative.'" *General Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 160, 102 S. Ct. 2364, 2372, 72 L. Ed. 2d 740 (1982). In granting class certification, the Court acknowledged its inherent authority to modify the Class definition. Class Certification Order, at 2.

Plaintiffs' proposed modifications to the Class definition are appropriate because they are based on evidentiary developments that occurred after class certification. *Abante Rooter and*

*Plumbing, Inc. v. Alarm.com Inc.*, No. 15-CV-06314-YGR, 2018 WL 558844, at *2 (N.D. Cal. Jan. 25, 2018) ("District courts have a responsibility to review continually 'the appropriateness of a certified class in light of developments subsequent to class certification.'"); *In re Korean Ramen Antitrust Litig.*, No. 13-CV-04115-WHO, 2018 WL 1456618, at *2 (N.D. Cal. Mar. 23, 2018) ("The types of 'developments' that lead to modification . . . can be evidentiary or legal.").

### 1. The iPod Touch Should Be Excluded from the Definition of "iOS Device"

Plaintiffs claim that Apple unlawfully monopolizes the aftermarket for the sale of iOS apps and in-app content. During the class certification stage, Plaintiffs alleged that the aftermarket flowed from the foremarket for all iOS-installed mobile devices: iPhones, iPads, and iPod Touch devices. *See* June 1, 2021 Expert Report of Daniel L. McFadden (ECF No. 443-14), ¶¶ 43-44.

Since class certification, Plaintiffs completed fact discovery and have retained a liability expert who, after conducting additional analysis and review, has determined that ███████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ *See* Declaration of Rachele R. Byrd in Support of Motion to Modify Class Definition and Approve Notice to the Class ("Byrd Decl."), Ex. A [Excerpts from the Expert Report of Joseph E. Stiglitz], ¶ 23. Prof. Stiglitz ████████████████████████████████████████████████████████████████████████████ ████████████████████████. *Id.* ¶¶ 251-57, 282-88. Prof. Stiglitz analyzed the evidence and determined that ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████. *Id.*, ¶¶ 264-67. Internal Apple documents and industry analyses also recognize ████████████████████████████████. *Id.*, ¶¶ 268-69, 297-98.

Most importantly, Prof. Stiglitz has reviewed the relevant evidence and determined that ████████████████████████████████████████. *Id.*, ¶¶ 245-305. Prof. Stiglitz explains that ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████

---

PLAINTIFFS' MOT. TO MODIFY CLASS DEFINITION AND DIRECT NOTICE
Case No. 11-cv-06714-YGR
-5-

████████████████████████████████████. *Id*., ¶¶ 239-244. Thus, he concludes that ████████████████████████████████████████ ████████████. *Id*., ¶¶ 242-44.

However, after considering the evidence, Prof. Stiglitz has concluded that, █████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████.[2] *Id*. ¶ 240. After considering Prof. Stiglitz's conclusions, Plaintiffs determined that it would be in the best interest of the Class as a whole to present only the strongest aftermarket claims at trial, and they seek to refine the Class definition accordingly by limiting the foremarkets to smartphones and tablets. Accordingly, they propose to limit the Class to purchases of iPhones and iPads in the relevant foremarkets of smartphones and tablets, respectively.

Courts have allowed plaintiffs to modify class definitions based on expert work conducted after class certification. *See Andrews v. Plains All Am. Pipeline, L.P*, No. 2:15-CV-0411-PSG (JEMx), 2019 WL 6647928, at *2, *6 (C.D. Cal. Nov. 22, 2019) (granting motion to amend class definition based on "finalized evidence" and "the completion of various experts' work").[3] In *Andrews*, the plaintiffs based their class definition on "the information available to them at the time" and their experts' preliminary analyses. *Id.* at *1. The court granted the plaintiffs' motion to

[1]

[2] Market power and monopoly power are different. "Monopoly power" specifically implies a single firm dominating a market by controlling prices or excluding competition, while "market power" is a broader concept encompassing a lesser degree of control over output and prices. *See United States v. Microsoft*, 253 F.3d 34, 51 (D.C. Cir. 2001) (*en banc*).

[3] Courts routinely permit plaintiffs to amend class definitions when, as here, the new class is narrower than the class definition originally proposed and does not involve a new claim for relief. *See Bee, Denning, Inc. v. Cap. All. Grp.*, 310 F.R.D. 614, 621 (S.D. Cal. 2015) (collecting cases).

amend the class definition based on their post-class certification expert reports and found that defendants were not prejudiced by the modification because "Plaintiffs have not sought to bring new claims, have not sought to expand the class definition beyond that in the complaint, and have brought their motion prior to the close of expert discovery." *Id.* at *8.

The same is true here. Plaintiffs continue to assert two claims against Apple for unlawful monopolization and attempted monopolization of the aftermarket for iOS apps and in-app content in violation of Section 2 of the Sherman Act, which are unchanged by Plaintiffs' proposed modifications to the Class definition. Plaintiffs also seek to *narrow* the certified Class rather than expand it beyond the definition in the Complaint. Thus, if anything, the proposed amendment slightly *reduces* the amount of Apple's potential liability.[4] In addition, Plaintiffs have brought this motion before expert disclosures have been completed (reply expert reports are due on June 13, 2025) and before expert discovery closes (on July 7, 2025), thus reducing or eliminating any potential prejudice to Apple.

Additionally, Plaintiffs informed Apple that they were no longer pursuing claims relating to the iPod Touch in November 2024 when Plaintiffs amended their interrogatory responses to remove the iPod Touch from the list of products relevant to this matter. *See* Byrd Decl., Ex. D [Plaintiffs' Amended and Supplemental Responses and Objections to Defendant Apple Inc.'s First Set of Interrogatories], at 5-6. On January 30, 2025, Apple confirmed its understanding that Plaintiffs were no longer pursuing claims relating to the iPod Touch. *Id*., Ex. E ("Plaintiffs have deleted previous language from their prior interrogatory responses regarding the iPod touch, we understand that Plaintiffs are no longer pursuing any claims arising out of purchases made through or otherwise in relation to the iPod touch device.").

Thus, there is no risk of unfair prejudice to Apple by the elimination of iPod Touch devices from the relevant foremarkets.

---

4 ███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ Byrd Decl., ¶ 5.

PLAINTIFFS' MOT. TO MODIFY CLASS DEFINITION AND DIRECT NOTICE
Case No. 11-cv-06714-YGR
-7-

## 2. The $10 Spending Cutoff Should Apply to Individual Payors

During the class certification stage, Plaintiffs proposed the $10 spending cutoff in the Class definition based upon lifetime spending in any single Apple ID. The Court will recall that, at the time of class certification, Plaintiffs only had transactional data linked to Apple IDs, not to individual Class members. During class certification, ███████████████████████████████ ███████████████████████████████████████████. *See* Byrd Decl., Ex. F [Expert Report of Daniel L. McFadden, Ph.D.], ¶ 57 ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████ They proposed the lifetime spending cutoff at the Apple ID account level based on "the information available to them at the time." *Andrews*, 2019 WL 6647928 at *6.

At that time, Plaintiffs represented to the Court that they would match Apple IDs to individual Class members once they received the necessary data from Apple. *See* June 23, 2023 Hrg. Tr. (ECF No. 736) 92:22-93:21 (Mr. Rifkin) ("the regression model calculates damages on the individual Apple ID basis account by account . . . Those accounts need to be matched to individual class members . . . First [Apple has] to produce the data they said doesn't exist and then we have to run the mechanical matching to do it.").

Since then, Plaintiffs have received from Apple the data with the requisite datasets to complete the matching process. ████████████████████████████████████ █████████████████ On June 14, 2024, Apple █████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████ Byrd Decl., Ex. B [Declaration of Darryl Thompson], ¶¶ 6, 11. JND matched █████████████████████████████████████ ██████████ – *i.e.*, potential Class members. *Id.* ¶¶ 13-16. On January 3, 2025, JND delivered its

---

[5] The Court also will recall that Apple and its counsel previously insisted that such data did not exist. *See* Rollins Declaration (ECF No. 476-12), ¶ 5; Nov. 16, 2021 Hrg. Tr. (ECF No. 606) 79:23-25. The Court rejected Apple's claim. March 29, 2022, Order Denying Plaintiffs' Motion for Class Certification Without Prejudice (ECF No. 630) at 14.



list of deduplicated payors to Apple. *Id.* ¶ 18. On January 17, 2025, Apple matched approximately ███████████████████████████████████████████ and provided the results of its matching to Plaintiffs' experts,[6] completing the process Apple previously said was impossible.

Prof. McFadden's team, led by Minjae Song, Ph.D., has ███████████████ ████████████████████████████████████████████████████████████ ████████████ Byrd Decl., Ex. C [Expert Report of Minjae Song], Ph.D. ¶ 71. Dr. Song ████████████████████████████████████████████████████████████ ████████ . *Id.* ¶¶ 71, 85. He then ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████). *Id.* at 104, Figure 24.

Now that Plaintiffs have successfully determined which Apple IDs correspond to which payor, Plaintiffs request modification of the Class definition to apply the $10 spending cutoff to individual payors rather than Apple IDs. Imposing the lifetime spending threshold per Class member rather than per Apple ID is a fairer way to impose the cutoff because it does not arbitrarily favor Class members with fewer Apple IDs or penalize Class members with multiple Apple IDs. In addition, applying the spending cutoff by individual payor will ensure that the appropriate individual receives Class notice because the person who has the email address associated with an Apple ID may not be the payor for that account.

Applying the spending cutoff by payor will also not prejudice Apple. There is no material difference between the aggregate damages when the spending cutoff is applied by Apple ID versus by individual payor. *Id.* For example, in the "Flexible But-For-Pricing" scenario where Apple's price tiers do not exist in the But-For World, aggregate damages are $████████. The total number of Class members rises slightly (by just ██████) from ████████ (when the $10 threshold is applied at the Apple ID level) to ████████ (when the $10 threshold is applied to individual payors) and the number of harmed payors increases slightly (by just ██████) from ████ ████████████████ Class members. The percentage of unharmed Class members remains

---

[6] *See* Byrd Decl., Ex. I.

virtually unchanged (███ at the Apple ID level to ███ at the payor level). *See id.* at 104, Figure 24. The same persistence appears in the "Price Tiers in But-For world" scenario, where Apple's price tiers persist in the But-For world. In that scenario, aggregate damages are ██████. The total number of Class members again rises slightly (by just ████) from ██████ (when the $10 threshold is applied at the Apple ID level) to ██████ (when the $10 threshold is applied to individual payors). The number of harmed payors increases slightly (by just ████) from ██████ to ██████ Class members. The percentage of unharmed Class members again remains virtually unchanged (███ at the Apple ID level to ███ at the payor level). *See id.* at 105, Figure 25.

The composition of the Class differs only slightly – all but immaterially – whether the spending cutoff is applied at the Apple ID level (as before) or at the payor level (as Plaintiffs propose) – a remarkable consistency that confirms the robustness and reliability of Prof. McFadden's econometric modeling.

## B. The Modified Class Satisfies Rules 23(a) and (b)

The modified Class definition must satisfy the requirements of Rule 23. *See Maldonado v. Apple, Inc.*, No. 3:16-CV-04067-WHO, 2021 WL 134579, at *2 (N.D. Cal. Jan. 14, 2021) ("Because the modified definition serves the same purpose as the original one, the new class definition must meet the requirements of Federal Rule of Civil Procedure 23."). In making this determination, however, the court is not required to revisit elements of the Rule 23 analysis that have already been established. *See Andrews*, 2019 WL 6647928, at *10 ("This Court has previously determined that each of the elements of Rule 23 are met with respect to the Fisher Subclass . . . The minimal changes to the class definition do not alter the Court's conclusions"); *Minter v. Wells Fargo Bank, N.A.*, 280 F.R.D. 244, 247 (D. Md. 2012) ("The enlargement of the RICO subclass does not sufficiently change the landscape so that this Court need revise its prior decision regarding the superiority of class treatment for this case.").

The proposed modifications do not change the Court's analysis under Rule 23(a). The modified Class satisfies Rule 23(a) for the same reasons the Court found in its Class Certification Order. Likewise, the proposed modifications do not change the Court's analysis under Rule

---

PLAINTIFFS' MOT. TO MODIFY CLASS DEFINITION AND DIRECT NOTICE
Case No. 11-cv-06714-YGR
-10-

23(b)(3). The modified Class satisfies the predominance requirement under Rule 23(b)(3) for the same reasons the Court found in its Class Certification Order.

Significantly, now that the experts have computed damages for all App Store transactions and have used the matched payor and transaction data to calculate each individual Class member's damages – exactly as they represented they would do *before* trial – the Class does not suffer from any overbreadth concerns. When Dr. Song ran Prof. McFadden's model on the full App Store transactions dataset, the number of unharmed Class members in the "Flexible But-For-Pricing" scenario is either ▆▆▆▆ (when the spending cutoff is applied at the Apple ID level) or ▆▆▆▆ (when it is applied at the payor level). *See* Byrd Decl., Ex. C [Expert Report of Minjae Song, Ph.D.], at 104, Figure 24. Likewise, in the "Price Tiers in the But-For-Pricing" scenario, the number of unharmed Class members is either ▆▆▆▆ (when the spending cut-off is applied at the Apple ID level) or ▆▆▆▆ (when it is applied at the payor level). *Id.* at 105, Figure 25.

Plaintiffs' proposed modifications are in line with the Court's expectation that Plaintiffs would minimize the percentage of unharmed accounts encompassed in the Class, and it is in accordance with the Ninth Circuit's guidance that "the district court is well situated to winnow out those non-injured members at the damages phase of the litigation, or to refine the class definition." *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1137 (9th Cir. 2016).

### C. The Court Should Direct Notice to the Class by Email and Media Notice

After a court certifies a class under Rule 23(b)(3), it "must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Although reasonable efforts must be made to reach all class members, there is no requirement that each class member actually receive notice. *Sihler v. Fulfillment Lab, Inc.*, No. 20CV1528-LL-DDL, 2023 WL 7348425, at *2 (S.D. Cal. Nov. 7, 2023) (citing *Schneider v. Chipotle Mexican Grill, Inc.*, 336 F.R.D. 588, 595–96 (N.D. Cal. 2020), and *Silber v. Mabon*, 18 F.3d 1449, 1453-54 (9th Cir. 1994)).

Plaintiffs have developed a proposed notice plan in consultation with Epiq Class Action and Claims Solutions, Inc. ("Epiq"), a nationally-recognized legal administrator, which they expect will reach at least 80% of the members of the Class. *See* Declaration of Cameron R. Azari

Regarding Notice Plan ("Azari Decl."), ¶¶ 19, 35. Plaintiffs based their proposed notice plan on the Federal Judicial Center's guidelines for class notice. *See* Byrd Decl., ¶ 11.

Under the notice plan, Plaintiffs will send direct email notice to approximately ███ ███ potential Class members identified by JND (in the matching and deduplication effort described above) and by Plaintiffs' experts at email addresses to be provided by Apple. Azari Decl., ¶ 21. Those email addresses will include the email addresses for all *potential* Class members, both current and former purchasers of apps and in-app content for the iPhone and iPad with positive spend, without regard to the $10 spending cutoff. The email notice will be drafted in such a way that the subject line, the sender, and the body of the message overcome SPAM filters and ensure readership to the fullest extent reasonably practicable. *Id.*, ¶ 23. If an email is undeliverable, the notice administrator will make *two* additional attempts to resend the email. *Id.*, ¶ 24. The email notice will include an embedded link to the notice website. By clicking the link, recipients will be able to access the Long Form Notice and other information about the case. *Id.*, ¶ 23.

The notice plan also includes digital advertising in various sizes on the selected advertising network *Google Display Network*, which represents thousands of digital properties across all major content categories. *Id.*, ¶ 26. Digital Notices will run on mobile devices nationwide. *Id.* All digital advertising will link directly to the notice website, allowing visitors easy access to relevant information and documents. *Id.*

The notice plan will also include digital advertising on the leading social media platforms in the United States, including Facebook, Instagram, and X (Twitter). *Id.*, ¶ 27. Facebook is the leading social networking site in the United States with more than 193 million users in the United States, Instagram has 169 million active users in the United States, and X (Twitter) X has more than 105 million users in the United States. *Id.* Combined, approximately 39.5 million targeted impressions will be generated by the digital notices, which will be targeted nationwide. *Id.*, ¶ 29. The digital notices will run for approximately 30 days. Clicking on the digital notices will link the readers to the notice website, where they can easily obtain detailed information about the case. *Id.*, ¶ 30.

To facilitate locating the notice website, sponsored search listings will be acquired on the

three most highly-visited internet search engines: Google, Yahoo!, and Bing. *Id*., ¶ 30. When visitors to these search engines search for selected keyword combinations related to the case, the sponsored search listing advertisements will be displayed. *Id*. Generally, the sponsored search listing advertisement will appear at the top of the visitor's website page prior to the search results or in the upper right-hand column of the web-browser screen. *Id*. The sponsored search listings will be displayed nationwide. *Id*. All sponsored search listings will link directly to the notice website. *Id*.

Epiq will create and maintain a dedicated website with an easy-to-remember domain name. *Id*., ¶ 31. Class members will be able to obtain detailed information about the case and review key documents, including the Complaint, Long Form Notice, Class Certification Order, and other important court documents. *Id*. In addition, the notice website will include answers to frequently asked questions ("FAQs"), instructions for how Class members may opt-out (request exclusion), and how to obtain other case-related information. *Id*. The website address will be displayed prominently in all notice documents. *Id*.

Federal Rules of Civil Procedure 23(c)(2) and (3) prescribe the content of class notice. The proposed email notice and long form website notice convey the information required by Rules 23(c)(2) and (3) in plain, neutral language. *First*, the notices identify, in plain language, who are members of the Class (including the beginning and ending dates of the Class Period). *Second*, they inform recipients that the Court will exclude the individual from the Class if they request exclusion and specify the date by which they must do so. *Third*, the notices inform recipients that a judgment in this action, whether favorable or not, will include all Class members who do not request exclusion. And *fourth*, they inform recipients that they will be represented by Class Counsel and that any Class member who does not request exclusion may, if the member desires, enter an appearance through his or her own counsel. Thus, the proposed email notice and long form website notice conform with the requirements of Rules 23(c)(2) and (3). *See* Byrd Decl., Exs. G and H.

Plaintiffs provided Apple with an opportunity to review the email and long form notices and to provide comments and edits. Plaintiffs incorporated Apple's edits, other than those that (1) were inconsistent with Plaintiffs' proposed modifications to the Class definition, and (2)

removed language about Plaintiffs seeking injunctive relief. Byrd Decl., ¶ 11.

The notice plan is reasonably designed to reach the maximum number of Class members in the most efficient and reliable manner possible. There are approximately [redacted] individuals who are *potential* Class members (without regard to the $10 spending threshold), and those individuals are geographically dispersed across the United States. Because virtually all Class have at least one Apple ID – which is designated by email addresses – because they make all iOS app and in-app content purchases online using their Apple ID email addresses, and because Apple uses those Apple IDs as the primary means to communicate with its iOS device customers, the use of those email addresses for direct notice is particularly well-suited to reach the vast majority of Class members. Azari Decl., ¶ 22.

Direct notice by email only is sufficient because virtually all potential Class members have one or more known email addresses. *Cf. Cadena v. Am. Honda Motor Co*., No. CV 18-4007-MWF (MAAX), 2024 WL 5275025, at *2 (C.D. Cal. Oct. 24, 2024) (notice by email to all class members; postcard used to "reach[] class members with no associated email but a home address"). Accordingly, email notice is the best direct notice practicable under the circumstances. *See Sihler*, 2023 WL 7348425, at *3 (citations omitted).

To ensure that all Class members receive notice, the notice plan also includes media notice, a case-specific website, and a toll-free telephone number for answers to FAQs, and contact information for Epiq to provide additional information to Class members. Azari Decl., ¶ 33.

Plaintiffs request the Court order Apple to produce the Class List with email addresses within ten (10) days of entry of an order granting this motion. Epiq will then commence notice forty-five (45) days later and complete notice within thirty (30) days thereafter. Potential Class members will be given thirty-five (35) days from the completion of notice to opt out of the Class.

## V. CONCLUSION

Plaintiffs respectfully request that the Court modify its order certifying the class to: 1) remove the iPod Touch from the definition of "iOS Device," and 2) apply the $10 spending cutoff to individual payors. Plaintiffs also request that the Court direct notice of pendency to the Class by email and media notice.

DATED: April 15, 2025

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**

By:   */s/ Rachele R. Byrd*
RACHELE R. BYRD

RACHELE R. BYRD (190634)
BETSY C. MANIFOLD (182450)
STEPHANIE AVILES (350289)
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

**WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP**
MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
THOMAS H. BURT (*pro hac vice*)
270 Madison Ave
New York, NY 10016
Telephone: 212/545-4600
Facsimile: 212/686-0114

DAVID C. FREDERICK (*pro hac vice*)
AARON M. PANNER (*pro hac vice*)
KYLE M. WOOD (*pro hac vice*)
ASHLE J. HOLMAN (*pro hac vice*)
KELLEY C. SCHIFFMAN (*pro hac vice*)
ANNA K. LINK (*pro hac vice*)
**KELLOGG, HANSEN, TODD, FIGEL &
 FREDERICK, P.L.L.C**
1615 M Street, NW Suite 400
Washington, D.C. 20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999
dfrederick@kellogghansen.com
apanner@kellogghansen.com
kwood@kellogghansen.com
aholman@kellogghansen.com
kschiffman@kellogghansen.com
alink@kellogghansen.com

*Class Counsel for Plaintiffs*

---

PLAINTIFFS' MOT. TO MODIFY CLASS DEFINITION AND DIRECT NOTICE
Case No. 11-cv-06714-YGR
-15-

**SER-548**

Case: 25-2790, 08/12/2026, DktEntry: 34.40, Page 53 of 255

# EXHIBIT 2

## *PUBLIC –*
## *REDACTED VERSION*

**Pages 1 - 20**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Thomas S. Hixson, Magistrate Judge

IN RE APPLE iPHONE ANTITRUST     )
LITIGATION,                  )   **NO. C 11-06714 YGR (TSH)**
                                )

San Francisco, California
Friday, August 9, 2024

**SEALED TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING 11:14 - 11:41 a.m.**

**APPEARANCES**: (via videoconference)

For Plaintiffs:

    WOLF, HALDENSTEIN, ADLER, FREEMAN
    & HERZ LLP
    270 Madison Avenue
    New York, New York  10016
  BY:  **THOMAS H. BURT, ATTORNEY AT LAW**

    KELLOGG, HANSEN, TODD, FIGEL & FREDERICK
    Sumner Square
    1615 M Street NW
    Washington, D.C.  20036
  BY:  **KYLE M. WOOD, ATTORNEY AT LAW**

For Defendant:

    GIBSON, DUNN & CRUTCHER LLP
    One Embarcadero Center - Suite 2600
    San Francisco, California  94111
  BY:  **CAELI A. HIGNEY, ATTORNEY AT LAW**

Transcribed By:     Marla F. Knox, RPR, CRR, RMR
                     United States Official Court Reporter

**SER-550**

Friday - August 9, 2024                    11:14 a.m.

S E A L E D   P R O C E E D I N G S

---oOo---

THE CLERK:  All right.  Everyone, we are back on the record in civil action 11-6714, In Re: Apple iPhone Antitrust Litigation.  The Honorable Thomas S. Hixson presiding.

Counsel, let's start the way we did the last time with the Plaintiffs' arguing Counsel identifying themselves and then going down the list.

MR. BURT:  Good morning again, Your Honor, Thomas Burt, Wolf Haldenstein, for the Plaintiffs.

THE COURT:  Good morning.

MR. WOOD:  Kyle Wood, Kellogg Hansen Todd Figel & Frederick, also for Plaintiffs.

THE COURT:  Good morning.

MR. WOOD:  Good morning.

MS. HIGNEY:  Good morning, Your Honor, Caeli Higney of Gibson Dunn & Crutcher representing Apple.

THE COURT:  Good morning.  I have ordered this hearing temporarily sealed because the parties have indicated that highly confidential information may be discussed and they might want to propose redactions to the transcript afterwards.

Let me just make sure that we have the correct people at the hearing.

Plaintiffs, looking at all the names that you see on the

screen, does it seem to you that we have the appropriate people

and only the appropriate people at this hearing?

(Pause in proceedings.)

**MR. BURT:**  Yes, Your Honor, it does.

**THE COURT:**  And let me ask the same question of Apple.

**MS. HIGNEY:**  Yes, Your Honor.

**THE COURT:**  Okay.  Ms. Higney, is there something you wanted to say?

**MS. HIGNEY:**  Yes.  On the last hearing we had argument over docket number 898, that's Plaintiffs' motion to add additional custodians, and Your Honor asked whether those six custodians that Plaintiffs are requesting all appear on Apple's initial disclosures.

And both parties answered in the affirmative.  That is actually not correct with respect to Mr. Cook.  Mr. Cook is not on Apple's Rule 26 disclosures.

**THE COURT:**  Oh, okay.  Thank you.  Would Plaintiffs like to respond?

**MR. WOOD:**  Your Honor, I -- I trust Apple's assertion there.  I -- you know, I cannot guarantee that -- all I would say is that Plaintiffs' position is still the same; that they are entitled to the documents from his files to determine if they, indeed -- they, themselves, want to call Mr. Cook at trial and that's it.  Thank you, Your Honor.  I appreciate it.

**THE COURT:**  Thank you.  And thank you, Ms. Higney, for

**SER-552**

the correction.

Rose, it looks like Ms. Lin is in the waiting room.

**MR. BURT:**  Your Honor, I recognize Ms. Lin as an appropriate participant in this call.

**THE COURT:**  And does Apple as well?

**MS. HIGNEY:**  Yes, Your Honor.

(Pause in proceedings.)

**THE COURT:**  Okay.  Thank you.

**THE CLERK:**  She is joining, Judge.

**THE COURT:**  Great.  The parties have filed under seal the declaration of Darryl Thompson, which I have had the opportunity to review.  So, let me turn to Plaintiffs for your argument, please.

**MR. BURT:**  Thank you, Your Honor.  What Apple asked for, which was a ministerial set of instructions or algorithm or code that would allow Apple to do the process within its own walls of matching up payors to accounts -- bearing in mind that we have already accepted that Apple can do the matching of transactions to people and that that need never leave its walls beyond the very small sample that already has -- the information about the people, not their transactions, the process of matching that, that Apple had hoped would be simple, ministerial, replicable, verifiable, it is not.

I think the factual record made by the declaration is that it just isn't.  It is an iterative process that isn't only

**SER-553**

**SEALED PROCEEDINGS**

iterative but requires judgment.

It requires specialized expertise and problem solving. It's not the sort of thing that can just be embodied in a set of instructions.

So that idea, it just doesn't exist. And I think the factual record is quite clear on that.

As to the idea that somehow JND could walk Apple through it so that Apple could maintain the payor information within its own walls instead of within the air gapped information to JND and then be sort of slowly coached through the process one iteration at a time, I think also the factual record is that that is not practicable.

I'm going to point out three places in the declaration that bear directly on this. It is subparagraph 7D, 7K and 9B, where JND says we don't know how to do that.

It is -- it is quite a different thing to teach somebody what one does with expertise. I don't think I could coach somebody through being a litigator step-by-step as they litigated a case.

I don't expect JND to try to coach people through the de-duplication process that it does through the experience it has developed over years and many very large engagements.

So, Apple has had since February to articulate how -- how it is that the personally identifying information, not the transactions, and we -- again, we understand that matching the

**SER-554**

transactions -- what apps people buy, what content they buy in them -- we understand that that's very sensitive; and we have agreed that Apple can keep that forever within its own walls except for -- except for the small sample that has already been turned over so that it can never be matched to an individual person.  And that when it's turned over for the --

THE COURT:  Let me pause you right here.  What specifically are you asking me to order Apple to produce to JND?  You have described it as "account information" or "personal identifying information."  What's the right terminology of what you are asking for?

MR. BURT:  Payor information.

THE COURT:  Payor information?

MR. BURT:  Payor information.  It is the fields of payor information produced in the sample.

(Pause in proceedings.)

THE COURT:  And is it for all potential class members?

MR. BURT:  Yes, Your Honor.

(Pause in proceedings.)

THE COURT:  And would I also want to say not including transactional information?

MR. BURT:  I believe that's correct, not -- we all know what the transactional information means.  We all know what the payor identifying information means.  I don't think anyone is confused about definitions there, Your Honor.

**SEALED PROCEEDINGS**

**THE COURT:** Okay. Well, good. Thank you. I just wanted to make sure I say the right thing in my order but continue.

**MR. BURT:** So, I don't think that we have ever heard articulated a particular risk that applies to the payor identification information, not to the transactional information.

I think we have set up all the safeguards that could be reasonably required in these circumstances, and we are now talking about a process that is Plaintiffs' obligation to perform.

We have gone out of our way to find a vendor that can do it, that has already passed muster with Apple. And on top of that, we have imposed some -- we have worked with Apple to create some fairly stringent restrictions on how the information is used to make sure that we -- we give that more safeguarding than I think is even necessary here for that information.

Apple has never come back and said: Now, here is the threat model we are concerned about. Here is the thing, leaving aside the transactions, but just that payor identification information that is particularly sensitive.

Now, I expect that Apple is going to raise something with Your Honor that came up, as Apple says, for the first time in the declaration.

**SER-556**

Case 4:11-cv-06754-YGR   Document 221-3   Filed 09/03/24   Page 9 of 22     8
Case 4:21-cv-06754-JSR   Document 12-2   Entry ID: 14.49/03/24-15

SEALED PROCEEDINGS

And I want to emphasize that it came up in the first time -- for the first time in the declaration because of the process that we learned by getting the sample; that it will be necessary for -- ████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████

   ████████████████████████████████

███████████████████████████████████

████████████████████                All right.

So that's the least sensitive, least protected information that we now know we need because of the -- because of the sample providing the information that Apple doesn't update addresses in other fields; right.

So, we have a bunch of fields there where we know the addresses are stale.  A certain percentage of Americans move every year.

We didn't know for sure how that was handled until we saw the sample, and now we know that this is necessary.

I'm told by JND that having assessed it, they need to do that; and ███████████████████████████

███████████████████████████████████

████████████████████████████

   ████████████████████████████████

We had a discussion when the sample was produced about the size

of the number of records in the fields, and there's roughly --

████████████████████████████████████████████████████████.

So, once they do top level matches, it will compress a great deal.  We can't say for sure it will be, for example, 10 percent but a great deal.

And ██████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████   ████████

████████████████████████████████████████████████████████

████████████████████████████████

We have a methodology that works.  It is not a methodology that can be duplicated, packed up and shipped back to Apple. That's where we are, Your Honor.

THE COURT:  All right.  Let me hear from Apple.

MS. HIGNEY:  Thank you, Your Honor.  Apple's position remains the same; that Plaintiffs have not demonstrated a sufficient need for the full payor data set and that is because we understand that JND is proposing an iterative process.

We don't dispute that there will need to be an iterative process here, both in terms of cleaning the data set as it exists and in terms of determining if there are, you know, supposed matches between different payor account records.

But, we are talking about the full data set is a data set that involves ████████ -- ██████████████████████ of entries. So, that cannot be done through a manual process.

**SEALED PROCEEDINGS**

By definition, Plaintiffs are going to have to look -- JND is going to have to look at some subset of that data to figure out, okay, what are the issues here; what are the issues with the address fields that we see affecting a lot of these records, and then write code, as Mr. Thompson acknowledges in his declaration, to clean up those issues.

But they aren't religion to be going -- I mean, Mr. Burt can correct me if I'm wrong, but I can't conceive of a world in where they are literally going line-by-line in the full data set -- again, that's going to have over a ▉▉▉▉ observations -- to clean up each line, to identify, oh, this street is misspelled here; this phone number should be this there.

They are going to have to develop code. Again, Mr. Thompson recognizes that they are going to develop code to engage in that kind of cleanup process. So what remains unclear to Apple is why they can't develop that type of code using a sample.

And we invited Plaintiffs in our meet-and-confer -- after we received Mr. Thompson's declaration late last week, we invited Plaintiffs to tell us is there a sample of -- JND to tell us is there a sample -- if it is not the sample we provided to date, is there another sample that would be sufficient for your purposes?

Because one of the arguments that Plaintiffs had made was

that the current sample was not specified for this type of process, and Plaintiffs came back and JND came back and said: No, we have never done it with a sample before.

Apple, you know, as Your Honor suggested at the last hearing, talked to its data scientists experts. And, you know, according to them -- again, with the caveat that it's Apple position that this whole exercise cannot be done reliably. You know, we have taken that position from the beginning; but obviously we are working with Plaintiffs to try to provide them the data that they can use to implement some methodology.

So with that caveat, I will note that Apple's experts tell me that with the current sample of ▮▮▮▮▮ accounts, there is almost a 98 percent probability that a given errant value in one of those fields -- for example, the C-A-L-I, Cali, instead of C-A for California or whatnot -- a given errant value will affect at least -- there is a 98 percent probability that a given errant value that affects at least 1,000 accounts will show up in the sample.

So, what I'm getting at here is: If something is pervasive throughout the data set, if it is affecting at least 1,000 accounts, there is a 98 percent probability with the current sample that you will see that error. So you will be able to identify that error and clean it up with code in the sample.

If you take that sample size up to ▮▮▮▮▮ accounts,

**SEALED PROCEEDINGS**

then you would have a 99.99 percent probability that a given -- given errant value that affects at least 500 accounts would be captured in the sample.

So we think there is a way to clean the sample -- to clean the data here using the sample to write this iterative code using the sample.

The fact of the matter is like -- a sample, like I said, I think has to be used because Plaintiffs are not suggesting that they go line-by-line.

With respect to the matching, we would submit that the same -- the same thing is true. The reality is that JND must develop some different algorithms and codes to do the payor matching exercise.

In their declaration, Mr. Thompson acknowledges that, quote-unquote -- quote (as read:) "███████████████████ ████████████████████████████ ████████████████████████████ ████████████████ "

So Plaintiffs realize that we cannot achieve -- no one can expect to achieve perfection here.

So the question is: How much data do you need to get you to a place where you can develop a methodology that can be implemented across the whole data set?

And we would submit that there is -- there is a sample -- again, if Plaintiffs want to come back and say it's more than a

███████ you should produce ███████, Apple is very much willing to have that conversation with Plaintiffs. I invited them to make that proposal, and the only response we received was simply "JND has never done it with a sample."

To me, that doesn't mean it can't be done. It just means they haven't done it before.

With respect to the risks involved with producing this data, it is a massive data set of personal identifying information for, you know, like I said, over ███████ consumers which translates into ███████ records.

So it is a massive data set and it's information that again, would facilitate payments. That it's payor identifying information. It is information that would facilitate payments.

If there were to be a data breach of that data, it would be necessary -- could be necessary to notify all of those consumers pursuant to Apple -- applicable laws and regulations about data breach.

We are talking about -- I mean, that would present a massive harm to Apple and also, you know, to consumers, allowing their leaked information potentially to be used by bad actors.

So while Mr. Burt is correct, that Apple, you know, expressed a lot of concern about the linking data -- that is, the data that would allow you to see a given app store user's transaction history -- and we appreciate the fact that

**SEALED PROCEEDINGS**

Plaintiffs have moved off seeking that linking data -- there still is real threat, we believe, with exposing this volume of data to a potential security breach.

As Mr. Burt previewed in his remarks, for the first time in the declaration JND previewed that ████████████████

████████████████████████████

████████████████████████████

████████████     ████████████████

████████

They haven't been able to articulate to us ████████████

████████████████████████████████

████████████████████████████████

████████████████████████████

████████████████████████████████

████████████████████████████████

████     So we have a concern about that as well.

THE COURT: Well, I mean, ████████████████████

████████████████████ That doesn't seem like a terribly complicated or novel idea. What's your response to that?

MS. HIGNEY: Quite frankly, Your Honor, I'm not sure why the date -- but like ████████████████

████████████████.

Again, the exercise is not identifying potential contact information. We are not talking about a class notice process



**SER-563**

here.

We are talking about figuring out if two different payor records in the app store are the same people.

So we don't need ████████████ information. We just need to see, oh, payor A was at this address, this phone number, this credit card. Payor B different address, same phone number, same credit card. We think those are the same payor.

And it's that exercise of matching them up. I don't know why they need ████████████ information to perform that exercise.

THE COURT: Well, they say that ████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ █████████████████████

And █████████████████████████████████████ ████████████████ that could help, you know, winnow down any ones that are still in dispute.

Conceptually, I don't see why that doesn't make sense. What do you think?

MS. HIGNEY: Well, I think -- again, perhaps conceptually in a case where we were talking about a few hundred or a few thousand; but I just don't think that's going to be the case here -- it again goes to this, they need to be

**SEALED PROCEEDINGS**

writing some kind of code. They can't be doing this in a manual way.

And so, I think the leftovers that we are talking about could be huge. The volume of those -- I mean, I think Mr. Burt previously acknowledged, it will be in the ██████████ ███████ We are not talking about hundreds or thousands here.

And again, it is just not clear to me why if they are not able to tell based on all of the data fields that Apple is already providing, ██████████████████████ ████████

(Pause in proceedings.)

**THE COURT:** Okay. Well, thank you. Would Plaintiffs like to respond?

**MR. BURT:** Only briefly, Your Honor, because I recognize that you have -- you have shown a lot of patience in hearing us out today.

First, if the John Smith on Rally Road is the John Smith on Birchill Road and Transunion already knows that, it's not really a question of whether ████████████████ ███████████████████████ ████████████████

If Apple doesn't link those two people by saying this person moved but ██████████████████ we should use that.

Second, Apple has said that they maintain the position

**SEALED PROCEEDINGS**

that the process can't be done.  And that's really a sticking point.  How can Apple ask us to work with them to complete a process that they also say can't be completed.

And, third, on the core issue here, whether this can be done in a way that is ministerial and verifiable within Apple's walls, I think the factual record is the factual record.  Thank you, Your Honor.

THE COURT:  Thank you, Counsel.

I'm granting Plaintiffs' motion to compel and I'm ordering Apple to produce to JND the payor information for the potential class members.

As discussed, it won't include the transactional information.  It's just the payor information, the fields that Apple provided in the sample, I'm ordering Apple to provide that for all potential class members to JND.

We have now had a number of hearings on this issue, and I have reviewed the declaration of Darryl Thompson, and Plaintiffs have shown that this is the only way that JND will be able to determine which payors are the same people.

They have made a persuasive showing on this point, and I am persuaded.

Having JND be able to create code that it could turn over to Apple to implement strikes me as not viable, and it does matter to me that Apple's position is that the entire exercise that JND is performing simply can't be done reliably.

That gives me great concern about having JND operate in the dark and not have access to full data and try to guess at what code it should write.

I just don't think that that's a viable process. JND needs to have information to the -- payor information for all potential class members.

I take very seriously Apple's concerns about security and a data breach or a potential data breach. Those are major concerns. Apple is right to raise them.

However, Plaintiffs have made a sufficient showing that JND has done everything reasonable and will do everything reasonable to protect against a data breach, and I think that JND has made a sufficient showing in that regard.

So, I am ordering Apple to produce that information. I will also issue a written order essentially saying the same thing, likely later today.

Do Plaintiffs have any questions?

**MR. BURT:** I do not. Thank you, Your Honor.

**THE COURT:** Does Apple have any questions?

**MS. HIGNEY:** Your Honor, we would just respectfully ask that the order provides that Apple could produce that information in the same manner in which the sample was produced; that is, pursuant to the parties supplemental protective order if Plaintiffs agree but --

**THE COURT:** You want them produced in the same manner

**SER-567**

that Apple produced the sample?

MS. HIGNEY:  Correct.

THE COURT:  Is that okay with Plaintiffs?

MR. BURT:  That sounds right to me, Your Honor.  We expect to treat it in the same manner.

THE COURT:  Okay.  That all -- I will include that in my order, and I do hereby order that.

MR. BURT:  Well --

THE COURT:  Go ahead.

MR. BURT:  I'm realizing as Ms. Higney says that, Your Honor, if that's -- except to the extent that's inconsistent with what we have revealed to the Court and is embodied in the Thompson declaration about ███████████ ███████████████████████████████ ████████ With the caveat that we don't want to adopt protections in the protective order that overwrite that need, other than that we expect to treat it -- just as we did the sample.

THE COURT:  And Apple's response?

MS. HIGNEY:  Well -- well, Your Honor, we have concerns about taking that -- ███████████ ████████████████████████████ I would say if Plaintiffs make a showing down the road that that is necessary to ███████████████ Apple would be willing to entertain that at that point but right now

it feels very speculative.

THE COURT: I think Plaintiffs have made a sufficient showing that they can perform address verification. And so, I'm going to order that Apple may produce the payor information in the same manner that Apple produced the sample.

However, Plaintiffs may engage in address verification as they have described in the Thompson declaration as may be necessary.

MS. HIGNEY: Understood, Your Honor.

THE COURT: All right. Is there anything further that Plaintiffs would like to raise at the hearing today?

MR. BURT: There is not, Your Honor.

THE COURT: Anything further from Apple?

MS. HIGNEY: There is not, Your Honor.

THE COURT: All right. Thank you, Counsel. The matter is submitted.

MR. BURT: Thank you, Your Honor.

MS. HIGNEY: Thank you.

THE CLERK: Thank you, everyone. We are off the record in this matter and court is in recess.

(Proceedings adjourned at 11:41 a.m.)

---oOo---

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    August 12, 2024

*Marla Knox*
_____

Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
United States District Court – Official Reporter

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | Case No.  11-cv-06714-YGR   (TSH)<br><br>**PUBLIC VERSION OF DISCOVERY ORDER FILED UNDER SEAL AT ECF NO. 913**<br><br>Re: Dkt. Nos. 815, 898, 899 |

The Court held a hearing on August 9, 2024 concerning the discovery disputes at ECF Nos. 815, 898, and 899, and now issues the following order.

**A.      ECF No. 815**

For the reasons stated on the record, the Court **GRANTS** Plaintiffs' motion to compel and **ORDERS** Apple to produce payor data for all potential class members to JND.  This means the fields of payor information that were in the sample Apple provided and does not include transactional information.  Apple may produce the data in the same manner that it produced the sample, except that JND may use address verification as described in the Darryl Thompson declaration.

Plaintiffs have shown that this is the only way JND will be able to determine which payor IDs are the same payor.  Plaintiffs have shown it is not practical or feasible for JND to come up with an algorithm or methodology that it could turn over to Apple for Apple to implement to determine which payor IDs are the same payor.  Apple's insistence that JND can design such an algorithm or methodology that Apple could implement is significantly undercut by Apple's more basic position that there is no reliable way to perform this task at all.  Apple should not be left to implement something it says cannot be done reliably.

The Court takes seriously the confidentiality concerns Apple raises and its concerns about a potential data breach. No doubt about it, those are significant concerns. However, Plaintiffs have shown that JND has in place appropriate security measures. Further, the payor information the Court orders Apple to produce does not include transactional information, which will remain solely in Apple's possession. In other words, the payor information does not include, for example, which apps a payor downloaded.

## B. ECF No. 898

This dispute relates to request for production ("RFP") 56, which asks Apple to update its document collections. As presented to the Court, the dispute is whether Apple should do this for nine document custodians (Phil Schiller, Trystan Kosmynka, Erik Neuenschwander, Eddy Cue, Matthew Fischer, Carson Oliver, Kevan Parekh, Craig Federighi, and Tim Cook), as Plaintiffs contend, or for just three (Schiller, Kosmynka, Neuenschwander), as Apple contends.

Plaintiffs have the better of the argument. For its document productions in this action, Apple stated a collection cutoff date of September 30, 2019, so the custodial document productions are several years out of date. Apple explained at the hearing that even though it stated a September 30, 2019 collection cutoff date, in practice that meant that document collection went at least through September 30, 2019, and for some custodians it went later. Apple also explained that it has made some other document productions in the following years, though it does not dispute Plaintiffs' basic contention that the custodial document productions are generally several years out of date. In addition, Plaintiffs have also received Apple's document productions in the *Epic Games* case. Still, discovery in the *Epic Games* case wrapped up in early 2021, so Apple's document production remains at least several years out of date.

The Court doesn't buy Apple's argument that the relevant time period is only when Apple initially made the decisions being challenged in this lawsuit. Plaintiffs challenge not only Apple's alleged acquisition of monopoly power, but also its alleged maintenance of monopoly power over time. Apple doesn't believe its relevance argument either, as it never attempted to limit discovery to the 2007-08 time period. Nor does that theory of relevance accord with Apple's willingness to update its document production to the present day for three custodians.

2

United States District Court
Northern District of California

Plaintiffs have articulated good reasons, specific to each of the custodians in dispute, why that custodian is likely to have relevant documents that concern important areas of the case. Accordingly, the Court **ORDERS** Apple to update its custodial document productions for the nine custodians requested by Plaintiffs.

**C.      ECF No. 899**

Plaintiffs move to compel on RFPs 63-69, which request:

> REQUEST FOR PRODUCTION NO. 63:
> Produce all Documents Concerning you allowing users in the European Union to purchase Apps and In-App Products from App Marketplaces in response to the DMA.
>
> REQUEST FOR PRODUCTION NO. 64:
> Produce all Documents Concerning you allowing users in the European Union to Sideload Apps and App Marketplaces in response to the DMA.
>
> REQUEST FOR PRODUCTION NO. 65:
> Produce all Documents Concerning your projections or analyses of the impact of the availability of Sideloading and third-party App Marketplaces on the revenues or profits realized from your App Store storefront in the European Union.
>
> REQUEST FOR PRODUCTION NO. 66:
> Produce any Documents Concerning whether Apple granting users in the European Union the ability to Sideload Apps and to obtain Apps and In-App Products from third-party App Marketplaces will affect Handheld Device Security and/or User Privacy.
>
> REQUEST FOR PRODUCTION NO. 67:
> Produce Documents sufficient to show the steps, if any, that Apple has taken to preserve Handheld Device Security and User Privacy in the European Union, in light of Apple granting users the ability to Sideload Apps and to obtain Apps and In-App Products from third-party App Marketplaces.
>
> REQUEST FOR PRODUCTION NO. 68:
> Produce Documents sufficient to explain your Compensation Model in the European Union and to show the basis and rationale for your Compensation Model.
>
> REQUEST FOR PRODUCTION NO. 69:
> Produce Documents sufficient to show the costs you incur in collecting commissions from App Developers that utilize third-party Payment Processors when selling Apps and In-App Products to users in South Korea.

Let's group these into two buckets:  RFPs 63-68 and RFP 69.

3

**SER**-573

### 1.      RFPs 63-68 (EU DMA)

Plaintiffs argue that these RFPs concern Apple's responses to the European Union's Digital Markets Act, which took effect in March 2024.  Plaintiffs say that under the DMA, Apple has been required to make certain changes, including allowing third-party app marketplaces on iOS devices, permitting app developers to utilize alternative payment processors, and allowing consumers to "sideload" apps from the internet.  Plaintiffs say the requested documents about these new practices that Apple has been forced to adopt in the EU will test Apple's supposed pro-competitive justifications in favor of maintaining sole control over app distribution in the U.S.

Apple has several responses.  Its most basic response is to say that foreign conduct does not bear directly on Plaintiff's U.S.-based claims, citing this Court's decision in *Epic Games v. Apple Inc.*, 2020 WL 7779017 (N.D. Cal. Dec. 31, 2020).  In that case, the Court observed that "wholly extraterritorial conduct not directed at the U.S. cannot be a basis for liability in this case.  Having said that, foreign conduct can sometimes be relevant evidence of domestic conduct." *Id.* \*1.  The Court explained that it "cannot endorse a simplistic holding that documents about foreign conduct are always relevant or never relevant because neither proposition is true.  Instead, the analysis comes down to having a good theory of relevance.  The moving party needs to explain why documents concerning foreign activities are relevant to U.S. claims or defenses, and the Court must conduct a careful analysis to determine if the foreign documents actually would be relevant." *Id.*

Here, Plaintiffs do not claim that Apple's conduct in the EU could be a basis for liability under U.S. law.  Rather, they argue that Apple's foreign conduct is relevant.  And they have a pretty good theory of relevance:  In Europe, Apple is doing some of the very things it refuses to do in the U.S. because of privacy, security and other concerns, and it is doing them with some apparent success.  Plaintiffs say this may show that Apple's pro-competitive justifications for its complete control over app distribution are not as important as Apple says they are.  This is a good theory of relevance.

Apple argues that the DMA imposes numerous requirements on Apple that are not present in the U.S. and that Apple's policies in Europe therefore do not resemble the "but-for world" in

United States District Court
Northern District of California

4

which app distribution were not under its sole control because there are so many other things Apple is also required to do by the DMA.  Fair enough.  But relevance is a more forgiving standard than that.  *Some* of the things Apple is now required to do in the EU are among the things Plaintiffs want the Court to order Apple to do in the U.S., so discovery into how Apple is able to do them in the EU is relevant.  By the same token, Plaintiffs RFPs do not ask for documents about everything Apple has done to comply with the DMA.  The RFPs focus only on issues relevant to this case.

On the merits, Apple argues that its conduct in the EU does not show that its U.S. policies lack pro-competitive justification.  However, Plaintiffs do not have to win the case on the merits in order to obtain relevant discovery.  That gets litigation backwards.  First the parties do discovery, then they have a trial on the merits.

Finally, Apple asserts these RFPs are not proportional to the needs of the case and are overbroad.  However, those arguments are unpersuasive.  It is true that RFPs 63-66 request "all documents" and "any documents" concerning the stated subjects.  However, as Apple knows, large corporations almost never literally produce "all" documents on a given subject.  They identify a reasonable number of custodians who are likely to have responsive documents, as well as non-custodial sources that are likely to have responsive documents, and they take it from there. That is what Apple should do too.  Had Apple done this when Plaintiffs served these RFPs four and a half months ago, it would be done by now.

### 2. RFP 69 (South Korea)

Apple observes that this RFP is about app payment processing, whereas this case is about app distribution.  Again, that is a fair observation.  However, as Plaintiffs explained at the hearing, they contend that Apple wields its monopoly power over app distribution to exercise control over app payment processing, including on in-app purchases.  They contend that Apple's costs in collecting commissions in a regulatory environment in which it does not control app payment processing is relevant to showing, in part, what Apple's costs in collecting commissions would look like if Apple were not able to use its monopoly power over app distribution in the U.S. to exercise control over app payment processing.  That is a sufficient theory of relevance, especially

United States District Court
Northern District of California

5

given how non-burdensome this RFP is. Apple says there are all kinds of reasons its costs in South Korea would not reflect what its costs in the U.S. would be. But that's just a dispute about what the unproduced documents mean or show on the merits, which is not a bar to discovery.

**3.      Conclusion**

Accordingly, Plaintiffs' motion to compel as to RFPs 63-69 is **GRANTED**.

**IT IS SO ORDERED.**

Dated: August 9, 2024

THOMAS S. HIXSON
United States Magistrate Judge

United States District Court
Northern District of California

6

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR |

**JOINT DISCOVERY LETTER BRIEF REGARDING PLAINTIFFS' REQUEST FOR PRODUCTION NO. 55 TO DEFENDANT APPLE, INC.**

The Honorable Thomas Hixson
United States District Court for the Northern District of California
Courtroom E – 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Dear Judge Hixson,

Plaintiffs and Defendant Apple Inc. ("Apple" and together with Plaintiffs, the "Parties") respectfully submit this fourth joint statement regarding Request For Production No. 55, served on Apple on April 12, 2022. Following the discovery status conference on April 25, 2024, Your Honor directed the Parties to provide an update by May 1, 2024. After the Parties did so, Your Honor directed the Parties to provide another update by May 8, 2024. On May 8, 2024, after the Parties provided their second update, Your Honor directed the Parties to file a third update by May 10, 2024. On May 30, 2024, Your Honor directed the Parties to file a fourth update by June 6, 2024.

Counsel for the Parties continued to meet and confer in a good faith effort to resolve disputes concerning Apple's production of the data necessary to identify members of the Class, including uninjured members. Their ongoing discussions have centered around the availability of certain transactional data prior to mid-2014, and efforts to reach an agreement on the production of sample data that might help resolve the dispute before Your Honor.

## I.     Availability of Certain "Linking" Data

As Your Honor will recall, on May 9, 2024, Apple's counsel informed Plaintiffs' counsel that Apple had discovered that a certain transactional data field that could "link" the transaction data prior to mid-2014 with the payor account data had been deleted. *See* ECF No. 869. This information was shared for the first time on a meet and confer after Plaintiffs inquired into why Apple was experiencing technical difficulties in collecting the Parties' contemplated data sample (discussed in Section II, *infra*). At this time, Apple also informed Plaintiffs that it was "investigating the existence of backup data that would provide the missing transactional data field." Ex. 1.

The Parties noted in their May 10 update (ECF No. 869) their disagreement over Plaintiffs' entitlement to this linking data. Plaintiffs assert that the data linking payors—i.e., class members—to the transactions they paid for throughout the Class Period fall squarely within RFP No. 55's demand for "all documents concerning the identity of each and every member of the

- 1 -

**SER-577**

class." ECF No. 815 at 14 (cleaned up). Plaintiffs cannot determine how much a specific person paid for apps and in-app content—and, in turn, whether they meet the $10 spending threshold for Class membership—without data that link their identity to transactions. Apple continues to maintain that this "linking" data is not requested by RFP No. 55, which by its plain terms seeks documents "that identify which APPLE IDs belong to which members of the CLASS"—nothing more. But, regardless, Apple has been working diligently to locate any such linking information that is available.

On May 14, 2024, Plaintiffs' counsel followed up with Apple's counsel about this data availability issue with questions regarding the kind of data deleted, how and when it was deleted, and whether any backup data exists. Ex. 2. Plaintiffs also inquired whether Apple would consent to a motion from Plaintiffs seeking leave to take a Rule 30(b)(6) deposition on those topics. On May 17, 2024, Apple informed Plaintiffs that it had identified a potential backup source with the requested "linking" information covering the pre-2014 time period. *See* Ex. 1. It did not otherwise respond to Plaintiffs' inquiries. Then, on June 5, 2024, in response to Plaintiffs' counsel's inquiry, Apple confirmed for Plaintiffs that it had "identified a method of restoring that data for the pre-2014 time period, and Apple is now working to do so for the many billions of paid transactions for which we have previously produced records." It also informed Plaintiffs that its "[i]nitial testing" of the backup data shows that it "is highly reliable." Ex. 3. The Parties have not yet been able to meet and confer with respect to specific questions Apple understands Plaintiffs' counsel has about the backup data; about how the original data was deleted in the first place; or when the replacement data will be ready for Plaintiffs' expert and claims administrator to use (assuming it is usable and needed).

## II. The Parties' Discussions Over the Production of a Sample

In an effort to resolve their differences over the production of the data linking payors to transactions, the Parties have—since the initiation of this discovery dispute—been discussing ways in which Plaintiffs might obtain the necessary data without Apple ever producing the "key" to which it objected producing on April 12. *See* ECF No. 815 at 5.

In the spirit of compromise, Plaintiffs proposed that Apple produce a sample of the linked data: specifically, the payor fields associated with one million randomly selected Apple IDs, and for a further 50,000 randomly selected accounts from that one million Apple IDs, all transactions. This way, Plaintiffs could work with their claims administrator and Prof. McFadden to ascertain whether Plaintiffs could accommodate Apple's goal of never producing, in a single place, "non-anonymized information about users' identities . . . linked to the transactional data" (ECF No. 815 at 5) for more than a small sample group of accounts.

Apple has prepared the requested sample data and is ready to produce it to Plaintiffs' claims administrator once the Parties align on the terms of a supplemental protective order. The Parties currently dispute, however, whether Apple will be required to do more than produce that sample.

**Plaintiffs' position.** Plaintiffs' position is that Apple is suddenly and without justification attempting to alter the terms of the Parties' agreement. Plaintiffs repeatedly informed Apple that they would require Apple to produce more than just the sample data—it would need to produce all payor personal identifying information so Plaintiffs could effectively determine who might be

entitled to notice and be a Class member. Indeed, in the Parties' initial joint discovery letter brief, Apple memorialized this understanding: it would "produce personal identifying information ('PII') relating to payors for all U.S. transactions on the App Store." ECF No. 815 at 5. Plaintiffs would use that data to identify who all the Class members *might* be, and then Apple would "assist Plaintiffs in identifying which transactions are, per Plaintiffs' matching, tied together by common payors so that Plaintiffs can calculate" both how much they spent on apps and in-app content (for purposes of Class membership) and their damages. *Id.*

Plaintiffs never agreed, as Apple now contends for the first time, that their acceptance of the sample data—which was intended only to confirm if this process would be a reliable means of identifying Class members and their damages—relieved Apple of its duty to produce anything else. Plaintiffs have expressed a willingness, if possible, to have Apple complete the process of matching payors to transactions based on Plaintiffs' claims administrator's work with the sample, allowing Apple to give to Prof. McFadden a transactional data set with accurate but anonymized payors. However, the sampling proposal is a trial, and Plaintiffs have clearly stated that this outcome is a goal, but the results of a field test cannot be fore-ordained. Ex. 4; *see also* Ex. 5. In light of Apple's sudden change of position—which generates doubt about Apple's willingness to comply with its obligation to produce this data at all—Plaintiffs are considering insisting that Apple produce the full payor data, including the "key" that is the foundation of this dispute.

Plaintiffs further reiterate that Apple has yet to identify a genuine concern with the safety and security of the payor data in the hands of Plaintiffs' claims administrator, who has already agreed to provide extraordinary security protections. Indeed, Plaintiffs' claims administrator already hosts Apple consumer data in two other class action cases and hosts arguably even more sensitive personal health data in another matter. *See* ECF No. 815 at 4 & n.1.

**Apple's position.** As laid out in the Parties' initial joint brief (ECF No. 815), the Parties disagreed over the scope of data to be produced in response to RFP No. 55, with Plaintiffs demanding PII *and* linking data for all payors with U.S. App Store paid transactions, and Apple willing to produce only the PII. To bridge this divide, the Parties negotiated a mutually acceptable compromise over the scope of data to be produced: (i) Apple would produce a sample of a sizable amount of payor PII and a smaller amount of "linked" transactions; (ii) Plaintiffs' experts would use that sample to develop a protocol for matching; and (iii) that protocol would be provided to Apple to apply in a ministerial way such that Apple would not have produce all payors' PII with their transactional records, and Plaintiffs would have individual payors with multiple Apple accounts "matched" according to their experts' protocol. But weeks after the Parties reached that agreement, Plaintiffs' experts at JND balked at having to share their protocol—claiming a "proprietary" interest, despite disclosure of that work being subject to FRCP 26 requirements—and now Plaintiffs lay blame with Apple.

In its initial joint discovery brief, Apple made clear its position that it was willing to "produce personal identifying information ('PII') relating to payors for all U.S. transactions on the App Store," but that it was *not* willing to produce any data connecting the requested information about Apple's customers with their transactional records. ECF No. 815 at 5. After the Parties filed that brief, on April 24, 2024—minutes before a hearing scheduled with your Honor— Plaintiffs approached Apple with the compromise mentioned above—that Apple would produce

- 3 -

the payor fields associated with one million randomly selected Apple IDs, and for a further 50,000 randomly selected accounts from among that one million Apple IDs, produce transactional data. This sample would allow Plaintiffs (through JND) to determine a process for "matching" up payor accounts belonging to the same individuals, so that Apple could then mechanically apply Plaintiffs' process to the remainder of the payor data and identify for Plaintiffs the transactions associated with payors who are—according to Plaintiffs' method—the same. That information then would allow their economic expert (Prof. McFadden) to analyze the transaction data, grouped by payor, to determine which potential class members were injured or uninjured.

On April 30, 2024, the Parties discussed Plaintiffs' proposal. Apple made clear in that discussion that any agreement to provide the sample of payors' identifying information alongside transactional data was conditioned on the parties' mutual understanding that Apple would be providing this sample *in lieu of* producing such information for all Apple IDs. That was the compromise: Apple would provide some "linking" data, and in exchange would not have to produce data associated with all App Store users. Indeed, Plaintiffs' follow-up email on May 1 reflected their understanding that a "condition" of Apple's acceptance of the sampling proposal was that "plaintiffs never seek to have the full dataset at JND, or seek additional data." Ex 4. Plaintiffs further recognized that the "goal" of the process was for JND to use the sample to "provide a protocol to Apple for matching and that Apple will complete the process in an objective and ministerial way" and explicitly recognized that "challenges that arise in matching are not likely to be ameliorated by simply looking at all the data instead of a sample." *See* Ex. 4.

Apple responded and accepted Plaintiffs' proposed sampling compromise, recognizing that Plaintiffs needed to reserve their rights as to seeking additional fields or information if the data provided did not allow for them to perform the matching as anticipated. *See* Ex. 6. But the Parties' agreement nowhere contemplated that Apple would still be providing identifying information for the full set of App Store payors. *See id.* In their statement above, Plaintiffs claim that they "repeatedly informed Apple that they would require Apple to produce more than just the sample data—it would need to produce all payor personal identifying information," but tellingly do not point to *any* evidence supporting this assertion. That is because there is none. Again, the statement by Apple that it would produce PII for all payors *predated* the Parties' sampling discussions. Any suggestion that the parties discussed a full production of PII information for all App Store users *after* Plaintiffs proposed a sampling procedure is false.

What appears to have caused Plaintiffs to change course is that their experts at JND do not want to turn over their "matching protocol"—the method by which they match up individual payor accounts—to Apple because it is "proprietary." JND raised this concern for the first time on May 23, in a call in which the parties were discussing the logistics for the data sample delivery. JND said on that call that they were "not aware that they would need to return the code" they developed to Apple—despite Plaintiffs' earlier express acknowledgment to Apple that the objective of the sampling was that "JND will provide a protocol for matching and that Apple will complete the process in an objective and ministerial way." Ex. 4. It was only after that call that Plaintiffs began to claim that, notwithstanding the sampling agreement, they expected Apple to produce *all* PII to JND. *See* Ex. 7. But, as Apple has explained to Plaintiffs, JND will have to turn over its matching protocol to Apple regardless, as required by Rule 26 and the expert evidence stipulation and order

- 4 -

in this case. Dkt. 200. Moreover, Plaintiffs have not articulated any reason why the sample of PII for one million account IDs would be insufficient for JND's purposes.

Apple stands ready and able to abide by the terms of the Parties' sampling agreement.

* * *

**Plaintiffs' statement.** Plaintiffs request that the Court schedule a hearing on these issues. Apple's constant delay tactics, foot-dragging, and now its inability to assure Plaintiffs of the reliability of its process for recreating destroyed data has caused demonstrable prejudice. Indeed, even Apple's reproduction of the transaction data—which was supposed to be a ministerial task and crucial to achieving Apple's "goal" here—is sowing delay. Apple's reproduction is structured differently than prior productions, presenting a great risk that the new dataset will be unusable using common software without adequate instruction from Apple, which Apple has not yet produced. At this point, because of Apple's conduct, Plaintiffs will not have sufficient time to perform the required damages analysis before the October 10 expert report deadline that the Parties jointly proposed to Judge Gonzalez Rogers.[1]

**Apple's statement.** Apple has worked diligently to provide Plaintiffs with data that goes above and beyond what their actual discovery requests seek. Apple is open to a hearing with the Court to discuss these issues, but must note that Plaintiffs have not met and conferred with Apple about many of their complaints outlined above—particularly with respect to the backup data. For example, Plaintiffs misleadingly refer to Apple's "inability" to provide assurances about the reliability of such backup data, without ever having even asked Apple to provide such information. Similarly, Plaintiffs say above that "Apple has not yet provided" certain information about its reproduction of the transaction data—Plaintiffs requested that information this evening at 6:46 p.m. PT. Accordingly, Apple believes it would be productive for the parties to discuss such issues before declaring impasse or seeking Court intervention.

Thank you for Your Honor's continuing consideration and patience.

Respectfully submitted,

---

[1] Given Judge Gonzalez Rogers's heavy caseload, *see* Judge Gonzalez Rogers's Standing Order in Civil Cases at 1, Plaintiffs proposed to Apple that the Parties file a stipulated request for Judge Gonzalez Rogers to refer all remaining fact and expert discovery disputes and all related scheduling matters (including the pending dispute over Plaintiffs' RFP Nos. 63-69, *see* ECF No. 870), to Your Honor. Apple has refused to so stipulate and has given no reason for its refusal.

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

By: *Rachele R. Byrd*
Rachele R. Byrd

*Plaintiffs' Class Counsel*

GIBSON, DUNN & CRUTCHER LLP

By: *Caeli Higney*
Caeli Higney

*Counsel for Defendant Apple, Inc.*


## E-FILING ATTESTATION

I, Rachele R. Byrd, am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that the other signatory identified above has concurred in this filing.

*/s/ Rachele R. Byrd*
RACHELE R. BYRD

**SER**-582

# EXHIBIT 1

# GIBSON DUNN

Eli M. Lazarus
Of Counsel
T: +1 415.393.8340
M: +1 650.814.7016
elazarus@gibsondunn.com

May 17, 2024

Counsel,

Apple is in receipt of your letter dated May 14, 2024 ("Letter") and disagrees with your gross mischaracterization of the data issue—inaccurately claiming "spoliation" of data that was never requested by Plaintiffs and deleted in Apple's ordinary course of business to protect its consumers' privacy.

Setting that aside for present purposes, you asked Apple to "confirm that there are no backup records of the data at issue, such that the deleted data cannot be restored." Letter at 2. As we have previously shared with you, Apple has been investigating the existence of backup data that would provide the missing transactional data field. While our investigation is ongoing, we have now identified a potential source with such information covering the pre-2014 time period. Given that the existence of such backup data is a threshold question to the alleged "spoliation" issue—there could be no spoliation if the data in fact exists—we wanted to inform you of this development. We are working diligently to confirm whether this source has the requested information for the pre-2014 period and will revert to you as soon as possible with that confirmation.

Separately, we also wanted to confirm that Apple is moving forward with its plans to produce a random sample of payor identifying information associated with one million Apple IDs from the transactional data set. This sample—and the work that we understand that your consultant, JND, needs to perform to identify "linked" payors—should be unaffected by the pre-2014 data issue. Apple plans to be ready to produce these data on May 31.

Sincerely,

Eli M. Lazarus

**Gibson, Dunn & Crutcher LLP**
One Embarcadero Center Suite 2600 | San Francisco, CA 94111-3715 | T: 415.393.8200 | F: 415.393.8306 | gibsondunn.com

**SER-584**

Case: 25-1930, 08/12/2026, DktEntry: 34.4, Page 89 of 255

# EXHIBIT 2

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE

1615 M STREET, N.W.

SUITE 400

WASHINGTON, D.C. 20036-3215

_____

(202) 326-7900

FACSIMILE:

(202) 326-7999

May 14, 2024

*Via Electronic Mail*

Eli Lazarus
Gibson, Dunn & Crutcher LLP
One Embarcadero Center
Suite 2600
San Francisco, CA 94111-3715

Re:     *In re Apple iPhone Antitrust Litig.*, No. 4:11-cv-06714-YGR (N.D. Cal.) –
Spoliation of transactional data field by Apple regarding Plaintiffs' Request for
Production No. 55

Dear Mr. Lazarus:

Apple's counsel informed Plaintiffs' counsel on May 9, 2024, that Apple has destroyed a certain data field associated with pre-2014 transactional data, and therefore Apple cannot produce the responsive data (from this time period) necessary for Plaintiffs to perform the damages calculations that the Court has ordered.  Dkt. 789, at 27-28.

We take this apparent spoliation of evidence very seriously.  Suspending auto-delete policies is among the most basic obligations imposed on any company—and especially one with Apple's immense resources—to preserve relevant evidence for litigation.  *See, e.g.*, *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1067 (N.D. Cal. Oct. 25, 2006) (party that reasonably anticipates litigation is "required to suspend any existing policies related to deleting or destroying files and preserve all relevant documents related to the litigation."); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003) ("Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents."); *DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 977-79 (N.D. Ill. 2021) ("[D]isabling an autodeletion function is universally understood to be one of the most basic and simple functions a party must do to preserve ESI.").

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

Eli Lazarus
May 14, 2024
Page 2

In light of Apple's destruction of relevant data, Plaintiffs request Apple answer the following questions regarding the deleted, pre-2014 transactional data field:

- When (i.e., what date) was the transactional data field deleted?
- What information was contained in the deleted transactional data field?
- How was the transactional data field deleted?
- When Plaintiffs filed this case in 2011, what steps did Apple take to suspend the auto-deletion of relevant documents and data?
- When did Apple discover the pre-2014 transactional data field was deleted? Who discovered the data had been deleted?
- Please confirm that there are no backup records of the data at issue, such that the deleted data cannot be restored.
- Apart from this data, has any other potentially relevant information been deleted? What steps has Apple or its counsel taken to investigate whether any additional potentially relevant documents or data have been deleted?

Best regards,

*/s/ Joshua Hafenbrack*

Joshua Hafenbrack

cc:   Counsel of Record

**SER-587**

# EXHIBIT 3

| From: | Higney, Caeli A. |
|---|---|
| To: | Wood, Kyle M.; Lin, Ramona; Hafenbrack, Joshua; Swanson, Daniel G.; Richman, Cynthia; Kleinbrodt, Julian W.; Lazarus, Eli M.; Craig, Dana Lynn; Phillips, Harry R. S.; Rodd, Elizabeth; Castle, Nicole; Granda, Victoria C.; Lin, Ramona |
| Cc: | Mark Rifkin; Thomas Burt; "Rachele Byrd"; Schiffman, Kelley C.; Link, Anna K.; Holman, Ashle J. |
| Subject: | RE: In re Apple iPhone Antitrust Litigation |
| Date: | Thursday, June 6, 2024 12:16:38 AM |

Counsel,

As an initial matter, Apple does not agree with Plaintiffs' characterization of the data loss issue as "spoliation." Setting that aside, over the past few weeks, Apple has spent significant energy investigating the availability of backup data for the transactional data field that Apple thought (and voluntarily disclosed to Plaintiffs) was missing in the transactional data for the pre-2014 time period. We can now confirm that Apple has identified a method of restoring that data for the pre-2014 time period, and Apple is now working to do so for the many billions of paid transactions for which we have previously produced records. Initial testing indicates that this backup is highly reliable. We reiterate that this data field is not mentioned in or implicated by Plaintiffs' actual discovery requests in this matter, and Apple is going above and beyond its obligations by restoring the data for use in this litigation. We expect that this will resolve any concerns over alleged "spoliation."

With respect to the payor data sample, we continue to disagree with your characterizations about the compromise the parties reached—including as recounted in your separate email of this evening. The statement in the Joint Discovery Brief about Apple producing PII for "all" transactions was premised on Apple not producing any data connecting the requested information about Apple's customers with their transactional records. Dkt. 815. After the parties filed that brief, Plaintiffs proposed—and Apple accepted—a compromise whereby we would produce 1 million payor records, alongside transaction data that could be married up with that payor information for 50,000 accounts. That was the compromise: Apple would provide some "linking" data, and in exchange would not have to produce PII associated with all App Store users.

As noted in our May 30 letter and on Monday's call, Apple remains ready and willing to produce the payor data sample as previously agreed. Outside of JND's concern about sharing with Apple its methodology for matching payors (which it will have to do regardless of the amount of data produced), Plaintiffs have yet to identify any reason why this 1 million record sample is insufficient for your purposes. At the very least, we would think that Plaintiffs would want the sample to allow JND to determine if it could feasibly perform the payor matching exercise based on the sample data, before asserting an absolute need for the full payor data set. Again, we invite you to provide comments on Apple's proposed supplemental protective order so that Apple can move forward with producing that sample data.

It is our hope that the parties can submit a joint statement, as we have done in the past, but we need sufficient time to review and confer with our client. To that end, please send us your proposed status report by 12 pm PT tomorrow.

**SER-589**

Thank you,
Caeli

**Caeli A. Higney**
Partner

T: +1 415.393.8248 | M: +1 202.494.1288
CHigney@gibsondunn.com

**GIBSON DUNN**
Gibson, Dunn & Crutcher LLP
One Embarcadero Center Suite 2600, San Francisco, CA 94111-3715

---

**From:** Wood, Kyle M. <kwood@kellogghansen.com>
**Sent:** Wednesday, June 5, 2024 9:02 AM
**To:** Lin, Ramona <RLin@gibsondunn.com>; Hafenbrack, Joshua <jhafenbrack@kellogghansen.com>;
Swanson, Daniel G. <DSwanson@gibsondunn.com>; Richman, Cynthia
<CRichman@gibsondunn.com>; Higney, Caeli A. <CHigney@gibsondunn.com>; Kleinbrodt, Julian W.
<JKleinbrodt@gibsondunn.com>; Lazarus, Eli M. <ELazarus@gibsondunn.com>; Craig, Dana Lynn
<DCraig@gibsondunn.com>; Phillips, Harry R. S. <HPhillips2@gibsondunn.com>; Rodd, Elizabeth
<Erodd@mwe.com>; Castle, Nicole <NCastle@mwe.com>; Granda, Victoria C.
<VGranda@gibsondunn.com>
**Cc:** Mark Rifkin <rifkin@whafh.com>; Thomas Burt <burt@whafh.com>; 'Rachele Byrd'
<Byrd@whafh.com>; Schiffman, Kelley C. <kschiffman@kellogghansen.com>; Link, Anna K.
<alink@kellogghansen.com>; Holman, Ashle J. <aholman@kellogghansen.com>
**Subject:** RE: In re Apple iPhone Antitrust Litigation

**[WARNING: External Email]**

Dear Counsel:

As you know, we owe Judge Hixson a status report tomorrow regarding the parties' discussions
surrounding the production of payor data. In your May 17 letter, you informed us that there may
exist backup data that might remedy Apple's spoliation of certain payor data. You promised to
"revert . . . as soon as possible" with confirmation that the referenced backup data remedies the
issue. This information will be relevant to the Court's requested status update. Please provide us
with any additional information you can share at this time.

Best regards,

Kyle

**Kyle M. Wood**
**KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, N.W. | Suite 400 | Washington, DC 20036 | (202) 367-7806

Case 25-7930, 08/12/2026, DktEntry: 34.6, Page 94 of 255

# EXHIBIT 4

| | |
|---|---|
| **From:** | Burt, Thomas |
| **To:** | Lazarus, Eli M.; Byrd, Rachele; Higney, Caeli A. |
| **Cc:** | Rifkin, Mark; dfrederick@kellogghansen.com; Wood, Kyle M.; Lin, Ramona; Panner, Aaron M.; Hafenbrack, Joshua; Richman, Cynthia |
| **Subject:** | RE: In re Apple iPhone Antitrust Litigation |
| **Date:** | Wednesday, May 1, 2024 8:19:23 PM |
| **Attachments:** | image001.png |

**[WARNING: External Email]**

Dear Caeli:

We write to respond to Apple's conditional acceptance of our sampling proposal in an effort to resolve the payor data production dispute.

First, as we said on our call Tuesday, the sample data will enjoy the full protections at JND that we have discussed, residing in an air-gapped environment under access controls. We are open to any sensible method of transmission and suggest that Apple's people speak directly to JND to arrange the physical transport.

Second, having consulted with Brattle and to ensure that they can expeditiously work with output from Apple at the end of this process, we will need Apple to attach a unique transaction identifier to the entire transactional set, and re-produce that to Brattle. With a unique identifier (which must be common to the data Apple and Brattle are working with), Brattle can compute transaction-level damages in parallel with the matching process, and then later compile them by payor. Without such an ID, Brattle would either have to wait for both JND and Apple to complete matching work, or ingest a complete new set, either of which introduce more delay than is either necessary or acceptable.

Third, we understand that your condition was that plaintiffs never seek to have the full dataset at JND, or seek additional data, or ask for the key to be transported outside Apple. We have accepted the goal that JND will provide a protocol for matching and that Apple will complete the process in an objective and ministerial way, so as to prevent identifiable payor PII and the full transaction set from ever being in one place outside Apple's control. We also accept in concept that challenges that arise in matching are not likely to be ameliorated by simply looking at all the data instead of a sample. However, as we indicated in our call, it is impossible to determine in advance of seeing any part of the payor data whether additional fields or explanations will be necessary, or indeed, whether the proposal to have Apple complete the work based on JND's protocol will succeed. We accept the goal but we cannot commit to the success of a process that is, itself, a trial.

# EXHIBIT 5

| From: | Wood, Kyle M. |
|---|---|
| To: | "Higney, Caeli A."; Lazarus, Eli M.; Link, Anna K.; Granda, Victoria C.; Rifkin, Mark; Burt, Thomas; Manifold, Betsy; Byrd, Rachele; Guiney, Matthew; Frederick, David C.; Panner, Aaron M.; Hafenbrack, Joshua |
| Cc: | dswanson; crichman; Kleinbrodt, Julian W.; dcraig; hphillips2; Rodd, Elizabeth; Castle, Nicole |
| Subject: | RE: In re Apple iPhone Antitrust Litigation |

Caeli:

Thank you for your follow-up email from earlier this afternoon. There appears to be a disconnect between what Plaintiffs envision being the "matching" process, and what you have explained your understanding of the "matching" process to be. By way of response, we have laid out the four steps that we see occurring over the next several months that get us to a point where Plaintiffs are able to identify who the Class members are and their individualized damages.

1. JND Receives The Sample Data From Apple. Just as we noted on May 3, we understand Apple's concern to be that it does not want "identifiable payor PII **and** the full transaction set," together, "ever being in one place outside Apple's control." Email from T. Burt to C. Higney et al. (May 3, 2024). We "accepted th[at] goal." *Id.* The purpose of the sample is so that JND can understand the data it will be working with. Without seeing the data, "it is impossible to determine . . . whether additional fields or explanations will be necessary, or indeed, whether the proposal to have Apple complete the work based on JND's protocol will succeed." *Id.* When JND receives this sample, it will analyze and process the data to determine whether there is a way for Plaintiffs to ascertain Class members' identities and their damages without Apple producing both identifiable payor PII and the transactions associated with their identities in a single place.

To be clear: nowhere in our May 3 email, and never during any of our meet and confers, did Plaintiffs ever agree that the sample data was going to be the only data that JND would ever receive. This process, with Apple as the intermediary, simply will not work if that is the case.

2. Apple Produces To JND The Identifying Information For All Payors. Once we and JND confirm, through analysis of the sample, that there is a viable means of ascertaining Class members' identities and their damages without Apple producing the full dataset (containing both Payor PII and their transactions), the next step will be for Apple to produce **all** of the identifying information for **all** of the payors (not including the transactions information). In other words: Plaintiffs envision Apple producing **just** the personal identifying information of every payor in the transaction dataset, **segregated completely** from the transactions associated with them. The goal of this process is for JND to "roll-up" or "de-dupe" payor identities in the transaction dataset so that JND can create a list of *potential* Class members.

3. JND Provides The List Of Potential Class Members To Apple. This is the beginning of the "matching" process that Plaintiffs understood Apple agreed to perform. JND will provide to Apple a de-duped, or "rolled-up," list of people (with the other PII) who might be Class members. That list will show, for instance, which four different "John Smiths" in the payor dataset fall into the same "bucket"; i.e., are actually all one person.

4. Apple Tells Brattle Which Transactions Should Be Grouped Together For Damages Purposes. Once it has JND's rolled-up list of payors (potential Class members), Apple will then be asked to convey to Brattle the unique transaction identifiers that should be grouped together because they are associated with one Payor or belong in one "bucket" so they can calculate individual class damages. This, Plaintiffs think, can be done without Brattle ever knowing the actual identity of any Class member. And in this process, Apple would still hold the "key"—that is, the linking data between transactions and payor PII.

* * *

The feasibility of all of this, like many other things, needs to be confirmed by looking at the sample data. As you noted, Plaintiffs have reserved all rights, including but not limited to requesting additional data as necessary based on their analysis of the sample. That reservation of rights also includes requesting any and all additional data needed to properly notice all Class members. And it includes seeking any and all relief from Judge Hixson, including but not limited to asking Judge Hixson to rule on Plaintiffs' request for Apple to produce the "key."

We anticipate this adequately addresses the concerns you expressed in your email from earlier this afternoon. JND looks forward to receiving the sample data.

Very truly yours,

Kyle

**Kyle M. Wood**
**KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, N.W. | Suite 400 | Washington, DC 20036 | (202) 367-7806

NOTICE: This transmission is intended only for the use of the addressee and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately via reply e-mail, and then destroy all instances of this communication. Thank you.

**From:** Higney, Caeli A. <CHigney@gibsondunn.com>
**Sent:** Friday, May 24, 2024 3:03 PM
**To:** Wood, Kyle M. <kwood@kellogghansen.com>; Lazarus, Eli M. <ELazarus@gibsondunn.com>; Link, Anna K. <alink@kellogghansen.com>; Granda, Victoria C. <VGranda@gibsondunn.com>; Mark Rifkin <rifkin@whafh.com>; Thomas Burt <burt@whafh.com>; manifold@whafh.com; Rachele Byrd <byrd@whafh.com>; guiney@whafh.com; Frederick, David C. <dfrederick@kellogghansen.com>; Panner, Aaron M. <apanner@kellogghansen.com>; Hafenbrack, Joshua <jhafenbrack@kellogghansen.com>
**Cc:** Swanson, Daniel G. <DSwanson@gibsondunn.com>; Richman, Cynthia <CRichman@gibsondunn.com>; Kleinbrodt, Julian W. <JKleinbrodt@gibsondunn.com>; Craig, Dana Lynn <DCraig@gibsondunn.com>; Phillips, Harry R. S. <HPhillips2@gibsondunn.com>; Erodd@mwe.com; NCastle@mwe.com
**Subject:** [EXTERNAL] RE: In re Apple iPhone Antitrust Litigation

Counsel:

We write to follow up on our call yesterday with JND. As made clear in the parties' prior meet and confers, Apple's agreement to provide the sample of payors' identifying information for 1 million Apple IDs was conditioned on the parties' mutual understanding that Apple would be providing this sample *in lieu of* producing such information for all Apple IDs. As Plaintiffs wrote to Apple on May 3:

> We [Plaintiffs] have accepted the goal that JND will provide a protocol for matching and that Apple will complete the process in an objective and ministerial way, so as to prevent identifiable payor PII and the full transaction set from ever being in one place outside Apple's control. We also accept in concept that challenges that arise in matching are not likely to be ameliorated by simply looking at all the data instead of a sample. However, as we indicated in our call, it is impossible to determine in advance

**SER-595**

of seeing any part of the payor data whether additional fields or explanations will be necessary, or indeed, whether the proposal to have Apple complete the work based on JND's protocol will succeed. We accept the goal but we cannot commit to the success of a process that is, itself, a trial.

While Apple recognized that Plaintiffs needed to reserve their rights as to seeking additional fields or information if the data provided did not allow for them to perform the matching as anticipated, the parties' agreement did not contemplate that Apple would be providing identifying information for the full set of App Store payors. As you know, Apple has significant, well-founded privacy concerns with doing so – and the sampling proposal (that Plaintiffs themselves proposed) was intended to address those concerns. What we heard from JND on yesterday's call, however, was that they were expecting Apple to turn over information for all App Store payors, and that they did not understand that they would be turning over their matching algorithm to Apple for Apple to perform the matching on the full payor data set. JND's conception directly contradicts the parties' prior agreements. To the extent JND wants confidentiality protections for its algorithm, Plaintiffs are welcome to propose safeguards to be included in the stipulated protective order that the parties are currently working to finalize. But the litigation process obviously requires that the parties and their experts be able to make arguments about the correct approach to payor matching.

While Apple still intends to produce the sample data on or about May 31, it will not do so absent reaffirmation from Plaintiffs' counsel and JND that the process will proceed as previously discussed and agreed, namely that JND will provide a protocol for matching based on the sample, and that Apple will complete the process in an objective and ministerial way.

Best,
Caeli
**Caeli A. Higney**
Partner

T: +1 415.393.8248 | M: +1 202.494.1288
CHigney@gibsondunn.com

**GIBSON DUNN**
Gibson, Dunn & Crutcher LLP
One Embarcadero Center Suite 2600, San Francisco, CA 94111-3715

**From:** Wood, Kyle M. <kwood@kellogghansen.com>
**Sent:** Wednesday, May 22, 2024 2:24 PM
**To:** Lazarus, Eli M. <ELazarus@gibsondunn.com>; Link, Anna K. <alink@kellogghansen.com>; Granda, Victoria C. <VGranda@gibsondunn.com>; Mark Rifkin <rifkin@whafh.com>; Thomas Burt <burt@whafh.com>; manifold@whafh.com; Rachele Byrd <byrd@whafh.com>; guiney@whafh.com; dfrederick@kellogghansen.com; Panner, Aaron M. <apanner@kellogghansen.com>; Hafenbrack, Joshua <jhafenbrack@kellogghansen.com>; Higney, Caeli A. <CHigney@gibsondunn.com>
**Cc:** Swanson, Daniel G. <DSwanson@gibsondunn.com>; Richman, Cynthia <CRichman@gibsondunn.com>; Kleinbrodt, Julian W. <JKleinbrodt@gibsondunn.com>; Craig, Dana Lynn <DCraig@gibsondunn.com>; Phillips, Harry R. S. <HPhillips2@gibsondunn.com>;

Erodd@mwe.com; NCastle@mwe.com

**Subject:** RE: In re Apple iPhone Antitrust Litigation

**[WARNING: External Email]**

Eli,

Thanks for your letter. We will promptly respond. For now, I wanted to address some of the other items from my email to you this morning.

- **_First_**, the main topics that JND will want to clarify are listed below:
  - How will the production occur? Will Apple agree to produce the sample data on hard drives that JND will then load onto an air-gapped computer?
  - Will Apple be able to provide some sort of data dictionary or other document defining the content and purpose of each column of data produced?
- **_Second_**, you have the correct address for Brattle. We have two follow-up questions:
  - Can we interpret your note to mean that Apple intends to reproduce the entire transactional dataset with unique transaction identifiers for every transaction?
  - When does Apple anticipate producing this updated transactional dataset?

We are still working through the draft supplemental PO and will provide feedback when we have it. Lastly—has Apple given any consideration to Plaintiffs' proposal to stipulate to referring all fact and expert discovery disputes and related scheduling matters to Judge Hixson? We still have not heard from you on that.

Thanks,

Kyle

**Kyle M. Wood**

**KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.**

1615 M Street, N.W. | Suite 400 | Washington, DC 20036 | (202) 367-7806

NOTICE: This transmission is intended only for the use of the addressee and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately via reply e-mail, and then destroy all instances of this communication. Thank you.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

# EXHIBIT 6

**SER-598**

| | |
|---|---|
| **From:** | Lazarus, Eli M. |
| **To:** | Burt, Thomas; Byrd, Rachele; Higney, Caeli A. |
| **Cc:** | Rifkin, Mark; dfrederick@kellogghansen.com; Wood, Kyle M.; Lin, Ramona; Panner, Aaron M.; Hafenbrack, Joshua; Richman, Cynthia |
| **Subject:** | RE: In re Apple iPhone Antitrust Litigation |
| **Date:** | Friday, May 3, 2024 6:40:55 PM |
| **Attachments:** | image001.png |

Counsel: Thank you for your follow-up message below as we both work to reach a negotiated solution on the payor data production issues.

Apple is working to extract payor data as requested in your RFP No. 55. As previewed on Tuesday, we understand that the data to be produced will allow Plaintiffs to match transactions to payors by account IDs, as you originally requested—meaning that for the portion of the sample covering both payor data and transactions, JND will be able to see the payor PII records associated with a user account as well as the transactions associated with that user account. It appears from your email below that Plaintiffs would now like to take a step further and match payors to individual transactions; we believe that, at least for the last approximately ten years, Apple can also produce an individual billing ID for each transaction that can be linked to the payor data. We are still working with Apple to investigate whether any unique payor identifiers exist for transactions before 2014.

Apple is moving as quickly as it can internally to obtain necessary approvals and confirm logistics with respect to the sampling approach Plaintiffs have proposed, as well as the air-gapped devices to store the data. Once the parties have aligned on an approach, we anticipate that it will take a couple of weeks to prepare the requested sample data. In parallel, we will work with you to formalize a supplemental protective order, which we are now drafting to circulate for discussion and alignment.

Apple is also working to provide the transaction identifiers you mentioned below. We expect we will be able to provide this to you relatively soon and do not foresee it being a challenging process.

We understand your concerns about agreeing up front as to what Plaintiffs will not seek in the future. As previously discussed, what Apple is most concerned about is the key to match PII with transactions, so we would like to reach agreement that Plaintiffs will not seek that key (beyond the initial sample). But we recognize there may need to be some reservation of rights on both sides.

**Eli M. Lazarus**
Of Counsel

T: +1 415.393.8340 | M: +1 650.814.7016
ELazarus@gibsondunn.com

**GIBSON DUNN**
Gibson, Dunn & Crutcher LLP
One Embarcadero Center Suite 2600, San Francisco, CA 94111-3715

---

**From:** Burt, Thomas <burt@whafh.com>
**Sent:** Wednesday, May 1, 2024 5:18 PM
**To:** Lazarus, Eli M. <ELazarus@gibsondunn.com>; Byrd, Rachele <Byrd@whafh.com>; Higney, Caeli

A. <CHigney@gibsondunn.com>
**Cc:** Rifkin, Mark <rifkin@whafh.com>; dfrederick@kellogghansen.com; Wood, Kyle M. <kwood@kellogghansen.com>; Lin, Ramona <RLin@gibsondunn.com>; Panner, Aaron M. <apanner@kellogghansen.com>; Hafenbrack, Joshua <jhafenbrack@kellogghansen.com>; Richman, Cynthia <CRichman@gibsondunn.com>
**Subject:** RE: In re Apple iPhone Antitrust Litigation

**[WARNING: External Email]**

Dear Caeli:

We write to respond to Apple's conditional acceptance of our sampling proposal in an effort to resolve the payor data production dispute.

First, as we said on our call Tuesday, the sample data will enjoy the full protections at JND that we have discussed, residing in an air-gapped environment under access controls. We are open to any sensible method of transmission and suggest that Apple's people speak directly to JND to arrange the physical transport.

Second, having consulted with Brattle and to ensure that they can expeditiously work with output from Apple at the end of this process, we will need Apple to attach a unique transaction identifier to the entire transactional set, and re-produce that to Brattle. With a unique identifier (which must be common to the data Apple and Brattle are working with), Brattle can compute transaction-level damages in parallel with the matching process, and then later compile them by payor. Without such an ID, Brattle would either have to wait for both JND and Apple to complete matching work, or ingest a complete new set, either of which introduce more delay than is either necessary or acceptable.

Third, we understand that your condition was that plaintiffs never seek to have the full dataset at JND, or seek additional data, or ask for the key to be transported outside Apple. We have accepted the goal that JND will provide a protocol for matching and that Apple will complete the process in an objective and ministerial way, so as to prevent identifiable payor PII and the full transaction set from ever being in one place outside Apple's control. We also accept in concept that challenges that arise in matching are not likely to be ameliorated by simply looking at all the data instead of a sample. However, as we indicated in our call, it is impossible to determine in advance of seeing any part of the payor data whether additional fields or explanations will be necessary, or indeed, whether the proposal to have Apple complete the work based on JND's protocol will succeed. We accept the goal but we cannot commit to the success of a process that is, itself, a trial.

**SER-600**

EXHIBIT 7

| From: | Higney, Caeli A. |
|---|---|
| To: | Wood, Kyle M.; Lazarus, Eli M.; Link, Anna K.; Granda, Victoria C.; Mark Rifkin; Thomas Burt; manifold@whafh.com; Rachele Byrd; guiney@whafh.com; dfrederick@kellogghansen.com; Panner, Aaron M.; Hafenbrack, Joshua |
| Cc: | Swanson, Daniel G.; Richman, Cynthia; Kleinbrodt, Julian W.; Craig, Dana Lynn; Phillips, Harry R. S.; Erodd@mwe.com; NCastle@mwe.com |
| Subject: | RE: In re Apple iPhone Antitrust Litigation |
| Date: | Friday, May 24, 2024 3:02:54 PM |

Counsel:

We write to follow up on our call yesterday with JND.  As made clear in the parties' prior meet and confers, Apple's agreement to provide the sample of payors' identifying information for 1 million Apple IDs was conditioned on the parties' mutual understanding that Apple would be providing this sample *in lieu of* producing such information for all Apple IDs.  As Plaintiffs wrote to Apple on May 3:

> We [Plaintiffs] have accepted the goal that JND will provide a protocol for matching and that Apple will complete the process in an objective and ministerial way, so as to prevent identifiable payor PII and the full transaction set from ever being in one place outside Apple's control.  We also accept in concept that challenges that arise in matching are not likely to be ameliorated by simply looking at all the data instead of a sample.  However, as we indicated in our call, it is impossible to determine in advance of seeing any part of the payor data whether additional fields or explanations will be necessary, or indeed, whether the proposal to have Apple complete the work based on JND's protocol will succeed.  We accept the goal but we cannot commit to the success of a process that is, itself, a trial.

While Apple recognized that Plaintiffs needed to reserve their rights as to seeking additional fields or information if the data provided did not allow for them to perform the matching as anticipated, the parties' agreement did not contemplate that Apple would be providing identifying information for the full set of App Store payors.  As you know, Apple has significant, well-founded privacy concerns with doing so – and the sampling proposal (that Plaintiffs themselves proposed) was intended to address those concerns.  What we heard from JND on yesterday's call, however, was that they were expecting Apple to turn over information for all App Store payors, and that they did not understand that they would be turning over their matching algorithm to Apple for Apple to perform the matching on the full payor data set.  JND's conception directly contradicts the parties' prior agreements.  To the extent JND wants confidentiality protections for its algorithm, Plaintiffs are welcome to propose safeguards to be included in the stipulated protective order that the parties are currently working to finalize.  But the litigation process obviously requires that the parties and their experts be able to make arguments about the correct approach to payor matching.

**SER-602**

While Apple still intends to produce the sample data on or about May 31, it will not do so absent reaffirmation from Plaintiffs' counsel and JND that the process will proceed as previously discussed and agreed, namely that JND will provide a protocol for matching based on the sample, and that Apple will complete the process in an objective and ministerial way.

Best,
Caeli

**Caeli A. Higney**
Partner

T: +1 415.393.8248 | M: +1 202.494.1288
CHigney@gibsondunn.com

**GIBSON DUNN**
Gibson, Dunn & Crutcher LLP
One Embarcadero Center Suite 2600, San Francisco, CA 94111-3715

---

**From:** Wood, Kyle M. <kwood@kellogghansen.com>
**Sent:** Wednesday, May 22, 2024 2:24 PM
**To:** Lazarus, Eli M. <ELazarus@gibsondunn.com>; Link, Anna K. <alink@kellogghansen.com>; Granda, Victoria C. <VGranda@gibsondunn.com>; Mark Rifkin <rifkin@whafh.com>; Thomas Burt <burt@whafh.com>; manifold@whafh.com; Rachele Byrd <byrd@whafh.com>; guiney@whafh.com; dfrederick@kellogghansen.com; Panner, Aaron M. <apanner@kellogghansen.com>; Hafenbrack, Joshua <jhafenbrack@kellogghansen.com>; Higney, Caeli A. <CHigney@gibsondunn.com>
**Cc:** Swanson, Daniel G. <DSwanson@gibsondunn.com>; Richman, Cynthia <CRichman@gibsondunn.com>; Kleinbrodt, Julian W. <JKleinbrodt@gibsondunn.com>; Craig, Dana Lynn <DCraig@gibsondunn.com>; Phillips, Harry R. S. <HPhillips2@gibsondunn.com>; Erodd@mwe.com; NCastle@mwe.com
**Subject:** RE: In re Apple iPhone Antitrust Litigation

 **[WARNING: External Email]**

Eli,

Thanks for your letter. We will promptly respond. For now, I wanted to address some of the other items from my email to you this morning.

- ***First***, the main topics that JND will want to clarify are listed below:
    - How will the production occur? Will Apple agree to produce the sample data on hard drives that JND will then load onto an air-gapped computer?
    - Will Apple be able to provide some sort of data dictionary or other document defining the content and purpose of each column of data produced?

***Second***, you have the correct address for Brattle.  We have two follow-up questions:
- Can we interpret your note to mean that Apple intends to reproduce the entire transactional dataset with unique transaction identifiers for every transaction?
- When does Apple anticipate producing this updated transactional dataset?

We are still working through the draft supplemental PO and will provide feedback when we have it.

Lastly—has Apple given any consideration to Plaintiffs' proposal to stipulate to referring all fact and expert discovery disputes and related scheduling matters to Judge Hixson?  We still have not heard from you on that.

Thanks,

Kyle

**Kyle M. Wood**
**KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, N.W. | Suite 400 | Washington, DC 20036 | (202) 367-7806

NOTICE: This transmission is intended only for the use of the addressee and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately via reply e-mail, and then destroy all instances of this communication. Thank you.

# EXHIBIT 7

**SER-605**

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION**

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | Civil Action No. 4:11-cv-06714-YGR |

**EXPERT REPORT AND DECLARATION OF JONAH BERGER, PH.D.**

**SER-606**

## TABLE OF CONTENTS

I.   QUALIFICATIONS ........................................................................................... 1

II.  ASSIGNMENT ................................................................................................. 2

III. ALLEGATIONS AND BACKGROUND REGARDING PROFESSOR
MCFADDEN'S OPINIONS ABOUT PRICE TIERS AND FOCAL-POINT PRICING ...... 3

IV.  SUMMARY OF OPINIONS ............................................................................... 8

V.   THE LITERATURE PROFESSOR MCFADDEN CITES DOES NOT PROVIDE
ANY RELIABLE BASIS OR COMMON EVIDENCE FOR THE PROPOSITION THAT
99-CENT PRICING IS NOT WIDESPREAD ......................................................... 12

    A.   *Academic Literature Shows Firms Commonly Use 99-Cent Pricing*.......................... 12

    B.   *Professor McFadden Has Selected Arbitrary Examples of Low Percentages of 99-
Cent Pricing to Support His Unfounded Assertions*................................................. 19

VI.  PLAINTIFFS PROVIDE NO COMMON OR RELIABLE EMPIRICAL
EVIDENCE DEMONSTRATING THAT APPLE'S PRICE TIER POLICY CAUSES
DEVELOPERS TO CHARGE HIGHER PRICES ................................................... 22

    A.   *Professor McFadden's Original Opinion that Price Tiers Necessarily Lead to
Higher Prices Is Not Based on Empirical Analysis or Academic Research*.......................... 22

    B.   *Academic Literature Establishes Why Sellers Choose 99-Cent Pricing*..................... 25

    C.   *Apple's Price Tiers Provide Consumers with Benefits, Including Ease of Processing
and Improved Price Comparisons*................................................................. 28

VII. CONTRARY TO PROFESSOR MCFADDEN'S HYPOTHETICAL AND
UNSUPPORTED CLAIMS, EMPIRICAL EVIDENCE SHOWS THAT APPLE'S
REQUIREMENT THAT APP DEVELOPERS SET PRICES ENDING IN 99 CENTS
DOES NOT CAUSE DEVELOPERS TO CHARGE HIGHER PRICES ........................... 32

    A.   *Empirical Evidence from Google Play Demonstrates Apple's Requirement that App
Developers Set Prices Ending in 99 Cents Does Not Cause Developers to Charge Higher
Prices* ........................................................................................... 33

    B.   *Empirical Evidence from the Amazon Appstore and the Samsung Galaxy Store
Demonstrate that Apple's Requirement that App Developers Set Prices Ending in 99 Cents
Does Not Cause Developers to Charge Higher Prices* ............................................... 37

    C.   *Empirical Evidence of Pricing of Additional Digital Goods Suggests that Apple's
Requirement that App Developers Set Prices Ending in 99 Cents Does Not Cause
Developers to Charge Higher Prices*.............................................................. 39

        1.   *99-Cent Pricing is Common for Games*.................................................. 40

        2.   *99-Cent Pricing is Common for E-Books*................................................ 44

        3.   *99-Cent Pricing is Common for Digital Music* .......................................... 44

i

4.   99-Cent Pricing is Common for Video Goods, Including Buying and Renting Movies and TV Shows.................................................................................................. 46

D.   **App Developer Behavior after Apple's 2016 Introduction of 49-Cent Price Tiers for In-App Subscriptions on the App Store Further Suggests that Apple's Requirement that App Developers Set Prices Ending in 99 Cents Does Not Cause Developers to Charge Higher Prices** ........................................................................................................... 50

**VIII.   PROFESSOR MCFADDEN'S OPINIONS ABOUT THE IMPACT OF APPLE'S PRICE TIERS ARE DISCONNECTED FROM HIS THEORY OF HARM AND FROM PRICES OBSERVED IN THE REAL WORLD** ............................................. 53

A.   **The Economic Literature and Empirical Evidence Support the Need to Model Apple Price Tiers and Focal-Point Pricing** ......................................................................... 54

B.   **Professor McFadden's Updated Original Model and Additional Simulations Do Not Properly Incorporate Price Tiers and Focal-Point Pricing** ....................................... 56

1.   At Each Step, Professor McFadden's Updated Original Model and Simulation Fail to Model Price Tiers and Focal-Point Pricing. ....................................................... 57

2.   Step One: Professor McFadden Creates Composite Prices at the App Level, Removing Price Tier Information ....................................................................... 59

3.   Step Two: The Updated Original Model Predicts Prices that Do Not Account For Price Tiers or Focal Point Pricing ..................................................................... 61

4.   Step Three: Professor McFadden's "Simulations" Do Not Account For Price Tiers Or Focal-Point Pricing ................................................................................. 63

5.   Contradictions Between Professor McFadden's Model Assumptions and His Opinions Regarding Price Tiers Render His Updated Original Model Unreliable ............................. 66

6.   In Summary, Professor McFadden Does Not Offer a Model that Properly Accounts for Price Tiers or Focal-Point Pricing ..................................................................... 68

**SER-608**

## I.    Qualifications

1.    My name is Jonah Berger.  I am a Marketing professor at the Wharton School at the University of Pennsylvania.  I received my Ph.D. in Marketing from the Graduate School of Business at Stanford University and my B.A. in Human Judgment and Decision Making, also from Stanford University.

2.    My research focuses on consumer behavior, digital marketing, social influence, and technology.  My work examines how consumers make purchase decisions and how firms communicate with and influence consumers.  I have published over 60 articles in top-tier academic journals in marketing, consumer psychology, and other disciplines, including in the *Journal of Advertising Research*, *Journal of Marketing*, *Journal of Marketing Research*, *Journal of Consumer Research*, and *Journal of Consumer Psychology*.  I have also written three best-selling books that have been printed in over 30 different languages.  In addition, I currently serve as an Associate Editor at the *Journal of Marketing* and served as an Associate Editor at the *Journal of Marketing Research* from 2012 to 2020.

3.    I have received numerous awards for my research and writing.  In 2014, I received the American Marketing Association's Leonard L. Berry Marketing Book Award, which is given for a book that has had a significant impact in marketing and related sub-fields.  In 2017, I received the *Journal of Marketing*'s William F. O'Dell Award for the article that made the most significant, long-term contribution to marketing theory, methodology, and/or practice.  I was recognized from 2009 to 2013, in 2017, and again in 2021 by the American Marketing Association as one of the top-five most productive researchers in marketing.  The American Management Association named me one of the top 30 leaders in business and *Fast Company* magazine named me one of the most creative people in business.

4.    In addition to my research, I have extensive experience teaching and consulting on these topics.  I have won numerous teaching awards from the Wharton School and have consulted with hundreds of companies on topics such as consumer behavior, go-to-market strategy, generating word of mouth, and helping products and ideas catch on.

5.       A complete list of my publications and other academic and professional experience is in my curriculum vitae, which is attached to this report as **Appendix A**. A list of my testimony in the last four years is attached as **Appendix B**.

## II.     Assignment

6.       I have been retained by counsel for Apple to review and respond to the opinions offered by Professor Daniel L. McFadden ("Professor McFadden") in the reports he has submitted in this matter as they relate to Apple's price tiers and 99-cent pricing.[1]

7.       Specifically, I have been asked to assess Professor McFadden's claims that (1) Apple's price tiers are anticompetitive, reducing developer competition and raising developer prices to consumers;[2] and (2) that his model properly addresses the existence of Apple's price tiers and/or focal-point pricing dynamics in the world as it would have been but for the alleged anticompetitive conduct.[3]

8.       I make this declaration in support of Apple's Opposition to Plaintiffs' Renewed Motion for Class Certification and Apple's Motion to Exclude the Testimony of Professor Daniel McFadden and Dr. Rosa Abrantes-Metz.

9.       In forming my opinions and conclusions, I have relied upon the materials cited in this report. These cited materials include documents and data cited by Professor McFadden, documents and data produced in this case, and other publicly available data and documents. A full list of the documents and data on which I rely is in **Appendix C**. I understand that discovery is ongoing in this matter. Therefore, I reserve the right to supplement or amend my opinions should new information become available.

---

[1] Expert Report of Professor Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, June 1, 2021 ("McFadden Initial Report"); Reply Report of Professor Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, October 19, 2021 ("McFadden Reply Report"); Supplemental Expert Report of Professor Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, September 26, 2022; Revised Supplemental Expert Report of Professor Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, December 30, 2022; Second Revised Supplemental Expert Report of Professor Daniel L. McFadden in Support of Plaintiffs' Renewed Motion for Class Certification, January 19, 2023 ("McFadden Second Revised Supplemental Report"). In this report, I discuss Professor McFadden's various opinions related to 99-cent pricing and Apple's price tier requirement contained across these six reports, as well as in his depositions dated August 3, 2021, November 5, 2021, and December 5, 2022 (collectively, "Professor McFadden's opinions").

[2] McFadden Initial Report ¶¶ 124, 129, 130, 162.

[3] McFadden Second Revised Supplemental Report ¶¶ 85, 87.

2

10. I am being compensated at my standard billing rate of $1,100 per hour. I have been assisted by staff of Cornerstone Research, who worked under my direction. I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

### III. Allegations and Background Regarding Professor McFadden's Opinions About Price Tiers and Focal-Point Pricing

11. The price tier policy for the App Store was introduced by Apple concurrently with the App Store launch in 2008.[4] Prior to the launch of the App Store, Apple was already using 99-cent pricing for various products and digital goods that Apple itself sold. For example, Apple priced its songs on iTunes using 99-cent pricing dating back to as early as 2003. In addition to individual songs, Apple also had set album prices using 99-cent endings. Moreover, Apple chose prices that ended in 99 cents for television seasons and movie rentals and purchases. According to Eric Gray, Apple's director of commerce subscriptions and pricing services, Apple chose to establish 99-cent price tiers for developers on the App Store because, among other things, its customers were used to 99-cent price tiers, and Apple believed 99-cent price tiers would offer the best customer experience.[5] These familiar prices, namely those ending in 99 cents (among other prices, such as those ending in 49 cents) appear very frequently in the real

---

[4] Deposition of Eric Gray, February 12, 2021 ("Gray Dep."), pp. 26:4–7, 191:18–192:11 ("Q. . . . Were you involved in the initial creation of pricing tiers for the App Store? A. Yes. . . Q. And when did that process begin? A. It's a long time ago, but my rough estimate would be four to five months before the developer tools would have been available. And we made the tools available at WWDC in 2008, which WWDS is usually in June. So maybe – maybe in the November through February timing we would have started the process.); Apple, "The App Store Turns 10," July 5, 2018, available at https://www.apple.com/newsroom/2018/07/app-store-turns-10/.

[5] Gray Dep., pp. 195:24–196:14 ("Q. . . . And why did every one of the U.S.-based price tiers end in 99 cents at first for the App Store? A. Well, we had already -- our consumer -- remember, our Apple ID is used by customers across -- to purchase across the different service lines. And we had previously established 99 cent pricing for songs as early as 2003, as well as albums at 9.99, and we had music album pricing that was at every 99 cent ending. We had television seasons and movie rentals and -- and movie purchases, again, that were using 99 cents. So our customers -- it was ultimately because that's what our customers were used to; and it created, in our opinion, the best customer experience.").

3

world and are referred to throughout this report and in the academic literature as "focal prices" or "focal-point prices."[6]

12.     In the U.S., App Store price points for app downloads and in-app content range from $0.99 to $999.99 and are distributed as shown in Exhibit 1.[7]  Developers may also choose to set the prices of apps or in-app content to zero, thus offering their apps and content to consumers for free and without paying a commission to Apple.  In September 2016, Apple provided an expanded set of price tiers in the App Store for a subset of in-app purchases: auto-renewable subscriptions.[8]  According to the policy introducing this expanded set of price tiers, for prices below $29.99, developers could choose prices ending in 49 or 99 cents (i.e., $0.49, $0.99, $1.49 . . . $29.49, $29.99).[9]

---

[6] Frank Hackl, Michael E. Kummer, and Rudolf Winter-Ebmer, "99 Cent: Price Points in e-Commerce," *Information Economics and Policy*, 26, 2014, pp. 12–27, p. 3; Matthias Fengler and Joachim Winter, "Price-Setting and Price-Adjustment Behavior for Fast-Moving Consumer Goods," *Social and Economic Research with Consumer Panel Data: Proceedings of the First ZUMA Symposium on Consumer Panel Data*, 2001, pp. 95–113 at p. 99, available at https://nbn-resolving.org/urn nbn:de:0168-ssoar-49477-7.  As I discuss in Sections VI and VII of this report, the most common example of focal-point pricing is the use of prices ending in 99 cents, followed by prices ending in 49 cents.

[7] While Apple itself offers Apple One (a bundled subscription plan for Apple apps including Apple Music, Apple TV+, Apple Arcade, iCloud+, Apple News+, and Apple Fitness+) at prices of $16.95, $22.95, and $32.95, those products all have prices ending in 99 cents when sold individually.  See Apple, "Apple One," available at https://www.apple.com/apple-one/.  See also, e.g., Apple, "Apple News+," available at https://www.apple.com/apple-news/.  Considering these are prices offered by Apple for its own products (rather than external developers), I understand that the pricing of Apple One is not relevant to this matter.

[8] U.S. Storefront App Store Transaction Data; Apple App Store, "Offering Subscriptions," available at https://web.archive.org/web/20170211170257/https://developer.apple.com/app-store/subscriptions/.

[9] Apple, "App Store Subscription Pricing," December 2016, available at https://web.archive.org/web/20171222223003/https://developer.apple.com/app-store/subscriptions/App-Store-Subscription-Pricing.pdf.

4

*EXHIBIT 1*
*App Store Price Points*

| Paid App and In-App Purchase Price Points[1] | | Auto-Renewable Subscription Price Points[1][2] | |
| --- | --- | --- | --- |
| Range | Increment | Range | Increment |
| $0.99 – $49.99 | $1.00 | $0.49 – $29.99 | $0.50 |
| $49.99 – $99.99 | $5.00 | $29.99 – $124.99 | $1.00 |
| $99.99 – $249.99 | $10.00 | $124.99 – $299.99 | $5.00 |
| $249.99 – $499.99 | $50.00 | $299.99 – $329.99 | $30.00 |
| $499.99 – $999.99 | $100.00 | $329.99 – $349.99 | $20.00 |
| – | – | $349.99 – $499.99 | $50.00 |
| – | – | $499.99 – $999.99 | $100.00 |

Source: Equinux, "A Better App Store Pricing Matrix - Equinux," available at http://www.equinux.com/us/appdevelopers/pricematrix.html; Apple App Store, "Offering Subscriptions," available at https://web.archive.org/web/20170211170257/https://developer.apple.com/app-store/subscriptions/.

Note:
[1] Price points are grouped based on their price tier increments.
[2] The additional price points for auto-renewable subscriptions were added in September 2016.

13. Plaintiffs allege that "Apple has engaged in an anticompetitive scheme to monopolize the aftermarket for iOS applications" and that "Apple has succeeded in totally eliminating any and all competition in that multibillion dollar market."[10] Plaintiffs further allege that they have "been injured by Apple's anticompetitive conduct because they paid more for their iOS apps than they would have paid in a competitive market."[11]

14. In their complaint, Plaintiffs make limited mention of Apple's price tiers and their competitive effects, and do not explicitly explain how Apple's price tiers allegedly cause anticompetitive harm. Plaintiffs allege that Apple "controls what prices developers can charge . . . by insisting that every paid app be priced in dollar increments at $0.99, $1.99, $2.99, and so forth."[12] Plaintiffs also claim that, because Apple requires developers to select prices for their apps that end in 99 cents, developers are required to increase prices in one-dollar increments, which Plaintiffs allege "allows only for very blunt price adjustments because '[t]he vast majority

---

[10] Order Granting Stipulation for Leave to File Third Amended Consolidated Class Action Complaint, *In Re iPhone Antitrust Litigation*, September 17, 2020 ("Third Amended Complaint") ¶¶ 4, 5.
[11] Third Amended Complaint ¶ 53.
[12] Third Amended Complaint ¶ 11.

5

of [paid] apps are priced at 99 cents.'  Thus, a developer wishing to set a price lower than the Apple-mandated minimum price point must give away the app for free; one wishing to price above that point must at least double the $0.99 price."[13]  Plaintiffs do not mention, however, that the ███████████████ of all app downloads are in fact priced at $0.[14]

15.     In his Initial Report, Plaintiffs' expert, Professor McFadden, opined that Apple's price tier requirement causes developers to charge higher prices than they otherwise would absent the requirement.  Specifically, he claimed that "[c]ommon economic evidence [] provides support to the conclusion that Apple's restricted pricing policies hinder competition among app developers by limiting the force of competition to drive down prices."[15]  As the sole "evidence" to support this claim, Professor McFadden provided a hypothetical example of a paid app sold at $59.99.  The next price tier available below $59.99 is $54.99.  Professor McFadden speculated that while in a world with no price tiers "it would not require fierce competition to drive down its price below $59.99," in the presence of price tiers "the degree of competition that drives down the price of this app by $1 or $2 in a normal competitive market would not be enough to push down the price below $59.99."[16]  Professor McFadden did not discuss whether price tiers could also prevent competitive pressure from pushing prices *above* $59.99.

16.     Similarly, Professor McFadden opined that price tiers interfere with developers' ability to compete because they do not allow for "[i]ncremental price drops [that] can 'test the waters' to see if profits increase and rivals respond."[17]  He speculated, without supporting analysis or empirical evidence, that "[d]ropping a full tier risks a substantial loss and makes response by rivals more likely."[18]  He did not mention or make any claims about whether price tiers also inhibit "testing" *higher* incremental prices.  Finally, Professor McFadden claimed that, in a but-for world with additional available iOS app stores, "Apple would not impose the pricing tier policies on app developers," and that the "Apple App Store, and other competing app stores,

---

[13] Third Amended Complaint ¶ 50.

[14] See my workpapers.  This figure covers the entire time period of the U.S. Storefront App Store Transaction Data, which is July 2008 through April 2022.  In order to account for app downloads that are associated with both a zero price and a non-zero price in the data, this figure reflects the percentage of app download and price combinations that are priced at $0.

[15] McFadden Initial Report ¶ 129.

[16] McFadden Initial Report ¶ 129.

[17] McFadden Initial Report ¶ 162.

[18] McFadden Initial Report ¶ 162.

6

would have difficulty retaining or attracting app developers with such policies in place."[19]  In his Initial Report, Professor McFadden chose to disregard Apple's price tiers and focal-point pricing altogether "for the purposes of developing [his] econometric model."[20]

17.     The Court found that Professor McFadden's Initial Report did not provide foundation for his opinion that "pricing tiers would not exist absent anticompetitive conduct," and that "Professor McFadden's opinion [that Apple's price tier policy is anticompetitive and would not exist in a but-for world] lacks foundation and ignores overwhelming evidence to the contrary."[21]  Instead, the Court found, "overwhelming evidence suggests that developers would choose to price their apps at focal points ending in 99 cents"; Professor McFadden's model "does not provide a reliable method for determining but-for pricing in the presence of focal pricing," despite his admission that he would expect to see focal-point pricing in the but-for world; and Professor McFadden cites "no evidence" or "any other subject matter expert" to "justify his opinion that pricing tiers would not exist absent anticompetitive conduct."[22]  As far as I am aware, since the Court's ruling on the Plaintiffs' initial motion for class certification, Plaintiffs have not disclosed or offered expert testimony from any subject matter expert on the issue of price tiers or focal-point pricing.  Professor McFadden did not state that he was reaffirming his prior opinions regarding price tiers and focal-point pricing in his Second Revised Supplemental Report.[23]

18.     In his Second Revised Supplemental Report, Professor McFadden has offered an update to his original model (his "updated original model").  He has also offered two additional simulations that he claims can "accommodate Apple's tier pricing restrictions or focal pricing, should the Court or the jury find in the merit stage that these practices would persist in the But-For world."[24]  In Section VIII, I discuss Professor McFadden's updated original model and

---

[19] McFadden Initial Report ¶ 162.

[20] McFadden Second Revised Supplemental Report ¶ 85.

[21] Order Denying Plaintiffs' Motion for Class Certification Without Prejudice; Granting in Part and Denying in Part Apple's Daubert Motions to Exclude Testimony of Professor Daniel L. McFadden, *In Re iPhone Antitrust Litigation*, March 29, 2022 ("Class Certification Order"), pp. 11:19–22, 12:14–16.

[22] Class Certification Order, pp. 11:23–12:16.

[23] According to Professor McFadden, one would have to go through his previous reports sentence by sentence to determine whether each opinion he had still holds.  Deposition of Professor Daniel L. McFadden, December 5, 2022, p. 20:1–8.

[24] McFadden Second Revised Supplemental Report ¶ 85.

7

simulations and explain in detail how they fail to accommodate Apple's price tiers and focal-point pricing.

## IV. Summary of Opinions

19.      Based on my analysis of the facts of this case and my expertise, I have reached the following opinions:

20.      **Opinion 1:**  Despite substantial evidence of the prevalence of 99-cent pricing, Professor McFadden has claimed both that "price setting with a final 9 or 99 digit is far from universal" and that "focal pricing behavior is not universal."[25]  To the extent that Professor McFadden is contending that setting prices with a final nine or 99 digit is uncommon, he is incorrect.  The academic literature notes that 99-cent pricing is commonplace, is used across a variety of industries and types of goods, and is frequently employed by firms, even in the absence of any externally imposed requirement to do so.

21.      **Opinion 2:**  Professor McFadden concludes that, absent Apple's price tiers, developers would not adopt prices that end in 99 cents, and would instead adopt lower prices.  This conclusion is unfounded.  Despite admitting that he would expect to see focal-point pricing in the but-for world, Professor McFadden has overlooked the majority of the relevant academic research and instead used arbitrary examples of academic literature featuring lower percentages of 99-cent pricing that do not represent the consensus in the academic literature.  Professor McFadden has offered no reliable basis or common evidence to support his speculative claim that Apple's price tier requirements hinder competition among developers and lead to higher app prices.

22.      **Opinion 3:**  There are many reasons, which are well established in the academic literature, that help explain why sellers often choose 99-cent pricing.  In claiming that Apple's price tiers are anticompetitive, Professor McFadden has ignored the large body of literature that establishes why sellers choose 99-cent prices, including features of consumer behavior such as the left-digit effect and consumer preference for 99-cent pricing.  Professor McFadden has not offered any academic literature that establishes as a general matter that the existence of price

---

[25] McFadden Second Revised Supplemental Report ¶¶ 83, 88.

8

tiers, or 99-cent price tiers specifically, causes prices to be higher than they would be absent such tiers.

23. **Opinion 4:** Professor McFadden has failed to consider the benefits that price tiers can provide, including the cognitive ease they offer consumers. Academic literature suggests that 99-cent prices, as found in Apple's price tiers, can benefit consumers because such prices are familiar and easy to process. Additionally, research shows that same-digit price endings across sellers, as found in App Store developer pricing with Apple's price tiers, make it easier for consumers to compare prices. Finally, Apple's price tiers can also lead to lower prices. In fact, Professor McFadden, in stating that the effect of price tiers "could easily go either way," accepts that price tiers can lead to lower prices. Further, I understand Professor Hitt has opined that, to the extent there was a supracompetitive commission rate charged by Apple to developers (which Professor Hitt has argued there likely was not), both Apple's price tiers and focal-point pricing would likely have helped to prevent many developers from raising prices in response to the allegedly higher commissions.

24. **Opinion 5:** Empirical evidence across a variety of digital goods shows that Apple's price tier requirement does not cause developers to charge higher prices. Moreover, empirical evidence indicates that 99-cent pricing is even more common in the pricing of digital goods than in the physical goods that are generally canvassed in the academic literature, confirming the conclusions found in academic literature. This evidence is summarized in the table below:

9

| Platform(s) | Product | Percentage of Prices Ending in 99 Cents |
|---|---|---|
| Google Play | Paid App Downloads | ███ |
| Google Play | Paid App Download Consumer Amount Spent | |
| Google Play | Number of Paid App Downloads | |
| Google Play | In-App Purchase Products | |
| Google Play | In-App Purchase Consumer Amount Spent | |
| Google Play | Number of In-App Purchases | |
| Amazon Appstore | Paid App Downloads | 89% |
| Samsung Galaxy Store | Paid App Downloads | 52% |
| Digital Game Stores | Games | 93% |
| Game Pricing Aggregator | Games | 71% |
| E-books Providers | E-books | 93%–97% |
| Music Streaming Services | Music Streaming Subscription Products | 100% |
| Entertainment Streaming Services | Entertainment Streaming Subscription Products | 97% |
| Video Goods Providers | Movies and TV Shows | 95%–100% |

25.     Additionally, in 2016, Apple announced the introduction of "expanded price tiers," which included 49-cent tiers for auto-renewable subscriptions sold through the App Store.  My analysis finds that ██ percent of apps with subscription products never utilized the 49-cent tiers for any transaction price for any subscription product.  The apps that did use 49-cent tiers for a given product made ██████ transactions at those price tiers—██████ percent of all subscription transactions associated with these apps were made at prices ending in 49 cents.

26.     **Opinion 6:**  It is likely that Apple's price tiers would have existed even in the but-for world posited by Plaintiffs.  One would therefore need to assess the price tiers' impact on developer pricing choices in the but-for world in order to reliably model any impact and damages.  However, even if one assumes that Apple's price tiers would not have existed in the but-for world, one would still need to account for the likelihood that developers would employ

10

focal-point pricing and use prices ending in 99 cents. Though Professor McFadden agrees that focal-point pricing is common in the real world, he nevertheless asserts that one need not model focal-point pricing to determine impact and damages, pointing to some examples in academic literature that ignore focal-point pricing. This is not a justification for Professor McFadden's failure to incorporate price tiers or focal-point pricing when modeling but-for prices for hundreds of millions of app transactions. Academics often use different models and different assumptions when attempting to answer different questions. Here, the relevant question is what transaction prices individual consumers would have paid for app downloads and in-app purchases (including subscriptions) had Apple adopted a different business model in the but-for world. In my opinion, to reliably model but-for prices, it is necessary to account for the pricing dynamics observed in the real world—in this case, price tiers or focal-point prices. Professor McFadden has failed to do so.

27. **Opinion 7:** Contrary to Professor McFadden's claims in his Second Revised Supplemental Report, he has not provided a way to "accommodate" Apple's price tiers or focal-point pricing. He continues to use his original model, updated since the last report (i.e., his "updated original model") to predict but-for prices *without* accounting for price tiers or focal-point pricing in the actual or but-for worlds. He then claims that applying "simulations" after the fact can turn these but-for prices into new but-for prices that now incorporate either price tiers or focal-point pricing in the but-for world. But his new proposed simulations do not alter his overall approach or allow his updated original model to accurately assess Plaintiffs' theories of harm in the context of price tiers or focal-point pricing. This is because, among other reasons, Professor McFadden does not even purport to predict prices of individual in-app purchase items, instead creating artificial composite prices that are disconnected from Apple's price tiers and that do not result in focal-point prices. Further, Professor McFadden's updated original model and his "simulations" are internally inconsistent with his claims about the impact of price tiers, inconsistent with the way in which pricing works in the real world, and unreliable for assessing the impact of either price tiers or focal-point pricing.

28. A study of the data also shows that neither the pricing inputs nor the pricing outputs (i.e., predicted but-for prices) from either Professor McFadden's updated original model or his simulations properly account for Apple's price tiers. Nor do they reflect the focal-point pricing that would have existed in a but-for world if Apple's price tiers were absent. The data show that

11

both Professor McFadden's updated original model and his simulations generate but-for prices that are untethered from prices observed in the real world.

## V.   The Literature Professor McFadden Cites Does Not Provide Any Reliable Basis or Common Evidence for the Proposition that 99-Cent Pricing Is Not Widespread

29.   In his Second Revised Supplemental Report, Professor McFadden claimed that "price setting with a final 9 or 99 digit is far from universal," that "focal pricing behavior is not universal," and that focal-point pricing "does not figure significantly" in empirical economics.[26] One may not expect every single price for every single good in our economy to be transacted at a price ending in nine or 99 cents.  That said, there is a general consensus in the academic literature, based on substantial empirical evidence, that 99-cent pricing is commonplace, used across a variety of industries, and frequently employed by firms even in the absence of any pricing requirements.  Professor McFadden has ignored most of this academic literature, and instead used limited academic support to reach his opinions regarding the prevalence of 99-cent pricing.

### A.   Academic Literature Shows Firms Commonly Use 99-Cent Pricing

30.   Professor McFadden claimed in his Initial Report that 99-cent price tiers significantly constrain the ability of developers of low-priced apps to reduce prices because "an app developer of a $1.99 app cannot offer a 20 percent or 30 percent temporary price discount."[27]  However, this is not correct.  First, developers could, in fact, offer discounts by moving from $1.99 to $0.99, which would benefit consumers more than a 20 or 30 percent discount.  Second, the idea that the developer of a $1.99 app would necessarily choose to lower price by 20 or 30 percent if a change in price tiers made it possible (e.g., to $1.59 or $1.39) is not supported by the academic literature, which predicts that sellers often choose prices ending in 99 cents.  Academic literature provides substantial evidence that 99-cent pricing is commonplace, used across a variety of industries, and frequently employed by firms even in the absence of any externally imposed

---

[26] McFadden Second Revised Supplemental Report ¶¶ 83, 88.  See also Deposition of Professor Daniel L. McFadden, December 5, 2022, pp. 132:2–133:4.

[27] McFadden Initial Report ¶ 130.

requirements to price at 99 cents. Moreover, as I discuss in this section, due to factors unique to app transaction platforms, 99-cent prices are likely to be even more prevalent with respect to app downloads and in-app purchases than with respect to sales of the physical goods that are usually the focus of academic literature.

31.     A large body of academic work establishes that nine- and 99-ending prices are prevalent across a variety of industries, including in supermarket goods, alcohol, consumer electronics, and media and entertainment. For example, as shown in Exhibit 2, these studies find that nine is the most popular terminal digit, with 33.4 to 95 percent of prices ending with nine cents (with a median of 63.7 percent of nine-ending prices). This share is substantially higher than the 10 percent benchmark that should be expected if price endings were random.[28] Similarly, among these studies, anywhere from two to 91 percent of prices end in 99 cents (with a median of 41 percent of 99-ending prices). This too is significantly higher than the one percent benchmark that should be expected if price endings were random. Professor McFadden's Second Revised Supplemental Report focuses on only two of the papers included in Exhibit 2 below.

---

[28] Daniel Levy et al., "Price Point and Price Rigidity," *Review of Economics and Statistics,* 93(4), 2011, pp. 1417–1431 at p. 1419.

13

**EXHIBIT 2**
***Percentage of Prices Ending in X9 or 99 Cents in the Academic Literature,*** *By Category of Goods*

| No. | Paper[1] | Country | Period | Category | Price Range | Percentage of Prices Ending in X9 Cents | Percentage of Prices Ending in 99 Cents |
|---|---|---|---|---|---|---|---|
| | | | | | Median | 63.7% | 42.0% |
| | | | | | Minimum | 33.4% | 2.0% |
| | | | | | Maximum | 95.0% | 91.0% |
| 1 | Twedt (1965) | U.S. | 1965 | Supermarket Goods[3] | Not reported | 64.0% | - |
| 2 | Twedt (1965) | U.S. | 1965 | Supermarket Goods | Not reported | 57.0% | - |
| 3 | Stiving and Winer (1997) | U.S. | Over 2.4-year period | Supermarket Goods | Prices below $1 | 50.5% | - |
| 4 | Stiving and Winer (1997) | U.S. | Over 2.6-year period | Supermarket Goods | Prices below $1 | 36.1% | - |
| 5 | Levy et al. (2011) | U.S. | 1989–1997 | Supermarket Goods | Prices below $30 | 69.0% | 15.0% |
| 6 | Knotek (2019) | U.S. | 1989–1997 | Supermarket Goods | Not reported | 63.6% | - |
| 7 | Schindler (2001) | U.S. | 02.1997–03.1997 | Supermarket Goods | Median price is $13.72 | - | 56.8% |
| 8 | Knotek (2019) | U.S. | 2001–2011 | Supermarket Goods | Not reported | 63.7% | - |
| 9 | Knotek (2019) | U.S. | 2001–2011 | Supermarket Goods | Not reported | 75.0% | - |
| 10 | Anderson et al. (2015) | U.S. | 2005–2009 | Supermarket Goods | Not reported | 95.0% | 48.0% |
| 11 | Strulov-Shlain (2022) | U.S. | 2006–2019 | Supermarket Goods | Average price is below $5 | 69.0% | 32.0% |
| 12 | Strulov-Shlain (2022)[2] | U.S. | 2006–2019 | Supermarket Goods | Average price is below $5 | 87.0% | 41.0% |
| 13 | Ater and Gerlitz (2017) | Israel | 03.2013–11.2013 | Supermarket Goods | Not reported | 60.0% | 42.0% |
| 14 | Snir et al. (2017) | Israel | 07.2013–08.2013 | Supermarket Goods | Not reported | 72.0% | 60.0% |
| 15 | Conlon and Rao (2020) | U.S. (Louisiana) | 2006–2016 | Alcohol[4] | Average price is $18–$23 | - | 78.0% |
| 16 | Conlon and Rao (2020) | U.S. (Illinois) | 2006–2016 | Alcohol | Average price is $16–$20 | - | 80.0% |
| 17 | Conlon and Rao (2020) | U.S. (Connecticut) | 2006–2016 | Alcohol | Average price is $23–$24 | - | 91.0% |
| 18 | Lee et al. (2009) | U.S. | 2000s (two-year period) | Consumer Electronics[5] | Prices up to $3,670 | 38.7% | 30.0% |
| 19 | Levy et al. (2011) | U.S. | 2003–2005 | Consumer Electronics | Prices up to $6,000 | 33.4% | 26.7% |
| 20 | Hackl et al. (2014) | Austria | 2007 | Consumer Electronics | Average price is €402.3 | - | 2.0% |
| 21 | Lee et al. (2009) | U.S. | 2000s (two-year period) | Media and Entertainment[6] | Average price is $13.46 | 51.3% | 33.8% |
| 22 | Lee et al. (2009) | U.S. | 2000s (two-year period) | Media and Entertainment | Average price is $27.07 | 46.6% | 30.0% |
| 23 | Lee et al. (2009) | U.S. | 2000s (two-year period) | Media and Entertainment | Average price is $29.84 | 69.3% | 65.7% |
| 24 | Chenavaz et al. (2017) | U.S. | 03.2016–05.2016 | Books[7] | Prices below $30 | - | 30.6% |

Note:

[1]  Rows in **red** represent papers and statistics cited in McFadden Second Revised Supplemental Report.
[2]  This row reports statistics from the cleaned sample, while row 11 reports statistics from the full sample.
[3]  Supermarket Goods include grocery and drugstore goods.
[4]  Alcohol includes spirits.
[5]  Consumer Electronics include CDs, DVDs, PCs, software, digital camera, monitors, and hard drives.
[6]  Media and Entertainment include CDs, DVDs, and video games.
[7]  Books include hardcover and paperback books, e-books, and audiobooks.

32.    While academic research shows a high prevalence of 99-ending prices, some researchers have also noted that, due to the manner in which data is collected, the prevalence of such prices is in reality even higher than the research shows.[29]  For example, Strulov-Shlain (2022) studied the prevalence of different price points and argued that an analysis should be based off of "exact" prices paid in-store.[30]  However, retail scanner datasets, which are commonly used in these studies, often utilize weekly *average* prices.  Weekly average prices can misrepresent the prevalence of 99-cent prices in at least two ways.  First, if almost all prices for a product in a

---

[29] Avner Strulov-Shlain, "More than a Penny's Worth: Left-Digit Bias and Firm Pricing," *The Review of Economic Studies*, 2022, pp. 1–34; Edward S. Knotek, "The Roles of Price Points and Menu Costs in Price Rigidity," *Federal Reserve Bank of Cleveland Working Paper 19-23*, 2019, pp. 1–53, available at https://www.clevelandfed.org/publications/working-paper/2019/wp-1923-price-points-menu-costs-price-rigidity.

[30] Avner Strulov-Shlain, "More than a Penny's Worth: Left-Digit Bias and Firm Pricing," *The Review of Economic Studies*, 2022, pp. 1–34 at p. 6.

14

week ended in 99 cents, but a small number of sales (or even one sale) did not, the weekly average could be calculated to be a non-99-cent price.  Second, even if all prices for a product in a week ended in 99 cents, if some were higher and some lower (i.e., some $2.99 and some $1.99), the weekly average could be calculated to be a non-99-cent price.[31]  Strulov-Shlain (2022) conducted extensive data cleaning procedures in order to address this underlying concern, and after doing so, found that the share of nine-ending prices for supermarket goods increased from 69 to 87 percent, and the share of 99-ending prices increased from 32 to 41 percent.[32]

33.      Further, compared to some of the types of goods studied in the academic literature, the share of 99-ending prices should likely be even higher in the context of sales through app transaction platforms.  This is because apps are digital goods that are generally lower in cost.  As shown in Exhibit 3, when app downloads are priced above zero, the average price of a paid app download is $2.82, with over half (63 percent) of these transactions priced at $0.99 or $1.99.  The cost of subscription and non-subscription in-app purchases is also generally low.  As shown in Exhibit 4, the average price of a non-subscription in-app purchase is $8.72, with over half of these transactions priced between $0.99 and $3.99.  As shown in Exhibit 5, the average price of a subscription in-app purchase in the App Store is $11.27, with over half of these transactions priced between $0.49 and $7.99.

---

[31] Avner Strulov-Shlain, "More than a Penny's Worth: Left-Digit Bias and Firm Pricing," *The Review of Economic Studies,* 2022, Online Appendix, pp. 1–38 at pp. 11–12.

[32] Avner Strulov-Shlain, "More than a Penny's Worth: Left-Digit Bias and Firm Pricing," *The Review of Economic Studies*, 2022, pp. 1–34 at p. 8.  Knotek (2019) controls for this potential to have non-9-cent prices (due to averaging) by restricting the analysis to the prices of goods for which only one unit was sold in a given week, and finds that there are much higher frequencies of nine-ending prices.  Doing so increases the share of prices ending in nine from 63.7 to 78.3 percent for grocery goods and from 75 to 85.6 percent for drugstore goods.  See also Edward S. Knotek, "The Roles of Price Points and Menu Costs in Price Rigidity," *Federal Reserve Bank of Cleveland Working Paper 19-23*, 2019, pp. 1–53 at pp. 6–7, available at https://www.clevelandfed.org/publications/working-paper/2019/wp-1923-price-points-menu-costs-price-rigidity.

*EXHIBIT 3*
**Distribution of Transaction Prices for App Store Paid App Downloads, *2008–2022***

Percent of
Transactions



Source: U.S. Storefront App Store Transaction Data.

Note: This analysis is restricted to transactions of paid app downloads with a price greater than zero. Transactions where Apple is the developer are excluded. See Hitt Second Report, Appendix 7 for details regarding Apple Transaction Data processing.

16

**SER-624**

*EXHIBIT 4*

*Distribution of Transaction Prices for App Store Paid Non-Subscription In-App Purchases, 2009–2022*



Source: U.S. Storefront App Store Transaction Data.

Note: This analysis is restricted to transactions of non-subscription in-app purchases with a price greater than zero. Transactions where Apple is the developer are excluded. Non-subscription in-app purchases were not available on the App Store until 2009. See Hitt Second Report, Appendix 7 for details regarding Apple Transaction Data processing.

17

*EXHIBIT 5*

*Distribution of Transaction Prices for App Store Paid Subscription Products, 2011–2022*



Source: U.S. Storefront App Store Transaction Data.

Note: This analysis is restricted to transactions of subscription products with a price greater than zero. Transactions where Apple is the developer are excluded. Subscription products were not available on the App Store until 2011. See Hitt Second Report, Appendix 7 for details regarding Apple Transaction Data processing.

34. Academic literature has shown that some lower-priced goods are more likely to have prices ending with nine and 99 cents.[33] In particular, Lee et al. (2009) studied price endings for consumer electronics, for example, and found that the share of prices ending with nine cents was almost twice as high when prices were below $10 (48.7 percent) than when prices were between $100 and $1,000 (only 25.3 percent).[34] Similarly, they found that 99-cent pricing was most common for categories of goods that tend to have lower prices, such as music CDs (33.8

---

[33] Dongwon Lee et al., "Image Effects and Rational Inattention in Internet-Based Selling," *International Journal of Electronic Commerce*, 13(4), 2009, pp. 127–165.

[34] Dongwon Lee et al., "Image Effects and Rational Inattention in Internet-Based Selling," *International Journal of Electronic Commerce,* 13(4), 2009, pp. 127–165 at p. 140.

18

percent), movie DVDs (30.0 percent), and video games (65.7 percent).[35] These results are consistent with findings in the literature that consumers tend to ignore cent digits when making lower priced purchases.[36]

35. These empirical findings are also consistent with the theoretical literature finding that firms would generally be expected to set prices ending in 99 cents. According to Basu (2006), when all firms charge the same 99-cent-ending price, consumers ignore the cents digits of the price.[37] This means that firms do not have a strong incentive to deviate from 99-ending prices (either up or down). If a firm were to increase the price, consumers would notice the higher dollar price charged and purchase less from that firm. On the other hand, if a firm were to lower the price (by less than a dollar), consumers would not notice the change in price and hence it would not lead them to purchase more from the firm. The lower price would then have the effect of lowering the firm's profits.[38] Therefore, in general, firms would not be incentivized to move away from 99-ending prices.[39] Strulov-Shlain (2022), the paper cited by Professor McFadden, also found that consumers partially ignore the cents digits of prices. He found that the "optimal" pricing model predicts an "excess mass" of prices ending with 99 cents, and in fact, for given model parameters, predicts that all prices should end with 99 cents.[40]

### B. Professor McFadden Has Selected Arbitrary Examples of Low Percentages of 99-Cent Pricing to Support His Unfounded Assertions

36. As discussed in the previous section, academic literature both demonstrates that firms commonly use 99-cent pricing, and predicts why firms would be expected to use 99-cent pricing.

---

[35] Dongwon Lee et al., "Image Effects and Rational Inattention in Internet-Based Selling," *International Journal of Electronic Commerce,* 13(4), 2009, pp. 127–165 at p. 141. The paper also reported that $9 and $99 ended prices were more common for expensive goods. For example, 53.7 percent of prices above $1000 end at $9, and 51.8 percent of prices for the most expensive category end at $99. See Dongwon Lee et al., "Image Effects and Rational Inattention in Internet-Based Selling," *International Journal of Electronic Commerce,* 13(4), 2009, pp. 127–165 at pp. 143–145.

[36] Kaushik Basu, "Consumer Cognition and Pricing in the Nines in Oligopolistic Markets," *Journal of Economics & Management Strategy*, 15(1), 2006, pp. 125–141 at p. 130.

[37] Professor McFadden also acknowledges the Basu (2006) findings. See McFadden Second Revised Supplemental Report ¶ 82 (". . . consumers completely ignore the final digits of prices because they find it costly in a cognitive sense to process the exact price, leading firms to set prices ending in 9.").

[38] Kaushik Basu, "Consumer Cognition and Pricing in the Nines in Oligopolistic Markets," *Journal of Economics & Management Strategy*, 15(1), 2006, pp. 125–141 at p. 128.

[39] Kaushik Basu, "Consumer Cognition and Pricing in the Nines in Oligopolistic Markets," *Journal of Economics & Management Strategy*, 15(1), 2006, pp. 125–141 at pp. 134–135.

[40] Avner Strulov-Shlain, "More than a Penny's Worth: Left-Digit Bias and Firm Pricing," *The Review of Economic Studies*, 2022, pp. 1–34 at pp. 18–20.

19

Professor McFadden admitted that he has not done any academic work on the subject of left-digit effect, and has not "personally" done a search of academic literature on left-digit effect.[41] Instead, Professor McFadden cited just two papers out of the many that exist in the literature. See Exhibit 2 above. And the two papers he cites do not represent the consensus in the academic literature regarding the widespread use of 99-cent pricing by firms.

37. Professor McFadden cited Hackl et al. (2014)[42] for the proposition that "data . . . shows that 98 percent of prices end in values other than 99 cents and at least 64 percent of prices end in a last non-zero digit other than 9."[43] This paper, however, focused on much higher-priced products than those sold in the App Store (and those discussed in other academic studies), and thus, not surprisingly, reported a much lower share of prices ending with 99 cents than the general literature. See Exhibit 2 above.

38. Specifically, Hackl et al. (2014) focused on consumer electronics sold by online retailers, most of which are high-priced products (the average price was €403.2 for all products studied). The authors intentionally excluded any product whose average price was below €25. As discussed above, academic literature explains that expensive goods are less likely to have nine- and 99-cent endings. The authors acknowledged this fact and stated that "[f]or more expensive products . . . unit digits should be irrelevant for the consumer decision."[44] In fact, they reported that 21 percent of prices had the last euro digit of nine (e.g., €199.00), significantly higher than the portion of prices that ended in 99 cents.[45] The findings in this paper are consistent with the broader academic literature. The authors found support for the left-digit effect, and found that

---

[41] Deposition of Professor Daniel L. McFadden, December 5, 2022, pp. 130:16–131:10 ("Q. Have you done any academic work on the subject of left digit bias? A. No. I've done work on the impact of tier pricing and the impact of tier pricing on – on markets, but I have not investigated left digit bias. Q. And you indicated, I think, that you believe there is only one subject matter expert on left digit bias in the world? Is that – did I hear that right? A. No, I – I – I – that was perhaps facetious. That's the only piece of literature that I'm aware of where the term is – is even used, but I haven't searched that literature comprehensively. Q. Okay. Have you searched that literature even less than comprehensively? Have you looked for any articles other than the one you cite? A. I have not personally done a Google search on left digit bias.").

[42] Frank Hackl, Michael E. Kummer, and Rudolf Winter-Ebmer, "99 Cent: Price Points in e-Commerce," *Information Economics and Policy*, 26, 2014, pp. 12–27.

[43] McFadden Second Revised Supplemental Report ¶ 83.

[44] Frank Hackl, Michael E. Kummer, and Rudolf Winter-Ebmer, "99 Cent: Price Points in e-Commerce," *Information Economics and Policy*, 26, 2014, pp. 12–27 at p. 9.

[45] Frank Hackl, Michael E. Kummer, and Rudolf Winter-Ebmer, "99 Cent: Price Points in e-Commerce," *Information Economics and Policy*, 26, 2014, pp. 12–27 at p. 20.

20

consumers tend to ignore the cent digits in lower-priced items, and both the cent digits and the last dollar or euro digit in higher-priced items.[46]

39.      Professor McFadden has also omitted some of the key findings of the other paper he cites, Strulov-Shlain (2022).  Professor McFadden stated that the author found that "68 percent of prices end in values other than 99, and up to 31 percent of prices end in a value other than 9."[47]  In other words, he stated that the author found that 32 percent of prices end with 99 cents, and 69 percent of prices end with nine cents.  But these statistics are derived from the uncleaned sample of the author's dataset, which can result in *underreported* shares of nine- and 99-ending prices.[48]  As discussed above, the authors reported that a more accurate finding came after extensive dataset cleaning, in which the share of nine-ending prices increased from 69 to 87 percent and the share of 99-ending prices increased from 32 to 41 percent.[49]

40.      As discussed above, there exists substantial evidence in the academic literature of the prevalence of 99-cent pricing generally.  The academic literature notes that 99-cent pricing is commonplace, is used across a variety of industries and types of goods, and is frequently employed by firms.  Professor McFadden has highlighted only evidence that supports his conclusion that developers likely would not adopt 99-cent pricing in a but-for world without Apple's price tiers, while omitting the substantial evidence and literature that cuts against that conclusion.

---

[46] Frank Hackl, Michael E. Kummer, and Rudolf Winter-Ebmer, "99 Cent: Price Points in e-Commerce," *Information Economics and Policy*, 26, 2014, pp. 12–27 at p. 12.

[47] McFadden Second Revised Supplemental Report ¶ 83.

[48] Avner Strulov-Shlain, "More than a Penny's Worth: Left-Digit Bias and Firm Pricing," *The Review of Economic Studies*, 2022, pp. 1–34 at p. 8.  Professor McFadden has cited a working paper version of the article.

[49] Avner Strulov-Shlain, "More than a Penny's Worth: Left-Digit Bias and Firm Pricing," *The Review of Economic Studies*, 2022, pp. 1–34 at p. 8.

21

**VI.** **Plaintiffs Provide No Common or Reliable Empirical Evidence Demonstrating that Apple's Price Tier Policy Causes Developers to Charge Higher Prices**

    **A.** **Professor McFadden's Original Opinion that Price Tiers Necessarily Lead to Higher Prices Is Not Based on Empirical Analysis or Academic Research**

41. Professor McFadden offered speculative and unsupported opinions in his Initial Report that Apple's price tier requirement hinders competition among developers and leads to higher app prices. He has provided *no* evidence that Apple's price tier requirement has led a single developer to charge higher prices—and certainly no common evidence that price tiers lead developers in general to charge higher prices. In fact, as I explain below, there is no common or reliable empirical evidence supporting this notion.

42. Developers are able to both raise and lower prices in the presence of price tiers–prices simply must be raised or lowered to the next price tier. Additionally, as I discuss below, prices that end in 99 cents, as required by Apple's price tiers, are focal-point prices that are commonly chosen by sellers and preferred by buyers, even in the absence of any requirement to do so. As Professor McFadden has previously acknowledged, one would expect to see focal-point pricing even in the absence of price tier requirements.[50]

43. To show that Apple's price tiers are anticompetitive, I understand that Professor McFadden must at least show that price tiers cause developers to raise prices and not lower them. Yet he has not attempted to perform such an analysis. Take Professor McFadden's hypothetical example of a paid app currently priced at $59.99, as described above. Under Apple's current price tiers, the next available lower price is $54.99. But Professor McFadden has offered no quantification of the level of competitive pressure that would lead the hypothetical app to be priced at $59.99 rather than $54.99. Nor has he addressed the possibility that the presence of price tiers caused the developer of this hypothetical app to drop the price to $59.99 from a higher price that the developer would otherwise have charged. He also has not offered any evidence of the competitive pressure that would cause the developer to want to (a) lower app prices, but by less than that allowed by the price tiers, or instead (b) raise app prices, but by less than that allowed by the price tiers.

---

[50] Deposition of Professor Daniel L. McFadden, November 5, 2021, p. 152:11–13.

22

44.     Moreover, Professor McFadden has not offered any actual evidence of the existence of apps that might have maintained higher prices due to the price tier requirement.  He also has not explored the possibility that price tiers could lead developers to offer *larger* (rather than smaller) discounts than they otherwise would have.  Professor McFadden has not even acknowledged that it is possible for developers to choose not to *raise* prices because they do not want to go up to the next available tier.[51]

45.     Further, Professor McFadden's hypothetical $59.99 app, with a $5.00 gap between tiers, is not representative of the majority of apps on the App Store.  As shown in Exhibits 3–5 above, the vast majority of transactions occur at prices where the required price tiers are one dollar (rather than five dollars) apart.[52]  The average price of a paid app is $2.82 (with over half of transactions priced at $0.99 or $1.99); the average non-subscription in-app-purchase price is $8.72 (with over half of transactions priced between $0.99 and $3.99); and the average subscription in-app purchase price is $11.27 (with over half of transactions priced between $0.49 and $7.99).  $59.99 is in the far right tail of the distribution of prices, with almost all paid app downloads (99.95 percent) priced lower than $59.99.[53]  It is thus an extreme outlier among real-world price data on the App Store.

46.     Professor McFadden's claim that, as a result of Apple's price tiers, developers are unable to offer temporary price discounts to "test the waters" regarding potential price decreases is equally unsupported.  He has offered no evidence—much less common evidence—that developers would necessarily risk "a substantial loss" were they to temporarily reduce prices

---

[51] In his Reply Report, Professor McFadden claimed that "Apple's internal documents also highlight the shortcomings of its tier pricing policy."  See McFadden Reply Report ¶ 290.  The document to which he refers discusses the way in which app developers are able to set prices on the App Store across different countries, consistent with Apple's price tiers.  See APL_APPSTORE_10342115–2233 at APL_APPSTORE_10342137.  This document does not provide any insight into the expectation of how developers would price in the absence of Apple's price tiers.  As such, this document is uninformative in assessing whether price tiers are anticompetitive.  It provides no evidence contrary to the empirical and academic support presented in this report, which shows that developers would be likely to utilize 99-cent pricing even in the absence of Apple's price tiers.

[52] For non-subscription purchases, Apple's price tiers are spaced at one-dollar increments ending at 99 cents until $49.99, at which point they are in five-dollar increments.  Ninety-nine percent of paid app downloads are at prices below $49.99 and 96 percent of non-subscription in-app purchases are at prices below $49.99.  For subscription purchases, Apple's price tiers are 50 cents apart, with both prices ending in 49 cents and 99 cents until $29.99, at which point they are in one-dollar increments (e.g., $29.99, $30.99, . . .).  Ninety-four percent of subscription in-app purchases are at prices below $29.99.  These prices are in one-dollar increments from $29.99 until $129.99, at which point they are in five-dollar increments (e.g., $129.99, $134.99, . . .).  Ninety-nine percent of subscription in-app purchases are at prices below $129.99.  See my workpapers.

[53] Similarly, 97.6 percent of non-subscription in-app purchases and 98.1 percent of subscription purchases are priced lower than $59.99.  See my workpapers.

23

along the price tiers, rather than implement some other unspecified reduction that would be possible without tiers. Professor McFadden has not studied the actual considerations, behaviors, or pricing decisions of developers in this regard. As described above, in the presence of price tiers, developers may end up testing *larger* discounts than they otherwise would have *without* a substantial risk to profit. Furthermore, following Professor McFadden's logic, if price tiers did stop developers from "testing" small temporary price declines, price tiers would also be expected to stop developers from "testing" small temporary price *increases*. Finally, Professor McFadden's claim assumes a world where app developers would make frequent small price changes, but this does not reflect the industry context. Though constant, fluid price movements may be present in certain industries (e.g., gas prices or airline tickets), Professor McFadden has provided no evidence that this type of price movement occurs for apps or in-app purchases. To that end, Professor McFadden has offered no reliable or common evidence that developers would change their prices more frequently (whether up or down), including to "test the waters," absent Apple's price tier requirement.

47. Professor McFadden's opinions about developers' inability to respond to competitive pressure and offer discounts are also disconnected from his proposed damages model. I understand that Professor Prince has concluded that Professor McFadden's model is unable to show or test the impact of price tiers for a variety of reasons.[54] One of those reasons is that Professor McFadden's model relies on the assumption that every developer sets prices like a *monopolist*.[55] It thus follows that his model has not and cannot test his hypothetical claim that Apple's price tier requirements somehow impact the degree or characteristics of *competition between* developers, including the degree to which they would offer discounts.

48. In summary, I have seen no reliable empirical evidence to suggest that Apple's price tier requirement leads to higher prices, and neither Professor McFadden, nor any other expert, has offered any common or reliable evidence indicating this. Professor McFadden's claims that price tiers necessarily lead to higher prices is without any basis, since he has failed to provide *any* common or reliable support for his conclusions that Apple's price tiers *cause* developers to charge higher prices. As discussed in the sections that follow, extensive academic research and

---

[54] Expert Report of Professor Jeffrey T. Prince, Ph.D., March 10, 2023 ("Prince Second Report"), Section 5.2.
[55] Prince Second Report, Section 2.2.1.

24

empirical evidence support the notion that price tiers would not be expected to generally raise prices.

## B.    Academic Literature Establishes Why Sellers Choose 99-Cent Pricing

49.    For decades, academics have studied the various theoretical reasons why, as discussed above in Section V, sellers so frequently choose 99-cent pricing. As this section explains in detail, there are a number of reasons that contribute to why sellers choose 99-cent pricing, including features of consumer behavior (i.e., left-digit effect, preference for 99-cent pricing) that can lead to increased consumer demand.

50.    First, it is well established in the academic literature that consumers process digits from left to right. This often leads consumers to focus on the leftmost digit and selectively consider or ignore the cent digits of prices (i.e., the "left-digit effect").[56] The "left-digit effect" finds that when a price is reduced by one penny from a zero-ending price to a 99-ending price (e.g., from $3.00 to $2.99), this has a disproportionately large effect on consumers' perception of the price. This may be one reason why sellers choose 99-cent pricing. Indeed, Professor McFadden has acknowledged the existence of "left-digit bias" in his Second Revised Supplemental Report, citing a study that finds consumers "perceiv[ing] changes in left-digits as disproportionately large relative to changes in the right-most digits."[57]

51.    Many studies have validated this effect. For example, Stiving and Winer (1997) used scanner panel data for frequently purchased grocery products to model consumers' preferences and estimated the importance of each digit in a price. The authors found "strong evidence that consumers do not always process all of the numerical information contained in the price."[58]

---

[56] See, e.g., Manoj Thomas and Vicki G. Morwitz, "Penny Wise and Pound Foolish: The Left-Most Digit Effect in Price Cognition," *Journal of Consumer Research*, 32(1), 2005, pp. 54–64. This effect is also referred to as "left-digit bias," "drop-off mechanism," and "truncation." See, e.g., McFadden Second Revised Supplemental Report ¶ 82; Robert M. Schindler and Patrick N. Kirby, "Patterns of Rightmost Digits Used in Advertised Prices: Implications for Nine-Ending Effects," *Journal of Consumer Research*, 24(2), 1997, pp. 192–201; Mark Stiving and Russell S. Winer, "An Empirical Analysis of Price Endings with Scanner Data," *Journal of Consumer Research*, 24(1), 1997, pp. 57–67.

[57] McFadden Second Revised Supplemental Report ¶ 82.

[58] Mark Stiving and Russell S. Winer, "An Empirical Analysis of Price Endings with Scanner Data," *Journal of Consumer Research*, 24(1), 1997, pp. 57–67 at p. 58.

25

Instead, results suggested consumers process digits from left to right and "frequently ignor[e] [the] right-hand digits" of a price.[59]

52.     Thomas and Morwitz (2005) "corroborate[d] Stiving and Winer's (1997) finding" by conducting a series of experiments to "provide a cognitive account of when and why nine-ending prices are perceived to be smaller than a price one cent higher."[60]  Results indicated that the leftmost digit of a price can "exert a relatively greater influence than the other digits" in the price.[61]  The authors determined that, when presented with price options, consumers automatically mentally encode the prices according to the leftmost digit.[62]  A consumer might mentally map the price of $2.99 to $2.00, for example, despite the fact that $2.99 is much closer to $3.00.  This mental mapping exaggerates the difference between $2.99 and $3.00 and causes consumers to underestimate the magnitude of prices ending in 99 cents.[63]  The authors demonstrated that a similar effect did not occur when a price was reduced by one cent while the left digit remains unchanged (e.g., $3.20 to $3.19 or $2.80 to $2.79).[64]  These results demonstrated that lowering a price by one penny, specifically to a 99-ending price, affects consumers' magnitude perceptions when the leftmost digit changes, but does not affect magnitude perceptions when the left digit is unchanged, even if the price still ends in 9.

53.     Additionally, products with 99-cent prices are often perceived as disproportionately less expensive than products with prices one penny higher, another finding that helps explain why sellers choose 99-cent pricing.  For instance, Bizer and Schindler (2005) asked participants to estimate how many units of a particular product they could purchase for 73 dollars.[65]  The price of the product was shown as either ending in 00 or 99.  This study found that "respondents

[59] Mark Stiving and Russell S. Winer, "An Empirical Analysis of Price Endings with Scanner Data," *Journal of Consumer Research*, 24(1), 1997, pp. 57–67 at p. 58.

[60] Manoj Thomas and Vicki G. Morwitz, "Penny Wise and Pound Foolish: The Left-Most Digit Effect in Price Cognition," *Journal of Consumer Research*, 32(1), 2005, pp. 54–64 at pp. 54, 58.

[61] Manoj Thomas and Vicki G. Morwitz, "Penny Wise and Pound Foolish: The Left-Most Digit Effect in Price Cognition," *Journal of Consumer Research*, 32(1), 2005, pp. 54–64 at p. 55.

[62] Manoj Thomas and Vicki G. Morwitz, "Penny Wise and Pound Foolish: The Left-Most Digit Effect in Price Cognition," *Journal of Consumer Research*, 32(1), 2005, pp. 54–64 at p. 55.

[63] In contrast, the authors found no significant difference in consumers' perception of prices that were one penny apart but with the same leftmost digit (e.g., $3.59 vs. $3.60).  See Manoj Thomas and Vicki G. Morwitz, "Penny Wise and Pound Foolish: The Left-Most Digit Effect in Price Cognition," *Journal of Consumer Research*, 32(1), 2005, pp. 54–64 at p. 57.

[64] Manoj Thomas and Vicki G. Morwitz, "Penny Wise and Pound Foolish: The Left-Most Digit Effect in Price Cognition," *Journal of Consumer Research*, 32(1), 2005, pp. 54–64 at p. 58.

[65] George Y. Bizer and Robert M. Schindler, "Direct Evidence of Ending-Digit Drop-Off in Price Information Processing," *Psychology & Marketing*, 22(10), 2005, pp. 771–783 at p. 776.

26

estimated that significantly more items with 99-ending prices could be purchased for a given amount of money than items with the 00-ending prices only one cent higher.  In effect, items with 99-ending prices were thought of as more affordable than those with 00-ending prices."[66] This study found direct evidence that a "substantial proportion of . . . items with 99-ending prices . . . were treated as if their values were up to a dollar less than they actually cost."[67]

54.    As I discuss below, research shows that not only do consumers perceive prices ending with 99 cents as being disproportionately lower than prices one penny higher, but they also are disproportionately more likely to purchase products priced using 99-cent pricing (i.e., relative to both higher and lower prices).

55.    Research has also demonstrated that 99-cent pricing can lead to increased consumer demand, which further explains why sellers might choose 99-cent pricing.  For instance, Schindler and Kibarian (1996) conducted an experiment where consumers were given one of three catalogs containing identical products, the only difference being whether the catalog priced the products ending in 00, 99, or 88.[68]  The catalog that priced products ending in 99 cents resulted in more purchases, higher sales volumes, and purchases with a larger average price than both the 00-ending and the 88-ending catalogs.[69]

56.    Recently, List et al. (2023) confirmed the existence of left-digit effect in the market for ride-hailing services and found that 99-ending prices increased demand for the rides.[70]  First, the authors investigated seven months of data on Lyft rides in the U.S. and observed that customers were more likely to accept the rides with prices that were just below a round number (e.g., $10.99) than the rides with prices just above a round number (e.g., $11.01).  More than that, the rate of accepting rides dropped discontinuously by approximately one percentage point whenever

---

[66] George Y. Bizer and Robert M. Schindler, "Direct Evidence of Ending-Digit Drop-Off in Price Information Processing," *Psychology & Marketing*, 22(10), 2005, pp. 771–783 at p. 780.

[67] George Y. Bizer and Robert M. Schindler, "Direct Evidence of Ending-Digit Drop-Off in Price Information Processing," *Psychology & Marketing*, 22(10), 2005, pp. 771–783 at p. 780.

[68] Robert Schindler and Thomas M. Kibarian, "Increased Consumer Sales Response Through Use of 99-Ending Prices," *Journal of Retailing*, 72(2), 1996, pp. 187–199 at p. 191.

[69] Robert Schindler and Thomas M. Kibarian, "Increased Consumer Sales Response Through Use of 99-Ending Prices," *Journal of Retailing*, 72(2), 1996, pp. 187–199 at p. 192.  Anderson and Simester (2003) conducted a similar catalog experiment, changing the last dollar digit of two-digit prices (e.g., $39, etc.).  They found "conclusive evidence that $9 price endings can increase demand" and suggested that the results could be explained by consumers "'drop[ping]-off' the right-most digits."  See Eric T. Anderson and Duncan I. Simester, "Effects of $9 Price Endings on Retail Sales: Evidence from Field Experiments," *Quantitative Marketing and Economics*, 1, 2003, pp. 93–110 at pp. 94, 105.

[70] John A. List et al., "Left-Digit Bias at Lyft," *Review of Economic Studies*, 2023, pp. 1–74.

27

the price exceeded a whole dollar threshold (e.g., $11.00).[71]  Using this data, List et al. (2023) estimated a significant left-digit effect, finding that passengers perceived a 99-ending price as if "the price was lowered by 50 cents."[72]  Next, the authors conducted a large-scale experiment on the Lyft platform, in which they artificially lowered the prices between $X.00 and $X.09 to a 99-ending price just below $X.00—for example, from $13.00 to $12.99.  The authors found that "lowering prices . . . to just below a round number leads to a significant increase in profit and rides accepted."[73]  More than that, the 99-ending prices had a long-term effect, as users that observed 99-ending prices "were more likely to increase their usage of the Lyft app in the future."[74]

57.     In summary, the existence of the "left-digit effect" explains why consumers perceive 99-cent prices to be disproportionately smaller than a price one cent higher, and research has shown that 99-cent prices can also lead to a substantial increase in demand.[75]  These reasons, which are well established in the academic literature, may help explain why sellers often choose 99-cent pricing.  In claiming that Apple's price tiers are anticompetitive, Professor McFadden has ignored this large body of literature that establishes why sellers choose 99-cent prices.  Further, Professor McFadden has not offered any academic literature that establishes as a general matter that the existence of price tiers causes prices to be higher.

## C.     Apple's Price Tiers Provide Consumers with Benefits, Including Ease of Processing and Improved Price Comparisons

58.     Not only has Professor McFadden failed to demonstrate through reliable empirical analysis or academic research that price tiers necessarily lead to higher prices, he has also failed to consider the benefits that price tiers can provide to consumers—specifically, in the form of the cognitive ease they offer.  Apple's price tier policy utilizes 99-cent prices that are highly familiar to consumers and, thus, easier to process.  It also offers common pricing patterns utilizing same-

---

[71] John A. List et al., "Left-Digit Bias at Lyft," *Review of Economic Studies*, 2023, pp. 1–74 at p. 17.

[72] John A. List et al., "Left-Digit Bias at Lyft," *Review of Economic Studies*, 2023, pp. 1–74 at p. 2.

[73] John A. List et al., "Left-Digit Bias at Lyft," *Review of Economic Studies*, 2023, pp. 1–74 at p. 2.

[74] John A. List et al., "Left-Digit Bias at Lyft," *Review of Economic Studies*, 2023, pp. 1–74 at p. 2.

[75] Robert Schindler and Thomas M. Kibarian, "Increased Consumer Sales Response Through Use of 99-Ending Prices," *Journal of Retailing*, 72(2), 1996, pp. 187–199 at p. 196 ("The size of the 99-ending sales advantage found in this study - 8.0%- is substantial, both theoretically and managerially.").

28

digit endings, which makes it easier for consumers to compare prices. Finally, I understand that Professor Hitt has opined that Apple's price tiers and focal-point pricing would likely have prevented many developers from raising prices in response to the allegedly higher commission rate. These benefits, discussed in detail in the sections below, have been entirely ignored by Professor McFadden.

59. Academic literature suggests that 99-cent prices, as found in Apple's price tiers, can benefit consumers because they are familiar and easy to process. Peev and Mayer (2017), for example, studied consumer perceptions of two different forms of pricing: "just-below" prices (e.g., $4.99) and "precise" prices (e.g., $5.24). They suggested that the widespread presence of 99-ending (i.e., just-below) prices in the marketplace has made those prices familiar to consumers. Additionally, 99-ending prices have been established as a "standard pricing technique."[76] The authors concluded that, as a result of consumer familiarity, 99-ending prices require fewer cognitive resources (or cognitive elaboration), making them easier to process than precise prices that are less common.[77] This finding is in line with well-established results in the literature that familiar objects are "processed faster and more accurately than are unfamiliar objects."[78]

60. Research also shows that same-digit price endings, as found in Apple's price tiers, should make it easier for consumers to compare prices. Hung et al. (2021) investigated how the consistency of price endings affects consumers' price perceptions and purchase intent. They found that in cases where prices ended in the same digit, consumers were able to compute the difference between prices "efficiently," which means that consistency of the last digits of the prices being compared resulted in more fluent processing.[79] The research further concluded that as a result of this more fluent processing, consumers were more aware of the price discount and also had increased intent to purchase.[80]

---

[76] Plamen P. Peev and James Mark Mayer, "Consumer Perceptions of Precise vs. Just-Below Prices in Retail Settings," *Journal of Promotion Management*, 2017, pp. 673–688 at pp. 674–676.

[77] Plamen P. Peev and James Mark Mayer, "Consumer Perceptions of Precise vs. Just-Below Prices in Retail Settings," *Journal of Promotion Management*, 2017, pp. 673–688 at pp. 676, 682–683.

[78] Lester E. Krueger, "Familiarity Effects in Visual Information Processing," *Psychological Bulletin*, 1975, p. 949.

[79] Hui-Hsi Hung et al., "Consistent Price Endings Increase Consumers Perceptions of Cheapness," *Journal of Retailing and Consumer Service*, 61, 2021, pp. 1–11 at p. 7.

[80] Hui-Hsi Hung et al., "Consistent Price Endings Increase Consumers Perceptions of Cheapness," *Journal of Retailing and Consumer Service*, 61, 2021, pp. 1–11 at p. 6.

29

61.    Other work similarly suggests that Apple's price tiers may improve price comparisons, enabling consumers to more easily process pricing and find the best deal. Coulter and Roggeveen (2014), for example, suggested that people's processing fluency of a sequence of numbers is "determined by [the numbers'] degree of commonality," and that deals belonging to the same "approximation sequence" were more "fluently processed."[81] Consumers preferred such deals over deals that were more difficult to process, and were more likely to purchase products whose prices were easier to process.[82]

62.    Easier-to-process price comparisons (e.g., with price tiers like those offered by Apple) also enable consumers to better judge price differences. Consumers were able to more quickly evaluate the price differences between numbers with easy computations (e.g., $3.00 and $4.00) than difficult computations (e.g., $3.96 and $4.97). Moreover, because consumers "misattributed" how easy it was to compute the price difference, they "incorrectly judged the difference to be smaller" when it was more computationally complex, according to Thomas and Morwitz (2009a).[83] Similarly, Thomas and Morwitz (2009b) noted that people "judged the numerical difference to be larger when the left-digit difference is larger (e.g., [$]6.00 minus [$]4.95) than when the left- digit difference is smaller (e.g., [$]6.05 minus [$]5.00)."[84] This means the existence of 99-ending price tiers further enables improved price comparisons, since all prices would have the same left-digit difference (e.g., $4.99 minus $3.99). This research suggests that in the case of Apple's price tier policy, consumers would be faced with pairs of familiar prices (e.g., $1.99 and $2.99) with easy computations, thereby allowing consumers to correctly evaluate the differences in prices.

63.    Not only do Apple's price tiers simplify choice, enabling consumers to more easily process prices, but price tiers can actually lead developers to select lower prices than they otherwise would absent price tiers, thus benefitting consumers. For example, when developers choose between adjacent price tiers, they may choose the lower tier a fraction of the time, which

[81] Keith S. Coulter and Anne L. Roggeveen, "Price Number Relationships and Deal Processing Fluency," *Journal of Marketing Research*, 51(1), 2014, pp. 69–82.

[82] Keith S. Coulter and Anne L. Roggeveen, "Price Number Relationships and Deal Processing Fluency," *Journal of Marketing Research*, 51(1), 2014, pp. 69–82 at p. 80.

[83] Manoj Thomas and Vicki G. Morwitz, "The Ease-of-Computation Effect: The Interplay of Metacognitive Experiences and Naive Theories in Judgments of Price Differences," *Journal of Marketing Research*, 46(1), 2009, pp. 81–91 at p. 86.

[84] Manoj Thomas and Vicki G. Morwitz, "Heuristics in Numerical Cognition: Implications for Pricing," in *Handbook of Pricing Research in Marketing*, (Northampton, MA: Edward Elgar Publishing, 2009), pp. 132–149 at p. 141.

30

benefits consumers.  Therefore, since developers may be unwilling to increase their prices a tier

upwards, Apple's price tiers could provide the additional benefit to consumers of developers

choosing lower prices.  As Justice Gorsuch noted in his dissent in *Apple v. Pepper*, "Apple's 99-

cent rule creates a strong disincentive for developers to raise their prices."[85]  Even Professor

McFadden stated (in his August 2021 deposition) that price tiers can at times cause developers to

choose a lower price than they otherwise would.  Asked whether he had an opinion "as to

whether Apple's price tiers ever result in developer[s] setting prices lower than they otherwise

would in the real world," Professor McFadden said, "I think the answer is that it could easily go

either way"—that is, that Apple's price tiers could cause developers to set either higher or lower

prices.[86]  The price tier that the developer selects, according to Professor McFadden, "would

depend on a calculation of—of how profitable each of the tier points is."[87]

64.      By offering the opinion that there is no economic evidence that price tiers invariably lead

to higher prices, I do not mean to imply that the economic evidence suggests that price tiers

always and inevitably lead to lower prices.  But even Professor McFadden, in stating that the

effect of price tiers "could easily go either way," accepts that price tiers can lead to lower

prices.[88]  Further, I understand Professor Hitt has opined that, to the extent there was a

supracompetitive commission rate charged by Apple to developers (which Professor Hitt has

argued there likely was not), both Apple's price tiers and focal-point pricing would likely have

prevented many developers from raising prices in response to the allegedly higher

commissions.[89]  This is especially true given that, as Professor Hitt explains, digital transactions

have low marginal costs.[90]  Specifically, when marginal costs are low, and when faced with a

commission rate change, many developers would be unlikely to find it profitable to either move

---

[85] Gorsuch, J., Dissenting Opinion, *Apple Inc., Petitioner v. Robert Pepper, et al., On Writ of Certiorari to the United States Court of Appeals for the Ninth Circuit*, Supreme Court of the United States, No. 17-204, May 13, 2019, p. 6.

[86] Deposition of Professor Daniel L. McFadden, August 3, 2021, p. 125:1–15 ("Q. Do you have an opinion as to whether Apple's price tiers ever result in developer setting prices lower than they otherwise would in the real world? A. I haven't analyzed that question specifically.  But I would say this: If you had free hand at setting prices, you can -- you can maximize your profits, and then you would look at what profits you could actually attain if you fell back to one or another tier points and you pick out the one that has the -- has the higher profit.  Now, whether that's a higher price than the optimum -- that is, whether the tier is higher or lower than the optimum price -- I think the answer is it could easily go either way.").

[87] Deposition of Professor Daniel L. McFadden, August 3, 2021, p. 178:1–16.

[88] Deposition of Professor Daniel L. McFadden, August 3, 2021, p. 125:1–15.

[89] Expert Report of Professor Lorin M. Hitt, March 10, 2023 ("Hitt Second Report"), Sections 8.2, 10.1.

[90] Hitt Second Report, Sections 8.1, 8.2.

31

to a different 99-cent price tier, or, in the absence of price tiers, to move to a different 99-cent focal-point price.[91]  Thus, many app developers would be expected to continue to charge the same price in the but-for world (without price tiers) as in the actual world.[92]

65.      Therefore, not only has Professor McFadden failed to demonstrate that price tiers would necessarily result in higher prices, he has also ignored the benefits that price tiers can provide to consumers when facing competing prices.  First, consumers are more familiar with and tend to prefer 99-ending prices, and as a result, those prices are easier to process.  Second, 99-ending price tiers also offer common pricing patterns, utilizing same-digit endings, which makes it easier for consumers to compare prices.  And third, price tiers can lead to lower prices.

## VII.    Contrary to Professor McFadden's Hypothetical and Unsupported Claims, Empirical Evidence Shows that Apple's Requirement that App Developers Set Prices Ending in 99 Cents Does Not Cause Developers to Charge Higher Prices

66.      As discussed above, Professor McFadden has not provided any reliable basis or common empirical evidence for the proposition that 99-cent pricing is not widespread.  In fact, as discussed in Section V, academic literature demonstrates that 99-cent pricing is common.  In my opinion, not only do firms commonly use 99-cent pricing, but empirical evidence on digital goods shows that in a but-for world in which Apple did not impose price tiers, the share of 99-ending prices for apps in the App Store would likely have been even higher than shares shown in the literature.  Contrary to Professor McFadden's unsupported claims, this empirical evidence demonstrates that Apple's requirement that app developers set prices ending in 99 cents does not cause developers to charge higher prices.

67.      First, I study the prices that app developers charge when selling on non-App Store platforms, which do not require prices to end in 99 cents.  This is an obvious and natural comparison to how a developer might choose to price on the App Store in the absence of Apple's price tiers.  I find that developers most often choose prices ending in 99 cents, even absent any requirement to do so.  Second, I find the prices developers charge on Google Play tend to be the same as the prices offered on the App Store, and when they differ, there is no clear pattern of higher prices on the App Store.  Third, I study the prices of a variety of digital goods, including

---

[91] Hitt Second Report, Section 8.2.
[92] Hitt Second Report, Section 8.2.

32

games, e-books, movies, TV shows, and streamed music. (In his deposition, Professor McFadden endorsed a similar approach for how to evaluate the prevalence of focal-point prices.[93])  These findings suggest that prices ending in 99 cents are highly common in the sale of digital goods more broadly.  Fourth, I assess Apple's 2016 introduction of 49-cent price tier options for subscriptions.  This empirical evidence demonstrates that developers tend to prefer prices ending in 99 cents, as the vast majority of developers chose not to utilize prices ending in 49 cents.

68.     This empirical evidence further establishes that even in the absence of a 99-cent price tier requirement by Apple, developers would largely be expected to continue to utilize prices ending in 99 cents.  The available empirical evidence also establishes that when prices are set in an environment that, unlike the App Store, does not require prices to end in 99 cents, and those prices deviate from those on the App Store, those prices are not generally lower than those on the App Store.  This contradicts Professor McFadden's opinion that Apple's requirement that app developers set prices ending in 99 cents causes developers to charge higher prices.  Additionally, the findings of Professor Hitt show that Apple's price tiers and focal-point pricing would likely have prevented many developers from raising prices in response to the allegedly higher commission rate.

### A. Empirical Evidence from Google Play Demonstrates Apple's Requirement that App Developers Set Prices Ending in 99 Cents Does Not Cause Developers to Charge Higher Prices

69.     In this section, I provide evidence that paid app download prices and in-app purchase prices on the App Store and Google Play are most often the same across platforms.  This further demonstrates that there is no common empirical evidence showing that Apple's price tiers cause the prices of apps to be uniformly higher than they otherwise would be.

70.     Google Play is an app transaction platform for Android apps, as the App Store is a transaction platform for iOS apps.  Google Play does not, however, have price tier requirements

---

[93] Deposition of Professor Daniel L. McFadden, December 5, 2022, p. 127:5–19 ("[E]mpirically you have to define what you mean by a focal price and you have to list them out, and then you can go and look at – look at actual pricing at Walmart's or Amazon and – and – or the Google store or wherever there are not tiers fixed in place and ask how prevalent are they.  That's an empirical question.").

33

for developers.[94]  Despite the fact that Google Play allows developers to set prices anywhere from $0.05 to $400.00, developers typically choose to set app prices on Google Play that end in 99 cents.[95]  I have reviewed a snapshot of Google Play data produced by Google in response to a subpoena in this case.  These data contain all paid app downloads on Google Play in the U.S. during the month of January 2022.  As shown in Exhibit 6, ▮ percent of paid apps in this sample have prices ending in 99 cents, while the ▮▮▮▮▮▮▮▮▮▮▮▮ ending is 49 cents, representing ▮ percent of all paid app download prices.  Prices ending in 99 cents are even more prevalent when accounting for sales volume: ▮ percent of revenue and ▮ percent of downloads were associated with prices ending in 99 cents.  In addition to analyzing this sample of Google Play data, I have also analyzed an earlier snapshot of data from analytics company App Annie containing paid app downloads on Google Play in the U.S. as of December 2019.  Similarly, the App Annie data indicate that 73 percent of paid apps on Google Play had download prices ending in 99 cents, while the second most common price ending was 49 cents, representing 18 percent of all paid app download prices.  The data also indicate that 89 percent of revenue and 87 percent of downloads were associated with prices ending in 99 cents.

---

[94] Professor McFadden has conceded that he did not study developer pricing on Google Play, despite the absence of price tier requirements on this transaction platform.  See Deposition of Professor Daniel L. McFadden, August 3, 2021, p. 182:6–18 ("Q. (By Mr. Swanson) Have you studied developer pricing in the Android environment where there are no price tiers? A. I have not.  Q. Do you have any idea whether developers more frequently choose prices that end in 99 in the Google Play Store than otherwise? A. I -- I don't.  I mean, I'm aware that prices that end in 99 cents or -- or some other -- .9 or -- are quite common in the real world and that, presumably, are a -- a business response to consumers' perceptions.  But I don't -- I don't know specifically anything about the Google Store.").

[95] Google Play, "Supported Locations for Distribution to Google Play Users," available at https://support.google.com/googleplay/android-developer/answer/10532353.  This minimum price tier requirement was announced in May 2022.  See TechCrunch, "Google Play Targets Emerging Markets with Prepaid App Subscriptions and More," May 11, 2022, available at https://techcrunch.com/2022/05/11/google-play-targets-emerging-markets-with-prepaid-app-subscriptions-and-more/.

34

*EXHIBIT 6*
**Google Play Paid App Download Summary Statistics**

| Data Source | Percentage with Prices Ending in $X.99 | Percentage with Prices Ending in $X.99 or $X.49 |
|---|---|---|
| Google Play Sample (January 2022) | | |
| Products | | |
| Revenue | | |
| Number of Downloads | | |
| App Annie | | |
| Products | 72.8% | 91.0% |
| Revenue | 88.9% | 95.0% |
| Number of Downloads | 86.8% | 95.0% |

Source: Google Play Data; App Annie Data

Note: The Google Play sample is restricted to paid app downloads in the U.S. in January 2022 with a price greater than zero. Revenue figures for the Google Play sample reflect the total gross consumer amount spent. App Annie data is restricted to paid app downloads in the U.S. with a price greater than zero, and prices are as of 12/31/19.

71. In addition to analyzing the download prices of paid apps, I also reviewed the prices developers charge for in-app purchases for apps downloaded through Google Play. Specifically, I reviewed a snapshot of Google Play data in the U.S. for the month of January 2022, which contains all in-app purchases on Google Play during that month. Exhibit 7 shows that ▮ percent of all in-app products purchased in this sample end in 99 cents. Prices ending in 99 cents are even more prevalent when accounting for sales volume: ▮ percent of both gross consumer amount spent and number of in-app purchases were associated with prices ending in 99 cents. The second most common price ending was 49 cents, representing ▮ percent of all in-app purchase products.

72. Similarly, ▮ percent of subscription products ended in 99 cents. The ▮▮▮▮▮ common price ending for subscription products was 49 cents, representing ▮▮ percent of all subscription products.

35

**SER-643**

*EXHIBIT 7*

SER-644

73.     Analysis of app pricing (both downloads and in-app purchases) on Google Play demonstrates that even when not constrained by required price tiers, a significant majority of app developers still choose to use 99-cent pricing.  Additionally, in the minority of instances when developers choose prices that do not end in 99 cents, their prices tend to cluster around 49 cents which is also a focal price.

74.     In addition to analyzing the price distribution for apps on Google Play, I compared the prices of apps available on both Google Play and the App Store by filtering the App Annie data to paid U.S. apps offered on both Google Play and the App Store under a single unified product ID.  This comparison shows that prices for specific apps are usually the same across the two platforms.

75.     Exhibit 8 shows that 71 percent of the top 100 paid app downloads by revenue and 60 percent of all paid app downloads are priced the same on the App Store and Google Play.  When paid apps are priced differently, there is no observable pattern of higher prices offered on the App Store.  Across all paid apps, a similar percentage are priced higher on the App Store (19 percent) as are priced higher on Google Play (20 percent).  Results are similar for the top 100 paid app downloads: 16 percent are priced higher on the App Store, and 13 percent are priced higher on Google Play.  These results are consistent when accounting for sales volume.

36

*EXHIBIT 8*
**Paid App Downloads on App Store and Google Play Summary Statistics**

|  | App Store Price Equals Google Play Price | App Store Price > Google Play Price | App Store Price < Google Play Price |
|---|---|---|---|
| **Top 100 Apps** | | | |
| Percentage of Apps | 71% | 16% | 13% |
| Percentage of Revenue | 81% | 9% | 11% |
| Percentage of Downloads | 81% | 8% | 10% |
| **All Apps** | | | |
| Percentage of Apps | 60% | 19% | 20% |
| Percentage of Revenue | 78% | 10% | 12% |
| Percentage of Downloads | 77% | 11% | 12% |

Source: App Annie Data

Note: This analysis is restricted to paid app downloads in the U.S. with a price greater than zero. It does not include in-app subscriptions or purchases. Prices are as of 12/31/19. Values reflect the top 100 paid apps based on total revenue. Note that totals may not add up to 100 percent due to rounding.

76.    Where possible, I have also compared the prices of the top 100 in-app purchases (by consumer amount spent) in the sample month of Google Play in-app purchase data provided by Google (described above) to equivalent in-app purchases in the Apple transaction data for the same time period (January 2022).[96] I find that 93 percent of items available for in-app purchase in the sample from Google Play are offered at the same price on the App Store.[97] Thus, the overwhelming majority of in-app purchase prices in this sample are offered at the same price between Google Play and the App Store.

> **B.  Empirical Evidence from the Amazon Appstore and the Samsung Galaxy Store Demonstrate that Apple's Requirement that App Developers Set Prices Ending in 99 Cents Does Not Cause Developers to Charge Higher Prices**

77.    In addition to Google Play, I have reviewed prices of top apps on two other app transaction platforms, the Amazon Appstore and the Samsung Galaxy Store. The Amazon

---

[96] It should further be noted that this mapping analysis to find the equivalent product on the App Store required some judgment given data limitations. Additional detail regarding the mapping of a Google Play in-app purchase product to its equivalent product on the App Store is provided in Appendix D.

[97] This figure represents 93 percent of in-app purchases that I was able to match between the Google Play data and the App Store.

37

Appstore allows apps to be priced at a wide range of price endings, from a minimum price that varies by currency to a universal maximum price of $999.99.[98]  Similarly, the Samsung Galaxy Store allows apps to be priced at a variety of price endings, and the choice set of prices can vary by country/region.[99]  Even though they are not required to end in 99 cents, the prices of top apps on both of these app transaction platforms typically end in 99 cents.

78.      Exhibit 9 shows that, of the top 100 apps on the Amazon Appstore, 89 percent have download prices ending in 99 cents.[100]  When prices do not end in 99 cents, many instead ended in 49 cents.  Similarly, I analyzed the top paid app downloads and the top paid games presented on the Samsung Galaxy Store, since it reports apps and games in separate lists.  Exhibit 10 summarizes the download prices for the top five paid apps in each app category on the Samsung Galaxy Store.  Fifty-two percent of these prices end in 99 cents.  Exhibit 11 summarizes the download prices for each of the top five paid games in each game category (e.g., "Action adventure") on the Samsung Galaxy Store.  Seventy percent of these prices end in 99 cents.[101]

79.      Empirical evidence from these two app transaction platforms demonstrates that the majority of app developers still choose to use 99-cent pricing even when they are not required to do so.  In the minority of instances when developers choose prices that do not end in 99 cents, their prices almost all end in 49 cents.[102]

---

[98] Amazon Appstore, "Step 3: Availability and Pricing," available at https://developer.amazon.com/docs/app-submission/publish-app-availability-pricing.html.

[99] Samsung Galaxy Store Seller Portal, "App Registration," available at https://seller.samsungapps.com/guidePopup.as?numcid=0201030000&localeLanguage=en.

[100] This analysis is restricted to the top 100 paid app downloads on the Amazon Appstore, based on the quantity of units sold.  Prices of these apps were pulled from the Amazon Appstore website on November 14, 2022.  See Amazon, "Best Sellers in Apps & Games," available at https://www.amazon.com/gp/bestsellers/mobile-apps?ref_=appstore_categorynav.  This analysis includes games.

[101] The Samsung Galaxy Store reports top paid apps separate from top games.  The top paid app downloads reflect the top five paid app downloads in each of the 18 app categories on the Samsung Galaxy Store accessed on 11/29/22.  The top paid games reflect the top five paid apps in each of the 16 game categories on the Samsung Galaxy Store accessed on 1/17/23.

[102] In addition to analyzing the price distribution for apps on the Amazon Appstore and the Samsung Galaxy Store, I also attempted to compare the prices on these stores to the prices of what I determined were the same products on the App Store.  However, I was only able to match a small amount of these apps to the App Store.  Specifically, I was only able to match 32 of the 100 top paid app downloads on the Amazon Appstore, seven of the top 89 paid app downloads on the Samsung Galaxy Store, and 12 of the 73 top paid games on the Samsung Galaxy Store.  Given the small sample size, I did not perform this same price analysis for the Amazon Appstore and Samsung Galaxy Store.

38

*EXHIBIT 9*
**Summary of Amazon Appstore Top Paid App Downloads**

| Number of Apps | Percentage of Apps with Prices Ending in $X.99 | Percentage of Apps with Prices Ending in $X.99 or $X.49 |
|---|---|---|
| 100 | 89% | 94% |

Source: Amazon, "Best Sellers in Apps & Games," available at https://www.amazon.com/gp/bestsellers/mobile-apps?ref_=appstore_categorynav.

Note: This analysis is restricted to the top 100 paid app downloads on the Amazon Appstore, based on the quantity of units sold, accessed on 11/14/22. The Amazon Appstore only presents the top 100 paid app downloads on its website.

*EXHIBIT 10*
**Summary of Samsung Galaxy Store Top Paid App Downloads**

| Number of Apps | Percentage of Apps with Prices Ending in $X.99 | Percentage of Apps with Prices Ending in $X.99 or $X.49 |
|---|---|---|
| 89 | 51.7% | 52.8% |

Source: Samsung Galaxy Store.

Note: This analysis is restricted to the top five paid app downloads in each of the 18 app categories on the Samsung Galaxy Store accessed on 11/29/22. The "Transportation" category only lists the top four paid apps.

*EXHIBIT 11*
**Summary of Samsung Galaxy Store Top Paid Games**

| Number of Games | Percentage of Games with Prices Ending in $X.99 | Percentage of Games with Prices Ending in $X.99 or $X.49 |
|---|---|---|
| 73 | 69.9% | 72.6% |

Source: Samsung Galaxy Store.

Note: This analysis is restricted to the top five paid apps in each of the 16 game categories on the Samsung Galaxy Store accessed on 1/17/23. The "Card" category only lists the top four paid apps. The "Music," "Trivia," and "Word" categories only list the top three paid apps.

## C. Empirical Evidence of Pricing of Additional Digital Goods Suggests that Apple's Requirement that App Developers Set Prices Ending in 99 Cents Does Not Cause Developers to Charge Higher Prices

80. In addition to examining prices on other app stores, I also examined pricing of other digital goods, which demonstrates the prevalence of 99-cent pricing for digital goods more

39

broadly, even in the absence of any requirement to use 99-cent pricing.  Specifically, I examined the prices of games, e-books, video (including movies and television), and digital music across a variety of providers.  I selected these goods because, like apps, they are digital products available at relatively low price points and are traditionally purchased online or on mobile devices. Further, these digital goods include the most relevant goods related to the genres that Professor McFadden analyzed (Games, Music and Entertainment).[103]

81.     Among each of these types of goods and across a variety of providers, the findings show that 99-cent pricing is by far the most common:

> A.  Across several game providers, 93.0 percent of top games end in 99 cents and 70.6 percent of all games on a game pricing aggregator website end in 99 cents.
>
> B.  93.3 percent to 97.0 percent of e-book providers' e-book prices end in 99 cents.
>
> C.  100 percent of top music streaming and 96.6 percent of top entertainment streaming services' subscriptions end in 99 cents.
>
> D.  At least 94.9 percent across different types of video goods from several top providers, such as movies to buy and to rent and episodes and seasons of TV shows, have prices ending in 99 cents.

82.     As discussed in greater detail below, this provides further empirical evidence that developers would likely choose prices ending in 99 cents on the App Store even absent a requirement that they do so.[104]

### 1.     99-Cent Pricing is Common for Games

83.     This section demonstrates that across a variety of stores, 99-cent pricing is typical for digital game downloads.

84.     I first directly assessed game prices present on a variety of digital game stores including Epic, Nintendo, PlayStation, Steam, and Xbox.  Exhibits 12A– 12E show the prices of the top-selling games from each store.[105]  As summarized in Exhibit 12, the range of percentages of 99-

---

[103] McFadden Initial Report ¶¶ 210, 229.

[104] Appendix E summarizes the pricing requirements for two-sided platforms included in my analysis.

[105] See Note in Exhibit 12.

40

cent pricing is 88 to 100 percent, while the average is 93 percent.  When the prices do not end in 99 cents, they tend to end in either 49 cents or 0 cents.[106]

---

*EXHIBIT 12*
**Summary of Top Games from Select Stores,** *Percentage of Products with Prices Ending in 99 Cents*

| Platform | Percentage |
|---|---|
| Average | 93.0% |
| Minimum | 87.7% |
| Maximum | 100.0% |
| Epic | 93.8% |
| Nintendo | 92.0% |
| PlayStation | 91.5% |
| Steam | 87.7% |
| Xbox | 100.0% |

Source:  Epic Games, "Top Sellers," available at https://store.epicgames.com/en-US/collection/top-sellers; Nintendo, "Digital Best Sellers," available at https://www.nintendo.com/store/games/best-sellers/; PlayStation, "Best Sellers," available at https://store.playstation.com/en-us/category/877e5ce2-4afc-4694-9f69-4758e34e58cd/1/; Steam, "Top Sellers," available at https://store.steampowered.com/search/?filter=topsellers&ignore_preferences=1; Xbox, "Best Sellers," available at https://www.xbox.com/en-US/games.

Note:  Prices were pulled for the top 100 selling games listed on each store's website.  If a store did not list 100 games in this section, data on the amount of games listed were pulled.  Epic values reflect the top 98 games in its "Top Selling PC Titles" section available to buy accessed on 11/14/22.  Epic Games only presents the top 98 products on its website.  Nintendo values reflect the top 100 games in its "Digital Best Sellers" section available to buy accessed on 11/14/22.  PlayStation values reflect the top 100 games in its "Best Sellers" section avalable to buy accessed on 11/14/22.  Steam values reflect the top 100 games based on revenue in its "Top Sellers" section available to buy accessed on 11/14/22.  Xbox values reflect the top 13 games in its "Best Sellers" section available to buy accessed on 11/14/22.

85.     In addition to collecting and analyzing top games pricing from the game stores directly, I also analyzed data from the game pricing aggregator "Is There Any Deal," which collects prices for a broader set of game stores and games.[107]  Exhibit 13 shows that 99-cent pricing is common for all games (for which data are available) across a range of stores.  For example, 77 percent of games on Steam, the largest PC game store, have prices ending in 99 cents.  Similarly, 74 percent of games on Epic Game Store have prices ending in 99 cents.  Furthermore, 91 percent of games on the Microsoft Store have prices ending in 99 cents.  For all games, for which data

---

[106] See Exhibits 12A–12E.

[107] Is There Any Deal is a third-party pricing aggregator of game prices, allowing consumers to compare pricing from different game stores.  Specifically, I analyze 141,000 games across 34 stores.  This analysis is also restricted to U.S. stores.

41

Case: 25-7930, 06/12/2026, DktEntry: 34.4, Page 154 of 255

are available, the average percentage of prices ending in 99 cents is 71 percent across all stores.[108]

---

[108] Prices reflect the most recent price listed on each store.  This average is weighted by the number of games offered on each store.

**SER-650**

*EXHIBIT 13*
**Summary of Game Prices by Store from 'Is There Any Deal,'** *Percentage of Products with Prices Ending in 99 Cents*

| Store | Percentage |
|---|---|
| Average | 69.9% |
| Weighted Average | 70.6% |
| Minimum | 7.2% |
| Maximum | 96.7% |
| Steam | 77.2% |
| Itch.io | 35.5% |
| Fanatical | 40.5% |
| Humble Store | 84.3% |
| GreenManGaming | 83.1% |
| GamersGate | 87.4% |
| IndieGala Store | 92.5% |
| WinGameStore | 85.5% |
| GameBillet | 7.2% |
| Voidu | 64.6% |
| GOG | 87.2% |
| GamesPlanet US | 57.2% |
| AllYouPlay | 81.4% |
| Dreamgame | 63.0% |
| Newegg | 92.4% |
| Nuuvem | 83.1% |
| DLGamer | 25.4% |
| 2game | 90.2% |
| Gamesload | 55.3% |
| MacGameStore | 87.7% |
| Epic Game Store | 74.2% |
| Direct2Drive | 78.7% |
| Noctre | 78.1% |
| JoyBuggy | 17.1% |
| GamesRepublic | 48.1% |
| GameStop PC | 96.7% |
| Game Jolt | 56.1% |
| eTail.Market | 27.6% |
| Microsoft Store | 91.0% |
| Origin | 88.0% |
| Ubisoft Store | 91.9% |
| Humble Widgets | 78.0% |
| Blizzard | 74.2% |
| Square Enix | 95.0% |

Source: Is There Any Deal, "Is There Any Deal," available at https://isthereanydeal.com/.

Note: Analysis is restricted to the top 141,000 games on 'Is There Any Deal' with available price information on or before 10/24/22. Only the most recent prices for each game across each unique U.S. store were considered. Stores are ordered by the number of games available. The row labeled "average" reflects the simple average of percentages across all stores, while the row labeled "weighted average" reflects the weighted average of percentages across all stores, where weights are the number of games on each stores.

43

### 2. 99-Cent Pricing is Common for E-Books

86.     Ninety-nine-cent pricing is also typical for e-books.  Exhibits 14A– 14C show the prices of the top 100 e-books on Amazon's Kindle Store and Barnes & Noble, and the top 45 on Google Play.[109]  Exhibit 14 shows that overall, between 93 and 97 percent of prices end in 99 cents across providers, with an average of 96 percent.

---

***EXHIBIT 14***
***Summary of Top e-Books from Select Providers,*** *Percentage of Products with Prices Ending in 99 Cents*

| Platform | Percentage |
|---|---|
| Average | 95.8% |
| Minimum | 93.3% |
| Maximum | 97.0% |
| Amazon | 97.0% |
| Barnes & Noble | 97.0% |
| Google Play | 93.3% |

Source:  Amazon, "Best Sellers in Kindle Store," available at https://www.amazon.com/Best-Sellers-Kindle-Store/zgbs/digital-text/ref=zg_bs; Barnes & Noble, "B&N Top 100: Bestselling eBooks," available at https://www.barnesandnoble.com/b/ebooks-nook/_/N-1fZ8qa; Google Play, "Top Selling," available at https://play.google.com/store/books?hl=en_US&gl=US.

Note:  Amazon values reflect the top 100 e-books, based on the quantity of units sold, in its "Best Sellers in Kindle Store" section accessed on 11/14/22.  Barnes & Noble values reflect the top 100 e-books over a six-month period in its "Bestselling eBooks" section accessed on 11/10/22. Google Play values reflect the top 45 e-books in its "Top Selling" section accessed on 10/25/22.  Google Play only presents the top 45 e-books accessed on its website.

---

### 3. 99-Cent Pricing is Common for Digital Music

87.     Ninety-cent pricing is also common for digital music.  The digital music industry is dominated by subscription streaming services, and streaming accounted for 83 percent of the U.S. music industry in 2021.[110]  I reviewed the subscription prices of the available products listed on the websites of the top music streaming services: Spotify, YouTube Music, SoundCloud,

---

[109] Amazon values reflect the top 100 e-books, based on the quantity of units sold, in its "Best Sellers in Kindle Store" section accessed on 11/14/22.  Barnes & Noble values reflect the top 100 e-books over a six-month period in its "Bestselling eBooks" section accessed on 11/10/22.  Google Play values reflect the top 45 e-books in its "Top Selling" section accessed on 10/25/22.  Google Play only presents the top 45 e-books on its website.

[110] Statista, "Distribution of Music Industry Revenue in the United States from 2017 to 2021, By Source," available at https://www.statista.com/statistics/186304/revenue-distribution-in-the-us-music-industry/.

44

Pandora, Amazon Music, SiriusXM, Audiomack, iHeart Radio, Smule, and Sonos.[111]  As shown in Exhibit 15, 100 percent of the products from these music streaming providers have prices ending in 99 cents.

---

[111] To identify these apps, I first identified the top 20 apps in the music genre that were listed on the App Store on 2/24/23. Of these apps, I then only included those that were music streaming apps and listed subscription prices on their website. For example, Shazam is listed in the top 20 of the music genre, but because it is not a music streaming app, it is not included in this analysis.  See my workpapers.

45

*EXHIBIT 15*
*Summary of Top Music Streaming Provider Pricing*

| Rank | App | Subscription | Duration | Website Price | Price Ends in 99 Cents |
|------|-----|-------------|----------|--------------|------------------------|
| | | | | | 100.0% |
| 1 | Spotify - Music and Podcasts | Individual | Month | $9.99 | Y |
| 1 | Spotify - Music and Podcasts | Duo | Month | $12.99 | Y |
| 1 | Spotify - Music and Podcasts | Family | Month | $15.99 | Y |
| 1 | Spotify - Music and Podcasts | Student | Month | $4.99 | Y |
| 2 | YouTube Music | Premium | Month | $9.99 | Y |
| 3 | SoundCloud: Discover New Music | Go | Month | $4.99 | Y |
| 3 | SoundCloud: Discover New Music | Go+ | Month | $9.99 | Y |
| 3 | SoundCloud: Discover New Music | Go+ Student | Month | $4.99 | Y |
| 4 | Pandora: Music & Podcasts | Plus | Month | $4.99 | Y |
| 4 | Pandora: Music & Podcasts | Premium | Month | $9.99 | Y |
| 4 | Pandora: Music & Podcasts | Premium Family | Month | $14.99 | Y |
| 4 | Pandora: Music & Podcasts | Premium Student | Month | $4.99 | Y |
| 4 | Pandora: Music & Podcasts | Premium Military | Month | $7.99 | Y |
| 5 | Amazon Music: Songs & Podcasts | Unlimited | Month | $8.99 | Y |
| 6 | SiriusXM: Music, Sports & News | Streaming Music Showcase | Month | $4.99 | Y |
| 6 | SiriusXM: Music, Sports & News | Streaming Music & Entertainment | Month | $7.99 | Y |
| 6 | SiriusXM: Music, Sports & News | Streaming Platinum | Month | $10.99 | Y |
| 6 | SiriusXM: Music, Sports & News | Music Showcase | Month | $12.99 | Y |
| 6 | SiriusXM: Music, Sports & News | Music & Entertainment | Month | $17.99 | Y |
| 6 | SiriusXM: Music, Sports & News | Platinum | Month | $22.99 | Y |
| 7 | Audiomack - Stream New Music | Premium | Month | $5.99 | Y |
| 8 | iHeart: #1 for Radio, Podcasts | Plus | Month | $4.99 | Y |
| 8 | iHeart: #1 for Radio, Podcasts | All-Access | Month | $9.99 | Y |
| 9 | Smule: Karaoke Music Studio | VIP | Month | $15.99 | Y |
| 9 | Smule: Karaoke Music Studio | VIP | Year | $39.99 | Y |
| 10 | Sonos | Radio HD | Month | $7.99 | Y |

Source: Amazon, "Amazon Music Unlimited," available at https://www.amazon.com/music/unlimited; App Store, "Top Free Music Apps," available at https://apps.apple.com/us/charts/iphone/music-apps/6011; Audiomack, "Start Your Free Trial," available at https://audiomack.com/premium; iHeart, "Upgrade," available at https://www.iheart.com/upgrade?upsellFrom=54; Pandora, "Choose How You Want To Listen," available at https://www.pandora.com/; SiriusXM, "Popular Plans," available at https://www.siriusxm.com/plans?intcmp=Global%20Nav_NA_www:Home_ComparePlans; Smule, "Unlock Deal," available at https://www.smule.com/en/s/billing/pricing/v121; Sonos, "Sonos Radio HD," available at https://www.sonos.com/en-us/sonos-radio; SoundCloud, "SoundCloud Go," available at https://checkout.soundcloud.com/go; Spotify, "Pick Your Premium," available at https://www.spotify.com/us/premium/#plans; YouTube, "YouTube Music," available at https://music.youtube.com/music_premium/musicfeed.

Note: Values reflect all subscription options presented on websites of the top 20 apps in the music genre listed on the App Store accessed on 2/24/23 that also listed subscription prices on their website. Prices reflect the prices shown on the platform's website.

4.  99-Cent Pricing is Common for Video Goods, Including Buying and Renting Movies and TV Shows

88.  99-cent pricing is also common for video goods. Similar to the digital music industry, most paid video content is now accessed via subscription streaming services. In 2021, 90 percent of U.S. video-on-demand revenue came from video streaming.[112] I reviewed the subscription prices of the available products listed on the websites of top streaming services:

---

[112] Statista, "Video-on-Demand," available at https://www.statista.com/outlook/dmo/digital-media/video-on-demand/united-states#revenue.

46

Netflix, Peacock TV, HBO Max, Hulu, Disney+, Amazon Prime Video, Paramount+, and YouTube TV.[113]  As shown in Exhibit 16, 96 percent of the products from these video streaming providers have prices ending in 99 cents.

---

[113] To identify these apps, I first identified the top 20 apps in the entertainment genre listed on the App Store accessed on 2/24/23.  Of these apps, I then only included those that were video streaming services and listed subscription prices on their website.  For example, although TikTok is in the top 20 in the entertainment genre listed on the App Store, it is not a subscription video streaming service and therefore was not included in this analysis.  See my workpapers.

47

*EXHIBIT 16*
*Summary of Top Entertainment Streaming Provider Pricing*

| Rank | App | Subscription | Duration | Website Price | Price Ends in 99 Cents |
|------|-----|--------------|----------|---------------|------------------------|
| | | | | | 96.6% |
| 1 | Netflix | Basic with ads | Month | $6.99 | Y |
| 1 | Netflix | Basic | Month | $9.99 | Y |
| 1 | Netflix | Standard | Month | $15.49 | N |
| 1 | Netflix | Premium | Month | $19.99 | Y |
| 2 | Peacock TV: Stream TV & Movies | Premium | Month | $4.99 | Y |
| 2 | Peacock TV: Stream TV & Movies | Premium | Year | $49.99 | Y |
| 2 | Peacock TV: Stream TV & Movies | Premium Plus | Month | $9.99 | Y |
| 2 | Peacock TV: Stream TV & Movies | Premium Plus | Year | $99.99 | Y |
| 3 | HBO Max: Stream TV & Movies | With Ads | Month | $9.99 | Y |
| 3 | HBO Max: Stream TV & Movies | With Ads | Year | $99.99 | Y |
| 3 | HBO Max: Stream TV & Movies | Ad-Free | Month | $15.99 | Y |
| 3 | HBO Max: Stream TV & Movies | Ad-Free | Year | $149.99 | Y |
| 4 | Hulu: Stream TV & movies | With Ads | Month | $7.99 | Y |
| 4 | Hulu: Stream TV & movies | No Ads | Month | $14.99 | Y |
| 4 | Hulu: Stream TV & movies | Disney Bundle Trio Basic | Month | $12.99 | Y |
| 4 | Hulu: Stream TV & movies | Disney Bundle Trio Premium | Month | $19.99 | Y |
| 4 | Hulu: Stream TV & movies | Hulu + Live TV | Month | $69.99 | Y |
| 5 | Disney+ | Basic | Month | $7.99 | Y |
| 5 | Disney+ | Premium | Month | $10.99 | Y |
| 5 | Disney+ | Duo Basic | Month | $9.99 | Y |
| 5 | Disney+ | Trio Basic | Month | $12.99 | Y |
| 5 | Disney+ | Trio Premium | Month | $19.99 | Y |
| 6 | Amazon Prime Video | Prime Video | Month | $14.99 | Y |
| 7 | Paramount+ | Essential | Month | $4.99 | Y |
| 7 | Paramount+ | Essential | Year | $49.99 | Y |
| 7 | Paramount+ | Premium | Month | $9.99 | Y |
| 7 | Paramount+ | Premium | Year | $99.99 | Y |
| 8 | YouTube TV | Base Plan | Month | $64.99 | Y |
| 8 | YouTube TV | Spanish Plan | Month | $34.99 | Y |

Source:  Amazon, "Prime Video," available at https://www.amazon.com/hp/video/offers/intercept/; App Store, "Top Free Entertainment Apps," available at https://apps.apple.com/us/charts/iphone/entertainment-apps/6016; Disney+, "Choose Your Plan," available at https://www.disneyplus.com/; HBO Max, "Choose A Plan That Works for You," available at https://www.hbomax.com/; Hulu, "Select Your Plan," available at https://www.hulu.com/welcome; Netflix, "Choose the Plan That's Right for You," available at https://www.netflix.com/signup/planform; Paramount+, "Pick Your Plan," available at https://www.paramountplus.com/account/signup/pickplan; Peacock TV, "Pick A Plan.  Cancel Anytime.," available at https://www.peacocktv.com/plans/all-monthly; YouTube, "Choose the Plan That Works for You," available at https://tv.youtube.com/welcome/.

Note:  Values reflect all subscription options presented on websites of the top 20 video streaming apps in the entertainment genre on the App Store accessed on 2/24/23.  Prices reflect the prices shown on the platform's website.

89.    I also analyzed the prices of both movies and TV shows on Google Play, Amazon Prime Video, YouTube, and Vudu, the stores which sell individual movies or TV shows.[114]  Exhibits 17A– 17D attached show the prices of buying and renting top movies.[115]  For example, Exhibit

---

[114] Google Play, Amazon Prime Video, YouTube, and Vudu are four of the most popular online stores that sell individual movies and/or TV shows to consumers, rather than offer a subscription service that offers a range of movies or TV shows. Note that YouTube does not offer individual TV shows.

[115] Amazon values reflect the top 100 movies, based on quantity of units sold, in its "Best Sellers in Movies" section accessed on 11/15/22.  Google Play values reflect the top 45 movies in its "Top Movies" section accessed on 10/25/22. Google Play only presents the top 45 products on its website.  Vudu values reflect the top 100 movies in its "Top 200

48

17B demonstrates that 94.9 percent of rental prices for top movies end in 99 cents, while 100 percent of prices to buy these movies end in 99 cents. These results are similar across other stores. Exhibit 17 summarizes the prevalence of 99-cent pricing for the top movies across providers. For rentals, the proportion of prices ending in 99 cents ranges from 94.9 to 100 percent across providers, resulting in an average of 97.5 percent. For buying movies, all of the top movies have prices ending in 99 cents.

---

***EXHIBIT 17***
***Summary of Top Movies from Select Providers,*** *Percentage of Products with Prices Ending in 99 Cents*

| Platform | Rentals | Buys |
|---|---|---|
| Average | 97.5% | 100.0% |
| Amazon | 97.4% | 100.0% |
| Google Play | 94.9% | 100.0% |
| Vudu | 100.0% | 100.0% |
| YouTube | 97.8% | 100.0% |

Source: Amazon, "Best Sellers in Movies," available at https://www.amazon.com/gp/bestsellers/movies-tv/2858905011; Google Play, "Top Movies," available at https://play.google.com/store/movies?hl=en_US&gl=US; Vudu, "Top 200 Movies," available at https://www.vudu.com/content/movies/uxrow/Top-200-Movies/14028; YouTube, "Top Selling," available at https://www.youtube.com/playlist?list=PLHPTxTxtC0ial7mOT-Srrguvokjvlcbg7.

Note: Amazon values reflect the top 100 movies, based on quantity of units sold, in its "Best Sellers in Movies" section accessed on 11/15/22. Google Play values reflect the top 45 movies in its "Top Movies" section accessed on 10/25/22. Google Play only presents the top 45 products on its website. Vudu values reflect the top 100 movies in its "Top 200 Movies" section accessed on 11/14/22. YouTube values reflect the top 100 movies in its "Top Selling" section accessed on 11/14/22.

---

90. Exhibits 18A–18C show the prices of top TV shows by season and by episode sold through Amazon, Google Play, and Vudu.[116] For example, Exhibit 18B shows that for the top 45 TV shows, 100 percent of seasons and episodes have prices ending in 99 cents. These results are similar across other providers. Exhibit 18 summarizes the prevalence of 99-cent pricing for TV shows across providers.

---

Movies" section accessed on 11/14/22. YouTube values reflect the top 100 movies in its "Top Selling" section accessed on 11/14/22.

[116] Amazon values reflect the top 100 TV shows, based on quantity of units sold, in its "Best Sellers in TV" section accessed on 11/16/22. Prices reflect the most recent season available for each show. Google Play values reflect the top 45 TV shows in its "Top TV Shows" section accessed on 10/25/22. Google Play only presents the top 45 products on its website. Vudu values reflect the top 100 TV show-season combinations in its "Top 200 Television" section accessed on 11/16/22.

49

91.     For seasons, the proportion of prices ending in 99 cents ranges from 99 to 100 percent across providers, resulting in an average of 99.7 percent.  For episodes, all of the top episodes have prices ending in 99 cents.

---

**EXHIBIT 18**
**Summary of Top TV Shows from Select Providers,** *Percentage of Products with Prices Ending in 99 Cents*

| Platform | Per Season | Per Episode |
|---|---|---|
| Average | 99.7% | 100.0% |
| Amazon | 99.0% | 100.0% |
| Google Play | 100.0% | 100.0% |
| Vudu | 100.0% | 100.0% |

Source:  Amazon, "Best Sellers in TV," available at https://www.amazon.com/Best-Sellers-TV/zgbs/movies-tv/2864549011; Google Play, "Top TV Shows," available at https://play.google.com/store/movies/category/TV?hl=en_US&gl=US; Vudu, "Top 200 Television," available at https://www.vudu.com/content/movies/uxrow/Top-200-Television/14029.

Note:  Amazon values reflect the top 100 TV shows, based on quantity of units sold, in its "Best Sellers in TV" section accessed on 11/16/22.  Prices reflect the most recent season available for each show.  Google Play values reflect the top 45 TV shows in its "Top TV Shows" section accessed on 10/25/22.  Google Play only presents the top 45 products on its website.  Vudu values reflect the top 100 TV show-season combinations in its "Top 200 Television" section accessed on 11/16/22.

---

92.     This analysis demonstrates that 99-cent pricing is common for paid video content, including streaming, buying, and renting movies, and purchasing full seasons and individual episodes of TV shows.  The prevalence of 99-cent pricing for this type of digital good offers further support for my opinion that app developers would likely utilize prices ending in 99 cents even absent Apple's price tier requirement.

> **D.     App Developer Behavior after Apple's 2016 Introduction of 49-Cent Price Tiers for In-App Subscriptions on the App Store Further Suggests that Apple's Requirement that App Developers Set Prices Ending in 99 Cents Does Not Cause Developers to Charge Higher Prices**

93.     Empirical evidence from a change in available price tiers within the App Store also shows that, even when presented with alternative pricing options, the majority of developers would continue to price their products ending in 99 cents.  In 2016, Apple announced the introduction of "expanded price tiers" for auto-renewable subscriptions sold through the App

50

**SER-658**

Store.[117]  Starting in September 2016, for prices up to $29.99, Apple allowed developers to choose subscription prices ending in either 49 or 99 cents (i.e., $0.49, $0.99, $1.49…$29.49, $29.99).[118]

94.    As discussed above in Section III, Professor McFadden claimed in his Initial Report that the App Store's price tiers "interfere[] with app developers' ability to compete."[119]  If this were true, one would expect developers to make a substantial shift away from 99-cent pricing and instead make significant use of alternative price tiers when they became available.  Analysis of the App Store transaction data, however, refutes this hypothesis.  Specifically, analysis of the App Store transaction data finds that only a small minority of subscription product developers utilized 49-cent price tiers when they became available.  This suggests that developers would have adopted 99-cent pricing even without Apple's price tier requirement.

95.    In order to examine developers' utilization of the 49-cent tiers, I first analyzed the set of apps that include subscription products (i.e., all apps in the App Store transaction data that contain at least one subscription product within one year before and after the introduction of the 49-cent tier, which became available in September 2016).[120]  By limiting the data to this population, I could examine developers that offered subscription products prior to the time that the 49-cent tier was introduced, as well as shortly thereafter.  These developers had the option to either continue pricing their subscription products at the existing 99-cent price tier or to change the price to one of the new 49-cent tiers.  Although the 49-cent tiers were available for developers to use for all auto-renewable subscriptions, I found that 89 percent of apps with subscription products never utilized the 49-cent tiers for *any* transaction price for a subscription product.[121]

---

[117] Apple App Store, "Offering Subscriptions," available at
https://web.archive.org/web/20170211170257/https://developer.apple.com/app-store/subscriptions/.

[118] The first instance of prices of subscription products ending in 49 cents in the U.S. Storefront App Store Transaction Data is in September 2016.  See also Apple, "App Store Subscription Pricing," December 2016, available at https://web.archive.org/web/20171222223003/https://developer.apple.com/app-store/subscriptions/App-Store-Subscription-Pricing.pdf.

[119] McFadden Initial Report ¶ 162.

[120] I use September 1, 2016 as the introduction of the 49-cent tier, so this sample contains apps that had at least one subscription product in the data between September 1, 2015 and September 1, 2017.

[121] See Exhibit 19.  Note that just because an app is associated with a transaction price ending in 49 cents, it does not mean that all transactions of that app are priced at 49 cents.  An app can contain several subscription options with different price endings.

51

96.     Not only did most developers choose not to utilize prices ending in 49 cents, but when they did, there were very few transactions with that pricing.  Indeed, examining apps in which 49-cent pricing was utilized by developers reveals that only two percent of actual transactions were at prices ending in 49 cents.[122]  This suggests that there was no meaningful increase in consumer demand for subscription products with prices ending in 49 cents.

*EXHIBIT 19*
*Breakdown of Apps and Associated Subscription Transactions at the 49-Cent Price Tier[1]*

| Filter | Number of Distinct Apps | Percentage of Apps | Number of Transactions at 49 Cents[2] | Percentage of Transactions At 49 Cents[2] |
|---|---|---|---|---|
| | | | | |



Source:  U.S. Storefront App Store Transaction Data; Apple, "App Store Subscription Pricing," December 2016, available at https://web.archive.org/web/20171222223003/https://developer.apple.com/app-store/subscriptions/App-Store-Subscription-Pricing.pdf.

Note:
[1]  Values are restricted to transactions of subscription products associated with the specified set of apps.  Note that just because a transaction is associated with a set of apps, it may not be priced at the 49-cent tier.  An app can be associated with one product priced at the 99-cent tier and another product priced at the 49-cent tier.
[2]  Values reflect the transactions of subscription products that are at 49 cents and are associated with the specified set of products.  Percentages reflect the percentage of these transactions over the entire number of transactions associated with the specified set of apps.
[3]  Analysis is restricted to apps with at least one paid transaction of a subscription product within one year before and after the date that the 49-cent tier was available to developers, 9/1/16.  Transactions where Apple is the developer are excluded.  All subsequent figures are taken from this subset of apps.  In this exhibit, "49 Cents" refers to any price at the 49-cent tier (e.g., $0.49, $1.49, $2.49, *etc*.).  See Hitt Second Report, Appendix 7 for details regarding Apple Transaction Data processing.
[4]  Values reflect apps that were never associated with a transaction of a subscription product at the 49-cent price tier.
[5]  Values reflect apps whose only transactions at the 49-cent price tier were associated with subscription products that were introduced on or after 9/1/16.
[6]  Values reflect apps that had at least one subscription product associated with a transaction not at the 49-cent tier before 9/1/16, and a transaction at the 49-cent tier on or after 9/1/16.

97.     I also analyzed the set of existing subscription products that saw new prices ending in 49 cents (i.e., had 49-cent pricing introduced into them); in other words, subscription products that

---

[122] See Exhibit 19.

52

had at least one transaction ending in 99 cents before September 1, 2016, and at least one transaction ending in 49 cents after September 1, 2016.[123]  For each of these products, in order to control for the amount of time each price tier was available, I calculated the number of transactions per month at each of these price tiers after September 1, 2016.[124]  The data show that there were an average of ███ transactions per month at the 99-cent tier, compared to only ███ transactions per month at the 49-cent tier for these subscription products.[125]  Thus, even for subscription products that had 49-cent prices introduced, the number of transactions was greater for prices ending in 99 cents.

98.  The introduction of 49-cent tier options for subscriptions in the App Store provides a case study into the likelihood of any given developer adjusting its pricing decisions in the but-for world without price tier requirements.  Analysis of the introduction of the 49-cent price tiers for subscription products shows that app developers did not generally, or uniformly, choose any additional pricing options beyond prices ending in 99 cents.  The fact that most developers chose not to utilize prices ending in 49 cents at all, suggests that Apple's 99-cent price tier requirement did not cause developers to charge higher prices than they otherwise would absent the price tier requirement.

## VIII.  Professor McFadden's Opinions about the Impact of Apple's Price Tiers Are Disconnected from His Theory of Harm and from Prices Observed in the Real World

99.  Despite all of the academic and empirical evidence establishing the likely prevalence of 99-cent pricing in the but-for world, in his Initial Report, Professor McFadden chose to ignore Apple price tiers and focal-point pricing "for the purposes of developing [his] econometric model."[126]  In his Second Revised Supplemental Report, he has continued to take the position

---

[123] Note that it is possible for products to have transactions at prices not ending in 99 or 49 cents, likely due to discounts.

[124] In order to control for the amount of time each price tier was available, I divided the number of transactions associated with each price tier by the number of months that price tier appeared in the data for each subscription product.  For example, if a subscription product appeared in the data at the 99-cent price tier for 24 months, but only appeared at the 49-cent price tier for 12 months, the number of transactions associated with each tier is adjusted based on the number of months each price tier appears in the data.

[125] Figures reflect simple averages of paid subscription products associated with a transaction not at the 49-cent tier before 9/1/16, and associated with a transaction at the 49-cent tier on or after 9/1/16.  This includes 1,067 subscription products spanning across 874 apps.  Analysis is also restricted to transactions on or after 9/1/16 through 5/25/22 (the most recent date in the data).  See my workpapers.

[126] McFadden Second Revised Supplemental Report ¶ 85; McFadden Initial Report, Section VI.E.

53

that "Apple's pricing tiers are part of the Consumer Plaintiffs' theory of harm," and has added opinions that focal-point pricing is "not universal" and that "[e]conomists often omit focal pricing from their models when studying markets for digital goods."[127]

100.    In his Second Revised Supplemental Report, Professor McFadden has offered an update of his original model (what I call his "updated original model"), including a number of changes meant to address issues unrelated to 99-cent pricing.  This updated original model continues to be his main measure of damages.  He has claimed that he is able to use this updated original model to "accommodate Apple's tier pricing restrictions or focal pricing, should the Court or the jury find at the merit stage that these practices would persist in the But-For world."[128]  To be clear, in order to "accommodate" Apple's price tiers or focal-point pricing, Professor McFadden has *not* created a new model.  Rather, he has taken as given the outputs (i.e., composite in-app purchase prices) from the updated original model and then performed two "simulations" afterwards.[129]  He has claimed that these two "simulations" have allowed him to model a but-for world where Apple has 1) its current price tiers and alternatively 2) "tier pricing" that "expands its set of price tiers to include 750 price points."[130]

101.    As discussed in detail below, the projected prices from Professor McFadden's updated original model, and the simulations he uses on those projected prices, do not account for pricing patterns exhibited in the real world.  Importantly, as I further understand from Professor Prince's report, and from my own review of Professor McFadden's Second Revised Supplemental Report, Professor McFadden's new simulations do not alter his overall approach or allow it to accurately assess Plaintiffs' theories of harm in the context of price tiers or focal-point pricing.

### A.    The Economic Literature and Empirical Evidence Support the Need to Model Apple Price Tiers and Focal-Point Pricing

102.    As I have shown in detail above, Professor McFadden's claim that Apple's 99-cent price tiers lead to higher prices is unsupported.  Therefore, there is no reason to believe that price tiers

---

[127] McFadden Second Revised Supplemental Report ¶¶ 84, 85, 88.

[128] McFadden Second Revised Supplemental Report ¶ 85.

[129] Prince Second Report, Sections 2.2.1, 5.2.1

[130] McFadden Second Revised Supplemental Report ¶¶ 87–88, 93–94.  Professor McFadden explains that his simulation with 750 price points is meant to reflect "one reasonable structure that Apple could implement" in its settlement with developers, following Apple's agreement as part of that settlement to adopt a price tier menu with 750 price points.  See McFadden Second Revised Supplemental Report ¶ 94.

54

would be absent from the but-for world. Furthermore, even in a scenario in which price tiers are absent from the but-for world, theoretical and empirical evidence show that focal-point pricing, and especially 99-cent pricing, would be important in developers' pricing decisions regarding apps and in-app content. This has direct implications for the prices that developers would be expected to charge in the but-for world under Plaintiffs' theory. In a but-for world in which 99-cent price tiers exist as they do in the actual world, one should assess the price tiers' impact on developer pricing choices in both the actual and but-for worlds. In a but-for world where 99-cent price tiers do not exist, the likelihood that developers would adopt focal-point pricing of their own accord would need to be considered.

103. Nevertheless, Professor McFadden has claimed that he does not need to adjust his model for price tiers and focal-point pricing because "[e]conomists often omit focal pricing from their models."[131] As support, Professor McFadden has cited a few specific studies that attempt to model the demand for digital goods without addressing focal pricing.[132] Goolsbee and Petrin (2004) modeled the demand for television services, such as cable and satellite television.[133] Li (2019) estimated a consumer demand model for e-books and e-book readers.[134] Finally, Ghose and Han (2014) built and estimated a supply and demand model for mobile apps in the Apple App Store and Google Play store in order to evaluate the impact of app features on demand, monetization strategies (such as deciding between offering in-app purchases and in-app advertising), price elasticity, and consumer surplus from the availability of mobile apps.[135]

---

[131] McFadden Second Revised Supplemental Report ¶ 84.

[132] McFadden Second Revised Supplemental Report ¶ 84, footnotes 91–93.

[133] Austan Goolsbee and Amil Petrin, "The Consumer Gains from Direct Broadcast Satellites and the Competition with Cable TV," *Econometrica*, 72(2), 2004, pp. 351–381. Unlike Professor McFadden's model, the goal of this paper is to estimate an average welfare effect of the introduction of a new product (Direct Broadcast Satellites) across consumers, rather than the welfare changes at the individual consumer level, which is the question at issue here. The authors observed price data for different television services but did not indicate whether focal-point pricing was relevant for this market.

[134] Hui Li, "Intertemporal Price Discrimination with Complementary Products: E-Books and E-Readers," *Management Science*, 65(6), 2019, pp. 2665–2694. The goal of this paper is to estimate the effect of different price discrimination strategies on aggregate profits, sales, and consumer welfare. Unlike Professor McFadden's model, the author did not focus on estimating prices for each product and welfare effects for individual consumers. Nor did the author discuss whether focal-point pricing was present in the pricing data.

[135] Anindya Ghose and Sang Pil Han, "Estimating Demand for Mobile Applications in the New Economy," *Management Science*, 60(6), 2014, pp. 1470–1488. This paper intended to quantify "the value of mobile apps for consumers." The authors built and estimated a structural model of supply and demand for apps, which they used to estimate the effects of apps on consumer welfare. Unlike Professor McFadden's model, their model was not intended to predict the prices of specific apps or welfare effects on specific consumers. Nor did the authors discuss apps' pricing patterns or focal-point pricing.

55

104. The fact that these papers do not address price tiers or focal-point pricing is not a justification for Professor McFadden's failure to incorporate price tiers or focal-point pricing when modeling but-for prices for hundreds of millions of app transactions. Academics use different models and different assumptions when attempting to answer different questions. Here, the relevant question is what transaction prices individual consumers would have paid for app downloads, in-app purchases, and subscriptions had Apple adopted a different business model in the but-for world. The inapposite economic studies cited by Professor McFadden did not undertake any similar analysis. It is telling that Professor McFadden conceded in his deposition that he did not have a "comprehensive view" of whether economists often omit focal-point pricing from their models in performing the task at hand—that is, in forming opinions about predominantly common injury.[136] It is my opinion that in order to reliably model but-for prices in this matter, it is necessary to capture pricing dynamics generated by consumer behavior observed in the real world (i.e., price tiers or focal-point pricing). Otherwise, the model would not be suited to predict but-for prices of individual in-app purchase transactions and assess injury and damages for individual consumers. None of the papers cited by Professor McFadden undertook a similar task, so the fact that they omit a discussion of focal-point pricing is irrelevant.

### B. Professor McFadden's Updated Original Model and Additional Simulations Do Not Properly Incorporate Price Tiers and Focal-Point Pricing

105. Contrary to Professor McFadden's claims, he has not properly incorporated the effect of Apple's price tiers into his model, despite the fact that there is no reason to believe price tiers would be absent in the but-for world. In addition, Professor McFadden does not account for Apple's price tiers in the as-is world. Furthermore, it does not appear that his model does (or can) accommodate focal-point pricing (including prices ending in 99 cents), which would only be relevant in a but-for world that has no price tiers. Professor McFadden tries to support the assertion that his updated original model can accommodate price tiers and focal-point pricing by

---

[136] Deposition of Professor Daniel L. McFadden, December 5, 2022, p. 133:5–16 ("Q. (By Mr. Swanson) Do economists who form opinions about predominantly common injury often omit focal pricing from their models?. . . THE DEPONENT: I – I do not have a comprehensive view of what these – this class of experts have opined.").

56

stating that he has performed two "simulations" that account for price tier restrictions and focal-point pricing.[137]  This is incorrect.  As I will explain in detail below, Professor McFadden's updated original model does not in fact accommodate price tiers, nor do his simulations serve to adapt it to "accommodate Apple's tier pricing restrictions or focal pricing."[138]  Both his updated original model and his simulations generate but-for pricing that is untethered from prices observed in the real world.  I also discuss below in Section VIII.B.5 a number of important contradictions between Professor McFadden's modeling assumptions and his opinions regarding price tiers and focal-point pricing, which further render his updated original model unreliable for accurately assessing Plaintiffs' theories of harm in the context of price tiers or focal-point pricing.

      1.      At Each Step, Professor McFadden's Updated Original Model and Simulation Fail to Model Price Tiers and Focal-Point Pricing.

106.    Professor McFadden's model relies on a number of key steps (e.g., creating input data; running his updated original model to output predicted but-for prices; running an additional simulation to change those but-for prices).  As I understand from reviewing Professor McFadden's reports, and as I understand Professor Prince has opined, at each step, Professor McFadden has failed to model price tiers and focal-point prices for in-app purchases.[139]

107.    First, when projecting but-for prices, Professor McFadden does not use prices of individual in-app purchase items as an input for his updated original model.[140]  Instead, he creates an artificial composite in-app purchase price, in which he calculates a simple, unweighted average of all the prices of the different forms of in-app content associated with a given app (combining both subscription and non-subscription in-app purchase prices).[141]  Notably, these simple, unweighted average or composite in-app purchase prices—the input to his model in estimating but-for prices—do not represent actual prices used in transactions and thus are not

---

[137] McFadden Second Revised Supplemental Report ¶¶ 87–88.

[138] McFadden Second Revised Supplemental Report ¶ 85.

[139] Prince Second Report, Sections 5.2.1–3.  For paid downloads, Professor McFadden's simulation does generate but-for prices that are consistent with Apple's price tiers.

[140] Prince Second Report, Section 2.2.4.

[141] Prince Second Report, Sections 2.2.4, 5.1.1–2.

57

consistent with either Apple's price tiers or focal-points.[142]  I understand that Professor Prince has provided further analysis of the problems associated with Professor McFadden's simple, unweighted average, in particular the way in which it biases damages upwards by combining low- and high-priced items.[143]

108.    Second, Professor McFadden creates a model (his updated original model) that uses these simple, unweighted average prices (no longer on price tiers or representing focal-points) to predict developers' but-for pricing behavior.[144]  In other words, his updated original model predicts but-for in-app purchase prices using composite prices, not actual prices that account for the reality of price tiers or the focal-point pricing that would exist in a but-for world without price tiers.

109.    Third, after generating predicted composite prices from this updated original model without price tiers or focal-point prices, Professor McFadden changes these predicted composite prices through a "simulation," which he describes as a method to approximate price tiers or focal-point pricing for these same composite prices.[145]  The composite prices for in-app purchases are often a combination of the prices of multiple items.[146]  Thus, they are often not prices that are transacted with consumers or expected to follow Apple price tiers or focal-point pricing to begin with.  Yet, Professor McFadden still claims to simulate predicted composite prices that can "accommodate" both price tiers and focal-point pricing.[147]  A review of the prices generated by his simulation shows this not to be true.  Both the simulation's predicted composite prices, as well as the prices the simulation implies for individual in-app purchase items, are inconsistent with Apple's price tiers and do not represent focal-point prices.[148]

110.    Below, I examine in more detail the relevant steps in Professor McFadden's model regarding price tiers and focal-point pricing.  I find that Professor McFadden has not modeled Apple's price tiers or focal-point pricing in any step of his analysis.  I also find that Professor

---

[142] Prince Second Report, Sections 2.2.4, 5.1.1–2, 5.2.1–3.

[143] Prince Second Report, Section 5.1.2.

[144] Prince Second Report, Section 2.2.4.

[145] Prince Second Report, Section 5.2.1; McFadden Second Revised Supplemental Report ¶¶ 85–87.

[146] Prince Second Report, Section 5.1.2.

[147] McFadden Second Revised Supplemental Report ¶ 85.

[148] Prince Second Report, Section 5.2.1.

58

McFadden has offered opinions regarding price tiers that are directly contradicted in his modeling assumptions—another reason that his approach is unreliable.

### 2. Step One: Professor McFadden Creates Composite Prices at the App Level, Removing Price Tier Information

111. Professor McFadden has created a model (the updated original model) in which he assumes, for the purpose of calculating but-for prices, that developers make pricing decisions at the app level rather than at the individual item level.[149] Professor McFadden first aggregates the prices of all the individual items associated with an app, forming a single composite in-app purchase price.[150] Rather than using data that account for the price tiers that exist in the real world to develop a model that predicts pricing decisions related to individual items (i.e., different pricing decisions for different in-app items and subscriptions available for purchase in a given app), Professor McFadden's model predicts the pricing behavior for an entire app (i.e., a single combined simple, unweighted average price that reflects the pricing decisions for all in-app purchases and subscriptions for a given app).[151] Thus, Professor McFadden has created artificially derived pricing data that strip out the existence of price tiers in the real world.

112. Said differently, when predicting but-for prices, Professor McFadden starts by changing the *inputs* to his model: the Apple Transaction Data. The Apple Transaction Data is almost entirely denominated in 99-cent increments (with some small number of subscription transactions at 49-cent increments since 2016), consistent with the pricing of digital goods more broadly.[152] But Professor McFadden's input prices do not reflect this reality. Furthermore, I understand that Professor Prince has provided analysis of the additional problems associated with Professor McFadden's simple, unweighted average, in particular the way in which it biases damages upwards by combining low- and high-priced items.[153]

113. Take as an example the Genshin Impact app, a free download Games app with in-app purchases. As shown in Exhibit 20 below, Professor McFadden first calculates the composite in-

---

[149] Prince Second Report, Sections 5.1.1–2.

[150] Prince Second Report, Section 2.2.4.

[151] Prince Second Report, Sections 5.1.1–2, 5.2.1–2.

[152] 99.6 percent of App Store in-app purchase paid transactions with a non-zero price from 2008–2022 have prices ending in 99 cents and 0.4 percent have prices ending in 49 cents. See my workpapers.

[153] Prince Second Report, Section 5.1.2.

59

app price for Genshin Impact, which he finds to be $26.21. Unlike Genshin Impact's actual in-app content prices, this composite price does not conform to Apple's price tiers. I understand that Professor Prince has opined that this calls into doubt Professor McFadden's ability to account for Apple's price tiers for in-app purchases.[154]

---

**EXHIBIT 20**

**Example Illustration of Predicted Prices in Professor McFadden's Model**



Source: Prince Second Report Backup, ("ex_26.csv").

Note: These data represent Genshin Impact in-app content in September 2020.

---

114.   This issue is not specific to Genshin Impact; it occurs for apps throughout Professor McFadden's model.[155] Thus, while almost all in-app purchase transactions end in 99 cents in reality, Professor McFadden has altered the data such that, for apps offering more than one in-app purchase price (which is 71.1 percent of apps with in-app purchases in Professor

---

[154] Prince Second Report, Section 5.2.1.
[155] Prince Second Report, Section 5.2.1.

60

**SER-668**

McFadden's sample),[156] their prices no longer have the feature of being likely to end in 99 cents. Professor McFadden agreed in deposition that he had done this to the data, testifying that the "real-world as-is average IAP price likely won't end in 99 cents."[157]  In fact, only 45.6 percent of Professor McFadden's input composites have prices ending in 99 cents, and only 9.0 percent end in 49 cents,[158] despite the fact that in the real world, 99.6 percent of App Store transactions have prices ending in 99 cents and 0.4 percent have prices ending in 49 cents.[159]

### 3. Step Two: The Updated Original Model Predicts Prices that Do Not Account For Price Tiers or Focal Point Pricing

115.     Next, I understand that Professor McFadden has used the simple, unweighted average composite price data to generate a predicted (or but-for) composite price that he claims reflects the *average* in-app purchase price if Apple's commission rates were lower, as specified by Dr. Abrantes-Metz.[160]  In other words, the output of his updated original model represents but-for prices that are generated without acknowledging or incorporating Apple's actual price tiers in either the input prices (the tiers have been artificially removed) or his estimated but-for prices. See Exhibit 20 above.

116.    The predicted composite but-for prices also no longer have the feature of being likely to end in 99 cents.  For example, the composite but-for price for Genshin Impact's in-app content that Professor McFadden predicts ($21.94) does not conform to Apple's price tiers.  See Exhibit 20.  This issue is not limited to Genshin Impact.  I understand that Professor Prince has shown that Professor McFadden's own predicted but-for composite prices follow a pricing distribution pattern that is not reflected in the real world, with only 0.6 percent of composites ending in 99 cents and 0.7 percent of composites ending in 49 cents.[161]

117.    Lastly, and not surprisingly given the approach described above, Professor McFadden's updated original model implies that *individual item* but-for prices will also follow a pricing

---

[156] Prince Second Report, Appendix D.

[157] Deposition of Professor Daniel L. McFadden, December 5, 2022, p. 136:8–10.

[158] Prince Second Report, Appendix D.

[159] This reflects the percentage of paid transactions of in-app purchases with a non-zero price from 2008–2022.  See my workpapers.

[160] McFadden Second Revised Supplemental Report ¶¶ 7, 41–42.

[161] Prince Second Report, Appendix D.

61

distribution that is not reflected in the real world. Professor McFadden uses the percentage difference between his original as-is composite prices (the *inputs*) and his predicted but-for composite prices (the *outputs*) to calculate a "harm" rate for each app.[162] He then applies this "harm" rate to all in-app purchase transaction prices at the individual item level for each app.[163] While Professor McFadden claimed that his method does not calculate but-for prices for individual items, I understand that Professor Prince has demonstrated how Professor McFadden's methodology can be used to determine prices for individual items.[164] For example, I understand that Professor Prince has opined that the damages that Professor McFadden calculates for individual transactions necessarily imply but-for prices for those individual items.[165] I understand that Professor Prince has also noted that the but-for prices for individual items are calculated by applying Professor McFadden's composite price percentage change to the as-is prices for individual items, as shown in Exhibit 20 above. These new but-for individual item prices that are implied by Professor McFadden's updated original model also do not account for Apple's price tiers. In fact, only 1.0 percent of the implied but-for prices of individual in-app purchases end in 99 cents and 0.9 percent end in 49 cents.[166]

118.    The above should make evident that the but-for prices generated by Professor McFadden's updated original model (whether but-for composite in-app purchase prices or but-for prices for individual items) do not follow the distribution of pricing that is observed in the real world. As I show in "Step Three" below, the solution Professor McFadden has proposed in his Second Revised Supplemental Report, an additional "simulation," does not solve this problem. The simulation does not change his updated original model.[167] Rather, it simply takes the output from Professor McFadden's updated original model and changes the results after the fact.

---

[162] Prince Second Report, Sections 2.2.4, 5.1.1.

[163] Prince Second Report, Section 2.2.4.

[164] Prince Second Report, Section 5.1; McFadden Initial Report, Appendix E, ¶ 38 ("I convert the estimated IAP-item level demand equation into the IAP-level demand equation under the assumption that app developers change IAP-item prices by the same amount for a given app.").

[165] Prince Second Report, Section 5.1.1.

[166] Prince Second Report, Appendix D.

[167] Prince Second Report, Section 2.2.4.

62

4.      Step Three: Professor McFadden's "Simulations" Do Not Account For
        Price Tiers Or Focal-Point Pricing

119.    In his Second Revised Supplemental Report, Professor McFadden claims that his updated original model can incorporate price tiers that Apple imposed in the actual world and a new set of 750 price tiers representing Professor McFadden's prediction for Apple's planned price tiers created as a result of a settlement with iOS app developers, as well as focal-point pricing.[168] Professor McFadden also stated in the deposition that the settlement with developers is "some reflection of the environment in which the Apple Store would have operated under competition," without providing any support for that assertion.[169]

120.    Regarding Professor McFadden's simulation with 750 price points, it is important to note that (1) Professor McFadden's simulation does not account for the actual price tiers announced by Apple, (2) these planned price tiers are not being implemented until 2023, outside the class period, and (3) these additional tiers are being implemented due to a settlement, not a natural development, and thus, there is no basis to assume that they would have applied during the class period.[170] Furthermore, even in a world in which more prices are available, all of the empirical evidence presented in this report suggests that most developers would choose prices ending in 99 cents (see Section VII).

121.    Professor McFadden claims he can predict but-for prices with his updated original model, using the same inputs and generating the same outputs (which do not recognize Apple's price tiers or focal-point pricing) while adding a third step: a "simulation" which transforms those outputs.[171] In other words, after he predicts composite but-for prices using his updated original model, Professor McFadden tacks on a step that he claims can change them into prices that reflect price tier or focal price considerations.[172]

---

[168] McFadden Second Revised Supplemental Report ¶¶ 87–88, 93–94.

[169] Deposition of Professor Daniel L. McFadden, December 5, 2022, pp. 129:15–23 ("Q. Is it your assumption that Apple would be adopting those 750 price points in the but-for world as a result of a settlement with developers? . . . THE DEPONENT: What I would anticipate is that the settlement with developers is – is some reflection of the environment in which the Apple Store would have operated under competition,").

[170] Apple, "Apple Announces Biggest Upgrade to App Store Pricing, Adding 700 New Price Points," December 6, 2022, available at https://www.apple.com/newsroom/2022/12/apple-announces-biggest-upgrade-to-app-store-pricing-adding-700-new-price-points/. Professor McFadden's approximation of a new set of 750 price tiers actually includes 746 prices, 40 percent (300) of which end in 99 cents. See Second Revised Supplemental Report production, "menus.csv."

[171] Prince Second Report, Section 5.2.1, McFadden Second Revised Supplemental Report ¶¶ 87–88, 93–94.

[172] Prince Second Report, Sections 5.2.1, 5.2.2.

63

**SER-671**

122.    Professor McFadden assumes that each developer prices like a monopolist and would like to charge the price Professor McFadden has predicted with his updated original model, which is by construction not a price that accounts for price tiers or focal-point pricing.[173]  Then, as part of his simulation, he artificially assigns each developer to change its predicted composite but-for price to a price along price tiers Professor McFadden created.[174]  Professor McFadden does not set a single menu of price tiers that applies to all apps, as Apple has,[175] nor some form of menu that reflects actual, observed focal-point pricing.  Rather, he creates separate and unique price tiers *for each app*–price tiers which do not typically end in 99 cents.[176]  I understand Professor Prince has opined that Professor McFadden's simulation then has developers "choose" which composite price along each app-specific price tier menu would give the developer the highest profit.[177]  The increment for apps with at least one subscription item (no matter how many non-subscription items the app had) is 50 cents, and the increment for apps without a subscription item is $1.00.[178]  These increments are applied to the as-is composite price for each app in order to create unique, app-specific price tier menus.[179]  Importantly, Professor McFadden creates these increments based on the "size of the increments on Apple's tier schedule," but does nothing to incorporate any further analysis of focal-point pricing in a but-for world absent Apple's price tiers.[180]

123.    Professor McFadden's "simulation" approach does not actually model Apple's price tiers in the as-is or but-for worlds, and it does not take into account focal-point pricing, as shown in Exhibit 21.  Again, this issue is not limited to Genshin Impact.  I understand that Professor Prince has shown that only 44.2 percent of but-for composites from Professor McFadden's simulation of Apple's price tiers end in 99 cents and 10.3 percent end in 49 cents.[181]  Professor

---

[173] Prince Second Report, Section 2.2.1.

[174] Prince Second Report, Section 5.2.1.

[175] Professor McFadden admits to this in his deposition when presented with the hypothetical average composite price of $3.25, and how that composite would follow a specific tier in dollar increments around that price (e.g., $1.25, $2.25, $3.25, etc.).  See Deposition of Professor Daniel L. McFadden, December 5, 2022, p. 136:11–23.

[176] Prince Second Report, Section 5.2.1.

[177] Prince Second Report, Section 5.2.1.

[178] Note that the gaps between price tiers may differ from these amounts for the highest-priced content.  See Prince Report, Section 5.2.1.

[179] Prince Second Report, Section 5.2.1.

[180] McFadden Second Revised Supplemental Report ¶ 87; Prince Second Report, Section 5.2.3.

[181] Prince Second Report, Section 5.2.1.

64

Prince further shows that using Professor McFadden's simulation of 750 price points, only 6.3 percent of the but-for composites end in 99 cents and only 9.6 percent end in 49 cents.[182]

---

*EXHIBIT 21*
*Example Illustration of Predicted Tiered Prices in Professor McFadden's Simulation Approach*



Source: Prince Second Report, Section 5.2.1; Prince Second Report Backup ("ex_26.csv").

Note: These data represent Genshin Impact in-app content in September 2020. As noted in the Prince Second Report, the item-level but-for price is calculated by applying Professor McFadden's composite price percentage change to the item-level as-is price.

---

124.    Professor McFadden never reports but-for prices for individual items, nor does he ever show that they follow 99-cent price tiers.[183]  He testified in his December 2022 deposition that he did not "model what is going on inside the developer in terms of the menus they bring forward and the pricing in those menus of any individual items," stating that  "the granularity of my model is at the overall level of IAP average pricing."[184]  Thus, he claims his model is "silent" on the pricing of individual items.[185]

---

[182] Prince Second Report, Appendix D.

[183] Prince Second Report, Section 5.2.1.

[184] Deposition of Professor Daniel L. McFadden, December 5, 2022, pp. 113:21–114:2.

[185] Deposition of Professor Daniel L. McFadden, December 5, 2022, pp. 113:21–114:6, 134:12–19.

65

125.    That said, just because Professor McFadden chose not to report but-for prices of individual in-app purchase transactions does not mean that they are not directly implied by his model.  Further, as I understand Professor Prince has opined in his report, if but-for prices of individual in-app purchase transactions are not implied by Professor McFadden's model, then his model is unable to determine what consumers would have paid in the but-for world, and is therefore not predicting anything of relevance.[186]  As I noted above, I understand that Professor Prince has opined that Professor McFadden's model does indeed predict but-for prices for individual items.[187]  Furthermore, I understand that Professor Prince has noted that Professor McFadden's claim that he is "silent" on but-for prices of individual in-app purchase transactions is incompatible with his claim that he performed a price tier simulation.[188]  I understand that Professor Prince has calculated the prices for individual in-app purchase items that are generated using Professor McFadden's "simulation" of Apple's price tiers, an example of which is shown in Exhibit 21 above.  Based on those prices, I understand that Professor Prince found that only 32.7 percent end in 99 cents and 1.1 percent end in 49 cents.[189]  Professor Prince also shows that using Professor McFadden's simulation of 750 price points, only 4.8 percent of the implied but-for item-level prices end in 99 cents and only 2.2 percent end in 49 cents.[190]

126.    Therefore, the implied prices for individual items from Professor McFadden's simulation do not reflect Apple's actual price tiers, the proportion of prices ending in 99 cents found in the academic literature, the prices found on Google Play, on other app transaction platforms, or for other digital goods.

> 5.    Contradictions Between Professor McFadden's Model Assumptions and His Opinions Regarding Price Tiers Render His Updated Original Model Unreliable

127.    I have above shown that Professor McFadden's updated original model and simulations do not generate but-for prices that conform to price tiers or focal-point pricing.  In addition, Professor McFadden's updated original model contains two foundational assumptions that are in

---

[186] Prince Second Report, Section 5.1.1.

[187] Prince Second Report, Section 5.1.1

[188] Prince Second Report, Section 5.1.1.

[189] Prince Second Report, Section 5.2.

[190] Prince Second Report, Appendix D.

66

direct contradiction with his claims about the impact of price tiers. The internal inconsistency of Professor McFadden's assumptions renders his updated original model unreliable for assessing the impact of price tiers and demonstrates his failure to represent the dynamics of price tiers or focal-point pricing in his predicted but-for prices.

128.    First, Professor McFadden's model is based on the foundational assumption that *every developer prices like it is a monopolist*.[191]  This assumption is inconsistent with his theory of harm regarding Apple's price tier requirement (i.e., that price tiers lead to higher prices because they hinder developers' ability to compete with each other).[192]  Specifically, Professor McFadden has suggested that Apple's price tier requirement raises prices because it restricts developers' ability to compete with each other by doing things like "offer[ing] temporary price discounts."[193] If this were true, then to assess the impact of price tiers on pricing, one would ostensibly have to remove Apple's price tiers and assess how that changes the manner in which developers compete with each other. However, Professor McFadden's model (whether or not one adds on his "simulation") by design assumes that each developer prices like a monopolist, and so there are no strategic interactions between developers.[194]  Therefore, his model is unable to assess the impact of price tiers on developer competition and "competitive" pricing.

129.    Second, Professor McFadden's model is based on the foundational assumption that developers chose the exact profit-maximizing prices they desired in the actual world when Apple's price tiers were present.[195]  This directly contradicts his opinion that Apple's price tier requirement causes developers to charge higher prices than they otherwise would absent the requirement.[196]  I understand that Professor Prince has demonstrated that this assumption may have a large impact on Professor McFadden's predicted impact and damages.[197]  Further, it is worth considering the implications of what Professor McFadden has assumed in his updated original model (rather than the contradictory statements he has made in his report and deposition). If developers in the actual world charged the exact prices that maximized their

---

[191] Prince Second Report, Sections 2.2.1, 6.3.1.

[192] In fact, as discussed in Section VI, price tiers may lead to lower prices in some circumstances.

[193] McFadden Initial Report ¶ 130.

[194] Prince Second Report, Sections 2.2.1, 6.3.1.

[195] Prince Second Report, Section 5.2.

[196] Prince Second Report, Section 5.2.

[197] Prince Second Report, Section 5.2.2.

profits (as he assumes in his model), this would imply that Apple's price tiers were not anticompetitive.[198] In fact, it would imply that every single developer found a price ending in 99 cents or 49 cents to be profit-maximizing. This would be consistent with the empirical evidence presented above in Section VII, suggesting that developers would likely choose to utilize 99-cent pricing even absent any requirement to do so.[199] Yet, as described above, Professor McFadden's updated original model, under this foundational assumption, *does not generate predicted but-for prices that are likely to end in 99 cents*. To the contrary, it only predicts prices ending in 99 cents for 0.6 percent of composites and 1.0 percent of item-level prices for individual in-app purchase items.[200]

130. The internal inconsistency of Profession McFadden's assumptions renders his updated original model unreliable for assessing the impact of price tiers and demonstrates his failure to represent the dynamics of price tiers or focal-point pricing in his predicted but-for prices. This means that Professor McFadden fails to account for the likely presence of Apple's price tiers in the but-for world, despite the fact that they have existed throughout the class period.[201] Furthermore, Professor McFadden has offered a model that does not represent focal-point pricing in the but-for world, despite the myriad empirical evidence presented in Section VII.[202]

6.      In Summary, Professor McFadden Does Not Offer a Model that
        Properly Accounts for Price Tiers or Focal-Point Pricing

131. In sum, neither the projected prices from Professor McFadden's updated original model, nor the simulations he uses on those projected prices, properly accounts for Apple's price tiers, despite the fact that empirical evidence suggests there is no reason to believe that price tiers would be absent from the but-for world. Furthermore, as discussed above, even in a scenario in which price tiers are absent from the but-for world, theoretical and empirical evidence suggest that many developers would maintain 99-cent pricing, yet neither Professor McFadden's updated original model, nor the simulations he uses on those projected prices, account for this dynamic.

---

[198] Prince Second Report, Section 5.2.2.

[199] Prince Second Report, Sections 5.2.2–3.

[200] Prince Second Report, Appendix D.

[201] Prince Second Report, Section 5.2.2.

[202] Prince Second Report, Section 5.2.3.

68

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 10, 2023.

_____

Jonah Berger

69

# Jonah Berger

The Wharton School • University of Pennsylvania
jberger@wharton.upenn.edu

---

## Academic Positions

*The Wharton School, University of Pennsylvania*
    Associate Professor of Marketing (with tenure)        May 2013 –
    James G. Campbell, Jr. Assistant Professor of Marketing    July 2010— May 2013
    Assistant Professor of Marketing        July 2007 – June 2010

*Cornell NYC Tech*, Cornell University
    Visiting Professor of Marketing        July 2014— June 2015

*Fuqua School of Business, Duke University*
    Visiting Associate Professor of Marketing    July 2013 – Dec 2013

## Education
    Ph.D., Marketing, Stanford University, Graduate School of Business, 2007
    B.A., Human Judgment and Decision Making (with Distinction), Stanford University, 2002

## Honors and Awards
    MSI Scholar, 2020
    AMA-Sheth Foundation Doctoral Consortium Fellow, 2019, 2020, 2021, 2022
    Wharton Teaching Excellence Award 2019, 2020, 2021
    William F. O'Dell Award, Journal of Marketing Research, 2017
    Top 5 Most Productive Researchers in Marketing, AMA DocSig 2017-
    Outstanding Reviewer Award, *Journal of Consumer Research* 2015-2016
    Best 2012 Article Finalist, *Journal of Consumer Research,* 2015
    Top 30 Leaders in Business, American Management Association, 2015
    Emerald Citations of Excellence, article published in 2012, 2015
    Berry-AMA Book Prize for Best Book in Marketing, 2014
    Top 5 Most Productive Researchers in Marketing 2009-13, AMA DocSig 2013
    Most Creative People in Business, Fast Company, 2013
    Paul Green Award, *Journal of Marketing Research*, Finalist 2013
    Early Career Award, *Association for Consumer Research*, 2013
    Early Career Award, *Society for Consumer Psychology*, 2012
    Dean's Research Grant, The Wharton School, 2012
    Outstanding Reviewer Award, *Journal of Consumer Research* 2010-2011
    Outstanding Reviewer Award, *Journal of Consumer Psychology*, 2010-2011
    "Iron Prof" Award for "awesome faculty research," The Wharton School, 2011
    MBA Teaching Commitment and Curricular Innovation Award, The Wharton School, 2011
    Dean's Research Grant, The Wharton School, 2011
    Young Scholars Program, Marketing Science Institute, 2011
    Alex Panos Research Grant, The Wharton School, 2011
    *Journal of Consumer Research* Best 2007 Article Award Finalist, 2010
    James G. Campbell, Jr. Memorial Term Professorship, 2010
    Dean's Research Grant, The Wharton School, 2010
    AMA-Sheth Foundation Doctoral Consortium Fellow, 2006

Society for Consumer Psychology, Best Student Paper Award (Honorable Mention), 2006
Management Science Institute/JCP Research Competition (Honorable Mention), 2004
Jaedeke Scholar, Stanford Graduate School of Business, 2003

**Publications**

1. Packard, Grant, Jonah Berger, and Reihane Boghrati (2023) "The Persuasive Present (Tense)," Journal of Consumer Research.

2. Giovanni Luca Cascio-Rizzo, Jonah Berger, Rumen Pozharliev, and Matteo De Angelis (2023), "How Sensory Language Shapes Consumer Responses to Influencer-Sponsored Content," *conditionally accepted*, Journal of Consumer Research.

3. Berger, Jonah, Wendy Moe, and David Schweidel (2023), "Linguistic Drivers of Content Consumption," Journal of Marketing.

4. Packard, Grant and Jonah Berger (2023) "The Emergence and Evolution of Consumer Language Research," *forthcoming,* Journal of Consumer Research.

5. Boghrati, Reihane, Jonah Berger, and Grant Packard (2023), "Style, Content, and the Success of Ideas," Journal of Consumer Psychology.

6. Boghrati, Reihane and Jonah Berger, "Quantifying Cultural Change: Gender Bias in Music," *Conditionally Accepted*, Journal of Experimental Psychology: General.

7. Berger, Jonah, Joshua Conrad Jackson, and Ceren Kolsarici (2023), "Catalyzing Social Change: Does Concentration Encourage Action?" *forthcoming*.

8. Weingarten, Evan, and Jonah Berger (2023), "Discussing Proximal Pasts and Far Futures," Journal of Consumer Psychology.

9. Packard, Grant and Jonah Berger (2023), "Wisdom from Words: The Psychology of Consumer Language," Consumer Psychology Review, 6(1), 3-16.
   - Lead Article

10. Rogers, Benjamin A., Herrison Chicas, John Michael Kelly, Emily Kubin, Michael S. Christian, Frank J. Kachanoff, Jonah Berger, Curtis Puryear, Dan P. McAdams, Kurt Gray (2023), "Seeing Your Life Story As a Hero's Journey Increases Meaning in Life," Journal of Personality and Social Psychology.

11. Berger, Jonah, Matt Rocklage, and Grant Packard (2022) "Expression Modalities: How Speaking Versus Writing Shapes Word of Mouth," Journal of Consumer Research, 49(3), 389-408.
    - Editor's choice

12. Berger, Jonah and Grant Packard (2022) "Using Language to Understand People and Culture," American Psychologist, 77(4), 525–537

13. Laurino Dos Santos, Henrique and Jonah Berger (2022), "The Speed of Stories: Semantic Progression and Narrative Success," Journal of Experimental Psychology: General.
    - Authors contributed equally

14. Berger, Jonah, Grant Packard, Reihane Boghrati, Ming Hsu, Ashlee Humphreys, Andrea Luangrath, Sarah Moore, Gideon Nave, Christopher Olivola, Matthew Rocklage (2022) "Marketing Insights from Text," *Forthcoming,* Marketing Letters.

15. Madan, Shilpa, Gita Venkataramani Johar, Jonah Berger, Pierre Chandon, Rajesh Chandy, Rebecca Hamilton, Leslie John, Aparna Labroo, Peggy J. Liu, John G. Lynch, Jr., Nina Mazar, Nicole Mead, Vikas Mittal, Christine Moorman, Michael I. Norton, John Roberts, Dilip Soman, Madhu Viswanathan, Katherine White (2002), "Reaching for Rigor and Relevance: Better Marketing Research for a Better World," *Forthcoming*, Marketing Letters.

16. Toubia, Olivier, Jonah Berger, and Josh Eliashberg (2021), "Quantifying the Shape of Stories Predicts Their Success," Proceedings of the National Academy of Sciences, 118(26).
    - First two authors contributed equally

17. Berger, Jonah, Yoon Duk Kim, and Robert Meyer (2021) "What makes Content Engaging?  How Emotional Dynamics Shape Success," Journal of Consumer Research, 48(2), 235-250.

18. Packard, Grant and Jonah Berger (2021) "How Concrete Language Shapes Customer Satisfaction," Journal of Consumer Research, 47(5), 787-806.

19. Rifkin, Jacqueline, Katherine Crain, and Jonah Berger (2021), "Penny for Your Preferences: Leveraging Self-Expression to Increase Prosocial Giving," Journal of Marketing, 85(3), 204-219.

20. Jacqueline Rifkin and Jonah Berger (2021), "How Nonconsumption Can Turn Ordinary Items into Perceived Treasures" Journal of the Association of Consumer Research, 6(3), 350-361.

21. McDuff, Daniel and Jonah Berger (2021), "Why Do Some Advertisements Get Shared More than Others? Quantifying Facial Expressions to Gain New Insights," Journal of Advertising Research, 60(4), 370-380.

22. Packard, Grant and Jonah Berger (2020) "Thinking of You: How Second Person Pronouns Shape Cultural Success," Psychological Science, 31(4), 397-407.

23. Bellezza, Silvia and Jonah Berger (2020), "Trickle-Round Signals: When Low Status Is Mixed with High," Journal of Consumer Research, 47(1), 100-127.

24. Berger, Jonah, Ashlee Humphreys, Stephen Ludwig, Wendy Moe, Oded Netzer, and David Schweidel (2020), "Uniting the Tribes: Using Text for Marketing Insight," Journal of Marketing, 84(1), 1-25

25. Van Zant, Alex and Jonah Berger (2019) "How the Voice Persuades," Journal of Personality and Social Psychology, 118(4), 661-682.

26. Berger, Jonah and Grant Packard (2018), "Are Atypical Things More Popular?" Psychological Science, 29(7), 1178-1184.

27. Gullo, Kelley, Jonah Berger, Jordan Etkin, and Bryan Bollinger (2018), "Does Time of Day Affect Variety Seeking?" Journal of Consumer Research, 46(1), 20-35.

**Appendix A**

February 2023

28. Berger, Jonah and Alixandra Barasch (2018) "A Candid Advantage? The Social Benefits of Candid Photos," Social Psychological and Personality Science, 9(8), 1010-1016.

29. Buechel, Eva and Jonah Berger (2018), "Microblogging and the Value of Undirected Communication" Journal of Consumer Psychology, 28(1), 40-55.

30. Packard, Grant and Jonah Berger (2017), "How Language Shapes Word of Mouth's Impact," Journal of Marketing Research, 54(4), 572-588.

31. Sela, Aner Jonah Berger, and Joshua Kim (2017) "How Self-Control Shapes the Meaning of Choice" Journal of Consumer Research, 44(4), 724-737.

32. Weingarten, Evan and Jonah Berger (2017) "Fired Up for the Future: How Time Shapes Sharing," Journal of Consumer Research, 44(2), 432-447.

33. Akpinar, Ezgi and Jonah Berger (2017), "Valuable Virality," Journal of Marketing Research, 54(2), 318-330.

34. Berger, Jonah (2016), "Does Presentation Order Impact Choice After Delay?" Topics in Cognitive Science, 8(3), 670-684.

35. Chen, Zoey and Jonah Berger (2016) "How Content Acquisition Method Affects Word of Mouth," Journal of Consumer Research, 43(1), 86-102.

36. Park, Minsu, Mor Naaman, and Jonah Berger (2016) A Data-driven Study of View Duration on YouTube, 10th International AAAI Conference on Weblogs and Social Media (ICWSM).

37. Gregory Park, Andrew Schwartz, Margaret Kern, Maarten Sap, Evan Weingarten, Johannes Eichstaedt, Jonah Berger, David Stillwell, Michal Kosinski, Lyle Ungar, and Martin Seligman (2016) "Living in the Past, Present, and Future: Measuring Temporal Orientation with Language," Journal of Personality, 85(2), 270-280.

38. Akpinar, Ezgi and Jonah Berger (2015), "Drivers of Cultural Success: The Case of Sensory Metaphors," Journal of Personality and Social Psychology, 109 (1), 20-34.

39. Schwartz, H. Andrew, Park, G., Sap, M., Weingarten, E., Eichstaedt, J., Kern, M., Stillwell, D., Kosinski, M., Berger, J., Seligman, M., & Ungar, L. (2015). Extracting Human Temporal Orientation from Facebook Language. NAACL-2015: Conference of the North American Chapter of the Association for Computational Linguistics.

40. Berger, Jonah (2014) "Word-of-Mouth and Interpersonal Communication: A Review and Directions for Future Research" Journal of Consumer Psychology, 24(4), 586-607.

41. Barasch, Alix and Jonah Berger (2014) "Broadcasting and Narrowcasting: How Audience Size Impacts What People Share," Journal of Marketing Research, 51(3), 286-299.

42. Bhattacharjee, Amit, Jonah Berger and Geeta Menon (2014), "When Identity Marketing Backfires: Consumer Agency in Identity Expression," Journal of Consumer Research, 41(2), 294-309.

43. Milkman, Katherine and Jonah Berger (2014), "The Science of Sharing and the Sharing of Science" Proceedings of the National Academy of Sciences. 111(4), 13642-13649.

44. Berger, Jonah (2014), "Beyond Viral: Interpersonal Communication in the Internet Age," <u>Psychological Inquiry</u>, 24, 293-296.

45. Berger, Jonah and Raghuram Iyengar (2013), "Communication Channels and Word of Mouth: How the Medium Shapes the Message," <u>Journal of Consumer Research</u>, 40(3), 567-579.

46. Chen, Zoey and Jonah Berger (2013), "When, Why, and How Controversy Causes Conversation," <u>Journal of Consumer Research</u>, 40(3), 580-593.

47. Sela, Aner and Jonah Berger (2012) "How Attribute Quantity Influences Option Choice," <u>Journal of Marketing Research</u>, December, 942-953.

48. McShane, Blakely, Eric T. Bradlow, and Jonah Berger (2012), "Visual Influence and Social Groups" <u>Journal of Marketing Research</u>, December, 854-871.

49. Berger, Jonah, Eric Bradlow, Alex Braunstein, and Yao Zhang (2012), "From Karen to Katie: Using Baby names to Study Cultural Evolution" <u>Psychological Science</u>, 23 (10), 1067-1073.

50. Chan, Cindy, Jonah Berger, and Leaf Van Boven (2012), "Identifiable but not Identical: Combining Social Identity and Uniqueness Motives in Choice" <u>Journal of Consumer Research</u>, 39(3), 561-573.

51. Berger, Jonah and Katy Milkman (2012), "What Makes Online Content Viral?" <u>Journal of Marketing Research</u>, 49 (2), 192-205.
    - **William F. O'Dell Award, Journal of Marketing Research, 2017**
    - **Paul Green Award Finalist, Journal of Marketing Research, 2013**
    - **Emerald Citations of Excellence, 2015**

52. Sela, Aner and Jonah Berger (2012), "Decision Quicksand: How Trivial Choice Suck Us In" <u>Journal of Consumer Research</u>, 39(2), 360-370.
    - **Best 2012 Article Finalist, Journal of Consumer Research**

53. Berger, Jonah and Eric Schwartz (2011), "What Drives Immediate and Ongoing Word of Mouth?" <u>Journal of Marketing Research</u>, October, 869-880.

54. Berger, Jonah and Baba Shiv (2011), "Food, Sex, and the Hunger for Distinction." <u>Journal of Consumer Psychology</u>, 21, 464-472.

55. Berger, Jonah (2011), "Arousal Increases Social Transmission of Information," <u>Psychological Science</u>, 22(7), 891-893.

56. Berger, Jonah and Devin Pope (2011), "Can Losing Lead to Winning?" <u>Management Science</u>, 57(5), 817-827.

57. Berger, Jonah and Morgan Ward, (2010) "Subtle Signals of Inconspicuous Consumption," <u>Journal of Consumer Research</u>, 37(4), 555-569. (Lead Article)

58. Berger, Jonah, Alan T. Sorensen, and Scott J. Rasmussen (2010), "Positive Effects of Negative Publicity: When Negative Reviews Increase Sales," <u>Marketing Science,</u> 29(5), 815-827.

59. Berger, Jonah and Gael Le Mens (2009), "Key Considerations in Studying Cultural Abandonment Using Baby Names," Proceedings of the National Academy of Sciences.

60. Berger, Jonah and Gael Le Mens (2009), "How Adoption Speed Affects the Abandonment of Cultural Tastes," Proceedings of the National Academy of Sciences, 106, 8146-8150.

61. Sela, Aner, Jonah Berger, and Wendy Liu (2009), "Variety, Virtue, and Vice: How Assortment Size Influences Option Choice," Journal of Consumer Research, 35(3), 941-951.

62. Berger, Jonah and Chip Heath (2008) "Who Drives Divergence? Identity Signaling, Outgroup Dissimilarity, and the Abandonment of Cultural Tastes," Journal of Personality and Social Psychology, 95(3), 593-607.

63. Berger, Jonah and Lindsay Rand (2008), "Shifting Signals to Help Health: Using Identity Signaling to Reduce Risky Heath Behaviors," Journal of Consumer Research, 35(2), 509-518.

64. Berger, Jonah, Marc Meredith, and S. Christian Wheeler (2008), "Contextual Priming: Where People Vote Affects How They Vote," Proceedings of the National Academy of Sciences, 105 (26), 8846-8849.
    - **Featured in *Nature* (2008). 453, 1197.**

65. Berger, Jonah and Gráinne M. Fitzsimons (2008), "Dogs on the Street, Pumas on Your Feet: How Cues in the Environment Influence Product Evaluation and Choice," Journal of Marketing Research, 45(1), 1-14. (Lead Article)

66. Wheeler, S. Christian and Jonah Berger (2007), "When the Same Prime Leads to Different Effects," Journal of Consumer Research, 34(3), 357-368.

67. Berger, Jonah and Chip Heath (2007), "Where Consumers Diverge from Others: Identity-Signaling and Product Domains," Journal of Consumer Research, 34(2), 121-134. (Lead Article)
    - **Best 2007 Article Finalist, *Journal of Consumer Research***
    - **3rd highest cited JCR paper, 2011-2014**

68. Berger, Jonah, Michaela Draganska, and Itamar Simonson (2007), "The Influence of Product Variety on Brand Perceptions and Choice," Marketing Science, 26, 460-472. (Lead Article)

69. Pronin, Emily, Jonah Berger, and Sarah Molouki (2007), "Alone in a Crowd of Sheep: Asymmetric Perceptions of Conformity and Their Roots in an Introspection Illusion," Journal of Personality and Social Psychology, 92(4), 585-595.
    - **Featured in Editor's Choice section of *Science* (2007). 316, 1814.**

70. Heath, Chip, Ben Ho, and Jonah Berger (2006), "Focal Points in Coordinated Divergence," Journal of Economic Psychology, 27(5), 635-647.

71. Berger, Jonah and Chip Heath (2005), "Idea Habitats: How the Prevalence of Environmental Cues Influences the Success of Ideas," Cognitive Science, 29, 195-221. (Lead Article)

**Books, Chapters, and Other Publications**
72. Berger, Jonah (2020), *The Catalyst: How to Change Anyone's Mind,* Simon & Schuster.
    - **New York Times and Wall Street Journal Bestseller**

73. Berger, Jonah (2016), *Invisible Influence: The Hidden Forces that Shape Behavior,* Simon & Schuster.
   - **New York Times and Wall Street Journal Bestseller**

74. Berger, Jonah (2013), *Contagious: Why Things Catch On*, Simon & Schuster.
   - **New York Times, Wall Street Journal Bestseller, Amazon Best Business Book of 2013, AMA-Berry Book Prize for Best Book in Marketing 2014**
   - **A million copies in print in over 35 languages**

75. Berger, Jonah (2021), "Want Your Ad to Go Viral? Activate These Emotions," <u>Harvard Business Review</u>. February 4

76. Berger, Jonah (2020), "How to Persuade People to Change Their Behavior," <u>Harvard Business Review</u>. April 20

77. Berger, Jonah (2016), "The Goldilocks Theory of Product Success," <u>Harvard Business Review</u>. July 7

78. Buechel, Eva C. and Jonah Berger (2015), "Motivations for Consumers Engaging with Social Media," <u>Consumer Psychology in a Social Media World.</u>

79. Berger, Jonah (2015), "Word of Mouth and Interpersonal Communication," <u>Cambridge Handbook of Consumer Psychology</u>

80. Berger, Jonah (2012), "Crafting Contagious," <u>Google Think Quarterly</u>. August, 60-61.

81. Berger, Jonah (2012), "Bad Reviews Can Boost Sales. Here's Why," <u>Harvard Business Review</u>. March 28.

82. Berger, Jonah (2011), "Social Contagion and Word-of-Mouth," in *Consumer Insights: Findings from Behavioral Research*, Ed Joseph Alba, Marketing Science Institute.

83. Berger, Jonah (2011), "If You Want to Win, Tell Your Team It's Losing (a Little)," <u>Harvard Business Review</u>. October.

84. Rand, Lindsay and Jonah Berger (2010) "Using Identity Signaling to Improve Public Health" in *Leveraging Consumer Psychology for Effective Health Communications: The Obesity Challenge,* Eds. Rajeev Batra, Punam Anand Keller, and Victor J. Strecher, M. E. Sharpe.

85. Berger, Jonah (2008) "Identity-Signaling, Social Influence, and Social Contagion," in *Peer Influence Processes among Youth*, Eds. Mitch Prinstein and Ken Dodge, Guilford Press.

**Working Papers**

86. Li, Yang, Grant Packard, and Jonah Berger, "Conversational Dynamics: *When* Does Employee Language Matter?" *Under 2nd Revision*.

87. Oba, Demi and Jonah Berger, "How Communication Mediums Shape the Message," *Under Revision*.

88. Sepehri, Amir and Jonah Berger, "Passive Voice and Consumer Complaints," *Under Review*.

89. Van Zant, Alex, Jonah Berger, Grant Packard, and Harry Wang, "The Power of Pausing," *Under Review*.

90. Oba, Demi and Jonah Berger, How Hedges Impact Persuasion, *Under Review*.

91. Berger, Jonah and Olivier Toubia, "The Topography of Thought," *Under Review*.

92. Boghrati, Reihane and Jonah Berger, "What Drives Longer Conversations?" *Under Revision*

93. Sepehri, Amir, Reihane Boghrati, and Jonah Berger, "Measuring and Mitigating Bias in Machine Learning," *Under Review*.
    Winner, EMAC-Sheth Foundation Sustainability Research Competition 2022

94. "What Drives Virtual Influencer's Impact?" *Under Review*

95. Dore, Bruce and Jonah Berger, A Linguistic Signature of Sharing.

96. Improving Theoretical Development by Casting a Wider Net

97. The Power of Preparation: Brainstorming Flexible Topics Before Conversations Begin

98. A Machine Learning Approach to examine Originality of user-generated Content from TikTok
    Best in track paper, Big Data, Analytics, AI & Machine Learning track, Winter AMA

99. Sharing Comedy

100. Reverse Diffusion

101. Fast, Nate and Jonah Berger, "Message Splitting: Using Self-Relevant Material to Increase Prosocial Behavior".

102. Disposal in Response to Social Rejection

103. Sela, Aner and Jonah Berger, "On Culture and Metacognition"

104. Aner Sela, Jonah Berger, and Gia Nardini "How Tradeoffs Shrink Attribute Hierarchy"

105. Iyengar, Raghu and Jonah Berger, "How the Quantity and Timing of Social Influence Impact Product Adoption"

106. Stephen, Andrew and Jonah Berger, "Creating Contagious: How Social Networks and Item Characteristics Combine to Spur Ongoing Consumption and Drive Social Epidemics."

107. Berger, Jonah, Ben Ho, and Yogesh Joshi, "Identity Signaling with Social Capital: A Model of Symbolic Consumption."

108. Berger, Jonah, "When Does Social Influence Attract versus Repel? Identity-Signaling, Conformity, and Divergence."

109. Dover, Yaniv, Jonah Berger, Jacob Goldenberg, and Daniel Shapira, "Using the Internet to Spot Secrets."

## Select Research in Progress
Emotional Arcs and Movie Success
Trajectories within Narratives

## Service
MBA Curriculum Committee, 2021-
Organizer, Insights from Text Conference, 2017-
Wharton Digital Press Faculty Advisory Board
MBA Executive Committee, The Wharton School, July 2017-
Undergraduate Marketing Coordinator, The Wharton School, 2016-
Co-Founder, Technology and Behavioral Science Initiative, The Wharton School, 2015-
University of Pennsylvania Faculty Senate Executive Committee October 2018-2020
PhD Committee, The Wharton School, Sept 2009-July 2015
Curriculum Review Committee, The Wharton School, Sept 2015 – July 2016
MBA Class of 2014 Convocation Speaker 2012
Dean's Advisory Council, The Wharton School, Sept 2011 – July 2012
Decision Process Seminar, Co-Organizer, The Wharton School, Sept 2008 - July 2010
Course Development: MKTG 228/728 (Contagious: How Products, Ideas, and Behaviors Catch On)

## Editorial Activities
Associate Editor, *Journal of Marketing,* June 2018 -
Associate Editor, *Journal of Marketing Research,* July 2012 - 2020
Associate Editor, Special Issue on Social Media, *Information Systems Research*, 2011
Guest Editor, *Proceedings of the National Academy of Sciences*
Guest Editor, *Journal of Marketing*

Editorial Review Boards: *Journal of Consumer Research, Marketing Science, Journal of Consumer Psychology, Journal of Marketing Research, Journal of Marketing.*

Program Committees: *Association for Consumer Research* (2009, 2011, 2013, 2014, 2020 Knowledge Forum Chair), *Society for Consumer Psychology* (2008, 2013, 2014, 2020)

Selected Ad-Hoc Reviewing
*Journal of Personality and Social Psychology, Journal of Experimental Social Psychology, Journal of Personality, Journal of Decision Making, Organizational Behavior and Human Decision Processes, Trends in Cognitive Science, Journal of Experimental Psychology: Applied, International Journal of Research in Marketing, Psychological Science, Personality and Social Psychology Bulletin, Society for Judgment and Decision Making Conference, PLoS ONE, Social and Personality Psychology Compass, Management Science, Proceedings of the National Academy of Sciences, Evolution and Human Behavior, Journal of Behavioral Decision Making, Advances in Complex Systems, Nature: Human Behavior, Self and Identity*

## Advising
Demi Oba (co-advisor)
Ike Silver (committee member)
Reihane Boghrati
Ezgi Akpinar (co-advisor) winner, 2014 McKinsey Dissertation Award
Zoey Chen (committee member)
Cindy Chan (committee member)
Amit Bhattacharjee (committee member)

**Prior Testimony in the Last Four Years**

I have given expert testimony at deposition and/or at trial in the following matters since March 10, 2019:

1. *State of North Carolina ex rel. Joshua H. Stein, Attorney General vs. JUUL Labs Inc.*, General Court of Justice, Superior Court Division, State of North Carolina, Durham County, File No.: 19-CVS-2885. Deposition testimony on February 23, 2021, and February 24, 2021.

2. *In Re Duramax Diesel Litigation*, United States District Court for the Eastern District of Michigan, Case No. 1:17-cv-11661-TLL-PTM, and related matters. Deposition testimony on March 18, 2022.

3. *JUUL Labs, In. Marketing, Sales Practices, and Products Liability Litigation*, United States District Court, Northern District of California, File No.: 19-md-02913-WHO. Deposition testimony on October 7, 2021, November 30, 2021, and May 19, 2022.

4. *J. Hart et al. v. TWC Product and Technology LLC*, United States District Court, Northern District of California, Case No. 4:20-cv-3842-JST. Deposition testimony on June 3, 2022.

5. *J. Ciccio et al. v. SmileDirectClub, Inc.,* United States District Court, Middle District of Tennessee, Nashville Division, Case No. 3:19-cv-00845. Deposition testimony on July 25, 2022.

6. *Walter Peters v. Apple, Inc.,* Superior Court of the State of California, County of Los Angeles, Case No. 19STCV21787. Deposition testimony on August 26, 2022.

7. *State of Minnesota, by its Attorney General, Keith Ellison vs. Juul Labs Inc.*, Fourth Judicial District Court, State of Minnesota, County of Hennepin, Court File No. 27-CV-19-19888. Deposition testimony on September 30, 2022.

8. *City of Chicago v. Juul Labs, Inc. et al.*, In the Circuit Court of Cook County, Illinois County Department, Chancery Division. Case No. 2020CH04183. Deposition testimony on October 19, 2022.

9. *Commonwealth of Kentucky, ex rel. Daniel Cameron, Attorney General v. Johnson & Johnson, et al.,* Commonwealth of Kentucky, Franklin Circuit Court, Civil Action No. 16-CI-867. Deposition testimony on November 2, 2022.

10. *District of Columbia v. Juul Labs, Inc. et al.*, In the Superior Court of the District of Columbia, Civil Division. Case No. 2019-CA-007795-B. Deposition testimony on February 7, 2023.

**Appendix B**

11. *Yuga Labs, Inc. v. Ripps, et al.,* United States District Court, Central District of California.  Case No. 2:22-cv-04355.  Deposition testimony on March 9, 2023.

# Documents Relied Upon

**Academic Literature**

- Anindya Ghose and Sang Pil Han, "Estimating Demand for Mobile Applications in the New Economy," *Management Science*, 60(6), 2014, pp. 1470–1488.

- Austan Goolsbee and Amil Petrin, "The Consumer Gains from Direct Broadcast Satellites and the Competition with Cable TV," *Econometrica*, 72(2), 2004, pp. 351–381.

- Avichai Snir, Daniel Levy, and Haipeng Allan Chen, "End of 9-Endings, Price Recall, and Price Perceptions," *Economics Letters*, 155, 2017, pp. 157–163.

- Avner Strulov-Shlain, "More Than a Penny's Worth: Left-Digit Bias and Firm Pricing," *The Review of Economic Studies*, 2022, pp. 1–34, with Online Appendix.

- Christopher T. Conlon and Nirupama L. Rao, "Discrete Prices and the Incidence and Efficiency of Excise Taxes," *American Economic Journal: Economic Policy*, 12(4), 2020, pp. 111–143.

- Daniel Levy et al., "Price Point and Price Rigidity," *Review of Economics and Statistics*, 93(4), 2011, pp. 1417–1431.

- Dik Warren Twedt, "Does the "9 Fixation" in Retail Pricing Really Promote Sales?" *Journal of Marketing,* 29(4), 1965, pp. 54–55.

- Dongwon Lee et al., "Image Effects and Rational Inattention in Internet-Based Selling," *International Journal of Electronic Commerce*, 13(4), 2009, pp. 127–165.

- Edward S. Knotek, "The Roles of Price Points and Menu Costs in Price Rigidity," *Federal Reserve Bank of Cleveland Working Paper 19-23*, 2019, pp. 1–53, available at https://www.clevelandfed.org/publications/working-paper/2019/wp-1923-price-points-menu-costs-price-rigidity.

- Eric T. Anderson and Duncan I. Simester, "Effects of $9 Price Endings on Retail Sales: Evidence from Field Experiments," *Quantitative Marketing and Economics*, 1, 2003, pp. 93–110.

- Eric Anderson, Nir Jaimovich, and Duncan Simester, "Price Stickiness: Empirical Evidence of the Menu Cost Channel," *Review of Economics and Statistics*, 97(4), 2015, pp. 813–826.

- Frank Hackl, Michael E. Kummer, and Rudolf Winter-Ebmer, "99 Cent: Price Points in e-Commerce," *Information Economics and Policy*, 26, 2014, pp. 12–27.

- George Y. Bizer and Robert M. Schindler, "Direct Evidence of Ending-Digit Drop-Off in Price Information Processing," *Psychology & Marketing*, 22(10), 2005, pp. 771–783.

- Hui Li, "Intertemporal Price Discrimination with Complementary Products: E-Books and E-Readers," *Management Science*, 65(6), 2019, pp. 2665–2694.

- Hui-Hsi Hung et al., "Consistent Price Endings Increase Consumers Perceptions of Cheapness," *Journal of Retailing and Consumer Service*, 61, 2021, pp. 1–11.

- Itai Ater and Omri Gerlitz, "Round Prices and Price Rigidity: Evidence from Outlawing Odd Prices," *Journal of Economic Behavior & Organization,* 144, 2017, pp. 188–203.

- John A. List et al., "Left-Digit Bias at Lyft," *Review of Economic Studies*, 2023, pp. 1–74.

- Kaushik Basu, "Consumer Cognition and Pricing in the Nines in Oligopolistic Markets," *Journal of Economics & Management Strategy*, 15(1), 2006, pp. 125–141.

- Keith S. Coulter and Anne L. Roggeveen, "Price Number Relationships and Deal Processing Fluency," *Journal of Marketing Research,* 51(1), 2014, pp. 69–82.

- Lester E. Krueger, "Familiarity Effects in Visual Information Processing," *Psychological Bulletin*, 1975, p. 949

- Manoj Thomas and Vicki G. Morwitz, "The Ease-of-Computation Effect: The Interplay of Metacognitive Experiences and Naive Theories in Judgments of Price Differences," *Journal of Marketing Research,* 46(1), 2009, pp. 81–91.

- Manoj Thomas and Vicki G. Morwitz, "Penny Wise and Pound Foolish: The Left-Most Digit Effect in Price Cognition," *Journal of Consumer Research*, 32(1), 2005, pp. 54–64.

- Manoj Thomas and Vicki G. Morwitz, "Heuristics in Numerical Cognition: Implications for Pricing," in *Handbook of Pricing Research in Marketing*, (Northampton, MA: Edward Elgar Publishing, 2009), pp. 132–149.

- Mark Stiving and Russell S. Winer, "An Empirical Analysis of Price Endings with Scanner Data," *Journal of Consumer Research*, 24(1), 1997, pp. 57–67.

- Matthias Fengler and Joachim Winter, "Price-Setting and Price-Adjustment Behavior for Fast-Moving Consumer Goods," *Social and Economic Research with Consumer Panel Data: Proceedings of the First ZUMA Symposium on Consumer Panel Data*, 2001, pp. 95–113, available at https://nbn-resolving.org/urn:nbn:de:0168-ssoar-49477-7.

- Plamen P. Peev and James M. Mayer, "Consumer Perceptions of Precise vs. Just-Below Prices in Retail Settings," *Journal of Promotion Management*, 2017, pp. 1–16.

Case 4:11-cv-06714-YGR Document 830-7 Filed 04/26/24 Page 87 of 147
Case: 25-7930, 06/12/2026, DktEntry: 13.4, Page 195 of 255

**Appendix C**

- Régis Chenavaz et al., "Convenience Pricing in Online Retailing: Evidence from Amazon.com," *Economic Modelling,* 70, 2017, pp. 127–139. Robert M. Schindler, "Relative Price Level of 99-Ending Prices: Image Versus Reality," *Marketing Letters*, 12(3), 2001, pp. 239–247.

- Robert M. Schindler and Patrick N. Kirby, "Patterns of Rightmost Digits Used in Advertised Prices: Implications for Nine-Ending Effects," *Journal of Consumer Research*, 24(2), 1997, pp. 192–201.

- Robert Schindler and Thomas M. Kibarian, "Increased Consumer Sales Response Through Use of 99-Ending Prices," *Journal of Retailing*, 72(2), 1996, pp. 187–199.

**Bates-Stamped Documents**

- APL_APPSTORE_10342115–2233

**Data**

- App Annie Data

- U.S. Storefront App Store Transaction Data

- Google Play Data

**Depositions**

- Deposition of Eric Gray, February 12, 2021.

- Deposition of Professor Daniel L. McFadden, August 3, 2021.

- Deposition of Professor Daniel L. McFadden, November 5, 2021.

- Deposition of Professor Daniel L. McFadden, December 5, 2022.

**Expert Reports**

- Expert Report of Professor Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, June 1, 2021.

- Expert Report of Professor Jeffrey T. Prince, Ph.D., March 10, 2023.

- Expert Report of Professor Lorin M. Hitt, March 10, 2023.

- Reply Report of Professor Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, October 19, 2021.

- Revised Supplemental Expert Report of Professor Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, December 30, 2022.

- Second Revised Supplemental Expert Report of Professor Daniel L. McFadden in Support of Plaintiffs' Renewed Motion for Class Certification, January 19, 2023.

- Supplemental Expert Report of Professor Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, September 26, 2022.

**Legal Pleadings**

- Gorsuch, J., Dissenting Opinion, *Apple Inc., Petitioner v. Robert Pepper, et al.*, *On Writ of Certiorari to the United States Court of Appeals for the Ninth Circuit*, Supreme Court of the United States, No. 17-204, May 13, 2019.

- Order Granting Stipulation for Leave to File Third Amended Consolidated Class Action Complaint, *In Re iPhone Antitrust Litigation*, September 17, 2020.

- Order Denying Plaintiffs' Motion for Class Certification Without Prejudice; Granting in Part and Denying in Part Apple's *Daubert* Motions to Exclude Testimony of Professor Daniel L. McFadden, *In Re iPhone Antitrust Litigation*, March 29, 2022.

**Webpages**

- Amazon, "Amazon Music Unlimited," available at https://www.amazon.com/music/unlimited.

- Amazon, "Best Sellers in Apps & Games," available at https://www.amazon.com/gp/bestsellers/mobile-apps?ref_=appstore_categorynav.

- Amazon, "Best Sellers in Kindle Store," available at https://www.amazon.com/Best-Sellers-Kindle-Store/zgbs/digital-text/ref=zg_bs.

- Amazon, "Best Sellers in Movies," available at https://www.amazon.com/gp/bestsellers/movies-tv/2858905011.

- Amazon, "Best Sellers in TV," available at https://www.amazon.com/Best-Sellers-TV/zgbs/movies-tv/2864549011.

- Amazon, "Prime Video," available at https://www.amazon.com/hp/video/offers/intercept/.

- Amazon Appstore, "Step 3: Availability and Pricing," available at https://developer.amazon.com/docs/app-submission/publish-app-availability-pricing.html.

- App Store, "Top Free Entertainment Apps," available at https://apps.apple.com/us/charts/iphone/entertainment-apps/6016.

- App Store, "Top Free Music Apps," available at https://apps.apple.com/us/charts/iphone/music-apps/6011.

**Appendix C**

- Apple, "App Store Subscription Pricing," December 2016, available at https://web.archive.org/web/20171222223003/https:/developer.apple.com/app-store/subscriptions/App-Store-Subscription-Pricing.pdf.

- Apple, "Apple Announces Biggest Upgrade to App Store Pricing, Adding 700 New Price Points," December 6, 2022, available at https://www.apple.com/newsroom/2022/12/apple-announces-biggest-upgrade-to-app-store-pricing-adding-700-new-price-points.

- Apple, "Apple News+," available at https://www.apple.com/apple-news/.

- Apple, "Apple One," available at https://www.apple.com/apple-one/.

- Apple, "The App Store Turns 10," July 5, 2018, available at https://www.apple.com/newsroom/2018/07/app-store-turns-10/.

- Apple App Store, "Offering Subscriptions," available at https://web.archive.org/web/20170211170257/https://developer.apple.com/app-store/subscriptions/.

- Audiomack, "Start Your Free Trial," available at https://audiomack.com/premium.

- Barnes & Noble, "B&N Top 100: Bestselling eBooks," available at https://www.barnesandnoble.com/b/ebooks-nook/_/N-1fZ8qa.

- Disney+, "Choose Your Plan," available at https://www.disneyplus.com/.

- Epic Games, "Top Sellers," available at https://store.epicgames.com/en-US/collection/top-sellers.

- Equinux, "A Better App Store Pricing Matrix - Equinux," available at http://www.equinux.com/us/appdevelopers/pricematrix.html.

- Google Play, "Supported Locations for Distribution to Google Play Users," available at https://support.google.com/googleplay/android-developer/answer/10532353.

- Google Play, "Top Movies," available at https://play.google.com/store/movies?hl=en_US&gl=US.

- Google Play, "Top Selling," available at https://play.google.com/store/books?hl=en_US&gl=US.

- Google Play, "Top TV Shows," available at https://play.google.com/store/movies/category/TV?hl=en_US&gl=US.

- HBO Max, "Choose A Plan That Works for You," available at https://www.hbomax.com/.

- Hulu, "Select Your Plan," available at https://www.hulu.com/welcome.

- iHeart, "Upgrade," available at https://www.iheart.com/upgrade?upsellFrom=54.

**Appendix C**

- Is There Any Deal, "Is There Any Deal," available at https://isthereanydeal.com/.

- Netflix, "Choose the Plan That's Right for You," available at https://www.netflix.com/signup/planform.

- Nintendo, "Digital Best Sellers," available at https://www.nintendo.com/store/games/best-sellers/.

- Pandora, "Choose How You Want to Listen," available at https://www.pandora.com/.

- Paramount+, "Pick Your Plan," available at https://www.paramountplus.com/account/signup/pickplan.

- Peacock TV, "Pick A Plan.  Cancel Anytime.," available at https://www.peacocktv.com/plans/all-monthly.

- PlayStation, "Best Sellers," available at https://store.playstation.com/en-us/category/877e5ce2-4afc-4694-9f69-4758e34e58cd/1/.

- Samsung Galaxy Store Device Images.

- Samsung Galaxy Store Seller Portal, "App Registration," available at https://seller.samsungapps.com/guidePopup.as?numcid=0201030000&localeLanguage=en.

- SiriusXM, "Popular Plans," available at https://www.siriusxm.com/plans?intcmp=Global%20Nav_NA_www:Home_ComparePlans.

- Smule, "Unlock Deal," available at https://www.smule.com/en/s/billing/pricing/v121.

- Sonos, "Sonos Radio HD," available at https://www.sonos.com/en-us/sonos-radio.

- SoundCloud, "SoundCloud Go," available at https://checkout.soundcloud.com/go.

- Spotify, "Pick Your Premium," available at https://www.spotify.com/us/premium/#plans.

- Statista, "Distribution of Music Industry Revenue in the United States from 2017 to 2021, By Source," available at https://www.statista.com/statistics/186304/revenue-distribution-in-the-us-music-industry/.

- Statista, "Video-on-Demand," available at https://www.statista.com/outlook/dmo/digital-media/video-on-demand/united-states#revenue.

- Steam, "Top Sellers," available at https://store.steampowered.com/search/?filter=topsellers&ignore_preferences=1.

- TechCrunch, "Google Play Targets Emerging Markets with Prepaid App Subscriptions and More," May 11, 2022, available at

https://techcrunch.com/2022/05/11/google-play-targets-emerging-markets-with-prepaid-app-subscriptions-and-more/.

- Vudu, "Top 200 Movies," available at https://www.vudu.com/content/movies/uxrow/Top-200-Movies/14028.

- Vudu, "Top 200 Television," available at https://www.vudu.com/content/movies/uxrow/Top-200-Television/14029.

- Xbox, "Best Sellers," available at https://www.xbox.com/en-US/games.

- YouTube, "Choose the Plan That Works for You," available at https://tv.youtube.com/welcome/.

- YouTube, "Top Selling," available at https://www.youtube.com/playlist?list=PLHPTxTxtC0ial7mOT-Srrguvokjvlcbg7.

- YouTube, "YouTube Music," available at https://music.youtube.com/music_premium/musicfeed.

# Google Play to App Store In-App Purchase Mapping Methodology

This document outlines the methodology used in matching Google Play in-app purchase products to App Store in-app purchase products.

1. I first filtered to the top 100 products (by gross consumer amount spent) contained in the sample of Google Play in-app purchase data in the U.S. for the month of January 2022. This sample is discussed in further detail in Section VII.

2. In order to search for a corresponding in-app purchase product on the App Store, I filtered the Apple Transaction Data to in-app purchase transactions that occurred in January 2022.

3. For each of the top 100 in-app purchase products in the Google Play sample, I first attempted to match the Google Play app to a corresponding App Store app from the Apple Transaction Data.

   a. If either the Google Play app had an unclear name (*e.g.*, "ddi"), or the Apple Transaction Data didn't explicitly list an app corresponding to the Google Play app, I did not record a match for that specific Google Play in-app purchase product.

4. For each Google Play app for which I found a corresponding App Store app, I next searched for in-app purchase products in the Apple Transaction Data that closely resembled the Google Play in-app purchase products by examining product names.

   a. If either the Google Play in-app purchase product (*e.g.*, "6") or the list of potentially matching App Store in-app purchase products (*e.g.*, "EÃ¥Â¥Â—Ã©â‚¬Â  28609") contained unclear names, I did not record a match for that Google Play in-app purchase product.

   b. If there were multiple App Store in-app purchase products that appeared to be a match for the Google Play in-app purchase product, I selected the corresponding in-app purchase product in the App Store with the highest revenue and billings per the Apple Transaction Data as the match.

5. Using this methodology, I was able to match 57 of the top 100 Google Play in-app purchase products to the App Store.

# Platform Pricing Requirements[1]

| Platform | Type of Platform | Pricing Policy | Example Non-99 Price Endings | Evidence of 99-Ending Price Requirement |
|---|---|---|---|---|
| Amazon Appstore | App transaction platform | The platform allows developers to "enter a base list price and currency from the drop-down menu," with apps having minimum base list prices that vary by currency and a maximum price of $999.99 USD.  The price that developers "set for each marketplace is [their] suggested list price, which includes any VAT or similar taxes that apply in that marketplace."[2] | 00, 24, 35, 42, 46, 48, 50, 69, 88, 96[3] | No |
| Google Play | App transaction platform | The platform directs developers to go to the "App pricing" page in Play Console and enter a price.  The platform has a list of price ranges and currencies allowed by country and "use[s] the price [developers] enter as the base for calculating market-specific prices."[4] | 00, 19, 29, 55, 59, 95[5] | No |
| Samsung Galaxy Store | App transaction platform | The "Terms and Conditions" of the platform's "Seller Portal" page indicates that the platform will "charge the price set by [developers] (provided that such price conforms to the Applicaton price points specified by Samsung)."  The "App Registration" page indicates that developers can "manually enter and set the base price for each country/region" but can "adjust the price only to the available prices."[6] | 00, 09, 10, 20, 46, 48, 50, 75, 77, 79, 90, 95, 96[7] | No |
| Epic Games Store | Digital game store | The platform allows developers to "set a base USD price tier" for their product and "default price tiers for additional regions are then calculated using the provided USD value." If needed, developers can "create custom price tiers to determine [their] own regional pricing in place of using the suggested price tiers," contingent on approval by the platform.[8] | 19, 74, 79, 88, 95, 96, 97[9] | No |
| Microsoft Xbox | Digital game store | The platform allows developers to select a base price that "will be used in every market where [their] app is sold, unless [they] override the base price in any market(s)."  For base prices, developers "choose an available price tier," with tiers starting at 0.99 USD.  Additional tiers are "available at increasing increments (1.09 USD, 1.19 USD, and so on)," with "increments generally increas[ing] as the price gets higher."  Developers can override base prices in specific markets "either by choosing a different price tier or entering a free-form price in the market's local currency."[10] | 09, 19, 24, 54, 59, 79, 87[11] | No |
| Steam | Digital game store | The platform indicates that developers "have control over their own prices, in every currency."  The platform will make a "recommendation for all other currencies, based on whatever USD price [developers] choose," but recommendations do not need to be used.[12] | 00, 19, 24, 63, 69, 74, 79, 87, 89[13] | No |
| Google Play | e-Book provider | The platform allows developers to "enter the price" for their product and "select the list of countries or regions where this price should apply."[14] | 08, 17, 21, 24, 31, 54, 57, 65, 71[15] | No |
| Kindle Store | e-Book provider | The platform's publishing service allows authors to "choose [their] list price at [their] discretion, but it must be within . . . [a] range of minimum and maximum list prices."  When setting list prices, authors can choose to have that price automatically converted to prices in all available marketplaces and currencies or choose to enter a list price for each available marketplace and currency.[16] | 07, 21, 39, 44, 50, 65, 79, 80[17] | No |

# Platform Pricing Requirements[1]

Note:

[1]  Price requirement research is limited to two-sided platforms where the evidence gathered suggests that developers/publishers are able to set their own prices for their products.  To determine the extent of pricing requirements on each platform, pricing policies were examined and sample prices seen on the platform were collected.

[2]  Amazon Appstore, "Step 3: Availability and Pricing," available at https://developer.amazon.com/docs/app-submission/publish-app-availability-pricing.html.

[3]  Amazon Appstore, "Apps & Games," available at https://www.amazon.com/mobile-apps/b?ie=UTF8&node=2350149011.  Price endings reflect price endings shown on the Amazon Appstore on 3/7/23.

[4]  Google Play, "Set up your app's prices," available at https://support.google.com/googleplay/android-developer/answer/6334373?hl=en#zippy=%2Cpaid-apps.

[5]  Google Play, "Apps," available at https://play.google.com/store/apps.  Price endings reflect price endings shown on the Google Play Store on 3/7/23.

[6]  Samsung Galaxy Store Seller Portal, "Terms and Conditions," available at https://seller.samsungapps.com/help/termsAndConditions.as; Samsung Galaxy Store Seller Portal, "App Registra ion," available at https://seller.samsungapps.com/guidePopup.as?numcid=0201030000&localeLanguage=en.

[7]  Samsung Galaxy Store, "Galaxy Store," available at https://galaxystore.samsung.com.  Price endings reflect price endings shown on the Samsung Galaxy Store on 11/29/22.

[8]  Epic Games, "Create Custom Price Tiers," available at https://dev.epicgames.com/docs/epic-games-store/publishing-tools/store-presence/custom-price-tiers.

[9]  Epic Games, "Store," available at https://store.epicgames.com/en-US/.  Price endings reflect price endings shown on the Epic Games Store on 3/7/23.

[10]  Microsoft, "Set and schedule app pricing," available at https://learn.microsoft.com/en-us/windows/apps/publish/publish-your-app/schedule-pricing-changes?pivots=store-installer-add-on.

[11]  Microsoft Xbox, "Xbox Games Catalog," available at https://www.xbox.com/en-US/games/all-games.  Price endings reflect price endings shown on Microsoft Xbox on 3/7/23.

[12]  Steamworks, "Pricing," available at https://partner.steamgames.com/doc/store/pricing.

[13]  Steam, "Store," available at https://store.steampowered.com/.  Price endings reflect price endings shown on Steam on 3/7/23.

[14]  Google Play, "Book prices," available at https://support.google.com/books/partner/answer/3238849?hl=en.

[15]  Google Play, "Books," available at https://play.google.com/store/books.  Price endings reflect price endings shown on the Google Play Store on 3/7/23.

[16]  Kindle, "Price Your Book," available at https://kdp amazon.com/en_US/help/topic/G200641280.

[17]  Amazon, "Kindle Books," available at https://www.amazon.com/kindle-dbs/storefront?storeType=browse&node=154606011.  Price endings reflect price endings shown on Kindle Books on 3/7/23.

**SER-698**

**Exhibit 1**

# App Store Price Points

| Paid App and In-App Purchase Price Points[1] | | Auto-Renewable Subscription Price Points[1][2] | |
|---|---|---|---|
| **Range** | **Increment** | **Range** | **Increment** |
| $0.99 – $49.99 | $1.00 | $0.49 – $29.99 | $0.50 |
| $49.99 – $99.99 | $5.00 | $29.99 – $124.99 | $1.00 |
| $99.99 – $249.99 | $10.00 | $124.99 – $299.99 | $5.00 |
| $249.99 – $499.99 | $50.00 | $299.99 – $329.99 | $30.00 |
| $499.99 – $999.99 | $100.00 | $329.99 – $349.99 | $20.00 |
| – | – | $349.99 – $499.99 | $50.00 |
| – | – | $499.99 – $999.99 | $100.00 |

Source:  Equinux, "A Better App Store Pricing Matrix - Equinux," available at http://www.equinux.com/us/appdevelopers/pricematrix.html;  Apple App Store, "Offering Subscriptions," available at https://web.archive.org/web/20170211170257/https://developer.apple.com/app-store/subscriptions/.

Note:
[1]  Price points are grouped based on their price tier increments.
[2]  The additional price points for auto-renewable subscriptions were added in September 2016.

**SER-699**

**Exhibit 2**

# Percentage of Prices Ending in X9 or 99 cents in the Academic Literature
## By Category of Goods

SER-700

| No. | Paper[1] | Country | Period | Category | Price Range | Percentage of Prices Ending in X9 Cents | Percentage of Prices Ending in 99 Cents |
|---|---|---|---|---|---|---|---|
| | | | | | Median | 63.7% | 42.0% |
| | | | | | Minimum | 33.4% | 2.0% |
| | | | | | Maximum | 95.0% | 91.0% |
| 1 | Twedt (1965) | U.S. | 1965 | Supermarket Goods[3] | Not reported | 64.0% | - |
| 2 | Twedt (1965) | U.S. | 1965 | Supermarket Goods | Not reported | 57.0% | - |
| 3 | Stiving and Winer (1997) | U.S. | Over 2.4-year period | Supermarket Goods | Prices below $1 | 50.5% | - |
| 4 | Stiving and Winer (1997) | U.S. | Over 2.6-year period | Supermarket Goods | Prices below $1 | 36.1% | - |
| 5 | Levy et al. (2011) | U.S. | 1989–1997 | Supermarket Goods | Prices below $30 | 69.0% | 15.0% |
| 6 | Knotek (2019) | U.S. | 1989–1997 | Supermarket Goods | Not reported | 63.6% | - |
| 7 | Schindler (2001) | U.S. | 02.1997–03.1997 | Supermarket Goods | Median price is $13.72 | - | 56.8% |
| 8 | Knotek (2019) | U.S. | 2001–2011 | Supermarket Goods | Not reported | 63.7% | - |
| 9 | Knotek (2019) | U.S. | 2001–2011 | Supermarket Goods | Not reported | 75.0% | - |
| 10 | Anderson et al. (2015) | U.S. | 2005–2009 | Supermarket Goods | Not reported | 95.0% | 48.0% |
| **11** | **Strulov-Shlain (2022)** | **U.S.** | **2006–2019** | **Supermarket Goods** | **Average price is below $5** | **69.0%** | **32.0%** |
| 12 | Strulov-Shlain (2022)[2] | U.S. | 2006–2019 | Supermarket Goods | Average price is below $5 | 87.0% | 41.0% |
| 13 | Ater and Gerlitz (2017) | Israel | 03.2013–11.2013 | Supermarket Goods | Not reported | 60.0% | 42.0% |
| 14 | Snir et al. (2017) | Israel | 07.2013–08.2013 | Supermarket Goods | Not reported | 72.0% | 60.0% |
| 15 | Conlon and Rao (2020) | U.S. (Louisiana) | 2006–2016 | Alcohol[4] | Average price is $18–$23 | - | 78.0% |
| 16 | Conlon and Rao (2020) | U.S. (Illinois) | 2006–2016 | Alcohol | Average price is $16–$20 | - | 80.0% |
| 17 | Conlon and Rao (2020) | U.S. (Connecticut) | 2006–2016 | Alcohol | Average price is $23–$24 | - | 91.0% |
| 18 | Lee et al. (2009) | U.S. | 2000s (two-year period) | Consumer Electronics[5] | Prices up to $3,670 | 38.7% | 30.0% |
| 19 | Levy et al. (2011) | U.S. | 2003–2005 | Consumer Electronics | Prices up to $6,000 | 33.4% | 26.7% |
| **20** | **Hackl et al. (2014)** | **Austria** | **2007** | **Consumer Electronics** | **Average price is €402.3** | **-** | **2.0%** |
| 21 | Lee et al. (2009) | U.S. | 2000s (two-year period) | Media and Entertainment[6] | Average price is $13.46 | 51.3% | 33.8% |
| 22 | Lee et al. (2009) | U.S. | 2000s (two-year period) | Media and Entertainment | Average price is $27.07 | 46.6% | 30.0% |
| 23 | Lee et al. (2009) | U.S. | 2000s (two-year period) | Media and Entertainment | Average price is $29.84 | 69.3% | 65.7% |
| 24 | Chenavaz et al. (2017) | U.S. | 03.2016–05.2016 | Books[7] | Prices below $30 | - | 30.6% |

Note:

[1] Rows in red represent papers and statistics cited in McFadden Second Revised Supplemental Report.
[2] This row reports statistics from the cleaned sample, while row 11 reports statistics from the full sample.
[3] Supermarket Goods include grocery and drugstore goods.
[4] Alcohol includes spirits.
[5] Consumer Electronics include CDs, DVDs, PCs, software, digital camera, monitors, and hard drives.
[6] Media and Entertainment include CDs, DVDs, and video games.
[7] Books include hardcover and paperback books, e-books, and audiobooks.

Exhibit 3

## Distribution of Transaction Prices for App Store Paid App Downloads
### 2008—2022

Percent of
Transactions



Note: This analysis is restricted to transactions of paid app downloads with a price greater than zero. Transactions where Apple is the developer are excluded. See Hitt Second Report, Appendix 7 for details regarding Apple Transaction Data processing.

SER-701

Exhibit 4

# Distribution of Transaction Prices for App Store Paid Non-Subscription In-App Purchases
## 2009—2022



SER-702

Exhibit 5

**Distribution of Transaction Prices for App Store Paid Subscription Products**
2011–2022



SER-703

**Exhibit 6**

SER-704

# Google Play Paid App Download Summary Statistics

| Data Source | Percentage with Prices Ending in $X.99 | Percentage with Prices Ending in $X.99 or $X.49 |
|---|---|---|
| Google Play Sample (January 2022) | | |
| Products | 75.2% | 96.0% |
| Revenue | 76.6% | 95.9% |
| Number of Downloads | 81.3% | 97.5% |
| App Annie | | |
| Products | 72.8% | 91.0% |
| Revenue | 88.9% | 95.0% |
| Number of Downloads | 86.8% | 95.0% |

Source:  Google Play Data; App Annie Data

Note:  The Google Play sample is restricted to paid app downloads in the U.S. in January 2022 with a price greater than zero.  Revenue figures for the Google Play sample reflect the total gross consumer amount spent.  App Annie data is restricted to paid app downloads in the U.S. with a price greater than zero, and prices are as of 12/31/19.

**Exhibit 7**

# Google Play In-App Purchase Products

| | Total | | Subscriptions | |
|---|---|---|---|---|
| | **Percentage with Prices Ending in $X.99** | **Percentage with Prices Ending in $X.99 or $X.49** | **Percentage with Prices Ending in $X.99** | **Percentage with Prices Ending in $X.99 or $X.49** |
| Products | 79.3% | 85.4% | 69.3% | 76.2% |
| Gross Consumer Amount Spent | 97.1% | 97.7% | 96.5% | 97.5% |
| Number of Purchases | 97.1% | 98.4% | 96.2% | 98.5% |

Source:  Google Play Data

Note:  Analysis is restricted to in-app purchase transactions in the U.S. in January 2022 with a price greater than zero.

SER-705

**Exhibit 8**

# Paid App Downloads on App Store and Google Play Summary Statistics

|  | App Store Price Equals Google Play Price | App Store Price > Google Play Price | App Store Price < Google Play Price |
|---|---|---|---|
| **Top 100 Apps** | | | |
| Percentage of Apps | 71% | 16% | 13% |
| Percentage of Revenue | 81% | 9% | 11% |
| Percentage of Downloads | 81% | 8% | 10% |
| **All Apps** | | | |
| Percentage of Apps | 60% | 19% | 20% |
| Percentage of Revenue | 78% | 10% | 12% |
| Percentage of Downloads | 77% | 11% | 12% |

Source: App Annie Data

Note: This analysis is restricted to paid app downloads in the U.S. with a price greater than zero. It does not include in-app subscriptions or purchases. Prices are as of 12/31/19. Values for the top 100 apps reflect the top 100 paid apps based on total revenue. Note that totals may not add up to 100 percent due to rounding.

SER-706

Case 25-7030, 08/12/2026, DktEntry: 34.4, Page 124 of 255

**Exhibit 9**

# Summary of Amazon Appstore Top Paid App Downloads

| Number of Apps | Percentage of Apps with Prices Ending in $X.99 | Percentage of Apps with Prices Ending in $X.99 or $X.49 |
|:---:|:---:|:---:|
| 100 | 89% | 94% |

Source:  Amazon, "Best Sellers in Apps & Games," available at https://www.amazon.com/gp/bestsellers/mobile-apps?ref_=appstore_categorynav

Note:  This analysis is restricted to the top 100 paid app downloads on the Amazon Appstore, based on the quantity of units sold, accessed on 11/14/22.  The Amazon Appstore only presents the top 100 paid app downloads on its website.

**Exhibit 9A**

# Summary of Amazon Appstore Top Paid App Downloads

| No. | App Name | Price | Price Ends in $X.99? | Price Ends in $X.99 or $X.49? |
|---|---|---|---|---|
| | **Percentage of Apps** | | **89.0%** | **94.0%** |
| 1 | Minecraft | $6.99 | Y | Y |
| 2 | Toca Life: Hospital | $3.99 | Y | Y |
| 3 | Toca Kitchen 2 | $2.99 | Y | Y |
| 4 | Geometry Dash | $1.99 | Y | Y |
| 5 | Muscle Power Race | $7.99 | Y | Y |
| 6 | Bat le God | $6.99 | Y | Y |
| 7 | Scary Teacher 3D | $0.99 | Y | Y |
| 8 | Just Rope Like Tangle | $4.99 | Y | Y |
| 9 | Train Shooter | $4.99 | Y | Y |
| 10 | Five Nights at Freddy's | $2.99 | Y | Y |
| 11 | Hero Equip | $5.99 | Y | Y |
| 12 | Ragdoll Smash! | $7.99 | Y | Y |
| 13 | Giants Raid | $8.99 | Y | Y |
| 14 | Castle Defence Line | $5.99 | Y | Y |
| 15 | Fan Defence | $7.00 | N | N |
| 16 | Belt and Save | $5.99 | Y | Y |
| 17 | Hole Protector | $4.99 | Y | Y |
| 18 | Toca Life: City | $3.99 | Y | Y |
| 19 | Knife Agent - Throw and Hit | $6.99 | Y | Y |
| 20 | Toca Pet Doctor | $3.99 | Y | Y |
| 21 | Doll Run: Dress Up and Design | $6.99 | Y | Y |
| 22 | Colorful Snake Run: Eat, Grow, Win | $4.99 | Y | Y |
| 23 | Raft.io 3D | $8.99 | Y | Y |
| 24 | Saw Defense | $5.99 | Y | Y |
| 25 | Toca Boo | $3.99 | Y | Y |
| 26 | Mermaid Glitter Cupcake Chef - Ice Cream Cone Game | $9.99 | Y | Y |
| 27 | Run Stage Boy Space Tag Collector | $2.99 | Y | Y |
| 28 | Gacha Club | $12.99 | Y | Y |
| 29 | Angry Goose | $6.99 | Y | Y |
| 30 | Toca Life: Neighborhood | $3.99 | Y | Y |
| 31 | God, Please! | $5.99 | Y | Y |
| 32 | Worm Run 3D: Feed Them All | $4.99 | Y | Y |
| 33 | Bloons TD 6 | $6.99 | Y | Y |
| 34 | Dodge the Saw | $6.99 | Y | Y |
| 35 | Ready, Set, TWERK! - Running Game | $6.99 | Y | Y |
| 36 | Dragon Merge - Dinosaurs Battle | $6.99 | Y | Y |
| 37 | Breaking Chain | $5.99 | Y | Y |
| 38 | Gacha Life | $12.99 | Y | Y |
| 39 | Escape from Routine | $6.99 | Y | Y |
| 40 | Drive Through Years | $6.99 | Y | Y |
| 41 | Toca Life: Vacation | $3.99 | Y | Y |
| 42 | Player Videos for Kids (No ads) | $2.99 | Y | Y |
| 43 | The Jackbox Party Pack 3 | $24.99 | Y | Y |
| 44 | Hired gun | $6.99 | Y | Y |
| 45 | Crazy Going Ball Slide Ball | $1.99 | Y | Y |
| 46 | Coffee Mania - Cup Stack | $6.99 | Y | Y |
| 47 | Dynamite Boom Burst Prunk | $5.99 | Y | Y |
| 48 | Sonic The Hedgehog 2 | $2.99 | Y | Y |
| 49 | Blow the Gum | $5.99 | Y | Y |
| 50 | PJ Masks™: Moonlight Heroes | $6.49 | N | Y |
| 51 | Magic piano Pink Music | $3.99 | Y | Y |
| 52 | Thief Puzzle: To Pass A Level | $4.99 | Y | Y |
| 53 | Toca Life: Office | $3.99 | Y | Y |
| 54 | Idle Clash 3D | $4.99 | Y | Y |
| 55 | Sky Race! | $6.99 | Y | Y |
| 56 | Animal Race: Transform and Run | $6.99 | Y | Y |
| 57 | Toca Life: School | $3.99 | Y | Y |
| 58 | Toca Life: After School | $3.99 | Y | Y |
| 59 | PJ Masks: Racing Heroes | $3.99 | Y | Y |
| 60 | Poppy Playtime Chapter 1 | $9.99 | Y | Y |
| 61 | Arrow Jumper 3D | $5.99 | Y | Y |
| 62 | Drive Me Plenty | $7.99 | Y | Y |
| 63 | Hair Challenge | $8.99 | Y | Y |
| 64 | Bead Hama and Loom Pattern! | $6.49 | N | Y |
| 65 | Tile Maze - Swipe and Stack | $6.99 | Y | Y |
| 66 | Flip Sponge | $5.49 | N | Y |
| 67 | Milk Crate Challenge | $9.00 | N | N |
| 68 | Bat le of Pocket Tanks | $7.99 | Y | Y |
| 69 | Zombies Alert | $6.99 | Y | Y |
| 70 | Explosive Fun Cubes | $6.99 | Y | Y |

**Exhibit 9A**

| 71 | City Runner | $6.99 | Y | Y |
|---|---|---|---|---|
| 72 | Fatty Roll | $9.00 | N | N |
| 73 | Bikini Bottom for Mine Craft New | $18.99 | Y | Y |
| 74 | Celebrity Frozen Snow Cone Maker | $0.99 | Y | Y |
| 75 | Stone Attack - Smashing Street Fight: Idle Brick Smash Battle | $4.99 | Y | Y |
| 76 | Sonic The Hedgehog 4 Episode I | $2.99 | Y | Y |
| 77 | Toca Hair Salon 3 | $3.99 | Y | Y |
| 78 | Toca Life: Pets | $3.99 | Y | Y |
| 79 | Super Guns Mods for Mine Craft New | $18.99 | Y | Y |
| 80 | AirReceiver | $2.99 | Y | Y |
| 81 | Sonic Jump | $2.99 | Y | Y |
| 82 | Clean the Pool | $8.00 | N | N |
| 83 | Teach Your Monster to Read \| Phonics and Learn to Read | $5.99 | Y | Y |
| 84 | Extreme Falling Fun: Avoid Obstacles to Land and Win | $4.99 | Y | Y |
| 85 | Just Snowboard Adventure Party | $5.99 | Y | Y |
| 86 | Master Cubes Colors Cannon Hit | $8.00 | N | N |
| 87 | Cops Vs Robbers Jail Break | $1.99 | Y | Y |
| 88 | Poppy Playtime Chapter 2 | $9.99 | Y | Y |
| 89 | Conquer Arena with Rope | $5.99 | Y | Y |
| 90 | Blue-Red Tactics | $4.99 | Y | Y |
| 91 | Dalgona Candy Challenge | $9.99 | Y | Y |
| 92 | Baldi's Basics Classic | $9.99 | Y | Y |
| 93 | LEGO® Star Wars™: The Complete Saga | $2.49 | N | Y |
| 94 | Color Slide | $8.50 | N | N |
| 95 | Toca Life: Stable | $3.99 | Y | Y |
| 96 | Evidence Master | $7.49 | N | Y |
| 97 | Quiplash | $9.99 | Y | Y |
| 98 | Peppa Pig: Holiday Adventures | $2.99 | Y | Y |
| 99 | PAW Patrol: Pups to the Rescue | $1.99 | Y | Y |
| 100 | Granny Chapter 1 | $9.99 | Y | Y |

Source: Amazon, "Best Sellers in Apps & Games," available at https://www.amazon.com/gp/bestsellers/mobile-apps?ref_=appstore_categorynav

Note: This analysis is restricted to the top 100 paid app downloads on the Amazon Appstore, based on the quantity of units sold, accessed on 11/14/22. The Amazon Appstore only presents the top 100 paid app downloads on its website.

**Exhibit 10**

# Summary of Samsung Galaxy Store Top Paid App Downloads

| Number of Apps | Percentage of Apps with Prices Ending in $X.99 | Percentage of Apps with Prices Ending in $X.99 or $X.49 |
|:---:|:---:|:---:|
| 89 | 51.7% | 52.8% |

Source:  Samsung Galaxy Store

Note:  This analysis is restricted to the top five paid app downloads in each of the 18 app categories on the Samsung Galaxy Store accessed on 11/29/22.  The "Transportation" category only lists the top four paid apps.

**Exhibit 10A**

## Summary of Samsung Galaxy Store Top Paid App Downloads

| App Category | No. | App Name | Price | Price Ends in $X.99? | Price Ends in $X.99 or $X.49? |
|---|---|---|---|---|---|
| | | **Percentage of Apps** | | 51.7% | 52.8% |
| Books | 1 | Miracast Screen Mirroring | $1.99 | Y | Y |
| | 2 | Star View | $3.99 | Y | Y |
| | 3 | International Super Stories | $2.00 | N | N |
| | 4 | The Words of God | $2.00 | N | N |
| | 5 | Gospel Library | $0.99 | Y | Y |
| Customization | 1 | MT Skjald Regular Latin Flipfont | $1.79 | N | N |
| | 2 | MT Edwardian Medium Latin FlipFont | $1.79 | N | N |
| | 3 | MT Skate Std Light Latin FlipFont | $1.79 | N | N |
| | 4 | MT Brunette Std Regular Latin FlipFont | $1.79 | N | N |
| | 5 | MT Flicka Std Regular Latin FlipFont | $1.79 | N | N |
| Education | 1 | Noteshelf | $4.99 | Y | Y |
| | 2 | TV Cast Mirroring | $2.90 | N | N |
| | 3 | Hebrew-English Dictionary 2021 v.v \| PROLOG \| פרולוג \| מילון אנגלי - עברי | $7.99 | Y | Y |
| | 4 | Adding Fractions Math Game | $0.99 | Y | Y |
| | 5 | SQL Code Play Pro | $2.49 | N | Y |
| Finance | 1 | My Budget Organizer - Budget Planner with Sync | $1.99 | Y | Y |
| | 2 | Money Manager - Expense, Bills & Budget | $1.46 | N | N |
| | 3 | Stock IT: Stock Management | $0.99 | Y | Y |
| | 4 | Bills Budget Planner - Expense Tracker With Sync | $2.09 | N | N |
| | 5 | DTank | $0.99 | Y | Y |
| Fonts | 1 | Oh OnMyWay™ Latin Flipfont | $1.79 | N | N |
| | 2 | Nm HelloSoulmate™ Latin Flipfont | $1.79 | N | N |
| | 3 | RtCottonCandy™ Latin Flipfont | $1.79 | N | N |
| | 4 | Oh RetroType™ Latin Flipfont | $1.79 | N | N |
| | 5 | CatAlittleWish™ Latin Flipfont | $1.79 | N | N |
| Health | 1 | Remote Body Temperature | $1.99 | Y | Y |
| | 2 | Sleep Tracker Pro: Sleep Recorder & Sleep Cycle Tracker, Sleep Sounds | $2.99 | Y | Y |
| | 3 | The Wonder Weeks | $2.99 | Y | Y |
| | 4 | Migraine Diary V2 | $1.00 | N | N |
| | 5 | Body Blood Pressure Tracker - Smart BP Recorder & BP Source | $3.75 | N | N |
| Kids | 1 | Toca Life: School | $3.99 | Y | Y |
| | 2 | Toca Life: Farm | $3.99 | Y | Y |
| | 3 | Fun English Learn: Educational Games for Kids - Learn English Game No Ads Version | $2.99 | Y | Y |
| | 4 | Funny Kids Truck Puzzle - Educational Jigsaw Game for Toddlers and Kids - No Ads Version | $2.99 | Y | Y |
| | 5 | Christmas Games For Kids | $2.99 | Y | Y |
| Lifestyle | 1 | Facetime Duo - Unlimited Video | $0.99 | Y | Y |
| | 2 | S9 Launcher - Themes and Wallpaper hd | $0.99 | Y | Y |
| | 3 | fonts.keyboard.fontboard stylish | $0.99 | Y | Y |
| | 4 | S9 Theme Launcher for Samsung | $0.99 | Y | Y |
| | 5 | Scenes Edge and Widget | $5.99 | Y | Y |
| Music | 1 | Smart Recorder -- High-quality voice recorder | $0.99 | Y | Y |
| | 2 | Music for Samsung Galaxy | $0.99 | Y | Y |
| | 3 | Music Editor: Ringtone maker & MP3 song cutter | $0.99 | Y | Y |
| | 4 | DJ Studio 5 - Music mixer | $0.99 | Y | Y |
| | 5 | voice recorder | $0.99 | Y | Y |
| Photo | 1 | Filter - Nocturne | $1.00 | N | N |
| | 2 | Filter - Prism | $1.00 | N | N |
| | 3 | Filter - Nostalgia | $1.00 | N | N |
| | 4 | Filter - Blue Jeans | $1.00 | N | N |
| | 5 | Filter - Ruddy | $1.00 | N | N |
| Shopping | 1 | ToDo List - Events Tasks Calendar Planner ListByStatus | $0.99 | Y | Y |
| | 2 | IPTV FILM SPOR | $0.99 | Y | Y |
| | 3 | Strong VPN | $7.99 | Y | Y |
| | 4 | Pro Shopping Deals, Coupons & Promo Codes | $5.50 | N | N |
| | 5 | Sell & Buy Any | $1.50 | N | N |
| Social media | 1 | WhatsUp Messaging App | $1.00 | N | N |
| | 2 | Singal Private Messenger | $1.00 | N | N |
| | 3 | [zotori] A happy smile_dark | $1.50 | N | N |
| | 4 | [zotori] A happy smile_light-kakaotalk theme | $1.50 | N | N |
| | 5 | I am getting old, for fun | $1.00 | N | N |
| System management | 1 | Sleek Icon Pack | $3.00 | N | N |
| | 2 | ✦ TREK ✦ Sounds [Pro] | $1.95 | N | N |
| | 3 | Flat Black and Red Icon Pack | $3.00 | N | N |
| | 4 | Black Crystal Icon Pack | $1.00 | N | N |
| | 5 | Black Icon Pack | $3.00 | N | N |
| Tools | 1 | Control Center | $1.99 | Y | Y |
| | 2 | Super S9 Launcher for Galaxy S9/S8/S10 launcher - Theme | $1.00 | N | N |
| | 3 | Volume Edge Pro | $0.99 | Y | Y |
| | 4 | Easy Voice Recorder Pro | $2.99 | Y | Y |
| | 5 | SO S20 Launcher for Galaxy S,S10/S9/S8 Theme | $1.00 | N | N |

## SER-711

**Exhibit 10A**

| | | | | | |
|---|---|---|---|---|---|
| Transportation | 1 | Tv Cast | $1.90 | N | N |
| | 2 | OsmAnd -- Maps & GPS Offline | $0.99 | Y | Y |
| | 3 | FindMyCar Pro | $2.99 | Y | Y |
| | 4 | Car expenses | $5.99 | Y | Y |
| Travel | 1 | Charlotte Douglas Airport (CLT) Info + Tracker | $0.99 | Y | Y |
| | 2 | City Guide Turkey | $9.99 | Y | Y |
| | 3 | Myrtle Beach Airport (MYR) Info | $0.99 | Y | Y |
| | 4 | El Paso Airport (ELP) Info | $0.99 | Y | Y |
| | 5 | Charleston Airport (CHS) Info | $0.99 | Y | Y |
| Video | 1 | LumaFusion: Professional video editing and effects | $19.99 | Y | Y |
| | 2 | Simple Audio Extractor | $0.99 | Y | Y |
| | 3 | Video Player HD | $0.99 | Y | Y |
| | 4 | Video Maker Movie Editor | $2.00 | N | N |
| | 5 | PK Master - Magical Video Status Maker | $0.99 | Y | Y |
| Workplace | 1 | QR Barcode Scanner PRO | $1.90 | N | N |
| | 2 | QR Scanner & Barcode reader PRO - No Ads - QR Code Generator - quick scan QRCode without ads for Samsung Galaxy | $2.99 | Y | Y |
| | 3 | PDF Scanner - Document Scanner | $4.00 | N | N |
| | 4 | Bills Organizer with Sync - Remind on Time | $1.48 | N | N |
| | 5 | YQ inPin Artistical™ Latin Flipfont | $1.79 | N | N |

Source:  Samsung Galaxy Store

Note:  This analysis is restricted to the top five paid app downloads in each of the 18 app categories on the Samsung Galaxy Store accessed on 11/29/22.  The "Transportation" category only lists the top four paid apps.

**SER-712**

**Exhibit 11**

# Summary of Samsung Galaxy Store Top Paid Games

| Number of Games | Percentage of Games with Prices Ending in $X.99 | Percentage of Games with Prices Ending in $X.99 or $X.49 |
|---|---|---|
| 73 | 69.9% | 72.6% |

Source:  Samsung Galaxy Store

Note:  This analysis is restricted to the top five paid apps in each of the 16 game categories on the Samsung Galaxy Store accessed on 1/17/23.  The "Card" category only lists the top four paid apps.  The "Music," "Trivia," and "Word" categories only list the top three paid apps.

Case 25-7030, 08/12/2026, DktEntry: 304.12, Page 4 of 255

**Exhibit 11A**

# Summary of Samsung Galaxy Store Top Paid Games

| Game Category | No. | Game Name | Price | Price Ends in $X.99? | Price Ends in $X.99 or $X.49? |
|---|---|---|---|---|---|
| | | **Percentage of Games** | | 69.9% | 72.6% |
| Action adventure | 1 | SpongeBob SquarePants: Battle for Bikini Bottom | $9.99 | Y | Y |
| | 2 | Minesweeper | $0.99 | Y | Y |
| | 3 | Dash n stack Blocks 3D Game - Collect Blocks Build Tower and Paint the stacks | $0.99 | Y | Y |
| | 4 | Super Santa PRO Christmas | $0.99 | Y | Y |
| | 5 | Inferno - Horror Survival Game | $1.49 | N | Y |
| Arcade | 1 | Tap Away 3D - Clear all the blocks in order! | $0.99 | Y | Y |
| | 2 | Match them All | $0.99 | Y | Y |
| | 3 | Flip it-Bottle flip game | $0.99 | Y | Y |
| | 4 | Belt and Save | $0.99 | Y | Y |
| | 5 | Draw One Part - Guess & Draw the missing part | $0.99 | Y | Y |
| Board | 1 | Bagatur Chess Engine | $3.50 | N | N |
| | 2 | How To Draw A Cute Girl Easy | $0.99 | Y | Y |
| | 3 | How to Draw Christmas Cute Things | $0.99 | Y | Y |
| | 4 | Tic Tac Toe, 2 Player Game | $0.99 | Y | Y |
| | 5 | How to make kawaii organizer easily | $0.99 | Y | Y |
| Card | 1 | solitaire | $2.54 | N | N |
| | 2 | Solitaire | $2.54 | N | N |
| | 3 | Solitaire | $2.54 | N | N |
| | 4 | 15in1 Solitaire | $2.99 | Y | Y |
| Casual | 1 | JumpCU | $3.00 | N | N |
| | 2 | Coloring Book - Call of the Wild | $1.00 | N | N |
| | 3 | How to make kawaii notebook | $0.99 | Y | Y |
| | 4 | Torpedo Run (No Ads) | $0.99 | Y | Y |
| | 5 | Spunky Friends | $7.99 | Y | Y |
| Music | 1 | One Hand Clapping | $9.99 | Y | Y |
| | 2 | Stress relief music maker Pro | $5.99 | Y | Y |
| | 3 | Relax Music Game PRO | $5.99 | Y | Y |
| Online games | 1 | Icy Purplehead: Super Slide | $0.99 | Y | Y |
| | 2 | Moto X3M Bike Race Game | $0.99 | Y | Y |
| | 3 | Crafting and Building | $0.99 | Y | Y |
| | 4 | Theme Park Craft: Build & Ride | $0.99 | Y | Y |
| | 5 | Craft World - Master Building Block Game 3D | $0.99 | Y | Y |
| Puzzle | 1 | Tic Tac Toe | $1.99 | Y | Y |
| | 2 | Tetris-Trixology | $9.50 | N | N |
| | 3 | Classic Snake | $1.00 | N | N |
| | 4 | Jewel Crush Game | $9.50 | N | N |
| | 5 | The Dinosaurs Maze 2D | $2.50 | N | N |
| Racing | 1 | Wreckfest | $9.99 | Y | Y |
| | 2 | Race to snow bridge - collect blocks beat people and build bridge | $0.99 | Y | Y |
| | 3 | Vertigo Racing | $3.99 | Y | Y |
| | 4 | Street Racer Nitro | $1.99 | Y | Y |
| | 5 | Vengeance Truck Amazing Train | $1.00 | N | N |
| Role playing | 1 | Stardew Valley | $4.99 | Y | Y |
| | 2 | Battle Chasers: Nightwar | $9.99 | Y | Y |
| | 3 | Bigfoot Quest | $2.99 | Y | Y |
| | 4 | Coloring kids | $0.99 | Y | Y |
| | 5 | Cricket game | $0.99 | Y | Y |
| Shooting | 1 | Doom Day | $10.00 | N | N |
| | 2 | Bill The Bowman | $9.50 | N | N |
| | 3 | Mission Rampage | $1.00 | N | N |
| | 4 | Space Impact- shooter | $3.00 | N | N |
| | 5 | Unknown Uprising: Episode 1 | $4.49 | N | Y |
| Simulation | 1 | Poppy Scary Playtime Granny | $0.99 | Y | Y |
| | 2 | Squishy Coloring Pages | $0.99 | Y | Y |
| | 3 | How to Make Pop it Easily | $0.99 | Y | Y |
| | 4 | Fancy Slime - How To Make Fluffy Slime Easily At Home | $0.99 | Y | Y |
| | 5 | Rubik's Cube 3D (Premium) | $0.99 | Y | Y |
| Sports | 1 | Football Cup 2022 | $1.99 | Y | Y |
| | 2 | Football Heads Cup | $2.00 | N | N |
| | 3 | Minigolf World | $2.01 | N | N |
| | 4 | Football Championships 2022 | $2.99 | Y | Y |
| | 5 | Football Kicks 2022 | $1.99 | Y | Y |
| Strategy | 1 | Overrun: Zombie Tower Defense - Premium | $1.99 | Y | Y |
| | 2 | 1943 Deadly Desert Premium | $0.99 | Y | Y |
| | 3 | monopoly game | $1.99 | Y | Y |
| | 4 | Baldi's Basics Field Trip Demo | $0.99 | Y | Y |
| | 5 | Baldi's Basics Classic | $0.99 | Y | Y |
| Trivia | 1 | Gravity Force Finger 137 | $1.50 | N | N |
| | 2 | Non Stop Balloons Shooter | $1.50 | N | N |
| | 3 | Diy squishies - How to make squishy easily | $0.99 | Y | Y |

**SER-714**

**Exhibit 11A**

| Word | 1 | Puzzle | $2.54 | N | N |
|------|---|--------|-------|---|---|
| | 2 | scrabble us | $1.99 | Y | Y |
| | 3 | scrabbler fr | $1.99 | Y | Y |

Source: Samsung Galaxy Store

Note: This analysis is restricted to the top five paid apps in each of the 16 game categories on the Samsung Galaxy Store accessed on 1/17/23. The "Card" category only lists the top four paid apps. The "Music," "Trivia," and "Word" categories only list the top three paid apps.

Case 25-7030, 08/12/2026, DktEntry: 34.1, Page 112 of 147

**Exhibit 12**

# Summary of Top Games
# from Select Stores

## Percentage of Products with Prices
## Ending in 99 Cents

| Platform | Percentage |
|----------|------------|
| Average | 93.0% |
| Minimum | 87.7% |
| Maximum | 100.0% |
| Epic | 93.8% |
| Nintendo | 92.0% |
| PlayStation | 91.5% |
| Steam | 87.7% |
| Xbox | 100.0% |

Source:  Epic Games, "Top Sellers," available at https://store.epicgames.com/en-US/collection/top-sellers; Nintendo, "Digital Best Sellers," available at https://www.nintendo.com/store/games/best-sellers/; PlayStation, "Best Sellers," available at https://store.playstation.com/en-us/category/877e5ce2-4afc-4694-9f69-4758e34e58cd/1/; Steam, "Top Sellers," available at https://store.steampowered.com/search/?filter=topsellers&ignore_preferences=1; Xbox, "Best Sellers," available at https://www.xbox.com/en-US/games

Note:  Prices were pulled for the top 100 selling games listed on each store's website.  If a store did not list 100 games in this section, data on the amount of games listed were pulled.  Epic values reflect the top 98 games in its "Top Selling PC Titles" section available to buy accessed on 11/14/22.  Epic Games only presents the top 98 products on its website.  Nintendo values reflect the top 100 games in its "Digital Best Sellers" section available to buy accessed on 11/14/22.  PlayStation values reflect the top 100 games in its "Best Sellers" section avalable to buy accessed on 11/14/22.  Steam values reflect the top 100 games based on revenue in its "Top Sellers" section available to buy accessed on 11/14/22.  Xbox values reflect the top 13 games in its "Best Sellers" section available to buy accessed on 11/14/22.

# Summary of Top Games on Epic Games

| No. | Product Name | Price | Price Ends in 99 Cents? |
|---|---|---|---|
| | **Percentage of Products with Prices Ending in 99 Cents** | | **93.8%** |
| 1 | Assassin's Creed® Valhalla Standard Edition | $19.79 | N |
| 2 | Anno 1800 Standard Edition | $19.79 | N |
| 3 | EA SPORTS™ FIFA 23 Standard Edition | $69.99 | Y |
| 4 | Grand Theft Auto V: Premium Edition | $29.99 | Y |
| 5 | Assassins Creed Odyssey Standard Edition | $14.99 | Y |
| 6 | Marvel's Spider-Man: Miles Morales | $49.99 | Y |
| 7 | God of War | $49.99 | Y |
| 8 | Assassin's Creed Origins Standard Edition | $11.99 | Y |
| 9 | PC Building Simulator 2 | $24.99 | Y |
| 10 | Goat Simulator 3 - Pre-Udder Standard Edition | $29.99 | Y |
| 11 | Football Manager 2023 | $59.99 | Y |
| 12 | Dead by Daylight | $19.99 | Y |
| 13 | Marvel's Spider-Man Remastered | $59.99 | Y |
| 14 | Ghostbusters: Spirits Unleashed | $39.99 | Y |
| 15 | Assassin's Creed Valhalla + Watch Dogs: Legion Bundle | $32.99 | Y |
| 16 | Sifu | $39.99 | Y |
| 17 | SnowRunner | $29.99 | Y |
| 18 | UNCHARTED™: Legacy of Thieves Collection | $49.99 | Y |
| 19 | Saints Row | $59.99 | Y |
| 20 | Assassin's Creed Syndicate Standard Edition | $7.49 | N |
| 21 | Anno 2205 - Standard Edition | $9.99 | Y |
| 22 | KINGDOM HEARTS HD 1.5+2.5 ReMIX | $49.99 | Y |
| 23 | Riders Republic | $59.99 | Y |
| 24 | Gotham Knights | $59.99 | Y |
| 25 | Red Dead Redemption 2 | $59.99 | Y |
| 26 | Farming Simulator 22 | $49.99 | Y |
| 27 | Rainbow Six Siege Standard Edition | $19.99 | Y |
| 28 | Hogwarts Legacy | $59.99 | Y |
| 29 | ARK: Survival Evolved | $19.99 | Y |
| 30 | theHunter: Call of the Wild™ | $19.99 | Y |
| 31 | Cyberpunk 2077 | $59.99 | Y |
| 32 | Borderlands 3 | $59.99 | Y |
| 33 | Sins of a Solar Empire 2 | $39.99 | Y |
| 34 | Madden NFL 23 | $59.99 | Y |
| 35 | Far Cry 6 Standard Edition | $59.99 | Y |
| 36 | Assassin's Creed Rogue Standard Edition | $6.59 | N |
| 37 | Ghost Recon Breakpoint Standard Edition | $59.99 | Y |
| 38 | Among Us | $4.99 | Y |
| 39 | STRANGER OF PARADISE FINAL FANTASY ORIGIN | $59.99 | Y |
| 40 | Assassin's Creed® III: Remastered | $19.99 | Y |
| 41 | World War Z Aftermath | $39.99 | Y |
| 42 | Cities: Skylines | $29.99 | Y |
| 43 | HITMAN 3 | $59.99 | Y |
| 44 | Darkest Dungeon II | $29.99 | Y |
| 45 | Tiny Tina's Wonderlands | $59.99 | Y |
| 46 | KINGDOM HEARTS III + Re Mind (DLC) | $59.99 | Y |
| 47 | Slime Rancher 2 | $29.99 | Y |
| 48 | The Callisto Protocol | – | – |
| 49 | Assassin's Creed® Valhalla + Immortals Fenyx Rising™ Bundle | $32.99 | Y |
| 50 | Satisfactory | $29.99 | Y |
| 51 | Dying Light 2 Stay Human | $59.99 | Y |
| 52 | Chivalry 2 | $39.99 | Y |
| 53 | Voidtrain | $29.99 | Y |
| 54 | The Division 2 Standard Edition | $29.99 | Y |
| 55 | Tony Hawk's™ Pro Skater™ 1 + 2 | $39.99 | Y |
| 56 | Sid Meier's Civilization® VI | $59.99 | Y |
| 57 | Sackboy™: A Big Adventure | $59.99 | Y |
| 58 | Assassin's Creed® I: Director's Cut | $5.99 | Y |
| 59 | MechWarrior 5: Mercenaries Standard Edition | $29.99 | Y |
| 60 | Farming Simulator 19 | $19.99 | Y |
| 61 | Anno 2070 | $7.49 | N |
| 62 | Evil Dead: The Game | $39.99 | Y |
| 63 | Total War: WARHAMMER III | $59.99 | Y |
| 64 | Mount & Blade II: Bannerlord | $49.99 | Y |
| 65 | Rising Storm 2: Vietnam | $24.99 | Y |
| 66 | Disney Dreamlight Valley | $29.99 | Y |
| 67 | A Plague Tale: Requiem | $49.99 | Y |
| 68 | Subnautica | $29.99 | Y |
| 69 | The Elder Scrolls V: Skyrim Special Edition | $39.99 | Y |
| 70 | Overcooked! 2 | $24.99 | Y |
| 71 | Ooblets | $29.99 | Y |

# Summary of Top Games on Epic Games

| No. | Product Name | Price | Price Ends in 99 Cents? |
|---|---|---|---|
| | Percentage of Products with Prices Ending in 99 Cents | | 93.8% |
| 72 | Among Trees | $7.49 | N |
| 73 | NARAKA: BLADEPOINT | $19.99 | Y |
| 74 | Need for Speed™ Unbound Standard Edition | $69.99 | Y |
| 75 | Jurassic World Evolution 2 | $59.99 | Y |
| 76 | Total War: WARHAMMER II | $59.99 | Y |
| 77 | It Takes Two | $39.99 | Y |
| 78 | A Total War Saga: TROY | $49.99 | Y |
| 79 | Salt and Sacrifice | $19.99 | Y |
| 80 | Remnant: From the Ashes | $39.99 | Y |
| 81 | FINAL FANTASY VII REMAKE INTERGRADE | $69.99 | Y |
| 82 | Subnautica Below Zero | $29.99 | Y |
| 83 | Totally Accurate Battle Simulator | $19.99 | Y |
| 84 | HUMANKIND™ Standard Edition | $49.99 | Y |
| 85 | LEGO® Star Wars™: The Skywalker Saga | $49.99 | Y |
| 86 | Killing Floor 2 | $29.99 | Y |
| 87 | Train Sim World® 3: Standard Edition | $49.99 | Y |
| 88 | RAILGRADE | $19.99 | Y |
| 89 | Way of the Hunter | $39.99 | Y |
| 90 | Arcadegeddon | $29.99 | Y |
| 91 | RimWorld | $34.99 | Y |
| 92 | Horizon Zero Dawn™ Complete Edition | $49.99 | Y |
| 93 | Elite Dangerous | $29.99 | Y |
| 94 | Battlefield™ 2042 | $59.99 | Y |
| 95 | Total War: WARHAMMER | $59.99 | Y |
| 96 | The Outer Worlds | $59.99 | Y |
| 97 | Crysis Remastered Trilogy | $49.99 | Y |
| 98 | Tom Clancy's Ghost Recon Wildlands Standard Edition | $49.99 | Y |

Source: Epic Games, "Top Sellers," available at https://store.epicgames.com/en-US/collection/top-sellers

Note: Analysis is restricted to the top selling 98 games on the Epic Games Store accessed on 11/14/22. Epic Games only presents the top 98 products on their webpage.

**Exhibit 12B**

# Summary of Top Games on Nintendo Store

| No. | Product Name | Price | Price Ends in 99 Cents? |
|---|---|---|---|
| | **Percentage of Products with Prices Ending in 99 Cents** | | **92.0%** |
| 1 | Pokémon™ Violet | $59.99 | Y |
| 2 | Pokémon™ Scarlet | $59.99 | Y |
| 3 | Sonic Frontiers | $59.99 | Y |
| 4 | Sifu | $39.99 | Y |
| 5 | Call of Juarez: Gunslinger | $19.99 | Y |
| 6 | Tactics Ogre: Reborn | $49.99 | Y |
| 7 | Bratz™: Flaunt your fashion | $39.99 | Y |
| 8 | Minecraft | $29.99 | Y |
| 9 | LEGO® Marvel Super Heroes 2 | $2.99 | Y |
| 10 | Mario Kart™ 8 Deluxe | $59.99 | Y |
| 11 | Disney Dreamlight Valley | $29.99 | Y |
| 12 | Stardew Valley | $14.99 | Y |
| 13 | Overcooked! 2 | $6.24 | N |
| 14 | HARVESTELLA | $59.99 | Y |
| 15 | Totally Accurate Battle Simulator | $19.99 | Y |
| 16 | Windbound | $19.99 | Y |
| 17 | Splatoon™ 3 | $59.99 | Y |
| 18 | Nintendo Switch™ Sports | $39.99 | Y |
| 19 | A Little to the Left | $14.99 | Y |
| 20 | Mario Party™ Superstars | $59.99 | Y |
| 21 | Cattails | $14.99 | Y |
| 22 | Rogue Legacy 2 | $24.99 | Y |
| 23 | MARIO + RABBIDS SPARKS OF HOPE | $59.99 | Y |
| 24 | Overcooked Special Edition | $3.99 | Y |
| 25 | Among Us | $5.00 | N |
| 26 | Super Smash Bros.™ Ultimate | $59.99 | Y |
| 27 | Pokémon™ Legends: Arceus | $59.99 | Y |
| 28 | Animal Crossing™: New Horizons | $59.99 | Y |
| 29 | Green Hell | $24.99 | Y |
| 30 | Bayonetta™ 3 | $59.99 | Y |
| 31 | Mortal Kombat 11 | $9.99 | Y |
| 32 | ONE PIECE: PIRATE WARRIORS 4 | $59.99 | Y |
| 33 | LEGO® Harry Potter™ Collection | $49.99 | Y |
| 34 | Octodad: Dadliest Catch | $14.99 | Y |
| 35 | LEGO® DC Super-Villains | $5.99 | Y |
| 36 | Persona 5 Royal | $59.99 | Y |
| 37 | The Mean Greens - Plastic Warfare | $9.99 | Y |
| 38 | NARUTO SHIPPUDEN: Ultimate Ninja STORM 2 | $3.99 | Y |
| 39 | Golf Story | $6.99 | Y |
| 40 | INSIDE | $1.99 | Y |
| 41 | Unpacking | $19.99 | Y |
| 42 | Hollow Knight | $15.00 | N |
| 43 | Eastward | $14.99 | Y |
| 44 | Blasphemous | $6.24 | N |
| 45 | Cooking Simulator | $19.99 | Y |
| 46 | HOT WHEELS UNLEASHED™ | $49.99 | Y |
| 47 | Kirby's Dream Buffet™ | $14.99 | Y |
| 48 | The Legend of Zelda™: Breath of the Wild | $59.99 | Y |
| 49 | Farm Tycoon | $19.99 | Y |
| 50 | GOD EATER 3 | $8.99 | Y |
| 51 | Dying Light: Definitive Edition | $49.99 | Y |
| 52 | Real Boxing 2 | $14.99 | Y |
| 53 | EA SPORTS FIFA 23 Nintendo Switch™ Legacy Edition | $39.99 | Y |
| 54 | Retro Bowl | $4.99 | Y |
| 55 | Crypt of the NecroDancer: Nintendo Switch Edition | $19.99 | Y |
| 56 | Cult of the Lamb | $24.99 | Y |
| 57 | Monster Energy Supercross - The Official Videogame 3 | $29.99 | Y |
| 58 | Super Mario Odyssey™ | $59.99 | Y |
| 59 | Super Mario™ 3D World + Bowser's Fury | $59.99 | Y |
| 60 | New Super Mario Bros.™ U Deluxe | $59.99 | Y |
| 61 | Thief Simulator | $19.99 | Y |
| 62 | .cat Milk | $9.99 | Y |
| 63 | Yooka-Laylee | $5.99 | Y |
| 64 | SWORD ART ONLINE: FATAL BULLET Complete Edition | $8.99 | Y |
| 65 | Kirby™ and the Forgotten Land | $59.99 | Y |
| 66 | Cuphead | $19.99 | Y |
| 67 | ONE PIECE Pirate Warriors 3 Deluxe Edition | $39.99 | Y |
| 68 | Worms W.M.D | $5.99 | Y |
| 69 | Worms Rumble | $1.99 | Y |
| 70 | House Flipper | $9.99 | Y |
| 71 | LEGO® Marvel™ Super Heroes | $39.99 | Y |

**SER-719**

**Exhibit 12B**

# Summary of Top Games on Nintendo Store

| No. | Product Name | Price | Price Ends in 99 Cents? |
|---|---|---|---|
| | **Percentage of Products with Prices Ending in 99 Cents** | | **92.0%** |
| 72 | My Time at Portia | $7.49 | N |
| 73 | NARUTO: Ultimate Ninja STORM | $19.99 | Y |
| 74 | The Escapists: Complete Edition | $2.99 | Y |
| 75 | No Man's Sky | $59.99 | Y |
| 76 | Run Sausage Run! | $2.49 | N |
| 77 | LEGO® Worlds | $5.99 | Y |
| 78 | Shadow Samurai Revenge | $1.99 | Y |
| 79 | The Survivalists | $6.24 | N |
| 80 | Luigi's Mansion™ 3 | $59.99 | Y |
| 81 | Yes, Your Grace | $19.99 | Y |
| 82 | Big Buck Hunter Arcade | $1.99 | Y |
| 83 | Pokémon™ Brilliant Diamond | $59.99 | Y |
| 84 | Pokémon™ Sword | $59.99 | Y |
| 85 | MY HERO ONE'S JUSTICE | $5.99 | Y |
| 86 | Mario Strikers™: Battle League | $59.99 | Y |
| 87 | AER Memories of Old | $1.99 | Y |
| 88 | Arcade Archives VS. SUPER MARIO BROS. | $7.99 | Y |
| 89 | Golf With Your Friends | $4.99 | Y |
| 90 | Real Truck Simulator USA Car Games - Driving Games, Parking Sim, Car Speed Racing 2022 | $9.99 | Y |
| 91 | Super Mario Party™ | $59.99 | Y |
| 92 | The Suicide of Rachel Foster | $3.99 | Y |
| 93 | Factorio | $30.00 | N |
| 94 | ARK: Survival Evolved | $19.99 | Y |
| 95 | LIMBO | $1.99 | Y |
| 96 | The Jackbox Party Pack 9 | $29.99 | Y |
| 97 | The Escapists 2 | $4.99 | Y |
| 98 | Turnip Boy Commits Tax Evasion | $14.99 | Y |
| 99 | Monster Prom: XXL | $15.99 | Y |
| 100 | My Universe - PET CLINIC CATS & DOGS | $5.99 | Y |

Source: Nintendo, "Digital Best Sellers," available at https://www.nintendo.com/store/games/best-sellers/

Note: Analysis is restricted to the 100 best selling games on the Nintendo Store accessed on 11/14/22. Nintendo only presents the top 100 products on their webpage.

**SER-720**

**Exhibit 12C**

# Summary of Top Games on the PlayStation Store

| No. | Product Name | Price | Price Ends in 99 Cents? |
|---|---|---|---|
| | **Percentage of Products with Prices Ending in 99 Cents** | | **91.5%** |
| 1 | FIFA 21 Standard Edition PS4™ & PS5™ | – | – |
| 2 | The Last of Us Part II | $39.99 | Y |
| 3 | Madden NFL 21 PS4™ & PS5™ | – | – |
| 4 | Ghost of Tsushima: Legends | $19.99 | Y |
| 5 | NBA 2K21 | $59.99 | Y |
| 6 | Marvel's Spider-Man: Game of the Year Edition | $39.99 | Y |
| 7 | Watch Dogs®: Legion PS4 & PS5 | $59.99 | Y |
| 8 | MLB The Show 20 | $19.99 | Y |
| 9 | NHL® 21 | – | – |
| 10 | Grand Theft Auto V: Premium Edition | $29.99 | Y |
| 11 | Tony Hawk's™ Pro Skater™ 1 + 2 | $39.99 | Y |
| 12 | Mortal Kombat 11 | $49.99 | Y |
| 13 | STAR WARS™: Squadrons | $7.99 | Y |
| 14 | Need for Speed™ Heat Deluxe Edition | $69.99 | Y |
| 15 | FINAL FANTASY VII REMAKE | $59.99 | Y |
| 16 | Assassin's Creed® Odyssey Ultimate Edition | $29.99 | Y |
| 17 | God of War | $19.99 | Y |
| 18 | PGA TOUR 2K21 | $59.99 | Y |
| 19 | Mafia: Definitive Edition | $39.99 | Y |
| 20 | DRAGON BALL Z: KAKAROT | $14.99 | Y |
| 21 | Nioh 2 | $39.99 | Y |
| 22 | Marvel's Iron Man VR | $19.99 | Y |
| 23 | WWE 2K Battlegrounds | $15.99 | Y |
| 24 | Project CARS 3 | $59.99 | Y |
| 25 | The Division 2 - Warlords of New York - Ultimate Edition | $23.99 | Y |
| 26 | Need for Speed™ Hot Pursuit Remastered | $39.99 | Y |
| 27 | UFC® 4 | $59.99 | Y |
| 28 | No Man's Sky PS4 & PS5 | $59.99 | Y |
| 29 | Cuphead | $19.99 | Y |
| 30 | Ghostrunner | $10.49 | N |
| 31 | ARK: Survival Evolved | $6.59 | N |
| 32 | Skater XL | $29.99 | Y |
| 33 | The Sims™ 4 | – | – |
| 34 | Crash™ Team Racing Nitro-Fueled | $13.99 | Y |
| 35 | The Last Of Us™ Remastered | $19.99 | Y |
| 36 | Mafia: Trilogy | $59.99 | Y |
| 37 | Borderlands 3 PS4™ & PS5™ | $59.99 | Y |
| 38 | Tom Clancy's Ghost Recon® Breakpoint | $59.99 | Y |
| 39 | DARK SOULS™: REMASTERED | $39.99 | Y |
| 40 | SpongeBob SquarePants: Battle for Bikini Bottom - Rehydrated | $13.49 | N |
| 41 | Fallout 76 | $39.99 | Y |
| 42 | Stranded Deep | $8.99 | Y |
| 43 | FAR CRY 5 | $59.99 | Y |
| 44 | The Outer Worlds | $59.99 | Y |
| 45 | UNCHARTED 4: A Thief's End | – | – |
| 46 | The Walking Dead: Saints & Sinners - Standard Edition | $19.99 | Y |
| 47 | Spyro™ Reignited Trilogy | $39.99 | Y |
| 48 | PUBG: BATTLEGROUNDS | – | – |
| 49 | 13 Sentinels: Aegis Rim | $29.99 | Y |
| 50 | The Witcher 3: Wild Hunt – Game of the Year Edition | $49.99 | Y |
| 51 | NASCAR Heat 5 | $19.99 | Y |
| 52 | HITMAN™ 2 | $59.99 | Y |
| 53 | Wreckfest | $11.99 | Y |
| 54 | World War Z | $29.99 | Y |
| 55 | Mortal Shell | $10.49 | N |
| 56 | Control: Ultimate Edition | $39.99 | Y |
| 57 | Maneater PS4 | $39.99 | Y |
| 58 | Maneater PS4 & PS5 | $39.99 | Y |
| 59 | Dreams | $7.99 | Y |
| 60 | Saints Row: The Third Remastered | $39.99 | Y |
| 61 | Black Desert: Traveler Edition | $29.99 | Y |
| 62 | Destroy All Humans! | $17.99 | Y |
| 63 | Kingdoms of Amalur: Re-Reckoning | $11.99 | Y |
| 64 | Yu-Gi-Oh! Legacy of the Duelist: Link Evolution | $9.99 | Y |
| 65 | Risk of Rain 2 | $6.24 | N |
| 66 | The Legend of Heroes: Trails of Cold Steel IV Digital Deluxe Edition | $35.99 | Y |
| 67 | GORN | $9.99 | Y |
| 68 | Shadow of the Tomb Raider Definitive Edition | $39.99 | Y |
| 69 | Plants vs. Zombies: Battle for Neighborville™ | $7.49 | N |
| 70 | KINGDOM HEARTS All-In-One Package | $99.99 | Y |
| 71 | Amnesia: Rebirth | $29.99 | Y |

Case 25-7030, 08/12/2026, DktEntry: 34.2, Page 264 of 255

**Exhibit 12C**

# Summary of Top Games on the PlayStation Store

| No. | Product Name | Price | Price Ends in 99 Cents? |
|---|---|---|---|
| | **Percentage of Products with Prices Ending in 99 Cents** | | **91.5%** |
| 72 | Fallout 4: Game of the Year Edition | $39.99 | Y |
| 73 | Attack on Titan 2: Final Battle | $59.99 | Y |
| 74 | ACE COMBAT™ 7: SKIES UNKNOWN | $8.99 | Y |
| 75 | Streets Of Rage 4 | $24.99 | Y |
| 76 | The Elder Scrolls V: Skyrim VR | $59.99 | Y |
| 77 | Monster Hunter World: Iceborne Digital Deluxe | $26.79 | N |
| 78 | Wasteland 3 | $9.99 | Y |
| 79 | LEGO® Marvel™ Super Heroes | $19.99 | Y |
| 80 | Hunt: Showdown | $39.99 | Y |
| 81 | KINGDOM HEARTS HD 1.5 +2.5 ReMIX | $49.99 | Y |
| 82 | SMITE Ultimate God Pack Bundle | $29.99 | Y |
| 83 | Vacation Simulator | $19.49 | N |
| 84 | Street Fighter V: Champion Edition | $29.99 | Y |
| 85 | MOBILE SUIT GUNDAM EXTREME VS. MAXIBOOST ON | $59.99 | Y |
| 86 | Battlefield V Definitive Edition | $9.99 | Y |
| 87 | Cities: Skylines - PlayStation®4 Edition | $7.99 | Y |
| 88 | Attack on Titan 2 | $59.99 | Y |
| 89 | Crysis Remastered | $29.99 | Y |
| 90 | LEGO® Batman™ 3: Beyond Gotham | $19.99 | Y |
| 91 | Judgment | $29.99 | Y |
| 92 | Devil May Cry HD Collection & 4SE Bundle | $44.99 | Y |
| 93 | Yakuza 6: The Song of Life | $4.99 | Y |
| 94 | Yakuza Kiwami 2 | $19.99 | Y |
| 95 | WRC 9 FIA World Rally Championship PS4 & PS5 | $49.99 | Y |
| 96 | Assassin's Creed® Origins Gold Edition | $24.99 | Y |
| 97 | STAR WARS™ Battlefront™ II: Celebration Edition | $9.99 | Y |
| 98 | RIDE 4 | $49.99 | Y |
| 99 | Arizona Sunshine® | $39.99 | Y |
| 100 | Kingdom Come: Deliverance Royal Edition | $7.99 | Y |

Source:  PlayStation, "Best Sellers," available at https://store.playstation.com/en-us/category/877e5ce2-4afc-4694-9f69-4758e34e58cd/1/

Note:  Analysis is restricted to the 100 best selling games on the PlayStation Store accessed on 11/16/22.  The PlayStation Store presents the top 108 products on their webpage.

Case 25-7030, 08/12/2026, DktEntry: 34.12, Page 124 of 255

**Exhibit 12D**

# Summary of Top Games on Steam

| No. | Product Name | Price | Price Ends in 99 Cents? |
|---|---|---|---|
| | **Percentage of Products with Prices Ending in 99 Cents** | | **87.7%** |
| 1 | Call of Duty®: Modern Warfare® II | $69.99 | Y |
| 2 | American Truck Simulator | $4.99 | Y |
| 3 | Bendy and the Dark Revival | $29.99 | Y |
| 4 | American Truck Simulator - Texas | $17.99 | Y |
| 5 | Warhammer 40,000: Darktide | $39.99 | Y |
| 6 | SMITE® | – | – |
| 7 | Lost Ark | – | – |
| 8 | ZERO Sievert | $17.99 | Y |
| 9 | Counter-Strike: Global Offensive | – | – |
| 10 | Cities: Skylines | $8.99 | Y |
| 11 | Solasta: Crown of the Magister | $13.99 | Y |
| 12 | We Who Are About To Die | $19.79 | N |
| 13 | Sonic Frontiers | $59.99 | Y |
| 14 | Apex Legends™ | – | – |
| 15 | God of War | $49.99 | Y |
| 16 | War Thunder | – | – |
| 17 | Destiny 2 | – | – |
| 18 | Warhammer 40,000: Darktide - Imperial Edition | $24.52 | N |
| 19 | Farming Simulator 22 | $39.99 | Y |
| 20 | RimWorld | $34.99 | Y |
| 21 | Deep Rock Galactic | $9.89 | N |
| 22 | Pentiment | $19.99 | Y |
| 23 | Sid Meier's Civilization® VI | $5.99 | Y |
| 24 | Marvel's Spider-Man: Miles Morales | $49.99 | Y |
| 25 | MONSTER HUNTER RISE | $19.99 | Y |
| 26 | ELDEN RING | $59.99 | Y |
| 27 | Warhammer: Vermintide 2 | $5.99 | Y |
| 28 | Dead by Daylight | $19.99 | Y |
| 29 | Tactics Ogre: Reborn | $49.99 | Y |
| 30 | Dying Light 2 Stay Human | $32.99 | Y |
| 31 | The Elder Scrolls® Online | $19.99 | Y |
| 32 | New World | $39.99 | Y |
| 33 | Solasta: Crown of the Magister - Inner Strength | $7.99 | Y |
| 34 | Grand Theft Auto V | – | – |
| 35 | EA SPORTS™ FIFA 23 | $69.99 | Y |
| 36 | FINAL FANTASY XIV Online | $19.99 | Y |
| 37 | Halo Infinite | – | – |
| 38 | Warframe | – | – |
| 39 | Floodland | $29.99 | Y |
| 40 | Fallout 76: The Pitt | $39.99 | Y |
| 41 | The Sims™ 4 | – | – |
| 42 | Rust | $39.99 | Y |
| 43 | Black Desert | $9.99 | Y |
| 44 | Farming Simulator 22 - Platinum Expansion | $19.99 | Y |
| 45 | Team Fortress 2 | – | – |
| 46 | Shadows Over Loathing | $19.54 | N |
| 47 | Madden NFL 23 | $59.99 | Y |
| 48 | Squad | $37.49 | N |
| 49 | Persona 5 Royal | $59.99 | Y |
| 50 | Dota 2 | – | – |
| 51 | Cyberpunk 2077 | $59.99 | Y |
| 52 | Outward Defini ive Edition | $17.99 | Y |
| 53 | Spiritfarer®: Farewell Edition | $7.49 | N |
| 54 | RimWorld - Biotech | $24.99 | Y |
| 55 | Grounded | $39.99 | Y |
| 56 | Yu-Gi-Oh! Master Duel | – | – |
| 57 | MultiVersus | – | – |
| 58 | Tales of Arise | $33.99 | Y |
| 59 | Summoners War: Chronicles | – | – |
| 60 | Microsoft Flight Simulator 40th Anniversary Edition | $59.99 | Y |
| 61 | The Elder Scrolls V: Skyrim Special Edition | $39.99 | Y |
| 62 | Gotham Knights | $59.99 | Y |
| 63 | Borderlands 3 | $14.99 | Y |
| 64 | Monster Hunter: World | $14.99 | Y |
| 65 | Marvel's Spider-Man Remastered | $59.99 | Y |
| 66 | Hogwarts Legacy | $59.99 | Y |
| 67 | Red Dead Redemption 2 | $59.99 | Y |
| 68 | Ready or Not | $39.99 | Y |
| 69 | Soulstone Survivors | $9.99 | Y |
| 70 | Cities: Skylines - Content Creator Pack: Skyscrapers | $5.99 | Y |
| 71 | American Truck Simulator - Montana | $10.79 | N |

**SER-723**

Case 4:25-7030, 08/12/2026, DktEntry: 34.1, Page 120 of 147

**Exhibit 12D**

# Summary of Top Games on Steam

| No. | Product Name | Price | Price Ends in 99 Cents? |
|---|---|---|---|
| | **Percentage of Products with Prices Ending in 99 Cents** | | **87.7%** |
| 72 | Devil May Cry 5 | $9.89 | N |
| 73 | Among Us VR | $9.99 | Y |
| 74 | Going Medieval | $19.99 | Y |
| 75 | Bravery and Greed | $19.99 | Y |
| 76 | Starship Troopers: Terran Command | $23.99 | Y |
| 77 | Victoria 3 | $49.99 | Y |
| 78 | Tom Clancy's Rainbow Six® Siege | $19.99 | Y |
| 79 | NBA 2K23 | $59.99 | Y |
| 80 | STAR WARS™: The Old Republic™ | – | – |
| 81 | Somerville | $22.49 | N |
| 82 | Against the Storm | $19.99 | Y |
| 83 | Marauders | $29.99 | Y |
| 84 | Phasmophobia | $13.99 | Y |
| 85 | MARVEL SNAP | – | – |
| 86 | Total War: WARHAMMER III | $59.99 | Y |
| 87 | Dune: Spice Wars | $23.99 | Y |
| 88 | RuneScape ® | – | – |
| 89 | Project Zomboid | $19.99 | Y |
| 90 | Solasta: Crown of the Magister - Lost Valley | $9.09 | N |
| 91 | Stardew Valley | $14.99 | Y |
| 92 | Cosmoteer: Starship Architect & Commander | $19.99 | Y |
| 93 | ARK: Survival Evolved | $19.99 | Y |
| 94 | Deadside | $11.99 | Y |
| 95 | DayZ | $44.99 | Y |
| 96 | Sea of Thieves | $39.99 | Y |
| 97 | Risk of Rain 2 | $24.99 | Y |
| 98 | Phantasy Star Online 2 New Genesis | – | – |
| 99 | Raft | $19.99 | Y |
| 100 | Call of Duty®: Black Ops III | $59.99 | Y |

Source: Steam, "Top Sellers," available at https //store.steampowered.com/search/?filter=topsellers&ignore_preferences=1

Note: Analysis is restricted to the 100 best selling games on Steam accessed on 11/15/22. Steam presents the top 9,164 products on their webpage.

**SER-724**

Case 25-7030, 08/12/2026, DktEntry: 34.4, Page 122 of 255

**Exhibit 12E**

## Summary of Top Games on Xbox

| No. | Product Name | Price | Price Ends in 99 Cents? |
|---|---|---|---|
| | **Percentage of Products with Prices Ending in 99 Cents** | | **100.0%** |
| 1 | Madden NFL 23 Xbox One | $29.99 | Y |
| 2 | Batman: Arkham Collection | $59.99 | Y |
| 3 | Sonic Frontiers | $59.99 | Y |
| 4 | EA SPORTS™ FIFA 23 Standard Edition Xbox One | $59.99 | Y |
| 5 | DRAGON BALL XENOVERSE 2 | $8.99 | Y |
| 6 | NBA 2K23 for Xbox One | $26.99 | Y |
| 7 | Grand Theft Auto V (Xbox One & Xbox Series X\|S) | $59.99 | Y |
| 8 | Grand Theft Auto V: Premium Edition & Great White Shark Card Bundle | $44.99 | Y |
| 9 | Mortal Kombat XL | $19.99 | Y |
| 10 | Mafia III: Definitive Edition | $29.99 | Y |
| 11 | Madden NFL 23 All Madden Edition Xbox One & Xbox Series X\|S | $49.99 | Y |
| 12 | Police Simulator: Patrol Officers | $39.99 | Y |
| 13 | Mount & Blade II: Bannerlord | $49.99 | Y |

Source: Xbox, "Best Sellers," available at https://www.xbox.com/en-US/games

Note: Analysis is restricted to the 13 best selling games on the Xbox website accessed on 11/16/22. The Xbox website presents the top 13 products on their webpage.

**SER-725**

Case 4:11-cv-00724-YGR, Document 880-7, Filed 04/26/24, Page 122 of 147
Case 25-7030, 08/12/2026, DktEntry: 34.4, Page 122 of 255

**Exhibit 13**

## Summary of Game Prices by Store from 'Is There Any Deal'

### Percentage of Products with Prices Ending in 99 Cents

| Store | Percentage |
|---|---|
| Average | 69.9% |
| Weighted Average | 70.6% |
| Minimum | 7.2% |
| Maximum | 96.7% |
| Steam | 77.2% |
| Itch.io | 35.5% |
| Fanatical | 40.5% |
| Humble Store | 84.3% |
| GreenManGaming | 83.1% |
| GamersGate | 87.4% |
| IndieGala Store | 92.5% |
| WinGameStore | 85.5% |
| GameBillet | 7.2% |
| Voidu | 64.6% |
| GOG | 87.2% |
| GamesPlanet US | 57.2% |
| AllYouPlay | 81.4% |
| Dreamgame | 63.0% |
| Newegg | 92.4% |
| Nuuvem | 83.1% |
| DLGamer | 25.4% |
| 2game | 90.2% |
| Gamesload | 55.3% |
| MacGameStore | 87.7% |
| Epic Game Store | 74.2% |
| Direct2Drive | 78.7% |
| Noctre | 78.1% |
| JoyBuggy | 17.1% |
| GamesRepublic | 48.1% |
| GameStop PC | 96.7% |
| Game Jolt | 56.1% |
| eTail.Market | 27.6% |
| Microsoft Store | 91.0% |
| Origin | 88.0% |
| Ubisoft Store | 91.9% |
| Humble Widgets | 78.0% |
| Blizzard | 74.2% |
| Square Enix | 95.0% |

Source: Is There Any Deal, "Is There Any Deal," available at https://isthereanydeal.com/

Note: Analysis is restricted to the top 141,000 games on 'Is There Any Deal' with available price information on or before 10/24/22. Only the most recent prices for each game across each unique U.S. store were considered. Stores are ordered by the number of games available. The row labeled "average" reflects the simple average of percentages across all stores, while the row labeled "weighted average" reflects the weighted average of percentages across all stores, where weights are the number of games in each store.

**Exhibit 14**

# Summary of Top e-Books from Select Providers

## Percentage of Products with Prices Ending in 99 Cents

| Platform | Percentage |
|---|---|
| Average | 95.8% |
| Minimum | 93.3% |
| Maximum | 97.0% |
| Amazon | 97.0% |
| Barnes & Noble | 97.0% |
| Google Play | 93.3% |

Source: Amazon, "Best Sellers in Kindle Store," available at https://www.amazon.com/Best-Sellers-Kindle-Store/zgbs/digital-text/ref=zg_bs; Barnes & Noble, "B&N Top 100: Bestselling eBooks," available at https://www.barnesandnoble.com/b/ebooks-nook/_/N-1fZ8qa; Google Play, "Top Selling," available at https://play.google.com/store/books?hl=en_US&gl=US

Note:  Amazon values reflect the top 100 e-books, based on the quantity of units sold, in its "Best Sellers in Kindle Store" section accessed on 11/14/22.  Barnes & Noble values reflect the top 100 e-books over a six-month period in its "Bestselling eBooks" section accessed on 11/10/22.  Google Play values reflect the top 45 e-books in its "Top Selling" section accessed on 10/25/22.  Google Play only presents the top 45 e-books on its website.

**Exhibit 14A**

# Summary of Top e-Books on Kindle Store

| No. | Product Name | Price | Price Ends in 99 Cents? |
|---|---|---|---|
| | **Percentage of Products with Prices Ending in 99 Cents** | | **97.0%** |
| 1 | Homecoming (Empire High Book 6) | $6.99 | Y |
| 2 | Princess and the Player (Strangers in Love) | $3.99 | Y |
| 3 | Desert Star (A Renée Ballard and Harry Bosch Novel) | $14.99 | Y |
| 4 | The Washington Post Digital Access | $7.99 | Y |
| 5 | The Bookstore Sisters: A Short Story | $1.99 | Y |
| 6 | Corrupted Chaos: An Enemies to Lovers Forced Proximity Romance (Tarnished Empire) | $4.99 | Y |
| 7 | Icebreaker (The UCMH Series Book 1) | $3.99 | Y |
| 8 | The Perfect Marriage: A Completely Gripping Psychological Suspense | $7.99 | Y |
| 9 | The Quarry Girls: A Thriller | $4.99 | Y |
| 10 | The Book Woman's Daughter: A Novel | $1.99 | Y |
| 11 | It Starts with Us: A Novel (It Ends with Us Book 2) | $13.99 | Y |
| 12 | The Boys from Biloxi: A Legal Thriller | $14.99 | Y |
| 13 | Until You Can't | $3.99 | Y |
| 14 | King of Wrath : An Arranged Marriage Romance (Kings of Sin) | $4.99 | Y |
| 15 | The Other Emily | $8.54 | N |
| 16 | Reminders of Him: A Novel | $5.99 | Y |
| 17 | The Wrong Bride: Ares and Raven's Story (The Windsors) | $5.99 | Y |
| 18 | The Widow | $4.99 | Y |
| 19 | No Plan B: A Jack Reacher Novel | $14.99 | Y |
| 20 | Blood Mercy: A Fantasy Romance (Blood Grace Book 1) | $4.99 | Y |
| 21 | Light to the Hills: A Novel | $4.99 | Y |
| 22 | Hidden in Snow (The Are Murders Book 1) | $4.99 | Y |
| 23 | The Housemaid: An absolutely addictive psychological thriller with a jaw-dropping twist | $3.99 | Y |
| 24 | Runaway Groomsman | $4.99 | Y |
| 25 | Half Broke Horses: A True-Life Novel | $1.99 | Y |
| 26 | The Vibrant Years: A Novel | $4.99 | Y |
| 27 | Never Lie: An addictive psychological thriller | $3.99 | Y |
| 28 | Things We Never Got Over (Knockemout Book 1) | $5.99 | Y |
| 29 | The Last Dragon King: Kings of Avalier | $4.99 | Y |
| 30 | It Ends with Us: A Novel | $10.99 | Y |
| 31 | Keeper of Enchanted Rooms (Whimbrel House Book 1) | $4.99 | Y |
| 32 | Arrogant Monster (Vlasov Brata Book 1) | $2.99 | Y |
| 33 | Thriving in the Storm: Nine Principles to Help You Overcome Any Adversity | $0.99 | Y |
| 34 | What Was Meant To Be | $3.99 | Y |
| 35 | Crave | $7.99 | Y |
| 36 | Heartless: A Small Town Single Dad Romance | $4.99 | Y |
| 37 | Regretting You | $5.99 | Y |
| 38 | Going Rogue: Rise and Shine Twenty-Nine (Stephanie Plum Book 29) | $14.99 | Y |
| 39 | Taken by Fate (The Alpha Territories Book 1) | $3.99 | Y |
| 40 | The Wrong Bridesmaid | $3.99 | Y |
| 41 | Mine For Yours: A Single Parent, Small Town Romance | $4.99 | Y |
| 42 | Friends, Lovers, and the Big Terrible Thing: A Memoir | $14.99 | Y |
| 43 | Lessons in Chemistry: A Novel | $14.99 | Y |
| 44 | Christmas with Dad's Best Friend: An Age Gap Holiday Romance (Silver Fox Daddies) | $2.99 | Y |
| 45 | Haunting Adeline (Cat and Mouse Duet Book 1) | $4.99 | Y |
| 46 | Twenty Years Later: A Riveting New Thriller | $13.77 | N |
| 47 | The Christmas Bookshop: A Novel | $1.99 | Y |
| 48 | Arrogant Mistake (Vlasov Bratva Book 2) | $5.99 | Y |
| 49 | Hooked (Never After Series) | $4.99 | Y |
| 50 | Verity | $11.99 | Y |
| 51 | The Good Guy Challenge: A Fake Dating Standalone Romance | $3.99 | Y |
| 52 | The New York Times - Daily Edition for Kindle | $19.99 | Y |
| 53 | Secret Daddy: An Age Gap, Secret Baby Romance (Silver Fox Daddies) | $2.99 | Y |
| 54 | Charm (Crave Book 5) | $9.99 | Y |
| 55 | The Paris Bookseller | $13.99 | Y |
| 56 | Frost (Frost and Nectar Book 1) | $3.99 | Y |
| 57 | Happenstance | $4.99 | Y |
| 58 | Layla | $5.99 | Y |
| 59 | Baby Surprise (Alpha Billionaire) | $0.99 | Y |
| 60 | Conqueror (Galactic Kings Book 4) | $4.99 | Y |
| 61 | Provoke: A Grumpy Boss Romance | $3.99 | Y |
| 62 | Mad Honey: A Novel | $14.99 | Y |
| 63 | Quarterback Sneak: A Forbidden Sports Romance (Red Zone Rivals) | $4.99 | Y |
| 64 | One of Those Faces: A Novel | $4.99 | Y |
| 65 | Well Behaved Wives: A Novel | $4.99 | Y |
| 66 | Triple Cross: The Greatest Alex Cross Thriller Since Kiss the Girls (An Alex Cross Thriller Book 28) | $14.99 | Y |

**Exhibit 14A**

# Summary of Top e-Books on Kindle Store

| No. | Product Name | Price | Price Ends in 99 Cents? |
|---|---|---|---|
| | **Percentage of Products with Prices Ending in 99 Cents** | | **97.0%** |
| 67 | A Not So Meet Cute | $4.99 | Y |
| 68 | After She Left: A gripping, emotional page turner with a twist (Claire Amarti Book Club Reads) | $2.99 | Y |
| 69 | Permanent Record | $1.99 | Y |
| 70 | Long Shadows (Memory Man Series Book 7) | $14.99 | Y |
| 71 | ALL IN: 6 & 7-Figure Entrepreneurs Share Success Secrets for Unlocking the Imposs ble and Achieving Your Wildest Dreams | $0.99 | Y |
| 72 | Excuse Me While I Disappear: Tales of Midlife Mayhem | $4.99 | Y |
| 73 | Consider Me (Playing For Keeps Book 1) | $3.99 | Y |
| 74 | The Alpha's Fated Encounter: An Opposites Attract Shifter Romance (Fated To Royalty Book 1) | $5.99 | Y |
| 75 | All Her Fault: The breathlessly twisty Sunday Times bestseller everyone is talking about | $0.99 | Y |
| 76 | Psycho Beasts: Enemies to Lovers Romance (Cruel Shifterverse Book 3) | $4.99 | Y |
| 77 | Forever After All: A Billionaire Marriage of Convenience Novel | $5.99 | Y |
| 78 | The Secrets of Bridgewater Bay: A darkly gripping dual-time novel of family secrets to be hidden at all costs . . . | $0.99 | Y |
| 79 | Brutal Prince: An Enemies To Lovers Mafia Romance (Brutal Birthright Book 1) | $4.99 | Y |
| 80 | Daddy Fox (MC Daddies Book 9) | $3.99 | Y |
| 81 | Twisted Love: A Brother's Best Friend Romance | $4.99 | Y |
| 82 | Saccie Soto Is Back: A Novel | $13.99 | Y |
| 83 | The Duke Alone | $4.99 | Y |
| 84 | Fall of Snow: A Dark Mafia Romance (Frost Industries Book 3) | $4.99 | Y |
| 85 | Unbroken Bonds (The Bonds that Tie Book 6) | $4.99 | Y |
| 86 | Beautiful Graves | $4.99 | Y |
| 87 | Demon Copperhead: A Novel | $15.99 | Y |
| 88 | Kill Spree (Starship for Sale Book 7) | $4.99 | Y |
| 89 | The Do-Over (The Miles High Club Book 4) | $3.99 | Y |
| 90 | The Stopover (The Miles High Club Book 1) | $3.99 | Y |
| 91 | How to Kill Men and Get Away With It: A deliciously dark, hilariously addictive debut psychological thriller, about friendship, love and murder for 2022! | $0.99 | Y |
| 92 | Dirty Little Midlife Drama: A Small Town Romcom (Heart's Cove Hotties Book 8) | $5.99 | Y |
| 93 | Harry Potter and the Sorcerer's Stone | $9.99 | Y |
| 94 | The Brighter the Light | $2.49 | N |
| 95 | Single Dads Club: A Contemporary Reverse Harem Romance | $2.99 | Y |
| 96 | Tarnished Tyrant (Zhukova Bratva Book 1) | $2.99 | Y |
| 97 | Hunting Adeline (Cat and Mouse Duet Book 2) | $4.99 | Y |
| 98 | The Memory Box: Heartbreaking historical fiction set partly in World War Two, inspired by true events, from the global bestselling author | $0.99 | Y |
| 99 | Brain Damage: A twisted psychological thriller that will keep you guessing | $2.99 | Y |
| 100 | Fairy Tale | $16.99 | Y |

Source: Amazon, "Best Sellers in Kindle Store," available at https://www.amazon.com/Best-Sellers-Kindle-Store/zgbs/digital-text/ref=zg_bs

Note: Analysis is restricted to he top 100 e-Books on the Amazon Kindle Store website accessed on 11/10/22. Amazon only presents the top 100 products on their webpage.

**SER-729**

Case 25-7030, 03/12/2026, DktEntry: 34.1, Page 234 of 255

**Exhibit 14B**

# Summary of Top e-Books on Barnes & Noble

| No. | Product Name | Price | Price Ends in 99 Cents? |
|---|---|---|---|
| | **Percentage of Products with Prices Ending in 99 Cents** | | **97.0%** |
| 1 | Thriving in the Storm: Nine Principles to Help You Overcome Any Adversity | $0.99 | Y |
| 2 | Desert Star (Harry Bosch Series #24 and Renée Ballard Series #5) | $14.99 | Y |
| 3 | Family Honor (Sunny Randall Series #1) | $2.99 | Y |
| 4 | Going Rogue: Rise and Shine Twenty-Nine (Stephanie Plum Series #29) | $14.99 | Y |
| 5 | Half Broke Horses: A True-Life Novel | $1.99 | Y |
| 6 | The Secrets of Bridgewater Bay: A darkly gripping dual-time novel of family secrets to be hidden at all costs . . . | $0.99 | Y |
| 7 | Dress Her in Indigo (Travis McGee Series #11) | $1.99 | Y |
| 8 | The Second Husband | $11.99 | Y |
| 9 | Summer in Paradise (Married in Malibu Romance Collection, Books 1-3) | $0.99 | Y |
| 10 | No Plan B (Jack Reacher Series #27) | $14.99 | Y |
| 11 | The Boys from Biloxi: A Legal Thriller | $14.99 | Y |
| 12 | Suspect | $14.99 | Y |
| 13 | Dandelion Summer (Blue Sky Hill Series #4) | $2.99 | Y |
| 14 | Someone to Cherish (Westcott Series #8) | $2.99 | Y |
| 15 | Permanent Record | $1.99 | Y |
| 16 | The Viper | $5.99 | Y |
| 17 | Isabel Puddles Investigates | $9.99 | Y |
| 18 | Daughters of Hecate: The Complete Urban Fantasy Series | $0.99 | Y |
| 19 | Triple Cross (Alex Cross Series #28) | $14.99 | Y |
| 20 | The Family Remains | $6.99 | Y |
| 21 | It Starts with Us: A Novel | $13.99 | Y |
| 22 | Aurora | $5.99 | Y |
| 23 | Dinners with Ruth: A Memoir on the Power of Friendships | $6.99 | Y |
| 24 | Wyoming Homecoming | $7.99 | Y |
| 25 | The Paris Bookseller | $13.99 | Y |
| 26 | Clive Cussler The Sea Wolves (Isaac Bell Series #13) | $14.99 | Y |
| 27 | The German Girl | $1.99 | Y |
| 28 | Blood Rogue | $0.99 | Y |
| 29 | The West Side Series - The Complete Box Set - Books 1 - 6 | $1.99 | Y |
| 30 | Long Shadows (Amos Decker Series #7) | $14.99 | Y |
| 31 | Livid (Kay Scarpetta Series #26) | $14.99 | Y |
| 32 | The Revolutionary: Samuel Adams | $7.99 | Y |
| 33 | Defending His Hope | $0.99 | Y |
| 34 | Carrie Soto Is Back: A Novel | $13.99 | Y |
| 35 | It Ends with Us | $10.99 | Y |
| 36 | Lessons in Chemistry | $14.99 | Y |
| 37 | Racing the Light (Elvis Cole and Joe Pike Series #19) | $14.99 | Y |
| 38 | The Next Best Day | $7.49 | N |
| 39 | Verity | $11.99 | Y |
| 40 | The Christmas Bookshop: A Novel | $1.99 | Y |
| 41 | A Murder Yule Regret (Bread Shop Mystery #7) | $7.99 | Y |
| 42 | Christmas at Twilight (Twilight, Texas Series #5) | $1.99 | Y |
| 43 | An Honest Lie | $2.99 | Y |
| 44 | The Finding Series Books 1-3 | $0.99 | Y |
| 45 | Twelfth Knight's Bride | $0.99 | Y |
| 46 | Secluded Cabin Sleeps Six | $14.99 | Y |
| 47 | Ten Popes Who Shook the World | $1.99 | Y |
| 48 | Friends, Lovers, and the Big Terrible Thing: A Memoir | $14.99 | Y |
| 49 | Charm (Crave Series #5) | $9.99 | Y |
| 50 | Some of It Was Real | $11.99 | Y |
| 51 | Mad Honey | $14.99 | Y |
| 52 | The Maze | $13.99 | Y |
| 53 | The Distant Hours: A Novel | $1.99 | Y |
| 54 | Down and Dirty | $0.99 | Y |
| 55 | The History of Jerusalem: Its Origins to the Early Middle Ages | $1.99 | Y |
| 56 | Righteous Prey (Lucas Davenport Series #32) | $14.99 | Y |
| 57 | The Male Brain: A Breakthrough Understanding of How Men and Boys Think | $1.99 | Y |
| 58 | Rage | $3.99 | Y |
| 59 | An Acquired Taste | $0.99 | Y |
| 60 | The Man Who Invented Motion Pictures: A True Tale of Obsession, Murder, and the Movies | $3.99 | Y |
| 61 | Texas Christmas Dare | $0.99 | Y |
| 62 | Full House (Janet Evanovich's Full Series #1) | $2.99 | Y |
| 63 | Peril in Paris (Royal Spyness Series #16) | $14.99 | Y |
| 64 | Once Shadows Fall: A Jack Kale and Beth Sturgis Mystery | $1.99 | Y |
| 65 | Come Back to You | $0.99 | Y |
| 66 | Sugar Plum Spies: A Section 47 book | $4.99 | Y |

**SER-730**

Case 4:11-cv-00723-YGR, Document 856-7, Filed 04/16/24, Page 127 of 147

# Summary of Top e-Books on Barnes & Noble

| No. | Product Name | Price | Price Ends in 99 Cents? |
|---|---|---|---|
| | **Percentage of Products with Prices Ending in 99 Cents** | | **97.0%** |
| 67 | The Cloisters | $14.99 | Y |
| 68 | Toughest Cowboy in Texas (Happy, Texas Series #1) | $0.99 | Y |
| 69 | The Physicists' Daughter: A Novel | $8.99 | Y |
| 70 | Less of a Stranger | $2.99 | Y |
| 71 | Home Sweet Christmas: A Holiday Romance Novel | $12.99 | Y |
| 72 | Fairy Tale | $16.99 | Y |
| 73 | An Amish Second Christmas | $7.49 | N |
| 74 | My Policeman: A Novel | $10.99 | Y |
| 75 | The Other Wife: The pulse-racing thriller that's impossible to put down | $1.99 | Y |
| 76 | November 9 | $10.99 | Y |
| 77 | A Christmas to Remember: An Anthology | $2.99 | Y |
| 78 | The Choice: The Dragon Heart Legacy, Book 3 | $14.99 | Y |
| 79 | Blow: How a Small-Town Boy Made $100 Million with the Medellín Cocaine Cartel and Lost It All | $1.99 | Y |
| 80 | The House Between Tides: A Novel | $1.99 | Y |
| 81 | Murder at Black Oaks (Robin Lockwood Series #6) | $14.99 | Y |
| 82 | The Christmas Spirit: A Novel | $11.99 | Y |
| 83 | Demon Copperhead | $15.99 | Y |
| 84 | Dark Rivers of the Heart | $1.99 | Y |
| 85 | Oath of Loyalty | $14.99 | Y |
| 86 | The Rules of Magic | $1.99 | Y |
| 87 | A Christmas Deliverance | $9.99 | Y |
| 88 | Dawnlands: A Novel | $14.99 | Y |
| 89 | Dirty Little Secrets: a gripping thriller of lies, privilege, secrets and betrayal | $0.99 | Y |
| 90 | Now Is Not the Time to Panic | $14.99 | Y |
| 91 | The Marriage Portrait | $14.99 | Y |
| 92 | Foraging for Survival: Ed ble Wild Plants of North America | $1.99 | Y |
| 93 | The New Neighbor: A Thriller | $8.49 | N |
| 94 | Desperation in Death (In Death Series #55) | $14.99 | Y |
| 95 | Last One To Know | $6.99 | Y |
| 96 | Rocking the Cowboy's Christmas | $0.99 | Y |
| 97 | Another Christmas from Hell | $3.99 | Y |
| 98 | Sharp Edges | $1.99 | Y |
| 99 | Chosen by the Vikens | $4.99 | Y |
| 100 | Dreamland | $14.99 | Y |

Source:  Barnes & Noble, "B&N Top 100: Bestselling eBooks," available at https://www.barnesandnoble.com/b/ebooks-nook/_/N-1fZ8qa

Note:  Analysis is restricted to  he top 100 e-Books on the Barnes & Noble website accessed on 11/10/22.  Barnes & Noble only presents  he top 100 products on their webpage.

# Summary of Top e-Books on Google Play

| No. | Product Name | Price | Price Ends in 99 Cents? |
|---|---|---|---|
| | **Percentage of Products with Prices Ending in 99 Cents** | | **93.3%** |
| 1 | It Starts with Us: A Novel | $11.99 | Y |
| 2 | The Boys from Biloxi: A Legal Thriller | $14.99 | Y |
| 3 | Long Shadows | $14.99 | Y |
| 4 | Fairy Tale | $16.99 | Y |
| 5 | If This Book Exists, You're in the Wrong Universe | $14.99 | Y |
| 6 | Dark Whisper | $14.99 | Y |
| 7 | Fire & Blood: 300 Years Before A Game of Thrones | $9.99 | Y |
| 8 | Righteous Prey | $14.99 | Y |
| 9 | It Ends With Us: A Novel | $10.99 | Y |
| 10 | I'm Glad My Mom Died | $14.99 | Y |
| 11 | Verity | $11.99 | Y |
| 12 | I'm the Evil Lord of an Intergalactic Empire! (Light Novel) | $9.99 | Y |
| 13 | 1984 | $2.99 | Y |
| 14 | Magical Explorer: Reborn as a Side Character in a Fantasy Dating Sim | $8.99 | Y |
| 15 | The Maze | $14.99 | Y |
| 16 | The High Notes: A Novel | $14.99 | Y |
| 17 | Distant Thunder | $14.99 | Y |
| 18 | Wreck & Ruin: An Age Gap Romance | $6.99 | Y |
| 19 | Where the Crawdads Sing | $12.99 | Y |
| 20 | Mad Honey: A Novel | $14.99 | Y |
| 21 | A Court of Thorns and Roses | $6.65 | N |
| 22 | Chainsaw Man: Dog And Chainsaw | $6.99 | Y |
| 23 | Bofuri: I Don't Want to Get Hurt, so I'll Max Out My Defense., Vol. 7 (light novel) | $8.99 | Y |
| 24 | My Quiet Blacksmith Life in Another World | $7.99 | Y |
| 25 | The Silmarillion | $11.99 | Y |
| 26 | Ugly Love: A Novel | $10.99 | Y |
| 27 | The Subtle Art of Not Giving a F*ck: A Counterintuitive Approach to Living a Good Life | $12.99 | Y |
| 28 | 2022-2026 Xcel Program Code of Points | $75.00 | N |
| 29 | Salt, Fat, Acid, Heat: Mastering the Elements of Good Cooking | $19.99 | Y |
| 30 | The Golden Enclaves: A Novel | $13.99 | Y |
| 31 | The Eminence in Shadow | $9.99 | Y |
| 32 | The Lost Metal: A Mistborn Novel | $14.99 | Y |
| 33 | Black Summoner (Manga) | $8.99 | Y |
| 34 | The 6:20 Man: A Thriller | $14.99 | Y |
| 35 | Oath of Loyalty | $14.99 | Y |
| 36 | The Irregular at Magic High School, Vol. 20 (light novel) | $7.99 | Y |
| 37 | Project Hail Mary: A Novel | $12.99 | Y |
| 38 | Beyond the Wand: The Magic and Mayhem of Growing Up a Wizard | $14.99 | Y |
| 39 | A Court of Mist and Fury | $6.71 | N |
| 40 | Dune: Volume 1 | $9.99 | Y |
| 41 | Chainsaw Man: CHAINSAW vs. BAT | $6.99 | Y |
| 42 | Dreamland: A Novel | $14.99 | Y |
| 43 | Desperation in Death: An Eve Dallas Novel | $14.99 | Y |
| 44 | Atomic Habits: An Easy & Proven Way to Build Good Habits & Break Bad Ones | $11.99 | Y |
| 45 | Confidence Man: The Making of Donald Trump and the Breaking of America | $16.99 | Y |

Source: Google Play, "Top Selling," available at https://play.google.com/store/books?hl=en_US&gl=US

Note: Analysis is restricted to he top 45 e-books, based on number of sales, on the Google Play Store accessed on 10/25/22. Google Play only presents the top 45 products on their webpage.

**Exhibit 15**

# Summary of Top Music Streaming Provider Pricing

| Rank | App | Subscription | Duration | Website Price | Price Ends in 99 Cents |
|------|-----|--------------|----------|---------------|------------------------|
| | | | | | 100.0% |
| 1 | Spotify - Music and Podcasts | Individual | Month | $9.99 | Y |
| 1 | Spotify - Music and Podcasts | Duo | Month | $12.99 | Y |
| 1 | Spotify - Music and Podcasts | Family | Month | $15.99 | Y |
| 1 | Spotify - Music and Podcasts | Student | Month | $4.99 | Y |
| 2 | YouTube Music | Premium | Month | $9.99 | Y |
| 3 | SoundCloud: Discover New Music | Go | Month | $4.99 | Y |
| 3 | SoundCloud: Discover New Music | Go+ | Month | $9.99 | Y |
| 3 | SoundCloud: Discover New Music | Go+ Student | Month | $4.99 | Y |
| 4 | Pandora: Music & Podcasts | Plus | Month | $4.99 | Y |
| 4 | Pandora: Music & Podcasts | Premium | Month | $9.99 | Y |
| 4 | Pandora: Music & Podcasts | Premium Family | Month | $14.99 | Y |
| 4 | Pandora: Music & Podcasts | Premium Student | Month | $4.99 | Y |
| 4 | Pandora: Music & Podcasts | Premium Military | Month | $7.99 | Y |
| 5 | Amazon Music: Songs & Podcasts | Unlimited | Month | $8.99 | Y |
| 6 | SiriusXM: Music, Sports & News | Streaming Music Showcase | Month | $4.99 | Y |
| 6 | SiriusXM: Music, Sports & News | Streaming Music & Entertainment | Month | $7.99 | Y |
| 6 | SiriusXM: Music, Sports & News | Streaming Platinum | Month | $10.99 | Y |
| 6 | SiriusXM: Music, Sports & News | Music Showcase | Month | $12.99 | Y |
| 6 | SiriusXM: Music, Sports & News | Music & Entertainment | Month | $17.99 | Y |
| 6 | SiriusXM: Music, Sports & News | Platinum | Month | $22.99 | Y |
| 7 | Audiomack - Stream New Music | Premium | Month | $5.99 | Y |
| 8 | iHeart: #1 for Radio, Podcasts | Plus | Month | $4.99 | Y |
| 8 | iHeart: #1 for Radio, Podcasts | All-Access | Month | $9.99 | Y |
| 9 | Smule: Karaoke Music Studio | VIP | Month | $15.99 | Y |
| 9 | Smule: Karaoke Music Studio | VIP | Year | $39.99 | Y |
| 10 | Sonos | Radio HD | Month | $7.99 | Y |

Source: Amazon, "Amazon Music Unlimited," available at https://www.amazon.com/music/unlimited; App Store, "Top Free Music Apps," available at https //apps apple.com/us/charts/iphone/music-apps/6011; Audiomack, "Start Your Free Trial," available at https://audiomack.com/premium; iHeart, "Upgrade," available at https://www iheart.com/upgrade?upsellFrom=54; Pandora, "Choose How You Want To Listen," available at https //www.pandora.com/; SiriusXM, "Popular Plans," available at https://www siriusxm.com/plans?intcmp=Global%20Nav_NA_www:Home_ComparePlans; Smule, "Unlock Deal," available at https://www.smule.com/en/s/billing/pricing/v121; Sonos, "Sonos Radio HD," available at https //www.sonos.com/en-us/sonos-radio; SoundCloud, "SoundCloud Go," available at https //checkout soundcloud.com/go; Spotify, "Pick Your Premium," available at https://www.spotify.com/us/premium/#plans; YouTube, "YouTube Music," available at https://music.youtube com/music_premium/musicfeed

Source: Amazon, "Amazon Music Unlimited," available at https://www.amazon.com/music/unlimited; App Store, "Top Free Entertainment Apps," available at https //apps apple.com/us/charts/iphone/entertainment-apps/6016; Audiomack, "Start Your Free Trial," available at https //audiomack.com/premium; iHeart, "Upgrade," available at https //www.iheart com/upgrade?upsellFrom=54; Pandora, "Choose How You Want To Listen," available at https://www.pandora.com/; SiriusXM, "Popular Plans," available at https://www.siriusxm com/plans?intcmp=Global%20Nav_NA_www:Home_ComparePlans; Smule, "Unlock Deal," available at https://www.smule com/en/s/billing/pricing/v121; Sonos, "Sonos Radio HD," available at https://www.sonos.com/en-us/sonos-radio; SoundCloud, "SoundCloud Go," available at https //checkout soundcloud.com/go; Spotify, "Pick Your Premium," available at https //www.spotify.com/us/premium/#plans; YouTube, "YouTube Music," available at https //music.youtube.com/music_premium/musicfeed

Note: Values reflect all subscription options presented on websites of the top 20 apps in the music genre listed on the App Store accessed on 2/24/23 that also listed subscription prices on their website. Prices reflect the prices shown on the platform's website.

**Exhibit 16**

# Summary of Top Entertainment Streaming Provider Pricing

| Rank | App | Subscription | Duration | Website Price | Price Ends in 99 Cents |
|---|---|---|---|---|---|
| | | | | | 96.6% |
| 1 | Netflix | Basic with ads | Month | $6.99 | Y |
| 1 | Netflix | Basic | Month | $9.99 | Y |
| 1 | Netflix | Standard | Month | $15.49 | N |
| 1 | Netflix | Premium | Month | $19.99 | Y |
| 2 | Peacock TV: Stream TV & Movies | Premium | Month | $4.99 | Y |
| 2 | Peacock TV: Stream TV & Movies | Premium | Year | $49.99 | Y |
| 2 | Peacock TV: Stream TV & Movies | Premium Plus | Month | $9.99 | Y |
| 2 | Peacock TV: Stream TV & Movies | Premium Plus | Year | $99.99 | Y |
| 3 | HBO Max: Stream TV & Movies | With Ads | Month | $9.99 | Y |
| 3 | HBO Max: Stream TV & Movies | With Ads | Year | $99.99 | Y |
| 3 | HBO Max: Stream TV & Movies | Ad-Free | Month | $15.99 | Y |
| 3 | HBO Max: Stream TV & Movies | Ad-Free | Year | $149.99 | Y |
| 4 | Hulu: Stream TV & movies | With Ads | Month | $7.99 | Y |
| 4 | Hulu: Stream TV & movies | No Ads | Month | $14.99 | Y |
| 4 | Hulu: Stream TV & movies | Disney Bundle Trio Basic | Month | $12.99 | Y |
| 4 | Hulu: Stream TV & movies | Disney Bundle Trio Premium | Month | $19.99 | Y |
| 4 | Hulu: Stream TV & movies | Hulu + Live TV | Month | $69.99 | Y |
| 5 | Disney+ | Basic | Month | $7.99 | Y |
| 5 | Disney+ | Premium | Month | $10.99 | Y |
| 5 | Disney+ | Duo Basic | Month | $9.99 | Y |
| 5 | Disney+ | Trio Basic | Month | $12.99 | Y |
| 5 | Disney+ | Trio Premium | Month | $19.99 | Y |
| 6 | Amazon Prime Video | Prime Video | Month | $14.99 | Y |
| 7 | Paramount+ | Essential | Month | $4.99 | Y |
| 7 | Paramount+ | Essential | Year | $49.99 | Y |
| 7 | Paramount+ | Premium | Month | $9.99 | Y |
| 7 | Paramount+ | Premium | Year | $99.99 | Y |
| 8 | YouTube TV | Base Plan | Month | $64.99 | Y |
| 8 | YouTube TV | Spanish Plan | Month | $34.99 | Y |

Source: Amazon, "Prime Video," available at https //www.amazon.com/hp/video/offers/intercept/; App Store, "Top Free Entertainment Apps," available at https://apps apple.com/us/charts/iphone/entertainment-apps/6016; Disney+, "Choose Your Plan," available at https://www.disneyplus com/; HBO Max, "Choose A Plan That Works For You," available at https://www.hbomax com/; Hulu, "Select Your Plan," available at https //www hulu com/welcome; Netflix, "Choose The Plan That's Right For You," available at https://www netflix.com/signup/planform; Paramount+, "Pick Your Plan," available at https://www.paramountplus.com/account/signup/pickplan; Peacock TV, "Pick A Plan. Cancel Anytime.," available at https //www.peacocktv.com/plans/all-monthly; YouTube, "Choose The Plan That Works For You," available at https //tv.youtube.com/welcome/

Note: Values reflect all subscription options presented on websites of the top 20 video streaming apps in the entertainment genre on the App Store accessed on 2/24/23. Prices reflect the prices shown on the platform's website.

**Exhibit 17**

# Summary of Top Movies from Select Providers

## Percentage of Products with Prices Ending in 99 Cents

| Platform | Rentals | Buys |
|---|---|---|
| Average | 97.5% | 100.0% |
| Amazon | 97.4% | 100.0% |
| Google Play | 94.9% | 100.0% |
| Vudu | 100.0% | 100.0% |
| YouTube | 97.8% | 100.0% |

Source:  Amazon, "Best Sellers in Movies," available at https://www.amazon.com/gp/bestsellers/movies-tv/2858905011; Google Play, "Top Movies," available at https://play.google.com/store/movies?hl=en_US&gl=US; Vudu, "Top 200 Movies," available at https://www.vudu.com/content/movies/uxrow/Top-200-Movies/14028; YouTube, "Top Selling," available at https://www.youtube.com/playlist?list=PLHPTxTxtC0ial7mOT-Srrguvokjvlcbg7

Note:  Amazon values reflect the top 100 movies, based on quantity of units sold, in its "Best Sellers in Movies" section accessed on 11/15/22.  Google Play values reflect the top 45 movies in its "Top Movies" section accessed on 10/25/22.  Google Play only presents the top 45 products on its website.  Vudu values reflect the top 100 movies in its "Top 200 Movies" section accessed on 11/14/22.  YouTube values reflect the top 100 movies in its "Top Selling" section accessed on 11/14/22.

**Exhibit 17A**

# Summary of Top Movies on Amazon

| No. | Product Name | Price to Rent | Price to Rent Ends in 99? | Price to Buy | Price to Buy Ends in 99? |
|---|---|---|---|---|---|
| | **Percentage of Products with Prices Ending in 99 Cents** | | **97.4%** | | **100.0%** |
| 1 | Dog | $5.99 | Y | $19.99 | Y |
| 2 | The Lost City | $3.99 | Y | $24.99 | Y |
| 3 | Blacklight | $3.99 | Y | $14.99 | Y |
| 4 | Hideen Figures | – | – | – | – |
| 5 | Top Gun: Maverick | $5.99 | Y | $19.99 | Y |
| 6 | The Hunger Games | $3.99 | Y | $7.99 | Y |
| 7 | The Commuter | $3.99 | Y | $9.99 | Y |
| 8 | The Wolf of Wall Street | $3.99 | Y | $16.99 | Y |
| 9 | No Time to Die | $5.99 | Y | $19.99 | Y |
| 10 | Ghostbusters: Answer the Call | $3.99 | Y | $12.99 | Y |
| 11 | Transformers: Dark of the Moon | $3.99 | Y | $16.99 | Y |
| 12 | The Hunger Games: Catching Fire | $3.99 | Y | $7.99 | Y |
| 13 | The Hunger Games: Mockingjay Part 2 | $3.99 | Y | $7.99 | Y |
| 14 | The Hunger Games: Mockingjay Part 1 | $3.99 | Y | $7.99 | Y |
| 15 | Unhuman | $3.99 | Y | $14.99 | Y |
| 16 | 13 Hours: The Secret Soldiers of Benghazi | $3.99 | Y | $9.99 | Y |
| 17 | Bullet Train | $5.99 | Y | $9.99 | Y |
| 18 | Love, Rosie | – | – | – | – |
| 19 | Torn Hearts | $3.99 | Y | $14.99 | Y |
| 20 | Warm Bodies | $3.99 | Y | $4.99 | Y |
| 21 | Child's Play (2019) | $3.99 | Y | $14.99 | Y |
| 22 | Mission: Impossible IV - Ghost Protocol | – | – | – | – |
| 23 | Bridesmaids Unrated | $3.99 | Y | $14.99 | Y |
| 24 | Jack Ryan: Shadow Recruit | $3.99 | Y | $14.99 | Y |
| 25 | The Turning | – | – | – | – |
| 26 | The Place Beyond the Pines | – | – | – | – |
| 27 | Helll on the Border | $3.99 | Y | $7.99 | Y |
| 28 | Sausage Party | $2.99 | Y | $13.99 | Y |
| 29 | The Longest Ride | $3.99 | Y | $14.99 | Y |
| 30 | Edward Scissorhands | $3.99 | Y | $14.99 | Y |
| 31 | Terrifier | – | – | – | – |
| 32 | October Kiss | $7.99 | Y | $9.99 | Y |
| 33 | House of Gucci | $5.99 | Y | $18.99 | Y |
| 34 | Where the Crawdads Sing | $5.99 | Y | $19.99 | Y |
| 35 | The Devil You Know | $5.99 | Y | $6.99 | Y |
| 36 | The Prodigy | $3.99 | Y | $14.99 | Y |
| 37 | Candyman | $3.99 | Y | $14.99 | Y |
| 38 | A Quiet Place Par II | $3.99 | Y | $14.99 | Y |
| 39 | Murder on the Orient Express (2017) | $3.99 | Y | $14.99 | Y |
| 40 | Pride and Prejudice | $3.99 | Y | $14.99 | Y |
| 41 | The Huntsman: Winter's War | $3.99 | Y | $14.99 | Y |
| 42 | Failure to Launch | $3.99 | Y | $14.99 | Y |
| 43 | The Adjustment Bureau | $3.99 | Y | $14.99 | Y |
| 44 | Serving Sara | $3.99 | Y | $6.99 | Y |
| 45 | The Courier (2019) | $2.99 | Y | $12.99 | Y |
| 46 | The Rocky Horror Picture Show | $3.99 | Y | $14.99 | Y |
| 47 | Dirty Grandpa | $3.99 | Y | $7.99 | Y |
| 48 | Nope | $5.99 | Y | $19.99 | Y |
| 49 | Fight Club | – | – | – | – |
| 50 | The Unbearable Weight of Massive Talent | $5.99 | Y | $19.99 | Y |
| 51 | Alice | $3.99 | Y | $9.99 | Y |
| 52 | Money Monster | – | – | – | – |
| 53 | Ghostbusters: Afterlife | – | – | $14.99 | Y |
| 54 | Superbad | – | – | – | – |
| 55 | Licorice Pizza | $5.99 | Y | $19.99 | Y |
| 56 | The Silence of the Lambs | $3.99 | Y | $14.99 | Y |
| 57 | The Expendables | $3.99 | Y | $6.99 | Y |

**SER-736**

Case 25-7030, 08/12/2026, DktEntry: 34.8, Page 134 of 255

**Exhibit 17A**

# Summary of Top Movies on Amazon

| No. | Product Name | Price to Rent | Price to Rent Ends in 99? | Price to Buy | Price to Buy Ends in 99? |
|-----|--------------|---------------|----------------------------|--------------|---------------------------|
| | **Percentage of Products with Prices Ending in 99 Cents** | | **97.4%** | | **100.0%** |
| 58 | Jumangi: Welcome to the Jungle | $3.49 | N | $14.99 | Y |
| 59 | Teenage Mutant Ninja Turtles: Out of the Shadows | $3.99 | Y | $14.99 | Y |
| 60 | Law Abiding Citizen | $3.99 | Y | $9.99 | Y |
| 61 | Friday Night | – | – | – | – |
| 62 | Pumpkin Pie Wars | – | – | – | – |
| 63 | Annihilation | – | – | – | – |
| 64 | Snake Eyes: G.I. Joe Origins | $3.99 | Y | $14.99 | Y |
| 65 | Halloween | $3.99 | Y | $9.99 | Y |
| 66 | Spider-Man: No Way Home | – | – | $14.99 | Y |
| 67 | The Equalizer | $3.99 | Y | $14.99 | Y |
| 68 | 22 Jump Street | $3.99 | Y | $13.99 | Y |
| 69 | Shutter Island | $3.99 | Y | $14.99 | Y |
| 70 | Role Models | $3.99 | Y | $14.99 | Y |
| 71 | X | $5.99 | Y | $19.99 | Y |
| 72 | Are We Done Yet? | $3.99 | Y | $12.99 | Y |
| 73 | A Walk to Remember | – | – | – | – |
| 74 | Now You See Me 2 | – | – | – | – |
| 75 | The Invisible Man (2020) | – | – | – | – |
| 76 | Rough Night | $3.49 | N | $12.99 | Y |
| 77 | Christmas in the Rockies | – | – | – | – |
| 78 | Incarnation | $3.99 | Y | $9.99 | Y |
| 79 | The Expendables 3, 4K | $3.99 | Y | $6.99 | Y |
| 80 | Loving Pablo | $3.99 | Y | $14.99 | Y |
| 81 | Orphan: First Kill | $5.99 | Y | $19.99 | Y |
| 82 | Up in the Air | $3.99 | Y | $14.99 | Y |
| 83 | Madea's Family Reunion | $3.99 | Y | $7.99 | Y |
| 84 | Dr. No | $3.99 | Y | $14.99 | Y |
| 85 | We Were Soldiers | $3.99 | Y | $9.99 | Y |
| 86 | The Dilemma | $3.99 | Y | $14.99 | Y |
| 87 | Secrets in Suburbia | $3.99 | Y | $9.99 | Y |
| 88 | Primal | $3.99 | Y | $9.99 | Y |
| 89 | Fall | $5.99 | Y | $19.99 | Y |
| 90 | Harry Potter and the Sorcerer's Stone | $3.99 | Y | $14.99 | Y |
| 91 | Blade Runner 2049 | – | – | – | – |
| 92 | Now You See Me | – | – | – | – |
| 93 | Spider-Man: No Way Home (Extended Version) | – | – | $14.99 | Y |
| 94 | The King of Staten Island | – | – | – | – |
| 95 | Trauma Center | $3.99 | Y | $7.99 | Y |
| 96 | Venom: Let There Be Carnage | – | – | $14.99 | Y |
| 97 | Elvis | $5.99 | Y | $19.99 | Y |
| 98 | Funny Thing About Love | – | – | – | – |
| 99 | Jurassic World Dominion - Extended Version | $5.99 | Y | $19.99 | Y |
| 100 | Zombieland: Double Tap | $3.99 | Y | $13.99 | Y |

Source: Amazon, "Best Sellers in Movies," available at https://www.amazon.com/gp/bestsellers/movies-tv/2858905011

Note: Analysis is restricted to a sample of the top 100 movies on Amazon accessed on 11/14/22. A dash indicates that there was no available price for the specified option.

**Exhibit 17B**

# Summary of Top Movies on Google Play

| No. | Product Name | Price to Rent | Price to Rent Ends in 99 Cents? | Price to Buy | Price to Buy Ends in 99 Cents? |
|---|---|---|---|---|---|
| | **Percentage of Products with Prices Ending in 99 Cents** | | **94.9%** | | **100.0%** |
| 1 | Top Gun: Maverick | $4.99 | Y | $19.99 | Y |
| 2 | Bullet Train | $5.99 | Y | $19.99 | Y |
| 3 | Where the Crawdads Sing | $5.99 | Y | $19.99 | Y |
| 4 | Jeepers Creepers Reborn | $6.99 | Y | $13.99 | Y |
| 5 | Jurassic World Dominion | $5.99 | Y | $19.99 | Y |
| 6 | Clerks III | – | – | $14.99 | Y |
| 7 | Minions: The Rise of Gru | $4.99 | Y | $19.99 | Y |
| 8 | Fall | $5.99 | Y | $19.99 | Y |
| 9 | Nope | $5.99 | Y | $19.99 | Y |
| 10 | Everything Everywhere All At Once | $4.99 | Y | $19.99 | Y |
| 11 | Bodies Bodies Bodies | $4.99 | Y | $19.99 | Y |
| 12 | The Black Phone | $5.99 | Y | $19.99 | Y |
| 13 | Halloween | $3.99 | Y | $9.99 | Y |
| 14 | Thor: Love and Thunder | $5.99 | Y | $19.99 | Y |
| 15 | Elvis | $5.99 | Y | $19.99 | Y |
| 16 | X (2022) | $4.99 | Y | $9.99 | Y |
| 17 | Halloween | $2.99 | Y | $9.99 | Y |
| 18 | Spider-Man: No Way Home | – | – | $14.99 | Y |
| 19 | Coraline | $3.99 | Y | $12.99 | Y |
| 20 | Emily The Criminal | $6.99 | Y | $9.99 | Y |
| 21 | Watcher | $3.99 | Y | $12.99 | Y |
| 22 | Ghostbusters: Afterlife | – | – | $8.99 | Y |
| 23 | Harry Potter and the Sorcerer's Stone | $3.99 | Y | $9.99 | Y |
| 24 | The Unbearable Weight of Massive Talent | $4.49 | N | $19.99 | Y |
| 25 | Spirit Halloween: The Movie | $3.99 | Y | $7.99 | Y |
| 26 | Zach Snyder's Justice League | – | – | $14.99 | Y |
| 27 | The Batman | $5.99 | Y | $19.99 | Y |
| 28 | Batman and Superman: Battle of the Super Sons | – | – | $19.99 | Y |
| 29 | Top Gun | $2.99 | Y | $12.99 | Y |
| 30 | Avatar | $3.99 | Y | $14.99 | Y |
| 31 | Beetlejuice | $3.99 | Y | $9.99 | Y |
| 32 | Scream | $2.99 | Y | $9.99 | Y |
| 33 | Trick 'R Treat | $3.99 | Y | $9.99 | Y |
| 34 | Hocus Pocus | $3.99 | Y | $7.99 | Y |
| 35 | The Bad Guys | $5.99 | Y | $19.99 | Y |
| 36 | Hereditary | $2.99 | Y | $12.99 | Y |
| 37 | Terrifier | $2.99 | Y | $8.99 | Y |
| 38 | Vesper | $6.99 | Y | $12.99 | Y |
| 39 | Beast (2022) | – | – | $19.99 | Y |
| 40 | Orphan: First Kill | $4.99 | Y | $9.99 | Y |
| 41 | The Cabin in the Woods | $3.99 | Y | $4.99 | Y |
| 42 | Scream | $2.99 | Y | $9.99 | Y |
| 43 | Get Out | $3.49 | N | $14.99 | Y |
| 44 | Room on the Broom | $2.99 | Y | $6.99 | Y |
| 45 | Bandit | $3.99 | Y | $9.99 | Y |

Source:  Google Play, "Top Movies," available at https://play.google.com/store/movies?hl=en_US&gl=US

Note:  Analysis is restricted to  he top 45 movies on the Google Play Store accessed on 10/25/22.  Google Play only presents the top 45 products on their webpage. A dash indicates that  here was no available price for the specified op ion.

**Exhibit 17C**

# Summary of Top Movies on Vudu

| No. | Product Name | Price to Rent | Price to Rent Ends in 99 Cents? | Price to Buy | Price to Buy Ends in 99 Cents? |
|---|---|---|---|---|---|
| | **Percentage of Products with Prices Ending in 99 Cents** | | 100.0% | | 100.0% |
| 1 | Top Gun: Maverick | $4.99 | Y | $19.99 | Y |
| 2 | Beast | $5.99 | Y | $9.99 | Y |
| 3 | Bullet Train | $5.99 | Y | $19.99 | Y |
| 4 | Three Thousand Years of Longing | – | – | $19.99 | Y |
| 5 | Don't Worry Darling | $19.99 | Y | $24.99 | Y |
| 6 | Nope | $5.99 | Y | $19.99 | Y |
| 7 | Top Gun 2-Movie Collection | – | – | $29.99 | Y |
| 8 | DC League of Superpets | $5.99 | Y | $19.99 | Y |
| 9 | Spider-Man: No Way Home - Extended Cut | – | – | $14.99 | Y |
| 10 | Fall | $5.99 | Y | $19.99 | Y |
| 11 | Barbarian | $3.99 | Y | $14.99 | Y |
| 12 | See How They Run | $3.99 | Y | $14.99 | Y |
| 13 | Medieval | $4.99 | Y | $19.99 | Y |
| 14 | On the Line | $6.99 | Y | $14.99 | Y |
| 15 | Elvis | $5.99 | Y | $19.99 | Y |
| 16 | Jeepers Creepers Reborn | $6.99 | Y | $14.99 | Y |
| 17 | Doctor Strange in the Multiverse of Madness | $5.99 | Y | $9.99 | Y |
| 18 | The System | $6.99 | Y | $9.99 | Y |
| 19 | Pearl | – | – | $19.99 | Y |
| 20 | The Minute You Wake Up Dead | $6.99 | Y | $12.99 | Y |
| 21 | Jurassic World Dominion | $5.99 | Y | $19.99 | Y |
| 22 | The Matrix 4-Film Déjà vu Collection | – | – | $44.99 | Y |
| 23 | Minions: The Rise of Gru | $5.99 | Y | $19.99 | Y |
| 24 | The Invitation: Unrated Edition | $5.99 | Y | $19.99 | Y |
| 25 | Twilight: The Complete Saga | – | – | $29.99 | Y |
| 26 | After Ever Happy | $3.99 | Y | $9.99 | Y |
| 27 | Where the Crawdads Sing | $5.99 | Y | $19.99 | Y |
| 28 | The Lair | $6.99 | Y | $14.99 | Y |
| 29 | Batman and Superman: Battle of the Super Sons | $5.99 | Y | $19.99 | Y |
| 30 | Clerks III | – | – | $14.99 | Y |
| 31 | Bros | $19.99 | Y | $24.99 | Y |
| 32 | X & Pearl 2-Pack | – | – | $29.99 | Y |
| 33 | Breaking | $5.99 | Y | $7.99 | Y |
| 34 | Paws of Fury : The Legend of Hank | $4.99 | Y | $19.99 | Y |
| 35 | Thor: Love and Thunder | $5.99 | Y | $19.99 | Y |
| 36 | Dr. Seuss' The Grinch | $3.99 | Y | $14.99 | Y |
| 37 | The Black Phone | $5.99 | Y | $19.99 | Y |
| 38 | Smile + Spell: 2-Movie Collection | – | – | $24.99 | Y |
| 39 | Christmas Classic 3-Movie Collection | – | – | $33.99 | Y |
| 40 | Avatar | $3.99 | Y | $9.99 | Y |
| 41 | Gigi & Nate | – | – | $14.99 | Y |
| 42 | Detective Knight: Rogue | $6.99 | Y | $14.99 | Y |
| 43 | The Wolf and the Lion | $3.99 | Y | $7.99 | Y |
| 44 | Harry Potter Complete 8-Film Collection | – | – | $78.99 | Y |
| 45 | The Conjuring 3 Film Collection | – | – | $34.99 | Y |
| 46 | Tyler Perry's Madea 9-Film Collection | – | – | $29.99 | Y |
| 47 | Spaceballs | $3.99 | Y | $14.99 | Y |
| 48 | Elf | $3.99 | Y | $14.99 | Y |
| 49 | Everything Everywhere All at Once | $4.99 | Y | $19.99 | Y |
| 50 | The Illusionist | $2.99 | Y | $5.99 | Y |
| 51 | Dr. Seuss' How the Grinch Stole Christmas | $3.99 | Y | $14.99 | Y |
| 52 | V for Vendetta | $3.99 | Y | $9.99 | Y |
| 53 | Me Before You | $3.99 | Y | $14.99 | Y |
| 54 | Bodies Bodies Bodies | $4.99 | Y | $19.99 | Y |
| 55 | Iron Man 1-3 | – | – | $24.99 | Y |
| 56 | Coraline | $2.99 | Y | $12.99 | Y |
| 57 | Alice in Wonderland | – | – | $9.99 | Y |
| 58 | Confess, Fetch | $4.99 | Y | $19.99 | Y |
| 59 | Pocahontas | $3.99 | Y | $4.99 | Y |
| 60 | The Polar Express | $3.99 | Y | $14.99 | Y |
| 61 | Hacksaw Ridge | $3.99 | Y | – | – |

**SER-739**

**Exhibit 17C**

# Summary of Top Movies on Vudu

| No. | Product Name | Price to Rent | Price to Rent Ends in 99 Cents? | Price to Buy | Price to Buy Ends in 99 Cents? |
|---|---|---|---|---|---|
| | **Percentage of Products with Prices Ending in 99 Cents** | | **100.0%** | | **100.0%** |
| 62 | National Lampoon's Christmas Vacation | $3.99 | Y | $14.99 | Y |
| 63 | 9-Bit Christmas | $3.99 | Y | $14.99 | Y |
| 64 | The Silence of the Lambs | $3.99 | Y | $14.99 | Y |
| 65 | Spider-Man: No Way Home | – | – | $14.99 | Y |
| 66 | X | $4.99 | Y | $19.99 | Y |
| 67 | Caddyshack | $3.99 | Y | $4.99 | Y |
| 68 | Doctor Strange 2-Movie Collection | – | – | $16.99 | Y |
| 69 | The Road Warrior (Mad Max II) | $3.99 | Y | $4.99 | Y |
| 70 | The Chronicles of Narnia: The Lion, the Witch, and the Wardrobe | $3.99 | Y | $17.99 | Y |
| 71 | My Cousin Vinny | $3.99 | Y | $14.99 | Y |
| 72 | The Dirty Dozen | $2.99 | Y | $4.99 | Y |
| 73 | Bromates | $5.99 | Y | $9.99 | Y |
| 74 | Saving Private Ryan | $2.99 | Y | $9.99 | Y |
| 75 | The Chronicles of Narnia: Prince Caspian | $3.99 | Y | $17.99 | Y |
| 76 | The Sandlot | $3.99 | Y | $14.99 | Y |
| 77 | The Magnificent Seven | $3.99 | Y | $14.99 | Y |
| 78 | The Good House | $19.99 | Y | $24.99 | Y |
| 79 | Platoon | $3.99 | Y | $6.99 | Y |
| 80 | Accident Man: Hitman's Holiday | $6.99 | Y | $12.99 | Y |
| 81 | Zack Snyder's Justice League | – | – | $14.99 | Y |
| 82 | Jurassic World Ultimate Collection | – | – | $59.99 | Y |
| 83 | Outbreak | $3.99 | Y | $4.99 | Y |
| 84 | Clerks II / Clerks III | – | – | $19.99 | Y |
| 85 | Running the Bases | $5.99 | Y | $19.99 | Y |
| 86 | Eternals | $3.99 | Y | $9.99 | Y |
| 87 | Avengers 4-Movie Collection | – | – | $29.99 | Y |
| 88 | Emily the Criminal | $3.99 | Y | $9.99 | Y |
| 89 | The Santa Clause 1-3 | – | – | $33.99 | Y |
| 90 | Alice Through the Looking Glass | $3.99 | Y | $9.99 | Y |
| 91 | A Savannah Haunting | $6.99 | Y | $9.99 | Y |
| 92 | Orphan: First Kill | $4.99 | Y | $19.99 | Y |
| 93 | The Ambush | $6.99 | Y | $12.99 | Y |
| 94 | The Chronicles of Narnia: The Voyage of the Dawn Treader | $3.99 | Y | $14.99 | Y |
| 95 | Mrs. Doubtfire | $3.99 | Y | $14.99 | Y |
| 96 | Animal Adventures 10-Movie Collection | – | – | $48.99 | Y |
| 97 | Captain America: Civil War / The Winder Soldier / The First Avenger | – | – | $24.99 | Y |
| 98 | Top Gun | $2.99 | Y | $14.99 | Y |
| 99 | Shang-Chi and the Legend of the Ten Rings | $3.99 | Y | $9.99 | Y |
| 100 | The Martian (Extended Edition) | $3.99 | Y | $14.99 | Y |

Source:  Vudu, "Top 200 Movies," available at https://www.vudu.com/content/movies/uxrow/Top-200-Movies/14028

Note:  Analysis is restricted to a sample of the top 100 movies on Vudu accessed on 11/14/22.  A dash indicates that there was no available price for the specif

**Exhibit 17D**

# Summary of Top Movies on YouTube

| No. | Product Name | Price to Rent | Price to Rent Ends in 99 Cents? | Price to Buy | Price to Buy Ends in 99 Cents? |
|---|---|---|---|---|---|
| | **Percentage of Products with Prices Ending in 99 Cents** | | **97.8%** | | **100.0%** |
| 1 | Top Gun: Maverick | $7.99 | Y | $19.99 | Y |
| 2 | Ticket to Paradise | $19.99 | Y | $24.99 | Y |
| 3 | Bullet Train | $5.99 | Y | $19.99 | Y |
| 4 | Nope | $5.99 | Y | $19.99 | Y |
| 5 | Terrifier 2 | $9.99 | Y | $14.99 | Y |
| 6 | Pearl: An X-traordinary Origin Story | – | – | $19.99 | Y |
| 7 | Everything Everwhere All at Once | $5.99 | Y | $19.99 | Y |
| 8 | Fall | $5.99 | Y | $19.99 | Y |
| 9 | Minions: The Rise of Gru | $4.99 | Y | $19.99 | Y |
| 10 | Dr. Seuss' The Grinch | $3.99 | Y | $14.99 | Y |
| 11 | Dr. Seuss' How The Grinch Stole Christmas | $3.99 | Y | $14.99 | Y |
| 12 | Jurassic World Dominion | $5.99 | Y | $19.99 | Y |
| 13 | Don't Worry Darling | $19.99 | Y | $24.99 | Y |
| 14 | Avatar | $3.99 | Y | $14.99 | Y |
| 15 | Spider-Many: No Way Home (Extended Version) | – | – | $14.99 | Y |
| 16 | Beast | $5.99 | Y | $10.99 | Y |
| 17 | Black Panther | – | – | $9.99 | Y |
| 18 | John Wick | $3.99 | Y | $14.99 | Y |
| 19 | Jeepers Creepers: Reborn | $7.99 | Y | $13.99 | Y |
| 20 | Aquateen Forever | – | – | $19.99 | Y |
| 21 | American Sniper | $3.99 | Y | $14.99 | Y |
| 22 | Coraline | $4.99 | Y | $14.99 | Y |
| 23 | Interstellar | $7.99 | Y | $14.99 | Y |
| 24 | Barbarian | $3.99 | Y | $14.99 | Y |
| 25 | Brothers | $3.99 | Y | $6.99 | Y |
| 26 | Black Phone | $5.99 | Y | $19.99 | Y |
| 27 | After Ever Happy | $4.99 | Y | $12.99 | Y |
| 28 | Elvis | $5.99 | Y | $19.99 | Y |
| 29 | Thor: Love and Thunder | $5.99 | Y | $19.99 | Y |
| 30 | Bros | $19.99 | Y | $24.99 | Y |
| 31 | The Wolf of Wall Street | $7.99 | Y | $16.99 | Y |
| 32 | John Wick Chapter 3: Parabellum | $3.99 | Y | $19.99 | Y |
| 33 | Fifty Shades of Grey | $3.99 | Y | $14.99 | Y |
| 34 | American Psycho | $3.99 | Y | $12.99 | Y |
| 35 | Where the Crawdads Sing | $5.99 | Y | $19.99 | Y |
| 36 | The System | $6.99 | Y | $12.99 | Y |
| 37 | John Wick Chapter 2 | $2.99 | Y | $14.99 | Y |
| 38 | The Batman | $3.99 | Y | $13.99 | Y |
| 39 | Ted | $3.99 | Y | $14.99 | Y |
| 40 | X | $5.99 | Y | $19.99 | Y |
| 41 | Me Before You | $3.99 | Y | $14.99 | Y |
| 42 | The Meg | $3.99 | Y | $14.99 | Y |
| 43 | The Big Short | $3.99 | Y | $16.99 | Y |
| 44 | Spider-Man: Into The Spider-Verse | $3.99 | Y | $14.99 | Y |
| 45 | The Polar Express | $3.99 | Y | $14.99 | Y |
| 46 | Home Alone | $3.99 | Y | $14.99 | Y |
| 47 | Medieval | $5.99 | Y | $19.99 | Y |
| 48 | Ted 2 | $3.99 | Y | $14.99 | Y |
| 49 | Transformers | $7.99 | Y | $19.99 | Y |
| 50 | The Lair | $6.99 | Y | $14.99 | Y |
| 51 | Twilight | $3.99 | Y | $7.99 | Y |
| 52 | Clerks III | – | – | $14.99 | Y |
| 53 | Dragon Ball Super: Broly | $3.99 | Y | $14.99 | Y |
| 54 | Sonic The Hedgehog 2 | $7.99 | Y | $19.99 | Y |
| 55 | The Godfather | $7.99 | Y | $16.99 | Y |
| 56 | Knives Out | $3.99 | Y | $19.99 | Y |
| 57 | Straight Outta Compton | $3.99 | Y | $14.99 | Y |
| 58 | Top Gun | $7.99 | Y | $16.99 | Y |
| 59 | Fifty Shades Darker | $3.99 | Y | $14.99 | Y |
| 60 | DC League of Superpets | $5.99 | Y | $19.99 | Y |

**Exhibit 17D**

# Summary of Top Movies on YouTube

| No. | Product Name | Price to Rent | Price to Rent Ends in 99 Cents? | Price to Buy | Price to Buy Ends in 99 Cents? |
|---|---|---|---|---|---|
| | **Percentage of Products with Prices Ending in 99 Cents** | | **97.8%** | | **100.0%** |
| 61 | Ready Player One | $3.99 | Y | $14.99 | Y |
| 62 | Creed II | $5.99 | Y | $14.99 | Y |
| 63 | The Invitation | $5.99 | Y | $19.99 | Y |
| 64 | The Prince of Egypt | $3.99 | Y | $14.99 | Y |
| 65 | Fury | $3.99 | Y | $13.99 | Y |
| 66 | Shrek | $3.99 | Y | $14.99 | Y |
| 67 | Baby Driver | $3.49 | N | $14.99 | Y |
| 68 | Zach Snyder's Justice League | $14.99 | Y | – | – |
| 69 | Coco | $3.99 | Y | $19.99 | Y |
| 70 | F9: The Fast Saga | $3.99 | Y | $14.99 | Y |
| 71 | Tropic Thunder | $7.99 | Y | $14.99 | Y |
| 72 | Get Out | $3.49 | N | $14.99 | Y |
| 73 | National Lampoon's Christmas Vacation | $3.99 | Y | $14.99 | Y |
| 74 | Live Die Repeat: Edge of Tomorrow | $3.99 | Y | $14.99 | Y |
| 75 | The Equalizer | $3.99 | Y | $14.99 | Y |
| 76 | Midsommar | $3.99 | Y | $14.99 | Y |
| 77 | Encanto | $3.99 | Y | $19.99 | Y |
| 78 | Dune | – | – | $14.99 | Y |
| 79 | The Hunger Games | $3.99 | Y | $7.99 | Y |
| 80 | Whiplash | $3.99 | Y | $13.99 | Y |
| 81 | Elf: Buddy's Sing & Cheer Along Edition | – | – | $14.99 | Y |
| 82 | On the Line | $6.99 | Y | $14.99 | Y |
| 83 | The Twilight Saga: New Moon | $3.99 | Y | $7.99 | Y |
| 84 | Joker | $3.99 | Y | $14.99 | Y |
| 85 | The Truman Show | $3.99 | Y | $14.99 | Y |
| 86 | Doctor Strange in the Multiverse of Madness | $5.99 | Y | $19.99 | Y |
| 87 | The Matrix | $3.99 | Y | $14.99 | Y |
| 88 | Creed II | $3.99 | Y | $14.99 | Y |
| 89 | Speed Racer | $3.99 | Y | $7.99 | Y |
| 90 | Once Upon a Time in…Hollywood | $3.99 | Y | $13.99 | Y |
| 91 | Us | $3.99 | Y | $14.99 | Y |
| 92 | 300 | $3.99 | Y | $14.99 | Y |
| 93 | The Nightmare Before Christmas | $3.99 | Y | $17.99 | Y |
| 94 | Spirited Away | $4.99 | Y | $16.99 | Y |
| 95 | Batman and Superman: Battle of the Super Sons | $4.99 | Y | $19.99 | Y |
| 96 | Sicario | $3.99 | Y | $12.99 | Y |
| 97 | Pokemon Detective P kachu | $3.99 | Y | $14.99 | Y |
| 98 | El Infierno | $3.99 | Y | $9.99 | Y |
| 99 | Hotel Transylvania 3 | $3.99 | Y | $13.99 | Y |
| 100 | Fifty Shades Freed | – | – | $14.99 | Y |

Source:  YouTube, "Top Selling," available at https://www.youtube.com/playlist?list=PLHPTxTxtC0ial7mOT-Srrguvokjvlcbg7

Note:  Analysis is restricted to a sample of the top 100 movies on YouTube based on sales accessed on 11/14/22. A dash indicates that there was no available price for the specified option.

**SER-742**

**Exhibit 18**

# Summary of Top TV Shows from Select Providers

## Percentage of Products with Prices Ending in 99 Cents

| Platform | Per Season | Per Episode |
|---|---|---|
| Average | 99.7% | 100.0% |
| Amazon | 99.0% | 100.0% |
| Google Play | 100.0% | 100.0% |
| Vudu | 100.0% | 100.0% |

Source:  Amazon, "Best Sellers in TV," available at https://www.amazon.com/Best-Sellers-TV/zgbs/movies-tv/2864549011; Google Play, "Top TV Shows," available at https://play.google.com/store/movies/category/TV?hl=en_US&gl=US; Vudu, "Top 200 Television," available at https://www.vudu.com/content/movies/uxrow/Top-200-Television/14029

Note:  Amazon values reflect the top 100 TV shows, based on quantity of units sold, in its "Best Sellers in TV" section accessed on 11/16/22.  Prices reflect the most recent season available for each show.  Google Play values reflect the top 45 TV shows in its "Top TV Shows" section accessed on 10/25/22.  Google Play only presents the top 45 products on its website.  Vudu values reflect the top 100 TV show-season combinations in its "Top 200 Television" section accessed on 11/16/22.

**Exhibit 18A**

# Summary of Top TV Shows on Amazon

| No. | Product Name | Per Season Price | Per Season Price Ends in 99 Cents? | Per Episode Price | Per Episode Price Ends in 99 Cents? |
|---|---|---|---|---|---|
| | **Percentage of Products with Prices Ending in 99 Cents** | | **99.0%** | | **100.0%** |
| 1 | Yellowstone: Season 5 | $39.99 | Y | $2.99 | Y |
| 2 | Miss Scarlet and the Duke: Season 2 | $14.99 | Y | $2.99 | Y |
| 3 | Ghosts: Season 2 | $19.99 | Y | $2.99 | Y |
| 4 | Magpie Murders: Season 1 | $14.99 | Y | $2.99 | Y |
| 5 | NCIS: Season 20 | $20.93 | N | $2.99 | Y |
| 6 | The Equalizer: Season 3 | – | – | $2.99 | Y |
| 7 | Survivor: Season 43 | $24.99 | Y | $2.99 | Y |
| 8 | Young Sheldon: Season 6 | $14.99 | Y | $2.99 | Y |
| 9 | CSI: Vegas | $29.99 | Y | $2.99 | Y |
| 10 | The Amazing Race: Season 34 | $19.99 | Y | $2.99 | Y |
| 11 | So Help Me Todd: Season 1 | $29.99 | Y | $2.99 | Y |
| 12 | NCIS: Los Angeles: Season 14 | $34.99 | Y | $2.99 | Y |
| 13 | Bo Hearts Abishola: Season 4 | $14.99 | Y | $2.99 | Y |
| 14 | The Challenge: Season 38 | $24.99 | Y | $2.99 | Y |
| 15 | Tyler Perry's Sistas | $24.99 | Y | $2.99 | Y |
| 16 | Married at First Sight: Season 15 | $24.99 | Y | $2.99 | Y |
| 17 | Roadworthy Rescues | $14.99 | Y | $2.99 | Y |
| 18 | Tyler Perry's The Oval | $24.99 | Y | $2.99 | Y |
| 19 | Siesta Key | $19.99 | Y | $2.99 | Y |
| 20 | Below Deck Mediterranean | $14.99 | Y | $2.99 | Y |
| 21 | Tyler Perry's House of Payne | $24.99 | Y | $2.99 | Y |
| 22 | The Real Housewives of Salt Lake City | $14.99 | Y | $2.99 | Y |
| 23 | Iron Resurrection | $19.99 | Y | $2.99 | Y |
| 24 | Tyler Perry's Assisted Living | $24.99 | Y | $2.99 | Y |
| 25 | Chicago P.D. | $34.99 | Y | $2.99 | Y |
| 26 | Chicago Fire | $34.99 | Y | $2.99 | Y |
| 27 | Grey's Anatomy | $34.99 | Y | $2.99 | Y |
| 28 | Law and Order: Special Victims Unit | $34.99 | Y | $2.99 | Y |
| 29 | The Real Housewives of Potomac | $19.99 | Y | $2.99 | Y |
| 30 | All American | $29.99 | Y | $2.99 | Y |
| 31 | Chucky | $19.99 | Y | $2.99 | Y |
| 32 | Queen Sugar | $24.99 | Y | $2.99 | Y |
| 33 | American Horror Story | $19.99 | Y | $2.99 | Y |
| 34 | Teen Mom: The Next Chapter | $24.99 | Y | $2.99 | Y |
| 35 | American Dad | $29.99 | Y | $2.99 | Y |
| 36 | Sister Wives | $29.99 | Y | $2.99 | Y |
| 37 | Darby & Joan | – | – | $2.99 | Y |
| 38 | Documentary Now! | – | – | – | – |
| 39 | Bachelor in Paradise | $24.99 | Y | $2.99 | Y |
| 40 | Chicago Med | $29.99 | Y | $2.99 | Y |
| 41 | Winter House | $14.99 | Y | $2.99 | Y |
| 42 | Law and Order: Organized Crime | $34.99 | Y | $2.99 | Y |
| 43 | Gold Rush | $29.99 | Y | $2.99 | Y |
| 44 | Saturday Night Live | $24.99 | Y | $2.99 | Y |
| 45 | All American: Homecoming | $24.99 | Y | $2.99 | Y |
| 46 | Antiques Roadshow | $19.99 | Y | $2.99 | Y |
| 47 | Family Guy | $39.99 | Y | $2.99 | Y |
| 48 | Mountain Men | $24.99 | Y | $2.99 | Y |
| 49 | Walker | $19.99 | Y | $2.99 | Y |
| 50 | Love After Lockup | $19.99 | Y | $2.99 | Y |
| 51 | Alaska The Last Frontier | $9.99 | Y | $2.99 | Y |
| 52 | Shark Tank | $19.99 | Y | $2.99 | Y |
| 53 | Law and Order | $24.99 | Y | $2.99 | Y |
| 54 | Atlanta | $19.99 | Y | $2.99 | Y |
| 55 | Station 19 | $29.99 | Y | $2.99 | Y |
| 56 | Lego Masters | $28.99 | Y | $2.99 | Y |
| 57 | 90 Day Fiance Happily Ever After? | $29.99 | Y | $2.99 | Y |
| 58 | Bob's Burgers | $39.99 | Y | $2.99 | Y |
| 59 | The Cleaning Lady | $24.99 | Y | $2.99 | Y |
| 60 | Monarch | $19.99 | Y | $2.99 | Y |
| 61 | The Reisdent | $28.99 | Y | $2.99 | Y |
| 62 | Maine Cabin Masters | $24.99 | Y | $2.99 | Y |
| 63 | DC's Stargirl | $24.99 | Y | $2.99 | Y |
| 64 | TALES FROM THE TERRITORIES | $19.99 | Y | $2.99 | Y |

**SER-744**

**Exhibit 18A**

# Summary of Top TV Shows on Amazon

| No. | Product Name | Per Season Price | Per Season Price Ends in 99 Cents? | Per Episode Price | Per Episode Price Ends in 99 Cents? |
|---|---|---|---|---|---|
| | **Percentage of Products with Prices Ending in 99 Cents** | | **99.0%** | | **100.0%** |
| 65 | Family Karma | $14.99 | Y | $2.99 | Y |
| 66 | Black Ink Crew | $19.99 | Y | $2.99 | Y |
| 67 | Beyond Oak Island | $24.99 | Y | $2.99 | Y |
| 68 | Hip Hop Homicides | $19.99 | Y | $2.99 | Y |
| 69 | Chopped | $14.99 | Y | $2.99 | Y |
| 70 | Pit Bulls & Parolees | $14.99 | Y | $2.99 | Y |
| 71 | Love After Lockup | $19.99 | Y | $2.99 | Y |
| 72 | Cherish the Day | $19.99 | Y | $2.99 | Y |
| 73 | RENO 911! | $19.99 | Y | $2.99 | Y |
| 74 | Walker: Independence | $19.99 | Y | $2.99 | Y |
| 75 | Ghost Adventures | $29.99 | Y | $2.99 | Y |
| 76 | Holiday Baking Championship | $14.99 | Y | $2.99 | Y |
| 77 | Street Outlaws: No Prep Kings: The Great Eight | $24.99 | Y | $2.99 | Y |
| 78 | Taken Hostage | $4.99 | Y | $2.99 | Y |
| 79 | Below Deck Adventure | $14.99 | Y | $2.99 | Y |
| 80 | Car Fix | $35.99 | Y | $2.99 | Y |
| 81 | Hell of a Week with Charlamagne Tha God | $19.99 | Y | $2.99 | Y |
| 82 | The Surreal Life (2022) | $14.99 | Y | $2.99 | Y |
| 83 | Fixer Upper: The Castle | $9.99 | Y | $2.99 | Y |
| 84 | The Simpsons | $39.99 | Y | $2.99 | Y |
| 85 | NCIS: Hawaii | – | – | $2.99 | Y |
| 86 | All Girls Garage | $35.99 | Y | $2.99 | Y |
| 87 | The Neighborhood | $14.99 | Y | $2.99 | Y |
| 88 | Alaskan Bush People | $19.99 | Y | $2.99 | Y |
| 89 | Ridiculousness | $24.99 | Y | $2.99 | Y |
| 90 | An Unexpected Killer | $14.99 | Y | $2.99 | Y |
| 91 | The Murder Tapes | $9.99 | Y | $2.99 | Y |
| 92 | Little People, Big World | $19.99 | Y | $2.99 | Y |
| 93 | Young Rock | $19.99 | Y | $2.99 | Y |
| 94 | American Monster | $19.99 | Y | $2.99 | Y |
| 95 | Locked Up Abroad | $14.99 | Y | $2.99 | Y |
| 96 | The Culpo Sisters | $9.99 | Y | $2.99 | Y |
| 97 | The Pact | $9.99 | Y | $2.99 | Y |
| 98 | Good Bones | $24.99 | Y | $2.99 | Y |
| 99 | East New York | $29.99 | Y | $2.99 | Y |
| 100 | Call Me Kat | $14.99 | Y | $2.99 | Y |

Source: Amazon, "Best Sellers in TV," available at https://www.amazon.com/Best-Sellers-TV/zgbs/movies-tv/2864549011

Note: Analysis is restricted to a sample of the top 100 TV shows on Amazon accessed on 11/16/22. A dash indicates that there was no available price for the specified option.

**SER-745**

**Exhibit 18B**

# Summary of Top TV Shows on Google Play

| No. | Product Name | Per Season Price | Per Season Price Ends in 99 Cents? | Per Episode Price | Per Episode Price Ends in 99 Cents? |
|---|---|---|---|---|---|
| | **Percentage of Products with Prices Ending in 99 Cents** | | **100.0%** | | **100.0%** |
| 1 | Rick and Morty (Uncensored) | $18.99 | Y | $1.99 | Y |
| 2 | The Owl House | $4.99 | Y | $1.99 | Y |
| 3 | Better Call Saul | $23.99 | Y | $1.99 | Y |
| 4 | Yellowstone | $14.99 | Y | $1.99 | Y |
| 5 | Game of Thrones | $19.99 | Y | $2.99 | Y |
| 6 | The Office | $29.99 | Y | $1.99 | Y |
| 7 | The Big Bang Theory | $19.99 | Y | $1.99 | Y |
| 8 | American Horror Story | $14.99 | Y | $1.99 | Y |
| 9 | DC's Legends of Tomorrow | $24.99 | Y | $1.99 | Y |
| 10 | Taskmaster | $12.99 | Y | $1.99 | Y |
| 11 | Young Sheldon | $29.99 | Y | $1.99 | Y |
| 12 | The Walking Dead | $30.99 | Y | $1.99 | Y |
| 13 | S.w.a.t. (2017) | $29.99 | Y | $1.99 | Y |
| 14 | PAW Patrol | $14.99 | Y | $1.99 | Y |
| 15 | Grey's Anatomy | $29.99 | Y | $1.99 | Y |
| 16 | South Park | $9.99 | Y | $1.99 | Y |
| 17 | Family Guy | $24.99 | Y | $1.99 | Y |
| 18 | NCIS | $29.99 | Y | $1.99 | Y |
| 19 | Blue Bloods | $29.99 | Y | $1.99 | Y |
| 20 | Chicago Fire | $29.99 | Y | $1.99 | Y |
| 21 | NCIS: Los Angeles | $34.99 | Y | $1.99 | Y |
| 22 | SpongeBob SquarePants | $14.99 | Y | $1.99 | Y |
| 23 | Archer | $9.99 | Y | $1.99 | Y |
| 24 | It's Always Sunny in Philadelphia | $14.99 | Y | $1.99 | Y |
| 25 | The Rookie | $24.99 | Y | $1.99 | Y |
| 26 | Futurama | $9.99 | Y | $1.99 | Y |
| 27 | Chicago PD | $29.99 | Y | $1.99 | Y |
| 28 | Sherlock | $13.99 | Y | $4.99 | Y |
| 29 | Tyler Perry's Sistas | $19.99 | Y | $1.99 | Y |
| 30 | 1883 | $14.99 | Y | $1.99 | Y |
| 31 | Brooklyn Nine-Nine | $16.99 | Y | $1.99 | Y |
| 32 | Law & Order: Special Victims Unit | $29.99 | Y | $1.99 | Y |
| 33 | Harley Quinn | $14.99 | Y | $1.99 | Y |
| 34 | Mad Men | $9.99 | Y | $1.99 | Y |
| 35 | Sons of Anarchy | $14.99 | Y | $1.99 | Y |
| 36 | The Real Housewives of Potomac | $14.99 | Y | $1.99 | Y |
| 37 | Jersey Shore: Family Vacation | $19.99 | Y | $1.99 | Y |
| 38 | Friends | $19.99 | Y | $1.99 | Y |
| 39 | House | $29.99 | Y | $1.99 | Y |
| 40 | The Simpsons | $24.99 | Y | $1.99 | Y |
| 41 | Parks and Recreation | $19.99 | Y | $1.99 | Y |
| 42 | Doctor Who | $9.99 | Y | $1.99 | Y |
| 43 | Doctor Who: The Specials | $1.99 | Y | $1.99 | Y |
| 44 | The Real Housewives of Beverly Hills | $19.99 | Y | $1.99 | Y |
| 45 | Breaking Bad | $14.99 | Y | $1.99 | Y |

Source: Google Play, "Top TV Shows," available at https://play.google.com/store/movies/category/TV?hl=en_US&gl=US

Note: Analysis is restricted to the top 45 TV shows on the Google Play Store accessed on 10/25/22. Google Play only presents the top 45 products on their webpage. Season prices reflect the price of the most recent season available on Google Play.

Case 4:25-7030, 08/12/2026, DktEntry: 34.4, Page 251 of 255

**Exhibit 18C**

# Summary of Top TV Shows on Vudu

| No. | Product Name | Per Season Price | Per Season Price Ends in 99 Cents? | Per Episode Price | Per Episode Price Ends in 99 Cents? |
|---|---|---|---|---|---|
| | **Percentage of Products with Prices Ending in 99 Cents** | | **100.0%** | | **100.0%** |
| 1 | Murder in the Heartland: Season 6 | $7.99 | Y | – | – |
| 2 | Yellowstone: Season 5 Pt. 1 | $14.99 | Y | $1.99 | Y |
| 3 | Yellowstone: Season 4 | $14.99 | Y | $1.99 | Y |
| 4 | Yellowstone: Season 1 | $14.99 | Y | $1.99 | Y |
| 5 | Yellowstone: Season 1-4 | $44.99 | Y | – | – |
| 6 | The Office: Season 4 | $17.99 | Y | $1.99 | Y |
| 7 | The Office: Season 3 | $17.99 | Y | $1.99 | Y |
| 8 | The Office: Season 2 | $17.99 | Y | $1.99 | Y |
| 9 | The Office: Season 1 | $9.99 | Y | $1.99 | Y |
| 10 | Yellowstone: Season 2 | $14.99 | Y | $1.99 | Y |
| 11 | The Office: Season 5 | $17.99 | Y | $1.99 | Y |
| 12 | Yellowstone: Season 3 | $14.99 | Y | $1.99 | Y |
| 13 | The Office: Season 6 | $17.99 | Y | $1.99 | Y |
| 14 | The Office: The Complete Series | $99.99 | Y | – | – |
| 15 | The Office: Season 7 | $17.99 | Y | $1.99 | Y |
| 16 | Rick and Morty: Season 6 | $18.99 | Y | $1.99 | Y |
| 17 | The Big Bang Theory Holiday Episodes | $14.99 | Y | – | – |
| 18 | The Big Bang Theory: Season 1 | $19.99 | Y | $1.99 | Y |
| 19 | The Big Bang Theory: Season 3 | $19.99 | Y | $1.99 | Y |
| 20 | The Big Bang Theory: Season 4 | $19.99 | Y | $1.99 | Y |
| 21 | The Big Bang Theory: Season 5 | $19.99 | Y | $1.99 | Y |
| 22 | The Big Bang Theory: Season 6 | $19.99 | Y | $1.99 | Y |
| 23 | The Big Bang Theory: Season 8 | $19.99 | Y | $1.99 | Y |
| 24 | The Big Bang Theory: Season 2 | $19.99 | Y | $1.99 | Y |
| 25 | PAW Patrol: Mighty Pups: Season 1 | $4.99 | Y | – | – |
| 26 | The Big Bang Theory: Season 7 | $19.99 | Y | $1.99 | Y |
| 27 | The Big Bang Theory: The Complete Series | $99.99 | Y | – | – |
| 28 | The Big Bang Theory: Season 9 | $19.99 | Y | $1.99 | Y |
| 29 | The Office: Season 8 | $17.99 | Y | $1.99 | Y |
| 30 | The Walking Dead: Season 11 | $30.99 | Y | $1.99 | Y |
| 31 | The Big Bang Theory: Season 10 | $19.99 | Y | $1.99 | Y |
| 32 | The Big Bang Theory: Best of Guest Stars: Vol. 2 | $14.99 | Y | – | – |
| 33 | Band of Brothers: Season 1 | $34.99 | Y | $3.99 | Y |
| 34 | Friends: Season 5 | $15.99 | Y | $1.99 | Y |
| 35 | The Big Bang Theory: Season 11 | $19.99 | Y | $1.99 | Y |
| 36 | Game of Thrones: Season 1 | $24.99 | Y | $2.99 | Y |
| 37 | Friends: Season 3 | $19.99 | Y | $1.99 | Y |
| 38 | Friends: Season 6 | $19.99 | Y | $1.99 | Y |
| 39 | Friends: Season 4 | $19.99 | Y | $1.99 | Y |
| 40 | Friends: Season 7 | $19.99 | Y | $1.99 | Y |
| 41 | The Office: Season 9 | $17.99 | Y | $1.99 | Y |
| 42 | Friends: Season 2 | $19.99 | Y | $1.99 | Y |
| 43 | Friends: Season 8 | $19.99 | Y | $1.99 | Y |
| 44 | Chucky: Season 2 | $14.99 | Y | $1.99 | Y |
| 45 | Friends: Season 1 | $19.99 | Y | $1.99 | Y |
| 46 | Friends: The Complete Series | $99.99 | Y | – | – |
| 47 | The Big Bang Theory: Season 12 | $19.99 | Y | $1.99 | Y |
| 48 | Friends: The One With All The Guest Stars Vol.1 | $14.99 | Y | – | – |
| 49 | Everybody Loves Raymond: Season 1 | $14.99 | Y | $1.99 | Y |
| 50 | Sherlock: Season 1 | $12.99 | Y | $4.99 | Y |
| 51 | Band of Brothers / The Pacific | $59.99 | Y | – | – |
| 52 | Friends: Season 9 | $19.99 | Y | $1.99 | Y |
| 53 | Friends: The One with All the Guest Stars Vol.2 | $14.99 | Y | – | – |
| 54 | Better Call Saul: Season 6 | $23.99 | Y | $1.99 | Y |
| 55 | Parks and Recreation: Season 3 | $17.99 | Y | $1.99 | Y |
| 56 | Game of Thrones: Season 3 | $24.99 | Y | $2.99 | Y |
| 57 | Spider-Man: Into the Spider-Verse / Spider-Man: The New Animated Series | $39.99 | Y | – | – |
| 58 | Salem Witch Trials: Season 1 | – | – | – | – |
| 59 | Friends: Season 10 | $19.99 | Y | $1.99 | Y |
| 60 | Pride and Prejudice: Season 1 | $10.99 | Y | $1.99 | Y |
| 61 | Game of Thrones: Season 8 | $19.99 | Y | $2.99 | Y |
| 62 | Parks and Recreation: The Universe of Andy Dwyer | $9.99 | Y | – | – |
| 63 | Rick and Morty: Season 5 | $18.99 | Y | $1.99 | Y |
| 64 | The Chosen: Season 1 | $22.99 | Y | $2.99 | Y |

Exhibit 18C

# Summary of Top TV Shows on Vudu

| No. | Product Name | Per Season Price | Per Season Price Ends in 99 Cents? | Per Episode Price | Per Episode Price Ends in 99 Cents? |
|---|---|---|---|---|---|
| | Percentage of Products with Prices Ending in 99 Cents | | 100.0% | | 100.0% |
| 65 | Rick and Morty: Season 1 | $14.99 | Y | $1.99 | Y |
| 66 | Parks and Recreation: Season 1 | $17.99 | Y | $1.99 | Y |
| 67 | Rick and Morty: Season 2 | $14.99 | Y | $1.99 | Y |
| 68 | Batman: The Animated Series: Volume 1 | $19.99 | Y | $1.99 | Y |
| 69 | Parks and Recreation: Season 2 | $17.99 | Y | $1.99 | Y |
| 70 | Game of Thrones: Season 4 | $24.99 | Y | $2.99 | Y |
| 71 | Lifers: Behind Bars: Season 1 | – | – | – | – |
| 72 | Game of Thrones: Season 2 | $24.99 | Y | $2.99 | Y |
| 73 | Body Cam Cops: Season 1 | – | – | – | – |
| 74 | Parks and Recreation: The Complete Series | $69.99 | Y | – | – |
| 75 | The Angry Birds Movie plus Angry Birds Toons Volume 1 | $17.99 | Y | – | – |
| 76 | Game of Thrones: Season 5 | $24.99 | Y | $2.99 | Y |
| 77 | The Pacific: Season 1 | $34.99 | Y | $3.99 | Y |
| 78 | Parks and Recreation: Season 5 | $17.99 | Y | $1.99 | Y |
| 79 | Game of Thrones: The Complete Series | $99.99 | Y | – | – |
| 80 | Parks and Recreation: Season 1 | $9.99 | Y | $1.99 | Y |
| 81 | Hollywood and Crime: Season 1 | – | – | – | – |
| 82 | Hell's Kitchen: Season 1 | – | – | – | – |
| 83 | Game of Thrones: Season 7 | $19.99 | Y | $2.99 | Y |
| 84 | Game of Thrones: Season 6 | $24.99 | Y | $2.99 | Y |
| 85 | Everybody Loves Raymond: Season 2 | $14.99 | Y | $1.99 | Y |
| 86 | 1883: Season 1 | $19.99 | Y | $1.99 | Y |
| 87 | Everybody Loves Raymond: Season 3 | $14.99 | Y | $1.99 | Y |
| 88 | Bones: Season 1 | $19.99 | Y | $1.99 | Y |
| 89 | Everybody Loves Raymond: The Complete Series | $79.99 | Y | – | – |
| 90 | Sherlock: Season 2 | $12.99 | Y | $4.99 | Y |
| 91 | Ascension Mini Series | $4.99 | Y | $1.99 | Y |
| 92 | The Challenge: Season 38 | $19.99 | Y | $1.99 | Y |
| 93 | Parks and Recreation: Season 6 | $17.99 | Y | $1.99 | Y |
| 94 | Rick and Morty: Seasons 1-5 | $79.99 | Y | – | – |
| 95 | Everybody Loves Raymond: Season 4 | $14.99 | Y | $1.99 | Y |
| 96 | True CSI: Season 1 | – | – | – | – |
| 97 | PAW Patrol: Super Pups | $5.99 | Y | – | – |
| 98 | Supernatural: Season 1 | $24.99 | Y | $1.99 | Y |
| 99 | Criminal Minds: Season 1 | $14.99 | Y | $1.99 | Y |
| 100 | The Triangle: Season 1 | $5.99 | Y | $1.99 | Y |

Source:  Vudu, "Top 200 Television," available at https://www.vudu.com/content/movies/uxrow/Top-200-Television/14029

Note:  Analysis is restricted to a sample of the top 100 TV seasons on Vudu accessed on 11/16/22.  A dash indicates that there was no available price for the specified option.

**Exhibit 19**

## Breakdown of Apps and Associated Subscription Transactions at the 49-Cent Price Tier[1]



| Filter | Number of Distinct | Number of Transactions at 49 [2] | Percentage of Transactions At 49 [2] |
|---|---|---|---|
| Universe of Apps[3] | | | |
| Apps With No Transactions at 49 Cents[4] | | | |
| Apps With at Least One Transaction at 49 Cents | | | |
| Apps With 49-Cent Transactions Only Associated With New Products[5] | | | |
| Apps With 49-Cent Transactions Associated With Existing Products[6] | | | |

Source:  U.S. Storefront App Store Transaction Data; Apple, "App Store Subscription Pricing," December 2016, available at https://web.archive.org/web/20171222223003/https:/developer.apple.com/app-store/subscriptions/App-Store-Subscription-Pricing.pdf

Note:

[1]  Values are restricted to transactions of subscription products associated with the specified set of apps.  Note that just because a transaction is associated with a set of apps, it may not be priced at the 49-cent tier.  An app can be associated with one product priced at the 99-cent tier and another product priced at the 49-cent tier.

[2]  Values reflect the transactions of subscription products that are at 49 cents and are associated with the specified set of products.  Percentages reflect the percentage of these transactions over the entire number of transactions associated with the specified set of apps.

[3]  Analysis is restricted to apps with at least one paid transaction of a subscription product within one year before and after the date that the 49-cent tier was available to developers, 9/1/16.  Transactions where Apple is the developer are excluded.  All subsequent figures are taken from this subset of apps.  In this exhibit, "49 Cents" refers to any price at the 49-cent tier (e.g., $0.49, $1.49, $2.49, *etc.* ).  See Hitt Second Report, Appendix 7 for details regarding Apple Transaction Data processing.

[4]  Values reflect apps that were never associated with a transaction of a subscription product at the 49-cent price tier.

[5]  Values reflect apps whose only transactions at the 49-cent price tier were associated with subscription products that were introduced on or after 9/1/16.

[6]  Values reflect apps that had at least one subscription product associated with a transaction not at the 49-cent tier before 9/1/16, and a transaction at the 49-cent tier on or after 9/1/16.

**SER-749**



**Exhibit 21**

# Example Illustration of Predicted Tiered Prices in Professor McFadden's Simulation Approach