No. 25-7930

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

IN RE APPLE iPHONE ANTITRUST LITIGATION

---

ROBERT PEPPER; EDWARD LAWRENCE; STEPHEN H. SCHWARTZ,

*Plaintiffs-Appellants,*

v.

APPLE INC.,

*Defendant-Appellee.*

---

On Appeal from the U.S. District Court
for the Northern District of California
Case No. 4:11-cv-6714 | Hon. Yvonne Gonzalez Rogers

---

## SUPPLEMENTAL EXCERPTS OF RECORD
## VOLUME 4 OF 12 (SER-752–SER-959)

---

Cynthia E. Richman
Harry R. S. Phillips
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
(202) 955-8500

Caeli A. Higney
Julian W. Kleinbrodt
Eli M. Lazarus
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Ctr., Ste. 2600
San Francisco, CA 94111
(415) 393-8200

Theodore J. Boutrous Jr.
Daniel G. Swanson
Blaine H. Evanson
Bradley J. Hamburger
Matt Aidan Getz
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

*Counsel for Appellee Apple Inc.*

# EXHIBIT 5

SER-753

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | Civil Action No. 4:11-cv-06714-YGR |

**EXPERT REPORT AND DECLARATION OF JEFFREY T. PRINCE, PH.D.**

March 10, 2023

**SER-754**

**Table of contents**

1. INTRODUCTION ...................................................................................................................3

2. BACKGROUND ...................................................................................................................3

    *2.1. Overview of Professor McFadden's Model*............................................................... 5

    *2.2. Professor McFadden's Methodology Explained*........................................................ 6

        *2.2.1. Specifying Mathematical Modeling Assumptions*................................................ 9

        *2.2.2. Estimating Consumer Demand* .......................................................................... 12

        *2.2.3. Calculating Developer Costs* ............................................................................ 15

        *2.2.4. Predicting But-for Prices* .................................................................................. 18

        *2.2.5. Determining Harm* ............................................................................................. 20

    *2.3. Adjustments in Response to the Court's Order* ....................................................... 21

    *2.4. Subsequent Data Issues* ........................................................................................... 23

3. SUMMARY OF OPINIONS ...............................................................................................28

4. PROFESSOR MCFADDEN'S MODEL CANNOT RELIABLY ESTIMATE MARGINAL COSTS AND, IN TURN, HARM .........................................................................................................32

    *4.1. Professor McFadden's Model Generates Unverified Marginal Costs That Are Higher Than Industry Evidence Suggests* ...................................................................................... 33

    *4.2. Professor McFadden Assumes a Flawed Relationship Between Prices and Marginal Costs* ... 36

    *4.3. Professor McFadden Imposes Arbitrary Margin Constraints That Evidence Suggests Would Inflate Marginal Costs and Result in Overestimation of Harm* ............................... 45

5. THE CHANGES PROFESSOR MCFADDEN HAS MADE DO NOT REMEDY THE DEFICIENCIES THE COURT IDENTIFIED .........................................................................46

    *5.1. Professor McFadden Has No Reliable Method for Measuring Harm for In-App Purchases* .. 46

        *5.1.1. Professor McFadden Claims His Model Does Not Predict But-For Prices for In-App Purchases*.................................................................................................................. 48

        *5.1.2. Professor McFadden's Implied But-for Prices for In-App Purchases Based on the Percentage Method Overstate Harm and the Number of Harmed Accounts*................... 52

    *5.2. Professor McFadden Still Does Not Account for Apple's Price Tiers or Focal-Point Pricing* ... 61

        *5.2.1. Professor McFadden's "Price Tier" Simulation Does Not Address the Court's Concern*........... 62

        *5.2.2. Professor McFadden's Model Ignores Price Tiers in the As-Is World, Accounting for Which Can Significantly Change Which Accounts Are Harmed and Total Harm* ............................... 68

        *5.2.3. Professor McFadden Does Not Offer Analyses Related to Focal-Point Pricing*........................... 74

    *5.3. Professor McFadden's Model Continues to Find Many Unharmed Accounts, and His Analysis of 75 Samples Does Not Resolve the "Switcher Issue"* ............................................................. 76

    *5.4. Professor McFadden's $10 Spending Cut-off Analyses are Not Relevant and His Conclusions Are Misleading* ............................................................................................... 80

**6. PROFESSOR MCFADDEN'S MODEL CONTINUES TO BE DISCONNECTED FROM THE REALITIES OF THE MARKET IT STUDIES** ..................................................................................................84

*6.1. Professor McFadden's Model Makes Predictions That Contradict Reality* .................................. 84

    *6.1.1. Professor McFadden's Model Grossly Overstates the Extent to Which App and In-app Purchase Prices Respond to a Change in Commission Rates* .................................................................. 85

    *6.1.2. Professor McFadden's Model Predicts Unrealistic Variation in Marginal Costs for the Same App Over Time* ...................................................................................................................................... 88

    *6.1.3. Professor McFadden's Model Predicts Inaccurate Profit Margins for Developers* ..................... 90

*6.2. Professor McFadden Still Fails to Model Most Genres in the Apple App Store* ........................... 92

*6.3. Professor McFadden Makes Assumptions That Are Plainly at Odds with Market Realities* ... 95

    *6.3.1. Professor McFadden Incorrectly Assumes That Developers Price Like Monopolists* ................. 95

    *6.3.2. Professor McFadden Ignores That Different Apps Face Different Levels of Competition and Demand* ...................................................................................................................................................... 96

    *6.3.3. Professor McFadden Incorrectly Ignores Different Channels of Distribution for Apps* .............. 98

    *6.3.4. Professor McFadden Continues to Ignore Free Apps* ................................................................... 99

**7. APPENDIX A – CV AND PRIOR TESTIMONY** ...............................................................................100

**8. APPENDIX B – DOCUMENTS RELIED UPON** ................................................................................119

**9. APPENDIX C – PROFESSOR MCFADDEN ASSUMES RATHER THAN DEMONSTRATES THAT ALL APPS WITH THE SAME GENRE AND APP STORE BUSINESS MODEL FACE THE SAME PRICE SENSITIVITY** .........................................................................................................................123

**10. APPENDIX D – DISTRIBUTION OF ENDING DIGITS IN PROFESSOR MCFADDEN'S ANALYSES** ..............................................................................................................................................124

**11. APPENDIX E – PROFESSOR MCFADDEN'S PRICE TIER SIMULATION IN THE CONTEXT OF THE "DOLLAR METHOD"** ...........................................................................................................126

**12. APPENDIX F – PARAMETER ESTIMATES FOR DEMAND HETEROGENEITY ANALYSIS** ... 128

**13. APPENDIX G – SQL CODE FOR HARM ESTIMATION** ................................................................131

SER-756

**1. INTRODUCTION**

1. I make this declaration in support of Apple's Opposition to Plaintiffs' Renewed Motion for Class Certification and Apple's Motion to Exclude the Testimony of Prof. Daniel McFadden and Dr. Rosa Abrantes-Metz.

2. I previously submitted an Expert Report and Declaration in this matter on August 10, 2021, another Declaration on November 9, 2021, and a further Declaration on November 30, 2021.[1] My qualifications, CV, the list of prior matters in which I have provided testimony, and the list of materials I relied upon in reaching my conclusions were provided in that report. Appendix A provides an updated CV and list of prior testimony, and Appendix B provides a list of additional materials I have relied upon in preparing this report.

3. I have been asked by counsel for Apple to analyze the Supplemental Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, dated September 26, 2022, and assess the methods and methodologies proposed therein.[2] Specifically, I was asked to evaluate the reliability, as a matter of economics and econometrics, of Professor McFadden's methods, models, and methodology for providing common economic proof of impact and damages attributable to Apple's alleged conduct. As part of that evaluation, I also reviewed the Class Certification Order issued on March 29, 2022, and Plaintiffs' Renewed Notice of Motion and Motion for Class Certification issued on September 26, 2022.[3] I reserve the right to update or supplement my opinions as further information is made available to me.

**2. BACKGROUND**

4. On June 1, 2021, Professor McFadden offered an expert report ("McFadden Initial Report"),[4] which proposed a method purportedly to calculate individual and total damages

---

[1] Expert Report and Declaration of Jeffrey T. Prince, Ph.D., dated August 10, 2021 ("Prince Initial Report"); Declaration of Jeffrey T. Prince, Ph.D. in Support of Apple's Motion to Exclude Reply Opinions of Daniel L. McFadden, dated November 9, 2021 ("Prince First Declaration"); Supplemental Declaration of Jeffrey T. Prince, Ph.D. in Support of Apple's Motion to Exclude Reply Opinions of Daniel L. McFadden, dated November 30, 2021 ("Prince Second Declaration").

[2] Supplemental Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, dated September 26, 2022 ("McFadden Supplemental Report").

[3] Order Denying Plaintiffs' Motion for Class Certification without Prejudice; Granting in Part and Denying in Part Apple's *Daubert* Motion to Exclude Testimony of Professor Daniel L. McFadden, *In re iPhone Antitrust Litigation*, March 29, 2022 ("Class Certification Order"); Plaintiffs' Renewed Notice of Motion and Motion for Class Certification; Memorandum and Points of Authorities, *In re iPhone Antitrust Litigation*, September 26, 2022 ("Plaintiffs' Renewed Motion for Class Certification").

[4] Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, June 1, 2021 ("McFadden Initial Report").

due to Apple's alleged conduct using common economic evidence. Professor McFadden and I exchanged several reports and declarations regarding that method over the ensuing months.[5]

5. On March 29, 2022, the Court denied Plaintiffs' motion for class certification without prejudice.[6] The Court granted in part a *Daubert* motion regarding Professor McFadden's opinions, recognizing several fundamental problems with his proposed method, and inviting him to correct them in a renewed class certification motion and associated expert report.[7]

6. On September 26, 2022, Professor McFadden submitted a Supplemental Report ("McFadden Supplemental Report") in which he offered a few adjustments to his previous method, purportedly to address the Court's concerns.[8] His Supplemental Report and associated methods are not free-standing, but rather build on and reference his previous reports and methods. Due to several coding and data processing errors, Professor McFadden filed a "Revised Supplemental Report" on December 30, 2022 ("First Revised McFadden Supplemental Report"), and then another "Revised Supplemental Report" on January 19, 2023 ("Second Revised McFadden Supplemental Report").[9] Collectively, I will refer to these reports as "McFadden Supplemental Reports."

7. This section proceeds as follows. First, I provide an initial overview of Professor McFadden's model (Section 2.1). Second, I explain how Professor McFadden's methodology works (Section 2.2). Third, I recap the deficiencies the Court highlighted in its Class Certification Order, which motivated Professor McFadden's Supplemental Reports, and summarize the adjustments Professor McFadden made for his Supplemental Report (Section 2.3). Finally, I discuss the data processing errors Professor McFadden made, which necessitated Revised Supplemental Reports, and how the results changed as a result of correcting those errors (Section 2.4).

---

[5] Specifically, my original rebuttal report on August 10, 2021, Professor McFadden's reply report on October 19, 2021, my declaration on November 9, 2021, Professor McFadden's declaration on November 23, 2021, and my declaration on November 30, 2021. See Prince Initial Report; Reply Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, dated October 19, 2021 ("McFadden Reply Report"); Prince First Declaration; Declaration of Daniel L. McFadden in Support of Plaintiffs' Opposition to Defendant Apple Inc.'s *Daubert* Motion to Exclude Reply Testimony of Professor Daniel L. McFadden, dated November 23, 2021 ("McFadden Declaration"); Prince Second Declaration.

[6] Class Certification Order, p. 1.

[7] Class Certification Order, p. 1.

[8] McFadden Supplemental Report, ¶¶ 2–5.

[9] Revised Supplemental Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, dated December 30, 2022 ("Revised McFadden Supplemental Report"). Second Revised Supplemental Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, dated January 19, 2023 ("Second Revised McFadden Supplemental Report").

## *2.1. Overview of Professor McFadden's Model*

8. The general goal of econometric analysis is to *estimate* causal relationships between certain inputs and outcomes observed in the data, and then, in many cases, to *predict* outcomes under some change in inputs. In the context of antitrust litigation, according to the ABA Antitrust Section's treatise on Econometrics, "Econometric analysis is often used to identify and quantify the impact of allegedly illegal acts and distinguish that impact from effects caused by other factors."[10] More specifically:

> "Econometric and regression analyses are particularly useful in separating the impact of an alleged anticompetitive act on market outcomes (such as pricing) from the impact of other influences. That is, when correctly implemented, econometric techniques can isolate and measure the effect of a single explanatory factor on the economic outcomes that are relevant when estimating damages."[11]

Professor McFadden's methodology attempts to leverage an econometric model in this way in this litigation, but fails in many important regards.

9. Professor McFadden first develops a model of consumer demand and developer behavior that yields predictions on price sensitivity, marginal costs, and ultimately the prices that purportedly would have prevailed but for Apple's allegedly anticompetitive conduct ("but-for prices"), which I discuss in detail in Section 2.2. I note that Professor McFadden does not offer any opinion on what commission Apple would have charged in the but-for world. Instead, Professor McFadden estimates damages by using Dr. Rosa Abrantes-Metz's but-for commission rate as an input to his model.[12]

10. To calculate damages, Professor McFadden defines an account[13] as harmed if, as a result of Apple's alleged misconduct, that account paid excessive prices for apps or in-app content on net.[14] Thus, the goal of Professor McFadden's econometric model is only to predict how

---

[10] American Bar Association, *Econometrics: Legal, Practical and Technical Issues*, Second Edition, (ABA Book Publishing, 2014) ("ABA Econometrics Treatise"), p. 301

[11] ABA Econometrics Treatise, p. 305.

[12] In his Initial Report, Professor McFadden relied on an informal review of a few transaction platforms to propose a but-for commission rate of 10–12 percent which was found by the Court to be "cherry picked." He now adopts Dr. Abrantes-Metz's commission rate but neither evaluates nor validates her conclusions. Professors Hitt and Schmalensee discuss why the rate determined by Dr. Abrantes-Metz is fundamentally unreliable. See Expert Report of Richard Schmalensee, Ph.D., dated March 10, 2023 ("Schmalensee Second Report"); Expert Report of Lorin M. Hitt, Ph.D., dated March 10, 2023 ("Hitt Second Report").

[13] As I will discuss in Section 2.2.5, there is a disconnect between consumers and accounts. Professor McFadden's method deals only with accounts—consumers may have multiple accounts.

[14] McFadden Reply Report, ¶ 200. The alleged conduct could have made some apps or in-app content more expensive while making others less expensive.

**SER-759**

developers would have priced their products had Apple charged a different commission rate but changed no other aspect of its business model or ecosystem. He then estimates the "overcharge" as "the difference between [the 'as-is' price] and [the 'but-for' price]" and calculates damages for all accounts by multiplying the price difference by the as-is quantity.[15] Professor McFadden does not address other aspects of the world that might have been different absent Apple's alleged misconduct, regardless of their potential effect on consumers.[16]

### *2.2. Professor McFadden's Methodology Explained*

11. The core idea behind Professor McFadden's model is the assumption that developers set prices to maximize their profits. The fundamental tradeoff when setting prices is that developers can attract more customers by setting lower prices, but they can earn a greater profit on each customer by setting higher prices. This tradeoff in Professor McFadden's model is affected by three key factors: the price sensitivity of demand, developer's marginal cost, and Apple's commission rate.

12. Price sensitivity of demand measures how reactive consumers, as a whole, are to price changes. Greater price sensitivity means, for example, an increase in price will cause a greater reduction in quantity demanded. In Professor McFadden's model, price sensitivity of demand manifests as elasticity of demand, which measures the percentage change in quantity demanded caused by a 1 percent change in price. Marginal cost is the additional cost associated with selling an additional paid download or in-app item. Typically, the higher the marginal cost, the higher the price developers will have to set to earn a profit per sale, which will lead the developer to raise the price.

13. Professor McFadden does not use empirical measures of actual marginal costs for each developer, but rather uses his model to infer marginal costs for each developer. Based on this inference, he finds that marginal costs can sometimes be negative. Professor McFadden does not take the position that it actually costs developers less to deliver their apps to more users, or to deliver more sales of in-app content to their users, but instead ascribes negative marginal cost for a developer to offsetting marginal revenues from sources such as advertising. However, he does this without any evidence; he does not study advertising in any way—either by including a choice of monetization method in his model, or by

---

[15] McFadden Initial Report, ¶ 150.

[16] Schmalensee Second Report, Section V.E.

empirically studying which apps actually offer in-app advertising, and whether these are the same apps that his model assigns a negative marginal cost.[17]

14. In particular, a characteristic of Professor McFadden's model is that it implies that that all apps with prices below a certain "threshold" have negative marginal costs.[18] For example, paid download Games, Music, and Entertainment apps with no in-app purchases have negative marginal costs if and only if they have $0.99 prices.[19]

15. The third key determinant of a developer's price in Professor McFadden's model is Apple's commission. Importantly, the effect of Apple's commission on developer pricing in Professor McFadden's model depends on whether the marginal cost is positive, negative, or zero. If marginal cost is zero, then Apple's commission has no effect on the profit-maximizing price.[20] Even though the developer will keep a smaller share of total revenue when Apple's commission rate increases, the price that previously maximized total revenue continues to do so. As a result, the developer chooses the same price to maximize revenue, regardless of whether it keeps 70 percent, or 88 percent, or 100 percent of the revenue after Apple's commission.

16. If marginal cost is positive, then a higher Apple commission will create an incentive for the developer to set a higher price. This is because a higher commission decreases the profit margin—the difference between revenue and marginal cost expressed as a percentage of revenue—at any given price.[21] Conversely, if marginal cost is negative, a higher Apple

---

[17] McFadden Initial Report, footnote 245 ("I understand that some app developers have other revenues sources such as advertising. In the absence of detailed revenue data for app developers, [marginal cost] may capture part of the additional revenues as a negative component.").

[18] Because marginal costs vary based on the estimated parameters of Professor McFadden's model, the threshold prices vary by app genre and App Store business model (i.e., between downloads and in-app purchases). Furthermore, paid downloads transactions for apps that also offer in-app purchases in the same month do not always satisfy this strict threshold pattern. However, transactions that do not satisfy this threshold pattern are highly infrequent, accounting for ▮▮▮▮ percent of all paid transactions in Games, Music, and Entertainment, and around ▮ percent of revenue in those genres. Therefore, while this minor caveat applies to all subsequent discussions of the relationship between prices and marginal costs in this report, for ease of exposition, I do not repeat it every time. See Workpaper 1.

[19] As described in Appendix E of the McFadden Initial Report, $c_{jt}^d = (1 - \tau)(\frac{1}{\alpha^d} + p_{jt}^d)$, implying that marginal costs are negative whenever $\frac{1}{\alpha^d} < p_{jt}^d$. For the estimates of $\alpha^d$ presented in Figure 2 of the McFadden Second Revised Supplemental Report, this threshold price is $1.64 for Games apps and $1.04 for Music and Entertainment apps.

[20] Deposition of Daniel McFadden, Ph.D., August 3, 2021, Volume I ("First McFadden Deposition"), 243:16–24 ("[A.] And this -- these estimates have the property that those marginal cost estimates can -- can be zero or negative. That is, there's nothing in the -- in the model which constrains those -- from taking on values in that range. And when that's the case, a -- a consumer -- a firm that has zero marginal cost will -- will not pass -- pass on any cost -- any reduction in the commission to consumers."). See also Prince Initial Report, ¶ 86 ("Apps that have zero, or negative, marginal costs likely will not lower their prices in response to a change in Apple's commission in the but-for world."). Developer competition—which Professor McFadden ignores in his model—would also be expected to affect developers' prices. I return to this idea throughout this report.

[21] As an example, suppose the marginal cost for downloads offered by the developer is $1. In the absence of an Apple commission, a $5 price generates an 80 percent profit margin. But with a 30 percent Apple commission, a $5 price only

**SER-761**

commission leads to a *higher* profit margin at any given price.[22] Therefore, the developer can lower price while maintaining a high profit margin, taking into account the fact that a decrease in price will further increase demand. Hence, in the case of negative marginal costs, the developer has an incentive to lower price.[23]

17. Nearly any model formulated to answer Professor McFadden's question—how prices respond to commissions—will find that positive marginal costs imply a positive relationship between commissions and prices, negative marginal costs imply an inverse relationship between commissions and prices, and zero marginal costs imply no relationship between commissions and prices. This is true for most tax incidence models like the one Professor McFadden implements; an increase in an ad valorem tax only yields an increase in consumer prices if the marginal cost of production is positive.[24] However, even under a tax incidence framework, it is crucial to correctly and reliably measure or estimate marginal costs,[25] which Professor McFadden has not done here. As I discuss later in Section 4, in contrast to evidence suggesting that many apps have marginal costs of zero or close to zero, Professor McFadden finds that marginal costs are greater than zero for 86 percent of the transactions for which he calculates marginal costs;[26] all of the remaining transactions had negative marginal costs, and nearly 96 percent of such transactions occurred at prices of $4.99 or less.[27] Professor

---

generates about a 71 percent profit margin ($\frac{5\times0.7-1}{5\times0.7} = \frac{2.5}{3.5} = 0.714$). Therefore, all else equal, the developer will tend to set a higher price to increase its profit margin, taking into account the fact that an increase in price will decrease demand.

[22] For example, suppose the marginal cost for downloads for the developer is -$1. In the absence of an Apple commission, a $5 price generates a 120 percent profit margin. But with a 30 percent Apple commission, a $5 price generates about a 129 percent profit margin ($\frac{5\times0.7+1}{5\times0.7} = \frac{4.5}{3.5} = 1.286$).

[23] First McFadden Deposition, 243:24–244:5 ("And if they have a negative marginal cost, presumably they have other -- other sources of revenue in that case. Then they may actually respond to the reduced commission by increasing their price. That's -- that's an implication of the model and that's -- that's allowed in my analysis.").

[24] See Hans Jarle Kind and Marko Köthenbuerger, "Taxation in Digital Media Markets," *Journal of Public Economic Theory*, 20(1), 2018, pp. 22–39 at p. 25 ("The fact that [value-added taxes] at the outset affect equilibrium prices only for goods with positive marginal costs is apparently often overlooked in public debates.").

[25] Indeed, the academic tax incidence literature highlights the importance of taking marketplace realities into account. The empirical literature, for example, finds that tax incidence depends on the amount of competition firms face. See Christos Genakos and Mario Pagliero, "Competition and Pass-Through: Evidence from Isolated Markets," *American Economic Journal: Applied Economics*, 14(4), 2022, pp. 35–57 at p. 35 ("We find that pass-through increases from 0.4 in monopoly markets to 1 in markets with four or more competitors and remains constant thereafter. The speed of price adjustment is about 60 percent higher in more competitive markets."). The theoretical tax incidence literature uses different models depending on the economic environment. See Don Fullerton and Gilbert E. Metcalf, "Tax Incidence," in *Handbook of Public Economics*, ed A. J. Auerbach and M. Feldstein (2002), pp. 1787–1872. Additionally, the literature cautions that one must be careful in choosing a functional form for demand functions in policy analysis. See Nicholas Stern, "The Effects of Taxation, Price Control and Government Contracts in Oligopoly and Monopolistic Competition," *Journal of Public Economics*, 32(2), 1987, pp. 133–158 at p. 154 ("The dependence of these [tax incidence] results, and those concerning dual pricing, on the elasticity of the elasticity indicates that one must be careful in choosing functional form for demand functions in policy analysis.").

[26] Exhibit 5.

[27] Workpaper 2. Transactions at prices less than or equal to $4.99 accounted for ▉ percent of revenue coming from transactions with negative marginal costs.

McFadden does not verify whether the app-specific marginal costs calculated for each app by his model are sensible and consistent with reality.

18. In the remainder of this section, I describe Professor McFadden's methodology, which involves five steps:

- First, he specifies certain mathematical modeling assumptions regarding consumer demand and developers' price-setting behavior. (Section 2.2.1)
- Second, he estimates consumer demand using Apple App Store transaction data. (Section 2.2.2)
- Third, he calculates developer costs using the margins implied by his model. (Section 2.2.3)
- Fourth, he uses his estimates of consumer demand and developer costs to predict what prices would be if there were a change in the App Store commission rate. (Section 2.2.4)
- Finally, he determines harm by calculating the difference in the as-is prices and but-for prices for each account. (Section 2.2.5)

*2.2.1. Specifying Mathematical Modeling Assumptions*

19. In the first step, Professor McFadden specifies a variety of assumptions regarding consumer demand and developers' price-setting behavior. This step does not involve any data analysis.[28]

20. An important early assumption Professor McFadden makes is that price sensitivity is the same for all apps with the same genre and App Store business model (i.e., paid downloads or in-app purchases).[29] Professor McFadden concedes this is "not an empirical assumption" and

---

[28] These assumptions are formalized using a small set of equations, from which Professor McFadden derives a single equation that relates an app's price, consumers' price sensitivity (related to, but mathematically distinct from, elasticity), the developer's marginal cost, and Apple's commission rate. If one knows any three of these four values, one can calculate the fourth using this equation. See McFadden Initial Report, Section VI.D.

[29] Third McFadden Deposition, 76:11–18 ("Q. Your model assumes that consumers have the same price sensitivity for all apps in a given genre; is that correct? A. If by 'price sensitivity' you mean the -- the parameter coefficient on price within the demand model, the answer is yes, within each business model for either downloads and separately for IAP."). I discuss the implications of this in more detail Appendix C. Professor McFadden's model does allow for different price sensitivities for different app genres, and for downloads vs. in-app purchases. See McFadden Initial Report, ¶ 210. As I explain below, this variability in price sensitivities for different genres means there is no straightforward way to apply results from one genre to another. Professor McFadden must estimate his model for all genres to properly determine harm. Professor McFadden uses the term "business model" to refer to three types of *apps*: those that offer only paid downloads (no in-app purchases), those that are free to download but offer in-app purchases, and those that are paid downloads *and* offer in-app purchases. Throughout this report, I use the term "App Store business model" slightly differently, to classify *transactions* as either paid downloads or in-app purchases. A very few apps (representing ███ percent of total Games, Music, and Entertainment revenue) employ both "business models" in the sense that I use the term. My use of the term "business model" does not imply that all apps with the same "business model" are alike in any other way beyond offering paid downloads or in-app purchases. See Workpaper 3.

presents no evidence to corroborate it in any of his reports.[30] I have shown in my prior work on this matter that this assumption yields absurd predictions.[31] For example, all Games apps priced at $1.99 would experience the same decrease in demand if they raised their price by $1—even if some of those apps are unpopular and face fierce competition from numerous similar games, while others are household names and face little competition. The implication of this is that, in Professor McFadden's model, every single app in the App Store sets prices as if it were a monopolist because no developer considers the demand for or price of any other app when setting its own prices.[32]

21. More fundamentally, by assuming that a single number can be used to characterize demand, e.g., all in-app purchases for Games apps, Professor McFadden effectively assumes a perfect correspondence between an app's price and its marginal cost. Holding fixed Apple's as-is commission rate (e.g., at 30 percent), Professor McFadden's assumption implies that there is only one possible explanation for differences in price between two apps sharing the same genre and App Store business model (i.e., paid downloads or in-app purchases): they must face different marginal costs. His model includes no role for differing demand conditions such as differences in popularity of the apps, user loyalty, and presence of substitutes. As a result of his assumption, his model implies a strict relationship between prices and implied marginal costs: higher priced apps necessarily have higher marginal costs.

22. Professor McFadden attempted to defend this assumption in his Reply Report, arguing that "one would expect apps with similar marginal costs to be sold at similar prices and apps with very different marginal costs to have very different profit-maximizing prices."[33] These relationships are only true if everything else about the apps is the same (i.e., all else is equal). One would not expect two apps with similar marginal costs to be sold at similar prices if one faced loyal, price-insensitive demand, while the other faced intense competition for price-conscious customers. By fixing a single price sensitivity parameter for all apps with the same

---

[30] See First McFadden Deposition, 174:5–22 ("Q. Does your model assume that all apps in the same category or genre face demand functions with the same price sensitivity? A. Yes, that's -- the current model does -- has that form. It -- it could be elaborated if there is evidence available that there are significant variations from that over -- over the apps. Q. Well, did you have any empirical basis for the assumption that you made? A. I would say that it -- it's not an empirical assumption. It's a modeling assumption that is to -- you -- you start a model. You keep it as -- as simple as you can to capture the effects that you need to capture, and so this is the -- the starting point is the simple assumption that there's a common -- common effect, and you elaborate the model as -- if you need to."). See Deposition of Daniel L. McFadden, December 5, 2022 ("Third McFadden Deposition"), 241:18–242:4 ("Q. Does your model assume that all apps with the same genre and business model have the same price sensitivity? A. The answer to that is if -- provided we understand that 'price sensitivity,' in my terminology, is the coefficient on price in the – in the log linear demand model, the answer is yes. Q. Do you agree that some apps in a given genre might face more competition than other apps in the same genre? A. I – I have – I have no specific evidence one way or the other.").

[31] Prince Initial Report, ¶¶ 67–68.

[32] The ability to set prices without respect to competitor's prices is a hallmark of a monopolist.

[33] McFadden Reply Report, ¶ 81.

genre and App Store business model, Professor McFadden has assumed, not shown, the "all else equal" condition.[34]

23. In Professor McFadden's model, harm is closely related to marginal costs. If and only if an app's marginal costs are positive will a lower Apple commission mean a lower price, and a conclusion that consumers are harmed in Professor McFadden's view.[35] Because of the strict relationship between prices and implied marginal costs in Professor McFadden's model, higher-priced apps *must* have higher marginal costs. As a result, higher-priced apps with positive marginal costs lower their prices in the but-for world and generate harm, while lower-priced apps with zero or negative marginal costs do not. I must emphasize that this is ultimately an assumption of Professor McFadden's, not a finding from any analysis. From this perspective, all that remains for his empirical work to do is determine how high the price of an app needs to be (i.e., what is the threshold price) for a given genre and App Store business model, such that one can assume marginal costs, and therefore purported harm, are positive. Consequently, by not considering differences in the demand faced by apps within a genre, Professor McFadden does not show that accounts are harmed in a common manner; instead, he assumes it.

24. Another important assumption Professor McFadden makes is that developers do not consider Apple's price tiers and focal-point pricing when setting prices. Because there are no price tiers or focal-point pricing, every developer in Professor McFadden's model necessarily changes their prices in the but-for world.[36] As explained above, higher priced apps, which by Professor McFadden's assumption have higher marginal costs, lower their prices in the but-for world. But that does not have to be the case.

25. Had Professor McFadden allowed for higher priced apps to have zero or close to zero marginal costs, and developers to consider Apple's price tiers or focal-point pricing, many of those apps would not have lowered their prices in the but-for world, and therefore, would not

---

[34] He similarly argues that this pattern "stem[s] from [his] model," which "is based on a consumer utility maximization model widely used in the academic literature." See McFadden Reply Report, ¶ 81. However, Professor McFadden fails to acknowledge that that "widely used" model itself has a price sensitivity parameter, and that parameter could vary from app to app, but he has assumed it does not.

[35] [FN_819ADD] Because of the way Professor McFadden implements his "percentage method," transactions for apps that offer both paid downloads and in-app purchases in the same month may not satisfy this pattern. In particular, Professor McFadden commingles paid downloads and in-app purchases for the same app, assuming that the same percentage overcharge applies to each, even if one had a positive marginal cost and the other had a negative marginal cost. However, transactions with a positive marginal cost but a higher but-for price, or vice-versa, are ▮▮ ▮▮ infrequent, accounting for less than ▮ percent of all paid transactions in Games, Music, and Entertainment, and aroun ▮ percent of revenue in those genres. While this minor caveat applies to all subsequent discussions of the relationship between marginal costs and harm, or the relationship between marginal costs and whether an app raises or lowers its prices in the but-for world in this report, for ease of exposition, I do not repeat it every time. See Workpaper 1.

[36] Apps would not change prices only if marginal costs were estimated to be exactly zero or the as-is and but-for commission rates were exactly identical.

have generated harm.[37] Professor McFadden attempts to "accommodate Apple's tier pricing restrictions" in the but-for world in a sensitivity analysis (which he calls a "simulation") in his Supplemental Reports.[38] However, as I explain later, his simulation predicts but-for prices that do not align with Apple's price tiers.

26. Although these are not the only important assumptions Professor McFadden makes,[39] his assumptions around price sensitivity, developer competition, marginal costs, price tiers, and focal-point pricing have critical implications for his ability to reliably answer the questions at issue in this case.

### 2.2.2. Estimating Consumer Demand

27. Professor McFadden uses prices and quantities of apps and in-app purchases in the App Store transaction data to estimate a model of consumer demand, i.e., how sensitive consumer demand is to price. When estimating demand for in-app purchases, Professor McFadden conducts his analysis for each item—that is, he keeps data separate for each of the in-app purchase items offered for a given app.[40] However, everywhere else in his model he aggregates across these items and operates at what he calls the "app level."[41]

28. The App Store transactions data contain almost 500 million accounts and over 5.5 million apps, out of which more than 1.4 million apps have paid transactions. While a given sample of users may be random, selecting among the apps, even within a random sample, is not itself random. Professor McFadden uses just 4,883 of these 1.4 million apps to estimate consumer demand by applying the following selection criteria:[42]

- He focuses only on the transactions of accounts in his 75 0.1 percent samples.[43]

---

[37] See Christopher T. Conlon and Nirupama L. Rao, "Discrete Prices and the Incidence and Efficiency of Excise Taxes," *American Economic Journal: Economic Policy*, 12(4), 2020, pp. 111–143 at p. 140 ("Price points and their associated rigidities mean that firms withstand cost shocks, including tax increases, until they are sufficiently far from their optimal price that moving to the next price point leaves them better off, resulting in infrequent but large prices changes in set increments.").

[38] Second Revised McFadden Supplemental Report, ¶¶ 85, 87. As I explain later in this report, Professor McFadden performs two simulations, one purportedly to simulate the Apple App Store price tiers and one purportedly to simulate a theoretical 750-tier schedule.

[39] In addition, he assumes that developers set prices as though they only sell a single iOS app meaning that they do not optimize prices of an app sold through different channels, including their own websites. Professor McFadden also makes no distinction between subscription and non-subscription in-app purchases.

[40] McFadden Initial Report, Figure 15 notes.

[41] Second Revised McFadden Supplemental Report, footnote 55.

[42] See Exhibit 1; Second Revised McFadden Supplemental Report, ¶ 15.

[43] Second Revised McFadden Supplemental Report, ¶ 54.

**SER-766**

- He restricts his analysis to apps within just three genres—Games, Music, and Entertainment. This means that he excludes 24 of 27 genres from his analysis.[44]
- Within Games, Music, and Entertainment, he uses only the most popular apps—those that account for 70 percent of revenue within a genre in at least one year.[45]

29. Exhibit 1 illustrates how these selection criteria narrow the set of apps Professor McFadden uses to estimate consumer demand from almost 5.6 million to a mere 4,883.

*EXHIBIT 1*
*Professor McFadden estimates demand using a narrow subset of apps*



Source: McFadden Production

Note: Each bar represents the number of apps at each stage of Professor McFadden's data filtering process. Each subsequent group of apps is a subset of the preceding one. Professor McFadden uses the final 4,883 apps to estimate consumer demand.

30. Despite estimating demand using a limited number of apps, Professor McFadden assumes that his estimates of consumer price sensitivity apply to all apps within Games, Music, and Entertainment.[46] He combines Music and Entertainment and treats them as though they are a

---

[44] Expert Report and Declaration of Lorin M. Hitt, Ph.D., dated August 10, 2021, ¶ 49 ("Hitt Initial Report").

[45] McFadden Initial Report, Appendix E, ¶ 24; McFadden Supplemental Report, footnote 43.

[46] In particular, though Professor McFadden removes apps under his 70 percent revenue cutoff from the estimation sample, he applies the same estimated consumer price sensitivity to these apps in his but-for price prediction step. McFadden Initial Report, ¶ 221.

single genre, offering no evidence or tests that this is warranted, "based on [his] opinion that…they will have similar content costs."[47] Professor McFadden testified that he may combine some other genres with Games, or with Music and Entertainment.[48] If he did that, he would need to re-estimate consumer demand for the newly combined genres, which could lead to significantly different consumer price sensitivity estimates, but-for prices, and estimates of harm. In other words, all of his results may change.

31. Professor McFadden claims to "refine and sharpen" his estimation of consumer demand by imposing "profit margin constraints" on his model.[49] (Here and throughout this report, I use the term "profit margin" as Professor McFadden does—to mean price less marginal cost, divided by price. This is different from the way the term is often used to mean the earnings of a firm after all of its expenses—including fixed costs and, in this context, commissions—divided by its revenue. Profit margins in the more typical sense can be far lower than Professor McFadden's margin constraints.) As I previously showed and as Professor Watson further explains,[50] these constraints alone determine the estimates of price sensitivity in almost all cases, and the transaction data on prices and quantities are largely ignored. These margin constraints are constructed in a subjective and arbitrary manner and rely on accounting data from only three developers in the Games genre (Epic Games, Playtika, and Pocket Gems), two developers in the Music genre (Spotify and Pandora), and one developer in the Entertainment genre (Netflix).[51] This is the same approach Professor McFadden used in his Initial Report, which the Court questioned.[52] However, Professor McFadden has provided no new analysis in his Supplemental Reports to address the Court's concerns.[53]

---

[47] Deposition of Daniel L. McFadden, December 5, 2022 ("Third McFadden Deposition"), 78:15–80:15.

[48] Third McFadden Deposition, 102:1–16 ("Q. (By Mr. Swanson) Professor, which genres out of all of the other genres can be combined for estimation purposes, like you did with music and entertainment? A. That's not a question that I -- that I addressed in my supplemental report, and I have not sat down to -- to do that determination. Q. Do you know if any of the other genres should be combined with the games genre for estimation purposes? A. At this point, I don't know. I -- I simply don't know. Q. Okay. Have you ruled out combining other genres with the game genre for estimation purposes? A. I would say I haven't -- I haven't ruled it out.").

[49] McFadden Initial Report, ¶¶ 142, 214.

[50] Prince Initial Report, Section 7; Prince First Declaration, ¶ 28; Expert Report of Mark Watson, Ph.D., dated March 10, 2023, , Section 4.1. ("Watson Report").

[51] Prince Initial Report, ¶ 98; Prince First Declaration, ¶ 28.

[52] The Court found that the developer costs that were used to form the margin constraints were not "fulsome," and stated that it "would expect a more fulsome analysis or reliance on an industry expert for purposes of trial." See Class Certification Order, p. 10.

[53] Third McFadden Deposition, 170:6–16 ("Q. … In other words, have you added data from any additional developers beyond what you used before to set your margin constraints? A. As of the supplemental report, no, I did not add additional firms for which I had margin data.").

32. In my previous work on this matter, I also observed that Professor McFadden's estimations of demand are unstable because they rely on what econometricians call "weak instruments."[54] Professor Watson discusses this issue in greater detail.[55]

### 2.2.3. Calculating Developer Costs

33. Once consumers' price sensitivity is estimated, in order to calculate each app's marginal cost, Professor McFadden uses the algebraic relationship, implied by his model, between prices, consumer price sensitivity, marginal costs, and commission rates. As I explained above, marginal costs are one of the key drivers of Professor McFadden's but-for prices.[56] Whether there is an overcharge for a given app or in-app purchase depends on whether it has positive, zero, or negative marginal costs. In addition, in Professor McFadden's model, apps with negligible marginal costs will respond with minute price adjustments. Accordingly, if Professor McFadden's model overestimates marginal costs, it will overestimate harm and the number of harmed accounts.

34. Professor McFadden overstates the precision with which his model can be used to infer marginal costs. First, in the real world, App Store prices must conform to a specific set of tiers (ending in 99 cents, or 49 cents for subscriptions), and Professor McFadden claims that this requirement affects the prices developers set, meaning that they may not be the true profit-maximizing prices. For example, according to Professor McFadden, a developer may make more profit charging $2.10 for an in-app purchase item, rather than the nearest tier price of $1.99, but one only observes the tier price of $1.99 in the as-is world.[57] Professor McFadden ignores his own observation and then proceeds under the contradictory

---

[54] Prince First Declaration ¶ 38.

[55] Watson Report, Section 6.1, Appendix G.

[56] Prince Initial Report, ¶ 82.

[57] McFadden Initial Report, ¶ 128 ("Second, common economic evidence supports the allegation that Apple has been controlling what prices developers can charge. It exercises this control by setting a pricing tier for apps and in-app content rather than letting app developers set the price of their products… App developers choose a price point from this tier rather than choosing the price they would like to charge."), ¶ 129 ("Common economic evidence also provides support to the conclusion that Apple's restricted pricing policies hinder competition among app developers by limiting the force of competition to drive down prices"), ¶ 130 ("Common economic evidence likewise provides support to the conclusion that Apple's restricted pricing policies also hinder the app developer competition by limiting app developers' ability to offer temporary price discounts. An app developer of a $1.99 app cannot offer a 20 percent or 30 percent temporary price discount to boost its app sales. Its only choice is to give a 50 percent price discount. An app developer of a $0.99 app is even more constrained. It cannot offer any price discount."), ¶¶ 216–217 ("One complication in using the profit maximization conditions to infer the variable margin is that app developers are somewhat constrained in setting the profit maximizing price due to the App Store pricing tier policies. When the profit maximizing price for a Paid Download app is $3.50, for example, an app developer can only choose between $2.99 and $3.99. When this app developer is observed to charge $3.99, the cost inferred based on the profit maximizing condition would be different from the cost inferred when the app developer charges $3.5. However, because I use the margin range as constraints, as opposed to using an exact margin level as constraints, the profit maximization conditions do not have to be precise. In Appendix F I explain using a range of the margin as constraints is conceptually not much different from using an exact margin level as constraints and the profit maximization conditions that account for Apple's pricing tier policies."), Appendix F (which shows that the price developers sets merely satisfies inequalities showing it generates more profit than the neighboring tiers, rather than an equation showing it is profit-maximizing).

SER-769

assumption that the observed prices are profit-maximizing, which he admitted in deposition.[58] Second, Professor Berger explains,[59] and Professor McFadden agrees,[60] that developers may have reasons to voluntarily set prices at focal points, but the demand model he uses to infer marginal costs is incompatible with developers doing so. As I explain later, either according to Professor McFadden's claim that developers' as-is prices are meaningfully restricted by Apple's price tiers, or accounting for voluntary focal-point pricing, Professor McFadden can only infer a range of marginal costs from the observed data, not a specific value, a fact he also admitted in deposition.[61] As a result, he can only infer a (wide) range of total damages.

35. As described above, a consequence of Professor McFadden's mathematical assumptions is that prices and marginal costs are directly linked for all apps with the same genre and App Store business model (i.e., paid downloads or in-app purchases). This means, for example, that for Paid Downloads in the Games genre, Professor McFadden's price sensitivity estimate implies a "threshold" price of $1.64, meaning all apps priced above $1.64 have positive marginal costs, all apps priced below $1.64 have negative marginal costs, and all apps priced at $1.64 have zero marginal costs. As a result, all app downloads in the Games genre with prices of $0.99 (i.e., below the threshold price) will have a negative marginal cost and higher prices in the but-for world. Those with prices above $0.99 at the next tier of $1.99 (i.e., above the threshold price) will have a positive marginal cost and lower prices in the but-for

---

[58] First McFadden Deposition, 176:16–177:4 ("Q. Changing subjects to -- sort of back to the 99-cent price tiers for the 99-cent pricing, your model -- well, does your model and its estimations take account of the fact that, in the actual world, developers are choosing prices subject to the price tiers? A. The answer is: The way the model is currently implemented, we treat the price they actually charge as their profit-maximizing price, even though it will be on a price tier. We treat their -- their but-for product maximizing price as if it would be whatever that maximization is without pushing it back to a price-tier approximation.").

[59] Expert Report of Jonah Berger, Ph.D., dated March 10, 2023 ("Berger Report"), Section VI.B.

[60] Deposition of Daniel McFadden, November 5, 2021, Volume I ("Second McFadden Deposition"), 152:7–13 ("Q. Okay. If Apple removed its price tier policy or was made to remove its price tier policy, would you expect that app prices would still cluster at 99-cent price points? A. I agree that focal point pricing is common, and I agree that I would expect to see it in -- in any world, including a but-for world.").

[61] Third McFadden Deposition, 148:8–24 ("Q. Isn't it a fact that when you observe that in the real world the developer selected a tier price of $1.99, all you know is that that price was more profitable than the 99-cent or the 2.99 price tier? A. You certainly know that, and you also know or at least as an economist assume that developers are profit maximizers, so that -- they are missing products which maximize their products. Q. But with price tiers in the real world, isn't it a fact that you can't know exactly what the developer's marginal cost is? A. The answer is -- is yes, you can -- you can determine that within -- within limits. Q. And the limits are implicitly defined by the tiers, correct? A. Yes."). See also McFadden Initial Report, ¶¶ 216–217 ("One complication in using the profit maximization conditions to infer the variable margin is that app developers are somewhat constrained in setting the profit maximizing price due to the App Store pricing tier policies. When the profit maximizing price for a Paid Download app is $3.50, for example, an app developer can only choose between $2.99 and $3.99. When this app developer is observed to charge $3.99, the cost inferred based on the profit maximizing condition would be different from the cost inferred when the app developer charges $3.5. However, because I use the margin range as constraints, as opposed to using an exact margin level as constraints, the profit maximization conditions do not have to be precise.").

world.[62] For Paid Downloads, not a single app in the Games genre is priced at $1.64, so according to Professor McFadden's model, not a single Games app has zero marginal costs.

36. Writ large, these assumptions cause Professor McFadden to estimate unrealistic marginal costs. Most notably, his model concludes that approximately zero applications will have zero marginal cost. Of the transactions for which he calculates marginal costs, 86 percent have marginal costs greater than $0, all of the remaining transactions had negative marginal costs, and nearly 96 percent of such transactions occurred at prices of $4.99 or less.[63] In contrast, testimony by app developers,[64] the academic literature on digital goods,[65] and Professor Hitt's conclusions[66] suggest that many apps have marginal costs of zero or close to zero. Furthermore, in Section 4.2, I explain that Professor McFadden makes no attempt to verify

---

[62] In particular, Professor McFadden's mathematical form for demand, together with his assumption that all paid downloads within a genre and all in-app purchases within a genre face the same price sensitivity of demand, mean that elasticity of demand is strictly proportional to price. If an app's elasticity of demand equals 1, then its price maximizes *marginal revenue* (that is, the revenue gained by selling one additional item or download). For such a price to also maximize *profit*, marginal revenue must equal marginal profit, which means marginal cost must be equal to zero. All apps with prices above this will have elasticities greater than 1, which is consistent with positive marginal costs; all apps with prices below this will have elasticities less than 1, which is consistent with negative marginal costs. See McFadden Initial Report, ¶ 240.

[63] See Workpaper 2. Transactions at prices less than or equal to $4.99 accounted for ■ percent of revenue coming from transactions with negative marginal costs.

[64] Trial Testimony of Mr. Timothy Sweeney, *Epic Games, Inc. vs. Apple, Inc.*, May 3, 2021 ("Sweeney Testimony"), 190:12–16 ("Q. What does it cost to Epic to generate a V-Buck, minting a V-Buck? A. There is no cost to a V-Buck. There's cost in developing the software, but the V-Bucks themselves don't have a marginal cost.").

[65] See Paul A. Samuelson and William D. Nordhaus, *Economics*, Nineteenth Edition (Special Indian Edition), (McGraw Hill, 2009), p. 161 ("[information technology] typically has the property that it is very costly to produce the first copy and very cheap to produce subsequent copies…. The marginal cost of distributing an extra unit of…software was close to zero."). See also Anja Lambrecht et al., "How Do Firms Make Money Selling Digital Goods Online?" *Marketing Letters*, 25(3), 2014, pp. 331–341 ("Lambrecht et al. 2014") at pp. 332–333 ("Digital products … have near zero marginal costs of production and distribution …"); Avi Goldfarb and Catherine Tucker, "Digital Economics," *Journal of Economic Literature*, 57(1), 2019, pp. 3–43 ("Goldfarb and Tucker 2019") at p. 3 ("Digital goods can be replicated at zero cost"); Richard A. Posner, "Intellectual Property: The Law and Economics Approach," *Journal of Economic Perspectives*, 19(2), 2005, pp. 57–73 at p. 58 ("[I]n the case of software distributed over the Internet… variable cost, and hence marginal cost, are close to zero."); Carl Shapiro and Hal R. Varian, *Information Rules: A Strategic Guide to the Information Economy*, (Boston, MA: Harvard Business School Press, 1999), at p. 3 ("Economists say that production of an information good involves high fixed costs but low marginal costs."); Yannis Bakos et al., "Shared Information Goods," *Journal of Law and Economics*, 42(1), 1999, pp. 117–156 at p. 119 ("Specifically, in many settings, technology is reducing both the marginal cost of producing original units and the inconvenience cost of small-scale sharing. This is true largely because information goods are increasingly available in digital form. They are composed of bits, not atoms—and bits can be quickly, accurately, and inexpensively duplicated by consumers and producers alike."); Paul A. Belleflamme, "The Economics of Digital Goods: A Progress Report," *Review of Economic Research on Copyright Issues*, 13(2), 2016, pp. 1–24 at p. 1 ("[A]t any level of production of the good, the marginal cost of delivering [a digital good] to an extra consumer (i.e., the cost of reproducing) is close to zero."); Hal R. Varian et al., *The Economics of Information Technology: An Introduction*, (Cambridge: Cambridge University Press, 2004), p. 25 ("[M]any information and technology-related businesses have cost structures with large fixed costs and small, or even zero, marginal costs."); Joseph C. Nunes et al., "Why Are People so Prone to Steal Software? The Effect of Cost Structure on Consumer Purchase and Payment Intentions," *Journal of Public Policy & Marketing*, 23(1), 2004, pp. 43–53 at p. 44 ("Software is an example of a product that possesses a cost structure with a relatively low VC and a high FC."); Joel Waldfogel, "How Digitization Has Created a Golden Age of Music, Movies, Books, and Television," *Journal of Economic Perspectives*, 31(3), 2017, pp. 195–214 at p. 195 ("Once information is transformed into digital form, it can be copied and distributed at near-zero marginal costs."); Joel Waldfogel, "Copyright Research in the Digital Age: Moving from Piracy to the Supply of New Products," *American Economic Review*, 102(3), 2012, pp. 337–342 at p. 339 ("[D]igitization has reduced the marginal cost of digital products to essentially zero.").

[66] Hitt Second Report, Section 8.1.1

whether the marginal costs calculated using his model are consistent with actual marginal costs of developers.

### 2.2.4. Predicting But-for Prices

37. Professor McFadden next uses his estimated price sensitivities and marginal costs to predict the prices that developers in Games, Music, and Entertainment genres would charge if a "but-for commission rate" were uniformly applied to all transactions.[67] Professor McFadden once again relies on the mathematical relationship, implied by his model, between prices, consumer price sensitivity, marginal costs, and the commission rate.[68] In so doing, he again relies on all of the myriad assumptions discussed above, and some additional ones.

38. In stark contrast to how developers set prices in the real world, for in-app purchases, Professor McFadden predicts one but-for composite in-app purchase price for each app. To understand what he does, consider a hypothetical free-download Games app that has two in-app purchase items, one non-subscription item priced at $0.99 with 5 purchases, and one subscription item priced at $9.99 with 1 purchase. While Professor McFadden treats these two items separately when estimating demand for in-app purchases, he subsequently combines them into a composite in-app item with a single as-is purchase price of $5.49 ($0.99 + $9.99 divided by 2) and a purchase quantity of 6. Professor McFadden next infers a single marginal cost of 0.59 and predicts a but-for price of $5.33 for the composite in-app purchase item.[69]

39. However, to determine harm for individual accounts, one needs but-for prices for specific items they purchased, not for Professor McFadden's abstract composites. Professor McFadden was previously unclear about how "item-level" harm should be calculated,[70] wavering between a "dollar method" in which all items for a given app are assumed to change their prices by the same dollar amount, and a "percentage method" in which they all change their prices by the same percentage. In my previous reports, I showed that the "dollar method" generates absurd results (e.g., negative but-for prices and damages greater than an account's total spending); and the Court required that Professor McFadden clarify his methodology.[71]

---

[67] McFadden Initial Report, Appendix E, ¶¶ 41–45; McFadden Supplemental Report, ¶ 7.

[68] The mathematical relationship is slightly more complex but conceptually similar for paid downloads for Games apps that also have in-app purchases.

[69] See Workpaper 13. These values are calculated using Professor McFadden's equations as described in McFadden Supplemental Report, ¶ 110, assuming an as-is commission rate of 30 percent and a but-for commission rate of 13.63 percent.

[70] McFadden Supplemental Report ¶ 34.

[71] Prince Second Declaration, Section II; Class Certification Order, p. 9.

40. In his Supplemental Reports, Professor McFadden now uses his "percentage method" to calculate harm for in-app purchase transactions. However, he has also testified that his model is "silent" with respect to the but-for prices of individual in-app purchase transactions and that his model does not predict but-for prices for in-app purchase items.[72] In other words, he claims to calculate harm for in-app items, but at the same time claims that his analysis cannot predict but-for prices for individual in-app items. Professor McFadden has not previously voiced this opinion regarding the "silence" of his model with respect to in-app purchases, and I discuss its implications further in Section 5.

41. To operationalize his "percentage method," Professor McFadden first determines the percentage difference between the as-is and but-for prices for his constructed composite in-app item for each app. Then, he applies this percentage to the prices of each of the individual items to determine the but-for harm associated with these transactions. I explain in Section 5.1 why Professor McFadden's percentage method is flawed.

42. Professor McFadden's but-for prices are also erroneous because he fails to account for Apple's price tiers or focal-point pricing. He ignores Apple's price tiers altogether when predicting but-for prices for his core results, and as discussed above, his model has no feature which gives rise to focal-point pricing. Even for his purported "simulation" of Apple's price tiers, his "percentage method" means that but-for in-app purchase prices do not align with Apple's price tiers. I discuss this at more length in Section 5.2.

43. Another consequence of Professor McFadden's assumptions is that, accounting for price tiers, the threshold price for having positive marginal costs and thus harm is only $1.64 for Games Paid Download apps. This is a consequence of his assumption that all paid downloads within a genre with download prices below a threshold will have a negative marginal cost and those with download prices above that same threshold will have a positive marginal cost. In the end, nearly 14 percent of the paid transactions Professor McFadden studies—nearly 96 percent of which occurred at prices of $4.99 or less—would have a higher price in the but-for world than in the as-is world because those transactions are estimated by him to have negative marginal costs.[73] However, the fact that Professor McFadden's model is able to generate negative marginal costs for nearly 14 percent of the transactions does not mean that his model is reliable. As I explain in Sections 4.1 and 4.2, his model, by construction, rules out the possibility that apps have zero marginal costs and is designed to find higher marginal

---

[72] Third McFadden Deposition, 113:21–114:6 ("A. I do not model what is going on inside the developer in terms of the menus they bring forward and the pricing in those menus of any individual items, and – and the granularity of my model is at the overall level of IAP average pricing and IAP spending. And so the model is silent. I do not know what would happen. Even if you – even if a developer has a single IAP item in the as-in world, I do not model nor am I predicting what their menu would look like in the but-for world.").

[73] See Workpaper 2.

costs for higher-priced apps, which means that it will overestimate the extent to which prices will fall in the but-for world.

44. Even ignoring all the problems with Professor McFadden's determination of but-for prices, his analysis is incomplete because he does not predict but-for prices for the ███████ paid transactions that occur outside the Games, Music, and Entertainment genres.[74] As I will explain in Section 6.2, Professor McFadden has neither attempted to apply his existing model to other genres, nor provided any discernible methodology for doing so, nor proposed any new model to cover those genres. And as mentioned above, even within the three genres he does consider, Professor McFadden assumes that the estimates of consumer price sensitivity based on a limited set of 4,883 apps apply to all other apps.[75]

*2.2.5. Determining Harm*

45. Finally, Professor McFadden uses his estimated but-for prices to calculate harm for each account and then sums account-level harm to calculate aggregate harm.[76] Because his determination of harm at the account level has numerous flaws, many of which I discuss in this report, his calculation of aggregate harm is also flawed.

46. As I discussed earlier, Professor McFadden determines an account to be harmed based on the net difference between the as-is and but-for prices across all of that account's purchases.[77] I purposely distinguish between consumers and accounts because Professor McFadden does not attribute harm to any consumer, just to accounts. The putative class, however, is defined in terms of consumers, who may have multiple accounts.[78] In practice, Professor McFadden calculates these net differences between the as-is and but-for prices at the account level for all accounts in the full Apple transaction data, and for all Games, Music, and Entertainment apps with paid downloads or in-app purchases, *but only for these three genres*.[79] As I discuss in Section 6.2, his quantification of individual and total harm is

---

[74] See Workpaper 30.

[75] Exhibit 1.

[76] Second Revised McFadden Supplemental Report, ¶ 43.

[77] McFadden Initial Report, Appendix E, ¶ 46; McFadden Supplemental Report, ¶ 13.

[78] Plaintiffs' Notice of Motion and Motion for Class Certification; Memorandum of Points and Authorities, *In re Apple iPhone Antitrust Litigation*, November 16, 2021 ("Plaintiffs' Motion for Class Certification"), p. 1 ("Plaintiffs bring this class action…on their own behalf and on behalf of persons…."); Plaintiffs' Renewed Motion for Class Certification, p. 15 ("Plaintiffs propose a narrowed class definition consisting only of persons who possessed an account…"); Second McFadden Deposition, 117:11–17 ("Q. And do you have an understanding of how many class members have multiple Apple IDs? A. Only vaguely in the sense that I know how many customers roughly the Apple Store has and I know how many accounts it has, so I know that it's on the -- on the -- certainly more than one account per person, but I don't know the number.").

[79] McFadden Supplemental Report, ¶¶ 29, 32–33. In his Initial and Reply Reports, Professor McFadden performed these calculations only for accounts in a 0.1 percent sample, and only for the popular Games, Music, and Entertainment apps that survived his 70 percent revenue cutoff. See McFadden Reply Report, ¶ 165.

incomplete without determining but-for prices for the remaining genres, because ▮ percent of the accounts which Professor McFadden classifies as harmed or unharmed made some purchases in these other genres.

47. Even ignoring any problems with Professor McFadden's modeling assumptions and calculations, and even using his most recent figures, he concedes that at least 17.8 percent of accounts, or almost 31.5 million accounts, are unharmed.[80] Professor McFadden's own calculations find that millions of accounts are not just unharmed but actually *benefit* from Apple conduct.[81] These figures continue to be quoted at the account level because neither Professor McFadden, nor any other expert, has yet attempted to link accounts to individuals, and thereby determine if individual class members are injured. Professor McFadden testified that he understands this process "would not be part of the merits phase. It would come at a later point"[82] and that "the distribution mechanism…will be handled by other experts."[83]

### 2.3. Adjustments in Response to the Court's Order

48. In its Order, the Court granted in part Apple's *Daubert* motion to exclude Professor McFadden's analysis due to its "deficiencies."[84] In particular, the Court raised the following concerns with Professor McFadden's analysis:

- His but-for commission rate was "cherry-picked" and "not based on any legitimate scientific, economic, or mathematic principle."[85]
- His calculations "contained data errors."[86]
- His analysis lacked "clarity" regarding the "percentage method" versus "fixed dollar method."[87]
- His analysis of developer cost data was not "fulsome."[88]

---

[80] Second Revised McFadden Supplemental Report, Figure 6 (176,964,271 × 17.8 percent = 31,509,491).

[81] See Workpaper 4.

[82] Third McFadden Deposition, 231:1–5 ("THE DEPONENT: My understanding at this point is that the issue of how individuals with multiple accounts would be handled is something that would not be part of the merits phase. It would come at some later point.").

[83] Third McFadden Deposition, 239:10–18 ("Q. (By Mr. Swanson) Do you -- do the opinions in your supplemental report modify that proposed process for identifying and compensating harmed class members in any way? A. No. I -- I have -- as far as I'm concerned, that is -- that issue is moot, because I have not been asked to offer an opinion further on the distribution mechanism. My understanding that -- that will be handled by other experts.").

[84] Class Certification Order p. 1.

[85] Class Certification Order, p. 5.

[86] Class Certification Order, p. 8.

[87] Class Certification Order, p. 9.

[88] Class Certification Order, footnote 8.

- His analysis "ignore[d] Apple's focal-point pricing and pricing tiers in calibrating but-for pricing."[89]
- He could not reliably identify which and how many class members were unharmed, with his model "allow[ing] for Apple IDs to switch between harmed and unharmed."[90]
- He did not provide clarity about the model's confidence level.[91]
- His "model produce[d] results which are too speculative."[92]

49. Professor McFadden claims to address some of the deficiencies identified by the Court in his Supplemental Reports, but his attempts, as I discuss in this report, fall short. His overall model and methods, and in particular his foundational erroneous assumptions, remain largely unchanged. For example, he continues to assume that developers set prices like monopolists and all apps with the same genre and App Store business model have the same price sensitivity; and he still uses only a small subset of apps in the Games, Music, and Entertainment genres for estimation. His model still finds that all apps and in-app purchase items above a (low) threshold price produce an overcharge, while only the lowest-price apps become more expensive in the but-for world. Some of the minor adjustments Professor McFadden makes include:

- He relies entirely on Dr. Rosa-Abrantes Metz for the determination of the but-for commission rate, which she estimates to be 13.63 percent.[93] As Professor Hitt and Professor Schmalensee show, her methodology is flawed and unreliable.[94]
- He estimates consumer demand using 75 separate 0.1 percent samples instead of one sample.[95] As Professor Watson shows, his estimation of consumer demand is not econometrically reliable.[96]
- He implements a "percentage method" to determine account-level harm associated with in-app purchases.[97] I explain the problems with this approach in Section 5.1.

---

[89] Class Certification Order, p. 11.

[90] Other concerns in this category included the "confidence level" of the model; the fact that "the identity or the number of unharmed…are not 'necessarily tightly determined'"; and the fact that all of Professor McFadden's results are presented in terms of accounts, multiple of which may belong to the same person. See Class Certification Order, pp. 8, 13, 14, 26. The last of these issues would not be addressed until "after judgment is rendered." See Class Certification Order, p. 26.

[91] Class Certification Order, p. 13.

[92] Class Certification Order, p. 26.

[93] McFadden Supplemental Report, ¶ 7.

[94] Hitt Second Report, Section 9; Schmalensee Second Report, Section IV.

[95] McFadden Supplemental Report, ¶¶ 54–55.

[96] Watson Report, Section 4.

[97] McFadden Supplemental Report, ¶¶ 40–42.

- He proposes a simulation purportedly to account for Apple's price tiers.[98] I explain the problems with this simulation in Section 5.2.
- He analyzes the harm for a narrowed class with a minimum spending cutoff of $10.[99] While this cutoff is arbitrary and Professor McFadden implements it incorrectly, even taking Professor McFadden's results at face value, he continues to find 10.3 million unharmed accounts within the narrowed class.[100]

## 2.4. Subsequent Data Issues

50. After submitting his Supplemental Report, Professor McFadden and his team discovered a variety of data processing and coding errors. In response, he has submitted two Revised Supplemental Reports. These revised reports corrected errors regarding the genre classification of apps, the calculation of standard errors, and one or more undisclosed errors in his harm calculations.[101]

51. Chief among these issues, Professor McFadden failed to consistently update classifications of apps whose genre classifications changed across productions of the App Store transactions data. Apple produced a total of three App Store transactions data files. As Professor McFadden explains in his report, Plaintiffs' counsel instructed him and his team to use the most recent data in case of date overlaps across the productions.[102] However, Professor McFadden failed to consistently update the genre based on the most recent Apple production.[103] The error affected the 75 samples used for demand estimation and the single sample used for his price tier analysis, but not the overall dataset to which he applies his estimated coefficients.[104] This inconsistency in the way he handled genre classification across datasets impacts his key results such as total harm and identities of accounts that are harmed.

---

[98] McFadden Supplemental Report, ¶ 85.

[99] McFadden Supplemental Report, ¶ 77; Third McFadden Deposition, 209:13–18.

[100] Second Revised McFadden Supplemental Report, Figure 6; McFadden Third Deposition, 209:13–18 ("Q. Okay. Now, if we go back to your original figure 6 in your supplemental report, that shows that with a $10 spending cutoff applied, 7.6 percent of accounts were unharmed; is that -- is that correct? A. Yes."). Professor McFadden applies the $10 spending cutoff after estimating his model and calculating damages, so all the flaws as described in this report still apply to the narrowed putative class.

[101] Specifically, the standard error for the total harm estimate has not yet been updated. First Revised McFadden Supplemental Report, Figure 1; Second Revised McFadden Supplemental Report, Figure 1.

[102] McFadden Supplemental Report, ¶ 6 ("In addressing these issues, Counsel for Consumer Plaintiffs asked me to use the most up-to-date App Store transactions data Apple has produced.").

[103] Deposition of Daniel McFadden, February 17, 2023 ("Fourth McFadden Deposition"), 10:4–21.

[104] Specifically, Professor McFadden uses three different sets of genre classifications in creating three different datasets. When he built a dataset consisting of all Games, Music, and Entertainment apps for his final harm calculations, Professor McFadden correctly used the most recent genre classification. For the 75 samples that Professor McFadden used to estimate his coefficients, he incorrectly used the genre classification in the oldest Apple production each app appears in. For the single sample he used for his price tier analysis, he only used the most recent classification for apps that were present in the first of three data productions; apps that were present in the second and third data productions, but not the first, he classified according to the second data production.

SER-777

52. Ultimately, ███ apps that, in at least one of the three productions, were labeled as Games, Music, or Entertainment, changed genre classifications across the various Apple productions. Exhibit 2 contains more information about the extent of this issue.

---

***EXHIBIT 2***

***Summary of Genre Inconsistencies in McFadden Supplemental Report***



Source: McFadden Production

Note:

[1] The columns "Number of Apps" and "Total Revenue" consider Apple's full transactions data in scope.

[2] App genre is determined according to the genre value assigned to the app's download.

---

53. As Exhibit 2 shows, this issue is very rare, as it affects a little over ███ percent of apps ever classified as Games, Music, or Entertainment. But while a change in genre for ███ apps out of 545 thousand may seem minor, because of the manner in which Professor McFadden has constructed his model, this small change had noticeable effects on which accounts Professor McFadden classified as harmed. Exhibit 3 summarizes how many accounts switched from "harmed" to "unharmed," or vice-versa, from the McFadden Supplemental Report to the Second Revised McFadden Supplemental Report. Professor McFadden sought to downplay the effect of the genre classification mistake.[105] However, as shown, more than one million accounts changed their harm status because of this issue. In other words, a relatively small change in genre classification had a substantial impact on McFadden's harm estimates.

---

[105] Fourth McFadden Deposition, 83: 5–10 ("Q. The genre classification corrections that you made after your initial supplemental report affected the percentage of accounts that your model predicts are unharmed. Is that correct? A. Yes. Not very much, but yes.").

*EXHIBIT 3*
*Effect of Genre Inconsistency Correction on Which Accounts Are Classified as Harmed*

| Status when using regression coefficients from the Supplemental Report | | Status when using regression coefficients from the Second Revised Supplemental Report | Number of accounts with status change | |
|---|---|---|---|---|
| "Harmed" | → | "Unharmed" | ▉ | ▉ |
| "Unharmed" | → | "Harmed" | ▌ | ▉ |

Source: McFadden Production

Note: These results apply Professor McFadden's methods exactly, except using two different sets of regression coefficients. The first set of regression coefficients comes from the McFadden Supplemental Report, while the second comes from Second Revised McFadden Supplemental Report.

54. These results highlight the instability of Professor McFadden's model, which I have criticized previously and Professor Watson addresses in his report.[106] If an apparently small data processing issue, "relatively uncommon" as Professor McFadden described it,[107] can lead to so many accounts changing from harmed to unharmed, or vice-versa, then the model cannot be said to reliably determine whether a given account is harmed. Furthermore, the changes in genre status happened among three productions of the App Store transaction data (between June 2, 2021 and July 11, 2022). There is no guarantee that such classifications will not change again, in which case one would expect some number of accounts to change from harmed to unharmed, or vice-versa.[108]

55. Professor McFadden also failed in his first Supplemental Report to calculate standard errors as described in the text. While he claimed that his standard errors relied on 11,250 calculations, his presented figures only involved 300 such calculations.[109] This error impacts the margins of error associated with his estimates. In turn, this affected his estimated precision of damage calculations, in particular those corresponding to Music &

---

[106] Prince Initial Report, ¶ 32. In its Class Certification Order, the Court declared that "without revised analysis and clarity, the Court does not find Professor McFadden's pricing model to be reliable as a means for determining antitrust injury or damages." See Class Certification Order, p. 9. See also Watson Report, Section 4–5.

[107] Fourth McFadden Deposition, 54:6–15 ("Q. Do you have any understanding as to whether it is a frequent or infrequent occurrence for a developer to change the primary category designation of their app? A. I haven't specifically studied that question, but the reclassification between the first, second, and third productions of data from Apple indicates that it's relatively uncommon.").

[108] Fourth McFadden Deposition, 58:11–15 ("Q. Can changes to the genres of apps in your samples affect your estimated price coefficients? A. It can. Q. Can it affect your total harm estimates? A. Somewhat.").

[109] In statistical terms, Professor McFadden claimed that he was using 150 bootstrap iterations for each of his 75 samples, whereas in practice he used only four bootstrap iterations. See Fourth McFadden Deposition, 61:12–20 ("Q. And you had indicated in your report that the bootstrap procedure that you were intending to follow involved drawing 150 sets of bootstrap samples. Is that right? A. That's correct. Q. And was the impact of the error, the coding error, that your computer implementation actually only ran four out of 150 bootstrap samples? A. In at least some cases, yes.").

Entertainment transactions. The result is that McFadden's estimates are far less precise than originally reported, demonstrating the over-sensitivity and instability of his model.[110]

56. Beyond the model's instability, these and the preceding errors in Professor McFadden's Initial Report also cast doubt on the rigor and reliability of his analysis. Exhibit 4 illustrates how the percent of unharmed accounts, as calculated by Professor McFadden, has evolved across each of his reports. After correcting the errors I uncovered in his Initial Report, the percentage of unharmed accounts predicted by his model more than doubled, increasing from 5.8 percent of accounts to 14.6 percent.[111] In his Supplemental Report, even before addressing the various data and coding errors, he found an even higher percentage of unharmed accounts, accounting for 17.2 percent of the total.[112] His attempts at fixing a number of the errors in his Supplemental Report increased the number of unharmed accounts by over one million to 17.8 percent.[113] In his price tier analysis, which I will address in section 5.2, he finds up to 20 percent of unharmed accounts.[114] These repeated errors raise serious questions about the ability of Professor McFadden's analysis to yield any reliable conclusions.

---

[110] Professor McFadden's various error corrections increased the standard error of the damages associated with Music & Entertainment transactions by more than ▌ times, increasing from ▬▬▬▬ to ▬▬▬▬. See McFadden Supplemental Report, ¶ 16, Figure 1; Second Revised McFadden Supplemental Report, ¶ 16, Figure 1. See also Fourth McFadden Deposition, 75:16–76:13 ("Q. Professor, is it correct to say that the price sensitivity estimate for music and entertainment in-app purchases in your first revised supplemental report is more uncertain than the estimate in your initial supplemental report? A. It's correct to say that the standard -- sorry. Go back for one minute. You're referring to the IAP coefficient for music and entertainment -- Q. Yes. A. -- is that correct? It's correct to say that the standard error is larger in the December report, carried also into the January report. And I would say in terms of explanation, that the standard error in the September report was affected by the coding error, as well as the genre reclassification. Q. And so the coding error you believe contributed to the standard error being smaller in the September report than it is in the December or January reports? A. I  elieve that's the case, yes.").

[111] Class Certification Order, p.8:1-6.

[112] McFadden Supplemental Report, ¶ 16, Figure 1.

[113] Second Revised McFadden Supplemental Report, ¶ 16, Figure 1.

[114] Second Revised McFadden Supplemental Report, ¶ 96, Figure 7.

**EXHIBIT 4**
*The Percent of Unharmed Accounts has Steadily Increased Across Each of Professor McFadden's Reports*



Professor McFadden's Reports

Source: McFadden Reports
Note: Each bar represents the percentage of unharmed accounts in one of Professor McFadden's reports.

57. In summary, Professor McFadden's analysis has had multiple errors and data issues. The Court acknowledged the "data errors" contained in Professor McFadden's Initial Report,[115] further errors have led him to issue two revisions to his supplemental report, and errors persist in his produced code. For example, Professor McFadden's code sometimes generates incorrect but-for download prices for apps with paid downloads and in-app purchases.[116] Indeed, as he testified, there were "errors and glitches" committed by his team, due to "some deep mechanical or human error" such that, to this date, they do not know why their results were not reproducible.[117] Furthermore, even after correcting the damages number, Professor

---

[115] Class Certification Order, p. 8.

[116] Professor McFadden relies on a numerical optimizer to determine the but-for prices of apps with both paid downloads and in-app purchases. However, optimizers can sometimes find the "wrong" answer, for example by finding a local optimum in the "wrong" area, or by failing to run for enough iterations to converge closely to the numerical optimum. In this instance, Professor McFadden's optimization technique sometimes yields answers that are wrong for the paid download prices of apps with both paid downloads and in-app purchases. As an example, I found that his approach can generate prices that are as much as $3.05 less than the true but-for price, implying a percentage price decrease in the but-for world that is 30.5 percentage points larger than the true price decrease. See Workpaper 5.

[117] Fourth McFadden Deposition, 14:14–15:9 ("Q. Okay. If you flip to the second printed page of the exhibit, at the very top there Ms. Byrd says: 'These updates have nothing to do with Professor McFadden's model or methodology but were made due to errors and glitches in the computational implementation of his methodology.' Do you have an understanding of what the nature of those errors and glitches was or is? A. Well, I think the problem in the December 30th numbers, which was corrected in the January 19th numbers, appears to be some deep mechanical or human error in putting in the wrong input

**SER-781**

McFadden failed to update his results for the standard errors of his damage calculations in the second revision of the Supplemental Report, reporting identical values in the first and second revisions. He incorrectly claimed to have verified the standard errors,[118] yet I found a difference of over ██████ between the standard errors of Music & Entertainment transactions damages.[119]

## 3. SUMMARY OF OPINIONS

58. After reviewing Professor McFadden's Supplemental Reports and other relevant materials, my opinions regarding Professor McFadden's proposed methodology remain unchanged. This is unsurprising, given how little his model changed in response to the Court's concerns. Specifically, Professor McFadden's proposed methodology remains incapable of (a) proving with common evidence that all or nearly all members of the proposed consumer class have been harmed, (b) determining which members of the proposed consumer class have been harmed, and (c) calculating their damages in any reliable manner. Even setting these issues aside, Professor McFadden's own calculations show that a substantial number, at least 31.5 million, or 17.8 percent of App Store accounts are unharmed, contradicting his claim that nearly all members of the proposed consumer class are harmed.[120] Even with the $10 cutoff Professor McFadden imposes, he estimates 10.3 million, or 7.9 percent, accounts are unharmed.[121] My overall opinion is supported by five more specific opinions below.

59. **Opinion 1.** Professor McFadden's approach to inferring marginal costs, which play a key role in determining harm, yields marginal costs that are unrealistic in two respects. First, Professor McFadden's modeling assumptions both imply and impose that developers' prices and their marginal costs are formulaically related in a manner that is inaccurate. In his model, all apps with the same genre and App Store business model with prices above a specific threshold will necessarily have a positive marginal cost, and therefore all such apps will

---

file, not the one that was supposed to be put in, or taking off the wrong output file. And I don't think to this date Brattle knows why the December 30th numbers were not reproducible by Apple. But I think the understanding I have from the accounting staff is that Apple experts had this right and it was our mistake.").

[118] Fourth McFadden Deposition, 63:4–17 ("Q. And did you report the exact same standard errors in both in Figure 1 for both of these revised reports? A. The answer is that these are differently the same numbers from one another, and I believe there was no change to this level of significant digits between the December 30th and the January 19th calculation. Q. Okay. So you verified that the standard errors in the January revised report were correct and identical to the prior standard errors? A. I believe – my understanding is that the calculations in the January 19th report incorporate all of the coding corrections and rerun – rerun that was required for that, and they were correct.").

[119] Professor McFadden reports a standard error of ██████ for Music & Entertainment damages in both revisions of the Supplemental Report, while I find a standard error of ██████. See Workpaper 6; First Revised McFadden Supplemental Report, ¶ 16, Figure 1; Second Revised McFadden Supplemental Report, ¶ 16, Figure 1.

[120] This represents the baseline without the $10 cut-off. See Second Revised McFadden Supplemental Report ¶ 79, Figure 6; Second Revised McFadden Supplemental Report Backup, Figure 6.

[121] See Second Revised McFadden Supplemental Report Figure ¶ 79, Figure 6; Second Revised McFadden Supplemental Report Backup, Figure 6.

become less expensive in the but-for world and result in harm. His assumptions do not allow for any high-priced apps to have zero or negative marginal costs, and therefore, the only apps he infers to have zero or negative marginal costs are those with prices below his "threshold." The implications of his modeling assumptions are crucial to his calculation of harm yet lack any grounding in real world evidence. Second, Professor McFadden's inferred marginal costs are higher than industry evidence suggests because his margin constraints require them to be high, by assumption. For apps where marginal costs are smaller in reality than Professor McFadden infers they are—which industry evidence, including that discussed by Professor Hitt, suggests is common—Professor McFadden will substantially overestimate damages associated with that app.[122] These problems are exacerbated by Professor McFadden's focus on composite in-app purchase prices, which tend to be higher, on average, than the actual transaction prices for in-app purchases and are therefore more likely to produce a positive marginal cost than the individual item prices.

60. **Opinion 2.** Professor McFadden's small modifications to his method, purportedly to address four of the Court's concerns, fail to do so.

61. *First*, Professor McFadden's revised method to calculate harm from in-app purchase transactions continues to overstate harm and understate the number of unharmed accounts. Professor McFadden has repeatedly shifted his position regarding whether all the prices for in-app purchases for an app should change in the but-for world by the same dollar amount ("dollar method") or by the same percentage amount ("percentage method"). I previously demonstrated that his proposed "dollar method" led to absurd results,[123] and he claimed that the "percentage method" was a more "sensible method."[124] The Court then asked Professor McFadden to provide "revised analysis and clarity" regarding his approach.[125] In this round, he claims he can use his "percentage method" to determine harm associated with each account's specific in-app purchases. However, at the same time, he disclaims his model's ability to predict *any* but-for prices for individual in-app items, meaning he cannot offer but-for prices for ███ percent of spending on the App Store.[126] There is inherent contradiction in his position—he claims that he can calculate harm for in-app purchases while at the same time have no measure of their prices in the but-for world. Yet, this is the position from which he implements his method, which artificially replaces individual item prices that tend to be low and likely to rise in the but-for world according to his model with aggregate prices that

---

[122] Hitt Second Report, Section 8.1.1.

[123] Prince Initial Report, Section 6.4.

[124] Second McFadden Deposition, 106:6–19.

[125] Class Certification Order, p. 9.

[126] See Workpaper 7.

tend to be higher and likely to fall in the but-for world according to his model. As a result, he overestimates harm.

62. *Second*, despite offering new analyses, Professor McFadden still fails to consistently account for Apple's price tiers and focal-point pricing. He claims that his "price tier simulation" accounts for Apple's price tiers, but it does not even predict but-for prices that are consistent with Apple's price tiers. Limiting but-for prices to Apple's price tiers in his simulation decreases harm by 28.2 percent and more than doubles the number of unharmed accounts.[127] Even if Professor McFadden's price tier simulation were correct, which it is not, his model contradicts his claim that he believes Apple's price tiers affect developers' pricing in the as-is world. If his claim were correct, and Apple's price tiers do effectively constrain developers' pricing in the as-is world, his model could offer only wide bounds on which accounts are harmed and the total harm. Any specific estimate within these bounds would be speculative, as his model could not rule out increases or decreases of up to nearly 50 percent. On the other hand, Professor McFadden has sometimes taken the position that developers would have voluntarily set prices at focal points even in the absence of price tiers, but he fails to offer any analysis of focal-point pricing, or a model that could give rise to focal-point pricing.

63. *Third*, Professor McFadden purports to address the Court's concern regarding the "switcher issue" by obtaining estimates of consumer demand using 75 different 0.1 percent samples and applying the average of those estimates to determine harm. However, the use of 75 samples is a red herring and does nothing to address his model's fundamental flaws. Despite his use of 75 samples, his model continues to predict that many accounts are unharmed, undermining his claim that all or nearly all putative class members are harmed due to Apple's challenged conduct. The fraction of unharmed accounts predicted by Professor McFadden's model has grown through his various reports as he has corrected various errors and made data updates. It even fluctuates due to small changes in assumptions. Because of this, there is the potential for multibillion-dollar changes to Professor McFadden's estimated damages. For example, when alternative, more reasonable, assumptions are applied to his model, the number of unharmed accounts increases substantially (up to 44.8 percent[128]). These swings in unharmed accounts due to Professor McFadden's errors and assumptions mean that he cannot determine how many and which accounts are harmed in a reliable and common manner. Professor McFadden's use of 75 samples does not change that.

---

[127] Exhibit 15.

[128] Exhibit 19.

**SER-784**

64. *Fourth*, to decrease the number (or percentage) of unharmed accounts, Professor McFadden states that he has removed from his analysis all accounts for which spending was less than $10. His $10 cutoff reduces the percentage of accounts that he estimates to be unharmed, in part because his model's assumptions imply that the lowest priced transactions are the ones associated with no harm. But the cutoff is arbitrary, economically baseless, and incorrectly implemented. In particular, he removes unharmed accounts with less than $10 of spending in the Games, Music and Entertainment genres, even if they have more than $10 of spending across all genres. This removes the accounts of putative class members—including one of the named plaintiffs, Mr. Hayter—and overstates the extent to which the cut-off removes unharmed accounts. Fixing this particular implementation problem, and ignoring all other issues with Professor McFadden's analysis, means that instead of 7.9 percent of surviving accounts (or 10.3 million accounts) being unharmed as Professor McFadden claims, 12.4 percent (or 18.5 million accounts) are.[129]

65. **Opinion 3.** I have tested Professor McFadden's model by comparing several of its predictions to real-world outcomes, and find that it fails to produce realistic predictions, rendering it incapable of reliably predicting but-for prices and determining harm. First, his methodology predicts that developers' pricing would respond strongly to a change in commission rates when empirical evidence indicates otherwise. Second, his model predicts unrealistic variation in marginal costs for an app over time. Additionally, he oversimplifies the marketplace, assuming that developers set prices like monopolists, ignore other channels of distribution for apps, face uniform demand conditions across different apps, and do not consider free apps when making pricing decisions.

66. **Opinion 4.** Because an account is harmed only if it is harmed on net across all of its transactions, Professor McFadden cannot determine whether any account is harmed until he analyzes all genres. Yet, Professor McFadden has not, to date, modeled any genres outside Games, Music, and Entertainment. He further acknowledges that applying his model to genres outside Games, Music, and Entertainment would not be "mechanical," and I have previously shown that a straightforward attempt to apply his methods to the Sports genre fails.[130] Applying his model to each other genre would require significant additional analyses that he has not yet done but may fundamentally change his conclusions regarding total and individual harm. For example, because the margin constraints Professor McFadden uses are based on cost data from developers specific to a genre, modeling other genres would require identifying developers, analyzing their cost data, and calculating margin constraints *for each*

---

[129] See Exhibit 20; Workpaper 23.

[130] Prince Initial Report, ¶¶ 120–122.

*genre*. As Professor McFadden has admitted, there is no formula or prescription as to how to calculate these constraints, and thus are reliant on his subjective judgment.

## 4. PROFESSOR MCFADDEN'S MODEL CANNOT RELIABLY ESTIMATE MARGINAL COSTS AND, IN TURN, HARM

67.  As discussed in Section 2.2, marginal costs are crucial to Professor McFadden's methods because they determine whether there is an overcharge. In particular, in his model, apps with positive marginal costs are predicted to be cheaper in the but-for world, apps with negative marginal costs are predicted to be more expensive in the but-for world, and apps with zero marginal costs would not change their prices in the but-for world.[131] This is true not only in Professor McFadden's model, but in many tax incidence models like his; an increase in an ad valorem tax typically yields an increase in consumer prices only if the marginal cost of production is positive.[132] Even taking as given the tax incidence framework, however, it is important to correctly and reliably estimate the marginal costs, which Professor McFadden has not done here.[133] In this section, I first show that Professor McFadden's inferred marginal costs are higher than what would be expected for this industry. I then discuss the two assumptions made by Professor McFadden that are unsupported, unrealistic, and tend to inflate estimates of marginal costs and therefore harm.

---

[131] This is a direct result of Professor McFadden's modeling assumptions. The change in price for a paid download app between the but-for and real worlds can be written as $p_{jt}^{d\,BF} - p_{jt}^{d\,RW} = \frac{c_{jt}^d}{1-\tau^{BF}} - \frac{c_{jt}^d}{1-\tau^{RW}}$, which will be positive for $\tau^{BF} < \tau^{RW}$ whenever $c_{jt}^d < 0$. See McFadden Initial Report, Appendix E, ¶¶ 36, 41.

[132] See Hans Jarle Kind and Marko Köthenbuerger, "Taxation in Digital Media Markets," *Journal of Public Economic Theory*, 20(1), 2018, pp. 22–39 at p. 25 ("The fact that [value-added taxes] at the outset affect equilibrium prices only for goods with positive marginal costs is apparently often overlooked in public debates.").

[133] The academic tax incidence literature highlights the importance of taking marketplace realities into account. The empirical literature, for example, finds that tax incidence depends on the amount of competition firms face. See Christos Genakos and Mario Pagliero, "Competition and Pass-Through: Evidence from Isolated Markets," *American Economic Journal: Applied Economics*, 14(4), 2022, pp. 35–57 at p. 35 ("We find that pass-through increases from 0.4 in monopoly markets to 1 in markets with four or more competitors and remains constant thereafter. The speed of price adjustment is about 60 percent higher in more competitive markets."). The theoretical tax incidence literature uses different models depending on the economic environment. See Don Fullerton and Gilbert E. Metcalf, "Tax Incidence," in *Handbook of Public Economics*, ed A. J. Auerbach and M. Feldstein (Amsterdam: Elsevier Science B.V., 2002), pp. 1787–1872. Additionally, the literature cautions that one must be careful in choosing a functional form for demand functions in policy analysis. See Nicholas Stern, "The Effects of Taxation, Price Control and Government Contracts in Oligopoly and Monopolistic Competition," *Journal of Public Economics*, 32(2), 1987, pp. 133–158 at p. 154 ("The dependence of these [tax incidence] results, and those concerning dual pricing, on the elasticity of the elasticity indicates that one must be careful in choosing functional form for demand functions in policy analysis.").

### *4.1. Professor McFadden's Model Generates Unverified Marginal Costs That Are Higher Than Industry Evidence Suggests*

68. Professor Hitt presents evidence that shows many apps have zero or close to zero marginal costs.[134] As discussed in my Initial Report and Professor Hitt's report, the economic literature also supports the view that digital goods have very low—or even zero—marginal costs.[135]

69. An example of small or zero marginal costs is virtual currency, which is in-app content available on many apps. Users can purchase virtual currency and then exchange it for additional content within an app. For example, users purchase digital content such as skins and outfits for their characters using the virtual currency V-Bucks on Fortnite, a game offered by Epic Games. While app developers may incur fixed costs to develop the digital content on which users spend virtual currency, there likely are no or minimal costs for app developers to allow additional users to access that content, or to increase the quantity of virtual currency they sell.[136] Indeed, during the *Epic Games v. Apple* trial, Epic's CEO testified that V-bucks have no marginal cost.[137]

70. Despite this evidence, Professor McFadden does nothing to systematically account for this feature of the marketplace. Instead, he has built a model that treats marginal cost as a continuous variable, which means that mathematically, his model simply cannot generate a marginal cost that is exactly zero.[138] Economists often use models that can accommodate prediction of discrete values like zero when such values are of particular economic significance.[139] Zero marginal costs are economically important here: as discussed above, apps with a zero marginal cost will not change their prices in response to a change in Apple's

---

[134] Hitt Second Report, Section 8.1.1.

[135] Prince Initial Report, ¶ 83; Hitt Second Report, Section 8.1.1. See also footnote 65 above.

[136] See Lambrecht et al. 2014 and Goldfarb and Tucker 2019.Because payment processing infrastructure exhibits economies of scale, the marginal cost of payment processing for each transaction is small. See "Paying Up: The New Economics of Payment Systems," *Oxera*, June 30, 2020, available at https://www.oxera.com/insights/agenda/articles/paying-up-the-new-economics-of-payment-systems/, accessed March 9, 2023. ("Retail payments have long been characterized by the following three economic features … economies of scale—which mean that it can be more efficient to operate a platform with a large number of users."); Risto Gogoski, "Payment Systems in Economy – Present End Future Tendencies," *Procedia – Social and Behavioral Sciences* 44, 2012, pp. 436–445 at p. 438 ("The payment industry also exhibits considerable economies of scale."). Furthermore, under the App Store's model, payment processing is handled as part of Apple's commission, not incurred by developers as an additional cost.

[137] Sweeney Testimony, 190:12–16 ("Q. What does it cost to Epic to generate a V-Buck, minting a V-Buck? A. There is no cost to a V-Buck. There's cost in developing the software, but the V-Bucks themselves don't have a marginal cost.").

[138] Donna L. Mohr et al., "Probability and Sampling Distributions," in *Statistical Methods*, Fourth Edition, ed. Donna L. Mohr, William J. Wilson, and Rudolf J. Freund (Cambridge: Academic Press, 2022), pp. 65–122. . ("Since the area under any curve corresponding to a single point is (for practical purposes) zero, the probability of obtaining exactly a specific value is zero.")

[139] For examples see: Takeshi Amemiya, "Tobit models: A survey," *Journal of Econometrics*, 24(1-2), 1984, pp. 3–61. Christopher T. Conlon and Nirupama L. Rao, "Discrete Prices and the Incidence and Efficiency of Excise Taxes," *American Economic Journal: Economic Policy*, 12(4), 2020, pp. 111–143. er Strulov-Shlain, "More than a Penny's Worth: Left-Digit Bias and Firm Pricing," Chicago Booth Research Paper, 2021, pp. 19–22

commission. Yet Professor McFadden's model, by construction, rules out the possibility that apps have zero marginal costs and will not change their prices in the but-for world. Professor McFadden also makes other assumptions (which I discuss in Sections 4.2 and 4.3) that tend to overestimate marginal costs. As a result, not only is Professor McFadden's model incapable of generating zero marginal costs, it generates very few instances where marginal costs are close to zero.

71. Exhibit 5 displays the distribution of marginal costs estimated by Professor McFadden for all Games, Music, and Entertainment apps. Professor McFadden finds that more than 86 percent of transactions are for apps with marginal costs larger than $0, while the rest, about 14 percent, had negative marginal costs. Over 70 percent have marginal costs greater than $5, and almost 7 percent have marginal costs greater than $20. Meanwhile, for no apps does the model yield precisely zero marginal cost, and only 1.4 percent of transactions were for apps with marginal costs within ten cents of zero.[140]

---

*EXHIBIT 5*
*Percentage of Transactions by Marginal Costs for Paid Downloads and In-App Purchases: Games, Music, and Entertainment*

| Marginal Cost | Percentage of Transactions |
|---|---|
| Less than -$2.00 | 1.43% |
| Between -$2.00 and -$1.00 | 5.26% |
| Between -$1.00 and -$0.10 | 5.81% |
| Between -$0.10 and $0.00 | 1.13% |
| 0 | 0.00% |
| Between $0.00 and $0.10 | 0.30% |
| Between $0.10 and $1.00 | 2.57% |
| Between $1.00 and $2.00 | 5.94% |
| Between $2.00 and $5.00 | 7.17% |
| Between $5.00 and $10.00 | 26.78% |
| Between $10.00 and $20.00 | 36.63% |
| Greater than $20.00 | 6.97% |

Source: McFadden Production
Note: Table shows the percentage of transactions for which Professor McFadden estimates marginal costs in the indicated bin. Intervals are inclusive on the boundary that is further from zero, and inclusive on the boundary that is closer to zero. For example, "between -$2.00 and -$1.00" means greater than or equal to -$2.00, and (strictly) less than -$1.00, while "between $5.00 and $10.00" means "(strictly) greater than $5.00 and less than or equal to $10.00."

---

[140] Even if one rounds to the nearest cent, only 0.02 percent of transactions involve apps for which the model yields a marginal cost between negative one-half cent and positive one-half cent. See Exhibit 5 backup.

72. Professor McFadden's estimated marginal costs also can be higher than the $20.00 indicated in the previous exhibit, sometimes dramatically so. For example, he estimates that the marginal costs of Final Fantasy XV: A New Empire's in-app content ranged between $55.70 to $63.88 in 2019.[141] Further, contrary to Epic's CEO's testimony that Fortnite's V-bucks have no marginal cost for Epic Games,[142] Professor McFadden estimates that Fortnite's in-app content would have a marginal cost of up to $24.76 in 2018.[143] This represents a profit margin of only 38.1 percent. Professor McFadden has provided neither the theoretical justification nor the empirical evidence that marginal costs for in-app content should reach such high levels.

73. While not the primary focus of this section, I also observe that the negative marginal costs his model finds—which he characterizes as "mostly low price apps and in-app purchases"[144] and almost 96 percent of transactions for such apps occurred at $4.99 or less[145]—are difficult to square with reality. Professor McFadden does not interpret them literally as it costing developers less to deliver their apps to more users, or to deliver more sales of in-app content to their users, but instead has consistently attributed them to "other revenue sources such as advertising."[146] If Professor McFadden finds "other revenue sources such as advertising" sufficiently important in this industry that they apply to over 13 percent of transactions, then he should have studied these alternative monetization methods, modeled

---

[141] See Workpaper 8.

[142] Sweeney Testimony, 190:12–16 ("Q. What does it cost to Epic to generate a V-Buck, minting a V-Buck? A. There is no cost to a V-Buck. There's cost in developing the software, but the V-Bucks themselves don't have a marginal cost.").

[143] See Workpaper 8.

[144] McFadden Initial Report, ¶ 240.

[145] See Workpaper 2. Transactions at prices less than or equal to $4.99 accounted for almost 76 percent of revenue coming from transactions with negative marginal costs.

[146] McFadden Initial Report, footnote 245 ("I understand that some app developers have other revenues sources such as advertising. In the absence of detailed revenue data for app developers, [marginal costs] may capture part of the additional revenues as a negative component."), ¶ 225 ("If an app developer selling a Free Download IAP app relies on other revenue sources such as advertising, because it cannot break even at the 30 percent commission, this app developer may increase its IAP price at a lower commission rate. In my model, such cases would be identified by zero or negative cost estimates."), ¶ 240 ("I note that there are a relatively small number of apps for which either download or IAP prices are estimated to increase somewhat in the But-For world. These are mostly low price apps and in-app purchases. This is because the As-Is price they charge is "too low" for the estimated price elasticities, meaning that they could have made more money by charging higher prices but they did not. This could happen if they have other revenue sources such as advertising. In such cases, their variable cost estimates would be negative as they include the omitted revenues."). See also First McFadden Deposition, 243:16–244:5 ("And this -- these estimates have the property that those marginal cost estimates can -- can be zero or negative. That is, there's nothing in the -- in the model which constrains those -- from taking on values in that range. And when that's the case, a -- a consumer -- a firm that has zero marginal cost will -- will not pass -- pass on any cost -- any reduction in the commission to consumers. And if they have a negative marginal cost, presumably they have other -- other sources of revenue in that case. Then they may actually respond to the reduced commission by increasing their price. That's -- that's an implication of the model and that's -- that's allowed in my analysis."); Third McFadden Deposition, 156:9–16 ("Q. Now, is -- is c what you're referring to when you speak in your report about the developer's marginal cost? A. Yes. It's -- it's the net incremental cost of delivery one unit, making note of both the direct cost of -- whether we -- we're required to service that to unit and netting indirect revenue as unmeasured from other sources."); Fourth McFadden Deposition, 72:14–20 ("Q. You agree that there is marginal impact on advertising revenue that is evidenced by the negative marginal cost estimates that you come up with, wouldn't you? A. The model allows for the possibility that marginal costs, net of advertising revenue offsets, can be negative.").

them, and analyzed how they affect developers' decisions.[147] He did not even empirically verify whether the apps his model assigns negative marginal costs do, in fact, have other sources of revenue. Instead, he simply assumes—without evidence—that his simplified model is capable of capturing the incentives they create. Notwithstanding his model's ability to generate negative marginal costs, his model is designed such that it cannot generate zero marginal costs, and as I explain in section 4.2, will generate higher marginal costs for higher-priced items, by construction. This means that his model will tend to overestimate marginal costs and the extent to which developers will lower their prices in the but-for world.

74. In the following sub-sections, I discuss the specific assumptions Professor McFadden makes that lead him to overestimate marginal costs, and ultimately, harm.

### *4.2. Professor McFadden Assumes a Flawed Relationship Between Prices and Marginal Costs*

75. As discussed in Section 2, in Professor McFadden's model, higher priced apps *always* have higher marginal costs than lower priced apps, so long as they face the same commission rate. That is because, among apps in a given genre with a given App Store business model, price and marginal cost are inextricably linked through his model's assumptions.  But while it is true that high marginal costs necessarily imply high prices because otherwise developers would lose money on each transaction, the reverse need not be the case. As I show below, apps with *low* marginal costs might charge *high* prices if demand is sufficiently strong and inelastic. Because Professor McFadden's model by assumption forbids this possibility—that high prices could also be associated with low or even zero marginal costs—it tends to overestimate marginal costs on average.

76. Professor McFadden's assumption that high prices necessarily imply high marginal costs is not always borne out in actual data. For example, consider two free-to-download Games apps with in-app purchases, Dino Hunter: Deadly Shores and Sheep Up, with similar average commission rates over 29 percent.[148] Exhibit 6 shows Professor McFadden's composite in-app purchase prices for these apps, as well as the marginal costs that would be obtained by applying Professor McFadden's methods to their developers' accounting data.[149] Note that by conducting this exercise, I am not endorsing Professor McFadden's use of accounting data to determine marginal costs; it is simply to illustrate the limitations of Professor McFadden's methods. As the exhibit shows, Professor McFadden's calculated composite in-app purchase

---

[147] See Exhibit 5.

[148] See backup for Exhibit 6.

[149] Marginal cost is an economic concept not directly observed in accounting data, but I calculate implied marginal costs corresponding to profit margins for these apps. Professor Hitt calculates profit margins for these apps using data from developer productions applying the same method that Professor McFadden used to calculate developer margins for his margin constraints. See Hitt Second Report, Section 8.1.3.2 ("I calculate variable margins from Professor McFadden's model output and the developer accounting data") for detail on these calculations and sample.

price for Dino Hunter: Deadly Shores is higher than the composite in app-purchase price for Sheep Up, but the marginal cost that would be obtained by applying Professor McFadden's methods to the developer's accounting data is lower for ██████████████████. Professor McFadden's model is incapable, by assumption, of predicting this pattern and so is disconnected from market realities.

**EXHIBIT 6**

*Marginal Costs Obtained from Professor McFadden's Model are Inconsistent with Marginal Costs in Accounting Data*



| App | Composite In-App Purchase Price | Implied Accounting Marginal Cost |
|---|---|---|

Source: McFadden Production: Hitt Second Report Backup, "annual_margin_comparison.xlsx"

Notes:

[1] Dino Hunter: Deadly Shores data is based on 2018.

[2] Sheep Up data is based on 2013.

[3] The (yearly) composite in-app purchase price is the simple, unweighted average of the monthly composite in-app purchase prices based on the full transactions data.

[4] The implied accounting marginal cost is calculated by applying the accounting profit margin that Professor Hitt reports to the (yearly) composite in-app purchase price.

77. Professor Hitt extends this analysis to a broader group of apps for which accounting data is available. He finds that while Professor McFadden's model indeed predicts a one-to-one, decreasing relationship between price and profit margin (i.e., an increasing relationship between price and marginal cost), there is no such relationship suggested by developer accounting data. Instead, higher priced apps may have higher profit margins and vice-versa.[150]

78. Not only are higher prices tied strictly to higher marginal costs in Professor McFadden's model, the link between prices and marginal costs is such that all apps with the same genre and App Store business model with prices above a threshold will have a positive marginal cost, and apps with prices below the threshold will have a negative marginal cost. This is important because, as I discussed in Section 2, apps with a positive marginal cost lower their prices in the but-for world, necessarily implying harm, while apps with a zero or negative marginal cost do not.[151] Therefore, in Professor McFadden's model, apps with as-is prices above one of four thresholds will have a positive marginal cost and will *always* result in

---

[150] Hitt Second Report, Figure 20.

[151] Prince Initial Report, Appendix F.1. Specifically, apps with positive marginal costs whose but-for commission rate is lower in the but-for world (as is true for Professor McFadden's but-for world) become cheaper. Apps with exactly zero marginal costs do not change their prices in the but-for world. *See* Prince Initial Report, Appendix F.2. The relationship between the sign of marginal costs and the sign of damages does not apply to apps that have both paid downloads and in-app purchases.

harm, and which threshold is relevant depends only on the app's genre (but combining Music and Entertainment) and App Store business model.[152]

79. Put another way, Professor McFadden's model determines incidences of harm across ███████ apps using just four numbers;[153] he compares each app-month's as-is price (i.e., each app's as-is price in each month) to one of the four numbers, and this comparison alone determines whether purchases of this app-month at that price generated harm.[154] This pattern is a result of Professor McFadden's assumptions, rather than an empirical fact observed in the data.

80. For example, Exhibit 7 illustrates this pattern using Professor McFadden's estimated model for paid download Games apps without in-app purchases. It demonstrates that his model will assign positive marginal costs to apps with as-is prices above approximately $1.64, and negative marginal costs to apps with prices below that threshold. Because this threshold of approximately $1.64 is not close to any of Apple's price tiers, no app will be close to the threshold, and so it is impossible for Professor McFadden to find a marginal cost close to zero, let alone exactly zero.[155] Furthermore, Professor McFadden's model infers that any paid download-only Game priced at $5.99 or above facing a 30 percent as-is commission has a marginal cost greater than 50 percent of the price—that is a profit margin below 50 percent. For $49.99 apps facing a 30 percent as-is commission, the profit margin drops to 32.3 percent and goes down from there for higher-priced apps. This contrasts with industry evidence that zero marginal costs are common for digital goods in the real world.

---

***EXHIBIT 7***
***Professor McFadden's Model Arbitrarily Assumes that Paid Download-only Apps with Prices Above a Threshold***

---

[152] Because Professor McFadden estimates different consumer price sensitivity parameters for each of Paid Downloads and paid in-app purchases for Games and for Music & Entertainment, there are multiple thresholds in his model. For in-app purchases, the threshold is based on the composite in-app purchase price that Professor McFadden uses in his "percentage method" to predict but-for prices. For the ██ percent of app-months that offer both paid downloads and in-app purchases, whether Professor McFadden predicts that a given transaction would have cost less in the but-for world is more complex than just comparing the as-is price to a threshold. In fact, in these cases, Professor McFadden's percentage method assigns the same percentage harm to every transaction for the app-month—both downloads and in-app purchases—even if, for example, his model infers a negative marginal cost for the download and a positive marginal cost for the in-app purchases. See Workpaper 9; McFadden Supplemental Report, footnote 53.

[153] Workpaper 9. This is the number of paid app-months in Music, Games, and Entertainment, except for those that offered both paid downloads and in-app purchases.

[154] The relationship between the as-is costs and the sign of damages does not apply to apps that have both paid downloads and in-app purchases.

[155] There are zero instances where a Games Paid Downloads has an as-is price of $1.64, and therefore zero instances for which Professor McFadden estimates zero marginal costs. Because Professor McFadden drops app-month where the download price changes within the month, there is no possibility of him analyzing an app-month with an average download price of $1.64. In reality, Professor McFadden's code fails to properly drop such app-months on a few occasions, but nevertheless his code still yields no paid downloads-only Games apps with a marginal cost within 16 cents of zero. See Workpaper 10.

*Have Positive Marginal Costs, while Those with Prices Below the Threshold Have Negative Marginal Costs:*
*Games*

| As-Is Price | Marginal Cost | But-For Price | Overcharge Ratio |
|---|---|---|---|
| $0.99 | -$0.46 | $1.11 | -12.5% |
| **$1.64** | **$0.00** | **$1.64** | **0.0%** |
| $1.99 | $0.24 | $1.92 | 3.3% |
| $2.99 | $0.94 | $2.73 | 8.5% |
| $3.99 | $1.64 | $3.54 | 11.2% |
| $4.99 | $2.34 | $4.36 | 12.7% |
| $5.99 | $3.04 | $5.17 | 13.8% |
| $6.99 | $3.74 | $5.98 | 14.5% |
| $7.99 | $4.44 | $6.79 | 15.1% |
| $8.99 | $5.14 | $7.60 | 15.5% |
| $9.99 | $5.84 | $8.41 | 15.8% |
| $10.99 | $6.54 | $9.22 | 16.1% |
| $11.99 | $7.24 | $10.03 | 16.4% |
| $12.99 | $7.94 | $10.84 | 16.6% |
| $13.99 | $8.64 | $11.65 | 16.7% |
| $14.99 | $9.34 | $12.46 | 16.9% |
| $15.99 | $10.04 | $13.27 | 17.0% |
| $16.99 | $10.74 | $14.08 | 17.1% |
| $17.99 | $11.44 | $14.89 | 17.2% |
| $18.99 | $12.14 | $15.70 | 17.3% |
| $19.99 | $12.84 | $16.51 | 17.4% |
| $24.99 | $16.34 | $20.56 | 17.7% |
| $29.99 | $19.84 | $24.62 | 17.9% |
| $34.99 | $23.34 | $28.67 | 18.1% |
| $39.99 | $26.84 | $32.72 | 18.2% |
| $44.99 | $30.34 | $36.77 | 18.3% |
| $49.99 | $33.84 | $40.83 | 18.3% |

Source: McFadden Production

Note:

[1] As-is prices taken from Apple's price tier schedule.

[2] Marginal costs and but-for prices for a given as-is price are estimated and predicted by using Professor McFadden's model. I assume a 30 percent as-is commission rate, I apply Professor McFadden's but-for commission rate of 13.63 percent, and I use the mean of Professor McFadden's 75 sample estimates produced on January 19, 2023.

[2] At an as-is price of approximately $1.64, Professor McFadden's model predicts a marginal cost of zero for a Games paid download.

[3] The overcharge ratio is calculated as 1 – (but-for price / actual price).

81. Exhibit 8 illustrates this pattern using Professor McFadden's estimated model for free-to-download Games apps with in-app purchases, a set of apps that account for 90.2 percent of damages in Professor McFadden's model.[156] It demonstrates that any app with a composite

---

[156] See Workpaper 7.

in-app purchase price over approximately \$4.64 will have positive marginal costs and associated harm.[157] Even though only ▮ percent of actual Games in-app purchases are for *items* priced above \$4.64, approximately ▮ percent of Games in-app purchases are for app-months with Professor McFadden's *composite* prices over approximately \$4.64.[158] In other words, Professor McFadden has built a model that associates only high prices with harm, and even though most transactions are for low-priced items, Professor McFadden's model *guarantees* large amounts of total harm and few unharmed consumers by replacing individual item prices with composite in-app purchase prices.

82. Meanwhile, only apps with a composite in-app purchase price of approximately \$4.64 will have a zero marginal cost. Because Professor McFadden takes simple, unweighted averages of in-app purchase prices (that end in 99 cents) to arrive at his composite price, he would be extremely unlikely to find a composite price that is near \$4.64. And as discussed above, because his model estimates marginal costs as a continuous variable, he will *never* find a marginal cost that is exactly zero.

---

[157] There are zero instances where a Games composite in-app purchase has an as-is price exactly equal to the threshold, and therefore zero instances where Professor McFadden estimates zero marginal costs. See Workpaper 11.

[158] See Workpaper 12.

*EXHIBIT 8*

*Professor McFadden's Model Arbitrarily Assumes that Free-to-Download Apps with Composite In-App Purchase Prices Above a Threshold Have Positive Marginal Costs, while Those with Prices Below the Threshold Have Negative Marginal Costs: Games*

| As-Is Composite In-App Purchase Price | Marginal Cost | But-For Composite In-App Purchase Price | Overcharge Ratio |
|---|---|---|---|
| $0.99 | -$2.56 | $1.68 | -69.9% |
| $1.99 | -$1.86 | $2.49 | -25.3% |
| $2.99 | -$1.16 | $3.30 | -10.5% |
| $3.99 | -$0.46 | $4.11 | -3.1% |
| **$4.64** | **$0.00** | **$4.64** | **0.0%** |
| $4.99 | $0.24 | $4.92 | 1.3% |
| $5.99 | $0.94 | $5.73 | 4.3% |
| $6.99 | $1.64 | $6.54 | 6.4% |
| $7.99 | $2.34 | $7.36 | 7.9% |
| $8.99 | $3.04 | $8.17 | 9.2% |
| $9.99 | $3.74 | $8.98 | 10.1% |
| $10.99 | $4.44 | $9.79 | 10.9% |
| $11.99 | $5.14 | $10.60 | 11.6% |
| $12.99 | $5.84 | $11.41 | 12.2% |
| $13.99 | $6.54 | $12.22 | 12.7% |
| $14.99 | $7.24 | $13.03 | 13.1% |
| $15.99 | $7.94 | $13.84 | 13.5% |
| $16.99 | $8.64 | $14.65 | 13.8% |
| $17.99 | $9.34 | $15.46 | 14.1% |
| $18.99 | $10.04 | $16.27 | 14.3% |
| $19.99 | $10.74 | $17.08 | 14.6% |
| $24.99 | $14.24 | $21.13 | 15.4% |
| $29.99 | $17.74 | $25.19 | 16.0% |
| $34.99 | $21.24 | $29.24 | 16.4% |
| $39.99 | $24.74 | $33.29 | 16.8% |
| $44.99 | $28.24 | $37.34 | 17.0% |
| $49.99 | $31.74 | $41.40 | 17.2% |

Source: McFadden Production

Note:

[1] As-is prices taken from Apple's price tier schedule. It is important to note that Professor McFadden's composite in-app purchase prices need not, and generally do not, fall on price tiers.

[2] Marginal costs and but-for prices for a given as-is price are estiamted and predicted by using Professor McFadden's model. I assume a 30 percent as-is commission rate, I apply Professor McFadden's but-for commission rate of 13.63 percent, and I use the mean of Professor McFadden's 75 sample estimates produced on January 19, 2023.

[3] At an as-is price of approximately $4.64 Professor McFadden's model predicts a marginal cost of zero for a Games free-to-download app with in-app purchases.

[4] The overcharge ratio is calculated as 1 – (but-for price / actual price).

**SER-795**

83. Exhibit 9 provides a different illustration of the simplistic relationship between the as-is price of an app and the amount of harm associated with that app that arises from Professor McFadden's assumptions. Exhibit 9 illustrates this pattern in particular for Games apps with in-app purchases and no paid downloads, assuming a 30 percent as-is commission, but the same basic pattern, with different numbers, also applies to in-app purchases for Music and Entertainment, paid downloads for Games, and paid downloads for Music and Entertainment.

**SER-796**

**EXHIBIT 9**

*Illustration of Relationship Between As-Is Price, But-for Price, and Harm in Professor McFadden's Model: Games*



Source: McFadden Production

Note: This analysis uses the mean of Professor McFadden's 75 sample estimates, assumes a 30 percent as-is commission rate, and focuses on free-to-download paid in-app purchase apps. Harm estimates are based on harm attributable to Games free-to-download paid-in app purchase app transactions in the full data without a $10 spending cutoff. Negative harm corresponds to damages from transactions with apps that have as-is composite in-app purchase prices below $4.64. Harm corresponds to damages from transactions with apps that have as-is composite in-app purchase prices above $4.64. Harm is not proportional to the area in the chart, because it also depends on quantities and as-is commission rates, which are not illustrated in the exhibit.

84. All of these exhibits highlight the absurdity of Professor McFadden's model. He provides no evidence that all apps sharing a genre and App Store business model will necessarily have the same marginal costs, nor that they would price in a similar manner in the but-for world.

43 of 133

**SER-797**

He also does not verify that the marginal costs inferred by his model are consistent with reality, despite the importance of marginal costs to his determination of harm:

> "Q: It's a general question. Have you done any analysis, any testing, to confirm whether the variable margins and marginal costs that your modeling generates for all of the relevant developers and their apps are – are actually correct and accurate?
> A: The answer is no, I – I've been able – to only work with the data that I have."[159]

I showed in Section 4.1 that they are not, in fact, consistent with reality.

85. This result is purely an artifact of Professor McFadden's assumption that all apps sharing a genre and App Store business model also share a common price sensitivity of demand, as I explained in Section 2.2.1. Yet despite how crucial this assumption is for his ability to supposedly estimate harm in a common manner, Professor McFadden neither presents evidence in support of that assumption, nor does he show that his results would hold without it. On the contrary, his strict assumption is contradicted by common sense—which suggests that certain apps with loyal audiences would have far lower price sensitivity than less well-known apps. And his results, far from being robust to this assumption, completely depend on it—as I showed in my original report, his model breaks down altogether when this assumption is even slightly relaxed,[160] and I provide further evidence of this in Section 6.3.2.

86. Furthermore, Professor McFadden's assumption leads to his finding that only low-price apps become more expensive in the but-for world, while all high-price apps become cheaper in the but-for world, which is directly contradicted by Professor Hitt's analysis of real-world developer responses to commission changes. While Professor Hitt finds that most apps do not change their prices in response to commission changes, those that do raise their prices include both high-price and low-price apps, including apps with prices both above and below the thresholds arising from Professor McFadden's model.[161]

87. Professor McFadden claims that "whether or not an app developer's marginal cost is negative or not is an empirical question, and my model identifies such cases, which renders an app-by-app inquiry unnecessary,"[162] but this is wrong. His model does not "identify"

---

[159] Third McFadden Deposition, 174:13–20.

[160] Specifically, I divided apps into high-revenue and low-revenue categories based on their lifetime revenues in Professor McFadden's original 0.1 percent sample. Then, I estimated demand according to Professor McFadden's method, but allowed for the price sensitivity parameter (and log downloads coefficient) to vary across these groups. This yielded very different price sensitivities for the two groups. See Prince Initial Report, ¶¶ 70–72.

[161] Hitt Second Report, Section 6.

[162] McFadden Reply Report, ¶ 94.

SER-798

cases; rather, as I have described in this section, it assumes patterns. By assuming a common price sensitivity of demand, Professor McFadden has equated the question of whether an app developer's marginal cost is positive, negative, or zero to a question of whether or not its as-is price falls above or below a certain common value. He has not shown that app-by-app inquiry is unnecessary; he has replaced that inquiry with a blanket assumption for which he has offered no evidence.

### 4.3. Professor McFadden Imposes Arbitrary Margin Constraints That Evidence Suggests Would Inflate Marginal Costs and Result in Overestimation of Harm

88. As I explained in Section 2, Professor McFadden imposes margin constraints in his estimation of demand, which almost entirely determine his estimates of consumer price sensitivity and thus the range of values that his inferred marginal costs can take on average.[163] In turn, this determines where the threshold prices, above which marginal costs are positive, fall. As Professors Watson and Hitt explain, these margin constraints are ad hoc and based on data for an extremely limited and unrepresentative set of developers.[164] Therefore, Professor McFadden's inferred marginal costs and, in turn, harm estimates are equally arbitrary.

89. In particular, to the extent that the profit margin ranges Professor McFadden uses are too low, his inferred marginal costs, and therefore harm estimates, will be too high. Professor McFadden constrains the average profit margins to lie between 60 percent and 90 percent for Games. As mentioned above, I use the term "profit margin" as Professor McFadden does—to mean price less marginal cost, divided by price. This is different from the way the term is often used to mean the earnings of a firm after all of its expenses—including fixed costs and, in this context, commissions—divided by its revenue. Profit margins in the more typical sense can be far lower than Professor McFadden's margin constraints. Therefore, his inferred average marginal costs for Games necessarily lie between 10 percent and 40 percent of app prices on average. Similarly, for Music and Entertainment Professor McFadden's requirement that average profit margins lie between 20 and 60 percent implies that on average marginal costs must be between 40 and 80 percent of as-is price. As discussed in Section 4.1 and as Professor Hitt shows, evidence suggests that in the actual world marginal costs are zero or close to zero (and thus roughly zero percent of the as-is price) for many apps, including many Games in-app purchases, which means that the marginal costs inferred by Professor McFadden are likely to be too high.[165]

---

[163] Prince Initial Report, Appendix F.3.

[164] Hitt Second Report, Section 8.1.3.1; Watson Report, Section 4.3.

[165] Hitt Second Report, Section 8.1.1.

90. Professor Watson shows that if the end points of the profit margin constraints were closer to 100 percent (i.e., average marginal costs were closer to zero), then the amount of harm and number of harmed accounts would fall substantially. Specifically, Professor Watson finds that if the margin constraints for Games were changed from ███████████████████ percent, the percent of unharmed accounts increases from 17.8 percent to 29.0 percent and total harm decreases from \$10.2 billion to ████████.[166] Therefore, it is likely that Professor McFadden has overestimated total harm and percent of harmed accounts by a large margin due to these assumptions.

## 5. THE CHANGES PROFESSOR MCFADDEN HAS MADE DO NOT REMEDY THE DEFICIENCIES THE COURT IDENTIFIED

91. As described in Section 2, Professor McFadden's model is largely unchanged since his initial report. Despite offering a few adjustments in an attempt to address the Court's Class Certification Order, Professor McFadden's changes do not solve the fundamental unreliability of his model. In this section, I discuss his responses to four concerns expressed by the Court (Professor McFadden's "percentage method," his price tier analysis, the "switching" issue, and the number of unharmed accounts) and explain why those responses are insufficient or inappropriate and do not remedy his model's fundamental unreliability.

### 5.1. Professor McFadden Has No Reliable Method for Measuring Harm for In-App Purchases

92. The vast majority of paid transactions on the App Store—and in Professor McFadden's studied genres—are in-app purchase transactions. Despite this, Professor McFadden's method for calculating purported harm from these transactions is arbitrary and unreliable on two different levels:

- Substantial time in the last round was devoted to determining how exactly his model calculates but-for prices for in-app purchases. Now, Professor McFadden claims his model cannot predict but-for prices for specific in-app purchase items at all, and yet purports to calculate harm arising from these transactions. (Section 5.1.1)

---

[166] Watson Report, Section 4.2. Professor McFadden imposes constraints on the average profit margins across apps. This means that individual apps can have positive marginal costs, even if the aggregate average is zero. Specifically, over 13 percent of Games apps have positive estimated marginal costs when changing the margin constraints to 90 to 100 percent, even though the coefficient that results from this sensitivity implies an average profit margin of 100 percent. Furthermore, the margin constraints for Music & Entertainment apps correspond to the ones chosen by Professor McFadden.

- Even ignoring this issue and focusing on Professor McFadden's implicit but-for prices for in-app purchase items, his percentage method is at odds with empirical evidence and overstates harm. (Section 5.1.2)

93. Professor McFadden claims to offer no theory of individual in-app purchase prices and instead insists that his calculation of damages for in-app purchase transactions is done at the level of aggregate spending for an app.[167] Even in the case of transactions for apps that offer a single in-app purchase item, Professor McFadden argues that his damages for in-app purchase transactions do not correspond to the difference between an as-is and but-for price for that single item:

> "Q. So am I correct to understand you to say that if an app has one in-app purchase item, your model can accurately and reliably predict it, but if the app has two in-app purchase items, your model can only predict what the average IAP price will be reliably?
> A. No. In fact, my answer that I just gave was – was exactly the opposite. I said that the – I do not model what is going on inside the developer in terms of the menus they bring forward and the pricing in those menus of any individual items, and – and the granularity of my model is at the overall level of IAP average pricing and IAP spending. And so the model is silent. I do not know what would happen. Even if you – even if a developer has a single IAP item in the as-in world, I do not model nor am I predicting what their menu would look like in the but-for world.
> Q: You're not predicting a price for single IAP items when those are the only items for an app?
> The DEPONENT: Sorry. You – you're making the – the speculation that they would continue to have a single [item] in the but-for world. I – the – my model is silent on the – the question as to whether they would have a single app in the but-for world…The model makes no assumption what the configuration would be of the menu offer by that developer in the but-for world, whether it would be a single item, whether there would be multiple

---

[167] McFadden Second Revised Supplemental Report, ¶ 42 ("It is important to highlight that I use the average IAP price (in a given month) to calculate individual damages from multiple IAP items offered for sale in an app and do not calculate But-For prices for individual IAP items. As demonstrated in the example above, once I estimate the overcharge to consumers for a given app-month as a percentage of Apple's App Store commission revenues, I use this ratio to calculate each account's damages (associated with this app) based on its *spending* in a given app-month. Because I use each account's spending as a basis of damages, I do not need to estimate IAP item-level But-For prices.") [emphasis in original]. See also Third McFadden Deposition, 111:9–14 (Q. So you're making no assumption, empirical or otherwise, that individual IAP items move or would move in the but-for world uniformly together? A. That is correct. My -- my model is at the granularity that I do the analysis – does not speak to that issue."), 113:21–114:6 ("A. I do not model what is going on inside the developer in terms of the menus they bring forward and the pricing in those menus of any individual items, and -- and the granularity of my model is at the overall level of IAP average pricing and IAP spending. And so the model is silent. I do not know what would happen. Even if you -- even if a developer has a single IAP item in the as-in world, I do not model nor am I predicting what their menu would look like in the but-for world.").

items, how they would be priced. The model deals only with IAP average price and IAP number of transactions and spending."[168]

94. Despite this claim, Professor McFadden must calculate damages for the individual in-app purchase transactions that class members actually make (and are at issue in this litigation). Any calculated damages for these transactions necessarily imply but-for prices for these transactions. Professor McFadden's approach to calculating these damages—his percentage method—is at odds with empirical evidence and yields numerous unreliable results for the estimated harm and fraction of unharmed accounts. In particular, Professor McFadden's percentage method fails to capture the empirical fact that developers sell, and set prices for, in-app purchase items. As a result, his model makes nonsensical predictions concerning damages that are not grounded in reality.

95. Throughout this section and report, I use the following terminology to discuss the various purported prices related to in-app purchases:

- "Composite in-app purchase prices" refer to Professor McFadden's chosen object of analysis—the average price across each of the various items (including subscriptions and non-subscription in-app purchases) available for a given app at a given time.
- "As-is prices for individual (in-app purchase) items" refer to the actual, observed transaction prices for specific in-app purchase items. Depending on the context, this may refer to the price of an individual transaction, or the weighted average purchase price for a specific item across all purchases of that item in a given month.
- "But-for prices for individual (in-app purchase) items" refer to the prices for individual items that would purportedly prevail in the but-for world.
    - » In Professor McFadden's analysis, because he argues that his model does not produce such prices, these prices are an implication of how he calculates harm using the "percentage method," and so I refer to them as "implicit."
    - » In my application of his model to individual items (introduced in Section 5.1.2105), these prices are not implicit, but are the direct output of the model.

### 5.1.1. Professor McFadden Claims His Model Does Not Predict But-For Prices for In-App Purchases

96. When discussing in-app purchases, Professor McFadden and Plaintiffs' counsel have repeatedly affirmed that his model operates at the "app level," and that the prices of all in-

---

[168] Third McFadden Deposition, 113:13–115:8.

app purchase items for the same app will adjust in lockstep.[169] As I discussed in Section 5.1, in the prior round of briefing, Professor McFadden repeatedly shifted his position regarding whether all the prices change by the same dollar amount or the same percentage amount.[170] As emphasized in my earlier reports, Professor McFadden's use of the former "dollar method" had perverse implications such as predicting negative but-for prices for in-app purchases and individual account damages that exceed total account spending.[171] Ultimately, the Court's Order recognized that Professor McFadden's testimony seemed generally to support the latter "percentage method," but that he had not implemented it.[172] In his supplemental report, he now states that he "endorsed [the percentage method] as the best way to calculate individual damages"[173] and that he uses this method to "calculate the damages associated with each of [an account's] individual transactions."[174]

97. Now, Professor McFadden bases his harm calculations on the "percentage method," but at the same time he substantially disclaims most of its implications. In particular, while he argues such a method can be used to calculate harm, he also claims that his model is "silent" with respect to the but-for prices of individual in-app purchase transactions.[175] In other words, he claims that neither the "percentage method" nor any other method can be applied to his model to predict but-for prices of individual in-app purchase items. Furthermore, he claims his model is also "silent" on even what collection of in-app purchase items developers would offer in the but-for world.[176]

98. This interpretation of his model's output—that it offers no prediction of but-for prices for individual in-app purchase items—is new and illogical. When Professor McFadden calculates purported damages for in-app purchase transactions that consumers made, he necessarily also calculates a but-for price for the items those consumers purchased. Furthermore, he appears to be claiming that his model's purported "silence" regarding the

---

[169] McFadden Initial Report, Appendix E, ¶ 27; Plaintiffs' Opposition to Defendant Apple Inc.'s *Daubert* Motion to Exclude Reply Testimony of Professor Daniel L. McFadden, dated November 23, 2021 ("Plaintiffs' Opposition"), p. 14; Second McFadden Deposition, 91:9–21, 92:8–18; 94:7–24.

[170] First McFadden Deposition, 169:11–23; Second McFadden Deposition, 94:18–24, 96:4–15, 102:12–23, 122:19–123:23. For a more detailed discussion of this issue, see Prince First Declaration, ¶ 52.

[171] Prince First Declaration, ¶ 61.

[172] Order, p. 9.

[173] McFadden Second Revised Supplemental Report, ¶ 40.

[174] McFadden Second Revised Supplemental Report, ¶ 68.

[175] McFadden Second Revised Supplemental Report, ¶ 42; Third McFadden Deposition, 113:13–115:8.

[176] Third McFadden Deposition, 116:19–117:4 ("Q. (By Mr. Swanson) But -- but you are not assuming that the developer maintains its business model in terms of the number of in-app purchase items it offers in the but-for world; is that correct? A. It is correct, but at the level of granularity of -- of -- in-app menus, my model is silent on how -- how those are organized by the developer. I deal only with profit maximization at the granularity -- granularity of average IAP price and total IAP transactions.").

prices of individual in-app purchase items somehow inures him from any empirical inquiry that might falsify his claimed damages.

99. For example, if as he claims his model truly had no implications for observable facets of in-app purchases, like prices, quantities, or even the collection of items developers offer, then such implications could not be tested against real-world data. This is particularly important because I show in Section 5.1.2 below that if one analyzes the but-for prices for individual items necessarily implied by Professor McFadden's percentage method, they indeed run counter to real-world data.

100. If one were to take Professor McFadden at his word, then his model could calculate harm for the vast majority of transactions because to estimate harm for these individual transactions, one would need but-for prices for the associated individual in-app purchase items. In fact, Professor McFadden's claim that his model is "silent" with respect to the but-for prices of individual in-app purchase transactions would mean that, for Games, Music, and Entertainment apps, his model is "silent" on the harm associated with 90.1 percent of transactions, 97.0 percent of developer revenue, and 96.9 percent of Apple App Store commissions—i.e., 99.1 percent of Professor McFadden's claimed damages.[177]

101. First, if Professor McFadden's claim were true that his model is "silent" on what collection of in-app purchase items developers would offer in the but-for world, then he could not calculate harm on in-app purchase transactions. In particular, he claims that an app's in-app content may change in the but-for world—that his model is also "silent" regarding the "in-app menus" of in-app purchases, the number of such items, and "how those are organized by the developer" in the but-for world.[178] Thus, he claims his model only makes predictions about an account's total spending on in-app content for each app in the but-for world, not about the items purchased and associated payment in the but-for world. In his stated view, in the but-for world, the account in question may have purchased a different set of items or even a different number of items within the app. If this were true, the difference between the two levels of spending would have no economic meaning or significance in terms of harm to a consumer at all: if the bundle of items is not fixed, then it is not clear that different prices make a consumer better or worse off. If spending *and* the

---

[177] The damages percentage is calculated as the ratio of damages from in-app purchase transactions to total damages. See Workpaper 7.

[178] Third McFadden Deposition, 116:19–117:4 ("Q. (By Mr. Swanson) But -- but you are not assuming that the developer maintains its business model in terms of the number of in-app purchase items it offers in the but-for world; is that correct? A. It is correct, but at the level of granularity of -- of -- in-app menus, my model is silent on how -- how those are organized by the developer. I deal only with profit maximization at the granularity -- granularity of average IAP price and total IAP transactions.").

item change, then Professor McFadden cannot determine the impact on an account for an at-issue transaction.

102. An example can illustrate that it is impossible to draw meaningful conclusions about individual or aggregate harm in such a situation. Suppose that in the as-is world, a free download app offers a single in-app purchase item—a package of ten units of in-app currency for $2.99, and that a particular account purchased one such item in the as-is world. Further suppose that Professor McFadden calculates damages for this account on this app to be $0.87. In Professor McFadden's own description of his model, he only claims that the account would have spent $2.12 in the but-for world on in-app content for that app.[179] The account might purchase multiple different items in the but-for world (none of which exist in the as-is world). Similarly, the account might purchase a single, but different, item in the but-for world. For example, the $2.12 in spending might be a package of 7 units of in-app currency. Clearly, in such a situation, it becomes impossible to interpret the $0.87 as damages—the account is spending less but also receiving less in-app currency resulting in an ambiguous net effect in magnitude and could even result in a net benefit to the account.

103. Further, if, as Professor McFadden claims is possible, both the price of the item and the quality of the item change, one cannot apply Professor McFadden's own damages definition—the difference between the as-is price and the but-for price multiplied by the as-is quantity—because the as-is item is a different product from the but-for item. As a result, Professor McFadden presents a model and method of damages assessment that are incompatible with one another.

104. Second, Professor McFadden's claim that he is "silent" on transaction-level predictions is in direct contradiction with his claim that he performs a price tier simulation that can accommodate price tiers in the but-for world. While I discuss methodological problems with Professor McFadden's price tier simulation in Section 5.2, any claims that his model "can accommodate Apple's tier pricing restrictions" mean that his model must be able to predict but-for prices for individuals in-app purchase items that are consistent with those restrictions, as these are the actual prices that are subject to those pricing restrictions.[180] If, as he claims, his model does not predict but-for prices for in-app purchase items, then his price tier

---

[179] Third McFadden Deposition, 113:21–114:6 ("A. I do not model what is going on inside the developer in terms of the menus they bring forward and the pricing in those menus of any individual items, and -- and the granularity of my model is at the overall level of IAP average pricing and IAP spending. And so the model is silent. I do not know what would happen. Even if you -- even if a developer has a single IAP item in the as-in world, I do not model nor am I predicting what their menu would look like in the but-for world.").

[180] Revised Supplemental McFadden Report, ¶ 85.

**SER-805**

simulation (which is simply an extension of the same model) does not address the 90.1 percent of transactions that are in-app purchases. [181]

105. Given that Professor McFadden's stated claim—that he does not predict but-for prices for individual items, or even which items will be available in the but-for world—cannot be true in a world where he offers a damages number to the court, I move in the next section to analyzing the but-for prices for individual items clearly implied by his percentage method. Professor McFadden's modeling method, his own calculation of damages, and his own computer code[182] all point to a single tenable assumption for plausibly calculating damages for in-app item purchases: that Professor McFadden's percentage method means that accounts purchase the same items in both the as-is and but-for worlds, and that the prices change by a common percentage across all items for a given app in a given month. I explain this in more detail in the next section, as well as why his percentage method, even when applied to in-app items as it must, is an unreliable approach.

*5.1.2. Professor McFadden's Implied But-for Prices for In-App Purchases Based on the Percentage Method Overstate Harm and the Number of Harmed Accounts*

106. In this section I provide several reasons why Professor McFadden's percentage method is unreliable. It is important to note at the outset that the "percentage method" is an assumption made by Professor McFadden, not an empirical finding, and it is critical to his entire approach. However, Professor McFadden provides no justification or empirical evidence for this assumption. As I discuss below, even setting aside all of the other problems with Professor McFadden's model and approach, this assumption alone leads to overstating harm and the number of harmed accounts and has implications that are inconsistent with empirical fact.

107. Professor McFadden averages the prices of all in-app items for each app and calculates an as-is composite in-app purchase price for the app. Then he uses his model to predict a but-for composite in-app purchase price. However, consumers do not purchase "composites." They purchase individual in-app items. So Professor McFadden must ultimately predict but-for prices for each individual in-app purchase item in order to calculate damages on consumers' actual purchases. To do that, Professor McFadden uses his "percentage method,"

---

[181] See Workpaper 7.

[182] McFadden Supplemental Report, Backup Material, File "Full Third Production (Merged)/R/5. Step1_calc_pct_unharmed.R," line 135.

which assumes that each individual in-app purchase item changes its price by the same percentage as the composite in-app purchase price changes.[183]

108. Professor McFadden's "percentage method" is best illustrated with an example. Consider a hypothetical free-download Games app that has two in-app purchase items, one priced at $0.99 and one at $9.99. Professor McFadden would calculate an as-is composite in-app purchase price of $5.49, and his model would predict a but-for composite in-app purchase price of $5.33.[184] The composite in-app purchase price would therefore experience a 2.9 percent decrease in the but-for world, according to his model. Professor McFadden's "percentage method" assumes that all purchasers of this app were harmed to the tune of 2.9 percent of their total spending on the app—regardless of which specific items they bought— which implies that both in-app purchase items would also experience a 2.9 percent price decrease in the but-for world. The $0.99 item would cost $0.96 and the $9.99 item would cost $9.70.[185]

109. Even setting aside all other problems with Professor McFadden's model, this approach alone leads him to overstate harm and the number of harmed accounts. I show this by applying Professor McFadden's model to directly predict but-for prices for individual items rather than predicting but-for composite in-app purchase prices and then using the percentage method to calculate damages for purchases of individual items. This modification does not make Professor McFadden's model any more difficult to implement.[186]  I note that I do not

---

[183] Professor McFadden claims that he calculates overcharge to consumers as a percentage of Apple's App Store commissions. Mathematically, however, this approach is equivalent to a percentage of prices. To see this, note the following. Using Professor McFadden's notation, the overcharge ratio is given by $r_{jt} = \frac{\left(p_{jt}^{AS} - p_{jt}^{BF}\right) * Q_{jt}^{AS}}{\tau^{AS} * p_{jt}^{AS} * Q_{jt}^{AS}}$. Because quantity appears in both the numerator and denominator of the ratio, it cancels out and price and commission are all that matters. The ratio can therefore be simplified to $r_{jt} = \frac{\left(p_{jt}^{AS} - p_{jt}^{BF}\right)}{\tau^{AS} * p_{jt}^{AS}}$. Professor McFadden then applies this ratio to the commission paid for a particular transaction with app $j$ in period $t$. It is important to note that the commission rate isn't the actual transaction-level commission rate, but rather the total commissions collected on the app in a month divided by the total spending on that app in that month. Multiplying this ratio by the commission for the purchase of a given item $i$ yields $r_{jt} * \tau_{jt} * p_{jti}^{AS} = \frac{\left(p_{jt}^{AS} - p_{jt}^{BF}\right)}{p_{jt}^{AS}} * p_{jti}^{AS}$. So again, when applying the ratio to a given transaction, the commission rate cancels, and what remains is a constant percentage change in price. See McFadden Second Revised Supplemental Report, ¶ 41.

[184] See Workpaper 13. These calculations use the mean of Professor McFadden's 75 sample estimates for the Games in-app purchase price sensitivity parameter, assume an as-is commission rate of 30 percent and a but-for commission rate of 13.63 percent.

[185] See Workpaper 13.

[186] For this analysis, I use the same full transactions data that Professor McFadden uses and the mean of Professor McFadden's 75 sample estimates. However, while Professor McFadden uses his model to estimate composite marginal costs for in-app purchases, I use his model to estimate marginal costs for each individual in-app purchase item. While Professor McFadden uses his model to predict a but-for composite in-app purchase price for each app and then uses his "percentage method" to calculate but-for prices for in-app purchase items, I use his model to predict but-for prices for each individual item. Both approaches operate monthly. Professor McFadden's method for paid downloads drops app-months if the paid download price changes within the month, and assumes there are no damages associated with transactions during the relevant month for this app. To be conservative, in the present analysis, I do not make the analogous decision for in-app

endorse this adjustment as a solution to Professor McFadden's unreliable model for the many reasons I describe in the rest of this report and in my prior work on this matter, but it is useful for illustrating this particular point.

110. Exhibit 10 presents both total purported harm and the percentage of unharmed accounts, computed by applying Professor McFadden's model to calculate but-for prices for individual in-app purchase items rather than composite in-app purchase prices, and using the same full transactions data as Professor McFadden. The percent of accounts that are unharmed doubles, from 17.8 to 35.9 percent, and damages decrease by ▮ percent from $10.2 billion to ▮ ▮. Using Professor McFadden's $10 cutoff, the percent unharmed increases by more than three times from 7.9 to 27.7 percent, increasing the number of unharmed accounts to 36 million.[187]

---

purchase items. Instead, for individual items whose prices change within a month, I use the weighted average price for that item within a month.

I use Professor McFadden's but-for paid download prices for apps with both paid downloads and in-app purchases. Note that extending Professor McFadden's approach for calculating but-for paid download prices of apps with both paid downloads and in-app purchases is conceptually straightforward. However, I have reviewed Professor McFadden's code and found that it sometimes generates incorrect results for these types of apps, even in his unaltered model as he presented it in his report. For example, I found that his approach can generate but-for prices that are as much as ▮ less than the true but-for price, implying a percentage price decrease in the but-for world that is ▮ percentage points larger than the true price decrease. Given this issue, I chose not to predict new but-for paid download prices for apps that have both paid downloads and in-app purchases, thus avoiding the unreliability of Professor McFadden's code for these apps' but-for paid download prices, which account for only ▮ percent of total Games, Music, and Entertainment revenue. See Workpaper 3; Workpaper 5.

[187] See Workpaper 14.

---

***EXHIBIT 10***

***Total Harm and Percent Unharmed: Professor McFadden's "Percentage Method" vs. Application to Predict But-for Prices for Individual Items***



Source: McFadden Production

Note:

[1] Total harm and percent unharmed for Professor McFadden's percentage method correspond to the numbers reported in Figure 6 of Second Revised McFadden Supplemental Report.

[2] I calculate total harm and percent unharmed for the item-level application by extending Professor McFadden's model to predict but-for prices separately for each individual item. I use as-is prices based on the full transactions data and the mean of Professor McFadden's 75 sample estimates produced on January 19, 2023. The but-for paid download prices correspond to the prices predicted by Professor McFadden. Total harm represents the net harm across all consumers in McFadden's sample.

[3] Note that there are 8 accounts (out of 176,964,271), all of which Professor McFadden classifies as unharmed, that drop out when I apply his model to individual in-app purchase items. These accounts drop out because he erroneously fails to assign one of his three "business model" groupings to the apps purchased by these accounts. But such lack of assignment only affects 5 app-months among Games, Music and Entertainment apps with a paid transaction. This applies to every instance in which I apply Professor McFadden's model to individual in-app purchase items.

111. The reason for the sharp decrease in damages and increase in percent unharmed when Professor McFadden's model is applied to actual individual in-app purchase prices rather than an artificial aggregate becomes apparent when looking at how this plays out for a specific app.111 Exhibit 11 presents the three unique items of Woody Block, a Game, available during March 2021. The prices vary considerably across items, █████████

██████████████████████

**SER-809**

**EXHIBIT 11**

*Professor McFadden's "Percentage Method" Averages Out Highly Relevant Heterogeneity Across In-app Purchase Items: Woody Block – March 2021*

| | Formula | VIP Membership Weekly | VIP Membership Monthly | VIP Membership Half-Yearly |
|---|---|---|---|---|
| Number of Transactions | | ■ | ■ | ■ |
| *Professor McFadden's "Percentage Method"* | | | | |
| [A] As-Is Item Price | | | | |
| [B] As-Is Composite Price | Average of [A] across items | | | |
| [C] Composite Marginal Cost | Apply Model to [B] | | | |
| [D] But-for Composite Price | Apply Model to [B] | | | |
| [E] Percentage Change | [E] = ([D] - [B]) / [B] | | | |
| [F] But-for Item Price | [F] = [A] × (1 + [E]) | | | |
| **[G] Harm per Transaction** | **[G] = [A] - [F]** | | | |
| *Adaptation to Predict But-for Prices for Individual Items* | | | | |
| [A] As-Is Item Price | | | | |
| [B] Marginal Cost for Individual Item | Apply Model to [A] | | | |
| [C] But-for Price for Individual Item | Apply Model to [A] | | | |
| **[D] Harm per Transaction** | **[D] = [A] - [C]** | | | |

Source: McFadden Production

Note:

[1] The as-is composite in-app purchase price is the simple, unweighted average of the individual in-app purchase itme prices. The in-app purchase item prices are calculated by Professor McFadden as the monthly average transaction price based on the full transactions data.
[2] The composite marginal cost and but-for price reflect the mean of Professor McFadden's 75 sample estimates produced on January 19, 2023.
[3] The item-level marginal cost and but-for price are calculated by applying Professor McFadden's model to each item separately and reflect the mean of Professor McFadden's 75 sample estimates produced on January 19, 2023.

112. As the exhibit shows, if Professor McFadden were to use his model to predict but-for prices for individual items, as in the Exhibit 10 analysis, he would find that the cheapest item has negative marginal costs and would become more expensive in the but-for world, while the more expensive items have positive marginal costs and would become cheaper in the but-for world. Most transactions for this app ■ would have ■ prices in the but-for world, and relatively few transactions ■ ■ would have lower prices. In contrast, Professor McFadden's "percentage method" explicitly assumes all purchases are at the moderate composite price of $8.99, and his model calculates a composite marginal cost of $3.06 and a but-for composite price that is 8.99 percent lower than the as-is price; therefore he finds all transactions (instead of just ■ percent) would be priced lower in the but-for world.

113. As can be seen in Exhibit 11, when using Professor McFadden's model to predict but-for prices for individual items, for multi-item apps it predicts that the many low-priced items are more expensive in the but-for world. When Professor McFadden employs his "composite price" approach he does not allow these low-price items to stand on their own. Instead, he

**SER-810**

combines low-price items with high-price items, and the resulting in-app purchase composite price tends to go down in the but-for world, even when there are many low-price items purchases for the given app. When he applies his percentage method, taking the percentage change in the composite price and applying it to all items in the app, it necessarily implies that each individual item gets cheaper in the but-for world, even very low-priced items. Because many accounts purchase primarily low-price items, and such transactions occur in large volume, damages are biased upward, and the number of unharmed accounts is biased downward, by abstracting from prices for each item and focusing instead on composites.

114. This problem with his approach is intuitive in light of the discussion of the relationship between as-is prices, marginal costs, and calculated harm in Sections 18 and 4.2. Recall that Professor McFadden's model implies a threshold price such that any purchase above that price is "harmed", and any below is not. Then, by averaging low-priced items together with higher-price items, he ensures that even many of the low-priced items are treated as though their prices are above the threshold, and are assigned positive marginal costs. In other words, by taking a simple, unweighted average of prices of all of the items available for purchase for a given app, Professor McFadden pushes many of even the cheapest items above the threshold price for harm—which in turn makes them generate harm by assuming that they behave like higher-priced items. Professor McFadden has thus built a model that predicts that low-priced items (which make up a large share of transactions) will not fall in price in the but-for world, but instead inevitably get more expensive in the but-for world and hence should not contribute to any calculated harm. But Professor McFadden avoids this implication and calculates positive harm for most accounts by inappropriately averaging these low-priced items together with much higher-priced items.

115. An example of this problem with Professor McFadden's model is Roblox. Roblox in April of 2019 sold packages of virtual currency, Robux, at prices ranging from $0.99 to $24.99. Rather than allowing these items to stand on their own, Professor McFadden calculates and focuses on a composite in-app purchase price of $10.66. Consequently, and in strong contrast to Professor Hitt's finding that apps with virtual currency tend to have zero marginal costs,[188] Professor McFadden estimates a marginal cost of ▮▮▮▮ for Roblox in April of 2019,[189] and therefore finds that the but-for price of *every* Roblox transaction in that month—including the $0.99 transactions—would be lower.

116. Not only does Professor McFadden's percentage method bias upward his total damages estimate and downward his estimate of unharmed accounts, but it is inconsistent with empirical evidence on price changes for in-app items. When developers change prices for in-

---

[188] Hitt Second Report, Section 8.1.1.
[189] See Workpaper 15.

app items, they do not always change prices for all items by the same percentage or even in the same direction.

117.  Exhibit 12 shows how rarely this happens. Professor Hitt shows that developers typically do not adjust their prices at all in response to commission changes, so it is not fruitful to focus on commission changes to test the implications of Professor McFadden's percentage method. Instead, I look more generally at the 2,348 monthly observations for apps in Games, Music, and Entertainment in Professor McFadden's original 0.1 percent sample that had at least two in-app purchase items, and at least ▌ of them changed its price between consecutive months. More than ▌ of the time ▌ of the monthly observations for apps), none of the other items changed their prices at the same time. Only in ▌ of the 2,348 monthly observations for apps did all items change their price, and only for ▌ did all items change their price in the same direction. In the end, only ▌ of the 2,348 monthly observations for apps (less than ▌ percent) followed the pattern prescribed by Professor McFadden's percentage method, with all available items changing their prices by the same percentage.

*EXHIBIT 12*



Source: McFadden Production

Note:

[1] Price changes are calculated using the 0.1 percent sample from Professor McFadden's Appendix D. To make price-change comparisons between an app's in-app purchase items, I filter to apps where I observe at least two in-app purchase items across two consecutive months.

[2] An in-app purchase item price change is identified by comparing the last price of the item in a given month to the last price of the item in the previous month. To avoid capturing price movements that are due to data errors, I consider only differences between item-month prices of at least $0.49 to be "price changes."

[3] "All items change price" refers to the subset of monthly app observations where all of the in-app purchase items that are observed across consecutive months change their price.

[4] "Same dollar change" and "Same percentage change" distinguish between positive and negative dollar/percentage changes.

118. Additionally, Professor McFadden's percentage method implies that purchases of subscription and non-subscription in-app items for the same app will implausibly be affected similarly by a commission rate change. Transactions for app-months with both subscription and non-subscription in-app purchase items available represent ▮ percent of Games, Music, and Entertainment transactions and account for 14.8 percent of purported harm.[190] Most non-subscription transactions for these apps face a 30 percent commission rate in the as-is world, while some of the subscription transactions might face a 15 percent commission rate.  This means that the commission rate will tend to fall further—and according to Professor McFadden's model the item prices will change more—for the non-subscription

---

[190] See Workpaper 16.

transactions than for the subscription transactions. But Professor McFadden obscures this heterogeneity by computing a single average as-is commission rate across both types of the app's transactions, and assuming that commission rate applies to all transactions in the as-is world.

119. Finally, Professor McFadden's percentage method has the property that it can treat similar purchases quite differently. Consider two purchases (even by the same account) of the same item, for the same price, in adjacent months; under certain circumstances, Professor McFadden's approach can predict that one transaction would produce positive harm while the other produces negative harm. This unrealistic result follows from the fact that Professor McFadden's app-level in-app purchase price changes when new items are introduced or some items are discontinued, even if all continuing items keep exactly the same prices.

120. Exhibit 13 presents an example of precisely this phenomenon. No Ads, an in-app purchase item for app Mob Control, had a price of $2.99 during July 2021 and had the same price one month later. However, because another item, Triple Cannon and No Ads was introduced in August 2021, Professor McFadden's composite in-app purchase price changed between these two months. Given the different as-is prices for the composite item, Professor McFadden estimates different but-for prices in these two months. As a result, he finds the 6,503 transactions in July 2021 would have higher prices in the but-for world, whereas the 7,231 transactions one month later, and potentially only one day later—which occurred at the same price—would have lower prices in the but-for world.

---

**EXHIBIT 13**
*Professor McFadden's "Percentage Method" Predicts that Transactions for the Same Item at the Same Price Can Have Different But-For Prices: Mob Control*

| | Price | |
|---|---|---|
| | **July 2021** | **August 2021** |
| No Ads | $2.99 | $2.99 |
| Triple Cannon and No Ads | - | $9.99 |
| McFadden's As-Is Composite Price | ▮ | ▮ |
| McFadden's But-For Composite Price | ▮ | ▮ |
| Percentage Change | ▮ | ▮ |
| **Consumers Who Purchased No Ads Harmed?** | ▮ | ▮ |

Source: McFadden Production
Note:
[1] In the full transactions data, there were ▮ transactions of "No Ads" in July 2021 and ▮ transactions of "No Ads" in August 2021.
[2] Professor McFadden's but-for composite in-app purchase price is calculated using the full transactions data and the estimates produced by Professor McFadden on January 19, 2023.

**SER-814**

### *5.2. Professor McFadden Still Does Not Account for Apple's Price Tiers or Focal-Point Pricing*

121. In its Class Certification Order, the Court found that "Professor McFadden's model ignores Apple's focal-point pricing and pricing tiers in calibrating but-for pricing."[191] In his Supplemental Report, Professor McFadden claims that his model "can accommodate Apple's tier pricing restrictions or focal pricing," and that he "conduct[s] a simulation that approximates a But-For world where Apple maintains its current tier pricing structure."[192] However, this simulation fails in at least three respects:

- Professor McFadden's price tier simulation does not predict but-for prices that are consistent with Apple's price tiers. Because he aggregates in-app purchases to a composite in-app purchase price and uses his percentage method, only 44.2 percent of his but-for composite in-app purchase prices, and 32.7 percent of his implied but-for prices for individual in-app purchase items, end in $X.99; only another 10.3 percent and 1.1 percent end in $X.49. When I adjust his simulation so that it generates but-for prices for individual items that end in $X.99 or $X.49, I find that the fraction of unharmed accounts more than doubles from 20.0 to 41.2 percent and damages fall by 28.2 percent. (Section 122)

- Professor McFadden claims (at least, in his first report) that Apple's price tiers are anticompetitive and stop developers from choosing the prices they would like to charge.[193] In other words, he argues that observed prices in the as-is world are not the exact prices developers would have chosen absent price tiers. However, in his model he assumes the opposite—that Apple's price tiers in the as-is world have no effect on as-is prices and that developers have chosen their exact profit-maximizing prices even in the presence of those price tiers. His choice to argue one reality (i.e.,

---

[191] Class Certification Order, p. 11.

[192] McFadden Supplemental Report, ¶¶ 86–87.

[193] McFadden Initial Report, ¶ 128 ("Second, common economic evidence supports the allegation that Apple has been controlling what prices developers can charge. It exercises this control by setting a pricing tier for apps and in-app content rather than letting app developers set the price of their products… App developers choose a price point from this tier rather than choosing the price they would like to charge."), ¶ 129 ("Common economic evidence also provides support to the conclusion that Apple's restricted pricing policies hinder competition among app developers by limiting the force of competition to drive down prices"), ¶ 130 ("Common economic evidence likewise provides support to the conclusion that Apple's restricted pricing policies also hinder the app developer competition by limiting app developers' ability to offer temporary price discounts. An app developer of a $1.99 app cannot offer a 20 percent or 30 percent temporary price discount to boost its app sales. Its only choice is to give a 50 percent price discount. An app developer of a $0.99 app is even more constrained. It cannot offer any price discount."), ¶¶ 216–217 ("One complication in using the profit maximization conditions to infer the variable margin is that app developers are somewhat constrained in setting the profit maximizing price due to the App Store pricing tier policies. When the profit maximizing price for a Paid Download app is $3.50, for example, an app developer can only choose between $2.99 and $3.99. When this app developer is observed to charge $3.99, the cost inferred based on the profit maximizing condition would be different from the cost inferred when the app developer charges $3.5. However, because I use the margin range as constraints, as opposed to using an exact margin level as constraints, the profit maximization conditions do not have to be precise. In Appendix F I explain using a range of the margin as constraints is conceptually not much different from using an exact margin level as constraints and the profit maximization conditions that account for Apple's pricing tier policies."), Appendix F (which shows that the price developers sets merely satisfies inequalities showing it generates more profit than the neighboring tiers, rather than an equation showing it is profit-maximizing).

price tiers have an effect on prices), but model another (i.e., price tiers have no effect on prices), has a large impact on his damages estimates. If one adjusts his model to reflect his stated belief that price tiers impact as-is prices, it generates a large *range* of damages estimates: harm might be up to 53.1 percent lower or up to 63.2 percent higher, and the fraction of unharmed accounts may be up to 23.8 percentage points lower or up to 19.3 percentage points higher, than one would find if restrictions on as-is prices were ignored. Any particular estimate within this wide range is necessarily speculative. (Section 134)

- Professor McFadden does not offer any analyses related to focal-point pricing. While he purports to address the Court's finding that he ignores focal-point pricing, his proffered price tier simulation does not address this shortcoming. (Section 5.2.3)

122. In deposition, but not in his written reports, Professor McFadden offered a new hypothesis that developers design their menu of product offerings precisely so that their profit-maximizing prices fall perfectly on Apple's price tiers.[194] Professor McFadden has provided no evidence in support of such hypothesized behavior by developers. Furthermore, even taking this hypothesis as given, Professor McFadden would need to provide a new model incorporating such behavior; his current model contains no element whereby developers choose their menu of products, let alone in such a manner to ensure that their profit-maximizing prices fall on Apple's tiers. If Professor McFadden provides such a new model in the future, I reserve the right to evaluate and comment on its reliability at that time.

### 5.2.1. Professor McFadden's "Price Tier" Simulation Does Not Address the Court's Concern

123. Professor McFadden's claim that his price tier simulation "account[s] for price tiers or focal pricing in the But-For world" is false.[195] In-app purchase content accounts for ▊ percent of Games revenue, ▊ percent of Music and Entertainment revenue, and over 99.1 percent of purported damages.[196] Nonetheless, because of Professor McFadden's aggregation of in-app purchase prices and use of the "percentage method," he fails to predict but-for prices that conform to Apple's price tiers, even in his simulation devoted specifically to price tiers. This failure occurs at three separate levels. Adjusting his simulation such that it predicts but-for prices that conform to Apple's price tiers both reduces harm and increases the number of unharmed accounts.

---

[194] Third McFadden Deposition, 149:3–19 ("[T]he assumption underlying this analysis is that these firms are offering products that are profit-maximizing at the prices they charge, and -- and those products have been -- have been designed and menus designed with price restrictions in mind. Q. So are you saying now that it's your assumption that the precise price tier prices are the respective profit-maximizing prices higher than any other price choice for the developer in the real world?... THE DEPONENT: The answer is yes, that's the assumption that's made…").

[195] McFadden Supplemental Report, ¶ 81.

[196] See Workpaper 7.

124. First, as I discussed in Section 5.1.1, Professor McFadden's model is conceptually incapable of accounting for price tiers for in-app purchases. Recall Professor McFadden's claim that his model is "silent" with respect to the but-for prices of individual in-app purchase transactions.[197] In other words, he states that it cannot estimate but-for prices for individual in-app purchase items, because it does not have that "degree of granularity."[198] If, as he claims, his model cannot estimate but-for prices for individual in-app purchase items, it cannot possibly predict but-for prices for those same items that conform to Apple's price tiers.

125. Second, if Professor McFadden's model cannot account for Apple's price tiers at the individual in-app purchase item level, one would at least expect that his simulation would predict composite prices that conform to Apple's price tiers. They do not. To be clear, in actuality, composite prices for in-app purchases themselves would not be expected to conform to Apple's price tiers because they are a combination of multiple prices. Yet, Professor McFadden has claimed his simulation based on these same composite prices "can accommodate Apple's tier pricing restrictions or focal pricing."[199] He claims this at the same time that he claims that his model does not predict or simulate in-app purchase prices for individual items, which are the prices that in reality must conform to price tiers. It follows that one has no choice but to focus on composite in-app purchase prices because, taking at face value Professor McFadden's claim, those are the only prices predicted by his model. As I show next, these simulated composite prices do not conform to Apple's price tiers.

126. To perform his "price tier simulation," Professor McFadden uses the following process. He "assume[s] that developers… must choose But-For average IAP prices by adjusting their As-Is price in fixed increments consistent with the size of the increments on Apple's tier schedule."[200] Apple's price tiers require prices to end in $X.99 or, for subscriptions only, $X.49. Professor McFadden modifies this requirement by requiring the composite in-app

---

[197] Third McFadden Deposition, 113:21–114:6 ("A. I do not model what is going on inside the developer in terms of the menus they bring forward and the pricing in those menus of any individual items, and -- and the granularity of my model is at the overall level of IAP average pricing and IAP spending. And so the model is silent. I do not know what would happen. Even if you -- even if a developer has a single IAP item in the as-in world, I do not model nor am I predicting what their menu would look like in the but-for world.").

[198] Third McFadden Deposition, 103:17–104:18 ("Q. Okay. I'm going to focus on the last sentence, which is on page 17, where you state that you don't need to estimate IAP item level but-for prices. Do you see that? A. Yes. Q. Is that because you used the so-called percentage method to estimate the alleged changes to what consumers paid for IAP items for an app? A. That's correct…I would emphasize that I don't -- I don't do that calculation, and that's a gran- -- granularity of calculation that I actually think is inappropriate for this application, because that requires a great deal of information on consumer substitution between items and -- and the developer's design of menus and -- of different items and -- and would amend their menus, and that's a degree of granularity that I think is unnecessary for this case and a distraction from its primary purpose.").

[199] McFadden Supplemental Report ¶ 85.

[200] McFadden Supplemental Report, ¶ 87. Professor McFadden first calculates the but-for price absent any consideration of price tiers, then performs his "price tier simulation" to adjust this but-for price to be consistent with the size of the increments on Apple's tier schedule. Professor McFadden adopts a slightly more complex procedure for apps with both paid downloads and in-app purchases.

purchase prices be adjusted in steps that mirror the increment of the Apple price tier menu for individual in-app purchases. Thus, when an app offers at least one subscription item—regardless of how many non-subscription items it offers—Professor McFadden allows its composite price to adjust in 50 cent increments, and for apps without a subscription item the allowed adjustments are $1.00 steps.[201]

127. This process does not ensure that each predicted composite in-app purchase price conforms to Apple's price tiers. For example consider Genshin Impact, a free download Games app with in-app purchases which was recognized as the iPhone Best Game of Year in 2020.[202] Professor McFadden calculates that, in September 2020, the composite price of Genshin Impact's in-app content was $26.21—a number that, even in the as-is world, does not conform to Apple's price tiers.[203] Because Genshin Impact has no subscription items, Professor McFadden's simulation chooses but-for composite prices from among prices in $1 increments away from $26.21 and determines the most profitable but-for composite price among those to be $22.21. Stating the obvious, prices ending in $X.21 do not conform to Apple's price tiers, and thus Professor McFadden's proposed simulation makes it impossible to choose a but-for composite price that lies on Apple's price tiers. In other words, when an app's as-is composite in-app purchase price does not conform to Apple's price tier, neither will the but-for composite in-app purchase prices that his simulation predicts.

128. Exhibit 14 shows that this is a pervasive problem in Professor McFadden's price tier simulation: 54.4 percent of predicted composite in-app purchase prices end in digits other than $X.99, and 45.4 end in digits other than $X.99 or $X.49. Therefore, even in the simulation that purports to incorporate Apple's price tiers, Professor McFadden's predicted but-for composite prices for Genshin Impact do not lie on Apple's price tiers. Among those composite in-app purchase prices that *do* end in $X.99, 62.1 percent cover app-months with only a single in-app purchase item and another 15.0 percent cover app-months with two in-app purchase items. Aside from these special cases, the procedure performs poorly; only 17.4 percent of but-for composite in-app purchase prices covering at least three items end in $X.99, and another 6.8 percent end in $X.49.[204]

---

[201] McFadden Second Revised Supplemental Report, ¶ 87. Professor McFadden imposes larger gaps between allowable prices at higher prices.

[202] "Apple presents App Store Best of 2020 winners," *Apple*, available at https://www.apple.com/newsroom/2020/12/apple-presents-app-store-best-of-2020-winners/, accessed on March 5, 2023.

[203] See the backup to Exhibit 26 in Appendix E for all Genshin Impact numbers referenced in this and the next paragraph.

[204] See Workpaper 17.

**EXHIBIT 14**

*Frequency of Final Price Digits ending in $X.49 or $X.99 for Composite In-App Purchases and Individual Item But-for Prices in Professor McFadden's Apple Price Tier Simulation*



Source: McFadden Production

Note:

[1] The sample of observations for this figure, and its associated percentages as reported on the vertical axis, are monthly observations of apps for which Professor McFadden makes a but-for price prediction for a composite in-app purchase in his Apple price tier simulation and for which at least one in-app purchase item has an as-is price that conforms to Apple's price tier rules. This is a subset of the apps present in the particular 0.1 percent sample Professor McFadden uses for his price tier simulations. The sample of individual items are items with an as-is price that is above zero and conforms to Apple's price tier rules, and for which Professor McFadden predicts a but-for composite in-app purchase price in his Apple price tier simulation for the item's associated app. But-for prices for individual items are found by applying the "percentage method." Ending digits are found by rounding Professor McFadden's but-for prices to the nearest two digits.

[2] 0.2 percent of as-is prices of individual items end in .49. 1 1 percent of implicit but-for prices of individual items end in .49.

129. Third, Professor McFadden's "price tier simulation" implies but-for prices for individual items that also fail to conform to Apple's price tiers, even though these are the prices that actually would be subject to Apple's price tiers. While Professor McFadden claims that his model does not predict individual in-app purchase prices, as I discussed in Section 5.1, one can calculate the implicit but-for prices for individual items. In particular, Professor McFadden's percentage method converts the change in the composite in-app purchase price into a percentage and implicitly applies that percentage change to each individual item's price.[205] Most of the implied but-for prices for individual items from his simulation do not fall on an Apple price tier, even though in actuality these are the products sold by developers, purchased by consumers, and covered by Apple price tiers. In fact, for

---

[205] As discussed above, Professor McFadden's claim that his model does not provide but-for prices for individual in-app purchase items is fundamentally incompatible with a realistic incorporation of Apple's price tiers, and also faces all of the problems discussed in Section 5.2. Therefore, for the purposes of this analysis I analyze the but-for prices implicit in his percentage method. As in Section 5.1, I assume that Professor McFadden's percentage method means that accounts purchase the same items in both the as-is and but-for worlds, and that the prices change by a constant percentage across all items for a given app.

Genshin Impact in September 2020, *none* of the items had implicit but-for prices that ended in $X.99 or $X.49, even in Professor McFadden's "price tier simulation."

130. Again, these failures are not specific to Genshin Impact. Exhibit 14 shows that 66.2 percent of Professor McFadden's predicted but-for prices for individual items end in digits other than $X.99 or $X.49.

131. To demonstrate the consequences of Professor McFadden's failure to realistically account for Apple's price tiers in his purported price tier simulation by focusing on composite in-app prices, I adjust that simulation to apply to item prices rather than composite in-app purchase prices. Specifically, I first apply his model to estimate marginal costs and predict but-for prices for individual items rather than for a composite in-app purchase, as in Section 5.1. Then, I adjust Professor McFadden's price tier simulation such that, for each item, the adjusted simulation requires developers to select from Apple's actual price tiers, thus guaranteeing a but-for price ending in $X.99 or $X.49 for each item. I do not endorse this adjustment as a solution to Professor McFadden's unreliable model for the many reasons I describe in the rest of this report and in my prior work on this matter.  This adjustment does, however, allow one to observe the profound impact that Professor McFadden's choice to simulate only composite prices, and not individual item prices, has on measures of individual and total damage.

132. Exhibit 15 presents the results. The fraction of unharmed accounts more than doubles, from 20.0 to 41.2 percent, and damages decrease by 28.2 percent. Using Professor McFadden's $10 cutoff, the percent unharmed increases by almost a factor of four, from 6.9 to 27.6 percent, and damages decrease by 28.1 percent.[206] This result again highlights the consequences of Professor McFadden focusing on higher, composite prices rather than typically lower prices for specific items; the former prices are high enough that in his model, developers may find it profitable to lower them by a full dollar, while the latter prices are not.

---

[206] See Workpaper 18.

**SER-820**

**EXHIBIT 15**

*Total Harm and Percent Unharmed: Professor McFadden's Purported Simulation of Apple Price Tiers vs. Application to Predict But-for Prices, and Enforce Apple's Price Tiers, for Individual Items*



Professor McFadden's Analysis Based on Composite In-App Purchase Prices

Adaptation to Predict But-for Prices, and Enforce Apple's Price Tiers, for Individual Items

Source: McFadden Production

Note:

[1] Percent of total harm is relative to net harm in Professor McFadden's Apple price tier simulation. All calcuations are based on the 0.1 percent sample of accounts Professor McFadden uses for his own price tier simulations. In addition, these calcultions use the parameter estimates based on this 0.1 percent sample of accounts and reported in Figure 10 of Professor McFadden's Second Revised Supplemental Report. For individual items, this analysis maintains Professor McFadden's assumption that the observed as-is prices are exactly profit-maximizing. The blue bar for percent unharmed reports the results Professor McFadden provides in Figure 7 of his Second Revised Supplemental Report.

133. Finally, Professor McFadden also proposes a second simulation, in which he purports to capture a new menu of price tiers with about 750 price points, all of the problems I have shown above apply equally to this second simulation. In particular, in this simulation, 38.1 percent of Professor McFadden's but-for composite in-app purchase prices fail to end in 9, and only 18.2 percent of the implied item-level prices end in 9.[207] Applying Professor McFadden's model to predict but-for prices for individual items and adjusting Professor McFadden's price tier simulation such that, for each item, developers select from the 750 price tier schedule reduces total damages by 22.4 percent and raises the percent of accounts

[207] Exhibit 24; Exhibit 25.

**SER-821**

unharmed by a factor of more than 1.9, or 13.3 percentage points, relative to Professor McFadden's 750 price tier simulation using composite in-app purchase prices.[208]

134. Professor McFadden has argued that I originally developed the approach of adjusting composite IAP prices in fixed increments, citing my Second Declaration.[209] However, this claim fails to appreciate that I did not endorse that analysis as a way to properly account for price tiers for in-app purchases. I performed that analysis merely to demonstrate that accounting for price tiers for in-app purchases had the potential to change Professor McFadden's results substantially. Further, I undertook this approach in the context of the "dollar method," not the "percentage method," and in fact warned that "the percentage method is fundamentally incompatible with 99-cent pricing.[210] While again taking care not to endorse this method as an appropriate way to handle pricing, or price tiers, for in-app purchases, I note that the approach *does* produce implicit item-level prices that are largely consistent with Apple's price tiers when it is applied in the context of the dollar method, as I show in Appendix E.

*5.2.2. Professor McFadden's Model Ignores Price Tiers in the As-Is World, Accounting for Which Can Significantly Change Which Accounts Are Harmed and Total Harm*

135. While Professor McFadden purports to address the effect of Apple's price tiers in the but-for world using his "price tier simulation" (subject to all the problems discussed above), he does not account for the effect that he claims Apple's price tiers have on the as-is world. Professor McFadden claimed in his Initial Report that as-is prices chosen by developers may not be exactly profit-maximizing,[211] and he suggested something similar in deposition.[212] Professor Berger explains why this claim is incorrect for many developers, who would voluntarily choose the same prices due to focal-point pricing.[213] I discuss the issue of voluntary focal-point pricing in the next subsection and explain that Professor McFadden has used a demand model that is incompatible with such pricing patterns.

136. Separate from the voluntary focal pricing issue, however, Professor McFadden has created a model that directly contradicts his claim that developers' as-is prices may not be

---

[208] See Workpaper 19.

[209] McFadden Second Revised Supplemental Report, ¶ 86.

[210] See Prince Second Declaration, ¶ 11.

[211] McFadden Initial Report, ¶¶ 128–130, 216–217, Appendix F.

[212] Third McFadden Deposition, 148:8–24 ("Q. Isn't it a fact that when you observe that in the real world the developer selected a tier price of $1.99, all you know is that that price was more profitable than the 99-cent or the 2.99 price tier? A. You certainly know that, and you also know or at least as an economist assume that developers are profit maximizers, so that -- they are missing products which maximize their products. Q. But with price tiers in the real world, isn't it a fact that you can't know exactly what the developer's marginal cost is? A. The answer is -- is yes, you can -- you can determine that within -- within limits. Q. And the limits are implicitly defined by the tiers, correct? A. Yes."). If he believed that developers chose exactly profit-maximizing prices, he would have answered that he could infer marginal costs exactly.

[213] Berger Report, Section VI.B.

exactly profit-maximizing. This contradiction has large implications for the range of but-for prices he ultimately predicts with his model because it impacts the precision of his estimates of each developer's marginal cost. As I explained in Section 2, to predict but-for prices Professor McFadden must first estimate marginal costs. To do so, he designs a model that assumes that the observed as is price is *exactly* the profit maximizing price, independent of any price tier restrictions.[214] In other words, Professor McFadden creates a model that assumes that each developer would have set the same prices even if Apple did not have price tiers. He confirmed in deposition that his model operates this way.[215] Yet, in contradiction to this assumption in his model, he also states that each developer's observed price *is not exactly profit-maximizing* but instead is selected because it is the most profitable choice from among Apple's price tiers.[216]

137. In fact, this claim is the basis for the design of his purported simulation of Apple's price tiers in the but-for world, which I analyzed in Section 5.2.1.

138. Importantly, though, if developers do not set exactly profit-maximizing prices in the actual world (as Professor McFadden claims and as he assumes in his simulation), then his model, which assumes that developers *do* set exactly profit-maximizing prices, will predict incorrect but-for prices, even setting aside all other problems with his model.

139. Here I exhibit the implications of this contradiction. Consider, for example a developer of a paid download Game app that faces a 30 percent commission rate that selected an as-is price of $4.99. When Professor McFadden estimates his model he assumes that this developer has chosen a profit-maximizing price of exactly $4.99 and forms his conclusions about but-for prices and harm accordingly. In his Initial Report, however, he opined that with price tiers, developers cannot charge their exact profit-maximizing prices, which means observed as-is prices will *not* be exact profit-maximizing prices.[217] He could have formulated his model to capture this dynamic but chose not to. Going back to the same example, under Professor McFadden's estimated model, in the presence of price tiers, the app's actual profit-

---

[214] Third McFadden Deposition, 150:15–17 ("The model as described in Appendix E assumes that in the as-is world, firms are maximizing their profits at the prices they charge."), 154:1–155:4 ("Q. And each unit that's sold incurs a cost equal to whatever value [the marginal cost] takes in -- in the respective cases of downloads and IAPs, correct? A. Yes, under -- under product maximization, yes…under the assumption of profit maximization, one can recover from the observed price what [the marginal cost] is.").

[215] Third McFadden Deposition, 150:1–22 ("Q. If -- if that assumption is correct, then developers would choose those prices that end in 99 cents even if there were no price tiers, because you've just told me they're the profit-maximizing prices in the real world, right? … THE DEPONENT: No, I don't -- I don't agree that that's a logical conclusion. It's entirely possible that if -- if they're in the absence of tiers, they would design and price their products even more profitably. Q…Do you take that into account in your model? A. The model as described in Appendix E assumes that in the as-is world, firms are maximizing their profits at the prices they charge. Q. And that's an assumption. Is there anywhere in your report where you marshal empirical evidence to show that's actually a description of reality? A. No.").

[216] McFadden Initial Report, ¶¶ 128–130, 216–217, Appendix F.

[217] McFadden Initial Report, ¶¶ 128–130, 216–217, Appendix F.

maximizing price could be anywhere between $4.44 and $5.44.[218] If the profit-maximizing price were any higher than $5.44, the developer would choose a higher tier; any lower than $4.44, and they would choose a lower tier. In turn, this means that he would only be able to infer a range for marginal costs, rather than a single value. As he admitted in deposition, "with price tiers in the real world…you can determine [marginal costs] within…limits…implicitly defined by the tiers."[219]

140. This range of potential profit-maximizing prices and marginal costs in turn would imply a range of but-for prices. If the developer had wanted to set a price of $5.44 in the as-is world, then its profit-maximizing price would have to change by a large amount in the but-for world for it to move to the next tier down and set a price of $3.99 in the but-for world. But if the developer had wanted to set a price of $4.44 in the as-is world, then its profit-maximizing price would only have to change by a small amount in the but-for world for it to move to the next tier down and set a price of $3.99 in the but-for world.

141. I quantify the impact of Professor McFadden's failure to model his own claim that Apple's price tiers affect as-is prices. I show that, taking seriously Professor McFadden's claim, his model is consistent with a wide range of potential outcomes for the but-for world. As in the example above, for each app download or in-app purchase item I calculate the range of prices in the as-is world that could be profit maximizing, given Professor McFadden's model, the observed as-is price, and his opinion that the profit-maximizing price may differ from the observed as-is price due to price tiers.[220] Then, I predict the but-for prices implied by the highest and lowest profit-maximizing prices within this range.[221] Due to the incompatibility between Professor McFadden's in-app purchase composite prices and Apple's existing price tiers, I apply Professor McFadden's model as I did in Section 5.2.1 for all of the results in the rest of this subsection and predict but-for prices for individual items.[222] To mirror Professor McFadden's price tier simulation, I limit my attention to the particular 0.1 percent sample he uses for his price tier simulation.

---

[218] See Workpaper 20.

[219] Third McFadden Deposition, 148:17–24.

[220] The formula for calculating the feasible range of marginal costs depends on the parameter estimates from Professor McFadden's model, which are the same for all apps with the same genre and App Store business model, as well as the commission rate faced by each developer. For this analysis I continue to use Professor McFadden's app-average commission rate. In addition, I account for the fact that the price tiers faced by developers in the as-is world differ for subscription and non-subscription content.

[221] Exhibit 17 provides estimates following Professor McFadden's baseline assumption that there are no price tiers or focal pricing behaviors in the but-for world, while Exhibit 16 provides estimates when Apple's existing price tiers are applied in the but-for world.

[222] In the current analysis, I do not make but-for predictions for downloads of apps with both paid downloads and paid in-app purchases. I also do not make but-for predictions for item-months associated with prices that do not conform to Apple's existing price tiers. When there are items (downloads or in-app purchases) for which I do not make a prediction, but Professor McFadden does, I use Professor McFadden's estimate of the but-for price when calculating harm.

142. Exhibit 16 presents the results of this analysis for the case when developers select from Apple's existing price tiers in the but-for world as well in the as-is world, analogous to the orange bars in Exhibit 15 above. It is apparent in these results that Professor McFadden's model does not imply a narrow interval of harm outcomes as he claims via the standard errors in his Supplemental Report, but rather is consistent with a wide range of harm outcomes. I showed in Exhibit 15 that enforcing Apple's price tiers for individual items in the but-for world, but ignoring price tiers in the as-is world, means that 41.2 percent of accounts are unharmed. Here, I find that if one accounts for Professor McFadden's own opinion that observed as-is prices may not be exactly profit-maximizing due to the existence of price tiers in the as-is world, his model is in turn consistent with a wide range of shares of unharmed accounts, from 17.4 percent up to 60.5 percent. For the same reasons, total harm may be up to 63.2 percent higher or 53.1 percent lower than what one finds when assuming (contrary to Professor McFadden's stated opinion) that observed as is prices are exactly profit-maximizing.  Applying the latter percentages to the total purported harm calculated in Section 5.1.2 means that total damages might lie anywhere between ███████ and ███████

---

[223] $(1 - 0.53) \times$ ███ $=$ ███.
[224] $(1 + 0.63) \times$ ███ $=$ ███.

---

### EXHIBIT 16

*Range in Harm Estimates and Percentage of Unharmed Accounts Implied by the Range of Profit-Maximizing Prices Consistent with Professor McFadden's Model and Observed Prices in the As-Is World, With Apple's Price Tiers Enforced for Individual Items in the But-For World*



Source: McFadden Production

Note:

[1] Percent of total harm is the ratio of net harm in each analysis to the net harm I calculate in the application of Professor McFadden's model to individual item prices and enforcing Apple's existing price tiers for but-for prices of individual items. All calculations are based on the 0.1 percent sample of accounts used in Professor McFadden's price tier simulations. In addition, these calcultions use the parameter estimates based on this 0.1 percent sample of accounts and reported in Figure 10 of Professor McFadden's Second Revised Supplemental Report.

[2] For a given as-is price, when price tiers are in effect in the but-for world developers with higher exactly profit-maximizing prices require larger commission rate changes to induce them to lower their price. This is consistent with the phenomenon that price tiers are leading developers with exactly profit-maximizing prices above their as-is price to charge lower prices than Professor McFadden's model would predict if commissions were unchanged and price tiers were removed.

143. Exhibit 16 presents the results of this analysis for the case when developers select from Apple's existing price tiers in the as-is world, but are allowed to set any price in the but-for world. As before, it is apparent in these results that according to Professor McFadden's claim that Apple's price tiers prevent developers from setting profit-maximizing prices in the as-is world, his model does not imply a narrow interval of harm outcomes as he claims via the standard errors in his Supplemental Report. Instead, it is consistent with a wide range of harm outcomes, and any particular estimate within that range would be speculative.

**SER-826**

**EXHIBIT 17**

*Range in Harm Estimates and Percentage of Unharmed Accounts Implied by Range of Profit-Maximizing Prices Consistent with Professor McFadden's Model and Observed Prices in the As-Is World, With No Price Tiers Enforced in the But-for World*



Source: McFadden Production

Note:

[1] Percent of total harm is the ratio of net harm in each analysis to the net harm I calculate in the application of Professor McFadden's model without price tiers in effect in the but-for world to the prices individual items. All calculations are based on the 0.1 percent sample of accounts used in Professor McFadden's price tier simulations. In addition, these calcultions use the parameter estimates based on this 0.1 percent sample of accounts and reported in Figure 10 of Professor McFadden's Second Revised Supplemental Report.

[2] For a given as-is price, with price tiers no longer in effect in the but-for world and no commission rate changes developers with high exactly profit-maximizing prices would charge higher prices than seen in the as-is world. For items with positive marginal cost, this creates a higher initial level from which Professor McFadden's model predicts price declines in response to the commission rate decrease.

144. In performing theses analyses, I stress that I do not endorse Professor McFadden's model, even with these adjustments, because of all its other problems, including the fundamental problem that his model cannot reliably estimate marginal costs and fails to find many apps with marginal costs near zero.[225] Furthermore, by presenting the exhibits above, I do not mean to imply, even if Professor McFadden were correct that Apple's price tiers affect pricing in the as-is world, that *every* developer had the lowest possible profit-maximizing price that is consistent with the data, or that *every* developer had the highest possible profit-maximizing price that is consistent with the data. Rather, the above analysis shows that

---

[225] Additionally, Professor McFadden's model cannot correctly determine marginal costs because it doesn't account for focal-point pricing.

**SER-827**

Professor McFadden (a) has made fundamental claims about the marketplace (i.e., that price tiers are anticompetitive and do not allow developers to set the exact profit-maximizing price), (b) has then created a damages model that explicitly assumes the opposite, and (c) this assumption has large impacts on the claimed precision of his damages estimates, even ignoring all of Professor McFadden's other errors. If Professor McFadden claims (as he does) that price tiers do not allow developers to set their exact profit maximizing prices, then he must build a model that respects this assumption and acknowledge the implication that it is not possible to estimate either total harm or the number of unharmed accounts with precision—but he decidedly does not do so.

### 5.2.3. Professor McFadden Does Not Offer Analyses Related to Focal-Point Pricing

145. Professor McFadden distinguishes price tiers from focal-point pricing, which he describes as "voluntary pricing by sellers" that "arise[s]… out of equilibrium."[226] Indeed, Professor Berger shows that there is substantial evidence that developers would likely have set prices ending in $X.99 even absent Apple's price tiers.[227] The Court observed that "overwhelming evidence suggests that developers would choose to price their apps at focal points ending in 99 cents."[228]

146. Here again, Professor McFadden appears to take contradictory positions. First he testifies that developers would set different prices absent Apple's price tiers. But he agrees that app prices would likely still cluster at 99-cent points even absent Apple's price tier policy.[229] The prevalence of 99-cent pricing in the Google Play store—which does not have price tiers—is empirical proof.[230] As Professor Berger explains, there is strong empirical evidence that in digital goods markets firms voluntarily set prices ending in 99 cents even absent a requirement to do so.[231] Professor Berger further explains that 99-cent pricing can emerge due to consumer behavior prevalent in the real world, such as "left-digit effect" and a preference for familiar prices, and that it can potentially increase consumer demand.[232]

147. However, Professor McFadden's model incorporates no such aspects. It assumes a smooth demand curve, which does not reflect any consumer preference (or developer

---

[226] Third McFadden Deposition, 124:11–17 ("By the way, I [Professor McFadden] would make a clear distinction between tier prices and local [*sic*] prices. Tier prices are imposed to – to – monopolistic seller, and focal prices are something that arise out of – out of equilibrium and the – the voluntary pricing by sellers, and those are not necessarily the same.").

[227] Berger Report, Section VI.B.

[228] Class Certification Order, p. 11.

[229] Second McFadden Deposition, 152:7–13 ("Q. Okay. If Apple removed its price tier policy or was made to remove its price tier policy, would you expect that app prices would still cluster at 99-cent price points? A. I agree that focal point pricing is common, and I agree that I would expect to see it in -- in any world, including a but-for world.").

[230] Class Certification Order, p. 12.

[231] Berger Report, ¶¶ 30–42.

[232] Berger Report, ¶¶ 49–52.

**SER-828**

incentive) to choose focal-point prices. Even ignoring the issues with composite in-app purchase prices and the "percentage method," this is borne out in the fact that his baseline analysis ignoring price tiers predicts that only 0.3 percent of but-for paid download prices end in $X.99.[233] If his model incorporated features that rationalize focal-point pricing, this would not be the model's output.

148. Indeed, Professor McFadden does not analyze focal-point pricing at all. He suggests that his 750-tier simulation exercise does so by arguing, "To the extent that apps will set their But-For prices only at focal points, e.g. prices ending in 99 cents, their pricing decision works the same as that when pricing tiers exist in the But-For world."[234] The claim that his proposed price tier simulation can recreate the outcomes associated with focal-point pricing does not hold in general. His price tier simulation starts with a model that assumes that developers would prefer to sell their products at prices other than those on price tiers (whether 99 cents or the 750 tiers he proposes in his second simulation). It then simulates a world in which developers are forced to choose a less profitable price from the available price tiers due to a price tier policy governing their pricing. Voluntary focal-point pricing is different by nature. With voluntary focal point pricing each developer is free to choose any price, but has voluntarily chosen a focal-point price because the developer has decided it is in its best interest to do so. Professor McFadden has offered no approach to model voluntary focal-point pricing, even while acknowledging that its presence would likely lead many developers to choose 99 cent pricing in the absence of price tiers.

149. More generally, Professor McFadden has made no attempt to document, either empirically or through economic logic, even which prices might be focal. And he has provided no indication how he would capture focal-point pricing for individual in-app purchase items in a realistic way given his claims that his model is "silent" on the but-for prices of individual in-app purchase items, which comprise 90.1 percent of transactions and 99.1 of claimed damages.[235]

150. Professor McFadden's failure to build a model that can capture focal-point pricing has qualitatively similar consequences as his failure to account for Apple's price tiers. While the exact consequences cannot be known without constructing a model that properly gives rise to focal-point pricing, I have already shown in Section 5.2.1 that enforcing restrictions that limit prices to Apple's price tiers in the but-for world tends to reduce harm and increase the number of unharmed accounts. Further, as I showed in Section 5.2.2, if one claims, as Professor McFadden does, that price tiers cause developers to charge different prices than

---

[233] See Workpaper 21.

[234] McFadden Supplemental Report, footnote 97.

[235] See Workpaper 7.

they otherwise would, accounting for this dynamic in Professor McFadden's model would make it incapable of precisely determining harm or the number of unharmed accounts.

***5.3. Professor McFadden's Model Continues to Find Many Unharmed Accounts, and His Analysis of 75 Samples Does Not Resolve the "Switcher Issue"***

151. Professor McFadden purports to "address the switcher issue"—wherein the net harmed status of accounts changed depending on the sample he analyzed—by estimating consumer demand with 75 different 0.1 percent samples and applying an averaged set of estimates to the full transaction data.[236] However, the use of 75 samples instead of one does not address any of the fundamental problems with Professor McFadden's model that I discuss in this report, and in this section, I show that the model remains wholly unsuited for the purposes of determining harm, and which accounts are harmed, in a common manner due to Apple's challenged conduct in this matter.

152. Before discussing this unreliability further, however, I note that Professor McFadden's model, even by his own calculations, has predicted a large fraction of unharmed accounts that has continued to grow throughout his reports and revisions to his analyses. As I show in Exhibit 18, in his original report, he claimed that 5.8 percent of accounts were unharmed,[237] but after multiple revisions, this baseline figure has more than tripled to 17.8 percent.[238]

---

[236] Second Revised McFadden Supplemental Report, ¶¶ 45, 54–55.

[237] McFadden Initial Report, ¶ 241.

[238] In his Reply Report, Professor McFadden amended his harm calculation to be net harm, finding 7.7 percent of accounts were unharmed (McFadden Reply Report, ¶ 200). When he accounted for his data processing error that I pointed out in my Initial Report, he further revised the fraction of unharmed accounts to 14.6 percent (McFadden Reply Report, footnote 371). In his Declaration, he found that this number further increases to 15.3 percent if his estimation uses all apps in a sample rather than the top 70 percent revenue apps (McFadden Declaration, ¶ 9). In the first version of his Supplemental Report, he found that 17.2 percent of accounts were unharmed (McFadden Supplemental Report, Figure 1). In revising his Supplemental Report, he found that 17.6 percent of accounts were unharmed and has now settled upon a figure of 17.8 percent (First Revised McFadden Supplemental Report, Figure 1; Second Revised McFadden Supplemental Report, Figure 1).

***EXHIBIT 18***
***Percent Unharmed Figures throughout Professor McFadden's Reports***

| Report | Change from Previous Figure | Percent Unharmed |
|---|---|---|
| Opening Report | - | 5.8 |
| Reply Report | Amended harm calculation to use net harm definition | 7.7 |
| Reply Report | Accounted for data processing errors | 14.6 |
| Declaration | Provided harm measures using all apps in a sample rather than only apps in top-70 percent by revenue | 15.3 |
| Supplemental Report | Estimated parameters on 75 samples and harm on full transactions data | 17.2 |
| First Revised Supplemental Report | Initial attempt to correct genre classification method | 17.6 |
| Second Revised Supplemental Report | Corrected undisclosed errors in harm estimation code and again modified genre classification | 17.8 |

Source: McFadden Initial Report; McFadden Reply Report; McFadden Declaration; McFadden Supplemental Report; McFadden Production

153.  Even applying Professor McFadden's economically baseless $10 spending cut-off, introduced only after his percentage of unharmed accounts grew over time, yields 7.9 percent unharmed accounts, totaling nearly 14 million.[239] Therefore, setting aside all the methodological issues with Professor McFadden's model, it predicts a substantial number of unharmed accounts, which severely undermines Professor McFadden's claim that all or nearly all putative class members have been harmed.

154. But even ignoring the persistent fact that Professor McFadden's model finds large numbers of unharmed accounts, Professor McFadden's results are highly sensitive to errors he has made, as the count of such accounts has swung substantially as he has corrected some of those errors, even as he employs 75 samples. Professor McFadden finds that 176,964,271 accounts purchased apps in the Games, Music, and/or Entertainment genres in his analysis.[240] This means that the revisions to his supplemental report from 17.2 percent to 17.8 percent unharmed represent a difference of over a million accounts.[241] Moreover, whether a particular account has been harmed or not has been changing with every one of Professor McFadden's corrections, which means that his analysis cannot reliably identify unharmed

---

[239] Second Revised McFadden Supplemental Report, Figure 1. 176,964,271 × 7.9 percent = 13,980,177.

[240] Second Revised McFadden Supplemental Report, Figure 1.

[241] 176,964,271 × (17.8 percent − 17.2 percent) = 1,061,785.

accounts. It is entirely plausible that if another error is discovered or a revision is made in the future, the fraction of unharmed accounts could change further. He even testified that "numbers may change" if he used "an extra year's worth of transactional data beyond April 2022."[242]

155. As a specific example of Professor McFadden's continuing "switcher issue" despite his use of 75 samples, consider his latest revision, caused by a change in genre classifications for a few apps. As Professor Watson discusses, for one of his 75 Music and Entertainment samples, this change affected only 7 apps and yet changed the price sensitivity estimate from -62.3 to -1.6.[243] Even though the other 74 samples saw much smaller changes, the total harm from Music and Entertainment fell by ▮▮▮▮▮▮, or about ▮▮ percent,[244] and led to more than 1 million accounts switching from unharmed to harmed. These changes were most likely driven primarily by just the one sample where there was a substantial change in the price sensitivity estimate. Clearly, the use of 75 samples has not given Professor McFadden's model the requisite robustness and stability.

156. Not only is the number of unharmed accounts predicted by Professor McFadden's model sensitive to his errors and revisions, but the model is also highly sensitive to his assumptions. As I demonstrate in this report, Professor McFadden makes a number of unrealistic assumptions that are disconnected from market realities. For example, Professor McFadden assigns zero damages for monthly observations of apps that experience a within-month as-is download price change because his model is not "designed" to deal with temporary price reductions.[245] However, he does not do the same for in-app purchases and assign zero damages for monthly observations of apps that experience a within-month in-app purchase price change.[246] Doing so increases the fraction of unharmed accounts from 14.3

---

[242] Fourth McFadden Deposition, 94:25–95:5 ("Q. Is it your opinion that your 75 sample average coefficient estimates for the game genre would be unchanged if you ran your model on all data, including, let's say, an extra year's worth of transactional data beyond April 2022? A. No. I think that numbers may change.").

[243] Specifically, only 7 apps moved into or out of the regression sample. See Watson Report, Appendix H.

[244] Second Revised McFadden Supplemental Report, Figure 1; Watson Report, Appendix H. ▮▮▮▮▮▮▮▮▮▮▮ = ▮▮ percent.

[245] Third McFadden Deposition, 81:5–24 ("Q. In that footnote, you say that you assign zero damages for app-months that experience a within-month As-Is download price change because you assume these price changes represent temporary price reductions or price fluctuations that are not explained by fluctuations in demand or marginal costs. Do you see that? A. Yes. Q. Is yo    model in capable of dealing with temporary price reductions or price fluctuations?  A. It's -- it's not designed to do that. It's designed to reflect the -- the overall change in prices so, if you like, the appropriate changes in prices that might result from a decline in – in commissions to -- to determine the full granularity of the dynamics of -- of temporary fluctuations would involve a -- a more -- a different and more complex model. I have not -- I don't think it would be appropriate for this application.").

[246] Professor McFadden testified that the composite in-app purchase price cannot fluctuate within a month because it is only calculated once per month. However, this misses the fact that composite in-app purchase price is based on the price of individual items. The price of the individual items is calculated in the same way as the download price, and just like the download price, item prices can and do change within months. See Third McFadden Deposition, 83:12–84:5 ("Q. Well, you calculated an average IAP price at the app level, correct? A. Correct. Q. And that average IAP price is an average of all of the IAP item prices for the app, correct? A. That's correct. Q. And that average IAP price can change or fluctuate within a given month, can it not? A. I think given the way it's calculated, no, it could not, because it's calculated on the basis of a

percent to 23.4 percent.[247] Small changes to the but-for commission rate, too, drastically change the number and identity of harmed accounts.[248]

157. Exhibit 19 summarizes the sensitivities presented throughout this report as well as certain sensitivities in the reports of Professor Hitt and Professor Watson. As this exhibit demonstrates, applying alternative, reasonable assumptions leads to a dramatic increase in the number of unharmed accounts in Professor McFadden's model. This means that in spite of any effort he has taken since the Court's Class Certification Order, including employing 75 samples, Professor McFadden's unreliable methodology remains sensitive to assumptions and continues to overestimate harm.

*EXHIBIT 19*

*Changing the Unrealistic Assumptions of Professor McFadden's Model Generates Even More Unharmed Accounts*

| Professor McFadden | | | Alternative | | |
|---|---|---|---|---|---|
| Assumption | Total Harm | % Unharmed | Assumption | Total Harm | % Unharmed |
| Professor McFadden's "percentage method" for calculating item-level but-for prices | ▮ | 17 8%[1] | Professor McFadden's model applied t predict but-for prices for individual item | ▮▮ | 35 9%[2] |
| Professor McFadden's proposed but-for price-tier simulation based on composite in-app purchase prices | ▮ | 20 0%[4] | Professor McFadden's price tiers simulation adapted to predict but-for prices and enfore price tiers for individual items | ▮▮ | 41 2%[6] |
| Professor McFadden's proposed but-for price-tier simulation based on composite in-app purchase prices | ▮ | 20 0%[4] | Price tiers accounted for in the as-is world and Professor McFadden's price tiers simulation adapted to predict but-for prices and enfore price tiers for individual items | ▮ | 17.4% to 60 5%[8] |
| Professor McFadden's $10 spending cutoff based only on Games, Music, and Entertainment spending | | 7 9%[9] | 10$ spending cutoff based on spending across all genres | | 12.4%[10] |
| Dr. Abrantes-Metz's proposed 13.63 percent but-for commission rate | ▮ | 17 8%[1] | Alternative but-for rates consistent with Dr. Abtrantes-Metz's methodology, as discussed by Professor Hitt | ▮ | 17 6% to 44 8%[11] |
| Price sensitivity restricted to be the same across high- and low-price apps | ▮ | 17 8%[1] | Price sensitivity allowed to vary across high- and low-price apps | ▮ | Harm Undefined[12] |
| Professor McFadden's proposed margin constraints based on six developers' accounting data | ▮ | 17 8%[1] | Professor Watson's sensitivity analysis of the margin constraints | ▮▮ | 29 0%[13] |
| Professor McFadden assumption of zero damages for app-months with within-month download price changes | | 14.3%[14] | Zero damages assigned to app-months with within-month download or in-app purchase price changes | | 23.4%[15] |

Source: McFadden Production; Watson Report, Section 4.2

Note:

[1] Second Revised McFadden Supplemental Report, Figure 6.

[2] Calculated based on the full transactions data used by Professor McFadden, the mean of Professor McFadden's 75 sample estimates, and applying his model to predict but-for prices for individual items. See Exhibit 10.

[3] Calculated as ▮ percent of total damages in Second Revised McFadden Supplemental Report, Figure 6. ▮ percent corresponds to the damages as a share of flexible pricing damages in Second Revised McFadden Supplemental Report, Figure 7.

[4] Second Revised McFadden Supplemental Report, Figure 7.

total number of -- of item transactions and total spend for that app for the month. Q. You're saying that that calculation cannot change within the month, or are you saying that calculation is done for a given month? …. THE DEPONENT: That calculation is done for a given month.").

[247] See Workpaper 31; Second Revised McFadden Supplemental Report, Figure 7.

[248] See Section 6.1.1.

[5] Calculated ▮ percent of total harm according to Professor McFadden's proposed app-level price-tier methodology in the but-for world ▮. ▮ percent is calculated based on Professor McFadden's 0.1 Appendix D Sample, using Professor McFadden's demand estimates from this sample, and applying Professor McFadden's model to predict but-for prices and enforce Apple's price tiers for individual items. See Exhibit 15.

[6] Calculated ▮ ed on Professor McFadden's 0.1 percent Appendix D sample, using Professor McFadden's demand estimates from this sample, and applying Professor McFadden's model to predict but-for prices and enforce Apple's price tiers for individual item. See Exhibit 15.

[7] Calculated as ▮ and ▮ percent, respectively, of total harm according to Professor McFadden's proposed app-level price-tier methodology in the but-for world ▮. ▮ and ▮ percent are calculated based on Professor McFadden's 0.1 percent Appendix D sample, using Professor McFadden's demand estimates from this sample, taking price tiers into account in the as-is world, and applying Professor McFadden's model to predict but-for prices and enforce Apple's price tiers for individual item. See Exhibit 16.

[8] Calculated based on Professor McFadden's 0.1 percent Appendix D sample, using Professor McFadden's demand estimates from this sample, taking price tiers into account in the as-is world, and applying Professor McFadden's model to predict but-for prices and enforce Apple's price tiers for individual item. See Exhibit 16.

[9] Second Revised McFadden Supplemental Report, Figure 6.

[10] Calculated based on the full transactions data used by Professor McFadden and the mean of Professor McFadden's 75 sample estimates while restricting attention to accounts with total spending above $10. See Exhibit 20.

[11] Calculated based on the full transactions data used by Professor McFadden and the mean of Professor McFadden's 75 sample estimates while considering an alternative set of but-for commission rates discussed by Professor Hitt. See Hitt Second Report, Section 9 3 and Section 9.4. See also Exhibit 21.

[12] Calculated based on Professor McFadden's 0.1 percent Appendix D sample while allowing Professor McFadden's price sensitivity parameter to vary by an app's price. See Exhibit 28.

[13] Calculated based on the full transactions data used by Professor McFadden, considering an alternative set of profit margin constraints in Professor McFadden's 75 sample estimation, as analyzed by Professor Watson. See Watson Report, Section 4.2.

[14] Backup to Second Revised McFadden Supplemental Report. See OR Sample Estimation\Estimation without Music betaQ\intermediate\Para 241 - Pct Method\tau0p1363\person_summ_pct.csv.

[15] Calculated based on Professor McFadden's 0 1 percent Appendix D sample, using Professor McFadden's demand estimates from this sample, and assigning zero damages to monthly observations of apps that experience a within-month in-app purchase price change. See Workpaper 31.

158. Professor Watson explains why, econometrically, the use of more samples does not render Professor McFadden's model reliable. Professor Watson notes that it does not address the uncertainty surrounding Professor McFadden's subjective and all-important margin constraints and does not fix the imprecision of his transactions-data-based estimates, i.e., those formed by ignoring the margin constraints. Furthermore, he explains that Professor McFadden's approach of averaging 75 distinct estimates is not the correct way to employ 75 samples.[249]

### 5.4. Professor McFadden's $10 Spending Cut-off Analyses are Not Relevant and His Conclusions Are Misleading

159. In his Supplemental Report, Professor McFadden presents several results "among only those accounts that spent more than $10 in total during the 14-year period from July 2008 to April 2022."[250] He states that the majority of unharmed accounts can be excluded by implementing this cut-off. As I show below, this statement is false because Professor McFadden incorrectly excludes certain accounts that this rule would not exclude.[251] Further, many of the accounts removed by Professor McFadden's cut-off have low spending because they have transactions associated with low priced apps. In his model, low-priced apps are the ones that have higher but-for prices (generating no harm). Therefore, while the removal of

---

[249] Watson Report, Sections 5.3, 6.2.

[250] Second Revised McFadden Supplemental Report, ¶ 77.

[251] See Workpaper 22.

accounts that made only a few low-priced purchases appears to be aimed at reducing the number of unharmed accounts, this is misleading because it is Professor McFadden's modeling assumptions (rather than any empirical evidence) that make unharmed accounts cluster around low price points. In this section, I explain how Professor McFadden's cut-off is arbitrary, is applied in a misleading way that understates the number of unharmed accounts that survive his cut-off, and is inconsistent with Plaintiffs' revised class definition and therefore not relevant to this matter.[252]

160. First, Professor McFadden's $10 threshold is an arbitrary cut-off and is not based on economic analysis. Professor McFadden testified that he has no opinion on whether the class should be truncated by a dollar spend or whether such a cutoff should be at $10 or any other number.[253] By Professor McFadden's own admission, the reliability of his model is not improved in any way by this cutoff,[254] nor does it make his model any more capable of identifying harmed accounts, nor does it cure any of the problems with his model noted elsewhere in this report.

161. Second, even setting aside the conceptual issues with his cut-off, Professor McFadden applies his cut-off in a way that is inconsistent with Plaintiffs' class definition and biases the results. Plaintiffs move to certify a class of "persons who paid more than $10 in total to Apple during the Class Period for iOS applications and in-app purchases from any one Apple ID account."[255] But Professor McFadden only removes accounts with less than $10 of spending in the Games, Music and Entertainment genre, even if they have more than $10 of spending across all genres. He notes this in his own report, and claims he will alter the cutoff when he models additional genres, but as I explain in Section 6.2, he still has not done so despite his claims that it could be done "with minimal efforts."[256] But even though he has not modeled genres outside of Games, Music, and Entertainment, he agreed in deposition that he could have still included in his calculations—but did not—accounts who spent less than $10

---

[252] Professor McFadden has also testified that "if you redefine the class as those with a $10 spending cutoff and restart the analysis from the very beginning, it's possible that that would have an effect on the estimated demand parameters." If Professor McFadden were to re-estimate his model and obtain a different set of estimated demand parameters, none of his current figures and estimates would be accurate, and his new estimates may be economically nonsensical. In particular, and as I discuss at greater length in Section 5.3, Professor McFadden's model can fail (for example by estimating upward sloping demand curves) when estimated on different samples. Therefore, none of the results of his report related to the cutoff are reliable. See Third McFadden Deposition, 234:18–235:1 ("A. Is it -- given the demand parameters, it would make no difference in the damage calculations for any given individual what their spending level is. But if you redefine the class as those with a $10 spending cutoff and restart the analysis from the very beginning, it's possible that that would have an effect on the estimated demand parameters.").

[253] Third McFadden Deposition, 216:21–217:22 ("Q. Are you offering any opinion that the class should be truncated by a dollar spend to cutoff? A. No. I -- I am simply responding to counsel's request. …Q. Do you have any opinion as to whether a $10 lifetime cutoff is superior to an $8 or an $18 cutoff? A. No.").

[254] Third McFadden Deposition, 231:12–23 ("Q. Is your methodology more reliable with a lifetime spending cutoff? …THE DEPONENT: I think my model is applicable to the class in its original definition and would be applicable to either a subclass, if that's how this is a result legally, or to a new reduced size class if that's the way it's resolved. I believe the model could be used for each, and it's -- it would stand on its own bottom. Its reliability can be determined on its merits.").

[255] Plaintiffs' Renewed Motion for Class Certification, p. 1.

[256] McFadden Second Revised Supplemental Report, footnote 82; McFadden Reply Report, ¶ 191.

in those genres, but more than $10 including other genres.[257] As a result of this incorrect implementation, Professor McFadden's analysis does not measure the impact of plaintiffs' proposed redefinition of the class on the alleged harm, and it overstates the extent to which the cutoff removes unharmed accounts.

162. To see why, suppose an account spent $9 in Games, Music, and Entertainment and $9 in other genres. Because this individual spent at least $10 in total via a single account, this individual would be a putative class member. But because Professor McFadden would ignore the $9 spent in other genres, his analysis would exclude the account. This issue is pervasive in Professor McFadden's analysis: of the over ███████ accounts that are removed by Professor McFadden's narrow $10 threshold ███ percent spent more than $10 in total across all genres.[258] Professor McFadden would exclude all these accounts when they, by definition, belong to putative class members. In fact, Professor McFadden incorrectly drops one of the named plaintiffs from his analysis for this reason. Mr. Hayter spent $28.94 on the App Store, but only $1.99 of this spending was in Games, Music, or Entertainment.[259] Thus, Professor McFadden erroneously assumes Mr. Hayter is not a member of the narrowed class.

163. Correcting Professor McFadden's implementation of the $10 cutoff for spending across all genres increases the fraction of unharmed accounts. Exhibit 20 presents the results of applying a $10 spending cut-off across all genres for the set of accounts that are included in Professor McFadden's analysis of the Games, Music, and Entertainment genres. By considering spending across all genres, this analysis adds back accounts that spent less than $10 on Games, Music, and Entertainment but more than $10 across all genres.[260] The number of unharmed accounts increases by more than ███████ from 10.3 million accounts to ███ accounts, and the fraction of unharmed accounts increases from 7.9 to 12.4 percent.[261] Professor McFadden's claim that "the majority of unharmed accounts can be excluded" by implementing a $10 spending cutoff is also false.[262] Of the 31.5 million accounts unharmed in his baseline analysis, there are still ███████ unharmed accounts after removing accounts with $10 spending across all genres.[263] In the context of Professor McFadden's

---

[257] Fourth McFadden Deposition, 92:21–93:5 ("Q. Do you need to model additional genres in order to determine whether an account has more or less than $10 in lifetime spending across all genres? A. The answer is yes. If you do this across all genres, both the -- both the cutoff and the actual calculated harm would be based on all the genres analyzed. Q. But you could calculate an accounts lifetime spending across all genres today, could you not? A. Yes.").

[258] See Workpaper 22.

[259] See Workpaper 23.

[260] The accounts that are added back in this analysis have purchases in other genres that Professor McFadden fails to model, which will ultimately affect injury determination. I discuss the issues with Professor McFadden's failure to model most genres in Section 6.2 of this report.

[261] In his implementation of the $10 cutoff, ███████ accounts are dropped from the calculation of harm. Of these accounts, 54.3 percent (███████ accounts) are harmed, and 45.7 percent ███████ accounts) are unharmed. See Workpaper 22.

[262] Second Revised McFadden Supplemental Report, ¶ 79.

[263] Second Revised McFadden Supplemental Report, Figure 6; McFadden backup for Figure 6.

purported price tier analysis focused on composite in-app purchase prices, or my application from Section 5.2.1 that focuses on prices for specific items, correcting the implementation of the $10 cutoff leads to an even larger increase in the fraction of accounts that are unharmed.

---

**EXHIBIT 20**

*Percent Unharmed: $10 Spending Cutoff Based on Total Spending and Based Only on Games, Music, and Entertainment Spending*



Source: McFadden Production

Notes:

[1] The percent unharmed using Professor McFadden's implementation of the $10 cutoff corresponds to the number reported in Figure 6 of Professor McFadden's Second Revised Supplemental Report. The percent unharmed when counting spending across all genres towards the $10 cutoff uses Professor McFadden's account-level damage estimates based on the full transactions data and the mean of his 75 sample estimates produced on January 19, 2023. Instead of only counting Games, Music, and Entertainment spending towards the cutoff, it counts an account's spending across all genres towards the $10 cutoff.

[2] For both Professor McFadden's price tier analysis and my application of his model to individual item prices, harm is calculated for the 0.1 percent sample of accounts Professor McFadden uses for his price tier simulations. For this analysis, Professor McFadden's model is applied using the parameter estimates calculated based on the 0.1 percent sample used for Professor McFadden's price tier simulations and reported in Figure 10 of his Second Revised Supplemental Report.

---

164. Furthermore, Professor McFadden errantly removes accounts that belong to class members, meaning that his analysis does not fit Plaintiffs' revised class definition. Professor McFadden's analysis excludes all accounts that spent less than $10.[264] But Plaintiffs' class definition consists of individuals (and all of their accounts) who own any one account with at

---

[264] Third McFadden Deposition, 223:17–21 ("Q. Is that how you understand a $10 cutoff would be applied, by limiting damages calculations to the accounts whose total spending is $10 or more? A. Yes.").

least $10 in spending.[265] Some of the accounts that Professor McFadden removes, therefore, may belong to class members—to individuals who spent at least $10 from a different account. The removal of any such accounts will lead to an incorrect determination of harm, both for that individual and in aggregate. For instance, consider a hypothetical individual who spends $8.91 on her first account and $10.05 on her second account. Because this individual spent at least $10 via a single account this individual would be a class member, and both accounts should be included when calculating total harm. However, Professor McFadden's account-level analyses would exclude the first account from any of his cutoff calculations.

## 6. PROFESSOR MCFADDEN'S MODEL CONTINUES TO BE DISCONNECTED FROM THE REALITIES OF THE MARKET IT STUDIES

165. Professor McFadden's model has not been adjusted in fundamentally important ways to reflect the market it purports to model. First, it continues to produce inaccurate and economically nonsensical predictions. Second, his model ignores most of the genres in the App Store. Third, the assumptions it makes over price setting, competition, and distribution are plainly incompatible with market realities.[266] Together, these shortcomings mean the model is fundamentally unreliable—which implies that it cannot reliably predict counterfactual prices, which accounts are uninjured, and/or total harm.

### 6.1. Professor McFadden's Model Makes Predictions That Contradict Reality

166. Professor McFadden's model produces many inaccurate predictions regarding but-for prices, real-world marginal costs, and developer profit margins—all of which are fundamental outputs of his model.

167. In the economic literature, it is common and expected for an econometrician to compare an econometric model's features and predictions to data and observed realities to determine

---

[265] Plaintiffs' Renewed Motion for Class Certification, p. 15 ("Plaintiffs propose a narrowed class definition consisting only of persons who possessed an account that spent more than $10 on apps and IAP transactions.").

[266] See, for example, the discussion of his model's unrealistic implication regarding relative marginal costs and response in marginal cost to commission rate changes. Third McFadden Deposition, 160:2–161:2 ("Q. If two apps in the same genre with the same business model have different prices, do you assume they have different marginal costs if they face the same commission rate? A. Yes. The assumption is that firms are profit maximizers, and given what we observe on developers, they've got -- you know, their -- the prices they charge, we -- we have no way of distinguishing further. Q. Do you think it is likely that marginal costs, as you estimate them, would change at the exact same time as a change in the commission rate?... A. I -- I have not examined that issue. I -- I've -- I'm not sure that I have the – have the data. I'd go back and look at the record in which -- to see if there are data in which commission rate changes and then worry about the dynamics of the response.").

whether it is reliable.[267] However, Professor McFadden has not tested whether his model makes accurate predictions by comparing these predictions to real-world outcomes.[268] Instead, he just asserts that his analyses are reliable. In this section, in my original report, and in earlier declarations in this matter, I perform some validation tests for the model, and I find that the model fails them.

*6.1.1. Professor McFadden's Model Grossly Overstates the Extent to Which App and In-app Purchase Prices Respond to a Change in Commission Rates*

168. In Professor McFadden's model, all consumer harm follows from the idea that developers will lower prices if commission rates go down. Professor McFadden's model not only predicts that prices will respond to commission rates, but also depends on that being the case for there to be any consumer harm. However, the "prediction" is a direct consequence of Professor McFadden's assumptions rather than an empirical finding. In fact, real-world data contradict what Professor McFadden assumes through his model: when Apple has changed commissions in the past, most developers did not change their prices.

169. First, Professor McFadden does not *find* that developers change prices as a result of a change in the commission rate; he assumes it. The assumptions of Professor McFadden's model imply that any app that does not have zero marginal costs—a knife edge case in his model—will change its prices if the commission rate changes.[269] I discussed this issue at more length in Section 4.

170. Second, when Apple has changed commissions in the past, most developers did not change their prices. Apple has adopted multiple programs or rules that reduced the commission rates on some transactions in the App Store. Three such programs are the Small

---

[267] For example, Fagiolo et al. (2019) provide a review of the literature on agent-based model validation. Based on Axtell and Epstein (1994) and Barde and van der Hoog (2017), the degree of empirical validity takes four possible levels. A Level 0 model is "a caricature of reality," a Level 1 model "is in qualitative agreement with empirical macro structures," a Level 2 model "produces quantitative agreement with empirical macro-structures," and a Level 3 model "exhibits quantitative agreement with empirical micro-structures." Fagiolo et al. find that publishing standards "require at least that satisfaction of Level 1" but that current developments in empirical validation are progressing to Level 2 models. As I discuss throughout this section, Professor McFadden does not provide empirical validation of his findings, even "in qualitative agreement with empirical macro structures." For example, he does not find even macro-level support for the change in prices that his model predicts. See Giorgio Fagiolo et al., "Validation of Agent-Based Models in Economics and Finance," in *Computer Simulation Validation*, (Springer, 2019), pp. 763–787 at pp. 9–10.

[268] See Third McFadden Deposition, 160:15–161:2 ("Q. Do you think it is likely that marginal costs, as you estimate them, would change at the exact same time as a change in the commission rate? … A. I -- I have not -- I have not examined that issue. I -- I've -- I'm not sure that I have the -- have the data. I'd go back and look at the record in which -- to see if there are data in which commission rate changes and then worry about the dynamics of the response.").

[269] This is a direct result of Professor McFadden's modeling assumptions. The change in price for a Paid Download app between the but-for and real worlds can be written as $p_{jt}^{d\,BF} - p_{jt}^{d\,RW} = \frac{c_{jt}^d}{1-\tau^{BF}} - \frac{c_{jt}^d}{1-\tau^{RW}}$, which will be non-zero whenever $\tau^{BF} \neq \tau^{RW}$ and $c_{jt}^d \neq 0$. The result is similar for apps with in-app purchases. See McFadden Initial Report, Appendix E, ¶¶ 36, 41.

Business Program, the Video Partner Program, and lower commission rates on auto-renewing subscriptions after the first year, and they present an opportunity for a validation exercise: one can analyze how developers actually responded when Apple instituted these changes, and then compare that to what Professor McFadden's model predicts would have occurred for these same events.

171. Professor Hitt performs this validation exercise. First, he calculates the amount by which developers changed prices when their apps joined these programs. He finds that app developers rarely reduce app download prices or in-app purchase prices when they are charged lower commission rates by Apple.[270] Second, by contrast, Professor Hitt demonstrates how Professor McFadden predicts that nearly 100 percent of these apps will change prices in the but-for world, and most will reduce them.[271]

172. In Professor McFadden's model, developers' but-for prices are highly sensitive to the but-for commission rate. In Exhibit 21, I present the total harm and the fraction of unharmed accounts when using the set of commission rates implied by the Microsoft Store game apps' profit margins using Dr. Abrantes-Metz' formula and as discussed by Professor Hitt.[272] As this exhibit shows, Professor McFadden's model predicts large changes in price and is very sensitive to the but-for commission rate. Professor McFadden acknowledged this in deposition, stating, "my analysis is sensitive to the commission rate."[273] In Professor McFadden's model, changes to the commission rate on the order of 15 percent—comparable to the advent of the Small Business Program and Video Partner Program—lead to large changes in prices that are not consistent with the empirical evidence discussed by Professor Hitt.[274] Instead, Professor McFadden's model pervasively overstates the incidence and degree of price changes.

---

[270] See Hitt Second Report, Section 6. Professor Hitt studies the price change of apps which experienced commission rate reductions after joining the Small Business Program (SBP), the Auto-Renewing Subscription Program (ARS), and the Video Partner Program (VPP). He finds that ▮ percent of apps and items in the SBP, ▮ percent of apps and items in the ARS, and ▮ of apps or products in the VPP did not reduce their prices following their change in commission rate.

[271] Hitt Second Report, Section 7.

[272] Hitt Second Report, Section 9.3 and Section 9.4.

[273] Third McFadden Deposition, 65:24–66:2 ("THE DEPONENT: I think the -- it's -- a very broad question, and I think a broad answer is that my analysis is sensitive to the commission rate, so that the analysis -- the supplementary report analysis using a 12 percent commission rate would have given materially different results.").

[274] Hitt Second Report, Section 6.

**EXHIBIT 21**

*Changes to the But-for Commission Rate Drastically Change Professor McFadden's Estimated Harm*

| But-For Commission Rate[1] | Without $10 Spending Cutoff | | | With $10 Spending Cutoff | | |
|---|---|---|---|---|---|---|
| | Total Harm[2] | Percent Unharmed | Number of Unharmed Accounts | Total Harm[2] | Percent Unharmed | Number of Unharmed Accounts |
| 10.71% | | 17.6% | 31,169,210 | | | |
| 12.41% | | 17.7% | 31,302,916 | | | |
| 13.63% | $10,182,647,838 | 17.8% | 31,509,479 | $10,174,474,503 | 7.9% | 10,283,028 |
| 15 05% | | 22.7% | 40,135,737 | | | |
| 15.44% | | 23.5% | 41,559,427 | | | |
| 15 91% | | 24.3% | 42,933,197 | | | |
| 16 55% | | 25.2% | 44,507,371 | | | |
| 17.79% | | 26.7% | 47,227,449 | | | |
| 17 96% | | 26.9% | 47,593,216 | | | |
| 19 09% | | 28.5% | 50,518,932 | | | |
| 22.12% | | 33.0% | 58,329,410 | | | |
| 22 29% | | 33.2% | 58,799,074 | | | |
| 22 34% | | 33.3% | 58,942,636 | | | |
| 22 80% | | 34.1% | 60,409,139 | | | |
| 24.70% | | 37.5% | 66,395,404 | | | |
| 26 92% | | 41.6% | 73,701,078 | | | |
| 28 38% | | 44.8% | 79,217,593 | | | |

Source: McFadden Production; Hitt Second Report, Section 7

Notes:

[1] Set of commission rates implied by the Microsoft Store game apps' profit margins using Dr. Abrantes-Metz' formula and as discussed by Professor Hitt. See Hitt Second Report, Section 9.3 and Section 9.4.

[2] Total harm and percent unharmed for a given but-for commission rate are calculated by applying Professor McFadden's model to full transactions data while using the mean of his 75 sample estimates produced on January 19, 2023. Total harm represents the net harm across all accounts.

[3] The $10 spending cutoff corresponds to Professor McFadden's implementation of the cutoff and therefore only cosinders spending across Games, Music, and Entertainment.

173. Note that as the but-for commission rate moves from 26.9 percent to 28.4 percent the total harm, with and without the $10 spending cutoff, goes from over ▮ to negative ▮ —indicating that accounts would actually be worse off by ▮ if the commission rate were 28.4 percent. The fact that Professor McFadden's model is liable to predict a swing in total harm of over ▮ due to a relatively small change in commission rate emphasizes the importance of aligning well with real world data to demonstrate its reliability.[275]

---

[275] See Exhibit 21.

*6.1.2. Professor McFadden's Model Predicts Unrealistic Variation in Marginal Costs for the Same App Over Time*

174. The simplifications in Professor McFadden's model also imply unrealistic variation in marginal costs for a given app over time. As I explained above, because apps are observed setting a wide variety of prices while most of them face a commission rate of 30 percent, Professor McFadden predicts an unrealistic distribution of marginal costs across apps. Now consider an analogous example: a single app that has constant prices over time but experiences a sudden change in commission rate. For such cases, Professor McFadden's model will predict a jump in marginal costs when the commission rate change occurs. This result is plainly unrealistic because the determinants of marginal cost are internal to the developer and completely divorced from commission rates.

175. Exhibit 22 displays the marginal costs over time for Paid Download apps in the Games genre. Of this sample of 2,682 apps, ▮▮▮▮ joined the Small Business Program in December 2020. For these apps, Apple's commission rate fell from approximately 30 percent to 15 percent. In the context of computing harm, Professor McFadden would infer that marginal costs stay fixed while prices change. However, because these apps did not change their prices when the commission rate changed, Professor McFadden's model infers sudden, large changes in these apps' marginal costs, simultaneous with the change in commission rate, while marginal costs remain constant for the otherwise similar apps.

176. Marginal costs for this sample of 2,682 apps are constant in the months leading up to the start of the Small Business Program, regardless of whether the apps are part of the program or not, but Professor McFadden estimates a more than 20 percent increase in the marginal cost for the ▮▮▮▮ apps that join the program immediately after. This can be seen in Exhibit 22; marginal costs are 100 percent of their September value all through October and November. For the apps that join the program, Professor McFadden estimates marginal costs at a more than 120 percent level of their initial value, with the increase occurring in the month following the start of the program.

88 of 133

***EXHIBIT 22***
***Marginal Costs in Professor McFadden's Model Before and After a Change in the Commission Rate***



Source: McFadden Production; Hitt Second Report Backup, "sbp_list.csv"
Note: Average changes in marginal costs are shown for 2,682 Paid Download only apps in the Games genre, of which ▉▉▉ are in the Small Business Program. ▉▉▉ of the apps experienced a change in price during this time period. The apps in the exhibit joined the Small Business Program on December 23, 2020. Professor McFadden aggregates all transactions for a given app to the month-level and assumes transactions occurred on the first day of the month. For example, all transactions for December 2020 are aggregated and timed as December 1st, 2020. As a result, the averages for December 2020 include some transactions with 30 percent commission rates and some transactions with 15 percent commission rates, meaning they will partially reflect the effects of the Small Business Program. The full effects of the lowering in the commission rate are captured beginning on the January 2021 marginal costs average.

177. This result follows from the simplifications in Professor McFadden's model and the ensuing relationship between prices, price sensitivity, marginal costs, and commission rates discussed above. Under Professor McFadden's assumptions, any change in commission, all else equal, must lead to a change in price. If the data show that the commission rate changed but the price stayed the same, the model will conclude that all else was not equal—that something else must have changed at the same time, by exactly the right amount to keep the price the same. Because his estimates for price sensitivity are fixed over time, the only other variable that could have changed at the same time is marginal cost, so Professor McFadden's model assumes that it must have changed by just enough to keep the price the same. Of course, there is another, far more realistic possibility: marginal costs did not change, but the developers simply did not choose to respond to the change in commission rate.

178. Paradoxically, when Professor McFadden predicts but-for prices from a change in commission rates, he assumes precisely the opposite. That is, when he considers a but-for

89 of 133

**SER-843**

world with lower Apple commissions, he assumes that marginal costs do not change, which therefore means that prices must. Given that his model, when applied to real-world commission changes, predicts (unrealistically) that marginal costs often rise when Apple commissions fall, this is inconsistent. Had he assumed an increase in marginal costs in response to a lowering of the commission rate in the but-for world as his model does for the as-is world, he would have predicted lower damages and a higher number of unharmed accounts.

*6.1.3. Professor McFadden's Model Predicts Inaccurate Profit Margins for Developers*

179. As explained in Section 2.2, Professor McFadden imposes constraints that ensure that the average profit margin across all apps in a category will lie within a particular range. The specific range he imposes is informed by accounting data for no more than three developers per category: Epic Games, Pocket Gems, and Playtika for Games; Spotify and Pandora for Music, and Netflix for Entertainment apps.[276] I test his model's estimated profit margins for these six developers against the data he relies upon. I find that, particularly for the three Games developers, the profit margins from the model and the data do not match, meaning Professor McFadden's model not only is at odds with observed reality, but is at odds with observed reality he specifically uses as a crucial input.[277]

180. Exhibit 23 lists the Games apps developed by Epic Games, Pocket Gems, and Playtika that were available in 2018. In the first column, I list the profit margin Professor McFadden's model calculates for each of these apps. In the second column, I list the profit margin Professor McFadden purports to calculate for the app's developer, using the developer's own accounting data. Clearly, these do not match closely, often differing by a factor of two or more, meaning the accounting data do not reflect the margins in Professor McFadden's model (further undercutting the validity of his margin constraints), his model is not accurate, or both.

---

[276] Second Revised Supplemental McFadden Report, Section 3.

[277] Professor McFadden has testified that he cannot compare the model-implied margins against the accounting margins in an "apples-to-apples way." However, Professor McFadden's margin constraints do exactly that: they compare model-implied profit margins with accounting profit margins. See Third McFadden Deposition, 176:5–177:2 ("Q. (By Mr. Swanson) Well, let's make sure we understand this. … Does your model generate a but-for price for the Netflix app, for downloads of the Netflix app? A. It -- it would, yes. Q. Okay. And would it also generate estimates of the marginal cost for downloads of the Netflix app? A. It would. Q. Well, have you ever compared those estimates to the data that you had and looked at from Netflix? A. The answer is I -- I cannot do that in -- in a -- in a apples-to-apples way, because the Netflix data is accounting data, and all I can deduce from that, those data, are -- is information on -- on margins that are, I think, typical firms in this genre. And I used end balance, upper and lower balance on the observed margins, for the firms that I do observe in this genre.").

### *EXHIBIT 23*

*Professor McFadden's Model-Implied Profit Margins Do Not Match the Accounting Margins*



Source: McFadden Production; McFadden Initial Report

**SER-845**

Note:

[1] The as-is prices for the model-implied profit margins are the yearly prices Professor McFadden calculates on the full transactions data. The marginal costs for the model-implied profit margins are the marginal costs that Professor McFadden estimates when using the yearly as-is prices from the full transactions data and the mean of his 75 sample estimates produced on January 19, 2023. The exhibit shows model-implied margins for all Epic Games, Playtika, and Pocket Gems apps in ▮▮. In cases where ▮▮ data was not available, the exhibit shows data for ▮▮ or ▮▮.

[2] Accounting margins are the margins for each developer that Professor McFadden reports in McFadden Initial Report, ¶¶ 189–191. Accounting margins for developers other than Epic Games show the range of profit margins from 2017–2019.

181. This finding is particularly remarkable because the profit margins in the right-hand column are the very data points Professor McFadden purports to use to estimate his model, and as Professor Watson discusses at length, they play an outsize role in the estimation, effectively determining his results.[278] And these are the only three such profit margins Professor McFadden uses for the Games genre. This is not a situation where a model is fit to millions of points, and it fails to capture a few of them; the model relied on these three points in particular, and yet it fails to capture them. Because his model cannot even reasonably predict the very facts he is using to calibrate his model, it is highly unlikely to be able to reliably predict other quantities such as damages or the fraction of harmed accounts.

182. In particular, the accounting margins that Professor McFadden uses are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—this pattern is consistent with his estimation of marginal costs that I discussed in Section 4. The issue of inaccurate profit margins is not limited to the three app developers. The unrealistic variation in marginal costs across apps, discussed in the last section, also implies a wide distribution in estimated profit margins that is divorced from reality and inconsistent with Professor McFadden's margin constraints. For example, Professor McFadden estimates that 14.3 percent of observations have a profit margin of more than 150 percent.[279] As can be seen in Exhibit 23, these facially unrealistic predictions also extend to the apps that he uses in his margin constraints.

### 6.2. Professor McFadden Still Fails to Model Most Genres in the Apple App Store

183. Professor McFadden continues to ignore all genres outsides of Games, Music, and Entertainment—24 of the total 27 genres in the Apple App Store.[280] In total, this failure implies that 859,528 out of 1,402,348 apps with paid transactions in the Apple App Store are completely ignored by his model, including 82,488 out of 99,575 apps with subscription

---

[278] Watson Report, Section 4.2.

[279] Workpaper 24. An observation in Professor McFadden's data consists of a month and application pair. Observations with profit margins exceeding 100 percent are apps with negative marginal costs. As detailed above, these apps with negative marginal costs tend to be low-price apps.

[280] Hitt Initial Report, ¶ 49.

transactions.[281] None of the tweaks to his method that he offers addresses this important omission.

184. As I have previously noted, Professor McFadden's refusal or inability to model these other genres means his current model cannot compute injury and damages for every account—let alone every class member.[282] For three separate reasons, ignoring nearly 90 percent of the genres means Professor McFadden cannot demonstrate that his model can "obtain an exact measure of class-wide harm" or reliably determine the number of unharmed accounts.[283]

185. First, extending Professor McFadden's analysis to other genres is neither mechanical nor straightforward. Despite his claims that one could derive the appropriate margin constraints for other genres "with minimal efforts,"[284] Professor McFadden later testified that he did not know what margin constraints would be appropriate for other genres and that the process for determining them would not be "mechanical."[285] His most recent reports and testimony provide no further guidance. Even supposing these data were available, to extend his methods to another genre, Professor McFadden must appropriately determine variable costs—which he has not, even for Games, Music, and Entertainment[286]—and ensure representativeness—which he also has not.[287] Professor McFadden has admitted that there is no "formula or prescription" for his margin constraint calculations, meaning they ultimately rely on his subjective judgment.[288] Despite the passage of more than 15 months since his original report, and the production of additional accounting data by nine developers from seven genres, Professor McFadden has not attempted to expand his analysis to any additional genres, which highlights the uncertainty that his method could be fully applied for a merits trial.[289]

186. Additionally, as I explained in Section 2, Professor McFadden uses instrumental variables during estimation, and he uses different variables for Games and for Music and Entertainment. Thus, to extend his analysis to other genres, Professor McFadden must determine the instrumental variables he will use for his estimation procedure in those genres.

---

[281] See Workpaper 16.

[282] Prince Initial Report, Section 8.3.

[283] McFadden Supplemental Report, ¶ 44.

[284] McFadden Reply Report, ¶ 191.

[285] Second McFadden Deposition, 220:22–221:9, 142:11–143:3.

[286] Prince Initial Report, Section 7.2.

[287] Prince Initial Report, ¶ 98; Third McFadden Deposition, 173:17–174:4.

[288] Third McFadden Deposition, 182:10–19 ("Q. (By Mr. Swanson) Okay. Is there a particular method to use in -- in determining bounds of this sort in statistical analysis? A. I do not believe there's a formula or prescription for how it should be done. Q. Is it an exercise that involves the application of judgment? A. Again, I would -- I would have to go back and review how it was actually done to -- to answer the question.").

[289] Hitt Second Report, Section 8.1.3.

To date, Professor McFadden has not done so, explained how he would do so, or provided any evidence that such instruments would be reliable.[290] As I have shown in previous work in this matter,[291] and as Professor Watson explains in greater detail,[292] the instruments that he uses for his *current* analysis are unreliable, let alone any instruments he may use to analyze additional genres.

187. Applying Professor McFadden's model to other genres is likely to produce unreliable results. As my previous work has shown, attempting to apply Professor McFadden's model to the Sports genre yielded results that made no economic sense: they predicted *greater* consumer demand for in-app purchases the *higher* those products were priced.[293] I find similar results when updating my analysis with the most recent data as well as Professor McFadden's 75 sample approach. In the majority of samples, Professor McFadden's model either completely fails to estimate the slope of the demand curve or estimates an upward-sloping demand curve.[294] To date, my analysis remains the only disclosed attempt to apply Professor McFadden's model to one of the other 24 genres in the App Store. Without modeling all genres, there is no guarantee that Professor McFadden's methodology will yield economically sensible results.

188. Second, Professor McFadden has not measured harm from transactions in the 24 unmodeled genres. As both Professor McFadden and I have shown, his model can predict but-for prices that are higher than real-world prices, generating "negative" harm. As a result, by failing to model all genres, Professor McFadden cannot determine net harm without determining the but-for prices for apps in *all genres*. This limitation is particularly salient because ███ percent of all the accounts he measures damages for have at least one paid transaction outside of Games, Music, and Entertainment.[295] Without calculating harm for these transactions, Professor McFadden cannot make a harm prediction about any of these accounts, and consequently he cannot estimate aggregate damages.

189. Relatedly, there is a third reason why omitting genres means that Professor McFadden cannot reliably identify aggregate or account-level harm. Professor McFadden has stated that

---

[290] Second McFadden Deposition, 220:22–221:9; Third McFadden Deposition, 99:25–100:17 (Q. And how would a well-trained economist determine which instrumental variables to use to estimate damages for the social media genre …[A.] I have -- I have not sat -- sat down to look at what the possibilities are. I think clearly when one is looking for instruments, there are -- there are econometric statistical criteria that need to be met. They need to be correlated with the variables that require instrumentation. They to be uncorrelated with the disturbances in your model. And it is -- it is a matter of econometric judgment and, when possible, testing to determine what sets of variables will work, and one is often limited by what's available.").

[291] Prince Declaration, ¶¶ 35–40.

[292] Watson Report, Section 6.1, Appendix G.

[293] Prince Initial Report, ¶¶ 120–121; Prince Second Declaration, Section IX.

[294] This failure occurs both for the Games margin constraints and instruments as well as the Music & Entertainment margin constraints and instruments. See Workpaper 25.

[295] See Workpaper 26.

he may choose to combine some other genres with Games, or with Music and Entertainment.[296] Such a choice would require re-estimating consumer demand for the newly combined genres, which would lead to different consumer price sensitivity estimates. Consequently, all but-for prices currently predicted by his model would also change, because they depend on the price sensitivity parameters. This means that *every* conclusion of Professor McFadden's is subject to change, pending his decisions about whether to combine other genres with Games and/or Music and Entertainment.

### *6.3. Professor McFadden Makes Assumptions That Are Plainly at Odds with Market Realities*

190. Professor McFadden ignores fundamental market realities that are key to economic analysis. In my Initial Report, I explained that Professor McFadden's model does not take into account any competition around price setting—essentially making each developer price like a monopolist.[297] In this report, I argue that this is clearly unrealistic and moreover, has profound implications for the conclusions of his model given that different apps face different levels of demand and competition. Professor McFadden furthermore ignores that developers may distribute their apps through channels outside of the Apple App Store and that many apps are actually free to the consumer. As I showed in my Initial Report, if free apps were able to increase their prices in the but-for world, a substantial number of accounts moved from harmed to unharmed status.[298]

### *6.3.1. Professor McFadden Incorrectly Assumes That Developers Price Like Monopolists*

191. As explained in my Initial Report, Professor McFadden does not account for competition between apps, even within the same genre.[299] He has not addressed this shortcoming in his supplemental report. Instead, his model continues to assume that developers have no incentive to respond to changes in the price of other apps, even if they are in the same genre or offer a substitutable product.

192. This makes the incredibly strong assumption, without any evidence, that there exists no group of apps that offer different products and lower their prices to compete with one

---

[296] Third McFadden Deposition, 102:1–18 ("Q. (By Mr. Swanson) Professor, which genres out of all of the other genres can be combined for estimation purposes, like you did with music and entertainment? A. That's not a question that I -- that I addressed in my supplemental report, and I have not sat down to -- to do that determination. Q. Do you know if any of the other genres should be combined with the games genre for estimation purposes? A. At this point, I don't know. I -- I simply don't know. Q. Okay. Have you ruled out combining other genres with the game genre for estimation purposes? A. I would say I haven't -- I haven't ruled it out. Games seem to be a -- a somewhat unique genre in terms of how it's used in the -- certainly in terms of the amount of spending.").

[297] Prince Initial Report, ¶ 14.

[298] Prince Initial Report, Appendix E.

[299] Prince Initial Report, Section 6.3.

another, which is completely unrealistic.[300] First, Professor McFadden testified that, in reality, there is competition between apps, and rivals do impose limits on developers' ability to set their own prices.[301] Second, the extent to which developers change their price in response to a change in commission rates depends on market characteristics such as competition among apps.[302] Finally, it is unreasonable to believe that demand for Hulu will not change if Paramount+ increases its price, and accordingly, one would expect Hulu to respond by potentially raising its own prices; suggestive of such responsive pricing is the fact that Apple TV+, Sling TV, Hulu + Live TV, and Disney+ all announced price hikes for early December of 2022.[303] At the same time there continues to be a wide selection of free streaming services—an aspect of this and other markets that Professor McFadden's analysis entirely ignores.[304] Professor McFadden's model incorrectly assumes that each streaming service will set prices while ignoring the behavior of other developers of competing video streaming apps.

*6.3.2. Professor McFadden Ignores That Different Apps Face Different Levels of Competition and Demand*

193. As explained above, Professor McFadden's model does not explicitly account for competition and strategic interactions between apps. The only way competition can impact his results is, indirectly, through the estimated elasticity of demand. As Professor McFadden has acknowledged,[305] basic economics dictates that an app subject to strong competition will exhibit large price elasticities (i.e., strong price sensitivity), as consumers are able to substitute to rival apps. Conversely, apps for which there is not much competition would

---

[300] Regarding firms with differentiated products and competing by setting prices, see Michael Baye and Jeff Prince, *Managerial Economics and Business Strategy*, Tenth Edition, (McGraw-Hill, 2022), pp. 348–349 ("…as firm 2 raised its price, some of its customers would defect to firm 1, and thus the demand for firm 1's product would increase. This would raise firm 1's marginal revenue, making it profitable for the firm to increase its price.").

[301] First McFadden Deposition, 83:12–24 ("Q. Do you Assume that every iOS app developer possesses monopoly power? A…if you produce a differentiated product, you have at least some local ability or market power to control the price you charge for that product. The limits of that ability will be determined by the uniqueness of the near product and the ability of rivals to attract potential customers away from you.").

[302] Schmalensee Report, Secion V.D.

[303] Madeline Garfinkle, "Which Streaming Services Are Raising Prices? See the List," *Entrepreneur*, November 7, 2022, available at https://www.entrepreneur.com/business-news/which-streaming-services-are-raising-prices-see-the-list/438642, accessed March 9, 2023.

[304] James K. Willcox, "Best Free Streaming Video Services" *Consumer Reports*, February 23, 2023, available at https://www.consumerreports.org/streaming-media-devices/guide-to-free-streaming-video-services-a1149608760/, accessed March 9, 2023. ("The good news is that budget-conscious consumers can also stream movies free from a growing list of services. The best free streaming services include Amazon Freevee, Crackle, Hoopla, the Roku Channel, and several more, all listed below. These free streaming services are available through most streaming devices and smart TVs, as well as on laptops, smartphones, and tablets–just like Netflix, Hulu, and other streaming services you have to pay for."). Many of these free options include ads, a feature shared with the lower-cost tiers of paid services where ads are still included (e.g., Hulu, HBO Max, Paramount Plus, etc.).

[305] First McFadden Deposition, 128:10–14 ("[A.] If the app developer faces…strong competition, that elasticity will be large. People will easily substitute away from it to rival apps, and if there's not much competition for it, then that elasticity will be low.").

have low elasticities.[306] However, Professor McFadden's model cannot capture differences in competitive pressures because he assumes (without any supporting evidence) that apps with the same genre and App Store business model have the same price sensitivity.[307]

194. This leads to the unrealistic conclusion that all apps in a given genre that charge the same price face the same elasticity of demand, even if they face very different levels of competition. This assumption is at odds with the academic literature. For example, Kesler et al. (2019) find that the intensity of competition varies across apps. They define an app submarket based on its set of similar apps, as determined in the Google Play Store.[308] For each submarket, the authors calculate the Herfindahl-Hirschman Index (HHI), a commonly accepted measure of market concentration, and find that market concentration varies by submarket.[309] In contrast, Professor McFadden replaces a nuanced competitive landscape with an artificially homogenous marketplace where all apps with the same genre and App Store business model face the same competitive conditions. This constitutes another example of how Professor McFadden has assumed common impact, rather than demonstrated it.

195. Professor McFadden provides no justification for his assumption of identical price sensitivity parameters for all apps with the same genre and App Store business model.[310] In my previous reports, I tested whether demand is different for very popular apps (above-median revenue) and less popular apps (below-median revenue). I found that both within Games and within Music & Entertainment, very popular apps face different price sensitivity than less popular apps.[311] For this report, I test whether price sensitivity is different for high-price apps and low-price apps. This alternative grouping is motivated in part by the concern that low-price apps may be more closely substitutable with the large mass of free apps

---

[306] First McFadden Deposition, 128:10–14 ("[A.] If the app developer faces…strong competition, that elasticity will be large. People will easily substitute away from it to rival apps, and if there's not much competition for it, then that elasticity will be low.").

[307] First McFadden Deposition, 174:5–9 ("Q. Does your model assume that all apps in the same category or genre face demand functions with the same price sensitivity? A. Yes, that's -- the current model does -- has that form."); Third McFadden Deposition, 76:11–18 ("Q. Your model assumes that consumers have the same price sensitivity for all apps in a given genre; is that correct? A. If by 'price sensitivity' you mean the -- the parameter coefficient on price within the demand model, the answer is yes, within each business model for either downloads and separately for IAP.").

[308] Reinhold Kesler et al., "Competition and Privacy in Online Markets: Evidence from the Mobile App Industry," ZEW - Centre for European Economic Research Discussion Paper, 2019, p. 5 ("The Google Play Store mainly consists of apps that are divided into 40 subcategories (including 17 for games), which themselves cover several thousands of markets as we will show.").

[309] Kesler et al. find the average app to be active in a market with an HHI of 1500 across market segments, suggesting low to moderate market concentration. See Reinhold Kesler et al., "Competition and Privacy in Online Markets: Evidence from the Mobile App Industry," ZEW - Centre for European Economic Research Discussion Paper, 2019, p. 11.

[310] Third McFadden Deposition, 77:8–79:9 ("Q. I am asking if you have an opinion as to the significance to your results of your assumption that the price sensitivity coefficient is the same for a given genre and business model. A. The answer is I do -- do not at this point have an analysis contained in my supplemental report in which I examine that issue… Q. Is there any process or test that you apply to determine whether multiple genres are properly treated as exhibiting the same price sensitivity coefficient? A. I have not done a formal statistical test of that.").

[311] Prince Initial Report, ¶¶ 70–71. In Professor McFadden's Reply Report, he argues that this sort of an exercise is "not a correct way to make [his] model more 'flexible.'" See McFadden Reply Report, ¶¶ 131–134. In Appendix F, I explain why this criticism is misguided and this exercise is informative.

whereas the features available in high-price apps are more clearly differentiated from free options.

196. For this analysis, I tested different definitions of high- and low-price apps, and for all of these definitions I found that the model generated economically invalid results across one or more parameters. Specifically, I find that either Professor McFadden's model yields a positive price sensitivity estimate—indicating consumers *increase* purchases when app prices go up—or a negative relationship between download and in-app purchase quantities—indicating that reducing downloads (e.g., by raising download prices) increases demand for in-app purchases. As noted in my previous reports, these estimates imply firms would want to set infinitely high prices which is clearly inconsistent with developers' real-world behavior and also means Professor McFadden's model cannot be relied upon to estimate how many accounts have been harmed or by how much. This is yet another example of how fragile Professor McFadden's model is.[312] Furthermore, the estimates that do have the correct sign provide suggestive evidence that lower-priced apps do indeed face higher price sensitivity than higher-priced apps. Appendix F provides more detail on the parameter estimates and model failures for the estimation allowing for price sensitivity to vary between high- and low-price apps.

*6.3.3. Professor McFadden Incorrectly Ignores Different Channels of Distribution for Apps*

197. Professor McFadden's analysis ignores that developers may consider different channels of distribution when setting prices and would likely not set the Apple App Store prices in isolation. Developers' pricing decisions for apps and in-app purchases available on the App Store may be affected by the availability of alternative distribution channels. Developers may attempt to maximize combined profits across all channels or may set their prices to compete with content available on different channels. Academic literature on multi-channel distribution shows that a firm's pricing decision depends on factors such as the different costs of delivering a product through each channel, the popularity of each channel, the willingness of consumers to switch between different channels, and the amount of competition faced in each channel.[313] It is highly plausible that these developers would not adjust their prices in a

---

[312] An invalid parameter estimate means that, given the regression results, the model is not consistent with profit maximization at finite prices. Instead, at the estimated parameter values, the developers would be better off charging an infinitely high price for either downloads or in-app purchases. In Professor McFadden's model, this occurs when either the term relating download quantities and in-app purchase quantities is negative (the beta parameters, see Prince Initial Report, ¶ 114) or when the terms relating price and quantity (the alpha parameters) are zero or positive (see Prince Initial Report ¶¶ 120, 122). Adapting the approach taken in Professor McFadden's current report, I do not estimate the beta parameter for the Music & Entertainment genres.

[313] See, e.g., Kyle D. Cattani et. al., "Coordinating Traditional and Internet Supply Chains," in *Handbook of Quantitative Supply Chain Analysis*, (Springer, 2004), pp. 643–677; Pavel Kireyev et al., "Match Your Own Price? Self-Matching as a Retailer's Multichannel Pricing Strategy," *Marketing Science*, 36(6), 2017, pp. 908–930; Christian Homburg et al., "The Multichannel Pricing Dilemma: Do Consumers Accept Higher Offline Than Online Prices?" *International Journal of Research in Marketing*, 36(4), 2019, pp. 597–612.

but-for world of lower commission rates, but Professor McFadden's model does not even consider this possibility.

### 6.3.4. Professor McFadden Continues to Ignore Free Apps

198. As explained in my Initial Report, Professor McFadden's model does not include free apps despite the fact that these apps are an important part of the iOS ecosystem.[314] Even though consumers who only downloaded free apps are not part of the purported class, it is important to consider transactions for free apps that were made by members of the purported class.[315] Toward that end, as I explained in my Initial Report, Professor McFadden's own model and logic predict that free apps would raise their prices in the but-for world had he included them in the analysis.[316] And even supposing it were appropriate to exclude free apps from the calculations of but-for prices in his model, he nevertheless does not factor in the competitive pressures that free apps place on paid apps. As explained above throughout this section, Professor McFadden consistently ignores the competitive landscape in which apps set prices, biasing his results and rendering them unreliable. He furthermore ignores that the availability of these apps might change in the but-for world, making class members either worse off or better off. Given that almost 75 percent of all apps are free, and ▮ percent of Games, Music, and Entertainment apps are free, his failure to account for how these apps interact with the paid content ignores an essential reality of this market.[317]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 10, 2023.

_Jeffrey T. Prince (signature)_  03/10/2023

Jeffrey T. Prince                                Date

---

[314] Prince Initial Report, ¶ 51.

[315] Class Certification Order, p. 13.

[316] Prince Initial Report, ¶ 52.

[317] Workpaper 27. Free apps are apps that never have a Paid Download transaction and never have a paid in-app purchase transaction in Professor McFadden's cleaned transactions data.

## 7. APPENDIX A – CV AND PRIOR TESTIMONY

### JEFFREY T. PRINCE

2029 S. Hawksmoore Dr.   Office: 812-856-2692
Bloomington, IN 47401     Fax:812-855-3354

E-mail: jeffrey.t.prince@gmail.com
Web page: https://sites.google.com/view/jeffrey-t-prince/home

## PERSONAL INFORMATION
Born: April 29, 1976 at Cincinnati, OH
Citizenship: USA
Married to Ann Prince
Children: Katherine Prince, Elizabeth Prince, Henry Prince

EDUCATION
Ph.D.: Economics, Department of Economics, Northwestern University, 2004.
Dissertation Title: The Diffusion of Durable Information Technology Products.
M.A.: Economics, Department of Economics, Northwestern University, 2000.
B.A.: Economics, Miami University, 1998, *Summa Cum Laude*.
B.S.: Mathematics/Statistics, Miami University, 1998, *Summa Cum Laude*.

## FIELDS OF SPECIALIZATION
Primary:   Industrial Organization
Secondary:Applied Econometrics, Strategy, Regulation

## ACADEMIC POSITIONS HELD
Professor of Business Economics and Public Policy (with tenure), Kelley School of Business, Indiana University, 2017-present.

Harold A. Poling Chair in Strategic Management, Kelley School of Business, Indiana University, 2015-present.

Chairperson, Department of Business Economics and Public Policy, Kelley School of Business, Indiana University, 2016-2019 & 2020-present.

Faculty Affiliate, Indiana University Data Science Program, 2018-present.

Advisory Committee Member, Indiana University Center for Survey Research, 2018-present.

University Fellow at the Technology Policy Institute, 2021-present.

Co-Director, Kelley Institute for Business Analytics, 2016-2022.

Chief Economist, Federal Communications Commission, 2019-2020.

Associate Professor (with tenure) of Business Economics and Public Policy, Kelley School of Business, Indiana University, 2010-2017.

Visiting Scholar, Strategy Department, Kellogg Graduate School of Management, Northwestern University, Summer and Fall, 2015.

**SER-854**

Visiting Scholar, Center of Business and Public Policy, McDonough School of Business, Georgetown University, Fall, 2015.

Cathie and Jerry Anderson Faculty Fellow, Kelley School of Business, Indiana University, 2013-2015.

Assistant Professor, Applied Economics and Management, Cornell University, 2004-2010 (promoted to Associate with tenure, July, 2010).

**NONACADEMIC EXPERIENCE**
National Security Agency, Cryptologic Mathematician in Director's Summer Program, Fort George G. Meade, Maryland, Summer 1998.

UNEXT, Consultant and Co-author for Online Masters Business Course in Vertical Integration, Chicago, Illinois, Summer 2001.

Nationwide Insurance, Actuarial Intern, Columbus, Ohio, Summer 1997.

**EDITORIAL POSITIONS**
Co-editor, *Journal of Economics and Management Strategy*, 2015-present.

Editorial Board member, *Information Economics and Policy*, 2008-present.

Co-editor, *Journal of Economics and Management Strategy Special Edition on Digital Transformation and the Business Revolution*, 2023 (expected).

**BOOKS**
*The Metaverse: What Everyone Needs to Know*, with Scott J. Shackelford and Michael Mattioli, Oxford University Press, in progress.

*Managerial Economics and Business Strategy, 10th Edition*, with Michael R. Baye, McGraw-Hill Education, 2022.

*Predictive Analytics for Business Strategy: Reasoning from Data to Actionable Knowledge*, McGraw-Hill Education, 2019.

*Managerial Economics and Business Strategy, 9th Edition*, with Michael R. Baye, McGraw-Hill Education, 2017.

*Managerial Economics and Business Strategy, 8th Edition*, with Michael R. Baye, McGraw-Hill Education, 2014.

**WORKING PAPERS**
"Do People Around the World Care Whether Their Data Are Stored Locally?" with Scott Wallsten, 2022.

"Do Consumers View Fees Differently Than Prices?" with Daniel Simon, 2022.

"The Time Elasticity of Online Variety", with Shane Greenstein, 2022.

"Optimal Promises: Application of a General Framework to Airline Schedule Times", with Daniel Simon, 2020, under review. (Working version at SSRN)

"The Effect of International Travel on the Spread of Covid-19 in the U.S.", with Daniel Simon, 2020, under review. (Working version at SSRN)

**REFEREED PUBLICATIONS**

"The Effect of Domestic Travel on the Spread of Covid-19 in the U.S.", with Daniel Simon, forthcoming in *Applied Economics Letters*. (Working version on SSRN)

"How Much is Privacy Worth Around the World and Across Platforms?", with Scott Wallsten, *Journal of Economics and Management Strategy*, 31, pp. 841-861, 2022. (Working version at SSRN)

"Mobile Internet Usage and Usage Based Pricing", with Shane Greenstein, *Journal of Economics and Management Strategy*, 30, 4, pp. 760-783, 2021. (Working version at SSRN)

"Economics at the FCC: 2019-2020", with Allison Baker, Patrick Brogan, Octavian Carare, Nicholas Copeland, Patrick DeGraba, Steven Kauffman, Paul LaFontaine, Catherine Matraves, Sean Sullivan, Patrick Sun, and Emily Talaga, *Review of Industrial Organization*, 57, pp. 827-858, 2020.

"The Persistence of Broadband User Behavior: Implications for Universal Service and Competition Policy", with Andre Boik and Shane Greenstein, *Telecommunications Policy*, 43, 8, 2019. (Available at SSRN). (NBER working paper No. w22427).  Extended working version titled: Empirical Economics of Online Attention.

"A Paradigm for Assessing the Scope and Performance of Predictive Analytics", *Information Economics and Policy*, 47, pp. 7-13, 2019. (Available at SSRN).

"Distinguishing Bandwidth and Latency in Households' Willingness-to-Pay for Broadband Internet Speed," with Yu-Hsin Liu and Scott Wallsten (lead article), *Information Economics and Policy*, 45, pp. 1-15, 2018.  (Available at SSRN).

"Does Competition Lead to Agglomeration or Dispersion in EMR Vendor Decisions?", with Seth Freedman and Haizhen Lin, *Review of Industrial Organization*, 53, 1, 57-79, 2018. (Working version at SSRN).

"Information Technology and Patient Health: Analyzing Outcomes, Populations, and Mechanisms", with Seth Freedman and Haizhen Lin, *American Journal of Health Economics*, 4, 1, 51-79, 2018. (Working version at SSRN). (NBER working paper No. w21839)

"Measuring Consumer Preferences for Video Content Provision via Cord-Cutting Behavior", with Shane Greenstein, (lead article) *Journal of Economics and Management Strategy*, 26, 2, 293-317, 2017.  (Working version at SSRN).

"The Impact of Mergers on Quality Provision: Evidence from the Airline Industry", with Daniel Simon, *Journal of Industrial Economics*, 65, 2, 336-362, 2017. (Working version at SSRN).

"The Effect of Competition on Toxic Pollution Releases", with Daniel Simon, *Journal of Environmental Economics and Management*, 79, 40-54, 2016. (Working version at SSRN).

"Determinants of Private Long-Term Care Insurance Purchase in Response to the Partnership Program", with Haizhen Lin, *Health Services Research*, 51, 2, 687-703, 2016. (Working version at SSRN).

"Do Incumbents Improve Service Quality in Response to Entry:  Evidence from

**SER-856**

Airlines' On-Time Performance", with Daniel Simon, *Management Science*, 61, 2, 372-390, 2015. (Working version at SSRN).

"Does Service Bundling Reduce Churn?", with Shane Greenstein, *Journal of Economics and Management Strategy*, 23, 4, 839-875, 2014. (Working version at SSRN).

"Indirect Network Effects and the Quality Dimension: A Look at the Gaming Industry", with Jin-Hyuk Kim and Calvin Qui, *International Journal of Industrial Organization*, 37, 6, 99-108, 2014. (Working version at SSRN).

"Is Dual Agency in Real Estate a Cause for Concern?", with Vrinda Kadiyali and Daniel Simon, *Journal of Real Estate Finance and Economics*, 48, 1, pp. 164-195, 2014. (Working version at SSRN).

"The Impact of the Partnership Long-term Care Insurance Program on Private Coverage", with Haizhen Lin, *Journal of Health Economics*, 32, 6, pp. 1205-1213, 2013.  (Working version at SSRN).

"Racial Bias in Expert Quality Assessment: A Study of Newspaper Movie Reviews", with Lona Fowdur and Vrinda Kadiyali, *Journal of Economic Behavior and Organization*, 84, 1, pp. 292-307, 2012. (Working version at SSRN)

"The Welfare Impact of Reducing Choice in Medicare Part D: A Comparison of Two Regulation Strategies", with Claudio Lucarelli and Kosali Simon, *International Economic Review*, 53, 4, pp. 1155-1177, 2012. (Working version at SSRN)

"Relating Inertia and Experience in Technology Markets: An Analysis of Households' Personal Computer Choices", *Applied Economics*, 43, 29, pp. 4501-4514, 2011. (Working version at SSRN)

"Are Risk Preferences Stable across Contexts?  Evidence from Insurance Data", with Levon Barseghyan and Joshua Teitelbaum, *American Economic Review*, 101, 2, pp. 591-631, 2011. (Working version at SSRN)

"Is Time Inconsistency Primarily a Male Problem?", with Dan Shawhan, (lead article) *Applied Economics Letters*, 18, 6, pp. 501-504, 2011. (Working version at SSRN)

"Has the Internet Accelerated the Diffusion of New Products?", with Daniel Simon, *Research Policy*, 38, 8, pp. 1269-1277, 2009. (Working version at SSRN)

"How Do Households Choose Quality *and* Time to Replacement for a Rapidly Improving Durable Good?", *International Journal of Industrial Organization*, 27, 2, pp. 302-311, 2009. (Working version at SSRN)

"Multi-market Contact and On-Time Performance in the US Airline Industry", with Daniel Simon, *Academy of Management Journal*, 52, 2, pp. 336-354, 2009. (Working version at SSRN)

"Repeat Purchase amid Rapid Quality Improvement: Structural Estimation of the Demand for Personal Computers", (lead article) *Journal of Economics and Management Strategy*, 17, 1, pp. 1-33, 2008. (Working version at SSRN)

"Internet Adoption and Usage Patterns are Different: Implications for the Digital Divide",

**SER-857**

with Avi Goldfarb, (lead article) *Information Economics and Policy*, 20, 1, pp. 2-15, 2008. (Listed as the #1 most cited article for this journal since 2008: http://www.journals.elsevier.com/information-economics-and-policy/most-cited-articles/). (Working version at SSRN)

"The Beginning of Online/Retail Competition and Its Origins: An Application to Personal Computers", *International Journal of Industrial Organization*, 25, 1, pp. 139-156, 2007. (Working version at SSRN)

"The Diffusion of the Internet and the Geography of the Digital Divide in the United States", with Shane Greenstein, in (eds) Robin Mansell, Chrisanthi Avgerou, Danny Quah, and Roger Silverstone, The Oxford Handbook of Information and Communication Technologies, Oxford University Press, pp. 168-195, 2007. (NBER working paper No. W12182)

**NON-REFEREED PUBLICATIONS**
"Coordinated Effects (Merger)," Global Dictionary of Competition Law, eds. Kovacic, W., Whish, R., Healey, D., forthcoming.

"Information," with Michael R. Baye, Elgar Encyclopedia on the Economics of Competition and Regulation, ed. Noel, M., forthcoming.

"Empirical Evidence of the Value of Privacy", with Scott Wallsten, *Journal of European Competition Law and Practice*, 12, 8, pp. 648-654, 2021.

"The Economics of Digital Platforms: A Guide for Regulators", with Michael R. Baye, Global Antitrust Institute Report on the Digital Economy, 2020. (Available at SSRN)

"FCC Comments on Vertical Merger Guidelines", with Giulia McHenry, Patrick DeGraba, Eric Ralph, Catherine Matraves, Eugene Kiselev, and Aleksandr Yankelevich, February, 2020.

"Does Original Content Help Streaming Services Attract More Subscribers?", *Harvard Business Review*, April, 2018.  (Available at HBR.org)

"Position Statement on Challenges Facing Online Video Distributors", FCC's Video Landscape Workshop, March, 2016.

"The Dynamic Effects of Triple Play Bundling in Telecommunications", Time Warner Research Program on Digital Communications, Winter, 2012.  (Available here).


"The Geographical Diffusion of the Internet in the United States", with Shane Greenstein, in (eds) Munindar Singh, The Practical Handbook of Internet Computing, CRC Press, pp. 56-1 – 56-17, 2004.

**TEACHING EXPERIENCE**
Lecturer, 2024 (scheduled).
    Digital Economics for Business.

Lecturer, 2019-2021.
    Predictive Analytics for Business Strategy II. (MBA level)

Lecturer, 2018-2021.
    Predictive Analytics for Business Strategy I. (MBA level)

**SER-858**

Lecturer, 2011-2017.
    Predictive Analytics for Business Strategy.

Lecturer, 2016.
    Econometric Methods in Business II (PhD level).

Lecturer, Summer 2012-2014.
Introduction to Economics (Global Business Institute)

Lecturer, 2011.
            Managerial Economics.

Lecturer, 2010.
            Business Econometrics.

At Cornell:
        Lecturer, 2006-2010.
            Empirical Analysis of Industrial Organization (PhD level).

Lecturer, 2005-2010.
            Introduction to Business Regulation.

Lecturer, 2007-2010.
            Game Theory for Applied Economists (PhD level).

Lecturer, Summer 2007.
            Gaming: In the Casino and Beyond (Cornell Adult University).

Guest Lecturer, 2005-2006.
Graduate Industrial Organization, Empirical methods (PhD level).
At Northwestern:
Teaching Assistant, 2000-2004.
Introductory Econometrics, Transportation, Intermediate Microeconomics, Honors Thesis
Seminar, Advanced Econometrics.

Lecturer, 2002-2003.
Introductory Econometrics, Accelerated Probability and Statistics.

**FELLOWSHIPS AND AWARDS**
Best Research Poster, Research Conference on Communications, Information and
Internet Policy, 2015.

Trustees Teaching Award, Indiana University, 2015.

Trustees Teaching Award Finalist, Indiana University, 2012, '13, '14, '15.

Certificate of Excellence in Reviewing, Information Economics and Policy, 2014.

Sauvain Teaching Award Nominee, 2014.

Innovative Teaching Award, Kelley School of Business, 2012.

Young Faculty Teaching Excellence Award, Cornell University, 2008.

Outstanding Graduate Student Teacher Award, Northwestern University, 2004.

**SER-859**

Distinguished Teaching Assistant Award, Northwestern University, 2001,'02,'03,'04.

University Summer Fellowship, Northwestern University, 2003.

University Fellowship, Northwestern University, 1999-2000.

Teaching Assistant Fellow, Northwestern University.

George W. Thatcher Prize for top student in economics, Miami University, 1998.

Alumni Senior Prize for outstanding student in mathematics and statistics, Miami University, 1998.

Actuarial Exam P (equivalent based on passing pre-2000 Part 1 and Part 2 exams), 1998.


**GRANTS AND OTHER FUNDING**
Advanced Analytics for IU's Addictions Grand Challenge

NET Institute Summer Research Grant

Research Data Grant, Kelley School of Business

Time Warner Research Stipend

Cornell's Institute for the Social Sciences Theme Project Faculty Fellow

Cornell Institute for the Social Sciences Small Grant Award

INVITED PAPER PRESENTATIONS
"Do People Around the World Care Whether Their Data Are Stored Locally?"
University of Nebraska, November, 2022.

"Optimal Promises: Application of a General Framework to Airline Schedule Times"
International Industrial Organization Conference, May, 2022.

"How Much is Privacy Worth Around the World and Across Platforms?"
University of Kent, October, 2021.
Kelley Faculty Research Series, IU Mexico Gateway, May, 2021.
Game Theoretic and Behavioral Economic Insights on Social Media, February, 2021.
Research Conference on Communications, Information and Internet Policy, February, 2021.
NBER Economics of IT and Digitization Workshop, July, 2020.
FTC PrivacyCon, July, 2020.

"The Effect of International Travel on the Spread of Covid-19 in the U.S."
Purdue, November, 2020.

"Mobile Internet Usage and Usage Based Pricing"
Research Conference on Communications, Information and Internet Policy, February, 2021.
Federal Communications Commission, October, 2020.
International Industrial Organization Conference, May, 2020.

"A Paradigm for Assessing the Scope and Performance of Predictive Analytics"
Technology Policy Institute, February, 2018.

**SER-860**

"Distinguishing Bandwidth and Latency in Households' Willingness-to-Pay for Broadband Internet Speed"
Bureau of Economic Analysis, October, 2017.
Technology Policy Institute, October, 2017.
Research Conference on Communications, Information and Internet Policy, September, 2017.

"The Empirical Economics of Online Attention"
Pomona College, March, 2019.
Research Conference on Communications, Information and Internet Policy, September, 2017.
Searle 8th Annual Conference on Internet Commerce, June, 2017.
Federal Communications Commission, March, 2017.
Media Economics Workshop, October, 2016.
University of Oklahoma, September, 2016.
International Industrial Organization Conference, April, 2016.
American Economic Association Annual Meetings, January, 2016.
Kellogg School of Management, November, 2015.
Georgetown University, October, 2015.
Research Conference on Communications, Information and Internet Policy, September, 2015.

"Does Competition Lead to Agglomeration or Dispersion in EMR Vendor Decisions?"
International Industrial Organization Conference, April, 2017.

"The Effect of Competition on Toxic Pollution Releases"
International Industrial Organization Conference, April, 2015.
University of California, Davis, March, 2015.

"The Impact of Mergers on Quality Provision: Evidence from the Airline Industry"
Strategic Management Society Conference "Strategies in a World of Networks," September, 2014.
International Industrial Organization Conference, April, 2014.

"Measuring Consumer Preferences for Video Content Provision via Cord-Cutting Behavior"
Cable Show Academic Workshop, April, 2014.
Research Conference on Communications, Information and Internet Policy, September, 2013.

"Information Technology and Patient Health: Analyzing Outcomes, Populations, and Mechanisms"
IUPUI, January, 2018
Purdue University, November, 2014.
ASHEcon Conference, June, 2014.
University of Massachusetts, April, 2014.
International Industrial Organization Conference, April, 2014.
NBER Economics of IT and Digitization Workshop, July, 2013.

"Indirect Network Effects and the Quality Dimension: A Look at the Gaming Industry"
Indiana University Economics Department, November, 2013.
International Industrial Organization Conference, May, 2013.

"Does Service Bundling Reduce Churn?"

NBER Economics of IT and Digitization Workshop, July, 2012.
International Industrial Organization Conference, March, 2012.
Federal Trade Commission, March, 2012.
Michigan University, November, 2011.
Research Conference on Communications, Information and Internet Policy, September, 2011.

"The Impact of the Partnership Long-term Care Insurance Program on Private Coverage"
University of Cincinnati, October, 2012.

"Do Incumbents Improve Service Quality in Response to Entry:  Evidence from Airlines' On-Time Performance"
Ohio State University, November, 2012.
Econometric Society North American Summer Meeting, June, 2011.
Temple University, November, 2010.
Miami University, October, 2010.
International Industrial Organization Conference, May, 2010.

"Has the Internet Accelerated the Diffusion of New Products?"
Bureau of Economic Analysis, November, 2009.

"Are Risk Preferences Stable across Contexts?  Evidence from Insurance Data"
Econometric Society North American Summer Meeting, June, 2008.

"Multi-market Contact and On-Time Performance in the US Airline Industry"
International Industrial Organization Conference, May, 2008.

"The Welfare Impact of Reducing Choice in Medicare Part D: A Comparison of Two Regulation Strategies"
ASHEcon Conference, June, 2010.
International Industrial Organization Conference, April, 2009.
Federal Trade Commission, March, 2008.

"Is Dual Agency in Real Estate a Cause for Concern?"
International Industrial Organization Conference, May, 2008.
Midwest Economic Association Annual Meeting, March, 2008.

"Internet Adoption Patterns and Usage are Different: Implications for the Digital Divide"
University of Maryland, April, 2007.

"How Do Households Choose Quality and Time to Replacement for a Rapidly Improving Durable Good?"
Kelley School of Business, February, 2010.
Duke University, September, 2007.
Cornell University, September, 2007.
Econometric Society North American Summer Meeting, June, 2007.
International Industrial Organization Conference, April, 2007.

"Relating Inertia and Experience in Technology Markets: An Analysis of Households' Personal Computer Choices"
Dartmouth Winter IO Conference, January, 2006.

"The Beginning of Online/Retail Competition and Its Origins: An Application to Personal Computers"
International Industrial Organization Conference, April, 2006.
Cornell University, March, 2006.

ASSA SGE, January, 2006.

"Repeat Purchase amid Rapid Quality Improvement: Structural Estimation of the Demand for Personal Computers"
Penn State University, April, 2007.
Econometric Society World Conference, August, 2005.
International Industrial Organization Conference, April, 2005.
Miami University, March, 2005.
ASSA SGE, January, 2005.
Duke University, November, 2004.
Cornell University, November, 2004.
NBER Summer Institute, July, 2004.

**EXPERT PANELS AND ENGAGEMENTS**
Panel on Breaking Developments in Damages Calculations, Litigating Patents and Trade Secret Remedies Summit, January, 2023.

Antitrust: Overview and Recent Developments, University of Nebraska Tech Policy Forum, January, 2023.

Econometrics for Policy Makers, University of Nebraska Tech Policy Forum, January, 2023.

Research Roundtable on Regulating Privacy, George Mason University, December, 2022.

Do People Care Where Their Data Are Stored?  Tech Refactored Podcast, Nebraska Governance and Technology Center, November 2022.  (Podcast link)

Advertising Markets: Is the Current Ecosystem Stimulating Competition?  Concurrences' Global Antitrust Economics Conference, November, 2021.

Damages from Data Breach and Misuse of Personal Information, Brattle Group, October, 2021.

Broadband Mapping Roundtable, Technology Policy Institute, October, 2021.

Panel on Competition and Innovation, 14th Annual Innovation Economics Conference, August, 2021.

Privacy, Please? American Bar Association Panel on Valuing Privacy, April, 2021.

Two Think Minimum Podcast with Scott Wallsten and Sarah Oh, Technology Policy Institute, February, 2021.  (Podcast link)

Panel on the Economy of Spectrum Sharing and Business Development, NSF Virtual Workshop on New Paradigms in Intelligent Spectrum Management and Regulations, December, 2020.

Scientific Sense Podcast Interview with Gill Eapen, October, 2020.  (Podcast link)

Panel on the Attention Economy, Technology Policy Institute Aspen Forum, October, 2020.  (Online video)

Panel on Antitrust Policy and Intellectual Property (moderator), Northwestern/USPTO Conference on Innovation Economics, August, 2020.

**SER-863**

Panel on STELAR/Retransmission Consent, Phoenix Center Telecom Symposium, December, 2019.

BU Technology Policy Research Initiative Conference on the Law and Economics of IP, July, 2019.

FTC Merger Retrospective Hearing, Federal Trade Commission, April, 2019 (Online video).

Panel on Consumer Protection and Regulation, Maurer School of Law, March, 2018.

Terminator or the Jetsons? The Economics and Policy Implications of Artificial Intelligence, Technology Policy Institute, February, 2018.

All Data is Health Data; The Impact of Data and Data Laws on Clinical Care, Innovation, and Research, Symposium at Hall Center for Law and Health, October, 2017.

Tools of Damages Estimation, IPO's Damages and Injunctions Committee Conference, June, 2017.

The Unlikely Pairing of Payers, Providers and Pharma for Patient Centered Analytics, Kelley Forum on Healthcare Analytics, September, 2016.

Challenges Faced by Online Video Distributors, Federal Communications Commission Video Landscape Workshop, March, 2016 (Online video).

The Future of Video Policy and Business Models, hosted by the Technology Policy Institute, January, 2014 (Online audio).

**PUBLIC SPEECHES**
"State of the Economy"
Mechanical Contractor Association of Indiana Annual Meeting, June, 2022.

"IoT and Telecom Policy"
Nelms Distinguished E-Seminar Series, University of Florida, October, 2020.

"Delivering Econometrics Skills within a Business Analytics Curriculum"
Robert Morris Teaching Economics Conference, February, 2018

"Critical Assessment of Correlation vs. Causality for Business Decisions"
180 Degrees Consulting, Indiana University, February, 2017

"Bringing Repeated Games to Life via Empirical Examples"
McGraw-Hill Education Fall INXPO Event, October, 2016
University of Phoenix School of Business Symposium, March, 2016
McGraw-Hill Education Teaching Workshop for Professional Development, March, 2013

"Critical Assessment of Correlation vs. Causality for Public Policy"
Vietnam Initiative with Indiana University, October, 2015

"As Graduates of Elder, You are Ready…"
Cincinnati Elder High School Graduation Commencement, May, 2005

**PUBLIC COMMENTARY**
"Comment on the January 2022 DOJ and FTC RFI on Merger Enforcement: Issues

**SER-864**

Related to Digital Markets," with Lesley Chiou, Nathanial Hipsman, and Sachin Sancheti, public submission to antitrust agencies, March, 2022. (Available at SSRN)

"People Lie When Answering Polls. Here's How to Fix It", with Scott Wallsten, *Technology Policy Institute Blog*, January, 2021. (Available at TPI)

"Travelers Coming from Italy May Have Driven First US Covid-19 Wave More Than Those From China, Study Suggests", with Daniel Simon, *The Conversation*, January, 2021. (Available at the Conversation)

"Improved Economic Analysis Should Be Lasting Part of Pai's FCC Legacy", with Babette Boliek and Jerry Ellig, *The Hill*, December, 2020. (Available at The Hill)

**MEDIA COVERAGE**
Specific Papers/Books/Public Commentary:
"Travelers Coming from Italy May Have Driven First US Covid-19 Wave More Than Those From China, Study Suggests," the *Conversation*, January, 2021.
Reprint in Associated Press, Yahoo News

"How Much is Privacy Worth Around the World and Across Platforms?"
"Facebook Would have to pay $3.50 Per Month to U.S. Users for Sharing Contact Info: Study" by Nandita Bose, *Reuters*, February 25, 2020. Reprint in *NY Times*. (Online version)

"A Paradigm for Assessing the Scope and Performance of Predictive Analytics"
"A Paradigm for Assessing the Scope and Performance of Predictive Analytics – Economic and Policy Implications of AI," by Wallis G. Romzek, Technology Policy Institute, April 17, 2018. (Online version).

"Does Original Content Help Streaming Services Attract More Subscribers?"
"Will Netflix Win the Streaming Wars?", Louis Foglia, BEME News, August, 2019. (Video).
"Streaming Video: Original Content is the Hook," by David Marino-Nachison, Barron's Next, April 25, 2018. (Online version).

Predictive Analytics for Business Strategy
"Kelley Professor's New Book 'Actively' Advocates the Role of Economics within Today's Analytics Boom," by George Vlahakis, Kelley School official blog, March 27, 2018. (Online version).

"The Impact of Mergers on Quality Provision: Evidence from the Airline Industry"
"Flight Delay? Lost Luggage? Don't Blame Airline Mergers, Research Shows," by George Vlahakis, reprinted in *Science Daily*, May 23, 2017. (Online version).

"The Empirical Economics of Online Attention"
"We Spend a Fixed Amount of Time Online Each Week (But People with Higher Incomes Spend Less)," by Julia Hann, Forbes, September 14, 2016. (Online version).
"Let Them Eat Internet," by Tyler Cohen, *Marginal Revolution*, July 19, 2016. (Online version).
"Consumers Have a Troubling Internet Habit That's Threatening Digital Media," by Myles Udland, *Business Insider*, July 19, 2016. (Online version).
"Richer People Spend Less Time on the Internet," by Allee Manning, *Vocativ*, July 19, 2016. (Online version).

"The Impact of the Partnership Long-term Care Insurance Program on Private Coverage"

**SER-865**

"The Boomer Challenge: It's a Numbers Game," by Paul Barr, *Hospitals and Health Networks*, April 8, 2014. (Online version).

"Do Incumbents Improve Service Quality in Response to Entry:  Evidence from Airlines' On-Time Performance"
"Study Finds That Competition May Lead to More Airline Delays," by Hugo Martin, *LA Times*, December 22, 2013. (Online version).

"Racial Bias in Expert Quality Assessment: A Study of Newspaper Movie Reviews"
"Psychology Uncovers Racism at the Movies," by Dr. Raj Persaud and Adrian Furnham, *Psychology Today*, September 5, 2015. (Online version)
"Men in Black the movie – but men in white would be a better film?," by Dr. Raj Persaud and Adrian Furnham, *Huffington Post*, May 22, 2012. (Online version).

"The Welfare Impact of Reducing Choice in Medicare Part D: A Comparison of Two Regulation Strategies"
"Medicare As We've Known It Isn't an Option," by Betsy McCaughey, *Wall Street Journal*, April 27, 2011. (Online content).

"Internet Adoption Patterns and Usage are Different: Implications for the Digital Divide"
"People below 'digital divide' would use the Internet more, if they had it," by Bill Steele, *Cornell Chronicle*, April 18, 2008. (Online version).
Invited guest for "Digital Divide," *Nevada Public Radio*. (Online content).

Expert Opinion:
    "ISP/Website 'Mutuality of Interests' – or Retrans Blackouts – Among Net Neutrality Reversal Possibilities," *Communications Daily*, Vol. 34, No. 17, January, 2014.

**PROFESSIONAL SERVICE**
Miami University Economics Advisory Board, 2023-present.

BEPP Faculty Research Awards Committee, 2022-2023.

NBER Small Digitization Grants Review Committee, 2022.

Research Conference on Communications, Information and Internet Policy (TPRC) Program Committee, 2017-2021.

International Industrial Organization Conference (IIOC) Local Organizer, 2018.

Midwest Health Economics Conference Local Organizing Committee, 2016.

European Conference on Information Systems (ECIS) Associate Editor of the track "Decision Analytics, Big Data, and Visualization," 2016.


International Conference on Information Systems (ICIS) Associate Editor of the track "Decision Analytics, Big Data, and Visualization," 2014.

International Industrial Organization Conference (IIOC) Program Committee, 2012-2014.

Ad hoc referee for:

*Agricultural and Resource Economics Review, American Economic Journal: Applied Economics, American Economic Review, Applied Economics, Applied Financial Economics, B.E. Journal of Economic Analysis & Policy, Communications of the Association for Information Systems, Economic Inquiry, Economics of Education Review, Economics of Innovation and New Technology, Economics Letters, European Journal of Law and Economics, Geneva Papers on Risk and Insurance, Growth and Change: A Journal of Urban and Regional Policy, Health Economics, Health Services Research, Information Economics and Policy, International Economic Review, International Journal of Industrial Organization, Israel Science Foundation, Journal of Air Transport Management, Journal of Banking and Finance, Journal of Competition Law and Economics, Journal of Economics and Business, Journal of Economics and Management Strategy, Journal of the European Economic Association, Journal of Gerontology, Journal of Health Economics, Journal of Industrial Economics, Journal of Policy Analysis and Management, Journal of Political Economics, Journal of Public Economics, Journal of Risk and Insurance, Journal of Rural Studies, Journal of Urban Technology, Leverhulme Trust, Management Science, Marketing Science, National Science Foundation, Organizational Science, Oxford Bulletin of Economics and Statistics, Quantitative Marketing and Economics, Quarterly Journal of Economics, Quarterly Review of Economics and Finance, RAND Corporation, RAND Journal of Economics, Research Policy, Review of Economics and Statistics, Review of Industrial Organization, Review of Network Economics, Risk Management and Insurance Review, Social Behavior and Personality, Southern Economic Journal, Strategic Management Journal, Telecommunications Policy, Telematics and Informatics, Transportation Research Part E, U.S.-Israel Binational Science Foundation, World Development*

External tenure/promotion/reappointment reviewer for:
Boston University, City University of Hong Kong, Drexel University, Emory University, Fairfield University, Georgetown University, Imperial College London, Loyola University Maryland, Purdue University, Stanford University, University of Colorado, University of Georgia, University of Massachusetts, University of Oklahoma, University of Oregon

External program reviewer for:
Ball State University Economics

**DISCUSSANT ACTIVITIES**
International Industrial Organization Conference, May, 2022
"Conflicts of Interest, Ethical Standards, and Competition in Legal Services," by Jan Bouckaert and Johan Stennek

NBER Economics of Digitization Summer Institute Meeting, July, 2021
"Browsers Don't Lie? Gender Differences in the Effects of Covid-19 Lockdowns on Digital Activity and Time Use," by Amalia R. Miller, Kamalini Ramdas, and Alp Sungu
"Does Telemedicine Transcend Disparities or Create a Digital Divide? Evidence from the Covid-19 Pandemic," by Jeffrey McCullough, Kartik K. Ganju, and Chandy Ellimoottil

NBER Economics of Digitization Summer Institute Meeting, July, 2018
"Steering Incentives and Bundling Practices in the Telecommunications Industry," by Brian McManus, Aviv Nevo, Zachary Nolan, and Jonathan W. Williams

International Industrial Organization Conference, April, 2017
"Price-Linked Subsidies and Health Insurance Markups," by Sonia Jaffe and Mark Shepard

NBER Economics of Digitization Meeting, March, 2017
"Using Massive Online Choice Experiments to Measure Changes in Well-being," by Erik Brynjolfsson, Felix Eggers, and Avinash Gannamaneni

**SER-867**

International Industrial Organization Conference, April, 2016
"Using Matching to Study Merger: An Application to the U.S. Airline Industry," by Zexuan Liu, Pallab Ghosh, and Qihong Liu
"Market Structure with the Entry of Peer-to-Peer Platforms: The Case of Hotels and Airbnb," by Chiara Farronato and Andrey Fradkin

Searle Center Conference on Innovation Economics, June, 2015
"How Do Open Standards Influence Inventive Activity? Evidence from the IETF," by Wen Wen, Chris Forman, and Sirkka Jarvenpaa

Searle Center Conference on Internet Search and Innovation, June, 2015
"Match Quality, Search, and the Internet Market for Used Books," by Sara Fisher Ellison
"E-Book Pricing and Vertical Restraints," by Babur De los Santos and Matthijs Wildenbeest

International Industrial Organization Conference, April, 2015
"Do Private Medicare Firms Face Lower Costs?," by Keaton Miller
"The Market for Electric Vehicles: Indirect Network Effects and Policy Impacts," by Yiyi Zhou

Searle Center Research Roundtable on Patents and Technology Standards: The Data Sets, April, 2015

American Economic Association Annual Meetings, Pricing and Resource Allocation in Telecommunications, January, 2015
"Employing Auctions to Allocate Scarce Resources," by John Mayo and David Sappington

American Economic Association Annual Meetings, Digital Media Economics, January, 2015
"Super Returns? The Effects of Ads on Product Demand," by Seth Stephens-Davidowitz, Hal Varian, and Michael D. Smith

Searle Center Conference on Internet Search and Innovation, June, 2014
"Auction vs. Posted-Price: Market Mechanism, Lender Behaviors, and Transaction Outcomes in Online Crowdfunding," by Zaiyan Wei and Mingfeng Lin

Research Roundtable on the Law and Economics of Digital Markets, July, 2013
"Digital Music Consumption on the Internet," by Bertin Martens and Luis Aguiar

Searle Center Conference on Internet Search and Innovation, June, 2013
"When Does Retargeting Work? Information Specificity in Online Advertising," by Anja Lambrecht and Catherine Tucker
"Local News Online: Aggregators, Geo-Targeting and the Market for Local News," by Lisa George

International Industrial Organization Conference, May, 2013
"The Impact of Privacy Policy on the Auction Market for Online Display Advertising," by Garrett Johnson
"Transactions in Two-Sided Markets," by Alexei Alexandrov and Daniel Spulber

American Economic Association Annual Meetings, Economics of the Internet, January, 2013
"Supply-Side Responses to Privacy Protection," by Avi Goldfarb and Catherine Tucker

Searle Center Book Preview Roundtable, December, 2012
*Innovation from the Edges: The Economics of Creating the Commercial Internet,* by Shane Greenstein

Searle Center Conference on Internet Search and Innovation, June, 2012
"News Aggregators and Competition among Newspapers," by Doh-Shin Jeon and Nikrooz Nasr Esfahani
"Technology Shocks in Multi-Sided Markets: The Impact of Craigslist on Local Newspapers," by Robert Seamans and Feng Zhu

Midwest Health Economics Conference, May, 2012
"The Anticipatory Effects of Medicare Part D on Drug Utilization," by Abby Alpert

International Industrial Organization Conference, March, 2012
"Intra-Household Effects on Demand for Telephone Service: Empirical Evidence," by Ching-I Huang
"Unobserved Risk Type and Sorting: Signaling Game in Online Credit Markets," by Kei Kawai, Ken Onishi, and Kosuke Uetake

NBER Economics of Digitization Meeting, February, 2012
"The Effect of Localization in News Aggregators on Local News Consumption," by Susan Athey and Markus Mobius

Federal Trade Commission Microeconomics Conference, November, 2011
"Do Firms Game Quality Ratings? Evidence from Mandatory Disclosure of Airline On-Time Performance," by Silke Forbes, Mara Lederman, and Trevor Tombe

International Industrial Organization Conference, May, 2010
"Competition in Public School Districts: Student Sorting, School Quality Determination, and School Entry," by Nirav Mehta
"A Model of Entry and Network Access Competition in Local Telephony," by Gustavo Marcos and Eduardo Saavedra

International Industrial Organization Conference, April, 2009
"Consumer Search and Online Demand for Durable Goods," by Jun Kim, Bart Bronnenberg, and Paulo Albuquerque
"Price Controls and Competition in Gasoline Retail Markets," by Juan Esteban Carranza and J.F. Houde

International Industrial Organization Conference, May, 2008
"A Simple Model of Pricing for Non-storable Goods in Oligopoly: Some Considerations on Airline Pricing Behaviour," by Marco Alderighi
International Industrial Organization Conference, April, 2007
"Markov Perfect Industry Dynamics with Many Firms," by Gabriel Weintraub

International Industrial Organization Conference, April, 2006
"Price, Price Dispersion and Number of Sellers at a Low Entry Cost Shopbot," by Michelle Haynes and Steve Thompson

International Industrial Organization Conference, April, 2005
"Asymmetric Advertising Costs as a Barrier to Entry: Evidence from Theatrical Motion Pictures," by Charles Moul

**BOOK REVIEWS**
Tucker, C. and Marthews, A., *You'll Pay for That: Payment Systems, Privacy, and Political Dissent*, MIT Press, 2023.

Bekes, G. and Kezdi, G., *Patterns, Causality and Prediction: Data Analysis for Business, Economics and Policy*, Cambridge University Press, 2017.

Lesser, W., *American Business Regulation: Understand, Survive, and Thrive*, M.E. Sharpe, 2015.

**CONSULTING AND EXPERT WITNESS WORK**
Expert reports, deposition, testimony and consulting for various matters including:
Competition policy and antitrust
Consumer protection
Damages calculations
Intellectual property
Privacy valuation
Survey design and analysis
Telecommunications policy

**MEMBERSHIPS**
American Economic Association.

Industrial Organization Society.

Academy of Management.

Association for Information Systems.

Team member for Cornell's Institute for the Social Sciences Theme Project, Getting Connected: Social Science in the Age of Networks, 2005-2008.

**UNIVERSITY SERVICE**
Member of Indiana Business Research Center Executive Director Search Committee, 2021-2022.

Member of Diversity, Equity & Inclusion Task Force, 2020-2021.

Member of Hiring Committee for Business Economics and Public Policy, 2017-2018, 2015-2016 & 2010-2011.

Chair of Hiring Committee for Business Economics and Public Policy, 2014-2015 & 2013-2014.
Kelley Direct Policy Committee, 2014-2016.

Judge for Kelley Honors Case Competition, 2016.

Judge for Deloitte Undergraduate Case Competition, 2017, 2015, 2011.

Co-founder and Judge for Economic Consulting Case Competition (EC3), sponsored by the Keystone Group, 2011-2015.

Co-founder and Co-organizer for BEPP "Eat, Meet, & Compete," 2012-2015.

Undergraduate Policy Committee, 2012-2014 & 2010-2011.

Doctoral Advisor for Business Economics and Public Policy, 2011-2012.

Doctoral Policy Committee, 2011-2012.

Judge for Net Impact Sustainable Business Club 2010 Case Competition, 2010.

*At Cornell:*
Applied Economics and Management Petitions Committee, 2007-2010.

Policy Analysis and Management External Hiring Committee, 2006-2007 & 2009-2010.

Mann Café Advisory Board, 2007-2010.

Institute for the Social Sciences Small Grant Program Committee, 2008.

Biz Quiz Faculty Advisor, 2008.

Applied Economics and Management Seminar Committee, 2005-2007.


Judge for Globalize '07, Cornell Hotel School, 2007.

Mann Library Vendor Evaluation Sub-committee, 2006.

**PHD STUDENTS**
    *Committee Chair:*
          Hong Lee
          Aparna Soni
          Yu-Hsin Liu
          Yejing Ren
      Junlin Du (Co-chair)
      Fernanda Lopez de Leon

    *Committee Member:*
      Ningning Guo
          Abhishek Ganguly
          Catalin Stefanescu
          Susan Kayser
          Eric Schmidbauer
          Shyam Venkatesan
      Carlos Castelan
          Joo Yeon Sun
      Annemie Maertens (Substitute member)
      Thanasin Tanompongphandh
          Jiahong Zhang
      Lona Fowdur
      Anirban Mukherjee
      Marc Bellemare (Substitute member)
      Hyunkyung Choe
          Daniel Shawhan

    *External Proposal Reviewer:*
      Andres Jola Sanchez (chair)
          Mohammad Ghuloum
      Kyle Bradley

**MASTERS STUDENTS**
*Committee Member:*
      Malcolm Wade (Johns Hopkins, Systems Engineering)

**SER-871**

**List of Prior Testimony**
**JEFFREY T. PRINCE**

Testimony (1)
    Qualcomm Incorporated v. Apple Incorporated (Case No. 3:17-cv-1375), United States District Court for the Southern District of California, March 7 & 8, 2019

Tutorial-styled Hearing ("Hot Tub") (1)
    Dennis McGrath et al. v. Marriott International, Inc. et al. (Case No. 8:19-cv-00368-PWG), United States District Court of Maryland Southern Division, March 21, 2022

Deposition (6)
    Walter Peters et al. v. Apple, Inc. (Case No. 19STCV21787), Superior Court for the State of California County Los Angeles, September 12, 2022

    Hachette Book Group, Inc. et al. v. Internet Archive (Case No. 1:20-cv-04160-JGK-OTW), United States District Court Southern District of New York, June 9, 2022

    Dennis McGrath et al. v. Marriott International, Inc. et al. (Case No. 8:19-cv-00368-PWG), United States District Court of Maryland Southern Division, December 23, 2021

    Theta IP, LLC v. Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (Case No. 6:20-cv-00160-ADA), United States District Court for the Western District of Texas Waco Division, October 28, 2021

    Apple iPhone Antitrust Litigation (Case No. 4:11-cv-06714-YGR), United States District Court for the Northern District of California Oakland Division, October 4, 2021

    Dennis McGrath et al. v. Marriott International, Inc. et al. (Case No. 8:19-cv-00368-PWG), United States District Court of Maryland Southern Division, August 13, 2021

    Wi-LAN Inc. v. Apple Inc. (Case No. 3:14-cv-02235-DMA-BLM), United States District Court for the Southern District of California, June 11, 2019

**SER-872**

## 8. APPENDIX B – DOCUMENTS RELIED UPON

Academic Articles

- Anja Lambrecht et al., "How Do Firms Make Money Selling Digital Goods Online?" *Marketing Letters*, 25(3), 2014, pp. 331–341.

- Avi Goldfarb and Catherine Tucker, "Digital Economics," *Journal of Economic Literature*, 57(1), 2019, pp. 3–43.

- Avner Strulov-Shlain, "More than a Penny's Worth: Left-Digit Bias and Firm Pricing," *Chicago Booth Research Paper*, 2021, pp. 19–22.

- Christian Homburg et al., "The Multichannel Pricing Dilemma: Do Consumers Accept Higher Offline Than Online Prices?" *International Journal of Research in Marketing*, 36(4), 2019, pp. 597–612.

- Christopher T. Conlon and Nirupama L. Rao, "Discrete Prices and the Incidence and Efficiency of Excise Taxes," *American Economic Journal: Economic Policy*, 12(4), 2020, pp. 111–143.

- Christos Genakos and Mario Pagliero, "Competition and Pass-Through: Evidence from Isolated Markets," *American Economic Journal: Applied Economics*, 14(4), 2022, pp. 35–57.

- Hans Jarle Kind and Marko Köthenbuerger, "Taxation in Digital Media Markets," *Journal of Public Economic Theory*, 20(1), 2018, pp. 22–39.

- Joel Waldfogel, "Copyright Research in the Digital Age: Moving from Piracy to the Supply of New Products," *American Economic Review*, 102(3), 2012, pp. 337–342.

- Joel Waldfogel, "How Digitization Has Created a Golden Age of Music, Movies, Books, and Television," *Journal of Economic Perspectives*, 31(3), 2017, pp. 195–214.

- Joseph C. Nunes et al., "Why Are People So Prone To Steal Software? The Effect of Cost Structure on Consumer Purchase and Payment Intentions," *Journal of Public Policy & Marketing*, 23(1), 2004, pp. 43–53.

- Nicholas Stern, "The Effects of Taxation, Price Control and Government Contracts in Oligopoly and Monopolistic Competition," *Journal of Public Economics*, 32(2), 1987, pp. 133–158.

- Reinhold Kesler et al., "Competition and Privacy in Online Markets: Evidence from the Mobile App Industry," ZEW - Centre for European Economic Research Discussion Paper, 2019.

- Risto Gogoski, "Payment Systemts in Economy – Present End Future Tendencies," *Procedia – Social and Behavioral Sciences* 44, 2012, pp. 436–445.

- Paul A. Belleflamme, "The Economics of Digital Goods: A Progress Report," *Review of Economic Research on Copyright Issues*, 13(2), 2016, pp. 1–24.

- Pavel Kireyev et al., "Match Your Own Price? Self-Matching as a Retailer's Multichannel Pricing Strategy," *Marketing Science*, 36(6), 2017, pp. 908–930.

- Richard A. Posner, "Intellectual Property: The Law and Economics Approach," *Journal of Economic Perspectives*, 19(2), 2005, pp. 57–73.

- Takeshi Amemiya, "Tobit models: A survey," *Journal of Econometrics*, 24(1-2), 1984, pp. 3–61.

- Yannis Bakos et al., "Shared Information Goods," *Journal of Law and Economics*, 42(1), 1999, pp. 117–156.

## Books and Book Chapters

- American Bar Association, *Econometrics: Legal, Practical and Technical Issues*, Second Edition, (ABA Book Publishing, 2014).

- Carl Shapiro and Hal R. Varian, *Information Rules: A Strategic Guide to the Information Economy*, (Boston, MA: Harvard Business School Press, 1999).

- Don Fullerton and Gilbert E. Metcalf, "Tax Incidence," in *Handbook of Public Economics*, ed A. J. Auerbach and M. Feldstein (2002), pp. 1787–1872.

- Donna L. Mohr et al., "Probability and Sampling Distributions," in *Statistical Methods*, Fourth Edition, ed. Donna L. Mohr, William J. Wilson, and Rudolf J. Freund (Cambridge: Academic Press, 2022), pp. 65–122.

- Giorgio Fagiolo et al., "Validation of Agent-Based Models in Economics and Finance," in *Computer Simulation Validation*, (Springer, 2019), pp. 763–787.

- Hal R. Varian et al., *The Economics of Information Technology: An Introduction*, (Cambridge: Cambridge University Press, 2004).

- Jeffrey M. Perloff and Dennis W. Carlton, *Modern Industrial Organization*, Fourth Edition, (Essex: Pearson, 2015).

- Kyle D. Cattani, et al., "Coordinating Traditional and Internet Supply Chains," in *Handbook of Quantitative Supply Chain Analysis*, (Springer, 2004), pp. 643–677.

- Michael Baye and Jeff Prince, *Managerial Economics and Business Strategy*, Tenth Edition, (McGraw-Hill, 2022).

- Paul A. Samuelson and William D. Nordhaus, *Economics*, Nineteenth Edition (Special Indian Edition), (McGraw Hill, 2009).

## Depositions

**SER-874**

- Deposition of Daniel McFadden, Ph.D., August 3, 2021.

- Deposition of Daniel McFadden, November 5, 2021.

- Deposition of Daniel L. McFadden, December 5, 2022.

- Deposition of Daniel McFadden, February 17, 2023.

- Trial Testimony of Mr. Timothy Sweeney, *Epic Games, Inc. vs. Apple, Inc.*, May 3, 2021.

Expert Reports and Declarations

- Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, dated June 1, 2021.

- Expert Report and Declaration of Jeffrey T. Prince, Ph.D., dated August 10, 2021.

- Expert Report and Declaration of Lorin M. Hitt, Ph.D., dated August 10, 2021.

- Reply Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, dated October 19, 2021.

- Declaration of Jeffrey T. Prince, Ph.D. in Support of Apple's Motion to Exclude Reply Opinions of Daniel L. McFadden, dated November 9, 2021.

- Declaration of Daniel L. McFadden in Support of Plaintiffs' Opposition to Defendant Apple Inc.'s *Daubert* Motion to Exclude Reply Testimony of Professor Daniel L. McFadden, dated November 23, 2021.

- Supplemental Declaration of Jeffrey T. Prince, Ph.D. in Support of Apple's Motion to Exclude Reply Opinions of Daniel L. McFadden, dated November 30, 2021.

- Supplemental Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, dated September 26, 2022.

- Revised Supplemental Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, dated December 30, 2022.

- Second Revised Supplemental Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class Certification, dated January 19, 2023.

- Expert Report of Jonah Berger, Ph.D., dated March 10, 2023.

- Expert Report of Lorin M. Hitt, Ph.D., dated March 10, 2023.

- Expert Report of Richard Schmalensee, Ph.D., dated March 10, 2023.

- Expert Report of Mark Watson Report, Ph.D., dated March 10, 2023.

Legal Documents

**SER-875**

- Order Denying Plaintiffs' Motion for Class Certification without Prejudice; Granting in Part and Denying in Part Apple's *Daubert* Motion to Exclude Testimony of Professor Daniel L. McFadden, *In re Apple iPhone Antitrust Litigation*, March 29, 2022.

- Plaintiffs' Opposition to Defendant Apple Inc.'s *Daubert* Motion to Exclude Reply Testimony of Professor Daniel L. McFadden, *In re Apple iPhone Antitrust Litigation*, November 23, 2021.

- Plaintiffs' Notice of Motion and Motion for Class Certification; Memorandum of Points and Authorities, *In re Apple iPhone Antitrust Litigation*, November 16, 2021.

- Plaintiffs' Renewed Notice of Motion and Motion for Class Certification; Memorandum and Points of Authorities, *In re Apple iPhone Antitrust Litigation*, September 26, 2022.

Websites

- "Apple presents App Store Best of 2020 winners," *Apple*, available at https://www.apple.com/newsroom/2020/12/apple-presents-app-store-best-of-2020-winners/, accessed on March 5, 2023.

- "Paying Up: The New Economics of Payment Systems," *Oxera*, June 30, 2020, available at https://www.oxera.com/insights/agenda/articles/paying-up-the-new-economics-of-payment-systems/, accessed on March 9, 2023.

- James K. Willcox, "Best Free Streaming Video Services," *Consumer Reports*, December 31, 2022, available at https://www.consumerreports.org/streaming-media-devices/guide-to-free-streaming-video-services-a1149608760/, accessed on March 9, 2023.

- Madeline Garfinkle, "Which Streaming Services Are Raising Prices? See the List," *Entrepreneur*, November 7, 2022, available at https://www.entrepreneur.com/business-news/which-streaming-services-are-raising-prices-see-the-list/438642, accessed on March 9, 2023.

**SER-876**

## 9. APPENDIX C – PROFESSOR MCFADDEN ASSUMES RATHER THAN DEMONSTRATES THAT ALL APPS WITH THE SAME GENRE AND APP STORE BUSINESS MODEL FACE THE SAME PRICE SENSITIVITY

1. Professor McFadden offers no evidence in his reports or testimony that all apps with the same genre and App Store business model face the same price sensitivity. In this Appendix, I consider three possible arguments that his assumption is supported by evidence and categorically reject each.

2. First, Professor McFadden provides an Appendix in his Initial Report in which he purports to derive his demand equation from "consumer utility maximization."[318] While that phrasing makes it sound as though the equation is derived from first principles, that is incorrect. In fact, the consumer utility maximization framework he uses merely rearranges the same variables and makes the same assumptions. In particular, he assumes there as well that each individual consumer exhibits the same sensitivity to price when considering purchasing any given app within a genre and App Store business model. Thus, Professor McFadden cannot rely on utility maximization to support his assumption; it is merely a different way of stating the same assumption.

3. Second, Professor McFadden purports to estimate his demand model with high precision by quoting (mostly) small standard errors.[319] Professor Watson explains in detail why that conclusion is incorrect.[320] But even if it were correct, those standard errors are *themselves* calculated under the same assumption that all apps with the same genre and App Store business model face the same price sensitivity. They cannot prove or support such an assumption, because they *depend* on the assumption. Said another way, if I assume that a polygon is a rectangle, measure its width and height, and find that it is 2 inches by 4 inches, with high precision, that in and of itself does not show that the object is in fact a rectangle. In fact, the way I measured its length and width may very well have been informed by my initial assumption that it was a rectangle. For example, I might have measured its height through its midpoint, rather than using its left side or right side. That would be appropriate if it were in fact a rectangle, but would clearly be misleading if it were a circle, and certainly performing the measurement very precisely would not confirm, on its own, that it is a rectangle.

4. Finally, Professor McFadden may argue that he has allowed for sufficient flexibility by including "app fixed effects" or "year-month fixed effects,"[321] or even a small set of control

---

[318] McFadden Initial Report, Appendix D.

[319] Second Revised McFadden Supplemental Report, Figure 3.

[320] Watson Report, Sections 4, 5, 6.

[321] Second Revised McFadden Supplemental Report, Figure 3 and associated notes.

variables.[322] These variables govern the overall *level* of demand for an app. That is, if properly estimated in a valid model, which Professor McFadden does not do, they would provide information about how many downloads of a particular app might sell at the price of $0.99, and this number might vary from app to app, reflecting that some apps are more popular. But they do nothing to weaken his strong assumption about how much that quantity *changes* as the price changes, which he assumes is the same for all apps with the same genre and App Store business model.

## 10. APPENDIX D – DISTRIBUTION OF ENDING DIGITS IN PROFESSOR MCFADDEN'S ANALYSES

5. As discussed in more detail in Section 5.2, Professor McFadden's purported price tier simulation fails to predict but-for prices that conform to Apple's price tiers due to his use of composite in-app purchase prices.[323] Overall, ██ percent of app-month combinations with paid in-app purchase content are associated with multiple in-app purchase products. As demonstrated above in Exhibit 14, 45.6 percent of as-is composite in-app purchase prices end in $X.99, and 9.0 percent of as-is composite in-app purchase prices end in $X.49. In Professor McFadden's main analysis without price tiers, 0.6 percent of but-for composite in-app purchase prices end in $X.99, 0.7 percent of but-for composite in-app purchase prices end in $X.49, 1.0 percent of implied but-for prices for individual items end in $X.99, and 0.9 percent of implied but-for prices for individual items end in $X.49.[324]

6. Exhibits 24 and 25 show the ending digits of Professor McFadden's but-for prices for his price tier simulation featuring 750 price points in the but-for world. For values between $0.49 and $49.99 this price tier schedule allows all prices ending in $X.X9 (for example $1.19, $1.29, $1.39, etc.) to be on the price tier. Among composite in-app purchase as-is prices, only 61.9 percent end in $X.X9.[325] In the but-for world, only 13.6 percent of composite in-app purchase prices end in $X.X9 when Professor McFadden does not apply the 750 price tiers.[326] In Professor McFadden's 750 price tier analysis, again only 61.9 percent of but-for composite in-app purchase prices end in $X.X9, 6.3 percent of but-for composite in-app purchase prices end in $X.99, 9.6 percent of but-for composite in-app purchase prices end in $X.49, 18.2 percent of implied item-level but-for prices end in $X.X9, 4.8 percent of implied

---

[322] See, e.g., Backup to Second Revised McFadden Supplemental Report, "75 Alternative Sample Estimation/Estimation without Music betaQ/code/functions_regressions/run_gmm_games m" lines 23, 35, 37, "75 Alternative Sample Estimation/Estimation without Music betaQ/code/functions_regressions/gmm_criterion.m" lines 8, 11.

[323] Item-month-level calculations comprise item-months with as-is prices that align with Apple's price tiers. App-month-level calculations comprise app-months with at least one item that aligns with Apple's price tiers.

[324] See Workpaper 28.

[325] See Exhibit 24.

[326] See Workpaper 28.

**SER-878**

item-level but-for prices end in $X.99, and 2.2 percent of implied item-level but-for prices end in $X.49.[327]

---

*EXHIBIT 24*
*Frequency of Cent Values for But-For Composite In-App Purchase But-For Prices in Professor McFadden's Purported Simulation of 750 Price Tiers*



Source: McFadden Production
Note:
[1] Professor McFadden's simulation with 750 price tiers features tiers with prices ending in $X.X9. The figure shows that in Professor McFadden's purported price tier analysis for composite in-app purchases, only 61.9% of prices end in $X.X9.
[2] The sample of observations for this figure, and its associated percentages as reported on the vertical axis, are monthly observations of apps for which Professor McFadden makes a but-for price prediction for a composite in-app purchase in his Apple price tier simulation and for which at least one individual in-app purchase item has an as-is price that conforms to Apple's price tier rules. This is a subset of the apps present in the particular 0.1 percent sample Professor McFadden uses for his price tier simulations. Ending digits are found by rounding Professor McFadden's calculated prices to the nearest two digits.

---

[327] See Workpaper 28.

**SER-879**

**EXHIBIT 25**
*Frequency of Cent Values for Implied But-For Prices of Individual In-App Purchase Items in Professor McFadden's Purported Simulation of 750 Price Tiers*



Source: McFadden Production
Note:
[1] Professor McFadden's simulation with 750 price tiers features tiers with prices ending exclusively in $X.X9. The figure shows that in Professor McFadden's purported price tier analysis, only 18.2% of implied but-for prices for individual in-app purchases end in $X.X9.
[2] The sample of observations for this figure, and its associated percentages as reported on the vertical axis, are item-months for which the item has an as-is price that is above zero and conforms to Apple's price tier rules, and for which Professor McFadden predicts a but-for composite in-app purchase price in his Apple price tier simulation for the item's associated app. But-for prices for individual items are found by applying the "percentage method." Ending digits are found by rounding but-for prices to the nearest two digits.

## 11. APPENDIX E – PROFESSOR MCFADDEN'S PRICE TIER SIMULATION IN THE CONTEXT OF THE "DOLLAR METHOD"

7. As discussed in Section 5.2, combining a fixed increment adjustment for composite in-app purchase prices with the "dollar method" for converting composite price changes into implied but-for prices for individual items—setting aside its other problems, which ultimately led to Professor McFadden abandoning it—is much better at predicting but-for prices that fall on Apple's price tiers. While again taking care not to endorse this method as an appropriate way to handle pricing, or price tiers, for in-app purchases, I note that the approach *does* produce implicit item-level prices that are largely consistent with Apple's price tiers when it is applied in the context of the dollar method. This can be illustrated in

**SER-880**

two ways: by analyzing the Genshin Impact example, and by reproducing Exhibit 14 (the fraction of but-for prices ending in $X.49 and $X.99).

**EXHIBIT 26**

*Genshin Impact Prices in the As-is and But-for World under Professor McFadden's Price Tier Simulation (Primary Version, 87 Tiers) in Context of Dollar Method, September 2020*



Source: McFadden Production

Note: The but-for prices for individual items are calculated by applying Professor McFadden's calculated dollar change for the composite in-app purchase price to the as-is prices of individual items. Composite but-for prices report the but-for price based on Professor McFadden's purported simulation of Apple's price tiers.

**SER-881**

*EXHIBIT 27*

*Frequency of Targeted Cent Values for Implied Individual Item But-For Prices From Professor McFadden's Price Tier Simulations Using the Dollar Method*



Source: McFadden Production

Notes:

[1] The sample of observations for this figure, and its associated percentages as reported on the vertical axis, are monthly observations of apps for which Professor McFadden makes a but-for price prediction for a composite in-app purchase in his Apple price tier simulation and for which at least one in-app purchase item has an as-is price that conforms to Apple's price tier rules. This is a subset of the apps present in the particular 0.1 percent sample Professor McFadden uses for his price tier simulations. The sample of individual items are items with an as-is price that is above zero and conforms to Apple's price tier rules, and for which Professor McFadden predicts a but-for composite in-app purchase price in his Apple price tier simulation for the item's associated app. But-for prices for individual items are found by applying the "dollar method." Ending digits are found by rounding Professor McFadden's but-for prices to the nearest two digits.

[2] 0.2% of as-is prices of individual items end in $X.49.

## 12. APPENDIX F – PARAMETER ESTIMATES FOR DEMAND HETEROGENEITY ANALYSIS

8.  This Appendix contains the results referenced in Section 6.3.2. In particular, I estimate Professor McFadden's demand model assuming that different groups of apps may face different price sensitivities of demand. I consider groupings based on the app's price. I estimate price sensitivities separately for apps above and below a series of price cutoffs. For example, I create two samples—apps with download prices below $5 and composite in-app purchase prices below $10, and all other apps. Then, within each of these two groups, I apply Professor McFadden's methodology to estimate price sensitivities within each genre and App

128 of 133

Store business model.[328] For robustness, I apply this procedure at several different price cutoff values for download prices and in-app purchase prices.

9. As shown in Exhibit 28, for all twelve groupings I consider, I find that at least one (and often several) of the coefficient estimates violate foundational economic assumptions, meaning his model is inconsistent with profit maximization in the as-is world and is unable to calculate harm for even this minor adjustment to his model. This highlights the fact that Professor McFadden's model depends crucially on his assumption of uniform price sensitivity and in fact cannot even operate without it.

*EXHIBIT 28*
*Varying Price Sensitivity Within Genre by Average Annual Price*



Note:
[1] All alternative regressions are estimated using the 0.1 percent sample analyzed in Appendix D of Professor McFadden's Second Revised Supplemental Report.
[2] An app's download price is assigned as the average across all its annual download prices. An app's in-app purchase price is assigned as the average across all its annual in-app purchase prices.
[3] The apps used in regression are partitioned based on whether their average download price and average in-app purchase price are below or above the cutoffs specified above. Apps below this cutoff have one set of demand estimates, while apps above this cutoff will have a separate set of demand estimates.

10. Exhibit 29 provides further detail. For a comparison point, it first recaps Professor McFadden's own estimates, which assume a single price sensitivity, along with his reported standard errors. Below that, it reports the estimated coefficients I obtain using methods when I allow price sensitivity to vary across price groupings. Coefficients which are economically nonsensical are in red. Among those in black, which have the economically expected sign, notice that the price sensitivity coefficients—for both paid downloads and in-app purchases,

---

[328] The price cutoff is based on the average of the annual average prices used in Professor McFadden's margin constraint condition. Due to the presence of apps with both paid downloads and paid in-app content, Professor McFadden jointly estimates the price sensitivity for downloads and in-app content. To maintain this approach, the division of apps within genres is similarly based on both the download price and the price of in-app purchase bundles. Thus, while Professor McFadden's baseline model has 5 parameters (3 for Games, 2 for Music & Entertainment), each model with price groups has 10 parameters (5 for each price group).

129 of 133

and for all genres—are much smaller in magnitude, usually by at least half and often substantially more than that, for the higher-priced group. While Professor Watson explains that a formal characterization of uncertainty of these estimates is not possible and so they cannot be formally tested for significant differences,[329] they are facially inconsistent with Professor McFadden's assumption that the price sensitivity faced by apps is the same across all apps with the same genre and App Store business model.

11. Furthermore, the fact that the high-priced group invariably is estimated to have a lower price sensitivity calls into question Professor McFadden's assumed functional form. One property of Professor McFadden's assumed functional form, together with the uniform price sensitivity assumption, is that higher-priced apps have higher elasticities of demand than lower-priced apps. That is, Professor McFadden *assumes* that higher-priced apps have higher elasticities of demand than lower-priced apps. But when the uniform price sensitivity assumption is relaxed, the data suggest that the lowest-priced apps are more price sensitive than Professor McFadden assumes, while the highest-priced apps are less, calling into question the overall pattern.

*EXHIBIT 29*
*Parameter Estimates from Varying Price Sensitivity Within Genre by Average Annual Price*



Source: McFadden Production
Note:
[1] The top panel shows parameter estimates based on 0.1 percent sample as shown in Appendix D of Professor McFadden's Second Revised Supplemental Report. All alternative regressions are estimated using this same 0.1 percent sample.
[2] An app's download price is assigned as the average across all its annual download prices. An app's in-app purchase price is assigned as the average across all its annual in-app purchase prices.
[3] The apps used in regression are partitioned based on whether their average download price and average in-app purchase price are below or above the cutoffs specified above. The low-price group has download prices below the cutoff and a composite in-app purchase price below the cutoff. Apps below this cutoff have one set of demand estimates, while apps above this cutoff will have a separate set of demand estimates.

---

[329] Watson Report, Section 4.1.

12. Professor McFadden may critique this approach to grouping apps, as he did in his Reply Report,[330] due to endogeneity concerns. However, this misunderstands the purpose of the alternative groupings I have proposed. I do not in any way mean to propose the above models and estimates as correct, valid, or reliable. I merely offer them as inconsistent with Professor McFadden's own assumptions. If Professor McFadden's assumption is correct that every app within a group has the same price sensitivity, then splitting his sample according to the values of an "endogenous" independent variable should still produce the same estimated price sensitivity (within the range of statistical uncertainty), assuming his instrumental variables are valid. This is not the case, as shown above.

## 13. APPENDIX G – SQL CODE FOR HARM ESTIMATION

13. When implemented exactly as given in his production, the code Professor McFadden uses to tabulate harm for each individual account (after calculating but-for prices) takes several days to complete the calculations. In order to run the multiple sensitivities presented in this Report in a limited amount of time, as well as to calculate damages numerous times during my attempts to replicate Professor McFadden's results (which changed several times while he attempted to correct various errors), I replaced this piece of Professor McFadden's code— and only this piece—to make it more efficient. When applied to Professor McFadden's assumptions in his main analysis in his Second Revised Supplemental Report, my improved code matches his total damage estimate within $500, out of ▬▬▬▬▬ and only 12 accounts switch harm status, out of almost 177 million accounts.[331] The rest of this appendix explains in greater detail how Professor McFadden's code operated, and what changes I made.

14. Professor McFadden's harm estimation procedure involves loading various large datasets into the statistical package R environment, which are then used to perform the harm calculations. Presumably because R holds data in memory and the entire data is too large to fit in memory on his machine, he breaks the data into 185 pieces based on app, and processes each piece separately. For each of these 185 dataset pieces, sequentially, he then:

- Cleans the transactions data but does not aggregate it (i.e., each row still represents one transaction).

---

[330] McFadden Reply Report, ¶¶ 130–133.

[331] See Workpaper 29. When calculating harm categories, damage values are rounded to three decimal places. This means that accounts with a net harm sufficiently close to zero could be categorized as unharmed due to rounding.

- Joins together monthly quantities, prices, and the purported calculated consumer percent overcharge for every app-month in the dataset piece.[332]
- Joins the result onto the piece of transactions data.
- Calculates the purported amount of damage for each paid transaction in the dataset piece for which his model calculates a but-for price (e.g., ignoring paid download app-months where the price changes within the month).
- Aggregates the damages and spending for each account, but only across the apps covered within the dataset piece.

15. Following these computationally intensive steps, Professor McFadden re-combines the 185 dataset pieces and aggregates harm and spending for each account across all 185 pieces. Then, he calculates the aggregate results, including total purported harm and spending across all accounts, or across those accounts that survive his $10 spending cut-off.

16. My process makes four important changes to this:

- I use SQL for these steps, which is more efficient than R for processing large datasets.
- I do not divide the data into 185 pieces, but rather work with all of the data at once.
- Before I join the transactions data to the app-month level quantity and price data, and overcharge percentage data, I aggregate to the account-app-month level and discard irrelevant columns of transaction data, keeping only the information needed for the harm calculations.
- I join the app-month price and quantity data separately, save the result, and only afterward join on overcharge information. This allows me to consider many sensitivities yielding different overcharges without having to repeat the entire process.

17. The efficient version of the code virtually matches Professor McFadden's results, and the few discrepancies can be explained by machine precision and computational environment issues. When applied to Professor McFadden's assumptions in his main analysis in his Second Revised Supplemental Report, my code produces a total damages number that is within $500 (out of ███████████) of that calculated by Professor McFadden's code. Furthermore, when applied to Professor McFadden's assumptions in his main analysis in his

---

[332] The overcharge data is for all apps for which Professor McFadden calculates a but-for price, not just those in this dataset piece. However, the monthly quantities and prices are only for the dataset piece, so the rest of the overcharge data drops out during the joining process.

Second Revised Supplemental Report, my code disagrees with his regarding whether individual accounts are harmed in only 12 cases (out of almost 177 million).

**SER-887**

# EXHIBIT A

BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com

MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
THOMAS H. BURT (*pro hac vice*)
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

*Interim Class Counsel and Proposed Co-Class Counsel*

[Additional Counsel Appear on Signature Page]

<div align="center">

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

</div>

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR |
| | **[PUBLIC REDACTED VERSION OF SEALED DOCUMENT]** |
| | **PLAINTIFFS' RENEWED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES** |
| | DATE: April 4, 2023<br>TIME: 2:00 p.m.<br>CTROOM: 1, 4th Floor<br>JUDGE: Hon. Yvonne Gonzalez Rogers |

**NOTICE OF MOTION AND RENEWED MOTION FOR CLASS CERTIFICATION**

PLEASE TAKE NOTICE that on April 4, 2023, at 2:00 p.m. in Courtroom 1, 4th Floor of the above-entitled Court, located at 131 Clay Street, Oakland, California, Plaintiffs Robert Pepper, Stephen H. Schwartz, Edward W. Hayter and Edward Lawrence ("Plaintiffs") will, and hereby do respectfully renew their motion for an Order:

1. certifying the following Class:

All persons in the United States, exclusive of Apple and its employees, agents and affiliates, and the Court and its employees, who purchased one or more iOS applications or application licenses from Defendant Apple Inc. ("Apple"), or who paid Apple for one or more in-app purchases, including, but not limited to, any subscription purchase, for use on an iOS Device at any time since July 10, 2008 (the "Class Period"). The Class is limited to those persons who paid more than $10.00 in total to Apple during the Class Period for iOS applications and in-app purchases from any one Apple ID account;

2. appointing Plaintiffs as Class Representatives; and

3. appointing Wolf Haldenstein Adler Freeman & Herz LLP and Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C. as Co-Class Counsel.

All the prerequisites and requirements for class certification are met and therefore certification is warranted. Plaintiffs base their Renewed Motion for Class Certification on:

1. the Court's March 29, 2022, Order Denying Plaintiffs' Motion for Class Certification Without Prejudice; Granting in Part and Denying in Part Apple's *Daubert* Motions to Exclude Testimony of Professor Daniel L. McFadden (ECF No. 630);

2. the Memorandum of Points and Authorities filed in support of this Motion, appended hereto;

3. the Declaration of Rachele R. Byrd and its exhibits: (a) the Expert Report of Rosa M. Abrantes-Metz, Ph.D.; and (b) the Supplemental Expert Report of Daniel L. McFadden;

4. all other records and papers on file in this action;

5. any oral argument and evidence that may be presented at the hearing on this Motion; and

6. all other matters properly before the Court.

PLAINTIFFS' RENEWED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION;
MEM. OF Ps & As
Case No. 11-cv-06714-YGR
-1-

**SER-890**

DATED: September 26, 2022

**WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP**

By: _/s/ Rachele R. Byrd_
BETSY C. MANIFOLD
RACHELE R. BYRD
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com

MARK C. RIFKIN
MATTHEW M. GUINEY
THOMAS H. BURT
**WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

*Interim Class Counsel and Proposed Co-Class
Counsel*

DAVID C. FREDERICK (*pro hac vice*)
AARON M. PANNER (*pro hac vice*)
DANIEL V. DORRIS
**KELLOGG, HANSEN, TODD, FIGEL &
 FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
dfrederick@kellogghansen.com
apanner@kellogghansen.com
ddorris@kellogghansen.com

*Counsel for Plaintiffs and Proposed
Co-Class Counsel*

MICHAEL LISKOW
**CALCATERRA POLLACK LLP**
1140 Avenue of the Americas, 9th Floor
New York, NY 10036-5803
Telephone: (212) 899-1761
Facsimile: (332) 206-2073
mliskow@calcaterrapollack.com

*Counsel for Plaintiff Robert Pepper*

PLAINTIFFS' RENEWED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION;
MEM. OF Ps & As
Case No. 11-cv-06714-YGR
-2-

## TABLE OF CONTENTS

PAGE

I.   STATEMENT OF ISSUES TO BE DECIDED ....................................................................1

II.   INTRODUCTION ..........................................................................................................1

III.   BACKGROUND .............................................................................................................2

 A.   The *Daubert* Motions........................................................................................ 2

 B.   The Class Certification Motion.......................................................................... 4

IV.   ARGUMENT ...................................................................................................................5

 A.   Common Questions of Law and Fact Predominate ............................................ 5

  1.   Step One: Calculating Apple's But-For Commission Rate ....................... 5

  2.   Step Two: Pricing Model ......................................................................... 8

  3.   Step Three: Identification of Undamaged Class Members ...................... 11

 B.   A Class Action is Superior................................................................................ 19

 C.   Appointment of Class Counsel and Class Representatives................................. 20

V.   CONCLUSION...............................................................................................................20

## TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*Abdeljalil v. GE Capital Corp.,*
306 F.R.D. 303 (S.D. Cal. 2015) ........................................................................ 15

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.,*
247 F.R.D. 156 (C.D. Cal. 2007) ........................................................................ 17

*Apple ipod itunes Antitrust Litig.,*
No. C 05-00037 JW, 2008 U.S. Dist. LEXIS 107127
(N.D. Cal. Dec. 22, 2008) ................................................................................... 20

*Blue Cross & Blue Shield v. AstraZeneca Pharm. LP*
*(In re Pharm. Indus. Average Wholesale Price Litig.),*
582 F.3d 156 (1st Cir. 2009) ............................................................................... 17

*Briseno v. ConAgra Foods, Inc.,*
844 F.3d 1121 (9th Cir. 2017) ............................................................................ 18

*Gold v. Lumber Liquidators, Inc.,*
No. 14-cv-05373-TEH, 2017 U.S. Dist. LEXIS 96724
(N.D. Cal. June 22, 2017) .............................................................................. 15, 16

*Hawkins v. Kroger Co.,*
337 F.R.D. 518 (S.D. Cal. 2020) ........................................................................ 16

*Image Technical Servs., Inc. v. Eastman Kodak Co.,*
No. C 87-1686, 1994 U.S. Dist. LEXIS 12652
(N.D. Cal. Aug. 31, 1994) ................................................................................... 19

*In re Air Cargo Shipping Servs. Antitrust Litig.,*
No. 06-MD-1175 (JG) (VVP), 2014 U.S. Dist. LEXIS 180914
(E.D.N.Y. Oct. 15, 2014) .................................................................................... 18

*In re Capacitors Antitrust Litig. (No. III),*
No. 17-md-02801-JD, 2018 U.S. Dist. LEXIS 195310
(N.D. Cal. Nov. 14, 2018) ................................................................................... 18

*In re Cardizem CD Antitrust Litig.,*
200 F.R.D. 297 (E.D. Mich. 2001) ..................................................................... 17

*In re Conseco Life Ins. Co. LifeTrend Ins. Sales and Mktg. Litig.,*
270 F.R.D. 521 (N.D. Cal. 2010) ........................................................................ 16

**SER-893**

*In re Dynamic Random Access Memory Antitrust Litig.*,
   No. M 02-1486 PJH, 2006 U.S. Dist. LEXIS 39841
   (N.D. Cal. June 5, 2006) ................................................................................. 19

*In re High-Tech Emple. Antitrust Litig.*,
   985 F. Supp. 2d 1167 (N.D. Cal. 2013) ....................................................... 19

*In re Lidoderm Antitrust Litig.*,
   No. 14-md-02521-WHO, 2017 U.S. Dist. LEXIS 24097
   (N.D. Cal. Feb. 21, 2017) ............................................................................. 18

*In re Live Concert Antitrust Litig.*,
   No. 2:06 ML 01745-SVW-RCx, 2011 U.S. Dist. LEXIS 161362
   (C.D. Cal. Jan. 4, 2011) ................................................................................. 17

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
   169 F.R.D. 493, 526 (S.D.N.Y. 1996) .................................................... 17, 18

*In re Rubber Chems. Antitrust Litig.*,
   232 F.R.D. 346 (N.D. Cal. 2005) .................................................................. 20

*In re Scrap Metal Antitrust Litig.*,
   527 F.3d 517 (6th Cir. 2008) ......................................................................... 17

*In re Tableware Antitrust Litig.*,
   241 F.R.D. 644 (N.D. Cal. 2007) .................................................................. 19

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   267 F.R.D. 583 (N.D. Cal. 2010) .................................................................. 16

*Jammeh v. HNN Assocs., LLC*,
   No. C19-0620JLR, 2020 U.S. Dist. LEXIS 164281
   (W.D. Wa. Sept. 9, 2020) ............................................................................... 16

*Messner v. Northshore Univ. Health Sys.*,
   669 F.3d 802 (7th Cir. 2012) .................................................................... 12, 15

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018) ..................................................................................... 6

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) ............................................................. 12, 14, 15

*Ruiz Torres v. Mercer Canyons Inc.*,
   835 F.3d 1125, 1137 (9th Cir. 2016) .................................................... 12, 13

*Sandoval v. Cnty. of Sonoma,*
  No. 11-cv-05817-TEH, 2015 U.S. Dist. LEXIS 55571
  (N.D. Cal. Apr. 27, 2015) ............................................................................................. 15

*Thompson v. Clear Channel Communs., Inc. (In re Live Concert Antitrust Litig.),*
  247 F.R.D. 98 (C.D. Cal. 2007) .................................................................................... 19

*Tyson Foods, Inc. v. Bouaphakeo,*
  577 U.S. 442 (2016) ...................................................................................................... 12

*US Airways, Inc. v. Sabre Holdings Corp.,*
  No. 11 Civ. 2725 (LGS), 2022 U.S. Dist. LEXIS 53622
  (S.D.N.Y. Mar. 24, 2022) ................................................................................................ 6

*Valentino v. Carter-Wallace, Inc.,*
  97 F.3d 1227 (9th Cir. 1996) ........................................................................................ 19

*Wolf v. Hewlett Packard Co.,*
  No. CV 15-01221 BRO (GJSx), 2016 U.S. Dist. LEXIS 181822
  (C.D. Cal. Sept. 1, 2016).............................................................................................. 16

*Zaklit v. Nationstar Mortg. LLC,*
  No. 5:15-cv-2190-CAS (KKx), 2017 U.S. Dist. LEXIS 117341
  (C.D. Cal. July 24, 2017) .............................................................................................. 15


**Rules**

Fed. R. Civ. P. 23(b)(3)................................................................................................. 19
Fed. R. Civ. P. 23(g)(1)................................................................................................. 20


**Other Authorities**

3 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 10:5 (4th ed. 2002)............. 17

32B AM. JUR. 2D Federal Courts § 1600........................................................................ 16

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    STATEMENT OF ISSUES TO BE DECIDED

a)    Whether the Court should certify the Class pursuant to Federal Rules of Civil Procedure 23(a) and (b);

b)    Whether the Court should appoint Plaintiffs Class Representatives; and

c)    Whether the Court should appoint Wolf Haldenstein Adler Freeman & Herz LLP and Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C. as Co-Class Counsel.

### II.    INTRODUCTION

Plaintiffs bring this Renewed Motion for Class Certification pursuant to the Court's March 29, 2022, Order Denying Plaintiffs' Motion for Class Certification Without Prejudice and Granting in Part and Denying in Part Apple's *Daubert* Motions to Exclude Testimony of Professor Daniel L.  cFadden (ECF No. 630) (the "March 29 Order"). The Court found that Plaintiffs satisfied most of the requirements for class certification under Rule 23, but denied the motion without prejudice due to specific noted deficiencies in Prof. McFadden's benchmarking and econometric modeling. March 29 Order at 1.

In its March 29 Order, the Court stated that it anticipated the deficiencies in Plaintiffs' initial motion for class certification "can be addressed" and directed that "where an argument has been analyzed and rejected, Apple shall not re-argue the issue on the anticipated next round of briefing." March 29 Order at 2.

Plaintiffs have resolved all the deficiencies previously identified by the Court. As discussed thoroughly below, Plaintiffs' experts (Prof. McFadden and a new expert on software, transaction platform, and payment system pricing, Rosa M. Abrantes-Metz, Ph.D.) have corrected all the deficiencies noted in the March 29 Order. Plaintiffs' experts have (i) mathematically computed Apple's but-for commission rate of 13.63 percent using economic modeling and has used benchmarking only as a robustness check, (ii) with which they then performed even more rigorous econometric modeling (after correcting the computational errors noted in the March 29 Order) using 75 random samples of Apple IDs to derive a robust damages model, (iii) which they have run against *every* transaction in the Games and Music & Entertainment genres from the *entire* App

Store database, (iv) to compute an exact damages estimate for *all* Apple IDs through common class-wide proof, aggregating to ▮▮▮▮ billion for the Games and Music & Entertainment transactions alone, (v) at a 95 percent confidence level.

For all these reasons, Plaintiffs' renewed class certification motion should be granted.

## III.   BACKGROUND

The Court addressed both the *Daubert* motions directed at Plaintiffs' class damages expert Daniel L. McFadden, Ph.D., and the class certification motion in its March 29 Order.

### A.   The *Daubert* Motions

*First*, the Court specifically rejected Apple's challenge to the "overarching model which Professor McFadden used." March 29 Order at 3. The Court found Prof. McFadden's hypothesis that "the commission charged to the developers serves effectively as a 'tax'" was "scientifically sound." *Id.* at 3-4.

*Second*, the Court rejected Apple's challenge to Prof. McFadden's market definition of a "single relevant aftermarket for the sale of iOS apps and in-app content to customers." *Id.* at 4. Regarding the relevant market definition, the Court found that his considerations of potential substitutes were "sound in rendering an expert opinion on the market definition." *Id.*

*Third*, the Court addressed Prof. McFadden's three-step impact and damages model. As to step one – his benchmark analysis – the Court excluded Prof. McFadden's benchmark opinion because "he is not an expert in app development, app pricing, IAP transactions, or payment processing, nor does he rely on any expert in these fields." March 29 Order at 5. The Court also found that Prof. McFadden's but-for commission rate was "cherry-picked from a few data points" and was "arbitrary and not based on any legitimate scientific, economic, or mathematic principle." *Id.* To address these deficiencies, Plaintiffs submit the expert opinion of Dr. Abrantes-Metz with their renewed class certification motion. *See* Declaration of Rachele R. Byrd ("Byrd Decl."), Ex. A. Dr. Abrantes-Metz has extensive expertise in econometrics, statistics, and monetary and financial economics, including the economics of multisided platforms. *Id.*, ¶ 1. Most importantly, she has considerable expertise in software and transaction platform pricing, as well as payment system pricing, which the Court found that Prof. McFadden lacked. *Id.*, ¶¶ 8-9; March 29 Order at

5.

Using widely accepted scientific, economic, and mathematic principles, Dr. Abrantes-Metz has mathematically calculated Apple's but-for commission rate by performing economic modeling of Apple's App Store effective commission in a competitive market for iOS app distribution and IAP transactions. Dr. Abrantes-Metz then verified the accuracy of her mathematical calculation of the but-for commission rate by performing a more comprehensive and rigorous benchmark analysis than the one previously submitted by Prof. McFadden.

As to step two – Prof. McFadden's econometric price modeling – the Court has rejected Apple's argument that his model was unreliable because it generated negative but-for pricing for a small fraction of transactions. March 29 Order at 11. The Court also has rejected Apple's challenge to Prof. McFadden's decision to exclude from his analysis free apps that have no IAPs. *Id.* at 13-14. The Court explained that excluding free apps was consistent with Plaintiffs' theory of the case because those apps are not subject to Apple's commission rate and because consumers who downloaded only free apps are not part of the Class. *Id.*

However, the Court identified certain computational errors that made the model Prof. McFadden used to determine the prices for apps and IAP that would have prevailed absent Apple's anticompetitive conduct unreliable. Prof. McFadden corrected some of those computational errors during class certification discovery, including counting an account as not suffering monetary damages where there was no "net harm" and correcting a data error which inadvertently caused certain apps to be excluded from the analysis. *See* March 29 Order at 8. The Court identified one other computational error: Prof. McFadden's use of the fixed-dollar method instead of the percentage method to reduce prices in the but-for world. *Id.* at 9. Because the "extent and impact" of that error was "unclear," the Court determined it could not find his original model reliable. *Id.*

The Court also found that Prof. McFadden's prior model was unreliable because he did not consider the possibility that focal-point pricing and pricing tiers would exist even absent Apple's anticompetitive conduct. March 29 Order at 11-12. Finally, in response to Apple's argument that Prof. McFadden's original sampling methodology allowed for a very few number of accounts to switch from being damaged in one sample to undamaged in another sample, the Court directed

Plaintiffs to address the issue in their renewed class certification motion. *Id.* at 12-13.[1]

As to step three – identifying actual Class members who suffered monetary harm as well as those who did not from their Apple IDs – the Court found that Professor McFadden's proposed method for identifying undamaged Class members was reasonably objective. March 29 Order at 14.

### B.     The Class Certification Motion

In the March 29 Order, the Court found that Plaintiffs have satisfied all the requirements of Rule 23(a) because: (1) the class is sufficiently numerous (*id.* at 15-16); (2) four core common questions exist to satisfy the commonality requirement (*id.* at 16-18); and (3) Plaintiffs satisfy the adequacy and typicality requirements (*id.* at 18-20).

As to Rule 23(b)(3), Plaintiffs argued that the predominance requirement was satisfied with respect to: (a) the relevant market; (b) Apple's market power in the relevant market; (c) Apple's willful acquisition and maintenance of monopoly of power; (d) Apple's anticompetitive conduct; (e) class wide antitrust injury; and (f) estimation of damages. *Id.* at 22. Apple responded that Plaintiffs had failed to demonstrate that antitrust injury can be proven on a class-wide basis. *Id.* Apple did not dispute that predominance is otherwise satisfied with respect to the other elements of Plaintiffs' claims.

The Court has found that Professor McFadden's impact and damages model is "grounded in economic principles and literature" and that "his theory is scientifically sound." March 29 Order at 4. However, the Court concluded that Plaintiffs did not meet their predominance burden as to class-wide antitrust injury "because they rel[ied] on an unsound methodology, which cannot reliably demonstrate which members, and how many, were injured, as common proof of class wide impact" and, therefore, "at this juncture individual issues will predominate with respect to injury." *Id.* at 25. As to class-wide damages, the Court found "that Consumer Plaintiffs have failed to establish that Professor McFadden's current damages model is a reliable means of assessing class-wide damages." *Id.* at 26. This finding was based upon (1) the issues the Court identified in the

---

[1]     The Court rejected the argument that sampling was inherently unreliable, finding that to be an issue "of weight not admissibility." March 29 Order at 13.

**SER-899**

*Daubert* section of the March 29 Order; and (2) a belief that Plaintiffs did not intend to run the damages model until after trial.[2] *Id.* at 26.

The Court did not make findings on superiority, nor did it appoint Plaintiffs as Class Representatives or their counsel as Co-Class Counsel.

## IV.   ARGUMENT

### A.   Common Questions of Law and Fact Predominate

In its March 29 Order, the Court concluded that, in light of its rulings on the *Daubert* motions, Plaintiffs had not met their predominance burden by proving class-wide impact and damages. March 29 Order at 25-27. The Court accepted certain aspects of Prof. McFadden's three-step model as sound and reliable – which remain unchanged in his Supplemental Report – but excluded other portions of his opinions and gave Plaintiffs an opportunity to cure the deficiencies and errors that the Court identified. As explained below, Prof. McFadden and Dr. Abrantes-Metz have now corrected all those deficiencies and errors.

### 1.   Step One: Calculating Apple's But-For Commission Rate

The Court excluded Prof. McFadden's benchmark analysis because he "is not an expert in app development, app pricing, IAP transactions, or payment processing, nor does he rely on any expert in these fields." March 29 Order at 5. The Court also found that his benchmark analysis was "cherry-picked from a few data points" and was "arbitrary and not based on any legitimate scientific, economic, or mathematic principle." *Id.*

---

[2] Plaintiffs always have intended to **run the damages model before trial** once the Court accepts Prof. McFadden's econometric model. *See* Nov. 16, 2021 Hrg. Tr. (ECF No. 606) 74:5-21 (MR. RIFKIN: ". . . When … we present this case at trial … Professor McFadden will testify, this is my methodology for calculating the damages for each and every Apple ID, for all 400 million of them, and I've done that calculation. Here it is . . . . And the net effect of all of that will be a – an aggregate number the sums … all the positive damages and all the negative damages that are calculated from his model, period, end of stop. There's going to be a number at the end of the day, and it's going to net out all the IDs. THE COURT: And when do I get the number? MR. RIFKIN: When we present our damages at trial, and you get it from Professor McFadden on the witness stand."); Plaintiffs' Opposition to Defendant Apple Inc.'s *Daubert* Motion to Exclude Reply Testimony of Professor Daniel L. McFadden filed Nov. 23, 2021 (ECF Nos. 598-3, 598-4) at 6-9; Dec. 14, 2021 Hrg. Tr. (ECF No. 627) 10:5-7. It is only the matching of Apple ID accounts to actual people that will take place after trial as part of the notice and claims administration process.

Plaintiffs have resolved the Court's criticism of Prof. McFadden's benchmark analysis by submitting the expert mathematical computation of Apple's effective but-for commission rate performed by Dr. Abrantes-Metz. *See* Byrd Decl., Ex. A. Dr. Abrantes-Metz holds a Ph.D. and a Masters in Economics from the University of Chicago. She also holds a Masters in Economics from the Universitat Pompeu Fabra in Barcelona, Spain, and a *Licenciatura* in Economics from Universidade Católica Portuguesa. *Id.*, ¶ 2. Dr. Abrantes-Metz has more than two decades of experience specializing in antitrust, securities, and financial regulation. Her main areas of specialization are econometrics and statistics, industrial organization, and monetary and financial economics. *Id.*, ¶ 1. Most pertinent to her work in this case, Dr. Abrantes-Metz has wide experience in technology and software industries and, in particular, expertise in software, transaction platform, and payment system pricing. *Id.*, ¶¶ 8, 9. Dr. Abrantes-Metz has provided testimony on damages, liability, class certification and plans of allocation for classes related to collusion and monopolization involving multisided platforms in various industries including payments systems. *Id.* For example, Dr. Abrantes-Metz provided trial testimony on behalf of the plaintiff airline in *US Airways, Inc. v. Sabre Holdings Corp.*, No. 11 Civ. 2725 (LGS) (S.D.N.Y. 2022), which Plaintiffs believe is the first case to be tried to a jury using a two-sided platform damages model following the Supreme Court's decision in *Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018). *See* Byrd Decl., Ex. A, ¶ 9 and Appendix A.

Dr. Abrantes-Metz investigated what commission rate Apple would have charged in the App Store in a competitive but-for world ("BFW"). But for Apple's anticompetitive conduct, there would have been non-Apple iOS app stores, against which Apple's App Store would have had to compete to sell apps and IAP to iOS device consumers; as a result, Apple would have charged lower, competitive commission rates.

Dr. Abrantes-Metz developed an economic model for iOS app stores to mathematically calculate what Apple's App Store effective commission rate would have been absent its anticompetitive conduct. *Id.*, ¶¶ 26-29. The economic model relies upon a fundamental economic relationship between app store profit margin, costs, and prices (commission rates) and allows Apple's BFW commission rate to be calculated mathematically consistent with the market shares

and profit margins that would likely be seen in a competitive BFW. Using that economic model, Dr. Abrantes-Metz mathematically calculated that a commission rate of 13.63 percent would have prevailed absent Apple's anticompetitive conduct. *Id.*, ¶¶ 18, 23, 59.

The economic model Dr. Abrantes-Metz uses to calculate the App Store's effective commission rate is widely accepted and used (including on many occasions by Dr. Abrantez-Metz herself), and is based upon sound scientific principles. Byrd Decl., Ex. A, ¶ 21. The model Dr. Abrantes-Metz used to compute Apple's BFW commission rate is substantially similar to the one used by Prof. Economides in the Developer Plaintiffs' case in his "Rival Profit Yardstick" analysis to which the Court referred in the March 29 Order. Byrd Decl., Ex. A, ¶ 25; March 29 Order at 7. Prof. Economides relied upon the same fundamental economic relationship between app store profit margin, costs, and prices but relied on different data and documents for the model's inputs to conclude that the prevailing commission rate would have been approximately 13.0 percent in a BFW where Apple faces two rivals, and 14.8 percent in a BFW where Apple faces one rival. Byrd Decl., Ex. A, ¶ 25. The only pertinent differences between Dr. Abrantes-Metz's and Dr. Economides's models are that Dr. Abrantes-Metz used (i) more conservative assumptions (a single-rival world rather than the two-rival world analyzed by Prof. Economides), and (ii) better data (including data from Apple's own survey expert, Prof. Itmar Simonson, Ph.D.[3]). *Id.*, ¶¶ 25, 29, 37-42. Dr. Abrantes-Metz calculates the but-for commission rate of 13.63 percent, which is similar to the results reached by Dr. Economides. *Id.*, ¶¶ 18, 23, 25, 59.

Dr. Abrantes-Metz then performed a robustness check of her mathematical computation of Apple's but-for commission rate using economic modeling by analyzing the average commission rates observed in the sale of Windows PC games as a benchmark. Byrd Decl., Ex. A, ¶ 63. Notably, Dr. Abrantes-Metz relies on this comparative analysis only as a robustness check, not to determine Apple's but-for commission rate. Moreover, her comparative analysis differs from Prof. McFadden's prior analysis in two important respects. *First*, Dr. Abrantes-Metz includes more – and different – benchmark companies in her robustness analysis than Prof. McFadden used in his

---

[3]     *See* Expert Report and Declaration of Itamar Simonson, Ph.D., filed August 11, 2021 (ECF No. 476-9) ("Simonson Report"), Ex. 22.

benchmark analysis. *Id.*, ¶ 120 & Figure 1. *Second*, Dr. Abrantes-Metz has sufficient expertise in the software industry to offer the opinion that the app stores she used in her robustness analysis are appropriate comparators. *Id.*, ¶ 9.

Finally, Dr. Abrantes-Metz determines that with a commission rate of 13.63 percent, Apple would still achieve an operating margin of 57.2 percent on the App Store in the BFW, which is significantly higher than the Windows Store's profit margin of 23 percent from Windows PC game apps sales. Byrd Decl., Ex. A, ¶¶ 23, 60.

### 2. Step Two: Pricing Model

**Calculation Data and Model Errors**: Plaintiffs have addressed each of the calculation data and model errors identified by the Court in its prior order. Two of those issues – determining whether an account suffered monetary damages on a "net" basis and a computational error that excluded certain apps whose minimum monthly average price was not precisely the same as its maximum monthly average price over a given year – were previously resolved in Prof. McFadden's reply report submitted during briefing on the original class certification motion. *See* Reply Report of Daniel L. McFadden, filed Oct. 19, 2021 (ECF No. 554-5), ¶¶ 200-02; March 29 Order at 8. Those corrections have been incorporated in Prof. McFadden's Supplemental Report and no longer affect his results. Byrd Decl., Ex. B, ¶¶ 10, 13, 70.

As to the third computational issue, concerning the use of either the fixed-dollar method or the percentage-method in his computation of but for prices, Prof. McFadden now uses the percentage method *exclusively*, consistent with his testimony that this is "the best way to do individual damage calculations." March 29 Order at 9. The Court's concern over whether Prof. McFadden used the fixed-dollar or percentage method has been resolved.

As discussed below, although he is not required to do so at the class certification stage, Prof. McFadden now has *run the model* on *all* the transactional data for the Games and Music & Entertainment genres[4] in the *full App Store data* to calculate damages for the entire Class by

---

[4] In preparing his Supplemental Report, Prof. McFadden has not had sufficient time for the computer to process the massive database for the other app genres, in part because of time lost when Apple produced defective transactional data for a portion of the Class Period (which Apple did not correct until July 11, 2022). In any event, the "Court agree[d] that the model need not be

computing individual damages for each unique Apple ID (*i.e.*, account-by-account) and then aggregating the account-level damages to compute a single estimate of class-wide damages. Byrd Decl., Ex. B, ¶¶ 29, 64-66. This is not an approximation, but rather an **exact** summation of **all** individual account damages for those genres, eliminating any debate over the best method for **estimating** class-wide damages. *Id.*, ¶¶ 36, 64-66.

**Focal Pricing and Pricing Tiers**: Plaintiffs also have resolved the Court's concern regarding the possibility that focal-point pricing and pricing tiers would exist even absent Apple's anticompetitive conduct by proposing a revised model that allows for focal-point pricing and pricing tiers. *See* March 29 Order at 11-12. Consistent with Plaintiffs' claim that Apple's pricing tiers are anticompetitive, Prof. McFadden again computes damages **without** pricing tiers in the BFW. Byrd Decl., Ex. B, ¶ 85. However, Prof. McFadden also demonstrates in his Supplemental Report that his model is able to show class-wide impact and compute account-level damages, and identify undamaged accounts with complete precision, even **with** price tier restrictions or voluntary focal pricing in the BFW. *Id.*, ¶¶ 85-96 & Figure 7. He runs his model allowing for focal-point pricing and pricing tiers – specifically using the 750 price points that Apple agreed to in its settlement with the developers.[5] The results are similar (less than one percent difference in class-wide damages) to the results he obtained running the model without focal-point pricing and pricing tiers. *Id.*, ¶¶ 85-96 & Figure 7.[6] Because Prof. McFadden has incorporated focal-point pricing and pricing tiers into his analysis and because that modeling change has not materially altered the

run for class certification purposes." March 29 Order at 26. But to reiterate, Plaintiffs' expert **will run the econometric model against the entire database of App Store transactions before trial**.

[5]     As part of its settlement with the developer class, Apple proposed to implement by March 2023 a price tier menu with 750 price points. Byrd Decl., Ex. B, ¶ 94; Administrative Motion for Approval of Extension of Time Relating to Settlement Agreement Provision 5.1.4, *Cameron v. Apple Inc.*, Case No. 4:19-cv-03074-YGR, filed May 31, 2022 (ECF No. 476), 1:14-27.

[6]     Prof. McFadden estimated class-wide damages using price tiers and focal pricing using a single 0.1 percent sample. *See* Byrd Dec., Ex. B, ¶ 86 and Appendix B. Due to the limited time allotted by the Court to incorporate Apple's revised data production, and the computational intensity of this analysis, Prof. McFadden did not have sufficient time to perform the tier and focal pricing analysis using the mean coefficients applied to the full Apple transactions data for this report. However, the underlying methodology he applies to the 0.1 percent sample may also be applied to the full data using the mean coefficients. *Id.*, ¶ 88, n.101.

results, there is no longer any viable challenge to the reliability of Prof. McFadden's model on this basis.

**Robustness**: Plaintiffs have resolved the Court's concern over the model's robustness – specifically, the possibility that an account might or might not show monetary harm depending on which 0.1 percent random sample[7] is used (so-called "switcher accounts") (*see* March 29 Order at 13 & n.10) – by drastically increasing the number of samples used in the revised model.

In his Supplemental Report, Prof. McFadden explains that the existence of "switchers," *i.e.*, the same account can be "damaged" in one 0.1 percent random sample while being "undamaged" in another 0.1 percent random sample, is not a problem with the methodology of his report but is an ordinary and expected consequence of sampling. Byrd Decl., Ex. B, ¶¶ 47-48. He explains that "switchers" existed for two reasons: (1) because of miniscule differences in the estimated coefficients (the value of the estimated coefficients can differ depending on which 0.1 percent sample is used); and (2) because each 0.1 percent sample contains slightly different sets of apps and slightly different transactions. *Id.*, ¶¶ 50-51. The exact percentage of undamaged accounts varies across different random samples for the same reasons. *Id.*, ¶ 52.

Prof. McFadden has addressed the issue in his Supplemental Report by: (1) running his model with 75 separate and independent 0.1 percent samples (as opposed to just one 0.1 percent sample) to estimate 75 sets of coefficients (one set for each sample) in the revised model; and (2) applying the average of those 75 sets of coefficients ***to the full set of App Store transactions data for the Music & Entertainment and Games genres,*** the approximately [redacted] transactions in those genres produced to date, to calculate damages, eliminating any variation in which apps or transactions he includes in the damages calculation. Byrd Decl., Ex. B, ¶¶ 53-57.[8] By increasing the number of samples 75-fold, Prof. McFadden has drastically reduced the likelihood that small

---

[7] The Court has rejected Apple's argument that a 0.1 percent sample is too small to produce reliable results. March 29 Order at 13 ("the issue is one of weight not admissibility").

[8] The percentage of unharmed accounts also varies across different random samples for the same reasons that cause the switchers. Prof. McFadden eliminates this variation by applying the average value of 75 sets of the coefficients to the full transactions data in calculating account-level damages. Byrd Decl., Ex. B, ¶ 55.

differences in estimated coefficients may result in "switcher accounts" (the first source of "switchers"). *Id.* at ¶ 56. And by running the model against the *full App Store data for the Music & Entertainment and Games genres*, he has entirely eliminated the possibility that small differences in the sets of included apps across different samples may result in any "switcher accounts." *Id.*

As with the other refinements to his econometric model, these changes have enhanced the reliability of the model without materially altering the results. This process results in total class-wide damages for the Games and the Music & Entertainment genres of ███████ Byrd Decl., Ex. B, ¶ 65 & Figure 4. The revised econometric modeling reliably produces this result at a 95 percent confidence level. *Id.*, ¶¶ 60-61.[9]

### 3. Step Three: Identification of Undamaged Class Members

The Court has accepted Prof. McFadden's proposed methodology for identifying damaged and undamaged Class members through a claims administration process, using claim submission forms, Apple IDs, and Apple's internal records. March 29 Order at 14 ("It is not uncommon for class members to be identified using such means in class actions.").

**Percentage of Accounts with No Monetary Damages**: The Court has expressed concern that Plaintiffs could not "reliably demonstrate which members, and how many, were injured." March 29 Order at 25. As an initial matter, Plaintiffs believe all Class members have suffered antitrust injury because they each purchased apps or made in-app transactions that were distorted by Apple's anticompetitive conduct – including being subject to reductions in output or quality. Plaintiffs, however, pursue only the remedy of monetary overcharge damages. As to those damages, Plaintiffs have endeavored to identify using McFadden's revised methodology which Class members suffered damages and by how much.

When this Court previously ruled that Plaintiffs had not reliably identified which Class members had monetary damages, it noted that the Ninth Circuit had "not squarely addressed the issue of whether a particular percentage of uninjured class members defeats predominance." *Id.* at

---

[9] The Court directed the parties to clarify the confidence level on the renewed motion. March 29 Order at 13 n.10.

24.

Since then, the Ninth Circuit, sitting *en banc*, decided *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022), where it squarely rejected the argument "that Rule 23 does not permit the certification of a class that potentially includes more than a de minimis number of uninjured class members." *Id*. at 669. *See also Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1137 (9th Cir. 2016) ("the district court is well situated to winnow out" a fortuitously non-injured subset of class members)).[10]

Professor McFadden's revised methodology easily meets the Ninth Circuit's requirement for class certification announced in *Olean* and easily "demonstrate[s] which members, and how many, were injured." March 29 Order at 25. He has now **run the revised model on all Games and the Music & Entertainment transactions from the entire App Store transactions database**. The revised model computes *exactly* which accounts suffered monetary damages from those transactions and which accounts did not. Byrd Decl., Ex. B, ¶¶ 72-73. This expert analysis is more than sufficient to carry Plaintiffs' burden of providing common evidence capable of proving damages because it is common evidence that each Class member could and would use to prove their own individual claims. *See Olean*, 31 F.4th at 667 (Supreme Court established in *Tyson Foods* "that if 'each class member could have relied on [the plaintiffs' evidence] to establish liability if he or she had brought an individual action,' and the evidence 'could have sustained a reasonable jury finding' on the merits of a common question,' … then a district court may conclude that the plaintiffs have carried their burden of satisfying the Rule 23(b)(3) requirements as to that common

---

[10]    Plaintiffs' burden is to demonstrate the existence of common evidence that can establish whether specific Class members have been injured (and by how much). The common evidence – here, Prof. McFadden's econometric modeling – need not demonstrate that each Class member was damaged. His methodology can serve as common evidence of impact and injury even if it shows that certain Class members (whether a *de minimis* amount or more) suffered no monetary damage. *Olean,* 31 F.4th at 669; *see also Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 823 (7th Cir. 2012) ("[T]hat some class members' claims will fail on the merits if and when damages are decided [is] a fact generally irrelevant to the district court's decision on class certification").

question of law or fact") (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455 (2016)).[11]

Because Prof. McFadden has now run the model on the ***entire App Store transactions database*** (at least for Music & Entertainment and Games), his damages computation identifies, through common mathematical proof, precisely which accounts (and how many) have damages and which accounts (and how many) have no damages. Byrd Decl., Ex. B, ¶¶ 72-73. Therefore, Prof. McFadden's methodology identifies the total number and percentage of undamaged accounts. His computation of damages will be easily repeated ***before trial*** for all the App Store genres once Apple makes its final, up-to-date pre-trial production of all App Store transactional data.

Prior to trial, the parties and the Court will know ***exactly*** which accounts (by unique Apple ID) have and which accounts have not been damaged for all App Store transactions in the Class Period.[12] ***All*** those undamaged accounts identified mathematically by the final computations Prof. McFadden will perform ***before trial*** can easily be eliminated from the Class. The process of eliminating undamaged accounts can be done ***before trial*** and will not pose any difficulty at trial.

Once the Apple ID accounts are linked to Class members (*see* discussion *infra.*) and damages are netted on a per Class member basis, Plaintiffs expect the number of actual Class ***members*** (as opposed to Apple IDs) with zero damages to be fewer than the number of accounts with zero damages because many accounts have very little spend and likely reflect the secondary or tertiary accounts of users with multiple Apple IDs. But importantly, now that Prof. McFadden has run his econometric model against the entire App Store transaction database, all the

---

[11]    To be clear, Plaintiffs will rely solely on Prof. McFadden's analysis to identify those accounts that suffered monetary harm. For those accounts that Prof. McFadden's analysis shows suffered no monetary harm, Plaintiffs will not seek to introduce any individualized evidence of monetary damages and will not seek any damages on behalf of those accounts. Eliminating the undamaged accounts has no effect on the aggregate damages, which the model computes as the sum of all account damages (those without monetary damages are netted out against those with monetary damages).

[12]    Accordingly, Prof. McFadden's methodology for matching Apple ID accounts to Class members will identify, through common proof, precisely which Class members (and how many and) have damages and which Class members (and how many) have no damages. Matching Apple ID accounts to Class members will also compute the individual damages for all Class members with damages. March 29 Order at 14.

fortuitously undamaged accounts **can be and have now been identified** before trial with precision and certainty and can be winnowed out.[13] As the Ninth Circuit held in *Ruiz Torres*, 835 F.3d at 1137, "fortuitous non-injury to a subset of class members does not necessarily defeat certification."

To address any additional concerns the Court may have regarding the portion of Class members for whose accounts Prof. McFadden's model shows no monetary injury, Plaintiffs also offer an amended class definition to alleviate any potential overbreadth issue. *See Olean*, 31 F.4th at 669 n.14 ("court must consider whether the possible presence of uninjured class members means that the class definition is fatally overbroad"). As an initial matter, there is no overbreadth issue with the original class definition. Each person in the original class definition is appropriately a Class member because each suffered antitrust injury by being forced to use an App Store subject to anticompetitive policies that reduced output (quality and quantity). *See* March 29 Order at 24 ("all unharmed class members were exposed to Apple's alleged anticompetitive policies and conduct by way of using the App Store").

To be sure, Prof. McFadden's analysis shows that up to approximately 17.2 percent of the accounts have not suffered monetary injury in the form of an overcharge. Byrd Decl., Ex. B, ¶¶ 16, 68, 75, Figure 1 & Figure 6. But even that number standing alone lacks important context. Because there are far more unique Apple ID accounts than individual Class members,[14] and most of the undamaged accounts have little App Store spending,[15] it is very likely that undamaged accounts are secondary or tertiary accounts. Once Apple IDs are matched to actual Class members, the number and percentage of undamaged Class members is likely to be significantly lower than the number and percentage of undamaged accounts. Plaintiffs expect that after all the accounts are

---

[13]   Plaintiffs will, before trial, run the model again on updated data which will include transactions that have occurred and will occur between April 26, 2022, and trial.

[14]   There are 498 million unique accounts in the App Store transactional database with at least $0.99 in spending on apps or IAP. Byrd Decl., Ex. B, ¶ 15. However, there are fewer than 120 million iPhone users in the United States, some number of whom have no App Store spending and are not even in the Class. *See Number of iPhone users in the United States from 2012 to 2022*, STATISTA.COM, https://www.statista.com/statistics/232790/forecast-of-apple-users-in-the-us/ (last visited Sept. 25, 2022). Therefore, the average App Store customer has multiple accounts with unique Apple IDs.

[15]   *See* Byrd Decl., Ex. B, ¶ 76 & Figure 5.

---

matched to actual **people**, the number and percentage of undamaged **Class members** will be significantly lower than the number and percentage of undamaged accounts. Plaintiffs therefore submit that the 17.2 percent of accounts suffering no monetary injury does not reflect an overbroad class definition.

However, to remedy any remaining overbreadth concerns, Plaintiffs propose a narrowed class definition consisting only of persons who possessed an account that spent more than $10 on apps and IAP transactions. Most of the undamaged **accounts** spent less than $10 (and many accounts spent much less than that) on Music & Entertainment and Games app purchases and IAP combined. Prof. McFadden has considered the impact of excluding from the class definition accounts with less than $10 in spending and has determined that the proposed $10 threshold will reduce the number and percentage of undamaged accounts (*id.*, ¶¶ 16, 69, 77, 79, Figures 1 & 6), and Plaintiffs believe it will likewise further reduce the number and percentage of undamaged Class members. The undamaged accounts that spent $10 or less made only slight use of the App Store and thus suffered *de minimis* adverse financial effects from the challenged App Store policies. They added little or nothing to the overall damages. Indeed, the econometric modeling nets out all the undamaged accounts against the damaged accounts. Byrd Decl., Ex. B, ¶ 13. This is not a situation where the defendant may be prejudiced by an overbroad class that expands the threat of potential liability. *See Messner*, 669 F.3d at 825 (explaining class overbreadth concerns are animated by the "*in terrorem* character of a class action" (internal quotations and citation omitted)).

This narrowed class definition reduces the percentage of **accounts** with no damages by approximately 68 percent, from 17.2 percent to just 7.6 percent. Byrd Decl., Ex. B, ¶¶ 16, 78 & Figures 1 & 6. *See Olean*, 31 F.4th at 669 n.14 (problem of "potentially 'over-inclusive' class 'can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis'"). "[C]ourts routinely permit plaintiffs to *narrow* the scope of their class at the certification stage." *Zaklit v. Nationstar Mortg. LLC*, No. 5:15-cv-2190-CAS (KKx), 2017 U.S. Dist. LEXIS 117341, at *21 (C.D. Cal. July 24, 2017); *see also Gold v. Lumber Liquidators, Inc.*, No. 14-cv-05373-TEH, 2017 U.S. Dist. LEXIS 96724, at *13 n.4 (N.D. Cal. June 22, 2017)

(same); *Sandoval v. Cnty. of Sonoma*, No. 11-cv-05817-TEH, 2015 U.S. Dist. LEXIS 55571, at *6-*7 (N.D. Cal. Apr. 27, 2015) (amending complaint to refine proposed class definition "unnecessary as the class definition is established, if at all, in the order certifying the class"); *Abdeljalil v. GE Capital Corp.*, 306 F.R.D. 303, 306 (S.D. Cal. 2015) (narrower definition at class certification is "allowable"); *In re Conseco Life Ins. Co. LifeTrend Ins. Sales and Mktg. Litig.*, 270 F.R.D. 521, 530 (N.D. Cal. 2010) (same); *Wolf v. Hewlett Packard Co.*, No. CV 15-01221 BRO (GJSx), 2016 U.S. Dist. LEXIS 181822, at *22 n. 4 (C.D. Cal. Sept. 1, 2016) (same).[16] Further, "'the basic responsibility for determining the extent of a class membership falls upon the trial judge,' and a plaintiff's own narrowing of a class definition helps the judge ensure 'the class feature of the litigation [is] within reasonably manageable proportions and bounds.'" *Gold*, 2017 U.S. Dist. LEXIS 96724, at *13-*14 (quoting 32B AM. JUR. 2D Federal Courts § 1600) (footnotes omitted).

Because many of the economically unharmed accounts are secondary or tertiary accounts with few App Store transactions, matching the Apple IDs to Class members likely will further reduce the number and percentage of Class members with no damages.

**Plaintiffs Will Run the Damages Model Before Trial:** The Court also found "that Consumer Plaintiffs have failed to establish that Professor McFadden's current damages model is a reliable means of assessing class-wide damages." March 29 Order at 26. That finding was based upon: (1) the issues the Court identified in the *Daubert* section of the March 29 Order concerning the reliability of the model (addressed *supra*); and (2) the Court's belief that Plaintiffs did not intend to run the damages model until after trial. *Id.*

In the March 29 Order, the Court held that "plaintiffs may rely on aggregate damage estimates" at the class certification stage, but added that they must "establish that 'there is a

---

[16]     *See also Hawkins v. Kroger Co.*, 337 F.R.D. 518, 526 (S.D. Cal. 2020) (plaintiffs may narrow class definition without seeking leave to amend); *Jammeh v. HNN Assocs., LLC*, No. C19-0620JLR, 2020 U.S. Dist. LEXIS 164281, at *24-*26 (W.D. Wa. Sept. 9, 2020) (permitting modifications to class definition because they were minor, required no additional discovery, and caused no prejudice to defendants); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 590-91 (N.D. Cal. 2010) (same).

---

PLAINTIFFS' RENEWED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION;
MEM. OF Ps & As
Case No. 11-cv-06714-YGR
-16-

method, common across the class, for arriving at individual damages' to survive the predominance inquiry." *Id*. at 25 (citation omitted). Prof. McFadden has done just that with the data he has been provided to date. As Plaintiffs previously explained, once they receive the then-current App Store transactional data and the Court has accepted Prof. McFadden's damages model, Prof. McFadden will ***run the damages model before trial on the entire database of App Store transactions*** to calculate and present an ***aggregate*** damages figure for ***every*** Apple ID account to the jury. *See* note 2, *supra*. To avoid any doubt on this important issue, even though he is not required to do so at this stage, Prof. McFadden now has ***run the model on all the transactions in the Games and Music & Entertainment genres*** using App Store data complete through April 25, 2022. Byrd Decl., Ex. B, ¶¶ 6, 15, 65, Figures 1 & 4.

At trial, Prof. McFadden will testify as to the ***aggregate*** damages suffered by all Class members, netting out any so-called "negative damages" for a small percentage of Apple ID accounts against the overwhelming percentage of accounts that have suffered "positive damages."[17] Furthermore, Plaintiffs have demonstrated that Prof. McFadden's impact and damages model calculates damages for ***all*** of the approximately 500 million unique accounts and also aggregates Class damages by netting out the positive and negative losses of ***each*** account. Byrd Decl., Ex. B, ¶¶ 29, 41, 44, 64 & Figure 4.[18]

---

[17]   The aggregate amount of damages suffered by the Class is the exact same whether "negative damages" are netted against "positive damages" for all Apple IDs or are first netted for each individual Apple ID and then the net damages for all the Apple IDs are summed together. This is due to the commutative property of addition, which means that when two or more numbers (whether positive or negative) are added in any order, the sum always remains the same.

[18]   Plaintiffs previously showed that "proof of aggregate damages calculations [at trial] is well established in federal court and implied by the very existence of the class action mechanism itself." *Blue Cross & Blue Shield v. AstraZeneca Pharm. LP (In re Pharm. Indus. Average Wholesale Price Litig.)*, 582 F.3d 156, 197 (1st Cir. 2009) (citing 3 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 10:5, at 483-86 (4th ed. 2002) ("Aggregate computation of class monetary relief is lawful and proper.")); *see also In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 534 (6th Cir. 2008) ("Damages in an antitrust class action may be determined on a classwide, or aggregate, basis. …") (quoting *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 526 (S.D.N.Y. 1996)). *See also Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 175 (C.D. Cal. 2007) ("routine for courts in antitrust class actions to rely on class-wide, aggregate techniques to calculate individual damage awards"); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 324 (E.D. Mich. 2001) (finding "aggregate approach to measure class-

Now that Prof. McFadden has calculated each account's damages across all of the Class, only matching Apple ID accounts to actual Class members will take place after trial as part of the notice and claims administration process, using claim submission forms, Apple IDs, and Apple's internal records.[19] *See* March 29 Order at 14 (rejecting Apple's argument that Apple IDs could not be matched to individual Class members and finding Prof. McFadden's "proposed method for identifying unharmed class members reasonably objective"). In *NASDAQ*, the Southern District of New York held that aggregate damages may be awarded in an antitrust class action on a class-wide basis "where the computerized records of the particular industry, supplemented by claims forms, provide a means to distribute damages to injured class members in the amount of their respective damages." *Id.*, 169 F.R.D. at 526. In that regard, Apple's comprehensive App Store records will provide a means to distribute damages to all injured Class members in proportion to their respective damages by matching Apple IDs to each Class member and then netting out the "negative damages" from the "positive damages" for each individual Class member.

In *In re Capacitors Antitrust Litigation (No. III)*, No. 17-md-02801-JD, 2018 U.S. Dist. LEXIS 195310 (N.D. Cal. Nov. 14, 2018), the Court recently noted that "a variety of tools can be used to address damages," including "the appointment of a magistrate judge or special master to preside over individual damages proceedings [or] altering or amending the class definition in response to developments at trial." *Id.* at *65 (citing *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 (JG) (VVP), 2014 U.S. Dist. LEXIS 180914, at *279 (E.D.N.Y. Oct. 15, 2014)). The Court also noted that it could "call for a trial plan . . . that addresses how the aggregate damages estimated from [the plaintiffs'] expert's report can then be apportioned

wide damage[s] appropriate")"; *In re Live Concert Antitrust Litig.*, No. 2:06 ML 01745-SVW-RCx, 2011 U.S. Dist. LEXIS 161362, *11 (C.D. Cal. Jan. 4, 2011) ("'routine for courts in antitrust class actions to rely on class-wide, aggregate techniques to calculate individual damages'") (quoting *Allied Orthopedic*, 247 F.R.D. at 166, 175)).

[19]    "Defendants will have … opportunities to individually challenge the claims of absent class members if and when they file claims for damages. At the claims administration stage, parties have long relied on 'claim administrators . . . and other techniques tailored by the parties and the court' to validate claims." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1131 (9th Cir. 2017) (citation omitted).

among the class members." *Id.* (citing *In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2017 U.S. Dist. LEXIS 24097, at *63 (N.D. Cal. Feb. 21, 2017)). Significantly, the Court held that issues regarding how to apportion aggregate damages among class members "do not warrant a denial of class certification." *Id*

**B.      A Class Action is Superior**

Because Plaintiffs' experts have corrected all the deficiencies noted in the March 29 Order, the superiority requirement is easily met. Superiority under Rule 23(b)(3) is met where "classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Apple cannot seriously question the superiority of the class mechanism for resolving the antitrust claims asserted against it here. Litigating the monopolization and attempted monopolization claims of each iOS Device customer on an individual basis, even if it were practically feasible, is plainly not the preferable alternative. *See, e.g.*, *In re High-Tech Emple. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1128 (N.D. Cal. 2013) (class action superior where "Plaintiffs case rises and falls with their common evidence"); *Image Technical Servs., Inc. v. Eastman Kodak Co.*, No. C 87-1686, 1994 U.S. Dist. LEXIS 12652, at *9 (N.D. Cal. Aug. 31, 1994) (finding class action superior method because, "[d]espite the complexity of determining individual damages, other methods of adjudicating this controversy would appear to be even more complex and less efficient."); *Thompson v. Clear Channel Communs., Inc. (In re Live Concert Antitrust Litig.)*, 247 F.R.D. 98, 148 (C.D. Cal. 2007) (class mechanism clearly superior way to resolve antitrust claims, even if individualized damages analysis assumed to be required); *In re Dynamic Random Access Memory Antitrust Litig.*, No. M 02-1486 PJH, 2006 U.S. Dist. LEXIS 39841, at *51 (N.D. Cal. June 5, 2006) ("unnecessarily duplicative, and judicially inefficient, for the court to mandate individual trials as to each class member").

Indeed, class certification is nothing less than essential if the private antitrust enforcement mechanism is to function at all. "The modest amount at stake for individual plaintiffs . . . renders individual prosecution impractical; class treatment not only promotes judicial economy, it represents plaintiffs['] only chance for adjudication." *In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 652 (N.D. Cal. 2007) (citing *Amchem Prods. v. Windsor*, 521 U.S. 591, 616 (1997)). A class

---

action is the superior means of resolving cases such as this, where individual claims are too small to be litigated individually but which involve large damages in the aggregate. *See Amchem Prods.*, 521 U.S. at 617. In *iTunes*, this Court certified an antitrust class action that "involves potentially millions of class members," where individual recoveries "would likely be no more than several hundred dollars," finding that "there would be little incentive for an individual iPod purchaser to take on a factually complex antitrust case such as this one." *Apple ipod itunes Antitrust Litig.*, No. C 05-00037 JW, 2008 U.S. Dist. LEXIS 107127, at *23 (N.D. Cal. Dec. 22, 2008). The Court's analysis applies with identical force to this case as well.

### C.     Appointment of Class Counsel and Class Representatives

Rule 23 requires the Court to appoint counsel to represent the interests of the Class. *See* Fed. R. Civ. P. 23(g)(1); *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 355 (N.D. Cal. 2005). The Court had "no concerns" regarding the adequacy of Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein") and Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C. ("Kellogg Hansen") to serve as Co-Class Counsel. March 29 Order at 20, n.11. The Court should appoint Wolf Haldenstein and Kellogg Hansen as Co-Class Counsel.

The Court also found that Plaintiffs are adequate (March 29 Order at 20), and should therefore also appoint Plaintiffs as Class Representatives.

### V.     CONCLUSION

Accordingly, this case meets all the requirements of Rules 23(a) and 23(b)(3) for class certification. Plaintiffs therefore request that the Court grant their renewed motion to certify the class action, to appoint Plaintiffs as Class Representatives, and to appoint Wolf Haldenstein and Kellogg Hansen as Co-Class Counsel.

DATED: September 26, 2022

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**

By:___ */s/ Rachele R. Byrd*_____
BETSY C. MANIFOLD
RACHELE R. BYRD
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com

PLAINTIFFS' RENEWED NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION;
MEM. OF Ps & As
Case No. 11-cv-06714-YGR
-20-

**SER-915**

byrd@whafh.com

MARK C. RIFKIN
MATTHEW M. GUINEY
THOMAS H. BURT
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com
burt@whafh.com

*Interim Class Counsel and Proposed Co-Class
Counsel*

DAVID C. FREDERICK (*pro hac vice*)
AARON M. PANNER (*pro hac vice*)
DANIEL V. DORRIS
**KELLOGG, HANSEN, TODD, FIGEL &
   FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
dfrederick@kellogghansen.com
apanner@kellogghansen.com
ddorris@kellogghansen.com

*Counsel for Plaintiffs and Proposed
Co-Class Counsel*

MICHAEL LISKOW
**CALCATERRA POLLACK LLP**
1140 Avenue of the Americas, 9th Floor
New York, NY 10036-5803
Telephone: (212) 899-1761
Facsimile: (332) 206-2073
mliskow@calcaterrapollack.com

*Counsel for Plaintiff Robert Pepper*

28704v8

# ATTACHMENT A

SER-917

BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
BRITTANY N. DEJONG (258766)
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
dejong@whafh.com

MARK C. RIFKIN (*pro hac vice*)
MATTHEW M. GUINEY (*pro hac vice*)
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com

*Interim Class Counsel and Proposed Co-Class Counsel*

[Additional Counsel Appear on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION | No. 4:11-cv-06714-YGR<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br><br>DATE:     Nov. 16, 2021<br>TIME:     10:00 a.m.<br>CTROOM: 1, 4th Floor<br>JUDGE:   Hon. Yvonne Gonzalez Rogers |

## NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

PLEASE TAKE NOTICE that on November 16, 2021, at 10:00 a.m. in Courtroom 1, 4th Floor of the above-entitled Court, located at 131 Clay Street, Oakland, California, Plaintiffs Robert Pepper, Stephen H. Schwartz, Edward W. Hayter and Edward Lawrence ("Plaintiffs") will, and hereby do respectfully move this Court for an order:

1. certifying the following Class:

> All persons in the United States, exclusive of Apple and its employees, agents and affiliates, and the Court and its employees, who purchased one or more iOS applications or application licenses from Defendant Apple Inc. ("Apple"), or who paid Apple for one or more in-app purchases, including, but not limited to, any subscription purchase, for use on an iOS Device at any time since July 10, 2008 (the "Class Period");

2. appointing Plaintiffs as Class Representatives; and

3. appointing Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein") and Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C. ("Kellogg Hansen") as Co-Class Counsel.

All the prerequisites and requirements for class certification are met and therefore certification is warranted. Plaintiffs base their Motion for Class Certification on: the Memorandum of Points and Authorities filed in support of this Motion; the Declaration of Rachele R. Byrd and its exhibits; the Declarations of Robert Pepper, Stephen H. Schwartz, Edward W. Hayter and Edward Lawrence; the Expert Report of Daniel L. McFadden; all other records and papers on file in this action; any oral argument and evidence that may be presented at the hearing on this Motion; and all other matters properly before the Court.

DATED: June 1, 2021

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By:  */s/ Rachele R. Byrd*
RACHELE R. BYRD

BETSY C. MANIFOLD
RACHELE R. BYRD
BRITTANY N. DEJONG
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599

-1-

manifold@whafh.com
byrd@whafh.com
dejong@whafh.com

MARK C. RIFKIN
MATTHEW M. GUINEY
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com

*Interim Class Counsel and Proposed
Co-Class Counsel*


DAVID C. FREDERICK (*pro hac vice*)
AARON M. PANNER
MINSUK HAN
**KELLOGG, HANSEN, TODD, FIGEL &
  FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C.  20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
dfrederick@kelloghansen.com
apanner@kelloghansen.com
mhan@kelloghansen.com

*Counsel for Plaintiffs and Proposed
Co-Class Counsel*

-2-
PLTFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEM. OF Ps & As
Case No. 11-cv-06714-YGR

**SER-920**

**TABLE OF CONTENTS**

**PAGE**

I.    STATEMENT OF ISSUES TO BE DECIDED ................................................................1

II.   INTRODUCTION ...........................................................................................................1

III.  STATEMENT OF FACTS ..............................................................................................2

    A.    Relevant Background........................................................................................ 2

    B.    Sales of iOS Apps and IAP Constitute a Relevant Antitrust Market..................... 4

    C.    Apple's Market Power is Largely Derived from Significant Switching Costs and Imperfect Information................................................................................. 6

    D.    Apple's Market Power in the Relevant Market Is Evidenced by Its 100% Share of the Market and Its Substantial Profit Margins ......................................... 7

    E.    Apple's Purported Business Justification Is Pretextual ......................................... 8

    F.    Class Members Have Been Uniformly Impacted and Suffered Damages............ 10

IV.   ARGUMENT..................................................................................................................11

    A.    Standards for Class Certification ......................................................................... 11

    B.    The Four Prerequisites of Rule 23(a) Are Satisfied............................................ 12

        1.    The Class Is Undoubtedly Numerous ...................................................... 12

        2.    Class Members Share Common Questions of Law and Fact..................... 12

        3.    Plaintiffs Are Typical.............................................................................. 13

        4.    Plaintiffs Are Adequate........................................................................... 14

    C.    The Requirements of Rule 23(b)(3) Are Satisfied.............................................. 15

        1.    Common Questions of Law and Fact Predominate .................................. 16

            a.    Common Evidence Will Prove the Relevant Market and Apple's Power in That Market......................................................... 17

            b.    Common Evidence Will Prove Apple's Willful Acquisition and Maintenance of Monopoly Power........................................... 18

**SER-921**

        c.      Common Evidence Will Prove Apple's Anticompetitive Conduct ........................................................................ 19

        d.      Common Evidence Will Prove Causal Antitrust Impact ............. 19

        e.      The Damages Will Be Estimated Using a Common Method ....... 21

    2.      Superiority ................................................................................... 24

  D.      Appointment of Class Counsel .............................................................. 25

V.      CONCLUSION ................................................................................................. 25

**SER-922**

**TABLE OF AUTHORITIES**

**PAGE(S)**

**Cases**

*Amchem Products, Inc. v. Windsor,*
521 U.S. 591 (1997) ............................................................................ 12, 15, 16, 24

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
568 U.S. 455 (2013) ...................................................................................... 11, 12

*Apple Inc. v. Pepper,*
139 S. Ct. 1514 (2019) .................................................................................. *passim*

*Apple iPod iTunes Antitrust Litig.,*
2008 U.S. Dist. LEXIS 107127
(N.D. Cal. Dec. 22, 2008) ............................................................... 12, 13, 15, 24

*Bafus v. Aspen Realty, Inc.,*
236 F.R.D. 652 (D. Idaho 2008) ................................................................... 20

*Blackie v. Barrack,*
524 F.2d 891 (9th Cir. 1975) ..................................................................... 12, 14

*Blue Shield of Va. v. McCready,*
457 U.S. 465 (1982) ...................................................................................... 20

*Bogosian v. Gulf Oil Corp.,*
561 F.2d 434 (3rd Cir. 1977) ........................................................................ 20

*Coal. For ICANN Transparency, Inc. v. VeriSign, Inc.,*
611 F.3d 495 (9th Cir. 2010) ........................................................................ 16

*Comcast Corp. v. Behrend,*
569 U.S. 27 (2013) ........................................................................................ 23

*Cummings v. Connell,*
316 F.3d 886 (9th Cir. 2003) ........................................................................ 14

*Dilts v. Penske Logistics, LLC,*
2013 U.S. Dist. LEXIS 192323
(S.D. Cal. Jan. 17, 2013) ............................................................................... 11

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
504 U.S. 451 (1992) ...................................................................................... 17

*Ellis v. Costco Wholesale Corp.,*
657 F.3d 970 (9th Cir. 2011) ........................................................................ 16

**SER-923**

*Erica P. John Fund, Inc. v. Halliburton Co.,*
  563 U.S. 804 (2011)..................................................................................................... 16

*FTC v. Qualcomm Inc.,*
  969 F.3d 974 (9th Cir. 2020) ...................................................................................... 16

*Giuliano v. Sandisk Corp.,*
  2015 U.S. Dist. LEXIS 193817
  (N.D. Cal. May 14, 2015) ..................................................................................... 18, 19

*Glictronix Corp. v. Am. Tel. & Tel. Co.,*
  603 F. Supp. 552 (D.N.J. 1984) .................................................................................. 20

*Gonzales v. Free Speech Coal.,*
  408 F.3d 613 (9th Cir. 2005) ...................................................................................... 13

*Hanlon v. Chrysler Corp.,*
  150 F.3d 1011 (9th Cir. 1998) ........................................................................ 13, 14, 15

*Hanon v. Dataproducts Corp.,*
  976 F.2d 497 (9th Cir. 1992) ...................................................................................... 14

*Hawaii v. Standard Oil Co. of Cal.,*
  405 U.S. 251 (1972)..................................................................................................... 11

*Hunt v. Check Recovery Sys., Inc.,*
  241 F.R.D. 505 (N.D. Cal. 2007)................................................................................ 15

*Image Tech. Servs., Inc. v. Eastman Kodak Co.,*
  125 F.3d 1195 (9th Cir. 1997) .................................................................................... 17

*Image Tech. Servs., Inc. v. Eastman Kodak Co.,*
  1994 U.S. Dist. LEXIS 12652
  (N.D. Cal. Aug. 31 1994).............................................................................................. 24

*In re Aftermarket Auto. Lighting Prods. Antitrust Litig.,*
  276 F.R.D. 364 (C.D. Cal. 2011) ............................................................................... 23

*In re Apple & AT&TM Antitrust Litig.,*
  569 F. Supp. 2d 1288 (N.D. Cal. 2008) ..................................................................... 17

*In re Blood Reagents Antitrust Litig.,*
  2015 U.S. Dist. LEXIS 141909
  (E.D. Pa. Oct. 19, 2015)............................................................................................... 23

*In re Capacitors Antitrust Litig. (No. III),*
  2018 U.S. Dist. LEXIS 195310
  (N.D. Cal. Nov. 14, 2018)............................................................................................. 23

PLTFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEM. OF Ps & As
Case No. 11-cv-06714-YGR

**SER-924**

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
 308 F.R.D. 606 (N.D. Cal. 2015)........................................................................... 11

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
 2006 U.S. Dist. LEXIS 39841
 (N.D. Cal. June 5, 2006) ................................................................................. *passim*

*In re Glumetza Antitrust Litig.*,
 336 F.R.D. 468 (N.D. Cal. 2020)........................................................................... 16

*In re High-Tech Emp. Antitrust Litig.*,
 289 F.R.D. 555 (N.D. Cal. 2013)........................................................................... 20

*In re High-Tech Emp. Antitrust Litig.*,
 985 F. Supp. 2d 1167 (N.D. Cal. 2013) ...................................................... 13, 23, 24

*In re Korean Ramen Antitrust Litig.*,
 2017 U.S. Dist. LEXIS 7756
 (N.D. Cal. Jan. 19, 2017) ..................................................................................... 23

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
 522 F.3d 6 (1st Cir. 2008)..................................................................................... 20

*In re Qualcomm Antitrust Litig.*,
 328 F.R.D. 280 (N.D. Cal. 2018)........................................................................... 13

*In re Rubber Chemicals Antitrust Litig.*,
 232 F.R.D. 346 (N.D. Cal. 2005)................................................................ 11, 21, 25

*In re Static Random Access (SRAM) Antitrust Litig.*,
 2008 U.S. Dist. LEXIS 107523
 (N.D. Cal. Sept. 29, 2008) .................................................................................... 12

*In re Static Random Access Memory Antitrust Litig.*,
 264 F.R.D. 603 (N.D. Cal. 2009)........................................................................... 23

*In re Tableware Antitrust Litig.*,
 241 F.R.D. 644 (N.D. Cal. 2007)........................................................ 12, 15, 16, 23, 24

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
 267 F.R.D. 291 (N.D. Cal. 2010)...................................................................... 16, 20

*In re TFT-LCD Antitrust Litig.*,
 267 F.R.D. 583 (N.D. Cal. 2010)........................................................................... 23

*In re Vitamins Antitrust Litig.*,
 209 F.R.D. 251 (D.D.C. 2002)............................................................................... 16

SER-925

*Johnson v. Ariz. Hosp. & Healthcare Ass'n,*
 2009 U.S. Dist. LEXIS 122807
 (D. Ariz. July 14, 2009) ............................................................................................ 23

*Kanawi v. Bechtel Corp.,*
 254 F.R.D. 102 (N.D. Cal. 2008) ............................................................................. 19

*Leyva v. Medline Indus., Inc.,*
 716 F.3d 510 (9th Cir. 2013) .................................................................................... 21

*Little Caesar Enters. Inc. v. Smith,*
 172 F.R.D. 236 (E.D. Mich. 1996) ........................................................................... 22

*Moore v. Jas. H. Matthews & Co.,*
 682 F.2d 830 (9th Cir. 1982) .................................................................................... 21

*Newcal Indus., Inc. v. Ikon Cjfice Solution,*
 513 F.3d 1038 (9th Cir. 2008) ............................................................................ 13, 17

*Nitsch v. Dreamworks Animation SKG Inc.,*
 315 F.R.D. 270 (9th Cir. 2016) ................................................................................ 14

*Ohio v. Am. Express Co.,*
 138 S. Ct. 2274 (2018) ........................................................................................ 17, 18

*Cptronic Techs., Inc. v. Ningbo Sunny Elec. Co.,*
 2019 U.S. Dist. LEXIS 169446
 (N.D. Cal. Sep. 20, 2019) .......................................................................................... 23

*Pecover v. Elec. Arts, Inc.,*
 2010 U.S. Dist. LEXIS 140632
 (N.D. Cal. Dec. 21, 2010) .......................................................................................... 14

*Reiter v. Sonotone Corp.,*
 442 U.S. 330 (1979) .................................................................................................. 11

*Ruiz v. XPO Last Mile, Inc.,*
 2016 U.S. Dist. LEXIS 152095
 (S.D. Cal. Feb. 1, 2016) ............................................................................................ 11

*Shcjfer v. Cont'l Cas. Co.,*
 2007 U.S. Dist. LEXIS 96189
 (C.D. Cal. Jan. 26, 2007) .......................................................................................... 19

*Stockwell v. City and County cf San Francisco,*
 749 F.3d 1107 (9th Cir. 2014) ........................................................................ 11, 12, 16

PLTFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEM. OF Ps & As
Case No. 11-cv-06714-YGR

**SER-926**

*Sullivan v. Nat'l Football League,*
  34 F.3d 1091 (1st Cir. 1994)................................................................................. 20

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.,*
  209 F.R.D. 159 (C.D. Cal. 2002) .......................................................................... 14

*Thompson v. Clear Channel Commc'ns, Inc. (In re Live Concert Antitrust Litig.),*
  247 F.R.D. 98 (C.D. Cal. 2007) ....................................................................*passim*

*Valentino v. Carter-Wallace, Inc.,*
  97 F.3d 1227 (9th Cir. 1996) ................................................................................ 24

*Wal-Mart Stores, Inc. v. Dukes,*
  564 U.S. 338 (2011).............................................................................. 11, 12, 13

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
  395 U.S. 100 (1969)................................................................................................ 20

**Statutes**

15 U.S.C. § 2......................................................................................................... 1, 13

**Other Authorities**

6 A. Conte & H. Newberg, NEWBERG ON CLASS ACTIONS (4th ed. 2002)........... 11, 12, 14, 17, 22

**Rules**

Federal Rules of Civil Procedure ("FRCP") 23 .................................................*passim*

**SER-927**

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   STATEMENT OF ISSUES TO BE DECIDED

a)   Whether the Court should certify the Class pursuant to the Federal Rules of Civil Procedure ("FRCP") 23(a) & (b);

b)   Whether the Court should appoint Plaintiffs Class Representatives; and

c)   Whether the Court should appoint Wolf Haldenstein and Kellogg Hansen as Co-Class Counsel.

### II.   INTRODUCTION

Plaintiffs bring this class action pursuant to Section 2 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 2 (the "Sherman Act"), on their own behalf and on behalf of persons who bought software applications ("apps") or licenses for apps from Apple or paid Apple for in-app purchases,[1] including subscription purchases, on the "App Store," which is entirely owned and operated by Apple, for use on one or more iPhones, iPads, or iPod Touches ("iOS Devices"), at any time since the App Store opened on July 10, 2008. TAC ¶ 1.[2]  Plaintiffs allege that Apple unlawfully monopolizes the retail market for the sale of apps, including IAP, and uses its monopoly power to charge consumers supra-competitive prices for apps and IAP. *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1518 (2019). This "is a classic antitrust claim." *Id*. at 1519.

Plaintiffs challenge Apple's decision to **require** its customers to buy apps and pay for IAP for their iOS Devices **only** from Apple, which monopolizes the aftermarket for iOS apps and IAP. Eddy Cue, a senior Apple executive admitted that Apple tries "to get people **hooked to the [iOS] ecosystem**." Byrd Decl., Ex. B (emphasis added). Apple's CEO, Tim Cook, recently admitted that Apple tries to avoid competition from developers and other app stores: if other app stores were allowed to compete with its App Store, Apple would "have to differentiate [its App Store] in some

---

[1] "In-app purchases" ("IAPs") are purchases made within applications, such as payment for additional application features, full versions of games, and subscriptions for access to content and membership. Third Amended Complaint ("TAC"), ¶ 4.

[2] "iPads" include all iPad Pro, iPad Mini and iPad Air models as well as standard iPads. TAC, ¶ 1, n.1. iPads use the "iPadOS" operating system. Declaration of Rachele R. Byrd in Support of Plaintiffs' Motion for Class Certification ("Byrd Decl."), Ex. A, 315:21-316:18. Both iPadOS and the operating system used on iPhones and iPod Touch will be referred to as "iOS" because there are no relevant differences between iOS and iPadOS.

-1-

way." *Id.*, Ex. C, 3934:23-3935:1.

Plaintiffs now seek certification under FRCP 23(a) and (b)(3) on behalf of the following Class of consumers:

> All persons in the United States, exclusive of Apple and its employees, agents, and affiliates, and the Court and its employees, who purchased one or more iOS apps or app licenses from Apple, or who paid Apple for one or more in-app purchases, including, but not limited to, any subscription purchase, for use on an iOS Device at any time since July 10, 2008.

The case easily meets all the requirements for class certification. The Class consists of millions of Apple customers; Plaintiffs' claims are typical for all other Class members; Plaintiffs are adequate class representatives; and Class members share many common questions of law and fact. The overwhelming predominant common questions in this case include: (1) whether the aftermarket for iOS apps and IAP is a relevant market and whether Apple has power in that market; (2) whether Apple willfully acquired or maintained monopoly power in that market; (3) whether Apple has engaged in anticompetitive conduct; (4) whether Apple's monopoly has caused antitrust injury to Plaintiffs and all other members of the Class; and (5) if so, what measure of damages is proper.

## III.   STATEMENT OF FACTS

### A.   Relevant Background

Apple launched the iPhone in June 2007. It designed and built the iPhone's operating system, known as "iOS," to enable iPhone users to send and receive calls; download, install, and run computer-like software programs (called "applications" or "apps") to browse the Internet; transform music into cell phone ringtones; take photos; play games; and engage in other functions typically performed on desktop or laptop computers. TAC, ¶ 2. On September 14, 2007, Apple introduced the iPod Touch, a device similar to the iPhone without telephony, which also operates on iOS and runs apps that also run on the iPhone. *Id.*, ¶ 3. On April 3, 2010, Apple introduced the iPad, a tablet computer with a touch screen interface, utilizing the same iOS as the iPhone and iPod Touch and able to run apps that function on those devices as well. *Id.*

Apple designed iOS to be a "closed" system. *Id.*, ¶ 36. Unlike traditional desktop or laptop computers, whose operating systems allow consumers to buy software applications from

-2-

competing software distributors, the iOS prevents iOS Device customers from buying software applications from anyone other than Apple. *Id.*, ¶ 6. Apple's operating system for desktop and laptop computer operating system, called "macOS," from which Apple derived the iOS, allows consumers to buy software from non-Apple vendors and to pay such vendors directly without having to pay an additional fee to Apple. *Id.*, ¶ 7. An iOS Device customer does not agree to buy apps or pay for IAP only on the App Store. *Id.*, ¶ 18. Apple forces that upon them to keep them "hooked" into its iOS "ecosystem," Byrd Decl., Ex. B, and to avoid having to compete with developers or other app stores to sell apps or IAP.

Apple has owned and operated 100% of the App Store since its launch on July 10, 2008. Apple employees staff the App Store, and Apple controls all its revenue and business operations. TAC, ¶ 45. Apple collects all money customers spend on the App Store for apps and IAP (which it calls "billings"), keeps its cut (which it calls "revenue"), and then remits the remainder to developers. Byrd Decl., Ex. D, 278:1-279:17.

Apple **un*i*formly** charges a 30% commission on the amount its customers pay for virtually all paid apps and IAP through the App Store—which has not changed since the launch of the App Store. The ***same*** commissions have been charged on billions of transactions for paid apps and IAP. Apple now charges a reduced commission of 15% in limited circumstances, which has little effect on its overall business. In 2016, Apple reduced its commission from 30% to 15% for ***all*** subscription renewals after the first year of a subscription. TAC, ¶ 10. Additionally, in late 2020, in response to the adverse publicity and pressure from regulators and litigants (including this and related litigation) about Apple's App Store monopoly and supra-competitive commissions, Apple announced the App Store Small Business Program, beginning in January 2021, in which existing developers that earned less than $1 million in total proceeds (net of Apple's commission and some taxes and adjustments) in the prior calendar year pay a reduced commission of 15%. *See* https://developer.apple.com/app-store/small-business-program/ (last visited May 31, 2021).

At either 30% or 15%, Apple's commission is the ***same*** for all the affected apps and IAP, and Apple's customers all pay the ***same*** prices for apps and IAP in the App Store. Byrd Decl., Ex.

**SER-930**

E, 86:10-87:3. Apple permits no individually negotiated commissions or prices for paid apps or for IAP.

Apple also controls the prices developers can charge for their apps. Developers may only charge a price that ends in $.49 or $.99 (e.g., $0.49, $.99, $1.49, $1.99, or $2.99) for each app and all IAP. TAC, ¶ 50; Byrd Decl., Ex. D, 265:6-11, 266:12-15, 268:2-270:11. Apple eliminates more than 99% of the price points that developers may charge to Apple's customers for all paid apps and IAP.[3]

Just prior to the launch of the App Store, Steve Jobs falsely claimed that Apple did not "intend to make money off the App Store," and if Apple's 30% commission "pays for running the store, well that will be great." *Id.*, Ex. G at '81. The App Store has been enormously profitable since 2009. *See id.*, Ex. H ("[w]e are definitely making money"); Ex. I, 89:13-90:7, 90:9-91:13. The App Store has "obviously done, far, far better than" just covering costs. *Id.*, Ex. J, 175:11-25. Apple gets its enormous profit because it ensures that its App Store is the *only* store in the world where the tens of millions of U.S.-based iOS Device owners (and many millions more worldwide) can buy an iOS app or pay for IAP. TAC, ¶ 5.

**B.     Sales of iOS Apps and IAP Constitute a Relevant Antitrust Market**

Sales of iOS apps and IAP is a type of relevant antitrust market known as an "aftermarket." *See* Byrd Decl., Ex. K, ¶ 43. In the primary market, consumers choose a mobile device with OS pre-installed, such as iOS or Android. *Id.*, ¶ 44. All iOS Devices come pre-loaded with the iOS and cannot be used without it, and the iOS cannot be used on non-Apple devices. *Id.* iOS apps (so-called "native" apps) (and IAP) may only be downloaded and installed from Apple's App Store. *Id.*, Ex. E, 98:2-11; Ex. A, 224:6-13. Because customers pay the App Store directly, Apple collects its commission on all paid apps and IAP without depending on the developers or any third party to remit Apple's share. *Id.*, Ex. D, 278:1-8; Ex. C, 3863:18-3864:2 ("If not for IAP, we would have

---

[3] For prices greater than $29.99, developers may only charge prices in $1.00 increments (e.g., $30.99, $31.99, $32.99); for apps and IAP where the price is greater than $124.99, developers may only charge prices in $5.00 increments (*e.g.*, $129.99, $134.99, $139.99); and for apps and IAP where the price is greater than $299.99, developers may only charge in $10.00 increments (*e.g.*, $309.99, $319.99, $219.99). *Id.*, at 270:2-25; Ex. F.

to come up with another system to invoice developers").

Most important, apps compatible with non-iOS mobile devices are not reasonable substitutes for iOS apps. Non-iOS apps cannot be installed or operated on iOS devices, and *vice versa*. In addition, consumers face various types of costs if they attempt to switch to alternative mobile platforms—for example, from iOS to Android—called "switching costs." Byrd Decl., Ex. K, ¶ 66. Therefore, the prices of apps on non-iOS platforms, including on Android, websites, or consoles, do not affect or constrain the commission that Apple charges on the sale of apps and IAP through its App Store.

Apple further protects its App Store from competition from other platforms by enforcing the "anti-steering" policy – prohibiting app developers from informing iOS users, inside the app or in the App Store, of the availability of their app and in-app purchases on other platforms. *See* Byrd Decl., Ex. L, § 2.3.10 ("[D]on't include names, icons, or imagery of other mobile platforms in your app or metadata, unless there is a specific, approved interactive functionality"); *id*. at § 3.1.1 ("Apps and their metadata may not include buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than in-app purchase."); Ex. M, 117:20-22 ("apps [were] generally prohibited from pointing to their availability on other platforms.")

Web-based applications accessible through a web browser on an iOS Device, called "web apps," are likewise not reasonable substitutes for installing native apps and making in-app purchases through the App Store. *Id*., Ex. K, ¶¶ 48-58; Ex. I, 47:20-22. *First*, there are "voluminous" technological benefits of native apps over web apps. *Id*., Ex. J, 81:2-84:6; Ex. N. *Second*, web apps have limited functionality compared to native apps. Native apps are "faster," "use less memory," and "take advantage of the native graphics libraries in a way that is either not available or would have to be shoehorned in a web app." *Id*., Ex. J, 81:17-24, 83:8-17; Ex. M, 249:13-18; Ex. O, 254:1-15, 258:18-259:19. *Third*, while native apps can use large portions of an iPhone's gigabytes of memory, web apps are limited to just 50 MB of cache memory, which severely limits the size of web apps and requires information to be overwritten frequently. *Id*., Ex. K, ¶ 51; Ex. P, 145:1-7, 146:1-11; Ex. I, 175:12-21. *Fourth*, web apps use different and more limited Application Programming Interfaces ("APIs") to enable certain functionalities than native

PLTFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEM. OF Ps & As
Case No. 11-cv-06714-YGR

apps use. *Id.*, Ex. P, 141:3-15.

**C.     Apple's Market Power is Largely Derived from Significant Switching Costs and Imperfect Information**

Apple enjoys market power in the iOS aftermarket thanks to their locked-in consumers, who have relatively inelastic demand and face high switching costs, which helps Apple set and maintain the supra-competitive App Store commission. Byrd Decl., Ex. K, ¶ 98-101. Switching costs include: (1) the equipment costs of switching which typically requires switching multiple devices (*e.g.*, iPhones, iPads, Macs, AppleTV, watches); (2) the cost of re-purchasing apps because apps purchased on iOS are not compatible with non-iOS devices; (3) the loss of data stored on iOS apps not easily transferable to outside iOS, including various user account information and auto-generated random passwords; and (4) the loss of "ecosystem integration" with other Apple devices including iPhones, iPads, Apple TV, Apple Watch, and Macs. *Id.*, ¶¶ 70-75. Because of the switching costs, the incidence of consumers switching between iOS and Android is relatively low. *Id.*, Ex. Q, 152:2-11.

Apple purposefully exploits the high switching costs. As Eddy Cue, a senior Apple executive, explained: "The more people use our stores the more likely they are to buy additional Apple products and upgrade to the latest versions. Who's going to buy a Samsung phone if they have apps, movies, etc already purchased? They now need to spend ***hundreds more to get to where they are today***. . . . Who leaves Apple products once they've bought apps, music, movies, etc!" *Id.*, Ex. B (emphasis added); Ex. I, 67:13-19, 68:1-13, 69:1-5. In an agenda for a 2010 executive team meeting, Steve Jobs wrote that he wanted to "tie all of our products together, so we further ***lock customers into our ecosystem***." *Id.*, Ex. R (emphasis added); Ex. J, 248:25-249:1, 249:18-23.

Apple leverages the high switching costs by withholding information in the primary and secondary markets about future market conditions or alternatives, substantially enhancing its market power in the iOS apps and IAP aftermarket. Byrd Decl., Ex. K, ¶ 98. Competition in the primary market for iOS Devices does not constrain Apple in the aftermarket because consumers lack sufficient information about the features and costs of the aftermarket when they make their

-6-

choice in the primary market.[4] When buying an iOS Device, consumers lack sufficient information to accurately predict how they will use their iOS Device, what apps and in-app content will be available, and how much they will spend on apps, in-app content, and other complementary products. *Id.*, ¶ 103.[5] Further, after consumers make their foremarket purchases, Apple's so-called "anti-steering" provision prohibits developers from telling them about less costly IAP options thereafter. *Id.*, Ex. C, 3864:21-23; Ex. L §§ 2.3.10, 3.1.1; Ex. M, 117:1-2. These factors all contribute to Apple's near-complete monopoly power in the aftermarket for paid iOS apps and IAP.

> **D.** **Apple's Market Power in the Relevant Market Is Evidenced by Its 100% Share of the Market and Its Substantial Profit Margins**

The App Store is the only place where Apple's iOS Device customers can buy apps and pay for IAP. Apple has cornered virtually 100% of the worldwide multi-billion-dollar market for iOS apps and IAP by eliminating all competition. Byrd Decl., Ex. K, ¶ 108; TAC, ¶ 51. With few immaterial exceptions, the App Store is the only means by which iOS users can install native iOS apps. Byrd Decl., Ex. U, 133:20-135:17; Ex. E, 72:8-12; Ex. D, 143:5-13; Ex. C, 3932:11-13. Furthermore, Apple requires all app developers to distribute their iOS apps solely through the App Store and prohibits them from distributing apps directly through third-party app stores. *Id.*, Ex. V at '99, § 7.3.

The App Store's extremely high gross and net margins are further evidence of Apple's market power. *Id.*, Ex. K, ¶ 116. Presentations to Apple executives with decision-making authority for the App Store regularly include a detailed analysis of the App Store's financial performance.

---

[4] From its own analysis, Apple understood that demand for apps is "highly inelastic" as consumers lack comparative information concerning the app content prices across platforms. *Id.*, Ex. S; Ex. T, 308:13-20.

[5] Apple does not estimate—nor inform consumers regarding—the amount of money a consumer spends on apps over the lifecycle of an iPhone. *Id.*, Ex. D, 133:2-11, 136:9-17; Ex. I, 188:2-189:5, 189:18-22. Apple prevents developers from referencing to customers its commission structure. *Id.*, Ex. M, 144:10-23 (Apple "did not like to see [information on Apple's commission] in [a developer's] marketing text" for the app). It never disclosed the 30% commission on paid apps and IAP before the Supreme Court's 2019 ruling in Plaintiffs' favor. *Pepper*, 139 S. Ct. 1514. Consumers thus lacked the information they needed to assess lifecycle costs of apps. Byrd Decl., Ex. D, 132:20-24, 134:6-21.

PLTFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEM. OF Ps & As
Case No. 11-cv-06714-YGR

*Id.*, Ex. W; Ex. X; Ex. Y, 56:6-8, 97:3-7, 234:12-21. Those presentations disclosed that Apple's share of the App Store revenue for FY2019 (net of remittance to developers) was $13.5 billion and that it earned a gross margin of 92.7% on these sales, and its net margin, after deducting all operating expenses (or "OPEX"), was 82.8%. *Id.*, Ex. X at '6318; Ex. K, ¶ 117. Apple predicted that its FY2020 App Store gross margin would increase to 93.5% and its net margin would increase to 83.1%. *Id.*, Ex. X at '6318; Ex. K, ¶ 118. The exceptionally high profit margins of the App Store year after year confirm that Apple extracts supra-competitive rents from its customers.

Nor did Apple ever base the 30% commission on its cost to create or run the App Store or provide services to developers. *Id.*, Ex. I, 137:13-138:3, 138:9-14, 140:10-141:10. When the App Store launched in 2008, Apple set the commission rate *ad hoc*: Mr. Cue and Mr. Jobs simply picked a rate without *any* consideration of App Store costs or the costs of providing developers with software development tools. *Id.*, 135:8-136:14, 137:13-138:3, 138:9-14.

In June 2011, Phil Schiller, the Apple senior executive in charge of marketing the iPhone, said he did not think "that 70/30 will last . . . forever" because "someday we will see enough challenge from another platform or web based solutions to want to adjust our model." *Id.*, Ex. Z; Ex. I, 143:25-144:6, 145:6-13. The size of the App Store profits—then over $1 billion annually—caused Schiller to ask: "is that enough to then think about a model where we ratchet down from 70/30 to 75/25 or even 80/20" if Apple could maintain a "$1B a year run rate." *Id.*, Ex. Z; Ex. I, 143:25-144:6; 145:6-13.

Despite Mr. Schiller's prediction, Apple's commission on paid apps and IAP largely have remained 30% because it forecloses the competition that he expected, and its App Store net profits have swelled to well over $10 billion per year. *Id.*, Ex. X at '318. Apple still does not consider costs in setting its commission to this day. *Id.*, Ex. I, 140:10-141:10. As a monopolist, Apple is able to set prices arbitrarily and without considering costs.

**E.    Apple's Purported Business Justification Is Pretextual**

Apple's purported business justification for forbidding sales of iOS apps outside the App Store—alleged security and privacy concerns—is pretextual. Apple's choice for the App Store to be the only market for iOS apps and IAP payments was a business decision; it was not necessary

-8-

to ensure the iOS ecosystem's security.[6]

The iOS operating system and the hardware on which it runs—*not* the App Store sales platform—are the *primary sources of iOS device security*. Byrd Decl., Ex. KK, at '311, Ex. BB, 322:10-19, 323:25-324:13; Ex. CC, 2556:9-22. Apple easily could implement features to support app purchases and payment for IAP without forcing iOS Device customers to shop and pay on the App Store, just as it does with macOS.[7] Apple allows developers to sell apps to Mac users outside of Apple's Mac app store. But iOS offers even more robust *operating system-based* security features than macOS. *See id.*, Ex. A, 207:24-208:1; Ex. BB, 321:3-19. Apple has no genuine security reason for restricting iOS app distribution to the App Store because the App Store itself provides little if any extra security beyond what is provided by iOS.

Apple's reasonable security concerns[8] could be met even if app sales were opened—like what Apple does on macOS or through third party actions. *Id.*, Ex. CC, 2569:12-20; 2571:17; Ex. J, 127:9-22, 129:5-18. And, of course, requiring IAP payment processing on the App Store does not advance security—that payment structure merely empowers Apple to take its cut from consumers before remitting developer proceeds. *Id.*, Ex. C, 3863:18-3864:2.

---

[6] In 2007, Apple prepared two white papers to assess the risks of distributing third-party apps on the iOS platform. Byrd Decl., Ex. AA; Ex. J, 108:22-24, 109:18-110:4. These "technical document[s] from a technical team . . . building the [iOS] security infrastructure," explicitly contemplated the possibility of distribution outside the App Store and assumed that "the technical infrastructure . . . [would] allow for *other distribution mechanisms*" beyond the App Store. *Id.*, 129:19-130:19 (emphasis added).

[7] For example, iOS requires "sandboxing," which "restrict[s] [apps] from accessing files stored by other apps or from making changes to the device," is a security feature provided by the operating system, not the App Store. *Id.*, Ex. DD, at '383. *See also id.* Ex. A, 207:24-208:1.

[8] The perfunctory app review process does little to keep iOS devices secure. *Id.*, Ex. EE; Ex. BB, 140:15-141:12. Apple does not monitor apps to see if they have changed after they have been published in the App Store. *Id.*, Ex. E, 200:4-11. And Apple has only a limited ability to detect malicious apps during the review process (*id.*, Ex. FF, 94:9-23), as evidenced by a number of malicious apps that Apple failed to detect. *Id.*, Ex. M, 214:23-215:23. Apple acknowledged that the App Store has had "all kinds of security and privacy issues," including "apps in the store that have defrauded customers . . . [or] potentially taken their data." *Id.*, Ex. I, 169:1-9. Some fraudulent apps evade Apple's screening even after multiple rounds of app review. *Id.*, Ex. FF, 121:19-23.

PLTFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEM. OF Ps & As
Case No. 11-cv-06714-YGR

**SER-936**

### F.     Class Members Have Been Uniformly Impacted and Suffered Damages

Apple's unlawful and anticompetitive exclusivity scheme has generated enormous supra-competitive profits for Apple. Since 2008, Apple has collected more than $59.8 billion in App Store revenue, and more than $50 billion in App Store revenue just in the last four years. *Id.*, Ex. K, ¶ 25; Ex. X, at '317. Apple charges the same commissions (whether 30% or 15%) on all apps and all IAP. *Id.*, Ex. E, 86:10-87:3. And Apple's customers pay **uniform prices** for each app and for IAP. For any given app or IAP, all iOS Device customers pay the exact **same** prices. *Id.*, Ex. D, 265:6-11, 266:12-15, 268:2-270:25. Customers do not separately negotiate prices.

Apple's conduct increases the prices of apps and IAP paid by consumers. *Id.*, Ex. K, ¶ 131. Consumers bear a large portion of Apple's 30% commission. Specifically, anyone who buys apps or pays for IAP is impacted by Apple's supra-competitive App Store commissions because they lead directly to increased prices for apps and IAPs in the App Store. *Id.*[9] Developers charge consumers higher prices on the App Store than they charge through other distribution channels unencumbered by Apple's 30% commission, "to help offset" Apple's 30% commission. *Id.*, Ex. T, 177:19-178:2; Ex. D, 94:6-11; *see also id.*, Ex. II ("Due to the 70/30 revenue split, [Pandora] will be charging $12.99 on iOS at launch and the service will be available for $9.99 on web."). This price differential exists even between iOS and other Apple platforms. For example, CBS All Access charges $6.99 on iOS, where Apple's fee is 30%, but only $5.99 on Apple TV, where Apple's fee is 15%. *Id.*, Ex. JJ, at '680; Ex. T, 177:2-17, 178:10-21, 179:5-9. Apple has overcharged Class members by **billions** of dollars for paid apps and IAP during the Class Period as a result of its anti-competitive conduct. *Id.*, Ex. K, ¶¶ 236, 239.[10]

---

[9] Apple's conduct also harms innovation by preventing new and innovative app stores on iOS and app development that could benefit consumers. *See id.*, Ex. K, ¶ 243; Ex. HH (Apple said reduced commissions of Small Business Program would enhance innovation).

[10] But for Apple's conduct, competing app stores would have entered the iOS apps and IAP aftermarket, alongside the option of direct distribution of apps and IAP payment, offering competitive alternatives to the App Store. *See, e.g., id.*, Ex. A, 72:5-12, 74:6-9 (in macOS, multiple third-party app stores sell apps alongside direct sales by multiple developers, including Microsoft).

-10-

## IV.    ARGUMENT

### A.    Standards for Class Certification

Antitrust class actions play an integral role in the private enforcement of antitrust laws. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979); *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 266 (1972); *see generally* 6 A. Conte & H. Newberg, NEWBERG ON CLASS ACTIONS, § 18:1, at 3-6 (4th ed. 2002) ("NEWBERG"). Courts should "'resolve doubts in these actions in favor of certifying the class.'" *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 612 (N.D. Cal. 2015) (quoting *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005)); *Dilts v. Penske Logistics, LLC*, 2013 U.S. Dist. LEXIS 192323, at *5 (S.D. Cal. Jan. 17, 2013) ("doubts regarding the propriety of class certification should be resolved in favor of certification").

Rule 23 permits class certification where: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interest of the class." *Ruiz v. XPO Last Mile, Inc.*, 2016 U.S. Dist. LEXIS 152095, at *14 (S.D. Cal. Feb. 1, 2016). Further, the party seeking class certification only needs to satisfy the requirements of one of the subsections of Rule 23(b). *Id.* at *13. Class actions for money damages proceed under Rule 23(b)(3), which additionally requires that "the questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FRCP 23(b)(3). The Court may certify a class action if, after "rigorous analysis," it determines that Plaintiffs have met their burden. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011).

While the class certification analysis must be rigorous, a motion for class certification does not require "free-ranging merits inquiries." *Stockwell v. City and County of San Francisco*, 749 F.3d 1107, 1111-12 (9th Cir. 2014) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013)). "Rule 23(b)(3) requires a showing that **questions** common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen*

-11-

**SER-938**

*Inc.*, 568 U.S. at 459. *See also Stockwell*, 749 F.3d at 1112 ("demonstrating commonality does not require proof that the putative class will prevail on whatever common questions it identifies"). The Court may consider the merits only to the extent the class determination involves considerations enmeshed in the factual and legal issues comprising Plaintiffs' causes of action. *See Dukes*, 564 U.S. at 351. Moreover, the Court is "bound to take the substantive allegations of the complaint as true." *In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 648 (N.D. Cal. 2007) ("*Tableware*") (quoting *Blackie v. Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975)).

Antitrust actions are well-suited for class-wide resolution. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Like other antitrust claims, Plaintiffs' claims against Apple rest on evidence and economic analysis common to all iOS Device customers. Plaintiffs will prove that sales of iOS apps and IAP is a properly defined relevant antitrust market; Apple has monopoly power in that market; Apple willfully acquired or maintained that power; and its conduct caused antitrust injury and damages to the Class. In addition, as set forth in the Expert Report of Daniel L. McFadden, established and reliable econometric models are available to quantify the antitrust impact and damages caused by Apple's alleged anticompetitive conduct on a class-wide basis.

**B.     The Four Prerequisites of Rule 23(a) Are Satisfied**

**1.     The Class Is Undoubtedly Numerous**

Rule 23(a)(1) provides that a class should be certified if "the class is so numerous that joinder of all members is impracticable." Because millions of Apple customers bought iOS apps or paid for IAP throughout the U.S., numerosity is easily satisfied. *See Apple iPod iTunes Antitrust Litig.*, 2008 U.S. Dist. LEXIS 107127, at *8-9 (N.D. Cal. Dec. 22, 2008) ("*iTunes*"), *amended by* 2009 U.S. Dist. LEXIS 10755 (N.D. Cal. Jan. 15, 2009); *In re Static Random Access (SRAM) Antitrust Litig.*, 2008 U.S. Dist. LEXIS 107523, at *37 (N.D. Cal. Sept. 29, 2008) (Where the precise size of the class is unknown, but "'general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied.'") (quoting NEWBERG, § 3:3).

**2.     Class Members Share Common Questions of Law and Fact**

Rule 23(a)(2) requires "questions of law or fact common to the class." The commonality requirement is satisfied if a classwide proceeding has the "capacity . . . to generate common

-12-

answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (citations and quotations omitted). "Antitrust liability alone constitutes a common question." *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013) ("*High-Tech II*"). *See also In re Qualcomm Antitrust Litig.*, 328 F.R.D. 280, 294 (N.D. Cal. 2018) (commonality satisfied where plaintiff questions whether defendant's business practices are anticompetitive and whether each class member suffered the same injury as a result of defendant's anticompetitive conduct).

To begin, Plaintiffs must prove both that a "'relevant market' exists and that the defendant has power within that market." *Newcal Indus., Inc. v. Ikon Cᵢfice Solution*, 513 F.3d 1038, 1044 (9th Cir. 2008). Additionally, questions surrounding "the willfulness of Apple's behavior" and "questions of antitrust injury" will be integral to Plaintiffs' success on their monopolization and attempted monopolization claims and are common to the Class. *iTunes*, 2008 U.S. Dist. LEXIS 107127, at *14-15. Those quintessential common questions are shared by each Class member. Even if each Class member were forced to proceed individually on their antitrust claims, each would have to prove market and market power as foundational elements of their own cases. The "questions of market definition, market share, and market power are common to all members of the proposed class." *Id.*, at *12.

In addition to common factual issues, Class members also share the legal issue of whether Apple violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by monopolizing the aftermarket for iOS apps and IAP. Whether Apple violated the antitrust laws is a common legal issue. *See Gonzales v. Free Speech Coal.*, 408 F.3d 613, 618 (9th Cir. 2005); *Thompson v. Clear Channel Commc'ns, Inc.* (*In re Live Concert Antitrust Litig.*), 247 F.R.D. 98, 113 (C.D. Cal. 2007) ("*Live Concert*").

### 3. Plaintiffs Are Typical

Rule 23(a)(3) requires that "the claims . . . of the representative parties are typical of the claims . . . of the class." FRCP 23(a) (3). "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct

-13-

which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quotations and citation omitted). In antitrust cases like this, typicality "will be established by plaintiffs and all class members alleging the same antitrust violations." *Pecover v. Elec. Arts, Inc.*, 2010 U.S. Dist. LEXIS 140632, at *32 (N.D. Cal. Dec. 21, 2010) (quotations and citation omitted). Moreover, the typicality requirement is "liberally construed." *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 164 (C.D. Cal. 2002).

Plaintiffs allege the same antitrust claims as all other members of the Class. Each Plaintiff (and Class member) purchased an iOS Device and then bought an app from Apple or paid for IAP through the App Store during the Class Period, and each was injured by paying the supra-competitive prices for the apps and IAP. *See* Byrd Decl., Exs. LL-OO; *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 284 (9th Cir. 2016) ("all class members were injured by the same alleged antitrust conspiracy and incurred the same alleged injury – suppressed compensation caused by Defendants' single antitrust conspiracy.") These common facts give rise to common claims by Plaintiffs and all other Class members for the same antitrust violations by Apple – monopolization and attempted monopolization of the aftermarket for apps and IAP.

### 4.    Plaintiffs Are Adequate

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." FRCP 23(a) (4).   Adequacy under Rule 23(a)(4) turns on two basic questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020.

To disqualify either class representatives or class counsel, perceived conflicts of interest must "relat[e] to the subject matter of the suit" (NEWBERG, §18:14, at 40-41; *see also Blackie*, 524 F.2d at 909) and must be actual, not hypothetical. Mere potential conflicts are not sufficient to defeat class certification. *See Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003) ("this circuit does not favor denial of class certification on the basis of speculative conflicts"). Here, the interests of Plaintiffs and the rest of the Class are entirely aligned. As direct consumers of iOS apps and in-

-14-

app content during the Class Period, they all share the same interest in determining: (1) whether Apple monopolized the iOS apps aftermarket; and (2) whether they paid supra-competitive prices for apps and in-app content as a result. *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 U.S. Dist. LEXIS 39841, at *36 (N.D. Cal. June 5, 2006) ("*DRAM*") (adequacy of representation met because "the named plaintiffs allege that all members of the proposed class paid artificially inflated prices as a result of defendants' [antitrust violation] during the relevant class period, that all suffered similar injury as a consequence of the conspiracy, and that all seek the same relief"). Under these circumstances, no conflicts preclude class certification. *See Tableware*, 241 F.R.D. at 649.

Plaintiffs are motivated advocates for the Class. They have retained legal counsel with considerable experience in the prosecution of major class and antitrust litigation. Plaintiffs have produced documents, provided declarations and/or sat for depositions. *See* Byrd Decl., Exs. LL-OO. Plaintiffs are committed to the prosecution of this action on behalf of the Class. *Id*. They easily meet the adequacy requirement, and the Court should appoint them Class Representatives.

C.     **The Requirements of Rule 23(b)(3) Are Satisfied**

Rule 23(b)(3) is satisfied when "questions of law or fact common to the class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(3). When "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022; *iTunes*, 2008 U.S. Dist. LEXIS 107127, at *22.

To determine whether a class action is superior to individual actions, "courts consider the interests of the individual members in controlling their own litigation, the desirability of concentrating the litigation in the particular forum, and the manageability of the class action." *iTunes*, 2008 U.S. Dist. LEXIS 107127 at *22 (citing *Amchem*, 521 U.S. at 615, and *Hunt v. Check Recovery Sys., Inc.*, 241 F.R.D. 505, 514 (N.D. Cal. 2007)).

-15-

The "predominance" and "superiority" factors are closely related: when common issues predominate, class actions achieve economy and efficiency by minimizing costs and avoiding the confusion that would result from inconsistent outcomes. *See Tableware*, 241 F.R.D. at 651.

### 1. Common Questions of Law and Fact Predominate

Predominance is satisfied where the elements of class claims are subject to generalized, as opposed to individualized, proof. *DRAM*, 2006 U.S. Dist. LEXIS 39841, at *38; *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 266 (D.D.C. 2002); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 310 (N.D. Cal. 2010). "Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws." *Amchem*, 521 U.S. at 625. "Considering whether questions of law or fact common to class members predominate begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). Plaintiffs will use generalized proof for each element of their claims.

To prove their Sherman Act section 2 monopolization claim, Plaintiffs will need to prove: "(a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020). For Plaintiffs to prove their claim for attempted monopolization, they will need to prove: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Coal. For ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 506 (9th Cir. 2010) (internal quotation marks omitted). These standard "common questions" will predominate here. "[T]he state of the market and [Apple's] use and maintenance of monopoly power, as opposed to individual plaintiff's conduct, drives the claim." *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 475 (N.D. Cal. 2020).

Moreover, under Rule 23 (b)(3) courts should not evaluate merits issues, but should "focus[] on whether the questions presented, whether meritorious or not, were common to the members of the putative class." *Stockwell*, 749 F.3d at 1113-14; *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 & n.8 (9th Cir. 2011) (district court resolves "factual disputes necessary to determine whether there was a common pattern and practice that could affect the class *as a*

-16-

*whole*" but "not to determine whether class members could actually prevail on the merits of their claims") (emphasis in original).

As Prof. McFadden confirmed, each element of Plaintiffs' monopolization and attempted monopolization claims can and will be proved with evidence common to all Class members. *See Live Concert*, 247 F.R.D. at 149; Newberg, § 18.25 at 84 ("common liability issues such as conspiracy or monopolization have, almost invariably, been held to predominate over individual issues").

### a.   Common Evidence Will Prove the Relevant Market and Apple's Power in That Market

The two predominant issues here will be the definition of the relevant market (*i.e.*, the aftermarket for iOS apps and IAP) and whether Apple possesses monopoly power in that market. *See Live Concert*, 247 F.R.D. at 147 (regardless of the merits of parties' positions, market definition and market power were predominant common issues supporting class certification). To state a valid claim under the Sherman Act, a plaintiff "must allege that the defendant has market power within a 'relevant market.'" *Newcal*, 513 F.3d at 1044 (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992)). "The relevant market is the field in which meaningful competition is said to exist." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997).

In *In re Apple & AT&TM Antitrust Litig.*, the plaintiffs alleged a substantially identical "aftermarket for iPhone applications that 'would not exist without' the primary market for iPhones, and is thus 'wholly derivative from and depend[e]nt on the primary market.'" *Id.,* 596 F. Supp. 2d 1288, 1304 (N.D. Cal. 2008) (quoting *Newcal*, 513 F.3d at 1049). This Court held that "[t]he allegations in the Complaint recite[d] facts, which, if presumed to be true, would support the existence of an aftermarket for iPhone applications, under the standard articulated by the Ninth Circuit in *Newcal*." *Id*. Here, Plaintiffs allege a nearly identical aftermarket: for iOS applications and IAP that would not exist without the primary market for iOS Devices.

The market in this case is different from the two-sided transaction platform at issue in *Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ("*Am. Ex.*"). There, the Supreme Court described a two-sided transaction platform as one "supplying only *one* product – *transactions* – which is

-17-

jointly consumed" by the parties on both sides of the platform. *Id*. at 2286 n.8 (emphasis added). In contrast, the Supreme Court explained in this case that Apple's App Store is an "electronic store where iPhone owners can ***purchase iPhone applications from Apple***." *Pepper*, 139 S. Ct. at 1518 (emphasis added). Apple does ***not*** sell apps or IAP to developers.[11] The Supreme Court did not identify the App Store as a two-sided transaction platform because it does not sell only one product jointly consumed by parties on both sides of the transaction the way ancillary credit card transactions were sold to both parties in *Am. Ex.*[12]

Moreover, Plaintiffs will use common evidence to demonstrate that Apple has power in that aftermarket. Plaintiffs have offered the economic analysis of Prof. McFadden regarding market power. Prof. McFadden's expert report opines that evidence common to every member of the Class — such as evidence of Apple's near 100% share of the market, evidence of Apple's substantial profit margins, and evidence that Apple prevents distribution of iOS apps outside the App Store – demonstrates Apple's market power in the relevant market. Byrd Decl., Ex. K, ¶¶ 108-122. *See Giuliano v. Sandisk Corp.*, 2015 U.S. Dist. LEXIS 193817, at *53 (N.D. Cal. May 14, 2015) ("economic analysis . . . offered a plausible class-wide methodology to establish market power.")

### b.   Common Evidence Will Prove Apple's Willful Acquisition and Maintenance of Monopoly Power

Plaintiffs also will use common evidence to demonstrate that Apple willfully acquired and maintained its monopoly power in the iOS apps and IAP aftermarket. *First*, Apple designed iOS to be a "closed" system to prevent iOS Device consumers from installing and running apps that

---

[11] *AmEx* is also distinguishable because American Express's anti-steering provisions sought to level the playing field with its competitors, other credit card companies, whereas Apple's anti-steering provisions empty the playing field of competition and allow Apple to maintain its near-100% monopoly over the relevant market. *Am. Ex.*, 138 S. Ct. at 2280.

[12] The App Store does not become a two-sided transaction platform merely because Apple's customers and app developers have each asserted antitrust claims against Apple. "Multiple suits are not atypical when the intermediary in a distribution chain is a bottleneck monopolist or monopsonist (or both) between the manufacturer on the one end and the consumer on the other end. A retailer who is both a monopolist and a monopsonist may be liable to different classes of plaintiffs—both to downstream consumers and to upstream suppliers—when the retailer's unlawful conduct affects both the downstream and upstream markets." *Pepper*, 139 S. Ct. at 1525. Of course, whether the App Store is or is not a two-sided market is *itself* a common question.

PLTFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEM. OF Ps & As
Case No. 11-cv-06714-YGR

**SER-945**

they did not obtain from Apple. TAC, ¶ 36. The only way to install an iOS app on an iOS Device, short of jailbreaking the device, is to download it from the App Store. Byrd Decl., Ex. U, 133:20-135:17, Ex. E, 72:8-12; Ex. D, 143:5-13; 247:15-22; Ex. C, 3932:11-13. *Second*, Apple isolates its App Store from competition from other platforms by prohibiting app developers from informing iOS users, in the iOS app or on the App Store, of the availability of their apps or IAP on other platforms. *See id.*, Ex. L, §§ 2.3.10, 3.1.1; Ex. M, 117:20-22. This evidence of willful acquisition and maintenance of monopoly power is common to all Class members and will predominate over any individualized issues. "The question of whether there has been an antitrust violation is a common issue rather than an individual one. In no event will the individual circumstances of particular class members be relevant to the inquiry of whether such a violation has occurred." *Giuliano*, 2015 U.S. Dist. LEXIS 193817, at *52.

### c. Common Evidence Will Prove Apple's Anticompetitive Conduct

Apple's anticompetitive conduct is common to all Class members and is not in any way individualized. Apple locked all iOS Devices to prevent all Class members from downloading native apps from, or paying for IAP through, anywhere but the App Store. Plaintiffs will therefore use class-wide proof of Apple's anticompetitive conduct in proving their monopolization and attempted monopolization claims. *See Id.* at *53 ("Plaintiffs will rely on common evidence to establish an antitrust violation, *i.e.*, to show that the Disputed Patents were fraudulently procured and used by SanDisk to acquire and maintain monopoly power in the final flash product market.")

Apple's pretextual business justifications are affirmative defenses that are insufficient to defeat a motion for class certification. *See Kanawi v. Bechtel Corp.*, 254 F.R.D. 102, 109 (N.D. Cal. 2008) (affirmative defense "must be proven, and is not an appropriate basis to deny class certification."); *Shajfer v. Cont'l Cas. Co.*, 2007 U.S. Dist. LEXIS 96189, at *15 (C.D. Cal. Jan. 26, 2007) ("Court is not convinced that issues of damages or affirmative defenses preclude class certification"). In any event, evidence tending to prove or disprove Apple's purported business justifications likewise will be common to all Class members.

### d. Common Evidence Will Prove Causal Antitrust Impact

"Antitrust 'impact'—also referred to as antitrust injury—is the 'fact of damage' that results

-19-

from a violation of the antitrust laws." *DRAM*, 2006 U.S. Dist. LEXIS 39841, at *40. "It is the causal link between the antitrust violation and the damages sought by plaintiffs." *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 19 n.18 (1st Cir. 2008) (citing *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1103 (1st Cir. 1994)). Thus, Plaintiffs here "must be able to establish, predominantly with generalized evidence, that all (or nearly all) members of the class suffered damage as a result of [Apple's] alleged anti-competitive conduct." *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 567 (N.D. Cal. 2013) ("*High-Tech I*") (quoting *In re TFT-LCD*, 267 F.R.D. at 311).

To demonstrate antitrust injury at trial, Plaintiffs need only show some damage suffered because of the alleged anticompetitive behavior. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969) ("burden of proving the fact of damage . . . is satisfied by . . . proof of *some* damage flowing from the unlawful [conduct]; inquiry beyond this minimum point goes only to the amount and not the fact of damage"). At the class certification stage, Plaintiffs "need only advance a plausible methodology to demonstrate that antitrust injury can be proven on a class-wide basis." *DRAM*, 2006 U.S. Dist. LEXIS 39841, at *45. Antitrust injury "flows from that which makes defendants' acts unlawful." *Blue Shield of Va. v. McCready*, 457 U.S. 465, 484 (1982). Proof of such antitrust impact can be "made on a common basis so long as the common proof adequately demonstrates some damage to each individual." *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 454 (3rd Cir. 1977). Antitrust "[i]mpact is a distinct element of liability, independent of proof of a violation and independent of the matter of individual damages." *Glictronix Corp. v. Am. Tel. & Tel. Co.*, 603 F. Supp. 552, 588 (D.N.J. 1984).

Plaintiffs typically establish antitrust injury or impact for class certification through expert testimony that generally accepted economic methodologies are available to demonstrate such impact and to reasonably calculate damages on a class-wide basis. *See e.g.*, *Live Concert*, 247 F.R.D. at 144; *DRAM*, 2006 U.S. Dist. LEXIS 39841, at *44-45; *Bafus v. Aspen Realty, Inc.*, 236 F.R.D. 652, 658 (D. Idaho 2008) (expert declaration described what appeared to the court to be a viable method for determining economic effect on a class basis). Plaintiffs have submitted the

PLTFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEM. OF Ps & As
Case No. 11-cv-06714-YGR

Expert Report of Dr. Daniel L. McFadden in support of their motion for class certification.[13]  *See* Byrd Decl., Ex. K. Prof. McFadden has conducted a sophisticated, two-step analysis, first estimating Apple's but-for commission structure and then estimating the effect of Apple's but-for commission on the prices for apps and IAP in the BFW. To conduct that analysis, Prof. McFadden used a combination of multivariable regression model (estimating consumer demand) and a structural model (using profit maximization conditions to estimate developer costs and but-for prices). The two-step analysis and the econometric methodology as applied by Prof. McFadden are widely accepted by economists to determine and measure the effects of anticompetitive conduct on market prices. Prof. McFadden's work on the data he has received to date establishes that the analysis and methodology satisfactorily determine and measure by common means the effect of Apple's anticompetitive conduct on app and IAP prices.

Whether consumers paid to subscribe to music streaming services or purchased 100 virtual tokens in a game app, their transactions were subject to higher prices because of Apple's App Store supra-competitive commissions, as a result of which app developers inflated the price of apps and IAPs above a competitive level. *Id.*, ¶ 131. App Store commissions increased app developers' effective operating costs, and app developers set higher prices to offset some of the increased cost. Prof. McFadden's methodologies and conclusions are fully consistent with Plaintiffs' aftermarket antitrust theory and with the Supreme Court's decision in *Pepper*. This evidence of antitrust impact will be common to all members of the Class and will predominate over any individualized issues.

<div align="center">

**e.**    **The Damages Will Be Estimated Using a Common Method**

</div>

Once antitrust injury is established, the overall burden of proving damages is eased significantly under Section 2 of the Sherman Act. *See Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 836 (9th Cir. 1982); *DRAM*, 2006 U.S. Dist. LEXIS 39841, at *48. Individual damages issues are thus generally no bar to certification of antitrust claims. *See Live Concert*, 247 F.R.D. at 133-34; *Rubber Chems.*, 232 F.R.D. at 354; *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir.

---

[13]Among his many qualifications, Prof. McFadden is the E. Morris Cox Professor Emeritus of Economics at the University of California at Berkeley and Nobel Laureate in Economics for his work on discrete choice modeling. *See* Byrd Decl., Ex. K, ¶ 1, 2.

<div align="center">

-21-

</div>

2013) (plaintiffs need only propose a valid method for calculating class-wide damages, not an actual calculation of damages); *see generally* NEWBERG, §18:27.

Here again, the quantification of damages reinforces predominance because Plaintiffs will calculate damages on a class-wide basis, based upon one or more well-established and reliable damages methodologies. *See, e.g., Little Caesar Enters. Inc. v. Smith*, 172 F.R.D. 236, 267 (E.D. Mich. 1996); *DRAM*, 2006 U.S. Dist. LEXIS 39841, at *48-50. In this case, Plaintiffs will establish damages for all iOS apps customers pursuant to a common methodology, which Prof. McFadden has formulated.

*First*, Prof. McFadden investigated what app store commission rates Apple would have charged in a competitive but-for world ("BFW"). But for Apple's anticompetitive conduct, there would have been non-Apple iOS app stores, against which Apple's App Store would have had to compete to sell apps and IAP to iOS device consumers; as a result, Apple would have charged lower, competitive commission rates. Prof. McFadden has determined that the BFW commission rate would have ranged from 10% to 12%. Prof. McFadden based this range on various benchmark analyses he performed as well as his analysis of Apple's App Store profit margin. Byrd Decl., Ex. K, ¶ 136.

*Second*, based upon Apple's transactional data (through September 30, 2019), data produced by App Annie, an app market analytics firm, and app developers' cost data produced in discovery to date, Prof. McFadden estimated a model of consumer demand and app developer costs to calibrate app and in-app content prices in the competitive BFW. This model consists of (1) consumer demand for apps and IAP, (2) app developers' cost of supplying apps and in-app content, *i.e.*, app developers' supply function, and (3) app developers' pricing decisions. Prof. McFadden estimated this model of demand and supply, given Apple's real world app store commissions, and then used the estimate to calibrate the app and in-app content prices that iOS device consumers would have paid if Apple had charged competitive commissions. *Id.*, ¶¶ 137, 138.

Courts repeatedly have acknowledged similar methodologies as accepted means of calculating class-wide damages in antitrust cases. Multiple regression analysis of the kind Prof.

-22-

McFadden used here is commonly used at class certification. *See* Federal Judicial Center, *Reference Manual on Scientific Evidence*, at 260 (3rd ed. 2011), available at https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf; *see also, e.g., In re TFT-LCD Antitrust Litig.*, 267 F.R.D. 583, 606 (N.D. Cal. 2010) ("courts have accepted multiple regression analyses as means of proving antitrust injury and damages on a class-wide basis"); *High-Tech II*, 985 F. Supp. 2d at 1212; *In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 371-73 (C.D. Cal. 2011); *In re Capacitors Antitrust Litig. (No. III)*, 2018 U.S. Dist. LEXIS 195310, *56 (N.D. Cal. Nov. 14, 2018); *In re Korean Ramen Antitrust Litig.*, 2017 U.S. Dist. LEXIS 7756, *33-37 (N.D. Cal. Jan. 19, 2017). Moreover, use of a structural model, as Prof. McFadden has done, is also an accepted methodology. *See, e.g., In re Static Random Access Memory Antitrust Litig.*, 264 F.R.D. 603, 615 (N.D. Cal. 2009) (structural model was a "plausible methodolog[y] … to demonstrate class-wide injury"); *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 2019 U.S. Dist. LEXIS 169446, at *13-15 (N.D. Cal. Sep. 20, 2019). Finally, use of a benchmark is "a generally accepted methodology for proving antitrust impact and damages." *In re Blood Reagents Antitrust Litig.*, 2015 U.S. Dist. LEXIS 141909, at *29 n.9 (E.D. Pa. Oct. 19, 2015); *see also Johnson v. Ariz. Hosp. & Healthcare Ass'n*, 2009 U.S. Dist. LEXIS 122807, at *38 (D. Ariz. July 14, 2009).

Apple may challenge Prof. McFadden's application of these accepted methodologies for calculating class-wide damages, but this is not the time or place to resolve any battle of experts. "It is not necessary that plaintiffs show that their expert's methods will work with certainty at this time. Rather, plaintiffs' burden is to present the court with a likely method for determining class damages." *Tableware*, 241 F.R.D. at 652; *Live Concert*, 247 F.R.D. at 110 ("district court is not permitted to discount the testimony of a plaintiff expert merely because the defendant has challenged some aspect of the expert's opinion"). Prof. McFadden's damages model is consistent with Plaintiffs' theory — and the Supreme Court's view – of the case. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("'plaintiff's damages case must be consistent with its liability case'") (citation omitted); *Pepper*, 139 S. Ct. at 1518.

-23-

### 2.     Superiority

Superiority under Rule 23(b)(3) is demonstrated where "classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Apple cannot seriously question the superiority of the class mechanism in resolving the antitrust claims asserted against it here. Litigating the monopolization and attempted monopolization claims of each iOS Device customer on an individual basis, even if it were practically feasible, is plainly not the preferable alternative. *See, e.g., High-Tech II*, 985 F. Supp. 2d at 1228 (class action superior where "Plaintiffs case rises and falls with their common evidence"); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 1994 U.S. Dist. LEXIS 12652, at *9-10 (N.D. Cal. Aug. 31 1994) (finding class action superior method because, "[d]espite the complexity of determining individual damages, other methods of adjudicating this controversy would appear to be even more complex and less efficient."); *Live Concert*, 247 F.R.D. at 148 (class mechanism clearly superior way to resolve antitrust claims, even if individualized damages analysis assumed to be required); *DRAM*, 2006 U.S. Dist. LEXIS 39841, at *51 ("unnecessarily duplicative, and judicially inefficient, for the court to mandate individual trials as to each class member").

Indeed, class certification is nothing less than essential if the private antitrust enforcement mechanism is to function at all. As the court held in *Tableware*: "The modest amount at stake for individual plaintiffs . . . renders individual prosecution impractical; class treatment not only promotes judicial economy, it represents plaintiffs['] only chance for adjudication." *Id.*, 241 F.R.D. at 652 (citing *Amchem*, 521 U.S. at 616). A class action is the superior means of resolving cases such as this, where individual claims are too small to be litigated individually but which involve large damages in the aggregate. *See Id.,* at 617. In *iTunes*, this Court certified an antitrust class action that "involves potentially millions of class members," where individual recoveries "would likely be no more than several hundred dollars," finding that "there would be little incentive for an individual iPod purchaser to take on a factually complex antitrust case such as this one." *Id.*, 2008 U.S. Dist. LEXIS 107127, at *23. The Court's analysis applies with identical force to this case as well.

PLTFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEM. OF Ps & As
Case No. 11-cv-06714-YGR

**SER-951**

### D.     Appointment of Class Counsel

The Court should appoint Wolf Haldenstein and Kellogg Hansen as Co-Class Counsel. Rule 23 requires the Court to appoint counsel to represent the interests of the Class. *See* FRCP 23(g)(1); *Rubber Chems.*, 232 F.R.D. at 355. For the reasons stated above in connection with the adequacy requirements of Rule 23(a) (4), and Wolf Haldenstein has demonstrated thus far in its role as Interim Class Counsel in this litigation, Wolf Haldenstein has served as lead counsel throughout this litigation and undoubtedly is "well equipped" to vigorously represent the proposed Class. *See* Byrd Decl., Ex PP. Moreover, Kellogg Hansen is a preeminent law firm representing both plaintiffs and defendants in complex trial and appellate matters. With more than 90 attorneys, Kellogg Hansen boasts an extensive record of success before the Supreme Court and in Courts of Appeals and District Courts throughout the United States. *See* Byrd Decl., Ex. QQ. Kellogg Hansen successfully briefed and argued the appeal before the Supreme Court in *Pepper*. The Court should accordingly appoint Wolf Haldenstein and Kellogg Hansen as Co-Class Counsel.

## V.     CONCLUSION

Accordingly, this case easily meets all the requirements of Rules 23(a) and 23(b)(3) for class certification. Plaintiffs therefore request that the Court grant their motion to certify the class action, to appoint Plaintiffs as Class Representatives, and to appoint Wolf Haldenstein and Kellogg Hansen as Co-Class Counsel.

DATED: June 1, 2021

**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**

By:     */s/ Rachele R. Byrd*
            RACHELE R. BYRD

BETSY C. MANIFOLD
RACHELE R. BYRD
BRITTANY N. DEJONG
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
dejong@whafh.com

MARK C. RIFKIN

-25-

**SER-952**

MATTHEW M. GUINEY
**WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP**
270 Madison Ave
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
rifkin@whafh.com
guiney@whafh.com

*Interim Class Counsel and Proposed Co-Class
Counsel*

DAVID C. FREDERICK (*pro hac vice*)
AARON M. PANNER
MINSUK HAN
**KELLOGG, HANSEN, TODD, FIGEL &
 FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C.  20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
dfrederick@kellogghansen.com
apanner@kellogghansen.com
mhan@kellogghansen.com

*Counsel for Plaintiffs and Proposed
Co-Class Counsel*

272950v13

-26-

# Exhibit 20

SER-954

THEODORE J. BOUTROUS JR., SBN 132099
 tboutrous@gibsondunn.com
RICHARD J. DOREN, SBN 124666
 rdoren@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
 dswanson@gibsondunn.com
JAY P. SRINIVASAN, SBN 181471
 jsrinivasan@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

VERONICA S. MOYÉ (Texas Bar No.
24000092; *pro hac vice*)
 vmoye@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900

MARK A. PERRY, SBN 212532
 mperry@gibsondunn.com
CYNTHIA E. RICHMAN (D.C. Bar No.
492089; *pro hac vice*)
 crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

ETHAN DETTMER, SBN 196046
 edettmer@gibsondunn.com
RACHEL BRASS, SBN 219301
 rbrass@gibsondunn.com
CAELI A. HIGNEY, SBN 268644
 chigney@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105
Telephone: 415.393.8200
Facsimile: 415.393.8306

*Attorneys for Defendant Apple Inc.*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re Apple iPhone Antitrust Litigation | CASE NO.  4:11-cv-06714-YGR<br><br>**SUPPLEMENTAL DECLARATION OF MARK ROLLINS IN SUPPORT OF APPLE INC.'S *DAUBERT* MOTION TO EXCLUDE REPLY TESTIMONY OF PROFESSOR DANIEL L. MCFADDEN**<br><br>The Honorable Yvonne Gonzalez Rogers<br><br>Date:  Dec. 14, 2021<br>Time:  10:00 a.m.<br>Courtroom:  1, 4th Floor |

Pursuant to Civil Local Rule 7-5, I, Mark Rollins, declare as follows:

1.      I am employed as a Finance Manager at Apple Inc. ("Apple") and, among other duties, work with the teams of engineers responsible for all of Apple's identity and access management.

2.      I submitted a declaration dated August 10, 2021 in support of Defendant Apple Inc.'s *Daubert* Motions and Oppositions to Class Certification, and I submit this supplemental declaration in support of Apple's *Daubert* Motion to Exclude Reply Testimony of Professor Daniel L. McFadden.  I have personal knowledge of the facts stated below and, if called as a witness, I could and would testify competently thereto.

3.      As I explained in my prior declaration, people or entities use and make purchases on the App Store through "Apple IDs," which are unique, password-protected accounts.  People or entities can obtain multiple Apple IDs to use the App Store—for example, using different email addresses.

4.      Apple can locate the purchase history for a single Apple ID, like the report I included as **Exhibit 1** to my prior declaration, but only by running a manual search for that Apple ID in a specific software tool.  Such purchase history information may include a name, billing address, email address, payment types, and last four digits of a credit card for a given Apple ID.

5.      Apple can only pull the purchase history reports described in Paragraph 4 one-at-a-time. That is, an individual employee at Apple must manually type an Apple ID into the software tool Apple uses to search for payment information associated with that Apple ID, and then the tool displays a purchase history report for that single Apple ID; the tool cannot be used to pull information for several Apple ID queries at once.

6.      I understand Plaintiffs' expert in this litigation has proposed that Apple could use the type of information contained in the purchase history report attached as **Exhibit 1** to my previous declaration to confirm whether certain information (i.e., email addresses, billing addresses, names) match across different Apple IDs in order to link multiple Apple IDs to a single individual.  But the only way to identify instances of overlap in such data between different Apple IDs is for an employee to run manual searches (i.e., for a certain name, Apple ID, email address, physical address, payment method, and/or telephone number) in certain software tools—including the tool I describe in Paragraph 4—and then attempt to try to compare or match the information that is returned.  Due to the way in

which data are stored at Apple, there is no automated process at Apple that could be used to filter, link, or otherwise identify potentially related accounts using this type of information aside from individual, manual searches.

7.      Further, if a search for a particular piece of information—like a search for the name "Daniel McFadden"—turned up 20 "hits" when queried in Apple's systems, an individual Apple employee would likely have to spend considerable time comparing addresses or other potentially correlating information to ascertain whether those 20 Apple IDs may belong to the same person—not to mention attempting to ascertain whether, for example, "Dan McFadden" and "Daniel McFadden" were the same user.

8.      I understand, for example, that an Apple employee ran a manual search for the name of one of the named Plaintiffs, "Edward Hayter," in one of Apple's software tools in connection with this litigation in or around July 2019.  That search returned 12 "hits" in the United States, which included entries for ▓▓ "Edward Hayter"'s with address information in ▓▓▓▓▓▓ with an address in ▓▓▓▓▓ with an address in ▓▓▓▓▓ with an address in ▓▓▓▓▓▓▓▓▓), and ▓▓ with ▓▓▓▓▓▓▓  The search results also included, for example,  a ▓▓ ▓▓▓▓▓ and, separately, a ▓▓▓▓▓▓ Apple ID.

9.      Further, as I have previously explained, even if Apple identifies potential overlapping information associated with more than one Apple ID, Apple otherwise does not and cannot independently and accurately identify or validate names, email addresses, billing addresses, payment methods, or phone numbers across Apple IDs to establish that certain Apple IDs do or do not belong to the same person or entity.  That is, for example, even if a manual search located multiple Apple IDs associated with the same billing information or name, Apple has no way to accurately verify or confirm that those Apple IDs actually belong to the same individual as opposed to different individuals using the same credit card or with the same name—for example, a father and son who share both a first and last name and potentially a credit card.  This is true for *every single* Apple ID account, which is what I meant when I said "each or every" in my prior declaration.

10.      I understand, for example, that the named Plaintiff Edward Lawrence identified in a deposition in this case ▓▓ different Apple IDs he uses or has used in the past:

Gibson Dunn &
Crutcher LLP

SUPPL. DEC. ISO APPLE'S DAUBERT OF MCFADDEN        CASE NO. 4:11-cv-06714-YGR
- 2 -
**SER-957**

████████████████████      ████████████████      ████████████████████

████████████████████████████████ SER-958 █████

11.    In connection with this litigation, in or around April 2020, Apple manually ran a purchase history queries for the Apple IDs Mr. Lawrence identified as belonging to him. As reflected on those reports, for the Apple ID ███████████████ the name associated with the purchase history was ██████████ the billing address the user submitted, as reflected on that report, was ████████████████████████████ the credit card number ended in ██████ and was a ████ card, and the phone number was entered as ████████████.   *See* **Exhibit 2**.   For ████████████████████ the billing address was ████████████████████████ the credit card ended in ██████ and was a ████ card, and the phone number was ████████████.   *See* **Exhibit 3**. And for ████████████████████ the billing address was ████████████████████████████████ the credit card number ended in ██████ and was a ████ and two phone numbers were listed as ████ ██████ and ████████████   *See* **Exhibit 4**.

12.    As reflected in the purchase history data for Mr. Lawrence, there is variation in the information across his accounts—while the ██████████ and ████████████ Apple IDs share the same credit card number/type, they do not share the same phone number; while the ████████████ Apple ID shares one phone number each with ██████████ and ████████████ it does not share a credit card number with either.  And ██████████ and ████████████—while they share a billing address—could be housemates, parent/child, or the same person.

13.    Consistent with the process I explain in Paragraphs 4 and 5 above, in order to pull the information in the purchase histories for Mr. Lawrence, Apple had to run individual searches for each individual Apple ID in a specific software tool.  And in order to try to verify that all of these accounts actually belong to the same individual—particularly given the differing account information—only Mr. Lawrence himself could confirm his Apple IDs, as I understand he testified to during his deposition.

14.    Because Apple does not have an automated, non-manual way to identify potential overlap across all Apple IDs, Apple also cannot provide a reasonable estimate of the number of Apple IDs that contain overlapping information (such that they may belong to the same individual), or the

number of IDs in similar situations to Mr. Lawrence's—that is, where some data matches between two (or more) Apple IDs, but other data does not.

15.     While I understand that Plaintiffs assert that matching email addresses using names and physical addresses "might well match with ninety or ninety-five percent confidence on all the accounts opened by a particular consumer," I have no reason to believe this could be the case.  In fact, the examples I reviewed in Paragraphs 8 and 10-12 above for two of the named Plaintiffs, Edward Lawrence and Edward Hayter, indicate that such matching is highly unlikely to identify associated accounts with such precision:  I understand that there are five named Plaintiffs in this case, meaning that at least 2/5—or 40%—may not be matched using Apple's information with confidence.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 30, 2021 at Cupertino, California.

By:  _____
    Mark Rollins