No. 25-7930

---

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

IN RE APPLE IPHONE ANTITRUST LITIGATION

---

ROBERT PEPPER; EDWARD LAWRENCE; STEPHEN H. SCHWARTZ,

*Plaintiffs-Appellants*,

v.

APPLE INC.,

*Defendant-Appellee.*

---

On Appeal from the U.S. District Court
for the Northern District of California
Case No. 4:11-cv-6714 | Hon. Yvonne Gonzalez Rogers

---

### SUPPLEMENTAL EXCERPTS OF RECORD

### VOLUME 5 OF 12 (SER-960–SER-1242)

---

Cynthia E. Richman
Harry R. S. Phillips
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
(202) 955-8500

Caeli A. Higney
Julian W. Kleinbrodt
Eli M. Lazarus
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Ctr., Ste. 2600
San Francisco, CA 94111
(415) 393-8200

Theodore J. Boutrous Jr.
Daniel G. Swanson
Blaine H. Evanson
Bradley J. Hamburger
Matt Aidan Getz
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

*Counsel for Appellee Apple Inc.*

Case 25-7980, 08/12/2026, 42615641, Page 1 of 283

# Exhibit 16

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

IN RE APPLE IPHONE

ANTITUST LITIGATION,                    Case No. 11-cv-06714

_____          YGR (TSH)

DONALD R. CAMERON, et al.,

    Plaintiffs,

        vs.                             Case No. 19-cv-03074

                                         YGR (TSH)

Apple Inc.,

    Defendant.

_____

ZOOM DEPOSITION OF DANIEL McFADDEN, Ph.D.

(Reported Remotely via Video & Web Videoconference)

Berkeley, California (Deponent's location)

Tuesday, August 3, 2021

Volume I

STENOGRAPHICALLY REPORTED BY:

REBECCA L. ROMANO, RPR, CSR, CCR

California CSR No. 12546

Nevada CCR No. 827

Oregon CSR No. 20-0466

Washington CCR No. 3491

JOB NO. 4737818

PAGES 1 - 249

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION


IN RE APPLE IPHONE

ANTITUST LITIGATION,                Case No. 11-cv-06714

_____     YGR (TSH)

DONALD R. CAMERON, et al.,

    Plaintiffs,

       vs.                          Case No. 19-cv-03074

                                  YGR (TSH)

Apple Inc.,

    Defendant.

_____



ZOOM DEPOSITION OF

DANIEL McFADDEN, Ph.D., taken on behalf of the

Defendant, with the deponent located in Berkeley,

California, commencing at 9:05 a.m., Tuesday,

August 3, 2021, remotely reported via Video & Web

videoconference before REBECCA L. ROMANO, a

Registered Professional Reporter, Certified

Shorthand Reporter, Certified Court Reporter.

**SER-963**

APPEARANCES OF COUNSEL

(All parties appearing via Web videoconference)


For the Developer Plaintiffs:

    HAGENS BERMAN SOBOL SHAPIRO LLP

    BY:  TED WOJCIK

    Attorney at Law

    1301 Second Avenue

    Suite 2000

    Seattle, Washington 98101

    (206) 623-7292

    tedw@hbsslaw.com


For the Consumer Plaintiffs:

    WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

    BY:  THOMAS H. BURT

    Attorney at Law

    270 Madison Avenue

    New York, New York 10016

    (212) 545-4600

    burt@whafh.com




/////

Veritext Legal Solutions
866 299-5127

SER-964

APPEARANCES OF COUNSEL(cont'd)

(All parties appearing via Web videoconference)


For the Defendant:

    GIBSON, DUNN & CRUTCHER LLP

    BY:  DANIEL G. SWANSON

    Attorney at Law

    333 South Grand Avenue

    Los Angeles, California 90071-3197

    (213) 229-7430

    dswanson@gibsondunn.com


For the Defendant:

    GIBSON, DUNN & CRUTCHER LLP

    BY:  HARRY R. S. PHILLIPS

    Attorney at Law

    1050 Connecticut Avenue, N.W.

    Washington, DC 20036-5306

    (202) 887-3706

    hphillips2@gibsondunn.com


/////

Veritext Legal Solutions
866 299-5127

**SER-965**

APPEARANCES(cont'd)

(All parties appearing via Web videoconference)


ALSO PRESENT:

      Nathaniel Hipsman, Cornerstone Research

      Jonathan Manuel, Videographer

      Scott B. Murray, Director, Commercial
Litigation at Apple

      Matt Riesdorph, Concierge Technician

      Dr. Samuel Weglein, Analysis Group

      Dr. Kristof Zetenyi, Analysis Group


/////

Veritext Legal Solutions
866 299-5127

**SER-966**

INDEX

DEPONENT                                              EXAMINATION

DANIEL MCFADDEN, PH.D.                                      PAGE

VOLUME I

                    BY MR. SWANSON                          9

                    BY MR. WOJCIK                         242

E X H I B I T S

NUMBER                                                      PAGE

                    DESCRIPTION

Exhibit 37    Expert Report of Daniel L.                    16

              McFadden in Support of

              Plaintiffs' Motion for Class

              Certification.

/////

Page 6

**SER-967**

Berkeley, California; Tuesday August 3, 2021

9:05 a.m.

---o0o---

THE VIDEOGRAPHER: Good morning. We are now going on the record at 9:05 a.m. on August 3rd, 2021.

This is the Media Unit 1 of the video-recorded deposition of Daniel McFadden in the matter of In Re Apple iPhone Antitrust Litigation, filed in the United States District Court, Northern District of California. This is Case No. 4:11-cv-06714-YGR.

This deposition is being held via Zoom technology.

My name is Jonathan Manuel, from the firm Veritext Legal Solutions, and I am the videographer. The court reporter is Rebecca Romano, from the firm Veritext Legal Solutions.

Counsel and all present in the room and everyone attending remotely will now state their appearances and affiliations for the record. If there any objections to proceeding, please state them at the time of your appearance, beginning with

Page 7

the noticing attorney.                                    09:06:23

        MR. SWANSON:  Dan Swanson of Gibson Dunn,

representing Apple Inc.

        MR. BURT:  Thomas H. Burt,

Wolf Haldenstein Adler Freeman & Herz LLP, for           09:06:34

Consumer Plaintiffs.

        MR. WOJCIK:  This is Ted Wojcik,

Hagens Berman Sobol Shapiro, for the Developer

Plaintiffs.

        MR. PHILLIPS:  This is Harry Phillips,          09:06:48

Gibson Dunn, for Apple.  And we also have with us

Scott Murray of commercial litigation at Apple.

        THE VIDEOGRAPHER:  Okay.  Will the

court reporter please swear the witness.

        THE COURT REPORTER:  Professor, if you          09:07:04

could raise your right hand for me, please.

        THE DEPONENT:  (Complies.)

        THE COURT REPORTER:  You do solemnly

state, under penalty of perjury, that the testimony

you are about to give in this deposition shall be       09:07:04

the truth, the whole truth and nothing but the

truth?

        THE DEPONENT:  I do.


/////                                                    09:07:19

Page 8

**SER-969**

DANIEL McFADDEN, Ph.D.,                    12:22:22

having been administered an oath, was examined and

testified as follows:

                    EXAMINATION                    12:22:22

BY MR. SWANSON:

    Q.    All right.  Good morning,

Professor McFadden.  As you heard, I'm Dan Swanson.

I'll be asking the questions today for Apple.  It's

nice to meet you.                                  09:07:28

        Could -- could you please state your full

name for the record.

    A.    Daniel McFadden.

    Q.    And what is your business address?

    A.    I'm emeritus at the University of         09:07:39

California, Berkeley.  I still receive mail there,

and my home address is ███████████████████

█████████████.

    Q.    All right.  Thank you.

        Professor, have you had your deposition    09:07:52

taken before?

    A.    I have.

    Q.    Have you done a virtual deposition like

this before?

    A.    Yes.                                      09:08:01

Page 9

SER-970

Q.   Okay.  So you are familiar with the procedures such as they are?

A.   I'm learning, yes.

Q.   Okay.  If at any point today you would like to take a break, please let us know and we'll be happy to do that.

Is there -- is there any reason why the deposition can't go forward today?

A.   No.

Q.   All right.  Terrific.

Professor, do you consider yourself to be an expert in antitrust economics?

A.   It's certainly one of the areas that I've worked on for many decades.

Q.   Okay.  And what do you consider to be authoritative books or other texts in the area of antitrust economics?

A.   Well, I started out with Areeda-Turner, and I still go back to that very useful source.

Q.   Any others?

A.   Well, there are industrial organization textbooks which are, you know, on -- in my library and which I consult when I need to.

Q.   And which -- which ones do you consult when you are looking -- looking to see the

Veritext Legal Solutions
866 299-5127

SER-971

authoritative writings on antitrust economics?

MR. BURT: Objection. Form.

THE DEPONENT: I would say that I don't normally opine on issue -- issues of antitrust law so that -- my references are primarily the economics industry. And for that, Jean Tirole's book is one that I often refer to. Shearer's book I sometimes use. I sometimes use the Perloff book.

Q. (By Mr. Swanson) All right. Thank you.

Have you -- have you authored any books or articles on the subject of antitrust economics?

A. Not -- not in the narrow sense of the use of that term, no. I've -- I have written more generally on microeconomics, and that deals with -- with markets and the organization of markets, but books, no.

Q. To your knowledge, has a Court ever excluded any of your opinions before?

A. In 1980, I was voir dired out of a antitrust case in which the issue was refusal to deal with potential rivals.

Q. And were you, in that case, engaged by the defendant or the plaintiff?

A. I was engaged by the plaintiff.

Q. Do you recall what the title of that case

09:09:19
09:09:36
09:10:04
09:10:24
09:10:48
09:11:08

Page 11

was?

A. It involved tugboat operations on the Pacific Coast. I don't recall the exact title.

Q. Was it the Murphy Tugboat case?

A. I don't think so. That -- that -- the name is not familiar to me in any case.

Q. Okay. All right. Just taking a stab.

To your knowledge, has a Court ever expressed disagreement with any of your opinions, setting aside the instance of exclusion?

A. Well, I am not sure how to answer the question. Certainly in the -- in the tugboat case, the judge ruled that my -- my theory of the case was beyond the current meaning of antitrust law.

By the way, that -- that theory was the theory adopted by the DOJ in the Microsoft case, so I was simply 20 years too early.

Q. Timing is everything.

Your billing rate is $1100 an hour; is that right?

A. That's correct.

Q. Do you have an estimate on how many hours you have spent on the case so far?

A. I don't have any -- I don't have a close estimate. It's been a few weeks.

Page 12

Q. Okay. You note in your report that you are a principal of The Brattle Group and that several Brattle colleagues have helped you in this matter; is that correct? 09:12:35

A. That is correct. 09:12:48

Q. Which Brattle colleagues have assisted you with respect to your work in this case?

A. Primarily Minjae Song. He's been my contact person, and he is the one who is -- supervise remaining members of the team. 09:13:05

Q. And that's Minjae Song, S-O-N-G?

A. Correct.

Q. Okay. And who are the other members of the team?

A. I -- I don't have a list in front of me, and I -- I can't recall all the names. There's a -- a dozen or so people that have worked with the -- this team. 09:13:21

Q. And what has Minjae Song done in this matter to assist you? 09:13:39

A. Oh, he and I work collaboratively throughout the whole process of preparing my report, and he has supervised the work of his associates.

Q. Okay. Are you aware that another Brattle 09:13:52

Page 13

SER-974

employee, Michael Cragg, had a role in the Epic case? 09:14:00

A. I am somewhat aware of that. I'm -- I'm aware that -- of it, but I don't know any details.

Q. And I take it he did not assist you with respect to your work in this case? 09:14:16

A. That is correct.

Q. And are you compensated by The Brattle Group for your work in this matter?

A. Yes. 09:14:27

Q. Does The Brattle Group take a percentage of your billings in this matter?

A. They do not.

Q. Do you know how much Brattle has billed the plaintiffs so far in this case? 09:14:40

A. No, I do not.

Q. Do you have a -- a rough estimate?

A. I have no idea.

Q. Okay. Have you had any communications with any governmental agency or regulator, whether 09:14:58 in the U.S. or outside the U.S., about Apple or about app stores?

A. No, I have not.

Q. When were you engaged by the plaintiffs in this case? 09:15:15

Page 14

**SER-975**

A.    Last December.                                      09:15:16

Q.    And who, in particular, retained you?

A.    I was contacted by the president of Brattle, David Sunding, to ask if I would be interested in working on it.                                09:15:31

Q.    And have you worked with counsel for the Consumer Plaintiffs?

A.    I have worked with -- with the Brattle team, and -- and -- but my contact with counsel has been through the team -- with Mr. Burt.        09:15:48

Q.    Okay.  Have you reviewed the operative version of the consumers' complaint in this case?

A.    I read it initially back in December, and I haven't reread it recently.

Q.    What is your general understanding of the     09:16:11
nature of Plaintiffs' challenge to Apple's conduct?

A.    My -- my understanding that -- of the complaint, it alleges that Apple has monopolized the aftermarket for apps operating on the iOS     09:16:31
operating system and has utilized that monopolization to over- -- overcharge consumers for apps.

Q.    I understand -- do you have a copy of your expert report there with you?                       09:16:54

Page 15

A.   I do.   I have it in both -- in paper and on a -- on a screen, the same document.

Q.   Okay.   Great.

We are going to officially mark it as an exhibit, which means we, I think, download it to -- through the Exhibit Share functionality, and it will be marked as -- I believe the next in order is Exhibit 37.

(Exhibit 37 was marked for identification by the court reporter and is attached hereto.)

MR. SWANSON:   Although, you can feel free to use the version that you have.   Hopefully they are identical, but let -- let's just get that up.

Q   (By Mr. Swanson)   All right.   Do you have the exhibit?

A.   I have it, and I'm clicking on the -- where I'm supposed to click, and so far it hasn't --

Q.   It may take a moment.   We just need you to verify that this is the proper -- proper document, once it shows up.

But while we are waiting, I'll just note for the record that the document is a document that is denominated "Expert Report of Daniel L. McFadden in Support of Plaintiffs' Motion for Class

Page 16

SER-977

Certification," dated June 1st, 2021.                    09:18:06

A.   I now have it.

Q.   Okay.  Is -- is that -- is that your expert report in this -- in this matter?

A.   One moment.  I have -- to control the      09:18:26 screen here for one second.

Yes, I've -- at least from the first few pages, it is identical to my own copy.

Q.   Okay.

A.   So, yes, it's the same document.          09:18:44

Q.   Good.  Thank you.

So if you wouldn't mind, turn to page 3, please, and I'm going to ask you a question about paragraph 9.  Let me know when you are there.

A.   I have that in front of me.  I'm going to   09:19:04 try to make this -- just a technical aside, I'm going to try to make this larger -- or I'm just going to use my copy, which isn't larger.  I think I will just use my copy --

Q.   That's fine.                               09:19:21

A.   -- which is a -- the print is larger --

Q.   Yeah.

A.   -- so I can read.

Q.   I agree.  I'm using a print copy myself, so I'm all in favor of that.                        09:19:27

Page 17

SER-978

A.   Yes, I have this in front of me.   09:19:30

Q.   Okay.  Paragraph 9 starts with the following:  "Consumer Plaintiffs allege that Apple monopolized the aftermarket by equipping iOS mobile devices with an operating system that   09:19:42 forecloses iOS device users from buying iOS applications from any source other than Apple and from paying for certain in-app purchases except to Apple, and thus forces iOS device users to pay Apple a 30 percent fee for buying iOS   09:19:59 applications and making those in-app purchases."

Do you see that?

A.   Yes.

Q.   Do you understand Consumer Plaintiffs to be challenging the design of Apple's iOS   09:20:11 operating system?

MR. BURT:  Objection.  Form.

THE DEPONENT:  That's not my understanding.  My understanding is the issue is that the operating system has implemented a   09:20:19 business policy of allowing purchase of iOS apps solely through the Apple distribution.

MR. SWANSON:  Okay.

THE DEPONENT:  The Apple Store.

Q    (By Mr. Swanson)  How is that business   09:20:39

Page 18

**SER-979**

Case 4:11-cv-06714-YGR Document 642-13 Filed 04/27/21 Page 20 of 248

policy implemented in the operating system, if you    09:20:41

have an understanding?

MR. BURT:  Objection.

THE DEPONENT:  I -- I don't -- I don't

have the technical understanding.  All I can say is    09:20:57

that the operating system is set up in such a way

that it is not easy or -- acceptable to Apple for

people to hack the operating system and install

apps that are not approved through the Apple Store.

Q.   (By Mr. Swanson)  Do you have an    09:21:27

understanding as to whether there are reasons,

other than what Consumer Plaintiffs allege is an

anticompetitive motive, for Apple to design its

operating systems so that it's not easily hacked?

MR. BURT:  Objection.    09:21:44

THE DEPONENT:  Yes.

Q.   (By Mr. Swanson)  And -- and what --

what -- what's your understanding?

A.   I understand that there are legitimate

concerns of -- of security and protection of the    09:21:54

proprietary system.

Q.   And you do understand that it is

proprietary, correct?

A.   Yes.

Q.   And you understand that the iOS    09:22:08

Page 19

operating system is protected by intellectual

property rights?

    A.  It -- as a general matter, yes.  I

don't -- I don't know specifically what -- what

those property rights are.

    Q.  But -- but you are not assuming, for

purposes of any of your opinions, that Apple lacks

intellectual property rights over its proprietary

software; is that correct?

    A.  It's correct that my -- my analysis does

not depend on Apple abrogating its property rights.

    Q.  The second sentence in paragraph 9, going

back to where we were -- or picking up where we

left off, is as follows:  "Consumer Plaintiffs also

allege that Apple controls what prices developers

can charge and," quote, "'exercises that control by

insisting that every paid app be paid in dollar

increments at $0.99, $1.99, $2.99, and so forth,'"

end quote.

      Do you see that?

    A.  Yes.

    Q.  Do you understand that Plaintiffs are

challenging this conduct as anticompetitive?

    A.  Yes, I understand that's an allegation in

the complaint.

Page 20

SER-981

Q. What -- what was your assignment -- or what is your assignment in this case?

A. My assignment was to determine whether there was a -- a basis for calculating a common effect of Apple conduct and its -- its application to the proposed -- to consumer class and whether there were formulaic methods for determining the degree of harm and the allocation of harm and the compensation for harm among the members of the class.

Q. And is that the assignment you carried out in your expert report?

A. That's certainly my intention, yes.

Q. And did you draft your expert report?

A. The report was prepared and collaboratively with -- with my team, and I was involved both in supervising structure and in drafting, but other members were also involved in drafting.

Q. Were there specific portions of the report that you drafted from the start?

A. No, I would say that it was a collaborative, back-and-forth effort throughout in which -- in terms of the report itself, language which proposed by me or by others and edited by me

09:23:37

09:23:56

09:24:18

09:24:35

09:24:53

09:25:18

Page 21

or suggested edits by me and others, and we went

back and forth on it.

Q. Okay. If you could flip to page 125 of your report, that is the section that's entitled "Appendix B Materials Relied Upon"?

A. I have now, yes.

Q. Okay. Does this appendix identify all the documents and information that you relied upon in connection with forming your opinions set forth in your report?

A. I -- I believe so. The -- this part of the report was prepared by my associates, and my instructions to them were to follow the attorneys' agreements on what should be included.

Q. On the first page of Exhibit B [sic] -- I guess that would be page 125 of the report -- you list a number of depositions. I count eight -- eight names there.

Do you see that upper half of the page?

A. Yes.

Q. Did you -- I don't see any names of any of the Epic witnesses from the Epic case.

Did you review any depositions of any Epic witnesses?

A. I believe that Dr. Evans is on the

09:25:23

09:25:40

09:26:00

09:26:26

09:26:48

09:27:07

Page 22

**SER-983**

list -- well -- well, not -- not a deposition. An 09:27:14

expert report. Referring specifically to the

depositions -- I'm sorry, repeat the question

about -- about it.

Q. Sure. 09:27:25

I was just wondering if you had reviewed

and relied upon any depositions of any Epic

witnesses; that's all.

A. I -- I believe I -- I believe rely upon

some statements from Timothy Cook. I don't know 09:27:46

whether they came from trial testimony or a

deposition. I'd have to go back and look.

Q. Okay. Have you reviewed the depositions

of any of the named Plaintiffs in this case?

A. Personally, I have not, and I don't know 09:28:11

whether my colleagues did.

Q. Okay. Do you know who the named

Plaintiffs are?

A. I saw their -- saw names at the top of

the complaint, but I did not attend to it. I don't 09:28:30

remember them.

Q. You mentioned a moment ago that you have

relied on the trial testimony of Tim -- Tim Cook.

MR. BURT: Objection.

Q. (By Mr. Swanson) Did you -- well, if 09:28:44

Page 23

**SER-984**

there's any question about that, did you rely on          09:28:47

trial testimony of Tim Cook?

    A.   In my report, there is one cite to his

statements, and I believe that probably came

from -- from trial testimony.  I don't even -- I am          09:29:04

not even sure what case, but it's -- it's a -- it's

a footnote in the report.

    Q.   Did you -- did you -- do you recall

relying on any trial testimony from the Epic case?

    A.   I would -- I would hesitate to say that          09:29:31

there was none, because some of my colleagues did

follow that case, but as -- as I recall and as I'm

aware, that was not used in the report.  I -- I --

I -- I prepared to be corrected if -- if I did, but

I don't recall it.          09:29:59

    Q.   Okay.  You mentioned an expert report by

Dr. Evans.

    Do you recall reviewing any of Dr. Evans'

written or oral trial testimony in the Epic case?

    A.   I definitely had conversations with my          09:30:19

colleagues about Dr. Evans' testimony, and they --

they summarized some of it to me -- I said

"testimony."  I mean his report -- and I took that

into -- I thought about that in preparing my

report.          09:30:45

Page 24

SER-985

Q.   And I know you cite the report of Dr. Evans dated February 16 of this year.

Did you review his subsequent report after that date?

A.   Again, I am not sure what my colleagues reviewed, but I -- I, personally, did not.

Q.   Have you had any communications with Dr. Evans about this case?

A.   No, I have not.

Q.   You also list an Appendix B, the rebuttal expert report of Francine Lafontaine.

Do you see that?

A.   Yes.

Q.   You understand she is -- or was testifying on behalf of Apple?

A.   That's correct.

Q.   Okay.  Have you reviewed any expert reports or trial testimony of any of the other Apple experts from the Epic case?

A.   I have not.  I'm -- I'm not aware, again, of my -- my colleagues might have looked at, but I don't know about.

Q.   Okay.  I take it you didn't interview any of the named Plaintiffs?

A.   That's correct.

09:30:45

09:31:04

09:31:24

09:31:39

09:31:56

09:32:11

Page 25

SER-986

Q. Did you interview anyone at all in connection with your work in this case?

A. No, I did not.

Q. Did counsel provide you with any assumptions that you relied on in forming your opinions?

A. I would say that I was assigned the -- the task of establishing that there was common evidence across the class, and the -- it would -- relayed to me by my team that it was important to pay attention to the commonality of the effects on the class and my report. I would say that's a primary instruction that I received.

Q. Professor, have you identified any errors, omissions, mistakes in your report since you submitted it?

A. No, I have not.

Q. Okay. Have you reviewed the report submitted by the Developer Plaintiffs' experts?

A. No. I have had summaries presented to me -- verbal summaries by some members of my team on selected points, but I have not reviewed the reports myself.

Q. Okay. Did anything in the summaries that you received cause you to reconsider any of your

Page 26

SER-987

opinions?                                                      09:34:00

A.   No.

Q.   Are you aware of anything in the summaries of the Developer Plaintiff expert reports that conflicts with or is in contention with the     09:34:14 opinions that you have offered?

MR. BURT:  Objection.

THE DEPONENT:  I -- I did not -- I am not aware of any conflicts.  I'm aware that there may be verbal usages which needed clarification between     09:34:27 the usages among the experts.

Q.   (By Mr. Swanson)  And which -- which verbal usages might need some clarification, in your view?

A.   There is -- there is some question as to     09:34:47 whether the Apple App Store is a -- a two-sided industry or a -- or a platform business, and I think those -- those terms have been used in ways which are not always meaning exactly the same thing and may not have been used in this -- exactly the     09:35:13 same way by myself and other experts.

Q.   Are you thinking of any particular opinion held, for example, by Professor Elhauge?

A.   It has been reported to me that Developers' experts -- and I think     09:35:39

Page 27

Mr. Economides -- Dr. Economides as well -- have described the Apple App Store as a -- as a platform business, and I -- I don't -- I don't use that term for the Apple App Store in my report, and we can discuss what the economic -- whether there's any economic difference in our -- our usages or meaning.

Q.   Okay.  Well, we'll -- we'll come back to that topic, then.

Did -- do -- did you or any of the staff working under your direction communicate with Professor Elhauge or Professor Economides prior to submitting your report?  I'm not asking -- I'm not asking for what you've communicated about, just whether -- whether there was any communication.

A.   I -- as far as I'm aware, there's been no communication.

Q.   Okay.  Aside from counsel and your staff at Brattle, have you discussed your opinions about the case with anyone?

A.   No, I have not.

Q.   Could you turn to paragraph 42 on page 21 of your report?

A.   Paragraph 44?  Was that the --

Q.   Paragraph 42.

09:35:42

09:36:07

09:36:26

09:36:44

09:37:02

09:37:51

Page 28

A.   42.   Okay.

I have that in front of me, yes.

Q.   Okay.   In paragraph 42, you state: "Common economic evidence supports the conclusion that there exists a relevant antitrust market for selling consumers iOS apps and in-app content, which are relevant products in this market."

You define, therefore, a relevant antitrust market for selling consumers iOS apps and in-app content; is that right?

A.   As I understand the question, the answer is:  Yes, I -- I -- it's my opinion that iOS apps are a relevant aftermarket.

Q.   And you regard consumers who have iOS mobile devices as the consumers in that market, correct?

A.   Correct.

Q.   And in your relevant market, Apple is a retailer that sells iOS apps and in-app content; is that right?

A.   Yes, I think that's my economic terminology for their activity.

Q.   Okay.   And in your relevant market, app developers are suppliers that manufacture apps and in-app content and supply them through Apple; is

Page 29

SER-990

that right?                                                  09:39:27

    A.   Yes.

    Q.   And your opinion is that the relevant
products in your relevant market are iOS apps and
in-app content; is that correct?                            09:39:41

    A.   Correct.

    Q.   In paragraph 41, which is -- starts on
the prior page, page 20, you state that "Defining
relevant markets allows for identification of
market participants..."                                     09:40:04

       Do you see that?

    A.   Yes.

    Q.   Okay.  Are consumers direct participants
in your relevant market?

    A.   Yes.                                         09:40:18

    Q.   Are developers direct participants in
your relevant market?

    A.   I would say yes.

    Q.   And how is it that developers are direct
participants in your relevant market?                       09:40:33

    A.   Well, this is -- this is a -- a market in
which developers sell to consumers through the
intermediary, which is the App Store, the retailer
and distributor.

    Q.   If developers sell through an             09:40:58

Page 30

SER-991

intermediary, are they direct participants in your relevant market?

A. In my -- in my view, the market is -- the market for iOS apps is -- is one with -- with two stages. There's a stage in which developers provide downloads of their apps to -- to the -- to the gateway provided by the App Store, and the second stage is the transfer of those downloads from the App Store to the -- to the consumer.

Q. Have you defined a relevant wholesale market in this case?

A. I have not specifically defined a -- a wholesale market, but using the terminology that I have used and -- and -- which is that the Apple Store is an intermediary retailer and distributor. The -- the relationship between the Apple Store and the developers is -- is a wholesale market relationship, and the relationship between the App Store and consumers is a retail market relationship, and those two markets are bound -- closely bound together.

Q. Are those markets, while closely bound together, nonetheless distinct?

A. I am not sure what -- what the -- you would mean by "distinct." For -- for what purposes

09:41:00

09:41:20

09:41:52

09:42:12

09:42:32

09:42:59

Page 31

are they distinct?  They clearly are distinct in          09:43:02

terms of who the -- who the actors are in each side

of this market.  Are they distinct in the point of

view of an economic analysis of -- of how this

market operates and how it would operate under          09:43:16

different conduct?  They -- they are not distinct.

They're -- they need to be treated together.

    Q.  Do they need to be treated together for

market definition purposes?

        MR. BURT:  Objection.  Form.          09:43:37

        THE DEPONENT:  I would say that it -- it

shouldn't matter for market definition purposes

whether -- whether they -- they are linked.  If you

talk about the -- the retail market -- and that's

tied to the wholesale market -- the -- the retail          09:44:03

market may be a -- a relevant market for antitrust

purposes, but the wholesale market may be

sufficiently closely tied to it so that you cannot

analyze the retail market for antitrust purposes

without also considering the impacts on the -- on          09:44:24

the wholesale side.

    Q.  (By Mr. Swanson)  And -- and is the

relevant market that you have defined the retail

market?

    A.  I would say it is the retail market,          09:44:42

Page 32

SER-993

but -- as -- essentially, we are continuing my          09:44:44

previous answer.  It is sufficiently closely linked

to the wholesale market; that, from an economic

point of view, these things have to be considered

together.  You cannot analyze the retail market in      09:44:59

isolation from the impact of the Apple Store

conduct on both sides.

Q.   Have -- have you defined a market that

includes both sides?

A.   I would say that my market definition              09:45:22

applies to both sides.

Q.   And can you tell me where you say that in

your report, that your market definition applies to

both sides?

MR. BURT:  Objection.  Form.                            09:45:37

THE DEPONENT:  Well, I don't say it in

the report, but the -- the -- the definition of the

market in my report does not distinguish sides

in -- in Apple Store operations.  It is simply --

it simply talks about the -- the market for iOS        09:45:59

apps, and -- and I think that is -- that is a

market -- it is a market in which is broken into

a -- a wholesale segment and a retail segment

divided by an intermediary distributor.

Q.   (By Mr. Swanson)  Is it your opinion             09:46:26

Page 33

SER-994

that, as a general matter, wholesale and retail  09:46:28

markets are tightly connected?

A. I don't -- they can -- they can be, and

in some cases they -- they are not.

I mean, certainly the traditional  09:46:44

textbook economic story is one in which a firm

might have a monopoly on one side of the market,

but they are not -- they -- they're treated as if

they are priced so that -- in that case, it's

sensible to talk about only -- only one side, but I  09:47:01

think in a -- if you go one step beyond the most

elementary textbook case and ask how an

intermediary firm with market power influences the

economic environment in which they operate, it's --

it's clear -- and the economics of it is clear --  09:47:24

is that it will have both upside and down --

upstream and downstream effects, and -- and those

effects would be linked, and the appropriate market

and the appropriate analysis is going to take into

account both the upstream and the downstream sides.  09:47:42

Q. Can you give me an example of another

pair of retail and wholesale markets that are

tightly integrated in the same sense?

A. Certainly -- certainly classic auction

markets, like eBay, have -- have that property.  09:48:04

Page 34

Stock -- stock markets have that property, without    09:48:15

such a close linkage because buyers and sellers

are -- are anonymous and numerous, but -- but those

are two examples.

Q.   Back to paragraph 42 of your report, you    09:48:31

state, in paragraph 42, that "Apple, as the

retailer, sets the App Store commission, which when

paid by developers leads to the determination of

the retail prices paid by consumers and the

wholesale prices received by developers."    09:48:50

Do you see that, the end of the

paragraph?

A.   Yes.

Q.   And then you have a footnote to that,

indicating that you explain how Apple's commission    09:49:06

sets both downstream retail and upstream wholesale

prices later on in your report.

Is it -- is it your view that Apple's

commission is the determining factor to downstream

retail and upstream wholesale prices?    09:49:36

MR. BURT:  Objection.

THE DEPONENT:  My view is that the Apple

commission acts very much like a ad valorem tax,

and when that tax is imposed or increased, it has

impacts on both upstream and downstream, depending    09:49:55

Page 35

on the nature of those -- those two sides of the -- 09:50:00

of the market.

Q.   (By Mr. Swanson)  You have a footnote on

this page 21.  It's footnote to the first sentence

of paragraph 42, and it's to the Apple versus 09:50:20

Pepper Supreme Court decision.

Do you see that?

A.   One moment.  I have to read closely.

Q.   Sure.  Footnote 55.

A.   I -- I -- I see the footnote.  I -- I 09:50:54

don't recall the content.  I would have to go back

and look at the content of the -- of the citation.

Q.   Are -- you -- you reviewed the

Supreme Court's decision in the Pepper matter,

right? 09:51:12

A.   Yes, I'm aware of it.  It's been

described to me.

Q.   And are -- are there any aspects of that

decision that you are relying on for purposes of

your opinions in this case? 09:51:25

A.   Well, certainly I'm -- I'm relying on the

thrust of that opinion, which is that the consumers

have standing as -- and can be treated as -- as

direct rather than indirect purchasers, and

they have -- they have legal standing for that. 09:51:50

Page 36

That's -- my analysis is predicated on that assumption.

Q. Okay. Do you agree that developers choose the retail price of their apps?

A. From an economic point of view, it -- we -- I think that, generally, economists would view who -- who actually posts the price as being secondary to who functionally controls what that posting has to be. So I would say that developers -- developers post the price -- post the retail price. They post what I would suggest is similar to a manufacturer's suggested retail price. But that -- what that price is, is, in turn, influenced by the -- the conduct of the distributor.

Q. Well, a manufacturer's suggested retail price is exactly that, right? It's not the price the consumer has to pay, is it?

A. That -- that -- I -- I agree that that is a gradation of -- of difference.

Q. Is -- is the price that the developer posts in your understanding the price that the consumer has to pay?

A. That is my understanding, yes.

Q. Are you aware that Professor Elhauge

09:51:52

09:52:18

09:52:38

09:53:03

09:53:16

09:53:37

Page 37

disagrees with your opinion that the App Store is a                        09:53:40

retailer and developers are wholesalers?

    A.   No, they -- the only summary I have been

given from -- from Mr. Elhauge is that he has an

opinion that it's a two-sided market.  I don't         09:53:58

necessarily disagree with that.  I don't think

that's in disagreement with my position.

    Q.   In your opinion, the relevant market is

an aftermarket; is that -- is that correct?

    A.   Yes.                                          09:54:20

    Q.   In -- well, can you turn to paragraph 46,

please, on page 22.  Let me know when you are

there.

    A.   Yes, I -- I have it.  I'm just -- just

reading it in preparation for your question.          09:54:57

    Q.   Take your time.  Just let me know when

you are ready.

    A.   Yes, I have read the paragraph.

    Q.   You state that "common economic evidence

supports the conclusion that app downloads and         09:55:17

in-app purchases are part of a signal aftermarket

for iOS device consumers..."

        You define your aftermarket based on the

consumer's substitution opportunities, correct?

    A.   Yes.                                          09:55:37

Page 38

**SER-999**

Q.   And in paragraph 46, you go on to say that "Common economic" -- "Common economic evidence supports the conclusion that iOS device consumers choose apps based on their needs, not based on how app developers monetize their apps." 09:55:39 09:55:52

Is it your opinion that your relevant aftermarket is defined by consumer needs and not developer needs?

A.   Well, the relevant market is -- is defined by the property -- defined by a portfolio of products with the -- with the property that the -- the intermediary in this market -- in this case the Apple Store -- has -- has the ability to control prices, and that's -- my conclusion is that it does.  And those -- that control extends to both the upside and the -- upstream -- upstream and downstream side of the market. 09:56:13 09:56:43

(The Court Reporter seeks clarification.)

Q    (By Mr. Swanson)  In paragraph 44 of your report, which is on the prior page, page 21, I'll ask you about that first sentence once you are there. 09:57:18

A.   Yes, I'm there.

Q.   You say that "In the primary market, consumers choose OS installed mobile devices..." 09:57:40

Page 39

Why is the primary market limited to mobile devices?

A.    Oh, I think that the Apple Store functions primarily as a distributor to holders of Apple iOS mobile devices.  I'm -- I'm not -- I'm not aware -- I'm not aware that acquisition of apps for nonmobile devices is a -- is an Apple Store function.

Q.    Well, do you understand that consumers choose OS-installed PCs, Macs, laptops, consoles, tablets, and smart TVs too?

MR. BURT:  I'm sorry, can I hear that question back.  Never mind.  The real time got it. I can read it.  Sorry.

THE DEPONENT:  Yes, I -- I understand that consumers can buy a variety of digital devices.  It's certainly an important category, are mobile devices.

Q.    (By Mr. Swanson)  You understand that the variety of devices -- digital devices that consumers can buy, like PCs, Macs, laptops, consoles, tablets, and smart TVs all have applications, apps, available for them?

A.    Yes, I understand there are portfolios of apps available, yes, on these -- on these other

09:57:47

09:58:13

09:58:37

09:59:03

09:59:26

09:59:51

Page 40

SER-1001

devices.                                                          09:59:54

Q.   In your opinion, is there a wholesale aftermarket for iOS apps?

MR. BURT:  Objection.  Form.

THE DEPONENT:  I am not sure the -- the          10:00:19
use of the -- "aftermarket" is the right qualifier in your question.  The -- the aftermarket is one form by consumers who have already acquired a device and are subsequent -- subsequently making purchases of apps for -- for that device.  So          10:00:49
that's -- that's the aftermarket on the consumer side.

On the developer side, perhaps you can use the same terminology, but, economically, of course, what's going on is the developers are          10:01:05
developing apps which they can then specialize to one operating system or another if they find it in their interest to do so.

