**No. 25-7930**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

*IN RE APPLE IPHONE ANTITRUST LITIGATION*

Appeal from the United States District Court for the
Northern District of California (No. 4:11-cv-6714)
(Hon. Yvonne Gonzales Rogers)

**BRIEF AMICUS CURIAE OF THE RETAIL LITIGATION CENTER, INC. IN SUPPORT OF APPELLEE AND AFFIRMANCE**

Monica Welt
Josh Moore
RETAIL LITIGATION CENTER, INC.
99 M Street SE, Ste. 700
Washington, DC 20003
(202) 869-0162

Jaime A. Santos
Andrew Kim
Cassandra M. Snyder
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4034

*Counsel for Amicus Curiae the Retail Litigation Center, Inc.*

August 19, 2026

# TABLE OF CONTENTS


INTEREST OF AMICUS CURIAE ........................................................................1

INTRODUCTION ..........................................................................................2

ARGUMENT ..................................................................................................4

I. District courts must rigorously analyze whether common evidence exists to identify injured class members as part of the Rule 23(b)(3) inquiry. ..........................................................4

A. The "rigorous analysis" requirement is particularly critical for Rule 23(b)(3) damages classes.................................5

B. The existence of uninjured class members can present serious predominance and superiority issues.............................7

C. Carefully analyzing whether common evidence exists to identify injured class members advances significant practical and fairness considerations. .....................................11

II. Plaintiffs' claims-administration solution is no substitute for Rule 23(b)(3)'s rigorous analysis.....................................................15

III. Plaintiffs' rule would fundamentally alter not only antitrust class actions, but class actions across a broad range of contexts, and would disproportionately harm retailers in particular. ................20

CONCLUSION ..............................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Pipe & Constr. Co. v. Utah*,
414 U.S. 538 (1974)....................................................................................9

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)..................................................................................19

*American Sur. Co. v. Baldwin*,
287 U.S. 156 (1932)..................................................................................17

*Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*,
568 U.S. 455 (2013)..................................................................................12

*Apple Inc. v. Pepper*,
587 U.S. 273 (2019)..................................................................................21

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011).............................................................................11, 12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................................................12

*Black Lives Matter L.A. v. City of L.A.*,
113 F.4th 1249 (9th Cir. 2024) ...............................................................6, 7

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) ....................................................................19

*Califano v. Yamasaki*,
442 U.S. 682 (1979)....................................................................................5

*Castillo v. Costco Wholesale Corp.*,
No. 2:23-cv-01548-JHC, 2024 WL 4785136 (W.D. Wash. Nov. 14, 2024)......21

*CGC Holding Co., LLC v. Broad & Cassel*,
773 F.3d 1076 (10th Cir. 2014) ....................................................................7

*Chewy, Inc. v. U.S. Dep't of Lab.*,
69 F.4th 773 (11th Cir. 2023) .......................................................................1

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)....................2, 5, 6, 7, 15

*Coopers & Lybrand v. Livesay*,
437 U.S. 463 (1978)....................12

*Deposit Guar. Nat'l Bank v. Roper*,
445 U.S. 326 (1980)....................18

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)....................12

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)....................8

*Esgate v. Home Depot U.S.A., Inc.*,
No. 6:24-cv-01806-MTK, 2025 WL 1207217 (D. Or. Apr. 24, 2025)....................21

*In re Folgers Coffee Mktg.*,
159 F.4th 1151 (8th Cir. 2025)....................22

*Gold v. Lumber Liquidators, Inc.*,
323 F.R.D. 280 (N.D. Cal. 2017)....................14, 16, 21

*Hadley v. Kellogg Sales Co.*,
324 F. Supp. 3d 1084 (N.D. Cal. 2018)....................20

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)....................6

*Healy v. Milliman, Inc.*,
164 F.4th 701 (9th Cir. 2026)....................19

*Kirtsaeng v. John Wiley & Sons, Inc.*,
568 U.S. 519 (2013)....................1

*La Buy v. Howes Leather Co.*,
352 U.S. 249 (1957)....................18

*Lab'y Corp. of Am. Holdings v. Davis*,
605 U.S. 327 (2025)....................13

*Lindsey v. Normet*,
405 U.S. 56 (1972)....................17

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)....................8

*Marek v. Lane*,
571 U.S. 1003 (2013)....................16

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012)....................10, 13

*Microsoft Corp. v. Baker*,
582 U.S. 23 (2017)....................12

*Miles v. Kirkland's Stores Inc.*,
89 F.4th 1217 (9th Cir. 2024)....................9

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) (en banc)....................2, 6, 8, 9, 10, 11

