**No. 25-7930**

In the

# United States Court of Appeals
## For the Ninth Circuit

**IN RE: APPLE IPHONE ANTITRUST LITIGATION**

ROBERT PEPPER; EDWARD LAWRENCE; STEPHEN H. SCHWARTZ,
*Plaintiffs-Appellants,*

v.

APPLE INC.,
*Defendant-Appellee.*

Appeal from the U.S. District Court for the Northern District of California,
No. 4:11-cv-06714, Hon. Yvonne Gonzalez Rogers

**BRIEF OF AMICI CURIAE THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AND BUSINESS ROUNDTABLE IN SUPPORT OF DEFENDANT-APPELLEE**

Jonathan D. Urick
Matthew P. Sappington
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062
T: (202) 463-5337

Brian D. Schmalzbach
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
T: (804) 775-4746
bschmalzbach@mcguirewoods.com

*Counsel for Amici Curiae*
(*additional counsel listed on inside cover*)

August 19, 2026

Liz Dougherty
General Counsel and Corporate Secretary
BUSINESS ROUNDTABLE
1000 Maine Avenue SW
Suite 500
Washington, DC 20024

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 34. Disclosure Statement under FRAP 26.1 and Circuit Rule 26.1-1**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form34instructions.pdf*

**9th Cir. Case Number(s)** 25-7930

Name(s) of party/parties, prospective intervenor(s), or amicus/amici filing this form:

Chamber of Commerce of the United States of America; Business Roundtable

Under FRAP 26.1 and Circuit Rule 26.1-1, I make the following disclosures:

1. I disclose the following information required by FRAP 26.1(a) and/or Circuit Rule 26.1-1(b) for any nongovernmental corporation, association, joint venture, partnership, limited liability company, or similar entity[1] which is a party, prospective intervenor, or amicus curiae in any proceeding, or which the government identifies as an organizational victim below in section 2 of this form,[2] or which is a debtor as disclosed below in section 3 of this form.

   a. Does the party, prospective intervenor, amicus, victim, or debtor have any parent companies? Parent companies include all companies that control the entity directly or indirectly through intermediaries.
   ○ Yes ◉ No

   If yes, identify all parent corporations of each entity, including all generations of parent corporations *(attach additional pages as necessary)*:

   b. Is 10% or more of the stock of the party, prospective intervenor, amicus, victim, or debtor owned by a publicly held corporation or other publicly held entity?
   ○ Yes ◉ No

---

[1] A corporate entity must be identified by its full corporate name as registered with a secretary of state's office and, if its stock is publicly listed, its stock symbol or "ticker."
[2] To the extent it can be obtained through due diligence.

If yes, identify all such owners for each entity *(attach additional pages as necessary)*:

| |
|---|
| |

2. In a criminal case, absent good cause shown, the government must identify here any organizational victim of the alleged criminal activity:

| |
|---|
| n/a |

3. In a bankruptcy case, the debtor, the trustee, or, if neither is a party, the appellant must identify here each debtor not named in the court of appeals caption:

| |
|---|
| n/a |

4. Are you aware of any judge serving on this Court who participated at any stage of the case, either in district court, administrative proceedings, or in related state court proceedings?

   ○ Yes ◉ No

   If yes, list the name of the judge and the case name, case number, and name of court of the related proceedings:

| |
|---|
| |

I certify that *(select only one)*:

◉ this is the first disclosure statement filed in the above-referenced case by the above-identified party/parties, prospective intervenor(s), or amicus/amici, and this disclosure statement complies with FRAP 26.1 and Circuit Rule 26.1-1.

○ the party/parties, prospective intervenor(s), or amicus/amici submitting this supplemental disclosure statement has previously filed a compliant disclosure statement in this case, and this updated disclosure statement discloses changed or additional information.

○ I have reviewed this form, FRAP 26.1, and Circuit Rule 26.1-1 and, to the best of my knowledge, have no information to disclose at this time.

