**No. 25-7930**

# In the United States Court of Appeals for the Ninth Circuit

**IN RE APPLE iPHONE ANTITRUST LITIGATION**

Appeal from the United States District Court for the Northern District of California in No. 4:11-cv-6714 (Hon. Yvonne Gonzalez Rogers)

**BRIEF OF AMICI CURIAE COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, SOFTWARE & INFORMATION INDUSTRY ASSOCIATION, CHAMBER OF PROGRESS, NETCHOICE, AND TECHNET IN SUPPORT OF APPELLEE**

Sanjiv P. Laud
Lucien Wang
MCCURDY LAUD, LLC
400 S. 4th St., Ste. 401, #31
Minneapolis, MN 55415
Tel: (612) 699-0545

*Attorneys for Amicus Curiae Software & Information Industry Association*

Adam Acosta
PIERSON FERDINAND
601 Pennsylvania Ave NW, Ste. 900
Washington, DC 20004
Tel: (771) 244-2815

*Attorney for Amici Curiae Computer & Communications Industry Association and TechNet*

Susanna R. Allen
Tyler P. Young
W. Seth Cook
YETTER COLEMAN LLP
600 Travis St., #5400
Houston, TX 77002
Tel: (713) 632-8000

*Attorneys for Amici Curiae Chamber of Progress and NetChoice*

## CORPORATE DISCLOSURE STATEMENTS

The Computer & Communications Industry Association has no parent corporation and no publicly held corporation owns 10% or more of its stock.

TechNet has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Dated: August 19, 2026

/s/ *Adam Acosta*

Adam Acosta
PIERSON FERDINAND
601 Pennsylvania Ave NW, Ste. 900
Washington, DC 20004
Tel: (771) 244-2815

The Software & Information Industry Association has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Dated: August 19, 2026

/s/ *Sanjiv P. Laud*

Sanjiv P. Laud
MCCURDY LAUD, LLC
400 S. 4th St., Suite 401, #31
Minneapolis, Minnesota 55415
Telephone: (612) 699-0545
sanjiv@mccurdylaud.com

The Chamber of Progress has no parent corporation and no publicly held corporation owns 10% or more of its stock.

NetChoice has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Dated: August 19, 2026

*/s/ Susanna Allen*

Susanna Allen
YETTER COLEMAN
600 Travis St., #5400
Houston, TX 77002
Tel: (713) 632-8000

## TABLE OF CONTENTS


Corporate disclosure statements ..... i

Table of authorities ..... iv

Interest of *amici curiae* ..... vi

Argument ..... 1

I. Uninjured class members exacerbate the *in terrorem* effect of class actions, particularly against companies with widely adopted technologies. ..... 1

A. Classes swollen with uninjured members coerce settlement regardless of the merits ..... 1

B. These dynamics disproportionately burden innovative, technology-driven companies and are most destructive in nascent technology markets. ..... 4

II. Uninjured class members defeat predominance under Rule 23(b)(3). ..... 5

III. Uninjured class members cannot satisfy the standing requirements of Article III or substantive antitrust law. ..... 8

A. The presence of uninjured class members is an Article III barrier to certification. ..... 8

B. The district court properly focused on concrete injury rather than mere exposure to the complained-of conduct. ..... 14

C. The antitrust standing doctrine independently forecloses Plaintiffs' proposed class. ..... 17

D. Accepting Plaintiffs' exposure theory would chill innovation and undermine the consumer welfare foundation of antitrust law. ..... 19

IV. Plaintiffs' post-trial proposal raises significant Seventh Amendment and Due Process concerns. ..... 21

Conclusion ..... 25

# TABLE OF AUTHORITIES

## Cases

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051 (9th Cir. 1999) .......... 17

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) .......... 10, 25

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) .......... 2

*Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990) .......... 17, 18

*Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017) .......... 22

*Cordoba v. DIRECTV, LLC*, 942 F.3d 1259 (11th Cir. 2019) .......... 2, 12

*Davis v. FEC*, 554 U.S. 724 (2008) .......... 13

*Epic Sys. Corp. v. Lewis*, 584 U.S. 497 (2018) .......... 2

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) .......... 12

*Healy v. Milliman, Inc.*, 164 F.4th 701 (9th Cir. 2026) .......... passim

*In re Asacol Antitrust Litig.*, 907 F.3d 42 (1st Cir. 2018) .......... 12, 23, 24

*In re Bridgestone/Firestone Tires Prods. Liab. Litig.*, 288 F.3d 1012 (7th Cir. 2002) .......... 25

*In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184 (3d Cir. 2020) .......... 23

*In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619 (D.C. Cir. 2019) .......... 13, 23

*Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672 (7th Cir. 2009) .......... 2

*Lab'y Corp. of Am. Holdings v. Davis*, 605 U.S. 327 (2025) .......... 3, 4, 8

*Marlo v. UPS, Inc.*, 639 F.3d 942 (9th Cir. 2011) .......... 6

*Mr. Dee's Inc. v. Inmar, Inc.*, 127 F.4th 925 (4th Cir. 2025) .......... 12

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (en banc) .......... passim

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) .......... 21

*Ruiz Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125 (9th Cir. 2016) .......... 16

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)........................ passim

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) .................... 11, 17

*United States v. Aluminum Co. of Am.*, 148 F.2d 416 (2d Cir. 1945) .... 19

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966)................ 18, 19, 20

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001).............17

*Van v. LLR, Inc.*, 61 F.4th 1053 (9th Cir. 2023) ....................................23

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ........................................................................ 19, 20

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)..................... 5, 7, 21

**Constitutional Provisions**

U.S. Const. amend. VII ............................................................. 1, 21, 22

U.S. Const. art. III................................................................... passim

**Statutes**

28 U.S.C. § 2072(b) .............................................................. 10, 21

**Rules**

Fed. R. Civ. P. 23 .................................................................... passim

**Other Authorities**

2025 Carlton Fields Class Action Survey (2025), https://tinyurl.com/474nkhvt ..............................................................2

Mark Fenwick et al., *Regulation Tomorrow: What Happens When Technology Is Faster than the Law?*, 6 Am. U. Bus. L. Rev. 561 (2017) ..................................................................................4

Sheila B. Scheuerman, *Due Process Forgotten: The Problem of Statutory Damages and Class Actions*, 74 Mo. L. Rev. 103 (2009).......................4

## INTEREST OF *AMICI CURIAE*

Computer & Communications Industry Association ("CCIA") is an international, not-for-profit trade association representing a broad cross-section of communications and technology firms.[1] For more than 50 years, CCIA has promoted open markets, open systems, and open networks, including as a party to and as amicus in litigation. CCIA's members employ more than 1.6 million workers, invest more than $100 billion in research and development, and contribute trillions of dollars in productivity to the global economy. CCIA submits this brief to address the consequences of certifying a class action inflated with uninjured members—an issue that disproportionately affects innovative, technology-driven business models that scale quickly and have global reach.

The Software & Information Industry Association ("SIIA") is the principal trade association for the software and digital information industries. SIIA's membership includes nearly 400 software companies, search engine providers, data and analytics firms, and digital publishers that serve nearly every segment of society, including business, education, government,

[1] A list of CCIA members is available at https://ccianet.org/about/members/.

healthcare, and consumers.[2] SIIA is dedicated to creating a healthy environment for the creation, dissemination, and productive use of information. SIIA therefore has an interest in ensuring that the powerful tool of class action litigation is not abused.

Chamber of Progress is a tech-industry coalition devoted to a progressive society, economy, workforce, and consumer climate. Chamber of Progress seeks to protect internet freedom and free speech, to promote innovation and economic growth, and to empower technology customers and users.[3] In keeping with that mission, Chamber of Progress believes that allowing a diverse range of websites and philosophies to flourish will benefit everyone—consumers, store owners, and application developers.

NetChoice is a national trade association of online businesses that share the goal of promoting free enterprise and free expression on the Internet.[4] NetChoice fights to ensure the internet remains innovative and free. Toward those ends, NetChoice engages in litigation, amicus curiae work, and political advocacy.

---

[2] A list of SIIAs' members is available at https://www.siia.net/about-us/member-companies.

[3] A list of the Chamber of Progress's corporate partners is available at https://progresschamber.org/partners/.

[4] A list of NetChoice's members is available at https://tinyurl.com/yuwv2eat.

TechNet is the national, bipartisan network of technology chief executive officers and senior executives that promotes the growth of the innovation economy by advocating a targeted policy agenda at the federal and 50-state level. TechNet's diverse membership includes dynamic American businesses ranging from startups to the most iconic companies in the world and represents over five million employees and countless customers in the fields of information technology, artificial intelligence, e-commerce, the sharing and gig economies, advanced energy, transportation, cybersecurity, venture capital, and finance.[5] TechNet's members have first-hand experience with the harmful effects of aggregating claims of uninjured people through class actions that violate Article III and Rule 23.

This brief is filed with the consent of all parties. No party or its counsel, and no person other than amici curiae or their counsel, authored this brief in whole or in part or contributed money that was intended to fund preparing or submitting this brief.

[5] A list of TechNet members is available at https://www.technet.org/our-story/members/.

