**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**No. 25-7930**

IN RE APPLE IPHONE ANTITRUST LITIGATION

On Appeal from the United States District Court
for the Northern District of California
Case No. 4:11-cv-6714-YGR Hon. Yvonne Gonzalez Rogers

**BRIEF OF PHOENIX CENTER FOR ADVANCED LEGAL AND ECONOMIC PUBLIC POLICY STUDIES AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT-APPELLEE APPLE, INC.**

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal
and Economic Public Policy Studies
5335 Wisconsin Avenue, NW
Suite 440
Washington, DC 20015
(202) 274-0235
lspiwak@phoenix-center.org

*Attorney for Amicus Curiae Phoenix Center*
*for Advanced Legal and Economic Public Policy Studies*

August 19, 2026

## CERTIFICATE OF COUNSEL REGARDING CONSENT TO FILE

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), counsel for the Phoenix Center hereby certifies that all parties have consented to the filing of this brief.

s/ *Lawrence J. Spiwak*

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and Economic Public Policy Studies
5335 Wisconsin Avenue, NW, Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235

August 19, 2026

## CERTIFICATE REGARDING AUTHORSHIP

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), the Phoenix Center certifies that no party's counsel authored this brief, in whole or in part; that no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and that no person other than the Phoenix Center contributed money that was intended to fund preparing or submitting the brief.

s/ *Lawrence J. Spiwak*

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and Economic
Public Policy Studies
5335 Wisconsin Avenue, NW, Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235

August 19, 2026

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF COUNSEL REGARDING CONSENT TO FILE................ ii

CERTIFICATE REGARDING AUTHORSHIP............................................ iii

TABLE OF CONTENTS.........................................................................iv

TABLE OF AUTHORITIES....................................................................vi

INTERESTS OF AMICUS CURIAE .........................................................1

SUMMARY OF ARGUMENT ..................................................................2

ARGUMENT...........................................................................................5

I. McFadden's Model Does Not Measure Common Injury; It Finds That Different Members Experience Opposite Economic Effects From The Same Conduct...........................................................................5

A. McFadden's Model Is Inconsistent With Plaintiffs' Theory .....7

B. Plaintiffs Improperly Gerrymander The Class And Re-Label McFadden's Model.........................................................12

1. The Class Was Drawn To Fit The Model, Not The Injury ........................................................................13

2. Plaintiffs Improperly Re-Label McFadden's Model From Common Proof To Damages ...................................14

II. The Issue Is Not The Tolerable Percentage Of Potential Uninjured Members Of The Class But The Heterogeneity In Injury Itself........16

A. Olean And Briseno Are Inapposite To The Facts Of This Case ..........................................................................................16

B. This Case Is Directly Analagous To The D.C. Circuit's Ruling In Rail Freight II............................................................19

C. Divided Class Also Defeats The Adequacy of Representation Required By Rule 23(a)(4) ..... 22

III. McFadden's Model Does Not Plausibly Establish Antitrust Injury ... 24

CONCLUSION ..... 29

Form 8: Certificate of Compliance for Briefs ..... 30

CERTIFICATE OF SERVICE ..... 31

CERTIFICATE OF ADMISSION TO BAR ..... 32

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) .......... 23

*In re Asacol Antitrust Litig.*,
907 F.3d 42 (1st Cir. 2018) .......... 21, 22

*Atlantic Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990) .......... 19

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) .......... *passim*

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) .......... 14

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) .......... 23

*In re Int. Rate Swaps Antitrust Litig.*,
2023 No. 16-MD-2704 (JPO), U.S. Dist. LEXIS 225154 (S.D.N.Y. 2023) .......... 16, 21

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) .......... *passim*

*Pickett v. Iowa Beef Processors*,
209 F.3d 1276 (11th Cir. 2000) .......... 23, 24

*In re Rail Freight Fuel Surcharge Antitrust Litig.* (*Rail Freight II*),
934 F.3d 619 (D.C. Cir. 2019) .......... *passim*

*In re TFT-LCD Antitrust Litig.*,
267 F.R.D. 291 (N.D. Cal. 2010) .......... 24

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 15, 16, 19

*Valley Drug Co. v. Geneva Pharms., Inc.*,
350 F.3d 1181 (11th Cir. 2003) .......................................................... 22, 23

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ............................................................................ 7, 13

**Court Rules**

Fed. R. Civ. P. 23......................................................................................*passim*

**Other Authorities**

Hal R. Varian, Joseph Farrel, and Carl Shapiro, THE ECONOMICS OF INFORMATION TECHNOLOGY: AN INTRODUCTION (Cambridge Univ. Press 2004)..........................................................................................27

Jane Choi, *What Happens to App Prices when Developers Pay Lower Commission Fees? Evidence from the European Union* (Analysis Grp. Nov. 2025)................................................................................ 25, 26

Nick Huntington-Klein, THE EFFECT: AN INTRODUCTION TO RESEARCH DESIGN AND CAUSALITY (Chapman & Hall 2022).......................................26

## INTERESTS OF AMICUS CURIAE

The Phoenix Center is a non-profit 501(c)(3) research organization that studies the law and economics of the digital age. Over the past three decades, the Phoenix Center has authored numerous pieces of scholarly research—many of which have been published in leading academic journals—that explain complex economic concepts to policymakers and laymen alike. As this case involves both unique and important issues of economics and law, the Phoenix Center has an established interest in the outcome of this proceeding and believes that its perspective will assist the Court in resolving this case.