Q.   (By Mr. Swanson)  And do you understand that developers frequently find it in their          10:01:21
interest to do so?

A.   I -- I haven't systematically gone and -- and counted, but the -- my -- my impression is to the contrary; that many apps are not developed for multiple platforms, or if they are developed for          10:01:52

Page 41

multiple platforms, they are -- they are not exactly the same, either in terms of user experience or in transferability of -- of history across platforms.

Q. Is your relevant aftermarket a retail aftermarket?

A. I would say it is; although, in my -- in my earlier answers, I said that I believe -- I believe, in this case, that -- that the relevant market really extends all the way from developers to consumers with an intermediate -- intermediary distributor, and the issue is the conduct of the distributor which affects both downstream and upstream economic outcomes.

Q. Professor, can you turn to paragraph 85 on page 42 of your report, please?

A. I will quickly read --

Q. Sure.

A. -- that paragraph.

Yes, I have read that.

Q. You are relying here on an analysis conducted in the Epic case by Dr. Evans; is that correct?

A. I'm -- I am reporting on and endorsing the calculations done by Dr. Evans, yes.

10:01:55

10:02:10

10:02:38

10:03:01

10:03:47

10:04:08

Page 42

Q.   Did you or staff, under your direction, replicate Dr. Evans' analysis?    10:04:15

A.   Not that I'm aware.

Q.   What -- what did you do to reach the conclusion that his analysis is reliable?    10:04:27

A.   It -- it appeared to be a straightforward collection of data from -- from Epic and the -- the fact -- well, that -- it seemed to be a direct -- a direct inference and commonsense inference from -- from a -- data produced by Epic.    10:05:02

Q.   Did you review any of the commentary on Dr. Evans' analysis by any of Apple's experts?

A.   No, I did not.

Q.   In your opinion, is Dr. Evans' analysis that you are referring to here common evidence that    10:05:28 supports the conclusion that apps compatible with non-iOS devices are not substitutes for iOS apps?

A.   I would say it is -- it is an element that is obviously a specific developer, but the -- the phenomenon, which is just an example or an    10:05:50 illustration, in my opinion, is probably quite general.

Q.   Well, even if Dr. Evans' study were reliable evidence, wouldn't you have to analyze consumers switching for other apps to reach any    10:06:07

Page 43

**SER-1004**

reliable conclusion about consumer switching behavior?                                                10:06:11

A.   I -- I think that one can engage in -- and certainly there's an academic literature in which people have engaged in the study of switching    10:06:30 behavior of -- of -- of consumers, and I think the general -- what Dr. Evans produces here is simply some empirical confirmation that that general -- general finding in the academic literature is correct; that switching -- switching is difficult    10:07:01 and costly for all consumers.

Q.   And is that literature that focuses on software applications?

A.   It is certainly, I would say, focused first on device choice.  But there are aspects of    10:07:25 it that also deal with the aftermarket.

Q.   And what literature are you thinking of specifically?

A.   Well, I have citations in the report, and I would have to go back and find them for you.    10:07:40

Q.   Okay.  The -- the -- you are thinking of literature that you have cited in your report; is that correct?

A.   Correct.

MR. SWANSON:  Okay.  I think we are at or    10:07:47

Page 44

a little beyond the hour mark.

Are you interested in taking a short break?

THE DEPONENT:  I would -- I would appreciate it.

MR. SWANSON:  Let's do that, then.

How much -- Mr. Burt, how much time?  Or, Professor, how much time would you like to take?

THE DEPONENT:  Ten minutes?

MR. BURT:  Okay.

THE VIDEOGRAPHER:  Okay.  We are now going off the record.  The time is 10:08 a.m.

(Recess taken.)

THE VIDEOGRAPHER:  We are now back on the record.  The time is 10:19 a.m.

Q.    (By Mr. Swanson)  Professor, as an economist, do you agree that a two-sided platform offers different products or services to two different groups who both depend on the platform to intermediate between them?

A.    I -- I have not heard that definition before, and I'm not sure that would characterize my understanding of a platform.

The -- the -- the use of the phrase "different products or services," I -- I'm not sure

Page 45

**SER-1006**

what functionally that distinction means.

Q.    Okay.  Are you familiar with the concept of a two-sided transaction platform?

A.    Yes, I am.

Q.    And what is your understanding, as an economist, of what a two-sided transaction platform is?

A.    That there is a -- a platform or intermediary that is arranging transactions between upstream economic agents and downstream economic agents, with services that include providing information, matching, ensuring fulfillment of the transaction and so forth.

And that depending on how you define the term "platform," those transactions might be fully simultaneous on -- on both sides of the platform or they might be -- they might -- may not be simultaneous.  They might -- there might be some, say, production to inventory in between that you could still have an intermediary acting as a platform.

Q.    Can you give an example of a two-sided transaction platform?

A.    Well, I think Amazon is a -- is a good example.  Amazon acts both as a traditional

Page 46

**SER-1007**

retailer in the sense that it acquires products

from suppliers, inventories them, and then

distributes from inventory.

But it also facilitates direct

transactions where the shipment comes directly from

the supplier to the consumer.  And Apple's role is

to process the payment and -- and ensure

fulfillment.

I would say that, in that case, Apple is

a -- I'm sorry, not Apple -- Amazon is a platform

in both the -- the narrow sense of -- of just

facilitating matching and then the broader sense of

essentially providing -- acting as an intermediary,

or if you would like, retailer distributor.

Q.   Do you -- do you regard Uber as a

two-sided transaction platform?

A.   I would say, yes.  It -- it has that

characteristic.

Q.   And what's the upstream and what's the

downstream in connection with that platform?

A.   Well, in that -- in that case, the -- the

transaction is that the -- the supplier is

providing transportation and the consumer is

demanding transportation.  And the role of the --

role of Uber, the role of the platform is to

10:21:40

10:21:55

10:22:12

10:22:35

10:22:48

10:23:10

Page 47

connect up an individual supplier with an

individual consumer. 10:23:13

That's -- that's I think -- I think the

narrowest and -- definition of what a -- how a

platform works. 10:23:26

Q. Do you agree that because transaction
platforms can't make a sale unless both sides of
the platform simultaneously agree to use their
services, that two-sided transaction platforms
exhibit strong indirect network effects? 10:23:43

A. Well, I don't -- I don't agree that --
first of all, that -- that platform as it seems to
be used these days is restricted solely to that
kind -- that kind of a transaction, first of all.

But if you -- if you confine yourself to 10:24:04
that narrow definition of a platform, then I think
I would agree. But I would like to have the
question repeated so make sure I'm answering the
right question.

MR. SWANSON: Okay. Why don't we have 10:24:20
our court reporter reread it.

(Record read as follows:

"QUESTION: Do you agree that because

transaction platforms can't make a

sale unless both sides of the 10:24:25

Page 48

Veritext Legal Solutions
866 299-5127

**SER-1009**

platform simultaneously agree to use
their services, that two-sided
transaction platforms exhibit strong
indirect network effects?")

THE DEPONENT:  I -- I'd say the answer is
that I -- I agree in part.  And that is to say,
in -- in the most extreme cases where matching is
absolutely the primary function of the platform,
the -- the -- the -- the whole thing doesn't work
unless you can get an exact match.

But in a -- in a more general notion of
platforms, you -- you begin to get the
possibilities of sub- -- substitution.  And -- and
it doesn't have to be necessarily a unique match --
match to facilitate the transaction.

So that, for example, in the -- in the
Apple Store, consumers are relatively anonymous.
So it -- it's not -- not a question of matching
Consumer Jones with Developer X.  It's -- it's a
question of Developer X posting -- posting a price
through the App Store which is then available to --
to all consumers.

So that's -- that's actually -- still has
some aspects of a platform industry, but not -- not
in the most strict, narrowest sense.

10:24:25

10:24:57

10:25:13

10:25:30

10:25:50

10:26:06

Page 49

Q.   (By Mr. Swanson)  Do you -- do you have an understanding of what indirect network effects are?

A.   Yes.  The -- the most -- the strongest kinds and -- and/or network effects come from when -- when the -- the -- there's a question of -- of interoperability or exclusivity.  So that the problem -- the issue -- the -- the business of the platform is to acquire a match and -- and the -- the value to any consumer of that platform will depend on the availability of actors on the -- on the far side of the market that -- that could constitute a match.  And they're also influenced by the -- the possibility that if someone else takes -- takes a match, that reduces their opportunities.

So those are -- those are -- are examples of -- of what you might call extra -- externalities and -- and -- well, let me -- I think that's the -- answers the question.

Q.   Do you agree that two-sided transaction platforms are best understood as supplying only one product; namely, transactions?

A.   No, I don't agree.  Because I think that current use of the term "platform" is -- is

10:26:13

10:26:22

10:26:47

10:27:04

10:27:21

10:27:41

Page 50

considerably broader and -- and would include    10:27:44

other -- other kinds of -- of services.  It's not

primarily a matching function.

Q.   Just so we're both on the same page,

I'll -- I'll note my question was about a    10:27:59

particular type of two-sided platform, two-sided

transaction platform.  So let me just ask it again

to make sure you -- you got that part.

Do you agree that two-sided transaction

platforms are best understood as supplying only one    10:28:15

product; namely, transactions?

A.   No, I see no -- no reason -- I -- I

disagree with that.  I -- I think that a -- a

platform may be handling a portfolio of products.

And -- and, in fact, I think if you look at what    10:28:34

are considered to be standard examples of

platforms, such as Uber, they -- they -- they

typically do involve different products; namely,

transportation between different origin and

destination points.    10:28:52

Q.   Professor, do you agree that only other

two-sided platforms can compete with a two-sided

platform for transactions?

A.   As I sit here, I have a hard time

thinking of -- of -- of examples.  But, again, I    10:29:24

Page 51

think it depends, in part, on how narrowly or broadly you use the term "platform."

Q.   And in your usage, do you use the term "platform" narrowly or broadly?

A.   It's -- it's -- it's not -- it's not a word that I use except when it comes up and I'm asked about it.  So I don't have a standard usage. I -- I try to basically reconcile my understanding of how these things work economically with the terminology that people are -- are -- are using.

To go -- to respond to your previous question, I -- I don't think it's out of -- out of the question that you could have an industry in which there are -- there's -- there's matching -- a matching function going on provided by some firms and a -- a more conventional distribution function supplied by -- by other firms.  And they -- you could consider those in the -- in the same market by some tests for whether it's the same -- same market or not.  But I -- I actually have -- as I sit here, I have trouble thinking of examples where that would be the case.

Q.   In your opinion, does the App Store provide a more conventional distribution function as distinct from a matching function?

Veritext Legal Solutions
866 299-5127

SER-1013

would you ever use terminology that speaks only of separate markets?

MR. BURT: Objection.

THE DEPONENT: Well, why -- why indeed. I -- I -- I think that in -- in -- certainly in terms of some kinds of -- some kinds of legal distinctions, it may be -- it may be important to segment or differentiate the -- the point of -- at which a market operates.

I -- but I think that economically the -- the -- the fundamental in -- in economics, you want -- you want to look at the -- at what -- basically, what's -- what's happening to the actors under -- under some kind of change in -- in the market, in -- in -- in the environment. And -- and that should be conducted as widely as necessary to capture the main effects.

And whether that's -- encompasses what you might call submarkets into -- into one larger market, encompasses different products grouped together, I think that -- that is -- it's just -- it's a practical question as to what -- what is -- what is reasonable to do.

Q. (By Mr. Swanson) Do you -- do you define any submarkets in this case?

Page 54

**SER-1014**

would you ever use terminology that speaks only of 10:32:31

separate markets?

MR. BURT: Objection.

THE DEPONENT: Well, why -- why indeed.

I -- I -- I think that in -- in -- certainly in 10:32:44

terms of some kinds of -- some kinds of legal

distinctions, it may be -- it may be important to

segment or differentiate the -- the point of -- at

which a market operates.

I -- but I think that economically the -- 10:33:08

the -- the fundamental in -- in economics, you

want -- you want to look at the -- at what --

basically, what's -- what's happening to the actors

under -- under some kind of change in -- in the

market, in -- in -- in the environment. And -- and 10:33:26

that should be conducted as widely as necessary to

capture the main effects.

And whether that's -- encompasses what

you might call submarkets into -- into one larger

market, encompasses different products grouped 10:33:46

together, I think that -- that is -- it's just --

it's a practical question as to what -- what is --

what is reasonable to do.

Q. (By Mr. Swanson) Do you -- do you define

any submarkets in this case? 10:34:02

Page 54

**SER-1015**

A.  I -- I don't.  But I recognize that certainly different app genres are accessed for different reasons by consumers and are treated in the App Store and by developers as being somewhat separate kinds of beasts.  And so that if one -- I suppose for some purposes one might say, for example, talk about the submarket for game apps, iOS game apps.

Q.  Do you, in this case, define a market that encompasses different products grouped together?

A.  I would -- I would say, yes, I do.  And as -- as is -- as is standard, that is to say, when one -- when one talks about defining a market where products are -- are differentiated in any way, the -- the critical question is where -- where -- where does the differentiation matter enough so that they're not easy substitutes, so they're really distinct markets and where are -- are the -- are the differentiations of the products sufficiently limited.  So that there's relatively easy substitution among them and -- and they -- they basically behave as -- as if they're in the same market.

And that -- that's a -- that's an

Page 55

**SER-1016**

empirical practical distinction.  Of course, it -- 10:35:57

it matters in cases like this.

Q.    Professor, it's your opinion, is it not,

that common economic evidence supports the

antitrust market alleged by Consumer Plaintiffs? 10:36:16

A.    Yes.

Q.    Are -- are you aware that Consumer

Plaintiffs allege that the market in this case is

different from the two-sided transaction platform

at issue in the Amex case? 10:36:33

MR. BURT:  Objection to form.

THE DEPONENT:  I don't recall the details

of the Amex case, so perhaps you can, in your

questions, tell me what the difference is.

Q.    (By Mr. Swanson)  Well, do you understand 10:36:50

what industry was at issue in the Amex case?

A.    I know it involved credit card

transactions.

Q.    Okay.  And is it your opinion that the

market in this case is different from the type of 10:37:05

two-sided transaction platforms that exist in the

credit card business?

A.    I would say that -- that from an

economist's point of view, functionally, they --

the app -- iOS app market has similarities to 10:37:32

Page 56

SER-1017

the -- to credit cards in that primary function of     10:37:39

the -- of this intermediary is to facilitate

transactions and -- and fulfill -- fulfill

transactions.  So those are -- those are common --

common features in those two markets.              10:37:58

Now, Amex is different in the sense

that I -- I believe that credit card companies are

not in the business of trying to match individual

consumers with individual sellers.  They -- they

just facilitate the -- the -- the transactions.    10:38:13

And the Apple Store, in some sense, does

that too but plays a -- plays a more prominent role

in that the way it posts the apps in its -- in its

App Store directory, that can certainly influence

what consumers see, what -- what developers -- who    10:38:42

developers can access on the consumer side.

So that the Apple Store has a -- has --

has a function, which is, I think, different than

credit cards.

Q.   Do you believe that a credit card           10:39:01

company -- let's choose American Express as an

example -- is not in the business of trying to

match American Express cardholders with merchants

who accept the American Express card?

A.   I think the term -- the term "match" in     10:39:30

Page 57

**SER-1018**

your question here is a different meaning than it does in -- previously.

When I talk about matching in the credit card business, I'm -- I'm saying that they're -- there is -- there -- they're not matching. They're essentially facilitating transactions, facilitating fulfillment of -- of transactions.

Certainly, a credit card company will be in the business of -- of acquiring sellers who will accept their card and trying to -- persuading consumers to acquire their card. I wouldn't call those matching activities. Those are, you know, customer -- customer acquisition activities.

Q. Are you aware that the Consumer Plaintiffs allege that the App Store does not sell only one product jointly consumed by parties on both sides of the transaction the way ancillary credit card transactions were sold to both parties in American Express?

THE DEPONENT: Would you -- Reporter, would you read that question back, please.

(Record read as follows:

"QUESTION: Are you aware that the Consumer Plaintiffs allege that the App Store does not sell only one

Page 58

SER-1019

product jointly consumed by parties

on both sides of the transaction the

way ancillary credit card

transactions were sold to both

parties in American Express?")

THE DEPONENT:  Unfortunately, reading it back didn't clarify the -- the question for me.

I think it -- it's certainly true that the -- the -- the plaintiffs in this case -- well, I'm sorry.

Now -- now I'm losing -- losing my -- I'm sorry.  I've lost my train of thought.

Perhaps read it again -- once again.  There -- there are really two parts to it.  I would like to respond to the first part.

(Record read as follows:

"QUESTION:  Are you aware that the

Consumer Plaintiffs allege that the

App Store does not sell only one

product jointly consumed by parties

on both sides of the transaction the

way ancillary credit card

transactions were sold to both

parties in American Express?")

THE DEPONENT:  I -- I do not interpret

10:40:46

10:40:46

10:41:27

10:41:38

10:42:06

10:42:11

Page 59

the plaintiffs' complaint as drawing -- drawing    10:42:13

any -- any distinction between the situation

they're in and -- and credit card companies.  I

don't recall a reference to credit cards in their

complaint.                                          10:42:31

            I -- I -- I do understand that they --

their position is that there are multiple apps.

They're -- those are not identical products, but

that there is a common impact on the whole class of

consumers of Apple conduct, irrespective of the     10:42:49

fact that there are indistinguishable products;

namely, different apps.

     Q.   (By Mr. Swanson)  Sir, in your opinion,

is the App Store a two-sided transaction platform?

            MR. BURT:  Object to form.              10:43:17

            THE DEPONENT:  I would say that it is in

the sense that its conduct influences the economic

outcomes, both upstream and downstream.  It's --

it's a platform in which it has -- it has market

power and can exercise market power on both the     10:43:39

upstream and the downstream side of the market.

     Q.   (By Mr. Swanson)  Well, is there any

sense in which the App Store is not a two-sided

transaction platform, in your opinion?

     A.   I would say my -- my definition of a      10:44:06

Page 60

two-sided platform is that it's -- it's -- it has
both an upstream and a downstream side.  As a
general economic matter, you could have a -- a
platform industry that is a price taker on one side
and a price maker on the other side.  And so it
could either be a monopolist -- a pure monopolist
with pure -- competition on its acquisition of
input or it could be a pure monopolist with --
selling into a competitive market.

        Those are -- those are extreme cases.  I
think the Apple Store is clearly neither -- neither
of those.

    Q.   Can you identify any economist who has
offered the opinion that the App Store is not a
two-sided transaction platform?

        MR. BURT:  Objection.  Form.

        THE DEPONENT:  I am not aware of what
economists, in general, have said about this
matter.  And so the answer is I'm not -- I'm not
aware of an opinion that it's not two-sided.  But I
don't necessarily have all the -- all the
references at my hands.

    Q.   (By Mr. Swanson)  Do you agree that to
optimize sales the App Store must find the balance
of pricing that encourages the greatest number of

Page 61

matches between consumers and developers?

10:45:42

A.   The -- your hypothetical suggests the App Store's objective is to optimize sales.  I assume by that you mean, revenue to Apple?

10:46:03

Is that what you mean by the term "sales" in this context?

Q.   I mean gross sales on the platform.

A.   I -- I -- my position on this -- or my opinion on this is that Apple has and -- and it's

10:46:24

expected to have, the objective of making money from the App Store.  And that -- that's -- that's their -- that's their criteria.

Q.   Well, do you agree that to optimize sales, the App Store must find the balance of

10:46:42

pricing --

(Brief interruption.)

MR. SWANSON:  Let me start over.

Q.   (By Mr. Swanson)  Do you agree that to optimize sales, the App Store must find the balance

10:46:53

of pricing that encourages the greatest numbers of matches between consumers and developers?

MR. BURT:  Objection.  Form.

THE DEPONENT:  I don't think that's an implication of sales optimization, no, of -- of --

10:47:07

of profit maximization.  I think that they --

Page 62

SER-1023

they -- they have to balance the money they make    10:47:15

per transaction with the number of transactions

that are made, just -- just like any price-making

firm does.

       Q.   (By Mr. Swanson)  Do you agree that the    10:47:27

App Store cannot sell transactions to either

consumers or developers individually?

         MR. BURT:  Objection.  Form.

         THE DEPONENT:  Your question suggests

that -- that the Apple -- Apple Store has a -- has    10:47:49

a -- a direct, hands-on intermediary role in

fulfilling a -- a -- a transaction, has an active

intermediary role in which they are making some

conscious choice as to whether or not to approve

this transaction.    10:48:17

      My understanding is that the way they

process things is -- is algorithmic, that they

simply approve -- approve developers and developer

products, and they allow these products to have a

posted price with the understanding that they will    10:48:36

take a commission from that and that, at that

point, it's -- it's hands-off in terms of -- of how

many transactions occur.

       Q.   (By Mr. Swanson)  Would you describe your

market for selling consumers iOS apps and in-app    10:48:59

Page 63

content as single-sided?                          10:49:04

MR. BURT:  Objection.  Form.

THE DEPONENT:  Well, I think in terms of
dealing with consumers, the behavior of the
App Store is very much like a traditional retailer.          10:49:25
So that's a -- that's a transaction between a -- a
retailer and a -- and a consumer.

Now, the products that they are selling
are produced to order rather than to inventory.  So
it's not that the Apple Store is inventorying          10:49:45
licenses, which it then distributes as -- as
they're demanded.  But rather, that it simply goes
back to the developer -- effectively goes back to
the developer and says here -- here's an order,
fill it.  But that's not inconsistent with the          10:50:03
traditional notion of a retailer.

Q.   (By Mr. Swanson)  In your market
definition analysis, do you take into account
indirect network effects?

MR. BURT:  Objection.  Form.          10:50:23

THE DEPONENT:  I'm not -- could you be
specific about what you mean by "indirect network
effects" here?

Q.   (By Mr. Swanson)  Well, do you assess the
effect of any consumer substitution on developer          10:50:34

Page 64

SER-1025

substitution?                                                    10:50:38

A.   Well, the answer is that in -- in the analysis that -- that I have done, I'm considering the aftermarket for iOS apps as a market which has differentiated products.  And I have done an   10:50:58 analysis of the common -- common effect of the Apple Store intermediation on the -- on the overall cost to consumers of acquiring the portfolio products that they acquire.

Q.   Based on your understanding of market   10:51:25 definition, should a relevant market include all reasonably interchangeable substitutes?

A.   The answer is, yes, if by "reasonably interchangeable" you mean that they are relatively easy and low cost substitutes for the -- the vast   10:51:47 majority of participants in the -- in the market.

Q.   Are all iOS apps in your relevant market substitutes for each other?

A.   I -- I would imagine that some are close substitutes and -- and, for example, different   10:52:20 games, to play solitaire, would be probably quite close substitutes across genres.

I would expect substitution to be relatively low, but -- but nevertheless, I -- I would say those are -- are a common market in the   10:52:42

Page 65

SER-1026

sense that they -- they are impacting in a common

way by the behavior of the -- of the distributor,

of the Apple Store.

Q.   Are free apps a product in your relevant

market?

A.   They are -- well, the -- the answer to

that is -- is a little complicated because they are

-- they are in the data.  We have the transactions

database from Apple, which includes both free

downloads and paid downloads, either initially or

IAP.

And -- okay.  So -- I'm sorry.  I lost my

train of -- of response.

THE DEPONENT:  Could you read the

question back, please.

(Record read as follows:

"QUESTION:  Are free apps a product

in your relevant market?")

THE DEPONENT:  Yes.  So as I said,

it's -- it's -- it's complicated because the -- the

data we have includes free apps.

The consumer class is defined as those

who have paid for apps.  So that free apps --

consumers who consume only free apps are not in the

class.

Page 66

Generally, in the -- in the modeling and econometric work that I've done, we have excluded free apps and dealt only with -- with paid apps. And I believe that is almost always the case, but I -- I -- I'm -- I'm prepared to go back and look at sections to make sure.

Q.   (By Mr. Swanson)  Just so I'm clear on your answer, your answer is, yes, free apps are a product in your relevant market?

MR. BURT:  Objection.

THE DEPONENT:  Say that -- say it one more time, please.

Q.   (By Mr. Swanson)  Sure.

Just so I'm clear on your answer, is your answer, yes, free apps are a product in your relevant market?

MR. BURT:  Objection.

THE DEPONENT:  No.  My -- my answer is that they -- they are in the data.  They are excluded from the definition of -- of -- of the class, and they're excluded from the calculations of harm and implied damages.

Q.   (By Mr. Swanson)  Are free apps reasonably interchangeable with apps that are paid?

A.   Fairly clearly not -- not completely,

Page 67

**SER-1028**

because otherwise paid apps would have no -- no    10:55:44

existence.

Q.   Are you familiar with the concept of

cluster markets?

A.   No, I'm not.    10:56:05

Q.   Does your relevant market definition

group together different app genres that are not

substitutes for each other?

A.   I would say that it does, yes.

Q.   In your opinion, would a retail store in    10:56:29

the but-for world that only offers iOS game apps

be in the same relevant market as a retail store

that only offers iOS entertainment and music

apps?

A.   Well, I think from the economic point of    10:56:57

view, it's perfectly reasonable to expect that you

could have that kind of a market structure.  You

could -- it's -- it's not that much different than

saying you can have a retailer, some of whom are

nationwide, some of whom are limited to various    10:57:13

regions, but they are -- they're in the same market

in -- in the regions where they both appear.

Q.   In your opinion, would a retail store --

a retail store in the but-for world that only

offers iOS game apps be in the same relevant    10:57:32

SER-1029

market as a retail store that only offers iOS
photography apps?

A. I would say that for the purposes of the
practical market definition, in terms of the
complaint and purposes of this case, I would view
those as being in the same market in the sense that
they -- they are affected in a common way by
Apple Store conduct.

Are -- are -- if -- if for other economic
purposes you want to define the market narrowly to
limit it to close substitutes, then -- then sub- --
submarkets may -- may be important for that
purpose. So it may be that -- that game -- game
markets are a -- a distinct market for some
purposes.

I -- I think, from a practical economic
point of view, the issue here is -- is that one
should not get too focused on the definition of the
market and should concentrate more on the -- on the
conduct and the arena in which it's economically
appropriate to assess that conduct.

Q. Is your definition of the relevant market
in this case based on the view that markets should
be defined by the conduct of the defendant?

MR. BURT: Objection. Form.

Page 69

SER-1030

THE DEPONENT: I would say not that they should be. But that if the conduct of a defendant is to monopolize and extract excess profit to overcharge for a portfolio of products, that is functionally what matters. And so that the -- whatever that portfolio of products is -- is -- is the relevant class of products to consider for the purposes of -- of sorting out liability and -- and harm in that application.

And I would say that if -- if -- I think that is -- that is more important than -- than what -- what market definitions might be in terms of -- of substitution.

Now, obviously, a firm is not going to be able to monopolize a market unless they control -- they control the close substitutes. If they -- if there are close substitutes that they can't control, then -- then their market power would be eroded by -- by consumers exiting the market.

So it's -- it's not -- it's not that these things are totally disconnected. But that -- but that in the end, the real question is what portfolio products is the relevant portfolio for considering whether conduct is inappropriate or not.

Page 70

SER-1031

Q.   (By Mr. Swanson)  Is it your opinion that    11:01:06
all of the products affected by Apple's alleged
anticompetitive conduct are in the same relevant
market?

A.   I would say, in my report, I have treated    11:01:26
the aftermarket -- aftermarket for iOS apps as a
single market with a distinction on the consumer
side of demand for -- for genres.  You might
consider that -- those to be submarkets of that
overall market.  And my opinion is, is that's the    11:01:47
appropriate definition of the market to consider
for this case.

Q.   Is it your opinion that Apple's alleged
anticompetitive conduct affects free apps?

A.   The last word again, please.    11:02:03

Q.   Is it your opinion that Apple's alleged
anticompetitive conduct affects free apps?

MR. BURT:  Objection.  Form.

THE DEPONENT:  I -- I believe that the
impact on their -- of their conduct on free apps,    11:02:32
that the direct impact is -- would be limited.
It -- it just -- from a mechanical point of view,
it's obviously limited.

So the question would be whether there
are secondary effects on -- on what developers can    11:02:47

Page 71

do and how they -- how they pay -- make profits.  I
think as a -- as a secondary matter, if Apple
charges a very high commission, then it makes
raising revenues through advertising more important
for developers.

        And when you're living on advertising
revenues, that -- you may want to be -- have a free
app in order to maximize the number of eyeballs to
see your advertisements.  So that's an example
of -- of the kind of secondary effect that might --
might be present.

    Q.   (By Mr. Swanson)  In terms of the
secondary effect, are you referring to developers
potentially switching between business models
funded by in-app advertising and business models
funded by a download price or in-app purchase
price?

    A.   I am.  I'm -- I'm -- I'm saying that the
App Store commission, which influences what the --
what the profitability is of -- of selling these
things now changes balance against the -- the
potential revenue to be gained from advertising.
That would -- that would -- in turn would shift --
potentially shift the response of developers.

    Q.   How about developers who, in the real

11:02:52

11:03:17

11:03:39

11:03:56

11:04:19

11:04:38

                                              Page 72

**SER-1033**

world, use free apps for purposes of making physical sales of goods and services, have you considered those in your analysis?

A. No, they are -- they are not -- they are not part of the analysis. And they're -- they are not affected directly by Apple App Store commission rates.

I think the only -- the only question there would be how do you -- how do you get to be classified as -- as a -- a material goods as opposed to a digital goods seller and that this -- I -- I think that Apple has -- has certainly had a role in determining that.

I -- I -- my report doesn't, I think, deal directly with any issues that might arise from such conduct.

Q. If the commission for sales of digital products through apps from the App Store goes down, would that encourage developers of apps that sell only physical goods and services to substitute towards selling digital content?

MR. BURT: Object to the form.

THE DEPONENT: I -- I understand the question and I -- I -- I simply do not know how Apple has or would treat a seller who is selling

11:04:41

11:04:57

11:05:18

11:05:39

11:06:05

11:06:25

Page 73

SER-1034

both physical and digital content.

I -- I believe that they would distinguish those two different activities. And -- and perhaps then your question is asking me would -- would -- would the developer produce more -- more virtual product and less real product.

It's possible. I don't know.

Q. (By Mr. Swanson) Professor, you conclude in your report that software applications developed for personal computers or gaming consoles are not part of the relevant market; is that a fair statement?

A. Yes. For my purposes, my -- my -- my opinion is that the cost of replacing a -- a mobile device function, app function with a nonmobile device app function is sufficiently substantial for many consumers so that they -- they -- they will not flee from a -- a -- from an excess commission.

That is to say, that's -- that's pretty much the classical definition of a market, that they -- their cost of switching are sufficiently high so that they're not going to abandon that -- that market with a -- with small increases in price.

Q. Well, does market definition require some

Page 74

group of consumers to abandon a putative market in    11:08:13

order for substitutes to be considered part of the

same relevant market?

       MR. BURT:  Object to the form.

       THE DEPONENT:  There -- there are a lot    11:08:27

of words coming at me at once in that question.  So

let me -- let me take a minute to think about it.

       Why don't we try by having the question

read back.

    Q.   (By Mr. Swanson)  I -- I'll try -- I'll    11:08:48

try it again.

       Does market definition require some group

of consumers to abandon a putative market in order

for substitutes to be considered part of the

relevant market?    11:09:03

    A.   I would say that the definition of -- of

a market would be that a -- a -- if -- if the

market were -- were monopolized, the -- if this

group of products were controlled by a single firm,

would it -- would it have the ability to -- to    11:09:28

raise prices.  That's -- that's kind of the

traditional test for this.

       And my -- my opinion is that -- that this

aftermarket for iOS devices has that

characteristic.    11:09:49

Page 75

SER-1036

Q.   Are you aware that the Sony PlayStation is a game console?

A.   Please, sir, repeat the question.  I just didn't get all the words.

Q.   Sure.

Are -- are you aware that the Sony PlayStation is a game console?

A.   Yes.

Q.   Is the PlayStation online store a retailer that sells apps and in-app content?

A.   Well, I would say that -- that it is. It's a -- it's a retailer with a somewhat different business model.  I think then the -- in the Apple Store in this case; namely, that the business model is to essentially market -- market devices in combination with the games that are going to be played on them and -- and the business model there, as I understand it, is to provide these devices at or -- at or at very little cost, with the -- with the revenue to be gained from the -- from the apps that are -- that are actively promoted by the device maker.

Q.   Are app developers in the PlayStation online store suppliers that manufacture apps in an in-app content and supply them through Sony?

11:09:56

11:10:08

11:10:17

11:10:46

11:11:11

11:11:30

Page 76

A.   Yes, I would -- I -- I would say they are.  I would say that the -- as far as I understand that relationship, that is very close to a -- a classical situation in which the -- the -- the PlayStation business is -- is just buying -- basically, buying product from suppliers.

The -- the -- the mechanics of the transaction may involve things that look like app downloads, but it's effectively a traditional firm and supplier relationship.

Q.   In your opinion, are app -- app downloads and in-app purchases, via the Sony PlayStation, part of a single aftermarket for Sony PlayStation owners?

A.   I would say that I have not expressed an opinion in my report on this.  But if you ask me, I would say that I don't even view that as -- as an aftermarket.

I -- I think it -- it -- as I sit here now, my -- my opinion would be that producing a -- a gaming device like a PlayStation and marketing a series of games that can be played on it is -- is itself -- is itself the market.

Q.   Is it your opinion that consumers who buy Sony PlayStations are not locked into that

Page 77

SER-1038

platform?                                              11:13:38

          MR. BURT:  Objection.  Form.

          THE DEPONENT:  No, I -- I have not --

certainly have not expressed an opinion on that

matter in my report.  And the -- the answer is, I     11:13:53

don't know the extent to which buyers -- buyers of

that device would feel locked in.

          I don't know anything about the details

of that market and whether -- what games are

available exclusively on one device or another.       11:14:12

     Q.   (By Mr. Swanson)  What -- what would you

need to know in order to make a determination as to

whether, in any economic sense, purchasers of

Sony PlayStations become locked into the

PlayStation platform?                                 11:14:32

     A.   You got to begin by trying -- trying to

determine whether Sony was extracting prices for

games that was supracompetitive, that -- whether --

whether the pricing of the entire device and

subsequent app acquisition experience for -- for      11:15:06

these gaming -- gaming devices itself showed

evidence of being a -- a market -- a market in

which -- was being monopolized or in which market

power was being utilized to extract profit.

     Q.   If you learned that Sony charged            11:15:33

                                           Page 78

developers a 30 percent commission for their game 11:15:36

downloads or in-app purchases, would that lead you

to conclude that Sony was extracting prices for

games that were supracompetitive?

MR. BURT:  Objection. 11:15:52

THE DEPONENT:  Not -- not on its own, no.

I mean, I think one would simply look at the -- at

the -- at the overall ability of consumers to

choose their gaming device and look at whether that

market is sufficiently competitive so that the 11:16:13

overall profit -- profitability of the -- the Sony

device was a competitive price.

Q.   (By Mr. Swanson)  Would -- would you look

at the profitability of the online PlayStation

store as well as the profitability of the 11:16:32

PlayStation device together?

MR. BURT:  Objection.

THE DEPONENT:  These questions are

leading me rather far from my experience.  I -- I'm

not even aware that there is a PlayStation online 11:16:54

function separate from a device.  So I -- I -- it's

difficult for me to answer because for me this is

purely -- purely hypothetical.

Q.   (By Mr. Swanson)  Well, you've testified,

or at least stated in your report, that software 11:17:18

Page 79

**SER-1040**

applications developed for gaming consoles are not        11:17:20

part of the relevant market, correct?

A.    Well, I -- I did -- have not used them

as a -- as a benchmark.  And my view is that the

relevant market is the market for iOS apps for        11:17:35

mobile devices.

Q.    Well, do you have an understanding as to

how consumers obtain apps when they own gaming

consoles?

A.    Actually, I don't know how -- I don't        11:18:01

know how that works.

Q.    Would you agree that some portion of

iOS device owners also own PlayStations or other

game consoles?

A.    I would -- I would imagine that's the        11:18:15

case.

Q.    Do you know what percentage of iOS

device owners also own game consoles?

A.    I don't.

Q.    Are you assuming it is a small        11:18:29

percentage?

A.    Yes, although I -- I don't think I'm

actually making an assumption.  The -- the fact

that individuals may have multiple devices does not

automatically mean that -- that the products        11:18:50

Page 80

SER-1041

working on those different devices are close                    11:18:54

substitutes, in part, because of how they're used.

They -- an app used on a mobile device,

by definition, is something that you can carry

around with you fairly easily.  And an app that's            11:19:09

used on a nonmobile device is, by definition,

something that's -- for which you have to be

stationary or -- or at least it would be a

substantial burden to move it around.

So I think that -- that distinction alone           11:19:26

is -- is enough to effectively define the market --

market for iOS apps on mobile devices.

MR. SWANSON:  I think we've been going

for about an hour.

Would this be a good time for a break?           11:19:47

MR. BURT:  That's fine.

THE VIDEOGRAPHER:  Ten minutes?

MR. BURT:  That's just fine.

THE DEPONENT:  Yes, ten minutes.

MR. SWANSON:  Okay.                              11:19:58

THE VIDEOGRAPHER:  Okay.  Sure.  We are

now going off the record.  The time is 11:20 a.m.

(Recess taken.)