*Panelli v. Target Corp.*,
172 F.4th 1120 (9th Cir. 2026)....................21

*Rodriguez v. Google LLC*,
No. 20-cv-04688-RS, 2024 WL 38302 (N.D. Cal. Jan. 3, 2024)....................20, 21

*Pension Benefit Guar. Corp. ex rel. Saint Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
712 F.3d 705 (2d Cir. 2013)....................12

*SEC v. Jarkesy*,
603 U.S. 109 (2024)....................17

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
559 U.S. 393 (2010)....................18

*Shaulis v. Nordstrom, Inc.*,
865 F.3d 1 (1st Cir. 2017)....................22

*South Dakota v. Wayfair, Inc.*,
585 U.S. 162 (2018)....................1

*State v. Welch*,
595 S.W.3d 615 (Tenn. 2020) ....................1

*Stillmock v. Weis Mkts., Inc.*,
385 F. App'x 267 (4th Cir. 2010) ....................14, 16, 21

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*,
552 U.S. 148 (2008) ....................12

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ....................8, 14

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016) ....................8

*United States v. Armour & Co.*,
402 U.S. 673 (1971) ....................17

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ....................2, 5, 6, 7, 15, 18, 19

*Zinser v. Accufix Rsch. Inst., Inc.*,
253 F.3d 1180 (9th Cir.), *amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001) ....................9

**Statutes**

15 U.S.C. § 1681c(g)(1) ....................14

15 U.S.C. § 1681n(a)(1)(A) ....................14

28 U.S.C. § 2072(b) ....................18

**Rules**

Fed. R. App. P. 29(a)(2) ....................1

Fed. R. App. P. 29(a)(4)(E) ....................1

Fed. R. Civ. P. 23 advisory committee note ....................12

Fed. R. Civ. P. 23(b)(3) ....................6

Fed. R. Civ. P. 23(b)(3)(D) ....................7

**Other Authorities**

Charles B. Casper, *The Class Action Fairness Act's Impact on Settlements*, 20 Antitrust 26 (2005) .......................................................13

Carlton Fields, *2026 Carlton Fields Class Action Survey*, https://perma.cc/V6V9-ATM6.......................................................23

Adam Mills Masarek, *Lex Machina Class Action Litigation Report 2026* (LexisNexis Apr. 2026), https://perma.cc/529C-RXUU...........................23

4 *Newberg and Rubenstein on Class Actions* (6th ed. 2026)..................................16

Barbara J. Rothstein & Thomas E. Willging, Fed. Jud. Ctr., *Managing Class Action Litigation: A Pocket Guide for Judges* 30 (3d ed. 2010) .............16

## INTEREST OF AMICUS CURIAE[1]

The RLC is a 501(c)(6) nonprofit trade association that represents national and regional retailers, including many of the country's largest and most innovative retailers, across a breadth of retail verticals. The RLC is the only trade organization solely dedicated to representing the retail industry in the courts. The RLC's members employ millions of people throughout the United States, provide goods and services to tens of millions more, and account for tens of billions of dollars in annual sales. The RLC offers retail-industry perspectives to courts on important legal issues and highlights the industry-wide consequences of significant cases.

Since its founding in 2010, the RLC has filed more than 250 amicus briefs on issues of importance to the retail industry. Its amicus briefs have been helpful to courts throughout the United States, as demonstrated by the references to RLC amicus briefs that appear in numerous precedential opinions. *See, e.g.*, *South Dakota v. Wayfair, Inc.*, 585 U.S. 162, 184 (2018); *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 542 (2013); *Chewy, Inc. v. U.S. Dep't of Lab.*, 69 F.4th 773, 777-778 (11th Cir. 2023); *State v. Welch*, 595 S.W.3d 615, 630 (Tenn. 2020). RLC members are often defendants in class action lawsuits, including antitrust suits like this one.

---

[1] All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2). No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus*, its members, or its counsel made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

The RLC has a strong interest in ensuring that courts uphold the proper legal standards governing class certification, so that its members are not subjected to improper certification of overly broad classes and the intense settlement pressure that accompanies those decisions.

## INTRODUCTION

Plaintiffs' position in this case stretches Rule 23(b)(3) far beyond its bounds. A district court properly denies certification or decertifies a class under Rule 23(b)(3) where the plaintiffs have failed to provide any reliable method, let alone a common method, for excluding millions of uninjured class members before final judgment. That is not only well within a district court's discretion, it is *mandated* by precedents from the Supreme Court and this Court, which have consistently explained that courts are *required* to analyze whether class members have presented common evidence of class-wide injury, and whether uninjured class members render a class fatally overbroad. *See, e.g.*, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-350 (2011); *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022) (en banc).