**Signature** s/ Brian D. Schmalzbach **Date** 8/19/2026

*(use "*s/[typed name]*" to sign electronically-filed documents)*

# TABLE OF CONTENTS

**Page**


IDENTITY AND INTEREST OF AMICI CURIAE ....................................... 1

STATEMENT OF CONSENT, AUTHORSHIP, AND CONTRIBUTION ....................................... 2

INTRODUCTION ....................................... 2

ARGUMENT ....................................... 4

I. The District Court properly decertified the damages class, much of which is uninjured. ....................................... 4

A. Rule 23 demands rigorous analysis of its prerequisites. ....................................... 5

B. Establishing predominance requires proof of a workable mechanism to winnow out uninjured putative class members. ....................................... 7

C. The district court correctly found that the presence of many uninjured class members destroys Rule 23's predominance prerequisite. ....................................... 12

D. The absolute volume of uninjured class members—and not just the percentage—matters to predominance. ....................................... 16

II. Lax analysis of uninjured class members hurts businesses and the economy. ....................................... 18

CONCLUSION ....................................... 20

CERTIFICATE OF COMPLIANCE ....................................... 22

CERTIFICATE OF SERVICE ....................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013)....................17

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)....................6

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)....................11

*Ariz. Christian Sch. Tuition Org. v. Winn*,
563 U.S. 125 (2011)....................2

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011)....................19

*Bowerman v. Field Asset Servs., Inc.*,
60 F.4th 459 (9th Cir. 2023)....................12

*Califano v. Yamasaki*,
442 U.S. 682 (1979)....................5

*Clippinger v. State Farm Auto. Ins. Co.*,
173 F.4th 817 (6th Cir. 2026) (en banc) ....................17

*Coinbase, Inc. v. Bielski*,
599 U.S. 736 (2023)....................19

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)....................4–7, 15

*Coopers & Lybrand v. Livesay*,
437 U.S. 463 (1978)....................19

*Cordoba v. DIRECTV, LLC*,
942 F.3d 1259 (11th Cir. 2019)....................11

*E. Tex. Motor Freight Sys., Inc. v. Rodriguez*,
431 U.S. 395 (1977)....................................................................................6

*Flecha v. Medicredit, Inc.*,
946 F.3d 762 (5th Cir. 2020)..............................................................10, 17–18

*In re Asacol Antitrust Litig.*,
907 F.3d 42 (1st Cir. 2018) ...................................................................9, 11–12

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
934 F.3d 619 (D.C. Cir. 2019)...........................................................................7–9

*Lab'y Corp. of Am. Holdings v. Davis*,
605 U.S. 327 (2025)..............................................................................9, 20

*Olean Wholesale Grocery Coop. Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) (en banc) ..........................................3–4, 7, 10–11

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985)..................................................................................17

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)..............................................................................4, 9–10

*Unger v. Amedisys Inc.*,
401 F.3d 316 (5th Cir. 2005)..........................................................................5

*Van v. LLR, Inc.*,
61 F.4th 1053 (9th Cir. 2023)........................................................................7–9

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)..............................................................................4–6, 9

*Zinser v. Accufix Rsch. Inst., Inc.*,
253 F.3d 1180 (9th Cir. 2001)..........................................................................7

**Rules**

Fed. R. Civ. P. 23(b)(3) .................................................................2–4, 10–11, 18

**Other Authorities**

Adeola Adele, *Dukes v. Wal-Mart: Implications for Employment Practices Liability Insurance* (July 2011) .......................................................18

Carlton Fields, *2026 Carlton Fields Class Action Survey* (2026), https://classactionsurvey.com/ ...........................................................18, 19

Henry J. Friendly, *Federal Jurisdiction: A General View* (1973) .........................19

Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97 (2009)......................................................................7

U.S. Chamber Institute for Legal Reform, *Do Class Actions Benefit Class Members? An Empirical Analysis of Class Actions* (Dec. 2013), http://bit.ly/3rrHd29 ...............................................................18

## IDENTITY AND INTEREST OF AMICI CURIAE

The Chamber of Commerce of the United States of America is the world's largest business organization. As the nation's leading advocate for business, the Chamber represents companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files amicus curiae briefs in cases, like this one, that raise issues of concern to the nation's business community.

Business Roundtable represents more than 200 chief executive officers of America's leading companies. Business Roundtable CEOs lead U.S.-based companies that support one in four American jobs and almost a quarter of U.S. gross domestic product. Business Roundtable was founded on the belief that businesses should play an active and effective role in the formulation of public policy, and Business Roundtable members develop and advocate for policies to promote a thriving U.S. economy and expanded opportunity for all. Business Roundtable participates in litigation as *amicus curiae* when important business interests are at stake.