# ARGUMENT

The putative class in this appeal undisputedly includes millions of uninjured persons. Plaintiffs treat these uninjured members as a minor inconvenience to be handled in post-trial claims processing, but the presence of uninjured members in a putative class is hugely important. Uninjured members inflate class damages claims and magnify the *in terrorem* effect of class-action litigation—especially for technology companies whose products may touch tens or hundreds of millions of users. When individualized questions of injury predominate over common questions and defeat standing under Article III and the antitrust laws, the class cannot be certified. Plaintiffs' suggestion to remove uninjured class members in post-trial claims processing raises significant Seventh Amendment and Due Process concerns.

## I. UNINJURED CLASS MEMBERS EXACERBATE THE *IN TERROREM* EFFECT OF CLASS ACTIONS, PARTICULARLY AGAINST COMPANIES WITH WIDELY ADOPTED TECHNOLOGIES.

### A. Classes swollen with uninjured members coerce settlement regardless of the merits.

All too often, plaintiffs seek to inflate class sizes and damages figures to extract class settlements regardless of the merits. The Supreme Court has

long recognized the danger: "when damages allegedly owed to tens of thousands of potential claimants are aggregated and decided at once, the risk of an error will often become unacceptable." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350 (2011). "Faced with even a small chance of a devastating loss, defendants will be pressured into settling questionable claims." *Id.* Class-action litigation of this kind thus can "unfairly place pressure on the defendant to settle even unmeritorious claims." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 524 (2018) (cleaned up). And the pressure is anything but hypothetical: class-action defense is now "one of the fastest-growing areas of legal spending," with U.S. companies spending $4.21 billion defending class actions in 2024 alone. *See* 2025 Carlton Fields Class Action Survey at 3–6 (2025), https://tinyurl.com/474nkhvt; *see id.* at 7 (projecting class-action claims will grow another 7.6% in 2025).

A class with "a great many" uninjured members magnifies that coercion. *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1276 (11th Cir. 2019) (quoting *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009)); *accord Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC* 31 F.4th 651, 669 n.14 (9th Cir. 2022) (*en banc*). "Given the '*in terrorem* character of a class action,' a class defined so as to improperly include uninjured class members

increases the potential liability for the defendant and induces more pressure to settle the case, regardless of the merits." *Id.* (internal citation omitted). As Justice Kavanaugh recently explained, "[o]verbroad and incorrectly certified classes threaten massive liability . . . . That reality in turn can coerce businesses into costly settlements that they sometimes must reluctantly swallow rather than betting the company on the uncertainties of trial." *Lab'y Corp. of Am. Holdings v. Davis*, 605 U.S. 327, 333 (2025) (Kavanaugh, J., dissenting from dismissal of certiorari as improvidently granted).

In this case, Plaintiffs seek more than $20 billion on behalf of a class of roughly 200 million people—a class certified on Plaintiffs' assurance that their expert could match payment records to actual consumers, and decertified when the resulting record-matching exercise left the district court with "no confidence" in his work. Op. at 4, 22. Plaintiffs' expert eventually conceded that he could not quantify—or even estimate—the error rate in the analysis used as a critical input to identify who was injured and by how much. *Id.* at 6, 15. A defendant confronting an eleven-figure aggregate demand backed by admittedly unvalidated proof of injury faces precisely the choice the *Concepcion* Court warned of: settle claims of unknown merit, or "bet[] the

company on the uncertainties of trial." *Lab'y Corp.*, 605 U.S. at 333 (Kavanaugh, J., dissenting).

### B. These dynamics disproportionately burden innovative, technology-driven companies and are most destructive in nascent technology markets.

The *in terrorem* problem falls hardest on innovative, technology-driven companies that scale quickly and reach nearly every facet of society. When aggregated statutory damages are "combined with the procedural device of the class action," the result is "absurd liability exposure in the hundreds of millions—or even billions—of dollars on behalf of a class whose actual damages are often nonexistent." Sheila B. Scheuerman, *Due Process Forgotten: The Problem of Statutory Damages and Class Actions*, 74 Mo. L. Rev. 103, 104 (2009). Scholars have likewise cautioned against legal regimes that "stifle[] or distort[] technological development" as "disruptive technologies arrive more frequently and at a faster pace." Mark Fenwick et al., *Regulation Tomorrow: What Happens When Technology Is Faster than the Law?*, 6 Am. U. Bus. L. Rev. 561, 563, 572 (2017).