## SUMMARY OF ARGUMENT

This appeal can be decided almost entirely from Plaintiffs' opening brief. If this Court accepts everything Plaintiffs say, then this Court should affirm the district court's decertification of Plaintiffs' proposed class—a divided class that should not have been certified in the first place.

Plaintiffs' theory is that each class member suffered antitrust injury because Apple's allegedly supra-competitive commissions increased App Store prices. Their own common proof rejects that theory. Plaintiffs rely on Professor Daniel McFadden's damages model, which predicts positive overcharges for millions of purchasers and negative overcharges for millions of others; one group adverse to the other. Plaintiffs do not dispute those predictions. They argue that the negatives may simply be "nett[ed] out" of the positives, 4-ER-625 (Pls.' Opp. to Def.'s Mot. to Exclude McFadden), and that anything left over can be resolved in claims administration.

But Plaintiffs' argument ignores the fundamental question at bar. Federal Rule of Civil Procedure 23 ("Rule 23") asks whether the proposed class is, in fact, a class—*i.e.*, whether its members share the common injury Plaintiffs allege. Plaintiffs' problem is that McFadden's model does not identify one class suffering from common injury; it identifies a group of diverse purchasers experiencing opposite economic effects from the same alleged conduct.

This case, therefore, is not analogous to the fact patterns this Court confronted in *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022), or in *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017). Those cases involved classes comprised of people with a common positive injury, with individualized questions going only to exposure or the amount of damages. This case is instead analogous to the fact pattern the D.C. Circuit confronted in *In re Rail Freight Fuel Surcharge Antitrust Litig.* (*Rail Freight II*), 934 F.3d 619 (D.C. Cir. 2019). There, as here, Plaintiffs claimed that all parties were injured but their damages model—like McFadden's—said some were advantaged and not injured. The D.C. Circuit found that the roughly two thousand individualized injury determinations that would be required for those advantaged class members defeated predominance. Here, Plaintiffs' own proffered common proof identifies approximately *ten million* such inquiries.

Plaintiffs' renewed motion for class certification—filed in 2022 after the district court initially excluded McFadden's model as unreliable—confirms the point. Plaintiffs did not revise McFadden's model to eliminate the negative overcharges. Instead of reshaping the model to fit the theory, *Plaintiffs reshaped the class to fit the model*, adopting a $10 spending threshold because the threshold would "reduce the number and percentage of undamaged accounts[.]" 4-SER-910 (Pls.'

Renewed Mot. for Class Cert.). That decision alone shows that Plaintiffs' proposed class lacks predominance.

Moreover, McFadden's model does not plausibly establish antitrust injury from the pass-through of Apple's 30% commission to consumers in the form of higher prices. McFadden's pass-through calculation is purely speculative; it is not estimated from actual changes in commissions and prices. When commission rates do change, the available real-world empirical evidence shows that app developers do not pass those changes through to prices. This lack of pass-through is not theoretically anomalous. McFadden acknowledges that possibility for digital goods with zero marginal cost of production. Pls.' Op. Br. at 12. Where theory and evidence conflict, the evidence governs.

## ARGUMENT

### I. McFadden's Model Does Not Measure Common Injury; It Finds That Different Members Experience Opposite Economic Effects From The Same Conduct

Plaintiffs defined their class as those people who either "purchased one or more iOS applications or application licenses" from Apple or who "paid Apple for one or more in-app purchases" at any time since July 10, 2008. Significantly, Plaintiffs' proposed class was "limited to those persons who paid more than $10.00 in total to Apple during the class period … from any one Apple ID account." 1-ER-3 (Order Granting Mot. to Exclude Thompson and Mot. to Decert. Class). Unfortunately for Plaintiffs, the District Court observed that the class needs to consist of "persons"—not Apple ID accounts. *Id.*

Under Plaintiffs' theory, injury is both universal and individual: "all Class members have suffered antitrust injury because they each purchased apps or made in-app transactions that were distorted by Apple's anticompetitive conduct," 4-SER-906 (Pls.' Renewed Mot. for Class Cert.), and any "class member who purchased apps and in-app content on the App Store was exposed to Apple's illegal monopoly conduct." Pls.' Op. Br. at 1 (quotations omitted). The injury is higher prices: "anyone who buys apps [] is impacted by Apple's supra-competitive App Store commissions because they lead directly to increased prices for apps [] in the App Store[.]" 2-ER-259 (Pls.' Mot. for Class Cert.). Plaintiffs contend that the source

of injury is Apple's alleged anticompetitive conduct, the mechanism is the commission, and the injury is higher prices from the pass-through of the inflated commission.

Under McFadden's model, common proof of injury for each member requires three inputs: the but-for competitive commission; the price reduction from passing that lower commission through (the overcharge); and each class member's purchases. *See* 4-ER-679-80 (Order Denying Pls.' Mot. for Class Cert.). According to McFadden, injury can then be identified by summing the app-level overcharges for each member. 4-ER-685 (Order Denying Pls.' Mot. for Class Cert.). Plaintiffs' expert Dr. Abrantes-Metz put the but-for commission at 13.63%, less than half Apple's headline 30% rate. 1-ER-4 (Order Granting Mot. to Exclude Thompson and Mot. to Decert. Class). McFadden (with Dr. Minjae Song) estimated the overcharges and summed them to each member using Darryl Thompson's attempted deduplication of accounts to unique payors. 1-ER-7-8 (Order Granting Mot. to Exclude Thompson and Mot. to Decert. Class). With Thompson's analysis excluded by the district court, that derivative summation was effectively excluded as well, and the class was decertified. 1-ER-28 (Order Granting Mot. to Exclude Thompson and Mot. to Decertify Class). The district court had made clear, in no uncertain terms, that a failure to calculate injury for class members—not Apple IDs—would lead to

decertification. 2-ER-108 (Order Denying Mot. to Exclude McFadden and Granting Pls.' Mot. for Class Cert.).