THE VIDEOGRAPHER:  We're now back on the

record.  The time is 11:31 a.m.                              11:31:24

Veritext Legal Solutions
866 299-5127

**SER-1042**

Q.    (By Mr. Swanson)  Professor, do you regard John Terrell as an authority on the topic of two-sided platforms?    11:31:29

A.    I do.

Q.    How -- how do you define monopoly power?    11:31:43

A.    I view it as -- as a synonym for market power.  And market power is the ability to influence -- influence set prices on whatever transactions you're dealing with.

That is to say, that the -- the competition, the impact of rivals is not such that you're constrained -- very narrowly constrained in the prices you can charge or collect.    11:32:09

Q.    Do you agree that market power is the ability to raise price profitably by restricting output?    11:32:27

A.    That's one feature of market power.  But other -- there are other features.  And you can -- you can control the attributes of your products without being undercut by other people's similar products.    11:32:50

You can perhaps, on the input side, be able to reduce the price you have to pay for some inputs as a result of your position.

Those are all manifestations or aspects    11:33:06

Page 82

of market power.                                              11:33:12

        Q.    Professor, have you studied whether any
iOS app developers possess monopoly power in the
markets in which their apps are sold?

        A.    I haven't set out to make that study        11:33:28
individually, but it's in the nature of markets
with different -- differentiated products that are
not perfect substitutes.  That every producer of
those -- of a differentiated product has a certain
degree of market power, a certain ability to set   11:33:49
their own price.

        Q.    Do you assume that every iOS app
developer possesses monopoly power?

        A.    I haven't -- I haven't used the term
"market power" in -- in respect to them, but the --   11:34:13
but if I use the general term "market power,"
I'll -- I'll repeat the answer I just gave.

              Namely, that if you produce a
differentiated product, you have at least some
local ability or market power to control the price   11:34:30
you charge for that product.  The limits of that
ability will be determined by the uniqueness of the
near product and the ability of rivals to attract
potential customers away from you.

              But the answer is not zero.  And in my   11:34:50

                                                    Page 83

**SER-1044**

analysis, I do assume that developers choose -- choose their prices in -- on the basis of their operating environment.

Q. Do you distinguish degrees of market power?

MR. BURT: Objection.

THE DEPONENT: Market power is certainly a continuum and you can have it to -- to various degrees, at least in the -- in the sense of having more or less freedom to vary your prices.

You can have it in larger or smaller arenas. So a firm may have market power in some portfolios' products and -- and not in others. It may have market power on one side of the market and not on the other, or varying degrees.

So those are all variations in market power, yes.

Q. (By Mr. Swanson) Do you assume that all iOS app developers have a high degree of market power in the market or markets in which their apps are sold?

MR. BURT: Objection.

THE DEPONENT: I assume that each developer has the ability to set their price with the objective of maximizing their profit. And they

Page 84

SER-1045

do that taking into account the elasticity of

demand for their product and -- and their -- and

their costs per unit delivered.  So that's my --

that's my assumption.

That approach to the analysis attributes

some -- some degree of market power to them.  And

that degree is determined by the -- the elasticity

of demand that they face.

So the -- the -- the answer to your

question directly is that I -- I don't make an

assumption on that.  I have -- I have empirical

results on the degree to which they have the

ability to price above marginal cost.

Q.   (By Mr. Swanson)  Does -- do -- do you

assume that each developer has the ability to set

their price with the objective of maximizing their

profit by taking into account the prices set by

their competitors?

A.   For the main part your question, the

answer is, yes, I assume that developers have the

ability to set their prices to maximize their

profits and certainly the -- the economic context

for that is that if they have rivals, producing

close substitutes, then that will limit their

market power and that will be evidenced by the

11:36:15

11:36:33

11:36:51

11:37:12

11:37:40

11:38:03

Page 85

SER-1046

elasticity of demand that they perceive.

So in that sense, they do take account of what their rivals have the ability to do.

Q.   Professor, how do you define monopsony power?

A.   Monopsony in the -- in the textbooks says that a firm is a -- unique or has limited rivals in purchasing inputs and, therefore, can control how much it buys and through that the price it pays for the -- for the inputs.

Q.   Do you have an opinion as to whether the App Store has monopsony power?

A.   Well, one -- one feature of monopsony power is that the -- the firm who can exercise that can create a -- a gap between what it costs them to acquire a good and what it -- what they can sell it for.  And so the evidence of the -- of the market -- monopsony market power is that they are able to make more money as -- as a result.

So I -- I think the answer to that -- that the -- the critical test, the acid test, in the end is whether -- whether they can profit from their -- from their market position.

Q.   Well, does Apple, through the App Store, pass the test of monopsony power?

Veritext Legal Solutions
866 299-5127

SER-1047

A.   I would -- I would say it does in the sense that it -- it has the ability to influence both what the sellers can take away.  And -- and it also has monopoly power and it can influence the -- the price that consumers have to pay.  So it is -- it exercises both monopoly and monopsony power.

Q.   Does the relevant market in which Apple possesses monopsony power different from a relevant market in which Apple possesses monopoly power, in your opinion?

A.   No.  I think that the relevant -- the relevant portfolio of products here, which defined in the market is if the portfolio of iOS apps for mobile devices and -- and that's -- that -- that's the relevant definition in the market and that's -- that applies in both the upstream and the downstream side of the Apple Store.

Q.   Well, in the retail market in which you opine that Apple has monopsony power, Apple is selling apps, correct?

A.   You used the term "monopoly" or "monopsony" in that question?

Q.   Monopoly.  Sorry.

THE DEPONENT:  Okay.  Fine.  I'm sorry. I misunderstood.

11:40:10

11:40:29

11:40:56

11:41:18

11:41:36

11:41:49

Page 87

Please, Reporter, just read the whole                11:41:51
question back.

MR. SWANSON:  I -- I can restate it
because I might have misspoken.

Q.   (By Mr. Swanson)  In the retail market in        11:41:59
which you opine that Apple has monopoly power,
Apple is selling apps, correct?

A.   In -- in effect, as an economic
transaction, yes.

Q.   And in a wholesale market in which Apple,        11:42:17
you say, has indications of monopsony power, Apple
is buying apps; is that correct?

A.   Yes, in the -- in -- I -- I agree in the
same sense, yes.

Q.   Okay.  And -- and is it your opinion that        11:42:31
the -- the relevant market encompasses both of
those retail and wholesale markets?

A.   Yes.  I think practically for the
purposes of this case, it does.

Q.   And is that an opinion you've expressed          11:42:55
in your report?

A.   I don't recall the -- the exact
sentences, but the whole analysis that I carry out
is predicated on the -- on the proposition that app
developer behavior on the upside of the market       11:43:15

Page 88

influences outcomes for consumers on the downside 11:43:20

of the market, and that Apple -- Apple Store

conduct in the middle influences both ends.

Q.   Is it your opinion, as an economist, that

a firm can have both monopoly and monopsony power 11:43:39

in exactly the same market?

MR. BURT:  Objection.

THE DEPONENT:  When you say "exactly the

same market," I think this is just a question of

semantics.  There are transactions taking place 11:43:57

between sellers and the Apple Store, and between

the Apple Store and consumers.  It's -- these are

the same product being -- being transacted through

the -- through the Apple Store distribution system.

And the question as to whether that -- 11:44:17

those transactions constitute a single market or

a -- or a double market, I think is -- is semantic.

It's not economic.  The -- the economic reality is

that in order to analyze the impact of the

Apple Store conduct in -- in a case like this, you 11:44:38

need to -- you have to consider both sides.

Q.   (By Mr. Swanson)  Is it your opinion that

Apple possessed monopoly power in the relevant

market you define on the day that the App Store

opened? 11:44:59

Page 89

SER-1050

A.   My -- my analysis is -- sorry.  11:45:14

My analysis is based on the overall impact of Apple conduct over the -- over the class period and that does include -- that goes back to the day that the Apple Store opened.  11:45:34

What I'm aware of is that third-party apps were not initially offered by the App Store and so that any possibility for -- of any conduct would have come only after the -- the whole -- they opened this market to transactions and paid apps.  11:46:00

Q.   Is it your understanding that there was an App Store before Apple offered third-party apps?

A.   I don't recall specifically how it was -- how it was structured.  I believe it was structured as -- as iTunes originally and became -- or the  11:46:31 App Store was separated as -- as a separate entity from iTunes or took over certain functions of iTunes.

My -- my recollection, from my reading of the history of this industry was that initially  11:46:50 Apple began to distribute free apps through the -- through iTunes.

Q.   Is -- well, do you have an understanding as to how many third-party apps were on the App Store in its first year of operation?  11:47:11

Page 90

SER-1051

A.   No, I don't -- I -- I think I have some
tables in my -- in my report on this.  But
I don't -- certainly don't remember it, as I sit
here.

Q.   And it's your -- but do you understand
that the App Store stored in 2008?

A.   Again, I would have to go back to the
specific history to make sure of dates.  I'm -- I'm
not contradicting you.  I just don't remember.

Q.   And is it your opinion that when Apple
opened the App Store, it exercised monopoly power
by raising price and restricting output?

A.   You use the term "raising price" and
"restricting output."  I -- I think we've talked
earlier about how the App Store -- App Store
operates or how -- how I understand that it
operates, which is that Apple -- Apple allows
developers to post retail prices with the
understanding that they will have a -- a commission
deducted from the revenue that they receive and
that Apple itself does not directly intervene in
determining whether transactions can take place or
not, except through the device of whether they
license a developer -- a developer's app to be on
the store or not.

11:47:18

11:47:29

11:47:47

11:48:12

11:48:34

11:48:56

Page 91

Q.   Well, is it your opinion that Apple acted                11:49:00
as a monopolist after opening the App Store and
restricted output in the relevant market?

          MR. BURT:  Objection.  Form.

          THE DEPONENT:  My -- my opinion is that            11:49:16
over the class period that Apple engaged in this
conduct.  I -- I have not been asked to break it
down by periods.  I -- it would be feasible to do
that, but I haven't done it.

Q.   (By Mr. Swanson)  Well, just so we're                   11:49:41
clear, do you have an opinion as to whether or not
Apple possessed monopoly power in December of 2008?

A.   No.  My -- my response is I -- I view
that as -- as an empirical issue.  One would have
to simply go and -- and look at what the -- for       11:50:00
example, what the rates were in the Apple App Store
versus competitive benchmarks, for example, to
determine whether they were exercising market
power.

Q.   Can a firm have monopoly power over a                   11:50:19
period without having monopoly power at each point
in that period?

A.   Certainly -- certainly conceptually,
that's possible.

Q.   Is that the case here as a factual                      11:50:43

Page 92

**SER-1053**

matter?                                                    11:50:46

A.   I haven't set out to test that
specifically.  My -- my analysis is for the overall
degree of exercise of market power by the
Apple Store over the entire period.                        11:51:04

If -- if there was a reason to do, so I
could go back and -- and elaborate the model to --
to break it down by periods.  In the end, that
would be an empirical issue.

Q.   Well, how -- how does one analyze whether       11:51:25
a firm possesses monopoly period over a period,
let's say, of ten years?

Does that differ it from analyzing
whether the firm has monopoly power in the first
year of that ten-year period?                              11:51:41

A.   I think the answer to the question is
that if the objective of the -- of the analysis is
to determine harm over the entire period, one is
simply looking for the average effect over that
ten-year period, it is then unnecessary to break it        11:52:04
down a year -- year by year.

If there is a counterclaim that over
certain subperiods the firm was not exercising
monopoly power, then it would be -- certainly be
appropriate to do an analysis to determine                 11:52:27

Page 93

if that's, in fact, the case.                    11:52:29

What the implications of that would be for determining the overall harm over the entire period, it's -- it's not obvious.  The -- the initial looking for the average effect, the common    11:52:46 effect, may and probably is still valid, even if the market power of the firm varied from year to year.

Q.   Are you aware that Dr. Evans testified to his opinion that Apple did not possess monopoly    11:53:08 power through the App Store in the first couple of years of its existence?

A.   I'm not aware of that.

Q.   Okay.  Do you disagree with Dr. Evans?

A.   No.  As I've said, I think it's an    11:53:26 empirical matter.  I have no evidence one way or the other.  So it's -- I'm -- I'm -- I'm open -- open to new information.

Q.   Are -- are you familiar with the concept of critical mass?                    11:53:42

MR. BURT:  Form.

THE DEPONENT:  It's a -- it's a common term.

Can you give me some context?

Q.   (By Mr. Swanson)  Sure.                    11:53:52

Page 94

Are you familiar with the concept of critical mass in the context of platform economics?

A. Well, I think I know generally.

There's -- there's -- there are tip-over points in platforms because ubiquity in the externalities associated with ubiquity are -- are important in -- in those kinds of platforms.

And I -- I presume just from the common definition of this term that that's referring to -- how many -- how many share of the markets you need to reach critical mass in order to achieve the economies of ubiquity.

Q. Do you have an opinion as to when the App Store attained critical mass?

A. Well, the presumption in your question is that -- is that there is some critical mass required for the App Store to -- to function or to acquire monopoly power.

I -- I don't think I agree with that presumption. The -- the market power associated with the Apple Store was it came from its ability to exclude rivals and function as the sole source of distribution of iOS App Store mobile -- mobile devices.

So that -- I think that market power came

11:53:53

11:54:10

11:54:28

11:54:53

11:55:10

11:55:31

Page 95

**SER-1056**

into -- into existence and was exercised as soon -- as soon as Apple decided to make that distribution exclusive to them.

Q. Is -- is it your opinion that Apple attained monopoly power in your relevant market before it attained critical mass?

A. My -- my opinion is that the -- the notion of critical mass, if it means what I think it means, is -- is not -- not particularly relevant to the -- to the operation of the Apple App Store, because it was not the case that one -- one needed to -- I'm going to finish my sentence and then I'm going to give you another thought.

It's not -- it's not the case that they needed to have a -- a certain share of the iOS app transactions in order to be able to have power in that market.

Now, there's another aspect to critical mass and that's sort of network -- network interactivity. I could imagine that at some level a developer would view the Apple App Store as a must carry distribution outlet if he's selling a game which involves network interactions and the -- the critical mass among the interactions would depend on the devices that people are using and the

Page 96

SER-1057

apps they -- they download.

So I -- in that sense, there is a critical mass that's a different dimension than I was thinking of.

Q.   In that sense, is it your opinion that Apple attained monopoly power before it attained critical mass?

MR. BURT:  Objection to form.

THE DEPONENT:  I would say that, in the end, that's an empirical question.

The question is, effectively, was Apple free to set commissions early on, even when some games still had some question as to whether they were going -- going to operate primarily on PlayStations, PCs, or mobile devices.  And -- and at that point, if those apps had been important enough revenue sources for Apple, that might -- might have been a consideration for them in -- in setting -- setting their commissions.

I -- I don't know the details of the history, but my impression is that many -- many apps came along well after the initial opening of the App Store.  Some of these were apps that involved networking among consumers who bought them and that in -- in those cases, those consumers were

Page 97

basically -- tend to be already locked into one     11:59:11

kind of device or -- or -- or another.

Q.   (By Mr. Swanson)   Were game consoles one

of the types of device that consumers were already

locked into?     11:59:35

A.   I do not know the history really in any

detail at all of the development of the gaming --

gaming devices and -- and mobile -- mobile devices.

But my -- my impression is that gaming --

gaming devices came in somewhat earlier and that     11:59:52

they are -- at least initially, did not have

substantial network capabilities.

I don't know what the -- I don't know

myself whether they do or do not have network

capacities now and whether inter-user play is an     12:00:13

important part of gaming device market -- market

activity.

Q.   Okay.  Let -- let me change subjects a

little bit and ask you to turn to paragraph 116 of

your report, which is on page 56.     12:00:36

A.   Yes, I have that page in front of me.

Q.   Okay.  You -- you indicate there that

"profit margins can provide useful insights on

market power."

Do you see that?     12:01:03

Veritext Legal Solutions
866 299-5127

SER-1059

A.   Yes.                                                    12:01:03

Q.   Is it your opinion that Apple's profits
from the App Store are alone sufficient evidence to
establish that Apple has monopoly power?

A.   No, that would not be my opinion.          12:01:16

Q.   I don't want to interrupt if you're not
finished.

A.   I am finished.

Q.   Okay.  Thank you.

Are you familiar with the concept of             12:01:28
economic profits?

A.   The term "economic profits"?

Q.   Yes.

A.   I -- I am, although I don't know what
context and what you mean by it.                   12:01:41

Q.   Well, do economists have a definition of
the term "economic profits"?

A.   Well, yes.  It would be the -- the
bottom-line revenues that you can get from an
activity less -- less the cost of engaging in an    12:02:05
activity.

Q.   Do economists draw a distinction between
economic profits and accounting profits?

A.   Oh, very definitely they do, because
there are many accounting categories that are --    12:02:22

Page 99

are ambiguous -- economically ambiguous in terms of

what their impact is. And -- and I'd say in the

real world ambiguous as well.

Q. In paragraph 116, you state that "common

evidence supports that the Apple App Store enjoys a

substantially high level of both gross and net

margins."

Are you relying on accounting profits for

that statement?

A. Basically, yes. There are -- economists

will take accounting data and try to recategorize

it to bring it closer to the economic -- economic

notion such as gross margin. But basically the

underlying concept is an accounting concept.

Q. And what does the term "gross margin"

mean to you?

A. Oh, it's -- it's simply the -- the ratio

of -- of price reduced by the marginal cost of

providing a unit of a product divided by the price

of that product.

Q. And what is the net margin?

A. It's -- it's a -- a slightly narrower

definition of what constitutes the marginal or

variable cost of providing a unit of the product.

There's the same -- the -- the net margin

12:02:26

12:02:43

12:03:02

12:03:27

12:03:50

12:04:09

Page 100

**SER-1061**

will take off somewhat more cost components.

12:04:13

Q.   What -- what cost components, other than marginal cost would be taken out to calculate a net margin?

A.   Oh, the -- the -- there's always a

12:04:26

question in -- in working with accounting data what -- what costs are tied directly to the sale of a unit and what costs are being amortized over the sale of the unit.  And with a lot of -- a lot of gradations in between where it's often quite

12:04:47

difficult to know economically the extent to which that particular incurred cost was locked to that particular transaction.

So that to -- to answer your question, the accounting definition of gross margin is -- is

12:05:06

something like price minus the cost of goods and services by some accounting measure, again, by -- as a ratio to price.  And net margin would involve some additional cost which might be attributed to the transaction, but less closely tied to it.  That

12:05:34

is maybe allocated to the transaction, but less -- less closely tied to it.

Q.   And when you say that "common evidence supports that the Apple App Store enjoys a substantially high level of both gross and net

12:05:52

Page 101

**SER-1062**

margins," what -- what -- what number are you -- are you thinking of?

What -- what is -- what's the substantially high level that you're referring to here in numerical terms?

A.  Well, in numerical terms, it's -- it's the numbers given in figure 8 and discussed in the paragraphs following paragraph 116, which are -- are gross margins in -- in the vicinity of ████████, and net margins in the vicinity of -- I don't see the figure here, but it's ████████, something like that.

Q.  Now, you are of the opinion that the App Store is a retailer of apps that pays wholesale prices to developers, correct?

A.  That's -- that's -- that's my economic interpretation of their operation, yes.

Q.  And the wholesale price is 70 percent of the retail price, correct?

A.  Correct.

Q.  So Apple's gross margin must be no more than 30 percent of App Store retail prices, correct?

A.  No, I disagree -- you've led me down some accounting definitions here.  I don't agree with

Page 102

this calculation.  It's mixing apples and oranges, 12:07:24
I believe.  Please start over.

Q.   Well, explain to me how a firm can sell a product at retail, pay a wholesale price that is 70 percent of the retail price and have a 12:07:41 ██████ margin?

A.   The -- the distinction here is -- is simply the accounting, how the -- how the payments to developers are -- are accounted for.

My understanding of the remedies -- and 12:08:04 I -- I would like to turn to figure 8, because you're now asking me about Apple accounting -- accounts.  And I need to refresh my memory of how -- how they do this.  And, unfortunately, even in my -- in large print, it's pretty small. 12:08:26

Q.   It is.

A.   I'll be -- I'll be back.

Q.   Sure.  Go right ahead.

A.   I think I -- I have to say here that your -- I'm -- I'm trying to respond to your 12:09:05 questions.

The -- the numbers in my report are based on Apple accounting numbers, pure and simple. I'm -- I'm not an accountant.  And this is the way they keep their -- their records.  And in -- in my 12:09:20

Page 103

SER-1064

opinion, that is a high margin, that's based on a    12:09:29

comparison with similar app retailers who -- who

are in markets with rivals.  And so that judgment

is -- it's higher than -- than in those benchmark

alternatives.    12:09:51

Q.  Do -- do those similar app retailers, in

your view, sell their apps as retailers?

A.  I think the distinction is to -- you call

it selling the app.  That's a semantic distinction.

I think it's well understood that the way the    12:10:13

Apple App Store operates, and all these other

app stores operates, is that they -- they

facilitate and fulfill the transaction of a license

from a developer to a -- a consumer.

So that, I think, is more appropriate    12:10:31

language.

Q.  Well, does a retailer sell at the retail

price or the wholesale price, in your opinion?

A.  Well, as -- as a -- as a retailer in the

distribution of apps to consumers, Apple is -- is    12:10:56

acting as -- as a retailer, yes.

Q.  And you would agree that if you are

assessing a gross or net margin for a retailer,

that you should look at the revenues that come from

sales at the retail price, should you not?    12:11:18

Page 104

A.   Well, that, to me -- to me, that's an accounting question and I -- I would have to leave it to the accountants to answer.

I -- in my judgment, the Apple accounting data on their gross margins is providing information on the -- the revenue they get relative to their actual cost of operation and that the payments to developers are not included as part of their cost of operation.

Q.   Well, does that make economic sense if Apple is an economic retailer?

A.   I think it makes -- it makes perfectly -- perfect economic sense.  It's just a question of making the semantics match reality.

Q.   Well, do the -- does the economic reality indicate that an economic retailer sells at the retail price?

A.   I mean, there are -- I -- I think what -- what you are pressing me on is the question of how -- essentially at what level a -- a gross margin is calculated.

And what you're suggesting is that the -- even in the Apple App Store case, that they should be counting the money they transfer to the developer as -- as part of their marginal cost.

Page 105

SER-1066

It's possible -- certainly possible to do          12:13:12

the accounting that way, and it would certainly

give you a -- a lower gross margin.

The -- the statement that Apple has a

high gross margin in my paragraph 116 is -- is     12:13:26

really based on a -- a comparison of the

Apple App Store with benchmarks of -- of app stores

that are -- do have rivals.

Q.   Okay.  So -- so you're not testifying

that it is appropriate, as an economic matter, to  12:13:49

disregard wholesale costs in determining a

retailer's margins?

A.   I would say, as an economist, that --

that the margin that you look at should be related

to how it's going to be used.  And in -- in this   12:14:08

case, it's going to be used simply to compare the

Apple Store with benchmarks that are -- are not

monopolized or allegedly monopolized.  And so if

you're consistent, you could make the comparison

either way, I believe.                             12:14:37

Q.   Professor, are you familiar with the

economic concept of joint costs?

A.   Yes.

Q.   What is the economic definition of joint

costs?                                             12:14:50

Page 106

A.   Well, they -- they -- they are costs that      12:14:52

typically incurred when one is dealing with -- with

a series of activities and each of those activities

requires some -- some input.  And that -- and

that -- that input is shared, or the benefits of      12:15:13

that input are shared.

For example, a firm might acquire a

computer that's used for various purposes, and the

question would be -- the cost of that computer is

then -- is then a joint cost to be allocated in      12:15:32

some way across its uses.

Q.   Is there any way for an economist to

allocate joint costs in a nonarbitrary way?

MR. BURT:  Objection to form.

THE DEPONENT:  Yes.      12:15:52

Q.   (By Mr. Swanson)  And -- and what

nonarbitrary way or ways are there for an economist

to allocate joint costs?

A.   An economist would typically look at the

total cost as -- as a function of the level of      12:16:06

activity in the various types of activity.  And by

regression analysis, or in some form, provide a --

an allocation of those -- of that joint cost to the

individual activities.  You -- it's effectively a

way of -- of determining the marginal effect of      12:16:31

Page 107

**SER-1068**

each activity on the joint cost.

Q.   If -- if there is a nonarbitrary way to allocate joint cost, are they really joint?

A.   Yes, they can -- they certainly -- or -- well, that -- of course, the -- the answer to that depends on what you mean by "joint."

The -- the answer is that those costs appear, say, in -- in accounts associated with -- with various -- various levels of activity and -- and different types of activity.  And there is no obvious rule for how those costs would be divided up in -- and assigned to those activities.

So this -- this -- what I've described is one way to do it.  I think that ordinary usage of the term "joint cost" would -- would call that a joint cost.

Q.   Yeah.  I'm -- I'm talking about the economic issues of joint costs.

If -- if costs are truly joint in the economic sense, is there a nonarbitrary way to allocate them?

A.   Well, I think the answer is if -- if -- if -- if they -- if they are truly joint, it would simply say that -- that -- in -- in that -- in that regression, you -- you -- the regression doesn't

Page 108

SER-1069

work.  You can't -- you can't get coefficients.  12:18:21

Perhaps -- perhaps because the -- the activities

all have to -- all march in lockstep.

So the -- the ability to -- to

distinguish economically whether a cost is joint or  12:18:38

not depends on how it varies with the level of one

activity versus another activity.

Q.  Does Apple incur any costs that are joint

costs of the App Store and an iOS operating

system?  12:19:00

A.  I haven't investigated that specifically,

but I would assume that is the case.

Q.  Do you have an assumption about the

magnitude of those joint costs?

A.  No, I do not.  12:19:15

Q.  Does Apple incur any costs that are joint

costs of the App Store and the iPhone business?

A.  I would say that those are substantially

distinct lines of business for Apple.  There's

certainly fixed costs, R&D costs that are incurred  12:19:39

by Apple, which affect -- affect all of -- all of

their lines of business, that are common to lines

of business.  Certainly some administrative costs

are common to all lines of business.

So in -- so in that sense, there are --  12:20:01

Page 109

there are some that are joint. But I -- I would have to say, as a -- as a practical matter, I -- I -- I believe that the -- the Apple Store can and does function as a fairly independent line of business.

Q. Have you performed any econometric study of -- of Apple's costs to determine what costs should be allocated to the App Store?

A. No.

Q. How would you do that, if you were to undertake that project?

A. Effectively, the -- the starting point would be the kind of -- kind of regression that I mentioned before.

Namely, you would take Apple's total cost outlay in a period and regress it on the level of the various activities that they have; unit sales of devices, numbers of Apple Store transactions, broken down as necessary. And that would be a -- a systematic way of allocating Apple's overall costs across these lines of business.

Q. Let me shift topics again.

You used the phrase "but-for world" throughout your report.

What -- what do you mean by the "but-for

12:20:05

12:20:22

12:20:41

12:20:54

12:21:21

12:21:41

Page 110

SER-1071

world"?                                                    12:21:43

A.   The but -- the "but-for world" is an
economic environment in which the alleged defending
acts of the Apple Store are no longer present.  And
I believe that the complaint pictures that market       12:22:01
as becoming a market in which there -- there
would -- could be rival app stores that are
licensed to transfer iOS operating software.

Q.   What -- what is the time frame of your
but-for world?                                          12:22:33

A.   In my -- in my analysis, I -- I compare
the prices paid by consumers for iOS apps over
the entire class period with what they would have
been had Apple adopted commissions commensurate
with the -- the benchmarks that I determined of --     12:23:08
of more competitive App Stores.

Q.   What is the first event in your but-for
world that differs from the actual world?

A.   The calculation -- the calculations that
I model and -- and carry out would replace the --      12:23:34
the actual commission charged by Apple and in any
transaction with the -- a benchmark level.

So for example, if Apple, at some point,
for some transaction was charging 30 percent and
the benchmark is 12 percent, I used 12 percent         12:24:02

Page 111

SER-1072

rather than 30 for that transaction. And that's true for all the transactions through the class period.

Q. And -- and what -- what's the first thing that's happening in the but-for world, aside from prices, compared to the actual world?

What's different about the but-for world aside from pricing?

A. In -- in the but-for world that I modeled, that is the only difference, I believe. I'm prepared to qualify my answer, but I don't believe there's any other difference.

Q. Does your but-for world involve any redesign of the iPhone or any other Apple device?

A. It does not.

Q. Now, your report at section V describes Apple's anticompetitive conduct alleged by Consumer Plaintiffs; is that -- is that fair to state?

A. Yes. I just -- I'm just going to that.

Yes, it describes what I understand the complaint alleges to be the anticompetitive conduct.

Q. And looking at section V, the first paragraph there is paragraph 123.

You say "it is important to my analysis

12:24:06

12:24:17

12:24:37

12:24:54

12:25:22

12:25:40

Veritext Legal Solutions
866 299-5127

SER-1073

to consider what behavior would not be present in
the But-For world."

        Do you see that?

    A.   Yes.

    Q.   What behavior is not present in the
but-for world, in your opinion?

    A.   My understanding is, is that in the as-is
world, the Apple Store has actively restricted
distribution of IOS apps to its -- its own
distribution store and has not allowed any rival
entry -- entry by rivals.

        And it has engaged in conduct which
effectively punishes developers who have -- who
have attempted to provide alternatives to the Apple
App Store either -- but -- but by -- by some
organizational device.

    Q.   Can -- can you identify the developer
that was first punished by Apple in that sense?

    A.   I probably cannot.  I'm -- I'm aware of
the history of Spotify and Pandora and I'm
somewhat -- somewhat aware -- aware of the history
of Epic.

        And those are the examples that I -- that
come to mind.  But I -- there may have been earlier
cases.  I -- perhaps I'd have to review my own

Page 113

SER-1074

report to recall if I mentioned any others, if I have noted them.

Q. Does section V of your report identify all of the conduct of Apple's that is present in the real world, but not present in your but-for world?

A. I -- I believe so, in the sense that my -- my but-for world is -- is concerned solely with the implication of a reduction in the Apple commission to competitive levels.

Q. If you could turn to paragraph 125 of your report, page 60, I'll ask you a question once you've got a chance to look.

A. Yes, I've reviewed that paragraph.

Q. Okay. Thank you.

I'd like to focus on the statement toward the middle, that "Common economic evidence supports the conclusion that there have been multiple attempts by app developers to diversify the means of distributing iOS apps and in-app content, but Apple shut down those attempts."

Do you see that?

A. Yes.

Q. When you refer here to diversifying the means of distributing iOS apps and in-app

Page 114

SER-1075

content, are you intending to convey that these

attempts involved developers trying to set up their

own iOS app stores?

A.   My understanding is that in the -- in the

case of Spotify, for example, it was an attempt to

provide an -- an alternative payment mechanism

outside the App Store so that consumers would be

able to access Spotify content they paid for on

their iPhone without incurring the -- the

commission.

In the case of Epic, my understanding is

that Epic did effectively propose a -- a rival

App Store selling their games and perhaps games of

others.

Q.   You mentioned Pandora is.

Was there an instance where Apple shut

down an effort by Pandora to diversify the means of

distributing iOS apps and in-app content?

A.   My understanding is that both Pandora and

Spotify have -- have -- are -- are no longer

available except perhaps for some legacy consumers

for content.

That is to say, for both of those music

apps, if you want to purchase enhanced content

or -- or things like that, you have to go -- go to

Page 115

them directly outside the iOS system.                          12:31:24

Q.    Is it -- well, you're not suggesting that Pandora or Spotify attempted to open an iOS App Store, are you?

A.    No.  No.  I mean, the -- the -- the          12:31:41
sentence you're referring to also refers to the channels for distribution of iOS content.  And -- and in this case, these -- these particular developers chose -- chose a nonApple Store way of providing content -- and -- and as a result, they          12:32:08
are not -- they don't have this capacity to do this on the Apple Store, or they're not exercising it at -- at the added commission.

Q.    In -- in your section V, you also mention Telegram.                                               12:32:29

Is -- did Apple shut down an attempt by Telegram to diversify the means of distributing iOS apps and in-app content?

A.    I don't know the specifics of the Telegram history.                                         12:32:43

Q.    Do you have an understanding as to whether Telegram attempted to open an iOS App Store?

A.    I don't know.

Q.    You mentioned Kobo as an example in          12:32:51

Page 116

**SER-1077**

section V.                                                          12:32:56

Is it your understanding that Kobo was making an attempt that Apple shut down to diversify the means of distributing iOS apps and in-app content?                                                           12:33:10

A.   I don't know the history of Kobo.

Q.   Do you know if Kobo was attempting to offer an iOS App Store?

A.   I don't know.

Q.   Do you know if any other attempt to                           12:33:20
diversify the means of distributing iOS apps and in-app content that Apple shut down?

A.   I -- I -- as I sit here, no, I don't have a -- a list in mind.

Q.   And if you had a list at any point, you                       12:33:44
would have included that in your report; is that fair?

A.   And please be specific.  A list of what again?  Of -- of attempts to establish rival app stores?                                                            12:34:06

Q.   That -- that -- that works as a question.

A.   The answer is, I -- I -- I didn't -- I didn't have it.  So the question of whether I would use it never came up.

MR. SWANSON:  Okay.  I think we have gone                          12:34:22

Page 117

SER-1078

about another hour and we're probably around                    12:34:24

lunchtime for West Coasters.  But I'm fine to take

a lunch break whenever.

        MR. BURT:  It's sort of foreseen that

around this time you -- you might suggest a lunch               12:34:36

break.  And I think we had foreseen that we'd be

positive on that.

        MR. SWANSON:  Oh, okay.  Well, that --

that's good.

        So how long -- I think the -- the two --            12:34:45

the folks maybe who get the biggest vote are

Professor McFadden and our court reporter, who are

working the hardest.

        THE COURT REPORTER:  Should we go off the

record?                                                        12:34:56

        THE DEPONENT:  I'm -- I'm -- I'm somewhat

flexible.  45 minutes, perhaps, or an hour.

        MR. SWANSON:  That's --

        MR. BURT:  My experience -- okay.  If you

want an hour, we can do an hour.                               12:35:07

        MR. SWANSON:  It's -- it's up to you.

Whatever -- whatever you prefer.

        THE DEPONENT:  Any -- any preferences

from others?

        MR. BURT:  You're -- you're the witness.            12:35:18

Page 118

**SER-1079**

Your call.

THE DEPONENT:  Let's -- let's do a full hour.

MR. SWANSON:  Okay.

THE VIDEOGRAPHER:  Okay.  Sounds good. I'll take us off the record.

We are now going off the record.  The time is 12:35 p.m.

(Recess taken.)

THE VIDEOGRAPHER:  We are now back on the record.  The time is 1:36 p.m.

Q.   (By Mr. Swanson)  Professor, does your model account for the ability of developers to sell digital content in their iOS apps without using Apple's in-app purchase mechanism?

A.   Please read back the question.

Q.   Sure.  I will do it.

Does your model account for the ability of developers to sell digital content in their iOS apps without using Apple's in-app purchase mechanism?

A.   Well, it does in the sense that those alternatives are currently forbidden to developers by Apple, as I understand it.

Q.   Well, take -- take an example of, say,

Page 119

SER-1080

Netflix, which can sell subscription to digital

content outside the app that can be accessed within

the app without using Apple's in-app purchase.

Does your model account for that?

A.   I would say the model does in the sense

that there are no harm or damages attributed to a

consumer who is accessing Netflix content on -- on

their iPhone.

Q.   Through -- through subscription via

Netflix websites; is that what you are indicating?

A.   Where -- where they have subscribed

directly to Netflix, correct.

Q.   And why would a consumer be injured in

such a situation?

A.   They are not.

Q.   Speaking of situations where a developer

has a free app and allows subscriptions only on its

own website, if the developer switches from that

model to offering the app on the App Store with

in-app purchase of the subscription so that it can

no longer be purchased on the website, would you

expect the price of the subscription to go up, go

down, or stay the same?

A.   I would expect the price of the

subscription to go up because if that developer has

Page 120

SER-1081

positive marginal cost, then there is a positive

relationship between their actual cost and the

price they charge, and the commissions is part of

that cost.

Q.   Have you seen any evidence in this case

of subscription prices declining in those

circumstances?

A.   I have not specifically sought out

examples.  I'm aware of statements from the

European Commission, for example, to the effect

that the same product is available at a lower price

outside the Apple Store than it is inside the

Apple Store, and I'm aware of a few cases where

that's also true for games which are available both

inside and outside.

Q.   Professor, could you turn to

paragraph 128 on page 61 of your report?

A.   Yes, read that.

Q.   You indicate in that paragraph that Apple

has been controlling what prices developers can

charge by setting up pricing tier for apps and

in-app content rather than letting app developers

set the price of their products.

Do you see that?

A.   Yes.

Page 121

**SER-1082**

Q.   And does your but-for world assume that developers are free to charge whatever they want for their apps and in-app content?    01:41:20

A.   The but-for-world calculations that I currently do consider that case.  That is to say, they don't impose explicitly the Apple tier structure.  But my -- my calculations are readily adapted to a situation in which they -- in which they did.    01:41:38

Q.   Is it -- are you offering an opinion that Apple's 99-cent-price-tier structure is anticompetitive?    01:42:03

A.   Yes.  I would say, as a matter of economics, tier -- tier structures have a -- have a substantial effect on the nature of -- of competition.    01:42:24

Q.   Is it your opinion that a tier structure, such as Apple's, is price fixing?

A.   The answer is:  No.  I would -- I haven't labeled it price fixing.  Although, certainly setting a -- a tier structure itself is something that would be hard to sustain if you did not have some market power.    01:42:52

Q.   In your opinion, is vertical price fixing inherently anticompetitive?    01:43:11

Page 122

A.  If, by "price fixing," you mean essentially posting a price, clearly not; that the only -- it's only anticompetitive in the situation where it's -- it's combined with acts which are judged to be anticompetitive.