Those precedents are grounded not only in the requirements of Rule 23 itself, but in serious practical and constitutional concerns with Plaintiffs' proposed alternative. Class actions are an exception to the typical mode of individual

adjudication, but they do not suspend the constitutional protections that attend any civil case. Due process principles, the Seventh Amendment, and the Rules Enabling Act protect a defendant's right to challenge each plaintiff's claims before a court or jury—including the threshold requirement that every class member demonstrate standing by proving individual injury. Those protections are violated where a court certifies a class that includes admittedly uninjured members on the theory that a third-party administrator can weed them out *after* final judgment.

And from a pragmatic and fairness perspective, it would be untenable to allow class plaintiffs to inflate their classes with uninjured members for the substantive life of a case, only to weed them out *after* final judgment, at the claims-administration stage by a non-Article III claims administrator. Certifying a large class action imposes hydraulic settlement pressure on class-action defendants faced with potentially ruinous damages—even for meritless claims. Accordingly, a class-certification ruling is frequently a trigger for settlement. And when companies agree to a settlement amount, that money is generally distributed to a settlement fund and distributed by a third party. If any money is left over after all injured members have been compensated—if, for example, uninjured members were unable to collect their allotted portions—that leftover money generally is not returned to the company. In practice, then, it is the size of the class *at certification* that matters for companies in large class actions.

These problems are particularly acute for retailers, whose scale and visibility make them the most frequent targets of large class-action lawsuits, especially lawsuits that include large swaths of members who are either uninjured or for whom proof of injury is anything but common—not just in antitrust actions, but product-liability actions, false-advertising actions, and more. Plaintiffs' suggestion that whether and to what extent consumers who purportedly are part of the class were harmed can be sorted out by a claims administrator after trial and after any damages verdict is awarded would put the hydraulic settlement pressure animating the "rigorous analysis" rule into hyperdrive, create serious due process concerns, and encourage the filing of overly broad putative class actions that have a particularly adverse impact on retailers. This Court should reject Plaintiffs' position and endorse the district court's careful, evidence-based analysis below.

## ARGUMENT

### I. District courts must rigorously analyze whether common evidence exists to identify injured class members as part of the Rule 23(b)(3) inquiry.

Plaintiffs' opening brief suggests that the district court required the impossible at class certification—faulting plaintiffs for failing to match every Apple ID to every putative class member and to calculate each individual's precise damages through conclusive expert testimony. Opening Br. 2. That is not remotely what the district court did. The court carefully evaluated Plaintiffs' evidence of class-wide injury and damages and decertified the class after excluding expert testimony that failed to

identify, with any confidence, Apple customers actually injured by the alleged antitrust violations. 1-ER-6-7, 1-ER-25-28. Without common evidence to identify injured class members, determining Article III injury-in-fact and antitrust injury would require predominantly individualized inquiries for hundreds of millions of class members—making a class action an inferior method of adjudication. 1-ER-25-28.

This type of careful, fact-laden analysis is precisely what district courts are *supposed* to do in evaluating the propriety of a sprawling Rule 23(b)(3) damages class. As this Court and the Supreme Court have repeatedly explained, Rule 23(b)(3)'s predominance requirement is no easy hurdle. And for good reason: Rule 23(b)(3) is an "adventuresome invocation" "designed for situations in which class-action treatment is not as clearly called for," so courts have a "duty to take a close look at whether common questions predominate over individual ones." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (quotation marks and citation omitted). At the very least, then, the presence of millions of uninjured class members without any reliable method of excluding those uninjured class members is a valid basis for a district court to deny class certification (or decertify a class) under Rule 23(b)(3).

### A. The "rigorous analysis" requirement is particularly critical for Rule 23(b)(3) damages classes.

Class actions are an "exception to the usual rule" that cases are litigated individually. *Dukes*, 564 U.S. at 348 (quoting *Califano v. Yamasaki*, 442 U.S. 682,

700-701 (1979)). Because of that, class certification is "not to be granted lightly," *Black Lives Matter L.A. v. City of L.A.*, 113 F.4th 1249, 1258 (9th Cir. 2024), and courts must apply a "rigorous analysis" to determine whether Rule 23's requirements are met, *Dukes*, 564 U.S. at 351. That "rigorous analysis" requires confirming that the Rule's requirements "are *in fact*" satisfied, as "Rule 23 does not set forth a mere pleading standard." *Id.* at 350. As this Court has emphasized, "[p]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Olean*, 31 F.4th at 664 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275-276 (2014)). And they must do so "by a preponderance of the evidence." *Id*. at 665.