Amici's members and their subsidiaries are often targeted as

defendants in class actions. Amici thus are familiar with class-action litigation, both from the perspective of individual defendants in class actions and from a more global perspective. Amici have a significant interest in this case because the proper application of Article III and Rule 23 raise issues of immense significance not only for their members, but also for the customers, employees, and other businesses that depend on them.

## STATEMENT OF CONSENT, AUTHORSHIP, AND CONTRIBUTION

Counsel for all parties consented to the filing of this brief. No counsel for any party authored this brief in whole or in part and no entity or person, aside from amici curiae, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

## INTRODUCTION

"In an era of frequent litigation [and] class actions . . . , courts must be *more* careful to insist on the formal rules of standing, not less so." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 146 (2011) (emphasis added). This case illustrates how the "rigorous analysis" required by Rule 23 protects against the improper certification of classes inflated by uninjured class members who lack standing. The order at issue decertified a Rule 23(b)(3)

class of Apple App Store customers seeking billions in damages for purported Sherman Act violations that allegedly resulted in some customers overpaying for apps or in-app purchases. But Plaintiffs' own expert agreed that many *millions* of putative class members were not injured. The district court initially denied class certification based on that glut of unharmed customers. The court later—and questionably—granted certification because it trusted Plaintiffs' say-so that those uninjured members reliably could be minimized or removed from the class. 2-ER-133. When Plaintiffs finally had to *prove* it, however, the court decertified the class because there was "no way to show that antitrust injury is 'capable of being established through a common body of evidence, applicable to the whole class.'" 1-ER-26 (quoting *Olean Wholesale Grocery Coop. Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 666 (9th Cir. 2022) (en banc)).

This Court should affirm. Even if it were ever permissible to certify a class that contains so many uninjured class members, it would remain impermissible to do so here because the need to winnow out those uninjured class members before judgment means that individual inquiries would predominate over the common questions. Under Rule 23(b)(3), plaintiffs must show, among other things, that any common questions "predominate

over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). That is Plaintiffs' burden of *proof*, not just pleading: "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). And that obligation applies to questions of Article III standing no less than the merits. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021); *Olean*, 31 F.4th at 668 & n.12. The district court thus was constrained to find that common issues would not predominate when so many class members would lack common proof of injury. That finding was no abuse of discretion.

## ARGUMENT

### I. The District Court properly decertified the damages class, much of which is uninjured.

Class certification is such a momentous event—with such significant implications for defendants—that courts must apply a "rigorous analysis" to the requirements of Rule 23. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). That analysis includes a "'close look' at whether common questions predominate over individual ones" under Rule 23(b)(3). *Id.* at 34. Here, the class-certification record shows that many putative class members lack the

injury-in-fact required to sue under Article III. Whatever other problems such a glut of uninjured class members creates, it requires at a minimum a workable plan to winnow out the uninjured consistent with the predominance requirement. Here, the district court correctly concluded that the enormous presence of uninjured class members and lack of an effective winnowing plan destroyed predominance. 1-ER-26–28. This Court should affirm the decertification of the putative class.

### A. Rule 23 demands rigorous analysis of its prerequisites.

Rule 23 creates an "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties." *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979). But class actions still raise "important due process concerns" for both defendants and absent class members. *Unger v. Amedisys Inc.*, 401 F.3d 316, 320 (5th Cir. 2005). Accordingly, district courts must "conduct a 'rigorous analysis' to determine whether" a proposed class satisfies Rule 23, "even when that requires inquiry into the merits of the claim." *Comcast*, 569 U.S. at 35 (citing *Wal-Mart*, 564 U.S. at 351).

Chief among Rule 23's safeguards is the requirement for damages class actions that a named plaintiff "affirmatively demonstrate" that common questions predominate over individual ones. *Comcast*, 569 U.S. at 33

(quoting *Wal-Mart*, 564 U.S. at 350). This "demanding" predominance requirement ensures that "proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997). That cohesion exists only when all class members "possess the same interest and suffer the same injury." *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (quotations omitted). Merely pleading "a violation of the same provision of law" and labeling it a common question is not enough, because "any competently crafted class complaint literally raises common questions." *Wal-Mart*, 564 U.S. at 349–50. Proving predominance by establishing a common, classwide injury ensures "sufficient unity so that absent members can fairly be bound by decisions of class representatives." *Amchem*, 521 U.S. at 620–21.