The technology sector—encompassing many of amici's members—is particularly vulnerable because class actions alleging privacy violations, data breaches, or anticompetitive conduct in digital marketplaces routinely propose

classes numbering in the tens or hundreds of millions—defined by nothing more than the download of an application or the creation of an account. In many such cases, large swaths of the proposed class may have experienced no concrete injury sufficient to confer standing under *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). In others, like this one, the absence of reliable evidence showing whether an individual class member suffered concrete injury defeats certification because common questions do not predominate over individual ones. Indeed, Plaintiffs' own experts acknowledged that some of the proposed class members may have been net beneficiaries of the challenged conduct, Op. at 24–25, yet Plaintiffs proffered no reliable common method for telling the two groups apart. Permitting certification of such sweeping classes, untethered from proof or assessment of individualized injury, creates a systemic incentive for plaintiffs to target companies whose products reach the largest number of consumers, irrespective of whether those consumers were actually harmed. Exposure comes to be measured by the popularity of the product rather than the merit of the claim.

## II. UNINJURED CLASS MEMBERS DEFEAT PREDOMINANCE UNDER RULE 23(B)(3).

Plaintiffs failed to "affirmatively demonstrate" that Rule 23(b)(3) is satisfied. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *see*

*Marlo v. UPS, Inc.*, 639 F.3d 942, 947 (9th Cir. 2011) (stating plaintiff has the burden under Rule 23).

In antitrust class actions, proof of injury is one of the "essential elements," and the plaintiff must therefore demonstrate that the alleged injury is "capable of being established through a common body of evidence, applicable to the whole class." *Olean*, 31 F.4th at 666. As *Olean* recognized, "[a] district court is in the best position to determine whether individualized questions, including those regarding class members' injury, 'will overwhelm common ones and render class certification inappropriate under Rule 23(b)(3).'" *Id.* at 669. That is exactly what the district court did here.

After several attempts at class certification, the district court rejected Plaintiffs' proposed expert who sought to match Apple's payor records to consumers and did so under all four prongs of Rule 702, finding that "Thompson's expert testimony should be excluded because he is not qualified, his methods are not reliable, he did not reliably apply his methods, and his testimony is not relevant to this action." Op. at 22. As a result, Plaintiffs "proffer[ed] no methodology to match Apple ID accounts to consumers, and therefore no way to show that antitrust injury is 'capable of being established

through a common body of evidence, applicable to the whole class.'" *Id.* at 25 (*quoting Olean*, 31 F.4th at 666).

Plaintiffs now attempt to shift blame for these shortcomings. Plaintiffs complain that Thompson was forced to review records on an "air-gapped computer" with no Internet, could not contact "purchasers in cases of uncertainty" and take notes verbatim without violating the protective order, and had "less than two months to determine which of the more than one billion payor records belonged to the same unique purchaser." *Id.* at 23–24. Plaintiffs also contend that "Apple has information that would allow the effective matching." *Id.* at 38. But Plaintiffs apparently acquiesced to these restrictions and did not file a motion to compel or seek other relief to address these issues during their multiple certification attempts. *See* Appellants' Br. at 20–25. Rather, Plaintiffs "chose to rely" on "an error-ridden 'matching' attempt." Op. at 1.

In short, Plaintiffs failed to "affirmatively demonstrate" that Rule 23 is satisfied. *See Dukes*, 564 U.S. at 350. Plaintiffs should be held to their burden, and an overbroad class with potentially millions of uninjured members cannot be certified. *See Olean*, 31 F.4th at 669 n.14 ("When a class is defined so broadly as to include a great number of members who for some reason could

not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification.") (internal quotes omitted); *Lab'y Corp.*, 605 U.S. at 328. When a damages class includes both injured and uninjured members, common questions do not predominate.") (Kavanaugh, J., dissenting).

## III. UNINJURED CLASS MEMBERS CANNOT SATISFY THE STANDING REQUIREMENTS OF ARTICLE III OR SUBSTANTIVE ANTITRUST LAW.

The potential for coercive pressure is especially relevant here. It is well-established that plaintiffs must be able to demonstrate an injury in fact to have standing. For that reason, the district court was correct to consider only evidence of concrete injuries, rather than mere exposure to allegedly anticompetitive conduct. Similarly, plaintiffs' newly minted "exposure to the market" injury theory does not constitute antitrust injury. This "exposure" injury theory would up-end settled antitrust doctrine and severely chill the innovation incentives invaluable to a thriving tech industry.