Thompson's exclusion is material and correct, no doubt. But as detailed here, the class should not have been certified in the first place because there has been no showing of common injury. McFadden's model shows that the class contains members who were harmed and members who were benefited from the same conduct—the very opposite of the "predominance" required by Rule 23(b). Even if Thompson could have accurately matched Apple IDs to class members, Plaintiffs nonetheless cannot show common injury. *Cf. Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 354, 356, 359 (2011) (a class did not meet the prerequisites of Rule 23 where the expert evidence was inadequate to prove an element of the claim for the entire class).

### A. McFadden's Model Is Inconsistent With Plaintiffs' Theory

At the class certification stage, McFadden's model estimated overcharges for two genres—Games and Music & Entertainment apps and in-app purchases ("IAPs")—where the overcharge is the price paid at the "monopoly" commission minus the theoretically-derived (not empirically observed) price paid at the but-for

commission.[1] McFadden's modeling choices and regression estimates hold, for example, that for a Games app the overcharge is: $0.19 \times (-1.64 + p)$, where $p$ is the actual price paid for the app. Revised Supplemental Expert Report of Daniel L. McFadden in Support of Pls.' Mot. for Class Cert., App. E ¶¶ 111-12, *In re Apple iPhone Antitrust Litig.*, No. 4:11-cv-06714-YGR (N.D. Cal. Apr. 26, 2024), ECF No. 829-5 (hereinafter "Revised McFadden Report").[2] Basic arithmetic divides the class, producing harmed and benefitted class members. Plug \$0.99 (a common app price) into the Games formula and the overcharge is *negative*: $0.19 \times (-1.64 + 0.99) \approx -\$0.12$. The price at the 30% commission is twelve cents *lower* than at the 13.63% but-for commission. The lower commission does not reduce price—it raises price! This outcome compounds with each app purchased below the threshold: a purchaser of eleven \$0.99 game apps (spending \$10.89, so inside the revised class definition) has damages of about -\$1.36—a benefit, not a

---

[1] As we are not parties to this proceeding and are opining on the district court's certification rulings, our brief uses unredacted data from the certification stage of this proceeding.

[2] This equation $(0.19 \times (-1.64 + p))$ is an application of the equation found in paragraph 111 of the Revised McFadden Report, which purports to calculate the "estimated net monetary loss" of a consumer who purchased a Games app. Revised McFadden Report, App. E ¶¶ 111-12. The first constant (0.19) is a ratio based on Apple's and Plaintiffs' proffered but-for commission rate ((0.3 - 0.1363)/(1 - 0.1363) = 0.19). Revised McFadden Report ¶ 7; Pls.' Op. Br. at 6-7. The second constant (-1.64) is the inverse of the price coefficient from the regression ($1/\alpha$), where $\alpha$ is the price coefficient from McFadden's regression ($\alpha$ = -0.61 for a Games download). Revised McFadden Report ¶ 63, fig.3.

harm. The formulas do the same to Music & Entertainment apps (any price below $1.04), Games in-app purchases (any price below $4.55), and Music & Entertainment IAPs (any price below $1.33), and the negatives again compound with each purchase below the threshold.[3]

Table 1 summarizes the purchases of five hypothetical class members purchasing up to thirteen apps at assorted prices and their damages according to McFadden's model. To keep it simple, overcharges are based on the formula for Games apps. When the net overcharge is positive the member suffers an injury; when the net overcharge is negative the member enjoys an advantage incompatible with Plaintiffs' theory of the case.

[3] For these services, McFadden's regression produces: (1) $\alpha = -0.96$ for Music & Entertainment apps; (2) $\alpha = -0.22$ for Games in-app purchases; and (3) $\alpha = -0.75$ for Music & Entertainment in-app purchases. Revised McFadden Report ¶ 63, fig.3. Subsequent filings for the merits phase, unavailable at the time of decertification, do not meaningfully alter the content of this discussion. *See generally* Expert Report of Daniel L. McFadden, Ph.D., *In re Apple iPhone Antitrust Litig.*, No. 4:11-cv-06714-YGR (N.D. Cal. Mar. 5, 2026), ECF No. 1098-20; Expert Report of Minjae Song, Ph.D., *In re Apple iPhone Antitrust Litig.*, No. 4:11-cv-06714-YGR (N.D. Cal. Mar. 5, 2026), ECF No. 1095-42.