Q.  Let me make sure my question was clear.

Are you -- are you familiar with the phenomenon of vertical price fixing?  Sometimes called "resale price maintenance"?

A.  Yes, I am.

Q.  Is it your opinion that vertical price fixing is inherently anticompetitive?

A.  I -- I don't think that it's -- it's a -- per se, anticompetitive.  I think, in many cases, there -- in many economic environments, it -- it would be.  It depends -- it depends on how it affects competition.

Q.  And how would you assess whether vertical price fixing was inherently anticompetitive?

MR. BURT:  Objection.

THE DEPONENT:  Well, I haven't laid out a -- a research plan for -- for doing that, and I would certainly have to think about the -- the detailed steps, but the -- an obvious approach would be to try to compare markets otherwise

01:43:20
01:43:39
01:43:52
01:44:15
01:44:36
01:44:55

Page 123

SER-1084

comparable, one of which has a resale price                    01:44:59

maintenance or -- or a tier structure in place

versus one that does not.

Q.    (By Mr. Swanson)  Are you modeling the

absence of Apple's tier structure in the but-for              01:45:15

world because you are assuming it will be absent

because it's anticompetitive?

A.    The -- the answer to that is that the

model that I have worked out and provided results

for so far is -- is -- gives a but-for world in               01:45:35

which both the plaintiffs alleged anticompetitive

acts are gone.  However, the model itself is -- is

readily adaptable to situations in which one or the

other of those might not be declared

anticompetitive.                                              01:45:59

Q.    So if the finder of fact determines that

Apple's pricing tiers are not anticompetitive, how

would you adapt your model to that finding?

A.    This is described in Appendix F of my

report.  Effectively, a firm, maximizing their               01:46:19

profit under a tier structure, will -- can consider

only -- only price alternatives that are on the --

on a tier.  And so that -- that optimization would

be carried out in that form rather than in a

continuous price setting form.                                01:46:40

Page 124

Q.   Do you have an opinion as to whether   01:46:46
Apple's price tiers ever result in developer
setting prices lower than they otherwise would in
the real world?

A.   I haven't analyzed that question   01:47:02
specifically.  But I would say this:  If you had
free hand at setting prices, you can -- you can
maximize your profits, and then you would look at
what profits you could actually attain if you fell
back to one or another tier points and you pick out   01:47:23
the one that has the -- has the higher profit.

Now, whether that's a higher price than
the optimum -- that is, whether the tier is higher
or lower than the optimum price -- I think the
answer is it could easily go either way.   01:47:42

Q.   Do you agree that Apple's 99-cent pricing
tiers create a strong disincentive for developers
to raise their price?

A.   If -- if, by "99-cent tier," you mean
the -- the 99 -- the one-dollar gap between one   01:47:59
tier level and the next?  I think -- my opinion is
that that has a fairly strong effect on the ability
of developers to discount to attract users or to
test the waters to see if the market would sustain
alternative prices, essentially because it requires   01:48:29

Page 125

**SER-1086**

them to take a pretty strong position vis-à-vis

rivals and vis-à-vis consumers rather than --

rather than a -- a small change that rivals -- or

consumers might not pay too much attention to.

Q.   Does your model in the but-for world
allow for short-term price discounting?

MR. BURT:  Objection.  Form.

THE DEPONENT:  I would say that, right
now, the model is silent on short-term price
discounting because it is -- its objective and --
is to obtain a overall picture of the common effect
on the class that change -- of the change in Apple
conduct, and it's not a model of detail developer
behavior, particularly at the level of detail of
the -- of the timing, say, of price changes or
discounts.

Q.   (By Mr. Swanson)  Your model assumes that
a developer will maintain a particular price level
for an entire year, at least, correct?

A.   Currently, the model is conducted month
by month.  And the -- the developer in -- within
the model, it has a profit-maximizing price
determined within each month.

That's true for the core of the model.
There are some places where we use annual or other

01:48:31

01:48:56

01:49:22

01:49:45

01:50:12

01:50:37

Page 126

time periods, but the month, I believe, is the --
the period we use for the core of the model.

Q.   Okay.  Well, thank you, then, for
clarifying that.

On paragraph 129 of your report -- let me
know when you are there.

A.   Yes, I have that in front of me.

Q.   In paragraph 129 of your report, you
indicate that Apple's price tiers hinder
competition among app developers by limiting the
force of competition to drive down prices.

Do you see that?

A.   Yes.

Q.   Is it your opinion that, without Apple's
price tiers, developers would compete more on
price?

A.   Yes, I believe they would.  They -- the
effect -- the effect of tiers in this market and
in -- in other markets, in general, is to -- is
to -- is to discourage entry, discourage test
excursions.  It has the effect of stabilizing
markets, and that stabilization can be
anticompetitive.

Q.   How can you determine from your model or
within your model whether a given developer faces

Page 127

substantial competition?

01:52:08

MR. BURT: Objection. Form.

THE DEPONENT: In the -- in the model, under the assumption of product maximization, there is a simple mathematical relationship between the 01:52:21 developer's marginal cost and -- and price -- and retail-quoted price. And that also -- that relationship is mediated by the demand elasticity that that app faces.

If the app developer faces strict -- 01:52:50 strong competition, that elasticity will be large. People will easily substitute away from it to rival apps, and if there's not much competition for it, then that elasticity will be low, and that affects the relationship between marginal cost and price. 01:53:11

Q. (By Mr. Swanson) And what -- what would be an example of an elasticity that would be consistent with a high level of competition?

A. Oh, generally, you would expect any of these firms to push their price to a point where 01:53:35 the elasticity is -- is greater than one in magnitude, and so that's -- that's the lower bound, and -- and highly elastic demands close to competition are -- I think are often -- elasticity is, like, three or five. I don't think there's any 01:53:56

Page 128

standard table which says one is higher than the    01:53:59

other.  But in my -- in my judgment, three is

pretty competitive.

    Q.   If you took two different game apps, for

example, both of which are 99 cents in the real    01:54:16

world, would you be able to determine which of the

two faced more competition from the results of your

model?

    A.   Not without further information, no.

    Q.   Would your model allow those two game    01:54:45

apps to have elasticities of demand that vary,

you know, as between the two, substantially?

    A.   The analysis that I do currently looks

for the common effect of, you know,

profit-maximizing pricing behavior on -- within the    01:55:14

genre and how that would respond to a change in

Apple commissions.  So it's looking for the

common -- common effect.  It's -- it's not

distinguishing individual variations around that

common effect.    01:55:35

    Q.   Would -- would two game apps in the --

well, would two -- two apps in the game genre that

have the same price have the same demand elasticity

in your model?

    A.   No, not necessarily.  They -- they do --    01:55:58

**SER-1090**

they have the same estimated demand parameters, but not -- those don't apply the same elasticity.

Q. And that's the case if they both have the same price?

A. Even if they -- if they -- if they have the same price, they -- the implication is that they will have comparable marginal costs, and the demand elasticity would -- at close -- that is implied by that -- I -- I have to think about that and go back and -- and do the algebra to -- to check.

In general, the -- the -- the demand -- the demand elasticity faced by individual developers will be a function of their price, but I -- it may well be the case that, at the same price, they have the same elasticity.

Q. Professor, in the but-for world, how many rival iOS app stores will there be?

A. I have not offered any -- any opinion on that. In fact, to go further, I have offered no opinion on the -- the form competition would compare to pressures would lead Apple to lower its commission. I have simply done the calculation of what commissions are that would be consistent with competition among app stores.

01:56:02

01:56:18

01:57:01

01:57:17

01:57:43

01:58:10

Page 130

**SER-1091**

How that would actually be achieved in -- in a but-for world by Apple could be by limit pricing. It could be by entry of rivals. It could be by other mechanisms, I suppose. But I don't have an opinion on what combination of those would actually achieve the -- the bottom line.

Q. If you believe that that could be achieved through limit pricing, does that mean that your but-for world is consistent with no actual entry?

MR. BURT: Form.

THE DEPONENT: Yes, my but-for world is consistent with a -- a situation in which Apple rules allowed entry, but it sets its commissions in such a way that potential entrants found it unprofitable to come in. That -- that's what limit pricing does, and that's certainly a possible outcome.

Q. (By Mr. Swanson) Do you have any opinion as to the App Store's market share on the but-for world?

A. The answer is: No, I don't because I -- I am not offering any opinion that the but-for world would have a specific industrial structure in terms of whether rivals are actually present;

Page 131

whether rivals are potential. As I just mentioned,  01:59:45

they might be achieved by limit pricing. It might

be achieved by actual entry. It might be achieved

by other -- other mechanisms which are possible

competitive responses.  02:00:01

Q. Now, it's your opinion that, in the

but-for world, Apple would reduce its default

commission below 30 percent, correct?

A. Yes.

Q. Is -- is it a necessary condition for  02:00:18

your opinion about consumer class-wide impact that

Apple lowers the 30 percent commission in the

but-for world?

A. The -- the -- the harm that I measure and

the damages that I calculate are -- are based on a  02:00:46

but-for world in which Apple is assumed to lower

its commission rate to what I consider -- I find to

be a competitive benchmark. And if that changes,

both the -- the level of harm, the -- which

consumers are harmed and how much they are harmed,  02:01:14

could all change.

Q. And to the extent Apple would continue to

charge 30 percent as a commission in the but-for

world, that would lead to consumers who your

analysis says are injured to being uninjured,  02:01:32

Page 132

correct?

A. Well, your hypothetical, it seems to --
it seems to be inconsistent.

In the -- in the but-for world, I'm
assuming that competitive forces would force Apple
to a competitive benchmark. Obviously it's a
question of -- on its merits, as to what that level
would -- exactly would be, but given a but-for
level, my -- my position and my calculations on
this are based on the assumption that that level
would be achieved; that that benchmark level would
be achieved by whatever form the competitive
pressures take.

Q. You -- you reached a conclusion about the
but-for commission rate in a way that doesn't rely
on your model, correct?

A. My -- my opinion on but-for commission
rates is based on a comparison of -- of -- well,
it's based on some benchmarks which are app stores
that are recently opened for app -- apps other than
the Google and -- Google Store and Apple App Store
apps, and these are benchmarks in which there is
some competition across providers.

Q. Your mathematical model that you have
constructed does not predict what commission Apple

02:01:35
02:01:46
02:02:09
02:02:30
02:02:55
02:03:25

Page 133

will charge in the but-for world, correct?                02:03:29

A.    Correct.

MR. BURT:  Objection.

Q.   (By Mr. Swanson)  And it wasn't designed

to do that, correct?                                      02:03:35

A.    Correct.

Q.    And you haven't made any mathematical

model or statistical model of the but-for

commission, have you?

A.    No.  I mean, obviously, an economist          02:03:48

could do that, and I'm aware that that could be

done, but I have not done it in this case.

Q.    Would you please turn to paragraph 155 of

your report.  It starts on page 71.

Are you there?                                            02:04:39

A.    Yes, I am now there.  Let me take a quick

look at the paragraph.

Yes.

Q.    You state there in that first sentence on

page 71 on paragraph 115 that "When estimating           02:05:06

competitive But-For prices for a market that has

never experienced competition, as in the case at

hand, markets that have similar characteristics but

are more competitive can provide useful

benchmarks."                                              02:05:23

Page 134

SER-1095

My question is:  How do you determine whether a benchmark market has similar characteristics?

A.    Well, I think it's largely common sense. Are they dealing with economic agents that have rough -- roughly similar interests?  Firms that have roughly similar technologies and -- and business models?  You know, are the products, by a -- by a commonsense measure, somewhat similar?  I don't think there's a -- there's a scientific bright line which says that one benchmark is ideal, and -- and another one is unacceptable.  It's -- it's a commonsense judgment.

Q.    You have rejected the -- the domestic Android App Store business as a benchmark; is that correct?

A.    I have -- the answer is:  Yes.  I know it as the Google Store.  But, yes, I have rejected the Google Store as a -- as a benchmark.

Q.    What about the Samsung Store?

A.    I -- I don't -- I don't recall looking at the Samsung Store.  I -- I did not, myself, look individually at benchmarks.  I simply asked the team to look for market situations in which rough -- roughly comparable business models

02:05:25
02:05:36
02:06:06
02:06:28
02:06:46
02:07:12

Page 135

for developers -- roughly comparable for decisions
for consumers and some degree of competition
among -- among the platforms for getting the apps
delivered, and I told them to exclude situations in
which there was a clear claim of noncompetitive
conduct, which is, I understand, to be the case for
the Google Store.  And also I asked them to exclude
game -- game devices because I -- I believe that's
a different business model.

  Q.  So you excluded stores on game consoles.
You excluded Google.  You haven't considered
Samsung.

    What -- what -- did you define your
benchmark by exclusion, or were there other options
that your team examined beyond PC games?

    MR. BURT:  Objection.  Form.

    THE DEPONENT:  My instructions to the --
to the team that -- that did this for me was:
Simply look for things that are -- as -- as
comparable as you can find where -- where the
delivery platform is competitive and -- and exclude
situations where there is already an allegation of
monop- -- monopoly or there's clearly a different
business model.  Those -- those are the only
instructions that I gave them.

Page 136

Q. (By Mr. Swanson) Did you instruct your team to exclude the Mac App Store? 02:09:01

A. No, I -- not -- I didn't one way or the other. No.

Q. Do you know if that was excluded as a benchmark? 02:09:15

A. It's -- it's not -- it's not listed among the benchmarks mentioned in the report, as I recall. So I -- I -- I don't recall it being brought up as a -- as a candidate for inclusion. 02:09:35

Q. Well, do you consider the Mac app environment to be competitive?

A. I don't -- I don't know. I haven't -- I haven't looked at it. And the question, for me, is a little complicated because there are, obviously, 02:09:56 places where native apps are available, and there are places where, basically, nonnative apps are available. And for PCs, it's -- I'm -- I'm aware that there are a broader range of apps that are -- are, essentially, Web-based. They are not -- not 02:10:21 necessarily native to the machine. I don't -- I actually have no idea what's in the Mac store in terms of what's native to the IS [sic] operating system and what's -- what's Web-based.

Q. Are you aware that -- that apps can be 02:10:38

Page 137

SER-1098

Q. directly downloaded onto Macs?                    02:10:43

A. iOS apps? -- iOS-compatible native apps? Is that the question?

Q. The Mac is not an iOS-operating-system device.                    02:10:58

You are aware of that, aren't you?

A. Well, it's an -- it's an Apple operating system. It's a proprietary system. It certainly has many features in common with the -- with the iOS operating system, but I'm -- I'm -- I'm aware                    02:11:12 that there are -- are differences; that, you know, Yosemite or Sierra are different operating systems in the -- in -- operates on my iPhone.

Q. So whatever operating system the Mac uses, are you aware that developers can -- well, or                    02:11:27 consumers can -- download the apps of developers outside the Mac App Store?

A. I -- I'm -- I'm not entirely aware of this because I seem to recall that on the -- on the Apple device -- my wife's Apple device, there's                    02:11:57 a -- an Apple App Store icon, so as I sit here, I don't know how it works. It seems to me that -- that that would seem to appear to be an Apple App Store source.

Q. Is it -- is it -- well, are you saying                    02:12:18

Page 138

**SER-1099**

that you don't know whether or not consumers can 02:12:20

directly download apps, including app stores, onto

the Mac?

A. What I'm saying is that, just based on

my -- my own experience helping my wife on her -- 02:12:34

her Apple Mac, is that my recollection is that

there is an Apple App Store logo there, and I

assume that that means that she can download apps

from -- from the App Store. I assume those are

then apps that are native to the operating system 02:12:57

on the Mac or -- or Web-based. I am not sure about

that.

Q. Professor, for a benchmark to be

reliable, is it important for the market to be in

the same geographic market as the relevant market 02:13:16

in question?

A. Oh, I think that judgment would -- would

depend on circumstances, not specifically on -- on

geography, but I can -- I can -- I can tell you

that in the discussions with my team, we did 02:13:37

discuss whether overseas app stores would be

appropriate, and we concluded that their operating

conditions and government regulations and so forth

were sufficiently different so that their -- their

value would be questionable. 02:14:01

Page 139

Q. For a benchmark to be reliable, is it important for the market to be comparable to the relevant market in question over the whole class period?

A. To answer your question, I -- I would say that -- first of all, that the benchmarks that I have are -- are not -- do not extend over the entire class period. They are based on relatively recent -- relatively recent developments in which rival app stores have arisen, especially since about 2016; so that my whole analysis is predicated on the -- on the comparison of Apple commissions and these benchmarks in the latter part of the class period.

Q. If you flip to paragraph 156, which is on page 72, and then I will ask you a question once you get there.

A. Yes, I have read it.

Q. You state here that "What has happened to games app stores on the PC platform in the last few years is particularly relevant."

My question is: Why is what happened to game app stores on the PC platform in the last few particularly relevant to but-for commissions in 2008 or 2009?

02:14:03

02:14:18

02:14:43

02:15:09

02:15:36

02:15:54

Page 140

A. I think it's -- I think it is -- it is relevant because it is -- it is a competitive benchmark in a situation where you can clearly identify relatively similar products, relatively similar economic agents on the -- on the -- on the -- the ends of the market and where it's -- it's clear there is -- there is rivalry going on so that the -- those criterion for a benchmark are met.

If there were -- if that situation arose earlier, then it would be better to use a -- a benchmark that was closer in time, but I think what's particularly -- makes it particularly relevant here is they are similar in most respects except for the degree of competition. And I don't -- I don't see the time period being a first-order issue in this comparison.

Q. Is what happened to game app stores on the PC platforms in 2008 particularly relevant to but-for commissions in 2008 in this case?

A. Please repeat the question.

Q. Is what happened to game app stores on the PC platforms in 2008 particularly relevant to but-for commissions in 2008 in this case?

A. Well, it would be relevant if there were

02:16:01
02:16:18
02:16:34
02:16:57
02:17:17
02:17:44

Page 141

competition among PC game app stores at that time                    02:17:47

and so that the other conditions for being a

relevant benchmark were met.  But in my

investigation to this point, I'm not aware that

there are -- are such comparable benchmarks in that       02:18:05

period specifically.

Q.   Well, is it your opinion that, in 2008,

the PC games business was not competitive?

A.   No, that's -- that's not what I said.

What I said was that I am not aware that there             02:18:30

were -- there was an actively competitive market

for apps -- PC game apps at that time.

Q.   Well, what -- what do you consider to be

an "actively competitive market"?

A.   Well, I would -- I would say that in --           02:18:55

in general, the same criteria that you would use,

in general, to judge whether a market is -- is

roughly competitive or not; if it has a reasonable

number of firms; that no single firm has -- has

extremely large share.  Those would be traditional        02:19:15

economic tests for whether it's a competitive

market.

Q.   So based on those tests, when did the PC

games business first become competitive, in your

opinion?                                                  02:19:31

Page 142

SER-1103

A. That's not a -- a question that I have sought to answer in the past.

What I asked the team for was to find benchmarks where there was clear competition, and they found the ones that I cite in my report.

I see that the date on at least the two cited in this paragraph that we are referring to are 2018. So I didn't -- I didn't specifically instruct them to go and look for earlier periods where there might -- might have been competition.

As far as I'm aware, they didn't alert me that there were earlier periods, and as far as I'm aware, there are not.

Q. You discuss Steam as a potential benchmark from which one can infer but-for commission rates; is that fair?

A. I do, yes.

Q. Are you familiar with Steam's current commission structure?

A. I -- I believe it's -- I have numbers for it in the report, but I don't remember them as I sit here.

Q. Well, let me see if I can refresh you.

Are you aware that Steam charges a 30 percent commission on every app, up to the point

02:19:34
02:19:46
02:20:06
02:20:21
02:20:35
02:20:46

Page 143

at which the app earns $10 million in revenues?                    02:20:49

A.   I would have to go to my specific paragraph.  What I recall is that the Steam commissions have been changed -- or have been changing as entry has occurred in this app -- in    02:21:06 these app markets.

Q.   Are -- are you assuming that Steam stop charging a 30 percent commission after entry occurred?

A.   As I sit here, I don't remember the    02:21:23 numbers.  I would have to go and look at my own paragraphs.

Q.   Well, if Steam continued to charge a 30 percent commission on most apps, would that be consistent with your benchmark?    02:21:35

A.   Well, I -- first of all, I don't -- I don't think that what commission they were charging would be -- is -- is itself part of the determination of what's an appropriate benchmark. You -- you set up the benchmark in terms of whether    02:21:59 conditions for competition in a -- in a market are met, and then the consequences of that flow from it.

So I think the answer is that if -- if Steam is an appropriate benchmark, and whatever    02:22:18

Veritext Legal Solutions
866 299-5127

SER-1105

commission they are charging would go into the

calculation of what a -- what a commonsense

competitive benchmark would be.

Q. Is it your opinion that in an actively

competitive benchmark market, that a online store

in that market could continue to charge a

30 percent commission?

MR. BURT: Objection to form.

THE DEPONENT: Well, I think the nature

of competition is that competitive pressures come

in -- in various ways, and, obviously, in an

app store, developing with developers -- or in a --

say in a competitive app store dealing with

developers, they have to worry about the ability

of a developer to switch app stores.

I could imagine circumstances in which

the switching costs for a developer from an

existing app store would be so high that they --

they would be willing to pay a very high

commission, if charged, rather -- rather than

bailing out. That's -- that's a -- that's a

general economic phenomenon. Of course, that's the

same phenomenon that comes into the definition of

the limits of a market.

Q. (By Mr. Swanson) Well, you indicated you

Veritext Legal Solutions
866 299-5127

SER-1106

could imagine circumstances where the developer 02:23:54
would face high switching costs.

Have you actually made any empirical
investigation of -- of the extent of switching
costs for developers in the real world? 02:24:05

A.   No, I have not undertaken any detailed
study of -- of developers.  I -- I have done what I
consider to be the -- the necessary modeling to
reflect the impact of their behavior on consumers,
and I haven't gone beyond that. 02:24:30

Q.   Who -- who or -- or which firms are the
entrants into the PC game business that you have
been referring to?

A.   I -- I can't -- I can't recall the names
without going back to my report. 02:24:51

Q.   Is Epic Games Store one of the entrants
you are relying on?

A.   I don't -- I don't even recall that.  I
would have to go and look.

Q.   Your understanding is that there have 02:25:10
been entrants into the PC game business?

A.   That is my -- my understanding; that
since 2018, the premise mentioned in these
paragraphs, 156 and 157, I believe, would be
counted among -- among them. 02:25:32

Page 146

Q. So that would be the Epic Games Store, would be one, right?

A. As -- as I report, yes.

Q. And there's the reference to Steam.

Was Steam -- Steam was not entrant; it was an incumbent, correct?

A. Yes.

I would not make a distinction between incumbents and -- and entrants in -- in determining the benchmark.

What we are doing here is asking, you know, what -- what kinds of commissions are, in fact, charged in a situation where there is competitive pressure. Clearly, obvious -- obvious competitive pressure because there are multiple incumbents for entry.

Q. Now, in paragraph 157, you note: "Previously, Steam had charged a constant 30 percent commission rate on game revenues. Under Steam's new commission structure, the commission rate paid to Steam would fall to 25 percent on a game's sales above $10 million, and decrease again to 20 percent on sales above $50 million."

Do you see that?

A. Yes.

Page 147

SER-1108

Q. You understand that a game that had sales 02:26:51
below $10 million was -- is still charged the
30 percent commission by Steam?

A. That's apparently the case, yes.

Q. Okay. And you believe that that is a 02:27:08
competitive reaction on the part of Steam in an
actively competitive market?

A. I would say that it -- it remains to be
seen. I -- I would -- I would -- I would imagine
that small developers with sales less than this 02:27:29
have to rethink their alliance with Steam.

Q. Do you --

A. So maybe competitive pressures will come.

Q. Do you -- are you aware of how many game
apps had their commissions reduced after Steam 02:27:48
changed its commission structure?

A. No, I don't. I mean, clearly the
10-million- and 50-million-dollar thresholds are
limiting you to large -- fairly large apps, so
there are not -- there are not so many of those. 02:28:14

Q. Are you of the view that
Epic Game Store's 12 percent commission fee, which
you refer to in paragraph 156, is a proper
benchmark for the but-for world?

A. It's certainly one of the -- one of the 02:28:38

Page 148

markets that I have cited as a potential benchmark, 02:28:44
yes.

Q. Why does Epic Games Store charge a 12 percent commission and Steam charges a 30 percent commission, except for very -- except for apps that earn more than $10 million? 02:28:56

A. Well, I -- I would say that that -- that's a situation in which I would -- I would expect that there's competitive pressure on Steam.

Q. Do you have an understanding as to whether Epic Games Store charged a below-cost commission in order to attempt to attain critical mass for its platform? 02:29:24

A. I -- I -- I don't have a direct answer to that question. We -- we have looked at Epic's cost structures, and my recollection from those calculations for -- for Epic, in particular, is that they are -- they are pricing above their marginal costs. 02:29:48

Q. Do you have an opinion as to whether they're pricing above their average total cost? 02:30:09

A. No, I haven't -- I haven't gone to look at -- at -- at company's books. I don't even know if I have general access to the company's books so that -- total cost and profits are available to me 02:30:28

Page 149

only from firms that are publicly listed.  I don't even know if Epic is publicly listed.

Q.  Do you know if Epic offers developers lucrative minimum guarantees in order to place their apps exclusively in Epic's Games Store?

A.  No, I have not had any reports on that, and I haven't studied it.

Q.  Do you agree that, since 2008, many online stores -- online app stores have charged a 30 percent default commission rate?

A.  The question is am I aware that that is the case?

Q.  Yes.

A.  No, I'm -- I'm -- I'm not aware that it's the case.  I -- if you told me it -- with data, that it was, I wouldn't be particularly surprised; because a general economic pattern is that firm -- firms will -- will charge the current market price, unless competitive pressures force -- force prices down.  So the way I would ordinarily expect the dynamics of a -- any market, including this market, to work is that people would come in as potential rivals in some form or another.  They would charge these existing prices and see if they -- see if they can sustain it.

Page 150

Q. In the but-for world, how much time would it take before entry would lead Apple to charge the 10 to 12 percent but-for commission level that you use as a benchmark?

MR. BURT: Objection. Form.

THE DEPONENT: I have -- I have no idea how -- I -- I would be, I think, a difficult calculation for -- for economists, so -- because it -- it -- it depends on the detailed evolution of the structure of the market, and that's -- that's much harder to predict than to predict that competitive pressures, in general, will operate on some timescale.

Q. (By Mr. Swanson) Do you agree that until the day before yesterday, that Microsoft Store on Windows charged game app developers a 30 percent commission on paid transactions?

A. I have -- I have looked at data from the Microsoft Store in the past, but -- and I -- I think I dimly recall that August 1st was a -- was a switch date. But beyond that, I don't remember any details.

Q. Do you understand that, before that switch date, Microsoft charged a 30 percent commission?

Page 151

**SER-1112**

A. I don't recall. I just don't remember now. 02:33:40

Q. If you look at paragraph 158, tell me if that refreshes your recollection.

A. Well, yes, it does. So your description 02:33:58 is correct.

Q. So from the beginning of time until the day before yesterday, Microsoft charged a 30 percent commission for game apps, correct?

A. Apparently, so. 02:34:14

Q. But you believe the commission that Microsoft charged the day before yesterday is the proper benchmark for the but-for world?

MR. BURT: Objection to form.

THE DEPONENT: No, I think to the 02:34:29 contrary.

What -- what you are -- are seeing right now is a response to the Microsoft Store to competitive pressure. That's the -- the move from 30 percent to 12 percent is the -- is the effect of 02:34:44 competitive pressure.

Q. (By Mr. Swanson) How do you reconcile the fact that the commission reduction announced by the Microsoft Store that you cite is limited to game apps; while, in the but-for world, you would 02:35:03

Page 152

SER-1113

apply that rate to every app?

02:35:06

MR. BURT: Objection. Form.

THE DEPONENT: In -- in my calculations, I -- I assume that the competitive pressure that would be applied to Apple -- to the Apple Store would -- would come from things like rival -- rival Apple Stores or other competitive pressures that would -- would apply across the genres.

02:35:28

If -- if the -- an alternative but-for world was proposed in which that -- those competitive pressures would differ across genres, that could be built into the model. But sitting here as an economist, that's -- that strikes me as being a -- a -- a secondary effect rather than -- rather than the common effect of Apple's conduct.

02:35:52

02:36:16

Q. (By Mr. Swanson) Professor, in paragraph 159, you refer to the Discord Game Store.

Do you see that?

A. Yes.

Q. Are you relying on the Discord Game Store as part of your analysis of the benchmark for the but-for world?

02:36:43

A. Give me a minute to reread my paragraph.

I -- the -- the intention of these paragraphs is to mention this particular App Store

02:37:23

Page 153

as -- as a competitive entrant.  I -- I believe it   02:37:31

would be -- if they are, in fact, a competitive

entrant, as I claimed here, it would be appropriate

to look at their -- their commissions.

Q.   If Discord shut down its game store,   02:37:47

would that lead you to reconsider whether their

commission rate was a proper benchmark for the

but-for world?

A.   Oh, I would definitely be curious as to

what the circumstances were, if that's something   02:38:08

that's actually happened.  Firms come and go for --

for a variety of reasons, so not -- not always

simply because they can't make money.

Q.   In paragraph 161, you state, that first

sentence, that you use 10 to 12 percent as to the   02:38:28

but-for commission rate?

A.   Yes.

Q.   Within that band, is there a point

estimate that you consider to be the most accurate

but-for commission rate?   02:38:47

A.   No, I think that that -- that band itself

is -- I also consider a 5.2 and a 15 percent

commission rate in -- in an appendix.  That -- I

think that band is representative of what the --

the competitive App Store market commission rate   02:39:09

Page 154

would be.

So, in my opinion, it's -- it's appropriate for this analysis, but as -- as additional data comes in, if -- if it does on the behavior of comparable markets, then that's subject to revision.

Q. When you refer to 15 percent as an upper bound for sensitivity checks, does that mean, in your opinion, the but-for commission could be as high as 15 percent?

A. I am -- I am not offering an opinion that is confined to 10 to 12, but my -- my judgment on the basis of the benchmarks that I have now, that's the most likely range.

The 15 percent is used because it is a -- it's a commission that Apple has currently adopted for certain uses, and it, presumably, is at least sufficient to cover their costs; otherwise, they would not have adopted so low a commission rate.

The 5.4 commission rate, as stated in the report, is based on credit -- credit card comparables, which are somewhat, but not, perhaps, as closely comparable as the PC game store -- app stores.

MR. SWANSON: I think we have going for a

Page 155

bit over an hour.  Shall we take a break?          02:40:56

          MR. BURT:  Seems prudent.

          THE VIDEOGRAPHER:  We are now going off

the record.  The time is 2:41 p.m.

          (Recess taken.)                           02:41:05

          THE VIDEOGRAPHER:  We are now back on the

record.  The time is 2:52 p.m.

          Q.   (By Mr. Swanson)  Professor, in your

but-for world, do you assume that there will be a

single uniform commission rate?                     02:52:46

          A.   Yes, the but-for calculation that I do

uses one of these rates here, hovering in the 10 to

12 percent range or the two extremes, and seems

that's uniform.

          Q.   Is there some reason why you would reject  02:53:16

the possibility that there would, in the but-for

world, be a tiered commission structure?

          A.   I would not reject that possibility.  I

believe that, under competition, competition would

tend to erode a tier structure -- well, leave it at  02:53:45

that time.

          Q.   Well, can you identify multiple stores in

your benchmark PC game market that do not use a

tier structure?

          A.   I would have to go back to the data      02:54:14

                                                    Page 156

behind the report because I don't -- I don't recall.

Q. You are aware that Steam has multiple tiers, correct?

A. Yes.

Q. Microsoft Store does not charge a uniform commission rate, correct?

A. I don't recall the details of their commissions.

Q. Okay. The Epic Game Store -- does Epic uniformly charge 12 percent?

A. I don't know that either.

Q. You indicated earlier, I believe, that your model assumes that only the commission rate would be different in the but-for world; is that -- is that correct?

MR. BURT: Objection. Form.

THE DEPONENT: In my but-for world, my assumption is that the forces of competition would drive the Apple Store commission rate down to the -- the benchmark level for which the calculation is done and that that would -- those forces of competition would have the uniform effect across -- across different genres, for example.

Q. (By Mr. Swanson) You are aware that

02:54:17
02:54:27
02:54:35
02:55:06
02:55:21
02:55:42

Page 157

developers make payments, other than commission

payments, to Apple, are you not?

A. Yes.

Q. Are you assuming that, in the but-for

world, there would be no change in those other

payments?

A. I don't think I made an explicit

assumption on that in the sense that I -- I deal

only with the impact of the Apple Store commission

on the prices for downloads set by the developers.

So I think the -- the model is -- is moot on --

mute on that issue. It doesn't require an

assumption one way or the other.

Q. If, in the but-for world, Apple charged a

5 percent royalty on developers' sales of iOS app

and in-app content through non-App Store channels,

would that affect the accuracy of your model?

A. I think I understood your question, but

could you state it again just so I have the -- make

sure I have the right percentages going to the

right place.

Q. Sure. Fair enough. And let me try to

make it as clear as I can.

In the but-for world, if you assume the

but-for commission that you currently assume, but

Page 158

also assume that Apple charges a 5 percent royalty    02:57:29

on developer sales of iOS apps and in-app content

through non-App Store channels, would that affect

the results of your injury and damage calculations?

A.   Not -- not in the model that's currently    02:57:57

formulated.

Q.   And that's because the model does not

take into account payments that developers make

other than by other commission?

A.   Well, that's correct, and it also    02:58:20

takes no -- no account of the mechanism by which

Apple would -- would or could charge royalties

on -- on non-iOS -- iOS apps purchased through

some other means.  I -- I don't even know how that

would work.    02:58:43

Q.   Does your model assume that the level of

security and privacy with respect to apps that are

sold would be the same in the but-for world as it

is in the actual world?

MR. BURT:  Objection to form.    02:59:11

THE DEPONENT:  I don't have an explicit

assumption, but my -- in my but-for world, the only

change is reduction in the Apple Store commission

due to competitive pressure, and I would say the --

the implicit assumption is that nothing else is    02:59:27

Page 159

changing in terms of the characteristics of apps or

the characteristics of the hoops they go through to

ensure that they are compatible and -- and not --

don't create vulnerabilities for the operating

system.

Q. (By Mr. Swanson) If, in the but-for world, Apple and competing iOS app stores charged different commissions, how would you determine where a developer would choose to place its apps?

A. Well, certainly in the current analysis, I don't explicitly model a -- a competitive market with rival app stores, and I -- I don't have a model of how developers choose where to place their -- where to place their apps.

So, currently, the model calculations I do don't -- don't depend on that. I -- I don't believe that, in considering common effect on the consumer class, that that is going to be relevant.

Q. Professor, could you turn to paragraph 180 of your report. This would be pages 80 and 81.

A. I have that in front of me.

Q. Can you tell me what -- what Equation 8 is at the top of page 81?

A. Equation 8 is a demand equation, the

Page 160

SER-1121

demand for downloads of -- of paid download apps.  03:01:44

Q.  In Equation 8, does the quantity of apps downloaded depend on the price of the -- of the app?

A.  Of the download, yes.  03:02:03

Q.  Does the quantity of the app downloaded depend on the price of any other app?

A.  In this equation, as -- as written, it does not; although, those -- some of those features are captured in other variables, and they can  03:02:29 appear in -- in the -- sorry.

(Interruption in proceedings.)

THE DEPONENT:  So let me step back a minute before we heard voices.

So that, yes, only -- only the own price  03:02:56 enters this demand equation.  Competition is, to some extent, reflected in the -- in the additional variables that are -- that are in the equation. There are -- there are time effects and -- and app effects, and they will -- they -- they -- they,  03:03:21 essentially, absorb a lot of the information about the environment in which a pricing decision is being made.

But -- but I think that is the -- the direct answer to your question.  03:03:35

Page 161

SER-1122

Q    (By Mr. Swanson)  By the way, have you    03:03:41
been able to recall, since we discussed it, whether
the elasticity demand estimate that you get is the
same for all apps in a given genre at a given price
point?    03:03:58

A.  I haven't had -- I didn't go back and
think about that.  But I think the -- the answer
is -- in Equation 8 the answer is "no," because
the -- the -- the different apps with different X's
will have the -- the same parameter alpha in    03:04:28
different levels of Q, and I think that will
produce different demand elasticities.

Q.  Okay.  In Equation 8, does the quantity
of the app demanded or downloaded depend on the
price of in-app purchases for that app?    03:04:55

A.  It does not.

Q.  In your model, if the price of the
Spotify app changes, would it impact the demand for
downloads of YouTube Music?

A.  Please repeat the question.    03:05:15

Q.  Sure.

And I will ask you to assume that
Spotify -- assume the time period when Spotify
actually had a positive price in its app.

But in that period, if the price of the    03:05:31

Page 162

Spotify app changes, would that impact the demand for the YouTube Music app? 03:05:35

A. The YouTube Music app?

Q. YouTube Music, uh-huh.

A. Okay. I -- I understand the question. 03:05:46 Thank you.

The -- the answer is that -- in -- in terms of what this equation captures in the environment in which they start from, which, itself, may -- may vary because of what's going on 03:06:09 in other -- other apps, a -- a -- a first order effect of a price change is -- is -- comes from their -- change in their own price.