These principles apply not only to Rule 23(a)'s requirements of commonality, numerosity, typicality, and adequacy, but also to Rule 23(b)'s requirements. *See Comcast*, 569 U.S. at 34; *Olean*, 31 F.4th at 664. So, in certifying a damages class under Rule 23(b)(3), a court must rigorously analyze whether Rule 23(b)(3)'s requirements of predominance and superiority are met. Predominance requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The superiority inquiry, in turn, asks whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id*. District courts assessing

compliance with Rule 23(b)(3) must consider, among other factors, "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D).

This Court and the Supreme Court have repeatedly emphasized the stringency of the predominance requirement in particular. Although commonality and predominance both require at least a "rigorous" analysis, "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast*, 569 U.S. at 34. The "difficult[y]" of meeting this strict requirement means that it "'regularly presents the greatest obstacle to class certification.'" *Black Lives Matter L.A.*, 113 F.4th at 1258 (quoting *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014)). Thus, while Plaintiffs complain about the district court's close engagement with the facts as the record developed through the course of the litigation—and focus on opinions from *their experts* that they view as sufficient to satisfy predominance—a careful, fact-intensive analysis is precisely what the Supreme Court and this Court have *repeatedly* emphasized is required in the class-certification context.

### B. The existence of uninjured class members can present serious predominance and superiority issues.

Certification of any class requires that all members "suffered the same injury." *Dukes*, 564 U.S. at 350 (citation omitted) (discussing commonality inquiry). But for a damages class under Rule 23(b)(3), injury plays a particularly important role in determining whether the rigorous predominance and superiority requirements are

met. This Court and the Supreme Court have repeatedly instructed courts to carefully consider injury at the certification stage. The predominance inquiry "begins, of course, with the elements of the underlying cause of action," *Olean*, 31 F.4th at 665 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011)), and injury—a core requirement for Article III standing—is "an indispensable" element of a plaintiff's case that must be established "with the manner and degree of evidence required at the successive stages of the litigation," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). That is particularly true in antitrust class actions, where plaintiffs must additionally prove, as an "essential element[] of the cause of action," that antitrust injury is "capable of being established through a common body of evidence, applicable to the whole class." *Olean*, 31 F.4th at 666 (citation omitted).

In addition to being an element of the claim itself, injury is dispositive for obtaining relief in a Rule 23(b)(3) damages class: to state the obvious, uninjured class members cannot collect individual damages at the end of a class action. Each member of the class ultimately "must have Article III standing in order to recover individual damages," as "'Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring)).

Thus, as this Court has recognized, Rule 23(b)(3) requires a district court to "rigorous[ly] analy[ze]" whether a plaintiff has "actually prove[n]" that individualized questions of injury do not predominate over common questions. *Olean*, 31 F.4th at 664, 668 & n.12 (citations omitted). If material individualized questions of injury persist in a certified class, it not only implicates fairness and constitutional concerns, *see infra* pp. 15-20, but it can turn a class action into "a series of mini-trials," which "undermin[es] the 'efficiency and economy' that Rule 23 was designed to promote," *Miles v. Kirkland's Stores Inc.*, 89 F.4th 1217, 1226 (9th Cir. 2024) (quoting *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 553 (1974)). And if the parties must separately litigate injury for each class member to establish his right to recover, "a class action is not 'superior'" to other forms of adjudication. *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir.), *amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001).

Those principles dictate the result here. The district court properly determined that certification was inappropriate given the inability to reliably exclude uninjured class members prior to final judgment. The court gave Plaintiffs every opportunity to perfect their method for identifying injured class members, including a lengthy discovery period, thousands of pages of expert reports, and multiple amendments to the class definition. *See* Answering Br. 3. But on a final, rigorous inspection based on the factual record that Plaintiffs developed over the course of the litigation, the

court determined that the method could not reliably isolate and exclude *millions* of uninjured members within the class. *See* 1-ER-25-28; Answering Br. 24-28. The district court explained that Plaintiffs' unreliable method would result in individualized issues predominating over common ones, and would result in a patently "overbroad" class. 1-ER-26-28 (citation omitted).