To satisfy the predominance requirement, plaintiffs must offer "a theory of liability that is [ ] capable of classwide proof." *Comcast*, 569 U.S. at 37. Otherwise, a liability finding about a named plaintiff cannot determine "in one stroke" whether defendants are liable to the entire class, and liability cannot be a "common" issue. *Wal-Mart*, 564 U.S. at 350. Dissimilarities within the proposed class therefore may defeat class certification even when

some commonality exists. *See* Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131–32 (2009).

Plaintiffs thus bear the burden of *proving*—not just alleging—that their claims "in fact" can be litigated on a classwide basis without the need for individualized mini-trials. *Comcast*, 569 U.S. at 33–34. *Dis*proving such amenability to classwide adjudication is not Defendant's burden. *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). Nor can plaintiffs satisfy or shift their burden with mere allegations. *Comcast*, 569 U.S. at 33–34 (requiring "evidentiary proof" that elements of Rule 23 are satisfied). Plaintiffs' evidence "must meet all the usual requirements of admissibility" including Rule 702. *Olean*, 31 F.4th at 665.

### B. Establishing predominance requires proof of a workable mechanism to winnow out uninjured putative class members.

The need for rigorous analysis is acute when a defendant "provide[s] evidence that at least some class members lack meritorious claims . . . thus summoning the spectre of class-member-by-class-member adjudication." *Van v. LLR, Inc.*, 61 F.4th 1053, 1069 (9th Cir. 2023); *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 624 (D.C. Cir. 2019) (for class members who "cannot prevail on the merits," their "claims must

be winnowed away as part of the liability determination"). In that scenario, "the district court must determine . . . whether a class-member-by-class-member assessment of the individualized issue will be unnecessary or workable." *Van*, 61 F.4th at 1069. That determination requires a "winnowing mechanism" to cull those meritless claims. *Rail Freight*, 934 F.3d at 625.

That winnowing mechanism must successfully balance the efficiency needed for predominance while respecting defendants' rights. It "must be truncated enough to ensure that the common issues predominate, yet robust enough to preserve the defendants' Seventh Amendment and due process rights to contest every element of liability and to present every colorable defense" for each putative class member's claims. *Id*.

And the district court must have that viable winnowing plan at the outset, *before* certifying the class.

> [T]o determine whether a class certified for litigation will be manageable, the district court must *at the time of certification* offer a reasonable and workable plan for how that opportunity will be provided in a manner that is protective of the defendant's constitutional rights and does not cause individual inquiries to overwhelm common issues.

*In re Asacol Antitrust Litig.*, 907 F.3d 42, 58 (1st Cir. 2018) (emphasis added); *see also Van*, 61 F.4th at 1069 (vacating certification and remanding for the district court to "re-assess whether [plaintiff] has met her burden" of showing that individualized inquiries are unnecessary or workable). Without that plan in place, plaintiffs cannot "'affirmatively demonstrate' that the commonality and predominance requirements are satisfied." *Rail Freight*, 934 F.3d at 622 (quoting *Wal-Mart,* 564 U.S. at 350); *accord Asacol*, 907 F.3d at 61 (Barron, J., concurring) (without a viable winnowing plan, "the plaintiffs have not yet shown that common rather than individual issues would predominate if this class were certified").

The threat to predominance is particularly acute from putative classes containing uninjured members. *TransUnion LLC v. Ramirez* confirms that "[e]very class member must have Article III standing in order to recover individual damages." 594 U.S. 413, 431 (2021). Thus, at a minimum,[1] courts

[1] The district court did not address "the distinct question whether every class member must demonstrate [Article III] standing *before* a court certifies a class." *TransUnion*, 594 U.S. at 431 n.4. That question remains open. *See Van*, 61 F.4th at 1068 n.12; *Lab'y Corp. of Am. Holdings v. Davis*, 605 U.S. 327, 328 (2025) (Kavanaugh, J., dissenting from dismissal as improvidently granted) ("I would hold that a federal court may not certify a damages class that includes both injured and uninjured members."). Because the district court

must determine before final judgment whether each class member has any Article III injury-in-fact. But individualized questions over whether each class member has *any* injury may—and here, would—destroy the predominance of any common questions. Indeed, as one jurist has noted, a court's injury-in-fact analysis should be "particularly rigorous" at the certification stage "given the transformative nature of the class-certification decision." *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 770 (5th Cir. 2020) (Oldham, J., concurring).