### A. The presence of uninjured class members is an Article III barrier to certification.

"When individualized questions relate to the injury status of class members, Rule 23(b)(3) requires that the court determine whether individualized inquiries about such matters would predominate over common

questions." *Olean*, 31 F.4th at 668. When, as here, a proposed class demonstrably includes millions of uninjured members, the sheer volume of individualized standing determinations that this court requires at summary judgment will overwhelm any common questions. *See Healy v. Milliman, Inc.*, 164 F.4th 701 (9th Cir. 2026). And even if plaintiffs raise a fact issue on standing at summary judgment, their injuries will have to be proven at trial. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). An important reason that these individualized determinations matter is that, to recover, the Constitution requires each class member to have Article III standing. *TransUnion*, 594 U.S. at 430-31. It therefore cannot be an abuse of discretion for a district court to decertify a class that includes millions of demonstrably uninjured members because individualized questions of injury and Article III standing will certainly predominate.

This Court recently held that "*TransUnion* requires named and unnamed members of a certified class for money damages to demonstrate that there is a genuine dispute of material fact over standing at summary judgment." *Healy*, 164 F.4th at 710. That holding follows from the Supreme Court's instruction that standing must be demonstrated "with 'the manner and degree of evidence required at the successive stages of the litigation.'" *Id.* at

708 (quoting *TransUnion*, 594 U.S. at 431). These holdings reflect the Supreme Court's unambiguous instruction that "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *TransUnion*, 594 U.S. at 431.

These principles are reflected in the structural constraints that govern class litigation: "Rule 23's requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act, which instructs that rules of procedure 'shall not abridge, enlarge or modify any substantive right.'" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (quoting 28 U.S.C. § 2072(b)). "[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion*, 594 U.S. at 431. A class action cannot manufacture Article III jurisdiction where none exists.

Though *Healy* recognized this Court's longstanding rule that a class may be certified when at least one named plaintiff demonstrates standing before certification, *Healy* also made clear that "*TransUnion* . . . compels unnamed class members to demonstrate evidence of standing . . . prior to trial at summary judgment." *Healy*, 164 F.4th at 706–09. As such, because plaintiffs will have to demonstrate standing "prior to trial," *id.* at 708, the pre-

certification analysis must ask whether individualized questions of standing will predominate.

Accordingly, *TransUnion*, *Healy*, *Olean*, Rule 23, and the Constitution required the district court here to consider a distinct question at the certification stage: will the need for individualized standing determinations predominate over common questions? Simply put, "[b]ecause the Supreme Court has clarified that '[e]very class member must have Article III standing in order to recover individual damages,' Rule 23 also requires a district court to determine whether individualized inquiries into this standing issue would predominate over common questions." *Olean*, 31 F.4th at 668 n.12 (internal citations omitted). This rule follows naturally from the intersection of the requirement that every class member have Article III standing, *TransUnion*, 594 U.S. at 431, and Rule 23(b)(3)'s requirement that "common, aggregation-enabling, issues in the case [be] more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).

This predominance inquiry is straightforward here, where Plaintiffs' own expert estimates that approximately 11 million unidentified accounts suffered no financial injury. The need to adjudicate the standing of those

millions of individuals—whether at summary judgment, at trial, or after trial (as Plaintiffs propose)—will overwhelm any common questions regarding the existence of a conspiracy or the methodology of a damages model. The question is not whether a handful of uninjured members might be "pick[ed] off" through individualized rebuttal, *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014), but whether millions of individualized standing determinations will "predominate and render an adjudication unmanageable," *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53–54 (1st Cir. 2018); *see also, e.g.*, *Cordoba*, 942 F.3d at 1277 (recognizing "a meaningful difference between a class with a few members who might not have suffered an injury traceable to the defendants and a class with potentially many more").

Other circuits, both before and after *TransUnion*, have overwhelmingly held that class certification should be denied when significant numbers of class members are uninjured. *See, e.g.*, *Mr. Dee's Inc. v. Inmar, Inc.*, 127 F.4th 925, 934 (4th Cir. 2025) ("attempting to define a class with such a high share of uninjured members also raises Article III standing concerns"); *Cordoba*, 942 F.3d at 1277 ("meaningful difference" between a class with a few uninjured members and one "with potentially many more"). These cases, including those decided before *TransUnion*, rest on principles that the Supreme Court has

since reinforced rather than disturbed—namely, that Article III requires concrete injury, that "standing is not dispensed in gross," *TransUnion*, 594 U.S. at 431 (citing *Davis v. FEC*, 554 U.S. 724, 734 (2008)), and that the presence of uninjured class members creates individualized issues that can preclude predominance. *E.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619 (D.C. Cir. 2019) (affirming denial of class certification where a large portion of proposed class suffered no injury and the plaintiffs "proposed no further way short of full-blown, individual trials" to determine which class members were injured).