**Table 1. Examples of Member Overcharge for Games Apps**

| Member → <br> Apps Purchased ↓ | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| 1 | 0.99 | 1.99 | 1.99 | 1.99 | 9.99 |
| 2 | 0.99 | 3.99 | 3.99 | 3.99 | |
| 3 | 0.99 | 4.99 | 4.99 | 4.99 | |
| 4 | 0.99 | | 0.99 | 0.99 | |
| 5 | 0.99 | | | 0.99 | |
| 6 | 0.99 | | | 0.99 | |
| 7 | 0.99 | | | 0.99 | |
| 8 | 0.99 | | | 0.99 | |
| 9 | 0.99 | | | 0.99 | |
| 10 | 0.99 | | | 0.99 | |
| 11 | 0.99 | | | 0.99 | |
| 12 | | | | 0.99 | |
| 13 | | | | 0.99 | |
| Total Spend | 10.89 | 10.97 | 11.96 | 20.87 | 9.99 |
| Net Overcharge | -1.36 | 1.15 | 1.03 | -0.09 | 1.59 |

*Overcharge formula for Games apps = 0.19 × (-1.64 + p).*

Member 1 purchases eleven apps at $0.99 each with summed overcharges (*i.e.,* injury) of -$1.36. Despite Plaintiffs' theory that higher commissions raise prices and all class members suffer injury, this class member pays less for apps at Apple's alleged monopoly commission. Member 1 is advantaged by the alleged monopoly conduct.

Member 2 purchases three apps at $1.99, $3.99 and $4.99 and suffers an injury of $1.15. Member 3 purchases those same three apps but also one $0.99 app. Despite spending more than Member 2 ($11.96 versus $10.97), Member 3's injury declines. This example shows that the existence of apps or IAPs associated with

negative overcharges affect any class member who purchased those apps or IAPs, even those who show a net injury.

Member 4 is like Member 2 but purchases ten additional $0.99 apps and realizes a net overcharge of -$0.09 (a benefit), again paying less at the alleged monopoly commission. McFadden's model is universally defective; it routinely mixes benefit and injury from the same alleged anticompetitive conduct.

Notably, Member 5 purchases one app for $9.99 and suffers an injury of $1.59, the largest injury in the table, but this member is excluded from the class by the $10 spending limit.

The splitting of the class into injured and advantaged members is not random regression noise; it is the algebraic result of McFadden's model. Plaintiffs try to explain the perversions away as a feature of apps that earn advertising revenue. Pls.' Op. Br. at 12 ("And, in some cases—for example, where a developer obtains significant revenues from advertising—the model predicts a profit-maximizing IAP price that is higher at a lower commission rate."). But that explanation is speculation, not proof. McFadden's model contains no advertising, no promotions, and no dynamics. Every $0.99 Games app has a negative overcharge and every $1.99 Games app a positive one, whether the app includes advertising or not, and the negative overcharges extend to IAPs (at varying price thresholds), not just apps.

If advertising divides the class, then the model should have been revised to account for advertising to keep the entire class on the same side of the injury line. It was not.

### B. Plaintiffs Improperly Gerrymander The Class And Re-Label McFadden's Model

A *negative* damage calculation is an affirmative prediction that the challenged conduct left the purchaser *better off* than in the but-for world; the alleged monopoly behavior allowed some class members to pay less. McFadden's model does not merely produce different amounts of damages from a common overcharge among injured members; it predicts opposite effects of injury from the challenged conduct itself. The district court identified the problem at the outset when considering Apple's challenge to McFadden's testimony: "Ultimately the issue here is negative damages[.]" 4-ER-686 (Order Denying Pls.' Mot. For Class Cert.). The model simply does not support Plaintiffs' allegations of universal harm.

Plaintiffs' response to the district court's "negative damages" concern is revealing. *Id*. Plaintiffs searched for a solution and found two. First, Plaintiffs redefined the class to reduce the appearance of negative damages, fishing for some *de minimis* share that might comport with their interpretation of the caselaw they cite as support. 4-SER-910 (Pls.' Renewed Mot. for Class Cert.). Second, Plaintiffs re-label McFadden's model away from class-wide evidence of injury to a damages model relevant only for post-trial administration. 4-ER-701 (Order Denying Pls.' Mot. for Class Cert.). Neither solution holds water.

### 1. The Class Was Drawn To Fit The Model, Not The Injury

If the negative damages reflected an econometric error, then one would expect Plaintiffs to revise the model. They did not. If the negatives reflected a defect in the liability theory, then one would expect Plaintiffs to revise the theory. Again, they did not. Instead, Plaintiffs *revised the class*—expressly adopting the $10 threshold because it would "reduce the number and percentage of undamaged accounts[.]" 4-SER-910 (Pls.' Renewed Mot. for Class Cert.). As the district court put it: "plaintiffs have revised their class definition to limit the number of uninjured class members." 2-ER-133 (Order Denying Mot. to Exclude McFadden and Granting Pls.' Mot. for Class Cert. (noting Plaintiffs' acknowledgment "that an estimated 17.8% of accounts in Professor McFadden's model are uninjured")).

To clarify a point of nomenclature, in McFadden's model there are no uninjured members (*i.e.*, those who were entirely unaffected by the alleged conduct), save the rare mathematical coincidence. There are those with positive overcharges (*i.e.*, those who were injured), and those with negative overcharges (*i.e.*, those who were advantaged).

Rule 23 assumes that a class is defined by the alleged wrong and the persons are harmed by it, and that the common proof is then tested against that class. *See Wal-Mart Stores, Inc.*, 564 U.S. at 359. Here the process ran in reverse. The class was redrawn after the common proof failed, not before. Nothing in Plaintiffs'

liability theory distinguishes a purchaser who spent $9.99 from one who spent $10.01; the line is drawn at that point not because the theory changes there, but because the model predicts fewer undamaged accounts above it. The threshold removed 46.4 million accounts (26% of the class) while moving total damages by roughly 0.08%. Revised McFadden Report at 32, fig.6. It is not an injury criterion or an exposure criterion—the threshold removes both injured and advantaged class members. *See* 4-SER-836 & n.261 (Prince 2023 Report). Rather, the threshold is a dial set to the value that made the model's output appear more presentable. Instead of fixing McFadden's model, Plaintiffs re-defined the class at the altar of McFadden's model, sacrificing injured members in the process. *Cf. Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (holding that at the class certification stage, "any model supporting a plaintiff's damages case must be consistent with its liability case[.]") (citations omitted).