So the answer is that -- not in this model. 03:06:34

Q. Professor, are you familiar with the term "pass-through" or -- or "passing on"?

A. Yes --

MR. BURT: Object --

THE DEPONENT: -- I am. 03:06:47

Q. (By Mr. Swanson) And -- and what's your understanding of -- of that term?

A. It's a -- it's a term which is used or applied to a situation in which one side of a market incurs a -- a charge, and the effect -- 03:07:05

Page 163

which affects their price, and then that, in turn,   03:07:16

affects the price on the other side of the market.

        Leading example is in my report.  If a

ad valorem tax is imposed, it has an impact on both

the upstream and the downstream side.   03:07:37

    Q.   Does -- well, speaking of your model and

commissions, does competition between apps offered

by different developers affect the degree of

pass-through of commission?

        MR. BURT:  Objection.  Form.   03:08:09

        THE DEPONENT:  To -- to first order, the

effect of a change in a commission on one developer

is -- is determined by their own price elasticity.

        The -- the -- the circumstance in which

they are in and how their level of demand is,   03:08:28

what -- what the elasticity is -- their own price

elasticity is -- that they see is certainly

affected by -- by substitutes.  But the -- the --

the pass-through is the first order returned by

their own price elasticity.   03:08:53

    Q    (By Mr. Swanson)  Do you agree that

economic theory teaches the different levels of

pass-through will result from different levels of

competition?

    A.    Well, I think that -- I have a hard time   03:09:13

Page 164

identifying an economic literature that's -- that's    03:09:18

specific to -- specific to pass-through, I think,

in the sense that you are using it.

        But what is -- what is certainly true is    03:09:33

that -- is that the phenomenon of pass-through

is -- is related to the sensitivity of the parties

on the -- on the two sides of -- of the market,

and -- and their -- and their -- their cost and

their ability to substitute, and so forth, so that

you will certainly have different pass-through    03:09:54

rates for products that have different cost

structures or different demand elasticity.

    Q.    And your opinion is that statement is

true of iOS apps?

        MR. BURT:  Objection.  Form.    03:10:13

        THE DEPONENT:  I -- I would -- I would    03:10:13

expect that it is -- it is true to a degree that

there is -- there is a -- a common effect across

apps because apps have a -- similarities and

that -- but on -- as a second order, there -- there    03:10:30

will be differences among apps that can produce

second-order variables.

    Q    (By Mr. Swanson)  Does an app developer,

in your model, make any choices in the but-for

world, other than changing its download price in    03:10:49

Page 165

its in-app purchase price?                          03:10:54

MR. BURT:  Objection.  Form.

THE DEPONENT:  The -- the assumptions

underlying my calculations and model are that those

prices -- or in -- in the different models, the      03:11:10

relevant one, are the only things that change.

Q.   (By Mr. Swanson)  Your model assumes that

developers choose a single price for all in-app

purchases, correct?

A.   Not quite.  There are -- there are         03:11:34

parent -- parent companies identified by Apple as

by parent IDs, and these companies may offer a

variety of in-app purchases so that -- and

there's -- there's -- there's -- there's,

essentially, a question of what happens at the --   03:11:58

at the parent level versus the individual app

level.  My -- my assumptions are at the parent

level.

Q.   Your -- just so I understand this, you

are assuming that, at the parent level, there is a   03:12:15

single in-app purchase price?

A.   No, I'm -- I am allowing in-app purchase

prices to vary app -- app by app, so even if they

are from the same parent...

Q.   I didn't want to interrupt if you are not   03:12:47

finished.

A. That was the end.

Q. Okay. Is it your understanding that each app has only a single in-app purchase price for the duration of its existence?

A. Please repeat the question. I didn't hear the last few words.

Q. Yeah.

Is it your understanding that each app has only a single in-app purchase price for the duration of its existence? This is a question about the real world.

A. No, I simply use the transactions data with the price as listed so that it is -- it is specific to the transaction.

Q. If a particular app at a particular time offers a multiplicity of in-app purchase options, what do you -- at different prices, what do you assume in your model is the price for that app -- app's in-app purchase?

A. Please clarify the question. You said Internet, and I am not sure what that meant in this context of the question.

Q. Okay. Let me try it again. I'm sure I screwed that up.

Page 167

For a given app that offers a multiplicity of in-app purchase options at different prices, what does your model indicate is the in-app purchase price?  Does it take account of all of those in-app purchase offerings, or does it average it, or does it do something else?

A.   Each -- each transaction is treated as a purchase of a -- of a unit of -- of something.  I'll -- I'll modify that later.  But treated it as an in-app purchase of something, and -- and the -- there is certain amount that -- the consumer pays for that.  And then in the but-for calculation, the assumption is simply that the -- the share of the reduced commission that goes to consumers is -- is applied to that particular price paid by the consumers.  So that's -- that's, mechanically, how the calculation is done.

Q.   So if there is an app that offers in-app purchases for 2.99, 3.99, and 4.99, how -- how does your model determine what the pricing for those three different offerings will be in the but-for world?

A.   Each -- each one is treated as a separate transaction, and the applicable share of the drop in commission is applied to each -- each one.  So

03:14:13

03:14:38

03:15:04

03:15:27

03:15:53

03:16:10

Page 168

if it's a reduction from, let's say, 30 percent for

that particular transaction to 12 percent for that

particular transaction, that's the -- that --

that's -- that's the relevant reduction, and then

they share that -- borne by the developer versus

the consumer is -- goes into the calculation, and

that's applied transaction by transaction, so

there's no -- there's no sense in which there's

aggregation across different in-app purchase units

in -- in the calculation.

    Q.  So sticking with my hypothetical of an

app that offers in-app purchases in the real world

at 2.99, 3.99, and 4.99, in your but-for-world

calculations, are you -- does your model change the

price of those three offerings by the same dollar

amount?

    A.  No, it changes them by the same

percentage amount; so that if the -- if the

conclusion of the analysis is that -- that consumer

prices for -- for apps in that genre go down by

8 percent, then that 8 percent reduction is applied

to each individual transaction.  So 8 percent of

1.99, 8 percent of 2.99, 8 percent of 3.99.

    Q.  Are you -- are you completely confident

that that's how the model works?

Page 169

A.   I'm -- I'm -- I'm -- I'm quite confident. 03:18:14
There is -- there is aggregation going on, but I --
I don't -- in a sense that we -- we do aggregate
over apps within a -- within a parent, but I -- I
think that, functionally, the -- the -- the       03:18:28
calculation is -- produces the same number.  That's
what I just described.

Q.   Do you -- does your model assume that
each developer sells a single app?

A.   No, it -- it -- it -- it treats every app   03:18:49
transaction as a -- an individual transaction
and -- and -- and does a -- a -- a calculation of
how that transaction would change in the but-for
world.

Q.   Do -- do you allow a zero to be a           03:19:11
profit-maximizing choice for the download price?

A.   I do in the sense that I consider a -- a
large group of business models for which that will
be -- when I say "group," I consider a -- a
predominate business model in which that -- that is 03:19:45
the case.  I -- I do not calculate download prices,
except within a given business model.  I'm assuming
that the -- a given app developer continues to use
but for the business model that they used as is.

Q.   And you -- the business model for which    03:20:10

Page 170

you -- or your model operates with zero pricing is
the business model of free download but in-app
purchase offering; is that right?

A. If I understand your question, it's the
other -- the other way around; namely, that the
business model, which has a paid download and no --
no IAP, is one -- one that I consider. And the
business model in which paid download, plus paid
IAP is one that I consider; although, its -- its
role -- its role in this market is quite small, and
the third category is the three download paid IAP
category, which is the dominant business model in
this market.

Q. And for apps that offer in-app
purchasing, a zero price for the download could
increase demand for in-app purchases, could it not?

A. Please ask it again.

Q. For apps that offer in-app purchases, a
zero price for the download could increase demand
for in-app purchases, could it not?

A. In -- in the business model in which
there is paid download and paid apps, there is a
balancing going on by the -- by the developer
and -- under product maximization in which that --
that is a -- is a consideration.

03:20:14

03:20:36

03:21:01

03:21:18

03:21:38

03:21:59

Page 171

One aspect in my model, though, is that I -- I -- I assume that in -- in in-app purchases, consumers are making those purchases without the foresight as to exactly what they might download as an in-app purchase later.

Q. So you are assuming that, when a consumer decides whether or not to download an app, their decision is not affected by the price of any in-app purchase option in that app?

A. That -- that's correct. The -- the economic reason for is that consumers are often unaware what their opportunities will be. They view that as a -- they often make a conditional decision, which they don't have to make now, and so they tend to pay little -- little attention to what the -- what the long-run operating costs might be when they make these initial choices.

Q. Could zero be a profit-maximizing price for an app that does not offer digital in-app purchases?

A. Only -- only -- only if it has zero marginal costs, and my general observation and opinion is that there are positive marginal costs for -- for app producers; that there is some issue of whether -- whether all costs are captured, but

Page 172

there are elements of marginal costs which are          03:24:04

clearly positive.

Q.   Does Uber have any marginal cost with

respect to its app?

A.   I haven't specifically studied Uber, but        03:24:23

I have little doubt that they do.

Q.   And -- and why do you think Uber charges

a zero price?

A.   Zero price for what?

Q.   Oh, for a download.                               03:24:37

A.   You mean for the initial download?

Q.   Correct.

A.   Well, in that -- in that sense, Uber is

no different than the majority of -- of iOS app

developers.  The predominant -- predominant model      03:24:54

is free download, followed by IAP purchases.

That's the -- that's, I think, the same as the Uber

model.

Q.   In your model for downloading apps, does

the quantity of in-app purchases impact the demand     03:25:18

for apps?

A.   I will -- I will try to be precise.

As a -- as a direct effect, no, and for

the reasons that I stated in the previous response;

namely, that there is, I think, strong economic        03:25:47

Page 173

Veritext Legal Solutions
866 299-5127

**SER-1134**

evidence that, in decisions like this, consumers either don't know or they don't bother to acquire the information about what downstream costs might be.

Q. Does your model assume that all apps in the same category or genre face demand functions with the same price sensitivity?

A. Yes, that's -- the current model does -- has that form. It -- it could be elaborated if there is evidence available that there are significant variations from that over -- over the apps.

Q. Well, did you have any empirical basis for the assumption that you made?

A. I would say that it -- it's not an empirical assumption. It's a -- it's a modeling assumption that is to -- you -- you start a model. You keep it as -- as simple as you can to capture the effects that you need to capture, and so this is the -- the starting point is the simple assumption that there's a common -- common effect, and you elaborate the model as -- if you need to.

Q. Does your model rest on the assumption that consumers have identical preferences?

A. No, I think there is no -- no assumption

03:25:54

03:26:14

03:26:36

03:27:00

03:27:19

03:27:41

Page 174

like that.

03:27:43

Q. You derived your demand model from a consumer utility maximization framework, correct?

A. I have an appendix in which I show that one can do so, but I would say that that's -- that's, essentially, a demonstration of a capability, not a -- not a rigorous derivation. That is, model -- Equations 8 and 9, which we discussed before, are -- are fundamentally an empirical model of -- of demand for these products for downloads and for IAP.

03:28:01

03:28:21

Q. And is the appendix that you were referring to in your answer Appendix D, as in "Dan"?

A. Correct.

03:28:39

Q. Okay. Do all consumers in that framework have the same probability of downloading an app?

A. You are referring now specifically to the -- to that appendix?

Q. Yes.

03:29:05

A. I would like to go to that and just refresh myself quickly.

Q. Of course.

A. The answer is that -- that model, as written, has -- has variation across consumers only

03:29:46

Page 175

-- only in an idiosyncratic taste term, and that term is specified so that the probabilities have a -- have a lojic form.  That's a relatively restricted, although empirically, widespread -- wide, often used form, and if -- if it was important to connect Equations 8 and 9 back to economic theory, this -- this could be elaborated to include more variation across consumers if it's -- if it seemed appropriate.

But as I say, my -- my view is that 8 and 9 are, essentially, practical and empirical specifications of market -- market demand, and the connection back to utility theory is satisfying for an economist, but -- but not essential to the use of 8 and 9.

Q.   Changing subjects to -- sort of back to the 99-cent price tiers for the 99-cent pricing, your model -- well, does your model and its estimations take account of the fact that, in the actual world, developers are choosing prices subject to the price tiers?

A.   The answer is:  The way the model is currently implemented, we treat the price they actually charge as their profit-maximizing price, even though it will be on a price tier.

Page 176

We treat their -- their but-for product                        03:31:54
maximizing price as if it would be whatever that
maximization is without pushing it back to a
price-tier approximation.

So that's, mechanically, the way -- the                        03:32:11
way the current calculation works.

Q.   Your model allows the price of a 99-cent
app in the real world to drop to 96 cents, to pick
a number in the but-for world, right?

A.   It would, yes.                                            03:32:34

Q.   And if Apple's pricing tier still applied
in the but-for world, do you know what price a
given developer would set if its but-for-world
app-price estimation is 96 cents?

A.   Well, I can -- I can tell you how the                     03:33:01
model would be modified to -- to take that into
account, and what it would do is calculate the
profit associated with the -- the price-tier points
that are available and would maximize among those.

So I believe in the case that the -- the                       03:33:24
unrestricted price would be 96 cents; that the two
nearest alternatives are zero and 99 cents.  The
zero will clearly yield zero profit, zero revenues,
so the 99 cents would be the next place the
developer would go.                                            03:33:48

Page 177

Q.   If your model indicates that, in the but-for world, an app -- download price for an app would be 96 cents, if you were to adapt the model to allow for the price tiers to exist in the but-for world, what -- would the -- would the developer, in such a case in your adapted model, charge 99 cents or would the developer charge zero?

A.   I think it's clear -- clear that 99 cents -- developers would continue to -- to charge 99 cents, and a developer whose initial charge is higher, let's say 3.99, would -- would, again, come in on a tier and would either stay at 3.99 or would go all the way down to 2.99, even if the optional price for him would be, say, 2.50. And it would depend on a calculation of -- of how profitable each of the tier points is.

Q.   In a model that adapted for Apple's tier-price structure, would developers ever charge zero in the but-for world?

MR. BURT:  Objection.  Form.

THE DEPONENT:  If they have positive marginal costs, then they -- they have an interest in charging a positive price -- well, actually, even if they have zero marginal cost, they have an interest in charging a positive price; otherwise,

03:33:56
03:34:13
03:34:31
03:34:57
03:35:19
03:35:38

Page 178

**SER-1139**

they -- they have no revenue.                                    03:35:40

So they -- they would -- they would presumably find the 99-cent tier at least better than -- than zero.  But, of course, the calculation would be that they would -- they would cycle                03:35:52 through all the possible price tiers and pick out the ones that is most beneficial for them.

Q.   (By Mr. Swanson)  Do you -- do you regard 99-cent pricing as focal?

MR. BURT:  Objection.  Form.                                     03:36:15

THE DEPONENT:  Well, the world "focal" is used in many -- many contexts, and I am not sure always the same way.

Generally, my -- I'm -- what I'm aware of is that consumers often think of prices somewhat                   03:36:33 categorically, so that if something is near -- near a dollar, they think of it as a dollar.  If it's 99 cents, sometimes they -- they seem -- seem to have the illusion that it's -- it's less than a dollar.  Perhaps the illusion that it's                           03:36:51 substantially less than a dollar.

So -- the -- the term "focal" is usually used to apply to the idea of -- of what -- what -- consumers, when they see something, they -- they associate it with a particular value.                           03:37:09

Page 179

So that -- I ask you what -- what's the percent chance that you -- you will buy something. They will typically give an answer: Well, 100 percent or 90 percent or 75 percent. They won't say 83.4 percent.

That's what I normally mean by "focal," and if -- if that's what you mean -- perhaps you could ask the question again.

Q. (By Mr. Swanson) Does your model, which assumes there are no price tiers in the but-for world, take account of the likelihood that consumers will more likely choose a 99-cent price than a even one-dollar price?

MR. BURT: Objection.

Q. (By Mr. Swanson) All other things being equal?

MR. BURT: Objection.

THE DEPONENT: The answer is: No, the model does not take that into account. Could it? If -- if there were -- if there were a symptomatic pattern of consumers misinterpreting prices to focal points, then that -- the model could be easily modified to take that into account.

But I -- I would say that, in my -- in my opinion, with some experience in both consumer work

03:37:11

03:37:28

03:37:42

03:37:59

03:38:07

03:38:29

Page 180

and -- and behavioral economics, that these -- the
phenomena are -- as they exist, are very -- are
very hard to systematize and quantify so that I
think that there would be a misleading deviation
from the purpose of the model, which is to find a
common effect.

Q    (By Mr. Swanson)  Well, if -- if aspects
of the real world deviate from finding a common
effect, shouldn't you take account of the aspects
of the real world?

MR. BURT:  Objection to form.

THE DEPONENT:  Well, the -- the answer
is:  If -- if there were systematic patterns in
behavior, it would -- it would be appropriate to
take those into account so that if -- if consumer
demand is influenced in some systematic way by
focal points, then it would be appropriate for --
to build a demand model in which only focal points
appear or -- or are given some extra role, but
as -- as I say -- so the answer is:  Yes, if that
was systematic and there was a -- a good history in
economics that it mattered and there was a way to
handle it, I think it would be appropriate to
include it.

If it's a -- if it's somewhat speculative

03:38:33

03:38:54

03:39:13

03:39:30

03:40:01

03:40:15

Page 181

and -- and not very well-established phenomenon, 03:40:19

then I think it's -- it's probably more speculative

and dangerous to try to build it in than it is to

look -- look for the -- look for the -- the average

effect that -- that is not trying to build it in. 03:40:36

Q.   (By Mr. Swanson)  Have you studied

developer pricing in the Android environment where

there are no price tiers?

A.   I have not.

Q.   Do you have any idea whether developers 03:40:54

more frequently choose prices that end in 99 in the

Google Play Store than otherwise?

A.   I -- I don't.  I mean, I'm aware that

prices that end in 99 cents or -- or some other --

.9 or -- are quite common in the real world and 03:41:16

that, presumably, are a -- a business response to

consumers' perceptions.  But I don't -- I don't

know specifically anything about the Google Store.

Q.   You are aware that many developers have

the same app functionally in the Apple App Store 03:41:37

and the Google Play Store, are you not?

A.   I'm aware that -- that there are many

that do, and there are -- there are many who do

not.

Q.   As to the many that do, would you, as an 03:41:55

Page 182

economist, have any prediction as to whether the

developer would charge the exact same price in the

Google Play Store, even if there are no price tiers

in the Google Play Store?

A.   I -- I imagine that the -- the

considerations of the developer in this situation

are -- are multifold.  It's interested in

maximizing profits within each store, but it is

also -- cares -- cares about its -- its image or

whether the store in which its selling product

would do different pricing elsewhere as

being some -- some explicit or implicit violation

of some kind of the most-favorable-nation

understanding.

So I -- I -- I can imagine that

developers would be cautious about charging

substantially different prices.  But on the other

hand, it seems to me that they -- they might well

choose to do so.

Q.   Well, do you have any basis, other than

imagining that Apple has any most-favored-nation

requirement on developers with respect to pricing

in the -- in the Google Play Store?

A.   No, my -- my statement was a

hypothetical.  I have no information.

03:41:58

03:42:25

03:42:45

03:43:05

03:43:24

03:43:42

Page 183

Q. Have you evaluated to what extent, if any, your demand estimates are driven by your supplemental cost data as opposed to the observed relationships between price and quantity? 03:43:47

A. Yes, I do have a sense of that, and -- and their influence is not zero. But much -- much of the analysis would be similar and -- and give roughly similar results with -- with different bounds drawn -- drawn from the -- the cost data for this limited number of developers. 03:44:05

03:44:33

Q. Do -- do you agree that your profit margin constraints are algebraically equivalent to constraints on your price-sensitivity parameters?

A. Yes, that's an algebraic relationship.

Q. Would you expect that most of your price-sensitivity parameters would depend on the observed transaction data? 03:44:56

A. I believe you are asking me a question about the estimation and what drives the estimation. Essentially, in -- in terms of -- of the data and what drives the estimation in terms of the data are the -- are the price variations that we do see for specific transactions. That's -- that's the most critical economic experience, if -- if I can use that term, which determines those -- 03:45:23

03:45:50

Page 184

those price coefficients.                                    03:45:54

So in -- in that -- in that sense, the answer to your question is that -- that the price data for transactions is -- is important and -- and is -- is largely determinative.                        03:46:09

Q.   Would it surprise you if you learned that most of your price-sensitivity parameters do not depend at all on the observed transaction data?

A.   I -- I don't know quite what you mean by that hypothetical.                                        03:46:34

What I -- what I can tell you is that the -- the estimation was carried out using the -- using the conditions that -- that come from the -- the price sensitivity with bounds that come from developer margin data, and -- and that's -- that's   03:46:58 an integrated estimation.

The -- the statement that you -- you could -- you could drop -- drop the transactions data, I don't -- I don't even know what that would mean econometrically.                          03:47:19

Q.   Could you -- could you please turn to paragraph 186 of your report.  It starts on page 182.

A.   Yes, I have that paragraph.

Q.   You state there that you "do not need   03:48:03

every app developer's cost to assess common 03:48:04

economic impact because I use consumer demand and

app developer's profit maximization conditions

estimate to app developer's costs."

The question is:  Do you need any app 03:48:17

developer's costs to assess common economic impact?

A.    The -- the answer is that you -- you do

not, but the accuracy of the calculations can --

can be improved because app developer's cost data

allow you to determine the demand parameters more 03:48:49

precisely, and that's -- that's useful for the

conclusion.

Q.    How many app developers do you need cost

information for in order to be confident in the

precision of your estimates? 03:49:09

A.    Right now, I have developer cost data

that I'm using on roughly ten developers or ten

individual apps.  And I use those data in a quite

flexible and robust way by using to establish

fairly broad bounds. 03:49:42

And so in response to your question,

how -- how many -- the question -- the answer would

be in the -- in the way -- way I'm using it now.

I -- I have used a method that I think is

appropriate to the -- to the ten -- ten or so, the 03:50:03

Page 186

developer's costs data files that I have.  If -- if, in the future, circumstances were changed -- changed -- I know that, for example, there is developer data that we received too late to be included in my analysis.  If those data or additional data became available, then it would be appropriate, I think, econometrically to -- to adjust those bounds.

Q.   I saw six developers or apps for which you indicated you had cost data:  Pocket Gems, Playtika, P-L-A-Y-T-I-K-A, Epic Games, Spotify, Pandora, and Netflix.

Are there four more?

A.   No.  The -- the six are certainly the number of -- of parents, and -- but I would have to go back and -- and look -- look more carefully at the underlying calculations to see if we broke out individual apps within the -- within the parent, so I -- I accept six as the -- the number of parents. That sounds right.

Q.   Okay.  And do you provide any evidence in your report to show that these six developers are representative of the full universe of developers?

A.   I would say that they -- they are representative, but they are certainly not a random

Page 187

**SER-1148**

sample.  And, for example, they -- they are weighted -- you know, to the extent six observations are weighted, they are weighted to public companies and to -- to Epic.

So to -- to -- to answer the question, how representative they are, that would be useful to have more developer data.

Q.   Have you tested whether the six are representative of developers in the class with respect to revenue distribution?

MR. BURT:  Objection to form.

THE DEPONENT:  I -- I don't recall the exact calculation, but these are all substantial developers with substantial revenue, so they are at the upper end.  The -- the distribution of developers itself is extremely skewed with -- there's, what, ██████ developers in a large subsample of the entire transactions database. Only -- only ██████████████████ of those ever -- ever get purchased so that there's a huge tail of -- of apps that are still in the Apple Store but, basically, are -- have no -- no real impact.

And then among the -- the developers -- I think there are approximately -- approximately

Page 188

███████████████████ apps that, themselves,  03:53:35

produces ██████ of Apple Store revenues so

that -- and I believe all -- all of my cost data is

from that group.  So they -- they -- they

represent, I don't think, inappropriately --  03:53:55

actually appropriately the -- the subclass of -- of

apps and developers that are major sources of

revenue for the Apple Store and major sources of

expenditure for consumers.

Q.   (By Mr. Swanson)  Did -- did you take  03:54:14

steps to validate the marginal costs estimated in

your model against the real world?

A.   Well, in -- I -- I do in the following

sense.

First of all, I ask my staff -- my -- my  03:54:31

associates, "Look carefully at the accounting data

that comes from the developers and, to the extent

that this can be discerned, to isolate components

of costs that are clearly marginal cost

components," and I've -- I've -- those -- those  03:55:00

basically go into the gross margins on which I --

which I -- is the empirical evidence on which I

base bounds on gross margins.

Q.   Are you -- are you finished?  I'm sorry,

I don't want to interrupt.  03:55:29

Page 189

A. I'm finished.

03:55:31

MR. SWANSON: Okay. I think we've gone for another hour. Maybe a little bit beyond that. Should we take a break?

MR. BURT: That's good.

03:55:40

THE VIDEOGRAPHER: We are now going off the record. The time is 3:55 p.m.

(Recess taken.)

THE VIDEOGRAPHER: We are now back on the record. The time is 4:0- -- I'm sorry, 4:08 p.m.

04:07:56

Q. (By Mr. Swanson) Professor, would you turn to paragraph 218 in your report, please.

A. Yes, I have that.

Q. In paragraph 218, you indicate that you used a 1/10th of 1 percent sample of the Apple IDs and the transactional data; is that correct?

04:09:00

A. Correct.

Q. And you indicate that "Statistical principles teach us that a subsample of data is representative of the whole data if it is randomly drawn."

04:09:18

Do you see that?

A. Yes.

Q. So is it your expectation that if you ran your model on multiple randomly drawn samples, that

04:09:31

Page 190

the results would not be materially different?    04:09:38

A.   That's correct.

Q.   If you did that and you got materially different results, would that lead you to question the reliability of your original sample?    04:09:53

A.   The original sample was impeccably drawn on the basis of Apple Store's hexadecimal identification of accounts, so there should be absolutely no defection in the statistical sample. So if there were material differences, it would    04:10:21 raise the question as to whether the Apple Store representation of their coding is correct.

Q.   You only run your model on three app genres; is that correct?

A.   That's correct.    04:10:45

Q.   And as to two of them, you combine -- you combine them together, music and entertainment, correct?

A.   Correct.

Q.   Have you confirmed that your model is    04:10:57 valid for the other genres in the App Store?

A.   At this point, I have not done the other genres.  The reason for picking the ones that I do is that they represent a very substantial share of Apple Store revenues and, consequently, a very    04:11:19

Page 191

substantial share of the -- of the damages, so it

would take unusual variations in -- in the

remaining genres to have -- have a -- a different

overall conclusion than I have reached.

Q. There are another two dozen additional genres, correct?

A. There are, yes.

Q. Have you -- well, do you have any opinion as to whether there are unusual variations in any of those?

A. I -- I have not looked at them, so at this point, I can't make that judgment. There may be differences, but as I say, I think that these categories I did consider that are the majority of App Store revenues are going to substantially control the overall conclusions of the -- of the harm to the class.

Q. Do you have -- well, strike that. I'm sorry.

Can you tell us how you would apply your model to apps in the sports genre?

A. I -- I would anticipate that the same model structure would be applied to that genre, but I don't know the details of -- of how it operates. Is it a -- is a pay-per-view business model? The

Page 192

question would be whether the business model of those developers is -- is the same as one of the ones that I have currently adopted.

Q. And would that be important to determine how to apply margin constraints?

A. Not necessarily if -- it may well be that the free -- free download paid IAP model that is now dominant among the -- the gaming developers is also the business model used by the sports developers. I suppose that -- royalties and licenses are, obviously, serious consideration in sports apps, and so they may look more like music and entertainment apps than they do like game apps.

Q. Have you -- have you examined the apps of the two named Plaintiffs in the developer class action?

MR. BURT: Objection.

THE DEPONENT: I have not.

Q. (By Mr. Swanson) Would you expect that your model would apply to the apps of those two developers?

A. I -- I would have to go and look at what apps they actually purchased, but they -- the model is certainly intended to apply to them as well as to the class as -- as a whole.

Page 193

Q.   Well, I was referring to the developer class action, not -- not the consumer class action.

I was asking if you have looked at the apps and whether your model would apply to the apps of the named Developer Plaintiffs?

A.   Oh, I'm sorry, I -- I did mishear your -- your question.  I was thinking of the consumer class.

The answer is:  I am not familiar, in any detail, with the developer suits or actions, and I have -- aside from my six or so developers' cost data, I have no additional cost data on developers.

Q.   Okay.  And why did you run the music and entertainment genres together in your model?

A.   They -- they seem to be a similar business model in which royalties or content were important so that their -- their gross margins were lower, but the -- but similar between -- between the two categories.

And they could -- they could have been broken out, but, again, my rule was to start simple, and if it seemed to explain things, not -- not go through the elaborations.

Q.   Could you turn to paragraph 13 of your report, please.  It's on page 5.

04:14:48
04:14:59
04:15:14
04:15:44
04:16:06
04:16:26

Page 194

**SER-1155**

A. Yes, I have it. Let me take a moment to read it.

Q. Sure.

A. Yes, I have reread it.

Q. You state that "Common... evidence supports the conclusion that, absent the alleged misconduct, all or nearly all consumers of iOS apps or in-app content would have paid lower prices for their purchases."

Are you offering the opinion that Apple's alleged conduct injured all, as in 100 percent, of the consumers in the class?

A. No, the -- the -- the complaint alleges that in -- in situations where the extra competitive commission of Apple led to increased prices for apps relative to what they would have been in the but-for world, those -- those consumers are harmed by its -- its net calculations done consumer by consumer. And we can identify the -- the -- the level of harm or magnitude of harm associated with each individual consumer.

Q. But you are not offering an opinion that 100 percent of consumers in the class were injured; is that correct?

A. It's -- it's -- it's correct. That --

Page 195

SER-1156

that is not -- that is not a necessary opinion for

the analysis and is not implied by the analysis.

Q.   So is it your opinion that virtually all

consumers in the class were injured by Apple's

conduct?

A.   That is a conclusion that I reach on the

basis of the model, the results.

Q.   What does "virtually all" mean?

A.   In the model, in its current form, it

means that about 94 percent or -- or more of

consumers were harmed.  They paid higher prices

than they would have in the but-for world.

Q.   How many consumers is 6 percent?

A.   Well, I -- I -- I can't do the arithmetic

in my head.

Q.   Well, how many consumers are in the

class?

A.   I don't recall that either.

Q.   Is it more than 100 million?

A.   I -- I don't remember seeing the

number -- I don't remember the number, so I don't

recall.

Q.   I haven't seen in it your report.

How would calculate how many consumers

are in the class?

04:18:32

04:18:46

04:19:02

04:19:29

04:19:42

04:19:52

Page 196

**SER-1157**

A.    Oh, that's a well -- well determined by the definition of the -- of the class.  The class consists of all U.S. domestic consumers with some -- some, obviously, exclusions who paid for either a download or an IAP through -- through the class period.  So you simply go to the Apple transactions data and find all the -- all the IDs of people who had a paid transaction.

Q.    And have you -- have you done that?  Have you counted that number?

A.    Well, my team has -- has certainly done that.  Whether they have actually produced that number, I don't know.  If -- if I have seen it, I don't recall it.

Q.    If -- if 1 million consumers in the class are not injured, would you still say that virtually all were injured?

MR. BURT:  Objection.

THE DEPONENT:  My -- my number is 96 -- 94 percent, by my model, appear to be injured.  And -- and that's -- that's the number on which I make the statement "virtually all."  94 percent is a very large proportion.

I should say, in -- in addition, they are -- by a vast proportion, the sources of

04:19:54

04:20:10

04:20:35

04:20:51

04:21:05

04:21:24

Page 197

Apple Store revenue sold at the -- the small share
of consumers who, in the model, appear to be
uninjured account for far less than █ percent of
the total revenue in the Apple Store.

Q.   (By Mr. Swanson)  Well, are -- are you
offering the opinion that as many as 10 million
consumers are uninjured?

MR. BURT:  Objection.  Form.

THE DEPONENT:  I'm offering -- offering
the opinion that it -- it may be the case that as
many as 6 percent of -- in the class are uninjured.

Q.   (By Mr. Swanson)  And to --

A.   And -- and -- and I should say -- let me
say, in -- in the current model -- this is -- this
is subject to something specific to the model -- it
could change as the model changes.  It could change
as additional data from the App Store becomes
available.  So it's -- it's not -- it's not a fixed
number.  The -- the important feature is that it is
a -- a small share.

Q.   And to determine how many uninjured
consumers 6 percent would be, you would multiple
6 percent times the number of Apple IDs that made
purchases during the class period?

A.   Yes, I believe that would be the

Page 198

**SER-1159**

calculation which gave the 94 percent/6 percent breakdown.

Q.   So if there were 100 million Apple IDs that made purchases during the class period, you would be comfortable saying that all -- or virtually all of the class was injured even though there were 6 million uninjured members by your count?

A.   I'm completely comfortable in saying that -- it's absolutely possible to identify from their specific transactions who was injured and who was not so that perhaps lawyers are concerned with a percentage, but in terms of the economic impact on the common class, it's clear.  We can tell who was harmed, and we can tell who was not, and we can devise a scheme of compensation for those who were actually harmed.

Q.   We'll come back to that.

Have you quantified the minimum amount of injury that you believe every consumer has incurred or virtually all consumers have incurred?

A.   No.

Q.   Do you know if it's more than a dollar?

A.   I think, in principle, a consumer could buy -- could buy one in-app purchase for, say,

Veritext Legal Solutions
866 299-5127

4.99, and the overcharge should be something like 8 or 9 percent, but that -- that's less than a dollar.

Q. Do you agree that a consumer's injury must be calculated by looking at all of the apps that he or she paid money for?

A. I think it's appropriate -- appropriate to...

Q. Were you -- were you finished?

A. No. I'm sorry. Some- -- something -- I got a -- I got a strange thing on my computer saying "installing drivers." Perhaps -- perhaps we can take a five-minute, a quick -- quick break, and I will just see if there's something going on -- actually, I'm back, so I think, perhaps, I can ignore the -- what is going on as long as everything is still functioning.

What has happened is that my Veritext exhibit has gone black, but I have a paper copy of my report, so I think that doesn't matter either.

Q. Okay. Well, if -- if something happens to your computer again and you want to stop, just -- we'll take a break. So just let us know.

A. I keep -- I keep getting dings and -- and -- hold on one minute, please.

04:24:57
04:25:11
04:25:40
04:25:57
04:26:14
04:26:34

Page 200

Q.   Okay.

04:26:36

(Discussion off the stenographic record.)

THE DEPONENT:  I apologize, but I think I'm back, and -- and you can hear me; I can hear you.  So I think we can proceed.

04:27:27

MR. SWANSON:  Okay.

THE DEPONENT:  I have another copy of my report, as I said, my own copy, which I was reading from, in any case, so I think we can proceed.

MR. SWANSON:  Okay.  All right.  Well, thank you.  Let us know if that changes.

04:27:40

Q    (By Mr. Swanson)  Do you agree that it's necessary in calculating harm to a given consumer to net out the impacts of positive and negative excess commissions on that consumer's various transactions?

04:27:57

A.   Yes.  First of all, that -- that is what I have done, and I think that's, in general, appropriate in calculating harm and -- and damages, and so I -- I did in this case.  I think it's appropriate.

04:28:15

Q.   Okay.  So you agree that if a consumer spent money on an app whose but-for price is lower than another app whose but-for price is higher, the net harm of Apple's conduct would need to account

04:28:30

Page 201

for both those price changes; is that right?

A. Yes, that's the way I do it, and I think that's economically appropriate.

Q. And if the net is -- is positive, then the consumer has not been harmed, correct?

A. That would be correct. Yes.

Q. Can you calculate net impact across all the transactions in the class period?

MR. BURT: Objection. Form.

THE DEPONENT: By "net impact," do you mean the total damages? Is that -- is that your use of the term?

Q. (By Mr. Swanson) Can you -- can you calculate net impact for each consumer across all of the 60-plus-billion transactions in the class period?

A. The answer is that the model is designed to do that. As we've discussed at this point, I have considered two genres, the games genre and the combined entertainment/music genre. Those are major components of the Apple Store operations.

Once that -- if this model were then extended and it reached -- extended in exactly the same way to other genres, then, yes, that would have the capacity to do this for each consumer.

Page 202

Q. Are consumers that download free apps that have never paid for an app or in-app purchase members of the class? 04:30:12

A. My understanding is that they are not.

Q. Do you know how many accounts in the transaction database that you have, have never paid for an app or an in-app purchase? 04:30:22

A. I -- I don't recall the number now. It's -- it's a -- I have seen the percentage in the past. It's a -- it's a moderate -- moderately low percentage. 04:30:36

Q. Let's than 20 percent?

A. That's my recollection, but I -- I'm recollecting from memory, so I am not -- I am not going to be positive about it. 04:30:53

Q. Do you have an opinion as to whether those consumers have been injured by Apple's alleged conduct?

A. The consumers who have never paid?

Q. Correct. 04:31:06

A. I certainly have not calculated any damages or -- or -- to the consumers. I think that, from an economic point of view, they are -- they have the potential to be harmed; because if the Apple Store commissions were competitive and 04:31:23

Page 203

apps were less expensive, they might have been

persuaded to buy them, so you have consumers who

have been -- been turned away.  Whereas, they would

have been better off had they been able to buy at

a -- at a competitive price, but I have not

quantified that, and I'm -- I'm -- my current

calculations do not include any damage estimation

for that.

     Q.    Professor, could you please turn to

paragraph 240 on page 105.