Contrary to Plaintiffs' repeated suggestion (*see, e.g.*, Opening Br. 1, 28, 38, 43-44), that careful, fact-laden analysis does not *violate* this Court's *en banc* decision in *Olean*; it *directly follows* from *Olean*. As this Court there made clear, "[w]hen 'a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification.'" 31 F.4th at 669 n.14 (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824 (7th Cir. 2012)). That is why, the Court explained, "a court must consider whether the possible presence of uninjured class members means that the class definition is fatally overbroad." *Id.* That is precisely what the district court did here. And because Plaintiffs could not put forth *any* reliable, common method for identifying which of the hundreds of millions of potential class members were uninjured, simply redefining the class to exclude uninjured members was no longer a possibility. *See* 1-ER-7 ("Crucially, [Plaintiffs' expert] admitted that he did not, and could not, provide an error rate or confidence interval to validate his work."); *see* 1-ER-15-16;

1-ER-23 ("The Court has no confidence in Thompson's work."). In other words, the problem was with Plaintiffs' evidence, not the district court's analysis.

In sum, a district court has discretion—*at minimum*—to deny or retract class certification where millions of uninjured class members exist and the Plaintiffs present no reliable method of excluding them before final judgment. The "district court is in the best position to determine whether individualized questions, including those regarding class members' injury," will predominate over common questions. *Olean*, 31 F.4th at 669. Here, the district court properly recognized that Plaintiffs sought to stretch Rule 23(b)(3) beyond its limits.

### C. Carefully analyzing whether common evidence exists to identify injured class members advances significant practical and fairness considerations.

The rigorous analysis that the Supreme Court and this Court have consistently demanded is grounded not only in Rule 23's text, but also in significant practical and fairness concerns. Certifying a class is generally the most important ruling in a class action. When faced with the risk of exorbitant class liability—and the certainty of costly discovery—most companies will settle rather than proceed to trial. This "in terrorem" effect of improperly certifying a massive class distorts the litigation process and the strategic decisions available to class-action defendants. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350 (2011). In litigation more broadly, the threat of extensive discovery, the risk of liability, and the disruption to ordinary

business operations enable "plaintiffs with weak claims to extort settlements from innocent companies." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 163 (2008); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007) (observing that "the threat of discovery expense will push cost-conscious defendants to settle even anemic cases before reaching" summary judgment). In many civil cases, the burdens of asymmetrical discovery "elevates the possibility that 'a plaintiff with a largely groundless claim [will] simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the discovery process will reveal relevant evidence.'" *Pension Benefit Guar. Corp. ex rel. Saint Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).

The class action context magnifies the stakes exponentially. As the Supreme Court has repeatedly recognized, companies are frequently pressured into settling certified class actions before trial even where the plaintiffs have "questionable claims," *Concepcion*, 563 U.S. at 350, and the companies have "meritorious defense[s]," *Microsoft Corp. v. Baker*, 582 U.S. 23, 29 (2017) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 476 (1978))—because even a small risk of "potentially ruinous liability" is too high, *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 474 (2013) (citation omitted); Fed. R. Civ. P. 23 advisory

committee's note to 1998 amendment (justifying Rule 23(f)'s expansion of appellate rights on the ground that "granting certification … may force a defendant to settle rather than incur the costs of defending a class action and run the risk of potentially ruinous liability"). All of this means certified class actions rarely make it to trial before settling. *See* Charles B. Casper, *The Class Action Fairness Act's Impact on Settlements*, 20 Antitrust 26, 26 (2005).

Given the "in terrorem" effect of large class actions, allowing plaintiffs to include large numbers of uninjured class members at the class certification stage (here, millions) just incentivizes plaintiffs to stuff their classes with uninjured members in an effort to tip the settlement scales in their favor. Doing so "coerce[s]" companies into "costly settlements" that they "must reluctantly swallow" to avoid "betting the company on the uncertainties of trial." *Lab'y Corp. of Am. Holdings v. Davis*, 605 U.S. 327, 333 (2025) (Kavanaugh, J., dissenting from dismissal of writ of certiorari). And increasing the number of class members increases the potential liability and, therefore, the settlement amount. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012) (the "in terrorem" effect of large class actions "can be magnified unfairly if it results from a class defined so broadly as to include many members who could not bring a valid claim even under the best of circumstances").