Uninjured class members pose a predominance problem. "When individualized questions relate to the injury status of class members, Rule 23(b)(3) requires that the court determine whether individualized inquiries about such matters would predominate over common questions." *Olean*, 31 F.4th at 668. "Because the Supreme Court has clarified that '[e]very class member must have Article III standing in order to recover individual damages,' Rule 23 also requires a district court to determine whether individualized inquiries into this standing issue would predominate over common questions." *Id.* at 668 n.12 (quoting *TransUnion*, 594 U.S. at 431);

properly held that Rule 23 itself bars certification anyway, this Court likewise need not reach that question.

*Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1273 (11th Cir. 2019) (standing for uninjured class members presents a "powerful problem under Rule 23(b)(3)'s predominance factor"); *Asacol*, 907 F.3d at 53–54 (if a substantial number of class members "in fact suffered no injury," the "need to identify those individuals will predominate").

*Olean* does not help Plaintiffs. There, common questions could predominate because—as that case arrived in this Court—the plaintiffs' evidence purported to resolve the question of *each* class member's standing simultaneously—with no need for winnowing. If that jury "found that [the plaintiffs' expert's] model was reliable, then the [plaintiffs] would have succeeded in showing antitrust impact on a class-wide basis." 31 F.4th at 681. And vice versa. *Id.* "In neither case would the litigation raise individualized questions regarding which members of the [class] had suffered an injury." *Id.*; *cf. Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 468 (2013) (holding that named securities class-action plaintiffs need not establish materiality at class-certification stage because "the failure of proof on the element of materiality would end the case for one and for all; no claim would remain in which individual reliance issues could potentially predominate"). That is the distinction between a true classwide injury

model—where common proof resolves every class member's standing at once—and individualized post-certification screening, which destroys predominance by requiring member-by-member adjudication. *See, e.g.*, *Bowerman v. Field Asset Servs., Inc.*, 60 F.4th 459, 470 (9th Cir. 2023) (common policy of not paying overtime does not predominate over individualized question "whether the class members actually worked overtime"). This case falls into the latter category. *See* Part I.C, *infra*.

### C. The district court correctly found that the presence of many uninjured class members destroys Rule 23's predominance prerequisite.

This record amply triggers the need for a "reasonable and workable plan" to winnow uninjured class members. *Asacol*, 907 F.3d at 58. Plaintiffs had every opportunity to propose such a plan, but they failed after having multiple chances to do so. The district court was right to decertify the class.

The reasons why many putative class members are uninjured are substantially undisputed. Plaintiffs' theory is that the App Store allows Apple to charge app developers "supracompetitive" commissions, some of which are passed down to App Store customers. Opening Br. 8–9. Put differently, App Store customers allegedly would have paid less to

download certain apps or for certain in-app purchases but for the alleged monopolistic conduct.

But Plaintiffs' own expert agrees that the prices for certain apps or in-app purchases would be the same or even *higher* in the but-for world with lower App Store commissions. *See* Opening Br. 12–13; Response Br. 12 (citing 7-SER-1676, 7-SER-1791). For example, developers who face no marginal costs for additional digital sales may see no need to reduce prices based on lower commissions. *See* Opening Br. 12–13; Response Br. 12 (citing 8-ER-1522, 9-SER-2139–40). And developers who receive advertising revenue may choose to sacrifice additional advertising revenue in exchange for charging higher App Store prices that lead to more App Store revenue at lower volume. *See* Opening Br. 12–13; Response Br. 12 (citing 8-ER-1522, 9-SER-2153–57). The absence of lower prices (or presence of even higher prices) in the but-for world depends on factors idiosyncratic to each developer. Response Br. 12–13 (citing 8-ER-1522). Whether a given customer was injured thus depends on which apps that customer patronized from which developers. *See* Opening Br. 13–14; Response Br. 13–14.