Plaintiffs invoke *Healy* to argue that Apple can simply seek summary judgment on individual standing, but they get the import of *Healy* exactly backwards. *See* Appellants' Br. at 52. *Healy*'s holding does not resolve the predominance problem presented here—it magnifies it. Under *Healy*, unnamed class members in a damages suit must "demonstrate that there is a genuine dispute of material fact over standing at summary judgment." *Healy*, 164 F.4th at 710. Thus, the predominance inquiry here required the district court to analyze whether individualized standing determinations will predominate at the summary judgment stage. *See Olean*, 31 F.4th at 668–69. The prospect of litigating the standing of each of the—at minimum—11 million

uninjured class members through individualized summary judgment proceedings is not a procedural afterthought. Rather, it is precisely the kind of "individualized inquir[y]" that overwhelms common questions and defeats predominance under Rule 23(b)(3). *Olean*, 31 F.4th at 669 n.12.

This Court reviews class certification determinations for abuse of discretion and will "uphold a district court's determination that falls within a broad range of permissible conclusions." *Olean*, 31 F.4th at 663, 669. Here, the district court was well within its discretion to decertify a proposed class that included millions of members who demonstrably suffered no cognizable injury.

### B. The district court properly focused on concrete injury rather than mere exposure to the complained-of conduct.

*Olean* held that a class may be certified where the plaintiffs' evidence is "capable of proving antitrust impact on a class-wide basis." *Olean*, 31 F.4th at 684. The district court concluded that the plaintiffs lacked such competent class-wide evidence after the court excluded their proffered matching methodology as unreliable. On appeal, plaintiffs contend that there was competent class-wide evidence even absent the excluded expert report because all class members were "exposed to" Apple's alleged monopolization of app distribution and in-app payments. Appellants' Br. at 33. But under

*TransUnion*, a concrete injury conferring standing must bear a "'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 417. Plaintiffs' exposure theory cannot satisfy that standard.

The facts of *TransUnion* illustrate the point. A class of 8,185 consumers alleged that TransUnion violated the Fair Credit Reporting Act by placing alerts in their credit files identifying them as potential matches to names on the Department of the Treasury's Office of Foreign Assets Control list of terrorists, drug traffickers, and other serious criminals. *Id.* at 417. The Court held that only the 1,853 class members whose credit reports had actually been disseminated to third-party businesses suffered a concrete harm; the 6,332 class members whose files were never disseminated did not. *Id.* at 434. The Court found that the latter group lacked standing because "[o]nly those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.* at 417.

The same principle defeats exposure theories in other settings. A consumer whose personal information is exposed in a data breach suffers no concrete injury absent evidence that the information was actually accessed or

used to his or her detriment. And so too here. Absent class members did not suffer concrete injury merely because they were "exposed to" Apple's alleged monopolization of app distribution and in-app payments. A purchaser who paid no supracompetitive commission stands in the same position as the *TransUnion* class members whose files were never disseminated: a statutory violation may have occurred in the abstract, but that purchaser has suffered no concrete harm of the sort Article III demands. The diminished "choice" Plaintiffs invoke in app distribution, app purchases, and payment processing is not an injury bearing a "close relationship" to any harm traditionally remediable in American courts.

Plaintiffs seem to rely on *Ruiz Torres v. Mercer Canyons, Inc.*, for the proposition that absent class members need not demonstrate concrete injury. *See* 835 F.3d 1125, 1137 n.6 (9th Cir. 2016). But that decision is no longer the law of the circuit. As this Court recently recognized, *TransUnion* abrogated *Ruiz Torres* and its ilk on precisely that point. *Healy*, 164 F.4th at 708. The reason is simple: *Ruiz Torres* allowed a class to proceed on the assumption that exposure to the challenged conduct sufficed, treating any shortfall in actual injury as a question of overbreadth to be sorted out later on the merits. *TransUnion* rejected that assumption, holding that "[e]very class

member must have Article III standing in order to recover individual damages" and that "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." 594 U.S. at 431 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring))

### C. The antitrust standing doctrine independently forecloses Plaintiffs' proposed class.

In addition to Article III, the antitrust standing doctrine forecloses Plaintiffs' proposed class. Antitrust standing requires "antitrust injury"—that is, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999) (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)). Plaintiffs cannot establish antitrust standing because their brand new theory of injury—mere exposure to an allegedly monopolized marketplace—is not an antitrust injury.

Participation in a market served by a successful platform is not, without more, an antitrust injury. This is because "having a monopoly does not by itself violate § 2." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001). Rather, Section 2 condemns only the unlawful acquisition or

maintenance of monopoly power—a principle "distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966). Likewise, the Clayton Act's private right of action requires injury to business or property. *See* 15 U.S.C. § 15. Mere exposure to a monopoly market does not show harm to a business or property flowing from an antitrust violation—evidenced by the fact that plaintiffs have made no attempt to quantify the alleged "harm" of this exposure.