### 2. Plaintiffs Improperly Re-Label McFadden's Model From Common Proof To Damages

With McFadden's model splitting the class into injured and advantaged—thus offering no common proof of antitrust injury—Plaintiffs recharacterize McFadden as merely a damages model. That is not how this case was litigated. Plaintiffs represented that, once Apple's transactional data were complete, McFadden "will be able to calculate the exact extent of injury suffered by each class member." 2-ER-133 (Order Denying Mot. to Exclude McFadden and Granting Pls. Mot. for Class

Cert.). The district court accepted that representation, treating the model as the class-wide proof of injury. 2-ER-123 (Order Denying Mot. to Exclude McFadden and Granting Pls.' Mot. for Class Cert.). McFadden's model is the only class-wide proof Plaintiffs offered that Apple's commissions caused monetary injury to all individual members. Having invited the court to read the model as measuring class-wide injury, Plaintiffs cannot recast it as measuring only damages simply because it has produced millions of class members with negative overcharges.

The negative overcharges admit only two readings, and neither is a damages question. Either McFadden's model defines injury, in which case millions of members are uninjured or advantaged, or McFadden's model is wrong, in which case individualized proceedings are required to determine who was injured and how. There is no third reading.

The issue at bar is not aggregate damages. The issue is whether the proposed class is, in fact, a class. Aggregate netting answers the wrong question. *Cf.* Pls.' Op. Br. at 13 ("necessary to identify all of that class member's purchases . . . and add up all of the overcharges (nearly all positive, some possibly negative)."). Rule 23 certifies claims asserted by persons, not aggregate net positions. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("Every class member must have Article III standing in order to recover individual damages. 'Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not.'")

(citations omitted); *In re Int. Rate Swaps Antitrust Litig*., 2023 No. 16-MD-2704, 2023 U.S. Dist. LEXIS 225154, *30 (S.D.N.Y 2023) ("[c]ourts routinely 'requir[e] that statistical models offered by plaintiffs show all class members suffered some injury' as part of the predominance inquiry.") Reliable matching of transactions to class members would not help Plaintiffs—it would hurt them. The more accurately the overcharge is assigned to each class member, the more precisely the model identifies the members whose overcharges are negative. Perfect matching would not restore predominance; it would sharpen the very division that destroys it. Since Plaintiffs aver the account- and member-level calculations are "not materially different," Pls.' Op. Br. at 24-25 & n.10, Thompson, in their own view, is neither here-nor-there. The class is not a class; by Plaintiffs' own model and admission, some members of the class are antagonistic with Plaintiffs' case—they are better off with the alleged monopoly commission.

## II. The Issue Is Not The Tolerable Percentage Of Potential Uninjured Members Of The Class But The Heterogeneity In Injury Itself

### A. *Olean* And *Briseno* Are Inapposite To The Facts Of This Case

Plaintiffs frame this appeal as another dispute over the tolerable percentage of uninjured members. As support, Plaintiffs rely on two cases decided by this Court: *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (*en banc*) and *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017). But both cases are inapposite to the present case.

For example, the common proof in *Olean* established a single positive overcharge (10.28%) applicable to every purchaser exposed to the admitted criminal conspiracy. The individualized questions were who bought tuna, how much, and when, with good records available to answer each. Every class member lay on the same side of zero. *Olean*, 31 F.4th at 661-62.

*Briseno* is the same: every purchaser bought the allegedly mislabeled Wesson oil, and once the common premium was fixed, only purchase volume varied, and total volume sold was a known quantity. *Briseno*, 844 F.3d at 1132 (one harm multiplied by quantity so that "'[t]he addition or subtraction of individual class members affects neither the defendant's liability nor the total amount of damages it owes to the class.'" (quoting *Mullins v. Direct Digital, LLC,* 795 F.3d 654, 670 (7th Cir. 2015)).

Thus, *Olean* and *Briseno* involved a straightforward question—did you buy the product at an inflated price during the class period? If yes, then apply the overcharge; if no, then you are out. The direction of the effect never changes. There was no dispute over how many tuna buyers were advantaged by higher tuna prices, or how many purchasers of all-natural cooking oil prefer some unnatural ingredients mixed in.

McFadden's model is different in kind. It does not estimate a common, positive overcharge or premium for every purchaser. It predicts positive overcharges

for some and negative overcharges for others. The common proof therefore does not produce heterogeneous damages on varying quantities based on a common injury; it produces heterogeneous injury. 4-ER-698 (Order Denying Pls.' Mot. for Class Cert.) ("Once the over[ch]arge is calculated, the last step includes determining which class members are harmed and unharmed."). It places millions of class members on opposite sides of the injury line itself.