     A.    Yes, I have that -- I have read it.

     Q.    You note that there are "relatively small

number of apps for which either download or IAP

prices are estimated to increase somewhat in the

But-For world."  You go on to say, "These are

mostly low price apps and in-app purchases."

          Are these mostly 99-cent apps or -- or

app purchases -- in-app purchases?

     A.    They are.

     Q.    Did you examine whether there are

instances of zero-price downloads raising price in

the but-for world?

     A.    I believe the model does allow for that

possibility.

     Q.    Does the -- the 6 percent figure that is

Veritext Legal Solutions
866 299-5127

SER-1165

the converse of the 94 percent figure you mentioned          04:34:02

earlier with respect to uninjured class members, is

that figure calculated based on net impact, at

least for the genres that you -- you do calculate?

A.   Yes, it's based on net impact, and it is,          04:34:21

as I understand, based on looking at all of the --

all of the transactions of a -- of a given consumer

that are -- that are paid and looking at the model

implication for the change in the price they would

have paid in the but-for world, obtaining for each          04:34:44

transaction a -- a positive or negative amount,

adding all those up for -- all of that consumer's

transaction, and the -- the 6 percent are the

number of consumers in our -- in our sample who

would, in net, not come out with a loss in the          04:35:08

but-for world -- I'm sorry, would not come -- come

out with a loss to be compensated.

Q.   Could you flip to paragraph 241 on

page 106, please.

A.   Yes, I reread that.          04:36:18

Q.   Okay.  Now, there's a 5.8 percent figure

in that paragraph.

Is that what you have been referring to

when you speak of -- of the 6 percent?

A.   Yes, that's -- that's just my roundup of          04:36:31

**SER-1166**

5.8.

Q.   Now, that 5.8 percent figure comes from your simulations for the games, entertainment, and music categories, right?

A.   That's correct -- well, let me read the -- read my paragraph again to refresh my memory.

At this point, I -- I don't recall whether I did this calculation for the two categories combined or the game category only.  I would have to go back and check the background calculations.

Q.   Okay.  Well, you say, "Limiting my analysis to the sample used in simulating the But-For world for the Games, Entertainment, and Music categories" -- that's the first part of that sentence.

Are -- are you saying that you're limiting this analysis to the 1/10th-of-a-percent sample that you took, or are you saying something different than that?

A.   No, I think that refers to the 1 percent sample -- 1/10th -- 1/10th of one sample.

Q.   And from that sample, you looked at the top ███████ revenue apps, correct?

Page 206

A.   That's correct.

04:38:13

Q.   Was that about ███ apps?

A.   Just somewhat under ███, yes.

Q.   Okay.  And how many apps were in the bottom-30-percent-revenue category?

04:38:22

A.   Sorry, I got my -- I turned to the screen and -- and lost track of the question.  Could you just read -- read it back to me.

Q.   Sure.

How many apps are in the bottom-30-percent-revenue category?

04:38:44

A.   Oh, a great many.  I think in the -- in the -- in the 1/10th-of-1-percent sample, there are on the order of 150,000 apps, and so of -- of those, about ███ are responsible for 70 percent of revenues.

04:39:10

Q.   So your 5.8 percent figure here in paragraph 241 is based on looking at ███ out of the, oh, number of apps that you just mentioned; is that correct?

04:39:36

A.   That's correct, but, of course, the -- the primary revenue generator.  So that -- that tail of apps, although numerically large, has -- has quite a small effect on any of the important calculations in this case.

04:39:56

Page 207

Q. You -- your 5.8 percent figure in paragraph 241 is calculated without looking at the prices in the but-for world of ███ apps; is that correct?

A. The -- the -- the model is -- is estimated using the top-70-percent-revenue apps. That's approximately ███ apps. So all -- all calculations done in that model are based on those apps; that's correct.

Q. And in paragraph 241, you say -- you estimate that "approximately 5.8 percent of the Consumer Class members spent money on only those apps and in-app content items whose But-For prices are higher at the 12 percent But-For commission rate."

That does not indicate that you carried out a net impact analysis, does it?

A. For -- for the sentence, as stated, that's correct. The 5.8 percent, as stated, says this is the proportion who spent money only on apps for which the but-for price went up. So there would be -- if -- if someone then starts to look at the -- look at the -- their experience on things where the price did go up, you would -- you would get a different number.

04:40:00
04:40:17
04:40:34
04:40:52
04:41:20
04:41:47

Page 208

Q.   You -- you would certainly get no lower number than 5.8 percent, would you?

MR. BURT:  Objection.  Form.

THE DEPONENT:  It -- it goes the -- it goes the other way; that what would happen is if -- if -- if you start taking -- if you net gains and losses -- oh, I see what you are -- sorry, I see what you are asking.

Yes, by that calculation, there could be consumers for whom the net -- who have a net gain rather than a net loss.

Q.   (By Mr. Swanson)  And have you estimated what approximate percentage of the consumer class members, based on a netting methodology, would have been uninjured?

A.   I don't -- I believe that has been estimated, and my -- my recollection is that that number is -- is, in fact, small also.  But I don't recall this specific calculation.

I -- I do believe that when I compute damages, I -- I do the netting entirely in the damage calculation.

Q.   But as you sit here, you don't know how much higher than 5.8 percent the net-impact figure is?

Page 209

**SER-1170**

A. The answer is: No, I don't recall it.    04:43:58

No, I -- I don't recall the -- the specifics of how

these percentages were -- were calculated, so I

would have to go back and look at the various

calculations that were done.    04:44:17

Q. Does your opinion on class-wide impact

depend on all of the Apple conduct alleged in the

case by the plaintiffs being found to be

anticompetitive?

MR. BURT: Objection. Form.    04:44:33

THE DEPONENT: No, I would say that the

class complaint is -- is that Apple had

anticompetitive acts that impacted the majority

of -- of -- large majority of the people in the

class and that who those people are is clearly    04:45:02

identifiable from the transactions records so that

the amount of damage in the distribution of damages

is well defined.

Q. (By Mr. Swanson) Well, if your sample --

your 1/10th-of-a-percent sample is not perfectly    04:45:26

representative, you would not know exactly who the

uninjured members of the class are, would you?

MR. BURT: Objection. Form.

THE DEPONENT: The sample would not be

used for the damage analysis and calculations. It    04:45:44

Page 210

SER-1171

was used for -- for the purposes of attractability in -- in the econometric estimation.

The model, once estimated, can be applied to the entire database and, with procedures that are described in -- in the report, scaled up from the 70 percent of apps to all apps. So there is -- there are straightforward relatively mechanical procedures for filling in these steps.

Q.   (By Mr. Swanson)  Is it your testimony that if you ran the model again on a different random sample of the same size, that you would identify the exact same 5.8 percent of consumer class members as being uninjured?

MR. BURT:  Objection.  Asked and answered.

THE DEPONENT:  Running the data on a sample introduces some effects of sampling.  If you draw a different sample, you will get somewhat different numbers.  It's -- in this exercise that I have performed, we are dealing with a -- a 1/10th-of-1-percent sample is still 64 million observations.  So we are dealing with a very large random representation of Apple Store customers, and so there may be statistical variations, and they may show up in these percentages, but it would

04:45:48

04:46:08

04:46:26

04:46:41

04:47:07

04:47:32

Page 211

be -- it would be shocking to me if they turned out    04:47:35

to be significant -- economically or legally

significant.

Q    (By Mr. Swanson)  It would be shocking to

you if that were the case.    04:47:49

Have you -- have you run that test?

A.   No, a total analysis was done on

1/10th-of-1-percent sample, one sample of about

64 million observations, and we used bootstrap

methods to estimate what the effect of the    04:48:13

sample -- sampling noise is, and it's de minimis.

That's shown in Appendix C, I believe.

Q.   Professor, if, under your assumptions,

Apple charged a 30 percent commission rate in the

but-for world until 2018, would it still be your    04:48:41

opinion that virtually all class members were

harmed by Apple's conduct?

A.    Please repeat the question?

Q.   If, contrary to your assumption, Apple

charged a 30 percent commission rate in the but-for    04:49:01

world until 2018 and, afterward, charged the

commission that you find, the 12 percent

commission, would it still be your opinion that

virtually all class members were harmed by Apple's

conduct?    04:49:20

Page 212

MR. BURT: Objection. Form.

THE DEPONENT: The answer is that, that is a calculation that -- that could be done, and it -- in the nature of this model, results would change.

Q. (By Mr. Swanson) Are you aware that more than ■ percent of Apple -- Apple ID accounts in the Apple transactional data that you had, had no transactions after 2017?

A. No -- no paid transactions?

Q. Correct.

A. I'm -- I'm not aware of that specific number, no.

Q. Do -- do you have an order of magnitude for that -- for that quantity?

A. No, I mean, it -- it -- it doesn't surprise me in that the percentage of people who ever make paid transactions is not that high to begin with. And, clearly, what happens with Apple accounts is that they don't -- they don't get erased from the Apple database, except through extraordinary efforts, and so many people have redundant accounts. They have accounts associated with an app -- with a device that they have mothballed. And so, yes, your numbers do not

Page 213

SER-1174

surprise me at all.

Q.   If Apple adopted Steam's 30/25/20 commission structure in the but-for world, would virtually all of the class members be harmed in your opinion?

MR. BURT:  Objection.  Form.

THE DEPONENT:  I will answer by saying that who gets harmed in -- in my model calculation depends on what the but-for commission rate or rates from -- from Apple would have been.  So the -- the first answer is that, yes, the number of class members who are -- who are harmed would -- would change.

Q.   (By Mr. Swanson)  Do you know what percentage of consumer class members would be uninjured if, in the but-for world, Apple adopted Steam's 30/25/20 commission rate structure?

A.   I don't know it as I sit here.  It's -- it's a straightforward calculation using the model and the modeling framework that I have now.

My -- my reaction to your -- your hypothetical is that I -- I have no -- no reason to believe that's a realistic but-for world.  I think the spirit of the but-for world is that Apple would have yielded to competitive pressure or anticipated

Page 214

competitive pressure and charged competitive rather     04:52:44

than supracompetitive commissions and that -- that

there would not have necessarily been a long lag

before they did that.

Q.   Well, how long of a lag would there be,     04:53:00

in your opinion?

A.   My calculations are based on the

assumption that in a but-for world in which they

were being careful not to engage in anticompetitive

conduct, that they -- they would have charged     04:53:11

competitive commissions all along.

I -- I, at this point, do not have an

opinion on what those competitive commissions would

have been in the early years.  But the -- sort of

the spirit of my analysis is that over- -- overall,     04:53:32

over the whole damage period, that their

commissions would have been more like the

benchmarks that I have found rather than their

actual commissions.

Q.   Professor, is it correct that your model,     04:53:52

as you've applied it so far, has provided

overcharge estimates for those 2,000 apps only that

you've mentioned earlier?

MR. BURT:  Objection.  Form.

THE DEPONENT:  Yes.  I have a section     04:54:19

Page 215

**SER-1176**

describing how the model would -- would be scaled up, and that's -- that's used in my -- in my damage estimates. But the model itself operates on those ███ apps.

Q  (By Mr. Swanson)  Would it surprise you to know that you've calculated but-for app prices for less than 1 percent of all apps that have paid transactions over the class period?

A  That's not a number that I have looked at, and -- and I think the more -- the more relevant number is: What -- what proportion of Apple Store revenues are represented by these particular paid transactions that -- that, in the end, the issue is: What -- what -- what -- what were the main sources of harm from Apple Store behavior and who in the main was affected.

So there may be tails -- tails of consumers or tails of apps for which that determination is hard to make or not made -- made in a relative -- relatively simple way by scaling up, for example.

But the -- the -- the thrust of the -- of the cost, the liability -- the thrust of the damages depends on the -- the relative -- the modest -- relatively modest number of apps that are

Page 216

SER-1177

big-revenue popular and big-revenue producers.     04:56:10

Q.   To estimate impact for all class members, you would need to estimate demand for apps in in-app content that aren't included in your 1/10th-of-a-percent sample, right?     04:56:25

A.   I -- I -- I do not think that's necessary.  I think that the -- the calculations on -- on the group that I have establish that the -- that the methodology is sound -- is -- is economically sound and meets -- meets the requirements for reliability.     04:56:50

I -- I think that -- that you can refine these calculations.  You can -- you can explicitly account for the tails rather than -- rather than scaling up, but the importance of these tails is so small in the -- in the overall calculation that they -- in the end, they, essentially, are not -- cannot -- should not make any difference in the -- in the determination of whether there's liability and -- and -- and at least the first order of the magnitude of the damages, if there is liability.     04:57:08     04:57:27

Q.   Let me ask to turn to paragraph 221 in your report.  This is -- starts on page 97.

A.   Yes, I have reread the -- the paragraph.

Q.   You state that although you "use a random     04:58:18

Page 217

**SER-1178**

subsample to estimate common economic impact, i.e., 04:58:22

the Consumer Class damages, I can scale up the

estimation results for the whole data (that is, for

every single App Store transaction) without much

difficulty." 04:58:35

Does "scaling up," as you use that term

here, mean that you would rely on averages instead

of using your model to estimate but-for prices for

each app?

A.    Excuse me for one minute while I finish 04:58:54

reading the last paragraph -- two sentences.

The -- the -- the scaling-up procedure

that's indicated here simply assumes that if you

find that prices of apps on a particular genre

would fall by 8 percent for -- for most -- most 04:59:31

transactions, then you would -- you would scale up

by assuming that that percentage also applies to

the -- to the uncovered -- uncovered apps.

Having -- having reviewed what I just

said, I think I should qualify it by saying that -- 04:59:58

I -- I have not recently reviewed the -- the -- the

method that's -- that's been proposed for scaling

up in -- in detail.  So I may be misrepresenting

how it works.

Q.    Can your model estimate but-for prices 05:00:25

for every app and in-app purchase during the class
period?

    A.   I think the answer is:  Yes, in
principle; that is, the -- the restriction to the
1/10th-of-1-percent sample and the restriction to
the 70-percent-highest-revenue-generator apps were
choices made to -- to make the analysis feasible
and practical within the time frame in which I was
working.  And, in principle, the same modeling
approach, given -- given sufficient computer time
and calendar time, can -- can be extended to the
entire universe.

    Q.   And on page 98, still in paragraph 221,
you say that since the 1 percent --
1/10th-of-1-percent sample "provides estimates that
are statistically representative of estimates that
would be obtained from the full data, it is
reasonable to assume the omitted apps have the same
percentage overcharge as the average for the
included apps."

      First of all, in the context of your
sample, when you refer to the "omitted apps," are
you referring to the 148,000 that you mentioned
earlier?

    A.   The answer is "yes."  If the -- if the

Page 219

scaling is done first by scaling from the

70 percent apps to all apps for the

1/10th-of-1-percent sample, then the -- then the

procedure would be to assume that the -- that the

model estimated on the -- on the 70 percent of --

of apps also applies to the remaining 30 percent --

30 percent of the revenue apps, which is a lot of

apps, because that's a very large, long-but-thin

tail.

Q. So those would be the ███ apps you

referred to earlier, right?

A. The █ percent is either ███ or still

app -- somewhat less than ███ apps in the -- in

the econometric model.

Q. So first you would scale up the results

from the ███ apps to the full 150,000 apps in

your 1/10th-of-1-percent sample, right?

A. That's basically what I just described.

I am not sure about the numbers because I would

have to go back and check.

As -- as we sit here, I believe the

150,000 or so were -- were apps for which --

obviously they -- they are the apps that appear. I

am not sure that those are -- that's the count of

the ever-paid apps that appear. That's -- I would

Page 220

SER-1181

have to go back and check that.                                    05:03:56

Q.   Well, either way, there are a lot more than 150,000 apps that you would need to scale up for, right?

MR. BURT:  Object to form.                                        05:04:10

THE DEPONENT:  The -- the question would be how many -- how many paid apps there are, because there are many, many unpaid apps.  How many paid apps need to be brought into the -- into the calculation, and I would -- I would say that --    05:04:31
that may be -- that may be the order of magnitude of how many -- how many additional apps would need to be considered.

I think an important point is that the revenue and the possible damages associated with    05:04:53
this tail is -- is sufficiently small so that it -- it can have almost no effect on either the model or the damages so that included in -- directly in -- in the model estimation or leaving -- leaving them for scaling later is very unlikely to have any    05:05:16
significant effect.

Q.   (By Mr. Swanson)  The 150,000 apps, using that number that you -- that I understand is an approximation, that is the number of apps that are either paid or have paid in-app purchases --    05:05:40

Page 221

**SER-1182**

correct? -- in your sample?    05:05:43

A.   I would have to go back and check the text where that number appears, but that -- that -- I think that's likely to be what I meant.

Q.   Okay.  And if you switch your attention    05:05:58 to all of the paid apps, including those which have in-app purchases, even if they have a zero-download price that existed over the consumer class period, that's well over a million, isn't it?

A.   Well, that's not a -- that's not a number    05:06:25 that I know.  I haven't calculated or asked for that -- calculation of that number.

Q.   I'm still on page 98, but in paragraph 222 -- well, if you want to take a look at that first before I ask my question, go ahead.    05:06:57

A.   Yes, I have read the paragraph.

Q.   Okay.  In paragraph 222, you state that "Alternatively, I can be more precise by using the estimated coefficients of the demand equations to calibrate demand for these apps and in-app    05:08:01 content."

Are -- are you saying here that you can be more precise than making an assumption that the omitted apps had the same percentage overcharge as the average for the included 2,000 apps?    05:08:13

Page 222

**SER-1183**

A. I would say yes. What I'm -- what I'm saying here is that one could do this -- do this calculation app by app for all of these omitted apps and that that should be more -- more precise. As I sit here, I don't know how much more precise. My guess is it would make very little difference.

Q. That's a guess, correct?

A. That's a guess, yes.

Q. In paragraph 224 -- well, once again, go ahead and take a look at it first before I ask my question.

A. Yes, I have read the paragraph.

Q. You state that you "can apply these But-For app and" in-app "prices to the Consumer Class members who are not selected in the random sampling based on the apps and in-app content they spent money on during the Class Period."

How do you plan to do that?

A. That's -- that's quite -- quite simple. The -- the -- the 1/10th-of-1-percent sample is a large representative sample of the -- of the complete population. You do the calculation for that sample, and then you multiply the results by -- the results that depend on -- on individual consumers -- the aggregate of consumers. You

05:08:25

05:08:47

05:09:05

05:09:40

05:09:56

05:10:23

Page 223

multiply the sample aggregate by 1,000 to get    05:10:28

the -- to get an estimate of the population

aggregate.

And in terms of how the subsequent

analysis would go, you would then look at each --    05:10:40

each transaction for any person in the Apple

transactions database, and you would go through the

same calculations for the -- for a non-sample

member that you had previously done for a sample

member, and you would calculate their -- their net    05:11:03

harm and compensation in exactly the same way.

Q.   Have you done that for any of the named

class representatives?

A.   Well, this is a calculation for -- for --

that would apply to any individual in the -- in the    05:11:24

class.  I -- and what I just described was how you

scale up from the sample to the entire population.

This now seems to be a separate question,

which is whether I have applied the model to named

class individuals; is that right?    05:11:46

Q.   Yes, you are right.  That is a separate

question.  I apologize.

A.   And the answer is:  No, I have not done

that calculation.

Q.   Do you have an opinion one way or the    05:11:57

Page 224

SER-1185

other as to whether any of the named class representatives has been injured by Apple's conduct?

MR. BURT: Objection to form.

THE DEPONENT: The answer is that without -- without doing the calculation, I -- I don't have an opinion on that.

MR. SWANSON: We've been going for more than an hour. Why don't we take our last break. I think it will be our last break.

THE VIDEOGRAPHER: We are now going off the record. The time is 5:12 p.m.

(Recess taken.)

MR. SWANSON: We're now back on the record. The time is 5:22 p.m.

Q. (By Mr. Swanson) And I'm going to definitely try not to use our remaining 40, whatever, minutes.

So the -- the Apple transaction data, Professor, provide information on each Apple IDs, app download and in-app purchase transactions, right?

A. Correct.

Q. Could you please turn to paragraph 131 of your report.

Page 225

THE COURT REPORTER: And, Mr. Burt, you are muted, just so you know.

MR. BURT: Page 62?

MR. SWANSON: Page 62, correct.

THE DEPONENT: I've read the paragraph, yes.

Q. (By Mr. Swanson) Okay. I wanted to focus on the sentence at the end where you state that "In general, affected consumers are identified by their Apple account ID's."

What do you mean, "in general"?

A. That -- that's -- that's the way the class is defined and the way -- the way harm is calculated and the way compensation would be distributed under -- under feasible mechanism.

It's possible, or, in fact, likely, that some consumers have multiple apps, multiple -- I'm sorry. Multiple Apple IDs, and we have -- we treat every Apple ID as a separate consumer. So in -- but it's, in general, true that Apple IDs are associated with consumers. It's possible that some -- some consumers have multiple IDs.

I'm -- I believe the transactions database is limited to American and to -- to people. But part -- part of the meaning of general

Page 226

SER-1187

here, it -- it's possible that there Apple IDs that

appear to be consumers that's classified by Apple

that are entirely some kind of end user.

Q. If there are consumers who have multiple

Apple IDs, isn't a fact that you will be unable to

determine whether those consumers are injured

unless you net out all the transactions carried out

by the total set of their IDs?

MR. BURT: Objection to form.

THE DEPONENT: The answer is that the

calculation has to be done by Apple ID because the

transactions database does -- does not tell you

anything about whether different Apple IDs are

associated with a single person or not.

There is -- there -- and -- and as far as

I know, Apple itself would not know whether

separate Apple IDs are coming from the same person

or not. So that I think that it is beyond the

reach of Apple or the plaintiffs to -- to -- to try

to -- to try to merge Apple IDs attached to a

single individual or to a single family, or to a

single payer. That might be the economic ideal,

but I think that is beyond the bounds of

practically.

Q. (By Mr. Swanson) Have you identified all

Page 227

SER-1188

of the Apple IDs of the named class representatives?

     A.   I have not.  And -- and as far as I know, that would not be possible for me.  Apple -- App Store transactions data would probably be even difficult to do the reverse search by asking -- asking them for their -- their actual Apple ID, collecting all of their actual transactions and -- and then searching through the entire transactions database to find them.  It's not -- not impossible, but it would certainly be a challenging calculation.

     Q.   If there was a class member who had two Apple IDs and your calculation showed that one of the Apple IDs was negligently injured and the other Apple ID was very much better off, in the but-for world, would you be able to determine whether that individual was injured?

          MR. BURT:  Objection to form.

          THE DEPONENT:  As -- as I've indicated, there is simply nothing in the transactions database which would allow that kind of -- kind of identification.  So it's a -- so it's a -- a hypothetical which has no -- no practical possibility of -- of implementation.

Page 228

So the answer is, of course, if you could -- if -- if you could group Apple IDs by -- by payers, you could then do these calculations and compensation each payer appropriately.

But that's -- that's beyond the pale of practically or possibility.  And so the best you can do is look at each app owner that's -- that's -- those are data that Apple has, presumably.  They know of -- they know a -- a credit card or some way of -- payment mechanism for their -- their customers.  So -- so a -- a scheme to compensate them could be conducted by Apple.

I would -- I would say that if -- if Apple would -- chose to try to match different accounts for individuals and made that available to the plaintiffs, the plaintiffs could certainly use it in the same spirit as the -- as we do things currently.

So I would just leave it as an open invitation to Apple if they are willing to undertake that Herculean task, that would be beneficial perhaps to resolution of the case.

Q.   (By Mr. Swanson)  Well, do you agree that it is not possible to link different IDs held by the same person in the data or to determine when

05:29:15
05:29:31
05:29:52
05:30:16
05:30:31
05:30:47

Page 229

more than one person shares an ID?

MR. BURT: Objection to form.

THE DEPONENT: It's not -- it's not possible in the transactions data as turned over to us -- to the plaintiffs by Apple.

I would not rule out the possibility that -- that Apple could do this at least partially, because it has -- it has real identification data associated with their encoded Apple IDs.

Q. (By Mr. Swanson) What -- on what basis do you indicate that Apple has real identification data?

A. They -- they know, for example, what the payment mechanism is associated with an Apple ID. It's presumably an active credit card, or something like that.

So if -- if -- if I were a programmer for Apple and I was told, go and link all of the accounts that use the same credit card, I -- I could do that.

I still would probably get an incomplete matching because people might use a different credit card on a different Apple ID account, and then Apple itself would -- would not possible know.

Page 230

Maybe they can match names if they actually collect names. But, again, name -- name matching is -- is well known to produce a lot of false positive and false negatives. So probably at best, it can be done in an incomplete way.

Q. Professor, do you agree that consumers can be injured only if the developers are able and choose to pass on the overcharge to them in the form of higher app prices?

MR. BURT: Objection to form.

THE DEPONENT: In terms of the -- the model and the damages that I've calculated, that is the channel for damages. So in terms of the harm I've calculated and the damages that comes from overcharges and the retail price paid by the consumer, as a result of Apple conduct, and -- a mediator or -- influenced by developer conduct, that -- that much is -- that much is true.

Q. (By Mr. Swanson) So do you agree that to determine if Apple's conduct damaged plaintiffs at all, a court will first have to explore whether and to what extent each individual app developer was able and then opted to pass on the 30 percent commission to its consumers in the form of higher app prices?

Page 231

MR. BURT:  Objection to form.                     05:33:39

THE DEPONENT:  No, I do not agree.

The -- the -- there -- there is a common effect of

Apple conduct and developer conduct on the consumer

class.                                            05:33:53

I have designed a model which, in my

opinion, captures the common effect of developer

conduct on the class.  And I believe that is

sufficient for determining harm to the class and

the distribution of harm among class members.     05:34:11

Now, I -- I will -- I will -- will

leave -- I would leave open the question as to

whether if -- if additional information or data

were forthcoming on developer conduct and there

were, persuasive data, that my assumptions of      05:34:34

product maximization are systematically incorrect,

then I would modify -- I would propose modifying my

model to take those effects into account.

But that -- that is a -- that is

basically a -- a modeling question.  You -- you     05:34:58

want the model to do the best job you can of

reflecting the common effect, given -- given the

information that you have.

Q.   (By Mr. Swanson)  Professor, you indicate

in your report -- I think you mentioned earlier     05:35:16

                                                    Page 232

that, in your view, the App Store commission works the same way as a sales or ad valorem tax.

Is that -- is that your opinion?

A.   That is my opinion, complicated by the fact that the developers are not price takers. They are actually setting their prices.  So that -- that calculation has to also account for how the developers react -- react.

But the -- the basic economics of the proposition that a -- a charge from an intermediary, be it -- be it the government or be it the Apple App Store, has an impact on both the upstream and the downstream side of the market. That's -- that's fundamental economics.  It -- it -- deeper -- deeper than just the supply and demand curves drawn in a -- in a figure.

Q.   Do you agree that the total harm from an excessive commission is the sum of harm to developers and consumers?

MR. BURT:  Objection to form. Foundation.

THE DEPONENT:  I -- I would say, as an economist, that I agree with that.  But as a observer of the legal scene, I would say that I find that legal rules for liability and damages are

Page 233

SER-1194

not always consistent or commensurate on upstream 05:36:53

and downstream sides.

So I -- I would allow for the possibility

that the legal outcomes for Apple would depend on

determination of the law as well as -- as well the 05:37:08

fundamental economics.

Q.   (By Mr. Swanson)  If a particular

methodology for ascertaining the incidence of the

alleged excessive commission were to overstate

damages to one group, whether developers or 05:37:31

consumers, it would necessarily result in

understating damages for the other group, would it

not?

MR. BURT:  Objection.  Form.

THE DEPONENT:  If -- sorry.  If -- if -- 05:37:48

one -- one had a consolidated legal case in which

both developers and consumers were in the same case

and -- and the -- the judge were making this

determination, I -- I would anticipate the -- the

answer would be yes. 05:38:07

If, as in the real world, developer

actions and consumer actions are separate and

perhaps not necessarily subject to the same legal

precedents and -- who -- who knows how it would

work out.  That's a -- that's a mare's nest for 05:38:26

Page 234

**SER-1195**

lawyers to entertain themselves with.                    05:38:33

Q.   (By Mr. Swanson)  Are -- are you aware that in his damages calculation in the developer class action, Professor Economides assumes that in the but-for world app prices paid by consumers would not change?                    05:38:47

A.   Yes, that has been described to me.

Q.   Do you consider that to be an accurate assumption?

A.   I understand that that is an assumption that is permitted under the -- under the legal theory on which the developer case is being brought.  And in -- in some sense what the calculation he's done is -- in my interpretation is what one might call a safe harbor calculation, because it relieves the expert of doing calculations which might yield more -- more for the -- more for the plaintiffs in the -- in the developer case, but would be involved with things that are that more difficult to establish.                    05:39:00 05:39:21 05:39:48

Q.   Are -- are you embracing Professor Economides' opinion that his estimate of injury and damages, based on the assumption that consumer app prices would not change in the but-for world is conservative?                    05:40:08

Page 235

A.   I -- I would agree that it is -- it is --   05:40:14
it is conservative for Apple relative to what
developers might be entitled to if they -- if they
did the full calculation, simply on the grounds
that the developers, in principle, are entitled to   05:40:32
what they would gain from product maximization in
the but-for world.

        And by having them keep their but-for
world prices fixed, they -- they are -- they're not
taking advantages of opportunities that may be   05:40:50
there to maximize their profits.  So in that sense
it is -- it is conservative.

Q.   Are you aware that Professor Elhauge
testified in his deposition that app and in-app
purchase prices are unlikely to change in the   05:41:08
but-for world, as a matter of fact?

A.   I -- that -- that was described to me
briefly.  I -- my understanding is the context for
that was his belief that tier -- tier pricing would
tend to rigidify and fix a lot of prices so they   05:41:31
would not change.

Q.   It also is his opinion that developers
have low marginal costs.

        Do you agree with that?

        MR. BURT:  Objection to form.   05:41:47

Page 236

**SER-1197**

THE DEPONENT: I don't know what low means. In -- in my calculations, I impute or through looking at developer accounts infer marginal cost. I would say that marginal costs for iOS apps are small numbers. They're not zero. And they are -- they are significant costs for developers in -- in relationship to the revenues that they can receive. That -- that said, I -- I wouldn't disagree they -- that they are small.

Q. (By Mr. Swanson) Would you agree with Dr. Evans, who testified in the Epic case, that the marginal cost of buying additional content in a game is zero?

MR. BURT: Objection to form.

THE DEPONENT: The cost to the developer -- I'm sorry. The cost to the developer --

Q. (By Mr. Swanson) Yes, for --

A. -- versus the consumer?

Q. The cost to the developer for supplying the content marginally for an additional in-app purchase by a consumer?

A. I think my -- my evidence and the evidence from the developers is that they -- they do have positive marginal costs in most cases for

05:41:48

05:42:05

05:42:36

05:42:54

05:43:01

05:43:17

Page 237

delivery in-app content. These are hosting costs and the user acquisition cost to name specific categories.

Q. If you could turn to paragraph 235 of your report and I'll ask you one question once you've had a chance to look.

A. Yes, I've reread the paragraph.

Q. You find that the consumer class bore 81.8 percent of the burden that the App Store commissioned from the games category while app developers bore the remaining 18.2 percent of the burden.

Is it your understanding that Professor Economides would estimate that app developers bore 100 percent of the burden?

MR. BURT: Objection. Form.

THE DEPONENT: I understand that Professor Economides has done a calculation assuming that consumer prices for the apps don't change. I view that as a -- a legitimate economic calculation, particularly in the context of what I understand to be the legal requirements for establishing damages on -- on the developer's side.

I would say that I have absolutely no problem with what I understand to be the legal

05:43:23

05:43:41

05:44:39

05:44:52

05:45:09

05:45:35

Page 238

foundation of that calculation. And my

understanding further is that he has not offered an

opinion on -- on what the split would be if

developers did go on and optimize their profits.

Q. (By Mr. Swanson) In order for

Professor Economides' estimate to be conservative,

it would have to be the same as or less than the

███ percent of the burden that you estimate,

correct, in dollars?

MR. BURT: Object to form.

THE DEPONENT: The -- the proposition is

that Professor Economides' calculation is

conservative in terms of the developers dealing

with Apple. Okay. And they -- they -- they --

they -- he could have possibly have done an

alternative calculation of profit maximization for

developers that would have yielded larger damages

for developers. That -- that's my understanding of

his report as it's been described to me.

I have not done the calculation and I --

I wouldn't speculate on how this would all work

out. If these cases were consolidated, for

example, and -- and both -- the plaintiffs on both

ends decided to -- to work out jointly, how any

damage were to be divided, I -- I don't have an

Page 239

opinion now on how that would work out.                    05:47:31

Q.   (By Mr. Swanson)   Well, do you -- are you able to determine a dollar figure that corresponds with your ███ percent figure in paragraph 235 for the games category?                    05:47:48

A.   Yes.  I do so in -- in -- in paragraphs near this one.

Q.   And you figure out the -- the corresponding dollar figure for the ███ percent burden.                    05:48:05

That's the developer burden, in your opinion?

A.   I have not done that calculation.

Q.   But you've done the calculation for the 81.8 percent consumer burden?                    05:48:16

A.   Let me be precise.  In figures like -- figure 17 in paragraph 238, I estimate the percentage change in wholesale prices and retail prices as a result of the but-for Apple conduct compared with as-is conduct.                    05:48:54

And if you looked at figure 17, the first column in terms of mean effect, that's a -- for -- this is the entertainment and music genre, a 9.4 percent decrease in the retail price that consumers are paying and a 13.2 percent increase in                    05:49:16

Page 240

the wholesale price that developers are -- are

receiving.  That's for downloads.

        Similar numbers for in-app purchases.
The -- the split is somewhat different in that

case.  That's -- that's -- that's the calculation

that I can do.  You multiple that by the -- the

actual number of transactions, going transaction by

transaction and those are converted into dollars.

        Q.    Thank you.

        Are -- are any numbers of the consumer

class also iOS app developers?

        A.    I have not asked that question.  I --

I -- I don't know.  I -- I -- my understanding that

is, in general, app developers have their own Apple

ID relationship established there.  They're --

they're identified -- certainly identified in the

transactions database by parent and -- and app IDs,

Apple IDs.

        Q.    Professor, do you -- do you use an

iPhone?

        A.    I do.

        MR. SWANSON:  Well, on -- on behalf of

Apple, I thank you.

        I -- I've got no further questions this

time.

05:49:20

05:49:36

05:49:54

05:50:20

05:50:45

05:50:56

Page 241

MR. WOJCIK: This is Ted Wojcik for Developers. I was hoping to ask just a question or two of the professor if there is time left on the record. I wanted to just pipe up real quick.

Does -- do you -- do you have any objection to that, Mr. -- Mr. Burt, in the next couple of minutes?

MR. BURT: Of course not.

You have the mic. Please proceed, Counselor.

MR. WOJCIK: Wonderful.

EXAMINATION

BY MR. WOJCIK:

Q. Hi, Professor. I'm Ted Wojcik. I'm counsel for the developer class. And I just have -- I have a -- just a quick question for you.

So we just discussed the -- the way in which you calculated overcharge and the -- the percentage to division between developers and consumers.

As part of your work in this case, did you identify any particular developer that you think passed on or that you calculate passed on 100 percent or more of the overcharge that you identified?

Veritext Legal Solutions
866 299-5127

SER-1203

MR. BURT:  Objection.  Form.

05:51:58

THE DEPONENT:  Prior to the work in the case?

Q.  (By Mr. Wojcik)  Oh, I'm sorry.

A.  I don't understand the question.

05:52:08

Q.  I'm sorry.

As part of your work on -- on this case, did you identify any developer that passed on 100 percent or more of the overcharge?

MR. BURT:  Same objection.

05:52:19

THE DEPONENT:  Well, in the -- in the model and in -- in the model calculations, I -- I impute the -- the marginal cost of -- of each developer from the price they charge and -- and the marketwide estimate of the price sensitivity of -- of consumers.  And this -- these estimates have the property that those marginal cost estimates can -- can be zero or negative.  That is, there's nothing in the -- in the model which constrains those -- from taking on values in that range.

05:52:40

05:53:04

And when that's the case, a -- a consumer -- a firm that has zero marginal cost will -- will not pass -- pass on any cost -- any reduction in the commission to consumers.  And if they have a negative marginal cost, presumably they

05:53:28

Page 243

**SER-1204**

have other -- other sources of revenue in that

case.  Then they may actually respond to the

reduced commission by increasing their price.

That's -- that's an implication of the

model and that's -- that's allowed in my analysis.

Q.   (By Mr. Wojcik)  Did you identify -- just

to maybe pose the question differently.

Did you identify any specific developers

by name that would have passed -- that passed on

100 percent of the overcharge?

A.   The answer is I have -- I have the

capacity to do that, but I haven't done it.  As to

say -- as I described how the model works it can --

it can imply zero or negative marginal cost for

some developers.  And if I went back to the

transactions database, they are -- they are named

by an ID code.  I'm not sure if -- if the -- that

ID code is immediately transcribed -- transcribable

to -- a real entity name.  I'm not sure if they're

encoded or not.  That's -- that's not a part of the

database that I've queried.

Q.   Understood.

So that is not the kind of analysis that

is included in your report?

A.   It -- it is -- it is not.

05:53:31

05:53:46

05:54:10

05:54:33

05:54:56

05:55:14

Page 244

I mean, what is included in my report is

a -- is account of the -- the share of the

consumers who would be -- who would not be harmed

because they have not purchased all or most of

their purchases from apps that I impute to have

zero or negative marginal costs.