There are many examples of exactly this kind of coercive settlement, including against retailers. Take *Stillmock v. Weis Markets*, where the Fourth Circuit certified a class bringing claims under the Fair and Accurate Credit Transaction Act, which imposed penalties of $100 to $1,000 for printing credit-card numbers on receipts. 15 U.S.C. §§ 1681c(g)(1), 1681n(a)(1)(A); *Stillmock v. Weis Mkts., Inc.*, 385 F. App'x 267 (4th Cir. 2010). The class included nearly 15 million receipts printed by the defendant's grocery store chain, totaling a devastating $15 billion litigation risk. *Stillmock*, 385 F. App'x 267 at 279 (Wilkinson, J., concurring specially). There was no evidence that the class experienced identity theft or any other injury (and this was a pre-*TransUnion* world, before the Court clarified that a "mere risk" of harm does not suffice for Article III injury, *see TransUnion LLC*, 594 U.S. at 436). Yet, to avoid an "annihilative" class action judgment, *Stillmock*, 385 F. App'x at 276 (Wilkinson, J., concurring specially), the grocery store owner settled, *see Stillmock v. Weis Mkts., Inc.*, No. 1:07-cv-01342 (D. Md. Mar. 31, 2011), ECF No. 120-1 at 3. And other recent examples abound. *See, e.g.*, *Gold v. Lumber Liquidators, Inc.*, 323 F.R.D. 280, 285, 287, 294 (N.D. Cal. 2017) (certifying class challenging allegedly defective bamboo flooring, where class included everyone who purchased flooring even though only 2.6% of customers complained of defects); *Gold v. Lumber Liquidators, Inc.*, No. 3:14-cv-05373 (N.D. Cal. Oct. 22, 2020), ECF No. 331 (granting final approval of $30 million settlement).

## II. Plaintiffs' claims-administration solution is no substitute for Rule 23(b)(3)'s rigorous analysis.

Plaintiffs suggest that there is no reason to analyze individualized issues related to injury at the class-certification stage at all—that all of those issues can be sorted out at the "post-trial claims administration" stage after a jury rules in their favor and decides on a damages verdict. Opening Br. 46; *see id.* at 32, 47, 47-48. That is demonstrably wrong, as should be evident from the numerous Supreme Court cases admonishing district courts to analyze at class certification whether all class members "suffer the same injury," *Dukes*, 564 U.S. at 350 (citation omitted), and whether plaintiffs seeking Rule 23(b)(3) certification successfully proved that antitrust injury could be proved class-wide, *Comcast*, 569 U.S. at 37-38. Simply promising that at claims administration there will be some workable model for identifying and excluding injured class members is unfair and impractical, and will lead to litigation abuses, particularly for retailers like RLC members.

*First*, as noted above, certifying a class exerts significant pressure on companies to settle and therefore often ends the litigation prior to trial. That pressure is exacerbated when the class is inflated with uninjured members—especially when there is no apparent reliable method for excluding those uninjured members prior to final judgment. Waiting until the claims administration stage to identify a reliable method for weeding out uninjured members from the class is too little, too late—the

damage caused by the erroneous certification of an overly broad class will already have been done.

Moreover, once a case has settled—like in *Stillmock* and *Gold*, mentioned above—it generally makes no difference to the defendant whether uninjured class members can be weeded out at the claims administration stage. When parties settle a large class-action, the company typically pays a lump sum to a settlement fund, which is then distributed to class members via an administrative process. *See* Barbara J. Rothstein & Thomas E. Willging, Fed. Jud. Ctr., *Managing Class Action Litigation: A Pocket Guide for Judges* 30 (3d ed. 2010); 4 *Newberg and Rubenstein on Class Actions* §§ 12:16, 12:18, 12:20 (6th ed. 2026). But if any money is left over in the settlement fund after all injured class members have been paid, allowing "any unclaimed funds" to "revert to the defendant … is generally disfavored." Rothstein & Willging, *supra*, at 20; *see also* 4 *Newberg and Rubenstein* § 12:29 ("reversion to the defendant is likely the least popular way of dealing with unclaimed funds"). The more common approach is either to distribute "the entire settlement fund" to injured class members on a "prorat[ed]" basis, Rothstein & Wilging, *supra*, at 20, or—probably "the most prevalent method"—to use any leftover funds as a *cy pres* award, 4 *Newberg and Rubenstein* § 12:32; *see Marek v. Lane*, 571 U.S. 1003, 1006 (2013) (Roberts, C.J., statement respecting denial of certiorari) (noting that "[*c*]*y pres* remedies" are "a growing feature of class action settlements").

Companies thus rarely get back money that has already been allocated to a settlement fund.

Postponing the injury inquiry to the claims administration stage is therefore unfair to companies, for whom the size of the class as certified is generally the only relevant number for practical purposes. While uninjured class members may not ultimately receive relief from a class settlement, companies still end up forced to pay for uninjured members.

*Second*, beyond these serious fairness concerns, postponing Rule 23(b)(3)'s rigorous analysis to the claims-administration stage has serious constitutional implications: The Constitution (and, by extension, the Rules Enabling Act) protect a class-action defendant's right to a judicial determination on whether absent class members have been injured, and relegating that task to a third-party claims administrator does not constitutionally suffice.