The district court also recognized that some putative class members were uninjured because of a disconnect between the customer names in

Apple's records and the "payors" in the putative class. 1-ER-21; *see also* 1-ER-3. Although Plaintiffs' expert equated the two, the accountholder directing the purchase is often not the payor. As many parents know all too well, children with their own Apple IDs may use their parents' credit cards to pay. 1-ER-22. Such children "do not have a concrete economic injury." *Id.*

The district court correctly recognized early on that there were many uninjured members of the putative class. 2-ER-110–12. But the court initially "accept[ed] plaintiffs' representation" that their expert could cure that problem by matching Apple ID numbers to actual payors and "limit[ing] the percentage of unharmed class members swept in by the narrowed class definition." 2-ER-108; *see also* 2-ER-133 (the court "expects, given plaintiffs' representations," that the expert's future analysis will reduce the number of uninjured class members).

Better late than never, the district court realized that Plaintiffs could not bear their burden of proving predominance given the volume of uninjured class members. Because Plaintiffs' expert agreed that different customers would be no better off (or even worse off) in the but-for world, "it is crucial that the model accurately and reliably match payor records to

actual consumers to determine whether the consumer was injured." 1-ER-26. Yet Plaintiffs' post-certification expert could not reliably match transactions to customers. Plaintiffs thus have "no way to show that antitrust injury is 'capable of being established through a common body of evidence, applicable to the whole class.'" *Id.*[2]

Nor did Plaintiffs offer any reliable way to winnow out those uninjured class members. In fact, Plaintiffs recognized their burden to do so, but the district court excluded their expert who purported to winnow out the uninjured by matching transactions to customers. 1-ER-9–23. Now that they are left with no such winnowing plan, Plaintiffs suggest that the uninjured morass is *Apple*'s problem to carve out: "Nothing prevents Apple from seeking summary judgment as to any absent class members who (they assert) lack valid claims for any reason, including (supposed) lack of standing." Opening Br. 52. That suggestion flips the rigorous class-

[2] In affirming decertification, this Court should clarify that it does not endorse the earlier certification based on the district court's "*expecting* a small percentage of unharmed people to be included in the final analysis." 1-ER-27 (emphasis added). Certifying a class based on what a court *expects* the evidence to show—or what plaintiffs *represent* it will show—violates the requirement that plaintiffs demonstrate the elements of Rule 23 with "evidentiary proof." *Comcast*, 569 U.S. at 33–34.

certification analysis on its head. *Plaintiffs* bear the burden of showing that there is a workable way to pare the class down to members with Article III standing. And requiring a *defendant* to pluck out millions of uninjured class members for individualized reasons is never a workable plan. To the contrary, resorting to individualized summary judgment on each uninjured class member—as Plaintiffs seem to suggest Apple must do here, *see id.*—confirms that Plaintiffs failed to bear their burden of proving predominance.

### D. The absolute volume of uninjured class members—and not just the percentage—matters to predominance.

In affirming the decertification order, this Court should clarify that the *number* of uninjured class members, separate from and in addition to their *proportion* of the class, is relevant to the predominance analysis. The district court ultimately reached the right result but refused to "focus on the number of unharmed members rather than the percentage." 1-ER-27. That approach was mistaken for two reasons.

First, the absolute number of uninjured class members is relevant to the burden of winnowing them out. Even if the percentage of uninjured class members were "only" 7.9%, 1-ER-5, that would require winnowing *millions* of people out of the class, 2-ER-133–34. It was Plaintiffs' burden to

propose how to perform that winnowing efficiently; they have not met that burden. *See* Part I.B, *supra*. Indeed, the parties appear to dispute whether nearly *every* payor is injured based on his or her unique purchasing history. Sussing out whether each payor is injured threatens to require universal mini-trials that would destroy predominance. *See Clippinger v. State Farm Auto. Ins. Co.*, 173 F.4th 817, 837 (6th Cir. 2026) (en banc) (the need for "mini trials as to each class member" means that "individualized questions will predominate over common ones").

Second, the refusal to consider the absolute number of uninjured plaintiffs improperly elevates policy concerns above Rule 23's requirements. *See* 1-ER-27 ("Given Apple's size, that approach would almost inevitably shield Apple from ever being held accountable for potentially illegal conduct."). "[T]he Supreme Court has made clear that fear of underenforcement is no justification for class certification." *Flecha*, 946 F.3d at 769; *see also Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013) (Rule 23 does not "establish an entitlement to class proceedings for the vindication of statutory rights"). If these class members' claims "would be uneconomical to litigate individually," *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985), that may be relevant to the superiority of class litigation

over other methods of adjudication under Rule 23(b)(3). But that conclusion does not remotely excuse the independent requirement of predominance. *See Flecha*, 946 F.3d at 769.