Because merely possessing monopoly power over a market is not a § 2 violation, mere exposure to that market cannot plausibly be "injury of the type the antitrust laws were intended to prevent." *Atl. Richfield*, 495 U.S. at 334.

Yet Plaintiffs' theory would allow purchasers with no overcharge—and even purchasers whose transactions reflect negative overcharges (i.e., those who paid less than they would have absent the alleged monopoly)—to claim injury merely because they transacted in an allegedly monopolized marketplace. That improperly substitutes market status for concrete harm. Plaintiffs' exposure theory inverts the statutory structure of § 2: rather than requiring proof of anticompetitive conduct causing concrete harm, it treats the mere existence of a dominant platform as a self-executing source of injury for

everyone who ever transacted on it, regardless of how that position was lawfully achieved. That approach cannot be squared with the settled distinction between lawful monopoly and unlawful monopolization, and it must be rejected. *See Grinnell*, 384 U.S. at 571; *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).

### D. Accepting Plaintiffs' exposure theory would chill innovation and undermine the consumer welfare foundation of antitrust law.

The highly problematic policy consequences of Plaintiffs' exposure theory confirm its doctrinal error. Antitrust law permits—indeed, encourages—companies to compete aggressively on the merits. The Supreme Court has held that "[t]o safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." *Trinko*, 540 U.S. at 407. And "[t]he successful competitor, having been urged to compete, must not be turned upon when he wins." *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945) (Hand, J.). Success achieved through invention and innovation is encouraged by the antitrust laws. *See Grinnell*, 384 U.S. at 571.

But if Plaintiffs' exposure theory were accepted, it would turn this important principle of antitrust law on its head. If antitrust injury can be

inferred from exposure to an allegedly monopolized platform, then the success of a platform becomes the mechanism for establishing injury. Amici are innovative and industry-leading technology firms that regularly develop new technologies leading to new markets, in which the innovator necessarily has a large market share. Plaintiffs' theory would convert successful new technology platforms into strict-liability targets for class-wide damages. That result is contrary to the settled principle that lawful market power achieved through superior products or business acumen is permitted under the antitrust laws. *See Grinnell*, 384 U.S. at 571; *Trinko*, 540 U.S. at 407.

Such a theory is especially dangerous in nascent technology markets, where a firm may lawfully achieve significant market power by introducing a superior product, improving an existing product, or even creating an entirely new market of which it is the only participant. This is good for consumers, and consumer welfare is the bedrock of antitrust law. If firms face greater litigation risk because they competed effectively enough to build new markets, rather than harming competition in some way, the result would be to disincentivize companies from making the very investments and product improvements that benefit consumers.

Because the exposure theory would punish market success rather than anticompetitive conduct, this Court should reject it and reaffirm that antitrust standing requires proof of a cognizable injury tied to unlawful behavior—not mere participation in a market served by an innovative firm.

## IV. PLAINTIFFS' POST-TRIAL PROPOSAL RAISES SIGNIFICANT SEVENTH AMENDMENT AND DUE PROCESS CONCERNS.

Plaintiffs' proposal to sort injured from uninjured class members only after a liability verdict does not cure the defects in their certification theory; it compounds them. Deferring proof of injury to a post-trial claims process would deprive defendants like Apple of the right to contest an essential element of each class member's claim before a jury and convert Rule 23 from a procedural device into a source of substantive liability. Neither the Seventh Amendment nor the Due Process Clause permits that, and the Rules Enabling Act forbids it.

"[T]he Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right,'" and thus "a class cannot be certified on the premise that [the defendant] will not be entitled to litigate its statutory defenses to individual claims." *Dukes*, 564 U.S. at 367 (quoting 28 U.S.C. § 2072(b)); *see Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845–46 (1999) (warning

against an "adventurous application" of Rule 23 that infringes Seventh Amendment rights).

Here, injury is an "essential" element of an antitrust claim. *Olean*, 31 F.4th at 666. Yet Plaintiffs conflate proof of injury with a mechanical allocation of damages after a trial. *See, e.g.,* Appellants' Br. at 38 (matching purchases bears "only on the administrative feasibility of identifying the individual damages of class members – a consideration irrelevant to class certification") (citing *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1123 (9th Cir. 2017)); *id.* at 43 ("*Olean* confirms that the need to calculate whether (and to what degree) individuals suffered damages is a question reserved for the claims-administration stage").