Plaintiffs pointing to *Briseno* to push the injury question post-trial also lacks merit. As this Court recognized in *Olean*, antitrust injury is a separate element, prior to any measure of recovery: "[d]amages are measured only after each plaintiff has demonstrated that the defendant's conduct caused the plaintiff to suffer an antitrust injury." *Olean*, 31 F.4th at 666. And "when individualized questions relate to the injury status of class members," Rule 23(b)(3) requires the court to decide whether those inquiries predominate. *Id.* at 668. Netting positive against negative overcharges may yield an aggregate damages figure, though one distorted by the inclusion of negative overcharges for a presumably commonly purchased app price point ($0.99) even by members with summed positive overcharges, but it does not establish that the members assigned negative overcharges suffered any antitrust injury.[4]

---

[4] The share of $0.99 apps in McFadden's sample is available in his original report, although redacted. Expert Report of Daniel L. McFadden in Support of

However, a member who paid *less* because of the commission was not injured but advantaged, and because "low prices benefit consumers" these members suffer no antitrust injury. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990). Nor may the injury inquiry be deferred to claims administration, because "[e]very class member must have Article III standing in order to recover individual damages." *TransUnion LLC,* 594 U.S. at 431. *Olean*'s percentage debate presupposes a common injury with quantity-based heterogeneous recovery. *Olean*, 31 F.4th at 679. The record in this case presents heterogeneous injury, and both *Olean* and *Briseno* presented the opposite situation.

### B. This Case Is Directly Analogous To The D.C. Circuit's Ruling In *Rail Freight II*

Although the facts of neither *Olean* nor *Briseno* are analogous to the case at bar, the D.C. Circuit was presented with a very similar set of facts in *In re Rail Freight Fuel Surcharge Antitrust Litig.,* 934 F.3d 619 (D.C. Cir. 2019) (*Rail Freight II*). There, the plaintiffs, as here, "maintain[ed] that the alleged conspiracy injured every one of them," yet their own model, as here, showed that 2,037 members (12.7%) "suffered only negative overcharges and *thus no injury*." *Rail Freight II*, 934 F.3d at 623 (emphasis supplied) (quotations omitted). The D.C. Circuit held that "even assuming" the model was reliable for the other 87.3%, that left "no

---

Plaintiffs' Mot. for Class Cert., App. E ¶ 24, *In re Apple iPhone Antitrust Litig.*, No. 4:11-cv-06714-YGR (N.D. Cal. Apr. 26, 2024), ECF No. 643-11.

common proof" of injury for the remainder, requiring "individualized inquiries to determine which of at least 2,037 (and possibly more) class members were actually injured." *Id.* at 623-24. Those 2,037 inquiries defeated predominance.

What remains is a matter of counting, and *Rail Freight II* tells us what to count. The D.C. Circuit held that the predominance-defeating quantity is the number of individualized determinations, not their share of the class or their share of the defendant's revenue, as Plaintiffs maintain here. Pls.' Op. Br. at 13 ("Plaintiffs showed that less than half of 1% of sales involved negative overcharges") (quotations omitted). As the D.C. Circuit reasoned,

> the plaintiffs argue that the 2,037 class members for whom their damages model shows no injury are a de minimis portion of the class because their shipments make up less than one percent of the railroads' overall revenue from the alleged conspiracy. But revenue is irrelevant to predominance, which looks to whether elements such as causation and injury may be proved through common evidence, not how much the defendants benefited from any wrongdoing.

*Rail Freight II,* 934 F.3d at 626.

The D.C. Circuit's logic in *Rail Freight II* was precise on the definition of *de minimis*: "six percent of a 'class totaling only fifty-five' members might be *de minimis*, but 12.7 percent of this class yields '2,037 uninjured class members' (according to the common proof), all of whom would need individualized adjudications of causation and injury." *Id.* at 625 (citations omitted). Thus,

concluded the D.C. Circuit, "[g]iven the need in this case for at least 2,037 individual determinations of injury and causation, the district court did not abuse its discretion in denying class certification on the ground that common issues do not predominate." *Id.* at 627.

Likewise, in *In re Interest Rate Swaps Antitrust Litig.,* 2023 U.S. Dist. LEXIS 225154, the plaintiffs' theory was that "all putative class members paid more than they would have in the but-for world," *id.* at *23, yet their expert's "calculations show[ed] that a substantial percentage of trades were executed at negative or zero spreads," meaning "such trades could not have been harmed by the antitrust conspiracy," *id.* at *14. Considering *Rail Freight II*, the judge ruled that the plaintiffs had not sufficiently demonstrated that class-wide impact was "capable of proof at trial through evidence that is common to the class." *Id*. at *30. "[B]ecause of the individual inquiry required to evaluate whether each [interest rate swap] traded at or below zero spreads, any class trial would . . . devolve into thousands of mini-trials to determine eligibility for class members." *Id*. at *30-31; *see also In re Asacol Antitrust Litig.,* 907 F.3d 42, 57-58 (1st Cir. 2018) (noting that neither party found a single case "allowing, under Rule 23, a trial in which thousands of class members testify" and declining to create the first).

The difference in this case is merely *scale*, not principle. *Rail Freight II* turned on 2,037 individualized injury determinations, an "unmanageable" number.

*Rail Freight II*, 934 F.3d at 625; *see also Olean,* 31 F.4th at 669 n.14 ("Rule 23(b)(3)'s predominance requirement is not satisfied when the need to identify uninjured class members 'will predominate and render an adjudication unmanageable.'" (quoting *In re Asacol Antitrust Litig.,* 907 F.3d at 53-54)). Plaintiffs' own common proof identifies at least *ten million individualized inquiries* (near 6% for upwards of 200 million class members) that would be required, many times the thousands held by sister circuits to be too many. Pls.' Op. Br. at 24-25 & n.10 (citing Expert Report of Minjae Song, Ph.D. at 44, fig.13, *In re Apple iPhone Antitrust Litig.*, No. 4:11-cv-06714-YGR (N.D. Cal. Mar. 5, 2026), ECF No. 1095-42). Viewed in this light, Plaintiffs' proposed class is by any reasonable definition "fatally overbroad." *Olean,* 31 F.4th at 669 n.14.