That's -- that's the calculation that --

that I've done.  But I haven't -- there's nothing

in that calculation that requires me to look --

look at the -- the names of the specific

developers.

MR. WOJCIK:  Understood.  Thank you.  And

that's -- that's all I have.

MR. BURT:  No questions.

THE VIDEOGRAPHER:  Okay.  If that's --

everyone's done, I can take us off the record and

conclude the deposition.

MR. SWANSON:  That's good.

THE VIDEOGRAPHER:  Okay.  We are now

going off the record at 5:56 p.m.  And this

concludes today's testimony given by Daniel

McFadden.  The total number of media was four and

will be retained by Veritext Legal Solutions.

Thank you.

(TIME NOTED:  5:56 P.M.)

Page 245

I, DANIEL McFADDEN, Ph.D., do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear notes; that my testimony as contained herein, as corrected, is true and correct.

Executed this _____ day of _____, 2021, at _____,_____.

_____
DANIEL McFADDEN, Ph.D.

Page 246

I, Rebecca L. Romano, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Court Reporter, do hereby certify:

That the foregoing proceedings were taken before me remotely at the time and place herein set forth; that any deponents in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [X] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: August 4, 2021

Rebecca L. Romano, RPR, CCR

CSR. No 12546

Page 247

Veritext Legal Solutions
866 299-5127

**SER-1208**

Case 25-7920, 08/12/2026, DktEntry: 34.6, Page 250 of 283

# Exhibit 2

THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
RICHARD J. DOREN, SBN 124666
  rdoren@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
JAY P. SRINIVASAN, SBN 181471
  jsrinivasan@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

VERONICA S. MOYÉ (Texas Bar No.
24000092; *pro hac vice*)
  vmoye@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900

MARK A. PERRY, SBN 212532
  mperry@gibsondunn.com
CYNTHIA E. RICHMAN (D.C. Bar No.
492089; *pro hac vice*)
  crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

ETHAN D. DETTMER, SBN 196046
  edettmer@gibsondunn.com
RACHEL S. BRASS, SBN 219301
  rbrass@gibsondunn.com
CAELI A. HIGNEY, SBN 268644
  chigney@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105
Telephone: 415.393.8200
Facsimile: 415.393.8306

*Attorneys for Defendant APPLE INC.*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re Apple iPhone Antitrust Litigation | CASE NO. 4:11-cv-06714-YGR |
| | **DEFENDANT APPLE INC.'S OPPOSITION TO NAMED CONSUMER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| | The Honorable Yvonne Gonzalez Rogers |
| | Date: Nov. 16, 2021 |
| | Time: 10:00 a.m. |
| | Courtroom: 1, 4th Floor |

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| INTRODUCTION | | 1 |
| FACTUAL BACKGROUND | | 1 |
| LEGAL STANDARD | | 4 |
| ARGUMENT | | 5 |

I. The Commonality Requirement Is Not Satisfied ................................................. 5

II. The Typicality and Adequacy Requirements Are Not Satisfied .............................. 10

III. The Predominance Requirement Is Not Satisfied ........................................... 12

    A. Named Plaintiffs' Theory of Classwide Impact Rests on Unsupported Assumptions About But-For Commission Levels ........................................... 13

        *1. McFadden's 10-12% but-for commission rate ignores reality.* ................. 14

        *2. McFadden's uniform, but-for rate ignores the complexity of the competitive landscape.* ................................................... 15

        *3. The App Store has other features for which consumers would pay a higher rate.* ................................................... 16

        *4. App developers would face other costs in the but-for world.* ................ 17

    B. Named Plaintiffs' Theory of Classwide Impact Rests on an Unreliable Model of But-For App Prices ................................................... 18

        *1. McFadden's econometric model assumes uniformity and generates unreliable app prices.* ................................................... 18

        *2. Even with its untenable assumptions, McFadden's model yields more than a* de minimis *number of uninjured class members.* ........... 19

        *3. Adjusting McFadden's flawed assumptions yields even larger numbers of uninjured class members.* ................................. 20

        *4. Named plaintiffs cannot salvage McFadden's model by removing uninjured members from the class.* ................................. 22

IV. The Superiority Requirement Is Not Satisfied ........................................... 23

    A. A Class Trial Would Be Unmanageable ................................................... 24

    B. Named Plaintiffs and the Named Developers Damages Models Are Irreconcilable ................................................... 25

CONCLUSION ................................................... 25

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.    CASE NO. 4:11-cv-06714-YGR

Gibson, Dunn & Crutcher LLP

# TABLE OF ABBREVIATIONS

### CASES

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.,*
   247 F.R.D. 156 (C.D. Cal. 2007) ...................................................................................11

*Am. Express Co. v. Italian Colors Rest.,*
   570 U.S. 228 (2013) ...........................................................................................................5

*Amchem Prods. v. Windsor,*
   521 U.S. 591 (1997) .........................................................................................................12

*Andrews v. Plains All Am. Pipeline,*
   777 F. App'x 889 (9th Cir. 2019) ...................................................................................19

*Apple Inc. v. Pepper,*
   139 S. Ct. 1514 (2019) ...............................................................................................21, 25

*Apple, Inc. v. Psystar Corp.,*
   586 F. Supp. 2d 1190 (N.D. Cal. 2008) ...........................................................................8

*In re Asacol Antitrust Litig.,*
   907 F.3d 42 (1st Cir. 2018) .......................................................................19, 20, 22, 23

*Brown Shoe Co. v. United States,*
   370 U.S. 294 (1962) ...........................................................................................................7

*Brown v. Electrolux Home Prods., Inc.,*
   817 F.3d 1225 (11th Cir. 2016) ........................................................................................5

*Burkhalter Travel Agency v. MacFarms Int'l, Inc.,*
   141 F.R.D. 144 (N.D. Cal. 1991) .....................................................................................7

*Carrera v. Bayer Corp.,*
   727 F.3d 300 (3d Cir. 2013) ...........................................................................................23

*Comcast Corp. v. Behrend,*
   569 U.S. 27 (2013) ...........................................................................................1, 4, 5, 12, 20

*In re Digital Music Antitrust Litig.,*
   321 F.R.D. 64 (S.D.N.Y. 2017) .....................................................................................24

*Ellis v. Costco Wholesale Corp.,*
   657 F.3d 970 (9th Cir. 2011) ..........................................................................4, 5, 12, 20, 24

*Epic Games, Inc. v. Apple Inc.,*
   493 F. Supp. 3d 817, 835 (N.D. Cal. 2020) ....................................................................8

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.   CASE NO. 4:11-cv-06714-YGR

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES** (*continued*)

Page(s)

*Exhaust Unlimited, Inc. v. Cintas Corp.,*
223 F.R.D. 506 (S.D. Ill. 2004)...........................................................................................7

*Fed. Trade Comm'n v. Qualcomm Inc.,*
969 F.3d 974 (9th Cir. 2020)...............................................................................................9

*Fishman v. Est. of Wirtz,*
807 F.2d 520 (7th Cir. 1986).............................................................................................11

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.,*
326 F.R.D. 592 (N.D. Cal. 2018).........................................................................................4

*Freeland v. AT&T Corp.,*
238 F.R.D. 130 (N.D. Cal. 2019).......................................................................................17

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l,*
695 F.3d 330 (5th Cir. 2012)...............................................................................................6

*Gen. Tel. Co. of Sw. v. Falcon,*
457 U.S. 147 (1982)...........................................................................................................10

*Graphic Prods. Distribs. v. ITEK Corp.,*
717 F.2d 1560 (11th Cir. 1983)..........................................................................................11

*In re Graphics Processing Units Antitrust Litig.,*
253 F.R.D. 478 (N.D. Cal. 2008).......................................................................................20

*Grodzitsky v. Am. Honda Motor Co.,*
957 F.3d 979 (9th Cir. 2020)..............................................................................................23

*Hanon v. Dataproducts Corp.,*
976 F.2d 497 (9th Cir. 1992)..............................................................................................10

*Henry v. Assoc. Home Equity Servs., Inc.,*
272 B.R. 266 (C.D. Cal. Jan. 7, 2002) ..............................................................................11

*In re High Tech Emp. Antitrust Litig.,*
289 F.R.D. 555 (N.D. Cal. 2013).................................................................................12, 25

*In re Hotel Tel. Charges,*
500 F.2d 86 (9th Cir. 1974)................................................................................................24

*In re Intuniv Antitrust Litig.,*
2019 WL 3947262 (D. Mass. Aug. 21, 2019)...............................................................22, 23

*Kottaras v. Whole Foods Market, Inc.,*
281 F.R.D. 16 (D.D.C. 2012)..............................................................................................25

Gibson, Dunn & Crutcher LLP

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.     CASE NO. 4:11-cv-06714-YGR

**TABLE OF AUTHORITIES** (*continued*)

Page(s)

*L.A. Mem'l Coliseum Comm'n v. NFL*,
    791 F.2d 1356 (9th Cir. 1986)........................................................................................24

*Leegin Creative Leather Prod. v. PSKS*,
    551 U.S. 877 (2007)...................................................................................................17

*Lithium Ion Batteries Antitrust Litig.*,
    2017 WL 1391491 (N.D. Cal. Apr. 12, 2017) .............................................................13

*In re Lithium Ion Batteries Antitrust Litig.*,
    2018 WL 1156797 (N.D. Cal. Mar. 5, 2018)..............................................1, 12, 22

*Litton Sys., Inc. v. Am. Tel. & Tel. Co.*,
    700 F.2d 785 (2d Cir. 1983).........................................................................................11

*In re Live Concert Antitrust Litig.*,
    247 F.R.D. 98 (C.D. Cal. 2007) ...................................................................................5

*New York v. Facebook, Inc.*,
    2021 WL 2643724 (D.D.C. June 28, 2021) ...............................................................9

*In re Niaspan Antitrust Litig.*,
    464 F. Supp. 3d 678 (E.D. Pa. 2020) ...................................................................20, 24

*Ohio v. Am. Express Co. ("Amex')*,
    138 S. Ct. 2274 (2018)...........................................................................................6, 17

*In re Optical Disk Drive Antitrust Litig.*,
    303 F.R.D. 311 (N.D. Cal. 2014).................................................................................13

*Pierce v. Ramsey Winch Co.*,
    753 F.2d 416 (5th Cir. 1985).......................................................................................11

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    292 F. Supp. 3d 14 (D.D.C. 2017)........................................................................19, 20

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013) ...................................................................................12

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    934 F.3d 619 (D.C. Cir. 2019) .......................................................................19, 20, 22

*Sidibe v. Sutter Health*,
    333 F.R.D. 463 (N.D. Cal. 2019)................................................................................12

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 459 (1993)...................................................................................................7

Gibson, Dunn &
Crutcher LLP

iv

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.    CASE NO. 4:11-cv-06714-YGR

**TABLE OF AUTHORITIES** (*continued*)

Page(s)

*In re Tableware Antitrust Litigation,*
    241 F.R.D. 644 (N.D. Cal. 2007)........................................................................................5

*Torres v. Mercer Canyons Inc.,*
    835 F.3d 1125 (9th Cir. 2016)..........................................................................................19

*United States v. E.I. du Pont de Nemours & Co.,*
    351 U.S. 377 (1956)...........................................................................................................7

*Verizon Commc'ns Inc. v. L. Cᵢfs. cf Curtis V. Trinko, LLP,*
    540 U.S. 398 (2004)...........................................................................................................9

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011).........................................................................................1, 4, 5, 6, 12

*Ward v. Apple Inc.,*
    2018 WL 934544 (N.D. Cal., Feb. 16, 2018), aᵢf'd, 784 F. App'x 539 (9th Cir. 2019).....12, 19, 20

*Williams v. Apple,*
    --- F.R.D.---, 2021 WL 2186223 (N.D. Cal. 2021).......................................................23

*Zinser v. Accufix Rsch. Inst., Inc.,*
    253 F.3d 1180 (9th Cir. 2001), cp'n amended on denial cf reh'g,
    273 F.3d 1266 (9th Cir. 2001).......................................................................................4, 24

*In re Zurn Pex Plumbing Prods. Liab. Litig.,*
    644 F.3d 604 (8th Cir. 2011)...........................................................................................19

**RULES**

Fed. R. Civ. P. 23(a)(3-4).......................................................................................................10

Fed. R. Civ. P. 23(b)(3)...........................................................................................................24

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.      CASE NO. 4:11-cv-06714-YGR

**SER-1215**

Gibson, Dunn &
Crutcher LLP

**TABLE OF ABBREVIATIONS**

| Abbreviation | Referenced Document |
|---|---|
| **Ex. __** | Exhibit to the Declaration of Rachel S. Brass in Support of Defendant Apple Inc.'s Opposition to Consumer Plaintiffs' Motion for Class Certification and Defendant Apple Inc.'s *Daubert* Motion to Exclude Testimony of Professor Daniel L. McFadden, filed concurrently. |
| **Dev. Opp. __** | Apple Inc.'s Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Class Certification, filed concurrently in *Cameron, et al. v. Apple Inc.*, 4:19-cv-03074-YGR. |
| **Mot. __** | Plaintiffs' Notice of Motion and Motion for Class Certification; Memorandum of Points and Authorities, filed June 1, 2021 at Dkt. 441. |
| **Mot. to Excl. __** | Defendant Apple Inc.'s *Daubert* Motion to Exclude the Testimony of Professor Daniel L. McFadden, filed concurrently. |
| **Mot. Tr. Plan __** | Defendant Apple Inc.'s Notice of Motion and Motion to Compel Plaintiffs to Submit Trial Plan; Memorandum of Points and Authorities, filed concurrently. |
| **[Name] Dep. __** | Deposition transcript of named witness, attached as an Exhibit to the Declaration of Rachel S. Brass in Support of Defendant Apple Inc.'s Opposition to Consumer Plaintiffs' Motion for Class Certification and Defendant Apple Inc.'s *Daubert* Motion to Exclude Testimony of Professor Daniel L. McFadden, filed concurrently. |
| **Trial Tr. __** | Transcript of the trial held in *Epic Games, Inc. v. Apple Inc.*, 4:20-cv-05640-YGR-TSH, from May 3, 2021 to May 22, 2021, in Oakland, CA. |
| **Hitt ¶ __** | Expert Report and Declaration of Lorin M. Hitt, Ph. D., dated August 10, 2021 and filed concurrently. |
| **Malackowski ¶ __** | Expert Report and Declaration of James E. Malackowski, dated August 10, 2021 and filed concurrently. |
| **Prince ¶ __** | Expert Report and Declaration of Jeff Prince, Ph. D., dated August 10, 2021 and filed concurrently. |
| **Rubin ¶ __** | Expert Report and Declaration of Aviel D. Rubin, Ph. D., dated August 10, 2021 and filed concurrently. |
| **Schmalensee ¶ __** | Expert Report and Declaration of Richard Schmalensee, Ph. D., dated August 10, 2021 and filed concurrently. |
| **Simonson ¶ __** | Expert Report and Declaration of Itamar Simonson, Ph. D., dated August 10, 2021 and filed concurrently. |
| **Willig ¶ __** | Expert Report and Declaration of Robert D. Willig, dated August 10, 2021 and filed concurrently. |
| **McFadden ¶ __** | Expert Class Certification Report of Plaintiffs' Expert Daniel L. McFadden, dated and filed June 1, 2021 at Dkt. 442-11. |
| **Economides ¶ __** | Expert Class Certification Report of Plaintiffs' Expert Professor Nicholas Economides, dated June 1, 2021 and filed in *Cameron, et al. v. Apple Inc.*, 4:19-cv-03074-YGR at Dkt. 332-1. |
| **Elhauge ¶ __** | Expert Class Certification Report of Plaintiffs' Expert Professor Einer Elhague, dated June 1, 2021 and filed in *Cameron, et al. v. Apple Inc.*, 4:19-cv-03074-YGR at Dkt. 332-2. |
| **Tregillis ¶ __** | Expert Class Certification Report of Plaintiffs' Expert Christian Tregillis, dated June 1, 2021 and filed in *Cameron, et al. v. Apple Inc.*, 4:19-cv-03074-YGR at Dkt. 332-3. |

Gibson, Dunn & Crutcher LLP

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.     CASE NO. 4:11-cv-06714-YGR

## INTRODUCTION

As the Court is well aware, class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation omitted), and a class may be certified only if the Court is "satisfied, after a rigorous analysis" that Rule 23's requirements are met, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011). To satisfy the predominance requirement, for example, antitrust plaintiffs must show that they can prove "antitrust impact and damages . . . on a class-wide basis." *In re Lithium Ion Batteries Antitrust Litig.*, 2018 WL 1156797, at *3 (N.D. Cal. Mar. 5, 2018) (Gonzalez Rogers, J.).

The Consumer Plaintiffs' sole expert testified that "the purpose of [his] model" was "to find common effect." Ex. 17, McFadden Dep. 181:5-6. In other words: "You -- you want the model to do the best job you can of reflecting the common effect, given -- given the information that you have." *Id.* 232:19-23. Rather than modeling the real world (or even a realistic but-for world), Prof. Daniel McFadden designed his model to meet the certification standard. For that reason, among others, his opinions should be excluded. *See* Mot. to Excl. § IV.A-D. But even if the Court were to consider McFadden's opinions, they cannot be taken at face value—this Court, unlike McFadden, cannot simply *assume* uniformity. Rather, this Court has to make *findings* regarding commonality, typicality, and predominance; and in so doing, the Court has to weigh McFadden's opinions (to the extent admitted) against the evidence of individualized issues. As explained below, the named plaintiffs have not carried their burden of proof on the disputed Rule 23 prerequisites.

## FACTUAL BACKGROUND

Four individuals—plaintiffs Robert Pepper, Stephen Schwartz, Edward Hayter, and Edward Lawrence—ask this Court to certify a class that includes every U.S. consumer who has ever paid for an app download or in-app purchase on any iOS device "at any time since July 10, 2008." Mot. 2. They assert that this putative class contains "millions of Apple customers" (Mot. 12)—and likely scores of millions[1]—all with their unique preferences, spending habits, and mix of apps and purchases from

---

[1] The named plaintiffs do not analyze data by reference to putative class members, but rather by Apple IDs. While roughly 204 million Apple IDs have made app-related purchases on the U.S. storefront since July 10, 2008, some consumers have multiple Apple IDs, and some share devices and Apple IDs with others. Rollins Decl. ¶¶ 3, 6. Even among named plaintiffs, Hayter admits that he has

more than 25 different categories in the App Store—including games, news, medical, shopping, productivity, weather, navigation, lifestyle, social networking, and magazines and newspapers. *See* Hitt ¶¶ 24, 70-77 (describing App Store consumers). It includes ████████████ that virtually never pay for apps, and more than ██████████ that spent a considerable amount. Hitt ¶ 74, *see also* Fig. 15. It contains ████████████ that have *only* ever spent money on games, and ████████████ of consumers who have never played a mobile game in their life. Hitt ¶ 77; *see also id.* ¶ 76, Fig. 17. And it covers ████████████ that have not transacted through the App Store since around October 2017. *See* Hitt ¶ 216.

The named plaintiffs contend that each of these millions of people were "uniformly impacted" by Apple's alleged conduct. Mot. 21. This assertion is implausible on its face, and belied by the named plaintiffs' own varied experiences:

**Edward Hayter**, for example, purchased only one paid app for approximately $2 and spent $17 on in-app purchases during the entire class period, but has downloaded 128 free apps. *See* Ex. 10 (purchases). Even if the named plaintiffs could show that the $19 Hayter spent on the App Store was inflated by a few cents, the evidence shows that he received far more net benefit from the store. *See* Ex. 13, Hayter Dep. 172:25-174:5 (the apps he regularly uses do not involve payment of commissions to Apple). In fact, when asked if he felt "like [he] paid too much for [his] apps," Hayter responded: "No." *Id.* at 260:16-18. Further, virtually all Hayter's digital transactions occurred *outside* the App Store, including the "thousands of dollars" he paid his cable company to view content on his iPhone. Hayter used apps from the App Store to enjoy that content, but the apps were free and Apple received no money for the transactions. *Id.* at 206:11-22.

**Robert Pepper** testified that he benefits from the secure iOS environment, his iOS devices are more reliable than his non-iOS devices, and he does not need antivirus software for his iOS devices. *See* Ex. 15, Pepper Dep. 202:23-203:6 (agreeing that "Apple's found a way to do pretty good with respect to the security of its devices without having to resort to antivirus software"). In fact, Pepper

three or more Apple accounts, and Schwarz shares an account with his wife. Ex. 13, Hayter Dep. 25:10-17; Ex. 14, Schwartz Dep. 126:11-17. The named plaintiffs present no way to identify proposed class members, and their expert testified it is "beyond the reach" of *either* party to identify which *people*—as opposed to Apple IDs—are in the class and suffered injury. Ex. 17, 226:7-227:24; *see also* McFadden ¶ 132 n.199.

testified that he would be concerned about "opening up iOS to additional app stores" if "it made it more likely that [his] phone could be infected with malware or a virus." *Id.* at 146:21-147:12.

Pepper switched from an iPhone to an Android device during the class period, but his Android experienced "glitches" and "would freeze." *Id.* 47:3-18, 62:25-63:8. He then switched *back* to an iPhone in 2012 or 2013, with full knowledge of Apple's 30% commission and policies. *Id.* at 47:3-22, 89:22-90:8. Pepper has had fewer glitches with his iPhone than he experienced with his Android. *Id.* 62:25-63:8. Pepper agreed it was not "difficult or challenging" to switch between devices. *Id.* 69:10-13. Hayter likewise has had no issues switching between devices. *See* Ex. 13, 87:18-25 ("I have owned more than one phone personally at any given time, okay? I have owned a Samsung. I have owned a Blackberry, okay? But I've always owned an iPhone. . . . It's like having five cars and your favorite is the Mercedes, and the iPhone is my Mercedes.").

**Edward Lawrence** admits that free apps have improved his life. Ex. 16, Lawrence Dep. 151:6-10; *see also id.* 142:5-13, 141:12-21 (uses Pandora and YouTube "daily"). Lawrence views the App Store's malware vetting as "a good thing": "I have a Windows computer, and I had to buy a third-party device . . . to keep viruses away. I don't have to do that on my iOS accounts, either on the iPad or the iPhone." *Id.* at 175:23-176:4, 178:24-179:8.

**Edward Schwartz**, on the other hand, purchased an atypically high percentage of paid apps, at 17%. Ex. 11. But unlike other named plaintiffs, he wants to gut the iPhone's secure environment—he believes in caveat emptor and would prefer the ability to download iOS apps from other sources even if it put him at risk of malware or malfunctions. As he stated, an app store should leave it "up to the buyer, you know, to look at what he is downloading and to say this is unsafe." Ex. 14, Schwartz Dep. 141:3-18. That said, Schwartz is loyal to Apple and would never consider switching to Android. *Id.* at 53:23-54:1. As he explained, "Apple has a terrific public reputation. . . . I think it is a great company," and "Apple has a reputation for being particularly secure." *Id.* at 92:7-93:1.

Although the four named plaintiffs seek to represent millions of **absent putative class members**, they do not provide the Court with any information about those individuals. Apple, in contrast, commissioned a survey of consumers regarding the issues presented by plaintiffs' claims. The survey results show that consumers have widely varying preferences regarding the App Store's

features.  When asked to allocate "points" to various features—from availability of free apps, to parental controls, to privacy—for instance, respondents' dispersions of those points varied from each other's.  Some, for example, allocated zero points to the "number of free apps" available in an App Store, while some allocated 100 points; over half of the respondents allocated zero points to "parental controls," while at least one allocated 50 points.  Simonson ¶¶ 56-58 & Ex. 6

Respondents similarly differ in terms of which of these features they consider "must-haves." *Id.*  Indeed, the only thing a great majority of the putative absent class members share is the high value they place on the App Store's privacy, security, and app quality and variety.  Simonson ¶ 63 & Ex. 6; *see also, e.g.*, Ex. 16, Lawrence Dep. at 175:23-176:4; Ex. 14, Schwartz Dep. 92:7-93:1; Ex. 15, Pepper Dep. 202:23-203:6; Rubin ¶¶ 55-107 (describing App Store and app distribution protections).  For the majority of consumers, privacy and malware protection are considered "must-have" features: 87.2% and 73.8%, respectively.  Simonson ¶ 57.  If an app store does not offer privacy or malware protection—or offers unsatisfactory privacy or malware protection—consumers would likely reject the store for that reason alone, regardless of price.  *See id.* at ¶¶57, 63.  In fact, the majority of consumers would not switch away from the App Store when presented with alternative, hypothetical iOS app stores that have lower prices but greater uncertainty surrounding those features.   Simonson ¶ 19; *see also* Rubin ¶¶ 20, 126-66 (describing impact of changing App Store and app distribution protections).

## LEGAL STANDARD

Under Rule 23(a), the named plaintiffs must prove by a preponderance of the evidence: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.  *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 606 (N.D. Cal. 2018).   The named plaintiffs also must satisfy Rule 23(b)(3)'s heightened burden of showing that any common questions predominate over individual ones, *Comcast*, 569 U.S. at 33, and that a class action is the superior method of adjudication, *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001), *op'n amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001).  Rule 23 "does not set forth a mere pleading standard"; a "party seeking class certification must affirmatively demonstrate his compliance with" Rule 23.  *Dukes*, 564 U.S. at 350.  Courts "must perform a 'rigorous analysis [to ensure] that the prerequisites of Rule 23(a) have been satisfied.'"  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011)  (quoting

*Dukes*, 564 U.S. at 350-51). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim," which "cannot be helped" because "[t]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Dukes*, 564 U.S. at 351 (citation omitted). Because Rule 23 "imposes stringent requirements for certification that in practice exclude most claims," *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013), "doubts about whether the requirements … have been met" should be resolved against class certification. *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233-34 (11th Cir. 2016) (internal quotation marks and citation omitted).

## ARGUMENT

The motion for class certification is riddled with legal error, demonstrating that the named plaintiffs (and their lawyers) know that the putative class cannot be certified under the proper standards. For example, they cite *In re Tableware Antitrust Litigation*, 241 F.R.D. 644, 648 (N.D. Cal. 2007), for the notion that courts are "bound to take the substantive allegations of the complaint as true" (Mot. 12); but that approach was later *rejected* by the Supreme Court in *Dukes*, 564 U.S. at 350. As another example, they assert that "this is not the time or place to resolve a battle of experts" (Mot. 23, citing *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98 (C.D. Cal. 2007)), but that approach was *rejected* by the Supreme Court in *Comcast*. 569 U.S. at 34 ("By refusing to entertain arguments against respondents' damages model that bore on the propriety of class certification, simply because those arguments would also be pertinent to the merits determination, the Court of Appeals ran afoul of our precedents requiring precisely that inquiry."). Instead, as the Ninth Circuit has emphasized, failure to resolve "critical factual disputes," including those presented in a "battle of the experts," is grounds for reversal. *Ellis*, 657 F.3d at 982, 984. To grant the named plaintiffs' motion, the Court would have to contravene settled precedent from the Supreme Court and the Ninth Circuit. Following that precedent, in contrast, requires denying their motion.

## I.      The Commonality Requirement Is Not Satisfied

The named plaintiffs contend that "[w]hether Apple violated the antitrust laws is a common . . . issue." Mot. 13. That is like saying that whether Wal-Mart violated Title VII was a common question, a proposition the Supreme Court squarely rejected in *Dukes*. 564 U.S. at 350 ("any competently crafted

class complaint literally raises 'common questions'"). Under binding precedent, the named plaintiffs bore the burden of identifying a common question "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* The named plaintiffs make no effort to comply.

In a scant paragraph citing no evidence, the named plaintiffs assert that this case presents the "quintessential common questions" of market definition, market power, and anticompetitive conduct; and that these questions "are shared by each [putative] Class member." Mot. 13. But all of plaintiffs' common questions depend on three critical assumptions:

(1) that a *single*, relevant market applies to all putative class members;

(2) that market conditions can be *averaged* for the entire 13-year class period, such that they can be treated as *static*; and

(3) that Apple's conduct applied *uniformly* to all putative class members—i.e., tens of millions of iOS customers.

If any of these assumptions is wrong, the named plaintiffs' commonality argument crumbles. That is because plaintiffs' "questions" are common only if they can be answered by the same facts and evidence. If, instead, putative class members participated in different markets, featuring different market conditions and conduct, then their claims do not actually turn on common issues and evidence. Here, the evidence disproves all three assumptions underlying plaintiffs' commonality argument.

*First*, the named plaintiffs cannot satisfy commonalty by simply *asking* whether their market definition is correct. Mot. 13. Rather, an "accurate definition of the relevant market" is necessary to establish every element of an antitrust claim. *Ohio v. Am. Express Co. ("Amex")*, 138 S. Ct. 2274, 2285 (2018). Accordingly, the Court must assess the merits of a plaintiff's proposed market where, as here, it is relevant to class certification. *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 348 (5th Cir. 2012) ("factual determinations" pertaining to market definition "were necessary for the district court to decide whether to certify a class").

Here, the named plaintiffs, relying solely on their expert's report, propose a single market consisting of all "sales of iOS apps and [in-app purchases]." Mot. 4. As Apple's experts show, however, in reality Apple competes in multiple relevant markets in which different developers and

consumers transact. *See* Hitt ¶¶ 33-34, 229-231, 249-269; Willig ¶¶ 16-19, 113-152. Even the named plaintiffs' expert, Prof. Daniel McFadden, admits that his market definition likely encompasses discrete markets, such as the market for game apps. Ex. 17, 55:7-8, 69:9-15; *see also* Hitt ¶¶ 34, 252-59; Willig ¶¶ 17, 116-35 (the game-app transactions market is a distinct market).

A relevant market should be defined to include only products that are "reasonably interchangeable." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956); *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Here, many iOS app transactions are not reasonably interchangeable. For example, game-app transactions are not reasonably interchangeable with dating-app or business-app transactions. *See* Schmalensee ¶ 59. McFadden admits that his market definition includes non-substitutable products. Ex. 17, 55:9-56:2, 65:17-68:8; Conversely, McFadden uniformly excludes all free app transactions despite the fact that they are often a substitute for paid transactions. *Id.* at 67:18, 72:6-24 (admitting that developers switch between paid and free apps for various business reasons); Schmalensee ¶ 52.

Because, as Professor Willig explains, consumers "differ according to the relevant app transaction markets in which they" participate (Willig ¶ 19), a proper interchangeability analysis dooms consumer plaintiffs' proposed market definition. Apparently recognizing this, McFadden argues that "if the conduct of a defendant is to monopolize …, that is functionally what matters" and "that is more important than … what market definitions might be in terms of … substitution." Ex. 17, 69:3-70:25 ("one should not get too focused on the definition of the market"). The Supreme Court, however, says otherwise. *See Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 459 (1993) (in all Section 2 cases, relevant markets must be defined and market power cannot be inferred from conduct). And the correct market definition is highly consequential for class certification here. Indeed, if members of the putative class participate in different markets, then the evidence in one market cannot be common proof of monopolization of distinct market. *See Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144, 154 (N.D. Cal. 1991) (denying class certification where, *inter alia*, there were significant differences in the products purchased); *Exhaust Unlimited, Inc. v. Cintas Corp.*, 223 F.R.D. 506, 513 (S.D. Ill. 2004) ("Common proof of actual injury to each class member requires that all class members operate in the same relevant market, otherwise they could not be affected in a common manner by the

Gibson, Dunn & Crutcher LLP

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.    CASE NO. 4:11-cv-06714-YGR

**SER-1223**

challenged conduct."). Here, many putative class members spent money on only a single category of apps—for example, games. *See* Hitt ¶ 77. Many other putative class members spent little-to-no money on games. *Id*. ¶ 74; Pepper Dep. 58:9 ("I'm not really a game person"). The named plaintiffs cannot certify a class based on the bare assumption that all of those consumers were in the same market and can use common evidence to prove their claims. *See* Willig ¶ 152.

Named plaintiffs' market definition also improperly excludes non-iOS platforms. "Single-brand markets are, at a minimum, extremely rare" (*Epic Games, Inc. v. Apple Inc.*, 493 F. Supp. 3d 817, 835 (N.D. Cal. 2020) (quoting *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190 (N.D. Cal. 2008))), and the named plaintiffs and McFadden have not shown that this rare circumstance applies here. Indeed, McFadden did not even analyze gaming transactions outside the iOS environment. *See, e.g.*, Ex. 17, 78:8-10 ("I don't know anything about the details of that market and whether -- what games are available exclusively on one device or another."). Yet, Apple's experts show that consumers can make purchases through game consoles, personal computers, and other mobile devices. *See* Hitt ¶¶ 252-259. Likewise, video-streaming app users engage in transactions for content on other platforms, such as tablets, laptops, smart TVs, and streaming sticks. *See* Hitt ¶¶ 260-66 (defining market for video steaming app transactions). The named plaintiffs have not carried their burden of demonstrating that they can define a relevant market with common evidence—and this alone defeats commonality.

*Second*, the named plaintiffs try to manufacture commonality by assuming that their single iOS transaction market was uniform and static since 2008. Specifically, McFadden admits that he "average[d]" the market conditions across the 13-year class period, instead of assessing changes to the market and Apple's alleged market power over each point in the class period. Ex. 17, 92:1-94:18 ("I haven't set out to test" whether Apple had monopoly power in any specific period, and "have no evidence one way or the other" if Apple had such power in the first two years). Further, McFadden did not consider the evolution of app transactions over the past 13 years, changes in consumer preferences, or the quantity and quality of potential market entrants throughout that time period. Indeed, McFadden admitted that he knew virtually nothing about the evolution of app transactions, and all of his opinions are based on a few cherry-picked observations over the past 2-3 years. *Id*. 94:9-18, 98:6-8, 140:1-142:12. By holding the world of app transactions static over the past 13 years, McFadden

is able to assume that Apple's policies and prices also would have been static over that time period, and that if a consumer overpaid for a game-app transaction in 2008, a different consumer would have similarly overpaid for a dating-app transaction in 2021.  McFadden conducted no analysis to support that opinion—rather, he simply assumed the commonality he was supposed to demonstrate.

In the real world, app stores have not remained static for more than a decade.  Hitt ¶¶ 51-55, 78-106, Figs. 19-21.  The App Store itself has offered numerous rate structures—including the Video Partner Program, the Reader Rule, special rates for subscriptions, and most recently the Small Business Program.  *Id.* ¶ 52.  Other app stores have also had dynamic pricing structures.  *Id.* Fig. 19-21.  Because the putative class made different purchases, at different times, subject to different conditions and policies, McFadden's assumption of a static market defies reality and assumes classwide impact.

*Third*, the named plaintiffs claim there is a common question regarding Apple's alleged anticompetitive conduct, because Apple "designed iOS to be a 'closed' system" and had a single policy of "prohibiting app developers from informing iOS users … of the availability of their apps or IAP on other platforms."  Mot. 18-19.  But that common question fails because it misapprehends the law.  An alleged "monopolist has no duty to deal with its competitors, and a refusal to do so is generally lawful."  *New York v. Facebook, Inc.,* 2021 WL 2643724, at *12 (D.D.C. June 28, 2021) (citing *Verizon Commc'ns Inc. v. L. Cjfs. cf Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004)); *see also Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020) ("As the Supreme Court has repeatedly emphasized, there is 'no duty to deal under the terms and conditions preferred by [a competitor's] rivals[.]").  "It follows that a firm's merely announcing its choice not to deal with competitors, whatever the motivation for doing so, cannot violate Section 2."  *Facebook*, 2021 WL 2643724, at *12.  Rather, a Section 2 claim must turn on analysis of "specific instances in which that policy was enforced."  *Id.*

Here, the named plaintiffs rely entirely on an announced "policy"—a legally invalid basis for a Section 2 claim.  McFadden's report purports to identify "specific instances" of Apple allegedly refusing to deal with app developers or putative app stores, McFadden ¶ 125 (Epic, Spotify, Telegram, and Kobo), but he admitted at his deposition that the *only* instance he is aware of in which Apple declined to allow a competing app store involves Epic in 2020-2021.  Ex. 17, 114:16-117:24.  A consumer who purchased a news subscription in 2015 cannot be harmed by Apple's purported refusal

to deal with Epic in 2020, and even a game app purchaser cannot suffer antitrust injury unless the refusal was unlawful and the transaction occurred after Apple's refusal and after, in the but-for world, the price paid would have dropped due to competition with an Epic store. Accepting McFadden's cursory references to other alleged refusals in his report does not solve this problem, but would create additional questions that apply differently to different putative class members. Thus, these alleged "specific instances" do not implicate or impact every member of the class in common.

The named plaintiffs did not satisfy commonality, because they simply reframed the elements of their claims as questions, and they simply assumed—instead of proved—that they could use common evidence to generate common answers that will drive this litigation.[2]

## II.     The Typicality and Adequacy Requirements Are Not Satisfied

"The purpose of the typicality requirement is to assure that the interest[s] of the named representative[s] align[] with the interests of the class," including "whether the action is based on conduct which is not unique to the named plaintiffs." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "[C]lass certification is inappropriate" here, where the named plaintiffs seek changes to the App Store that would harm millions of putative members, and are "subject to unique defenses which threaten to become the focus of the litigation." *Id.*; *see also* Fed. R. Civ. P. 23(a)(3-4); *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982) (commonality and typicality "tend to merge" with each other and with adequacy).