Due process requires that a defendant be given "an opportunity to present every available defense." *Lindsey v. Normet*, 405 U.S. 56, 66 (1972) (quoting *American Sur. Co. v. Baldwin*, 287 U.S. 156, 168 (1932)); *see also, e.g.*, *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971) (recognizing that the "right to litigate the issues raised" in a case is "guaranteed … by the Due Process Clause"). Without consent or a recognized exception, *see SEC v. Jarkesy*, 603 U.S. 109, 127-132 (2024), a defendant cannot be deprived of the opportunity to have the relevant

determinations made as the Constitution guarantees: by an Article III court or, when required, a jury pursuant to the Seventh Amendment. No matter how complex the case or numerous the parties—indeed, *especially* in complex and large case—a district court's reliance on a non-Article III entity to adjudicate fundamental issues without party consent is "an abdication of the judicial function depriving the parties of a trial before the court on basic issues involved in the litigation." *La Buy v. Howes Leather Co.*, 352 U.S. 249, 256 (1957) (concluding that writ of mandamus was appropriate where district court had referred case to a special master for trial).

The class-action context does not alter these inherent due process rights. The class action is merely a procedural device that "leaves the parties' legal rights and duties intact and the rules of decision unchanged." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010) (plurality opinion); *see also Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 332 (1980) (class action device is "ancillary to the litigation of substantive claims"). A contrary approach to class certification would violate the Rules Enabling Act, which embodies the due process principle that procedural rules cannot "abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b); *see also Dukes*, 564 U.S. at 367.

Due process thus prohibits class certification where class treatment would deprive a defendant of its opportunity to litigate individualized defenses before an Article III judge or a jury—including the opportunity to litigate individual questions

of injury. *See Dukes*, 564 U.S. at 367 ("[A] class cannot be certified on the premise that [the defendant] will not be entitled to litigate its … defenses to individual claims."); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612-613 (1997) ("Rule 23's requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act…."'). A plaintiff seeking class certification must thus establish that uninjured class members can be weeded out prior to final judgment in a manner consistent with the defendant's due process and Seventh Amendment rights and Rule 23(b)(3)'s standards.

To be sure, this Court has suggested that not every component of the inquiry need be litigated at the certification-stage if a defendant will have an opportunity to present its defenses later. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1132 (9th Cir. 2017). But those issues cannot be deferred until after final judgment for resolution by a third-party administrator. *See Healy v. Milliman, Inc.*, 164 F.4th 701, 708 (9th Cir. 2026) (unnamed class members cannot wait to demonstrate standing until "an individualized claims process"). If the proponent of a damages class cannot show a reliable method for excluding uninjured class members before final judgment, then due process prohibits certification.

*Third*, these fairness and constitutional concerns are mutually reinforcing. The constitutional problem arises precisely because of the unfairness inherent in allowing a claims administrator to decide, post-trial, issues of standing and injury

that are both critical and jurisdictional. And the significant risk of error by a non-Article III claims administrator, combined with the erosion of class-action defendants' due process rights, only intensifies the settlement pressure that an overly broad class creates.

## III. Plaintiffs' rule would fundamentally alter not only antitrust class actions, but class actions across a broad range of contexts, and would disproportionately harm retailers in particular.

Class actions stuffed with claimants of questionable injury have exploded in recent years, and retailers are a prime target of these lawsuits. Some of these actions are denied certification or reversed on appeal, but many are not. This lenient approach to standing permits extreme aggregation of damages claims that operate to classic "in terrorem" effect.

This is not limited to the antitrust context. Consumer lawsuits across a broad range of contexts obtain class certification despite obvious injury problems. In *Hadley v. Kellogg Sales Co.*, for example, the district court certified a class of consumers challenging various statements on cereal packaging suggesting that Kellogg cereal is healthy—despite no common method to determine which class members even saw the statements (some of which were "in miniscule font") before purchasing. 324 F. Supp. 3d 1084, 1098-1099 (N.D. Cal. 2018). In *Rodriguez v. Google LLC*, the district court erroneously certified a class of 100 million plaintiffs challenging Google's data collection practices and seeking over half a billion

dollars—despite the fact that class members could not prove injury from mere data collection. No. 20-cv-04688-RS, 2024 WL 38302 (N.D. Cal. Jan. 3, 2024). Contrary to the Supreme Court's and this Court's precedents, the district court deferred the question of injury until later in the case rather than grapple with it as part of class certification. *See id.*; *see also supra* p. 14 (citing *Stillmock* and *Gold*).