## II. Lax analysis of uninjured class members hurts businesses and the economy.

An appropriately rigorous analysis is sorely needed to combat the burdens that class-action litigation on behalf of uninjured class members imposes on the business community and the public.

Class-action litigation costs in the United States are eye-popping. In 2025, those costs exceeded $4.5 billion. *See* Carlton Fields, *2026 Carlton Fields Class Action Survey* at 6 (2026), https://ClassActionSurvey.com. Defending *even one* class action can cost a business over $100 million. *See, e.g.*, Adeola Adele, *Dukes v. Wal-Mart: Implications for Employment Practices Liability Insurance* 1 (July 2011). Those class actions can persist for years, accruing legal fees with no resolution of class certification—let alone the dispute as a whole. *See* U.S. Chamber Institute for Legal Reform, *Do Class Actions Benefit Class Members? An Empirical Analysis of Class Actions* at 1, 5 (Dec. 2013), http://bit.ly/3rrHd29 ("Approximately 14 percent of all class action cases remained pending four years after they were filed, without resolution or

even a determination of whether the case could go forward on a class-wide basis.”). And the burden of promiscuous class actions is spreading—nearly 75% of companies reported actively managing class actions against them in 2025. *2026 Carlton Fields Class Action Survey* at 8.

Certifying a class—and especially a class bloated with the uninjured—creates extraordinary exposure and thus immense pressure on defendants to settle even meritless cases. Judge Friendly aptly termed these “blackmail settlements.” Henry J. Friendly, *Federal Jurisdiction: A General View* 120 (1973); *see Coinbase, Inc. v. Bielski*, 599 U.S. 736, 743 (2023). As the Supreme Court explained, “[c]ertification of a large class may so increase the defendant’s potential damages liability and litigation costs that he may find it economically prudent to settle and to abandon a meritorious defense.” *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 476 (1978); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350 (2011) (noting “the risk of ‘in terrorem’ settlements that class actions entail”).

Judicial recommitment to rigorous enforcement of both Article III and Rule 23 at the class-certification stage would help. These legal requirements, if properly enforced, ensure that parties do not waste time and money—and defendants do not face undue settlement pressure—litigating a certified

class action through trial only for a court to conclude at final judgment that uninjured class members have run rampant. The district court's admirable rigor in scrutinizing uninjured class members—at least after completion of discovery—is a promising development that this Court should encourage to combat the immense pressure to settle inflated, meritless class actions.

That coercion not only undermines the rule of law, but hurts the entire economy. "[C]oerced settlements substantially raise the costs of doing business. And companies in turn pass on those costs to consumers in the form of higher prices; to retirement account holders in the form of lower returns; and to workers in the form of lower salaries and lesser benefits." *Lab'y Corp.*, 605 U.S. at 333 (Kavanaugh, J., dissenting from dismissal as improvidently granted). "Simply put, the consequences of overbroad and incorrectly certified damages class actions can be widespread and significant." *Id.*

## CONCLUSION

For these reasons and those in Apple's brief, the Court should affirm the order denying class certification.

Dated: August 19, 2026

Respectfully submitted,

/s/ Brian D. Schmalzbach
Brian D. Schmalzbach
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Telephone: (804) 775-4746
bschmalzbach@mcguirewoods.com

*Counsel for Amici Curiae*

Jonathan D. Urick
Matthew P. Sappington
U.S. Chamber Litigation Center
1615 H Street NW
Washington, DC 20062
Telephone: (202) 463-5337

*Counsel for Amicus Curiae Chamber of Commerce of the United States of America*

Liz Dougherty
General Counsel and
Corporate Secretary
BUSINESS ROUNDTABLE
1000 Maine Avenue SW
Suite 500
Washington, DC 20024

*Counsel for Amicus Curiae Business Roundtable*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 4,051 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point size.

*/s/ Brian D. Schmalzbach*
Brian D. Schmalzbach

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2026, the foregoing was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate ACMS system. All participants in the case are registered ACMS users and will be served by the system.

*/s/ Brian D. Schmalzbach*
Brian D. Schmalzbach