But neither *Olean* nor *Briseno* holds that a plaintiff may defer individualized questions of injury by lumping them into a damages-allocation process after trial. *See Olean*, 31 F.4th at 682 n.31 (addressing "a straightforward process of applying the class-wide overcharge to the Tuna Purchasers' net sales records"); *Briseno*, 844 F.3d at 1124 n.4 (addressing ascertainability issues "through analysis of Rule 23's enumerated requirements," noting overbroad classes are subject to Rule 23(b)(3)). After

all, evidence of standing for unnamed class members is required "prior to trial." *Healy*, 164 F.4th at 708.

This Court and other circuits have refused to certify classes where, as here, plaintiffs lacked a common method to establish antitrust injury for the whole class—a showing that cannot be deferred until after trial. *See, e.g., Van v. LLR, Inc.*, 61 F.4th 1053, 1069 (9th Cir. 2023) (vacating certification where some purchasers received discounts because injury determinations "could potentially involve up to 13,680 depositions and months of trial," which "certainly cannot be described as de minimis"); *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 194–95 (3d Cir. 2020) (vacating certification where "the District Court appears to have treated the parties' arguments as a dispute about damages, rather than antitrust injury"); *In re Rail Freight*, 934 F.3d at 624 ("Uninjured class members cannot prevail on the merits, so their claims must be winnowed away *as part of the liability* determination.") (emphasis added); *Asacol*, 907 F.3d at 53 ("[T]his is not a case in which a very small absolute number of class members might be picked off in a manageable, individualized process *at or before trial*.") (emphasis added).

Plaintiffs suggest that only 5.1% to 5.9% of the class is uninjured, but that ignores that Mr. Thompson's proffered methodology is unreliable—a

conclusion that Plaintiffs do not meaningfully challenge on appeal. *See* Appellants' Br. at 40-42. Thus, Plaintiffs cannot reliably know what percentage of the proposed class is actually injured, much less propose a process for reliably winnowing out millions of uninjured class members.

Even if Mr. Thompson had offered a reliable methodology, Plaintiffs' post-trial "allocation" proposal is far from straightforward. For example, Plaintiffs admit that in instances of "uncertainty" Mr. Thompson may need to contact purchasers "to confirm if two similar payor records corresponded to the same person." *Id.* at 23. Even with the necessary data, Plaintiffs admit that the "problem is perfecting the method of mining [the data] for damages-allocation purposes at the end of the case," which "can often take multiple iterations in generating a claims process." Pls.' Pet. at 21-22.

Ultimately, Plaintiffs had multiple shots at class certification and failed to "offer a reasonable and workable plan" to deal with the uninjured class members "in a manner that is protective of the defendant's constitutional rights and does not cause individual inquiries to overwhelm common issues." *Asacol*, 907 F.3d at 58. "Tempting as it is to alter doctrine in order to facilitate class treatment, judges must resist so that all parties' legal rights may be

respected." *In re Bridgestone/Firestone Tires Prods. Liab. Litig.*, 288 F.3d 1012, 1020 (7th Cir. 2002) (citing *Amchem*, 521 U.S. at 613).

## CONCLUSION

The ruling of the district court should be affirmed.

Dated: August 19, 2026

Respectfully submitted,

*/s/ Susanna Allen*

Susanna Allen
Tyler Young
Seth Cook
YETTER COLEMAN
600 Travis St., #5400
Houston, TX 77002
Tel: (713) 632-8000

*Attorneys for Amici Curiae Chamber of Progress and NetChoice*

*/s/ Sanjiv P. Laud*

Sanjiv P. Laud
Lucien Wang
MCCURDY LAUD, LLC
400 S. 4th St., Suite 401, #31
Minneapolis, MN 55415
Tel: (612) 699-0545

*Attorneys for Amicus Curiae Software & Information Industry Association*

*/s/ Adam Acosta*

Adam Acosta
PIERSON FERDINAND
601 Pennsylvania Ave NW, Ste. 900
Washington, DC 20004
Tel: (771) 244-2815

*Attorney for Amici Curiae Computer & Communications Industry Association and TechNet*

## CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMITATIONS

I, Sanjiv P. Laud, certify that the foregoing brief was prepared using a proportionally spaced typeface and contains 5,455 words, thereby complying with the type-volume limitations of the Federal Rules of Appellate Procedure and the Ninth Circuit Rules.

Dated: August 19, 2026

*/s/ Sanjiv P. Laud*

Sanjiv P. Laud
MCCURDY LAUD, LLC
400 S. 4th St., Suite 401, #31
Minneapolis, Minnesota 55415
Telephone: (612) 699-0545
sanjiv@mccurdylaud.com