### C. The Divided Class Also Defeats The Adequacy Of Representation Required By Rule 23(a)(4)

The inclusion of unharmed and benefited class members independently defeats the adequacy of representation required by Rule 23(a)(4). *Cf. Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003). When the district court originally found that Rule 23(a)(4)'s adequacy of representation element was satisfied, it did so while at the same time excluding McFadden's proffered but-for commission rate. That means the district court did not have before it a complete injury model that exposed the split of the class. *See* 4-ER-676-702 (Order Denying Pls.' Mot. for Class Cert.). The district court had no occasion to test

adequacy of representation for a class that Plaintiffs' own expert would divide. In any event, the court remained under a continuing duty to confirm the prerequisite of adequacy of representation when McFadden's model was revised to show that millions of class members were benefited by the offending conduct that Plaintiffs claimed injured all class members.

This revision to McFadden's model, however, shows that the class representatives are not adequately representing the class. Plaintiffs have abandoned their obligation to demonstrate injury for those class members who the model shows were uninjured. Representatives whose objective is to improve the certifiability of their own claims by discarding others who advance the same liability theory do not "possess the same interest and suffer the same injury as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997) (citations omitted); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998) (adequacy turns on whether "the named plaintiffs and their counsel have any conflicts of interest with other class members"). A "fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class," *Valley Drug Co.,* 350 F.3d at 1189, and "no circuit has approved of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class." *Id.* at 1190; *accord Pickett v. Iowa Beef Processors*,

209 F.3d 1276, 1280 (11th Cir. 2000) (reversing certification where the class included "those who claim[ed] harm from the very same acts from which other class members benefitted.").

## III. McFadden's Model Does Not Plausibly Establish Antitrust Injury

At the certification stage Plaintiffs must "advance a plausible methodology to demonstrate that antitrust injury can be proven on a class-wide basis." *In re TFT-LCD Antitrust Litig.*, 267 F.R.D. 291, 311 (N.D. Cal. 2010) (citations omitted). In *Olean*, for example, the plaintiffs' expert had the actual transaction prices on both sides of a real conspiracy boundary—sales during the collusion period and sales during benchmark periods before and after it—and the overcharge was the observed difference between them. *Olean,* 31 F.4th at 671. The expert's but-for prices were not invented from theory; they were predicted from that same transaction data and then checked against the prices class members actually paid. *Id.* at 672-73. The antitrust injury was tethered, at every step, to something observed.

McFadden's but-for price is not measured in actual data; McFadden's pass-through of the commission is based on a simple theoretical pricing model that may or may not describe reality. A theory is mere rumor absent evidence supporting it. McFadden's results require corroboration against what in fact happens to prices when the commission changes, if such evidence is available. And it is. McFadden simply chose to ignore it. 1-SER-94-98 (McFadden Tr. 137-150).

Defendant's expert Dr. Lorin Hitt offered such an analysis, drawing on three natural experiments. Opening Expert Report and Declaration of Lorin M. Hitt, Ph.D. ¶ 305, *In re Apple iPhone Antitrust Litig.*, No. 4:11-cv-06714-YGR (N.D. Cal. Mar. 5, 2026), ECF No. 1095-20 ("Hitt Report"). Each studied an Apple program that cut the commission rate sharply—from 30% to 15%, a reduction comparable to the 13.63% but-for commission McFadden himself adopts—across large shares of iOS developers (51.4%) and consumer accounts (82.5%). Hitt Report ¶ 301. Despite reductions of this magnitude, developers did not reduce prices on 90.8%, 85%, and 93.8% of products studied in the three programs. Hitt Report ¶ 306, Ex. 51. In the Small Business Program, for example, prices rose after the cut in a greater share of cases (12.1%) than they fell (6.2%), and did not move at all for 81.7%. Hitt Report ¶ 311, Ex.52. Prices change over time for many reasons, but the evidence overwhelmingly indicates that app prices bear little or no relationship to the commission—there is no pass-through of a commission reduction.

Another episode reaches the same result. *See* Jane Choi, *What Happens to App Prices when Developers Pay Lower Commission Fees? Evidence from the European Union* (Analysis Grp. Nov. 2025). When the European Union's ("EU") Digital Markets Act led Apple to cut commissions by roughly ten percentage points for developers adopting alternative business terms in 2024, an analysis of more than 41 million EU transactions across some 21,000 products found that prices held

steady or rose on 91% of products and 94% of transactions. *Id.* at 2, 8. Among the small share that fell, the median reduction was 2.5%, and a fifth were under five cents. *Id.* at 6. A placebo test—the very control McFadden faulted Hitt for omitting—assigned a fictitious commission cut one year earlier and produced a price-decrease rate barely distinguishable from the rate following the real cut.[5] A reasonable assessment of the data is that the rare app price decreases are an ordinary month-to-month price churn, not a pass-through.