While the named plaintiffs' failure to prove (or even meaningfully address) typicality masks conflicts within the putative class, several are apparent. Schwartz's stance on security—wishing to gut the iPhone's secure environment and make every consumer responsible for ensuring they do not download dangerous apps (Ex. 14, 141:3-18), and Lawrence's stance on privacy—casting aside personal privacy when purchasing apps because he believes nothing is private (Ex. 16, 183:17-19, 184:7-185:4), for example, pit each of them against the putative class, 73.8% of whom consider

---

[2]    The named plaintiffs' attempt to establish market-power commonality by pointing to "the App Store's extremely high gross and net margins," Mot. 7, cannot solve the problem of non-commonality injected by multiple relevant markets, as evidence of profit can only be used to assess market power *within* a relevant market. In any event, their profit-margin evidence is unreliable. *See* Mot. to Excl. § IV.B.3.

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.     CASE NO. 4:11-cv-06714-YGR

**SER-1226**

Gibson, Dunn & Crutcher LLP

malware protection a "must-have" feature, and 87.2% of whom say the same for privacy. Simonson ¶ 57; *see also* Ex. 27, Trial Tr. 193:3-4, 302:19-25 (absent class member Tim Sweeney); Rubin ¶¶ 20, 127-37. *Henry v. Assoc. Home Equity Servs., Inc.*, 272 B.R. 266, 279 (C.D. Cal., Jan. 7, 2002) (typicality and adequacy not satisfied where "[p]laintiffs are challenging [conduct] that many class members may view as a benefit"). Schwartz's and Lawrence's extreme stances also conflict with the other named plaintiffs, who admitted benefiting from the App Store's security measures. *See* Pepper Dep. 146:16-20, 146:21-14712 (he would be concerned about "opening up iOS to additional app stores" if "it made it more likely that [his] phone could be infected with malware or a virus"); Ex. 13, Hayter Dep. 251:17-25 (iPhone never broke due to malware: "It's important"). *See Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 178 (C.D. Cal. 2007) (no typicality where "[e]ven as between" the "named Plaintiffs there is sufficient heterogeneity to indicate that proof that one Plaintiff was overcharged is not probative of whether other class members were overcharged").

Moreover, Pepper's experience switching from an Android device and app store (which frequently experienced "glitches" and "crashed") to an iPhone during the litigation and with full knowledge of Apple's 30% commission (Pepper Dep. at 47:3-22, 89:22-90) subjects him to an individualized defense given his pre-purchase knowledge of App Store policies and prices. *See Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 436 (5th Cir. 1985) ("[A]n antitrust plaintiff, like other injured parties, must mitigate damages."); *Fishman v. Est. of Wirtz*, 807 F.2d 520, 558 (7th Cir. 1986); *Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 700 F.2d 785, 820 (2d Cir. 1983); *Graphic Prods. Distribs. v. ITEK Corp.*, 717 F.2d 1560, 1583 (11th Cir. 1983); *see also* Lawrence Dep. 55:12-13 (Lawrence "kn[ew] about Apple and their practices for a long time" before filing suit, subjecting him to similar individualized defense). Pepper's switching also undercuts the named plaintiffs' "aftermarket" theory—that device-switching costs are prohibitively high and therefore "lock" consumers into the App Store. Mot. 6. Many survey respondents did not mention difficulty in switching devices as a reason for not switching. Simonson Rpt. ¶ 24. And a majority of consumers stated that they would not switch away from the App Store, when they were presented with an alternative app store that had lower prices but was less protective of their privacy and security. *Id.* ¶ 19.

Apple is entitled to assert such defenses not just against the named plaintiffs, but as to other

would-be class members. *See Dukes*, 564 U.S. at 367 ("Because the Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right,' a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its statutory defenses to individual claims." (citations omitted)). Apple cannot litigate these defenses on a classwide basis.

## III.  The Predominance Requirement Is Not Satisfied

"Even if Rule 23(a)'s commonality requirement may be satisfied"—and it is not here—"the predominance criterion [under Rule 23(b)] is far more demanding." *Amchem Prods. v. Windsor*, 521 U.S. 591, 623 (1997). To satisfy predominance, antitrust plaintiffs must show they can prove "antitrust impact and damages . . . on a class-wide basis." *Lithium Ion*, 2018 WL 1156797, at *3; *see also In re High Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 566 (N.D. Cal. 2013) ("in antitrust cases, impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof"). And they must do so in a way that conforms to their liability theory. *Comcast*, 569 U.S. at 35.

Named plaintiffs invite the Court to commit error by again relying on outdated and overruled case law to suggest that they need only offer a "plausible methodology" to prove classwide impact. In fact, antitrust plaintiffs bear the "burden . . . to provide a viable method for *demonstrating* class-wide antitrust injury based on common proof." *Ward v. Apple Inc.*, 2018 WL 934544, at *3 (N.D. Cal., Feb. 16, 2018), *aff'd*, 784 F. App'x 539, 540 (9th Cir. 2019) (Gonzalez Rogers, J.) (emphasis added); *Sidibe v. Sutter Health*, 333 F.R.D. 463, 493 (N.D. Cal. 2019) ("Rule 23 not only authorizes a hard look at the soundness of statistical models that purport to show predominance—the rule commands it."). A "rigorous analysis" of predominance entails not just an assessment of plausibility but "judging the persuasiveness of the evidence presented" for and against certification. *Ellis*, 657 F.3d at 982 (vacating class certification because the district court "confused the *Daubert* standard" for admissibility of expert evidence "with the 'rigorous analysis' standard to be applied when analyzing" the Rule 23 factors).

Here, the named plaintiffs fall far short of their burden. They rely on an antitrust impact methodology created by Prof. McFadden. But McFadden never analyzed the evidence in this case (in fact, he knew nothing about the named plaintiffs, other devices that consumers use for app transactions, or significant platforms like the Mac App Store) to determine *whether* a common methodology was

Gibson, Dunn & Crutcher LLP

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.     CASE NO. 4:11-cv-06714-YGR

**SER-1228**

appropriate. Ex. 17, 23:13-21, 79:24-81:13, 98:3-17, 137:1-139:12. Instead, by his admission, his objective was to assume commonality as a "starting point" and create a model that generated a "common effect." *Id*. 174:15-22, 180:24-181:6, 232:20-23 ("[Y]ou want the model to do the best job you can of reflecting the common effect, given -- given the information that you have."). That type of expert analysis is improper at class certification. *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 320–21 (N.D. Cal. 2014) (concluding that expert's "model makes no attempt to establish, but instead simply assumes, class-wide impact" where it assumed overcharge was "the same for all purchasers across all models of [optical disk drives] and throughout the entire class period"); *In re Lithium Ion Batteries Antitrust Litig.*, 2017 WL 1391491, at *1 (N.D. Cal. Apr. 12, 2017) (Gonzalez Rogers, J.) (denying class certification when plaintiff's impact methodology failed to "account for the decision-making of a variety of resellers and manufacturers in an intricate distribution chain").

Driven by that objective, McFadden proceeded in two steps. First, McFadden purported to identify the commission rate(s) Apple would have charged the a but-for world. Second, McFadden created an econometric model of consumer prices in the but-for world. But as Apple's experts explain, both steps in McFadden's analysis are unreliable and, at crucial junctures, assume commonality instead of proving it. Schmalensee ¶¶ 197-214; Hitt ¶¶ 172-183. However, as McFadden himself admitted, his own model estimates many millions of uninjured consumer accounts, an amount that he deems "relatively small." McFadden ¶ 226. In reality, as detailed by Prof. Prince, the but-for world would teem with uninjured class members.

### A. Named Plaintiffs' Theory of Classwide Impact Rests on Unsupported Assumptions About But-For Commission Levels

McFadden admits that, rather than applying any economic expertise, he used "commonsense judgment" to identify the but-for commission rates in the first step of his analysis. McFadden testified that an expert could have performed this work, but he did not. Ex. 17, 134:7-135:13 (admitting "an economist could" build "a mathematical model or statistical model of the but-for world commission," but he did not "do[] so in this case"). Instead, litigation consultants assisting McFadden cherry-picked commission rates for four PC game-store apps, and then McFadden adopted the "commonsense" conclusion that Apple would have charged a 10-12% commission rate in the but-for world, across every app category and the entire 13-year class period. This is facially implausible, not "commonsense." As

Professors Hitt and Schmalensee explain, all evidence suggests that in the but-for world, Apple would most likely charge the same 30% headline rate as it does today. Hitt ¶¶ 29, 194-98; Schmalensee ¶¶ 20, 133-42. McFadden's opinion is unreliable, not the product of any type of scientific analysis, and contrary to real-world evidence. *See* Mot. to Excl. § IV.B.

**1. *McFadden's 10-12% but-for commission rate ignores reality.*** It was named plaintiffs' burden to put forth a reliable methodology for determining Apple's commission rate(s) in the but-for world. Instead, McFadden conducted an unscientific "benchmark analysis," which consisted of litigation consultants selecting four PC game-app stores that allegedly operate in competitive markets (Valve's Steam store, the Microsoft store, the Epic store, and Discord). McFadden then looked at the lowest commission rates charged by those four stores, and concluded that Apple would have charged a 10-12% commission rate in the but-for world. McFadden ¶¶ 136, 153-161.

Apple's *Daubert* motion identifies numerous flaws in McFadden's benchmark analysis. *See* Mot. to Excl. § IV.B. Among them, McFadden purports to rely on Valve's Steam store, "the largest PC game store by registered users" (McFadden ¶ 156). But, as Prof. Hitt explains, Steam has charged a 30% headline commission for virtually all app purchases since it began distributing third-party games in 2005. Hitt ¶¶ 91-92; (at most 302 titles qualified for lower commission tiers in 2019). Similarly, McFadden relies on the Microsoft Store, which has charged a 30% headline rate for most games for most of its existence, including at the time McFadden submitted his expert report. *See* McFadden ¶ 158 (relying on Microsoft commission rates that become effective in August 2021); McFadden Dep. 152:03-21 (admitting that Microsoft "apparently" charged a 30% commission on game apps "from the beginning of time until the day before yesterday"); Hitt ¶¶ 97-99 & Fig. 20. McFadden also relies on the Epic Games Store's 12% rate, but he was unaware that Epic set prices below actual cost in order to generate critical mass for its store, or that Epic provides developers with costly minimum-guarantees. Ex. 17, 148:21-149:2, 149:10-150:7; Ex. 21, Allison Dep. 89:22-90:3, 129:19-24; Ex. 28, Kreiner Dep. 244:2-5, 256:12-16; Ex. 23, Trial Tr. 1232:14-17 (Allison); Hitt ¶ 80. McFadden also purports to rely on the 10% commission rate charged by Discord, but he did not know that store shut down only months after announcing that rate. Ex. 17, 153:16-154:13; Hitt ¶ 80, 102.

McFadden's benchmark analysis also ignored every other app store that has charged a 30%

commission rate—including the Samsung Galaxy and Google Play Android app stores that face sideloading and competing stores on the same device, Hitt ¶¶ 83-90, 199-200 (describing Android app store models), and Apple's Mac App Store, which named plaintiffs admit permits "multiple third-party app stores," Mot. 10 n.10; *see also* Hitt ¶¶ 94-96.  Indeed, McFadden did no work to determine whether the Mac App Store was a reasonable benchmark that undermined his 10-12% but-for rate.  Ex. 17, 137:11-14 ("Q.  [D]o you consider the Mac app environment to be competitive? A. I don't . . . know I haven't looked at it."), *id.* 138:14-139:12 (does not know whether Mac users can buy apps from other stores—his sole knowledge comes from seeing "an Apple App Store icon" on his wife's computer).

Just like these platforms, the App Store has maintained a headline 30% commission rate since it opened.  At the same time, Apple continues to charge nothing for distributing free apps, and introduced lower rates—such as the 15% commission for subscriptions, certain video content, and developers earning less than $1 million per year.  *See* Ex. 24, Trial Tr. 2740:3-2742:5, 2805:2-11, 2806:5-21, 2810:16-23 (Schiller); Ex. 1.  McFadden fails to explain why, in the but-for world, Apple would have abandoned those rates and done something that no company has *ever* done profitably and successfully in the real world:  offer a single-tier 10-12% commission for all apps.

**2.  McFadden's uniform, but-for rate ignores the complexity of the competitive landscape.** McFadden's 10-12% but-for commission also ignores the dynamic competitive landscape among app platforms.  *See* Mot. to Excl. § IV.B.2.  As Apple's experts demonstrate, just like the world in which McFadden drew his "benchmarks," any but-for world would likely contain competing app stores differentiated along multiple dimensions, and developers would pay non-uniform commissions.  *See* Schmalensee ¶¶ 138-142; Hitt § 8.1.  Some stores would likely charge a non-negotiable 30% commission rate, as the Mac App Store does currently.  ██████████████████ ██████████████████████████████████ ███████████████████████  Other entrants might take Epic's approach of charging a lower headline rate and offering exclusive (minimum guarantee) deals to attract developers and (through indirect network effects) consumers.  *See* Ex. 6 (Media analysis of Epic Games Store commission rate).  Still others may emulate Steam and charge tiered commissions anchored off 30% with lower rates for the most lucrative games.  Hitt ¶ 92.  And, although McFadden's benchmark

analysis makes no mention of sideloading, some developers would choose to sell directly to a consumer, as some large developers do in the PC and Android environments. Hitt ¶ 108, 296 (describing direct distribution by large game developers); *cf.* Compl. ¶ 57 ("competitive iOS apps distribution market" would involve "buying directly from app developers"). These market realities mean that assessing consumer injury requires knowing where developers would sell, where consumers would buy, and the prices developers and consumers would pay. Schmalensee ¶ 139, Hitt ¶ 37, 277, 321-23. McFadden ignores this complexity.

McFadden also leaves no room for marketplace changes over time because such "calculation[s]" are "difficult . . . for economists." Ex. 17, 151:1-13. He assumes Apple would have charged a static 10-12% commission in the but-for world without taking into account, for example, *when* the first iOS app store competitor entered the market, *what* its starting rate would have been, and *how* it would have affected the App Store's commission rates. *See* Mot. to Excl. § IV.B.2. As Professors Hitt and Schmalensee explain, other app platforms have changed commissions over time since 2008. Schmalensee ¶ 135 & Ex. 4; Hitt Figs. 19-21.

***3. The App Store has other features for which consumers would pay a higher rate.*** No evidence suggests that in a but-for world, Apple would abandon its commitment to the privacy, security, and user experience that defines its brand. Ex. 26, Trial Tr. 3937:8-11 (Cook) (agreeing that "Apple believes privacy is a basic human right" and a "key differentiator in the market for its products"); *see also* Ex. 27, Trial Tr. 193:3-4, 302:19-25 (Epic CEO—and putative class member— Tim Sweeney testifying he values privacy); Ex. 13, Hayter Dep. 159:7-9 (similar). McFadden himself makes the "implicit assumption" that, aside from the commission, "nothing else is changing" in the but-for world, including the App Store's security and privacy features. McFadden Dep. 159:16-160:05. Even in the but-for world, Apple would continue to review every app submitted to ensure it meets high privacy-protection standards and does not contain malware or offensive content. Ex. 25, Trial Tr. 1183:12-1184:6, 1185:15-1186:20 (Kosmynka); *see also* Rubin ¶¶ 59-80. This, coupled with the fact that iOS users value these App Store features, and most would *not* shift purchases to less reputable

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.     CASE NO. 4:11-cv-06714-YGR

**SER-1232**

Gibson, Dunn &
Crutcher LLP

stores even at a discount, Simonson ¶ 63,[3] means Apple could charge a higher commission in the but-for world than McFadden allows. Hitt ¶¶ 30, 198, 314-20. *See Leegin Creative Leather Prod. v. PSKS*, 551 U.S. 877, 896-97 (2007) (quality can increase consumer demand despite higher prices); *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 147-49 (N.D. Cal. 2019) (rejecting plaintiffs' impact model for ignoring effect of product quality on price).

Further, as Prof. Schmalensee explains, in the but-for world, the App Store also would benefit from indirect network effects that increase demand for its store. Schmalensee ¶¶ 124, 131, 136. In a two-sided platform, "the value of the services that [the] platform provides increases as the number of participants on both sides of the platform increases." *Amex*, 138 S. Ct. at 2281. A developer values—and pays a premium for—a platform that provides a bigger and broader audience. Hitt ¶¶ 311-313 & Fig. 33 (developers transact through Steam despite availability of lower rates from other stores). Consumers, likewise, value platforms with greater choice and diversity of apps. *See* Ex. 15, Pepper Dep. 69:14-17, 76:3-7 (never searched for an app and been unable to find it on App Store). McFadden makes no assumption that the App Store would have a small market share, and indeed does not rule out a share approaching 100%. McFadden Dep. 130:17-132:05. As such, he fails to account for this two-sided nature of the market, Schmalensee ¶¶ 36-39, and the ensuing value to both sides.

**4. App developers would face other costs in the but-for world.** McFadden ignores the likelihood that in the but-for world, Apple would monetize its IP differently, and developers could pass that added cost onto individual consumers. The technologies Apple licenses developers to build iOS apps are subject to various intellectual property protections that stem from $100 billion in R&D over the past 15 years. Malackowski ¶¶ 19-21, 82-127, 143-65; Ex. 26, Trial Tr. 3989:9-11 (Tim Cook explaining that Apple "need[s] a return on our IP . . . [W]e have 150,000 API's to create and maintain and numerous developer tools."). McFadden's model implausibly assumes that Apple would reduce its commission by more than half without any offsetting increase in other fees to compensate for developers' use of its intellectual property. But Apple likely would monetize the technology it

---

[3] The named plaintiffs testified that Apple has a superior reputation, and they value App Store features. *See* Ex. 15, Pepper Dep. 154:10-13 (reliable performance of iPhone important); Ex. 16, Lawrence Dep. 246:6-10, 247:14-16 ("much easier" to buy on App Store compared to Windows; App Store has "improved" his mobile phone experience); *id.* 179:3-13 ("environment where the apps that are available to you are vetted" is an "advantage" and "good thing"); Ex. 14, Schwartz Dep. 92:7-93:1.

licenses—including through various other models, like increased annual developer fees, a royalty on developer profits, charging for app review, or licensing specific technologies for a fee. Ex. 17, McFadden Dep. 159:7-15 (admitting his "model does not take into account payments that developers make other than by other commission" or potential "royalties"); *see* Malackowski ¶¶ 196-207 (potential alternative monetization options); Schmalensee ¶¶ 143-60 & Ex. 5; Willig ¶¶ 189-214; Hitt ¶¶ 324-43.

In short, McFadden's 10-12% uniform commission rate is based on an arbitrary benchmark analysis, as opposed to any sort of rigorous scientific assessment of what Apple would have actually charged in the but-for world. No reasonable fact-finder could rely on McFadden's opinion, in view of all the evidence, to conclude that the App Store would have had a uniform 10-12% commission from 2008 to present in the but-for world. Thus, even if the Court does not exclude his testimony entirely, McFadden's testimony cannot support a finding of predominance. The Consumer Plaintiffs chose to stake their entire bid for certification on McFadden, and McFadden chose to premise all of his opinions on the but-for commission. Because his assumption is false, none of his conclusions follow.

**B.** **Named Plaintiffs' Theory of Classwide Impact Rests on an Unreliable Model of But-For App Prices**

The second step in McFadden's methodology is equally unreliable, but for different reasons. Whereas McFadden's first step fails because he essentially picked a commission percentage out of thin air without any economic analysis, his second step features a complex econometric model that seeks to estimate prices of selected apps and in-app purchases in the but-for world. But McFadden's econometric model is riddled with flaws.

One extraordinary defect that alone precludes class certification is that McFadden's model estimates vastly more than a *de minimis* number of uninjured class members—14.6% of user accounts, totaling nearly 30 million. Prince ¶ 10, 32. And as Prof. Prince explains, this is just the model's base case, since the number of uninjured people is far higher after correcting for the numerous flaws in McFadden's model. *Id.* ¶¶ 7, 10, 35. The named plaintiffs have presented no way to identify and extract uninjured people from the class, which means their motion for class certification must be denied.

*1. McFadden's econometric model assumes uniformity and generates unreliable app prices.*
As explained in more detail in Apple's *Daubert* motion, McFadden's opinions on app and in-app purchase prices in the but-for world are unreliable and should be excluded. Mot. to Excl. § IV.C.

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.    CASE NO. 4:11-cv-06714-YGR

Gibson, Dunn & Crutcher LLP

**SER-1234**

McFadden did not approach his opinions scientifically, to assess *whether* there is a common effect, but instead designed his model to "find a common effect" (Ex. 17, 180:24-181:6), treating common impact as a "modeling assumption" rather than one of several possible results. *Id.* 174:15-22; Mot. to Excl. § IV.A. Further, McFadden's model rests upon a tiny and demonstrably unrepresentative sample of apps—just over 1,800—which includes apps from only three of 27 app genres, and fails when run on other genres. Mot. to Excl. § IV.C; Prince ¶¶ 116-23. Worse still, McFadden's model fails basic robustness checks, rendering them useless to the Court. Mot. to Excl. § IV.C.2. Because McFadden's opinions are inadmissible—or at a minimum, not credible—the named plaintiffs cannot meet their burden of showing impact on a predominantly common basis. *Ward*, 2018 WL 934544, at *3 (plaintiffs bear the "burden . . . to provide a viable method for demonstrating class-wide antitrust injury based on common proof" (citation omitted)).

   *2. Even with its untenable assumptions, McFadden's model yields more than a* **de minimis** *number of uninjured class members.* Even under his own methodology, however, McFadden admits there are a substantial number of "class members who show no damages." McFadden ¶ 227. Classes may not be certified containing "a great number" of uninjured class members. *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1138 (9th Cir. 2016). If a large number of class members "in fact suffered no injury," the "need to identify those individuals will predominate and render an adjudication unmanageable." *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53-54 (1st Cir. 2018); *see also In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 616 (8th Cir. 2011)). Cases "involving uninjured class members 'suggest that 5% to 6% constitutes the outer limits of a *de minimis* number.'" *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 625 (D.C. Cir. 2019) (citation omitted); *see also Andrews v. Plains All Am. Pipeline*, 777 F. App'x 889, 892-93 (9th Cir. 2019) (denying class certification when plaintiffs' expert's model indicates that many employees within the class likely were not injured); *Asacol*, 907 F.3d at 47 (no predominance where approximately 10% of the class was uninjured); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 137 (D.D.C. 2017).

   Here, McFadden's model results in more than a *de minimis* number of uninjured class members. Despite claiming his model can show that "all or nearly all consumers" would have paid lower prices for their digital transactions (McFadden ¶ 13), McFadden admitted in his report that his own

calculations for the three largest categories of apps show that "approximately 5.8% of the Consumer Class members" are uninjured, a number he dismissed as "relatively small." *Id.* ¶ 226, 241. In his deposition, he admitted that this figure was an underestimate, because it did not measure net harm across a given account's purchases. Ex. 17, 208:5-25; *id.* 201:12-21; McFadden Rpt. n.198. When applying the proper net harm measure using McFadden's computer code, the model predicts that 7.7% of user accounts—almost 15.7 million—suffered no economic impact. Prince ¶ 31. When a technical bug in McFadden's computer code is fixed, however, that figure rises to an astounding 14.6% or almost 30 million accounts. Prince ¶ 32. Nevertheless, Prof. McFadden opines that "all or nearly all" of the putative class has been injured. McFadden ¶ 13.

These facts alone preclude certification, as they establish that the percentage of uninjured class members exceeds the "the outer limits of a *de minimis* number," *Rail Freight*, 292 F. Supp. 3d. at 137, and the sheer quantity of uninjured class members is enormous, *see In re Niaspan Antitrust Litig.*, 464 F. Supp. 3d 678, 718 (E.D. Pa. 2020). Courts have rejected classes with far fewer uninjured class members. *Rail Freight*, 934 F.3d at 627 (rejecting class containing 2,037 uninjured class members); *Asacol*, 907 F.3d at 53-54 (rejecting class where "apparently thousands . . . in fact suffered no injury").

**3. Adjusting McFadden's flawed assumptions yields even larger numbers of uninjured class members.** Even if the Court were willing (and able) to sort out the millions of uninjured class members McFadden admits are included in named plaintiffs' putative class, to find that common issues would predominate, the Court would still be required to resolve factual disputes regarding the merits of McFadden's model, including the legitimacy of the model's underlying assumptions. *See Comcast*, 569 U.S. at 34; *Ellis*, 657 F.3d at 982, 984 (courts must resolve factual questions relevant to class certification); *Asacol*, 907 F.3d at 47; *see also Ward*, 2018 WL 934544, at *3 ("[C]ertification [should not be] automatic every time counsel dazzle the courtroom with graphs and tables." (quoting *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 491 (N.D. Cal. 2008))).

Changing McFadden's unrealistic assumptions reveals that far more than 30 million accounts are uninjured. For example, applying but-for commission rates that, unlike McFadden's, account for the prevalence of 30% headline commission rates throughout the class period yields many more millions of uninjured accounts. Prince shows that if Apple, for instance, implemented McFadden's

Gibson, Dunn & Crutcher LLP

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.     CASE NO. 4:11-cv-06714-YGR

implausible 12% uniform rate in November 2018—around the time the first of the lower rates in McFadden's benchmark analysis were implemented—65% of accounts (or 132.2 million) would be uninjured. Prince ¶¶ 43-44, 46.[4]  Similarly, if Apple, like Steam, charged 30% on the first $10 million followed by reduced rates for additional sales, more than 21% of accounts (43.1 million total) would be unharmed. *Id.* ¶ 47.  Additionally, if (as McFadden's model predicts) a 12% but-for commission rate would attract some developers to change their monetization strategy and begin charging for formerly free (zero-charge) apps (which are 72% of apps in the App Store over the class period), more than 33.4% of accounts (68 million total) would be uninjured. *Id.* ¶¶ 51-56.  Such vast numbers of uninjured class members clearly defeat predominance.

Even these numbers understate the number of uninjured class members.[5]  For instance, if—contrary to McFadden's assumption—$0.99 pricing tiers (or their equivalent in the form of "focal" pricing) would remain in the but-for world, more than half of apps would not change their but-for prices. Prince ¶¶ 122-124; *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1528 (2019) (Gorsuch, J., dissenting) ("because Apple's 99-cent rule creates a strong disincentive for developers to raise their prices, it makes plaintiffs' pass-on theory of injury even harder to prove.").  McFadden's model cannot assess the number of uninjured accounts to the extent that focal point (0.99) pricing was common in the but-for world. Prince ¶¶ 57-59, 61.  In fact, McFadden did not do any study of focal-point pricing. *See* Ex. 17, 125:1-11, 182:6-9.  He just assumed that Apple's price tiers would disappear in the but-for world, and built his model with that assumption as a given.  But focal-point pricing is commonplace in competitive markets, including the PC store market that McFadden holds out as a competitive benchmark. Schmalensee ¶¶ 211-12 (explaining that focal point pricing would prevail in the but-for world); Mot. to Excl. § IV.C.3; *see also Lithium Ion*, 2018 WL 1156797, at *5 ("Having failed to provide an explanation for the effect of focal point pricing on the pass-through analysis previously calculated, the Court cannot find that the antitrust injury to the class can be determined on a common

---

[4]  And these totals do not account for the data error noted previously, which Prof. Prince discovered on the eve of finalizing his report. *See* Prince ¶ 33.  So they likely understate the true number.

[5]  McFadden has many other unsupported assumptions that exaggerate impact.  For example, he assumes apps will not compete with one another in the but-for world (Prince ¶¶ 62-65); and consumers have the same price sensitivity for all apps in the same genre (*id.* ¶¶ 66-72).  He also applies arbitrary, unrepresentative, and incorrectly calculated constraints on developers' profit margins and, when removed, leave more than 18% of accounts (36.6 million) unharmed. *Id.* ¶¶ 90-106.

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.      CASE NO. 4:11-cv-06714-YGR

**SER-1237**

Gibson, Dunn & Crutcher LLP

basis as to the putative class."). And, as explained above, it is most likely that Apple would continue to charge a 30% commission rate in the but-for world, meaning that consumers who made purchases through the App Store would pay the same prices under McFadden's model. Prince ¶ 45. That would include the substantial number of iOS users who would continue to obtain apps exclusively through the App Store rather than patronizing alternative options offering less curation, increased search costs, lower privacy, and a higher risk of malware. Simonson ¶ 63. "Identifying [these] uninjured consumers with any degree of confidence would require an assessment of individual-specific facts" such as the individual's risk appetite, privacy preferences, and price sensitivity. *In re Intuniv Antitrust Litig.*, 2019 WL 3947262, at *8 (D. Mass. Aug. 21, 2019); *see also Asacol*, 907 F.3d at 51.

Because the evidence reveals that, after correcting the erroneous assumptions built into McFadden's model, there would be many millions more uninjured accounts beyond the 30 million that even McFadden acknowledges, individualized inquiries would predominate over common ones.

**4. *Named plaintijfs cannot salvage McFadden's model by removing uninjured members from the class.*** McFadden also does not present "a reasonable and workable plan" for the Court to winnow out uninjured consumers. *Rail Freight*, 934 F.3d at 625 (denying certification when plaintiffs proposed "no further way—short of full-blown individual trials—to reduce this number and segregate the uninjured from the truly injured" (citation omitted)). Instead, McFadden states—with no elaboration—that he can "identify [uninjured] Class members individually" because "App Store transactions data provide detailed transaction-level information." McFadden ¶ 241. But the numbers of uninjured plaintiffs vary widely depending on what assumptions are adjusted. Plus, each of these changes alters which accounts are injured. *See* Prince ¶ 56 (over 26% of accounts changed from harmed to unharmed, or vice-versa, when free apps are factored in). In short, "this is a case in which any class member may be uninjured, and there are apparently [millions] who in fact suffered no injury," *Asacol*, 907 F.3d at 53, and McFadden's model provides no mechanism—let alone a "reasonable and workable" one—to weed them out, *see Intuniv*, 2019 WL 3947262, at *7 (winnowing mechanism must "allow [Apple] to challenge class members' individual, purported injury").

Even if McFadden's model could reliably identify which accounts, and how many, were injured (and it cannot), Plaintiffs still could not establish classwide injury. McFadden suggests he can identify

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.     CASE NO. 4:11-cv-06714-YGR

Gibson, Dunn &
Crutcher LLP

**SER-1238**

each affected consumer and determine injury and damages "based on Apple ID's." McFadden ¶ 132 & n.199. Yet he also concedes that "it is not possible to link different ID's held by the same person, or determine when more than one person shares an ID." *Id.* ¶ 132 n.199. Apple's Finance Manager Mark Rollins, confirms this is the case. Rollins Decl ¶¶ 1-7.[6] As named plaintiffs' own experience shows, it is not uncommon for iOS users to own multiple accounts or share accounts. Accordingly, McFadden cannot say what any given consumer purchased and therefore whether they would have paid more or less for those purchases in the but-for world. Ex. 17, 227:4-24. Indeed, McFadden has not even tried to identify the four named plaintiffs' various Apple IDs to determine whether any of them were injured under his model, and that such a task is "challenging," if not "impossible." *Id.* 227:25-228:12. Even taking McFadden's model as given, these "gaps in the record" make it "infeasible" to identify the potentially millions of uninjured class members. *Williams v. Apple*, --- F.R.D.---, 2021 WL 2186223, at *8-9, *25 (N.D. Cal. 2021) (partially denying class certification when "not only is it likely that the putative class contains many members who never suffered the alleged contractual breach, but also it is infeasible to determine who those injured class members are").

\* \* \*

The named plaintiffs cannot meet their predominance burden because they rely on unsound expert opinions regarding classwide impact. *See Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 986 (9th Cir. 2020) (no class certification because plaintiffs offered inadmissible expert opinion of alleged classwide defect). Even if the Court finds that any of McFadden's opinions are *admissible*, that is insufficient to carry their Rule 23 burden. *Id.* (requiring more than mere admissibility). McFadden's opinions are also *unpersuasive*—particularly in light of the competing, reliable opinions offered by Apple's experts—which defeats the named plaintiffs' motion. *Ellis*, 657 F.3d at 982, 984.

**IV.    The Superiority Requirement Is Not Satisfied**

The named plaintiffs also have not proved that a class action provides the superior method of adjudicating this dispute. Fed. R. Civ. P. 23(b)(3). The named plaintiffs' proposed class action would devolve into a morass of individualized inquiries, and the consumer and developer plaintiffs have failed

---

[6]  This also has import for ascertainability. *See Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013) (plaintiff must prove that the class is "readily ascertainable based on objective criteria").

to present a manageable trial plan that would avoid duplicative damages. *See Zinser*, 253 F.3d at 1192 (not superior if "each class member has to litigate numerous and substantial separate issues").

### A.    A Class Trial Would Be Unmanageable

A proper inquiry into the elements of a monopolization claim, including particularly antitrust injury, would require extensive analysis of each putative class member's transaction history, use of the App Store, and benefits conferred. *See In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 95, 98 (S.D.N.Y. 2017) (individualized inquiries to determine whether alleged unlawful price fixing would be offset by illegal free downloads would predominate over common issues). That is because "[a]n antitrust plaintiff may recover only to the 'net' extent of its injury," taking into account "amounts a plaintiff would have expended in the absence of the [alleged] violation." *L.A. Mem'l Coliseum Comm'n v. NFL*, 791 F.2d 1356, 1367 (9th Cir. 1986).

Such an individualized analysis would be a massive and inefficient undertaking. In *Epic*, for example, a three-week trial was needed just to develop facts related to *one* specific developer and one primary app. Here, the enormous burden of the individualized inquiries is only amplified by the breathtaking scale of the putative class—at least scores of millions of consumers. As the Ninth Circuit has observed in a case involving a putative class a fraction of the size of the possible class here:

> In a class of forty million, assuming only ten percent of these unknown class members came forward with claims, and assuming the proof of each claim required only ten minutes, approximately one hundred years would yet be required to adjudicate the claims. Unless the court is to allow the procedural device of the class action to wear away the substantive requirements to maintain a private antitrust cause of action, this suit raises far too many individual questions to qualify for class action treatment.

*In re Hotel Tel. Charges*, 500 F.2d 86, 89-90, 92 (9th Cir. 1974) (reversing class certification and explaining that actions have been dismissed due to manageability alone, "particularly in cases involving large numbers of plaintiff class members"); *Niaspan*, 464 F. Supp. 3d at 718 ("[E]ven if only a small percentage of consumers were uninjured . . . the sheer class size creates significant difficulties" for manageability.)[7] The Court would need to devote a vast majority of time to "mini-trials" for each putative class member here to cover *at least* (1) what apps a consumer downloaded; (2) the consumer's

---

[7] The named plaintiffs' bare assertion that individual claims may be "insufficiently large to warrant individual action" does not change this result. *See In re High-Tech Employee Antitrust Litig.*, 289 F.R.D. 555, 583–84 (N.D. Cal. 2013) (declining to certify class despite small individual claims).

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.     CASE NO. 4:11-cv-06714-YGR

**SER-1240**

Gibson, Dunn & Crutcher LLP

actual use and the value derived from those apps; (3) whether, for each app a consumer used, in the but-for world the developer would have passed on alleged savings (or conversely potential price increases) to consumers and, if so, when and to what extent;[8] (4) whether each consumer would have actually used an alternative to the iOS App Store in the but-for world; and (5) whether, on balance, the consumer has benefitted from or been harmed by Apple's App Store policies. *See* Hitt ¶¶ 277. Resolving these complex evidentiary questions for each member of a purported multi-million member class would be extremely burdensome. *E.g.*, *Kottaras v. Whole Foods Market, Inc.*, 281 F.R.D. 16, 25 (D.D.C. 2012) (individualized inquiries to determine whether shoppers paid higher or lower prices would predominate and render class litigation unmanageable).

### B.    Named Plaintiffs and the Named Developers Damages Models Are Irreconcilable

Class certification would also be improper because the injury and damages models proffered by the consumer plaintiffs and the parallel developer plaintiffs are irreconcilable. The Supreme Court has already recognized that Apple could be subject to "multiple suits" brought by both upstream app developers (who set app prices) and downstream consumers (who directly purchase apps) only because consumers could "seek damages based on the difference between the price they paid [for the apps] and the competitive price" (or "the *full amount* of the unlawful overcharge"), while developers would merely "seek lost profits [for offering apps and services] that they could have earned in a competitive retail market." *Pepper*, 139 S. Ct. at 1525. But plaintiffs failed to heed the Supreme Court's guidance, and put Apple (and the Court) in an untenable position by seeking duplicative damages. *See id.* at 1529 (Gorsuch, J., dissenting). As Apple has elsewhere explained, plaintiffs should at minimum be required to address these issues before the Court rules on the certification motions. *See generally* Mot. Tr. Plan. To the extent they are unwilling or unable to do so, that will be yet another reason to deny certification.[9]

### CONCLUSION

For the foregoing reasons, the Court should deny the motion for class certification.

---

[8]    This also requires resolving complex individualized issues at the developer level, as the fact-finder would need to determine the competitive conditions that each developer would have faced in the but-for world and how their prices would have changed over time as a result. *See* Dev. Opp. § II.C.

[9]    Business practices in the innovative and rapidly changing technology industries also militate against certification. Dev. Opp. § III.

Gibson, Dunn & Crutcher LLP

**SER-1241**

DATED:  August 10, 2021

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Mark A. Perry*

Theodore J. Boutrous Jr.
Daniel G. Swanson
Mark A. Perry
Cynthia E. Richman
Rachel S. Brass
Caeli Higney

*Attorneys for Defendant Apple Inc.*

Gibson, Dunn &
Crutcher LLP

APPLE'S OPPOSITION TO NAMED CONSUMERS' MOT. FOR CLASS CERT.      CASE NO. 4:11-cv-06714-YGR

**SER-1242**