Retailers are particularly susceptible to these types of dubious class-action claims. Retailers operate at a scale and visibility that make them frequent targets of litigation, with implications that extend well beyond any single company. Large retailers like RLC's members (such as Target, Walmart, Walgreens, The Home Depot, Publix, Gap Inc., Ikea, and many others) sell thousands of products to many millions of customers each year, via both physical stores and online marketplaces. These retailers are frequently sued in large class actions—from antitrust to product liability. *See Apple Inc. v. Pepper*, 587 U.S. 273, 276 (2019) (describing overcharge claims against retailers as "a classic antitrust claim"); *see also, e.g.*, *Panelli v. Target Corp.*, 172 F.4th 1120 (9th Cir. 2026) (reversing dismissal of putative class action related to alleged advertising of bed sheets); *Esgate v. Home Depot U.S.A., Inc.*, No. 6:24-cv-01806-MTK, 2025 WL 1207217 (D. Or. Apr. 24, 2025) (denying motion to dismiss in putative class action challenging Home Depot's and its Blinds.com-related sites' price-display policies); *Castillo v. Costco Wholesale Corp.*, No. 2:23-cv-01548-JHC, 2024 WL 4785136 (W.D. Wash. Nov. 14, 2024) (granting in part

and denying in part motion to dismiss putative class action challenging data-collection practices by pharmacy webpages).

Additionally, the nature of injuries asserted against retailers in class actions is often easy to fake and difficult to disprove. Although "the mere purchase of an item [cannot] constitute cognizable injury," purported class members can simply claim that they did not receive what they paid for—when in fact they received exactly what they reasonably expected. *See, e.g.*, *Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 11 (1st Cir. 2017) (affirming dismissal of consumer's putative class action lawsuit against clothing retailer related to price tags after probing asserted injury and determining that consumer received exactly what she paid for); *In re Folgers Coffee Mktg.*, 159 F.4th 1151, 1156 (8th Cir. 2025) (reversing class certification of claims alleging coffee canisters falsely represented the amount of coffee because "for many people in [the] proposed class, the representations on the containers would not have caused them any ascertainable loss; instead, they got exactly what they had bargained for when they purchased the Folgers products at issue").

Moreover, many brick-and-mortar stores do not necessarily track each and every purchase made by each and every individual who walks through the doors, leaving proof of injury subject to a consumer's say-so. Thus, even where viable claims may exist in the abstract, there may not be any objective proof of purchase to

substantiate those claims or proof that the consumer was the ultimate payor who actually suffered injury.

These dynamics have serious implications for retailers, many of whom operate on miniscule margins. In 2025, class-action spending constituted over $4.5 billion in annual spending for surveyed large companies. *See* Carlton Fields, *2026 Carlton Fields Class Action Survey* at 6-7, https://perma.cc/V6V9-ATM6. Of that $4 billion, more than 22% consisted of consumer-fraud cases—in which consumers claim to have relied on a retailer's or manufacturer's allegedly misleading, exaggerated, or false statements about a product. *Id.* at 9. Indeed, according to a recent report by LexisNexis, online retailers (alongside tech companies) are the most frequent defendants in class action lawsuits. *See* Adam Mills Masarek, *Lex Machina Class Action Litigation Report 2026* 13 (LexisNexis Apr. 2026), https://perma.cc/529C-RXUU. In fact, 116 putative class-action lawsuits were filed against Walmart alone between 2023 and 2025. *Id.*

Courts must be able to critically probe these important questions of injury—just as the district court correctly did here. Otherwise, consumers (and plaintiffs' lawyers) will be incentivized to file larger and more expensive class actions stuffed with class-member claims over which federal courts lack jurisdiction—which will disproportionately impact the retailers at the front lines of class-action litigation.

## CONCLUSION

The Court should affirm the district court's order decertifying the class.

August 19, 2026

Respectfully submitted.

s/ *Jaime A. Santos*

Jaime A. Santos
Andrew Kim
Cassandra M. Snyder
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4034

Monica Welt
Josh Moore
RETAIL LITIGATION CENTER, INC.
99 M Street SE, Ste. 700
Washington, DC 20003
(202) 869-0162

*Counsel for Amicus Curiae the Retail Litigation Center, Inc.*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-7930

I am the attorney or self-represented party.

**This brief contains** 5,529 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ○ complies with the word limit of Cir. R. 32-1.
- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - ☐ it is a joint brief submitted by separately represented parties.
  - ☐ a party or parties are filing a single brief in response to multiple briefs.
  - ☐ a party or parties are filing a single brief in response to a longer joint brief.
- ○ complies with the length limit designated by court order dated ______.
- ○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Jaime A. Santos **Date** 8/19/2026
*(use "s/[typed name]" to sign electronically-filed documents)*