The failure of app developers to pass-through commission reductions is fully compatible with McFadden's theory, which holds that when the marginal cost of a download is zero, there is no pass-through of a change in the commission to the app or IAP price. Pls.' Op. Br. at 12 ("[I]f a developer's variable costs associated with a download or with IAP purchases are zero, a change in the commission rate does not affect the developer's profit-maximizing price and, although the developer receives more of the purchase price at a lower commission rate (and Apple receives less), the user pays the same price."). For digital goods, zero marginal cost is the

---

[5] Placebo tests are common in causal analysis. Say a treatment is given in 2025, and the effect is estimated to be 10%. In the placebo test, a pseudo-treatment is applied in 2024, before the treatment, to determine if the alleged response merely reflects a trend or is determined by some other factor. *See, e.g.,* Nick Huntington-Klein, THE EFFECT: AN INTRODUCTION TO RESEARCH DESIGN AND CAUSALITY at 169 (Chapman & Hall 2022) ("A placebo test is [] a test where you pretend that treatment is being assigned somewhere it isn't, and you check whether you estimate an effect.")

baseline assumption, so the lack of a pass-through is the expected theoretical result.[6] McFadden, however, reports a pass-through of commission changes—sometimes positive and sometimes negative—because he largely forbids zero marginal cost when his econometric model limits the permissible price-cost margin to developers' variable cost margins (the zero-marginal cost margin is 100%, which is excluded). McFadden assumes—he does not estimate—the pass-through rate of a commission reduction.[7]

---

[6] *See* Hal R. Varian, Joseph Farrel, and Carl Shapiro, THE ECONOMICS OF INFORMATION TECHNOLOGY: AN INTRODUCTION at 3 (Cambridge Univ. Press 2004) (observing that while "constant fixed costs and zero marginal costs" are, for physical products, merely "common assumptions for textbook analysis," for information goods that cost structure is "the baseline case"). Apps and in-app purchases are paradigmatic information goods—potentially costly to create but effectively costless to reproduce and deliver for each additional download or purchase.

[7] Apple expert Dr. Mark Watson offers two simple, compelling analyses of the "variable cost" constraint applied within McFadden's econometric model (which trapped the theoretically implied price-marginal cost margin to the range of price-variable cost margins, the two cost measures being entirely different things). *See generally* Expert Report of Mark Watson*, In re Apple iPhone Antitrust Litig.*, No. 4:11-cv-06714-YGR (N.D. Cal. Apr. 26, 2024), ECF No. 830-6 ("Watson Report"); 1-SER-162-63 (Rebuttal Expert Report of Mark Watson, Ph.D.). Watson used McFadden's model and data, re-estimated the models absent the constraint, and showed that in almost every case it was this margin constraint, not the true quantity-price relationship, that determined the price coefficient. In 149 out of 150 regressions for Games apps and IAPs, the price coefficient (or elasticity) was determined not by the data but by the assumed profit margins. Watson Report ¶ 16. For Games apps, the price coefficient was inflated from about -0.20 absent the constraint to -0.61 with it. *Id.* at 17, Ex. 2. With a price coefficient of -0.20, the overcharges for Games apps would be negative at any app price below $5, not $0.99, leading to even more negative overcharges across the class members. Like the $10 spending threshold, the variable cost constraint is a kluge to the model to reduce the

McFadden's claims and economic reality are disparate. The plausibility of a theoretical claim, which is all McFadden has, rests on the evidence supporting it. The most relevant evidence for this case—actual price changes associated with actual commission rate changes—offers compelling evidence that App Store prices and commission rates are unrelated. McFadden's rumored pass-through rates are implausible on evidence of actual commission reductions, and thus the model is implausible.

---

occurrence of negative damages. Watson also replaced the quantity and price data with random numbers from the New York Powerball Lottery and showed that McFadden's model continued to produce damages of comparable size. 1-SER-138 (Rebuttal Expert Report of Mark Watson, Ph.D).

## CONCLUSION

Plaintiffs' common proof—the McFadden model—does not identify one class sharing one injury. Instead, the model identifies purchasers whom the challenged conduct allegedly harmed and purchasers whom the same conduct allegedly benefitted. If this court accepts Plaintiffs' theory, accepts McFadden's model, and accepts Plaintiffs' description of both, then Plaintiffs' case fails on Rule 23(b)(3) predominance, if not 23(a)(4) adequacy. Accordingly, the district court's decertification of the class should be affirmed.

Respectfully submitted,

Phoenix Center for Advanced Legal and
Economic Public Policy Studies

*/s/ Lawrence J. Spiwak*
Lawrence J. Spiwak

*Attorney for Phoenix Center for Advanced Legal and Economic Public Policy Studies*

Date: August 19, 2026

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** No. 25-7930.

I am the attorney or self-represented party.

**This brief contains 6449 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Lawrence J. Spiwak* **Date** August 19, 2026
*(use "s/[typed name]" to sign electronically-filed documents)*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 19th day of August 2026, I caused the foregoing Amicus Curiae Brief to be submitted electronically with the Clerk of the Court through the Court's appellate ECF system.

Phoenix Center for Advanced Legal and
Economic Public Policy Studies

*/s/ Lawrence J. Spiwak*
Lawrence J. Spiwak

*Attorney for Phoenix Center for Advanced Legal and Economic Public Policy Studies*

**CERTIFICATION OF ADMISSION TO BAR:**

I, Lawrence J. Spiwak, hereby certify as follows:

1. I am a member in good standing of the bar of the United States Court of Appeals for the Ninth Circuit.

2. Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

/s/ *Lawrence J. Spiwak*

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and Economic Public Policy Studies
5335 Wisconsin Avenue, NW
Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235
Email: lspiwak@phoenix-center.org

August 19, 2026